UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) | CASE NO: 2:20-CV-02291-DOC-KESx |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Los Angeles, California |
| vs. | ) | |
| | ) | Tuesday, May 27, 2025 |
| CITY OF LOS ANGELES, ET AL., | ) | |
| | ) | (9:00 a.m. to 12:08 p.m.) |
| Defendants. | ) | (1:20 p.m. to  4:28 p.m.) |

EVIDENTIARY HEARING RE COMPLIANCE WITH THE LA ALLIANCE
SETTLEMENT AGREEMENT [DKT.NO.767][863]
AND THE ROADMAP MOU AGREEMENT

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:              SEE PAGE 2

Courtroom Deputy:        Karlen Dubon

Court Reporter:          Recorded; CourtSmart

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

APPEARANCES:


For Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                         MATTHEW UMHOFER, ESQ.
                         Umhofer Mitchell & King
                         767 S. Alameda Street, Suite 270
                         Los Angeles, CA 90021
                         213-394-7979


For Defendants:          JENNIFER M. HASHMALL, ESQ.
                         Miller Barondess, LLP
                         1999 Avenue of the Stars, Suite 1000
                         Los Angeles, CA 90067
                         310-552-4400

                         SCOTT D. MARCUS, ESQ.
                         ARLENE N. HOANG, ESQ.
                         THEANE D. EVANGELIS, ESQ.
                         Los Angeles City Attorney's Office
                         200 N. Main Street, Room 675
                         Los Angeles, CA 90012
                         213-978-6952

                         MARCELLUS A. MCRAE, ESQ.
                         KAHN A. SCOLNICK, ESQ.
                         PATRICK J. FUSTER, ESQ.
                         ANGELIQUE KAOUNIS, ESQ.
                         JAMES N. ROTSTEIN, ESQ.
                         Gibson Dunn & Crutcher
                         333 South Grand Avenue
                         Los Angeles, CA 90071

For Intervenor:          SHAYLA R. MYERS, ESQ.
                         Legal Aid Foundation of LA
                         7000 S. Broadway
                         Los Angeles, CA 90003
                         213-640-3983


Special Master:          MICHELLE MARTINEZ

Also present:            PAUL WEBSTER

3

**INDEX**

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PAUL WEBSTER | 17/85 | | | |
| EMILY VAUGHN HENRY | 104 | 142 | 159 | -- |
| DON GARZA | 169 | | | |
| LAURA FROST | 184/214 | | | |

| PLAINTIFFS' EXHIBITS | RECEIVED |
|---|---|
| 93 | 27 |
| 114 | 27 |
| 25 | 27 |
| 26 THROUGH 35 | 36 |
| NOTED DOCUMENTS | 63 |

**4**

**Los Angeles, California; Tuesday, May 27, 2025; 9:00 a.m.**

**(Call to Order)**

THE COURT: Then we'll go on the record in Case No. -- are we on the record with CourtSmart, 20-0229-1, LA Alliance for Human Rights versus the City of Los Angeles, et al.

And, counsel, you can just remain seated. You can use the lectern at any time, but during flu season I'm trying to avoid you cross-pollinating and getting sick, but if you're more comfortable, go to the lectern. It's just a courtesy and also you can pretend you're in state court, you can remain seated if you want to make a presentation so we have more documents in front of you.

So let's begin with LA Alliance. Your appearance please?

MS. MITCHELL: Thank you, Your Honor. I've been in federal court too much to stay seated. Elizabeth Mitchell on behalf of plaintiff, LA Alliance. Matthew Umhofer is also present just stepped out to speak to a witness and Paul Webster will be here for the LA Alliance as well.

THE COURT: All right. Thank you. Let me turn to the Los Angeles City Attorney's Office.

MS. EVANGELIS: Good morning, Your Honor, Theane Evangelis, on behalf of the City of Los Angeles.

THE COURT: Okay. Thank you very much.

MR. MCRAE: Good morning, Your Honor, Marcellus

EXCEPTIONAL REPORTING SERVICES, INC

**5**

McRae, Gibson Dunn & Crutcher on behalf of the City of Los Angeles.

THE COURT: All right. Thank you very much. Pleasure.

MR. SCOLNICK: Your Honor, Kahn Scolnick also on behalf of the City.

THE COURT: All right. Thank you very much. Are you related to Chase Scolnick?

MR. SCOLNICK: I happen to be, my brother.

THE COURT: Okay. Well, it has nothing to do with this hearing, but welcome. Okay?

MR. SCOLNICK: Understood, Your Honor.

THE COURT: He appears often in my court.

MR. SCOLNICK: Yes.

THE COURT: All right. Counsel, please.

MR. FUSTER: Good morning, Your Honor, Patrick Fuster on behalf of the City.

THE COURT: All right. Thank you.

MS. KAOUNIS: Good morning, Your Honor --

THE COURT: I can't hear you, I'm sorry.

MS. KAOUNIS: Good morning, Your Honor, Angelique Kaounis of Gibson Dunn on behalf of the City.

THE COURT: All right. Thank you. And by the way, you're welcome to get a chair even if it's crowded so you don't have to make that transition back and forth and be part of

**6**

your --

MR. ROTSTEIN:  Good morning, Your Honor, James Rotstein of Gibson Dunn also on behalf of the City.

THE COURT:  Same courtesy, if you want to get a chair and be closer to the counsel, that's fine.

MR. ROTSTEIN:  Thank you, Your Honor.

THE COURT:  All right.  We're going to have another screen set up.  We are here for one day in 7A, it's Judge Walter's court because the ceremonial court was not available to us, but for the rest of the week and for whatever time period we need in the future if any, will be in the ceremonial court on the first floor, so you can direct your witnesses there.

I've received your documentation and I want to thank all of you humbly for working so hard over the weekend.  It's a compliment to all parties.  I know that's difficult on Memorial Day, it's difficult for the Court, difficult for you, but we need to proceed.

For Ms. Myers, I'm going to expect your participation in these proceedings at all -- as well.  When I've made a prior ruling concerning the representation of LA Alliance also applies to you and I make that ruling orally.

So, counsel, I'd like to hear an overview.  I'd like to hear some kind of opening statement from both of you, some kind of representation about what the evidence will show.

**7**

**MS. MITCHELL:** Good morning, Your Honor, Elizabeth Mitchell for plaintiff LA Alliance for Human Rights.

We are here today because despite over five years of this Court's direct oversight, multiple settlement agreements and billions of taxpayer dollars spent, the City of Los Angeles has failed repeatedly and systematically to fulfill its most basic commitments to the Court, to plaintiffs, to the unhoused residents of this City, and to the public.

Seven people die homeless every single day. This is not a data point. It is not a statistic. I got a text last night, a picture of a man who died on 5th and Main Street. It is a human tragedy unfolding in slow motion across sidewalks, parks, and underpasses throughout this city, while leaders recite promises and deliver delays.

The special master, the Alvarez and Marsal assessment, the controller and even the City's own reporting confirm a singular truth. The system is broken. Not temporarily, not bureaucratically but inherently. The City has failed to meet its shelter and housing production obligations under both the Alliance settlement agreement and the Road Map agreement. It has failed to engage and resolve encampments as required. It has failed to produce an actionable fundable plan to complete the 12,915 beds it agreed to. Thousands of beds remain unaccounted for just two years before the deadline.

These are not abstract breaches. These are promises

that are broken to thousands of people who are living and dying on the streets.  The A&M audit conducted independently over the course of a year found that at least 2.3 billion in City funding, probably more, but they could not quantify it, was allocated across homelessness programs.  With hundreds of millions of dollars spent in ways that cannot be verified.

Thousands of beds allegedly created are untraceable. Key financial data that was incomplete, contradictory or entirely missing.  They concluded the system requires not a patch but a rebuild from the ground up.

Antiquated systems, obsolete data infrastructure, contracts lacking accountability and leadership either unwilling or unable to correct course.  The Special Master has now even recommended sweeping government reform, including potentially creating an independent city department or shifting to a new continuum of care model because the current arrangement is functionally incapable of supporting change and this agreement.

Your Honor, this Court has offered the City every opportunity to fix itself.  It appointed monitors, it facilitated collaboration, it gave space for mayors, supervisors, council members and agency heads to do their job. But the job has not been done.

We will call Paul Webster, Executive Director of LA Alliance who will explain the violations and the basis for the

**9**

Alliance's request.  We will call skid row residents and community organizers will explain what these violations for the unhoused and at risk communities.  We will call the City's experts and hopefully elected officials to demonstrate the City's failures and we will call housing and shelter experts who can explain what best efforts actually looks like.

Instead of achieving a substantial and meaningful reduction in unsheltered homelessness, which is what plaintiffs negotiated for and is contained in the settlement agreement as the identified purpose, what this Court and this community received is what the Court in Plata (phonetic) called trained incapacity, a bureaucracy that is no longer capable of reforming itself even in the face of crisis.

And that, Your Honor, is why we are here.  Plaintiffs are not asking for receivership lightly but after years of unfulfilled obligations, incomplete reporting and systemic dysfunction we believe judicial intervention is the only mechanism that can ensure compliance, restore credibility and save lives.

Receivership is not punishment, Your Honor.  It is protection.  It is a tool -- this Court has full equitable authority to use when violations persist and when no other remedies has succeeded.  The Court has the authority, the evidence is overwhelming and the crisis is ongoing.  We respectfully urge this Court to act decisively and now.  Thank

you.

**THE COURT:**  Then, counsel, on behalf of the City. And once again now would you introduce yourself to the record just because we're on CourtSmart.

**MS. EVANGELIS:**  Thank you, Your Honor.  Theane Evangelis on behalf of the City of Los Angeles.

I recognize that a lot of work has already been done in this case and we very much appreciate the Court's attention to a critical issue facing our community, one that we are all working to solve, but this hearing is not and cannot be a referendum on the policy choices made by the City.

This Court has limited jurisdiction to resolve specific cases and controversies.  And the only case and controversy presently before this Court relates to the settlement agreement with the Alliance and the Alliance's claim that the City has breached or will somehow in the future breach that agreement.

But when the Alliance dismissed its claims, the Court retained jurisdiction only to enforce that agreement.  That's a question of contract interpretation and it's governed by California law.  That interpretation starts with the plain language of the agreement and it can't be used to strip city officials of core governmental authority.  That's something that no city official can contract away under the constitution.

The City has fully complied with the settlement

agreement, so the Alliance doesn't want to talk about the actual terms.  Instead, Your Honor, they're trying to transform this proceeding into a roving commission into the much debated public policy issues around homelessness and the division of authority between governmental agencies in California.  But, of course, that's not a proper function of an Article 3 court.

And as the Supreme Court made clear just last year in grants passed, federal courts aren't equipped to balance all of the competing policy considerations to fix homelessness, much less to displace state and local officials whom the Constitution vests with the authority over those issues.

So that is the proper framing of this proceeding. And the only legitimate basis for this evidentiary hearing is the settlement agreement.  And the Alliance is the one who's flat out ignoring that agreement, Your Honor.

Just months ago our City suffered the devastation of a once in a lifetime fire that destroyed an area larger than San Francisco, an emergency declaration remains in effect on both the State and local level.  And the City is engaged in an unprecedented rebuilding effort that necessarily has consumed its time, attention and resources.

The parties foresaw the possibility of such an event, such a natural disaster, and they agreed that it would require a pause of obligations and a renegotiation of the agreement. That's Section 8.2.  That section says the City's obligations

in Sections 3 through 5, the very obligations that the Alliance is asking this Court now to enforce, quote, shall be paused. That is so critical, Your Honor, and the parties it said would meet and confer on any necessary and appropriate amendments to those obligations.  But instead of recognizing the enormous stress that our City is under and honoring its promise to meet and confer on amendments in light of that pause, the Alliance ran to court the month after those fires and sought sanctions against the City's supposed breaches.

It's all the more stunning that they did that, Your Honor, because the City hasn't breached any obligation whatsoever and the evidence will show that.  The agreement imposes two core obligations, creating beds and reducing tents and make shift shelters.

I'll start with bed creation.  The Alliance is speculating here that the City won't be able to hit the total amount by the deadline in 2027.  Of course, that's two years away.  The motion is entirely premature.  When we're talking about two years in the future.

So the only question right now is whether the City has used its best efforts to hit aspirational milestones, the evidence will show the answer is yes, undoubtedly.  The City has invested substantial resources in creating beds and has made significant progress despite all of the challenges that it has faced.

The Alliance disagrees with the City's policy choices, like investing in the Inside Safe program, but Section 8.1 of the settlement agreement left that choice to the City's quote, sole discretion.  The prior administration did not and could not have lawfully tied this administration's hands on which shelter options to prioritize.

So the Alliance is wrong in asserting that the City hasn't provided a beds plan.  Nothing required the City to provide a plan up front on how it would produce all 12,915 beds by the end of 2027.  That would defeat the whole purpose of leaving the how to the City's sole discretion.  And having milestones, which contemplate incremental steps over the life of the agreement.

So the Alliance's attempt to impose sanctions because the City supposedly fell short of milestones on reductions and -- is completely unwarranted.  The City, and this is very clear in the agreement, Your Honor, the City never agreed that the removal of a tent or structure would count only if the person using the tent or structure accepted an offer of alternative shelter.  Of course that rule would have been impossible to administer because the City has no way of knowing at the time of removing a tent whether a person will ultimately accept shelter, much less if the person would do so permanently.

The City has no control over that person's choices.

**14**

So in effect, the argument, Your Honor, boils down to a version of Martin v Boise (phonetic) on steroids.  It's that removal of tents must be accompanied with permanent housing guaranteed, but of course, the Supreme Court rejected that argument last year.  It's unworkable and there's no basis for imposing that expansive obligation on the City in either the text of the agreement or the negotiation history as we will see the evidence will show.

So the Alliance has tried to detract from its deficient showing under the settlement agreement by pivoting to the MOU, the Road Map agreement, but of course, that's between the City and the County.  The Alliance has no standing whatsoever to come to this Court and seek compliance with that agreement.  They're not a party, they weren't an intended beneficiary and the worst part of it, Your Honor, is not only are they trying to enforce an agreement they're not a party of, they're trying to rewrite that agreement.

So that agreement under no interpretation whatsoever says what the Alliance is trying to say here.  And the Court lacks jurisdiction over that question because the Alliance has no standing to enforce that agreement.

So, Your Honor, I just want to briefly -- we're not there yet and I don't think we should put the cart before the horse, but I do think it's worth addressing the City -- oh, excuse me, the Alliance's demand for the extraordinary and

draconian remedy of receivership.

Any discussion of that is -- would be unprecedented, unlawful, unconstitutional, and it's not properly before the Court. So the question of remedy, of course, arises only if the Alliance first proves a breach which it cannot do. And there have been so many procedural irregularities here that compound all of the problems with even broaching that subject.

We will, of course, have more to say, Your Honor, when we get to the remedy stage and have our due process right to be heard on this issue. But our position is that receivership is categorically unavailable and unconstitutional as a remedy, even in the event of a breach.

So with that, I will just conclude by saying that cities all across the country are grappling with some of the most complex and vexing issues related to the causes of and the solutions to the homelessness crisis. City officials here in Los Angeles are diligently working to address the problem.

The Alliance's overly intrusive interpretation of the settlement agreement and its request for increasingly over the top and unconstitutional remedies are only distracting the City and its officials and diverting critical resources away from action with endless requests for process and monitoring and so on and so on.

We're looking forward to demonstrating that the Alliance's interpretation of the settlement agreement is

**16**

unsupported and that its accusations of breach are unfounded. Thank you.

THE COURT:  Counsel, thank you.  Ms. Myers, do you have any opening remarks you'd like to make?

MS. MYERS:  No, Your Honor.

THE COURT:  All right.  All parties have been on notice since the last hearing and I know you're coming to the court recently on behalf of the City, so thank you.  And I do apologize for the hours you've had to work over the weekend. We work the same hours, so misery loves company.  But you've been on notice concerning the Road Map enforcement agreement and that you should be prepared today to counter that.  And I made an oral ruling on the last occasion, that ruling still stands.  In fact, that's also expanded to intervenors in this case if they wish to conduct examination in this matter.

Counsel, your first witness, please.

MR. MCRAE:  Your Honor, before we get started with the Alliance calling a few witnesses --

THE COURT:  Counsel, thank you very much.  Your first witness, please.  You may be seated.

MR. UMHOFER:  Your Honor, the Alliance calls Paul Webster to the stand.

THE COURT:  Thank you.  Mr. Webster, if you'd step forward, please.  And, counsel, I don't mean to be discourteous, we'll take your motions or thoughts in a few

moments.  Witnesses are here, they'll be called now.  I'll be with you as a courtesy in a moment.  Raise your right hand, sir.  Mr. Webster, raise your right hand, please.  Karla, if you'd administer an oath, please.

**PAUL WEBSTER, PLAINTIFFS' WITNESS, SWORN**

THE COURT:  Thank you, sir.  If you'd please be seated in the witness box.  It's just to my right.  And if you'd comfortably be seated, sir.  And after seated, would you face the parties.  Would you state your first name slowly.

THE WITNESS:  My name is Paul Webster.

THE COURT:  And would you spell your last name, sir?

THE WITNESS:  W-E-B-S-T-E-R.

THE COURT:  All right.  Direct -- for direct examination on behalf of LA Alliance.

MR. UMHOFER:  Yes, Your Honor.

**DIRECT EXAMINATION**

BY MR. UMHOFER:

Q    Good morning, Mr. Webster.

A    Good morning.

Q    Mr. Webster, what do you do for a living?

A    I am a senior fellow on homelessness policy with the Cicero Institute and I am the Executive Director of the LA Alliance for Human Rights.

Q    What are the roles, jobs you've held prior to the roles you currently hold?

Webster - Direct / By Mr. Umhofer                                **18**

A     I've been a policy analyst for probably about the last 30 years.  Prior to signing on with -- as the Executive Director for the LA Alliance for Human Rights I ran a non-profit advocacy organization focusing on federal and state homelessness policy.  Prior to that, I was the senior policy advisor at the U.S. Department of Housing and Urban Development, focusing on homelessness policy.

Prior to that -- what did I do prior to that?  I worked for a service provider that provided services, housing and all kinds of different interventions for families experiencing homelessness in north San Diego County.

Q     How many years have you spent working in the area of homelessness?

A     15.

Q     And how many years have you spent working in the area of housing?

A     Probably 25.

Q     How long have you been involved with the LA Alliance?

A     I'd say since 2016, 2017, I want to say.

Q     And what are the roles you played with the LA Alliance besides executive director?

A     That's pretty much been my sole responsibility with LA Alliance.

Q     Are you familiar with the settlement agreement that was reached with the City in this case?

Webster - Direct / By Mr. Umhofer                                    **19**

A     I am.

Q     Exhibit 25 is on the iPad in front of you, available on the iPad in front of you.

            **MR. UMHOFER:**  I will also display it with the Court's permission, this is already in the record.

            **THE COURT:**  You may, but I want the courtesy for all counsel to be able to see the document one time.  Karlen, would you ask MIS to come up again.

            **THE CLERK:**  Yes, sir.

            **THE COURT:**  Okay.

            **MR. UMHOFER:**  So, Your Honor, the City does have all of our exhibits.

            **THE COURT:**  Thank you very much, counsel.

            **MR. UMHOFER:**  Sorry.

            **THE COURT:**  Would you ask them to come out and set this up?

        **(Pause)**

            **THE WITNESS:**  Are you ready for me?

            **THE COURT:**  Nope, not yet.  I want the courtesy to all counsel to be able to see this.  And we're bouncing between courtrooms for one day.

            **THE WITNESS:**  Understood.

            **THE COURT:**  So I know the MIS folks are trying to get this up.  I'm well aware of this document, counsel, so we can continue with this portion.  But, Karlen, I'm -- they need to

Webster - Direct / By Mr. Umhofer                    **20**

get this up.

       **MR. UMHOFER:**  Your Honor, I'm going to provide an iPad with those documents to the City as well.

       **THE COURT:**  I've got it on the screen.

       **MR. UMHOFER:**  Yeah, but this is for the City, Your Honor.

       **THE COURT:**  But I want to make certain that you folks, especially as a collective body, you've got six or seven attorneys with you.  So as a courtesy, I want you to be able to see this and I don't know if that's coming up on your screen, is it?

       **UNIDENTIFIED:**  It is, Your Honor.

       **THE COURT:**  Okay.  Thank you very much.  Then proceed.

**BY MR. UMHOFER:**

Q   Are you familiar with the obligations of the City set out in this agreement?

A   I am.

Q   Have you reviewed this agreement in full?

A   I have.

Q   Now, turning the page to the Section 5.2 which reflects milestones and deadlines and what I'd ask of you is if you might read Section 5.2 aloud for the Court.

A   Certainly.  Therefore, the City will create plans and develop milestones and deadlines for one, the City's creation

Webster - Direct / By Mr. Umhofer                    **21**

of shelter and housing solutions to accommodate a minimum of 60 percent of unsheltered City shelter appropriate people experiencing homelessness in each city -- in each council district as determined by the required number.

Q    Mr. Webster, just for the court reporter's sake, I'm going to ask you to read just a little bit slower.

A    Okay.  No worries.  2)  The City's plan for encampment engagement, cleaning and reduction in each council district; 3) The City's creation of shelter and/or housing to accommodate a minimum of 60 percent of unsheltered city shelter appropriate people experiencing homelessness in the city as determined by the required number; and 4) the City's plan for encampment engagement, cleaning and reduction in the city.

     The City will provide the plans, milestones and deadlines to plaintiffs and the City and plaintiffs agree to work together in good faith to resolve any concerns or disputes about the plans, milestones and deadlines and will consult with the Court for resolution if necessary.

     The City will provide a report setting for the milestones and deadlines.  The parties agree the City will promptly employ its best efforts to comply with established plans, milestones and deadlines.

Q    Is there an obligation in this document to -- for the City to create plans for the City's creation of sheltered housing solutions -- almost on -- and the creation of sheltered housing

Webster - Direct / By Mr. Umhofer                    **22**

solutions under 1 and 3?

          **MR. ROTSTEIN:**  Objection, Your Honor, calls for a legal conclusion and lack of foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Yes.

**BY MR. UMHOFER:**

Q    Does the language create plans appear here?

A    It does.

          **MR. UMHOFER:**  And, Your Honor, is there an obligation for the City to provide those plans -- I'm sorry, Mr. Webster.

Q    Does the agreement contemplate the City providing plans and milestones and deadlines to the plaintiffs?

          **MR. ROTSTEIN:**  Objection.

          **THE COURT:**  And for the record, this is limited to your opinion, okay?  This is your opinion.  All right.

          **THE WITNESS:**  Yes.

Q    So --

          **MR. ROTSTEIN:**  Your Honor, to the extent that the witness is, you know, being proffered as an expert, you know, the City objects on that ground.  There obviously hasn't been a Daubert hearing, there's been no expert discovery on any of this and the plaintiffs have not proffered Mr. Webster as an expert.

          **THE COURT:**  All right.  Thank you.  Please proceed. Overruled.

Webster – Direct / By Mr. Umhofer                **23**

Q    Now, can we take a look at Exhibit 114, please?  Is this the bed plan that the City produced as of November 2022?

A    Yes.

Q    What does this document reflect in your understanding?

A    This is the initial plan that the City of Los Angeles provided to demonstrate its intention and desire to create various types of housing and shelter and interim housing for people experiencing homelessness, so that they could meet the metrics and milestones of the settlement agreement.

Q    Is it your understanding that this bed plan reflects a total number of beds that meets that 60 percent minimum under the agreement?

        **MR. ROTSTEIN:**  Objection, lack of foundation, Your Honor.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes.

**BY MR. UMHOFER:**

Q    Did this -- did the number of beds on this first plan add up to the 12,915 in your recollection?

A    Yeah, as I recall it did.  If you scroll down, I think it has a total at the very bottom.  Well, at the bottom of the total document.

Q    Is there a total at the bottom there?

A    No, there's not.

Q    In fact, this plan did not contain the full number of

Webster - Direct / By Mr. Umhofer                    **24**

12,915 beds as required under the agreement, correct?

MR. ROTSTEIN:  Objection, Your Honor, leading.

MR. UMHOFER:  Your Honor, I'm going to ask counsel -- Your Honor, I'm going to ask if you can instruct counsel to wait until I'm done with my question.

THE COURT:  Restate your question.

BY MR. UMHOFER:

Q    Are you aware of whether this list actually added up to 12,915 or did it fall short?

THE COURT:  Now your objection, counsel.

MR. ROTSTEIN:  Leading and also --

THE COURT:  Overruled.  You can lead an expert witness, counsel, as you know.

MR. ROTSTEIN:  But, Your Honor, what we objected to Mr. Webster --

THE COURT:  I understand that, it's overruled. You've had plenty of notice about this now.  Counsel, your answer.

Q    Now --

THE COURT:  Counsel, what did you say?

MR. MCRAE:  I'm sorry?

THE COURT:  What was the conversation just now?

MR. MCRAE:  I told my colleague that we have not had any notice that this witness would be proffered as an expert so that I can edify --

Webster - Direct / By Mr. Umhofer                **25**

THE COURT:  All right.  I'd appreciate it --

MR. MCRAE:  -- his objections.

THE COURT:  -- if you shut off your microphone as a courtesy.  That would be appreciated.

MR. MCRAE:  Very well, thank you, Your Honor.

THE COURT:  Your comments are not --

MR. MCRAE:  So your comments are not --

THE COURT:  -- over --

MR. MCRAE:  Thank you.  Thank you.

BY MR. UMHOFER:

Q    Now, are you familiar with the special master in this case?

A    I am.

Q    Does the special master produce reports in the context of her obligations under this agreement?

A    That's right.

Q    And as Exhibit 93 one of those reports issued in May of 2025.

A    That's right.

Q    Now, if we go to and apologies for the scrolling, everybody, I hate to -- well, I'm unscrolling, you're not seeing it yet, so I'm glad I'm not making everybody sick.

THE COURT:  Counsel, we'll strike the comments.

MR. UMHOFER:  Apologies, Your Honor.

THE COURT:  We'll strike the comments.  We don't need

Webster - Direct / By Mr. Umhofer                    **26**

side comments.

          **MR. UMHOFER:**  Apologies, Your Honor.

          **THE COURT:**  Thank you.

**BY MR. UMHOFER:**

Q    And so at the top of page 15, is there a summary of the beds in progress?

A    Yes.

Q    And at the bottom, before Table 1 is there a reference to a bed obligation of 12,915?

A    Yes.

Q    Is that that 60 percent number based on the pit count under the agreement?

A    Yes, the point in time count of 2022.

Q    So what is your understanding of the significance of the then obligation of 12,915, what does that mean?

A    The number 12,915 is the point in time count of unsheltered people experiencing homelessness that was estimated in the City of the Los Angeles in the 2022 plan time count time and 60 percent of that unsheltered point in time count.

Q    Is there -- could you read --

          **MR. UMHOFER:**  And, Your Honor, I'm not sure if the Court needs us to move to admit documents that are already in the docket on this case.

//

//

Webster - Direct / By Mr. Umhofer                **27**

THE COURT:  I'll let each of you cooperate in that regard, but just to be certain until if you reach an accommodation if you do, 93's received, counsel.

**(Plaintiffs' Exhibit Number 93 received in evidence)**

MR. UMHOFER:  Thank you.

BY MR. UMHOFER:

Q    And so --

THE COURT:  And so is 114.

**(Plaintiffs' Exhibit Number 114 received in evidence)**

MR. UMHOFER:  Thank you.  And 25 is the other one we've covered, Your Honor.

THE COURT:  And 25.

**(Plaintiffs' Exhibit Number 25 received in evidence)**

Q    And so could you read the bullet point below the obligation of that requirement?

A    Where it says --

Q    Deficit.

A    -- deficit towards 60 percent people experiencing homelessness, housing goal across council districts --

THE COURT:  A little slower, please.

THE WITNESS:  I'm sorry.  Deficit towards 60 percent, people experiencing homelessness, housing goal across council districts 3,822.

Q    What do you understand that 3,822 number to represent?

A    That is the lack of housing or shelter beds provided --

Webster - Direct / By Mr. Umhofer                **28**

created by the City in order to meet the 12,915 goal.

Q    And above that, do you see a reference to beds in progress up above?

A    Uh-huh.

Q    And so is the deficit -- what do you understand the deficit to be, beds done or beds in progress?

          MR. ROTSTEIN:  Objection, lack of foundation.

          THE COURT:  Well, also it's ambiguous.  Would you restate that question?

**BY MR. UMHOFER:**

Q    There is -- what do you understand this 3,822 number of beds to represent, beds completed or beds in progress?

A    Neither.

          MR. ROTSTEIN:  Objection, Your Honor, it's compound and also the same objection, lack of foundation.

          THE COURT:  Overruled.

          THE WITNESS:  In my view the 3,822 deficit reflects the beds that are not in progress and not completed towards -- that should be going towards the 12,915 bed goal.

          THE COURT:  And, counsel, for both parties since we're at that juncture, take a little bit of time on direct and cross-examination with this document.  The Court's obviously aware of this document and has been for quite some time.  I think eventually the Court's going to want to know, from your perspective as an opinion, what beds were in progress and what

Webster - Direct / By Mr. Umhofer                    **29**

beds were completed.  In other words, the 3,822 is simply, from your standpoint apparently, a non-creation.

THE WITNESS:  That's correct or non-planning.

THE COURT:  Yeah.  I would want to know eventually how are completed according to this document.

BY MR. UMHOFER:

Q    Mr. Webster, do you see a reference on the page in front of you to the number of beds open?

A    Yes.

Q    And what's that number?

MR. ROTSTEIN:  Objection, lack of foundation, speculation.

THE COURT:  Overruled.  These are the City's own documents.  You can cast your opinion.

THE WITNESS:  4,815.

Q    And the number of beds in process?

A    4,278.

THE COURT:  Okay.  Thank you.

Q    Now, did the City produce in 2024 another bed plan?

A    Well, they contemplated one.

Q    And let's go to Exhibit 114.  Is this the bed plan that the City produced in 2004 (sic), an updated bed plan?

THE COURT:  Counsel, did you say 114?

MR. UMHOFER:  Exhibit 114, Your Honor.

THE COURT:  Well, 114 I thought was the 11,922 bed

Webster - Direct / By Mr. Umhofer                    **30**

plan, I may be mistaken.

          **MR. UMHOFER:**  Sorry, Your Honor, I apologized.  I got

them reversed.

Q    So 114, is 114 the bed plan as of 11/9, 2022?

A    Yes.

Q    Correct.  And then is 113 the bed plan submitted on

9/12/24 by the City updated?

A    Correct.

Q    Now, did the City withdraw this bed plan?

A    Yes, it did.

Q    And taking you to the part in the transcript, there was a

hearing on October 25th, 2004 -- 2024, correct, in this case?

A    Yes.

Q    And that was a hearing re motion for order for settlement

agreement compliance.  Do you see that there?

A    Uh-huh, yes.

Q    And if we go to page 5 of this, could you read the

statement of Ms. Flores that is blown up for you on page 5 of

that transcript?

A    Certainly.

          "But first I would like to thank the Court and the

          County for participating this morning.  We do think

          we have had a very productive session.  And based

          upon those productive discussions between the City

          and the County, the City and the County have

**EXCEPTIONAL REPORTING SERVICES, INC**

committed to working together to pursue solutions at the highest levels.  And based upon those discussions, quote, the City hereby withdraws the bed plan and will present other possible solutions to ensure the timely compliance with the City's agreement with the LA Alliance."

Q    So am I correct, what do you understand the City hereby withdraws the bed plan to mean?

          **MR. ROTSTEIN:**  Objection, calls for a legal conclusion.

          **THE COURT:**  Overruled.  This is your opinion.

          **THE WITNESS:**  In my opinion, well we thought we had a proposed bed plan and then the City basically withdrew the bed plan and said that they were no longer interested in pursuing that bed plan.

**BY MR. UMHOFER:**

Q    After withdrawing the 2024 plan, to your knowledge, has the City produced a bed plan to the plaintiffs in this case?

A    No.

Q    Has the City provided the bed plan to the Court?

A    Not to my knowledge.

Q    To your knowledge, has the City created a bed plan in compliance with its obligations under this agreement?

A    No.

Q    Go back to the milestones and deadlines under the

Webster - Direct / By Mr. Umhofer                          **32**

agreement.  Does under the Section 5 of the settlement agreement, does the City have an obligation to develop milestones and deadlines in your understanding?

MR. ROTSTEIN:  Objection, calls for a legal conclusion and vague.

THE COURT:  I'm sorry, counsel, I missed that question.  I was writing a note and I apologize.  Would you restate it?  I simply have CourtSmart, so I don't have the ability to have read back right now.  Your question was?

**BY MR. UMHOFER:**

Q   Does the -- do you understand the agreement to contain an obligation for the City to develop milestones and deadlines for the creation of beds under the agreement?

MR. ROTSTEIN:  Objection, calls for a legal conclusion and --

THE COURT:  Overruled.  You can answer that question. It's simply your opinion.

THE WITNESS:  Yes, in my opinion, it does.

Q   And has the City created and provided to the plaintiffs milestones and deadlines to your --

MR. ROTSTEIN:  Same objection, Your Honor.

Q   -- understanding?

MR. ROTSTEIN:  Same objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Well, they created milestones and

Webster - Direct / By Mr. Umhofer                    **33**

deadlines initially and there it is.

Q    And what's been marked as Exhibit 24, is this document the milestones created and submitted by the City for bed creation?

A    That's the document that was created and submitted by the City.

THE COURT:  I'd like to know the date of that document for the record?

THE WITNESS:  Well, the original date was November 9th, 2022 I believe.

THE COURT:  Just a moment.  Just one moment, counsel.

**(Pause)**

THE COURT:  All right.  Thank you, counsel.

**BY MR. UMHOFER:**

Q    Is there a reference to a date here at the top under the words Alliance milestones?

A    Yes.

Q    What's that date?

A    November 9th, 2022.

Q    And these came from the City; am I correct?

A    That's correct.

Q    And what is the significance of the numbers going down under all CDs 1, 2, et cetera, what does CD stand for?

A    Council district.

Q    And --

THE COURT:  All right.  Now, I'd appreciate -- I used

Webster - Direct / By Mr. Umhofer **34**

to know by heart these council districts and the council representatives but that's changed recently.  Eventually when we refer to CD-1 or CD-14, I'd like to know the names of the council people and you'll find that set forth in the special master's report.  There you'll have a breakdown.  It also occurs in numerous other locations, so take your time with that, I want to know the council person and the district.  So when you say CD-14 it used to be David Owen, okay.

MR. UMHOFER:  Understood, Your Honor.  I don't anticipate --

THE COURT:  No, I've been through too many council people now.  So there have been huge changes since I became involved with the case.

MR. UMHOFER:  Your Honor, I think what we'll do is we'll work with the City to create a glossary for the Court.

THE COURT:  We'll do that over the recess, okay?

MR. UMHOFER:  That sounds good, Your Honor.  Thank you.

THE COURT:  All right.

BY MR. UMHOFER:

Q   So did the City -- now the City also has an obligation under the agreement to provide reporting on their beds, correct?

MR. ROTSTEIN:  Objection, calls for a legal conclusion.

Webster - Direct / By Mr. Umhofer                **35**

THE COURT:  Overruled.

THE WITNESS:  Correct.

THE COURT:  And once again, this is your opinion.

Q    I'm looking now at Exhibit No. 26.  Is this one of the
first, if not the first quarterly report submitted by the City
for compliance with the bed obligations under the agreement?

A    Yes, it is.

Q    When was that submitted?

A    December 31st, 2022.

Q    And does this purport to list off the numbers of beds at
various different locations?

A    Correct.

Q    Now, are you -- am I correct that the City has produced
several of these reports over the course of this case?

A    Correct.

Q    And have you reviewed Exhibits 26 through 35?

A    I have.

Q    And are those also -- pulling up Exhibit 29 for example,
more quarterly reports based -- for different time periods over
the life of the case?

A    Correct.

MR. UMHOFER:  And, Your Honor, I'd move 26 through 35
into evidence.

//

//

Webster - Direct / By Mr. Umhofer                    **36**

THE COURT:  They're received, counsel.  I can also take judicial notice of them.

**(Plaintiffs' Exhibits Numbers 26 through 35 received in evidence)**

MR. UMHOFER:  Thank you, Your Honor.

BY MR. UMHOFER:

Q    The -- Exhibit 36 is this a summary that is based on those reports that were provided by the City?

A    That's correct.

MR. ROTSTEIN:  Object.  Your Honor, objection, lack of foundation.  This appears to be, you know, prepared with no indicia of reliability.

THE COURT:  But by the City?  But by the City?

MR. ROTSTEIN:  We don't know, yeah.  We -- objection, lack of foundation.

THE COURT:  Overruled, counsel.

BY MR. UMHOFER:

Q    Now, this document was created by the plaintiffs, correct?

A    That's correct.

MR. ROTSTEIN:  Same objection, Your Honor.

THE COURT:  No, this can be used as a demonstrative, counsel, overruled.

Q    And --

THE COURT:  It's simply his opinion.

MR. UMHOFER:  I apologize, Your Honor.

Webster - Direct / By Mr. Umhofer                     **37**

Q    Did you confirm that the numbers in this chart match the City reports in Exhibits 26 through 35?

A    I did.

Q    Is this an accurate summary of the City's reporting of its bed progress?

A    Yes, it is.

Q    And I'd like to pull up Exhibit 26.  Is Exhibit -- sorry, 126.  Is Exhibit 126 a chart based on the numbers set forth in that summary document we just looked at, Exhibit 36?

          **MR. ROTSTEIN:**  Your Honor, we object to this exhibit, demonstrative.  Again, we don't know what this is.  There's no indicia of reliability, we have a lack of foundation.

          **THE COURT:**  Well, I think what we're going to get to, which will be obvious to all of us is some kind of comparison by LA Alliance with the documents filed by the City, it's as simple as that.

          **MR. ROTSTEIN:**  Your Honor, we don't --

          **THE COURT:**  And they're entitled for these documents submitted by the City to show if they are accurate numbers or not.

          **MR. ROTSTEIN:**  Your Honor, we understand -- number one, it's argument; but number two, this was not created by the witness.

          **THE COURT:**  I understood it was created -- I thought it was by LA Alliance.

Webster - Direct / By Mr. Umhofer                    **38**

THE WITNESS:  That's correct.

THE COURT:  Are you aware of this document?

THE WITNESS:  Yes.

THE COURT:  Did you help create it?

THE WITNESS:  Yes.

THE COURT:  Overruled.

BY MR. UMHOFER:

Q    Have you confirmed that the numbers --

UNIDENTIFIED:  Objection, vague.

THE COURT:  No, just a moment.  In the audience, that's it.  The next time you'll be in the hallway, okay?  Far different proceedings than we've had in the past.  Understood?  All right, counsel.

BY MR. UMHOFER:

Q    Have you compared the numbers in these charts to that summary chart and confirmed that they accurately reflect what is contained in the City's reports and Exhibit 36, the summary chart?

A    Yes.  Except there's -- it looks like there's a missing report or there's -- there we go.

Q    So we'll go through these one by one.

A    Okay.

Q    So what is this first page of Exhibit 126 purport to demonstrate?

A    This is simply a line graph that demonstrates the metrics

EXCEPTIONAL REPORTING SERVICES, INC

Webster - Direct / By Mr. Umhofer                    **39**

or the milestones that the City committed to in the settlement

agreement per quarter indicated by the blue line and a line

graph indicated by the red line of the number of beds created

as indicated by the City's quarterly reports.

          **THE COURT:**  Now, I want you to repeat that one more

time to me.  The blue line.

          **THE WITNESS:**  This graph indicates the -- by the blue

line, the number of beds the City committed to create in their

bed plan and in the red line, the number of beds that were

created according to the City's quarterly reports.

          **THE COURT:**  All right.  Just one moment.

     **(Pause)**

          **THE COURT:**  All right.  Thank you.

**BY MR. UMHOFER:**

Q    There's a reference at the top --

          **THE COURT:**  Yeah, if you're taking photographs,

delete that photograph immediately.  There's no photographer

here.  Call a couple of CSOs, okay, one in the audience.  If

you've taken a photograph, get it off your phone, and I'm

saying that gently now.  Am I clear?  There's no photography in

the federal court.  All right, counsel.

Q    Mr. Webster, there's a reference to the City's original

accounting method at the top.  Do you --

A    Yes.

Q    -- understand what that is, what that means?

Webster - Direct / By Mr. Umhofer                          **40**

A    Yes, I am.

Q    What does that -- what does this chart mean to reflect when it says original counting method?

A    Well, until the March 31st, 2025 quarterly report, the City reported beds based on essentially, you know, beds that were created through Triple H, maybe some interim housing beds, a variety of methods to count beds that have been consistent since they began reporting.

Q    Did something change in March 2025?

A    Yes, it did.

Q    Is the second page of Exhibit 126 intended to reflect that change in counting method?

A    Yes, it does.

        **MR. ROTSTEIN:**  Objection, legal conclusion, lack of foundation.

        **THE COURT:**  Overruled, counsel.

**BY MR. UMHOFER:**

Q    To your -- what was that change in counting method to your understanding?

        **MR. ROTSTEIN:**  Same objection, Your Honor.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  The City on this last quarterly report included a whole number of beds that were considered not a part of the LA Alliance settlement agreement up until that quarterly report.

Webster - Direct / By Mr. Umhofer                    **41**

Q    So if we go back to the last quarterly report, which is Exhibit 35, there are some end notes at the end of that report, correct?

A    Correct.

Q    And could you read out loud, if you can, I know it's small, the end notes numbered 8?

A    Certainly.  Beginning January 1st, 2025 these inside safe interim housing sites are included in the Alliance list.  The start date listed is when the sites were very occupied under the inside safe program.  In accordance with the MOU between the City and County, the start date of any reimbursement for services under the MOU is January 1st, 2025, which is the beginning of the quarter that the sites are included in the Alliance report.  The number of PE -- the quote number of PEH served data is also based on a January 1st, 2025 start date.

         **THE COURT:**  Just one moment, please.  If you go back to that document.

         **MR. UMHOFER:**  Apologies, Your Honor, yes, I will.

         **THE COURT:**  Can you blow up number 8 again please?

         **MR. UMHOFER:**  Yes, Your Honor.

         **THE COURT:**  All right.  Thank you.  Please proceed.

**BY MR. UMHOFER:**

Q    Mr. Webster, above that, do you see a reference to total units open to date and in process?

A    Yes.

Webster - Direct / By Mr. Umhofer                                    **42**

Q     And what is that number?

A     Total unit beds open to date and in process 11,002.

          **THE COURT:**  Just a moment.

     **(Pause)**

          **THE COURT:**  All right.  Please proceed, thank you.

Q     And this is the latest report, quarterly report produced by the City concerning bed creation?

A     If this is the March 31st, 2025 report, is the latest report.

Q     Is -- how much short of 12,915 about is 11,200?

          **MR. ROTSTEIN:**  Objection, foundation, legal conclusion, argumentative.

          **THE COURT:**  Overruled,  You can deduct the number. You can answer.

          **THE WITNESS:**  12,915 minus 11,002, if my brain arithmetic is good, it's about what, 1,900?

          **THE COURT:**  We can take judicial, it's about 1,913. Counsel do the math for a moment.  On behalf of the City.

          **MR. MCRAE:**  Yes, Your Honor.

          **THE COURT:**  No, the objection was lack of foundation, simply deduct 12,915 from 11,002.

          **MR. MCRAE:**  Your Honor, as I understood it, the objection was actually to the entire line of questioning --

          **THE COURT:**  Well, I apologize.

          **MR. MCRAE:**  -- about the milestones, because they're

Webster - Direct / By Mr. Umhofer                    **43**

not contractual obligations and relevance --

THE COURT:  Okay.

MR. MCRAE:  -- and lack of foundation.

THE COURT:  All right.  Thank you, overruled.  It's 1,913.

BY MR. UMHOFER:

Q    Now, going back to that chart here, under this chart, under the cumulative count, do the City's open beds per quarter on any quarter equal the number -- equal the milestone number.

A    No.

THE COURT:  Now, what is that milestone number, in your opinion?

MR. ROTSTEIN:  Objection, relevance, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Just the milestone number is determined per quarter, so in each quarter the report created by the City was below the number that they committed to in the settlement agreement.

THE COURT:  Okay.  Now, actually I want you to walk me through it for either side.  Those milestones by quarter for a moment and what's below the number.

MR. UMHOFER:  I think we'll do that in the next chart, Your Honor.

THE COURT:  All right.  Is it direct or cross, I want to know what that is.

MR. UMHOFER:  Yes, Your Honor.

Q    And so under the original counting method, what is the cumulative number of open beds as of Q-1 2025?

MR. ROTSTEIN:  Objection, relevance, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  The cumulative open beds per quarter -- well, wait a minute, are you --

BY MR. UMHOFER:

Q    On the furthest to the right, Q-1 2025 --

A    Yeah.

Q    -- what's the cumulative new open beds?

A    Oh, I see, yeah, 5,069.  That is the aggregate, uh-huh.

Q    And what is the cumulative milestone goal for Q-1 2025?

A    Right, that's 6,782.

Q    Now, under the new counting method, am I correct that there's a steep upward trend in this last quarter?

A    Yes, you're correct.

Q    And that reflects those new beds that weren't previously counted that you recently testified to?

A    That is correct.

Q    And what is the cumulative number of open beds under this new counting method?

A    6,724.

THE COURT:  Just a moment.

Once again I don't have real time at my disposal.

State that number slowly.

THE WITNESS:  6,724.

THE COURT:  All right.  Just a minute.

In the bottom right-hand corner of Exhibit 126, you have the number 6,782, what does that represent?

THE WITNESS:  That represents the goal, the milestone that the City committed to producing.

MR. ROTSTEIN:  Objection, move to strike.  This is lack of foundation, it's legal conclusions and frankly it's not relevant.  The City did not commit to achieving the milestones, that's not what the settlement agreement says.

THE COURT:  Overruled.  You'll argue that, counsel, in your final summation.  All right, counsel.

**BY MR. UMHOFER:**

Q    And so that does -- even under the new counting agreement, does the cumulative number of new beds meet or exceed the cumulative milestone as of Q-1 2025?

A    No.

THE COURT:  Just one moment.

**(Pause)**

THE COURT:  And, counsel, I'll be with you in just a moment.  I want to look at something.

**(Pause)**

THE COURT:  All right.  Please proceed, thank you.

Q    This is the third page of Exhibit 126.  What is the title

Webster - Direct / By Mr. Umhofer                    **46**

of this chart?

A    You'd like me to state the title of the chart?

Q    Please do.

A    The title of the chart is bed shortfalls under original counting method.

Q    What does this chart purport to demonstrate?

A    It demonstrates the number of beds that is lacking per quarter that the City failed to produce.

Q    And so the numbers in white going from left to right reflect what?

        **MR. ROTSTEIN:**  Your Honor, we renew our objection.

        **THE COURT:**  Overruled.

        **MR. ROTSTEIN:**  Lack of foundation, relevance, again this is --

        **THE COURT:**  Overruled.

        **MR. ROTSTEIN:**  -- legal conclusion and again, the milestones are not what was agreed on in the settlement agreement.

        **THE COURT:**  Thank you, counsel.  You can make that a continuing objection.  Okay?

        **MR. ROTSTEIN:**  Thank you, Your Honor, we do.

        **THE COURT:**  Thank you.  Overruled.

        **THE WITNESS:**  The numbers in white represent the milestones that the City committed to produce, the beds the City committed to produce.

Webster - Direct / By Mr. Umhofer                **47**

**BY MR. UMHOFER:**

Q    And what does the numbers that are in the red bars below represent?

A    Those are the number of beds that were failed to be created by the City.

Q    And these numbers are cumulative, correct, mean they add up over time, correct?

A    Correct.

Q    Did the City --

        THE COURT:  Well, just a moment, explain that to me. I don't understand the answer or the question, by cumulative.

        MR. UMHOFER:  Yes, Your Honor.

Q    What does cumulative mean to you, as opposed to per quarter?

A    What that means is that, for example, in Q-1 2024 you'll see that the City failed to produce 2,670 beds, but then in Q-2 2024 they exceeded the number of beds, so the cumulative total is not -- is 1,933.  So they were able to make up some of the deficit from the quarter before.

        THE COURT:  So the point is, it would show improvement for -- since quarter 4, 2,023 was 2,380, the City now has reduced that or the largest -- strike that.

        Quarter 1, 2024, 2,670, that's your -- I'm going to call it a deficit.  But the City has made up about 900 -- strike that.  My math's off.  Yeah, a little over 900 bed

Webster - Direct / By Mr. Umhofer                    **48**

spaces and reduced that to a deficit of about 1,713.

THE WITNESS:  Between those -- yeah, comparing those two quarters.  So cumulative to me is --

THE COURT:  Just a moment, yes or no?

THE WITNESS:  Yes.

THE COURT:  All right.  Simple as that.

Q    And so do you understand the City to have made up the deficit as of Q -- under its milestones and deadlines as of Q-1 2025?

MR. ROTSTEIN:  Objection, speculation, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  No.

**BY MR. UMHOFER:**

Q    Under their original counting method, how far short are they as of Q-1 2025 their last report?

A    1,713 beds.

THE COURT:  All right.  Now just one moment.

All right.  Thank you, please continue.

Q    Turning to the fourth page of Exhibit 126, is this a per quarter assessment of the bed shortfalls under the original counting method?

A    Correct.

Q    And so what does it mean at Q-4 2022 that the number is minus 901?

THE COURT:  Just a moment, let me look at that.

All right.  Thank you.  You can answer the question.

THE WITNESS:  That means that the City failed to create the number of beds agreed to in the settlement agreement by 901 beds.

Q   So they fell 901 beds short of their milestone?

MR. ROTSTEIN:  Objection.

THE WITNESS:  Correct.

MR. ROTSTEIN:  So I just want to confirm that the continuing objection is for the entire document.

THE COURT:  It's for the entire document, counsel.

MR. ROTSTEIN:  Thank you, Your Honor, and I'd like to move to strike Mr. Webster's prior answer.

THE COURT:  Overruled.  Your question, counsel? Again, you didn't complete the question and we didn't get it on CourtSmart because the answer was cut short.

BY MR. UMHOFER:

Q   So as of Q-4 2022, they failed to create 901 of the beds they committed to under the milestones, correct?

A   Correct.

MR. ROTSTEIN:  Objection, legal conclusion, Your Honor.

THE COURT:  Overruled.

Q   Now, did they meet their obligation under the mile -- did they meet milestone in Q-4 2022?

EXCEPTIONAL REPORTING SERVICES, INC

Webster - Direct / By Mr. Umhofer                **50**

**MR. ROTSTEIN:** Same objection, Your Honor, and it goes back to the continuing sustaining objection we have.

**THE COURT:** Overruled.

**THE WITNESS:** We're looking at Q-4 2022?

Q    Right. Did they meet their milestone?

A    Did they not.

Q    Did they meet their milestone in Q-1 2023?

**MR. ROTSTEIN:** Same objection, Your Honor.

**THE COURT:** Overruled.

**THE WITNESS:** They did not.

**MR. UMHOFER:** And I'll give them a standing objection to the rest of these questions about this particular -- along these particular lines.

**THE COURT:** All right.

**BY MR. UMHOFER:**

Q    Q -- did they meet their milestone in Q-2 2023?

A    They did not.

Q    Did they meet their milestone in Q-3 2023?

A    They did.

Q    Did they meet their milestone in Q-4 2023?

A    They did not.

Q    Did they meet their milestone in Q-1 2024?

A    They did not.

Q    And did -- am I correct that they met their milestones in Q-2, Q-3 of 2024 and Q-1 of 2025?

A     Correct.

Q     And they -- did they meet their milestone in Q-4 of 2024?

A     They did not.

Q     And this is under the original counting method, correct?

A     That's correct.

Q     Now --

     **THE COURT:**  Just a moment, let's go back to that document.  Did they reach it in 2025 in the first quarter, shows a plus 186, doesn't it?  Look at Q --

     **THE WITNESS:**  Correct.

     **THE COURT:**  -- 1, '25.  So let's finish this out. They met their requirement 186, didn't they?

     **THE WITNESS:**  Correct.

     **THE COURT:**  All right.  Thank you.

**BY MR. UMHOFER:**

Q     Now -- so the next page of Exhibit 126 what does this purport to reflect?

A     These are the number of beds created by the City in accordance with the settlement agreement for each quarter and then it demonstrates that in Q-1 2025 the number of beds that were reported in the quarterly report based on a new method of counting beds.

     **THE COURT:**  All right.  Just a moment.

     **(Pause)**

     **THE COURT:**  All right.  Please continue.  Your next

question.

MR. UMHOFER:  Yes, Your Honor.

Q    Had they ever created as many beds under their reporting in any quarter prior to Q-1 2025 as they did in Q-1 2025?

MR. ROTSTEIN:  Objection, calls for a legal conclusion.  Also, we object to this new counting method on the demonstrative.  This is just additional data points that the City provided, it's not a new counting method.

THE COURT:  And you've put in new data point, it really is irrelevant frankly, overruled.  I want to hear that question again though.

BY MR. UMHOFER:

Q    Has the City ever created as many beds in any other quarter as it did -- as it purported to create in Q-1 2025?

A    No.

Q    Those new counting method beds going back to Exhibit 35 --

THE COURT:  Well, just a moment I want to refresh my recollection what you mean by new accounting.

MR. UMHOFER:  That's where I'm going, Your Honor.

THE COURT:  All right.

Q    And so under -- this is under Exhibit 35, those new beds come from footnote 8, that are described in footnote 8, correct?

THE COURT:  From inside safe then; is that correct?

THE WITNESS:  Correct.

**THE COURT:**  All right.

Q    Now, the total number of beds created in that quarter would be 165 plus 254 which based on my iPhone --

**MR. UMHOFER:**  I will represent to the Court is 1,909 beds in quarter 1, total beds in quarter 1 2025.

Q    Had they created anywhere near that number of beds in a single quarter in any other quarter than Q-1 2025?

**MR. ROTSTEIN:**  Objection, asked and answered.

**THE COURT:**  Overruled.

**THE WITNESS:**  No.

**BY MR. UMHOFER:**

Q    And going back to the second page of Exhibit 126, it is those new beds that reflect that steep rise from Q-4 2024 to Q-1 2025, correct?

A    That's what I believe.

Q    Is it your understanding that inside safe beds were previously not counted in prior quarters?

**MR. ROTSTEIN:**  Objection, speculation and relevance, Your Honor.

**THE COURT:**  Overruled.

**THE WITNESS:**  That's what I understand.

Q    Now, based on the City's reporting, is it your understanding that back to the milestones and deadlines under Exhibit 2025 (sic), the settlement agreement, is it your understanding that the City has complied with the milestones

Webster - Direct / By Mr. Umhofer                    **54**

and deadlines for the creation of shelter and housing solutions to accommodate a minimum of 60 percent unsheltered City shelter appropriate PEH in each council district or in the City as a whole under 1 and 3?  Is it your understanding that the City has complied with that?

          MR. ROTSTEIN:  Objection, calls for a legal conclusion, relevance, Your Honor.

          THE COURT:  Overruled, you can state your opinion.

          THE WITNESS:  No.

BY MR. UMHOFER:

Q    Do you have an understanding as to why the inside safe beds were previously not counted toward the Alliance total?

          MR. ROTSTEIN:  Objection, lack of foundation.

          THE COURT:  Well, just a moment I'm going to sustain this object.  This CO or CEO will be here apparently by both parties, I want that question answered though eventually.  I don't think you're the appropriate person to answer that question, sustained.

Q    Under the agreement, is it your understanding that beds are required to be in existence throughout the life of the agreement?

          THE COURT:  You can guess that opinion.  It's self-evident.

          MR. ROTSTEIN:  Objection, legal conclusion and --

          THE COURT:  Overruled, counsel.  You can guess that

Webster - Direct / By Mr. Umhofer                    **55**

opinion.

THE WITNESS:  That's my understanding.

Q    Are you familiar with the inside safe program?

A    Yes.

Q    Do you understand whether inside safe beds have historically been beds that would exist for the duration of the agreement?

A    No.

MR. ROTSTEIN:  Same objection.  Same objection, Your Honor.

THE COURT:  Overruled.

BY MR. UMHOFER:

Q    Back here to the milestones and deadlines and the obligations here, is there -- could you read aloud under 5.2 the number 2?  So thereafter, the City will create plans and develop milestones and deadlines --

THE COURT:  Counsel, just a little bit slower.

MR. UMHOFER:  Sorry, I apologize.

THE COURT:  Thank you.

Q    If you could read the first part up until 4 and then read both sub-numbers 2 and 4.

A    Certainly.  Therefore, the City will create plans and develop milestones and deadlines for 2) the City's plan for encampment engagement, cleaning and reduction in each council district; and 4) the City's plan for encampment engagement,

Webster - Direct / By Mr. Umhofer                    **56**

cleaning and reduction in the City.

Q   Now, did the City -- and is the City required to provide those plans, milestones and deadlines under the agreement to the plaintiffs?

     **MR. ROTSTEIN:**  Objection, legal conclusion, lack of foundation.

     **THE COURT:**  Would you restate that for just a moment?

**BY MR. UMHOFER:**

Q   Could you read the sentence that I've got the pointer at here.

     **MR. ROTSTEIN:**  Objection, legal conclusion, lack of foundation and his opinion, Your Honor, is irrelevant.

     **THE COURT:**  No, you can read that section.  Read the section.

     **THE WITNESS:**  The City will provide the plans, milestones and deadlines to plaintiffs.

     **MR. UMHOFER:**  That's fine, that's fine.

Q   Is it your understanding that the City has provided plans, milestones and deadlines for sub-numbers 2 and 4 to the plaintiffs?

A   Yes.

Q   And is Exhibit 47 those milestones for encampment reduction?

A   Yes.

Q   Are they broken down by council district?

Webster - Direct / By Mr. Umhofer                                    **57**

A    Yes.

Q    And are there aggregate numbers?

A    There are.

Q    And so if we go down the line here, is there a requirement that the City or excuse me, does the milestone at January 1 through June 2023 reflect the number 800?

A    Correct.

Q    And in every quarter after that, or in every reporting period after that, is the number 1,125?

A    Correct.

        **MR. ROTSTEIN:**  Objection relevance to this whole line of questioning regarding milestones.  It's not relevant to the settlement agreement.

        **THE COURT:**  Overruled.

**BY MR. UMHOFER:**

Q    And are these the milestones that were provided by the City under the settlement agreement?

A    They are.

Q    Now, has the City reported, submitted reports of progress on these milestones?

A    They have.

Q    Is Exhibit 60 their first report?

A    It is.

Q    And under -- and what is the first reporting period here for these milestones?

A    January 1st through June 30th, 2024.

Q    Does this report provide any information about any periods prior to January '24?

A    It does not.

        THE COURT:  Just a moment.

    **(Pause)**

        THE COURT:  Would you turn back?

        **MR. ROTSTEIN:**  Object, relevance, Your Honor.  The Court has already ruled on this and it's been the subject of litigation.

        THE COURT:  Overruled.

        **MR. ROTSTEIN:**  About when these milestones have been submitted, Your Honor.

        THE COURT:  Thank you.

        All right.  Just a moment.

    **(Pause)**

        THE COURT:  All right.  Now, if you'd turn back to Exhibit 60 please.

        **MR. UMHOFER:**  Yes, Your Honor.  Apologies.

        THE COURT:  All right.  Thank you, please continue.

**BY MR. UMHOFER:**

Q    Now, to your knowledge has the City ever provided information for the two reporting periods for which there were deadlines --

        THE COURT:  I'm sorry, somebody coughed, could you

**EXCEPTIONAL REPORTING SERVICES, INC**

repeat that please?

Q    Has the City ever provided information about its performance under the milestones and deadlines for January through June 2023 or July through December 2024?

MR. ROTSTEIN:  Objection, lack of foundation and vague as to information.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MR. UMHOFER:

Q    Did they provide that information in their first report?

MR. ROTSTEIN:  Objection, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  No.

Q    Did they provide that information in their second report, which is Exhibit 61?

MR. ROTSTEIN:  Objection, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  No.

Q    Did they provide that information in their third report which is Exhibit 62?

A    No.

MR. ROTSTEIN:  Objection, lack of foundation and relevance, Your Honor.

THE COURT:  Overruled.  Now, I want you to go back though when you mention these reports and once again I want the

dates that go with those reports.

MR. UMHOFER:  Very well, Your Honor, we'll get --

THE COURT:  So back again so I can make notes.

BY MR. UMHOFER:

Q    So this Exhibit 60 is for what time period?

A    January 1st through June 30th, 2024.

THE COURT:  All right.  Just a moment.

MR. UMHOFER:  Sorry.

THE COURT:  Go back to that document please.

All right.  The next exhibit?

Q    Exhibit 61, when was that -- at what time periods are covered by Exhibit 61?

A    January 1st through June 30th, 2024 and July 1st through September 30th, 2024.

THE COURT:  All right.  Just a moment.

All right.  The next exhibit.

Q    Exhibit 62, what time periods are reflected there?

A    January 1st through June 30th, 2024 and July 1st through December 31st, 2024.

Q    Finally Exhibit 63, what time periods are purported to -- are reported here?

A    January 1st through June 30th, 2024, July 1st through December 31st, 2024 and January 1st through March 31st, 2025.

THE COURT:  Now, just a moment.

(Pause)

Webster - Direct / By Mr. Umhofer                    **61**

THE COURT:  All right.  Please continue.

**BY MR. UMHOFER:**

Q    Is Exhibit 59 another summary of the City's reports that was created by the plaintiffs in preparation for this case?

MR. ROTSTEIN:  Objection, lack of foundation, relevance.

THE COURT:  Overruled.

MR. ROTSTEIN:  And --

THE COURT:  You can answer.

THE WITNESS:  Yes.

**BY MR. UMHOFER:**

Q    Have you checked these numbers against the City's reports?

THE COURT:  And first of all, counsel, I can take judicial notice this was submitted by the City, wasn't it?

MR. UMHOFER:  This particular document was created --

MR. ROTSTEIN:  No.

THE COURT:  Or was it prepared by LA Alliance?

MR. ROTSTEIN:  LA Alliance.

THE COURT:  As a demonstrative.  But it relates back then to the submission by the City, correct?  In other words, there is no submission by the City?

MR. MCRAE:  No, Your Honor.  To parse the distinction, this purports to be a summary of data that was submitted by the City but was created by the Alliance.

THE COURT:  No, I understand that.

**EXCEPTIONAL REPORTING SERVICES, INC**

Webster - Direct / By Mr. Umhofer                    **62**

**MR. MCRAE:**  Therefore, it isn't derivative, it's not the City's work product.  It purports to be work product most likely of counsel.

**THE COURT:**  Well, this is, but they can go back to the original documents and show the Court those original submissions or non-submissions, can't they?

**MR. MCRAE:**  They could.

**THE COURT:**  Okay.

**MR. MCRAE:**  But they have in front of this witness work product of counsel, which we submit is not a demonstrative and there's another note here that contains argument as the Court can see with an asterisk that says their math is off.  That's surely --

**THE COURT:**  We'll take those comments out.  Those comments are improper.  But it seems to me it's really relatively easy to resolve and that is, we have the documents submitted by the City.  You can certainly submit a demonstrative showing the calculations by the City and whether they're appropriate or not.  Overruled.

**MR. MCRAE:**  Well, Your Honor, just one point of clarification in terms of being a demonstration, we would understand that that would not be admitted into evidence.

**THE COURT:**  No, I'm going to receive these counsel in all likelihood, if there's a foundation to them.  It9's no different than having a summary quite frankly.  I don't wish to

Webster - Direct / By Mr. Umhofer                    **63**

debate this too long.

MR. MCRAE:  That's fine.

THE COURT:  If we had a summary of original documents like checks out in the hallway and we had a summary document that would be received.

MR. MCRAE:  So continuing objection --

THE COURT:  I think we all know that.  Thank you very much, counsel.  It's overruled.

MR. MCRAE:  Thank you.

MR. UMHOFER:  And to be clear, Your Honor, we are submitting this both as a summary under Federal Rule of Evidence 1006 --

THE COURT:  Yeah.

MR. UMHOFER:  -- we provided prior notice.

THE COURT:  No, it's self-evident.  They're received.

**(Plaintiffs' documents noted above received in evidence)**

**BY MR. UMHOFER:**

Q    The -- have you checked this against the City's reports?

MR. ROTSTEIN:  Your Honor, we'd like a continuing objection on the document.

THE COURT:  Thank you, overruled.

THE WITNESS:  Yes.

Q    And do the numbers and with apologies for the math is off comment, which we will remove from the record, are the numbers reflected in these documents the numbers that are reflected in

Webster - Direct / By Mr. Umhofer                    **64**

those City reports?

A     Yes, it is, they are.

Q     Now, did -- based on the City's reports, did the City meet

its milestone for June 30th, 2023?

        **MR. ROTSTEIN:**  Objection.

        **THE COURT:**  Just a moment.

        **MR. ROTSTEIN:**  Objection, lack of foundation, calls

for a legal conclusion.  And, Your Honor, I just want to

clarify do we have a continuing objection on this document

based on the projections?

        **THE COURT:**  I understand that and I understand you'd

like a record as to each item so you protect the record, I

respect that, okay yeah, but it's a continuing objection just

to cover your record also.

        **MR. ROTSTEIN:**  Thank you, Your Honor.

        **MR. UMHOFER:**  Your Honor, I hate to ask for this, but

may I have a brief sidebar?

        **THE COURT:**  No.

        **MR. UMHOFER:**  Okay.  I'll do it in open court then.

Your Honor, I'm going to object to the coaching of counsel

who's objecting by other counsel.  I can hear it and it is

distracting --

        **THE COURT:**  Well, just a moment.  Counsel, not to

have a chilling effect.  You're more than welcome to converse

with each other, but please keep it down.  I can hear it also

**EXCEPTIONAL REPORTING SERVICES, INC**

and it's inappropriate.  Now, thank you.  Be seated, counsel, that's the second warning by the way.

**MR. ROTSTEIN:**  Thank you.

**THE COURT:**  And it's distracting and just as you've objected to the -- their math is off, I agree with you, let's get rid of that nonsense.  Stop using the microphone so I can at least hear it, please, or speak in a quieter voice.  Now that's the last admonition.

**MR. MCRAE:**  I just have a -- I don't know if my button is working.

**THE COURT:**  I don't know if it is either or not, but I've counseled you twice now.  There won't be a third time. Thank you very much, counsel, it's distracting and it's inappropriate.

Now, that was distracting.  So we're going to go through this again very slowly.

**MR. UMHOFER:**  Right.

**BY MR. UMHOFER:**

Q   So as of the first reporting period for which the City established milestones, is there any reported numbers for 12/31/22?

A   No.

**THE COURT:**  12/31/22, it's the first line.  Has City milestone period 800.

**MR. UMHOFER:**  Yes.

Q    Are there any reported numbers about the City's efforts to meet those milestones?

A    No.

          THE COURT:  Okay.  Who's in CD-1?  I know it, but I want to know that you know who that person is.

          MR. ROTSTEIN:  Eunisses Hernandez.

          THE COURT:  Well, just a moment.  Eunisses Hernandez, great.  Who's in CD-2?

          MR. ROTSTEIN:  Adrin Nazarian.

          THE COURT:  Excellent.  Who's in CD-3?

          MR. ROTSTEIN:  Bob Blumenfield.

          THE COURT:  Excellent, who's in CD-4?

          MR. ROTSTEIN:  Nithya Raman.

          THE COURT:  You're doing extraordinary well.  Who's in CD-5?

          MR. ROTSTEIN:  Katy Yaroslavsky.

          THE COURT:  Thank you.  Who's in CD-6?

          MR. ROTSTEIN:  Nova Padilla.

          THE COURT:  CD-7?

          MR. ROTSTEIN:  Monica Rodriguez.

          THE COURT:  CD-8?

          MR. ROTSTEIN:  Marqueece Harris-Dawson.

          THE COURT:  CD-9?

          MR. ROTSTEIN:  Curren Price.

          THE COURT:  CD-10?

MR. ROTSTEIN:  Heather Hutt.

THE COURT:  Excellent.  Who preceded Heather Hutt?

MR. ROTSTEIN:  Tracy -- who preceded her?  I do not know the answer to that.

THE COURT:  I'm not chiding you at all, okay, it's just I've been through so many council people, so I -- you're not on the line for that.  I'm joking with you.  Who's in CD-11?

MR. ROTSTEIN:  Traci Park.

THE COURT:  Who's in CD-12?

MR. ROTSTEIN:  John Lee.

THE COURT:  13?

MR. ROTSTEIN:  Hugo Soto-Martinez.

THE COURT:  Martinez.  14?

MR. ROTSTEIN:  Ysabel Jurado.

THE COURT:  And who preceded that?

MR. ROTSTEIN:  I do not, Your Honor.

THE COURT:  Kevin de Leon.  Who's in 15?

MR. ROTSTEIN:  Tim McOsker.

THE COURT:  Now, let's get the names of the council people up on top so we know what CD districts are performing or not instead of numbers.  We can go through quickly.  Why don't you turn to June 30th, 2023.

//

//

Webster - Direct / By Mr. Umhofer                    **68**

**BY MR. UMHOFER:**

Q   Were there any reported numbers for the City's efforts to

meet its milestone of 1,000 as of June 20 -- excuse me, June

30th, 2023?

A   No.

Q   And were there any milestone efforts reported for the

City's efforts to meet its milestones as of December 31st,

2023?

          **MR. ROTSTEIN:**  Objection, Your Honor.  Again,

relevance, we're looking for a standing objection because the

milestones do not go to a breach of the settlement agreement.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  No.

**BY MR. UMHOFER:**

Q   Now, there are numbers reported as of 6/30, 2024, correct?

A   Correct.

Q   And those numbers, the total on the right exceeds the

1,250 set forth as a milestone on the left, correct?

A   I'm sorry.

Q   There's the --

          **THE COURT:**  Yeah, read those numbers in so there's no

confusion for all of us.

Q   The milestone as of June 30th, 2024 is 1,250, correct?

A   Correct.

Q   And then go all the way over to the right, they created a

Webster - Direct / By Mr. Umhofer                    **69**

total of 1,685 beds by that time period, correct?

A    That's correct.

Q    So in that quarter they exceeded their milestone, based on their reported numbers, correct?

A    That's correct.

Q    And the only other full quarter or full reporting period that we have is 12/23 -- excuse me, 12/31, 2024 their milestone is what?

A    1,250.

Q    And they created?

A    3,017.

Q    Is there still however a cumulative deficit based on the City's reported numbers.

        **MR. ROTSTEIN:**  And, Your Honor, I just want to confirm that we have a standing objection based on relevance, given that the milestones do not go to the breach of the settlement agreement.

        **THE COURT:**  All right.  Thank you.  Actually they created 1,424, didn't they?  The total is 3,017.

        **MR. UMHOFER:**  Yes.

**BY MR. UMHOFER:**

Q    So if we're on -- this line here, I apologize for the lack of line numbers, 12/31, 2024 we have a 1,250 number, if you go all the way over to the right under the white number, you have a total bed creation in that time period of 3,017, correct?

EXCEPTIONAL REPORTING SERVICES, INC

Webster - Direct / By Mr. Umhofer                    **70**

A    Actually this is encampment removal.

            **THE COURT:**  Just a moment, we have CourtSmart so finish your question before you answer and we'll get the objection.

Q    Am I correct that in the period that the reporting deadline of 12/31, 2024 the City had a milestone of 1,250 and reported that they had addressed 3,017 encampments during that time period?

            **MR. ROTSTEIN:**  Objection, relevance, Your Honor, and lack of foundation.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  Correct.

**BY MR. UMHOFER:**

Q    And then though there weren't -- they weren't an obligation to report until June 2025.

            **MR. ROTSTEIN:**  Objection.

Q    Am I --

            **THE COURT:**  Well, that's a statement, it's not a question, counsel, ask a question.

Q    Was there a report dated 3/31, 2025?

A    There was.  There is.

Q    Is there a milestone, however, for that time frame?

A    No.

            **MR. ROTSTEIN:**  Relevance, calls for a legal conclusion.

**THE WITNESS:**  Overruled.

Q    So there's no milestone to measure their 1,424 against, correct?

A    Correct.

Q    Now, are you aware that there has been litigation in this case over the -- that there's been litigation over the issue of how encampment reductions are counted?

A    Yes.

Q    And pointing you to Exhibit 37 at page -- this is -- sorry, I'll move it a little slower.  This is the plaintiffs' -- this is Docket No. 863, this is plaintiffs' motion for order re settlement agreement compliance.  Do you see that there?

A    I do.

Q    That's Exhibit 37.  If we go to the thirteenth page of this exhibit, of this brief is there a discussion of the encampment reduction numbers beginning on page 13?

A    Yes, there is.

Q    And is there a discussion of -- could you read the sentence here that begins however?

**MR. ROTSTEIN:**  Your Honor, this is a pleading.  This is argument.

**THE COURT:**  Overruled, it's going to eventually come down to the parties having approached the Court for resolution over encampment reduction, cleaning and this issue concerning what resolutions mean.  I can take judicial notice of this,

Webster - Direct / By Mr. Umhofer                    **72**

counsel.  Overruled.

Q    Could you read out loud this sentence?

A    Yes.  However, through discussions with the City over the last six months in addition to presentations made in the homelessness and housing committee it has become clear that the City's counting Care and Care Plus clean ups as quote resolutions or in the terms of the settlement agreement, quote reductions.

Q    And are you aware that the City responded -- what do you understand those Care and Care Plus clean ups to be to the extent that you have an understanding?

        **MR. ROTSTEIN:**  Objection, Your Honor.  You know, Mr. -- plaintiffs' counsel is coaching the witness through this entire line of questioning, Your Honor, walking him through the pleading.

        **THE COURT:**  Overruled.  You can answer.

        **THE WITNESS:**  My understanding of the Care and Care Plus clean ups are when the City Department of Sanitation divisions go out to rights of way that are filled with people experiencing homelessness encampments and they clean, they spray, they collect trash and refuse and then they leave.

**BY MR. UMHOFER:**

Q    Did the City file a brief on this subject?

A    I understand that they did.

Q    And that's Exhibit 48 here, Docket 871, correct?

A    Correct.

Q    And at page 14 of their brief, does the City address the encampment reduction issue?

        **MR. ROTSTEIN:**  Objection, Your Honor, this is argument from the brief.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes.

Q    And in that argument, did the City defend its use of its counting of Care and Care Plus toward the encampment reduction milestone?

        **MR. ROTSTEIN:**  Objection, argumentative, Your Honor.

        **THE COURT:**  Overruled.

        **MR. ROTSTEIN:**  And it calls for a legal conclusion.

        **THE COURT:**  Overruled.  This is your opinion.

        **THE WITNESS:**  Yes.

        **THE COURT:**  I also take judicial notice of this briefing.

        **THE WITNESS:**  Yes.  They argued that the Care and Care Plus clean ups should be counted as encampment reductions.

**BY MR. UMHOFER:**

Q    And am I correct that they accused the Alliance of attempting to rewrite the provisions of the settlement agreement?

        **MR. ROTSTEIN:**  Objection, argument, legal conclusion, and Your Honor, it doesn't appear this has been productive --

Webster - Direct / By Mr. Umhofer                    **74**

THE COURT:  Well, I'll take judicial notice, counsel. They're oral arguments by both parties concerning the Care and Care Plus being used as encampment reduction.

MR. ROTSTEIN:  And, Your Honor, for that reason we move to strike this entire line of questioning.

THE COURT:  Overruled.  In fact, I'm going to give wide discretion to all the experts who testify for both the City and the CAO when he's here and the Mayor if needed, so you can actually answer that question.

THE WITNESS:  Yes.  The City attempted -- the City claimed that the Alliance was rewriting the settlement agreement.

BY MR. UMHOFER:

Q    Now, did the Court issue an order on this subject?

A    Yes, they did.

Q    Is that here at Exhibit 52, Docket No. 874?

A    That's correct.

Q    And I know you're not a lawyer, but to the extent that you understood this order, did you understand this order to mean that it was -- well, I'm just going to have you read this line from the -- from that order.

MR. ROTSTEIN:  Objection, Your Honor, relevance.

THE COURT:  I'll simply read it into the record. I'll take judicial notice of the Court's own ruling, and that is, the City may not report clean ups from programs such as

EXCEPTIONAL REPORTING SERVICES, INC

care or care plus as reductions to prove compliance with the settlement agreement because they are not permanent in nature. The Court agrees with plaintiff that cleaning an area, only to have unhoused individuals move back in without offers of shelter or housing is not a resolution or encampment reduction and shall not be reported as such.  C) thus the City is only to report encampment reductions that have a more permanent meaning, such that unhoused individuals are moved off the street and given shelter or housing.

**BY MR. UMHOFER:**

Q    To your knowledge, has the City ever produced reports that do not count Care and Care Plus clean ups?

          **MR. ROTSTEIN:**  Objection, lack of foundation, relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  No.

Q    Have you seen any document or evidence outside the City's reporting that demonstrates that it is complying with the milestones for encampment reduction without counting Care and Care Plus clean ups?

          **MR. ROTSTEIN:**  Objection, relevance, lack of foundation, calls for a legal conclusion.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  No.

Q    So I want to take you finally to the road map agreement.

That's here at --

THE COURT:  Well just one moment.  Why don't we take -- this would be a segway, counsel, for about -- a recess till -- how long would counsel like?  About 20 minutes?  Yeah, okay, we're going to take a recess, except I want to pay the courtesy to the gentleman.  You started to address the Court.  All the rest of you can go to lunch if you'd like to, use the restroom, somebody from LA Alliance should remain, but what did you want to address the Court at the beginning of the proceedings and I wanted to get the witnesses but you wanted to address the Court.

MR. MCRAE:  Totally understood, Your Honor.  Some of this in process will be affected.  One was that given the -- what we understand to be the limited purpose of the hearing, which is namely to determine whether or not there is evidence of a breach of the Alliance with the settlement agreement, as to a number of witnesses that will be called after this witness, we wanted to have an offer -- a proffer as to their testimony for a couple of reasons.

Many of whom and we heard it in the opening statement are ostensibly going to talk about systemic failures of the system, with a capital S that goes far beyond the province of the City as well as many other externalities that have nothing to do with the four corners of the settlement agreement with the Alliance.  That testimony would be irrelevant, it would

EXCEPTIONAL REPORTING SERVICES, INC

also in some instances spill into, as we've seen here, proffers of legal conclusions as well as unfounded purported expert testimony lacking a foundation.

But the main thing is that it's outside the strike zone. The strike zone is was there a breach of the settlement agreement. These people talking about how the system at large, writ large has failed, obviously people can have debates about that, but that's really beyond the narrow issue here. So we would want that proffer.

Also we need to be able to get the proffer to determine, because notwithstanding the fact that people's names may have been visible to prior counsel, we're now in a much more confined process where people are offered from the witness stand their status as to whether they're lay witnesses or expert witnesses. This is actually the first time that that is being manifested.

And obviously to the extent that these people are being proffered as experts we want to have the full panoply of rights under the Federal Rules of Civil Procedure with respect to expert depositions, expert discovery and so forth.

And then with respect, for example, an Emily Vaughn Henry, for example, this is a witness that was just disclosed on Friday. The fact is she hasn't worked with, what is a totally separate entity, LAHSA, which is not even a party to the agreement since February of 2024. And if this is to come

in and to air out allegations with respect to what happened there, again it massively begs the question how is this possibly relevant to whether there's a breach of bed count and encampment reduction which are the only obligations that we're talking about, as opposed to milestones under the agreement.

The other issue that we had and I think we're taking care of these as they come in actually is on the issue of three exhibits that we got quite late, quite frankly I believe it was Friday and over the weekend.

One of them I think is Exhibit 135, there's another or 136, it seems like the Court's preference is that we take up those objections seriatim as the exhibits are introduced.  And we have a standing objection and we understand the Court's prior comments with respect to the Road Map agreement being the source of discussions and rulings here previously, but as my colleague Ms. Evangelis stated in the opening statement, we have a continuing objection to that because again you can't determine whether there's a breach of the Alliance settlement agreement based on whether there is or isn't compliance with the Road Map agreement with the County.

Those are entirely separate agreements and at least with respect to the Alliance settlement agreement it has an integration clause in paragraph 18 which specifically says that any modification has to be in writing and mutually executed, which is yet another reason why this perpetually moving target

of what the obligations are is problematic because you can't post facto come in and rewrite the parties' agreements.

And so those are the issues that we want to clear out and I thank the Court for the time.

THE COURT:  All right.  Thank you.

MR. MCRAE:  By the way, I apologize earlier for the volume modulation, I think I've got the button system down now. So thank you.

THE COURT:  I have a short memory, so it's not a concern.  Ms. Myers.

MS. MYERS:  Thank you, Your Honor, thank you.

THE COURT:  I need to be able to hear you, so please push that button.

MS. MYERS:  Your Honor?

THE COURT:  I still can't hear you.  So why don't you come to the lectern for a moment.  Now, we're using up valuable time and I'm going to hear you, so you can each create all of your records you want to, but we're back in session at 11 o'clock, so be full warned about that.  Witnesses aren't going to be standing around.

MS. MYERS:  Yes, Your Honor, this will be very quick, Shayla Myers on behalf of the intervenors.  Your Honor, thank you this morning for your extension of your ruling, the oral ruling about the third parties being able to enforce agreements.  We appreciate the intervenor's opportunity to

participate.  And the parties, including the intervenors and the County and the City and the LA Alliance after the hearing on the 15th had discussed ensuring that the intervenors and County were included on exchanges of evidence and witnesses and those sorts of things.

And the LA Alliance provided us the -- their portion of the witness list.  It's only this morning, Your Honor, that we had any awareness that they had actually exchanged evidence.  I had -- I e-mailed the LA Alliance and the City and we've received the LA Alliance's information, but the intervenors have not been included in any of that information so we haven't had any opportunity to prepare related to it.  We'll obviously reserve our opportunity to participate but just want to make that record clear.

And to the extent that the City has any exhibits, we would appreciate that as well as being included going forward.

THE COURT:  Note that because if you're -- you need to come back for questions, Ms. Myers, the Court may allow that and may recall witnesses if needed.  Mr. Umhofer.

MR. UMHOFER:  Yes, Your Honor, I believe counsel for the City is operating under a mistaken impression of what the scope of this hearing is.  We are seeking a receivership.  This is an evidentiary hearing about a receivership.  This is not a bifurcated proceeding.  This is not a proceeding in which we are presenting evidence and then in some future case seeking a

receivership.  We are seeking receivership now.  We are presenting evidence that shows both a violation and the fact that the City can't fix it.  That's the part that's broken. It's all one hearing.

And the notion that we're doing some sort of trifurcated proceeding is not consistent with the Alliance's intent and I don't -- and I'll leave to the Court as to whether it's consistent with the Court's understanding of what's about to happen.

But the Alliance's intent is to present evidence and argument about why the City has breached and why it cannot fix it and therefore receivership is necessary.  That's what we understand this hearing to be about and I object to the City's efforts, new efforts I think based on new counsel arriving to try to cabin this hearing to one single thing, which is one agreement violated.

I think we've addressed the issues of the Road Map with respect to witnesses including Emily Vaughn Henry.  She will testify as to the reliability of the counts that are being submitted to the Court in support of its -- the City's efforts to meet its milestones and obligations.  These are not irrelevant.  This is not irrelevant testimony.

As to experts, I don't actually believe that Mr. Webster offered a single expert opinion.  I asked him factual questions and he answered those.  To the extent that

the Court is prepared to accept expert testimony, the Court has discretion to do that. This is not a trial. And this is not a jury trial, this is a setting in which we have provided notice of who our folks are and we will be asking largely factual questions, but to the extent that expert testimony does emerge we think it's within the Court's discretion to discern that, because we're not in front of the jury where expert related stuff can be confusing.

I think I've addressed most of the objections --

THE COURT: All right. Thank you then, counsel. I saw you standing, please.

MS. EVANGELIS: Thank you, Your Honor. I appreciate the opportunity to respond.

The issue of a receivership first appeared in the Alliance's reply brief filed I believe it was in February. It was pretty shocking to us that they would put the cart before the horse in such a way completely improper.

First, that's an issue of remedy. It's an extraordinary and unconstitutional remedy. We'll get to that, there will be briefing on that, but this evidentiary hearing is for the first preliminary question of whether there's even been a breach at all to an agreement on its face doesn't even mature until 2027. So that's the first issue.

That would be an extraordinary remedy. This is not a freewheeling hearing into what we all wish we could all order

the City to do.  The City's policy choices are left to the City's sole discretion and the City has absolutely used best efforts.

This hearing is about whether there's been a breach of the sole agreement between that party and this party and that is the Alliance and the City.  So I want to make that very clear.  We are not here to get into remedy before there's even any finding of any breach.  And, of course, this is an Article 3 Court and to do that, in my mind, would be unprecedented, so I'm surprised that counsel would think --

**THE COURT:**  All right.

**MS. EVANGELIS:**  -- otherwise.

**THE COURT:**  Thank you, counsel.

**MR. UMHOFER:**  Your Honor, we requested the receivership in open court.  We moved for that receivership in March of 2025.  This Court then ordered this hearing and it defined the scope of this hearing, my recollection, as based on the plaintiff -- and I believe this is the last hearing, that this hearing would be based -- would be to address the issues raised in the plaintiffs' last brief, which was replete with arguments about the receivership.

**THE COURT:**  Okay.

**MR. UMHOFER:**  I'll leave it there, Your Honor.

**THE COURT:**  All right.  Thank you, counsel.  You have 12 minutes to use the restroom, we'll reconvene at 11 o'clock.

**84**

(Recessed at 10:47 a.m.; reconvened at 11:00 a.m.)

THE COURT:  We're back on the record.  And are we on CourtSmart?  All right.  All counsel are present, the parties are present.  Thank you for your courtesy, you can be seated, though.

MS. KAOUNIS:  Your Honor, may I quickly request that the witnesses who have not testified yet and who are scheduled to testify be excluded from the Court under Rule 615 please?

THE COURT:  Certainly.  So if there's a witness, they might be excluded from the courtroom.

MR. ROTSTEIN:  Your Honor, before --

THE COURT:  Counsel, just a moment.  The tag teaming -- I'll hear from any counsel, but would you be seated for just a moment.

MR. ROTSTEIN:  Of course, Your Honor.

THE COURT:  I see your enthusiasm and I appreciate that.

Normally I'll allow lead counsel to address the Court not four or five counsel.  Can we sort that out so that I get at least two or three counsel instead of multitudes of counsel?

MR. ROTSTEIN:  Yes, Your Honor.

THE COURT:  All right.  Sort that out.  Thank you very much.

All right.  We'll proceed then.  All counsel and the parties are present, the witness is on the stand.  And,

counsel, please.

MR. ROTSTEIN:  Your Honor, I'd just like to ask for two quick clarifications we'd like to make.

THE COURT:  Counsel --

MR. ROTSTEIN:  Number one, we just --

THE COURT:  -- I'm not going to be clarifying.  Have a seat.  We're moving on with the witnesses.  We'll take that up at lunch time when witnesses are not inconvenienced.

MR. ROTSTEIN:  Yes, Your Honor.

THE COURT:  Am I clear?  Thank you very much.  I appreciate your courtesy.  All right.  Counsel, your questions now.

**DIRECT EXAMINATION (CONTINUED)**

**BY MR. UMHOFER:**

Q    Mr. Webster, are you familiar with the Road Map agreement?

A    Yes, I am.

Q    Are we looking at it as Exhibit 1?

A    Yes, we are.

MR. ROTSTEIN:  Objection, Your Honor, motion to strike Mr. Webster's prior testimony and again we'd like to renew our objection on relevance.  The Road Map agreement, plaintiff is not party to it and it's not relevant to this evidentiary hearing.

THE COURT:  And you have my prior ruling, that ruling remains in effect.  In fact, I've extended that not only beyond

Webster - Direct / By Mr. Umhofer                          **86**

LA Alliance but now to the intervenors as well.  Counsel, your question, please.

Q    And that agreement consists of two documents, right, Exhibit 1 which is this binding term sheet, correct?

A    Correct.

Q    And under that binding term sheet, how many beds does that binding term sheet call for to be created by the City within 18 months?

MR. ROTSTEIN:  Objection, Your Honor, calls for a legal conclusion.

THE COURT:  Overruled and I can take judicial notice of this, counsel.

THE WITNESS:  The road map agreement called for 6,700 beds.

MR. UMHOFER:  Your Honor, before we --

THE COURT:  And, counsel, I know you're coming new to the case but this was negotiated between the Board of Supervisors, this City at the highest level.  The Court became involved at some point, just you know, for clarification for you.  Thank you very much, counsel, be seated.

MR. UMHOFER:  Your Honor, I just have one point of clarification about exclusion of witnesses.  I do see one witness in the room that -- who I think should stay, but it's up to the Court.  It's Special Master Martinez.

THE COURT:  Oh, she's going to remain, absolutely.

Webster - Direct / By Mr. Umhofer                 **87**

**MR. UMHOFER:**  Okay.  I understand, Your Honor, I just wanted to make sure.

**THE COURT:**  No, at all times she'll be present.

**MR. UMHOFER:**  Yes, Your Honor.

**BY MR. UMHOFER:**

Q    Exhibit 2 is the memorandum of understanding that supplements that term sheet, correct?

**MR. ROTSTEIN:**  Objection, relevance, Your Honor.

**THE COURT:**  Overruled.

**MR. UMHOFER:**  And I'll give counsel a standing objection to relevance around his testimony.

**THE COURT:**  Well, I think on behalf of the City though they're entitled to make their record --

**MR. UMHOFER:**  Understand.

**THE COURT:**  -- in the Circuit, it's a standing objection.  If you feel uncomfortable with that record and you want to make an objection, but it's adding to time.  I'll leave that to your discretion, but you have a record that you're objecting to this and it's a continuing objection.  Quite frankly it's going to slow down a little bit of the questions on cross and redirect and et cetera, but I'll leave that to you.  You've got your objections, counsel, be seated, thank you.

//

//

BY MR. UMHOFER:

Q    And so under that term sheet there are City obligations, correct?

         MR. ROTSTEIN:  Objection, Your Honor, legal conclusion.

         THE COURT:  Overruled.

         THE WITNESS:  Correct.

Q    And the -- apologies.

     At page 4 there is a detailed discussion of the new beds that should be provided by the City, still the same 6,700 number, correct?

         MR. ROTSTEIN:  Objection, Your Honor, legal conclusion, relevance, leading.

         THE COURT:  Just a moment, counsel.

         Overruled.

         THE WITNESS:  Correct.

BY MR. UMHOFER:

Q    And again the City has under the MOU as well as the term sheet the obligation to create -- well, the obligation to create 6,000 beds with 7,000 beds for a bonus, correct?

         MR. ROTSTEIN:  Objection, Your Honor, legal conclusion, leading, relevance.

         THE COURT:  Well, first of all it's -- you said 7,000 and actually it's 700.  And actually I think it's 5,900 and 800 if my memory is correct, but let's take a look at this for just

a moment.

Yeah, my apologies, it's 700 within the 18 months. And these were to be new beds.

Q    Now, did the City -- excuse me, did the City and the County -- well, did the City produce reports to the Court and to the plaintiffs on its compliance with the Road Map agreement?

MR. ROTSTEIN:  Objection, Your Honor, legal conclusion, relevance and leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.

Q    And is Exhibit 3 one of those Road Map reports that the City produced?

A    Yes.

Q    And is this first one, Exhibit 3 for the period June 16th through October 15th, 2020?

MR. ROTSTEIN:  Objection, Your Honor, legal conclusion, relevance, and it's also leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. UMHOFER:

Q    And have you reviewed the City's reports in support of the Road Map agreement that have been submitted to the Court over the course of this litigation?

A    I have.

Webster - Direct / By Mr. Umhofer                90

Q    And are Exhibits 3 through 22, I'll go to 22, those

reports, those quarterly reports on the City's compliance with

the Road Map agreement.

A    They are.

Q    Now, has the City -- this is the last report, let's go to

the last page.  How many beds does the City --

        THE COURT:  Just a moment, for the record, what is

the date of this report, not the last report, what's the date?

        MR. UMHOFER:  This report is --

Q    What is the date -- what is the quarter ending on this

one?

A    The quarter ending is March 31st, 2025.

Q    And this was filed with the Court when?

A    April 15th, 2025.

Q    Go down to the bottom there, how many beds does the City

purport to have created, open and occupiable as of March 31st?

A    7,624 beds.

Q    Now, are you familiar with the report produced by Alvarez

and Marsal?

A    I am.

Q    And looking now at Exhibit 23 is that the A&M report?

        MR. ROTSTEIN:  Objection, relevance, Your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  Yes, it is.

//

**BY MR. UMHOFER:**

Q    Now, at page 64, apologies, this will take me a second to get there.

        **MR. UMHOFER:**  Apologies for the delay, Your Honor.

     **(Pause)**

Q    Okay.  At page 64 under the PACER pages of Exhibit 23 is there discussion of the Road Map program?

        **MR. ROTSTEIN:**  Objection, Your Honor, hearsay, relevance and lack of foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  There is.

Q    And could you read the portion that begins here?

A    The largest discrepancy relates to TLS contracts.  LAHSA identified 95 contracts for the 2,293 scattered sites representing approximately 30 percent of all open and occupiable beds, reported by the City as of June 30th, 2024.

     Of the contracts identified by LAHSA, approximately 70 percent did not report financial expenditures in FY 2023 through 2024.  A&M requested supporting work papers from LAHSA regarding the TLS bed count to investigate this discrepancy further in an effort to ensure all costs related to TLS were captured.  However, LAHSA was unable to provide the requested documentation.  And instead, furnished a memorandum that was not sufficient to permit reconciliation of the identified misalignment in contracts.

Therefore, A&M could not validate the reported number of TLS beds or the total expenses necessary to support those beds.

Q    Now --

        **MR. ROTSTEIN:**  Your Honor, we'd like to move to strike Mr. Webster's reading of the A&M report into the record. It's already part of the docket.  You know, to the extent Mr. Webster testifying about it, he didn't prepare it, he doesn't know anything about it in terms of how it was prepared, what went into it, and it's hearsay.  So we would move to strike his prior testimony.

        **THE COURT:**  Overruled.

**BY MR. UMHOFER:**

Q    Now, if we go back to the most recent figures, by the way let's go back to there and what's the number -- what's the percentage of open occupiable beds that the TLS beds comprise?

        **MR. ROTSTEIN:**  Objection, lacks foundation, relevance.

        **THE COURT:**  Overruled, as it pertains to the A&M report.

        **THE WITNESS:**  The report states that 30 percent, approximately 30 percent of all open and occupiable beds.

**BY MR. UMHOFER:**

Q    So if we go back to the most recent report, the open and occupiable beds' number is 7,624, correct?

A    Correct.

Webster - Direct / By Mr. Umhofer                    **93**

Q    And if I'm doing the math right, can we take judicial notice that the number -- that 30 percent of that number is 2,287 total?

MR. UMHOFER:  Your Honor, I apologize, I wanted to take judicial notice of the math on that.

THE COURT:  Does anybody have a calculator?

MR. UMHOFER:  I've got it right here, I just did it.

THE COURT:  You can check out the calculation but I think we're wasting time.  Is there any problem with the 30 percent, other than --

MR. ROTSTEIN:  Your Honor --

THE COURT:  -- your general objection?

MR. ROTSTEIN:  Based on relevance, Your Honor.

THE COURT:  All right.  I'll accept that representation then, counsel, 2,287.

**BY MR. UMHOFER:**

Q    Are you aware of any evidence or documentation that explains how the City could create beds without expenditures for them?

A    No.

Q    Based on what A&M found, are you concerned as to whether the City has actually created the number of beds it purports to have created under the Road Map agreement?

MR. ROTSTEIN:  Objection, Your Honor, foundation, relevance, hearsay.

Webster - Direct / By Mr. Umhofer                    **94**

THE COURT:  Yeah, I'm going to sustain that objection, but I'll state to both of you the Court's concern. I'm going to want to hear direct and cross-examination in this area.  So it's self-evident that -- from your testimony and from A&M that you don't have verification of these beds; is that correct?

THE WITNESS:  I'm sorry?

THE COURT:  You don't have verification of these beds; is that correct?

THE WITNESS:  That's correct.

THE COURT:  All right.

Q   Now, before I wrap up here, can I ask you to look back -- apologies.

Okay.  Can I ask you to look back at Exhibit 35.  This is the City's last bed report, correct?

A   That's correct.

Q   And we had focused on number 8 but there is a -- I'll move on.

Does the settlement agreement contain an articulation of the --

THE COURT:  Now, just a moment now you've moved from the Road Map back to the LA Alliance agreement?

MR. UMHOFER:  Yes, I'm back to the LA Alliance settlement agreement, yes, Your Honor.

THE COURT:  Okay.  Thank you.

**BY MR. UMHOFER:**

Q    Does the settlement agreement contain a statement of the purpose for the agreement?

        MR. ROTSTEIN:  Objection, legal conclusion, Your Honor.

        THE COURT:  Overruled.  In your opinion you can state that.

        THE WITNESS:  It does state a purpose.

Q    And could you read out loud the statement of purpose that appears in the agreement?

A    Whereas, the purpose of this agreement is to substantially increase the number of housing and shelter opportunities in the City of Los Angeles and to address the needs of everyone who shares public spaces and rights of way in the City of Los Angeles, including both housed and unhoused Angelinos to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles.

Q    Why was this purpose important to the Alliance in entering into this agreement?

        MR. ROTSTEIN:  Objection, Your Honor.

        THE COURT:  Well, just a moment.  Were you employed by the Alliance at the time of this agreement?

        THE WITNESS:  Yes, I was, Your Honor, yeah.

        THE COURT:  Overruled.  You can state your answer.

        THE WITNESS:  Yeah, 2022, correct, uh-huh.

THE COURT:  You didn't state your answer then.

THE WITNESS:  Oh, I'm sorry, so why do I think --

BY MR. UMHOFER:

Q    Why was --

A    What is my opinion the reason that this agreement had the purpose of this agreement?

Q    I want to know as the executive director of the Alliance, what was -- why was this purpose important to the Alliance in entering into this agreement?

A    Well, it's because the people that we represent who are residents of Los Angeles and business owners of Los Angeles and even people experiencing homelessness in Los Angeles wanted a meaningful and sustainable reduction in the suffering and in the negative impacts of unsheltered homelessness in Los Angeles.

And they had appealed to their members of their City Council, they appealed to their Mayor, they appealed to pretty much everybody that they could and it was very challenging to get any kind of substantial or meaningful action that would actually reduce the number of unsheltered people experiencing homelessness that most often were occupying public spaces and rights of way.

THE COURT:  Now, just a moment, let's be clear which mayor though.  This was Mayor Garcetti?

THE WITNESS:  That was -- yes, he was the mayor at

the time.

THE COURT:  Not Mayor Bass when this was entered into, I want to be clear about that.

THE WITNESS:  Correct.

MR. ROTSTEIN:  Your Honor, move to strike based on relevance and hearsay.

THE COURT:  No, overruled, counsel, it was Mayor Garcetti, it was MRT at the time, it was Judge Birotte, the special master, and the Court became involved at some point. You wouldn't be aware of that, so as a courtesy to you.  This was negotiated over a long period of time, overruled.

**BY MR. UMHOFER:**

Q    And finally, Mr. Webster, based on your review of the A&M audit, do you have as executive director of the Alliance concerns about the City's efforts to accomplish the purpose of this agreement?

MR. ROTSTEIN:  Objection, hearsay, foundation, relevance, also calls for speculation.

THE COURT:  From your party's perspective, you can express those concerns, whatever they are.

THE WITNESS:  From the perspective of the LA Alliance we sought a lawsuit against the City and County of Los Angeles so that we could get meaningful and sustainable reductions in the number of people who were experiencing homelessness in Los Angeles, not only for the sake of those individuals, but for a

Webster - Direct / By Mr. Umhofer                **98**

lot of the negative impacts that those individuals create, with respect to quality of life, ability to do business, livability in the City.

We -- because we had concerns early on as we were receiving the number of the quarterly reports that we've been referencing so far, we wanted to find out if actually there was the financing going to the right place, what type of housing the resources were going to, the number of people that were actually being served, what the outcomes of those services were, what the outcomes of the provision of housing on the number of people experiencing homelessness and I -- the challenge, and I'll just go back to some of the summary documents that the Alliance has prepared to document the overtime cumulative discrepancy between what the metrics and milestones were and what the reports from the City were.

We were so frustrated in terms of this discrepancy that we petitioned the Court and asked, is there some third party that could actually verify our concerns?  I mean, where is the money coming from, where is it going to, what is it providing, what are the outcomes that it is producing and so we were -- when the Court appointed a third party auditor, Alvarez and Marstin (sic) and then they subsequently conducted their investigation and their analysis when we got that report back, it showed that not only did -- were there no answers with respect to the finances, with the financial oversight, with the

EXCEPTIONAL REPORTING SERVICES, INC

Webster - Direct / By Mr. Umhofer                **99**

performance of providers, with the way that contracts were being handled and actually what the contracts produced, the City's ability to provide accountability.  The City's ability to pay performing providers.

We not only saw that a lot of our deepest concerns were completely founded, but they were even worse than what we had expected and what we saw according to the Alvarez and Marsal report was really a City programs and LAHSA programs that were in complete disarray and had no connection between the money that was being paid, the services being provided, and whether or not we were achieving substantial and meaningful reductions in unsheltered homelessness in the City of Los Angeles.

**MR. ROTSTEIN:**  Excuse me, Your Honor, we would move to strike that entire testimony.  It's hearsay, lack of foundation, it's not relevant.  It's argument and properly injecting legal conclusions throughout his testimony and it's -- you know, it's an entire narrative here.

**THE COURT:**  All right.  Overruled.

**MR. UMHOFER:**  No further questions at this time, Your Honor.

**THE COURT:**  Now, how -- would you like to cross-examine first or would you like to pay the courtesy to Shayla Myers on behalf of the intervenors?

Why don't you two talk about it, as a courtesy

**100**

between yourself, because, Ms. Myers, you represent a substantial group here.  And the City may wish to delay their cross-examination depending upon your examination.  So why don't you two talk as a courtesy and decide for a moment who'd like to proceed next.

        **(Pause)**

        **MR. MCRAE:**  Your Honor, thank you for the courtesy. We've had a chance to confer.  Our understanding is that counsel doesn't wish to cross-examine now because I believe she said that they don't have the exhibits.

        **THE COURT:**  All right.

        **MR. MCRAE:**  I'm sure the Court is going to have to sort out whether this -- how that will happen.

        **THE COURT:**  How that will happen.  Ms. Myers, why don't you reserve then in light of some of the exhibits you've received and the record you've made.

        I'll turn to the City then and on behalf of the City. And once again, would you state your name as you go to the lectern.  The reason for that is we're on CourtSmart.

        **MR. ROTSTEIN:**  Your Honor, James Rotstein on behalf of the City.  We're going to have no cross for Mr. Webster.  I just want to clarify two things that I previewed for you when we came back from the break.

        Number one, I just want to make sure from a technical standpoint that the colloquy that Mr. McRae and you had was on

**101**

the record, I think it was, but we just want to confirm that it was.

THE COURT:  With who?

MR. ROTSTEIN:  Mr. McRae, my co-counsel.

THE COURT:  Well, counsel, I assume it was because we've got CourtSmart.  So during the recess, check with CourtSmart, I don't have real time.  I'm assuming it was, if not, check and you can make the same --

MR. ROTSTEIN:  Thank you, Your Honor.

THE COURT:  As a courtesy.  I want to make sure you've got it on the record.

MR. ROTSTEIN:  And, second, we just want to make it abundantly clear that we object to Mr. Webster's entire, you know, testimony.  He was never offered by plaintiffs as an expert.  We received no discovery on that as, you know, provided for under the rules.  We don't even know Mr. Webster's supposed area of expertise.  We've never gotten the opportunity to brief this.  We've never gotten the opportunity to depose Mr. Webster.

And, you know, his testimony -- you know, he's not testifying as a legal expert.  And throughout his testimony he was injecting, you know, many allegations of why there -- why he thought there was a breach.  And that's entirely improper.

It's irrelevant, it lacks foundation, it also calls for a legal conclusion.  So we want to make sure that that

objection to his entire testimony is on the record and we're also going to be filing a written motion objecting on those same grounds.

THE COURT: Okay. Counsel, your response if any?

MR. UMHOFER: Your Honor, I'm pleased and surprised that they've chosen not to cross Mr. Webster. I don't think there's been a single point at which they've identified actual expert testimony. The Court has ruled on their objections as they've gone and we'll respond to whatever they file.

THE COURT: All right. Would you be kind enough to call your second witness? And, sir, thank you very much. I'm going to ask you to remain though through these proceedings. I don't think any witness' credibility will be tainted once they've testified. Okay? I'm not sure if you're going to be returning, though. You may be returning if Ms. Myers recalls you at some future point.

Ms. Myers, do you have any objection to his remaining?

MS. MYERS: No, Your Honor. And we do intend to ask a couple of questions.

THE COURT: Sure.

MS. MYERS: We just want an opportunity to review the exhibits over lunch.

THE COURT: You'll have that courtesy.

MS. MYERS: Thank you, Your Honor.

THE COURT:  Mr. Webster, you may step down.  Your second witness please.

MR. UMHOFER:  Yes, Your Honor, the plaintiffs call Emily Vaughn Henry.

THE COURT:  Thank you.  If you'd be kind enough to step forward.  And would you be kind enough to stop at that location, would you raise your right hand please.  Would you state your -- strike that.  And we're going to administer an oath to you, Karlen.

**EMILY VAUGHN HENRY, PLAINTIFFS' WITNESS, SWORN**

THE COURT:  Thank you.  Would you please be seated here in the witness box?  And after you're comfortably seated, would you make sure you pull your chair closer to that microphone.  And would you face the parties and would you please state your full name?

THE WITNESS:  My full name is Emily Vaughn Henry.

THE COURT:  Would you spell your first name please?

THE WITNESS:  E-M-I-L-Y.

THE COURT:  And your last name please?

THE WITNESS:  V-A-U-G-H-N, space, Henry, H-E-N-R-Y.

THE COURT:  Thank you.  Direct examination by LA Alliance.

//

//

//

**DIRECT EXAMINATION**

**BY MR. UMHOFER:**

Q    Yes, would you prefer I refer to you as Ms. Henry or Ms. Vaughn Henry?

A    Ms. Henry is fine.

Q    Thank you.  Ms. Henry, what do you for a living?

A    I'm currently the assistant CIO for San Bernadino County.

Q    And what jobs have you held prior to that role?

A    Prior to that I was the deputy CIO and data officer for the Los Angeles Homeless Services Authority.

Q    And before that?

A    And before that I was the CIO for La Sierra University.

Q    What does CIO stand for?

A    Chief information officer.

        **THE COURT:**  I'm going to slow you down just a little bit.  Would you state that again?  Chief --

        **THE WITNESS:**  Chief information officer.

**BY MR. UMHOFER:**

Q    When you were at LAHSA, what was -- what were your responsibilities as a CIO?

A    My responsibilities as a CIO was to modernize the data management infrastructure and processes, in addition to bringing the technology, infrastructure into the 21st Century.

Q    Did you deal during your time at LAHSA with data that relates to homelessness and persons experiencing homelessness

Vaughn Henry - Direct / By Mr. Umhofer            **105**

in Los Angeles?

A    I did.

Q    Did you make efforts to ensure that that data as developed and as communicated was accurate?

A    To the best of my knowledge, yes.

Q    Now, you left LAHSA when?

A    February 1st of 2024, right in the middle of the night I finished homeless count for the County I received a call from human resources and I was shepherded into the CEO's office and the CEO said to me, she's going in a different direction.

Q    So you were terminated?

A    Yes.

         MS. KAOUNIS:  I'm not sure the Court heard me, objection to hearsay.

         THE COURT:  I couldn't hear, counsel.  There was -- I apologize.

         MS. KAOUNIS:  I'm sorry, Your Honor, I didn't speak loudly.  Objection, hearsay.

         THE COURT:  All right.  Overruled.

**BY MR. UMHOFER:**

Q    Were you given a reason why you were terminated?

         MS. KAOUNIS:  Same objection.

         THE COURT:  Overruled.

         THE WITNESS:  Yes, I was.

Q    What was that reason?

A    One, I'm going in a different direction and two, the second reason was there were issues with the data.

Q    What was the name of the person who communicated this to you?

A    Dr. Va Lecia Adams Kellum.

        **MS. KAOUNIS:**  Objection, relevance.

        **THE COURT:**  Overruled.

Q    And her role at LAHSA was?

A    CEO of the organization.

        **MS. KAOUNIS:**  I'm going to object on this whole line of questioning, Your Honor, on the basis of relevance.

        **THE COURT:**  Overruled.

Q    Is she at LAHSA at this point?

A    To my knowledge, yes.

Q    Now, there was a reference to data.  Did you understand what that meant when the CEO of LAHSA said to you you're being fired because of data?

        **MS. KAOUNIS:**  Objection, foundation, hearsay.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes.

**BY MR. UMHOFER:**

Q    What did you understand that to mean?

        **MS. KAOUNIS:**  Same objection.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  When the new leadership came into LAHSA

the focus on how we produce and share data externally became a prime focus specifically for council members.  So our mission on how we produced data shifted where we were tasked with providing data to council members and the recommendation was we need to keep our council members happy because there was a lot of noise from council members specifically one area was, you know, on the inside safe data, that was one of the areas of focus.

In addition, you know, my task was to improve the data systems integrating LAHSA.  These systems have been outdated for two decades and so as leadership transitioned it's my understanding and my recollection we went through five different leaderships in three years.  Which is a lot for an organization that's trying to improve on process and procedures specifically around data.

I'll give an example.  When I talk about data specifically we had, think of it you have a house, but the foundation for the house, the rooms and how your plumbing and the inside of those things were never fully designed and formulated for an organization of LAHSA's size.

So the programs that were being funded through LAHSA, the data infrastructure was never really built to match the level of funding that was being received.  So think about it, you have this brand new house, you open the door and there's no foundation in simple terms.

**MS. KAOUNIS:** Your Honor, I want to move to strike that entire answer as irrelevant and the portion related to what the council members were articulating is also hearsay.

**THE COURT:** Overruled.

**BY MR. UMHOFER:**

Q    Were you responsible for producing to others data concerning the Mayor's Inside Safe program?

A    When new leadership came about we were tasked with, you know, putting together how data was going to be reported for Inside Safe. At the time, my team didn't have clear guidance in what does that really look like, because it was something that was new, we were being given a task to produce information that a previous provider had sort of replicated based on the Ocean Front Lock, I would say initiative. And that was being brought into LAHSA to replicate the data similarly.

And given that we didn't have any foundational data models built, it was very difficult to really produce data in an accurate manner that actually made sense. So when the new leadership came about, I was basically the one questioning the validity of that information because it wasn't matching the narrative that was out in the public hemisphere.

And I did attend a council meeting and that's factual, where a council member challenged my thinking and logic on the data because quote/unquote it wasn't pretty enough. Basically I was challenged because I did show data where the City was

Vaughn Henry - Direct / By Mr. Umhofer                **109**

paying for motels and hotels that were vacant and that was a

factual piece of evidence.

     And a week later I was told that I would no longer be

responsible for producing that data, it was going to be shifted

to another individual on the new leadership team.

Q    Who was the --

          **MS. KAOUNIS:**  Your Honor, I'm going to move to strike

that entire narrative as non-responsive, beyond the scope of

the question, irrelevant and the portions that were quoting

council members is also hearsay.

          **THE COURT:**  Overruled.

Q    Who was the council member that expressed to you that the

data was not pretty enough?

A    Council Member Blumenfield.

          **MS. KAOUNIS:**  Same objection as to hearsay.

          **THE COURT:**  Overruled.

Q    When was that --

          **THE COURT:**  All right.  Counsel, I know you're

disadvantaged in preparation, Blumenfield has written more than

one letter to the Court.  You can check back on the Court

docket and you'll see some of his concerns.

          **MS. KAOUNIS:**  Thank you, Your Honor.

          **THE COURT:**  Thank you.

//

//

**BY MR. UMHOFER:**

Q    When was that interaction with Council Member Blumenfield?

A    That was approximately I would say around -- I can't recall the exact time frame, whether if it was January of 2024 or it could have been December of 2023.  But I can't recall that specifically, but there is a video of it on line.

Q    How soon after that were you taken off of managing data for the Inside Safe program?

A    Two days later.

Q    To whom was that responsibility given?

A    Bevin Kuhn.

          **THE COURT:**  I'm sorry, who?

          **THE WITNESS:**  Bevin Kuhn.

          **THE COURT:**  Could you spell the first name for me, please?

          **THE WITNESS:**  B-E-V-I-N.

          **THE COURT:**  And the last?

          **THE WITNESS:**  Last name K-U-H-N.

          **THE COURT:**  Thank you.

**BY MR. UMHOFER:**

Q    What was Bevin Kuhn's role at LAHSA?

          **MS. KAOUNIS:**  Objection, relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  She was hired as my senior advisor for data in IT.  And shortly after that when the new leadership

came about, she was elevated to be responsible for producing Inside Safe data and various dashboards that I did not review prior to being published.

**MS. KAOUNIS:** Objection, non-responsive, move to strike.

**THE COURT:** Overruled.

Q   Ms. Kuhn worked for whom when she -- who was Kuhn's supervisor at the time she took over the Inside Safe data?

**MS. KAOUNIS:** Objection, foundation.

**THE COURT:** Overruled.

Q   If you know.

**THE COURT:** You can answer the question.

**THE WITNESS:** I was her supervisor and then shortly there was a dotted line to her to Rachel Johnson and the CEO of Adopt a Village, Dr. Va Lecia Adams Kellum.

Q   After that Inside Safe data was removed from your responsibility and over to Ms. Kuhn, did you have any visibility on that data?

A   I only saw the data when it was published, meaning on our website or when it was presented at council meetings.  I did not have an opportunity to vet the data or even challenge the source or truth of the data.

Q   And, Ms. Henry, I'm just going to ask you pause a little bit and I'm going to ask the question in order to give counsel an opportunity to object.

A    Sure.

Q    All right.  After the Inside Safe data was removed from your area of responsibility, did you continue to have concerns about the quality of the data?

A    I did and I did express those concerns and so did my staff.

MS. KAOUNIS:  I'm going to object on the basis of relevance, Your Honor.

THE COURT:  Overruled.

BY MR. UMHOFER:

Q    What were the things you communicated, the concerns that you communicated internally at LAHSA about the Inside Safe data after it was taken away from you?

MS. KAOUNIS:  Same objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  The number of individuals served, where they were served, and the duration of the stay of the individuals in the hotel and motels and how we were coming up with those numbers.

MS. KAOUNIS:  Objection, foundation.

Q    And what made you --

THE COURT:  Overruled and just one moment.  Just one moment, please.

(Pause)

THE COURT:  Just one moment, please.

Vaughn Henry - Direct / By Mr. Umhofer                **113**

(Pause)

THE COURT:  All right.  Please proceed.

BY MR. UMHOFER:

Q    What made you concerned about those numbers?

MS. KAOUNIS:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  I was concerned because I saw inflection of the number of individuals served versus what we had prior reported and I wasn't sure where this data was coming from, given that we didn't have any formulated process with agencies that were part of the Inside Safe on how they were going to report the information to LAHSA.

In addition, a lot of the data that was being collected were on the Excel spreadsheets, so there really wasn't like a source of truth, which we do have a HMIS system, which is the Homeless Management Information System, which is where that data should have been stored and stored and reported on and not used Excel spreadsheets because we know there is -- I always call it the human in the loop where, you know, as human beings you do make errors when you have to do data entry manually, especially in Excel.

BY MR. UMHOFER:

Q    Where were those Excel spreadsheets kept and with whom?

MS. KAOUNIS:  Objection, relevance.

THE COURT:  Overruled.

**THE WITNESS:**  To my knowledge, they were kept on Bevin Kuhn's laptop.

Q    Did they reside anywhere else?

A    Not to my knowledge.

Q    And those numbers did not come from HMIS?

**MS. KAOUNIS:**  Objection, relevance, foundation.

**THE COURT:**  Overruled.

**THE WITNESS:**  I'm not sure where you gathered that data from, to be very honest.

Q    Are you aware of what was done to verify the accuracy of the data that was coming off of Ms. Kuhn's laptop?

**MS. KAOUNIS:**  Objection, relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  She was responsible for compiling the data, going through a Q/A process of the data so no one else had insight, meaning the individuals that were part of the data quality team within the data management department they did not have insight into the validation of going through quality checks of that data.

So this data resided with her on her computer, she produced them, wrote the narrative and published them.

**MS. KAOUNIS:**  I'm going to object that entire narrative is hearsay.

**THE COURT:**  Overruled.

//

**BY MR. UMHOFER:**

Q    And after -- and that data, was that reported outward to the media and to the City?

A    Yes.

Q    Are you aware of any checks by any person on the quality or reliability of that data besides Ms. Kuhn?

          **MS. KAOUNIS:**  Objection, foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Not to my knowledge.

Q    Were you ever told not to produce data because Ms. Kellum did not want Mayor Bass to look bad?

          **MS. KAOUNIS:**  Objection, relevance and hearsay.

          **THE COURT:**  Overruled, you can answer that question.

          **THE WITNESS:**  I can?

          **THE COURT:**  Yes, you can.

          **THE WITNESS:**  We were told by the new leadership that we need to do whatever we can to make the Mayor look good. That was the tone that was set by the new leadership.

Q    And by the new leadership, you mean whom?

A    Dr. Va Lecia Adams Kellum.

Q    Are you aware --

          **MR. UMHOFER:**  Sorry.

          **MS. KAOUNIS:**  Yeah, I'm going to move to strike. That's hearsay.

          **THE COURT:**  Overruled.

**BY MR. UMHOFER:**

Q    Are you aware of any prior relationship between Mayor Bass and Ms. Kellum before she took over at LAHSA?

         **MS. KAOUNIS:**  Objection, relevance.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  No, I'm not aware.

Q    Who said that they wanted to make the Mayor look good?

         **MS. KAOUNIS:**  Objection, hearsay, relevance.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  Dr. Va Lecia Adams Kellum.

Q    Was there any way to replicate the data produced by Ms. Kuhn?

         **MS. KAOUNIS:**  Objection, foundation.

         **THE WITNESS:**  I tried.  No.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  I could not replicate the data that was being produced.

Q    Were you ever asked to delete e-mails sent --

         **MS. KAOUNIS:**  Objection.

Q    -- by Mayor Bass?

         **MS. KAOUNIS:**  Objection, relevance.

         **THE COURT:**  Just a moment, if it goes to data then -- it's overruled.  If it goes to just generally deleting e-mails I'm not sure of the import of that.

         **MR. UMHOFER:**  Let's -- let me back up, Your Honor.

**BY MR. UMHOFER:**

Q    Did you occasionally receive e-mails or did you at some time receive e-mails that came from Mayor Bass to your e-mail in box?

A    I personally did not.

THE COURT:  Okay.

Q    Did you receive them forwarded to you on any occasion?

MS. KAOUNIS:  Objection, relevance, hearsay.

THE COURT:  Overruled.  Did you receive them forwarded to you?

THE WITNESS:  One e-mail was forwarded to me and I was asked to delete the e-mail because it was from the Mayor's personal e-mail account.

Q    Was it -- do you know the subject of the e-mail?

A    I did not read it, but I did reiterate the retention policy because we are a government entity, we do fall under the retention policies in the State of California, but I did -- my recommendation was to blacklist the Mayor's e-mail account, personal e-mail account and so that way the Mayor could not send e-mails to LAHSA using her personal e-mail account.

MS. KAOUNIS:  Move to strike as non-responsive and relevance.

THE COURT:  So you don't know then if this pertained to data or numbers or whether this was just a personal communication; is that correct?

Vaughn Henry - Direct / By Mr. Umhofer                **118**

THE WITNESS:  That is correct.

THE COURT:  All right.  Let me take that under advisement for a while.  Let me think about that, counsel.  I may strike that testimony.  We'll see.

BY MR. UMHOFER:

Q    Last question on that.  Who asked you to delete the e-mails?

A    Dr. Va Lecia Adams Kellum.

Q    And one more question, why did you refuse to delete the e-mail?

A    I did take an oath when I took my position at LAHSA as the deputy CIO that I would be responsible and either charged with my duty to protect and I would not obstruct any rules on behalf of an executive knowing that I have a fiduciary responsibility to taxpayer dollars and we are custodians of the data and especially around individuals that are experiencing homelessness, that we are not charged with lying, falsifying any of those things.

MS. KAOUNIS:  Objection, move to strike, irrelevant, legal conclusion, lacks foundation.

THE COURT:  Overruled.

BY MR. UMHOFER:

Q    Did you have -- did you understand yourself to be under an obligation not to use personal e-mails to do LAHSA work?

THE COURT:  Just a moment.

**MS. KAOUNIS:**  Objection --

**THE COURT:**  As to who?

Q    Did you understand yourself --

**THE COURT:**  Oh, okay.

Q    -- as being under an obligation not to use personal e-mails to do LAHSA work?

A    That is correct.

**THE COURT:**  I'm going to take that under submission, counsel.  I may strike this portion.  I want a little bit of time to reflect on this.  Once again, you don't know what these e-mails pertained to; is that correct?  You don't know if they were personal e-mails like I'm having a good day or data information; is that correct?

**THE WITNESS:**  I do know when I received the call from Dr. Adams Kellum it was pertaining to LAHSA business.

**THE COURT:**  Okay.

**THE WITNESS:**  That's what I told and that's when I made the decision that this falls under our retention policy.

**THE COURT:**  I see.

**MS. KAOUNIS:**  Move to strike, hearsay, and also legal conclusion.

**THE COURT:**  All right.  I'll take that under submission, counsel, thank you.

//

//

Vaughn Henry - Direct / By Mr. Umhofer                **120**

**BY MR. UMHOFER:**

Q    Are you familiar with a consulting firm called Gardner Consulting?

A    Yes.

Q    Did they receive a contract for $1.5 million under the -- under LAHSA?

            **MS. KAOUNIS:**  Objection, hearsay, relevance.

            **THE COURT:**  Yeah, on this issue I think from reading some press articles that this might be getting into an area involving Dr. Adams and contracts with her husband.  Is that correct?

            **MR. UMHOFER:**  No, this one is not related to her husband.

            **THE COURT:**  Well, what's your offer of proof then?  I want to make certain where you're going with this by --

            **MR. UMHOFER:**  The witness was fired by Va Lecia Adams Kellum.

            **THE COURT:**  Uh-huh.

            **MR. UMHOFER:**  This was another one of the issues upon which the whistleblower raised concerns before being fired.

            **THE COURT:**  And what was the issue?  In other words, if it's data related that's one issue.  If it's some personal issue, some kind of conflict between the two, I have no idea, so I'd like to hear what the offer of proof is concerning what her testimony would be.  If it's data related from LAHSA then

the City certainly is responsible for that.

MR. UMHOFER:  Your Honor, what I'd like to do is just let's just go piece by piece, I'd like to ask the witness what the contract was for so we can determine whether it's related to data or not.

THE COURT:  Well, why don't you walk up and talk to her quietly and ask her.  Okay?

MR. UMHOFER:  May I approach?

THE COURT:  If it's not related to data, then I'm concerned.  In other words, counsel, if it's concerning incorrect data on either the LA Alliance, Inside Safe --

MS. KAOUNIS:  Your Honor?

THE COURT:  Counsel, thank you very much, I'll be right with you, I promise you.  Inside Safe, LA Alliance, or the Road Map then it's relevant.  If it's not related to that, then it's a lawsuit or termination, et cetera, then I'm concerned.

MR. UMHOFER:  I understand, Your Honor.  My offer of proof is that the contract was related to --

THE COURT:  It was what?

MR. UMHOFER:  The contract was related to the creation and establishment of LAHSA's data infrastructure.

THE COURT:  Overruled.  You can answer the question then.

//

**BY MR. UMHOFER:**

Q    Ms. Henry, what was the nature of the contract, the $1.5 million contract with Gardner Consulting?

      MS. KAOUNIS:  Objection, hearsay.

      THE COURT:  Overruled.

      MS. KAOUNIS:  Relevance.

      THE WITNESS:  The contract was issued to Gardner to come in and assess the data management department, our staff, whether the staff had the skills to deliver on the data requirements for the City and the County of Los Angeles, in addition to building out our data infrastructure, which we did not have.  So Gardner did a comprehensive assessment on our staffing, in addition to making -- made recommendations on the data systems that we needed to build within the organization so that way we're able to produce the data that's being asked of us.

      THE COURT:  I want to ask you a question for a moment to be certain.  Were you employed at the time that this was taking place with --

      THE WITNESS:  Yes.

      THE COURT:  -- Gardner?  All right.

      MS. KAOUNIS:  Your Honor, I'd like to move to strike. It's hearsay, she does not have foundation and it's irrelevant.

      THE COURT:  Overruled.

//

Vaughn Henry - Direct / By Mr. Umhofer        **123**

**BY MR. UMHOFER:**

Q    Did you express concerns about this contract to those who supervised you at LAHSA?

A    So I wanted to correct the record, the total contract was $3.5 million.  1.5 million was the first phase of the contract that was approved by the LAHSA commissioners.  The second phase was where the new team wanted to move forward with the new contract for Gardner and I raised concerns that at the time we did not have the admin funding to support a contract of that size.

So my recommendation was let's focus on the phase 1 of the work with Gardner and then phase 2, we can go back and ask for funding, but we were directed -- I was directed and the deputy to financial officer was directed by Rachel Johnson to go find the money.

THE COURT:  Just a moment.  Does this Gardner Consulting effort/contract pertain to data?  Does it pertain to reports, for instance, and the credibility of those reports or does it pertain the capacity of your office to undertake this kind of an analysis?

THE WITNESS:  It was both.  The first part we wanted to focus mainly on one, the Inside Safe reports and also the pit count, the homeless count that we conduct every year.  So there was two big initiatives based on that contract, in addition to the assessments of the staff.

THE COURT:  And your objection, counsel?

MS. KAOUNIS:  I was objecting, Your Honor, on lack of foundation.

THE COURT:  Overruled, thank you.

**BY MR. UMHOFER:**

Q    Who did you raise concerns to about this contract?

A     I raised the concerns to the executive team which consisted of Dr. Va Lecia Adams Kellum, Rachel Johnson, to Foram Anoy (phonetic), Christina Dixon, Jeffrey Sampson at the time was part of that and the other person that was on the executive team, Keisha Douglas (phonetic) and myself.  We met every Monday and I brought it up.

Q    What was the response when you raised these concerns?

MS. KAOUNIS:  Objection, hearsay, relevance.

THE COURT:  Well, it's also who's responding, in other words, you mentioned a team, I don't know which member of the team is responding to you.

THE WITNESS:  So Rachel Johnson responded who's the -- I believe her title is chief of staff.

THE COURT:  And who's present in this when she responded?

THE WITNESS:  The people I mentioned, they were all present.

THE COURT:  All right.  Overruled.

//

**BY MR. UMHOFER:**

Q    And what did Rachel Johnson say?

**MS. KAOUNIS:**  Objection, hearsay.

**THE WITNESS:**  Go find the money to fund it.

Q    Were you terminated after raising these concerns?

**MS. KAOUNIS:**  Objection, relevance.

**THE WITNESS:**  So the concerns were brought up around November/December, I was busy right in the middle of preparing for the homeless count.  So my focus was completing the count in January and then after January, February 1st is when I was terminated.

Q    Did you ever have responsibility for assessing, managing data related to the Road Map agreement?

**MS. KAOUNIS:**  Objection, relevance.

**THE WITNESS:**  Yes.

Q    And what was your role with respect to the Road Map data?

**MS. KAOUNIS:**  Same objection.

**THE COURT:**  Overruled.

**THE WITNESS:**  The Road Map data was a very challenging data.  It -- just compiling that data for LAHSA, so one of the things that they struggled with from a programming perspective, so the programs were responsible and specifically Molly Wrights (phonetic) and Nathaniel Fargog (phonetic), they were the ones that were negotiating with the City on how this data was going to be produced, how this program was going to be

Vaughn Henry - Direct / By Mr. Umhofer                **126**

managed.

And my team was responsible for producing that data once the program were set up in the HMIS system.  The challenge we were having is identifying the individuals that were supposed to be part of that Road Map reporting.  And on January 29th, a couple of days before I was terminated I did provide a report to the City on what I found on the data pertaining to the Road Map report itself.

And I did share that.  It was very complicated and challenging because these individuals were not being tracked in the Homeless Management Information System.  So to report on individuals who are not being tracked in the system is very challenging.

MS. KAOUNIS:  Objection, Your Honor, non-responsive. We're going to ask that the witness be instructed to answer the question and not going into lengthy irrelevant narratives.

THE COURT:  Overruled.  She's responded to the question.

BY MR. UMHOFER:

Q    Do you have -- did you have concerns about the accuracy of the data that was being reported outward concerning how many beds were being created and how many people were being served under the Road Map agreement?

MS. KAOUNIS:  Objection, lack of foundation, relevance.

Vaughn Henry - Direct / By Mr. Umhofer                    **127**

THE COURT:  Overruled.

THE WITNESS:  So when I receive the call, typically I was never really brought into having those conversations with the City, but when it was -- when I was reached out directly to say, hey, Emily, we need to produce this data on the Road Map and what data do you have, you know, pertaining to homelessness, individuals that were part of it.  So my response was, well, have we been tracking -- do we have a list of the individuals pertaining to the beds that we are supposed to report on.  And I said, I don't have that list, do you have the list.  And I was told, oh, we need to report to Judge Carter so I'm happy to meet you for the first time.

And two days later I was terminated because I said we just don't have the data, we haven't been tracking the data in the HMIS system in a manner that makes sense.

MS. KAOUNIS:  I'm going to move to strike that, non-responsive.  To the extent she's quoting other people that was hearsay and irrelevant and calls for a legal conclusion.

THE COURT:  Overruled.

BY MR. UMHOFER:

Q    Who at the City were you communicating with?

A    Ed Gibson.

Q    Do you understand what Ed Gibson's role is?

A    I believe he works for the CBO's office.

THE COURT:  And who is this?

**THE WITNESS:** Ed Gibson, I think the chief business office, I'm not sure. I do know he reports to -- I forgot the gentleman's name, I can see him, he's the finance guy for the City. I can't recall his name at that time.

**BY MR. UMHOFER:**

Q    Would it be Matt Sabo?

Q    Yes, Matt Sabo.

Q    By the way, do you know whether Mayor Bass is on the LAHSA Commission?

A    Yes.

Q    Is she?

A    Yes, she is.

Q    So -- and two days after you made that statement to Mr. Gibson about the data you were terminated?

A    Yes.

Q    How many years did you spend working with data related to homelessness at LAHSA?

A    Three years.

Q    And based on that experience, do you believe that the data system concerning homelessness is broken?

A    Yes.

**MS. KAOUNIS:** Objection, relevance, also calls for a legal conclusion.

**THE COURT:** Well, it's too broad. I want to hear that broken down if I'm going to allow that opinion and I'm

Vaughn Henry - Direct / By Mr. Umhofer                     **129**

going to start with the questions concerning the Road Map agreement, and if so, why and LA Alliance, if so why.  So sustained.

            **MR. UMHOFER:**  Let me try to break that down, Your Honor.

            **THE COURT:**  All right.

**BY MR. UMHOFER:**

Q    Do you have concerns about the ability of the data management system at LAHSA to accurately count the number of beds and individuals who are related to the City's and the County's homelessness efforts?

            **MS. KAOUNIS:**  Objection, relevance, also vague to as to what's data.

            **THE COURT:**  I'm going to have you break that down, counsel.  I want to know specifically if this is an opinion she's going to cast concerning the Road Map agreement or the LA Alliance agreement.  So I'm going to sustain the objection.

Q    Let's start with the LA Alliance.  Do you understand that the City has reporting obligations related to how many beds they've created under the LA Alliance agreement?

            **MS. KAOUNIS:**  Objection, vague as to --

            **THE WITNESS:**  Yes.

            **MS. KAOUNIS:**  -- foundation.

            **THE COURT:**  Overruled.  You can answer that question.

Q    And do you have concerns about the ability of LAHSA to

Vaughn Henry - Direct / By Mr. Umhofer                    **130**

produce accurate data like that?

MS. KAOUNIS:  Objection, relevance.

THE COURT:  Overruled, you can answer that question.

THE WITNESS:  Yes.

BY MR. UMHOFER:

Q    And what are those concerns?

A    The concerns you can, you know, look at an audit that was done by the controller Mejia's office in 2024.  Where it was identified that we were not tracking the number of beds accurately in the HMIS system.  And so there's that issue.

And then from a data quality perspective we never really finalized the data quality team within LAHSA.  So you have individuals that are charged with reviewing data, that I mean, nothing disrespectful about the individuals, but they don't have the skills on how to do that.

So you're looking at a piece of paper and someone tells you there's 15 beds, you know, how do you go back into the system and actually track those 15 beds?  I mean, that step is missing.  So you have individuals making arbitrary decisions that, yes, 15 beds exist, so who's going to challenge that there's 15 beds.

MS. KAOUNIS:  Your Honor, I'm going to move to strike that as irrelevant, lacks foundation, and non-responsive to the question.

THE COURT:  Overruled.

EXCEPTIONAL REPORTING SERVICES, INC

MS. KAOUNIS:  Also speculation.

THE COURT:  Overruled.

BY MR. UMHOFER:

Q    Do you have concerns that the data infrastructure does not exist at LAHSA to accurately report beds and people served under the LA Alliance agreement?

A    Yes.

MS. KAOUNIS:  Objection, vague, as to data.

THE COURT:  Overruled.

Q    And your answer was yes.  What are those concerns about the data infrastructure?

A    The way that -- I'll try not to get too technical.  When LAHSA's issued programs, for instance, when Measure H came about several different programs came, you know, with that, same thing with when the City -- you know, the Road Map project.  Everyone said, yes, we can do this work, but the reality at the end of the day we didn't have the data infrastructure set up.

I mean, if you want to call Excel spreadsheets, you know, part of a data infrastructure great, but we didn't have a data warehouse, we didn't have data marts, we didn't have -- you know, now everyone's using Snowflake, it's just another data Cloud, we didn't have any of those foundational things that are so important to have, you know, when you're doing the data especially on this magnitude.

Vaughn Henry - Direct / By Mr. Umhofer                    **132**

I mean, good example, you know, I don't want to segway too off but when I came to LAHSA and saw we were doing homeless count, it's all on paper.  And then when I try to automate that, you know, I know a lot of citizens pushed back, but to me that was an accurate count, yes, the numbers went up, but the reality is, I stood by that data because I knew it was right.

Can I say that this year?  That's a whole different conversation.  But in terms of having the foundational systems to manage data for an organization that's been in existence for 25 years it just does not exist.  And what you have now I call it smoke and mirrors.

**MS. KAOUNIS:**  Objection, Your Honor, I want to move to strike that entire response.  The witness does not have information or foundation to testify as to the data after it was no longer something she was looking after, and certainly not after she left LAHSA.  Also it purports to provide an expert opinion.  She's not been qualified as an expert here.

**THE COURT:**  Overruled.

BY MR. UMHOFER:

Q    Now, were you involved -- you mentioned that this year is a different story.  What did you mean by that?

**MS. KAOUNIS:**  Objection, foundation.

**THE COURT:**  Well, what -- when were you terminated, what date so I know.

**THE WITNESS:**  February 1st after the homeless count,

Vaughn Henry - Direct / By Mr. Umhofer    **133**

after we completed.

THE COURT:  Of 2025?

THE WITNESS:  I'm sorry, 2024.  My apologies.

THE COURT:  Of 2024.

THE WITNESS:  Yes.

THE COURT:  And you're asking about this year.

Sustained.

**BY MR. UMHOFER:**

Q    Yeah, I'm just asking by what you meant by this year?  So did you mean 2025?

A    2025.

Q    2025.

MS. KAOUNIS:  Objection.

THE COURT:  Well, just a moment, is she casting an opinion about 2025 when she's not employed?

MR. UMHOFER:  I'm going to try to lay a foundation, Your Honor.

THE COURT:  I'm going to sustain the objection.

MR. UMHOFER:  Okay.

Q    What is your visibility into the 2025, the homelessness count that came out in 2025?

MS. KAOUNIS:  Objection, calls for speculation, foundation.

THE COURT:  I don't understand the question, counsel.

Q    What information do you have concerning or what access do

EXCEPTIONAL REPORTING SERVICES, INC

Vaughn Henry - Direct / By Mr. Umhofer                **134**

you have to data concerning the count, the homelessness count that came out in 2025?

THE COURT:  Just a moment.  Between 2024 and 2025?

MR. UMHOFER:  Yes.  I'm talking about the pit count that came out in 2025 and I'm asking her now --

THE COURT:  Compared to what?

MR. UMHOFER:  Just that, just that.  I'm asking her what information she has --

THE COURT:  Just what information she's -- okay.

BY MR. UMHOFER:

Q   So what access to information about the 2025 -- the pit count that came out in 2025 do you have if you were not employed at LAHSA since 2024?

THE COURT:  You can answer that question.

THE WITNESS:  I can?

THE COURT:  Yes, you may.

MS. KAOUNIS:  I want to object for the record, Your Honor, lack of foundation, also vague as to data.

THE COURT:  Overruled, we're about to find out what this foundation is, if there is any.

THE WITNESS:  The information I have just staff, their concerns about how the data was being compiled.

MS. KAOUNIS:  Move to strike as hearsay.

THE COURT:  Yeah, I'm going to strike that counsel.

THE WITNESS:  Okay.

THE COURT:  In other words, I want to be sure. You're not employed in 2025; is that correct?

THE WITNESS:  I'm referring to this year's, yes.

THE COURT:  Okay.  So if you're asked questions about 2025, you'd be relying upon information from potentially staff or other people you've talked to.

THE WITNESS:  Correct.

THE COURT:  You're not getting LAHSA data from 2025?

THE WITNESS:  No.

THE COURT:  Objection sustained.

MR. UMHOFER:  Your Honor, are the hearsay rules applicable to this hearing?

THE COURT:  I'm sorry?

MR. UMHOFER:  Are the hearsay rules applicable to this hearing, I'm just --

THE COURT:  Put it this way, I want to make sure there's a foundation.  So the foundation rules are certainly applicable and hearsay rules can be, but a lot of this goes to her state of mind.  Okay?

MR. UMHOFER:  Understood.

THE COURT:  And if the questions are directed towards inaccurate data in LA Alliance or the Road Map agreement when she was employed, then those questions are relevant.

BY MR. UMHOFER:

Q    Do you have the same concerns that you articulated about

the LA Alliance data about the Road Map data as well?

        **MS. KAOUNIS:**  Objection, relevance, foundation, vague as to time.

        **THE COURT:**  Overruled.  You can answer that question.

        **THE WITNESS:**  Yes, I do.

        **THE COURT:**  Well, if they don't ask it, I'm going to. Why?

        **MS. KAOUNIS:**  Objection to relevance, Your Honor.

        **THE COURT:**  Overruled.  Why?

        **THE WITNESS:**  Because the way the data is being reported and how it should be reported is still not remedied.

        **THE COURT:**  What do you mean remedied?

        **MS. KAOUNIS:**  Objection, Your Honor, relevance.

        **THE COURT:**  Overruled.  What do you mean remedied?

        **THE WITNESS:**  In terms of how do you identify the individuals correctly in the HMIS system, which is the Homeless Management Information System, how the individuals that are entitled to those beds, how are they being identified and reported on.

        **MS. KAOUNIS:**  Your Honor, I'm going to move to strike that.  Your Honor ruled that this witness didn't have foundation after she was terminated and she's testifying about what the state of the data is today.

        **THE COURT:**  Overruled, you were employed during the Road Map agreement for a substantial period of time.

THE WITNESS:  Yes.

THE COURT:  All right.  And so -- and those reports, you know, come to the Court --

THE WITNESS:  Yes.

THE COURT:  -- from LAHSA and from the City.

THE WITNESS:  Uh-huh.

THE COURT:  All right.  Counsel.

BY MR. UMHOFER:

Q   Are you concerned, based on everything you've testified to that the data system that under -- that leads to the public reporting and reporting to the Court of LA Alliance and Road Map data is broken?

MS. KAOUNIS:  Objection, Your Honor, relevance --

THE COURT:  Yeah, that --

MS. KAOUNIS:  -- foundation.

THE COURT:  We're going to spare you answering that question, that's pretty broad, okay, on that determination or not.  All right.  Counsel, thank you.

Q   Last one, do you have any -- do you have similar concerns with the data supporting public reporting of Inside Safe beds?

MS. KAOUNIS:  Objection, relevance, foundation, vague as to time.

THE COURT:  Yeah, I want to hear more foundation concerning Inside Safe.

MR. UMHOFER:  All right.

Q    Were you --

        THE COURT:  Whether she was aware of these numbers, et cetera.

Q    Were you involved in managing data related to the Inside Safe program?

        MS. KAOUNIS:  Vague as to time, objection.

        THE COURT:  Overruled.

        THE WITNESS:  Yes, I was.

Q    During what time period?

A    When the program started in December 2023 is when we got wind of Inside Safe was coming from the City with Dr. Adams Kellum and her team.  So I was charged with putting together my team, while we were having conversations with the City on how we were going to fund this program, how we were going -- which providers were going to be part of the Inside Safe initiative, which motels, how are we going to identify, you know, the providers, how are we going to identify training.

     And we started creating -- it's called a program within the HMIS, which is the Homeless Management Information System. We were building a program in that system and then, because we felt this was a source of truth because this is the data that impacts everyone that's experiencing unsheltered and sheltered homelessness.

     And then it was reported.  I was told that we were going to start tracking the data on Excel spreadsheets and not within

the HMIS system.

MS. KAOUNIS: I'm going to move to strike as non-responsive, also to the extent she's quoting others who are in the courtroom is hearsay.

THE COURT: Overruled.

**BY MR. UMHOFER:**

Q    And was the public reporting on the Inside Safe beds based on that source of truth you just referenced?

A    The first set of reports that were under my domain, yes.

Q    And when did that change?

A    That changed after the meeting with council member Blumenfeld the day I went to City Council to present on the state of Inside Safe from a funding and a data perspective.

Q    You --

MS. KAOUNIS: I move to strike as lack of foundation and non-responsive.

THE COURT: Overruled.

Q    You mentioned there was an inflection in that data after that point, correct?

A    Uh-huh, yes.

Q    Was that an inflection downward or an inflection upward?

A    An inflection upward.

THE COURT: Overruled.  What was your answer?

THE WITNESS: Yes, there was an inflection upward in the data.

Vaughn Henry - Direct / By Mr. Umhofer                    **140**

**BY MR. UMHOFER:**

Q     What do you mean by upward?

A     The amount of individuals served increased dramatically.

Q     From when?

A     From a month before to when we looked at the report, I produced the report at the council meeting and I would say after, January 2024, during that time period, the numbers started increasing.

          **MR. UMHOFER:**  No further questions at this time, Your Honor.

          **THE COURT:**  Do you want to break for lunch to prepare cross-examination as a courtesy so you're fresh?

          **MS. KAOUNIS:**  We can go on.

          **THE COURT:**  Then is one hour acceptable for everyone? Good.  I see the enthusiasm.  Then we'll come back at -- well, let's just make it a quarter after 1.  Okay?

          **MR. MCRAE:**  Your Honor, is the witness under an instruction since the witness has been tendered not to talk to plaintiffs' --

          **THE COURT:**  If you request it, she will be.

          **MR. MCRAE:**  I would request it.

          **THE COURT:**  During this interim period of time, you've probably met with the plaintiffs before --

          **THE WITNESS:**  Uh-huh.

          **THE COURT:**  -- in preparation for your testimony, but

I want to make certain that you do not speak to them during the lunch hour.

THE WITNESS:  Okay.

THE COURT:  That way in cross-examination there's an opportunity --

THE WITNESS:  Okay.

THE COURT:  -- without.  Okay?

THE WITNESS:  Yes.

THE COURT:  All right.  Thank you very much.  We'll see you at 1:15.

MR. MCRAE:  Are we in recess, Your Honor?

THE COURT:  Please.  I'm not capturing you, so go have a nice lunch.

(Recessed at 12:08 p.m.; reconvened at 1:20 p.m.)

THE COURT:  Thank you.  If you'd summon the witness, please, so she could retake the stand.  Counsel, if you'd summon the witness so she could retake the stand.

Thank you very much.  If you'd retake the witness stand, please.

(Witness Emily Vaughn Henry retakes the stand.)

Now, once again, do you have an agreement; is Ms. Myers going to -- counsel Shayla Myers, are you going to conduct any examination or reserve?

MS. MYERS:  Reserve, Your Honor.  Thank you.

THE COURT:  All right.  Then as a courtesy, please,

Vaughn Henry - Cross / By Ms. Kaounis                    **142**

back to the City for cross examination.

       **MS. KAOUNIS:**  Thank you, Your Honor.  And I just wanted to do some (inaudible) --

       **THE COURT:**  I can't hear, counsel.  I'm sorry.

       **MS. KAOUNIS:**  I wanted to introduce one new member of my team that's also sitting at counsel's table.  Daniel Willey is sitting (inaudible) --

       **THE COURT:**  Welcome.  More than happy to have you here.  Thank you.

    **(Pause)**

                   **CROSS EXAMINATION**

**BY MS. KAOUNIS:**

Q    Ms. Vaughn Henry, you were terminated from your employment at LAHSA in February of 2024, correct?

A    Yes.

Q    And your lawyer sent a letter to LAHSA after that point in time, correct?

A    Yes.

Q    And you haven't been employed by LAHSA since February of 2024, right?

A    Yes.

Q    And you were never employed by the City of Los Angeles, correct?

A    No.

Q    And in the letter that your lawyer sent to LAHSA, it gives

Vaughn Henry - Cross / By Ms. Kaounis **143**

reasons for termination; do you recall that?

A    Yes.

Q    Okay.  And among those reasons that your lawyer listed were ongoing concerns regarding your leadership, performance, and failure to meet LAHSA's standards of professional conduct and behavior; you recall that?

A    I do.

Q    Okay.  And the reasons given also included inappropriate behavior and communication with staff and division leadership, including erratic behavior, lack of communication, and demoralization of staff with poor leadership skills; do you recall that as well?

A    That was hearsay.

        **THE COURT:**  Overruled.

Q    Do you recall that, ma'am?

A    I do.

Q    And it also included ongoing issues with data management, correct?

A    Yes.

Q    Okay.  And the letter was sent to the L.A. City Attorney's office as well, correct?

A    To my knowledge.

Q    And you saw a final version of the letter before it was sent, correct?

A    I believe I did.

Vaughn Henry - Cross / By Ms. Kaounis **144**

Q    And your lawyer had authorization to send that letter on your behalf, correct?

A    I -- yes.

Q    And in that letter you demanded a payment of $3.5 million; is that right?

A    Yes.

Q    And you ultimately settled the claim with LAHSA; is that correct?

A    That is correct.

Q    And you settled it for a very small portion of that demand, correct?

A    That was based on mutually negotiations, yes.

Q    And in the letter, your lawyer claimed that LAHSA hadn't produced data to the City; do you recall that?

A    Can you repeat the question, please?

Q    In your letter, your lawyer claimed that LAHSA hadn't produced data to the City related to the number of claims that were served by Inside Safe, correct?

A    That is correct.

Q    You told L.A. council members that the supposedly unreported data related to when unhoused people exit the Inside Safe program, correct?

A    I do not recall that.

Q    You don't recall telling them that the information related to when somebody exits the program, it may not be the case that

the individual's exit date was accurately reported?

A    I do not recall making that statement.

Q    Your letter to LAHSA intentionally -- well, your letter to LAHSA claims that it didn't intentionally produce the data because the CEO of LAHSA did not want Mayor Bass to look bad; do you recall that?

A    That is correct.

Q    But you had previously told council members in 2023 that the holdup in giving data access was not from LAHSA, correct?

A    I do not recall making that statement, ma'am.

        MS. KAOUNIS:  Do Exhibit 7.  I want to introduce a August 3rd, 2023 article entitled "Horrifying Homeless Service Data Problems."  This is something that reports your statements to the council.  See if it refreshes your recollection.

        THE COURT:  You can approach, counsel, if you want to give that to her.

        MR. UMHOFER:  I need to see it.

        MS. KAOUNIS:  Yeah.  I'm going to be (inaudible) --

        MR. UMHOFER:  Thank you.

    (Pause)

        THE COURT:  Thank you very much.  I appreciate it.

BY MS. KAOUNIS:

Q    Have you seen this article before, Ms. Vaughn?

A    I do not recall, but I'm reading it right now.

Q    I want to direct your attention to page seven in the

Vaughn Henry - Cross / By Ms. Kaounis                    **146**

middle.  You'll see there's a reference to yourself.  See where

it says Vaughn Henry, the LAHSA official, responded that the

holdup in giving data access is not from LAHSA; do you see

that?

A    I'm reading it.  I do not recall making that statement but

I'm reading what you said here.

Q    You have no reason to believe that the press reported that

inaccurately, correct?

A    I do not recall speaking to the press on this matter

either.

Q    Okay.  You have no reason to recall that they reported it

inaccurately, correct?

A    No, I do not.

     **(Pause)**

Q    You wouldn't have misstated the facts to the city council

as reported in this article, correct?

          **MR. UMHOFER:**  Objection.  Assumes facts regarding

what is reported in the article as accurate.

          **THE COURT:**  I'm sorry, I couldn't hear.

          **MR. UMHOFER:**  Objection, assumes facts that the facts

reported in the article are accurate.

          **THE COURT:**  Overruled.  You can answer.

          **THE WITNESS:**  Can you repeat your question again,

ma'am?

//

**BY MS. KAOUNIS:**

Q    You would not have misstated the facts to the city council when you reported them, correct?

A    I mean, this article's not -- isn't referencing Inside Safe, it doesn't articulate what data this is, you know, being attributed to.  If it's, you know, it's not clear.

Q    Do you recall reporting about any other data at the time?

A    Yeah.  We report on data, we report on homeless, you know, data.  We also report on data by council districts in terms of the number of people that are served by each council districts on a monthly basis.

Q    To clarify for the record, I'm talking about this particular article.  You don't recall speaking about different data at this time, correct?

A    Yeah.  It's very vague.  It's not clear specifically which type of data.  It says raw data, --

Q    And --

A    -- access to raw data.  That could be access to homeless services raw data around the pit count.

Q    And to the extent it is talking about Inside Safe, you agree that you wouldn't have misstated the facts to the city council as reported in this article, correct?

A    I would never misstate facts to anyone.

Q    You reported -- well, take a step back.  You were aware of the data issues that you testified about earlier at least by

Q   -1 2023; is that correct?

A     Q-1, is that fiscal year or calendar year?

Q     Calendar year.

A     Q-1 of 2023, what specific data are you referring to?

Q     The Inside Safe data.

A     Yes.

Q     Okay.  So you were aware that you had data concerns in Q-1 2023, correct?

A     Yes.  And those were identified during a council meeting because the way the -- we did not have enough information on how the Inside Safe program should be structured.

Q     Which council meeting are you referring to?

A     The one you quoted in this article.

Q     So you claim that LAHSA did not report accurate data to the City as late as January 31st, 2024, right?

A     That is not what I stated.

Q     That's not what you stated earlier.

A     What I -- can you repeat what -- can you repeat the question, please?

Q     You claimed that LAHSA did not report accurate data to the City as late as January 31st, 2024, correct?

A     That is correct because I was removed from providing data on Inside Safe.

Q     But during the time, you reported the Inside Safe bed data yourself, you stand by the data, correct?

A    Because the data that I reported, I stand by it, and it was accurate.  The data that was produced after that council meeting when I was removed from producing that data, no, I do not stand by the accuracy of it.

Q    Let's just make sure that the timeline is clear here.  You testified that you reported the data to the City in 2023, correct?

A    Approximately, yes.

Q    Okay.  And --

A    That's when the program was starting up.

Q    And you testified that that data that you reported was correct, --

A    Yes.

Q    -- right?  And you testified that at some point you were removed from reporting that data, correct?

A    Yes.

Q    And that time period was after you had a conversation with councilman Blumenthal, correct?

A    That was at a council meeting.

Q    Okay.  And that council meeting took place in January, 2024, did it not?

A    I cannot recall the timeframe.

Q    Okay.  So you don't recall meeting with --

A    Because it does -- the article does -- it does not say 2024.  It says May of 2023 was when I attended a budget

Vaughn Henry - Cross / By Ms. Kaounis                    **150**

meeting.

Q    To be clear, you had a meeting with Councilman Blumenthal in January, 2024 to give an update on the number of census tracks for the homeless count, correct?

A    That is correct.

Q    Okay.  So was it after that meeting that you were removed?

A    The meeting that we had was a general, a public city council meeting just for clarity.  And after we had a meeting talking about the census track so I'm trying to recall.  I'm trying to follow your sequence of questioning specific to data.

So the meeting I had with Councilman Blumenfeld in 2024, that is correct.

Q    And you were removed from overseeing the Inside Safe data after that meeting in January, 2024.

A    No, that occurred prior, ma'am.  So the Inside Safe program started in 2023 and then in 2024 time period.  And so because I left LAHSA in 2024.  So Inside Safe started prior to that.

Q    Correct.  And for --

A    Okay.

Q    -- the time period that you were overseeing Inside --

A    Yes.

Q    -- Safe, you have stated under oath that you stood by the data, correct?

A    The data I produced, correct.

Vaughn Henry - Cross / By Ms. Kaounis                **151**

Q    Right.  And you produced that data through at least August of 2023.

A    Correct.

Q    Correct.  And so from August, 2023 to the time that you were terminated in February of 2024, there were how many reports of data to the City Attorney's office --

A    I cannot --

Q    -- for Inside Safe?

A    -- recall.  There's -- we would produce several sleeves of data for the City of LA.

Q    So you don't recall that it was produced quarterly.

A    I -- not to my knowledge --

Q    And you're not aware --

A    -- I can't recall, now.

Q    -- when it was produced.

A    I am aware when it was.  I just don't remember the frequency.  I knew every week we would provide update on Inside Safe to all of the council members' offices.

Q    And are you aware of when the City Attorney's office had a reporting obligation with respect to the settlement in this case?

A    All I was asked to was to provide the report that I did to Gibson in January of 2024 regarding the roadmap.  And I clearly articulated that the data was missing because we weren't tracking the individuals correctly in HMIS.

Q    So --

A    And that was in 2024.

Q    So to be clear, from the time period that you stopped overseeing the data in August of 2023 until February, 2024, you don't know what happened with the data, correct?

A    All I knew was the data was being produced by Bevin to the City council without me vetting the data or quantifying and saying this date is actually correct; never produced the source of truth, where was she collecting this data from, beside Excel spreadsheets from the agency providers.

Q    Right.  It wasn't your responsibility at that point, correct?

A    I mean, I had oversight of the department.  But at the time I was removed from reviewing her work, so Rachel Johnson and Dr. Adams Kellum were the ones reviewing her body of work.

Q    Right.  You never reviewed any of those reports that went over --

A    I would see the --

Q    -- to the City Attorney's office.

A    -- reports after they were published, and then I would question them.

Q    Did you ever audit any of the reports?

A    I am not an auditor.  The audit that did take place was by Kenneth Mejia's office on the number of beds regarding specifically to the road -- the specific lead to the report

we're asking about today pertaining to the Alliance, yes.

Q    To be clear, you never personally audited any of the numbers that you're calling into question today.  And, in fact, you never saw the information before it was produced, correct?

A    Some of the information was shared with me.  But I never audited some of the reports.

Staff would question me, say, Emily, this doesn't look right.  But I would -- but then the reports were already sent back, already sent to the requester.

MS. KAOUNIS:  Move to strike as nonresponsive, Your Honor.  Also hearsay.

THE COURT:  (Inaudible) the objection.

MR. UMHOFER:  Objection, no basis to --

THE COURT:  I'm -- who made the objection.  I couldn't hear.

MR. UMHOFER:  Objection, --

MS. KAOUNIS:  I moved to strike her testimony --

THE COURT:  No.  The answer --

MS. KAOUNIS:  -- as nonresponsive --

THE COURT:  The answer --

MS. KAOUNIS:  -- and hearsay.

THE COURT:  The answer remains, counsel.

**(Pause)**

//

//

BY MS. KAOUNIS:

Q    The supposedly inaccurate data that related to Inside Safe was when unhoused people exit the system, correct?

A    When unhoused -- also people that are being brought in from encampments into the Inside Safe program.

Q    Your concern, as I understand was -- as articulated, was that the City was supposedly paying for empty motel rooms after persons had exited the hotels; is that correct?

A    That is the report I provided to Councilmember Blumenfeld that hotels were being -- motels, hotel owners are being paid for rooms that were vacant.

Q    And you don't know exactly how many beds were impacted by the supposed inaccuracies, correct?

A    Because we weren't tracking it correctly.  They were not being tracked correctly.

Q    Can I have an answer to my question, please?  You don't know how many beds were actually impacted by the supposed inaccuracy, correct?

A    We were charged with, I believe at the time, a little over 2,000 beds were paid for but less than 2,000 individuals had occupied those beds.

Q    Madam, can I have an answer to my question, please?  You don't know the number of beds that were impacted by (inaudible) --

A    I cannot recall the number of beds that were impacted.

Vaughn Henry - Cross / By Ms. Kaounis                    **155**

Q    Did you ever know the number --

A    Yes, I did.  But I can --

Q    -- of beds that were impacted?

A    -- not recall the number of beds at this time that were impacted.

Q    How would you know the number of -- well, strike that.

    You never went to the motels to confirm their records against what was being reported, correct?

A    No.  That's what the auditors are for.

Q    And you didn't conduct any audit yourself.

A    No, I did not.

Q    And --

A    But we knew how much money motels and hotels were being paid because we received the report from the City.

        **MS. KAOUNIS:**  Move to strike the last part of nonresponsive.

Q    So what you're saying --

        **THE COURT:**  Overruled.

**BY MS. KAOUNIS:**

Q    -- is that some number of beds may have been occupied when a person had already left the Inside Safe program, correct?

A    If I understood your question correctly, your -- what you -- what I heard you say is some beds may have been occupied, but the person would have already left; is that what you're saying?

**EXCEPTIONAL REPORTING SERVICES, INC**

Vaughn Henry - Cross / By Ms. Kaounis                    **156**

Q    Some beds may have been reported as occupied when the person had already left.

A    That is correct.

Q    Okay.  And the Inside Safe beds, only a portion of the total beds reported with respect to bed availability, correct?

A    Correct.

Q    And you don't know what portion that is, correct?

A    Because the data was not available and we were being asked to report something that there is no data for.

Q    You don't know the number of beds that it -- the number of beds that Inside Safe makes up with respect to the total available bed population, correct?

A    I cannot recall at this time.

Q    You know the difference between -- you know that an available bed is different than an occupied bed, correct?

A    Correct.

Q    So regardless of whether the data shows that someone left the Inside Safe program, that accuracy wouldn't affect whether or not the number of beds created was pursuant to the settlement agreement or not, correct?

A    I cannot recall.

Q    Well, if a bed that is -- you agree that a bed that is available is different than a bed that is actually occupied, correct?

A    Correct.

Vaughn Henry - Cross / By Ms. Kaounis        **157**

Q    Okay.  The data issues -- you referred to previously a report by Kenneth Mejia, the City Controller; do you recall that?

A    Yes.

Q    Okay.  That report related to LAHSA data, correct?

A    Yes.

Q    And the findings in that report were specific to LAHSA, correct?

A    Correct.

Q    And you understood that LAHSA is not a party to the settlement agreement between the City and the Plaintiffs here, correct?

A    Correct.

Q    And you understand that one of the findings in the controller's report was that some shelters had been inaccurately reporting bed utilization, correct?

A    Correct.

Q    And that report provided recommendations, correct?

A    To my knowledge, correct.

Q    And those recommendations related to what LAHSA should do with respect to reporting, correct?

A    I cannot recall at this time what the specific reports -- what the pacific (sic) recommendations were for improvement.

Q    You understood, though, that it was an audit of LAHSA, correct?

Vaughn Henry - Cross / By Ms. Kaounis                   **158**

A     That it was an audit of LAHSA, yes.

Q     Okay.  And you don't know based on that report what number of beds was impacted by the alleged data management issues with respect to Inside Safe, correct?

A     I cannot recall at this time.

Q     And you don't know if the audit report even uses the word "bed," right?

A     I cannot recall at this time but I'm pretty confident it does say the word beds.

Q     And you also don't know whether the report actually uses the word Inside Safe, or the term Inside Safe, correct?

A     I cannot recall that at this time.

Q     And you don't know whether the report uses the term "housing," right?

A     I cannot recall.

Q     And you don't know whether the report uses the term "hotel," right?

A     I cannot recall at this time.

Q     You don't know whether the report uses the term "motel," correct?

A     I cannot recall at this time.

Q     And just to be clear, even if you knew the number of beds that were impacted by the data reporting issues that you claim relate to occupancy, that would not affect the number of beds the City was required to make available under the settlement

Vaughn Henry - Redirect / By Mr. Umhofer                    **159**

agreement, correct?

A    I cannot recall at this time.

**(Pause)**

         **MS. KAOUNIS:**  That's all I have for this witness,
Your Honor.

         **THE COURT:**  All right.  Thank you.

         **MS. KAOUNIS:**  Thank you.

         **THE COURT:**  Redirect.

                         **REDIRECT EXAMINATION**

**BY MR. UMHOFER:**

Q    Ms. Henry, do you have exhibit I believe it's --

         **MR. UMHOFER:**  I'm not sure, what is the exhibit
number on this, 70?

         **MS. KAOUNIS:**  It was an impeachment exhibit.  I don't
think we have (inaudible) --

         **MR. UMHOFER:**  Okay.

         **MS. KAOUNIS:**  -- number so --

         **MR. UMHOFER:**  No problem.

**BY MR. UMHOFER:**

Q    Do we -- do you have that article in front of you?

A    Yes, I do.

Q    Okay.  Can you turn to page -- there's page numbers on the
lower righthand corner.  Could you turn to page three?  And
could you read to yourself that page just to refresh your
recollection around this?

Vaughn Henry - Redirect / By Mr. Umhofer            **160**

     (Pause)

A    Yes.

Q    Now, is this the meeting where you gave Mr. Blumenfeld, Councilmember Blumenfeld data, and he said it wasn't pretty enough?

A    That is correct.

          **THE COURT:**  I'm sorry, I can't hear the objection.  I think somebody objected but I --

          **MS. KAOUNIS:**  Objection, foundation.

          **THE COURT:**  Overruled.

          **MR. UMHOFER:**  Now --

          **THE COURT:**  And pull that microphone, counsel, just a little closer.

          **MS. KAOUNIS:**  Yeah.

          **THE COURT:**  Yeah.  Thank you.  I appreciate it.

**BY MR. UMHOFER:**

Q    Do you remember councilmen -- Councilmember Blumenfeld saying that's horrifying at that meeting?

A    Yes, I do.

          **MS. KAOUNIS:**  Objection, foundation.

          **THE COURT:**  Overruled.

Q    And was the subject of the that's horrifying content -- comment the fact that they were missing datapoints about people who leave Inside Safe shelter programs?

          **MS. KAOUNIS:**  Objection, hearsay, yeah, foundation.

Vaughn Henry - Redirect / By Mr. Umhofer                    **161**

THE COURT:  Overruled.

BY MR. UMHOFER:

A    Yes, that is correct.

Q    And so what was the concern about missing datapoints for people leaving Inside Safe that you spoke about during that meeting?

MS. KAOUNIS:  Objection, foundation.  She testified she didn't remember.

Q    Do you recall what you said about Inside Safe and missing datapoints about people who leave the system during this meeting?

A    Because there is a motel, hotels were being paid.  When individuals left the hotels, they weren't not being tracked into the HMIS system, so there is no way of saying to stop paying for Emily because she's left this room.

So the City was continuously paying for individuals that had already exited the system, which is what I articulated during that meeting.

Q    So the City's paying for empty beds.

A    Correct.

Q    And that's what Councilmember Blumenfeld said was horrifying, correct?

A    Correct.

MS. KAOUNIS:  Objection, hearsay.

THE COURT:  Overruled.

EXCEPTIONAL REPORTING SERVICES, INC

Vaughn Henry - Redirect / By Mr. Umhofer          **162**

**BY MR. UMHOFER:**

Q   Do you recall Councilmember Marqueece Harris-Dawson saying it's -- it feels like we're flying blind with people's money --

        **MS. KAOUNIS:**  Objection, hearsay.

Q    -- during that meeting?

        **MS. KAOUNIS:**  Outside the scope.

        **THE COURT:**  Overruled.

**BY MS. KAOUNIS:**

A    Yes, that is correct.

Q    Do you recall Councilmember Rodriguez saying get me off this merry-go-round from Hell during that meeting?

        **MS. KAOUNIS:**  Objection, hearsay, --

A    Yes.

        **MS. KAOUNIS:**   -- outside the scope.

        **THE COURT:**  Overruled.

**BY MR. UMHOFER:**

Q    Now let's go to page six.  Do you recall there being a discussion at that same meeting around councilmembers' direct access to LAHSA's data?

A    Yes.

        **MS. KAOUNIS:**  Objection, outside the scope.

        **THE COURT:**   Overruled.

**BY MR. UMHOFER:**

Q    And when, on page seven, you talked about the holdup giving data access is not from LAHSA but LA's continue of care

**EXCEPTIONAL REPORTING SERVICES, INC**

Vaughn Henry - Redirect / By Mr. Umhofer     **163**

board (sic), you're talking about that direct -- councilmember direct access to LAHSA's data, correct?

A     Correct.

MS. KAOUNIS:  Objection, leading.

Q     Were you talking --

THE COURT:  That is -- sustained.  That is leading, counsel.

**BY MR. UMHOFER:**

Q     What were you talking about when you talked about giving data access not being the -- LAHSA not being the problem but LA's continue of care board being --

MS. KAOUNIS:  Objection, lacks foundation.

THE COURT:  Overruled.

**BY MR. UMHOFER:**

A     The joint effort between the City and County was made prior to the new leadership.  We were trying to give councilmember and city employees access -- minimal read-only access to HMIS where PII and PHI and HIPAA data would not be -- we wouldn't be violating the rights of individuals that are in the HMIS system.

And we came up with a policy which is vetted by City and the County.  We agreed what type of access we would be providing to council offices.

However, there's a Continuum of Care Board that has to review every policy as it pertains to the homeless management

Vaughn Henry - Redirect / By Mr. Umhofer                **164**

information system specific to access.

And so the holdup was from that Continuum of Care Board where they had issues with giving access to council offices and various city departments and the county.

        **MS. KAOUNIS:**  Objection, --

Q    Is that --

        **MS. KAOUNIS:**  -- legal conclusion.

        **THE COURT:**  Overruled.

**BY MR. UMHOFER:**

Q    Is that issue about data access for councilmembers different from the data issue regarding Inside Safe participants leaving motels and the City still paying for them?

A    Yes.

Q    Were you erratic during your time at LAHSA?

A    No.

        **MS. KAOUNIS:**  Objection.

Q    Did you demoralize --

        **THE COURT:**  Overruled.

**BY MR. UMHOFER:**

Q    Did you demoralize people during your time at LAHSA?

A    No.

Q    How much money did you end up getting in settlement with the City?

A    Believe it was about $210,000.

Q    The City paid you --

Vaughn Henry - Redirect / By Mr. Umhofer                    **165**

A     Not the City, from LAHSA.

Q     LAHSA.

A     My apologies, not the City.

Q     So LAHSA paid you $210,000 in response to the concerns you raised in that letter.

A     Correct.

          **MR. UMHOFER:**  No further questions at this time.

          **THE COURT:**  Ms. Myers, are you going to have any questions at this time?

          **MS. MYERS:**  No, Your Honor.  I'd like to --

          **THE COURT:**  You could reserve.

          **MS. MYERS:**  Yes, thank you, Your Honor.

          **THE COURT:**  All right.  I'll turn back to the City.

          **MS. SPEAKER:**  Nothing further.

          **THE COURT:**  All right.

          **MR. MCRAE:**  Your Honor, may I ask --

          **THE COURT:**  Please.

          **MR. MCRAE:**  -- your procedurally if one needs to excuse one's self --

          **THE COURT:**  Feel free to go.

          **MR. MCRAE:**  Thank you, Your Honor.

          **THE COURT:**  Are you returning, though?

          **MR. MCRAE:**  I am.

          **THE COURT:**  Okay.

          **(Laughter)**

**166**

THE COURT: (Inaudible) place everyone in a call. I don't know who's returning to testify or not, but we'll be very polite.

I've set aside three weeks for these hearings but I think it will go quicker than that, okay. But I want to be certain.

THE WITNESS: Okay.

But, trust me, if we need you, we'll find you.

THE WITNESS: Okay.

THE COURT: Okay. Thank you very much. You may step down.

**(Witness steps down.)**

Counsel, your next witness, please.

MS. MITCHELL: Your Honor, regarding this witness, just to be clear, we do not have -- she's here by subpoena so we do not have control over her. I certainly have her number and can reach out but --

THE COURT: Who?

MS. MITCHELL: Regarding Ms. Henry. I cannot guarantee Ms. Henry's response --

THE COURT: Oh, she'll respond.

MS. MITCHELL: Okay.

THE COURT: Give them their number and have a good day, okay?

THE WITNESS: Yeah. Okay.

167

(Laughter)

MS. MITCHELL:  Okay.  Thank you.

THE COURT:  She's going to give you both the numbers. We'll resolve that now.

THE WITNESS:  Okay.  Thank you.

MS. MITCHELL:  Thank you.

THE COURT:  Now call the next witness.

MS. MITCHELL:  Thank you, Your Honor.  We have our next witness -- Kevin Call (phonetic) unfortunately had a death in the family and had to leave to go be with family.  So our next witness will be Don Garza.

THE COURT:  Okay.  Please --

MS. MITCHELL:  May I step outside, Your Honor?

THE COURT:  You may.

MS. MITCHELL:  Thank you.

(Pause from 1:51 p.m. to 1:52 p.m.)

THE COURT:  Thank you, sir.  If you'd step forward between the double doors.  Karlen's our clerk -- sir, this way. And if you'll raise your right hand, please.

Karlen, if you'd administer an oath, please.

**DON GARZA, PLAINTIFFS' WITNESS, SWORN**

THE COURT:  Thank you.  Please take the witness stand, sir.  You can be seated.

MR. SCOLNICK:  And, Your Honor, in the interest of time, can I make a standing relevance objection to this

witness's testimony?

THE COURT: Certainly. And you can also object each time if you care to.

MR. SCOLNICK: Thank you.

THE COURT: Make sure your record's covered, okay?

MR. SCOLNICK: Thank you, Your Honor.

THE COURT: Sir, would you state your full name?

THE WITNESS: Yes. My name is Don Garza.

THE COURT: And would you spell your last name?

THE WITNESS: G-A-R-Z-A.

THE COURT: Now, counsel, let me -- all parties know. And I don't know if you folks from Gibson and Dunn know this.

But I was introduced to Don Garza through General Jeff (phonetic) three or four years ago, so I've known him on the street. I've been down to skid row numerous occasions. He's one of the many people on the street who I have met.

Also, I disclosed to you that during the fires, that skid row actually collected 18,000 kits, you know, those masks, those -- and there was a concern that a lot of us had about the veterans over on the west side of LA.

One of the wonderful stories about this City that I just want to share with all of you and pride -- that we could take pride in is that those masks were distributed first to folks on skid row because of the hazard.

And this came from a private organization. It did

Garza - Direct / By Ms. Mitchell                    **169**

not come from the City or the County.

Afterwards, there were about boxes of masks.  The community made the decision to get over to the west side of Los Angeles.  And Don Garza and some other folks literally drove trucks over trying to find veterans and other people on the west side.

I mean, just one of the great stories about this city that we should all take a lot of pride in, that those who sometimes need the most help reached out first with the mask when they had them left over.

That's how I know him, okay?  So I've had numerous occasions with him and I wanted to disclose that with transparency.

And thank you for your efforts on behalf of the homeless veterans, Mr. Garza.

Counsel, --

**MS. MITCHELL:**  Thank you, Your Honor.

**THE COURT:**  -- direct examination.

**MS. MITCHELL:**  Thank you.

**DIRECT EXAMINATION**

BY MS. MITCHELL:

Q   Now, Mr. Garza, you've been attending these hearings for quite some time; is that right?

A    Yes.

Q    And you were in the military; is that correct?

EXCEPTIONAL REPORTING SERVICES, INC

Garza - Direct / By Ms. Mitchell                 **170**

A      Yes.

Q      What branch?

A      The United States Marine Corp.

Q      And at some point were you discharged?

A      Yes.

Q      Were you discharged with full benefits?

A      No, ma'am.

Q      What was the status of your discharge, Mr. Garza?

A      Bad conduct discharge.

Q      And was that related to -- without getting into details to some mental health issues that you had related to your military service?

A      Yes, ma'am.

Q      And at some point after you were discharged did you end up homeless, unsheltered on the street?

A      Yes, ma'am.

Q      And then at some point after that did you move into housing in skid row?

A      Yes, ma'am.

Q      And where are you living currently?

A      I'm living at the Rosslyn Hotel on the corner of Fifth and Main.

Q      And is that considered within the skid row neighborhood?

A      Yes.

Q      And, again, without getting into details to your personal

Garza - Direct / By Ms. Mitchell                    **171**

health history, Mr. Garza, do you have a diagnosed mental health issue resulting from your time in the military?

A    Yes.  I have an award letter from the VA.  Every veteran has the right to file a claim, regardless of discharge of service.  So I did file a claim seeking help.

And, yes, I have a diagnosis of posttraumatic stress disorder.

Q    And do you have a diagnosed physical health issue as well?

A    Yes, ma'am.  I have chronic inflammatory demyelinating polyneuropathy, hypothyroidism, and now I have type two diabetes.

Q    The --

A    And pilonidal cyst.  I should never been in the Marine Corp.  I shouldn't have made it through MEPS.

Q    The Rosslyn Hotel where you currently are, is that -- you said -- is that subsidized housing?

A    For me, it's section 42.  It's low income housing, tax credit housing.  And I pay 35 percent of area median income. So I'm paying over 75 percent of my income on rent.

Q    Do you fear losing your housing?

A    Yes.

        THE COURT:  Would you explain that a little bit further?  I know it's 35 percent of the AMI.  Explain to me the 30 -- 75 percent.

        THE WITNESS:  I only get $1200 a month from social

Garza - Direct / By Ms. Mitchell                    **172**

security disability.

When I served in the military at that time, they were giving extended work credits to those that served in the military.  So when I got out and I sought help at a mental hospital, they applied for SSI for me and I didn't qualify for SSI.  I qualified for social security disability.

So it -- as it stands, I only get $1200 a month.  And my rent right now is -- I don't know if it's 75 percent, I need to recalculate, but it's $601 right now.  So I'm subsisting off of, what, $400 a -- well, 500 with bills (inaudible) 300 bucks every month.

**BY MS. MITCHELL:**

Q    I may have asked this question.  Do you fear losing your housing?

A    Yes, I do.

Q    And what would happen if you lost your housing, Mr. Garza?

A    I'd wind up in the street.

Q    Are you active in the skid row community?

A    At this time, I mean, I do what I can.  Right now I'm focusing on mainly my health.  I go to the gym.  I do sauna for therapy and to help with my physical ailments so I don't get cramps too much at night.

I wish I could do more.  I used to do so much.

Q    And you have been a resident in the area for 25 years; is that right?

A    Yes.

Q    And for those of you who may not know or who may be reading the record later, what is skid row?

     **(Pause)**

A    I'm under oath, aren't I?

Q    You are.  Would you like some water?

A    Yes, ma'am.  Get some water.  I'm dried up.

          **THE COURT:**  You know, we may not have water in there. Karlen, do we have some water?  Yeah.  Thank you very much.

          **MS. SPEAKER:**  May I approach (inaudible)?

          **THE COURT:**  Sure.

          **THE WITNESS:**  Wasn't expecting this.  Thank you.

**BY MS. MITCHELL:**

A    What is skid row?  Skid row is where people go to die. That's what skid row is.

     Some of us don't, we refuse to.  Others don't make it. The only way you get out the skid -- out of skid row is if you actually choose or you die.  That's what it is.

Q    How would you describe daily life in skid row right now?

A    I got there in 1999, and it was skid row.  And a lot of people are telling me, when you go down to Fifth and Main that it doesn't look like skid row.

     But when I was there, when I first got there, every -- there were no tents allowed, so everything -- drug sales were open, people dying on the streets, it was open.  You could see

Garza - Direct / By Ms. Mitchell                    **174**

everything going on.  It was skid row.

So when I go -- if you go down toward -- I call them the bottoms.  You go down there at San Pedro and all that area down there, the tents, when you start -- when you cross Maple, you start seeing all the tents.

So everybody assumes that when you're on Broadway and when you're on spring and when you're on Main Street that everything's fine.  Actually, that is skid row, what it used to be when I got there.

And then when you go down and everybody gets the visuals of the tents, then all of a sudden, oh, my God, it's skid row, oh, my God, all these homeless people.  And I'm like, they're people --

**MS. MITCHELL:**  Mr. Garza, why don't you take a moment?  I'm going to ask my next question.

Q    How would you describe daily life in skid row right now?

A    It's a family, it's a community.  We know that.  It's a community.  I'm not going to deny that.  They tried to make it a policy but it's a community.

Daily life in skid row is -- I don't know really how to explain it.  It's survival.  You know, you been living in the housing, it's survival.

But -- and I'm going to say it.  It's family.  When I see people that I may disagree with, I tell them.  I walk up to them.  I'm sentimental, I'm getting older.  I don't want to see

Garza - Direct / By Ms. Mitchell                    **175**

you die.  I don't want to see you go away.  I see you.  I've seen all the battles that have happened, and we need you still.

Q    Who is Barbara Brown?

A    Barbara Brown was a woman who lived at the Ellis Hotel.

I knew Barbara Brown because I would sit -- I would go down to a market on Spring Street next to the Los Angeles Theater Center.

Only know it as Carlos's Market because Carlos was the owner, and he liked people sitting there and talking with him because he was the employee who was there.

She would come in and she would buy an ice cream, and she would pay cash.

One day one of my actual neighbors in the building, he wouldn't walk in because she was in there.  And he walked in and he said, I'm not going to go inside the market where there's trash.  And I'm not -- once the trash left, then I walked in.  So I knew her from around the community.

What happened to Barbara was she apparently suffered with schizophrenia.  And I know and understand that SO housing is housing of last resort for those of us that suffer with mental illness.

Her neighbors didn't want her there.  They couldn't put up with her.  They said that she was knocking on the doors, asking for cigarettes, that she was screaming at times.  So they had her evicted.

She died at night in the rain.  They had a memorial service for her.  And I cried.  And the neighbor, they actually -- her neighbors walked up to me and told me that she would -- that's a -- she was in a better place.

I am so -- they -- our advocates don't understand that we hear everything that they say.  When they say things like, well, at least they died with their rights on, apparently she died with her rights on.

The man last night that died on the corner of Fifth and Main died with his rights on.  Is that what -- when I hear that, it's -- they're willing to sacrifice me --

        **MS. SPEAKER:**  (Inaudible)

**BY MS. MITCHELL:**

Q    Mr. Garza, did Barbara Brown die of hypothermia, to your knowledge?

A    Yes.

Q    Do people unsheltered in the skid row community have access to safe, stable shelter?

        **(Pause)**

A    No.  There's shelters, there's the missions, there's -- but it's not enough.

Q    Now, how long, Mr. Garza, have you been attending these hearings and status conferences in this case?

A    I just don't know the specific time.  It's hard for me to gauge the timeframe.  But I've been coming for a while.

Garza - Direct / By Ms. Mitchell                    **177**

Q    Would you say a couple years?

A    Yes.  It's been a couple of years.

Q    And are you aware that the City of Los Angeles was
required to create thousands of new shelter or housing beds
under both the roadmap agreement and the LA Alliance agreement?

A    Yes.

Q    Have you heard statements or testimony to the extent that
the City has failed to create those beds?

          **MR. SCOLNICK:**  Objection, hearsay.

          **THE COURT:**  Overruled.

A    Yes.

Q    Are you aware that thousands of beds have been identified
as in process for several years?

A    As of --

          **MR. SCOLNICK:**  Objection, foundation.

A    -- today, yes.

          **THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q    What has been the impact on you and your community on the
City's failure to create enough beds?

          **MR. SCOLNICK:**  Object to the extent it calls for a
legal conclusion.

          **THE COURT:**  Overruled.

A    People are waiting for housing.  There are people in this
room right now that I met today that are here, upset because

Garza - Direct / By Ms. Mitchell                    **178**

they're -- they've been waiting for months --

          MS. SPEAKER:  Years!

A     -- years for a voucher.

          MR. SPEAKER:  Years.

A     Some of them had their vouchers taken away for housing.

          MS. SPEAKER:  Amen!

          THE COURT:  No, just a moment, folks.  Folks, just a moment.

          MS. SPEAKER:  Sorry.  He's speaking too much truth my soul right now and my situation (inaudible).

          THE COURT:  Okay.  Thank you.  Please continue.

          THE WITNESS:  Can you repeat the question, please?

**BY MS. MITCHELL:**

Q     What has been the impact of the City's failure to create enough beds?

A     People are languishing, dying on the streets of skid row.

Q     Are you familiar with the Alvarez and Marsal assessment that was released earlier this year of the City's homelessness programs?

A     Yes.

Q     Now, the audit found huge amounts of money could not be traced to results, and that many services were not reaching people on the street.  Were you surprised by those findings?

          MR. SCOLNICK:  Objection, hearsay.

          THE COURT:  Overruled.

A     They didn't have to die.  That was enough money for housing.  There's enough money for the shelters, there's enough money to do all of it.  We don't have to fight for one or the other.  There's plenty.  Where did the money go?

Why are these people dying on our streets?  Why are they dying?  And I've seen this for 26 years.

I worked hard.  I did the campaign to try to get people elected, get close, get my ear in there, work with community organizations, the LA -- I've done everything I can hoping that it would come, that the cavalry would be there, that it would -- that they would come, that instead of just feeding people to keep them alive long enough for them to show up, that they would arrive.

They -- hope never came.  It came piecemeal.  Some people made it, some people didn't.

THE WITNESS:  I'm sorry, Judge.

MS. MITCHELL:  That's okay, Mr. Garza.

THE WITNESS:  It's been a long time.  I just want -- I just wish that these people would stop fighting over resources.  The money is there.  Where did it go?  Where is it?

They didn't have to die.  They could have done -- they could have been (inaudible) improvement on the SROs instead of people choosing to live in the street because they didn't want to live in the shit hole housing.  They would prefer to live in the street.

Garza - Direct / By Ms. Mitchell                    **180**

And now finally after so many years after I was on a project advisory committee (inaudible) project redevelopment project area.  I got -- negotiated 1700 units of housing.

The committee voted me.  I'm talking about the wealthy, the poor, everybody.

It took years to get that housing built.  It took years, but it got built.  But it's not enough.  The other SROs did not get rehabbed.

Now, finally -- that was 2002.  I think the end of that money was the Roslynn (inaudible) 2012 to be able to leverage for more stacks of money.  And then --

Q   Mr. Garza, I'm going to ask you again about the audit. The -- is it your sense that the funding and services of the billions of dollars that are being poured into the system are making its way to the street from what you can see?

**MR. SCOLNICK:**  Foundation and hearsay, Your Honor.

**THE COURT:**  Overruled.

A   No.

Q   What would it mean for the people of skid row, not just practically but maybe emotionally, if those thousands of units of promised shelter and housing were available today?

**MR. SCOLNICK:**  Foundation again, Your Honor.

**THE COURT:**  Overruled.

A   It would mean somebody had a chance to live if the money was actually allowed to be spent on the people in skid row.

**EXCEPTIONAL REPORTING SERVICES, INC**

Garza - Direct / By Ms. Mitchell                    **181**

Q    The last question I'm going to ask you, Mr. Garza, from where you stand, what message would you want the Court and the City to hear on behalf of the people -- of behalf of you and the people that you speak for?

A    I can only say I speak for myself.  I believe that every human being has the right to speak for themselves.

Those of us who suffer with a mental illness, every day we fight for the semblance of freewill and autonomy.  And there are people that are always trying to claim that they speak for me.  I would never presume to try to speak for somebody else.

I believe in the First Amendment.  I put my life on the line for the First Amendment, crossed two minefields in Kuwait. We were tasked -- they told us we were not expected to survive.

What I -- there -- I don't want to get into religious and I don't want to get into it because we can spout it all we want to, love your neighbor.

Well, what I'm seeing is nobody loving their neighbor right now and leaving people to die in the streets like the gentleman that died next to my house last night.

And it just -- for people like Barbara who never had a chance to speak up, where was the other option for her?  If I lose my housing, where is the other option for me?  Why do I have to wait?

If I get in the street for two years for the housing to be built, I'm going to die.  If I wind up in the street, I'm going

**182**

to die.  I'm not going to survive.  I have medication that has to be refrigerated.  I am going to die.

MS. MITCHELL:  Thank you.  I have no further questions at this time of this witness, Your Honor.

THE COURT:  All right.  Sir, just a moment.  You remain for just a moment.

Ms. Myers, do you have questions on cross examination?

MS. MYERS:  (Inaudible)

THE COURT:  Does the City have questions?

MR. SCOLNICK:  We have no questions, Your Honor.  We would just like to renew our objection.  While Mr. Garza's testimony, we appreciate it, of course, we don't believe it's relevant to the issues before the Court having to do with breach.

THE COURT:  Mr. Garza, thank you very much.

**(Witness steps down.)**

MS. MITCHELL:  Your Honor, the Alliance would next -

THE COURT:  Just a moment.  I'm going to allow a certain amount of testimony concerning the impact.

But I'm happy to convene court on skid row and have you folks see it.  So you think about that this evening.  And I may order a hearing on skid row during this proceeding so we all see.

We don't have to literally sit in a courtroom and

**183**

listen.  We can go down and see it.  So you think about that. And if you all stipulate to it, I'll ask the chief judge if I can convene on skid row.

Counsel, your next witness.

**MR. MCRAE:**  Your Honor, I do want you to know that our team did go down to Fifth and Sixth Street last night.

**THE COURT:**  Okay.

**MR. MCRAE:**  Thank you.

**THE COURT:**  And by the way, I appreciate that.

**MR. MCRAE:**  Thank you.

**THE COURT:**  I've dealt with so many counsel -- and not you, this -- who literally haven't bothered to go take a look.  We're lawyers and we'll go through that process.

But -- yeah, your next witness, counsel.

**MS. MITCHELL:**  Thank you.  We would call Laura Frost. May I step outside, Your Honor?

**THE COURT:**  Please.

**MS. MITCHELL:**  Thank you.

**THE COURT:**  Publicly and on the record I want to thank Gibson, Dunn for doing that.  I want you to clearly hear that.  I can't tell you over the last five years how interesting it's been not to see that kind of caring.  And that's a compliment to you.  Okay.

Thank you very much.  If you'd step forward, would you raise your right hand, please?

LAURA FROST, PLAINTIFFS' WITNESS, SWORN

THE COURT:  Thank you.  Would you please be seated just to my right?  And the witness box is -- well, the entrance is closest to the wall.  Thank you very much.

And, counsel, on direct or cross, you may need documents.  You can put them up on the board or you can bring documents to the witness if you choose (inaudible).

Would you state your full name for the record, please?

THE WITNESS:  Yes.  My name is Laura Frost.

THE COURT:  And would you spell your last name, please?

THE WITNESS:  F-R-O-S-T.

THE COURT:  Thank you.  And this would be direct examination.

Counsel, we've been in session about an hour so why don't each of you call those recesses that you need for either the Plaintiff or the City as you get into these examination?

**(Pause)**

DIRECT EXAMINATION

BY MS. MITCHELL:

Q    All right, Ms. Frost -- and I may have missed it as I was plugging things in up here.  Did you already state your first and last name for the record?

A    I did.

Frost - Direct / By Ms. Mitchell                    **185**

Q    Okay.  Thank you.  And what is your current role?

A    I am a director with Alvarez and Marsal.

          **MS. MITCHELL:**  Can you pull the microphone just a little bit closer?  Because we've got a recording.

          **THE WITNESS:**  Is this better?

          **MS. MITCHELL:**  Yes.

          **THE WITNESS:**  Okay.

**BY MS. MITCHELL:**

Q    And what is Alvarez and Marsal?

A    Alvarez and Marsal is a management consulting firm.

Q    What is your area of expertise within the firm?

A    I am -- expertise can -- what do you mean?

Q    What is -- you said you are a director.  Is there -- are you a director within a particular department or division?

A    Oh, yes.  I am a director within our public services division.

Q    And can you briefly describe for us your background, training, and experience which brought you to be a director at Alvarez and Marsal?

A    Absolutely.  I -- education background, premed degree with honors.  I got my masters in accounting and then I worked at Deloitte in their forensic and dispute practice.

     I then went to Baker Tilly do business valuation.  I've been with Alvarez and Marsal for approximately seven years.  I started in our disputes investigations practice.

Frost - Direct / By Ms. Mitchell                    **186**

I've done corporate bankruptcy as well as -- and I've also been within our public sector practice, which is where I'm currently.

Q    Now, I am showing you what has been marked and I believe already introduced as Exhibit 23, the independent assessment of City-funded homelessness and assistance programs; did you work on this?

            **MR. MCRAE:**  Your Honor, this is a -- objection, a document to which we have a standing objection in that it does not purport to be a determination of whether the City is in breach of any obligations under the Alliance settlement agreement.

            It is far more wide-ranging and very aspirational in terms of much larger goals of improvement and so forth.

            It is not a forensic audit, does not comply with any standards applicable to governing -- governmental entities being audited.  And so on relevance grounds we have that objection.

            We also have an objection that it lacks foundation and is replete with hearsay because, of course, it is a synthesis of what purports to be a anonymized communications with various individuals who are not available or subject to cross examination, whose identity is unknown, whose ability to be determined for veracity and reliability is impossible.

            And so not only does it lack foundation and is

EXCEPTIONAL REPORTING SERVICES, INC

replete with hearsay without any recognized exception, it is not relevant to the narrow question of whether there is a breach of the agreement, nor can it be offered with respect to determining a contract interpretation issue which we understand to be the focus before the Court.

**THE COURT:** Overruled. But this performance audit became a part of a very limited need for forensics. Is the City prepared to stipulate to a forensic audit to resolve these problems?

**MR. MCRAE:** No, Your Honor. The City --

**THE COURT:** Okay. Thank you very much, counsel.

Continue your direct examination, please.

**MS. MITCHELL:** Thank you.

**BY MS. MITCHELL:**

Q    Can you describe the other members of your team that participated in this assessment?

A    Yes. We had a multidisciplinary team, approximately ten team members with various backgrounds. We had CPAs, we had individuals with clinical experience as registered nurses and doctors, all either healthcare and/or public sector backgrounds.

Q    Approximately how many people from Alvarez and Marsal worked on this report?

A    Ten team members, excluding executives.

Q    And was this report ordered by the Court as a result of a

Frost - Direct / By Ms. Mitchell                    **188**

sanctions motion that was brought by the Alliance last year?

A    Yes, that is my understanding.

Q    And at that time, did the City have any objections to your organization conducting this assessment?

        **MR. MCRAE:**  Objection.  Lack of foundation, also calls for a legal conclusion and speculation as to what the City thought.

        **THE COURT:**  Overruled, counsel.  If you look back in the record, I could take judicial notice of this.  Examine the record closely.  Thank you.  Overruled.

**BY MS. MITCHELL:**

Q    You can answer.

A    Can you please repeat the question?

QQ    Sure, at the time that this was commissioned by the Court, in response to that motion, did the City object to this assessment in any way, to your knowledge?

A    Not to our knowledge.

Q    And as you sit here today, prior to today, has the City submitted any objections to this assessment?

A    No.

        **MR. MCRAE:**  Lack of foundation.

        **THE COURT:**  I'm sorry, just a moment before you answer.

        **MR. MCRAE:**  Lack of foundation.  It hasn't been established that the witness would be acquainted with the

Frost - Direct / By Ms. Mitchell                    **189**

record to know if objections had been filed.

**THE COURT:**  Overruled.  You can answer the question.

**THE WITNESS:**  No.

**BY MS. MITCHELL:**

Q    What was the very brief, and I know that this was heavily negotiated, so in your own terms, can you briefly describe the scope of your work when it came to this assessment?

A    Absolutely.  The scope of our assessment from a high level is tracing the flow of City funds and valuing the services offered by the City programs within our scope.  That was the Roadmap Freeway Agreement, the Alliance Settlement Agreement, and Inside Safe, and then analyzing reported results and data to obtain an objective perspective on the alignment of financial decisions with service delivery outcomes.

Q    And my understanding is you have a copy of Exhibit 23 in front of you today, is that right?

A    I do.  Yes.

Q    Is this a true and correct version from what you can see of the report that you submitted to the Court?

A    Yes.

Q    Okay, can you briefly, before we get into it, explain your methodology?

A    Our methodology was taking a step back.  We were objectively trying to evaluate the homelessness response system as it pertained to our scope.  So how funds were used, what

**EXCEPTIONAL REPORTING SERVICES, INC**

Frost - Direct / By Ms. Mitchell                    **190**

results were achieved, and whether services met their intended goals.  So from that perspective, we attempted to gain a full understanding of what was required under each City program or what their goals were.  That involved analyzing various documentation, contracts, MOUs, for example, gathering financial and accounting data from the City and LAHSA, as well as understanding the performance and reports that were provided to us.

**MR. MCRAE:**  Your Honor, move to strike on relevance grounds.  The homelessness response system is broader than the scope of the settlement agreement itself.  Can I have a continuing objection to this document and this line of inquiry regarding these findings and assessments and conclusions and so forth?

**THE COURT:**  You may.  You can also make individual objections if you'd like to.

**MR. MCRAE:**  Thank you.

**THE COURT:**  But I'll take that as a continuing objection so your record's covered.

**BY MS. MITCHELL:**

Q    Did you conduct interviews?

A    We did, yes.

Q    About how many interviews did you conduct, if you know?

A    Approximately 90, if I'm recalling correctly.

Q    90 interviews.  Did you do any field work?

Frost - Direct / By Ms. Mitchell                    **191**

A    We did.

Q    What did that field work entail?

A    We went on-site to various shelters, as well as permanent housing locations that were reported to the Court, as well as Inside Safe that were not reported to the Court at the time.

Q    Did you request data from the City and from LAHSA as part of your assessment?

A    Yes, we had sent data requests to both the City and LAHSA.

Q    And how many data requests did you send, if you recall?

A    I believe ultimately -- sorry, I'm just looking at a report.

Q    That's okay.  I'm going ask you, Ms. Frost, if you were looking at the report, if you could just please tell us what page number you are looking at to reference your answer, that would be helpful.

A    Absolutely, on page 32 of 160.  We had ultimately formal data requests reaching approximately 72 to the City and 75 to LAHSA.

Q    And did you have any data requests to the County as well?

A    We did have data requests to the County.

Q    And how many data requests were sent to the County?

        **MR. MCRAE:**  Objection, relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I believe we, top of my head, at least eight.  Sorry.

Frost - Direct / By Ms. Mitchell                    **192**

**BY MS. MITCHELL:**

Q    Did you review, oh, I'm sorry, were done you answering?

A    Please.

Q    Okay, did you review the City's quarterly reports that they submitted to this Court for both the Roadmap and the Alliance agreement?

A    We reviewed what the City had reported to the Court under the Alliance Roadmap agreement.

Q    Did you review program data?

A    Can you --

    **MR. MCRAE:** Objection, vague as to program data and as to time.

    **THE COURT:** I'm sorry, would you repeat that question?  I was looking at the document on page 32 for just a moment.  So just repeat the question.

    **MS. MITCHELL:** Sure, my question was, did you review program data?

    **MR. MCRAE:** Objection, vague as to program data and as to time.

    **THE COURT:** Overruled.

    **THE WITNESS:** Can you help me understand what you mean by program data, please?

**BY MS. MITCHELL:**

Q    Sure, did you review data that was produced to you on these various programs: the Roadmap agreement, the Alliance

Frost - Direct / By Ms. Mitchell                 **193**

agreement, and the Inside Safe agreement?

A    Yes, we reviewed data such as executive reporting that the City provided to us in relation to the City programs, as well as what LAHSA had produced.

Q    Okay, and to clarify, what was the period of time in which you reviewed?  What was the look back period?

A    Our look-back period was from June 1st, 2020 through June 30th, 2024.

Q    Were any parts of the system that you reviewed difficult to assess due to missing or inadequate documentation?

        MR. MCRAE:  Objection.  Relevance, also vague.

        THE COURT:  Overruled.

        THE WITNESS:  Our team definitely took a very reiterative process in requesting and obtaining data.  So for example, if we received data, it would take us time to review it, and then if we identified any gaps or discrepancies, we would return to the respective party and ask for clarification, and then that potentially led to supplemental data requests.

BY MS. MITCHELL:

Q    Did you have any difficulty obtaining information?

        MR. MCRAE:  Objection.  Relevance.

        THE COURT:  Overruled.

        THE WITNESS:  We had some -- I mean, in good faith, I think all parties were responsive to our data requests.  It definitely took a very reiterative process in making sure we

Frost - Direct / By Ms. Mitchell                                    **194**

were all aligned of what we were ultimately requesting.

Q    Did you ultimately get all the data that you requested?

A    If we did not receive the data, from our understanding, the data did not exist.

        **MR. MCRAE:**  Your Honor, I'd move to strike it as vague as the data from whom.  There are multiple entities referred to in the report.

        **THE COURT:**  And so counsel, LAHSA, City, or County?

        **MS. MITCHELL:**  I can break it up, Your Honor.  Sure.

        **THE COURT:**  Sustained.

**BY MS. MITCHELL:**

Q    Sure.  So there are three separate entities from which you requested program data; is that right?

A    Correct.

Q    So did you have any difficulty obtaining any program data that you requested or financial data from LAHSA?

        **MR. MCRAE:**  Relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes.  We had some difficulty obtaining data from LAHSA on the premise that potentially that data did not exist and was not available to be produced.

Q    Did you have to go back to LAHSA multiple times to request additional information?

A    Yes.

Q    Going to the City, did you have difficulty getting data,

Frost - Direct / By Ms. Mitchell                    **195**

either -- whether that's program data or financial data from

the City?

     **MR. MCRAE:**  Objection, vague as to data, which part

of the City, and time, also relevance.

     **THE COURT:**  Overruled.

     **THE WITNESS:**  Within the data request that we had

sent to the City, again, taking an iterative process, if we

were not provided the data that we had requested, it was our

understanding that it did not exist.

     **MR. MCRAE:**  Objection.  Move to strike as to the last

part, as speculation as to whether it existed, as it is just an

understanding and not a fact and no basis for the

understanding.

     **THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q    What about the County?  Did you have difficulty getting

data or financial information from the County?

     **MR. MCRAE:**  Relevance.

     **THE COURT:**  Overruled.

     **TH WITNESS:**  We -- similarly, the County was

responsive to our data request, and if we did not receive the

requested data, it was our understanding that the data did not

exist.

     **MR. MCRAE:**  Same objection.  Lack of foundation.

     **THE COURT:**  Overruled.

Frost - Direct / By Ms. Mitchell                    **196**

Q    Let's turn to some of the conclusions in the report. We're going to go ahead and look at page 4.  And I'm going to turn towards that first paragraph under "key findings," where it says poor data quality and integration.  Do you see that?

A    I do, yes.

Q    You note that there was a limited capacity to measure effectiveness and intervention which risks resources being misspent.  Do you recall that conclusion?

         **MR. MCRAE:**  Objection.  Relevance.  There are no data quality and integration obligations in the settlement agreement.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  Yes, I recall.

**BY MS. MITCHELL:**

Q    And why was that important?

A    The premise of this key finding is good data is the foundation of good strategic decision-making.  So if you don't have good data, it is difficult to determine whether your decisions are leading to its intended outcomes of potential waste of resources, right, such as the inability to determine whether the beds reported ultimately existed and whether services were being provided.

Q    And you have a sentence here that notes that these difficulties made it difficult to confirm reported bed counts. Do you see that?

A     Yes.

        MR. MCRAE:  Objection.  Relevance.

        THE COURT:  Overruled.

Q    Were you ultimately able to confirm reported bed counts for the Alliance program or for the Roadmap program?

A    No, we were ultimately unable to verify within the beds that we had looked at.

Q    You also note that you were unable to track participant outcomes.  What does that mean?

A    Tracking participant outcomes would be if a participant was ultimately matched to that respective bed, what their long-term housing stability was or what their outcome ultimately ended up being.

Q    And finally, you note here that you were unable to align financial data with performance metrics.  What does that mean?

        MR. MCRAE:  Relevance.

        THE COURT:  Overruled.

        THE WITNESS:  Inability to align financial data performance metrics, meaning that what was money, what was spent, whether that was able to be correlated to a specific performance metric.  So meaning, for example, if money that was spent on a respective contract for a specific site, we were unable to definitively confirm that we were matching those funds spent on that respective contract to the performance associated with that data.

**MS. MITCHELL:**  Okay.  So taking a step back, were you able to track what was being spent to what expected outcomes were?

**MR. MCRAE:**  Objection.  Vague as to spent by whom, at what time, or for what, and also relevance.

**THE COURT:**  Overruled.  You can answer the question, please.

**THE WITNESS:**  No, we were unable to determine what ultimately the City spent and what the ultimate outcomes were for those funds by participant.

**BY MS. MITCHELL:**

Q    So let's go over to the next page, page 5.  And I want to focus you here on this conclusion that there was a disjointed continuum of care system.  Do you see that?

**MR. MCRAE:**  Objection.  Relevance.  It's not an obligation under the settlement agreement of the Alliance.

**THE COURT:**  Overruled.

**THE WITNESS:**  Yes.

Q    And you identify siloed processes, differing prioritization and matching processes, fractured system causing confusion among stakeholders, including service providers.  Why is that important?

A    This finding is important because ultimately a fractured system increases the risk of failing to connect people experiencing homelessness to the right services at the right

Frost - Direct / By Ms. Mitchell                          **199**

time.

Q   Why does confusion among stakeholders, including service providers, matter in this context?

        MR. MCRAE:  Objection.  Vague as to what context.  To the extent it's not the settlement agreement, relevance.

        THE COURT:  Overruled.  You can answer the question.

        THE WITNESS:  I believe in relation to confusion among stakeholders, we are trying to communicate in this finding that if stakeholders aren't on the same page of ultimately how referrals are processed, ultimately matched, what services are being received and by whom, it definitely causes confusion of how to distribute and make informed decisions of available resources.

**BY MS. MITCHELL:**

Q   Did you find that service providers directly understood how to get an unsheltered person sheltered?

        MR. MCRAE:  Objection.  That's speculation as to what other people thought and hearsay.

        THE COURT:  Overruled.  Answer the question, please.

        THE WITNESS:  During our fieldwork, we definitely heard different perspectives of how people were matched to beds.

        MR. MCRAE:  Move to strike the hearsay.

        THE COURT:  Overruled.

Q   All right.  Let's go down to limited financial oversight

Frost - Direct / By Ms. Mitchell                    **200**

and performance monitoring.  You know invoice reviews primarily reconciled aggregate amounts rather than verifying the quality, legitimacy, or reasonableness of the expenses.  Can you explain the importance of this?

MR. MCRAE:  Objection.  Relevance.  Neither financial oversight or performance monitoring or terms of any obligation the City has undertaken.

THE COURT:  Overruled.

THE WITNESS:  In our professional opinion, it's important to be able to understand how money is being spent on services and having oversight of those services.

BY MS. MITCHELL:

Q    And ultimately, did you find that there was any verification of services that were actually provided?

A    We were unable to --

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  We were unable to obtain evidence to gain insight into whether those services were verified.

Q    And you also noted that discrepancies in responses were regularly going unchecked; is that right?

MR. MCRAE:  Relevance and vague.

THE COURT:  Overruled.

THE WITNESS:  Apologies.  One more time.

Q    Sure.  You noted that discrepancies in contract responses

Frost - Direct / By Ms. Mitchell                    **201**

were regularly going unchecked; is that right?

MR. MCRAE:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  Yes, we did identify limitations in performance monitoring throughout the look-back period.

Q    Okay.  Now, when you note LAHSA, and here I will highlight it, LAHSA approved service provider invoices based solely on high-level review.  I'm going to change that because I don't like pink.  What does that mean?

MR. MCRAE:  Objection.  Relevance, also speculation, and hearsay.

THE COURT:  Overruled.

THE WITNESS:  Throughout our assessment, it was our understanding of how invoices were being approved was based on the required documentation that provided a high-level overview of what services.  So, for example, generally what was required for service providers to submit to LAHSA was a profit and loss statement or a general ledger, which was a high-level review of financial documents.  It wouldn't necessarily be what you would imagine of like a receipt to give insight into verification of expenses.

BY MS. MITCHELL:

Q    You also note antiquated systems, manual processes, prolonged budget amendments, and inconsistent invoice submission practices.  Why is that important?

EXCEPTIONAL REPORTING SERVICES, INC

Frost - Direct / By Ms. Mitchell                    **202**

          **MR. MCRAE:**  Objection.  Relevance and also vague as to whom this is attributed to.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  This finding is specific to antiquated systems and manual processes between LAHSA and the City as it related to cash requests.  So, for example, in that italics second paragraph, right, the invoicing process between how the City or how LAHSA would submit what their invoice, respectively the cash request, which was in our opinion antiquated, right, it was an Excel spreadsheet that was being sent, and we found human errors and inaccuracies in those cash requests.

**BY MS. MITCHELL:**

Q    Now, going to the bottom of that page, lack of contractual clarity and accountability.  You note that contracts frequently contain broad terms without clear definitions, which created ambiguity about the scope and type of services delivered.  Why is that important?

          **MR. MCRAE:**  Your Honor, objection.  Relevance.  These are also clearly references to legal opinions as to ambiguity within contracts or whether terms are derived broadly without clear definition.  It's also not relevant.  None of the people that created this, there's been an establishment that they even have a juris doctorate or would even be qualified to opine, and it wouldn't be improper for them to do that.

          **THE COURT:**  Overruled.  You can answer.

**EXCEPTIONAL REPORTING SERVICES, INC**

Frost - Direct / By Ms. Mitchell **203**

THE WITNESS:  Can you please repeat your question?

BY MS. MITCHELL:

Q    Sure.  I'm going to focus you on the conclusion at the bottom of this page, lack of contractual clarity and accountability, which you note, because the contracts provide broad terms without clear definitions, this created ambiguity about the scope and type of service delivered.  What does that mean?

MR. MCRAE:  Same objections, and I would also add speculation.

THE COURT:  Overruled.  You can answer the question, please.

THE WITNESS:  Given an ambiguity in contractual language, we learned that service providers may interpret that differently.  So, for example, what constitutes a hot meal?  Does that hot meal have to be served hot?  Is that just access to a microwave to nuke the meal?  What constitutes functional showers?  I mean, what we're trying to describe here is when you have an ambiguity of language and allow discretion to the service providers in determining their understanding of that respective service, it allows variability between how each service provider interprets that required service.

BY MS. MITCHELL:

Q    So, in other words --

MR. MCRAE:  Move to strike.  Relevance.

Frost - Direct / By Ms. Mitchell                    **204**

THE COURT: Overruled.

Q    -- a service provider can define a security as one thing, and a different service provider defines security as something totally different; is that right?

MR. MCRAE: Objection. Leading and relevance.

THE COURT: Overruled.

THE WITNESS: Security is another example of being unable to verify ultimately what deemed that security expense and what was ultimately provided, yes.

**BY MS. MITCHELL:**

Q    All right, turning to the next page, we're now on page 6, and we're looking at cost and service variability. Can you explain that to us, please?

MR. MCRAE: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: Cost and service variability, when cost reasonableness is not reviewed, it's difficult to understand, basically, are you getting a good value for the respective intervention that you are paying for in that respective service? So, for example, in this italicized first paragraph, you can see that personnel expenses may have ranged on a per bed per day from $67 to $7. Security, $32 to $2. But I want to highlight that these should not be considered absolute, right, like to varying formats and expense categories within the supporting financial statements that profit and loss and

Frost - Direct / By Ms. Mitchell                    **205**

general ledger referred to earlier.  That just illustrates the

challenges in actually determining what services the City

ultimately funded.

Q    And can you explain to us why it was significant that, for

example, personnel expenses ranged from $67 per person per

night to $7 per person per night?  Why is that a concern?

        **MR. MCRAE:**  Objection.  Relevance, also vague as to

concern and significance as to who we're even talking about.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  From the perspective of wanting to

understand how much money you are spending and what you are

getting from it, it is difficult when you have this variance of

the quality of service as it deemed of $67 per bed per day in

comparison to $7 per day.

**BY MS. MITCHELL:**

Q    So, for example, if I am a service provider and I am

charging security expenses for $32 per person per night and

nobody is checking to see whether or not I'm actually doing the

thing I say I'm doing, is that an ability to insert fraud into

this process, in your opinion?

        **MR. MCRAE:**  Objection.  It's leading.  It's also an

incomplete hypothetical.  It's counsel basically testifying,

and it's not grounded in any reality.  It's literally a

hypothetical, starting with if.

        **THE COURT:**  Overruled.

THE WITNESS:  When you have a range of reasonable costs and you're unable to verify those costs as well as confirming cost reasonableness, there is a heightened risk of potential asset misappropriation.

Q    Prior to today, I sent you a copy of plaintiffs' response regarding certain issues that the LA Alliance filed on April 8th, 2025.  I'm sorry, May 8th, 2025, and that's at Docket 899.  Did you have an opportunity to review this?

A    I have seen this document.  Yes.

Q    Okay.  And I asked you, starting on page 13 --

MR. MCRAE:  Your Honor, I'd object also even to the publication of this.  There's just questions foundationally about what it is.  I don't think it's proper that it be published.  There would be other objections that might obviate that.

THE COURT:  Overruled.  I'll take judicial notice of these documents, counsel.

MR. MCRAE:  I further, and is the judicial notice merely to the existence of them, not to the truth of their content?

THE COURT:  At this time, I'll take the content from the testimony, but I will notice the documents filed by the Court.  And that's judicially noticed.

MS. MITCHELL:  Thank you, Your Honor.

//

Frost - Direct / By Ms. Mitchell **207**

**BY MS. MITCHELL:**

Q    On page 13, I summarized the audit findings and ultimately what it means.  Did you have an opportunity to review this?

A    I have reviewed this, yes.

Q    And I summarized in layperson's terms the findings as far as what it means kind of for people that are non-assessors or non-auditors.  Do you see that?

A    Yes.

Q    All right.  And do you disagree with the characterizations or summaries of any of the assessment findings that I put in this pleading?

         **MR. MCRAE:**  Objection.

         **THE COURT:**  Sustained.  You can argue this, but I want to hear what her audit discloses to her.  You can agree with this if you want to, but I'm more interested in what you're finding concerning the City's ability to track to whom they're paying and for what they're paying.  And I don't want you testifying from a document submitted by either party.

         So, obviously, the 2.3 billion is in the A&M document.  So, counsel, you can rephrase that, but I don't think I want to see an adoption of an argument by one party. You can argue that in simplified terms.

         **MS. MITCHELL:**  I'll ask a question, Your Honor, if that's helpful.

         **THE COURT:**  Sure.

EXCEPTIONAL REPORTING SERVICES, INC

**BY MS. MITCHELL:**

Q    Do you agree that based on everything that you and your team reviewed over the last 11 months, the City in general does not know how much it's paying to whom and for what?

MR. MCRAE:  Objection, vague.  Also, relevance.

THE COURT:  Overruled.  You can answer that question.

MR. MCRAE:  Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Based on our assessment, I agree with that representation.

**BY MS. MITCHELL:**

Q    Do you agree that multiple people within the system that you reviewed did not know exactly how to get an unsheltered person sheltered?

MR. MCRAE:  Objection.  Speculation about what other people understood.  Lack of foundation.  It's also lack of relevance.

THE COURT:  You'll have cross-examination.  I'm going to allow your opinion on that.  You can testify.  Answer that.

THE WITNESS:  And from our understanding of what LAHSA had explained to us through correspondence, through written correspondence, there was not a formal prioritization and matching policy across the City programs in the look-back period.  And that definitely, from our understanding, created some confusion among stakeholders.

Frost - Direct / By Ms. Mitchell                    **209**

MR. MCRAE: Objection. Speculation and hearsay as to a document that's not in evidence and not even identified by date. It's not relevant. Speculation, hearsay.

THE COURT: Overruled.

Q   Did you find anybody within the system that you reviewed from the City or from LAHSA actually verified that services were rendered by the providers pursuant to the invoices that they were submitting?

MR. MCRAE: Objection.

THE COURT: And I want to break that down for a moment. I want to know specifically from the City or from LAHSA or from the County.

MS. MITCHELL: I can break it down, Your Honor.

THE COURT: Okay. Not just a holistic question.

BY MS. MITCHELL:

Q   Did you find, based on your review and your team's extensive review, anybody within LAHSA was actually verifying that services were being rendered by the providers as they were submitting invoices?

MR. MCRAE: Relevance, vague, and lack of foundation.

THE COURT: Overruled. Please answer that question.

THE WITNESS: We did not identify evidence that gave us insight into whether LAHSA was verifying expenditures when approving the invoice.

THE COURT: Just a moment.

EXCEPTIONAL REPORTING SERVICES, INC

Frost - Direct / By Ms. Mitchell                                **210**

THE WITNESS:  Verifying services.

THE COURT:  All right.  Counsel, any question?

MS. MITCHELL:  Thank you.

Q    Did you find that anybody within the City of Los Angeles was verifying that services were actually being rendered by the providers pursuant to the invoices that were being submitted?

MR. MCRAE:  Vague, relevance, lack of foundation.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  From the evidence that we saw, we did not obtain evidence that the City was verifying services from the cash request that LAHSA was submitting to the City.

BY MS. MITCHELL:

Q    Who in the city, based on your review, had the oversight obligation of LAHSA?

MR. MCRAE:  Objection.  Lack of foundation, obligation, calls for a legal conclusion, and vague.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Understanding between the City contracts with LAHSA and within those contracts, the LA Housing Department was delegated that responsibility.

Q    Now, based on your review, would you agree with the statement that fraudulent charges, if any, would go undetected during this contract review process?

MR. MCRAE:  Objection.  It's a hypothetical.

THE COURT:  Just a moment.  Is that contained in your

report, that language?

THE WITNESS:  We did not -- fraud is not within our report.

THE COURT:  Okay.

MR. MCRAE:  An objection, then, on relevance grounds and lack of foundation.

THE COURT:  No, I'll allow the answer.  So the fraud determination was not within your scope?

THE WITNESS:  Correct.

THE COURT:  Okay.

MS. MITCHELL:  My question was a little bit different, though, Your Honor, if I may.

THE COURT:  Re-ask it.

BY MS. MITCHELL:

Q    My question was, because of the significant cost and performance variability across service providers, would it be reasonable to believe that fraudulent charges would go undetected based on your review?

MR. MCRAE:  Your Honor, that calls for speculation --

THE COURT:  No.  I'm going to sustain that, counsel.

Q    Okay.  Would you agree that based on your review and your assessment, that nobody within the City actually could say where the money went and whether it was well spent?

MR. MCRAE:  The lack of foundation as to whether this witness literally spoke to every person in the City who would

Frost - Direct / By Ms. Mitchell **212**

even have knowledge to be able to do that.  Also, relevance.

THE COURT:  Overruled.

MR. MCRAE:  Lack of foundation.

THE COURT:  You can answer that question.  Overruled.

THE WITNESS:  I apologize, Ms. Mitchell.  Can you kindly repeat your question?

MS. MITCHELL:  No problem.

Q   Based on your review and based on the interviews that you conducted and the people that you talked to, would you agree with the statement that nobody within the City would actually say where all the money went and whether it was well spent?

MR. MCRAE:  Objection.  Relevance, lack of foundation, and a hypothetical.

THE COURT:  Overruled.

THE WITNESS:  Correct.  I agree with your statement that throughout our assessment, the City was unable to provide us complete accounting records that would give us insight that the City would know what money was spent to the respective service provider.

BY MS. MITCHELL:

Q   Turning over to Exhibit 25, which is the settlement agreement between the LA Alliance for Human Rights and the City of Los Angeles, did you review this document in preparing your assessment?

A   Is this at docket --

THE COURT: Yeah, I don't think she's going to know the docket number, counsel.

THE WITNESS: Sorry.

MS. MITCHELL: That's okay. I'll turn to the actual --

THE COURT: Do you want to refer to the -- whether it's the LA Alliance or the Roadmap Agreement or the MOU?

MS. MITCHELL: This is Exhibit 25. This is the LA Alliance agreement.

THE COURT: Okay.

THE WITNESS: Yes. We -- our team has reviewed the settlement agreement.

MS. MITCHELL: And turning --

THE COURT: Before we get into that, do folks want to recess for 15 or 20 minutes?

MR. MCRAE: Yes, Your Honor.

THE COURT: Okay. Let's take a recess for about 15 minutes then. And I can't read because of the glare of the clock. What time is it?

UNIDENTIFIED SPEAKER: It's five to 3:00, Your Honor.

THE COURT: Thank you. I'll see you at ten after.

(Recessed at 2:53 p.m.; to reconvene at 3:11 p.m.)

THE COURT: Are we ready to go back into session?

UNIDENTIFIED SPEAKER: Yes, Your Honor.

THE COURT: All right. Then we're back in session.

Frost - Direct / By Ms. Mitchell                **214**

Counsel are present.  The witness is present.  Counsel, you're continuing the examination on direct examination, please.

            **MS. MITCHELL:**  Thank you, Your Honor.

                    **DIRECT EXAMINATION (CONTINUED)**

**BY MS. MITCHELL:**

Q    Now, where we left off, I was just about to show you page 7 of 28 of the Alliance Settlement Agreement.  Ooh, that didn't work out.  At the end, we have this identification of purpose of the settlement agreement.  Do you see this halfway down page 7 of 28?

A    Yes.

Q    Okay.  And can you please read this section into the record?

A    Beginning at line 10?

Q    Beginning at line 10 through 15.

A    "Whereas the purpose of this agreement is to substantially increase the number of housing and shelter opportunities in the City of Los Angeles and to address the needs of everyone who shares public spaces and rights of way in the City of Los Angeles, including both housed and unhoused Angelenos, to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles."

Q    Now, based on the work that you have done, you and your team have done over the last nearly year, would you agree that in order to have success under this system, as defined here on

                    **EXCEPTIONAL REPORTING SERVICES, INC**

the purpose, to achieve this purpose, one would need a functioning homelessness response system to support it?

**MR. MCRAE:**  Objection.  Calls for a legal conclusion.  It's vague.  It lacks foundation.  And to the extent this witness is interpreting what is a recital, which is not even an obligation under the agreement, not only does she lack foundation, it lacks relevance.  It's not an obligation.  It's a recital.

**THE COURT:**  Overruled.

**THE WITNESS:**  Can you help me understand the verbiage you used of functioning?

**BY MS. MITCHELL:**

Q    What do you know the word functioning to mean?

**MR. MCRAE:**  Relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  In relation to a functioning homelessness response system, I would imagine proper resources, coordination, and oversight.

Q    And would you agree that in order to achieve the purpose of this agreement, as articulated here, a functioning homelessness response system, as you just articulated it, is necessary?

**MR. MCRAE:**  Objection, Your Honor.  To the extent this calls for expert testimony, it's not been vetted or disclosed.  We haven't had a chance to have discovery.  It

lacks foundation.  And to the extent it calls for a legal conclusion, it's improper.  It's also not relevant.

THE COURT:  Overruled.  Answer the question, please.

THE WITNESS:  I believe to serve the purpose of this agreement, you need to have a functioning homelessness response system and defining functioning within having proper resources, coordination, and oversight.

Q    And based on your extensive review of the programs within Los Angeles, do you believe that there is a functioning homelessness response system, as you defined it, in Los Angeles sufficient to support this settlement agreement?

MR. MCRAE:  Objection.  It calls for a legal conclusion, relevance.  It's also beyond the assessment.  And the witness is giving what sounds like brand new opinions from the witness stand where the term functioning had to be defined.  This is a due process issue at this point.

THE COURT:  Overruled.  This was a performance audit that the City agreed to.  They did not agree to a forensic audit.  This is appropriate.  You can answer that question.  Overruled.

THE WITNESS:  Ms. Mitchell, can you kindly repeat your question?

BY MS. MITCHELL:

Q    Yes.  Do you believe that it is possible to achieve the goals of the settlement -- at least, this is what I think I

Frost - Direct / By Ms. Mitchell                    **217**

asked.  Do you believe it's possible to achieve the goals of the settlement agreement with the existing system being not functional?

MR. MCRAE:  Objection.  Lack of foundation, relevance, and the City never agreed for the assessment to be used for all purposes or any purposes, quite frankly.

THE COURT:  Overruled.

THE WITNESS:  Can you please help me understand what you mean by goals of the settlement agreement?

Q    Yes.  The goals as articulated here in the recital that are highlighted on the screen.

MR. MCRAE:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  Yes.  To meet the goal, as of understanding, to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles, it's our understanding you need a functioning homelessness response system as defined as having proper resources, coordination, and oversight.

MR. MCRAE:  Your Honor, move to strike is misstating the document, which speaks for itself.  It speaks to a purpose, not goals, and embedded in the question were goals.

THE COURT:  Overruled.

MS. MITCHELL:  Your Honor, I would ask that --

THE COURT:  That's fine, Counsel.  We can --

**MS. MITCHELL:**  I object to the ongoing speaking objections, Your Honor, from counsel.

**THE COURT:**  Counsel, your next question.

**BY MS. MITCHELL:**

Q    Okay.  Regarding the -- well, I'm sorry.  I don't think I got an answer to that question.  Would you like me to ask the question again?

**THE COURT:**  You can re-ask it.

Q    Thank you.  Is it possible to achieve the goals of the settlement agreement as identified here in this recital within the existing homelessness response system in Los Angeles as you reviewed it?

**MR. MCRAE:**  Objection to the extent it calls for an expert opinion or legal conclusion.  It calls for speculation with is it possible.  It lacks foundation and relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  As reviewed within the look-back period under the three City programs, we did not believe -- we found the system was not functioning.  Apologies, Ms. Mitchell.  Was that your question?

**BY MS. MITCHELL:**

Q    My question was, is it possible to achieve the goals of the settlement agreement as articulated in this recital under the current homelessness response system?

**MR. MCRAE:**  Objection again.  Mischaracterized in the

document.  Relevance.  Calls for legal conclusion.  Lack of foundation.

**THE COURT:**  Overruled.  You can answer the question.  If you needed it repeated?  We can repeat it.  We've got -- in other words, there's been a question, objection, and question and objection.  So if you need it restated, we'll -- she'll re-ask it.

**THE WITNESS:**  Can you please restate your question?

Q    Yes, and I would ask that the objection stand so that I can ask the question without interruption.  Is it possible to achieve the goals of the settlement agreement as articulated in this recital under the current existing homelessness response system in Los Angeles?

**MR. MCRAE:**  Objection.  Hypothetical.  Calls for a legal conclusion.  Lack of foundation and relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  The goal is to achieve a substantial and meaningful reduction in sheltered homelessness in the City of Los Angeles within our look-back period, we do not -- from the evidence that we reviewed under these three City programs, from June 1st, 2020, through June 30th, 2024, we do not believe in the state that it was in that it could achieve a substantial and meaningful reduction in unsheltered homelessness in the city of Los Angeles.

**MR. MCRAE:**  Objection, Your Honor.  Also vague.

Frost - Direct / By Ms. Mitchell                    **220**

Those terms are not defined substantial and meaningful, so the

testimony is irrelevant.

          **THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q    Going back to the assessment that you did, Exhibit 23.

Now, one of the main strategies under the Roadmap agreement was

the use of time-limited subsidies.  Do you recognize that

phrase, time-limited subsidies?

A    Yes.

Q    And what does that phrase mean?

A    Time-limited subsidies, or referred to as within scattered

sites within the City program, specifically the Roadmap Freeway

Agreement, were rental subsidies and other supportive services

as deemed within the contract for people experiencing

homelessness.

Q    Were time-limited subsidies also referred to as rapid

rehousing vouchers?

A    Yes.  That is my understanding.

Q    Now, turning to page 63, at the bottom of page 63, where I

have just zoomed in on Exhibit 23, you identify that more than

half of the funding for TLS service provider contracts linked

to the Roadmap program were from other sources.  Can you

explain that?

          **MR. MCRAE:**  Objection.  Relevance and lack of

foundation and hearsay.

THE COURT:  Overruled.  Overruled.

THE WITNESS:  From our understanding, the City and County were funding TLS slots, or beds under roadmap.

THE COURT:  Now, just one moment, please.

(Pause)

THE COURT:  I'll be with the counsel in just a moment.

(Pause)

THE COURT:  Thank you.  If you'd like to ask your question, please.

MS. MITCHELL:  Thank you.

BY MS. MITCHELL:

Q    So you identify that, I think, more than 55 percent of the funding for TLS programs linked to the Roadmap program came from other sources.  What other sources, other than the City, did the TLS funding come from, to your understanding?

MR. MCRAE:  Objection.  Lack of foundation that there is an understanding, also relevance.

THE COURT:  Overruled.  Can you answer the question, please?

THE WITNESS:  Other funding sources could include funding from the County or other funding sources received by LAHSA.

THE COURT:  Just a moment.

(Pause)

Frost - Direct / By Ms. Mitchell                                    **222**

THE COURT:  All right.  Your next question, counsel. Thank you for your courtesy.

MS. MITCHELL:  Thank you.

Q    Starting with a sentence that, I guess, starts with per, that I'm pointing out with my laser.  Do you see that per LAHSA?

A    Yes.

Q    Can you read that next sentence for us, please?

A    Per LAHSA, TLS beds reported under the roadmap program include all clients funded through TLS contracts that receive comingled funding, quote/unquote, LAHSA's position is that all clients are --

Q    I'm going to stop you there.  Let's end where it says funding.  I just want to ask a question about that sentence. What do you understand comingled funding to be?

MR. MCRAE:  Objection.  Lack of foundation, hearsay, and relevance.

THE COURT:  Overruled.

THE WITNESS:  Comingled funding, meaning that for that TLS contract referenced could receive more than just City funds and other funding sources may be used.

MS. MITCHELL:  So funding was coming from outside of the City, and LAHSA was putting it all in the same fund with the City funds.  Is that your understanding?

MR. MCRAE:  Objection, leading.

**EXCEPTIONAL REPORTING SERVICES, INC**

Frost - Direct / By Ms. Mitchell                    **223**

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Yes.  For the respective TLS contract to receive comingled funding, multiple funding sources may have been leveraged.  So for example, if the City provided funding to LAHSA, they may have used that funding in addition to, for example, the County funding that LAHSA had also received.

MS. MITCHELL:  And let's go on to the next sentence. So LAHSA's position is that all clients are, I'm just going to read this into the record, served by the full amount of funding a program receives, and clients cannot be meaningfully separated by those funded by the City and those not.  Do you have an understanding of what that means?

MR. MCRAE:  Objection.  Hearsay, lack of foundation, and relevance.

THE COURT:  Overruled.

THE WITNESS:  When multiple funding sources are used to serve the terms of the contract and that respective service, it is difficult to distinguish what specifically the City funded versus the other funding sources from clients served.

BY MS. MITCHELL:

Q    And there's quotation marks around that statement. LAHSA's position is that all clients are served by the full amount of funding a program receives, and clients cannot be meaningfully separated by those funded by the City and those not.  Was that a direct quote?

EXCEPTIONAL REPORTING SERVICES, INC

Frost - Direct / By Ms. Mitchell                    **224**

A      Yeah.

        **MR. MCRAE:**  Objection, hearsay.  That's what makes it hearsay.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes, it's in reference to a LAHSA -- footnote 238, a LAHSA memo Roadmap report.  Fiscal year '23 through '24, Q3 date April 5th, 2024.

Q    And just to confirm, you never received any objections from the City to the assessment findings until today; is that right?

        **MR. MCRAE:**  Objection.  Lack of foundation.

        **THE COURT:**  Overruled.

        **MR. MCRAE:**  And relevance.

        **THE WITNESS:**  We have not received any objection from the City on this finding.

**BY MS. MITCHELL:**

Q    Going to the next paragraph.

        **THE COURT:**  I just want to make sure, have you received any objection from LAHSA concerning this finding?  You said you've received none from the City.  Do you know of any objection by LAHSA?  I'm going to throw in the County also, just to make sure.

        **THE WITNESS:**  For clarification, direct correspondence to A&M?  I cannot recall a specific correspondence from LAHSA on this directly to A&M.

**THE COURT:** Okay, thank you.

Q    And Ms. Frost, apologies, I keep wanting to call you Ms. Collier. Ms. Frost, you were at the hearing in, I think it was March 29th of 2025 of this year; is that right?

A    I believe so.

Q    And at that point, the City had an opportunity to ask A&M questions at that hearing. Do you recall that?

**MR. MCRAE:** Your Honor, objection, relevance. The hearing was not this evidentiary hearing about whether there's a breach of the settlement agreement. It's also not relevant.

**THE COURT:** No, overruled. You can answer that question.

**THE WITNESS:** Are you referring to the court hearing where we had issued our draft report? It was the first hearing after that. Yes, I do recall that hearing, and I do not recall the City inquiring specifically on the TLS contracts.

**BY MS. MITCHELL:**

Q    Did the City inquire specifically about anything at that hearing, to your recollection?

**MR. MCRAE:** Objection, Your Honor. The City's never agreed that this could be used for any or all purposes.

**THE COURT:** No, overruled. You can answer that question.

**THE WITNESS:** No, I do not recall.

Q    And you were also here on May 15th, just a couple weeks

Frost - Direct / By Ms. Mitchell                    **226**

ago, also, again, presenting your final findings at that hearing; is that right?

A    Correct.

Q    And at that point, did the City have an opportunity to ask you any questions at all?

A    They were offered the --

MR. MCRAE:  Objection.  Lack of foundation, Your Honor.  Also, relevance.

THE COURT:  No, overruled.  You can answer that question.

THE WITNESS:  I do recall the City having the opportunity and do not recall any objection related to TLS.

**BY MS. MITCHELL:**

Q    Turning to your findings, again, we are on page 64 of Exhibit 23 with the paragraph identified as mentioned.  Now, let me ask this question.  Were you able, ultimately, to verify the number of TLS beds that were provided by the City of Los Angeles under the Roadmap agreement?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  No, we were unable to verify the number of beds reported.

Q    Why not?

MR. MCRAE:  Objection.  Lack of foundation and relevance.

Frost - Direct / By Ms. Mitchell                **227**

THE COURT:  Overruled.

THE WITNESS:  In relation to TLS, for example, when we were attempting to understand how do we -- to obtain evidence, right, from these 95 contracts that LAHSA identified as related to these scattered sites reported, we were unable, from that 95 -- list of 95 contracts, we did not identify 70 percent of the expenditures within that fiscal year, specifically fiscal year '24.  Therefore, if we were unable to confirm the expenditures for those contracts that pertained to those sites, we were then, therefore, unable to verify the actual expenses and respective slots that were reported.

BY MS. MITCHELL:

Q   So, referring to your findings, 70 percent of the contracts did not report financial expenditures in fiscal year 2023-2024.  Did those -- did you look at those same contracts for the years prior, 2022 to 2023?

A   No, this question was specific to the 2,293 scattered sites as of June 30th, 2024.

Q   Now, regarding the 30 percent of the contracts which you were able to identify financial expenditures, could you link the 30% of those contracts to the 2,293 scattered sites?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  Overruled.  You can answer the question, please.

THE WITNESS:  From the understanding, right, if 30

EXCEPTIONAL REPORTING SERVICES, INC

Frost - Direct / By Ms. Mitchell                    **228**

percent of those 95 contracts were identified had expenditures, we were ultimately unable, then, to determine based on the supporting documentation provided, ultimately which contracts had -- were allocated the respective number of those utilized slots.  So specifically -- I'm trying to explain this very clearly, if you have 2,293 scattered sites or respective TLS slots --

THE COURT:  Just a moment, would you repeat that number, 2,293?

THE WITNESS:  Scattered sites or TLS slots, and you have, of those scattered sites, only expenditures for 30 percent of those contracts, you would then want to understand, for the expenses that I have record of, how many slots were ultimately funded by those expenditures and we were unable to obtain evidence to gain that level of insight.

**BY MS. MITCHELL:**

Q    Turning to page 105 of Exhibit 23, you talk about the time limit subsidy agreements and -- well, let me -- I'll ask a different question.  Were you able to look at the invoice details, a little bit different than what you just said, the invoice detail in those 30 percent of those contracts, to know how many slots each contract was funding?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  No, I do not recall from the data that

**EXCEPTIONAL REPORTING SERVICES, INC**

Frost - Direct / By Ms. Mitchell                    **229**

was provided, the number of specific slots funded for each of those 95 contracts.  And then what was ultimately, right, from our understanding, the 2,293 is utilized, not just funded.

Q    And you mention here, A&M reviewed the TLS contracts under the Roadmap program named LAHSA contracts and the number of TLS slots was not easily identifiable.  Is that in reference to the 30 percent of the contracts that did have the financial expenditures?

MR. MCRAE:  Objection.  Relevance.  Hearsay.

THE COURT:  Overruled.

THE WITNESS:  The 95 list of contracts is relying upon what LAHSA identified as related to those.  From my recollection, right, we had expenditure data for roadmap program named LAHSA contracts that were not part of those 95.

THE COURT:  Would you restate that for me?

THE WITNESS:  From my understanding, the 95 contracts that LAHSA identified as pertaining to the 2,293 utilized TLS slots may not have been all of the TLS contracts that we had record of within this Roadmap program named LAHSA contracts.  I just wanted to clarify that for record.

THE COURT:  All right.  Now --

MS. MITCHELL:  May I proceed, Your Honor?

THE COURT:  You may.

//

//

**BY MS. MITCHELL:**

Q    Showing you the sentence that has been highlighted, starting with therefore.  Can you read that sentence, please?

A    "Therefore, A&M could not validate the reported number of TLS beds or the total expenses necessary to support those beds."

Q    Was that just for fiscal year 2023-2024 or was that throughout the look-back period?

        **MR. MCRAE:**  Objection.  Relevance and compound.

        **THE COURT:**  Overruled.  Overruled.

        **THE WITNESS:**  This specific finding is related to fiscal year '24, specifically as of the slots reported as of June 30th, 2024.

**BY MS. MITCHELL:**

Q    Were you able to validate the reported number of TLS beds or the total expenses necessary to support those beds for any of the fiscal years that you looked at related to the Roadmap agreement?

        **MR. MCRAE:**  Relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  My apologies, Ms. Mitchell.  Can you kindly repeat your question?

Q    Were you able to validate the reported number of TLS beds or the total expenses necessary to support those beds for any of the years that you looked at during this assessment?

Frost - Direct / By Ms. Mitchell                    **231**

A    Ultimately, specific to this request was specific to fiscal year '24.  I do not recall off the top of my head if we had traced all of the contracts and related expenditures for previous fiscal years.

Q    Have you seen recent media reports about TLS beds specifically reported, I think, first in LAist by Nick Gerda?

        **MR. MCRAE:**  Objection.  Relevance and hearsay.

        **THE COURT:**  Yeah, I'm just curious about the relevance, counsel.  In other words, I appreciate that it comes from the audit.

        **MS. MITCHELL:**  I can make a proffer, Your Honor, if that's helpful.

        **THE COURT:**  All right.

        **MS. MITCHELL:**  There was a significant additional follow-up that happened by Mr. Gerda with LAHSA and he published additional spreadsheets and email exchanges regarding specifically these TLS beds and I'm --

        **THE COURT:**  Are you aware of this, first of all, foundationally?

        **THE WITNESS:**  Yes, I'm aware of this article.

        **THE COURT:**  You've read those articles?

        **THE WITNESS:**  I have read one article, I believe, from LAist related to TLS.

        **THE COURT:**  And what's your question, counsel?

        **MS. MITCHELL:**  My question is, was there anything

**EXCEPTIONAL REPORTING SERVICES, INC**

Frost - Direct / By Ms. Mitchell                    **232**

about the reports, the emails, whatever was contained in that

article that changes your conclusion that you could not

validate the reported number of TLS beds?

          **MR. MCRAE:**  Objection.  It's unintelligible.  It's

vague.  It's hearsay.  We don't even know what article we're

talking about, the date or the content, and it's not relevant.

          **THE COURT:**  Well, first, it was pretty widely

distributed.  But I'm going to broaden that, whether it's LAist

or any other source, has there been a change in any of these

publications?  The press has been interested in this and

they've done some investigative reporting.  Is there anything

that you've read that changes, you know, your opinion in this

matter?

          **MR. MCRAE:**  Same objections.

          **THE COURT:**  I mean, does it, in other words, I'm only

going to rely upon your audit, but there may be something that

came to your attention subsequently through investigative

reporting by the press that may cause you to raise or lower

these figures or reexamine.  That's what I'm after.  If it's

changed in some way from some external source, we'll include

LAist, Times, whatever news or any other source.

          **MR. MCRAE:**  Same objections.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Ultimately, from what I recall from the

article, LAHSA had -- it does not change the finding in this

Frost - Direct / By Ms. Mitchell                    **233**

report that we ultimately could not verify these TLS beds. LAHSA, from my understanding, produced a different contract list to the press in relation to these scattered size, these TLS slots.

THE COURT: Did you receive this data, or was it just, or do you know, was it simply distributed? I don't mean simply. Was it distributed to the press, or was it also distributed to you?

THE WITNESS: I read it in the press, and I believe Nick, I can't recall who, had sent us that data that was received from LAHSA as well.

THE COURT: And did that change an opinion on your part?

THE WITNESS: t did ultimately not change our opinion whether we could validate the reported number of TLS beds from what we had sought, although it was a different contract listing. It's our understanding that was still provided of what was funded, those respective TLS slots that were funded, and those respective expenditures. Not necessarily, again, getting us to understanding what was ultimately utilized and funded for those respective slots.

MR. MCRAE: Your Honor, I'd move to strike. None of those documents are before us. We don't even know what they are, or whether they purport to be complete. How do you cross-examine that? I mean, we don't have -- we don't even know what

it was referring to.

THE COURT:  I'll give you time.  I think that was so widely distributed throughout the southland.  I'll give you time for cross-examination.  I'll give you that.  But the Court's relying upon the audit itself, one way or the other, whether something changes her mind that you've received externally from any source, you know, I'd like to know, and apparently it hasn't.  So, counsel.

MS. MITCHELL:  Thank you.

**BY MS. MITCHELL:**

Q    Let's move on to the LA Alliance agreement.  Was your team able to verify all of the City's claimed beds under the LA Alliance agreement?

MR. MCRAE:  Objection.  Vague and relevance.

THE COURT:  Do you understand the question?

THE WITNESS:  Were we able -- may I repeat the question?

THE COURT:  Please.

THE WITNESS:  Is there a question asking if the A&M team was able to verify the number of beds reported under the Alliance settlement program?

MS. MITCHELL:  Correct.

MR. MCRAE:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  We were unable to verify the number of

beds upon requesting evidence that may have given us insight into the number of beds created and reported to the Court.

THE COURT:  So we've moved off of the Roadmap now over to LA Alliance.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q    And why was your team unable to verify the City's claimed beds?

MR. MCRAE:  Objection.  Relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  We had requested resource management system reports.  I believe I'm referencing that correctly. RMS, which, from my understanding, gave a list of units by respective site.  That would be the site address as well as the RMS program name.  We attempted looking at those reports that LAHSA kindly provided to see if we could trace that site address within the RMS report to what was in the quarterly reports.  And ultimately, we found some sites and were unable to identify them by the address.

BY MS. MITCHELL:

Q    Turning to page 115 of Exhibit 23, you note down at the bottom where it says, further -- well, I'm sorry, let me back up to the sentence before.  "Without being able to confirm the base number of units for each PSH site within the RMS vacancy

Frost - Direct / By Ms. Mitchell                    **236**

reports, a vacancy analysis could not be performed."  Why not?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  In addition to the site addresses that I referenced, we attempted to just look at the listing of units within each of those respective sites, and those units did not correspond as well.  So ultimately, if we were unable to validate, we didn't want to incorrectly report a potential vacancy rate.

THE COURT:  Just one moment, counsel.

(Pause)

THE COURT:  Counsel, your next question, please.

MS. MITCHELL:  Thank you.

BY MS. MITCHELL:

Q    For the next sentence, starting here, can you read this?

A    "Further, approximately 20 percent of the PSH sites identified as open were" --

Q    All right.  Let me go to the next page.  So, "Further, approximately 20 percent of the PSH sites identified as open were" --

A    I believe, I apologize, I believe the word not is missing, but "were not easily identified within the RMS reports, deepening concerns about transparency regarding available resources and potential underutilization of those resources."

Q    Okay.  That typo is important, so I'm going to go back.

"Further, approximately 20 percent of the PSH sites identified as open were not easily identified within the RMS reports." Did I read that correctly with the typo not inserted?

A    Correct.

        **MR. MCRAE:**  Objection.  Relevance and leading.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes.

Q    Okay.  And what does that mean when you say it was not easily identified within the RMS reports?

        **MR. MCRAE:**  Sam, objections, relevance?

        **THE COURT:**  Overruled.

        **THE WITNESS:**  We looked at the RMS reports, specifically the site addresses that were within those reports to tie them to the quarterly status reports to the Court, and were unable to find that respective address.

**BY MS. MITCHELL:**

Q    So 20 percent of the sites identified as open and occupiable you were not able to find in the RMS system run by LAHSA; is that right?

        **MR. MCRAE:**  Leading and relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Correct.  I do want to clarify.  I believe it was the Alliance element as well as the Roadmap program.

Q    So 20 percent of both the Roadmap and the Alliance

Frost - Direct / By Ms. Mitchell                                238

permanent supportive housing bets.

A    Correct.

          MR. MCRAE:   Same objections.

          THE COURT:   Overruled.

Q    And do you know what the RMS system is, the resource management system?

A    Outside of our understanding that this is the system used to track vacancies and match participants with permanent supportive housing, that is the extent of our knowledge of the system.

Q    Did you ask anybody from LAHSA about why the A&M team was unable to find those addresses in the RMS reports?

A    Yes.

          MR. MCRAE:   Objection.  Relevance.

          THE COURT:   Overruled.

          THE WITNESS:   LAHSA confirmed that it is --

          MR. MCRAE:   Objection.  The question is answered.

          THE COURT:   Finish your answer, please.

          THE WITNESS:   We did ask LAHSA and LAHSA explained that they are working with the LA Housing Department to correct and determine why those sites were not easily identifiable.

          MR. MCRAE:   Move to strike as hearsay.

          THE COURT:   Overruled.

//

//

**BY MS. MITCHELL:**

Q    Did anybody or the person from LAHSA, do you recall who it was that you spoke to at LAHSA about this issue?

A    It was an email.  I do not recall off the top of my head which respective individual had sent that email.

Q    Did they deny that those 20 percent of sites were not found within the RMS reports?

         **MR. MCRAE:**  Objection.  Hearsay, relevance, and best evidence --

         **THE COURT:**  I don't understand the --

         **MS. MITCHELL:**  That was a bad question.  May I ask another question -- a different question, Your Honor?

         **THE COURT:**  I didn't understand the question.

Q    Did anyone -- when you contacted LAHSA to ask why 20 percent of these beds were not found within the RMS reports, did anybody from LAHSA respond and tell you that you were wrong?

         **MR. MCRAE:**  Objection.  Relevance, hearsay.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  We had reached out to LAHSA and in a question as they first reviewed what they had produced in relation to Roadmap, they explained that -- they recognized that those sites and had identified we cannot locate those within these reports and they acknowledged that and said they were working with the Housing Department to correct that.  They

Frost - Direct / By Ms. Mitchell                    **240**

weren't sure why.

**BY MS. MITCHELL:**

Q    Did your team analyze the City's encampment resolution strategies including the CARE, CARE Plus operation?

A    We requested data from the City to give us insight into those metrics.

Q    Did you ask data in relation to whether those CARE, CARE Plus operations were being paired with offers of shelter or housing?

          **MR. MCRAE:**  Objection.  Relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  From the data provided by the City, we were unable to determine whether from a CARE Plus operation if someone was ultimately served or housed.

Q    Would you describe the homelessness response system in Los Angeles that you reviewed as accountable?

          **MR. MCRAE:**  Objection.  Vague, lack of foundation, relevance, and to the extent it calls for a legal conclusion, lacking a foundation.

          **THE COURT:**  I'd like to know as to each entity.  In other words, it's too broad right now.  And that is as to the Roadmap, LA Alliance, or Inside Safe.  So, counsel, you can break that question down, but right now it's sustained.

**BY MS. MITCHELL:**

Q    Did you -- would you describe the homelessness response

Frost - Direct / By Ms. Mitchell                    **241**

system within LAHSA specifically that you evaluated, did you find it to be accountable?

     **MR. MCRAE:**  Vague and relevance as to what accountable means.

     **THE COURT:**  That's overruled, but Counsel, I need to know if we're referring to the Roadmap agreement, the LA Alliance agreement, Inside Safe agreement.  Those are separate agreements, and so the question is too broad for me.

     **MS. MITCHELL:**  Your Honor, I think that she can describe all of them together, but I can ask a separate question.

     **THE COURT:**  No, she's not going to because I've already made the ruling, counsel.  So you can break it down or you can move on.

     **MS. MITCHELL:**  Thank you, Your Honor.

**BY MS. MITCHELL:**

Q   Regarding the road -- specifically the Roadmap agreement between the City and the County in conjunction with this Court and under the Alliance umbrella, did you find that homelessness response system to be accountable as to LAHSA?

     **MR. MCRAE:**  Same objection, relevance and vague.

     **THE COURT:**  Overruled.  Overruled.  You can answer that question.

     **THE WITNESS:**  Ms. Mitchell, can you kindly repeat your question?

Frost - Direct / By Ms. Mitchell                    **242**

**BY MS. MITCHELL:**

Q    I can try.

A    Sorry.

Q    That's okay.  Did you find in reviewing the contracts and the data and the interviews related specifically to the Roadmap agreement, did you find -- would you describe LAHSA's system in tracking that contract to be accountable?

        **MR. MCRAE:**  Relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I do not believe from within the scope of our assessment, we ultimately determined the level of accountability within LAHSA.

Q    Would you describe the homelessness response system within LAHSA as related specifically to the Roadmap agreement to be transparent?

        **MR. MCRAE:**  Objection.  Relevance.

        **THE COURT:**  Overruled.

        **MR. MCRAE:**  Vague.

        **THE WITNESS:**  Can you clarify, when you mean transparent, are you referring to transparency of beds being online and services being rendered?  Can you kindly help me understand what you mean by the transparency within LAHSA for the Roadmap?

//

//

**EXCEPTIONAL REPORTING SERVICES, INC**

**BY MS. MITCHELL:**

Q    Yeah.  Let me maybe break it down a little bit more.  Did you find that LAHSA was able to provide sufficient data to support its conclusions about beds produced and people helped?

          **MR. MCRAE:**  Objection.  Relevance and vague, lack of foundation.

          **THE COURT:**  Overruled.  This is as to the Roadmap agreement.

          **THE WITNESS:**  In the Roadmap agreement, no, I don't believe that we received all the evidence we needed to verify the beds reported by the City.

Q    Regarding the City of Los Angeles, when it comes to the Roadmap agreement specifically, would you describe the homelessness response system in the City of Los Angeles as accountable?

          **MR. MCRAE:**  Objection.  To the extent it calls for a legal conclusion, it's vague, lack of foundation, and relevance.

          **THE COURT:**  Overruled.  You can answer that question.

          **THE WITNESS:**  It was in the city of Los Angeles and from our assessment and from our understanding of even the City's communications, there does appear to lack a line of fiscal accountability in terms of the homelessness response system.

          **THE COURT:**  Now, just a moment.  How's everybody

Frost - Direct / By Ms. Mitchell                    **244**

holding up?  Focused?

MR. MCRAE:  Well, Your Honor, and in case you were asking, it's eight minutes to 4:00.

THE COURT:  No, I couldn't see.  It's got a glare.

Still focused?

MR. MCRAE:  Yes, Your Honor.

THE COURT:  Anybody need a break?  Witness okay?

MS. MITCHELL:  I'm good, Your Honor.

THE COURT:  You're good?  All right.  Just checking.

MS. MITCHELL:  Thank you.

**BY MS. MITCHELL:**

Q    Okay, so let's now talk about the Alliance program, right, the settlement agreement between LA Alliance and the City. Would you find -- would you describe the homelessness response system, specifically retaining to the Alliance agreement within LAHSA to be accountable?

MR. MCRAE:  Objection. Vague.  Also relevance.

THE COURT:  Overruled.

THE WITNESS:  Within the scope of our assessment and the cross look-back period, we did not look into the accountability within the organization of LAHSA.

**BY MS. MITCHELL:**

Q    Why not?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

EXCEPTIONAL REPORTING SERVICES, INC

Frost - Direct / By Ms. Mitchell                    **245**

**THE WITNESS:** We were ultimately looking at, in the perspective of how City funds were serving people experiencing homelessness within these three programs. So we were ultimately looking from the financial and performance standpoint of City funds, not necessarily the organizational accountability within LAHSA's operations.

Q   Would you -- did you find sufficient data to support the reported outcomes on both beds and individuals served related specifically to the Alliance agreement from LAHSA?

**MR. MCRAE:** Objection. Lack of foundation. Relevance. It' compound and it's vague.

**THE COURT:** Overruled.

**THE WITNESS:** Can you kindly repeat your question, Ms. Mitchell?

**MS. MITCHELL:** Sure.

Q   Did you find sufficient data from LAHSA to support their conclusions regarding beds produced and people served under the Alliance program?

**MR. MCRAE:** Same objections and relevance.

**THE COURT:** Overruled.

**THE WITNESS:** From my understanding of the Alliance settlement agreement, data in relation to permanent supportive housing may have been coming from the City, right? Not necessarily all from LAHSA within our look-back period.

//

Frost - Direct / By Ms. Mitchell                    **246**

**BY MS. MITCHELL:**

Q    Okay, so let's ask about the City then.  Would you describe the homelessness response system in the City of Los Angeles as accountable as it pertains to the Alliance program?

       **MR. MCRAE:**  Objection.  Vague, and relevance, and lack of foundation.

       **THE COURT:**  Overruled.

       **THE WITNESS:**  In terms of fiscal accountability, I believe it mirrors what we identified within Roadmap program.

Q    What about performance accountability?  Did you find performance accountability within the City of Los Angeles relating to the Alliance program?

       **MR. MCRAE:**  Vague, relevance, lack of foundation.

       **THE COURT:**  Overruled.

       **THE WITNESS:**  In relation to performance accountability, our understanding from the City, we did not find clear evidence on that.

Q    And relating to data, did you find sufficient data produced by the City of Los Angeles to support its reported outcomes, both in terms of bed and people served, in the Alliance program?

       **MR. MCRAE:**  Objection.  Relevance.  Vague.  Lack of foundation.  And to the extent it calls for a legal conclusion.

       **THE COURT:**  Overruled.

       **THE WITNESS:**  Can you kindly repeat your question,

Ms. Mitchell?

**BY MS. MITCHELL:**

Q    Did you find sufficient data to support the outcomes that were reported by the City of Los Angeles in reference to the Alliance program in terms of both beds and people?

          **MR. MCRAE:**  Same objections and relevance.

          **THE COURT:**  Overruled.  You can answer that.

          **THE WITNESS:**  We did not obtain data to gain insight into the outcomes reported in the quarterly reports to the Court.

Q    So let's turn to the Inside Safe program.  Specifically regarding the homelessness response system in LAHSA, as it pertains to Inside Safe, would you describe that system as accountable for both the fiscal and performance perspective?

          **MR. MCRAE:**  Relevance, vague, and lack of foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  We did not look into, within our scope and the look-back period, within the level of accountability within the organization of LAHSA for Inside Safe.

**BY MS. MITCHELL:**

Q    And did you find sufficient data to support the reported outcomes, both in terms of beds and housing, of Inside Safe?

          **MR. MCRAE:**  Objection.  Vague as to whom, given the witness's last answer, it's also leading.

          **THE COURT:**  Overruled.  You can answer the question,

Frost - Direct / By Ms. Mitchell                    **248**

please.

MR. MCRAE:  And relevance.

THE WITNESS:  When you reference beds reported under Inside Safe, can you help me understand what you're referring to?

Q    Sure.  The beds that were reported under the Inside Safe program as being open when they were reported publicly.

A    Ultimately, we were unable to -- I know from the evidence that we obtained, we were unable to reconcile the data between the Inside Safe reports and the various other documentation that we had received in relation to the various motel, hotel beds, right?  That could have been under a booking agreement, occupancy agreements, and the way that those were structured and the data that we had, we were unable to ultimately reconcile.

Q    Let's talk about booking agreements.  Why were you unable to reconcile the reported booking agreements?

MR. MCRAE:  Objection.  Relevance and lack of foundation.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    Let me set a quick foundation, actually, just to be clear. To your understanding, what are the motel, hotel booking agreements in Inside Safe?

A    Booking agreements under Inside Safe, to my understanding,

EXCEPTIONAL REPORTING SERVICES, INC

Frost - Direct / By Ms. Mitchell                    **249**

were based on usage.  So it's a contract that the City directly entered into with a motel, hotel owner.  And those beds would be funded based on actual usage for a set rate that the City and that respective party had agreed to.

Q   And those booking agreements that were reported, were you able to verify those booking agreements as actually utilized?

**MR. MCRAE:**  Objection.  Relevance, vague, foundation.

**THE COURT:**  Overruled.

**THE WITNESS:**  We received invoices, and I believe that was part of our scope of looking at invoices pertaining to those booking agreements.  But ultimately, there was nothing to reconcile in relation to, like, what you would imagine from the Roadmap and Alliance quarterly status reports of a set number of beds.  For example, since booking was based on usage, depending on the day.

Q   So with the booking agreements, could a person stay one day?

**MR. MCRAE:**  Objection.  Vague, lack of --

**THE COURT:**  I'm sorry, I couldn't hear the question. Would you repeat that?

**MS. MITCHELL:**  Yeah.  Yeah.

**BY MS. MITCHELL:**

Q   So with a booking agreement, which is reported sometimes under the Inside Safe program, could a person stay one day with a booking agreement voucher?

**MR. MCRAE:** Objection. Vague, lack of foundation, hypothetical, relevance.

**THE COURT:** Overruled. You can answer that question.

**THE WITNESS:** Yes, it's possible that a person could stay at a motel/hotel under a booking agreement for just one day.

Q    And would it be possible for a person to stay for 30 days under a motel/hotel booking agreement under Inside Safe?

**MR. MCRAE:** Lack of foundation, hypothetical, relevance.

**THE COURT:** Overruled.

**THE WITNESS:** Yes, it could be possible that someone would stay at that respective motel/hotel for 30 days under the Inside Safe booking agreement.

Q    Was there any way for you to verify from those invoices or any other documentation that a person actually utilized those beds as reported?

**MR. MCRAE:** Relevance.

**THE COURT:** Overruled.

**THE WITNESS:** No, we did not obtain any evidence that an individual would have actually stayed within that bed.

**BY MS. MITCHELL:**

Q    What role did the County coordination or lack of coordination play in the systemic breakdowns that we've been talking about today?

Frost - Direct / By Ms. Mitchell                        **251**

A    Can you help me understand specifically what your --

Q    Sure.  Did you find a high level of coordination between the County services and the City, for example, interim beds under the Roadmap program?

        **MR. MCRAE:**  Objection.  Vague, and relevance, and lack of foundation.

        **THE COURT:**  Overruled.  You can answer that question.

        **THE WITNESS:**  We did not, from my understanding, within the scope of our assessment, under the Roadmap program, the City and the County had an MOU of services to be provided by the County, ultimately -- so, I apologize, Ms. Mitchell, can you --

**BY MS. MITCHELL:**

Q    I'll ask a more specific question, Ms. Frost.  Did you attempt to verify whether or not services were actually being provided by the County pursuant to the Roadmap agreement in those beds or projects?

        **MR. MCRAE:**  Relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  In relation to all Roadmap beds, right, shelter, permanent supportive housing, we may have permanent supportive housing, we did obtain data and gain insight into for shelter outside of that.  I don't believe we obtained evidence to understand any referral or ultimate outcome to gain that level of insight.

**BY MS. MITCHELL:**

Q    So, I'm sorry, was that regarding permanent supportive housing or interim or both?

A    For the evidence received by the county would have been specific to permanent supportive housing under the roadmap program.

Q    Did you look at the provision of services within the interim shelter programs under roadmap?

        **MR. MCRAE:** Objection.  Relevance and vague.

        **THE COURT:** Overruled.

        **THE WITNESS:** I do not believe we -- I do not recall looking into that.

Q    At the last hearing, I asked your colleague Diane Rafferty whether this was a system that could be fixed by a few patches or needed a systemic overhaul and her response was that the processes are extremely broken and so it really needs to be built from the ground up.  Do you recall that statement?

        **MR. MCRAE:** Objection, Your Honor.  Relevance.

        **THE WITNESS:** I do recall that statement.

**BY MS. MITCHELL:**

Q    Do you agree with Ms. Rafferty's assessment?

        **MR. MCRAE:** Relevance.

        **THE COURT:** Overruled.

        **THE WITNESS:** I do agree with Ms. Rafferty's assessment.

Frost - Direct / By Ms. Mitchell **253**

Q    And why do you agree with the assessment that the processes are extremely broken?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I believe through the course of this assessment, we found various gaps across the entire system within our scope, right, Roadmap, Alliance, Inside Safe.  I think to correct those gaps, it requires to fix what we acknowledge is a broken system.

Q    As you sit here today can you say that in terms of the Roadmap agreement have been met based on your assessment?

MR. MCRAE:  Objection, Your Honor.  That calls for a legal conclusion.  It lacks foundation.

THE COURT:  No, you can answer that question and this is in terms of the numbers, the beds.

THE WITNESS:  On the premise of being able to verify the beds, we would be unable to conclude whether the City has met those number of beds that were reported.

BY MS. MITCHELL:

Q    As you sit here today can you say that the terms of the settlement agreement between the LA Alliance and the City have been met in terms of beds?

MR. MCRAE:  Your Honor, objection.  Relevance, lack of foundation, calls for a legal conclusion, and their analysis stopped a year ago.

Frost - Direct / By Ms. Mitchell                           **254**

**THE COURT:**  Just a moment.  It depends upon what time period we're talking about.  This agreement runs in 2027. There are quarterly reports.  I'm going to sustain the objection.  It's too broad at the present time.

Q   As of the time frame that you looked at, during that period of time, were you able to confirm that the beds that were reported as open were actually open under the Alliance agreement?

**MR. MCRAE:**  Objection.  Vague and to the extent it calls for a legal conclusion.

**THE COURT:**  Overruled.  You can answer that question.

**THE WITNESS:**  We were unable to verify the number of beds reported to the Court under the Alliance settlement as of June 30th, 2024.

**THE COURT:**  And that's 2023 to 2024?  Was that correct?

**THE WITNESS:**  Sorry, Your Honor.  As of June 30th, 2024.

**THE COURT:**  As of June 30th, I'm sorry.  I misheard that.  Thank you.

**BY MS. MITCHELL:**

Q   And as you sit here today, can you say that the City of Los Angeles has in place a system capable of meeting the terms, excuse me, the purpose, I will say, of the settlement agreement as identified previously in Exhibit 25?

Frost - Direct / By Ms. Mitchell                    **255**

**MR. MCRAE:** Objection. Lack of foundation given that the witness analysis ended a year ago.

**THE COURT:** Overruled. You can answer the question.

**MS. MITCHELL:** Would you like me to ask the question again?

**THE WITNESS:** Would you please, Ms. Mitchell?

**THE COURT:** No, I'm going to reverse that for the time being. Let's take a break. I want to think a little bit about that question. I'm not sure that's a correct ruling by the Court. So why don't we take a recess for 15 minutes, okay?

**MS. MITCHELL:** Your Honor, I actually -- I can withdraw that question. I have one more question and then I can step down and they can do their cross when we get back, if that's okay.

**THE COURT:** All right, certainly.

**MS. MITCHELL:** Yeah, thank you.

Q   So after this conclusion, when did -- let me restart that. When did this assessment get sent to the parties, to your knowledge?

A   The original draft of our report, March 6th, 2025.

Q   And has anybody from the City of Los Angeles leadership reached out to you since then to discuss potential solutions to the systemic problems that you identified?

**MR. MCRAE:** Objection. Relevance. There's no obligation to do that.

Frost - Direct / By Ms. Mitchell                    **256**

THE COURT:  No, overruled.  You can answer that question.

THE WITNESS:  We met with City -- the A&M team met with the City after the last -- the Court hearing in March, after the Court granted all parties to meet with A&M and we had a meeting.  The City had questions in relation to the report.  I do not recall specifically if the City had asked in relation to our recommendations how we would propose correcting that outside of -- nothing that I can recall specific to this report.

THE COURT:  Let me ask, Judge Barat and Special Master Martinez have been available at all times.  Were they included in this reach out between you and the City?

THE WITNESS:  Yes, Special Master Martinez was in that meeting.

THE COURT:  Okay, was Judge Barat in that meeting?  Do you recall?

THE WITNESS:  I apologize, who?

THE COURT:  Judge Barat, Andre Barat.

THE WITNESS:  I do not recall Judge Barat being on that meeting.

THE COURT:  Okay, all right.  Counsel, your next question please.

MS. MITCHELL:  Okay, sure.

//

**BY MS. MITCHELL:**

Q    So my question was a little bit more specific than that. Have there been any proposed solutions from the City that you have heard specifically?

**MR. MCRAE:**  Objection, vague.  Also relevance.

**THE COURT:**  Overruled.  You can answer the question.

**THE WITNESS:**  Proposed solutions in relation to our report, Ms. Mitchell?

Q    Correct, to rectify the various systemic problems that you identified.

A    With respect to our report, no, we have not had that -- I do not recall any correspondence specific from the City in relation to these findings that we identified within our report, like within the executive summary.

**MS. MITCHELL:**  All right.  I have no further questions for this witness at this time, Your Honor.

**THE COURT:**  When we come back, Ms. Myers, are you going to have questions before the City?

**MS. MYERS:**  Yes, Your Honor.

**THE COURT:**  Have you worked that out?  Is that acceptable to the City or would you like to go first or have you worked that out with Shayla Myers?  Well, work that out over the recess.  Tell me when you come back.  Let's take 20 minutes.  We'll reconvene at 4:30, okay?  Thank you very much. You may step down.

MR. MCRAE:  Your Honor, are we in recess?

THE COURT:  We are.  Thank you for asking.

**(Recessed at 4:09 p.m.; to reconvene at 4:25 p.m.)**

THE COURT:  And all counsel and parties are present. It's about 4:30.  So Ms. Myers, when you start your cross-examination, you call the time.  In other words, if you don't want to finish this evening, then start tomorrow when you're fresh, okay?  If you'd like to start this evening, why don't you start briefly if you're comfortable, and then tell us a good time to recess.

MS. MYERS:  I mean, Your Honor, if given the choice, I just received the order of the witness list today.  I understand that was exchanged by the parties.  So if given the choice, I wouldn't mind taking the extra time to be able to start tomorrow fresh, just because that would give us a chance to review the exhibits.  But, Your Honor, it's up to you.

THE COURT:  You'd probably have universally happy counsel.  Why don't we do this then?  Would 8 o'clock be acceptable to all of you?  Excellent.  Good.  So 8 o'clock tomorrow morning then, and go get some sleep, stay as fresh as you can, okay?

MR. MCRAE:  Thank you, Your Honor.  Have a nice evening.

THE COURT:  Give you a chance to prepare.  Now a couple more things.  Counsel, one more moment.  We're still on

the record.

For this Court's record, it's unclear what the LAist article you were referring to as plaintiffs' counsel when you questioned the witness about this article.  I'd like you to identify that article.

MS. MITCHELL:  At this moment, Your Honor?

THE COURT:  No, you can do it tomorrow morning if you'd like.  Okay, first thing.  All right.  Yeah, there have been a number of Times articles, LAist articles.

MS. MITCHELL:  We'll exchange it with the parties tonight, Your Honor --

THE COURT:  I can't hear you.

MS. MITCHELL:  We'll exchange it with the parties tonight, Your Honor, and we'll submit it tomorrow.

THE COURT:  Thank you.

MR. MCRAE:  Your Honor, not to pick a nit, but given the hour, is it possible to have a commitment that we'll get the identifiers of that article by, let's say, 5:30?

THE COURT:  I don't know.

MS. MITCHELL:  What is an identifier?  I'll just send it to you.

MR. MCRAE:  Meaning what it is, the name, date, title?

MS. MITCHELL:  I'll send you the link in five minutes.

260

MR. MCRAE:  Excellent.

THE COURT:  Well, let's say by 5:30 so you're not pressed.  Well, good night.  Have a wonderful evening.  We'll see you tomorrow at 8 o'clock.

MR. MCRAE:  You too, Your Honor.

MS. MITCHELL:  Thank you, Your Honor.

THE COURT:  I'll still be here, so go about your work.

Now for the other parties, we're still on the record. Has the County come up with a suggested name for the special master?

MS. HASHMALL:  Your Honor, we took the name that you suggested this morning and we're conferring with our client.

THE COURT:  Okay, confer and take your time.  There's no -- yeah, make sure you're comfortable and if you're not, then we'll move on, okay?

MS. HASHMALL:  Yeah, thank you.

THE COURT:  Yeah, but --

(Pause)

THE COURT:  Then counsel, for the witness, we'll see you tomorrow at 8 o'clock properly.  You'll be back on the stand at that time for cross-examination for Ms. Myers, okay?

THE WITNESS:  Thank you, Your Honor.

THE COURT:  And remember, we'll be down in the ceremonial courtroom tomorrow.  You'll be on the first floor.

261

(Proceedings concluded at 4:28 p.m.)


CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



_____                    May 28, 2025

            Signed                                       Dated


*TONI HUDSON, TRANSCRIBER*