UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) CASE NO: 2:20-CV-02291-DOC-KESx |
| | ) |
| | ) CIVIL |
| Plaintiffs, | ) |
| | ) Los Angeles, California |
| vs. | ) |
| | ) Wednesday, May 28, 2025 |
| CITY OF LOS ANGELES, ET AL., | ) |
| | ) (8:04 a.m. to 11:59 a.m.) |
| Defendants. | ) (1:00 p.m. to  5:12 p.m.) |

EVIDENTIARY HEARING RE COMPLIANCE WITH THE LA ALLIANCE
SETTLEMENT AGREEMENT [DKT.NO.767][863]
AND THE ROADMAP MOU AGREEMENT

(DAY 2)

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:                SEE PAGE 2

Courtroom Deputy:           Karlen Dubon

Court Reporter:             Recorded; CourtSmart

Transcribed by:             Exceptional Reporting Services, Inc.
                            P.O. Box 8365
                            Corpus Christi, TX 78468
                            361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES:


For Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                         MATTHEW UMHOFER, ESQ.
                         Umhofer Mitchell & King
                         767 S. Alameda Street, Suite 270
                         Los Angeles, CA 90021
                         213-394-7979


For Defendants:          JENNIFER M. HASHMALL, ESQ.
                         Miller Barondess, LLP
                         1999 Avenue of the Stars, Suite 1000
                         Los Angeles, CA 90067
                         310-552-4400

                         SCOTT D. MARCUS, ESQ.
                         ARLENE N. HOANG, ESQ.
                         THEANE D. EVANGELIS, ESQ.
                         Los Angeles City Attorney's Office
                         200 N. Main Street, Room 675
                         Los Angeles, CA 90012
                         213-978-6952

                         MARCELLUS A. MCRAE, ESQ.
                         KAHN A. SCOLNICK, ESQ.
                         PATRICK J. FUSTER, ESQ.
                         ANGELIQUE KAOUNIS, ESQ.
                         JAMES N. ROTSTEIN, ESQ.
                         Gibson Dunn & Crutcher
                         333 South Grand Avenue
                         Los Angeles, CA 90071

For Intervenor:          SHAYLA R. MYERS, ESQ.
                         Legal Aid Foundation of LA
                         7000 S. Broadway
                         Los Angeles, CA 90003
                         213-640-3983


Special Master:          MICHELLE MARTINEZ

3

<u>INDEX</u>

| <u>PLAINTIFFS' WITNESSES</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| **LAURA FROST** | | | | |
| BY MS. MYERS | | 6 | | |
| BY MR. MCRAE | | 34/66 | | |
| | | | | |
| **DIANE RAFFERTY** | | | | |
| BY MS. MITCHELL | 122 | | | |
| BY MS. MYERS | | 151 | | |
| BY MR. MCRAE | | 186 | | |
| | | | | |
| **LAURA FROST** | | | | |
| BY MS. MITCHELL | | | 222/235 | |
| BY MR. MCRAE | | | | 230 |
| | | | | |
| **MATT SZABO** | | | | |
| BY MS. MITCHELL | 238 | | | |

<u>EXHIBITS RECEIVED</u>                                          <u>NONE</u>

**4**

**Los Angeles, California; Wednesday, May 28, 2025; 8:04 a.m.**

**(Call to Order)**

THE COURT:  Counsel, first of all good morning.  And we're back in session, all counsel are present, the parties are present.  I'd ask the witness, Ms.  Frost, if you'd retake the stand please for cross-examination.

There's also a daily transcript being prepared.  I've invited both parties to read that transcript to make certain that it's accurate, and if not, call that to the Court's attention, okay?  All right.  Thank you very much.

Good morning.

THE WITNESS:  Good morning.

THE COURT:  How are you?

MR. MCRAE:  Your Honor, can we invoke the Rule with respect to what I understand to be another A&M witness.

THE COURT:  I'm sorry?

MR. MCRAE:  There's another A&M witness that I believe will be called to testify who's present.  Can we invoke the Rule please?

THE COURT:  For that witness, I'm going to ask you to wait outside for just a moment with A&M.  After these witnesses testify, though, counsel, they're going to be invited into court.

MR. MCRAE:  No, I understand.  And --

THE COURT:  And also, counsel, if they're subject to

**5**

recall they'll be invited back into the court.

MR. MCRAE: One other point I want to make is that there was a change in the plaintiffs' line up in terms of witnesses yesterday. I believe Ms. Rafferty actually was in the courtroom before I was made aware that she was going to be called as a witness.

THE COURT: You know, counsel, I'm very close to revoking you and I don't tell you why, I don't expect this testimony to change substantially from the A&M report. And therefore, I really don't see why these witnesses are being excluded from A&M and I think they ought to be allowed to listen to each other's testimony quite frankly. This report isn't going to change. I am going to revoke that.

Counsel, A&M's welcome to remain, just as the Special Master is. All right. Thank you. Cross-examination, please, Ms. Myers, if you're comfortable.

MS. MYERS: I have a little bit of a frog in my throat, so I'm looking for the mask -- do we know where the masks are for the mic, just out of -- to be conscious of everyone?

THE COURT: What do you need, we'll see if we can --

MS. MYERS: The masks for the mics, they were over here.

THE COURT: Oh, fine. And my apologies. We're switching. We have this courtroom the rest of the week. If we

Frost - Cross / By Ms. Myers                          **6**

go into next week, we're bargaining with the administration

here to see if we can stay in the courtroom.  Okay?  Otherwise

we might have to switch for a day or two.

      **MS. MYERS:**  Thank you.  Shayla Myers on behalf of the

intervenors.

<b>CROSS EXAMINATION</b>

**BY MS. MYERS:**

Q    Ms.  Frost, thank you so much for coming back today and

answering some additional questions.  So yesterday you were

speaking about the time limited subsidy program, correct?

A    Correct.

Q    Can you just tell us what your understanding is of the

time limited subsidy program?

A    Can you clarify in terms of the scope of services?

Q    What exactly is a time limited subsidy based on your

understanding in the audit?

A    The time limited subsidy was a program that encompassed

change rate throughout, as of late 2022, TLS and rapid

rehousing, shallow subsidy, there are a few other programs,

ultimately the premise was to provide rental subsidy, financial

assistance, or any other supportive services such as case

management to participants.

Q    And so effectively the time limited subsidies rather than

creating a bed is about providing a financial subsidy to pay

for rent; is that correct?

<b>EXCEPTIONAL REPORTING SERVICES, INC</b>

Frost - Cross / By Ms. Myers                    **7**

**MR. MCRAE:**  Objection, leading.

**THE COURT:**  Overruled.

**THE WITNESS:**  Yes, that is my understanding.

**BY MS. MYERS:**

Q   Okay.  And so unlike the, for example, a tiny home where you could actually visit a bed, what was the process that you looked for to verify whether the time limited subsidies were actually created for purposes of the Road Map agreement?

**MR. MCRAE:**  Objection, relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  To -- since there wasn't to your point of a physical location, such as a shelter that was created under the Road Map agreement and these were quote/unquote scattered sites, we attempted to understand and verify by looking at which contracts were relevant to those sites.  And then seeing if we could identify expenditures.

Q   And when you speak about expenditures, what do you mean by that?

A   Cost incurred for the respective contract that relates to that site.

Q   So were you looking at expenditures by LAHSA or were you looking at expenditures by the service provider?

A   This would have been through LAHSA's general ledger, so LAHSA's accounting records.

**THE COURT:**  I'm sorry.  I'm having trouble just with

Frost - Cross / By Ms. Myers                                  **8**

the echo.  Pull that microphone close to you so you don't have to bend over.  And would you slow down just a little bit and repeat that to me.

THE WITNESS:  Absolutely.  Is this better, Your Honor?

THE COURT:  Yeah, I just want to hear the -- your answer again please and we're going to slow you down, both of you, you and Ms.  Myers.

THE WITNESS:  Absolutely.  The expenditure data that we were looking at was from LAHSA's general ledger.

**BY MS. MYERS:**

Q    So that was -- so expenditures would have been LAHSA's payments to service providers; is that correct?

A    This would have been expenditures that would have been recorded through LAHSA's general ledgers of what service providers had reported of expenses incurred that ultimately LAHSA would have reimbursed them for.

Q    So the time limited subsidy was operating on a reimbursement process, so if a service --

THE COURT:  I'm going to slow you down and have you restate that now.

MS. MYERS:  Fair.

Q    So LAHSA was based on -- was making payments on the time limited subsidies based on reimbursements; is that correct?

A    That is --

Frost - Cross / By Ms. Myers                                    **9**

MR. MCRAE:  Objection, leading --

THE WITNESS:  -- my understanding, yes.

MR. MCRAE:  -- and also relevance.

THE COURT:  Overruled.

BY MS. MYERS:

Q    And so when you were documenting the --

THE COURT:  Just a moment.  First of all, I couldn't hear the answer with the objection, so we're going to start all over.  Now, we're going to breathe, everybody's going to breathe, deep breaths and what we're going to try to do is wait because there's going to be an objection probably to every question.  That's fine, make your record.

UNIDENTIFIED:  Your Honor, also --

THE COURT:  No, counsel, have a seat, thank you very much.  Okay.  These are the rules now.  We're going to slow down.

Q    So for the time limited subsidies when you're speaking about expenditures was LAHSA operating on a reimbursement system then when a service provider made an expenditure and LAHSA would reimburse that?

A    Correct.

MR. MCRAE:  Objection, leading, lack of --

THE COURT:  Overruled.

MR. MCRAE:  -- foundation and relevance.

THE COURT:  Overruled.  Now you can answer.  And if

Frost - Cross / By Ms. Myers                **10**

you can remember, if you can't, the objection, then just ask to receive the question.

THE WITNESS:  Correct, that is my understanding.

BY MS. MYERS:

Q    Okay.  So what were you looking for when you were looking at the books for LAHSA's books for evidence of the time limited subsidies?

A    For the scattered sites, we requested to understand which contracts pertained to those scattered sites so we could obtain an understanding.  I can take a step back.  Under the Road Map agreement, right, there's multiple contracts from service providers.  Those can be funded in multiple ways.

The City has various contracts with LAHSA.  If you're solely looking at the City to LAHSA contract, that's program named, so the Road Map program named contracts, we saw three TLS contracts.

THE COURT:  You saw what?

THE WITNESS:  Three that were solely funded within that program named contract.  So we requested LAHSA to provide us insight into all the contracts that related to those 2,293 scattered sites reported in the Road Map quarterly report as of June 30th, 2024.

MR. MCRAE:  Your Honor, I'd move to strike all the testimony about the Road Map agreement as irrelevant and would like to have a standing objection to this line of inquiry --

Frost - Cross / By Ms. Myers                                    **11**

THE COURT:  You have a standing --

MR. MCRAE:  -- about the Road Map agreement.

THE COURT:  -- objection.  That's clear, counsel, thank you.

**BY MS. MYERS:**

Q    And so -- go ahead.

A    No, please.

Q    And so how many contracts did LAHSA identify for you that related to the TLS slots that were included in the Road Map agreement?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  LAHSA identified 95 contracts as pertaining to the scattered sites.

Q    And when you talk about the 2,293 slots, what was your understanding of what a slot is?

A    Those slots, my understanding, was rental subsidy that a participant was enrolled and receiving rental assistance and that was being counted for the bed.

THE COURT:  Now, I want you to repeat the question and I want you to repeat the answer.  Okay?

Q    So when you identified 2,293 slots, what was your understanding about what a slot was for purposes of the Road Map agreement?

MR. MCRAE:  Relevance.

Frost - Cross / By Ms. Myers                                    **12**

THE COURT:  Overruled.

THE WITNESS:  Those slots from our understanding were rental subsidies that were provided for housing for a participant.

THE COURT:  For what?

THE WITNESS:  A participant, so a person experiencing --

THE COURT:  Participant, thank you.

BY MS. MYERS:

Q    And where did that 2,293 number come from?

A    There were three line items within -- sorry, I didn't know if you were going to object before I answered.

THE COURT:  We don't have an objection.  Well, it's a continuing objection so fine.

THE WITNESS:  Okay.  The 2,293 came from three line items in the quarterly status report.  I believe it was number 1 which was 2,163.  Number 60 and 61, which were a supplemental 130 scattered sites, so the 2,163 plus the 130 got us to 2,293.

Q    So you identified 2,293 slots from the Road Map agreement which came from the City; is that correct?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.  That is our understanding that the City reported to the Court.

THE COURT:  I'm sorry, we're going to have you repeat

Frost - Cross / By Ms. Myers                    **13**

that slowly.

THE WITNESS:  Yes.  The 2,293 was our understanding of what the City had represented to the Court in the quarterly status report.

**BY MS. MYERS:**

Q    Do you know how the City arrived at that number?

MR. MCRAE:  Objection, lack of foundation.

THE COURT:  Overruled.

MR. MCRAE:  And relevance.

THE COURT:  Overruled.

THE WITNESS:  My understanding, the City requested LAHSA to provide that data to them to represent to the Court.

Q    And did you ask LAHSA how they --

THE COURT:  Just a moment, the City requested LAHSA to give that data to them subject to?  Repeat your answer, I didn't hear it.

THE WITNESS:  The City, from my understanding for the Road Map agreement relied in relation to the scattered sites for LAHSA to provide that data to them so they could report it to the Court.

THE COURT:  Okay.  Thank you.

Q    And do you know how LAHSA derived that number?

MR. MCRAE:  Objection, relevance, foundation.

THE COURT:  Overruled.

THE WITNESS:  We asked LAHSA how they divided the

Frost - Cross / By Ms. Myers                    **14**

utilized slots of those respective contracts, since we were unable to identify approximately 70 percent of those expenditures.  They produced a memorandum that outlined their steps and pulling that data from HMIS or into a Tablo dashboard.

MR. MCRAE:  Objection, hearsay and move to strike as to the content of the out of court memorandum.

THE COURT:  Overruled.

BY MS. MYERS:

Q   So was it your understanding that the 2,293 slots were slots that were used or slots that were paid for or something else?

MR. MCRAE:  Objection, foundation, compound, relevance.

THE COURT:  Overruled.  Do you remember the question? Do you remember the question?

THE WITNESS:  What was that, Your Honor, I'm sorry?

THE COURT:  Do you remember the question?  I'm sorry, now I'm speaking too low.

THE WITNESS:  Can you please repeat your question, Ms. Myers.

Q   The 2,293 slots that were identified by the City that you were investigating, were those slots that were used or slots that were paid for or something else?

MR. MCRAE:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  From our understanding, the 2,293 that LAHSA presented were slots that were utilized.  Since we ultimately couldn't trace the expenditures, they wouldn't be able to trace payments.

**BY MS. MYERS:**

Q     And do you know if those slots -- if a single person using a slot constituted one out of the 2,293?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  In the memorandum they -- I believe was produced to the Court they outlined, I can't remember off the top of my head how they pulled that, but they did have various criteria that they would use to then determine how they would deem a slot utilized.

Q     Okay.  So there were 2,293 slots that were utilized, but can you tell us how many people used a single slot in the 2,293?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  We did not see any evidence of that, no.

THE COURT:  Would you repeat that slowly?

THE WITNESS:  We did not see any evidence that would provide us insight into the number of people that were served

Frost - Cross / By Ms. Myers                          **16**

for each slot.

          THE COURT:  All right.  Just a moment.  Counsel, I'll be right with you.

     **(Pause)**

          THE COURT:  All right.  Please continue.

**BY MS. MYERS:**

Q    So just to make sure I understand correctly, it was your understanding that the 2,293 slots had to be utilized to be counted, not simply funded?

          **MR. MCRAE:**  Objection, argument and lack of foundation.

          **THE COURT:**  Overruled.

          **MR. MCRAE:**  And also to the extent it calls for a legal conclusion.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Correct.  That was our understanding based on how they were pulling the data.  They claimed that these were the slots utilized.

Q    And so based on that, for a slot that was utilized, based on your experience looking at LAHSA data and based on your experience that this assessment if a slot actually was utilized, would you have expected there to be an expenditure?

          **MR. MCRAE:**  Objection, incomplete hypothetical, relevance, lack of foundation, also to the extent it calls for a legal conclusion.

Frost - Cross / By Ms. Myers                    **17**

**THE COURT:**  Overruled.

**THE WITNESS:**  I mean, I want to distinguish to your point between being utilized and being -- and costs being incurred.  You can be enrolled potentially in a TLS program, but ultimately if rental assistance was being provided, we would need to see that supporting documentation which we ultimately couldn't get to.

So if they were enrolled into a TLS program, and how it was described to us is they would identify all city funded TLS contracts, then there are associated program IDs, within HMIS.  Within HMIS, you can have multiple contracts pertaining to that program ID.

So it was unable from the data that was produced to determine how many slots were ultimately utilized by contract.  And therefore, what was ultimately funded for a slot, not necessarily just enrollment.

**BY MS. MYERS:**

Q    And were you ever provided any other way other than expenditures to verify the existence of these time limited subsidy slots?

**MR. MCRAE:**  Relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  We were not.

Q    Okay.  What were the goals of the assessment of the City's programs?

MR. MCRAE:  Objection, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Our high level goals was to understand what the City funded in relation to the City programs and ultimately what services were rendered and received and the outcomes they achieved.

**BY MS. MYERS:**

Q    And so part of it was to -- was part of the goal of the assessment to verify the existence of the beds that were allocated in the Road Map agreement?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  We ultimately, yes, as part of our assessment we attempted to reconcile the -- within our sample the beds reported to the Court and when we conducted on site field work or any type of field work of whether those beds were in existence.  So it was part of our assessment.

Q    And yesterday when you testified that you were unable to verify the City's bed count and the Road Map agreement, was that because you did not have sufficient data from the City of Los Angeles to verify that?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Correct.

Q    And did you ask the City for data sufficient to verify the

Frost - Cross / By Ms. Myers                    **19**

existence of the beds and the Road Map agreement?

      **MR. MCRAE:**  Objection, vague and relevance.

      **THE COURT:**  Overruled.

      **THE WITNESS:**  We did ask and they pointed us to LAHSA.

**BY MS. MYERS:**

Q    And did you ask LAHSA for data sufficient to verify the existence of the beds in the Road Map agreement?

A    Just to clarify this was -- I'm still referring to TLS under the Road Map agreement, we did ask LAHSA, yes.

Q    Okay.  Just looking at the Road Map agreement as a whole, was part of your assignment, for lack of a better term for this assessment, to verify the existence of the beds that the City reported in the Road Map agreement?

      **MR. MCRAE:**  Objection, relevance.

      **THE COURT:**  Overruled.  Do you recall the question?

      **THE WITNESS:**  Yes.  We -- I want to make sure that I'm answering this as accurately as possible.  When we requested -- throughout the duration of the assessment, right, from the objective evidence based perspective we wanted to see what money was spent, what was contractually obligated, so when we looked in question relation to the number of beds for all of Road Map, we ultimately asked what available data in relation to that specific site that LAHSA would provide, I think to the extent that we requested it, had been related to contracts for

Frost - Cross / By Ms. Myers                    **20**

those respective sites.

And so to verify the beds, you would then look to that contract to see if it was outlined there that the service provider provide this amount of services for these number of beds at this respective site.

**BY MS. MYERS:**

Q    And so you specifically requested the contracts rather than data as a whole sufficient to verify the existence of the beds; is that correct?

A    Correct.

**MR. MCRAE:**  Objection, relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  Correct.

**THE COURT:**  I'm sorry, your answer was?

**THE WITNESS:**  Correct, yes.

Q    And did you go back to LAHSA and inform them that you didn't feel that you had sufficient data to verify the existence of the bed count --

**MR. MCRAE:**  Objection, relevance.

Q    -- in the Road Map agreement?

**THE COURT:**  Overruled.  You can answer.

**THE WITNESS:**  We requested that if they could produce work papers in relation to TLS specifically.  For the other sites outside of TLS when we did on site field work we would have that insight from service providers how many beds that

Frost - Cross / By Ms. Myers                              **21**

they had.  And then would compare that to what was reported to the Court.

So it may not have come directly from LAHSA, it may have been what the service provider explained to us while we were on site.

**BY MS. MYERS:**

Q    Okay.

**MR. MCRAE:**  Objection, hearsay.

**THE COURT:**  Overruled.

Q    I'm going to ask you a couple of questions about the Care Plus program.  Was the Care Plus -- first of all, what do you understand the Care Plus program to be?

A    The Care Plus program from my recollection was a program through the Department of Sanitation in relation to cleaning endeavors and providing services to people -- to encampments or people experiencing homelessness.

Q    And what services were provided to people through the Care Plus program?

**MR. MCRAE:**  Objection, lack of foundation and vague.

**THE COURT:**  Overruled.

**THE WITNESS:**  We were unable to gain that level of insight.  From our understanding, and that put service outside of the borough of sanitation, we understood there to be Care, Care Plus outreach teams, but that would be through LAHSA.

Q    Did -- as part of your assessment for this assessment, did

Frost - Cross / By Ms. Myers                    **22**

you look at the Care Plus program?

          **MR. MCRAE:**  Objection, vague.

          **THE COURT:**  Do you understand the question?

          **THE WITNESS:**  Can you maybe explain what you mean we looked at the Care Plus program?

**BY MS. MYERS:**

Q    Did you evaluate the effectiveness of the Care Plus program?

          **MR. MCRAE:**  Objection, vague.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  We attended a Care Plus operation, ultimately that was the extent due to the available data that would give us insight as to how it related to the scope of the City programs.

          **MR. MCRAE:**  Move to strike as non-responsive.

          **THE COURT:**  Overruled.

Q    And why did you look at the Care Plus program, for purposes of going to a cleanup and asking for data related to it?

          **MR. MCRAE:**  Objection, relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  My understanding Care Plus/Care operations were part of the encampment reduction or resolutions under the Alliance program.

Q    And where did that understanding come from?

EXCEPTIONAL REPORTING SERVICES, INC

Frost - Cross / By Ms. Myers                           **23**

MR. MCRAE: Objection, hearsay, foundation.

THE COURT: Overruled.

THE WITNESS: I can't recall at the top of my memory of where that information came from.

**BY MS. MYERS:**

Q   So your examination of the Care Plus program was limited to attending one Care Plus clean up; is that correct?

A   Correct.

Q   And did you ask for any data related to the Care Plus program?

A   We did not ask for data pertaining specifically to the Care Plus.  The data would have been in relation to encampment reductions or clean ups as it related to the Alliance program.

Q   Did you ask for that data?

MR. MCRAE: Objection, asked and answered.

THE COURT: Overruled.

THE WITNESS: We did, yes.

THE COURT: And this is for Care Plus?

THE WITNESS: For Care -- we asked for --

THE COURT: Care and Care Plus?

THE WITNESS: We asked for data in relation to the encampment resolution reduction under the Alliance program.

THE COURT: Okay.

//

//

**EXCEPTIONAL REPORTING SERVICES, INC**

**BY MS. MYERS:**

Q    And to whom did you ask for that data?

A    The City.

Q    And did you receive any data?

A    Yes, we did.

Q    What data did you receive?

A    I believe it was a list of clean ups, but I cannot recall off the top of my head the specific fields of that data.  In our report and I can try to find the page reference or record, but ultimately in looking at that data we were unable to determine whether people were ultimately served or housed.

Q    And when you say you received a list of clean ups, was it your understanding that what you received was a list of Care Plus clean ups?

A    That may have been included in the data, yes.  I cannot recall at the top of my memory whether it was explicitly distinguished at the top of my memory.

        **MR. MCRAE:**  Move to strike, lack of foundation and non-responsive.

        **THE COURT:**  Overruled.

Q    Do you know if there were other programs that were listed under the encampment resolutions other than the Care Plus clean ups?

A    I do not recall off the top of my head.

Q    And was that included in the assessment, the list of data

Frost - Cross / By Ms. Myers                      **25**

that you received?

A     It was commented on that we reviewed the data that was produced by the City and to that level that we were unable to gain insight into, that was the extent of what we ultimately reported.

Q     And the data was lacking, because it didn't identify whether individuals were moved into housing or received other services; is that correct?

          **MR. MCRAE:**  Objection, assumes facts that there is a requirement for the reduction to count to have an offer of housing.  Also it lacks foundation, it calls for a legal conclusion and relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Can you kindly repeat the question, Ms. Myers.

          **MS. MYERS:**  Sure.

**BY MS. MYERS:**

Q     When you reviewed the data, you determined that it was insufficient for purposes of your analysis because it did not provide information about whether individuals were moved into housing or received services; is that correct?

          **MR. MCRAE:**  Same objections.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  When reviewing the data we were also trying to determine if we could reconcile to what the City

Frost - Cross / By Ms. Myers                    **26**

reported to the Court.  That data did not give us that level of insight and we were unable to figure out what exactly was within that data and ultimately if someone was served.  That was the extent.  And so our report solely just shows what the City reported to the Court.

**BY MS. MYERS:**

Q   So the assessment that is in the -- in your audit that you provided to the Court is based solely on the City's reports to the Court?

A   Correct.

Q   Did the information that the City provided to you related to the encampment resolutions, did it provide locations of those -- of the clean ups or the encampment resolutions?

A   I cannot recall every data field off the top of my head, but unfortunately I can't recall exactly.

Q   Okay.

        **THE COURT:**  Is there something that would refresh your memory concerning that?

        **THE WITNESS:**  We would have -- I could refer the -- to the data that was produced by the City and can review that.

        **THE COURT:**  All right.

Q   Did you ever -- were you ever informed by the City of Los Angeles that they did not have data responsive to any particular request?

        **MR. MCRAE:**  Objection, lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  We -- there -- one specific thing that the City represented they were unable to produce related to HACLA and for PSH, that was the one request that stands at the top of my memory today of one thing the City said they didn't -- did not or could not produce.

BY MS. MYERS:

Q     And what is HACLA?

A     The Housing Authority for the City of Los Angeles.

Q     And PSH stands for what?

A     Permanent Supportive Housing.

Q     And so what data were they unable to provide to you?

MR. MCRAE:  Objection, it assumes facts that testimony was can't or wouldn't, not unable to.

THE COURT:  Overruled.

THE WITNESS:  May I refer to the report?

Q     Of course.

A     Referencing page 117 for -- in the middle of that --

THE COURT:  Do you want that put up on the Elmo?  Or we can put it up on the screen.

MS. MYERS:  Yeah, that's fine, Your Honor, thank you.

THE COURT:  And we've situated the screen so everybody can see each document simultaneously.  So let's see if we can put that up for just a moment.  That way we'll road test it for the day with other witnesses also.

Frost - Cross / By Ms. Myers                    **28**

So each of you have a screen in front of you.  We've had MIS set up a screen in the corner and why don't we just take a break for just a moment.

MS. MYERS:  Sure.

(Pause)

MS. MYERS:  Okay.

THE COURT:  All right.  Thank you.  And, sir, thank you very much, appreciate it.

**BY MS. MYERS:**

Q    Is that the page you're referring to?

A    Yes.

Q    And which part of the report are you referring to?

A    The first paragraph in the middle, it starts with, for example, HACLA did not provide PSH data --

THE COURT:  Just one moment.  Let me catch up with you.

MS. MYERS:  That's in the first paragraph on --

THE COURT:  No, it's in the second to the last line first paragraph, for example.  Now, start again please, thank you.

THE WITNESS:  For example, HACLA did not provide PSH data that would have shed further light on long term housing impacts.

Q    And did you request that data from the City of Los Angeles?

Frost - Cross / By Ms. Myers                    **29**

A    Yes, we did.

Q    And they did not provide that data.

A    Correct.

Q    Did they identify whether they could provide that data or would not provide that data?

        **MR. MCRAE:**  Objection, lacks foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  The -- in correspondence with the City they -- we asked in our correspondence to the CAL office and they pointed us to the data that we were requesting from HACLA and HACLA provided the fields in which the data would be provided, but could not provide that, the actual data, just confirmed data fields existed.

        **THE COURT:**  I'm sorry, you dropped your voice, once again.  And confirmed?

        **THE WITNESS:**  HACLA provided the fields within the data that they would have to produce in relation to participants enrolled within permanent supportive housing, but they ultimately decided not to produce that data.

        **MR. MCRAE:**  Objection, Your Honor, relevance.  HACLA is not the City.

        **THE COURT:**  Thank you, overruled.

**BY MS. MYERS:**

Q    Did you request data from the Los Angeles Police Department?

A     We did, yes.

Q     What data did you request for the Los Angeles Police Department?

          **MR. MCRAE:**  Objection, relevance.

          **THE COURT:**  Overruled, you can answer the question.

          **THE WITNESS:**  There were various data requests.  I apologize, I can't recall off the top of my head how many or what those specific requests were.

**BY MS. MYERS:**

Q     Did you request data to verify whether individuals who were arrested were unhoused?

          **MR. MCRAE:**  Relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  My recollection, we requested data from LAPD as their interactions with people experiencing homelessness as it would pertain within our scope, so under the three programs across the look back period, including arrest data.

Q     And were one of the data fields that you were seeking whether the individual who was arrested was unhoused?

          **MR. MCRAE:**  Objection, relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Yes.

Q     And did you receive that data from the Los Angeles Police Department?

A    They claimed -- they pointed us to a publicly available arrest data and claimed that they -- that was all the data that they had.

Q    And that publicly available arrest data was that available on a City website?

        **MR. MCRAE:**  Relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  To my recollection, yes.

**BY MS. MYERS:**

Q    And did they provide you any additional data other than what was available on that publicly available website?

        **MR. MCRAE:**  Same objection.

        **THE COURT:**  I couldn't hear, counsel, I'm sorry.

        **MR. MCRAE:**  Relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I'm sorry, Ms.  Myers, can you please repeat?

Q    Did they provide you any other data other than what was available on that publicly available website?

A    In relation to that request, no.

Q    And did they ever provide you data related to whether an individual who was arrested was unhoused?

A    No, they did not.

Q    And that doesn't appear in the publicly available website?

        **MR. MCRAE:**  Objection, lack of foundation.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  Not that we had identified, no.

Q    And did you ask them specifically whether they had any additional data, other than what was available on the publicly available website?

            **MR. MCRAE:**  Relevance.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  We did not supplement that with asking. We -- it was our understanding that them pointing us to that publicly available website of arrest data was their response to our request.

**BY MS. MYERS:**

Q    And so did you understand from their response that the only data that they had available related to arrestees or the data that was available on that publicly available website?

            **MR. MCRAE:**  Objection, foundation --

            **THE COURT:**  Overruled.

            **MR. MCRAE:**  -- hearsay.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  Yes.

Q    And when the City represented that they didn't have data like this from the LAPD, that they did not have the arrestee data, did you have any other mechanism to verify whether or not the City had that existing data?

            **MR. MCRAE:**  Relevance.

Frost - Cross / By Ms. Myers                                    **33**

THE COURT:  Overruled.

THE WITNESS:  We did see memos that allegedly that the LAPD was tracking those interactions, but ultimately did not see any evidence of that.

**BY MS. MYERS:**

Q    For purposes of your assessment, did you have to take the City's word for it when they said they didn't have data available?

THE COURT:  Would you --

MR. MCRAE:  Objection --

THE COURT:  -- repeat that question just a little more slowly, just a little slower.

Q    When the City represented that they did not have data, like this data, did you have to take the City's word for it that that data did not exist?

MR. MCRAE:  Objection.

THE COURT:  In other words, did you have any other avenues that you could take to get this data?

THE WITNESS:  Yes, we took the City's word that they did not have that data.

MS. MYERS:  Okay.  Thank you.  No further questions.

THE COURT:  Counsel, before your cross-examination, would you like to take a recess and get up or get set up as a courtesy or would you like to start now?

MR. MCRAE:  I think I should -- Your Honor, I think I

should be good, but thank you for the --

THE COURT: Okay. And if you need to call a recess, call it whenever it's comfortable for you.

**CROSS EXAMINATION**

**BY MR. MCRAE:**

Q    Good morning, Ms. Frost.

A    Good morning.

Q    You've never been accepted as a legal expert by any Court, right?

A    I have not been a legal expert under Court provided testimony, no.

Q    Well, let's expand that a little bit, shall we. My question was, isn't it a fact that you've never been accepted as an expert on the law by any Court, under any circumstances, correct?

A    Correct.

Q    You don't hold yourself out as an expert on the law, correct?

A    I -- no.

Q    You're not a lawyer.

A    I am not a lawyer.

Q    You don't have a juris doctorate, also known as a law degree.

A    I do not have a law degree.

Q    You've never been accepted by any Court as an expert on

Frost - Cross / By Mr. McRae                    **35**

the causes of homelessness, correct?

           **THE COURT:**  On the causes of?

           **MR. MCRAE:**  Homelessness.

           **THE WITNESS:**  I am not an expert on homelessness.

**BY MR. MCRAE:**

Q    And isn't it also true that you've never been accepted by

any Court as an expert on solutions to homelessness, correct?

A    Correct.

Q    Now, I don't want to invite confusion.  In the context of

the word braiding, in terms of sources of funding for housing,

isn't it true that you've never been qualified as an expert on

the subject of braiding?

A    And can you clarify your question.  Are you referring to

an expert like testimony in court?

Q    Well, it would be an expert on any context, whether it be

in a deposition, whether it be in a proceeding, whether it be

in a courtroom, meaning that you have never been accepted as

an -- by any Court as an expert on the subject of braiding,

correct?

A    Within the Court, no.

Q    For instance, you don't know whether HUD itself

acknowledges that braiding is a commonly accepted practice that

it, in fact, encourages in order to give flexibility to

maximally use funds and fill gaps when a single source cannot

pay for all costs needed to operate a program, right?

Frost - Cross / By Mr. McRae                **36**

A     Can you please repeat your question?

Q     Yes.  You don't know whether HUD itself, the Housing and Urban Development acknowledges braiding as a commonly accepted practice that it, in fact, encourages in order to give flexibility to maximize the use of funds and to fill gaps when a single source cannot pay for all costs needed to operate a program, yes or no?

A     Funds are able to --

          **THE COURT:**  First of all, for all counsel I'm not going to limit these questions to yes or no by either side.  This is for the Court's benefit.  These won't be yes or no questions.  So reask the question, make certain that they're not -- there's not going to be limitation, counsel.

          **MR. MCRAE:**  Very well, Your Honor.

          **THE COURT:**  Any witnesses, including the CAO who's testifying, et cetera, so we won't be going down that line with the plaintiff or the defense.  These will be full answers.  All right.  So if you care to reask the question.

          **MR. MCRAE:**  May I proceed, Your Honor?

          **THE COURT:**  Please.

**BY MR. MCRAE:**

Q     You don't know whether HUD itself acknowledges braiding as a commonly accepted practice that it, in fact, encourages in order to give flexibility to maximize the use of funds and to fill in gaps when a single source cannot pay for all costs

Frost - Cross / By Mr. McRae    **37**

needed to operate a program, correct?

A    I am aware that HUD has stated that, yes.

Q    Oh, okay.  Let's talk about some of the assertions that you've made yesterday and today.  For starters, the assessment ended in the period June 30, 2024, correct?

A    Yes.

Q    Therefore, the assessment does not purport to speak to what the City has done relative to the subjects of the assessment since June 30th, 2024, right?

A    Correct.  Our look back period ended on June 30th, 2024.

Q    Now, the assessment references interviews with various anonymized people, correct?

A    Yes.

Q    But the assessment does not attach the notes of any of those interviews, right?

A    Not all notes were disclosed.

Q    And the names of the people interviewed obviously because they're anonymized are not provided for the City or anyone else to assess whether those people were informed, disgruntled or mistaken and the like, correct?

A    Incorrect.  I think relied upon the report in relation to an interview was disclosed.

Q    But in terms of the names of the people, those weren't provided, correct?

A    The names of individuals, correct, were not provided.

Frost - Cross / By Mr. McRae                                    **38**

Q    And the assessment has no breakdown in terms of exactly which members of your ten team -- of member team did what specific task in preparing the assessment, correct?

A    Can you repeat your question please?

Q    Sure.  Your assessment does not provide a breakdown of exactly what each given member of the ten person team did in effectuating the assessment, correct?

A    This is a collaborative effort for all team members, so there would be no way to distinguish singularly one person doing one task.

Q    So the answer to my question is correct, there is no individualized breakdown in terms of an allocation and time devoted by team members to create the assessment?

A    Correct.  It is not in the report.

Q    And you were asked if you had read the Alliance settlement agreement, right?

A    Correct.

Q    Okay.  I think that's Exhibit 25.  Why don't we pull that up if we can.

        **MR. MCRAE:**  Exhibit 25.  This is Exhibit 23.

    **(Pause)**

        **MR. MCRAE:**  And why don't we go to, what I believe using the ECF sequential pagination is going to be page 7.  And I'm turning -- actually we go to the preceding page, to page 6. So that we just have the cover, first page of the settlement

**EXCEPTIONAL REPORTING SERVICES, INC**

Frost - Cross / By Mr. McRae                    **39**

agreement.  That's fine.  This part is fine.

Q    So I want to make sure that I understand this.  You were asked yesterday whether you had read the settlement agreement.  I'm correct that your response was a team member had read the settlement agreement; is that right?

A    Yes.  I may have read it as well or a team member may have read it in addition.

Q    Well, I want to put a finer point on that.  You said, I may have read it.  Can you tell the Court now whether, in fact, you ever read the settlement agreement?

A    I -- for Docket 429 specifically under Exhibit 25, I don't know if I have seen this version.  I have seen other dockets of the settlement agreement that I have read, but I can't speak to Docket 429.

Q    I'm not -- and forgive me if I'm being imprecise.  I don't mean whether you've read this particular copy of the settlement agreement.  I'm just trying to unequivocal determine can you tell us whether you have ever read what purports to be the settlement agreement entered into by the City of Los Angeles and the plaintiffs in this litigation?

A    What purports on the settlement agreement, not specifically Docket 429, yes.

Q    Well, working off of your recollection, you don't recall seeing any commitment by the City in its settlement agreement with the Alliance in terms of how long the City would make a

given bed under the bed count available, correct?

A      (No response)

Q    You didn't see that in the agreement.

A     In relation to this Docket 429, I can't speak to it.

Q    Well, and is it that you can't speak to it because you don't know whether you read it or that you can't speak to it because you're not an attorney and you wouldn't feign to interpret it.

A    I believe I recall maybe a different docket, which had supplemental documentation.  I can't recall off the top of my head what that supplemental documentation would be in relation to the settlement agreement.

Q    And just again to parse that a bit, you're saying that you don't know whether the supplemental documentation that you're referring to actually was incorporated into and is part of the settlement agreement with Alliance, correct?

A    Correct.

        **MS. MITCHELL:**  Objection, Your Honor, the document speaks for itself.

        **THE COURT:**  No, overruled.

**BY MR. MCRAE:**

Q    So let's proceed --

        **THE COURT:**  I just want to make sure we have the answer.  The answer was?

        **THE WITNESS:**  Can you please repeat your question?

Frost - Cross / By Mr. McRae                     **41**

THE COURT:  I'm not sure the answer got cut off with the objection, so I think the answer was yes, but I'm not sure I heard that.

MR. MCRAE:  Yes.

BY MR. MCRAE:

Q    My question was, you do not know whether the supplemental documentation that you're recalling was in fact incorporated into and part of the Alliance settlement agreement, correct?

A    Correct.

Q    You don't recall seeing in any Alliance settlement agreement a commitment by the City to make an offer of housing any time it made an encampment reduction, correct?

A    Can you repeat your question, please?

Q    You don't recall ever seeing any commitment by the City of Los Angeles under the Alliance settlement agreement to make an offer of housing of any duration each time it affected an encampment reduction, correct?

MS. MITCHELL:  Objection, the document speaks for itself, Your Honor.

THE COURT:  Overruled.  If you know the answer, you can state it or your opinion.

THE WITNESS:  I cannot recall in reference to Exhibit 25.

Q    You don't recall seeing in any Alliance settlement agreement any limitations that were placed on the City in terms

Frost - Cross / By Mr. McRae                                    **42**

of how it would fund beds counted towards its bed count

obligation, correct?

A    Can you please repeat your question?

Q    You don't recall seeing any limitation in the Alliance

settlement agreement where the City limited itself in terms of

the source of funds for any bed it provided towards its

obligations of the bed count under that agreement, correct?

          **MS. MITCHELL:**  Objection, the document speaks for

itself.  I'd just like a standing objection, Your Honor.

          **THE COURT:**  Overruled.  If you have an opinion, you

can answer it.

          **THE WITNESS:**  I cannot recall in relation to Exhibit

25.

**BY MR. MCRAE:**

Q    You also can't point to any restriction in the Alliance

settlement agreement that would prevent the City from including

Inside Safe beds towards its bed count obligations under the

Alliance settlement agreement, correct?

A    Inside Safe beds were not counted within our look back

period under the Alliance settlement.

          **THE COURT:**  I'm sorry, would you repeat that more

slowly.  I --

          **THE WITNESS:**  From our understanding Inside Safe beds

were not part of the Alliance settlement within our look back

period.

Frost - Cross / By Mr. McRae                    **43**

Q    I had a different question.  I'm drawing on your --
perhaps you did, perhaps you didn't read the settlement
agreement and in the context of the settlement agreement, not
your understanding extrinsic to the settlement agreement, you
have not seen anywhere in the settlement agreement, which is
Exhibit 25 any restriction that would prevent the City from
including Inside Safe beds towards its bed count obligation
under that agreement, correct?

A    I don't believe I can answer your question because Inside
Safe beds have various agreements that -- that were represented
yesterday we talked about the difference between a booking
agreement and occupancy agreement, so unclear what your
question is specifically as it relates to Alliance.

Q    Perhaps I can simplify it.  The words Inside Safe bed
don't even appear in the settlement agreement with Alliance,
correct?

A    The Inside Safe program, to my recollection, is not
explicitly mentioned in Exhibit 25.  I don't believe it was in
existence at that time.

Q    You also can't point to any statement in the Alliance
settlement agreement where the City commits to a specific
duration that an encampment has to be reduced.

A    Can you please -- do you mean by a time period of an
encampment reduced?

Q    I can.  And maybe I can do that by improving on the

question.

Isn't it a fact that the term encampment reduction is not defined in the settlement agreement with Alliance, correct?

A    I cannot recall off the top of my head if it was defined.

Q    And in addition to not being defined in the settlement agreement, nor does the settlement agreement which is Exhibit 25 state how long a person who is the subject of an encampment reduction must be off the streets in order for the encampment reduction to count.

A    I have not read specifically Exhibit 25, Docket 429, I cannot recall if that is, in fact, mentioned.

Q    So let's talk about a few more statements.

MR. MCRAE:  Your Honor, would you mind if I approach. I have a bottle of water over there, I just want to retrieve it.

THE COURT:  Counsel more than welcome to.

MR. MCRAE:  Thank you.

THE COURT:  In fact, if you don't tell my colleagues, you can bring coffee in.  Okay?

MR. MCRAE:  Will do, Your Honor.

THE COURT:  This is ceremonial court and I might get in trouble for that.  But with the hours we're about to keep, all of you may need some caffeine.

//

//

**BY MR. MCRAE:**

Q    Now, throughout the assessment and in the context of your testimony yesterday and today, there've been a number of times when you've said that the assessment rendered A&M unable to verify various things.  Do you recall that?

A    There have been times that A&M -- as I said, we were unable to verify beds, yes.

Q    Beds, okay.  And let's talk about that.  To be precise, in any instance where the assessment says that A&M was unable to verify a bed for instance, that doesn't mean that the bed did not exist, in fact, correct?

        **THE COURT:**  And, counsel, I want to be clear LA Alliance agreement are you referring to or are you referring to the Road Map?

        **MR. MCRAE:**  Thank you very much, Your Honor.  I appreciate that.  I'm referring to the Alliance agreement.

        **THE COURT:**  Thank you, thank you.

        **MR. MCRAE:**  Thank you, Your Honor.

**BY MR. MCRAE:**

Q    Do you need me to rephrase?

A    Can you -- can you kindly repeat?

Q    I'm happy to do so.

    In any instance in which the assessment that says A&M was unable to verify a given bed counted towards the bed count under the Alliance agreement, that does not mean that the bed,

in fact, did not exist, correct?

A    We were unable to obtain evidence to verify that the bed existed.

Q    Right.  I'm incorporating that and now asking you to confirm the fact that you did not have evidence to confirm the existence of something does not mean that the bed did not, in fact, exist, correct?

Do you understand the distinction?

A    Yes.  We did not -- if we did not have any evidence to your question of the bed may have existed.

Q    And let's talk about, for example, a contrast if we can in terms of the assessment and what it is.  You understand, of course, that there's a difference between an assessment and an audit, right?

A    Yes, there's a difference between an assessment and an audit.

Q    So let's take a look if we can, we had Exhibit 23 before, let's pull that up again and go to page 3 of Exhibit 23.  And for the record, when I indicate page numbers in these exhibits, where there is an ECF number, I am referring to the upper right-hand corner sequential numbering.

As you can see, please let me know, you can see this on your screen, right, I just want to make sure we're on the same page.

A    Yes, I can see, thank you.

**THE COURT:**  You can confirm that on the screen also.

**THE WITNESS:**  Yes.

**BY MR. MCRAE:**

Q    Now, isn't it a fact that A&M felt it important to include certain disclaimers about the scope and use of its work product here of this assessment, correct?

A    Can you please -- I'm sorry, it disappeared from my screen.

Q    Oh, sure.  It was important for A&M to include certain disclaimers about the scope and use of this assessment, correct?

A    What do you mean my disclaimers of the use, are you -- is there a certain section or page that you're referring to?

Q    That's my next question.

A    Okay.

Q    Let me direct your attention to page 3, paragraph 3 of Exhibit 23 which reads in pertinent part, that A&M and the Court agreed that A&M's work would not constitute a formal review or audits, here's the salient language, with any applicable accounting standards.  You see that, right?

A    Yes.

Q    That was important for A&M to put that in this assessment, correct?

A    This paragraph was included in the final report, yes.

Q    Also important to A&M was the sentence that follows this

Frost - Cross / By Mr. McRae                                **48**

that says, the Court also understands that A&M is not a public accounting firm or a CPA firm, excuse me, I added the indefinite Article A or CPA firm and does not issue opinions or financial statement or provide audit or attestation services, correct?

A    Correct.

Q    Now, notwithstanding -- and those are what I mean by disclaimers, by the way.  Notwithstanding those disclaimers, A&M has been paid $3.53 million by the City of Los Angeles for this assessment, right?

A    Correct.

Q    So let's discuss some of the standards that the assessment assues (sic) in terms of what it wasn't striving to meet.

So you're also aware, given your background, that governmental entities like municipalities are actually subject to performance audits conducted pursuant to generally accepted government audit standards, right?

A    Yes.

Q    If I refer to that as GAGAS, will you understand what I mean?

A    Yes.

Q    And you understand that one of the purposes of accounting standards, according to Section 1.07 of GAGAS is to assist auditors in objectively obtaining and evaluating sufficient appropriate evidence and reporting the results, correct?

Frost - Cross / By Mr. McRae                    **49**

A     I do not have that in front of me, I cannot speak to that.

Q     Okay.  You're familiar with the definition of performance audit under GAGAS?

A     Yes.

Q     All right.  Let's put it up on the screen so we can both be looking at it.  This is Section 1.21 and I'm going to need an exhibit number.

        **UNIDENTIFIED:**  207.

Q     207.

        **MR. MCRAE:**  Is it 207 or 208?

        **UNIDENTIFIED:**  Sorry.

        **MR. MCRAE:**  It's 208.  It's 208, excuse me.

Q     Exhibit 208.  Exhibit 208, Section 1.21 provides that the performance audit provides objective analysis, findings and conclusions to assist management and those charged with governments and oversight with among other things improving program performance and operations, reducing costs, facilitating decision-making by parties responsible for overseeing or initiating corrective action and contributing to public accountability, correct?

A     Based on, yes, 1.21.

Q     Correct.  And to be clear, in disclaiming in the assessment paragraph 3, page 3 of Exhibit 23 --

A     Uh-huh.

Q     -- any adherence to any applicable accounting standard

Frost - Cross / By Mr. McRae                    **50**

that would include GAGAS Chapter 8 of the field work standards on performance audits, right?

A    I can't speak to that.

Q    Well, what I'm really asking you is sort of the logical extension of the statement that the assessment will not comply with or seek to have compliance with any applicable accounting standard that would necessarily include a GAGAS accounting standard on fieldwork performance audits, correct?

A    That is not my understanding of page 3.

Q    Okay.

A    Third paragraph.

Q    You do agree with me that it does say that there will not be, and we can go back to it, let's take a look at Exhibit 23, page 3, paragraph 3 that the A&M work here would not constitute a formal review or audit in accordance with any applicable accounting standards, right?  That's what it says.

A    That is what it states.

Q    And there's no point at which A&M retracts that statement in this assessment, correct?

A    The statement is not retracted anywhere in the report to my knowledge.

Q    There's no point where A&M amplifies or makes any changes to that unequivocal statement that the work here will not constitute a formal review or audits in accordance with any applicable accounting standards, correct?

A    We were not issuing any -- we're not issuing opinions on any financial statements that is my understanding of the reason this was included, but I cannot state to our legal team of why.

Q    Fair enough.  Getting back to Exhibit 208 and Section 806. If we could show that, obviously we need to give you a moment to match the switch.

Now, Section 806 of GAGAS speaks to fieldwork requirements establish an overall approach for auditors to apply in planning and performing an audit to obtain sufficient appropriate evidence that provides a reasonable basis for findings and conclusions based on the audit objectives for performance audits conducted in accordance with GAGAS, the requirements and guidance in Chapters 1 through 5 and 9 also apply.  You see that, right?

MS. MITCHELL:  Objection, lacks foundation.

THE COURT:  Overruled.

BY MR. MCRAE:

Q    Do you see --

A    I see 8.06, are you referring to another paragraph?

Q    And would it also be fair to say that in purporting not to produce an assessment in accordance with any applicable accounting standard that would also include GAGAS Section 3.04, correct?

A    I cannot speak to that.

Q    Okay.  Let's go to Section 3.04 of Exhibit 208 which is at

Frost - Cross / By Mr. McRae                                    **52**

page 25.  Now, Section 3.04 of GAGAS requires in pertinent part that the audit be performed in accordance with ethical principles and requires that the auditors take on only that work they are competent to work, performing high quality work and maintaining integrity and objectivity in performing work. You're aware of that, correct?

A    Yes.

Q    So we've established that the product that your firm delivered here was not a formal regulatory audit, correct?

A    We were not providing any opinions on any financial statements and reflective language to encompass that.

Q    Well, the disclaimer in the report doesn't just say that this isn't a formal audit because we're not commenting on a financial statement.  What it actually says is, that it's not a formal audit.  In other words, there's no qualifier, it's not contextualized, correct?

          **MS. MITCHELL:**  Objection, argumentative, compound, vague.

          **THE COURT:**  Do you understand the question?

          **THE WITNESS:**  I do not.  Can you please clarify.

**BY MR. MCRAE:**

Q    Let's go back to Exhibit 3, paragraph 3.  Exhibit 23, paragraph 3, page 3.  Okay.  So here where it says that A&M's work would not constitute a formal review or audit in accordance with any applicable accounting standards it doesn't

Frost - Cross / By Mr. McRae                    **53**

say that the reason for that is because there's not a formal audit being conducted of the City's financial statements, correct?

        **MS. MITCHELL:**  Objection, argumentative and vague.

        **THE COURT:**  Overruled.  You can answer the question if you have an answer to it.

        **THE WITNESS:**  My understanding of reading the last sentence it's in relation to financial statement reporting engagement that is subject to these various internal (indisc.) Again, I can't speak to the specific legal reasons of this disclaimer, but I don't believe it diminishes the evidence based objective assessment that was conduct.

**BY MR. MCRAE:**

Q    Well, respectfully that wasn't my question.  But also when you say I can't speak to the legal reason or the thinking of the lawyers ostensibly who -- and I don't know who provided this, I'm just repeating what you said.

    Is it fair to say that again, as far as this last paragraph that we're looking at here, that that's actually referring to even though A&M may include analysis of financial accounting data that the assessment isn't an examination in accordance with AICPA and other standards that are stated there, correct?

A    Or any other type --

Q    That's what that relates to.

Frost - Cross / By Mr. McRae                 **54**

A     -- of financial statement reporting engagement.

Q     Right.  And so that's the third sentence in this paragraph that telescopes reference to what would be a subset of the scope of the assessment which is analysis of accounting data, right?

A     Yeah, I cannot speak to that.  Obviously something in the engagement letter between the City and the Court.

Q     The point being, the constituent elements of the assessment were not limited to analysis of financial accounting data, correct?

A     It was not solely limited to, for this is a financial and performance assessment.

Q     It was, in fact, including purportedly other analyses such as data integration, correct?  That's another component of the assessment.

A     What do you mean by data integration analysis?

Q     Well, data integration is literally terms that are used in the assessment in terms of some of the key findings, correct?

A     Correct, data integration.  But what do you mean by data integration analysis?

Q     The analysis of the topic of data integration in the context of the assessment that A&M prepared.

A     On the topic of data integration, yes.

Q     All right.  So we were talking about the fact that this work, the assessment, Exhibit 23 is not a formal regulatory

Frost - Cross / By Mr. McRae                                    **55**

audit, it was an assessment, right?

A     This was a financial and performance assessment.

Q     And an assessment as the heading suggests if we go to page 7 of Exhibit 23 it says here that it was provided if we look at the middle portion of page 7, it says key recommendations for improvement.  So in part the assessment was provided to give the City recommendations for improvement, correct?

A     Correct.

Q     Okay.  In connection with Exhibit 25, which is the settlement agreement that we've been talking about, you don't see any obligation or rephrase that.  You don't see any commitment by the City as part of what it's agreeing to do in that settlement agreement to make recommendations -- to accept recommendations of improvement from A&M, correct?

A     Can you please clarify your question?

Q     You don't see anywhere in the settlement agreement, that is the Alliance settlement agreement, Exhibit 25 a commitment by the City of Los Angeles to accept any recommendations for improvement provided by A&M, correct?

A     The Alliance settlement was dated prior to this engagement, so no, our assessment would not be referenced and from my understanding in the settlement agreement.

Q     And in terms of talking about the assessment itself and people that worked on it, you would agree with me that the assessment doesn't contain any discussion of whether any

members of the team that produced this assessment had any prior experience conducting assessments of a City's homeless response program, right?

A    Can you please repeat your question?

Q    There is no place in the assessment where it purports to lay out any experience that any member of the team that created the assessment may or may not have had with respect to the assessment of a City's homeless response program, correct?

A    Correct.

Q    And there also is no statement in the assessment assuming just for the sake of this question that any such prior experience was had by members of the A&M team that any city or other body ever accepted any of those recommendations, correct?

A    Can you please repeat your question?

Q    To the extent that A&M has ever had any experience making recommendations following an assessment of a City's homeless response program, the assessment does not set forth whether any of those recommendations were ever accepted, correct?

A    I'm not sure I understand your question.

Q    What I am asking you is assuming that A&M has ever created recommendations in connection with assessing a governing body's homeless response system, the assessment doesn't set forth any example of where any of those recommendations would have been accepted, correct?

A    Are you referring to this assessment like this report?

Q    Let me try this again in a different way.  I'll try to --

A    Thank you.

Q    -- streamline it.

There's no representation in the assessment that anyone has ever accepted any recommendation that A&M has ever made on the topic of homeless response systems, correct?

THE COURT:  Do you understand the question?

THE WITNESS:  This is not within our -- I'm not sure I fully understand what your question is.

BY MR. MCRAE:

Q    I'm going to move on.  You also note, as far as the scope of work and by you, I mean the collective you, A&M, and I actually think in this context, you recall being in a hearing in this court, this building, not necessarily this specific room, May 15th, 2025 where you stated,

"Our report presents insights so we can collectively strengthen the system that this vulnerable population relies on."

Do you recall saying that?

A    Yes.

Q    And you understand that even if the City wants to strengthen its system, that strengthening the system was not a commitment that the City made under the Alliance agreement -- the Alliance settlement agreement, correct?

A    I don't believe I can speak to that.

**THE COURT:** I'm sorry, I didn't hear your answer.

**THE WITNESS:** I don't believe I can speak to that.

Q    You also recall saying in open court on May 15th that you wanted your report to be used as a -- and by the report, it's the assessment to be used as a blueprint to improve transparency, refine processes and maximize the impact of every dollar spent on homelessness services, correct?

A    That is my recollection.

Q    You appreciate that even if the City wanted to achieve each of those goals to the fullest extent, the settlement doesn't impose any requirement that the City do so and by the settlement I mean the settlement agreement with Alliance, correct?

A    I can't speak to that requirement.

Q    Okay. Let's turn to Exhibit 25 and let's go to ECF page 9. Now I direct your attention to the first sentence under the title terms and continuing jurisdiction, lines 12 through 14, but in pertinent part actually line 12.

You do recall to the extent that you reviewed the settlement agreement that Section 2 says that the City has five years to complete its obligations under the Alliance settlement agreement, correct?

A    I read the parties agree the duration of the agreement shall be five years.

Q    And nothing in the assessment obviously changes that,

Frost - Cross / By Mr. McRae                     **59**

correct?

A     Nothing is on that -- nothing within the report would change the duration of this agreement.

Q     Now, as far as the specific description of A&M's engagement with the City, why don't we take a look at Exhibit 205.  And I'm going to ask you after allowing you to take a look at this first page and if you need us to flip the pages, we can do that, this purports to be A&M's May 17th, 2024 retainer agreement with the City of Los Angeles.  Do you recognize this document as such?

A     Yes.

Q     And would it be correct that there was an amendment to this engagement letter dated on or about September 9th, 2024, correct?

A     In reference to LAPD, yes.

Q     And that would be Exhibit, let's see if we can pull it up, 206.  This document obviously is titled and we can all read that, but if we flip the page here, go to the next page and the page after that, this is the September 9th, 2024 amendment to the -- to A&M's engagement letter with the City, correct?

A     Yes.

Q     Now, there was a second proposed amendment to the engagement letter, let's take a look at Exhibit 207.  And if we turn to the next page, this proposed second amendment was dated October 25th, 2024 but it was never signed by the City,

correct?

**MR. MCRAE:**  Why don't we go to the last page with the execution signatures will be present.

Q    Is that consistent with your understanding that the proposed second amendment was never executed by the City?

A    There are no signatures, yes, is my understanding.

Q    Now, if we wanted to know what the final scope of work was that A&M was asked to do in rendering this assessment, what we would do is we would turn to Exhibit 206 which is the September 9th, 2024 as amended engagement letter, correct?

A    Can you please repeat your question?

Q    If we want to know, having reviewed the progression of amendments in the original engagement letter, what actually ended up being the scope of work agreed upon in A&M's engagement letter with the City of Los Angeles, we would look to the September 9th, 2024 amended engagement letter between the City and A&M, correct?

A    I viewed that as a supplemental engagement to like amendment to the already existing engagement from the May 17th.

Q    Let's take a look at Exhibit 206 and look at ECF 4 of that document and actually it's on the screen here.  And we're not going to read all of this, there is no express statement in this updated scope of service where A&M is saying and the City is agreeing that what A&M will be doing is rendering any opinions about whether the City of Los Angeles is complying

Frost - Cross / By Mr. McRae                          **61**

with its obligations under the Alliance settlement agreement,

correct?

A     Correct.

Q     And by the way, on that subject, the scope of work also

doesn't include in the engagement letter between A&M and the

City of Los Angeles that A&M would be offering any opinions

about whether the City would be in compliance with any of its

obligations under the Alliance settlement agreement as of June

15th, 2027, correct?

          **MS. MITCHELL:**  Objection, vague, ambiguous, lacks

foundation, misstates the testimony.

          **THE WITNESS:**  If you understand the question, you can

answer it.  And if you don't understand it, he can restate it.

          **THE WITNESS:**  Can you please restate your question?

**BY MR. MCRAE:**

Q     Sure.  And I'll break it down.

      The engagement letter -- actually let me expand that.

There is no engagement letter between A&M and the City of Los

Angeles where A&M's scope of work includes opining about

whether the City of Los Angeles will be in compliance with its

bed count obligations under the settlement agreement with

Alliance in June 2027, correct?

          **MS. MITCHELL:**  Objection, vague, misstates the

documents.  They speak for themselves.

          **THE COURT:**  Do you understand the question?  If not,

he can restate it.  Do you understand the question?

THE WITNESS:  I'm sorry, can you please repeat your question?

Q    Sure.  After this sip.

There is no engagement letter between A&M and the City of Los Angeles where the scope of work for A&M includes even speaking to, whether the City of Los Angeles will be in compliance with any of its bed count obligations under the Alliance settlement agreement in June 2027, correct?

MS. MITCHELL:  Objection, the documents speak for themselves.

THE COURT:  Overruled.

THE WITNESS:  I don't -- not that I can recall from our engagement letters explicitly mentioning compliance.

BY MR. MCRAE:

Q    Explicitly or implicitly mentioning compliance as of June 2027, there would be no discussion anywhere in the assessment or anywhere in a scope of work in an engagement letter where A&M was talking about whether the City would be in compliance with any of its bed count obligations under the settlement agreement as of June 2027, correct?

MS. MITCHELL:  Objection, lacks foundation, the documents speak for themselves.

THE COURT:  Overruled.  If you have an opinion, you can give it.

Frost - Cross / By Mr. McRae                    **63**

THE WITNESS:  I can't speak to that.

Q    Isn't it also true that there is no place in the assessment for, in any scope of engagement between A&M and the City where A&M states that it will be opining about whether the City will be in compliance with any encampment reduction obligations under the Alliance settlement agreement as of June 2027?

MS. MITCHELL:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  I don't have the engagement letter in front of me.  I can't speak to that.

**BY MR. MCRAE:**

Q    All right.  Let's put it back up, let's go back to Exhibit 206, page 4.  It's right in front of you.

A    This is not the entire document.  Are you referring just to this -- where it states the date September 9th, 2024?

Q    I'm happy for you to refer to any document you like, quite frankly, with this statement.  There is not a single document that has ever been created between A&M and the City of Los Angeles where A&M purports to say that it will be offering opinions about whether the City of Los Angeles will be in compliance with its encampment reduction obligations under the Alliance settlement agreement in June 2027, correct?

MS. MITCHELL:  Objection, lacks foundation, the documents speak for themselves.

Frost - Cross / By Mr. McRae                          **64**

THE COURT:  Overruled.  If you have an opinion, you can cast it.

THE WITNESS:  From my assuming engagement letter dated May 17th, 2024 I -- this is an amendment on relation to LAPD.  I don't have the original engagement letter in front of me to speak to what you're asking me.

MR. MCRAE:  Let's put up Exhibit 205.

BY MR. MCRAE:

Q    This is the May 17th, 2024 engagement letter to which you're referring, correct?

A    Correct.

Q    This is the paragraph titled description of services and it goes on to include the services that will be provided ostensively under this engagement letter in this Exhibit 205, correct?

A    Correct.

Q    And just like any other document that A&M has in its possession there is no document, here included, where A&M purports that what it will be doing is stating whether in 2027 in June, the City of Los Angeles will be in compliance with its encampment reduction obligations under the Alliance settlement agreement, correct?

MS. MITCHELL:  Objection, lacks foundation.  I ask that the witness be given the document and have an opportunity to review it.

MR. MCRAE:  I'm fine to do that.

THE COURT:  All right.

MR. MCRAE:  It'll take a moment.

THE COURT:  Why don't we take a recess here.  We've been in session about an hour and a half --

MR. MCRAE:  That's fine, Your Honor, thank you.

THE COURT:  -- let her review that document.

All right.  Then, counsel, would 20 minutes be acceptable?

MR. MCRAE:  Certainly.

THE COURT:  20 minutes then.  Have a good recess then.

MS. MITCHELL:  I'd like a copy also of all the exhibits that you're using.

MR. MCRAE:  My colleagues are endeavoring to --

MS. MITCHELL:  I'm sorry?

MR. MCRAE:  My colleagues are endeavoring to get them to you.

**(Recessed at 9:27 a.m.; reconvened at 9:45 a.m.)**

THE COURT:  We're back on the record.  All parties have returned and if you'd be kind enough as the witness to retake the stand on behalf of A&M.

THE WITNESS:  Of course.

MR. MCRAE:  Your Honor, for the record, the witness asked if she could retain the copy of the engagement letter

Frost - Cross / By Mr. McRae                    **66**

that was requested and I said yes.  I don't think that exchange was picked up, thank you.

THE COURT:  All right.  Thank you.

And, counsel, at your pleasure.

MR. MCRAE:  Thank you, Your Honor.

CROSS EXAMINATION (CONTINUED)

BY MR. MCRAE:

Q    Ms.  Frost, am I correct that for the bulk of the 20 minute break that we just had you were engaged in a conference with Ms.  Rafferty and counsel for the plaintiffs?

A    I was speaking with Ms.  Rafferty and Ms.  Mitchell was also around.

Q    Around?  But also speaking, correct?

A    I didn't check my clock.  I don't know how long I was speaking to Ms.  Mitchell.

Q    Now, before the break, we were talking about the scope of the work of A&M and I want to put a finer point on something. There is no part of the assessment or any scope of work between the City of Los Angeles and A&M where A&M makes any statements about whether or not the City will be in compliance with its encampment reduction obligations under the settlement agreement in 2026, correct?

A    In the engagement letter it states under description of services, A&M will report on the programs as outlined above including the Alliance settlement program and the need to

EXCEPTIONAL REPORTING SERVICES, INC

Frost - Cross / By Mr. McRae                    **67**

address the homelessness, including their objectives, target

populations, methods of delivery, reporting and management.

But there is no explicit language of compliance explicitly.

Q    When you say explicitly, let's put a fine point on it.

That word compliance is not in the scope of the work that you

just read, right?

A    The word compliance is not.

Q    Okay.  And more specifically going back to my question and

it expands beyond the scope of engagement in Exhibit 205 to

include the assessment, there is no statement in any document

by A&M or to which A&M is a party that purports to state

whether the City will be in compliance with its encampment

reduction obligations under the Alliance settlement agreement

in 2026, correct?

A    That language I -- explicitly is not in the engagement

letter.

Q    It's not explicitly in the engagement letter, it's not

implicitly in the engagement letter, it's not in any form a

discussion about whether the City will be in compliance with

the Alliance settlement agreement in 2026, correct?

          **MS. MITCHELL:**  Objection, argumentative.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I can't speak to that.

//

//

Frost - Cross / By Mr. McRae                                    **68**

**BY MR. MCRAE:**

Q    Well, let's approach it this way.  The assessment which is Exhibit 23 does not say that the City will not create 12,915 beds by 2027, correct?

A    That direct language that the City will not create 12,915 beds is not in the -- explicitly in the engagement letter.

Q    The assessment does not say that the City will not achieve 9,800 encampment reductions under the Alliance settlement agreement whenever those obligations fully accrue, correct?

A    We're not referring to the engagement letter, we're referring to the report?

Q    The assessment.

A    In the final report -- what is your question if -- what language is in there?

Q    The assessment does not state that the City will not achieve 9,800 encampment reductions whenever those obligations fully accrue under the Alliance settlement agreement, correct?

A    We do not make a statement on whether the City or not will meet its compliance obligations.

Q    Under the Alliance settlement agreement.

A    Under the Alliance settlement agreement.

Q    Now, let's turn to page 4, ECF 4 of Exhibit 23.  We are now focusing on the language of the key findings, factual and performance overview of City programs.  For instance, in the paragraph we're looking at, poor data quality and integration,

Frost - Cross / By Mr. McRae                    **69**

there's no discussion of data quality and integration in the

Alliance settlement agreement, right, which is Exhibit 25?

A    There's no -- can you please repeat your question?

Q    Yeah.   There's no reference to data quality and

integration in the Alliance settlement agreement which is

Exhibit 25, correct?

A    I cannot speak to that.  I don't have the settlement

agreement in front of me.

Q    We can have Exhibit 25 placed in front of you.  I can give

you a hard copy if that would make it easier.

A    Okay.

     **(Pause)**

          **MR. MCRAE:**  Your Honor, may it please the Court may I

approach?

          **THE COURT:**  Certainly.

          **MS. MITCHELL:**  What are you --

          **MR. MCRAE:**  This is Exhibit 25 just make sure

everyone and counsel has.

          **MS. MITCHELL:**  Thank you.

     **(Pause)**

**BY MR. MCRAE:**

Q    As you peruse that and I'm not trying to put a time limit

on your perusal, I just want to have the question top of mind

as you're doing that.

A    Uh-huh.

Frost - Cross / By Mr. McRae                    **70**

Q    There is no commitment by the City to do anything with respect to data quality and integration in Exhibit 25, which is the Alliance settlement agreement, correct?

     **MS. MITCHELL:**  Objection, misstates the document, speaks for itself.

     **THE COURT:**  Overruled.

     **(Pause)**

     **THE WITNESS:**  In relation to data within the scope of our report as it relates to the Alliance settlement, it would be in relation to the status updates and any respective data that's reported to the Court.

**BY MR. MCRAE:**

Q    The point being there is no undertaking by the City in the Alliance settlement agreement which is Exhibit 25 as to what the state of the data quality and integration will be, correct?

     Let me put it -- let me withdraw the question.

     The settlement agreement which is Exhibit 25 does not contain any commitment or undertaking by the City to do a specific thing as to data quality and integration, correct?

     **MS. MITCHELL:**  Objection, misstates the document, speaks for itself.

     **THE COURT:**  Overruled.  You can answer the question.

     **THE WITNESS:**  Can you please repeat your question, sorry, I'm just making sure I understand what you're asking.

Q    What I'm asking is, isn't it true that on the topic of

EXCEPTIONAL REPORTING SERVICES, INC

Frost - Cross / By Mr. McRae                          **71**

data quality and integration, the Alliance settlement agreement does not contain any commitment by the City of Los Angeles to do anything relative to data quality and integration?

          **MS. MITCHELL:**  Same objection, Your Honor.

          **THE COURT:**  Overruled, if you have an opinion, you can cast it.

          **THE WITNESS:**  Yeah, I don't believe I can answer that outside of the requirements of the settlement in relation to data that we looked at under status updates.

**BY MR. MCRAE:**

Q    Right.  And with respect to the status updates, the words data quality and integration don't appear in the settlement agreement which is Exhibit 25, right?

A    Correct.  Those explicit words data quality is not, that I can see, within Section 7.

Q    When you say explicit words, there's not an implicit reference to integration.

          **MS. MITCHELL:**  Same objection.

Q    In other words, it's either -- it's a binary concept, it either is present or it isn't, correct?

          **MS. MITCHELL:**  Objection, argumentative and compound.

          **THE COURT:**  Just a moment.  It may or may not be, but regardless do you understand the question?

          **THE WITNESS:**  Is that -- when I refer to explicit language, I mean the actual words, data quality and integration

Frost - Cross / By Mr. McRae                    **72**

are not within this paragraph 7.1 and 7.2.

Q    Let's talk about the next concept here in Exhibit 3, which is the reference to -- if we can move down, quantification of funding for City programs.  You would agree with me that there is no commitment by the City of Los Angeles in Exhibit 25 with respect to quantifying funds for any of its programs, correct?

A    In relation to -- can you please repeat your question?

Q    Sure.  There is no commitment by the City of Los Angeles in Exhibit 5 to do any quantification of funding for City programs, correct?

A    In Exhibit 25?

Q    Yes, which is the settlement agreement.

A    Right, I do not under -- yes, that is my understanding there is no requirement to quantify funding from my recollection.

Q    And --

        **MR. MCRAE:**  I just need a moment here.

Q    You're aware also just for point of reference in Section 3.2 of Exhibit 25 which is before you at lines 14 through 17 in the context of discussing the topic of that paragraph, the sentence at lines 14 through 17 reads, the housing or shelter solutions may be government and/or privately funded as long as each offer is adequate for the individual.  Do you recall that statement in the settlement agreement which is Exhibit 25?

A    I can see it rows 14 through 17.

Frost - Cross / By Mr. McRae                     **73**

Q      Lines 14 --

A      I'm sorry, thank you.

Q      Yes.

A      Lines 14 through 17, yes.

Q      And let's go back to Exhibit 23, page 5 the next topic in the key findings is disjointed continuum of care.  You would agree with me that the words continuum of care don't appear in the settlement agreement which is Exhibit 25, correct, with Alliance?

A      In the settlement agreement, Exhibit 25 that I have in front of me I have the City will use its best efforts to engage with the appropriate county entity, including but not limited to Department of Mental Health, Department of Health Services, Department of Public Social Services or Department of Public Health for intervention treatment, services and/or housing as appropriate for PEH who are not city shelter appropriate, as referenced in relation to other sections that may involve the County which would be in relation to the continuum, the full continuum of care.

Q      Well, and again, I want to parse a distinction between an interpretation and what the agreement -- language of the agreement actually says.  What you just read is not referenced anywhere in the document that was signed by the parties which is Exhibit 25 as agreeing that what you just read is a reference to a continuum of care system, correct?

**EXCEPTIONAL REPORTING SERVICES, INC**

Frost - Cross / By Mr. McRae                              **74**

A    Are you asking on page 3, line 17 through 22 are explicitly within the engagement letter?

Q    No.  What I'm asking is, what you just equated and said, oh well that is the continuum of care system, I'm saying the agreement which the parties signed and has an integration clause does not say that what you described shall be identified as a continuum of care system, correct?

          **MS. MITCHELL:**  Objection, vague, ambiguous.

          **THE COURT:**  Just a moment.  Do you understand the question?

          **THE WITNESS:**  Are you explicitly -- maybe I'm not fully understanding in terms of the continuum of care as we defined it as in relation to including the County as part of this agreement and Exhibit 25.

**BY MR. MCRAE:**

Q    Let me try this another way.  The words continuum of care system don't appear in Exhibit 25, right?

A    Not that I can recall.

Q    Right.  So if it -- logically it follows that if the continuum of care system is not mentioned in the agreement, which is Exhibit 25, there is no definition of the term continuing of care system in Exhibit 25, right?  That would have to logically follow, wouldn't it?

A    Continuum of care system is not defined in Exhibit 25 as I can see.

Frost - Cross / By Mr. McRae                    **75**

Q    Let's move on to the next topic of key findings, limited financial oversight and performance monitoring.

Now, you'd also agree with me that the settlement agreement which is Exhibit 25 does not contain any commitment by the City of Los Angeles to have financial oversight and performance monitoring in this Alliance settlement agreement, correct?

A    I can't speak to that.

Q    All right.  Let's go on to the next one, which is in Exhibit 3.  Now we're in page 5, lack of contractual clarity and accountability.  There is no discussion in the settlement agreement where the City makes any commitments with respect to contractual clarity and accountability in the Alliance settlement agreement which is Exhibit 25, correct?

MS. MITCHELL:  Lacks foundation, calls for speculation and the document speaks for itself.

THE COURT:  Overruled, you can answer that question if you understand it.

THE WITNESS:  Can you please repeat your question?

BY MR. MCRAE:

Q    No where in the Alliance settlement agreement does the City make any commitment with respect to contractual clarity and accountability, correct?

MS. MITCHELL:  Same objection.

THE WITNESS:  There is --

THE COURT:  Overruled.

THE WITNESS:  I do not see any language in relation to contractual clarity within Exhibit 25.

Q    And let's go to the middle of page 6 of Exhibit 23.  The next reference is cost and service variability.  There is no commitment in the settlement agreement on the part of the City of Los Angeles to do anything with respect to cost and service variability, correct?

A    Not that I can see in Exhibit 25.

Q    Let's go to the next one, page 7, reconciliation of spending.  In Exhibit 25 which is the Alliance settlement agreement there is no place where the City has any commitment to do anything with respect to reconciliation of funding within the City, correct?

MS. MITCHELL:  Your Honor, if I could just have a standing objection to the document speaks for itself and I can stop --

THE COURT:  You may.

MS. MITCHELL:  -- seriatim objections.

THE COURT:  And you can make individual objections also if you'd like to, just as the defense did.

MS. MITCHELL:  Thank you, Your Honor.

THE COURT:  But either one, you have a standing objection.

THE WITNESS:  Correct, I do not see that in Exhibit

Frost - Cross / By Mr. McRae                    **77**

25.

**BY MR. MCRAE:**

Q    I couldn't -- I'm sorry, I couldn't hear you.

A    Oh, I do not see that in Exhibit 25.

Q    Now, whatever progress that the City has made towards achieving its obligations under the Alliance settlement agreement, it's your understanding that it made that progress notwithstanding the various findings in the assessment, correct?

A    Can you please repeat your question?

Q    Sure.  The assessment has various findings.  We've discussed them at least notionally, typically in the key findings, correct?

A    Correct.

Q    And you would agree that notwithstanding all of the findings and assertions contained in the assessment, whatever measurable progress the City has achieved towards its bed count and encampment reduction obligations under the Alliance settlement agreement, it has done so even without adopting, to your knowledge, any of the recommendations into the assessment, correct?

         **MS. MITCHELL:**  Objection, assumes facts, lacks foundation, compound.

         **THE COURT:**  Well, if you have an opinion, I'll let you express that.  That can also though can come from another -

- from other officials that'll be called or the CAO, so you can ask the question.  You can ask the question.

MR. MCRAE:  Oh, I can, thank you.  I'm sorry, did you say ask the next question?

THE COURT:  No, you can ask this question.

MR. MCRAE:  Thank you, thank you.

BY MR. MCRAE:

Q    So -- do you need me to repeat it?

A    Yes, please.

Q    Okay.  Notwithstanding any finding contained in the assessment, you would agree with me that whatever measurable progress the City has achieved towards its encampment reduction and bed count obligations under the Alliance settlement agreement, to your knowledge, it has achieved that measurable progress even without adopting any of the recommendations in the Alliance settlement agreement -- excuse me, in the assessment, correct?

A    I can't speak to that.

Q    And the other question I was asking you is, whatever measurable progress the City has achieved towards its bed count and encampment reduction obligations under the Alliance settlement agreement it's done so notwithstanding all the assertions and findings contained in the assessment, correct?

MS. MITCHELL:  Same objection.

THE COURT:  Overruled, if you have an opinion, you

Frost - Cross / By Mr. McRae                    **79**

can cast it.

        THE WITNESS:  I do not have an opinion on that.

BY MR. MCRAE:

Q    You and I have never communicated before today, correct?

A    Correct.

Q    But you've had communications with plaintiffs' counsel
before today.

A    Yes.

Q    And in the context of preparing the assessment, you had
ongoing communications with plaintiffs' counsel?

A    Correct, yes.

Q    And the ongoing communications that you had with
plaintiffs' counsel, at least to some extent, obviously
informed some of what you did and by you, I mean the collective
you, the A&M team in preparing the assessment?

        MS. MITCHELL:  Objection, assumes facts, vague,
ambiguous.

        THE COURT:  Do you understand the question?

        THE WITNESS:  I don't understand the question.

        THE COURT:  Just restate it.

        MR. MCRAE:  Sure.

BY MR. MCRAE:

Q    The communications that you had with plaintiffs' counsel
in this case, at least to some extent informed what you did as
a team at A&M in creating the assessment, correct?

Frost - Cross / By Mr. McRae                    **80**

THE COURT:  So this is towards the creation of the assessment, not her testimony in court.

MR. MCRAE:  Correct.

THE COURT:  All right.  Thank you.  You can answer.

THE WITNESS:  All -- given that we were retained by the City and the Court all parties we've taken consideration, right, we've met during the negotiation of this engagement letter, we've provided updates, yes, we've communicated along the way including with plaintiffs' attorneys.

BY MR. MCRAE:

Q    And you also spoke with plaintiffs' counsel in preparing to testify?

A    Counsel explained that she would like me to provide testimony, yes.

Q    Okay.  And you had discussions with plaintiffs' counsel regarding the perspective testimony that you would be providing in court?

A    I asked what testimony she would like from the A&M team and that was communicated.

Q    Okay.  So plaintiffs' counsel, if I understand it, told you what testimony that plaintiffs' counsel would like, I believe that's what you just said from the A&M team, correct?

A    In relation to our report what specifically in relation to what testimony and since we were listed as a witness we asked.

Q    Let's talk about -- let's go back to Exhibit 23, page 7.

**EXCEPTIONAL REPORTING SERVICES, INC**

Frost - Cross / By Mr. McRae                    **81**

We're going to focus on the recommendations for improvement.

I don't know if there's a way for you to get an angle of this where you can see the entire slate of recommendations on one page, maybe that can be done here.  I'm hoping so.  Oh, wonderful, thank you, it's a split screen.  Do you see that?

A    Yes, I see it.

Q    Okay.  So the recommendations here range from establish a comprehensive homeless strategy and strengthen fiscal alignment, all the way up to and including conduct an independent operational assessment of LAHSA.  Do you see that?

A    Yes.

Q    And even if the City wanted to incorporate and adopt these recommendations, you'd agree that there's no commitment in the Alliance settlement agreement which is Exhibit 25 for the City to do any of the things described in these recommendations, correct?

A    I'm sorry, can you please repeat your question?

Q    Sure.  Even if the City wanted to adopt the recommendations set forth on pages 7 and 8 of Exhibit 23 you would agree with me that there is no commitment by the City in the Alliance settlement agreement which is Exhibit 25 to do any of the things described in these recommendations, correct?

**MS. MITCHELL:**  Objection, asked and answered.

**THE COURT:**  Overruled, you can answer it again if you'd like to.

**THE WITNESS:**  I'm not sure I understand your question.

**BY MR. MCRAE:**

Q    At no place in Exhibit 25 which is the Alliance settlement agreement does the City of Los Angeles make a commitment to adopt any of these recommendations?

A    Correct.

Q    Right?

A    From my understanding, the A&M assessment is not within the settlement agreement from --

Q    The other thing I want to explore with you is you would agree with me that in looking at these recommendations, some of the recommendations that you make for the City include things that would cost money for the City to implement, right?

A    Yes.

Q    The assessment doesn't contain an estimate as to the amount of money that it would take the City in order to implement any of these recommendations in Exhibit 23, correct?

A    That was not within our scope.

Q    The assessment doesn't contain any discussion of the source of funds available, if any, to comply with any of the assessment's recommendations, correct?

A    Correct.

Q    There's no discussion in the assessment of what budgetary adjustments the City might have to make in order to make funds

available to implement any of these recommendations, correct?

A    Correct.

Q    You've heard the concept that for every action there's an equal and opposite reaction.

A    I have heard that.

Q    Right.  And so in the context of a budget, it's finite as opposed to infinite, right?

A    Yes.

Q    And there's no discussion in the assessment of how long it might take to implement any of these recommendations in Exhibit 23, correct?

A    Correct.

Q    There's no discussion in the assessment of whether there are any legal or other impediments to the City's adoption or implementation of any of these recommendations, correct?

A    Can you please repeat your question or maybe reword it, I'm not sure I understand.

Q    There's no discussion in the assessment as to whether there are any legal or other impediments to the City of Los Angeles were it to implement any of the recommendations in Exhibit 23, correct?

A    Not that I can recall.

Q    Now, it's also true that there are a number of recommendations in Exhibit 23, which is the assessment, that require action by entities other than the City of Los Angeles,

Frost - Cross / By Mr. McRae                    **84**

such as LAHSA and the County of Los Angeles, correct?

A    Sorry, can you please repeat the question?

Q    Sure.  Taken collectively, as we see the recommendations, you would agree that at least some of these recommendations to be implemented would require actions by entities other than the City of Los Angeles, including LAHSA and the County of Los Angeles.

A    Correct, yes.

Q    The assessment does not contain a discussion of the likelihood of any such contribution or action by other entities actually occurring, does it?

A    There's no discussion of that in -- no.

Q    The assessment doesn't contain any discussion about how long it might take for the City of Los Angeles to secure cooperation from other separate independent bodies, correct?

A    No, that is not within the assessment.

Q    The assessment doesn't discuss the challenges that the City of Los Angeles might face in seeking to secure that cooperation, correct?  Let me rephrase that, that was vague.

     The assessment doesn't contain any assessment of the challenges that the City of Los Angeles may encounter in securing any such cooperation from other entities, correct?

A    It does not explicitly discuss cooperation from other entities outside of naming the necessary collaboration for the respective recommendation.

Frost - Cross / By Mr. McRae                            **85**

Q    Now, I want to pivot to another point here, which is you would agree with me that it is -- it's imperative that in the assessment that there be an actual factual basis for every assertion that's made in there?

A    Yes.

Q    In fact, you would go so far as to say that it's important that there be a reasonable basis for every assertion contained in the assessment, correct?

A    Correct.

Q    You would agree with me that the assessment to the extent that it's making assertions, making conclusions, those need to be supported by evidence, correct?

A    Any assertions within our report was based on evidence received or potentially no evidence.

Q    Now part of the centrality of having evidence and factual bases for assertions is so that other people can read the assessment and assess the validity of the assertions being made in it, at least in part, based on the quality or efficacy of the bases for the assertions, right?

A    I'm not sure I understand your question.

Q    One of the reasons why it's important that the assertions made in the assessment have factual bases or evidence to support them, is so that readers can assess the validity of the assessment -- the assertions, correct?

A    I'm not sure I'm following your question.  I mean, there's

Frost - Cross / By Mr. McRae                    **86**

various analyses within the report that would -- from various data received so a reader would not be able to recreate, right, without the underlying data.

Q    And the assessment provides all the underlying data?

A    All the underlying data sourced.

Q    No, I'm saying as attached to the assessment, some 165 pages I think it is, you're saying that is the assessment contains all the underlying information that would enable a reader to recreate all the inputs and analysis that A&M did in creating the assessment in order to assess for themselves whether or not they found flaws in any step of the way in the creation of that assessment, is that what you're saying?

A    Every source is footnoted within the report, but we had data confidentiality with various parties, so no, we didn't disclose every document that we received and relied upon.

Q    So there would be some instances at least where there would be gaps due to that restriction, perhaps other, where a reader would not be able to completely recreate all the inputs, thought processes that went into the creation of the assessment, correct?

A    Without the data someone could not recreate any respective analysis that it's referencing to.

Q    There is no quantification in the assessment of the extent to which the analyses that lead into the creation of the assessment cannot be recreated for the very reason you just

mentioned, which is an absence of data, right?

MS. MITCHELL:  Objection, vague and unintelligible.

THE COURT:  Do you understand the question?

THE WITNESS:  I do not understand the question.

THE COURT:  Please reask it.

BY MR. MCRAE:

Q    The assessment does not state the extent to which data gaps or other impediments make it impossible for a reader to recreate the analyses that led up to the creation of the assessment, correct?

MS. MITCHELL:  Objection, vague and unintelligible.

THE COURT:  All right.  Do you understand the question?

THE WITNESS:  I don't.

THE COURT:  Counsel, could you reask, I'm not sure that it's understood --

MR. MCRAE:  Sure.

THE COURT:  -- by the Court or by the witness.

BY MR. MCRAE:

Q    The question is, the -- let's build this creatively.

You stated that it is true that not all the data that went into creating the assessment is available to the reader, correct?  We just talked about that.  You said there were confidentiality restrictions and that is some of the reasons why not all the data as inputs is available to the reader,

correct?

A    Available to the reader solely relying on this report as the 163 pages, yes.

THE COURT:  Counsel, just for my clarity, there are a number of disputes along the way that came to the Court's attention in a number of hearings that started and then the City seemed to work it out, LAHSA seemed to work it out, you may not be aware of those.  Some of those were HIPPA restrictions, that LAHSA called or the City called to the assessor's attention.  Is that what you're talking about?

MR. MCRAE:  No, I'm actually -- thank you, Your Honor.

THE COURT:  My apologies.  Please ask the question.

MR. MCRAE:  No, no, no, quite all right, thank you for that actually.  But that's a helpful clarification.

BY MR. MCRAE:

Q    I don't mean in any way to restrict the nature, source or duration of any gap that would enable there to be the full transparency necessary for a third party to come in and to recreate in its entirety the analysis that resulted in the assessment.

So the Court has mentioned one data point, which are HIPPA restrictions.

THE COURT:  Those were called by the City and by LAHSA as issues curtailing somewhat and we got into evidentiary

items, in fact, one was going to be held late in the evening hours and everyone seemed to resolve it.  Magical.  The later it is, the more gets resolved.

MR. MCRAE:  Yeah.

THE COURT:  But there were quite a few discovery disputes that came that the City and LAHSA were contesting concerning privacy issues or whatever.

MR. MCRAE:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. MCRAE:  And again, I'm not purporting to limit that.

BY MR. MCRAE:

Q    But the point that I'm trying to establish here, is -- and you actually raised it, when you said in our exchange about recreation of the analysis.  I was drawn to that and I just want to understand if you would agree with me that if someone has possession of the report itself, which is the assessment, 165 or so pages, that the report itself, the assessment does not describe anywhere in there the extent to which information that went into the report is not available to the reader.

MS. MITCHELL:  Objection, vague and --

THE COURT:  Do you understand the question?

THE WITNESS:  No, I'm sorry, I --

THE COURT:  I apologize.  You're going to have to reask it.

Frost - Cross / By Mr. McRae                    **90**

MR. MCRAE:  Okay.

Q    Is there any document where A&M makes any effort to articulate the extent to which missing data would prevent a reader from recreating its analysis in the assessment?

A    The analysis would be -- rely upon data received, so I'm not sure I understand your question.

Q    I'm following your prior testimony where you said that in some instances, due to privacy restrictions, the information is not made available in the report.  And I'm merely asking, whether or not apart from that observation, does A&M in any document state, and if it does, it does, if it doesn't, it doesn't, the extent to which missing data that is not contained in the assessment may prevent a third party reader from recreating the assessment.

MS. MITCHELL:  Same objection.

THE COURT:  Once again I want to make sure, do you understand the question?

THE WITNESS:  Yeah, I apologize, I'm not following.

BY MR. MCRAE:

Q    You understand that in the world of accounting and analysis and so forth, one of the concepts that's talked about in terms of visibility and actually having a document that is judged based on its compliance with an objective metric for example like GAP, GAS or GAGA, that one of the concepts embedded in that is the ability to recreate the analysis, that

Frost - Cross / By Mr. McRae                   **91**

is the opinion, correct?

          **MS. MITCHELL:**  Objection, lack of foundation.

Q    Well, you're familiar with that concept in your work,

right?

A    Yeah, I'm sorry, I'm just not understanding your question

in relation to -- I mean, if you can point me to a specific

table that you're referencing, otherwise I'm not sure what

you're trying to ask.

Q    You know what, here's what we'll do.  Whatever your

testimony was on recreation, we're going to go with that.  I'm

going to move on to something else.

     You agree with me that GAGAS in terms of its section on

auditing standards in Section 8.132 says that auditors must

prepare audit documentation related to planning, conducting and

reporting for each audit, correct?

A    I don't have that in front of me, I can't speak to that.

Q    Let's pull it up.  And I believe this is --

          **MR. MCRAE:**  Is this 208?  208, thank you.

Q    Exhibit 208, Section 8.132, you can see here that the

language auditors must prepare audit documentation related to

planning, conducting, and reporting each audit, correct, you

see that?

A    I see that language.

Q    Now again we had a discussion earlier this morning about

the assessment not being subject to any applicable auditing

Frost - Cross / By Mr. McRae                    **92**

standard, of course, that would naturally include Section 8.132, right?

A    I can't speak to that, but yeah, I mean --

Q    Going back to the need for a factual basis for every assertion, you agree that there are instances in the assessment where the assessment makes assertions without providing a factual basis.

A    Can you please like -- can you please help me understand what you're referring to specifically?

Q    Sure.  But I'm just asking you, and we'll do this, I'm happy to go through some examples.  I have some.  But you in part authored the assessment, right?

A    Yes, I contributed to the report.

Q    And in your contribution to the assessment, you're aware that there are a number of statements where there is not an attribution or a citation to a source in the assessment.  I'm just asking you that as a general matter, I'm happy to go through specific examples, but threshold level, you're aware that that occurs in the assessment, right?

A    Can you repeat your question?

Q    You're aware that the assessment contains numerous assertions without identifying a factual basis for it, correct?

A    I can't speak to that, if you can help me find an example I'm happy to --

Q    All right.

**MR. MCRAE:**  Let's go to page 135 of Exhibit 23.

Q   Now we're in section 5.4.1 and we're in the bottom, the three lines at the bottom.  It says, when City officials shape policy at LAHSA, LAHD may be less inclined to highlight potential shortcomings in any -- excuse me, in an entity that the City helps govern.  Do you see that?

A   Yes.

Q   There's no citation for that statement.

A   Correct.

Q   That would be one example.  Let me give you another, but before we do that, let's progress down this.

    Taking that statement, the operative language being may be less inclined, do you see that?

A   Yes.

Q   There's no statement in the assessment of the likelihood that that will ever occur, correct?

A   Correct, it's may be less inclined, yes.

Q   Nor is there any statement in the assessment that there's been any instance where this assertion about being less inclined to highlight shortcomings has, in fact, occurred, correct?

A   Can you help me, can you please rephrase your question, I'm not sure I understand?

Q   We've established that the assessment doesn't state the likelihood that this -- this being the sentence we just read --

Frost - Cross / By Mr. McRae                    **94**

A     Uh-huh.

Q     -- will occur, right?  Right?  That was what you testified to just a few minutes ago, right?

A     Uh-huh.  Yes, sorry.

Q     It is also the case that the assessment doesn't identify any instance where this being disinclined to highlight potential shortcomings has, in fact, in reality ever occurred, correct?

A     I think it's, in my opinion, a vague statement.  I think we have in the report excerpts from -- communications from LAHD on wanting to follow in relation to LAHSA.

Q     I'm sorry, I -- let me -- what I'm asking you specifically is this.  This is a statement that -- about people being less inclined to highlight potential shortcomings.

A     Uh-huh.

Q     And really the point here and we can do this with respect to countless statements of may, possibly, potential, the assessment is replete with language of that sort, which is not saying that something has happened or that it will happen, but just that there's a possibility it'll happen without any calibration of the likelihood that it'll occur, correct?

        **MS. MITCHELL:**  Objection, lacks foundation, vague, compound.

        **MR. MCRAE:**  It was, I withdraw the question.

//

**BY MR. MCRAE:**

Q    Focus -- I did that to partly give you context to what I'm trying to get to here.  Going back to this specific example the words may be less inclined is not accompanied by any statement that this particular phenomenon that you describe here, has in fact, occurred, correct?

A    I'm -- from our assessment I think we have highlighted this in previous texts.

Q    Okay.  There's no text anywhere where as cited as an example of someone being less inclined, where they actually were less inclined to highlight a shortcoming where there is a statement by the assessment that this, in fact, occurred, particularly as a result of City officials allegedly shaping policy of LAHSA, correct?

          **MS. MITCHELL:**  Objection, vague, ambiguous, lacks foundation and compound.

          **THE COURT:**  Do you understand the question?

          **THE WITNESS:**  Are you asking -- I'm just trying to understand.  Are there other areas in the report that lead evidence of why we needed -- inclined to highlight this risk?

**BY MR. MCRAE:**

Q    No.  I'm asking you whether you said, let's make it even simpler, an example, a specific example of whether -- that -- where someone was less inclined to highlight potential shortcomings as described in this assessment.  Do you cite a

Frost - Cross / By Mr. McRae                    **96**

specific example of that in the assessment?

A     If I can take a moment I can review the report.

Q     It's 165 pages, if it's fine with the Court, it's fine with me.

          **THE COURT:**  Or if you want to go on with questioning or you can do it also during the recess.

          **MR. MCRAE:**  I can do that.  Thank you, Your Honor, let me do that.

          **THE COURT:**  And you can recall her if you'd like.

**BY MR. MCRAE:**

Q     Let's go to this question here.  Now you admit that it is important notwithstanding the issuing of any applicable accounting standard for the assessment to be neutral, correct?

A     Correct.

Q     And impartial, correct?

A     Yes.

Q     Now, this statement that's made in page 135 that we're looking at when City officials shape policy at LAHSA, LAHD may be less inclined to highlight potential shortcomings in an entity the City helps governs.  The assessment doesn't contain a similar assertion against the County even though the County makes the same number of commission appointments to LAHSA as the City, correct?

A     Our assessment did not include City or County funding specifically.

Frost - Cross / By Mr. McRae                    **97**

Q    Right.  So the answer to my question would be, yes, that that's correct?

A    It was not within our scope.

Q    So that's a yes?

         **MS. MITCHELL:**  Objection, Your Honor, I think the answer speaks for itself.

         **THE COURT:**  That misstates the answer, counsel.

         **MR. MCRAE:**  Okay.

         **THE COURT:**  It's not a yes, it's quite a different answer.

**BY MR. MCRAE:**

Q    Let me make sure I understand, it's yes, because it was not within the scope of your work?

A    Can you please repeat your question.

Q    I'm going to move on.

     Let's go to page 129 of the assessment.  On page 129 of the assessment there's a statement, without a clear grasp on the types and range of supportive services, the increased housing retention or contribute to higher exit rates or re-entry into homelessness, resource allocations decisions may not effectively address existing service delivery gaps.  Do you see that?

A    Yes.

Q    Now, there's no citation to any source for that statement in this sentence, correct?

Frost - Cross / By Mr. McRae                    **98**

A    This was a key takeaway of Section 4.5 so this is just a summary of previous statements that had been made in that section with respect to sources.

Q    But the assessment in total, all of it, doesn't state that they may not effectively address existing service delivery gaps, it doesn't state the likelihood at any point that that has happened or will happen, correct?

          **MS. MITCHELL:**  Objection, compound, vague, ambiguous.

          **MR. MCRAE:**  Let me rephrase.

**BY MR. MCRAE:**

Q    The assessment doesn't state the likelihood that it will occur, that resource allocation decisions may not effectively address existing service delivery gaps, correct?

A    I believe there's statements within the report that show how different types of interventions have different outcomes. So I believe there is evidence that shows what you're asking.

Q    Well, I'm actually asking something different.  I'm actually addressing specifically the language may not effectively address.  And my point is to understand the gravity or the import of that statement.

     The assessment does not at any time quantify the likelihood that that may be the case, like a 10 percent chance, a 2 percent chance, a 30 percent chance, in other words, nothing along those lines when we read about may, or might or potential to tell us quantitively the nature of the risk,

Frost - Cross / By Mr. McRae                    **99**

right?

A    I --

            **MS. MITCHELL:**  Objection, assumes facts that it's

possible.

            **MR. MCRAE:**  Well, if we can stipulate to that.

            **THE COURT:**  Do you understand the question?

            **THE WITNESS:**  I believe it is in your question, are

you asking if there's an actual quantifiable risk of potential

resource allocation may not effectively address existing

service delivery gaps?

**BY MR. MCRAE:**

Q    No, I'm not asking you as you sit here now whether or not

there's a quantifiable risk, I'm asking whether or not the

assessment purports to state the quantity of that risk.

A    Outside of what's already identified within the report of

the various outcomes with respected interventions, and the fact

that the City was unable to quantify I believe that risk is

already laid out within the report.

Q    Right.  And my point is, nowhere in the report is there

any numerical quantification of it, correct?

A    To answer that, you would have to presume that there

wasn't any potential -- I don't believe I can answer your

question because I --

Q    Okay.

A    -- believe it's outlined in the report of service delivery

Frost - Cross / By Mr. McRae                    **100**

gaps.

Q    So let's go to the bottom of page 137.  It says, without a clearly defined chain of command and well documented communication channels, accountability may have been diminished.  Do you see that?

A    Yes.

Q    There's no quantification of the likelihood that that occurred in the assessment, correct?

A    Correct.

Q    Okay.  And the assessment doesn't state the likelihood that this issue would continue to be something that could occur in the future, correct, and by the future I mean after June 30th, 2024 when the assessment period ended.

A    Are you referring to -- so this statement specifically within LAHSA?

Q    Yes.  Whatever the context of this sentence is in the full paragraph that starts in summary, and then ends with the language that I just read which is the dependent clause starting without and ending with diminished.

A    Right.  This was solely within the look back period, any changes that are made past that, we wouldn't have insight into.

Q    So if we go to page 105 of Exhibit 23 it says, without a -- excuse me, A&M reviewed the TLS contracts under the Road Map program named LAHSA contracts and the number of TLS slots was not easily identifiable, correct?

A    Correct.

Q    Okay.  Easily identifiable, just for clarity does not mean non-identifiable, correct?  It means challenges in identifying it, right?

A    Correct.

Q    Okay.  And the Road Map program that you're referring to is the City's MOU with the County, correct?

A    No, this Road Map program named LAHSA contracts would be the contract between the City and LAHSA under the Road Map named contracts.

Q    Thank you.  You're not referring to the agreement that the City has with the Alliance, correct, in the context of referencing these Road Map program named LAHSA contracts, right?

A    Can you please repeat your question?

Q    Right.  In referring to the Road Map program named LAHSA contracts --

A    Uh-huh.

Q    -- that is not talking about the City of Los Angeles contract -- excuse me, the City of Los Angeles settlement agreement with Alliance, correct?

A    Correct.

Q    Let's move on to ECF page -- let's go to ECF page 5 of Exhibit 23.  And we're going to go into the heading, lack of contractual clarity and if you go on to the next page at page

6, it says, these challenges were compounded by multiple funding sources poorly designed and siloed processes, lack of collaboration and overlapping responsibilities between the City, the County, LAHSA and service providers, right?

A    Yes.

Q    Now, isn't it a fact that in addressing homelessness in Los Angeles, the City of Los Angeles and the County of Los Angeles have different responsibilities, correct?

And if you don't know, that's fine too.

A    I don't -- I can't off the top of my head remember any defined overlapping responsibilities.

Q    Meaning that you don't know the exact nature of any distinction between responsibilities that the City and County respectively had for addressing homelessness?

A    Can you please repeat your question.

Q    I'm asking if what you just said is I don't know the -- whether there are differences in terms of the responsibilities of the City of Los Angeles and the County of Los Angeles respectively have for addressing homelessness.

A    At the top of my head, I do not have knowledge of every distinction in terms of responsibilities that the County and City have.

Q    And when it comes to the City of Los Angeles, the County of Los Angeles and LAHSA, you do understand that all three of these entities rely on multiple different funding sources,

Frost - Cross / By Mr. McRae                          **103**

correct?

A    Yes.

Q    And you understand that the multiple different funding sources that the City of Los Angeles, the County of Los Angeles and LAHSA have also have different requirements as to each of those multiple funding sources, correct?

A    Yes, each funding source has its own requirements, yes.

Q    Let's talk about at the top of page 7 in the context of cost and service variability which is a carryover from page 6.

           **MR. MCRAE:**   That's fine, thank you, you can put that back up.

Q    It notes here at page 7 that the observation suggests that participants, plural, outcomes are dependent on a multitude of factors.  Do you see that?

A    Yes.

Q    Now, the assessment does not identify all of the factors in that multitude, correct?

A    Correct.

Q    And it's safe to say that the City certainly doesn't have control over all the factors in that multitude, correct?

A    Correct.

Q    And the assessment does not specify -- well, let me move on.

     The assessment -- let's look at page 101 of Exhibit 23. Here it says under shelter or interim housing and this is

language that we were looking at previously, under the terms of the program named LAHSA contract, participants were referred to the interim housing beds through LAHSA's centralized matching process for interim housing and the rest of the sentence.

Actually I think we looked at something different just to correct the record, but it says what it says.  Here's my question, you understand that LAHSA was created by a joint powers agreement between the City and the County of Los Angeles?

A     Yes.

Q     And you understand that LAHSA has its own employees.

A     Yes.

Q     Its own budget.

A     Yes.

Q     Its own operating procedures.

A     Yes.

Q     And if we look at Exhibit 123 at page 121, in the paragraph that reads in summary, going to the second sentence that says determining -- consequently determining whether a intervention or site performs effectively requires a nuanced examination of these intersecting elements, rather than relying on a single indicator, such as type of housing arrangement or intervention.  Do you see that?

A     Yes.

Q     But if we go to page 94 of the assessment, there's also a

Frost - Cross / By Mr. McRae                    **105**

statement in the assessment that this process involved

requesting, referring to the preceding sentence, this process

involved requesting and reviewing supporting documentation for

certain expenditures which hindered the close out process.  Do

you see that?

A    I see that statement, yes.

Q    So to the extent you are saying that documents need to be

reviewed more carefully to ensure funds were actually spent and

services were actually provided, this could result in longer

pay periods by the City to providers participating in its

program, correct?

A    Referring to the -- sorry, the cash request number 23

paragraph, correct, on page --

Q    What I'm saying is that in any instance in the assessment

where there's an observation or assertion that documentation

should be reviewed more carefully to ensure funds were actually

spent and services were actually provided, that could result in

the City having longer periods of time that pass before it pays

a provider participating in a City program in a given instance,

correct?

A    Well, to answer that question I think you'd have to

understand who was ultimately -- whoever the contract was with.

If the contract was between LAHSA and the service provider and

LAHSA was delegated that responsibility of oversight, then it

would be LAHSA respectfully not necessarily the City.

EXCEPTIONAL REPORTING SERVICES, INC

Frost - Cross / By Mr. McRae                          **106**

Q    Fair enough.  And, in fact -- and thank you.  In fact, to make this at a slightly bigger level of abstraction or generality, who -- for whoever is paying for the bed, whatever the source of the funding is, to the extent that the assessment is saying that any time a payment is made for a given bed, for example, the documentation needs to be reviewed more carefully to ensure that the funds were actually spent and services were actually provided, you agree that that could result in a longer period of time to pay a provider participating in that program, correct?

A    I think it would depend on the structure of like the staffing, there's a multitude of factors.

Q    So it might.

A    It could.

Q    Yeah.  And there's no assessment in the -- excuse me, there's no statement in the assessment discussing whether the specter of longer pay periods for providers could be a disincentive for providers to participate in the City's homelessness programs for example, right?

A    Can you please repeat your question?

        THE COURT:  Counsel, you can take a moment.  I saw one of the associates come over.  Don't stand on formality.  If you --

        MR. MCRAE:  Oh, thank you, appreciate it.

        THE COURT:  Yeah, take your time with that.  And

Frost - Cross / By Mr. McRae                    **107**

for -- I think there's seven of you, you're welcome to

participate at any time.  I'm not very formal about that, so if

you see something you want to impart to your counsel for

goodness sakes, just you're free to approach him.  Okay?

MR. MCRAE:  May I inquire what that is?

THE COURT:  Please, absolutely.

And by the way, while we're doing that apparently

with seven of you, I imagine you have some division of

responsibility in terms of different witnesses.  I'm not going

to preclude that.  Now normally I would go with two or three

senior partners, but I appreciate the objections coming from

one source if there's objection, with the help of a senior or

lead counsel, fair enough, that way we don't have different

associates.  So if you have a division responsibility, all are

welcome to participate.  Okay?

MR. MCRAE:  Thank you, Your Honor.

BY MR. MCRAE:

Q   What I was asking you is, the assessment does not contain

a discussion as to whether any of its recommendations if

adopted could act as a disincentive for providers to

participate in any of the homeless programs described in the

assessment, correct?

THE COURT:  Do you understand the question?

THE WITNESS:  Yeah, apologies.  Can you please

clarify?

EXCEPTIONAL REPORTING SERVICES, INC

THE COURT:  Yeah.

Q    I'm going to go beyond that particular question, maybe this will be easier.  The assessment does not contain any analysis of whether the additional costs associated with implementing any of its recommendations would be greater or less than the benefits of implementing the recommendations.

MS. MITCHELL:  Objection, vague and ambiguous.

THE COURT:  Just a moment, do you understand the question?  Could you reask that, counsel, I'm not sure the Court understands it.  I apologize.

MR. MCRAE:  No problem, Your Honor.

BY MR. MCRAE:

Q    The assessment does not contain any discussion of whether the costs of implementing any of the recommendations in the assessment outweigh the benefits of doing so.

A    We do not quantify the cost to implement the recommendations that were identified.

Q    And that would naturally follow that since the cost were not quantified, nor was there any comparative analysis of whether the cost of implementing those recommendations would exceed the theoretical benefits of doing so, correct?

MS. MITCHELL:  Objection.  Vague, ambiguous, compound.

THE COURT:  If you understand the question, you can answer it.

**THE WITNESS:**  I believe there's a high level of risk right when you -- throughout the report, I think we identified if you can't -- I don't think you can quantify risk when you're talking about service quality and the value that you're receiving for those dollars.

**BY MR. MCRAE:**

Q    You would agree with me that you -- excuse me, that the assessment, let me rephrase that.  A&M doesn't know what the bed count under the Alliance settlement will be -- settlement agreement will be in June 15th, 2027, correct?

A    I do not know what the bed count would be in the future.

Q    And as you sit here right now, you don't know what the City of Los Angeles has reported as a bed count number as of today relative towards its obligations under the Alliance settlement agreement, correct?

A    As of today, are you referring to March 31st, 2025?

Q    I mean as of today.

A    I don't -- if the City has reported to the Court as of today, I have not seen it now, so I wouldn't know.

Q    And you don't know what the encampment reduction count will be for the City under the Alliance settlement agreement at any point in 2026, correct?

A    Correct.  I cannot speak to the future.

Q    And one of the reasons why you can't tell us what the City will be able to achieve relative to its bed count and

Frost - Cross / By Mr. McRae                    **110**

encampment reduction numbers, tomorrow, a month from now, a year from now, two years from now, is that a lot of things can happen in a year or two, correct?

A     Yes.

Q     Yeah, I mean like an unprecedented wildfire that burned down an area larger than the City of San Francisco.  That happened after the assessment was written, right?

A     No, I --

Q     Well, I'm sorry, it happened after the review period of the assessment, which ended in 2024.  The fires occurred in 2025.

A     Right.  So yeah, the report was issued in March 2025, our lookback period ended June 30th, 2024.

Q     That's what I meant, that at least the reporting period, the salient reported period, was before the wildfires occurred, correct?

A     Correct.

Q     And obviously that's not something that anybody could have possibly predicted, that that would have occurred, or at least not with a level of certainty to profess it as, this in fact will occur, right?

A     I --

        **MS. MITCHELL:**  Objection.  Vague, ambiguous, calls for speculation.

        **MR. MCRAE:**  Withdrawn.

**BY MR. MCRAE:**

Q    The point being that in the course of a year or two years, you, you being A&M, have no way of knowing what additional resources the City might have in terms of meeting its Alliance settlement agreement obligations in the future, right?

A    Can you repeat your question?

Q    You have no way of knowing what additional resources may become available to the City over the next year or so in meeting its bed count and encampment reduction obligations under the Alliance settlement agreement, correct?

A    I can't speak to the future, correct.

Q    And I want to, before I round that out, I want to ask you something.  You agree with me that the assessment makes note of one of the reasons why A&M didn't get all the data that it requested, and let's focus on the City, Los Angeles.  Was that statement made because in some instances, people from the City of Los Angeles did not give data after saying that they thought that the request exceeded the scope of your engagement?  Do you recall that language in the assessment, that some data refusal requests -- data requests were refused because of a belief that the request exceeded the scope of the engagement?  Do you recall that language in the assessment?

A    Off the top of my head, I can't specifically think of a -- well, can I review the report just for a quick minute?

Q    Sure, of course.

A    I think I may --

(Pause)

THE WITNESS:  I believe there is some language in relation to us trying to make sure that we remained within the scope of this assessment when making data requests.

BY MR. MCRAE:

Q    I'm sorry, I didn't follow that.  Could you say that again?

A    There's language that I'm referencing on page 32 of 160 in relation to the parties may have exercised discretion interpreting the data requests from A&M.  At the same time, A&M endeavored to limit its data requests and information directly relevant to the objectives of this engagement.  Therefore, all parties' interpretations may have limited the completeness of the data set, which may have affected the comprehensiveness of their respective analyses.

Q    Okay.  So were you just saying that one of the factors over which A&M did not have control was the interpretation of the request as to its scope and meaning by the parties to whom the requests were made?

A    Yes, all parties may have interpreted the scope in their own way.  Then we would have, kind of what we were alluding to yesterday, reiterative requests of requesting data, receiving it, and then having further communications if needed.

Q    And tell me if you agree with this, the assessment,

Frost - Cross / By Mr. McRae                    **113**

doesn't it contain language at some point stating that at least one of the reasons why information wasn't provided is because people thought that the request exceeded the scope of the request?  Excuse me, the scope of the engagement.

A    I can't recall specifically that language at the top of my head to cite in the report.

Q    So for the reason -- let me tell you why I'm drawing this out.  There were a number of times yesterday when you were saying, from the lack of information provided, we understood it didn't exist.  And I'm suggesting to you, isn't it true that another reason why you may not have had information is because the way in which the request was interpreted, someone could have felt that what you were requesting was beyond the scope of what you were being asked to do.

          **MS. MITCHELL:**  Objection.  Calls for speculation and misstates the testimony.

          **THE COURT:**  Overruled.  If you understand the question, you can answer it.

          **THE WITNESS:**  I apologize, can you please repeat your question?

**BY MR. MCRAE:**

Q    Sure.  Rather than the default of, if we didn't receive the information, that must mean that it didn't exist, isn't an alternative explanation, at least in some instances, that you didn't receive the information because the persons to whom the

Frost - Cross / By Mr. McRae                                **114**

request was made felt that the information exceeded the scope of what you were doing and didn't want to give it to you?

            MS. MITCHELL:  Objection calls for speculation.

            THE COURT:  If you --

            THE WITNESS:  I believe there is a level of good faith that parties wanted to participate in this assessment as agreed upon, but I can't -- to your point, if someone, a party, did not want to produce data and claimed they weren't able to, that was their -- we could not compel them.

Q    Right, and I'm not talking about compulsory process or a subpoena or anything, and I appreciate the good faith comment. What I'm asking you is, as an example, someone to whom the request was made, let's say of the City, if they felt that the request exceeded the scope of your engagement, you just said that you thought the parties were operating in good faith, they could decide, I don't think A&M is entitled to this based on their engagement, so we don't have to provide it, correct?

            MS. MITCHELL:  Objection.  Compound, argumentative.

            THE COURT:  Overruled.  If you understand the question, you can answer it.

            THE WITNESS:  I can't speak to what a party may or may not have thought and ultimately did not communicate with us.

//

//

Frost - Cross / By Mr. McRae                          **115**

**BY MR. MCRAE:**

Q    Right, and the point being that just because you don't have information or didn't have information during this reporting period ending June 30, 2024, doesn't mean the information didn't exist then, right?

A    That -- yes.

Q    And it certainly doesn't mean that the information doesn't exist now, right?

A    I can't speak to that, but yes.

Q    Nor does it speak to whether the information will exist as of 2027 or 2026, correct?

A    I'm not sure I understand your question.

Q    Meaning any purported gap in information that the assessment says existed as of June 30, 2024, that doesn't mean that that information gap or purported lack of information, due to a lack of existence, that that will be true in 2025, 2026, or 2027, correct?

A    If data did not exist within the look-back period, that maybe it may exist in the future?  Is that your question?

Q    Correct.  It's possible, isn't it?

A    Potentially, yes.

Q    All right.  I want to talk to you a bit about who you spoke to in connection with preparing the report that is the assessment.  By you, again, I mean the collective view at A&M. Was A&M, in the context of preparing the assessment, having

Frost - Cross / By Mr. McRae                          **116**

ongoing communications with anyone, including the special master or the Court, to discuss the scope of the report as it was being prepared?

A    Yes, as well as the parties and through hearings from when we were engaged through the issuance of our draft report.

Q    Okay.  Well, let's say the special master is an example.  When A&M would have discussions, meetings with the special master to confer about the assessment that was being prepared, were those in open court, those exchanges?

A    Those exchanges may have been in court, and they may have been outside of hearings.

Q    Well, to the extent that the communications that A&M had with the special master incident to the creation of the assessment were outside of court, are you aware of any notes, documents memorializing the substance of those discussions?

A    Notes memorializing discussions with --

Q    The special master.

A    -- the special master?  I mean, we would have periodic status updates to discuss where A&M was with the assessment, updates from data requests.  Special master Martinez was cc'd on every data request we sent to the parties to make sure that the Court was in the loop because of the intent to keep this as transparent as possible to all parties.

Q    Understood.  My question, however, was, was it the case that every communication that A&M had with the special master,

Frost - Cross / By Mr. McRae                    **117**

to the extent it was not in open court, is reflected in a document so that third parties like the City could know when it was not present, what exactly was said between A&M and the special master?

A    No, we did not keep notes for every encounter with the special master.

Q    And did A&M keep notes of its discussions with counsel for the plaintiffs in this case in each instance when it had discussions?

A    No, I do not believe we kept notes, and same with the City and with the County.

Q    And would that be true also in any exchange that A&M had with the Court for that matter?

A    All parties, not every meeting was memorialized with notes.

Q    Let me ask you, we were talking about June 30, 2024, and the period thereafter, and the challenges in terms of predicting the future.  Another reason why you're not able to state what the bed count or encampment reductions will be by the City in 2026-2027 is that you don't know what cooperation the City may receive from other entities towards meeting its obligations under the alliance settlement agreement in the next year or so, correct?

A    Yes.

Q    You also don't know what policy changes the City might

Frost - Cross / By Mr. McRae                              **118**

affect over the next two years that could impact its approach

to satisfying its obligations under the alliance settlement

agreement, correct?

A    Correct.

Q    And you're not aware of, if I could switch glasses here

for a second, and nor are you aware of any statement by the

City that it would meet its bed count obligations under the

Alliance settlement agreement by doing anything that the

assessment says, correct?

A    Can you please repeat your question?

Q    You're not aware of any commitment by the City to achieve

its bed count obligations under the Alliance settlement

agreement by doing what A&M says in the assessment, correct?

A    I'm not sure I understand your question.

Q    You're not aware of any promise by the City to achieve its

encampment reduction obligations by doing any of the things

that A&M describes in the assessment, correct?

A    I'm not sure, sorry, I understand your question of what

you're trying to ask.

Q    So A&M makes a number of recommendations in its

assessment, correct, and makes a number of findings and

takeaways and so forth.

A    Yes.

Q    You're not aware of any promise by the City to fulfill its

obligations under the Alliance settlement agreement by doing

Frost - Cross / By Mr. McRae                    **119**

any of those things, correct?

A    An obligation on its Alliance settlement to do any of these recommendations for compliance?  Correct.

          **MR. MCRAE:**  Your Honor, may I have a moment?

          **THE COURT:**  You may.

**BY MR. MCRAE:**

Q    I want to go back to Exhibit 205, which I think you have a physical copy of still.

A    Yes.

Q    Would you agree if we can have that up on the screen as far as the scope of work that's described there?  The engagement agreement between the City of Los Angeles and A&M also does not include A&M assessing the City's compliance with contractual obligations under the Roadmap program, correct?

A    The word compliance is not within the language that I am seeing in front of me.

Q    And to put a finer point on it, at no point in the assessment does A&M state whether the City of Los Angeles is in compliance or not in compliance with the Roadmap agreement with the County, correct?

A    The word compliance is not within this engagement letter.

Q    Right, and I'm pivoting now to the assessment.  The assessment itself at no point purports to state whether the City is in compliance with the MOU with the County, correct?

A    Correct.

**MR. MCRAE:** I think I have nothing further at this point, Your Honor, for this witness, subject to if there's any latitude.

**THE COURT:** I'm sorry, I didn't hear you. I'm sorry.

**MR. MCRAE:** I think I may be done at this point. Oh, actually, can you hang on one second?

**THE COURT:** A&M will be subject to recall regardless. We don't know where the future testimony will take us, so they'll be available.

**(Pause)**

**MS. MITCHELL:** Your Honor, I just got notice, Ms. Rafferty is here, and we had intended to put her up briefly, but she has to catch a flight. Would we be able to put her up out of order so we can get her on and off the stand so she can --

**THE COURT:** Subject to redirect and recross, absolutely.

**MS. MITCHELL:** Of course, thank you.

**THE COURT:** As a courtesy. So why don't you call your next witness at this time. If you'd step down, regardless for counsel's edification, I'm going to ask you to remain available. I don't know what the CAO is going to say or the suggested witnesses by the City. And I'm holding the Apex issues in advance until I see what the response is by the two witnesses that the City has requested testify first. So she'll

Frost - Cross / By Mr. McRae                    **121**

be returning to the stand regardless and maybe after the CAO

testifies or CEO, I'm sorry.

          **MS. MITCHELL:**  May I bring her up, Your Honor?

          **THE COURT:**  Please.  What time is your plane flight?

          **THE WITNESS:**  I can delay it.  I'll delay it.

          **THE COURT:**  Okay.  Well, let's start.  So hopefully

you'll catch it today or tonight and we'll try to be courteous.

So if you'd raise your right hand, please.  Carla, would you

administer an oath, please?

          **DIANE RAFFERTY, PLAINTIFFS' WITNESS, SWORN**

          **THE COURT:**  Thank you.  If you'd please be seated to

my right, and the entrance is around the machine.  So watch --

and if you'd be seated, please, and would you state your full

name for the record?

          **THE WITNESS:**  Diane Rafferty, R-A-F-F-E-R-T-Y.

          **THE COURT:**  All right.  Just a moment.

          **MS. MITCHELL:**  May I proceed, Your Honor?

          **THE COURT:**  Just one moment, please.  Counsel, please

proceed.

          **MS. MITCHELL:**  May I proceed, Your Honor?

          **THE COURT:**  You may, thank you.

          **MS. MITCHELL:**  Thank you.

//

//

//

**EXCEPTIONAL REPORTING SERVICES, INC**

**DIRECT EXAMINATION**

**BY MS. MITCHELL:**

Q    Ms.  Rafferty, what is your current position?

A    I'm a managing director for Alvarez & Marsal.

Q    And are you within a particular sector with Alvarez & Marsal?

A    Yes.  I work under public sector services and I run my own division for health care delivery and compliance.

Q    Okay.  Can you briefly describe your background, training, and experience which led you to this position today?

A    My degree is I have a bachelor's in nursing.  My master's is in healthcare administration.  I've been a hospital CEO, COO, CNO.  I was recruited by Alvarez & Marsal during the Brotman Hospital bankruptcy.  So I've been with A&M for almost 16 years in November.  The first 14 years, I was a managing director for the health care industry group and transferred over to public sector almost two years ago.

Q    And what is the -- can you briefly describe what the public sector section does?

A    We have a large practice in public sector.  We have education.  We have a federal practice.  My practice is under health care, which we call HHS.  And there are four divisions in HHS.  I lead the division for compliance, health care delivery.  I have other managing directors in my division, senior directors, directors, staff that report to me.

Rafferty - Direct / By Ms. Mitchell                                **123**

Q    And as part of -- you were part of the authoring team of what we have shown as Exhibit 23, which is the independent assessment that was done by A&M; is that right?

A    Correct.  I think as Ms.  Frost has mentioned, there were ten of us.  We also conferred with some of our executive leadership before we took this engagement.  We also had interns, but we really don't count those as staff that helped work on this.  I will let you know that I was over the engagement.  Ms.  Frost and the other team members did all the legwork, although I did monitor and look at their reports, also did quite a few site visits.

Q    Okay.  And can you describe the other members of your team by name and role?

A    Scott McGee, who's a managing director who works for disputes and investigation.  Lisa Brown, who is a senior director who works with what we call D&I, disputes and investigation.  We had Emily Brandenfels, who's a physician who does street medicine and is a family practice physician.  I'd have to go back and look at everyone off the top of my head, but those were the main key members.

Q    Okay.  Now, in April of 2024, so about 13 months ago, were you here in this very courtroom presenting A&M's proposal in response, I think, to the RFP that was set out for this audit/assessment?

A    We did want to do this work, I think, just because of the

Rafferty - Direct / By Ms. Mitchell                    **124**

social consciousness of it.  We also made it extremely clear we are not an auditing firm.  We do not follow GAAP.  We do not do formal audits.  I know there's a lot of confusion with the word audit.  For us, in our business, when we talk about audit, we talk about a financial audit.  This was an assessment.  Very different.

Q    And can you describe the difference between a financial audit and an assessment?

A    A financial audit, for me, as when I was a CEO, when I did -- I had to produce audited financials to my board, that does follow GAAP and looks at all the revenue expenses, makes sure it's categorized correctly, your P&L is balanced.  That was not our role.  Our role was to look at exactly what our statement of work says, along with those amendments, was to assess the best of our knowledge from the data we received on who we asked and interviews, which is not duplicative because you cannot reassess an interview.

Q    Did you make that clear to the parties when we were evaluating the various firms that were presenting proposals to do this assessment?

A    We did.  I also had that --

        **MR. MCRAE:**  Your Honor, I'm sorry.  There's something on the screen that's very distracting.  I don't know if the Court is seeing this.

        **THE WITNESS:**  It's a moon launch.

**EXCEPTIONAL REPORTING SERVICES, INC**

MR. MCRAE:  I don't know what this is, but --

THE COURT:  Let the record reflect we have a moon launch.

MR. MCRAE:  And now we see the face of Plaintiffs' counsel.

MS. MITCHELL:  There.  Now we have the moon landing off of the screen.

BY MS. MITCHELL:

Q    Okay.  So -- and I'm sorry I missed your answer.  So had you made it clear to the parties that you were not conducting a financial audit pursuant to the GAO standards?

A    We did.  I also had -- to be able to do this engagement, I had to attest to our general counsel for all of A&M, which we called Big A&M, that this would not be a financial audit, including my boss who runs public sector.

Q    Did you offer to the parties and to the City the ability to have you contract out and bring in, as a subcontractor, a CPA auditing firm as part of this process?

A    We did, because we wanted to make sure that our statement of work was meeting the need.  If there was a need for financial audit or the City wanted to go under a complete financial forensic audit, we offered that we would subcontract with a CPA firm of their choice to add that to the scope.

Q    And did they take you up on that?

A    They denied the request.

Q    And showing you what has been marked as Defense Exhibit 208 is the government auditing standards.  This is a lengthy document, but are you generally familiar with the government auditing standards?

A    Generally.  I'm not an accounting -- accountant.  I certainly took finance with my MHA.  But no, that is not within my depth of knowledge.

Q    Okay.  Did you conduct this assessment with integrity?

        **MR. MCRAE:**  Objection.  Vague to the extent it's not referenced to any objective standard.

        **THE COURT:**  Overruled.  It goes to state of mind.  Overruled.

        **MS. MITCHELL:**  Excuse me, Your Honor?  Is that sustained?

        **THE COURT:**  That's overruled.  You can ask the question.

**BY MS. MITCHELL:**

Q    Did you conduct this assessment with integrity, Ms. Rafferty?

A    Yes.  All our work in the standards of Alvarez & Marsal are extremely high, and integrity means honesty, making sure that we do things appropriately.  I think what was unique in this engagement is, because of my background as a registered nurse, and I do behavioral health nursing, that be able to approach people on the street in this situation in a kind and

Rafferty - Direct / By Ms. Mitchell **127**

respectful manner.  So all of the team -- I chose who was on this team, and no one could be on this team that didn't have integrity, ethics, and trust.

Q    What about objectivity, which is listed here in Defendant's Exhibit 208, page 26, if my eyes do not deceive me?  Did you conduct this assessment with objectivity?

MR. MCRAE:  Objection.  Same objection.  Vague.

THE COURT:  Overruled.  Is this the same document that was referred to?

MS. MITCHELL:  Yes, Your Honor.

THE COURT:  Counsel, is this the same document you referred to?

MR. MCRAE:  It is, but --

THE COURT:  Just different sections?

MR. MCRAE:  I believe so.  But I think they may actually be some of the same sections.

THE COURT:  That's the way police officers talk to me, I believe so.  Is this the same document that you referred to?

MR. MCRAE:  It is the same document.  I think you asked if it's the same section.

THE COURT:  Please continue.  Please continue.

MS. MITCHELL:  And I believe it is referencing the same section, Your Honor.

//

Rafferty - Direct / By Ms. Mitchell                **128**

**BY MS. MITCHELL:**

Q    And I'm sorry, I don't know if I heard your answer.  Did you conduct this investigation assessment with objectivity?

        **MR. MCRAE:**  Objection.  There's no foundation that the counsel's question as to these terms is consistent with how these terms are defined in these standards that weren't followed.  It's just an undefined reference to integrity or objectivity, which could mean anything.

        **THE COURT:**  I think you've both gotten into the document.  I'm not sure how much this is going to weigh in any decision I make, but the door's been open here for both of you now concerning the alleged audit versus assessment.  Overruled.

        **THE WITNESS:**  I can answer that?

        **MS. MITCHELL:**  Yes, you can.

        **THE COURT:**  Yes, please.

        **THE WITNESS:**  Okay.  Yes, objectivity was brought into this.  I was born and raised in Los Angeles.  My office is based in Los Angeles and D.C.  I chose to have a team member that were not familiar with Los Angeles.  That included Seattle, Denver, Texas.  I wanted folks on the team that had an objective view that do not read the press and hear what's going on in Los Angeles to have that objectivity.

**BY MS. MITCHELL:**

Q    And referring to (d) here under 3.06, did you use any government information, resources and positions improperly?

Rafferty - Direct / By Ms. Mitchell                **129**

A     No.

Q     And referring to (e) on 3.6, did you and your team conduct yourselves professionally throughout the assessment?

        **MR. MCRAE:**  Same objection.  Vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I believe we did.  We never had any objections from working with the County, working with the City, working with LAHSA or the Court in any time we were ever accused of being unprofessional.

Q     Now referring to, if I may have a moment, Your Honor.  Did you hear counsel's questions earlier about braiding -- braiding funds?

A     I did.

Q     And what is -- are you familiar with HUD's explanation or definition of braiding?

A     I'm familiar with HUD braiding.  We don't call it braiding in our company.  We call it commingling.  Commingling of funds is very common.  In health care work, we'd look at federal match to certain kinds of funds.  It is used to make sure that you maximize your resources for wherever those funds are intended for.

Q     Okay.  And so braiding or commingling sort of involves compiling funds from several different sources and putting them into one source and using them from that source.  Is that the general sense?

A    Correct.

Q    And does HUD have some requirements regarding what happens when federal funds are quote/unquote braided?

        **MR. MCRAE:**  Objection.  Lack of foundation.  The witness has already said this.  Also vague as to HUD in terms of which sector or industry as to which it might have a given regulation or requirement.  And there's a lack of foundation this witness has edified on those topics.

        **THE COURT:**  Thank you, counsel.  You may answer.

        **THE WITNESS:**  I may answer.  I'm not totally familiar with HUD, but I am familiar with commingling.  The rules that we follow are that once you use federal funds, or this happens with grant funds also, and especially if there's allocated requirements for grant funds, when you use federal funds, you're responsible for tracking those funds to make sure that they are provided for the purpose and how those funds are spent.

        So it's not only funds coming in commingling.  You can -- once the funds are used, you have to be able to show that those funds were allocated appropriately to their means.

        **MR. MCRAE:**  And I move to strike.  The question was about what HUD requires, and the witness responded, I'm not familiar with HUD, but this is what we do.  It's also vague as to who we are and whether it's relevant.

        **MS. MITCHELL:**  I'm happy to clarify, Your Honor.

Rafferty - Direct / By Ms. Mitchell                    **131**

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    Thank you.  Now, are you familiar with CFR section 200.302?

A    I am.

THE COURT:  Just a minute.

THE WITNESS:  I'm sorry.

THE COURT:  200?

MS. MITCHELL:  200.302.  CFR Section 200.302.

THE COURT:  Thank you.  All right.

Q    And does that govern the requirement for documenting spending of federal funds?

A    It does.

MR. MCRAE:  Objection.  Lack of foundation and calls for a legal conclusion.

THE COURT:  Overruled.  And, counsel, I believe that this was also brought up at a prior hearing that you may not have been present at, but there are some civil attorneys here who were, and this document has come up before concerning the regulations.  Counsel?

BY MS. MITCHELL:

Q    And, in your opinion, based on your review, when LAHSA -- was LAHSA able to account for the dollars that they received from HUD when they were commingling or braiding funds?

MR. MCRAE:  Objection.  Relevance as to LAHSA.

Rafferty - Direct / By Ms. Mitchell                    **132**

        **THE COURT:**  Overruled.

        **THE WITNESS:**  To our knowledge, the information that we receive -- we, Alvarez & Marsal.  Should I say that every time I say we?

Q    I think we understand who we is.

A    Okay.

Q    Thank you.

A    They could say that certain funds went to a certain entity, but they could not define that entity.  I think a good layman's analogy that one of our team members used is he has kids in college, and when his kids ask for funds to be put in their debit account for books, he gives that money for those books.  He doesn't know where that money was spent on books or anything else.  There was a lack of transparency to understand once the funds were commingled, they might be able to know it went to a certain program, but there was no check and balance or transparency to account for those funds.  If there were, they were not provided for us.

        **MR. MCRAE:**  Your Honor, move to strike as vague, not sure who the entity is that's being referred to that those comments are directed towards.

        **THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q    I'm going to ask you about some statements that you have made on the record throughout these proceedings over the last

Rafferty - Direct / By Ms. Mitchell                    **133**

year or so as you came back to give periodic status updates to this Court and to the parties.  You made a statement at the last hearing in response to a question that I asked you about whether the system, in your opinion, based on your full assessment, a few patches to fix some of the problems was necessary or a systemic overhaul.

THE COURT:  Counsel, could you repeat that question?

MS. MITCHELL:  Yeah, I'm sorry, Your Honor, I was just setting the scene.

Q    So what I'm going to do is read your statements and then have you explain them.  You made the statement, I think, and this is ECF 909, page 10, line 16 through 11, line 6.  "I think it needs to start from the ground up to figure out what you, the City and County, really want to do to make this system totally different.  There's too many gaps."

THE COURT:  Counsel, slower.  Slower, please.

Q    "There's too many gaps and there's old data systems and it's really hard to just patchwork it because it becomes you solve one problem and then you don't solve another.  So in our assessment, because we do a lot of this work, is really build it up from the ground up.  That's not saying to replace every single person, but the processes are extremely broken."  Do you recall making that statement just not even two weeks ago?

A    I do.

MR. MCRAE:  Objection.  Relevance.

Rafferty - Direct / By Ms. Mitchell                    **134**

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    What did you mean when you said the processes are extremely broken?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Our reference in our report and our discussions in court about the process being broken, we found that requests for data were, and there was a comment earlier made, was a denial to fulfill that request versus someone thought it was not within our scope versus they didn't exist.  We didn't have that information.  We talked to many, many people on the street.  No, I don't have names.  We do have dates and where we were.  That many people applying for benefits or trying to find benefits were kind of left out of the system or there was no contact back to them.  We asked things such as job descriptions.  When someone says they're a case manager in the street out working with clientele, what were those job descriptions?  What were those qualifications?

We could not get a lot of that response.  There seems to be a lot of disjoint communication between all the parties.  I think the best analogy I can use, and I was thinking about this, that when you have a home, an older home with bad plumbing and you have a leak, you can fix that leak and then you're fixing another leak.  And eventually you have

to say, I think we need to have new plumbing in the house.  And we found as we went through our interviews and assessed data and gaps in data that we realized there were multiple system issues that had been longstanding.

**BY MS. MITCHELL:**

Q    Docket 768 on September 4th of 2024, you were here, and I also believe it was in this courtroom, on page 11, lines 15 through 25, you state, it has been difficult to get data.  We understand everybody's busy.  We understand.  It's not that intent not to give us the information.  I think there's so many programs out there, sub-providers, how many flows.  It's never -- it just is not a concrete basis.  I explained to you, it's like a bowl of spaghetti.  Every time we try and look at where funds went, how they were given to a provider, and how do we know that provider provided that service, it's very convoluted and complicated.  We know we still have to dig in deeper.  We appreciate the Court's support in getting data.

Now, can you describe the difficulty that you had, your team had, in obtaining the data from the City, LAHSA, and to some extent the County?

A    Yes.

MR. MCRAE:  Relevance, Your Honor.

THE COURT:  Overruled.  You may answer the question.

THE WITNESS:  Okay, thank you.  Yes, we did have to come to court and express there were multiple delays after

numerous e-mails, correspondence, making sure that our requests were clarified to whoever we were asking for that report.  E-mails didn't come back in a timely manner.

I don't know if we presented some of those e-mails.  We kept a lot of the information to show these delays.  We were really hoping that we could complete this assessment within four to six months, and the delays were just pushing off the deadline for us to be able to have the appropriate and ample information to write our report.  So we had to come to court and ask for help.

**BY MS. MITCHELL:**

Q    On the following page, you make the statement, I think sometimes that data does not exist, and that is a concern.  Do you recall saying that?

A    I do.

**MR. MCRAE:**  Objection.  Relevance.

**THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q    And why is the lack of data a concern?

**THE COURT:**  You may answer.

**THE WITNESS:**  Thank you.  The lack of data was a concern because it's hard when you don't have -- you know, there's an old saying, bad data in, bad data out.  So we really wanted to understand the process and give all the parties that we were talking to good time to explain to us.  Maybe we

Rafferty - Direct / By Ms. Mitchell          **137**

weren't seeing it by just looking at invoices and contracts, and no, I'm not an attorney, but I do quite a few contracts, that we have -- to have the ability to get that data.

In my heart, and I know this isn't a question, you know, maybe you can tell me I can't answer it, but I think there's a lot of people in the system that are very well intended, and I felt -- it's the nurse in me.  If we asked for something and we didn't get it, it wasn't because someone was trying to block our information.  I felt that it must mean that the information's not there.  They don't have the ability to produce data.

A good example is outcome data.  How do they know when they pay a service provider, LAHSA pays a service provider, and the contract says they're going to provide three meals a day?  We would ask, how do you know those three meals a day were provided?  Do you do audits of outcomes?  Do you validate that the service has been provided?  And we never got that information, so my assumption, yes, it's an assumption, that the data wasn't there.

**MR. MCRAE:**  Your Honor, I would move to strike that as self-confessed speculation, also way beyond the scope of the question and being non-responsive.

**THE COURT:**  Overruled.

**THE WITNESS:**  I'll be careful.

//

**BY MS. MITCHELL:**

Q   Now, Ms. Rafferty, you later mentioned in a hearing October 3rd of 2024, discussing some difficulties that you had when you visited some of the sites, identifying insufficient number of case managers with too many participants.  Do you recall that?

A   Yes.

Q   Can you describe that -- the finding that you made?

        **MR. MCRAE:**  Objection.  Relevance.

        **THE COURT:**  Overruled.  You may answer.

        **THE WITNESS:**  When we did go to certain sites, we tried to determine how many beds they had, how many case managers they had, how referrals were made to that site.  What we were explained to us, both by the service provider and the residents there, that those services were not being provided.  If there was a number of case managers that were supposed to be assigned to that site, we were told they had only seen two people for a period of time, that the services really weren't being provided.

        **MR. MCRAE:**  Objection.  Move to strike, hearsay.

        **THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q   You also mentioned at the same hearing that you were concerned about some of your team members having PTSD as a result of their work.  Can you describe that?

Rafferty - Direct / By Ms. Mitchell                **139**

MR. MCRAE: Objection. Relevance.

THE COURT: Overruled.

MR. MCRAE: Also speculation.

THE COURT: Overruled. You may answer.

THE WITNESS: For me personally, I've worked in the street. When I was at USC, we spent time on Skid Row, and I'm a nurse, an ex-ER trauma nurse. My view was a little different.

We had a lot of our team members who had never dealt in this situation, both on Skid Row and other areas where people are experiencing homelessness. Even with the physician on our team, there was a lot of discussion afterwards that this was extremely hard on people to see what's going on every single day on the street.

So I had to kind of give people a break to say, you know, it was extremely difficult. It's what people here experience every day.

Q   And I'm sorry to push on this because I can tell you're getting emotional on this, but when you say it was hard to see, can you describe that for us?

MR. MCRAE: Objection. Relevance.

THE COURT: Overruled. You can answer.

THE WITNESS: I mean, do you want one case or general?

//

**BY MS. MITCHELL:**

Q    Why don't you give us an example?

            **THE COURT:**  When I disclosed to counsel, the City knows this, but she'd come into court on more than one occasion down to Skid Row and parts of her team and literally, I believe, saved the life of a baby on the row.  And if she hadn't been there, quite frankly, I think that infant would be dead.

            And by the way, I want to once again pay a compliment, so it's on the record, to your law firm for going down there.  I want that very clear.  Most of the attorneys in my court have avoided that.  I don't know if we're going to have a session on the row or not.  I just saw this morning that the plaintiff requested that.  I don't think that that could be accomplished by tomorrow, and that would only come with the City's acquiescence also.  I pay you that courtesy.

            But my guess is that you haven't been on the row talking to people, and I don't mean to chide you nor have that expectation, but there's a record of me warning the parties before this court that if they undertook this endeavor, and they were selected when we originally went through this process, that they should expect to have their lives substantially changed.  And that's been expressed to this court on more than one occasion in some of the interaction with A&M and their team.

Rafferty - Direct / By Ms. Mitchell                    **141**

So if you've suddenly inquired into some of the conversations that the Court had, I'll share with you that some of those were literally, if not counseling sessions, but a look back at how personally devastating that this was to their team members.  And if you wish me to elucidate further, I will.  But if we get into that kind of conversation, we're going to open up quite a box here.

All right, counsel.

**MS. MITCHELL:**  Thank you, Your Honor.

**THE COURT:**  You can answer this question.  I think all counsel needs to hear the reality of this experience on the streets.  So you can answer the question.

**THE WITNESS:**  Okay.  Yes, I was with you, Judge Carter.  We met a woman who had an infant with a lot of comorbidities and extremely ill, was on portable oxygen and NG feeding, and had been discharged from a local hospital without follow-up and care and put on Skid Row.  And there were no resources for this mom and this baby.

The baby was very sick, should not have been on the street.  Trying to get this mom resources and understand her rights under EMTALA to be able to go to an emergency department and be cared for.

I personally took this case on my own, not within this scope, but I'm also a registered nurse in the state of California, so I'm a mandated reporter.  I think there were

Rafferty - Direct / By Ms. Mitchell                **142**

other people on Skid Row that didn't know what to do because there's limited medical and social services on Skid Row.  And this is just one case of hundreds of cases that happen every single day.

**BY MS. MITCHELL:**

Q    And Ms.  Rafferty, to clarify, NG feeding, that's a tube that goes -- or maybe why don't you describe what you mean by NG tube.

A    Sorry.  An NG tube is a nasogastric tube that is placed from the mouth into the stomach of someone who cannot eat.  And the portable oxygen is for someone who is having breathing difficulties to support their respiration.

Q    Now, the same hearing, we were talking about service providers, and you referenced -- I apologize.  If I may have a moment, Your Honor.  I think you made a statement, we really need to understand how the money is getting to people on the street.  And in site locations of 18 locations, you made the statement, it's just -- you can extrapolate that there's a huge problem with the service providers.  And not every single one, we're not saying that, but we're seeing people suffer.  Sort of bounced around, but that's on page 21.  Can you describe the problem with the service providers that you were seeing?

        **MR. MCRAE:**  Objection.  Vague and relevance insofar as it doesn't pertain to compliance with the Alliance settlement agreement.

Rafferty - Direct / By Ms. Mitchell                    **143**

THE COURT:  Overruled.  You may answer.

THE WITNESS:  So the issue with the service providers and being able to provide ample beds through the agreement, along with those beds, the County provides mental health and medical services.  We did have a question on how service providers were chosen.  So on some of our site visits, some of the service providers made derogatory comments about the residents.  They're all drug addicts and thieves.  We were told that.

MR. MCRAE:  Your Honor, move to strike his hearsay.

THE COURT:  Overruled.  Overruled.

MS. MITCHELL:  Continue.  You can keep going.

THE COURT:  You may answer.

THE WITNESS:  The service providers also, some of the service providers, and there were, I think it was one of the times we were in a hearing when the controller was talking about his audit and how service providers submit invoices for repair of their property, capital repairs.  And the service providers were complaining that the residents were stealing the plumbing and breaking walls, and they weren't getting the support that they needed.

So we didn't validate the truth of the story.  We just heard from the service providers that the people that they were providing beds and shelter for, it's a personal comment.  Can I make a personal comment?

**MS. MITCHELL:** You can go ahead and say it and he'll object if he wants.

**THE WITNESS:** Their lack of compassion and caring for the environment, such as cleanliness, things like that, that there was some concern with some of the service providers and the services they were providing and responsible for and being paid for.

**MR. MCRAE:** Objection. Relevance. Hearsay. Foundation.

**THE COURT:** Overruled.

**BY MS. MITCHELL:**

Q   And then after reporting on the issues that you had witnessed with the service provider, there was a question by the Court and that your statement to us was that this was almost universal. Is this true or not true --

**MR. MCRAE:** Objection.

Q   And your response was, it's true.

**MR. MCRAE:** Sorry. Objection. Relevance.

**THE COURT:** Overruled.

**MR. MCRAE:** Your Honor, I was hoping I wouldn't have to do this, but can you give an instruction that people in the gallery are not to mimic Your Honor saying overruled, because I'm trying intentionally to listen to you and I'm picking up people in the gallery.

**THE COURT:** I didn't notice, but if there --

Rafferty - Direct / By Ms. Mitchell                    **145**

MR. MCRAE:  Thank you.

THE COURT:  -- if that is occurring, please just desist.  Okay.  Thank you.  The counsel will call that to my attention if that's the case.

MR. MCRAE:  Thank you, Your Honor.

THE COURT:  Thank you.

BY MS. MITCHELL:

Q    Ms.  Rafferty, do you remember my question?

A    I don't.  Sorry.

Q    My question was, is it true that from what you saw, that the issues that you were noticing with the service providers were "almost universal"?

A    Correct.

Q    Now, and I'm nearly done.  I think it's nearly lunchtime, so it works out.  There was a same question -- same hearing, October 3rd of 2024, there was a question by then Special Master Gandhi, and he said, are you saying what you believed to be indicia of fraud?  He made a joke about needing a glass of wine for that answer.  And then you made the statement, if you want to -- oh, excuse me, this is my political answer.  When you receive state and federal funds, you are required to understand where those funds go.  Otherwise, other people much more powerful than us could come in and audit that at a different level that we provide.

So we, our division from Alvarez and Marsal, we work in

EXCEPTIONAL REPORTING SERVICES, INC

public sector, so we understand funding mechanisms from state, counties, and federal government.  So we are overly compulsive about looking at that.  I would just say there's probably some work to do.  Do you recall that statement?

A    I do.

          **MR. MCRAE:**  Objection.  Relevance.

          **THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q    So I'm going to ask that question again. I'm going to ask for your nonpolitical answer, Ms.  Rafferty.  So the question was, did you see what you believed to be an indicia of fraud?

          **MR. MCRAE:**  Objection.  Vague as to indicia of fraud.  Lack of foundation.  This witness is not an accountant, a certified public auditor, or anything of the sort.  Also exceeding the scope of the assessment, as well as the scope of work.  So this is brand new testimony that we've had no opportunity to cross-examine or have discovery on or anything else.

          **THE COURT:**  This assessment touches on the corner of that in numerous occasions and raises the issue.  Overruled. You can answer that question.

          **THE WITNESS:**  Yes, that is my statement.  I will say that my initial response was probably not the best I've ever given.  It was based, I was a little, I was taken back by the question.

Rafferty - Direct / By Ms. Mitchell **147**

We were not hired and it was not within our scope to determine fraud or not fraud. There is a fine line between not knowing what you're doing, not having systems to understand how to track funds, is that negligence, is that intent.  We never looked at intent.  I am not qualified to say that is fraud. It's -- that's why I recommend -- I mean, the City -- we recommended that the City bring in a financial auditor to determine that.

We were questioning why funds could not be completely traced, or what we call funds flow, from where they begin and where they end, and who's ever accountable for those funds, do they have a record of what was spent, what was used, and how they were used?  We could not determine that.

**BY MS. MITCHELL:**

Q    Now, you were excluded from the courtroom yesterday, but your colleague testified that the City of Los Angeles does not have in place a system capable of meeting the purpose of the settlement agreement, which was to meaningfully and substantially reduce unsheltered homelessness in Los Angeles.  Would you agree with that conclusion?

**MR. MCRAE:**  Objection.  Misstates the testimony, also calls for a legal conclusion, and it lacks foundation and relevance.

**THE COURT:**  Overruled.  You can answer that question.

**THE WITNESS:**  It is our belief, along with my

Rafferty - Direct / By Ms. Mitchell          **148**

colleague and everyone on our team, with the current data systems, the current systems that are used to communicate between the County, LAHSA, and the City, are not adequate to be able to justify the creation of beds, determine if beds are in use, or determine if they can meet the bed requirement of the agreement.

MR. MCRAE:  Your Honor, move to strike is lacking foundation --

THE COURT:  Overruled.

MR. MCRAE:  -- and also hearsay.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    I'm sorry, I don't think I quite understood the answer.

A    I would agree with my colleague's comment.

Q    Okay, thank you.  I appreciate that.  Did you have any pre-existing relationship with any of the parties prior to accepting this agreement to conduct the assessment on behalf of A&M?

A    We did not.

MS. MITCHELL:  I have no further questions at this time.  Thank you, Your Honor.

THE COURT:  Before we start cross-examination, it's 12:00 noon.  Ms. Myers -- have you worked out agreement with Ms. Myers?  Do you have questions?

MS. MYERS:  I do, I have.

THE COURT:  You do?

MS. MYERS:  Yes, Your Honor, I do have a few.

THE COURT:  Is there an agreement between you and the City that you'd go next again?

MR. MCRAE:  There isn't, but I'm happy to have the interveners go first.

THE COURT:  Okay.  Then let's go to lunch for an hour.  We'll come back at 1 o'clock, okay?

MS. MITCHELL:  Your Honor, for the sake of Ms.  Rafferty's time, is there a way we can just push through and get her off the stand so she can go catch her flight?

THE COURT:  Well, I'm not going to limit the time.  That's the problem.  It's not going to be -- the other witness, I expect to be back, and maybe Ms.  Rafferty will be back, depending upon some of the testimony in the future.  But if we have a time estimate and we can go to 12:30, that's fine, but I don't know that we can do that.

MR. MCRAE:  Depending on how much time --

THE COURT:  We're wasting time.  Why don't you go over and talk to each other?

MR. MCRAE:  That's fine.

THE COURT:  Just have a consultation between all the parties, and if you have a time period, we can finish Ms.  Rafferty, fine.  If not, our apologies.  Just a moment. Let's see if they can work this out.

Rafferty - Direct / By Ms. Mitchell                    **150**

(Pause)

THE COURT:  Counsel, if you want me to come back earlier, for instance, I'm happy to do that, but I leave that to all of you folks.  I've been taking an hour, but we can have less if you want, by agreement.

(Pause)

THE COURT:  I apologize if you have to come back.

THE WITNESS:  I'm sorry I cried.

MS. MITCHELL:  Ms. Rafferty, when do you need to leave to catch your flight or have you already --

THE COURT:  Why don't you step down, Ms. Rafferty, and talk to them quietly for just a moment.  Counsel, we don't need this on the record.  Why don't all of you folks for the City, et cetera, work out a time period with Ms. Rafferty?

THE WITNESS:  I won't make it, anyway, so I'll stay.  No, I won't make it.

(Pause)

THE COURT:  Thank you.  Apparently, she's indicated to the Court that this is important and she's going to --

MS. MITCHELL:  She's also already missed her flight, it seems like, so we'll break for lunch, come back.

THE COURT:  Break for lunch.  Let's come back at 1 o'clock, okay?

MS. MITCHELL:  Thank you.

THE COURT:  Thank you very much.  Counsel, have a

good lunch then.

**(Recessed at 11:59 a.m.; to reconvene at 1:00 p.m.)**

        **THE COURT:**  We're back on CourtSmart.  All counsel are present, the parties are present, and the witness is present.

        Ms.  Myers, this would be cross-examination, on behalf of the interveners.

        **MS. MYERS:**  Thank you, Your Honor.

                        **CROSS EXAMINATION**

**BY MS. MYERS:**

Q    Good afternoon, Ms.  Rafferty, and I appreciate in advance the attorneys, Judge Carter, and obviously the witness's patience as I navigate the technology up here on my own, but I appreciate the opportunity to ask you just a few questions related to your testimony that you've given before.

     One of the issues that you raised in response to Ms.  Mitchell's questions was related to repairs at some of the facilities that you saw had not been made.  Can you tell us which types of facilities these repairs needed to be made?

        **MR. MCRAE:**  Objection.  Vague and relevance.

        **THE COURT:**  Overruled.  Please answer.

        **THE WITNESS:**  Some of the repairs were just stated to us from the service providers regarding plumbing, fixing of walls, and so forth.

Q    Can you tell us what kinds of facilities these complaints

Rafferty - Cross / By Ms. Myers                    **152**

were received regarding?

A    I'd have to go back and look at the addresses.

         **MR. MCRAE:**  Objection.  Hearsay.

**BY MS. MYERS:**

Q    As you sit here, you can't tell us whether they were in the tiny home villages or in the abridged home shelters, in the permanent housing structures?

A    I'd have to go back and look.  They weren't in the tiny homes.

Q    They were not in the tiny homes?

A    No.

Q    Were they in the permanent housing?

A    I'd have to go back and look at the address.

         **MR. MCRAE:**  Objection.  Hearsay.

Q    When you looked into -- I assume you all looked into some of these complaints, is that fair?

A    We took those complaints from what the service provider told us.

Q    And did the service provider give you a sense of whether or not they were given enough resources contractually to make those repairs themselves or whether it was the obligation of the funder to make those repairs?

         **MR. MCRAE:**  Objection.  Compound with the "or" conjunction, also calls for a legal conclusion and hearsay.

         **THE COURT:**  Do you understand the question?  Do you

Rafferty - Cross / By Ms. Myers                    **153**

understand the question?

THE WITNESS:  There were two questions.

THE COURT:  There were two questions.  Counsel, re-ask the question, please.

MS. MYERS:  Sure.

BY MS. MYERS:

Q    Was it your understanding that the service provider had enough funding to make the repairs themselves?

MR. MCRAE:  Objection.  Vague, lack of foundation relevance.

THE COURT:  It's foundational.  If you have that knowledge, you can state where you received that from or, you know, a provider or whomever.  If you don't, then there's no foundation.

THE WITNESS:  I don't have that information.

Q    Did you look into the service provider's complaints about -- well, strike that, let me ask.  Were these complaints from the service provider to you who was doing the assessment?

MR. MCRAE:  Objection.  Vague, and lack of foundation calls for hearsay.

THE COURT:  Overruled.

THE WITNESS:  I think the best way to answer that is there was a service provider who complained of it was difficult to get payment for repairs and there were multiple repairs required due to the clientele that they were dealing with, such

EXCEPTIONAL REPORTING SERVICES, INC

Rafferty - Cross / By Ms. Myers                    **154**

as plumbing.

**BY MS. MYERS:**

Q    And so you don't know whether the service provider was able to make those repairs related to funding or whether -- I'll just leave it at that.

MR. MCRAE:  Objection.  Lack of foundation, calls for hearsay, and relevance.

THE COURT:  Would you restate that?  It was a little quick.  I didn't hear the last portion.

MS. MYERS:  Sure.  I was just asking if she knew whether -- do you know whether the service provider was able to make those repairs?

MR. MCRAE:  Same objections.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  I do not.

**BY MS. MYERS:**

Q    And was looking into the amount of contracts, the amount of money related to contracts and the services that were required within the scope of A&M's assessment?

MR. MCRAE:  Objection. Vague, assessment of what, whom, when.

THE COURT:  You can cast that opinion.

THE WITNESS:  Can you repeat the question?

Q    Sure.  Was part of -- within the scope of the assessment, and when I say assessment, I mean the 160 page report that you

Rafferty - Cross / By Ms. Myers                    **155**

created for this Court, that within the scope of the

assessment, were you able to look into whether the contracts

that were provided to service providers were sufficient to

cover necessary repairs?

A     We didn't --

          **MR. MCRAE:**  Objection.  Vague, lack foundation,

relevance.

          **THE COURT:**  Do you understand the question?

          **THE WITNESS:**  I understand the question.

          **THE COURT:**  You can answer the question.

          **THE WITNESS:**  We did not.

**BY MS. MYERS:**

Q     Did you look into -- when -- have you heard a discussion

within the courtroom or within the context of providing your

assessments into the day rates provided from contracts that

were covered by these agreements?

A     Yes.

Q     What is your understanding of what the day rate is?

          **MR. MCRAE:**  Objection.  Relevance.

          **THE COURT:**  Overruled.  You can answer the question.

          **THE WITNESS:**  The day rate is paid based on bed

occupancy.

Q     And what is the day rate?  What is your understanding of

what constitutes the day rate?  Understanding that that's what

it's paid for, but do you understand what the day rate is?

**THE COURT:** Now, there may be day rates for different programs, and if so, that needs to be broken down.

**BY MS. MYERS:**

Q   When I use the term day rate, do you understand what I mean?

A   I do understand the term day rate.  I don't have the knowledge to say are the -- depending on the program, how day rates are paid or, I don't have that knowledge.

Q   Is it safe to say that a day rate is the amount that is paid under a contract per day to a shelter provider per participant?

**MR. MCRAE:** Objection.  Lack of foundation.  Incomplete hypothetical.  Lack of -- and relevance.

**THE COURT:** Overruled.

**THE WITNESS:** That's my understanding.

Q   Okay.  And in the course of the assessment that you provided to the Court, did you look into the day rates that were provided to shelters through the contracts that were part of each of the agreements, starting with the Roadmap.  Did you look at the day rates that were part of the LAHSA contracts as part of the Roadmap?

**MR. MCRAE:** Relevance.

**THE COURT:** Overruled.

**THE WITNESS:** I would refer to the team to get that exact information.  My role was the oversight of the statement

Rafferty - Cross / By Ms. Myers                    **157**

of work and the engagement.  The detail really is based -- it would be better to ask one of my team members the exact question.

**BY MS. MYERS:**

Q    Okay.  Do you know whether examining the day rates of the various contracts covered by the Roadmap agreement was part of the scope of work for the A&M assessment?

            **MR. MCRAE:**  Relevance.

            **THE COURT:**  Overruled.  You can answer the question.

            **THE WITNESS:**  I would ask my team members.

**BY MS. MYERS:**

Q    Okay.  And same thing with the LA Alliance agreement.  Do you know whether it was covered by the scope of the agreement?

            **MR. MCRAE:**  Objection.  Vague.

            **THE COURT:**  Overruled.

            **MR. MCRAE:**  And lack of foundation, relevance.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  It would be best to ask the team.

Q    Okay.  And so the only part of your understanding of the repairs that you spoke about in response to Ms.  Mitchell's questions was simply a provider speaking to you about a specific situation at a specific location.

            **MR. MCRAE:**  Objection.  Hearsay.  Relevance.

            **THE COURT:**  Overruled.  You can answer the question.

            **THE WITNESS:**  Yes.

Q    So one of the questions that Ms. Mitchell asked you had to do with a question that she had actually asked Ms. Frost, which is whether the City has the systems in place to meaningful and substantially reduce homelessness. Correct?

          **MR. MCRAE:** Objection. Relevance.

          **THE COURT:** Overruled.

          **THE WITNESS:** Can you rephrase that? You asked Ms. Frost --

**BY MS. MYERS:**

Q    Ms. Mitchell asked Ms. Frost that question, and you overheard that question, correct?

A    Yeah. Can you repeat the question?

Q    Is whether the City has the systems in place to meaningfully and substantially reduce homelessness.

A    During our review for the assessment, it appeared to us because of delays in accessing data or asking questions that weren't answered, it does not appear they have the correct systems.

Q    Okay. And when Ms. Mitchell --

          **MR. MCRAE:** Lack of foundation, Your Honor. Move to strike.

          **THE COURT:** Overruled.

Q    And when Ms. Mitchell was asking that question, do you know where the term "meaningfully and substantially reduce homelessness" comes from?

A    I do not.

Q    Okay.  And I would point you to the settlement agreement.
Hold on just one second.

        **(Pause)**

        **THE COURT:**  And you can put that up, counsel, if you
need to.

        **MS. MYERS:**  Yeah, I'm doing that right now.  Thank
you, Your Honor.

        **(Pause)**

**BY MS. MYERS:**

Q    So this is Plaintiffs' Exhibit 25, and I'm going to refer
you to the specific recital in the settlement agreement.  Can
you just read the third recital down, starting with whereas?

A    So I have to put my glasses on.  "Whereas the purpose of
this agreement is to substantially increase the number of
housing and shelter opportunities in the City of Los Angeles,
and to address the needs of everyone who shares public spaces
and rights of way in the City of Los Angeles, including housed
and unhoused Angelenos, to achieve a substantial and meaningful
reduction in unsheltered homelessness in the City of Los
Angeles."

Q    Thank you.  And in the course of your assessment for A&M,
did you assess whether or not this settlement agreement could
result in a substantial and meaningful reduction in unsheltered
homelessness in the City of Los Angeles?

Rafferty - Cross / By Ms. Myers                    **160**

MR. MCRAE:  Objection.  Lack of foundation.

THE COURT:  Overruled.

MR. MCRAE:  Also, irrelevance.

THE COURT:  Overruled.  You can answer that question, if you have an opinion.

THE WITNESS:  Can I ask for clarification?

THE COURT:  Please.

THE WITNESS:  Are you asking if this paragraph results in more shelter?  Is that what your question is?

BY MS. MYERS:

Q   I'm asking whether the terms of this settlement agreement would result in a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles.  I'm simply asking if A&M's assessment focused on whether the settlement agreement would result in a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles.

A   That was the intent.

MR. MCRAE:  Objection.  Lack of foundation, and calls for speculation as to what the intent of the parties was, as far as any obligation under this agreement.  Calls for a legal conclusion.

THE COURT:  Overruled.  And I didn't hear your answer.

THE WITNESS:  I believe that was the intent.

EXCEPTIONAL REPORTING SERVICES, INC

Rafferty - Cross / By Ms. Myers                    **161**

Q    So the intent of the A&M assessment was to determine whether the terms of the settlement could result in a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles?

            **MR. MCRAE:**  Objection.  Mischaracterizes the scope of work, the face of the assessment itself, to the extent it calls for a legal conclusion.  Also, lack of foundation and irrelevance.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  The intent of our engagement was to analyze funds being used and how they were utilized and the outcome of that.  Yes, our engagement resulted in all of this, but our engagement wasn't specifically to look and see if there was the ability to do so.  Our assessment was to look at what was happening in the look-back period.  So it's a little confusing.

            You're asking me to answer this, but our engagement is per our statement of work.  Our statement of work is what we abide by.  We try not to have scope creep or when we're asked to do something on a contractual basis, we are guided by those.

**BY MS. MYERS:**

Q    So it was not part of A&M's assessment then to determine whether the terms of the settlement agreement would result in a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles.

Rafferty - Cross / By Ms. Myers                      **162**

MR. MCRAE: Objection. Relevance, calls for a legal conclusion.

THE COURT: Overruled. You can answer the question. What was your understanding what the scope was in relation to the agreement.

THE WITNESS: Yes. The reason there was a request to have a third party come in and evaluate were the processes. Yes, the intent of the processes and how funds are flowed is to improve the people on the street, to provide shelter for people on the street, to find -- that is the intent. We were very careful in how we worded our engagement in our report. We made recommendations. We know that there's no requirement to follow our recommendations. We looked at processes which we felt were not adequate to make sure that all the funds were being used in the appropriate way, not the appropriate way but resulted in the outcomes that were intended by those funds.

So I guess in a roundabout way, they're separate but they're not separate.

BY MS. MYERS:

Q    I'm just looking at your -- at the opinion that you offered to Ms. Mitchell, which is that the data systems in place are insufficient to result in a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles. And I'm asking you, given that you gave that opinion, if you had reached a similar opinion related to the

Rafferty - Cross / By Ms. Myers                    **163**

terms of the agreement and whether the terms of the agreement,

the creation of 12,950 new shelter and housing opportunities,

if that would result in a substantial and meaningful reduction

in unsheltered homelessness in the City of Los Angeles.

**MR. MCRAE:**  Objection.  Compound, unintelligible.  It

calls for a legal conclusion.

**THE COURT:**  Now, are you asking if the 12,900 in the

LA Alliance agreement is going to lead to a substantial and

meaningful reduction?

**MS. MYERS:**  I'm asking Ms.  Rafferty if she's

developed an opinion about whether the creation of 12,915 beds

would result in a substantial and meaningful reduction in

unsheltered homelessness in Los Angeles.

**THE COURT:**  You can answer that question, if you have

an opinion.

**THE WITNESS:**  So my opinion, not speaking as a

subject matter expert or expert witness.  The comment I made --

the answer I provided to Ms.  Mitchell was regarding the data.

We do not feel the data systems and the way information is

collected is adequate to provide the goals of the settlement.

As to the number of beds, I'm not an expert to say

that that many beds are going to make an impact to the level of

homelessness.  The level of homelessness is still -- it's

substantial in Los Angeles City and County.  So I would not be

able to say how many beds are truly needed.

Rafferty - Cross / By Ms. Myers                                    **164**

**BY MS. MYERS:**

Q    And as part of your assessment, did you look into inputs into homelessness, i.e., the ways in which people are falling into homelessness here in Los Angeles?

          **MR. MCRAE:**  Objection.  Relevance and vague.

          **THE COURT:**  Overruled.  You can answer the question.

          **THE WITNESS:**  We did not look at it in a scientific way.  During our interviews, we did talk to people about how they came into the circumstances.  They did the social impacts to their situation.  But we did not include that as something that we could document to say 30 percent of the population that we interviewed were due to that.  We did not take that scientific approach.  We did hear from people, but that was voluntary to us.

**BY MS. MYERS:**

Q    And did you look into the number of people who were falling into homelessness in Los Angeles?

          **MR. MCRAE:**  Relevance.

          **THE COURT:**  You may -- each year or --

          **MS. MYERS:**  In any given period.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  We did look at the point-in-time count information that was publicly available.

Q    And did you look at the number of people who were falling into homelessness compared to the number of people who were

                    **EXCEPTIONAL REPORTING SERVICES, INC**

Rafferty - Cross / By Ms. Myers                    **165**

being housed?

     **MR. MCRAE:**  Objection.  Relevance, vague, lack of foundation.

     **THE COURT:**  Overruled.  You can answer that question.

     **THE WITNESS:**  We did not.

**BY MS. MYERS:**

Q    As part of your assessment, did you look into -- did you consider -- strike that.  As part of your assessment, did you look into the number of units of housing and shelter that were lost during the time period that was covered by your assessment?

     **MR. MCRAE:**  Objection. Relevance.

     **THE COURT:**  Do you understand the question?

     **THE WITNESS:**  No.

     **THE COURT:**  Would you repeat that question?

Q    When you assessed the number of units that were gained as a result of the LA Alliance agreement, did you also look into the number of affordable housing units that were no longer available within the housing market in Los Angeles during the same given amount of time?

     **MR. MCRAE:**  Objection.  Relevance.

     **THE COURT:**  Overruled.  You can answer the question.

     **THE WITNESS:**  We did not.  That was not within our scope, and that would've been a pretty extensive engagement to determine how many beds are really in existence, how many have

Rafferty - Cross / By Ms. Myers                    **166**

gone out of service, how many are coming into service.  That was not part of our assessment.

**BY MS. MYERS:**

Q    Okay.  And for that question, I was talking specifically about housing, but you mentioned beds.  So let's talk about shelter beds.  Did you look at whether or not any shelter beds were taken offline in the course of the look-back period for the agreement?

          **MR. MCRAE:**  Objection.  Vague, lack of foundation, relevance.

          **THE COURT:**  Overruled.  You can answer that question.

          **THE WITNESS:**  We did not.

Q    So as you sit here, as you look at the number of beds that were added, can you tell us from a net gain perspective how many beds were added -- how many shelter beds were added to the inventory in Los Angeles during the look-back period?

          **MR. MCRAE:**  Objection.  Vague, relevance, and lack of foundation.

          **THE COURT:**  And is this as to the LA Alliance timeframe, the five years, or the Roadmap, or both?

          **MS. MYERS:**  Both.

          **THE COURT:**  Both?  All right.  Overruled.  You can answer the question.  And you can take, I think, from that about 12,900 and 6,800 about, you know, give or take, about 19,000 beds.

**THE WITNESS:** The information that we received for our report was given to us. We did not count beds or there was no ability to validate every single bed number in the report, either report.

**BY MS. MYERS:**

Q   And so that has to do with the number of beds that were added as a result of the LA Alliance and the Roadmap agreements, correct?

**MR. MCRAE:** Objection. Relevance, lack of foundation.

**THE COURT:** Overruled.

**THE WITNESS:** I think it's the same response. As far as beds available and what category they lived in was information that we received. We would rely on the sender for accuracy. We could not -- we can't validate that. Like I said, to be able to have such an endeavor to visit every single site was not within our scope.

Q   Sure. Let's assume the accuracy. I know there's been questions about the accuracy of the City's reporting, but let's assume the accuracy of the reports: the approximately 5,000 beds that have been created, the 6,700 beds that were created as a result of the Roadmap, assuming the accuracy of that. Did you assess, given the creation of those beds, whether or not looking at the potential loss of beds, whether then there had been a net increase in number of beds during the look back

period?

MR. MCRAE:  Objection.  Relevance, lack of foundation.

THE COURT:  Versus the loss of beds in that period?

MS. MYERS:  Yeah, the net gain.  Yes, the number, the new additional beds.  So the number of new beds subtracting the number of beds that were lost.  So the net gain to the City of Los Angeles.

THE COURT:  You can answer that question.  Overruled.

THE WITNESS:  I'm not quite sure how to answer that. I mean --

BY MS. MYERS:

Q    Did you look at the net number of beds that were gained during the look back period?

A    All the information in our report was based on the information -- the questions asked and the information provided to us.

Q    And one of the questions you did not ask was whether any beds were lost, correct?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  We did not ask how many beds had been lost.

Q    One of the things you did look at during the course of the audit was the exit rates for each of the different programs, is

Rafferty - Cross / By Ms. Myers                    **169**

that correct?

A     (No response).

Q     And did you look at that for permanent, for all of the types of shelter and housing opportunities or did you look at exit rates for a specific portion of the shelter and housing opportunities that were for each agreement?

        **MR. MCRAE:**  Objection.  Compound, vague, and relevance.

        **THE COURT:**  Overruled.  Do you understand the question?

        **THE WITNESS:**  I do.

        **THE COURT:**  Okay, you may answer, please.

        **THE WITNESS:**  We looked at exit rates of the programs that we evaluated.

**BY MS. MYERS:**

Q     And so for each of them, that includes --

        **MS. MYERS:**  Apologies, Your Honor.

    **(Pause)**

        **MR. MCRAE:**  Your Honor, while we're doing this, can I ask -- am I right that there's no restroom on this floor?

        **THE COURT:**  Counsel, they've moved me from court to court so often, I don't know.  If you discover one, let me know.  Okay?

        **MR. MCRAE:**  Okay.  You got it.

        **UNIDENTIFIED SPEAKER:**  I can confirm that there's no

Rafferty - Cross / By Ms. Myers                    **170**

restroom.

          THE COURT:  My best guess is just down the stairs and just across by the elevators.  Okay?

          MR. MCRAE:  Thank you, Your Honor.

          THE COURT:  And you're free to go and -- I mean, you're free to go use the restroom and come back in.

     **(Pause)**

**BY MS. MYERS:**

Q    Are you familiar with this figure, which is page 118 of Exhibit 23, Plaintiffs' Exhibit 23?

A    I am.

Q    And are you familiar about how these numbers were calculated?

          MR. MCRAE:  Objection.  Relevance.

          THE COURT:  Overruled.

          THE WITNESS:  I would have to ask my team.

Q    Okay.  And can you tell us what the percentage of clients that exited is?  Do you understand what that means?

          MR. MCRAE:  Objection.  Lack of foundation.

          THE COURT:  In each specific program?

          MS. MYERS:  Just the general category, Your Honor.

          THE COURT:  In general?  All right.  Thank you.

          THE WITNESS:  As per the numerator and denominator?

Q    Just when it speaks about percentage of clients exited, can you explain what that means?

Rafferty - Cross / By Ms. Myers                    **171**

THE COURT:  Could you put that back up for just -- there you go.

MS. MYERS:  I'm glad it's not just me.

THE WITNESS:  It's basically the number of clients that exited the program and either entered permanent housing, homelessness, or exited to homeless but not specified.

BY MS. MYERS:

Q   Okay.  And this assessment was done specific to shelter and interim housing, correct?

A   Yes.

Q   Okay.  So when it says Roadmap programs, shelter and interim housing exits, that means specifically of the shelter and interim housing programs within the Roadmap program, 93.6 percent of clients exited out of those programs; is that correct?

MR. MCRAE:  Objection.  Relevance.  Leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.  This was data based off the HMIS data from LAHSA.

Q   Okay.  When you say HMIS, is that H-M-I-S?

A   Yes.  Sorry.

Q   And so of the 93.6, I just want to understand if I'm reading this correctly, of the 93.6 percent, 17.2 percent of individuals exited from shelter and interim housing into permanent housing out of the Roadmap agreement, is that

Rafferty - Cross / By Ms. Myers                    **172**

correct?

A    Based on the information we received, the number is what we received.

Q    Okay.  And then when it says 72.5 percent at the far right exited to homelessness and not specified, do you know what that means?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  It's basically the number that was received that's not specified.

**BY MS. MYERS:**

Q    And homeless, right?

A    Per the categories that are collected through the HIMS (sic) data, yes.

Q    Okay.  And 36.6 percent, they know exited into homelessness; is that correct, reading the data?

MR. MCRAE:  Objection.  Lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  That is correct.

Q    Okay.  And so same thing with the Alliance, 77.7 percent of clients exited out of LA Alliance programs, correct?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  That is correct.

Rafferty - Cross / By Ms. Myers                        **173**

Q    And fully 49.8 percent exited to homelessness.

        **MR. MCRAE:**  Same objection.  Relevance.

        **MS. MYERS:**  Is that correct?

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Under the Alliance program, that is correct.

**BY MS. MYERS:**

Q    Okay.  And so we're to understand that 49.8 percent of people who were sheltered in Alliance program, shelter and interim housing, that left those programs, wound up back on the street?

        **MR. MCRAE:**  Same objection.  Relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Based on the information we received, yes.

Q    Okay.  And then the Inside Safe program, 67.1 percent exited out of the Inside Safe program, correct?

A    That is correct.

Q    And the Inside Safe program, all of it was classified as shelter and interim housing, correct?

A    Correct.

        **MR. MCRAE:**  Objection.  Lack of foundation, relevance.

        **THE COURT:**  Overruled.

Q    So the 67.1 percent is out of all participants of the

**EXCEPTIONAL REPORTING SERVICES, INC**

Rafferty - Cross / By Ms. Myers                    **174**

Inside Safe Program, 67.1 percent had exited out of the Inside

Safe Program, correct?

          **MR. MCRAE:**  Relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  That is correct.

**BY MS. MYERS:**

Q    And 35.2 percent had exited into permanent housing?

          **MR. MCRAE:**  Relevance.

          **THE COURT:**  Overruled.

Q    And so fully 28.7 percent had fallen back into

homelessness?

          **MR. MCRAE:**  Relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Based on --

Q    Can I get the next page, please?

A    Based on the information we received, yes.

Q    And did you have any reason to doubt the information that

you received related to exits from homelessness or exits from

the programs?

          **MR. MCRAE:**  Objection.  Lack of foundation and

relevance.

          **THE WITNESS:**  In our report, we relied on the data

given to us.

          **THE COURT:**  Let me find out, do you know where that

data was received?  Did it come from the City or LAHSA or -- go

Rafferty - Cross / By Ms. Myers                          **175**

back to the prior slide, would you, for just a moment, counsel.

It says HMIS data provided by LAHSA on December 17th, 2014.

Does that paragraph apply to the statistics you see under the

Roadmap, Alliance, and Inside Safe?

            **THE WITNESS:**  Yes.

            **THE COURT:**  Okay.  All right.

            **MS. MYERS:**  The next page, please.  Thank you.

            **THE COURT:**  And, counsel, would you go back one more

moment?  I want to make a note.  I apologize.  Thank you.

            All right.  Thank you very much, counsel.

**BY MS. MYERS:**

Q    And just to make sure I understand, the Roadmap programs

were the programs that were created as part of compliance with

the Roadmap agreement between the City and the County, correct?

            **MR. MCRAE:**  Objection.  Relevance, lack of

foundation, calls for a legal conclusion.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  That is our understanding.

Q     Okay.  And then where it says Alliance, those are programs

that were created consistent with the Alliance settlement

agreement that counted towards the 12,915 beds required under

the settlement?

            **MR. MCRAE:**  Legal conclusion.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  That is correct.

Rafferty - Cross / By Ms. Myers                    **176**

Q    And this is a sample of programs, correct, that are part of each of the three agreements, correct?

          **MR. MCRAE:**  Objection.  Relevance.

          **MS. MYERS:**  Figure 4.3.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  That is correct.

**BY MS. MYERS:**

Q    Okay.  And the purpose of this, likewise, where it speaks about exit data, exit data is to be understood as people leaving the programs, correct?

          **MR. MCRAE:**  Relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  That is correct.

Q    And so where it says permanent housing, we're to understand permanent housing as these are people who are exiting into permanent housing?

          **MR. MCRAE:**  Same objection.  Relevance.  Can I have a standing objection to 4.3, Your Honor?

          **THE COURT:**  Certainly.

          **MR. MCRAE:**  Thank you.

          **THE COURT:**  Overruled.

          **MS. MYERS:**  Thank you, Your Honor.

          **THE WITNESS:**  That is correct.

//

//

Rafferty - Cross / By Ms. Myers                                  **177**

**BY MS. MYERS:**

Q    And so whenever it says homelessness, we're to understand that people exiting out of those programs, the information, the data in that column demonstrates that that is the percentage of individuals who exited back into homelessness, correct?

A    Correct, based on the data we received from LAHSA.

Q    And when you all reviewed this data and the data before, did you draw any conclusions about the success of the interim housing programs to substantially and meaningfully reduce unsheltered homelessness in the City of Los Angeles?

        **MR. MCRAE:**  Objection.  Relevance, also asked and answered.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  When we received this data, because it does not have validation categories on the why, as curiosity, we wondered why there was such variation in the programs.  And because we did not have the information on how clients were always placed, we didn't know if the percentage of people exiting to homelessness was based on their acuity or their comorbidities.  It was just a curiosity question.

        I do not believe, from my knowledge, that they track that information on why one program has a higher exit rate than another.

//

//

Rafferty - Cross / By Ms. Myers                    **178**

**BY MS. MYERS:**

Q    Do you know if they track at all, not why one as opposed to another, but why they have the rates that they have?  You're talking about comparisons, but are individual programs assessing why they have those rates?

          **MR. MCRAE:**  Objection.  Relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  To my knowledge, they did not have that information.

**BY MS. MYERS:**

Q    So the only information you have then is that in most programs that you assess, the interim housing or shelter programs, in most of the programs, more than one-third of individuals and sometimes up to 50 or 60 percent of individuals were falling back into homelessness, correct?

          **MR. MCRAE:**  Objection.  Relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  That's what the data has shown.

Q    Okay.  Was one of the understood goals of the homeless services system that you were assessing, was one of the understood goals that you were looking at when you were looking at the success of the overall homeless services program, was one of those goals to move people out of homelessness?

          **MR. MCRAE:**  That's unintelligible.  Understood by whom at what time?

Rafferty - Cross / By Ms. Myers                    **179**

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Our understanding, all these programs are to reduce the population experiencing homelessness and provide permanent housing.

Q    Okay.  And so when you were assessing the programs and their success as a homeless services program, you were assessing them in relationship to that goal.  Is that correct?

MR. MCRAE:  Objection. Relevance.

THE COURT:  And would you repeat that goal?  In other words, when you said that goal, I want to make sure I'm tracking.

BY MS. MYERS:

Q    Well, let me ask Ms.  Rafferty, can you articulate what that goal was, what the goal is again?  Because I think you articulated it better than I did, certainly.

A    The goal is to reduce the overall population, people experiencing homelessness and to provide permanent housing.  I think there's an additional goal in all of this, is to additionally provide services.  That is part of the goal of all of this, is to be able to provide services needed for this community along with homelessness, I mean, permanent housing.

Q    So the goal is to move people out of homelessness and into permanent housing?

MR. MCRAE:  Objection. Relevance.  It's also leading.  And it's vague as to what goal we're talking about,

EXCEPTIONAL REPORTING SERVICES, INC

Rafferty - Cross / By Ms. Myers **180**

for whom, at what time?

THE COURT:  Overruled.  You can answer the question. Do you want to repeat the question, counsel?  Counsel, she may have lost the question with the objection.

Q   When you were -- it seems like you had an answer.

A   Go ahead and repeat the question.

Q   So when you're assessing the overall goal of homeless -- of the homeless services system that you were assessing for purposes of this, was one of the overall goals that you understood of that system, to move people experiencing homelessness off the streets and into permanent housing.

MR. MCRAE:  Objection. Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MYERS:

Q   And as part of that assessment, did you look at the types of interventions that were being provided by the City of Los Angeles to see whether any of those -- whether each of them furthered that goal?

MR. MCRAE:  Objection. Relevance.

THE COURT:  Overruled.

THE WITNESS:  Can you repeat the question?  I'm sorry.

Q   Did you look at any of the individual interventions with an eye towards whether those interventions specifically

EXCEPTIONAL REPORTING SERVICES, INC

furthered the goal of moving people experiencing homelessness off the streets and into housing, permanent housing?

**MR. MCRAE:** Objection. Relevance. Not obligations under the settlement agreement.

**THE COURT:** Overruled. You can answer the question.

**THE WITNESS:** We did not look at each intervention and how they impacted homelessness. There are so many interventions, how you get people document ready, how you have the ability to contact someone, how you have the ability to move them through either temporary shelters to permanent housing. There are multiple systems required to move someone to permanent housing. We did not look at each step in the process and evaluate each step as to its impact or success.

**BY MS. MYERS:**

Q    Okay. And that includes each of the different types of interventions within the Roadmap agreement?

**MR. MCRAE:** Objection. Relevance.

**THE COURT:** Overruled.

**THE WITNESS:** That is correct.

Q    Okay. And that includes each of the different types of interventions within the LA Alliance settlement agreement?

**MR. MCRAE:** Objection. Relevance.

**THE COURT:** Overruled.

**MS. MYERS:** Okay. Thank you. No further questions.

**THE COURT:** Did you answer the last question? Okay.

**182**

Thank you.  All right.  Counsel, then --

MR. MCRAE:  I do have questions, Your Honor, and I hate to do this, but I do need a comfort break, if I may.

THE COURT:  We need a recess right now?

MR. MCRAE:  Yes, please.  Thank you.

THE COURT:  How about 20 minutes then, counsel. Let's just make it even on the hour, 2 o'clock.  Okay?

MR. MCRAE:  That's fine.  Thank you.

**(Recessed at 1:40 p.m.; to reconvene at 2:04 p.m.)**

THE COURT:  Then we're on CourtSmart.  Wait.  Okay.

MR. MCRAE:  Your Honor, counsel is conferring on the witness order.

**(Counsel confer from 2:04 p.m. to 2:05 p.m.)**

MR. MCRAE:  Your Honor, we've been endeavoring to confer about witness order.  I think one thing that we need to understand is how long we think we might go.

THE COURT:  You know my hours.

MR. MCRAE:  I'm afraid I do.

THE COURT:  Well, you tell me how long you want to go.  I mean, --

MR. MCRAE:  Yeah.  No, I --

THE COURT:  Hours mean nothing to me, okay.  No, you just decide.

Most importantly, though, I want all of you folks functional, in other words, you know, able to be alert.

But my -- you don't want to keep my hours, trust me. So you consult with what's comfortable. I can't help you with that.

You want to go to 9:00 o'clock, if the chief judge --

MR. MCRAE: Okay.

THE COURT: -- let's me keep it open, that's fine. So you two talk now.

MR. MCRAE: Speaking for myself only, I'm going to --

THE COURT: Sure.

MR. MCRAE: -- pass. But I'll --

THE COURT: And I want you prepared.

MR. MCRAE: I'll confer --

THE COURT: And for goodness sakes, stay as fresh as possible for both sides.

And by the way, Saturdays and Sundays are open to me, too. I work Saturdays and Sundays, so no problem.

All joking aside, you'll get me out of a scintillating patent case if you want to. I'm just joking with all counsel for the record.

   **(Judge/Ms. Speaker confer.)**

Counsel, we might be spending more time than taking testimony but --

MS. SPEAKER: We're making lunch plans, Your Honor.

MR. SPEAKER: Your Honor, I think we have a plan in terms of progression so I think we can resume.

THE COURT: Well, you don't need to inform me. Let's just start.

MR. SPEAKER: Correct.

THE COURT: Okay.

(Counsel for the parties confer.)

MR. MCRAE: Your Honor, can the witness retake the stand? Thank you.

(Counsel for the parties confer.)

MR. MCRAE: I'm ready to proceed whenever the Court is. Thank you.

THE COURT: Ms. Rafferty's returned to the stand. All counsel are present, the witness is present. We're on CourtSmart. And this would be cross examination by the City.

MR. MCRAE: Yes. And, Your Honor, I just wanted to make a couple of apologies actually. Mr. Garza spoke to me at the lunch hour. And I did not know the Court's etiquette with respect to speaking to witness.

He was very kind and very gracious. But to avoid any appearance of running afoul of any rules that the Court may have because I haven't familiarized myself with them, and because he has testified and I don't know if he's going to be subject to recall, I didn't engage.

THE COURT: Who's that?

MR. MCRAE: Mr. Garza, I --

THE COURT: Oh, that's fine, for goodness sakes.

MR. MCRAE:  Okay.  And so I just want to apologize to him.  I did not want to seem rude or disrespectful.  I'd be happy to speak to you now that I know that the Court says that that's okay.

THE COURT:  Any witness can speak to any party at any time.

MR. MCRAE:  Thank you.  Because --

THE COURT:  For either side regardless of who's calling that party.

MR. MCRAE:  I'd like to make --

THE COURT:  This should have transparency involved with all of the folks willing to talk to either side.

MR. MCRAE:  And just --

THE COURT:  Okay.

MR. MCRAE:  -- I'd like to make a similar apology to Ms. Rafferty because she approached me in a very kind, polite way and was going to ask me something or say something to me, and I declined because she obviously was going to be cross examined by me, and no other counsel were present.  I didn't want to have any appearance of impropriety there.

THE COURT:  There's --

MR. MCRAE:  I did not mean to be disrespectful to you in any way.

THE COURT:  There's no problem.

THE WITNESS:  No.  And I was just going to ask you if

Rafferty - Cross / By Mr. McRae                    **186**

you were based in LA, that was all.  We were in the lunch line so --

THE COURT:  Let's make this clear.  From the Court's perspective, any witness may talk to any party at any time about this case.  And that's been clear from this Court's standpoint from the beginning.

And I want to reinforce that.  Whoever you are as witnesses, if the other party wants to talk to you, fine.

MR. MCRAE:  Thank you.

THE COURT:  Please.

MR. MCRAE:  I will proceed.

**CROSS EXAMINATION**

**BY MR. MCRAE:**

Q    Ms. Rafferty, one of the things that you talked about was the difference between an assessment and an audit, correct?

A    Correct.

Q    And for sake of clarity, the assessment that is Exhibit 23 was not a formal regulatory audit, correct?

A    It was not a forensic financial audit or a regulatory audit.  I -- can you clarify what you mean by regulatory?

Q    Meaning that it is not an audit that would be deemed to be appropriate and one that entities that are public entities that are regulated would be subject to.

A    Correct.

Q    And the assessment, which is Exhibit 23, was not a

EXCEPTIONAL REPORTING SERVICES, INC

Rafferty - Cross / By Mr. McRae          **187**

performance audit that professed to be conducted in accordance with GAGAS, correct?

A    Correct.

Q    Now, I want to make sure that I understand a bit of your background given the number of topics we covered.  Believe you volunteered from the stand that you are not an accountant; is that right?

A    That is correct.

Q    So that means that you're also not a certified public auditor; is that right?

A    That is correct.

Q    You're not a forensic auditor; is that right?

A    Correct.

Q    And I understand I think you also said that you are not an attorney; is that right?

A    That is correct.

Q    And you are not a legal expert; is that right?

A    Pertaining to what part of the law?

Q    I -- let me rephrase the question.  I take it that you've not been qualified to testify as an expert on the law on any subject by a court.

A    I need to clarify what part of the law.  I consider CMS regulations, the CFRs, and COPs part of the law.  And I am an expert in that.

Q    Right.  But in terms of offering legal opinions as far as

EXCEPTIONAL REPORTING SERVICES, INC

the meaning and interpretations and the applicability of those things, no court has allowed you to do that, correct?  Opining about the ultimate legal conclusion on what those standards mean and so forth.

A     Regarding the COPs and CFRs and CMS?

          **MR. MCRAE:**  Let me rephrase the question.

Q    At least insofar as we're talking about the assessment, you did not purport to be an expert on any topic that has any legal implication related to something that's covered in the assessment, correct?

A     That is correct.

Q    Now, if I understand it, you have a Bachelor of Science degree in nursing from State University in New York, correct?

A     Correct.

Q    You also have a master's degree in healthcare administration from University of Lavern, correct?

A     Correct.

Q    And I believe you said that you were a nurse.  And is that with a specific credential or title?  Because I want to be precise.  I assume there may be different types of nurses.

A     There are different types of nurses.  I'm licensed in California and Montana.  I think you -- in California we call them licensed vocational nurses.  They're still considered nurses.  Also, licensed practical nurses are called nurses.

          I'm a registered nurse licensed in California and licensed

Rafferty - Cross / By Mr. McRae                    **189**

in Montana.

Q    Now let's look at if we can what purports to be your firm's website that has your biography, or at least a description of you.  Exhibit 215.  This is your picture, correct?

A    It's an older picture, correct.

Q    This appears to be -- and if we can just scroll the pages for Ms. Rafferty -- does this appear to be the current depiction of you on your firm's website?

A    It does.

Q    And one of the things that's noted about you is that you have more than 35 years of healthcare experience; is that right?

A    What do you define as healthcare?

Q    Well, I'm quoting.  I should have been more precise.  I'm quoting that your firm's website says that you have more than 35 years of healthcare experience.  So I actually wouldn't be in a position to answer your question.  You would have to do that for us.

A    Correct.  On biographies both for law firms and consulting firms, experience is put in kind of a general bucket.  So my experience with healthcare is behavior health, acute care.

      I was a joint commission surveyor.  I do a lot of regulatory compliance work under CMS, under system improvement agreements, and corporate integrity agreements.  Worked in

Rafferty - Cross / By Mr. McRae                    **190**

state not-for-profit.  So that's kind of encompasses healthcare.

Q    This description of your biography in Exhibit 215 further states that you have extensive background in behavioral healthcare, including acute post-acute substance use disorder, medication assistance programs, and forensic health, right?

A    That is correct.

Q    What it doesn't say is that you have any experience whatsoever in assessing the operations of cities with respect to their homelessness response systems; is that right?

A    Can I ask a clarifying question?

Q    Believe you can.

A    What do you consider experience?

Q    That's a good question.  But for purposes of my question I'm merely asking what is and is not present on your website description.

Am I correct that there's no representation or description of you having had experience in addressing the homeless response system of any governmental level of a county, a state, or a city?  That's not contained, not described in your biography here, correct?

A    That is not stated in my bio.

Q    Okay.  Now, let me take you back to May 15th, 2015 when I asked you if these statements that were made in court, if this is something that you recall saying, one of which is that Los

Rafferty - Cross / By Mr. McRae                         **191**

Angeles's effort to address homelessness is unique because it is so vast and there are so many different components; do you recall saying that?

A    Can I ask a clarifying question?

Q    Sure.

A    Did you say 2015?

Q    I hope I didn't.  But --

     **THE COURT:**  Yeah, you did.

Q    -- if I did, then I stand in correction, and thank you.  I meant to say May 15th, 2025.  And now with that correction, and I thank you for it, do you recall saying that the Los Angeles effort to address homelessness in -- is unique because it is so vast and there are so many different components?

A    I do.

Q    And you believe that that's still true, correct?

A    I do.

Q    You also stated at the same May 15th conference that same year, 2025, that there's no examples out there, there's little things that we see work but not on a system level, and the size and scope of LA and LA County; you recall saying that?

A    I do.

Q    You still believe that's true, correct?

A    I do.

Q    And you further agree that at the same hearing, May 15th, 2025, you said everyone in this room would like their, you

Rafferty - Cross / By Mr. McRae                    **192**

know, their questions answered in this report.  And everyone needs to go back and look at scope and look at our scope.

And so we as a consulting firm can't vary from the scope, so we don't answer every single question.  You said that, didn't you?

A    Yes.

Q    It's as true now as it was then, correct?

A    Correct.

Q    Now, let me ask you.  There was some discussion about an offer to have a different type of analysis that was made you said I believe to the City by a subcontractor with respect to an auditing service; is that right?

A    The question -- can I answer the way I hear the question?

Q    Please.

A    When there was a notification RFP put out for this work, the -- I know there were three firms that applied.  One other firm was an auditing firm.

So we wanted to make it very clear that if the City needed a forensic financial audit, we could not conduct that.  That is not what we do with our company.

When we were in discussions, we said that we could perform an operational audit, and if the City wanted to have a forensic audit, we could make some recommendations, we could use them as a subcontractor.  We were willing for the City to say what would work for them.

Rafferty - Cross / By Mr. McRae                            **193**

Q    So the reason I ask that is because I want to draw a couple of distinctions.  First of all, you're not aware of any commitment that the City made in its settlement agreement with the Alliance to undertake any variety of the audits that you described, correct?

A    Correct.

Q    And the point earlier in the exchange was regardless of why the assessment is not a performance audit conducted in accordant with GAGAS, nothing changes that fact, correct?

     I mean, in other words, as we sit here today, it is still true that the assessment was not a performance audit that professed to be conducted in accordant with GAGAS, right?

A    This was not a forensic audit so it would not follow GAP and GAAS.

Q    Or GAGAS.

A    Uh-huh.

Q    Because there's GAP, G-A-P, --

A    GAAS, yeah.

Q    -- there's GAAS, G-A-A-S.  There's also GAGAS, G-A-G-A-S. The point being that the assessment did not profess to have adherence to any of those standards, correct?

A    That is not what the City asked for, correct.

Q    And so you understand -- or I'll ask you.  Is it -- isn't it your understanding that one of the reasons that these standards, these objective standards exist, GAAS, GAP, GAGAS is

embedded in the very name standard.

It's to achieve standardization and uniformity in review to promote objective reliability; you understand that, right?

**MS. MITCHELL:** Objection, relevance. This was not done to those standards, and all parties agree to that, Your Honor.

**THE COURT:** Overruled.

**BY MR. MCRAE:**

A    I could not comment on that. That is -- I am not a CPA. I'm not an accountant.

This engagement had nothing to do with those requirements. Our company does performance audits on companies all the time.

We do outcome measurements, vast -- I know you're aware of A and M. Your company contacted us to make sure there was no conflict. There was a discussion with the general counsel.

It's been very clear we did not perform a financial audit. We do not follow, GAP, GAAS, GOG (phonetic). We said it over and over. I've said it in court. It does not apply to our assessment. It does not apply to our report.

Q    I appreciate that. I'm actually asking a different question, which is that it's the purpose behind the standards because you would agree with me that one of the unique attributes of these standards -- which no disagreement that they weren't followed here.

But one of the unique attributes of GAGAS, for example, is

that adhering to them allows everyone to be reading from the

same objective metric against which they are assessing the

efficacy of the effort undertaken by the examiner, right?

          **MS. MITCHELL:**  Objection, --

A     No.

          **MR. MCRAE:**  Okay.

          **MS. MITCHELL:**  Sorry.  Objection, compound, vague.

          **MR. MCRAE:**  Well, --

          **THE COURT:**  Overruled.

**BY MR. MCRAE:**

Q    So when you have standards, for example, and let's just pinpoint it to this specific instance.  You had an exchange with counsel for the Plaintiffs where you were asked, did you conduct this audit with integrity and accountability and so forth.

     To parse this distinction a little bit, the question I'm asking is there's no representation in the assessment that the assessment was conducted in a manner to achieve the accountability and reliability as defined in GAGAS, correct?

A     I don't understand the question because you're referring to financial parameters.  This was not a financial assessment.

     What you're referring and trying to get me to say is that every assessment that is done by my company is unethical because it's not under these requirements.

     If you're not doing a forensic financial audit, you do not

Rafferty - Cross / By Mr. McRae                    **196**

follow all GAP -- but you're -- you -- every consulting firm,

including law firms, can do an assessment of the facts and

maintain efficacy and maintain nonbiased.  They do not have to

follow a financial guideline.

What you're -- what you want me to say and what you're

leading me to say is that, no, because we did not do a

financial audit, you're saying there's no efficacy to our

report, which I stand very strong that is the wrong conclusion.

And I will not say that.

**MR. MCRAE:**  Well, respectfully, you've answered a

question that I haven't posed because I'm not trying to get you

to say that.  And I'd appreciate it if you'd just let me ask my

question one at a time.  And we'll both do the best to try to

get through the exchange.

Q    I am not suggesting that I'm asking you to do that.  What

I am pointing out is when you do not tether your undertaking to

objective standards and definitions that everybody can agree on

with respect to methodology or what reliability or transparency

or independence means, it leaves you free to interpret what

those means.

And your interpretation of those words may not be

consistent with the interpretation under those standards.  Does

that make sense to you?

**MS. MITCHELL:**  Objection, argumentative, and no

question pending.

Rafferty - Cross / By Mr. McRae          **197**

MR. MCRAE:  No, that was a question.

THE COURT:  Do you understand the question?

THE WITNESS:  I understand the question.  But that's also with the law.  There's a law that's written, and it can be interpreted differently by different attorneys.  So I'm confused.

MR. MCRAE:  All right.  We can leave it at that.

BY MR. MCRAE:

Q    Let me move on to this, which is at no point was there a undertaking -- and I want to talk to you about this concept that you described called scope creepage.

Now, what scope creepage means -- and sometimes it's called mission creep -- is when there is a deviation or departure or excursion from a defined set of activity or a scope of work, right?

A    It is a movement away from the contractual compliance a statement of work which is signed and agreed to by both parties.  It is stepping out of those requirements.

Q    Right.  And at no point -- and if you need to have Exhibit 205 in front of you, which is the engagement letter between A and M and the City, I'm happy to provide it.  But perhaps you recall this.

At no point was there an undertaking by A and M to conduct an assessment in accordance with any concepts like integrity, accountability, etcetera as defined under GAGAS, right?

EXCEPTIONAL REPORTING SERVICES, INC

Rafferty - Cross / By Mr. McRae                    **198**

A    I cannot speak to the definition of GAGAS.

Q    Okay.  And you're not a HUD grading expert, are you?

A    I am not.

Q    Okay.  And one of the things that you were talking about with counsel for the Plaintiffs is systemic reform or macrolevel reform of the homeless response system.

     In other words, not tethered to the City, not tethered to the Alliance settlement agreement, but just on a macro like existential level, a response to the homeless response system; do you recall that?

A    Not in those words but --

Q    Let's say you recall having a discussion about efforts that you were undertaking in the assessment that were broader than merely the City's obligations under the Alliance settlement agreement; that fair?

A    That's fair.

        **MR. MCRAE:**  Okay.  And you're not aware -- let's put up Exhibit 25.  I think you were asked about this.

        **MR. SPEAKER:**  Twenty-five?

        **MR. MCRAE:**  Exhibit 25.

**BY MR. MCRAE:**

Q    Well, this is Exhibit 25.  And if we go to what I believe is page seven of the ECF -- actually I did this before.  Six I think is where we want to be.

     This is Exhibit 25 that purports to be the settlement

**EXCEPTIONAL REPORTING SERVICES, INC**

agreement between the City of Los Angeles and Alliance.  I want to ask you.  Have you in fact read this document?

A    This is the original agreement, the original settlement agreement.

Q    When you say the original settlement --

A    I'm --

Q    -- agreement, that's why I'm thrown --

A    I'm --

Q    -- off by what you're saying.

A    Because I don't see the title and I don't have the --

Q    Oh.

A    -- entire document.  I --

         **MR. MCRAE:**  Let's go preceding page.

         **THE COURT:**  The confusion is, counsel, that there's simply a docket number.  I don't know how she'd know that.  So put up that document or somebody give her the document --

         **MR. MCRAE:**  That's fine.

         **THE COURT:**  -- so we have the right document.

         **MR. MCRAE:**  There we have the title amended executed proposal.  Let's go to the next page.  We can just keep doing this on the screen.  Go to the next page until we see the caption divider Exhibit 1.  Next page.  Keep going.  This says Exhibit 1.  Now the next page.

         Well that's where it starts.  I'm happy to pass a copy of the settlement agreement to the witness, though, Your

Rafferty - Cross / By Mr. McRae                    **200**

Honor.  Your Honor, I believe I have a copy if I can approach.

THE COURT:  All right.  Thank you.

MR. MCRAE:  I don't think I marked on it.  May I?

THE COURT:  Please.

THE WITNESS:  Thank you.

MR. MCRAE:  You're very welcome.

BY MR. MCRAE:

Q    This document being Exhibit 1 to Exhibit 25, which purports to be the settlement agreement -- and I think you'll see as you peruse that that the pages have some signatures towards the end.  Now that you --

THE COURT:  Well, counsel, go to the end so we're certain what we're looking at for just a moment.

MR. MCRAE:  Okay.  Certainly.  And do you -- would you like the technician to do anything else at this point, Your Honor?

THE COURT:  All right.  Thank you.  No.

MR. MCRAE:  Okay.  Thank you.

BY MR. MCRAE:

Q    Ms. Rafferty, have you ever read this document?

A    I have.  But it's been a period of time.  I couldn't -- I'd have to sit down and really read it --

Q    Okay.

A    -- to be able to comment on it.

Q    Okay.  That's fair.  Let me ask you a few questions about

Rafferty - Cross / By Mr. McRae                    **201**

it.  Whether in your recollection or looking at it right now,

there is -- do -- there is no -- in the section that we're

looking at right here on the screen, you can see that there is

a title at line eight called recitals; do you see that?

A    I do.

Q    You've seen that phrase, recitals, in contracts before.

A    I have.

Q    Now, notice on the next page of this exhibit there's

another section, and that's called terms; you see that, right?

A    I do.

Q    So you're familiar -- I think you said from the stand

actually when you were speaking to Plaintiffs' counsel you've

seen a fair number of contracts.

     So this probably isn't the first time that you've seen a

distinction in a contract between recitals, prefatory remarks

and so forth about how the parties may have got there and what

their aspirations may be, and the actual terms of the agreement

in the term section; you've seen that before, right?

A    I have.

Q    Okay.  So one of the things you were asked about, if we

could go back to the recitals, and let's go to the next page,

you were asked on page two of this settlement agreement about

the language in paragraph ten through 15; you recall that?

A    (No audible response.)

Q    And for relevant purposes, you read out loud the purpose

**EXCEPTIONAL REPORTING SERVICES, INC**

of the agreement is to substantially increase the number of

housing and shelter opportunities in the City of Los Angeles.

And you went on to read and to address the needs of

everyone who shares public spaces and rights of way in the City

of Los Angeles, including both housed and unhoused Angelinos to

achieve a substantial and meaningful reduction in unsheltered

homelessness in the City of Los Angeles; you see that?

A    That's what it states from line ten to 15, correct.

Q    And you observed when you read that that that language is

contained in the recital portion of the agreement, right?

A    It is in the recitals section.  But I think it's also the

intent of the agreement.

Q    Well, the agreement would speak for itself on that point,

right?  In other words, the talk about the purpose of the

agreement is contained in the recital section, right?

A    (No audible response.)

Q    Correct?

A    Are you asking that this agreement was not intended to --

is that -- I'm confused.

Q    No.  What I'm asking you is the statement of the purpose

of the agreement is in the recital section, not the term

section, correct?

A    I'd have to sit down and read the entire thing to see if

it's in the terms.

Q    I'll show it to you on this screen.  We can expand this

page.  The paragraph you just read is ten through 15, which is the last paragraph before the section begins that says terms; you see that, right?

A    Well, under 1.1 on line 18 it says, as used herein shall refer this settlement agreement and associated documents.  Is that -- does that refer to the recitals or does that refer to something else?

MR. MCRAE:  I don't know if the Court wants me to answer your questions so I'm going to refrain --

THE WITNESS:  Oh, sorry.  I apologize.

MR. MCRAE:  -- from doing that.  No, that's quite all right.  But the fact that you even asked the question is instructive.

**BY MR. MCRAE:**

Q    The point being that -- and I'll make this -- let's confine this this way.  You would agree with me that when -- and, by the way, you didn't participate in the negotiation of the settlement agreement, right?

A    I did not.

Q    You are not in any position to opine about or say what any of the parties were thinking as their intent when they negotiated this settlement agreement, correct?

A    I could not.

Q    Okay.  And so when we -- simply this.  When we look at the agreement and the parties represented by counsel structured the

Rafferty - Cross / By Mr. McRae          **204**

agreement, they divided the agreement in segments.  One segment was recitals and another segment was terms; is that right?  You see that.

A    I do.

Q    Okay.  And the language that you were asked to read from is in the recitals section.  If we can just go back to the prior page before this, you'll see that that is the last paragraph of the recitals, right?

A    Correct.

Q    Okay.  Now let's go back to that language on the next page.  Now, one way -- you can tell me if this is how -- when you were asked about this, you were thinking about this, one way to read this language is that this recital is not defined in terms of what substantially increase means or what substantial and meaningful reduction means; would you agree with that?

        **MS. MITCHELL:**  Objection.  The document speaks for itself.

        **THE COURT:**  Overruled.

**BY MR. MCRAE:**

A    As I stated, I'm not a lawyer so I should not comment on a legal document that I did not partake in its negotiation.

Q    Okay.  And if I were to put to you that if you were to take the position that the substantial increase in the number of housing and shelter opportunities and achieving substantial

Rafferty - Cross / By Mr. McRae                    **205**

and meaningful reduction in unsheltered homelessness, that that

purpose was reflected in the bed count and encampment reduction

obligations in this agreement -- are you with me thus far?

A    (No audible response.)

Q    In other words, if you were to assume that that's what

that language refers to, that the language in lines ten through

15 refers to the ultimate bed count and encampment reduction

obligations; are you with me?

A    Correct.  But I don't assume.

Q    I know.  But just for purposes of this discussion, if you

were to assume that, and I appreciate you don't.  But if you

were, do you follow me thus far?

A    But I won't assume.

Q    I understand.  But for purpose of my question, are you

able to do so just so that you can follow my question?

A    But I feel the question's leading so I'm hesitant to

answer.

        **MR. MCRAE:**  Well let me finish the question and then

you can express your thought on it.

Q    My point is that if one were to make that equation between

the language in ten through 15 here and to state that what that

means is the parties were saying that the substantial increase

in the number of housing and shelter opportunities and the

substantial and meaningful reduction in unsheltered

homelessness was reflected in their agreement on the bed count

**EXCEPTIONAL REPORTING SERVICES, INC**

and the encampment reduction, people who have been asking you, that would be another way if someone was asking you whether or not Los Angeles was in a position to achieve what's stated in this purpose, that would be another way of asking if you made that equation whether the City of Los Angeles was going to be able to achieve its bed count and encampment reduction obligations under the Alliance settlement agreement, right?

**MS. MITCHELL:**  Objection, compound, calls for speculation, --

**THE COURT:**  Just a minute.

**MS. MITCHELL:**  -- and unintelligible.

**THE COURT:**  Do you understand the question?

**THE WITNESS:**  No.  There were too many questions in the question.

**MR. MCRAE:**  All right.  Let me just try it this way then.

**BY MR. MCRAE:**

Q    Would you agree with me that A and M has no idea whether the City of Los Angeles will meet its bed count obligations in June, 2027?

A    There's no one in the room that can predict the future, so no.

Q    And the same would be true with respect to whether or not the City of Los Angeles will meet its encampment reductions in 2026, A and M can't say whether that's the case, and literally

Rafferty - Cross / By Mr. McRae          **207**

no one in this room can, correct?

A     Neither can the City, correct.

Q     Now, you didn't -- but meaning A and M didn't conduct a forensic audit or, excuse me, a financial audit of the City's financial statement and operations.  You're not saying that other entities did not, right?

A     Are you asking -- I'm not -- I can't ask you a question.

        **MR. MCRAE:**  Can I withdraw the question?  Because that may help you because I agree that was not a precise question.  Maybe you were wondering you mean in the context of this case, and you would be right.  That's what made it vague.

Q     What I mean is you understand that the City of Los Angeles episodically is audited for its financial statements and records and so forth.

        **MS. MITCHELL:**  Objection, vague.

        **THE COURT:**  Could you repeat that counsel?  I didn't hear.  I'm sorry.

**BY MR. MCRAE:**

Q     You understand that the City of Los Angeles on occasion does undergo audits conducted pursuant to GAGAS.

A     I don't have that knowledge.

Q     Okay.

A     I would -- see, I would say I assume, and you're not allowed to assume, so most cities do go through financial audits.  But I cannot tell you when Los Angeles goes through

audits, what -- when they're mandated.  I can't tell you that.

Q   Well, but if it were put to you that another highly well-known auditing firm, or more than one in fact, had conducted an audit of the City of Los Angeles's compliance with monies provided under federal programs and issued a clean opinion, if that were put to you, you'd have to respect that, right?

A   No.

Q   Oh, you wouldn't have to?

A   Not in the context you're asking me.  A financial audit shows revenue, expense categories; does not say the money was used appropriately or the money was accounted for.

So I can't answer that because in the context that you're asking me is if an audit was performed in Los Angeles, I would say that that audit -- most financial audits by auditing firms and CPA firms do not look at the outcome of funds.

They look at spending categories, they look at revenue resources.  They look at the P and L.  But they do not know -- you can spend a million dollars on a category, does not mean at the end of the day it went to that category or -- that's not what an audit does.

An audit, a financial audit -- I'm not a CPA, but a financial audit in my understanding looks at numbers; does not look at the result of those numbers.

It's a balanced accounting to make sure that you follow general principles of accounting.  And that audit, you can

absolutely have a clean audit and still have misappropriation of funds.  I think we all know that.

Q    Well, my question -- and I need to broaden it -- if it weren't limited to a financial audit, and if the audit in fact covered the items that you described, but the fact is the only difference is that it was actually done by someone other than A and M, you would have to respect those findings, correct?

A    If an audit was done to understand the funding resources, how the funds were used as and attended, and a measurement of outcome, such as reducing homelessness, such as providing services, making sure that the bed count is not only required by the agreement but adequate to get people off the street, and there's outcome measurements to know people not going back into homelessness, yes, I would have to respect that audit.

Q    Right.  And if we put a finer point on it, if someone conducted an audit of whether funds that were provided by the Federal government were appropriately used in accordance with whatever Federal requirements there were, with the caveats that you built into it -- and, again, if that was done by a third party auditing firm that you respected, you would have to respect those findings, right?

A    If it was compliant with 2 CFR 200 which states that -- and I'm not a legal expert.  But my understanding of reading that requirement is not only tracing, understanding how when Federal funds are used, are they used as intended.

And my understanding in -- is that it's not just they went to a certain category.  Once they reach whatever destination or requirement those funds are being used for, that there's outcome measurement, there's accountability in how those funds were spent.

If there was an audit that showed every dollar coming into the funnel, how they were distributed by LAHSA or who -- whatever entity it is, and to show that they resulted in the intent of those funds, yes, I would have respect for that audit.

Q    And you don't know as you sit here one way or the other whether that was done.

A    We did request if there was outcome measurements, both from the City, LAHSA, and the County on how there was knowledge to understand that the funds, as the mayor puts them, hit the street.

We were never given that information that the funds were used as intended and not misinterpreted or misplaced.  We asked for that information.

It was our understanding in the information we received that that is not -- that's not available, those funds are not -- that information is not available.

          MR. MCRAE:  Respectfully, that wasn't my question at all.

          THE WITNESS:  Oh, I'm sorry.

BY MR. MCRAE:

Q    My question was you don't know whether the audit that you described in the penultimate answer that you gave, not the one that you just gave but the one before that, you don't know whether those sorts of audits and examinations were conducted by someone other than A and M, correct, as you sit here now?

A    Based on our request if there was additional information, I can't answer that.  I don't -- it was -- we would love to have known that.  I would think that we would have been given that information.  So to my knowledge there have not been other audits.

Q    That's kind of my point.  Your audit review period ended in 2024, correct?  And --

A    Correct.

Q    -- so what I'm saying is -- and that's why I keep emphasizing as you sit here today, you don't know whether the sorts of examinations that you said that you would have more confidence in have been done by people other than A and M, correct?

A    As far as what's available on public websites through LAHSA, through the City, we have never seen that that work has been done after our period of review.

It has never been made public that an audit had been conducted in the last year or so that would be able to give the citizens of Los Angeles that information, you're correct.

Rafferty - Cross / By Mr. McRae                  **212**

Q    But, again, you -- and, again, you say that you haven't seen it.  You're not saying it doesn't exist because you can't make a definitive statement like that.

A    I shouldn't assume but I would assume it doesn't exist.

        **MR. MCRAE:**  Fair enough.

Q    But taking the point that it doesn't -- that it may exist and you don't know whether it does, let me ask you this.  As far as the assessment itself and getting back to the scope of work that A and M conducted, nothing in the engagement letter that A and M had with the City of Los Angeles makes any changes to the City's obligations under the Alliance settlement agreement, correct?

A    Correct.

Q    Nothing in the assessment that A and M created makes any changes to the settlement agreement that the City of Los Angeles had with Alliance, correct?

A    Correct.

Q    And you still have that Exhibit 25 in front of you, right?

A    It disappeared.

Q    I mean --

A    Oh.  In front of me.

Q    -- the physical copy, right.  So we were talking about the distinctions between the recital portions of the agreement with the discussion about substantially increasing and meaningful reduction and the terms.

I want to direct your attention to another paragraph of the agreement, which is paragraph 18, if we can go to that. It's paragraph 18 in this exhibit.

You're aware of this language about the entire agreement and no other reliance.  This is what is often called an integration clause; you've seen this before in this agreement.

A    I have.

Q    And you're aware that what it says in salient part is that any alteration -- and I'm reading lines 14 through 16 -- change, or modification of or to this agreement shall be made by written instrument executed by each party hereto in order to become effective, right?

A    I'm hesitant to comment on a document that I did not contribute to.  And I'm not an attorney.

Q    Well, I'm just asking you if I read that correctly.

A    I've also --

Q    Well, --

A    -- I'm always hesitant to read lines without reading an entire agreement, sitting down, and having time to absorb it and taking pieces out of an agreement because it can lead to speculation and it can lead to misinterpretation.

Q    Well, at one point when you were the head of the team that created this assessment, is that when you think that you may have read the settlement agreement with the lines?

                **MS. MITCHELL:**  Objection, misstates the testimony.

**MR. MCRAE:**  Well I'm asking.

**THE COURT:**  Overruled.

A   Is the question -- oh, I can't ask you a question.  Can I ask you a question?  Prior to the engagement being signed or after?

Q   You just said that you would be hesitant to opine or talk about a contract, especially given the fact that you're not a lawyer, if you hadn't studied the whole thing.

What I'm trying to ascertain here is do you have any idea the point in time in which you may have read this settlement agreement?

A   I cannot recall the exact date, no.

Q   Now, one of the other things I want to discuss with you is you've been asked -- oh, as far as you're aware, there's only one settlement agreement between the City of Los Angeles and the Plaintiffs in this case, correct?

A   Correct.

**THE COURT:**  Are you referring to LA Alliance or the --

**THE WITNESS:**  The roadmap.

**THE COURT:**  -- roadmap or Inside Safe?

**MR. MCRAE:**  I was saying the Plaintiffs in this case which I assume just meant LA Alliance because this is the only --

**THE COURT:**  LA Alliance, okay.

Rafferty - Cross / By Mr. McRae                          **215**

              **MR. MCRAE:**  Yes.

              **THE COURT:**  All right.

              **MR. MCRAE:**  Thank you, Your Honor.

              **THE COURT:**  Referring to LA Alliance.

              **MR. MCRAE:**  I'll repeat the question for the record.

**BY MR. MCRAE:**

Q    You're not aware of any agreement between the City of Los Angeles and the Alliance other than Exhibit 25.

A    I am not.

Q    You're not aware of any modifications or changes to -- in all of the time that you spent and the 165-page document that A and M corrected, you're not aware of any modification or alteration or change to this settlement agreement with the Alliance that was reduced to a written instrument and executed by each party, correct?

A    I cannot say yes or no.  We were not notified of any changes.

Q    Now, one of the things that you also talked about, and I think this was your word, you described a sense of disjointedness; do you remember that word you used, disjointed or disjointedness?

A    When did I use that word?

Q    In your testimony earlier today before the lunchbreak in the colloquy that you were having with counsel.  It may -- quite frankly, I don't want to presume.  It's your testimony.

If you don't recall saying it, that's fine.

Do you recall talking about an observation that you had about disjointedness?

A    I -- yes, --

Q    Okay.

A    -- I made that comment.

Q    You've got Exhibit 25 in front of you.  There is no commitment by the City of Los Angeles to achieve any degree of jointedness in Exhibit 25, correct?

A    The intent of the document or what it says on the page, I don't think that terminology is used on the page.  The intent of the document I can't speak to.

Q    All right.  Now, with respect -- I just want to make sure that I understand this also.  After May 15th of this year, I talked to you about the statements that you made in court.

Do you know whether A and M had any communications with the special master or the Court after May 15th, other than what was in court?

A    Personally or the team?

Q    Everybody at A and M.

A    I think -- I can't recall.  It was very commonplace for us to talk to Ms. Myers, the County, the City, the special master. We were open to talk to everyone.

We did not -- I did not write dates and times.  We had many Teams calls with the City and the County.  There were just

Rafferty - Cross / By Mr. McRae                    **217**

-- we were open to talk to anyone.

Q    Right.  And my question was whether in particular with respect to the special master or the Court, A and M as a collective group that created the assessment had any communications about its work with the assessment outside of being in court.

A    We did have conversations with the special master to give updates, understanding court dates, were we supposed to attend all through the engagement, just updates, make sure that we were on time, our timelines, more of just a process update.

Q    Okay.  And you have Exhibit 25 in front of you.  You agree that it does not contain any commitment by the City to effectuate a net increase over any period of time in terms of available beds, correct?

        **THE WITNESS:**  When you ask me questions that say you disagree and you start with you agree, you put me in an awkward position because it's a double -- you're asking me a question but you're already telling me that I agree.

        So if you could ask the question and let me say I agree or not agree, it would be very helpful because it's leading me to confusion.  And it feel -- I feel like you're leading the witness to say I agree.

        So if you could start your questions with did you or have you instead of you agree, don't you or you don't agree would be really helpful.

I apologize.  I'm just -- I want to be helpful to you, but your line of questioning is intimidating.  And so if you could just ask me the question, that would -- and I will answer to the best of my knowledge.

But it takes me a while when you start with I -- you agree, don't you.  And I have to think do I or don't I, and then I have to think about what the question is.

**MR. MCRAE:**  Well, with that recital I certainly don't mean to intimidate you.  Please let us know if you need to gather yourself and take a recess.

**THE WITNESS:**  I'm fine.

**MR. MCRAE:**  Okay.  And if you experience any intimidation that prevents you from answering the questions, you'll let us know.

**THE WITNESS:**  And I just let you know, so thank you.

**MR. MCRAE:**  Okay.  With respect to the quarrel that you have with the questions being leading, that's not a quarrel with me.  That's the entire legal profession.  This is called cross examination.

**THE WITNESS:**  Understood, sir.

**MR. MCRAE:**  So let me proceed.

**BY MR. MCRAE:**

Q    My question to you is the settlement agreement, which is Exhibit 25, with the Alliance does not contain any discussion about the City affecting a net increase in terms of available

Rafferty - Cross / By Mr. McRae          **219**

beds over any period of time, correct?

A     I would have to read through the entire document to see.

Q     As you sit here now, do you have any recollection of any undertaking by the City to effectuate a net increase in beds over any period of time under the Alliance settlement agreement?

A     I don't believe so.

Q     And on the subject of exit rates about which there was exchange with counsel for the Intervenors, as you sit here, you do not see any discussion of a commitment by the City to do anything with respect to exit rates in the settlement agreement with the Alliance, correct?

A     Correct.

          MR. MCRAE:  May I have a moment to confer --

          THE COURT:  Sure.  Absolutely.

          MR. MCRAE:  -- with my colleagues?

          THE COURT:  Take your time with your team.

     (Pause)

BY MR. MCRAE:

Q     So I want to ask you this question.  When you were being examined, one of the comments that you made was that you wanted to or A and M wanted to do this work because of the social conscience aspect of it.

A     Correct.

Q     Would it also be a true statement that the $3.5 million

**EXCEPTIONAL REPORTING SERVICES, INC**

Rafferty - Cross / By Mr. McRae                    **220**

that A and M was paid was another reason why it wanted to do the work?

A     Very similar to law firms accepting jobs, yes.

          **MR. MCRAE:**  Thank you.  I have nothing further at this time, Your Honor.

          **THE COURT:**  Redirect.

          **MS. MITCHELL:**  No, Your Honor, thank you.

          **THE COURT:**  Well just to make sure, I want to go around the room.  Everybody consult.  Ms. Myers, do you have questions?

          **MS. MYERS:**  No, Your Honor.

          **THE COURT:**  City, do you have any further questions?  Just make sure.

          **MR. MCRAE:**  No, Your Honor, thank you.

          **THE COURT:**  Okay.  Thank you very much.  If we need you, we'll contact you.  And I promise you we'll be courteous, okay, in finding you.

          Then, counsel, your next witness.

          **MS. MITCHELL:**  I think that we're going to finish up with Ms. Frost.

          **THE COURT:**  I'm sorry?

          **MS. MITCHELL:**  Laura Frost was on the stand.  We were going to do some brief redirect.

          **THE COURT:**  All right.  So we're going to finish the redirect.  I think we were on redirect and recross.  If you'd

step forward and be seated.  And watch the step, watch that step, okay?  Thank you.  And you can be seated.

And, counsel, just to remind me to make certain with each witness that retakes the stand, there's about a four-inch gap that you can't see.  And so I'm cautioning each of you to be careful when you come up.

All right.  Counsel, the witness is back on the stand.  This is redirect examination by LA Alliance.

**MS. MITCHELL:**  Thank you, Your Honor.

I also want to note that Mr. Szabo entered the courtroom --

**THE COURT:**  Yeah.

**MS. MITCHELL:**  -- partway through and --

**THE COURT:**  I really don't care if witnesses are present.  I don't expect -- but if you -- each one of you want to exclude them, that's fine.

**MS. MITCHELL:**  No, Your Honor, I don't.  I'm not moving to exclude him.  I just wanted to note that for the record that he is present in the courtroom.

**THE COURT:**  Okay.  Fine.  As far as I'm concerned, witnesses can remain.  I don't expect -- I'm not too concerned frankly.  So --

**MS. MITCHELL:**  Thank you, Your Honor.

**THE COURT:**  -- Mr. Szabo wants to be present, that's fine.

MS. MITCHELL:  May I proceed?

THE COURT:  Please.  This is redirect.

MS. MITCHELL:  Thank you.

**LAURA FROST, PLAINTIFFS' WITNESS, RECALLED, PREVIOUSLY SWORN**

**REDIRECT EXAMINATION**

BY MS. MITCHELL:

Q    Now, Ms. Frost, there was a question posed to you about whether you communicated with Plaintiffs' counsel prior to this proceeding about your testimony; do you recall that question?

A    Yes, I do.

Q    When you and -- and that was you and I, right, you and I spoke prior to testifying?

A    Correct.

Q    Did I ever at any point tell you what to say?

A    Absolutely not.

Q    Did I tell -- give you the general topics that I was going to ask you?

A    Yes.

Q    Now, throughout this process from the beginning of the assessment until today, have you had communications periodically with the City?

A    Yes.

Q    Have you had communications with attorneys for the City?

A    Yes.

Q    Have you had communications with anybody from the County?

Frost - Redirect / By Ms. Mitchell                **223**

A     Yes.

Q     And what about attorneys for the County?

A     Yes.

Q     And what about the Intervenors, attorneys for the
Intervenors?

A     Yes, we have.

Q     And at any point did anybody raise any concerns or issues
with you talking to anybody, any of the parties throughout this
process?

        MR. MCRAE:  Objection, it's vague as to whether it
was talking in preparation for an evidentiary hearing versus
talking in connection with preparation of the assessment.

        THE COURT:  Overruled.  You can answer the question.

A     No.  No one has ever objected.

Q     Has anyone from the City ever asked you for documentation
underlying your assessment?

A     In relation to -- I do not recall the City asking for
underlying data that was relied upon and referenced in the
report.

Q     I'm going to turn to Exhibit 23, page 105; do you have
your report there with you?

A     I do, yes.

        MS. MITCHELL:  All right.  Let me plug mine in on
this side.  I'm going to ask about a question that was asked to
you about page 105.  Okay.

Q    There was a conclusion -- let's see.  I believe it was that the slots were not easily -- there it is.  On the bottom of this page, A and M reviewed the TLS contracts and the roadmap program named LAHSA contracts, and the number of TLS slot was not easily identifiable; do you see that section?

A    I do, yes.

Q    Okay.  And counsel asked you on cross examination about whether they could be identifiable, but it just wasn't easy; do you remember that question?

A    Vaguely.

Q    Okay.  Did you try to find the number of TLS slots in those contracts?

A    Yes.  We attempted to review the contracts to identify the number of slots that were funded.

Q    Okay.  And were they -- were you able to identify them at all?

A    No, not to my recollection.

Q    Okay.  So it's not that it was very difficult to find, it's that they couldn't be found --

A    Correct.

        **MR. MCRAE:**  Objection, --

Q    -- in your review.

        **MR. MCRAE:**  -- contradicts the document, and relevance as to this topic.

        **THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q    All right.  Let's turn to Exhibit 25.  You were asked a question about --

THE COURT:  Well, just a moment, counsel, that last question was a statement.  I didn't hear an answer to that.

MS. MITCHELL:  I believe there was an answer.

THE COURT:  I heard --

THE WITNESS:  Correct.

THE COURT:  -- the objection.  Was there an answer; did you answer that question?

THE WITNESS:  I believe my answer was correct.

THE COURT:  Okay.  I'm sorry.  I missed that.  Thank you.

THE WITNESS:  Of course.

**BY MS. MITCHELL:**

Q    And for clarity's sake, correct that you could not find the slots at all; is that right?

MR. MCRAE:  Same objection.

A    Correct.

THE COURT:  Overruled.

**BY MS. MITCHELL:**

Q    So you were also asked --

THE COURT:  Just a moment.  I can't hear the question.  I heard the question.  I can't hear the answer, so we're going to slow down now.

MS. MITCHELL:  Okay.

THE COURT:  What was your answer?

THE WITNESS:  Correct.  The number of slots we did not identify within the contracts that we reviewed.

THE COURT:  Okay.  Thank you.

**BY MS. MITCHELL:**

Q    Now, finally, you were asked about whether or not the City had an obligation to provide data or to cooperate on data collection; do you recall that question?

MR. MCRAE:  Objection, mischaracterizes the testimony and the question.  There was no such question.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  My apologies, Ms. Mitchell.  Do you remind repeating?

MS. MITCHELL:  Sure.

THE COURT:  Well, counsel, you've said the City.  I think counsel was pointing out a subsection of the document that he'd referred to before.  So I'm going to sustain the objection.

The question wasn't the City.  He was referring to a series of criteria.

MS. MITCHELL:  So I -- maybe let's -- I'll try to take another shot at it, Your Honor.

THE COURT:  Well, just a moment.  Those questions were in fact directed at obligations by A and M.  I apologize

and reverse that ruling.  Overruled.

MS. MITCHELL:  Thank you, Your Honor.

THE COURT:  You can answer the question.

MS. MITCHELL:  Would you like me to --

THE COURT:  Yeah.  Restate the question.

MS. MITCHELL:  -- restate the question.

THE WITNESS:  Yeah.  I apologize.

MS. MITCHELL:  No problem.

BY MS. MITCHELL:

Q   So do you recall there was a question by the City about whether or not in this settlement agreement, Exhibit 25, there was any obligation that the City had regarding data integrity or collection; do you recall those series of questions?

MR. MCRAE:  Renew the --

A   I do.

MR. MCRAE:  -- objection.  I'm sorry, I didn't catch the last part.  It dropped off.

MS. MITCHELL:  Well, because you interrupted me probably.

MR. MCRAE:  No, I thought you were finished.  I apologize.

MS. MITCHELL:  So the question was a series of --

THE COURT:  Well just a moment, both of you.  Thank you for your participation.

MS. MITCHELL:  Yes.

Frost - Redirect / By Ms. Mitchell                    **228**

THE COURT:  I'm just joking with you.

(Laughter)

Let's all take a deep breath, okay?  Deep breathing.  Just joking with you.  Now the question again.

MS. MITCHELL:  I'll try it a third time.

BY MS. MITCHELL:

Q    So the -- on the City's cross examination, counsel for the City asked a series of questions regarding Exhibit 25 on whether or not the City had an obligation on data collection, data integrity.  And there was a series of questions regarding data; do you recall that series of questions?

MR. MCRAE:  Objection, mischaracterizes the question.

THE COURT:  Overruled.

MS. MITCHELL:  Okay.

BY MS. MITCHELL:

Q    I'm going to direct you to Exhibit 25, section 7.2.  Why don't you go ahead and read that section for us aloud, please?

A    Seven point two:

"The parties will engage a mutually agreed upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of this agreement.

"The City shall be responsible for paying all fees, if any, or for obtaining grants or other private funding if needed."

Frost - Redirect / By Ms. Mitchell                    **229**

Q     And to your knowledge, other than A and M, did the City ever engage a mutually agreed upon third party to provide data collection, analysis, comments, and regular public reports?

          **MR. MCRAE:**  Objection, relevance.

          **THE COURT:**  Overruled.

          **MR. MCRAE:**  And calls for a legal conclusion to the extent it purports to be interpreting section 7.2.

          **THE COURT:**  Overruled.

A     Not to my knowledge.

Q     Are you in fact -- is A and M a mutually agreed upon third party which analyzed data, made comments, is making a public report in the City's compliance with the term of this agreement?

          **MR. MCRAE:**  Your Honor, objection, legal conclusion. I believe yesterday the Court said A and M was hired as a result of a sanctions order.  So how could it be -- in any event, objection, legal conclusion, foundation.

          **THE COURT:**  Overruled.  You can answer the question.

**BY MS. MITCHELL:**

A     In relation to whether A and M was retained solely for compliance, I cannot speak to.  But we did provide data collection, analysis, comments, and this report was public.

          **MS. MITCHELL:**  I have no further questions at this time, subject to the introduction of exhibits, Your Honor.

          **THE COURT:**  All right.  Ms. Myers, I think by

Frost - Recross / By Mr. McRae                    **230**

agreement this turns to you for examination.

          **MS. MYERS:**  No further questions.

          **THE COURT:**  Then it would turn back to the City for examination.

          **MR. MCRAE:**  Just a couple.

          **THE COURT:**  And this would be recross.

                    **RECROSS EXAMINATION**

**BY MR. MCRAE:**

Q    So one of the things that you were just talking about was discussions that you had with Plaintiffs' counsel about your prospective testimony.  And for purposes of symmetry, I want to make sure that I understand your answer.

     I don't believe that you were asked whether you had any discussions with representatives of the City about your prospective testimony.  So let's make sure that we're clear here.

     You in fact have had discussions, at least with counsel with whom you were just speaking, about your prospective testimony in this evidentiary hearing, right?

A    (No audible response.)

Q    You said as much ten minutes ago.

A    Yes.  I have, yes.

Q    Okay.  You have not had discussions with any attorney for the City about your prospective testimony in the evidentiary hearing that we've been participating in this week, correct?

Frost - Recross / By Mr. McRae                    **231**

A    No City attorney has reached out in relationship to my
testimony.

Q    And not only no City attorney but no attorney on behalf of
the City, including me or my firm, correct?

A    No, the City attorney or -- has -- no City attorney to my
knowledge has reached out to me.

Q    And when you say they haven't reached out to you, can we
also conclude that that means that you've had no discussions
about your prospective testimony with any lawyer representing
the City of Los Angeles in connection with this evidentiary
hearing.

A    Yes, no attorney has --

Q    Okay.

A    -- reached out to me to discuss.

         **MR. MCRAE:**  Now, I believe you were just asked -- if
we could put up Exhibit 25 again -- about Exhibit 25, section
7.2.  Sure.

         Your Honor, I don't want to misplace anybody's Big
Gulp but there's a --

         **MS. MITCHELL:**  I wish.

         **MR. MCRAE:**  -- about a swimming pool of water here.

    **(Laughter)**

**BY MR. MCRAE:**

Q    All right.  So we're looking at section 7.2 of Exhibit 25.
And do you recall being asked whether in effect A and M was the

**EXCEPTIONAL REPORTING SERVICES, INC**

Frost - Recross / By Mr. McRae                    **232**

party or the entity contemplated by section 7.2; do you recall

that?

            **MS. MITCHELL:**  Objection, misstates the question.

            **MR. MCRAE:**  Well, --

            **THE COURT:**  You can ask that question, counsel.

            **MR. MCRAE:**  Yeah.

            **THE COURT:**  Overruled.

**BY MR. MCRAE:**

Q    You were asked a series of questions ultimately ending up

with has the City retained anyone other than A and M to do an

analysis of data.

    And I appreciate your carveout that the A and M

assessment, you're not speaking to whether that was to have an

analysis of compliance by the City with the terms of the

agreement.

    But you recall that question being put to you about

whether A and M was the only entity hired by the City in

connection with this paragraph 7.2; do you recall that

discussion?

A    Can you please repeat?  I'm sorry.  That was -- can you

please repeat your question?

Q    You recall having a discussion with counsel moments ago

about whether A and M is the only entity to your knowledge that

was retained by the City in connection with section 7.2 of

Exhibit 25, correct?

Frost - Recross / By Mr. McRae                          **233**

A      I recall that question.

Q      Okay.  Now, --

        **MS. MITCHELL:**  Objection, misstates the question.

Q      -- you would agree, right, that the language that was read to you, first of all, required that this agreement of the parties, it says that they're going to engage a mutually agreed upon third party, right?

A      A mutually agreed upon third party, yes.

Q      And it -- obviously you can see this.  In section 7.2, this agreement was written before the sanctions hearing that preceded A and M being retained in this case, right?

A      Yes.

Q      Okay.  So would it be fair to say then that there's really no basis that you can think of to think that when section 7.2 is talking about retaining someone to have regular reports on the City's compliance with the terms of the agreement, that they were talking about A and M, right?

A      Right.  This is any mutually agreed upon third party.  It does not specifically say A and M.

Q      Right.  And there's no document that you're aware of where the City has said, oh, yes, A and M was retained pursuant to section 7.2, right?

A      Not to my knowledge of pursuant and related to a specific section.

        **MR. MCRAE:**  I have I think one other question.  I

Frost - Recross / By Mr. McRae                              **234**

think I left a sheet of paper over here.

Q    Now, from the time that the -- that A and M created the penultimate draft of the assessment until the final report, in that interim, do you know whether the collective A and M, meaning you and your other team members, had any communications with the LA Alliance regarding that assessment?

A    After the March 27th hearing, if I'm recalling that date correctly, when the Court opened us to communicate with all parties.

Q    Right.  And that would be open to do it.  And I'm now asking do you know whether that happened.

A    After March 27th, yes.

Q    Okay.  And can you recall with whom A and M had communications regarding the progression towards the final report after the draft of the penultimate assessment was prepared?

A    Can you ask your question one more time?

Q    Yes.  We've established that the Court provided an invitation for people to speak with A and M regarding the assessment after March 27th, 2025.  And I'm asking in essence to the extent the discussions were had and that invitation was accepted, with whom?

A    We had meetings with LA Alliance.  We had meetings with the City, the County, as well as the Intervenors.

Q    Anyone else?

A      Not that I can recall out -- just the parties to this case.

Q      Okay.  And as I asked your colleague, you're not aware of anything in the assessment that changes any of the City's obligations under the settlement agreement, correct?

A      Not that I have been made aware of.

            MR. MCRAE:  Nothing further.

            THE COURT:  All right.  Now, go around the room because let's just make sure.  Do you have any further questions?

            MS. MITCHELL:  I have one more question, Your Honor.

            THE COURT:  Not so fast.  So all right.

                    **FURTHER REDIRECT EXAMINATION**

**BY MS. MITCHELL:**

Q      Had any other attorney for any other party contacted you prior to this hearing, would you have met with them?

            MR. MCRAE:  Calls for speculation.

            THE COURT:  Overruled.

A      Absolutely, yes.

            MS. MITCHELL:  No other questions, Your Honor.

            THE COURT:  Now, you're not limited to that so search your notes, etcetera.  You're not limited to that re-redirect.

            If you have any other questions you might have neglected or that you want to ask, please consult your team for the City, consult Intervenors, see if there's any questions.

**236**

You're not limited to the redirect, okay?

Ms. Myers, any other questions?

**MS. MYERS:**  No further questions, --

**THE COURT:**  On behalf of --

**MS. MYERS:**  -- Your Honor, thank you.

**THE COURT:**  -- the City.

**MR. MCRAE:**  No, Your Honor.

**THE COURT:**  Okay.  Thank you very much.  If we need you, we'll certainly find you.  Thank you for your courtesy.  Watch your step down.  There's a (inaudible).

Okay.  Counsel.

**MS. MITCHELL:**  Thank you, Your Honor.  The Plaintiff calls Matt Szabo to the stand.

**THE COURT:**  All right.  Before doing so, we've been in session a while.  Could we take about a 15-minute recess, --

**MS. MITCHELL:**  Sure.

**THE COURT:**  -- get set up at that time?  All right.  We're in recess then for 15 minutes.  Thank you.

And, counsel, once again, the same courtesy.  You'll go as far tonight as you'd like to.  If you're going after 6:00 o'clock, let me make a call to the chief judge.

Back in my court we could go to 10:00 o'clock.  Here, they shut off the lights and air apparently.  I'm just kidding you.  But they do shut off the air about 6:00 o'clock, okay?

//

MS. SPEAKER: Candlelight.

THE COURT: So I need permission to keep that on.

(Recess taken at 3:21 p.m.; reconvened at 3:38 p.m.)

THE COURT: All right. And, counsel, we're -- are we back on CourtSmart? We're back on the record. All counsel are present and, counsel, if you'd like to call your next witness.

MS. MITCHELL: Thank you, Your Honor. Plaintiff calls -- oh, excuse me, before we get started, may Ms. Rafferty be excused?

THE COURT: Oh, absolutely, yeah.

MS. MITCHELL: Thank you.

THE COURT: Subject to recall if the Court has questions concerning A&M or the audit or if the parties do.

MS. MITCHELL: Thank you, Your Honor. Plaintiff calls Matt Szabo as an adverse witness.

THE COURT: All right. Thank you. And, sir, if you'd step forward please. Karlen is the clerk, if you'd raise your right hand, she's going to administer an oath there.

THE CLERK: You can stop there. Please raise your right hand.

MATT SZABO, PLAINTIFFS' WITNESS, SWORN

THE COURT: Thank you, sir. If you'd approach the witness box and as you come up the stairs, be careful. There's a four inch rise. And, sir, if you'd be seated and face the parties. Would you state your full name, sir?

THE WITNESS:  My name is Matt Szabo.  Full name is Matthew William Szabo.

THE COURT:  And would you spell your last name, sir?

THE WITNESS:  S as in Sam, Z as in zebra, A-B as in boy, O.

THE COURT:  Thank you.  Direct examination please on behalf of LA Alliance.

MS. MITCHELL:  Thank you.

**DIRECT EXAMINATION**

**BY MS. MITCHELL:**

Q    Mr. Szabo, please briefly describe your current role.

A    Currently I am the City Administrative Officer for the City of Los Angeles.  That is a role which although unique to Los Angeles can be generally described as kind of a combination between a chief financial officer and a city manager, which general large cities are familiar with.  Not exactly entirely both of those roles, but it is very close to that.

Q    And prior to being appointed -- and excuse me, you were appointed CAO by the prior mayor, Mayor Garcetti; is that right?

A    Correct.

Q    And prior to that you were --

THE COURT:  Counsel, would you move that microphone just a little bit closer and speak just a little bit slower.

MS. MITCHELL:  Oh.  I have to move it closer.

Q    Prior to being appointed as CAO, you were in Mayor Garcetti's administration; is that right?

A    That's correct.

Q    And what was your role then?

A    I was the deputy chief of staff.

Q    And when were you appointed as CAO?

A    I was appointed CAO in May of 2021, confirmed and took office in July of 2021.

Q    What are your responsibilities as CAO when it comes to LA City's homelessness response system?

A    So there's a number of responsibilities.  Number one, as the office and city official that reports equally under the city charter to the mayor and the city council I have represented the mayor and the city council in negotiations related to this case and this settlement, along with the city attorneys of course, representing them from a policy perspective.

Also my office, of course, is the principal office making the financial recommendations to the Mayor and the council, who's responsible for the city budget.  We also, due to the nature of the management role that our -- that the CAO has, in coordinating other departments we do have some role in the City's homelessness response, some of the functions were placed in my office, principally on the financial side, but we have some other roles as well as it relates to supporting some

Szabo - Direct / By Ms. Mitchell                          **240**

outreach efforts.

Q    And what are those roles relating to supporting outreach efforts?

A    We have staff that work with council offices that coordinate Care and Care Plus operations.  We do not run the Care and Care Plus operations, but we coordinate the outreach and other departments around those efforts.  We also coordinate with other departments on the RV operations, vehicle and RV operations for vehicle and RV reduction.

Q    And when you said coordinating departments, are you talking, was that the outreach, the Care, Care Plus reaching out with council districts, et cetera that you just described?

A    So we coordinate with the council districts and then there are outreach, there's an outreach component with -- through LAHSA.  And then the -- with Care and Care Plus it's primarily sanitation and LAPD also has a role.

     So we coordinate across those departments and agencies for the execution of those operations.

Q    But your office, the City -- the Office of the City Administrative Officer does not have the oversight role of LAHSA; is that right?

A    We do not.

Q    And who -- which department has that?

A    Well, the oversight role of LAHSA sits with the Board of Commissioners.

Q    Okay.  And --

A    Of LAHSA.

Q    And which city department is responsible for reviewing invoices and working directly with LAHSA on their shelter and the financing?

        MR. MCRAE:  Objection, vague.

        THE COURT:  Overruled.  Do you understand the question that was asked?

        MS. MITCHELL:  Let me ask a more direct question.

        THE COURT:  It'll be reasked.

        MS. MITCHELL:  Thank you.

BY MS. MITCHELL:

Q    What role does the LAHD, LA Housing Department have in oversight of LAHSA, if any?

A    So the Los Angeles Housing Department holds the contracts with LAHSA, so LAHSA -- we contract with LAHSA, LAHSA contracts with service providers in almost all cases.  There are some cases in which we direct contract, but -- so that is the relationship.  The housing department holds, manages, maintains, reviews the contract and the compliance with the contract with LAHSA and then LAHSA does the same with the service providers.

Q    Okay.  So the LA Housing Department holds the contract, CAO's office coordinates the departments.  Is there communication between the Housing Department and the CAO's

office regarding what services have been provided?

      **MR. MCRAE:** Excuse me, vague.

      **THE COURT:** Overruled. I'm sorry, overruled, you can answer that question.

      **THE WITNESS:** There's constant communication between the CAO and Housing.

**BY MS. MITCHELL:**

Q   My question was a little bit more specific though. My question was, was there communication between the CAO's office and the Housing Department about what services have been provided confirming that the contracts are being fulfilled?

A   I mean, I would need you to be more specific about that. That's -- there are multiple contracts, multiple services that are provided, so I would need you to be more specific.

Q   Okay. Are there times when there are communications between the CAO's office and the Housing Department about whether or not the services are being fulfilled relating to the contracts?

      **MR. MCRAE:** Objection, vague.

      **THE COURT:** Do you understand the question?

      **THE WITNESS:** I understand the question.

      **THE COURT:** All right. Overruled, you can answer the question.

      **THE WITNESS:** The answer is yes, but again, without greater specificity it's -- you know, there's constant

communication.  We communicate with the Housing Department on a broad number of issues.

**BY MS. MITCHELL:**

Q    Showing you what has been marked as Exhibit 25.  This is Docket 429, this is the settlement agreement between LA Alliance the City of Los Angeles.  Do you recognize this document?

A    I do.

Q    You helped negotiate this document; is that right?

A    Correct.

Q    Turning to -- let's see, we're on page 10 of 28 according to the docket numbers.  Section 3.1, can you read this first paragraph for us starting with 3.1?

A    Out loud?

Q    Yes, please.

A    The City agrees to create a required number of housing or shelter solutions, which is equal to but in the City's discretion may be greater than the shelter and/or housing capacity needed to accommodate 60 percent of the unsheltered City shelter appropriate PEH within the City based on LAHSA's 2022 point end time count.

Q    And this is -- the term expires -- it's a five year term, right, for the agreement?

A    Yes.

Q    And do you recall that the Court issued the order

Szabo - Direct / By Ms. Mitchell                    **244**

approving this agreement on I believe it was June 13th of 2022.
Do you recall that?

A    I believe it was June 14th, but yes.

Q    June 14th, thank you for the correction.  And is it your
position that under the agreement the City is permitted -- oh,
and I'm sorry.

Ultimately the City came up with the 60 percent number to
which plaintiffs agreed, which was 12,915 shelter or housing
beds; is that right?

A    12,915 was the required number as determined by the 2022
point time count which is -- took place after the -- which was
released after the settlement was authorized by the Court.

Q    Thank you.  And the -- is it your position that the City
in order to fulfill the terms of this Section 3.1 could put up
all 12,915 beds on June 12th of 2027 and take them down on June
15th, 2027 and that would fulfill the terms of this agreement?

**MR. MCRAE:**  Objection, it's an incomplete
hypothetical.  It also calls for a legal conclusion.  It's also
vague as to who you is, whether it's him in his individual
capacity or some other capacity which he may not even have the
ability to represent if it's the latter.  So -- and a lack of
foundation to the extent that it stretches to that letter
interpretation of you.

**THE COURT:**  Overruled.  You can answer the question
please.

THE WITNESS:  That is a hypothetical which I would in my official capacity never recommend to the City of Los Angeles.  However, there are no interim deadlines within the settlement agreement.  We didn't agree to any and we wouldn't have agreed to any.  There are no interim deadlines.  The deadline to establish the beds is June of 2027.

BY MS. MITCHELL:

Q    And so my question to you again was, is it your position in your official capacity that in order to fulfill the terms of the contract the City would be able to put up all 12,915 beds on June 12th of 2027 and take them down on June 16th of 2027 and that would fulfill the terms of the contract.

MR. MCRAE:  Objection.  It calls for a legal conclusion.  It's an incomplete hypothetical, it lacks foundation and it's vague.

THE COURT:  Overruled.  You can answer the question please.

THE WITNESS:  My understanding is that the settlement, the obligations contained within the settlement, the settlement itself ends in June of 2027.  I believe that's what the document says.

Q    All right.  My document was a little bit different, though, Mr. Szabo.  My question was, is it the City's position or your position, in your official capacity, that the City could put up all 12,915 beds on June 12th, 2027 and take them

Szabo - Direct / By Ms. Mitchell                    **246**

down on June 16th, 2027 and that would fulfill the terms of this agreement?

MR. MCRAE:  Objection, calls for speculation, lack of foundation, calls for a legal conclusion, it's an incomplete hypothetical and relevance.

THE COURT:  Overruled.

THE WITNESS:  It's -- look it's my position is the settlement would not dictate the City's homelessness policy beyond June of 2027 should we comply with the obligations of establishing the 12,915 beds by that date.

MS. MITCHELL:  Your Honor, I'd ask the Court to direct the witness to answer the question.

MR. MCRAE:  Respect --

THE COURT:  No, you can reask the question, counsel. I'm not going to start directing witnesses.

**BY MS. MITCHELL:**

Q    I can reask it all day, Mr. Szabo.  My question is -- Mr. Szabo, I apologize.

My question is, is it the City's position that the City to fulfill the terms of this agreement which you helped negotiate and the City entered into, the City would be permitted to put up all 12,915 beds on June 12th of 2027, take them down on June 16th of 2027 and the City would have fulfilled its obligation under this agreement.

MR. MCRAE:  Same objections that it lacks foundation,

calls for a legal conclusion, it's vague in relevance and it's been asked and answered multiple times.

THE COURT:  Overruled.  You can answer the question, sir.

THE WITNESS:  I'm not going to concede to a preposterous hypothetical, but I -- my position is and what I have advised the council and the mayor is that our obligations are to establish 12,915 units by June of 2027 and that we should -- and that beyond that should we fulfill that obligation that we would have complied with the settlement and would no longer be under the term of the settlement.

**BY MS. MITCHELL:**

Q    Why is it a preposterous hypothetical, Mr. Szabo?

MR. MCRAE:  Your Honor, this is bordering on argument and --

THE COURT:  What's argumentative, counsel?  Just restate it.

MS. MITCHELL:  Okay.

Q    Mr. Szabo, you just said that you're not going to answer a preposterous hypothetical.  Do you recall that answer that you just gave to me?

A    I do recall.

Q    Please describe to me what is preposterous about the hypothetical that I just posed?

A    Because we're talking --

**MR. MCRAE:** Same objection, Your Honor. It's not his -- it's counsel's hypothetical and this is -- it's not relevant quite frankly, given that it is a hypothetical.

**THE COURT:** Overruled. You can answer the question, sir.

**THE WITNESS:** Because we have a responsibility to the people of Los Angeles and the taxpayers to use their dollars appropriately and to go through whatever -- all of the effort and expense that would be required to establish 12,000 units of housing on one day only to then take them down three weeks later is, in my view, preposterous.

**BY MS. MITCHELL:**

Q    Referring you over to page 7 of 28, this section that starts whereas, do you see that section?

A    I do.

Q    And we have read this into the record over and over, so for the purpose of moving this forward, I will read it into the record now. Whereas, the purpose of this agreement is to substantially increase the number of housing and shelter opportunities in the City of Los Angeles and to address the needs of everyone who shares public spaces and rights of way in the City of Los Angeles, including both housed and unhoused Angelinos to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles.

**MR. MCRAE:** Your Honor, can we have the same courtesy

for this witness to get a physical copy of the settlement

agreement so he can read it?

          THE COURT:  Absolutely.

BY MS. MITCHELL:

Q    Sure.  Mr. Szabo --

          THE COURT:  Let's have someone bring that to him.

Q    -- do you see the iPad in front of you?

          MR. MCRAE:  No, no, I mean, a physical hard copy.

          THE COURT:  Well certainly.

          MR. MCRAE:  So let's --

          THE COURT:  Will somebody supply that to the witness?

          MR. MCRAE:  Yeah.

          MS. MITCHELL:  I can do that.

Q    So that you know, Mr. Szabo, all of the exhibits are

loaded in that iPad, you can click on the numbers and you can

scroll through if you'd like to.

          MR. UMHOFER:  Your Honor, may I approach?

          THE COURT:  Certainly.

          THE WITNESS:  Thank you.

Q    Would you like a minute to look through the agreement?

          THE COURT:  If you want, take a few moments and go

through it.

          THE WITNESS:  Okay.

     **(Pause)**

Q    Are you ready?

**MS. MITCHELL:**  Your Honor, may I proceed?

**THE COURT:**  You may proceed, thank you.

Q    Would you agree that putting up 12,915 shelter beds on June 12th of 2027 and then taking them down four days later on June 16th of 2027 would not achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles?

**MR. MCRAE:**  Your Honor, objection.  It's an incomplete hypothetical, it lacks foundation.  It calls for a legal conclusion.  It assumes that something in the recital is an obligation under the agreement, it's not relevant and it lacks foundation.

**THE COURT:**  Overruled.  You may answer, sir.

**THE WITNESS:**  This section that you've -- that you're highlighting is not a term of the agreement that binds the City.  It's a whereas clause, so I don't know.  I'm not -- I don't know how I can answer that question.

**BY MS. MITCHELL:**

Q    Okay.  So taking that off the screen, not referring to the agreement at all or the whereas clause or whether or not it's a recital, my question to you is, hypothetically if the City were to put up 12,915 shelter beds on June 12th of 2027 and take them down four days later on June 16th of 2027, would that achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles?

**MR. MCRAE:** Objection, it's argument. It lacks foundation. It's an incomplete hypothetical and it's talking about something two years from now.

**THE COURT:** Overruled. You can answer the question.

**THE WITNESS:** As proposed in your hypothetical which is not reality at all because we are well into this agreement and have established thousands of units and have housed thousands of people. It would be inconsistent.

**BY MS. MITCHELL:**

Q   Meaning it would not achieve a substantial and meaningful reduction on sheltered homelessness to do so.

**MR. MCRAE:** Objection also that the terms are undefined and therefore they are vague in addition to it being an incomplete hypothetical and to the extent it calls for a legal conclusion, objection.

**THE COURT:** Overruled. You can answer the question.

**THE WITNESS:** Within the frame of your hypothetical which is not in anywhere -- it just is not consistent with reality, yeah, I would agree.

Q   Thank you. Let's turn over to the same exhibit, Exhibit 25. Let's scroll into section 5, that says milestones and deadlines. And looking specifically at Section 5.1, can you read that section into the record please?

A   5.1, within 30 days from the date information from the 2022 pit count is confirmed by LAHSA and released, the City

Szabo - Direct / By Ms. Mitchell                    **252**

will calculate the required number and provide its calculation with the plaintiffs.  The parties agree to meet and confer in good faith to resolve any objections to the calculation of the required number raised by plaintiffs.  Any objection that cannot resolved by the parties may be heard by the Court if necessary.

Q    Now, Mr. Szabo, if you recall in 2022 the pit count was delayed being certified by HUD; is that right?

A    Correct.

Q    So the pit count was not released and I think officially approved by HUD until October of 2022.  Do you recall that?

A    Yes.

Q    And do you recall within 30 days of HUD releasing that information, the City calculated the required number and provided it to plaintiffs.

          MR. MCRAE:  Objection, lack of foundation, relevance.

          THE COURT:  Overruled.

          THE WITNESS:  I do recall that, yes.

BY MS. MITCHELL:

Q    Okay.  And so you would agree that the City met the requirement of 5.1; is that right?

          MR. MCRAE:  Objection, calls for a legal conclusion --

          THE COURT:  Overruled.

          MR. MCRAE:  -- lack of foundation.

THE COURT:  Overruled, you may answer the question, sir.

THE WITNESS:  I believe we did, yes.

BY MS. MITCHELL:

Q    Directing you now to Section 5.2, I'm not going to ask you to read this whole thing, but I'd like for you to read, starting at thereafter or here and read those first four lines.

MR. MCRAE:  Your Honor, is the count -- is the witness at liberty to read as much of the document in answering this question as he likes?

THE COURT:  Well, let's resolve the whole thing.  Why don't one of you as counsel or the witness read 5.2 in its entirety and then you can go back to it.

MS. MITCHELL:  Sure.

Q    Mr. Szabo, why don't you go ahead and read out loud 5.2 in its entirety.

A    Thereafter, the City will create plans and develop milestones and deadlines for the City's creation of shelter and housing solutions to accommodate a minimum of 60 percent of unsheltered City shelter appropriate PEH --

Q    Mr. Szabo, I'm sorry --

A    Yes.

Q    -- I know the Court's about to ask you to slow down a little bit because it's being recorded, thank you.

A    Okay.  60 percent of unsheltered City shelter appropriate

Szabo - Direct / By Ms. Mitchell   **254**

PEH in each council district as determined by the required number; 2) the City's plan for encampment engagement, cleaning and reduction in each council district; 3) the City's creation of shelter and/or housing to accommodate a minimum of 60 percent of unsheltered City shelter appropriate PEH in the City as determined by the required number; and 4) the City's plan for encampment engagement, cleaning and reduction in the City.

The City will provide the plans, milestones and deadlines to plaintiffs and the City and plaintiffs agree to work together in good faith to resolve any concerns or disputes about the plans, milestones and deadlines and will consult with the Court for resolution if necessary.

The City will provide a report setting forth the milestones and deadlines.  The parties agree that the City will promptly employ its best efforts to comply with established plans, milestones and deadlines.

Q    Thank you, Mr. Szabo.  Is it the City's position that the City did not have to promptly employ its best efforts to comply with established plans, milestones, and deadlines?

**MR. MCRAE:**  Objection, lack of foundation, calls for a legal conclusion.

**THE COURT:**  Overruled.

**MS. MITCHELL:**  Actually, you know what, Your Honor, let me withdraw that and I'll ask another question.

//

Szabo - Direct / By Ms. Mitchell                **255**

**BY MS. MITCHELL:**

Q    The City did, in fact, create plans and develop milestones and deadlines under Section 1 for the City's creation of sheltered housing solutions to accommodate the 60 percent of unsheltered City shelter appropriate PEH; is that right?

A    Correct.

Q    Showing you Exhibit 24, do you recognize this document?

A    I do.

Q    And what is it?

MR. MCRAE:  Your Honor, this is on the screen.  I don't think I can read this, I don't know if the Court can.

MS. MITCHELL:  Okay.  We can talk about it overall.

THE COURT:  I'm familiar with this document, counsel.

MR. MCRAE:  Okay.  I'm sorry, I --

THE COURT:  Do you have the document?

MR. MCRAE:  Yeah, but it's --

THE COURT:  Do you have a hard copy?

MR. MCRAE:  Oh, let me ask my team.

MS. MITCHELL:  All the documents were provided to counsel, Your Honor.

THE COURT:  Okay.  We've got seven counsel here.

MS. MITCHELL:  We do have an iPad if you want to --

THE COURT:  Let's find that copy, okay?  All right.

MR. MCRAE:  Thank you.

THE COURT:  We'll be with you in just a moment.  Let

EXCEPTIONAL REPORTING SERVICES, INC

them find that copy and let's give a hard copy for you all,

too, so you're not struggling with the screen.

THE WITNESS:  Okay.

THE COURT:  I'd like a hard copy for the witness also please.

BY MS. MITCHELL:

Q    Mr. Szabo, would you be able to read a hard copy?  Would you like a hard copy of the document?  It's also accessible on the iPad if that's easier for you.

A    If you're going to ask me to read out loud anything on this document --

Q    I will not.

A    Okay.  Then I think I'm okay.

Q    Okay.  I'll zoom in if I'm asking you to actually read anything.

A    Okay.

MS. MITCHELL:  May I continue, Your Honor?

THE COURT:  Please.

Q    Okay.  Mr. Szabo, what is Exhibit No. 24?

A    It is the City's submission of the milestones over the course of the five years for each council district and I believe the bottom has the totals.

Q    Okay.  And I'm just going to blow this up so that we can all see it a little bit better.  This says Road Map on the top left and then on the -- immediately next to it it says Alliance

Szabo - Direct / By Ms. Mitchell                    **257**

milestones.  Do you see that?

A    Yes.

Q    Now, it's a little confusing I think because we have all been referring to the City/County MOU as the Road Map, and the LA Alliance/City agreement as the Alliance agreement is two separate things.  And so can you explain to me the difference or what this was intended to convey with the Road Map on the left and the Alliance milestones on the right?

        **MR. MCRAE:**  Objection as to the preamble incorporated into the question as lacking foundation.

        **THE COURT:**  No, overruled.  The Road Map was used in a number of different ways in this matter, so please.

        **THE WITNESS:**  You know here's where I would like to -- is there a physical copy?

**BY MS. MITCHELL:**

Q    Yeah.  And you can also -- do you want to --

        **THE COURT:**  Yeah.

Q    You can just hit No. 24 and that way you can zoom in.  I don't think a physical copy is going to --

        **THE COURT:**  You know I would feel more comfortable and so would you if you had a copy as a courtesy.  Let's get you a copy.  Counsel, we've got lots of Xerox machines some place in the courthouse and I'm sure counsel has an extra copy between all of the parties, as a courtesy I'd like the witness to have that copy in front of him.

MS. MITCHELL:  No problem, Your Honor, thank you.

(Pause)

THE COURT:  You know, let me give him the Court's copy to save some time.  I'm familiar with these documents. Okay?  Would that help?

THE WITNESS:  Yes.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  And just return that to me after.

THE WITNESS:  Yes, just as soon as -- okay.

BY MS. MITCHELL:

Q    Mr. Szabo, while you're reviewing it are you okay if I ask another question I think that might clarify?

A    Please.

Q    Is it true that at the time sort of all these agreements were collectively referred to as Road Map and then later they were separated in the way that the City was referring to the Road Map as the City/County MOU and the Alliance milestones separately?

MR. MCRAE:  Objection.

THE COURT:  For the LA -- just a moment, for the LA Alliance agreement?

MS. MITCHELL:  Right.

MR. MCRAE:  Objection, assumes facts, again as to the preamble, lacks foundation and to the extent that it calls for

a legal conclusion.

THE COURT:  No, overruled, I think it'll be helpful to both parties.  It's going to cure this confusion between the Road Map which is the settlement agreement of the 6,800 and the use of the word Road Map in the LA Alliance agreement and I'm going to constantly ask each of you on direct or cross to keep designating that, because Road Map is used in the LA Alliance agreement also.

And there's no question.  Let them ask a question again, okay.  So, counsel, reask your question again please.

**BY MS. MITCHELL:**

Q    Can you explain why it says Road Map on the left with Road Map interventions, open and occupiable on the left-hand side and then on the right-hand side it says Alliance milestones?

A    So to my recollection we included or it was included because I believe -- no, I'm sorry.  Let me restate that.

We included that column to reflect the progress and commitment by each council district up until that point.  So I think it was for context that we were providing as an example in Council District 14 acknowledging that even though Council District 14 had a -- that their goal, even though it wasn't -- they don't have a goal in -- a council district specific goal in the settlement, but their portion of the goal was fairly extensive.  We wanted to acknowledge that they had already engaged in significant efforts in establishing housing under

Szabo - Direct / By Ms. Mitchell                    **260**

the Road Map.

THE COURT:  Let's go to 14, because it's not on the screen.

THE WITNESS:  Oh, I'm sorry.

THE COURT:  For just a moment, as a courtesy to all the parties.  Thank you.  That would be at the time, Kevin De Leon's district; is that correct?

THE WITNESS:  Correct.

THE COURT:  Okay.  Now, counsel, I've asked you constantly to get the council person -- well, I'm familiar with it.  Please continue.  I know who the council people were at the time.

**BY MS. MITCHELL:**

Q    So at the time I think Council District 15 was Council member was Buciano; is that right?

A    Correct.

Q    So on the left in gray we have numbers that indicate the Road Map beds that had been opened and occupiable at the time; is that right?

A    Correct.

Q    And then the number next to it in blue is the identification of the council district; is that correct?

A    Correct.

Q    All right.  And then going further over it says Alliance milestones at the top, do you see that?

Szabo - Direct / By Ms. Mitchell      **261**

A     I do.

Q    And is this document intended to fulfill the City's obligations under 5.2 to provide the -- to develop the plans, milestones, and deadlines and provide that to the plaintiff?

        **MR. MCRAE:**  Objection, calls for a legal conclusion and lacks foundation as to fulfilling obligations under a settlement agreement.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  This was the document that we submitted in compliance with 5.1.1 -- wait.  I'm sorry, 5.1 was the other one.  5.2.

**BY MS. MITCHELL:**

Q    So Exhibit 24 was the plans, milestones and deadlines and it was intended to satisfy the City's obligation for Section No. 1.

A     Correct.

        **MR. MCRAE:**  Objection, I'm sorry, I thought the question was finished, was it?

        **MS. MITCHELL:**  No, it was not.

        **MR. MCRAE:**  Well, he answered, so can we redo that?

        **MS. MITCHELL:**  Sure.  Let me be more specific or I guess I'll reask the question.

Q    So the -- those plans and milestones and deadlines were developed and provided to the plaintiff in order to satisfy the City's obligatons under 5.2.1 and 5.2.3; is that right?

EXCEPTIONAL REPORTING SERVICES, INC

MR. MCRAE: Objection, lack of foundation, calls for a legal conclusion.

THE COURT: Overruled, you may answer, sir.

THE WITNESS: Correct, yes.

BY MS. MITCHELL:

Q    And at the time there was no plan for encampment engagement, cleaning and reduction in each council district or city-wide as required by 5.2.2 and 5.2.4; is that right?

MR. MCRAE: Objection, foundation, relevance.

THE COURT: Overruled. You may answer, sir.

THE WITNESS: We had not developed those plans at the time of submitting this document.

Q    Okay. That was ultimately submitted to the plaintiffs and to the Court a little more than a year later after we filed the motion for sanctions in like January or February of last year; is that right?

MR. MCRAE: Your Honor, objection, this is gratuitous. The Court has already said that's the origin of the encampment reduction milestones. So it's cumulative, it's gratuitous and not relevant.

THE COURT: Overruled. Do you recall the question, sir? If not, they can restate it.

THE WITNESS: Can you restate the question?

//

//

Szabo - Direct / By Ms. Mitchell **263**

**BY MS. MITCHELL:**

Q   Sure.  So the City's plans, milestones and deadlines for encampment engagement, cleaning and reduction was not presented to and finalized for presentation to the plaintiffs until actually I think it was January of 2024; is that right?

**MR. MCRAE:**  Same objections.

**THE COURT:**  Overruled.

**THE WITNESS:**  That's my general recollection but I don't have the documents in front of me.

**BY MS. MITCHELL:**

Q   Now, in 5.1 is the use of the phrase the City will, do you see that?

A   I do.

Q   And you agree that that created an obligation that the City had to comply with; is that right?

**MR. MCRAE:**  Your Honor, there's a lack of foundation, it calls for a legal conclusion.

**THE COURT:**  Overruled.

**THE WITNESS:**  We agreed to this term.

Q   Okay.  And in 5.2 there's another phrase, the City will create plans and develop milestones.  You agree that also created a legal obligation by the City; is that right?

**MR. MCRAE:**  Same objection, Your Honor, lack of foundation and it calls for a legal conclusion.

**THE COURT:**  Overruled, you may answer the question,

sir.

THE WITNESS:  We agreed to that term as well.

Q    Further down on line 19 there's a statement, the City will provide plans, milestones and deadlines to plaintiffs and you agree that that established an obligation for the City to then provide the plans, milestones and deadlines to the plaintiff; is that rights?

MR. MCRAE:  Same objection, lacks foundation, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  We agreed to that.

BY MS. MITCHELL:

Q    Now further down on line 23, there's a statement, the City will provide a report setting forth the milestones and deadlines and you ultimately did that even if the encampment stuff took a little bit longer; is that right?

A    Yes, correct.

Q    And then finally on line 34 there's a statement, the parties agree that the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines.  Do you see that line?

MR. MCRAE:  Objection, Your Honor, counsel said line 34.  The lines don't go to 34.  I think counsel meant 24.

THE COURT:  Just restate the question, counsel.

Q    Sure.  On line 24, there's a sentence the parties agree

the City will promptly employ its best efforts to comply with established plans, milestones and deadlines.  Do you see that?

A    I do.

Q    And do you agree that this sentence imposed an obligation on the City to employ its best efforts to comply with the established plans, milestones and deadlines that we see in Exhibit 24?

        **MR. MCRAE:**  Objection, calls for a legal conclusion and lack of foundation.

        **THE COURT:**  Overruled.  You may answer, sir.

        **THE WITNESS:**  Yes, to the extent that best efforts isn't defined, we did agree to best efforts.

**BY MS. MITCHELL:**

Q    The City agreed that it would promptly employ its best efforts to comply with the milestones and deadlines that the City itself provided for itself in Exhibit 24, correct?

        **MR. MCRAE:**  Asked and answered, Your Honor.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Correct.  Correct.

Q    Moving on to the A&M assessment previously identified as Exhibit 23.  Have you had an opportunity to review this exhibit?  Excuse me, this assessment which is labeled Exhibit 23.

A    I have, yes.

Q    And you read the conclusion on page 4 that there was poor

data quality integration.  Did you see that?

MR. MCRAE:  Your Honor --

THE COURT:  Just a moment.  Turn to page 4 on the screen --

MS. MITCHELL:  Sure.

THE COURT:  -- so we're all looking at the same document.  And your question again was?

BY MS. MITCHELL:

Q    I misread it.  You read the conclusion that there was poor data quality and integration.  Did you see those findings?

A    I did see those findings.

Q    Did you see that they found insufficient financial accountability?

MR. MCRAE:  Your Honor, there's an entire sentence after that.  It's -- can the witness read the entire sentence to its conclusion.

MS. MITCHELL:  I object to counsel directing the witness, this is cross-examination.

THE COURT:  You have cross-examination, redirect and recross, so.

Q    Thank you.  You may answer, Mr. Szabo.

A    The question is do I see that -- those words?

Q    Do you see that there was a finding that there was insufficient financial accountability by A&M in this assessment?

Szabo - Direct / By Ms. Mitchell                    **267**

A    I see that.

Q    And that led to an inability to trace substantial funds allocated to City programs.  Do you see that?

        **MR. MCRAE:**  Objection, assumes facts that that's true it's what it said.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I see that.

**BY MS. MITCHELL:**

Q    Do you see the conclusion that there was fragmented data systems across LAHSA, the City and the County?

A    I see that.

        **MR. MCRAE:**  Objection, relevance.

        **THE COURT:**  Overruled.

Q    Are you aware that A&M came to the conclusion that it ultimately was not able to verify the beds that were established as a result of the Road Map agreement?

        **MR. MCRAE:**  Objection, relevance to the extent that these are not -- excuse me, relevance because they're not obligations under the settlement agreement.  The document speaks for itself and lack of foundation.

        **THE COURT:**  Overruled.  You may answer the question, sir.

        **THE WITNESS:**  I'm aware that that is what they included in their report.

Q    Are you --

**EXCEPTIONAL REPORTING SERVICES, INC**

A    Although I challenge their conclusions based on the statements they made throughout the document that that questioned the validity of their conclusions.  So I acknowledge that I read the words on the page, but I'm not acknowledging the conclusion or the conclusion was arrived to in an appropriate manner.

Q    You disagree with the conclusion, there's poor data quality and integration; is that right?

A    I disagree that they came to that conclusion to an appropriate manner.

Q    Do you think there's poor data quality and integration within the homelessness response system, specifically relating to the Road Map, the Alliance and the Inside Safe programs as reviewed by A&M?

         MR. MCRAE:  Objection, compound and it lacks relevance.  They're not terms of the Alliance settlement agreement.

         THE COURT:  Overruled.  You may answer the question, sir.

         THE WITNESS:  No, I don't agree with that and that is not to say that there can't be improvements, there can always be improvements, but I don't agree with their findings in large part because their findings did not follow generally accepted standards that would allow them and allow the consumers the information that they published to be comfortable with the

validity and objectivity of their analysis.

**BY MS. MITCHELL:**

Q    Mr. Szabo, do you agree that there's poor data quality and integration within the Los Angeles homeless in system (phonetic)?

          MR. MCRAE:  Objection, vague as to what that is and it lacks foundation and relevance.

          THE COURT:  Overruled, you can answer the question, sir.

          THE WITNESS:  And I'm not going to make an assessment of the entire homeless in system because when you're talking about the homeless in system you're talking about multiple levels of government that are not within the purview of the City.  And you're talking about the city, you're talking about the county, you're talking about the state, you're talking about the federal government, you're talking about non-profits.  And there's certainly -- there can be improvements in any effort, but I don't agree with the findings and conclusions made in the A&M report.

Q    Do you believe that the data quality and integration within the City of Los Angeles is good?

          MR. MCRAE:  Objection.  Vague.

          MS. MITCHELL:  Well, let me ask a better question.  Thank you.

//

Szabo - Direct / By Ms. Mitchell                **270**

**BY MS. MITCHELL:**

Q    Do you believe that the data quality and integration within the City of Los Angeles related specifically to homelessness response systems as reflected in Roadmap and Alliance is good?

**MR. MCRAE:** Objection.  Relevance, lack of foundation, not an obligation under the Alliance settlement agreement.

**THE COURT:** Overruled.  You may answer, sir.

**THE WITNESS:** So, excuse me.  I mean, good is not generally a standard that I use to make assessments.  However, I'm confident in the numbers that are reported by my office.

Q    Are you confident in the numbers reported by LAHSA?

**MR. MCRAE:** Objection.  Lack of foundation, relevance.

**THE COURT:** Overruled.  You may answer, sir.

**THE WITNESS:** With the numbers that we have an opportunity to review and provide feedback to, I'm confident in what is within our -- within the purview of the City administrative office.  So to the extent that we work with LAHSA or outside partners and have an opportunity to review the data, although we may not own and control the data, if we're reporting the data, I'm confident in the data.

//

//

**BY MS. MITCHELL:**

Q   My question was a little bit different, though.  Are you confident in the data quality and integration within LAHSA as reported to the City, that that is good, accurate data?

**MR. MCRAE:**  Objection.  It's vague.  It lacks foundation.  It's not relevant.

**THE COURT:**  Overruled.  You may answer, sir.

**THE WITNESS:**  And I believe I answered the question.  I don't understand the difference in the question.  It's -- you're asking me -- if you're asking me to comment on all data produced by LAHSA, I'm not -- I can't make that assessment.  If you're asking me to comment on data that we have the opportunity to review for the purposes of reporting, for the purposes of complying with the obligations of the settlement, I'm confident in that data.  Yes.

**BY MS. MITCHELL:**

Q   And have you been out to check interim sites to determine whether or not services are being provided?

**MR. MCRAE:**  Objection.  Lack of foundation that that would be the responsibility of his position, to physically go out and do that, and relevance, and it's vague.

**THE COURT:**  Overruled.  But I'm not certain that as the CAO, he would be going out personally, counsel, maybe members of his staff.  I don't know.  But I wouldn't expect the CAO necessarily to personally check.  You can answer the

question about whether you personally check or not.

THE WITNESS:  I have not personally conducted compliance site visits.

Q    Have members of your office personally conducted site visits to confirm that services are being provided appropriately pursuant to the contracts?

MR. MCRAE:  Objection.  Vague.  Which contracts, with whom, over what time, lacks foundation, it calls for speculation and relevance.

THE COURT:  I'm also -- is this as to the LA Alliance agreement and the Roadmap agreement, or is this an overall question as to both?

MS. MITCHELL:  I think it's an overall question as to both to the extent this conclusion was an overall conclusion as to both Roadmap and Alliance.

THE COURT:  All right, overruled.  You can answer the question, sir.

MR. MCRAE:  I renew my objections.

THE COURT:  Thank you.

THE WITNESS:  There are -- there are members of the CAO staff which do -- that do work in the field, so I can't -- I can't say definitively whether -- whether they have or they haven't as it relates to, for the purposes of -- for the purposes of physically verifying whether services have been, are being delivered, that would not be their -- that would not

Szabo - Direct / By Ms. Mitchell                                  **273**

be their responsibility directly.

There are other measures that we have in place to -- to validate -- to validate the data, and it typically is not physical visits.  We're talking -- these are analysts that are reviewing and validating reports that are submitted.

**BY MS. MITCHELL:**

Q   They're reviewing reports and invoices, is that right?

A   In part, yes.

Q   Do you see -- do you disagree with the conclusion there's insufficient financial accountability which led to an inability to trace substantial funds allocated to City programs?

**MR. MCRAE:**  Objection, again, it's fragmented. There's -- it lacks foundation and relevance, and it's vague.

**THE COURT:**  Overruled.  You can answer the question, sir.

**THE WITNESS:**  I don't -- I am not convinced that in the areas of the report where A&M determines that there's insufficient anything, it's -- it reads to me like they did not fully either have the time to or capacity to understand what they were looking at.  So I don't agree, and I will not agree to any of those conclusions.

I think they received a lot of data.  I think they did their best to report on what they were seeing.  But I think, and they even admitted as such that some of the information, they didn't have the capacity to fully absorb and

**EXCEPTIONAL REPORTING SERVICES, INC**

understand, and even acknowledge that they weren't making findings that the data was inaccurate.  But really this is a reflection of their own -- the limitations of their own capacity to conduct a review which was not an audit.

**BY MS. MITCHELL:**

Q    Mr. Szabo, it is March, excuse me, May 28th of 2025, and the City has had this assessment since March, at least March 6th of 2025.  Is that right?

A    Well, if you're talking about the drafts that they released before there was opportunity to comment, then I suppose yes.

Q    And the City had an opportunity to dispute or respond to the assessment findings and did not.  Is that right?

        **MR. MCRAE:**  Objection, Your Honor.  It's vague as to context, not in an evidentiary hearing.

        **THE COURT:**  Overruled.

        **MR. MCRAE:**  And it also lacks foundation.

        **THE COURT:**  Overruled.  You can answer the question, sir.

        **THE WITNESS:**  I wouldn't be the person responsible for that.  So whether the City attorney's office issued a response, I don't -- I don't know.

**BY MS. MITCHELL:**

Q    Did you personally work on anything, any type of response or objection over the last nearly three months to this

Szabo - Direct / By Ms. Mitchell                    **275**

assessment?

          **MR. MCRAE:**  Objection.  Lacks foundation, relevance.

It's also vague.

          **THE COURT:**  Overruled.  You can answer the question,

sir.

          **THE WITNESS:**  To this Court, no.

Q    Did anybody in your office work on any type of response to

this assessment for the purposes of providing it in court?

          **MR. MCRAE:**  Objection.  Lacks foundation, relevance.

          **THE COURT:**  Overruled.  You can answer the question,

sir.

          **THE WITNESS:**  Not for the purposes of providing a

response in court.  Responsibility, in my view, is to the

decision makers, to the mayor and the council, and so we

certainly provided our assessment, but not in a formal way in

this Court.

**BY MS. MITCHELL:**

Q    Going back to the question on the key findings that's up

on the screen, the insufficient financial accountability, do

you believe that there is sufficient financial accountability

within LAHSA?

          **MR. MCRAE:**  Objection.  Vague.  As to what issue,

over what time, and relevance?

          **THE COURT:**  I'm going to sustain that, counsel.  I

think it's the -- well, this is a general finding, but it's to

the Roadmap and LA Alliance programs.  So just restate the question.

MS. MITCHELL:  Thank you, Your Honor.

Q   Do you believe there was sufficient financial accountability within LAHSA during the period of time of this look back from 2020 to 2024 as related to the Roadmap and Alliance programs?

MR. MCRAE:  Objection.  Vague, lack of foundation, and relevance.

THE COURT:  Overruled.

THE WITNESS:  The reports that my office is responsible for issuing to the council and to this court, to the City council and the mayor and to this court.  I am confident in the integrity of that data, whether that data was sourced within the City or with partners.

BY MS. MITCHELL:

Q   Have you heard Monica Rodriguez refer to LAHSA's data as the merry-go-round from hell?

MR. MCRAE:  Your Honor, relevance and hearsay.

THE COURT:  Yeah, I think now we're getting into some comments by council members, and that also can work towards the Apex Doctrine.  I'm a little concerned about getting into different council members bickering back and forth or their respective views, counsel.

So that also came in through another witness, I

believe, and I don't think that this witness necessarily needs to be put in that position.

**MS. MITCHELL:**  Your Honor, I believe this was the Court's order specifically that Mr. Szabo was to testify prior to us being able to talk to council members about what that phrase means.  Merry-go-round from hell was one of the ones that was cited.

**THE COURT:**  Well, if Mr. Szabo -- I'd like you to move on.  I'd like the evening to think about that for a moment, counsel.

**MS. MITCHELL:**  Thank you, Your Honor.

**THE COURT:**  And you can take a recess if you'd like to, but I'd like to mull that over for a little while.

**MS. MITCHELL:**  I'm happy to continue and come back to this, Your Honor.

**THE COURT:**  Why don't you?

**MS. MITCHELL:**  Thank you.

**BY MS. MITCHELL:**

Q    So a moment ago, Mr. Szabo, you noted that your obligation was to provide, I think it was, advice to the mayor and to the council on these issues; is that right?

A    I was referring to my assessment of the A&M review.

Q    And you provided that -- was it like a written assessment?

**MR. MCRAE:**  Objection.  Relevance.

**THE COURT:**  Would you repeat that, counsel?

**MS. MITCHELL:** Yes. Was it a written assessment that you provided to the mayor and to the council on this assessment?

**THE COURT:** Overruled. You can answer the question, sir.

**MR. MCRAE:** Objection to the extent it also gets into deliberative process privilege or attorney/client privilege.

**THE COURT:** As presently phrased, counsel, I'm going to sustain the objection. The question is if this was made public or not. In other words, is there some document that's been filed?

**MS. MITCHELL:** I don't know if there is or not.

**THE COURT:** You can ask.

Q   Mr. Szabo, you made an assessment of this report and provided it in some capacity to the mayor and to the council; is that right?

A   Not in a formal way, no.

Q   So there's nothing written about your assessment of this report?

A   No. We did not issue a report and not in a formal way.

Q   And so was it an oral report to the city council and to the mayor of your assessment of this report?

**MR. MCRAE:** Same objections, Your Honor, to the extent this is encroaching on --

**THE COURT:** Overruled, as long as we're not getting

into the content of that.  You can answer if this was an oral report.

THE WITNESS:  I have not issued a formal report on the contents of the A&M audit, written or verbal.

**BY MS. MITCHELL:**

Q    Have you spoken to the mayor or any members of the council about this report?

MR. MCRAE:  Objection.  Relevance and lack of foundation as far as how that could possibly be probative of whether there would be a breach of the settlement agreement.

THE COURT:  Without getting into the content, you can answer that question.  Overruled.

THE WITNESS:  I have.

Q    Okay.  And have you spoken -- again, without getting into the content, have you spoken to the mayor about your assessment of this report.

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't recall if I've spoken to the mayor directly.

**BY MS. MITCHELL:**

Q    Have you spoken to Monica Rodriguez regarding your assessment of this report?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

Szabo - Direct / By Ms. Mitchell                    **280**

THE WITNESS:  I don't recall.

Q    Specifically, which council members have you spoken to with regard to this --

A    I do not recall.  I talk to the members of the council on a daily basis, and we discuss a broad range of topics, and I will not be able to recall to whom and at what time or what dates I may have discussed the contents of this report.

Q    Okay.  So taking a step back, to your knowledge, has anybody within the City prior to the beginning of this hearing produced anything formal in the way of an objection or a response to this report?

MR. MCRAE:  Objection. Vague.  Assumes there was an obligation to do so.  Relevance.  It lacks foundation.

THE COURT:  Overruled.  You can answer that question, sir.

THE WITNESS:  We haven't.  But I will say that for -- you know, this was not something that -- I mean, this is an assessment.  I don't view it as particularly actionable, and it certainly wasn't -- a response certainly wasn't required.

BY MS. MITCHELL:

Q    Showing you the next page over, do you see this finding there was a disjointed continuum of care system?

MR. MCRAE:  Your Honor, can I have a standing objection on relevance grounds to the entire line of exchange on the assessment, Exhibit 23?

Szabo - Direct / By Ms. Mitchell                **281**

THE COURT:  Certainly.

MR. MCRAE:  Thank you.

THE WITNESS:  I do see that, yes.

Q    Okay.  Do you agree that there's a disjointed continuum of care system?

MR. MCRAE:  Vague.  Relevance.  Lack of foundation.

Q    Let me ask a more specific question, Your Honor.  Do you agree that there's a disjointed continuum of care system as it relates to the Alliance program, the Roadmap program, and Inside Safe?

MR. MCRAE:  Objection.  Compound, relevance, lacks foundation, vague.

THE COURT:  Overruled.  You can answer the question, sir.

THE WITNESS:  I'm not in a position to make that assessment, but this is exactly the type of finding that I have a problem with because it is written as an expression of an opinion, and everybody has an opinion about homelessness. Everyone in this courtroom has an opinion about homelessness, but this is based on their assessment, their feeling, what they may have discovered through the process of finding out and learning the things that they were learning through this process.

They even say potential inequities.  They didn't make a finding of inequities.  They're just talking about things

**EXCEPTIONAL REPORTING SERVICES, INC**

that may or may not be the case, that I think goes back to the limitations of their own research and reporting.

**BY MS. MITCHELL:**

Q    How many team members were involved from A&M in this assessment, to your knowledge?

MR. MCRAE:  Relevance and lack of foundation.

THE COURT:  Would you restate that question, counsel?

MS. MITCHELL:  Sure.  How many team members, to your knowledge, were involved in creating this assessment over the last 11 months?

MR. MCRAE:  Relevance and lack of foundation.

THE COURT:  If you know.

THE WITNESS:  I don't know.  I mean, I'm assuming there's more people that work on this that have shown up.  I don't know.

**BY MS. MITCHELL:**

Q    So you don't know whether there was sufficient capacity within A&M to review these and understand these issues?

MR. MCRAE:  Objection.  Assumes that capacity is merely the number of people working as opposed to capability of processing and understanding the information.

THE COURT:  Overruled.

THE WITNESS:  I think in their own report they acknowledged it.  They said in a number of occasions we weren't able to identify or the manner in which the data was made

Szabo - Direct / By Ms. Mitchell **283**

available made it difficult to come to a conclusion, et cetera, et cetera.

I also don't know the extent of their capacity because I was not interviewed.  So I didn't have direct interaction with them in the creation of this report.

Q   So their statements that it was difficult to find data, for example, you interpret that as they had an inability, lack of capacity to make those determinations.

**MR. MCRAE:**  Mischaracterizes the witnesses' collective testimony.

**THE COURT:**  Overruled.  You can answer the question, sir.

**THE WITNESS:**  They were provided thousands of documents and it is true that the nature of the system requires they were looking at City documents, they were looking at documents from LAHSA, they were looking at documents from the county and other documents, federal funding, et cetera.  And in multiple instances in their own report, they indicated the challenge that they had in deciphering.  In some cases, they cited time limitations.  And on top of that, it was -- again, it was not a report, it was not an audit that adhered to any generally accepted standards.  And they went to great lengths to make it clear that this was not to be seen as a formal assessment on the condition of the City's finances, their financial documents.  And if it were, they would need to have

**EXCEPTIONAL REPORTING SERVICES, INC**

complied with generally accepted standards.

So the findings that they have are based on, as I read it, if you're asking my opinion about what I read, based on some of what they felt might be the case, based on some limited information that they were able to absorb and understand in creation of the report, but without any of the rigor and objectivity and independence required for a formal assessment. So I think in all of those ways, the capacity of this report was greatly limited.

**BY MS. MITCHELL:**

Q   Well, you said capacity of the report, but we're talking about capacity of A&M to understand the data, to understand the issues, and to synthesize them within these findings and recommendations, right?

**MR. MCRAE:** Objection. Mischaracterizes the witness's testimony.

**THE COURT:** Overruled. You can answer the question, sir.

**THE WITNESS:** I could also use the word limitation.

**BY MS. MITCHELL:**

Q   So when you said -- when one of the examples that you noted was that A&M said they had difficulty in deciphering and you interpreted that as a capacity issue, not that the data was wrong; is that right?

**MR. MCRAE:** It mischaracterizes the witness's

Szabo - Direct / By Ms. Mitchell **285**

testimony.

THE COURT:  Do you understand the question?

MR. MCRAE:  Lack of foundation.

THE COURT:  Well, I'm not going to overrule that.  Do you understand the question?

THE WITNESS:  I do.  Yeah, I do.

THE COURT:  Okay.

THE WITNESS:  Should I answer?

THE COURT:  You can answer, sir.

THE WITNESS:  Yes, and A&M admitted itself that it was not making an assessment that the underlying data was wrong.  They argued at a point that they acknowledged the limitations of their review and stated that and then also stated that they were not making a finding that the underlying data was necessarily invalid.

**BY MS. MITCHELL:**

Q   You see multiple times throughout the report where they identified a lack of data; is that right?

MR. MCRAE:  Objection.  Vague.  The document speaks for itself.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes, they mentioned that several times. I will also point out, though, that they did not suggest that data was in some way withheld or not provided by the City in a timely manner.  They did receive thousands and thousands of

Szabo - Direct / By Ms. Mitchell                    **286**

pages of documents and financial data, and they -- well, I'll just leave it at that.

Q    Referring to the conclusion or to the example that they provided in italicized here in this middle of the page where they said there was confusion among stakeholders including service providers.  Do you see that?

A    I do see that, yes.

Q    Do you disagree with the assessment that there is confusion among stakeholders including service providers with respect to shelter or interim housing?

A    I don't know who they're talking about.  I'm sorry.

        **MR. MCRAE:**  I'm sorry.  Objection.  Takes the statement out of context because you have to read the entire paragraph, lacks foundation, and relevance.

        **THE COURT:**  Overruled.  You can answer, sir.

        **THE WITNESS:**  I don't know who they're talking about. And this is another example.  I mean, they conducted, I think they said over 90 interviews.  They indicated in part some of the site visits that they went on and the people that they talked to on those site visits.  But confusion among stakeholders, that could be anyone.  I don't know the context in which they're making this assessment that there was confusion.  I think confusion is subjective.  So, no, I don't agree on any of those levels with, I guess, your question.

//

**BY MS. MITCHELL:**

Q    Showing you the next section, limited financial oversight and performance monitoring.  Do you see that section?

A    I do.

Q    Do you disagree with the finding from A&M there was limited financial oversight and performance monitoring regarding these three programs during the period of 2020 to 2024?

**MR. MCRAE:**  Objection.  Mischaracterizes the document, which speaks for itself, lack of foundation, and relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  I do disagree.  And they admit in their first line the basis of my disagreement.  Again, they're not saying that -- they're basically saying that because we were focusing on making sure that the financial information was correct, which is our obligation, they're then jumping towards a reasonableness measure under their heading of limited financial oversight and performance monitoring.

**BY MS. MITCHELL:**

Q    So do you agree that the invoice reviews by the city and LAHSA did center on reconciling the aggregate amounts in financial reports rather than verifying the quality, legitimacy, and reasonableness of expenses?

**MR. MCRAE:**  Objection.  Lack of foundation, the

document speaks for itself, and relevance.

THE COURT:  Overruled.  You can answer, sir.

THE WITNESS:  Our obligation under both the Roadmap and the Alliance settlement is to establish a certain number of units of housing.  And our obligation is to ensure that the numbers that we're reporting are accurate.  And part of the manner in which we can provide assurances that the numbers that we're reporting are accurate is by reviewing the financial data and making sure that what we're reporting and what we have paid for exists in terms of the number of beds that we have provided.

Q    Do you agree that there was nobody at the City verifying the quality, legitimacy, or reasonableness of expenses?

A    I don't agree with that.

MR. MCRAE:  I'm sorry.  Objection.  Vague, lack of foundation, and relevance.

THE COURT:  Overruled.  You may answer, sir.

THE WITNESS:  No, I don't agree with that.  I don't agree with that, and I didn't say that.  What I said is that they're talking about limited financial oversight, and then they jump to a reasonableness of expenses standard, a legitimacy standard.

Our job is to provide housing and get folks off of the sidewalk into that housing, and that's what our reports and that's what the information that we provided to this Court

represents.  So I just don't -- I mean, I think this report conflated a number of issues.  They found potential insufficiencies in one area and applied it to another.  So I don't even agree with how they're taking financial oversight and then bringing in several other issues.  So that's what I disagree with.

**BY MS. MITCHELL:**

Q    Okay.  So who at the City was verifying the quality, legitimacy, or reasonableness of expenses under these programs during the look-back period?

        **MR. MCRAE:**  Objection.  Compound, lack of foundation, vague, relevance.

        **THE COURT:**  Overruled.  You can answer the question, sir?

        **THE WITNESS:**  You would need to be more specific about the program.

**BY MS. MITCHELL:**

Q    Sure.  Let's specifically look at the Roadmap program. Who at the City was responsible -- excuse me, who at the City was actually verifying the quality, legitimacy, and reasonableness of expenses related to the Roadmap program from 2020 to 2024?

        **MR. MCRAE:**  Vague as to Roadmap program, relevance, lack of foundation.

        **THE COURT:**  Overruled.  This applies to the

Szabo - Direct / By Ms. Mitchell                    **290**

settlement, not the use of the word Roadmap in the LA Alliance. This would be the Roadmap agreement.

**THE WITNESS:**  The Roadmap agreement.  So again, our obligations under the Roadmap agreement was to establish the 6,700 units within 18 months of various types, and we did that. And we have been reporting on that since 2020 or 2021.  So, I mean, our office is responsible for verifying the numbers that we reported and is also responsible for reporting the numbers. So we've been responsible for that piece.

Q   Understood.  The CAO's office has been responsible for verifying and reporting the numbers.  My question is, who at the City is verifying the quality, legitimacy, or reasonableness of the expenses?

**MR. MCRAE:**  Vague, lack of foundation, relevance, not an obligation of the settlement agreement with the Alliance.

**THE COURT:**  Overruled.  You may answer that question, sir.

**THE WITNESS:**  There are a number of levels of review, but I think where you're going, and I don't want to guess again because there's a number of programs, but you have contracts with the service providers.  You have contracts that LAHSA has with the service providers that have a required scope of services.  You have the contract between LAHSA and the City of Los Angeles that governs LAHSA's contracting responsibilities. So there are multiple levels of review.

Szabo - Direct / By Ms. Mitchell                    **291**

**BY MS. MITCHELL:**

Q    So is it your testimony that nobody at the City is actually responsible for verifying the quality, legitimacy, or reasonableness, or is it that everybody at the City is responsible for verifying the quality, legitimacy, and reasonableness of expenses?

          **MR. MCRAE:**  Objection.  It's --

          **THE COURT:**  Do you understand that question?

          **THE WITNESS:**  I understand the words that she said, yes.

          **MR. MCRAE:**  I'd like to object.

          **MS. MITCHELL:**  I'll rephrase.  I'll rephrase.  I'll rephrase.

Q    So my question to you is, because you testified just a moment ago that the City was actually verifying the quality, legitimacy, or reasonableness of expenses in the Roadmap program, and my question to you is who at the City was verifying the quality, legitimacy, or reasonableness of expenses of a program?  And it could be a department.  It could be a person.  It could be nobody.  I'd like the answer to that question.

          **MR. MCRAE:**  Objection.  Relevance, lack of foundation.

          **THE COURT:**  Overruled.  You can answer, sir.

          **THE WITNESS:**  There are multiple levels of review

Szabo - Direct / By Ms. Mitchell                    **292**

depending on the program.  So I'm not going to point to a

single person that's responsible for all programs.  I'm not

going to -- it's just -- there are multiple levels of review

when the City is contracting with LAHSA and LAHSA is

contracting with the service providers.

**BY MS. MITCHELL:**

Q    So you can't point to a single person or department that

was verifying the quality, legitimacy, or reasonableness of

expenses; is that right?

        **MR. MCRAE:**  Objection.  Mischaracterizes the

witness's testimony and asked and answered multiple times.

        **THE COURT:**  Overruled.  You may answer the question,

sir.

        **THE WITNESS:**  I don't know how I can answer it

differently.  There are multiple levels of review.  I don't

know what I'm going to say that's different than the last time

I answered the question or the time before.

**BY MS. MITCHELL:**

Q    Do you agree that the homelessness response system in Los

Angeles is broken?

        **MR. MCRAE:**  Objection.  Relevance.

        **THE COURT:**  Would you restate that question?  I

couldn't hear.

Q    Yes.  Do you agree, Mr. Szabo, that the homelessness

response system in Los Angeles is broken?

**MR. MCRAE:** Objection. Relevance. It's also vague as to all the participants in the system, and it lacks foundation. And it's not relevant to whether there's a breach of the Alliance settlement agreement.

**THE COURT:** Overruled. You can answer the question, sir.

**THE WITNESS:** You would need to define the homelessness response system before I could even begin to address that question. And as you know, there are multiple levels and multiple agencies involved. So --

Q   Have you heard the mayor of Los Angeles say that the homelessness response system in Los Angeles is broken?

**MR. MCRAE:** Objection. Relevance, assumes facts, lack of foundation.

**THE COURT:** Overruled. You can answer that question, sir.

**THE WITNESS:** I may have. I may have. I don't recall. Again, if you're asking me, do I remember her saying something on a specific date at a specific event or speech, or I don't. I mean, it's possible. I don't know.

**BY MS. MITCHELL:**

Q   Were you at the State of the City speech that the mayor delivered last month at City Council?

A   I was.

Q   And do you recall her in that specific speech stating that

Szabo - Direct / By Ms. Mitchell                    **294**

the homeless system in Los Angeles is broken?

      **MR. MCRAE:**  Objection.  It's vague.  It's asked and answered.  And relevance.

      **THE COURT:**  Overruled.  You can answer the question, sir.  You may answer.

      **THE WITNESS:**  I don't specifically recall.  But it was a public speech, so if that's what she said, I would assume that's happened.

Q   I'm going to ask the question and the Court can, I guess, make the decision.  Has Mayor Bass ever expressed that opinion to you that the homeless system is broken?

      **MR. MCRAE:**  Objection.  To the extent it calls for violation of the deliberative process privilege.

      **THE COURT:**  Sustained.

Q   What did Mayor Bass mean when she said at the State of the City speech that the homeless system was broken?

      **MR. MCRAE:**  Objection.  Calls for speculation.

      **THE COURT:**  Sustained.

      **MR. MCRAE:**  And assumes facts.

**BY MS. MITCHELL:**

Q   Mr. Szabo, do you speak for the mayor?

      **MR. MCRAE:**  Objection.  Vague, relevance, context, ambiguous.

      **THE COURT:**  On what issue, is it on the Roadmap and the Inside Safe and the LA Alliance agreement?  Is it

generally?  I'm going to sustain.  It's ambiguous, counsel.  In other words, in what area would he be directed to answer that question?

MS. MITCHELL:  I think to the extent that these findings are related to the homelessness system in general, from their review of the three programs, I think it is related to the homelessness system in general, Your Honor.

THE COURT:  I think he's here with this Apex Doctrine, really, as the lesser potential official to the mayor, and therefore I'm going to allow you to answer that question, sir.

MR. MCRAE:  It's vague as to speak to the mayor on what, or for the mayor on what, and lack of foundation, relevance.

THE COURT:  I thought it pertained to homelessness, counsel.  So re-ask a question, counsel.

MR. MCRAE:  But on finances, on policy, I mean, it's still vague because there are layers of talking about that and different perspectives.

THE COURT:  That's why she's re-asking the question.

BY MS. MITCHELL:

Q    Yes.  Do you speak for the mayor on homelessness policy?

MR. MCRAE:  Objection.  Vague, relevance.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I'm not the mayor's spokesperson.

Szabo - Direct / By Ms. Mitchell                    **296**

Q    Do you speak for the city council or any specific city council member on homelessness policy?

MR. MCRAE:  Objection.  Vague and relevance.

THE COURT:  It's also compound.  Would you re-ask that question, please?

MS. MITCHELL:  Yes.

Q    Do you speak for the city council as a whole on homelessness policy?

MR. MCRAE:  Same objection.

THE COURT:  Wait for the objection.  There's going to be one in just a moment.  Objection, counsel?

MR. MCRAE:  Yes.  Vague, relevance, lack of foundation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  In certain circumstances, when the council has given direction or made a policy determination as a body, in certain circumstances, I represent the position of the council in those circumstances.  I report to the mayor and the council.

BY MS. MITCHELL:

Q    Do you speak for any specific council member regarding homelessness policy?

MR. MCRAE:  Objection.  Vague as to speak for.  It lacks foundation.  It's not relevant.

THE COURT:  Well, I think we're all aware of

Szabo - Direct / By Ms. Mitchell                  **297**

disagreements with different council members concerning homelessness.  I can't imagine that you speak for an individual council person.  I'm going to sustain the objection, counsel.  I don't think that he is in a position as a CAO to speak for a particular council person.

MS. MITCHELL:  And if that's his testimony, that's his testimony, Your Honor.  The question is just a yes or no.  Does he speak for any individual person?

THE COURT:  Are you referring, though, to the obvious disagreement by some council members with others?  Are you pertaining to the president of the council?

MS. MITCHELL:  No, Your Honor.  If I may make a proffer, I'm getting at the Apex witness doctrine, that each council member has their own opinion based on their own set of facts.  And Mr. Szabo here, Mr. Szabo, excuse me, cannot testify to those opinions because he doesn't speak for any specific council member.

THE COURT:  I'll allow the question.  You can answer that question, sir.

MR. MCRAE:  Objection on relevance grounds.

THE COURT:  Overruled.

THE WITNESS:  I'm not the spokesperson for any individual member of the city council.

BY MS. MITCHELL:

Q    What corrective actions have you taken or has your office

EXCEPTIONAL REPORTING SERVICES, INC

or has the City taken in response to this assessment?

MR. MCRAE:  Objection.  Assumes fact there was any obligation to take corrective action.  It's vague as to what corrective action is.  It lacks foundation, and it's not relevant because it's not an obligation under the settlement agreement with the Alliance.

THE COURT:  Overruled.  You can answer the question, sir.

MR. MCRAE:  Oh, one other thing.  To the extent that it would require him to discuss things that have occurred that are subject to deliberative process privilege and attorney-client privilege that are not public, my objection would be that he should not be required to answer that.

THE COURT:  You can testify about actions you have taken or may have taken.  We're not going to get into the content or conversations.  So you can answer that question.

THE WITNESS:  As I've stated, I don't view the assessment as actionable in the manner in which it presents its findings and have not taken any formal action to make recommendations to the City's elected leadership to take action.

BY MS. MITCHELL:

Q    To your knowledge, has the City taken any corrective action or any steps towards any corrective action in response to this assessment?

Szabo - Direct / By Ms. Mitchell                    **299**

**MR. MCRAE:**  Objection.  It's vague.  It lacks foundation.  It assumes that there's an obligation to do so. It's not relevant because there is no obligation to do so.

**THE COURT:**  Overruled.  You can answer the question, sir.

**THE WITNESS:**  There may have been some council motions that have referenced the assessment.  I do not recall the extent of them at this moment.

**MR. MCRAE:**  Your Honor, I want to make sure that we're not getting into a territory that would involve violation of deliberative process privilege or the attorney-client privilege for that matter.

**THE COURT:**  That question doesn't get into that area, counsel.  Your next question, counsel.

Q    Have there been any changes in response to this assessment in how homelessness data is tracked within the City of Los Angeles?

**MR. MCRAE:**  Objection.  It's vague as to the entire City of Los Angeles, as to different contributors that are beyond the CAO.  It lacks foundation.  It's not relevant. There's no obligation under the settlement agreement to do this.

And also, again, if it's divulging things discussed in the context of deliberative process or attorney-client privilege, object on that grounds as well.

Szabo - Direct / By Ms. Mitchell                    **300**

THE COURT:  Overruled.  You can answer the question, sir?  And caution, stay away from specific conversations.

THE WITNESS:  As I said, I believe there have been some -- there have been some council motions that have asked for some action.  But again, that's only speaking for the city council.  I cannot comment and I'm not aware beyond that.

BY MS. MITCHELL:

Q   Okay.  And I may have missed it.  What are those specific council motions that have asked for specific action in response to this assessment?

MR. MCRAE:  I would object on relevance, lack of foundation, attorney-client privilege to the extent it's applicable, as well as the deliberative process privilege.

THE COURT:  Overruled.  As long as these are public through one of the committees, for instance, or a matter of public notice, certainly not an executive session or in closed session with the council.  You can answer that question.  Overruled.

THE WITNESS:  And no, you didn't miss it because I did not reference any, specifically because I don't recall at the moment which and which member introduced them.

BY MS. MITCHELL:

Q   But it's your recollection that there were specific motions that were introduced in response to this assessment?

A   I said there may have been.  I'm not sure.

MS. MITCHELL: Your Honor, I'm about to move on to a new section. I'm happy to continue. I know counsel had asked to recess at 5:00, but we can keep going if that's the Court's preference.

MR. MCRAE: No, if counsel thinks counsel is going to finish their direct examination, that's fine. I'm fine with marching on.

MS. MITCHELL: All right. I have a lot more to go, Your Honor. Again, happy to continue, but it's going to be probably at least another hour.

THE COURT: I can see this agreement that we're going to recess tonight.

MR. MCRAE: It seems to be so.

THE COURT: Was 8 o'clock comfortable for you? I usually start at 7:30, but this is a different environment for me here. So, and I can make it at 8:30?

MR. MCRAE: That would be fantastic.

THE COURT: 8:30?

MR. MCRAE: Yes.

THE COURT: I just don't know child care, driving for all of you folks.

MR. MCRAE: Thank you. I can't say anything about child care.

THE COURT: I'm here about 6:30 or 7:00. You don't want to start. You don't want to keep my hours.

**302**

MS. MITCHELL:  Your Honor, I do have one issue.  We have been approached by several members of the media asking to make statements, and it's my -- there's no jury present, but I did want to get the Court's public direction on that before we say something one way or another.

THE COURT:  I don't think what any of you say to the media is going to influence me, frankly.

MS. MITCHELL:  Appreciate that, Your Honor.

THE COURT:  I'm not going to base my rulings on your conferences on behalf of the City or the mayor or you as plaintiffs in this matter, or if you care to make a statement. I'm not going to put a First Amendment cloud over any of you.

MR. MCRAE:  Your Honor, I noticed also --

THE COURT:  I'm not a jury, in other words.  You don't have to worry about me being influenced by that.

MR. MCRAE:  Earlier in the day, I noticed that while the A&M witnesses were on and off the stand, regardless of who was examining them, they would be conferring with counsel.  I'm assuming that the same holds true for Mr. Szabo.  There's no --

THE COURT:  Absolutely.

MR. MCRAE:  Okay.

THE COURT:  Same courtesy.  Listen, it's as simple as this.  You can talk to anybody you want to or nobody.  You can talk to Elliot Lash, you can talk to your counsel, and all witnesses can talk to parties who they might perceive are

EXCEPTIONAL REPORTING SERVICES, INC

303

hostile to their particular position.

MR. MCRAE: Thank you, Your Honor.

MS. MITCHELL: Thank you, Your Honor.

THE COURT: Then, what time? 8:30? Is that comfortable for everybody?

MR. MCRAE: Yes, Your Honor.

THE COURT: Comfortable for you tomorrow, 8:30? I know you've got business for this.

MR. MCRAE: Have a nice evening, Your Honor.

THE COURT: Okay.

THE WITNESS: That works. Thank you.

THE COURT: All right, then. Counsel, 8:30, then we're in recess. Thank you.

(Proceedings concluded at 5:12 p.m.)

* * * * *

304

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>May 28, 2025</u>

         Signed                                    Dated


*TONI HUDSON, TRANSCRIBER*