UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al., | ) ) ) | Case No. LA CV 20-02291-DOC- (KESx) |
| Plaintiffs, | ) ) | Los Angeles, California |
| vs. | ) ) | Thursday, May 29, 2025 |
| CITY OF LOS ANGELES, et al., | ) ) | (8:34 a.m. to 9:11 a.m.) (9:11 a.m. to 10:25 a.m.) |
| Defendants. | ) ) | (10:47 a.m. to 12:06 a.m.) (1:15 p.m. to 1:33 p.m.) |
| _____ | ) | (1:39 p.m. to 2:29 p.m.) (2:58 p.m. to 3:52 p.m.) (4:09 p.m. to 5:33 p.m.) (5:49 p.m. to 6:46 p.m.) |

TRANSCRIPT OF EVIDENTIARY HEARING RE COMPLIANCE WITH THE LA ALLIANCE SETTLEMENT AGREEMENT [767] [863]AND THE ROADMAP MOU AGREEMENT (DAY 3)
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Appearances:                    See next page.

Court Reporter:                 Recorded; CourtSmart

Courtroom Deputy:               Karlen Dubon

Transcribed by:                 L. Caldwell/Jordan Keilty
                                Echo Reporting, Inc.
                                9711 Cactus Street, Suite B
                                Lakeside, California 92040
                                (858) 453-7590

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

III-2

APPEARANCES:

For the Plaintiffs:          ELIZABETH A.  MITCHELL, ESQ.
                             Spertus, Landes & Umhofer, LLP
                             617 West 7th Street, Suite 200
                             Los Angeles, California 90017
                             (213) 205-6520

                             MATTHEW D. UMHOFER, ESQ.
                             Spertus, Landes & Umhofer, LLP
                             1990 South Bundy Drive
                             Suite 705
                             Los Angeles, California 90025
                             (310) 826-4700

For the Defendants:          THEANO EVANGELIS KAPUR, ESQ.
                             MARCELLUS A. MCRAE, ESQ.
                             PATRICK J. FUSTER, ESQ.
                             JAMES N. ROTSTEIN, ESQ.
                             KAHN A. SCOLNICK, ESQ.
                             Gibson Dunn and Crutcher LLP
                             333 South Grand Avenue
                             Los Angeles, California 90071
                             (213) 229-7000

                             JOSEPH D. EDMONDS, ESQ.
                             Gibson Dunn and Crutcher LLP
                             3161 Michelson Drive
                             Suite 12
                             Irvine, California 92612
                             (949) 769-0557

                             ANGELIQUE KAOUNIS, ESQ.
                             Gibson, Dunn and Crutcher LLP
                             2000 Avenue of the Stars
                             Suite 1200
                             Los Angeles, California 90067
                             (310) 552-8546

For the Intervenors:         SHAYLA R. MYERS, ESQ.
                             Legal Aid Foundation of Los
                               Angeles
                             7000 South Broadway
                             Los Angeles, California 90003
                             (213) 640-3983

III-3

APPEARANCES:  (Cont'd.)

For the County of Los          LAUREN M. BRODY, ESQ.
  Angeles:                     JASON H. TOKORO, ESQ.
                               Miller Barondess, LLP
                               2121 Avenue of the Stars
                               Suite 2600
                               Los Angeles, California 90067
                               (310) 552-4400

III-4

I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Matt Szabo (recalled) | 8 | -- | -- | -- |
| Elizabeth Funk | 155 | 172 185 | 187 | -- |
| Etsemaye Agonafer | 190 | 241 336 | 345 | 357 |

| EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|

Plaintiffs':

| 1 | Road Map agreement | 66 | -- |
|---|---|---|---|
| 2 | Memorandum of understanding | 72 | -- |
| 5 | 2021 COVID-19 Homelessness Road Map report | 74 | -- |
| 24 | Milestones and deadlines | 95 | -- |
| 25 | LA Alliance settlement agreement | 87 | -- |
| 34 | Alliance settlement agreement quarterly report for quarter ending 12/31/24 | 96 | -- |
| 35 | Alliance settlement agreement quarterly report for quarter ending 3/31/25 | 96 | -- |
| 44 | Attachment 5 Appendix | 317 | -- |
| 52 | Court order | 128 | -- |
| 62 | Quarterly report attachment | 127 | -- |
| 63 | City report dated 4/15/25 | 129 | -- |
| 82 | 2001 audit by HUD of LAHSA | 13 | -- |
| 83 | 2007 audit by HUD | 21 | -- |

*Echo Reporting, Inc.*

III-5

| EXHIBITS   (Cont'd.) | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| **Plaintiffs':** | | | |
| 84 | 2018 follow-up audit report | 25 | -- |
| 85 | 2019 audit | 31 | -- |
| 89 | 2023 L.A. City Controller homelessness audit | 35 | -- |
| 91 | 2024 L.A. County Auditor-Controller review of LAHSA | 44 | -- |
| 92 | 2024 audit by L.A. City Controller | 57 | -- |
| 114 | Alliance potential project list | 88 | -- |
| 150 | Audio from Housing and Homelessness Committee meeting | 106 | -- |
| 152 | Audio from Housing and Homelessness Committee meeting | 113 | -- |

**Defendants':**

(None.)

III-6

Los Angeles, California; Thursday, May 29, 2025  8:34 a.m.

--o0o--

(Call to Order)

THE COURT:  Counsel, we're back on the record, and would you make your appearances again.  We have a new CourtSmart, and so, because of that, we need your appearances.

MS. MITCHELL:  Thank you, your Honor.  Good morning.  Elizabeth Mitchell on behalf of Plaintiffs, and with me is my colleague, Matthew Umhofer.

THE COURT:  Good morning.

Counsel, just remain seated.  You don't have to stand.

MS. EVANGELIS:  Good morning, your Honor.  Theane Evangelis for the City of Los Angeles.

THE COURT:  Good morning.

MR. MCRAE:  Marcellus McRae, Gibson, Dunn and Crutcher, for the City of Los Angeles.

THE COURT:  Thank you.

MR. EDMONDS:  Good morning.  Joseph Edmonds with Gibson, Dunn and Crutcher for the City of Los Angeles.

THE COURT:  And all of you are for the City, but with Gibson Dunn.  Is that correct?

MR. EDMONDS:  All of the people that are at -- physically touching this table, with the exception of the

III-7

technician, who is with us but is not permanently employed by the firm.

THE COURT:  All right.  Thank you, Counsel.

MS. KAOUNIS:  Angelique Kaounis with Gibson, Dunn and Crutcher for the City.

MR. FUSTER:  Patrick Fuster, Gibson, Dunn and Crutcher, for the City.

MR. ROTSTEIN:  And James Rotstein of Gibson, Dunn for the City.

THE COURT:  Yes.  And yesterday -- I'm usually, in litigation, used to having the senior partner address me. I've been taking the position lately that I want more young lawyers involved in my court.  So do divide out this work, and you're an associate, and it's agreeable with your lead counsel.

You can certainly address the Court on any issue that you've been assigned to.  I think it's a good way for our young lawyers to become involved, also, but I'd appreciate the objections coming from that one lawyer who made the presentation, with lead counsel, you know, giving advice or lending a hand, so it doesn't come from different sources.

Yes.  My apologies.

MS. MYERS:  Shayla Myers from the Legal Aid Foundation of Los Angeles on behalf of Intervenors.

III-8

THE COURT:  We need to move you forward a little bit more, and if you want to share this table, you're more than welcome to.

And on behalf of the County?

MS. BRODY:  This is Lauren Brody and Jason Tokoro, Miller Barondess, for the County of Los Angeles.

THE COURT:  Okay.

MR. TOKORO:  Good morning, your Honor.

THE COURT:  Who are you?

MR. TOKORO:  Jason Tokoro.  I was here on the last hearing, on the 15th.

THE COURT:  Okay.  And Mira is not here today?

MS. BRODY:  Yes.  Apologies.  Mira is caught up in another proceeding.

THE COURT:  That's fine.

And good morning, Mr. Szabo.  Mr. Szabo is back on the stand.  This is continued cross (sic) examination.

MATT SZABO - DEFENDANTS' WITNESS - RESWORN

MR. MCRAE:  Your Honor, can I put myself in the young lawyer category?  Withdrawn.

THE COURT:  Well, if I took a picture.  No, I'm just kidding.  No.  Remember, they can take your wisdom and advice as the lead senior counsel.  I just don't want objections coming from three different sources.

MR. MCRAE:  Understood.

III-9

THE COURT:  Whoever made that presentation, the associate or the partner, can make the objection, but that's with your advice and consent.  Okay?

MR. MCRAE:  Thank you, your Honor.

THE COURT:  Counsel, cross examination.

MS. MITCHELL:  Thank you, your Honor.

DIRECT EXAMINATION  (RESUMED)

BY MS. MITCHELL:

Q    Mr. Szabo, yesterday we talked quite a bit about your response to the A and M assessment.  Do you recall that?

A    I do.

MR. MCRAE:  Objection, vague as to "your."

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    And you indicated that you disagreed with the findings of the assessment.  Is that right?

MR. MCRAE:  Objection, vague, and mischaracterizes the witness' testimony.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I believe that I stated that the nature of the review didn't meet the standards that I would view as actionable findings.

BY MS. MITCHELL:

Q    Okay.  And those were the government accountability

III-10

standards, GAGAS.  Is that right?

A    That's one set of standards, correct.

Q    What are the other standards?

A    Generally accepted accounting standards, and there are a number of others, but the A and M report made it clear that not only did it not comply with GAGAs, it didn't comply with any set of generally accepted standards in presenting its finding, nor would the -- should the report be taken as an assessment consistent with any of those standards.

Q    I understand that that's your opinion.  Those standards are used by other organizations like HUD, and the City Controller, and the County Controller.  Is that right?

        MR. MCRAE:  Objection, vague.

        THE COURT:  Overruled.  You can answer the question.

        THE WITNESS:  In many of their reports, yes.

BY MS. MITCHELL:

Q    Okay.  Were you surprised by the A and M assessment findings?

        MR. MCRAE:  Objection, vague as to -- it's a 165-page report.

        THE COURT:  Overruled.

        MR. MCRAE:  Also, relevance.

        THE COURT:  Overruled.  You can answer the question, sir.

III-11

THE WITNESS:  I don't say I would -- I don't know if I would say I was surprised.

BY MS. MITCHELL:

Q    Okay.  Now, personally, you said that you disagreed that there was poor data quality and integration.  Do you recall that testimony?

MR. MCRAE:  Objection, vague as to context, and relative to what?

THE COURT:  Overruled.

THE WITNESS:  I believe that the -- what -- I believe what I said was that the manner in which they reached their conclusions was insufficient for me to agree with their finding.

BY MS. MITCHELL:

Q    You disagree that there was limited financial oversight and performance monitoring as it pertains to the City.  Is that right?

MR. MCRAE:  Objection, vague --

THE COURT:  Do you understand --

MR. MCRAE:  -- and relevance.

THE COURT:  Do you understand the question?  It can be re-asked if you don't.

THE WITNESS:  Yes.  I mean, I believe we discussed this at some length, and I disagreed wholesale with the findings, based on the nature of the report, and the -- what

III-12

appeared to be its limitations in absorbing and understanding, and the completeness of its review.

THE COURT:  Just a moment.  Are we referring to A and M's report or the Controller's report?

MS. MITCHELL:  The A and M report, your Honor.

THE COURT:  A and M report.  All right.  Thank you.

MS. MITCHELL:  Thank you.

BY MS. MITCHELL:

Q    And your answer was as to the A and M report, correct?

A    Correct.

Q    Are you aware that a 2001 audit by HUD, Housing and Urban Development, of LAHSA, concluded that LAHSA violated grant agreements by failing to conduct onsite monitoring of sub-grantees, and failed to conduct any monitoring prior to awarding renewal grants.

MR. MCRAE:  Objection, your Honor, relevance as to LAHSA.  I believe counsel also said 2001, which I don't even know if that's possible, but, assuming that's the case, it would also not be relevant.  And a standing objection to questions regarding the A and M audit as -- or assessment -- not being relevant to a breach of an agreement with the Alliance settlement agreement.

THE COURT:  Overruled.

MS. MITCHELL:  Your Honor, I'm also --

III-13

THE COURT:  No, just -- that's overruled.  Number two, I want to stop for just a moment, and I want to get out some of those reports.  These reports already came before the Court on a prior proceeding, and if you go back in the docket -- and I know you're coming in, and I don't know if you've seen that docket, but these reports were referred to before.  So, just a moment.  Why don't all of you folks just visit with one another for just a minute.

(Pause.)

THE COURT:  Counsel, you may proceed.

MS. MITCHELL:  Thank you, your Honor.  And I believe that these audits were also cited in Plaintiffs' response, Docket 899, as well.

THE COURT:  They were.

MS. MITCHELL:  I also would object to the long speaking objections, your Honor.  I believe that it is coaching and instructing the witness at this point.

MR. MCRAE:  Your Honor, it's not coaching.  I'm just trying to make sure that my objection is understood.

THE COURT:  You have a continuing objection, Counsel.  I'm not going to chill you in any way.  You have a record to make on both sides, but it is difficult for some of the witnesses who aren't, let's say, more used to federal court.  Mr. Szabo certainly is used to the stress, let's say.

III-14

A lot of the other folks appearing for the first time are not, and you saw that yesterday on both parties' parts, when they were unable to recall the question, and it had to be asked numerous times.  I leave that to each of you, but, well, I won't have a chilling effect.  So this objection is overruled.  Now let's move on.

MS. MITCHELL:  Thank you.

THE COURT:  2001 report.

BY MS. MITCHELL:

Q    Did I get an answer from you, Mr. Szabo?

A    Can you repeat the question?

Q    Sure.  Are you aware of a 2001 audit by the Housing and Urban Development, HUD, of -- the audit was of LAHSA, which concluded that LAHSA violated grant agreements by failing to conduct onsite monitoring of sub-grantees?

THE COURT:  Well, just a moment.  I'm going to insist, if we're going through these, they're going up on that screen, so we all see this at the same time.

MS. MITCHELL:  Sure.

THE COURT:  I don't think it's fair to the witness, and I don't think it's fair to the parties.  So what's this going to be marked as?

MS. MITCHELL:  This is Exhibit 82, your Honor.

THE COURT:  Exhibit 82.  And if you need at any time to review this report, or further reports are called to

III-15

your attention, take that time.  Plus, if you need to exit the stand and talk to counsel for a moment, there's no issue with the Court.  Fair enough?

THE WITNESS:  Yes.  I appreciate that.

THE COURT:  Okay.

MS. MITCHELL:  Your Honor, my questions largely are whether Mr. Szabo was aware of these findings.

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    So, showing you Exhibit 82, page two.  Have you seen -- this is the 2001 HUD audit.  Have you seen this document?

MR. MCRAE:  Objection, also vague as to audit of whom, also still relevance.

THE COURT:  Overruled.

THE WITNESS:  I would need time to review this document in order to --

THE COURT:  Take your time.

THE WITNESS:  -- give appropriate comment.

THE COURT:  Take your time.

MR. MCRAE:  May the witness be given a physical copy?

THE COURT:  Absolutely.

MS. MITCHELL:  Does the Court have the physical copy?

III-16

THE COURT:  I've got a physical copy, because it's a submission of the parties and because of the prior hearings.

MS. MITCHELL:  In the interest of expediting this, your Honor --

THE COURT:  No, we're not going to expedite it. We're going to have a full hearing.  Time is not a concern.

So, if you need to read this, read it.

Someone bring him a copy.  Counsel, you should have this as Exhibit 82.  Okay?  Counsel on the defense, you got this exhibit?

MR. MCRAE:  Yes, your Honor.  I was just --

THE COURT:  All right.  And so, for our records, counsel for the defense has this exhibit.  Why don't you give it to your witness, please.

MS. MITCHELL:  Thank you, your Honor.

MR. MCRAE:  We're -- yes.

MS. MITCHELL:  And it is in the iPad.  It's easily accessible by just hitting "Exhibit 82."

MR. MCRAE:  We --

THE COURT:  Just a moment, for all of you.  That's an order.  That's not a request.

MR. MCRAE:  Thank you.

THE COURT:  Now we've stopped this conversation. It's wasting time.

III-17

MR. MCRAE:  We're doing it as quickly as possible.

THE COURT:  Counsel, we're wasting time.

Defense is now handing Exhibit 82, which they have in their possession, to the witness.

(Witness proffered document.)

BY MS. MITCHELL:

Q    Are you ready, Mr. Szabo?

A    Yes.  We can --

MS. MITCHELL:  Your Honor, may I proceed?

THE COURT:  Not yet.

I want to make sure you've read the document. Have you had enough time to read this document?

THE WITNESS:  I mean, I've --

THE COURT:  Continue reading until you're comfortable.

THE WITNESS:  Okay.  I will, you know --

THE COURT:  Continue reading until you're comfortable.

THE WITNESS:  Okay.  Fair enough.

THE COURT:  It's not an issue.

THE WITNESS:  Okay.

THE COURT:  All right.  Counsel, the witness has indicated he's looked at that document and read it.

MS. MITCHELL:  Thank you.

//

III-18

BY MS. MITCHELL:

Q    Mr. Szabo, do you see that, in this 2001 HUD audit, HUD found that LAHSA had not done any onsite monitoring of any sub-grantees until October 2000, even though the sub-grantees had been operating and receiving funding for years?

MR. MCRAE:  Objection, vague, and relevance.

THE COURT:  Overruled.

THE WITNESS:  I think you said, "Sub-grantees," right?  Is that -- my understanding is this is related to one service provider.

BY MS. MITCHELL:

Q    Yes.  I'm just asking about this specific finding.  Do you recall -- or have you seen this before?  Prior to today, had you seen this audit?

A    I'm not familiar with -- I was not familiar with this audit.

Q    Now, Mr. Szabo, there are something like eight public audits over the last 20 years of LAHSA, and in the interest of time, some of them are eight pages, some of them are hundreds of pages.  I'm not going to ask you to review every single one of them.  I will just ask you, are you aware of any findings by any auditors which either support or refute any of the findings by A and M in the assessment which we were talking about yesterday and this morning?

III-19

MR. MCRAE:  Objection, lack of foundation.  It's vague, it's compound, involving multiple audits, and it also calls for a legal conclusion, and relevance.

THE COURT:  Overruled.  But, if we need to, you can go through each of those audits.  It's too broad right now, and I don't know what he's read and what he hasn't.

MS. MITCHELL:  I don't know, either, so I would like to find out.  Thank you, your Honor.

THE COURT:  Well, then, I'll sustain the objection, but you can go through each of these audits.

BY MS. MITCHELL:

Q    So my question is, are you aware of any audits that refute any of the findings?

A    It's --

THE COURT:  And the question is -- I don't know the basis for what he's read.  I don't know what audits he's --

MS. MITCHELL:  Your Honor, I'll move on.  I don't think this line of questioning is worth the amount of time.

THE COURT:  Well, no, Counsel.  We're not going to do that.  Time is not an issue for either of the parties, and that's not going to be used to help the Court speed this along.

MS. MITCHELL:  These are public records which are already on record in this case, your Honor.  I don't

III-20

believe --

THE COURT:  But the problem is, I don't know what he's looked at, Counsel.  That's why the foundation -- so I have had these audits before the Court before.  I'm aware of what they are.  I know Gibson, Dunn is aware of what they are.  You're aware of what they are.  I'm not sure what he's aware of, and if he's speaking for the City, then I need to know that he's representing the mayor or not, or the council or not, because we have an apex doctrine, and the question before me is going to be, can he adequately answer some of these questions?  So turn to your next audit.

MS. MITCHELL:  I don't think, for Plaintiffs' purposes, I need to hear from Mr. Szabo.  If the Court wishes me to go through each audit with Mr. Szabo, I'm happy to do that, but, for Plaintiffs' purposes, we don't feel that we need to hear his opinion on the audits.  But, again, if the Court wants to hear it, we can go through.

THE COURT:  Well, if I get a continuing objection that -- foundationally, about what he's relying upon, which is the continuing objection, then yes, we're going through each audit.

MS. MITCHELL:  I'll withdraw the question, your Honor.

THE COURT:  Okay -- no.  I think the Court wants to know now.

MS. MITCHELL:  Okay.  Okay.

THE COURT:  I want to know the basis of this, and eventually I'm going to want to know through all parties if Mr. Szabo is representing his own viewpoint today, or if he's representing the mayor's viewpoint or the council's viewpoint.  That's going to make a difference in the apex doctrine.

MS. MITCHELL:  Thank you, your Honor.

THE COURT:  So, if we need to take the time, hopefully, it will be taken now.  That way, possibly, the mayor doesn't need to testify.

MS. MITCHELL:  Your Honor, I am concerned about time, for our purposes.  Here's what I would propose happens.  If I have Mr. Szabo review every single one of these audits on this stand right now, it's going to take hours, which we can do.  I think another option would be to hand him hard copies of the audits, give him an opportunity to review while we have another witness on the stand.

THE COURT:  I think he's aware of the majority of these audits.  That's going to be my guess.  He's certainly aware of the auditor-controller.  He's certainly aware of the audits from the County.  He's certainly aware of some of these HUD audits.  And I think, if we just go through these for both parties, we won't have an objection concerning ambiguity.  I think it's not going to be necessary to

III-22

refresh his recollection with many of these audits.  I think the 2001 is causing problems because he represents he hasn't seen the El Monte (phonetic) audit.

BY MS. MITCHELL:

Q    Do I understand that correctly, Mr. Szabo?  You have not seen this, or you don't recalling seeing this 2001 audit, prior to today?

A    I don't recall seeing it, no.

Q    Okay.  Let's move on to the 2007 audit by HUD, which was issued June 8th of 2007.  Do you see this document?

MR. MCRAE:  Objection, your Honor.  Can we have an exhibit number?  And relevance.

MS. MITCHELL:  Yes.  Thank you.  I apologize. It's Exhibit 83.

THE COURT:  Exhibit 83.

MS. MITCHELL:  I think the relevance speaks for itself.

THE COURT:  By the way, don't worry about time. If we need to have a Saturday session, we'll have a Saturday session.  You'll have plenty of time.

MS. MITCHELL:  Understood, your Honor.  Thank you.

MR. MCRAE:  May I approach, your Honor?

THE COURT:  You may.

MR. MCRAE:  Do we have ongoing permission to hand physical copies to the witness?

III-23

THE COURT:  Yes.  You don't have to ask.

MR. MCRAE:  Okay.

THE COURT:  Just approach.

MR. MCRAE:  Thank you, your Honor.

THE COURT:  He's actually your witness, Counsel.  So, okay.

MR. MCRAE:  And do we have a standing objection to these audits?

THE COURT:  You have a standing objection, but welcome to Saturday.

MR. MCRAE:  Whatever pleases the Court.

THE COURT:  It pleases me.  So let's get busy now.

Counsel, these have come up before for Gibson, Dunn's edification in court.  Mr. Szabo was in and out of court during some of this before.  Frankly, he should be aware of this document, and I think we can save time if you ask him if he's aware of it.

MS. MITCHELL:  I think that is my question pending, your Honor, but, if not, I'll ask again.

THE COURT:  Ask him.

BY MS. MITCHELL:

Q    Mr. Szabo, are you aware of this 2007 audit by HUD?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  I'm aware of the audit, but I -- we

III-24

would need -- I would need to review it if we're going to have a conversation about it.

THE COURT:  Well, then, you can direct your questions to him.  He's aware of this audit, Counsel.

MS. MITCHELL:  Thank you.

BY MS. MITCHELL:

Q    I'm going to refer you specifically to the bottom section of page one, where it says, "What we found."  Do you see that?

A    I do see that.

Q    And looking at the very first line, can you read that first line for me, starting with "The authority."

A    "The authority did not perform onsite fiscal monitoring of its project sponsors during the past two years."

Q    Does that conclusion, in your opinion, support or refute the A and M assessment finding?

MR. MCRAE:  Objection, your Honor, they were reviewing a different time period.  The look-back period wasn't in the last decade or two.

MS. MITCHELL:  That's a fair question.  I'll withdraw and rephrase, your Honor.

BY MS. MITCHELL:

Q    Is this finding in 2007 consistent with the same findings during the period of 2020 to 2024 regarding the onsite fiscal monitoring of LAHSA?

III-25

MR. MCRAE:  Objection, your Honor, lack of foundation and relevance that these documents even pertain to the same subject matter as the assessment.

THE COURT:  Overruled.  You can answer the question, sir.

THE WITNESS:  I don't agree that they are related, as they were 18 years, 17 years apart, and we're talking about -- you know, the A and M assessment was looking at specific programs, and this is on an entirely different matter.

BY MS. MITCHELL:

Q    The next sentence -- please read the next sentence. Actually, if we can just do this, Mr. Szabo.  Why don't you go ahead and read the entire paragraph into the record.

A        "The authority" -- or what we found --
        "The authority did not perform onsite
        fiscal monitoring of its project
        sponsors during the past two years.  It
        also did not properly perform its 100
        percent source documentation desk review
        for at least two years of its project
        sponsors to ensure that cash match
        funding was available and supported.  Of
        the two project sponsors reviewed, one
        had applied ineligible expenses as cash

III-26

match, while the other was unable to support its cash match due to a poor financial management system. We attributed these deficiencies to the authority's lack of capacity to comply with HUD requirements while under management of the" --

Q    I don't know that we need to go on to the next -- are you aware -- or were you aware today of these findings?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I'm aware of the findings.

BY MS. MITCHELL:

Q    Going on to what has been marked as Exhibit 84, which is a 2018 follow-up --

(Proceedings recessed briefly.)

THE COURT:  Okay.  Counsel, the microphone is back on.

MR. MCRAE:  Your Honor, just to correct the record, I believe, in Exhibit 83 -- and the document will speaks for itself -- Mr. Szabo, in reading that paragraph, inserted the word "years," and I just want to reflect that I think that that was an error, but, again, the document will speaks for itself.  Thank you.

MS. MITCHELL:  If I may have a moment, your Honor?

III-27

I think this needs to reset.  Thank you.  I think -- may I ask a question, your Honor?

BY MS. MITCHELL:

Q    I believe the question that I asked was whether you have seen this Exhibit 84, 2018, Auditor, L.A. County, report prior to today.

MR. MCRAE:  Relevance.

THE COURT:  I didn't hear your answer.  I'm sorry.

THE WITNESS:  This is an audit from the County for a County program with LAHSA.  So this would not have been something directly in my purview, no.  I have not seen it before today.  I'm the City, of the City of Los Angeles.

BY MS. MITCHELL:

Q    Thank you for reminding me.  Showing you page five of Exhibit 4, there was a finding --

A    Exhibit 4?  I'm sorry.  I don't have Exhibit --

Q    Exhibit 84.  I apologize if I misspoke.  There was a finding that there were inadequate staffing levels.  Were you aware of this finding prior to today?

MR. MCRAE:  Objection, lack of foundation.  The witness just said this wouldn't come in his purview.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Not before today.

//

III-28

BY MS. MITCHELL:

Q    Thank you.  Also in Exhibit 84, page seven, there was a finding by the L.A. County Auditor-Controller that LAHSA inappropriately used retroactive contracts.  Were you aware of this prior to today?

MR. MCRAE:  Objection, relevance and lack of foundation.

THE COURT:  Just a moment.  Would you show the Court where that's located, please?

MS. MITCHELL:  Yes, your Honor.  It's on page seven.  It's the finding number two.

THE COURT:  I have that.  I'm looking at the documents quickly, but you're on page three on the screen.  It's page seven, but I've got page three.

MS. MITCHELL:  I think it's page three of the attachment.  You're correct, your Honor.  But it's page seven of the exhibit.

THE COURT:  Counsel, will you show me where that is on that page?  All right.  Just a moment.

MS. MITCHELL:  And, for the record, I have zoomed in on the first paragraph, that starts with "Retroactive contracts."

THE COURT:  Could you move that up, please, on that page.

MS. MITCHELL:  Is that easier to read, your Honor?

III-29

THE COURT:  Yes.  Thank you.  Counsel, your question, please.  Thank you.

MS. MITCHELL:  I think my question was, to Mr. Szabo, "Were you aware of these findings prior to today?" And I believe the answer was "No."

BY MS. MITCHELL:

Q    Is that right, Mr. Szabo?

MR. MCRAE:  Objection to relevance.

THE COURT:  Overruled.

MR. MCRAE:  Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MS. MITCHELL:

Q    Showing you finding number four, which is page six of 17 in the attachment, and it is page 10 of the exhibit. There is a finding that:

        "LAHSA management lacked documentation
        supporting all available cash advances
        from funding sources."

    Let me read that again a little bit better.  The finding of number four was it:

        "Lacked documentation supporting all
        available cash advances from funding
        sources were obtained."

    And the explanation is:

III-30

"LAHSA management did not provide documentation to support that the agency took full advantage of requesting and/or obtaining all cash advances allowed from their funding source."

Do you see that finding, Mr. Szabo?

MR. MCRAE:  Objection, relevance and lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I see that.

BY MS. MITCHELL:

Q   Were you aware of this finding prior to today?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  I mean, look.  I couldn't -- if you're going to continue to ask me questions about this as it relates to a county program that is outside the time frame and the scope of what we're talking about, I'm going to continue to say no, but there are issues that are consistent that we are aware of, have been aware of, and have addressed.

BY MS. MITCHELL:

Q   Okay.  Thank you.  Moving you to page 10 of the attachment, which is Exhibit -- page 14 on Exhibit 84, finding number eight, "Fiscal operations lacked" --

III-31

MR. MCRAE:  I'm sorry, your Honor.  That's not on the screen.

MS. MITCHELL:  Thank you.

"Fiscal operations lacked management oversight, with inadequate staffing levels, retroactive contracting with the sub-recipients, and agency management did not ensure that their AR and AP units/divisions followed up on their aged receivables/payables timely."

BY MS. MITCHELL:

Q    Do you see that finding?

MR. MCRAE:  Objection, relevance and lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I do see that finding.

BY MS. MITCHELL:

Q    And were you aware of that finding prior to today?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  As it relates to this audit of a county program outside of the time range of what we're talking about, no.

BY MS. MITCHELL:

Q    Moving on to Exhibit 85, which is a 2019 audit that was

III-32

done on LAHSA outreach programs by Ron Galperin, the prior controller, were you aware of --

THE COURT:  Just one moment.  Be with you in one moment.  Counsel, your question again, please.

MS. MITCHELL:  Thank you, your Honor.

BY MS. MITCHELL:

Q    Mr. Szabo, were you aware of this audit that was released on August 28th, 2019, prior to sitting here today?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.  Yes, I was aware of the audit when it was released.

BY MS. MITCHELL:

Q    Showing you page five of the exhibit, which is the executive summary.  Now, this is -- was an audit of LAHSA's outreach efforts.  Is that right?

MR. MCRAE:  Objection, vague, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  That is what the audit is described to be, yes.

BY MS. MITCHELL:

Q    Okay.  And the auditor determined that:

"LAHSA failed to meet five citywide outreach goals in the fiscal year

III-33

reviewed, 2018 and 2019."

Is that right?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  That is what the audit says, yes.

BY MS. MITCHELL:

Q    And then, on the next page, page six in the exhibit, which is still in the executive summary, the -- it goes on to state that -- on number five:

"Program data is complete and accurate.

The goal was 95 percent of data, and

LAHSA chose not to report on that goal."

Do you see that?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  I see that.

BY MS. MITCHELL:

Q    Do you know what that means?

MR. MCRAE:  Objection, relevance --

THE COURT:  Overruled.

MR. MCRAE:  -- and lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I would need to more carefully review to --

THE COURT:  Take your time.

III-34

THE WITNESS:  -- refresh my memory.

THE COURT:  Take your time and review it, then, please.

(Pause.)

MR. MCRAE:  Your Honor, I'd also like to have a continuing objection, in addition to the lack of relevance and lack of foundation, that any of these audits relate to any of the obligations in the settlement agreement, or that they in any way relate to the same subject matter, same time period as the assessment, which was prepared under different standards.

THE COURT:  Thank you, Counsel.

BY MS. MITCHELL:

Q    Are you ready, Mr. Szabo?

A    I am, but what I was looking for is the detail on that item, and I can't seem to find it.

Q    Okay.  So you don't know why LAHSA chose not to report on the program goal -- excuse me -- the goal of program data being complete and accurate?

MR. MCRAE:  Objection, lack of foundation and relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't think the report addresses that at all.  I don't see it.  If I -- I mean, I'm trying to review.  I don't see a section where there is detail behind

III-35

that, that item.  It may exist.  I have not seen it.

BY MS. MITCHELL:

Q    I haven't seen it, either.

A    Okay.  So, no.  So, based on -- I have not.  I don't know, and apparently the report doesn't know.

Q    Thank you.  In 2019, were you in Mayor Garcetti's office, administration, at that time?

A    I was.

Q    Going back to page two of that same exhibit, Exhibit 85, there was a summary, and I'll blow it up here.  Can you read that paragraph, please, that starts with "LAHSA's."

A         "LAHSA's insufficient street outreach
          performance is matched by its loose
          review and reporting procedures on these
          activities.  All of this hinders the
          agency's ability to make data-driven
          decisions and impairs its ability to
          deploy resources in a way that will most
          effectively combat homelessness."

Q    Based on your understanding, is that finding still applicable to LAHSA today?

          MR. MCRAE:  Objection, lack of foundation, calls for speculation, relevance, and the witness neither works for nor speaks for LAHSA.

          THE COURT:  Overruled.  You can answer that

III-36

question.

THE WITNESS:  It's -- we have -- we're in an entirely different era of street outreach, due in part to additional resources added to LAHSA, the change of administration, improvements that have been made over the last seven years.  So I think that this -- the entire content of this report, whether valid or invalid at the time, is dated, and somewhat -- and not relevant to the reality of our outreach programs as they currently exist.

BY MS. MITCHELL:

Q    Okay.  So the finding that LAHSA had loose review and reporting procedures, do you believe that finding is applicable today to non-outreach activities, as well?

MR. MCRAE:  Objection, lack of foundation, calls for speculation, relevance --

THE COURT:  Overruled.

MR. MCRAE:  -- and vague.

THE WITNESS:  I don't even know how to respond to that, because are you -- you're asking me if I believe that a finding on one area is applicable to other areas that are not addressed in the finding?  I can't answer that.

BY MS. MITCHELL:

Q    Okay.  Turning now to Exhibit 89, the 2023, December 5th, 2023, L.A. City Controller homelessness audit, are you familiar with this audit?

III-37

THE COURT:  Just one moment, Counsel.

(Pause.)

MR. MCRAE:  Your Honor, I'm not trying to rush the witness, but can I inquire how long it might take to review? Because I may excuse myself and come back, which is perfectly fine.  I just don't want to miss his testimony.

THE COURT:  You're wasting time.  Go excuse yourself --

MR. MCRAE:  Thank you.

THE COURT:  -- and come on back.  It's fine.

MR. MCRAE:  I'll take five minutes.

THE COURT:  All counsel could be excused at any time, co-weekly (sic) on both sides.  So you need to use the restroom.

(Pause.)

MR. MCRAE:  Your Honor, as a point of --

THE COURT:  I'm sorry.

MR. MCRAE:  Your Honor, as a point of clarification, we understood yesterday that the Court stated that any and all witnesses participating in the hearing could be in court.

THE COURT:  They can be in court.

MR. MCRAE:  Thank you, your Honor.

THE COURT:  So all of these folks have worked hard for the respective sides, and the City is welcome to have

III-38

anyone, and the Plaintiffs are welcome to have anyone.

MR. MCRAE:  Thank you, your Honor.

THE COURT:  I don't think testimony is going to change, quite frankly, for either side, and maybe the good thing about that is we're all going to be more knowledgeable through this process.  Hopefully, wherever we come out on this, we're all trying to improve, simple as that.

MR. MCRAE:  Thank you, your Honor.

(Pause.)

MS. MITCHELL:  Your Honor, may I continue?

THE COURT:  Are you finished?  Okay.

Then, please, your question.

MS. MITCHELL:  Thank you.

BY MS. MITCHELL:

Q    Were you familiar with this L.A. City Controller audit prior to today?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes, I was aware of the audit.

BY MS. MITCHELL:

Q    And this was released -- showing you page two of the exhibit, just the introductory letter, this was released December 5th of 2023.  Is that right?

MR. MCRAE:  Sorry.  That's not on the screen.

MS. MITCHELL:  Thank you.

III-39

        MR. MCRAE:  Relevance.

        MS. MITCHELL:  Your Honor, there's an objection
pending.

        THE COURT:  Overruled.

        THE WITNESS:  That is what the letter indicates as
its release date, yes.

BY MS. MITCHELL:

Q    Showing you the bottom of the page, page two, the
findings by the L.A. City Controller were:

        "The data entry issues related to

        participant enrollment and exit, and bed

        attendance data."

    Do you see that?

        MR. MCRAE:  Objection, relevance.

        THE COURT:  Overruled.

        THE WITNESS:  I do see that.

BY MS. MITCHELL:

Q    Do you disagree with the controller's finding that
there were data entry issues relating to enrollments and
exits?

        MR. MCRAE:  Objection, vague, lack of foundation,
and relevance.

        THE COURT:  Overruled.

        THE WITNESS:  This audit is -- was largely about
the -- LAHSA's monitoring of bed availability, and there

III-40

have been ongoing issues with daily real-time assessment of that ability, and I believe that LAHSA has acknowledged that, and has initiated, as a result of this audit, improvements in the system.

BY MS. MITCHELL:

Q    So my question was, were you -- do you disagree with the findings that there were data entry issues relating to participant enrollments and exists and bad attendance data?

MR. MCRAE:  Objection, relevance, compound, lack of foundation.

THE COURT:  You can answer the question, sir.

THE WITNESS:  I don't disagree that the audit cited issues, for multiple reasons, around LAHSA's bed availability system, and that -- and the need for improvements.

BY MS. MITCHELL:

Q    The next finding is:

        "LAHSA did not follow up with interim
        housing providers on their point-in-time
        sheltered homeless count data, despite
        red flags indicating potential data
        quality issues."

    Do you see that finding?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

III-41

THE WITNESS:  I do see that.

BY MS. MITCHELL:

Q    Were you aware of that prior to today?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I'm aware of this audit.

BY MS. MITCHELL:

Q    Do you disagree with the controller's finding --

MR. MCRAE:  Relevance.

BY MS. MITCHELL:

Q    -- that the LAHSA failed -- that:

"LAHSA failed to follow up, despite red

flags indicating potential data quality

issues"?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.  You can answer that question, please.

THE WITNESS:  This is regarding the point-in-time count, and LAHSA's execution of the point-in-time count, which relies on a census of the current occupants of shelters city- and countywide.  If the controller found that, I did not see LAHSA objecting to that.  Actually, I didn't see if they made any commitments on improving that, but I had no reason to -- I'm just not familiar enough with the interaction between LAHSA and the service providers as

III-42

it relates to the point-in-time count, to agree or disagree.

MR. MCRAE:  I renew the lack of foundation objection for that reason.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    Can you read the next bullet point down for us, starting with "A significant number."

A           "A significant number of shelters have recently reported low bed utilization rates, increasing the risk that the number of sheltered homeless is being undercounted, and that the available beds may not be used efficiently."

MR. MCRAE:  Object -- excuse me.

THE COURT:  Was there an objection, Counsel?  I missed it.

MR. MCRAE:  It was relevance.

MS. MITCHELL:  I'm sorry.  Was that overruled, your Honor?

THE COURT:  Yes.  You may ask the question.  I think the question was answered -- or asked.  I didn't hear an answer, though.

BY MS. MITCHELL:

Q    I'll ask the question.  Do you have any reason to disagree with those findings by the L.A. City Controller?

III-43

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't have a basis to agree or disagree at this time.

BY MS. MITCHELL:

Q    Now, seven years prior to this, in 2016, LAHSA attempted to develop, like, a real-time shelter bed availability system.  Are you aware of that?

MR. MCRAE:  Objection, vague, lack of foundation, and relevance.

THE COURT:  Overruled.

THE WITNESS:  I am somewhat aware of that.  I'm aware that it happened.  I'm not aware of the details.

BY MS. MITCHELL:

Q    Okay.  And are you aware that they were unable to do so, or they did not complete that task?

MR. MCRAE:  Objection, vague, compound, lack of foundation, and relevance.

THE COURT:  Overruled.

THE WITNESS:  I'm not aware of the details of that effort.

BY MS. MITCHELL:

Q    Okay.  Why don't you go ahead and read bullet point four here for us, please.

A        "LAHSA attempted to develop a

III-44

public-facing shelter bed availability system, 'Find A Shelter,' in the past, but low participation rates by providers and inaccurate data limited the usefulness of the system."

Q    Do you have any reason to disagree with that finding by the controller?

MR. MCRAE:  Objection, lack of foundation, and it's a continuing objection, relevance, and vague.

THE COURT:  Overruled.

THE WITNESS:  I don't have a basis to agree or disagree.

BY MS. MITCHELL:

Q    Showing you the final bullet point.  Can you please read that into the record?

A    "LAHSA's current system for tracking bed availability, 'Bed Reservation System,' is so unreliable that LAHSA relies on daily census e-mails to track bed availability, rather than the reservation system."

Q    Do you have any reason to disagree with that finding by the controller last year?

MR. MCRAE:  Lack of foundation, relevance, and vague.

III-45

MS. MITCHELL:  I apologize.  I also misstated the date.  It was -- I said, "Last year."  It was two years ago, or a year and a half ago.

THE COURT:  Overruled.

MR. MCRAE:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  I don't have a basis to either agree or disagree.

THE COURT:  Just one moment, please.  All right.  Thank you.  Please continue.

BY MS. MITCHELL:

Q    Showing you Exhibit 91, Los Angeles Homeless Services Authority finance contracts, risk management, and grants management review, which was completed by L.A. County Department of Auditor-Controller, dated November 19th of 2024.  I believe your counsel is giving you a hard copy.  Were you familiar with this audit prior to appearing here today?

MR. MCRAE:  We're going to be giving you a physical copy.  Just one second.

THE COURT:  Thank you.

BY MS. MITCHELL:

Q    My question, Mr. Szabo, was, were you familiar with this audit prior to today?

THE COURT:  Counsel, he's going to look at that

III-46

for just a moment.

BY MS. MITCHELL:

Q    Would you like more time, Mr. Szabo?

THE COURT:  Yes, he -- let the witness take the time to review this.  Well, you can ask the initial question, if he's aware of it, but then, if he needs time, I want to give him the time to review it.

MS. MITCHELL:  That's fine, your Honor.  Thank you.

THE WITNESS:  This is an audit requested by the L.A. County Board of Supervisors, and conducted by the Los Angeles County Department of Auditor-Controller on county funds.  I am not familiar with this audit.

BY MS. MITCHELL:

Q    Now, LAHSA is a joint powers authority.  Is that true?

A    That is true.

Q    So it is run, effectively, by both the City and the County together.  Is that right?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  It's run by an executive commission, which is appointed by the County and the City.

BY MS. MITCHELL:

Q    Would you agree that if -- findings of poor data quality of LAHSA by the County, that would impact

III-47

interactions and homelessness response services that the City uses LAHSA for as well?

MR. MCRAE:  Objection, it's an incomplete hypothetical.  It's vague.  There's a lack of foundation, and it doesn't have any relevance, no idea what we're talking about in terms of services, time, anything.

THE COURT:  This has come before the Court again.  It's the joint powers agreement.  It's dated February 28, 2001.  Counsel, do all of you have that?

MR. MCRAE:  And I'm sure that we do, your Honor, but my objection is not to whether it's joint powers --

THE COURT:  Thank you.  Would you get that out?  Would you get that?  Would you get --

MR. MCRAE:  -- but this question.

THE COURT:  I'm sorry.  Would you get that out, please.

MR. MCRAE:  Sure.

MS. MITCHELL:  I don't believe it was identified as an exhibit.  I can certainly pull it up, your Honor, if it's helpful.

THE COURT:  The joint powers agreement was referred to before.  It's part of the record.

MS. MITCHELL:  It's -- it was -- I think it was cited in our response, as well, your Honor.

THE COURT:  It was.

III-48

MR. MCRAE:  That's not what my objection pertains to.  It was a question about this document, and it wasn't -- I'm not -- that wasn't my objection.  I didn't object to the question about joint powers.  My objection was to this question about this document.

THE COURT:  Well, then, restate the question. Perhaps I misunderstood.  My apologies.

BY MS. MITCHELL:

Q   Would you agree that findings by L.A. County of deficiencies in LAHSA's finance contracts, risk management, and grants management system, findings by L.A. County, would be relevant to the City's work with LAHSA, as well?

MR. MCRAE:  Objection, relevance, calls for a legal conclusion.

THE COURT:  Overruled.

MR. MCRAE:  It's vague.  It lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  It depends on the program.

BY MS. MITCHELL:

Q   Going to page -- I'm on page three of Exhibit 91, which, on the attachment, is page one of 16, finding number one, "Did not establish agreements for working capital advances."  Were you familiar with that finding prior to today?

MR. MCRAE:  Objection, relevance.

III-49

THE COURT:  Overruled.

THE WITNESS:  Not this specific finding, no.

BY MS. MITCHELL:

Q    Now, the City receives money from Measure H, or did prior it becoming it Measure A, but during this time, the City received money as part of the Measure A distribution. Is that right?

MR. MCRAE:  Relevance.

THE COURT:  I'm sorry.  I couldn't hear it.

MR. MCRAE:  Relevance.  Sorry.

THE COURT:  Overruled.

THE WITNESS:  There was nothing in Measure H that allocated dollars directly to the City, no.

BY MS. MITCHELL:

Q    Did the City benefit from Measure H at all?

MR. MCRAE:  Objection, vague, and relevance.

THE COURT:  Overruled.  Please answer the question.

THE WITNESS:  Measure H was used largely to fund services for permanent supportive housing and interim housing units that -- many of which were established by the City, and many of which are within the City of Los Angeles.

BY MS. MITCHELL:

Q    So you would agree that the City benefitted from Measure H funds?

III-50

MR. MCRAE:  Objection, vague, lack of foundation, and relevance.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I would agree.

BY MS. MITCHELL:

Q    Turning to the next finding, on page two of the attachment, which is page four of the exhibit, zooming in on number two, the finding that "LAHSA did not recoup annual cash advances," were you aware of this finding prior to today?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  Not specific to this audit.

BY MS. MITCHELL:

Q    Turning to the next finding, number three, which is page five of the exhibit, that there was "inadequate contract data," were you aware of that finding prior to today?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Not as it relates to this audit.

THE COURT:  I'm sorry?  I didn't hear.

THE WITNESS:  Not as it relates to -- no.

THE COURT:  Okay.

III-51

THE WITNESS:  No.

BY MS. MITCHELL:

Q    Finding number four, "Inadequate controls over cash advances" -- and this is page six of the exhibit -- were you aware of that finding prior to today?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  Not as it relates to this audit.

BY MS. MITCHELL:

Q    In any of these findings, one, two, three, or four, do you have any reason to doubt the accuracy of the findings that were issued by the County Controller's Office?

MR. MCRAE:  Objection, lack of foundation, and relevance, and vague.

THE COURT:  Overruled.

THE WITNESS:  I don't have a basis to agree or disagree with the findings.

BY MS. MITCHELL:

Q    Finding number five, "Inappropriate use of funds," this is on page seven of the exhibit.  This is Exhibit 91.  Have you seen -- excuse me.  Were you familiar with this finding prior to today?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  Not as it relates to this audit, no.

III-52

BY MS. MITCHELL:

Q    Do you have any reason as you sit here today to disagree with the findings by the Country Controller-Auditor?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I don't have a basis for -- to agree or disagree.

THE COURT:  Just one moment, Counsel.

MS. MITCHELL:  Would you like me to go back to the next -- the prior page, your Honor?

THE COURT:  Yes, please, to number five.  I'll be with you in one moment.  Thank you, Counsel.

MS. MITCHELL:  Thank you, your Honor.

BY MS. MITCHELL:

Q    Mr. Szabo, going to the next page, page eight, finding number six, that there were late payments to sub-recipients, were you familiar with this finding prior to today?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Not as it relates to this audit.

BY MS. MITCHELL:

Q    Do you have any reason as you sit here today to

III-53

disagree with these findings?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.  And if you need to review the document more thoroughly, you may.

THE WITNESS:  It's fine.  I have neither a basis to agree or disagree.

THE COURT:  I'm sorry?  I couldn't hear.  I'm sorry.

THE WITNESS:  I do not have a basis to either agree or disagree with the finding.

THE COURT:  Thank you.

BY MS. MITCHELL:

Q    Showing you finding number seven on the following page, page nine of Exhibit 91, the finding that there were record-keeping deficiencies with the working capital advances, were you familiar with that finding prior to today?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Not as it relates to this audit.

BY MS. MITCHELL:

Q    Do you have any reason to doubt the accuracy of this finding by the County?

III-54

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I don't -- I do not have a basis to agree or disagree with this finding.

BY MS. MITCHELL:

Q    Showing you the following finding on page 10 of Exhibit 91, that there were improper retroactive contacts.  Did you -- were you familiar with this finding prior to today?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Not as it relates to this audit.

BY MS. MITCHELL:

Q    Following page, page 11, finding number nine of Exhibit 91, the finding that there was inadequate contract -- excuse me, let me rephrase -- number nine, that there was an inadequate contract monitoring plan, were you familiar with the finding prior to today?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Not as it relates to this audit.

BY MS. MITCHELL:

Q    Do you have any reason to disagree with the findings?

III-55

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I don't have a basis to agree or disagree with that finding.

BY MS. MITCHELL:

Q    Moving on to page 13 of Exhibit 91, finding number 10, lack of contract monitoring standards -- and I'll zoom out -- were you aware of this finding prior to today?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Not as it relates to this audit.

BY MS. MITCHELL:

Q    And do you have any reason to disagree with this finding as you sit here today?

A    I don't have a basis to --

MR. MCRAE:  Objection, lack of foundation, and relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't have a basis to agree or disagree.

THE COURT:  Just a moment, Counsel.  Thank you, Counsel.

//

III-56

BY MS. MITCHELL:

Q    Finding number 11, on page 14, that there were delays with reimbursement claims, were you familiar with this finding prior to today?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Not as it relates to this audit.

BY MS. MITCHELL:

Q    By the way, you mentioned Measure H funds, permanent supportive housing units within the City of Los Angeles -- excuse me.  Measure --

THE COURT:  I couldn't hear you, Counsel.

BY MS. MITCHELL:

Q    Measure H funds, permanent supportive housing services for projects, permanent supportive housing projects, within the City of Los Angeles.  Is that right?

A    Correct.  It funds the intensive case management services associated with permanent supportive housing units within the City, yes.

Q    And is that -- are those permanent supportive housing units some of the units that are reported as part of the Alliance program?

MR. MCRAE:  Objection, vague.

THE COURT:  Do you understand the question?

III-57

THE WITNESS:  I do.

THE COURT:  You may answer.  Thank you, sir.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q    And what about the permanent supportive housing projects that have been reported as part of the Road Map program?

MR. MCRAE:  Objection, incomplete.  What about them?

THE COURT:  Overruled.

THE WITNESS:  The limited number of PSH units that are reported as part of the Road Map, yes, are funded -- they're funded by the County.  I do need to clarify this, because I do believe they are all funded from Measure H, but I'm not the authority on whether they're using other funds. There may be cases where they use other funds, but my understanding is that Measure H covers the services associated with all of the PSH units, both in the Road Map and in the Alliance.

BY MS. MITCHELL:

Q    Thank you.  Showing you finding number 15 on page 17 of Exhibit 91, there was no quality assurance and improvement program.  Were you familiar with this finding prior to arriving here at court today?

MR. MCRAE:  Objection, lack of foundation, and

III-58

relevance.

THE COURT: Overruled.

THE WITNESS: Not as it relates to this audit.

BY MS. MITCHELL:

Q Showing you Exhibit 92, a homelessness audit that was released by the L.A. City Controller called "Pathways to Permanent Housing," and it was dated December 10th of 2024, were you familiar with this audit prior to arriving here today?

MR. MCRAE: Objection, relevance.

THE COURT: Overruled. And just a moment, Counsel.

Do you have that in front of you, sir?

THE WITNESS: I do.

THE COURT: All right. Just a moment. All right. Thank you, Counsel. Your question, please.

BY MS. MITCHELL:

Q I think my question was, were you familiar with this audit prior to arriving here today?

MR. MCRAE: Relevance.

THE COURT: Overruled.

THE WITNESS: Yes, I am familiar with this audit.

BY MS. MITCHELL:

Q Showing you page three of Exhibit 92, the key findings on interim housing, there was a finding by the L.A. City

III-59

Controller that occupancy rates were -- never went above 78 percent during the five-year period that was reported.  Do you see that?

MR. MCRAE:  Objection, the document speaks for itself, it mischaracterizes the document, lack of foundation, and relevance.

THE COURT:  overruled

THE WITNESS:  I see that, yes.

BY MS. MITCHELL:

Q    Do you have any reason to disagree with the L.A. City Controller's findings here?

MR. MCRAE:  Objection, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  I do not have a reason to disagree, but I would need to review, if you're asking me to agree.

THE COURT:  I'm sorry?  I didn't hear.

THE WITNESS:  I said I don't have a basis to disagree.  I'll just leave it at that.  I don't have a basis to disagree.

BY MS. MITCHELL:

Q    The next finding is that there were severe data quality issues.  Can you read that paragraph for us, starting at the second bullet point, "Severe data quality issues."  Would you like me to blow it up a little more?

III-60

A   Can we move it over?  There we go.  Thank you.

"The lack of reliable information makes meaningful evaluation of system performance difficult, impedes LAHSA's ability to hold underperforming service providers accountable, and prevents the City from making informed decisions about where to direct future spending."

Q   Do you have any reason to disagree with that finding?

MR. MCRAE:  Objection, relevance, and lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I would need to review the specific area that it's describing.

THE COURT:  Take your time and look at the document.

And if you could blow up that section, Counsel, as we go, it would be easier for all the parties to read in the court.  So you're at "Severe data quality issues," the third bullet point.

(Pause.)

BY MS. MITCHELL:

Q   Are you ready, Mr. Szabo?

A   I am, I believe.  It appears that that is a general statement, so, unless I'm -- again, unless I'm missing it,

III-61

it appears that it is a general statement, and so I would not be able to address it without looking at the specifics that that general statement is referring to.

Q    But you don't have any reason as you sit here today to disagree with that statement.  Is that right?

A    I can't tell you -- sorry.

MR. MCRAE:  Objection, lack of foundation, relevance.

THE COURT:  Overruled.  You can answer the question, sir.

THE WITNESS:  I can't tell you if I agree or disagree unless I'm able to look at the underlying information.

BY MS. MITCHELL:

Q    Underlying information that the controller reviewed?

A    The basis.  I mean, again, what I was looking for was a section in the audit that was specific to that finding, and I don't see one.  So --

Q    I guess my question is -- I'm sorry.  Were you finished?

A    No.  I was just going to repeat that if -- that, in order for me to indicate to you whether I agree or disagree, have a basis for a basis for agreeing or disagreeing, I would need to see the underlying information.

Q    My question was a little bit more general, though, was

III-62

that -- well, maybe I'll ask a more general question, Mr. Szabo.  Do you have any reason -- regardless of what's contained in the audit, do you have any reason to disagree with the statement that there are severe data quality issues found within LAHSA?

MR. MCRAE:  Your Honor, objection.  That's unintelligible, if it's outside the audit, but pertaining to the audit.

THE COURT:  Overruled.

MR. MCRAE:  It's also lacking foundation, and it is not relevant.

THE COURT:  Overruled.  You can answer the question, sir.

THE WITNESS:  It is -- LAHSA is an enormous agency, with about $800,000,000 of programs that flow through it that it funds, and there have been well-documented issues.  So, in general, I don't disagree that there have been issues with data at LAHSA.

However, with that understanding, in the areas that the City is responsible for, particularly as it relates to our obligations under the settlement agreement, we have taken steps to ensure that the data that we are reporting is accurate, using our own processes.

MR. MCRAE:  Your Honor, just to clarify, when the witness said, "The settlement agreement," perhaps, just to

III-63

clear the record, he could state what settlement agreement

he's referring to, so the record is clear.

THE COURT:  Is that your question of him?

MR. MCRAE:  It's not a question.  It's just a

request.  For clarity of the record, it might be helpful.

THE COURT:  Cross examination, please ask him.  If

you want to ask him now, I have --

THE WITNESS:  Yes.

MR. MCRAE:  Thank you.  Thank you, your Honor.

MS. MITCHELL:  I can ask the question, your Honor.

It's fine.

BY MS. MITCHELL:

Q    Mr. Szabo, when you refer to the --

THE COURT:  We have cross examination, but, for

clarity, just --

THE WITNESS:  Yes.

THE COURT:  -- which are you referring to?

THE WITNESS:  I'm referring to the settlement

agreement that is the basis of this entire proceeding.

THE COURT:  Are you referring to the Road Map

agreement?

THE WITNESS:  The --

THE COURT:  Are you referring to the LA Alliance

agreement --

THE WITNESS:  The LA Alliance agreement.

III-64

THE COURT:  -- or are you referring to Inside Safe?

THE WITNESS:  I'm referring to the settlement agreement that --

THE COURT:  Hold on.  There's --

THE WITNESS:  -- of which Inside Safe is part of our reporting.

THE COURT:  There's lot of settlement agreements. Let's go Road Map agreement.  Let's take that one first.

THE WITNESS:  Yes.

THE COURT:  LA Alliance?

THE WITNESS:  Yes.

THE COURT:  Inside Safe?

THE WITNESS:  Yes.

THE COURT:  Okay.  Got it.

BY MS. MITCHELL:

Q    Does the City of Los Angeles rely on LAHSA to report data as part of those three programs?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  We do, and we have to.  We have to work with LAHSA in all -- yes.  We have to work with LAHSA. They are a contractor.  They work with the service providers.  They contract with the service providers.  So yes, we work with LAHSA, and we do rely on their data,

III-65

subject to our verification.

BY MS. MITCHELL:

Q    Well, let's go back real quick.  When you said, "We rely on their data, subject to verification," what does that mean?

A    That means that we have a professional staff that works with LAHSA to reconcile and verify, to the very best of our ability, the data that we're reporting both to the city council and the mayor, and to this Court.

Q    But the data is coming from LAHSA, correct?

        MR. MCRAE:  Objection, argumentative, and asked and answered.

        THE COURT:  I want to hear your question again. I'm not sure I heard it correctly.

BY MS. MITCHELL:

Q    The data is coming from LAHSA, correct?

        MR. MCRAE:  It's vague, it's asked and answered, and it's argumentative.

        THE COURT:  Overruled.  You can answer the question.  "The data is coming from LAHSA?," I think was the question.

        THE WITNESS:  In some cases, LAHSA owns the data, or LAHSA is the source of the data.  That is correct.

BY MS. MITCHELL:

Q    The next bullet point, "LAHSA's program management and

III-66

monitoring are vastly inadequate," can you read that paragraph into the record, please.

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  "The agency does not have a formal process in place to regularly review the performance of providers, including occupancy, placement rates, and hold underperforming service providers accountable by requiring significant corrective action."

BY MS. MITCHELL:

Q   Do you have any reason to disagree with that finding as you sit here today?

MR. MCRAE:  Objection, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  Again, it's not clear what it's referring to, if that's a general statement or if it's a specific program.

THE COURT:  Just one moment, please.  Thank you.

BY MS. MITCHELL:

Q   The three programs that we have been discussing that were subject to the assessment, Inside Safe, the Alliance program, and the Road Map program, would you agree that

III-67

those three programs make up the majority of the housing and shelter projects within the City of Los Angeles?

MR. MCRAE:  Objection, relevance --

THE COURT:  Overruled.

MR. MCRAE:  -- and vague.

THE WITNESS:  It -- I believe it does, yes.  I believe that's a fair statement.

BY MS. MITCHELL:

Q    Let's move on to Exhibit 1.  Can you describe the Road Map agreement for us, please?

MR. MCRAE:  Objection, relevance.

THE COURT:  Well, just a moment.  Before we get into that, do you want to recess --

MR. MCRAE:  Sure.

THE COURT:  -- the session, Counsel?

MS. MITCHELL:  I can --

THE COURT:  No.  If you want to continue on, that's fine.  I'm just trying to be polite.

MS. MITCHELL:  I can keep going, your Honor.

THE COURT:  Do you want -- all right.

MR. MCRAE:  I thought we were asking the witness, as well, whether he needs a break.  I don't know.

THE COURT:  Do you need a recess at all?

THE WITNESS:  A brief recess would be nice.

THE COURT:  Sure.  Then let's take one.  Okay.

III-68

THE WITNESS:  Thank you.  Appreciate it.

THE COURT:  Then, Counsel, 15 minutes.  Go have a good recess.  Okay.  We'll see you in 15 minutes.  In fact, let's make that easy.  Let's make that 20 minutes, so quarter to the hour.  Okay?  Thank you very much.  You may step down, take a rest.  And, by the way, you're more than welcome to talk to counsel at any time.  There's no preclusion.  Okay?

(Proceedings recessed briefly.)

THE COURT:  We're back on the record, Counsel.  All parties are present.

MR. UMHOFER:  Your Honor, the Court has previously requested a glossary of the council districts, their current -- and their current occupants.  We have prepared that.  I provided it to all the other parties over here.  I don't think, at this point, in the second rendition, that there's any objection to it.  I'm happy to bring this up to the Court.  It's been distributed to the parties.

THE COURT:  Just mark it as an exhibit.

MR. MCRAE:  Your Honor, I'm sorry.  I know that earlier there was an issue.  I'm afraid I wasn't briefed on who counsel on my team was speaking to, so that I could confirm that this is acceptable.  I don't know.

MR. UMHOFER:  I spoke with Angelique.  I gave her a copy.

III-69

THE COURT:  I simply want CD1, for instance, to have a name of a councilperson.  I know who they are, but we'll refer to that council district and the name of the councilperson if we need to.  Okay?

MS. MITCHELL:  With just the council members, your Honor, there's both current and prior occupant.  Did the Court require prior occupant, as well?

THE COURT:  I probably know who the prior occupants are by heart.  I simply want to know who the present occupants are.  Do you have that?

MS. MITCHELL:  Okay.  So maybe just strike the second column, and then we can provide the Court with the information requested.

MR. UMHOFER:  Okay.  We'll do a third rendition of that and get it to the Court.

MR. MCRAE:  Thank you, your Honor.

THE COURT:  And, by the way, if you want to include both prior and present, that's fine, because we go clear back to 2020 with some of these agreements.  Okay?

MR. UMHOFER:  Your Honor, may I approach with that, then?

THE COURT:  Yes.

MR. UMHOFER:  Thank you, your Honor.

THE COURT:  Thank you.

MR. MCRAE:  Your Honor, I think that --

III-70

THE COURT:  Well, give it an exhibit number.  I don't like the record not to have an exhibit number.

Just a moment.  We can do this during lunchtime.  The witness is on the stand.  His time is valuable.  We're back in session.

MS. MITCHELL:  Thank you, your Honor.

THE COURT:  All right.  This is continued direct examination.

MS. MITCHELL:  Thank you.

BY MS. MITCHELL:

Q    Mr. Szabo, I think we were getting to the Road Map agreement.  Can you briefly describe what the Road Map agreement is?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  I can.  I would appreciate a physical copy, though.  This is kind of --

BY MS. MITCHELL:

Q    Exhibit 1.

(Witness proffered document.)

A    -- difficult to work with.  Thank you.

Q    Yes.  My question was, can you briefly describe the Road Map agreement?

MR. MCRAE:  Objection, calls for -- "describe" is vague, and, also, lack of relevance, lack of foundation.

III-71

THE COURT:  Well, just a moment.  I didn't hear the question.

BY MS. MITCHELL:

Q    Can you briefly describe the Road Map agreement?

MR. MCRAE:  It's --

THE COURT:  Overruled.

MR. MCRAE:  It's vague, lack of foundation, relevance.

THE WITNESS:  The Road Map agreement is an agreement between the City of Los Angeles and the County of Los Angeles whereby the City agreed to establish 6,000 new beds over a period of 18 months, beginning -- and this is what I was trying to refer to -- beginning in -- in fact, I don't remember the date, actually -- over a period of 18 months in 2020, beginning in 2020, through, I believe, December of 2021.

And the agreement was -- covered a period of five years, whereby the County agreed that it would pay the City a total of up to $293,000,000 to cover a portion of the services, the operating costs of those beds.  The total agreement was for 6,700 beds, but there were an additional 700 beds that were added that were already within existing agreements.

BY MS. MITCHELL:

Q    Now, what we're looking at in Exhibit 1 is the short

III-72

term sheet that was reached by the City and the County on June 18th, 2020.  Is that right?

MR. MCRAE:  Objection, legal conclusion, relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.  June 18th is what the document indicates.

BY MS. MITCHELL:

Q    Okay.  And looking at Exhibit 2, this is the memorandum of understanding between the County of Los Angeles and the City of Los Angeles.  It was Docket Number 185, and that was the more formalized agreement that was ultimately finalized October 13th of 2020.  Is that right?

MR. MCRAE:  Objection, vague, relevance, lack of foundation, calls for a legal conclusion.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    Or it was filed on October 13th of 2020?

MR. MCRAE:  Compound, same objections.

THE WITNESS:  October 13th, 2020, is what is indicated on the document as the filed date.

BY MS. MITCHELL:

Q    And this is, in fact, the final memorandum which finalized the terms and conditions involving the term sheet of the Road Map MOU.  Is that right?

III-73

          MR. MCRAE:  Objection, relevance, lack of foundation, calls for a legal conclusion.

          THE COURT:  Overruled.

          THE WITNESS:  Correct.

BY MS. MITCHELL:

Q     Okay.  Going back to the term sheet, which is Exhibit 1, the City committed to establishing 5,300 beds within 10 months, and if the City did so, it received a bonus of $8,000,000, is that right, from the County?

          MR. MCRAE:  Objection, relevance, and calls for a legal conclusion again.

          THE COURT:  Overruled.

          THE WITNESS:  Correct.  That's what the term sheet says.

BY MS. MITCHELL:

Q     And the City actually accomplished that goal, right? It established 5,300, or more than 5,300 beds in 10 months, and --

          MR. MCRAE:  Relevance.

BY MS. MITCHELL:

Q     -- and received the bonus, the $8,000,000 bonus, from the County?

          MR. MCRAE:  Relevance.

          THE COURT:  Overruled.

//

III-74

BY MS. MITCHELL:

Q    Is that right?

A    I don't believe we received the bonus.

Q    Did the City build over 5,300 beds within 10 months?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.  Yes, we did.

BY MS. MITCHELL:

Q    But the City never received the $8,000,000 bonus from the County?

MR. MCRAE:  Asked and answered, lack of foundation --

THE COURT:  Overruled.

MR. MCRAE:  -- relevance.

THE COURT:  Overruled.

THE WITNESS:  And I need to just clarify.  I wasn't CAO at the time.  I do not -- it is not my recollection that we received the bonus, but I would need to confirm that.  I don't believe we did.

BY MS. MITCHELL:

Q    Okay.  Showing you what has been marked as Exhibit 5, this is the COVID-19 Homelessness Road Map report involving a City-County MOU dated April 15th of 2021, with interventions open and occupiable on April 16th of 2021. Were you CAO at this time?

III-75

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  April 15th, 2021?

BY MS. MITCHELL:

Q    Correct.

A    I was not CAO at that time.

Q    You were still in the mayor's office.  Is that right?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MS. MITCHELL:

Q    Showing you page five of five, how many total confirmed beds were open and occupiable on April 16th of 2021?

MR. MCRAE:  Objection, relevance, and lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  The report indicates 6,195.

BY MS. MITCHELL:

Q    And going back one page, on the new beds, page four on Exhibit 5, how many new beds did the City establish by this date?

MR. MCRAE:  Objection, lack of foundation.  The witness can only read what's on the document.

MS. MITCHELL:  According to the report.

MR. MCRAE:  Well, then, the document speaks for

III-76

itself, and there's not a question, other than "Can you read?"

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  The report indicates 5,467.

BY MS. MITCHELL:

Q    All right.  Now, as part of the Road Map beds, the City was using a mix of beds, some interim, some permanent supportive housing, some safe parking, and some time-limited subsidy vouches.  Is that right?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  We were using a mix of -- it is accurate that we were using a mix of housing interventions. As just a clarification, at the time the rental subsidy program was called "Rapid Rehousing."

BY MS. MITCHELL:

Q    Now, the City has been reporting thousands of time-limited subsidy beds, also known as "rapid rehousing beds," as part of its Road Map obligation for the last five years.  Is that right?

MR. MCRAE:  Objection, vague, lack of foundation, and relevance.

THE COURT:  Overruled.

III-77

THE WITNESS:  We have been reporting -- a portion of our Road Map commitment has been met over the last five years, through either the rapid rehousing program or its successor program, time-limited subsidies.

BY MS. MITCHELL:

Q    And for the last couple years, at least, it's been roughly 2,000 beds of the 6,700 that were reported as part of the Road Map agreement have been time-limited subsidy beds.  Is that right?

MR. MCRAE:  Objection, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  It has been approximately that number.

BY MS. MITCHELL:

Q    Okay.

A    It has fluctuated, as the agreement allows us to do.

Q    Were you aware that a significant portion of the funding for those beds was coming from sources outside the City of Los Angeles?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.  You may answer the question.

THE WITNESS:  "Outside of the City of Los

III-78

Angeles," you're referring to the TLS program?

BY MS. MITCHELL:

Q    Correct.

MR. MCRAE:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  We were aware, we are aware, that the program combines funding from other sources.  It's a single program.  It is a program run by LAHSA, and in an effort to maximize the dollars and to provide as many rental subsidies to as many persons experiencing homelessness, or formerly experiencing homelessness, as possible, they combine the funding, for efficiency purposes.  We are -- we do understand that.

BY MS. MITCHELL:

Q    And you understood that for the last five years, that a significant portion of the funding was coming from the County and the state for these beds.  Is that right?

MR. MCRAE:  Objection, lack of foundation, vague, and relevance.

THE COURT:  Overruled.

THE WITNESS:  Well, we're now talking about, you know, who touched the money last, basically.  There are multiple sources of funds that fund this program.  There are funds that flow directly from the state to LAHSA.  There's funds that flow from the state to the County, funds that

III-79

flow from the state to us, and that is a portion of how we're funding the TLS program, yes.

BY MS. MITCHELL:

Q    Okay.  So, in essence, money is coming from the state, money is coming from the County, and money is coming from the City, and they're all going into one account that is funding the beds.

MR. MCRAE:  Objection.

BY MS. MITCHELL:

Q    Is that accurate to say?

MR. MCRAE:  Objection, compound, vague, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  It is a -- that's accurate.  It is a program that is designed to maximize the use of the dollars, rather than have siloed programs.

BY MS. MITCHELL:

Q    Let's go ahead and go back to Exhibit 2.  Do you have Exhibit 2 in front of you, the City-County MOU?

A    Yes, I do.

Q    Okay.  Let's look at Section 3A, and, looking at Section 3A, the City had an obligation to provide a total of 6,000 new beds.  Is that right?

MR. MCRAE:  Objection, lack of foundation, and relevance --

III-80

THE COURT:  Overruled.

MR. MCRAE:  -- and also calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  That is what Section 3A indicates, yes.

BY MS. MITCHELL:

Q    And the City specifically had to provide those beds. Is that right?

MR. MCRAE:  Objection, asked and answered, it calls for a legal conclusion, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  "Provide" is the term the document uses, yes.

BY MS. MITCHELL:

Q    Okay.  Now, going over to Section 3E, please read into the record Section 3E.

A         "Except as otherwise stated in this MOU,
          or to the extent County is responsible
          for costs in the agreement or plan
          between the parties other than this MOU,
          City is responsible for all costs,
          including capital costs, operating
          costs, and/or other expenses associated
          with the 6,000 new beds and 700 other

III-81

beds described herein."

Q    It's your contention that the City provided those beds, even though the City did nothing to procure those TLS beds. Is that right?

MR. MCRAE:  Your Honor, objection.  This is legal argument about the interpretation of a contract.  It lacks foundation, it calls for a legal conclusion, and it assumes that the word "provide" or "responsible" is mutually exclusive with the money coming from someplace else, so long as the City provides the beds.  So it's inappropriate to examine the witness on the interpretation of the contract.

THE COURT:  Overruled.  You can answer the question.

MS. MITCHELL:  And I'm also going to object that that was significant coaching by counsel, your Honor.

MR. MCRAE:  It's not coaching.  It's articulating the objection.

THE COURT:  I thank both of you for your participation.

MS. MITCHELL:  Thank you, your Honor.

THE COURT:  Let's cease the colloquy between counsel.  Am I clear?

MR. MCRAE:  Yes, your Honor.

THE COURT:  Clear?

MR. MCRAE:  Yes, your Honor.

THE COURT:  Am I clear?

MR. MCRAE:  Yes, your Honor.

THE COURT:  All right.  Thank you very much.  The objection is overruled.

Your answer, sir, if you can remember the question.

THE WITNESS:  Could you repeat the question?

BY MS. MITCHELL:

Q    It's your contention that the City provided those beds, even though the City did nothing to procure those beds?

MR. MCRAE:  Objection --

BY MS. MITCHELL:

Q    Is that correct?

MR. MCRAE:  -- vague as to "you," lack of foundation, calls for a legal conclusion, relevance, and assumes facts.

THE COURT:  Overruled.  You can answer that question, sir.

THE WITNESS:  The definition of "new beds" in the MOU specifically identifies rental assistance, including rapid rehousing, as an eligible intervention that would quality for the counting of new beds.

BY MS. MITCHELL:

Q    Mr. Szabo, is it the City's contention that the City provided those beds, even though the City did nothing to

III-83

actually procures those additional beds?

MR. MCRAE:  Objection, that's argument, lack of foundation, vague, and relevance.

THE COURT:  Overruled.  You can answer that question, sir.

THE WITNESS:  I completely disagree that -- with the assertion that the City did absolutely nothing to procure those beds.  We -- the purpose of this agreement was to establish through multiple means, and as many means as possible, an extraordinarily high number of beds in a very, very short period of time.  I mean, the fact that we agreed to 6,000 new beds over an 18-month period of time required the City to use every possible resource and pursue every possible pathway to get as many beds out as possible.

So, if the agreement required the City to create from the ground up its own programs, there is no way we would have been able to -- no way we would have been able to agree to that, and it wouldn't have been efficient.  It would have been a waste of resources.  And so, yes, the city used every possible option, as allowed for in the MOU between the City and the County, to establish those beds, including programs run by other agencies, which we funded.

BY MS. MITCHELL:

Q    Even though those funds were coming from the state and from the County, regardless?

III-84

MR. MCRAE:  Objection, it's argument, lack of foundation, relevance, calls for a legal conclusion, and it's been asked and answered now.

THE COURT:  It's incomplete.  Restate the question, Counsel.

BY MS. MITCHELL:

Q    It is the City's contention that the City should get credit for those time-limited subsidy beds that it did not pay for, where the funding came from other sources, even though that funding was coming into LAHSA regardless of whether the City was also contributing money?

MR. MCRAE:  Objection, it's compound, it assumes facts, it calls for a legal conclusion, it lacks foundation, relevance, and it's vague.

THE COURT:  Overruled.  You may answer the question, sir.

THE WITNESS:  So there's a number of -- I think you're making a number of points there I don't -- I'm going to try to address.  So, number one, you know, we were responsible for establishing these beds or providing these beds.  I don't think, you know, a city or a county or a state is funded -- there's multiple sources of funding.  I don't think -- if you're arguing that the City is responsible for establishing these beds using its own locally generated general funds, that's -- that makes no

III-85

sense whatsoever.  The --  of course we would maximize the use, and use state funds or federal funds or other funds that the City is able to secure for the purposes of providing housing.

That's -- it would be -- it would make absolutely no sense to limit the funding sources in which we could rely on to get these beds available for people who were living on the street, and yes, I mean, if we're establishing and providing the beds, using a program that uses other sources of funds, I find that completely legitimate and consistent with the agreement.  We do the same exact thing with permanent supportive housing, of which this agreement allows for.

The City doesn't pay for -- out of its own general funds the entirety of the cost of the project.  We contract with a developer.  We provide a certain subsidy.  Some of that subsidy we get through a federal program, the Home program.  The developer is responsible for other sources of funds, state funds and federal funds, and that, combined, causes -- you know, allows for the construction of that new housing.

Nowhere did we ever contemplate limiting the City to programs its only developed, or funds that it's only -- that are only locally generated.  We would not have agreed to that.  It didn't agree -- it didn't require that, and, by

III-86

the way, the County paid us $53,000,000 in the first year, and $60,000,000 the second year, and 60 the third, 60 the fourth, and 60 the fifth, validating that we had met our obligation.

BY MS. MITCHELL:

Q    The money that was being paid from the County for time-limited subsidy beds was in addition to the yearly contributions the County was making directly to the City as part of this program.  Is that right?

MR. MCRAE:  Objection, vague, lack of foundation, relevance.

THE COURT:  Overruled.  You can answer the question, sir.

THE WITNESS:  The $60,000,000 was exclusive to providing services for the beds that were established, not for establishing the beds.

BY MS. MITCHELL:

Q    Are you aware that A and M made the determination that there were no expenditures for 70 percent of the time-limited subsidy contracts that they were given as part of the Road Map program?

MR. MCRAE:  Objection, mischaracterizes the assessment, relevance, lack of foundation, and vague.

THE COURT:  overruled

THE WITNESS:  I'm aware that they reported that

III-87

finding.

BY MS. MITCHELL:

Q    Are you aware that there was no identification of time-limited subsidy slots in the 30 percent of the contracts where they did find expenditures?

MR. MCRAE:  Same objections, relevance, lack of foundation, vague.

THE COURT:  Overruled.

THE WITNESS:  Can you repeat the question?

BY MS. MITCHELL:

Q    Are you aware that Alvarez and Marsal could not identify the number of slots belonging to each contract for the 30 percent of contracts they reviewed that did provide expenditures for TLS?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I'm aware that they were unable to reach a conclusion within the time they had to write the report.

BY MS. MITCHELL:

Q    Moving on to the settlement agreement, the LA Alliance settlement agreement, which is Exhibit 25.

THE COURT:  I'm sorry, Counsel.  Could you repeat that?  Could you repeat that?

III-88

BY MS. MITCHELL:

Q    Yes.  Moving on to Exhibit 25, which is the LA Alliance settlement agreement.  We talked a bit about this yesterday, and as part of the settlement agreement, the City agreed to produce 12,915 beds.  Is that right?

MR. MCRAE:  Objection, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Thank you.  I'm going to leave these here because -- thanks.

The settlement agreement -- the City agreed to establish the required number of units, and subsequently that required number was determined to be 12,915.

BY MS. MITCHELL:

Q    And as part of the settlement agreement, of the City fulfilling the settlement agreement, the City provided a potential project list in November of 2022, which was the bed plan at the time.  Is that right?

MR. MCRAE:  Objection, calls for a legal conclusion.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    And I just put on the screen Exhibit 114, which is the Alliance potential project list, dated November 9th of 2022. Do you recognize this list?

III-89

MR. MCRAE:  Well, your Honor, there's two questions pending.  This is the second question.

MS. MITCHELL:  I'll withdraw the most recent question.

THE COURT:  So the question now is, do you recognize this document?

THE WITNESS:  I do recognize the type of document. I'm just trying to determine, what was this -- if this was part of our -- of a quarterly report to the Court, or was this a separate document provide?  I mean, this is how we --

THE COURT:  Just a moment.  Take your time with it.

THE WITNESS:  Yes.  This appears to be in the format that my office produces, yes.  I don't see what it is attached to, though, but -- or whether this is a standalone document, but this appears --

THE COURT:  Just as a courtesy, they can give you the cover page of this, also.

THE WITNESS:  Okay.

THE COURT:  So, Counsel, you have 114.  Do you want to --

MS. MITCHELL:  There was no cover page with this. This was provided as a standalone document.

THE COURT:  Well, it's recognizable to the Court, but I -- you know, this is so simply resolved by each of

III-90

you.  Can you reach a stipulation that this a quarterly report?

MS. MITCHELL:  This is not a quarterly report, your Honor.

THE COURT:  I thought it was.

MS. MITCHELL:  No.

THE COURT:  My apologies.

MS. MITCHELL:  This is the potential project list, as identified by the top left.

THE COURT:  My apologies.

MS. MITCHELL:  Yes.

THE COURT:  Thank you very much.

BY MS. MITCHELL:

Q    This was a potential project list as of November 9th, 2022, which was submitted to the Alliance as the bed plan to meet, partially meet, the 60 percent obligation.  Do you recall that?

MR. MCRAE:  Objection, lack of foundation, calls for a legal conclusion.

THE COURT:  Take your time with that, because I think you and I thought it might be a quarterly report.

THE WITNESS:  Yes.

THE COURT:  I didn't look up at the project list.

THE WITNESS:  Right.  I don't recall the specifics, but, again, this is consistent with the types of

III-91

reports that we have generated regarding the projects in process.

BY MS. MITCHELL:

Q    Okay.  And on November 9th of 2022, that was about a month after the 2022 point-in-time count was released.  Is that right?

MR. MCRAE:  Objection, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MS. MITCHELL:

Q    And do you recall --

MR. MCRAE:  Your Honor, I'm sorry.  Did the witness answer the question?  I didn't hear it.  I'm sorry.

THE COURT:  I didn't hear an answer, either.

MR. MCRAE:  You heard it?

THE COURT:  No.

MR. MCRAE:  Okay.  That makes two of us.

THE WITNESS:  Correct.  I'm sorry.

MR. MCRAE:  Okay.  Thank you.

THE WITNESS:  The answer was yes, correct.

BY MS. MITCHELL:

Q    And do you recall, in providing this potential project list, that the total number of projects as provided by the City did not add up to 12,915?

III-92

MR. MCRAE:  Objection, lack of foundation, relevance.

THE COURT:  Overruled, but I don't expect you to do that kind of math in your head.  All right.

THE WITNESS:  Yes.  There's -- well, I'll just say this.  There's -- I mean, there's no -- there's no summary, so I'm not going to give you a -- be able to give you a number of --

THE COURT:  Well, we've got so many counsel here.  They've got calculators.

THE WITNESS:  Yes.

MS. MITCHELL:  We --

THE COURT:  Counsel, you can reach a stipulation quickly and quit wasting time with this.  How many?

MR. MCRAE:  Right.

THE COURT:  Get out your computers.  You've got them handheld.

MR. MCRAE:  Can somebody give me --

MS. MITCHELL:  We have a separate document that we can do.

THE COURT:  No, no.  Just a moment.  This is --

MR. MCRAE:  Give me the document.

THE COURT:  -- amazing.  Let's just get a calculation done quickly.  You don't have to do that in your head.

III-93

THE WITNESS:  Okay.

THE COURT:  Let them do it.

MR. MCRAE:  Can you add these up?  Get a calculator and add it up, and let me know.

THE COURT:  Also, as a courtesy to you and the Court, if there is a discrepancy, we have the right to know if it's one or, you know, a hundred.  So let's let them do the work.

THE WITNESS:  Okay.

MR. MCRAE:  Your Honor, so that we can make sure we're on the --

THE COURT:  Thank you, Counsel, very much.  I'm giving you direction now.  Before we address something --

MR. MCRAE:  Well, I have a question, though, to understand the Court's direction.  I don't know what I'm adding.  There's two columns.  So I don't know -- I want to be sure I'm being responsive.

THE COURT:  Walk over to counsel, and that will save some time.  That means both of you are rising to your feet.  You're moving towards each other.  We can resolve this very quickly.

(Pause.)

MS. MITCHELL:  Your Honor, I think what we just agreed to is we're going to run a sum on the Excel.  We'll share it with counsel during the break, and we'll come up

III-94

with a stipulated number --

THE COURT:  That's fair enough.

MS. MITCHELL:  -- and I can ask a different question in the meantime.

THE COURT:  Do it over the lunch hour.  Is that acceptable to both counsel?

MR. MCRAE:  Yes, your Honor.

THE COURT:  That way, we're not wasting time.  Thank you.

MS. MITCHELL:  Okay.

THE COURT:  Thank you.  All right.  Then please continue, Counsel.

BY MS. MITCHELL:

Q    So, as of the start of this agreement, did the City have a plan to reach all -- or to build -- on how the City was going to build all 12,915 beds?

MR. MCRAE:  Objection, vague, and relevance.

THE COURT:  Overruled.

THE WITNESS:  No.  We had a commitment.

BY MS. MITCHELL:

Q    And do you recall the approximate number of beds that the City had a plan for, and what the delta was between the plan and the commitment?

MR. MCRAE:  Objection, it's vague, there's a lack of foundation, and relevance.

III-95

THE COURT:  Do you understand the question?

THE WITNESS:  I understand the question.

THE COURT:  Overruled.  You can answer, sir.

THE WITNESS:  But I don't recall that, from 2022, what that actual delta was.  It's been a constantly evolving number.

BY MS. MITCHELL:

Q   But you remember that there was a delta, there was a difference?

A   There certainly would have been.

MR. MCRAE:  Same objections, relevance, lack of foundation.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q   Showing you Exhibit 24, which we talked about yesterday, which is the milestones and deadlines that was produced pursuant to the agreement, Section 5.2.  The City failed to meet its cumulative milestones every quarter, including the most recent one.  Is that right?

MR. MCRAE:  Objection, relevance --

THE COURT:  Overruled.

MR. MCRAE:  -- and also calls for -- to the extent it calls for a legal conclusion.

THE COURT:  Overruled.  Counsel, if you look back in the record, we've already had prior hearings concerning

this, as well.

THE WITNESS:  Correct.  That is correct.

BY MS. MITCHELL:

Q    Showing you Exhibit 34.

MS. MITCHELL:  And, Counsel, I'm going to show 35 next, also, if you want to get that ready.

BY MS. MITCHELL:

Q    Showing you Exhibit 34.  This was Exhibit A that was attached and filed in this case as Docket 858-1 on January 2nd of 2025.  This appears to be the quarterly reports, or it does state on the top, "Alliance Settlement Agreement Quarterly Report," for the quarter ending December 31st of 2024.  Do you recognize this document?

A    I do.

Q    Okay.  And that was for the October through December of 2024 period, is that right, quarter four -- excuse me, quarter two of the fiscal year?

A    This would have been the -- correct.  This would have been the report from quarter two of this fiscal year, yes.

Q    Okay.  And showing you page five of Exhibit 34, the total units or beds open to date you have as 12,815.  Is that right?

A    Four thousand eight hundred and fifteen, correct.

Q    Now I'm going to move on to Exhibit 35.

THE COURT:  Just a moment, Counsel.  Would you put

III-97

that document back up, please?

MS. MITCHELL:  Sure.  Would you like me to zoom in, your Honor?

THE COURT:  Would you blow that up, please?  All right.  Thank you.

BY MS. MITCHELL:

Q    Moving on to Exhibit 35, this is the Alliance settlement agreement quarterly report for the quarter ending March 31st of 2025, that was filed with this Court on April 15th, Docket 892-1.  Do you see that?

A    I do.

Q    And going to the end of this, how many units or beds open did the City report as of this last quarter?

A    Six thousand seven hundred and twenty-four.

Q    Okay.  Now, that astonishing catchup is because the City added Inside Safe beds to their reports for the first time.  Is that right?

MR. MCRAE:  Your Honor, I would move to strike. "Astonishing" is just argument.

THE COURT:  Stricken.  Just restate the question.

BY MS. MITCHELL:

Q    That catchup of about nearly 2,000 beds is from the City adding Inside Safe beds to its report for the first time.  Is that right?

MR. MCRAE:  Objection, incomplete as phrased,

III-98

relevance, lack of foundation.

THE COURT:  Overruled.  You can answer the question, sir.

THE WITNESS:  Approximately 1,200 of the beds were added from the Inside Safe program, yes.

BY MS. MITCHELL:

Q    And that is reflected here in footnote eight -- see if we can get that a little better -- which reads:

"Beginning January 1st of 2025, these
Inside Safe interim housing sites are
included in the Alliance list."

Is that right?

A    Correct.

Q    Now, Inside Safe beds had never been included in the Alliance agreement before.  Is that right?

MR. MCRAE:  Objection, that calls for a legal conclusion as to whether Inside Safe beds were included in the agreement, as opposed to reported, and it's vague, and it lacks foundation.

THE COURT:  Restate the question, Counsel.

BY MS. MITCHELL:

Q    Prior to this report, you had never reported any -- well, these 1,200 Inside Safe beds as part of your -- as part of meeting your obligation in the Alliance settlement. Is that right?

III-99

MR. MCRAE:  Objection, lack of foundation, relevance, legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  We had -- and I think you were -- specific to your question, we had included Inside Safe beds which were either under long-term contract or had been actually purchased by the City.  So we did include the Mayfair, which is used by Inside Safe, and I believe -- in the second quarterly report, I believe we included 216 beds. I want to double-check that, but I think we did that.

BY MS. MITCHELL:

Q   Okay.  The new beds that were added are beds that are hotel/motel leases in both occupancy agreements and booking agreements.  Is that right?

MR. MCRAE:  Objection, vague --

THE COURT:  Overruled.

MR. MCRAE:  -- and relevance.

THE COURT:  Overruled.

THE WITNESS:  The approximately 1,200 beds that were added were in occupancy agreements or booking agreements, correct.

BY MS. MITCHELL:

Q   Okay.  I want to -- before we talk about those, I want to take a look at some new permanent supportive housing beds that were added as part of this agreement, in lines -- let's

III-100

see.  There's a few of them here.  Let's start with lines 50, 51, and 52, where it notes, "Permanent supportive housing master lease."  Do you see that?

A    I do see that, yes.

Q    Okay.  And those beds were actually open as of 2023. Is that right?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  That's what we're reporting, yes.

BY MS. MITCHELL:

Q    But they weren't added to the agreement until this last quarter.  Is that right?

MR. MCRAE:  Object, your Honor.  "Added to the agreement" calls for a legal conclusion, and it's unintelligible, and it lacks foundation.

THE COURT:  Do you understand the question?

THE WITNESS:  I do understand the question.

THE COURT:  Overruled.

THE WITNESS:  I believe that is the case.  I believe that is the case, but I -- again, that's -- I would need to -- I would need to review.

THE COURT:  Is there something you would like to look at?  If so, we've got the time.

BY MS. MITCHELL:

Q    I can probably direct you a little bit to what you're

III-101

trying to look at.  Do you see the parenthetical that refers to like a footnote three or an endnote three next to all of these?  And then we can go look at endnote three, and that might help refresh your recollection.

A    That's what I was looking at, but there's no detail in endnote three.  So --

Q    So let's read endnote three:

            "Beginning January 1st of 2025, there
            permanent supportive housing sites are
            included in the L.A. -- in the Alliance
            list."

      Do you see that?

            MR. MCRAE:  Objection, relevance.

            THE COURT:  Overruled.

            THE WITNESS:  I do see that.

BY MS. MITCHELL:

Q    Why were those beds only included in the Alliance list beginning January 1st, 2025, if they were open in 2023?

            MR. MCRAE:  Objection, relevance.

            THE COURT:  Overruled.

            THE WITNESS:  I would need to review my notes on that.  I don't have that answer currently.

BY MS. MITCHELL:

Q    If we took a break, would you be able to review your notes, like, over lunch, and come back this afternoon and

III-102

answer these questions?

A    Yes.  No, that's -- I just don't have that memorized.

Q    Okay.  So we would ask for that for all of the ones with the note three of why there's -- because there's several others, and I can identify the lines -- why they were just added when they were opened previously, but I'll ask different questions, and we'll come back to that one.

So, regarding the Inside -- the new Inside Safe hotel/motel occupancy and booking agreements -- let's see. We'll go directly to them.  They're found largely on page four, lines 99 through 137.  Do you see that?  And it's small font.

A    Yes, I see that.

Q    Okay.  And this report was filed April 15th of 2025. Is that right?

A    Correct.

Q    This is about two months after the Alliance filed its motion for settlement compliance, on February 20th of 2025. Is that right?

MR. MCRAE:  Objection, relevance --

THE COURT:  Overruled --

MR. MCRAE:  -- and lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  If that was the date of the filing, then that would be accurate.

III-103

BY MS. MITCHELL:

Q    Okay.  Now, you never -- well, let's talk about the occupancy agreements.  Occupancy agreements are where the City enters into a master lease agreement for all or part of these hotels or motels -- is that right? -- as part of Inside Safe?

A    That's correct.

Q    Okay.  And what is a booking agreement?

A    A booking agreement is an agreement with a hotel or motel.  It is a contract whereby the City has the right to fill any or all available vacancies, or at least those contemplated in the agreement, as needed to house people involved -- or being provided housing through an Inside Safe operation.

Q    So, if a person needs a hotel room, the City will pay for it.  Is that right?

A    That is correct.  That is the advantage of the booking agreements, is that we only pay for what we use.

Q    And LAHSA actually pays for it, and the invoices the City, and the City reimburses LAHSA.  Is that right?

        MR. MCRAE:  Objection, compound, relevance, lack of foundation --

        THE COURT:  Overruled.

        MR. MCRAE:  -- and vague.

        THE COURT:  Overruled.

III-104

THE WITNESS:  It -- no.  It may have been that case in the -- initially, when the contracts were wrapped up with the service provider, and the service provider paid for the rooms, but, when we moved -- that was the initial phase of the program.  As we moved towards contracts, we have direct contracts with the hotels and motels.

BY MS. MITCHELL:

Q    Okay.  And for these 1,200 that were added, that were not included before, that was because previously you didn't believe that you could count these beds as part of the Alliance settlement program.  Is that right?

MR. MCRAE:  Objection, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  So the nature of the program, the nature of the Inside Safe program, has evolved and matured. When the program first began in late 2022 and into 2023, it was very temporary in nature, or the motels and hotels were not under contract.  There was no actual -- there was no sense that -- a belief that we would be able to report on rooms over time -- well, wait.

MR. MCRAE:  He wasn't finished with this answer. He was just giving you a courtesy to confer.

BY MS. MITCHELL:

Q    I'm sorry.  You can continue, Mr. Szabo.

III-105

A    So the program -- the Inside Safe program, when it was initiated, did not lend itself for us to be able to accurately -- or, rather, consistently -- report on the beds that were being used.  The beds were not under contract.  They were individual agreements that were issued under an emergency declaration, and, at the time, we were -- we weren't sure if there was going to be -- we weren't sure of the longevity of each of those rooms.  So it was -- we did not include those rooms in our reporting.

Q    Many of these rooms that you're reporting, these -- let's talk about the occupancy agreement -- are not leased through June 12th of 2027.  Is that right?

            MR. MCRAE:  Objection, relevance.

            THE COURT:  Overruled.

            THE WITNESS:  That's correct.

BY MS. MITCHELL:

Q    And just a couple months ago, in January and February, it was the CAO Office's position that the booking agreements would never count as part of the Alliance agreement.  Is that right?

            MR. MCRAE:  Objection, lack of foundation, relevance, relevance, calls for a legal conclusion.

            THE COURT:  Overruled.

            THE WITNESS:  I don't recall that being the position, that we -- that they would never count, but -- I

III-106

don't recall that.

BY MS. MITCHELL:

Q    Okay.  I'm going to be playing for you a portion of the audio of the Housing and Homelessness Committee.  This has been identified as Exhibit 150 and provided to counsel.

A    Yes.

     (Audio plays.)

Q    Okay.  I want to pause right there.  So you made the statement that "We are not counting any beds that are not in contract through June of 2027."

          MR. MCRAE:  Your Honor, I'd object.  There was more after that, and it should be played in context, for the rule of completion, and, also, the question as phrased is mischaracterizing the witness' testimony, and it's vague.

          THE COURT:  Overruled.  You can answer the question, and if the entire tape is going to be played, we can do that on cross.  Okay?

          THE WITNESS:  Again, repeat the question.

BY MS. MITCHELL:

Q    Yes.  My question was, as of this hearing, January 29th of 2025, it was the CAO's position and the City's position that these hotel/motel booking agreements that did not extend to June of 2027 could not be counted towards the Alliance settlement obligations.  Is that right?

          MR. MCRAE:  And, also, relevance, lack of

III-107

foundation, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  It wasn't our -- it was not our position that they could not be included.  It was our determination at the time not to include them.  There is nothing about Inside Safe beds that is inconsistent with the requirements of the settlement.  The nature of the program did not -- when it was initiated, did not lend itself to an ability to consistently report, and so that was a determination made internally.  It was not a determination on the eligibility of the beds, necessarily.

As the program matured and progressed and evolved, and we started to establish consistent booking agreements with motels over time, and consistent occupancy agreements, some of which were -- some of which would extend through 2027, we reevaluated, and made the determination to include those beds, because they were -- everything about those beds is consistent with the requirements in the settlement, or the definition of what a bed would be, could be counted for, in the settlement.  It is a new bed.  It was established after 2022.

The first beds were established in December of 2022.  They are used for the express purposes of providing immediate shelter to those that are living on the street.  It is exactly what is contemplated, although we have no

III-108

requirement in the settlement agreement to house individuals, that is certainly what -- the purpose of establishing housing, of course, is to house homeless individuals, and that's what that program is designed to do, and so we made the determination -- we revisited our position as to whether we should include them, and determined that we should include the beds while they exist.

Of course, if they're temporary, if the beds come offline before June of 2027, our obligation would be to replace those beds, of course, because our understanding is that there's no obligation that the beds are static.  We have to establish the total number of 12,915.  We currently have those 1,200 new beds that we added in last report that exist, that are housing people who were formerly living on the street.  If some of those beds come offline because the agreements end, we would be obligated to replace those beds, but they are compliant as they exist today.

MR. MCRAE:  Your Honor, for the record, can we have clarification that the agreement being referred to in the witness' responses to that last question -- whether that was the Alliance settlement agreement?

MS. MITCHELL:  I will stipulate that it was to the Alliance settlement agreement.

THE COURT:  Thank you.

MS. MITCHELL:  I think we're all clear.

III-109

BY MS. MITCHELL:

Q   So, to be clear, it's the City's position that it could have been counting these beds this entire time, but it just recently chose to start counting these beds in the last quarter?

MR. MCRAE:  Objection, compound, argumentative, mischaracterizes the witness' testimony, and also calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  I think that's fair.

BY MS. MITCHELL:

Q   And that's because you did not have any reasonable certainty that the motel room would be open through -- and available -- through June of 2027.  Is that right?

MR. MCRAE:  No.  Objection, your Honor, it mischaracterizes the witness' testimony, argumentative, calls for a legal conclusion, and vague.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  So the analysis -- as the program has evolved over time, so has our judgment and assessment, and initially we did not have a basis to determine the longevity of the program, whether the program was going to continue to rely on motels for multiple years, whether it was going to convert to something else.

III-110

This was a new program, established under an emergency order by a new mayor, a new administration, and so, as -- and that started in 2022.  We are now in the third year of the program, and there has been consistent commitment by the leadership of the City to the program.

I mean, just to remind you, it started under an emergency order.  The council declared a state of emergency At the mayor's request, the council handed the mayor extraordinary authority to conduct this work, and provided $50,000,000 in that first year.  The second year, they provided $250,000,000.  The third year, they provided $185,000,000.  And as we are currently in our budget deliberations --

THE COURT:  All right.  I'm sorry.  Would you repeat that?  That was a little bit took quick for me, and I apologize.

THE WITNESS:  Sorry.  I'm sorry, and I apologize to the reporter, as well.  The program started in 2022, under an emergency order.  In early 2023, the council appropriated $50,000,000 to the program.  In the following year, the council appropriated $250,000,000, the year after that, $185,000,000, and in this current year, or the current budget that we are -- that is under consideration, in fact, will be voted on by the city council tomorrow -- includes a continuation of the program yet again.

III-111

So, as the program has matured, as it has become more institutionalized, we reflected on our initial determination not to include the beds, because we just weren't sure how long the program was going to last, whether we would be able to identify for at least even a longer period than a few months whether the beds would be available.  But the beds that are currently available, or they're currently being used under the program, are all under some kind of a contract for an extended period of time.

If the -- even if the agreements are only a year, they could be renewed, and, while those beds are open, they are, in my view, completely compliant with the terms of the settlement.  I mean, it is quite literally what was contemplated in the discussions that led to the settlement. It is quite literally what's contemplated in the settlement, establishing in this case, under an emergency order, with urgency, beds that are provided to move people off of -- out of encampments and into those rooms, and then to resolve the encampment after the fact.

So everything about the program is consistent with what the settlement calls for, and the manner in which the program has been pursued, both by the mayor and by the funding decisions by the city council, is in every way consistent with best efforts.

III-112

BY MS. MITCHELL:

Q    And just so I'm clear, though, as of January 29th of 2025, it was the city's position that they were not counting these beds towards the Alliance settlement?

MR. MCRAE:  Objection, asked and answered, mischaracterizes the witness' testimony, and relevance.

THE COURT:  Overruled.  You can answer the question, sir.

THE WITNESS:  At that time, we had not reevaluated our previously held position, and so that is -- I believe that that's accurate.

BY MS. MITCHELL:

Q    Okay.  And all of these beds are still being held and operated out of the mayor's office through the Inside Safe program.  Is that right?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  The mayor's office administers the program.

BY MS. MITCHELL:

Q    And the mayor has declined to permit the controller to audit that program.  Is that correct?

MR. MCRAE:  Objection, lack of foundation, and relevance.

III-113

THE COURT:  Overruled.

THE WITNESS:  That is my understanding.

MS. MITCHELL:  I'm now going to play a clip from the Housing and Homelessness Committee, Exhibit 152.

MR. MCRAE:  Your Honor, can we have a proffer as to what this, hopefully, relates to?

MS. MITCHELL:  I mean, they've had the clips now for a bit, so I think they can make their own judgment.

THE COURT:  I think we're all aware of the clip, Counsel.

MR. MCRAE:  Your Honor, my objections are not to what has preceded my firm's involvement in the case.  We're in an evidentiary hearing now.  So it isn't a quarrel with what's on the docket.  It's now being used in an evidentiary hearing that has entirely different procedures and objections and so forth.  So here that's why I'm asking, what is it being offered for here?

THE COURT:  The Court has much broader discretion in an evidentiary hearing.  Your objection is overruled. All of us are aware of 162 (sic).

You can play the tape, Counsel.

MS. MITCHELL:  Thank you.  And this is the Homelessness and Housing Committee meeting on February 12th of this year, and I believe it was Pedro Torres and Kendra Leal, both from the CAO's office, that were talking.

III-114

BY MS. MITCHELL:

Q    Do you know both of those individuals?

A    Yes.  They work in my office.

Q    Okay.

     (Audio plays.)

          THE COURT:  Could you turn that up?  Start over, please, and move the microphone closer.

          MS. MITCHELL:  I don't think it's coming from.  I don't think the microphone is picking up.  I think it's on the system.

          THE COURT:  Karlen, maybe there's a way to boost the sound on that a little bit.

     (Audio plays.)

          THE COURT:  That's fine.

     (Audio plays.)

BY MS. MITCHELL:

Q    Okay.  Pausing right there, that was Pedro Torres saying, "There are current occupancy agreements that do not meet the Alliance requirement of extending past June 2027," and that was prior to the city reevaluating, including these in the Alliance program.  Is that right?

          MR. MCRAE:  Your Honor, objection.  That is argument, and characterizing what was played.  Secondly, as to this transcription and the last one, there is no foundation laid with respect to who created it, whether it's

III-115

complete and accurate, so there's a lack of foundation with respect to that, as well.

Also, there's no establishment that the person speaking can intelligibly speak to the Alliance agreement, so relevance, or that that person is a lawyer or capable of opining about what it means.  So, for all of those reasons, a standing objection to these, what could also possibly be hearsay statements, in a non-authenticated video -- audio.

THE COURT:  Overruled.

THE WITNESS:  Can you repeat the question, please?

BY MS. MITCHELL:

Q    Yes.  This was Mr. Torres from your office representing that these -- or the occupancy agreements that do not extend past June 2027 don't count for the Alliance agreement, and that's prior to what we just talked about with the City reevaluating its position on that issue.  Is that right?

MR. MCRAE:  Objection, same objections.

THE COURT:  Overruled.

THE WITNESS:  I mean, Mr. Torres is an analyst in my office, and was attempting to convey our current reporting.  I don't think he was -- and he is not a city attorney.  He isn't determining what's eligible or not eligible.

And so I don't -- you know, this was a committee meeting.  He was reflecting what, at the time, we were

III-116

counting and what we weren't counting, and I don't think -- you know, the manner in which he said it wasn't -- didn't in any way determine what would be eligible.  He stated what he stated, in a way that -- you know, he's not fully -- he wasn't involved in negotiating the agreement.  I think he was conveying to the committee his understanding, and -- but that doesn't determine what is -- what the actual settlement agreement would allow for.

BY MS. MITCHELL:

Q    I understand that, Mr. Szabo.  My question only is, as of this date, February 12th of 2025, was that prior to the city rethinking its position on including the Alliance -- the Inside Safe beds as part of the Alliance agreement?

            MR. MCRAE:  Objection, relevance.

            THE COURT:  Overruled.

            THE WITNESS:  That would -- I can't say that. The -- there have been internal discussions for some time.

Q    Okay.  I'm going to keep playing.

     (Audio plays.)

     And I'm sorry.  Just for clarifying purposes, the "I will caveat that," that's Pedro Torres speaking, correct?

            MR. MCRAE:  Same objections, your Honor, continuing objection on relevance, authentication, foundation.

            THE COURT:  Overruled.

III-117

MS. MITCHELL:  And, for the record, the witness nodded.

BY MS. MITCHELL:

Q    That was a yes, Mr. Szabo?

A    Yes.

(Audio plays.)

Q    Okay.  So Mr. Torres indicated that the CAO was recommending transitioning a number of rooms from booking to occupancy in order to count them as part of the Alliance agreement.  Is that right?

MR. MCRAE:  Objection, calls for speculation, lack of foundation, and as to what Mr. Torres said or thought, also irrelevant --

THE COURT:  Overruled.

MR. MCRAE:  -- and hearsay.

THE COURT:  Overruled.

THE WITNESS:  That is what -- that appears to be what he was indicating, but -- and -- but that was also prior to -- I mean, I will say this.  It had been the recommendation of my office that, initially, that if we were going to count Inside Safe beds, that extending them beyond -- or any beds, rather, that we knew would extend beyond 2027 would be compliant.  There would be no question about that.  As the program has evolved, however, we are paying for these beds.  Those -- these beds are in use, and

III-118

now that we're in the third year of the program, we reassessed that position, because I cannot tell you -- there is no certainty that these beds will not be open in 2027.

The program is now in its third year, and, as we're covering the cost of those beds that are new beds, that were established after 2022, that are being used actively to house individuals who are currently in encampments, again, that -- we reassessed our position, and believe that that is absolutely consistent with the terms of the settlement.  Some of them may continue on through 2027. If some of them do not, if some of them come offline, we, of course, would be -- have an obligation to replace them, to meet the required number.

BY MS. MITCHELL:

Q    Now, none of these Inside Safe beds were included in the bed plan that was provided to the Alliance in 2022 as part of the City's plan to meet its obligations under the Alliance agreement.  Is that right?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  The 2022 bed plan that you're referring to was submitted prior to Mayor Bass taking office as mayor of the City of Los Angeles.

BY MS. MITCHELL:

Q    And there has been no updated bed plan that has been

III-119

provided to the Alliance or to the Court since that date that included these Inside Safe beds.  Is that right?

MR. MCRAE:  Objection, relevance, vague.  It calls for a legal conclusion.

THE COURT:  Overruled.  You can answer the question, sir.

THE WITNESS:  That's -- I believe that's correct.

BY MS. MITCHELL:

Q    In the fall of 2024, the City did submit an updated bed plan, but then subsequently withdrew that bed plan.  Is that right?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  You're referring -- yes, yes, if you're referring to the bed plan that contemplated the migration of Road Map beds.

BY MS. MITCHELL:

Q    I was --

A    Is that correct?  Is that what you're referring to?

Q    That's exactly right.

A    Okay.

Q    Yes.  Why was that withdrawn?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  It was withdrawn as a result of a

III-120

conference with the County and the special master, and, I believe -- and Judge Barat.

MR. MCRAE: Your Honor, I'm not sure if this is getting into any settlement discussions or anything that might be protected by any applicable mediation or other privileges. I don't know. I'm just putting that in front of the witness so that he's aware, if that triggers anything, to proceed accordingly.

THE COURT: And thank you for that. So far, the answer is simply who the parties were involved. If it gets into communications, then let's raise another objection. Okay?

MR. MCRAE: Thank you.

BY MS. MITCHELL:

Q    Would you like to continue your answer or stop there?

A    I'll stop there.

Q    So, based on discussions between the City and the County, the City made the choice to withdraw its new proposed bed plan in October of 2024. Is that right?

MR. MCRAE: Objection, relevance.

THE COURT: Overruled.

THE WITNESS: Correct.

BY MS. MITCHELL:

Q    And so no additional or updated bed plan has been produced to the Alliance or to the Court since that date.

III-121

Is that right?

MR. MCRAE:  Objection, relevance, assumes there's an obligation to have another one, lack of foundation, and vague.

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MS. MITCHELL:

Q    Okay.  Now, using your new counting method, including the Inside Safe beds and these additional master lease permanent supportive housing beds that we'll talk about, I think, after lunch, what is the current delta, meaning what is the current number of beds that the City needs to meet its obligation, 12,915, as opposed to the number that is currently planned for?

MR. MCRAE:  Your Honor, I move to strike "new counting method" as clearly argumentative of counsel.

THE COURT:  Counsel, it's innocuous.  We can change it to "recent."  It doesn't matter.

MR. MCRAE:  But it's --

THE COURT:  Overruled.

MR. MCRAE:  Okay.

THE WITNESS:  The latest report, which includes 6,700 beds that are open and occupiable, and 4,300 beds, just over 43 -- or just under 4,300 beds that are in process, all of which are consistent with the terms of the

III-122

settlement, would leave a delta of approximately 1,900 beds for the City to establish over the next two years.

BY MS. MITCHELL:

Q    At the time you were working on counting these new beds or finding the new beds for the most recent quarter report, Exhibit 35 that we have on the screen, were you aware of the cumulative milestones at that time and what the City's goal was trying to reach?

MR. MCRAE:  Objection, relevance, and vague.

THE COURT:  Overruled.

THE WITNESS:  Yes, we're aware.  We are aware of the milestones.

BY MS. MITCHELL:

Q    Okay.  And was the goal of counting Inside Safe beds to meet the cumulative milestone?

MR. MCRAE:  Objection, calls for a legal conclusion, vague, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MS. MITCHELL:

Q    So it's a coincidence that the newly counted beds brought the city close to the cumulative milestone as of the recent quarter?

MR. MCRAE:  Your Honor, that's argumentative.

THE COURT:  Sustained.  Just restate the question.

III-123

BY MS. MITCHELL:

Q    If the City didn't need to meet the 12,915 number until 2027, and had no obligation to meet any milestone before then, why the effort to meet the milestone recently?

MR. MCRAE:  Objection, it's compound, it calls for a legal conclusion, and it's argumentative --

THE COURT:  Overruled.  You can answer the question, sir.

MR. MCRAE:  -- and not relevant.

THE COURT:  Thank you.

You can answer the question, sir.

THE WITNESS:  I agree that our obligation is to meet 12,915 by June of 2027, and then I agree that we are not required to meet any of the milestones, but making progress towards that number is certainly something that the city has -- is making its best efforts to achieve.

BY MS. MITCHELL:

Q    Okay.  You were aware that the Alliance is seeking receivership over the City homelessness programs at this point?

MR. MCRAE:  Objection, relevance, your Honor, and lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I'm aware that you've made various filings, yes.

III-124

BY MS. MITCHELL:

Q    Was the effort by the City to make the numbers meet the milestones, part of that effort, to avoid the Court imposing receivership in this hearing?

MR. MCRAE:  Objection, lack of foundation.  It calls for a legal conclusion, could potentially involve attorney-client privileged discussions.

THE COURT:  It's the last objection I'm concerned about, whether we're going to get into any discussion between you or other persons involved.  That's for argument later, Counsel.  I'm sustaining the objection.  I think it's of grave concern to the Court that we would get into that kind of a colloquy between you and whoever you would be discussing this with.

BY MS. MITCHELL:

Q    Let's move on to the Care and Care Plus issues with the encampment objections.  The City has an objection to reduce encampments pursuant to the agreement, and committed last year --

THE COURT:  Wait just a moment, Counsel.

MS. MITCHELL:  Yes.

THE COURT:  Before we get into Care and Care Plus, I'm sorry.  It's 12:00 -- or a little after 12:00.  Why don't all of you go to lunch.  Would that be a convenient time to break?

*Echo Reporting, Inc.*

III-125

MR. MCRAE:  I don't know how much longer counsel has on direct.  That would be fine with counsel, finishing on this -- or cross, rather.

MS. MITCHELL:  I'm going to --

THE COURT:  Counsel, you choose.  If you have -- if it's time to go lunch, it's time to go to lunch.  If not, we'll go forward.

MS. MITCHELL:  I'd love to push through and get this done.  I'm hoping for just 10 minutes, depending on the length of the answers, your Honor.

THE COURT:  All right.  Please proceed.

MS. MITCHELL:  Thank you.

BY MS. MITCHELL:

Q    So the City has been reporting on the efforts to reduce encampments as part of this agreement under Section 5.2.

THE COURT:  You know what, Counsel?  My apologies.

MS. MITCHELL:  Yes.

THE COURT:  My clerk just reminded me, we've got an executive committee meeting for the Court, and I've just realized my colleagues are sitting up there on the floor.

MS. MITCHELL:  Don't want to keep them waiting.

THE COURT:  My apologies.  We're going to take a break at this time, and return at 1:15.

Sir, thank you very much.  You may step down.

MS. MITCHELL:  Thank you.

III-126

THE COURT:  Okay.  Counsel, 1:15.  Thank you.

(Proceedings recessed to reconvene.)

III-127

Afternoon Session

--o0o--

(Call to Order)

THE COURT:  We're back on the record with CourtSmart.  And, Counsel, this is your continued direct examination.

MS. MITCHELL:  Thank you, your Honor.  And, for the Court's edification, we have a witness that is from out of town that needs to be testifying.  And, so, I have agreed with counsel we're going to be finishing Mr. Szabo's direct. We're going to take another witness out of order.  Her name is Elizabeth Funk, and then Mr. Szabo will go back on the stand.

THE COURT:  Okay.  Thank you.

MS. MITCHELL:  Thank you.

MATT SZABO - PLAINTIFFS' WITNESS - PREVIOUSLY SWORN

DIRECT EXAMINATION  (RESUMED)

BY MS. MITCHELL:

Q   Mr. Szabo, when -- before we broke, I started to ask you about the encampment reductions, and I want to -- I want to get us back to that place.

So, I am showing you what has been marked as Exhibit 62 -- excuse me.  It got flipped -- Exhibit 62.  Can you describe that to us?

A    I can, but just one moment.  Your Honor, there was a --

III-128

there was an iPad here.

MS. MITCHELL:  Oh.

THE WITNESS:  -- that -- thanks.

THE COURT:  Thank you.  I appreciate that.

MS. MITCHELL:  Would you like to see a hard copy of it?

THE WITNESS:  I have -- I have the hard copy.  But just for the future as we continue, but we -- we can go on. That's fine.

BY MS. MITCHELL:

Q    Okay.  Well, I'll ask you just about this.  This is just a two-page document.

A    Um-hmm.

Q    But Mr. Umhofer is going to go get the iPad, and we'll get that right to you in a minute.

A    Okay.

Q    Okay.  Can you describe what Exhibit 62 is?

A    Exhibit 62 is our -- is an attachment to our quarterly report to the Court of -- for the period ending December 31st, 2024, that describes our -- that reports our encampment reduction data per council district.

Q    Okay.  And the -- that was dated January 22nd of 2025 at Docket 858.  Are you familiar with the Court's order identified as Exhibit 52 regarding not counting Care and Care Plus cleanups as encampment resolutions or encampment

III-129

reduction?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  It's also vague as those are undefined terms and relevance.

THE COURT:  Overruled.  You can answer the question, sir.

THE WITNESS:  I'm familiar with this order, yes.

BY MS. MITCHELL:

Q    Now showing you Exhibit 63.  This is the most recent report filed from the City on April 15th of 2025, Exhibit 63, Docket 892.  Zooming in on those dates, you're reporting from January -- well, all of 2024 and then January to March of 2025, is that right?

A    Correct.

Q    And you've never reported on resolutions from 2022 through 2023, is that right?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MS. MITCHELL:

Q    And did anything change about your reporting from -- well, let me ask a different question, withdraw and ask a different question.

Did the City change its reporting strategies after the Court -- the Court's order that we saw at Exhibit 53?

III-130

MR. MCRAE:  Objection.  Vague.

BY MS. MITCHELL:

Q    On Care and Care Plus.

MR. MCRAE:  Objection.  Vague.  Relevant.  Lack of foundation.

THE COURT:  I want to make sure.  Do you understand the question, sir?

THE WITNESS:  I believe so.

THE COURT:  All right.  Overruled.

THE WITNESS:  Let me -- let me restate.  The question is did we change our reporting strategy since the time of the -- the order being issued?

BY MS. MITCHELL:

Q    Correct.  That's my question.

A    No.

Q    So, the numbers that we see from January 1st to March 31st of 2025 are -- include the Care and Care Plus reductions, is that right?

MR. MCRAE:  Objection.  It's vague as to what those mean or if they mean the same thing.  It lacks foundation.  Relevance.  Calls for legal conclusion.

THE COURT:  Overruled.  You can answer, sir.

THE WITNESS:  So, I have the -- the order hasn't been discussed further, and it would need further clarification before we would make any changes, and but, in

III-131

particular, I -- I believe there is -- there can be a -- it can be easy to mistake the term "cleanup" for encampment reduction.  And -- and we view cleaning and encampment reduction as -- as different things.

So, what we are reporting and what we are continuing to report -- what we have reported and what we are continuing to report are actual reductions of tents, makeshift shelters, cars and RVs, consistent with the agreement that established the milestones.  We are not counting cleaning as an encampment reduction.

MS. MITCHELL:  Your Honor, may my colleague approach the stand with the iPad with the exhibits?

THE COURT:  Certainly.

MS. MITCHELL:  Thank you.

BY MS. MITCHELL:

Q    So, I guess I just want to make sure, though, that the -- nothing has changed in the way the City is reporting the resolutions in this last quarter from the quarter prior?

MR. MCRAE:  Objection.  It's asked and answered.  And, to the extent it seeks to invade attorney-client privilege discussions or deliberative process discussions, I object on those grounds as well.

THE COURT:  Overruled.  This doesn't involve a conversation, just whether it's changed or not.  Overruled.

THE WITNESS:  It has not changed.

III-132

BY MS. MITCHELL:

Q     Thank you.  Who sets homelessness policy for the City of Los Angeles?

MR. MCRAE:  Objection.  Vague.  Lack of foundation.  Relevance.

THE COURT:  Could you repeat that?  That was too quick, and I --

BY MS. MITCHELL:

Q     Sure.  Who sets homelessness policy for the City of Los Angeles?

MR. MCRAE:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  The Mayor and the City Council are the heads of the policy -- or the -- the Mayor and the City Counsel direct policy for -- for the City of Los Angeles.

BY MS. MITCHELL:

Q     Who makes decisions about which beds to fund to fulfill the City's obligation under the roadmap agreement?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lack of foundation and relevance.

THE COURT:  Overruled.

THE WITNESS:  The decisions on which beds to fund, it's the -- the Mayor and the City Council.  They ultimately approve all appropriations in the City.

//

III-133

BY MS. MITCHELL:

Q    And the same is true for the Alliance agreement as well, is that right?

MR. MCRAE:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  Ultimately, yes.

BY MS. MITCHELL:

Q    Who makes decisions relating to Inside Safe?

MR. MCRAE:  Vague.  Which decisions?  Over what period of time?  Lack of foundation.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Are you asking who -- you need to clarify that question because if you're asking who makes decisions on funding, that's -- I'll give you one answer. If you're asking about policy decisions and operations, that's another answer.

BY MS. MITCHELL:

Q    Sure.  The -- the let's say policy decisions, who sets the policy for Inside Safe?

MR. MCRAE:  Objection.  Vague as to which policy, what period of time.

THE COURT:  Overruled.

MR. MCRAE:  Relevance.  Lack of foundation.

THE COURT:  Overruled.  You can answer that question, sir.

III-134

THE WITNESS:  Policy outside of funding decisions --

BY MS. MITCHELL:

Q   Yes.

A   -- are -- are made by the Mayor's office.  It's consistent -- consistent with the regulations attached to the Homelessness Emergency account, which funds -- which funds the Inside Safe Program.

Q   And the Mayor makes decisions in consultation with other -- well, let me -- let me withdraw that and ask a better question.

Are there multiple departments or multiple people within her administration that advise her in conjunction with the policy that she is setting on Inside Safe?

MR. MCRAE:  Objection.  Vague.  Relevance.  Lack of foundation.

THE WITNESS:  I'm going to ask --

THE COURT:  You can answer that question.

THE WITNESS:  Okay.  Again, are there multiple departments or multiple persons, is that the question?

BY MS. MITCHELL:

Q   Yes.

A   So -- so, there -- the Mayor has a multiple staff that she relies on in the Mayor's office that she certainly consults with and that are responsible for executing the

III-135

program.  There are multiple departments in the City that play a role in the execution of the Inside Safe operations, all of which would have -- all of whom would have some role in advising the Mayor.

Q    The Mayor also sits on the LAHSA Commission?  That's right?  She's the Commissioner?

A    Correct.

Q    Was she aware of the data issues identified by Alvarez and Marsal prior to the assessment being released?

MR. MCRAE:  Objection.  Calls for speculation. Lack of foundation.  It's vague.  It's a 165-page report. Relevance.

THE COURT:  Would you repeat that question, please?

MS. MITCHELL:  Yes.

BY MS. MITCHELL:

Q    Was Mayor Bass aware of the data issues identified by Alvarez and Marsal prior to the assessment being released?

MR. MCRAE:  Object --

THE COURT:  Overruled.  You may answer that question.

MR. MCRAE:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  Was the Mayor aware of the contents of the report before the report was released?

III-136

BY MS. MITCHELL:

Q    The issues identified in -- within the report.

MR. MCRAE:  That's unintelligible.  It's vague. Lack of foundation.

THE COURT:  Just a moment.  Do you understand the question?

(No response.)

THE COURT:  Let's have -- let's have it reasked to be certain.  Okay.  You can reask the question.

MS. MITCHELL:  Sure.

BY MS. MITCHELL:

Q    Was the Mayor aware of the issues identified by Alvarez and Marsal prior to the assessment being released?

MR. MCRAE:  It's also potentially calling for privileged communications.  It lacks foundation.  It's vague, and there's no relevance.

THE COURT:  Prior to the assessment being released?

MS. MITCHELL:  Correct.

THE COURT:  Overruled.  You can answer that question, without getting into content or conversation.

THE WITNESS:  I -- I can't -- I can't tell you whether -- whether there was some -- I -- I can't tell you that -- no, I can't tell you that.

//

III-137

BY MS. MITCHELL:

Q    Okay.  At the last hearing, when Mayor Bass appeared, she said -- excuse me.  Were you at the last hearing March -- I think it was March 29th of this year?

A    I was not.  I was -- I was sick that day.

Q    At -- at the last hearing, Mayor Bass said that she "knew the system was broken" and "I know there's a lot in this report that I agree with."  Are you aware of what in the report Mayor Bass agrees with?

        MR. MCRAE:  Objection.  Relevance.  Calls for speculation.  Lack of foundation.

        THE COURT:  This has a lot to do with the Apex Doctrine.

        MR. MCRAE:  The objection also is that --

        THE COURT:  Counsel, just a moment.  I'll be right with you.  Let me have just a moment.

    (Pause.)

        THE COURT:  I'll be right with you, Counsel.  Why don't you discuss it amongst yourselves, and I'll be right with you.

        MS. MITCHELL:  Thank you, your Honor.

    (Pause.)

        THE COURT:  All right.  Thank you for your courtesy, Counsel.  I'd like to hear the question again, please.

III-138

MS. MITCHELL:  Thank you, your Honor.

BY MS. MITCHELL:

Q    At the last hearing, Mayor Bass said that she knew the system was broken and that "I know there's a lot in this report that I agree with."

What -- what in the report does Mayor Bass agree with?

MR. MCRAE:  Objection.  It calls for speculation. Lack of foundation.  The Court referenced Apex.  Someone not knowing something doesn't mean that what they may or may not know is essential to the case.

THE COURT:  I want you to discuss that amongst your team for a moment.  This is critical.  Why don't you take a few moments with the  City Attorneys here, et cetera, amongst your colleagues to discuss if you want to raise that objection or not.  I think under the Apex Doctrine you don't want the Mayor appearing.  I understand that.  I have to decide if Mr. Szabo or any other witnesses are adequate.

I -- I leave that to your --

MR. MCRAE:  No, I -- I understand.

THE COURT:  I think -- I'm giving you that courtesy.

MR. MCRAE:  And I'll confer with them.

THE COURT:  I'm giving you that courtesy.

MR. MCRAE:  But I just want to complete the objection on the record notionally, and then I'll confer,

III-139

and I can tell you if it's confirmed, which, again, the information has to be essential to the resolution of the case.  It's not simply a fishing expedition on whether somebody knows something or not because that doesn't advance the ball, but --

THE COURT:  No comments.

MR. MCRAE:  -- I'll have the colloquy.

THE COURT:  I'm just paying you the courtesy, Counsel.  This is a critical area that we've reached now.

(Pause.)

THE COURT:  And if you want to step down for a moment.  They may take a moment, and if you want to be involved in the conversation, please, there's no -- there's no (indiscernible).  Okay.

THE WITNESS:  Okay.  Thank you, sir.

(Proceedings recessed briefly.)

THE COURT:  Counsel are all present.  The witness has returned.

Counsel?

MR. MCRAE:  Yes, your Honor.  I'd like to add to the objection that I was making just by starting out by noting that Mr. Szabo will not purport to speak about what the Mayor knows or what the Major thinks, that we have briefed the Apex issue.  We also add the objection that inquiring about the Mayor's thoughts or visions, et cetera,

III-140

would invade the deliberative process privilege and perhaps the attorney-client privilege.  We have a brief on the Apex issue.  We would request supplemental briefing.  If the Court is going to be ruling on this issue, we would like to request a say so that we can seek appropriate relief from the Ninth Circuit.

THE COURT:  And, Counsel?

MS. MITCHELL:  Again, we have briefed these issues multiple times.  I think the questions of when you have the person who we just established is being briefed by multiple departments, not just Mr. Szabo, but multiple entities, also sits on LAHSA Commission, is setting policy for the City of Los Angeles when it comes to particularly Inside Safe, which is now being counted, the Mayor, in conjunction with the Council, is making decisions about which beds to fund under these agreements, and then she makes the statement that she knew the system was broken and that there's a lot in the report that she agrees with, I think it is in -- it's crucial that we understand what it was in the report that she agrees with.  I think all of these issues -- at this point, fundamentally, it's important.  These are policy questions, and the policy makers should be testifying to these questions, what they knew and -- and what the decisions were.  And to the extent this triggers the deliberative process privilege, we would emphasize it is a

III-141

qualified privilege that can be overcome by a showing that these issues are important not only to the case but to the community, and I would submit, your Honor, that they are very much so, both of those things.

MR. MCRAE:  Your Honor, to add to our objection, the problem is there's a conflation of policy versus the narrow contractual obligations under the settlement agreement with the Alliance that the City has.  This is not about homelessness and crises systemically in general.  It is way far afield from that.  It's about whether there's compliance with the contractual obligations under agreement where the accrual of the obligations isn't until 2026 or 2027.

So, excursions about what people think and what they want to do about things in general relating to homelessness is a massive fishing expedition, and it is invasive, and it is not relevant to the narrow determination of contract compliance and contract interpretation.

MS. MITCHELL:  May I briefly respond to that, your Honor?  So, the manner in which the City is choosing to fulfill its obligations under the Alliance Agreement and the Roadmap Agreement is being set by policy.  So, while it is not the policy that is directly at trial, the manner in which the City is attempting to or failing to fulfill those obligations is being set by the policy makers at the highest

III-142

level.  And, therefore, we think this line of questioning is important as we have submitted we believe that actually a hearing from the policy makers themselves is important, particularly because they have chosen to weigh in on this space and give opinions that we think are crucial to understand.

MR. MCRAE:  The City never forfeited the right on how to elect in its own governing its approach to satisfying narrow contractual obligations under the Alliance settlement agreement.  So, to suggest that because there is consideration, whether it be at a policy or any other level, how to approach complying with the settlement agreement, again, is a conflation.  What these Plaintiffs contracted for are outputs, beds, encampment reductions, not control over input which is the discretion that no sovereign entity can waive under any circumstances, nor would we want them to because it would result in counter-majoritarian measures where Plaintiffs' groups, people that are not duly elected, are seeking to impose on the City an agenda not only what it does over success of administrations but how it approaches to satisfying contracts.  That is not democracy.  That is not the law.  That is not cognizable, and it's an affront to common sense.

MS. MITCHELL:  Your Honor, the City retained discretion on how to meet its obligations so long as the

III-143

milestones were being met.  That's in the agreement.  The City has conceded the milestones have not been met.

Now, they argue they don't have to meet them, but that's a different discussion.  So, the issue of policy has been directly set forth by the City as the manner in which they're meeting these or not meeting these obligations.

MR. MCRAE:  There is no evidence that --

THE COURT:  Counsel, both of you, thanks very much.  The objection is sustained.

Next question, Counsel.

MS. MITCHELL:  Your Honor, in order to make a record, I'm going to ask the next series of questions, and the Court can rule how the Court's going to rule.

BY MS. MITCHELL:

Q    I asked you a question yesterday regarding Monica Rodriguez expressing about LAHSA and the homelessness response system in general, describing it as a merry-go-round from hell.

Have you heard her say those words?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  I'm going to sustain that objection.

BY MS. MITCHELL:

Q    What does Monica Rodriguez mean by the phrase "merry-go-round from hell"?

MR. MCRAE:  Objection.  Lack of foundation.

III-144

Relevance.

THE COURT:  Sustain the objection.

BY MS. MITCHELL:

Q    Monica Rodriguez -- Council Member Rodriguez has been on the council since 2017, is that right?

MR. MCRAE:  Relevance.

BY MS. MITCHELL:

Q    If you know.

THE COURT:  Could you repeat that question?

BY MS. MITCHELL:

Q    If you know,  Council Member Rodriguez has been on City Council since 2017?

THE COURT:  You can answer  that question.

THE WITNESS:  I believe that's correct, yes.

BY MS. MITCHELL:

Q    And she was -- she sat on the Housing and Homelessness Committee for a number of years, until quite recently, is that right?

A    That is correct.

Q    She received briefings from various departments, including yours, related to this issue, is that right?

MR. MCRAE:  Objection.  Relevance.  Lack of foundation.  Vague.

THE COURT:  Could you repeat that question, please?

III-145

BY MS. MITCHELL:

Q    Monica Rodriguez, Council Member Rodriguez, has received briefings from various departments about the homelessness issue, including the CIO's office, is that right?

MR. MCRAE:  Objection.

THE COURT:  I'll sustain the objection, Counsel.

BY MS. MITCHELL:

Q    How many Inside Safe operations have taken place in Council Member Rodriguez's district?

MR. MCRAE:  Objection.

THE COURT:  Just a little -- little slower.

BY MS. MITCHELL:

Q    How many Inside Safe operations have taken place in Council Member Rodriguez's district?

MR. MCRAE:  Objection.  Relevance.  Lack of foundation.

THE COURT:  I'm going to sustain that objection.

BY MS. MITCHELL:

Q    How many Inside Safe operations has Council Member Rodriguez requested of the Mayor?

MR. MCRAE:  Objection.  Lack of foundation.  Calls for speculation.  Relevance.

THE COURT:  Sustain the objection.

//

III-146

BY MS. MITCHELL:

Q    Council Member Traci Park at the budget hearings last week announced that the City has wasted hundreds of millions of dollars on homelessness housing.  What did she mean by that?

MR. MCRAE:  Objection.  Calls for speculation.  Lack of foundation.  Relevance.

THE COURT:  Sustained.

BY MS. MITCHELL:

Q    Council Member Park in discussing the hundreds of millions of dollars that were wasted on homelessness housing, she states "When no one can even tell us which ones are operational and which ones aren't or how many beds we have" and that "LAHSA is a free for all.  Literally no one can account for the billions we flushed down the toilet" and that "The City is completely unprepared and unable to manage our own homeless affairs."

What did Traci Park, Council Member Park, mean by those statements?

MR. MCRAE:  Objection to this entire line of reaching speeches in, knowing that the person lacks foundation.  There's no relevance.  It calls for speculation.

THE COURT:  Sustained.

MS. MITCHELL:  May I have a moment, your Honor?

III-147

THE COURT:  Certainly.

(Pause.)

BY MS. MITCHELL:

Q    Let's go back to Exhibit Number 35.  Prior to lunch, I had asked a question about a series of projects.  Line 50, 51, 52 are included.  I believe lines 60 and 62 are also included on this page, which is page three of Exhibit 35. And I asked you why if they were opened in 2023 were they just now included in the Alliance reporting.  Do you have an answer for that question?

A    I do have an answer to that question.  And I appreciate the time for clarification.  The -- these are master leased buildings that we had included -- or that serve clients of Inside Safe Program.

So, the -- the Master Lease Program had been established, and the contract for the leasing of these -- of these units had been -- had been established at the dates that are -- that are shown on the -- on the page, but we, after that time, began using them and paying for the -- the units so that they could be used for Inside Safe clients to move them from the motels to -- to more permanent housing.

Q    Okay.  And the -- is it accurate that anything with the end note three annotation on this exhibit refers to Inside Safe Programs like this?

MR. MCRAE:  Objection.  Vague.

III-148

THE COURT:  Overruled.  You can answer that question.

BY MS. MITCHELL:

Q    I can identify the lines if it's helpful.

A    Yeah, if you can -- can you go to the bottom there?

Q    Sure.

A    I think -- I think -- I think that notation related to the Master Leasing units.

Q    Which are the units we're talking about, right?

A    Correct.

Q    Yes.

A    Yes, correct.  We -- we noted -- we noted each of those -- each of those buildings were added, and those are all related to units that are available or in use by Inside Safe participants.

Q    The City is in a budget crisis, is that true?

MR. MCRAE:  Objection.  Vague.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  I -- I wouldn't say that.  The City faced severe financial challenges this year.  The Mayor proposed a balanced budget, a structurally balanced budget. The Council reviewed that budget and made changes to that budget and are poised to send that budget back to the Mayor for her consideration.  If the Council's adopted budget or

III-149

any change therein between what the Council adopted and what the Mayor proposed becomes the final adopted budget, we will have a balanced and structurally balanced budget.

BY MS. MITCHELL:

Q    And that -- that includes cuts to multiple departments, is that right?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  If it goes towards homelessness, I'll allow you to ask the question.  I don't know where you're going with this question.

MS. MITCHELL:  I'm not sure how it wouldn't relate to homelessness, your Honor, but I'll set -- maybe I'll set more of a foundation if that's helpful.

THE COURT:  Well, if eventually it leads to the homeless crisis, I'm going to allow that.  So --

BY MS. MITCHELL:

Q    Okay.  You can answer, Mr. Szabo.

MR. MCRAE:  Lack of foundation.

THE COURT:  Overruled.  It's just a general question.

THE WITNESS:  The -- in order for the budget to be balanced, the Mayor had to propose and the Council was required to adopt a number of severe cuts to -- to City programs and operations.  In doing so, they largely preserved our commitment and our funding for our

III-150

homelessness programs, holding that as a priority among other very very important programs.

BY MS. MITCHELL:

Q    There were -- as part of this budget, this proposed budget that the Council is voting on tomorrow, there will be layoffs, is that right?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  The budget includes, as -- as approved by the Council, over 700 full position eliminations that could lead to layoffs.

BY MS. MITCHELL:

Q    Now, the City Attorney's Office is part of that budget, right, receives an allotment of -- as part of the budget, is that correct?

MR. MCRAE:  Objection.  Relevance.  Foundation.

THE COURT:  Who, Counsel?  Would you repeat that?

MS. MITCHELL:  The City Attorney's Office.

MR. MCRAE:  Relevance.  Foundation.

THE COURT:  The relevance, Counsel?  Offer of proof?

MS. MITCHELL:  My offer of proof, your Honor, is that the City can find money when it needs to find money.

THE COURT:  Well, you can argue that later,

III-151

Counsel.

MS. MITCHELL:  I think I can argue it if I have facts, your Honor.

THE COURT:  Sustain the objection.  Picking out a particular department I don't think is appropriate.

BY MS. MITCHELL:

Q    Last week the City made a choice to hire the private law firm of Gibson, Dunn and Crutcher to represent the City in this matter, is that right?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  You can answer that question.

THE WITNESS:  I believe it was last week.

BY MS. MITCHELL:

Q    And how many Gibson, Dunn and Crutcher lawyers are here in this courtroom today?

MR. MCRAE:  Relevance, your Honor.  This is grandstanding.  It's irrelevant.

THE COURT:  I'll sustain the objection, Counsel. I mean, I think we've already established the number of lawyers, and we already established Gibson, Dunn and Crutcher, right?

MR. MCRAE:  Yes, your Honor.

MS. MITCHELL:  Thank you, your Honor.

THE COURT:  Okay.  I've already mentioned I think seven lawyers.  Welcome.

III-152

MS. MITCHELL:  Thank you.  Thank you, your Honor.

BY MS. MITCHELL:

Q    What -- what's the hourly rate that the City is paying for the Gibson, Dunn and Crutcher partners to be here today?

MR. MCRAE:  Your Honor, objection.

THE COURT:  Sustained.

MR. MCRAE:  Privilege.  Relevance.

THE COURT:  Sustained.

BY MS. MITCHELL:

Q    What's the hourly rate that the City pays City Attorneys to be here today?

MR. MCRAE:  Objection, your Honor.  Relevance.

THE COURT:  Sustained, Counsel.  You can later on argue this if you'd like to.

MS. MITCHELL:  Understood.  Thank you, your Honor.

BY MS. MITCHELL:

Q    Going back to the audit --

THE COURT:  That's a good joke with all of you -- all of us on the Federal Bench, whatever the Plaintiff's salary is or your wage, we need a raise.  I'm just joking. Comes from all of my colleagues, okay.  We haven't had one in 30 years.  So, if I allow that question, I think there'll be immense jealousy by your colleagues on the Federal Bench. So, that's just a joke.  Let's continue.

MS. MITCHELL:  Your Honor, as the only lawyer in

III-153

the room that's not getting paid to be here, would agree, maybe the second -- second lawyer that's not getting paid to be here.

MS. MYERS:  Yeah, I don't think you want to go there.

BY MS. MITCHELL:

Q    Okay.  So, going back to the audit agreement, it looked at three key programs --

MS. MITCHELL:  Well, actually, you know what.  Let me take a moment, your Honor.  I might be done.

THE COURT:  All right.

(Pause.)

MS. MITCHELL:  I think I'm done at this point, your Honor.

THE COURT:  Okay.

MS. MITCHELL:  And we would like to go ahead and --

THE COURT:  Now, listen to this.  I don't know --

MS. MITCHELL:  Yes.

THE COURT:  -- your schedule, but Ms. Myers would have the next examination normally and then the City.  You won't believe my hours.  I could fit in your schedule.  So, when you talk to those folks out there on both sides you're involved in the City right now and running the City.  I can have Saturday sessions if it's convenient.  I can go late at

III-154

night if it's convenient.  Okay.  So, you talk to them about what gets you back here so you can continue on with your duties.  Fair enough?

THE WITNESS:  Will do.

THE COURT:  Okay.  And we'll make that comfortable for you.

MS. MITCHELL:  Okay.  Thank you, your Honor.  So, at this time, we would like to call Elizabeth Funk to the stand, out of order.  Thank you.  And thank you to counsel for the courtesy.

THE COURT:  And if you'd be so kind, would you raise your right hand, please.

ELIZABETH FUNK - PLAINTIFFS' WITNESS - SWORN

THE COURT:  My clerk is missing for a moment.

(Pause.)

THE COURT:  And I'm going to have you pull the microphone just a little bit closer or move a little bit closer to the microphone.

THE WITNESS:  I'm not sure you are.  I've a loud voice on my own.

THE COURT:  Please state your full name, please.

THE WITNESS:  Elizabeth Funk, F-U-N-K.

THE COURT:  All right.  And would you spell your first name, please.

THE WITNESS:  Elizabeth, E-L-I-Z-A-B-E-T-H.

III-155

THE COURT:  And your last name, please?

THE WITNESS:  Funk, F-U-N-K.

THE COURT:  F-U-N-K.  All right.  I thank you.

Direct examination, please.

DIRECT EXAMINATION

BY MR. UMHOFER:

Q    Ms. Funk, what do you do for a living?

A    I am the CEO of a nonprofit called Dignity Moves.

Q    What does Dignity Moves do?

THE COURT:  You know what?  I'm going to slow you way down.  We're going to start all over again.

BY MR. UMHOFER:

Q    What do you do for a living?

THE COURT:  There we go.

THE WITNESS:  I am the CEO of a nonprofit called Dignity Moves, which is focused on building interim supportive housing for people experiencing homelessness.

BY MR. UMHOFER:

Q    How long have you held that role for?

A    For about three and a half years now.

Q    What did you do before that?

A    Most of my career has been in technology and then later as an impact investor.  I started at Microsoft when Windows was first coming out, which dates me, and then was one of the earliest employees at Yahoo, sort of reinventing how we

III-156

were going to interact with technology and each other, and then --

THE COURT:  I'm just going to slow you way down. Okay.

THE WITNESS:  Okay.

THE COURT:  Little bit slower.

THE WITNESS:  I'm a fast talker.  Was at Yahoo in the very early days when we were 10 people in a room, no sign on the door.

And fast forward, I started into the industry of impact investing, invested in for-profit capital in companies that have a social good, primarily micro finance globally, which is the concept of small loans to the world's poor so they can build their own way out of poverty, and I funded a number of micro finance organizations around the world and invested in Latin America and other places that have a social impact.

BY MR. UMHOFER:

Q    What do you to the issue of homelessness?

A    First of all, my mother who's very patriotic, has said, Why are you helping all the poor in all these other countries and not our own?  But, really, it -- you know, I care about homelessness.  I think as a Californian, we all do.  And, yet, for me, what struck -- what got me was that looking at this problem of unsheltered homelessness

III-157

specifically, it strikes me it's absolutely solvable, and that's what got me most excited was to say, Wait a minute. We're spending huge budgets.  We're spending them wrong. And if we looked at things differently, we really could end this problem, and that's the kind of thing that as an entrepreneur gets me going.

Q    How did Dignity get its start?

A    The word?  For my --

Q    No.  The -- I'm asking about the organization.  What was the genesis of the organization?

A    The -- the reason I asked that question was that my impact investment fund was called the Dignity Fund because lending money to people to build their own way out of poverty is about dignity.  I carried that word over because it's -- in a similar way, dignity is the one thing that's been lost in our system as we address these humans who are humans.  And, as we treat them more like rodents or cardboard or numbers, we've lost track of their humanity, and I think if we start with that, then solutions start to become much more obvious.  And, so, I believe that if we look at some of the basic human needs such as people having privacy and having their own place where they can stay stable, that the dignity of that is very powerful.

Q    Did you start Dignity Moves?

A    I did, yes.

III-158

Q    And how is it funded?

A    Dignity Moves is funded with the combination of philanthropy as well as government grants.  We get a fair number of grants from the state and from local municipalities.  But it started entirely philanthropically because there's a lot of philanthropy out there really looking for innovative solutions to this problem, and we've been really lucky to see a lot of that come our way.

Q    What cities have you -- has Dignity Moves worked in during the time it's been operating?

A    Our first two communities were in San Francisco and Santa Barbara.  In San Francisco, like most communities, the department was fiercely opposed to spending money on anything that wasn't permanent.  We rarely heard -- you know, any money we spend on something that isn't permanent is a waste of resources.  And I can elaborate dramatically on that, but I very fundamentally respectfully disagree.  And we -- we said, You know what, we're going to kind of prove this anyway.  And we raised all of the money for our first site philanthropically in San Francisco.  That project was $2.2 million, which for 70 rooms worked out to about -- about 32, 33 thousand dollars per room.  And we built it in four months, start to finish.  So, 90 people are there.  It was -- we -- part of our magic sauce is that we don't have land cost.  We borrow vacant land.  This was a property that

III-159

had been condemned for seismic reasons.  It was an old school, had two parking lots.  So, we set up on those parking lots, set up relocatable cabins, and we had 90 people there and about 10 dogs, and $2.2 million in four months.  And once we did that first community, it really -- word started spreading fast, and we've now replicated that up and down the state.

Q    Does Dignity -- would you say that Dignity Moves has a particular model for addressing the homelessness crisis?

A    We do.  First of all, we don't accept that this problem's not solvable.  We start with assuming that we can get everyone indoors.  And when I say "this problem", I don't mean homelessness at large, and I don't mean the housing crisis.  Those are some big problems.  But unsheltered homelessness is solvable.  It's absolutely solvable.  It's four walls and a roof.

And, so, what we do is we go into these municipalities and say, We will solve this problem.  Now, let's work backwards at what it's going to take.  And land is expensive.  Great.  Let's borrow land.  People want their own room.  They won't go to a shelter with bunk beds.  Great.  Everyone gets their own room.

Give me another one.  Building Codes are onerous.  Yes, they are.  It's part of the reason we have this housing crisis, but this is an emergency.  You declare a shelter

III-160

crisis.  And we have become really experts at using the shelter crisis Building Codes that have been outlined by the state, an appendix that designates safety that allows you to waive pretty much everything else.  So, we use emergency Building Codes.  We use prefabricated modular units that are mass produced.  And the good news is there are lots of those out there today, with backyard accessory dwelling unit laws and all of the incentives around manufactured housing.  We've worked with dozens of different manufacturers.  So, there are lots of choices.

And I will also say that I know Los Angeles is familiar with -- with earlier adopters of the sort of tiny home cabin model with pallet shelters.  But there are so many additional, you know, now newer companies and new renovations.  We've got one that's 3D printed coming in San Luis Obispo.  We've got some that are fully solar and off grid.  So, we buy from different manufacturers depending on the duration the project's going to be in place, budget, and other requirements.

MR. SCOLNICK:  Your Honor, I'm sorry.  I'd like to interpose a relevance objection, but also perhaps we could return to a question and answer format.  The speeches I think are inappropriate.

THE WITNESS:  Sorry.

MR. SCOLNICK:  I know the witness is probably -- I

III-161

just would request that we return to question and answer format.

THE COURT:  Okay question.

MR. SCOLNICK:  Thank you.

BY MR. UMHOFER:

Q    Why isn't your focus on permanent housing or permanent supportive housing?

A    Well, my belief is that the permanent housing in California, for very good reasons, our Building Codes are -- are very extensive.  It just costs too much to build our way out of this problem of unsheltered homelessness particularly with permanent housing only.  It also takes a very very long time, and the devastation that happens when people are on the streets is truly devastating and causes a whole lot more fiscal and physical issues both to communities and to -- and to the individuals themselves.

So, we are focused on fast solutions that can be done at scale, and that is not generally permanent housing.

Q    Why not allow people to live on the streets until that permanent housing arrives?  Why wouldn't that be the approach?

MR. SCOLNICK:  Objection.  Relevance.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  There are two primary reasons.

III-162

First is the devastation to the person because when people first become homeless, less than 20 percent have a serious enough mental or behavioral health issue that prevented them from maintaining stable housing.

After being on the streets for even a few weeks or a few years, that has changed dramatically, so, the devastation to that person's mental and physical health. But also the cost to society of leaving people on the streets, cleaning up after them, taking care of them in emergency rooms that were preventable and all the rest is very expensive.

MR. SCOLNICK:  Your Honor, I'd object that this witness is not an expert or at least has not been qualified as such.  So, this is all inappropriate and lacks foundation.

THE COURT:  Overruled.

MR. SCOLNICK:  And, again, relevance, and we would ask for limiting of speeches.

THE COURT:  Well, I'm not sure yet, Counsel.  I don't know that I would be letting an opinion based on this, but I'm not certain that I'm going to exclude this.  I think we're all seeking knowledge.  And, so, for a brief period of time.  But this is limited now, Counsel.

MR. SCOLNICK:  Yes, your Honor.

//

III-163

BY MR. UMHOFER:

Q    If you -- based on your experience at Dignity Moves, if you had to house 4,000 people as quickly as possible, what would best efforts to do that look like to you?

MR. SCOLNICK:  Incomplete hypothetical and relevance.  Lacks foundation, and it calls for a legal conclusion.

THE COURT:  You can answer that question, but Los Angeles may be different than San Francisco, different than Santa Barbara.  I'll allow you to answer that general question.

THE WITNESS:  Generally, what we do is we find vacant sites that are available for a few years, find manufactured units of different types, and set them up on the vacant sites and build them fast and cost effectively in months.

BY MR. UMHOFER:

Q    Do you have examples of where you've done that?

A    Yes.  San Francisco, San Jose.  We're actually doing -- you know, we're working with the City of San Jose to literally reach functional zero unsheltered.  We've got projects Alameda, Roanoke Park, all up and down the state.

Q    Can you describe a project that is an example of that moving fast to get as many people inside as you just described?

III-164

MR. SCOLNICK:  Relevance, your Honor.

THE COURT:  Overruled.

THE WITNESS:  Examples.  So, the San Francisco one that I just mentioned is a great example.  Start to finish, four months.  And Roanoke Park we built a quality that's permanent quality in eight months.  And that one was home key funded, which requires it to be in place for 55 years, which is not our normal.  So, and everything in between, but it all is about the political will and the municipality working closely with us to maintain that emergency spirit and that emergency mindset and get people in quickly.

BY MR. UMHOFER:

Q    In those examples, can you give us one example of how the funding worked?  Was it all government funding or did it come from elsewhere?

MR. SCOLNICK:  Relevance.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I'll take the example of our downtown Santa Barbara project where the County contributed about a third of the funding, and philanthropy contributed two-thirds of the -- of the funding.

BY MR. UMHOFER:

Q    So, what was the total number?

A    That one was about three and a half million I believe.

III-165

Q    And about how much of that was philanthropy?

MR. SCOLNICK:  Relevance --

THE WITNESS:  Two-thirds.

MR. SCOLNICK:  Relevance.  Lacks foundation.

THE COURT:  I'm sorry.  I didn't hear the question.

BY MR. UMHOFER:

Q    About how much of that was philanthropy?

A    Two-thirds.

THE COURT:  Two-thirds.  All right.  Thank you. Overruled.

BY MR. UMHOFER:

Q    In the projects that you've worked in, have you received donations of land from philanthropic sources or other sources?

A    Yes.

MR. SCOLNICK:  Relevance.

THE COURT:  Yeah, I'm -- I don't want to be discourteous, but I don't think I'm going to write an opinion based upon this, about the alternatives, let's say, to a different policy or policies by different cities.  So, I'm going to limit this a little bit.

MR. UMHOFER:  Understood, your Honor.

THE COURT:  I'm always willing to listen, but you won't be with us too much longer.  All right.  So,

III-166

Counsel --

MR. UMHOFER:  I understand, your Honor.  Yes.

THE COURT:  All right.  Please.

BY MR. UMHOFER:

Q    So, and --

MR. UMHOFER:  I'm sorry, your Honor.  May I ask that question again?

THE COURT:  Please.

BY MR. UMHOFER:

Q    In some of these projects, have you received donations or contributions of land from private sources or the government?

MR. SCOLNICK:  Relevance.

THE WITNESS:  Yes.  Private landowners have property tax exemption benefits, and they're often very eager to let us borrow vacant land.

BY MR. UMHOFER:

Q    How much vacant land have you been able to secure through philanthropic means?

MR. SCOLNICK:  Relevance.

THE WITNESS:  I actually don't know that answer.

THE COURT:  What I'm worried about is getting into a comparison of different cities' policies how land is built out.  I think over the last five years I've been inundated with that.  No discourtesy to you.  Okay.  Pleasure to meet

III-167

you.  But, by the same token, I don't want to get into a situation where Los Angeles is compared to San Francisco or the best policies.  That -- that's really a legislative and executive function.  Couple more --

MR. UMHOFER:  Your Honor --

THE COURT:  -- questions, and --

MR. UMHOFER:  I understand, your Honor.

THE COURT:  Couple more questions.

BY MR. UMHOFER:

Q    Our point here is best efforts, and I'm going to ask you now --

THE COURT:  By the way, afterwards, wherever we're going with this, happy to meet with you.  All counsel want the same thing.

THE WITNESS:  Sure.

THE COURT:  My curiosity.  Can you get us out of tiny homes into something bigger in the modular sense?

THE WITNESS:  Absolutely.

THE COURT:  Okay.  How large?

THE WITNESS:  In fact, well, you can make it as big as you want.  We've got projects -- we've got one in Santa Barbara actually that has bathrooms and little kitchenettes in it for people -- that was funded by the hospital, people coming out of hospitals that moved in one for families that are much larger.  We've got ones that --

III-168

THE COURT:  Okay.  Thank you.

THE WITNESS:  -- could be two bedroom.

THE COURT:  That's it.

THE WITNESS:  You can do what you want, yeah.

THE COURT:  Couple more questions.

BY MR. UMHOFER:

Q    Have you done work in Los Angeles?

MR. SCOLNICK:  I'll object again, your Honor, that this is not an expert on anything as far as we know and certainly not an expert on best efforts.

THE COURT:  I know, but I --

MR. SCOLNICK:  Let alone --

THE COURT:  -- can see your enthusiasm for learning even if we're not going to write about this for a moment.  So, as a courtesy, a couple more.

MR. SCOLNICK:  Understood, your Honor.

THE COURT:  Thank you very much.  All input is welcome because we're all trying to do the same thing eventually.

BY MR. UMHOFER:

Q    Have you done any work through Dignity Moves in Los Angeles?

A    Not to date.  We have been working towards that but not yet.

Q    Okay.  And what are you working toward?

III-169

A    Actually, we've had good conversations with a couple of the City Council districts and nothing to announce yet.

MR. UMHOFER:  Give me a moment.

THE COURT:  Um-hmm.

(Pause.)

BY MR. UMHOFER:

Q    In Los Angeles, based on your interactions to date working on potential projects, what could you accomplish here in Los Angeles with $400 million of mixed philanthropy and government money toward taking unsheltered people off the streets?

MR. SCOLNICK:  Objection.  Calls for speculation. Relevance.

THE COURT:  I'm going to sustain that objection. That's my fear, Counsel, when we get into a comparison of Los Angeles land values, et cetera, versus San Francisco, versus, you know, Barstow.

MR. UMHOFER:  Nothing about land values, your Honor.  And, I --

THE COURT:  Yeah.

MR. UMHOFER:  They've argued we've got to -- they've argued that we've got to prove best efforts.  I'm here to present -- present evidence about what best efforts looks like.  That's what this witness does.  And, so, to be barred from answering -- from asking questions about best

III-170

efforts to house unsheltered people seems to be keeping me from being able to do something that they say I have to do.

MR. SCOLNICK:  Your Honor, this is not an expert on best efforts, let alone an expert in best efforts in Los Angeles or what's best efforts under the settlement agreement.

THE COURT:  I think it's enough that she's described what her efforts are, how successful she's been. I think, first of all, you're to be commended.  Anybody who enters this has to have a good heart.  Okay.  But I think I -- the Court doesn't want to get into a comparison, especially geographically between, you know, land cost, leasing.  Unfortunately, I --

THE WITNESS:  Well, the nice thing is we don't pay for land.  Land cost is a neutral.  We borrow land.

THE COURT:  Okay.

THE WITNESS:  With Thousand Oaks, Ojai, San Bernardino, Blossomville, Modesto, Oakland, you know, and it's across the state.

THE COURT:  Okay.  Okay.  Counsel?

BY MR. UMHOFER:

Q    Putting aside land value and the specific -- specifics of particular geographies, with $400 million to build shelter, what could you accomplish in -- with $400 million in Los Angeles, putting aside land values --

III-171

A     Right.

Q     -- in a year?

A     The nice thing --

          MR. SCOLNICK:  Objection --

          THE WITNESS:  -- is land values --

          MR. SCOLNICK:  Objection --

          THE WITNESS:  -- are irrelevant.

          MR. SCOLNICK:  Objection.  Calls for speculation.

          THE COURT:  I am going to sustain the objection.

          MR. UMHOFER:  No further questions, your Honor.

          THE COURT:  Just a moment.  Not so fast.  Have a seat.  See if they have any questions for you.

          Cross examination, Ms. -- Mr. --

          MR. SCOLNICK:  Can we have one moment, your Honor?

          THE COURT:  No, no, just a moment.  Ms. Myers? I'm coming to Ms. Myers now.  Thank you very much.

          MR. SCOLNICK:  Sorry.

          MS. MYERS:  I do have just a couple of questions, your Honor.

          THE WITNESS:  Sure.

          THE COURT:  Please.  Now, she -- by introduction, she represents the Intervenors in this matter.  Okay.

          THE WITNESS:  Thank you.

//

//

III-172

CROSS EXAMINATION

BY MS. MYERS:

Q    Yes, Shayla Myers from the Legal Aid Foundation of Los Angeles on behalf of the Intervenors in this lawsuit.  You said -- you testified that it cost $2.2 million to build a project in San Francisco, is that correct?

A    Correct.

Q    And was that just the capital costs?

A    Yes.

Q    And, so, that's the cost of the structures alone?

A    Correct.

          MR. SCOLNICK:  Relevance.

          THE COURT:  Overruled.

BY MS. MYERS:

Q    Were there operating costs associated with operating the Dignity Moves project?

A    Of course, yes.

          MR. SCOLNICK:  Relevance.

          THE COURT:  Overruled.

BY MS. MYERS:

Q    And can you tell me what -- are you familiar with --

          THE COURT:  No, just a moment.  Just a moment. We're all going to slow down because we're speaking over the top of each other.

          MS. MYERS:  Sure.

III-173

THE COURT:  Wait till you answer the question because there's going to be an objection almost on every occasion a question is asked.  Okay?

THE WITNESS:  Got it.

THE COURT:  And, otherwise, counsel doesn't have a chance to object.

THE WITNESS:  I understand.

THE COURT:  All right.  Now, you have a question?

BY MS. MYERS:

Q    Are you familiar with the term "day rate" when it comes to shelters?

THE COURT:  Now, just a moment.  Now your objection.

MR. SCOLNICK:  Relevance, your Honor.

THE COURT:  Overruled.  Can you answer the question?

THE WITNESS:  Yes.

BY MS. MYERS:

Q    What is a day rate based on your understanding?

THE COURT:  You've answered -- well, objection?

MR. SCOLNICK:  No objection, your Honor.

THE COURT:  All right.  As long as we're not getting into a comparison between San Francisco and LA and Oakland -- it's much too variable -- you can answer day rate.  What's a day rate?

III-174

THE WITNESS:  It's the cost of the supportive services and operating costs per person per day.

BY MS. MYERS:

Q    Okay.  And what are the operating costs for a Dignity Moves project, and -- putting aside supportive services?

MR. SCOLNICK:  Relevance.

THE WITNESS:  Varies widely.

BY MS. MYERS:

Q    So, for the San Francisco project --

THE COURT:  Counsel, see, we're going too fast again.  That's why counsel has to rush the objection.  He's concerned about the answer coming too quickly.

Overruled.  You can answer the question.

THE WITNESS:  It varies widely depending on the types of supportive services and operating costs of the project that might be for severely acute behavioral health needs versus one that's for job seekers.

BY MS. MYERS:

Q    Okay.  Putting aside supportive services, do you know what the day rate is for the San Francisco Dignity Moves project that cost $2.2 million for the capital contribution?

MR. SCOLNICK:  Relevance.  We're getting into San Francisco again.

THE COURT:  We're not getting into the build outs, though.  Overruled.  You can -- you can answer that

III-175

question.

THE WITNESS:  Generally, they're not broken out between operating and supportive services in these projects because it's usually one supportive services agency contract that covers both staffing and maintenance.

BY MS. MYERS:

Q    So, do you know what the day rate is then with supportive services and operating costs combined for that San Francisco project?

MR. SCOLNICK:  Relevance.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  Yes, I do.

BY MS. MYERS:

Q    And what is that rate?

MR. SCOLNICK:  Relevance.

THE COURT:  Overruled.

MR. SCOLNICK:  And foundation, your Honor.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Approximately $100 per person per night.

BY MS. MYERS:

Q    Okay.  And, so, then for the -- I'm sorry.  You said there were 90 people in the facility, is that correct?

III-176

THE COURT:  Objection?

MR. SCOLNICK:  No objection, your Honor.

THE COURT:  All right.  You can answer.

THE WITNESS:  Yes.

BY MS. MYERS:

Q    So, then the daily rate is 90 people times $100 per day per night, is that correct -- or, I'm sorry -- per day, is that correct?

MR. SCOLNICK:  Your Honor, it's relevance.  If you want to hear this testimony, we'll let it go.

THE COURT:  No.  You can object.

MR. SCOLNICK:  Okay.

THE COURT:  I don't want to --

MR. SCOLNICK:  Just I -- I can keep objecting, but you know my objection.  It's a standing objection to all these -- this --

THE COURT:  All right.

MR. SCOLNICK:  -- this testimony.

THE COURT:  Okay.  Overruled.

MR. SCOLNICK:  The entire -- the entire discussion with Ms. Funk today.

THE COURT:  You can answer.

THE WITNESS:  It seems like it's a test of my mental calculations, but, yes, I believe that that is -- you're correct.

III-177

BY MS. MYERS:

Q    But in order to get the day rate for the entire facility, you would just multiply the number of participants times $100, is that -- is that correct?

THE COURT:  You can answer the question.

THE WITNESS:  It's typically the other way around, where there's a contract to operate the site, and it's divided by the number of people.  So, the -- the per person would vary.  It's not usually contracted on a -- on a per head, on a per capital basis.

BY MS. MYERS:

Q    Okay.  And you used the term "interim supportive housing".  Do you draw a distinction between interim supportive housing and shelter?

MR. SCOLNICK: Objection.  Relevance and foundation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  That's a very important question.  Absolutely, yes.

BY MS. MYERS:

Q    And what would the distinction be for you?

THE COURT:  You can answer the question.

THE WITNESS:  Interim supportive housing is by definition private rooms.  HUD's definition of housing is

III-178

separate sleeping quarters and your habitual place of residence.  So, it is a form of housing that is quite different in format as well as the impact to the individual from a bunk bed in a group warehouse.

MR. SCOLNICK:  Your Honor, move to strike.  We have no evidence that this witness has any foundation to talk about HUD or -- and she's not an expert.  So, objection.

THE COURT:  Overruled.

THE WITNESS:  All right.  Did you want me to repeat my answer?

MS. MYERS:  I'm sorry, your Honor.  I didn't hear you.

THE COURT:  Overruled.

MS. MYERS:  Overruled?

THE COURT:  Um-hmm.

THE WITNESS:  So, the answer, the difference between shelter and interim supportive housing is that shelter is an interim place.  Typically it is -- the stereotype in the past has been congregate format.  Interim supportive housing is a subset of that which is private separate sleeping quarters and someone's habitual place of residence, meaning it's not an overnight stay.

BY MS. MYERS:

Q    Okay.  But it's still a shelter in terms of the -- the

III-179

-- I'll go back.  So, it's still interim in terms of it is not intended to be a permanent place for a person to reside, is that correct?

MR. SCOLNICK:  Objection, your Honor.  Vague. Irrelevant.  Lacks foundation, and she's not an expert.

THE COURT:  Just a moment.

(Pause.)

THE COURT:  Just a moment.

(Pause.)

THE COURT:  Counsel, your question again, please?

BY MS. MYERS:

Q    I believe I asked about the interim nature of the housing.  The units that you're talking about are still intended to be temporary in nature, correct?

MR. SCOLNICK: Vague.  Relevance.  Foundation. Not an expert.

THE COURT:  Overruled.

THE WITNESS:  Yes, that is correct.

BY MS. MYERS:

Q    And do you have a sense of the average length of stay for an individual in one of your programs?

MR. SCOLNICK:  Same objections.

THE COURT:  Overruled.  You can answer that.

THE WITNESS:  Eight months is the average in our programs.

III-180

BY MS. MYERS:

Q    And the average length of time when a project is constructed -- well, I'll go back.  The projects are not intended to be permanent in nature.  The structures are not intended to be permanent in nature, correct?

MR. SCOLNICK:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  That's correct.

BY MS. MYERS:

Q    And I believe you testified that they last -- let me just ask.  How long on average do your projects last?

MR. SCOLNICK:  Same objections.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  It depends on the manufacturer and the site specifics.  There are some products are durable enough to be 55 years, but they are relocatable in every case.

BY MS. MYERS:

Q    And, so, how long on average does one of your projects last, not the -- not the actual building itself but the actual placement on a specific site for a limited duration, how long do they last on average?

MR. SCOLNICK:  Relevance.

THE COURT:  Overruled.  You can answer the

III-181

question.

THE WITNESS:  We've had some that were only contracts for 18 months and some that are, you know, very long.  I would say an average is about a five-year lease.

BY MS. MYERS:

Q    Okay.  And what happens to the individuals who are in those locations after those projects shut down?

MR. SCOLNICK:  Relevance.  Calls for speculation.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  They're treated like shelter in the system.  So, they are intended to be an interim stay, and then the person is then assessed and hopefully they work with a case manager and all the rest, and they work their way into a more permanent solution.

BY MS. MYERS:

Q    Okay.  So, a person who is in one of your projects is still technically homeless, is that correct?

MR. SCOLNICK:  Objection.  Relevance and vague.  I assume we're still talking about San Francisco.

THE WITNESS:  Well, this is statewide.  We're working across --

THE COURT:  No, I think she's just generally what the different -- with the different projects in Santa Barbara, et cetera.

MR. SCOLNICK:  Move to strike, your Honor.

III-182

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  So, the -- and now I've lost track of the question.  So, what happens to them after?

BY MS. MYERS:

Q    No.  So, individuals who are in your projects which are shelters are still considered homeless, correct?

MR. SCOLNICK:  Relevance and vague.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  That is correct.  They are considered sheltered homeless.

BY MS. MYERS:

Q    Have you ever worked on any projects that were funded by municipalities?

MR. SCOLNICK:  Relevance.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Most of our projects are funded in one way or another by the city or county, generally not entirely.  We bring some philanthropy to it, but quite a few of them are, yes.

BY MS. MYERS:

Q    Have you built any projects in San Francisco that were funded by -- by the City or -- City and County and County of San Francisco?

III-183

MR. SCOLNICK:  Relevance.

THE COURT:  No.  As long as we don't have a comparison with Los Angeles, overruled.

THE WITNESS:  No, we have not yet.

BY MS. MYERS:

Q    Okay.  Is there any cost differences when you work with municipalities and when you work for philanthropy when it comes to building those units?

MR. SCOLNICK:  Relevance.  Vague.  Lacks foundation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Very significant actually.  The San Francisco project that we built through philanthropy and as a nonprofit was about $32,000 per room.  When the City replicated that with Department of Public Works, it was three times that.

BY MS. MYERS:

Q    And do you have a sense of why there was a -- why it cost three times more to build it when it a municipality built it?

MR. SCOLNICK:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I do.  We spent a lot of time looking at that.  I mean, first of all, it's the obvious

III-184

things like we had an eighth grade class go to Bed Bath and Beyond and decorate the rooms, and so a lot of things get donated.  But also, you know, Public Works for reasons have a lot of processes and a lot of additional red tape that as a nonprofit we don't face.

BY MS. MYERS:

Q    Isn't it true that one of the significant differences between when you build with philanthropy and when you build with a municipality is labor costs?

MR. SCOLNICK:  Relevance.  Vague.  Calls for speculation.

THE COURT:  Generally speaking, you can answer that question.

THE WITNESS:  That is not the case.  In fact, our project in San Francisco, if you want to use it as an example, was built with union labor and prevailing wage.

BY MS. MYERS:

Q    So, it's not the case that one of the -- one of the major differences between the cost of your project when you build with philanthropy and when you build with the municipalities is prevailing wage labor costs then?

MR. SCOLNICK:  Same objection.

THE COURT:  You can answer that question.

THE WITNESS:  No, that's not the case.

//

III-185

BY MS. MYERS:

Q    Have you ever said publicly that that is the case, that it -- that it is the cost of labor that drives up the cost when municipalities are involved?

MR. SCOLNICK:  Relevance.

THE COURT:  Overruled.  You can answer it.

THE WITNESS:  I -- if I have, I've not -- I do not recall.

MS. MYERS:  Okay.  I have no further questions. Thank you.

THE COURT:  Cross examination?

MR. SCOLNICK:  Just a couple of questions, your Honor.

THE COURT:  Hold on.  And, remember, whatever your answers are, they should pertain to your general experience. We're not going to compare Los Angeles --

THE WITNESS:  Right.

THE COURT:  -- to San Francisco or Oakland or whatever.

THE WITNESS:  Got it.

THE COURT:  All right.  Thank you.

FURTHER CROSS EXAMINATION

BY MR. SCOLNICK:

Q    Ms. Funk, just so I'm clear, you're not offering any testimony today about the City of Los Angeles complying with

III-186

the settlement agreement with the Alliance, are you?

THE COURT:  Well, she might --

THE WITNESS:  Am I good to --

THE COURT:  -- be prepared to do that, Counsel.  I foreclosed that I think, but you can answer that question.

THE WITNESS:  No, I'm not.

BY MR. SCOLNICK:

Q    And you're also not testifying about the City of Los Angeles' compliance with the Roadmap Agreement with the County of LA, are you?

A    No, I am not.

MR. SCOLNICK:  That's it, your Honor.  Thanks.

THE COURT:  Okay.  Thank you.

Redirect?  Oh, I'm sorry.  You --

MR. MCRAE:  No, I -- you're right.  I was wrong.  I was going to ask for a recess to go to the restroom, but you were right.  You were 100 percent right.  That is the protocol when it is redirect.  I apologize.

THE COURT:  No, no.  If you want to go to the restroom --

MR. MCRAE:  No.  I don't want to miss anything, your Honor.  That's why I keep asking.

THE COURT:  Redirect?  And, Counsel, as long as we keep these general educational, et cetera, I have no problem.  I just worry about any comparison, et cetera and,

III-187

you know, LA, San Francisco, Oakland.

REDIRECT EXAMINATION

BY MR. UMHOFER:

Q    Ms. Funk, I'm about to give you a hypothetical that my colleague over here will object to.  If the settlement agreement in this case needed 4,000 more beds in order to meet the milestones and deadlines set forward there, what -- putting aside land costs and comparison with other places, what could Dignity Moves do to close that 4,000-bed gap?

        MR. SCOLNICK:  Objection, your Honor.  Incomplete hypothetical.  Vague.  Relevance.  Lacks foundation, and the witness is not an expert.

        THE COURT:  I'm going to -- I'm going to sustain that, Counsel.

        MR. UMHOFER:  No further questions, your Honor.

        THE COURT:  Any recross, Ms. Myers?

        MS. MYERS:  No, ,your Honor.

        THE COURT:  Counsel?

        MR. SCOLNICK:  No.  Thank you.

        THE WITNESS:  Humbly thank you.  We're always willing to learn, and thank you very much.

        THE WITNESS:  Thank you.

        THE WITNESS:  Pleasure.

        THE COURT:  And, Counsel, would you like to have a recess?

III-188

MR. MCRAE:  Yes, your Honor.

THE COURT:  All right.  Let's have a recess. About 20 minutes then, Counsel.  We'll be back at that time.

(Proceedings recessed briefly.)

THE COURT:  We're on the record.  All counsel are present.

Counsel, your next witness, please.

MR. MCRAE:  Your Honor, thank you for the accommodation.  The parties have conferred.  We do have agreement that due to Doctor Agonafer's schedule, that she will be the next witness to take the stand.

THE COURT:  All right.

MR. MCRAE:  But Matt Szabo is prepared to resume in the morning.

THE COURT:  All right.

MR. MCRAE:  Our colloquy, though, has revealed a difference in view as to when we might end today.

THE COURT:  Just a moment.  Whenever you want.

MR. MCRAE:  Yes.

THE COURT:  We're wasting time.  Let's get that witness on the stand.  Time is valuable right now.

MR. UMHOFER:  Your Honor, the Plaintiffs call Doctor Etsemaye Agonafer.

THE COURT:  Thank you very much.

Would you be kind enough to raise your right hand,

III-189

please.

ETSEMAYE AGONAFER - PLAINTIFFS' WITNESS - SWORN

THE COURT:  And would you please be seated here in the witness box.

(Pause.)

THE CLERK:  Watch your step.

THE COURT:  There's a rise right there.

And after you're comfortably seated, would you face the parties and state your full name, please.

THE WITNESS:  Good afternoon.  I'm Doctor Etsemaye Agonafer.

THE COURT:  Okay.  I can tell already you've got a very soft voice, and that's okay.  But we need to get that microphone and you close to each other.  Please state your name again.

THE WITNESS:  Good afternoon.  My name is doctor Etsemaye Agonafer.

THE COURT:  Thank you.  Would you spell your first name, please.

THE WITNESS:  E-T-S-E-M-A-Y-E.

THE COURT:  Okay.

THE WITNESS:  Agonafer, A-G-O-N-A-F-E-R.

THE COURT:  Thank you very much.

Direct examination, please.

//

III-190

DIRECT EXAMINATION

BY MR. UMHOFER:

Q    Doctor Agonafer, what is your current job?

A    I am currently the Deputy Mayor for Homelessness and Community Health for the City of Los Angeles.

Q    How long have you held that role?

A    I have held that role since January of 2024.

Q    Were you a part of the Mayor's administration at the start of her administration, Mayor Bass?

          MS. KAOUNIS:  Objection.  Vague.

          THE COURT:  Do you understand the question?

          THE WITNESS:  I do.

          THE COURT:  All right.  You can answer the question.

          THE WITNESS:  I was not formally part of her administration.  I served as her consultant starting May of 2023 when I served to support thinking through strategies around health and behavioral health services for people experiencing homelessness.

BY MR. UMHOFER:

Q    And you were paid through -- by the City for that consultancy role?

          MS. KAOUNIS:  Objection.  Relevance.

          THE COURT:  Overruled.

          THE WITNESS:  Correct.

III-191

BY MR. UMHOFER:

Q    How long have you known the Mayor?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  I met the Mayor when I was a White House fellow and worked for the Biden/Harris administration and worked for Secretary Fudge while she was a congresswoman.

BY MR. UMHOFER:

Q    You also worked in a county institution, LA County institution, is that correct?

MS. KAOUNIS:  Object to form.  Vague.

THE COURT:  Will you restate that, please.

BY MR. UMHOFER:

Q    You also worked in an LA County institution, correct?

THE COURT:  All right.  Overruled.  You can answer the question.

THE WITNESS:  Okay.  I both trained, conducted research, and practiced in County facilities across LA County.

BY MR. UMHOFER:

Q    And you're the first person to hold the role that you currently hold?  That role didn't exist before you stepped into it, correct?

III-192

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Do you understand the question?

THE WITNESS:  Yes, I do.

THE COURT:  You can answer it.  Overruled.

THE WITNESS:  I am the first Deputy Mayor for Homelessness and Community Health.

BY MR. UMHOFER:

Q    Do you have an understanding as to why that role was created?

MS. KAOUNIS:  Objection.  Foundation.

THE COURT:  No.  Overruled.  You can answer that question.

THE WITNESS:  I was brought onto this role because of the Mayor's priorities.  She established an emergency declaration at the start of her administration and wanted to bring folks indoors quickly and urgently and make sure that they had the rapid round services that they deserve.

BY MR. UMHOFER:

Q    Is that state of emergency, by the way, still in effect?

A    It is.

Q    On homelessness, correct?

A    Correct.

Q    There's also a state of emergency arising out of the fires that -- that took place at the beginning of this year,

III-193

correct?

MS. KAOUNIS:  Objection.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  That is correct, but that's outside of my purview.

BY MR. UMHOFER:

Q    So, day in and day out, your focus is on homelessness, correct?

MS. KAOUNIS:  Object.  Vague.

THE WITNESS:  As I --

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  Sure.  As I stated, I started in this role in January of 2024, and my role has evolved since then.  Initially, I was focused on coordinating and enhancing health and behavioral health services for people experiencing homelessness and at risk for homelessness. Later, that role evolved to include the oversight of the Inside Safe Program, along with other programs like the Collaborative for Substance Use Care.

And in January of this year, my role expanded to include the Continuum for Homeless and Housing -- Homelessness and Housing, from prevention to unsheltered homelessness, sheltered homelessness and the production of affordable housing, in partnership with many of our City

III-194

departments, the Housing Department, LAHSA, and the Housing Authority.

BY MR. UMHOFER:

Q    Can you restate the -- your purview at the start?  It was related to health services, is that correct?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  My role was related to coordinating and enhancing health, behavioral health, and social services, and that's broad.  I'm an internal medicine physician.  Internal medicine in and of itself includes primary care, hospital medicine for anybody above the age of 18.  But health, behavioral health, psychiatric disorders, substance use disorders.  Social services includes housing, income benefits, Social Security benefits, health benefits.  So, it really was about coordinating all of those types of services.  Some -- most the City actually does not conduct, but working with our partners across the region to make sure people were receiving all of the services that they needed.

BY MR. UMHOFER:

Q    So, far as you mentioned substance use and mental health services, those are supposed to be provided by the County to persons experiencing homelessness, correct?

MS. KAOUNIS:  Objection.  Foundation.

III-195

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  They are provided by the County, but they're also provided by a number of healthcare delivery systems across LA County.

BY MR. UMHOFER:

Q    Is one of the reasons that you were brought in to coordinate those services because those services that were supposed to be coming from the County were not being delivered to persons experiencing homelessness on the streets of Los Angeles?  Isn't that why -- one of the reasons why you were brought in?

MS. KAOUNIS:  Objection.  Foundation.  Relevance. Calls for speculation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Sure.  The reason why I was brought in is that every unhoused individual experiences a variety of things, and the sole purpose was to make sure that each of those individuals received care in a number of ways.  The County provides services, street medicine teams.  Nonprofit health systems across the region also do that.  For Inside Safe specifically, you know, LAHSA contracted service providers.  Those case managers are -- are focused on a number of things, housing navigation, connecting them to a

III-196

variety of resources.  And, so, I'm not really sure how to answer your question, but each individual comes into their circumstances in a really unique way, and those people on the front line like I used to be have to figure out how to tailor their services to them.

Q    Has the Mayor ever told you that the County is failing to provide the services that they should be to persons experiencing homelessness and you need to help fill that gap?

MS. KAOUNIS:  Objection.  Deliberative process.  Also relevance.

THE COURT:  Sustained.

THE WITNESS:  I don't believe the Mayor has ever said --

THE COURT:  You don't have to answer that question.

MS. KAOUNIS:  Yeah.  Sustained means --

THE WITNESS:  Sorry.

BY MR. UMHOFER:

Q    Now, you -- part of --

MS. KAOUNIS:  Move to strike the answer.

THE COURT:  Was there an answer?  I didn't hear it.

MR. MCRAE:  Partial.

MS. KAOUNIS:  Yeah.  She started.

III-197

THE COURT:  Stricken.

MR. UMHOFER:  Your Honor, I think we're running into the same problem we ran into on day one.  I think that counsel who's not making the objections is speaking directly into the microphone while coaching his counsel -- his partner.  So, I'm hearing it.  It's distracting.

THE COURT:  I'll just be alert.  Next question.  Okay.

MR. UMHOFER:  Thank you, your Honor.

BY MR. UMHOFER:

Q    Now, you are there to help the Mayor make decisions on homelessness, correct?

MS. KAOUNIS:  Objection.  Deliberative process.

THE COURT:  Overruled.  You can answer.  Your role?

THE WITNESS:  My role is to implement and execute the Mayor's priorities and initiatives.  And, first and foremost, to uphold the oath that I took in medical school, to serve the people that are vulnerable and living on the streets in a way that is centered in love and making sure that we recognize each of those individuals are someone's loved one and child.

BY MR. UMHOFER:

Q    You said you're there to help the Mayor implement her priorities on homelessness.  She sets those priorities,

III-198

correct?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  The question was?

BY MR. UMHOFER:

Q    You set -- does the Mayor set the priorities on homelessness that you attempt to assist her with?

MS. KAOUNIS:  Same objection.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  The Mayor sets priorities in collaboration with everybody in the City and meets the needs of the -- of all Angelinos.  And my role is to execute her priority of moving folks indoors urgently, making sure that they receive the health, behavioral health and social services that they need, and we produce affordable housing so that we can move them off the streets into shelter and eventually permanent housing so that they stay well and can live lives with dignity.

BY MR. UMHOFER:

Q    So you help the Mayor execute on priorities she sets on homelessness, correct?

MS. KAOUNIS:  Objection.  Asked and answered. Vague.

THE COURT:  Overruled.  You can answer the question.

III-199

THE WITNESS:  I believe I answered the question.

THE COURT:  Okay.

BY MR. UMHOFER:

Q    Does the Mayor set priorities on homelessness, yes or no?

MS. KAOUNIS:  Objection.  Asked and answered.

THE COURT:  Overruled.  You can answer it.

THE WITNESS:  I believe I answered the question.

THE COURT:  Well, answer it again just to be sure.

THE WITNESS:  Okay.  My role is to implement the priorities and initiatives of the Mayor, which include urgently moving folks that are living on the streets into shelter because the streets are not a waiting room, making sure that they receive health and behavior health services that they deserve when they're in shelter, and that we produce enough affordable housing so that we can move them into permanent shelter where they can be healthy and well.

BY MR. UMHOFER:

Q    And, again, the Mayor sets those priorities and initiatives, not you, correct?

MS. KAOUNIS:  Objection.  Asked and answered.

THE COURT:  Overruled.  You can answer again.  In other words, he's --

THE WITNESS:  I -- I --

THE COURT:  -- talking about the Mayor.

III-200

THE WITNESS:  I can repeat my response and also I wasn't in the administration at the beginning, and I can't speak to all of the folks that were involved in developing her priorities, and I think I answered the question.

BY MR. UMHOFER:

Q    Is one of her -- is one of the Mayor's priorities complying with the LA Alliance settlement agreement?

MS. KAOUNIS:  Objection.  Speculation.  Calls for a legal conclusion and --

THE COURT:  Overruled.

MS. KAOUNIS:  -- foundation.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  The Mayor is the executive of function of the City, and the City agreed to the terms and is working towards -- every day working towards meeting those goals.

BY MR. UMHOFER:

Q    Is the Mayor working towards meeting those goals?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  As to the LA Alliance agreement?

MR. UMHOFER:  As to the LA Alliance agreement.

THE COURT:  Overruled.  You can answer the question, please.

MS. KAOUNIS:  Foundation.

III-201

THE COURT: Overruled.

THE WITNESS: I'm -- I'm not sure how to answer that. I believe I answered the question.

BY MR. UMHOFER:

Q   I'm going to ask it again. Is the Mayor working to comply with the LA Alliance agreement? If you can answer yes or no, I'd like you to.

THE COURT: No. I'm not going to restrict yes or no answers by either party.

MR. UMHOFER: Just -- I'm not restricting.

THE COURT: Counsel, I'm not going to get into yes or no by either of the parties. Witnesses are going to give full answers. If they don't answer the question, then ask it again.

MS. KAOUNIS: Your Honor, I'm also going to just object. Vague. Lack of foundation. We haven't established that this witness knows the terms. We've just asked a vague question.

THE COURT: That she doesn't know the terms?

MS. KAOUNIS: Calls for a legal conclusion. There's been no foundation laid I don't believe.

THE COURT: All right. Thank you. Overruled. Now, you may have forgotten the question because there's been lots of colloquy back and forth. So, as a courtesy, they'll reask the question of you.

III-202

THE WITNESS:  Okay.

THE COURT:  Thank you.

BY MR. UMHOFER:

Q    Is one of the Mayor's priorities and initiatives to comply with the LA Alliance Settlement Agreement?

MS. KAOUNIS:  Objection.  Asked and answered.

THE COURT:  Overruled.

MS. KAOUNIS:  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  Our office's priorities, along with all of the City departments is to meet the milestones of any agreement --

BY MR. UMHOFER:

Q    Including --

A    -- that we have committed to.

Q    Sorry.  I'm sorry to interrupt you.

A    Sure.

Q    Including the LA Alliance Agreement, correct?

MS. KAOUNIS:  Objection.  Form.  Lack of foundation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I believe I answered the question.

BY MR. UMHOFER:

Q    I'm not sure you did.  So, I'm going to ask again.

III-203

A    Okay.

THE COURT:  Well, we'll stop the colloquy between both.

MR. UMHOFER:  I understand.

THE COURT:  Just reask the question.

BY MR. UMHOFER:

Q    Is the Mayor -- is one of the Mayor's policies and initiatives complying with the LA Alliance Settlement Agreement?

MS. KAOUNIS:  Objection.  Lack of foundation.  Relevance.  Deliberative process.

THE COURT:  Overruled.

THE WITNESS:  I guess I'd like to understand what you mean by policy initiatives.  For me, policy initiatives include things like the Inside Safe Encampment Resolution Program, things like the Collaborative for Substance Use.  The work that we're doing with all of the departments that -- and the Council offices that move policy forward.  So, maybe you need to restate the question.

BY MR. UMHOFER:

Q    Have you assisted the Mayor or advised the Mayor -- not asking what you said, but on the subject of the settlement agreement with the LA Alliance?

MS. KAOUNIS:  Lacks foundation.  Deliberative process.

III-204

THE COURT:  Overruled.  You can answer that question but not into any specific conversation.

THE WITNESS:  Sure.  As you described, my role evolved over the last year and a half.  I was not involved in conversations about this settlement.

BY MR. UMHOFER:

Q    Have you ever --

A    That I can discuss.

Q    I'm sorry.  I didn't mean to interrupt.  Are you finished with your --

A    Sure.  I'm done.

Q    Have you ever actually looked at the LA Alliance Settlement Agreement?

MS. KAOUNIS:  Object to form.  Foundation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I believe I have seen it in a variety of meetings that might have been privileged.

BY MR. UMHOFER:

Q    Have you read it?

A    I may have skimmed the document.

Q    You're in charge of advising the Mayor on homelessness.  Am I right?

MS. KAOUNIS:  Object to form.

THE COURT:  Overruled.

III-205

BY MR. UMHOFER:

Q    That's -- I'm sorry.  Let me put -- let me take back the in charge.  One of your roles is advising the Mayor on homelessness, correct?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  As I described, my role has evolved over time.  Since January of this year, I now support and advise on the entirety of the continuum.

BY MR. UMHOFER:

Q    Including the LA Alliance Agreement and the City's compliance, correct?

MS. KAOUNIS:  Objection.  Vague.  That lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  That is not correct.

BY MR. UMHOFER:

Q    So, you don't have anything to do with the City's compliance with the LA Alliance Settlement Agreement?

A    I work --

MS. KAOUNIS:  Objection -- hold on.  Hold on.  Objection.  Misstates her testimony.  Lacks foundation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I work with the City Attorney's

III-206

Office and the CAO's Office, who reports the -- the Alliance milestones and tracks that information.  But, again, what I primarily focus on is the operations of Inside Safe, the Collaborative and the continuum of care.

BY MR. UMHOFER:

Q    Are you aware that the City is now counting Inside Safe beds towards the milestones set forth in the LA Alliance Agreement?

MS. KAOUNIS:  Objection.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  I am aware.

BY MR. UMHOFER:

Q    Now, I'm going to pull up the settlement agreement which we've already been talking about in this case.  You'll see it right there.  I don't mean to misstate your testimony, but am I correct that you have skimmed this document?

MS. KAOUNIS:  Objection.  Foundation.  Give her a moment to review it.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  May I review this document?

MR. UMHOFER:  Yes.

THE COURT:  Take your time with it if you want -- if you want to read it or look at it.

III-207

MR. UMHOFER:  There's an iPad in front of you.  If you scroll down to Exhibit 25, that iPad there.

THE COURT:  I think she's -- just a moment.  She'd like a hard copy.  We're going to pay her the courtesy of giving her a copy now.  And take your time with it if you need a recess.

THE WITNESS:  Thank you.

(Pause.)

UNIDENTIFIED SPEAKER:  Your Honor, may I approach?

THE COURT:  Please.

THE WITNESS:  Thank you.

(Pause.)

BY MR. UMHOFER:

Q    Have you had a chance to look at the document?

A    I just skimmed the document.

Q    And you've seen that document before, correct?

A    I have seen this document before.

Q    Did you read that document previous to being here as part of your role as the Deputy City Mayor on Homelessness?

A    I read a lot of documents as part of my role as Deputy Mayor of Homelessness and Community Health --

Q    Was this one of them?

MS. KAOUNIS:  Give her a --

THE WITNESS:  This -- not --

MS. KAOUNIS:  Yeah, give her a minute to finish

III-208

her answer.

THE WITNESS:  Not specific to the Inside Safe Program, the Collaborative for Substance Use care, but I am aware of this document and have discussed it with the CAO's Office and the City Attorneys.

BY MR. UMHOFER:

Q    Why did you read the document the first time you read it?

MS. KAOUNIS:  Objection.  Deliberative process. Privilege.

THE COURT:  Overruled.  As long as it doesn't get into a conversation.

THE WITNESS:  I had -- I don't remember even the first time I read this document.  I -- I can't --

BY MR. UMHOFER:

Q    One of the reasons why you read this document is because you needed to in order to do your job to advise the Mayor on homelessness, is that correct?

MS. KAOUNIS:  Objection.  Calls for a legal conclusion.  Deliberative process and an attorney-client privilege.

THE COURT:  Overruled.

MS. KAOUNIS:  Also relevance.

THE COURT:  Overruled.  Would you answer that question?

III-209

THE WITNESS:  Can you restate the question?

BY MR. UMHOFER:

Q    Is one of the reasons why you reviewed this document because it was important for you as the Deputy Mayor on Homelessness to understand what's in this document?

MS. KAOUNIS:  Objection.  Calls for privileged communications.  Lacks foundation.  Calls for speculation. Relevance.

THE COURT:  Overruled.  You can answer the question, please.

THE WITNESS:  I'm not really sure how to answer that question.  I am -- I am many things.  I'm a physician, a researcher, a medical educator, but I'm not a lawyer. Even if I were to skim this document, I would rely on City Attorneys to be able to interpret it for me.  And, like I said, most of the work that I do is, you know, related to the continuum, bringing folks inside, bringing beds online, and the CAO's Office is responsible for counting the numbers required for this -- this settlement and reporting it.

BY MR. UMHOFER:

Q    Do you understand that one of the goals of this agreement is to bring people inside?

MS. KAOUNIS:  Objection.  Lacks foundation.

THE COURT:  Overruled.

MS. KAOUNIS:  Calls for a legal conclusion.

III-210

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  I'm -- again, I'm not an attorney.  And, so, I -- the goals, from my understanding around street cleanings and beds that are bought online.  And, so, I'm not sure what you mean in terms of bringing folks inside.  But I'm happy to tell you about the Inside Safe Program and what we do to bring folks inside every day.  In fact, we brought some folks inside today.

BY MR. UMHOFER:

Q    Are beds an important element to bringing people inside?

MS. KAOUNIS:  Objection.  Vague.  Calls for a legal conclusion.

THE COURT:  Restate that as a question, counsel.  That was a statement.

BY MR. UMHOFER:

Q    Are beds important to bringing people inside?

MS. KAOUNIS:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  In addition to the need for beds, there's also a need to build trust with the communities that are living on the streets.  And what we do with Inside Safe or our field intervention team does every day is go and assesses the encampment communities that the Council offices

III-211

submits to us, builds relationships with not only the encampment community but the community at large.  And then with the beds that we have in our portfolio, we're able to bring them inside voluntarily.  And, so, that's what's required to bring folks indoors, trust.

BY MR. UMHOFER:

Q    Are beds important to bringing people inside?

        MS. KAOUNIS:  Objection.  Calls for a legal conclusion and relevance.  Vague.

        THE COURT:  Overruled.  You can answer the question.

        THE WITNESS:  I believe I answered the question. First and foremost, you need to build trust with these communities that have mistrust of systems who've promised things to them over and over again.  We're talking about unhoused individuals and elderly folks that have, you know, retired and don't have enough savings to pay rent.  You're talking about individuals who, you know, their families were broken apart because of some medical debt that left them unable to pay their bills.  You're talking about folks that I used to care for at Twin Towers Correctional Facility that left jails and prisons and don't have a safety net to catch them.  So, they end up on the street.  You're talking about foster youth who phase out of the system.  Trust is needed. Beds are also needed.  Along with all of that are the

III-212

services needed to make sure that each of those individuals are met exactly where they are.

BY MR. UMHOFER:

Q    Do you understand -- not as a lawyer but as the Deputy City Mayor for Homelessness, do you understand that there are obligations in this agreement for the City to create additional beds?

A    That is my understanding.

MS. KAOUNIS:  Hold on.  Asked and answered.  Calls for a legal conclusion.  Lacks foundation.

THE COURT:  Overruled.  I believe you stated the answer, but I'm not sure that we picked that up on CourtSmart.  Would you state that again.

THE WITNESS:  That is my understanding.

BY MR. UMHOFER:

Q    And do you understand -- and I think I heard you mention the term "milestones" previously -- that there are milestones in this agreement for the creation of beds?

MS. KAOUNIS:  Calls for legal conclusion.  Lacks foundation.

THE COURT:  Overruled.  You may answer, please.

THE WITNESS:  I understand that.

BY MR. UMHOFER:

Q    And do you also understand that there are milestones for encampment engagement?

III-213

MS. KAOUNIS:  Calls for a legal conclusion.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  I also understand that.  But, again, it's not under my purview to track those numbers or report them back to the Court.

BY MR. UMHOFER:

Q    So, you don't have any role in verifying the accuracy of the numbers reported to the Court or the public --

MS. KAOUNIS:  Objection --

BY MR. UMHOFER:

Q    -- on beds created?

MS. KAOUNIS:  Objection.  Misstates testimony.  Lacks foundation.  Calls for a legal conclusion.

THE COURT:  Overruled.  You may answer, please.

THE WITNESS:  I can restate my role, but, no, that is not my responsibility.

BY MR. UMHOFER:

Q    Where does the data come from concerning Inside Safe and its creation of beds and its services provided to people?  Where do you get that data from?

MS. KAOUNIS:  Objection.  Vague.  Calls for a legal conclusion.  Lacks foundation.

THE COURT:  Overruled.  You may answer the question.

III-214

THE WITNESS:  Sure.  Inside Safe is a citywide encampment resolution program.  I mentioned earlier we have a field intervention team that goes out and conducts assessments of encampments across the City that each of the Council offices submit.

Once that site is assessed, the beds nearest that encampment are identified, and the folks that are in that encampment actually agree to coming inside and encampment is resolved.  And the person is moved from the encampment -- after consenting to give away their belongings, they are moved to the interim housing site.  For Inside Safe, it's a hotel or motel.

Once they reach that hotel or motel, the LAHSA contracted service providers conduct an intake.  At that point, they are collecting information about the participant and inputting it sometimes into their own data platforms, but ultimately, that information is transferred into the Homeless Management Information System.

So, to answer your question, the data that we receive around Inside Safe is -- it comes from LAHSA, and we provide a monthly report called the Homeless Emergency Account Report that goes to the Council Offices for them to approve funding that's transferred for the program.

BY MR. UMHOFER:

Q    Are you -- do you know who Emily Vaughn Henry is?

III-215

MS. KAOUNIS:  Objection.  Calls for -- well, lacks foundation.

THE COURT:  Overruled.

MS. KAOUNIS:  And relevance.

THE COURT:  Overruled.

THE WITNESS:  I believe I met Emily Vaughn Henry as a consultant virtually in a group meeting.

BY MR. UMHOFER:

Q    Do you understand that she previously held the role of Chief Information Officer at LAHSA?

A    I believe that was --

MS. KAOUNIS:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  I believe that was her title.

BY MR. UMHOFER:

Q    And do you understand that she no longer has that title?

MS. KAOUNIS:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  I understand that.

BY MR. UMHOFER:

Q    Do you -- are you aware that there was a time at which Emily Vaughn Henry was in charge of collecting and verifying data concerning Inside Safe?

MS. KAOUNIS:  Relevance.  Vague.

III-216

THE COURT:  Overruled.

THE WITNESS:  I -- I was a consultant when Emily was in her role, and I work with the Inside Safe data as -- as of Spring of 2024, and I work closely with LAHSA to make sure that those reports are generated for us so that we can send it to the Council for their review and approval.

BY MR. UMHOFER:

Q    Did you ever work with Emily Vaughn Henry concerning Inside Safe data, as a consultant or in your role as -- as Deputy Mayor?

MS. KAOUNIS:  Lacks foundation.  Asked and answered.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't believe I did.

BY MR. UMHOFER:

Q    Do you know that there was a time during -- are you aware that there was a time during which she was the person at LAHSA who collected and verified Inside Safe data and reported that outward?

MS. KAOUNIS:  Lacks foundation.  Relevance.

THE COURT:  Overruled.

MS. KAOUNIS:  Vague.

THE COURT:  Overruled.

THE WITNESS:  Again, I was a consultant when she was in her role.  I worked closely with -- my team actually

III-217

works closely with the data team over at LAHSA now.  So, I can't speak to what she did.

BY MR. UMHOFER:

Q    Are you aware that the verification and collection of Inside Safe data responsibility was taken away from Ms. Henry and given to a person named Bevin Cune (phonetic)?

MS. KAOUNIS:  Lacks foundation.  Relevance.  Hearsay.

THE COURT:  Overruled.

THE WITNESS:  I don't know the details of how the work was transferred, but I do know Bevin Cune.

BY MR. UMHOFER:

Q    And Bevin Cune is involved in reporting Inside Safe data from LAHSA outward, correct?

MS. KAOUNIS:  Vague.  Relevance.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  Again, my team works closely with LAHSA's data team.  Bevin oversees -- Bevin Cune oversees that team, but I can't speak to the details of what that looks like.

BY MR. UMHOFER:

Q    So, Bevin oversees the team, the data team at LAHSA that handles the Inside Safe data, correct?

MS. KAOUNIS:  Objection.  Lacks foundation.

III-218

Vague.

THE COURT: Overruled.

THE WITNESS: I can't speak to the details --

MS. KAOUNIS: Relevance.

THE WITNESS: -- of Bevin's job description, but I -- she oversees all of LAHSA's data, not just Inside Safe but all of it.

BY MR. UMHOFER:

Q    And do you communicate with Bevin in your role today around Inside Safe data?

MS. KAOUNIS: Vague. Relevance.

THE COURT: Overruled.

THE WITNESS: Not regularly. If there is an issue with my data team's work with Bevin's team, we will speak on occasion.

BY MR. UMHOFER:

Q    Is it important that the Inside Safe data be accurate?

MS. KAOUNIS: Objection. Vague. Relevance.

THE COURT: Overruled.

THE WITNESS: It is important that all City interim housing data or homeless service data is accurate. But I described for you for Inside Safe how the data is collected. As a researcher, I'll tell you that your data is only as good as it -- as it's collected. And, so, our homeless service providers collect that information and are

III-219

responsible for putting that into HMIS.  More than that, I'm not sure how to answer your question.

BY MR. UMHOFER:

Q    If you had concerns that Inside Safe data was inaccurate or incomplete, what would you do?

MS. KAOUNIS:  Objection.  Vague.  Calls for speculation.  Relevance.

THE COURT:  You can answer that question. Overruled.

THE WITNESS:  Part of the work of Inside Safe is constantly improving the program.  When the program started versus where it is today is -- is -- is different.  It's -- the data quality is improved.  The way we conduct our operations, the way we engage with LAHSA, our service providers, the County, all of that has improved over time, and I work with my team and with the CAO's Office to generate the most accurate report as possible to be presented to the Council so that they can approve the information that's there and the funding that gets transferred to be able to do the work.

BY MR. UMHOFER:

Q    If you learned that that data that you're going to report to the council concerning Inside Safe was incomplete or inaccurate, what would you do?

MS. KAOUNIS:  Lacks foundation.  Calls for

III-220

speculation.  Relevance.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Can you define for me what you mean by data being inaccurate?

BY MR. UMHOFER:

Q    Let's say the data was being kept on a laptop rather than being taken from the HMIS system.

MS. KAOUNIS:  Okay.  Relevance.  Lacks foundation. Calls for speculation.  And incomplete hypothetical.

BY MR. UMHOFER:

Q    If the data -- if the data wasn't coming from the place you thought -- I think you just said that it came from HMIS. If the Inside Safe data wasn't coming from HMIS but was coming from a laptop maintained by a particular individual, would that be a situation that would concern you about the accuracy of the data that you thought was coming from HMIS?

MS. KAOUNIS:  Objection.  Vague.  Lacks foundation.  Relevance.  Calls for a legal conclusion. Incomplete hypothetical.

THE COURT:  Overruled.  You can answer that question, please.

THE WITNESS:  I don't even know how to answer that hypothetical.  What I do know is that the data that LAHSA sends to us is HMIS data, and we rely on that data to be

III-221

able to -- to share the information with the Council.

BY MR. UMHOFER:

Q    But if you  learned that that data wasn't coming from HMIS, what would you do?

MS. KAOUNIS:  Okay.  Asked and answered. Relevance.  Lacks foundation.  Calls for speculation.  Vague and incomplete hypothetical.

THE COURT:  Overruled.  You can answer that question, please.

THE WITNESS:  I don't know how to answer that question.  I -- I rely on our joint powers authority to provide us the information.  We work with the service provider.  We work with LAHSA to ensure that every single operation intakes are done completely for each of our participants.  We work with them on making sure that document readiness is -- is documented accurately.  We work with them to document incidents and so much more.  And, so, it's just really hard for me in this moment, year three of the program, to -- to even entertain this hypothetical.

BY MR. UMHOFER:

Q    Would you report to the City Council Inside Safe data that you knew did not come from HMIS?

MS. KAOUNIS:  Objection.  Lacks foundation.  Calls for speculation.  Incomplete hypothetical.  Vague.

THE COURT:  Overruled.  You can answer that

III-222

question.

THE WITNESS:  To my knowledge, we use a number of data sources for those HEA reports, the Homeless Emergency Account reports.  LAHSA's HMIS data, if we have -- if there is an issue pertaining to HACLA or the Housing Authority City of Los Angeles or the Los Angeles Housing Department, we include that data.

BY MR. UMHOFER:

Q    If you had concerns about the accuracy of Inside Safe data, would you report it to City Council?

MS. KAOUNIS:  Objection.  Asked and answered.

THE COURT:  Overruled.

MS. KAOUNIS:  Relevance.  Lacks foundation. Incomplete hypothetical.

THE COURT:  Overruled.

THE WITNESS:  I'm a physician.  I can't lie about numbers.  I took a Hippocratic oath to protect every single person that comes my way.  Each unhoused individual in Los Angeles I view as my patient.  And, so, I -- again, I do not know how to answer this hypothetical because it's not in my fabric.

BY MR. UMHOFER:

Q    But I'm right that you can't lie about data, right?

MS. KAOUNIS:  Objection.  Vague.  Lacks foundation.  Incomplete hypothetical.

III-223

THE COURT: Well, overruled. Would you answer that question. The general question you can't lie about data, you can answer that question.

THE WITNESS: No. I can't lie about data.

BY MR. UMHOFER:

Q  Now, are you aware that Emily Vaughn Henry raised concerns about the quality and the source of truth for Inside Safe data and then was fired?

MS. KAOUNIS: Vague. Calls for speculation. Lacks foundation. Relevance.

THE COURT: The question is are you aware. You can answer that question.

THE WITNESS: I am not aware of the reasons why Emily Vaughn Henry was fired.

BY MR. UMHOFER:

Q  Are you aware that she raised concerns about the quality and source of truth for Inside Safe data?

MS. KAOUNIS: Same objection. Vague. Lacks foundation. Calls for speculation. Relevance. Assumes facts.

THE COURT: You can answer it one more time.

THE WITNESS: I'm thinking back to LAHSA Commissions that our office staffs. I may have seen letters written by her attorneys claiming that, but I don't know if that's based in fact.

III-224

BY MR. UMHOFER:

Q    Did you investigate those allegations that were set forth in the letters by her attorney?

        MS. KAOUNIS:  Objection.  Lacks foundation. Completely irrelevant.

        THE COURT:  Overruled.  You can answer the question.

        THE WITNESS:  Again, I was not around when Emily Vaughn Henry was working at LAHSA, nor was it in my purview to look at these reports.  In January 2025, when I began to oversee all of it and overseeing Inside Safe since the Spring of 2024, I don't know why I would investigate that because we were constantly quality improving the data that we were receiving from LAHSA.

BY MR. UMHOFER:

Q    Is one of the reasons why you should investigate that the data might be questionable in light of Ms. Henry's letters that you would be aware of?  Is that a good reason to investigate data?  I mean, you handle data for Inside Safe, right?

        MS. KAOUNIS:  Vague.  Assumes facts. Argumentative.

        THE COURT:  It's compound, Counsel.  Reask the question.

//

III-225

BY MR. UMHOFER:

Q    You -- you were involved with reporting data for Inside Safe, correct?

MS. KAOUNIS:  Objection.  Vague.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  I am responsible for sharing the data that LAHSA gives us in a report that summarizes the details, and I do this -- I work on this report in conjunction with the City -- the City's Administrative Office.

BY MR. UMHOFER:

Q    And at some point, you became aware that Emily Vaughn Henry, the CIO of LAHSA, raised concerns about the quality of Inside Safe data, correct?

MS. KAOUNIS:  Objection.  Vague.  Asked and answered.  Lacks foundation.  Relevance.

THE COURT:  Overruled.  You can answer the question, please.

THE WITNESS:  I believe I answered the question.

BY MR. UMHOFER:

Q    So, you read those letters.  And after you read those letters, what did you do to make sure the Inside Safe data that you were involved with is accurate?

MS. KAOUNIS:  Objection.  Lacks foundation.

III-226

Misstates prior testimony.  She said letter.  Assumes facts. Relevance.

THE COURT:  Overruled.  You can answer the question, please.

THE WITNESS:  I work with the data team and with LAHSA on a weekly/daily basis to improve the quality of -- of the data for our Inside Safe Program.  It had nothing to do with the letter.

BY MR. UMHOFER:

Q    Are you saying that the quality of a letter that questions the quality of Inside Safe data has nothing to do with the quality of Inside Safe data?

MS. KAOUNIS:  Objection.  Vague.  I think that was unintelligible.  I'm not sure --

THE COURT:  I'm going to sustain -- I'm going to sustain it, Counsel.

BY MR. UMHOFER:

Q    Who set's City policy on homelessness?

MS. KAOUNIS:  Objection.  Vague as to time.  Asked and answered.

THE COURT:  I'm assuming the present time.  You can answer that question.

THE WITNESS:  City policy around homelessness is made by a number of folks, the Mayor's Office, the City Council.

III-227

THE COURT:  Just a moment.  The Mayor's Office and who?

THE WITNESS:  All of the Council offices.

THE COURT:  All Council offices.

THE WITNESS:  All 15.

BY MR. UMHOFER:

Q    And not you, correct?

MS. KAOUNIS:  Objection.  Misstates prior testimony.

THE COURT:  Overruled.

BY MR. UMHOFER:

Q    Do you set City policy on homelessness?

A    I think I've made very clear what my role has been is to implement the Mayor's priorities and initiatives.  Policy is made -- all policy in the City of Los Angeles is made in conjunction with the executive branch, the Mayor of the City, and the legislative branch, the 15 Council offices.

Q    And you don't speak for the City Council as a whole on homelessness, correct?

A    I do not.

Q    And you don't speak for the Mayor on homelessness, correct?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  As I stated, I -- my responsibility

III-228

is to implement the priorities and initiatives of the Mayor. I -- I'm currently speaking on behalf of myself in the role that I serve as Deputy Mayor of Homelessness and Community Health.

BY MR. UMHOFER:

Q    Now, homelessness is an important policy for the Mayor, is that safe to say?

        MS. KAOUNIS:  Objection.  Vague.

BY MR. UMHOFER:

Q    It's an important issue for the Mayor, correct?

        THE COURT:  Overruled.  You can answer that question.

        THE WITNESS:  It absolutely is an important issue not only for the Mayor, but it should be an important issue for everybody in this room.

        MR. UMHOFER:  No objection to that.

BY MR. UMHOFER:

Q    Is -- you're not involved in setting the budgets for homelessness, are you?

        MS. KAOUNIS:  Objection.  Vague.

        THE COURT:  Overruled.  You can answer the question.

        THE WITNESS:  The budgetary process in the City is, again, like policy, both the -- the Mayor's function as well as all 15 Council offices.

III-229

BY MR. UMHOFER:

Q    And you don't speak for Traci Park on homelessness, do you?

A    I do not.

          MS. KAOUNIS:  Objection.  Vague.  I'm sorry.

          THE COURT:  Overruled.

BY MR. UMHOFER:

Q    And you don't speak for Monica Rodriguez on homelessness either, do you?

          MS. KAOUNIS:  Same objection.

          THE COURT:  Overruled.

          THE WITNESS:  I do not.

BY MR. UMHOFER:

Q    Are you in closed sessions of the City Council?  I'm not asking what's said.  I'm asking whether you are in closed sessions of the City Council when decisions are made and discussions are had on homelessness-related legislation?

          MS. KAOUNIS:  Okay.  I understand.  I'm still going to assert deliberative process privilege.

          THE COURT:  I'm sorry, Counsel?

          MS. KAOUNIS:  He -- counsel asked if the witness --

          THE COURT:  Inside when --

          MS. KAOUNIS:  Deliberative process privilege.  Just want to confirm that she's not going to disclose --

III-230

THE COURT:  You can answer if you're present but not to any conversation, please.

MS. KAOUNIS:  And attorney-client privileged.

BY MR. UMHOFER:

Q    So, are you in closed session when council goes into closed session to discuss homelessness-related issues and legislation?

THE WITNESS:  Again, my role has evolved a lot over the last year and a half.  I don't believe I've attended any closed sessions.  But if there's a specific closed session that you're referencing, I'm happy to try to jog my memory.

BY MR. UMHOFER:

Q    Is this your first time appearing in this courtroom or in any courtroom related to -- where proceedings have been held in this case?

MS. KAOUNIS:  Object.  Vague.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  I have been an attendant in this courtroom.  But, again, my role evolved.  The organization of our -- of our team has changed since I think the last time that I was in this courtroom.

BY MR. UMHOFER:

Q    Have you given the Mayor any advice -- not asking for

III-231

the content of that advice.  Have you given the Mayor any advice about this case?

        MS. KAOUNIS:  I'm going to still assert the deliberative process.

        THE COURT:  I don't see why that question goes if it's answered -- because your next question will obviously be what's what advice.

        MR. UMHOFER:  No.  No.  Not going to ask that question.

        THE COURT:  Then it's going to get sustained very quickly.  So --

        MS. KAOUNIS:  Then, yeah, then it's not relevant.

        THE COURT:  Counsel, your offer of proof?

BY MR. UMHOFER:

Q    Have you -- were you here in January 2023 when the Mayor made her first appearance in court in this case?

        MS. KAOUNIS:  Objection.  Lacks foundation.

        THE COURT:  Overruled.  That refers to you being in court in January.

        THE WITNESS:  January what date?

BY MR. UMHOFER:

Q    2023.

A    Do you know the exact date?  Because I started as Deputy Mayor for Homelessness and Community Health on January 31st, 2024.

III-232

Q     2024, though, correct?

A     Yes.

Q     Okay.  So, I'm asking about 2023.  Would you have been in court on January 2023, the Mayor's first appearance in this case?

A     Again, I was not in my role.  And, no, I was not.

Q     Have you been involved in every discussion the Mayor has had concerning the LA Alliance agreement, to your knowledge?

          MS. KAOUNIS:  Vague.  Lacks foundation.  Calls for speculation.

          THE COURT:  Is the question --

          MS. KAOUNIS:  Relevance.

          THE COURT:  -- in every -- in every?

          MR. UMHOFER:  Every.

          THE COURT:  Every?

          MR. UMHOFER:  Every.

          THE COURT:  I'll sustain the objection.

BY MR. UMHOFER:

Q     Have you been involved in discussions with the Mayor concerning the LA Alliance case?

          MS. KAOUNIS:  Objection.  Lacks foundation. Vague.

          THE COURT:  Overruled.  You can answer that question.

III-233

THE WITNESS:  I'm --

THE COURT:  Without -- be careful.  No conversation between you and the Mayor.

THE WITNESS:  Yeah.

MS. KAOUNIS:  Yeah, and I'm going to assert deliberative process and privilege as well.

THE COURT:  Overruled.  You can answer the question.

MS. KAOUNIS:  Attorney-client privilege.

THE WITNESS:  I'm going to -- I have many conversations with the Mayor, and I can't say with certainty.

BY MR. UMHOFER:

Q    Do you believe that the Mayor has knowledge concerning the LA  Alliance Agreement that you do not have?

MS. KAOUNIS:  Objection.

THE COURT:  Sustained.

MS. KAOUNIS:  Calls for speculation -- oh.

THE COURT:  Sustained.

BY MR. UMHOFER:

Q    Who did you discuss your testimony -- who did you talk with about your testimony in this court before coming today?

MS. KAOUNIS:  Yeah, objection.  Assumes facts --

THE COURT:  Now, for both sides, honestly, I don't care who's talked to whom.  It's not going to make any

III-234

difference in my eventual decision.  So, each party can talk to anybody you want to or nobody.  And on the other side, with A and M, et cetera, any party can talk to any party if they want to.

MS. KAOUNIS:  And attorney-client privilege.

THE COURT:  It's irrelevant.

BY MR. UMHOFER:

Q    Do you know who Ms. Kellum is?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Are you referring to Doctor Adams Kellum?

BY MR. UMHOFER:

Q    Va Lecia Adams Kellum, yes.

A    Yes, I know who she is.

Q    And -- and do you -- did you do any -- did you work with her in your consultant role or in your role as Deputy Mayor?

A    I -- what do you mean by consult?  I work with LAHSA all of the time, and she's the CEO of the organization.

Q    So, what I'm asking --

A    Or the Executive Director.

Q    -- is in your role as a consultant and then in your role as Deputy Mayor, did you communicate with Doctor Adams

III-235

Kellum?

MS. KAOUNIS:  Objection.  Compound.  Vague.

THE COURT:  Overruled.  You may answer that question.

THE WITNESS:  I believe I have spoken to her throughout the time that I've served in my capacity.

BY MR. UMHOFER:

Q    Did you ever have conversations with her where she expressed a view that LAHSA should attempt to produce data that made the Mayor look good on homelessness?

MS. KAOUNIS:  Objection.  Hearsay.  Lacks foundation.  Assumes facts.  Relevance.

THE COURT:  No.  Overruled.  You can answer that question.

THE WITNESS:  No.

BY MR. UMHOFER:

Q    Have you ever heard her make any statement, Ms. -- Doctor Adams Kellum make any statements to that effect, that it was her, that she wanted to make the Mayor look good on homelessness?

MS. KAOUNIS:  Objection.  Relevance.  Assumes facts.  Lacks foundation.  Hearsay.

THE WITNESS:  No, I don't believe I've ever heard her say that.

//

III-236

BY MR. UMHOFER:

Q    Do you member seeing in that attorney letter from Ms. Henry that Ms. Henry was told that she needed to make the data look good for the Mayor?

         MS. KAOUNIS:  Objection.  Hearsay.  Relevance. Lacks foundation.  Assumes facts.

         THE COURT:  It's also -- it's also a statement, Counsel.  You can ask a question, but that's a statement as if it's true.

BY MR. UMHOFER:

Q    Are you aware that one of the allegations Ms. Henry put in her letter was that she was told by Ms. Adams Kellum to make the data -- by Doctor Adams Kellum to make the data look good for the Mayor?

         MS. KAOUNIS:  Objection.  Lacks foundation. Relevance.  Hearsay.

         THE COURT:  As to foundation I'm not certain, you know, what you read, if anything that letter.

         THE WITNESS:  I don't remember all of the details of the letter.  I can't even tell you who wrote it.  I remember there was a letter.

BY MR. UMHOFER:

Q    Have you been involved in any conversations outside of the -- your communications with the Mayor or City Council Members where there was a discussion about making sure the

III-237

data made the Mayor look good on homelessness?

MS. KAOUNIS:  Objection.  Relevance.  Lacks foundation.  Deliberative process.  Attorney-client privilege.  Assumes facts.

THE COURT:  Well, I'm going to make certain that that doesn't involve a Council Member, the Mayor.  I think -- I'll let counsel ask it concerning any other person or persons.

THE WITNESS:  I don't believe so.  Look, the Mayor brought me on board to make sure that every individual gets the services that they need and that we demonstrate the constant improvement and the excellence that each of these people deserve because we are building trust with them in the street.  So, I -- this line of question is really difficult to answer, personally really difficult to answer.

BY MR. UMHOFER:

Q   I'm certain it is, and I apologize for that, but I'm going to ask you one more time.  Did you do anything -- once you learned that Doctor -- that Ms. Henry had raised concerns about the quality of the data on Inside Safety, did you do anything to make sure that you looked into those allegations?

MS. KAOUNIS:  Objection.  Vague.  Relevance  Lacks foundation.  Assumes facts.  Hearsay.

THE COURT:  Overruled.  You can answer that

III-238

question.

THE WITNESS:  Again, I have done -- I work day and night, my team works day and night to make sure that we are serving these -- every single unhoused individual the way they deserve.  I know this because of my own lived experience, because of the patients I've cared for for many years.  We work tirelessly to make sure that the data is as accurate as possible so that we can figure out how to make it even better.

BY MR. UMHOFER:

Q    Did you work tirelessly to make sure that the Inside Safe data was coming from HMIS and not Ms. Cune's laptop?

MS. KAOUNIS:  Objection.  Assumes facts. Relevance.  Lacks foundation.  Hearsay.

THE COURT:  Would you restate the question?  I'm not sure I heard the entire question.

BY MR. UMHOFER:

Q    Did you work tirelessly to determine whether the Inside Safe data was coming from HMIS as opposed to Ms. Cune's laptop?

MS. KAOUNIS:  Objection.  Assumes facts. Relevance.  Lacks foundation.  Hearsay.  Vague.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  I'm not really sure how I would know

III-239

what's in Ms. Cune's laptop.  I don't go to her home to figure out what's on her laptop.

BY MR. UMHOFER:

Q    And you didn't ask her whether the data that she's reporting to you and the Mayor was coming from HMIS or her laptop?

MS. KAOUNIS:  Objection.  Vague.  Assumes facts. Relevance.  Lacks foundation.  Hearsay.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I'm not even sure if I would know to ask her that.  I -- I assume that LAHSA is providing me the information that our service providers are inputting into HMIS.  And we are using that data to report what we're doing on a day to day.  I can tell you how many people were brought indoors today because my -- my intervention -- my field intervention team told me so.  And then that -- that number is verified with what's put into HMIS every single time.

BY MR. UMHOFER:

Q    So, you assumed -- I think I just heard you say you assume that the data is coming from HMIS, right?

MS. KAOUNIS:  Objection.  Misstates prior testimony.

THE COURT:  Overruled.  You can answer the

III-240

question.

THE WITNESS:  I don't know what another synonym is for assumed, but we rely on LAHSA to provide us the HMIS data, and we use that to report to our Council Offices on a monthly basis.

MR. UMHOFER:  May I have a moment, your Honor?

THE COURT:  Certainly.

(Pause.)

MR. UMHOFER:  No more questions at this time, your Honor.

THE COURT:  All right.  Ms. Myers, do you have questions?

MS. MYERS:  Yes, your Honor.  Would it be possible to take just a quick break?

THE COURT:  Oh, absolutely.  Fifteen minutes, is that okay, folks?

ALL:  Yes, your Honor.

THE COURT:  I'll see you in 15 minutes.  Thank you very much.

(Proceedings recessed briefly.)

THE COURT:  All right.  Then we're back on the record.

Ms. Myers, your cross examination, please.

MS. MYERS:  Yes, your Honor.  Thank you very much.

THE COURT:  And would you state your name once

III-241

again, just because we're on Courtsmart.

MS. MYERS:  Just one second, your Honor.

(Pause.)

MS. MYERS:  Shayla Myers from the Legal Aid Foundation of Los Angeles on behalf of the Intervenors in this case.

ETSEMAYE AGONAFER - PLAINTIFFS' WITNESS - PREVIOUSLY SWORN

CROSS EXAMINATION

BY MS. MYERS:

Q    Doctor Agonafer, thank you so much for being here.  And you testified previously that you are responsible for the Inside Safe Program for the City of Los Angeles, correct?

A    I am responsible for the operations, the day-to-day operations of the Inside Safe Program.

Q    Okay.  In your own words, how would you describe what the Inside Safe Encampment Resolution Program is?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  Inside Safe is a citywide encampment resolution program that's both person centered and community centered.  It's built on the foundation of establishing trust with both the person and the community at large to voluntarily bring them indoors to an interim housing site.  Most of our portfolio is made up of hotel and motels that neighbors the encampment community.

III-242

Our team -- well, the field intervention team receives priority encampments from the Council Offices. They then assess each of those encampments, the people that live in them, the surrounding community, and identify beds that are nearest to that encampment.  They work to maintain that social network of the encampment community so that they can be brought indoors together voluntarily.  And then once they come into the interim housing site, our LAHSA contracted service providers then conduct -- or manage the operational services, which include 24/7 residential monitoring, three meals a day, and weekly case management that's really focused on housing navigation and connecting the individual with resources that they need.  But it's solely dependent on the participant's willingness to share what their needs are and their readiness to move through the continuum.

BY MS. MYERS:

Q     So, the Inside -- oh, go ahead.

A     There's one -- one more part that I forgot to mention.

Q     Go ahead.

A     Each of the encampment sites that our team resolves we'll monitor on a weekly basis for repopulation.  And when there are beds available, we offer that housing resource to anybody who repopulates the area or didn't come in the first time around.  And, to date, we've done -- I think today was

III-243

the 102nd operation, and we've brought in over 4300 people and housed more than a thousand people into permanent housing.

Q     You answered many of my next questions.

A     Okay.

Q     But I'm going to break down some of what you just answered.

A     Sure.

Q     So, is it fair to say that the Inside Safe Program focuses on specific encampments in the City of Los Angeles?

        MS. KAOUNIS:  Objection.  Vague.

        THE COURT:  Overruled.

        THE WITNESS:  Inside Safe focuses on the encampment priorities that are submitted by each of the Council Offices, and the Council Offices sort of decide which their priorities are, submits it to the team after our assessment, and our assessment includes a number of things, trying to figure out the number of people in the encampment, the -- the willingness to come indoors, the severity in terms of how many tents there are, and the impact on the surrounding community.

        Resolving the encampment is dependent on making sure we have the beds available that's nearest to the community.  Oftentimes, folks that live on the west side are not interested in moving to the east side or to South LA.

III-244

And, so, we are mindful of maintaining that social network in the community that they are aware of.

BY MS. MYERS:

Q    And when you say "We make the decision about which encampments" after you receive the priorities from the Council Offices, who actually makes the decisions about which encampments to target with Inside Safe?

MS. KAOUNIS:  Objection.  Vague.  Deliberative process.

THE COURT:  Overruled.  You can answer the question, please.

THE WITNESS:  Like I said, it is a submission by the Council Office, and based on the beds that are available in the portfolio, it's a -- it's a collaboration really between our office, the Council Office.  And then, I mean, I didn't even speak to all the departments that are involved in a day of an operation.  But it's a -- it's a collaborative effort with all folks involved to determine, you know, which -- which one we can resolve.

BY MS. MYERS:

Q    Certainly, and it sounds like there are a lot of departments that are involved on the day of.  But after a list of encampments are submitted by the Council Offices, are there more encampments submitted by Council Offices than Inside Safe operations that can be conducted at any given

III-245

time?

MS. KAOUNIS:  Vague.  Lacks foundation. Relevance.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I don't remember the total number off the top of my head.  To date, I believe about 180 encampments have been submitted as priorities to the Mayor's office, and we have assessed approximately 150 or so and, like I said, resolved 102.  But I'm not sure if you're referring to other types of efforts across the City because I know that Council Offices submit encampments to the CAO's Office for Care, Care Pluses and RV operations.

BY MS. MYERS:

Q    So, I'm going to ask you just about Inside Safe for this.

A    Okay.

Q    So, 180 priorities have been submitted by Council Offices, and you've assessed approximately 150, is that correct?

A    I believe that number is a good estimate.

Q    Okay.  And who made the decision to assess those approximately 150 as opposed to the other 30 that have not yet been assessed?

MS. KAOUNIS:  Objection.  Lacks foundation.

III-246

Relevance.

THE COURT: Overruled. You may -- you can answer that question.

THE WITNESS: Sure. The team as a -- the field intervention team is made up of 18 individuals with lived experience. They are responsible for assessing all of these sites, building trust, monitoring each of these sites for repopulation, and they conduct one to two operations per week and monitor all 100 sites on a weekly basis and do repopulation efforts every other week.

So, the -- the real reason why we haven't hit all of the assessments is just a matter of time and effort that it requires.

BY MS. MYERS:

Q   And who oversees the field intervention team?

MS. KAOUNIS: Objection. Lacks foundation. Relevance.

THE COURT: Overruled.

THE WITNESS: I am the Deputy Mayor for Homelessness and Community Health. We have a Senior Director of the Inside Safe Program who oversees the Inside Safe field intervention team managers and specialists.

Q   And who is that?

MS. KAOUNIS: Objection. Vague.

THE COURT: Overruled.

III-247

THE WITNESS:  You are just asking for the name of the individual?

BY MS. MYERS:

Q    Yes.

A    Okay.  Anita Wells -- or her last name has changed. Anita Kagotti (phonetic).

Q    And, so, is she responsible for making the decision about where the field intervention teams go to do the assessments?

MS. KAOUNIS:  Objection.  Lacks foundation. Vague.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  As the priorities are submitted, the team attempts to go to every single one of them.  We just haven't gotten to the full number.  But it's under Anita -- Anita Kagotti's direction.  And I'm --

BY MS. MYERS:

Q    So, the --

A    -- aware of it as well.

Q    Apologies.  So, is it first come first serve, first in the door encampment identified, you're working your way through the list, and so the last 30 that haven't been identified -- or that haven't been assessed are the last 30 that were identified by Council Offices?

MS. KAOUNIS:  Objection.  Vague.  Assumes facts.

III-248

Relevance.

THE COURT:  Overruled.

THE WITNESS:  Do you mean first come, first serve for the assessments or for the actual resolution?

BY MS. MYERS:

Q    For the assessments.

A    For the assessment, yes, it's first come, first serve. But, again, it really is dependent on how busy the week is. For instance, this month I believe they conducted seven or eight operations, some pretty large ones.  And, so, depending on the sale of the work, the rate in which they complete those assessments varies.

Q    So, when you say "operations", you're referring specifically to an Inside Safe encampment resolution operation?

A    Correct.

Q    Okay.  And that's different than the field intervention team's assessment of the encampment, correct?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  Correct.  The assessment is typically two plus weeks of engaging with that encampment community.  It's a dynamic community, usually different times of day you'll see different people.  And, so, they're actively getting to know those individuals, creating a by

III-249

name list, working with the County to see -- and with LAHSA to see if they're already in the system, if services have been rendered.  It is a whole process.  I -- I don't want to mis-describe sort of the -- the assessment phase is really important to trust building.

BY MS. MYERS:

Q    Do you have a sense of how long the assessment phase is and -- the between the time the assessment occurs and when an Inside Safe operation usually occurs?

MS. KAOUNIS:  Objection.  Vague.  Assumes facts. Relevance.

THE COURT:  Overruled.

THE WITNESS:  It depends.  It depends on the bed availability.  It depends on the -- the individuals that live in the encampment and their willingness to come indoors.  It depends on the severity of their circumstances. Not every person in an encampment is eligible for a hotel, motel situation.  Some folks need a higher level of care, and that's why we engage with both LAHSA and the County to see if somebody, you know, was in a good -- or wasn't eligible for our type of bed and would be better suited somewhere else.

BY MS. MYERS:

Q    You said you create a by name list.  What is a by name list?

III-250

MS. KAOUNIS:  Objection.  Vague.  Assumes facts. Relevance.

THE COURT:  Overruled.

THE WITNESS:  The by name list is a list of encampment residents, but it's called a by name list because not everybody goes by a traditional first and last name. They may have another name that they go by.  We try to be mindful of what their wishes are and call them by what they wish to be called.

MS. KAOUNIS:  Your Honor --

BY MS. MYERS:

Q    By the --

MS. KAOUNIS:  I'm sorry.  Before the next question, could you remind the gallery to keep their commentary quiet.

THE COURT:  If there are comments coming from the gallery, please silence.

MS. KAOUNIS:  Thank you.

THE COURT:  As a courtesy of the witnesses and the court.

BY MS. MYERS:

Q    So, by name literally refers to the name that a person goes by?

A    Correct.

Q    Okay.  And that by name list is a list of people who

III-251

are in the encampment that you're focusing on for purposes of that assessment, is that correct?

MS. KAOUNIS:  Objection.  Vague.  Assumes facts. Relevance.

THE COURT:  Overruled.

THE WITNESS:  Can you repeat that?  I just want to make sure I'm understanding what you're describing.

BY MS. MYERS:

Q    Sure.  You said there's a list, a by name list that you create when you -- when the field intervention teams go out and do the assessment.  Is that a list of all of the individuals who are at the encampment?

MS. KAOUNIS:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  it is a list of the individuals that are at the encampment during the time of the assessment with a clear acknowledgment that that group of people may change on the day of an operation.  Hence, why we work with LAHSA and the County in the event that someone new shows up. Oftentimes our team builds so much trust with these encampment communities that more people show up on the day of an operation.  The by name list really serves as a way to estimate how many beds we actually need on the day of an operation to bring everybody indoors.

Q    Going back to after an assessment is conducted, you

III-252

said that you've conducted 150 assessments of the roughly 180 encampments that have been submitted by counsel offices, right?

A     (No response.)

Q    And out of that, when you say 180 encampments, is that 180 total for the life of Inside Safe?

MS. KAOUNIS:  Objection.  Vague.  Assumes facts. Relevance.

THE COURT:  I'm sorry.  Would you say that again? I missed the last portion.

MS. MYERS:  Sure.

BY MS. MYERS:

Q    I'm asking if the 180 priority encampments that have been listed by Council Office and submitted to the Mayor's Office, is that all of the encampments that have been submitted by the Council Offices through the lifetime of Inside Safe?

MS. KAOUNIS:  Objection.  Vague.  Assumes facts. Relevance.

THE COURT:  Overruled.

THE WITNESS:  The Inside Safe Encampment Resolution Program has evolved over time since day one to present day.  I was not around in the early days when they were running encampment resolutions.  What I'm speaking to is the total number across the span of the program, and I

III-253

can't even tell you when we started to tabulate the number of priorities that were submitted because I -- I believe we started it when -- I can't even estimate when we did -- when we started tabulating all of the priorities that were submitted.  But, to my knowledge, it's from the start of the program.

BY MS. MYERS:

Q    Okay.  And understanding that Inside Safe has evolved as a program, when you say there have been 102 Inside Safe Encampment Resolution Programs or operations, is that the lifetime of Inside Safe, so starting from the very first one that was conducted till now, 102?

MS. KAOUNIS:  Objection.  Vague.  Assumes facts.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.  On a monthly basis, we produce homeless emergency account reports that are verified by LAHSA.  The last reports that we received was end of April, so, April 30th of 2025.  That doesn't include the last seven or eight operations that were done in the month of May.  So, my 102 is based off of the total from the beginning of the program.

BY MS. MYERS:

Q    Okay.  Do you know roughly how many encampment resolutions and operations have been done, Inside Safe

III-254

Encampment Resolution operations have been done through sort of this iteration of Inside Safe as you -- as you understand it for purposes of -- of keeping track?

A    I would have --

        MS. KAOUNIS:  Objection.  Vague.  Relevance.

        THE COURT:  Overruled.

        THE WITNESS:  I would have to go back to reports to be able to give you those exact numbers.  I just know that the general total for -- since the inception of the program.

BY MS. MYERS:

Q    Okay.  And, so, going back to how the specific locations are picked, you identified a number of factors that go into the decision making about whether an Inside Safe operation should occur.

A    Um-hmm.

Q    Who -- who determined what those factors were?

        MS. KAOUNIS:  Objection.  Assumes facts. Relevance.  Lack of foundation.

        THE COURT:  Overruled.  You can answer the question, please.

        THE WITNESS:  That predates me, but, again, our team has fine tuned our process over the course of the last two and a half, three years, and the factors that I mentioned are the ones that we focus on in this moment.

III-255

BY MS. MYERS:

Q     Okay.

A     The severity of the encampment, the size of it, the bed availability.  I'm sure there's other factors.  But, primarily, I mean, most importantly it's whether or not the folks that are living in the encampment want to come indoors because it's a voluntary program.

Q     And when you have -- when -- in answering the questions, you mentioned the team and you mentioned we a couple of times related to making the determination about which Inside Safe -- which encampments to focus on.  When you say "we" and "the team", who are you referring to?

        MS. KAOUNIS:  Objection.  Assumes facts.  Misstates prior testimony.  Relevance.

        THE COURT:  Overruled.  You can answer the question.

        THE WITNESS:  I think I mentioned earlier the Mayor's Office operates the day to day of the Inside Safe Encampment Resolution Program.  And, so, when I refer to "we", I'm talking about my team and the Mayor's Office of Housing and Homeless Solutions.

BY MS. MYERS:

Q     Okay.  And who is on your team?

A     I have a large team, and I don't have everybody's names but happy to provide an org chart if that's helpful.

III-256

Q     I'm really just trying to hone in on the group of folks who make the decision about which Inside Safe operations to conduct.

          MS. KAOUNIS:  Objection.  Vague.  Assumes facts.  Relevance.

          THE COURT:  Overruled.  You can answer the question.

          THE WITNESS:  There are 18 field intervention team members that are managed by the senior director of Inside Safe who I oversee.  We receive the Council's priorities.  We work with each of the Council Offices, and based on the beds that are available, we conduct the encampment resolution.  So, the prior -- which encampment is done first is really dependent on the beds that are available closest to the encampment, where the folks in that encampment are willing to come inside.

BY MS. MYERS:

Q     And you also mentioned the size of the encampment and the severity of the encampment, correct?

A     Yes, but --

          MS. KAOUNIS:  Objection.  Vague.

          THE WITNESS:  -- if you -- yes, and you can only bring folks inside with beds that are available.

BY MS. MYERS:

Q     Of course.  And you can only bring folks inside who

III-257

want to come inside.  So --

A     Exactly.

Q     -- understanding that these are the factors, you have -- you've connected 102 operations, 180 encampments have been submitted, and 150 were assessed.  Just trying to get down to who made the decision to conduct those encampment resolution programs that were conducted.

            MS. KAOUNIS:  Objection.  Asked and answered. Relevance.  Assumes facts.

            THE COURT:  Overruled.  You can answer the question.

            THE WITNESS:  It seems as if you're looking for one individual.

BY MS. MYERS:

Q     No.

A     Well, your question makes me feel like you're -- you want me to identify one individual.  Inside Safe is a collaborative, a partnership with many entities, Mayor's Office, Council Office.  The CAO helps us with the administration and the reporting of it, all of the departments that come out on the day of an operation, LA Sanitation, Parking, LAPD just for security, the service providers, LAHSA, County.  And, so, it's hard for me to answer your question because the -- it is truly a partnership intended to, you know, wrap our arms around

III-258

folks and support them in their moments of need.

Q    Understanding all that --

A    Yeah.

Q    -- there was a -- there was an Inside Safe operation today, correct?

A    Correct.

Q    Where was that?

A    I believe it was in Council District 15.

Q    Do you know the specific location of the Inside Safe operation?

A    Off the top of my head, no, I do not.

Q    Okay.  But you know it was in Council District 15?

A    I do.

Q    Okay.  So, based on that, is it -- is it fair then that Councilmember McOsker, as councilmember for Council District 15 submitted the encampments to the Mayor's Office?

         MS. KAOUNIS:  Objection.  Assumes facts. Relevance.

         THE COURT:  Overruled.  You can answer the question.

         THE WITNESS:  I should maybe clarify.  I don't think we've ever had a councilmember themselves submit their encampment priority.  It was likely one of the councilmember's staff.

//

III-259

BY MS. MYERS:

Q    That's a great question.  Do you know who it was in Councilmember McOsker's office?

A    I do not.  I would have --

MS. KAOUNIS:  Objection.

THE WITNESS:  Oh.

MS. KAOUNIS:  Objection.  Relevance.  Okay.  Your Honor, there's an objection on relevance.

THE COURT:  Oh, I'm sorry.  I didn't hear it. Overruled.

THE WITNESS:  I -- I do not.  That is -- that is information that the team collects.  I don't have that information.

BY MS. MYERS:

Q    Okay.  Who on your team would collect that information?

MS. KAOUNIS:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  The Senior Director of Inside Safe, along with her team of 18 folks.

BY MS. MYERS:

Q    So -- so, someone from the Council Office could submit the encampment priority to a member of the field intervention team, is that correct?

MS. KAOUNIS:  Objection.  Misstates prior testimony.  Assumes facts.  Relevance.

III-260

THE COURT:  I'm sorry.  Would you restate the question?

BY MS. MYERS:

Q   I'll just say, Doctor Agonafer, you identified 18 field intervention team members.  I'm assuming when you just said 18 team members, you were talking about field intervention team members, correct?

MS. KAOUNIS:  Objection.  Assumes facts. Relevance.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I should clarify.  So, the Council Offsides submit their priorities into a portal where it is put into a spreadsheet, and the team checks in on that spreadsheet and then assesses each of those encampments and determines whether or not they can conduct an encampment resolution.

BY MS. MYERS:

Q   Okay.  And that -- that portal, is that a -- is that a Google sheet?  Is that -- do you -- do you know what it is?

MS. KAOUNIS:  Objection.  Assumes facts. Relevance.

THE COURT:  Overruled.

THE WITNESS:  I believe it's a Google sheet or Google form.  I don't --

III-261

BY MS. MYERS:

Q    Are there any limitations on the number of encampments that Council Offices can submit through this portal?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  No.  Every councilmember has the opportunity to submit encampments at their leisure.

BY MS. MYERS:

Q    Okay.  And then after the -- the Council Offices and obviously not the councilmembers themselves --

A    Yeah.

Q    -- but the Council Offices submit the -- the encampments through the portal, then the field intervention teams will then go out and assess based on the -- the list that is in front of them, is that correct?

MS. KAOUNIS:  Objection.  Assumes facts. Relevance.

THE COURT:  Overruled.

THE WITNESS:  I believe that's correct.

BY MS. MYERS:

Q    And then do the field intervention teams fill out -- write a report about what they've identified?

MS. KAOUNIS:  Objection.  Vague.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  They generate an assessment, yes.

III-262

BY MS. MYERS:

Q    And is it a -- is it a form or is it a free flowing report, is it through a portal?  What is the form that the assessment takes?

            MS. KAOUNIS:  Objection.  Vague.  Relevance.

            THE COURT:  Overruled.

            THE WITNESS:  It has evolved over time, and I don't know -- I don't look at the details on a day to day.  My -- my role has really evolved over the last several months, to include many things, and at this point, the Inside Safe field intervention team, you know, continues to improve their -- their program with my oversight.

BY MS. MYERS:

Q    And, just as to time, just so that it's clear as we're talking about this, I'm talking about right now, understanding that the Inside Safe Program has evolved.

A    Yes.

Q    So, we'll talk about right now.  And if I have questions about in the past, I'll identify that specifically if that's helpful.

      Okay.  So, speaking -- the field intervention team generates their assessment, and that is passed -- is that passed on to the senior person responsible for the field intervention team?

            MS. KAOUNIS:  Objection.  Vague.  Relevance.

III-263

THE COURT:  Overruled.

THE WITNESS:  The Inside Safe Senior Director oversees the entirety of the team.  There are managers on the team and specialists on the team.  They have different roles in terms of all components of the Inside Safe Encampment Resolution Program.  So, yes, some of them do.

BY MS. MYERS:

Q    Some of them do pass on the assessments?

A    To each other, yes.

Q    Okay.  And when you say there are managers and specialists, are those included in the 18 -- 18 person field intervention team?

MS. KAOUNIS:  Objection.  Vague.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MYERS:

Q    Okay.  So, then I'm just trying to understand after the assessment is conducted and the written product is developed, what happens with that written product?

MS. KAOUNIS:  Objection.  Vague.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  There's another component of the team that monitors that availability across our Inside Safe hotel, motel portfolio.  We have both booking and occupancy agreements.  The booking agreements are where we lease out

III-264

one room at a time within a hotel.  The occupancy agreements is where we lease the entirety of the hotel.  The portfolio is a mixed bag in terms of size, location.  So, our -- another component of the team actually calls motel owners on a weekly -- actually twice a week to check on vacancies so that -- and then that -- that number is also verified with our service providers, our LAHSA contract service providers that operate each of those sites.

With that bed availability, we're able to sort of right size the encampment that's been submitted as a priority to what's available in that moment.  And the bed availability changes on a day to day.

BY MS. MYERS:

Q    That is very helpful.  I'm just trying to get at what happens to the written assessment after -- after it's conducted by the field intervention team.  What happens to that written assessment, putting aside the bed availability?

MS. KAOUNIS:  Objection.  Your Honor, we're going really far afield here.  I'm questioning the relevance.  Can we get a proffer on this document discovery question that we're getting right now?

THE COURT:  No.

MS. MYERS:  Your Honor, I'm just trying to understand the decision making process because it goes directly to the Council District by Council District

III-265

division in the Encampment Reduction Plan.

THE COURT: Oh.

MS. MYERS: And, so, I'm happy to --

THE COURT: You -- you may answer the question.

MS. KAOUNIS: Okay. So, same objections. Vague. Relevance.

THE COURT: Overruled.

THE WITNESS: We -- we hold onto the assessment. We reassess it based off of that bed availability that I just described. We also use that assessment when we're planning the actual operations, if we've secured enough beds to be able to resolve the encampment that was recently assessed. We use that -- that assessment in our conversations in the planning calls with all of the departments across the City, the Council Office, and LAHSA, and the County.

BY MS. MYERS:

Q    Okay. So, we're talking -- now we're talking about planning the Encampment Resolution --

A    Um-hmm.

Q    -- Program. I'm not there yet.

A    Okay.

Q    Still on the picking the location part of it. So, understanding there's a field -- a field assessment that's done, and you said, "we" take the field assessment, but my

III-266

understanding is you're not directly involved in the sort of day-to-day right now -- right now of picking the individual encampments.  So, do you get the Field Assessment Report when it's done?

MS. KAOUNIS:  Objection.  Vague.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I apologize.  I refer to my team as we because --

BY MS. MYERS:

Q    Sure.

A    -- we are a team.  But my team receives the assessment. They are the ones that are holding onto it, looking at it with the other group of -- of another side of the team that looks at bed availability in deciding which one can be resolved.  It is -- it is a -- it is a matrix of some sort to perfectly match an encampment to the beds that are available while maintaining the social network of the -- the encampment.  We are not in the work of -- of taking one person from one side of town to the other.  We are trying to bring them indoors together.

There are times where there are three hotels in a neighboring encampment where we will split up the encampment community, but it's really at the -- I mean, it's -- it's voluntary to the person and the community that's there.

Q    Sure.  So, going back to the Field Assessment Reports,

III-267

that's still the stage that we're on.  That  Field Assessment Report is provided to your team.  Who on your team gets that?

MS. KAOUNIS:  Objection.  Relevance.

THE WITNESS:  I can't speak to the details of who on my team gets that.

THE COURT:  Overruled.

BY MS. MYERS:

Q    Okay.  So, some -- some people on your team.  Can you tell us the -- the job descriptions or the job titles of the people on your team who might receive that Field Assessment Report?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Counsel?

MS. MYERS:  Your Honor, again, I'm -- I'm literally just trying to get at the question of how locations are chosen for Inside Safe, because it goes directly to the district -- the Council District by Council District approach.

THE COURT:  I'm sorry.  It goes directly to what? I couldn't hear.

MS. MYERS:  The Council District by Council District Approach and reporting related to the Encampment Reduction Plan, which is a key issue in this motion -- or in this hearing.

III-268

MS. KAOUNIS:  I'm sorry, but I'm not -- I'm failing to understand that explanation as to the relevance of compliance with the settlement here.  Maybe there could be a further articulation.

THE COURT:  We will eventually get tied in to either the LA Alliance or the Roadmap Agreement.

MS. MYERS:  Yes, your Honor.  This goes directly to the LA Alliance Settlement Agreements and the --

THE COURT:  On the 60 percent Council District by Council District?

MS. MYERS:  Yes, your Honor.  And the -- and, specifically, the Encampment Reduction Plan and the District by District approach --

THE COURT:  Overruled.

MS. MYERS:  -- related to the Encampment Production Plan.

THE COURT:  All right.  Thank you.

MS. KAOUNIS:  I'm failing to understand, your Honor, how the names of the people who received certain reports is --

THE COURT:  Yeah.

MS. KAOUNIS:  -- relevant to compliance.

THE COURT:  Specific names, I agree with you, Counsel.

MS. MYERS:  And, your Honor, I think the -- the

III-269

pending question that I had was the -- the job titles of the -- and, your Honor, I'm literally just trying to get at --

THE COURT:  I'm giving you some leeway, Counsel.

BY MS. MYERS:

Q    So, can you tell us the -- the job titles or the -- the group of folks who are receiving these Field Assessment Reports for the purposes of determining which encampments to focus on for Inside Safe?

MS. KAOUNIS:  Relevance.

THE COURT:  You can answer the question.

THE WITNESS:  Okay.  There are -- there's a Senior Director of the program who may receive the reports but also could be contributing to creating the reports.  The managers are overseeing the specialists.  All of them spend time, a majority of their time, out in the field.  And, so, I can't -- I'm not really sure how to answer your question because all 18 of them are assessing the sites, writing up this report, and then determining with the other subset of the team where the beds are available.  So, I mean, a lot of members across my team, not just the Inside Safe FIT team, field intervention team, see assessments.  And -- and all of the departments that engage on the day of an operation also see that assessment.

BY MS. MYERS:

Q    And, just to clarify, I'm not really focusing on who

III-270

gets the reports.

A    Okay.

Q    But I'm really focusing on who gets the reports for purposes of any -- like inputting that information into the decision making process related to which encampments to conduct Encampment Resolution Program at.

          MS. KAOUNIS:  Relevance.  This -- I'm going to assert a Rule 403 objection.  This is confusing and a waste of time.

          THE COURT:  Overruled.

          THE WITNESS:  Can you repeat the question?

BY MS. MYERS:

Q    So, just to clarify, as I said, I'm not really looking for where the Encampment Assessment Reports are distributed, but I'm looking at who receives -- not name but job title -- who receives the field intervention team's assessment reports for purposes of integrating that data that they collected from the report into the decision making process about where to conduct an encampment cleanup.

          MS. KAOUNIS:  Same objection.  Asked and answered.

          THE COURT:  I'm not certain.  You can answer that again.

          THE WITNESS:  The -- the Senior Director of Inside Safe and the Inside Safe  Field Intervention Team Managers together.

III-271

BY MS. MYERS:

Q    Okay.  And after the assessment is written and the bed count is -- the bed count is determined, who takes that information and decides where to conduct an Inside Safe encampment resolution operation?

        MS. KAOUNIS:  Asked and answered.  Relevance. Rule 403.

        THE COURT:  Overruled.

        THE WITNESS:  The Senior Director takes that information, engages with the Council Offices, notifies them that the beds are available and that they can conduct the encampment resolution.  An agreement is made that -- on the date that they would do -- they'll do it, and the planning calls are scheduled.

BY MS. MYERS:

Q    Okay.  So, it's the Senior Director in consultation with the Council Office that makes --

        MS. KAOUNIS:  Objection.

BY MS. MYERS:

Q    -- the decision about where -- where the -- whether to do an encampment resolution operation?

A    I think -- yeah, I --

        MS. KAOUNIS:  Objection.  Asked and answered. Relevance.  403.

        THE COURT:  Overruled.  I think you just said yes?

III-272

THE WITNESS:  I believe I've answered this question over and over again, but it seems that you're unhappy with the response.  It's -- it's never a black and white decision making process, but it happens in conjunction with the Council Office, and the Senior Director leads those conversations.

BY MS. MYERS:

Q    Okay.  Are you involved in the decisions about where to conduct encampment resolution operations?

MS. KAOUNIS:  Relevance.

THE COURT:  Overruled.  You can ask the question.

THE WITNESS:  I am generally aware of where encampment resolutions are conducted.  I allow my Senior Director to make those decisions given her experience with the program and her leadership of her team.

BY MS. MYERS:

Q    Okay.  So, then the encampment that -- the encampment resolution operation that was conducted this morning, the decision to conduct that was made by the Senior Director and -- in consultation with the Council Office, is that correct?

MS. KAOUNIS:  Relevance.  Asked and answered. Assumes facts.

THE COURT:  Overruled.  One more time.

THE WITNESS:  With my oversight, the Senior Director has that conversation with the Council Offices.  I

III-273

am still their supervisor.

BY MS. MYERS:

Q    Right.  What I'm trying to get at is why the decision was made to -- to do the encampment resolution operation in Council District 15 this morning at that location as opposed to in a different Council District.

        MS. KAOUNIS:  Objection.  Relevance.  Asked and answered.  403.

        THE COURT:  Overruled.  You can answer the question.

        THE WITNESS:  I think I answered this.  It's based off bed availability.  In Council District 15, there were beds that were neighboring that encampment and available to resolve the -- the encampment.

BY MS. MYERS:

Q    And who makes the decision about which -- which hotels and motels to -- to target?  And -- and I'm -- and I'm -- and I'm just asking this.  Is -- let me just back up and ask this.  Does your office lease up as many hotels and motel rooms as you can for the Inside Safe Program that are available or do you make selections of hotel rooms and motel rooms based on priorities?

        MS. KAOUNIS:  Relevance.  Assumes facts.  Lacks foundation.

        THE COURT:  Overruled.

III-274

MS. KAOUNIS:  Vague.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  As I mentioned before, there are both booking and occupancy agreements.  The booking agreements you can sort of turn a bed on and off because you're not leasing out the entirety of the motel.  The occupancy agreements -- well, let me go back.

The booking agreements you can turn on and off depending on if someone's in the bed.  If no one's in the bed, we're not paying for that bed.  For the occupancy agreements, we're actually leasing all -- for most of the sites, all of the beds, and we're paying for them whether a person is in them or not.

So, part of the calculation in deciding can you run an encampment resolution is optimizing those occupancy agreements because we don't want to have them vacant and turning on booking agreements as needed and if it's actually available.  You actually have to call the motel owner who runs that booking agreement and say, Do you have any other beds that we can turn on, because we have an upcoming encampment resolution.  And, so, that's kind of -- that is why our team checks in with both motel owners and service providers on a twice a week basis, to be able to identify bed availability and match them to those priority

III-275

encampments that are assessed by the entirety of the field intervention team.  And then, you know, once we're able to match the encampment to those beds, it's a conversation with the Council Office that we're ready to move forward with that operation.

BY MS. MYERS:

Q    And when you talk about bed availability, are you talking about bringing new hotel and motel rooms -- new hotel and motels on board or are you talking about bed availability in existing hotels and motels that are participating in Inside Safe?

A    In existing hotels.

          MS. KAOUNIS:  Vague -- vague.  Relevance.

          THE COURT:  Overruled.

          MS. KAOUNIS:  Go ahead.

          THE WITNESS:  In existing hotels and motels.

BY MS. MYERS:

Q    Okay.  So, when you're assessing bed availability, it really is how many hotel rooms are in, for example, the Silver Lake Hotel?

          MS. KAOUNIS:  Objection.  Vague.  Relevance.

          THE COURT:  Overruled.  You can answer the question.

          THE WITNESS:  At the beginning of this program, when I was not overseeing it, there was a constant process

III-276

of bringing new hotels and motels online.  Since I have overseen the program, that has slowed down.  We have really just focused on renegotiating those contracts to bring the cost down and to extend the length of time that those hotel contracts exist, and we work in concert with the CAO and General Services Department and the City Attorneys to administer those contracts with the motel owners.

BY MS. MYERS:

Q    When was the last time the City brought on a new hotel or motel room -- motel -- I'm sorry -- hotel or motel?

MS. KAOUNIS:  Objection.

BY MS. MYERS:

Q    Into the Inside Safe Program?

THE COURT:  I'm sorry.  Would you restate that just a little slower.

BY MS. MYERS:

Q    When was the last time the City brought a new hotel or motel into the Inside Safe Program?

MS. KAOUNIS:  Objection.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  I don't recall the date, but each of those Homelessness Emergency Account Reports that we submit to council includes any changes to our hotel, motel portfolio because we need council's approval of each of those contracts and the funding that goes towards paying

III-277

them.

BY MS. MYERS:

Q    Okay.  Thank you.  And, so, is it fair to say that the City's primary responsibility for the Inside Safe Program is to either identify the encampments and conduct the encampment resolution?

MS. KAOUNIS:  Objection.  Vague.  Misstates prior testimony.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  The Mayor's Office operates the day to day of the Inside Safe Program, and the priorities are submitted by the Council Office.  The administration is conducted by the CAO's office.  LAHSA operates the -- the hotels and motels with services.  It is multiple people involved in the process.

BY MS. MYERS:

Q    Okay.  If the encampment -- if the Inside Safe Encampment Resolution Program starts with the identification of an encampment and runs through housing people or putting people in shelters in the hotels, if that's the -- if that's the timeline of the Inside Safe Encampment Resolution Program, does -- is it fair to say that the City's primary responsibility goes from the beginning of identifying the encampment through to the point of the encampment resolution and then the City passes on that responsibility to a service

III-278

provider?

MS. KAOUNIS:  Objection.  Vague.  Assumes facts. Relevance.  Lacks foundation.

THE COURT:  Overruled.

MS. KAOUNIS:  And calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Maybe it would be helpful for me to describe the phases of the Inside Safe Program because I think you're truncating what our -- what our field intervention team is actually doing.

So, in the planning phase, there's the assessment and determining whether or not there are beds available, getting all of the departments together to be able to ultimately resolve the encampment, which involves a number of departments.

And then the stabilization phase where we bring someone into interim housing, yes, the LAHSA contracted service providers are responsible for, you know, providing their operational services, the residential monitoring, the three meals a day, the -- their weekly case management.  But our field intervention team actually goes and checks back in on our participants.

Like I said, that trust building in that planning phase is really key, and -- and my team of 18 team members and the Senior Director are really doing God's work when

III-279

they get to know each individual, brings them inside.  They then work with the County to do service connect days.  They work with street medicine teams that go and check in on certain participants.  And then there's sort of the repopulation management phase where we go back to each encampment and monitor it for any repopulation that occurs and bring more folks indoors.  And that sometimes involves some of the departments to help clean the street afterwards.

So, I think the way you've described it doesn't take into account we actually follow the person, as we should, all the way through.  And then we work really closely with LAHSA's contracted service providers to support, as we can with document readiness, connecting them with housing resources, and we know a number of Inside Safe participants who've actually been permanently housed and we're still in touch with.

BY MS. MYERS:

Q    So, the City's involvement in the Inside Safe Program continues even after -- even after folks are brought into the Inside Safe motels and hotels?

MS. KAOUNIS:  Objection. Relevance.  Asked and answered.  Your Honor, I'm really questioning the relevance.  This is a lot of questioning about process.  Just can we get a proffer?

THE COURT:  Overruled.

III-280

THE WITNESS:  The Mayor's Office is involved in taking care of our -- our clients.  I would -- I'm a primary care internal medicine physician.  I -- I take care of people from the age of 18 all the way till death.  That same premise is what we apply to the people that we bring indoors.  And, so, the Mayor's Office does follow as many participants that are willing to be followed that we can.

BY MS. MYERS:

Q    And you said one of the important aspects of the Inside Safe Program is that it's a voluntary program, correct?

A    Correct.

Q    And understanding that it's a voluntary program, how many people have voluntarily come inside since the Inside Safe Program started?

MS. KAOUNIS:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  To my understanding, every single person that is brought indoors was voluntarily brought indoors.  No one was forced to come inside.  You remember that I practiced at Twin Towers Correctional Facility for several years every weekend.  I know what a carceral system is.  This is not one.

BY MS. MYERS:

Q    And how many people have voluntarily been brought inside?

III-281

A     To date, we've had over 4300 people voluntarily come inside.  But LAHSA produces the monthly report that gives you the exact details.

Q     Okay.

THE COURT:  I'm sorry.  You dropped your voice.  Would you say that again?

THE WITNESS:  LAHSA produces the monthly reports with the exact details in terms of the number of people brought indoors.

THE COURT:  Okay.

BY MS. MYERS:

Q     You said -- you said previously that once the beds are identified and people voluntarily agree to come inside, then an encampment is resolved, is that correct?

MS. KAOUNIS:  Objection.  Misstates prior testimony.

THE COURT:  Overruled.  You can answer the question.

MS. KAOUNIS:  And -- and calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  That -- that is the term that we use.  What it means is that those that wanted to come indoors came indoors.  There are instances where an individual is just not ready and those individuals are left

III-282

alone.  But oftentimes when the team goes back for the repopulation monitoring, that individuals says, Yeah, no, I miss my neighbor, and I want to -- I want to try it.  And in those instances, if a bed is available, we -- we move them indoors.  But I -- I understand how the term "resolution" could be misinterpreted by many.

BY MS. MYERS:

Q    Not misinterpreting or interpreting.  Just trying to get your understanding of what it means for an --

A    Sure.

Q    -- encampment to be resolved.  So, what does that term mean for you, an encampment has been resolved?

          MS. KAOUNIS:  Objection.  Relevance.  Calls for a legal conclusion.

          THE COURT:  Overruled.

          THE WITNESS:  It means that the team went out with all of the departments, with LAHSA, with County, and voluntarily brought everybody indoors.  Consent was provided for the relinquishment of -- of their belongings, and -- and it -- and at that point, it's time to begin the clock on monitoring for repopulation.

          MS. KAOUNIS:  Your Honor, may I ask what -- how much time we have?

          THE COURT:  Thank you, Counsel.  Next question, please.

III-283

BY MS. MYERS:

Q    And you said -- you previously testified that people agree to give up their belongings as part of Inside Safe, is that correct?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  That is my understanding.

BY MS. MYERS:

Q    Okay.  And is that a condition of enrollment in Inside Safe?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.

MS. KAOUNIS:  Calls for a legal conclusion.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  There is a limit in terms of the number of items somebody can bring into the hotel room.  I don't know the exact amount of -- of stuff that they can bring indoors, but I believe LA Sanitation records consent of each of the individuals allowing for removing their belongings.

BY MS. MYERS:

Q    That's helpful.  So, if a person agrees to give up their belongings, then the LA Sanitation takes a video in

III-284

which they give consent, correct?

MS. KAOUNIS:  Objection.  Lacks foundation.  She said she believes.  Relevance.

THE COURT:  Overruled.  You can answer -- you've answered the question.

THE WITNESS:  I believe that's the case.  I don't go to every operation.  I have been to a handful over the course of my time.  So, yes, I believe I answered the question.

BY MS. MYERS:

Q    And for the handful of Inside Safe operations that you went to, was that the practice?

MS. KAOUNIS:  Objection.  Relevance.  Vague.

THE COURT:  The practice concerning what?

MS. MYERS:  Practice related to LA Sanitation recording.

THE COURT:  Sanitation?  Yeah.

MS. MYERS:  Yeah.

THE COURT:  Overruled.

THE WITNESS:  I believe so, yes.

BY MS. MYERS:

Q    And, so, now, going back to my question, is it a condition of enrollment in Inside Safe to give up your belongings?

MS. KAOUNIS:  Objection.  Asked and answered.

III-285

Relevance.  Rule 403.

THE COURT:  When they call it a resolution, that's what I think that this is driving at.

MS. MYERS:  Yes, your Honor.

THE COURT:  Yeah.  Overruled.  You can answer the question.

THE WITNESS:  There are many conversations with each of these individuals to determine whether or not they're willing to come inside.  I -- I -- I've -- I feel like this is a bit of a trick question because each individual -- so, let me back up.

As a physician, when I do a procedure, I have the patient sign a consent form, and I believe that this process is about the same thing.  They are told beforehand what they are signing up for.  They are told about the services that are delivered inside the interim housing sites, and they are told that their friends, their neighbors are going to come along with them.

And, so, to my knowledge, they are as informed as possible of what is to come and why they are consenting to giving up their belongings.  Now, have I spoken to every single participant about their decision?  No.  But that is the process.  It's the process in the hospital when you want me to do a procedure on you.  And, so, I'm not sure how to answer your question further.

III-286

BY MS. MYERS:

Q    Well, I think my question was just if it was a condition of enrollment in Inside Safe to give up your belongings?

MS. KAOUNIS:  Your Honor, this has been asked and answered.  I'm going to say again that I think this is discovery I have to say for another action that is pending against the City with respect to taking of belongings.  I think it's improper to use this forum as a vehicle to get discovery.

MS. MYERS:  Your Honor, if I may respond.

MS. KAOUNIS:  And this is a waste of time.

THE COURT:  I don't think it's discovery, Counsel. But I think this has been asked and answered a number of times.

MS. MYERS:  And I would just like to respond to that, your Honor.

THE COURT:  Please.

MS. MYERS:  I've proffered and your Honor has ruled whether or not I'm counsel on a different matter.  I would note that that matter has nothing to do with the seizure of property related to Inside Safe.

THE COURT:  What matter is that?  Is it in my court?  I've got a number of these matters.

MS. MYERS:  You'll have to ask counsel for Gibson

III-287

Dunn -- or Gibson Dunn and Crutcher.

THE COURT:  What -- what court is this in, Counsel?  I have some.  Judge Fischer has some.

MS. MYERS:  Go ahead.

THE COURT:  Numerous colleagues have these.  What court is this in, to make certain I don't have a -- an issue here.

(Pause.)

MS. KAOUNIS:  I'm not sure I know.

THE COURT:  These questions drive towards this encampment resolution and the definition, and you say that the team -- it means the team got a person indoors.  And this is relevant, Counsel.

MS. MYERS:  Thank you, your Honor.

MS. KAOUNIS:  Your Honor, just to -- to answer your question first, we think it may relate to the case before Judge -- Judge Fischer, which --

THE COURT:  Okay.

MS. KAOUNIS:  -- is the Garcia case.

THE COURT:  It's got nothing to do with this Court then.  I've got one with Steven Yagman (phonetic) coming up.  I don't think it involves any issue here.

MS. MYERS:  And I would just note counsel for the City is well aware that that case has nothing to do with Inside Safe, so --

III-288

THE COURT:  Oh, thank you.  Please proceed.

BY MS. MYERS:

Q    Okay.

MS. KAOUNIS:  Wait.  And, just to be clear I want to assert my objection on relevance.  The testimony has nothing to do with the contract at issue in this case, and I've stated that several times now.  So, I'm objecting to this whole line of questioning.

THE COURT:  It has to do with encampment resolution.  Overruled.

MS. KAOUNIS:  But, your Honor, that's -- that's a definition.  We're getting -- we're asking a witness about a specific term.  We haven't put the contract in front of her.  There's -- she's -- they've been calling for a legal conclusion.

THE COURT:  Thank you.  Overruled.

MS. MYERS:  And --

THE COURT:  Counsel, don't.  Your next question now.  It's been overruled.  You may ask a question.

BY MS. MYERS:

Q    So, when a person gives up their belongings, is the amount of property that they give up documented anywhere?

MS. KAOUNIS:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't know the exact process, but

III-289

I believe LA San holds onto that documentation.

BY MS. MYERS:

Q    Okay.  And is the requirements to give up property before coming into Inside Safe, is that documented anywhere?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I'm not sure what you're referring to.

BY MS. MYERS:

Q    Well, you -- you said that a person agrees to give up their belongings to go into the Inside Safe Program.  And I'm wondering if that policy is documented anywhere?

MS. KAOUNIS:  Objection.  Assumes facts. Relevance.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Um, I would have to go back and look at service provider contracts, motel contracts.  I don't know that detail.

BY MS. MYERS:

Q    Would that information be given to the individual who is enrolling in Inside Safe?

MS. KAOUNIS:  Objection.  Asked and answered. Relevance.  Assumes facts.  Vague.

THE WITNESS:  Again, I am not in the weeds of the day-to-day process.  If --

III-290

THE COURT:  Overruled.  You can answer the question.  I'm sorry.

THE WITNESS:  Sure.  Sorry.  I'm not in the weeds of the day-to-day process.  So, I can't speak to that.

BY MS. MYERS:

Q        Okay.  When you speak about an encampment being resolved, what do you mean by an encampment?

MS. KAOUNIS:  Objection.  Calls for a legal conclusion.  Relevance.

THE COURT:  No.  Overruled.  You can answer that question.

THE WITNESS:  An encampment can mean many things.  For me, it means that there is an unhoused person that needs to be brought inside.  It could be many people.  And, so, that's -- that's the principle that -- that we work by.

BY MS. MYERS:

Q    Has Inside Safe ever done an encampment resolution operation for a single person?

MS. KAOUNIS:  Objection.  Calls for a legal conclusion.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  I don't believe we've done a specific encampment resolution for one person.  But that repopulation management there could be one person that is

III-291

left behind or one person that showed up after everyone cleared. There are a number of reasons why people repopulate. But I would have to look at the information that the team gives me on a monthly basis to be able to tell you. I don't -- I don't think so, though.

BY MS. MYERS:

Q    So, Inside Safe does not focus on single individuals for purposes of the encampment resolution operation, correct?

MS. KAOUNIS: Objection. Vague. Relevance. Legal conclusion.

THE COURT: Overruled. You can answer the question.

THE WITNESS: It -- it depends. I mean, if -- if an -- if one person has a lot of -- I'm reluctant to call it any -- it's their home. It's their home, and it could have -- it could be a big structure. It could be a vehicle that has materials that are right outside of it. It -- it really depends. And, so, it's hard to answer your question, and we are meeting the person in the community exactly where they are and attempting to build trust so that they can come indoors.

BY MS. MYERS:

Q    So, is part of the focus then in determining whether to focus an encampment resolution --

III-292

THE COURT: I'm sorry. Counsel, could you start again slower?

BY MS. MYERS:

Q   So, is part of the determination then for purposes of an encampment resolution operation whether to conduct it, the amount of -- the amount of space the encampment takes up on the sidewalk?

A   It could.

MS. KAOUNIS: Objection. Objection. Vague. Legal conclusion. Relevance.

THE COURT: Overruled.

THE WITNESS: It could. It -- like I said earlier, there's a number of factors. I listed a few off the top of my head, but there are a number of factors that go into the "severity" of a site.

BY MS. MYERS:

Q   What other factors go into the severity of a site?

MS. KAOUNIS: Objection. Asked and answered. Relevance. Rule 403. Vague.

THE COURT: Could you -- I didn't hear the question. Did you say the security of the site?

MS. MYERS: The severity of the site, your Honor.

THE COURT: The severity. I'm sorry.

MS. MYERS: Yeah.

MS. KAOUNIS: Your Honor, the witness listed the

III-293

factors.  Counsel read them back to her, and this has been asked and answered.  Relevance.

THE COURT:  Overruled.  You may ask the question.

BY MS. MYERS:

Q    Sure.  You -- as your counsel noted, I asked for the factors and you listed a number of them, and you mentioned severity.  But now, as we're talking, you identified that the size and amount of belongings in an encampment can go to severity.  So, I'm just digging in a little bit about what other factors go into severity.

MS. KAOUNIS:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  The complexity of each encampment is so different.  It is so different.  We can walk the streets of Skid Row.  We can go down the Figueroa Corridor in South LA.  We can go under the 405 on the west side.  They are so different.  And, so, it's -- it's really difficult to be able to answer that question because, again, we meet the people and the community exactly where they are.  The priority is submitted by the Council Office.  We work in concert with them.  We look at the beds that are available, and that's how the decision is made.

BY MS. MYERS:

Q    So, when you say encampment resolution operation and you use the term "encampment", are you referring to -- under

III-294

the term "encampment", are you referring to all of the -- the tents and vehicles and individuals in the specific area of a single encampment or are you dividing out encampment to mean each of the individual tents?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  I'm sorry.  The last portion, Counsel, was too quick.  Reask the question.

MS. MYERS:  Sure.

BY MS. MYERS:

Q    When you used the term "encampment resolution" and you're speaking about an encampment, are -- do you -- what do you mean by that term?

MS. KAOUNIS:  Objection.  Vague.  Relevance.  Asked and answered.

THE COURT:  Overruled.

MS. KAOUNIS:  Calls for a legal conclusion.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  I'm not in the details with the field intervention team in terms of how they identify zones. So, let me back up to that portal that I told you about.

When the Council Office submits a site that's a priority for them, it's typically a cross street, and then the team just goes out to that cross street and then assesses what's there and determine what zones that they

III-295

will target to -- to figure out how to engage with the folks, to figure out what they can actually resolve. Sometimes that includes tents. Sometimes that includes makeshifts. Sometimes that includes RVs or vehicles. Every single one of them works different. And, so, again, I'm not in the weeds of the day to day. In my other careers I may have been, but in this moment, I can't speak to those details.

BY MS. MYERS:

Q    So, when you identify a zone, are you referring to everyone within that zone as a single encampment for purposes of the encampment resolution operation?

MS. KAOUNIS:  Objection.  Relevance.  Legal conclusion.

THE COURT:  Overruled.  Overruled.  You can answer the question.  Identify everyone in the zone?

THE WITNESS:  So, there -- one encampment resolution could have multiple zones.  It could have one zone.

THE COURT:  Would you say that again just a little slower?

THE WITNESS:  Yes.  Every encampment resolution could have one zone or multiple zones.

THE COURT:  Okay.

THE WITNESS:  And, so, it's not that every zone is

III-296

counted as an encampment resolution.  And those zones are the ones that are monitored.  Sometimes after resolving encampments, tents or makeshifts can repopulate other areas outside of that zone.

BY MS. MYERS:

Q    When you say repopulate, does that mean by individuals who were previously in the Inside Safe operation and who were brought inside and have now come out and are back?

MS. KAOUNIS:  Objection. Vague.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  It's a -- it depends.  Like I said earlier, when we resolve an encampment, everybody who voluntarily comes inside comes inside.  Those that choose not to be a part of the program can stay where they are.

Sometimes people will exit the program and go back to where they lived before.  And, so, it just -- it really depends on each individual's circumstances and each encampment site.

BY MS. MYERS:

Q    And, so, the repopulation efforts focus on bringing people who are in those zones inside after an encampment resolution operation has been conducted?

MS. KAOUNIS:  Objection. Vague.  Relevance.

THE COURT:  No.  Overruled.  You can answer that question.

III-297

THE WITNESS:  I believe you have that correct.

BY MS. MYERS:

Q    The 4300 people that have been brought inside through Inside Safe, does that include -- is that 4300 individuals or is it 4300 instances in which a person was brought inside?

THE COURT:  Just a moment.  Would you say that again a little bit more slowly.

BY MS. MYERS:

Q    Is it -- I understand it's a little bit confusing but gets to the heart of it.

THE COURT:  It's not confusing.  Just need to slow you down.

BY MS. MYERS:

Q    If you're talking about 4300, is that 4300 individuals or is it 4300 instances in which someone was brought inside?

MS. KAOUNIS:  Objection.  Vague.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I would have to check with the LAHSA data source to be able to tell you definitively.  There -- yeah.

BY MS. MYERS:

Q    Okay.  So, you can't tell us whether -- if a person is brought in -- if a person has exited from Inside Safe, goes back to the location, is brought inside again through

III-298

repopulation, whether that person is included in the 4300?

MS. KAOUNIS:  Objection.  Asked and answered --

BY MS. MYERS:

Q    Right?

MS. KAOUNIS:  Sorry.

THE COURT:  Overruled.

MS. KAOUNIS:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I cannot speak to that, but I can -- I can tell you with some certainty that we didn't bring one person in 4300 times.

BY MS. MYERS:

Q    Fair.  I don't think anyone thinks that.  We were more just trying to figure out do you -- let me ask this.  How -- do you have a sense of how often it is that someone exists Inside Safe, goes back to the encampment and then comes back to Inside Safe through this repopulation operation?

MS. KAOUNIS:  Objection.  Relevance.  Lacks foundation.  Vague.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  Repopulation -- or exits happen across all City interim housing sites.  Transitions from what you know to something new are hard for all of us, housed and unhoused individuals.  Exits happen for a number

III-299

of reasons, back to the streets, to hospitals, to jails. And, unfortunately, we've had 73 people pass away.

And, so, to answer your question, yes, there are some people who exit the interim housing on a portfolio -- not just Inside Safe, but all of them -- for a variety of reasons.  And the repopulation efforts are really to figure out what happened.  When we reencounter somebody that we brought indoors many months prior, that's the question we're asking.  And, you know, if it's the site that didn't work, the service provider that didn't work.  We're trying to figure that out, and we look for other opportunities as they become available.

BY MS. MYERS:

Q    And, so, it is the case then that -- never mind. Strike that.  You testified earlier that trust is important to bring people inside, correct?

A    (No audible response.)

Q    And why is it important to have trust to bring people inside?

MS. KAOUNIS:  Objection.  Compound.  Vague. Relevance.

THE COURT:  About the property why is it important?

MS. MYERS:  Why is it important to have trust to bring people inside.

III-300

THE COURT:  I'll sustain it, Counsel.  I'm more interested in the repopulation, and we've got other folks coming in and out obviously.  If you know those numbers, what's your definition of encampment resolution.  Sustained.

BY MS. MYERS:

Q    Is Inside Safe -- the Inside Safe Encampment Resolution Program the only -- the only encampment resolution program conducted by the City of Los Angeles?

MS. KAOUNIS:  Objection.  Relevance.  Legal conclusion.

THE COURT:  Overruled.  You can answer that.

THE WITNESS:  Based on our Inside Safe definition of what an encampment resolution is, where we voluntarily bring indoors the individuals and communities at large into our hotel, motel portfolio, we are the only citywide encampment resolution program.

THE COURT:  Okay.

BY MS. MYERS:

Q    Okay.  So, drawing a distinction between a citywide encampment resolution program and an encampment resolution operation, are there other encampment resolution operations conducted by the City of Los Angeles?

MS. KAOUNIS:  Objection.  Vague.  Asked and answered.  Relevance.

THE COURT:  Do you understand that question?

III-301

THE WITNESS:  I -- I assume you're referring to the Care, Care Pluses and the RV operations, but I'm not sure.

THE COURT:  Yeah.  Let's --

BY MS. MYERS:

Q    I'm not referring to anything.  I'm simply asking you if there are other encampment resolution operations conducted by the City of Los Angeles that don't fall under the purview of Inside Safe?

MS. KAOUNIS:  Same objections.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  I think it depends on your definition of encampment resolution.  My -- I think I've articulated the Inside Safe encampment resolution definition pretty clearly.  And, to my knowledge, there aren't other programs that do what -- do what we do with Inside Safe.

BY MS. MYERS:

Q    Okay.  So, how -- how would you define encampment resolution?

MS. KAOUNIS:  Objection.  Asked and answered. Relevance.  403.

THE COURT:  Overruled.  You can answer it one more time.  I want to be certain.

MS. KAOUNIS:  Legal conclusion.  Sorry.

III-302

THE COURT:  Overruled.

THE WITNESS:  An encampment resolution is a person-centered, community-centered voluntary program where you meet each individual in their community where they are and voluntarily bring them indoors.  The shelter that they're eligible for are Inside Safe portfolios hotels and motels, but there are a number of other types of interim and permanent housing depending on that individual's needs.

BY MS. MYERS:

Q    Okay.  So, based on that definition of encampment resolution, are there other -- are there other encampment resolution operations conducted by the City that do not fall under Inside Safe?

MS. KAOUNIS:  Objection.  Asked and answered.

THE COURT:  Overruled.

MS. KAOUNIS:  Relevance.

THE COURT:  You can answer that question if you know.

THE WITNESS:  I don't believe so.

THE COURT:  Okay.

BY MS. MYERS:

Q    Okay.  Are you aware of funding provided by the State of California for encampment resolutions?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.

III-303

MS. KAOUNIS:  Legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Are you referring to the Encampment Resolution Fund Grant?

BY MS. MYERS:

Q    Yes.

THE COURT:  Or CALTRANS, other areas?

BY MS. MYERS:

Q    Yes, I am referring to the Encampment Resolution Fund Grants by the State of California.  Are you aware of those grants?

A    I am aware of those grants.

Q    Okay.  Has the City of Los Angeles received any encampment resolution funds from the State of California?

MS. KAOUNIS:  Relevance and legal conclusion.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  I believe the City of Los Angeles has and those funds are often managed by Council Offices, the CAO.  The Mayor's Office recently received an Encampment Resolution Fund Grant.

BY MS. MYERS:

Q    Do you know where the Mayor's Office Encampment Resolution Fund -- fund was targeted, the location of the encampment resolution?

III-304

MS. KAOUNIS: Objection. Vague. Relevance. Legal conclusion.

MS. MYERS: I can ask that question again. That was poorly asked.

BY MS. MYERS:

Q   Is it your understanding that encampment resolution funds are targeted to specific encampment locations?

MS. KAOUNIS: Objection. Vague. Legal conclusion. Relevance.

THE COURT: Overruled. You can answer that question.

THE WITNESS: I can't speak to the breadth of all Encampment Fund Resolution Fund Grants and what people apply to, but I can speak to what we applied -- what our office applied to. They applied to it, though, before it was under my purview. And I'm aware of what we are awarded and what it was for.

Our Encampment Resolution Fund Grant, we applied to it after the 10 Freeway fires, and we're targeting an area underneath the 10 Freeway where there were a number -- there still are a number of encampments. Covers I believe Council District 1, 9, and 14. And it was a total of about $44 million over the course of two and a half years.

THE COURT: I want names for a moment. That would be Deleon's old district in 14. 1 is -- would be --

III-305

THE WITNESS:  It is Councilmember Hernandez.

THE COURT:  Hernandez.  And 9?

THE WITNESS:  Councilmember Price.  Price.

THE COURT:  Thank you.

BY MS. MYERS:

Q    And, so, the -- the Encampment Resolution Fund, did that money go to Inside Safe?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  This funding was awarded -- I forget the actual date that it became public.  It was sometime in January or February.  We have yet to receive those funds from the State, but we have every intention -- and that was what the application was written for -- to use it towards Inside Safe.

BY MS. MYERS:

Q    Okay.  And, so, the encampment resolutions that are done pursuant to that grant of Encampment Resolution Funds will be done as part of the Inside Safe Program, is that correct?

MS. KAOUNIS:  Objection. Vague.  Relevance.

THE COURT:  As part of the what program?

MS. MYERS:  Inside Safe Program.

THE COURT:  Inside Safe.  Thank you.

MS. KAOUNIS:  Objection.  Vague.  Relevance.

III-306

Legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  I think it might be actually important to explain here what the funds are used for for Inside Safe.  So, the cost of Inside Safe is really based -- it's a two-pronged cost.  One is the cost of the hotel, motel leases.  I told you about the booking and occupancy agreements.  The average cost of that is about 105 -- you have to check with the CAO on the actual numbers but about $105 per night per bed.

Then the other part of the costs for Inside Safe are the operational services, the residential monitoring, the three meals a day, the weekly case management, and that's $110 per night.  And, so, it -- the actual encampment resolution itself, the act of doing the assessment, the act of bringing all the departments together so you get consent from the participant and move them, put them on -- on the bus and move them into the hotel, there is -- we are not using our -- our -- the encampment resolution fund grant for those things.

THE COURT:  For what?

THE WITNESS:  For those other things.  It's really --

THE COURT:  For --

THE WITNESS:  -- just the hotels and the leases

III-307

and the operational services.  I should also mention now that those beds qualify for the Alliance, the operational services are covered.  And, so, the cost of the program is about $105 per night for the individuals that are in those beds, which makes the program about the same cost of all of the other interim housing beds effective July 1 where the cost for those beds will be $89 to $116 per night.

So, I'm not sure if I'm answering your question about that ERF grant, but if you are trying to get to the cost of things, I gave you an answer.

BY MS. MYERS:

Q    I was not, although, you know, in the interest of learning, as -- as Judge Carter points out, great.  I'm really just trying to get at the very narrow question of whether or not the encampment resolutions that will be done pursuant to that ERF grant will be part of the Inside Safe Program.  And I -- I understand form your answer, Yes, the encampment resolutions done under the ERF will be part of Inside Safe.

MS. KAOUNIS:  Objection.  Asked and answered. Legal conclusion.  Relevance.

THE COURT:  Overruled.  You can answer that.

THE WITNESS:  The Encampment Resolution Fund Grant will be used towards the cost of Inside Safe in those districts.

III-308

BY MS. MYERS:

Q    Okay.

A    And I explained those two costs.

Q    Yes.

A    So, I just want to be very clear it's not District specific.  It's related to those costs in those Districts for those encampment resolutions.

Q    Absolutely.  And Council District 1, which is Eunisses Hernandez's District, was recently awarded a Encampment Resolution Fund Grant from the State of California, is that correct?

            MS. KAOUNIS:  Objection.  Relevance.  Rule 403.

            MS. MYERS:  Happy to offer --

            THE COURT:  Thus far I've allowed it assuming that there was a relevance for the beds that are documented for Inside Safe which counted in the -- the agreements.  That was one area and the only reason I've allowed the questioning.

            The second was the encampment resolution and the term such as reduction, et cetera, and how this has been used, including Inside Safe or in these legal documents.  And your offer of proof?

            MS. MYERS:  Sure, your Honor.  And I'm -- I'm asking a -- a number of questions and getting a lot of information because I'm -- the -- the limited information

III-309

that I'm trying to get at is whether or not the City conducts encampment resolution operations beyond Inside Safe.

THE COURT:  Okay.

MS. MYERS:  And, so, I'm asking about specific funding opportunities that were provided and whether those -- that funding is under the purview of Inside Safe, because if it's not, that gets at the answer to the question, your Honor.

THE COURT:  That's what?

MS. MYERS:  That gets at the answer to the question, your Honor.

THE COURT:  Yeah.  Yeah.  Overruled then.  You can answer the question.

THE WITNESS:  Can you repeat the question?

BY MS. MYERS:

Q    Sure.  Councilmember Hernandez's office, which is Council District 1, recently received an Encampment Resolution Fund Grant from the State of California, correct?

A    Um-hmm.

MS. KAOUNIS:  Objection.  Relevance.  Asked and answered.  Calls for a legal conclusion.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  I believe they did, but every Council Office can apply to this funding in the way that

III-310

they want, and I'm not privy to the details of what their application was, and I'm not sure who's managing their grant, if it's the CAO or if they're managing it internally.

BY MS. MYERS:

Q    Okay.

A    And, so, I -- I can't speak to that.

Q    And, so, the funds -- the encampment resolutions that are conducted pursuant to these grants that are awarded through the City of Los Angeles do not necessarily go through the Inside Safe Program, is that correct?

MS. KAOUNIS:  Objection.  Asked and answered. Relevance.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  Prior -- prior to this upcoming fiscal year -- the budget has yet to be approved -- Inside Safe was primarily funded with general funds.  In Fiscal Year 25/26, we plan to use the ERF Fund Grant that we've recently received towards our Encampment Resolution Program.

Now, just because the State has a grant that's called Encampment Resolution Fund, I can't define -- I don't know all of the details of how that's defined or how applicants apply to that funding and what they plan on using it for.

BY MS. MYERS:

Q    So, if a Council Office uses the encampment resolution

III-311

funds to do outreach, identify individuals in an encampment, identify beds and pay for beds, provide services, bring people in from those encampments into those beds and provide services, would you consider that to be an encampment resolution?

MS. KAOUNIS:  Relevance.  Lack of foundation.  Calls for a legal conclusion.

THE COURT:  Overruled.  I think you already answered that.

MS. KAOUNIS:  Incomplete hypothetical.

THE COURT:  I'll let -- just a moment.  I'll let you answer that again.  I think you already answered it.

THE WITNESS:  Yeah, I believe I have.  I've -- I can define encampment resolution for Inside Safe.  The hypothetical of what a Council Office could potentially do with funds that they received or awarded from the State with a grant that's named Encampment Resolution Fund, I really am having a hard time being able to answer that.

BY MS. MYERS:

Q    Okay.  Would you consider a local jurisdiction providing services and support to people experiencing homelessness in encampments that results in meaningful paths to safe and stable housing, would you consider that to be an encampment resolution?

MS. KAOUNIS:  Objection, your Honor.  Counsel's

III-312

reading from a document.  Calls for a legal conclusion.
Relevance.  Asked and answered.

THE COURT:  Overruled.  You can answer that.

THE WITNESS:  Can you repeat the question?

BY MS. MYERS:

Q    Sure.  Would you consider a local jurisdiction providing services and support to people experiencing homelessness in encampments that results in meaningful paths to safe and stable housing, would you consider that to be an encampment resolution?

MS. KAOUNIS:  Same objections.  I'm also going to add that it's vague.

THE COURT:  Overruled.  You can answer the question.

(Pause.)

THE WITNESS:  For the work that I do, it's about the person.  It is about making sure that individual is met exactly where they are and they receive the -- the services and resources that they need in that moment.  I've explained what Inside Safe encampment resolutions are, and I cannot project other definitions that you're sharing.  I just -- I'm having a hard time being able to do that.

BY MS. MYERS:

Q    Okay.

A    For me in medicine, Diabetes is Diabetes, and there is

III-313

a shared definition that everyone has, and it's evidence based.  It's -- it's something that we all thought we -- we have guidelines to follow.  I'm not sure how to answer your questions in the way that I have been trained to answer questions.

(Pause.)

THE COURT:  All right, Counsel.  Thank you for your patience.  Please continue.

MS. KAOUNIS:  Your Honor, before we continue, just does the witness need a restroom break or water or anything like that?

THE COURT:  Absolutely.

MS. KAOUNIS:  We've been going a while.

THE COURT:  All of you folks are -- all of you folks are spending the hours.  So --

MS. KAOUNIS:  I just want to check on her.

THE COURT:  -- would you like a break?

THE WITNESS:  I would like some water.  But, otherwise, I can keep going.

THE COURT:  Why don't you step down -- why don't you step down and get some water.

Counsel, would you like to take a break?  If so, how long would you like?

MS. KAOUNIS:  How long do you have?

MS. MYERS:  I can't tell you because it depends a

III-314

lot on the witness's answers.  I'm happy to take a break. I'm also happy to keep going.  It's up to the witness.

THE COURT:  No.  All of you work that out.  Okay.

MS. MYERS:  Sorry.  I thought I only had a few questions, but it took longer than I thought.

THE COURT:  Time out, Counsel.  Just meet and confer for a moment.

MS. KAOUNIS:  Well, let's at least do 10 minutes so she can --

THE COURT:  You can go on tonight.  You can start tomorrow.  It's your choice.  Why don't you discuss that.

(Proceedings recessed briefly.)

THE COURT:  We're back on the record.  And, Counsel, you'll continue the examination, please.

MS. MYERS:  Thank you, your Honor.  Shayla Myers. I'm from the Legal Aid Foundation of Los Angeles on behalf of the Intervenors.

BY MS. MYERS:

Q    Doctor Agonafer, before we went on recess, we were talking about the definition of an encampment resolution. Would you define an encampment resolution as working -- as different departments working together to bring unhoused residents into -- into shelter?

MS. KAOUNIS:  Objection.  Asked and answered. Relevance.  Calls for a legal conclusion.

III-315

THE COURT:  Overruled.

MS. KAOUNIS:  If counsel's reading from something, introduce it to the witness and ask her about it.

THE COURT:  Okay.  Counsel, I think we can all guess what she's reading from.

MS. KAOUNIS:  Can we?  I don't know.

THE COURT:  Well, Counsel, my guess is, just to help you, remembering the settlement agreement, look at page two, lines -- paragraph 10 through 15, and that's what she's probably reading from.

BY MS. MYERS:

Q    I'm just trying to get at what -- what constitutes an encampment resolution for purposes of the City of Los Angeles.

And, so, is it fair -- is it fair to say that the purpose of an encampment resolution is to house Angelinos living in encampments, connect them to services, and prevent the return to their return to the streets?

MS. KAOUNIS:  Objection.  Lacks foundation. There's been no evidence at all that this witness was involved in the negotiation of a contract, that she's interpreted the contract, or anything of the sort.  She's already given her definition of encampment resolution as it relates to the Inside Safe Program.  Rule 403.

THE COURT:  Overruled.  You can answer it.

III-316

THE WITNESS:  Again, I've given a definition of Inside Safe Encampment Resolution Program, and I'm not sure how to respond to your question.

THE COURT:  Would you move the mic just a little closer?

THE WITNESS:  Sure.

THE COURT:  Okay.  Thank you so much.

BY MS. MYERS:

Q    I mean, I'm happy to answer (sic) it again.  I know there's objections.  I'm happy to answer (sic) it again just to make sure that it's -- that it's clear.  Would you say that -- that an encampment resolution houses Angelinos living in encampments, connects them to services and prevents their return to the street?

MS. KAOUNIS:  Lack -- calls for a legal conclusion.  Rule 403.  Asked and answered.  Relevance.

THE COURT:  Do you want to answer one more time?

THE WITNESS:  Encampments are diverse, filled with -- with people that come from very different backgrounds.  It is difficult for me to answer your question because the word "encampment" means something different to everyone.  The word "resolution" means something different to everyone.  And, most importantly, I don't even know if the people living in these encampments could define it for you either.

The point of all of this work is to ensure that

III-317

every individual that is living on the streets is treated with love and like they are someone's child and someone's loved one and they are given the services that they need to be healthy and well if they choose to take them.

BY MS. MYERS:

Q    Which I appreciate.  I am just trying to get to the definition of an encampment resolution.  So, I'm just going to show you what -- to counsel's point, I'm going to show you what's been marked as Exhibit 44, which is Attachment 5, an appendix from Mayor's Office of Housing and Homelessness Solutions.  And this is Plaintiff's Exhibit Number 44.  I'm just going to scroll down, and I appreciate the Plaintiffs providing me this tech to be able to do this.

So -- and I just want to point to the Inside Safe Project description.  Can you read that?

MS. KAOUNIS:  I'm going to object that the entire document has not been provided to the witness.  I made a request to have hard copies provided to her.  She requested hard copies.

THE COURT:  Certainly.  Give her a hard copy.

MS. KAOUNIS:  So, she needs a moment to review it.

THE COURT:  Thank you so much.

MS. KAOUNIS:  Sure.

BY MS. MYERS:

Q    And this is page 43 of a 45-page document.

III-318

A     Thank you.

MS. KAOUNIS:  Well, I'm going to object that we're asking the witness to interpret a 45-page document.

MS. MYERS:  I'm actually only referring to Appendix 5, which is that first page -- which is page 43. And this is part of a filing in the case and Attachment 5 to the filing, the appendix from Mayor's Office of Housing and Homelessness Solutions.  It is a filing in this case.  And looking just at the Inside Safe Program description, but please take your time.

(Pause.)

THE WITNESS:  I am familiar with this report, but I do want to qualify that I wasn't overseeing the -- the writing of this report on the date that it was written or submitted.  What was your question?

BY MS. MYERS:

Q     Looking at the first paragraph under the Inside Safe Program description --

A     Sure.

Q     -- defining the Inside Safe Program as to house Angelinos living in encampments, connect them to services, and present -- prevent their return to the streets, does that refresh your recollection about whether that meets the definition of an encampment resolution?

MS. KAOUNIS:  Objection, your Honor.  That was not

III-319

a true reading of the document.  There was a lot that was omitted there.  Relevance.  Lack of foundation.  Hearsay. Also calls for a legal conclusion.

THE COURT:  Overruled.  You can answer the question.

MS. KAOUNIS:  Oh, and assumes that she has a recollection.

THE WITNESS:  This paragraph states the description of Inside Safe, an encampment resolution -- what I define as an encampment resolution.  But I'm not sure -- because there's many of these reports.  This report is produced on a monthly basis.  This description evolved over time with the program, as we've continued to fine tune it. But that is how I think I described Inside Safe as an Encampment Resolution Program.

BY MS. MYERS:

Q    Okay.  Your counsel asked me to put into evidence what I was reading from, which I did.  And, so, that's what I put in front of you.  And now I'm just asking if that is an accurate description of what you would consider an encampment resolution to be?

MS. KAOUNIS:  For the record, I did not ask for the document to be put into evidence.  I asked for the full document to be shown to the witness when only a portion of it was being readed -- being read, and there was no

III-320

attribution of the document.  Calls for a legal conclusion.

THE COURT:  Just reask the question, Counsel.

BY MS. MYERS:

Q    That paragraph that -- I'll just -- I'll just ask it this way.  That -- the first sentence for the Inside Safe Program description, is that to you an accurate description of what you would consider to be an encampment resolution?

MS. KAOUNIS:  Relevance and calls for a legal conclusion.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  The way I read the sentence, it just -- it -- can I read it out loud?

"Inside Safe was launched under
Executive Directive 2 in December 2022
to house Angelinos living in
encampments, connect them to services,
and prevent their return to the street."

For me -- and I'm not sure what that hyperlink links to -- it defines Inside Safe, the program that I described earlier as a comprehensive person-centered, community-centered approach to resolving encampments with individuals who voluntarily come indoors.  I don't know if that is the definition for all encampment resolution programs, but this is the definition and -- and the way we describe Inside Safe as a program.

III-321

BY MS. MYERS:

Q    And would you consider that also to be the definition of an encampment resolution or is this definition specific only to Inside Safe?

MS. KAOUNIS:  Objection.  I'm sorry.  I didn't hear your question.  There's noise in the gallery.

THE COURT:  I'm sorry.  Yeah.  Thank you very much, Counsel.

MS. KAOUNIS:  Could you repeat your question?

THE COURT:  I think somebody had their phone on.

BY MS. MYERS:

Q    Looking at that defin -- what I'm asking is is that definition only Inside Safe or would you consider that also to be a definition of encampment resolution?

MS. KAOUNIS:  Objection.  Asked and answered. Calls for a legal conclusion.  Rule 403.

THE COURT:  So far we've had -- just for all of your memory -- "encampment resolution" means team got the person indoors.  Another statement was by the witness, an encampment resolution, person voluntarily volunteers for the program, voluntarily bringing that person indoors and prevent return to the streets.  Now we're on Exhibit 44, page 43 with the definition of Inside Safe.  The question is?

MS. MYERS:  Just, your Honor, whether this

III-322

definition of Inside Safe --

THE COURT:  Or is it broader?

MS. MYERS:  Is it broader, does it include encampment resolutions or is it -- or is there a distinction between Inside Safe and encampment resolutions.

THE COURT:  You can answer that question.

MS. KAOUNIS:  I want to object for the record. Still calls for a legal conclusion, and also asked and answered.

THE COURT:  Overruled.  You can answer -- you can answer that question.

THE WITNESS:  This exhibit, the entirety of the exhibit is the Homeless Emergency Account Report, the 22nd report as of November 30th, and it includes some funding recommendations.  The CAO includes all of the funding and resources used towards the program, includes reports on actual numbers of -- of people brought indoors, et cetera.

This section, the appendix, is written by our Mayor's Office and describes our program, Inside Safe.

BY MS. MYERS:

Q    And I appreciate the description of the exhibit.  I'm asking that -- that paragraph, if that definition is limited only to Inside Safe or would you consider -- just let's -- let's take Inside Safe out of this.  That definition, would you consider that to be a viable definition of an encampment

III-323

resolution?

MS. KAOUNIS:  Your Honor, asked and answered. Calls for a legal conclusion.

THE COURT:  No, it hasn't been asked -- answered yet.  You may answer that question.

THE WITNESS:  I think I've stated that the term "encampment" varies depending on who you ask.  The term "resolution" varies by who you ask.  This definition here is quite literally a program description.  I am -- I'm not sure how else to answer your question.

BY MS. MYERS:

Q    Let me ask this.  Is the term "encampment resolution" used in the Mayor's Office outside of the Inside Safe Program?

MS. KAOUNIS:  Objection.  Lacks foundation.  Calls for speculation.  Relevance.  Legal conclusion.  She doesn't know how it's used by other people in the office.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  I -- we talk about Inside Safe.  We talk about operations.  I think for other folks, we try to describe it in a way that they would understand it, understanding that every term is vague.  I think you know an Inside Safe operation when you see it before and after. And, so, I'm not -- I can't speak to how everybody speaks

III-324

about encampment resolutions or Inside Safe, but I know that when I'm talking to my team, when I'm talking to our partners, they understand the program to mean this.  These are -- this is what we're doing on a day to day.

BY MS. MYERS:

Q    And encampment resolutions, are you -- I'm asking specifically about that term.  I understand you want to talk about Inside Safe, but I understand from your prior testimony that your role within the Mayor's Office is significantly broader than just the Inside Safe Program, correct?

        MS. KAOUNIS:  Objection.  Misstates prior testimony.

        THE COURT:  Overruled.

        MS. KAOUNIS:  Asked and answered.

        THE COURT:  Overruled.

        THE WITNESS:  I think what I said was that my role in January of this year evolved to include efforts to prevent homelessness, which are outside Inside Safe, unsheltered homelessness, sheltered homelessness, the production of affordable housing.

BY MS. MYERS:

Q    So, broader than Inside Safe?

A    I do a number of things with a number of other departments.

III-325

Q    Sure.  And -- and I'm just asking if in your work on homelessness, as the Deputy Mayor of Homelessness and Community Health, if you use the term "encampment resolution" outside of describing the Inside Safe Program?

MS. KAOUNIS:  Your Honor, 403.  Asked and answered.  Relevance.  Calls for a legal conclusion. This --

THE COURT:  It hasn't been answered yet, your Honor.  Overruled.

THE WITNESS:  I talk about a number of things within the homelessness space and within the housing space, within the healthcare space.  I do a lot of translating between all three sectors so that we can enhance the -- the service delivery for every single person across the City of Los Angeles.  And, so, I'm not sitting around defining things with every single partner every day.  So, I'm, again, unsure of how to answer your question.

BY MS. MYERS:

Q    Okay.  You haven't answered my question.  Let me reframe it.

A    Okay.

Q    Are you aware of the term "encampment resolution" within the context of the Homeless Service Delivery System?

MS. KAOUNIS:  Objection.  Vague.  Calls for a legal conclusion.

III-326

THE COURT:  Overruled.

MS. KAOUNIS:  And relevance.

THE COURT:  Overruled.

(Pause.)

BY MS. MYERS:

Q    There's a -- there is a question pending.  Do you need me to restate the question?

A    Sure.

Q    Okay.  Are you aware of the term "encampment resolution" within the context of the Homeless Service Provision within the City of Los Angeles?

MS. KAOUNIS:  Objection.  Vague.  Relevance. Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Again, the term "encampment resolution" can be defined differently by folks in the Homeless Services sector.

BY MS. MYERS:

Q    Great.  How do you define it?

MS. KAOUNIS:  Objection.  Asked and answered. Calls for a legal conclusion.  Relevance.

THE COURT:  She has on two occasions now stated her definition of a person volunteering for this program and voluntarily bringing that person indoors and preventing the return to the street.

III-327

MS. MYERS:  And is that specifically to encampment resolutions or Inside Safe, your Honor?

THE COURT:  That was to Inside Safe.

MS. MYERS:  Exactly, your Honor.  And that's specifically what I'm getting at.

THE COURT:  Oh, encampment resolutions.  You can ask that question.

MS. KAOUNIS:  Okay.  Asked and answered.  Calls for a legal conclusion.  Rule 403.

THE COURT:  Overruled.

THE WITNESS:  As I mentioned earlier, when it comes to terms that have variable definitions, based off my training and practice as a healthcare provider, a physician, a researcher, I am uncomfortable defining it when I know that there are different definitions for different stakeholders.  And at the end of the day, for my patients, for the person I'm serving, I'm not sure if it makes a difference.

BY MS. MYERS:

Q    So, you don't have a definition of encampment resolution that you want to share with the Court today?

A    That's not what I said.

MS. KAOUNIS:  Objection.  Relevance.

BY MS. MYERS:

Q    Different question.

III-328

MS. KAOUNIS:  Hold on, Counsel.  Relevance.  Calls for a legal conclusion.  I apologize to the Court for directing my comments to counsel.

THE COURT:  All right.  Just reask the question.

BY MS. MYERS:

Q    So, you don't have a definition of encampment resolution -- given -- given your prerogative about not wanting to define things because of the impact on the people that you serve, you don't want to give this Court today your definition of an encampment resolution?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  It's also --

MS. KAOUNIS:  Calls for a legal conclusion.

THE COURT:  It's also argumentative.  Just ask a question.

MS. KAOUNIS:  Yeah, argumentative.

BY MS. MYERS:

Q    As you sit here today, do you have a definition of encampment resolution that you are willing to share with the Court?

MS. KAOUNIS:  Objection.  Asked and answered.  Lack of foundation.  Relevance.  403.

THE COURT:  I'll go back through the record, but I'm not positive.  I thought that that prior answer pertained to Inside Safe.  It could have been a broader

III-329

question, but my memory was Inside Safe as to both the prior answers.  This includes a broader definition concerning encampment resolution.  And your position?

THE WITNESS:  Inside Safe is the program that I'm operating right now.  Inside Safe is the program that I'm operating right now, along with a number of others and working with each of the departments to address the complexity of this homelessness crisis.  More than -- I mean, there are multiple issues that we are facing all at the same time, unsheltered folks on the streets, on folks living in interim housing, and those that are on the brink of losing everything.  And, so, I'm really having a hard time with this line of questioning because I'm not sure what the purpose of it is.

BY MS. MYERS:

Q    Okay.  I'm going to -- assuming that that is your answer to my last question, I'm going to move on.  You previously testified that you are familiar with the LA Alliance Settlement.  Is that accurate?

MS. KAOUNIS:  Object.  Misstates prior testimony.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I am generally aware of the Alliance Settlement.  I'm here in court.

//

III-330

BY MS. MYERS:

Q    As are many of us.

THE COURT:  We just got call from GSA.  The lights will not turn on past 7:00.  So, the administration has been very generous, but at 7 o'clock, the lights go out.  So, we'll all be here in the dark with candles.  I'm just kidding you.  You'll have to vacate at 7 o'clock.  Okay.  So, till 7 o'clock.  All right.

BY MS. MYERS:

Q    Okay.  I'm going to show you what's been marked as Exhibit 25, which is the settlement agreement that I know you're aware of since you're here in court.  And is this the settlement agreement that you're aware of?

A    This is the same document that was given to me earlier?

Q    Yes.

A    I'm sorry.  Repeat the question.

THE COURT:  I'm sorry, Counsel.  I was just asking her to call our court administrator and say that -- to thank him for the generosity of staying until 9:00 o'clock but that we're going to vacate at 7:00.  He may not know that.

Okay.  Now restate the question, Counsel.  I'm sorry.

BY MS. MYERS:

Q    I'm providing to you on the screen Exhibit 25.  Is this the settlement agreement that you're familiar with related

III-331

to this case?

MS. KAOUNIS:  Asked and answered.  I think she had looked at it preciously.

MS. MYERS:  Yes.  Your Honor had asked me to repeat the question.

MS. KAOUNIS:  Oh, I apologize.  Do you have a hard copy in front of you?

THE WITNESS:  Yes, I do.

MS. KAOUNIS:  I just want to make sure.

THE WITNESS:  Yes, this is the document.

BY MS. MYERS:

Q    Okay.  I Just want to make sure we're all talking about the same document.  Okay.  And you've seen this document before?

A    I have --

MS. KAOUNIS:  Asked and answered.

BY MS. MYERS:

Q    Do you -- do you play a role in -- are you aware that the City of Los Angeles submits reports related -- quarterly reports related to their compliance with the settlement agreement?

MS. KAOUNIS:  Objection.  Vague.  We're talking about the settlement agreement that's Exhibit 25?

MS. MYERS:  This settlement agreement, yes.

MS. KAOUNIS:  Um-hmm.

III-332

THE WITNESS:  I am aware that the CAO's Office works to submit this report on a quarterly basis.

BY MS. MYERS:

Q    Okay.  And do you play any role in reporting the milestones related to the LA Alliance Settlement Agreement?

MS. KAOUNIS:  Objection.  Calls for speculation. Lack of foundation.  Legal conclusion.  Vague.

THE COURT:  Overruled.  You can answer that question about quarterly reports.

THE WITNESS:  I'm not sure if I actually receive the reports myself, but I am aware that the CAO submits those reports.

BY MS. MYERS:

Q    Great.  That's a little bit of a different question. Are you -- do you participate in the preparation of those quarterly reports?

MS. KAOUNIS:  Vague.  Relevance.  Lacks foundation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  No, I do not.

(Pause.)

BY MS. MYERS:

Q    So, you don't -- you don't play any role in the preparation of the quarterly reports that are submitted by

III-333

the City to --

MS. KAOUNIS:  Objection.  Asked and answered.

THE COURT:  I think it's clear she said she did not.

MS. MYERS:  Sorry.  I was just regrouping after my technical fail.

THE COURT:  That's fine.

BY MS. MYERS:

Q    Okay.  What is your under -- you previously testified that your understanding of the goals of this litigation was around street cleanings and beds, is that correct?

MS. KAOUNIS:  Objection.  Misstates prior testimony.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I think I said something to that effect, yes.

BY MS. MYERS:

Q    Okay.  And what is your understanding about the goals in this case related to beds?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  The goals in the what?

MS. MYERS:  Related to beds.

MS. KAOUNIS:  Objection.  Vague.  Lack -- lack of foundation.  Calls for a legal --

THE COURT:  Vague.  Sustained.

III-334

MS. KAOUNIS:  -- conclusion.

THE COURT:  It's vague.  Sustained.

MS. KAOUNIS:  Oh, thank you.

BY MS. MYERS:

Q    Okay.  When you said that your understanding of -- that the goals related to the settlement agreement are around street cleanings and beds, what did you mean by street cleanings?

MS. KAOUNIS:  Objection.  Vague.

THE WITNESS:  My involvement in the day to day of reporting -- tracking this, reporting this is -- is not -- it doesn't happen.  I generally have an awareness.  I hear reports from CAO.  I'm not sure if I even get the reports in my email inbox.

THE COURT:  My apologies.

(Pause.)

BY MS. MYERS:

Q    Going back to your -- to the question --

THE COURT:  Counsel, Counsel.

(Pause.)

THE COURT:  Counsel, your question?  I'm sorry.

MS. MYERS:  Apologies, your Honor.

BY MS. MYERS:

Q    When you referred to the goals of the settlement being around street cleaning and beds --

III-335

A     Um-hmm.

Q     -- what did you mean by that?

MS. KAOUNIS:  Objection.  Asked and answered.

THE COURT:  Overruled.

MS. KAOUNIS:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Again, my role in -- in submitting reports is limited, nonexistent, and what I meant by that is my sort of big picture understanding of what the milestones are.

BY MS. MYERS:

Q   And where did you come by that understanding of your big picture understanding of what the milestones are?

MS. KAOUNIS:  Objection.  Deliberative process. Privilege.  Attorney-client privileged.  Relevance.

THE COURT:  Would you repeat that?  It was too quick, hard to absorb.

BY MS. MYERS:

Q   Where did you come upon this understanding of what the milestones are as being about street cleaning and beds?

MS. KAOUNIS:  Object --

THE COURT:  I'm worried about any conversation you might have had with the Mayor or members of the Council or the President, et cetera.

(Pause.)

III-336

THE COURT:  I'm going to sustain that objection.

MS. MYERS:  No further questions, your Honor, although I reserve the right to ask further questions of cross after the direct.

THE COURT:  The City?

MS. KAOUNIS:  Yes.  Counsel, do you have an estimate -- are you going to be asking questions?

(Pause.)

THE COURT:  Well, it depends upon what you ask. So, why don't we just get started with the time we have.

MS. KAOUNIS:  Yes.  Absolutely.

FURTHER CROSS EXAMINATION

BY MS. KAOUNIS:

Q    Doctor Agonafer, can you please describe your background?

THE COURT:  I'm sorry.  Would you restate your name just because of CourtSmart?

MS. KAOUNIS:  Of course.

THE COURT:  Thank you.

MS. KAOUNIS:  Angelique Kaounis for the City, with Gibson, Dunn and Crutcher.

BY MS. KAOUNIS:

Q    Doctor Agonafer, could you please briefly describe your background?

III-337

A    Sure.  I am an internal medicine physician, community engaged researcher and a medical educator.  I have dedicated my career to serving vulnerable populations, primarily because I'm a product of them and sort of got pulled into homelessness because of my lived experience and my patient care, not being able to prescribe the thing that my patients actually needed, a house, income.  I could prescribe all kinds of medications but not the things that actually make them healthy and well.

Q    And where did you go to school?

A    I've been on a journey.  I went to USC for undergrad and studied biochemistry.  Got a Bachelor's of Science, then went on to do a post doc at U.S. Davis, followed by being part of the second cohort of the UCLA Charles Drew PRIME Program.  It's a full degree program where I got both my medical degree and a Master's in Public Health with Health Policy and Management focus.  Then went on to go to my first choice residency program, UPMC in -- in Pittsburgh, and completed my internal medicine residency and was selected amongst one of the largest internal medicine residency programs to be the Chief Resident of the VA Pittsburgh's Quality and Safety Program.

I then came back to my hometown of Los Angeles and was a UCLA National Clinician Scholar where I developed my academic career and research focus.  I did -- I can tell you

III-338

about my community-engaged research if you're interested, but I also got a Master's of Science in Health Policy and Management with an emphasis on implement of science.

After that, went on to become faculty at Kaiser School of Medicine as Assistant Professor in the Department of Health Systems Science where I taught my students about social determinates of health and the concept of systems, integrating with each other to improve quality and population health at large.

And then I was fortunate to be selected as a White House Fellow in the Biden/Harris administration and was placed in the Department of Housing and Urban Development with Secretary Fudge where I served as a senior advisor, focus on integrating health and homeless services.

I then returned back home because home is where my heart was, and continued teaching before the -- I taught while continuing to work at Twin Towers Correctional Facility.  So --

THE COURT:  At what?

THE WITNESS:  Twin Towers Correctional Facility. So, I worked per diem at Twin Towers on the weekends since I was a scholar actually, and then I came on as a consultant for Mayor Bass, and then about nine months later was asked to become the Deputy Mayor of Homelessness and Community Health.

III-339

BY MS. KAOUNIS:

Q    And during your time at UCLA, were you involved in any clinical programs?

A    I did a couple of stints at UCLA.  As a medical student -- I think I mentioned this before -- I have trained and researched and practiced across a number of -- of healthcare delivery systems in the region, including the County system. I -- my clinical practice in the last several years has really been focused on my weekend work at Twin Towers, working in the inmate reception center where people come in and out of the facility.

Q    Have you heard of a program called Happy Feet?

A    Oh, Happy Feet was a foot health clinic.  So, I was part of that UCLA Charles Drew PRIME Program, a dual degree program with 17 incredible people.  We were the second cohort.  We were told, Here's $1,000.  Do something with an underserved population of your choosing, and just make sure it's sustainable.  We didn't really know.  We were -- we didn't even -- we were first year medical students.  We came to Skid Row and interviewed different people and asked them, what their primary asset was and learned that on average, they walk about 11 miles a day.  Their primary asset was their feet.  And before I learned how to diagnose and treat disease, we did a foot health clinic with podiatrists that still goes on today.  It's operated by undergrads at UCLA.

III-340

Q    You were asked a lot of questions about the settlement agreement in this case.  Are you in charge of interpreting the Alliance Settlement Agreement for the Mayor's Office?

A    I am many things, like I mentioned, but I'm not a lawyer, and that is not my role.  My role is primarily to implement the Mayor's priorities and her initiatives, including -- initially it was the Collaborative for Substance Use Care.  Then it became Inside Safe.  Then it became broader.  But it is not to interpret legalese.

Q    And can you explain just for a minute what the Collaborative is?

A    Oh, yes.  The Collaborative is a pilot for people experiencing homelessness where we screen people experiencing homelessness for substance use disorder.  Most of the data that exists out there is from the point in time count, an annual point in time count where you go out in the middle of the night, ask people all kinds of vulnerable questions, including their housing status, and you sort of expect them to tell you also about their mental health and substance use disorder.  If you're lucky, you'll get a real answer.

The Collaborative uses the same sort of foundation of the Inside Safe field intervention team.  As you're building trust with that person on the street, you're screening them for their readiness for change or if -- if they, you know,

III-341

are not ready to change.

So, the screening tool is brief. It's not a medical screening tool and assesses do you want to use safely, do you want outpatient treatment, do you want inpatient treatment. And for those that want to use safely or got to outpatient treatment, we connect them with the County resources that are available. For those that are interested in inpatient treatment, which is defined as withdrawal management, 24/7 residential monitoring or Sober Living, we have five contracted treatment centers that will get on the phone with the participant, conduct a clinical assessment and determine their eligibility. And if there's a bed available, they'll come inside. Typically, their Medi-Cal or Medicaid Insurance pays for it. But if it doesn't, we use our Opioid Tobacco Settlement funds to -- to pay for that for as long as the person needs.

We do those assessments on the street with our field intervention team, our Circle team. And we also have worked with service providers to start doing those screenings. We've also worked with LAHSA to embed that screening into HMIS and are continuing to train them to be better at -- at doing these screenings for us.

Q    Thank you. You mentioned you're not a lawyer. I just want to circle back to that quickly. You've heard of the Roadmap Settlement?

III-342

A    I have heard of it.  I was not here when this settlement was agreed upon, but I've heard of it.

Q    You -- you said you weren't here when it was agreed upon.  Is it your job to interpret the Roadmap Settlement?

A    No, it is not.

Q    And you were not -- sorry.  Strike that.

Were you here when the settlement agreement that is in this case was entered into?

A    No, I was not.

Q    You mentioned also bringing people in -- indoors as a community.  Can you tell me a little bit more about that outreach component of the Inside Safe Program?

A    Sure.  I've got a team of 18 individuals with different types of lived experience that takes the Council Office priorities, assesses each of their sites, talks to these individuals with all of their hearts, and assesses whether or not they're ready to come inside.

Because of the relationships built in that planning phase of things, the participants are excited to see them when they come back and check in on them at the hotel or when the street medicine team comes and checks in on them at the hotel.

We've had instances where some folks come inside and become really ill and end up in the hospital.  Our team checks in on them there too.  I've checked in on a patient.

III-343

So, the outreach is really intended to, you know, stay alongside that person for as long as they want us to, support LAHSA, the LAHSA and the -- the contracted service providers to be able to optimize their work, and there's always room for improvement. And, so, the team is actually really good at identifying those -- those opportunities because they hear it straight from the participant.

Q   Do you have any sense of how many offers of shelter are actually accepted in the Inside Safe Program by the individuals who are asked?

A   I don't have the exact number, but it is a majority of the encampment that says, Yes, I want to come inside, primarily because of the social network being maintained when they're offered housing. Most -- most folks will see one person say yes and want to join their friend or, you know, their neighbor. So, a majority of them tend to say yes on the -- on the first operation. There are some that say no and they're not ready for a variety of reasons. And, for them, we come back when we do our repopulation management, and when they're ready, we're there.

Q   So, when the City -- when the City offers someone a bed, that doesn't necessarily mean that bed is going to get occupied by that person, right?

A   Yeah. For all -- for all City programs. Part of all of this is -- is the person's choice. Just like in

III-344

medicine, I -- I think I referenced Diabetes before. I -- I've got to meet my patient exactly where they are in that moment. Even my mom with Diabetes, it's hard to get her to take her meds too. And, so, the same applies with housing.

Q    Are there -- you touched on this briefly in your testimony. Are there eligibility requirements for Inside Safe?

A    Inside Safe is an adult interim housing program. So, anyone over the age of 18 is -- is eligible. However, there are a number of scenarios or situations in which a person may not thrive in -- in a hotel setting, and that's why in that assessment phase the team works to identify if there are additional needs. We work with LAHSA. We work with the County and all of their outreach teams to figure out if a person needs a higher level of care.

Q    When you gave your view earlier today with regard to the definition of encampment resolution as it relates to Inside Safe, were you attempting to define for the Court what that term means under the Alliance Settlement Agreement?

A    No, because I wasn't here when that settlement agreement was made.

Q    And when you gave that definition to the Court, were you attempting to define for the Court what it means under the Roadmap Agreement?

III-345

A    No, I was not.  I wasn't here when those -- when that agreement was made.

MS. KAOUNIS:  That's all I have.

(Pause.)

THE COURT:  And redirect?

MR. UMHOFER:  Yes, your Honor.

REDIRECT EXAMINATION

BY MR. UMHOFER:

Q    Doctor Agonafer, were you at the State of the City Address that the Mayor gave I believe just days ago -- or one month ago, I apologize?

A    I wasn't physically in the room.  It was at capacity. I was upstairs in my office, and I watched it on -- on the computer.

Q    Did you hear this portion of the State of the City Address?

MS. KAOUNIS:  Objection.  Foundation.

THE COURT:  Overruled.  I imagine that we'll recognize Mayor  Bass's voice.

(Video played.)

BY MR. UMHOFER:

Q    Now, did you hear the Mayor say that in light of the audits that confirmed what we already know, the system is broken?  Did you hear that part?

MS. KAOUNIS:  Objection.  Relevance.

III-346

THE COURT:  Overruled.

THE WITNESS:  I just heard it.

BY MR. UMHOFER:

Q    Do you know what the Mayor meant -- do you have an understanding of what the Mayor meant when the Mayor referenced audits?

MS. KAOUNIS:  Relevance.  Lack of foundation. Calls for a legal conclusion.

THE COURT:  Speculation.  Sustained.

BY MR. UMHOFER:

Q    Has the Mayor ever used this language in public around you before, The system is broken?

MS. KAOUNIS:  Vague.  Lack of foundation. Relevance.

THE COURT:  It also can go to communications, Counsel, and the privilege.  Sustained.

MR. UMHOFER:  I limited my question to in public.

THE COURT:  Oh, in public.

MR. UMHOFER:  In public.

THE COURT:  Overruled.  You can answer the question.  Have you --

BY MR. UMHOFER:

Q    Have you ever heard the Mayor say --

THE COURT:  You heard her say that in public?

THE WITNESS:  She may have said it in public.  I

III-347

don't remember if there's an exact moment you're referring to.

BY MR. UMHOFER:

Q    Do you have an understanding based on the public statements of the Mayor what the Mayor means when the Mayor says regarding homelessness, that the system is broken?

MS. KAOUNIS:  Relevance.  Lack of foundation. Deliberative process privilege.  Calls for speculation.

THE COURT:  Well, I'm not going to ask you to speculate on that.

THE WITNESS:  Okay.

THE COURT:  Sustained.  Yeah.

BY MR. UMHOFER:

Q    In public, have you heard the Mayor refer to audits concerning homelessness?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Could you -- could you state that again?

BY MR. UMHOFER:

Q    In public, have you heard the Mayor refer to audits regarding homelessness?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.  You can make that -- you can answer that question, have you heard this in public, and not in any conversation --

III-348

THE WITNESS:  Yeah.

THE COURT:  -- you know, privately with --

THE WITNESS:  Absolutely.

THE COURT:  -- inside your offices, et cetera.

THE WITNESS:  I don't recall a specific time, but she may have, but I don't know what you're referring to or which audit you're referring to.

BY MR. UMHOFER:

Q    Do you agree with the Mayor that when it comes to homelessness, the system is broken?

MS. KAOUNIS:  Relevance.  Lack of foundation. Vague.  Calls for speculation.

THE COURT:  You can answer that question in your position.  Overruled.

THE WITNESS:  My perspective, homelessness is this complex thing.  I think earlier I described -- maybe it was to you -- the diversity of the population that can experience housing instability or being on the street or living in a shelter.  It is difficult to meet every individual where they are and create a system that is flexible enough to do so but also I think we have to acknowledge that the system involves a lot of different stakeholders.  I'm from healthcare.  I know how to speak healthcare.  Speaking to a homeless service provider or somebody in social services where they use a different

III-349

language, they have a different funding stream, they collect data in a different way than I do in healthcare, in order for the two of us to be able to work together, we have to be able to translate spaces.

Then you look at the housing sector, the folks that develop units and work on all the permits and the financing to make those units stand up.  They speak another language.

The thing that's common across all three of those sectors is we share the same person who's supposed to be served by those services and housed by those units.  And, so, there's work to be done to translate those spaces. Aligning the funding streams is going to be difficult, but I believe that I was asked to come onto this job because I can be a translator, because I know what the experience is like from the person that's living it, and that's what the system requires.

So, to answer your question about what the Mayor was thinking, I can't speak to what the Mayor was thinking and where she was coming from with her statements, but I just shared my own.

BY MR. UMHOFER:

Q   Do you disagree with the Mayor when she says the system is broken?

MS. KAOUNIS:  Objection.  Asked and answered.

III-350

Lack of foundation.  Calls for speculation.  Vague.

THE COURT:  Overruled.  You can answer that question from your own perspective.

THE WITNESS:  From my own perspective, systems are made up of people just as diverse as the population that we're trying to serve.  And in order for us to be able to serve them effectively, all people have to work together.  And there's always room for improvement.  I do it in medicine.  I'm doing it now as I integrate spaces and try to optimize the work.  That's my answer.

BY MR. UMHOFER:

Q    Is the system broken when it comes to homelessness in Los Angeles?

THE COURT:  This is --

MS. KAOUNIS:  Asked and answered.  Vague.

THE COURT:  this is from your perspective, not -- not the Mayor's.

THE WITNESS:  Understood.  Understood.

MS. KAOUNIS:  Relevance.  Calls for speculation.

(Pause.)

THE WITNESS:  I only know how to answer this question with analogy from medicine.  In medicine I'm not allowed to operate in the gray.  When someone has a disease, they are diagnosed with a disease based off of evidence.  When someone -- I offer them treatment, there are a number

III-351

of options that I can offer them.  So, I can't tell you that the system is broken.  I think that the system needs all sectors to work together to optimize the care for the people being served.

BY MR. UMHOFER:

Q    I'm going to ask again, is the homelessness system in Los Angeles broken?

MS. KAOUNIS:  Same objections.

THE COURT:  Why don't you answer it one more time.

MS. KAOUNIS:  Asked and answered.

THE COURT:  One more time.

THE WITNESS:  As a White House fellow, when I went around the nation and saw homelessness across the country, it looked so different from one city to the next.  Part of the reason why I came back home is because I knew that if we could solve for homelessness here, because LA, the City and the County, is so diverse and it looks different when you go to South LA, Skid Row, Westside, Eastside.

THE COURT:  Just a moment.  I'm going to stop the comment in the gallery.  Okay.  Clear?

(No audible response.)

THE COURT:  All right.  Thank you.  Counsel?

MR. UMHOFER:  Oh, I'm --

THE WITNESS:  I want to finish.

MR. UMHOFER:  She's still talking.

III-352

THE COURT:  Pardon me?

MR. UMHOFER:  I believe she's still talking.

THE COURT:  Okay.  Go ahead.

THE WITNESS:  If we could solve it across the regions of Los Angeles, we could solve it across the nation.

BY MR. UMHOFER:

Q    Have you reviewed the A and M audit?

A    Actually, because the interim auditor --

MS. KAOUNIS:  Objection.  Relevance.

MR. UMHOFER:  Your Honor, I believe there's an objection.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  Sure.  The interim auditors actually visited an Inside Safe operation.  They shadowed the team. they met with the team to learn their process.  So, yes, I did review -- scan -- it's a lengthy report -- I reviewed the report mostly to see if they captured the program correctly and to see if there was anything that I needed to remedy as the supervisor of the program.

BY MR. UMHOFER:

Q    So, you're the Deputy City Mayor for Homelessness, and you skimmed a court ordered audit --

MS. KAOUNIS:  Objection.

//

III-353

BY MR. UMHOFER:

Q    -- on homelessness?

MS. KAOUNIS:  Objection.  Misstates testimony. Lacks foundation.  Relevance.

THE COURT:  Would you --

MS. KAOUNIS:  And argumentative.

THE COURT:  Would you ask that question again?

BY MR. UMHOFER:

Q    But you're the Deputy City Mayor on Homelessness, and you just skimmed an audit, court ordered audit on homelessness?

MS. KAOUNIS:  Objection.  Lacks foundation. Relevance.  Misstates her testimony.  Argumentative.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  As I stated, because the -- the auditors came to Inside Safe, I scanned, reviewed a lengthy report.  I receive a number of emails and reports on a day to day.  I understand the importance of the audit because it was court ordered, but I also have a job to do and people to serve.

BY MR. UMHOFER:

Q    Did the audit identify things that were broken in the homelessness system in Los Angeles?

MS. KAOUNIS:  Objection.  Lacks foundation.  Calls

III-354

for speculation.  Relevance.  Hearsay.  Document speaks for itself.

THE COURT:  Overruled.

THE WITNESS:  The audit spans a time period.  If you could remind me the exact time period.  I believe it's only -- it covers the first year of the Inside Safe Program. It -- and what I struggled with when I read it, skimmed it, was the framing of it all together.  I think their directive was to cover Roadmap Settlement Agreement, the Alliance Agreement, and Inside Safe Encampment -- the Citywide Encampment Resolution Program that I've described at length. And, for me, the framing of it, it was -- it was comparing apples to oranges to potato chips.  The Roadmap has a number of services that are embedded within that agreement, things like tiny homes, Project Home Keys, safe parking, time limited subsidies.  Alliance at least for the time frame of the report had a couple of interim housing sites, and then Inside Safe, I've -- I've told -- I've explained to the Court, to you, what the entirety of what that is.  And, so, for me, what I struggled with as I read the report is the framing of it all, the time frame, how do I compare, what were the data sources, are they statistically significant, because, first and foremost, I'm a physician and a researcher.  So, I -- I look at documents like that with that level of -- of questioning.

III-355

BY MR. UMHOFER:

Q    After you skimmed the report, did you identify anything that you intended to do to change what you're doing at the City around homelessness?

MS. KAOUNIS:  Objection.  Asked and answered. Relevance.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Yeah.  Like I just mentioned, it covered the first year of Inside Safe is the program that I operate, that I manage the day-to-day operations of, and the report came I guess two years after that first year, and we, like I mentioned before, are constantly quality improving our processes.  We, because of Inside Safe and other things that we do in our portfolio, work closely with the Housing Department, LAHSA, and the County to fine tune our processes as well.  So, the time frame of the report, the work that we've been doing, that I specifically have been doing over the course of the last year and a half kind of outdated what the report was outlining.

MS. KAOUNIS:  Just for the record, assumes facts.

BY MR. UMHOFER:

Q    What are you doing differently in light of your skim of the court-ordered audit?

MS. KAOUNIS:  Objection.  Asked and answered.

III-356

Assumes facts.  Relevance.  Argumentative.  And this is way beyond the scope, your Honor.  We didn't talk about the A and M audit at all before, not audit -- document, review, whatever you'd call it, assessment.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Can you repeat the question?

BY MR. UMHOFER:

Q    What are you doing differently now that you've skimmed the court-ordered audit report?

MS. KAOUNIS:  Objection.  Argumentative.  Assumes facts.  Relevance.

THE COURT:  Overruled.  You can answer the question, please.

THE WITNESS:  On a day to day, we are improving our processes across the Inside Safe Program, the Collaborative, the work that we do with LAHD, LAHSA, the County.  And, so, are you asking me for a specific example or --

BY MR. UMHOFER:

Q    That would be fabulous.

MS. KAOUNIS:  Objection.  Asked and answered.  Lack of Foundation.  Relevance.

THE COURT:  Overruled.

//

III-357

BY MR. UMHOFER:

Q    Can you think of anything specific you're doing differently since you skimmed and because you skimmed the court-ordered audit?

MS. KAOUNIS:  Objection.  Relevance.  Lacks foundation.  Vague.  Argumentative.

THE COURT:  Overruled.

THE WITNESS:  It's hard to just pick one example. There are so many things that we're doing on a day to day.

MR. UMHOFER:  No further questions, your Honor.

THE COURT:  Then, Ms. Myers, do you have questions?

MS. MYERS:  No, your Honor.

THE COURT:  Counsel, do you have questions on behalf of the City?

MS. KAOUNIS:  I just have one clarifying question.

THE COURT:  All right.  Thank you.

                    RECROSS EXAMINATION

BY MS. KAOUNIS:

Q    You were asked just a moment ago about what's being done differently since the A and M assessment, correct?

A    Correct.

Q    You weren't in charge in the same role that you were -- today that you were in 2024, correct?

A    That is correct.

III-358

MS. KAOUNIS:  Okay.  Thank you.

THE COURT:  Okay.  Thank you very much.

THE WITNESS:  Thank you so much.

(Pause.)

THE COURT:  Counsel, 8:30 tomorrow, and who will your next witness be, just for clarity?

MR. UMHOFER:  Matt Szabo is resuming the stand.

THE COURT:  Matt Szabo.  All right.

UNIDENTIFIED SPEAKER:  Yes, your Honor

THE COURT:  And who --

UNIDENTIFIED SPEAKER:  Your Honor, do we know if Michelle will be back tomorrow?

THE COURT:  I think she was feeling ill today.

UNIDENTIFIED SPEAKER:  Yeah.

THE COURT:  She's pretty sick, but I -- I'm assuming she will be, but --

UNIDENTIFIED SPEAKER:  I'll -- I'll check in with her.

THE COURT:  Okay.  All right.  Thank you.  Goodnight.

MS. EVANGELIS:  Your Honor, I have a question.  May I?

THE COURT:  You can stay as long as you want, but in a couple of minutes, the lights are going out.

MS. EVANGELIS:  Thank you, your Honor.  So, I'm --

III-359

there's a briefing schedule that's coming up.  I wanted to ask the Court about page limits.

THE COURT:  Why don't you two talk about that informally, and if you can reach an agreement, I'll --

MS. EVANGELIS:  If your Honor is okay with 50 pages or so, 45 for our brief, would that be okay?

THE COURT:  I don't -- I don't know yet.

MS. EVANGELIS:  Okay.

THE COURT:  I've got a lot of briefing already.  I don't know that I need 50 pages from -- from you, quite frankly.  But if you both agree to a certain page number, so be it.  But I'm not going to -- goodnight.  We'll see you tomorrow morning.

MS. EVANGELIS:  Thank you.  And also I have one more question, your Honor.  Just -- I know that the court has scheduled a hearing on June 23rd.  I'm assuming that is after the briefing, that's when the closing arguments will be.  I just want to understand the timeline.

THE COURT:  I will be speeding up your schedule.  Fair warning to all of you, okay.  I may be speeding up your schedule, but I'll discuss that with you as soon as I get the page limits hammered out, but I don't want a lot of distance now with carrying 300 cases between the hearing and when I render a decision.

MS. EVANGELIS:  Thank you, your Honor.  And that

III-360

will be after the briefing, and we'll set the date for that hearing after the briefing?

THE COURT:  Counsel, let me repeat this.

MS. EVANGELIS:  Thank you.

THE COURT:  Let me repeat this.

MS. EVANGELIS:  I'm sorry?

THE COURT:  Let me repeat this.  I would usually say yes to almost anything you all agree to.  But right now the page limitation is 25 pages.  If you agree to more, so be it.  If you don't, then it's 25 pages.

MS. EVANGELIS:  Thank you, your Honor.

THE COURT:  As far as the schedule's concerned, I'm just putting you on fair warning.  I'm worried now carrying 300 cases that I move on to something else.  I'd like to get this resolved as quickly as possible.  So, I'll -- I'll hopefully work with you.

UNIDENTIFIED SPEAKER:  Finally, your Honor, do you know if it's okay if we leave things here or do we have to clear out completely?

THE COURT:  Yeah, I may still be sitting in the chair in the morning.  But I suggest you leave all your stuff and go on home.

UNIDENTIFIED SPEAKER:  Thank you, your Honor.

THE COURT:  Okay.

(Proceedings concluded.)

III-361

          I certify that the foregoing is a correct

transcript from the electronic sound recording of the

proceedings in the above-entitled matter.


/s/Jordan Keilty                    5/30/2025
Transcriber                         Date


FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:


/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.