UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

LA ALLIANCE FOR HUMAN RIGHTS, ) Case No. LA CV 20-02291-DOC-
et al.,                        )                    (KESx)
                               )
        Plaintiffs,            ) Los Angeles, California
                               )
vs.                            ) Friday, May 30, 2025
                               )
CITY OF LOS ANGELES, et al.,   ) (8:31 a.m. to 9:54 a.m.)
                               ) (10:18 a.m. to 10:51 a.m.)
        Defendants.            ) (11:03 a.m. to 12:04 p.m.)
_____) (1:13 p.m. to 2:34 p.m.)
                                 (2:52 p.m. to 2:53 p.m.)
                                 (3:00 p.m. to 3:53 p.m.)
                                 (4:08 p.m. to 5:16 p.m.)
                                 (5:29 p.m. to 5:47 p.m.)


TRANSCRIPT OF EVIDENTIARY HEARING RE COMPLIANCE WITH THE LA ALLIANCE SETTLEMENT AGREEMENT [767] [863]AND THE ROADMAP MOU AGREEMENT (DAY 4)
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Appearances:                   See next page.

Court Reporter:                Recorded; CourtSmart

Courtroom Deputy:              Karlen Dubon

Transcribed by:                L. Caldwell/Jordan Keilty
                               Echo Reporting, Inc.
                               9711 Cactus Street, Suite B
                               Lakeside, California 92040
                               (858) 453-7590

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

IV-2

APPEARANCES:

For the Plaintiffs:        ELIZABETH A.  MITCHELL, ESQ.
                           Spertus, Landes & Umhofer, LLP
                           617 West 7th Street, Suite 200
                           Los Angeles, California 90017
                           (213) 205-6520

                           MATTHEW D. UMHOFER, ESQ.
                           Spertus, Landes & Umhofer, LLP
                           1990 South Bundy Drive
                           Suite 705
                           Los Angeles, California 90025
                           (310) 826-4700

For the Defendants:        THEANO EVANGELIS KAPUR, ESQ.
                           MARCELLUS A. MCRAE, ESQ.
                           KAHN A. SCOLNICK, ESQ.
                           PATRICK J. FUSTER, ESQ.
                           JAMES N. ROTSTEIN, ESQ.
                           Gibson Dunn and Crutcher LLP
                           333 South Grand Avenue
                           Los Angeles, California 90071
                           (213) 229-7726
                           (213) 229-7675
                           (213) 229-7000
                           (213) 229-7520

                           JOSEPH D. EDMONDS, ESQ.
                           Gibson Dunn and Crutcher LLP
                           3161 Michelson Drive
                           Suite 12
                           Irvine, California 92612
                           (949) 769-0557

                           ANGELIQUE KAOUNIS, ESQ.
                           Gibson, Dunn and Crutcher LLP
                           2000 Avenue of the Stars
                           Suite 1200
                           Los Angeles, California 90067
                           (310) 552-8546

For the Intervenors:       SHAYLA R. MYERS, ESQ.
                           Legal Aid Foundation of Los
                             Angeles
                           7000 South Broadway
                           Los Angeles, California 90003
                           (213) 640-3983

*Echo Reporting, Inc.*

IV-3

I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Matthew Szabo (recalled) | -- | 11 247 | -- | -- |

| EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| Plaintiffs': | | | |
| 47 | Document | 127 | -- |
| Defendants': | | | |
| (None.) | | | |
| Intervenor's: | | | |
| 50 | Document re: 1200 Leighton Avenue | 102 | -- |
| 51 | Document re: 1203 Rolland Curtis Place | 103 | -- |
| 52 | Document re: 4222 Dalton Avenue | 103 | -- |
| 55 | Document | 127 | -- |
| 60 | Document re: 1261 to 1269 Rolland Curtis Place | 103 | -- |
| 62 | Document re:  1603 West 36th Place | 103 | -- |
| 65 | Document | 131 | -- |
| 77 | Document re: 920 South Gramercy Place | 113 | -- |
| 79 | 1317 South Grand Avenue | 113 | -- |

IV-4

| EXHIBITS (Cont'd.) | IDENTIFIED | RECEIVED |
|---|---|---|
| Intervenor's: | | |
| 80    1343 West 40th Place | 113 | -- |
| 86    6501 South Broadway | 114 | |
| 95    Document re: Stuart Hotel | 98 | -- |
| 302   City of Los Angeles quarterly status report | 74 | -- |

*Echo Reporting, Inc.*

IV-5

Los Angeles, California; Friday, May 30, 2025  8:31 a.m.

--o0o--

(Call to Order)

THE COURT:  Then we're back on the record.  All counsel are present -- Mr. Umhofer is not present.  Is he going to be here today?

MS. MITCHELL:  He is going to be here today.  I think he's going through security right now, your Honor.

THE COURT:  I'm sorry?

MS. MITCHELL:  He is going to be here.  I think he's going through security, your Honor.

THE COURT:  Okay.  All counsel are present, then, and, Counsel, who would you like to present as your next witness?  I think you indicated informally last night it was --

MR. MCRAE:  Presuming Mr. Szabo.

THE COURT:  Szabo?

MR. MCRAE:  Correct.

MS. MITCHELL:  Yes.

THE COURT:  So would you step forward.

MS. MITCHELL:  And, your Honor, also, for the Court's edification, I did speak to Special Master Martinez this morning.  She is still ill, but indicated, if we are getting through witnesses at a fast clip, she could come in this afternoon, if needed.

IV-6

THE COURT: All right. Yes. She was pretty sick yesterday. Hopefully, you folks weren't around her, but she's -- we got notice last night and this morning that she's literally bedridden. So --

MS. MITCHELL: Yes.

THE COURT: All right. Then, sir, would you retake the stand, and the same oath applies that was administered prior. We don't need to do that again.

MATT SZABO - DEFENDANTS' WITNESS - RESWORN

THE WITNESS: Thank you.

THE COURT: And watch your step.

You know, because we've changed CourtSmart, just to be certain, let's have your appearances this morning. So let's begin with the LA Alliance.

MS. MITCHELL: Good morning, your Honor. Elizabeth Mitchell on behalf of LA Alliance, Plaintiff in this matter. My colleague, Mr. Umhofer, will be here shortly.

THE COURT: Yes. And then let me turn to, I think, Shayla Myers on behalf of Intervenors. Let's go in the same order that we're doing the examination.

MS. MYERS: Good morning, your Honor. Shayla Myers from the Legal Aid Foundation of Los Angeles on behalf of the Intervenors.

THE COURT: Not on behalf of Gibson, Dunn.

IV-7

MS. EVANGELIS:  Good morning, your Honor.  Theane Evangelis on behalf of the City of Los Angeles.

THE COURT:  All right.

MR. MCRAE:  Good morning, your Honor.  Marcellus McRae, Gibson, Dunn and Crutcher, appearing on behalf of the City of Los Angeles.

THE COURT:  Counsel.

MR. EDMONDS:  Good morning, your Honor.  Joseph Edmonds on behalf of the City of Los Angeles.

THE COURT:  Okay.  Counsel.

MS. KAOUNIS:  Good morning, your Honor.  Angelique Kaounis from Gibson, Dunn on behalf of Los Angeles.

MR. SCOLNICK:  And good morning, your Honor.  Kahn Scolnick on behalf of the City.

MR. FUSTER:  Good morning, your Honor.  Patrick Fuster on behalf of the City of Los Angeles.

MR. ROTSTEIN:  And good morning, your Honor.  James Rotstein of Gibson, Dunn on behalf of the City.

THE COURT:  Before you begin your examination, I don't know how to raise this, so, transparency.  One of my former law clerks is employed by your firm, and she asked me to perform her wedding ceremony, and, unfortunately, we had a family commitment at the same time.  Her name is Alexa Barrett.

MR. MCRAE:  Yes.

IV-8

UNIDENTIFIED SPEAKER:  Yes.

THE COURT:  Okay.  Now, hold on.  It catches me in a peculiar position, because our staff would love to send her a wedding present.  By the same token, it's improper for me to contact her.  I quite don't know what to do about that, so would you all folks (sic) talk with each other?  Because we're heartbroken that my wife and I couldn't, you know, perform the ceremony, and I wanted to alert you that I believe she's with your firm.

MR. MCRAE:  Yes.

THE COURT:  That came to my attention last night.

MR. MCRAE:  I believe we filed something to that effect, your Honor, yes, that she's with our firm.

THE COURT:  Yes.  I just -- it's really not you as much.  It's the other side.

MR. MCRAE:  Of course.

THE COURT:  I don't know how to raise that, because, if I -- if we deliver a gift to her from our court family and my wife, that's without notification.

MR. MCRAE:  We'll confer, your Honor --

THE COURT:  Would you?  Yes.

MR. MCRAE:  -- and, hopefully, we'll be able to say we're all good with it.

THE COURT:  That's something that just lets us express our, you know, love and appreciation.

IV-9

MR. MCRAE: Of course, your Honor.

MS. MITCHELL: Your Honor, from the Alliance's perspective, we have no objection with sending a gift. We understand she's been fully walled off from this case.

THE COURT: Well, I can take her to dinner at Gibson, Dunn -- I'm just joking.

MS. MITCHELL: We have no objection to the wedding present, your Honor. I think that's completely fine, from our perspective.

THE COURT: Okay. If my wife and I, or staff, contact her, at least by phone, is there concern?

MR. MCRAE: No issue, your Honor, for the City.

THE COURT: You can wall her off.

MS. MITCHELL: None for us. We understand that she's walled off, and that's fine, your Honor.

THE COURT: Ms. Myers, any concern?

MS. MYERS: No, your Honor. We understand the law clerk/judge thing is sacred, so that's totally fine.

THE COURT: I'd hate to be accused later on, especially during these proceedings, of approaching.

MS. MYERS: No, and we appreciated Gibson, Dunn's effort to wall her off and to inform the Court of those procedures, so thanks for that.

THE COURT: Well, she's a terrific law clerk, so don't wall her off too much in view of the future. Okay?

IV-10

MS. MYERS:  Or do.  Or do.

THE COURT:  All right.  Well, then, Mr. Szabo, good morning --

UNIDENTIFIED SPEAKER:  Your Honor, in that --

THE COURT:  -- and we'll get you out of here as quickly as possible.  I know you have other duties.

UNIDENTIFIED SPEAKER:  Your Honor, in that same vein, I was struck with the notion that it might be nice to have doughnuts during the break, but I didn't want to offend one or cross any --

THE COURT:  No, as long as you're buying for both parties.

UNIDENTIFIED SPEAKER:  -- lines.  I'm happy to split the cost with Gibson, Dunn.  I hear they might have a little bit more in their bank accounts than we do.  But --

THE COURT:  Let's just --

MR. MCRAE:  Okay.  Thank you, your Honor.

THE COURT:  -- move on and -- I don't want to make a record in the ceremonial court, but it's --

MR. MCRAE:  Yes, your Honor.  We are not opposed to doughnuts, your Honor.

THE COURT:  You'll work that out.  Okay?

MR. MCRAE:  We're in violent agreement on doughnuts.

MS. MYERS:  We are at the Legal Aid Foundation.

IV-11

We are very opposed to doughnuts.

THE COURT:  You know, while we're having at least a good start to the morning, one story.  We had the <u>Fair Credit Reporting</u> case across the United States, involving Gutner (phonetic) and Obama, and the full credit rating that took our country from a Triple A down to an A whatever, and cost $2,000,000,000,000 worth of deficit, and there's a lot behind that case, a lot behind that story, but apparently they settled it because the Justice Department and the Treasury brought in doughnuts for the other side.  So it has nothing to do with this case, and nothing to do with this record.

All right.  Then, Ms. Myers, this is cross examination, please.

MS. MYERS:  Thank you.

THE COURT:  And Mr. Umhofer is present for the Plaintiff, as well.

MS. MYERS:  Yes.  And thanks to the Plaintiffs, again, for the use of your technology and for working that out this morning.

CROSS EXAMINATION   (RESUMED)

BY MS. MYERS:

Q    Good morning, Mr. Szabo.  Shayla Myers from the Legal Aid Foundation of Los Angeles.  Thank you for coming back this morning to answer some additional questions.

IV-12

Yesterday you attested that you are the CAO of the City of Los Angeles, correct?

A    That is correct.  And just -- did I need to spell my name for the clerk?  It's Matthew Szabo, last name S-Z-A-B-O.

THE COURT:  Thank you very much.  Appreciate it.

BY MS. MYERS:

Q    How long have you been in the position as CAO?

A    I've been CAO since July of 2021.

Q    And prior to July of 2021, did you work for the City of Los Angeles?

A    I did.

Q    And in what capacity did you work for the City of L.A.?

A    I worked in a number of capacities, going back to 2000, for multiple mayoral administrations, City Council Office, City Attorney's Office.  The most recent position that I held was Deputy Chief of Staff in the Garcetti administration.

Q    And it was in the Garcetti administration that you were appointed to the position of CAO?

THE COURT:  Counsel, just re-ask the question just a little bit slower.

BY MS. MYERS:

Q    And it was during the Garcetti administration that you were appointed to the position of CAO?

IV-13

A    Correct.

Q    And as the deputy chief of staff, can you just briefly summarize what your job duties were?

A    So a principal responsibility was a senior advisor to the mayor.  I also had operational responsibility for approximately half of the mayor's office at the time, including areas that related to budget, labor relations, and various policy areas.  I was also the mayor's representative on the discussions related to this case.

          MS. MYERS:  Your Honor, may I approach with the iPad for the exhibit?

          THE COURT:  Certainly.

BY MS. MYERS:

Q    And within your policy portfolio, did that include homelessness?

A    It did.

Q    And when you worked on labor issues, were there specific labor -- were there specific parts of the city where you worked on labor issues, or was that labor generally for the City?

A    It was labor generally, but the -- principally as it related to City employees, City employee representatives, the mayors, the chair of the committee that provides bargaining instructions to the CAO, and I was the mayor's advisor on that committee.

IV-14

Q    All right.  Within your work related to homeless policy issues, did you work on the homelessness -- homeless services delivery system for the City of Los Angeles?

MR. MCRAE:  Objection, vague.

THE COURT:  Do you understand the question?

THE WITNESS:  Well, I would actually like the question to be more specific.

THE COURT:  Yes.  Could you restate it.

BY MS. MYERS:

Q    Sure.  When you worked on homelessness policy issues, what kinds of issues did you work on?

A    So the staff that was assigned to homelessness, they did report up through me, so I did oversee their work, their work generally.  I would say I was a -- kind of a strategic -- I provided strategic guidance.  So, for example, in my capacity as -- actually, before I was deputy chief of staff, I was a deputy mayor for budget.

When the move was made to -- for the City to start investing a significant amount towards homelessness, or a significant increase in the amount that we were investing towards homelessness, I played a role in what that would look like.

I also played a major role in the first major interim housing program that the City developed, which became to be known as a "bridge home," establishing the general -- again,

IV-15

the strategy of having regionally disbursed bridge housing facilities that could be used to address encampments in that general region, and worked to make sure that our first bridge home facility, which is at El Pueblo, was established and built, and then in a manner that could be replicated across the city.

THE COURT:  And I think it would advisable on the record that the Court discloses that I met with you and Mayor Garcetti numerous -- on numerous occasions, so counsel knows that, in the interim period of -- or that -- in those early years, I'll say.

MS. MITCHELL:  Your Honor, can we specify that that was while all parties had waived ex parte communications?

THE COURT:  Pardon me?

MS. MITCHELL:  That was during the period of time that all parties had waived ex parte communications --

THE COURT:  That's correct.  It was on the record that --

MS. MITCHELL:  -- and there was no objection from either side.

THE COURT:  -- literally, I could talk to anybody in the city.

MS. MYERS:  And it was during the pendency of this case.

IV-16

BY MS. MYERS:

Q    And as part of the bridge home shelter creation, were you responsible for the creation of special enforcement cleaning zones around the bridge home sites?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  I was involved in that effort, but, of course, the special enforcement and cleaning zones were established, ultimately, by City Council, City Attorney, et cetera.  So -- but, in terms of the concept, yes.

BY MS. MYERS:

Q    And can you describe what that concept is?

A    The concept is roughly that -- or generally -- that if we established a bridge home shelter in a particular area of the city, that, as part of -- and I will just back up a little bit and say, you know, times have changed dramatically over the past five years, and it wasn't that long ago when it was -- there was enormous opposition, community opposition, to homeless facilities, and now we're in a much better place.

Now council members are begging for more facilities, and that's a great thing.  That's great progress.  But, as a way to ensure and allay the fears of the community, we established a policy that if you sited and built a bridge

IV-17

home facility to house homeless people in a particular neighborhood, that there would be a zone around that bridge home facility where there would be enhanced cleaning and enforcement of the applicable public right-of-way laws that we had, that we used at the time, to -- as a way to ensure that the -- if the community accepted this facility to house people, that it wouldn't turn into a magnet for encampments all around the facility and into the neighborhood.

Q    And so part of the way that you ensured that it would not become a magnet was through the use of these cleanings and through the enforcement of these laws, correct?

A    That was --

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  That was part of the strategy, yes.

BY MS. MYERS:

Q    Okay.  And when you speak of enforcement of public right-of-way laws that you were using at the time, can you tell us what those laws were?

MR. MCRAE:  Objection, calls for a legal conclusion, and relevance, lack of foundation.

THE COURT:  Briefly, you can describe that.

THE WITNESS:  Without being able to discuss the law in detail, I would defer to the City Attorneys for that, but the law on the books at the time was referred to as

IV-18

"56.11," LAMC 56.11, and it provided regulations around -- I would say that it would -- the way I would refer to it, the way I brief on it, is that it regulates things.  It regulates stuff in the public right-of-way, whereas other laws actually regulate people.  So that was a -- it was an ordinance that would prohibit a certain amount of items to be in the public right-of-way.

BY MS. MYERS:

Q   And that law is still on the books today, correct?

MR. MCRAE:  Objection, that calls for a legal conclusion.  It's also not relevant.

THE COURT:  I could take judicial notice of it, if you know.  You can answer.  This is before 41.18.

THE WITNESS:  Correct.  So I don't believe -- again, I don't believe it was -- if it was repealed, but it's not regularly used, is my understanding.  But, again, I don't -- I'm not the expert on that.  I don't know.  I don't believe it was repealed.  I'll leave it at that.

BY MS. MYERS:

Q   Okay.  Are you familiar with Care and Care Plus?

A   I am.

Q   Can you describe what Care and Care Plus are?

A   Care and Care Plus are teams from the Bureau of Sanitation that are deployed on a regular basis throughout the city to provide cleaning, either around encampments or

IV-19

actually in the area where encampments exist, so that it's either a comprehensive cleaning, where those living in the encampment would need to move while they conduct the cleaning, or a lighter touch-type cleaning where the teams would clean around the encampment, just to provide some basic level of sanitation.

Q    And the first kind that you described, is there a name for that kind of cleanup?

A    The comprehensive cleanup?

Q    Yes.

A    Typically referred to as "Care Plus."

Q    Okay.  And the lighter touch, is that referred to as "Care"?

A    Typically referred to as "Care," yes.

Q    And were you involved in the development of the Care and Care Plus program?

A    I was -- other than in terms of the development of the policies and regulations of -- related to Care and Care Plus, in part, but not in detail.  I didn't develop the policy.  The policy was developed through the Bureau of Sanitation, and reported up through the City Council policy committees.

Q    And is the Bureau of Sanitation, as far as you know, responsible for Care and Care Plus?

MR. MCRAE:  Objection, vague, lack of foundation,

IV-20

calls for a legal conclusion as to "responsible."

THE COURT:  Overruled.

THE WITNESS:  Bureau of Sanitation is the operating department that administers and executes the program.

BY MS. MYERS:

Q    Is there any other part of the City that you would say is responsible for Care and Care Plus?

MR. MCRAE:  Lack of foundation, calls for a legal conclusion, relevance.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Again, it depends on your definition of "responsible."  Ultimately the mayor and City Council are responsible for the funding and administration of all programs in the City.  So, in that context, yes, but it's the Bureau of Sanitation that is principally responsible for the program.

BY MS. MYERS:

Q    Yesterday you said that there are parts of the homelessness response system within the City that fall under the purview of the CAO's office, correct?

MR. MCRAE:  Objection, vague as to "homelessness response system."  Also, relevance.

THE COURT:  Overruled.  You can answer the

IV-21

question, sir.

THE WITNESS:  The CAO's office has a number of responsibilities related to homeless, homelessness principally.  It -- we maintain the financial oversight, the fiscal side of our funding and managing the various grants, and a substantial general fund that is dedicated to the various programs that the City administers.

We also do currently have a section of the office of regional outreach coordinators who are assigned -- there are seven of them who are assigned to council districts, and their role is pretty much what it -- what the name says. They coordinate efforts between departments and with council offices on outreach, and with LAHSA on outreach and execution of operations, which include RV operations and some coordination of Care and Care Plus, but we do not run the Care and Care Plus program.

There are multiple departments that are involved beyond sanitation, which includes Department of Transportation and the Los Angeles Police Department, and that all requires a coordinating function that our regional outreach coordinators meet.

BY MS. MYERS:

Q    How long has the coordinating function for Care and Care Plus been within the CAO's office?

MR. MCRAE:  Objection, vague.

IV-22

THE COURT:  Overruled.

THE WITNESS:  I believe that coordination -- well, actually, I'm sorry, and I'm not going to give you -- be able to give you precise -- I'm not going to be able to give you a precise date.  But it was relatively recent, because, prior to that, we had a centralized response system that coordinated these efforts, the Unified Homelessness Response Center, which was run out of, physically out of, the Emergency Management Department, but was ultimately coordinated by the mayor's office.

BY MS. MYERS:

Q    And so were you the CAO when this moved for this coordination from the Unified Homeless Response Center to the CAO's office?

A     I was.

MR. MCRAE:  Objection, vague as to "Unified Homeless Response System."

THE COURT:  Overruled.

MS. MYERS:  And I apologize if I said, "System." I meant "Center," UHRC.

BY MS. MYERS:

Q    Were you involved in the decision making related to removing coordination of Care and Care Plus from UHRC to the CAO's office?

MR. MCRAE:  Objection, lack of foundation,

IV-23

relevance.

THE COURT:  Overruled.

THE WITNESS:  No, I was not involved in the decision.  The decision was made by the mayor's office.

BY MS. MYERS:

Q    Do you know why that decision was made?

MR. MCRAE:  Objection, calls for speculation, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  I do not.

BY MS. MYERS:

Q    So, in addition to coordination of the Care and Care Plus, you said that you were involved in RV operations.  Is that correct?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  Yes.  Our regional outreach coordinators work with the council offices and the other departments to coordinate the RV operations.  Yes.

BY MS. MYERS:

Q    What is an "RV operation"?

A    RV operation is similar to what you would see in an Inside Safe operation, where outreach is provided to those who are living in cars and recreational vehicles for a period of time, and then the vehicles ultimately are removed

IV-24

from the public right-of-way if they are parked there illegally, and so there's an effort to house the individuals in the RV operation, but ultimately the vehicles are removed from the right-of-way.

Q    Yesterday Doctor Agonafer testified with Inside Safe that a core component of the Inside Safe program was about matching beds, bed availability, to the participants at an encampment, as part of Inside Safe.  Would you say that that is a core part of the RV operation?

MR. MCRAE:  Objection, the witness -- the record will speak for itself as far as the witness' testify, mischaracterizes the witness' testimony, lack of foundation, and relevance --

THE COURT:  Overruled.

MR. MCRAE:  -- and vague.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  The RV operations are designed and executive in close coordination with the council offices. So, in some cases, providing housing is a paramount and primary priority.  In some cases, council offices are interested in enforcement of public right-of-way regulations.  But there is an outreach component.  There is an effort to provide alternatives, regardless of the priorities of the council office, but, in some cases -- for

IV-25

example, we just had an RV operation, I want to say last week, in Council District 14, where there were no incidents, and 12 people were housed and the right-of-way was cleared.

BY MS. MYERS:

Q    And can you think of an instance in which there was a council district where no one was housed as a result of the RV operations?

          MR. MCRAE:  Objection, relevance --

          THE COURT:  Overruled.

          MR. MCRAE:  -- and lack of foundation.

          THE COURT:  You may answer the question, please.

          THE WITNESS:  I can't think of an instance.  I would need to -- I can't think of an instance, no.

BY MS. MYERS:

Q    Are there any documents that you could look at that would refresh your recollection or provide you that information?

          MR. MCRAE:  Relevance.

          THE COURT:  Overruled.

          THE WITNESS:  I believe there is documentation, yes.

BY MS. MYERS:

Q    And does that documentation get into whether -- how many individuals received housing as a result of the RV operation?

IV-26

MR. MCRAE:  Objection, vague, also calls for speculation, lack of foundation, and hearsay.

THE COURT:  Overruled.

THE WITNESS:  I believe so, yes.

BY MS. MYERS:

Q    And who would be responsible for that information?

MR. MCRAE:  Objection, vague, lack of foundation, relevance.

THE COURT:  Are you asking a person, because those can vary, or the entity?

BY MS. MYERS:

Q    I'll stick with department.  Where within the city would that information rest?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  That would ultimately rest with LAHSA, I believe, but I also believe that we -- the City Administrative Officer, my office, may have those records, as well.

BY MS. MYERS:

Q    And those record would detail how many individuals were housed, how many vehicles were towed, that sort of thing?

MR. MCRAE:  Objection, lack of foundation, calls for speculation, hearsay, also relevance.

IV-27

THE COURT:  Overruled.

THE WITNESS:  I believe so, yes.

BY MS. MYERS:

Q    Okay.  How did you know -- how did you learn about the details related to the RV operation and the fact that 12 people received housing in the Council District 14, Ysabel Jurado's district?  How did you learn about that information?

MR. MCRAE:  Objection, not knowing the source, just cautioning attorney-client privilege or other applicable privilege against disclosure.  I don't know the answer, your Honor.  I'm just prefacing that.

THE COURT:  I just want to caution, no communication.  So, if it's with a councilperson or the mayor, I don't want you to state what that communication is, but, if you became aware of it through your office or something like that, please answer.

THE WITNESS:  That's correct.  We -- I was made aware based on the work that our office did with the council office.

BY MS. MYERS:

Q    Okay.  So, then, it's a policy decision of the council offices whether to dedicate beds and resources for purposes of the RV operations.  Is that correct?

MR. MCRAE:  Objection, vague, relevance, lack of

IV-28

foundation.

THE COURT:  Do you understand the question?  She can restate it, if you need it.

THE WITNESS:  I understand the question.

THE COURT:  All right.  You can answer.

THE WITNESS:  I understand the question.

THE COURT:  Overruled.

THE WITNESS:  We work with the council offices, to our best ability, to reflect their priorities and -- we work with the council offices to reflect their priorities in the execution of the operations.

BY MS. MYERS:

Q   And so are the council offices responsible for identifying the beds that are available during RV operation?

MR. MCRAE:  Objection, vague, lack of foundation, calls for a legal conclusion, non-responsible.

THE COURT:  Overruled.

THE WITNESS:  In some cases, yes.  I mean, in some -- look.  This is a -- in some cases, yes, but that's not a hard requirement.

BY MS. MYERS:

Q   And I'm not asking about whether it's required.  I'm just asking, when bed resources are identified, is it the council office that identifies those resources?

MR. MCRAE:  Objection, lack of foundation.

Case 2:20-cv-02291-DOC-KES    Document 955    Filed 06/02/25    Page 29 of 304    Page ID #:26685

IV-29

THE COURT: Overruled.

THE WITNESS: The council office takes the lead in that effort, but it could be LAHSA, it could be help from the mayor's office. It's not -- that's why I'm not giving you a clear answer, because there is -- it's a -- there are multiple touchpoints for actually securing the beds. But I would say that it's -- the council office takes the lead in determining -- you know, working with our office, the need, and then making the -- working with the other entities that could provide the beds.

BY MS. MYERS:

Q    And then it's the council office's prerogative whether the RV operation occurs, whether or not beds are available, correct?

MR. MCRAE: Objection, asked and answered, it calls for a legal conclusion, lacks foundation, relevance.

THE COURT: Overruled. You can answer the question.

THE WITNESS: We work with the council offices, as I said, and reflect their priorities. Yes.

BY MS. MYERS:

Q    And so it's up to the council offices whether or not it goes forward, whether or not an RV operation goes forward? Let me back up. If beds are not available, have not been identified, is it up to the council office whether or not an

IV-30

RV operation goes forward?

MR. MCRAE:  Objection, it's an incomplete hypothetical.

THE COURT:  Would you restate that a little slower, please?

MS. MYERS:  Sure, your Honor.

BY MS. MYERS:

Q    You indicated that some -- in some instance, RV operations will go forward with beds and resources attached to it, and in other instances, RV operations go forward with enforcement in mind, correct?

MR. MCRAE:  Objection, compound.

THE COURT:  Overruled.

THE WITNESS:  It's not a binary.  There is an enforcement component.  There is an outreach component to all operations, and there are -- and if there efforts -- if there are individuals that are ready to receive housing, efforts are made to secure that housing for the individuals ready to receive housing.

The -- whether beds are secured ahead of time, that's the issue.  That isn't always the case, that a standard number of beds are secured and reserved, but there is always an effort through the outreach process to assess whether folks are ready or able to move into some kind of alternative housing.

IV-31

BY MS. MYERS:

Q    And what happens on one of these RV operations if a person indicates they are ready to go into -- and when we're talking about housing, just to be clear, are we talking about shelter or are we talking about housing?

MR. MCRAE:  Objection, that is three different questions, so it's compound.

MS. MYERS:  Sorry.  I'll step back.  Fair.

BY MS. MYERS:

Q    When you're talking about housing in this context, can you describe the housing that you're talking about?

MR. MCRAE:  Objection, it's incomplete.  It's --

THE COURT:  Overruled.  These have broad definitions, "housing," "shelter," et cetera.  You can answer that question.

THE WITNESS:  It would be the broad definition of "housing."  I don't -- there isn't a specific type housing that is reserved for RV operations.  There are a multitude of housing -- alternative housing types that are available, and -- or can be available, so it isn't -- there's not a specific housing type associated with RV operations.

BY MS. MYERS:

Q    Can you give me some examples of the types of housing that are available through these RV operations, just so we have a sense on the record what types of housing are

IV-32

available?

MR. MCRAE:  Objection, vague as to time, relevance, lack of foundation.

THE COURT:  Well --

BY MS. MYERS:

Q   And I'll clarify, when we're talking about time, I'm talking about the current era of RV operations, and if there's a distinction, if that has changed, please feel free to let us know.

THE COURT:  Please.

THE WITNESS:  Typically, it would be interim housing, could be the tiny home village, could be space in a bridge home shelter, could be a hotel/motel.  It depends on what's available at the time.

BY MS. MYERS:

Q   And isn't it the case in Los Angeles that individuals are rarely moved from the streets directly into, for example, permanent housing, like an apartment?

MR. MCRAE:  Objection, compound, vague as to "rarely," lack of foundation, relevance, and vague.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I'm not the expert on the process from the street-level homelessness to permanent housing, but, typically, that is what interim housing -- that is the

IV-33

definition of "interim housing," is moving people from homelessness to housing for a temperature period of time while they are -- while they become ready in various ways to move into permanent housing when it's available.

BY MS. MYERS:

Q    Okay.  And so, when you say, "Interim housing," do you mean shelter?

MR. MCRAE:  Objection, lack of foundation, relevance.

THE COURT:  Well, so far, I've allowed this line of questioning to range as far as the RVs, to see if the City was counting the RV efforts in either the Road Map or the LA Alliance agreement, and also to allow this to understand if those persons in RVs that were moved into shelter, interim housing, permanent housing, also included hotels and motels.  I think you've answered those questions thus far.

Counsel, what's your offer of proof here?

MS. MYERS:  Your Honor, one of the issues that is specific to Plaintiffs' motion is this question of encampment resolutions, and one of the things that the City has represented is that individuals are being moved from these RV operations into -- Mr. Szabo is now saying housing, but I think we need to clarify whether it's housing or shelter.  As part of that, that goes directly to the core

IV-34

issues.  That's what I'm trying to get at, your Honor.

MR. MCRAE:  Your Honor, real briefly, whether the City does more than what it's required to do under the settlement agreement, as far an encampment, is not relevant to whether the City is complying with its obligation.

So all of the anecdotal evidence about the City doing more, in other words, more beyond encampment reduction, having an offer of housing, that doesn't mean that the agreement has been modified to require an offer of housing with a reduction, and so I just want to put that on the record, that doing more doesn't obligate you to do more than you're legally required.  It just means that you've done more, which I think we would want to encourage the city to do.

THE COURT:  Sure.  Absolutely.

MS. MYERS:  And, your Honor, if I can respond to that?

THE COURT:  No, it's overruled, Counsel.  You can inquire.

BY MS. MYERS:

Q    All right.  So, when we're talking about tiny homes, a bridge home, and hotels and motels, you're talking about shelter, right?

MR. MCRAE:  Objection, vague.

THE COURT:  Do you understand the question?

IV-35

THE WITNESS:  I understand the words, but I don't think the question is on point.

THE COURT:  Restate the question.

BY MS. MYERS:

Q    Are you familiar with the HUD definition of "emergency shelter"?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  If you're referring to non-permanent housing, that's -- that would be -- you know, interim housing has many types.  When you use the word "shelter," it does suggest a very temporary, not even long-term stay, maybe not even a 24-hour stay availability, and that is something that we've moved, as you know, far beyond, and so our definition -- I don't use the term "shelter" for that purpose.

We use the term "interim housing," because interim housing is exactly that.  It's housing that is provided 24/7.  It has a number of services attached to it, and there is efforts to move those individuals from interim housing, when they are ready and when it is available, to permanent housing.

"Shelter" suggests a place that someone can go to spend the night, and then be asked to leave in the morning to fend for themselves, and we don't -- while there still

IV-36

are some shelters, overnight shelters, that operate in that manner, the majority of -- the vast majority of the City's investment in interim housing, and the type of interim housing that we provide to individuals, either through Inside Safe or other operations, is far superior to the antiquated "shelter" definition.

BY MS. MYERS:

Q    And the antiquated "shelter" definition is the HUD definition, or what you've just -- what you've now described as sort of a generalized understanding of what a shelter is?

        MR. MCRAE:  Objection, compound.

        THE COURT:  Give me just one moment.  I need to consult with the clerk.  One moment.

    (Pause.)

        THE COURT:  I'm sorry, Counsel.  My apologies. Would you re-ask the question, please.

        MS. MYERS:  Sure.  And, your Honor, if I can actually just step back related to this.

        THE COURT:  And what?

BY MS. MYERS:

Q    I certainly don't want to get into a fight with you, Mr. Szabo, about what -- the interim housing versus shelter, that sort of thing.  I just want to clarify about what's being offered to individuals in these RV operations, and you said, "Housing."

IV-37

So, if I understand correctly, when you say, "Interim housing," you are referring to something that is temporary in nature.  Well, why don't you define "interim housing" for me, so that we all have a clear understanding of what that is.

MR. MCRAE:  It's vague as to context, and assumes that it means the same thing in all circumstances.

THE COURT:  No.  Overruled.

THE WITNESS:  When we refer to "interim housing," understanding that my office doesn't establish the definitions, we are referring to the types of housing that we typically fund that are -- that is not considered permanent housing.  When we talk about permanent housing, we're talking about permanent supportive housing, or rental assistance in types of permanent-style housing, apartments, typically.  Interim housing can take many forms, from, say, even a safe-sleep situation, to a tiny village, to a bridge home, to a hotel or motel, to space that we lease in buildings, in existing buildings, that are used for interim housing.

MR. MCRAE:  Your Honor, I'm sorry to interrupt Mr. Szabo.  I've been informed by a member of my team -- and you asked the court that we alert you -- there's someone in the gallery that's trying to communicate with the witness by holding up something or pointing to it.

IV-38

THE COURT:  I also see it.  No.  I'm sorry.  Can't do that.  I've got a CSO (phonetic) in the back, and if you do that again, you're going to be removed from the court. Okay?  Thank you.

And, Counsel, thank you.

MR. MCRAE:  Thank you.

Sorry, Mr. Szabo.

THE WITNESS:  No, that's fine.  I was done.

BY MS. MYERS:

Q    And so that would include tiny homes, bridge home shelters, which are congregate shelters, correct?

A    Most of the shelters, not all -- excuse me.  Most of the interim housing projects under a bridge home are congregate, not all of them.

Q    Okay.  And then hotels and motels, and that's primarily the types of shelter interim housing that's offered at these RV operations, correct?

MR. MCRAE:  Objection, compound.

THE COURT:  And

THE COURT:  overruled

THE WITNESS:  Primarily.

BY MS. MYERS:

Q    And are there -- what else would be offered?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

IV-39

THE WITNESS:  I'm not aware beyond those general types.  There could be other opportunities.  There could be other -- you know, if -- and I'm speculating now.  I mean, there could be someone who's already matched to housing that could be -- that could receive a rental voucher, but, again, this is -- I'm now purely speculating.  There could be others.  Those are the primary, which I stated.

BY MS. MYERS:

Q   And if someone was matched to housing, and had a rental voucher, that would not come, then, through the RV operation, correct?

MR. MCRAE:  Objection, it's an incomplete hypothetical, lacks foundation, vague, relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't -- do you mean coming through the RV -- I mean, the RV operation is a multi-agency coordinated effort.  The housing resources would be typically provided through LAHSA.  LAHSA wouldn't say that it executes RV operations.  They wouldn't say that they are responsible for any of the, you know, enforcement, any of the enforcement component of an RV operation.  So I don't really actually accept that question.  There are multiple agencies.  If you're saying that -- does DOT or Sanitation provide housing?  Of course not.  But the coordinated effort, you're going to have outreach folks that are

IV-40

involved, outreach teams that are involved, that would be responsible for connecting the individuals to the appropriate housing, if it's available.

BY MS. MYERS:

Q    And are those outreach individuals always present at RV operations?

MR. MCRAE:  Objection, lack of foundation, vague, relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't know if it's always -- you're asking a categorical -- I don't know if, in every instance, there are outreach or LAHSA staff at every operation.  They're involved, as part of our general policy, but I don't know if there have been instances where they weren't involved.

BY MS. MYERS:

Q    Categorically, is LA -- when you say, "LADOT" -- let's just back up.  "LADOT," what are you referring to?

A    I'm sorry.

MR. MCRAE:  Compound.  I don't know if there's two questions.  There was a "categorically," and then it was a shift, mid-sentence.

THE COURT:  Overruled.

MS. MYERS:  I was just backing up.

THE COURT:  Overruled.

IV-41

MS. MYERS:  I'll back up.

THE COURT:  You can tell us what it stands for.

THE WITNESS:  "Los Angeles Department of Transportation."

THE COURT:  All right.

BY MS. MYERS:

Q     Categorically, is LADOT present at all RV operations?

MR. MCRAE:  Vague as to "categorically," lack of foundation, relevance.

THE COURT:  I'm more interested in whether they're a part of the relocation effort, and I'm allowing this to see if the City is counting or has counted this in terms of any of the submissions to the Court, and I'm allowing this because of the definitions, and sort of the substantial and meaningful reduction of unsheltered homelessness in the City of Los Angeles, and I've allowed it thus far, and given wide latitude to all parties to explore this encampment resolution issue, and the definitions that were put to the Court concerning "reduction" versus "cleaning."

If those questions are centered on whether this agency is part of the housing or shelter, et cetera, I'm going to allow it, but, at some point, I am going to rein in that discretion.

MS. MYERS:  Thank you, your Honor.

THE COURT:  All right.

IV-42

BY MS. MYERS:

Q    So is LADOT categorically part of the RV operations?

        MR. MCRAE:  Objection, vague.

        THE COURT:  Overruled.  You can answer that question.

        THE WITNESS:  Department of Transportation is always part of the RV operations.

BY MS. MYERS:

Q    Do RV operations sometimes take place alongside Care Plus operations?

        MR. MCRAE:  Objection, vague, lack of foundation, relevance.

        THE COURT:  Overruled.

        THE WITNESS:  I don't -- I can't speak to that.  I don't know.

        THE COURT:  Counsel, I'm going to let you explore this, to find out where the central authority is, and who is making those decisions in relation to those areas that I just stated.  So you can continue.

        MS. MYERS:  Thank you, your Honor.

BY MS. MYERS:

Q    Do Care Plus operations sometimes address vehicle removal?

        MR. MCRAE:  Objection, vague, relevance.

        THE COURT:  Overruled.  You can answer that

IV-43

question.

THE WITNESS:  The Bureau of Sanitation is not responsible for vehicle removal.

BY MS. MYERS:

Q    So I'm asking a little bit of a different question.  Is LADOT sometimes involved in Care Plus operations?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  They are sometimes involved.

BY MS. MYERS:

Q    And why would LADOT be involved with a Care Plus operation?

MR. MCRAE:  Objection, incomplete hypothetical, vague.

THE COURT:  Overruled.

THE WITNESS:  I can't speak to that.  I can't speak to that.  I mean, there is clearly a component in some operations where the street needs to be shut down, if there's going to be a comprehensive cleaning of the public right-of-way.  So DOT would be involved in that effort.

BY MS. MYERS:

Q    And would DOT sometimes be involved for the purpose of removing vehicles?

MR. MCRAE:  Objection, lack of foundation, vague, relevance.

IV-44

THE COURT:  Overruled.

THE WITNESS:  I'm not aware.  Potentially, but I'm not aware of operations, of joint operations.  It's possible.

BY MS. MYERS:

Q    Who schedules -- or who identifies the locations for Care Plus cleanups?

MR. MCRAE:  Objection, vague, relevance.

THE COURT:  Overruled.

THE WITNESS:  The -- again, the Bureau of Sanitation executes the program, and they schedule the locations, and the date and time of the operations, and that's done in coordination with the council offices.

BY MS. MYERS:

Q    Do the council offices identify the locations where Care Plus cleanups should take place?

A    The council offices --

MR. MCRAE:  Objection, vague.

THE WITNESS:  -- identify the -- their priorities.

BY MS. MYERS:

Q    And then, from those priorities, who identifies which Care Plus operations actually take place?

A    The Bureau of Sanitation.

Q    And what about Care cleanups?

MR. MCRAE:  Objection, vague.

IV-45

THE COURT:  Overruled.

THE WITNESS:  I can't speak to that.  I can't speak to that, because I believe there is a -- that Care cleanups are more regular in nature, whereas Care Plus is more of a planned operation.

BY MS. MYERS:

Q    How many Care Plus operations does the City of Los Angeles conduct on a yearly basis, if you know?

MR. MCRAE:  Objection, foundation, relevance.

THE COURT:  No, overruled.  You can answer that question.

But what time period?  Back to the  Road Map agreement, LA Alliance, or the present time?  Actually, I'm going to sustain that as being ambiguous.

MS. MYERS:  Okay.

THE COURT:  I didn't know these time frames.

BY MS. MYERS:

Q    In 2024, how many Care Plus operations did the City of Los Angeles conduct?

THE COURT:  In 2024?  All right.  Thank you.

THE WITNESS:  I can't give you an exact number, but it is in the thousands, as in more than 2,000, less than 5,000.  It's in that range.

BY MS. MYERS:

Q    Do you know how many Care Plus operations are conducted

IV-46

on a monthly basis if we're looking at 2024 and 2025?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  There are, on average -- we could do the math together.  There are at least two operations per council district per week.  So --

BY MS. MYERS:

Q    That's sufficient.

A    Thirty per week, yes.

Q    That does leave it to all of us to do the math, so that's very helpful.

A    Okay.

Q    And when you say there's two operations per council district per week, at a minimum, is each council office afforded the same number of Care Plus cleanups each week?

MR. MCRAE:  Objection, vague, relevance.

THE COURT:  No, overruled.  You can answer that question.

THE WITNESS:  Again, I'm not the operational lead on Care Plus.  There is some fluctuation, based on a number of factors.  There are certain specific teams.  For example, there is a team that's dedicated to Grand Avenue, because that's a particularly challenging area.  I believe there is a team dedicated to Venice.  There are some -- there is some

IV-47

fluctuation.  It isn't -- it is not necessarily standardized.

BY MS. MYERS:

Q    And Grand Avenue, that's in Council District Nine, Curren Price's district.  Is that correct?

A    Correct.

Q    And then Venice, that would be in Council District 11, Traci Park's district?

A    Correct.

Q    Okay.  And is there also a team dedicated to Skid Row?

A    I believe so.

Q    And that would be in Council District 14, and that's Ysabel Jurado's district, correct?

A    Correct.

Q    Do you know of any other specialized teams?

A    Not off the top of my head.

Q    Do you know how the specialized teams were dedicated?

        MR. MCRAE:  Objection, relevance, vague, lack of foundation.

        THE COURT:  Would you restate that, please.

BY MS. MYERS:

Q    Do you know -- you indicated there were specialized teams on Grand Avenue, Venice, Skid Row, potentially others. Do you know the process by which those specialized teams were dedicated?

IV-48

A    I don't know the process, other than that they were funded in -- I don't remember the budget in which they were funded, but they were funded some years ago, and have continued funding since then.

Q    So, putting aside these specialized teams, does each council district -- is each council district afforded the same number of days per week for Care Plus operations?

MR. MCRAE:  Objection, relevance, foundation, vague.

THE COURT:  The same number of days and -- I missed the last part.

MS. MYERS:  For Care Plus operations.

BY MS. MYERS:

Q    Let me back up.  Are Care Plus teams assigned to a single council district per day?

THE COURT:  Besides these specialized teams?

MS. MYERS:  Besides the specialized teams.  This is general Care Plus operations.

THE COURT:  All right.  You can answer that question.

THE WITNESS:  I'm not the director of the Bureau of Sanitation, and so I don't have operational control over the Care and Care Plus teams.

BY MS. MYERS:

Q    Okay.

IV-49

A    I can tell you my understanding is that there's at least two operations per district per week, and that there is some fluctuation.  There are oftentimes special operations, but I can't speak to that.

Q    Are you aware if it's an equal distribution amongst the council districts --

            MR. MCRAE:  Objection, relevance, vague.

BY MS. MYERS:

Q    -- putting aside the special teams?

            MR. MCRAE:  Objection, compound, relevance, vague, lack of foundation.

            THE COURT:  Overruled.  The difficulty is with the word "equal."  You can do your best to explain that, if you'd like.  You can answer that, but I understand that "equal" is a difficult definition.

            THE WITNESS:  Yes, and "equal" is also -- it's easy to say no.  I mean, no, I don't -- there's -- there -- as I said, there is fluctuation.  There are special operations.  There are special teams.  There are other -- you know, there's a standardized "Everyone gets two," and then there is more activity beyond that, but I cannot speak to how that is determined, how that's distributed.  That is not within my purview.

BY MS. MYERS:

Q    Whose purview is that under?

IV-50

THE COURT:  I'm sorry?

BY MS. MYERS:

Q    Whose purview is that under?

MR. MCRAE:  Objection, relevance.

THE COURT:  You can answer that question.

THE WITNESS:  As I've stated, the Care Plus operations are run out of the Bureau of Sanitation.

BY MS. MYERS:

Q    Bureau of Sanitation is not responsible for the allocation of days to council districts, is it?

MR. MCRAE:  Objection, vague, and calls for a legal conclusion as to "responsible."

THE COURT:  Overruled.  You can answer that question, please.

MR. MCRAE:  It also lacks relevance.

THE COURT:  You can answer the question, sir.

THE WITNESS:  Sure.  They are responsible for scheduling the operations.

BY MS. MYERS:

Q    Sure.  But is the -- but is Bureau of Sanitation responsible for telling council districts how many days they have Care Plus teams in their districts?

MR. MCRAE:  Objection, relevance, lack of foundation --

THE COURT:  Overruled.

IV-51

MR. MCRAE:  -- calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  They run the program.  They schedule the program.  I mean, the -- are you -- there are certainly budgetary constraints.  There was a discussion about that in public over the last several weeks, about what -- you know, what the budget could afford in terms of Care and Care Plus operations, but this is a program run by Sanitation.  I don't understand how that answer is not complete.

BY MS. MYERS:

Q    The Bureau of Sanitation determines how many days each council district gets for Care Plus cleanups.  Is that correct?

MR. MCRAE:  Objection, mischaracterizes the witness' testimony, and, in a form another (sic), this has been asked and answered.

THE COURT:  Overruled.

THE WITNESS:  The Bureau of Sanitation runs the program.

BY MS. MYERS:

Q    And your office coordinates -- the CAO's office coordinates with Sanitation, LADOT, all of the other entities, and the council offices related to -- well, it coordinates Care Plus, correct?

MR. MCRAE:  Objection, that's unintelligible.

IV-52

It's also lack of foundation.

THE COURT:  No, I think it drives to the central authority.  Overruled.

THE WITNESS:  We coordinate with the other departments.  As I have stated, the CAO's office and our regional coordinators often play a coordinating role if multiple agencies or multiple departments are involved in a particular effort, not -- you know, even separate and apart from homelessness.

So we -- our regional coordinators work with the council offices, Sanitation, Department of Transportation, Los Angeles Police Department, and LAHSA to make sure those efforts are coordinated when an operation is scheduled, but it is scheduled by the Bureau of Sanitation.

BY MS. MYERS:

Q    I think maybe we're running into a definitional problem with "scheduled."  Do you mean -- when you say, "Scheduled," do you mean day-to-day, today, Bureau of Sanitation said, "The Care Plus teams are going to an encampment on Sixth and Ardmore," and they made the decision about going to that location today?  Is that what you mean by "scheduling"?

MR. MCRAE:  Objection, your Honor, relevance. It's also a hypothetical.  It seems like we're getting kind of far afield here.

THE COURT:  Overruled.

*Echo Reporting, Inc.*

IV-53

THE WITNESS:  That seems to me like an appropriate definition of "scheduling."

BY MS. MYERS:

Q    Okay.  So another way to look at scheduling of the Care Plus teams would be "Today the Care Plus team is going to Council District 10," and is Bureau of Sanitation responsible for that?

MR. MCRAE:  Objection, lack of foundation as to "another way to look at it."  By whom, with any authority to make those decisions?  Lack -- it's irrelevant.

THE COURT:  That "it's responsible for that." Define the question.  Responsible for what?

MS. MYERS:  Responsible for the Care team going to Council District 10 today.

THE COURT:  Overruled.  Answer the question, please.

THE WITNESS:  I honestly don't know what you're asking.  You've asked the same question three times. It's -- Sanitation schedules the Care and Care Plus operations.  Sanitation schedules the Care and Care Plus operations.

BY MS. MYERS:

Q    And --

A    I don't -- am I -- I'm sorry if I'm missing what you're asking.

IV-54

Q    And so I'm attempting to break it down for you, Mr. Szabo, so that we are talking -- we are using the term "schedule" in the same way, because I do think there's an issue about the use of that term.  And so, just for a clear record, and for everyone's clarity, I'm attempting to break down different parts of scheduling, to understand who's responsible for it.

So you said that Sanitation is responsible for determining today that a Care Plus team would go the location of Sixth and Ardmore, correct?

MR. MCRAE:  Objection, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MYERS:

Q    And the identification of Sixth and Ardmore as a location that requires a cleanup would be done by the council office, correct?

MR. MCRAE:  Objection, incomplete hypothetical --

THE COURT:  Overruled.

MR. MCRAE:  -- and relevance.

THE COURT:  You can answer that.

THE WITNESS:  It would ultimately be determined by the Bureau of Sanitation, in consultation with the council office.

IV-55

BY MS. MYERS:

Q    But I asked if the council office identified Sixth and Ardmore as a location that needs a cleanup.

        MR. MCRAE:  Objection, that's not a question. That's a statement.

        THE COURT:  It's a different question.  Just re-ask it.  You can ask the question.

BY MS. MYERS:

Q    Is the council office responsible for identifying the location of Sixth and Ardmore as an encampment that needs a Care Plus cleanup?

        MR. MCRAE:  Objection, incomplete hypothetical, foundation, relevance.

        THE COURT:  Overruled.

        THE WITNESS:  The council office provides its priorities to the Bureau of Sanitation.  Based on those priorities, the Bureau of Sanitation schedules the Care and Care Plus cleanups.  For example, if the council office says, you know, "We want a Care Plus cleanup on Sixth and Main," the Bureau of Sanitation would say, "Okay.  We have these other operations happening.  You know, we would schedule it at this time, on the 18th of March."  Okay? That is typically how it works.

        So the Bureau of Sanitation is in charge of the operations.  They work with the council offices, yes, and

IV-56

based on those priorities, and based on the operational need.  For example, maybe it doesn't need a full Care Plus operation, a lighter-touch Care operation would suffice. Again, Sanitation is the operating department.  They're responsible for deploying the staff which are required to address the need, and they make that call, yes, in consultation with the council office, and then there's a coordinating effort to -- once that's decided, there's a coordinating effort that my office does play a role in.

BY MS. MYERS:

Q    Okay.  So we've established that the council district identifies the location through the priorities.  LA Sanitation specifically schedules that location on a give day.  So I want to back up one step further.  Who determines that Care Plus operations are taking place in a specific council district today?

MR. MCRAE:  Objection, incomplete hypothetical, relevance, foundation, and vague.

THE COURT:  Overruled.

THE WITNESS:  I literally do not know what you're asking.  I mean, I really don't know what you're saying. I've answered the question multiple times.  I do not know what you're asking.  If you can ask it in a different way, maybe that's helpful.

//

IV-57

BY MS. MYERS:

Q    And that's what I'm trying to do, Mr. Szabo.  All I'm trying to understand, and for the Court and everyone in the room to understand -- a Care Plus team went out to a council district today, correct?

A    (No response.)

Q    Care Plus teams are deployed -- I mean, let me back up. Are Care Plus teams deployed to specific council districts?

MR. MCRAE:  Objection, vague, lack of foundation, relevance.

THE COURT:  Well, obviously, they're deployed to different council districts.  Is the question who is making that decision or identification or scheduling?

MS. MYERS:  And I'm backing up even further, your Honor, just to clarify.

BY MS. MYERS:

Q    A specific care team is deployed to a specific council district on any given day, correct?

MR. MCRAE:  Vague.  "Deployed" is still in the question, and it's undefined.

MS. MYERS:  "Sent out to."  "Dispatched."

THE COURT:  Just a moment.  But there are also specialized teams in nine, 11, and 14, I believe, and that's going to be confusing.

MS. MYERS:  Putting those aside --

IV-58

THE COURT:  Putting those aside?

MS. MYERS:  Let's -- for purposes of this set of questions, let's put aside the special teams and concentrate only on the day-to-day teams that are deployed.

BY MS. MYERS:

Q    Is a care team deployed on any -- on a given day to a council district?

MR. MCRAE:  Objection, relevance, vague, lack of --

THE COURT:  I'm not sure I understand the question.

BY MS. MYERS:

Q    Care Team One -- the care teams are defined by numbers, correct?  So Care Team One, that's a team of people.  Do we understand that to be correct?

A    They are -- anywhere that they are deployed would be, if they are deployed within the City of Los Angeles, which I hope is the case, would be in a council district.  So, yes, a Care team or a Care Plus team is deployed in a council district.

Again, are you asking if specific teams, actual specific people, individuals, are assigned to a particular council district?  This is an operational -- that's an operational decision that the Bureau of Sanitation will take to manage their resources.

IV-59

Q    And that's a level of "in the weeds" that we don't need here today, Mr. Szabo.  I'm simply asking if a Care team is deployed each day to a specific council district, as in "Today, Care Team Seven is deployed to Council District Two."  Is that how the deployment works?

MR. MCRAE:  Objection, relevance, vague, lack of foundation.

THE COURT:  I understand that.  You can answer that question.

THE WITNESS:  That's -- and that's not within my purview.  I mean, I'm not the operational lead on deploying the Care and Care Plus resources.  I mean, I don't know. I'm not the -- that's not in my purview.

BY MS. MYERS:

Q    Okay.  Who within the City would know that?

MR. MCRAE:  Objection, that calls for speculation, and assumes that it's knowable.

THE COURT:  Overruled, because he understood the question.

THE WITNESS:  The Bureau of Sanitation runs the program.  They're responsible for scheduling Care and Care Plus operations.

BY MS. MYERS:

Q    Yes.  And who within your office would know that, given that your office is responsible for coordinating the Care

IV-60

Plus cleanups?

MR. MCRAE:  Argumentative, also assumes facts, lacks foundation, relevance.

THE COURT:  Well, once again, a specific person -- those people can change.

MS. MYERS:  I'll take a job description, your Honor, anyone within the CAO's office that's responsible for scheduling and coordinating the Care Plus cleanups.

MR. MCRAE:  Your Honor, can I have a standing objection that the level of granularity and peripheral relationship to the obligations under the agreement a this point -- it's just --

THE COURT:  Well, I think the search has constantly been for central authority, and who has that central authority, and I understand that the departments can be segmented, and I understand that there can be vast amounts of interchange, and I also understand, I think, your dual role, but, eventually -- well, I'll delay that thought.

That central authority I'm going to allow to be inquired into, and I do understand the complexity of the questions you're answering, and so, if there's a department, I don't need a name.  I understand that that can change.  But, if this falls under your bailiwick in some way, then I think counsel is entitled to know where this authority lies.

Counsel.

IV-61

BY MS. MYERS:

Q    Let me ask, the CAO's office sends out the Care and Care Plus schedules every day, doesn't it?

MR. MCRAE:  Objection, relevance, foundation.

THE COURT:  Overruled.

THE WITNESS:  We do.  We do, and that -- we've taken on that responsibility since the dissolution of the Unified Homelessness Response Center, and that is a function of their coordinating role, and that's -- I tried to make that point earlier.  But we coordinate.  We don't direct. We don't run the program.  But we do send out the schedule. That is true.

BY MS. MYERS:

Q    And I don't know that the record is clear on this particular point.  Is it the case that a specific Care team is -- or maybe you don't know -- that a specific Care team is deployed to a single council district each day?

MR. MCRAE:  Objection, relevance, asked and answered multiple times.

THE COURT:  It's been asked and answered, as well, Counsel.

If you have any further answer, you can cast it, but it's been asked and answered.

THE WITNESS:  No, I have nothing further on that question.

IV-62

MS. MYERS:  Okay.

THE COURT:  Your answer would be the same, then?

THE WITNESS:  It would be the same, yes.

BY MS. MYERS:

Q    So you don't know who made the decision -- who makes the decisions about which days are assigned to each council office?

MR. MCRAE:  Your Honor, this is the same variation on a theme, asked and answered.  It lacks foundation, relevance.

THE COURT:  I think you've already answered it.  Answer it one more time, just to be certain.

THE WITNESS:  The Bureau of Sanitation.

BY MS. MYERS:

Q    Okay.  Who within the Bureau of Sanitation?  Do you know?

MR. MCRAE:  Your Honor, people can change, as the Court has earlier said, relevance.

BY MS. MYERS:

Q    Do you know who is currently making that decision within the Bureau of Sanitation?

MR. MCRAE:  Relevance, lack of foundation.

THE COURT:  You can answer the question about who currently is in that situation.

THE WITNESS:  The Bureau of Sanitation has its own

IV-63

reporting structure.  Ultimately, the general manager is in charge of the bureau.

THE COURT:  I don't need a name.

THE WITNESS:  Okay.  Yes.  It's the -- it's ultimately the general manager.

BY MS. MYERS:

Q    The general manager of L.A. Sanitation makes the decisions about which days are assigned to which council district?

MR. MCRAE:  Objection, calls for speculation as to whether a separate department head delegates that authority, whether it varies over time.  This is just lacking foundation and relevance.

THE COURT:  Counsel, it's within the Bureau of Sanitation.

MS. MYERS:  Yes, your Honor, but the Bureau of Sanitation -- as Mr. Szabo pointed out, the Bureau of Sanitation is one of the largest departments within the City of Los Angeles.  Mr. Szabo --

BY MS. MYERS:

Q    Mr. Szabo, are you aware of which department within the Bureau of Sanitation conducts Care cleanups, Care and Care Plus cleanups?

MR. MCRAE:  Relevance, foundation.

THE COURT:  Overruled.  You can answer that

IV-64

question, if you know a department.

THE WITNESS:  It is a division.  It is called the Livability Services Division.

BY MS. MYERS:

Q   Okay.  So is it -- and the Livability Services Division is below the general manager, correct --

MR. MCRAE:  Objection, vague.

BY MS. MYERS:

Q   -- in the organizational chart of L.A. Sanitation?

MR. MCRAE:  Objection, assumes facts, lack of foundation, vague, relevance.

THE COURT:  Overruled.  You can answer that question.  We're looking for a central authority here, or if there is one.

THE WITNESS:  If there is a division within a department, the general manager would oversee that division, ultimately, yes.

BY MS. MYERS:

Q   Okay.  And so -- but that's not actually the question that I asked.  The Livability Services Division is below the general manager, correct?

MR. MCRAE:  Your Honor, lack of foundation. This -- he -- it's not within his responsibilities, and it's not relevant to anything.

THE COURT:  I'm not sure of that, Counsel.

IV-65

Overruled.  You can answer the question.

THE WITNESS:  I think the definition of "oversee" suggests that yes, it would be over that division.  So, yes, the general manager is over the division.  That division reports to the general manager.  That is typically how it works, standard bureaucracy.

BY MS. MYERS:

Q   So, when you say the general manager makes the decision, you understand that there is actually a division within the Bureau of Sanitation that likely makes that decision, correct?

MR. MCRAE:  Your Honor, that --

THE COURT:  No, you can answer that question.  In other words, from your understanding, if you have an understanding of this, you know, if you have some knowledge about this, it's simply the search of who makes that decision.  I understand it's under the general manager, but is there an entity under that making this decision?  And then thinking, of course, of the general manager, just as your staff would give you information.

THE WITNESS:  Sure.  Yes.  That is a typical reporting structure that -- yes.  A division head would make decisions or recommendations for a decision, but, ultimately, just as I am for my department, the general manager is responsible for all the decisions that are made

IV-66

by that department.

BY MS. MYERS:

Q    So, as the CAO, you're responsible for all of the decisions, then, related to the coordination of Care Plus, correct?

MR. MCRAE:  Objection, argumentative, lack of foundation, vague, calls for a legal conclusion, relevance.

THE COURT:  And you're referring all the decisions back to Mr. Szabo?

MS. MYERS:  Yes, like he's testified about the general manager over the Bureau of Sanitation.

MR. MCRAE:  Your Honor, he's speaking notionally and theoretically.  That's why his are these qualifications, because it's not his job.  He --

THE COURT:  And you can answer the question, it's not your job.

THE WITNESS:  I'm responsible for the actions of and decisions delegated to staff and divisions in my office, of course.

BY MS. MYERS:

Q    Yes.  So, then, you are responsible for the coordination of Care Plus?

MR. MCRAE:  Objection, vague as to "responsible," lack of foundation, calls for a legal conclusion, relevance.

THE COURT:  Overruled.

IV-67

THE WITNESS:  I'm responsible for the work that my office does, the contributions that my office makes to that coordinating effort.  Yes.

BY MS. MYERS:

Q    Okay.  And so does the City Council have any say about when -- about how many Care Plus days are allocated to each council district?

MR. MCRAE:  Objection, vague, lack of foundation, and relevance.

THE COURT:  Sustained in its present form.  The "City Council," do you mean council districts, each councilperson, the president of the council?

MS. MYERS:  So I was talking about the City Council as a body, whether the City Council has decision making related to the number of Care Plus cleanups allocated to each district.

THE COURT:  All right.  You can answer that question.

THE WITNESS:  Within its budgetary authority, in appropriating resources, the council as a body determines the level of Care and Care Plus operations that would be funded for the fiscal year.

BY MS. MYERS:

Q    And do they determine whether or not there is -- how those resources are distributed amongst the council

IV-68

districts?

MR. MCRAE:  Objection, vague, relevance.

THE COURT:  You can answer the question.

THE WITNESS:  They certainly have a policymaking role and policymaking responsibility, and the Bureau of Sanitation reports through a committee structure.

BY MS. MYERS:

Q    And so --

A    They have policy oversight.

Q    And so the distribution of Care Plus resources among a council district would be a policy decision?

MR. MCRAE:  Objection, vague, relevance, lack of foundation.

THE COURT:  You can answer that question.

THE WITNESS:  It is a policy decision.

BY MS. MYERS:

Q    I'm going to show you what's been marked as Exhibit 25.

MR. MCRAE:  Your Honor, maybe this is a good time for a recess, or let me be more specific.

THE COURT:  No, I --

MS. MYERS:  Can we take a recess, your Honor?

THE COURT:  It's a perfect time for a recess, Counsel.

MR. MCRAE:  Thank you.

THE COURT:  Would 20 minutes be okay?

IV-69

MR. MCRAE:  Yes.

THE COURT:  All right.  Twenty minutes.  Thank you.  Thank you.

You may step down.  Appreciate it.

(Proceedings recessed briefly.)

THE COURT:  If it's acceptable to all counsel, we're back on the record.  All counsel are present.  The witness, Mr. Szabo, is present, and this is a continuation by Ms. Myers on cross examination.

(Pause.)

MS. MYERS:  Your Honor, we need just one moment to load the exhibits.

THE COURT:  Sure.

MS. MYERS:  Thank you so much.

(Pause.)

MR. MCRAE:  Magnificent portraits, by the way.

THE COURT:  Sorry?

MR. MCRAE:  Magnificent portraits, by the way.

(Pause.)

MS. MYERS:  Thank you for your patience, your Honor.

BY MS. MYERS:

Q    And, Mr. Szabo, thank you for your patience.  Okay.  Mr. Szabo, yesterday you spoke about the settlement agreement in this case, the LA Alliance settlement, as we've

IV-70

been referring to it, correct?

A    Yes, I did.

Q    Okay.  And so I'm going to direct your screen -- I'm going to put something on the iPad -- to Exhibit 25, which is the settlement agreement in this case.  Do you recognize the settlement agreement?

A    I do.

Q    And yesterday you testified that you were responsible for -- or you were -- you participated in the negotiations as to many of the agreements in this case, correct?

          MR. MCRAE:  Objection, vague.

          THE COURT:  Overruled.

          THE WITNESS:  Yes.  I was certainly involved in the negotiation of the settlement agreement that you have on the screen.

BY MS. MYERS:

Q    Okay.  I'm going to direct your attention to Section 3, and specifically 3.1, and can you just read that section?

A         "The City agrees to create a required
          number of housing or shelter solutions
          which is equal to but, in the City's
          discretion, may be greater than, the
          shelter and/or housing capacity needed
          to accommodate 60 percent of the
          unsheltered City shelter-appropriate PEH

IV-71

within the city based on LAHSA's 2022 point-in-time count."

Q    Thank you.  And were you responsible for -- were you -- did you participate in the negotiation of this specific provision?

A    I did.

Q    And what is your understanding of the -- well, let me back up.  Has the City determined what constitutes the shelter or capacity needed to accommodate 60 percent of the unsheltered City-appropriate (sic) PEH within the City, what that number is?

MR. MCRAE:  Objection, vague, lack of foundation, calls for a legal conclusion.

THE COURT:  Overruled.  You can answer the question, sir.

THE WITNESS:  Yes.  We calculated the required number as indicated in 3.1, submitted it to the Court.  That number is 12,915.

BY MS. MYERS:

Q    Okay.  And how did you arrive at that number?

A    We arrived at that number by taking 60 percent -- actually, let me back up to get this correct.  So we looked at the -- we took the 2022 point-in-time count, unsheltered population.

We then looked at -- which was, of course, reported by

IV-72

LAHSA -- that same point-in-time count also indicated the number of individuals with serious mental illness. Individuals with serious mental illness and other physical and other disabilities, I believe, in other parts of this settlement, are defined as "individuals," but more appropriate for higher-level County-provided services.

So our definition of "City-shelter appropriate" are those who could be reasonably housed in the basic level of shelter that -- where there would not be a reasonable expectation that we would provide high levels of physical or mental health care.  Again, that's -- that would be County-appropriate care.

So we took the unsheltered population, minus the unsheltered population with serious mental illness, as reported by the 2022 count, and then the 60 percent of that number was -- yielded the 12,915.

Q    How did the City arrive at the 60 percent number?

MR. MCRAE:  Objection, to the extent that that calls for attorney-client privileged communications or deliberative process privilege, as well as divulging, perhaps, settlement discussions.

THE COURT:  Settlement.  That's, yes, the settlement issues.

MS. MYERS:  I can withdraw that question and ask a different question.

IV-73

BY MS. MYERS:

Q   Was the 60 percent part of a negotiated term of the settlement?

MR. MCRAE:  By definition, it's included in the agreement.  So the question as posed is unintelligible.

THE COURT:  Well, then it's self-evident.  You can answer that question.

THE WITNESS:  The settlement is a result of negotiated terms.  The 60 percent number was part of those terms.

BY MS. MYERS:

Q   What I'm asking is, the 60 percent didn't come from HUD guidelines or any other external source?  It was a negotiated term of the settlement, correct?

MR. MCRAE:  Objection, assumes that they're mutually exclusive, also would be intruding on settlement discussions, and relevance.  The term is what it is.

THE COURT:  What, concerning whether the HUD was considered or not?

MS. MYERS:  I'm just asking if it was an external number that comes from a regulatory body or anything else, or whether it was a negotiated term of the settlement.

THE COURT:  Yes.  You can answer that question.

THE WITNESS:  It was a negotiated term of the settlement

IV-74

BY MS. MYERS:

Q    And the number that you reached, the 12,915, then, excludes individuals who are experiencing homelessness who are identified as needing a higher level of care than the City provides in its shelters, correct?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Correct.  There's a definition of "city shelter-appropriate" in the settlement.

BY MS. MYERS:

Q    Okay.  And the City of Los Angeles provides quarterly updates to the Court of its progress related to the settlement agreement, correct?

A    We do.

Q    And is the CAO's office involved in preparing those reports?

A    We are, yes.

Q    And are you involved in preparing the substance of those reports?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  By "substance of the reports," you mean the attachments that identify the housing that we're submitting as compliant?

//

IV-75

BY MS. MYERS:

Q    Yes, the attachments that get to the City's progress towards the settlement agreement milestones.

A    Yes.  We prepare those attachments.

Q    Okay.  And so I'm going to show you what we marked as Intervenor's Exhibit Number 302, which is previously filed with the Court Document 892, and this is Plaintiff (sic) City of Los Angeles' quarterly status report.  Is this one of those reports?

A    Yes.

MR. MCRAE:  Could we have the next page float, because this is a caption page.

THE COURT:  Counsel, you have that exhibit, don't you?  Thank you.  Please proceed with your questions.

MS. MYERS:  This is the second page of the report.

THE COURT:  If you don't have that, indicate, but --

MR. MCRAE:  Will do.  Thank you, your Honor.

THE COURT:  Thank you.

THE WITNESS:  Yes.  This appears to be our third quarterly report of the -- for this year.

BY MS. MYERS:

Q    Okay.  And Exhibit A and Exhibit B -- I'm going to -- well, I'm going to show you Exhibit A.  So this is what's marked as Exhibit A in the report.  Is this one of the

IV-76

exhibits that your office prepares?

A     Yes, it is.

Q     And this is Exhibit B of the report (indicating).  Does your office also prepare Exhibit B?

A     Yes, we do.

Q     And what is Exhibit A?  Why don't we just go back to the beginning of it.

A     Exhibit A is a list of housing that has been -- that we are reporting as either open or in process, consistent with the terms of the settlement.

Q     Okay.  And so this -- the shelter and housing opportunities that are listed on here are the shelter and housing opportunities that the City has created pursuant to Section 3.1 of the settlement agreement.  Is that correct?

          MR. MCRAE:  Objection, calls for a legal conclusion.

          THE COURT:  Overruled.

          MR. MCRAE:  And -- I'm sorry -- lack of foundation.

          THE COURT:  You can answer, sir.

          THE WITNESS:  Correct.

BY MS. MYERS:

Q     Okay.  The settlement requires the City of Los Angeles to create new housing and shelter opportunities, correct?

          MR. MCRAE:  Objection, calls for a legal

IV-77

conclusion, also vague as to "new housing opportunities," and the agreement speaks for itself.

THE COURT:  Overruled.

THE WITNESS:  It does require the City to create the required number of housing or shelter solutions, yes.

BY MS. MYERS:

Q    And what is your understanding of what the City considers to be creating a housing or shelter solution?

MR. MCRAE:  Objection, vague, also relevance.

THE COURT:  Overruled.

THE WITNESS:  The settlement intentionally has -- includes very, very broad -- includes very broad definitions of both eligible housing resources and the manner in which the City would be allowed to create those housing resources. It goes so far as to not only -- it does not specify that the City is required to, for example, pay for 100 percent of the housing resources.

It even goes so far as to say that the City -- that there's -- the City could potentially not have to pay anything -- it could be privately funded -- but somehow cause to be -- come into existence through some City efforts.  And so it's -- in my view, it's broad.  If we in some way facilitate the housing resources, that, in my view, is -- would be compliant with the terms of the settlement.

//

IV-78

BY MS. MYERS:

Q    And it's based on that view that you've determined -- that you've included these resources as fulfilling the City's portion of the settlement agreement?

MR. MCRAE:  Objection, vague.

THE COURT:  Would you restate that.  I couldn't hear a portion of it.

BY MS. MYERS:

Q    So you indicated that the City's -- that the City needs to in some way facilitate the housing and shelter opportunities.  So my question is, is it based on that understanding that you were including these shelter resources on this list?

MR. MCRAE:  Objection, it mischaracterizes the witness' testimony as to "facilitate," and lack of foundation.

THE COURT:  All right.  Thank you.

Overruled.  You can answer the question.

THE WITNESS:  Based on my understanding of fairly clear language in the settlement, and the intent of the discussions, housing or shelter may be government or privately funded, and the settlement provides for a broad range of housing resources, without particular requirements or limitations on any particular type.  The -- it even includes family reunification, which, in and of itself, is

IV-79

not creating a bed, but it would allow for family reunification to count as one of the 12,915.

We have not reported that as such, but it is an extraordinarily broad -- gives the City extraordinary discretion to provide any type of housing resource that would ultimately reach 12,915 by 2027.

BY MS. MYERS:

Q   And I appreciate that, that information.  I'm asking you something very specific, which is, based on that definition, your understanding of the settlement agreement, the housing and shelter solutions that are included in this report fall within that understanding of what it means to create housing and shelter solutions?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Yes, correct.

BY MS. MYERS:

Q   Can we go back to Exhibit 25?  Can you point me to the part of the settlement agreement that talks about the manner in which the City can create housing and shelter solutions?

MR. MCRAE:  Your Honor, objection as phrased, as calling for a legal conclusion.  It also assumes that the settlement agreement places any such restriction or definition, and this witness lacks foundation to be, if

IV-80

asked, interpreting the settlement agreement or stating what legal obligations are.

THE COURT:  Overruled.

THE WITNESS:  So, first I just -- I need to say that, you know, in preparing the reports, we prepared them in consultation with the City Attorney's Office, and received guidance from that office to ensure that what we submit is compliant.  There are multiple sections of the settlement agreement that address housing, but, in -- principally -- and this would not be exhaustive in any way -- Section 3.2 lays out the City's discretion, and broad discretion for the type of housing that could be provided.

BY MS. MYERS:

Q    And that's very helpful.  So that speaks to the type of housing that the City may create, the type of housing that falls into the definition of "housing or shelter solutions." I'm looking for the specific provision that speaks to your position that the settlement says that, in some way, facilitating the housing constitutes creating the housing or shelter solutions.

MR. MCRAE:  Your Honor, this is argumentative, and it's a legal interpretation, and it presupposes that he has to prove a negative.  It's the fact that there is no restrictive language on that discretion that informs the position, not that that has to be stated out.  So the

IV-81

agreement is silent on that point, so he's being asked to prove a negative, which is improper burden shifting.  It calls for a legal conclusion, and it lacks foundation.

MS. MYERS:  Your Honor, and I would just object to the extent to which counsel is giving broad speaking objections that appear to be coaching the witness about his answer, just generally.

MR. MCRAE:  I'm not trying to do that, your Honor.  This is not a lawyer, and it's important that he's being asked questions, to point to language for a proposition that the agreement doesn't speak to.

THE COURT:  Overruled.  He's also part of the settlement process.

THE WITNESS:  The settlement in 3.2 says the housing or shelter solutions may be government and/or privately funded.  So my non-legal opinion, my reading of that, means, suggests, number one, it doesn't say the housing or shelter may be City government funded.  It could be state government funded, it could be federal government funded, or some combination therein, and/or privately funded, "and/or privately funded" meaning it could be housing that isn't funded by any government entity at all.

So, to me, that is the broadest spectrum of -- all housing is going to require some kind of funding in some manner, if there's a program associated with it.  So, if

IV-82

it's a privately funded program that has literally no -- a privately funded program that is operating within the City of Los Angeles that provides housing, that we don't have -- that we don't dedicate funds to, it suggests to me that that would be allowable.

BY MS. MYERS:

Q    So, if a private entity created a shelter in Los Angeles, the City of Los -- is it -- based on this, it's your view that the City could count that as the City creating a new housing or shelter solution, pursuant to this agreement?

MR. MCRAE:  Your Honor, it's an incomplete hypothetical, and it calls for a legal conclusion.  It could be donated by a nonprofit to the City for the purpose of satisfying this obligation.

MS. MYERS:  Your Honor, this is -- I would object. This is very specifically coaching the witness on the substance of an answer.

MR. MCRAE:  Your Honor --

MR. UMHOFER:  (Indiscernible) objection, your Honor.

MR. MCRAE:  Your Honor, I'm trying to help the witness, who is not a lawyer --

MR. UMHOFER:  (Indiscernible.)

MR. MCRAE:  -- no, wait -- to make sure that he

IV-83

understands the question, and that's why the objection is being made, to make sure that there's on misinterpretation or misleading questions that he is not in a position to answer.  That's why I'm trying to get a restriction on the question through an objection, and to have it rephrased.

MR. UMHOFER:  Helping a witness is coaching a witness.

MR. MCRAE:  No.

MR. UMHOFER:  It's totally --

MR. MCRAE:  Not helping the witness testify or give him the answer, but helping him and the record, to clarify the nature of the question and ensure that it is proper, based on his personal knowledge, and not be a grouse hunt for provisions that don't exist.

MR. UMHOFER:  Counsel is very helpful in describing what coaching a witness is.

MR. MCRAE:  That's not --

MR. UMHOFER:  (Indiscernible.)

THE COURT:  All right.  I want to thank both of you for your comments.  It would be helpful if they weren't speaking objections.  It would also be helpful to shorten the time.

So, with that guidance, re-ask the question.

BY MS. MYERS:

Q    And I would just go back to my question about the

IV-84

creation of the housing.  So, if a private shelter is created in the City of Los Angeles with no funding from the City of Los Angeles, could the City count that towards its obligations under the Alliance, Section 3.2 -- 3.1?

MR. MCRAE:  Objection, vague, incomplete hypothetical, lack of foundation, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  I would consult with the City Attorney's Office before making any submission.

BY MS. MYERS:

Q    But what is your understanding of the settlement agreement?  Would you count that for purposes of the settlement agreement when you're preparing the reports?

MR. MCRAE:  Objection, vague --

THE COURT:  Overruled.

MR. MCRAE:  -- and legal conclusion.

THE COURT:  You can answer.

THE WITNESS:  I can speak to what we've reported, but, if you're going to provide a number of hypothetical situations, my answer is going to be the same, which is, in that hypothetical situation, I would consult with the City Attorney's Office before submitting the report to the Court.

BY MS. MYERS:

Q    And -- okay.  When you say, "In some way facilitate the

IV-85

creation of the housing," what, other than funding, would you consider to be facilitating housing that would allow the City of Los Angeles to count it as creating new housing or shelter solutions?

MR. MCRAE:  Objection, vague, calls for a legal conclusion, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  There could be a number of ways that that could happen.  I wouldn't list them all, but an obvious example would be that we provide the land and permitting for such a facility to be built, without actually funding it.

BY MS. MYERS:

Q   So permitting a shelter would constitute the City's contribution sufficient to be defined as creating new housing and shelter solutions?

MR. MCRAE:  Your Honor, can I have that said again?  I'm sorry.  I just didn't hear the first part of it.

THE COURT:  As a courtesy, would you restate that?

MS. MYERS:  Of course.

BY MS. MYERS:

Q   So the City issuing a permit for a shelter would be sufficient for the City to count that as creating a new housing or shelter solution under the agreement?

MR. MCRAE:  Objection, calls for a legal conclusion, argumentative, lack of foundation, relevance.

IV-86

THE COURT:  Overruled.

THE WITNESS:  I didn't say that.  That's a new question.  What I said is very often, when we identify land, that land isn't appropriately zoned for a particular type of housing that would be -- for housing, either interim or permanent housing, for homeless.  So, if we were to identify land, there would also be zoning and permitting components to that.

To your second, different question, I would consult with the City Attorney's Office.

BY MS. MYERS:

Q    And, to date, has the City included any projects where the sole contribution of the City was granting permits?

MR. MCRAE:  Objection, asked and answered, lacks foundation, relevance.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I don't believe so, no.

BY MS. MYERS:

Q    You said a number of things the City could do, so you said providing land, permitting, zoning variances.  What else would fall under the City's contributions, outside of funding, that would allow it to count a privately funded shelter towards housing or shelter solutions?

MR. MCRAE:  That calls for a legal conclusion.

IV-87

THE COURT:  Do you understand the question?

THE WITNESS:  (No response.)

THE COURT:  I'm going to ask you to restate the question, Counsel.

MS. MYERS:  Sure.

BY MS. MYERS:

Q    So you mentioned providing land, permitting, zoning variances as the City's contributions that would allow the City to count privately funded shelter or housing solutions. What else would the City consider a contribution that would allow it to count as creating housing or shelter solutions for purposes of the settlement agreement?

MR. MCRAE:  Objection, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  I gave you an example of one potential option.  I'm not going to speculate on any possible combination of other ways in which the City could create the required number.  If -- as those opportunities and if those opportunities arise, I would -- with the detail and context, I would provide that information to the City Attorney before reporting it to the Court.

BY MS. MYERS:

Q    And so does the settlement agreement include a definition of the word "create"?

IV-88

THE COURT:  Of the word --

MS. MYERS:  "Create."

MR. MCRAE:  Objection, the document speaks for itself.

THE COURT:  Overruled.

(Pause.)

THE WITNESS:  I don't believe so, and it doesn't appear to be listed under the definition section as a -- it doesn't appear to be listed in the definition section.

BY MS. MYERS:

Q    Okay.  And then, in response to my question about -- you had indicated in the settlement agreement that it gives broad discretion related to these specific questions, and you pointed to Section 3.2, and then we moved off.  So I want to give you a chance to identify any other parts of the settlement agreement that you're relying on when you say the settlement agreement gives wide discretion in terms of creating housing.

MR. MCRAE:  Your Honor, can I have a standing objection that this calls for a legal conclusion, these questions?

THE COURT:  Yes.

You may answer.

MR. MCRAE:  -- as well as, potentially, attorney-client privilege in terms of his understanding, and

IV-89

deliberative process privilege, standing objection?

THE COURT:  Thank you.  You have that objection noted.

You may answer the question.

THE WITNESS:  Can you repeat the question?

BY MS. MYERS:

Q    Sure.  When -- I asked you previously about the settlement agreement and what it means to create housing and shelter solutions, and you indicated that the settlement agreement provides broad discretion in terms of what the City needs to do to create housing.

You had identified Section 3.2, and I'm asking if there's any other provision in the settlement that you were relying on when you gave that testimony.  I just want to give you the opportunity to point out any other provisions of the settlement that speak to that particular issue, in your understanding.

MR. MCRAE:  Objection, calls for a legal conclusion, lack of foundation.

THE COURT:  Overruled.  You can answer the question, sir.  If you need time to look at the document --

THE WITNESS:  So --

THE COURT:  Once again, if you need time to look at the document, please take that time.

THE WITNESS:  Yes.  If you'd like -- if I'm going

IV-90

to answer the question as posed, and be asked to identify any and all areas of the settlement agreement, I'm going to sit here and read the settlement agreement.

THE COURT:  Yes.  Why don't you step down, then, for a moment, then, and take that time.  Okay?

THE WITNESS:  Very good.

THE COURT:  And you can talk to your counsel at any time.  All right?

THE WITNESS:  Okay.

THE COURT:  So, Counsel.

MS. MYERS:  Although, Your Honor, I would object to him speaking to the counsel while the question is pending, but, certainly, if you want to allow it --

THE COURT:  Well, I don't think, for either side, there's going to shockingly -- you can have access to your counsel at any time, Counsel.

So you may step down.

So about 10 minutes?  Would that be acceptable?

MR. MCRAE:  Sure, your Honor.  Thank you.

THE COURT:  Yes.  Take your time with the document.  Thank you.

(Proceedings recessed briefly.)

MR. MCRAE:  The Court to restart?

THE COURT:  Well, Mr. Szabo is reading the document, Counsel.

IV-91

MR. MCRAE:  He says he's not.

THE WITNESS:  I apologize.  I was --

THE COURT:  You were not.  You were looking down.

THE WITNESS:  I was just --

THE COURT:  I thought --

THE WITNESS:  I was just reviewing other things --

THE COURT:  -- you were still --

THE WITNESS:  -- while we were waiting.  Yes.
Thank you.

THE COURT:  Thank you.  And we're back in session.
All parties are present, Counsel, and thank you, Counsel.

MS. MYERS:  Right.

THE COURT:  And, Mr. Szabo, you've had time to
re-look at the document?

THE WITNESS:  I have, yes.

THE COURT:  Okay.  Thank you.

Counsel.

MS. MYERS:  Thank you, your Honor.

BY MS. MYERS:

Q    And so did you have a chance to -- or did you speak to
your counsel during the break?

A    I did.

Q    And so just going back to the question that I had,
which was, you had previously testified that the settlement
gives wide latitude for a broad interpretation of what it

IV-92

means to create housing and shelter solutions, and I was asking you to pinpoint where in the settlement agreement you've relied on for purposes of making that statement, other than Section 3.2, which you already identified.

MR. MCRAE:  Objection, calls for a legal conclusion, deliberative process privilege, and attorney-client privilege, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  So the settlement in its entirety provides broad flexibility in both the type of housing and the timing of when that housing is to be delivered, throughout.  As it relates to specific sections, for that, I rely on the counsel of the City Attorney's Office.

BY MS. MYERS:

Q    Okay.  So, when you testified previously that the settlement gives that wide latitude, you don't have any specific provisions to point to?

MR. MCRAE:  Objection, mischaracterizes the witness' testimony, and asked and answered.

THE COURT:  Sustained.  I think he's pointed to 3.2 and 3.1.

MS. MYERS:  Yes.

BY MS. MYERS:

Q    And so you spoke about -- just now you spoke about broad flexibility as to the type and the timing of when that

IV-93

housing is created.  Understandable.  I'm asking about a very specific question, which is separate and apart from the type of housing and when that housing is created, and that has to do with specifically what the City has to contribute to a housing or shelter solution for the City to count it as having created it.

MR. MCRAE:  Objection, it calls for a legal conclusion.  It lacks foundation.  Attorney-client privilege, deliberative process privilege.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  The agreement in its entirety provides the City with broad discretion and broad flexibility.  As it relates to the specific sections that provide that, I would rely on the City Attorney's Office and advice of counsel.

BY MS. MYERS:

Q    So broad flexibility as to the City's contribution for purposes of creating housing?

MR. MCRAE:  Objection, calls for a legal conclusion, lack of foundation, asked and answered, deliberative process privilege, attorney-client privilege, and the agreement speaks for itself.

THE COURT:  Overruled.

THE WITNESS:  The agreement provides broad

IV-94

flexibility throughout as it relates to the City's

responsibilities and the manner in which it can meet those

obligations.

BY MS. MYERS:

Q    And that includes what the City's contribution is, from

your perspective --

        MR. MCRAE:  Objection.

BY MS. MYERS:

Q    -- to count the housing solutions and shelter solutions

as being created by the City?

        MR. MCRAE:  Objection, asked and answered, calls

for a legal conclusion, lack of foundation, deliberative

process privilege, attorney-client privilege.

        THE COURT:  You can answer the question, sir.

        THE WITNESS:  I believe that's evident throughout

the document.

BY MS. MYERS:

Q    Okay.  So, for purposes of counting housing and shelter

solutions that the City has created for purposes of

compliance with Section 3.1, can the count beds that were

already in existence before the settlement was signed?

        MR. MCRAE:  Objection, calls for a legal

conclusion, incomplete hypothetical, lack of foundation,

deliberative process privilege, attorney-client privilege.

        THE COURT:  Overruled.  You can answer the

IV-95

question.

THE WITNESS:  I would need to rely on the advice of the City Attorney's Office, based on the specifics of the situation, of the hypothetical that you're providing.  It's a broad hypothetical.  I can't comment on that, but -- so I would rely on the City Attorney's Office if the situation arose that would include that hypothetical.

BY MS. MYERS:

Q    And has that situation arose that would include that hypothetical?

MR. MCRAE:  Objection, unintelligible as phrased, and calls for a legal conclusion, lack of foundation, deliberative process privilege, attorney-client privilege.

THE COURT:  Overruled.  These would be beds already in existence when the settlement occurred.

THE WITNESS:  Not to my knowledge.  However, then you have to -- would have to define "already in existence."  There are a number of structures that certainly preexisted the settlement agreement that are used for housing, and so, again, it would need to -- we would need to look at the specifics of the situation, and I would rely on the City's -- City Attorney's advice to determine whether they would be eligible.

BY MS. MYERS:

Q    Well, let me -- let's not ask a hypothetical, then.

IV-96

Let me ask you specifically about the -- some specifics in here.  Give me just one second.  Okay.  And this is Exhibit 302.  It is Document 392.1.  I'm going to go down to the Mayfair Hotel.  Are you familiar with the Mayfair Hotel?

A    I am, and I think you just passed it.  Go up a little bit.

Q    There we go.  Is that better?  No.

A    Thank you.

Q    Sorry about that.  Okay.  There we go.  It's line 66, the Mayfair Hotel?

A    Yes.

Q    Are you familiar with the Mayfair Hotel?

A    I am.

Q    Okay.  Were the beds -- if you're aware, were the beds in the Mayfair Hotel in existence prior to the signing of the settlement agreement?

MR. MCRAE:  Objection, vague as to "the beds," lack of foundation, calls for a legal conclusion, and relevance.

THE COURT:  Overruled.

THE WITNESS:  The Mayfair has been in existence for 100 years.

BY MS. MYERS:

Q    And there are -- and the City is counting 294 beds -- as having created 294 beds?

IV-97

MR. MCRAE:  Objection, your Honor.  That's a statement.  It's not --

THE COURT:  Sustained.

BY MS. MYERS:

Q   Yes.  So the City is counting 294 beds in the Mayfair Hotel as having created them for purposes of the settlement, correct?

MR. MCRAE:  Objection, your Honor.  It calls for a legal conclusion, it lacks foundation, deliberative process privilege, attorney-client privilege.

THE COURT:  Overruled.

THE WITNESS:  Correct, yes.

BY MS. MYERS:

Q   Okay.  And what about the beds that were in existence prior to the signing of the settlement?  What -- let me back up and ask that differently.  What was the City's contribution that allows the City to count beds that were already in existence prior to the settlement as having created new housing or shelter beds?

MR. MCRAE:  Your Honor, objection, calls for a legal conclusion, lack of foundation, attorney-client privilege, deliberative process privilege.

THE COURT:  Overruled.  You may answer the question, sir.

THE WITNESS:  You're referring to the Mayfair?

IV-98

BY MS. MYERS:

Q    Yes, exactly.

A    What was the action by the City that allows us to count the beds?  Was that the question?  I'm sorry.

Q    Yes.

A    The City purchased the Mayfair.

Q    Okay.  So it's -- in that instance, the beds were in existence.  The City purchased the building, and so the City is now counting them as creating housing and shelter solutions, correct?

        MR. MCRAE:  Objection, calls for a legal conclusion, lack of foundation, attorney-client privilege, deliberative process privilege.

        THE COURT:  Overruled.

        THE WITNESS:  Yes.

BY MS. MYERS:

Q    Prior to the City's purchase of the Mayfair, what was your understanding about how the beds were being used at the Mayfair?

        MR. MCRAE:  Objection, relevance --

        THE COURT:  Overruled.

        MR. MCRAE:  -- lack of foundation.

        THE COURT:  Overruled.  You can answer the question, sir.

        THE WITNESS:  The Mayfair was vacant when we

IV-99

purchased it.

BY MS. MYERS:

Q    Do you know how long it had been vacant?

         MR. MCRAE:  Relevance, lack of foundation.

         THE COURT:  Overruled.  You can answer the question, sir.

         THE WITNESS:  I don't know how long it had been vacant.  I don't know.  I don't know how long it had been vacant.  It had been vacant for some time.

BY MS. MYERS:

Q    Okay.  So I'm going to ask you about my Number 95.

         THE COURT:  Did you say 95?

         MS. MYERS:  95, yes.

         THE COURT:  Thank you.

BY MS. MYERS:

Q    It's the Stuart Hotel, and, according to this agreement, it appears that the City is counting 60 units within the Stuart Hotel as interim housing, pursuant to a hotel and motel occupancy agreement.  Is that correct?

         MR. MCRAE:  Objection, your Honor, lack of foundation, calls for a legal conclusion.

         THE COURT:  Overruled.

         THE WITNESS:  That is correct.

BY MS. MYERS:

Q    Are you familiar with the Stuart Hotel?

IV-100

A    I am not familiar with the Stuart Hotel.

Q    And so are you aware of, prior to the City entering into a hotel and motel occupancy agreement, how the Stuart Hotel was used?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I'm not aware.

BY MS. MYERS:

Q    Okay.  Are you aware of the Residential Hotel Unit Conversion and Demolition Ordinance for the City of Los Angeles?

MR. MCRAE:  Relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I am aware of it.  I'm not an expert in any way on that ordinance.

BY MS. MYERS:

Q    Do you know generally what the ordinance provides?

MR. MCRAE:  Objection, relevance, lack of foundation --

THE COURT:  Overruled.

MR. MCRAE:  -- calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  I would not be able to speak to that ordinance.

//

IV-101

BY MS. MYERS:

Q    Okay.  Are you aware whether or not the CAO's office takes into account whether or not a building is required to be used as affordable housing before the City considers whether to count it was new housing or shelter?

MR. MCRAE:  Your Honor, this is irrelevant, and clearly in aid of another litigation, lacks foundation, calls for a legal conclusion.

THE COURT:  Overruled.

MS. MYERS:  Your Honor, I'd like to address that. That's entirely inappropriate, to make those suggestions about me or the Intervenors.  There is no basis whatsoever to make that statement, and then they've now done that twice.

THE COURT:  All right.  Overruled.

THE WITNESS:  Can you repeat the question?

BY MS. MYERS:

Q    Sure.  Are you aware whether or not there is any requirement -- when you qualify a building as counting towards the LA Alliance settlement, do you take into account whether or not those units were being used as affordable housing prior to counting them as units created for purposes of the settlement agreement?

MR. MCRAE:  Objection, calls for a legal conclusion, lack of foundation, deliberative process

IV-102

privilege, attorney-client privilege, calls for speculation, and vague.

THE COURT:  Overruled.

THE WITNESS:  We take into account the existence of a bed, and whether the bed is open and occupiable to house people experiencing homelessness, which is what the Stuart Hotel is presently used for.

BY MS. MYERS:

Q    Do you know if it was previously open and occupiable as available to house people previously experiencing homelessness before the City counted it towards the settlement agreement?

MR. MCRAE:  Objection, lack of foundation, relevance, calls for speculation, legal conclusion, deliberative process privilege, attorney-client privilege.

THE COURT:  Overruled.

THE WITNESS:  I'm not aware.

BY MS. MYERS:

Q    I'm going to direct you to Number 50.

THE COURT:  What number, Counsel?

MS. MYERS:  Number 50.

THE COURT:  Fifty, five, zero?  Thank you.

MS. MYERS:  Yes.

BY MS. MYERS:

Q    Actually I'm going to direct you towards 51.

IV-103

Yesterday, during your testimony, you were directed to Number --

THE COURT:  Is it 50 or -- I'm sorry -- 50 or 51?

MS. MYERS:  50, 51, and 52 --

THE COURT:  All right.  My apologies.

MS. MYERS:  -- 60 and 62.  They were all asked about together, separately, so I'm going to ask about them now.

BY MS. MYERS:

Q    Yesterday you testified about 51, 52, and 53, as well as 60 and 62, as buildings that are now subject to a master lease, correct?

A    I did, yes.  I believe there are more than just those six in our report, but yes, those are PSH master lease units.  Yes.

Q    Okay.  And what does it mean to "master lease" the unit?

MR. MCRAE:  Objection, calls for a legal conclusion --

THE COURT:  Overruled.

MR. MCRAE:  -- lack of foundation.

THE COURT:  You can answer the question.

THE WITNESS:  Master leasing is typically when an entity, in this case a service provider, leases out all or part of a building for the purposes of housing individuals

IV-104

formerly experiencing homelessness.

BY MS. MYERS:

Q    Do you know if any of these buildings, these apartment buildings, were occupied prior to the City counting them towards the settlement agreement, as creating new housing and shelter?

THE COURT:  And, to be specific, is that still on 50, 51, 53, 60, and 62?

MS. MYERS:  Your Honor, I'm happy to go through them.

BY MS. MYERS:

Q    Let's talk specifically about Number 51.  That's 1203 Rolland Curtis Place, and that's 19 units.

A    Can you slide the document over a little bit?

Q    Sure.  "Nineteen people served."

A    A little bit more, because we have a date in which it was opened.

Q    Yes.  Is that not on there?

A    It's --

THE COURT:  No, we can't see.

BY MS. MYERS:

Q    I think it needs to catch up.  Sorry about that.

A    Yes.  Okay.  Very good.  So, yes.  It was -- I'm sorry. It was 1204 Rolland Curtis Place, correct?

Q    Yes.

IV-105

A    Okay.  So we're reporting that that was open as of 12 -- the 1st of December of 2023.

Q    Yes.  And do you know if 1203 Rolland Curtis place is new construction?

MR. MCRAE:  Objection, vague, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't know whether it's new construction, no.

BY MS. MYERS:

Q    And the City -- the reason why -- as I understand from your testimony yesterday, the reason why the City is counting it as creating a new housing or shelter solution is that the City entered into a master lease, for the leasing of those 19 units, correct?

MR. MCRAE:  Objection, lack of foundation, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  So the City did not enter into a master lease.  There is a service provider which has entered into a master lease that is on contract with LAHSA.  The reason that we are counting -- and you may have the same question on all of these.  Why are master lease units showing that they're open prior to the report, prior to the third quarterly report, and yet why are we just counting

IV-106

them now?  It's because we are counting the beds.  We are counting these units because we -- because they are used as part of the Inside Safe program, as the permanent housing -- as part of the permanent housing solution, to take the folks from the hotels to the permanent housing.

So, once we started using these motels, which were already -- I will acknowledge they were already in use, but, once we started using them for master lease -- excuse me -- for Inside Safe clients, and paying for them through the homelessness emergency account, and they are permanent housing, we started to count them as units that are available for individuals experiencing homelessness.

THE COURT:  Counsel, just a moment.  Thank you. Please continue.

BY MS. MYERS:

Q    I'm actually asking a little bit of a different question, which is, it is the City's master leasing of the apartment complex that allows you to count that -- these 19 units as creating new housing or shelter solutions, correct?

MR. MCRAE:  Objection, calls for a legal conclusion, lack of foundation, vague, deliberative process privilege, attorney-client privilege.

THE COURT:  Overruled.

THE WITNESS:  Again, I will say the City does not have the master lease contract with the complexes directly.

IV-107

It's through a service provider, in which we are contributing funds for the master lease, for LAHSA.

BY MS. MYERS:

Q    Okay.  So it's the City's contribution of funds towards the contract -- towards the service provider that is master leasing these apartment buildings -- that is allowing the City to count it as creating new housing and shelter solutions, correct?

        MR. MCRAE:  Objection, calls for a legal conclusion, lack of foundation, attorney-client privilege, deliberative process privilege, and vague.

        THE COURT:  Overruled.

        THE WITNESS:  That's not what I said.  I was just correcting -- I was correcting the statement that the City master leased, but these are units that are actively and presently serving individuals experiencing homelessness through the Inside Safe program that the City is paying for. I'm not limiting the qualification for those units to just the statement that you made, but they are units that exist that are serving people who were formerly living on the street.  So, yes, we are counting those units.

BY MS. MYERS:

Q    And that's where I'm tripping up.  These are people who were formerly homeless who are now in these units, correct?

A    Correct.  To the extent that it's permanent housing, we

IV-108

would say, "Formerly homeless," yes.

Q    Okay.  So permanent units housing people who were formerly homeless, so no longer homeless but were formerly homeless, and is it that fact that allows it to be counted, or is the fact that the City is paying for it that allows it to be counted?

MR. MCRAE:  It's compound, with the "or."  It lacks foundation.  It calls for a legal conclusion.  It's vague.  Attorney-client privilege, deliberative process privilege.

THE COURT:  Overruled.

THE WITNESS:  So, again, I'm not determining the manner in which they qualify.  I said -- as I said, we consulted with our City Attorney.  I'm just stating the fact that these units are being used to house people that, as of at least 2022 or 2023, were living on the street, and, as a result of the Inside Safe program, are no longer living on the street, and they are now living in permanent housing. That is paid for by the City.  Yes, those qualify.

BY MS. MYERS:

Q    Okay.  Do you know if, prior to the City placing people and paying for people who were formerly experiencing homelessness into those units, if those units were occupied as apartments?

MR. MCRAE:  Objection, relevance.

IV-109

THE COURT:  You mean market value apartments or --

MS. MYERS:  I'm starting with a baseline of apartments.  I'm going to ask further, but --

THE COURT:  Overruled.

THE WITNESS:  I don't know.

BY MS. MYERS:

Q    Do you know if they were affordable units?

MR. MCRAE:  Relevance, your Honor, and also vague.

THE COURT:  Overruled.

THE WITNESS:  I don't know.

BY MS. MYERS:

Q    Do you know anything about the apartments for purposes of calculating these reports?

MR. MCRAE:  Objection, vague, your Honor.

BY MS. MYERS:

Q    About how they were used prior to the City counting them as creating new housing and shelter solutions?

THE COURT:  Overruled as to your prior objection.

MR. MCRAE:  Yes.  I was just saying, "Vague" as to which -- I don't know what properties we're talking about here.

THE COURT:  Well, let's make certain that the witness does.  Do you understand the question, sir?  If not, she can restate it.

THE WITNESS:  Well, the question was related to

IV-110

the Rolland Curtis Place property.  Is that right?

BY MS. MYERS:

Q    Sure, yes.  Let's limit it to Rolland Curtis.

A    And I had already -- I have already stated that I'm not aware of the use of the property prior to it being part -- included in the master lease program that is currently serving clients of Inside Safe.

Q    Okay.  And how about the -- then looking at Number 50, 1200 Leighton Avenue, 90037?

MR. MCRAE:  Objection, incomplete --

MS. MYERS:  I can finish my question, if that would be helpful.

MR. MCRAE:  Yes.

BY MS. MYERS:

Q    Okay.  Looking at 1200 Leighton Avenue, 90037, which is Number 50, are you aware of how that structure was used prior to the City counting it towards the LA Alliance compliance requirements under Section 3.1 of the settlement agreement?

MR. MCRAE:  Your Honor, could we have a relevance proffer?

THE COURT:  No.  I don't think it's necessary, Counsel.

You can continue.

THE WITNESS:  I'm not aware.

IV-111

BY MS. MYERS:

Q    Okay.  And Number -- we already talked about Number 51. Number 52, which is 4222 Dalton Avenue, 90062, which is 27 units that are in the LA -- that are counted towards the LA Alliance settlement agreement.  Are you aware of how those units were used prior to the City counting them towards its compliance with the LA Alliance settlement agreement?

            MR. MCRAE:  Objection, vague, lack of foundation, relevance.

            THE COURT:  Overruled.

            THE WITNESS:  I'm not aware.

BY MS. MYERS:

Q    And so, as to Number 53, 639 East 21st Street, 90011, where 21 units are counted towards the LA Alliance settlement agreement as permanent supportive housing pursuant to a master lease, are you aware of how those units were used prior to the City counting them towards the LA Alliance settlement agreement as newly created housing or shelter beds?

            MR. MCRAE:  Objection, vague, lack of foundation, calls for a legal conclusion.

            THE COURT:  Overruled.

            THE WITNESS:  I'm not aware.

BY MS. MYERS:

Q    Okay.  The same question as to Number 60, which is 1261

IV-112

to 1269 Rolland Curtis Place, which is 28 units that the City is counting as permanent supportive housing master leased towards its compliance with the LA Alliance agreement. Are you aware of how those units were used prior to the settlement -- prior to the City counting them?

MR. MCRAE: Objection, vague, relevance, lack of foundation, calls for a legal conclusion.

THE COURT: Overruled.

THE WITNESS: I'm not aware.

BY MS. MYERS:

Q   Okay. Number 62, which is 1603 West 36th Place, 90013, which is 81 units, counted as permanent supportive housing pursuant to a master lease in the LA Alliance settlement agreement, are you aware of how those units were used prior to the City counting them towards the LA Alliance settlement agreement?

MR. MCRAE: Same objection, relevance, lack of foundation, vague, calls for a legal conclusion.

THE COURT: Overruled.

THE WITNESS: I'm not aware.

BY MS. MYERS:

Q   Okay. So, as to 920 South Gramercy Place, 90019, which is 56 units of permanent supportive housing under a master lease, which is Number 77 on the report, are you aware of how those units were used prior to the City counting them

IV-113

towards the settlement agreement?

MR. MCRAE:  Objection, relevance, lack of foundation, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MS. MYERS:

Q   So Number 79, 1317 South Grand Avenue, 90015, 146 units of permanent supportive housing pursuant to a master lease, are you aware of how the City was using those units prior to recording them as part of the LA Alliance settlement agreement compliance?

MR. MCRAE:  Objection, vague, lack of foundation, relevance, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MS. MYERS:

Q   So Number 80, 1343 West 40th Place, 19 units of permanent supportive housing pursuant to a master lease, are you aware of how those units were used prior to the settlement -- the City counting them towards the settlement agreement?

MR. MCRAE:  Objection, vague, relevance, lack of foundation, calls for a legal conclusion.

MS. MYERS:  And if the City would like a standing objection as to the rest of these, that's -- that would be

IV-114

fine.

THE COURT:  Overruled.  I'll let you two work out a standing objection, if you'd like.

MR. MCRAE:  Yes, I would like a standing objection.

THE COURT:  There's a standing objection, then.

THE WITNESS:  No.

BY MS. MYERS:

Q    Okay.  And as to Number 80, 1343 West 40th Place, 90037, 19 units of permanent supportive housing pursuant to a master lease, are you aware of how those units were used prior to the City counting them?

MR. MCRAE:  Objection, your Honor, lack of foundation, calls for a legal conclusion.

THE COURT:  Overruled.

MR. MCRAE:  Vague, relevance.

THE COURT:  Well, if you have a standing objection, Counsel, you don't have to repeat it each time.

MR. MCRAE:  Okay.

THE COURT:  All right.  Overruled.

THE WITNESS:  No.

BY MS. MYERS:

Q    As to Number 86, which is permanent supportive housing, which is 6501 South Broadway, 90003, which is 49 units, are you aware of how those units were used prior to permanent

IV-115

supportive housing -- pardon me -- prior to the LA Alliance using them -- counting them towards the settlement agreement compliance?

A      No.   That was -- there we go.   No.

Q    Okay.   And then I just want to go back really quickly to the individuals who are in the -- in these particular units.   You said they're now in permanent supportive housing pursuant to the Inside Safe as part of a master lease.   Is that correct?

A      The units are available to the Inside Safe program for permanent housing.   So I can't speak to the individuals that are -- who are currently housed in the units, but it is -- those are units that are available to Inside Safe.

Q    And are the individuals in those units paying rent?

          MR. MCRAE:   Objection, relevance.

          THE COURT:   Could you state that question again? I didn't hear the last portion.

          MS. MYERS:   Sure.

BY MS. MYERS:

Q    Are the individuals in those units paying rent?

          THE COURT:   Overruled.   You can answer the question.

          THE WITNESS:   I don't believe so, but I would need to confirm that.

          THE COURT:   And I'm assuming either VASH or

IV-116

Section 8?

MS. MYERS:  Well, that is one of my questions, your Honor.

BY MS. MYERS:

Q    If they -- and it sounds like you may not notice, but you may be able to find the answer, but this specific question -- individuals in those units are paying rent.  Are they receiving any subsidies?

MR. MCRAE:  Objection, assumes facts, and also relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I can't speak to the individuals and how they're financed.  I can speak to the master leasing making the units available, which is the obligation of the settlement.

BY MS. MYERS:

Q    Sure.  Do you know if they're receiving time-limited subsidies?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I can't speak to that.

BY MS. MYERS:

Q    Okay.  And who would be able to answer that question?

MR. MCRAE:  Objection, calls for speculation.

IV-117

THE COURT:  Overruled.

THE WITNESS:  This is a program which is run by a service provider on contract with LAHSA.

BY MS. MYERS:

Q    Do you know which service providers?

MR. MCRAE:  Objection, vague as to time, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't.  I don't have -- I have, certainly, records of it, but I don't recall at this time.

BY MS. MYERS:

Q    And do you know if it's one service provider or multiple service providers who are running the master leases for these buildings?

MR. MCRAE:  Relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I'm not certain.

BY MS. MYERS:

Q    When you counted these units, did you verify whether any of the residents in any of these buildings were using time-limited subsidies that were being counted towards the Road Map agreement?

MR. MCRAE:  Asked and answered, lack of foundation, relevance.

THE COURT:  Overruled.

IV-118

THE WITNESS:  I don't know.

BY MS. MYERS:

Q    Do you know if any of the time-limited subsidies that the City of Los Angeles is counting towards the Road Map agreement are being used in any of the units that the City is counting towards the LA Alliance settlement?

MR. MCRAE:  Objection, vague, lack of foundation.

THE COURT:  No, overruled.  You can answer the question.

THE WITNESS:  I don't believe so.  I don't believe so, but I don't know.

BY MS. MYERS:

Q    If you don't believe that, what is your belief based on?

MR. MCRAE:  Objection to the extent that it calls for communications with counsel or is informed by those communications, deliberative process.

THE COURT:  Would you state the question again.  I didn't hear a portion of it.

BY MS. MYERS:

Q    You said you don't believe so.  I'm wondering what the basis is for your belief that that is not the case.

MR. MCRAE:  Same objections, your Honor, as to the source of the belief.

THE COURT:  Overruled.

IV-119

THE WITNESS:  We have not reported any time-limited subsidies in our quarterly reports for compliance with the Alliance settlement.

BY MS. MYERS:

Q   And I'm asking specifically about the roughly 2,200 that the City is reporting towards the Road Map agreement that is the basis of why we're here.

MR. MCRAE:  That's -- your Honor, I'd object to the characterization that "That's why we're here."

THE COURT:  Just a moment.  Just restate the question.

MS. MYERS:  Sure.

BY MS. MYERS:

Q   I'm asking specifically about the time-limited subsidies that the City is counting towards compliance with the Road Map agreement.  Understanding that TLS subsidies are not part of the Alliance agreement, I'm asking whether any of the time-limited subsidies the City is counting towards the Road Map are subsidizing units that the City is counting towards the LA Alliance settlement.

MR. MCRAE:  Your Honor, asked and answered, if I follow.  Also, relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't know.  As you know, the program, the TLS program, is -- there are multiple sites,

IV-120

and we would need to confirm that with the contracts.

BY MS. MYERS:

Q    So -- and I didn't do a good job when I restated my question.  I'm asking about the basis for your belief.  So I was asking, what is the basis for your belief that that is not occurring?

MR. MCRAE:  Same objections as to invading, potentially, attorney-client privilege, deliberative process privilege.

THE COURT:  Overruled.  You may answer the question.

THE WITNESS:  What I stated was that we were not counting time-limited subsidies for our quarterly report.  To your specific question, I would need to confirm that.

BY MS. MYERS:

Q    Okay.  Thank you.  And who would you speak to to confirm that?

A    I would not be prepared to give you a name of an individual.  That is a program run the LAHSA and a service provider, so we would need to go that route.

Q    Okay.  And you haven't done that in preparation of the quarterly reports, correct?

MR. MCRAE:  Objection, vague, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I'm not sure.  I can't answer that.

IV-121

BY MS. MYERS:

Q    Okay.  Let me go back to the settlement agreement.  I'm sorry.  I'm going to go back to Section Five of the settlement agreement, which you have before you, and particularly Section 5.2.  Are you familiar with Section 5.2 of the settlement agreement?

A    Yes, I am.

Q    And, specifically, are you familiar with 5.2, Section Two, which states that:

            "The City will create plans and develop
            milestones and deadlines for the City's
            plan for encampment engagement,
            cleaning, and resolution and reduction
            in each council district"?

      Are you familiar with that provision?

A    I am familiar with that provision, yes.

Q    Okay.  And then, as well, Section 5.2, Section Four, which states that "The City's plan for encampment engagement, cleaning, and reduction in the City."  You're familiar with that section?

A    I am familiar with that section.

Q    Okay.  When you helped negotiate the settlements, what was your understanding of the City's obligations under those two provisions?

            MR. MCRAE:  Objection, calls for a legal

IV-122

conclusion.

THE COURT:  Overruled.

MR. MCRAE:  And deliberative process privilege, attorney-client privilege.

THE COURT:  Overruled.

THE WITNESS:  My understanding is that the obligation was to provide plans, develop milestones and deadlines for each of those items that are listed, encampment engagement, cleaning, and reduction, on the council district level and on a citywide level, and to provide those to the Plaintiffs and the Court.

BY MS. MYERS:

Q    And did the City ever come up with the plan for encampment engagement, cleaning, and reduction?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  We did.

BY MS. MYERS:

Q    And are you familiar with the terms of those plans?

A    I am familiar with the terms of the plans, although the engagement and cleaning documents were provided some time ago.  So I wouldn't have complete recall of each of the specifics of the documents.

Q    Okay.  But you are generally familiar with them?

A    Yes.

IV-123

Q    Okay.  And, again, you previously said that you had negotiated plans and agreements related to the litigation. Were you involved in the negotiations related to the plans, these plans and milestones, pursuant to Section 5.2?

MR. MCRAE:  Objection, vague as stated, your Honor.

THE COURT:  Overruled.

THE WITNESS:  I was involved in some manner, yes.

BY MS. MYERS:

Q    Okay.  Do you know -- and do you know when these plans were adopted by the City?

A    When the plans were adopted by the City?  The -- I don't know, and I don't think that there is a specific date as it relates to encampment cleaning, because the encampment cleaning document was a reflection of the City's encampment cleaning program, which has been ongoing for several years.

The encampment engagement document, I believe, involved a -- I don't want to comment on that, but I don't believe that that was adopted by the City, but it reflected our ongoing policies and procedures.  And the encampment reduction, again, I don't recall the date, but that was developed and approved by the City Council at some point later.  I don't remember the date.

Q    Okay.  Speaking about the encampment engagements plan, was that plan ever presented to the Court, if you know?

IV-124

MR. MCRAE:  Objection, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I don't recall if there was a submission from the City Attorney.  I don't recall.

BY MS. MYERS:

Q    Okay.  Was that -- is that plan publicly available?

MR. MCRAE:  Same objection, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I don't know if it is.  I don't know if it is.

BY MS. MYERS:

Q    Do you remember what the contents of the encampment engagement plan was?

MR. MCRAE:  Objection.  If it's not publicly available, just asserting could be potentially subject to a privilege, attorney-client privilege, deliberative process privilege.

THE COURT:  Overruled.

THE WITNESS:  I don't recall the details of that plan, and I don't believe that you've submitted it for review, have you?

BY MS. MYERS:

Q    I'm sorry.  I missed --

A    I don't have -- I don't recall the details of the plan.

Q    Okay.  And you don't believe it was submitted for

IV-125

review?  Can you clarify?

A    No, no.  You did not submit it, so I can't review it here.  Yes.

Q    No, I do not have it.

A    Okay.

Q    And the encampment cleaning plan, similarly, can you tell us what's in the encampment cleaning plan?

MR. MCRAE:  Same -- lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Again, the details -- I don't recall the details.  This was several years ago that it was submitted.  But, as I recall, it generally described our encampment cleaning program, principally Care and Care Plus.

BY MS. MYERS:

Q    Okay.  So, for purposes of the encampment cleaning, do you know if it set any milestones of how many Care and Care Plus operations needed to be conducted?

MR. MCRAE:  Objection, calls for a legal conclusion, lacks foundation.

THE COURT:  And this was as to cleaning?

THE WITNESS:  Yes, the encampment cleaning process.

THE COURT:  Overruled.

THE WITNESS:  I don't recall.  I'd have to review the document.

IV-126

BY MS. MYERS:

Q    Okay.  And was that plan approved by the City Council?

        MR. MCRAE:  Objection, lack of foundation.

        THE COURT:  Overruled.

        THE WITNESS:  Not that I recall directly.
Indirectly, in the funding and establishment of the Care and
Care Plus program, yes, but I don't believe the plan itself
was -- I don't believe the plan itself was approved by the
City Council.

BY MS. MYERS:

Q    Okay.  And so, then, the encampment reduction plan, you
said that was approved by the City Council?

        MR. MCRAE:  Objection, mischaracterizes the
witness' testimony.  Also, lack of foundation.

        THE COURT:  Overruled.

        THE WITNESS:  So, your Honor, this would get into
conversations that took place in closed session.

        THE COURT:  All right.  Thank you.

        MS. MYERS:  Your Honor, I'm not asking for the
contents of any conversation.  I'm asking whether an
agreement was approved by the City Council.

        THE COURT:  You can answer that question, but no
conversation concerning closed session, or with the mayor or
any other councilperson.

        THE WITNESS:  It was approved.

IV-127

BY MS. MYERS:

Q   Okay.  I'm going to show you what's been marked as -- it's Plaintiffs' Exhibit 47.  This is Exhibit I -- I'm sorry.  This is Exhibit 47.  I'm going to show you this.  Is this what was approved by the City Council as the encampment reduction plan?

MR. MCRAE:  Objection, deliberative process privilege, attorney-client privilege, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  This appears to be the plan that was approved, yes.

BY MS. MYERS:

Q   Okay.  And I'm not trying to trip you up.  I'm just looking for some clarification.  I'm going to show you what's been marked as 55.  I'm going to go to what's been marked -- well, it was Exhibit J.  This was also submitted to the Court on February 27, 2024.  Apologies.  It's backwards.  This is a little bit different version of a similar document.

MR. MCRAE:  Your Honor, counsel is testifying.  Is there a question to the witness as to whether it's different?

MS. MYERS:  Sorry.  Fair.  I'll withdraw that.

BY MS. MYERS:

Q   Providing this to you (indicating).  Was this the

IV-128

encampment reduction plan that was approved by the City Council?

MR. MCRAE:  Same objections, lack of foundation, attorney-client privilege, deliberative process privilege.

THE COURT:  Overruled.

THE WITNESS:  So, look.  I appreciate that you indicated that you weren't trying to trip me up.  This document looks very, very similar.  I don't know if there were differences.  Thank you.  And, honestly, I wouldn't be able to tell you which one.  I wouldn't be able to tell you. I'm going to -- I'm not going to assume, either, but, if this was what was submitted -- I just -- I just don't know. These are similar in appearance.  There are slightly different numbers, it looks like, with the same total goal. So I can't tell you which one was approved and which one -- or even the origin of the first one.

BY MS. MYERS:

Q    Okay.  And, again, I'm not trying to trip you up, using the evidentiary hearing for purposes of developing the record, trying to establish what the encampment reduction plan was that was approved by the City Council.  As you sit here today, was it one of them?

MR. MCRAE:  Objection, your Honor, lack of foundation.

THE COURT:  Could you state that again?  That was

IV-129

too quick.

BY MS. MYERS:

Q    There are two encampment resolution plans that were submitted in this court as the encampment reduction plan approved by the City Council, and used in these proceedings. I'm trying to identify which one was approved by the City Council.

          MR. MCRAE:  Your Honor, my objection would be to saying they were both approved and submitted as such.  The record will speak for itself, the capacity in which they were submitted, and so I just want to make sure that that is lodged.

          THE COURT:  Overruled.  You can answer the question, sir.

          MR. MCRAE:  And a lack of foundation.

          THE WITNESS:  Look.  I -- the information is just organized in a slightly different way.  The aggregate milestone is the same.  It's slightly different.  So I would need to go back in my records to look at -- I mean, they're just too similar, and they look exactly the same.  There's just slight variations in numbers.  So I cannot tell you with certainty which is which.

BY MS. MYERS:

Q    Sure.  And is it possible for you to go back in your records and identify which your understanding is that the

IV-130

City Council approved?

MR. MCRAE:  Objection, assumes facts.

THE COURT:  Would you state that again, Counsel.

BY MS. MYERS:

Q    I was asking, Mr. Szabo, would it be possible for you to go back in your records and determine which one the City Council approved?

MR. MCRAE:  Assumes facts.

THE COURT:  Overruled.

MR. MCRAE:  Lack of foundation.

THE WITNESS:  I mean, I don't know until I did, unless I did (sic), but I don't know.  I don't know for certain.

BY MS. MYERS:

Q    And the intervening milestones are different between the two, correct?

MR. MCRAE:  Relevance and lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  They are slightly different, and -- yes, there's a slight difference.

BY MS. MYERS:

Q    And which one, Mr. Szabo, is the CAO's office using for purposes of reporting its compliance with the encampment milestones?

MR. MCRAE:  Objection, assumes facts.

IV-131

THE COURT:  Overruled.

THE WITNESS:  I believe it's the second one, but I would need to confirm that.  I would need to confirm that.

THE COURT:  Is the second one on the screen now?

THE WITNESS:  I'm sorry.  Exhibit -- I believe it's Exhibit 65.  Yes, Exhibit 65, the intervening milestones.

THE COURT:  Let's make certain.  Let's get the -- let's make certain it's the right ones up on the screen.  Why don't you take a look at the screen for a moment.  Is this the one that you believe is being submitted to the Court?

MS. MYERS:  And I can --

THE COURT:  I know it's sideways, but --

THE WITNESS:  Yes.  Well, if you -- can you go -- I guess go down, so we can go left?

THE COURT:  Let's move that up a little bit.  There we go.

BY MS. MYERS:

Q    And apologies.  I will rotate that in just a minute.

A    Sure.

Q    Let's see.  Those are the milestones (indicating)?

A    Yes.  Those appear to be the milestones that we're using in our reporting.

Q    Okay.

IV-132

A     Yes.

Q     So that is Exhibit 65, which is Document 668-1, which was filed on February 7th, 2024, with the Court.  Okay. Thank you for that.  And so this chart constitutes the encampment reduction plan that was approved by the City Council, correct?

          MR. MCRAE:  Objection, asked and answered, lack of foundation.

          THE COURT:  Overruled. Let's confirm that.

          THE WITNESS:  I believe so, yes.

BY MS. MYERS:

Q     Is this the entirety of the plan that was approved by the City Council --

          MR. MCRAE:  Lack of foundation.

BY MS. MYERS:

Q     -- for purposes of encampment reduction?  Now, for purposes of this line of questioning, I'm going to put aside engagement and cleaning.  We're going to talk only about encampment reduction plans.  So, for purposes of the encampment reduction plan, is this the entirety of the plan that was approved by the City Council?

          MR. MCRAE:  Objection to the preamble.  It assumes that there was a distinctions (sic).  Also, lack of foundation, and to the extent it invades deliberative process privilege or attorney-client privilege.

IV-133

THE COURT:  Overruled.

THE WITNESS:  So now we would be directly entering into our closed session conversation, and briefing of counsel.

BY MS. MYERS:

Q    I'm not asking about what was said.  I'm asking solely about the plan that was approved by the City Council.  That was provided to Plaintiffs, so there's -- I'm not asking for attorney-client privilege.  I'm asking about the plan that was approved.

MR. MCRAE:  Your Honor, objection to that, because there's no question about what is being asked, but, to the extent it's seeking the fruit of discussions with counsel, it's a distinction without a difference, as far as invading the privilege.

THE COURT:  No, this is approval by the council.  This doesn't involve communication.  It's overruled.

MR. MCRAE:  Or closed session.  Excuse me.

THE COURT:  Thank you.  Overruled.

THE WITNESS:  So there was -- again, I'm going to have -- there was discussions --

THE COURT:  I'm going to just caution you.  No conversation.  I don't want to know any communication.  I just want to know if this was approved by the council.

THE WITNESS:  Yes, this was approved by the

IV-134

council.

THE COURT:  Thank you.

BY MS. MYERS:

Q    And I'm just asking to clarify.  Is this the entirety of the agreement -- or the plan -- that was approved by council?  Is this chart, and the milestones and the deadlines therein?

MR. MCRAE:  Your Honor, objection that that could branch into deliberative process privilege, closed session, and attorney-client privilege.

THE COURT:  Maybe the importance of this is what's been submitted to the Court, and so this deliberative process, though, gets interesting in closed session with counsel, which you have the prerogative, but, also, these potentially are public documents, subject to public scrutiny, and I'm not certain why you would be an executive session, nor am I inquiring, but I think it is relevant to know what was approved, and if there are other documents in existence, I think that's salient and relevant, and I don't think that's subject to the deliberative privilege.  I'm going to overrule the objection.

You can answer that question, but no conversation, please.

THE WITNESS:  So I believe there was a some documentation, potentially, and I just -- this is not the

IV-135

question for me.  It's the question for the City Attorney. I believe there was some documentation, some representations submitted to the Court, per the discussions with the Plaintiffs, characterizing the encampment reduction milestones.  That would have been reflective of the discussion with the City Council.

BY MS. MYERS:

Q    And you would --

THE COURT:  Why are these subject to settlement conferences with Judge Birotte?  In other words, we may have a settlement privilege here, also, and I want to be certain.

THE WITNESS:  Quite possibly, but I'm not going to -- I'm not the person to make the call on that, again.

THE COURT:  Was Special Master Michele and/or Judge Birotte in these discussions?  I was somewhat walled off from those, also, by the parties.

THE WITNESS:  Very, very possibly, yes.  They were involved throughout.

BY MS. MYERS:

Q    So, as I understand it, there are documents that are part of the City's adoption of the encampment resolution plan that are beyond this chart.  Is that correct?

MR. MCRAE:  Mischaracterizes the witness' testimony, and assertion of the same privileges.

THE COURT:  No, overruled.  You can answer the

IV-136

question.

THE WITNESS:  I believe there is some documentation prepared by the City Attorney that reflects our encampment reduction milestones and provides some definition around them.

BY MS. MYERS:

Q    Were those documents ever submitted to the Court?

MR. MCRAE:  Objection, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I don't know.

BY MS. MYERS:

Q    Are those documents publicly available?

MR. MCRAE:  Lack of foundation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I don't know.

BY MS. MYERS:

Q    And who would be in a position to know whether those documents are publicly available?

MR. MCRAE:  Lack of foundation, and it calls for speculation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I would defer to the City Attorney.

//

IV-137

BY MS. MYERS:

Q    So you don't know who would know?  So you're saying the City Attorney would know whether they were publicly available?

A    Yes.  I said I would defer to the City Attorney.

Q    Okay.  What does --

MS. MYERS:  Thank you, Mr. Umhofer, for putting this in the right direction.

BY MS. MYERS:

Q    So, looking at the LA Alliance milestone goals, for council district one --

THE COURT:  Well, just a moment.  At some point, we're going to take a lunch, so, as a courtesy to you, you can take that lunch whenever you want to, but check with opposing counsel.  If this is a good breaking point, fine. If not, continue on, but get to a comfortable place, then, to break.

MR. MCRAE:  And, as we've said before, if we're nearing completion of the -- so that the witness will be tendered, City is fine with proceeding.  I know the City doesn't unilaterally decide when we stop, but, if we're getting to that point --

THE COURT:  That's a conversation the two of you can have.

MR. MCRAE:  The three.  Shall we confer briefly,

IV-138

your Honor?

THE COURT:  In other words, if you're going to take another 15, 20 minutes or an hour, let's take a break.

MR. MCRAE:  Completely, yes.

THE COURT:  If --

MR. MCRAE:  I'd better get over there, your Honor.

THE COURT:  If you're going to conclude in five minutes, then, if you want to go forward -- but that's counsel's choice now.  Each one of you, for each party, when you take the lectern, that's your choice, in terms of when to call the breaks.

Well, let's make this simple.  I think we're burning valuable time.  We're now in recess.  We'll see you at 1:15.  Okay?  That will give you 10 minutes extra, unless you want to -- unless you're close to finishing.

MS. MYERS:  No.  A recess is great, your Honor. Thank you.

THE COURT:  Recess.  Okay.  Let's take that recess, then.

Thank you very much, sir.  You may step down. And, once again, so there's no insinuation, you can talk to either counsel, both counsel, or no counsel, Mr. Szabo.

THE WITNESS:  Yes.

THE COURT:  All right.  Thank you.  Talk to anybody you'd like to.  Okay?  So there's no insinuation of

IV-139

any impropriety.  Thank you.  Okay.  Thank you.

        (Proceedings recessed to reconvene.)

Case 2:20-cv-02291-DOC-KES   Document 955   Filed 06/02/25   Page 140 of 304   Page ID #:26796

IV-140

<u>Afternoon Session</u>

--o0o--

(Call to Order)

THE COURT:  We're back on the record.  The witness is present.  Counsel are present.

Counsel, would you like to continue?

MS. MYERS:  Yes.  Thank you, your Honor.

MATT SZABO - PLAINTIFFS' WITNESS - PREVIOUSLY SWORN

CROSS EXAMINATION   (RESUMED)

BY MS. MYERS:

Q    So, when we went on recess for lunch, we were looking at Exhibit 65, Plaintiffs' Exhibit 65, which is Document 668-1, which is filed with the Court.  And then before the break, there was some confusion about what constituted the correct encampment reduction plan.  Were you able to resolve that confusion?

MR. MCRAE:  Objection as to the characterization, your Honor.

THE COURT:  Well, it's a little vague.  Sustained.

BY MS. MYERS:

Q    There were two separate documents submitted to this Court as the Encampment Reduction Plan.  I presented both of them to you, and you indicated you thought one was the Encampment Reduction Plan.  Were you able to confirm that Document 668-1, which is Exhibit 65, is the Encampment

IV-141

Reduction Plan that was approved by the City?

(Pause.)

A    The -- no, the -- I wasn't able to -- to confirm, but the -- the -- the -- the latter document or the document that you just mentioned is the -- is the document that we're using to assess the progress towards the milestones.

Q    Okay.  So, then, for purposes --

MR. UMHOFER:  May I approach with this?

BY MS. MYERS:

Q    So, for purposes in the next set of questions then, I'm going to refer to Document 65 -- Exhibit 65, which is the document in front of you, page 74.  I'm going to refer to that as the Encampment Reduction Plan then for purposes of these questions.

And, so, I'm going to actually direct you to Exhibit 302.  I'm going to put that on the screen.  And you previously attested that this is a document prepared by the CAO's Office to submit to the Court as part of the City's quarterly reporting for this case, correct?

A    Correct.  Correct, yes.

Q    And what is your understanding of what this quarterly report represents?

A    The quarterly -- the quarterly report represents the number of encampment resolutions or reductions as defined by the agreed upon documents per Council District and aggregate

IV-142

for the City.

Q    And, so, if we're looking at Council District 1, which is Eunisses Hernandez's District and the first row, the first column in the first row, January 1st through January 30th, 2024, it says 70.  What does the number 70 represent for purposes of this report?

A    The number 70 represents the number of tents, makeshift shelters, cars and RVs or RVs removed from the public right of way.

Q    So, for purposes of this reporting, the City removed 70 tents, vehicles and makeshift shelters, correct?

          MR. MCRAE:  Objection as to the "and".
Mischaracterizes the witness's testimony.

          THE COURT:  I couldn't hear you, Counsel.

          MR. MCRAE:  Oh, I'm sorry.  Objection to "and".
It mischaracterizes the witness's testimony.

          THE COURT:  It's --

          MR. MCRAE:  I'm saying as opposed to and/or.

          THE COURT:  Footnote two, Counsel, I think footnote two says data represents makeshift shelters and vehicles removed from the public right of way.

          MR. MCRAE:  Right.  But he was asked about his testimony.

          THE COURT:  Ah.  You may ask the question if you want.

IV-143

BY MS. MYERS:

Q    I was asking a -- I was actually asking a different question that what Mr. Szabo answered, which is number seven -- the number 70 represents tents, vehicles and makeshift shelters removed from the public right of way, correct?

A    Correct.

Q    Okay.  And that number corresponds then if you go to the Encampment Resolution Plan that was approved by the City Council in Exhibit 65, that represents the same type of item that -- that represents the same thing as what appears in the first column under CD1 for that time period.  Is that correct?

MR. MCRAE:  Objection.  Vague as to "thing".  Lack of foundation.

THE COURT:  Well, I thought it was 70 and 71. There's one digit off I think or one number off.

MS. MYERS:  Yeah.  One is milestones.  The other one is actual -- actual tents.

BY MS. MYERS:

Q    So, I'm just getting at when -- when it says 71 here for purposes of the LA -- LA Alliance milestone goals, was it your understanding then or are you representing that 71 refers to makeshift shelters, tents, and vehicles?

A    Yes, correct.

Q    Okay.  Okay.  And, so, there are two different

IV-144

footnotes here in the report.  Footnote one says:

"Data represents tents and vehicles

removed from the public right away."

And that footnote applies to January 1st to June 30th, 2024, correct?

A    Yes.  I'm -- and I'm sorry.  I -- I -- I see what you're trying to -- there are -- there are two definitions, if that's what you're trying to --

Q    Yes.

A    You could -- okay.  Yes, there -- the 70 -- the 70 in the reports represents tents and vehicles removed from the public right of way, and if you -- I'm just going to -- I'll leave it at that.  The -- the 70 represents 70 tents and vehicles removed from the public right of way.

Q    Okay.  So, for the reporting period from January 1st to June 30th, 2024, am I correct to understand that the City reported tents and vehicles removed from the public right of way?

A    Yes.

Q    And then for the next reporting periods, the City reported tents, makeshift shelters, and vehicles removed from the public right of way?

A    Yes, that's correct.

Q    Okay.  What does it mean to remove a tent from the public right of way?

IV-145

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  So, when we -- the -- the data provided is -- it does not -- is -- is agnostic as it relates to whether it's a Care and Care Plus operation or an Inside Safe operation or another operation that -- that provides housing because that was not the standard.  That was not the agreement.  The -- the standard is to -- that the City would remove 9800 tents, make -- tents, makeshift shelters, and vehicles from the public right of way over the period of the -- over the period of the agreement, which actually goes through 2026.  Those are the milestones, rather.

When we are reporting a removal of a tent, that would be when the Bureau of Sanitation in this case takes possession or custody of that tent, either voluntarily -- and where -- when there's a housing operation, there's an effort to convince or to offer the individual the opportunity to dispose of their -- of their tent as they're going to receive the housing resource.

So, when Sanitation either takes possession of the tent and disposes of it voluntarily, with voluntary compliance, whether -- or if the -- the tent is soiled or otherwise deemed a health hazard, Sanitation would take

*Echo Reporting, Inc.*

IV-146

possession, custody of the tent and -- and dispose of it, and there may be cases where the tent is yielded for the purposes of -- of storage.

Same goes for makeshift shelters.  As the --

BY MS. MYERS:

Q    I'm just going to ask about tents.

A    Okay.  Just tents.  Okay.

Q    Just tents.

A    What we are counting is tents that Sanitation takes possession of, takes custody of and removes from the public right of way.  To -- to provide more context to that definition, what we are not talking about is if a cleaning is about to happen and we close the street and request the individual to gather their belongings and move temporarily across the street while the cleaning of the public right of way takes place and then the move right back after the cleaning is completed, we do not count those movement of tents as encampment reductions or resolutions.  The reductions are defined by tents that the Bureau of Sanitation takes possession of either for the purposes of disposal or storage.

Q    So, you said that this -- that this is calculated during Care and Care Plus and Inside Safe operations.  What other operations go into calculating this data point?

A    I would ask you to clarify are we still speaking

IV-147

specifically and only about tents?

Q    Yes.

A    It would be -- I mean, I would say all of the operations where tents are removed from the public right of way involve the Bureau of Sanitation.  So, it would be a Care and Care -- a Care Plus team, rather, that would -- that would collect the data as they are removing the tents from the public right away, whether that is through a Care and -- a standard Care and Care Plus operation or whether that is after an Inside Safe operation has taken place and then Care and Care Plus could come in afterwards to -- to remove the items that are to be removed through voluntary compliance.

Q    So, you said Care and Care Plus, and you said Inside Safe.  Are there any other types of operations that LA Sanitation conducts that feed into this data point?

        MR. MCRAE:  Objection.  Asked and answered.

        THE COURT:  Overruled.

        THE WITNESS:  I mean, you're asking this -- a question that I don't think there's an answer to because any -- it's -- it's -- it is the Care Plus team that would do this work.  So, it's -- so, it's related to any time that a tent is removed, it's a Care Plus -- it's a Care Plus operation.

//

IV-148

BY MS. MYERS:

Q    Okay.

A    Whether it comes after an Inside Safe operation, another type of operation -- there's another type of housing operation that is taking place or whether it's a standard regularly scheduled cleaning.

Q    Okay.  That's helpful to clarify that Care Plus conducts the cleanups in relation to Inside Safe.

A    Yes.

Q    Okay.  So, for example, illegal dumping, if the LA Sanitation goes out to address illegal dumping, that would not count towards this total or would it?

        MR. MCRAE:  Ob -- well, it's compound.  It's --

BY MS. MYERS:

Q    Would it count towards this total?

        MR. MCRAE:  It's vague and ambiguous.  It lacks foundation.  An illegal dumping would call for a legal conclusion.

        THE COURT:  Overruled.

        THE WITNESS:  That -- that's a separate program.

BY MS. MYERS:

Q    Than Care Plus?

A    It's a separate program than Care Plus, yes.

Q    Okay.  And do separate teams conduct the illegal dumping versus Care and Care Plus?

IV-149

A     I would defer to those responsible for carrying out these operations, so the Bureau of Sanitation.

Q     You said it -- the tent removal includes when a tent is removed for storage by LA Sanitation, is that correct?

          MR. MCRAE:  Objection.  Asked and answered.

          THE COURT:  Overruled.  It's foundational.

          THE WITNESS:  Yes.

BY MS. MYERS:

Q     Under what circumstances would LA Sanitation take a tent for storage?

          MR. MCRAE:  Objection.  Lack of foundation and vague.

          THE COURT:  If you know, you can answer it.

          THE WITNESS:  I can't -- I can't give a complete answer, but the -- I know that the policy is to seek voluntary compliance.  So, the individual who has possession of the tent would -- the -- the primary objective is voluntary compliance.  Either they yield the tent for disposal, they may request that it be stored, or -- well, it would be those -- it would be those two options, whether in -- in working with the individual if they request that it be stored versus -- versus allowing the Sanitation to -- to dispose of it.  That's -- that's -- that is -- that's the process.

//

IV-150

BY MS. MYERS:

Q    I just want to make sure I -- I understand what your testimony is.  Is it your testimony that that -- those are the two instances in which a tent is removed from the public right of way ips when it's voluntarily surrendered or when it's -- when it's taken for storage?

        MR. MCRAE:  Objection.  Mischaracterizes the witness's testimony and asked and answered.

        THE COURT:  Just reask the question.

BY MS. MYERS:

Q    I'm -- I'm just trying to clarify what -- what your testimony is.  So, is it your testimony that the only two instances in which a tent is removed from the public right of way ips when it's voluntarily dis -- voluntarily surrendered by an unhoused person or it's sent to storage?

        MR. MCRAE:  Asked and answered.

        THE COURT:  Overruled.

        THE WITNESS:  That's not what I said.

BY MS. MYERS:

Q    Okay.

A    That's not what I said.

Q    Okay.  Can you clarify what you did say?

A    The question that you asked was regarding the instances that it would go to -- that the tent would go to storage.

Q    Yeah.

IV-151

A    So, that would be under the voluntary compliance.  I said if we're talking about tents only, Sanitation would seek to remove the tent through voluntary surrender, either surrender for disposal or surrender for storage.  Or if the environmental compliance inspectors determine that the tent is -- again, I'll use tent because we're only using tent.

Q    Yes.

A    -- is a -- a health hazard, a public health hazard, in that case, the Bureau of Sanitation would remove the tent and -- and dispose of it.

Q    Okay.  You -- you're right.  I'm asking you specifically about storage.  So, narrowing down to some storage.  So, putting aside discarding property, is it then your testimony that LA Sanitation only sends tents to storage when unhoused folks voluntarily surrender those tents for storage?

MR. MCRAE:  Objection.  Relevance, your Honor.

THE WITNESS:  So -- so, yet again, you're asking a -- a categorical?  I'm sorry.

THE COURT:  No.

(Pause.)

THE COURT:  I'm confused by that question.  I'm going to have you reask it.

MS. MYERS:  Sure.

//

IV-152

BY MS. MYERS:

Q    I'm -- I'm a little -- I'm a little confused as well. So, maybe I'll just take a step back.  Under what circumstances does LA Sanitation send tents to storage that would then get counted towards the LA Alliance encampment resolution data?

            MR. MCRAE:  Objection.  Vague.  Lack of foundation.

            THE COURT:  Overruled.

            THE WITNESS:  I would defer to the Bureau of Sanitation on that.

BY MS. MYERS:

Q    Okay.

A    We report the numbers if they are removed from the public right of way and sent to storage.  The manner in which that -- that is implemented, that's a -- I'd defer to Sanitation.

Q    Okay.  And who keeps track of whether a tent is sent to storage?

            MR. MCRAE:  Objection.  Lack of foundation and relevance.

BY MS. MYERS:

Q    For purposes of this report.

            MR. MCRAE:  Same objections.

            THE COURT:  Overruled.  You may answer.

IV-153

THE WITNESS:  The Bureau of Sanitation to -- the Bureau of Sanitation, but the report doesn't indicate whether a tent was sent to storage or disposed.

BY MS. MYERS:

Q    It just simply says it was removed from the public right of way?

A    Which is the standard.

Q    And you say which is the standard, and what standard are you referring to?

A    I'm referring to the -- the agreement that was set forth in -- in the milestones on the 9800 tents, makeshift shelters, and vehicles that were -- that was -- that was established.  Those -- that 9800, the standard was that the tents -- that 9800 tents, makeshift shelters and/or vehicles would be removed from the public right of way.

Q    And is that standard outlined in writing anywhere?

A    I believe that it is, yes.

Q    And where would one find that document?

        MR. MCRAE:  Objection.  Asked and answered.

        THE COURT:  Overruled.  You can answer that, please.

        THE WITNESS:  I believe that document was -- I believe that document was submitted to the Court.

BY MS. MYERS:

Q    And when you say "submitted to the Court", do you

*Echo Reporting, Inc.*

IV-154

understand that to be submitted to someone working with the Court or filed on the public docket?

MR. MCRAE:  Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  It's -- I mean, I don't -- I -- I wasn't -- I didn't send it in, but it's an exhibit.

THE COURT:  Just a moment.  Before that, if we have another break, counsel can find that for you.

THE WITNESS:  Yeah.

THE COURT:  All right.  If -- if it exists, and it may be a filing with the Court, Counsel.  But you can check and talk to counsel.

BY MS. MYERS:

Q    And, just to clarify, you said it -- was it a filing with the Court?

MR. MCRAE:  Objection.  Mischaracterizes the witness's testimony.

MR. MCRAE:  He believes it is, Counsel.

MS. MYERS:  Okay.

BY MS. MYERS:

Q    Did the -- did the standard set forth what it means to remove tents, makeshift shelter or vehicle from the public right of way?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lack of foundation.

IV-155

THE COURT:  Restate that again, please, a little slower.

BY MS. MYERS:

Q    Does the -- does the standard that you're referring to classify what it means to remove a tent encampment or vehicle from the public right of way?

MR. MCRAE:  Objection.

BY MS. MYERS:

Q    Focusing on remove.

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lack of foundation.

THE COURT:  Overruled.  You can answer the question, please.

THE WITNESS:  I -- I don't recall and -- and would need to review the documents.

BY MS. MYERS:

Q    Okay.  So, based on this -- based on this standard, is it your understanding that if an unhoused person is removing their belongings during a Care Plus cleanup and leaves a tent behind for disposal, that would count as a tent that was removed from the public right of way?

MR. MCRAE:  Objection.  Incomplete hypothetical.  Lack of foundation.  Vague.

THE COURT:  Over --

MR. MCRAE:  Calls for a legal conclusion.

IV-156

THE COURT:  You can answer the question.
Overruled.

THE WITNESS:  If the tent was removed from the public right of way by the Bureau of Sanitation, yes.

BY MS. MYERS:

Q     Does it matter if the unhoused person receives a subsequent -- receives a -- a tent that afternoon to replace the tent that was discarded?

MR. MCRAE:  Objection.  Vague as to receive.

THE COURT:  Overruled.

MR. MCRAE:  Incomplete hypothetical.  Calls for a legal conclusion.  Lack of foundation.

THE COURT:  I'm not certain foundationally how he'd know that.

MS. MYERS:  I'm -- I'm asking for purposes of the CA -- let me just clarify for everyone.  I'm asking for purposes of the CAO's report --

THE COURT:  Report.

MS. MYERS:  -- reporting data to the Court, if a tent --

THE COURT:  If there's a replacement tent?

MS. MYERS:  Yeah, if there's a replacement tent.

THE COURT:  Overruled.  You can answer that.

MR. MCRAE:  Your Honor, not objection.  I just -- can I understand the question?  If there's a replacement

IV-157

tent, what?  What's the question?

THE COURT:  The question basically was if you had a tent removed for whatever reason -- or I took the question to be -- and then that same afternoon another tent was replaced, somebody gave him -- he or she obtained it, how that's counted in a report to the Court.

MR. MCRAE:  You mean put back on the street?

THE COURT:  Thank you, Counsel.

MR. MCRAE:  Okay.

THE COURT:  Overruled.

MR. MCRAE:  All right.

THE COURT:  You can answer the question.

THE WITNESS:  I -- I don't know how it would be -- how we would go about accounting for that.

BY MS. MYERS:

Q    So --

A    I'm -- I'm -- I'm reporting tents that existed in the public right of way and through either voluntary compliance or determination by environmental compliance inspectors were deemed a hazard are removed from the public right of way. We count those.

Q    And can you -- can you explain what you mean by the term "voluntary compliance"?

A    Voluntarily surrendered by the individuals in possession of the tent --

IV-158

Q    Okay.  So, if --

A    -- to the Bureau of Sanitation.

Q    If an unhoused person turns over their tents to LA Sanitation at LA Sanitation's instruction, you would consider that voluntary compliance?

MR. MCRAE:  Objection.  Relevance.  Lack of foundation.  Calls for a legal conclusion.  Incomplete hypothetical and speculation.

THE WITNESS:  Yes.

THE COURT:  Um --

THE WITNESS:  Oh, I'm sorry, once again.

THE COURT:  That's fine.

THE WITNESS:  I'm so sorry, Judge.

THE COURT:  Yeah.  I think the answer's actually self-evident.  So, overruled.

BY MS. MYERS:

Q    What is -- that is the unhoused person in that circumstance voluntarily complying with?

MR. MCRAE:  Objection.  Incomplete hypothetical. Speculation.

THE COURT:  Would you --

MR. MCRAE:  Lack of foundation.

THE COURT:  -- restate that?

BY MS. MYERS:

Q    What is the unhoused person in that situation where you

IV-159

spoke of voluntary compliance, what are they complying with?

MS. KAOUNIS:  Lack of foundation.  Hypothetical. Calls for speculation.

THE COURT:  Yes, sustained.  I don't understand, Counsel.  It seems speculative and --

MS. MYERS:  Your Honor, Mr. Szabo has testified that they count that voluntary compliance.  I'm trying to understand what an individual is voluntarily complying with. What constitutes compliance?

THE COURT:  And how does that make a difference in the Court -- or the quarterly report submitted to the Court? In other words, if it has a nexus to that, I'm going to overrule the objection.

MS. MYERS:  Sure.

THE COURT:  If it doesn't, then I'm going to sustain it.

MS. MYERS:  Your Honor, it goes directly to the question that the City themselves posed about what this -- what the data points here represents.  The City has -- the City has argued that the -- these data points can't possibly represent people going into housing.  These people have a right because the City can't control whether they go into housing or not.  And, so, I'm trying to -- I'm trying to understand under what circumstances the City is taking unhoused folks' tents for purposes of this data collection.

IV-160

THE COURT:  And how does that relate, once again, back to the quarterly report, to the count?

MS. MYERS:  I'm trying to get at what is included in that count, your Honor.  If -- Mr. Szabo testified that -- that individuals -- he counts when individuals are in voluntary compliance.

THE COURT:  Okay.

MS. MYERS:  All I'm trying to get at, your Honor, is voluntary compliance with what, with laws, instructions, with -- with what does voluntary compliance refer to.

THE COURT:  One more question, and that is how does that affect the count, in other words, if the count's accurate or not?  Does it matter if it's voluntary compliance, abandonment?

MS. MYERS:  And, your Honor, I think that's what we're trying to get at is the universe that -- the universe of surrender and -- and the circumstances in which LA Sanitation gets a tent and what's counted towards this.

But I would note, your Honor, you've already ruled that this definition is not what -- is -- is not what the agreement actually gets to.  So, I -- I'm really just trying to understand --

THE COURT:  Removal?

MS. MYERS:  -- for purposes of this --

THE COURT:  I'm going to let you answer the

IV-161

question, but I'm going to be concerned at some point about 403.

MS. MYERS:  Sure.

THE COURT:  So, a few more questions in this area.

BY MS. MYERS:

Q    So, when you say voluntary compliance, voluntary compliance with what?

MR. MCRAE:  Objection.  Lack of foundation.  Vague.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Voluntary surrender of -- of the tent to the Bureau of Sanitation.  As it relates to the actual procedures that the Bureau of Sanitation follows to obtain the voluntary compliance, I would defer to the Bureau of Sanitation.

BY MS. MYERS:

Q    And I'm still trying to get at when you say voluntary compliance, are you speaking about -- let me -- let me ask you this.  When you say voluntary compliance, do you mean instruction by LA Sanitation to turn over a tent?

MR. MCRAE:  Objection.  Lack of foundation.  Vague.  Relevance.  Hypothetical.

THE COURT:  If you understand the question, you can answer it.

THE WITNESS:  I understand the question, and I

IV-162

will once again defer to the Bureau of Sanitation on the policies and procedures implemented to obtain voluntary compliance in these operations.

BY MS. MYERS:

Q    And, again, I'm asking about your testimony.  You're testifying about voluntary compliance.  Compliance with what?  Are you -- are you saying voluntary compliance with LA Sanitation's instruction to turn over a tent or voluntary compliance with the Municipal Code?  What does voluntary compliance refer to?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lack of foundation, and asked and answered multiple times and calls for speculation.

THE COURT:  No.  Overruled.  That one's clear.  You can answer.

THE WITNESS:  We report on the number of tents or makeshift shelters or vehicles that are removed from the public right of way.  Sanitation holds the -- the data for tents and makeshift shelters.  We work with them to verify the data and submit it to the Court, consistent with our agreement as to what constitutes an encampment reduction.

MS. MYERS:  Move to strike as nonresponsive, your Honor.

MR. MCRAE:  I oppose that, your Honor.

THE COURT:  Thank you.  Reask the question then.

IV-163

BY MS. MYERS:

Q    When you say voluntary compliance, are you -- what are you referring to the individual complying with?

MR. MCRAE:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  Once again, I will defer to the Bureau of Sanitation which is in charge of executing those operations.  The CAO's Office doesn't oversee that interaction.  Their policies and procedures lie within the Bureau of Sanitation, and I -- I can't answer that question. That I defer to -- to those responsible for executing the operation.

MS. MYERS:  Again, move to strike as nonresponsive, your Honor.

THE COURT:  I won't strike it.  That's the answer, Counsel.  Just reask the question.

BY MS. MYERS:

Q    Are you familiar with Los Angeles Municipal Code 5611?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I'm generally familiar with it.  I'm not a City Attorney.

BY MS. MYERS:

Q    What is your general understanding of Los Angeles Municipal Code 5611?

IV-164

MR. MCRAE:  Relevance.  Calls for a legal conclusion.

THE COURT:  Overruled.

MR. MCRAE:  And lack of foundation.

THE COURT:  You can answer it.  Overruled.

THE WITNESS:  General understanding is that it is a portion of the Municipal Code that regulates the amount of items that can be in the public right of way.

BY MS. MYERS:

Q   Under Los Angeles Municipal Code 56-11, are tents prohibited in the public right of way?

MR. MCRAE:  That calls for a legal conclusion, and it lacks foundation, and it calls for speculation.

THE COURT:  In your opinion, you can cast that opinion.  If you have an opinion about that, you can cast that opinion.

THE WITNESS:  My answer is, I mean, we haven't regularly used 5611 in -- in many years.  So, I -- my -- my recollection -- I don't -- I don't -- I don't recall how it -- how it regulates tents.  I believe there is some regulation, but I just don't remember what it is.

BY MS. MYERS:

Q   Okay.  Is there any other regulation or ordinance other than Los Angeles Municipal Code 5611 that would prohibit tents in the public right of way?

IV-165

MR. MCRAE:  That calls for a legal conclusion and speculation and lack of foundation.

THE COURT:  If you know of another ordinance, you can state what that might be, if you know.

THE WITNESS:  I would -- I would need -- I would need to defer to the City Attorney on that.

THE COURT:  Okay.

BY MS. MYERS:

Q    Okay.  So, then when you are speaking of voluntary compliance, you're not talking about then voluntary compliance with the Municipal Code?

MR. MCRAE:  That calls for speculation.

THE COURT:  Overruled.  You can state your answer, sir.

THE WITNESS:  I -- I'm reflecting my understanding of the policies and procedures that are implemented by the Bureau of Sanitation as they carry out their Care and Care Plus operations.

BY MS. MYERS:

Q    Is it your understanding that when a person goes into an Inside Safe facility, they are voluntarily giving up their belongings when they go into that facility?

MR. MCRAE:  Objection.  Relevance.  Lack of foundation.  Calls for a legal conclusion.  Speculation. Lack of foundation.

IV-166

THE COURT:  And how does that relate back to the quarterly count, Counsel?

MS. MYERS:  Your Honor, I'm trying to understand the circumstances in which the City is obtaining the items that go towards the encampments resolution data which relates directly to the arguments the City has put forth related to the interpretation of this agreement.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Repeat the question.

BY MS. MYERS:

Q   Is it your understanding that when individuals go into the Inside Safe Program, that they are voluntarily giving up their belongings before they go into the Inside Safe Program?

MR. MCRAE:  Objection.  Lack of foundation.  Calls for a legal conclusion.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I can't comment on that.

BY MS. MYERS:

Q   How many of the -- do you know how many of the tents and makeshift encampments recorded in the encampment resolution data relate to Inside Safe operations?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

IV-167

THE WITNESS:  We don't report that.

BY MS. MYERS:

Q    I asked you --

A    So, I don't -- so, I don't -- I don't know.

Q    Okay.  Would anyone know that?

MR. MCRAE:  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  Potentially, yes.

BY MS. MYERS:

Q    Who would know that?  Which City department would know that?

MR. MCRAE:  Lack of foundation.  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  The City department that is responsible for the Care and Care Plus operations.  That's the Bureau of Sanitation.

BY MS. MYERS:

Q    And, specifically the Livability Services Division, correct?

MR. MCRAE:  Calls for speculation.  Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes.

//

IV-168

BY MS. MYERS:

Q    Okay.  And do you request underlying data from the Livability Services Division related to the tents, makeshift encampments and vehicles that are included in the encampment reduction data?

        MR. MCRAE:  Vague.  Lack of foundation. Relevance.

        THE COURT:  Do you understand the question?

        THE WITNESS:  I do.

        THE COURT:  Okay.  Overruled.

        THE WITNESS:  We request data that is necessary for verification purposes to ensure that our reports are accurate as we're submitting them to the Court.

BY MS. MYERS:

Q    And what verification data do you receive?

A    Sanitation keeps fairly meticulous data on its tent, makeshift shelter removal from the public right of way.

Q    Do they?

        MR. MCRAE:  Objection.  That's argumentative.

        THE COURT:  Sustained.  Stricken.

BY MS. MYERS:

Q    And what do they provide to you?

A    They have a -- a database that records every tent and makeshift shelter removal from the public right of way. That database includes photographic evidence of the tents

IV-169

and makeshift shelters removed.

Q    Does that include the circumstances in which the tent or makeshift -- well, I'm going to stick with tent.  Does it include the context in which the tent was removed?

MR. MCRAE:  Objection.  Vague.  Relevance.

THE COURT:  Would you restate -- would you state that again?

BY MS. MYERS:

Q    Does it include information about the context in which the tent was removed from the public right of way?

MR. MCRAE:  Objection.  Vague.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't know because we are not required to report on that information.

BY MS. MYERS:

Q    So, I understand you're not required to report on that information, but you said that LA Sanitation provides that information for verification.  So, I'm just trying to get at whether the information they provide for verification provides the context in which the tent was removed.

MR. MCRAE:  Asked and answered.

THE COURT:  To Mr. -- to Mr. Szabo's office?

MS. MYERS:  Yeah.

THE COURT:  All right.  Overruled.

THE WITNESS:  We -- we review the -- the data

IV-170

necessary to confirm whether the tent or makeshift shelter was removed from the public right of way.  That if what I report on, and that is the data that we request as verification.  So, I don't know whether they have additional information.  But I request the necessary information to verify the numbers that I'm reporting to the Court.

BY MS. MYERS:

Q    And, so, from your perspective, what is the necessary information to verify what is removed from the public right of way?

MR. MCRAE:  Objection.  Vague.  Calls for a legal conclusion.  Lack of foundation.  Relevance.

THE COURT:  Overruled.  You can answer the question, please.

THE WITNESS:  The -- the date time of the operation, the photographic evidence that indicates what is being counted as a tent or makeshift shelter before and after is in my view substantial verification that what we are reporting is accurate.

BY MS. MYERS:

Q    So, it doesn't include the location of the cleanup?

MR. MCRAE:  Objection.  Asked and answered.

THE COURT:  I'm sorry?

BY MS. MYERS:

Q    So, it doesn't include the location of the cleanup?

IV-171

MR. MCRAE:  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  It includes the location.

BY MS. MYERS:

Q    Okay.  So -- so, date, time, photographic evidence before and after and location?

A    Yes.

Q    Anything else?

A    There's other information, but not to my knowledge, no. That's -- that's the basic information that -- that we request when -- when reviewing the numbers.

Q    Are you provided other information beyond what you request?

MR. MCRAE:  Objection.  Asked and answered.

THE COURT:  I believe you stated that you were but you can't recall.  Is that the answer?  Additional information or is this the substance of the information, the date, time, photographic evidence and the location?

THE WITNESS:  That's the basic information that -- that we review.  What I had answered previously is that I was not aware whether there was additional information because the nature of the report required to verify the removal.  So, we -- we look at the information necessary to verify the removal.

//

IV-172

BY MS. MYERS:

Q    What does the term "public right of way" mean?

MR. MCRAE:  Objection.  Calls --

BY MS. MYERS:

Q    For purposes of the data you're reporting for the LA Alliance, what is the public right of way?

MR. MCRAE:  Calls for a legal conclusion.  Lack of foundation.  Speculation.

THE COURT:  And an offer of proof.  How does that come back to the quarterly reports and the accuracy that the Court's receiving?  What's the nexus?

MS. MYERS:  Trying to understand what is included and what is excluded for purposes of these reports, because these reports indicate -- it's not clear that these reports indicate all of the tents or whether they indicate a certain number of tents.  So, I'm -- that's why I'm asking, your Honor, about each of the pieces.

THE COURT:  No.  I'm going to overrule the objection, Counsel.  They could come from other source than the public right of way.  I understand that.

THE WITNESS:  I'm not going to provide you a legal definition of the public right of way, but it is -- if I could finish, it -- it is generally streets and -- sidewalks, streets generally understood as the public right of way.

IV-173

BY MS. MYERS:

Q    And I'm not asking you for a legal definition.  I'm asking about what's included for purposes of these reports.  So, for purposes of these reports, you're talking about streets and sidewalks.  Is that accurate?

MR. MCRAE:  Objection, your Honor.  That does call for a legal conclusion.  Lack of foundation.  Calls for speculation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I mean, that's exactly why I said I'm not going to provide a legal -- a legal opinion on what is the definition of a public right of way.  I -- I give you a general understanding of where these operations take place.  They typically take place streets, sidewalks, cul de sacs, alleys, places where you would -- an average person would -- would see as the public right of way, where someone would -- would travel.  I -- I'm not going to give you a legal definition beyond that.  That's -- that's not what I'm trained to do.  So, I'll just -- I'm going to answer the question the same time when you ask it next.

BY MS. MYERS:

Q    If LA Sanitation conducts a cleanup in the Tujunga Wash, would they count the tents that were removed from the Tujunga Wash as part of this reporting?

IV-174

MR. MCRAE:  It's an incomplete hypothetical and relevance.

THE COURT:  Finish your answer, please -- or your question, please.

MS. MYERS:  That's -- that's my question, your Honor.  I'm trying literally to --

THE COURT:  I understand.

MS. MYERS:  -- to get at whether -- what operations are included for purposes of this.  There is a -- there are distinct terms that may not track, your Honor, with where the City conducts Care and Care Plus cleanup.

THE COURT:  Objection's overruled.  I believe you used the example of the Tujunga Wash --

MS. MYERS:  Exactly, your Honor.

THE COURT:  -- as one example.  All right.

THE WITNESS:  I -- I'm not sure.  I would need -- I would need to -- I would need to look at our -- at our records.

BY MS. MYERS:

Q    So, if the City of Los Angeles conducts an encampment resolution pursuant to an Encampment Resolution Fund Grant in the Arroyo Seco, would tents taken during that encampment resolution count towards encampment resolution data that you provided to the Court?

MR. MCRAE:  Objection.  Calls for a legal

IV-175

conclusion.  Lack of foundation and relevance.

THE COURT:  Overruled.

(Pause.)

THE WITNESS:  I -- I would -- I would consult with the City Attorney and, you know, there's -- we've reported over 5,000 encampment reductions.  I do not recall each of them and cannot recall -- won't be able to recall each of them as we're sitting here.  So, I -- those -- these examples I would need to consult with the City Attorney as to whether they were counted or not.

BY MS. MYERS:

Q    And the --

A    Or whether they would be counted or not.  Sorry.

Q    Apologize.  That information would be included, though, in the data verification that you received from LA Sanitation, correct?

MR. MCRAE:  Objection.  Lack of foundation.  Assumes facts.

THE COURT:  Overruled.

MR. MCRAE:  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  It would likely include that information, yes.

BY MS. MYERS:

Q    What is a makeshift encampment?

IV-176

A    I believe that the term we're using is makeshift shelter.

Q    Makeshift shelter, yes.

        MR. MCRAE:  Objection.  Calls for a legal conclusion.

        THE COURT:  Overruled.

        THE WITNESS:  So, there -- there is a -- there is a -- a definition that has been developed in consultation with the City Attorneys, I believe shared with the Plaintiffs on what constitutes a -- a makeshift shelter, and it is in general -- and I will not be able to go into specifics of the definition -- legal definition of a makeshift shelter.  It is a -- some kind of a structure erected that provides some kind of shelter that is in the public right of way or whatever we're defining, but it's some -- it's a structure that is not a tent that provides some kind of a shelter that is erected.  It could be free standing.  It could be against a wall, against a fence. Beyond that, I would have to defer to the -- to the document that has a more specific definition.

BY MS. MYERS:

Q    And, so, the City collects data about makeshift shelters that it obtains during encampment cleanups and documents that in the encampment resolution data, correct?

        MR. MCRAE:  Objection.  Lack of foundation.

IV-177

THE COURT:  You dropped -- your dropped your voice and I heard somebody cough.  So, state that again.

BY MS. MYERS:

Q    So, the City collects data about the number of makeshift shelters that the City obtains during these encampment cleanups and reports that as part of its reporting for the encampment resolution data, correct?

A    Correct.

Q    And who makes the determination about what is a makeshift shelter for purposes of this reporting?

MR. MCRAE:  Lack of foundation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  There -- there's a definition, again, developed with our City Attorney that is used by the Bureau of Sanitation to determine what is -- what is a makeshift shelter, and -- and, again, that's part of the reason why the -- the photographic evidence is -- is useful for verification, to ensure that a makeshift shelter that is being counted as being removed is consistent with the agreed upon definition.

BY MS. MYERS:

Q    And who makes that determination?

MR. MCRAE:  Asked and answered.  Calls for speculation.  Lack of foundation.

IV-178

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Once again, it's the Bureau of Sanitation that conducts those operations.

BY MS. MYERS:

Q    And, so, if -- if you know, who within the Livability Services  Division makes that determination?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I don't know --

MR. MCRAE:  And calls for speculation.

THE COURT:  And I don't need the name of the person, again.  Is there a division?

THE WITNESS:  Yes.

THE COURT:  I think you've already stated that but just for the record.

THE WITNESS:  Correct.  It's the Livability Services Division.

THE COURT:  Okay.  Thank you.

BY MS. MYERS:

Q    And do you know what class of employee within the Livability Services Division makes that determination?

MR. MCRAE:  Relevance.

THE COURT:  At the present time, you can answer that question if you know that person.

IV-179

(Pause.)

THE WITNESS:  I -- I don't want to speculate.  I -- I have an idea, but I don't have a -- I don't want to speculate.

BY MS. MYERS:

Q    Do you know is it an on-the-spot determination at the time of the cleanup or is it made subsequently when the reporting is -- is being done on a -- on a quarterly basis?

MR. MCRAE:  Relevance.  Lack of foundation.

THE COURT:  Overruled.  You can answer that question, please.

THE WITNESS:  As it relates to the policies and procedures of the Care and Care Plus operations, I would defer to the Bureau of Sanitation.

BY MS. MYERS:

Q    So, what does it mean to remove a vehicle from the public right of way?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lack of foundation. Vague.  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  That would be when the vehicle is impounded.

THE COURT:  Is what?

THE WITNESS:  Impounded.

IV-180

THE COURT:  Thank you.

THE WITNESS:  Sorry.

BY MS. MYERS:

Q    And who impounds vehicles for the City of Los Angeles, which department?

MR. MCRAE:  Objection.  Vague.  Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  The Department of Transportation. The impound yards I believe are under the Los Angeles Police Department.

BY MS. MYERS:

Q    Is that the official police garages?

MR. MCRAE:  Objection.  Calls for speculation. Relevance.

THE COURT:  Would you repeat that, please?

BY MS. MYERS:

Q    Is that the official police garages?

THE COURT:  Overruled.  You can answer the question if you know.

THE WITNESS:  I believe that's correct, yes.

BY MS. MYERS:

Q    The Department -- the Los Angeles Police Department can also make decisions about towing, correct?

MR. MCRAE:  Objection.  Lack of foundation.  Calls

IV-181

for speculation.

THE COURT:  Could you repeat that question a little bit more slowly, please?

BY MS. MYERS:

Q    The Los Angeles Police Department can also make decisions about towing, correct?

MR. MCRAE:  Vague.  Lack of foundation.  Calls for a legal opinion.  Calls for speculation.

THE COURT:  No.  Overruled.  You can answer the question.

THE WITNESS:  I believe that's the case.

BY MS. MYERS:

Q    So, for purposes -- what I'm getting at is for purposes of the encampment resolution data, does this include LA DOT data and LAPD data?

MR. MCRAE:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  It's impound records that are provided by DOT.

BY MS. MYERS:

Q    Okay.  Does that include vehicles that are towed by the LAPD?

MR. MCRAE:  Objection.  Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  For -- for the RV operations, it's

IV-182

the -- it's the Department of Transportation that takes the lead.

BY MS. MYERS:

Q   Are the only vehicles that are included for purposes of the encampment resolution data vehicles that are towed through the RV operations?

MR. MCRAE:  Objection.  Lack of foundation. Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MYERS:

Q   So, if a vehicle is towed for -- outside of an RV operation, it would not be included then in the encampment resolution data?

MR. MCRAE:  Objection.  Asked and answered. Relevance.  Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MS. MYERS:

Q   If a vehicle is towed during a Care Plus operation, would it be included in the encampment resolution data?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I would need to -- I would need to investigate that.

IV-183

BY MS. MYERS:

Q    And who would be able to answer that question, what department?

        MR. MCRAE:  Calls for speculation.  Relevance.

        THE COURT:  Overruled.

        THE WITNESS:  I just -- I don't -- I don't know the extent to which if there -- if there have been combined Care, Care Plus operations and RV operations.  I -- I don't know.  It's -- it's possible.  I don't know that -- it is -- it is possible that you could have overlapping operations at -- at the same time.  I don't know that that has happened. I don't know that it hasn't happened.  So, I can't give you an answer.

BY MS. MYERS:

Q    But vehicles can be towed during Care Plus operations, correct?

        MR. MCRAE:  Objection.  Speculation.  Lack of foundation.  Relevance.

        THE COURT:  Overruled.

        THE WITNESS:  I -- I believe a vehicle could be towed at any time.

BY MS. MYERS:

Q    Yes.  So, if a vehicle is towed during Care -- a Care Plus operation, would it be included in this data?

        MR. MCRAE:  Asked and answered.  Lack of

IV-184

foundation.

THE COURT:  Overruled.

THE WITNESS:  I would -- I would need to -- as I said, I would need to investigate whether there have been combined RV operations with Care, Care Plus operations.  I don't know.

BY MS. MYERS:

Q    I'm asking a different question, Mr. Szabo.  I am asking if a vehicle is towed during a Care Plus operation that is not in any way a crossover by an RV operation, if that vehicle would be counted towards the encampment reduction data?

MR. MCRAE:  Asked and answered.  Lack of foundation.

THE COURT:  Overruled.

MR. MCRAE:  And relevance.

THE COURT:  Overruled.

THE WITNESS:  I -- I don't -- I don't concede that a vehicle towed in  Care and Care Plus operation is a Care Care Plus -- would be counted as a Care and Care Plus tow.  I think if it's -- if it's an operation that involves recreational vehicles, there would be a component of an RV operation.  I don't -- so, I -- I can't answer that question right now.  I can't answer that question.  I'd be happy to look into that.

IV-185

BY MS. MYERS:

Q    So, it's -- I just want to understand your answer because I was asking -- I was asking specifically about Care Plus operations separate and apart from RV operations.  But is it your position that if an RV is towed during a Care Plus operation, it becomes an RV operation?

MR. MCRAE:  Mischaracterizes the witness's testimony.

THE COURT:  No.  It's a question.  You can answer that.

(Pause.)

MR. MCRAE:  It's an incomplete hypothetical.

THE COURT:  Overruled.

THE WITNESS:  I would need to -- I would need to investigate as to whether there is any -- if there was any counting of RVs or vehicles associated with the Care and Care Plus operation outside of an RV -- of what we would deem an RV operation.  And I don't -- what I'm saying is the numbers that we're reporting are from our RV operations.  If there is action taken to remove cars or RVs as part of a Care and Care Plus operation, there would be -- there would have to be some coordination with DOT in order for that to happen, in which case it might have been deemed a -- an RV operation.  I can't -- I can't answer that, though, with any more clarity than that.  I just -- I don't know.  It is

IV-186

possible, but I -- but I don't know.  And it's -- but the --
but, again, the -- the numbers that we are reporting are
numbers from RV operations.

BY MS. MYERS:

Q    Are the only vehicles towed during RV operations RVs?

        MR. MCRAE:  Objection.  Incomplete hypothetical.
Lack of foundation.  Calls for speculation.

        THE COURT:  Overruled.

        MR. MCRAE:  Relevance.

        THE COURT:  You can answer the question.

        THE WITNESS:  We call it an RV operation.  The
vehicles that would be addressed would be any kind of a
vehicle.  So, it wouldn't necessarily be a recreational
vehicle.

BY MS. MYERS:

Q    So, when you say you count vehicles that are towed
during an RV operation, how -- is an RV operation designed
by a location, like a zone, like the Inside Safe Program?

        MR. MCRAE:  Objection.  Assumes facts that it's
defined.  Compound.  Lack of foundation.  Relevance.

        THE COURT:  Overruled.

        THE WITNESS:  They -- the RV operations are
typically location based, yes.

BY MS. MYERS:

Q    And does the RV operation target any vehicle within

IV-187

that location?

MR. MCRAE:  Objection.  Vague.  Lack of foundation.

THE COURT:  Overruled.

(Pause.)

THE WITNESS:  I -- I don't know what you mean by target, but --

THE COURT:  I take that to mean that the operation can encompass both RVs and cars, for instance.  Is that correct?

THE WITNESS:  Yes, that would be correct.

THE COURT:  About that simple?

THE WITNESS:  Yes, that's correct.

BY MS. MYERS:

Q    So, when -- when an RV operation is planned, is -- is it targeting specific vehicles within that location or is it targeting all of the vehicles within that location that could be towed?

MR. MCRAE:  Objection.  Relevance.  Compound. Lack of foundation.  Calls for speculation.

THE COURT:  I don't understand the question. Repeat that question.

BY MS. MYERS:

Q    In an RV operation is -- in a specific location, are the RVs that are towed specifically targeted by that

IV-188

operation or does LA DOT tow all of the vehicles within that location that can be towed?

MR. MCRAE:  Objection.  Compound.  Lack of foundation.  Relevance.  Vague.

THE COURT:  Let me -- let me repeat back to you what I absorbed for a moment, and that is are they preselected in this geographical location before the operation takes place or is this an operation that, without preselection -- and you used the word "target", but not too concerned -- but would encompass RVs and cars once the operation started?

Now, that's probably ambiguous.  Counsel, why don't you object?  I'm just joking.  Okay.  Now, that's an inartful question, but as we -- you know, we use this time which is valuable to you and for the Court.

Do you understand the question that's being asked?

THE WITNESS:  Somewhat.

THE COURT:  Okay.

THE WITNESS:  Yes.

THE COURT:  Please.  I just used the word "preselected".  I just substituted that word.

THE WITNESS:  Sure.  And I think that's -- that's more helpful because the -- the -- the RV operations aren't kind of this surprise effort that no one saw coming.  And I'll finish if it's okay.

IV-189

They -- the RV operations, the day of the operation where there could be towing is the -- is the culmination of weeks of outreach.  Typically we start outreach to each of the -- those living in the cars or RVs three weeks out.  We work with a service provider.  We work with LAHSA and -- and attempt to link the individuals with other housing resources or other -- or other available housing resources, rather.  And, so, we are aware of the status -- by the time the -- any sort of enforcement action is taken, we are well aware of the status of all of the vehicles within that zone.  Nothing is a surprise, and -- and every effort is made to house the individuals or families which are -- which are living in the -- in the cars or RVs.

BY MS. MYERS:

Q    Could I ask your basis for that understanding of your description?

A    The --

Q    Do you go out to these -- you're -- you're attesting to a lot of issues, right, and I'm just -- I'm wondering is that from firsthand knowledge?  Do you attend these RV operations?  Do you get reports attesting to this?  How do you -- how do you understand that that is actually what occurs, these RV operations?

MR. MCRAE:  Your Honor, there are like four

IV-190

questions there.  Is it just the last one?

THE COURT:  Let's take the last one.  How do you understand that this occurred?

THE WITNESS:  Sure.  Staff in my office are responsible for coordinating the RV operations with the other departments and the Council Offices and LAHSA and the service providers, and I get regular reports.

BY MS. MYERS:

Q    So, you're -- you're reporting back to the Court, you're testifying right now, based on what has been represented to you by your staff?

MR. MCRAE:  Objection.  Incomplete.  Also mischaracterizes the witness's testimony.  And --

THE COURT:  Overruled.

MR. MCRAE:  -- also relevance.

THE COURT:  Overruled.

(Pause.)

THE WITNESS:  The CAO has a tremendous amount of responsibility.  I have 175 staff, and I represent their work every day on a variety of issues.  And -- and, yes, I -- I work with everyone on my staff and -- to gain an understanding of what they're doing and why they're doing it, the decisions that they're making.  So, yes, I'm representing the work of -- of very hard working staff in the CAO's office.

IV-191

BY MS. MYERS:

Q    Okay.  Does it matter why an RV is towed for purposes of your reporting for the encampment resolution data?

MR. MCRAE:  Vague.

THE COURT:  Do you understand the question?  I'm not sure I do.

THE WITNESS:  I think I do.  I'll try.

THE COURT:  All right.

THE WITNESS:  Is the -- well, I'll ask this, is it versus -- we are -- we're counting vehicles that are removed, that are impounded.  We are not counting vehicles, for example, if as a result of the outreach -- which is not uncommon that the individual living in the vehicle decides they don't want a housing resource, they don't want -- and they -- they drive away.

THE COURT:  Okay.

THE WITNESS:  And -- and, so, we don't count driving away as a -- as a reduction.

BY MS. MYERS:

Q    So, vehicles can be towed for a variety of reasons, correct?

A    Yes, they can, but I'm not going to recite the -- the various codes that would govern that.

Q    I'm not asking you to.

A    Okay.

IV-192

Q    Does it matter which of those various provisions in the Vehicle Code an RV is impounded for for purposes of the encampment resolution data?

MR. MCRAE:  Calls for a legal conclusion.  Lack of foundation, and relevance.

THE COURT:  I take that as a reporting issue.  You can answer that question.

THE WITNESS:  The standard for reporting in -- in -- for these purposes is whether the in this case vehicle was removed from the public right of way.  So, that's what we're reporting.  We're not -- we don't have a -- a standard as to the reason or why the -- the particular violation that was cited in terms of reporting the -- the removal of the vehicle.

BY MS. MYERS:

Q    Does it matter whether the vehicle as obtained from impound by the owner for purposes of the encampment resolution data?

THE COURT:  Was obtained from what, Counsel?

MS. MYERS:  If the owner obtained the vehicle after it was impounded.  So, when a vehicle is impounded, the owner has the opportunity to retrieve that vehicle.

THE COURT:  Sure.

MS. MYERS:  Does it matter whether the vehicle was retrieved?

IV-193

MR. MCRAE:  Objection.  Incomplete hypothetical as to when they reclaimed it.  Lack of foundation.  Vague. Relevance.  Calls for a legal conclusion.

THE COURT:  Well, my curiosity in terms of reporting is why the -- the data concerning RVs is based upon the removal, coupled with verification of impounding. So, you could check your record back to see that what's reported to the Court is also on an impound list.  So, it's to be used in two different ways.  You're saying removal. Counsel's removing to impounding, and that's confusing the Court.

So, I want either side at either point to make that clear to me.  How is this data being reported to the Court?  Is it simply on removal from the street, as noted by sanitation for instance or is it upon impounding by the police department when it's put inside an impound yard or from a tow truck driver?  That's what's confusing to me.

MS. MYERS:  I'm using impound, your Honor, because that's the term Mr. Szabo --

THE COURT:  You're free to ask that question.  I'd like -- and I also would ask either counsel to at some point for one and two,  for footnotes, who's drafting that?  Is the CAO's Office drafting one and two?  Is the City Attorney, if we know?  Who's drafting one and two on these quarterly reports?

IV-194

MR. MCRAE:  On Exhibit -- this Exhibit 302?

THE COURT:  Pardon me?

MR. MCRAE:  On 302, your Honor?

THE COURT:  Pardon me?

MR. MCRAE:  On Exhibit 302 that we're looking at?

THE COURT:  Counsel, look at one and two, 302.

MR. MCRAE:  Right.  Okay.  Thank you.

THE COURT:  It's right there on the screen.  Thank you.

Now, I'm going to leave that to counsel to ask. Those are a couple of my curiosities.  And I don't want to ask those questions myself.

BY MS. MYERS:

Q    So, when a vehicle is impounded by -- for -- as part of this RV operation, if it is released to the owner after it is impounded, is it counted towards the encampment resolution data?

MR. MCRAE:  Incomplete hypothetical.  Vague. Calls for a legal conclusion.

THE COURT:  Overruled.  You can answer the question.

MR. MCRAE:  Foundation.

THE COURT:  You can answer.

THE WITNESS:  I -- I don't -- I don't know.  I don't know the answer to that, but -- but I will say for

IV-195

clarity the numbers reported to the Court on RV or vehicle removal would all have impound records associated with them.

BY MS. MYERS:

Q    And what is that impound record?  Do you know?

A    I don't -- I don't draft those records.  I -- I don't know what you're asking.  They're impound records when the vehicles are -- are impounded with the various yards.

Q    Is it -- I'm -- I'm asking -- is it LA DOT's record or is it the impound yard's record?  And this goes to your Honor's question about removal versus impound.

         MR. MCRAE:  Objection.  Relevance as to who created it.

         THE COURT:  Overruled.

         THE WITNESS:  Those records are held by LA DOT.

BY MS. MYERS:

Q    So, as you sit here, you don't know whether they are removal records or impound records?

         MR. MCRAE:  Objection.  Mischaracterizes the witness's testimony.  Assumes facts.  Lack of foundation.

         THE COURT:  Overruled.

         THE WITNESS:  I believe I said impound records.

BY MS. MYERS:

Q    So, they would be the records that are kept by the official police garages that impound --

         THE COURT:  By specifically who?

IV-196

BY MS. MYERS:

Q    The official police garages who you've previously testified were the ones that impound the -- the vehicles?

MR. MCRAE:  Objection.  Asked and answered.  Mischaracterizes the witness's testimony.

THE COURT:  You can reanswer that, please, to be sure.

THE WITNESS:  The records that are provided are provided to us from DOT.

BY MS. MYERS:

Q    Okay.

A    So, the source of the records I can't -- I can't speak to, but DOT is responsible for -- for coordinating the removal of the vehicles in our RV operations.

Q    But you are -- but you are testifying that those are impound records that you are provided by LA DOT?

MR. MCRAE:  I'm sorry, your Honor.  Could I have the question repeated?

BY MS. MYERS:

Q    But you're testifying that the records that LA DOT provided to you are impound records?  And this goes directly to your Honor's question about removal versus impounds.  They're two different departments within -- two different agencies that are responsible for those things.

A    Um-hmm.

IV-197

MR. MCRAE: Objection. Assumes facts and asked and answered and relevance.

THE COURT: Overruled. This all goes to the two different agencies that might be involved.

THE WITNESS: Yes, I believe they're impound records --

THE COURT: Okay.

THE WITNESS: -- that are associated with the numbers that we're reporting to the Court.

BY MS. MYERS:

Q    Okay. So, when you are tracking -- when you are reporting vehicles removed, you are verifying that with vehicles impounded, correct?

MR. MCRAE: Objection. Vague as to you, also relevance and vague as to verify, lack of foundation.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MS. MYERS:

Q    Okay. If an RV is dismantled and not impounded, would it count towards the encampment resolution data?

MR. MCRAE: Calls for a legal conclusion. Lack of foundation. Attorney-client privilege.

THE COURT: Overruled.

THE WITNESS: I -- I would need to investigate that. If it's dismantled on the spot?

IV-198

BY MS. MYERS:

Q    Yes.

A    I -- I would need -- I would need to check into that.

Q    And who would you check in -- what department would you check in with related to that?

A    Actually, I would check in with my own -- with my own team on that.

Q    Okay.

     (Pause.)

BY MS. MYERS:

Q    How did the -- how -- how was the 9800 number arrived at for purposes of the encampment resolution milestones?

          MR. MCRAE:  Objection, your Honor.  Is this something the Court has history of?

          THE COURT:  I'm sorry?

          MR. MCRAE:  Is this something that the Court has history of, like how the 9800 number was achieved, the milestone number, because, if so, we're just going over -- I believe you've used the term "judicial notice" before, and I'm just -- that's what I'm trying to figure out.

          THE COURT:  Well, I'm -- I'm intimately aware of the negotiations along with Judge Birotte and the Special Master concerning LA Alliance, but at different times Judge Birotte conducted those processes.  I met with the Mayor and I think you as well on a number of occasions which I've

IV-199

disclosed to you.  So, I'm quite aware of these figures.

MR. MCRAE:  Okay.  That's what I was asking. Then, for that reason, I would object on potentially settlement or mediation because the question is how was the number derived.

THE COURT:  Yeah.

MR. MCRAE:  So, there may be some, you know, issues there as far as privilege.

THE COURT:  It was quite public also.  We actually conducted some of that right in court.

MR. MCRAE:  Oh, okay.

THE COURT:  I'm not saying all of it, but -- no. Overruled.

THE WITNESS:  It was negotiated with the Plaintiffs' counsel.

BY MS. MYERS:

Q   Is the number 9800, is that in reference to any other number in this settlement agreement or otherwise?

MR. MCRAE:  Objection.  Vague.

THE COURT:  Do you understand the question?  I'm not sure I do.

MR. MCRAE:  I do not understand the question.

THE COURT:  I don't either.  I'm sorry, Counsel. It's ambiguous.

MS. MYERS:  Your Honor, there are a number of --

IV-200

of numbers that relate to the settlement agreement, 60 percent of 2022 point in time count. There's a -- you know, there's the 12,915. There's -- there's a bunch of different numbers, and I'm wondering if 9,800 is in conversation or related to any of those other numbers.

MR. MCRAE: It's still vague as to what that means.

THE COURT: Sustained, Counsel. I'm not -- I'm not -- I'm not certain what that question entails, unfortunately.

BY MS. MYERS:

Q    Is 9800 a -- a percentage of 12,915, for example?

A    Ninety-eight hundred was a negotiated number with Plaintiffs' counsel.

Q    And was it chosen because it is a percentage of the 60 percent of unhoused people eligible for City services?

A    I don't believe that that is stated anywhere in any document. It was a negotiated number with the Plaintiffs' counsel.

Q    Are you part of those negotiations?

A    Yes, I was part of those negotiations, but I -- I'm also not going to talk about the nature and the back and forth of those negotiations.

Q    You don't believe --

A    It was a -- it was a negotiated number with Plaintiffs'

IV-201

counsel.

Q    And you don't believe that it was publicly stated anywhere about how that number was derived?

A    I -- I don't believe it was publicly stated.  I don't -- I don't know that there was -- whether there was any public statement anywhere ever about -- about those numbers.

Q    Okay.

        THE COURT:  Now, these numbers, for both counsel, so I'm transparent, these numbers to my knowledge, the Court wasn't aware of until the parties came to the Court.  The point in time count the Court was aware of, the 12,915 or at least how we arrived at that 60 percent from the point in time count.

        This resolution number may have come from Judge Birotte, may have come the Special Master.  It was brought to me by the Mayor at the time I believe, and -- and you may have been with Mayor Garcetti.  It was kind of a final checkoff after this had been negotiated between the parties. So --

        MR. MCRAE:  Thank you.

    (Pause.)

BY MS. MYERS:

Q    What is your understanding of the definition of encampment for purposes of encampment resolution data?

        MR. MCRAE:  Objection.  Calls for a legal

IV-202

conclusion.  Lack of foundation and relevance.

THE COURT:  No.  Overruled.  You can answer that question.

(Pause.)

THE COURT:  And are you referring to numbers, Counsel, like one or three or five or more generally?

MS. MYERS:  Just a -- just a definition of encampment for purposes of this -- of this data.

THE COURT:  Did you have an opinion about that or a thought?

THE WITNESS:  So, the definition of encampment for the purposes of reporting is an individual tent, makeshift shelter, car or recreational vehicle.

MS. MYERS:  Okay.  And, your Honor, I just want to just for a point of clarification, just hopefully to maybe short circuit this, I understand potentially you had mentioned that part of the documents that were part of the Encampment Resolution Plan may have been filed and the parties could confer about that.  So, if that is the case, I'm happy to take a recess and confer about that quickly.

THE COURT:  Well, why don't we take a recess anyway?  We've been at it almost an hour and a half.

MS. MYERS:  But just -- just on that particular point, I'm happy to take a recess if the idea is the parties can confer about what those documents are.  Otherwise, I'm

IV-203

going to walk Mr. Szabo through a filing and see if he can identify what those plans are.  So, I'm happy to do either one.

THE COURT:  And your question again?  I'm sorry.

MS. MYERS:  I'm just -- I'm just saying, your Honor, there's -- there are documents that have been identified as the plan, which I understand were part of a filing.  I'm happy to walk Mr. Szabo through the filings as I think it might be or we can meet and confer with counsel, and we can identify what that is.

THE COURT:  Why don't you meet and confer.  Okay.

MS. MYERS:  I just want to lay out what my plan is.

THE COURT:  Then why don't you meet and confer.

MS. MYERS:  Okay.  Thank you, your Honor.

THE COURT:  All right, Counsel.  Then 20 minutes, please.  And you can step down and participate.  Thank you very much.

THE WITNESS:  Thank you.

(Proceedings recessed briefly.)

THE COURT:  All right.  So, are we back on CourtSmart?  Back on CourtSmart?  Okay.  Let's go back on CourtSmart then.

MS. MYERS:  Your Honor, I believe the attorneys for the City are still conferring on the answer to our

IV-204

question.  We have not heard back.

THE COURT:  Okay.  Let's go -- let's go off of CourtSmart then, okay.  Just rest for a second.

(Proceedings recessed briefly.)

MS. MYERS:  Your Honor, I'm still waiting for Gibson Dunn to come back with the --

THE COURT:  Okay.

MS. MYERS:  -- with -- it's related to the document.

THE COURT:  Okay.

MS. MYERS:  Or not.

MS. MITCHELL:  And, your Honor, we -- if I may, we -- we discussed scheduling during this, and I think the City does not want to proceed with -- with witnesses tomorrow as we were hoping that we would have a Saturday session.  And, so, the thought is that we would go tonight until maybe 6:30 or so.

THE COURT:  They have a -- they have a rule here that I wasn't aware of.  It's 6 o'clock.

MS. MITCHELL:  6:00 p.m.?

THE COURT:  Yeah.  And they were very gracious last evening.

MS. MITCHELL:  Okay.

THE COURT:  But apparently there are some budgetary concerns --

IV-205

MS. MITCHELL:  Okay.

THE COURT:  -- keeping the courthouse open which I need to respect, because it's not my normal domicile.

MS. MITCHELL:  Okay.

THE COURT:  Okay.  So, at 6 o'clock, that will be it.  About 5:45 --

MS. MITCHELL:  Okay.

THE COURT:  -- we'll be vacating.  Okay.

MS. MITCHELL:  Okay.  So, now, your Honor, there's also a question about -- so, Laura Frost from A and M has been here obviously this whole time.  We -- Plaintiffs would anticipate calling her after Mr. Szabo testifies.  And, so --

THE COURT:  Well, she's still subject to redirect and recross, isn't she?

MS. MITCHELL:  Correct.

THE COURT:  Okay.  So, if you want to -- if you're not going to get to her today, then excuse her for today, and try to give her a time estimate between the parties out of courtesy when she'd need to return.

MS. MITCHELL:  Thank you, your Honor.

THE COURT:  Okay.  But, meanwhile, this is valuable time.  I'd like to get back on the record.

MS. MYERS:  Yes, your Honor.  Thank you.  I just heard back from the County -- or, I'm sorry -- from the City

IV-206

and from Gibson Dunn related to the outstanding issue related to the Encampment Resolution Plan.  We met and conferred over the break.  So, I'm going to ask Mr. Szabo to walk through some documents now.

THE COURT:  Okay.

MR. MCRAE:  Another quick thing in response to your question, your Honor.  Exhibit 302, footnotes one and two, those were created by the CAO's Office.

THE COURT:  CAO's Office.  Thank you very much. That saves a lot of questions and a lot of time.  I appreciate your courtesy on both parties' parts.

We're back on the record.  All counsel are present.  Mr. Szabo's on the stand.

Counsel, your questions.

MS. MYERS:  I'm actually just going to ask that specific question so it's evidence as opposed to representation from the attorneys.

BY MS. MYERS:

Q    Mr. Szabo, for Exhibit 302, there are two footnotes. One of them makes reference to tents and vehicles.  One of them make reference to tents, vehicles and encampments. What is the origin of that footnote?  Who's the author of that footnote?

A    That's a document prepared by -- by my office.

Q    Okay.  And that -- and that includes the footnotes?

IV-207

A    I'm sorry?

Q    And that includes the footnotes?

A    That -- that includes the footnotes.  That is -- that is correct.  It includes the footnotes, and there is a -- well, I'm going to stop there because I think we're going to go through the documents.  I'll address it when we get there.

Q    Okay.  So, before we went on break, I was asking you what documents constituted the Encampment Resolution Plan for purposes of the settlement agreement, as well as the Encampment Engagement Plan and the Encampment Cleaning Plan that you made reference to in your testimony.  And you had indicated that you thought the document may have been filed -- those documents may have been filed.  So, I'm going to show you some documents that have been filed on the docket in this case, and I'll just ask -- you can take your time, read through the documents and identify for us if those are the documents you are -- you were referring to when you had testified about the Encampment Engagement Cleaning and Resolution Plans.  Okay.

So, I'm going to show you -- first, let me just -- let me just back up to the -- this is Docket -- this is Exhibit 65, Plaintiff's Exhibit 65.  I'm going to start at the beginning.  This document was submitted to the Court on February 7th, 2024 as part of a motion for sanctions by the

IV-208

Plaintiffs.  This is the declaration of Elizabeth Mitchell in support of Plaintiffs' motion for an order re settlement agreement compliance and sanctions.

    Are you familiar with this document, Mr. Szabo?

A    Yes, I'm -- I'm familiar with the document.  I just -- which -- I'm sorry.  What page is it on Exhibit 65?

Q    I'm just starting with Exhibit 65 to show you the caption just to identify it for the record.

A    I see.

Q    Okay.

A    Yeah.

Q    And you'll see that this is a declaration with exhibits attached.  I'm primarily going to walk you through the exhibits, but I would just let you know that the declaration of Ms. Mitchell that was submitted is the first few pages of that document.  And that identifies for purposes of Plaintiffs what those exhibits are.  I'm not -- I'm not going to turn to that, but I'm just going to -- letting you know.

A    Um-hmm.

Q    I'm going to ask -- first I'm going to show you what has been marked -- was filed as Exhibit C, which is a letter dated January 8th, 2024 from Umhofer, Mitchell and King to David Michaelson and Scott Marcus in the City Attorney's Office.  Mr. Marcus is in the City Attorney's Office.  Is

IV-209

this the document -- does this relate to the Encampment Engagement Cleaning or Reduction Plans?

MR. MCRAE:  Objection.  Vague as phrased.  Your Honor, I'm sorry.  I objected that it's vague as phrased. I'm not really sure what --

THE COURT:  I think it's just --

MR. MCRAE:  -- we're talking about.

THE COURT:  -- foundational.

MR. MCRAE:  I'm --

BY MS. MYERS:

Q    Is this one of the three documents that you identified in your testimony as being one of the plans approved by the -- the City and the Plaintiffs related to Section 5.2 of the settlement agreement?

MR. MCRAE:  Objection.  It -- it's a letter from opposing counsel.

MS. MYERS:  Yes.

THE COURT:  I think that this is just foundational.  But do you recognize this?  It's opposing counsel.  I don't know that you would have seen this.

THE WITNESS:  I -- I -- I may have seen -- I may have seen this letter.  I just need to say as -- as we're walking through, there were -- there are several documents that attempt to -- to revise documents that were sent previously.  So, we need to be pretty -- we need to be very

IV-210

precise about the timeline and what it is that we're talking about, because they look similar.  So --

BY MS. MYERS:

Q    And --

A    -- for purposes of -- yes, I recognize this document.

Q    Okay.  And, to be clear, I'm not interested in the revisions or negotiations between the parties.  I'm seeking only to identify the Encampment Resolution Plan that the parties agreed to.  And, as I understand it, it may be part of this filing.  So, I'm asking you if the doc -- if this document, Exhibit C, is that plan?

MR. MCRAE:  Excuse me.  Objection.  Calls for a legal conclusion and vague.

(Pause.)

THE COURT:  And that starts at Exhibit 1.  In other words, the folder I have, it would start -- it's not the letter.  There's an exhibit attached to it, Exhibit 1.  Is your question is that the plan?

MS. MYERS:  I'm asking about Exhibit C, page 19.  There's a -- a number of internal references, your Honor.  So, Exhibit 65.  It's marked with the blue ribbon as Docket 668.1.

THE COURT:  Counsel, I've -- I've got that.

MS. MYERS:  Okay.

THE COURT:  But when you refer to the plan, this

IV-211

letter is not the plan, and --

MS. MYERS:  Your Honor, that is -- that is what I would assume, but based on my -- based on my conference with counsel, I -- I can't be sure of that.  And, so, I'm -- I'm -- based on the conference with counsel, I'm going to walk through each of these document.  And that's -- again, that is based on the representation --

THE COURT:  Why don't you turn to page 23 of this document for just a moment to save some time.

MS. MYERS:  Page 23 of Exhibit C?

THE COURT:  Exhibit 65, the same exhibit.  It's the exhibit.  Now turn the page.  Encampment Engagement Cleaning and Resolution.

MS. MYERS:  Yes.

THE COURT:  Are you referring to this document or are you referring back to the letter by counsel?

MS. MYERS:  Your Honor, all I can say is that I was told that it was -- that I needed to walk through each of the documents in the exhibit to understand and to give Mr. Szabo an opportunity to explain to the Court what the plan was.  I'm --

THE COURT:  All right.

MR. MCRAE:  Your Honor, could we propose maybe the parties trying to achieve a stipulation so as we -- because what's happening now is taking a lot of time.

IV-212

MS. MYERS:  Agree.

MR. MCRAE:  And maybe we could have --

THE COURT:  Do you want to meet and confer?

MR. MCRAE:  Yes.

THE COURT:  We might save an hour or so.

MR. MCRAE:  Yes.

MS. MYERS:  Your Honor, we did that, and this was the instruction I received.  I'm happy to meet and confer again.

MR. MCRAE:  But --

THE COURT:  Just a moment.  If you can't reach a resolution, then let's just see where we go and walk through it.

MR. MCRAE:  Yes.

THE COURT:  Because we're wasting time.  If you can, then we can go down this list very quickly.

MS. MYERS:  I would love that, your Honor.

THE COURT:  Well, step over, just see how cooperative we are.  If sow -- now I just want about five minutes, though.  We've taken 15 or 20 minutes just to try to resolve an issue.

     (Pause.)

THE COURT:  By the way, the Court's well aware of this letter and the attachments.  This came up in a hearing previously.  So, I'm quite familiar with these documents.

IV-213

Okay.

(Pause.)

MR. MCRAE:  All right.  Your Honor, thank you.  Counsel has had a chance to confer with one another and with the witness in order to try to expedite this.

THE COURT:  Thank you.  Thank you.  And, please, your questions.

MS. MYERS:  Okay.  Thank you, your Honor, for that time.

BY MS. MYERS:

Q    I'm looking at now still Exhibit 65.  I'm going to look at what is Exhibit F to 65.  The exhibit page is page 63, and the document itself begins on page 64.

(Pause.)

THE COURT:  And it should be on the screen.

(Pause.)

BY MS. MYERS:

Q    Have you had a chance to look at the document?

A    Yes, but just for -- for clarity, you said the document itself.  Are we -- if I could ask a question clarifying.  Are we only looking at the encampment reduction portion or are we looking at the whole -- the whole thing?

Q    I'd -- I'd like to ask you that question, Mr. Szabo.  Can you tell me what Exhibit F is?

A    Exhibit -- Exhibit F is the City's submission --

IV-214

appears to be the City's submission of its encampment

engagement cleaning and resolution plans and milestones.

Q    Okay.  You testified previously that the City adopted a

-- an Encampment Engagement Plan, correct?

A    Correct, yes.

Q    Is this the Encampment Engagement Plan that you were

speaking of?

A    Yes, this is the representation of the City's

Encampment Engagement Plan that was previously adopted

through various Council and executive actions, including

budgetary actions and reported in this document.

     So, I'm just being clear, this document --

Q    Yes.

A    -- was not submitted to the City Council for approval.

Everything in the document that relates to encampment

engagement is a policy or program that has previously been

authorized by the City Council and the Mayor.

Q    So, and -- and, Mr. Szabo, that gets to whether or not

this specific engagement plan was approved by the City

Council, but I'm -- I'm asking simply if this is the plan

that the City of Los Angeles adopted for encampment

engagement pursuant to section 5.2 of the settlement

agreement in this case?

A    This is the -- this is the plan that we submitted.

Q    Submitted to whom?

IV-215

A    Submitted to the Plaintiffs and the Court.

Q    Okay.  Is it your understanding that -- that this plan was approved by the Plaintiffs?  If you know.

          MR. MCRAE:  Objection.  Lack of foundation.

          THE COURT:  Overruled.

          THE WITNESS:  My understanding is that the plan represented in Exhibit F was in part accepted by the Plaintiffs and in part rejected by the Plaintiffs.

BY MS. MYERS:

Q    Okay.  Can you tell me which part was accepted?

A    As -- as I recall, the portions related to encampment engagement and encampment cleaning were accepted by the Plaintiffs.  The section regarding encampment resolution was -- was rejected, and there were further discussions on that portion only.

Q    Okay.  So, for purposes of your prior testimony, this document represents the Encampment Engagement and the Encampment Cleaning Plans but not the Encampment Resolution Plan, is that accurate?

A    Yes, that is accurate.

Q    Okay.  Thank you.  And, just -- just so the record is clear on this, the portion that was not accepted is starting on page -- of this document, which is 668.1, page 68 of 85 to the top or at the bottom, Exhibit F, page 61 or page five of the document, Resolution.  From that point and below,

IV-216

that's what was not accepted by the Plaintiffs?

          MR. MCRAE:  Objection.  Calls for speculation. Lack of foundation.

          THE COURT:  Overruled.

          THE WITNESS:  That is my understanding, yes.

BY MS. MYERS:

Q    Okay.  So, everything before then is the plan for engagement and cleaning?

          MR. MCRAE:  Objection.

BY MS. MYERS:

Q    For purposes of the compliance with the settlement agreement?

          MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lack of foundation.  Calls for speculation.

          THE COURT:  Overruled.

          THE WITNESS:  Yes.

BY MS. MYERS:

Q    Okay.  Perfect.  Thank you.  So, now I'm -- now I understand.  I'm moving on to Exhibit I.  Again, this is Exhibit 65 -- Plaintiffs' Exhibit 65 for purposes of this hearing.  It's Document 668.1, Exhibit I, and it's page 71. It appears to be a letter from the City of Los Angeles to Elizabeth Mitchell.

     Do you recognize this document?

A    I do recognize it, yes.

IV-217

Q    Okay.  And -- and what is -- what is this document as it relates to section 5.2 of the settlement agreement, City's obligation to create a plan related to encampment cleaning -- encampment engagement cleaning?

THE COURT:  I'm sorry.  You're dropping your voice.  Would you raise your voice and use the mic.

MS. MYERS:  Sure, your Honor

BY MS. MYERS:

Q    What is your understanding of this document as it relates to section 5.2 of the LA Alliance Settlement Agreement and the requirement to create an encampment engagement cleaning and resolution -- or reduction plan?

MR. MCRAE:  Objection.  Lack of foundation.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  So, this document was intended as the City's final proposal after negotiations with the Plaintiffs to satisfy the encampment reduction portion of -- of the settlement agreement.  This document was intended to replace and supersede the prior -- prior proposals that had been exchanged and had not been accepted.

BY MS. MYERS:

Q    So, from -- from the -- from your perspective, this is part of the Encampment Resolution Plan, this letter --

MR. MCRAE:  Objection.

IV-218

BY MS. MYERS:

Q    -- the content of this letter?

MR. MCRAE:  Objection.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  The contents of this letter, including the attachment, is the entire Encampment Resolution Plan.

BY MS. MYERS:

Q    Okay.  When you say the "attachment", what are you referring to?

A    The milestones -- the milestone goals for encampment reduction, which are attached, which is Exhibit J.

Q    Okay.  And, so, it's not actually an attachment to this letter, rather, it's another exhibit in this declaration, correct?

A    Correct.

MR. MCRAE:  Objection.

BY MS. MYERS:

Q    And, so, Exhibit J you previously reviewed and identified as the LA Alliance milestone goals?

A    Correct.

Q    And, for purposes of Exhibit J, that's Exhibit J to the Mitchell declaration, correct?

A    Correct, yes.

IV-219

Q    Okay.  So, just to -- just to ensure we have a clear record, Exhibit I and Exhibit J together are the entirety of the Encampment Resolution Plan for purposes of compliance with Section 5.2 of the LA Alliance Agreement?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MS. MYERS:

Q    Okay.  And you had previously testified that when this was approved by the City Counsel, there was some additional documentation related to this chart, correct?

MR. MCRAE:  Objection.  Mischaracterizes the witness's testimony.

THE COURT:  Overruled.

THE WITNESS:  This letter is what I was referring to.

MS. MYERS:  Okay.

THE COURT:  And this letter -- this letter is Exhibit I, is that correct?

THE WITNESS:  Correct.

THE COURT:  All right.

MS. MYERS:  Okay.  Great.  Thank you very much for that.

If I can have just -- just a minute, your Honor.

IV-220

(Pause.)

BY MS. MYERS:

Q    Are you aware that as part of Care Plus there is a tent exchange program that is sometimes deployed?

MR. MCRAE:  Your Honor, objection.  In addition to the relevance, we are in 403 territory and have been, and lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I'm not familiar with that program.

BY MS. MYERS:

Q    Okay.  So, if LA Sanitation were to give a person a new tent in exchange for a person surrendering a tent, would the tent that was surrendered count towards the encampment resolution data?

MR. MCRAE:  Objection.  Incomplete hypothetical. 403.  Relevance.  Calls for speculation.

THE COURT:  Overruled.

MR. MCRAE:  Also calls for a legal conclusion.

THE COURT:  Overruled.  You can answer the question, please.

THE WITNESS:  I would -- I would need to look into that.  I'm not sure.

BY MS. MYERS:

Q    Okay.  And then just -- and just a couple more questions.  The -- have you ever heard the term "encampment

IV-221

resolution" used outside the context of this litigation?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.  It's a -- it's a common term.

BY MS. MYERS:

Q    And how would you define that common term?

MR. MCRAE:  Objection to the extent it calls for a legal conclusion.  Lack of foundation.  Relevance.

THE COURT:  Well, it's also found, but you can -- if you've heard it in another, you know, venue of some kind.

BY MS. MYERS:

Q    Let me ask -- I can ask a couple of other -- withdraw that question and ask a couple of clarifying question.

You say it's a common term.  Common in what circles?

MR. MCRAE:  Objection.  Lack of foundation.

THE COURT:  Overruled.

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  It's -- it's a -- it's a common term that is used in multiple jurisdictions for addressing -- addressing encampments, and beyond that, it is a general term and can be -- have many definitions that -- that I will not be able to exhaust.

BY MS. MYERS:

Q    Does the City of Los Angeles -- has the City of Los

IV-222

Angeles received encampment resolution funds from the State of California?

MR. MCRAE:  Objection.  Relevance.  Vague.  Lack of foundation.  403.

THE COURT:  No.  It may be one of the sources of this definition.  You can answer that, sir.

THE WITNESS:  We do receive encampment resolution funds.

BY MS. MYERS:

Q   Do you know how many -- roughly how many Encampment Resolution Fund Grants the City has gotten?

MR. MCRAE:  403.  Relevance.  Lack of foundation.

THE COURT:  You can answer the question, sir.

THE WITNESS:  The program has been in place for a number of years.  We have received several.  I -- I don't know the total number, but there -- but there -- but there are several, probably north of -- north of 10, south of 20.

BY MS. MYERS:

Q   Okay.  And Encampment Resolution Grants -- Fund Grants from the State of California are given to cities or other jurisdictions to resolve encampments in specific locations, correct?

MR. MCRAE:  Objection.  Lack of foundation. Beyond Los Angeles.  Calls for a legal conclusion. Relevance.  403.

IV-223

THE COURT:  Overruled.  You're talking about state?

MS. MYERS:  I'm talking about state funds, yeah, your Honor.

THE COURT:  Overruled.

THE WITNESS:  Yes, generally.

BY MS. MYERS:

Q    And, specifically here in Los Angeles, when the City of Los Angeles has applied for encampment resolution funds, have they -- has the City applied for a specific encampment resolution funds for a specific encampment?

MR. MCRAE:  Objection.  403.  Lacks foundation. Relevance.

THE COURT:  From the -- from the state, Counsel?

MS. MYERS:  Yes, your Honor.  When the City has applied to the State.

THE COURT:  I know.  I understand that.  I want to make -- specifically it's from the State, not from HUD that you're referring to or whatever?

MS. MYERS:  No.  Specifically to the State.

THE COURT:  Overruled.

THE WITNESS:  The application does require a -- an indication of the -- of the location.

BY MS. MYERS:

Q    And is it your understanding that the purpose of these

IV-224

encampment resolution funds is to provide services and support to people experiencing homelessness in encampments that results in meaningful paths to safe and stable housing?

MR. MCRAE:  Your Honor, it calls for a legal conclusion.

THE COURT:  Over --

MR. MCRAE:  It lacks foundation, and I'd like to know the source of what counsel's reading from.

THE COURT:  Overruled.  If you're aware of that in terms of state grants, you can answer the question.

THE WITNESS:  That sounds -- that sounds right. It sounds like it may have been something in the documents related to the Encampment Resolution Fund.

BY MS. MYERS:

Q    And is that how the City of Los Angeles has used encampment -- I'll withdraw that.

Has the City of Los Angeles used encampment resolution funds to address specific encampments?

MR. MCRAE:  Objection.  Relevance.  403.  Lack of foundation.

THE COURT:  Overruled.

MR. MCRAE:  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  We -- we have.

//

IV-225

BY MS. MYERS:

Q    And have the -- have the funds been used to provide services and support to people experiencing homelessness in encampments?

MR. MCRAE:  Objection.  Asked and answered.  403. Relevance.

THE COURT:  Overruled.

MR. MCRAE:  Lack of foundation.

THE WITNESS:  Yes, they have.

BY MS. MYERS:

Q    And was the goal of that to result in meaningful paths to safe and stable housing?

THE COURT:  Counsel, would you slow down just a little bit and restate that.

BY MS. MYERS:

Q    And was the goal of that to result in meaningful paths to safe and stable housing?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Vague.  403.  Lack of foundation.  Relevance.

THE COURT:  Overruled.  You can answer that, sir.

THE WITNESS:  Yes, consistent with the intent of the grant.

BY MS. MYERS:

Q    And are you familiar with any of the -- the details of any of the encampment resolution funds encampment

IV-226

resolutions that the City has -- has conducted?

MR. MCRAE:  Objection.  Vague as to details.  403.  Relevance.  Lack of foundation.

THE COURT:  Are you aware of, do you mean personally present, grant funding, what?

MS. MYERS:  Aware of to the extent that you can -- you can testify as to -- as to what was -- what the specific encampment resolution entailed.

THE COURT:  About the specific what?

MS. MYERS:  What the specific encampment resolution entailed for any of the grants that the City received.

THE COURT:  Well, you can answer that question.  Overruled.

THE WITNESS:  I would not be able to testify in detail, no.

THE COURT:  Okay.

BY MS. MYERS:

Q    Are you refer -- are you aware of the Encampment To Home Program?

MR. MCRAE:  Objection.  Relevance.  Lack of foundation.  403.

THE COURT:  Overruled.

THE WITNESS:  I've heard that.  I've heard about that program.  I'm not familiar with that program.

IV-227

BY MS. MYERS:

Q     When you've heard of it, do you know what it refers to?

        MR. MCRAE:  Relevance.

        THE COURT:  Did you know it was what?

        MS. MYERS:  Do you know what it refers to?

        THE COURT:  Oh.

        MR. MCRAE:  And lack of foundation.

        THE COURT:  Is this de Leon's program?

        MS. MYERS:  I'm sorry, your Honor?

        THE COURT:  Was this De Leon's program in the State Senate?

        MS. MYERS:  No.  This -- this predated the -- the lawsuit, your Honor.  It was in the South Los Angeles --

        THE COURT:  What's the offer of proof here?  Are you getting to different definitions of encampment resolution?

        MS. MYERS:  Different instances of encampment resolutions that the City conducted.

        THE COURT:  That the City might be aware of and use?

        MS. MYERS:  Yes, that the City itself conducted.

        THE COURT:  Oh.  Overruled.  Either through grant funding or knowledge.  All right.

        MS. MYERS:  This is outside of the Encampment Resolution Fund.  This is a separate category of encampment

IV-228

resolutions.

THE COURT:  I see.  And the simple question was are you aware of this.  If you're not, just --

THE WITNESS:  I am, but that is also a very -- that is a general term that I -- I believe has been used in other parts of the City to -- to describe encampment efforts.  I believe it was also used in Venice for the -- the outreach and -- and removal of the tents along the boardwalk.  I don't know if it's an actual program.  I think it's just a term that people have used.

BY MS. MYERS:

Q   Okay.  And your understanding of that term that people have used is about providing outreach and -- and housing resources to people, is that correct?

MR. MCRAE:  Objection.  Lack of foundation.

THE COURT:  Overruled.

MR. MCRAE:  Calls for a legal conclusion.  403.

THE COURT:  Overruled.

THE WITNESS:  Generally, yes, that's correct.

BY MS. MYERS:

Q   Okay.  And when you refer to an Encampment to Home operation in Venice, are you referring to an Encampment to Home or encampment resolution operation that occurred on Ocean Front Walk?

MR. MCRAE:  Objection.  403.  Lack of foundation.

IV-229

THE COURT:  Overruled.

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.  The -- yes.

BY MS. MYERS:

Q    And -- and when was that operation?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I believe that operation was in -- I want to say it was in 2021.  So, it was -- it was several years ago.

BY MS. MYERS:

Q    And it was -- it was an encampment resolution that occurred in -- on Ocean Front Walk -- Boardwalk in -- for Venice Beach, correct?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MYERS:

Q    Okay.  Were you present -- withdrawn.  Were you aware of encampment resolutions that occurred early in this litigation related to the freeway agreement?

THE COURT:  Related to the what?

THE WITNESS:  The freeway -- the -- the Roadmap Agreement.

IV-230

THE COURT:  Roadmap.

MR. MCRAE:  Objection.  Relevance.  Lack of foundation.  Vague.  403.

THE COURT:  Overruled.

THE WITNESS:  I -- I'm not aware of specific encampment resolution -- resolution efforts related to the -- to the Roadmap, no.

BY MS. MYERS:

Q    You're not aware of a specific encampment resolution operation that occurred in Council District 3, Councilmember Blumenfield's District, as part of this litigation?

MR. MCRAE:  Assumes facts.  That's testimony. Also, asked and answered.  Lack of foundation.  403.

THE COURT:  Overruled.

THE WITNESS:  There have been hundreds of encampment resolution efforts over the past several years. And, no, I do not recall the details of each individual encampment resolution effort.

BY MS. MYERS:

Q    Just asking about those specific ones.  Just -- just a couple --

A    I do not.  I do not recall the details of that effort.

Q    Okay.  Are you -- are you aware of what happened at the Echo Park Lake Park in 2021?

MR. MCRAE:  Objection.  Vague.  What -- what

IV-231

happened?  Also 403.

THE COURT:  Sustained.

BY MS. MYERS:

Q    Are you -- are you aware of an encampment resolution operation that occurred at the Echo Park Lake in 2021?

MR. MCRAE:  403.  Relevance.  Lack of foundation.

THE COURT:  Overruled.

MR. MCRAE:  I am -- I am familiar with -- with that effort.  That was very high profile.

BY MS. MYERS:

Q    And how would you describe the effort by the City of Los Angeles related to the encampment resolution at Echo Park Lake?

A    403.  Relevance.  Lack of foundation.

THE COURT:  All right.  It's ambiguous also.  Are we talking about a definition that was used into safe and stable housing, for instance?  I don't understand the --

MS. MYERS:  Your Honor I'm simply asking Mr. Szabo if he can describe the -- he said he was a high profile operation.  I'm asking if he can describe that operation from the City's standpoint related to the encampment at Echo Park Lake.

MR. MCRAE:  Your Honor, lack of foundation and beyond his duties.

THE COURT:  Yeah.  I -- I'm concerned, Counsel,

IV-232

about 403 now.  If it ties to definitions that this City's used, for instance, in the past, then I'm going to let you ask those questions.  Just describing these encampment resolutions generally is taking too much time, frankly.

MS. MYERS:  Okay.  I -- I will just ask the --

THE COURT:  So, if you want to get into definitions, if the City used definitions, how that applies to Inside Safe and their resolutions or definitions, that's fine, but --

BY MS. MYERS:

Q    And the -- the Encampment to Home Program, would that fall under the commonly understood term "encampment resolution" as you understand it and you previously identified?

MR. MCRAE:  Call -- calls for speculation.  Lack of foundation.  403 as to what other people think.

THE COURT:  Just restate the question, Counsel.

BY MS. MYERS:

Q    I asked you specifically about the Encampment to Home Program.  Would you consider that an encampment resolution based on the definition of encampment resolution as you understand it generally?

MR. MCRAE:  Objection.  Assumes facts of a definition.  Calls for a legal conclusion.  Lack of foundation.  403.

IV-233

MR. MCRAE:  Yeah, I -- I think that the -- the definition Inside Safe Exhibit 44, page 43 -- both of you can check my memory on that.

MS. MYERS:  That's correct, your Honor.

THE COURT:  And partway down the line that's, you know, underlined --

MS. MYERS:  Yes, your Honor.

THE COURT:  -- it's sitting right there for all the parties to look at.  So, I don't know how this is --

MS. MYERS:  I just want to make sure that we're clear that that is a definition of an encampment resolution. So, I --

THE COURT:  Well, there's --

MS. MYERS:  -- I can ask Mr. Szabo that question.

THE COURT:  So, the offer of proof is that Exhibit 44, page 43, that that definition used by the City is rather common to other encampment resolution language?

MS. MYERS:  I haven't asked Mr. Szabo about that specific definition.  I'm happy to ask him about that specific --

THE COURT:  No, I'm --

MR. MCRAE:  Your Honor --

THE COURT:  I'm not suggesting that.  I just -- I don't hear that offer of proof yet in terms of I've got language in the Inside Safe Program that the City's using.

IV-234

I don't know how helpful it is concerning anything outside. For instance, Blumenfield, there may be an encampment resolution language there that was used.  Venice, I think that was the prior Sheriff before Traci Park was the -- I think -- I'm not sure if Bonin -- it was at the time of Park.

MS. MYERS:  It was.

THE COURT:  And I'm not certain -- in other words, when it's used within the City, I'm going to allow that type of question.  We're getting out into other areas.  Unless there's a directly contradictory phrase used, then I don't think it's very helpful.  I think then it's 403.

So, I'm going to let you inquire about Venice, if there's specific language used.  Blumfield, specific language.  How the City reacted.  I'll let you go into some of the cities nearby in terms of Los Angeles, because we've got an intertwined Los Angeles City network.  But as far as the --

MS. MYERS:  Your Honor, all of these are in the City of Los Angeles and were conducted by the City of Los Angeles.

THE COURT:  Okay.  Well, just ask a general question then.

MS. MYERS:  Okay.

THE COURT:  And let's move on.

IV-235

BY MS. MYERS:

Q    Is the -- is it a fair definition of an encampment resolution to house Angelinos living in encampments, connect them to services and prevent their return to the street?

MR. MCRAE:  Objection.  Fair for what context? It's vague.  Lack of foundation.  Could call for a legal conclusion.

THE COURT:  We could go through each one of these within the City.  It's a general question, and I think the -- the import of this from both sides is simply if the language, for instance, meaningful and safe, stable housing is an oddity or commonly used or words to that effect or this is an outlier.  We could spend hours on this, but --

THE WITNESS:  Yeah.

THE COURT:  -- the cities may have used it in different contexts, different encampment resolutions from Blumfield to Traci Park to --

THE WITNESS:  If I'm going to -- if I were to answer the question, actually, encampment resolution in the general sense is used to describe whatever efforts might be part of the plan and program that ultimately results in the removal of an encampment typically in the public right of way.  And -- and it -- there are many ways to go about that, but when -- when people refer to resolution, they're referring to the encampment that was there today, isn't

IV-236

there tomorrow.  It's -- it's the -- it's the removal of the -- the living of people on the street.

BY MS. MYERS:

Q    And is Inside Safe an encampment resolution program?

        MR. MCRAE:  Objection to the extent it calls for a legal conclusion.

        THE COURT:  No.  No.  Overruled.  You can answer that question.

        THE WITNESS:  It is -- it is a type of an encampment resolution program, yes.

BY MS. MYERS:

Q    Is the Encampment to Home Program --

        THE COURT:  Counsel, just one moment.

        MS. MYERS:  Okay.

    (Pause.)

        THE COURT:  I'm sorry, Counsel.  Your question.

BY MS. MYERS:

Q    Is the Encampment to Home Program we previously discussed, is that an encampment resolution?

        MR. MCRAE:  Objection.  Calls for a legal conclusion.  403.  Lack of foundation.

        THE COURT:  Overruled.  You can answer that question, please.

    (Pause.)

        THE WITNESS:  That would -- that would be an

IV-237

encampment resolution -- that would be an encampment resolution effort.  I want to use that word because when you say program, it suggests a -- a, you know, defined and standardized policies and procedures.  I think the Encampment to Home was -- was an effort that was tailored to the needs of that particular area.

BY MS. MYERS:

Q    How about the Ocean Front Walk effort that we previously discussed in at the time, Councilmember Bonin's District, CD 11.

          MR. MCRAE:  What --

BY MS. MYERS:

Q    Is that an encampment -- was that an encampment resolution?

          MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lack of foundation.  403.  Relevance.

          THE COURT:  Overruled.

          THE WITNESS:  That is a type of encampment resolution, yes.

BY MS. MYERS:

Q    Okay.  And you indicated you don't -- you didn't have information about the freeway agreement.  So, I won't ask about that.  The Echo Park Lake operation that we previously discussed, would you consider that an encampment resolution?

          MR. MCRAE:  Objection.  403.  Relevance.  Lack of

IV-238

foundation.

THE COURT:  Overruled.

THE WITNESS:  That is a -- that is a type of encampment resolution, yes.

BY MS. MYERS:

Q    And -- and is it a key component of an encampment resolution the provision of housing opportunities or options for individuals in that encampment?

MR. MCRAE:  Objection.  It's vague.  It lacks foundation.

THE COURT:  Would you restate that question slower?

MS. MYERS:  Sure.

BY MS. MYERS:

Q    Is a -- is a key -- is it an aspect of an encampment resolution to provide shelter or housing options to the individuals in that encampment?

MR. MCRAE:  Objection.  It's vague.  It's lack of foundation.  It could call for a legal conclusion.  Relevance.

THE COURT:  Overruled.

(Pause.)

THE WITNESS:  That -- that is within the broad range of what could be part of an encampment resolution effort, yes.

IV-239

BY MS. MYERS:

Q    And I'm asking -- let me ask is it a necessary component of an encampment resolution?

         MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lack of foundation.  Speculation.  403.

         THE COURT:  Overruled.

         THE WITNESS:  It depends on the -- the -- the policy and -- and procedures that are implemented.

BY MS. MYERS:

Q    I'm just -- I'm asking about your understanding of that term.  You testified that that's a commonly understood term, encampment resolution.  So, I'm asking based on your commonly understood definition of encampment resolution, does it include the provision of housing or resources to permanently or to move people from that encampment into housing or shelter?

         MR. MCRAE:  Objection.  Asked and answered.  Calls for a legal conclusion.  Lack of foundation.  403. Relevance.

         THE COURT:  Overruled.

         THE WITNESS:  It certainly can.  But -- but, as I said, it's -- it's a broad term.  It's a widely used term that could describe many types of -- varying types of efforts, but it absolutely can, yes.

//

IV-240

BY MS. MYERS:

Q    Does it need to --

MR. MCRAE:  Your --

BY MS. MYERS:

Q    -- in order for it to be understood as an encampment resolution?  Is it a necessary condition?

THE COURT:  Does it need to by whom?  By HUD, by the State, by whom?

MS. MYERS:  Your Honor, Mr. Szabo testified that it was a commonly understood --

THE COURT:  No.  I -- I heard that testimony.

MS. MYERS:  -- term.  I'm trying to get at what his -- what his commonly understood definition is of that term.  It's a -- it's a common term in the -- the world of homeless services provision.

THE COURT:  I'm --

MS. MYERS:  I --

(Pause.)

THE COURT:  I'm going to let you ask that question.  Otherwise we may end up going though each one of these documents.  And, quite -- or each one of these programs.  And, quite frankly, that's consumptive of time.  So, overruled.

THE WITNESS:  Resolution is an extraordinarily broad term.  And -- and, so, it could mean -- it could mean

IV-241

many things depending on the particular policies and procedures adopted around -- around the operation that would lead to the resolution.  It's -- I mean, resolution does not have a -- that is a -- a subjective term.

BY MS. MYERS:

Q    I understand that.  Okay.  I'm just going to point you to Exhibit 65 again, to -- to F.  This will be my -- hopefully my last couple of questions, but you're familiar with this document, right?

A    Uh --

Q    It's what we previously identified as part -- as the sections engagement and cleaning.

A    Yes.  Yes, I am.

Q    Okay.  Understanding that the City of -- that the LA Alliance didn't agree to the resolution and so that wasn't part of the plan, the resolution -- or, yeah, the resolution section was put forth by the City of Los Angeles, correct?

        MR. MCRAE:  Your Honor, relevance.  It's been testified that this was rejected.

        THE COURT:  Overruled.

        THE WITNESS:  Yes, it was.

BY MS. MYERS:

Q    Okay.  And, so, when you're speaking about encampment resolutions, speaking about encampment prioritization is based on the availability of housing resources and the

IV-242

severity of the encampments.  So, the availability of housing is a key component of an encampment resolution, correct?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Asked and answered.  403.  Relevance.  Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Are you citing a particular portion of the --

BY MS. MYERS:

Q    I'm citing to this page, in the middle of the page.

A    Yes.  That's what the -- that's what the words on the page say, yes.

Q    And that's what the City represented, that in order to resolve an encampment, the City must ensure there are beds available to match with encampment residents and that service providers have the capacity to provide case management and other services?

MR. MCRAE:  Again, relevance.  This was rejected.  Lack of foundation.  403.  It's not part of the agreement.  So, it's not relevant.

THE COURT:  Overruled.

THE WITNESS:  So -- so, I'm just -- sorry.  Just for -- that is what was represented in -- in that proposal which had a much different number.  That number was

IV-243

rejected.  That number was -- that number was rejected, and I just will say that the settlement agreement uses the word "reduction", and the adopted agreement between the Plaintiffs and the City does not use the word "resolution". It uses the word "reduction".  It says 9800 reductions.  It says reductions five or six times consistently throughout. That was adopted, agreed to by the Plaintiffs and accepted, and that is what we are reporting on, what we actually agreed to.

MS. MYERS:  Move to strike as nonresponsive.

MR. MCRAE:  Your Honor, I oppose.

THE COURT:  Counsel, your question?

BY MS. MYERS:

Q    I'm simply asking for purposes of an encampment resolution from the City's standpoint if the -- you now read what the City has put forward as an encampment resolution. If housing resources and providing housing or shelter opportunities to individuals in those encampments is a necessary component of an encampment resolution?

MR. MCRAE:  Objection.  Asked and answered.  It's a hypothetical because it was rejected.  Relevance.  Calls for a legal conclusion.  403.

MS. MYERS:  And I'm not asking specifically as to the settlement agreement.  I'm asking about encampment resolutions generally.

IV-244

MR. MCRAE:  Your Honor, if it's not tied to the settlement agreement, what's the proffer?

THE COURT:  Overruled.  Last time, though.  This is the last question.  We've been around this three or four times now.

BY MS. MYERS:

Q   Mr. Szabo, putting aside the use of this document for purposes of settlement communications and simply looking at this, the words on the page, would you agree with this, that in order to conduct an encampment resolution, which includes Inside Safe and various operations that you outlined, the City must ensure there are beds available to match with encampment residents and that service providers have the capacity to provide case management and other services?

MR. MCRAE:  Objection, your Honor.  It -- it's not relevant if it's not part of the settlement agreement. Calls for speculation.  Lack of foundation.  403.

THE COURT:  Overruled.  This isn't directed towards the settlement agreement.  This is, you know, your understanding of encampment resolution.

THE WITNESS:  It's -- it's not necessary.  It's not necessary, and -- and it's -- it's -- I will say the committee -- the City has that general commitment, but that's not -- that's not necessary.  And outside of the -- the confines of the very -- the specific proposal that was

IV-245

made and rejected and not operative, it -- it doesn't carry beyond that.

BY MS. MYERS:

Q    You said -- this might be my last question, your Honor. You said previously that in -- for an encampment resolution, an encampment is there and the next day it's gone.  If housing and shelter is not provided for purposes of an encampment resolution, what constitutes a resolution that leads to people not being there?

MR. MCRAE:  Objection, your Honor.  That's vague. It's argumentative.  It's irrelevant.  It's 403, and it lacks foundation, and it calls for speculation.

THE COURT:  Overruled.  You can answer that question.

THE WITNESS:  And that -- and that -- that varies based on the -- the program that is implemented, the policies that are adopted by the City or other cities.  What I was referring to is that -- is that commonly resolution is -- is the date, for example -- San Francisco would use the term the resolution date.  That is the date of which after various services are provided, the residents of the encampment are told that the encampment will -- will be removed whether they accept shelter or not.  And, so, that's -- that's I think the common term.  Resolution is -- is the end of the encampment as the encampment exists in the public

IV-246

right of way.  And -- and we have been developing over time programs and policies to -- to make that most effective, but that's within the purview of the -- the Mayor and the City Council.

MS. MYERS:  No further questions, your Honor.

MR. MCRAE:  Your Honor, can I have about 5 or 10 minutes to set up?

THE COURT:  You call the time.

MR. MCRAE:  Ten.

THE COURT:  Ten minutes?

MR. MCRAE:  Thank you, your Honor.

THE COURT:  Okay.  And, sir, why don't you step down.  And, once again, you're free to talk to anybody.

THE WITNESS:  Very good.  Thank you.

THE COURT:  About 10 minutes, Counsel?

MR. MCRAE:  Yes, sir.  Yes, your Honor.

(Proceedings recessed briefly.)

THE COURT:  We're back on the record -- back on the record.  All counsel are present.  The witness is present, and counsel on behalf of the -- the City, please.

MR. MCRAE:  Thank you, your Honor.  May I proceed?

THE COURT:  And would you reintroduce yourself to CourtSmart, just in case?

MR. MCRAE:  Yes, your Honor.  Marcellus McRae, Gibson, Dunn and Crutcher, appearing on behalf of the City

IV-247

of Los Angeles.

THE COURT:  Thank you.

FURTHER CROSS EXAMINATION

BY MR. MCRAE:

Q    Mr. Szabo, good afternoon.

A    Good afternoon.

Q    Sir, first I want to ask you is there anything that you wanted to clarify regarding any of your testimony up to this point over the last couple of days?

A    To clarify for my testimony, I would -- there were a couple of moments where there was information that I -- that I did not have at the ready.  So, I can add that  at this time if that's -- if that's appropriate.

Judge, the prior questioning asked regarding whether we count -- whether we count instances where vehicles are -- are destroyed as opposed to impounded, if we counted that in our numbers.  We are not counting those in our numbers.  If -- I was also asked whether there were any impound related to Care, Care Plus operations, if we counted those.  We do not count those either.  So, just for -- for clarity, it's just the -- the only numbers regarding vehicles that we're reporting are related to RV operations where there is a record of -- of impound from the Department of Transportation.

//

IV-248

BY MR. MCRAE:

Q    Sir, I want to direct your attention to the exchange that you had with counsel for the Plaintiffs yesterday, a considerable portion regarding a series of audits, including Exhibits 82, 83, 89, 91, 92, and that's not exhaustive. There may be a few others, but I want to refer to those all as the audits that you reviewed yesterday in the examination by counsel for the Plaintiffs.

Do you recall that?

A    I do.

Q    First of all, you're not employed by LAHSA, is that right?

A    I'm not employed by LAHSA, no.

Q    And did you see anything in any of the audit reports that you were asked to look at yesterday that spoke to whether the City is currently complying with its obligations under the Alliance Settlement Agreement?

A    I did not.

Q    Did you see anything in any of the audits that you reviewed yesterday that spoke to whether the City will be in compliance with its obligations under the Alliance Settlement Agreement at any time in the future?

A    I did not.

Q    Did you see anything in any of the audit reports that spoke to whether the City is complying with the Roadmap

IV-249

Agreement that it has with the County of Los Angeles?

A    I did not.

Q    And did you see anything that spoke to whether the City of Los Angeles at some future point will be in compliance with the Roadmap Agreement that it has withy the County?

A    I did not, no.

Q    Now, you were shown audits that spanned anywhere from 2001 referring back to the subjects which I recall may have been 1997 with the first one that you saw, the last century, all the way up until about 2018, maybe 2020.

Did you see anything that counsel for the Plaintiffs put in front of you that would inform you whether the programs that were the subject of those audits are operating in the same manner now that they were operating at the time those audits were conducted?

A    I didn't, and many of the programs don't exist.

Q    Did you see anything in any of the documents that counsel for the Plaintiffs put in front of you that spoke to whether any of the findings in any of the audits that you were shown were applicable today to any of the programs or entities that were the subject of those audits?

MS. MITCHELL:  Objection.  Vague.  Compound. Calls for speculation.  Lacks foundation.

THE COURT:  Overruled.  You can answer the question, sir.

IV-250

THE WITNESS:  I did not.

BY MR. MCRAE:

Q    Sir, let me ask you a bit about your college education. Where -- where did you graduate?

A    I graduated from the University of Notre Dame.

Q    And -- and what degree did you obtain there?

A    Bachelor's in Government International Relations with a concentration in Public Policy and Economics.

Q    And after that, did you do any further study?

A    I attended graduate school at USC.

Q    Okay.  And did you -- what did you study there?

A    Public policy.

Q    And -- and you've been working in city government in various forms for how long?

A    For 25 and a half years.

Q    With your background and your experience, would you ever make an attempt to use any of the audits that you were shown by Plaintiffs' counsel to validate the findings and recommendations in the assessment, which is Exhibit 23 in this case?

A    I'm sorry.  The assessment is the A and M assessment?

Q    The A and M document, yeah.

A    Would I have used any of the -- any of the documents that was -- that I was shown yesterday?

Q    Yes.

IV-251

A    To -- to validate the A and M assessment?

Q    Yes.

        MS. MITCHELL:  Objection.  Vague.  Ambiguous.  Lacks foundation.

        THE COURT:  Overruled.  You can answer the question.

        THE WITNESS:  No, I don't believe so.

BY MR. MCRAE:

Q    Why not?

A    Well, there -- many -- many of the -- the audits and reports are -- they were from several years ago.  They also related to -- many of them also related to County programs and county management, which was not the subject of the A and M evaluation.

Q    Sir, did you see anything in any of the audits that Plaintiffs' counsel presented to you that caused you to believe that the City is not using its best efforts to comply with its obligations under the Alliance Settlement Agreement?

        MS. MITCHELL:  Objection. Vague.  Ambiguous.  Lacks foundation.  Calls for speculation.

        THE COURT:  Overruled.  Answer the question, please.

        THE WITNESS:  No.

//

IV-252

BY MR. MCRAE:

Q    And did you see anything in any of the audits that Plaintiffs' counsel showed you that prompted you to believe that  the City is not in compliance with its obligations under the MOU Roadmap Agreement with the County?

MS. MITCHELL:  Same objection.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  Nothing, no.

BY MR. MCRAE:

Q    Sir, let me -- let me ask you, in the time -- the 25 years or so that you've been working in -- in city government, is it your experience that there are a number of audits of cities at least you've worked for where the audits are done on an annual basis?

A    Yes.  Correct.  We -- the City of Los Angeles itself conducts a number of annual audits.

Q    And is there a reason in your experience why someone wouldn't look at an audit from 2002 let's say and simply extrapolate that whatever findings were there would be applicable in 2025?

MS. MITCHELL:  Objection.  Leading.

MR. MCRAE:  I'm asking a question.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Well, of course, the programs and

IV-253

financial situations are constantly evolving in city -- any city, but certainly a city as large as Los Angeles.

BY MR. MCRAE:

Q    And let me just ask you -- your Honor, I have -- may I have one moment?  I'm just counting some pages.

THE COURT:  Certainly.

(Pause.)

BY MR. MCRAE:

Q    You -- you testified earlier that you were a negotiator on behalf of the City in connection with the Alliance Settlement Agreement.  To put a finer point on it, would you consider yourself a lead negotiator or the lead negotiator on the City of Los Angeles' behalf relative to the Alliance Settlement Agreement?

A    Yes, as it relates to the Alliance Settlement Agreement, I was negotiating along with the City Attorney on behalf of the Mayor and the City Council.

Q    And would it also be fair to say that you were a -- a primary negotiator in connection with the Roadmap Agreement between the County of Los Angeles and the City of Los Angeles?

A    Yes, I -- I was in that role, though I was representing the -- the Mayor of the City.

Q    And with respect to the -- the assessment that we were talking about that was done by A and M -- and I -- I want

IV-254

you to take that exhibit, which is Exhibit 23, the assessment that you were shown yesterday, and I want you to consider all the audits that you were shown yesterday.  And let me ask you, notwithstanding all of the findings and the assessment and all the audits that you were shown, in its last report on bed count under the Alliance Settlement Agreement, did the City report 11,002 beds towards the Alliance Settlement Agreement?

A    We did, yes.

Q    And -- and, notwithstanding all the findings and recommendations and thoughts and the assessment and the whole panoply of exhibits that you were shown as audits yesterday, did the City also report approximately 6129 encampment reductions in connection with encampment reduction obligations under the Alliance Settlement Agreement?

A    We did report that number, correct.

Q    And -- and, despite all the findings in the assessment and the numerous audits that you were shown over the last two decades, did seeing any of those things, Exhibit 23, the collective audits that you were shown, cause you to have so much as a ounce of doubt about whether the City will meet its obligations of bed count and encampment reductions under the Alliance Agreement with the Plaintiffs -- Alliance Settlement Agreement?

IV-255

A     None whatsoever.

Q     And why is that, sir?

A     Because the City is completely committed to meeting its obligations under the settlement.  It is committed -- and I -- and I can say from top to bottom of the -- amongst the members of the City Council to seek additional opportunities to provide housing for homeless residents.  The -- the programs, as I -- as I said yesterday or the day before, it is -- it is not -- it is not just a priority that -- that the Mayor and the Council speak to and speak about, but in -- they have consistently for the past several years dedicated the City's resources, a large portion of the City's resources of our -- of our general fund in addition to state and federal funds and funds from the County towards establishing housing, interim housing and permanent housing for the homeless and -- and even this year when, as the City was facing tremendous financial difficulties that led the Mayor to propose a budget with over 1600 layoffs, the City Council reviewed the budget, made a number of changes to the budget but largely kept intact the -- the funding that was proposed to be appropriated to homelessness, and -- and they will continue -- I have no doubt whatsoever in working with every member and the Mayor on a daily basis of their -- of their commitment to meeting the -- meeting the objectives and obligations of the -- of the settlement and beyond.

IV-256

Q    And, to, again, put a finer point on it, I'll ask you the same question, now pivoting from the Alliance Settlement Agreement.  Did any of the findings, conclusions, recommendations, observations and any of the audits that you saw yesterday or Exhibit 23, which is the assessment, cause you to have any doubt about whether the City is going to meet its obligations under the Roadmap Agreement with the County of Los Angeles?

A    No, none -- none whatsoever.  We --

Q    Why?

A    We met those obligations -- we met those obligations under -- under the initial 18-month required timeline, and we have continued to maintain those beds throughout the five years, and the County -- and, again, I want to -- to stress that this was a -- this was an agreement between the City and the County, and the Count had the option to reduce its contribution to the City should the -- if the City failed to maintain those -- those beds, the number of beds, the 6,000 beds, 6700, including the permanent housing, but the County faithfully and very promptly delivered the $53 million and then following that up with another $60 million and another 60, another 60, another 60, another 60 in the subsequent four years, in July, most of the time in the first week of July, and I view that -- I mean, I view that as -- as validation that we had met the terms of the agreement and we

IV-257

continued to meet the terms of that Roadmap Agreement throughout the five years of its -- of its term.

Q    And, sir, as a lead negotiator for the City of Los Angeles in connection with the Alliance Settlement Agreement, did you ever commit the City to take any actions whatsoever to address any of the findings or recommendations of the A and M firm in the assessment, which is Exhibit 23?

A    As part of -- as part of the settlement negotiators?

Q    Yes -- not as part of the negotiations.  I'm saying ultimately in terms of the agreement that you negotiated, in terms of what you agreed to, did that settlement agreement, Exhibit 25, to your knowledge, include anything where you committed the City of Los Angeles to taking any action whatsoever with respect to the findings and recommendations in the assessment, which is Exhibit 23?

        MS. MITCHELL:  Objection.  Leading.  Vague.  Compound, and calls for a legal conclusion.

        THE COURT:  Overruled.  You can answer.

        THE WITNESS:  No, not at all, the -- the settlement -- the idea of an audit was not even contemplated in the settlement agreement.

BY MR. MCRAE:

Q    And do you recall being shown I think it was Exhibit --

        MR. MCRAE:  Your Honor, can I -- hang on one second.  I just want to confer with my colleague here.

IV-258

(Pause.)

MR. MCRAE:  Exhibit 92, and maybe we can have that up on the screen so that we can all look at it.

BY MR. MCRAE:

Q    Sir, do you recall having a discussion with counsel for Plaintiffs about Exhibit 92 yesterday?

A    I -- I do, yes.

Q    And did you have a chance to see whether or not this audit purports to be governed by any applicable standards like GAAP or GAAS or G-A-G-A-S, GAGAS?

THE COURT:  Just a moment.  We've got --

MR. MCRAE:  Sure.

THE COURT:  -- a number of audits by -- I want to make sure -- Counsel, I've got it.  Now you can -- thank you.  I'm sorry.  It's up on the screen also.

MR. MCRAE:  You're very welcome.

THE COURT:  All right.  Okay.  I've got it.

BY MR. MCRAE:

Q    Sir, do you need me to repeat the question?

A    No, no.  I have -- yeah, I -- I did review, and it didn't -- and it does not appear to -- to claim that it is compliant with -- with any auditing -- auditing standards, generally accepted auditing standards.

Q    And did counsel for the Plaintiffs in the discussion yesterday with you on the various audits you were shown ever

IV-259

put anything in front of you to tell you whether or not all of those audits were conducted under the same or any standard?

A    Not -- not that I recall.  I don't -- I don't remember seeing anything that suggested as such.

Q    And you were here in court when individuals from A and M said a number of times -- we were looking at I believe it was page three, paragraph three of Exhibit 23, which is the assessment -- that the assessment was not conducted pursuant to any applicable accounting standard.  Were you in the court when that was said?

MS. MITCHELL:  Objection --

THE COURT:  Once again, we're referring to Controller Mejias?

MR. MCRAE:  No.  I'm sorry, your Honor.  I'm pivoting to Exhibit 23, and I'll put it up on the screen if that's better.

THE COURT:  Now just a moment.  I got lost.  So, we're not talking about the auditor Controller Mejias?

MR. MCRAE:  We're now --

THE COURT:  92?  So, what exhibit -- are you back to 23?

MR. MCRAE:  Yes, your Honor.

THE COURT:  All right.  I'm sorry.  Thank you very much counsel.

IV-260

MR. MCRAE:  Of course.

MS. MITCHELL:  And the objection was that it was leading, your Honor.

THE COURT:  I'm sorry?

MS. MITCHELL:  The objection was that it was a leading question, your Honor.

THE COURT:  Leading?

MS. MITCHELL:  Leading.

THE COURT:  No.  Overruled.

BY MR. MCRAE:

Q    Were you here in court when -- do you need me to repeat the question?

A    No, but I actually -- I actually was not in court --

Q    Oh.

A    -- at that time, and I think there was a change in the rule about witnesses being in the room.  I don't remember, but I wasn't -- I wasn't there on that day.

Q    Well, we -- we've now been edified that any person can be present at any time.  So, let me show you the -- the exhibit, Exhibit 23.  And we'll go to page three of that. Oh, it's already on the screen.  Let's go to page three.

Sir, I have in front of you page three of Exhibit 23 that says A and M and the Court agreed that A and M's work would not constitute a formal review or audit in accordance with any applicable accounting standards.  Do you see that?

IV-261

A      I see that, yes.

Q      And you've seen this assessment before, Exhibit 23?

A      I have, yes.

Q      And you were aware of that disclaimer that we just read about being conducted in accordance with any applicable accounting standards?

A      I was aware of it, yes.

Q      And does -- does this statement here in any way inform -- and you had this discussion yesterday with Plaintiffs' counsel about some of your views about the A and M assessment.  Let me ask you this.  Did you in any way perceive that this assessment which is Exhibit 23, would inform whether the City was in compliance with its obligations under the Alliance Settlement Agreement?

A      Did I perceive that it would inform?  I -- I -- you know, the -- it -- it was designed to look at three programs, including the Alliance Settlement, but it certainly didn't do anything to -- it didn't do anything that helped inform whether the City was -- was in compliance or out of compliance.

Q      And did you have any issues or concerns with this assessment?

A      Well, issues or concerns with this assessment generally?

Q      Yes.

IV-262

A    I mean, I -- yeah.  As I -- as I -- some of which I stated yesterday.  The issues -- some of the issues that I had with the assessment certain begin with the fact that it is the disclaimer that -- that you have on the screen, that it was not conducted under any generally accepted standards whatsoever.  It says that it does not issue opinions on financial statements or provide audits or other attestation services.  But, yet, it then proceeded to come right up to the edge of making financial assessments, making -- and then making -- it came up -- right up to the edge of making financial findings and then making recommendations based on those findings.  And -- and, so, that -- and the problem with that is that the reason that a firm or an audit would comply with generally accepted standards if that it would -- that they require the auditors to adhere to standards of ethics, of independence, objectivity, sound professional judgment, and -- and when we -- when we audit ourselves or when we contract with a firm to audit the City's finances, for example, they absolutely comply with those standards because they're necessary to give the consumers the information -- excuse me -- to give the consumers of the information assurance as to the reliability and the rigor with which the findings were arrived at, and -- and this is -- you know, this is serious -- these are serious issues, and we're talking about hundreds of millions of dollars,

IV-263

billions of dollars.  And when we're making findings about the status of how the City is managing its finances as it relates to homelessness, I -- I think it is absolutely essential, required that that kind of an assessment follow generally accepted standards.

Q    Do you recall language in the assessment to the effect that something may occur or that there's a risk that it may occur, language of that nature?

A    Yes.  I don't remember exactly where, but there -- there was -- that was -- that was common that there was -- that they raised issues, making -- making kind of incomplete assessments that this may happen but not determining what -- what is or is not.

Q    Did you find that particularly useful and helpful in reading it?

A    Found that completely unuseful.

Q    Sir, there was a lot of discussion yesterday and today about LAHSA.  And I want to telescope the discussion to the reporting, the quarterly reporting under the Alliance Settlement Agreement that is provided.  And, so, let's -- let's talk about bed count that's provided in terms of quarterly reports to contextualize LAHSA.

So, out of the 11,002 beds that were last reported under the Alliance Settlement Agreement, can you give us an idea of what number of beds that make up -- that are part of

IV-264

that 11,002 beds where the -- where that data comes from LAHSA where LAHSA alone owns or controls the data?  Is -- and forgive me if that's a terrible question, and if you don't know what I'm saying, I'll -- I'll try another one.

MS. MITCHELL:  Objection.  Vague.  Ambiguous.  Compound.  Terrible question.

THE COURT:  Do you understand the question?  Do you understand the question?

THE WITNESS:  I understand the question.

THE COURT:  All right.  You can answer it.  Overruled.

THE WITNESS:  Okay.  It -- it -- I don't -- I don't believe that any of the -- I don't believe that any of the beds that we are -- that we are reporting as -- as open and occupiable are entirely within -- within LAHSA's purview, particularly because the majority of those beds -- of those -- of the 6700 beds that are open in our reports, the majority of those are -- are permanent housing.  About 5,000 are permanent housing.  And -- or permanent housing or housing that the city owns.  So, we have our permanent housing program more than 3,000 units is principally with Proposition HHH that's run out of the Housing Department.  It also -- we also deal with the Housing Authority, which is a City Department.  Any of -- any and all Inside Safe hotels and motels are contracted directly with the City.  We have

IV-265

-- we have oversight, and we have multiple -- we have multiple ways to -- to verify that the units that we're reporting as open are indeed -- they do exist and -- and they are open.

But I would -- I would also say that even -- even if we did have to rely and did rely on our -- on an exclusively -- on a program exclusively managed by LAHSA for the data, that would absolutely be consistent with the terms of the settlement.  The settlement explicitly calls out a wide range of -- of housing resources, of -- of housing interventions, many of -- some of which are programs that at the time of the agreement were known to be run by LAHSA, like -- like the Rapid Rehousing Program, the Time Limited Subsidy Program.  And -- and those interventions are explicitly called out as eligible to count in as -- as part of our required number, and it was known at the time of the settlement agreement that those were LAHSA programs.  We haven't included them yet.  We may in the future, but it certainly would be allowed, and the -- and the Plaintiffs would have understood that when they agreed.

Q    And when you say the "agreement", are you talking about the Alliance Settlement Agreement?

A    Correct.

Q    Can I pause with you for a second something you just said, "We haven't been counting them thus far."  But you --

IV-266

you could at some point.  Is it -- I just want to make sure that I understood that.  Is that -- was that what you said?

Q    Correct.  We -- we haven't been counting -- we haven't been counting any time limited subsidies, which is a program that is run through LAHSA, funded by the City, but run -- run through LAHSA as part of our required number.  I do -- I do want to be clear about what I said about solely run programs because, as we discussed earlier today, a portion of the programs that we -- a portion of the beds that we reported were master leased units.  LAHSA does run the Master Leading Program through a service provider, but that is also part of the Inside Safe Program.  So, we have multiple ways to -- to verify even outside of LAHSA.  But, again, even if we -- even if we had to rely on LAHSA, that would certainly be allowed, and I do expect that we will include time limited subsidies as part of -- as part of our final 12,915.

Q    Let's explore this concept that you talked about of not counting something but then maybe later counting it.  Do you recall an exchange with Plaintiffs' counsel about new counting as it pertains to Inside Safe beds, for example, towards the bed count under the Alliance Settlement Agreement?

A    I do.  I believe that was a term that Plaintiffs' counsel used.

IV-267

Q    Now, when you take a number of beds and then add to that existing number of beds that you previously didn't count, do you call that new counting or do you just call that addition?

MS. MITCHELL:  Objection.  Leading.

MR. MCRAE:  Withdrawn.

BY MR. MCRAE:

Q    What do you call when you -- what do you call it when you have a number of existing beds and you have beds that may have been eligible to be counted but you didn't count them, for reasons we'll get into, but then you later add those beds?  Do you call that new counting?

A    That's not at all new counting.  It was counting consistent with the -- the terms of the agreement, and we made an assessment based on the progression and maturity of that particular program that those beds were -- that it was appropriate to count those beds.

Q    Sir, let's turn to Exhibit 25 and put that up on the screen, which is the Alliance Settlement Agreement that you've been talking about.

So, as the lead negotiator for the City in connection with the settlement agreement, did you at any time negotiate a provision that would have taken away the City's discretion of when it decided to count a bed towards its obligations under this agreement?

IV-268

A     No, not -- not at all.

Q     Why not?

A     Well, I didn't do that and would never have done that. It was critical -- a critical bargaining position for the City in reaching the settlement was -- you know, a number of them, but one was to maintain -- maintain maximum flexibility.  We did not want to pigeonhole the City or force the City into making policy decisions that it wasn't prepared to make or that may be inconsistent with the -- with the policy priorities of the Mayor and the Council.  We also wanted maximum flexibility on the timing of when the beds would need to come online due to the nature of homeless housing, particularly due to the nature of permanent housing which requires multiple sources of funding and -- and oftentimes things can fall through.  And, so, we -- we wanted to account for both flexibility in -- in the mix of permanent housing or interim housing and the ultimate timeline.  What we wanted, what we were willing and what we did commit to was a -- an obligation to establish a certain number of units over a five-year period with flexibility as to when those would be stood up and the types of housing that would be stood up.

Q     And, sir, let me -- let me go to section -- I think it's 3.2.  If we could go to section 3.2 of Exhibit 25. Does this paragraph, section 3.2 of Exhibit 25, have any

IV-269

relationship to the retention of discretion that you were just describing?

A    Certainly.  And I think it -- it conveys that -- that position that we were -- that we were bargaining for.  It outlines broad discretion.  In fact, it says sole discretion, any housing or -- or shelter solution, including but not limited to.  So, even the long list here wouldn't be complete or exclusive.  And it lists a number -- a number of options including, as I said earlier, programs that were at the time of this agreement known to be operated out of LAHSA.  So, it -- it was -- it achieved what the City was looking for, to give the City maximum flexibility to -- to get the units established as a -- as it saw fit.

Q    Sir, let me -- let me ask you another question here since we're in section 3.2.  A little earlier you were talking about flexibility in terms of the source of funding for the homes -- or, excuse me, the beds towards the bed count obligation.  Is the language we're seeing at lines 14 through 17 of section 3.2 of Exhibit 25 speak to that?

A    It certainly does.

Q    And -- and, since we're here, do you recall your exchange with counsel for the Intervenors and perhaps counsel for the Plaintiffs about whether the City could take credit for a bed that was not 100 percent or whatever percent funded out of the City's general funds?  Do you

IV-270

recall that?

A     I do recall that.

Q     Did you at any time commit the City to fulfilling its bed count obligations under the Alliance Settlement Agreement solely out of City funds?

A     I didn't, and -- and I -- under no circumstances would I have agreed to that as --

Q     Why?

A     -- the negotiator or recommended it to Council. Principally because of the -- of the nature of -- of funding.  First of all, these -- housing is -- is expensive, and we appropriately rely on varying sources of funds, including from the State and Federal Government, to -- to provide housing, and the -- the very best example, again, going back to our permanent supportive housing program, there's been -- there's been a lot of discussion which is a separate discussion about how much permanent housing costs, but the City's program, no matter what the actual number, the -- the per door number is, the City's program that the voters voted to tax themselves to give the City bonding authority $1.2 billion to provide 10,000 units of permanent supportive housing.

     Our -- our contribution to each of those units is about -- on average about $150,000.  We've acquired a developer to go out and procured -- and secure the remaining funding to

IV-271

make the project work.  So, we're using $150,000 per door of tax -- of City tax dollars and -- and then there is a stack of funding to make -- to make the project work.  So, under no circumstances would we have even contemplated for a moment an obligation that the City would have to cover the entire cost of the entire housing unit in order for it to qualify.

Q     And as the lead negotiator for the City in connection with the Alliance Settlement Agreement, did you negotiate any limitations on the source of funds for beds in order for the City to be deemed -- to be creating those beds?

A     We did not, and we would not have agreed to that.

Q     As the lead negotiator for the City in connection with Exhibit 25, the Alliance Settlement Agreement, did you commit the City to limit the source of funds or the City to be deemed responsible for the beds being created under the Alliance Settlement Agreement?

A     We did not.

Q     And, as the lead negotiator for the City of Los Angeles in connection with Exhibit 25, which is the Alliance Settlement Agreement, did you limit the source of funds for beds for them to be counted towards the City's obligations under the Alliance Settlement Agreement?

A     We did not.

Q     Sir, let's take a look at section 3.1 of Exhibit 25.

IV-272

Now, section 3.1 says in the first dependent clause:

"The City agrees to create a required
number of housing or shelter solutions
which is equal to but (in the City's
discretion) may be greater than."

And -- and the rest of the sentence.  I want to focus on "create".  You were the lead negotiator for the City in connection with this agreement.  Is the term "create" defined in this settlement agreement?

A    It is not.

Q    Okay.  Is the word "provide" defined in Exhibit 25?

A    It is not.

Q    Is the word "responsible" defined in Exhibit 25?

A    It is not.

Q    Now, do you recall the colloquy that you had with counsel for the Intervenors, apparently -- or intermittently with the word "newly created" for beds?  Do you recall the terms "newly created"?

MS. MITCHELL:  Objection.  Misstates the question.

MR. MCRAE:  Well, it's my question.  So, I don't know how I could misstate my own question, but --

THE COURT:  Restate the question.

BY MR. MCRAE:

Q    Do you recall counsel for the Intervenors referring to newly created beds?

IV-273

MS. MITCHELL:  Objection.  Misstates the record.

MR. MCRAE:  Well, the record speaks for itself.

THE COURT:  I don't recall, but I'll overrule the objection.  So, you can answer if you recall that.

THE WITNESS:  It was a long period of time.  I -- it's very possible I guess.

BY MR. MCRAE:

Q    Okay.  Well, let's -- let me just ask you this question.  As far as the beds that are part of the City's obligation under the Alliance Settlement Agreement, did you negotiate any provision under that agreement that required that the beds be created only after the settlement agreement?

THE COURT:  Referring to the LA Alliance Agreement?

MR. MCRAE:  Yes.

THE COURT:  Thank you.

MR. MCRAE:  And I mean -- and thank you, your Honor.  And I mean -- in fact, I'm going to try that question again.  Thank you.

BY MR. MCRAE:

Q    Did you commit the City as lead negotiator under Exhibit 25, which is the Alliance Settlement Agreement, to create newly created beds?

A    From -- no.  Newly created beds, so, if we're talking

IV-274

about, for example -- there's nothing -- nothing in the agreement or nothing that we would have agreed to that would limit the City or require the City to construct from the ground up 12,915 beds, even -- again, the -- the range of options would allow for master leasing, for example.  You would not assume that all master leased units would be in units that were created after June 14th of 2022.  But if we were to secure units in an apartment building master leased, if we were to purchase -- for example, many of the units that we have -- that are -- that we are reporting were purchased through -- with a State match in the Project Home Key Program.  A number of hotels that we've purchased and converted to permanent housing, those -- those hotels certainly existed prior to the settlement agreement, but they're -- they're clearly in our view compliant because they were secured by the City to provide housing for homeless individuals after the -- after the settlement was agreed to.

Q    Sir --

A    I want to -- I want to restate that just briefly, if I could.

Q    Sure.  Of course.

A    That there are units that were -- became open and occupiable after the -- after the settlement was agreed to.

Q    And was there anything in your agreement that you

IV-275

helped negotiate on behalf of the City that would preclude the City under Exhibit 25, which is the Alliance Settlement Agreement, from purchasing a hotel in order to have beds to count towards its bed count obligations under that agreement?

A    No, there's nothing in that -- in the agreement that would prohibit that.

Q    Now, I want to go back to this discussion we were having about having eligible beds, not counting them for some time, and then counting them later, and I want to specifically talk to you about the In (sic) Safe beds.  Do you recall having a discussion with counsel for the Intervenors and Plaintiffs where certain structures were open, let's say in 2023, but not counted towards the bed count until later -- let's talk about the In Safe beds in particular.  Why would the City have beds that were open under the In Safe Bed Program a year or two earlier and not simply count them towards the bed count obligation until later?

A    So, the -- the program was -- has -- has evolved fairly significantly since its inception, and just in terms of -- of the timeline, Mayor Bass was elected and took office in December of -- of 2022.  First day in office, declared a state of emergency on homelessness and then began to initiate activity consistent with that state of emergency,

IV-276

including the Inside Safe Program.  At the time and when the -- in the first several months of -- of Inside Safe, the motels were secured on a very temporary basis based on where the operations were -- were going to be held.  We did not even have contracts for the hotels.  We just had authority for expenditure, and we -- and we just paid the -- the hotel on an invoice basis for the first -- for the first several months.  We did not even have contracts for -- for the -- the motels until several months later, in which we started to engage in booking agreements.

     Booking agreements, as I described earlier, is -- are contracts where we have the right to fill the available rooms in -- in the hotel or motel.  But as the program has become -- has matured, has become more institutionalized in the City, we're now in the third year of the program, it's clear that this is -- this is -- this is going to be some kind of an ongoing effort, and the nature of the agreements that we have, the contracts that we have with the motels give us certainty that -- that the motels that we have under contract now will be under contract next month and next month and next and the month after that, whereas it was really kind of a month-to-month situation when the -- when the program first started.  So, it would be very difficult for us to reliably report those beds.  Even though they were beds that were created after June of 2022 for the purposes

IV-277

of housing homeless individuals, it would have been very difficult to report given the variation and fluctuation of that housing stock.

We now have a much more stable stock of hotel and motel rooms for the program.  Some -- not all of them are under contract through -- through 2027.  Some of them are.  But those that are under contract for a year or two, we certainly are counting.  I have no -- I cannot guarantee that those rooms will not be in service in 2027.  They may be.  They may not be.  But if -- if some of them come offline, we would replace them consistent with our obligations in the settlement agreement.

Q    Let me -- let me ask you a question about that.  When you were negotiating the settlement agreement, Exhibit 25, with the Alliance, did you commit the City that in order for a bed to count towards this 12,915 beds, that the contract securing that bed had to make it continuously open from the time that the agreement was executed until 2027 June 15th in order for the bed to count?

A    No, certainly not.  And that would be -- and that would be inconsistent with the terms of the settlement because the obligation is to have the $12,915 beds open and occupiable by June of 2027.  There -- there were no interim deadlines or interim requirements for a certain number of beds to be open.  So, much like -- and I don't want to conflate the

IV-278

two, but much like with the Roadmap, the -- the flexibility in -- in the agreement as certainly was negotiated from the City's side, would allow us to add beds and then possibly, you know, take them out of service, add beds and count them, but if for some reason they -- they had to come out of service, we certainly would have an obligation to replace them in order to meet the number, that the number needed to be 12,915 beds created after -- after June of 2022, and we -- we will meet that obligation whether the Inside Safe beds that -- whether all of the Inside Safe beds that we're currently reporting are all continued or not.  If they're not continued, we'll replace them.

Q    Why do you -- why do you say that?  With what confidence that even if the Inside Safe beds are not available and in use, the ones that are being counted now in reports, that confidence that the City would, nonetheless meet the 12,915 count by June 15th, 2027?

A    There is a complete commitment by the leadership and every member -- I would say every member of the City Council, to meet our obligations under this settlement agreement and certainly the commitment from the Mayor.  As it relates to -- to Inside Safe, the -- the conversation has largely been around continually looking for sustainable housing interventions, potentially more sustainable than hotel and motel rooms, and -- and, so, I think the -- the --

IV-279

the commitment has been for the past several years, number one, to keep the beds open that we have open to the greatest extent possible.  That may be difficult, and I'm -- well, I'm just going to say it, to keep the beds open to the greatest extent possible, even in -- in the face of severe financial headwinds.

And -- and as we proceed over the next -- over the next two years, you know, the gap is 1900 -- 1900 beds.  Again, we -- we were able to stand up many more than that in the Roadmap Agreement.  The -- the commitment is there from the City Council and the Mayor and the funding as well.  So, I'm completely confident that whether there -- whether we stick with the same Inside Safe beds that we're reporting now, that -- that we'll meet the 12,915.

Q    So, sir, under -- and why don't we put Exhibit 25, the settlement agreement, back up.  Under this Alliance Settlement Agreement, which is Exhibit 25, is there any provision that states how long a bed must be open in order for that bed to count towards the 12,915 bed count?

A    No.  There's -- there's no provision in the -- in the agreement related to that.

Q    Is there any provision in the agreement that dictates when the City has to count an eligible bed as part of its quarterly reporting of the -- towards the 12,915 bed count?

A    There's no provision that -- that dictates that.

IV-280

MR. MCRAE:  And let's go to the -- well, this is 6 of 28.  The inter-pagination at the bottom is page one.  Let's go to page two of these recitals and ask you a question about lines 10 through 15 of page two of this -- your Honor, I've been told, by the way, this happens not because our technician is making it disappear.  Sometimes the screen just goes black.

BY MR. MCRAE:

Q    So, we're at lines 10 to 15, and there was discussion about this language.  I want to talk to you about this.  At least as far as you were concerned, as a lead -- as the lead negotiator for the City of Los Angeles and negotiating this settlement agreement, was it of any significance that this language that we're looking at about substantially increasing the number of housing and shelter opportunities in the City of Los Angeles and achieving a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles was included in the recital portion of this agreement as opposed to the terms portion of this agreement?

A    Yes.  The -- the reason -- although this is -- this is a concept that certainly I can represent that the Mayor and the City Council believe in and are working towards every day, one of the important principles of the City's position on -- as it relates to our obligations in the settlement was, to the greatest extent possible, keep the obligations

IV-281

within the purview of what the City could reasonably achieve, and the -- the broader concept and the broader effort that is really -- when we're talking about the -- the solution to unsheltered homelessness inherently requires multiple agencies, principally the County, to -- to be involved.

And, so, when we're talking about the entire process from moving someone from unsheltered homelessness to permanent housing, that's something that the City can't do on its own by itself, and we need our partners.  And -- and as it relates to a settlement agreement, it was appropriate that the City would only commit to that which it can control as the City itself unilaterally.  We can -- we can create beds.  We can build -- cause housing to be built.  But the entire -- but that is one piece of what has been described as the homelessness response system.  We don't control it unilaterally.  So, the -- the commitments in the agreement are -- are consistent with what the City is reasonably able to execute on its own.

Q    And, sir, let me ask you, if the City had -- if the negotiation of this settlement agreement had ended with just this paragraph, with the notion of substantially increasing the number of housing and shelter opportunities and achieving a substantial and meaningful reduction in unsheltered homelessness, would you have understood

IV-282

precisely what the City's obligations were?

          MS. MITCHELL:  Objection.  Vague.  Ambiguous. Improper hypothetical.

          THE COURT:  You can cast your opinion about that. Overruled.

          THE WITNESS:  The -- the recital in lines 10 through 15, it's -- it's entirely -- these are subjective standards.  Substantial and meaningful can mean a different -- that's a different standard, one person versus -- versus another.  We wouldn't, of course, agree to a substantial and meaningful standard to meet.  We wanted to -- numbers to meet an objective standard.

BY MR. MCRAE:

Q    And without a number in terms of bed count or encampment reduction, without an actual quantifiable number, would you even know what the target obligation was if the language were that the obligation is to substantially increase the number of housing and shelter opportunities?

A    No, we would not.  We would not know.

Q    Now, you were played some audio recordings in court yesterday.  Do you recall that?

A    I do.

Q    And --

          THE COURT:  Just a moment.  Can I please with both counsel, there were two audios played during these

IV-283

proceedings.  I need both of them marked for my record.

MR. MCRAE:  Yes.

THE COURT:  They were played at different times, and I want to divulge to all counsel, you know that I also act as a monitor on an LA Alliance case.  So, I've already heard the Mayor's address.

MR. MCRAE:  Okay.

THE COURT:  In other words, yesterday, the objection was that a portion of it was played.

MR. MCRAE:  Oh.

THE COURT:  I want to divulge to both of you that when the mayor gave the State of the City's address, I already heard that pursuant to the monitoring before we got involved in the hearing.  So, I -- I've heard the entire tape.

MR. MCRAE:  Thank you, your Honor.

THE COURT:  And you -- you'd requested that entire tape.

MR. MCRAE:  Yeah.  I appreciate that because I didn't know that, and I -- I didn't know what -- well, thank you.

THE COURT:  No.  I'm just disclosing to you the --

MR. MCRAE:  Thank you.

THE COURT:  In fact, I've listened to a number of Council meetings and Homeless Committee meetings in the

IV-284

past --

MR. MCRAE:  Thank you.

THE COURT:  -- as part of my monitoring duties and through the Special Master also.

So, here's a couple of things I will need marked just over the weekend for you.  First, I need you to mark the letter that came about homeless service data problems that you sought to introduce.  I didn't receive that, but that was a newspaper or an article from LA I believe or -- or one of you.

MR. MCRAE:  That was I believe with Mr. --

THE COURT:  No, no.  I'm just going to give you -- it doesn't matter.  Just here's our weekend homework.  Okay.

Number two, there was a matter raised with LAist with (indiscernible).  I need that marked.  You referred to that also.  I need both of the audio tapes played and marked, and one of those is the tape I think you're about to play or refer to.

MR. MCRAE:  Yeah, I was going to refer to it, your Honor.  Would you prefer --

THE COURT:  No, I'm going to mark them, just receive that.  Okay.

MS. MITCHELL:  Well, I think I already have, your Honor.  And that's what I want to -- if I didn't, I certainly intended to.  We already have it --

IV-285

THE COURT:  You played a part of it.  Counsel objected that we hadn't heard the whole part.  I expected this to come up in the redirect -- or re -- cross examination.  So --

MS. MITCHELL:  I just wanted to provide the exhibit numbers.  I think we --

THE COURT:  No, no.  We'll do that later.  That's homework.

MS. MITCHELL:  Okay.  Sure.

THE COURT:  Gentleman's on the stand.  We're taking time.

Your question?

MR. MCRAE:  Yes, your Honor.

BY MS. MYERS:

Q    Mr. Szabo, you heard, I believe the Court is correct, two recordings yesterday or portions of them.  Do you recall that?

A    I do.

Q    Referring to both of those recordings, did you hear anything in those recordings that would cause you to change the numbers reported by the City as far as its bed count obligation under the Alliance Settlement Agreement, which is Exhibit 25?

A    No, nothing at all.

Q    Did you hear anything in those recordings that would

IV-286

prompt you to change the reported numbers for the City's encampment reductions under the Alliance Settlement Agreement, which is Exhibit 25?

A    No.

Q    Did you hear anything in those recordings that would cause you to have any doubt as to the City's compliance with its obligations under the Alliance Settlement Agreement?

A    No, not at all.

Q    Or its compliance under the Roadmap Agreement with the County of Los Angeles?

A    No.

Q    Or with the City's ability to, as of June 15th, 2027, be in compliance with its obligations relative to bed counts under the Alliance Settlement Agreement?

A    No.

Q    Or with the ability or the -- or the -- or the City meeting its encampment reduction obligations under the Alliance Settlement Agreement in 2026?

A    No.

Q    Sir, does the Alliance Settlement Agreement define -- let me rephrase this.  Relative to an encampment reduction, under the Alliance Settlement Agreement, does the Alliance Settlement Agreement dictate a duration for how long the person who was the subject of the encampment reduction is off the street in order for that encampment reduction to

IV-287

count towards the City's obligations under the Alliance Settlement Agreement?

MS. MITCHELL:  Objection.  Calls for a legal conclusion.

THE COURT:  Overrule.  You can answer the question.

THE WITNESS:  No.  It only -- it only obligates the City to provide a -- a plan for an encampment engagement cleaning and reduction.

BY MR. MCRAE:

Q    And -- and, again, I'll make this clear, again.  I'm asking you your understanding in the congruence of your capacity as a lead negotiator for the City on behalf of the City of Los Angeles in connection with the Alliance Settlement Agreement.  Is that understood?

A    Yes.

Q    Thank you.  Uh --

THE COURT:  I'm sorry.  Counsel, would you state that again, please?

MR. MCRAE:  Yes.

THE COURT:  A little slower.

BY MS. MYERS:

Q    I am asking you your understanding and about the Alliance Settlement Agreement in your capacity as the lead negotiator -- or, excuse me -- based on your understanding

IV-288

as the lead negotiator for the City of Los -- let me start over.

I am asking you for your understandings based on your role as the lead negotiator for the City of Los Angeles in connection with the Alliance Settlement Agreement and the County MOU.  Do you understand that?

MS. MITCHELL:  Objection.  Calls for a legal conclusion and also lacks foundation.  And, frankly, relevance.

BY MS. MYERS:

Q    Do you understand?

THE COURT:  Just a moment.

(Pause.)

THE COURT:  So, then you're not acting as the spokesperson for the City or the central authority?  He's only answering this as the negotiator?

MR. MCRAE:  I wasn't -- I wasn't parsing it that way.

THE COURT:  I just want to make certain --

MR. MCRAE:  Yeah, I wasn't --

THE COURT:  -- if we have a central authority here, what capacity he's acting in.  That has a lot to do eventually with the doctrine that we're going to struggle with.

MR. MCRAE:  Right.  No, I understand.

IV-289

THE COURT:  Okay.  Ask your question.

MR. MCRAE:  Well, no, no, no.  In order to do that, your Honor, we've been going about an hour, would it be okay if I conferred with my team and --

THE COURT:  Absolutely.

MR. MCRAE:  Thank you.

THE COURT:  Absolutely.  In fact, you'll the time that's --

MR. MCRAE:  Yes.

THE COURT:  -- comfortable for the --

MR. MCRAE:  Okay.  Great.  I mean, can we do 10 minutes now?

THE COURT:  Absolutely.

MR. MCRAE:  Thank you, your Honor.

THE COURT:  Why don't you step down.  And, by the way, I've given the witness permission to talk to anybody, including the counsel that represent him.  Okay?

MR. MCRAE:  Thank you, your Honor.

THE COURT:  Thank you very much.

(Proceedings recessed briefly.)

THE COURT:  And we're back on the record.  Counsel are present, and we're back in session, and we're also on CourtSmart.

And, Counsel, have you had enough time to discuss this matter?

IV-290

MR. MCRAE:  Yes, your Honor.

THE COURT:  Thank you very much.

MR. MCRAE:  Thank you.

THE COURT:  And would you like to continue, please?

MR. MCRAE:  Yes, your Honor.

BY MR. MCRAE:

Q    Mr. Szabo, over the last couple of days, you've been testifying about the City of Los Angeles compliance under the Alliance Settlement Agreement and the MOU with the County, right?

A    Correct.

Q    And, with respect to all of your testimony about the City's compliance under those two agreements, have you been testifying in your capacity as the CAO?

A    I have, yes.

Q    And in your capacity as the CAO, are you the person most knowledgeable about the City's compliance under the Alliance Settlement Agreement?

A    Yes.

Q    And under the Roadmap Agreement that the County of Los Angeles and the City have?

A    Yes.

Q    And I've also been asking you questions today about the -- the -- your role as lead negotiator in negotiating the

IV-291

Alliance Settlement Agreement on behalf of the City.  Do you recall that?

A     Yes.

Q     And also your role as lead negotiator for the City in connection with the Roadmap Agreement that the City of Los Angeles has with the County of Los Angeles, is that right?

A     Yes.

Q     And when you were negotiating those agreements, the Alliance Settlement Agreement and the Roadmap Agreement, you were negotiating on behalf of the City of Los Angeles, right?

A     Correct.

Q     Now, if I were to ask you all the questions that I've asked you about the understanding that you have about the Alliance Settlement Agreement and the County Roadmap MOU Agreement, when I was asking you those questions in your capacity as the lead negotiator for the City, would your answer to any of those questions have changed if you were answering them in your capacity as the CAO?

A     Not at all.

Q     Okay.  Thank you.  So, let's go back to Exhibit 25, and I want to go to paragraph 18 of Exhibit 25.  Mr. Szabo, directing your attention to paragraph 18 of Exhibit 25, which is the Alliance Settlement Agreement, the language that says in lines two through this:

IV-292

"This agreement constitutes the entire agreement between Plaintiffs and the City regarding the subject matter discussed hereof and supersedes any and all other agreements, understandings, negotiations or discussions either oral or in writing, express or implied between or among the parties relating to the subject matter hereof."

Did you also participate in the negotiation of this language?

A    Yes.

Q    And directing your attention to the last three lines of section 18 of Exhibit 25, reading:

"Any alteration change or modification of or to this agreement shall be made by written instrument executed by each party hereto in order to become effective."

Did you also participate in the negotiation of that language?

A    Yes.

Q    And was it important as you were negotiating this agreement, to have this language on behalf of the City?

A    Yes, extremely important.

IV-293

Q     Why?

A     Because the nature of -- the nature of this case that became -- that was resolved with the settlement had wide ranging discussions, multiple discussions in closed session. Our negotiations were wide -- again, wide ranging, and it covered a number of areas and possibilities before we settled on -- on these particular terms.  And, of course, I'm not going to go into any of that, but these were the terms that we agreed to, and it was important because multiple conversations had been had with multiple elected officials that -- that represent the City over the course of the time that -- that this -- between the time that the lawsuit was filed and the resolution in the settlement.  It was important that it was clear that -- that these were the terms and these were the only terms that the City was agreeing to.

Q     And, sir, let me -- let me ask you do you recall having a discussion with counsel for the Plaintiffs and counsel for the Intervenors about encampment reductions?

A     Regarding encampment reductions?

Q     Yes.

A     I do.  We've had multiple conversations.

Q     And -- and I mean in court, in other words, during your examination, when you were questioned about that?

A     Yes, of course.

IV-294

Q    And looking at Exhibit 25, which is the Alliance Settlement Agreement, are you aware of any language in that agreement that says that a encampment reduction that happens as a result of Care Plus activity cannot be counted towards an encampment reduction under the Alliance Settlement Agreement?

A    No, not at all.

Q    Would you have ever negotiated as part of this agreement that the City would not be able to count a Care Plus reduction of an encampment as an encampment reduction under this agreement?

A    No, not -- not at all.

Q    Why not?

A    This -- this agreement was limited to obligating the City to create housing.  Obligations or regulations of how the City addresses encampments was not -- was not -- is not part of a settlement.  It wasn't part of a settlement.  It was not -- not agreed to in any way other than our -- you know, the -- the item or the provision that requires the -- the milestones.  But we did not agree to anything that would regulate, limit or require the City to do anything relating to -- to encampments.

Q    And, just so that we're clear, do you see anything in Exhibit 25 that says that the label -- let me rephrase.  Do we -- do you see anything in Exhibit 25 that says that the

IV-295

name by which an encampment reduction is called will determine whether it can be counted as an encampment reduction?

A    No, there's nothing in there that addresses that.

Q    Now, you were asked yesterday about budget cuts that the City of Los Angeles has been facing.  Do you recall that?

A    I do.

Q    And is there anything about those budget cuts that causes you to believe that the City of Los Angeles will fail to comply with its obligations under the Alliance Settlement Agreement?

A    No.  No, even though the budget cuts are -- were severe, I -- I think the budget -- this year's budget in particular is a clear and convincing sign of the City's commitment to investing in homelessness solutions.  There were -- there were severe cuts that were taken in very high priority departments.  But even in the midst of that, Council continued its commitment with more than $300 million of the City's general fund towards our -- our homelessness efforts.

Q    Sir, does the City of Los Angeles under the Alliance Settlement Agreement, have options to choose from in terms of the type of beds it will provide in order to satisfy its obligations of bed count under that agreement?

IV-296

A     The City -- the City retained broad discretion.

Q     So, let me -- let me -- terms that have been used in the court here, interim housing, do you recall that being discussed here?

A     Yes.

Q     Permanent housing, do you recall that?

A     Yes.

Q     By the way -- by the way, are there other terms in connection with the sorts of beds that are the constituent elements of the bed count that the City reports on beyond permanent or interim?  Are there other sorts of beds that go into that mix of information that's reported?

A     Those are the -- those are the two principal essentially umbrellas.  There are different types of permanent housing and different types of interim housing, but generally the housing intervention -- housing interventions and housing solutions are categorized as either permanent or interim.

Q     As -- did you want to commit the City under the Alliance Settlement Agreement to have to use the cheapest and quickest bed solution in order to comply with the Alliance Settlement Agreement?

        MS. MITCHELL:  Objection.  Mr. Szabo's wants I think is -- are irrelevant here.

        THE COURT:  Overruled.  You can answer the

IV-297

question.

THE WITNESS:  No.  That was flexibility in the -- in the type of housing and the manner in which that housing was provided.  How much the City paid for it was an important -- an important bargaining position that I insisted upon at the direction of the City, the Mayor and the Council.

BY MR. MCRAE:

Q    So, for critics who say that permanent housing solutions cost more money and take longer, do you take those criticisms to mean that the City doesn't have discretion to pursue that policy towards satisfying its obligations if it wants to under the Alliance Agreement?

MS. MITCHELL:  Objection.  Calls for a legal conclusion.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  No, not at all.  And -- and, just to -- to emphasize that point, we certainly would not have even been at liberty to agree to anything of the sort because it was the voters who decided in 2016 to invest in permanent housing, and a settlement agreement was not going to -- at least as far as I was concerned and as far as the City Council was concerned, as the City Council and the Mayor were concerned, overturn the will of the voters.

IV-298

THE COURT:  Just a moment.  I think that's what we've been trying to avoid are those kinds of conversations that you may have had with the Mayor or the City Attorney. That would have been Feuer at the time, wouldn't it?

THE WITNESS:  Uh --

THE COURT:  Whatever.  I don't --

THE WITNESS:  Yes, yes.

MR. MCRAE:  Just so that we're clear --

THE COURT:  I don't -- I don't want to open up that door, Counsel.

MR. MCRAE:  Okay.

THE COURT:  You seem to be opening that door right now about those kinds of conversations.  I may be wrong about that, but I want to be cautious and coequal.

MR. MCRAE:  Very well, your Honor.

THE COURT:  Okay.

MR. MCRAE:  I'll move on.

THE COURT:  All right.

MR. MCRAE:  Thank you.

THE COURT:  If you want to inquire, but I don't know if that door is open or not.  I'm trying to stay away from conversations until we make some --

THE WITNESS:  Can I actually clarify that, maybe?

MR. MCRAE:  By all means.

THE WITNESS:  It's -- it's just that the -- the

IV-299

actions, the City took action to put -- to place before the voters an initiative to build --

THE COURT:  HHH?

THE WITNESS:  HHH, correct.  And, so -- and, so, in my capacity in representing prior actions of the City, I wouldn't agree to anything that would in any way limit our ability to implement the -- the voter approved initiative.

THE COURT:  And the Mayor I'm assuming at that time would have been Garcetti?

THE WITNESS:  Correct.

THE COURT:  Not Bass obviously.

THE WITNESS:  Correct.

THE COURT:  All right.  Thank you.

BY MR. MCRAE:

Q    And -- and you were here when I want to say Elizabeth Funk -- I believe that was the witness's name who testified as the CO of --

THE COURT:  Counsel, we've got about at the most five more minutes, and then --

MR. MCRAE:  Okay.

THE COURT:  -- 6 o'clock everybody has to be out of the courthouse.

MR. MCRAE:  I'm moving on to another topic if you --

THE COURT:  I know.  I'm just saying at 6 o'clock,

IV-300

everybody needs to --

MR. MCRAE:  Okay.

THE COURT:  -- be out of the courthouse, not --

MR. MCRAE:  Okay.

THE COURT:  -- packing their bags.

MR. MCRAE:  Oh, out of the courthouse, not leave at 6 but be -- okay.

THE COURT:  Right.

MR. MCRAE:  I'll just -- well, let me do this then.

BY MR. MCRAE:

Q    Do you see any provision in the Alliance Settlement Agreement that encampment reduction will be defined based on how the City may use the term encampment resolutions in context outside of the Alliance Settlement Agreement?

A    Nothing at all.

Q    And you heard of the tiny bed company, Dignity Moves? I'm sorry.  I said tiny bed.  I mean tiny homes.  That would be -- that was a malapropism.  I mean, tiny beds, tiny homes.  Sorry.

MS. MITCHELL:  I think it also misstates the testimony.  Objection.  It's not a tiny home company.

MR. MCRAE:  Okay.

MS. MITCHELL:  They do modular housing.

MR. MCRAE:  Modular housing.

IV-301

THE COURT:  Modular.

MR. MCRAE:  Modular housing.  I thought I heard that.

THE COURT:  I'm just going to suggest something. Why don't you just pick with that point.

MR. MCRAE:  That's fine.

THE COURT:  If you have more, I -- I don't want you pressed for time.

MR. MCRAE:  Thank you, your Honor.

THE COURT:  All right.  Here's what I need, once again.  I need this exhibit marked.  I forget, which one of you brought this to the Court's attention?

MR. UMHOFER:  Your Honor, I believe that that was brought forward by Plaintiffs for -- by Counsel for the City during the testimony.

THE COURT:  City?  Okay.  I want that marked.  I want the LAist article marked that you referred to.  I want the --

MS. MITCHELL:  Audio?

THE COURT:  -- tape that you played from the Mayor's --

MS. MITCHELL:  Your Honor, just the clips or the full?

THE COURT:  No.  I want -- I -- I'm going to suggest the whole thing.  There was an objection that only

IV-302

parts of it were played.  I -- I've heard the entire speech by the Mayor to the City.  So, you've -- you've actually -- you've actually got a transcript, quite frankly of, it.  So, attach the transcript to that tape, and I think two portions were played.

Have a wonderful weekend, and could we reconvene at 9 o'clock?  I have to start -- I have three or four other matters before you come into court on Monday, and I need the lunch hour also for another matter and then after you leave, because we keep the calendar going, and also, I want consecutive days.  Okay.

MR. MCRAE:  Yes, your Honor.

THE COURT:  So, Monday 9 o'clock?

MR. MCRAE:  Yes, your Honor.

MS. MITCHELL:  Thank you, your Honor.

THE COURT:  Wish you all the best of weekends.  Okay.

MS. MITCHELL:  We're in this courtroom again?

THE COURT:  Yeah, we're here until minimally Wednesday if we need it.

MS. MITCHELL:  Thank you.  Did you want to talk about C and --

THE COURT:  No.  We're off -- we're off the record now.  Have a good weekend.

ALL:  Thank you, your Honor.

IV-303

(Proceedings concluded.)

IV-304

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/Jordan Keilty                          5/31/2025
Transcriber                               Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:


/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.