UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) | CASE NO: 2:20-CV-02291-DOC-KESx |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Los Angeles, California |
| vs. | ) | |
| | ) | Monday, June 2, 2025 |
| CITY OF LOS ANGELES, ET AL., | ) | |
| | ) | (9:04 a.m. to 12:06 p.m.) |
| Defendants. | ) | (1:06 p.m. to 5:55 p.m.) |

EVIDENTIARY HEARING RE COMPLIANCE WITH THE LA ALLIANCE
SETTLEMENT AGREEMENT [DKT.NO.767][863]
AND THE ROADMAP MOU AGREEMENT

(DAY 5)

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:               SEE PAGE 2

Courtroom Deputy:          Karlen Dubon

Court Reporter:            Recorded; CourtSmart

Transcribed by:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

APPEARANCES:


For Plaintiffs:            ELIZABETH A. MITCHELL, ESQ.
                           MATTHEW UMHOFER, ESQ.
                           Umhofer Mitchell & King
                           767 S. Alameda Street, Suite 270
                           Los Angeles, CA 90021
                           213-394-7979


For Defendants:            LAUREN M. BRODY, ESQ.
                           Miller Barondess, LLP
                           1999 Avenue of the Stars, Suite 1000
                           Los Angeles, CA 90067
                           310-552-4400

                           THEANE D. EVANGELIS, ESQ.
                           Los Angeles City Attorney's Office
                           200 N. Main Street, Room 675
                           Los Angeles, CA 90012
                           213-978-6952

                           MARCELLUS A. MCRAE, ESQ.
                           JOSEPH EDMONDS, ESQ.
                           KAHN A. SCOLNICK, ESQ.
                           PATRICK J. FUSTER, ESQ.
                           ANGELIQUE KAOUNIS, ESQ.
                           JAMES N. ROTSTEIN, ESQ.
                           Gibson Dunn & Crutcher
                           333 South Grand Avenue
                           Los Angeles, CA 90071

For Intervenor:            SHAYLA R. MYERS, ESQ.
                           Legal Aid Foundation of LA
                           7000 S. Broadway
                           Los Angeles, CA 90003
                           213-640-3983


Special Master:            MICHELLE MARTINEZ

3

**INDEX**

| PLAINTIFFS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **MATT SZABO** | | | | |
| BY MR. MCRAE | | 6/42/60 | | |
| BY MS. MITCHELL | | | 72/88 | |
| BY MS. MYERS | | | | 116 |
| BY MR. MCRAE | | | | 172 |
| **BRIAN ULF** | | | | |
| BY MS. MITCHELL | 193/208 | | | |
| BY MR. FUSTER | | | 219 | |
| **LISA RAAGAS** | | | | |
| BY MR. UMHOFER | 225 | | 272 | |
| BY MS. KAOUNIS | | 248 | | |
| BY MS. MYER | | 260 | | |

**EXHIBITS RECEIVED**                                                   **NONE**

**EXCEPTIONAL REPORTING SERVICES, INC**

**4**

**Los Angeles, CA; Monday, June 2, 2025; 9:04 a.m.**

--oOo--

THE COURT:  We're on CourtSmart, counsel, are you comfortable proceeding this morning?

MR. MCRAE:  Yes, Your Honor.

THE COURT:  All right.  Thank you.  Mr. Szabo was in the middle of testimony on behalf of Gibson Dunn.

MS. MITCHELL:  And, Your Honor, as Mr. Szabo is walking to the stand I did want to let the Court know that we will be lodging this morning the three audio files that the Court requested were marked and obviously counsel has a copy and then we also will be marking as an exhibit the LAS article as the Court requested on Friday.

THE COURT:  All right.  We'll come back to that.

MS. MITCHELL:  Thank you.

THE COURT:  Let's get started with the testimony.  Time is valuable.  And, counsel, since we're back on CourtSmart, just reintroduce yourself to the record.

MR. MCRAE:  Will do, Your Honor, Marcellus McRae, Gibson Dunn & Crutcher appearing on behalf of the City of Los Angeles.

MS. MITCHELL:  And good morning, Your Honor, Elizabeth Mitchell and Matthew Umhofer on behalf of plaintiff LA Alliance for Human Rights.

THE COURT:  Counsel.

**5**

MS. EVANGELIS:  Good morning, Your Honor, Theane Evangelis on behalf of the City of Los Angeles.

MR. EDMONDS:  Good morning, Your Honor, Joseph Edmonds with Gibson Dunn & Crutcher --

THE COURT:  Thank you.

MR. EDMONDS:  -- on behalf of the City.

MS. KAOUNIS:  Good morning, Your Honor, Angelique Kaounis, Gibson Dunn on behalf of the City.

THE COURT:  Good morning.

MR. SCOLNICK:  Good morning, Your Honor, Kahn Scolnick, Gibson Dunn on behalf of the City.

THE COURT:  Okay.  Thank you.

MR. FUSTER:  Good morning, Your Honor, Patrick Fuster of Gibson Dunn & Crutcher on behalf of the City.

THE COURT:  All right.  Thank you.

MR. ROTSTEIN:  Good morning, Your Honor, James Rotstein of Gibson Dunn on behalf of the City.

MS. BRODY:  Lauren Brody Miller on behalf of the County.

THE COURT:  Okay.  Thank you.

MS. MYERS:  Good morning, Your Honor, Shayla Myers from the Legal Aid Foundation of Los Angeles on behalf of intervenors.

THE COURT:  And Mr. Szabo will return to the stand. And the same oath that was administered last week applies

today.  Thank you, sir.  Please proceed, counsel.

            **THE WITNESS:**  Thank you.

        **MATT SZABO, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN**

                        **CROSS EXAMINATION**

**BY MR. MCRAE:**

Q   Mr. Szabo, last week you talked about how the Exhibit 23 which is the assessment conducted by A&M professed that it wasn't conducted in accordance with any applicable standard. Do you recall that?

A   I do, yes.

Q   And are you aware that the various audits that you were shown last week by counsel for the plaintiffs reported that they were conducted under standards that differed one audit to the next?

A   Yes, I'm aware that there were different standards.

Q   And given your background and experience and current duties would comparing different reviews conducted in accordance with different standards have any impact on the conclusions that you could draw from such a comparison?

A   Well, it certainly would.  I mean that's -- that is one of the reasons that it is important when conducting reviews which will yield findings and recommendations that certainly a government agency, a government entity would act upon.  You would want a study that relies on generally accepted standards so that you can -- particularly over time have confidence in

Szabo - Cross / By Mr. McRae                                    **7**

the quality of the findings and the recommendations.

Q    And, sir, would you ever as CAO of the City of Los Angeles advise the City that it should do a comparison of different audits of different things over different time periods to inform a determination of whether the City will be in compliance with its obligations under the Alliance settlement agreement in 2026?

A    No, I would not.

Q    Or would you do such a comparison in order to determine whether the City of Los Angeles will be in compliance with its obligations under the Alliance settlement agreement in June of 2027?

          **MS. MITCHELL:**  Objection, vague, ambiguous and leading, Your Honor.

          **THE COURT:**  Do you understand the question?

          **THE WITNESS:**  I do.

          **THE COURT:**  You may answer.

          **THE WITNESS:**  No, I would not.

**BY MR. MCRAE:**

Q    Would you do such a comparison in order to have a determination of whether the City of Los Angeles will be in compliance with the Road Map settlement agreement that the City of Los Angeles has with the County of Los Angeles?

          **MS. MITCHELL:**  Same objection.

          **THE COURT:**  Overruled.

**THE WITNESS:**  No, I would not.

Q    And under the Alliance settlement agreement did the City of Los Angeles ever commit to address any of the concerns raised in any of the audits that you were shown last Thursday?

A    No the City did not.

Q    And under the Road Map settlement agreement with the County of Los Angeles that the City of Los Angeles has, did the City of Los Angeles ever commit to address any of the concerns raised in any of the audits that you were shown last Thursday?

A    No, the City did not make that agreement.

Q    And do any of the assessments, findings regarding TLS beds change your confidence in the number of beds the City has reported under the Alliance settlement agreement?

A    No.

Q    And do the -- do any of the assessments, findings regarding TLS beds change your confidence in the number of beds the City has reported under the Road Map settlement agreement with the County of Los Angeles?

A    No.

Q    Now, we started to talk about modular homes that were described by Ms. Funk last week.  Sir, let me ask you, are you aware that the cost of modular homes that Ms. Funk described do not include the cost of any of the services that are ancillary to persons occupying modular homes?

**THE COURT:**  I'm not sure I understand the question,

Szabo - Cross / By Mr. McRae                           **9**

counsel, could you reask it?

MR. MCRAE:  Sure.  I'll try it again.

**BY MR. MCRAE:**

Q    Are you aware that the cost of a modular home, in and of itself, just the modular home that Ms. Funk described does not include any of the services that are ancillary for persons occupying those modular homes?

MS. MITCHELL:  Objection, lacks foundation, vague, ambiguous, calls for speculation.

THE COURT:  Overruled, you can answer the question.

THE WITNESS:  Yeah, that would be -- it's typical that the services costs are separate from the capital costs.

Q    Right.  And you also heard Ms. Funk explain that modular homes sit on land that is leased for a limited duration.

MS. MITCHELL:  Objection, misstates the testimony as to lease.

THE COURT:  Overruled, you can answer the question.

THE WITNESS:  I -- if -- I don't recall everything that she said in her testimony.  I believe that -- yeah, I actually don't recall.

Q    Okay.  And any of the examinations by plaintiff counsel or the intervenors last week, did anyone present to you the total cost of the ancillary services for persons occupying these modular homes?

A    No.

Szabo - Cross / By Mr. McRae          **10**

Q    In any of the examination by plaintiffs' counsel or the intervenor's counsel last week, did anyone present to you the total cost of leasing or purchasing land on which the modular homes would sit?

A    No.

Q    In any of the examinations by plaintiffs' counsel or the intervenor's counsel last week did anyone present to you anything in the form of a guarantee that any leased land for the modular homes would be available for renewal when the lease is expired?

A    No.

Q    And, sir, in your experience as the CAO, do these sorts of considerations about the costs and duration of available options to address homelessness lend themselves to a one size fits all option to address homelessness?

        **THE COURT:**  Do you understand the question?  I'm not sure I do.  Counsel, can you restate that question please?

        **MR. MCRAE:**  Certainly, Your Honor.

**BY MR. MCRAE:**

Q    In light of these sorts of considerations about cost and duration of available options to address homelessness is it your experience that there's a one size fits all option to address homelessness?

A    There isn't and again as I've stated a number of occasions, it's critical that the City maintain flexibility

Szabo - Cross / By Mr. McRae                    **11**

because different scenarios, different plots of land, different

opportunities require the flexibility to require the solution

that's most suitable.  And suitable would also include

feasibility financially.

Q    And, sir, do you recall last week being questioned about

Mr. Torres (phonetic)?

A    Yes.

Q    And does Mr. Torres work for you, sir?

A    He does.

Q    And did you ever authorize Mr. Torres to speak on behalf

of the City of Los Angeles regarding what its obligations are

under the Alliance settlement agreement?

A    Staff that work in the CAO's homelessness unit oftentimes

do report to the City Council on reports that they played a

part in preparing.  And so to the extent that the report

related to the -- related to obligations in the Alliance

settlement, staff is certainly authorized to speak about that

which is in the report.

Q    So setting that aside, did you ever authorize Mr. Torres

to interpret on behalf of the City the meaning of the terms

under the Alliance settlement agreement?

A    No.

Q    Did you ever authorize Mr. Torres on behalf of the City of

Los Angeles to interpret the meaning of the terms in the Road

Map settlement agreement with the County of Los Angeles?

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Mr. McRae                    **12**

A    No.

Q    And to your knowledge, did the City of Los Angeles ever authorize Mr. Torres to speak on its behalf to interpret the meaning of the terms under the Alliance settlement agreement?

A    No.

Q    And to your knowledge, did the City of Los Angeles ever authorize Mr. Torres to speak on its behalf regarding the meaning of the terms under the Road Map settlement agreement with the County of Los Angeles?

A    No.

Q    And has the City's bed count obligation of 12,915 under the Alliance settlement agreement ever been modified in accordance with paragraph 18 of the Alliance settlement agreement which is Exhibit 25 requiring a writing executed by the parties?

A    I'm going to try to take a look at the exhibit really quickly.

Q    Sure.

        THE COURT:  Why don't you put that up.

        MR. MCRAE:  I think it's there.

BY MR. MCRAE:

Q    And let me repeat the question.  Has the City's bed count obligation 12,915, under the Alliance agreement, ever been modified?

A    If I recall correctly I believe the first number that we

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Mr. McRae                    **13**

reported may have been something like 12,909 and we made a

technical adjustment.  I believe that's the case.

Q    And since having agreed on the number of 12,915 for the

City's bed count obligation, has that bed count number the

Alliance settlement agreement ever been modified?

A    No.

Q    And as far as the encampment reduction obligations of

9,800, has that number of 9,800 encampment reductions after it

was agreed upon by the parties ever been modified under the

Alliance settlement agreement?

A    Not since the agreement, no.

        **MR. MCRAE:**  Your Honor, may I have one second to

confer with my colleagues?

    **(Pause)**

Q    And as far as beds counted towards the Alliance settlement

agreement, are you aware of any beds that have no financial

contribution out of the City's own funds?

A    No, I'm not.

Q    And has the City's bed count obligation of 6,700 under the

Road Map agreement ever been modified after the parties agreed

upon the 6,700 number?

A    The number has not been modified, no.

Q    As lead negotiator for the City under the Alliance

settlement agreement, did you place any conditions in that

agreement regarding how long an available bed had to remain

Szabo - Cross / By Mr. McRae                                 **14**

open in order for it to be counted towards the 12,915 bed count?

A    No, that -- the length of time a bed needed to be opened was not discussed and it is not in the agreement.

Q    As lead negotiator for the City of Los Angeles under the road map settlement agreement with the County of Los Angeles, did you place any condition regarding how long an available bed had to remain open in order to be counted under that Road Map agreement?

A    No condition on a length of time of a particular bed. Obviously inherent in the agreement with the County it is -- it was a five year term where we needed to maintain a number in order to qualify for the maximum contribution toward the services.

Q    And, sir, I want to talk to you about your thought process heading into negotiating the Alliance settlement agreement on behalf of the City.  Was there a distinction -- well, let me start with this.

     As you approached those negotiations relative to the Alliance settlement agreement on the City's behalf, did you have an understanding of what you were willing to obligate the City to do under the Alliance settlement agreement?

A    Oh, yes.

Q    And at the same time as you approached those negotiations on the City's behalf in connection with the Alliance settlement

Szabo - Cross / By Mr. McRae                    **15**

agreement did you also have in mind things that you wanted the City to be free to do above and beyond what it was obligated to do under the Alliance settlement agreement?

A    Yes.

Q    And is what you were willing to obligate the City to do under the Alliance settlement agreement the same thing as what you wanted the City to be free to do above and beyond what's in the Alliance settlement agreement?

          **MS. MITCHELL:**  Objection, vague, ambiguous.

          **THE COURT:**  Do you understand the question?  It really goes to state of mind, your intent.

          **THE WITNESS:**  Sure.  I mean, I can --

          **THE COURT:**  Counsel, just reask it.

          **MR. MCRAE:**  Sure.

**BY MR. MCRAE:**

Q    And was there a difference in your mind between what you were willing to obligate the City to do under the Alliance settlement agreement as opposed to things that you wanted the City to be free to do above and beyond what was contained in the Alliance settlement agreement?

A    What I was interested in securing in the final agreement were obligations that were consistent with the City's policy priorities and which were consistent with measures that the City was -- is and can be reasonably expected to successfully execute.

Szabo - Cross / By Mr. McRae                    **16**

Q    And to put a finer point on this, when you negotiated the
Alliance settlement agreement on the City's behalf, beyond the
obligations of the City in that agreement was it your intent
that the City would be able to pursue other things beyond the
agreement to address homelessness?

A    Certainly.

Q    And when you negotiated the Road Map agreement between the
City of Los Angeles and the County of Los Angeles was it your
intent that the City of Los Angeles would be free to do things
beyond the Road Map agreement in addressing homelessness?

A    Yes.

Q    Why was that important to you for the City to have the
ability to do things above and beyond what its obligations were
under the Road Map and Alliance settlement agreements
respectively?

A    Well, part of my job is to protect and preserve the
authority of the Mayor and the Council in their role as setting
the policy priorities and the funding priorities with the City.

So as it relates to what we were willing to agree to
certainly we could be -- we'd be willing to agree to obligate
the City to do certain things over a certain period of time to
meet the settlement requirements, but I would never have agreed
to limit the City's authority to anything that doesn't exist in
the settlement agreement.  I never would have agreed to that,
would not have recommended it to the City Council and even if I

Szabo - Cross / By Mr. McRae                    **17**

did it wouldn't have been approved.

Q    And you've talked about this discretion.  In your mind, when you negotiated the Alliance settlement agreement was there a distinction between the City's obligations under the agreement and the options available to the City to fulfill those obligations?

     Let me rephrase the question specifically with the bed count obligation.  As you were negotiating the Alliance settlement agreement was there a distinction in your mind between the bed count obligation, 12,915 and the choices or options available to the City in fulfilling that obligation?

A    There wasn't a distinction, but the flexibility and discretion that the agreement provided to the City was essential in giving us the confidence that we would be able to fulfill the agreement.

Q    And did you ever commit the City of Los Angeles in the Alliance settlement agreement to use only one approach to achieve the bed count obligation under that agreement?

A    No.

Q    Did you ever on behalf of the City of Los Angeles committed to have only one approach to achieve the encampment reduction obligation under the Alliance settlement agreement?

A    No.

Q    Now, sir, we were talking about doing things above and beyond the Alliance settlement agreement.  Did you ever

Szabo - Cross / By Mr. McRae                    **18**

consider telling the City of Los Angeles that it should stop

doing things to address homelessness that go beyond its

obligations under the Alliance settlement agreement to prevent

any claims that the City is now obligated to do more than it's

required to do under the agreement?

      **MS. MITCHELL:**  Objection, vague and ambiguous as to

things.

      **THE COURT:**  Yeah, sustained.  Can you restate that,

counsel?

      **MR. MCRAE:**  Sure.

**BY MR. MCRAE:**

Q    So did you ever think of telling the City that it should

stop engaging in efforts through the various programs that you

testified about last week to address homelessness that go

beyond its obligations under the Alliance settlement agreement

in order to prevent claims that by doing those additional

efforts the City is now obligated to do more than it's required

under that agreement?

A    No.  Never.  And the City has and continues to fund

programs and services outside of the scope of this agreement.

Q    Sir, have you ever heard the expression that two things

can be true at the same time?

A    I have.

Q    And you agree with the assertion that the City of Los

Angeles' efforts to address homelessness writ large can be

Szabo - Cross / By Mr. McRae                    **19**

improved?

A    I agree with that.

Q    And in your view acknowledging that the City of Los Angeles' efforts to address homelessness writ large can be improved, is that a concession in your view that the City of Los Angeles is not complying with its obligations under the Alliance settlement agreement?

A    Not at all.

Q    Why not?

A    Because we have very specific obligations in the settlement agreement.  The -- as it has often been referred to in this courtroom the homelessness response system is an imperfect system that relies on multiple agencies.  It is a system and I want to put quotes around system because it is a series of programs and efforts that have been built over a very short period of time to respond to a humanitarian emergency on the streets.

So this wasn't a system that was developed over ten years of research and careful thought.  There was always a need to immediately serve the people who were in serious -- who are suffering in serious ways on the street and oftentimes when you're trying to push resources out or house the person whatever -- you know, however you possibly can, it's not going to build the perfect system.

So certainly there can be improvements in the system,

Szabo - Cross / By Mr. McRae                **20**

there need to be improvements in the system, but that has

nothing to do -- and in fact, I would even argue that it shows

the commitment to meeting our obligations because I think

inherent in the conversation around, that led to the settlement

is we're going to do as much as we can in as many ways as we

can, which is why there's such flexibility in how we can do it

to provide housing that can be used to move people off the

street and ultimately into permanent housing.

So absolutely, do we need to improve the system, do we

need to improve certain programs, no question about it, but

that -- you know, as we are complying and as we are taking all

the steps that we need to comply with our obligations that can

be true at the same time.

Q   Sir, let me ask you the same question relative to the Road

Map agreement.  Does acknowledging that the City of Los

Angeles' efforts to address homelessness writ large can be

improved in your view amount to a concession that the City of

Los Angeles is not complying with its obligations under the

Road Map agreement with the County of Los Angeles?

A   Not at all.

Q   Is that for the same reasons you just testified relative

to the City's compliance of its obligations under the Alliance

settlement agreement?

A   It is and then I would also add one thing, one component

to that which is both in the Road Map and in the Alliance

settlement, the systems as we're referring to it or the system as we're referring to it existed and did have challenges both before we reached the Road Map agreement and before we reached the Alliance settlement agreement.

And there was no discussion anywhere that said you can do X, Y and Z, you can do master leasing, you can do rental subsidies, you can do short term housing or excuse me, you can do shared housing, you can do interim, you can do permanent, nowhere was there any discussion and nowhere in the agreement does it say except for if you have to rely on LAHSA.  It doesn't say that.  LAHSA existed.  We relied on LAHSA for our programs before the Road Map, during the Road Map and we will -- well, we'll see what happens but -- and we relied on LAHSA before the settlement and we are relying on it in certain circumstances as we proceed towards compliance.

Q    Sir, I want to talk to you about encampment reductions in some more detail.  Do you recall testifying last week in substance or effect that encampment reductions could be achieved in different forms?

A    I'm sorry could you repeat that?

Q    Sure.  And if you didn't say this, then that's fine, you can disabuse me of it.

Do you recall testifying in essence that an encampment reduction, as you defined an encampment reduction, could occur in different forms?

Szabo - Cross / By Mr. McRae                    **22**

A      Yes.

Q    Or actually let me rephrase that to maybe improve that. Do you recall testifying that an encampment reduction could occur through different approaches?

A      Yes.  That's a better way to describe what I said.

Q    Thank you.  And can you remind us to constitute an encampment reduction you had colloquy with counsel multiple times on this question about what you understand the term encampment reduction to mean in order to constitute an encampment reduction?  But since that was last week, can you tell us was your understanding that it's when the City removes and takes possession of a tent, make shift shelter or a vehicle and if that's wrong, I want you to use your own words, please.

A      No, that's correct.  The milestones that we agreed to, the ones that are operative today focus solely on the removal of a tent, a makeshift shelter, a car or an RV period.  It did not describe anything further as it relates to the policies, procedures approach or a program which would be used to achieve that removal.

Q    And that understanding that you just articulated, is that what you negotiated under the settlement agreement with the Alliance on behalf of the City in order for those encampment reductions to count under that agreement?

A      Yes, only -- again only to say that again, these are milestones.  The settlement agreement itself, the requirement

Szabo - Cross / By Mr. McRae                                    **23**

to remove a certain number of encampments, in my view, is not

required by the settlement itself.  Rather establishing

milestones for reduction and reporting on those milestones is,

but with that caveat, yes.

Q    And you have Exhibit 25.

        **MR. MCRAE:**  Why don't we put that up on the screen.

Q    And you have a physical copy up there I believe you do --

A    Yes.

Q    -- with the other documents that you have.  In this

Exhibit 25 which is the Alliance settlement agreement, did you

at any point in the final version of the agreement which

Exhibit 25 is ever agree that in order for an encampment

reduction to count under the Alliance settlement agreement it

would have to be linked with an offer of housing?

A    No.

Q    And did you ever include in the Alliance settlement

agreement a requirement that an encampment reduction would only

count if it were coupled with acceptance of an offer of

housing?

A    No.

Q    As to that latter point, why didn't you agree to that?

Namely, that in order for an encampment reduction to count it

would have to include acceptance of an offer of housing.

A    Well, again we -- the settlement agreement -- in the

settlement agreement we didn't agree to reduce any number of

EXCEPTIONAL REPORTING SERVICES, INC

encampments.  We didn't agree to resolve any number of encampments, if we're using that word which is different perhaps.  So that's number one.

But again, number two, an important principle that I was negotiating to preserve and I believe survived and was secured in the settlement agreement was that the City would be obligated to achieve measures that it could, on its own, achieve.  And that is the establishment of a certain number of units.

I did not want anything in here to rely on -- and to inherently rely on actions by other agencies, actions by the County, actions by the state, or other also actions and certainly not actions by an individual that has free will and doesn't need to accept housing.  I wouldn't ever agree that the City would be obligated to somehow force people to accept a provision of service if they did not want to accept it.  We never would have agreed to that, we didn't agree to that.  I wouldn't have recommended it and the counsel didn't authorize it.

Q    Sir, did you ever include in the Alliance settlement agreement a requirement that an encampment reduction would only count if it were achieved voluntarily?

A    No.

Q    Did you ever include in the Alliance settlement agreement a requirement that an encampment would -- reduction would only

Szabo - Cross / By Mr. McRae                    **25**

count if it did not involve abandoned property?

A     No.

Q     Did you ever include in the Alliance settlement agreement a requirement that an encampment reduction would only count if it occurred in a specific geographic location in the City of Los Angeles?

A     No.

Q     And speaking of encampment reductions, in your experience, is it your belief that they can in some instances, constitute threats to public safety?

          **MS. MITCHELL:**   Objection, vague and ambiguous, non-sensical question.

          **THE COURT:**   Could you restate the question?

          **MR. MCRAE:**   Sure.

**BY MR. MCRAE:**

Q     In your experience, is it the case that in some instances encampments -- you're right, I said encampment reductions, that would not make sense.  What I meant to say was encampments.

     In your experience, is it the case that encampments can, in some instances, constitute threats to public safety?

          **MS. MITCHELL:**   Same objection, Your Honor, also lacks foundation and calls for an expert opinion.

          **THE COURT:**   Overruled.

          **THE WITNESS:**   So that has been -- the answer is yes. There has been some recent reporting, this was the subject of

Szabo - Cross / By Mr. McRae **26**

some discussion during our just recently concluded budget deliberations related to the Fire Department.  And the Fire Department had presented some information regarding fires related to homeless encampments.  And they had presented data that suggested that there had been more than 75,000 fires related to encampments over the past six years, an average of about 34 fires at or around encampments every day.

So as it relates to fires being a threat to public safety I would say that the existence of encampments does present that particular threat.

**MS. MITCHELL:**  And I object, Your Honor, that Mr. Szabo's testimony relies entirely on hearsay.

**THE COURT:**  Okay.  Overruled.

**BY MR. MCRAE:**

Q   And as far as potential threats to public safety that encampments can cause, would I be correct that the discussion about fires is not meant to be an exhaustive identification of potential threats to public safety caused by encampments on --

**THE COURT:**  Would you restate that again please just a little more slowly.

**MR. MCRAE:**  Sure.  I'm sorry, did you also want me to slow down, Your Honor?  Very well.

Q   Would I also be correct that the discussion that you just had about fires potentially being an intended threat to public safety as a result of encampments that there are other issues

potentially related to public safety that can be the result of encampments?

MS. MITCHELL:  Objection, lacks foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  Certainly there are others.  I mentioned the fire data because there was a very public discussion around data that was presented to the City, based on their records of their call volume and their responses.  So that's just the most recent example.

**BY MR. MCRAE:**

Q    Let's take a look since we have Exhibit 25 on the screen. It's Section 5.2.  Now, sir, Section 5.2 has in pertinent part, if we look at the first two lines, 11 and 12 of Section 5.2 on this page, it says, thereafter the City will create plans and develop milestones and deadlines for.

And I want to take you to Romanet 2, which says, the City's plan for encampment engagement, cleaning and reduction in each council district.  Do you see that?

A    Yes.

Q    And I want to ask you, what did you intend for this language, encampment engagement, cleaning and reduction to mean when you negotiated the Alliance agreement on the City's behalf?

MS. MITCHELL:  Objection, relevance.

Szabo - Cross / By Mr. McRae                    **28**

THE COURT:  This whole issue of intent I've allowed because you're representing the City.  I'm concerned, though, that now we're going to get into settlement discussions, that this opens the door frankly, concerning what LA Alliance's position was or the Mayor's position, or your Council President or counsel's position.

I'm going to overrule the objection, but go with that caveat for a moment.  Okay?  All right.  Counsel, overruled.

MR. MCRAE:  Thank you, Your Honor.  I'm actually going to move on.

THE COURT:  Counsel, thank you very much, your question now.  Thank you.

MR. MCRAE:  I'm going to move on.

THE COURT:  All right.

BY MR. MCRAE:

Q    Sir, if the word reduction defined in the Alliance settlement agreement?

A    It is not.

Q    Is the word removed even in the Alliance settlement agreement?  Well, let me rephrase that.  Is removed defined in the Alliance settlement agreement?

A    It is not.

Q    Is the word removal defined in the Alliance settlement agreement?

A    It is not.

Szabo - Cross / By Mr. McRae                    **29**

Q    Is the words public right of way defined in the Alliance settlement agreement?

A    It is not.

Q    Are the -- let's go to the recital section.  Let's go to the second page here of Exhibit -- actually it'll be page 7 of Exhibit 25 using the ECF internal pagination, going to lines 10 through 15.

Sir, drawing your attention to the whereas clause in the recital starting at line 10 and ending at line 15, are the words at line 10 substantially increase defined under the Alliance settlement agreement?

A    No.

Q    And going to lines 14 that say, starting at line 13, to achieve a substantial and meaningful reduction, are those words substantial and meaningful reduction defined under the Alliance settlement agreement?

A    No.

Q    And I want to go back to May 2022 when the Alliance settlement agreement was executed.

        **MR. MCRAE:**  Your Honor, I just need one second to make a note.  I'm just going to pivot here.

        **(Pause)**

Q    Sir, when we go back to that time frame at the time May 2022 when the Alliance settlement agreement was executed, did the City have 12,915 beds ready to provide as open beds day

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Mr. McRae                    **30**

one, following the execution of the Alliance settlement agreement?

A     No.

Q     And did it occur to you when you negotiated the Alliance settlement agreement on the City's behalf and reached ultimately an agreement on this 12,915 bed count that it may take the City some time to create that number of beds?

         **MS. MITCHELL:**  Objection, relevance.

         **THE COURT:**  Objection?

         **MS. MITCHELL:**  Relevance, Your Honor.

         **THE COURT:**  Overruled.  You can answer the question.

         **THE WITNESS:**  Absolutely we expected it would take the entirety of the term of the agreement.

**BY MR. MCRAE:**

Q     And do some of the beds that the City is counting towards the bed count obligation under the Alliance settlement agreement include permanent housing?

A     They do, it does.

Q     And can it be the case that permanent housing can take longer to construct or acquire than interim housing?

A     In many cases and the nature of particularly construction from the ground up of new housing, that is a several year process if everything goes right.  And in your experience as the CAO, is it the case that permanent housing can also be more expensive than interim housing?

Szabo - Cross / By Mr. McRae                                    **31**

A     In terms of on the capital side, it absolutely is more expensive than interim housing.

Q     And so in the course of a five year term of the Alliance settlement agreement, is it the case that it may take longer to report to this Court the beds that came available in the form of permanent housing within that five year period than it might to report interim housing beds that were open and available?

A     I would say that the -- in May, as we were contemplating this agreement, to the extent that voters had already approved a measure and required the City to invest in permanent housing, it was understood and we knew that there is -- there would be fluctuations in the timeline of these projects, again because it's not entirely -- there are projects that the City subsidizes but there are other sources of funds that have to come to the project.

     And so we expected that there would be some delays.  There are also some delays if developers aren't able to secure the funding that they need to begin the project.  So it is not a surprise that certainly in the initial reports that we started the fall behind on the milestones, because the milestones were based on the schedules as they existed for permanent housing in 2022.

Q     And do you anticipate that beds that are permanent housing, that have been under construction for the last three years will at least in some instances become available at some

Szabo - Cross / By Mr. McRae                          **32**

point prior to the expiration of the Alliance settlement agreement in June 2027?

A    Yes, they will.  In our report, we're constantly monitoring these projects.  In some cases if projects that we have for example reported as in progress, if the -- if it looks like the timeline may be pushed beyond June of 2027 then we remove them from the in progress list.

Q    And once those permanent housing beds that were previously unavailable become available will you be adding them to the bed count that the City has in its reports under the Alliance settlement agreement?

        **MS. MITCHELL:**  Objection, vague, ambiguous as to those beds.

        **MR. MCRAE:**  The permanent --

        **THE COURT:**  You can answer that question.

        **THE WITNESS:**  Yes.  When the beds become open and occupiable we will add them to the report under the open and occupiable section.

**BY MR. MCRAE:**

Q    I want to switch gears for a second.  I want to ask you about the 11,002 beds reported in the last quarterly report filed with the Court.  Sir, can you tell us of those 11,002 beds reported on the most recent quarterly report for the City, for how many of those beds does the data in the form of the beds counted come from LAHSA.

A    The beds for which the data primarily comes from LAHSA is limited to the master leasing units.

THE COURT:  I'm sorry, would you state that again?

THE WITNESS:  The data that comes primarily from LAHSA is limited in our list to the 460 master leased units. LAHSA runs that program through a service provider.

BY MR. MCRAE:

Q    So of the 11,002 beds reported in the City's most recent quarterly report, approximately 460 of those beds are master lease agreement beds where the data comes from LAHSA?

A    Correct.

Q    And we'll test your arithmetic here or your math skills rather, 462 beds, that would be less than 5 percent of the 11,002 beds counted in the City's most recent quarterly report, correct?

A    That's correct.

Q    Sir, I want to talk to you about your report.

MR. MCRAE:  Let's go to Exhibit 35.

Thank you.

Q    Now, sir, this is the Alliance settlement agreement quarterly report ending March 31st, 2025 that the City of Los Angeles has submitted to the Court.

A    It is, yes.

Q    And when we talk about bed counts, is there a difference between in process beds and open beds?

A     Yes.

Q     Let's start with an open bed is, what is an open bed, as reported in the quarterly reports?

A     An open bed is a bed that is open and occupiable under the terms of the settlement.  It is available for -- to be used for a person experiencing homelessness or a person formerly experiencing homelessness in a case of permanent housing.

Q     And now let's talk about what an in process bed is as reported in Exhibit 35 in the quarterly reports.

A     So when we refer to in process, we're referring to beds that are in some phase of either construction or in the process of being approved.  So we would add a bed to the in process list if it has gone through some form of approval.

In many cases, in most cases it's approval by the City Council based on a recommendation to move funding to a project or to authorize it in some way, some official action, but it is not yet open.  It is not yet connected with a service provider that is ready to use the units for persons experiencing homelessness.

In most cases when we say in process, we're talking about projects that have been approved or in some phase of construction.

Q     And, sir, in the quarterly report here, which is Exhibit 35, how many of the reported beds if you can recall and you have the document in front of you, were open beds?

Szabo - Cross / By Mr. McRae **35**

A    We reported 6,724.

Q    And how many of the beds in the report which is Exhibit 35 were reported as in process?

A    4,278.

Q    And the number 11,002 then represents, as the document indicates, total units, beds open to date and in process, correct?

A    That is correct.

Q    Okay.  Now, sir, the settlement agreement goes back to when it was executed May 2022, in the course of providing quarterly reports over the last three years have there been instances where beds that in prior reports were listed as in process were moved to open beds in later reports?

A    Yes, in almost every report.

Q    So this designation and redesignation from in process beds to open beds, is that an ongoing phenomenon in the quarterly reporting to the Court?

A    It's ongoing.  It is how we are systematically complying and -- towards or complying with the settlement agreement.

        **MR. MCRAE:**  May I have one second to confer with a colleague?

        **(Pause)**

Q    And, sir, are you confident that the 12,915 count number under the Alliance settlement agreement will consist of 12,915 open beds by the expiration date of the Alliance settlement

Szabo - Cross / By Mr. McRae                          **36**

agreement in June of 2027?

A    Yes, it will.

Q    Why are you so confident?

A    I'm confident because the City, the City leadership is committed to meeting that goal and we are constantly working to not only ensure that then 4,000 units, 4,000 plus units that are in progress are completed within the term of the settlement, but that we are continually looking for other opportunities and additional opportunities over this last two years that we have to secure and to open the remaining number of beds.

Q    And I want to switch now to a topic that you covered.  Do you recall talking about a declaration of emergency the City of Los Angeles under section --

         **MR. MCRAE:**  Why don't we put Exhibit 25 up again.  So I stopped myself mid-question, so I'll restart.

Q    Do you recall talking last week about a declaration of emergency by the City of Los Angeles pursuant to Section 8.2 of Section -- Section 8.2 of Exhibit 25?

A    Yes, I do.

Q    And let me direct your attention to the language at lines 26 through 28 of the page where 8.2 starts and it carries over to line 1 through 6 of the next page, so the first page is page 14 of the ECF.  The second page is page 15.

         In the event of fires, floods, earthquakes, epidemics,

quarantine restrictions or other natural catastrophic occurrences, terrorist acts, insurrections or other large scale civil disturbances or any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council under the authority vested in them by the Los Angeles City charter and Los Angeles Administrative Code, paren, or other applicable ordinances, resolutions, laws, close paren, the obligations of the City as set forth in Sections 3, 4 and 5 of this agreement shall be paused.  And the parties agree to meet and confer on any necessary and appropriate amendments to those obligations.

Sir, this is a term that you -- Section 8.2, negotiated in this agreement?

A     Yes, of course, together with the city attorney.

Q     And you -- notwithstanding the invocation of Section 8.2 by the City of Los Angeles, as the CAO can you tell us whether the City has ceased its efforts to comply with the Alliance settlement agreement?

A     We have not.  We have not paused efforts to comply with the settlement agreement, even in the face of the declaration of emergency based on the wildfires in January.

Q     And let me also ask you, has the City created plans for a Bureau of Homelessness?

A     The -- yes.  The fiscal '25/'26 city budget which was approved by the City Council but is pending signature by the Mayor did include plans to create a Bureau of Homelessness

oversight within the housing department.

Q    And is there an effective date to your knowledge of when this Bureau may come into existence?

A    The budget becomes effective July 1st and the bureau would be established over the course of the fiscal year.  There are staffing plans and with anything, you know, with any new department or any new division of a department it will take some time to staff up, but the plans and the position authorities will become effective and available to fill on July 1st.

Q    Now, sir, you mentioned the fires that occurred in Los Angeles in 2025.  As the CAO, can you tell us whether those fires have had and will have a financial impact on the City of Los Angeles?

A    100 percent.  They will have a serious impact on the City of Los Angeles, not just in the -- as it relates to the direct cost and there is a direct cost of both the response and the damage that the fires had on actual city property and city infrastructure, but also on economic activity and the tax base.

     So much of our general fund is reliant on economically sensitive revenue sources and so as we are proceeding through the year, we're monitoring very carefully the impact that the fires and the reduced economic activity is having on our general fund.

Q    Is the City committed to have this Bureau of Homelessness

Szabo - Cross / By Mr. McRae                              **39**

notwithstanding the financial impact of the fires that you just

described?

A     Yes.

Q     And would you describe the Bureau of Homelessness that

you've discussed as being in the early stages of its existence?

          **THE COURT:**  You dropped your voice.  Could you say

that again?

          **MR. MCRAE:**  I'm sorry.

**BY MR. MCRAE:**

Q     Would you describe this Bureau of Homelessness that you've

described as being in the early stages of its existence?

A     Yes.

Q     And did the City come up with the idea of -- for this

Bureau of Homelessness on its own?  Let me rephrase the

question.

      Did the decision to have this Bureau of Homelessness, was

this something that the City decided to do by itself, rather

than something that was imposed externally on the City?

A     Yes.  There have been several discussions in the policy

committee around the need to improve oversight and performance

management, particularly in the relationship between service

providers and LAHSA and LAHSA's obligations under its contract

with the City.

      That is an ongoing conversation at the housing and

homelessness committee.  The chair of the committee submitted a

**EXCEPTIONAL REPORTING SERVICES, INC**

motion several months ago outlining the need for additional capacity so that we could more thoroughly monitor what are LAHSA's responsibilities, but we've made the decision or the chair's motion asked the City to build out capacity essentially to provide additional oversight for the relationships between LAHSA and the service providers.

Subsequent to that, there was discussion in the budget committee and there were plans and positions provided in the City budget to effectuate the Bureau of Homelessness oversight.

Q   Sir, I asked you a compound question so I'm going to break this up to make sure that the record's clear.  Was the Bureau of Homelessness something that was imposed on the City externally to do?

A   No.

Q   Was the Bureau of Homelessness instead something that the City decided to do itself?

A   Yes.

Q   And, sir, do you have any doubts that the City will be in compliance with its obligations with respect to encampment reductions under the Alliance settlement agreement when the deadline to complete those encampment reductions expires in 2026?

THE COURT:  I'm sorry, would you say that a little bit louder, please.

MR. MCRAE:  Yes.  Am I dropping off, Your Honor?

Szabo - Cross / By Mr. McRae                **41**

Yeah, let me lean forward.

**BY MR. MCRAE:**

Q    Do you have doubts that the City will be in compliance with its encampment reduction obligations under the Alliance settlement agreement when the deadline to complete those encampment reductions expires in 2026?

A    No.

Q    Why?

A    We have been making progress every reporting period and I expect that, in fact, the numbers that we reported in our quarterly report exceeded the milestones that were set for the end of December.  So I do expect that on the current pace, we will meet or exceed the milestones by our July report.

          MR. MCRAE:  Your Honor, I'm going to transition to something else.  Is this an appropriate time for --

          THE COURT:  Certainly.

          MR. MCRAE:  -- a recess?

          THE COURT:  20 minutes?

          MR. MCRAE:  Yes, thank you, Your Honor.

          THE COURT:  We'll take a 20 minute recess, thank you. All right.  Recessed and we'll see all of you folks at 10:30 then.  Sir, you may step down and you're more -- you can talk to counsel.

          THE WITNESS:  Thank you, Your Honor.

          **(Recessed at 10:11 a.m.; reconvened at 10;34 a.m.)**

THE COURT:  Counsel, are you comfortable going back into session?

MR. MCRAE:  Yes, Your Honor.

THE COURT:  All right, then all parties are present, we're back in session.  Are we on CourtSmart?  All right.

The witness has returned, and, counsel, you can continue your examination on behalf of --

MR. MCRAE:  Thank you, Your Honor.

CROSS EXAMINATION (CONTINUED)

BY MR. MCRAE:

Q   Mr. Szabo, I'd like to ask you, you testified last week about some of the positions that you've held prior to your current position.  In the interest of allowing you to complete that, and I'm referring to positions within the City of Los Angeles, are there any other positions that you've held that you haven't testified to for the City of Los Angeles?

A   I was a member of the Board of Public Works from 2013 to 2015.

Q   Anything else?

A   Beyond that, I believe I covered most everything, several years in the Garcetti administration, several years in the Villaraigosa administration, the last portion of the Riordan administration, working for a city council office and the city attorney's office for a period of time before that, or after Riordan, but before Villaraigosa.

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Mr. McRae                    **43**

Q    And I believe that you also testified as to your current

responsibilities, but, again, because of the nature of this, I

wasn't questioning you first.  Is there anything else regarding

your responsibilities currently that you would like to state

for purposes of completion that you haven't stated thus far?

A    The CAO has broad responsibilities in the city, so I

couldn't cover everything that I'm responsible for, that we're

responsible for, but I think it was generally well covered.

Q    I'm going to now ask you the names of some departments to

ask you whether -- well, let me move on from that instead.  Let

me talk to you about the Roadmap agreement with the City of Los

Angeles and the County of Los Angeles.  Sir, did you negotiate

the Roadmap agreement between the County of Los Angeles and the

City of Los Angeles to be part of the Alliance settlement

agreement?

A    No, that was a separate -- I refer to it internally as an

interim agreement as we were proceeding towards broader

settlement discussions with the Plaintiffs on Alliance.

Q    And when you negotiated the Roadmap settlement agreement

with the County of Los Angeles, were you negotiating with the

Alliance as a party to that agreement?

A    No.

Q    And did you, in negotiating the Roadmap settlement

agreement, make any promises in that agreement to the

Alliance?

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Mr. McRae                    **44**

A    No.

Q    I'd like you to take a look at Exhibit 25.  I'm going to put that back on the screen, and we're going to look at Section 3.1.  So in looking at the language of 3.1 of Exhibit 25, it says the City agrees to create a required number of housing or shelter solutions.  And, of course, lines 3 through 6 are also there as part of that sentence.  But I want to focus you on housing or shelter solutions.  Why did you -- can you tell us why housing or shelter solutions, why is it or?

A    It's or because it appropriately reflects the broad discretion that the document provides the City in achieving the goal.

Q    And why did you have this language that says, the City agrees to create a required number of housing or shelter solutions, which is equal to, but paren in the City's discretion, may be greater than what follows in lines 3 through 6?  Why the may be greater than?

        **MS. MITCHELL:**  Objection.  Lacks foundation, calls for speculation and relevance as to both sides of the agreement.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  We did not intend for this agreement to be a limitation on what the City could initiate, support, provide over five years.

//

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Mr. McRae                                **45**

BY MR. MCRAE:

Q     And in your understanding of beds that count under the bed count obligation of the City under the Alliance Settlement Agreement, can those beds include family reunification?

A     Yes, that was called out as a qualifying solution, yes.

Q     What does family reunification mean, as you understand it, in the context of the Alliance Settlement Agreement?

A     We have not counted any family reunification solutions as part of our quarterly reports.  However, there are efforts through service providers to attempt, as part of the housing process, where appropriate to reunify individuals with their families.  That could apply particularly to young people, transitional age youth, who can sometimes be reunified with their families as a way of providing a housing solution.

Q     Are you familiar with the term shared housing?

A     I am.

Q     And what does that mean?

A     Shared housing is when there are various units that have multiple rooms that share a kitchen.  Some of them could share a bathroom.  Some of them have their own bathrooms.  But it is a way to maximize the number of individuals that could be housed in a particular project.  Those that support -- part of the -- some of the benefits that some cite for shared housing is that it also provides the social kind of integration and for the individuals as well, since they would be living with three

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Mr. McRae                                    **46**

or potentially even more roommates.

Q    And was it your understanding that shared housing could provide beds that could be counted under the bed count under the Alliance Settlement Agreement?

A    Yes, I believe that was called out.

Q    And are you familiar with the term Safe Parking?

A    I am.

Q    What does that mean?

A    Safe Parking is a program where a service provider will rent out parking spaces and allow those who are living in their vehicles to park, typically overnight. And at that location, there would be services provided, hygiene services, showers, et cetera, to provide a safer place for folks who are sleeping in their vehicles to reside, at least overnight.

Q    And is it your understanding that Safe Parking could also provide beds that could be counted towards the bed count obligation under the Alliance Settlement Agreement?

A    Safe parking is an eligible solution, yes.

Q    And does Exhibit 25, which we're looking at, the Alliance Settlement Agreement, does it contain a definition of bed in terms of beds that could be counted towards the count under that agreement?

A    No, it doesn't contain a definition.  It provides a number of eligible interventions that included safe parking, safe sleep, family reunification, and others, and, of course,

permanent housing, tiny homes, et cetera.  But it also indicates that it's not limited to those that are cited.  So the principle that we were negotiating was maximum flexibility, and I believe that that's appropriately reflected in the agreement.

MR. MCRAE:  Your Honor, I'm sorry, I'm just going through notes to see if I can condense this.

THE COURT:  Take your time with that, that's fine.  Consult with your colleagues also, if you'd like.

MR. MCRAE:  Thank you, Your Honor.

BY MR. MCRAE:

Q   Sir, we've talked about the number 11,002 being the total of open and in-process beds reported in Exhibit 35, which is the March 2025 most recently submitted quarterly report under the Alliance Settlement Agreement.  Can you tell us approximately what percentage is 11,002 of the 12,915?

THE COURT:  Well, counsel, you can ask a leading question to save the math also if you want to.  If you have the percentage, that'll save a lot of time.

MR. MCRAE:  Thank you.

Q   Mr. Szabo, would 11,002 in-process and open beds combined be approximately 85 percent of the 12,915 bed count obligation under the Alliance Settlement Agreement?

A   Approximately, yes.

Q   And in terms of those constituent numbers of the in-

process beds and the open beds that constitute this 11,002 number reported in Exhibit 35, do you have confidence in the accuracy of the numbers in those reports -- in that report?

A    Yes.

Q    Why?

A    We are very conservative as it relates to what we're willing to report.  The majority of those beds are permanent housing of some type, where there is no question whatsoever as it relates to the existence of those beds and the use of those beds.  But the team that prepares the reports are conservative and they're, to the greatest extent possible, certain that everything that is reported is verified and verifiable and are meticulous.

And if in some cases, where there have been a bed or two that was misreported, the corrections are made in the subsequent report.  So it's not just -- it's reporting and it's continual verification to ensure that the reports are accurate.

Q    And will that continual verification and as needed adjustments be made up to and including the expiration of the Alliance Settlement Agreement in June 2027?

A    Continually, yes.

Q    And sir, you mentioned that a number of the beds, let's talk about the open beds, the 6,724 open beds reported in Exhibit 35, is it the case that approximately 5,000 of those are in the form of permanent supportive homes or houses?

Szabo - Cross / By Mr. McRae                          **49**

A     That is correct, yes.  About 5,000 of the 6,724 are permanent supportive housing of some type.

Q     And would those supportive housing, the permanent supportive housing that you describe, would those actually involve actual physical locations that were either leased or built from the ground up?

A     Correct.

Q     And would there be, in addition to a physical structure there, multiple reports that you as CAO receive from your staff regarding those structures?

A     Multiple reports, multiple approval processes through multiple levels of government and agencies.

Q     And would it be the case, sir, that the 4,278 in-process beds that are reported in Exhibit 35, are they also specifically accounted for by you and your staff?

A     Yes.

Q     Do these 4,278 in-process beds noted in Exhibit 35 include items, excuse me, units that are already purchased or funded?

A     Yes.

Q     Sir, has the City of Los Angeles used, in your view, its best efforts to comply with its bed count obligations under the Alliance Settlement Agreement?

A     Yes, it has.

Q     Why do you say that?

A     We have a systematic approach.  We have been making

Szabo - Cross / By Mr. McRae     **50**

progress every reporting period towards the goal.  We have a program that is fully funded to provide permanent supportive housing.  We have efforts, continual efforts, to seek state funding, which, of course, is called out for in the agreement.  State funding that has been used to create additional interim units.

We received additional grants, even just last year secured a grant to develop 500 tiny homes and it is an ongoing process of siting, developing, constructing new housing.  At the same time, as there is constant advocacy at the state level and federal level for new funding, at every level, in terms of from the Mayor herself and every member of the council, there is complete focus and commitment to secure the resources and to push the departments to get these projects up as quickly as possible.

Q   And based on all of that, do you believe that the City is on track towards achieving its bed count obligation under the Alliance Settlement Agreement by June 2027?

A   We are on track.

Q   And, sir, let's now talk about Section 5.2 of Exhibit 25, if we can go back to that exhibit.  Sir, the first line here of Section 5.2 in Exhibit 25, lines 11 through 12 of this ECF page 13, says that thereafter, the City will create plans and develop milestones and deadlines for.  And then there are Romanettes 1 through 4.  Did you include in this agreement,

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Mr. McRae                              **51**

which is Exhibit 25, any commitment by the City to create

multiple plans of a given plan?  In other words, once a plan

was submitted or provided, did you also include in the Exhibit

25 a requirement that the City would present subsequent plans?

A    We didn't agree to create subsequent plans.  We agreed to

discuss the plans.

Q    And in terms of talking about these milestones and

deadlines, has the City treated the milestones that were

created as obligations under the Settlement Agreement in the

same manner as the bed count and encampment reduction

obligations?

        **THE COURT:**  Do you understand that question?

Counsel, could you re-ask that question?  I'm not certain I

understand it.

**BY MR. MCRAE:**

Q    Yeah.  Let me -- I believe you testified that there have

been instances where the City in the last three years has not

achieved a milestone; is that right?

A    Correct.

Q    And when that occurred, did you regard that as the City

breaching an obligation under the Settlement Agreement, which

is Exhibit 25?

        **MS. MITCHELL:**  Objection.  Calls for legal

conclusion.

        **MR. MCRAE:**  Your understanding.

EXCEPTIONAL REPORTING SERVICES, INC

**THE COURT:**  Overruled.  You can answer.

**THE WITNESS:**  No, and very, very specifically because we did not agree to interim requirements.  The milestone language is there because they are milestones.  They are goals.  We didn't agree and we would not have agreed to quarterly requirements that if we did not make, if we did not meet, that we would be in breach.  We never would have agreed to that.

**BY MR. MCRAE:**

Q    Let me stop you right there.  At the time that you negotiated this Section 5.2 language about the milestones and deadlines and when you negotiated the milestones and deadlines as described in this paragraph, did it occur to you at all that there was a possibility that at some point in the five years that followed, the City might not make a milestone on occasion?

**MS. MITCHELL:**  Objection.  Relevance.

**THE COURT:**  At what time period, counsel, are you asking for this objective thought?

**MR. MCRAE:**  Following the execution of the Alliance settlement agreement in May of 2022.

**THE COURT:**  In May -- you can answer the question.

**THE WITNESS:**  It absolutely did.

Q    Why did you think that?

A    Because of the nature of, or the complicated nature of building housing, particularly permanent housing, but really

Szabo - Cross / By Mr. McRae                                    **53**

any of these projects requires multiple levels of approval, including, by the way, council members have to engage the community.  The community asks for more time to review X, Y, and Z if they want to talk to the service provider, et cetera.  The offices, in effort to move the project forward successfully, will often take more time, do what they need to do, engage the public, and not only did we think that there might be a case where the milestones would be missed, it was likely that something would happen, which is why we only agreed to provide milestones.  We did not agree to interim quarterly requirements that if we did not meet, we would be in breach.

We never would have agreed to that because we weren't going to -- I wasn't going to allow this agreement to supersede a public process that is necessarily, sometimes it's messy, sometimes it takes longer than you thought it would when you started the project.  We need to allow the elected officials to engage the public in an appropriate way in order to successfully not just build the housing, but secure public support for these efforts, even well beyond this settlement agreement.

**MS. MITCHELL:**  Objection, Your Honor.  Motion to strike the last portion as to what Mr. Szabo would allow.  It's non-responsive and it's irrelevant.

**THE COURT:**  Overruled.  This is your personal opinion.  Overruled.

Szabo - Cross / By Mr. McRae                    **54**

**BY MR. MCRAE:**

Q    Sir, are those considerations that you just provided in your last answer, what motivated you to include the best efforts language in the settlement agreement at line 24, 25 relative to compliance with plans, milestones, and deadlines?

        **MS. MITCHELL:**  Objection.  Relevance, lacks foundation.  It takes two parties to reach an agreement, Your Honor.

        **THE COURT:**  I'm sorry.  Would you say that again?  Just move the microphone.

        **MS. MITCHELL:**  Yes.  The objection is relevance and lacks foundation.  It also calls for speculation as far as two parties reaching an agreement.

        **MR. MCRAE:**  I'm only asking why he included the best efforts language, not why someone else may have agreed to it.

        **THE COURT:**  Overruled.  You can answer the question.

        **THE WITNESS:**  That's precisely why we insisted on the best efforts language.

**BY MR. MCRAE:**

Q    You've talked about a number of challenges that the City of Los Angeles has had, including the fires in 2025.  I want to make sure I understand this.  This agreement, the Alliance Settlement Agreement, was executed May 2022.  Is that right, sir?

A    Correct.  I believe that's when it was signed.

Szabo - Cross / By Mr. McRae                    **55**

Q    And this was still during the COVID pandemic?

A    Yes, I would say so.  It was a different phase of COVID,
but we were still in the echoes of COVID.

Q    And notwithstanding the fires in 2025, the COVID pandemic,
the other challenges that you mentioned, is it your testimony
that the City of Los Angeles has used best efforts to meet its
milestones and deadlines regarding bed count and encampment
reductions in the settlement agreement, which is Exhibit 25?

A    Yes, it is.

Q    Is that for the reasons that you've testified earlier?

A    Yes.

Q    And, sir, let me ask you, in considering whether the City
has used best efforts, as described in the Alliance Settlement
Agreement in Section 5.2, do you also consider the results of
those efforts in the form of the 11,002 beds?

          **THE COURT:**  Counsel, would you restate that, please?

          **MR. MCRAE:**  Sure.

          **THE COURT:**  A little louder.  Thank you.

**BY MR. MCRAE:**

Q    In considering whether the City has used best efforts in
meeting the deadlines and milestones set forth in Section 5.2
of Exhibit 25, is your response also motivated by the 11,002
beds reported in Exhibit 35?

A    Yes.

Q    So let's go back to exhibit -- well, we're still in

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 5.2.  I'm sorry, Exhibit 25.  But now we're going to go back to Section 3.2.  Oh, it's right in front of me.  Okay.  Sir, looking at Exhibit 25, Section 3.2, I want to ask you, do you recall being questioned by counsel for the interveners regarding the City of Los Angeles' purchase of apartments and hotels and motels in order to provide beds pursuant to the Alliance Settlement Agreement?

A    Yes.  I mean, there were a number of questions, but I generally remember, yes.

Q    So let me direct your attention to Section 3.2, Exhibit 25, where it says here, starting at line 7, subject to constitutional requirements and legal mandates, the City may choose at its sole discretion any housing or shelter solution, including, but not limited to, tiny homes, shared housing, purchased or master leased apartments, hotels, motels, or other buildings, congregate shelters, permanent supportive housing, rental assistance forward/rapid rehousing, family reunification, spring structures or tents, safe parking, safe sleeping forward/camping, affordable housing, and interim housing (including a bridge home beds), as long as the milestones are met.  Do you see that?

A    Yes.

Q    Okay.  Now, sir, let me ask you, when the City purchased or master leased apartments and counted those beds towards the bed count obligations, was it your understanding that the City

was simply exercising the discretion and negotiated in Section 3.2 here?

**MS. MITCHELL:** Objection. Compound question.

**THE COURT:** Overruled. You can answer the question.

**THE WITNESS:** Yes. Master leasing is explicitly allowed.

**BY MR. MCRAE:**

Q   And the next line here says the housing or shelter solutions, and this is still within Section 3.2 of Exhibit 25, the housing or shelter solutions may be government and/or privately funded, as long as each offer is adequate for the individual. Let's parse this.

When you were questioned last week about the source of funding for homes or beds, excuse me, that the City counted under the Alliance Settlement Agreement, were you taking into account this language in Section 3.2 that says that the housing or shelter solutions may be government and/or privately funded?

A   Yes, that's exactly what I was taking into account.

Q   And the term government at line 14 and Section 3.2, is it defined as meaning just the City of Los Angeles?

A   It does not.

Q   Does it exclude the County of Los Angeles?

A   It does not.

Q   Does it exclude the State of California?

A   It does not.

Szabo - Cross / By Mr. McRae                    **58**

Q    Does it exclude the federal government?

A    It does not.

Q    Does it exclude any other governmental entity?

A    It does not.

Q    The term adequate for the individual, is that term defined in this Exhibit 25?

A    It's not defined directly, although City shelter appropriate is defined, and I believe that that is what it was referring to.

Q    And, sir, let me ask you, go to Section 8.1 of Exhibit 25.  Here at 8.1 of Exhibit 25, lines 19 through 20, it says funding of housing and shelter opportunities created by the City shall be at the City's sole discretion.  When you counted, as the CAO, the beds that are reported in Exhibit 35, incident to the Alliance Settlement Agreement, were you also taking into consideration this discretion that you negotiated, that the funding for those beds that you were counting was at the City's sole discretion?

        **MS. MITCHELL:**  Objection, Your Honor.  Misstates the testimony to the extent we're referring to the discussion about the funding.  It was related to the Roadmap agreement and not the Alliance agreement.

        **THE COURT:**  I assumed that this was as to the LA Alliance agreement --

        **MR. MCRAE:**  Correct.

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Mr. McRae                                **59**

THE COURT:  Not the Roadmap agreement.

MR. MCRAE:  I'm only referring to Section 8.1 of the Alliance Settlement Agreement, Your Honor.  Thank you.

THE COURT:  Overruled.

BY MR. MCRAE:

Q    Do you need me to repeat the question?

A    Yes, please.

Q    Very well.  Sir, when you were -- every quarter since the execution of this Alliance Settlement Agreement, providing quarterly reports filed with this Court, identifying beds to be counted under that Alliance Settlement Agreement, in counting those beds, were you taking into account the sole discretion that the City reserved under Exhibit 25 as far as the funding of those housing and shelter opportunities, the beds that you were counting?

A    Yes.

Q    I want to pivot now to talk to you a little bit more about encampment reductions.

MR. MCRAE:  Oh, Your Honor, may I have a moment to confer with my team?

THE COURT:  Certainly.

(Pause)

MR. MCRAE:  Your Honor, actually, can I have five minutes?

THE COURT:  Certainly.

Szabo - Cross / By Mr. McRae                          **60**

MR. MCRAE:  Thank you, sir.  Thank you, Your Honor.

THE COURT:  Then we'll take a recess for five or ten minutes, counsel.  Thank you.

**(Recessed at 11:10 a.m.; reconvened at 11:23 a.m.)**

THE CLERK:  Reminder that all electronic devices should be turned off during session.

THE COURT:  Have you had enough time, counsel?

MR. MCRAE:  Yes, Your Honor.

THE COURT:  All right, thank you.  Please continue.

MR. MCRAE:  Thank you.

**CROSS EXAMINATION (CONTINUED)**

BY MR. MCRAE:

Q    Mr. Szabo, I wanted to ask you about the last encampment reduction count provided in the quarterly reports.  You recall that number, approximately 60.  Can you tell us what that number was?

A    I believe that number was 60, just over 6,100.

Q    And with respect to the numbers that you and your staff have reported to the Court, including the most recent quarterly report on encampment reductions, are you confident in those numbers?

A    I am.

Q    Why?

A    We have records to support each of those reported reductions.

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Mr. McRae                                          **61**

Q    And has the City used its best efforts to comply with its encampment reduction obligations under the Alliance Settlement Agreement?

A    We have.

Q    Why do you say that?

A    We have an entire division of the Bureau of Sanitation which is dedicated to cleanliness efforts in and around encampments.  It is a priority of the mayor and the council. Again, if we just heard the recent budget deliberations, it was a high priority for the city council to restore some funding, some necessary reductions that took place as a result of our financial challenges.  The Council instead decided to make other reductions in order to restore funding to the Livability Services Division.  And this is a program that's been in place for several years, that has been refined over several years, and we are confident in the numbers that it produces.

Q    Sir, I want to take you back to our discussion about the emergency declaration declared by the City of Los Angeles under Section 8.2.  Do you recall if that declaration occurred in or about January 7th or 8th, 2025?

A    It was about that time, yes.

Q    And as far as who declared the emergency, in addition to the City of Los Angeles, were there other agencies that declared a state of emergency?

A    The state and federal government.

Szabo - Cross / By Mr. McRae                    **62**

Q    And the County of Los Angeles?

A    Yes.

Q    And are you aware that Governor Newsom has also extended certain state of emergency protections to July 1st, 2025?

A    Yes.

Q    And we had a discussion last week about the A&M assessment, including earlier this morning.  I want to focus you on specific assertions in that report, one of which is that there are information gaps, and this is Exhibit 23 we're referring to, information gaps and other issues that make it difficult to verify the number of beds reported under the Roadmap and Alliance programs.  To the extent that Exhibit 23 says that, do you understand that observation to mean that a difficulty in verifying those beds means that those beds don't exist?

        **MS. MITCHELL:**  Objection.  Relevance.  Calls for speculation.  Lacks foundation.

        **THE COURT:**  I don't understand the question, counsel.  I'm sorry.

        **MR. MCRAE:**  Meaning, do you read and understand a difficulty in verifying the number of beds reported to mean that those beds do not, in fact, exist?

        **MS. MITCHELL:**  Objection.  Lacks foundation.  Calls for speculation.  Vague.  Ambiguous.

        **MR. MCRAE:**  I'm asking for an understanding.

Szabo - Cross / By Mr. McRae                    **63**

THE COURT:  Well, I don't understand it, unfortunately.

MR. MCRAE:  The distinction being between a difficulty in verifying something is not the same as saying that the thing that you have difficulty verifying does not exist.

THE COURT:  In representing the City, in his opinion?

MR. MCRAE:  In his understanding, yes.

THE COURT:  His understanding.  Is this the City's understanding or his understanding?  That's what's confusing me.  In other words, if it's the City's understanding, so be it.  If it's his understanding -- as the CEO, is he stating this on behalf of the City or is this his own subjective?  That's what I'm having trouble with, counsel.

MR. MCRAE:  I understand.  May I --

THE COURT:  Okay.  So re-ask the question.

MR. MCRAE:  Okay.  Let me move away from that and I'll actually potentially come back to it.

THE COURT:  All right.  You can consult your colleagues about that.  That's my -- I don't --

MR. MCRAE:  I can.

THE COURT:  I'm having trouble when he's subjectively stating this versus sometimes when he's stating it on behalf of the City.  So take your time.

MR. MCRAE:  I'll take that offer.

**(Pause)**

THE COURT:  They'll be right back.  By the way, I've given -- counsel, I've given Mr. Szabo and all of you carte blanche to talk to your respective counsel.  So if you want to be involved, you're more than welcome to.

THE WITNESS:  They'll call me.

THE COURT:  All right.  Why don't you step down and relax for a moment.  You don't have to sit up there.  Yeah, just step down.

THE WITNESS:  Step down?  Okay.  Sure.

**(Pause)**

THE COURT:  I think you can retake the stand.  Okay.  Go on.

By the way, for the record, what I've said to this witness and every other witness, that they're more than welcome to consult and be a part of any discussions with any counsel at any time.

MR. MCRAE:  Thank you, Your Honor.

THE COURT:  Okay.  I'm not drawing some subjective belief that somehow there's something inappropriate about that.

MR. MCRAE:  I'm ready to proceed whenever it pleases the Court.

THE COURT:  Please.

MR.MCRAE:  Thank you.

//

**BY MR. MCRAE:**

Q    Mr. Szabo, I'm asking you as CAO on behalf of the City, is it in your mind a difference between difficulty in verifying beds reported versus a determination that the beds don't exist?

        **MS. MITCHELL:**  Objection.  Lacks foundation.  Calls for speculation.  Relevance.

        **THE COURT:**  Overruled.  On behalf of the City, I'll state your opinion.

        **THE WITNESS:**  Yes.  There's a significant difference between those two.  Yes.

**BY MR. MCRAE:**

Q    Can you explain?

A    Well, this is the issue that I had with many of the -- much of the A&M analysis is that it didn't conclude that the beds didn't exist.  It instead recounted some of its challenges in deciphering the information, and those are two very, very different things.

     Our obligation is to provide the beds.  There are programs that we are relying upon to provide those beds.  We are using our best efforts to provide those beds based on what is available, and if there is difficulty in deciphering data that in many cases exists in a number of places, that's fine.  That's one thing, but that does not suggest that the beds don't exist.  That suggests that the consultant was -- had difficulty with the data that they had.

Q    Let me ask you a different observation in Exhibit 23, that there are siloed referral processes and disparate data systems impeding the establishment of a uniform coordinated entry system, and contributing to potential inequities in resource allocation and a lack of transparency.  Did the Alliance Settlement Agreement include any commitment by the city to address those things?

A    None whatsoever.

Q    And is it your understanding that notwithstanding that, that the City of Los Angeles is free to address those issues if it would like to, outside of the Alliance Settlement Agreement?

A    It is.

Q    Let me ask you about another observation in Exhibit 23, that the City has limited financial oversight and performance monitoring.  Did you include in the Alliance Settlement Agreement any commitment by the City relative to financial oversight and performance monitoring, as described in Exhibit 23?

A    No, we did not.

Q    Is it your understanding that the City is free, outside of the Alliance Settlement Agreement, to make efforts to address financial oversight and performance monitoring as it sees fit?

A    Yes.

Q    And are you aware also of the claim in Exhibit 23 that there is significant cost and performance variability across

service providers?

A    Yes, I'm aware.

Q    And, sir, did you include in the Alliance Settlement Agreement any commitment by the City of Los Angeles to address, assuming this is true, significant cost and performance variability across service providers?

A    Not at all.  It doesn't address that at all.

Q    Once again, is this an area with respect to significant cost and performance variability that you understand the City to be free to address outside of the Alliance Settlement Agreement if it chooses to?

A    Yes.

Q    Let me direct you also to an assertion that the A&M report claims that budget allocations for homeless assistance services were not routinely reconciled with actual spending or contractual obligations.  Is this issue something that you committed the City of Los Angeles to do or address in the Alliance Settlement Agreement?

A    No.

Q    Is the City of Los Angeles, in your understanding, free to address these reconciliation of spending and contractual obligation in the area of homeless assistance services should it choose to do so outside of the Alliance Settlement Agreement?

A    Yes.

Szabo - Cross / By Mr. McRae                    **68**

Q    And, sir, notwithstanding all of the observations in the

assessment that we just discussed, is it still your

understanding that the City will satisfy its obligations under

the Alliance Settlement Agreement?

A    It is, yes.

Q    And the Roadmap agreement with the County of Los Angeles?

A    Yes.

Q    And is it the case that the City of Los Angeles ever

agreed to implement any recommendations contained in the

assessment?

A    We did not.

Q    Is it your understanding that the City of Los Angeles is

free to do so as far as implementing recommendations in the

assessment above and beyond or outside of the Alliance

Settlement Agreement?

A    Yes.

Q    You've talked about Measure A before.  Do you have an

understanding of how much money the City of Los Angeles will

receive from Measure A?

A    In part, yes.  The dollars that have been determined that

will come to the City of Los Angeles, yes, I'm aware.

Q    And what is that approximate amount, sir, from your

understanding?

A    There is a local solutions fund portion of Measure A,

which takes the approximately 600 million -- which is a portion

Szabo - Cross / By Mr. McRae                    **69**

of the approximately $600 million of Measure A for services and

provides it based on a formula to local jurisdictions.  The

City would receive about $54.5 million.

Q    Sir, switching here to the City's Roadmap agreement with

the County of Los Angeles, has anyone from the County of Los

Angeles accused -- told you that they've accused the City of

Los Angeles of violating the Roadmap agreement?

A    No.

Q    Has anyone complained to you from the County about the

City's compliance with the roadmap agreement with the County of

Los Angeles?

A    Not at all.

Q    Is it your understanding that the MOU Roadmap agreement

with the County of Los Angeles expires June 30th, 2025?

A    It is, yes.

Q    And the number of beds that the City of Los Angeles has

reported under that Alliance agreement are how many,

approximately?

A    Our latest report, the number was higher than the required

amount.  It was approximately 8,000.

Q    And is it your understanding that the obligation under the

Roadmap Settlement Agreement with the County of Los Angeles had

a 6,700 bed count?

A    Yes.

Q    Sir, this situation, where the number of reported beds

under the Roadmap agreement with the County exceeds the number that were committed under the agreement, as you sit here now, is it your belief that the City of Los Angeles, under the Alliance Settlement Agreement, might end up exceeding the 12,915 number by June of 2027?

MS. MITCHELL: Objection. Compound question. Calls for speculation.

THE COURT: Overruled. You can cast that opinion.

THE WITNESS: I would like to think that's the case. We're making every effort to open as many beds as possible, separate and apart from the obligation, but I would like to think we'll exceed that amount.

BY MR. MCRAE:

Q    And with respect to the number of beds that the City of Los Angeles has reported under the Roadmap agreement with the County of Los Angeles, are you confident in those reported numbers?

A    Yes.

Q    And why is that?

A    Again, those numbers are based largely on beds that we have multiple sources of funding, multiple funding reports, multiple public processes, including processes, engagement with the community, and there was extensive records. And again, we're reporting -- we're conservative in what we report. We want to be precise, and I have confidence that the numbers that

Szabo - Cross / By Mr. McRae                    **71**

we're reporting are accurate.

          **MR. MCRAE:**  Your Honor, I would tender the witness at this point, subject to obviously any further question or calling of him.

          **THE COURT:**  Do you want to start now or do you want to take an hour for lunch and return at, let's say, at 12:45?  If you'd like to start now, fine.

          **MS. MITCHELL:**  Your Honor, either one is convenient for Plaintiffs.  I know the court has a 12 o'clock calendar, so I would defer to the Court on that.

          **THE COURT:**  12 o'clock, we've got some matters, but your choice.

          **MS. MITCHELL:**  I'll go ahead and start now, Your Honor.

          **THE COURT:**  I'm sorry?

          **MS. MITCHELL:**  We can go ahead and start now.

          **THE COURT:**  I didn't hear -- go to lunch?

          **MS. MITCHELL:**  We can go ahead and start now, Your Honor.

          **THE COURT:**  Okay, then start now.  I'm sorry.

          **MS. MITCHELL:**  May we have a moment to set up?

          **THE COURT:**  Absolutely.

          **MS. MITCHELL:**  Thank you.

          **THE COURT:**  Counsel, I've got a 12 o'clock calendar because we've been moving around our calendar to try to get

Szabo - Redirect / By Ms. Mitchell                    **72**

consecutive days with all of you.  So whenever we take lunch, I need about a good hour.

          MR. MCRAE:  Yes, Your Honor.

     **(Pause)**

          MS. MITCHELL:  All right, Your Honor, may I proceed?

          THE COURT:  Please.

          MS. MITCHELL:  Thank you.

          THE COURT:  And would you just restate your name for the record?

          MS. MITCHELL:  Yes, thank you, Your Honor.  Elizabeth Mitchell on behalf of Plaintiff LA Alliance for Human Rights.

                    **REDIRECT EXAMINATION**

**BY MS. MITCHELL:**

Q    Turning to Exhibit 63, I just want to be very clear about this because I don't know that your testimony was clear.  This is the latest quarterly report on the encampment reduction.  In fact, it says encampment resolution data filed April 15th, 2025; is that right?

A    Yes, that appears to be one of the attachments, yes.

Q    And referring to the way that it is being identified, it's actually identified as encampment resolution data at the top; is that right?

A    Correct.

Q    And this is how the City is purporting to report the reductions in encampments; is that right?

Szabo - Redirect / By Ms. Mitchell **73**

A    Correct.

Q    Now, the last quarter, January 1st to March 31st, I just want to be very clear.  These numbers that are being reported, do they include tents that were removed from the public way during CARE and CARE Plus cleanups without any permanent reduction?

**MR. MCRAE:**  Objection.  Vague as phrased.

**THE COURT:**  Overruled.

**THE WITNESS:**  Permanent reduction.  We are reporting tents that are removed that the Bureau of Sanitation takes possession of, takes custody of, and either disposes of or in some cases would take to storage.

**BY MS. MITCHELL:**

Q    And that is regardless of whether or not an individual has been offered housing or shelter; is that right?

**MR. MCRAE:**  Objection.  Vague.

**THE COURT:**  Overruled.

**THE WITNESS:**  There's always an outreach component to the operations, but it is not a requirement, particularly in the cases when the tents are deemed to be hazards, public health hazards.  They are removed and disposed of.

Q    And it is not reported as numbers that have a more permanent meaning, such as a person has moved inside or a person has reunited with their family or is otherwise off the street and not able to set up a tent again in the same

location; is that right?

      **MR. MCRAE:**  Objection.  Compound and vague.

      **THE COURT:**  Overruled.

      **THE WITNESS:**  Yes, the numbers that we report are consistent with the agreement.

**BY MS. MITCHELL:**

Q    Well, I'm sorry, that was not my question, Mr. Szabo.  My question was a little bit more specific in that the numbers that you're reporting in removing, for example, tents from the public right-of-way are not a permanent reduction, such that the person has either gone inside, accepted an offer of shelter, reunited with family, or in some other way is off the street, such that they will not set up the tent, a new tent, let's say, again in the same location; is that right?

      **MR. MCRAE:**  Objection. Compound, incomplete hypothetical, and vague, and it assumes facts.

      **THE COURT:**  Overruled.

      **THE WITNESS:**  That's correct per the agreement.

Q    Showing you Exhibit 35, and I want to focus specifically on the master leasing units, the example of which we have been talking about in lines 51, 52 -- 50, 51, 52, but also continue in a few other places in this agreement.  Do you see those sections?

A    I do, yes.

Q    Right.  Now, the Permits Board of Housing master lease,

Szabo - Redirect / By Ms. Mitchell                    **75**

those are being reported out of LAHSA; is that right?

A     That's correct.

Q     Is LAHSA also considering those part of its time-limited subsidy program?

          **MR. MCRAE:**  Objection.  Vague, lack of foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  There are time-limited subsidies used as part of the master lease program, but we are not counting those in these numbers.  That is to say, any of the time-limited subsidies that we are reporting elsewhere are removed from the list that we have provided in our Alliance quarterly report.

**BY MS. MITCHELL:**

Q     And when you say reporting elsewhere, you're referring to the Roadmap agreement?

A     I am.

Q     So in other words, these are distinguishable from the time-limited subsidies that are being reported in the Roadmap agreement, even though they're both considered a type of time-limited subsidy; is that right?

          **MR. MCRAE:**  Objection.  Compound, lack of foundation, and vague as to considered by whom to the extent it calls for a legal conclusion.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  If the City TLS was used to support a

Szabo - Redirect / By Ms. Mitchell                                    **76**

master leased unit, we did not include that unit or that property in the number of projects that we've listed as compliant with the Alliance.  If it was using TLS that is reported in the Roadmap, we kept that separate and we did not report it as being compliant with our Alliance obligation.

**BY MS. MITCHELL:**

Q    Thank you.  I guess my question is a little bit more specific.  Well, let me ask this, just to be clear, these master lease projects that you're reporting, such as in 50 through 53, those are run through LAHSA's time-limited subsidy program; is that right?

          **MR. MCRAE:**  Objection. Vague.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  There's a separate contract for master leasing.  So they have a service provider that runs that program that manages the leases with the properties.  They also, by the way, have a third-party fiscal agent that also verifies the financial information.  So we have access to the fiscal agent as well.

Q    So is that a yes, it is run through the time-limited --

A    No, I think it's a separate program.  I think it's a -- the master lease program is a distinct program.  It does rely on time-limited subsidies.  That's true.  I agree with that.  But it's a program -- it's a separate program run through a selected service provider.  I cannot remember the

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Redirect / By Ms. Mitchell                    **77**

name at this time.

Q    Okay.  And are each of these master lease permit

supportive housing buildings reported, which are part of the

Inside Safe program, are they all leased through June 13th of

2027?

        **MR. MCRAE:**  Objection.  Relevance.  It's vague, lack

of foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I don't know that that's the case.  I

would need to look property by property as to the term.  I

don't have that, but it wouldn't -- we would not have excluded

them if they did not -- if they did not have terms through June

of 2027.

**BY MS. MITCHELL:**

Q    Right.  You're saying just because they're on the list

doesn't mean that they're necessarily leased through June of

2027?

A    Correct.

Q    And these are the same -- 50 through 53, these are the

same projects we identified as being open as on December 1st of

2023 when you and I spoke last.  Can you explain why they

weren't placed as part of the Alliance reporting program as of

December 1st of 2023?

A    We are reporting our -- we're reporting the beds related

to Inside Safe.  We first started reporting them in our third

Szabo - Redirect / By Ms. Mitchell                    **78**

quarterly report.  So we brought them in to the report just as we were bringing in the beds for the other -- the other types of beds for Inside Safe.  So we did not retroactively report the beds prior to January of 2024.

Q    My question to you, though, I understand that you just started reporting these in the fourth quarter of 2020 -- well, fourth annual quarter of 2024, so the end of 2024.  Why were they not included earlier?

        **MR. MCRAE:**  Objection.  Vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  We didn't include prior to January the Inside Safe beds outside of the Mayfair.  And so in in reconsidering our position on Inside Safe, we also looked at the master leased properties that were being used by the program.

**BY MS. MITCHELL:**

Q    And you agree that these, including the other master lease properties with Inside Safe, were never provided as any type of bed plan to the Alliance prior to you including them in these quarterly reports; is that right?

        **MR. MCRAE:**  Objection.  Bed pan is, excuse me, bed plan is vague and ambiguous.  Also to the extent it calls for a legal conclusion.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Inside Safe did not exist when we

submitted the initial plan.

Q    And these locations that you identified were not included on any bed plan that was ever submitted to the Alliance prior to including them in the report; is that right?

        **MR. MCRAE:**  Objection.  Relevance.  Lack of foundation.  Calls for legal conclusion and vague.

        **THE COURT:**  Overruled.  You can answer the question.

        **THE WITNESS:**  I'm sorry, could you repeat the bed -- could you repeat the question, I'm sorry?

**BY MS. MITCHELL:**

Q    Yeah.  These locations that were being reported were never included as part of the bed plan to the Alliance prior to including them in the report, in this last quarterly report; is that right?

        **MR. MCRAE:**  Objection.  Assumes facts.  Lack of foundation.  Vague.  Calls for a legal conclusion.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  That's correct.  In some cases, the properties didn't exist yet as they were new construction.

Q    Understood, thank you.  Showing you Exhibit 25, the parties settlement agreement, you made statements to counsel, I think I got them in quotes, the City is committed to meeting its obligations in the settlement and there is no doubt whatsoever of the City's commitment to meeting the objections  -- objectives.  Do you recall that testimony?

Szabo - Redirect / By Ms. Mitchell                    **80**

A    I do.

Q    Did the Alliance anywhere in the settlement contract for a commitment by the City?

        **MR. MCRAE:**  Objection.  Vague.  Calls for a legal conclusion.  Lack of foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I'm sorry, I don't quite understand the question.

        **THE COURT:**  Would you repeat that, counsel?

        **MS. MITCHELL:**  Sure.  Thank you, Your Honor.

**BY MS. MITCHELL:**

Q    So your testimony is that the City is committed to hitting its targets and by the deadline and my question to you is did the Alliance contract for commitments or for beds in the agreement?

        **MR. MCRAE:**  Objection.  It assumes that there's a difference between the two and it's vague.  It lacks foundation and to the extent it calls for a legal conclusion.

        **THE COURT:**  Counsel, overruled.  Thank you.  Please answer.

        **THE WITNESS:**  The obligation is to establish the beds.  The settlement refers to best efforts, but the obligation is -- the obligation is to establish the required number of beds by June of 2027.

Q    Is the City required to use its best efforts to hit

Szabo - Redirect / By Ms. Mitchell                    **81**

milestones and deadlines?

**MR. MCRAE:**  Objection.  Calls for a legal conclusion.

**THE COURT:**  Overruled.

**THE WITNESS:**  There's language that that is -- that is where the language lives is that we would use best efforts to meet the milestones and deadlines, yes.

**MS. MITCHELL:**  So you agree that the City is obligated to use its best efforts to hit the milestones and deadlines provided to the plaintiffs that we see here in Exhibit 24; is that right?

**MR. MCRAE:**  Objection.  Calls for a legal conclusion.  Lack of foundation and potentially calling for privileged communications.

**THE COURT:**  Overruled.  You can answer, sir.

**THE WITNESS:**  Yes.

**BY MS. MITCHELL:**

Q    Going back to the settlement agreement, is the word aspirational contained anywhere in the settlement agreement to your knowledge?

A    I don't believe so.

Q    Now, the last quarterly report that you provided has a total in progress and I'm showing you what has been marked as Exhibit 35, has a total units and beds open to date and in process of 11,002 beds; is that right?

A    That is correct.

**EXCEPTIONAL REPORTING SERVICES, INC**

Q    How are you going to fill the gap to reach 12,915 beds?

A    So we are in ongoing conversations with the city council and the mayor on availability of funding, securing additional funding, and we will be developing the plans to close that gap and to replace any beds that may fall off of the count that we're currently counting as open and occupiable over the course of the next two years as provided by the settlement.

Q    So I am clear the City has no current plan at all for funding or placement of those remaining approximately 1,900 beds; is that right?

A    No, that is not right.

Q    Okay, so have you presented city council with a plan for the remaining 1,900 beds?

     **MR. MCRAE:**  Objection to the extent that it calls for deliberative process, privilege information.  It's also vague as to plan.

     **THE COURT:**  Overruled.

     **THE WITNESS:**  I've had a number of conversations in closed session with city council about our path forward on the Alliance Agreement, yes.

**BY MS. MITCHELL:**

Q    So a number of conversations, my question is does the City have a plan both from a funding perspective and a logistics perspective of how to increase this number to 12,915 instead of 11,002?

MR. MCRAE: Objection. Vague. And again, to the extent it (indisc.) deliberative process.

THE COURT: Overruled.

THE WITNESS: So again, I'm not going to reveal the contents of our closed session conversations, our closed session briefings with council, but there have been discussions on all of those issues, the funding issues, and the feasibility issues for closing the gap.

BY MS. MITCHELL:

Q    And have you provided any plan to plaintiffs --

MR. MCRAE: Excuse me. Your Honor --

Q    -- for the remaining 1,900 beds?

MR. MCRAE: I don't believe the witness was finished with his answer, could he finish his answer?

THE COURT: Overruled. You can answer the question.

THE WITNESS: What I was going to say actually was exactly you question that when that is -- when the plan is approved by the city council, we would provide it, although I would -- I'll just say that. I'm not going to provide anything until it's approved by the city council.

Q    Now, if the Court determines as the plaintiffs have argued that the newly added 1,900 beds do not count towards this agreement and instead the city has an obligation to hit 3,800 additional beds, which was the delta the city was reporting to its own counsel as of January, does the City have a plan to hit

Szabo - Redirect / By Ms. Mitchell                    **84**

those 3,800 beds and make them open and occupiable by June of 2027?

MR. MCRAE:  Your Honor, I'm going to object.  It's a lack of foundation.  It's compound.  It assumes that those numbers are apples to apples.  It calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  The -- I'm sorry, the assumption was that the beds that are open that are currently serving homeless individuals that are being paid for almost entirely by the City wouldn't count, so under that scenario, would we have a plan to?

BY MS. MITCHELL:

Q    Right, the newly added inside safe beds that were never part of this program before, the 1,900 beds that were just added in the last quarter, as plaintiffs are arguing those don't count, if the City has to hit 3,800 beds, which is that delta between the 12,915 and the open and occupiable, does the City have a plan to do that?

MR. MCRAE:  Objection, to the extent it calls for deliberative process privilege.  It's vague.  It's an incomplete hypothetical.  It calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  This is -- this relates to our conversations and briefings in closed session regarding the path forward to comply with the with the settlement agreement.

Szabo - Redirect / By Ms. Mitchell                    **85**

Q    And so you would agree that you have not provided any plan to plaintiffs or to the Court to meet that obligation of additional 3,800 beds; is that right?

**MR. MCRAE:**  Objection.  It's not -- it assumes that it's an obligation, so that assumes a fact that's not in the case.  It calls for a legal conclusion.  It lacks foundation and deliberative process privilege.

**THE COURT:**  Overruled.

**THE WITNESS:**  We've -- we have provided plans beyond the initial 2022 plan.  But to your specific hypothetical, I have not provided a plan that addresses that hypothetical to the city council for approval, so that could be provided to plaintiffs.

**BY MS. MITCHELL:**

Q    And just in January, you were testifying or I guess explaining to the Housing and Homelessness Committee that the City still had a delta of 3,800 beds to meet its obligations, isn't that true?

**MR. MCRAE:**  Objection.  Lack of foundation, vague --

**THE COURT:**  Overruled.

**MR. MCRAE:**  -- and relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  And I was referencing our most recently filed quarterly report at that time.

Q    Now there was some discussion about the -- whether or not

the City had met its obligations under the Roadmap agreement and I believe you indicated that the County did not pay that $8 million, which was the bonus for hitting 5,300 beds within a 10-month period, do you remember that discussion?

A    I do, yes.

**MS. MITCHELL:**  May I have a moment, Your Honor?

**THE COURT:**  Certainly.

**(Pause)**

**BY MS. MITCHELL:**

Q    Now do you recall that the County did not pay that $8 million because it contended the City did not actually open the 5,300 beds as it reported?

**MR. MCRAE:**  Objection, Your Honor.  No foundation, argumentative, calls for a legal conclusion, and vague.

**THE COURT:**  Overruled.

**THE WITNESS:**  That is my recollection.  Yes.

Q    Okay, and showing you what has been marked as Exhibit 140, the County actually conducted an audit on this issue; is that right?

A    That is my recollection, yes.

**MR. MCRAE:**  Objection.  Also relevance.

**THE COURT:**  Overruled.

Q    Okay.  Showing you page 31 of Exhibit 140.

A    If I could get a copy, that would be helpful.

Q    Sure.  Yeah, I'll get you a copy in just one second.

Szabo - Redirect / By Ms. Mitchell                          **87**

A      Thank you.

Q      Let me do this.

        **MR. MCRAE:**  Your Honor, we don't have a copy.

        **MS. MITCHELL:**  This was sent to counsel, but I also
have additional hard copies, Your Honor.  May I approach, Your
Honor?

        **THE COURT:**  Why don't you give the witness one?  I
can see the screen.  If you leave one with Karlen eventually,
I'd appreciate that.

**BY MS. MITCHELL:**

Q    This was also Docket 373, and Mr. Szabo, to direct your
attention, I'm looking at the County audit, which is identified
as Exhibit 3, and it's page 31 of the document I just handed to
you.  Do you need a moment to review?

        **MR. MCRAE:**  Your Honor, I didn't catch the exhibit
number for the host document.

        **MS. MITCHELL:**  This is Exhibit 140.

        **MR. MCRAE:**  Thank you.

        **THE WITNESS:**  Yes, I will need a moment to review.  I
may need a few moments.

        **MR. MCRAE:**  Your Honor, Mr. Szabo has indicated he
needs to read the document.  I note it's 12:05.  I don't know
if that --

        **THE COURT:**  I'm letting each counsel call the recess
whenever they'd like to, counsel.

MR. MCRAE:  Thank you.

THE COURT:  On both sides.

MS. MITCHELL:  That's fine, Your Honor.  Let's go ahead, and if the Court is amenable, let's break, and Mr. Szabo can review this over lunch, and we'll come back at 1:00 p.m.

THE WITNESS:  Thank you.

THE COURT:  All right, then, at 1:00 p.m., counsel, and I've got other matters, so we'll be in session throughout the lunch hour.

MR. MCRAE:  You want us to clear the tables, Your Honor?

THE COURT:  No, I don't think it's necessary.

MR. MCRAE:  Okay, thank you.

THE COURT:  I think it's a lot of logistics for each of you.  Just leave those where they are.

**(Recessed at 12:06 p.m.; to reconvene at 1:07 p.m.)**

THE COURT:  All right, Counsel, we're back on the record.  Mr. Szabo has returned to the stand.  And Counsel, you may continue redirect.

MS. MITCHELL:  Thank you, Your Honor.

**REDIRECT EXAMINATION (CONTINUED)**

BY MS. MITCHELL:

Q   Mr. Szabo, have you had an opportunity to review Exhibit 140, which was provided to you prior to lunch break?

A    I have, yes.

THE COURT:  And could you take a moment and just put that back up on the screen.

MS. MITCHELL:  Yes.

THE COURT:  I made a note 307 28 percent of new beds not open occupiable and the City could not provide adequate documentation to support an additional 267 or 24 percent. That's what I wrote in my notes but I'm not….

Okay.  Very well.  Thank you.

BY MS. MITCHELL:

Q    Now, the County ultimately did not pay the -- well, let me take a step back.  The County audited the new beds that were put up by the City as a result of the Roadmap Agreement, is that right?

A    They did, correct.  A sample.

MR. MCRAE:  Objection, relevance, foundation.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    They took about a 20 percent sample, is that right?  Let me restate that.

They sampled about 20 percent of the new beds and reviewed those to determine whether they were open and occupiable, is that right?

MR. MCRAE:  Objection, relevance, vague, lack of foundation, legal conclusion.

THE COURT:  Overruled.

Szabo - Redirect / By Ms. Mitchell                    **90**

THE WITNESS:  That's correct.

**BY MS. MITCHELL:**

Q    And ultimately concluded that 28 percent of the reported new beds were not open and occupiable by April 16th of 2021 and that the City could not provide adequate documentation to support an additional 24 percent by that same date, is that right?

MR. MCRAE:  Objection, relevance, lack of foundation, legal conclusion.

THE COURT:  Overruled.

MR. MCRAE:  Vague.

THE COURT (To the Witness):  And your answer, sir?

THE WITNESS:  That was the conclusion of the auditor/controller.

**BY MS. MITCHELL:**

Q    And ultimately the City did not receive that $8 million bonus, is that correct?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  We did not, despite our protest.

**BY MS. MITCHELL:**

Q    Let's go on to the -- Exhibit 114, which was we established the potential project was the bed list that was provided by the City to Plaintiffs as a partial production of the beds it intended to open in its progress towards the 12,915

**EXCEPTIONAL REPORTING SERVICES, INC**

and I believe we have a stipulation with counsel that the

delta --

      **MR. MCRAE:**  No.  There's no stipulation, Your Honor.

      **MS. MITCHELL:**  I provided this to counsel.  I heard no objection.  I thought that we were in agreement.

      **THE COURT:**  Just look over and talk to each other for a moment, see if you can reach a resolution.

    **(Counsel confer)**

**BY MS. MITCHELL:**

Q    Now do you recall, Mr. Szabo --

      **THE COURT:**  Counsel, just a moment.

      **MS. MITCHELL:**  Yes.

    **(Pause)**

      Thank you.

      Now, there is no stipulation, Your Honor, I will ask questions.

**BY MS. MITCHELL:**

Q    Do you recall, Mr. Szabo, that in the potential project list that was provided by the City it did not include a -- plans for all 12,915 beds, is that right?

A    That is correct.

      **MR. MCRAE:**  Objection, vague.

      **THE COURT:**  Counsel?

      **MR. MCRAE:**  I said objection, vague.  I'm sorry, Your Honor.

THE COURT:  My apologies.  Overruled.

THE WITNESS:  That is correct.

BY MS. MITCHELL:

Q    Do you recall that the difference in the numbers that were provided or the plans that were provided in 12,915 was somewhere around 4,000 beds?

MR. MCRAE:  Objection, vague as stated.

THE COURT:  Overruled.

MR. MCRAE:  And relevance.

THE COURT:  Overruled.

THE WITNESS:  This was a potential project list of -- from 2022, so again I haven't -- there's no summary though so I can't -- I can't say that's the case for sure, but this is, this is what we provided.

BY MS. MITCHELL:

Q    And it was short of 12,915, is that right?

THE COURT:  Counsel, would you re-ask that slower, please.

BY MS. MITCHELL:

Q    It was short of 12,915, is that right?

MR. MCRAE:  Objection, lack of foundation and relevance as a potential list.

THE COURT:  Overruled.

THE WITNESS:  Correct.

//

Szabo - Redirect / By Ms. Mitchell                    **93**

**BY MS. MITCHELL:**

Q    Now, as your counsel pointed out, the City retained discretion on determining the type of beds to produce in compliance with this agreement.  Do you agree with that statement?

          **MR. MCRAE:**  Objection, calls for a legal conclusion.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Yes, I believe that we have broad discretion in the agreement.

**BY MS. MITCHELL:**

Q    And the City has largely used permanent supportive housing to satisfy its obligation under this agreement, is that right?

          **MR. MCRAE:**  Vague as to largely.

          **THE COURT:**  Overruled.

          **MR. MCRAE:**  And calls for a legal conclusion.

          **THE COURT:**  Thank you, Counsel.

          **(To the Witness):**  You may answer.

          **THE WITNESS:**  Of the reported beds, the majority of them are supportive housing of some type

**BY MS. MITCHELL:**

Q    And there was nothing in the agreement that required you to use permanent supportive housing, is that true?

          **MR. MCRAE:**  Objection, relevance and calls for a legal conclusion.

          **THE COURT:**  Overruled.

Szabo - Redirect / By Ms. Mitchell                          **94**

THE WITNESS:  That's true.

BY MS. MITCHELL:

Q    And in fact, Proposition HHH permitted the City to use some of the $1.2 billion in funds to fund interim shelter, isn't that true?

MR. MCRAE:  Objection, relevance and lack of foundation and calls for a legal conclusion.

THE COURT:  Overruled.

(To the Witness):  You may answer the question, sir.

THE WITNESS:  That is true.

BY MS. MITCHELL:

Q    And in fact -- I'm showing you what has been marked as Exhibit 143.  This is a review of Proposition HHH which was submitted by the prior controller, Ron Galperin, on October 8th of 2019.  Are you familiar with this document?

MR. MCRAE:  Objection, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry, which exhibit number is it?

MS. MITCHELL:  Oh, let me give you a hard copy.  It's Exhibit 143.

May I approach, Your Honor?

THE COURT:  You may.

(Document tendered to Witness)

THE WITNESS:  Yes, this is a six -- this document is six years old but at the time I remember reviewing the document

EXCEPTIONAL REPORTING SERVICES, INC

and its analysis and recommendations.

**BY MS. MITCHELL:**

Q    And the recommendation that's provided at that time, and I'm showing you Page 2 of this document, the recommendations were to -- starting the first bullet point, can you read that recommendation for us, please?

          **MR. MCRAE:**  Your Honor, relevance.  I don't know the relevance.  This is six years old, before the agreement.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  "Put a greater focus on innovative practices to save time and money, including ways to reduce costs on approved or --

          **THE COURT:**  I'm sorry, could you read that just a little bit slower?

          **THE WITNESS:**  Oh, I'm sorry.

          **THE COURT:**  I appreciate it.

          **THE WITNESS:**  Yes.

          "Put a greater focus on innovative practices to save
          time and money, including ways to reduce costs on
          approved or conditionally approved projects, and
          consider using any savings achieved for temporary
          shelters, bridge housing, hygiene centers, and other
          service facilities to address more immediate needs."

//

//

Szabo - Redirect / By Ms. Mitchell                96

BY MS. MITCHELL:

Q    Now -- and thank you, Mr. Szabo.  Now, on direct with your counsel do you recall testifying that the voters made the choice to direct City policy towards permanent supportive housing, which is why the City was focusing so much on permanent supportive housing in complying with this agreement?

        MR. MCRAE:  Objection, incomplete characterization of the witness's testimony.

        THE COURT:  Overruled.

        THE WITNESS:  Correct, yes.

BY MS. MITCHELL:

Q    But the City chose to use that HHH funds to satisfy its obligations under this agreement, correct?

        MR. MCRAE:  Objection, vague, lack of foundation.

        THE COURT:  Overruled.

        MR. MCRAE:  And relevance.

        THE COURT:  Same answer, Counsel.

        THE WITNESS:  Under the Alliance settlement.

        MS. MITCHELL:  Yes.

        THE WITNESS:  Yes.

BY MS. MITCHELL:

Q    And the City chose to direct those funds significantly towards permanent supportive housing, isn't that true?

        MR. MCRAE:  Objection, relevance.

        THE COURT:  Overruled.

Szabo - Redirect / By Ms. Mitchell          **97**

THE WITNESS:  The HHH program, it's a bond program. It requires, it requires permanent -- the housing that it builds needs to be permanent in nature.  What the controller is referencing in the first bullet, temporary shelters, bridge housing, hygiene centers, and other service facilities, with the exception of service facilities they could potentially be a permanent facility, those would be ineligible uses of bond proceeds.

**BY MS. MITCHELL:**

Q    Showing you Page 1.  The sentence that starts HHH funds, can you read that sentence, please?

A    Yes.

"HHH funds can also be used to support new affordable housing units, temporary shelters, and service facilities."

Q    But the City in this case chose not to use HHH funds to put up temporary shelters and service facilities in order to complete its obligation under the Alliance Agreement, is that true?

MR. MCRAE:  Your Honor, objection, relevance.  It says can.

THE COURT:  Overruled, Counsel.

THE WITNESS:  Respectfully, it's a -- I think it's a misread of what the controller is writing here -- wrote here. It's the bond proceeds cannot be used for temporary facilities as it relates to a sprung structure, for example.  It could be

Szabo - Redirect / By Ms. Mitchell                    **98**

used to build a brick and mortar facility, a permanent facility that could be then used as a temporary shelter as it relates to the term of stay a person would be in it.

Same thing with service facilities.  It would absolutely not allow for temporary shelters or temporary service facilities as it relates to the duration of how long those facilities would be in existence.

Those are those -- those types are the types of facilities that would be considered less expensive, cheaper, cheaper solutions like the tiny homes, et cetera, et cetera. HHH does not allow for bond proceeds to be used in that manner.

**BY MS. MITCHELL:**

Q    Showing you Exhibit 142, Exhibit 1 to 142 which is on Page 7, and I will approach with a hard copy.  This is the text of the provision Homelessness Reduction and Prevention, Housing, and Facilities General Obligation Bond Program --

THE COURT:  Counsel?  Just a moment.  Would you read that more slowly, please?

MS. MITCHELL:  Yes.  Homelessness Reduction and Prevention, Housing, and Facilities General Obligation Bond Program which was put on the ballot, otherwise known as Prop HHH.

May I approach, Your Honor?

THE COURT:  You may.

MR. MCRAE:  Your Honor, that was a statement so I'm

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Redirect / By Ms. Mitchell                    **99**

going to object that it's not a question.

THE COURT:  Overruled.  She simply read the heading, Counsel.

(Document tendered to Witness)

**BY MS. MITCHELL:**

Q    Mr. Szabo, have you seen this before?

A    I may have, but I'm taking a look at it.  I'm reviewing it right now.

Q    I'm going to direct you to the language of the proposition which is on Exhibit 1 which starts at Page 7 of the exhibit that you're holding, Exhibit 142.

MR. MCRAE:  Your Honor, may the witness read the document?

THE COURT:  Yes.

MR. MCRAE:  Thank you.

MS. MITCHELL:  Your Honor, we have not provided these hard copies to the Court.  They're new exhibits.  Can I approach?

THE COURT:  Actually I'm aware of this exhibit, but if you have an extra copy I'd appreciate it.

(Documents tendered to Court)

Thank you.

(Pause)

//

//

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Redirect / By Ms. Mitchell                **100**

BY MS. MITCHELL:

Q    Are you ready, Mr. Szabo?

A    Yes, as it relates to Page 1, if that's the question, yes.

Q    That is the question.  Page -- you mean Page 7 starting with Exhibit 1?

A    Yes.

Q    That is reflected on the screen?  Okay.

So let's start with the top.  Can you read this paragraph into the record, please, starting with proceeds?

A         "Proceeds of the general obligation bonds to be issued in one or more series on a tax exempt or taxable basis as determined to be necessary or appropriate in an aggregate principal amount of up to one billion two hundred million dollars shall be used only for the purposes of acquisition or improvement of real property to provide."

Q    And Subsection A refers to supportive housing or supportive housing units, is that right?

A    Yes.

**MR. MCRAE:**  Objection, there's an entire paragraph, not just those words, for A.

**THE COURT:**  Overruled.

BY MS. MITCHELL:

Q    And Section B refers to temporary shelter facilities, storage facilities, and shower facilities and other facilities

**EXCEPTIONAL REPORTING SERVICES, INC**

to be used by the City, is that right?

MR. MCRAE:  Same objection, Your Honor, relevance and also the document has more than just the excerpt.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q   Yet it's still your position that Prop HHH, which was the funding source the City chose to use to fulfill the obligation, required the City to build nearly exclusively permanent supportive housing, is that right?

MR. MCRAE:  Objection, mischaracterizes the witness's testimony, lack of foundation, it calls for a legal conclusion, and it's vague.

THE COURT:  Overruled.

THE WITNESS:  That's not -- that's not my statement. That's not my position.  HHH required and could only be used for the acquisition or improvement of real property and it could be used for multiple uses, as I said.  If there was a facility that was a brick and mortar facility, a building that was either constructed or improved in order to provide services that are temporary in nature, that would be allowed.  That's -- I agree with that.  But you're still talking about -- you're still talking about construction.  You're still talking about making improvements that would have a usable life of 20 years or more.  That was the requirement.

Szabo - Redirect / By Ms. Mitchell          **102**

So yes, you could have a hard structure be used for temporary uses, that would be fine.  But the nature of the way bond proceeds were used wouldn't allow us to purchase tiny home villages or tiny homes with bond proceeds, for example.

**BY MS. MITCHELL:**

Q   And you're saying that because the tiny homes like the pallet shelters don't last for that period of time, is that right?

**MR. MCRAE:**  Objection, mischaracterizes the witness's testimony.

**THE COURT:**  Overruled.

**THE WITNESS:**  Principally, but there are other factors.  But yes.

**BY MS. MITCHELL:**

Q   Okay.  So HHH could have allowed you to acquire property to be used for temporary shelters, is that right?

**MR. MCRAE:**  Objection, calls for a legal conclusion, relevance, foundation.

**THE COURT:**  Overruled.

**THE WITNESS:**  Yes.

**BY MS. MITCHELL:**

Q   And could have permitted you to improve real property to provide temporary shelter facilities, is that right?

**MR. MCRAE:**  Objection, relevance, lack of foundation, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q    So the City made the choice to fulfill its obligations under the Alliance Agreement primarily with permanent supportive housing even though it had other options, is that true?

MR. MCRAE:  Objection, vague as to other options, calls for a legal conclusion, lack of foundation, relevance, also asked and answered.

THE COURT:  Overruled.

THE WITNESS:  We have used HHH to support the acquisition of properties that are used for interim housing. We've used HHH to improve facilities for the purposes of providing services.  The intent was made by the -- by those put in charge, the policy setting committee.  The bond also required a citizens oversight committee that set policy for the committee and that committee made a recommendation to maximize the number of new units that would be available on a permanent basis to switch or to focus almost exclusively, with exceptions but almost exclusively on permanent housing.  That was a policy decision that was made, that was a policy decision that predated the Alliance settlement.

//

//

**BY MS. MITCHELL:**

Q    Did the City ever go back to the committee and ask to switch its focus for any percentage of the HHH funds to foster interim housing?

**MR. MCRAE:**  Objection, relevance, lack of foundation.

**THE COURT:**  Overruled.

**MR. MCRAE:**  Vague.

**THE COURT (To the Witness):**  You may answer, sir.

**THE WITNESS:**  I believe we used, and I would need to -- I would need to look up the details, but I believe we used HHH proceeds for our local match requirement for Project Homekey, the first round of which was used for interim housing.

**BY MS. MITCHELL:**

Q    And was that included in the Alliance Agreement?

**MR. MCRAE:**  Objection, vague.

**THE COURT:**  Overruled.

**MR. MCRAE:**  Calls for a legal conclusion.

**THE COURT (To the Witness):**  You may answer.

**THE WITNESS:**  I believe it is not.  I believe they are not because they are included in the Roadmap Agreement.

**BY MS. MITCHELL:**

Q    Understood.  Let's go on over to the data, and I'm going to show you Exhibit 35.  This is the last quarterly report. And you made a statement that you are, quote, confident in the numbers reported even if LAHSA owns and controls the data and

has significant issues.  Do you recall making that statement?

MR. MCRAE:  Objection, mischaracterizes the witness's testimony.

MS. MITCHELL:  I'll ask a new question.

**BY MS. MITCHELL:**

Q    So regarding your confidence in the numbers reported, you indicated that the CAO's office can be confident because you do independent verification to reconcile and verify the data.  Is that right?

A    Correct.  To the extent possible, yes, we do.

Q    Okay.  And that reconciliation and verification consists of reviews of invoices and financial records, is that right?

MR. MCRAE:  Objection, vague as to what beds we're talking about.

THE COURT:  Overruled.

THE WITNESS:  Yes, it does.  But again it depends on which type of intervention.  Each has a different process.  So if you have a specific, if you have a specific question I can answer with more specificity, but generally yes.

**BY MS. MITCHELL:**

Q    Okay.  So on a general basis, does the CAO's office do anything other than reviewing invoices and financial records to independently verify the data that is being provided to it by LAHSA?

MR. MCRAE:  Objection, vague as to general basis.

Szabo - Redirect / By Ms. Mitchell **106**

THE COURT:  Overruled.

THE WITNESS:  Do anything other than review financial data and -- I mean there are multiple reports, expenditure records, invoices, of course, but also our staff also has access to HMIS in which in some cases we're able to verify the use of a particular unit or bed principally through the Inside Safe Program that we use to verify the booking agreements, because booking agreements, of course, are inherently variable so we take care to make sure that we're checking and rechecking the data related to the occupancy levels of those hotels and motels.

BY MS. MITCHELL:

Q    So relating to Inside Safe, at LAHSA -- does LAHSA have anything to do with Inside Safe?  And if so, in what capacity?

MR. MCRAE:  Objection, compound, also vague.

THE COURT:  Overruled.

THE WITNESS:  LAHSA is the -- yes, LAHSA is the primary contracting authority for service providers.  So as it relates to Inside Safe, for example we're using a motel, Motel 6, LAHSA would be responsible for contracting with the service provider to provide the services for some of the additional outreach to the encampment and then the services that would be provided in the hotel or motel, in this case the Motel 6.

Separately, the City, as it relates to securing the

beds, that's within the City of Los Angeles so we contract directly with the hotel and motel.  It did not start that way. Initially it was all costs that were carried by the service provider and then we paid the service provider for the services and the leasing costs of the hotels and motels, but we have since moved to direct contracting in the form of booking agreements and occupancy agreements.

**BY MS. MITCHELL:**

Q   And regarding the non-Inside Safe interim beds that are reported as part of this agreement, which I believe are Highland Gardens and potentially Mayfair, I'm not sure if Mayfair is run through Inside Safe, I'm sure you will clarify, what role, if any, does LAHSA have in those facilities?

        **MR. MCRAE:**  Your Honor, objection.  Is the witness to correct counsel's understanding as part of that question?

        **THE COURT:**  Overruled.

        **THE WITNESS:**  The same relationship, and I do believe I would need to -- I would need to double check, but I do believe the only open interim facility is Highland Gardens outside of Inside Safe.  Mayfair is used for Inside Safe.

**BY MS. MITCHELL:**

Q   Understood.  And then regarding reports for the housing units that are reported as part of this agreement, what role, if any, does LAHSA play in those facilities?

        **MR. MCRAE:**  Objection, lack of --

Szabo - Redirect / By Ms. Mitchell **108**

**MS. MITCHELL:** Let me restate. The question actually is a bad question. I said agreements.

**BY MS. MITCHELL:**

Q   Regarding the permits for the housing units that are reported as part of this agreement, what role, if any, does LAHSA have in those facilities?

**MR. MCRAE:** Objection, vague, lack of foundation.

**THE COURT (To the Witness):** Do you understand the question, sir?

**THE WITNESS:** I do.

**THE COURT:** All right, you may answer.

**THE WITNESS:** I do.

**THE COURT:** Thank you.

**THE WITNESS:** The -- LAHSA's role would be limited to the placements of individuals in those units. But the establishment of the units for most all of the PSH units, that's a City process, either the City through the Housing Department through the Triple H apparatus or through the Housing Authority, some combination thereof, as it relates to the services for permanent housing, that's -- those are contracted directly through the County of Los Angeles.

**BY MS. MITCHELL:**

Q   Okay. Showing you zooming in on Line 1 here, just as an example, Line 1 all the way over to the right there's a note total PEH served and it says 91. Do you see that?

**EXCEPTIONAL REPORTING SERVICES, INC**

THE COURT:  Counsel, would you repeat that, please?

MS. MITCHELL:  Yeah.  We're zooming in on Line 1. Make that easier to see.  Line 1, I'll highlight this, where it notes total PEH served and there's 91 people.

BY MS. MITCHELL:

Q    Do you see that?

A    Yes.

Q    Is that number reported by LAHSA?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  Just give me a moment, please.

(Pause)

Potentially as it relates to the intake process.

BY MS. MITCHELL:

Q    The coordinated entry system, moving people into the units, is that right?

A    Yes.

MR. MCRAE:  Objection, vague.

THE COURT:  I'm sorry, Counsel?

MR. MCRAE:  Vague and relevance.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    What role does Pedro Torres have in your office?

A    He's one of the analysts in the group related -- in the group responsible for homelessness, the homelessness

Szabo - Redirect / By Ms. Mitchell                    **110**

activities.

THE COURT:  Can you state that name again?

MS. MITCHELL:  Pedro Torres.

THE COURT:  All right, thank you.

BY MS. MITCHELL:

Q    And Mr. Torres is the gentleman we heard testifying before the Housing and Homelessness Committee in the February 12th, 2025, audio clip, is that right?

A    Yes, that's correct.

Q    Did you know that Mr. Torres was going to be attending Housing and Homelessness Committee that day?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Typically all of the staff that have worked on reports that are pending before the committee attend the committee.

BY MS. MITCHELL:

Q    My question was did you, Mr. Szabo, know that Mr. Torres was attending that committee that day?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE COURT:  I don't have -- I don't have a -- well, I'll just say I expect all of the staff to attend committee meetings if they work on a report.  Pedro assists in preparing reports.  He is not the chief of the division.  He's not the

Assistant City Administrative Officer over the division.  He's not the CAO.  He helps preparing -- he helps and assists in preparing the reports.  So yes, I did expect him to be there.

**BY MS. MITCHELL:**

Q    How many other individuals from the CAO's office were present on that day, if you know?

     **MR. MCRAE:**  Relevance, lack of found -- relevance, lack of foundation, calls for speculation.

     **THE COURT:**  Overruled.

     **THE WITNESS:**  I don't know.

**BY  MS. MITCHELL:**

Q    Did anybody from the CAO's office tell Pedro that he was wrong that day for reporting that booking agreements do not comply with the Alliance Settlement Agreement?

     **MR. MCRAE:**  Objection, lack of foundation and relevance.

     **THE COURT:**  Overruled.

     **THE WITNESS:**  I don't know.

**BY MS. MITCHELL:**

Q    Turning over to Exhibit 25, which is the Settlement -- well, let me ask, I'm sorry, one follow up to that last question.

     You said you don't know if anybody on that date told Mr. Torres he was wrong.  Did you on that date tell Mr. Torres that he was wrong for reporting that booking agreements don't

Szabo - Redirect / By Ms. Mitchell                    **112**

comply with the Settlement Agreement in this case?

        **MR. MCRAE:**  Objection, relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I did not.  I was not in attendance and it was -- that particular exchange was not brought to my attention.

**BY MS. MITCHELL:**

Q    Showing you Exhibit 25.  I want to look specifically at Section 3.2, which your counsel highlighted during your direct. It is your testimony that Section 3.2 provides the City with sole discretion to choose any housing or shelter solution it wants to, is that right?

A    That section gives the City broad discretion to use any of the listed housing interventions or others as appropriate.

Q    I'd like you to read for us the section highlighted in green, please.

        **MR. MCRAE:**  We don't see anything highlighted in green.

        Now we do.

        **MS. MITCHELL:**  Thank you.

        **THE WITNESS:**  "As long as milestones -- as long as the milestones are met."

**BY MS. MITCHELL:**

Q    So the City may choose at its sole discretion any housing or shelter solution as long as the milestones are met, is that

Szabo - Redirect / By Ms. Mitchell **113**

right?

        **MR. MCRAE:**  Objection, Your Honor.  It's incomplete.  It also starts subject to constitutional requirements and legal mandates and there's an entire paragraph there.

        **THE COURT:**  Overruled, Counsel.

        Counsel, is there any way that we can curtail the speaking objections?  You seem to be giving some guidance to the witness, frankly.

        **MR. MCRAE:**  I'm happy to do --

        **THE COURT:**  Can you just simply state the objection?

        **MR. MCRAE:**  Yeah, I --

        **THE COURT:**  Okay.

        **MR. MCRAE:**  -- just want to make sure the objection --

        **THE COURT:**  Thank you very much, Counsel, I appreciate that.

        **MR. MCRAE:**  -- is understood.  But yes.

        **THE COURT:**  I appreciate that.  Thank you, Counsel.

        Counsel, your question?

**BY MS. MITCHELL:**

Q   Mr. Szabo, if the City may choose at its sole discretion any housing or shelter solution as long as the milestones are met and we agree that the milestones have not been met in this case, wouldn't you agree that the City no longer may choose at its sole discretion any housing or shelter solution?

**MR. MCRAE:** Objection, lack of foundation, calls for a legal conclusion, relevance.

**THE COURT:** Thank you. Overruled.

**THE WITNESS:** I don't agree with that. We didn't -- we didn't -- we didn't agree to interim requirements. We agreed to set milestones and we agreed to employ best efforts to meet those milestones and I believe that we're doing that.

**BY MS. MITCHELL:**

Q   Now, this agreement caveats the City's sole discretion to provide any housing or shelter solution as long as the milestones are met. Is that not the plain language of this agreement?

**MR. MCRAE:** Objection, Your Honor, calls for a legal conclusion, lack of foundation, relevance.

**THE COURT:** Overruled.

**THE WITNESS:** That is, that is what the words say, correct.

**BY MS. MITCHELL:**

Q   And you agree that the milestones in this case have not been met, is that true?

**MR. MCRAE:** Objection, vague as to time, vague as to different milestones.

**THE COURT:** Overruled.

**THE WITNESS:** We have not reported having met the milestones in our quarterly reports to date.

MS. MITCHELL:  Subject to renewal of the request to call the Mayor of Los Angeles and Council members Rodriguez and Park to the stand, we have no further questions of this witness, Your Honor.

THE COURT:  All right.  And Ms. Myers, do you have questions or would you like a recess to set up before you examine?

MS. MITCHELL:  I think she'll be using our tech, right?

MS. MYERS:  Yeah.  But Your Honor, just a five-minute recess to --

THE COURT:  Sure.

MS. MYERS:  -- get started would be helpful.

THE COURT:  Sure.

MS. MYERS:  Thank you.

THE COURT:  Why don't you step down and once again you can consult with anyone you'd like.  Okay?

**(Witness stepped down)**

All right, then, about five or ten minutes.  Okay?  Let's take ten minutes just to be sure.  You can use the restrooms.

MS. MYERS:  Thank you, Your Honor.

**(Recess taken at 1:44 p.m.; reconvened at 1:57 p.m.)**

THE COURT:  Counsel, did you have enough time to set up?

MS. MYERS:  Yes, Your Honor, thank you very much.

THE COURT:  All right.  Comfortable then?  Then we're back on the record.  And this would be cross-examination.  Go ahead.

MS. MYERS:  Thank you, Your Honor, Shayla --

THE COURT:  By intervenors.

MS. MYERS:  -- Myers -- oh.

THE COURT:  I'm sorry.

MS. MYERS:  Shayla Myers with the Legal Aid Foundation of Los Angeles on behalf of the intervenors in this case.

**RECROSS EXAMINATION**

BY MS. MYERS:

Q    Good afternoon, Mr. Szabo.  You testified that you're confident that the City will meet its obligations under the settlements because City leadership is committed to meeting the LA Alliance settlement goals, correct?

A    Correct.

Q    And when you testified about City leadership, were you referring to the City Council and the Mayor?

A    Yes.

Q    Were you also referring to the city attorney?

A    The city attorney is part of city leadership, but the mayor and the council set the policy.

Q    And the City's ability to meet its obligations under the

Szabo - Recross / By Ms. Myers                    **117**

LA Alliance settlement rely on the cooperation of city leadership, correct?

      **MR. MCRAE:**  Objection, vague.

      **THE COURT:**  Overruled.

      **THE WITNESS:**  I'm sorry, could you repeat that?

**BY MS. MYERS:**

Q   Sure.  The City's ability to meet its obligations under the LA Alliance settlement relies on those City leadership's cooperation, correct?

      **MR. MCRAE:**  That's vague.

      **THE COURT:**  Do you understand the question?  It can be restated if you don't.

      **THE WITNESS:**  Yeah, it's fine.  Yes, I understand it and obviously yes.

Q   And, in fact, fulfilling the LA Alliance settlement obligations to date has required a significant amount of City Council cooperation, correct?

      **MR. MCRAE:**  Objection, vague and relevance.

      **THE COURT:**  When you say City Council, is that the Mayor's office, auditor?

      **MS. MYERS:**  The City Council, Your Honor, the elected --

      **THE COURT:**  City Council, all right.

      **MS. MYERS:**  -- members of the Los Angeles City Council.

THE COURT:  Okay.

THE WITNESS:  Yes, they approve all the appropriations.

**BY MS. MYERS:**

Q    And, in fact, they go beyond just approving appropriations, correct, they also approve permits that are -- that may be necessary for the construction of the beds that were included in the LA Alliance settlement, correct?

MR. MCRAE:  Objection, relevance and vague.

THE COURT:  Overruled.

THE WITNESS:  Well, I mean, if we're going to get specific, they don't really approve permits, but they do approve -- they approve the projects.  And in some cases, if there are actions that need to be taken as it relates to zoning, they're able to do that.

Q    And so for purposes of the housing and shelter opportunities that have been opened to date, then the City Council has been intimately involved in the approval of those projects then, correct?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  Yes.

Q    And so in order to meet the goals of the LA Alliance settlement it will require a significant amount of cooperation for approval of the projects that need to be constructed to

Szabo - Recross / By Ms. Myers          **119**

meet the Alliance goals, correct?

      **MR. MCRAE:**  That's unintelligible.  Also lack of foundation and relevance.

      **THE COURT:**  Do you understand the question?

      **THE WITNESS:**  Somewhat, yes.

      **THE COURT:**  Just restate the question, counsel.

      **MS. MYERS:**  Sure.

**BY MS. MYERS:**

Q    In order to fulfill the obligations of the LA Alliance settlement going forward by the date required by the settlement agreement it will require City Council cooperation to issue those approvals, correct?

      **MR. MCRAE:**  Objection, vague and lack of foundation.

      **THE COURT:**  Overruled.

      **THE WITNESS:**  Yes, I have trouble with the term cooperation.  You're asking me if the Council is going to cooperate with its own objectives.  If it -- so, yes, I mean the Council is going to -- the Council plays a very important part in the approval and establishment of housing.

Q    Can we turn to Exhibit 26?

      **MS. MYERS:**  Put this up on the screen.

Q    Are you familiar with Exhibit 26 which is Docket 516-1.

      **MS. MYERS:**  And just to clarify for the record, this is Plaintiffs' Exhibit 26.

Q    Are you familiar with this document?

A    It looks like a quarterly report, our second quarterly report of fiscal '22/'23.

Q    And was this the first quarterly report that was submitted for the LA Alliance case?

          **MR. MCRAE:**  Objection.

Q    If you know.

          **MR. MCRAE:**  Mischaracterizes the witness' testimony.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  It's likely -- this likely would have been the first quarterly report, yes.

**BY MS. MYERS:**

Q    Okay.  Thank you.  And I'm going to turn -- apologies that I'm kind of clumsy with this, but I'm going to turn to row number 105.  Can you identify number -- the project that's listed on row 105 of the quarterly report, page 2?

A    Yes.

Q    And can you just identify for the Court?

A    Oh, identify it, read it?

Q    Yeah.

A    105, permanent supportive housing, non-proposition HHH is the category.  The project is called Venice/Dell community, formerly known as Reis Davidson Community at 2102 South Pacific Avenue, 90291, 69 units of housing that is listed as in process.

Q    And are you familiar with the Venice/Dell project,

Mr. Szabo?

A    I am somewhat familiar with the project.

Q    It was an affordable housing development that was approved for Council District 11; is that correct?

MR. MCRAE:  Objection, lack of foundation and relevance.

THE COURT:  Overruled.

THE WITNESS:  It was a project that did receive initial approval of the City Council.

**BY MS. MYERS:**

Q    And it received the initial approval in City Council prior to the signing of the LA Alliance settlement agreement, correct?

MR. MCRAE:  Objection, lack of foundation.

THE COURT:  Would you restate that a little slower, counsel?

MS. MYERS:  Sure, Your Honor.

Q    And the Venice/Dell project received that primary approval that you just spoke of prior to the signing of the LA Alliance settlement agreement, correct?

MR. MCRAE:  Relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I honestly don't remember the date.  It was probably within the same year, but I don't remember the date of the Council action.

Szabo - Recross / By Ms. Myers                    **122**

**BY MS. MYERS:**

Q    Okay.  But it was -- it received a primary approval prior to the submission of this quarterly report, correct?

          **MR. MCRAE:**  Lack of foundation, relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I believe so, yes.  We likely would not have included it if it didn't receive at least some form of approval.

Q    And the Venice/Dell project was approved while Councilmember Mike Bonin represented Council District 11, correct?

          **MR. MCRAE:**  Relevance, lack of foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Correct.

Q    I'm going to show you now No. 34.  All right.  Are you familiar with Exhibit No. 34?  I know you've spoken about this exhibit in your prior testimony.

A    This is -- yes, this is the attachment for our second quarterly report to the Court for this year.

Q    Is it the latest quarterly report for this litigation?

A    No, we would have had another report filed on or about April 15th.

Q    Okay.  So this is the one that was filed in January 2025 for the quarter that ended December 31st, 2024?

A    Correct.

**EXCEPTIONAL REPORTING SERVICES, INC**

Q    Okay.  I'm going to show you the bottom.  I'm going actually show you now row 156.  Can you just review row 156?  And this row, row 156 that refers to the Venice/Dell community project, does that refer to the same project that you previously identified in the earlier quarterly report?

A    Yes, it does.

Q    And according to this entry, the Venice/Dell formerly known as Reis Davidson Community project with 69 permanent supportive housing units has been removed from the City Council or I'm sorry, from the City's quarterly reporting, correct?

A    Correct.

Q    And when you testified just previously you referred to -- that the Venice/Dell was an affordable housing project in Venice, correct?

          MR. MCRAE:  Objection, objection, relevance and also mischaracterizes the witness' testimony.

          THE COURT:  Overruled.

          THE WITNESS:  Correct.

BY MS. MYERS:

Q    And why was the Venice/Dell project removed from the City's reporting for their quarterly reports for its compliance with the LA Alliance settlement agreement?

          MR. MCRAE:  Relevance, lack of foundation.

          THE COURT:  Overruled.

          THE WITNESS:  It has been going through -- there have

been a number of hearings and at this stage we are making

assessments as to whether projects would be -- even if they

were to receive final approval would be complete by the June of

2027 date.  And given that Council is still in deliberation or

had had many hearings and had acted to not move the project

forward we removed it from the list.

**BY MS. MYERS:**

Q    And the City Council has acted to not move the project

forward, correct?

         **MR. MCRAE:**  Objection, vague.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  I would need to -- I would need to look

into that.  I believe there was a commission meeting where it

did not secure what it needed to move forward.

Q    And that was the Board of Transportation Commissioners,

correct?

         **MR. MCRAE:**  Objection, relevance, lack of foundation.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  I believe that's correct.

Q    There was a City Council election in 2022, correct?

A    There were multiple City Council elections in 2022, yes.

Q    And as part of that City Council election the Council --

City Council representation for Council District 11 was up for

grabs, correct?

         **MR. MCRAE:**  Objection, vague and relevance.

THE COURT:  Overruled.

THE WITNESS:  An election was held in Council District 11, yes.

**BY MS. MYERS:**

Q    And, in fact, the current Council member for Council District 11, Tracy Park was elected in that election, correct?

MR. MCRAE:  Relevance, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  That's correct.

Q    And during the 2022 election for the representative for Council District 11 approval of the Venice/Dell project was a contested part of the 2022 election, correct?

MR. MCRAE:  Objection, vague, relevance, lack of foundation.

THE COURT:  Well, if you know, you can cast that opinion.

THE WITNESS:  My basis to answer that question is reading news reports.

Q    And so based on your reading of news reports, is it your understanding that approval of the Venice/Dell project was a contested part of the 2022 election?

MR. MCRAE:  Objection, vague, relevance.

THE COURT:  Overruled.

THE WITNESS:  I recall that it was an issue.

//

**BY MS. MYERS:**

Q   And, in fact, candidate Tracy Parks sent a letter to the City Council asking the Council to postpone approval of the project until after the election because six of the eight candidates actively opposed the project, correct?

        **MR. MCRAE:**  Objection, lack of foundation.

        **THE COURT:**  Would you state that again?

        **MS. MYERS:**  Sure.

Q   In fact, candidate Tracy Park sent a letter to the Council asking the Council to postpone the project until after the election because six of the eight candidates in that election opposed the project, correct?

        **MR. MCRAE:**  Objection, hearsay, lack of foundation, relevance, vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I'm not familiar with that letter.

Q   Okay.  So are you familiar with Ms. Park calling spending on the project an egregious waste of taxpayer dollars?

        **MR. MCRAE:**  Objection, hearsay, assumes facts, lack of foundation and relevance.

        **THE COURT:**  If you're aware, you can answer the question.

        **THE WITNESS:**  I'm not aware of those -- of that quote.

//

Szabo - Recross / By Ms. Myers          **127**

**BY MS. MYERS:**

Q    Okay.  Are you aware that then candidate Tracy Park was on record opposing the Venice/Dell project?

        **MR. MCRAE:**  Objection, lack of foundation, relevance.

        **THE COURT:**  Objection overruled.

        **THE WITNESS:**  Based on news reports, I recall that that was the case, yes.

Q    Okay.  Did you have any input into the decision for the Venice/Dell project not to move forward at this point?

        **MR. MCRAE:**  Objection, deliberative process privilege, attorney/client privilege, vague, relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  No, I didn't have any -- that wasn't a decision that I made.

Q    And does stopping the development of the Venice/Dell project reflect the City's leadership commitment to meeting the goals of the LA Alliance settlement?

        **MR. MCRAE:**  Objection it calls for a legal conclusion --

        **THE COURT:**  Overruled.

        **MR. MCRAE:**  -- it lacks foundation, it's not relevant and it's vague.

        **THE COURT:**  You can answer the question, sir.

        **THE WITNESS:**  It's consistent with the flexibility that we negotiated in the settlement agreement.  This is a

**EXCEPTIONAL REPORTING SERVICES, INC**

public process.  There is a public policy is carried out between the representatives of the people and the people that they serve.  And the settlement required the flexibility for the elected leaders to carry out that public policy responsibility.

So we anticipated that there would be projects that perhaps wouldn't be approved, that may get started and may have to be pulled back, or for various other reasons that projects may not be able to be moved forward.

So we intentionally required the flexibility to allow for that process to move forward.  If the 69 units, as they have been, are removed, they will need to be replaced with 69 units of other housing that is compliant with the terms of the agreement and they will be.

**BY MS. MYERS:**

Q    And the approval of each project that is on this list is a public policy decision that's made by the City Council, correct?

**MR. MCRAE:**  Objection, vague, lack of foundation and relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  It's part of the public process, so yes, to that extent, yes.  I mean, I don't want to quibble over the issue of public policy versus public administration but it's public processes attached to each of these projects.

**BY MS. MYERS:**

Q    There is a municipal election coming up in 2026, isn't there?

          **MR. MCRAE:**  Objection, relevance.

          **THE COURT:**  I'm not sure, counsel, of relevance.

          **MS. MYERS:**  Your Honor, this goes directly to Mr. Szabo's prior testimony that he could attest to the City Council's commitment to the LA Alliance goals.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Yes.

Q    And eight of the City Council districts are up for election, correct?

          **MR. MCRAE:**  Relevance.

          **THE WITNESS:**  Yes.

          **THE COURT:**  Overruled.

Q    And there's an election for Mayor, correct?

A    Yes.

          **MR. MCRAE:**  Same objection, relevance.

          **THE COURT:**  Overruled.

Q    And there is also an election for a City attorney, correct?

          **MR. MCRAE:**  Relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Yes.

//

**BY MS. MYERS:**

Q    So based on the 2026 election, it is conceivable that the makeup of the City Council could change, correct?

        **MR. MCRAE:**  Objection, relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes.

Q    And, in fact, given term limits it's guaranteed that the makeup of the City Council will change, correct?

        **MR. MCRAE:**  Relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I believe so, yes.

Q    Okay.  It's also possible that the duly elected Mayor of the City of Los Angeles could change, correct?

        **MR. MCRAE:**  Hypothetical, lack of foundation, calls for speculation, relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  There's an election for Mayor.

Q    And as a result of that election, the Mayor could change, correct?

        **MR. MCRAE:**  Same objections.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  That is true.

Q    And it's possible that the City attorney could change because that position is also up for election, correct?

        **MR. MCRAE:**  Same objections, lack of foundation,

relevance, speculation.

THE COURT: Overruled.

THE WITNESS: That's true.

**BY MS. MYERS:**

Q   Okay.  And so if any of those, the makeup of any of those leadership positions change, you cannot ensure that the City leadership that is duly elected will be committed to meeting the goals of the LA Alliance settlement, can you?

MR. MCRAE: Objection, calls for speculation, lack of foundation, it's argumentative, relevance.

THE COURT: Overruled.

THE WITNESS: That is exactly why the flexibility contained in the settlement is necessary to allow for that public process, to allow for changing -- the settlement was agreed to when there was a different mayor, to allow the flexibility and to allow for the elected officials to exercise the authority that the people place in them when they elect them.  And if it isn't this project, it will be a different project.

If it isn't -- you know, we could have, we could absolutely have a change of perspectives from every different angle, you see it playing out every day in the budget process, but we still have to have a balanced budget.  And the budget could look completely different under -- based on the elections.

And so, yes, I'm not saying that every project ever considered by the former elected leaders will and must survive, but the commitment will be there.  How we meet that commitment will be up to the electeds.  That's the variable.  And that's the variable that we work to protect.

**BY MS. MYERS:**

Q    In fact, you can't control whether the commitment is there, can you?

MR. MCRAE:  Objection, vague, lack of foundation and argumentative.

THE COURT:  Overruled.

THE WITNESS:  I have a role in that.

Q    You have a role in determining whether the City Council members who vote on the project have a commitment to the settlement agreement?

MR. MCRAE:  Objection, relevance.

THE WITNESS:  I have a role in advising the Mayor and the City Council and I have consistently advised in favor of this -- in favor of meeting the terms of the settlement and we'll do that regardless of who's elected.

Q    Are you appointed, Mr. Szabo?

A    I am appointed, yes.

Q    And who were you appointed by?

A    Appointed by the Mayor.

Q    So do you know that you will be the CAO through June of

Szabo - Recross / By Ms. Myers                    **133**

2027?

A     I don't know that I'll be CAO tomorrow.

Q     Okay.  So looking at the City's obligations under the settlement agreement that we've been speaking to, which is the 12,915 beds.  You repeatedly testified that it is the City's position that the main enforceable obligation of the settlement agreement is the creation of those 12,915 housing and shelter opportunities, correct?

          **MR. MCRAE:**  Objection, mischaracterizes the witness' testimony and vague.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Correct.

**BY MS. MYERS:**

Q     And you've testified that the CAO's office has verified that the beds included in the reporting, the quarterly reporting that we've been referring to, that -- I'm going to strike that and back up because that was unintelligible.

     So you have testified that the CAO's office has verified that the beds included in the reporting for the compliance with the LA Alliance settlement, correct?

          **MR. MCRAE:**  I'm -- can I have that restated, Your Honor, I'm sorry.  I just lost the thread.

          **MS. MYERS:**  All right.

Q     You've testified that the CAO's office has verified that the beds included in the reporting for compliance with the LA

Szabo - Recross / By Ms. Myers                **134**

Alliance settlement agreement have been created pursuant to the agreement, correct?

       **MR. MCRAE:**  Objection, mischaracterizes the testimony, calls for a legal conclusion.

       **THE COURT:**  Overruled.

       **THE WITNESS:**  Yes, we verified the list.  I need to, of course, caveat that because we continually review and on occasion when we find errors, we correct those errors as soon as they're discovered.

**BY MS. MYERS:**

Q    The City paid over $10 million to A&M to conduct an audit of the settlement agreement, the Road Map agreement and Inside Safe, correct?

       **MR. MCRAE:**  Objection, mischaracterizes the witness' testimony.

       **THE COURT:**  Overruled.

       **THE WITNESS:**  It was closer to $3 million and it wasn't an audit.

Q    Okay.  So the City paid closer to $3 million to A&M to conduct an assessment of the settlement agreement, the Road Map agreement and the Inside Safe program, correct?

       **MR. MCRAE:**  Objection.  Exhibit 23 speaks for itself and mischaracterizes the witness' testimony.

       **THE COURT:**  Overruled.

       **THE WITNESS:**  Correct.

Szabo - Recross / By Ms. Myers                135

**BY MS. MYERS:**

Q    And wasn't one of the main purposes of the A&M assessments to verify the City's compliance with the LA Alliance settlement agreement?

          **MR. MCRAE:**  Objection, lack of foundation, mischaracterizes the witness' testimony, the document speaks for itself.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I'm not sure about that.  The scope was very broad, although it looked into the subject matter of the report was the Road Map, Inside Safe and Alliance, it was broader than whether the City was complying with the terms of the settlement agreement.

Q    But that was part of the broader scope of the agreement, correct?

          **MR. MCRAE:**  Objection.  The document speaks for itself, mischaracterizes the witness' testimony, lack of foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Part of it as it relates to the subject matter.

Q    Okay.  The City had a copy of the agreement or I'm sorry, of the assessment before it was finalized by A&M and filed with this Court, correct?

          **MR. MCRAE:**  Objection, vague and relevance.

Szabo - Recross / By Ms. Myers                    **136**

THE COURT:  Overruled.

THE WITNESS:  As I understand it, it was -- the draft was filed and made public and the City was made aware of the draft concurrent with it becoming public.

BY MS. MYERS:

Q    And that was before the final version was submitted, correct?

MR. MCRAE:  Objection, vague and relevance.

THE COURT:  Overruled.

Q    And with the City -- I'm sorry, did you want to.

A    Correct.  I believe if the final version that was submitted a few weeks ago, then yes.

Q    Yeah, and I can show you the final version.  What I'm referring to as the final version and you can tell me if you have a different understanding of what constitutes a final version.

So this is what I'm referring to --

A    Yes.

Q    -- as the final version which is Exhibit 23.  Is that your understanding of what the final version of the audit or I'm sorry, the agreement was.

MR. MCRAE:  Objection, mischaracterizes the document, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes, that's the version.

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Recross / By Ms. Myers                    **137**

**BY MS. MYERS:**

Q    And there was a -- and as you previously testified, there was a prior draft that was filed on the court's docket in this case and the City actually had, correct?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

Q    So do you have the prior -- if the City had the prior draft prior to the filing of the final draft, then you were aware of A&M's tentative finding that it could not verify all of the beds within the City's bed count, correct?

MR. MCRAE:  Objection, lack of foundation, document speaks for itself, relevance.

THE COURT:  Overruled.

MR. MCRAE:  It assumes facts.

THE COURT:  You may answer the question, sir.

THE WITNESS:  Well, you're referring to -- now you're referring to the Road Map.

Q    No, I'm referring to the LA Alliance agreement, the bed count in the Alliance agreement.

MR. MCRAE:  Again, Your Honor, assumes facts, mischaracterizes the document, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

//

Szabo - Recross / By Ms. Myers                    **138**

**BY MS. MYERS:**

Q     And did anyone from the CAO's office that works on the quarterly reports meet with the A&M team between the filing of the draft and the filing of the final report related to A&M's inability to verify the bed count?

          **MR. MCRAE:**  Objection, lack of foundation, relevance, vague.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I'm not sure.

**BY MS. MYERS:**

Q     Who would know whether someone in the CAO's office met with A&M?

          **MR. MCRAE:**  Calls for speculation, lack of foundation and relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I could verify that, I just can't right now.

Q     Okay.  And you previously testified that you believe that the failure of A&M to verify the beds was a problem of A&M interpreting the data, correct?

          **MR. MCRAE:**  Objection, mischaracterizes the witness' testimony, relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I said that in multiple portions of the audit they made statements suggesting that they couldn't

verify, didn't mean that we were out of compliance or didn't mean that we weren't appropriately executing our responsibilities but they couldn't verify or they found the multiple sources of information that they had to work with, difficult to work with, or confusing in order to come to a conclusion.

So they kind of -- they left an open-ended well we couldn't determine based on the complexity or the nature of the multiple sources of information.

**BY MS. MYERS:**

Q    So A&M said they couldn't verify the data and the CAO's office said you can verify the data for purposes of the quarterly report.  Did anyone from the CAO's office take the data used to verify the bed count for the quarterly report and meet with A&M to go over it and explain so that A&M could verify the bed count?

**MR. MCRAE:**  Objection, mischaracterizes the document. This is asked and answered, lack of foundation and relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  We met with them multiple times for multiple, multiple hours to assist in -- well, first of all, we provided the thousands and thousands of pages and then met with them after the fact to help them walk through and understand what it is that they were seeing.

Q    When you say after the fact, what does that mean after the

fact?

A     I'm sorry, after providing the data that they had requested.

Q     Okay.  But you don't know as you sit here whether someone from the CAO's office met with A&M after they came up with a conclusion that they couldn't verify the data before the draft was finalized and filed with the Court?

            **MR. MCRAE:**  Objection, vague, mischaracterizes the conduct, lack of foundation, relevance, asked and answered.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  It would be helpful if you pointed to -- with some specificity so I can give you a more complete answer because there were a number of places, a number of sections where they were referring to data held by LAHSA, to which LAHSA met -- I don't know if they met with them, to which LAHSA responded.

            And as I -- my read of it is most of the gaps that they identified were gaps between service providers, LAHSA.  In some cases LAHSA and the City but the majority of it was within the realm of LAHSA.  And the majority of our reporting as it relates to the Alliance case is held squarely within the City of Los Angeles.

            **MS. MYERS:**  Move to strike as non-responsive.

            **THE COURT:**  No, the answer remains.  You can reask the question.

**BY MS. MYERS:**

Q    The CAO's office did not attempt to meet -- I'm sorry.

The CAO's office did not meet with A&M after the draft was submitted to the Court and the final draft was submitted, correct?

**MR. MCRAE:**  Objection, asked and answered, relevance, lack of foundation.

**THE COURT:**  Overruled.

**THE WITNESS:**  I would need to confirm that.

**BY MS. MYERS:**

Q    Okay.  And one of the purposes against many of the assessment was also to verify the City's compliance with the Road Map agreement, correct?

**MR. MCRAE:**  Objection.  The document speaks for itself, mischaracterizes the document, mischaracterizes the witness' testimony, lack of foundation, relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  Road Map, the three way agreement was one of the three areas of study.

Q    And you had previously testified that your -- that the staff of the CAO's office is conservative about how you determine what to include in the quarterly reports, correct?

A    Correct.

Q    And when you were looking at the verification of the bed counts for purposes of the quarterly reports, both the Road Map

Szabo - Recross / By Ms. Myers                                    **142**

and the settlement, one of the things that you indicated that the CAO's office can point to is the public process that goes into the approval of projects that are included in the Road Map and settlement agreement, correct?

        **MR. MCRAE:**  Objection, vague, compound, lack of foundation, relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes, that's one way.

**BY MS. MYERS:**

Q    And that's -- and when you refer to the public process, that is the public process that includes the approvals of per nets funding, those sorts of public processes through the City Council, correct?

        **MR. MCRAE:**  Objection, vague, relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Sure, yes, product design, funding, there are a number of committees.  It's not just the City Council but many of the projects goes through the Municipal Facilities Committee, Council committees as well, so there are a number of touch points where reports are provided and public scrutiny is applied.

Q    And also with regards to the majority of the projects within LA Alliance settlement agreement and the Road Map agreement there's also a physical structure, correct, that can be reviewed?

Szabo - Recross / By Ms. Myers                    **143**

MR. MCRAE:  Objection, vague, relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

**BY MS. MYERS:**

Q    And you previously testified when you were speaking to the verification of the projects that part of the verification includes the existence of the physical structure like a tiny home village, correct?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes, that's part of it.

Q    Okay.  But that doesn't apply to time limited subsidies, does it?

MR. MCRAE:  Objection, vague, relevance.

THE COURT:  Overruled.

THE WITNESS:  Time limited subsidies are subsidies. They are not in and of themselves physical locations, but the use of the program does require physical locations for the recipient of the subsidy to be housed and to use the subsidy to cover the rent.

Q    And can those -- so, for example, an apartment if a time limited subsidy is used for an apartment then is that what you're referring to?

A    Yes.

Q    Or for example, if it's a master lease from the City of

Szabo - Recross / By Ms. Myers **144**

Los Angeles it would be that unit, correct?

A    Correct.

Q    Okay.

A    Correct.

Q    And what would the verification be for the use of the subsidy that the CAO's office would look to for purposes of verifying the time limited subsidies in the Road Map agreement?

**MR. MCRAE:**   Objection, relevance.

**THE COURT:**   Overruled.

**THE WITNESS:**   For TLS, we do work with LAHSA, they do run that program.  They contract with service providers, which is why in our reports we list the locations as scattered sites because there are multiple, multiple sites that the service provider then works with the individual and manages that relationship between the landlord, the individual receiving the subsidy and then charging against the subsidy.

**BY MS. MYERS:**

Q    And so I appreciate that you work with LAHSA who has that, but what does the CAO's office use for purposes of verifying the TLS slots?

A    So we do, as I said, as it relates to TLS, we do rely on LAHSA.  They have the contracts with the service providers that detail the number of PEH served and the source of those dollars.  It is as stated in the assessment, it does get complicated when you're using several sources of funds for --

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Recross / By Ms. Myers    **145**

to maximize the subsidy, or the number of subsidies that can be provided, which is part of the TLS program.  They use multiple sources of funding, but they do separate and keep track of all of the subsidies that City funding has contributed to.  And they have those records in the contracts with the service providers and we're confident in those records.

Q    So when you say they have those contracts -- they have those records and the contracts of the service providers, is the number that you're reporting the number of subsidies that are contracted for?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  The number of -- I'm sorry, I don't understand the question.

**BY MS. MYERS:**

Q    Okay.  So the -- you said that the records come from the contracts with the service providers.  And so when the City reports that there are more than 2,000 TLS subsidies that are being counted toward the Road Map agreement I'm asking because you said contracts, if that number represents subsidies that are contracted for, as opposed to, for example, used?

MR. MCRAE:  Objection, relevance, vague.

THE COURT:  Overruled, you can answer the question.

THE WITNESS:  I believe it's the latter.  I believe it's the latter, but there's -- there is -- there's a variable

Szabo - Recross / By Ms. Myers                          **146**

nature of time limited subsidies and -- but we're looking at the number of people actually using the subsidy at an apartment to provide housing.

**BY MS. MYERS:**

Q    So my understanding is that a TLS subsidy is a rental assistance for an apartment, correct, or a housing unit, correct?

        **MR. MCRAE:**  Relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  It's a rental subsidy.  It's a rental subsidy, that's what it is.

Q    And it's per apartment, correct, not per individual served.

        **MR. MCRAE:**  Relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  No.  It's -- the numbers that we're reporting are the individuals that received a subsidy from the -- in our case from the dollars that the City provided to the program.

Q    Not to put too fine a point on it, but this is the first I've heard that this is per person.  So if a rental subsidy for a unit for a family of four, would the City count that as four slots for purposes of reporting?

        **MR. MCRAE:**  It's an incomplete hypothetical, it lacks foundation, relevance.

**EXCEPTIONAL REPORTING SERVICES, INC**

THE COURT:  Overruled.

THE WITNESS:  And I don't want to even begin to get into the use of the word slot as it relates to how the TLS is funded.

So I -- to that specific question I would need to confirm that, but I think -- my understanding is that it would be if four people are housed, we would be reporting four. That's my understanding.  I would need to confirm that.

BY MS. MYERS:

Q    And could confirm that for you, Mr. Szabo?

A    I could confirm that.

MR. MCRAE:  Objection, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  I just don't have the answer at the moment.

Q    Okay.  And I'd like a clear record on this point relevant to terminology.  I don't want to have disputes about this for purposes of record.  So I'm using slots and you disagree with the term slot.  What would you -- how would you refer to the roughly 2,000 subsidy -- because subsidies doesn't seem to be the right word either, based on your testimony.  So what word would you use rather than slots?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  I would use individual served.

THE COURT:  I'm sorry, individual?

THE WITNESS:  Individual served.

THE COURT:  Okay.

**BY MS. MYERS:**

Q    Where does the term individual served appear for purposes of reporting?

MR. MCRAE:  Objection, unintelligible, also relevant, lack of foundation and argumentative.

THE COURT:  Overruled.

THE WITNESS:  I would need to -- I don't -- I would need to look at the -- I would need to review the documents.

Q    For purposes of Road Map reporting, are there any other types of housing and shelter solutions that count the number of people served for purposes of reporting?

MR. MCRAE:  Objection, relevance, calls for a legal conclusion, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I'm not sure.  I don't want to answer categorically.  I don't believe so.

Q    Are there any guidance documents or anything else in writing that describes how the City is counting these time limited subsidies for purposes of the Road Map agreement?

MR. MCRAE:  Objection, relevance, lack of foundation, vague.

THE COURT:  Overruled.

Szabo - Recross / By Ms. Myers                **149**

THE WITNESS:  The documents, there are a number of documents and documentation provided by LAHSA who runs -- which runs the program and I would refer to those documents.

BY MS. MYERS:

Q    When you say provided, provided to who?

MR. MCRAE:  Objection, relevance.

THE COURT:  Would you restate that counsel?

Q    When you say provided, provided to whom?

A    I believe there were documents that were provided in response to the A&M audit, the A&M assessment rather by LAHSA.

Q    Okay.  So when you speak about documents provided by LAHSA, you're speaking about the documents that were provided by LAHSA to A&M?

MR. MCRAE:  Objection, relevance.

THE WITNESS:  I believe there was subsequent memoranda in response to what was published in the A&M assessment.

Q    Okay.  I'm going to go back to Exhibit 25, the settlement agreement.  So looking at the settlement agreement in Section 3.1, the first statement, the first sentence, the City agrees -- I'm going to say the first phrase.  The City agrees to create a required number of housing or shelter solutions which is equal to, but in the City's discretion, may be greater than the shelter and/or housing capacity needed to accommodate 60 percent of the unsheltered City -- shelter appropriate PEH

Szabo - Recross / By Ms. Myers                    **150**

within the City based on LAHSA's 2022 point and time count.

Yesterday, I asked you if there was a definition of the term create in the settlement agreement as it relates to Section 3.1, correct?

**MR. MCRAE:** Mischaracterizes the record, also relevance.

**THE COURT:** Overruled.

**MR. MCRAE:** And asked and answered. It --

**THE COURT:** Overruled.

**THE WITNESS:** I recall vaguely, yes.

**BY MS. MYERS:**

Q    And there's no definition of the term create in the settlement agreement, correct?

**MR. MCRAE:** Asked and answered.

**THE COURT:** Overruled.

**THE WITNESS:** No, they're not.

Q    Okay. And so just for completeness, Section 8 you were previously asked by the City Council related to Section 8 of the agreement and particularly 8.1 which applies to funding of housing and shelter appropriate opportunities -- I'm sorry, funding of housing and shelter opportunities created by the City shall be at the City's sole discretion, correct?

A    Correct.

Q    And is there a definition within the settlement agreement of the term created?

Szabo - Recross / By Ms. Myers **151**

A    There is not.

Q    Yesterday you testified that parts of Care and Care Plus and the coordination of those programs fall within the CAO's office, correct?

MR. MCRAE:  Your Honor, I think counsel means Friday.

MS. MYERS:  Friday, yes.  I do mean Friday, thank you.

**BY MS. MYERS:**

Q    Friday you testified that Care and Care Plus -- parts of the Care and Care Plus coordination fall within the CAO's office, correct?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  The coordination of the operations as it relates to other agencies in the Council office is done by staff in the CAO's office.

Q    And staff at the CAO's office also does some of the coordination related to outreach; is that correct?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  Correct.

Q    And who provides outreach at Care and Care Plus operations?  Let me back that up.

Does the City provide outreach at Care operations?

MR. MCRAE:  Objection, vague, lack of foundation,

relevance.

THE COURT:  Overruled.

THE WITNESS:  At Care operations I don't believe so, but I don't think that that's -- there may be some cases where outreach is provided, but it's typically with the Care Plus operation.

BY MS. MYERS:

Q    Okay.  Does anyone provide outreach with the Care operations?

MR. MCRAE:  Objection, lack of foundation --

Q    Other than, other than the sort of selected outreach that you left -- the open -- the possibility of being provided by the City?

MR. MCRAE:  Objection, vague, relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  So we have funded through LAHSA homeless engagement teams.  We have general homeless engagement teams, we have Road Map specific homeless engagement teams, certainly at least through this fiscal year and in some cases they would conduct outreach at -- could conduct outreach at Care operations.  I don't believe it's the policy, but again I don't -- I can't say definitively that they are not provided.

//

//

Szabo - Recross / By Ms. Myers                 **153**

**BY MS. MYERS:**

Q    And you can't say definitively that they are provided in any instance, can you?

A    No.

Q    Okay.  So as to the Care Plus operations, does the City provide outreach during Care Plus operations?

        **MR. MCRAE:**  Objection, lack of foundation, relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes, there's typically outreach ahead of the operation.

**BY MS. MYERS:**

Q    And when you say ahead of the operation, what does that mean?

A    A period of time when the cleanup is -- in advance of when the cleanup is posted.  I don't know exactly how long ahead of the operation the outreach typically begins.  And it also varies, of course, because again, sometimes the Care Plus operations are coming in after an Inside Safe, an Inside Safe operation, in which case there's been weeks of outreach ahead of time.

Q    And where is that outreach -- who conducts the outreach that you're talking about related to Care Plus?

        **MR. MCRAE:**  Objection, relevance and vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  The homeless -- there are homeless

EXCEPTIONAL REPORTING SERVICES, INC

engagement teams that support the Care and Care Plus program.

But again that's -- depending on the type of operation, it

isn't only the homeless engagement teams.  There could be

outreach from, again if it's part of the -- if it's part of

Inside Safe, there's weeks of outreach from the Mayor's office,

there's outreach from the service provider assigned to the

operation, so it varies, it varies based on the type of

operation.

**BY MS. MYERS:**

Q    And so within the variability of this, there could be

outreach, it's also the case that there could not be outreach

to an encampment before a Care Plus operation, correct?

          **MR. MCRAE:**  Objection, 403, lack of foundation,

relevance, vague, calls for speculation.

          **MS. MYERS:**  Apologies, Your Honor, I'm happy to

address that but.

          **THE COURT:**  Please.

          **MS. MYERS:**  Your Honor, Mr. Szabo was asked on the

direct examination by his counsel about outreach during the

Care and Care Plus operations and he attested to it, so.

          **THE COURT:**  Overruled.

          **MR. MCRAE:**  Your Honor, may I respond to this?  I

think this was covered on Friday also.  This is asked and

answered.  We're now into like hour seven within intervenor's

counsel with Mr. Szabo, which is probably more than the time of

the plaintiff and City combined.

THE COURT:  Counsel, thank you very much.  Your question, counsel?

THE WITNESS:  I'm sorry, can you repeat the question?

BY MS. MYERS:

Q    Sure.  As there's variability related to outreach being -- that could be provided, it's also the possibility that outreach is not provided before a Care Plus operation, correct?

MR. MCRAE:  Objection, hypothetical, relevance, foundation.

THE COURT:  Overruled.

THE WITNESS:  It's possible.  If your question is there a possibility, it's possible.

Q    You testified that there are at least two outreach -- I'm sorry, two Care Plus operations per council district every week within the City of Los Angeles, correct?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

THE WITNESS:  Correct.

Q    Okay.  And, in fact, it's not that there's two Care Plus operations, it's that there's two days of Care Plus operations per Council district, correct?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  That's correct.

Szabo - Recross / By Ms. Myers                    **156**

Q    And in a single day in a Council district, can there be multiple Care Plus operations, correct?

        **MR. MCRAE:**  Relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  That's possible.

**BY MS. MYERS:**

Q    Okay.  As you sit here today, do you know how many of those Care Plus operations had outreach efforts at the encampment related to that Care Plus operation before the Care Plus operation was conducted?

        **MR. MCRAE:**  Vague, relevance, lack of foundation, 403.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I don't have a comprehensive list for you.

Q    I'm not asking for a list, I'm just asking for a number, a percentage.

        **MR. MCRAE:**  Same objections, lack of --

        **THE COURT:**  Overruled.

        **MR. MCRAE:**  -- foundation, 403, relevance, vague.

        **THE COURT:**  Would you repeat that a little more slowly?

        **MS. MYERS:**  Sure, Your Honor.

Q    I'm not asking for a list.  I'm asking for a number or a percentage.

**MR. MCRAE:**  Same objections, 403, lack of foundation, relevance, vague.

**THE COURT:**  Overruled.

**THE WITNESS:**  I can't give you a number.

**BY MS. MYERS:**

Q    How many teams are there when -- and just to clarify for the record, when I say HET I mean the homeless engagement teams that you spoke about, when you -- how many of those teams are there that are funded for Care Plus?

**MR. MCRAE:**  Objection, vague, relevance, lack of foundation, 403.

**THE COURT:**  Overruled.

**THE WITNESS:**  You know, I can -- I would need to confirm that for you because there's been a lot of fluctuation there and most of the numbers in my head are related to the '25/'26 budget that we just approved.  So I could confirm that, I can't confirm that right now.

Q    And where are the -- where did the HET teams that go out for Care and Care Plus, where are they situated for purposes of an organizational chart within the City of Los Angeles?

**MR. MCRAE:**  Objection, assumes facts, lack of foundation, 403, relevance, vague.

**THE COURT:**  Counsel, offer of proof?

**MS. MYERS:**  Your Honor, this goes directly to -- again, Mr. Szabo's testimony that outreach is always conducted

Szabo - Recross / By Ms. Myers                    **158**

related to Care and Care Plus operations.

THE COURT:  Yeah, overruled.

THE WITNESS:  They are employees of LAHSA.

BY MS. MYERS:

Q    Okay.  And does LAHSA hold the records related to the HET teams or does the City of Los Angeles have those records?

A    Vague, compound, relevance, 403.

THE COURT:  Overruled.

THE WITNESS:  They certainly would have the records related to their employees.  Does the City have separate records, I would need to confirm that.

Q    Okay.  So for purposes of your prior testimony where you testified that outreach teams always go out with the Care Plus teams, did you -- have you cross-referenced the HET's teams actions with LA Sanitation's records related to Care Plus to form the basis of your testimony?

MR. MCRAE:  Your Honor, move to strike the characterization and argument of the witness' testimony, also 403, lack of foundation, relevance, vague.

THE COURT:  Overruled.

THE WITNESS:  I have not done that myself, no.

Q    Has anyone in the CAO's office done that to support your testimony?

MR. MCRAE:  403, lack of foundation, vague, relevance.

Szabo - Recross / By Ms. Myers                 **159**

            **THE COURT:**  Overruled.

            **MR. MCRAE:**  Calls for speculation.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  I would need to confirm.

**BY MS. MYERS:**

Q    So as you sit here today, you don't know what the basis of
your testimony was related to outreach?

            **MR. MCRAE:**  Objection, very vague, lack of
foundation, relevance, 403.

            **THE COURT:**  I'll sustain that.  You can reask it,
counsel.

            **MS. MYERS:**  Sure.

Q    So as you sit here, you don't know the basis of your
testimony that outreach always precedes Care Plus operations.

            **MR. MCRAE:**  Objection, mischaracterizes the witness'
testimony, lack of foundation, vague, 403, and argumentative.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  That's the policy.  You've asked me to
prove that there isn't an instance, that an instance doesn't
exist when outreach hasn't been provided, that's a different
question.  I was describing the policy.

Q    I'm not asking about a specific instance, I'm asking for
the generally your testimony that the HET teams do outreach
prior to Care Plus.  And so now -- so your testimony is that it
is the policy of -- it is the policy to do outreach before Care

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Recross / By Ms. Myers                    **160**

Plus operations; is that correct?

MR. MCRAE:  Objection, asked and answered, argumentative, 403, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

**BY MS. MYERS:**

Q   Okay.  Whose policy is it that the HET teams do outreach prior to Care and Care Plus operations that you were testifying about?

MR. MCRAE:  403, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  The City's policy.

Q   So I just want to dig in a little bit related to that, which department has that policy?  Because yesterday you -- and the reason why I'm asking is that yesterday you testified that LA Sanitation has policies related to Care Plus.  Is this an LA Sanitation policy?

MR. MCRAE:  Your Honor, objection.  And again just to clarify the record we weren't here yesterday, none of were here.

MS. MYERS:  All right.  Friday.

MR. MCRAE:  And further, it lacks foundation, relevance, 403.

THE COURT:  Overruled.

THE WITNESS:  The HET teams are employees of LAHSA.

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Recross / By Ms. Myers                                    **161**

Q     Okay.

A     My office plays a role in coordinating all of the agencies related to the operations, the Care Plus operations.

Q     Okay.  So is it a CAO policy that HET teams do outreach before Care Plus operations?

          MR. MCRAE:  Objection, relevance, 403.

          THE COURT:  Overruled.

          THE WITNESS:  I believe -- I need to -- I can't confirm where the policy resides, whether it was in one of our engagement reports, I can't confirm where it exists.

**BY MS. MYERS:**

Q     Do you know if it's a written policy?

          MR. MCRAE:  Objection, relevance, lack of foundation.

          THE COURT:  Overruled.

          MR. MCRAE:  403.

          THE COURT:  You can answer.

          THE WITNESS:  I would need to confirm that.

Q     You were asked about the encampment reduction plan, you testified that the City is using its best efforts to meet the encampment reduction milestones in the settlement agreement, correct?

A     Yes.

Q     And there is a dispute in this case about what constitutes an encampment reduction, correct?

          MR. MCRAE:  Objection, calls for a legal conclusion.

**THE COURT:** Overruled.

**THE WITNESS:** If -- I mean, if you're disputing it, I don't have a dispute, but I mean it's -- we're reporting what we agreed to. I don't dispute that.

**BY MS. MYERS:**

Q   Okay. Just assuming that there is a dispute related to what constitutes an encampment reduction that is part of the reason why we are here, I just want to make very clear I understand when you say encampment reduction what you mean for purposes of the record. Is it an accurate statement to say that your testimony is the City is engaging in best efforts to remove 9,800 tents, make shift encampments, sorry, make shift shelters and vehicles from the public right of way prior to June 2026?

**MR. MCRAE:** Your Honor, asked and answered, cumulative, 403.

**THE COURT:** Overruled.

**THE WITNESS:** Give me one moment.

The amendment I would make to that is that I don't believe the final agreed to document indicates public right of way. It -- I believe it just says reduce 9,800 tents, make shift shelters, cars and RVs without location, without reference to whether it's in the public right of way or not.

//

//

Szabo - Recross / By Ms. Myers                                    **163**

**BY MS. MYERS:**

Q    So it's your position that the City is taking its best efforts to reduce 9,800 tents, make shift encampments, and vehicles.

A    Yes.

Q    Okay.  And so when you stated in your prior testimony that the City had engaged -- that the City had conducted 6,100 encampment reductions, what that means is the City has removed 6,100 tents, make shift shelters and vehicles, correct?

A    That's correct.

Q    And you testified that tents are sometimes removed because they are a public health threat, correct?

A    In some cases, yes.

Q    And what is the basis of your understanding that the City is removing tents and make shift encampments because they are a public health threat?

        **MR. MCRAE:**  Objection, mischaracterizes the witness' testimony.

        **THE COURT:**  Overruled.  Answer the question.

        **THE WITNESS:**  The basis of my understanding, I mean, I don't determine what is or isn't a public health threat but there are personnel, environmental compliance inspectors that will make that determination.  They're part of the Care and Care Plus teams.  They're part of Care Plus teams.

//

Szabo - Recross / By Ms. Myers                  **164**

**BY MS. MYERS:**

Q    And is it your understanding that environmental compliance inspectors are making the determinations related to the removal of tents and make shift encampments?

        **MR. MCRAE:**  Vague, lack of foundation, relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  They are making the determination as to whether a tent or make shift shelter is a public health hazard and therefore, it's required to be removed.  So under those circumstances they would make that call.

**BY MS. MYERS:**

Q    Tents are also removed because the tent is in violation of Los Angeles Municipal Code 5611, correct?

        **MR. MCRAE:**  Object, lack of foundation, relevance, 403.

        **THE COURT:**  Overruled.

        **MR. MCRAE:**  And also calls for a legal conclusion.

        **THE COURT:**  If you know, you can answer the question.

        **THE WITNESS:**  I really can't comment on that, I don't believe that it has been -- that section has been repealed, so it's possible, but.

Q    Okay.  Tents are also removed from -- have also been removed for purposes of reporting by environmental compliance inspectors, because individuals discard the tents and make shift encampments, correct?

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Recross / By Ms. Myers                    **165**

MR. MCRAE:  Objection, cumulative, asked and answered, lack of foundation, relevance, vague.

THE COURT:  Counsel, I believe this has been asked and answered, hasn't it?

MS. MYERS:  Your Honor, this goes back directly to Mr. Szabo's testimony about why.  In the prior testimony, Mr. Szabo opened the door for his testimony related to why tents and make shift encampments have been removed.  I'm just trying to get a sense of --

THE COURT:  All right.  But --

MS. MYERS:  -- how much he knows.

MR. MCRAE:  Your Honor, may I be briefly heard on that, real briefly.

THE COURT:  Very briefly.

MR. MCRAE:  I only closed the door because the testimony on Friday was about abandoned items and I just made the point that that's not an issue under the agreement.  So I didn't open it, I closed the door and we should keep it closed.

THE COURT:  I'm not certain that this is the turning point of the case for both of you.  Ask your question quickly and then let's move on.

MS. MYERS:  Okay.

BY MS. MYERS:

Q    You don't -- do you know whether tents are removed because individuals discard the tents?

Szabo - Recross / By Ms. Myers                    **166**

MR. MCRAE:  Relevance, lack of foundation, 403.

THE COURT:  I think we've covered that also but you can answer it one more time.

THE WITNESS:  I don't know.

THE COURT:  Okay.

Q    And just -- tents are also removed because tents are unattended during a cleanup; isn't that correct?

MR. MCRAE:  Cumulative, 403, relevance.

THE COURT:  One more time, to be certain.

THE WITNESS:  I don't know.

**BY MS. MYERS:**

Q    So the only reason you know of that tents are removed from the public right of way is because they're a public health threat.

MR. MCRAE:  Mischaracterizes the witness' testimony.

THE COURT:  No, overruled, you can answer that question.

THE WITNESS:  No, no, that's -- and that's not what I testified to.  There are a number of reasons they would be removed, but primarily if it is part of a -- if there is outreach that's conducted and there is an effort to achieve voluntary compliance and that is -- it's either voluntary compliance or determination it's a public health hazard are the top -- the principal reasons why tents or make shift shelters would be removed.

Q    How do you know that, Mr. Szabo?  How do you know that that's the principal reason that tents are removed from the public right of way?

          **MR. MCRAE:**  Relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  That's the policy that sanitation seeks to execute.

**BY MS. MYERS:**

Q    And what policy is that, Mr. Szabo?

          **MR. MCRAE:**  Foundation, relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Again at this point now, I'm going to go back to our -- what I said multiple times on Friday which is that the Bureau of Sanitation is the department that executes the Care and Care Plus operations.  I'm not -- I'll just leave it at that.  Care and Care Plus is run out of the Bureau of Sanitation.

Q    You actually don't know why LA Sanitation is removing them, including that they're removing them related to public health and safety threats, correct?

          **MR. MCRAE:**  Objection, argumentative and it's --

          **THE COURT:**  This will be the last answer in this area.  You can answer that question.

          **THE WITNESS:**  We do not have a requirement to report the reason why the tents were removed.  We have a requirement

Szabo - Recross / By Ms. Myers          **168**

to report the number of tents, make shift shelters, cars and RVs that are reduced and our job is to ensure to the greatest extent possible that we have supporting documentation for what we report and we do.

THE COURT:  Counsel, let's move on.

BY MS. MYERS:

Q   Okay.  As the chief negotiator for the City of Los Angeles related to the encampment reduction plan, it's your position that you negotiated for the encampment reduction plan to count the removal of tents, make shift shelters and vehicles, correct?

MR. MCRAE:  Objection, lack of foundation, vague and mischaracterizes witness' testimony.

THE COURT:  That's allowed.  You can answer that question.

THE WITNESS:  Yes.

BY MS. MYERS:

Q   Okay.  As the chief negotiator for the City related to this, what was your understanding of what a make shift shelter is for purposes of the encampment reduction plan.

THE COURT:  Counsel, I think we've already covered that.  He's responded to the make shift shelter.

MS. MYERS:  Your Honor, just to clarify Mr. Szabo yesterday deferred to --

THE COURT:  No, my apologies --

**MS. MYERS:**  And so I'm asking specifically in the same context that he testified on behalf of the City yesterday as the chief negotiator.  I did not ask him questions --

**THE COURT:**  My apologies.

**MS. MYERS:**  -- so I'm wondering if that changes his opinion.

**THE COURT:**  No, you're right, counsel, he can answer the question.

**MR. MCRAE:**  This was on Friday.

**MS. MYERS:**  Friday.

**THE COURT:**  Does it really matter?

Come on, let's move on now.

**THE WITNESS:**  So I'm sorry, were you asking were -- what was our intention in including make shift shelter?

**BY MS. MYERS:**

Q    Yes.

A    What was the -- the intention was to indicate that not every structure that is used is necessarily a tent.  So there are other structures that are not tents that are in largely the public right of way, but other areas as well and that the removal of those make shift shelters broadly defined would also count towards our reduction goal.

There was no specific definition of make shift shelter at the time of the agreement, but subsequent to that agreement a definition was established.

Szabo - Recross / By Ms. Myers                                    **170**

Q    And what is that definition?

A    I don't have that item in front of me.

Q    Who has that definition?

        **MR. MCRAE:**  Objection, speculation, lack of foundation.

        **THE COURT:**  That last question in this area, do you know who has that definition or is published some place?

        **THE WITNESS:**  It is published some place and I believe it was a Bureau of Sanitation document.

        **THE COURT:**  Okay.  Thank you.

        **THE WITNESS:**  They use for training.

        **THE COURT:**  Counsel, let's move on now.

**BY MS. MYERS:**

Q    And just was the definition provided to the plaintiffs in this case?

        **MR. MCRAE:**  Objection, lack of foundation.

        **THE COURT:**  No, you can answer that question.

        **THE WITNESS:**  I don't know.  I don't know if it was or wasn't.

        **THE COURT:**  Counsel.

Q    And has that publication been publicly filed with the Court?

        **MR. MCRAE:**  Lack of foundation, relevance.

        **THE COURT:**  You can answer that question.

        **THE WITNESS:**  I don't know.

**171**

THE COURT: All right. Now, let's move on, counsel, or --

MS. MYERS: May I ask one final question on that, Your Honor?

THE COURT: One final question, counsel, but.

Q    Was the definition included with the encampment reduction plan when it was approved by the City Council in January 2024?

MR. MCRAE: Objection, lack of foundation, vague, relevance, legal conclusion, speculation.

THE COURT: Overruled, you can answer that question.

THE WITNESS: There was a broad definition that was refined and that is why I believe in our quarterly reports we only included make shift shelters I believe in our second or third -- again, I don't have it in front of me, but I believe in our second or third report. So we revised our prior reports and only started using make shift shelters after the definition was refined.

THE COURT: All right. Counsel, we're going to move on now.

MS. MYERS: Those are my questions, Your Honor, thank you.

THE COURT: Okay. Now, counsel, would you like a recess briefly or are you ready to go?

MR. UMHOFER: I'm ready to go.

THE COURT: Okay. Please.

MR. UMHOFER:  Thank you.

THE COURT:  Oh, the court reporter needs a recess.

MR. UMHOFER:  Okay.

THE COURT:  I've got --

MR. UMHOFER:  Of course.

THE COURT:  So, counsel, about ten minutes?  The court reporter needs a break so we're in recess now, thank you.

**(Recessed at 3:12 p.m.; reconvened at 3:23 p.m.)**

THE COURT:  We're back in session.  All the parties are present.  I'm sorry, all the counsel are present, the witness is present, and this will be recross by the City.

MR. MCRAE:  Thank you, Your Honor.

THE COURT:  And once again, just to make sure, would you introduce yourself once again to CourtSmart, just to be --

MR. MCRAE:  Yes, Your Honor.  Marcellus McRae, Gibson Dunn & Crusher, appearing on behalf of the City of Los Angeles.

THE COURT:  Thank you.

MR. MCRAE:  May I proceed, Your Honor?

THE COURT:  Please.

**RECROSS EXAMINATION**

**BY MR. MCRAE:**

Q   Mr. Szabo, let's have Exhibit 25 back up on the screen.  Did you include in Exhibit 25 any requirement that an encampment reduction be permanent in order to be counted as an

encampment reduction under the Alliance Settlement Agreement?

**MS. MITCHELL:**  Objection.  Asked and answered.

**THE COURT:**  Overruled.  I'll let you answer one more time, sir.

**THE WITNESS:**  No, we did not.

Q    And sir, once the City of Los Angeles affects an encampment reduction, is it your understanding that it has the ability to physically restrain people who were the subject of an encampment reduction to prevent them from re-encamping?

**THE COURT:**  Could you say that again, counsel?  I didn't understand. I apologize.

**MR. MCRAE:**  Sure.

**BY MR. MCRAE:**

Q    Once the City completes an encampment reduction, is Mr. Szabo of the thought that the City has the ability to physically restrain people that were the subject of the encampment reductions to prevent them from re-encamping at some future time?

**THE COURT:**  Are you talking about 4118?

**MR. MCRAE:**  No, I don't believe so, Your Honor.

**THE COURT:**  Physically restrain.  We'll strike that.  Ask the question.  You can answer, sir.

Q    Let me rephrase the question.  Mr. Szabo, once the City affects an encampment reduction, does the City have the -- are there circumstances where people leave facilities such as even

Szabo - Recross / By Mr. McRae                                    **174**

Inside Safe housing to re-encamp?

A     That does happen, yes.

Q     And is there any requirement that you included in the Alliance Settlement Agreement that units that were leased to constitute contributions toward the bed count obligation had to continue to be leased through and including June 2027?

A     No, no.

Q     You said something on the stand about if a bed that was counted in a quarterly report was not available in a successive quarter, that that bed would be replaced.  Do you recall that?

A     Yes.

Q     Is that something, the replacing of beds that for whatever reason are taken out of the bed count, is that phenomenon of replacing beds something that you contemplated happening up to and including the expiration of the bed count obligation in June 2027?

A     Yes, absolutely.

Q     And why is that?

A     That's a -- almost an inherent condition of managing homeless interventions, homeless housing.  We see it present in the Roadmap and we were using our experience with the Roadmap to inform what we would agree to in the ultimate settlement. You know, just because something isn't available or won't be available for a long period of time, in our estimation it doesn't mean that we shouldn't move forward with it.  In some

Szabo - Recross / By Mr. McRae                                    **175**

cases there are time-limited leases, the use of the property, and so there's kind of a natural attrition on some of the projects.  We anticipated that.  We were comfortable with agreeing to ultimately hit the number.  Just like with the Roadmap, the complement of beds that we have in the number reported in our last quarterly report looks very different from the complement of beds that were reported in our first quarterly report on the Roadmap, and we expected the same thing would happen with our Alliance settlement.  As long as we met the number by June of 2027, we were comfortable that we would be able to meet it, even if we had the fluctuation throughout the five-year period.

Q    And sir, was there any requirement that you included in the Alliance Settlement Agreement that the City had to count toward its bed count obligations and quarterly reports beds from the moment that they were open?

A    No, no.

Q    So let's talk about -- you were asked some questions about bed plan, and at the time that the City had a plan, a bed plan, going back a couple of years, did you contemplate at the time that you executed -- at the time the Alliance Settlement Agreement was executed, that every bed that could in the future be eligible to be counted towards the bed count obligation would be known and in existence at the time of a plan created years earlier?

A     No, absolutely not.

Q     And sir, did you intend with the discretion that you've testified about that the City reserved under the Alliance Settlement Agreement to allow it to count towards the bed count obligation beds that later became available after the preparation of any plan with respect to that settlement agreement?

          **MS. MITCHELL:**  Objection.  Vague and ambiguous.

          **THE COURT:**  Do you understand the question?

          **THE WITNESS:**  I do, yes.

          **THE COURT:**  Okay.  Please answer it.

          **THE WITNESS:**  And yes, absolutely.  There was no sense whatsoever that the beds that we indicated were on our -- excuse me, I'll back up.  There was no sense that the beds that we submitted as potential beds which would comply with the agreement was an exhaustive list.  The milestones was our best estimate at the time of what we thought would be achievable, but we knew that there would need to be over the course of the five years additional funding secured, additional plans made, and units established.

**BY MR. MCRAE:**

Q     And sir, did you include anything in the Alliance Settlement Agreement that said that beds that weren't described in a plan at an earlier time could not be counted towards the bed count obligation at a later time?

A    No.

Q    And sir, if you were endeavoring to determine the difference in number between the 12,915 bed count and the beds that were open and in process, would you count less than all of the available beds that were open and in process in order to arrive at that number?

         **MS. MITCHELL:**  Objection.  Vague and ambiguous.

         **THE COURT:**  Do you understand the question?  Counsel, would you re-ask that?  I'm not sure I understood it.

**BY MR. MCRAE:**

Q    Sure.  If you were trying to determine what the difference was between the 12,915 beds under the Alliance Settlement Agreement and the number of beds that the City had at a given point that were open and/or in process, would you count less than all of the available beds -- excuse me, would you count less than all the beds that the City had reported as being open and/or in process to arrive at that number?

         **MS. MITCHELL:**  Objection.  Vague and unintelligible.

         **THE COURT:**  I'm not sure I understand it either, counsel.  I apologize.  Do you understand the question, sir?  I'm not sure I do, honestly.

         **THE WITNESS:**  I would expect, I'll try to answer it this way, that the beds that we would be reporting as open and in process would necessarily not equal 12,915 until very close to the end of the settlement agreement.

Szabo - Recross / By Mr. McRae                **178**

Q    And let me ask the question this way.  In the last quarterly report, which is Exhibit 35, when you presented a quarterly report that described a total of 11,002 beds, that consisted of both open beds and in process beds, did you also report that the delta or the difference between that number and the 12,915 beds was about 1,900 beds?

A    Yes.

Q    And in terms of talking about the delta between the beds that the City had that were open and in process compared to the 12,915, you included all the beds as of that date that were open and in process, yes?

A    Yes.

Q    Now, you were asked about this Roadmap agreement with the County of Los Angeles and whether the City ever got the bonus under that agreement and I want to parse a distinction here. The first thing is, did the City of Los Angeles protest not receiving the bonus?

A    We did.

Q    And was the operative language that was articulated by the County of Los Angeles with respect to not paying the bonus, whether the beds were both open and occupiable, that had been reported?

A    Yes.

Q    And what was the nature of the City's protest as to why that bonus should have been paid?

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Recross / By Mr. McRae                    **179**

A    Well, we had a number of issues with their assessment.  We felt and continue to believe that we met the requirement to have the first 5,300 open and occupiable by the date, I believe, was April 16th for a number of reasons.  I don't have the exhibit in front of me, but there were a number of issues that we had with the report.  I issued a letter to the auditor-controller and there were conversations with the Board of Supervisors and their homeless deputies.  Again, we felt strongly that we met that requirement.  In some cases, there were no issues that the beds were established.  It was whether there was, in some cases, a certificate of occupancy or a contract ready with the service provider that would have allowed someone to move into that bed on that date.

In a case for a few hundred of the beds that they raised issues with, it was actually a County facility.  We had a partnership with LA County and we relied on LA County.  It was their project that we helped fund.  And they indicated to us that it was open and ready to go and then they went back and revised their numbers after the fact or revised their assessment after the fact.  That was unfortunate.

But -- and then as it related to their assessment of the rapid rehousing program, we provided multiple sources of data, information, reports, leases, et cetera, as requested by the auditor, proving in our mind that the units that were reported as open and occupiable were actually open and occupiable, but

Szabo - Recross / By Mr. McRae                          **180**

they did not ultimately choose to provide the bonus.

Q    And again, the person --

THE COURT:  I'm sorry.  I didn't hear the last portion.  I'm sorry.

THE WITNESS:  The Board of Supervisors ultimately decided not to provide the bonus, although, again, we strongly believe that we made the April 16th deadline.  I will also point out, by the way, that again, over that period of time, although they did not provide us the bonus, the County paid the City every penny of what they owed us for the services, assuming the full complement of beds.

They made three payments in 2020 that added up to $53 million and then four payments of $60 million in the subsequent years after that, always within the first, I think, the latest we got the check was maybe perhaps the second week of July. They paid immediately as soon as the fiscal year began.

BY MR. MCRAE:

Q    And that was the distinction I was going to ask you to parse between receiving the bonus and whether the County nonetheless paid for the beds under the MOU agreement, the Roadmap agreement.  You've answered that.  And again, to put a finer point on this in distinguishing between the bonus and meeting the obligations, I believe you testified the County's never declared that the City was in breach of the Roadmap agreement, at least to you, is that correct?

Szabo - Recross / By Mr. McRae                          **181**

A     No, never.

Q     Let's now talk about Exhibit 114.  Can we have that up on the screen for a second?  Now, this document that you were questioned about, which is Exhibit 114, says in the upper left-hand corner, as of November 9th, 2022, and it's titled a potential project list.  Why is it titled potential project list?

A     These were projects that we had at least some initial idea that they could be moving forward.  They were in some phase of approval, and we provided this list.  Most of them are related to projects that would be in part funded by Prop HHH.  Others related to Project Home Key, the first two or three rounds of Project Home Key.  So they were potential.  Work still needed to be done, but it was in the scope of what we thought was possible at the very beginning of the settlement agreement.

Q     So does this document speak to the City's current compliance with its obligations under the Alliance Settlement Agreement?

A     No, it doesn't at all.

Q     Let's go back to Exhibit 25, Section 3.1 and 3.2.  Thank you.  Let's zero in on Section 3.2.  So you were asked questions about lines 13, 14, as long as the milestones are met.  I'd like to ask you a couple of questions about this.

First of all, do you see that the sentence at Section 3.2 in Exhibit 25 starts with subject to constitutional

Szabo - Recross / By Mr. McRae                                **182**

requirements and legal mandates?  Do you see that?

A     Yes.

Q     And did you include that language to be read in conjunction with the rest of the sentence?

          MS. MITCHELL:  Objection.  Leading, assumes facts, lacks foundation, calls for speculation.

          MR. MCRAE:  I'm asking if he did that.

          THE COURT:  Overruled.

          THE WITNESS:  Yes.

BY MR. MCRAE:

Q     And specifically, when you negotiated this language in Section 3.2, did you understand this to mean that if the City did not meet one or more milestones, that it would lose the discretion that it has to determine how it goes about providing the housing or shelter solutions and other areas of discretion under the agreement?

          MS. MITCHELL:  Objection.  Same objections, Your Honor.

          THE COURT:  I'm going to let you answer that question, sir.

          THE WITNESS:  No, I did not.

Q     And as far as your understanding of this language and what you -- when it was included in the agreement, what you understood it to be, can you tell us what that was as the lead negotiator for the City?

**MS. MITCHELL:**  Objection.  Calls for a legal conclusion.

**THE COURT:**  You can answer the question.

**MR. MCRAE:**  Well, let me, I'm going to rephrase the question.

Q    Here's what I'm going to ask you instead.  Where it says subject to constitutional requirements and legal mandates, did you at any point include this language about as long as the milestones are met to --

**THE COURT:**  Just a moment counsel, this is going to cause the confusion for the Court.

**MR. MCRAE:**  Okay.

**THE COURT:**  The question was specifically did you, that means he is drafting or giving the advice to put this in or the city attorney's office is.  The same question is going to apply as long as the milestones are met.  In other words, I'm not certain how much of this is your input versus the city attorney or whomever, you know, you're consulting.  So re-ask the question counsel.

**MR. MCRAE:**  Yes.

**THE COURT:**  Is this really his language?

**MR. MCRAE:**  And can I confer with one of my colleagues just for a second?

**THE COURT:**  Please.  Please.  As well, and if we're going to get into that, then the bottom language also.  So let

them -- by the way, you can talk, counsel, you're more than welcome to talk to the witness anytime.

   **(Pause)**

        **THE COURT:**  Counsel, take your time with that, the consulting back there.

        **MR. MCRAE:**  Your Honor, I'm going to move on.  Thank you.

**BY MR. MCRAE:**

Q    Now I want to talk to you about discretion as that term is used in Exhibit 25 here, Section 3.2.  Is it your -- did you consider that in the City exercising its discretion on how to achieve a housing or shelter solution or other areas of discretion in this agreement, that the Alliance may disagree with how the City exercises its discretion?

        **MS. MITCHELL:**  Objection.  Relevance, Your Honor.

        **MR. MCRAE:**  Your Honor, I'm trying to explore the meaning of discretion.

        **THE COURT:**  I'll let you answer, sir.  Overruled.

        **THE WITNESS:**  Yes, certainly.

Q    And did you understand discretion to mean that in the context of fulfilling its obligations under the settlement agreement, that the City was free from one administration of elected officials to another to change its mind as to how best to comply with the settlement agreement?

A    Yes, and that's a very large part of the reason why that

Szabo - Recross / By Mr. McRae                    **185**

language is there.

Q    And in fact, did the discretion that we're talking about here in Section 3.2 and throughout Exhibit 25, which is the alliance settlement agreement, did you also understand that to allow the City even within the same administration of elected officials to change its mind about how the city would approach fulfilling its obligations under the alliance settlement agreement?

A    Yes.

Q    And would that discretion that you included in the Alliance Settlement Agreement also include the ability to correct if there were a misstatement by the prior administration regarding something relevant to the settlement agreement?

        MS. MITCHELL:  Objection.  Vague, ambiguous, lacks foundation, calls for speculation.

        THE COURT:  I'm not certain I understand that, counsel.

        MR. MCRAE:  I'll move on.

        THE COURT:  A misstatement?

        MR. MCRAE:  I'll move on, Your Honor.

        THE COURT:  That's my concern.

BY MR. MCRAE:

Q    You were asked about Mr. Pedro Torres.  Do you recall that?

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Recross / By Mr. McRae          **186**

A     Yes.

Q     Mr. Torres works for you, right?

A     He does.

Q     And you were asked whether you corrected any statements by Mr. Torres, correct?  The statement that was read to you or that was played in court.  Do you recall that?

A     Correct.

Q     Did you say that that statement that you were asked about whether you corrected it had not been brought to your attention?

A     I did say that, yes.

Q     Okay.  And to the extent that you don't disabuse Mr. Torres of any misunderstanding that you feel that he may have, do you in any way feel that that binds the City to something that Mr. Torres said?

A     No.  I think he was put on the spot and he answered the question in the best way that he could.  Typically, if it was a hearing and I was -- and I would be available, I would have answered that question.

Q     Okay.  So let's talk about discretion a little bit more. When you were having your colloquy with counsel for the intervenors, did you understand the discretion reserved under the Alliance Settlement Agreement included the discretion to remove a project that was previously counted towards the bed count obligation and replace it with something else that was

Szabo - Recross / By Mr. McRae                    **187**

eligible?

A     Absolutely.

Q     Sir, you were asked about the A&M assessment.  Is it your understanding that A&M was tasked with making a legal determination of the meaning of the words in the Alliance Settlement Agreement?

A     No, they were not.

Q     Or that A&M was tasked with making legal determinations about the meaning of the terms of the Roadmap County Agreement with the City of Los Angeles and the County of Los Angeles?

A     No.

Q     Was it your understanding that A&M in the assessment was tasked with interpreting the intent of the parties to the Alliance Settlement Agreement?

          **MS. MITCHELL:**  Objection.  Beyond the scope of cross.

          **THE COURT:**  I'll allow it.  Overruled.

          **THE WITNESS:**  No.

**BY MR. MCRAE:**

Q     Is it your understanding that A&M was tasked with interpreting the intent of the parties to the Roadmap agreement between the County and the City of Los Angeles?

          **MS. MITCHELL:**  Objection.  Beyond the scope.

          **THE COURT:**  I think it's self-evident from the other questions asked.  Overruled.  You can answer the question.

          **THE WITNESS:**  No.

**THE COURT:**  This is the City's position?

**THE WITNESS:**  Yes.

Q    And sir, you were asked a number of questions by Intervenor's counsel about the content of the assessment.  Do you recall it being presented with any specific page or paragraph numbers?

A    No.

Q    And as far as what the content of the assessment is, would you defer to the assessment itself as far as at least the words on the page, maybe not their meaning, but in terms of what it actually says?

A    (No response.)

Q    Let me rephrase the question.  What I mean to say is this, to the extent that counsel for the Intervenors asked you a question that was based on language that does not appear in the assessment, might that change your answer to the question?

**MS. MITCHELL:**  Objection.  Misstates the record. Also vague and ambiguous.

**THE COURT:**  Do you understand the question?  Counsel, could you re-ask -- I'm not sure I understand it.

**MR. MCRAE:**  Sure.  Well, the question, for example, is to the extent that counsel for the Intervenors misstated what was contained in the assessment and that was a basis for an answer that you provided, might that impact your answer were you provided with the actual language in the assessment?

Szabo - Recross / By Mr. McRae                    **189**

MS. MITCHELL: Objection. Lacks foundation, calls for speculation, vague, and ambiguous.

THE COURT: Sustained.

MR. MCRAE: Okay.

BY MR. MCRAE:

Q    Sir, you mentioned in the colloquy with counsel for the Intervenors, for example, that the assessment refers to information gaps from, in some instances, service providers; is that right?

A    In some instances, yes.

Q    And the County of Los Angeles?

A    In some instances, yes.

Q    And you mentioned, I think, different agencies you said was part of your answer as well, as far as maybe the source of the information gap?

MS. MITCHELL: Objection. Misstates the record.

THE COURT: Overruled. You can answer the question.

THE WITNESS: I indicated LAHSA primarily. Yes.

BY MR. MCRAE:

Q    And again, can you just remind us, as far as the 11,002 beds that we talked about earlier, less than 5 percent of that number comes from data that's provided by LAHSA; is that right?

A    Correct, it's the 462 master lease units.

MR. MCRAE: Nothing further at this point, Your Honor, subject to our case, perhaps calling Mr. Szabo again.

**190**

Thank you.

THE COURT:  All right.  Sir, thank you very much.

THE WITNESS:  Thank you.

THE COURT:  I'm sorry?  Okay, if there's comments, please, in the audience, please desist.

Sir, you may step down.  Thank you very much.

THE WITNESS:  Thank you.

THE COURT:  Counsel, I'd like to pay courtesy to somebody who's been sitting here also, and that's A&M.  They were courteous and let the City go forward when Mr. Szabo was available and when the other witness was available.  And then I'll decide the (indisc.) doctrine immediately following.  But I think since all parties have made way for the City that she's been sitting here now for three days or four days.  And I think we're subject to redirect and recross with A&M, aren't we?

MS. MITCHELL:  We are subject to redirect and recross.  I have confirmed that Ms. Frost will be here tomorrow.  And so what we would --

THE COURT:  She's right there.

MS. MITCHELL:  Correct.  We also have two other witnesses that we were planning on calling today and then Ms. Frost and Ms. Martinez tomorrow.

THE COURT:  Is that agreeable?  All parties then?

MR. MCRAE:  Your Honor, my understanding would be that Ms. Frost wouldn't be subject to recall until after our

case.  That's how I understand the rules of procedure.  Not recalling a witness within your own case.

THE COURT:  No.  She hadn't gone through redirect or recross, according to my record.

MR. MCRAE:  I think we cured that the day after she testified, Your Honor.  The witness was tendered for that.  That was my recollection.  But obviously --

THE COURT:  Counsel, she's not going to be sitting much longer.  We paid that courtesy to the City, having your witnesses available, getting them on quickly.  We'll pay the same courtesy to the assessors.  All right.

So if you want to then call your additional witnesses, please.

MS. MITCHELL:  Thank you, Your Honor.  We call Brian Ulf to the stand, please.

THE COURT:  Thank you, sir.  And would you raise your right hand, please?

**BRIAN ULF, PLAINTIFFS' WITNESS, SWORN**

THE COURT:  Thank you, sir.  Would you please be seated here in the witness box.  There's a small ledge I'm worried about.

Sir, after you're comfortably seated, would you state your full name, please, for the parties?  Would you state your full name?

THE WITNESS:  I will.  My name is Brian David Ulf,

**192**

U-L-F.

THE COURT:  Now, counsel, I don't know.  I've lost track whether I talked to 400 people or a thousand people in this City with the consent of all counsel.  So I want you to be aware.  I think I first met this gentleman in 2020 during COVID over at Central Market.

THE WITNESS:  Before that, over by Penmar Golf Course.

THE COURT:  I'm sorry?

THE WITNESS:  By the Penmar Golf Course.

THE COURT:  And also out in -- is the Penmar out by the --

THE WITNESS:  The encampments along --

THE COURT:  -- in the encampments along there.  Yeah.  So I've seen him on at least two occasions that I recall.  Okay?  So all parties know.  And I can't remember if you were the 300th person I talked to or the 700th person.  So I'm aware of who the gentleman is.

MR. MCRAE:  Thank you, Your Honor.

THE COURT:  Counsel, direct examination, please.

MS. MITCHELL:  Thank you, Your Honor.  And just to clarify for the record, that was, of course, during the time that all parties had waived ex-parte communication.

THE COURT:  Right.  And as soon as this is over, I'll go back to my whatever my monitoring situation was

Ulf - Direct / By Ms. Mitchell **193**

before.  Right now, I've distanced myself from everyone or tried to.

MS. MITCHELL:  Thank you, Your Honor.

### DIRECT EXAMINATION

**BY MS. MITCHELL:**

Q    Mr. Ulf, what is your current role?

A    I am currently the CEO of SHARE, the Self-Help and Recovery Exchange in Culver City.

THE COURT:  And would you move that microphone just a little bit closer?  Would you go closer to the microphone?

THE WITNESS:  Thank you.

**BY MS. MITCHELL:**

Q    What is SHARE?  I know it as SHARE Collaborative Housing.  What is SHARE?

A    SHARE is Self-Help and Recovery Exchange.  We were founded in 1993.  So we're 32 years old.  It was based and formed based on providing social support and self-help support meetings.  Two founders in 1993.  And the idea was to take people that were in recovery or in need of recovery and get them together, similar to like an AA meeting.  But SHARE itself, the two women were going to separate meetings, and they said, why can't we form a building that has multiple meetings in it that would handle some of the 750 different life issues or traumas that exist?

And then we became the clearinghouse for the County to

give referrals to people that needed to get into self-help support. Basically, the biggest problem that was on the street at the time was the lack of social support and that's what meetings do. They bring you together, create fellowship, kinship, and the people you meet in the meetings, that's basically why it was set up. And then we moved, that was in 1993 and 1999.

We started our collaborative housing program in 2005, where we opened our first house in downtown LA. In 2009, we opened our first self-help center, which was one of the centers that people could come to in order to go to meetings. In 2010, we expanded the center to a much larger building in Culver City. We opened a recovery retreat in 2013 in Monterey Park. I can explain that when you need it. In 2016, we started advanced peer specialist training for the state. We trained --

**MR. FUSTER:** Your Honor, excuse me. Your Honor, it looks like the witness is reading off of something.

**THE COURT:** He's looking at something, counsel. You want to come up and see what he's looking at?

**MR. FUSTER:** We would.

**THE COURT:** Come on up. Sure.

**MR. FUSTER:** Thank you, Your Honor.

**THE COURT:** He probably has all of his past resume in front of him, so if you're concerned, please.

Ulf - Direct / By Ms. Mitchell                    **195**

Counsel, your next question.

**BY MS. MITCHELL:**

Q    Sure.  And just to shortcut this, I understand that your community and philanthropic efforts extend to various other organizations, including YMCA, the Metropolitan Los Angeles Board, the LAPD Community Police Advisory Board --

**THE COURT:**  Why don't you start over again?  I don't think the witness was able to focus with the counsel at his side.

**MS. MITCHELL:**  Sure.  I'm just trying to shortcut this a bit.

**BY MS. MITCHELL:**

Q    Mr. Ulf, I understand that your community and philanthropic efforts extend to other organizations, including YMCA of Metropolitan Los Angeles, the LAPD Community Police Advisory Board, Western Regional Alliance of Councils, the Venice Neighborhood Council Homeless Committee, the Venice Chamber of Commerce, the West Side Coalition, Casa de Amigas Women's Recovery Center in Pasadena, the Promises Recovery Alumni Advisory Board, and the Board of the Weingart Center Association on Skid Row.  Did I get them all?

A    Yes, there's plenty.

Q    Okay.  Mr. Ulf, are you personally in recovery?

A    Yes, I am.  April 26th was my 23rd year of sobriety.

Q    And how has your recovery experience influenced your work

**EXCEPTIONAL REPORTING SERVICES, INC**

Ulf - Direct / By Ms. Mitchell                    **196**

with SHARE?

A    It changed my life.  I was a pretty sick person.  I had a grand mal seizure in front of 80 people from my company, which was a big wake-up call.  I was then not allowed to be anonymous because everybody saw me have a seizure from an alcohol withdrawal.  So the longer I would stay sober since I wasn't anonymous, more people would call me and said, hey, can you help my dad?  Can you help my mom?  Can you help my kids?  And I started doing that a lot.  And for one way or the other, I was pretty successful in getting people to go into recovery and change their lives.

Q    Now, speaking specifically about the collaborative housing model that SHARE runs, how does the housing arrangement work within the houses?

A    Okay.  Well, currently, we have 42 houses that are open as SHARE collaborative housing throughout the county.  And basically, we use single-family homes throughout the county. They're usually between three and five bedrooms.  We have a duplex model that's five bedrooms, three baths upstairs, five bedrooms, three downstairs.  And we have two people that are in each room.

That's done on purpose because if you shut the door in your room and you're by yourself, you don't tend to come out.  But when you're living together, it's kind of like Airbnb.  I'd say like when you went to college, your parents

Ulf - Direct / By Ms. Mitchell                **197**

didn't put you in a room by yourself off campus.  You moved into a dorm.  So picture a dorm-type living with the motivation of having peer support.  We have 73 employees at SHARE.  Everyone that works for us is a person of lived experience.

THE COURT:  How many employees?  73?

THE WITNESS:  73, 72.  It changes.  58, 72, 73.  Hopefully a lot more soon.

THE COURT:  Thank you.

THE WITNESS:  And they're all lived experience people.  And that's really the secret sauce that we have is that everybody that's getting coached, so to speak, tend to deal with their peer specialists or their peer bridgers.  It's basically case management, but we call them peer bridgers because they use their lived experience to bridge them to their services.  It's virtually the same services that are provided with caseworkers.  And basically everyone in the home comes into the house and they're dealt with.  They come together as a group.  They have a house meeting and the peer bridger sits with them and everybody decides how they're going to live in that house together, like what happens if Charlie steals my milk?  What are the rules going to be?  Who's going to clean this?  Who's going to do that?  And we found that when you let the populations that live in our homes make the rules themselves, they tend to follow them.

//

**BY MS. MITCHELL:**

Q     Now, are these -- this collaborative housing model, is this used for individuals to provide shelter or housing for individuals who are experiencing homelessness or have experienced homelessness recently?

A     Oh, absolutely.  We kind of check all the boxes that's with the City.  We're a shelter.  We're transitional.  We're permanent supportive.  You can stay in our houses forever.  And depending on, you know, what the requirement is of the person that wants to come in to Silver Living, we have Silver Living places too.  So they're allowed to make the choice as to where they're going to go and the program that they're going to do.  Most, if not all, of our homes are owned by a person that owns the home, and they put their houses into this rental pool where the people move in.

The great part about our success is we're housing now, meaning right now tonight we have 41 beds available throughout the County.  It's a -- you know, that's why we're successful when we go out onto the streets ourselves.  I do outreach personally, and when you go up to a person that's homeless on the boardwalk or in an encampment and you can testify and disclose that, hey, I was one of you.  I smoked crack on Skid Row.  Personally, I did bad things.  I got arrested and all the things that no one's really proud of saying.  But you break down that wall and that barrier, and when I can sit there and

Ulf - Direct / By Ms. Mitchell                                    **199**

show them that they can move into a home today.  I've got a

book of pictures that we sit down and go through with them

about what the houses look like.  They're all fully furnished,

like Airbnb, tables, lamps, cable TV, laundry soap, all of

those types of things.  Everything that you would need to be

sufficient other than we don't provide meals for them.

Q    And how does rent typically get paid in one of these

houses?  Actually, I'm sorry, let me take a step back.  Are

these all sober living facilities?

A    No, they're not.

Q    Okay, so does a person have to be sober or in recovery to

live in one of your --

A    No, you do not.

Q    -- facilities?  Okay.  Now, how does rent typically get

paid in these collaborative housing facilities?

          **MR. FUSTER:**  Objection.  Relevance.

          **THE COURT:**  Counsel, the relevance?

          **MS. MITCHELL:**  I think it goes to the overall cost of

homeless housing in Los Angeles, Your Honor.

          **THE COURT:**  I'll allow you to answer the question.

          **THE WITNESS:**  Yes, everybody that's in our homes pays

some sort of rent, whether it's out of their SSI, SSDI, general

relief, or tenant time-limited subsidies or rental assistance.

//

//

**BY MS. MITCHELL:**

Q    Does rental assistance sometimes come from the City or the County?

MR. FUSTER:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  It comes from LAHSA, is where we get the rental assistance.  But we don't get big chunks of it in the sense that our goal is to get people off of subsidies, so our programs are volunteer -- I mean, trying to get people into jobs, trying to get them in to build their social support, going to meetings where you're actually working with each other to get better.  It's like when I moved in and I had a roommate in college, you know, he's going to library and getting A's and B's and I'm sitting there getting C's and D's.  Well, maybe I should go to the library.  Well, that same thing works in our homes.  Maybe I should go to an AA meeting.  Maybe I should get my GED.  Maybe I should reunite with my family.  And so as they start to resolve their unresolved issues, it opens up the whole program, just like AA does.

**BY MS. MITCHELL:**

Q    Do you have any contracts, current contracts, for the City of Los Angeles?

A    Yes, we do, and we're thrilled with the contracts that we have.  We just are finishing up and signed a renewal with CD3.  Bob Bloomingfield has been a tremendous supporter of our

agency.  We have subsidies that come with that.  They also were our sponsor and co-applicant as we applied to get BCHIP funding for Proposition 1, and we're really pleased that the governor, they had nine billion dollars' worth of applicants to get three billion dollars' worth of money, and we were one of 124 that were successful in getting it.  And that BCHIP money was three million dollars, which purchased outright for us to own two homes that will expand our respite program.  It's just an amazing program, which is kind of like a boot camp before you go into collaborative housing or move on.

Q    Okay.

        **MR. FUSTER:**  Your Honor, at this time, we would ask for a relevance proffer for this witness.

        **THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q    And the subsidies, you said, that come with the contracts for the City of Los Angeles, can you describe that?

A    I know on Fridays, I signed about 150 checks.  For 100 people that we house, rental assistance equated to about 320,000, and most of our subsidies and rent subsidies are anywhere between 400 and 6 or 700.  The rents for our homes vary depending on where the homes are located, but roughly the rents for each bed are between 600 and $900 a month.

Q    Okay, and if I understood correctly, the city or the county or LAHSA pays for the first couple months, and then the

Ulf - Direct / By Ms. Mitchell                           **202**

individual ultimately gets on SSI or SSDI or gets a job and

pays out of their own pocket; is that right?

A    No, they can get on it right away, and then there's

subsidies on top of that, but a lot of people get work.  I

mean, our outcomes are who the people become.  So we want to

get them off the time limited subsidies as quick as we can and

get them into work and get them into creating fellowship and

community, and that seems to be very successful.

Q    Other than Council District 3, do you have any other

current contracts for the City of Los Angeles?

A    Yes, we do.

         **MR. FUSTER:**  Objection, Your Honor.  Relevance, and

you know, we'd also ask for a standing relevance objection to

this examination, Your Honor.

         **THE COURT:**  Overruled.  You can answer the question.

         **THE WITNESS:**  Yes, we have one with CD3.  That's a

TLS contract.  It's a contract to place 20 people into

permanent supportive housing apartments.

**BY MS. MITCHELL:**

Q    Okay, so it's CD3, is that the only one --

A    No, CD3 is the one that we have with Bloomingfield, and

CD1 is Councilwoman Hernandez.

Q    Understood.

         **THE COURT:**  I'm sorry, you dropped your voice.  Is --

CD1 is?

MS. MITCHELL:  The name of the council.

THE WITNESS:  It's the name of the Council District.

THE COURT:  Oh, I know that, okay.  Thank you very much.

Q    I think he said is Councilwoman Hernandez.

A    Correct.

Q    Do you have any current contracts for the County of Los Angeles?

A    Yes, we do.

MR. FUSTER:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  We have totally about $7 million worth of contracts between DMH.  I got the thing.  DMH, we have a $2 million contract.  The Department of Mental Health also, our United Mental Health Promoters, is a $900,000 contract per year for us to deal with seniors 65 years and older.  That's a three-year contract at $952,000 a year.

BY MS. MITCHELL:

Q    I'm sorry, for the $952,000, how many people does that serve?

A    I don't have the exact stat --

Q    Okay.

A    -- but we're tied to KPIs that were given to us by the County.  That's in Supervisor District 2.

Q    Okay.

Ulf - Direct / By Ms. Mitchell                                    **204**

A    We also have ICMS contract, which is with the Department of Health Services.  That's to house 60 people.  Those are more highly -- higher level of mental health services that are required and that's very intense.  It's intensive case management.

We have, again, I told you CD1 and CD3, we call them time-limited subsidies contracts.  We also have contracts with the Gateway Cities.  The COGS, Gateway City COGS, the South Bay City COGS, and we have contracts out to get the San Gabriel Valley COGS.  Those are the 88 municipalities that are outside of the City of Los Angeles.  And we've had those contracts for several years and they keep getting renewed because it's a special housing-to-job requirement.

Q    Okay.  I'm going to stop you real quick.  What is COG?  What does that stand for?

A    The Council of Governments, so Gateway Cities is 27 cities and together they combine together and they act as one.

Q    Can you describe any contracts that you have pending with LAHSA specifically?

          **MR. FUSTER:**  Objection.  Relevance.

          **THE COURT:**  Overruled.  You can answer the question, sir.

          **THE WITNESS:**  I think the contract that we have specifically is to finalize the time-limited subsidies with our CD3 account.  We also have another contract which is really a

Ulf - Direct / By Ms. Mitchell                                205

wonderful one.  Apple hired us to bring our peer specialists to be in their stores.  There's one in Third Street Promenade and one in downtown LA.  They've identified 30 stores in their portfolio where they have tremendous problems with the populations that walk in and because we bring our lived experience peer specialists in, they de-escalate.  They use our tools of the trade in order to de-escalate any situations and we actually can get them and get them placed into permanent supportive housing or into our shared collaborative housing. That's been very successful.

**BY MS. MITCHELL:**

Q    The time-limited subsidy contracts that you have with LAHSA, is that for collaborative housing or is that for individual housing?

       **MR. FUSTER:**  Objection.  Relevance.

       **THE COURT:**  Overruled.

       **THE WITNESS:**  It's for any of our housing contracts.  We get subsidies for the COGS.  We get subsidies for CD1, CD3.  In any of our housing contracts, we get subsidies.

**BY MS. MITCHELL:**

Q    Did you make a formal offer several years ago to the City of Los Angeles to house 2,000 people for $8 million?

       **MR. FUSTER:**  Objection.  Relevance, leading.

       **THE COURT:**  Overruled.

**THE WITNESS:**  Yes, we did.  It was in October of 2018, I believe.  Mike Bonin, we've done three successful pilot programs using our program and he invited us to come to the Poverty and Homeless Committee at the city council and we made a proposal to house 100 people out of each city council district and 500 off Skid Row.

Q    And that was for $8 million; is that right?

A    Yeah.

**MR. FUSTER:**  Objection.  Relevance, leading.  It's also before the settlement agreement, Your Honor.

**THE COURT:**  Overruled.

Q    Did you ever get a response from the City of Los Angeles on that offer?

**MR. FUSTER:**  Objection.  Relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  We did not receive the contract.

**BY MS. MITCHELL:**

Q    What would it cost, approximate, ballpark, for you to house let's say 1,000 people today if you get a contract with the City of Los Angeles?

**MR. FUSTER:**  Objection.  Calls for speculation, relevance, also hypothetical.

**THE COURT:**  Overruled.

**MR. FUSTER:**  And it's also vague, Your Honor.

**THE COURT:**  Thank you.  You may answer the question.

THE COURT: Yeah, we put proposals together all the time and to house -- it just depends on how you want to measure the housing. If you want to do it on a per person cost or if you want to do it on a bed cost. If we do a thousand people in our regular collaborative housing model on a per bed cost, it's $26,836,273.50.

THE COURT: All right. Just one moment.

Is the Federal Trade Commission here as well as (indisc.)? Where are you located? Folks, I want you to go back and meet and confer, especially with this young gentleman who's unrepresented. And I'll join you at about 5:30, okay? We're in session right now. But I think you can spend the time negotiating this or attempting to. Remember, you don't need to reach a settlement. But I'm a little concerned about him representing himself, okay?

**(Recessed at 4:15 p.m.; to reconvene at 4:20 p.m.)**

MS. MITCHELL: May I continue, Your Honor?

THE COURT: Please. I want to make sure we're back on. Okay.

Now, by the way, when it gets to 4:30, go home. My law clerks know how to shut off CourtSmart. It's amazing.

COURT REPORTER: I'm here until 5:00, Your Honor.

THE COURT: Well, at 5 o'clock, go home. Okay. Counsel?

MS. MITCHELL: Okay. Thank you, Your Honor.

THE WITNESS:  Do you want me to continue where I was?

**DIRECT EXAMINATION (CONTINUED)**

**BY MS. MITCHELL:**

Q    So, I'll ask another question.

A    Okay.

Q    I think you said 26 million for roughly, approximately 26 million and change, for 1,000 people and that was per bed. Would it be less if it was per person?

A    Yes.

MR. FUSTER:  Objection.  Relevance, speculation.  It's also vague.

THE COURT:  Overruled.  Are these the --

MR. FUSTER:  It's also improper hypothetical, Your Honor.

THE COURT:  Thank you.  Are these 2018 numbers that you're telling the Court about?

THE WITNESS:  These are last week.

THE COURT:  Today's numbers.

THE WITNESS:  Today.

THE COURT:  Today.  All right.  Overruled.

THE WITNESS:  Our turnover, based on the success of the program and getting people through the system, we turn a bed over about 1.6 times a year, so using that figure on a per person basis, it's roughly 16,772,000.

THE COURT:  I'm sorry, would you repeat that slowly?

**THE WITNESS:** In order to house 1,000 people on a per person cost, it's rough -- because we move people through our housing at a pretty close clip to 1.6 times per year, the bed. It turns out to be 16,000, or 16,000,772.

**THE COURT:** I'm sorry, would you repeat that?

**THE WITNESS:** $16,772,670.94.

**BY MS. MITCHELL:**

Q   Per person.

A   Per person. No, that's per 1,000 people. It's 16,700 per person.

Q   Per person, which would turn into --

A   Then times 1,000 people. But at the one point -- I'm sorry.

Q   That's okay. And that's for one year; is that right?

A   It's anywhere between 8 months and 14 months. It just depends on, I mean, our outcomes are based on who they become. If they're ready to go, that bed gets back filled. If we have eight months of time limited subsidies or rental, we get some to them, some to them, others don't need it, and so we can move those subsidies around to the people that need it.

Q   Okay. So if I understand you correctly, if a person, let's say after a couple months, were able to start paying rent on their own through getting a job or through SSI or some other means, does that then reduce the cost of providing housing to that person?

Ulf - Direct / By Ms. Mitchell                    **210**

MR. FUSTER: Objection, Your Honor. Relevance, improper hypothetical, it's vague, also calls for speculation.

THE COURT: Overruled.

THE WITNESS: Yes, I mean, we can move the limit of subsidy if the person has a job, and the jobs we get are benefit-based jobs in our South Bay cities and our Gateway cities. We were asked to house 100 people and to get them jobs. It's our housing to employment contract, and we're supposed to get 40 percent of them jobs, and we got 74 percent of them jobs, and we housed 120. And that 74 is pretty much the same in South Bay cities for some reason, and our peer bridgers and peer specialists are the people with case management that we get them to the employment services, and again, we've been very successful in getting those people jobs.

**BY MS. MITCHELL:**

Q   So that 16,000 per person or 26,000 per bed number, does that include services to the individual of the peer bridging and the job placement and that kind of thing?

A   Absolutely --

MR. FUSTER: Objection. Relevance --

THE COURT: Overruled.

MR. FUSTER: Improper hypothetical, calls for speculation. It's also vague.

THE COURT: Counsel, please lower your voice.

MR. FUSTER: Oh, I'm so sorry.

THE COURT:  Thank you.

MR. FUSTER:  I'll move the microphone back.

THE COURT:  Overruled.  Counsel, thank you.

THE WITNESS:  Yeah, I mean, the expenses, you know, we have a budget that we go through and figure out, but it's salaries, taxes, benefits, occupancy, communications, equipment.  We have vans that we do outreach with, auto mileage and parking, supplies, rental assistance is included in that number, and subtotal and then indirect costs equals that 23 -- what is it, 2,315,000 to house 100 people under the budget that I'm looking at right now.

Q   Okay, so that would be a little bit less.  That'd be about 23,000,000 per person.

A   Excuse me, you're absolutely correct.

MR. FUSTER:  Objection.  Relevance, Your Honor.

THE WITNESS:  It's 23,156,000, not 26,000,000.  23,156,273.

BY MS. MITCHELL:

Q   Thank you.  How many -- if you know, how many homes are for rent in the county of, I'll say the County of Los Angeles right now?

MR. FUSTER:  Objection.  Relevance, Your Honor, also calls for speculation and lack of foundation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  On any given day, we've realized that

Ulf - Direct / By Ms. Mitchell                    **212**

there's about 10,000 single family homes for rent throughout the county, and we don't have to have any conditional use permits whatsoever to place this population or any of these populations into those homes.

Q   So if you were given a contract today to place 1,000 people in beds or to obtain 1,000 beds, how quickly could you do so?

**MR. FUSTER:**  Objection.  Relevance, improper hypothetical, calls for speculation, and lack of foundation.

**THE COURT:**  Overruled.

**THE WITNESS:**  Well, currently, our group that goes out and looks for houses, it's small, we have three people, we cold call to get houses.  It's difficult to get homes, to volunteer, to get into this process, so it usually takes us between two to six weeks to get a home open.  We'd love to get master leasing involved in ours, but we're not part of the City's master leasing program.

And again, the more we could own homes, like I mentioned, those duplexes, five bedrooms, three baths upstairs, five and three downstairs to two people per room, that holds 20 people.  And I think currently there's about 55 of those available in LA City.  You can purchase one of those for about $1.5 million, $1.6 million, and then the cost of furnishing it.

//

//

**BY MS. MITCHELL:**

Q    Okay, so I'm going to ask the question again.

A    Sorry.

Q    That's okay.  So if you were given a contract today to, let's say, obtain 1,000 beds for use of individuals who were currently experiencing or had recently experienced homelessness by the City of Los Angeles, and the City was using its best efforts to provide you those resources that you needed to scale up, how quickly could you get those beds?

A    1,000 beds?

        **MR. FUSTER:**  Objection, Your Honor.  Calls for a legal conclusion, relevance, it's an incomplete hypothetical, calls for speculation, there's a lack of foundation, it's also vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  In our proposal that we gave back in 2018, it was 2,000 beds within 12 to 36 months.  So 1,000 beds lasts probably 12 to 18 months.

**BY MS. MITCHELL:**

Q    And if you were able to scale up your division, I will call it, of individuals who is looking to find, place, and lease the homes that you just described, could you do so even faster?

        **MR. FUSTER:**  Objection, Your Honor.  Same objections, calls for a legal conclusion, it's an incomplete hypothetical,

relevance, lack of foundation, also calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  If we had the people, is that what you're asking?

MS. MITCHELL:  That's what I'm asking, correct.

THE WITNESS:  Yeah, I mean, I go out into tents and do outreach myself personally, and again, with the success rate, I think it's probably between 20 and 30 percent when you're down in a tent and say, this is what we've got, are you willing to do it?  And, you know, we figure that we get pretty successful in that.

So, and if -- when we actually get referrals, probably 800 referrals from all the other providers that have housing contracts, because they know we're housing first, so the people concerned, PATH, all the above, give referrals to us all the time.  We have people that call in, and actually, we have a call center that takes the calls over the phone.  We also, in the last two years, housed 230 TAY kids.  And recently, we were --

BY MS. MITCHELL:

Q    I'm sorry, you said TAY, that's --

A    TAY, Transition Aged Youth.

Q    -- transitional aged youth?

A    And then we were -- a private family gave us a half a million dollars to house 50 transition age youth and foster

children from November 1st to October 31st of this year, and we've housed 69 of them already in the first six months.  So as quick as we can go, as quick as we can get people.  We don't get hired to do outreach by the city or the county right now.  And so it's, it's virtually our own trying to fill our contracts.

Q   So Mr. Ulf, I think my question was just a little bit different than that.  Not how quickly could you fill beds.

A   Of course.

Q   That's okay.  Not how quickly could you fill beds, but the question was how quickly could you obtain the beds?  So if you increased your leasing program, how quickly could you obtain 1,000 beds?

A   It's a --

        **MR. FUSTER:**  Objection, Your Honor.  And I just want to flag, last week, Your Honor noted that you didn't want the parties to get into alternatives and different policies about what the best housing solution is, as it's just not relevant to the issue you're deciding.  And you received all that data and more, approximately, you know, over the course of five years.  You gave that instruction with plaintiffs' witness, Elizabeth Funk.  And, you know, plaintiffs' counsel was going down a very similar line of questioning.  We'd ask for that same instruction with this witness.

        **THE COURT:**  It's not the same issue, counsel.  That

Ulf - Direct / By Ms. Mitchell                    **216**

was comparison between different cities like San Jose, et cetera.  This is within the region.  Overruled.

THE WITNESS:  Can you repeat the question one more time?

**BY MS. MITCHELL:**

Q    Sure.  My question was, if you had the resources to be able to scale up your leasing department, so you had more than one person calling to obtain these homes either for master lease purposes or for -- to, you know, be able to buy them yourselves as you indicated.  How quickly could you provide those 1,000 beds?

A    Extremely quickly.

MR. FUSTER:  Objection.  Relevance, incomplete hypothetical, speculation, and --

THE COURT:  Overruled.  Now, you answer.

THE WITNESS:  It's a lot easier for us to go to a landlord and just master lease his house because our landlords have an MOU with us that they have to provide all those services and stuff.  So if we master lease, they would get a check instead of having to be more like the landlord on things get broken or those kind of things.  So that would go much quicker.  And obviously, if we were able to purchase properties like we got with the BCHIP funding, that goes very quick.

//

//

**BY MS. MITCHELL:**

Q    No, I think your answer before counsel interjected an objection was extremely quickly.  What do you mean by extremely quickly?  Do you think a year, less?

A    There's 10,000 houses out there.  If we could -- you know, if we had the big enough team to go out there and knock on enough doors, faster than we could do it before.  We said 12 to 18 months.  It'd be quicker.

        MR. FUSTER:  Your Honor, is it possible to take a five-minute recess?

        THE COURT:  Well, certainly.

        MR. FUSTER:  Okay.  Thank you so much.

        THE COURT:  Do you need to use the restroom or is it just a conference?  It doesn't matter if you want to have a conference, please don't use a restroom as a reason.  If you want to have a conference, just be blunt with me.  Tell me you want to have a conference.  Is that what you want to do?

        MR. MCRAE:  Your Honor, I need to make a call about scheduling for tomorrow and I know I want to be able to report to the Court the information I have.  I'm just concerned that if I don't step out now, I won't be able to do that.

        THE COURT:  Well, could you go out and make the call then so we could go on and get this witness off the stand?  I think we can conclude him then this evening.  Thank you very much.  Why don't you make the call?  You can make it in the

back of the courtroom.

MR. MCRAE:  That's all right, Your Honor.  I'll stay.

THE COURT:  All right.  Your next question now.  Let's get this witness off the stand.

MS. MITCHELL:  Yeah.  Yeah.  I think I'm -- we're coming to an end pretty quickly.

**BY MS. MITCHELL:**

Q   What is the -- well, and, and let me ask this question.  Can people stay in your collaborative housing homes permanently?

MR. FUSTER:  Objection.  Relevance, Your Honor.  Calls for speculation.

THE COURT:  Overruled.  Counsel, let's wrap this up now.

MS. MITCHELL:  Yes, Your Honor.

THE WITNESS:  We have four ladies down and --

THE COURT:  There's no question pending.  Let her ask the question now.

THE WITNESS:  I'm sorry.

**BY MS. MITCHELL:**

Q   Okay.  What percentage of the individuals in your collaborative housing programs return to homelessness?

MR. FUSTER:  Objection. Relevance, Your Honor.

THE COURT:  Overruled.  You can answer the question.

Ulf - Cross / By Mr. Fuster                **219**

THE WITNESS:  I have our stats that we have.  We have 605 people, 57 percent of the residents and 75 --

THE COURT:  Slow down now.  605 and what?

THE WITNESS:  Sorry.  90 percent who moved out were positive incomes, only 4 percent returning to homeless and 6 percent didn't respond.

Q    Only 4 percent of the people returning to homelessness?

A    Correct.

Q    So a 96 percent success rate; is that right?

A    That's correct.  Of the people that we have under contract.

MS. MITCHELL:  I have no further questions at this time.  Thank you.

THE COURT:  Thank you.  Ms. Myers, do you have questions?

MS. MYERS:  I do not, Your Honor.  Thank you.

THE COURT:  City, do you have questions?

MR. FUSTER:  Yes, Your Honor.

THE COURT:  Please.

                    CROSS EXAMINATION

BY MR. FUSTER:

Q    Mr. Ulf, first and very importantly, congratulations on your recovery.

THE COURT:  Thank you.  By the way, I am recalling now.  I met this gentleman at Central Market, but I think,

EXCEPTIONAL REPORTING SERVICES, INC

Ulf - Cross / By Mr. Fuster                    **220**

depending upon your memory, Michelle, I think I met four to six providers that day.  I'm not certain.  It was what I call one of the many provider days.  So just all, so counsel, no, now I'm recalling and you say I met you at Penmar.

THE WITNESS:  Yeah, I always wanted to meet you.  So I found out where you were going to be.

THE COURT:  I don't think most people do.

THE WITNESS:  So I found out where you're going to be and I staked out.

THE COURT:  But I met you at Penmar.

THE WITNESS:  Correct.  On the street.

THE COURT:  Counsel, I didn't recall that, but now, you know, I met him twice.

MR. FUSTER:  Thank you, Your Honor.

THE COURT:  I think 2021, maybe that's the range.  I didn't recall Penmar though.  Thank you.

MR. FUSTER:  Understood.  Thank you.

BY MR. FUSTER:

Q    Sir, you didn't sign the settlement agreement between the Alliance and the City of Los Angeles, correct?

A    Correct.

Q    And you and your organization SHARE are not parties to the settlement agreement.

A    Correct.

Q    You didn't negotiate the settlement agreement?

A    Not whatsoever.

Q    You're also not a party to the Roadmap agreement between the City and County?

A    No, sir.

Q    Neither is your organization?

A    Correct.

Q    And you didn't negotiate that agreement either?

A    Nothing.

Q    You're not an employee of the City of Los Angeles?

A    No, sir.

Q    And you've never been an employee of the City of Los Angeles, have you?

A    No, sir.

Q    You're not in charge of collecting and reviewing data on behalf of the City with respect to bed creation and encampment removal?

A    Not as far as creating the numbers, no.

Q    And you never personally prepared any quarterly reports on behalf of the City that were filed with this Court in connection with the obligations set forth in the settlement agreement, did you?

A    Not to my knowledge, no.

Q    And you've never worked in any type of management role for a city that has a population of almost 4 million people, is that correct?

**222**

A    Correct, sir.

MR. FUSTER:  Thank you, Your Honor.  Thank you.  No further questions.

THE COURT:  Consult with your co-counsel for just a moment.

(Pause)

MR. FUSTER:  Thank you.  No further questions.  Thank you.

THE COURT:  Counsel, redirect?

MS. MITCHELL:  No, Your Honor.  I have no further questions for this witness.  May we call our next witness, or should we take a break?

THE COURT:  Pardon me?

MS. MITCHELL:  May we go ahead and call our next witness, Your Honor?

THE COURT:  Most certainly.  Sir, thank you very much.  You may step down.

THE WITNESS:  Pleasure.  Thank you all.

MS. MITCHELL:  Thank you, Mr. Ulf.  We call --

MR. FUSTER:  Can we take five now, Your Honor?

THE COURT:  Now, if you want to break, that's great.  And let's get the next witness on and off the stand this evening, whoever that is also.  So let's take 10 minutes -- well, 15 minutes.  Let's come back and let's move along with the next witness.

**223**

(Recessed at 4:36 p.m.; to reconvene at 4:48 p.m.)

THE COURT:  Okay.  Then we're on the record, counsel, and all counsel are represent.  Counsel?

MR. MCRAE:  Yes, Your Honor, I just wanted to report on a brief scheduling issue.  I have a meeting where I am -- it's a client meeting where I have to be in the meeting between 11:00 and 12:00 tomorrow.

THE COURT:  Well, why don't I just take a recess for lunch 11:00 to 12:00?  Or 10:45 to whatever.  But I need to get -- listen, we've been courteous to the City.  We're going to be equally courteous to A&M, who's been sitting there for four days now.

MR. MCRAE:  Of course.

THE COURT:  That's the end of the discussion, but I'll work with you.

MR. MCRAE:  Okay.  Thank you, Your Honor.

THE COURT:  Okay?

MS. MITCHELL:  Your Honor, I actually have a witness who has to testify from 11:00 to 12:00 tomorrow and then he's out of town, John Masseri.  He was here on Friday and we weren't able to get him on the stand

THE COURT:  Could we put him on tomorrow morning then and ask A&M to wait just a little bit?

MS. MITCHELL:  He told me 11:00 to 12:00.  I'll check.

**224**

THE COURT: Good. Now, let's get started. Counsel, thank you very much. We're wasting more time discussing what we're going to do rather than doing it. Your next witness, please.

MR. UMHOFER: Your Honor, we call Lee Raagas to the stand.

THE COURT: Thank you. And if you come forward and if you'd be kind enough to raise your right hand, please.

**LISA RAAGAS, PLAINTIFFS' WITNESS, SWORN**

THE COURT: Would you please be seated here in the witness box. Thank you. Would you be kind enough to face counsel for all parties. Would you state your full name, please?

THE WITNESS: Lisa Raagas.

THE COURT: And would you -- is your first name L-E-E?

THE WITNESS: My nickname is Lee, but my legal name is Lisa.

THE COURT: Okay, Lisa and your last name, please.

THE WITNESS: R-A-A-G-A-S.

THE COURT: Once again.

THE WITNESS: R-A-A-G, like girl, A-S.

THE COURT: Thank you. Counsel, direct examination, please.

MR. UMHOFER: Thank you.

**DIRECT EXAMINATION**

**BY MR. UMHOFER:**

Q    Ms. Raagas, what do you do for a living?

A    I am a consultant for strategic initiatives around housing and acquisitions and divestitures.

Q    What were some of the previous jobs you've held?

A    I was the CEO for Skid Row Housing Trust during the pandemic.  I was a chief business development officer for a technology company.  I was a chief strategy officer for investment firms around distressed assets with PIMCO.  And before that, I was a chief strategy officer for H&R Block around housing and distressed assets.

Q    About how many years have you spent in the area of housing?

A    30, 35 years.

Q    And about how many years have you worked in the intersection between housing and homelessness?

A    On and off for about 15 years.

Q    What was your undergraduate degree in?

A    In organizational psychology.

Q    Did you get an advanced degree?

A    No.

Q    So what years were you with Skid Row Housing Trust?

A    I was a consultant for them around 2016 through very early 2022.

Raagas - Direct / By Mr. Umhoffer                    **226**

Q    And at what point did you become CEO?

A    I was the interim CEO very late 2019 and transitioned into the role right before COVID.

Q    What does Skid Row Housing Trust do?

A    They were a developer of permanent supportive housing. They had a 509A that was a property management company, and they were a service provider for case management services.

Q    During your time with Skid Row Housing Trust, were you able to observe the different kinds of housing and shelter  that are offered to people experiencing homelessness?

A    I observed shelter and directly observed permanent supportive housing.

Q    Can you describe what the different levels of from shelter up to permanent supportive housing that you observed during your time at Skid Row Housing Trust?

          **MS. KAOUNIS:**  Objection.  Calls for expert opinion.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  The --

          **THE COURT:**  Please you can answer the question.

          **THE WITNESS:**  The general hierarchy is it would go shelters, maybe interim housing, transitional housing, and then permanent supportive housing, but affordable housing is sprinkled in throughout those processes

//

//

**EXCEPTIONAL REPORTING SERVICES, INC**

**BY MR. UMHOFER:**

Q    Have you had the chance to -- well, have you had the chance to take a look at Exhibit 24, which I'm presenting here? This document, I'll represent to you, has already been discussed heavily in this case.  It is the milestones set forth by the City.  Did you have a chance to review this document?

A    Yes.

          **MS. KAOUNIS:**  Objection.  Foundation, relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Yes, I've seen this.

Q    It's also up on the other screen next to you, it's up to you which you want to look at.  Does that document lay out some different kinds of housing and other interventions that are being offered by the City under this -- these milestones?

          **MS. KAOUNIS:**  Objection.  Vague, relevance, foundation.

          **THE COURT:**  Overruled.

          **MR. UMHOFER:**  I'm sorry, Your Honor.  I don't think we heard your ruling.

          **THE COURT:**  I'm sorry.  Overruled.  My apologies for dropping my voice.

          **THE WITNESS:**  There is interim housing, like I mentioned before, and then permanent housing, which is the majority of the line items that this Roadmap is allocated to.

//

Raagas - Direct / By Mr. Umhoffer                    **228**

**BY MR. UMHOFER:**

Q    So is it safe to say there's an emphasis on permanent

supportive housing in this document?

            MS. KAOUNIS:  Objection.  Vague, foundation.

            THE COURT:  Overruled.

            THE WITNESS:  I'm sorry.  What was the question?

Q    Is it safe to say that there's an emphasis on permanent

supportive housing --

A    Yes.

Q    -- over other kinds of housing in this document?

A    Yes.

Q    Now, having worked with permanent supportive housing, have

you been able to observe the downside or the disadvantages to

pursuing permanent supportive housing as opposed to other kinds

of housing or shelter options?

            MS. KAOUNIS:  Objection.  Vague, foundation, calls

for expert opinion.

            MS. MYERS:  Join.

            THE COURT:  Overruled.  And you can answer --

            MS. KAOUNIS:  And relevance.

            THE COURT:  You can answer the question.

            THE WITNESS:  I can answer the question?

            THE COURT:  Please.

            THE WITNESS:  Is it the downside of permanent

supportive housing?

EXCEPTIONAL REPORTING SERVICES, INC

Raagas - Direct / By Mr. Umhoffer                    **229**

**MR. UMHOFER:**

Q    The downside or disadvantages vis-a-vis other forms of shelter or housing.

A    I would say that the  most prevalent downside of permanent supportive housing would be speed.  Speed to develop, speed to implement, speed to house.

Q    Did you have the ability to observe how long it takes from conception to availability of beds for a permanence -- the average permanent supportive housing project to move to readiness to receive people?

          **MS. KAOUNIS:**  Relevance, foundation, vague, calls for expert opinion.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  During the time that I was there and I just want to say that there's a caveat that it was a lot of COVID as well, but in general, the time -- do you want me to explain the timeline?

Q    Yes, what do you understand the timeline to be for permanent supportive housing from start to finish?

          **MS. KAOUNIS:**  Same objections?

          **THE COURT:**  Overruled.

          **THE WITNESS:**  So the general timeline is about maybe a year between application called NOFA and approval or what would be implemented into a budget under PEP?  I think it's project expenditure plan, and then it goes into loan

agreements and which is simultaneous to pre-development, which is about 6 to 12 months, and then it typically goes into construction, which is on average about three years.  And then if initiatives are being kind of simultaneously coordinated, like CES matches and voucher matches, et cetera, it's about a year to lease up a property once it goes in service.  So all in, it's probably about five and a half to six and a half years from the beginning of an application to a full lease up.

Q    And about how much time from start of construction to full lease up?

A    About four --

**MS. KAOUNIS:**  Objection.  Foundation.

**THE COURT:**  Overruled.  You can answer the question.

**THE WITNESS:**  About four to four and a half years.

**BY MR. UMHOFER:**

Q    Besides the speed, is there an issue with permanent supportive housing and its cost?

**MS. KAOUNIS:**  Objection.  Foundation, relevance, vague.

**THE COURT:**  Overruled.  You can answer the question.

**THE WITNESS:**  The -- well, it's costly.  There's all the data that points to the fact that it's costly.  So the capex, for lack of better term, the capital expenditure or the development costs are fairly expensive.  When I was at the trust, there was three projects that I inherited.  It was

probably about a little over 500,000 per unit at the time for the three projects we brought into service.

I know that when we were -- when I was leaving, there was, it was hitting about 600,000 per unit.  I think there's also a cost associated with matching.  There's something called a coordinated entry system that matches individuals to vouchers or voucher types.  And the vouchers and the rental subsidies are pretty important match that drives the financials and the economics around it.

And then probably most important that is now getting some attention is the operating expenditure costs or the budgets, the ongoing budgets outside of the rents, more around like what it costs to operate a building.  There was no specific carve out and that was pretty expensive for that maintenance budget.

**BY MR. UMHOFER:**

Q    Now, have you had a chance to look at what's already been discussed in this case is Exhibit 35, which is the Alliance Settlement Agreement quarterly report ending March 31, 2025?

**MS. KAOUNIS:**  Objection.  Foundation.

**THE COURT:**  Overruled.

**BY MR. UMHOFER:**

Q    Have you had a chance to look at that?

A    Yes, I've seen this report.

Q    And their address is on this report, correct?

Raagas - Direct / By Mr. Umhoffer                    **232**

A    Yes.

Q    Now, have you also had a chance to look at Exhibit 127, this document that I'm showing you here?

         **MS. KAOUNIS:**  Foundation.

         **THE COURT:**  Just one moment.

     **(Pause)**

         **THE COURT:**  Overruled.

Q    What is this document, Exhibit 127?

A    It's an internal memo for HHH projects.

Q    What's the date on this?

A    February 6, 2025.

Q    As we move through this, is there a table containing addresses and information concerning proposition HHH properties through June of 2024?

         **MS. KAOUNIS:**  Objection.  Foundation, relevance, calls for an expert opinion.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  Yes, this is a table that shows the addresses and the project statuses.

Q    And so as we go from left to right on Exhibit 127, is there a detail here about, and I can, the -- apologies, one moment, please.  Is there a detail here concerning the cost per unit?

         **MS. KAOUNIS:**  Same objection.

         **THE COURT:**  Overruled.

**THE WITNESS:** Yes, that's the data for the cost per unit.

**BY MR. UMHOFER:**

Q   And does this document also have a construction start date, reflect construction start dates -- apologies, let me back out of that, construction start dates and construction completion dates?

       **MS. KAOUNIS:** Objection, Your Honor.  Foundation, relevance, calls for expert opinion.

       **THE COURT:** Overruled.

Q   Does this document also contain a column for construction start and construction complete?

A   Yes, these are the columns for construction start and completion dates.

Q   Starting with Exhibit 35, which again is the quarterly report for the Alliance Settlement Agreement, and moving to, I'm going to take you down to line 192 of this document here. Line 192 reflects a location of 15302 West Raven Street.  Do you see that there?

A   Yes.

Q   Now, as we go over to the left-hand side in the Alliance Agreement, it says that bed is -- that bed at the Raven -- at Raven Street, sorry, is in process, correct?

A   Yes.

       **MS. KAOUNIS:** Objection.  Relevance, foundation,

Raagas - Direct / By Mr. Umhoffer                    **234**

calls for an expert opinion.

THE COURT:  Overruled.

THE WITNESS:  Yes.

**BY MR. UMHOFER:**

Q    Pulling up Exhibit 127 on the right-hand side here.

THE COURT:  Just a moment, counsel, you said exhibit?

MR. UMHOFER:  So, yes, we're now going to a separate exhibit, Your Honor.  I'm going to present them side by side.

Q    And so, as we look at -- apologies, let me, let's just do it this way.  As we look at Exhibit 127, and we go to line 128 there, is that the same Raven -- Raven Street address there at line 128 of Exhibit 127?

MS. KAOUNIS:  Objection.  Foundation, calls for expert opinion, relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

Q    And then as we go to the left on Exhibit 128, I'm going to move straight over here, the cost per unit, I'm going to ask you, I'm going to move this over to the right-hand side, so the cost per unit for the Raven is how much?

MS. KAOUNIS:  Objection.  Foundation, relevance, expert opinion.

THE COURT:  Overruled.

THE WITNESS:  $925,995.

//

**EXCEPTIONAL REPORTING SERVICES, INC**

Raagas - Direct / By Mr. Umhoffer          **235**

**BY MR. UMHOFER:**

Q    How does that compare in cost to your understanding of what a permanent supportive housing unit typically costs?

**MS. KAOUNIS:**  Objection.  Relevance, foundation, calls for expert opinion.

**THE COURT:**  Overruled.

**THE WITNESS:**  It's high.

Q    And moving, if we can -- we're going to go back up to the construction start date for 128, and that's going to be the last two columns there.  And so for the construction start date, there's a construction start date of -- I apologize, let me back that out to make sure we're working off the right column here.  So there's a construction start date on this one of -- I'm going to represent to you that these two columns on the right-hand side are side-by-side the construction start date and end date.  What's the construction start date on this?

**MS. KAOUNIS:**  Objection.  Foundation, relevance, calls for expert opinion.

**THE COURT:**  Overruled.

**THE WITNESS:**  November 1st, 2024 is the estimated start date.

**BY MR. UMHOFER:**

Q    And what's the estimated end date for this?

**MS. KAOUNIS:**  Same objection.

**THE COURT:**  Overruled.

Raagas - Direct / By Mr. Umhoffer                    **236**

THE WITNESS:  May 1st of 2026 is the estimated end of construction date.

Q   Based on your experience with permanent supportive housing, is that a reasonable time frame from start to finish of construction for a permanent supportive housing unit?

MS. KAOUNIS:  Objection, relevance, foundation, calls for an expert opinion and 403.  Your Honor, I'd like to make just a continuing objection to this line of questioning.

THE COURT:  Certainly.  Overruled.

BY MR. UMHOFER:

Q   Is that a -- based on your experience with permanent supportive housing, is that a reasonable time frame from start to finish of construction for a permanent supportive housing unit?

MS. KAOUNIS:  Same objections.

MS. MYERS:  Intervenors join the objections.

THE COURT:  Overruled.

THE WITNESS:  No, that's not a reasonable time frame, but also the data, the publicly available data doesn't support it.

BY MR. UMHOFER:

Q   Now, moving back to Exhibit 35, I'm going to go to line 190 on Exhibit 35.  Line 190 there is an address, what's the address at line 190?

A   728 North Lagoon Avenue, Wilmington, California 90744.

EXCEPTIONAL REPORTING SERVICES, INC

Raagas - Direct / By Mr. Umhoffer                    **237**

Q     If we go to Exhibit 127, and we go to line 120, same address, correct, for line 120?

A     Yes.

Q     Okay.  Now, if -- on line 120 if we scroll over for the Lagoon number, do you see any data for -- over on the right-hand side, for the columns that are set for construction start or end date for that line 120 document here?  So if we're looking at Lagoon -- apologies.

      So if we're looking at Lagoon here and then we're going over to the right-hand side on that, am I correct that the places where there would be start dates, construction dates, et cetera, there's no data whatsoever, correct?

          **MS. KAOUNIS:**  Objection, foundation, relevance, calls for an expert opinion.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  There's no data listed here.

**BY MR. UMHOFER:**

Q     Last one, Exhibit 35, line 189 and again Exhibit 35 is the -- am I correct that Exhibit 35 is that Alliance quarterly report, correct?

          **MS. KAOUNIS:**  Objection, foundation, relevance, expert opinion.

          **THE COURT:**  Just a moment.

Q     Am I correct that Exhibit 35 --

          **THE COURT:**  Line 189 -- counsel, line 189?

Raagas - Direct / By Mr. Umhoffer                    **238**

**MR. UMHOFER:**  Yeah, we'll go to line 189.

Q    Line 189 which --

**THE COURT:**  Which -- just a moment now.  I heard 189 but I may have misheard that.

**MR. UMHOFER:**  Right.  So Exhibit 35, line 189.

**THE COURT:**  All right.

Q    What is the address here?

A    18722 Sherman -- I'm sorry, 18722 West Sherman Way, California 91335.

Q    Okay.  And if we go to Exhibit 127 again and we look at line 121 here.  And line 121, do you see that same address on Exhibit 127?

A    Yes.

Q    Now, on line 121 as we go over to the right, do we see again on line 121 -- apologies.  If line 121 is here, do we see again n/a across the document at the place where we would expect to see construction dates and construction completion dates?

**MS. KAOUNIS:**  Objection, foundation, relevance, calls for expert opinion.

**THE COURT:**  Overruled.

**THE WITNESS:**  Yes.

**BY MR. UMHOFER:**

Q    Now if we look at -- in the same document line 126 do you -- that's Weingard Tower 1B.  Do you see that there?

A    Yes.

Q    And if we follow that over, line 126 and again, I just want to make sure we're corresponding --

THE COURT:  Just a moment, counsel.  I want you to line 126 up again.  I want to see the cost of this.

MR. UMHOFER:  Okay.  Yes, Your Honor.

THE COURT:  Just a moment now.

MR. UMHOFER:  126.

Q    What's the cost for line 126?

MS. KAOUNIS:  Objection, relevance, foundation, calls for expert opinion.

THE COURT:  Just one moment.  Just a minute. Counsel, would you go back.  I want to see the total cost on the project.

MR. UMHOFER:  Your Honor, I'm sorry, I can't hear what you're --

THE COURT:  I want to see the total project cost.  Go back.

MR. UMHOFER:  Yes, Your Honor.

THE COURT:  And just a moment.  All right.  90 million?

MR. UMHOFER:  Yes.

THE COURT:  Just a minute.

//

//

Raagas - Direct / By Mr. Umhoffer    **240**

**BY MR. UMHOFER:**

Q    So on this particular one and I want to make sure we're lining up the information correctly here, the construction date at line 126 -- the start of construction and end of construction can you read those out loud?

        **MS. KAOUNIS:**  Objection, relevance, foundation, calls for expert opinion.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  The estimated construction start date is May 8th of 2025 and the estimated end of construction date is June 8th of 2025.

Q    Is that a reasonable amount of time consistent with your experience for the building of permanent supportive housing unit?

        **MS. KAOUNIS:**  Objection, foundation, vague, calls for an expert opinion, relevance.

        **THE COURT:**  Overruled.

        **MS. MYERS:**  Intervenors join and add misstates her expertise.

        **THE COURT:**  Okay.  Thank you, overruled.

        **THE WITNESS:**  No.

**BY MR. UMHOFER:**

Q    That's one month to create a $90 million building, correct?

        **MS. KAOUNIS:**  Same objections.

Raagas - Direct / By Mr. Umhoffer                    **241**

THE COURT:  Overruled.

THE WITNESS:  Correct.

Q    Now, I want to show you what's been marked as Exhibit 109. Are you familiar with this report?

A    I just recently saw it last week, yes.

Q    What do you know about this report?

A    It was a reflection on why Skid Row Housing Trust went into receivership that -- and I think this was -- this research was funded by the Hilton Foundation.

Q    Do you know who --

MS. KAOUNIS:  Objection, relevance.

THE COURT:  Overruled.

Q    Do you know who did the report, who wrote the report?

A    I don't remember her name, but it was a consulting firm and with input of experts from around Los Angeles.

Q    Did you have a chance to review the report?

A    I reviewed it.

Q    Would you summarize it briefly for the Court?

MS. KAOUNIS:  Objection, calls for expert opinion, relevance, lack of foundation.

THE COURT:  Overruled, but would you scroll down this?  I want to read the topic headings for just a moment. Just a minute.

**(Pause)**

MS. KAOUNIS:  Your Honor, for the record, could we

Raagas - Direct / By Mr. Umhoffer                    **242**

have that exhibit number once more?

        **THE COURT:**  It's Exhibit 109.

        **MR. UMHOFER:**  109.

        **THE COURT:**  And could you go down, I'm only on the third topic heading.  Would you bring that exhibit back up please?

        **MR. UMHOFER:**  Sure.  Sure, Your Honor.

        **THE COURT:**  All right.  Take me up to the top of the page for just a moment.  I want to see this.

        All right.  Your next question please.

**BY MR. UMHOFER:**

Q    Could you briefly summarize what this report concluded and found?

        **MS. KAOUNIS:**  Objection, relevance, calls for expert opinion, foundation.

        **THE COURT:**  Overruled.

        **MS. KAOUNIS:**  Document speaks for itself.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  The report summarizes that the long term cost for permanent supportive housing has to be reviewed and rebuilt moving forward and in the hindsight, in the review of historical, subsidy vouchers, it identified that it was critically underfunded, permanent supportive housing, particularly SROs and studios were critically underfunded when they compared the voucher to fair market rents.

Raagas - Direct / By Mr. Umhoffer                    **243**

**BY MR. UMHOFER:**

Q    Is that consistent with your observations during your time

at Skid Row Housing Trust?

        **MS. KAOUNIS:**  Objection, relevance, foundation, calls

for an expert opinion.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes, that was consistent with my

experience at the trust.

Q    If you had to use your best efforts to create a thousand

new units of housing for shelter, would -- at a -- in a cost

effective and as quickly as possible manner, would you choose

permanent supportive housing?

        **MS. KAOUNIS:**  Objection, calls for a legal

conclusion, calls for an expert opinion, relevance, foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  What would be my best guess be, was

that the question?

Q    Yes.

A    I would focus on shelters and interim housing over

permanent supportive housing for speed of curing the

homelessness crisis.

Q    What else would you do?

A    I would --

        **MS. KAOUNIS:**  Same objections.

        **THE COURT:**  Well, it's a little unfocused, counsel.

I don't know what that question pertains, what else would you do.

**BY MR. UMHOFER:**

Q    In using your best efforts beyond focusing on shelter, what else would you do to ensure that the -- that a thousand beds could be made available as quickly as possible?

MS. KAOUNIS:  Objection, incomplete hypothetical, calls for a legal conclusion, calls for expert opinion, relevance, foundation.

THE COURT:  Overruled.

THE WITNESS:  I would work pretty diligently in making sure that the shelter or the interim housing environments were matched quickly to transitional housing or permanent supportive housing, maybe better integration of the data and the systems for matches, voucher types, and then open availability of housing stock.

Q    You mentioned that something recently happened to the Skid Row Trust or relatively recently after you left.  What happened to the Skid Row Housing Trust?

MS. KAOUNIS:  Objection, relevance.

THE COURT:  Overruled.

**BY MR. UMHOFER:**

Q    You may answer.

A    What happened after --

Q    After you left, was there some change in status at the

Skid Row Housing Trust?

A    Oh, it went into receivership.

Q    What do you understand a receivership to be?

          **MS. KAOUNIS:**  Objection, calls for a legal conclusion, calls for expert opinion, relevance, foundation.

          **THE COURT:**  Overruled, you can answer.

          **MS. KAOUNIS:**  Hearsay.

          **THE WITNESS:**  That the City and County had to intervene and identify a receiver to oversee the portfolio of the trust properties.

Q    And do you have an understanding as to why the City and the County did that?

          **MS. KAOUNIS:**  Objection, calls for a legal conclusion, relevance, lacks foundation, hearsay, calls for speculation.

          **THE COURT:**  Overruled.  You can answer the question.

          **THE WITNESS:**  Because there was a financial shortfall in the portfolio at large and the existing properties, particularly the older ones were falling into very risky statuses.

          **MR. UMHOFER:**  One moment, Your Honor.

     **(Pause)**

**BY MR. UMHOFER:**

Q    Just to be clear, among the different kinds of housing and shelter is permanent supportive housing the fastest way to get

to a bed created?

MS. KAOUNIS:  Objection, vague, relevance, incomplete hypothetical, calls for --

THE COURT:  It's been asked and answered also, but I'll let you answer it one more time.

THE WITNESS:  No, permanent supportive housing is not the fastest way to create a bed, but a bed is within a unit and permanent supportive housing units take a little while to create as I explained before.

Q    In fact, is permanent supportive housing the slowest way to get to a bed?

MS. KAOUNIS:  Objection, calls for speculation, vague, relevance, calls for an expert opinion.

THE COURT:  Overruled.

THE WITNESS:  Yes.

Q    Based on your experience at the Skid Row Housing Trust, do you have an opinion as to whether the homelessness services system is broken in Los Angeles?

MS. KAOUNIS:  Objection, relevance, calls for an expert opinion, foundation.

THE COURT:  Overruled, you can answer that question.

THE WITNESS:  Yes, I believe it's broken because of the results it's producing.

//

//

Raagas - Direct / By Mr. Umhoffer          **247**

**BY MR. UMHOFER:**

Q    Can you elaborate on that please?

        **MS. KAOUNIS:**  Objection, calls for a narrative,
relevance.

        **THE COURT:**  Overruled.  You can answer the question.

        **THE WITNESS:**  Well, in my experience with the Trust
and Los Angeles and permanent supportive housing, I was
consulting in the pre-H and HHH environment and I know in
looking back over the last nine or ten years the housing and
homelessness crisis has gotten worse.

        **MR. UMHOFER:**  No further questions at this time, Your
Honor.

        **THE COURT:**  Ms. Myers, cross-examination?

        Counsel, just a moment, by agreement --

        **MS. MYERS:**  Actually can we just meet and confer
amongst the parties just really quickly?

        **THE COURT:**  Absolutely.

        **MS. MYERS:**  Maybe take five minutes.

        **THE COURT:**  Absolutely.  I'll leave the bench and do
you want to step down for just a moment and relax or you can
just stay right there.  We'll take a five minute recess, okay?

        **THE WITNESS:**  Okay.

     **(Recessed at 5:25 p.m.; reconvened at 5:26 p.m.)**

        **THE COURT:**  And this would be for the County?

        **MS. KAOUNIS:**  This is for the City, Your Honor, with

EXCEPTIONAL REPORTING SERVICES, INC

consent of interventor's counsel I'm going to go first and if she has any further questions, intervenor's counsel is going to take those -- do those questions afterwards.

THE COURT:  I'm sorry.  Would you say that again?

MS. KAOUNIS:  With consent of intervenor's counsel I'm going to go first --

THE COURT:  Okay.  Thank you.

MS. KAOUNIS:  -- with my cross.

THE COURT:  Okay.  Thank you.  And just once again just for the record so we have your name.

MS. KAOUNIS:  Okay.  Angelique Kaounis, Gibson Dunn & Crutcher for the City.

THE COURT:  Thank you.

CROSS EXAMINATION

BY MS. KAOUNIS:

Q    Ms. Raagas, do you know who authored Exhibit 35?

A    Who authored?  I don't know what you mean, like where was the data from?

Q    Who wrote it?

A    LA City.org.

Q    Were you involved in the preparation of Exhibit 35?

A    Not of 35.

Q    Were you involved in the preparation of Exhibit 127?

A    Which one was 127?

Q    Exhibit 127 was the document that you were comparing to

Raagas - Cross / By Ms. Kaounis                    **249**

Exhibit 35.

            **MR. UMHOFER:**  Your Honor, I only wish to point out that the witness can access any document on the iPad in front of her.

            **THE WITNESS:**  It was Exhibit 124 -- it has Exhibit 24 on it.

            **MR. UMHOFER:**  If you hit the left-hand corner that'll take --

            **THE COURT:**  Counsel, why don't you just approach and see what she's looking at.

            **THE WITNESS:**  Okay.  I think I see it.  I'm sorry. What -- pull up which exhibit?

            **THE COURT:**  There we go.

**BY MS. KAOUNIS:**

Q    This is Exhibit 127 that you were testifying about before. Do you recall that?

A    I recall that, yes.

Q    You were not involved in the creation of Exhibit 127, correct?

A    I did not create 127.

Q    And you're not aware of how the data was collected and put into Exhibit 127, correct?

A    I believe the data was pulled down from the LA City.org KPI dashboard for a downloadable Excel spreadsheet.

Q    If you weren't involved in the creation of Exhibit 127,

Raagas - Cross / By Ms. Kaounis                    **250**

how would you know that?

A    I recognize the names and the addresses of these.

Q    Have you gone and personally confirmed all the data in
Exhibit 127 exists in the location that you've identified?

A    No.

Q    You testified earlier that you were involved in the Skid
Row Trust, do you recall that?

A    Yes.

Q    Okay.  The Skid Row Trust is not a signatory to the
settlement agreement between the Alliance and the City of Los
Angeles, correct?

A    Correct.

Q    And you personally are not a signatory to that settlement
agreement, correct?

A    Correct.

Q    You're not a party to this action, correct?

A    Correct.

Q    You did not negotiate the settlement agreement with the
City -- between the City and the Alliance, correct?

A    Correct.

Q    You're aware that the City has two more years under the
settlement agreement to fulfill its obligations, though,
correct?

          **MR. UMHOFER:**  Objection, calls for a legal conclusion
and lacks foundation.

**EXCEPTIONAL REPORTING SERVICES, INC**

**THE COURT:**  Overruled, you can answer that.

**THE WITNESS:**  I believe so.  I heard that earlier today.

**BY MS. KAOUNIS:**

Q    You're not a signatory to the Road Map agreement between the City and the County, correct?

A    Correct.

Q    And your former organization, Skid Row Trust is also not a signatory to that agreement, as far as you're aware.

A    Correct.

Q    And you didn't negotiate that agreement either, correct?

A    Correct.

**THE COURT:**  Counsel, just a little slower.  Could you repeat that please?

**MS. KAOUNIS:**  Sure.

Q    You did not negotiate that Road Map agreement, correct?

A    Correct.

Q    You've never worked in any management role for a City of more than 4 million people, correct?

A    Correct.

Q    You were fired as the CEO of Skid Row Housing Trust, correct?

A    Correct.

Q    And while you were CEO, the Trust was notified of compliance issues by state housing officials, correct?

Raagas - Cross / By Ms. Kaounis          **252**

A     Correct.

Q     In your May -- oh, these included negative cash flow at 60 percent of the Trust's projects with state funding, right?

A     Correct.

Q     This also included liabilities dwarfing assets, correct?

A     I believe so.

Q     And the issues also included high staff turnover and insufficient resources to complete five projects in development, correct?

A     That doesn't -- I don't recall that.

Q     Do you recall the high staff turnover?

A     Some high staff turnover during COVID when there was shelter in place mandates.

Q     And you recall some insufficient funding with respect to the completion of at least some projects, correct?

A     There was insufficient funding holistically across the portfolio because of the rental vouchers, I explained earlier.

Q     And in your May 2021 letter filed with the Court which for the Court's reference is at Docket 305, you stated that Skid Row Housing Trust supports immediately transitioning people off the street and into humane, sanitary and safe environments.  Do you recall that?

A     In May of 2021 where was this?

Q     You submitted a letter with the Court.  Do you recall that?

A    Oh, when I came here for the court?  Yes.

Q    And you wouldn't have -- well, strike that.

In June 2021 a month later, three local housing agencies, as well as the Los Angeles County Departments of Health Services and Mental Health warned that the Trust of habitability and safety issues that were causing its clients to decline housing in the Trust buildings, correct?

A    Actually it was the Trust that alerted the City that we needed more funding to cure some issues and that created a dialogue back and forth between some of the City entities and the Trust.

Q    The Trust was cited for violations of various City ordinances, correct?

A    Yes, correct.

Q    And the Trust failed to remedy them after the first violation, correct?

A    No, I don't believe that's correct.  Are you talking about the four properties that were on probation?

Q    I was talking about St. Mark's Hotel.  Are you familiar with that hotel?

A    Yes, that was one of the properties that was on probation back in 2018.

Q    In November 2021 state housing officials visited more than a dozen of the Trust properties and found 250 habitability violations, correct?

Raagas - Cross / By Ms. Kaounis                    **254**

A    No, that wouldn't be correct.  I think there was about a hundred habitability issues and the other issues were around smaller items that could be corrected like lighting, doors, et cetera.

Q    Okay.  So there were a hundred habitability issues.

A    Correct.

Q    And around that time the Los Angeles Housing Department notified the Trust that 13 of its properties, those with loans from the City were in default for failing to live up to the terms of their agreements, right?

A    Similar to the answer before, it was actually the Trust that was notifying the City a few years before that, even a few years before I was involved about their concerns about their shortfalls.

Q    The Trust had the shortfalls, correct?

A    Correct.

Q    And CBS Los Angeles actually aired a report on the deplorable conditions --

        THE COURT:  I'm sorry, counsel.

Q    -- at St. Mark's --

        THE COURT:  Who?  I didn't hear.  Who?

        MS. KAOUNIS:  CBS Los Angeles.

        THE COURT:  CBS Los Angeles, okay.

//

//

**BY MS. KAOUNIS:**

Q    Actually aired a report on the deplorable conditions at St. Mark's Hotel, right?

A    Correct.

Q    And several lawsuits were filed by tenants and creditors of the Trust also alleging inhabitable living conditions and/or seeking hundreds of thousands of dollars, correct?

A    That I don't know.

Q    The Trust had to borrow to make payroll and had accumulated several million dollars in debt, right, at the time you were there?

A    During the time that I was there we had PPP and EIDL loans.  We didn't have to get a loan for payroll.  I don't recall that.

Q    But there was several properties in debt, correct?

A    There was a lot of properties that had the economic shortfalls that I had mentioned earlier.

Q    Yet at one point during your tenure, you were being paid over $225,000 a year, correct?

A    I was paid -- yeah, that would be correct.  Maybe -- yeah.

Q    And you claimed expenses for a $450,000 executive coaching contract as well, correct?

A    No, I did not do that.

Q    At one point you'd hired two of your grown sons to work at the Trust; is that right?

A    I didn't hire them.  I was on a transition program out when I was done being the interim COO and the interim CEO at the time, not myself, hired them.

Q    Do you recall the cost of the executive coaching contract?

THE COURT:  Counsel, would you state that again just a little slower.

MS. KAOUNIS:  Sure.

BY MS. KAOUNIS:

Q    Do you recall the cost of the executive coaching contract?

A    I don't know who the executive consulting contract was for.

Q    Sorry, just to clarify.  Executive coaching, not consulting.

A    Executive coaching, I don't know who the coaching was for. If you tell me, I can probably tell you who it was.

Q    Let's skip that and move on.  As CEO of the Trust, you sought to diversify the Trust by setting up what you called project management office to pursue new ventures.  Do you recall that?

A    I did not set up the project management office.  It was set up prior to me.

Q    Okay.  And you pursued the projects associated with the project management office, correct?

A    I pursued revenue diversification projects.

Q    And did that include -- and that actually did include a

ten acre cannabis growing, processing and distribution center on vacant city property in south Los Angeles where clients of the Skid Row Housing Trust could go work, right?

A    That wasn't a project.  That was a beta.  That was a proof of concept for an expression of interest that we were asked to put together.  It was never a project.

Q    Right.  It was a proposal, correct?

A    It was not a proposal.

Q    How did you describe it a moment ago?

A    A proof of concept.

Q    Okay.  And in order to do a proof of concept you need to actually provide some type of proposal and outline of what the concept is, correct?

A    An executive summary.

Q    You're aware that substance abuse has been reported as one of the leading causes of homelessness, right?

A    Yes.

Q    So you consider that beta ensuring health and safety of encampment populations?

A    The request was of us, it wasn't my request.  So the City Lansit (phonetic) project asked the Trust and some social equity license holders to try to come up with an idea of how revenue could be generated to support a City that was negatively affected for cannabis issues of the past.

Q    May I have an answer to my question?

Raagas - Cross / By Ms. Kaounis                    **258**

A     I thought that was the answer.

Q     Do you consider that beta ensuring health and safety of encampment populations?

A     I still don't understand what you're asking.  It was a manufacturing proposal with housing.  It was a proof of concept.

Q     Right.

A     It wasn't housing in Skid Row, so I'm sorry if I'm confused.

Q     No, that's no problem at all.  Just to be clear, your beta included giving jobs to people who are on skid row in a cannabis growing plant, correct?

A     It was not in skid row.

Q     That's not my question.  It was to give people who were housed in skid row jobs on a cannabis growing plant, correct?

A     It was for whoever applied for a job.

Q     And those included people who were clients of the Skid Row Housing Trust, correct?

A     If they applied.  I don't know.  I honestly don't understand.

Q     You don't recall the beta suggesting that that would be the case, that the clients of Skid Row Housing Trust would be offered jobs or would be allowed to get jobs on that plant?

A     I think --

          **MR. UMHOFER:**  Objection, Your Honor, we're beyond

relevance, asked and answered.

THE COURT:  I can't hear you, I'm sorry?

MR. UMHOFER:  We're beyond relevance, asked and answered.

MS. KAOUNIS:  Well, Your Honor, this witness --

THE COURT:  Overruled.

MS. KAOUNIS:  -- has purported to give expert testimony --

THE COURT:  Counsel, counsel --

MS. KAOUNIS:  -- on best efforts.

THE COURT:  -- I overruled the objection.  You can answer the question.

**BY MS. KAOUNIS:**

Q    Can I get an answer please?

THE COURT:  Just restate the question.  I think she's recanting, counsel.

MS. KAOUNIS:  Sure.

Q    The beta that you proposed would allow and would invite Skid Row Housing Trust clients to work on a cannabis growing, processing, distribution center on a vacant city property in south Los Angeles, correct?

A    Yes, if they wanted to.

MS. KAOUNIS:  That's all, thanks.

THE COURT:  Now, just a moment.  Ms. Myers, I want to make you're -- I think you just traded order, that's all.  So

turn to Ms. Myers.

Now, remember in ten minutes, you have to go home. They shut off the lights in here.  I'm just kidding you, but we have to be out of the building by 6.  Okay?

**MS. MYERS:**  Okay.  I only have a few questions.

So Shayla Myers with the Legal Aid Foundation of Los Angeles on behalf of the intervenors.

**CROSS EXAMINATION**

**BY MS. MYERS:**

Q    You testified about the cost of various permanent, supportive housing units, correct?

A    Correct.

Q    And you were testifying specifically about the cost of permanent supportive housing units that were built using Proposition HHH funds, correct?

A    I believe so, correct.  I don't know if they were HHH or non-HHH, but I believe they were on the list that was presented to me.

Q    And was that related to Proposition HHH?

A    I believe so.

Q    Okay.  Do you know how much City funding went into each of the units that you testified about?

A    I'd have to see the --

**MS. KAOUNIS:**  Objection, foundation.

**THE COURT:**  I'm sorry, I --

Raagas - Cross / By Ms. Myers                    **261**

**MS. KAOUNIS:**  Foundation.

**THE COURT:**  Overruled.

**BY MS. MYERS:**

Q    Okay.  And can you just repeat your answer just in case the Court -- you're being recorded, so in case it misses it. So can you just repeat your answer?

A    I'd have to see --

**THE COURT:**  Counsel, repeat the question.

**MS. MYERS:**  Sure.

Q    Do you know how much City funding went into each unit?

A    I -- no, I don't know.  I do if I saw the report, there's a carve out for which HHH or non-HHH City contributions are on the reports that are published, but I don't know them off hand right now.

Q    Okay.  And Proposition HHH has a limit on how much money will be paid for each unit that's funded by Proposition HHH, correct?

A    I believe so.  I believe that's intact.

Q    And, in fact, the developer of a Proposition HHH unit is required to seek additional funding to cover the remaining cost of the unit; isn't that correct?

**MS. KAOUNIS:**  Objection, calls for expert testimony, relevance.

**THE COURT:**  Overruled.  You can answer that if you know.

**EXCEPTIONAL REPORTING SERVICES, INC**

Raagas - Cross / By Ms. Myers                                    **262**

THE WITNESS:  Yes, that's correct.

BY MS. MYERS:

Q    And so for every Proposition HHH unit that is constructed in the City of Los Angeles the developer actually brings additional funding for permanent supportive housing into the City of Los Angeles; isn't that correct?

A    Yes, that's correct.

Q    Okay.  And you testified that in response to the question about best efforts, what would you do to ensure 1,000 beds could be made available as quickly as possible, you said that you would focus on shelter, correct?

A    I said that I would definitely develop more shelters to get more people off the streets and prepared for housing.

Q    In preparation for housing; is that correct?

A    To get them off the streets, yes.

Q    Is the reason why you would focus on shelter because the shelter beds could be stood up more quickly than permanent supportive housing units?

        MS. KAOUNIS:  Objection, calls for an expert opinion.

        THE COURT:  Overruled, you can answer.

        THE WITNESS:  I'm sorry.  Say that again.

BY MS. MYERS:

Q    Is the reason why you said you would focus on shelter because the shelter beds could be stood up more quickly than permanent supportive housing?

Raagas - Cross / By Ms. Myers                   **263**

A    That's part of it.  The other part would be the increase in so many people that are falling into homelessness is so rapid that I think the speed to get people off the streets is critical.

Q    And you're saying that more people are falling into homelessness right now, is that your testimony?

A    I'm saying that when H and HHH when I was looking at the data through the time, the counts, the pit counts were a lot lower than they are today.  So today, the pit counts are a lot higher showing housing and homelessness increasing.

Q    Showing housing and homelessness increasing.

        **MS. KAOUNIS:**  Objection, vague, calls for --

Q    Can you clarify?

        **MS. KAOUNIS:**  -- calls for expert opinion, relevance.

        **THE COURT:**  Well, just a moment.  I'm not sure of the question.  The answer is understood, so your question, counsel?

**BY MS. MYERS:**

Q    Just can you clarify what you mean by housing and homelessness is increasing?

A    So in 2016 or 2017 if I recall correctly the County had about 45,000 homeless individuals or people that they were concerned about with the concentration of like 25 of 28,000 of them in the City.  I remember that being a very specific focal point, pre-H and HHH.

        And then the last time that I saw the data, it was 45,000

in the City and closer to 70,000 I think County-wide in LA. That's what --

MS. KAOUNIS:  Objection.

THE WITNESS:  -- I meant.

MS. KAOUNIS:  Objection, move to strike as hearsay, relevance, lacks foundation.

THE COURT:  Overruled.

BY MS. MYERS:

Q   At what point in time count are you pulling those numbers from?

A   The last pit count I think I looked at was 2023, 2024.

MS. KAOUNIS:  Same objections.

THE COURT:  Overruled.

Q   But can you tell us for purposes of your testimony whether that was the 2023 number or the 2024 numbers?

MS. KAOUNIS:  Objection, foundation, hearsay, relevance, calls for expert opinion.

THE COURT:  Overruled.

THE WITNESS:  I believe it was the 2023 published in 2024.  I'd have to look at my notes.

BY MS. MYERS:

Q   Okay.  In the 2024 point in time count, are you aware that -- have you looked at the 2024 point in time count for purposes of your testimony?

MS. KAOUNIS:  Objection, foundation.

Raagas - Cross / By Ms. Myers **265**

THE COURT: Overruled.

THE WITNESS: I looked at the homelessness data count, I don't recall specifically what year it was, because it wasn't what I was thinking I was going to be asked about.

Q   Would it change your perspective at all if you knew that the point in time count numbers related to sheltered homelessness in the City were going up while unsheltered homelessness was remaining the same?

MS. KAOUNIS: Objection, foundation, calls for expert opinion, relevance.

THE COURT: Overruled.

THE WITNESS: I'm sorry, can you -- I just want to make sure I understand what you're asking.

THE COURT: Just reask it, counsel.

MS. MYERS: Sure.

Q   Would it change your testimony related to the need for additional shelter beds if you knew -- if the numbers in the 2004 point in time count showed that the number of people experiencing sheltered homelessness had gone up while the number of people experiencing unsheltered homelessness remained the same?

MS. KAOUNIS: Objection, foundation, hearsay, relevance, calls for speculation, calls for expert opinion, and incomplete hypothetical.

THE COURT: Overruled.

**THE WITNESS:** No, I don't think that would change my opinion. It's still a significant amount of homeless individuals living out on the streets.

**BY MS. MYERS:**

Q   And if a person is in a shelter, they're still homeless, correct?

A    Correct.

Q   And that's why you also said that to ensure -- to move people off the streets one thing you would do is ensure that interim housing was matched quickly to permanent housing, correct?

**MS. KAOUNIS:** Objection, calls for expert opinion, relevance, foundation.

**THE COURT:** Overruled. You can answer the question.

**THE WITNESS:** I'm sorry, say that again.

Q   When asked about what best efforts entailed, you focused on matching. Matching people from interim housing to permanent housing, correct?

A    No, I think that was two separate things. I was talking, best efforts would be the matching system, the coordinated entry system, the match from the person to the voucher, voucher type and then the voucher type to the project or the building type needs to improve or be a little bit faster and then I think the other part, I think what you're referencing is I think it's dangerous for people to be sleeping on the streets

Raagas - Cross / By Ms. Myers                           **267**

and they should be in a sheltered environment.

Q    You also testified that it was important to move people quickly from interim housing to permanent housing, correct?

**MS. KAOUNIS:**  Objection, calls for an expert opinion, relevance.

**THE COURT:**  Overruled.  You can answer the question.

**THE WITNESS:**  I think that there needs to be a more rapid efficient process between street to shelter or shelter to interim and interim to permanent supportive housing because that timeline seems to be too long.

**BY MS. MYERS:**

Q    And one of the ways to increase the speed with which a person is matched from interim housing to permanent housing is to increase the number of permanent housing units, correct?

**MS. KAOUNIS:**  Objection, calls for speculation, foundation, expert opinion, relevance.

**THE COURT:**  Overruled, you can answer that.

**THE WITNESS:**  I think I'd actually agree.  I don't know what you're asking or I'm just not understanding the question.

**THE COURT:**  Just reask the question.

**MS. MYERS:**  Sure.

**BY MS. MYERS:**

Q    You said it's important for purposes of moving people out of homelessness to move people more rapidly from interim

housing or shelter to permanent housing, correct?

A    The whole process has to be more effective and shorter, yes.

Q    And one of the ways to speed up that step from interim housing to permanent housing is more permanent housing, correct?

        MS. KAOUNIS:  Objection, calls for speculation, calls for expert opinion, foundation.

        THE COURT:  Overruled, you can answer that.

        THE WITNESS:  I don't know if it'd be more permanent housing.  It would be more interim housing.  It would be -- transitional housing if I'm understanding you correctly.

Q    So then it's your testimony that there's enough permanent housing in Los Angeles to move people from interim housing to permanent housing?

        MS. KAOUNIS:  Objection, calls for expert opinion.

        THE COURT:  Overruled, you can answer that.

        THE WITNESS:  Yeah, I think it would be dependent on the needs of the person that is being identified.  So if people are homeless and they go into a shelter environment and they have certain needs that are more transitional, they should be transitional.  If it's more chronic and permanent, it should be more permanent.  The number ratios, I don't know.

        THE COURT:  Counsel, I think we've got to clear the building in just a moment so ask another question, it's almost

6 o'clock.

**BY MS. MYERS:**

Q    Shelters have higher rates of exits into homelessness than permanent supportive housing, correct?

       **MS. KAOUNIS:**  Objection, foundation, calls for an expert opinion, relevance.

       **THE COURT:**  Overruled, you can answer the question.

       **THE WITNESS:**  The more fall out from shelters versus more fall out from permanent supportive housing, is that what you're asking me?

Q    Yes.  More people fall back into homelessness from shelters than they do from permanent housing.

       **MS. KAOUNIS:**  Same objections.

       **THE COURT:**  I'm sorry, I didn't hear your answer.

       **THE WITNESS:**  I said I don't know what the ratio is for shelters, but I know it's or I would -- or the last that I looked, it was 20 to 25-ish percent of fallout from permanent supportive housing.  I don't know how it's measured and I don't know how fall out would be measured in shelters.

       **THE COURT:**  Okay.  Counsel, we've got to resume tomorrow then.  Would 8 o'clock be convenient for all counsel?

       Excellent, good.  All right.

       **MR. UMHOFER:**  Your Honor, can I just suggest.  I can have no further questions if we can all agree that she does not have to come up from San Diego tomorrow --

Raagas - Cross / By Ms. Myers                    **270**

**THE COURT:**  My apologies then but I'm not going to cut Ms. Myers out.  If you have more questions, more than a couple more, then she'll have to come back.  We can schedule her later in the day.

**MS. MYERS:**  I only have about three more questions, Your Honor.

**THE COURT:**  Three more questions, counsel.

**MS. MYERS:**  Roughly.  It's one area of questions.

**BY MS. MYERS:**

Q    You testified that the City and the County sought a receivership over the Skid Row Housing Trust, correct?

A    Yes, I think that would be more of a City and County question, but my understanding is yes, they wanted a receivership over the trust portfolios.

Q    And the Skid Row Housing Trust actually requested that the City and County seek a receivership over the Skid Row Housing Trust, correct?

A    I don't know that.

Q    Okay.  And are you aware that it was done for the purposes of avoiding -- the Skid Row Housing Trust defaulting on loans that had been issued to the Skid Row Housing Trust?

**THE COURT:**  Wait --

**MS. KAOUNIS:**  Objection, foundation.

**THE COURT:**  -- say that again, counsel.

*//*

Raagas - Cross / By Ms. Myers                      **271**

**BY MS. MYERS:**

Q    Are you aware that the receivership was requested by Skid Row Housing Trust to prevent loans being called against Skid Row Housing Trust?

        **MS. KAOUNIS:**  Objection, foundation, relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  No, I don't know that.  I wasn't there at the time.

Q    And are you aware that the receivership -- the primary purpose of the receivership was to prevent Skid Row Housing Trust from defaulting on loans that would have resulted in the ownership of the Skid Row Housing Trust buildings being reverted back to the lenders?

        **MS. KAOUNIS:**  Objection, foundation.

        **THE COURT:**  Overruled, you can answer that, if you know the answer.

        **THE WITNESS:**  I don't know that.  I wasn't there at the time.

        **MS. MYERS:**  Okay.  I will leave it at that, Your Honor.

        **MR. UMHOFER:**  Your Honor, can I confer with the witness just for a moment to see -- the only reason I'm doing this is --

        **THE COURT:**  Counsel, we've got about two minutes.

        **MR. UMHOFER:**  I understand.  Well then I'll just ask

Raagas - Redirect / By Mr. Umhofer                    **272**

my two questions.

THE COURT:  Counsel.

MR. UMHOFER:  Your Honor, I'm trying to get this
done, but I can talk to the witness.

THE COURT:  Okay.  No, get it done.  It's 6 o'clock.

MR. UMHOFER:  I understand.

THE COURT:  You're running for the door because the
Chief Judge has been gracious letting me stay till 6.  Ask your
question now very quickly.

MR. UMHOFER:  I understand.

THE COURT:  But that doesn't mean that I'm going to
cut off the City with the questions, et cetera.

**REDIRECT EXAMINATION**

**BY MR. UMHOFER:**

Q    Was one of the problems at the Skid Row Housing Trust a
lack of sufficient funding?

MS. KAOUNIS:  Objection, foundation, calls for a
legal conclusion, calls for expert opinion.

THE COURT:  Overruled.

THE WITNESS:  Yes.

Q    And is the City of Los Angeles one of the entities that
funded the Skid Row Housing Trust?

MS. KAOUNIS:  Objection, foundation, calls for expert
opinion, calls for a legal conclusion, relevance.

THE COURT:  Overruled.

MS. MYERS:  Also vague and ambiguous.

THE COURT:  Thank you.  You can answer the question.

THE WITNESS:  Yes, LAHD and HACLA.

MR. UMHOFER:  Okay, Your Honor.

THE COURT:  All right.  Then cross by Ms. Myers or the City?

MS. MYERS:  No, Your Honor.

THE COURT:  Counsel?

MS. KAOUNIS:  Thank you, Your Honor, no.

THE COURT:  All right.  Thank you very much, you're excused.  And 8 o'clock is going to be it for all parties. We'll see you at 8 o'clock tomorrow.

MR. UMHOFER:  Thank you, Your Honor.

THE COURT:  Please go to the doors just as quickly as you can.  The Chief Judge has been very gracious, okay.

**(Proceedings concluded at 5:55 p.m.; to reconvene at 8:00 a.m., June 3, 2025)**

**\* \* \* \* \***

274

## CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    June 3, 2025

            Signed                                      Dated


*TONI HUDSON, TRANSCRIBER*