UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| LA ALLIANCE FOR HUMAN RIGHTS, et al., | ) | Case No. 2:20-CV-02291-DOC-KES |
|---|---|---|
| Plaintiffs, | ) | |
| vs. | ) | Los Angeles, California |
| CITY OF LOS ANGELES, et al., | ) | Tuesday, June 3, 2025 |
| Defendants. | ) | 8:00 a.m. to 5:52 p.m. |

TRANSCRIPT OF COMPLIANCE HEARING
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT COURT

Appearances:                    See next page.

Court Reporter:                 Recorded; CourtSmart

Courtroom Deputy:               KARLEN DUBON

Transcribed by:                 TERRI HARPER
                                Huntington Court Reporters
                                    and Transcription, Inc.
                                301 North Lake Avenue
                                Suite 600
                                Pasadena, California  91101
                                (800) 586-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service



2

APPEARANCES:

For the Plaintiff              ELIZABETH ANNE MITCHELL, ESQ.
LA ALLIANCE FOR                MATTHEW DONALD UMHOFER, ESQ.
HUMAN RIGHTS:                  Umhofer, Mitchell and King LLP
                               767 South Alameda Street
                               Suite 270
                               Los Angeles, California  90021
                               (213) 394-7979


For the Defendant             ARLENE NANCY HOANG, ESQ.
CITY OF LOS                   Los Angeles City Attorney's
ANGELES:                      Office
                              200 North Main Street
                              Los Angeles, California  90012
                              (213) 978-6952

                              JAMES ROTSTEIN, ESQ.
                              MARCELLUS MCRAE, ESQ.
                              KAHN SCOLNICK, ESQ.
                              ANGELIQUE KAOUNIS, ESQ.
                              THEANE EVANGELIS, ESQ.
                              Gibson, Dunn & Crutcher LLP
                              333 South Grand Avenue
                              Los Angeles, California  90071
                              (213) 229-7658


For the                       SHAYLA RENEE MYERS, ESQ.
Interveners:                  Legal Aid Foundation of Los
                              Angeles
                              1550 West 8th Street
                              Los Angeles, California  90017



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

3

WITNESSES

PAGE

LAURA FROST
    Redirect Examination by Ms. Mitchell    6

PAUL WEBSTER
    Direct Examination by Ms. Mitchell    21
    Cross-Examination by Ms. Myers    43
    Cross-Examination by Mr. Rotstein    52

DEWEY TERRY
    Direct Examination by Ms. Mitchell    60
    Cross-Examination by Ms. Kaounis    82

LAURA FROST
    Redirect Examination by Ms. Mitchell    87

JOHN MACERI
    Direct Examination by Ms. Mitchell    118
    Cross-Examination by Ms. Myers    145
    Cross-Examination by Mr. Scolnick    161

LAURA FROST
    Direct Examination by Ms. Myers    169
    Cross-Examination by Mr. McRae    184
    Cross-Examination by Ms. Mitchell    221

MICHELE MARTINEZ
    Direct Examination by Ms. Mitchell    234
    Cross-Examination by Ms. Myers    282
    Cross-Examination by Ms. Kaounis    314

HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

4

Los Angeles, California; Tuesday, June 3, 2025

--o0o--

(Call to Order)

THE COURT:  On the record.  Counsel are present.

And, Counsel, your next witness, please.

MS. MITCHELL:  Good morning, Your Honor.  We will -- well, it looks like my first witness is not currently present, so we'll go ahead and we'll call Laura Frost to the stand.

THE COURT:  Is this for -- just a moment.  Is this the one who had the 11:00 o'clock?

MS. MITCHELL:  No, Your Honor.

THE COURT:  There's some witness you had problems with which is why --

MS. MITCHELL:  We resolved that issue, Your Honor, so what we're going to do --

THE COURT:  You've resolved that?

MS. MITCHELL:  Yes.  If I can just -- if I can just explain to the Court.

So because Mr. McRae needs to take a break, he's not the one that's going to take John Maceri, which is the individual who had the conflict.  So from 10:45 to 12:00 Mr. Maceri will be the only witness that we call while Mr. McRae is out, I guess in his office.



THE COURT: What's the lineup for today?

MS. MITCHELL: So this morning we have Ms. Frost who's going to testify. We also have Paul Webster who's back to address a couple things. Dewey Terry will testify. I think I covered them all, and then we're calling Michelle Martinez.

THE COURT: And will that conclude your case?

MS. MITCHELL: It should, yes.

THE COURT: Okay. Tentatively.

MS. MITCHELL: Yes. Tentatively obviously subject to the apex issue.

THE COURT: What's the best use of our time is to call Ms. Frost?

MS. MITCHELL: I think so.

THE COURT: All right.

Ms. Frost, if you'd return to the stand please. The same oath that was previously administered still applies. And would you restate your name for the record please?

THE WITNESS: Laura Frost, F-R-O-S-T.

THE COURT: Thank you.

And would you restate your name also counsel?

MS. MITCHELL: Thank you, Your Honor. Yes. Elizabeth Mitchell, Umhofer Mitchell and King on behalf of Plaintiff LA Alliance for Human Rights.

6

THE COURT: All right. Thank you. And this would be redirect I believe; is that correct?

MS. MITCHELL: Correct.

THE COURT: Thank you.

Whereupon,

LAURA FROST

Was called as a witness, and having been previously sworn, was examined and testified as follows:

REDIRECT EXAMINATION

BY MS. MITCHELL:

Q   Now, Ms. Frost, as you've been sitting here over the last several days and had an opportunity to listen to the witnesses have you also had an opportunity to review transcripts as they have come out?

A   Yes, I have reviewed the transcripts, as well as my team.

MR. MCRAE: Objection. Vague as to which transcripts.

THE COURT: Overruled. This is foundational. We'll see which ones she's read.

MS. MITCHELL: Sure.

BY MS. MITCHELL:

Q   Ms. Frost, which transcripts have you had the opportunity to review?

A   I've reviewed from May 27th and May 28th.

Q    Now --

A    I'm sorry.  Just to clarify that.  My team has reviewed all transcripts that have been docketed.

Q    Okay.  All transcripts that have been docketed so far?

A    Correct.  But, me personally, since I've been in the courtroom, I have not reviewed the transcripts outside of May 27th and 28th.

Q    Okay.  And did I send you those transcripts?

A    No, you did not.

THE COURT:  Counsel, all these transcripts are on the public docket.

MS. MITCHELL:  Understood.

THE COURT:  And on a public site so all of you know.

BY MS. MITCHELL:

Q    Did I ask you to review the transcripts?

A    No, you did not.

Q    Now, based on your review is there of the transcripts as well as sitting in here listening to the testimony over the last several days is there anything that you want to clarify?

A    Yes.

Q    And can I ask you a couple preliminary

questions before we go through them.  The first is did I ask you to clarify anything?

A    No.

Q    Okay.  Did you call me over the weekend and ask me if you were able to clarify things on the witness stand?

A    Yes.  I called you over the weekend and inquired if we were able to clarify anything on the record as my team had read the transcripts and wanted some clarification.

Q    And did you take notes on the issues that you felt you needed to clarify based on the testimony you both read and heard on the stand?

A    One more time?  I'm sorry.

Q    Yes.  Did you take notes on the items which you wish to clarify based on what you read and what you have heard in the last several days?

MR. MCRAE:  Relevance.

A    Yes, some of these matters I have also taken notes on while in court.

Q    Okay.  What's the first issue that you would like to clarify?

A    I -- we would like to clarify the -- in relation to the data and the reason why we used words such as "potentially" or "may."



Q    Okay.  And why did you use words such as "potentially" or "may"?

A    The weaknesses from the data or lack thereof reported to the A&M team were not a flaw in our methodology or competency.  They were a central finding of our work.  We identified and transparently --

MR. MCRAE:  Objection, Your Honor.  The witness appears to be reading from something, so could I have --

THE COURT:  Just stand beside her if you'd like.  Please continue.

MR. MCRAE:  -- to see what she's reading.

BY MS. MITCHELL:

Q    Ms. Frost, are you reading from the notes that you took on the issues that you want to clarify?

A    Yes.

MR. MCRAE:  Your Honor, can we request that the witness turn the notes over and testify from her recollection because the notes are hearsay?

THE COURT:  She took these in relation to the -- she can read from these notes.

MR. MCRAE:  Objection.  Hearsay.

THE COURT:  He can look at them over her shoulder.  Why don't you stand beside her.

MR. MCRAE:  Yeah.

THE COURT:  Interruptions are time consuming,



10

and I want you to have her read through these notes.  If you try to clarify an answer, you can.

Start again, please.

MS. MITCHELL:  Okay.  So we were talking --

THE COURT:  Just a moment.  Start again.  Slowly and loudly.

THE WITNESS:  Yes, Your Honor.

The weaknesses from the data or lack thereof reported to the team -- A&M team were not a flaw in our methodology or competency.  They were a central finding of our work.  We identified and transparently reported data quality issues.  Dismissing the report for flagging these deficiencies would ignore the very risk the engagement was designed to reveal.

For example, the cash requests submitted by LAHSA to the City are highly complex.  The requests provided lack the necessary evidence to trace expenditures to the lump sum reimbursements ultimately issued by the City.  The city controller acknowledged the shortfall claiming the City was cutting blank checks.

When the source data is so fragmented or non-existent that even an experienced accounting professional cannot reconstruct a reconciliation, the resulting deficiency is an internal control and documentation --

MR. MCRAE:  Objection, Your Honor.  This is a

narrative.  It's not a Q&A.

THE COURT:  Counsel, I'm sorry.  Overruled.  And I'd like to hear this and you're going to start over again without interruption.

You can begin.  She's trying to clarify, and I want to hear what your clarification is.  I appreciate it. You've got your record now.  You've got your record.

MR. MCRAE:  Can I have a continuing objection?

THE COURT:  I want to hear this straight through now.  You've made your point.  I understand it.  You're overruled.  Am I clear?

MR. MCRAE:  Yes.

THE COURT:  I want to hear this in total. Disruptive and it's hard to follow.  You've got your record.  I've overruled you.

Once again, start from the beginning.

THE WITNESS:  Yes, Your Honor.

The weaknesses from the data or lack thereof reported to the A&M team --

THE COURT:  Slower and louder.

THE WITNESS:  The weaknesses from the data or lack thereof reported to the A&M team are not a flaw in our methodology or competency.  They were a central finding of our work.  We identified and transparently reported data quality issues.  Dismissing the report for



flagging these deficiencies would ignore the very risk the engagement was designed to reveal.

For example, the cash requests submitted by LAHSA to the City are highly complex.  The requests provided lack the necessary evidence to trace expenditures to the lump-sum reimbursements ultimately issued by the City.  The city controller acknowledged the shortfall, claiming the City is cutting blank checks.

When the source data is so fragmented or non-existent that even an experienced accounting professional cannot reconstruct a reconciliation, the resulting deficiency is an internal control and documentation weakness.  It speaks to the program's processes, not to the competence of the professionals engaged to review them.

Using words such as "potentially" or "may" in our report does not indicate a lack of competency.  Those terms are employed to highlight areas that warrant further review, not because we lack the ability to make a professional judgment.  This approach ensures we neither overstate nor understate the evidence, adhering to professional standards.

THE COURT:  Did anybody contact you and ask you to make this clarification or statement?  In other words, did this generate from you, or did it generate from a

13

request from counsel or any other party?

THE WITNESS:  No.  This is a discussion with my team who all could not be here who read the transcripts and requested that if given the opportunity we would like clarification on the record.

THE COURT:  You had a second clarification or was that your clarification?

THE WITNESS:  We have a few.

THE COURT:  Okay.  Now I'll say for the record your objection is noted, but once I overrule that, as I did before, it's hard for me then to follow with the interjection in the reading.

MR. MCRAE:  Yeah, I understand, Your Honor.  I just wanted to make sure that I had a continuing objection.

THE COURT:  I'm trying to absorb this information.

MR. MCRAE:  Me too.

THE COURT:  Once I made that ruling, it seems that -- first of all, a lot of these folks testifying are professionals.  Mr. Szabo is government employee, some of the people from LA Alliance.  But here we have lay witnesses also coming in, first time probably a number of people have testified.

I understand you want your record.  I'm letting



14

you make the record. I could simply say all of your objections are taken, no further. I'm giving you every chance to make individual objections. I've got to absorb that information though. So in the middle of the reading I'd just appreciate me being able to hear the evidence.

MR. MCRAE: Right. I was just asking for a continuing objection. That's all. I just wanted to make sure for my record that that was the case.

THE COURT: Listen, Counsel, I'm going to let you make whatever record you'd like to, cooperating with both sides.

MR. MCRAE: Thank you.

THE COURT: I need to absorb this information and it's taking a lot of time. You've got your record. Please pay me the courtesy now of hearing, because quite frankly it's refreshing if she's clarifying on her own to hear what those clarifications are, and I have no idea what they are. So if any witness wants to correct themselves, you can bring Mr. Szabo back. You can bring other parties back if they're truly generating, you know, from their own source, and that's why I've asked you.

MR. MCRAE: Your Honor, thank you for the continuing objection. Can I make one other quick point?

This is a -- I don't have any advance notice of this speech. It's clearly like a supplement of some sort.

15

No one provided it to me.

THE COURT: I don't either.

MR. MCRAE: I know, but the difference is that I'm representing the City and it's, to me, kind of a fair warning and due process issue to have an opportunity to review the notes that the person's reading from so I could prepare a cross.

THE COURT: You're going to. I'm going to take a recess after that and we'll bring her back, but I like the fact that I'm hearing this for the first time, you're hearing this for the first time, and witnesses aren't being set up by counsel, quite frankly, for their side, so thank you.

MS. MITCHELL: And for the record, I have not seen these notes either, to be clear.

THE COURT: Pardon me?

MS. MITCHELL: I have not seen them either. I'm hearing this for the first time as well.

THE COURT: Rather refreshing. If you want to clarify or you want to correct, please. Quite frankly, you can put that in your report if you want to.

THE WITNESS: Thank you, Your Honor.

THE COURT: What was the next concern that you had in reading these transcripts?

THE WITNESS: The next concern was the depth of

experience that our team had.  So we just want to clarify that the A&M team was composed of at least 10 team members with a depth of experience in accounting, finance, health care, government operations, and public policy.  The team included certified public accountants, a chartered financial analyst, and clinicians.  I'm happy to provide a list of names, titles, and bios of everyone on the team if any party wants it.

THE COURT:  And was there any further clarification that you wanted to make?

THE WITNESS:  In relation to that item, Your Honor, or --

THE COURT:  Pardon me?

THE WITNESS:  Specific to that item, Your Honor, or may I please -- Yes, we have a few more if the Court doesn't mind.

THE COURT:  Go ahead.

THE WITNESS:  The reason A&M disclaimed governmental accounting standards, the American Institute of Certified Public Accountants, and other governmental standards is because A&M is not a CPA firm and cannot make statements that it performed work in accordance with those accounting standards.  Only CPA firms can make those statements.  However, it does not mean that we did not follow similar professional standards.

17

Our engagement was executed with the same principles of objectivity, due professional care, integrity, and documented evidence and transparency. The disclaimer language in our engagement letter surrounding the fact that we are not a CPA firm was signed and agreed to by the City and subsequently mirrored in our report. We have been working with the City for almost one year and our draft report was released three months ago, and not once did the City question our competency or dispute any finding until this hearing.

THE COURT: Anything else?

THE WITNESS: Yes, Your Honor. We relied on the Alliance settlement agreement and will use other City and LAHSA documents to understand the scope of requirement under each of the city programs.

Any references we made to the Alliance settlement were to understand objectives, requirements, and metrics for our assessment, not to render a legal opinion on whether every term of that Alliance settlement had been met. So although compliance is inherent to the agreements, we were not retained to provide a legal opinion.

THE COURT: In just a moment I'm going to take your notes from you, so what's the next one?

THE WITNESS: Just a few quick more notes.



18

The City and LAHSA are subject to single audits that are conducted by independent auditors.  The primary purpose of a single audit is to ensure that the organization receiving federal funds are using them appropriately and in compliance with federal regulations.

During the course of our engagement, A&M reviewed single audits for both the City and LAHSA.  The single audits do not opine on the effectiveness of the organization's internal controls or effectiveness use of funds.  A&M's findings do not contradict single audit findings as our findings address the effective use of funds and operational issues.  We were not issuing an opinion on a finished product, like a financial statement.  We were quantifying financial data and issuing an opinion on processes.  We'd also like to clarify we met with LAHSA after March 27th hearing as well.

In relation to TLS, LAHSA and the City have not produced sufficient evidence to demonstrate that the counted beds were new or even created.  The key deficiencies underpinning that fact are, one, gaps in expenditure support.  For 70 percent of the contracts LAHSA originally flagged as creating those new beds, no spending detail was provided.  LAHSA later clarified to the press those beds were not funded -- not all those beds were funded by the City.

Two, reliable contract universe.  LAHSA released multiple conflicting contract lists.  The lists do not specify by contract how many slots were authorized, created, and actually utilized.

The inconsistent address list.  So the address or site roster supplied did not tie to the stated number of slots.  It omitted basics such as street addresses, even when they had move-in dates, and overlapped with sites under the Alliance settlement.

The structure of data fragmented, incomplete, and internally inconsistent creates a high risk of inaccuracies, including double counting, and prevents the City from reliably measuring its progress.  This weakness lies in record-keeping and not in the diligence of professionals attempting verification.

THE COURT:  Okay.  Now, I agree with Counsel.  There's no way that you can cross-examine without looking at these notes.  We're not going to go on with this witness for the time being.

In fact, I'm going to ask you to hand the Court your notes, and would you tear those out?

THE WITNESS:  Oh, yes.

THE COURT:  Well, I'll have you do it, because I --

Would you give those to Karlen?  Or I'll give



those to Karlen.

Karlen, would you make copies of these for all counsel.

And would you step down for a while?

Counsel, we're not going to go forward with this.  I agree.  Let's take a look at these notes.  This apparently is coming with her representation from her and her team reading these transcripts.  Before we go forward, let's all take a look at these, and I want to read them also.  I've heard them now, okay?

Do you have another witness that you can call?

MS. MITCHELL:  Sure.  We can put up Mr. Webster right now, Your Honor.

THE COURT:  All right.  Well, why don't I take a -- Is he here?

MS. MITCHELL:  Yep, he's right in front of you, Your Honor.

THE COURT:  All right.  Right in front of me.

Sir, the same oath applies that was previously administered, still applies.  I need you to retake the stand, please.

And, Karlen, I'll need --

I'll need copies of that if you want more copies given, Counsel.  In fact, Counsel, I'm going to make three copies for Gibson, Dunn because of the folks you have



involved.

MR. MCRAE:  Thank you.

THE COURT:  I'll make two copies for the other side.  In fact, you want four copies?

MR. MCRAE:  Sure, Your Honor.  Thank you.

THE COURT:  By the way, once again, I'll note for the record that all of those objections are objections that you would have made concerning this narrative on her part, to protect your record.  Fair enough?

MR. MCRAE:  Thank you, Your Honor.

THE COURT:  But it helps me just absorb it at one time, because when there's interruptions in the middle, I've got to understand this.

MR. MCRAE:  Thank you, Your Honor.

THE COURT:  I appreciate it.  Okay.  Good.

All right.  Sir, would you restate your name, just because we're on CourtSmart?

THE WITNESS:  Paul Webster.

THE COURT:  Thank you.

Counsel?

MS. MITCHELL:  Yes.  Thank you, Your Honor.

Whereupon,

PAUL WEBSTER

was called as a witness, and having been previously sworn, was examined and testified as follows:



22

DIRECT EXAMINATION

BY MS. MITCHELL:

Q     Mr. Webster, thank you for coming back. Hopefully, we'll keep this brief.

Showing you Exhibit 25.  This is a copy of the settlement agreement that was reached in this case. This was filed May 24th of 2022.  Were you involved in negotiating this settlement agreement on behalf of the Alliance?

A     Yes.

Q     And I know you testified earlier, but can you please state your position as it relates to the Alliance?

A     I'm the executive --

THE COURT:  Just a little slower.  Say that again, please.

MS. MITCHELL:  Yes, Your Honor.  Thank you.

BY MS. MITCHELL:

Q     Can you please state your position as it relates to the Alliance?

A     I'm the executive director of the L.A. Alliance for Human Rights.

Q     Now, in connection with this agreement, I'm going to show you, looks like page 10 of the exhibit, 3.1 and 3.2, Housing and Shelter for City Shelter

Appropriate Individuals.  Do you recall helping negotiate this section?

A    Yes, I do.

Q    Did the Alliance contract for commitments or for beds?

MR. MCRAE:  Objection.  Calls for legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Beds.

MR. MCRAE:  Objection.  Also lacks foundation.

THE COURT:  Overruled.

BY MS. MITCHELL:

Specifically referring to 3.1, do you recall the exact number that was identified by the City pursuant to 3.1, which was the shelter and/or housing capacity needed to accommodate 60 percent of unsheltered city shelter appropriate P.E.H. within the city?

MR. MCRAE:  Objection.  Vague.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  That number is 12,915 beds.

BY MS. MITCHELL:

Q    And that's the number that the City calculated; correct?

MR. MCRAE:  Objection.  Lacks foundation.



24

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MS. MITCHELL:

Q    And do you recall subsequently -- and I'm showing you Exhibit 24 -- do you recall the City providing to the Alliance its milestones and deadlines in order to reach that 12,915 bed number?

A    Yes, I recall.

Q    And when you were negotiating on behalf of the Alliance, along with your counsel, was it your understanding that the City's obligation to build 12,915 beds pursuant to these provided milestones and deadlines was optional?

MR. MCRAE:  Objection.  Lacks foundation.  Calls for legal conclusion.  Also, vague.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MS. MITCHELL:

Q    What is your recollection of what, based on the agreement, what the Alliance was intending to negotiate for in requiring these milestones and deadlines to be met pursuant to the agreement?

MR. MCRAE:  Objection.  Calls for legal conclusion.  Lacks foundation.  Also, vague.

THE COURT:  Overruled.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

THE WITNESS:  Our objective was to secure a commitment from the City of Los Angeles to create a specific number of beds that people experiencing homelessness would be able to benefit from in coming off of the streets and homeless encampments and other various situations so that they could become housed.

BY MS. MITCHELL:

Q    And was it ever the Alliance's intent or understanding in negotiating this agreement that the City could wait until the very end of the agreement, June 12th of 2027, to build or provide or create or obtain all 12,915 beds?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lacks foundation.  Vague.  And relevance. Also, improper hypothetical.

THE COURT:  Overruled.

THE WITNESS:  Absolutely not.

BY MS. MITCHELL:

Q    Why not?

A    Well, there was considerable conversation about how the City could actually meet the metric and at what rate over what period of time.  And, in fact, where these beds would be located throughout the city.  So there's another provision of the settlement.

MR. MCRAE:  Your Honor, objection.  This is

26

getting into settlement privilege, settlement communications.

THE COURT:  Overruled.  I think we've got Mr. Szabo's opinion concerning this document.  This gentleman can cast his opinion concerning this document.

Now, re-ask the question because it came in the middle of an answer.  And then finish your answer.

BY MS. MITCHELL:

Q   Why was establishment of milestones and deadlines important to the Alliance as opposed to waiting the full five years for the 12,915 beds to be created or provided?

MR. MCRAE:  Objection.  Lacks foundation.  Calls for a legal conclusion.  Also, vague.

THE COURT:  Overruled.

THE WITNESS:  Our concern and our objective was that the City could actually demonstrate progress toward the objective of creating a significant number of beds to help get people off of the street and out of homelessness.

BY MS. MITCHELL:

Q   Showing you page 13 of the exhibit, which is specifically sections 5.1 and 5.2, the milestones and deadlines.  Drawing your attention specifically to section 5.2, was it important to the Alliance in negotiating this agreement that the City created plans and developed those

milestones and deadlines for certain things?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Vague.  Also, lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  Absolutely.

BY MS. MITCHELL:

Q    Showing you the section at the end that states "the parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines."  Was it your understanding in negotiating on behalf of the Alliance that the City had an obligation to move rapidly in complying with these milestones and deadlines?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lacks foundation.  Vague particularly as to "rapidly."

THE COURT:  Overruled.

THE WITNESS:  Yes, we had hoped that we would see progress upon the first quarterly report submitted by the City.

BY MS. MITCHELL:

Q    And was there anything about these milestones and deadlines that the Alliance considered aspirational instead of mandatory?

MR. MCRAE:  Objection.  Vague.  Calls for a



legal conclusion.  Relevance.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MS. MITCHELL:

Q    Going back to 3.2, I'm going to change to yellow.  The section that talks about the City choosing any housing or shelter solution at its sole discretion on lines 7 and 8.  Do you see that?

A    Yes.

Q    Is there a caveat as to what the City's discretion -- when the City's discretion might be limited in section 3.2 from the Alliance's perspective?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lacks foundation.  Vague as to caveat.  Also, relevance.

THE COURT:  Overruled.

MR. MCRAE:  It's also incomplete hypothetical, Your Honor.

THE COURT:  You may answer the question.

THE WITNESS:  There is.

BY MS. MITCHELL:

Q    And what is that caveat, sir?

A    The caveat is the clause, "as long as the milestones are met."

Q    And was that important to the Alliance in



negotiating this agreement?

A    Absolutely.

Q    Why is that?

A    Well, because the Alliance wanted to provide the City with as much opportunity and discretion in carrying out their commitment to the settlement so that they could use any means available to them as long as those activities resulted in making progress towards the milestones and that these milestones were actually met.

Q    And so from the Alliance perspective, if the milestones were not met, what would occur?

MR. MCRAE:  Objection.  Calls for speculation. Calls for legal conclusion.  Relevance.  Also, vague.

THE COURT:  Overruled.

THE WITNESS:  Well, if the milestones were not met, then our objective was that we would call out the City in not meeting these specific commitments and that we could determine what action we could do with the City in order to expedite the creation of beds to eventually meet the milestones.

BY MS. MITCHELL:

Q    Was it the Alliance's position that if the milestones are not being met, then the City at that point would lose its discretion to choose any housing or shelter solution because it was, for example --



THE COURT:  Counselor, would you state that again?  Would you move closer to the Michael and state that again?

MS. MITCHELL:  Yes.  Sorry, Your Honor.

BY MS. MITCHELL:

Q    Was it the Alliance's position that if the City was not meeting its milestones for bed creation, the City would lose discretion to, for example, choose a housing or shelter solution if it was too slow, etcetera?

A    Correct.

MR. MCRAE:  Objection.  Calls for legal conclusions.  Lack of foundation.  It's vague.  I don't know what "et cetera" means.  Also, calls for speculation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  If I could continue.  I remember a conversation --

MS. MITCHELL:  I want to warn you, not a conversation with counsel, but if you're talking about the discussions overall, I think that's okay.

THE WITNESS:  Yeah.  I remember a conversation where I was --

MR. MCRAE:  Your Honor, this is also getting into settlement communications as well, so we're very concerned about privilege here.

THE COURT: Overruled. You can answer the question.

THE WITNESS: I recall a conversation where I was like, from my perspective as the Executive Director of the LA Alliance, I wanted to mandate that the City provide specific types of housing. In fact, I wanted to say, look, the history of the City's investment in permanent supportive housing being so expensive and taking so long to come online requires perhaps some kind of a mandate that they would use some other alternatives, whether they be increasing shelter beds or tiny home villages, safe parking, lots of other low cost and greater yield types of housing alternatives. And that was -- my concern for that didn't follow through. It was ended.

BY MS. MITCHELL:

Q    Because there was discretion that was afforded to the City; is that right?

A    That is correct.

MR. MCRAE: Objection, Your Honor. Leading.

THE WITNESS: Well, the settlement itself says at its sole discretion.

MS. MITCHELL: Hold on. Hold on, Paul.

THE COURT: Just a moment. Just re-ask the question, Counsel.

BY MS. MITCHELL:



Q    Okay.  You said it was ended, your desire to dictate to the City the types of housing or shelter solutions that it was going to put up was ended, and was it ended because the contract ultimately gave the City discretion as long as the milestones were met?

MR. MCRAE:  Objection.  Leading.  Also, vague. Borderline unintelligible, Your Honor.

THE COURT:  Overruled.  I consider both you and Mr. Szabo experts.  You're both involved in the negotiations.

You can answer the question.

THE WITNESS:  Thank you.

Yeah.  My concern ended because we wanted to balance the commitment of the City with its ability to exercise discretion in providing the beds and creating the beds.

BY MS. MITCHELL:

Q    Showing you, again, Section 5.2.  Was it your understanding from the Alliance's perspective in negotiating for 5.2 Romanet 2 and Romanet 4, which deal with encampments, encampment engagement, cleaning, and reduction, was it your understanding that the reduction of encampments would be a reduction of a more permanent nature?

MR. MCRAE:  Objection.  Calls for a legal



conclusion.  Lacks foundation.

THE COURT:  Overruled.

MR. MCRAE:  Also, vague, Your Honor.

THE COURT:  Thank you.  You may answer the question.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q    You were also involved in subsequent discussions with the City when the City failed to produce initially those encampment engagement, cleaning, and reduction milestones and deadlines in November of 2022; is that right?

A    That's correct.

Q    And subsequently, was the Alliance provided a plan by the City on how it was going to meet those milestones -- excuse me -- how it was the plan milestones and deadlines that the City provided in order to meet those requirements under 5.2 Romanets 2 and 4?

MR. MCRAE:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MS. MITCHELL:

Q    Showing you Exhibit 65, page 69 of 65.  This was Exhibit F that was attached.  Do you recognize this document?

34

         A    Yes, I do.

         Q    What is it?

         A    It is a description of the City's efforts to address and attempt to resolve homeless encampments.

         Q    Is this the plan that was provided to the Alliance, I think it was in the fall of 2023, attempting to comply with the City's obligations under Section 5.2 for encampments?

         MR. MCRAE:  Objection.  Lacks foundation.  Calls for a legal conclusion.

         THE COURT:  Overruled.

         THE WITNESS:  No.

BY MS. MITCHELL:

         Q    Please explain.

         THE COURT:  I'm sorry, Counselor.  Would you state that again?

         MS. MITCHELL:  I said, please explain.

         MR. MCRAE:  Objection.  Calls for a narrative, Your Honor.

         THE COURT:  Overruled.

         THE WITNESS:  So this document was presented to the Alliance as if it were a plan.  Upon our review of this document, we were not satisfied that there was actually a plan.  Instead, it was merely a description. Here's some of the things that we'd like to do, here's



35

some of the approaches that we'd like to use, but it wasn't anything that said, here's the number of encampments throughout the city that will be resolved, and here's the number by which per quarter we will meet that commitment.

BY MS. MITCHELL:

Q   I showed you the prior page.  I think I failed to show you the first page.  Now, I will ultimately direct you to the resolution portion, but I just wanted to be clear.  Do you recall, is there a date on this, or do you recall whether this was the first, second, third iteration of this plan?

A   I think this was the first.  I think this is one of the first iterations.  This is one of the first attempts by the City to provide a plan that would satisfy our concerns.

Q   Okay.  Showing you now page 68, the resolution section, do you see at the bottom of this section where the City does identify at least some numbers?

A   Yes.

Q   And what were those numbers that the City identified?

A   They identified two tent and makeshift shelter encampments, and I think at least three

36

encampments per month.

Q    And was the City unsatisfied -- excuse me. Was the Alliance unsatisfied with those numbers?

A    Absolutely unsatisfied.

Q    Why?

A    We've got, according to the point-in-time count, we've got, you know, 50,000 people that are experiencing unsheltered homelessness in Los Angeles County.  I think somewhere, yeah.  And the City offered to reduce encampments by 2 or 3 a month.  We just thought that was ridiculous.  It doesn't rise to the level of having any kind of substantive impact on the number of homeless encampments over 6 months or over the 5 years of the settlement.

MR. MCRAE:  Your Honor, I move to strike based on relevance grounds.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    Did the Alliance take issue with the manner in which the City was resolving the encampments or the number of encampments it intended to resolve at that time?

MR. MCRAE:  Objection.  Compound.  Vague.  Also, lacks foundation.

THE COURT:  Overruled.



37

THE WITNESS:  It was the number of encampments that they were proposing to resolve.

BY MS. MITCHELL:

Q    There was no objection by the Alliance to the manner in which the City was demonstrating it would resolve those encampments; is that right?

A    That's correct.

Q    By the way, at that time, did the City proffer a definition of encampment, the word encampments?

MR. MCRAE:  Objection.  Calls for legal conclusion.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MS. MITCHELL:

Q    Ultimately, do you know how the definition of encampments was reached?

A    Yes.

Q    How was it reached?

A    Well, we asked the City how many encampments they knew of in the city of L.A.

MR. MCRAE:  Objection, Your Honor.  Again, this is intruding on settlement discussions directly.

MS. MITCHELL:  I can ask a more specific question that might be easier, Your Honor.

BY MS. MITCHELL:

38

Q    Did you come up with the definition of how we are now counting encampments?

A    Yes.

Q    And how did you come up with it if there was no -- Well, let me ask this.  How did you come up with the definition of encampments?

A    I looked at the definition of encampment in LAHSA's point-in-time count report and noted that they included in the definition of encampments tents, makeshift shelters, RVs, cars.  And so we decided that that would be the definition since it was already being used by LAHSA to count the number of homeless encampments.

Q    And so there was a definitive number target that the Alliance could see on the LAHSA website of the numbers?

MR. MCRAE:  Objection.  Lack of foundation. Leading.  Vague.

THE COURT:  Overruled.

THE WITNESS:  Yeah.  LAHSA used that definition to come up with the estimate of unsheltered individuals and the number of homeless encampments for the 2022 point-in-time count.

BY MS. MITCHELL:

Q    Okay.  Now showing you Exhibit 114, the Alliance potential project list as of



November 9th of 2022.  Have you seen this?

A    Yes, I have.

Q    Did you add up all of the units that were proposed by the City as part of their potential project list as of November 9th of 2022?

A    I did.

Q    And how did you do that?  Did you use a calculator?

A    Well, I imported the PDF file into Excel and then I simply totaled up the column that runs -- that says total units and the column that says PSH/interim units.

Q    So to be more specific, referring to the last two columns, the total units, and the PSH/interim units; is that right?

A    That's correct.

Q    And what was the total number of beds that was included in this potential project list as of November 9th of 2022?

A    I think that the number of total units was somewhere around 10,000.  I'd refer to my notes, but I'm just going off of memory at this point.  So it's --

Q    Are you afraid to use your notes?

A    I'm just, you know, I don't want to bring any paper up here.  Who knows what might happen.

It's 10,500 or so, 10,600 or so. And now the difference between total units and PSH/interim units is that, like for example, if you look at line -- Well, if you look at the row that starts off CD7 at the top, if you go to total units, it'll say 34. It'll go to PSH/interim units, it'll say 33. Well, that indicates, in my professional opinion, that there's one unit in that development that is used for either some kind of a manager or somebody who's not experiencing homelessness. So that's why you have the difference in the two columns.

Q    Okay.

MR. MCRAE: Your Honor, move to strike. This is just speculation, Your Honor. Lack of foundation.

THE COURT: Overruled.

BY MS. MITCHELL:

Q    Okay. When you totaled the PSH/interim units, what was the total number, if you recall?

A    I want to say it was around 8,600 units. So there's about a 2,000 unit difference between the two columns.

Q    Okay.

MR. MCRAE: Objection --

THE COURT: Would you state that again a little bit more slowly?

THE WITNESS: I'm sorry. I think there was



about 8,600 total PSH/interim units.

MR. MCRAE:  Objection, Your Honor.  Relevance.
Move to strike.  This is from 3 years ago.

THE COURT:  Overruled.  It was November, 2022,
according to my notes.

THE WITNESS:  That's correct.

BY MS. MITCHELL:

Q    And to be clear, has the Alliance received
any updated bed plans since November, 2022, of how the
City intends to fulfill its obligations under the
agreement?

MR. MCRAE:  Objection.  Assumes facts.  Calls
for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MS. MITCHELL:

Q    Would looking at your notes refresh your
recollection regarding the exact number of permanent
supportive/interim units the City purported to make under
this potential project list?

A    It would.

MS. MITCHELL:  Your Honor, may I bring the notes
to the witness?

THE COURT:  Counsel, if you want to look at his
notes, please come on up.



MR. MCRAE:  Yes.

THE WITNESS:  Thank you.

BY MS. MITCHELL:

Q    So I want you to take a look at your notes and then look back up when you are ready and you have refreshed your recollection.

A    Uh-huh.

Q    And what was the total number of PSH/interim units the City purported to make under this agreement in compliance with its obligation to hit 12,915 beds?

MR. MCRAE:  Objection.  Mischaracterizes the evidence.  And also lacks foundation.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  The number that I calculated is 8,322.

THE COURT:  8,322?

THE WITNESS:  8,322.

THE COURT:  All right.  Thank you.

BY MS. MITCHELL:

Q    And did you subtract that number from the City's obligation of 12,915?

A    I did.

MR. MCRAE:  Objection.  Relevance.



43

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    And what was the delta or difference between the number it provided and 12,915?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  4,593 beds.

MS. MITCHELL:  May I have a moment, Your Honor?

THE COURT:  You may.

MS. MITCHELL:  I have no further questions of this witness at this time.

THE COURT:  Ms. Myers, do you have questions?

MS. MYERS:  Just a few, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MS. MYERS:

Q    Good morning, Mr. Webster.  Shayla Myers with the Legal Aid Foundation of Los Angeles on behalf of the interveners.

You had testified that the definition of encampments for purposes of the encampment reduction came from losses terms as used in the point-in-time count; correct?

A    That's correct.

Q    And the point-in-time count, what does the point-in-time count count?



A     Well, the point-in-time count counts total people experiencing homelessness.  It counts people experiencing unsheltered homelessness.  It counts number of people who are experiencing chronic homelessness.  It counts number of people who have a substance use disorder who are homeless.  It counts the number of people who are experiencing serious mental illness that are homeless.  It counts the demographics of people who are homeless, for example, their age, their race, whether or not they're veterans.  It counts a lot of things.

Q     Common in all of what you identified that's counted is that it counts people; correct?

A     Well, it does some other things as well. A companion to the point-in-time count is the housing inventory count that counts units and beds and shelter beds.

Q     But for purposes of what you were referring to at the point-in-time count, you weren't speaking about the point-in-time count that specifically counts people; correct?

A     That's correct.  The point-in-time count report ultimately reports the number of people.  Now -- and I'll stop there.

Q     And so for purposes of the use of the term tents, makeshift shelters, and vehicles that LAHSA uses

45

for purposes of the point-in-time count, that always is a stand-in for people; correct?

MR. MCRAE:  Objection.  Lack of foundation. Calls for legal conclusion.

THE COURT:  You can answer the question.

THE WITNESS:  Yeah.  So what the continuums of care are encouraged to do by the United States Department of Housing and Urban Development is to use estimators for how many people reside in a particular type of homeless situation, whether it be a tent, a car, an RV, or a makeshift shelter.

BY MS. MYERS:

Q    So I'm just going to move on to the encampment reduction plan.  The LA Alliance ultimately agreed to an encampment reduction plan set of milestones that the City put forth; correct?

A    That's correct.

Q    Okay.  And do you have a sense of what documents the LA Alliance agreed to constitute the encampment reduction plan?

MR. MCRAE:  Objection. Vague.

THE COURT:  You understand the question?

THE WITNESS:  I think so.

THE COURT:  Overruled.

THE WITNESS:  I think what you're getting at is



when the City and the Alliance came to an agreement to ultimately resolve 9,800 encampments throughout the city, the City produced a table. And I believe that table is included as an exhibit. And that table demonstrated the City's commitment to how many encampments per quarter it would resolve per council district.

BY MS. MYERS:

Q    And I'm going to show you what's been marked as Exhibit 65, and specifically I'm going to show you what's been marked as Exhibit 65, which is Exhibit J of Document 668.1, which was previously filed with this Court. Is this the table that you were previously referring to?

A    That's the one.

Q    And is this your understanding of what constituted the encampment reduction plan that the LA Alliance and the City agreed to?

MR. MCRAE: Objection. Calls for legal conclusion.

THE COURT: Overruled.

THE WITNESS: Correct.

BY MS. MYERS:

Q    And so this is the -- Were there any other documents as part of the LA Alliance's agreement to the encampment reduction plan?

MR. MCRAE: Objection. Calls for legal conclusion. Also, vague.

THE COURT: Overruled.

THE WITNESS: The two documents that I relied on as we were attempting -- Well, the three documents, excuse me, that I relied on to monitor the City's efforts in reducing encampments was the settlement agreement, the quarterly reports, and this table here.

BY MS. MYERS:

Q   And so I'm asking specifically just at the agreement stage related to the encampment reduction plan that the LA Alliance and the City entered into. So you previously said this is the table that you understood constituted the City's encampment reduction plan; correct?

MR. MCRAE: Objection. Calls for legal conclusion.

THE COURT: Overruled.

THE WITNESS: Correct.

BY MS. MYERS:

Q   Correct. And just to clarify, you were the signatory for the LA Alliance at the time of the approval. And I'm going to withdraw that.

At the time of the approval of the encampment reduction plan, were you responsible for entering into agreements on behalf of the LA Alliance as

48

the executive director?

A    Yes.

Q    So you had the authority for LA Alliance to enter into agreements with the City of Los Angeles related to the settlement agreement?

MS. MITCHELL:  Objection.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  I think it was our board chair, myself, our board.  I mean, are you asking me who signed the settlement agreement on behalf of the LA Alliance?

BY MS. MYERS:

Q    I'm speaking only about the encampment reduction plan.  So when this was approved in 2024, I'm asking who had the authority to sign off on the proposal between the LA Alliance and the City of Los Angeles related to the settlement?

MR. MCRAE:  Objection.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  I think, yeah, I had the authority to do so.

BY MS. MYERS:

Q    Okay.  And is this the agreement, is this the agreed upon encampment resolution plan that the LA



Alliance and the City agreed to?

A    Yes.

Q    Okay.  Did you sign, did you physically sign this agreement, this encampment reduction plan?

A    I don't believe I did.

Q    Did you submit the encampment reduction plan to the Court for approval?

A    Yes, I believe we did.

Q    When did you do that?

A    Oh, I couldn't tell you, off the top of my head.

Q    Was it filed publicly with the Court, do you know?

MS. MITCHELL:  Objection.  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  I believe it was.

BY MS. MYERS:

Q    Was the encampment reduction plan filed publicly with the Court as part of the Court's approval of the encampment reduction plan?

THE COURT:  You mean docketed?

MS. MYERS:  Docketed.

THE COURT:  I mean, publicly filed.  I've got a transparent website that we put up versus the docket,



including the docketing.

BY MS. MYERS:

Q    Publicly filed on the Court's docket for this case?

A    I don't know.

Q    Okay.  Did you ever receive a signed copy of the encampment reduction plan from the City of Los Angeles?

A    Not personally.

Q    Do you know if the LA Alliance received a signed copy of the encampment reduction plan?

A    Are you asking like signed by who?

Q    By the City of Los Angeles.

A    No, not that I can recall.  I don't think a lot of these documents were quote/unquote signed.

Q    Okay.  What was the goal of the LA Alliance litigation?

MR. MCRAE:  Objection.  Calls for speculation. Lack of foundation.  And relevance.

THE COURT:  That's pretty broad.

MS. MITCHELL:  I'm also going to object it's beyond the scope, Your Honor.

THE COURT:  Well, I'm not worried about the scope too much with this hearing, but that's pretty broad.

MS. MYERS:  Sure, Your Honor.



THE COURT:  Okay.

BY MS. MYERS:

Q    Were you involved in the filing of the -- I'll back up.

Are you aware of the LA Alliance's purpose in filing this litigation?

MR. MCRAE:  Objection.  Relevance, Your Honor.

THE COURT:  Yeah, not too much relevance, Counsel.

MS. MYERS:  Well, Your Honor, both the parties have been debating and discussing the LA Alliance's goals as part of the recitals for the settlement agreement and the import of that for purposes of this.  But I'll withdraw the question, Your Honor.

MR. MCRAE:  I know the question was withdrawn, but it's just not relevant to the obligations, Your Honor.

MS. MYERS:  And obviously, the LA Alliance has a different position with that.  But again, I will withdraw the question, Your Honor.  You know what, I'm done with this witness.  Thank you so much.

THE COURT:  Then on behalf of Gibbons and Dunn.

MR. ROTSTEIN:  Your Honor, can we have a 15-minute recess?

THE COURT:  Oh, absolutely.

MR. ROTSTEIN:  Thank you.



52

THE COURT:  Now, have you also received a copy of -- Excellent, you've got a copy.  Okay.  thank you very much.  Then we'll see you in 15 minutes, Counsel.  Thank you.

Once again, just like Mr. Szabo, you're welcome to talk to counsel.

(A recess was taken off the record.)

THE COURT:  Okay.  Now, Counsel, we're back in session.  Counsel, if you'd be seated.

If you'd be seated, sir.

And have you finished your direct?

MS. MITCHELL:  Yes, Your Honor.

We have another representative of the L.A. Alliance.  May he sit up in the witness stand?

THE COURT:  Absolutely.

MS. MITCHELL:  Thank you.

THE COURT:  Beside you or wherever.

By protocol, though, we turn to Ms. Myers next.  You finished?

MS. MYERS:  With Mr. Webster?  Yes, Your Honor.

THE COURT:  You're done.  Okay.

Counsel, then on behalf of Gibson, Dunn.

MR. ROTSTEIN:  Thank you.

Thank you, Your Honor.

CROSS-EXAMINATION



BY MR. ROTSTEIN:

Q    Sir, you didn't sign the Alliance settlement agreement on behalf of the Alliance, did you?

A    Nope.  I don't believe I did.

Q    That was Don Steyer, wasn't it?

A    That's correct.

Q    And he was the chairman at the time?

A    He is our board chair.

Q    You also had no involvement in the Roadmap Agreement; correct?

A    That's correct.

Q    You're not a lawyer, are you, sir?

A    No, sir.

Q    You do not know the impact of the words, subject to constitutional requirements and legal mandates, has on the language as the milestones are met?

MS. MITCHELL:  Objection.  Calls for a legal conclusion and potentially a privilege.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Could you repeat the question?

BY MR. ROTSTEIN:

Q    Sir, you do not know the impact of the words, subject to constitutional requirements and legal mandates, and what that has on the language as the



milestones are met?

A    I think I have a pretty good idea, but I can't speak as an attorney.

Q    Because you're not a lawyer; correct?

A    That's correct.

Q    Sir, "create" is not defined in the settlement agreement, is it?

A    No, I don't believe it is.

Q    And best efforts is not defined in the agreement either?

MS. MITCHELL:  Your Honor, I'd ask if we're asking specific questions about the settlement agreement, that Mr. Webster has an opportunity to actually look at the settlement agreement.

MR. ROTSTEIN:  Of course.  We can provide a hard copy.

THE COURT:  And you can put that up on the screen also, if you'd like to.

MR. ROTSTEIN:  Sure.  Exhibit 25.

BY MR. ROTSTEIN:

Q    Mr. Webster, let us know when you've had a chance to review, and I'm happy to repeat my question.

A    You want me to review the whole settlement right now?

THE COURT:  That's fine.  We've got time.

55

Counsel, are there any specific portions, or do you want him to look at the entire settlement?  He can look at the entire settlement, if you'd like.

MR. ROTSTEIN:  He can look at the entire settlement, but my question, Your Honor, was I wanted to confirm that create is not defined in the settlement agreement, the word create.

THE WITNESS:  Yeah, I don't think I need to review the whole thing to look for that specific term.  I don't believe it is in the settlement agreement.

BY MR. ROTSTEIN:

Q    And best efforts, that's not defined either; correct?

A    It's not in the definitions, no.

Q    And you know the City has not waited until June 14, 2027, or I'll say June 13, 2027, to start building beds; correct?

A    Absolutely, correct.

Q    In fact, the City has built thousands of beds, hasn't it?

A    They certainly have.

Q    And you know the City has provided quarterly reports for both bed count and encampment reduction since the settlement agreement was executed?

A    I do.

56

Q    And you personally never audited those quarterly reports, did you?

MS. MITCHELL:  Objection.  Vague as to "audit."

THE COURT:  If you understand that term.  Just a moment, Counsel.

THE WITNESS:  I reviewed all the quarterly reports.  Whether or not you want to say that it reaches the legal definition of audit, that's up to you.

BY MR. ROTSTEIN:

Q    Sir, you're not an auditor, are you?

A    I'm -- I don't need to be an auditor to read a table and make conclusions based on the information in the table.  And I can compare that table with commitments otherwise and determine if the reporting in the table is consistent with the commitment that was made earlier.

Q    Sir, you didn't audit any of the quarterly reports pursuant to any type of professional auditing standard?

A    I'm not an auditor, no.

Q    Thank you.  And the settlement agreement doesn't say that the City loses its discretion provided under the agreement if the milestones are not met?

MS. MITCHELL:  Objection.  Calls for a legal conclusion.  Misstates the testimony.  It's also vague and

confusing.

THE COURT:  You understand the question?

THE WITNESS:  I do.

THE COURT:  Overruled.

THE WITNESS:  No, it doesn't, but it does set forth a process by which the City and the plaintiffs would meet and confer and come to a reasonable conclusion, reasonable disposition.

BY MR. ROTSTEIN:

Q    And you understand that Exhibit 114 that you were shown -- we're happy to put it back on the screen --

A    I remember it.

Q    -- was a potential list?

THE COURT:  Was what, Counsel?

MR. ROTSTEIN:  A potential list.

HE WITNESS:  Yeah, that's what it says up at the top, "Potential Projects."

So when I read "Potential Projects," I make that distinction between what they are potentially going to do and what they are going to do.

Q    And that was prepared three years ago; correct?

A    That's correct.

Q    And Exhibit 114 is outdated.



MS. MITCHELL:  Objection.  Vague and ambiguous.

THE WITNESS:  I think it's not outdated because I can look at the quarterly reports.

THE COURT:  Just a moment.

THE WITNESS:  Apologize.

THE COURT:  Overruled.

Now you answer.

THE WITNESS:  Okay.  I can look at the quarterly reports and reflect what the City is reporting based on the quarterly reports based on this list and see what they've accomplished.  And actually that's been my practice as I receive the quarterly reports.  Quite cumbersome, I might admit.

BY MR. ROTSTEIN:

Q    Sir, turning back to Exhibit 25, you can't point to any language that says once the City creates a plan, it must create amended versions of that plan in the future.

A    No, I don't believe that's in the settlement agreement.

MR. ROTSTEIN:  Your Honor, can I have a moment to confer with my colleagues?

THE COURT:  Certainly.  Take your time.

MR. ROTSTEIN:  No further questions at this time.  Thank you.



59

THE COURT:  Okay.  Thank you, Counsel.

Counsel, is there anything further by any of the parties?

Otherwise, sir, you may step down.

MS. MITCHELL:  Nothing by the Plaintiffs, Your Honor.

THE COURT:  Ms. Myers?

MS. MYERS:  Nothing from the Interveners, Your Honor.

THE COURT:  Gibson, Dunn?

MR. ROTSTEIN:  Nothing, Your Honor.

THE COURT:  Okay.  Sir, thank you very much.

Now we're going to wait for just a moment.  I've distributed the notes from Ms. Frost, but the last page, the last line is cut off.  We're just redoing that for you and for the Court.

MR. ROTSTEIN:  Thank you.

THE COURT:  During the recess, I read through those.

MS. MITCHELL:  Thank you, Your Honor.  We can call another witness in the meantime.

THE COURT:  If you can, it would be appreciated.

MS. MITCHELL:  The Plaintiffs call Dewey Terry to the stand.

THE COURT:  Thank you.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

60

Thank you, sir.  Would you raise your right hand?  Do you swear the testimony you're about to give shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

THE COURT:  Thank you very much, sir.

And after you're seated, would you face the parties?  Would you state your full name, sir?

THE WITNESS:  My name is Dewey Stephen Terry.

THE COURT:  Would you spell your first name, sir?

THE WITNESS:  D-E-W-E-Y; Terry, T-E-R-R-Y.

THE COURT:  All right.  So Ms. Myers knows, the counsel knows, I've met this gentleman numerous times, always on Skid Row and usually as part of the community. I believe, from my memory, you may have been introduced to me through General Jeff, initially.  I hope that's a correct recollection.  I think for a while you worked with Alchemy?

THE WITNESS:  Yes.

THE COURT:  So he's one of the hundreds of people that I've met on the street, and I want the parties to know that.

Counsel?

Whereupon,

DEWEY TERRY

was called as a witness, and having been sworn, was

examined and testified as follows:

DIRECT EXAMINATION

BY MR. UMHOFER:

        Q    Matthew Umhofer on behalf of Plaintiff

L.A. Alliance.  Good morning, Mr. Terry.

        A    Good morning.

        Q    Mr. Terry, what do you do for a living?

        A    Right now I'm at a reentry for people

that's coming out of prison to acclimate them back into

the world.  My past was I worked for Urban Alchemy as a

supervisor for street clean, climate stations, and tiny

homes.

        Q    What's the name of the organization you

currently work for?

        A    That is Amity Foundation.

        Q    And Urban Alchemy, how long were you

there?

        A    I was there actually 4-and-a-half years,

from 2020 to 2024.

        Q    And what was your role at Urban Alchemy?

        A    I started as a street clean, 5:00 o'clock

in the morning until 2:00 in the afternoon.  And then I

changed and became a supervisor over about 36 people,



opening climate stations and continue to have the street team.

Q    And could you describe the mission of Urban Alchemy?

A    Our mission is to help the homeless as best as we can, keep the areas clean.  We created a climate station because of the hypothermia deaths that occurred in downtown for the Skid Row.  So that served as coffee, water, blankets, shoes, bags, and things like that, like a 24-hour bag if somebody is out on the street.

We also have an area on town where it's a safe zone for women at night to keep them from getting raped or beat up.  So that was a good thing to do for our clients.

Q    And where does Urban Alchemy get its funding?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  From the City.

BY MR. UMHOFER:

Q    How about Amity?

A    Amity is privately funded.

Q    Now, how long have you worked on Skid Row for?

A    Since 2020.  Seven days a week.  I have to

come down because due to the fact that there's a lot of things going on, I'm well respected because what we do out there, and so I'm informed of a lot of things. I get up at 5:00 a.m. -- I don't get paid for this. I get up at 5:00 in the morning to make sure that -- they call me when something happens. Okay.

So I'll come down and I'll walk around all of Skid Row from Central all the way to Los Angeles, all the way from 4th to about 8th to walk around that perimeter because that's basically where they have them inhibited into this area. Due to the fact that it's 24 hours -- Right? -- there's a lot of crime. There's a lot of death, a lot of drugs. Fentanyl deaths are prevalent.

Now I have -- I'll put it like this. I have families from Texas when that governor sent those buses here and they had nowhere to go. So they called me because they couldn't go by the parks because the parks didn't want them there. Okay. So we had to find a place to put the families.

Now the families were all women, all children and babies. So we had to make sure that they're safe. They had no tents. They had nothing but other than they were staying in the Union Mission for 30 days and then the Union Mission ran out of funding, put them on the street. So we just had to make that -- they're still

there.  The children are still there.  There is no children ever been down there since they brought those buses.  No children.  Children's service will come and get these children.  Children's service has not at all picked these children up.

Now, even though we try to house these individuals, it's hard to house them because once they're housed, they only get a certain amount of time and then they come back because they've run out of funding.  Now they don't have tents because they gave the tents up.  So we try our best to do the best we can as a nonprofit.  Right?  So it's a lot of nonprofits that come together to try to maintain some stability for the women and the children.  Those are the things that we do.

Q    The location on town, what are the cross streets that intersect the area that you've created as a safe zone?

A    From 5th to 6th.

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.

You can answer the question, sir.

THE WITNESS:  5th and 6th in town.  That's the cross streets.

BY MR. UMHOFER:

Q    What have you done to make that area safe



65

for women and children?

MS. KAOUNIS:  Same objection.

THE COURT:  Overruled.

You can answer the question, sir.

THE WITNESS:  Well, we clean it up so it's -- You have to understand, you know, dysentery.  Dysentery can get you sick.  Okay.  There's a community center, but you still have dysentery.  So we make sure that it's clean.  We give them water holes, let them wash it down, give them chemicals to wash it down.  If they don't have any blankets, you know, we provide.  We've provided over 15,000 blankets since I've been there.

There was -- actually we used to do the count, count the tents in that area at one time.  So I would walk around and others would walk around and we'd do every street in there.  That means we start from Central to Ceres to Stanford, Gladys, Wall, Maple, all the way to Los Angeles.  We count them tents.  On every street, we count those tents, even on Wall.  Now, I go all the way to 4th Street and count.

And you know, 4th is a predominantly business area, but they do have tents.  This is where I found a man on Boyd in a box, and the weather was, like, 32 degrees.  So you know, I went to the box.  "Hey, man, you got to get up," you know, and found the man.  The man was froze to

66

death like a chicken.

And so we were with the city sanitation at that time helping to throw the trash in there.  Matter of fact, there's 7.5 tons of trash every day, 2 times a day.  All right?

So you could tell how dirty it gets because when you do that, you don't know what's going on.  People laying in wet clothes, living in tents with rats, got their kids in there.  They don't have anything, and you make a sub-living person because they can't work because they don't have ID.

Today, they're still there.  That's not saying that LAHSA hasn't been there; right?  But they're not housed.  So I got kids over there, and what are they to do?  Whose responsibility actually is it?  That's the question that we say because we don't see the money.  We don't get any money from the City.

We do the job every other Sunday.  We passed out 50,000 red bags.  We have donors that spend millions of dollars to do that so that people have something.

So it's a question of, to us, to me, really, why do we still have women that's getting raped, older women; right?  They have to come on that street to sleep.  The only reason that nobody messes with them, we got 24-hour staff there.  It is not our job.  That's LAPD's job.  But

LAPD got other things to do because you're in the most dangerous spot in Los Angeles is Skid Row.  No matter what it is, they're out there with nothing.  Nobody cares.  We feel that -- I feel that nobody cares.  They only do less care.  Less care is just less.  No care is bad.  But less care is put in the category with me as you're not doing your job.  So we do the best we can with the 20-something nonprofits that come down there.

And it's hard to see my politician, the people I vote for, come down, do a 30-second commercial, and go.

Now, I will say I've had Mrs. Adams down there. I've walked with her, showed her everything it is to be down there.  She got one child.  They went 30 days, and then I seen them again.  Then I had to get a tent for them.

There's no shame of the city or the county, I'll say it like that, that they're not --  whatever money they spend, is not trickling down for housing down there.

Also, I worked for the SROs.  The SROs is where they'll house people off the street.  They don't get care. Once they come out of the tent, they put them in the room. And when you go to one of those rooms -- and I was an inspector, so I went to 18 buildings downtown Los Angeles every night except Saturday and Sunday and I seen -- the only reason you know that the person was in the

building -- this is the truth, this is not hearsay.  I'm a eyewitness to it.  They put a blue tag on there.  That blue tag reminds you that somebody died in there.  Now, either they died from an overdose or either they died from old age.  But there's no one going around in that building to check on them, okay?

And they have psychs in there.  But here's a psych that might have 150 people.  Do you think that they're going to see 150 people every day?  Because that's what you've got to do because it changes every moment.  Skid Row changes every moment.  There is no policy, there is no plan to get Skid Row the way it needs to be, and there's not enough soldiers or people on the street to help it.  We can only put what we can for the people out there.  That's the issue that we have on Skid Row.

BY MR. UMHOFER:

Q    Since the beginning of 2023, have you been on Skid Row on a weekly basis?

A    Yes, seven days.

Q    Have you had the opportunity during that time period to observe the policies of the City and its impact on the residents of Skid Row?

MS. KAOUNIS:  Objection.  Relevance.  Foundation.

THE COURT:  Overruled.



You may answer.

THE WITNESS:  Yes.

BY MR. UMHOFER:

Q    And are you familiar with a program called Inside Safe?

A    Yes.

Q    Have you been able to observe the effect that Inside Safe is having on Skid Row based on your weekly to daily observations of Skid Row?

MS. KAOUNIS:  Objection.  Relevance. Foundation.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Yes.

BY MR. UMHOFER:

Q    And what is the impact that you have observed of Inside Safe on Skid Row since January of 2023?

MS. KAOUNIS:  Same objections.

THE COURT:  Overruled.

Can you answer, sir?

THE WITNESS:  Well, let's say it like this, this truth.  You might pick somebody and then park their car. They just got these (inaudible) down there -- Okay?  -- but they won't stay.  Okay?  They're back on the street. So here it is, even places to stay, they're back on the



street because it's temporary.  It's not permanent.

Most people got it crooked as it's permanent when they put somebody in there.  No, it's not.  Because they don't have enough facilities for them to put them in there, okay.  So you can spend a month, you can spend three weeks, you can spend 72 hours.  You're back on the street.

When I go around there and look, I see the same people since 2020 or they built some new stuff, the Wesley, you know, they built some new stuff, and it's being mismanaged.  Because they're just putting -- at the Cesar Hotel, it looks like a travesty.  You know, one flew over the cuckoo's nest.  As soon as you see it, you see them in there, and they smoke the base pipes, everything, got the people, the security sitting right there like it's nothing.

See, what disturbs us is nobody's taking any responsibility to oversee.  That's the number one thing, oversee what they're doing and where this money's going, because those people laying on that street right there, in them boxes, in them wet tents, with them kids, with their wet stuff, if we don't give them what they need, they won't get it.

And then you don't want them to start doing this.  And I said it earlier, you're making a sub-



workforce.  That means that they'll go down there and stand on the corner just to feed their kids and sell strawberries and flowers.  And that's the closest place to it.  Or this is the baddest thing.  You're pushing a woman that got 5 kids to do something that she don't want to do to feed her kids.  There's nothing down there.

The fire, that's why the 10 freeway caught on fire.  You know why the 10 freeway caught on fire?  Because they got a subject -- you think that's bad.  They're over there with wood and everything else trying to stay warm.  So the City took off all the steel cans because they used to take the steel cans like in the movie, put the wood in there and burn it to stay warm.  Okay.

If you don't want nobody down on Skid Row, let me tell you what happens when Skid Row takes care of its business.  They'll burn you up in your tent, or you burn your tent up.  Okay?  I've heard women screaming in the tent.  Right?  I can't do anything about it.  Screaming in the tent, and here come 5 or 6 people out of the tent with a smile on there, and she's walking down the street butt naked.

Or they have a mental situation, because everybody down there has trauma, even the people that work down there, because they see what's going on.  Right.

That they'll be walking nude until the LAPD stops them from getting in where they sell the diamonds and the gold. They'll turn them around, because they know who they are, and they start talking to themselves. This is what we look at when you have an overdose in the mind and the trauma, where they start walking around, talking to themselves, and there's no psychs that come down there.

We provide psychs. We get people to come down from the city and say, "Hey, we'll join with us so we can deal with it."

We have a wound team -- Okay? -- that comes down that was provided for us that takes care of all kinds of wounds. If you had a heart attack, they could take care of it.

Now, when you use certain drugs, some of those drugs eat the muscle off your body. Okay. So I know a lady, whole back arm gone. You can see the bone. Do you think that she went to the hospital after they let her go? No. She went to the nearest tent to shoot some dope. If we didn't have a wound team, then everybody that's down there that has big, swollen feet, cuts, been beat up or stabbed at night, they'd be dead.

I've heard in court that there's eight people dying on Skid Row, and nobody -- everybody was on their phones. They're not paying attention to humanity. That's

one thing about this, humanity.  They don't have it.  If it don't mess with you, it's not your business.

The City is responsible.  The county is responsible.  The politician is responsible because they took an oath to take care of the people in their cities.  And right now, we've got less care.  That's a bad thing.  You guys can say anything you want to say, but I've never seen anybody.

I'll tell you, you know what?  I did a commercial for Rick Caruso.  He didn't win.  I had Catherine Barger down there, walked around all the time.  She acts upon it, but have I seen anybody from any of them other districts?  No, because they don't care.  They'll stay over there on the other side of East L.A. past the bridge.  They just don't care.

Now, we're here.  To me, I've been coming because it hurts me to see.  I don't want no child.  You wouldn't want a child to look at you and say he didn't even help me.  You don't want a woman that's been beat up, black eyes, broke ribs, busts in the head.  I've seen them all, ran over by cars, everything.  You see it on TV.  But I haven't seen anybody that was concerned to push, to push to help the people.

The City has to have property to put the people.  You have to have tiny homes to put the people.  You've got

to have permanent housing after you put them in there.

May I say this?

THE COURT:  Let's get a question.  I've allowed a narrative.  Ask a question.

BY MR. UMHOFER:

Q    Have you seen and or observed a substantial reduction in homelessness on Skid Row since January of 2023?

A    No.

MS. KAOUNIS:  Objection.  Foundation.

THE COURT:  Overruled.

BY MR. UMHOFER:

Q    Have you observed an increase?

MS. KAOUNIS:  And vague.  Same objections.

THE COURT:  Slow down.

Re-ask the question.  Wait for your answer. Let's get the objection and see if you can answer.

Okay.  Start again.

BY MR. UMHOFER:

Q    Have you observed on Skid Row a substantial reduction in the amount of homelessness since January of 2023?  I'm going to ask you to pause for a moment so counsel can object.

MS. KAOUNIS:  Objection.  Vague.  Foundation.

THE COURT:  Overruled.



75

            Now you can answer.

            THE WITNESS:  No.

BY MR. UMHOFER:

       Q     Have you observed an increase in
homelessness in Skid Row since January of 2023?  Pause.

            MS. KAOUNIS:  Objection.  Foundation.
Relevance.  Vague.

            THE COURT:  Overruled.

            THE WITNESS:  Yes.

BY MR. UMHOFER:

       Q     Has the mayor -- have you observed the
mayor visit Skid Row during her administration?

            MS. KAOUNIS:  Objection.  Foundation.
Relevance.

            THE COURT:  (Inaudible) I'm going to sustain
that objection.

BY MR. UMHOFER:

       Q     Have you had a chance to learn about the
A&M audit assessment that was done in this case?

            MS. KAOUNIS:  Objection.  Foundation.  Vague.
Relevance.  Calls for an expert opinion.

            THE COURT:  Overruled.

            THE WITNESS:  Yes.

BY MR. UMHOFER:

       Q     What do you know about that audit?



MS. KAOUNIS: Objection. Foundation. Calls for an expert opinion. Calls for a narrative. Hearsay.

THE COURT: Overruled.

THE WITNESS: My understanding in layman's terms is that the company that's responsible for taking care of the housing and the people in Skid Row and other places needed to change drastically because there was less care. They weren't around. People are steadily coming. They're being displaced from other areas, and this is the only place that they can come where you don't get messed with.

So when they talk about LAHSA, LAHSA was -- and I've talked to every woman that ever came down there and talked to somebody and they were still there. Maybe one or two will be gone but they will be back.

I talked to Mrs. Adams. That was the first time I've ever seen her and took her around and let her see what they do. And after that, they had five or six teams out there after L.A. Times did a piece on it. Other than that, when the heat is not on them, you don't see them.

So people depend on this. They never had an office down there so people can go. They don't have an office. They do have one now where you can go see a psych. Right. But other than that, they're still living the same way every day.

I would invite you to come down and see for

yourself.  You can evaluate it yourself.  You know, that's one thing about it.  Can I say it?  I need permission from the Court to say this.  If you don't come and see what's going on, how are you going to let somebody tell you what's going on?  Because you don't see the harm that is being done.

The only time that you see these people with a smile on their face is when they're eating or somebody is giving them something or somebody is helping them.  You know, other than that, I have not seen.

If all these billion dollars was being spent, there shouldn't be nobody in Los Angeles homeless.  Because they should have places to go.  Once you house them in a tiny home, it's not to stay there no three or four years.  You're trying to acclimate people back into life.

Some people, most of everybody down there got mental health problems and drug problems.  That's prevalent down there.  Where do you put them?  Who takes care of them after the fact that you put them in a tiny home or SRO?  They don't do that.  And that's what I see.  And it hurts us because I see the same person.  You got to go to jail.  You got to go to prison to come out and get yourself clean.  But as far as the City and them providing places like that, it looks good on paper.  It looks good

because they got a building.  But there's nobody there.

THE COURT:  Counsel, question?

MS. KAOUNIS:  Your Honor, I'm going to just renew my objection on relevance and foundation and move to strike.

THE COURT:  Overruled.

BY MR. UMHOFER:

Q    Based on your observations at Skid Row since 2020, do you have an opinion as to whether the homelessness services system in Los Angeles is broken?

MS. KAOUNIS:  Relevance.  Foundation.  Calls for expert opinion.

THE COURT:  I'm not sure foundationally if he's familiar with some of the areas like Figueroa, Broadway, Central, you know, the Valley.  And when you say Los Angeles, I'm a little concerned.

MR. UMHOFER:  I will limit my question to Skid Row.

THE COURT:  My relationship and meetings with this gentleman have strictly been on Skid Row, although there may be others who have accompanied me in different parts of the city.  I don't think it was this gentleman.

MR. UMHOFER:  I'll ask the question differently, Your Honor.

BY MR. UMHOFER:



Q      Based on your observations of Skid Row, do you have an opinion about whether the homelessness services system for Skid Row in Los Angeles is broken?

MS. KAOUNIS:  Objection.  Relevance.  Vague. Calls for an expert opinion.  Foundation.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Yes.  It's broken.

BY MR. UMHOFER:

Q      And why do you say that?

A      Because there's less care.  We do not see or have knowledge of any other facility unless it's the Midnight Mission, the Douglas, the Fred Jordan, and the Union.  Other than that, you will get all other help from nonprofits and people with concern, churches, and things like that.

You will see the city trash people come through and clean up every other street on a certain day; right?  But they move right back.  As soon as they clean up, they move right back to the spot, okay?  If they're not there, take their tip.  We'll get them another one.

So those are the things that we look at because, see, you've got to be down there every day because there's a lot of things that's going on.  There's a lot of things that's not being done.  And what's not

being done is they're not moving the people quickly up out of the situation.  They're not giving them mental and guidance to keep them in the places that they got.  The funding might run out.  You've got to go, okay?  And they're back on the street.  So it's all the time the person that's on the street is an either/or situation.  You win a little while, you lose, you come back to the street, you try to talk to somebody to get it.

Some people, and I'm not saying this to be funny, some people are lucky where they're housed and they look better than what they were doing, okay?  That's some people.  But the majority of people today that's on Skid Row right now are in the same areas where they was when I started in 2020.  It dissipates.  Everything is ran into Skid Row.  They keep them in that square box.  They maintain that situation where they're there, and it's not cleaned up.

Q    Who's the they?

A    Well --

MS. KAOUNIS:  Objection.  Vague.  Foundation. Relevance.

THE COURT:  I missed the question.  What was the question?

MR. UMHOFER:  The witness just said the word they.  I asked who he meant by the word they.

81

THE COURT:  Overruled.

THE WITNESS:  Can I answer?

THE COURT:  Please.

THE WITNESS:  LAPD keep them in a square circle. You're not going up, like I said earlier in the testimony, you're not going up over past Broadway and put a tent. They're going to run you out of there.  You're not going up here.  They used to be over in front of the mayor's, in that park right there.  Right?  They're gone.  Right?  But they push them where they can watch them and keep everything down.  There's nobody pushing them in an area where they can live and thrive.  That's the question. That's the answer.  That's the remedy.  It's been going on before I came.

The only reason I stay like that, I'm more concerned for the women and the children, because you've got 70-year-old women, 50-year-old women.  You've got young girls that's out there and they're being taken advantage of.  And if somebody don't stand up and you turn your back, you're just helping them.

And that's how it is.  It's a vicious little situation that I think that if whatever mayor, whatever governor really want to make a statement, if you can dwindle down, and I mean dwindle down the homeless out here, you could be a pattern for somebody else.  That's

what we hope for.

But they don't come to the people that's doing the work.  They come to the people that speak good for their 30 seconds, and they get the money.  And then when they get the money, the money's being misused.  Okay?  We don't see it.

You can go to anybody on Skid Row and, you know, I look at people and your eyes tell on you.  Your eyes tell on you.  That's why your mother told you to look at me.  And I can see people in here that have discontent for, you know, just going through the motions.  That's not good.

THE COURT:  Counsel, question?

MR. UMHOFER:  May I have a moment, Your Honor?

THE COURT:  Yes.

MS. KAOUNIS:  Your Honor, I'm going to move to strike as nonresponsive.  I think the question was who is they.

THE COURT:  All right.  Thank you.

Overruled.

BY MR. UMHOFER:

Q    And at any point, has the mayor of Los Angeles, Karen Bass, come to you to ask you what might be done to help the people in Skid Row?

A    Not at all.



83

MS. KAOUNIS:  Objection.  Relevance.  Hearsay.

THE COURT:  I'm worried about that line of questioning.  I've already heard another name, and I'm just worried about the politics of that, quite frankly.  I don't think this is a question.  Let me sustain the objection.

MR. UMHOFER:  Question withdrawn.  No further questions.

THE COURT:  Thank you.

Ms. Myers?

MS. MYERS:  That's okay.  I don't have any questions for this witness.

THE COURT:  All right.  Thank you.

And Gibson, Dunn?

CROSS-EXAMINATION

BY MS. KAOUNIS:

Q    Good morning, Mr. Dewey.

A    Good morning.

Q    First of all, I'll say thank you for your volunteering and doing the work that you do.

A    Thank you.

Q    You were employed by Urban Alchemy; is that correct?

A    Yes, miss.

Q    And what position did you hold there?


HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

A     Supervisor.

Q     Okay.  And Urban Alchemy was not a signatory to the settlement agreement between the Alliance and the City of Los Angeles; is that right?

A     I don't know, miss.  I couldn't answer that question.

Q     Okay.  You were not a signatory to the settlement agreement; correct?

A     No.

Q     And you did not negotiate the settlement agreement; correct?

A     No, I didn't.

Q     And you are aware that the City has two more years under the settlement agreement to fulfill its obligations; right?

A     Yes.

Q     And you're not a signatory to the roadmap agreement between the City and County; right?

A     No, I'm not.

Q     And your organization, or your former organization, I should say, Urban Alchemy, also was not a party to that agreement; correct?

A     I could not speak upon that, miss.

Q     Okay.  And you didn't negotiate that agreement either; correct?



85

A     No, I didn't.

Q     You testified that Skid Row was the most dangerous spot in Los Angeles.  Do you recall that testimony?

A     Yes, Miss.

Q     So you'd agree that Skid Row is a unique place; right?

A     Yes, it is.

Q     And you'd agree that there are a lot of unhoused people in Los Angeles that don't live on Skid Row; right?

A     Yes.

Q     And you'd agree that a housing proposal that might work in one part of the city might not work in another part; right?

A     I disagree.

Q     You do agree or you disagree?

A     I disagree.

Q     And why is that?

A     Because they're all on housing.  It's just the way you implement your housing policy, and the policy is no good.  As I spoke earlier, Skid Row and other places where people are unhoused, it changes every day.  Every day, every second, every moment, it changes.

Q     And to be clear, you haven't seen any

other unhoused parts of the city except for Skid Row; correct?

A    Unhoused?  I've seen a lot of places around in the lower part of Los Angeles that's unhoused. You can go over there on Avalon and down below Rosecrant. They've got little (inaudible) all day long down there, people living in and discharging feces and stuff in the street.

Q    Have you seen the unhoused people that live in front of Castelli Mare on PCH?

A    No, I haven't.

Q    Have you seen the unhoused people that live on the Venice Boardwalk?

A    There is no more.

Q    Did you see them when they were there?

A    Yes, miss.

Q    Have you seen people in Canoga Park?

A    No, I haven't been that far.

MS. KAOUNIS:  That's all I have.  Thank you.

THE WITNESS:  Mm-hmm.

THE COURT:  Redirect?

MR. UMHOFER:  Nothing further, Your Honor.

THE COURT:  Any questions by any counsel?

Ms. Myers?

MS. MYERS:  No, Your Honor.  Thank you.



THE COURT:  None.

All right.  So thank you very much.  You may step down.

THE WITNESS:  Thank you, sir.

THE COURT:  Your next witness, please.

MS. MITCHELL:  Your Honor, there are three remaining witnesses.  Obviously, Ms. Frost.  It would be my preference to continue with her if we're permitted to do that at this time.

THE COURT:  I want to make sure --

MR. MCRAE:  I'm ready.

THE COURT:  Are you ready?

MR. MCRAE:  I'm ready.

THE COURT:  All right then.

MS. MITCHELL:  May I have a moment to get set up, Your Honor?

THE COURT:  Sure.  Let's make sure you finish your questions, then turn to Ms. Myers if she has questions next, and then back to Gibson, Dunn.

Ms. Frost, if you would retake the stand.  And I need the bottom -- Oh, thank you.  I can't see it up there.  So if they'd be kind of --

MR. MCRAE:  Your Honor, can I confer with plaintiff's counsel for a second?

(Pause)



88

MR. MCRAE:  Your Honor, can I confer with plaintiff's counsel?

THE COURT:  Absolutely.  Please.

And if you'd please be seated.  Thank you.  I can't see it when you put it there.

Counsel, we're going to give you the last page. I need multiple copies of this.

So, Counsel, do all of you have the last page, the last line?

MR. UMHOFER:  We do, Your Honor.  We do.

THE COURT:  All right.  Thank you.

Do you folks have enough copies?  We tried to make three or four for you for Gibson, Dunn.

MR. MCRAE:  Yes, Your Honor.  We have the last page, and thank you for that.

MS. MITCHELL:  May I proceed, Your Honor?

THE COURT:  Please.

Whereupon,

                    LAURA FROST

was called as a witness, and having been previously sworn, was examined and testified as follows:

                REDIRECT EXAMINATION

BY MS. MITCHELL:

        Q    Now, I want to address some of the clarifications that you had, and I appreciate you sharing



your notes with us, even though I'm not sure --

MR. MCRAE:  Your Honor, I'm sorry.  When we broke, the witness had been tendered.

MS. MITCHELL:  No.

MR. MCRAE:  That was my understanding, is that the exam was over, and that's why the Court said that we should have an opportunity to review the notes so that we could proceed with examination.  Is she being re -- Is redirect being reopened?

MS. MITCHELL:  I'm sorry.  I never tendered the witness, Your Honor.  I think we had the witness step off the stand so we could get a copy of the notes, and we could all evaluate that.  At no point did I say no further questions.

THE COURT:  Regardless, there's been no interruption by either party.  What's the prejudice?  What's the concern here?  All right.

Counsel, your questions.

MS. MITCHELL:  Thank you, Your Honor.

THE COURT:  We're okay with the time, Counsel.

MS. MITCHELL:  Thank you, Your Honor.

BY MS. MITCHELL:

Q    So I am referring to your -- The notes that you provided in the clarifications that we went through this morning, and I just have a couple follow-up

90

questions for you.  Do you have a copy of your notes in front of you?

A    I do, yes.

Q    Okay.  I'm doing my best to read your handwriting, so if I say something wrong, Ms. Frost, please correct me.  But there's a statement on there on page 2, and I will read from it.  "However, it does not mean that we did not follow similar professional standards.  Period.  Our engagement was executed with the same principles of objectivity" --

THE COURT:  Just a moment, Counsel.  Would you put that up on the Elmo, please?

MS. MITCHELL:  Oh, sure.  This one has my notes, Your Honor.  I'm going to switch them out for a different one.

THE COURT:  All right.  Thank you, Counsel.

MS. MITCHELL:  Okay.  And I've zoomed in a bit so that we can all see it.

So if I can continue, Your Honor.

THE COURT:  You may.

BY MS. MITCHELL:

Q    "The same principles of objectivity, due professional care, integrity, and documented evidence and transparency."

Now, my question to you, because you have



this statement in here, it doesn't mean that we didn't follow similar professional standards.  And I just want to confirm, you, in fact, A&M, did follow the professional standards of objectivity, professional care, integrity, documented evidence, and transparency?

A    Correct.

Q    Okay.

MR. MCRAE:  Objection.  Vague and lack of foundation.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    Turning to the next page, there's a statement in here, and this is on page 3.  "We also met with LAHSA after March 27th," and I think March 27th was the hearing date.  Is that the reference?

A    Correct.

Q    Thank you.  Did you also meet with the City after March 27th?

A    Yes.

Q    Did you also meet with the county or representatives from the county after March 27th?

A    Yes.

Q    Did you also meet with plaintiffs after March 27th?

A    Yes.



Q     And did you also meet with interveners after March 27th?

A     Yes.

Q     Did you meet with anybody else in relation to the assessment provided by A&M after March 27th?  In relation to?

A     No, no additional.  I think that's all the parties that we met with in relation to this report.

Q     And did any of those meetings include supplemental documentation provided to A&M?

MR. MCRAE:  Objection.  Vague and hearsay and lack of foundation.

THE COURT:  Overruled.

You can answer the question, please.

THE WITNESS:  No, I do not recall any supplemental documentation being provided to our team.

BY MS. MITCHELL:

Q     And did any of those meetings or conversations that you had after March 27th change, materially change, any of the findings or conclusions made by A&M?

MR. MCRAE:  Objection.  Vague and relevance.

THE COURT:  Overruled.

THE WITNESS:  Oh, wait, sorry.  May I just circle back to that question, Ms. Mitchell?  I believe we



did receive supplemental documentation from the interveners. But, sorry, I just wanted to make that clear.

BY MS. MITCHELL:

Q    Thank you for that clarification. My question to you is, did any of the conversations, and now I will add, or supplemental documentation, materially change any of the findings from A&M in the assessment?

MR. MCRAE: Same objections.

THE WITNESS: No.

THE COURT: I'm sorry, overruled. \

And you can answer the question, please.

THE WITNESS: No.

BY MS. MITCHELL:

Q    All right. I'm going to move to the next section, this next paragraph, which specifically deals with the TLS funding. Now, section number one, you have them numbered under the key deficiencies underpinning that fact.

Let me back up, Your Honor, so that the record is clear. I'm just going to read this portion into the record. You have a statement, "in relation to TLS, LAHSA and the City have not produced sufficient evidence to demonstrate that counted beds were new or even created." Did I read that correctly?

A    Correct.

Q    "The key deficiencies underpinning that fact are," and then you have three separate delineated sections; is that right?

A    Correct.

Q    The first one says, gaps in expenditure support.  Can you read -- well, actually, I think you already did read this into the record, so I will just ask the clarifying question.

For 70 percent of the contracts that showed no expenditures, is it your understanding that those 70 percent of expenditures that did not show -- excuse me, let me withdraw and rephrase, Your Honor.

Is it your understanding that for the 70 percent of the TLS contracts that had no expenditures, that those contracts were dedicated to TLS beds funded by different organizations?

MR. MCRAE:  Objection.  Lack of foundation.  Calls for a legal conclusion.  Relevance.  Also, mischaracterizes Exhibit 23.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  I apologize, Ms. Mitchell.  Can you please repeat your question?

BY MS. MITCHELL:

Q    Yeah, I'm just trying to further understand this subsection number one.  And you have this statement, 70 percent of the contracts LAHSA flagged as creating new beds/no spending detail was provided.  LAHSA later clarified to the press those beds were not funded by the City.

And my question to you is on that second sentence.  Is it your understanding that for those 70 percent of contracts that showed no expenditures, is it your understanding that those were for the beds not funded by the City?

MR. MCRAE:  Objection.  Unintelligible.  It's compound.  Vague.

THE COURT:  I'm not sure I understand the question, Counsel.

MS. MITCHELL:  Well, and I'm not sure I understand the statement, so I'll try to clarify.

BY MS. MITCHELL:

Q    What do you mean when you say LAHSA later clarified to the press those beds were not funded by the City?  What does that mean?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  Overruled.

You can answer that question.

THE WITNESS:  We wanted to obtain an



understanding of what the City funded in relation to the TLS beds that were counted under roadmap. We asked LAHSA, "Can you please produce a list of contracts that pertain to those scattered sites?"

They produced a list of approximately 95 contracts.

From that list, we looked at the accounting data that LAHSA produced. And from that list, we did not identify expenditure data from fiscal year 23 and 24 for those contracts that LAHSA identified as related to those beds. LAHSA later clarified the City did not fund all of those beds.

BY MS. MITCHELL:

Q   Now, showing you still on page 3 regarding the TLS findings, I think we covered number 2 sufficiently in your direct examination originally, so I'll move to number 3, which states inconsistent -- I'm sorry, can you read that first line for me?

A   Absolutely. Inconsistent address list. The addresses or site roster supplied do not tie to the stated number of slots. Sorry, I apologize. I think I went to the next line.

Q   No, no, I appreciate that. The writing just gets small, so I appreciate your help, Ms. Frost. So I want to start with, did you ask for a list of addresses

that were tied to the TLS bed slots under roadmap?

MR. MCRAE: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: Yes, we did.

BY MS. MITCHELL:

Q    And were you provided the list of addresses?

MR. MCRAE: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: Yes, LAHSA produced that data to us.

BY MS. MITCHELL:

Q    Okay. So what do you mean when you say the address roster supplied did not tie to the stated number of slots?

MR. MCRAE: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: We were hoping from that list, we would be able to tie the beds specifically counted under roadmap to a site address. So from the address documentation, it could not reconcile, meaning that address documentation did not have 2,293 line items.

BY MS. MITCHELL:

Q    Okay. were you able to get a street address for every single TLS slot?



MR. MCRAE: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: Would you repeat that, please?

BY MS. MITCHELL:

Q   Yes, were you able to get from LAHSA or any other source a street address for every TLS slot?

MR. MCRAE: Relevance.

THE COURT: Overruled.

THE WITNESS: From the data that LAHSA provided in relation to those slots, there were missing street addresses from that list. They had a housing move-in date, but they did not have a street address.

BY MS. MITCHELL:

Q   Okay. were you able to get street addresses for some of the slots?

MR. MCRAE: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MS. MITCHELL:

Q   Approximately, if you recall, what percentage of the addresses were you given that actually corresponded with a full street address and a slot?

MR. MCRAE: Objection. Vague and lack of relevance.

THE COURT: Just to be sure, do you understand



the question?

THE WITNESS:  I believe I understand the question.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  The majority of the -- if I'm recalling correctly, the majority of that list did have a street address.  There were just instances where we did not find a street address in the data produced.

BY MS. MITCHELL:

Q   Now, you also have a note going down to the next line that some of the addresses overlapped with sites under the Alliance settlement.  Can you explain that?

A   Right, even though the list of sites were unable to be reconciled to the number reported under the roadmap program, there were addresses that overlapped with the permanent supportive housing sites in the Alliance quarterly report as of June 30, 2024.

MR. MCRAE:  Your Honor, relevance and lack of foundation.  Vague.  Move to strike.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q   So just so I'm clear, the sites that were provided to you were the sites that were supposed to be



the TLS slots under roadmap and you compared those addresses to the Alliance addresses and found that they were the same?

MR. MCRAE:  Objection, Your Honor.  It's vague.  It's compound.  Relevance.  Misstates the witness's testimony.  And it's also leading.

THE COURT:  Overruled.

Do you recall the question?

THE WITNESS:  Yes, I do.  Correct, we found overlapping addresses.

BY MS. MITCHELL:

Q    Approximately how many overlapping addresses did you find?

MR. MCRAE:  Objection. Relevance. Vague. Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I can't recall the exact number on the top of my head.

BY MS. MITCHELL:

Q    Would you be able to find that information somewhere?

MR. MCRAE:  Objection.  Relevance and hearsay.

THE COURT:  Overruled.

THE WITNESS:  Yes, absolutely, we still have the data that LAHSA produced, so we would be able to produce

that.

BY MS. MITCHELL:

Q   Going down to the next line, can you -- well, I'll just ask you, can you read those next four lines for me down to the end of the notes?  Starting with the word, the structure of data, starting with that phrase.

A   The structure of data, fragmented, incomplete, and internally inconsistent, creates a high risk of inaccuracies, including double counting, and prevents the City from reliably measuring its progress. That weakness lies in record keeping, not in the diligence of professionals attempting verification.

Q   Were you and your team diligent in pursuing this information?

MR. MCRAE:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  I believe so, yes.

BY MS. MITCHELL:

Q   Mr. Szabo made a statement while he was testifying quote, it reads to me like they, referring to A&M, did not fully either have the time to or capacity to understand what they were looking at.  Do you recall that testimony?

A   Yes.



Q   Do you agree with him that A&M did not have the time to understand what you were looking at?

MR. MCRAE:  Objection.  Mischaracterizes Mr. Szabo's testimony.  Calls for speculation.

THE COURT:  Overruled.

You can answer the question.

MR. MCRAE:  And relevance.

THE COURT:  Overruled.

THE WITNESS:  Can you please repeat your question, Ms. Mitchell?

BY MS. MITCHELL:

Q   Sure.  Do you agree with Mr. Szabo that the A&M team, consisting of the 10 individuals that you identified earlier, did not have the time to or capacity to understand what you were looking at?

MR. MCRAE:  Objection.  Compound.  Lack of foundation.  Calls for speculation.  And relevance.

THE COURT:  Overruled.

THE WITNESS:  No, I do not agree with that statement.

BY MS. MITCHELL:

Q   Why not?

MR. MCRAE:  Same objections.  Relevance, calls for speculation, lack of foundation.

THE COURT:  Thank you, Counsel.  Now, just a



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

moment. I want to make sure that these questions are clear to you. So, Counsel, re-ask the question.

You've made your objection now, Counsel. If it's the same question, you can make your objection again, but it's difficult for some of the lay witnesses, frankly. How are we going to resolve that so we don't quash your ability to make a record, but also we can get the information before the Court? Because for Mr. Szabo and the other gentleman, who did you just have testify?

MS. MITCHELL: Paul Webster.

THE COURT: Yeah. These folks have been on the stand before. She's represented this is her first time, and legally you're entitled to make the objections, but they're getting a little confusing for the witness, I think. So how are we going to resolve that?

MR. MCRAE: I suppose the witness can state whether or not the witness is laboring under confusion, and then the question can be repeated. Otherwise, we can proceed.

THE COURT: Okay. I'll take your guidance, Counsel. Thank you.

MS. MITCHELL: Thank you, Your Honor.

BY MS. MITCHELL:

Q    Ms. Frost, have you been known by a different name during the last year as you've been

appearing and giving us updates in this Court?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.  My maiden last name is Collier.

BY MS. MITCHELL:

Q    And you since have gotten married and changed your name to Frost; is that right?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MS. MITCHELL:

Q    Now, why do you disagree with Mr. Szabo's statement that A&M did not fully have the time or capacity to understand what you were looking at?

MR. MCRAE:  Relevance.  Lack of foundation. Vague.

THE COURT:  Overruled.

THE WITNESS:  I believe we had a very competent team with a depth of experience, decades of experience in accounting, finance, health care, government operations, and public policy.  The team included certified public accountants, chartered financial analysts, and clinicians. Happy to provide a list of names, titles, and bios of everyone on the team if any party wants it.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

In terms of time, we asked for the data.  Either the data was provided or not provided.  So we had to base our report on the available information to us and leveling a level of practicality and cost in respect of the City.  And if any, no evidence after the issuance of the report, even within the three months from the date of the initial draft, has been produced to the A&M team.

BY MS. MITCHELL:

Q    Did you hear Mr. Szabo testify -- or, actually, this was on May 28th, so maybe you read it in the transcript, that the capacity of this report, referring to the A&M assessment, was greatly limited because it was based on, quote, some of what they felt might be the case, based on some limited information that they were able to absorb and understand in the creation of the report, but without any of the rigor and objectivity and independence required for a formal assessment.  Do you recall hearing or reading that testimony?

A    I vaguely recall Mr. Szabo's testimony.

Q    And did you, did A&M, speaking for A&M, base this report on feeling?

MR. MCRAE:  Objection.  Vague and irrelevance.  Also, calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  No, we took a very evidence-based

approach when formulating our findings and recommendations.

BY MS. MITCHELL:

Q   Was this report based on limited information?

MR. MCRAE:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  I believe our findings, recommendations, and throughout the report were formulated based on the data or lack thereof.

BY MS. MITCHELL:

Q   Did A&M as a whole, the A&M team as a whole, or you in particular -- well, let me ask one of those questions, actually.  I'll withdraw and rephrase, Your Honor.

Were you limited in your ability to absorb and understand the data that you were reviewing in creation of this report?

MR. MCRAE:  Objection.  Vague and relevance.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MS. MITCHELL:

Q   To the extent that you speak for the A&M team as a whole, was A&M limited in its ability to absorb and understand the information and creation of the report?



107

MR. MCRAE:  Objection.  Calls for speculation. Lack of foundation.  And vague and relevance.

THE COURT:  Overruled.

You can answer the question, please.

THE WITNESS:  No.

BY MS. MITCHELL:

Q    Do you agree with the statement that this report or the assessment was done without any rigor and objectivity?

MR. MCRAE:  Objection.  Mischaracterizes Mr. Szabo's statements.  Also, lack of foundation and relevance.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  I apologize, Ms. Mitchell.  Can you repeat the question?

BY MS. MITCHELL:

Q    Yeah, I'll read the full phrase.  Do you agree with Mr. Szabo's statement that this assessment was done without any of the rigor and objectivity and independence required for a formal assessment?  Do you agree with that?

MR. MCRAE:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  I do not agree with that.



108

BY MS. MITCHELL:

Q   Why not?

MR. MCRAE:  Same objections.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q   Why not?

A   Because we were -- we took a very rigorous evidence-based approach and aligned with professional standards.

Q   Was this a formal assessment?

MR. MCRAE:  Objection.  Asked and answered multiple times.  And also, vague.

THE COURT:  Overruled.

You can answer one more time, just to be certain.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q   Mr. Szabo also made a statement that A&M's assessment that there was a disjointed continuum of care system was, quote, based on their assessment, their feeling, end quote.  Was your assessment based on feeling?

MR. MCRAE:  Objection.  Asked and answered.  It also mischaracterizes Mr. Szabo's statement.

THE COURT:  Overruled.

THE WITNESS:  No.

109

BY MS. MITCHELL:

Q    Mr. Szabo gave an example of this, quote, unquote, feeling when A&M identified potential iniquities, but not making a finding of iniquities.  Do you recall that testimony?

MR. MCRAE:  Objection.  Mischaracterizes Mr. Szabo's testimony.  Also, relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q    Did you find iniquities in what you were reviewing?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  We identified, we identified potential inequities based on the data produced to us.

BY MS. MITCHELL:

Q    Can you give an example of a potential inequity that you reviewed, and if you need a copy of your report, please let me know.

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I have a copy of the report in front of me, may I reference that?

MS. MITCHELL:  Yes, of course.

THE COURT:  While you're doing that, Counsel, you mentioned yesterday you had a call today?

MR. MCRAE:  I have to leave at 10:40, and so thank you, Your Honor.

THE COURT:  Just remind me of that, okay?

MS. MITCHELL:  And, Your Honor, we have agreed that that's the period of time that Mr. Maceri will be testifying, so a different attorney from Gibson, Dunn will be cross-examining Mr. Maceri.

THE WITNESS:  One of a few examples within this report based on the evidence that we received could be --

MR. MCRAE:  Your Honor, can we have a page number of Exhibit 23?

THE WITNESS:  Apologies.  I'm on page 102.

MS. MITCHELL:  I can go ahead and put that up if that's easier, Your Honor.

THE COURT:  Please.

MS. MITCHELL:  Is that the page that you're looking to, 102 of 60?

THE WITNESS:  Correct.

MS. MITCHELL:  Okay.

THE WITNESS:  I believe 4.2.3 section speaks to that, as well as page 1 --

BY MS. MITCHELL:

Q    I'm sorry.  If you could just wait one



moment, Ms. Frost.  What about 4.2.3 points to inequities or potential inequities?

A     From my understanding, housing navigation was a key part of placing individuals who were enrolled in various shelters to permanent housing.  In this section, it outlines how those slots were determined across the sites reported in the Roadmap and Alliance, as well as Inside Safe.

Q     Okay.  What's another example?

MR. MCRAE:  Objection.  Move to strike.  Lack of foundation.  Mischaracterizes what the document says.  It speaks for itself.

THE COURT:  Overruled.

THE WITNESS:  Outside of section 4.2.3, figure 4.4 on page 120 of 160, if you see from the sampled sites, the exit data, some of these sites had exits to permanent housing of up to 60 percent, while some only had exits to permanent housing of 10 percent.

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q     Any other examples that you can think of as you sit here today?

MR. MCRAE:  Relevance.

THE WITNESS:  Apologies.  The report is over 165



pages. I'm sure there are various examples that we could point to in relation to our finding of potential inequities.

BY MS. MITCHELL:

Q How many meetings did you have with any people or groups of people at the City in researching and in your process of doing this assessment?

MR. MCRAE: Objection. Relevance.

THE COURT: Overruled.

MR. MCRAE: And lack of foundation.

THE COURT: You may answer the question.

THE WITNESS: We've met, I mean, we've conducted over 90 interviews. We met with city council members and their staff. We met with the CAO office multiple times. We also met with LAHSA. We met with LAPD. Very -- I mean, countless meetings.

BY MS. MITCHELL:

Q Did anybody suggest to you that you had to talk to the CAO, Matt Szabo, to understand the homeless system that you were reviewing?

MR. MCRAE: Relevance. Lack of --

THE COURT: I didn't hear the question, Counsel. I'm sorry.

BY MS. MITCHELL:

Q Yeah. Did anybody suggest to you at the



113

City or otherwise that A&M had to talk to Matt Szabo, the
CAO, to understand the homeless system that you were
reviewing?

MR. MCRAE:  Your Honor, relevance.  It also
assumes facts.  It's actually argument.  It lacks
foundation and it's vague.

THE COURT:  Well, the question is, did anybody
suggest that she talk to Mr. Szabo?

MS. MITCHELL:  Correct.

MR. MCRAE:  And the objection is that there's a
lack of foundation that would even be required.  And that
by not doing it, somehow it means something.  That's the
objection.  It's not relevant.

THE COURT:  Overruled.

You can tell us who you talked to.

THE WITNESS:  Mr. Szabo was copied on numerous
emails and correspondence, and he would be informed when
we were having meetings with his team.  I apologize.  Did
I answer your question?

MS. MITCHELL:  Well, sort of, and it's okay.
I'll ask follow-up questions.

BY MS. MITCHELL:

Q    Was Mr. Szabo invited to any of the
meetings that A&M had?

MR. MCRAE:  Objection.  Lack of foundation and

114

relevance.

THE COURT:  Overruled.

MR. MCRAE:  And also vague.

THE COURT:  You can answer that question.

THE WITNESS:  From my recollection, he'd be copied on when we were intending to meet with his team, like date, time.  I cannot recall if he was specifically on that calendar invite or if that invite was forwarded to him.

BY MS. MITCHELL:

Q    And did anybody from the CAO's office or elsewhere inform you that you could not understand the homeless system that you were reviewing unless you spoke to Mr. Szabo?

MR. MCRAE:  Argument, vague, lack of foundation, relevance, assumes facts.

THE COURT:  Overruled.

You can answer that question.

THE WITNESS:  No, no one ever directed us specifically to Matt Szabo to fully understand what our findings were.

BY MS. MITCHELL:

Q    If Mr. Szabo had asked to meet with you personally, would you have met with him?

MR. MCRAE:  Vague, foundation, calls for



speculation.

THE WITNESS:  Absolutely.  I apologize, Your Honor.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Absolutely.  We were open to talking to anyone, any party, throughout this entire time.

MS. MITCHELL:  I have no further questions at this time.

THE COURT:  Ms. Myers, do you have questions?

MS. MYERS:  Yes, Your Honor.  Given the timing, do you want me to just --

THE COURT:  I think out of courtesy to counsel, what time will you be back?  We're not going to accomplish much at this point.

MR. MCRAE:  Running here from my office, I think I can be back at 12:15.

THE COURT:  Don't run.  Walk safely.  Just in case.

MR. MCRAE:  12:15, I believe.

THE COURT:  We'll make sure that you're here.

All right.  Then let's do this.  Let's take a recess for the time being.

Who are you going to call next, Counsel?

MS. MITCHELL:  Your Honor, Mr. Maceri should be



here to testify in about 30 minutes.

THE COURT:  Pardon me?

MS. MITCHELL:  Mr. Maceri, John Maceri, will be here to testify in about 30 minutes.

THE COURT:  All right.  What's your suggestion?

MS. MITCHELL:  Your Honor, we had agreed with counsel that even though --

THE COURT:  No, no, I understand.  He's next.  I understand that.  Even though counsel's gone.  So what do you want to do with this next 30 minutes?

MS. MITCHELL:  Oh, as far as Ms. Frost; is that the question?

THE COURT:  Do you want to start for 10 minutes?

I just don't think 10 minutes out of context leads us any place, then coming back.  Maybe I should just go to lunch for 30 minutes and so should you.

MS. MYERS:  Your Honor, I think that would make the most of the parties' agreement.

THE COURT:  Yeah, let's do this:  We'd have a 15- or 20-minute recess anyway, for goodness sakes.  Why don't we reconvene at 11:00 o'clock when Mr. Maceri's here?  Would that be acceptable to everybody?

MS. MITCHELL:  Sounds great.

THE COURT:  We're losing 10 minutes.  That way, Counsel, you're not stressed.

117

MR. MCRAE:  Thank you.

THE COURT:  Thank you very much.

(A recess was taken off the record.)

THE COURT:  Then we're back in session.

Counsel are present.

And, Counsel, would you like to call your next witness, please?

MS. MITCHELL:  Yes, Your Honor.  Plaintiff calls John Maceri to the stand.

THE COURT:  Thank you very much.

Sir, if you'd step forward, please.  Would you be kind enough to raise your right hand, sir?

THE CLERK:  Do you solemnly swear that the testimony you are about to give and the cause now pending before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURT:  Thank you, sir.  If you'd please be seated here in the witness box.  And be careful when you come up the stairs.  There's about a two-inch rise, okay?

All right.  Thank you very much.  You may be seated.  Sir, after you're comfortably seated, would you face counsel?  Would you state your full name, please?

THE WITNESS:  John Maceri.

THE COURT:  And would you spell your last name,

118

sir?

THE WITNESS:  M as in Michael, A-C-E-R-I.

THE COURT:  Counsel, I'm doing my best to recall.  I've met Mr. Maceri at his offices, I believe, in 2020 or 2021.  I don't recall if I've had a conversation with him since.  I may have, so all parties know.  And thank you for meeting with me that day.  I think he was one of three providers we met with on that day, or maybe four.  So I think it was a morning session if I'm not certain.  And you have an office just off the 10?

THE WITNESS:  Yes, that's correct.

THE COURT:  Okay.

THE WITNESS:  At Arlington.

THE COURT:  Thank you very much, sir.  Pleasure.

Counsel, direct examination, please.

MS. MITCHELL:  Thank you, Your Honor.  And just to clarify again, Your Honor, that was during the period of time when all parties had waived ex parte communications.

THE COURT:  All parties had given consent to the (inaudible)  at the time, and all parties that they could speak to anyone.

MS. MITCHELL:  Thank you, Your Honor.

THE COURT:  Once again, I don't remember if he's the 200th person I talked to or the 400th person I talked

to.  Counsel?

MS. MITCHELL:  Thank you, Your Honor.

Whereupon,

JOHN MACERI

was called as a witness, and having been sworn, was

examined and testified as follows:

DIRECT EXAMINATION

BY MS. MITCHELL:

Q    Mr. Maceri, what is your current role?

A    I'm the CEO of The People Concern.

Q    How long have you served as the CEO of The People Concern?

A    25 years.

Q    Have you been a CEO that entire time, 25 years?

A    Yes.

Q    And what did you do prior to that?

A    Prior to that, I was the executive director of a nonprofit aid service organization for 12 years.

THE COURT:  Would you say that again, just a little slower, sir?

THE WITNESS:  Prior to The People Concern, for 12 years, I was the CEO of a nonprofit aid service organization.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

THE COURT:  Thank you very much.

BY MS. MITCHELL:

Q     And The People Concern, is it one of the largest service providers in Los Angeles, to your knowledge?

A     Yes.

Q     Can you briefly describe The People Concern and what the organization does?

A     So we're a nonprofit housing and service provider that provides services to people experiencing homelessness and survivors of domestic violence.  We work only in Los Angeles County, but all over Los Angeles County.  We provide street outreach, interim housing, permanent supportive housing, and then wraparound services, primary care, mental health care, substance use services, and domestic violence services.

Q     And what are the various interventions that you implement in terms of beds, if you understand that question?

A     Well, we operate both interim, which is temporary housing, mostly congregate facilities, although we do operate some Inside Safe programs that are individual motel rooMs. And then we have 3,800 units of permanent supportive housing throughout the county, which are individual units where people hold leases.

Q    Now, did you have the occasion to review a recent list of interventions that the City is including on the roadmap list, if you know what that is?

MR. SCOLNICK: Objection. Relevance. Lack of foundation.

THE COURT: Overruled.

Sir, you can answer the question, please.

THE WITNESS: Yes, I did.

BY MS. MITCHELL:

Q    And does The People Concern run any of the interventions identified on the roadmap list?

A    Yes. We operate 25 of the permanent housing sites and four of the interim housing sites, and we are scheduled to operate 10 of the permanent housing sites in development.

Q    Do you know the difference between the roadmap list and the Alliance list?

A    Yes.

Q    Okay. So was that the roadmap list or the Alliance list you're referring to?

A    My apologies. The Alliance list is where we have 25 permanent sites, 10 in development, four interim. And the roadmap site were mostly sites that we operated during the pandemic, although one or two of them have converted to permanent housing, and the interim

sites, the temporary sites, we no longer operate.

THE COURT:  And would you repeat for me?  I didn't write quickly enough.  You operate 25 permanent sites.

THE WITNESS:  Correct, on the Alliance.

THE COURT:  And then you have the next category of --

THE WITNESS:  There are 10 more sites.  So there are 25 that are currently operating.  There are 10 more in development where we will be the service provider.  So that's a 35 on the Alliance list, and we operate four interim housing on the Alliance list.  And then on the roadmap, there were a few sites that we operated during the pandemic that are no longer operating.  And I believe two of those sites converted to permanent housing.

THE COURT:  Thank you very much.  I appreciate that.

BY MS. MITCHELL:

Q    Are any of the sites that you identified as operating Inside Safe locations?

A    We operate two Inside Safe locations.

Q    Do you know which ones?

A    The Las Palmas and the Dusk.

Q    Now, we have been referring to the homelessness response system.  We've been using that

phrase in this courtroom, referring to -- Well, let me just ask this question. If I use the phrase homelessness response system in Los Angeles, do you have an understanding of what that means?

MR. SCOLNICK: Vague.

THE WITNESS: Yes, I believe I do.

THE COURT: Overruled.

You can answer the question.

MS. MITCHELL: So, Mr. Maceri, it's a little bit of an awkward dance that we do sometimes. I'll be asking the question. If there's an objection, you need to wait for the objection, and then you can answer.

THE WITNESS: Sorry.

MS. MITCHELL: That's okay.

THE COURT: Just re-ask the question.

BY MS. MITCHELL:

    Q    So if I refer to a phrase homelessness response system, do you understand what that means?

MR. SCOLNICK: Vague.

THE COURT: Vague. Overruled.

THE WITNESS: I believe I do. Yes.

BY MS. MITCHELL:

    Q    And what does it mean to you?

    A    Well, what it means to me is all the components of the system, including street outreach,



124

temporary or interim housing, prevention, permanent

housing, and supportive services.  Those are all the

components that make up the homeless response system.

BY MS. MITCHELL:

Q    And what role, to your understanding, does

LAHSA have in that system?

MR. SCOLNICK:  Foundation.

THE COURT:  Overruled.

THE WITNESS:  Well, LAHSA has a few roles in the

system.  They are both a systems administrator in terms of

administering contracts to providers like the People

Concern and others that deliver direct services.  LAHSA

also delivers some of those services themselves directly.

Yeah, those are the two primary roles of LAHSA.

BY MS. MITCHELL:

Q    Now, working in this field for decades,

based on your experience, do you believe that Los Angeles

has a functional homelessness response system?

MR. SCOLNICK:  Vague.  Relevance.  Foundation.

THE COURT:  Overruled.

You can answer that question, sir.

THE WITNESS:  In my opinion, no.  I think we

have a very fragmented system.

BY MS. MITCHELL:

Q    Please explain that.



A     Well, we have a very siloed system.  We work in four different databases, none of which are integrated.  We have a homeless services authority that has no authority to make decisions.  We have a highly politicized system.  The system is influenced by electeds and their staff.  And we don't have an overall vision other than everyone agrees that we want the point-in-time count to go down and we want the unsheltered count to go down every year.  But there's not an overarching plan for how we're going to achieve those metrics.

Q     And what are some of the symptoms that you've observed from the service provider side that indicate that dysfunction?

MR. SCOLNICK:  Objection.  Vague.

THE COURT:  Overruled.

MR. SCOLNICK:  Relevance.

THE COURT:  You can answer the question, sir.

THE WITNESS:  Thank you.  Well, it manifests itself in a variety of ways.  The way people are referred into interim housing, for instance.  The matching system to permanent supportive housing.  The execution of contracts, which, in fairness to LAHSA, has significantly improved in the last year but is still challenging.  We have many, many funding sources in the system.  So blending all of that funding and executing contracts in a

126

timely manner continues to be a challenge.

How we build housing, how we match people to available units, both on the interim and the permanent side, continues to be.  There are many, many barriers. The outreach teams working with individuals that they're trying to move into shelter, it's not so easy to do that.

BY MS. MITCHELL:

Q    Why not?

MR. SCOLNICK:  Relevance.

THE COURT:  Overruled.

You can answer the question, sir.

THE WITNESS:  Part of it are sort of the rules and structures and the policies, which are ever evolving and changing.  Some of it is the funding sources have different requirements and different rules.  And so, as an operator, we could have beds in one facility that have multiple funding sources and have different requirements for how those beds are accessed.

I think on the permanent housing side, the length of time that it takes to build housing and then to lease it up continues to be a huge challenge and a barrier.  And, frankly, there aren't enough places for people to live.  And so, often we find that people working with outreach teams, working with folks in interim housing, are stuck in the system because there's nowhere

to have them move to permanently.

BY MS. MITCHELL:

Q    Based on your experience, what would we need or what do we need in a functioning homelessness response system in Los Angeles?

MR. SCOLNICK:  Relevance, calls for expert opinion and speculation.

THE COURT:  Overruled.

You can answer the question, sir.

THE WITNESS:  Well, I think there are a few things that, you know, I described all the components of a functioning system.  You need prevention to keep people who are currently housed from becoming homeless.  And what we see on the ground as a practitioner, very practically, is the majority of newly homeless people in Los Angeles are losing their housing because they can't afford to pay their rent or they have some catastrophic event in their life, and they lose their housing very quickly.  So we need to go more upstream and work on keeping people housed.

In the middle, on the interim, we don't really, as I said earlier, we don't have an overarching plan for looking at if you have one temporary interim housing intervention, how many permanent housing interventions do you need and how many prevention interventions do you

128

need?  We've never really looked at the system as functioning that way.

In a lot of ways, everything is a one-off.  We build a new building, and we start all over again.  And the system functions and acts as if every day is Groundhog Day so that we just, you know, begin all over again.  And that's not a way to create throughput in a system when we have thousands of people that are languishing on the streets and waiting, you know, for beds.

We need to build more affordable housing, but not just ground up.  The system is heavily weighted towards permanent supportive housing, which is critically important, but not every person experiencing homelessness needs permanent supportive housing.

We need to expand the stock of affordable housing for people, you know, who are able to pay market rate rents or at least rents that are affordable in the current market.

We haven't done enough with shared housing.  We haven't looked at master leasing in a significant way.  There are lots of tools in the toolbox, even in an expensive real estate market like Los Angeles, that we could harness more housing units so that people are not languishing either on the streets or in temporary interventions.

BY MS. MITCHELL:

Q    Now, you made a statement that is somewhat relevant to what we have discussed today, that the system is weighted towards permanent supportive housing.  Why is that a problem in your view?

THE COURT:  Can you answer the question, sir?

THE WITNESS:  Sorry, I'm not a very good witness apparently.  I don't know that it's a problem per se.  I'm a huge proponent of permanent supportive housing.  We do a lot of permanent supportive housing.

I think the issue is, and let me just for context say why the system is currently weighted.  For many, many years, the highest acuity folks experiencing homelessness were literally screened out of permanent housing because they were considered bad tenants.  They had poor rental histories, poor credit histories, poor employment histories.  And so the people who needed access to housing the most were screened out.

So several years ago, when the coordinated entry system was implemented, the idea was that to democratize access to housing, that this would be one way based on people's acuity that they would be able to access permanent housing.  And frankly, I think that was a very good thing.  It was important.  It was a very important shift in the system.

The challenge, I think, is that the pendulum has swung too far and we focused only on building new permanent supportive housing and have not focused as much on all the other things that I described in sort of the middle of the spectrum.  And as a result of that, we now have people who are waiting much longer periods of time for permanent supportive housing units, which are very limited, as all affordable housing is limited in Los Angeles.  And we're missing the opportunity to house more people more quickly using other types of interventions.

BY MS. MITCHELL:

Q    And by missing the opportunity to house more people more quickly, what is the result in your experience?

MR. SCOLNICK:  Objection.  Foundation. Relevance.

THE COURT:  Overruled.

THE WITNESS:  Well, two things.  I think we have more people waiting on the streets longer to be moved indoors, and we have a lot of people in temporary housing, whatever that looks like, that are waiting to move into permanent housing.  And so the whole system gets backed up.

BY MS. MITCHELL:

Q    In your opinion, based on your experience,



131

25 years as the CEO of one of the largest service providers in the county and in the city, what does this solve?  How do we create a functioning homelessness response system in Los Angeles, in your opinion?

MR. SCOLNICK:  Vague.  Relevance.  Lacks foundation.  Calls for expert opinion.

THE COURT:  Overruled.

You may answer the question, please.

THE WITNESS:  Well, I think there are a few things.  I think one of the challenges now is when everyone's in charge, no one's in charge.  And as I said, we have a Homeless Services Authority that has no authority to make any decisions, and we have no entity.

So whatever entity is created needs to actually have the authority and power to be able to implement, I believe, both a citywide and a countywide plan that drives us towards the overarching goal, which everyone agrees is we want unsheltered homelessness to go down.  We want the street count to go down.  We want more people to be moved indoors, but not just moved indoors.  We want people to be permanently housed, and we want to keep them housed.

So in my view, it's not just about how many people can you move indoors and then leave them in a situation where they are.  Yes, it is infinitely better for them to be indoors.  There's no question about that.

But then my question is always, what's next?

And so I think to have a functioning system, as I said earlier, we need to look at all of the components of the system. We need to go upstream more and work on prevention. Whatever temporary interventions are created in housing, there needs to be a direct link to an exit strategy for permanent housing. And in permanent housing, we need to focus not just on permanent supportive housing, but in harnessing opportunities, shared housing, adaptive reuse, master leasing. These are all tools in the toolbox. No single one of those interventions by themselves is going to solve homelessness. We are not going to build our way out of this. It's too expensive and it takes too long, but we are not using all of the tools.

And I think more importantly, the biggest failure in the system is that it is influenced too heavily by politics and not real leadership that has both the political will but also the authority to be able to make decisions.

BY MS. MITCHELL:

Q    Showing you what has been marked as evidence at this point. This is the Alvarez and Marsal Independent Assessment of City Funded Homelessness Assistance Programs. Have you had an opportunity to review

133

this document, Mr. Maceri?

        A    Yes.

        Q    And did you have any disagreements with any of the conclusions that were reached?

        A    No.

        MR. SCOLNICK:  Relevance.

        THE COURT:  Overruled.

        You may answer, sir.

        THE WITNESS:  No, not at a high level.

BY MS. MITCHELL:

        Q    The audit identified misaligned roles between the city, county, and LAHSA resulting in poor coordination and oversight.  Is that consistent with your experience working as a service provider in Los Angeles?

        MR. SCOLNICK:  Objection.  Relevance. Foundation.  And mischaracterizes the document as an audit.

        THE COURT:  Overruled.

        THE WITNESS:  Yes.

        THE COURT:  Well, it's an assessment, Counsel.

        MS. MITCHELL:  Thank you, Your Honor.

        THE WITNESS:  In my experience, yes.

BY MS. MITCHELL:

        Q    The assessment also identifies confusion in how to get even a person in shelter and housing.  Is



134

that consistent with your experience as a service provider?

MR. SCOLNICK:  Relevance and vague.

THE COURT:  Overruled.

You may answer the question, sir.

THE WITNESS:  Yes, it is.

BY MS. MITCHELL:

Q    In your professional view, what would best efforts look like from a city trying to hit, let's say, a 1,000-bed milestone within a six-month period?

MR. SCOLNICK:  Objection.  Relevance. Foundation.  Calls for legal opinion.

THE COURT:  Overruled.

You may answer the question, sir.

THE WITNESS:  I'm not an attorney, so I can't give you a definition of best efforts.  What I would say is what I just described before is I think that there needs to be a very focused effort with a plan, with benchmarks that everyone working in the system is held accountable to.

When I talked about the fragmentation earlier, I think we would have a more effective system if we had a plan that was laid out.  How many interim housing beds do we need and what are those going to look like?  Because they're not all the same.  How many permanent housing

units do we need?  And, again, they aren't all going to look the same.

And then I think that there should be a better division of labor and oversight.  I think in the provider community, there are some providers that are better equipped to work in one area.  Even though most of us are generalists, I believe that we actually could have a more focused approach.  We're not doing that right now, as I said, because every new development is like a new day. And I think we should be driving towards being able to scale up more interim housing as long as, and this is really important, as long as it's linked to a permanent housing exit, which currently it's not.

BY MS. MITCHELL:

Q   So is it possible, in your view, to obtain or procure or create in some way, let's say, 1,000 beds for people experiencing homelessness in a six-month period?

MR. SCOLNICK:  Objection.  Lacks foundation. Calls for speculation.  Calls for expert opinion.  And incomplete hypothetical.

THE COURT:  Overruled.

THE WITNESS:  It's possible.  It would be challenging.  A thousand beds in six months is challenging.  But I think it is possible to substantially

increase our housing bed stock.

BY MS. MITCHELL:

Q    And if you were tasked with that role of obtaining, creating, or otherwise, well, I'll just say creating 1,000 beds in six months, how would you do it?

MR. SCOLNICK:  Same objections, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Well, it would be very similar to what I've described already.  I think we need to look at all of the interim housing interventions that are available now.  I think some of them could be expanded substantially.  I think we're really underutilized in the master lease area.  And I think there's still opportunities in adaptive reuse.

And I think in terms of standing up some more temporary possibilities, although I will say, frankly, most people experiencing homelessness don't like congregate shelter facilities, so that is very challenging, especially since there's been opportunities for people to be in single rooms, which is always preferable because people want their privacy, as we all want our privacy.

That being said, I think, as I said on the permanent side, I would weigh more on making sure that every temporary housing intervention has a permanent exit

strategy, because I think that we are falling short.

And we're spending.  Any kind of temporary housing is the most expensive intervention that we can have because they have to be operated 24-7.  They need to be staffed.  They are service-intensive.  Permanent supportive housing is service-intensive.  This work is service-intensive.  But if we're talking about limited resources, I think we have to weigh where are we going to have the greatest impact.  So clearly, we need more temporary, and we need more permanent, but those need to be linked in a strategic way.

BY MS. MITCHELL:

Q    And are they currently, in your opinion, linked in a strategic way?

A    No, they're not.

MR. SCOLNICK:  Belated objection on relevance, Your Honor.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    What are some of the challenges with Inside Safe you've observed, if you're comfortable sharing?

MR. SCOLNICK:  Vague.

THE COURT:  Counsel, I don't understand the question.



MS. MITCHELL:  I'll ask a more direct question, Your Honor.

BY MS. MITCHELL:

Q    What are some of the problems that you've seen with Inside Safe?

MR. SCOLNICK:  Vague.

THE COURT:  In relation to what, Counsel?

MS. MITCHELL:  I think in relation to operation, Your Honor.

THE COURT:  Then ask about operations.

BY MS. MITCHELL:

Q    Okay.  What are some of the challenges with operating Inside Safe programs that you've seen?

MR. SCOLNICK:  Still vague.

THE COURT:  Overruled.

THE WITNESS:  Well, there are a few.  One is that the Inside Safe sites, most of them are not linked to a permanent housing exit.  We see, as you're probably aware, Inside Safe is moving people directly from the streets into the motels.  So it is absolutely essential that people feel safe and that they're indoors, and that's a very good thing.  But there aren't adequate supports to be able to move those people into permanent housing.

We see a lot of challenges in the motels themselves with the owners of the motels, who are,

139

frankly, not good owners or operators.  They don't take care of their property, so there's lots of challenges around maintenance and security.

There continue to be challenges for the on-site resident services site.  The facilities themselves are not set up to provide on-site resident services space.  So if you're trying to provide mental health services, for instance, most of these buildings don't have private space, which means that services often have to be delivered in someone's unit, which can be challenging in and of itself.  So those are some of the operational challenges that we see.

BY MS. MITCHELL:

Q    To your knowledge and understanding is Inside Safe expensive to run?

MR. SCOLNICK:  Vague, relevance, a lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  It is.

BY MS. MITCHELL:

Q    Are there other housing assets that we could use that would be less expensive and or more expedient?

MR. SCOLNICK:  Vague, lack of foundation, calls for speculation.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

140

THE COURT:  Overruled.

You can answer the question, sir.

THE WITNESS:  Well, I think Inside Safe, I think using motel rooms in terms of housing stock is a good idea.  The challenge, again, is that there was no exit strategy, and so we've ended up with an expensive.  Just the cost of the hotel rooms alone, excluding the services, are very expensive, and it's hard to scale and sustain.

In terms of other kinds of interventions, as I said, there are congregate options, which are not always desirable by people experiencing homelessness, so I think we have to be honest about that and acknowledge that.

There are other kinds of interventions, temporary.  I've seen modular facilities, for instance, that have private rooms and private bathrooms that are less expensive.  There's a lot of capital cost up front, and obviously you have to find land in order to place them, but if you look at what other cities are doing around the state, that has been a really effective intervention.

So there's, you know, again, it's always looking at where is there going to be the greatest impact for the investment, and I think that we could do more to look at alternatives to motels.

BY MS. MITCHELL:



Q    Is there a role, in your view, for public-private partnerships or private equity in solving this crisis?

MR. SCOLNICK:  Relevance, foundation, calls for speculation.

THE WITNESS:  Yes.  I mean, I think there's a huge role for public-private partnerships.  If you look at what's here, even in Los Angeles, we have a few private equity firms that are investing in permanent supportive housing, for instance, and they're bringing their units in at, in many cases, under $300,000, a unit where the average cost is pushing $700,000, for instance, and that is a direct result of private equity being able to replace a single source and provide a single source of capital so that a developer doesn't have to have five or seven different sources in their capital stack, for instance.

What I cited, what's happening up in Santa Clara, where the City is partnering with nonprofits and private equity, they provided land, and they have built modular units and are bringing them in for substantially less.

So I think, in my opinion, not just relative to Inside Safe or, you know, our current situation, but for a long time I think that we have not harnessed the private market in terms of capital investments in the way that we



could.  There are plenty of institutional investors and even some individuals and families that would be willing to use their investment.  They may not make a multimillion-dollar donation, but they would be happy to invest and take a small return to be able to contribute to building more housing.

MR. SCOLNICK:  Your Honor, I'd move to strike the testimony about Santa Clara as irrelevant.

MS. MITCHELL:  I can set a foundation for that, Your Honor.

THE COURT:  Counsel?

MS. MITCHELL:  I think that that's a Dignity Moves project, the one that he's referring to, the modular units in Santa Clara.  And we heard testimony from Elizabeth Funk earlier in this hearing.

MR. SCOLNICK:  And I think the Court ruled that was irrelevant.

THE COURT:  Yeah, I don't want to get into cost comparisons out of the region.  For instance, San Jose, Oakland, San Francisco, Fresno, et cetera.  I think that the testimony is relevant concerning the region, and I include the Southern California region all the way up to Santa Barbara, Riverside, Orange County, and the different cities within the Los Angeles County.

MS. MITCHELL:  Sure.



THE COURT: So I'm going to sustain the objection, Counsel.

BY MS. MITCHELL:

Q    Are you familiar with dignity moves?

A    I am, yes.

Q    And do they have projects in Santa Barbara?

A    Yes, I believe they do.

Q    And is that what you were referring to by, for example, like a modular unit on donated land?

A    Yes.

Q    And you also referred to a private organization that was doing permanent supportive housing. Were you referring to SDS Capital?

A    Yes.

MR. SCOLNICK: Objection. Leading.

THE COURT: That is leading, Counsel, but you can ask him who is he referring to.

MS. MITCHELL: I'm not going to ask more questions about this issue, Your Honor. Well, I'll just ask the question.

BY MS. MITCHELL:

Q    When you refer to a private organization creating permanent supportive housing without government funding, what organization were you referring to?



144

          A    I was referring to Debbie LaFranchi and SDS Capital.

          THE COURT:  And slowly, what are the initials of S?

          THE WITNESS:  S-D, as in David, S, S-D-S Capital.

          THE COURT:  Okay.  I got it.  Thank you.

BY MS. MITCHELL:

          Q    And Debbie LaFranchi is the CEO?

          A    Yes.

          Q    Could unsheltered homelessness be ended in Los Angeles within two years with coordinated, urgent action, in your opinion?

          MR. SCOLNICK:  Objection.  Relevance. Foundation.

          THE COURT:  I'm going to sustain that, Counsel.

          MS. MITCHELL:  Thank you.

          THE COURT:  I don't think I want you or another expert in that situation of a time frame, okay?

BY MS. MITCHELL:

          Q    Is the City of Los Angeles, in your opinion, currently using best efforts, as you understand from a layperson's perspective, what best efforts is?

          MR. SCOLNICK:  Objection.  Calls for a legal opinion.  Relevance.  Foundation.

145

THE COURT: From a layperson's perspective, I'm going to sustain that, but, Counsel, he's well known in the provider field.

MS. MITCHELL: He is, and I'll set a little bit more of a foundation.

BY MS. MITCHELL:

Q    So from your experience as a service provider, longtime in Los Angeles, and when I refer to layperson's understanding, I'm referring to the phrase best efforts. So from your deep experience in the service provider industry in Los Angeles, do you believe the City is currently expending its best efforts?

MR. SCOLNICK: Relevance and calls for a legal opinion.

THE COURT: It's ambiguous to me. I don't understand the question, Counsel.

BY MS. MITCHELL:

Q    Yes, using its best efforts to increase the number of beds available to persons experiencing homelessness and reducing encampments.

MR. SCOLNICK: Relevance, calls for a legal opinion.

THE COURT: And from his experience as a layperson, because he's certainly not a layperson. As a service provider. As a provider.

146

MS. MITCHELL:  Sure, I can put it all together, Your Honor.

BY MS. MITCHELL:

Q    Mr. Maceri, in your experience as leading one of the largest service providers in Los Angeles, do you currently believe that the City is using its best efforts to increase the number of homeless housing beds in Los Angeles?

MR. SCOLNICK:  Objection.  Relevance.  Calls for a legal opinion.  And if the witness is testifying as an expert, he has not been qualified as such yet.

THE COURT:  I'll allow you to answer that in your professional capacity as a provider.

THE WITNESS:  I believe we can be doing more.

MS. MITCHELL:  I have no further questions.

THE COURT:  Ms. Myers, do you have questions?

MS. MYERS:  I do, Your Honor.

THE COURT:  All right.

CROSS-EXAMINATION

BY MS. MYERS:

Q    Good morning, Mr. Maceri.  Shayla Myers with the Legal Aid Foundation of Los Angeles.  It's good to see you.

A    Good morning.

Q    So the People Concern runs a variety of



housing interventions; correct?

A     Yes.

Q     And that includes both permanent supportive housing and interim shelters; is that correct?

A     Yes.

Q     Does the People Concern run any time-limited subsidy?  Let me back up and ask that.  Does the People Concern have any contracts to provide services related to time-limited subsidies?

A     Yes.

MR. ROTSTEIN:  Relevance.

THE COURT:  I'm sorry, I didn't – overruled, and your answer was?

THE WITNESS:  Yes, we do.

Q     And are those time-limited subsidy contracts with LAHSA?

A     Yes.

Q     And do you know where the source of funding comes from for those time-limited subsidies, subsidy contracts with LAHSA?

MR. ROTSTEIN:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I believe currently Measure H is soon to be converted to Measure A.

BY MS. MYERS:



Q   Okay.  In the past five years, has the People Concern had any time-limited subsidy contracts with LAHSA that were funded through the City of Los Angeles?

MR. SCOLNICK:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  We may have.  I can't say for certain.

BY MS. MYERS:

Q   Okay.  You said that the People Concern operates Inside Safe facilities; correct?

A   Yes.

Q   Do you know if those contracts have a time-limited subsidy component attached to the Inside Safe contract?

A   Yes, they do.

Q   Okay.

A   So for those, yes, TLS, I thought you were asking separate from Inside Safe.

Q   Okay.  And for the Inside Safe contracts that include a component of time-limited subsidies, would those contracts be funded by the City of Los Angeles?

A   Yes.

Q   And how long has the People Concern had those contracts?

A   Since we've been operating Inside Safe,



which is just about two years, a little over two years.

Q    Okay.  So going back to 2023; is that correct?

A    Correct.

Q    Okay.  And so for the time-limited subsidy component of those contracts, can you describe what the People Concern's obligations are with regard to the time-limited subsidy contract?

MR. SCOLNICK:  Relevance calls for a legal opinion.

THE COURT:  Overruled.

THE WITNESS:  We have a few responsibilities. One is housing navigation, so to actually locate units for people to move into, to help the potential tenant fill out the applications and kind of navigate that, the unit inspection, as well as actually helping people move into the unit.  So part of TLS is providing first and last and utilities if that is required for the unit, getting through the unit inspection, and then helping folks transition into the units.

BY MS. MYERS:

Q    And then does the People Concern actually provide the rental subsidy payments to the landlords for each of the participants enrolled in TLS?

A    Yes, for those.



150

MR. SCOLNICK:  Relevance.

THE WITNESS:  Sorry.

THE COURT:  Overruled.

You can answer the question, sir.

THE WITNESS:  Yes, for those units.

BY MS. MYERS:

Q   Okay.  And are you aware, for purposes of the Inside Safe Contract that includes the time-limited subsidy component, what the People Concern's obligation is in terms of people served under the TLS contract?

MR. SCOLNICK:  Vague.  Calls for a legal opinion.

THE COURT:  Overruled.

You can answer the question, sir.

THE WITNESS:  I am not sure I understand the question.

BY MS. MYERS:

Q   Sure.  That is fair.  So for purposes of the Inside Safe Contract, how is the People Concern's obligation quantified for purposes of what your obligation is for the Inside Safe Contract?

MR. SCOLNICK:  Vague.  Calls for a legal opinion.

THE COURT:  You understand the question, sir?

THE WITNESS:  I think so.  I am going to answer



it, and you will tell me if it is not correct.

So our obligation is quantified under the terms of the contract and in the scope of work in terms of what we are obligated to do.

BY MS. MYERS:

Q    And so for the scope of required services for the contract for Inside Safe, is it that the People Concern will operate a certain number of hotel rooms within a given hotel?  That is what I am asking.  How is the scope of required services quantified?  Is it by people or hotel rooms or length, or how is that quantified?

MR. SCOLNICK:  Vague and relevant.

THE COURT:  You understand the question?

THE WITNESS:  I believe so.

THE COURT:  Okay.  You may answer.

THE WITNESS:  By the number of contracted rooms and the number of people that are occupying those contracted rooms.

BY MS. MYERS:

Q    Okay.  Perfect.  That is exactly what I was getting at.  So for purposes of the time-limited subsidy portion of the Inside Safe Contract, how is the time-limited subsidy portion quantified?

MR. SCOLNICK:  Relevance.



THE COURT:  Overruled.

THE WITNESS:  It is basically funded the same way.  It is per slot, as it were.  And a slot is a person tied to a room occupied by a person who is qualified, who then would be eligible for a time-limited subsidy.

BY MS. MYERS:

Q    Okay.  Does the time-limited subsidy allocation, do you provide that only for individuals?

A    No.  We have some couples.  I do not believe in our -- our Inside Safe sites do not serve families, but we have had couples.

Q    Okay.  And so if a couple goes into a -- receives a time-limited subsidy and goes into an apartment together, would that be one slot or two?

A    It would be counted as two individuals.

Q    Okay.  For purposes -- that is what you would quantify as a slot; is that correct?

MR. SCOLNICK:  Vague and relevance.

THE COURT:  Overruled.

THE WITNESS:  That is my understanding.

BY MS. MYERS:

Q    Okay.  And so if -- so when you say the number of people that are served for purposes of a time-limited subsidy contract, then it does not matter how many apartments are rented then with those subsidies.  It

matters how many individuals are served?

MR. SCOLNICK:  Vague and misstates the testimony.

THE COURT:  Do you understand the question to make certain?

THE WITNESS:  I think I do.

THE COURT:  Okay.  You may answer.

Overruled.

THE WITNESS:  It is both.  It is both the unit, the apartment unit that is rented, and the number of people living in that unit.

BY MS. MYERS:

Q    Okay.  Okay.  So for purposes of the requirement for the contract, those two numbers may be different; correct?

A    They might be, yes.

Q    Okay.  And does the contract set a requirement for each of those, or does it set a requirement for one of those, as in rental subsidies paid out to an apartment or people served with rental subsidies?

MR. SCOLNICK:  Calls for legal opinion and compound.

THE COURT:  Can you answer the question, sir?

THE WITNESS:  I believe that the contract is



structured that it is the number of people served under the contract.

BY MS. MYERS:

Q    Okay.  Thank you.  Does the People Concern run any -- well, let me back up.

Are you familiar with the term tiny home village?

A    Yes, I am.

Q    What is your understanding of a tiny home village here in Los Angeles?

A    They are individual units, sheds.  They look a lot like small, TuffSheds is how I would describe them on land where there is usually centralized either dining facilities, restroom, shower facilities, but everyone has an individual sleeping area with shared common space.

Q    And has the People Concern ever operated a tiny home village?

A    No, we haven't.

Q    Okay.  Is there a reason why the People Concern has not operated a tiny home village?

MR. SCOLNICK:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  No.

THE COURT:  You can answer the question.

155

THE WITNESS:  Because we operate, we have existing interim facilities and just have chosen not to.

BY MS. MYERS:

Q    Okay.  You talked about a little bit in terms of the plaintiff's questions related to the cost of permanent supportive housing development.  You spoke a little bit about private equity development.  And you testified that private equity can oftentimes build housing cheaper than government funded development; correct?

A    Yes.

Q    And one of the reasons that you indicated it is more expensive to build government funded housing -- let me withdraw that question.

One of the reasons that you indicated it is cheaper for private equity to build housing is that there's a single source of capital; correct?

A    Yes.

Q    And one of the largest cost drivers of government funded projects is carrying costs related to the development time that it takes to build a project; correct?

MR. SCOLNICK:  Objection.  Relevance. Foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes.



BY MS. MYERS:

Q    And does that come in part because government funded contracts often require tying together different funding streams?

MR. SCOLNICK:  Objection.  Relevance. Foundation.  And calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MYERS:

Q    And one of the other drivers of the cost of government funded developments is the requirement under most government funded contracts to use prevailing wages for purposes of construction; correct?

MR. SCOLNICK:  Relevance.  Vague.  Lacks foundation.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Yes.

BY MS. MYERS:

Q    And that's not a requirement when it's private equity; correct?

A    Well, it depends.  If the rental subsidies are involved, then there usually is a prevailing wage requirement.

Q    So it depends on the rental subsidy



source, but not on the capital side, not on the front end?

A     Yes.

Q     Okay.  And so, if an entity like the City of Los Angeles decides that it's a public good to pay higher prevailing wages, that means that when the City of Los Angeles invests in permanent housing development, it will necessarily cost more; correct?

A     Yes.

Q     And those two things, carrying costs related to the stringing together of funding sources and prevailing wage costs, increased prevailing wage costs, are two of the largest drivers of government funded projects costing more than private equity; correct?

A     Yes.

Q     Are you familiar with Proposition HHH?

A     Yes.

Q     Has the People Concern built projects with Proposition HHH?

A     We've been involved in projects.  We've been involved in development projects using HHH money, yes.

Q     Does Proposition HHH set a limit on the amount of City funds from Proposition HHH that can go to each housing unit?

MR. SCOLNICK:  Relevance and calls for a legal

opinion.

THE COURT:  Overruled.

THE WITNESS:  I believe it does.

BY MS. MYERS:

Q    Do you know, as you sit here, do you know what that limit is?

A    I believe it's about $100,000.  Maybe it's higher than that, about $100,000 a unit.

Q    And so for each unit that costs more than $100,000, isn't it the case that the developer needs to then go out and find the additional funds to support the cost of the development of that unit?

MR. SCOLNICK:  Objection.  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MYERS:

Q    And so by leveraging funds from Proposition HHH City funding into the additional funding, Proposition HHH has actually resulted in a significant amount of additional funding coming to the City of Los Angeles for the construction of permanent supportive housing; correct?

MR. SCOLNICK:  Lacks foundation, vague.

THE COURT:  Overruled.

159

Can you answer the question, sir?

THE WITNESS:  Yes.

BY MS. MYERS:

Q   One of the things that you testified to about the way that the City of Los Angeles could use best efforts to scale up housing in the next six months, the increase of 1,000 beds, would be to look holistically at the system and balance the number of interim housing beds with the number of permanent supportive housing beds; correct?

A   Yes.

Q   And you used the term throughput; correct?

THE COURT:  I'm sorry.  You used the term?

MS. MYERS:  Throughput.

THE COURT:  Throughput.  All right.  Thank you.

THE WITNESS:  Yes, I did.

BY MS. MYERS:

Q   Can you describe what the term throughput means?

A   People moving through the system.  In other words, if someone is moving from the streets into interim housing, then eventually they're moving into permanent housing.  That's what I mean by throughput.

Q   And moving into permanent housing is important because that's what ultimately ends homelessness

160

for that individual; correct?

MR. SCOLNICK:  Objection.  Relevance.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Yes.

BY MS. MYERS:

Q    And so when you look at -- so you've been involved in the provision of services related to the homeless services delivery system over the past five years; correct?

A    Yes.

Q    And over the past five years, there has been a dramatic increase in the number of interim shelter beds here in the City of Los Angeles; correct?

A    Yes.

Q    And with regards to those interim housing beds, interim housing or shelter beds, are you aware of the rates of exits back into homelessness related to those interim shelter beds?

A    They're pretty high.

Q    And do you have a sense of whether the rate of falling back into homelessness for interim shelter beds, how that compares to the rate of falling back into homelessness for permanent supportive housing units?

MR. SCOLNICK:  Objection.  Relevance.  Lacks

161

foundation.  And vague.

THE COURT:  Overruled.

THE WITNESS:  I believe, based on the data that I've seen, that more people leave temporary housing to go back to the streets than in permanent housing.  It's not that people in permanent housing don't lose their housing, but it's a much, much smaller percentage.

BY MS. MYERS:

Q    And one of the things that you spoke about in terms of the homeless services delivery system and understanding a comprehensive system is that sometimes people fall out of affordable housing into homelessness; correct?

A    Yes.

Q    And part of what your understanding is of a comprehensive system to address homelessness would be homelessness prevention at the front end to prevent people from falling into homelessness; correct?

MR. SCOLNICK:  Objection.  Vague.  Lacks foundation.

THE COURT:  Overruled.

Can you answer that question?

THE WITNESS:  Yes.

BY MS. MYERS:

Q    If the City added 12,915 shelter beds

today, would that have a negative impact on the homeless services delivery system and the type of comprehensive strategy that you think would be necessary to address the homelessness crisis in Los Angeles?

THE COURT:  If you added 12,915?

MS. MYERS:  Yes, 12,915 shelter beds.

THE COURT:  Shelter beds.

MR. SCOLNICK:  Objection.  Vague.  Incomplete hypothetical.  Lacks foundation.

THE COURT:  Overruled.

Can you answer the question, sir?

THE WITNESS:  If that's all that we added without adding, as I said repeatedly, an exit strategy to permanent housing, then yes, I think it would overwhelm the system.  Because first of all, I don't know how we would create that many beds.  Second of all, I don't know how we would provide the services to that many people.  And I don't see how there would be any kind of reasonable throughput lacking a permanent exit strategy.

MS. MYERS:  Thank you.  No further questions, Your Honor.

THE COURT:  On behalf of Gibson, Dunn?

CROSS-EXAMINATION

BY MR. SCOLNICK:

Q    Kahn Scolnik on behalf of the City.  Good



afternoon, Mr. -- or good morning, I suppose, Mr. Maceri.

You talked a bit about the Inside Safe program; correct?

A    Yes.

Q    And you would agree that lots of people have been brought inside under the Inside Safe program; correct?

A    Yes.

Q    And in your words, that's a good thing.

A    Yes, it is.

Q    Of course, Inside Safe is not the only interim housing program for people experiencing homelessness in Los Angeles; correct?

A    Correct.

Q    I believe counsel just also asked you about tiny home villages.  You're familiar with those?

A    Yes.

Q    And you also testified about the Alvarez and Marsal assessment that was done in connection with this case; correct?

A    Yes.

MR. SCOLNICK:  Can we bring up Exhibit 23, please, which is the Alvarez and Marsal assessment, page 119?

THE COURT:  And does he have a hard copy?



164

MR. SCOLNICK:  I don't know that he does.  I'm happy to get one for him, Your Honor.

THE COURT:  Would somebody hand him a hard copy as well.  Sir, we'll also bring that up on the screen, but I want you to have a hard copy.

Thank you.  You can just approach the witness.

MR. SCOLNICK:  Thank you, Your Honor. Appreciate it.

BY MR. SCOLNICK:

Q    And when you get that, Mr. Maceri, I'm looking at page 119.

A    Okay.  Thank you.

Q    And the numbering is up top right corner.

A    Okay.  All right.

Q    Can you see on page 119 that Alvarez and Marsal purported to demonstrate outcomes for a variety of different interim housing solutions?

A    Yes, I can see that.

Q    And the rows in the middle show two tiny home villages.  If we can highlight those.  Do you see that?

A    Yes.

Q    And then the bottom three rows are three Inside Safe projects?

A    Yes.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

Q     And then the column on exit data, permanent housing, do you see that?

A     Yes.

Q     And do you see that for tiny home villages, Alvarez and Marsal purported to find that somewhere between 16 and 25.5 percent of individuals exit to permanent housing; right?

A     Yes.

Q     And somewhere between 50 percent and 62 percent exit to homelessness?

A     Yes.

Q     And let's look now at Inside Safe at the bottom and compare that.  For Inside Safe, A&M purported to find somewhere between 21.5 and 50 percent of individuals exiting to permanent housing; is that right?

A     Yes.

Q     And between 6.4 percent and 42 percent exit to homelessness?

A     Yes.

Q     And I believe that's it with this document.  And you testified you're not a lawyer; correct?

A     Correct.

Q     And you're not a legal expert; right?

A     Correct.

Q     You didn't negotiate the Alliance

settlement agreement?

A    No, I did not.

Q    And you didn't negotiate the roadmap agreement between the city and the county of L.A.; correct?

A    Correct.

Q    You testified earlier about a number of things that in your view could be done to improve the homeless response system; correct?

A    Yes.

Q    But none of those things are required under the Alliance settlement agreement; correct?

A    I don't believe so.

Q    And none of those things are required under the roadmap agreement?

A    I don't believe so.

Q    You would agree, of course, homelessness is a complex problem?

A    Yes, absolutely.

Q    And solving it in Los Angeles is going to involve the City, of course; right?

A    Yes.

Q    The county?

A    Yes.

Q    LAHSA?



167

A    Yes.

Q    LAPD?

A    Yes.

Q    Department of Sanitation?

A    Yes.

Q    The Housing Department?

A    Yes.

Q    Department of Transportation?

A    Yes.

Q    Non-profits?

A    Yes.

Q    Other service providers?

A    Yes.

Q    The state government?

A    Yes.

Q    And the federal government?

A    Yes.

Q    You also testified about a number of sites that you had, I believe, Inside Safe sites that were still in development; is that correct?

A    No, I did not say that.  I said that we have on the Alliance settlement, there are 10 sites, permanent housing sites that are in development.  We don't have any other.  We operate two Inside Safe.

Q    My mistake.  So you do have 10 permanent

168

sites in development that are affiliated with the Alliance agreement; correct?

A    Correct.

Q    Do you have every intention of completing those sites?

A    Yes.

Q    And do you understand the City has created over 5,000 beds that qualifies permanent housing in connection with the Alliance agreement?

MS. MITCHELL:  Objection.  Calls for speculation.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  I honestly don't know what the total bed count is.

MR. SCOLNICK:  Okay.  That's my last question, Your Honor.  Thank you.

THE COURT:  Thank you.  And then redirect?

MS. MITCHELL:  We have no further questions.

THE COURT:  All of you check your notes, just in case.  Ms. Myers, do you have any questions?

MS. MYERS:  No, Your Honor.  Thank you.

THE COURT:  City, want to consult, make certain.

Sir, thank you very much for your attendance. Thank you.  Watch your step down.

Counsel, who is your next witness?

MS. MITCHELL: Your Honor, we had an agreement not to call additional witnesses while Mr. McRae was gone, so if we can take a break until he gets back, I would appreciate that.

THE COURT: Absolutely. Who will be your next witness, though?

MS. MITCHELL: We would like to put Ms. Frost back on the stand.

THE COURT: All right. Now, have you had enough? Well, sorry. I'll talk to counsel when he comes back.

MR. SCOLNICK: Thank you, Your Honor.

MS. MITCHELL: And, Your Honor, for the Court's edification, I think the only remaining witness is Ms. Martinez, Special Master Martinez.

THE COURT: I'd like to get her on the stand as quickly as possible. She's been sitting here and coming back from the flu.

We also have the Apex Doctrine, though, to discuss, and I think I'll give you 10 minutes of argument on both sides. I'm aware of the briefing, but that's more than sufficient.

All right. I've got another matter then at 12:00 noon, and for the record, my staff is going to lunch, but I need you to keep CourtSmart on.

And, Counsel, go have a nice lunch.  If you'd come back at 1:00 o'clock.  We have other matters though.

MR. SCOLNICK:  Thank you, Your Honor.

(A recess was taken off the record.)

THE COURT:  Then I believe we were going to resume with Ms. Frost; is that correct?  Mrs.  Frost?

MS. MYERS:  Yes, Your Honor.

THE COURT:  All right.  If you would take the stand then.  And once again, would you reintroduce yourself to the record, but would you also state your maiden name before the change, so everybody knows that you're involved with the A&M audit.

THE WITNESS:  Laura Collier, maiden name Collier is spelled C-O-L-L-I-E-R, and married name Frost, F-R-O-S-T.

THE COURT:  Thank you.

MS. MYERS:  Just a moment to set up the tech, Your Honor.

THE COURT:  Oh, no, that's fine.

MS. MYERS:  Thank you.  Thank you so much.  There we go.  All right.

Whereupon,

LAURA FROST

was called as a witness, and having been previously sworn,



was examined and testified as follows:

                    DIRECT EXAMINATION

BY MS. MYERS:

        Q     Shayla Myers.  Okay.  perfect.  Shayla Myers with the Legal Aid Foundation of Los Angeles on behalf of the intervenors.  Good afternoon, Ms. Frost. Thanks for your patience in coming back this afternoon. You have been present at a number of the hearings for this case; correct?

        A     Correct.

        Q     And you've been here throughout the evidentiary hearing; correct?

        A     Correct.

        Q     And you were also here at a hearing that the Court conducted on March 27th, 2025; correct?

        A     Correct.

        Q     And the purpose of that hearing was, in part, for A&M to present the draft assessment to the Court and the parties; correct?

        A     Correct.

        MR. MCRAE:  Relevance foundation.

        THE COURT:  Overruled.

        THE WITNESS:  Correct.

BY MS. MYERS:

        Q     And in the course of that hearing, you



172

were open to receiving questions from the parties related to the draft; correct?

MR. MCRAE:  Relevance, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MS. MYERS:

Q    And, in fact, during the hearing, the parties asked you a number of questions about the assessment; correct?

MR. MCRAE:  Same objections, lack of foundation, relevance.

THE COURT:  Overruled.

THE WITNESS:  I believe they were, yes.

BY MS. MYERS:

Q    And during the hearing, intervenors highlighted parts of the assessment from A&M that related to A&M's inability to verify the beds that the City of Los Angeles had reported that it had created as part of the LA Alliance settlement agreement; correct?

MR. MCRAE:  Objection.  Lack of foundation. Calls for speculation.

THE COURT:  Overruled.

MR. MCRAE:  It's vague and also calls for a legal conclusion and relevance.

THE COURT:  Overruled.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

THE WITNESS:  Correct.

BY MS. MYERS:

Q    And at that hearing, all of the parties were present; correct?

MR. MCRAE:  Objection.  Lack of foundation and relevance.

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MS. MYERS:

Q    At the March 27, 2025 hearing, this Court did not finalize the A&M assessment, did it?

MR. MCRAE:  Relevance, foundation.

THE COURT:  Overruled.

THE WITNESS:  No, it did not.

BY MS. MYERS:

Q    And part of the reason that the report was not finalized was because the Court asked A&M to meet with the parties related to the draft assessment; correct?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Correct, yes.

BY MS. MYERS:

Q    And you participated in a number of those meetings; correct?

MR. MCRAE:  Relevance.



174

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MS. MYERS:

Q    And in the course of those meetings, did you have an understanding that the Court placed any limitations on the subject matter of those meetings?

MR. MCRAE:  Objection.  Lack of foundation. Calls for a legal conclusion.  Vague.  403.

THE COURT:  Overruled.

You can answer the question, please.

THE WITNESS:  There is no limitations that I'm aware of.

BY MS. MYERS:

Q    And in the course of those meetings -- well, let me back up.

A&M conducted a number of meetings with the parties; correct?

MR. MCRAE:  Objection.  Vague.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Correct.  Yes.

BY MS. MYERS:

Q    And did A&M place any limitations on the subject matter that they were open to discussing with the parties related to the assessment?

MR. MCRAE:  Relevance.



THE COURT:  Overruled.

THE WITNESS:  No, we did not.

BY MS. MYERS:

Q    And did A&M meet with representatives from the City of Los Angeles?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  We did, yes.

BY MS. MYERS:

Q    And can you tell us who A&M met with?

MR. MCRAE:  Your Honor, can I have a standing objection to not making objections outside of an evidentiary hearing where they wouldn't have to be presented is not relevant and 403?

THE COURT:  You have a standing objection, Counsel.

THE CLERK:  Yeah, I'm happy to list from the City.  Ms. Myers?

MS. MYERS:  Yes.  Thank you.

THE WITNESS:  The Assistant CAO, City Attorneys, Special Master Martinez, council members.  Apologies, I don't believe the council members, it may have been their staff were present, I believe that's all I can recall at the top of my head right now.  Oh, I apologize, representative from the Mayor's Office, Dr., I can't



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

recall.

BY MS. MYERS:

Q    Dr.  Agonafer?

A    Yes, thank you.  Yes.

Q    And within those meetings with the City, did A&M place any limitations on the topics that could be discussed?

MR. MCRAE:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  No, we did not.

BY MS. MYERS:

Q    Was A&M receiving, was open to receiving additional data from the parties related to the assessment?

MR. MCRAE:  Relevance and vague.

THE COURT:  Overruled.

THE WITNESS:  Absolutely, yes.

BY MS. MYERS:

Q    And in fact, A&M did receive some data from at least one of the parties; correct?

MR. MCRAE:  Vague.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Correct, yes.

BY MS. MYERS:

Q    So as part of the meetings after March



27th and before the A&M draft was finalized, did the CAO's office offer to provide you data sufficient to verify the number of beds that were created under the settlement agreement?

MR. MCRAE:  Objection.  Vague.  Lack of foundation.  Relevance.  Assumes that there was a duty. 403.

THE COURT:  Which agreement are you referring to?

MS. MYERS:  The settlement agreement, Your Honor, and I would just point out, counsel has a standing objection.  There's two settlement agreements.  When I say the settlement agreement, I'm referring to the LA Alliance settlement agreement as opposed to the roadmap agreement, just for the witnesses' sake.

THE COURT:  Overruled.

You can ask that question.

BY MS. MYERS:

Q   Okay.  So as part of the meeting and review of the draft after the March 27th hearing, did the CAO's office and the representative that you met with, did they offer you data sufficient to verify the number of beds that were created pursuant to the LA Alliance settlement agreement?

MR. MCRAE:  Objection.  Vague as to time.  Lack



of foundation.  Relevance.  403.

THE COURT:  Overruled.

THE WITNESS:  No, they did not.

BY MS. MYERS:

Q    And in fact, as part of the meetings with the CAO's office after the March 27th hearing and before the approval of the final draft, did the CAO's office offer you any data related to the creation of beds under the LA Alliance settlement agreement?

MR. MCRAE:  Objection.  Vague as to "any data."  403.  Lack of foundation.  And relevance.

THE COURT:  Overruled.

Can you answer the question, please?

THE WITNESS:  No, they did not.

BY MS. MYERS:

Q    As part of the hearing on March 27th, 2025, a number of parties raised issues that had been part of the assessment related to time-limited subsidies; correct?

MR. MCRAE:  Objection.  Vague.  Lack of foundation.  Relevance.

THE COURT:  Overruled.

Do you understand that question?

MS. MYERS:  I can ask it again, Your Honor.

BY MS. MYERS:



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

Q    As part of the hearing on March 27th, did the parties raise issues about the parts of the assessment that spoke directly to time-limited subsidies?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lack of foundation.  Vague.  Relevance.  403.

THE COURT:  Overruled.

THE WITNESS:  I cannot recall off the top of my head if time-limited subsidies were explicitly discussed.

BY MS. MYERS:

Q    As part of the meetings with the CAO's office following the March 27th hearing, did the CAO's office provide A&M with any data related to the roadmap agreement?

MR. MCRAE:  Objection.  Relevance.  Lack of foundation.  Calls for speculation.  403.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  No, they did not.

BY MS. MYERS:

Q    And as part of the meeting and review of the draft after the March 27th hearing, did the CAO's office offer you or offer to provide you with data sufficient to verify the number of beds created under the roadmap agreement?

MR. MCRAE:  Objection.  Relevance.  Vague as to



180

time.  Lack of foundation.  Calls for a legal conclusion. 403.

THE COURT:  Overruled.

THE WITNESS:  No, they did not.

BY MS. MYERS:

Q   And one of the conclusions that appears in the draft that was submitted to the Court and about which there was a hearing on March 27th was that there was insufficient data for A&M to verify the existence of the time-limited subsidies that the City of Los Angeles had reported in the roadmap agreement; correct?

MR. MCRAE:  Objection.  Vague.  Also relevance as to a draft.  Lack of foundation.  403.

THE COURT:  Overruled.

You can answer the question?

You may ask.

MS. MYERS:  Thank you, Your Honor.

THE WITNESS:  Correct.

BY MS. MYERS:

Q   And when A&M submitted the draft to the Court that was put forward on the Court's docket and publicly available, did A&M understand that it may be subject to questions from the parties about some of your findings?

MR. MCRAE:  Objection.  Relevance.  Lack of

181

foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes, it was very important for us that if there were any factual misrepresentations in the report, they were corrected.  So we wanted to give all parties opportunity to provide any additional feedback before finalizing.

BY MS. MYERS:

Q    And that would include, for example, data sufficient to verify the number of beds that were created under the LA Alliance settlement agreement; correct?

MR. MCRAE:  Objection.  Leading.  Calls for speculation.  Lack of foundation.  Vague.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Correct.  Yes.

BY MS. MYERS:

Q    And so following the hearing on March 27, 2025, A&M submitted a final assessment; correct?

A    Correct.

Q    And that final assessment was finalized after A&M had meetings with all of the parties; correct?

A    Correct.

Q    And I'm going to turn your attention to --
Did A&M make any substantive changes to any of the factual

findings in the final report?

MR. MCRAE:  Objection.  Argument.  Lack of foundation.  Calls for a legal conclusion.  It's vague as to substantive.

THE COURT:  Overruled.

THE WITNESS:  No, we did not.

BY MS. MYERS:

Q   So I'm going to show you what's been marked as Exhibit 23.  I'm going to specifically point you to page 4 of 160, where it says key findings, financial and performance overview of city programs. This section of the report is part of the executive summary; correct?

A   Correct.

Q   So I'm going to point you to one of the first key findings, which is the first paragraph.  Poor data quality and integration.  And the second sentence states, one of the primary obstacles was the inability to verify the number of beds the City reported on the roadmap and Alliance programs; correct?

MR. MCRAE:  Your Honor, this is cumulative. We've had maybe three days of testimony combined from Ms. Frost and Ms. Rafferty.  At some point, this needs to end. I mean, this has been covered.  And we're now just reading from this assessment the same things that have been put into the record before.  And I think this exceeds the

scope, if we're going to do that, with respect to the redirect as well.

MS. MYERS:  Your Honor, if I may, this is directly in response to Mr. Szabo's testimony and Mr. McCrae's questions, specifically related to the changes that were made.  There were some representations that substantive changes were made.  I want to make sure that Ms. Frost has an opportunity to explain this specific provision, because it's a critical part of the provision, and she hasn't had a chance to explain it relative to the draft.

MR. MCRAE:  Your Honor, three things.  One, that's a mischaracterization of the record.  Second, that's an admission that it exceeds the scope of the apology, essentially, that was read into the record with respect to the assessment by Ms. Frost.

And third, Ms. Frost is not, even by her own lawyer, being offered to go beyond what was stated on that examination.  This is beyond the scope of the initial redirect examination.

MS. MITCHELL:  I'm going to object to the characterization of Ms. Frost's statement as an apology, and also correct the record that I, Ms. Mitchell, am not, in fact, Ms. Frost's lawyer.

THE COURT:  All right, Counsel.  Both of you,



184

thank you very much.  Overruled.

MS. MYERS:  Thank you, Your Honor.

BY MS. MYERS:

Q    So one of the additions to the final assessment was that statement; correct?

MR. MCRAE:  Objection.  Vague.  Irrelevance. And cumulative.

THE COURT:  You're going to have to re-ask, Counsel.

BY MS. MYERS:

Q    Okay.  So the statement that I previously read, that one of the primary obstacles was the inability to verify the number of beds the City reported under the roadmap and Alliance programs. That specific sentence in that location, in the final draft, was an addition to the final draft; correct?

MR. MCRAE:  Objection.  Unintelligible.  It's also cumulative and vague and relevance.

THE COURT:  Overruled.

THE WITNESS:  We had bed verification already part of this key finding in the draft report.  We just wanted to provide clarity on this finding, as we received feedback that it wasn't very clear in the original draft.

BY MS. MYERS:

Q    So the substance of the report did not



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

change with the addition of this statement; is that correct?

MR. MCRAE:  It's argument, lack of foundation, vague, relevance.  The documents say what they say.

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MS. MYERS:

Q    And, in adding this sentence, was it your intention, as one of the authors of the report, to change the substance of the assessment?

MR. MCRAE:  Objection.  Relevance.  Lack of foundation.  Vague.

THE COURT:  Overruled.

THE WITNESS:  No, we just wanted to make sure our findings were clear.

MS. MYERS:  Those are all my questions, Your Honor.  Thank you.

Thank you, Ms. Frost.

THE WITNESS:  Of course.

THE COURT:  Counsel on behalf of Gibson, Dunn and the City?

MR. MCRAE:  Can we have a few moments to set up?

THE COURT:  Certainly.

And, Counsel, for either of you, if you decide not to use the lectern, I'm not too concerned.  Especially



with flu season on us.  So if you want to speak from, being seated, I'm not concerned.

CROSS-EXAMINATION

BY MR. MCRAE:

Q    Good afternoon, Ms. Frost.

A    Good afternoon.

MR. MCRAE:  Let's start with the notes that you read from this morning.  Did those notes -- may I inquire, Your Honor, I don't know if there was ever an exhibit number?

THE COURT:  There wasn't.  So let's have them marked.  What number would Counsel like?

MR. MCRAE:  Not my notes.  I don't --

MS. MITCHELL:  I think, let's start with the 400 series, to be safe.

THE COURT:  Just 400?

MS. MITCHELL:  400, Your Honor.

THE COURT:  400.  Thank you.

(Exhibit 400 was admitted in Evidence.)

BY MR. MCRAE:

Q    So talking about Exhibit 400, you have them in front of you?

A    I do, yes.

Q    And when I ask you this question, I don't mean physically who put what appears to be pen to paper,

but I'm asking who is the author of the notes that are Exhibit 400?

A       Collaborative discussion amongst the A&M team.

Q       Collaborative discussion.  So in other words, is it the entire A&M team that you've identified, the 10 people, which would include yourself, who authored Exhibit 400?

A       I received feedback from managing directors and senior directors.  So not all 10 team members, but key leaders in my team.

Q       Now, the 10 people that you're talking about, and let me parse a distinction here, managing directors, senior directors, were all of those people who you've given that title to or have that title, are you saying that all of those people were amongst the 10-member team that created the report?

A       They were part of the team that contributed to this assessment.  In relation to the notes, a few select of those team members, like the leadership.

Q       So a subset of the 10 contributed to the creation of the notes?

A       Correct.

Q       And of the subset of 10 people that contributed to the notes, not all of those people were

present in the courtroom during the testimony of the evidentiary hearing; correct?

A    They were not present at the evidentiary hearing.

Q    And that was my question.  And my next question is, as far as the collaborative effort that these notes, Exhibit 400, constitute, there's no breakout in terms of attribution of who amongst the sub-team of 10 contributed what; is that fair?

A    Correct.

Q    Okay.  There's not a record that you have with you now, at least, that identifies of the people that made their respective contributions to Exhibit 400, what, if any, information they did or didn't look at in the transcripts of the evidentiary hearing; right?

A    Apologies.

Q    Sure.  So what I'm asking you is, of the people who are the sub-team that contributed to the creation of Exhibit 400, there is no document that identifies how much of the evidentiary record, if any, in the form of the transcripts that they read; correct?

A    Correct.

Q    Okay.  So let's talk about some of these notes.  Can we have them up on the screen?  And so looking at this first -- the second paragraph, the second



paragraph says in pertinent part, and I'm looking at the third line, it says, reimbursements ultimately issued by the City, that's a period, the city controller acknowledged this shortfall, claiming City is cutting blank checks.  Do you see that?

A    I do, yes.

Q    Now, to contextualize all of this, all of the points that you've been talking about with respect to these notes pertain to work that A&M did in connection with the assessment where the look-back period ended in 2024; correct?

A    June 30th, 2024.

Q    Okay.  June 30th, 2024.  And so, A&M does not have a document where it purports to say whether or not, to the extent that there were any alleged blank checks being written, that that's happening now; correct?

A    Our look-back period was specific to June 1st, 2020, through June 30th, 2024.  Because of the nature of some cash requests, they may have been submitted by LAHSA after June 30th, 2024, pertaining to those expenditures.

Q    You said may have, and I want to put a real fine point on my question.  I'm asking you, A&M has no document where it's saying that blank checks are being written now, as we sit here today; correct?

190

A     This was in relation for context to the cash requests, so to your question, if the cash request process has changed today, from what I understand the testimony, nothing in relation to the process the City has represented to us has changed; right?

Q     You don't know that for a fact.

A     That was Mr. Szabo's testimony.

MS. MITCHELL:  Objection, Your Honor.  The witness needs to be able to answer the question.  I don't believe she was finished.

THE COURT:  Finish your answer, please.

THE WITNESS:  My understanding, and I could be misunderstanding Mr. Szabo's testimony, I understood him to be explaining that nothing from our report and our findings were taken into consideration to be changed.  So I am not under any knowledge currently that if the City has taken corrective action.

BY MR. MCRAE:

Q     So you were actually here in court when Mr. Szabo was testifying; right?

A     I was, yes.

Q     Do you recall a single question where Mr. Szabo was asked, sir, are all the systems and operations in effect during the look-back period operating in exactly the same manner now?  Do you recall him ever



191

being asked that question?

MS. MITCHELL: Objection. Argumentative.

MR. MCRAE: I'm asking if she recalls. She either does or she doesn't.

THE COURT: Overruled.

You can answer the question if you recall.

THE WITNESS: No, I do not recall him saying that.

BY MR. MCRAE:

Q    And you don't recall in the entire time that you've been sitting in this courtroom watching exhibits being placed up on the screen, any statement by anybody working on behalf of the City of Los Angeles saying that the systems and operations that informed the conclusions and recommendations of A&M during the look-back period are operating exactly the same way right now; correct?

A    I do not recall any representative explicitly saying that they have -- they're operating exactly the same, just not taking into consideration the findings for any corrective action.

Q    In fact, on this issue about corrective action, let's square this up right now.

The City of Los Angeles has never agreed in any document that you've ever seen that it would commit to



doing any corrective action relative to any finding by A&M; correct?

MS. MITCHELL:  Objection.  Asked and answered.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  Corrective action within relation to our estimate is not part of -- no.

BY MR. MCRAE:

Q    All right.  Let's talk about paragraph three on the first page.  Now, this talks about how using words like "potentially" or "may," and it says here in our report does not indicate a lack of competency.  Those terms are employed to highlight areas that warrant further review.  Is that what it says?

A    Yes.

Q    Okay.  And again, just to place this in the context, A&M did not conduct any further review beyond the look-back period that ended June 30th, 2024 relative to the assessment; correct?

A    Apologies, Mr. McRae.  Can you repeat your question?

Q    A&M did not conduct any further review of the subjects of the assessment beyond the look-back period that ended June 30th, 2024; correct?

A    I do not believe that's entirely accurate.

Q     Let's put it this way.  We don't have any document from A&M where it says that it is making any findings or recommendations beyond the look-back period of June 30th, 2024; correct?

MS. MITCHELL: Objection.  Vague.  Ambiguous. Lacks foundation.

THE COURT:  Do you understand the question?

MS. MITCHELL:  It also misstates the testimony.

THE COURT:  Do you understand the question?

THE WITNESS:  Apologies.  I don't believe I understand your question, Mr. McRae.

BY MR. MCRAE:

Q     So the look-back period, as you said, was 2020 to June 30th, 2024; correct?

A     Correct.

Q     There is no document from A&M in this courtroom that says that A&M is making findings or observations that pertain to a period other than the look-back period; correct?

A     I do not agree with that representation, no.

Q     You certainly don't have any documents from A&M saying that it's making findings that are applicable in 2025.

A     Throughout the report, there are

references to dates past June 30th, 2024, but it would be in reference to the look-back period, if that makes sense.

Q    Correct.  And the look-back period never changed; correct?  It was always that three-year period or four-year period that you described; correct?

A    Correct.  So if we were doing work in 2025, it would all -- yes, you're correct, it's in relation to the look-back period.

Q    It's baked into the name.  It's a look back, not a look forward; correct?

A    Correct.

Q    And let's talk about this language here, because it says that it may warrant further review or that it warrants further review, and then it goes on to say that not because we lack the ability to make a judgment, and then it says this approach ensures we neither overstate nor understate the evidence adhering to professional standards; right?  That's what it says?

A    Correct.

Q    Now, you would agree with me that the other thing that this approach does not do is it does not quantify the risk that's described in your note here, does it?

A    It does not quantify the risk.

Q    And the other thing that it doesn't do is

it doesn't state that the risk, at least according to these notes that's being described here, has actually materialized into an occurrence.

MS. MITCHELL:  Objection.  Vague and ambiguous as to "risk."  There is no risk referenced in the notes.

THE COURT:  Do you understand the question?

THE WITNESS:  Apologies, Mr. McRae.  I do not understand your question.

BY MR. MCRAE:

Q    Okay.  Well, when it talks about "potential" or "may" -- All right?  -- let's put it in those contexts.  With respect to whatever is stated potentially or the may, there's no statement in these notes that what has been described as something that may happen or that potentially could happen, that that actually materialized into an occurrence; correct?

MS. MITCHELL:  Objection.  Vague.  Ambiguous.  Lacks foundation.

THE COURT:  Do you understand the question?

THE WITNESS:  I believe I understand the question, Your Honor.

THE COURT:  Please answer.

Overruled.

THE WITNESS:  It's -- to definitively say that it's never -- we don't have any evidence of it, I believe



196

is an incorrect representation of that.  I believe we did see instances, but what we're saying is that it warrants further review.

BY MR. MCRAE:

Q    Yeah, yeah.  That wasn't my question.  My question is that to the extent that these notes say they're referring to some instance of something potentially happening or may happen, we're not going to be able to go to the assessment and find for every instance where you say that a statement that, and indeed, this actually did happen or the frequency with which it happened.

MS. MITCHELL:  Objection.  Vague.  Ambiguous. Lacks foundation.  Calls for speculation.  Unintelligible.

MR. MCRAE:  Do you understand -- I'm sorry.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  I believe there's numerous evidence within the report.  I cannot -- I can't put an umbrella statement to what you're asking.

BY MR. MCRAE:

Q    When you say there's evidence of it, I'm not asking that.  I'm not asking for an interpretation. I'm asking when the report says that something may occur, you would agree with me that it is certainly not the case

in every instance that the report says, and not only may it occur, as in there's a possibility of it occurring, it has occurred in these instances this number of times. Concrete things like that.  That doesn't appear in the assessment; right?

MS. MITCHELL:  Objection.  Compound and vague. Ambiguous.  Lacks foundation.  Calls for speculation.

THE COURT:  If you understand the question, you can answer it.  If not, counsel can re-ask it.

THE WITNESS:  I believe there's numerous evidence throughout the report.  So I would have -- if there's a specific statement that you are referring to, we can walk through that.

BY MR. MCRAE:

Q    Well, let me put it this way.  In the note that you and your sub-team created, you don't note any instances specifically here where any potential or may materialized in Exhibit 400; correct?

MS. MITCHELL:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  Correct.  We don't do an excerpt of a certain sentence in relation to that.

BY MR. MCRAE:

Q    Okay.  So let's go on to the second page of your notes.

Now, you would agree that paragraph 3, page 3 of Exhibit 23, and if you need to have it in front of you, that's fine.  I think you actually may have a copy, it's the assessment you created, says that it was not conducted in accordance with any applicable standard; right?

A    That's what it says.

Q    Let's look at the language together. Let's pull up Exhibit 3, 23, page 3, paragraph 3.  The salient language right in front of us is that A&M and the Court agreed that A&M's work would not constitute a formal review or audit in accordance with any applicable accounting standards; right?

A    That's what it says.  Correct.  We are not a CPA firm.

Q    Okay.  Well -- Hold on.

MS. MITCHELL:  Objection.  This is cumulative, Your Honor.  The witness has testified to this very paragraph multiple times as well.  Counsel has covered this multiple times as well.

MR. MCRAE:  It's foundational to questions I'm about to ask.

BY MR. MCRAE:

Q    Now, Ms. Frost, you testified earlier today, and I think the notes -- Let's go back to the notes



on the second page here.  And the second paragraph, in salient part, says, starting with however, it does not mean that we did not follow similar professional standards.  And then you say, our engagement was executed with the same principles of objectivity, due professional care, integrity, and documented evidence and transparency; right?

        A     That's what this says.  Correct.

        Q     Now, the first thing is, these notes don't say that the assessment was conducted in accordance with those very same principles as defined by GAP; correct?  That's not what these notes say; right?  You agree with me?

        A     Apologies, what was your question?  Can you kindly repeat your question?

        Q     You've got some words here, like objectivity, professional care, integrity.  They're not defined.  And my point is, you would agree with me that these notes don't say that whatever A&M thought it was doing, with respect to these words, that it is done in accordance with the same definitions of these terms as appears in GAP; right?

        MS. MITCHELL: Objection.  Vague.  Ambiguous.  Argumentative.

        THE COURT:  Overruled.



If you understand the question, you can answer.

THE WITNESS:  Correct, GAP is not defined here.

BY MR. MCRAE:

Q     And nor do these notes say that notwithstanding the use of these words, like integrity and objectivity and so forth, that the work that A&M did was done in accordance with how these terms are defined in GAAS, G-A-A-S; correct?

A     I believe we did align with government auditing standards.

Q     Well, that's not what GAAS is.  GAAS would be the government auditing standards.  I'm asking you about GAAS, number one.  But let me go back to my question.  There's not GAAS, the word GAAS, G-A-A-S, doesn't even appear in these notes; right?

A     Correct, GAAS is not on this page.

Q     Now, let me go to the next question.  You brought it up, GAAS.  Those are the accounting standards, the auditing standards applicable to governmental entities.  Correct?

A     Correct.

Q     And these notes, notwithstanding the use of the terms professional care, integrity, et cetera, they don't purport to say that the assessment was conducted in accordance with those terms as they are defined in GAGAS;

correct?

A    This page of notes does not explicitly state or define those words in relation to GAGAS.

Q    So is that a yes and an answer to my question?

A    I'm happy to clarify that we did adhere to professional standards in relation to government auditing standards.

Q    Well, let's turn to that, actually.  But let me just make sure I get an unequivocal answer to my question.  The notes that you read in open Court that you and your team had time to prepare, GAGAS does not appear. No reference to GAGS in this document; correct?

A    The acronym GAGAS is not on this page.

Q    So let's get to the next one.

MS. MITCHELL:  I'm sorry, Your Honor.  I'm, again, going to object to counsel cutting off the witness. I'd ask that he not talk over her while she's answering.

THE COURT:  Had you finished your answer?

THE WITNESS:  I have, Your Honor.

THE COURT:  I'm not sure if we picked that up, but I think we did, Counsel.

BY MR. MCRAE:

Q    Yeah, let me go to the next question.  No third party who's actually qualified to talk about GAGAS



and GAS and GAP and those standards has prepared any document saying that the A&M assessment comports with principles of objectivity, professional care, integrity, documented evidence, and transparency under any standard; right?

THE WITNESS:  Apologies, I don't believe I understand your question.  Can you please clarify?

Q    So we understand from your testimony this morning that A&M talks about its thoughts about whether it's work complied with certain undefined standards.  What I'm saying is no third party, meaning someone other than A&M, has been in this courtroom to say that the assessment by A&M was conducted in accordance with principles of objectivity, professional care, integrity, documented evidence, and transparency as defined by any of the applicable, by any standards that we've been discussing; correct?

A    Correct.

Q    Now, let's move down to the bottom portion of the same paragraph that we've been talking about here. You go on to say, or A&M goes on to say, I'm using the collective you for your subtitle, that we have been working with the City for almost one year, and our draft report was released three months ago, and not once did the City question our competency or dispute any finding until

this evidentiary hearing.  That's what this says; right?

A     Correct.

Q     So you fully understand that going back to March of this year, when you were questioned about that by counsel for the Interveners and all the meetings that you talked about and everything else, none of those things were this evidentiary hearing; right?

A     Correct.

Q     And I certainly want to make sure I'm clear on this.  You're not suggesting that the City had some duty to make objections to the assessment for purposes of the evidentiary hearing before there was an evidentiary hearing, are you?

MS. MITCHELL:  Objection.  Calls for a legal conclusion.  It's also irrelevant, Your Honor.

MR. MCRAE:  Oh, no, I just want to make sure that the witness isn't saying that.

THE COURT:  You can answer the question.

THE WITNESS:  Apologies, Mr. McRae.  Can you repeat your question?

BY MR. MCRAE:

Q     You're not suggesting that the City had some obligation to make objections about the use of this assessment in an evidentiary hearing before the evidentiary hearing occurred; right?



A    We requested that the City provide any feedback that they have in relation to the report and no finding or no feedback that disputed any finding was provided.

Q    That's not my question.  There's a difference between you making a request and an order of this Court; right?  You'd agree with that?

MS. MITCHELL:  Objection.  Calls for a legal conclusion.

MR. MCRAE:  That was my question.

THE COURT:  I understand, Counsel.

BY MR. MCRAE:

Q    Just re-ask it.

My question was, just to confirm this, A&M is not saying that the City of Los Angeles had some obligation to make an objection to the assessment with respect to how it may or may not be used in an evidentiary hearing before that evidentiary hearing even happened. That's my question.

MS. MITCHELL:  Objection.  Argumentative and calls for a legal conclusion.

THE COURT:  If you understand the question, you can answer.

THE WITNESS:  I don't believe I can speak to that.



BY MR. MCRAE:

Q    In fact, you're not saying that prior to the evidentiary hearing that A&M had any obligation to provide any information in response to a request by A&M; correct?

MS. MITCHELL: Objection. Vague. Ambiguous. Unintelligible.

THE COURT:  I think counsel misspoke.  Do you understand the question?

THE WITNESS:  Apologies, I do not understand the question, Your Honor.

BY MR. MCRAE:

Q    You're not suggesting that the City had any obligation prior to this evidentiary hearing to provide any information to A&M upon A&M's request?

A    I do not believe I can speak to that.

Q    And you're not saying that the City of Los Angeles ever agreed that unless it didn't make objections to the assessment prior to the evidentiary hearing, it would never make objections to the assessment in an evidentiary hearing; right?

A    Apologies, can you please repeat your question?

Q    You are not saying that the City of Los Angeles ever agreed that unless it made objections to the



assessment prior to this evidentiary hearing, it would never at some later point make objections to the assessment?

A    I don't believe I can speak to that.

Q    Now, let's go to the third page of your notes.  Let's go to the first paragraph.  We're going to go to the last dependent clause here.  It says, the we reference is A&M; correct?

A    Correct.

Q    We were not issuing an opinion on, does that say a finished product financial statement of, I apologize, I cannot make that out.  What does that say?

A    We were not issuing an opinion on a finished product such as a financial statement, like the statement of activities.

Q    Okay.  thank you.  It says, we, and that again is A&M, were quantifying financial data and issuing an opinion on processes.  That's what it says; right?

A    Correct.

Q    Now, you understand that the Alliance settlement agreement does not contain any commitment by the City of Los Angeles to do anything with respect to quantifying financial data; right?

A    To my understanding, no.

Q    You also understand that the Alliance



settlement agreement doesn't contain any commitment by the City of Los Angeles to do anything with respect to processes.

A   To my understanding, no.

Q   Let's go to the next paragraph. Now, you said that you've been in court over, I guess, the last couple of days. That would be true because today's Tuesday. I just wanted to make sure I wasn't saying like a weekend or something. So you heard Mr. Szabo say that of the 11,002 beds that are a combination of the open beds, and the in-process beds combined, that the number of beds where LAHSA was contributing the data is less than 5 percent. You were present in the courtroom when Mr. Szabo said that; right?

A   Yes, I do recall that.

Q   And A&M has never presented any assessment or report or anything else saying that the number of beds in the most recent quarterly report, which is Exhibit 35, out of the 11,002, is any different than the number that Mr. Szabo gave; right?

Let me rephrase the question. A&M has not presented any documentation where it claims that the number of beds out of the 11,002 beds in Exhibit 35, where the data was contributed by LAHSA, is any different than the number that Mr. Szabo gave; correct?

MS. MITCHELL:  Objection.  Lacks foundation.

Yes, sir.

I'm not agreeing with the objection.  I'm saying, I think that's probably right, that the witness doesn't know, but that's, or say I agree with you, but the witness can answer that.

The question then is?

BY MR. MCRAE:

Q    The question is, A&M has not presented any documentation where it's saying that the number of beds out of the 11,002 beds in Exhibit 35, where LAHSA contributed the data, is any different than the number that Mr. Szabo testified to; correct?

A    I believe the documentation from the A&M team would cast doubt and a potential risk on the accuracy of those reported numbers, but to your point, we have not, or we have not done that analysis.

Q    Well, yeah, one of the reasons you haven't done the analysis is that A&M didn't even have Exhibit 35 when it created, the Exhibit 35 pertains to a period that's not in the look-back period; correct?

A    Correct, yes, exactly.

Q    And Exhibit 35, as you know, is the most recent submission of quarterly reports relative to bed count by the City of Los Angeles according to Alliance



Settlement, the Alliance quarterly report?

A    Correct.  Yes.

Q    So as we keep reading here, one of the statements that's made here in this sentence is, here it is, LAHSA and the City have not produced sufficient evidence to demonstrate that counted beds were new or even created, do you see that?

A    Yes, I see that.

Q    So speaking about the Alliance settlement agreement, the term bed is not defined in that agreement; correct?

MS. MITCHELL:  Objection.  I think this is in relation to the time-limited subsidies, which is only in the Roadmap Agreement, not the Alliance Agreement.

MR. MCRAE:  I'm asking to make that exact point, that these are two entirely separate agreements.

THE COURT:  If you can answer the question.

THE WITNESS:  Bed is not defined in the Alliance settlement agreement.  Not that I can recall.

BY MR. MCRAE:

Q    And in fact, the Alliance settlement agreement doesn't say anything, it doesn't have the words new bed in it, does it?

A    I apologize, I don't have the Alliance Settlement in front of me, but I do not recall.


HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

210

Q    We can put Exhibit 25 in front of you if that would help.  Would that help?

A    That would be great, yes.

Q    Sure, sure, sure, we can get that for you. Give me a chance to get a sip of water.  Please let us know whenever you feel comfortable proceeding.

A    Yeah, absolutely, no, thank you.  I have it in front of me.

Apologies, your question was in relation to new beds?

Q    Yeah, the word new beds is not in Exhibit 25, is it?

A    Correct, it does not appear that it is in this exhibit.

Q    And the term bed is not defined in the County Roadmap Agreement; correct?

A    Are you referring to the Roadmap MOU?

Q    MOU, yes.

Apologies, I can't recall at the top of my head, I don't have it in front of me.

Q    Okay.  we can get that for you as well. While we're waiting for that, oh, it's ready.  Again, let us know whenever you're comfortable proceeding.

I have the Roadmap MOU in front of me, can you kindly repeat your question?

Q    I'm saying the words bed is not defined. In the Roadmap Agreement either, is it?

New beds is defined.  Right.

Q    In other beds, yes.  But in terms of what a new bed is, may I approach?  Your Honor, I don't have the document, may I approach?  May I approach the witness?

Oh, absolutely.

Thank you.

My apologies.  No, no, may I approach as well?

BY MR. MCRAE:

Q    And do you see any definition of new beds that says newly constructed in the County MOU?

It does not appear that newly constructed

Q    And let me move on to some other questions here.  Let's go back to your notes.  Now, you have Exhibit 25 still in front of you?

A    Sorry, 25 is the settlement agreement?

Q    The Alliance Settlement.  Sorry, I apologize.

A    Yes, I have it in front of me.

Q    The Alliance settlement agreement also doesn't define the word create, does it?

A    It's not a call, but I don't believe so.

Q    Now, you remember when you were testifying earlier today, and you were talking about some observation

about beds being utilized?

A    In relation to the notes?

Q    Yes.

A    Yes, utilized was mentioned.

Q    Right.  The Alliance settlement agreement does not say that a bed that is open and available must be utilized in order for it to be counted towards the 12,915 bed count obligation, does it?

A    Not that I'm, I do not believe occupation is, a bed is occupiable as defined.  I don't know if I can make that legal determination.

Q    And moving on to your notes where you say, in pertinent part, I'm looking at number one, which starts with gaps.  And you go on to say in the second sentence there, LAHSA later clarified to the press, those beds were not funded by the City.  You're aware that under the Alliance settlement agreement, there's no requirement that the City of Los Angeles pay out of its own funds for beds that are counted towards the 12,915 bed count; right?

A    Correct, that's my understanding.

Q    And let's go to the next sentence.  The next sentence here, with respect to the subject about TLS beds under the Roadmap Agreement, you would agree that the assessment does not talk about whatever TLS beds are included, if any, in any bed count under the Roadmap

Agreement as of today; correct?

MS. MITCHELL:  Objection.  Misstates the testimony.

THE COURT:  Overruled.

MR. MCRAE:  Well, that's the question.

THE WITNESS:  Apologies, Mr. McRae.  Can you repeat your question?

BY MR. MCRAE:

Q    You would agree with me that the assessment does not speak to the composition or number of any TLS beds that are being counted towards the bed count number under the Roadmap Agreement today.

A    Today, as in March, I'm sorry, as of the latest quarterly report of the roadmap of March 31st, 2025?

Q    I mean today as we literally are sitting here now.

A    I would not have information of how many TLS beds exist today.

Q    Let's go to the next paragraph.  Says inconsistencies, and in fact, just a point of reference, the utilization point, if you look at the second note that you have, the last two words in that note are actually utilized; right?

A    Correct.



214

Q      Okay.  we talked about that.  So let's go on to number three.  Inconsistent address?

A      Yes.

Q      Is that?  What does that say? Inconsistent address cut?  Is that what that says?

A      List.

Q      Oh, I'm sorry.  That's probably on me. Reading that incorrectly, I apologize.

All right.  In looking at that, I want to direct your attention to the last couple of lines here where it goes on to say, in reference to what precedes it, creates a high risk of inaccuracies, including double counting, and prevents the City from reliably measuring its progress.  You see that?

A      Correct, yes.

Q      Now again, that was reporting on data, right, and events that obviously were within the look-back period of the assessment; correct?

A      The data applied to the look-back period, but could be relevant today.

Q      It could be, but the fact is, is that anytime somebody says could be, you would agree that baked into could be is could not be.

A      Well, respectfully, I'll affirmatively say it is relevant today as sites that are reported to be

under roadmap are listed still today, well, respectfully, as of March 31st, 2025, under the Alliance settlement.

Q    Right, but today is June 3rd, or 2nd, or it's the 3rd.  Today is June 3rd; right?

MS. MITCHELL:  Objection.  Argumentative.

BY MR. MCRAE:

Q    Well, it is June 3rd, 2025; right?

A    Yes, it is June 3rd.

Q    Both of us had to check, I know.  And my point is, talking about today, as we are here now, A&M has not done an analysis of, let's say, for instance, the Exhibit 35, which is the most recent quarterly report that the City has submitted relative to bed counts; correct?

MS. MITCHELL:  Objection.  Misstates the testimony.

THE COURT:  Do you understand the question?

THE WITNESS:  Apologies, Mr. McRae.  I don't believe I understand your question.

BY MR. MCRAE:

Q    Okay.  the question is this.  This language right here that we're looking at that talks about a risk of inaccuracies.  These notes don't state the number of inaccuracies, if any, that have occurred; correct?

A    I don't believe I can definitively say

216

that.  Respectfully, there is evidence, but because of the lack of reconciliation in reference to the data across various data that LAHSA has produced, I cannot definitively state something, but I don't want to say that it does not exist in its entirety.

Q    I know the way of saying that is I don't know; right?

A    Respectfully, the data that LAHSA produced as representative of the roadmap slots did have overlap of addresses of the Alliance settlement, but we could not definitively reconcile.  So there is evidence, but there is to your point, I believe you're trying to make, there is not like there's still, it's not definitive because the evidence did not exist.

Q    No, the point I'm making is as of right now, you don't know whether that overlap still exists; correct?

A    As of today?

Q    As of June 3rd.

A    correct.

Q    Okay.  And let's, now last week in this courtroom, Diane Rafferty said no one in this courtroom knows whether the City of Los Angeles will be in compliance with its bed count obligations under the Alliance settlement agreement when the deadline expires.

Were you here when she said that?

A    I believe I was in the room, yes.

Q    So when she said no one in this courtroom knows, you were one of those people in the courtroom; right?  You were here?

A    Yes.

Q    Okay.  And at the same time, Diane Rafferty said last week in this courtroom that no one in this courtroom knows whether the City of Los Angeles will be in compliance with its encampment reduction obligations under the Alliance settlement agreement when the deadline expires.  You heard that?

A    I vaguely remember.  I don't want to mischaracterize her testimony, but.

Q    Well, let's put it this way.  You were here when Diane Rafferty testified last week; right?

A    Yes, I was here when Diane Rafferty testified.

Q    So you would have been among the people in the courtroom when she testified; right?

A    Correct, yes.

Q    And now you've been in court when counsel for the various parties have been asking questions that reveal different views about beds that can be counted under the Alliance settlement agreement; right?



218

A    Can you kindly be more specific?

Q    Let me ask this question instead.  I'll withdraw that one.  A&M has never been tasked with determining what beds can be counted under the Alliance settlement agreement; correct?

A    Correct.

Q    A&M has never been tasked with determining what encampment reductions can be counted under the Alliance settlement agreement; correct?

A    Correct.

Q    A&M has never been tasked with providing legal opinions about the meaning of any of the terms under the Alliance settlement agreement; correct?

A    Correct.

Q    A&M has never been tasked with providing legal opinions about the meaning of any of the terms under the roadmap settlement agreement; correct?

A    Correct.

Q    A&M has never provided a different bed count number relative to what's reported in Exhibit 35 by the City; correct?

Q    In Exhibit 35 is the Alliance settlement quarterly report March 31st; correct?

A    Well, Alliance, correct, yes.

Q    And as far as the encampment reductions

HCR

that the City of Los Angeles most recently reported in, Your Honor, can I have a moment to get that exhibit?  I don't have it off the top of my head.  I'm trying to get a data point for you.  It'll take me one second.

Let me try the question this way.  Relative to the most recent quarterly report that the City of Los Angeles submitted with its encampment reductions in that very last quarterly report, A&M does not have a document where it purports to have a different number of encampment reductions for that same period; right?

A    I do not believe so.

Q    All right.  Now, the engagement letter that A&M has or has had with the City of Los Angeles had a scope of engagement; correct?

A    Correct.

Q    And you're aware that the engagement letter also was amended by Exhibit 206, which was a September 9th, 2024 amendment that modified the scope of work of A&M relative to the assessment; correct?

A    In relation to LAPD, is that the amendment you're referring to?

Q    Apologies, I don't have it in front of me.

A    Yes.

Q    Now, other than that modification of the scope of work of the A&M engagement, there's been no other



220

modification of the scope of work for A&M's engagement relative to the assessment; correct?

A     No.  We had another agreement with the county, but in relation to with the City, LAPD is the last amendment to my knowledge.  Well, I believe we requested additional fees, but the question of additional scope of work, correct.

Q     You're saying you were asking for more money beyond the 3.5 million that A&M has been paid?

A     No, apologies, this was in relation to the 2.2.  To get it to 3.5 million?

Q     Part of that was the county.  Okay.  Now, you were asked a question about whether A&M had limited information in doing the assessment, do you recall that?

A     Apologies one more time, Mr. McRae.

Q     You were asked a question whether you agreed that A&M had limited information in doing the assessment, do you recall that?

A     Vaguely.

Q     I mean, wouldn't you agree that by definition, whatever information that A&M had, it had to be limited, it wasn't unlimited; right?

A     In relation to scope?

Q     In relation to anything.  There were limits on the information that A&M had by definition;

right?

A    Limits in reference to our scope.

Q    I'll withdraw the question.  You talked about potential inequities, do you recall that?

A    Yes, I recall that.

Q    And A&M is not proclaiming to state what potential inequities may or may not exist as of today, June 3rd, 2025; right?

A    Not today, June 3rd.

Q    Now, you were asked whether anyone said that you need to speak to Mr. Szabo to understand the City's response to homelessness, do you remember that?

A    Yes, I remember that.

Q    Just to make it clear, no one said you did not need to speak to Mr. Szabo to understand the City's response to homelessness; correct?

A    I do not recall if someone told us you do not need to talk to Mr. Szabo.

MR. MCRAE:  Can I have a moment, Your Honor?

(Pause)

MR. MCRAE:  Nothing further at this time, please, Your Honor.

THE COURT:  You want me to take a recess, Counsel?

MS. MITCHELL:  Your Honor, I have just a few



questions, and then maybe we can take a recess between witnesses.

THE COURT:  Well, I want to wait until you've consulted with your --

MS. MYERS:  Yes, thank you.

THE COURT:  -- Your team, please.

MS. MYERS:  I have nothing further at this point, Your Honor.

THE COURT:  That's fine.

Counsel?

MS. MITCHELL:  Thank you.

THE COURT:  Briefly now.

MR. MCRAE:  Yes, Your Honor.  Let me get my stuff out of your way.

CROSS-EXAMINATION

BY MS. MITCHELL:

Q    Regarding Exhibit 400, which are your notes, you indicated that that is a compilation of yours and your team's opinions; is that right?

A    Correct, yes.

Q    Do you agree with those opinions?

A    Yes.

Q    Is there anything about Exhibit 400, which are the notes that you prepared, that you disagree with?

A    No.



Q    As you've been sitting here listening to testimony over the last several days, have you heard anything to indicate that the systems or data that you reviewed have changed over the last year?

MR. MCRAE:  Objection.  Assumes there was a foundation for that, that it was asked.  Calls for a legal conclusion.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Ms. Mitchell, can you kindly repeat the question?

BY MS. MITCHELL:

Q    Sure.  My question is, have you heard any testimony or other evidence to indicate that the systems and data that you reviewed as part of your assessment have changed in any way in the last year?

MR. MCRAE:  Objection.  Lack of foundation. Calls for speculation.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I do recall being asked that, yes.

BY MS. MITCHELL:

Q    Have you -- did you hear any testimony or see any evidence over the last year that any of the systems and data that you reviewed as part of your assessment of the City of Los Angeles has changed?

MR. MCRAE:  Objection.  Lack of foundation.



224

Calls for speculation.  Relevance.  402.

THE COURT:  Overruled.

THE WITNESS:  No, I do not recall.

BY MS. MITCHELL:

Q    In your opinion, would the findings in your assessment be applicable to the systems and data in place today?

MR. MCRAE:  Vague, lack of foundation, calls for speculation, relevance 403.

THE COURT:  Overruled.

THE WITNESS:  I'm not aware of, based on a report of being a look-back period, I'm not aware or knowledgeable of any processes that have been changed that relate to our scope.

BY MS. MITCHELL:

Q    Showing you Exhibit 2, which is the roadmap MOU that counsel had you review, and I'm looking at specifically page 4, the definition of new beds.  Did you just look at that?

A    Yes.

Q    And included in the definition of new beds under Romanet 2 identifies when rental assistance, including rapid rehousing, may be included as a new bed under the roadmap agreement.  Do you see that?

MR. MCRAE:  Objection.  That calls for a legal



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

225

conclusion.  Lack of foundation.  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  Yes, I see that.

BY MS. MITCHELL:

Q    Okay.  And rental assistance and rapid rehousing are also known as time-limited subsidies; is that right?

MR. MCRAE:  Objection.  Lack of foundation. Leading.

THE COURT:  Overruled.

THE WITNESS:  That is my understanding.

BY MS. MITCHELL:

Q    And when may, under Romanet 2, rapid rehousing and rental assistance be used as a new bed under the roadmap agreement?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  One more time, Ms. Mitchell, I'm sorry.

BY MS. MITCHELL:

Q    Yeah, what is the requirement for a rental assistance, including rapid rehousing, to be counted as a new bed under the roadmap agreement?

MR. MCRAE:  That calls for a legal conclusion,



and it lacks foundation and relevance in 403.

THE COURT:  Overruled.

THE WITNESS:  Would you repeat that question?

BY MS. MITCHELL:

Q    Yeah, I'll ask a more specific question. Under the definition of new beds, which I'm showing on the screen in page 4, Exhibit 2, Romanet 2, is it your understanding that for time-limited subsidies to be included as a new bed under the roadmap agreement, they can only be included for the duration of assistance?

MR. MCRAE:  Your Honor, I'm going to object. The first sentence says new beds shall be defined as one and two Romanets.  The next sentence says may include any combination of, and is not a definition, but counsel keeps referring to it as a definition.  That is counterfactual, as the document itself says.

THE COURT:  Ms. Frost, do you recall the question?

THE WITNESS:  No, I'm sorry.

BY MS. MITCHELL:

Q    Okay.  Romanet 2, where it says new beds may include any combination of the following, Romanet 2 indicates that rapid rehousing, also known as time-limited subsidies, may only be counted for the duration of assistance.  Do you see that?



A    I do see that, yeah.

MR. MCRAE:  Relevance.  Lack of foundation.

BY MS. MITCHELL:

Q    Is another word for duration of assistance, utilization.

MR. MCRAE:  Objection.  Calls for a legal conclusion.

THE COURT:  Sustained.

BY MS. MITCHELL:

Q    When A&M evaluated time-limited subsidy beds and counted the ones that were utilized, what was the reason for that?

MR. MCRAE:  Objection.  Calls for a legal conclusion.  Relevance.  Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Would you restate that?

BY MS. MITCHELL:

Q    When A&M evaluated time-limited subsidy beds and identified beds that were utilized, what was the reason for looking at beds which were utilized?

MR. MCRAE:  Objection. Vague. Relevance. Lack of foundation.  Calls for speculation.

THE COURT:  The problem is I don't see the word utilized, Counsel.  I think you're transferring that, aren't you?



228

MS. MITCHELL:  No, Your Honor.

THE COURT:  Show me what that is.  I may be missing that just a minute.

BY MS. MITCHELL:

Q    I'm going to show you from Exhibit 400, thank you.  In looking at 400, in referencing your notes on this issue, did you look at beds which were utilized?

MR. MCRAE:  Objection, Your Honor.  Best evidence.  This is not the assessment.

BY MS. MITCHELL:

Q    Let me ask a new question.  Did you hear counsel ask you quite a bit about why A&M looked at beds that were utilized?

MR. MCRAE:  Mischaracterizes the testimony.

BY MS. MITCHELL:

Q    And if it helps, Ms. Frost, I can point you to section, to number two, where you talk about, and I think the sentence states, the lists do not specify by contract how many slots were authorized, created, and actually utilized.  Do you see that?

A    Yes.

Q    And why was A&M looking at slots which were actually utilized?

MR. MCRAE:  Relevance, lack of foundation.

THE COURT:  Overruled.



THE WITNESS:  So in relation to our assessment and through the look-back period, we wanted to understand slots reported, right, from the quarterly reports to expenditure data, to understand how those beds were counted as it related to city funds and what slots were ultimately formed from that respective contract.

BY MS. MITCHELL:

Q   And was it your understanding that time-limited subsidy beds were only to be counted if they were being utilized?

MR. MCRAE:  Your Honor, it's leading.  It calls for a legal conclusion.  It lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  We were just attempting to understand for the number of rental subsidies, if that could be determined from looking at the accounting data that LAHSA produced.  So that we weren't trying to make a statement on whether it needed to be utilized or not, we more so were concerned on if these slots were reported, was rental assistance received, and in what respective contract did that pertain to?

BY MS. MITCHELL:

Q   And ultimately, could you determine the number of beds which were utilized?

MR. MCRAE:  Objection.  Vague.  Lack of



foundation.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  We cannot determine by contract or trace any of the accounting data specifically to a bed or TLS slot that was reported in the quarterly reports.

BY MS. MITCHELL:

Q    Regarding the properties that you identified that there was overlap with the roadmap TLS beds and the most recent Alliance list as of March 31st of 2025 contained in Exhibit 35, would you be able to, after this hearing, provide that list to the Court or to counsel?

MR. MCRAE:  Objection.  Lack of foundation. Relevance.

THE COURT:  Overruled.

THE WITNESS:  If requested, absolutely happy to provide any data that we received, if allowed.

MS. MITCHELL:  Thank you, no further questions.

THE COURT:  Counsel, questions by Ms. Myers?

MS. MYERS:  No, Your Honor.

THE COURT:  Counsel, questions by the City?

MR. MCRAE:  Can I have a moment?

THE COURT:  Yes, to confirm.

MR. MCRAE:  No, Your Honor.  I don't think I have any questions.



231

I would just say, for the record, that I know it's hypothetical at this point.  If there were any evidence that would purport to be submitted after this hearing, it wouldn't be subject to cross-examination.  We would obviously strenuously object to that.  I'm just placing that there for the record.  We're not there yet because we don't have any supplemental work, but I'm just making the note.

So to answer the Court's question, no.  I do not have any further questions at this point.  What is the status, then, of Exhibit 400?

THE COURT:  It's marked as an exhibit.

MS. MITCHELL:  What's the status of that?

MR. MCRAE:  We would object, Your Honor, to the admissibility of those notes.

THE COURT:  Can we take that up later on?

MS. MITCHELL:  Yes, Your Honor.  We've got more witnesses on the scene.

THE COURT:  Thank you.  So thank you very much.  You may step down, and watch your step.

MS. MITCHELL:  And, Your Honor, may Ms. Frost be excused at this time?

THE COURT:  Yes, please.  Thank you very much.

Now, Counsel, would you like a recess?

MS. MITCHELL:  Yes.



THE COURT: I don't know how long we've been in session.

MR. UMHOFER: Your Honor, I have a brief non-witness -- well, this is not related to the calling of a particular witness. I have a brief statement to make about the Apex issue.

THE COURT: All right. Please.

MR. UMHOFER: Your Honor, as the Court knows, we have issued subpoenas to two council members and the mayor. The City has --

MR. ROTSTEIN: May I ask for a brief recess if we're going to argue about this now?

THE COURT: I'll hear from one of you at a time.

MR. UMHOFER: Okay. Your Honor, I'm going to take the Apex issue off the table if counsel would allow me to finish.

MR. ROTSTEIN: Yes, please. I just wanted to understand what was happening. Thank you.

THE COURT: Thank you, Counsel.

Between the two of you, thank you. And I -- would you restate?

MR. UMHOFER: So, Counsel, as you -- so, Your Honor, as you know, we have issued subpoenas to the mayor and to two city council members. There has been an objection and a motion to quash those subpoenas based on

the Apex doctrine. We understand that the City, and the City has already indicated on the record that the City, if the Court were to order the mayor or these, or perhaps the city council members to testify that the City would take the extraordinary measure of seeking a writ from the Ninth Circuit on this issue. I have been unable to find a single instance in which a court, in which a writ has been granted on an Apex issue. However, Your Honor, we are surprised and troubled by the fact that the City would attempt to keep the mayor off the stand. It's quite frankly, cowardice from our perspective. This is wrong.

THE COURT: Let's strike that. Let's, what are you requesting? What are you asking?

MR. UMHOFER: Your Honor, what I'm indicating is that we are going to withdraw our subpoenas to the mayor and the city council. And I'm giving the explanation as to why we're doing that. I'll be done in 30 seconds.

THE COURT: Yeah, but I don't want to get into the kind of statements that were just made. What's the City's position?

MS. EVANGELIS: Thank you, Your Honor. Thea May Evangelist on behalf of the City. So I understand counsel has just withdrawn the subpoenas so that might move the issue. Of course, I just would like to say for the record that of course the mayor and our city council are 1000

percent committed to solving the homelessness crisis and also to fulfilling the City's obligations under their agreement.

So I do find counsel statements to be uncalled for, but I can cite authority of course, where the ninth circuit has granted petitions and precisely the apex context, but it sounds like that's unnecessary since this is now moved so I will stop right there.

THE COURT:  Let me ask both of you a simple question.  I can already envision your closing statements to the Court.  Can we just bring it down a notch?  In other words, if you're going to argue different positions I'd like to get out of the subjectivity of particular persons involved in this process.  My simple question is are both of you then stipulating to the withdrawal of the subpoenas?

MR. UMHOFER:  Your Honor, that's what we've proposed.

THE COURT:  As to the mayor?

MS. EVANGELIS:  Yes.

THE COURT:  As to the mayor and as to both council persons; is that correct?

MR. UMHOFER:  Correct, Your Honor.

THE COURT:  Are you accepting that stipulation?

MS. EVANGELIS:  Yes.



THE COURT: Well then, so stipulated.

MR. UMHOFER: Thank you, Your Honor.

MS. EVANGELIS: Thank you.

THE COURT: Now can we do the following? Can we take a recess?

MS. MITCHELL: No objection, Your Honor.

THE COURT: All right. Thank you very much. We'll see you in 20 minutes. All right?

(A recess was taken off the record.)

THE COURT: Then we're back in session.

All counsel are present.

And, Counsel, if you'd call your next witness, please.

MS. MITCHELL: Thank you, Your Honor. Plaintiff's call Michele Martinez.

THE COURT: Thank you. If you'd -- well, first of all, why don't you step down and just stop at the bottom of the stairs. Then if you'd raise your right hand, please. Do you solemnly swear that the testimony you are about to give in the cause now pending before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT: Please proceed to the witness box and once again, watch this step. And if you'd face the

236

parties, please, and would you state your full name?

THE WITNESS:  Yes, it's Michele, and I'm going to spell Michelle because most people spell my name with two L's and it's actually with one L.  That's M-I-C-H-E-L-E, Christina Martinez, M-A-R-T-I-N-E-Z.

THE COURT:  Direct examination, please.

MS. MITCHELL:  Thank you, Your Honor.

Whereupon,

MICHELE MARTINEZ,

was called as a witness, and having been sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MITCHELL:

Q    What is your current role as it relates to the L.A.  Alliance case?

A    I'm the special master.

Q    And when were you appointed special master in this case by the Court?

A    Well, I was special master during the 2020 period.  Do you mean when I was Judge Carter's special master from there or when I actually entered into a contract with the City of Los Angeles?

Q    I think just when was the first time you were appointed as special master by the Court in this case.

A     In 2020.

Q     And was that at the beginning of the case?

A     Correct.

Q     And then once the City and the L.A. Alliance entered into an agreement, did your role change slightly?

A     Yeah, I became the official special master for the City of Los Angeles.

Q     Also known as a monitor; is that right?

A     Correct.

Q     And as a monitor overseeing the agreement, the L.A. Alliance City agreement, what does that entail?

MS. KAOUNIS:  Objection.

THE COURT:  Overruled.  You can answer the question, please.

THE WITNESS:  My role is to monitor the agreement signed by the parties on behalf of the Court.

BY MS. MITCHELL:

Q     And how do you gather information?

A     One, I go out into each council district. And to give some context, there's 15 council districts. And those council districts range from 13 square miles to actually 60 square miles.  The city is about 400 and almost 500 square miles.  So I just want to put that into context.



And I go out almost seven days a week out into the field to one, observe and monitor.  But as well, I have conversations with the parties, with the elected officials, with the unhoused community.  And I've also had learning sessions with the parties as well.

And I'm not finished.  It's okay.  And I also watch the city council meetings.  Any issue of council meetings that involved, in particular, just as recent, the budget, having to deal with homelessness spending, and also the Housing and Homeless Committee, and the strategy committee with the CAO's office.  And including LAHSA meetings, and then obviously as well for the county.

Q    Just wanted to make sure you're done.

A    Yes, I am done now.

Q    And when you go to site visits to observe and monitor, what are you doing when you're observing and monitoring?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

You can answer, please.

THE WITNESS:  Great.  Thank you, Your Honor.

In some instances, I will go out and one, look at the various housing solutions that have been put up on behalf of the Court, not for the City of Los Angeles.  I want to make that very clear.



And number two, there are times where I also go out for the care and care plus cleanups, and also go in and observe a lot of the different encampments per the roadmap agreement as well, off the freeway ramps.

BY MS. MITCHELL:

Q   And can you describe the listening sessions in brief, in this case?

MS. KAOUNIS:  Objection.  Vague.  Misstates prior testimony.

THE COURT:  Do you understand the question?

THE WITNESS:  I do, Your Honor.

We've had a couple of learning observation sessions, and I will just keep it to the context so that a lot of those discussions were had to understand the actual homeless response system that the City and the county is obviously a part of with its partner, LAHSA, who is the actual continuum of care.

BY MS. MITCHELL:

Q   Have those listening sessions, or at least one of the listening sessions, included any service providers?

MS. KAOUNIS:  Objection.  Vague.  I just want to clarify for the record, Your Honor.  The witness is saying "learning sessions."  Counsel is saying "listening sessions."  That's why my objection was made.



BY MS. MITCHELL:

Q    How would you like to refer to that?

A    I call them the learning and observation sessions.

Q    Okay.  I'll endeavor to use that phrase moving forward.  In one of these learning and observation sessions, were any service providers present?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q    By the way, how many learning and observation sessions have been held?

A    This year we had one and one the prior year.  And I also have had other learning and observation sessions with outreach workers, people out in the field, not with City staff or the parties.

Q    I understand.  Now, you recently submitted two independent monitoring reports in this case; is that right?

A    That is correct.

Q    I'm showing you what has been marked as Exhibit 93.  What is this document?

A    This is the recent special master report that was submitted to the Court in May.

Q     And this was filed May 14th of 2025; is that right?

A     Correct.

Q     Showing you page 5, second paragraph of page 5, you indicate that since 2020 you have dedicated yourself, I think, to monitoring, enforcing the settlement agreement, and learning and understanding the homelessness response system.  Can you explain a little bit more about what that means?

MS. KAOUNIS:  Objection.  The document speaks for itself.

THE COURT:  Overruled.

THE WITNESS:  Thank you, Your Honor.  I would just speak specifically to the, since I'm not addressing the county, I only want to speak specifically in the homeless response system that has to deal with the City of Los Angeles, because they all play a role in the homeless response system.  And I think here, in the context that we are speaking on the City of Los Angeles, it's only appropriate for me just to speak on the homeless response system and what the City partakes within that system.  And that is housing, obviously, and services and outreach.

BY MS. MITCHELL:

Q     And thank you for clarifying, and I do intend to only ask you questions regarding the City and

LAHSA, primarily, except, I suppose, when the county is intermittently involved.

But my question to you was a little bit broader because I want to understand what you mean when you say, for the last five years, you've dedicated yourself to learning and understanding the homelessness response system. Do you feel like you have a very good understanding of the homelessness response system in Los Angeles?

MS. KAOUNIS: Objection. Vague.

THE COURT: Overruled.

THE WITNESS: Thank you, Your Honor.

Yes, I do.

BY MS. MITCHELL:

Q   In 2018, you were an elected official in Santa Ana; is that right?

MS. KAOUNIS: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: Thank you, Your Honor.

That is correct.

BY MS. MITCHELL:

Q   Okay. and what position did you hold at that time?

A   I was on the city council, but for the purposes of that last two years that you're speaking of, I

243

was the vice mayor for the City of Santa Ana.

Q    And Santa Ana, at that time, intervened in a case pending before Judge Carter at that time; is that right?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  That is a correct statement.

BY MS. MITCHELL:

Q    As part of that effort, did you spearhead a shelter build in 28 days?

MS. KAOUNIS:  Objection.  Vague.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  That is a correct statement.

BY MS. MITCHELL:

Q    And how did you get it done in 28 days?

MS. KAOUNIS:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  Thank you, Your Honor.  Obviously, Michele Martinez didn't do that project on her own.  That was with the help of our city staff.

BY MS. MITCHELL:

Q    But my question to you is, I guess, how did that get done in 28 days?  If you could describe that for us.

A    Oh, the process?



244

Q    Yes.

THE WITNESS:  Your Honor?

THE COURT:  Yes?

THE WITNESS:  Okay.  And the only reason why I just state this because I want to ensure, I want to make sure that I am, I don't have legal counsel here representing me.  The City obviously has legal counsel.

You are not my attorney.  And no one else in this room.  And so I want to make sure that my statements from my prior work, you know, are, my personal opinion are not relevant to this case as it pertains to my work as a former elected official to building housing and what I did under the City of Santa Ana.  I don't believe it applies.

BY MS. MITCHELL:

Q    I appreciate that, Ms. Martinez.  My question is simply, what methods were involved in making sure that this shelter was built in 28 days?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.  Okay.  We used a process. We actually appointed our public works director who came from San Francisco.  He had a lot of background on project management and was able to get a lot done, and so we put him in charge.

And we worked with an outside developer to use



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

their property, and we entered into an RFP with an outside provider. That provider actually entered into a lease agreement separately from the City of Santa Ana with the private developer. And so we were able to overcome a lot of bureaucracy within the City to move that quickly.

BY MS. MITCHELL:

Q   And as I understand it, you actually placed a permit inspector on site; is that right?

A   That is a true statement.

MS. KAOUNIS: Objection. Vague. Relevance.

THE COURT: Overruled.

BY MS. MITCHELL:

Q   Did placing the permit inspector on site help facilitate building faster?

MS. KAOUNIS: Same objection. Vague.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MS. MITCHELL:

Q   Turning to the Alvarez and Marsal assessment that was done and showing you Exhibit 23, have you reviewed the assessment that was filed with the Court?

A   I have.

Q   And did you help oversee the assessment on behalf of the Court?

A   Yes.



246

MS. MITCHELL:  May I have a moment, Your Honor?

THE COURT:  Certainly.

BY MS. MITCHELL:

Q   Were you present during Mr. Szabo's testimony when he was criticizing Alvarez and Marsal?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I was here.  I was present.

BY MS. MITCHELL:

Q   Okay.  In your position overseeing A&M and the assessment, did you find that the company lacked capacity to review the data they were seeing?

MS. KAOUNIS:  Objection.  Lack of foundation. Relevance.  I'm also going to object to calls for an expert opinion.  This witness hasn't been qualified as an expert on accounting or assessments or audits.

THE COURT:  I think that those answers are best left to A&M and to Mr. Szabo.  I'm worried that the special master is getting into an area of capacity, and I don't think that that's within her purview, frankly.  I'm going to sustain the objection.

MS. MITCHELL:  That's fine, Your Honor.  I can move on.

BY MS. MITCHELL:

Q   Regarding the A&M's assessment and their



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

findings on the time-limited subsidy issue, that 70

percent of the contracts did not report financial

expenditures.  Are you familiar with that finding?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled, but I'd like to see you

put up that finding so it's on the screen.

THE WITNESS:  And yes, I read it in the

assessment.  Yes.

BY MS. MITCHELL:

Q   Now, as special master, are you in part

overseeing compliance with the roadmap agreement as well?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q   And I am showing page 64 of Exhibit 23,

specifically the second paragraph down, which identifies a

lack of expenditures for 70 percent of the beds.  As

special master overseeing these agreements and intimately

familiar with the homelessness response system in Los

Angeles, are you particularly concerned about time-limited

subsidies?

MS. KAOUNIS:  Objection.  Vague.  Relevance.

Lacks foundation.

THE COURT:  Overruled.



248

THE WITNESS:  Yes, because in the actual, regardless of this assessment or any other audits, the burden falls on the City of Los Angeles under Section 7.2 in the agreement to provide the actual data and records to verify and validate what they're submitting in their quarterly reports.  And that has yet to take place.  And to my recollection, I have not heard from any of the parties that that section has been withdrawn.

But at no certain time, and in my special master report in 2024, I highlight that 7.2 has not been met by the City of Los Angeles.  And so, again, I will just say that the burden falls on the City of Los Angeles regardless of this assessment or any other audit.  And that's what I'm going based off.

MS. KAOUNIS:  Objection.  Move to strike.  Legal conclusion.  Relevance.

THE COURT:  Sustained.

BY MS. MITCHELL:

Q    Have you attempted to independently confirm whether those time-limited subsidy slots were funded or implemented?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  It's a very complex issue as it pertains to time-limited subsidies for the reasons of not



having specific addresses.  It becomes very difficult to actually go to a specific location.  And as well, the data that I've seen and or I have observed in meetings, a lot of that information and documentation is county-related.

BY MS. MITCHELL:

Q   How is that information county-related?

MS. KAOUNIS:  Objection.  Vague.  Relevance.

THE WITNESS:  And, Your Honor, I have documents here.  These are all notes on my own because that's privilege, as you all know.  But this is public information.  And these are documents that are from the reports from the City administration office.  And I just want to, you know, so if someone wants to come up here, these are not any notes.  These are all public documents.

And I want to go to this document here that was the City performance management that was part of a CAO strategy homeless committee meeting in particular with Councilwoman Nithya Raman.  And it talks about time-limited subsidies.  And I'm certain that you all probably don't have this information in front of you.

But this is where I get the information that I'm speaking of, that a lot of the information in regards to time-limited subsidies is a very focus on county data.

MS. KAOUNIS:  Your Honor, I'm going to move to strike as non-responsive and lodge an objection that this

witness should not be questioned on anything that hasn't been presented and certainly hasn't been cited in her report.  We're hearing for the first time that there's a stack of documents that the witness is relying on that, to my knowledge, have not been cited in this report.

THE COURT:  You can come up and look at this.  It pertains to Nithya Raman.

THE WITNESS:  Correct.  Actually, Councilmember Raman's motion in regards to TLS and also the Bureau is highlighted in my report.

MS. MITCHELL:  I am familiar with the report, but perhaps I could get it so I can read it, the portion into the record so the record is clear about what we're referring to.

MS. KAOUNIS:  Your Honor, we object to the admission of any documents that have not been cited in the report.  For the record, Your Honor, I think we'd like some clarification.  The witness both said that the materials were privileged and also that they were public.

THE WITNESS:  I said my notes are privileged.  I have no notes up here.  This information is public.

MS. MITCHELL:  And, Your Honor, for the record, the witness has held up a staple document, which is titled "City Performance Management, Accurately Understanding the Impact of the City's Investment into the Region's

251

Homelessness Response," dated April 9, 2025.

And I believe this was attached to Councilmember Raman's motion; is that right?

THE WITNESS:  No, that was a homeless strategy meeting.

MS. MITCHELL:  Thank you.

THE COURT:  Counsel, this is a City-generated document then?

THE WITNESS:  It is a City-generated document. If it's Councilwoman Raman's, I don't believe it's technically generated.  You can get this online under the CAO's reports on his website.  Yes, that's where I got this document.  All these documents, I got them all online.

THE COURT:  All right.  Just a moment.

Proceed with your questions, and if there's an issue, we'll recess, get these documents, or one of you can look at these documents.  Proceed now.

MS. KAOUNIS:  Your Honor, may we just clarify the records on this privilege issue?  There are two issues, I think, remaining.

One, the witness had mentioned privilege with respect to her notes.  It's unclear to me why there's an assertion of privilege with respect to the notes.  Perhaps it's because I'm new on the case.  But if those were notes

that went into the report that was ultimately published, it's not clear to me why those would be privileged.

THE WITNESS:  Those notes are some of my conversations with the actual elected officials.

THE COURT:  Now, this is going to be interesting because when you've got elected officials involved, you're potentially representing those officials also.

I would just suggest that we move forward with the public documents created by the City and stay away from this issue as long as we can.  I don't know if you want to get into conversations with Nithya Raman, the special master.  So I think as long as we proceed with public documents, that I don't see the concern, especially if they're generated by the City.  So let's continue on with the questions now.

BY MS. MITCHELL:

Q    Okay.  I think my question was, have you been able to confirm the number of time-limited subsidy slots that were reported by the City are, in fact, in existence?

MS. KAOUNIS:  Objection.  Vague.  Foundation.

THE COURT:  Sustained.

BY MS. MITCHELL:

Q    Okay.  Have you attempted to confirm whether those TLS contracts were ever implemented as



reported in the roadmap agreement?

MS. KAOUNIS:  Objection.  Vague.  Relevance. Foundation.

THE COURT:  Overruled.

Can you answer that question, please?

THE WITNESS:  For the Court, yes.  On behalf of the City, the burden falls on the City of Los Angeles to provide that.

MS. KAOUNIS:  I'm going to move to strike as nonresponsive and also asserts a legal conclusion.

MS. MITCHELL:  May I ask the question?

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q   Have you attempted to confirm whether those TLS contracts were implemented as reported under the roadmap agreement?

MS. KAOUNIS:  Objection.  Vague.  Relevance. Foundation.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  The burden falls on the City of Los Angeles to validate and verify what they are producing to the Court.  They are just producing numbers.  There needs to be validated documentation behind that to ensure that those beds are actually being created.

254

MS. KAOUNIS:  Your Honor, I'm going to move to strike again.  Nonresponsive.  Also, asserts a legal conclusion.

THE COURT:  Have you been able to confirm whether those TLS slots were actually implemented or funded as reported under the roadmap agreement?

MS. KAOUNIS:  Vague.  Lacks foundation.  Calls for legal conclusion.  Calls for expert testimony.

THE COURT:  Answer the question, please.

THE WITNESS:  Again, the burden falls on the City of Los Angeles to provide the documentation to validate and verify that those TLS slots exist.

MS. KAOUNIS:  Your Honor, I'm just going to ask for a standing motion to strike on an answer where this witness is indicating what she believes to be the burden on the City of Los Angeles, which is a legal issue.  Thank you, Your Honor.

BY MS. MITCHELL:

Q    And has the City presented that data to you to confirm that those beds exist?

MS. KAOUNIS:  Objection.  Vague.  Lacks foundation.

THE COURT:  Overruled.

You can answer the question, please.

THE WITNESS:  They have not submitted anything



to me or to the Court.

BY MS. MITCHELL:

Q    Showing you Exhibit 93, I'm going to move on to the Alliance settlement agreement.  As of your last report, and I'll zoom in here on Section B, as of your last report, the date of the last report, how many beds were open at that time?

MS. KAOUNIS:  Objection.  Document speaks for itself.  Also vague as to open.

THE COURT:  Overruled.

THE WITNESS:  Total beds unit by December 31st of 2024, 4,815.

BY MS. MITCHELL:

Q    And how many total beds or units were in process as of 2024?

MS. KAOUNIS:  Objection.  Standing objection.

THE COURT:  Overruled.

THE WITNESS:  Per the report, 4,278.

BY MS. MITCHELL:

Q    And what was the deficit towards their 60 percent housing goal across the council districts?

MS. KAOUNIS:  Objection.  Calls for a legal conclusion.  Vague.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  Per the report, 3,822.



256

BY MS. MITCHELL:

Q    Based on the way the City issues its quarterly reports, have you found it difficult to track the beds?

MS. KAOUNIS:  Objection.  Vague.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  As it pertains to the way they report, because it's cumulative, you don't understand in a quarter by quarter basis what the status is per council district and or what's happening during the quarter because it's all cumulative.  So you have to break it down.  So that's cumbersome.

BY MS. MITCHELL:

Q    And to your understanding, has the City as of today met its cumulative milestone goal for bed creation?

MS. KAOUNIS:  Objection.  Vague.  Lacks foundation.  Calls for expert opinion.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Per the milestone submitted to the parties and to the Court, no.

BY MS. MITCHELL:

Q    Now, have you attempted to validate the

locations that have been identified by the City as part of the Alliance reporting in their compliance with the Alliance settlement?

MS. KAOUNIS:  Objection.  Vague.  Lacks foundation.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  May I answer the question?

On behalf of the Court to do spot checks, yes.

BY MS. MITCHELL:

Q    And have you actually been able to validate those locations or beds?

A    Yes.

MS. KAOUNIS:  Objection.  Lacks foundation. Calls for an expert opinion.  Calls for a legal conclusion.

THE COURT:  Overruled.

You may answer the question.

MS. MITCHELL:  So I'm showing you page 20.

THE COURT:  I didn't hear the answer.

THE WITNESS:  Yes.  The City has produced the beds that, yes, I have been to various permanent supportive housing sites and interim sites and tiny homes. I've seen the units myself.  Yes.

BY MS. MITCHELL:

Q    Okay.  Are there any locations that you



have not been able to verify?

MS. KAOUNIS:  Objection.  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MS. MITCHELL:

Q   Showing you paragraph 3 on Exhibit 93, page 21, you'd indicated that 20 sites are not part of the management and data from RSM slash HIMIS?

A   It's supposed to be HMIS, yes.

Q   Okay.  Thank you.  Is that RMS, Resource Management System?

A   Correct.

Q   Okay.  So it's 20 sites are not part of the management and data from RMS slash HIMIS.  What do you mean by that?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

You may answer, please.

THE WITNESS:  According to LAHSA, when I asked to do some spot checks for some of the units that were produced for December of 2024, I was told by LAHSA that the 20, I provided about 48 sites.  Those that are in progress and those that have been created, and LAHSA came back to me saying that 20 sites were not in their system.

MS. KAOUNIS:  Objection.  Move to strike.

Hearsay.

BY MS. MITCHELL:

Q    What does that mean that 20 sites were not in their system?

MS. KAOUNIS:  Same objection.

THE COURT:  Overruled.

If you know.

MS. KAOUNIS:  Yeah, and calls for speculation.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  LAHSA never responded.  I wasn't going to, as I mentioned earlier, how big the size of each council district are.  I wasn't going to just drive around when they initially told me that 20 sites were not part of the 48 sites that I was going to visit, so I was waiting for a response from LAHSA, and LAHSA never responded.  The last communication I had with them is when I communicated with the City indicating that they wanted a breakdown of the quarterly reports in a different format.

BY MS. MITCHELL:

Q    That LAHSA wanted a breakdown in a different format?

A    Yes.

MS. KAOUNIS:  Foundation.  Hearsay.  Vague.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    Did you ask the City to report on these 20 sites that LAHSA did not have as part of their RMS, HMIS system?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I cc'd the city attorneys on that.

BY MS. MITCHELL:

Q    And have you heard back from the City or from LAHSA regarding the status of these 20 sites?

MS. KAOUNIS:  Objection.  Calls for hearsay. Lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  As of today, no.

BY MS. MITCHELL:

Q    So as of today, have you been able to verify that those 20 sites, as reported as part of the Alliance agreement, are in fact open and operational?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  At this moment, I still will give the benefit of the doubt to the City of Los Angeles to respond if those beds exist.  I understand that if they're permanent supportive housing sites, that that may be with

261

their housing department.  And so I don't want to sit here today and tell you that those beds do not exist because they can't exist, but someone else has that information.

BY MS. MITCHELL:

Q    I guess my question was a little bit more specific, though.  To this day, have you been able to verify that those 20 sites exist?

MS. KAOUNIS:  Objection.  Asks and answers.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  I will stick to my original statement, is that I don't know if they exist or they're there.  I give the benefit of the doubt to the City of Los Angeles to provide that information.

BY MS. MITCHELL:

Q    But they have not provided that information yet; is that correct?

A    That is correct.

MS. KAOUNIS:  Asked and answered.

THE COURT:  Overruled.

MS. MITCHELL:  Turning to --

MR. MCRAE:  Your Honor, could you reissue the admonition about people not taking photographs?

THE COURT:  Well, yeah.  Just a moment.  Let me be very clear.  There's no photography.

MR. MCRAE:  Did you notice --

THE COURT:  Yes.

MR. MCRAE:  -- what appeared to be A phone being held up on the screen.

THE COURT:  Come on up for just a moment.  There are no photographs here.  I'm not going to turn you into an informant.  By the same token, why don't you quietly speak to counsel for a moment?

Counsel, why don't you speak to him and then quietly approach that person and that will delete the photograph.  Now, you're welcome to stay.  It may just be inadvertent, but there are no photographs here.

MR. MCRAE:  Thank you, Your Honor.

THE COURT:  Quietly approach that person. Without further ado, I think we can resolve that.

MR. MCRAE:  Thank you, Your Honor.

THE COURT:  Thank you.  And that person is more than welcome to stay.  There's no issue, but no photographs.  Okay?  So if they've taken a photograph, delete it.

Thank you.  Counsel, please continue.

BY MS. MITCHELL:

Q    Thank you.  Showing you the top paragraph of that same page, page 21 of Exhibit 93, you identify a few unresolved factors in your ability to verify the City-

reported data.  The first one being methodology confirmation.  Can you read that first sentence?

MS. KAOUNIS:  Objection.  Document speaks for itself.

THE COURT:  Overruled.

THE WITNESS:  Yeah, the City has yet to provide clear methodology for compiling and reconciling report figures.

BY MS. MITCHELL:

Q    And can you explain what you mean by that?

A    What I mean is I don't understand how the City has come up with their figures.  And again, you know, they have notes in their quarterly reports, but that's to the extent and it's very limited.  So I don't know where they gathered that information.

Yes, we've been told several times that LAHSA is, you know, they're custodial of some of their data, but at the same time, there are other city departments that have custody of that data as well, and none of that is provided within those quarterly reports.  It's just, you know, PEH served, the bed created, the bed in process, the address, and the council district.

BY MS. MITCHELL:

Q    And the last bullet point here says additional clarifications needed.  The City's responses



264

regarding discrepancies remain incomplete, impeding a definitive validation of reported figures.  Can you explain what you mean by that?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes, and some of the council districts within the quarterly reports, some of the figures that I added up were very different than the City of Los Angeles, but I will state that I did provide one council district to the City to confirm, and they were able to confirm, but I do believe that it is imperative that they also report that to the Court to ensure that there was validation of why there was a difference within those beds for that council district, and specifically council district one.

BY MS. MITCHELL:

Q    And what was the issue with council district one?

MS. KAOUNIS:  Objection.  Vague.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I would have to go to my notes. Not at the top of my head.  Yeah.

MS. MITCHELL:  That's okay.

THE WITNESS:  Don't know the numbers.

BY MS. MITCHELL:



Q   Showing you what has been introduced as Exhibit 35, this is the most recent quarterly report filed by the City of Los Angeles in compliance with the Alliance Settlement Program and purports to report the beds open to date.  Have you seen this document?

A   Yes.

Q   Going to page 4 of 6, there are a number of what have been identified as Inside Safe programs listed on this report.  Specifically, I'm looking at starting at page 99.  Do you see that?

A   I do.

Q   I'm sorry.  I said page.  I meant line 99.

A   Line 99.  Yes, I do.

Q   To your knowledge, have any of these hotel, motel, booking, or occupancy agreements been included in reports prior to this one filed April 15th of 2025?

MS. KAOUNIS:  Objection.  Relevance.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  Not to my recollection, in exception for the hotel, the Mayfair that the City of Los Angeles purchased.

BY MS. MITCHELL:

Q   Now, in your opinion, do occupancy



266

agreements under Inside Safe comply and count towards the bed count required under the Alliance Agreement?

A    Would you repeat that, please?

Q    Yes.  In your opinion, as special master and monitor of this agreement, do the occupancy agreements, the Inside Safe occupancy agreements for the hotels and motels count towards the City's bed count as part of this agreement?

MS. KAOUNIS:  Objection.  Calls for a legal conclusion.  Calls for expert opinion.  Vague.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  In regards to these particular beds, I brought up to, and I have to be limited in my responses here, but to the Court about these beds that have now been part of this quarterly report.  And special master Martinez, I don't want the context of any conversations that you've had with the Court separate from, you know, in public.  So I'm not going to be inquiring about those separate conversations, but my question is just to you about whether you believe that occupancy, let me take a step back.

I guess, Ms. Mitchell, I don't feel like I could opine on this because of these beds.  There was supposed to be a bed plan.  That bed plan was taken off last

October.  There was no more future discussions with the Court or the plaintiffs, and these are technically new beds now part of this quarterly report, and there has to be a decision between the parties if that's going to be accepted before I could opine.

MS. MITCHELL:  I see.  I understand.  Thank you for that clarification.

BY MS. MITCHELL:

Q    To your knowledge, the bed plan that was submitted by the City in November of 2022, is that the only operative bed plan that the Court has been presented with?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q    And you refer to the one that was withdrawn by the City last year.  That was in the fall of 2024 when the City initially proposed to use roadmap beds to migrate those over to the Alliance agreement and then withdrew that proposal.  That's what you're referring to?

MS. KAOUNIS:  Objection.  Vague.  Lacks foundation.  Calls for a legal opinion.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q    To your knowledge, and as a part of your monitoring of this case in the Los Angeles homeless systems in general, do you believe that the Inside Safe beds are equitably distributed throughout the City of Los Angeles?

MS. KAOUNIS:  Objection.  Relevance.  Calls for a legal conclusion.  Lacks foundation.  Calls for expert opinion.  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  As it pertains to the settlement agreement for the Alliance, regardless of the initiative that the City had, whether it's Inside Safe or any other kind of initiative, there is a section in the settlement agreement where there has to be equitable distribution. And I did mention in my 2024 report that there were instances with the Inside Safe beds where those beds were not equally distributed.  And you can reference my 2024 report.

MS. MITCHELL:  Thank you.

BY MS. MITCHELL:

Q    Now, as part of the City's obligation in the Alliance agreement, and I'll show you what has been marked as Exhibit 25, you've had occasion to review the settlement agreement; is that right?



A    Yes.

Q    Now, showing you paragraph 5.2, the last line, the parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines.  Do you see that?

A    I do.

THE COURT:  5.2 is not on our screen here.

MS. MITCHELL:  Oh, I'm sorry about that.

THE COURT:  Thank you.  Can we reread that, please?

MS. MITCHELL:  Sure.  Sure.

THE COURT:  Why don't we have the witness do it?

BY MS. MITCHELL:

Q    Ms. Martinez, can you read that line starting with the parties agree?

A    The parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines.

Q    And you track the milestones and deadlines in this case; is that right?

MS. KAOUNIS:  Objection.  Vague.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  The milestones that were submitted by the City of Los Angeles, yes.

BY MS. MITCHELL:



270

Q    And just so that we're clear, we're talking about Exhibit 24.  Are those the milestones and deadlines we're referring to?

A    That is a true statement.

Q    Going back to Exhibit 25, has the City met, I'll go here, has the City met its quarter by quarter milestones to date?

MS. KAOUNIS:  Objection.  Lacks foundation. Calls for an expert opinion.  Calls for legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Per the Roadmap Alliance milestones, obviously, no.

BY MS. MITCHELL:

Q    Now, going back to 25, based on your review over the last several years since the agreement has been instituted in 2022, has the City employed its best efforts to comply with plans, milestones, and deadlines for bed creation under 5.2?

MS. KAOUNIS:  Objection.  Lacks foundation. Calls for a legal conclusion.  Calls for expert opinion.

THE COURT:  I don't know if I'm comfortable with having a special master render that opinion.  I think that's ultimately the Court's determination based upon other evidence presented to the Court.

MS. MITCHELL:  Understood, Your Honor.



271

THE COURT:  I want that neutrality of the special master now and in the future.  I'm going to sustain the objection.

MS. MITCHELL:  Understood.  Thank you.

BY MS. MITCHELL:

Q    Let's go back to your report, Exhibit 93. Looking at page 22, you identify systemic and structural issues.  I'm specifically looking at that second paragraph.  I will blow it up.  Can you read that paragraph for us?

MS. KAOUNIS:  Objection.  The document speaks for itself.

THE COURT:  Overruled.

THE WITNESS:  If the City does not present a detailed plan to address the systemic and structural issues identified by the A&M assessment at the next hearing on May 15, the Court may need to intervene.  This intervention would ensure that the City addresses governance, structural changes, gaps in governance, and financial management challenges.  Judicial oversight may be required for the City to meet settlement agreement obligations.

BY MS. MITCHELL:

Q    And what systemic and structural issues are you referring to here?

272

MS. KAOUNIS:  Objection.  Lacks foundation. Calls for an expert opinion.  Relevance.

THE WITNESS:  May I answer?

Thank you, Your Honor.

Obviously, I cited the A&M assessment, but beyond that, there is a April 22 document report from the Chief Legislative Office, the Formation of a City Homelessness Governance Structure.  In this document here, the Chief Legislative Officer, who is Sharon Imtesso, references the systemic challenges the City has.

Let me just refer, when I speak about the systemic issues and the governance issues are specifically to the City of Los Angeles, not the regional homeless response system.  The CLA speaks on both of the City's internal issues with its governance structure.  I'm not sure if you all have a copy of this document.

I can read.  But, Your Honor, I'm not sure if you're going to want to give access to these documents to the parties here.  I'm going to just object and move to strike both as non-responsive and hearsay.  We're reading into the record statements made by other people.

BY MS. MITCHELL:

Q    If I understand correctly, you're talking about when you identify in your report systemic and structural issues, you're saying those identified both by

the A&M assessment and by the CLA of the City of Los Angeles in that document that you just identified; is that right?

MS. KAOUNIS:  Objection.  Leading.  Relevance. Compound.  Calls for an expert opinion.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q    Can you give me the title of that document again?

A    Yes.  It's the Formation of a City Homeless Governance Structure.  That's April 22nd, 2025. Council File 240330.

Q    Have you also identified systemic and structural issues based on your own experience as a special master in this case?

MS. KAOUNIS:  Objection.  Relevance.  Vague. Calls for an expert opinion.

THE COURT:  Overruled.

THE WITNESS:  In my opinion, yes.

BY MS. MITCHELL:

Q    In reviewing the A&M assessment that was done, is there anything in that assessment that you disagreed with?

MS. KAOUNIS:  Objection.  Vague.  Calls for a

274

legal opinion.  Calls for expert opinion.  Lack of foundation.

THE COURT:  You dropped your voice.  Could you repeat that?  Would you re-ask that?

MS. MITCHELL:  Yes.

BY MS. MITCHELL:

Q    In reviewing the A&M assessment that was done in this case, is there anything about that assessment that you disagreed with?

MS. KAOUNIS:  Same objections, and I think the Court already instructed on not having the witness give an opinion about what A&M already opined on, so I'm going to renew my objections.

THE COURT:  Overruled.

Do you want to answer that question?

THE WITNESS:  I do not, but I just would rephrase that.  The A&M assessment talked about the City of Los Angeles and the homeless response system as a whole, as a part of it.  I would just allude to the issue is that I've said it several times in many of the hearings here before the Court, that the homeless response system that the City works with, in particular with LAHSA, that system does not function well for the City of Los Angeles.

In particular with the CES system, when the City of Los Angeles is producing beds, and then they are unable



to actually utilize those beds for the people that are experiencing homelessness in their own city, because that system is regional in nature.  And so I believe, in my opinion, that the homeless response system that the city is currently under from a regional perspective does not function well for the City of Los Angeles.

MS. KAOUNIS:  Objection.  I'm going to move to strike as non-responsive.

BY MS. MITCHELL:

Q    Showing you page 25 of your special master report, you recommend establishing a fiduciary monitor. Why is that?

MS. KAOUNIS:  Objection.  Calls for a legal conclusion.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  For reasons, as I stated in my report, and I'll reference you back to that, but as well, the formation of a city homeless governance structure that the CLA put together, many of the statements that are in here reflect that the City does not have the infrastructure in place to help bring together a system that would function to address the homeless response system specifically for the City of Los Angeles in regards to its programs, whether it's their outreach, whether it's their housing interventions.

MS. KAOUNIS: Your Honor, I'm just going to ask for a standing objection to undisclosed documents that the witness is either reading or relying on, just because a document exists online doesn't mean it's been produced in this case as evidence, and we object to it being attempted to be brought in now.

THE COURT: I'm going to overrule that. These are City-produced documents, but I'll give you time. In other words, if you want time for cross-examination, you can look at these documents at any time and cross-examine tomorrow.

BY MS. MITCHELL:

Q    On page 27, you recommend extending the settlement agreement terms. Why is that?

A    That was something that the Court recommended to the parties, both the City and County, at, I want to say, the April hearing.

Q    And do you have an opinion about that as included in Exhibit 93?

MS. KAOUNIS: Objection. Vague. Calls for a legal opinion.

THE COURT: Overruled.

THE WITNESS: My opinion is in the report.

THE COURT: I'm sorry. I didn't hear you.

THE WITNESS: My opinion is in the report.



BY MS. MITCHELL:

Q   Okay.  And can you read that first paragraph under proposed extended settlement agreement terms between LA Alliance and the City?

A   Given the City's lack of bed funding plan, thousands of beds in process since 2022, the Alvarez and Marcell assessment and the plaintiff's briefing on receivership is probable that the City will engage in discussions with the LA Alliance or take into consideration the Court's proposal for a two-year extension of the settlement agreement.

Q   Now, you also, on page 11 and throughout Exhibit 93, you recommend the creation of a city department to manage homelessness.  Why is that?

MS. KAOUNIS:  Objection.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  The various housing and homeless committee meetings and or city council meetings, various of the elected officials talked about the need to have some centralized system within the City of Los Angeles.

BY MS. MITCHELL:

Q   Are you aware, as you've been watching the recent budget hearings, of whether the City is establishing a department of homelessness?

MS. KAOUNIS:  Objection.  Relevance.  Vague.  Hearsay.

THE COURT:  Overruled.

THE WITNESS:  In budget discussions, in particular, they discussed the bureau, doing a bureau of oversight within the Los Angeles Homeless Department.

BY MS. MITCHELL:

Q   And that would sit underneath the LAHD, Los Angeles Housing Department; is that right?

MS. KAOUNIS:  Objection.  Lacks foundation.  Relevance.

THE COURT:  Overruled.

That's a yes?

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q   And LAHD is the City department that has had the obligation to oversee LAHSA over the last several years; is that right?

MS. KAOUNIS:  Objection.  Relevance.  Calls for a legal conclusion.  Calls for expert opinion.

THE COURT:  Overruled.

THE WITNESS:  Per discussions and documents, yes, the Los Angeles Housing Department has been the oversight body for LAHSA's contracts.

MS. KAOUNIS:  I'm going to move to strike as



non-responsive and also a hearsay.

BY MS. MITCHELL:

Q    And have they done a good job of that oversight?

MS. KAOUNIS:  Objection.  Vague.  Calls for an expert opinion.

MS. MITCHELL:  I need to restate that, Counsel.

BY MS. MITCHELL:

Q    To your knowledge, based on what you have seen in the Housing and Homelessness Committee meetings, as well as what was reported in the Alvarez and Marsal assessment, has Los Angeles Housing Department reported a good oversight?

Let me withdraw and rephrase that question. That was a terrible question.

Has Los Angeles Housing Department demonstrated the ability to effectively oversee LAHSA?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  I'll allow it if it's tied to the A&M report.  I'm not going to allow that as a general opinion by the special master.

MS. KAOUNIS:  And I also just want to, it calls for an expert opinion and it lacks foundation.

THE COURT:  That's overruled, Counsel.

BY MS. MITCHELL:

280

Q    So reflecting specifically the A&M assessment, did the A&M assessment reflect adequate oversight and monitoring by LAHD of LAHSA?

MS. KAOUNIS:  Objection.  Relevance.  Calls for an expert opinion.  And vague.

THE COURT:  I'm going to mull that over.  I'm going to sustain that at the present time.  I want more time to think about that question.

BY MS. MITCHELL:

Q    Referring to Exhibit 23, the independent assessment that you have reviewed, are there mentions of LAHD in this independent assessment of City-funded homelessness assistance programs?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  The Court has already instructed that this witness wasn't going to be opining on the A&M report.

THE WITNESS:  Let me answer the question.  Yes, there is reference.

BY MS. MITCHELL:

Q    And does the A&M assessment reflect that Los Angeles, well, let me ask a different question.  How is Los Angeles Homelessness Department, excuse me, Los Angeles Housing Department described in terms of its oversight of LAHSA?



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

281

MS. KAOUNIS: Objection. Vague. Calls for expert opinion. Hearsay. Lacks foundation.

THE COURT: Overruled. It's foundational.

You can answer the question.

THE WITNESS: Can you restate your question?

BY MS. MITCHELL:

Q   Sure. How is LAHD, Los Angeles Housing Department, described by the assessment in its oversight capabilities of LAHSA?

THE COURT: And would somebody give her the hard copy document so we have that assessment in front of her?

MS. KAOUNIS: And same objections, Your Honor.

THE COURT: Just a moment. First of all, we'd like to get the hard copy document in front of her. As all the other witnesses have had that.

Counsel, why don't you refer to her page and put up that page on the screen for a moment so we know what you're talking about.

MS. MITCHELL: Actually, may I have a moment, Your Honor?

THE COURT: Certainly.

MS. MITCHELL: I apologize. If I may have just one more moment, Your Honor.

THE COURT: Take your time.

BY MS. MITCHELL:



282

Q    All right.  I'm going to show you page 5 of the A&M assessment where it identifies limited financial oversight and performance monitoring.  Do you see that?

A    Yes.

Q    Who or what department at the City, to your knowledge, had the obligation to oversight and monitor LAHSA's performance?

MS. KAOUNIS:  Objection.  Lacks foundation.  Calls for legal conclusion.  Calls for expert opinion.  Vague.  And foundation, if I didn't say that.

THE COURT:  Overruled.

You may answer the question.

THE WITNESS:  Thank you, Your Honor.  Is this on the limited financial oversight performance?

MS. MITCHELL:  Correct.

THE WITNESS:  Can you give me a minute to read, please?

MS. MITCHELL:  Yes.

THE WITNESS:  Thank you.

MS. MITCHELL:  Of course.  Take all the time you need.

THE WITNESS:  I see LAHSA.

BY MS. MITCHELL:

Q    Are you aware of what City department has

the obligation to oversee the financial oversight and performance monitoring of LAHSA?

MS. KAOUNIS:  Objection.  Vague.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  Per City documents and City meetings, the Los Angeles Housing Department.

MS. MITCHELL:  No further questions at this time, Your Honor.

THE COURT:  Ms. Myers, questions?

MS. MYERS:  Yeah.  Can we take a short recess, Your Honor?

THE COURT:  Pardon me?

MS. MYERS:  Can we take a short recess, Your Honor?

THE COURT:  Absolutely.  What time?

MS. MYERS:  How about 15 minutes?

THE COURT:  4:00 o'clock, okay?

MS. MYERS:  That's great.  Thank you, Your Honor.

THE COURT:   right.  We're going to recess until 4:00 o'clock.  Thank you.

(A recess was taken off the record.)

THE COURT:  We're back on the record.

Counsel, we're back on the record.



284

And, Ms. Myers, if you'd proceed, please.

MS. MYERS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. MYERS:

Q    Shayla Myers on behalf of the Intervenors from the Legal Aid Foundation of Los Angeles.  Special Master Martinez, good afternoon.

A    Good afternoon, Counsel.

I just want to ask a few questions related to the reports that you submitted in this case.  You've submitted two reports; correct?

Correct.

And you've submitted them publicly on the court docket in this case?

Correct.

And so both the Alliance and the City of Los Angeles have had a chance to review those reports; correct?

I would assume so.  It was on the public docket.

Okay.  So since they were filed in this case, then the parties received them and at least had the time and space to review them if they so choose; correct?

MS. KAOUNIS:  Foundation.

THE COURT:  Overruled.

Okay.  You may answer.

285

THE WITNESS:  Yes.

BY MS. MYERS:

Q    And so for purposes of the direct examination from the LA Alliance, you identified Exhibit 90, which is the independent monitoring report for year one; correct?

Correct.

And you submitted this report in February of 2024 as it relates to 2023; correct?

Correct.

And that was your first year operating as the Special Master appointed by the Court to oversee the settlement agreement in this case; correct?

Yes.

And when I talk about the settlement agreement, I am referring specifically to the settlement agreement between the LA Alliance and the City of Los Angeles, just so the record is clear.

Okay.  Thank you.

And when you submitted this report, did you receive any feedback from any of the parties in writing or otherwise related to the report?

I did not.

MS. KAOUNIS:  Relevance.

THE COURT:  Overruled.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

THE WITNESS:  I did not.

THE COURT:  Well, just a moment.  I didn't hear the answer.

THE WITNESS:  No.

BY MS. MYERS:

Q    I'm going to show you page 9.  Give me one second.  Okay.  So I'm going to put this in front of you.  It's on page 9.  And I'm going to just point to the second paragraph here.  And the second paragraph states that, I must caution the City that many of the new housing solutions in 2023 that are part of the Inside Safe program will not be counted towards the settlement agreement because these housing solutions will not be occupiable after 2027; correct?

MS. KAOUNIS:  Objection.  Foundation.

THE WITNESS:  Yes.

MS. MYERS:  And you included --

THE COURT:  Counsel, just a moment.

MS. MYERS:  Sure.

THE COURT:  Overruled.

And your answer was "yes"?

THE WITNESS:  Yes.

BY MS. MYERS:

Q    Okay.  And do you remember writing this section of the report?



Yes.

And why did you include this specific section in the report?

There was various --

MS. KAOUNIS:  Objection.  Calls for a legal conclusion.  Calls for expert opinion.

THE COURT:  Overruled.

THE WITNESS:  There were various discussions in the Housing and Homeless Committee back then and as well in the council meetings as it pertains to these particular beds and as well as the CAO mentioned prior to conversations were being had because this program was fairly new.  They didn't know if these beds would, you know, surpass, you know, they were very temporary in nature.  They didn't know how long they would last.

MS. KAOUNIS:  Objection.  Move to strike CSI.

BY MS. MYERS:

Q   And so in 2020, in 2023, when you were, for purposes of this monitoring agreement, there was the creation of the Inside Safe program and the addition of hotel and motel rooms as part of that program.  Correct?

MS. KAOUNIS:  Objection.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MYERS:



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

Q    And it are those hotel and motel rooms, the new housing solutions that you're referring to in this report in a sentence I just read.

MS. KAOUNIS:  Objection.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  At the time there weren't any of those um, Inside Safe beds that are in the 2025 report. The beds that were, it was a hotel, the Mayfair when they purchased.

BY MS. MYERS:

Q    So it, so then it's your -- this section refers only to the Mayfair, or does it refer to the, all of the hotel and motel rooms in the Inside Safe program?

A    The beds.

MS. KAOUNIS:  Objection.  Misstates the document.

THE COURT:  Overruled.

Can you answer the question?

THE WITNESS:  Yes.  All the beds.

BY MS. MYERS:

Q    Okay.  So it was your position in 2023 that the beds in the Inside Safe program would not count towards the LA Alliance settlement because the beds would not be occupiable after July of 2027; is that correct?

MS. KAOUNIS:  Objection.  Calls for expert



opinion.  Relevance.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  For my interpretation and understanding watching the housing and homeless committee meeting and hearing statements from the CAO, yes.

MS. MYERS:  And so that was also --

MS. KAOUNIS:  Moved to strike as hearsay and legal conclusion.

BY MS. MYERS:

Q    And so you included this in your report because it was part of the conversations that were happening amongst the city council members specifically related to those beds; correct?

MS. KAOUNIS:  Objection.  Hearsay.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  That is a true statement.

BY MS. MYERS:

Q    Did anyone from the City raise any concerns about your representation about what was happening within the City as stated in your report?

MS. KAOUNIS:  Objection.  Vague.  Relevance. Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  Not to my recollection.

BY MS. MYERS:



Q   Okay.  So this, this section of this report that said that the beds for purposes of Inside Safe would not count towards the LA Alliance went unremarked upon by the City of Los Angeles; correct?

MS. KAOUNIS:  Objection.  Vague.  Relevance.  Hearsay.  Calls for speculation.

THE WITNESS:  My recollection.

THE COURT:  Overruled.

You may answer the question.  Can you just repeat your answer?

THE WITNESS:  That is correct.

THE COURT:  Okay.  Thank you.

BY MS. MYERS:

Q   Okay.  Thank you.  And that remains the position of the City of Los Angeles as far as you understood until the last quarterly report; correct?

MS. KAOUNIS:  Objection.  Vague.  Speculation.  Lacks foundation.  Calls for expert opinion.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  In my prior statement as I you know, the only bed plan that the City has presented to the Court and to the, all the parties is the one I stand because the other one was withdrawn.

BY MS. MYERS:

Q   So those Inside Safe beds were not part of



that bed plan.  And obviously you know, the City has the opportunity to bring in new beds online.  but it's my understanding that these specific beds that we're speaking about an Inside Safe at no given time were there any discussions with the City as it pertains to these specific beds?

MS. KAOUNIS:  Move to strike for lack of foundation.

BY MS. MYERS:

Q    And do you know if the beds that were counted in the most recent quarterly report related to Inside Safe are beds that were part of the City's representation that those beds would not count towards the LA Alliance settlement agreement?

MS. KAOUNIS:  Objection.  Vague.  Calls for a legal conclusion.  Speculation.

THE COURT:  Overruled.

THE WITNESS:  For my recollection in prior homeless and housing committee meetings and obviously council meetings, yes.

MS. KAOUNIS:  Move to strike, hearsay.

BY MS. MYERS:

Q    So you also submitted a independent monitoring report for the settlement agreement for the year that just ended December 31st, 2024; correct?

A    Yes.

THE COURT:  I was waiting for objection.

BY MS. MYERS:

Q    Sorry.  And that would be Exhibit 93; is that correct?

A    Yes.

Q    Okay.  And is that the exhibit that's in front of you right now?

A    Yes.

Q    Okay.  Okay.  And so I'm going to show you page 19 and specifically I'm going to show you the starting with the line independent verification of the City's quarterly reports.

Q    So independent verification of the City's quarterly reports for 2024 have revealed numerical inconsistency in reported beds, units open and beds in progress and process across multiple council districts. so I'm going to have you restate that for sure, Your Honor.  actually special master Martinez, but the section that I just read, you wanted to read that for the record.

A    Independent verification.  Is that what --

Q    Yeah.

A    Independent verification of the City's quarterly reports for 2024 has revealed numerical

inconsistencies in reported beds, units opened and beds in process across multiple council districts.  These miscalculations underscore serious concerns about data integrity in the milestones tracking from LAHSA.

Q    Thank you.  And is this, is this a state, does this statement reflect something that you observed as the monitor in this case?

MS. KAOUNIS:  Objection.  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  In my understanding of how the City receives its data from LAHSA, yes.

BY MS. MYERS:

Q    Okay.  And so you were, you identified as part of your independent monitoring.  You identified numerical inconsistencies in reported beds and units opened.

MS. KAOUNIS:  Objection.  Relevance.  Calls for legal conclusion.  Calls for expert opinion.  Per what was reported in quarterly reports.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MYERS:

Q    Okay.  And that you, you also identified some inconsistencies in the numerical inconsistencies and beds in process.



THE COURT: Just restate that. Okay. Way too quick though.

BY MS. MYERS:

Q    And you also identified numerical inconsistencies in beds in process across multiple council districts. Correct?

MS. KAOUNIS: Objection. Lacks foundation. Calls for expert opinion. Relevance.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MS. MYERS:

Q    Per the documents that were submitted by the City. Do you know if the well, I'll withdraw that. And you previously testified as, as your role, within your role as the special monitor or the special master with the case, with this case that you often do spot checks related to the, the beds and the units. Correct?

MS. KAOUNIS: Objection. Vague.

BY MS. MYERS:

Q    And that as part of that monitoring that you identified 20 sites that were not identified in the RMS and HMIS databases. Correct?

A    yes. In my submission to LAHSA to ensure that I would be able to get access with those service providers, you know, permanent supportive housing, which

is the majority of the interventions for the LA Alliance agreement. I cannot just walk into somebody's unit. You need to have permission by the service providers. And that was the reason why I contacted LAHSA so that they can contact the service providers to let them know that I would be visiting those sites.

Q    And that's how you identified this, this mismatch between the two?

A    Correct. Through communication with LAHSA.

MS. KAOUNIS:  Objection.  Misstates prior testimony.  Vague.

THE COURT:  And, and you -- Both of you.  We need you to slow down.  Thank you.  And hold on.  Re-ask the question.

BY MS. MYERS:

Q    And that is how you identified the discrepancies in the data related to RMS and HMIS. Correct?

MS. KAOUNIS:  Just a moment.  Objection.  Vague. Misstates prior testimony.

THE COURT:  Overruled.

You may answer the question.

THE WITNESS:  Yes.  Per my communication with LAHSA.



BY MS. MYERS:

    Q   Thank you.  And you notified the City about these discrepancies by CCing the city attorneys assigned to this case; correct?

    MS. KAOUNIS:  Objection.  Vague.

    THE COURT:  Overruled.

    You may answer the question.

    THE WITNESS:  Yes, when I originally actually CCed the LA Alliance as well, and the attorneys, informing them that I was going to do spot checks.  And I had to communicate because LAHSA only responded to me as the special master and took the parties off.  And so I had to go back and forth so I could understand that there could have been some confusion with the parties because LAHSA removed them from the email communications.

BY MS. MYERS:

    Q   LAHSA removed who?

    A   The City of Los Angeles and the LA Alliance.

    Q   And ultimately the parties were made aware of this issue through the communications with you and LAHSA; correct?

    MS. KAOUNIS:  Objection.  Vague.  Foundation.

    THE COURT:  Overruled.

    THE WITNESS:  Yes.



BY MS. MYERS:

Q    And when did these communications occur?

A    In early May.

Q    Okay.  As part of your role as the special master, you've also spent time monitoring encampment resolutions; is that correct?

A    Yes.

Q    And as part of your role of monitoring encampment resolutions, what kinds of operations have you been monitoring?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  I've been to CARE and CARE Plus operations.

BY MS. MYERS:

Q    And what is your understanding of what a CARE and CARE Plus operation is?

MS. KAOUNIS:  Objection.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  It's my understanding that these are one, for public health, but have been utilized to remove encampments, RVs, makeshifts, so forth, and to clean those areas.  But with the understanding that outreach and other services are being provided and there's the HET teams that are with LAHSA that, when I've been at



those sites, they've been present to offer housing.

BY MS. MYERS:

Q    The HET teams have been present during the CARE Plus operations?

A    And some where I've been, and then there's been others where they have been there and have had no beds to offer.

Q    Have you been to CARE Plus operations where there were no outreach teams present?

A    Yes.

MS. KAOUNIS:  Objection.  I'm going to move to strike the last as lacks foundation.  And also, hearsay.

BY MS. MYERS:

Q    As part of your monitoring of encampment resolutions, have you also been to any Inside Safe operations?

A    Yes.

Q    What, can you tell us which Inside Safe operations you've been to?

A    Specific locations off the top of my head. I've been, I can tell you some of the council districts, CD1, CD4.

Q    What informed your decision to go to CARE and CARE Plus operations as part of your monitoring of the encampment resolution plan?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  Those were the programs that were being utilized for the encampment engagement and resolutions under the LA Alliance Agreement.

BY MS. MYERS:

Q    And where did you, understanding that that's why you were going, how did you come upon the knowledge that CARE and CARE Plus operations were being used by the City to count towards the encampment resolution plan?

MS. KAOUNIS:  Objection.  Vague.  Calls for a legal conclusion.  Calls for expert opinion.

THE COURT:  Overruled.

THE WITNESS:  The City stated, though, that here in court and in other city council meetings and the homeless and housing committee meetings.

BY MS. MYERS:

Q    So the City represented that it was using CARE and CARE Plus operations for part of its encampment resolution plan?

A    Yes.

Q    Okay.  And how do you decide which CARE and CARE Plus operations to monitor?

A    So the original ones that I've attended, I



300

continue to go because there's an understanding that those encampments can repopulate because there is no ability for the City to keep those clean all the time because those that are unhoused can come back.  And in particular, one great example is Skid Row.  On a weekly basis, they're having to move their belongings for it to be clean, and then they can come back.

Q    And that's actually a feature of the CARE Plus operations -- Right?  -- is that individuals have to move their belongings, but then they can come right back to the location; correct?

MS. KAOUNIS:  Objection.  Vague.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  That is correct.

BY MS. MYERS:

Q    And when you go out to CARE Plus operations, how do you know that a CARE Plus operation is happening in that location?

A    Well, you have various teams. You know, beyond the sanitation, there are other various teams that are coming up to pick up, whether it's law enforcement, whether it's these other teams that are coming to pick up the tonnage of waste.

Q    I'm going to show you what I've marked as Exhibit 305.  This is the City of Los Angeles CARE Plus



Cleaning and Rapid Engagement Schedule.  Have you ever seen a schedule like this?

A    Yes.

Q    Do you rely on these schedules to determine when to go out to CARE and CARE Plus operations?

A    When I first started, yes, but, you know, because they're per district and, you know, there's continuous locations where there's just continual problems and people come back, and so they kind of go to the same spots and locations, unless they're counseled because somebody from the overall CARE Plus team was unable to show up for whatever reason.

Q    Okay.  How did you, when you went out to the CARE Plus operations, relying on these schedules, how did you get the schedules?  How were they provided to you?

MS. KAOUNIS:  Objection.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  Originally, I would ask, I think a couple times I asked the city attorney's office, and then I would then, again, as I mentioned, I would continuously go to those locations, or when I'm out in the field and I would see all the various, you know, city staff.

It's a pretty big deal.  It's a tremendous amount of manpower that is out there, so you know something is going on, and so because a lot of times in



council districts, whether they happen or not happen, you know, it's kind of difficult to wait because you have to wait a day before, before the schedule is made public, and so I just made it upon my own schedule when I'm out there to go to those certain locations where I know typically they may be there.

BY MS. MYERS:

Q   So you've been going to the same locations to monitor the CARE Plus cleanups?

A   For the most part, yes.

MS. KAOUNIS:  Objection.  Misstates prior testimony.

BY MS. MYERS:

Q   And have you been keeping a running log of the CARE and CARE Plus operations that you've monitored?

A   For my records, yes.

Q   And the City and Mr. Szabo testified that the City of Los Angeles counts the removal of tents, makeshift shelters, and vehicles from the public right-of-way for purposes of encampment reductions; correct?

MS. KAOUNIS:  Objection.  Foundation.  Misstates testimony.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  That was my understanding.

BY MS. MYERS:

Q    Do you know if any of the CARE Plus cleanups that you monitored resulted in any of the tents, makeshift shelters, or vehicles that the City counted towards the encampment reduction plan?

MS. KAOUNIS:  Objection.  Foundation. Relevance.  Calls for speculation.  Calls for legal opinion.

THE COURT:  Overruled.

You can answer the question, please?

THE WITNESS:  I did not ask the staff.  They do use GIS in the sanitation, but I've never really spoken directly to them and asked if they were counting those towards.  So no, I wouldn't be able to tell you, no.

BY MS. MYERS:

Q    Has the City provided you any of the data that the CAO's office uses for verification of the removal of tents, makeshift shelters, or vehicles?

MS. KAOUNIS:  Objection.  Foundation. Relevance.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  No, just based on what I gather and what he presents to the Homeless and Housing Committee.

THE COURT:  And just for the record, he refers to Mr. Szabo?

THE WITNESS:  Mr. Szabo or his staff, yes.

Okay.  The CAO's office.

BY MS. MYERS:

Q    And when you say what they present to the Homeless and Housing, has the CAO's office presented on the encampment reduction plan and the removal of tents, makeshift shelters, and vehicles?  Have they presented on that data to the Homeless and Housing Committee?

MS. KAOUNIS:  Objection.  Relevance.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  I don't think in detail, but they do provide reports, and there is obviously the documentation of the LA Alliance settlement and where they're currently at per the quarter.

There's an example here of the Alliance settlement agreement progress of March 31st, 2024, and funding recommendations.  So these are the reports that the CAO provides in regards to the LA Alliance settlement agreement.

MS. KAOUNIS:  Your Honor, again, I'm going to make a request for the record that we get copies of all the documents that are being read by the witness.  It's inherently unfair for her to be testifying from documents we haven't seen before.  I understand that they're

305

supposed to be City documents, but this is the first time we're hearing about them.

BY MS. MYERS:

Q    Just for purposes of that and so that we have a clear record, if we're going to get the documents, Special Master Martinez, can you identify the document that you're referring to?

A    Yes.  It is CAO file 0220-05151, and it's the reference Alliance settlement agreement.  The subject is Alliance settlement agreement progress of March 31st, 2024, and funding recommendations for future permanent supportive housing master leasing.  Here's the reference of the encampment.

Q    And can you just tell us for the record where you got that document, where that document could be located?

A    Yes, on the City's website, on the clerk's.

Q    That Clerk Connect?

A    Yeah, that is Clerk Connect.

Q    Do you have the specific, just for ease for all of the parties, do you have the specific council file that it's filed in?

A    Yes, council file 231022.

MS. KAOUNIS:  Your Honor, again, for the record,



my objection stands.  There's thousands of documents on the City's website and the various council files.  We would like copies of this so that we can question the witness tomorrow.

THE COURT:  And I appreciate that.  Just making a record so it's easy when we go back and we get the documents, we know what Ms. Martinez is referring to.

BY MS. MYERS:

Q    So I'm going to show you what was previously marked as the intervener's Exhibit Number 302, which is document 892-2.  It's page 10 of that.  And this is the recently filed encampment resolution data.  Is this the type of data that you were just referring to that was presented to the City Council Homelessness and Housing Committee?

MS. KAOUNIS:  Objection.  Vague.  Foundation.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MYERS:

Q    Okay.  So beyond this data that you found in the council file and that also was filed with the court as part of the City's quarterly report, have you received any other information from the City of Los Angeles related to what the City counts for purposes of the reduction of



tents, makeshift shelters, and vehicles?

MS. KAOUNIS:  Objection.  Foundation.  Calls for expert opinion.  And calls for legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  This is the only documentation which is just numbers.

BY MS. MYERS:

Q    Okay.  Have you asked the City of Los Angeles to verify whether any of the CARE Plus cleanups that you observed resulted in the removal of tents, makeshift shelters, or vehicles that were counted towards the LA Alliance encampment resolution data?

MS. KAOUNIS:  Objection.  Vague.  Calls for expert opinion.  Calls for legal conclusion.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  May I answer?

THE COURT:  Yes.

THE WITNESS:  Over this past year, I have not because of issues that come before the Court over interpretation, so no.  That is something that the Court has full authority, and so my job is just to monitor based on what they say that they're going to produce as it pertains to their goals that they submitted their milestones of the 9,800 per quarter, per council district.

BY MS. MYERS:

Q    And the dispute that you're referring to that's in front of the Court, that's the dispute about whether a tent removed from the public right-of-way counts or it relates to a person being permanently housed.  Is that the dispute you're referring to?

MS. KAOUNIS:  Objection.  Vague.  Calls for legal conclusion.  Calls for expert opinion.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MYERS:

Q    In your monitoring of the settlement agreement, and specifically the encampment reduction plan or encampment resolution plan, has the City provided you, let me back up, used the term makeshift?  What does the term makeshift mean to you?

MS. KAOUNIS:  Objection.  Relevance.  Calls for expert opinion.  Calls for legal conclusion.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  In my opinion, a homemade structure.

MS. KAOUNIS:  Objection.

BY MS. MYERS:

Q    Is it what is also referred to for purposes of these proceedings as a makeshift shelter?

MS. KAOUNIS:  Objection.  Same objections.

THE COURT:  I'm going to have you repeat the question.

MS. MYERS:  Sure.

BY MS. MYERS:

Q    You said makeshift.  For purposes of the City's report, they referred to as a makeshift shelter. When you use the term makeshift, is that shorthand for makeshift shelter?

MS. KAOUNIS:  Objection.  Calls for legal conclusion.  Calls for expert opinion.  Relevance.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  Is it shorthand for?

MS. MYERS:  Makeshift shelter.

MS. MYERS:  Makeshift shelter being?

THE WITNESS:  A homemade structure.

MS. MYERS:  Your Honor, the term makeshift is sometimes used by folks, as opposed to makeshift shelter. Just clarifying for the record that when we talk about makeshift, we're referring to makeshift shelter.  You can answer that question.

THE WITNESS:  Yes.

THE COURT:  Okay.  Just a moment.  I didn't hear the answer, though.  I'm sorry.

THE WITNESS:  Yes.



THE COURT:  Okay.  Yes.  Okay.

BY MS. MYERS:

Q    And so what is your understanding of what constitutes a makeshift shelter?

MS. KAOUNIS:  Objection.  Calls for legal conclusion.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  A structure that an unhoused person is putting together to, that they seem is their personal belongings and it's their home?

BY MS. MYERS:

Q    Has the City ever provided you a definition for makeshift shelter that they are using for purposes of reporting their compliance with the L.A. Alliance Encampment Reduction Plan?

MS. KAOUNIS:  Calls for a legal conclusion. Vague.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  It's my understanding that the parties agreed to utilizing the LAHSA definition.

BY MS. MYERS:

Q    And that was the definition of tents, makeshift shelters, and RVs for purposes of encampments; correct?

MS. KAOUNIS:  Objection.  Calls for legal



311

conclusion.  Relevance.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MYERS:

Q    Okay.  And so just focusing solely on makeshift shelter, there has previously been testimony that there is a definition that the City uses for purposes of determining what constitutes a makeshift shelter.  Has the City ever provided you with that definition of what they consider a makeshift shelter to be?

MS. KAOUNIS:  Objection.  Misstates testimony. Foundation.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  In my recollection, no, they have not provided anything.  Mr. Szabo testified that the vehicle portion of the Encampment Reduction Plan counts vehicles that are seized by the City and impounded during RV operations.

BY MS. MYERS:

Q    Have you ever been to an RV operation?

MS. KAOUNIS:  Objection.  Misstates prior testimony.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.  In CD3.

BY MS. MYERS:



Q     When did you go to the RV operation in CD3?

A     Sometime last year.  I don't recall the date, but that is, I don't recall the date.

Q     And how did you become aware of the RV operation?

A     I was invited by the CD3 staff.

Q     Okay.  And are you aware how many vehicles were seized and impounded during the RV operation?

MS. KAOUNIS:  Objection.  Calls for a legal conclusion.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  At that specific site, I think there was only one.

BY MS. MYERS:

Q     You think there was only one vehicle that was seized and impounded?

A     Yes.

Q     Do you know if, for purposes of the LA Alliance reporting related to the Encampment Resolution data, whether that RV was counted towards the Encampment Resolution data submitted by the City?

MS. KAOUNIS:  Objection.  Lacks Foundation. Calls for a legal conclusion.

THE COURT:  Overruled.



THE WITNESS:  No, that's not a question that I asked the CD3 staff or the staff that were in charge.

BY MS. MYERS:

Q   Has the City provided you any documentation related to RV operations that are the data from which has been included in the Encampment Resolution data submitted to the Court?

MS. KAOUNIS:  Objection.  Vague.  Lacks foundation.  Calls for expert opinion.  Calls for a legal conclusion.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  The only thing that's provided is this document that highlights whether there are makeshift shelters and vehicles on the right-of-way.  That's pretty much the only documentation I'm aware of.

BY MS. MYERS:

Q   Okay.  And so has the City provided you the locations of the RV operations so you could monitor them?

THE COURT:  Was that an objection?

You may answer.

THE WITNESS:  No.

MS. MYERS:  Okay.  No further questions at this time.  Thank you, Your Honor.



314

THE COURT:  Okay.  And on behalf of the City.

MS. KAOUNIS:  Sorry, Your Honor.  I didn't hear that.

MS. MYERS:  Sorry, Your Honor.  I made some racket related to this, and I think the courtroom missed your last comment.  Apologies.

THE COURT:  Gibson, Dunn for in the City, please.  Unless you need a recess.  Would you like a recess?

MS. KAOUNIS:  I'm fine.

THE COURT:  Okay.  Thank you.

MS. KAOUNIS:  Your Honor, thank you.  I'm fine with the caveat that we'll be resuming tomorrow with the documents that were not provided to us.

THE COURT:  I couldn't hear you.

MS. KAOUNIS:  I'm fine with the caveat that we'll be resuming tomorrow with the documents that were not previously provided.

THE COURT:  We could take a break now if you want to wait for cross-examination and get those documents to you now.  But it's a huge stack.  There's no way we'll be able to get them.

MS. KAOUNIS:  That's okay.

THE COURT:  In other words, instead of you starting across now, if you want to examine those



315

documents overnight, you're more than welcome to.

MS. KAOUNIS:  Well, I would, if it's okay.

THE COURT:  It's okay.  I would prefer to start. I'll leave that to you, whatever you're comfortable with. And see what we can get accomplished.

MS. KAOUNIS:  But let me confer with my team. What are you most comfortable with?

THE COURT:  Okay.  Now, as far as documents, she's not going to Xerox them.  You're going to give them the data so that both parties can track.

THE WITNESS:  I can give them the council file, yes.

THE COURT:  And they're on a public website.  So we'll give you the data, how to find them, okay?

THE WITNESS:  Just for the record, I wasn't aware that as a special master, I had to provide any exhibits or evidence.  It's my role to have these documents, to watch these council meetings.  And so I just wanted to state that for the record.  I did not know that I had to provide exhibits for the work that I do.

THE COURT:  Counsel, would you mind taking your laptop?

MS. MYERS:  I don't need it.

THE COURT:  And for the record, I don't think that's how we've ever operated before.  So we were under

316

the same understanding, special master.  I'm not sure that this is a requirement.

First of all, you're saying that these are public documents.  Also, that you viewed various council meetings that could be reproduced.  Just a matter of time. So why don't we take that time this evening?

CROSS-EXAMINATION

BY MS. KAOUNIS:

Q    You read the Alliance settlement agreement; correct?

A    Yes.

Q    And that agreement sets forth the City's obligations to the Alliance in this matter; correct?

A    Yes.

Q    And you're aware that under Section 2 of the settlement agreement, the City has five years to complete its obligations; right?

MS. MITCHELL:  Objection.  It misstates the document.  The document speaks for itself.  It also calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Yes, per the agreement.

BY MS. KAOUNIS:

Q    And nothing in your report changes that; correct?



A     Yes.

Q     Do you have a LinkedIn profile?

A     I do.

MS. KAOUNIS:  Okay.  I'm going to mark as Exhibit 220 the LinkedIn profile of Michele Martinez. I'll provide a hard copy to counsel that we pulled off of LinkedIn.

May I approach, Your Honor?

THE COURT:  You may.

MS. KAOUNIS:  Thank you.

BY MS. KAOUNIS:

Q     Go ahead and take a moment to review that and let us know if that looks familiar.

A     Yes.

Q     Does this look like your LinkedIn profile?

A     Yes.

Q     Did you put this together?

A     I did.

Q     And to the best of your understanding, it's true and accurate?

A     Yeah, when I put it up, things have changed.

Q     You have no reason to believe that it is inaccurate; correct?

A     No.

318

Q    Okay.  And if you turn to page 5, you'll see your education.

A    Yes.

Q    And it says you went to Cal State Fullerton for a bachelor's in criminal justice.

A    That is correct.

Q    Okay.  And was that a degree you received?

A    Yes.

Q    Okay.  And there's also an entry for the Institute of Integrative Nutrition; is that right?

A    Yes.

Q    And you received a certificate there?

A    Yes.

Q    And there was a certificate of completion for the Harvard Kennedy School Executive Education; correct?

A    Yes.

Q    And then also you went to Santa Ana College Associate of Arts, which you received as well; correct?

A    Yes.

Q    Okay.  Did you go to law school?

A    I did not.

Q    And did you take any special monitor training in connection with your work in this matter?



319

        A    I didn't know it was a prerequisite.

            MS. MITCHELL:  Objection.  Relevance.
Foundation.

            THE COURT:  Overruled.

            May I have an answer?

            THE WITNESS:  At the Court of Counsel, is there
such a thing?

            MS. KAOUNIS:  I'm asking.  I don't know.  I'm
asking.

            THE WITNESS:  I just said that I didn't know
there was a prerequisite.

            THE COURT:  Just a moment between the two of
you.  And your question is?

            MS. KAOUNIS:  Did you take any special monitor
training in connection with your work in this matter?

            THE COURT:  You can ask the question.

            THE WITNESS:  I didn't know that there was a
prerequisite for that.

BY MS. KAOUNIS:

        Q    So I take it the answer is no.

        A    I stand by my statement.

        Q    Your first report was introduced
previously.  Did anyone assist you in writing that report?

        A    No.

        Q    And did anyone assist you in writing your



second report?

A   No.

Q   Okay.  You say in your first report, as a special master slash monitor, my primary role is to evaluate the City's compliance with the stipulations outlined in the L.A.  Alliance for Human Rights versus City of Los Angeles Agreement.  Correct?

A   And which report are you referring to?

Q   That's your first, and I'm happy to refer you to it.  I have it here.

A   Yes.

Q   Okay.  Your primary role is to evaluate the City's compliance with the settlement agreement; right?

A   Correct.

Q   You're not evaluating the Alliance's compliance with the settlement agreement; right?

A   Okay.  Whatever is in the agreement?

Q   Are you looking at the Alliance's compliance with the agreement?

A   Yes.  Mm-hmm.

Q   You are?  And is there anything in your report that addresses the Alliance's compliance with the agreement?

A   The settlement agreement?

Q    Mm-hmm.

THE COURT:  If you're speaking to the settlement agreement, if you can rephrase your question, because I think you're implying the L.A.  Alliance, specifically, and not the agreement with the L.A.  Alliance and human rights.  So I'm trying to get some clarification.  You can restate your question.

BY MS. KAOUNIS:

Q    I'm sorry if it was unclear.  You are not evaluating the L.A.  Alliance's compliance with the settlement agreement; correct?

A    I can't answer that question.  If you're asking -- the City is the one that the compliance is with the City of Los Angeles, not with the L.A.  Alliance.

Q    Okay.  And you're not assessing whether the Alliance acted in good faith at any point during the performance of the settlement agreement; right?

A    That's not my role.

Q    And under the plain terms of the agreement with the City, that's not what you were asked to do; right?

A    That's not my role.

Q    Your authority was delineated by the parties' agreement; is that fair?

A    Yes.



322

Q     And it's your job to evaluate compliance with the agreement as written; right?

A     Yes.

Q     And you likewise abide by the terms of your engagement letter as written; correct?

A     Yes.

Q     And you're not exercising any equitable discretion in order to interpret the contract; correct?

MS. MITCHELL:  Objection.  Vague.

THE COURT:  Do you understand the question?

THE WITNESS:  Can you restate?

BY MS. KAOUNIS:

Q     Are you sitting as an equitable decider in this matter, deciding what is equitable and what is not equitable as to the parties?

MS. MITCHELL:  Objection.  Vague.

THE COURT:  Do you understand the question?

THE WITNESS:  Yes.  My job is to be objective.

BY MS. KAOUNIS:

Q     So you're only assessing compliance with the actual terms of the agreement and not what is equitable as between the parties; correct?

MS. MITCHELL:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  Yes.



323

THE COURT:  But do you understand the question?

THE WITNESS:  I'll state my job is to be objective based on the compliances of this agreement.

THE COURT:  I'm sorry.  I didn't hear that last part.  Forgive me.

THE WITNESS:  My job is to be objective based on what's in this agreement.

BY MS. KAOUNIS:

Q   Okay.  And to the best of your understanding, you are not giving an equitable opinion as to the fairness of either party's actions or the terms of the agreement; correct?

MS. MITCHELL:  Objection.  Vague as to "equitable" in this context.

THE COURT:  Overruled.

THE WITNESS:  As I said in my last statement, I'm being objective.  I'm not sure I understand it.

THE COURT:  But if you understand the question, you can answer it.

THE WITNESS:  I stand by my prior response.

BY MS. KAOUNIS:

Q   In determining whether one party breaches this agreement, the settlement agreement, you're not assessing what is fair; correct?

A   I'm assessing what's in the agreement.



324

Q      And you wouldn't expect anybody else to assess what is fair.  You expect that you would be bound by the terms of the agreement that you're interpreting; correct?

MS. MITCHELL:  Objection.  Compound.  Vague.  Ambiguous.

THE COURT:  Overruled.

THE WITNESS:  That's not my role.

BY MS. KAOUNIS:

Q      Do you have any understanding of what equitable means in this settlement agreement?

A      Where in the agreement does it say equitable?

Q      We'll get to that.

A      Thank you.

Q      I'll put a pause on it.  There are no specific professional guidelines, as far as you're aware, that govern the writing of your report; correct?

A      Can you restate your question?

Q      There are no specific guidelines, like auditor guidelines, that govern the writing of your report; correct?

A      Well, it's really up to the Court to make that decision.

Q      But to your knowledge, you're not abiding



by any sort of auditor guidelines or anything of that nature; correct?

A    What do you mean by auditing guidelines?

Q    Well, for example, you're aware of the A&M report; right?

A    I am.

Q    And you're aware that there was a discussion in the prior testimony about whether it was an audit or whether it was an assessment; correct?

A    Yes.

Q    And my partner pointed out that there are certain guidelines associated with an audit that were not necessarily part of the report.  Do you recall that back and forth?

A    Yes.

Q    Okay.  So what I'm just trying to understand is, as far as you're aware, there are no specific guidelines that govern the writing of your report.

A    General accounting standards, is that what you're pertaining to?  The GASB?  Is that what you're pertaining to?

Q    Any.  It could be accounting, it could be judicial, as far as you're aware.

A    No.



326

Q    Okay.  You're not stating in the report that you're following any specific guidelines; right?

A    No.

Q    You're not a member of the State Bar; correct?

A    No.

Q    And you, to the best of your understanding, owe no fiduciary duty to either one of the parties; correct?

A    Correct.

Q    And you're not purporting to give an expert opinion; correct?

A    Can you define what expert means in this instance?

Q    To your knowledge, have you been qualified under the federal rules as an expert to testify?

A    No.

Q    Okay.  You did not take any oath before this Court; correct?

A    I do today.

Q    Other than the oath to testify, you did not take any oath in regards to your report; correct?

A    Correct.

Q    And you didn't make any ethics disclosures in relation to either one of your reports; correct?



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

A    Can you repeat that?

Q    You didn't make any ethics disclosures in connection with either one of your reports?

A    I didn't hear that last part.  I'm sorry.

Q    You didn't make any ethics disclosures in connection with either one of your reports?

MS. MITCHELL:  Objection.  Vague.  Ambiguous.

THE COURT:  You can answer that question.

THE WITNESS:  I'm not sure what this line of questioning pertains to.  I wasn't aware that I had to submit.  The Court never informed me that I had to submit any kind of ethics standards or the parties.  So I'm just trying to understand what your line of questioning is.

BY MS. KAOUNIS:

Q    Okay.  In your first report, you thanked the city staff and elected officials for being open to communication and feedback on the status of the settlement agreement during year one.  Do you recall that?

A    Yes.

Q    Okay.  And you also noted in your report that as of September 30th, 2023, the City has made significant strides in opening 2,347 beds or units.  Do you recall that?

A    Yes.

Q    And you observed that this accomplishment

was commendable; right?

A    Yes.

Q    And you noted that the landscape of compliance activities in the 2022-23 period has been significantly shaped by a myriad of challenges and advancements; right?  Sorry, and advancements; right?

A    If that's what it says in my report, yes.

Q    And you explained that the City encountered unprecedented obstacles leading up to the final quarter report of 2022; right?

A    If that's what's in my report, yes.

Q    And those unprecedented obstacles included unanticipated changes in the makeup and leadership of the city council; correct?

MS. MITCHELL:  Objection, Your Honor.  If the witness is being asked about a specific document, I'd ask that the specific document be handed to her or shown to her.

MS. KAOUNIS:  I believe she has a copy.

THE WITNESS:  I have both copies.

MS. KAOUNIS:  Yeah, and she said previously she knows what's in her report.

THE WITNESS:  Yes.

BY MS. KAOUNIS:

Q    And those, just to be clear, those



unprecedented obstacles included unanticipated changes in the makeup and leadership of the city council; correct?

A    If that's in my report, yes.

Q    And another unprecedented obstacle was the fact that there was an election underway; right?

A    Yes.

Q    And you observed that these shifts prompted the Alliance and the City to agree to an extension to establish encampment reductions and plans by council district and citywide in 2023; right?

A    Yes.

Q    And you applauded the City for its achievements in the initial year of the settlement; right?

A    Yes.

Q    And you noted that with the Inside Safe program, the City has actively pursued a comprehensive citywide plan to boost street engagement; correct?

A    Yes.

Q    And you stated that you were encouraged by the efforts made thus far and the strides that they, the City, continue to make to meet the terms of the agreement; right?

A    Yes, the elected body has been working really hard, yes.

Q    And you believe the City is firmly



330

committed to advancing efforts in addressing street homelessness for all individuals in L.A.; correct?

A    I believe so, yes.

Q    You're aware that there are some errors in your first report; right?

A    Yes.

Q    Okay.  You stated --

A    I am human.

Q    I'm sorry?

A    I am human.  We all are.  Right, exactly.

Q    You stated in your first report that the City's compliance with the settlement hinges significantly on the availability and efficient use of shelters and alternative housing options; right?

A    Yes.

Q    But you're aware that the City cannot force someone to accept a bed; correct?

A    Yes.

Q    And for that reason, the settlement doesn't require unhoused persons to use beds that are made available by the City; correct?

A    Yes, but it could offer shelter.

Q    The settlement could not compel unhoused persons to use available beds; correct?

A    Can you restate that?



331

Q      The settlement cannot compel unhoused persons to use available beds.  But it could offer, yes.  So it wouldn't be accurate to assess -- Well, it would not be an accurate assessment under the settlement agreement to count the usage of beds when the settlement doesn't require such usage; right?

A      Can you help me understand where you're getting that from?  Can you pinpoint where in the settlement agreement?

Q      Well, let's go to your report first, and I can give you the reference to your report, and you can look at the language.

A      Okay.  Great.  Okay.  Thank you.

Q      So it's Exhibit 90, and it's page 20.  The top paragraph, and we can pull it up.  And you see it's the second-to-last sentence in that paragraph.  It says, the City's compliance with the settlement hinges significantly on the availability and efficient use of shelters and alternative --

A      What page number, ma'am?

Q      Oh, I'm sorry.  Yeah.  It is page 20 of the filed document.

A      For the first report; correct?

Q      Yes.

A      And what paragraph did you say?

332

Q    I believe it's the first paragraph on the page, and it's the penultimate, the second-to-last sentence, the City's compliance.

A    Okay.  Yeah.  Okay.

Q    Okay.  You see that?

A    Yes.

Q    So it would not be an accurate assessment under the settlement agreements to count the usage of beds when the settlement does not require such usage; correct?

A    Well, in the core of the report, it also mentions how many PEH is being served, so what does that mean?

Q    May I have an answer to my question, please?

A    People experiencing homelessness, how many of those are being served by the beds that are being created?  That is my interpretation.

Q    But you understand that the City cannot compel unhoused people.

A    I understand they can't compel, but they can offer.

Q    Right.  So when you're assessing usage, that is not an accurate assessment of what is actually required by the settlement, because the settlement does not require people to use the beds; correct?

MS. MITCHELL:  Objection.  Misstates the record. Calls for a legal conclusion.

THE COURT:  Do you understand the question?

THE WITNESS:  Yes.  In my opinion, when beds are offered, most people will take those beds, so they are being utilized.

BY MS. KAOUNIS:

Q    When you say most people?

A    Most unhoused people.  In my experience that I've been out on the street, when offered a bed and it's available, they will take it.

Q    Do you have any empirical data to substantiate the assertion that 51 percent of people, when offered a bed, would take a bed?

MS. MITCHELL:  Objection.  Misstates the testimony.

THE COURT:  Can you answer the question?

THE WITNESS:  In my experience, in my personal experience as a former elected official, I observed it, and in my role being out there in the field, I've experienced that as well.

BY MS. KAOUNIS:

Q    So just to be clear, you have no empirical data to support the assertion that most people would accept a bed?



334

MS. MITCHELL:  Objection.  Vague as to "empirical data."

THE COURT:  If you understand the question, you can answer it.

THE WITNESS:  I don't understand the question.

BY MS. KAOUNIS:

Q    You're aware of the bed acceptance rates with respect to various programs in Los Angeles County; correct?

A    Yes.

Q    And what are those rates?

A    I have the reference document if you allow me to.

Q    Sure.

A    Okay.  I only have the number of sites and beds and rooms that are available for interim housing.  So I was looking for my other document from LAHSA that I don't have handy with me.  But I do have one document where it lists the city's housing availability.

Q    Would you read the title of the document for the record?

A    Yes, it is.  Actually, this is a letter from Councilwoman Monica Rodriguez.  It was submitted to the Court on March 14, 2024.  And she attached a document from February 15, 2024.  There is no council file.  It was

a homeless strategy committee from Matt Szabo, city's homeless outreach and city-wide outreach matrix that provides the homeless budget housing interventions and services and the housing availability.

Q    Okay.  And just to be clear for the record, your review of the material while you were on the stand here does not reflect a percentage of homeless persons who accepted shelter after an offer was made.

A    Not the document that I don't have with me yet.  Okay.  It's on my phone.

Q    I'm sorry.  Go ahead.  I didn't mean to interrupt you.

A    Go ahead.  It's fine.

Q    Okay.  You recognize that there's a difference between an offer and use; correct?

A    Yes.

Q    Okay.  And you're not aware of anything in the Alliance settlement that says a bed is only available if it is accepted by an unhoused person; correct?

A    Can you restate your question?

Q    Sure.  You're not aware of anything in the Alliance agreement that says a bed is only considered available if it is actually accepted by a homeless person; correct?

A    And the agreement only speaks about a new



336

bed being produced by the City.

Q    Okay.  You're not aware of anything in the Alliance agreement that says Inside Safe beds do not count toward the bed count; correct?

A    That's a true statement.

Q    Okay.  And you're not aware of anything in the settlement agreement that says there must be a new bed plan proposed at any time during the term of the agreement; correct?

A    No, it's not in the agreement.

Q    You're not a party to the roadmap agreement; correct?

A    No.

Q    Okay.  And to your knowledge, the county has not declared any breach under that agreement; correct?

A    To my knowledge, no.

Q    Let's turn to your second report, if we can.  For the record, that's Exhibit 93.  You have that in front of you?

A    Yes.

Q    Okay.  You state that the report serves as a structured proposal to assist city leaders in envisioning an independent governance model aimed at improving funding transparency, integrating housing and services, enhancing provider accountability, and promoting



sustainable housing placements; correct?

A    Yes, that's what it says in my report.

Q    The report's a proposal; correct?

A    It's a recommendation.

THE COURT:  Would you put that up on the screen as well?

MS. KAOUNIS:  Oh sure, of course.

THE COURT:  Thank you.

BY MS. KAOUNIS:

Q    My apologies.  That's on page 6, first paragraph.  And this uses the language structured proposal; correct?

A    Yes, but in the form of a recommendation.

Q    And the City did not engage you to envision an independent governance model; correct?

A    No.

Q    And your agreement for special master services doesn't say that you were hired to provide a structured proposal for independent governance model; correct?

A    That is true.

Q    And the settlement agreement between Alliance and the City also does not use that language; correct?

A    True, but I could provide recommendations



as a special master.

Q    And you were engaged, you say your report says you were engaged to facilitate development of the dispute resolution process referenced in paragraph 6 of the settlement agreement; correct?

A    Yes, but I'm not going to speak to that because the City of Los Angeles never entertained or provided information beyond just the initial document of the dispute resolution process.  It was created by the parties.

MS. KAOUNIS:  Okay.  I'm going to move to strike everything after yes is not responsive.

MS. MITCHELL:  And of course we would object to that, Your Honor.

BY MS. KAOUNIS:

Q    Okay.  And you were also engaged to oversee and serve as the arbiter of a dispute resolution process; correct?

A    If that's what it says in my report, the report or the agreement, yes.

Q    Okay.  To your knowledge the word transparency does not appear in the settlement agreement; correct?

A    To my understanding, but I would have to read it again.  You know, I don't read it every single



day.

Q   I'm happy to have you do that if you if you would like.

A   Take some time to read it if you guys want to bear with me.  I would defer to the Court if the Court would -- I skimmed through it.  I don't see the word transparency.

Q   And you also referenced in your second report the term integrated health services.  You can see that up on the screen.  Sorry, integrating housing and services.  Do you see that?

A   Yes.

Q   Okay.  The settlement doesn't say anything about new beds either; correct?

A   In the settlement agreement, the word new is in there, yes.

Q   Could you point me to where you're looking?  For the record, you're looking at Exhibit 25?  429-1; right?

A   Yes.  Yeah, I don't see "new."  I see "create."

Q   Okay.  And your 2025 report stated that to correct systemic inefficiencies, the City must establish an independent governance department focused on performance-driven homelessness response strategies.  Do



you recall that?

A    Yes.

Q    There's no contractual agreement between the City and Alliance to correct systemic deficiencies; correct?

A    In the agreement, yes.

MS. MITCHELL:  Objection.  Calls for a legal conclusion.  And misstates the document.

THE COURT:  Overruled.

THE WITNESS:  That is correct.  It is not in the agreement.

BY MS. KAOUNIS:

Q    Okay.  And your report also says the formation of a dedicated department to manage homelessness and the exploration of a transition to an independent continuum of care are steps that are essential for meeting obligations under the settlement agreement; correct?

A    Yes.

Q    And you're aware that there's no contractual agreement between the City and Alliance to form a dedicated department to manage homelessness; correct?

A    Well, the City is in conversations of doing that and that's the document that I shared earlier with you, the formation of a city homeless government

structure that a motion was made by Councilwoman Monica Rodriguez and why this document was produced by the chief legislative officer.

Q    I just want to make sure though that my question was clear for the record.  You're not aware of any contractual agreement between the City and the Alliance to form a dedicated department to manage homelessness; correct?

A    It's not in the agreement.

Q    And your report says Los Angeles can fundamentally transform its approach to homelessness, ensuring every individual receives the necessary support and resources; right?

A    It's in the report.

Q    Okay.  But again you are aware that the City cannot compel any single individual to accept necessary support and services that he or she may need; correct?

A    Yes, it could offer.

Q    So the City has not agreed in the settlement agreement to ensure that every individual actually receives the necessary support and resources as hard as it may try; correct?

A    Are you asking if that's in the agreement?

Q    Yes.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

A       Correct.

Q       And you explained that the A&M assessment identified potential non-compliance; correct?

A       Correct.

Q       You didn't use the unqualified phrase non-compliance though; correct?

A       And what --

Q       This is on page 9 of your report.

A       And what section?

THE COURT:  Counsel, if also all of you agree to some time that we break then so you can get these documents from the special master tonight.  Because at 6:00 o'clock, the doors close.  So if you want those documents, I would suggest that you choose a time to give all of us time because it's 6:00 o'clock.  Okay.  Let's finish with this question.  No, you take the time.  I'm just saying at 6:00 o'clock you may be out in the street trying to get documents.

It wouldn't be the first time.

BY MS. KAOUNIS:

Q       Okay.  So on the page 9, the penultimate paragraph, second to last, you'll see it says, there we go, it refers to in the second to last sentence, in addition over 500 million administered throughout LAHSA could not be definitively verified in terms of specific



services and the reported creation of open beds, highlighting potential non-compliance and mismanagement; correct?

A    That is correct.

MS. KAOUNIS:  Your Honor, if we need to break to get the documents, it makes sense to go ahead and do that now.  This is a good stopping point.

THE COURT:  That's up to each of you.  You decide.  I don't know the number you're requesting.

THE WITNESS:  Your Honor, I have a question.  I don't know this is precedented or not.  I guess if the Court is asking me to produce these documents --

THE COURT:  You're not going to produce them. You're going to simply tell them the public website to make it easier for them to get them.  So the City has these in their possession.  I assume that the public documents can have it.  It'll just save time.

THE WITNESS:  It's on the City Clerk Connect. It's on the City Clerk Connect.  Perhaps identification either by title or council file number.

THE COURT:  I imagine this may be a small portion of what she's looked at.  These came off of City Connect; correct?

THE WITNESS:  Yes.

THE COURT:  Okay.  So the idea would be that



someone is going to give a list of the title of the documents in that specific file, such that they can be sufficiently identified for Ms. Kiwanis to be able to get them.  I have no concern about doing that, but I imagine that this is a small portion.  In other words, as this continues on, I envision you're going to be subject to a lot more documentation that she's looked at.

THE WITNESS:  It's hundreds of documents, hundreds of council meetings, hundreds of homeless and --

THE COURT:  I would suggest to save all of your time that we go through the examination and then we take a break and those documents you're concerned about or the source of those documents, then we get those before we redirect and recross.  Because otherwise, I know that there are hundreds of documents out there, Counsel.  Take your time with that.

I think otherwise, I may just put you back with CityNet or Connect.  Those are your own documents.  I think it's not fair for you to flounder through hundreds of documents, even if they are your own documents, but I'm just quite certain that there's hundreds and hundreds of documents she's looked at, Counsel.

MS. MITCHELL:  I agree, Your Honor.  I'm from the Alliance perspective --

THE COURT:  Hold on.  Let the City have a



conference amongst themselves.

MS. MITCHELL:  If I'm understanding the Court, and correct me if I'm wrong, what I'm hearing the Court say is that there are potentially hundreds of documents. Time out.

THE COURT:  There may be, Counsel.  I don't know.

MS. MITCHELL:  Okay.  And so what I would propose in order to move the proceedings forward is for us to agree that the special master can provide us maybe a list of the documents.

THE COURT:  Counsel, I'm not going to do that. You can go through your examination, then I'll take a break if there's a concern about a particular area, and as a courtesy, we'll get those to you, but we're not going to make a list, Counsel.

MS. MITCHELL:  Your Honor, may I be heard on this issue?

THE COURT:  Please.

MS. MITCHELL:  This case has been pending for five years.  Special Master Martinez has been involved in this case for five years.  There have probably been thousands of documents.  There's at least a thousand filings on the docket, and so, you know, these are all documents that we're certainly aware of, and I think that

it would be a little ridiculous at this point to try to have Special Master Martinez identify the hundreds or thousands of documents that she's reviewed in coming to these conclusions.

THE COURT:  I do too, Counsel.  You're going to continue on with your questions.  At the end of your questions, then let's have a conference between all parties before we cross and redirect and see what documents are needed.  So your next question, please.  We can do that.

MS. KAOUNIS:  I just, I do want to note for the record, it sounds like counsel does not know which documents are at issue either.

THE COURT:  So let's continue with your report. You've got counsel people aware of these?  You've got agencies aware of these?

MS. KAOUNIS:  Your Honor, the difficulty we're having is that there are no citations in the report, and so we're being asked to cross-examine a witness in an evidentiary hearing where the City is being threatened with receivership, and we're not able to effectively cross-examine a witness who's presented --

THE COURT:  That's why we're going to take a break after your examination.  Okay.  Try to get the documents you need, okay?



BY MS. KAOUNIS:

Q    I'll at least refer you to them.  So let's go to page 10 of your second report, if we could.  And for the record, that's Exhibit 93.  You explained that a key finding of the A&M assessment was a lack of real-time monitoring.  Do you recall that?

A    Where in the A&M assessment, or my report?

Q    I'm sorry, it was your report, the second report.  Okay.  So that's Exhibit 93, and that was page 10, fourth bullet.

THE COURT:  And would you put that up on the screen, please?

MS. KAOUNIS:  Yes, per statements on council meetings, per elected officials, and LAHSA, and staff, in this court, and to me, and hearing, there is no real-time monitoring.  The only real-time monitoring that has happened, has happened with the controller, that when he did his Pathways Homeless audit.  Okay.  You're aware --

THE COURT:  Just a moment, could you please put that up on the screen?  I think the issue is we're not seeing it up on our -- Great, thank you very much, appreciate it.

MS. KAOUNIS:  You're aware that real-time monitoring of unhoused persons is not a requirement of the settlement agreement; correct?

348

THE WITNESS:  Yeah, but that is something that the elected body has asked for in Homeless and Housing Committee meetings, and as of recent, if I can get to this document, and they speak to it, it is the recent assessment on outreach, and maybe it's right here, yes, here it is, dated April 22nd, council file 231182, Homeless Outreach Inventories and Needs Assessment Report.

MS. KAOUNIS:  I'm going to move to strike everything after yes is non-responsive.

BY MS. KAOUNIS:

Q    You're not an elected official; correct?

A    I am not.

Q    And you're not charged with carrying out the policies of the elected officials as articulated in any council meetings; correct?

A    I am not.

Q    It would be incorrect to suggest that that's what the purpose of your report was; correct?

A    Can you repeat that?

Q    It would be incorrect to suggest that that is what the purpose of your report was meant to be; correct?

A    I don't understand your question.

Q    It would be incorrect to suggest that the parties engaged you to carry out the policy decisions of

the council members of Los Angeles; correct?

A    Yeah, that is not, yes.

Q    You also note in your second report that several projects may not be completed by June 13th, 2027, raising concerns about potential last-minute compliance risks; correct?

A    Yeah, per Matt Szabo's report, he mentions that there are three permanent supportive housing in the tune of over 135 units may not come to fruition and he will make the City Council aware as time progresses and that is the document that was provided on May 31st, 2024, council file 23-1011.

Q    Okay.  And you would agree though that the City's deadline for compliance with the settlement agreement is June 13th, 2027; right?

A    Yes.

MS. MITCHELL:  Objection.  Misstates the document.

BY MS. KAOUNIS:

Q    And you state that the City's current argument that bed creation is non-binding appears inconsistent with the terms of the settlement agreement and then you say the settlement agreement was ratified with enforceable housing mandates reinforcing compliance expectations.  Do you recall that?



350

A    Yes.

Q    And you -- and I apologize for the record, Your Honor, I did say June 13th, it was June 14th.  My apologies and clarify the record.  The settlement agreement does not actually state, well let me strike that.  You're not offering opinions on how to interpret the language in the settlement agreement; correct?

A    I am not.

Q    And you're not giving a legal opinion on what the settlement agreement requires; correct?

A    I am not.  I'm not an attorney.

Q    And so we can agree that you weren't asked to render any legal opinions in this case; correct?

A    That is correct.

Q    And you would also agree that it would not be appropriate for you to attempt to render any legal opinions in this case.

A    I'm not an attorney and I don't wish to be.  Not after these proceedings, boy.

Q    But the answer to my question would be yes; is that right?

A    Yes.

Q    When the report says the City's current argument is that bed creation is non-binding, the report doesn't cite to any source where the City actually makes

351

that argument; right?

A     Can you repeat that?

Q     When your report says the City's current argument is that bed creation is non-binding, the report doesn't cite to any source where the City actually makes that argument; right?

A     No, but it is in one of their motions in response to the Alliance.  I would have to go into my files.  I only brought a couple.  You know, most of it, you know, I'm in the generation that does everything on a cell phone.  I did this just for purposes because I knew I couldn't bring my cell phone up here.  But I have thousands of documents on my cell phone.

Q     You understand the difference between a goal and a milestone; correct?

A     Yes.

Q     Okay.  A goal is what you're trying to achieve according to a schedule, perhaps?

A     That's my understanding.

Q     And a milestone is a means of tracking progress towards that goal?

A     They're like benchmarks.

Q     And you understand that what the City has actually said is that the terms of the settlement agreement are binding, while the milestones are non-



binding, aspirational steps toward compliance with those terms.

MS. MITCHELL:  Objection.  Misstates the City's prior position and also misstates Matt Szabo's testimony.

MS. KAOUNIS:  Can you pinpoint me to where that says that in the --

THE COURT:  In abundance of caution, I'm going to overrule the objection.  I'm not sure what that, in my memory, was concerning Mr. Szabo.  So you can ask the question.

BY MS. KAOUNIS:

Q   Can you help pinpoint where you're stating, where you're getting that information in the agreement?

A   Well, I'm not referring to the agreements.

Q   I just wanted to know your understanding. So is it your understanding that the City has said that the terms of the settlement agreement are binding, while milestones are aspirational steps towards compliance?

A   You just articulated earlier that I'm not an attorney.  So yeah, if you're asking for my opinion or interpretation --

Q   I'm only asking for your understanding.

A   My understanding, which is, is it my opinion?

Q    It's your understanding of the City's position, that's all.  If you don't have an understanding, that's fine.

A    I just want to make sure I understand.

MS. MITCHELL:  Lacks foundation, calls for speculation,

THE WITNESS:  Your Honor, I don't understand.

THE COURT:  Okay.  Well let's move on.

BY MS. KAOUNIS:

Q    The City must provide housing and shelter solutions to achieve -- Your report says the City must provide housing solutions to achieve the statutory threshold of 60 percent of unsheltered city shelter appropriate persons; correct?

A    Yes.

Q    But the settlement agreement doesn't require the City to actually house 60 percent of unsheltered city shelter appropriate people; correct?

A    If you give me a minute to read the section of where it speaks about that, it says the City agrees to create required number of housing or shelter solutions which is equal to but in the City's discretion may be greater than the shelter and housing capacity needed to accommodate 60 percent of the unsheltered city shelter appropriate P.E.H.  within the City based on

losses 2022 point-in-time count.

Q    Right, so the agreement does not require the City to actually house 60 percent of unsheltered city shelter appropriate persons; correct?

A    It says accommodate.

Q    You want to read that again?  And please for the record if you could tell us what line you're reading.

A    It's section, it's page 5, number 3, 3.1 starting at number 2.  The City agrees to create a required number of housing or shelter solutions which is equal to but in the City's discretion may be greater than the shelter and or housing capacity needed to accommodate 60 percent of the unsheltered city appropriate P.E.H. within the City's based on losses 2022 point-in-time count.

Q    And capacity, just to be clear, doesn't mean actually being filled; correct?  It means having the ability to fill; right?

A    Yes.

Q    On page 17 of your report you provide a series of recommendations to the Court and to the City; right?

A    In the new report?

Q    Yes, in the second report, which is



355

Exhibit 93.

A     Yes.

Q     And if we look at the third bullet under recommendations for the Court there is a reference to occupancy standards; correct?

A     Yes.

Q     And to your knowledge the term occupancy standard is not defined in the report; correct?  I mean in the settlement agreement; correct?

A     Yes.

Q     In the Alliance settlement agreement; right?  And there's no definition provided in your report either; correct?

A     No.

Q     And there's no identification of a source of these supposed occupancy standards in your report; correct?

A     Correct.

Q     And you would agree that there's no place in the settlement agreement, well strike that, you can't point me to anything in the settlement agreement, strike that.  On the next bullet on page 17 you recommend strengthening service coordination to ensure shelter expansion aligns with wraparound services preventing gaps in mental health and substance use support from the County

of LA; right?

A    Yes.

Q    And the report goes on to say that this means if these services are not being provided the City must notify the court in writing; correct?

THE COURT:  Could you turn to that page so it's up on the screen?

MS. KAOUNIS:  Oh, I apologize, it's page 17. Did I not say it?

Q    For the record.  And it's strengthening service, do you see that?

A    Yes, with the caveat that we've, for the past year, we've had discussions with the county and City and regarding to, regarding to referrals and, you know, our learnings and observation sessions and conversations have been based on this specific issue where the City and many of the elected body have stated time and time again in housing and homeless committee meetings or council meetings that the county is not providing the services. Okay.  I'm going to move.

Q    You're aware that the City is not required to provide the wraparound services under the settlement agreement?

A    That's correct.

Q    In fact, wraparound services are

specifically identified as a county obligation under the settlement agreement; right?

A      Yes.

Q      There's also a reference on the same page 17 to reporting differences that you suggest should be addressed by May 30th, 2025.  Do you see that?

A      Yes.

Q      There's no reference in the report to what those specific reporting differences are; right?

A      Yes.

Q      And then page 18, the last full sentence the report says, according to docket 874, removals under CARE, CARE plus programs, do not meet settlement compliance requirements unless documentation of housing placements is provided; correct?

A      I'm going to go on to say that the Court still must agree and I make that statement in my report that this is an ongoing conversation and discussion and really up to the Court's jurisdiction and authority on what this definition is going to be.

Q      Okay.  But you would agree that that language doesn't appear in the settlement agreement; right?

A      Yes.

MS. KAOUNIS:  Okay.  Your Honor, I think we're

probably at a good stopping point.  Can we have 15 minutes before the court closes so we can resume in the morning?

THE COURT:  Do you want to take a break now?

MR. SCOLNICK:  Sure, I think that makes sense.

THE COURT:  Okay.  Do you want to --

MR. SCOLNICK:  No.  Your Honor, sorry, before we go off the record --

THE COURT:  We're not going off the record.

MR. SCOLNICK:  Okay.  Sorry.

THE COURT:  And we're not going to have a conversation off the record, so what did you want to say?

MR. SCOLNICK:  I just wanted to report the party's agreement on briefing for the final briefing.

THE COURT:  Your party's agreement may or may not meet with my consent, so --

MR. SCOLNICK:  We can agree and then you can tell us if you --

THE COURT:  Welcome to working this weekend. Okay.  Now, what would you like this evening so we accommodate both sides here?

MS. KAOUNIS:  What would I like to see?

THE COURT:  Yeah, what do you need for tomorrow if you're proceeding tomorrow?

MS. KAOUNIS:  Well, I'll continue with my examination.  I don't know, Your Honor, what has been



relied on, so it's a little bit of a difficult question for me to answer.  I'm happy to confer with the other side.

THE COURT:  So far, if there's a document that's been referred to, I want you to have that available.

Also, I know that you're coming in rather late, but so many of these documents have been shared for so long with so many parties that I think the City in total is responsible for the preparedness, but I understand your position.  So I'd like to get those documents to you that you referred to thus far, but I'm not going to have a wholesale list of a thousand documents prepared.  Okay.

Now, the counsel wants to talk to you, so we'll go over to our conference for a moment.  And we have 15 more minutes, Counsel, otherwise this is going to get exchanged outside the courthouse in the front steps, apparently.

Now, let me also ask Counsel, after the Special Master testifies, who's left to testify?  Don't catch each by surprise by saying, argue the matter, and we work out a time frame.

MS. MITCHELL:  Your Honor, subject to the introduction of the exhibits, which we're still working on, we've also submitted a request for judicial notice for the public documents.  We're resting.

360

THE COURT:  What are your thoughts, just so we have some planning, and I don't catch folks by surprise?

MR. MCRAE:  Your Honor, we have not, because we didn't know when their case was going to rest, we will confer as to whether or not we will be putting on any witnesses in our case.

THE COURT:  You will be prepared to discuss that with the Court.  Then be prepared to argue tomorrow.  Now, that doesn't mean you're, how is he, that doesn't mean you're arguing tomorrow.

MR. MCRAE:  Understood, Your Honor.

THE COURT:  You're leaving me kind of in a vacuum, and guess what?  They're going to vacate this court on Thursday.  We don't have this court.  So once again, we're going through the court system someplace, trying to find a court.  So hopefully we can get it done tomorrow, but if not, now how long would you like to argue on each side?  An hour?

MR. UMHOFER:  We propose, I believe, 45 minutes each side.

THE COURT:  That sounds like an hour and a half.

I'm just joking.  Now, why don't you two meet and confer with something fair, just walk towards each other now, as if this case is allegedly concluded, and come up with a time frame, and I'll probably adopt it.



MS. MITCHELL: We have an agreement, Your Honor. Yeah, Your Honor. Each party will get 45 minutes, and then the plaintiff will get 10 minutes for rebuttal, as the party who bears the burden.

THE COURT: Why don't you give yourselves a little bit more time, just in case, for goodness sake. You've worked hard on this case, why don't you give yourselves an hour and 15 minutes instead, and 45 minutes in 10?

MS. MITCHELL: I really like 45 minutes, Your Honor. Doesn't mean we have to use it.

THE COURT: You don't have to use it.

MS. MITCHELL: Right.

THE COURT: That way you're not stuck. Sold.

Okay. So let's do this. Would it be acceptable versus, I'm just hypothetically throwing this out, that you've got 55 minutes on your opening, 15 minutes on your closing, and you've got an hour and 10 minutes?

MS. MITCHELL: Fine. Works for you? That way nobody's stressed out and claiming we didn't have enough time.

MR. UMHOFER: Your Honor, in fairness, just because we bear the burden, we'd like more time than them.

THE COURT: Okay. See, I'm trying to accommodate everybody, unless you give me a suggestion.

MR. UMHOFER: Well, we did, but the Court rejected it.

THE COURT: How long did you want?

MR. UMHOFER: We went 45 minutes each side with an additional 10 to 15 minutes.

THE COURT: I just gave you more time.

MR. UMHOFER: I know, I'm not asking for it, but what you did was you gave us equal time based on your proposal, and we want more time because we bear the burden.

MR. MCRAE: Sounds like counsel wants 10 to 15 minutes more than what the other parties have. We're not going to do that. We're going to balance out the time. You've got the burden, but by the same token, you've got the time. And so the easiest way to do this is give you co-equal time.

THE COURT: And I know you're not going to do this, but you can't sandbag at the end. In other words, the end result is you want whatever you want for your opening, I'm going to give you. I'm going to give you a closing.

MR. UMHOFER: An hour each time split up as we deign to split them up is fine with the plaintiffs, Your Honor.

THE COURT: Okay. So 45 minutes and 15 minutes.

363

MR. UMHOFER:  That's fine, Your Honor.

THE COURT:  And 60 minutes.  That work?

MS. EVANGELIS:  That's fine, Your Honor.  We have an amazing accommodation.

THE COURT:  Thank you.  Now, hold on.  You'll be out in the street in just a moment.  It'll be cold and I'm just joking with you.  Okay.

MS. MYERS:  And, Your Honor, just to clarify the parties, I think we all agreed that the interveners would get time as well.

THE COURT:  Yeah, well, see, we need we've got the interveners over here also.  And when they start arguing, in a sense, I don't know whether that's, you know, sometimes in favor of the City, sometimes in favor of the county.

MS. MYERS:  Yes, welcome.  Welcome to the intervener's burden.  In this case, Your Honor, the parties met and conferred about this.  I believe all of the parties agreed that each of the parties would have the same amount of time with additional time for the plaintiffs for their rebuttal.

THE COURT:  Okay.  Now tell me your agreement. Then I'll probably buy into it.  What is the agreement?

MS. MYERS:  Your Honor, it's my understanding it was 45 minutes per party with the plaintiffs going first,



then interveners, then the City.  I believe that was their proposal order wise.  And then the plaintiffs would reserve 10 or 15 minutes for rebuttal.  45, 45, 45, 10?

THE COURT:  Done.  Okay.  Now, after reaching that incredible judicial decision, we need to get the exhibits in order now, because I'm not quite certain what's on the record.  Right.  And I, we're not going to keep you past 6:00 o'clock, so I'd like you here at 8:00 o'clock, but I think we should be prepared to really get these exhibits in order before you argue.  There's a number of objections, for instance, and we need to take those up.

MR. UMHOFER:  Agreed.  Those conversations are ongoing, Your Honor, I believe.

THE COURT:  Oh, yeah, I know, but -- Right, right.

MR. UMHOFER:  No, Your Honor.  I want to be very clear.  The defendants have, we've spoken with the defendants, they are working on a list, they're going to share it with us, and before we close, we will have a list of exhibits for you.

THE COURT:  Okay.  So would you like me to start with testimony again at 8:00 o'clock in the morning with the Special Master?

MR. UMHOFER:  Yes, sir.



THE COURT:  Does that give you enough time to get the documents this evening that, you know, she's covered thus far?

MS. KAOUNIS:  Yes, to that point, Your Honor, I just want to clarify what we were talking about is the documents that the Special Master has referenced during her testimony, which I believe is just a handful, is what we would --

THE COURT:  Yeah, just a handful.  So we'll get those to you tonight, and if you feel disadvantaged tomorrow, if something comes up, we'll take a break.

MS. KAOUNIS:  That would be, that would be very helpful.

THE WITNESS:  I think we have CF-0330 and CF-0220-05151, and those were the two that I had --

THE COURT:  Why don't we go off the record and for the last five minutes come up here and get those documents, just take a look at where they are.

THE WITNESS:  Your Honor, this is my first time going through this, and I'm smart enough to know that I may need my own counsel.  I'm not going to --

THE COURT:  You're reported by the Court.

THE WITNESS:  Yes, but --

THE COURT:  No, no, we're going to speed this along.  All you've got to do is just show those couple



documents that you referred to.  That's all.

THE WITNESS:  Well, but tomorrow, if I'm crossed with, and I provide --

THE COURT:  We'll worry about tomorrow.

THE WITNESS:  Okay.  Well, I'm still going to contact my attorney.

THE COURT:  Okay.  Well, do whatever you want to, but you're the Special Master of the Court, and I don't think you have to be concerned.  Okay.  All we're asking for is those simple documents you referred to, just so they can refer them back.  That's it.  Okay.

MR. MCRAE:  You said 8:00 o'clock, Your Honor?

THE COURT:  Now you're in recess.

And for all of you folks in the audience, I'd go leave immediately.  Okay?

(Proceedings concluded.)



367

(Proceedings concluded)

-o0o-



368

TRANSCRIPTIONIST'S CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Terri Harper*

_____          _____
TERRI HARPER                              June 3, 2025


FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/Ann Bonnette
_____
ANN BONNETTE, CSR. NO. 6108, President
Huntington Court Reporters and Transcription, Inc.

