

FILED
CLERK, U.S. DISTRICT COURT
06/04/205
CENTRAL DISTRICT OF CALIFORNIA
BY ____GSA____ DEPUTY
DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

June 4, 2025

The Honorable David O. Carter
U.S. District Court, Central Division State of California
Central District of California
411 West Fourth Street
Courtroom 10A Santa Ana, CA 92701-4516

2:20-cv-02291-DOC-KES

*-John 8:32 (KJV) "And ye shall know the truth, and the truth shall make you free."*

Dear Judge Carter:

As I remain under doctor's care, I am dictating this correspondence.

I am writing this letter to request the Court to appoint an attorney for me so that I may properly file a case to address the grievances detailed in DKT. 886, filed April 2, 2025, *"MOTION FOR PERMISSION TO REQUEST OF THE COURT TO REQUIRE THE CITY OF LOS ANGELES, HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, LOS ANGELES HOMELESS SERVICES AUTHORITY …".*

My request was for permission to file a motion relating to Case No. 2:20-cv- 02291-DOC-KES, LA ALLIANCE FOR HUMAN RIGHTS, et al vs. CITY OF LOS ANGELES. As of this writing, while I am continuing to try and obtain legal counsel and have proof of the same, I have not yet been successful despite the roughly thirty queries I have made.  Moreover, I remain under doctors' restrictions that have been extended for one year.  (See physician letters attached.)

1

Included in my search for counsel and assistance, was correspondence I forwarded to Paul Webster, Executive Director of the LA Alliance for Human Rights. On April 1, 2024, I wrote to Mr. Webster seeking assistance from LA Alliance as I became aware that LA Alliance represented both businesses and individuals, a fact I discovered in recordings of an Appellate Court proceeding. In my correspondence, I wrote the following to Mr. Webster:

"*I have read the transcripts from your hearings in federal court regarding your challenges with the City of Los Angeles and its failure to live up to a settlement agreement addressing homeless encampments.*

*I paid particular attention to Judge David Carter's repeated references to the lack of accountability with respect to the city's efforts to address this and other issues of the unhoused through its programs and service providers. As such, there is a genuine need for the court-ordered audit. I applaud this decision.*

*I want to provide you with documentation that fully illustrates the lack of accountability that your organization has grappled with for the past four years since its lawsuit was filed against the city. My documentation not only cites the lack of accountability from city agencies responsible for matters concerning homelessness but also the service providers contracted through the millions of dollars that are provided to LASHA.*"

2

On April 2, 2024, I sent Mr. Webster a cover letter, support documentation, and Google Docs links for additional documentation. A copy of that cover letter (with redactions) is attached.  (An unredacted copy is included in the documentation submitted to Special Master Martinez.)

I asked Mr. Webster to assist me by forwarding my documentation to the Court to be included in the Court's record. On April 9, 2024, Mr. Webster responded by asking me how my case related to that of the LA Alliance. I responded on the same day with what I knew to be the existing correlations:

*"As I wrote to you on April 1st regarding how my matter is related to the agenda of LA Alliance, I said: "I believe that because you lead two organizations addressing issues of the unhoused from the business community's perspective as well as from the unhoused who are directly impacted, you have an innate privilege and responsibility to bring this information to the Court.*

*This is the kind of documentation that, as you know, Judge Carter has requested, the kind that will afford him full transparency into the operations of the City and its programs and service providers that affect the lives of the unhoused."*

Mr. Webster did not respond to either my email dated April 9, 2024, or to any subsequent emails I sent asking for help from LA Alliance. Those emails were sent between April 10, 2024, through May 23, 2024.  (My correspondence and email

3

exchanges with Mr. Webster of LA Alliance and Attorney Elizabeth Mitchell of Umhofer, Mitchell, and King are contained in the documentation submitted to the Court through Special Master Michele Martinez. The dates are:  4/1/24, 4/2/24, 4/8/24, 4/9/24, 4/10/24, 4/15/24, 5/23/24, and 7/22/24.)

The findings of the court-ordered performance audit concerning how the City of Los Angeles and LAHSA jointly handled the city's housing crisis and the funding for it made the relationship between my matter and those championed by LA Alliance before this Court even more apparent. This information went on the record before the Court at its January 7th hearing during public comments.

The documents I asked LA Alliance to assist in getting to the Court are the same documents submitted to Special Master Michele Martinez at the Court's direction following the 7th January hearing, a total of 519 pages. The submitted documentation was referenced in the motion filed on my behalf on April 2, 2025.

In searching for legal representation, I also sought help from the Legal Aid Foundation of Los Angeles as early as April 5, 2024. I sent documentation to the attention of Attorney Shayla Myers of the Legal Aid Foundation of Los Angeles on April 8, 2024.  By May 13, 2024, I received a response from Attorney Myers, through her assistant, to the emails and support documentation I sent to her attention.

4

Attorney Myers conveyed to me, through her assistant, that her organization could not assist me with getting my documentation to the Court due to its role as an intervenor in LA ALLIANCE FOR HUMAN RIGHTS, et al vs. CITY OF LOS ANGELES. Attorney Myers said that I should contact LA Alliance because it is the Plaintiff in the case.  (My email exchanges with Attorney Myers are contained in the document package submitted to Special Master Martinez.)

I relayed the information Attorney Myers shared with me to Mr. Webster in an email dated May 23, 2024. My email was carbon-copied to then-Congressman Adam Schiff, State Senator Dave Cortese, Attorney Myers of the Legal Aid Foundation of LA, and the LA City Attorney's Office. While Mr. Webster did not respond, Attorney Elizabeth Mitchell, representing LA Alliance, wrote:

"… *I have read your email and unfortunately because we do not represent you, we are not in a position to be submitting documents on your behalf to the court.  However, you're welcome to do so yourself, as the court's contact information is on the Central District website."*

My last email to LA Alliance/Attorney Mitchell was sent on July 22, 2024, which included a request for assistance with representation. I believe that LA Alliance could have submitted my documentation to the Court, with the Court's permission, of course, through the Special Master.  At least the Court would have been aware of its existence in April 2024 rather than nine months later, following the

5

January 7th hearing, when the Court gave instructions to submit the documentation to the Special Master.

(My email exchanges with Attorney Elizabeth Mitchell of Umhofer, Mitchell, and King are contained in the document package submitted to Special Master Martinez.)

Since the filing of DKT. 886, several major, adverse events have occurred at the building located at 1317 S. Grand Boulevard for which the LOS ANGELES HOMELESS SERVICES AUTHORITY *aka* LAHSA, serves as the master leaseholder and whose construction and operations are supported by public dollars.

I detailed these events in a letter dated today (June 4, 2025) to the Mayor's Office, which is attached. Some highlights include the following:

"<u>On April 24th, the day after your last email to me, officers from the U.S. *IMMIGRATION AND CUSTOMS ENFORCEMENT accompanied by a contingent of LAPD officers on stand down, conducted a raid on the building.</u>*

*The ICE officers, armed with rifles and handguns, were apparently looking for undocumented immigrants, including those affiliated with suspected gangs, drug use/trafficking, and other suspected illegal activity. The elevator was shut down for lobby access, and ICE officers searched both the interior and exterior of the building.*

*Preceding this ICE raid, I forwarded a report to LAPD Police Chief Jim McDonnell on April 22nd, reporting the incidents of threats and other retaliatory*

6

*acts aimed at me and my wife for reporting suspected illegal activity and other adverse behaviors in the building."*

More than 50 emails have been sent to the Mayor's Office, LAHSA, the County of Los Angeles, the Office of Senator Alex Padilla, along with other public officials and agencies, about the problems in the building that affect health, safety, and welfare. To date, many of the same issues remain.

On May 15th, a city inspection was scheduled to find out if LAHSA had corrected multiple code violations found in the building that *"...affect the health and safety of the occupants and cause the building to be in violation of Los Angeles municipal code."*

The deadline to correct the violations was Friday, May 9th.  A walkthrough of the building will confirm the obvious—code violations still exist.

My concerns extend far beyond the building's violations; they encompass the core problems that the court-ordered performance audit has uncovered and how those problems resulted in my wife and me being trapped in a housing environment that is putting our health, safety, and welfare at risk. As you will note in my letter to the Mayor's Office, those problems include verbal threats aimed at my wife and me by individuals associated with the suspected gang/drug activity in the building, stalking incidents, and other acts of intimidation. All have been reported to the LAPD.

In conclusion, I would like to reiterate the urgency of my need for legal representation. I do hope that the Court will use its discretion in appointing an attorney who can promptly assist me. In addition to a copy of my June 4th correspondence to the Mayor's Office, I am also including copies of two physician letters from my specialists at UCLA Health.

Thank you for your time and consideration.

Sincerely,

Gregory Edward Gray

/cbg

Attachments: Letter to the Mayor's Office, June 4, 2025 with attachments; Dr. Alexan Yerevanian, UCLA Health Department of Neurology, May 8, 2025; Dr. Laura Sue, UCLA Health, Department of Endocrinology, May 7, 2025; LA Alliance/Paul Webster Cover Letter (REDACTED), April 2, 2024

# EXHIBITS

 **Outlook**

---

## Mayor Karen Bass Message

---

**From** LA City SNow <cityoflaprod@service-now.com>

**Date** Wed 6/4/2025 11:18 AM

**To** gegcbg@outlook.com <gegcbg@outlook.com>

            **Office of Mayor Karen Bass**

Greetings,

Thank you for contacting the Office of Mayor Karen Bass. Your request has been submitted and will be reviewed by our office.

If you submitted a request for assistance, our Constituent Services Team will be in contact with you as soon as possible. Thank you for your patience while we review your request.

If you submitted a general comment, we appreciate your feedback and input regarding issues impacting Angelenos and the City of Los Angeles.

Keep up to date with the Mayor's Office! Sign up [here] to receive our newsletter.

Sincerely,

Office of Mayor Karen Bass

 **Outlook**

---

### Fw: Mayor Karen Bass Message Ref: MSG12171530 and Ref: MSG12283126

---

**From** Gregory Edward Gray <gegcbg@outlook.com>

**Date** Wed 6/4/2025 10:37 AM

**To** LA City SNow <cityoflaprod@service-now.com>

**Bcc** gegcbg@outlook.com <gegcbg@outlook.com>

📎 6 attachments (3 MB)

Mail - Gregory Edward Gray - Outlook HACLA EMAILS UPDATE REQUEST AS OF 4 3 25.pdf; Mail - Gregory Edward Gray - Outlook LAHSA EMAILS 4 6 25 4 4 25.pdf; myUCLAhealth - Letter Details PHYSICIAN LETTER DR ALEXAN YEREVANIAN 5 8 25 WITH MRN REDACTED (2).pdf; myUCLAhealth - Letter Details PHYSICIAN LETTER DR LAURA SUE 5 7 25 WITH MRN REDACTED (2).pdf; Mail - Gregory Edward Gray - Outlook LAHSA EMAIL DELETION CONFIRMATION WITH EMAIL EXCHANGES WITH DR VA LECIA ADAMS KELLUM KRIS FREED OF LAHSA 5 8 25.pdf; Scan 09 May 25 13·04·12 CITY INSPECTION LETTER DATED APRIL 2 2025.pdf;

> *Revelation 12:11-KJV- "And they overcame him by the blood of the Lamb, and by the word of their testimony; and they loved not their lives unto the death."*
>
> *John 8:32- KJV- "And ye shall know the truth, and the truth shall make you free."*

June 4, 2025

Esha K.
Constituent Services Coordinator
Office of Mayor Karen Bass
City of Los Angeles

ATTN: Ref: MSG12171530 and Ref: MSG1228312

Dear Esha K.:

I remain under doctor's care with restrictions. As such, I am dictating the following:

I am responding to your email dated April 23, 2025.

Your acknowledgement of the matters concerning my reports to the Mayor's Office, LAPD, and LAHSA about threats and other retaliatory acts aimed at my wife and me for reporting suspected illegal activity and other adverse behaviors in the building located at 1317 S. Grand Avenue marks the first time the Mayor's Office has responded to these concerns.

Yesterday, (June 3, 2025) I received an email message confirmation that LAHSA CEO Dr. Va Lecia Adams Kellum did not read but deleted a series of emails regarding safety, health, and welfare

concerns that I forwarded to her and to her colleague, LAHSA Chief Strategist Kris Freed. (See attached.)

**This deletion confirmation serves to underscore the failure** by LASHA to timely address legitimate concerns that I have reported to it concerning the compromises to health, safety, and welfare in a building supported by public monies.

Here are more examples:

**On April 24th, the day after your last email to me, officers from U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, accompanied by a contingent of LAPD officers on stand down, conducted a raid on the building.**

The ICE officers, armed with rifles and handguns, were apparently looking for undocumented immigrants, including those affiliated with suspected gangs, drug use/trafficking, and other suspected illegal activity. The elevator   was shut down to lobby access. ICE officers searched both the interior and exterior of the building.

Preceding this ICE raid, I forwarded a report to LAPD Police Chief Jim McDonnell on April 22nd, reporting the incidents of threats and other retaliatory acts aimed at me and my wife for reporting suspected illegal activity and other adverse behaviors in the building. My report to Chief McDonnell included not only the incidents reported to the Mayor's Office, up to and including my last email to the Mayor's Office dated April 7th, but also incidents that occurred on April 10th and April 19th.

My reports of incidents occurring on April 10th and April 19th included individuals stalking me from my residence to the Metro, stalking me while riding on the Metro, and, ultimately, stalking me upon my return to my residence.

Since at least last October, my wife and I have reported to the Los Angeles Police Department a series of incidents that we believe are related to suspected gang and illegal drug activity occurring in the building. Our reports have been sent via email and through the LAPD reporting line. The emails include the one sent 4/22/25 preceded by those sent on 4/16/25, 4/7/25, 3/11/25, 2/12/25, 1/24/25, 1/1/25, 11/27/24 and 10/29/24.

The reports include the verbal threat aimed at us on April 4th by a problem tenant associated with the suspected gang and drug activity in the building, incidents of stalking and other acts of intimidation occurring on April 10th and April 19th.

As I shared in my cover letter to Chief McDonnell, dated April 22nd:

"...Moreover, we have reports to the Mayor's Office, LA City Council, Los Angeles County Board of Supervisors, Office of U.S. Senator Alex Padilla, and U.S. District Court, Central Division, State of California, in the court of The Honorable Judge David O. Carter.

*Those reports spoke to the ongoing problems regarding health, safety, and welfare in the building. Our report to the Court is part of its public record.*

*In addition, we have made reports and asked for help from the agencies (via Dr. Va Lecia Adams Kellum, CEO of LAHSA, Kris Freed, Chief Strategist of LAHSA, and Jennifer Hark Dietz, CEO of PATH) that receive federal, state, and city funds and that are responsible for the building and program services for tenants.*

*Lastly, I have reported these events to my UCLA HEALTH physicians and LA CARE HEALTH (via Dr. Michael Brodsky, Medical Services Director, LA CARE HEALTH PLAN), the latter being my health insurance provider as well as a major funder of programs at the building.*

*Sadly, after all of these months, much of the same activity still exists in the building. "*

*Proverbs 10:9 (KJV) He that walketh uprightly walketh surely: but he that perverteth his ways shall be known.*

I tell you this to underscore the seriousness of what I have reported to the Mayor's Office. As such, I expect the Mayor's Office to respond with a serious commitment to eradicate the illegal activity and other adverse behaviors occurring virtually every day in a building funded by public dollars.

I am attaching two physician letters from members of my health care team documenting how these events have adversely impacted my health. As a result, I am making a specific request to the Mayor's Office to help facilitate door-to-door car transportation services for me to and from the building for non-medical appointments. **I have been virtually house-bound for more than a month due to the threats, stalking, and other acts of intimidation. As such, curtailment of my daily activities has stymied my normal weekly schedule of cardiovascular and strength training as recommended by my physicians.**

There are a number of other areas that should prompt cause for alarm, immediate attention, and resolution from the Mayor's Office for a building that is publicly funded, including the following:

**1.**    The discovery that the security firm contracted by LAHSA and the building management has been BLOCKING incoming calls from our unit as we attempt to report incidents that threaten our health, safety, and welfare. The calls have gone straight to voicemail rather than being answered by a member of the security team. This has been ongoing for months with neither LAHSA nor the building management doing anything to date to correct the problem despite our multiple reports of this consistent, dangerous issue.

**2.**    A video surveillance wall in full view for anyone in the lobby to see when my wife and I are entering/exiting our unit. This unfettered access to video surveillance compromises the integrity of a system that should be the exclusive domain of the security firm, not for all to see. It is a dangerous practice because the indiscriminate access of the video surveillance has resulted in individuals affiliated with the suspected illegal and other adverse behaviors in this building (and

that I have reported) being privy to the exact time of my entry into and exit from my unit, the elevator and, ultimately, the lobby.

**3.**     No less than three visits to the building have been made by investigators from Adult Protective Services in 2024 and 2025, yielding two recommendations: a) that I report my concerns to an elected public official to escalate the matter, which I have done; and b) that an APS investigator make a report to the LAPD, which occurred.

**4.**     On May 15th, a city inspection was scheduled to find out if LAHSA had corrected multiple code violations found in the building that *"…affect the health and safety of the occupants and cause the building to be in violation of Los Angeles municipal code."* (SEE NOTICE ATTACHED. The deadline to correct the violations was Friday, May 9th. A walkthrough of the building will confirm the obvious—code violations still exist.

> *Isaiah 61:8 (KJV)- "For I the Lord love judgment, I hate robbery for burnt offering; and I will direct their work in truth, and I will make an everlasting covenant with them."*

<u>For all of the aforementioned reasons, I am making a direct request to the Mayor's Office to help facilitate immediate transfer to and payment for a new permanent housing location of my household's choosing in accordance with all applicable federal, state, and local housing laws and guidelines, including federal guidelines mandated by HUD pertaining to my household. This request includes that the Mayor's Office facilitate payment in full for all costs associated with this relocation. I also request from the Mayor's Office written assurance that HACLA, LAHSA, and all relevant federally-funded service providers correct errors in the content, quality, and execution of my HMIS data file and other housing program documentation, along with any program services relating to my household.</u>

As you also made a recommendation to file a grievance with LAHSA regarding my concerns about safety issues at the building located at 1317 S. Grand Avenue, including threats made against me and my wife for reporting suspected illegal and other adverse behaviors, <u>**please know that I have filed at least five grievances with LAHSA over the past three years concerning the following incidents, all of which are in violation of HUD federal guidelines and all applicable civil rights laws:**</u>

1.   **March 2022:** Health and other code violations at a LAHSA PRK site where my wife and I were sent by LAHSA in Lancaster—an unsanitary, roach-infested facility that was so bad, we took pictures and sent them to LAHSA. I had only been released from the hospital weeks before, and both my wife and I have underlying medical conditions that made us especially vulnerable to COVID and other health threats. There was never a formal response from LAHSA to the grievance. **These events are in violation of HUD federal guidelines and all applicable civil rights laws.**

2.   **November 2022:** LAHSA and its service provider, The Salvation Army, rejected my medical documentation to extend my interim housing while I was in the middle of working with a second LAHSA provider, PATH, to secure permanent housing. This is the only grievance that ever received a response—a denial by LAHSA. The denial was countered with a lawsuit filed in U.S. District Court before Judge David O. Carter on my behalf, resulting in LAHSA reversing that denial. The forced exit was scrapped because of an unofficial agreement between the attorney representing me and outside counsel representing LAHSA through the County of Los Angeles.  However, within weeks, when LAHSA thought no one was looking,

LAHSA tried again to force my exit while simultaneously, one of its service providers, PATH, created roadblocks in the completion of my housing navigation paperwork by trying to coerce me and my wife to sign paperwork contrary to the documentation's written instructions. **These events are in violation of HUD federal guidelines and all applicable civil rights laws.**

3.    **November 2024:** LAHSA, in its role as master leaseholder for the building at 1317 S. Grand Avenue, for its failure to promptly address the threats to health, safety, and welfare of the building and to me/my wife personally as seniors with documented disabilities.  This includes the destruction of the building, calculated at more than a million dollars, recently documented city building code violations, multiple suspected illegal activities that include suspected gangs, suspected drug trafficking, and other adverse behaviors, etc. **These events are in violation of HUD federal guidelines and all applicable civil rights laws.**

4.    **February 2025:** LAHSA service provider PATH as the building's in-house service provider for failing to assist with program violation issues involving its clients in the building, breaking building rules governing behavior and protocols, and for participating in suspected illegal activities. The grievance also reported how PATH abandoned me and my wife at LAX in January 2022 after one of its employees took photos of identification and other personal information for me and my wife, placed us on a conference call with a PATH administrator who promised to help with interim housing within two days, then refused to help us. Within a few days, I was hospitalized after falling in the airport due to what was diagnosed as symptoms relating to a possible stroke. **These events are in violation of HUD federal guidelines and all applicable civil rights laws.**

5.   **April 2025:** Weingart Center Association and LAHSA failing to correct the falsified and incorrect data contained in my HMIS after WEINGART administration made written assurances to do so more nearly two years ago and for failing to disclose to me and my wife the potentially dangerous issues of the tenancy at the building where we reside. I have already provided the Mayor's Office with a complete chronicle of events that led to the filing of this grievance, including a copy of the LAHSA correspondence attached.

**Since 2023, I have kept the Mayor's Office apprised of problems I have faced concerning HACLA, LAHSA, and LAHSA's service providers, including providing the Mayor's Office with a copy of correspondence sent in June 2023 via USPS Registered Mail to LAHSA CEO Dr. Va Lecia Adams Kellum. That was nearly two yea**

**The letter detailed problems I had with LAHSA service providers in my search for permanent housing that aligns with my medical needs and the needs of my household. The details included roadblocks associated with PROJECT ROOMKEY under former Mayor Eric Garcetti, as well as roadblocks that surfaced with INSIDE SAFE under Mayor Bass.  I shared with Dr. Adams Kellum how I corresponded with the former CEO of HACLA and the regional director of HUD to determine the status of my housing paperwork. I never received a response to my correspondence from either Dr. Adams Kellum or anyone at LAHSA. I never received a response from either HACLA's CEO or a final determination from the HUD regional director on how HUD intended to handle my concerns.**

**HACLA played a significant role in these issues and was the subject of motions filed on my behalf, again in the Court of Judge David O. Carter, which contended that HACLA violated HUD guidelines. The entire process was a violation of my civil rights.**

Additionally, I have previously sent correspondence to the Mayor's Office requesting assistance with innumerable matters concerning HACLA, LAHSA, and LAHSA's service providers on the following dates, including but not limited to: 1/17/23, 2/9/23, 6/23/23, 12/18/23, 2/9/24, 3/12/24, 5/23/24, 6/5/24, 6/17/24, 6/20/24, 6/21/24, 6/23/24, 7/22/24, 10/15/24, 11/25/24, 11/27/24, 12/4/24, 12/5/24, 12/16/24, 2/14/25, 3/26/25, 3/27/25, and 4/7/25.

As I wrote to Mayor Bass in June of last year:

"...as a client of the INSIDE SAFE INITIATIVE, I have experienced the following, including but not limited to: 1) falsification of my health and housing records; 2) acts of intimidation; 3) gross negligence in protecting my rights under HIPPA, THE PRIVACY ACT and ADA laws; 4) program/agency staff willfully ignoring no less than 25 medical letters from physicians at UCLA HEALTH documenting my medical challenges and need for permanent housing specific to my household needs; 5) willful sabotage by program/agency staff of my opportunities to move forward to secure permanent housing; and 6) attempts by program/agency staff to coerce me into interim housing rife with unsanitary, unsafe conditions and otherwise unsuitable for my medical and housing needs. I have documentation to support all that I have described."

In my correspondence to the Mayor's Office and included in my April 1, 2025, grievance, I made specific reference to at least one LAHSA service provider falsifying medical and housing data in my HMIS file. **The LAHSA service provider promised in writing more than two years ago to correct the data.  I never received a corrected copy of my HMIS file.  AS such,  my  HMIS file must be corrected and its data must adhere to HUD guidelines.**

This brings me to the matter of HACLA, and as I wrote to you on April 7, 2025:

"I have been promised timely contact with an assigned housing advisor from HACLA, but to date, that has not occurred. Attached is the email from a HACLA representative, dated February 27th, along with my follow-up, for which I have received no response."

As the attached February 27th email from HACLA states:

"*We are in the process of assigning your file to a new advisor within the next 48 hours. Once the assignment is complete, the advisor will reach out to you directly, and a letter will be sent confirming the new advisor.*"

Three months have passed since HACLA pledged to provide a housing advisor. (Please see HACLA emails attached.) **As of this writing, I have not heard from anyone at HACLA, and still do not have a housing advisor assigned**

Once again, since you have asked if there is anything further you can do to assist regarding HACLA, and your April 23rd email provided no response to this specific part of my request, **I would appreciate input from the Mayor's Office in resolving this matter since the assignment of a HACLA housing advisor is critical to ensure that my housing paperwork meets all applicable HUD guidelines. Equally important is ensuring that the LAHSA service provider that promised corrections to my HMIS data follows through, because that HMIS data must also adhere to HUD guidelines.**

**To this end, I will expect the Mayor's Office to require LAHSA and its service provider to make the corrections promised and provide me with a corrected copy of my HMIS file.**

Thank you in advance for your prompt reply regarding all of my concerns contained herein.

> *Isaiah 54:17-(KJV)-No weapon that is formed against thee shall prosper; and every tongue that shall*
> *rise against thee in judgment thou shalt condemn. This is the heritage of the servants of the Lord,*
> *and their righteousness is of me, saith the Lord.*

Sincerely,

Gregory Edward Gray

/cbg

Ref: MSG12171530
Ref: MSG12283126

---

**From:** LA City SNow <cityoflaprod@service-now.com>
**Sent:** Wednesday, April 23, 2025 3:08 PM
**To:** gegcbg@outlook.com <gegcbg@outlook.com>
**Subject:** Mayor Karen Bass Message

 **Office of Mayor Karen Bass**

Hi Mr. Gray,

Thank you for providing further information. I am sorry to hear of your situation, and I will make note of your concerns.

If you feel you are facing harassment or retaliation, please reach out to the Los Angeles Civil and Human Rights and Equity Department. They may be able to investigate the matter.
201 N. Los Angeles St., Suite 6, Los Angeles, CA 90012
213-978-1845
civilandhumanrights@lacity.org

Additionally, I am including the online form to file a grievance with LAHSA:
https://www.lahsa.org/support/contact-us

Thank you again for contacting the Office of Mayor Karen Bass. Please feel free to reach out if you need further assistance.


Best Regards,

Esha K.
Constituent Services Coordinator
Office of Mayor Karen Bass

---

2025-04-07 05:57:28 PM PDT
4/7/25


Esha K.
Constituent Services Coordinator
Office of Mayor Karen Bass

Dear Esha K:

As promised, I am forwarding you additional information regarding what are now two outstanding issues:

The first is extremely urgent concerning the safety of my wife and me in the building located at 1317 S. Grand Ave., Los Angeles, CA 90015. It requires immediate attention. As such, I am making a specific request for the Mayor's Office to do what it must to ensure safety in this building.

As the attached email details, my wife and I were threatened by a problem tenant on our floor last Friday when that tenant confronted us while in the elevator. We have reported the matter to the LAPD's Central Bureau. As noted in the email attached, we have also reported it to the leadership of LAHSA, since it serves as the master lease holder of the building. To date, I have heard nothing from LAHSA.

We consider this a direct threat from a tenant whose unit has been a constant source of disruption and is associated with suspected illegal drug activity. The LAPD came to the building early last month and could be heard knocking on that tenant's unit door, ordering hands on the floor, etc.

As we previously shared with the Mayor's Office, LAPD, and LAHSA, we have been the target of retaliatory acts for reporting these disruptions and suspected illegal activity by this tenant and their associates. There simply cannot be any tolerance for this kind of activity in a building funded by public dollars.

In a separate matter, I have been promised timely contact with an assigned housing advisor from HACLA, but to date, that has not occurred. Attached is the email from a HACLA representative, dated

Case 2:20-cv-02291-DOC-KES    Document 671    Filed 06/04/25    Page 19 of 49   Page ID #:28002

February 27th, along with my follow-up, for which I have received no response.

Since you have asked if there is anything further you can do to assist regarding HACLA, I would appreciate your prompt input on this matter as well, since the assignment of a HACLA housing advisor is critical to ensure that my housing paperwork meets all applicable HUD guidelines.


Sincerely,

Gregory Edward Gray

/cbg

Ref: MSG12171530

Ref:MSG12283126

 Outlook

---

**Not read: Fw: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812**

---

**From** Dr. Adams Kellum <valecia.adamskellum@LAHSA.org>

**Date** Tue 6/3/2025 2:41 PM

**To** Gregory Edward Gray <gegcbg@outlook.com>

Your message

  To: Dr. Adams Kellum
  Subject: Fw: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812
  Sent: Thursday, May 8, 2025 3:01:10 PM (UTC-08:00) Pacific Time (US & Canada)

 was deleted without being read on Tuesday, June 3, 2025 2:41:26 PM (UTC-08:00) Pacific Time (US & Canada).

 Outlook

---

## Fw: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

---

**From** Gregory Edward Gray <gegcbg@outlook.com>

**Date** Thu 5/8/2025 3:01 PM

**To**   kfreed@lahsa.org <kfreed@lahsa.org>

**Cc**   valecia.adamskellum@lahsa.org <valecia.adamskellum@lahsa.org>

**5/8/25**

**RESENDING TO ENSURE DELIVERY.**

**Gregory Edward Gray**

**/cbg**

---

**From:** Cheryl Gray <ggpi1@aol.com>

**Sent:** Thursday, May 8, 2025 1:33 PM

**To:** Kris Freed <kfreed@lahsa.org>

**Cc:** gegcbg@outlook.com <gegcbg@outlook.com>; Dr. Adams Kellum <valecia.adamskellum@lahsa.org>

**Subject:** Fw: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

5/8/25

Dear Ms. Freed:

The email you sent my husband this afternoon is noted below.  I have looked for an email from you sent last night but I cannot find it anywhere, including in my spam folder. Would you please resend it?  And, if you wouldn't mind, please also carbon copy my husband, whose email address is noted above. Thank you.

Sincerely,

Mrs. Cheryl Gray

----- Forwarded Message -----
**From:** Gregory Edward Gray <gegcbg@outlook.com>
**To:** Cheryl Gray <ggpi1@aol.com>
**Sent:** Thursday, May 8, 2025 at 01:27:05 PM PDT
**Subject:** Fw: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

> **From:** Kris Freed <kfreed@lahsa.org>
> **Sent:** Thursday, May 8, 2025 12:25 PM
> **To:** Gregory Edward Gray <gegcbg@outlook.com>

**Cc:** Dr. Adams Kellum <valecia.adamskellum@LAHSA.org>
**Subject:** Re: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

Hello Mr. Gray,

I responded on it to your wife last evening.

Best,
Kris

Get Outlook for iOS

---

**From:** Gregory Edward Gray <gegcbg@outlook.com>
**Sent:** Thursday, May 8, 2025 2:24:01 PM
**To:** Kris Freed <kfreed@lahsa.org>
**Cc:** Dr. Adams Kellum <valecia.adamskellum@LAHSA.org>
**Subject:** Re: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

5/8/25

Dear Ms. Freed:

The elevator is now working.  I/we still need your follow up on the correspondence sent to you last month concerning "Re: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812.". Please see emails below dated 4/4/25, 4/6/25 and 4/11/25.

Sincerely,

Gregory Edward Gray

/cbg

---

**From:** Kris Freed <kfreed@lahsa.org>
**Sent:** Thursday, May 8, 2025 9:26 AM
**To:** Gregory Edward Gray <gegcbg@outlook.com>
**Cc:** Dr. Adams Kellum <valecia.adamskellum@LAHSA.org>
**Subject:** Re: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

Just spoke to property managers and they stated it was fixed yesterday and went down again today. They stated they have service repair on their way out.

Best,
Kris

Get Outlook for iOS

---

**From:** Gregory Edward Gray <gegcbg@outlook.com>
**Sent:** Thursday, May 8, 2025 10:50:11 AM
**To:** Kris Freed <kfreed@lahsa.org>

**Cc:** Dr. Adams Kellum <valecia.adamskellum@LAHSA.org>
**Subject:** Fw: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

5/8/25

Dear Ms. Freed:

The elevator is down again this morning.
Security detail on our floor told my wife that no one had contacted anyone about the shutdown.

Sincerely,

Gregory Edward Gray

/cbg

---

**From:** Gregory Edward Gray <gegcbg@outlook.com>
**Sent:** Wednesday, May 7, 2025 9:56 AM
**To:** kfreed@lahsa.org <kfreed@lahsa.org>
**Cc:** valecia.adamskellum@lahsa.org <valecia.adamskellum@lahsa.org>
**Subject:** Fw: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

RESENDING TO ENSURE DELIVERY.

GREGORY EDWARD GRAY

/cbg

---

**From:** Gregory Edward Gray <gegcbg@outlook.com>
**Sent:** Wednesday, May 7, 2025 9:54 AM
**To:** Kris Freed <kfreed@lahsa.org>
**Cc:** Dr. Adams Kellum <valecia.adamskellum@lahsa.org>
**Subject:** Fw: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

5/7/25

RESENDING TO ENSURE DELIVERY.

Gregory Edward Gray

/cbg

---

**From:** Cheryl Gray <ggpi1@aol.com>
**Sent:** Wednesday, May 7, 2025 9:48 AM
**To:** kfreed@lahsa.org <kfreed@lahsa.org>

**Cc:** valecia.adamskellum@lahsa.org <valecia.adamskellum@lahsa.org>
**Subject:** Fw: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

5/7/25

Dear Ms. Freed:

The elevator was down this morning when my husband left for his doctor's appointment. He had to navigate the stairwell. Is the elevator working now? I need to know before I bring him home. Please advise.

Also, we never heard from you regarding the matters detailed below. Please share how these matters will be addressed.

Sincerely,

Mrs. Cheryl Gray

----- Forwarded Message -----
**From:** Gregory Edward Gray <gegcbg@outlook.com>
**To:** kfreed@lahsa.org <kfreed@lahsa.org>
**Cc:** valecia.adamskellum@lahsa.org <valecia.adamskellum@lahsa.org>
**Sent:** Friday, April 11, 2025 at 10:29:37 AM PDT
**Subject:** Fw: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

4/11/25

RESENDING TO ENSURE DELIVERY.

Gregory Edward Gray

/cbg

**From:** Cheryl Gray <ggpi1@aol.com>
**Sent:** Friday, April 11, 2025 10:23 AM
**To:** kfreed@lahsa.org <kfreed@lahsa.org>
**Cc:** valecia.adamskellum@lahsa.org <valecia.adamskellum@lahsa.org>
**Subject:** Fw: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

4/11/25

Dear Ms. Freed:

This week, I learned that there is no security camera installed in the elevator.

This is of great concern to me (and my husband). Multiple adverse situations have occurred in the elevator, not the least of which is the incident I reported to you a week ago today.

As we have not yet heard from you on how you/LAHSA intend to handle the verbal threat made against us by the problem tenant in #812, please add to your response when LAHSA will install/repair the security camera in the elevator.

Thank you for your prompt attention to these matters.

Sincerely,

Mrs. Cheryl Gray

----- Forwarded Message -----
**From:** Cheryl Gray <ggpi1@aol.com>
**To:** Kris Freed <kfreed@lahsa.org>
**Cc:** Dr. Adams Kellum <valecia.adamskellum@lahsa.org>
**Sent:** Sunday, April 6, 2025 at 03:53:36 PM PDT
**Subject:** Fw: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

4/6/25

Dear Ms. Freed:

Please note the email below.  We need your follow up regarding what has been done since our report to you/Dr. Adams about this safety issue.

Sincerely,

Mrs. Cheryl Gray

----- Forwarded Message -----
**From:** Cheryl Gray <ggpi1@aol.com>
**To:** Kris Freed <kfreed@lahsa.org>
**Cc:** Dr. Adams Kellum <valecia.adamskellum@lahsa.org>
**Sent:** Friday, April 4, 2025 at 09:54:52 PM PDT
**Subject:** RE: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

4/4/25

Dear Ms. Freed:

At about 8 PM tonight, my husband and I were verballythreatened by the tenant in #812 while in the building elevator.  Security cameras will capture this.
My husband and I were already on theelevator and the tenant got on from the third floor. She was clearly under theinfluence.
The tenant said, "How are you doing, ma'am? Ma'am?Ma'am?"  She kept repeating herself because I ignored her.  She continued to taunt me, becoming angrybecause I wouldn't respond.

Then the tenant said, "Thanks for calling the cops on me. That was bad, that was horrible. You thought I was illegal, but I'm legal. You thought I wouldn't be here, but I'm still here."
I still ignored the tenant, as did my husband. When my husband turned to me and said to be sure to document the conversation, the tenant interjected, "I've got documentation." My husband said to the tenant, "I wasn't talking to you."

The tenant then said to me, "I've got my eye on you." Then she said to my husband, "I've got my eye on you, too." We take this as a direct threat and a prelude to a retaliatory act by this tenant and her associates. There is no grey area surrounding what the tenant said and what it meant.

As my husband and I have already shared with you and your colleagues, this tenant has a history of disruptive behavior on this floor, and there is suspected illegal drug activity involving unit #812. (I have also attached an email thread dated January 1, 2025, regarding an apparent attempt to break into our unit by an individual associated with the tenant in #812. The thread also contains additional incidents concerning the compromise of our safety, health, and welfare.)
As my husband and I exited the elevator and headed to our unit, the tenant kept talking to us. My husband told the tenant, "Have a good night."
The tenant then said, "You're not going to have a good night. You're not going to sleep tonight."
This was unequivocally another direct threat.
As such, this incident will need to be handled immediately because of this tenant's history of disruptive behavior, including suspected illegal drug activity involving unit #812.
Please do ensure that the guards are on alert and that there is a able guard on this floor tonight and in the future. The police should also be notified.

Finally, due to the urgency of this matter, please inform me of how you intend to handle this.
Sincerely,

Mrs. Cheryl Gray

 Outlook

---

## Fw: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

---

**From** Gregory Edward Gray <gegcbg@outlook.com>

**Date** Sun 4/6/2025 3:57 PM

**To** kfreed@lahsa.org <kfreed@lahsa.org>

**Cc** valecia.adamskellum@lahsa.org <valecia.adamskellum@LAHSA.org>

**Bcc** gegcbg@outlook.com <gegcbg@outlook.com>; Ggpi1@aol.com <ggpi1@aol.com>

📎 1 attachment (214 KB)

Mail - Gregory Edward Gray - Outlook EMAIL KRIS FREED TAMAR GANTT 1 1 25.pdf;

**4/6/25**

**RESENDING TO ENSURE DELIVERY.**

**Gregory Edward Gray**

**/cbg**

---

**From:** Cheryl Gray <ggpi1@aol.com>
**Sent:** Sunday, April 6, 2025 3:53 PM
**To:** Kris Freed <kfreed@lahsa.org>
**Cc:** Dr. Adams Kellum <valecia.adamskellum@lahsa.org>
**Subject:** Fw: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

4/6/25

Dear Ms. Freed:

Please note the email below.  We need your follow up regarding what has been done since our report to you/Dr. Adams about this safety issue.


Sincerely,

Mrs. Cheryl Gray


----- Forwarded Message -----
**From:** Cheryl Gray <ggpi1@aol.com>
**To:** Kris Freed <kfreed@lahsa.org>
**Cc:** Dr. Adams Kellum <valecia.adamskellum@lahsa.org>
**Sent:** Friday, April 4, 2025 at 09:54:52 PM PDT
**Subject:** RE: REPORT OF A VERBAL THREAT MADE BY TENANT IN #812

4/4/25

Dear Ms. Freed:

At about 8 PM tonight, my husband and I were verbally threatened by the tenant in #812 while in the building elevator.  Security cameras will capture this.
My husband and I were already on the elevator and the tenant got on from the third floor. She was clearly under the influence.
The tenant said, "How are you doing, ma'am? Ma'am? Ma'am?"  She kept repeating herself because I ignored her.  She continued to taunt me, becoming angry because I wouldn't respond. Then the tenant said, "Thanks for calling the cops on me. That was bad, that was horrible. You thought I was illegal, but I'm legal. You thought I wouldn't be here, but I'm still here."
I still ignored the tenant, as did my husband. When my husband turned to me and said to be sure to document the conversation,  the tenant interjected, "I've got documentation."  My husband said to the tenant, "I wasn't talking to you."

The tenant then said to me, "I've got my eye on you." Then she said to my husband, "I've got my eye on you, too." We take this as a direct threat and a prelude to a retaliatory act by this tenant and her associates. There is no grey area surrounding what the tenant said and what it meant.

As my husband and I have already shared with you and your colleagues, this tenant has a history of disruptive behavior on this floor, and there is suspected illegal drug activity involving unit #812.  (I have also attached an email thread dated January 1, 2025, regarding an apparent attempt to break into our unit by an individual associated with the tenant in #812.  The thread also contains additional incidents concerning the compromise of our safety, health, and welfare.)
As my husband and I exited the elevator and headed to our unit, the tenant kept talking to us. My husband told the tenant, "Have a good night."
The tenant then said, "You're not going to have a good night. You're not going to sleep tonight." This was unequivocally another direct threat.
As such, this incident will need to be handled immediately because of this tenant's history of disruptive behavior, including suspected illegal drug activity involving unit #812.  Please do ensure that the guards are on alert and that there is an able guard on this floor tonight and in the future.  The police should also be notified.

Finally, due to the urgency of this matter, please inform me of how you intend to handle this.
Sincerely,

Mrs. Cheryl Gray

Name: Gregory Gray | DOB: 8/5/1953 | MRN: ███████ | PCP: Esther S. Yu, DO | Legal Name: Gregory Gray



**Santa Monica Neurology**
1801 WILSHIRE BLVD
SUITE 100
SANTA MONICA CA 90403
Phone: 310-319-5098
Fax: 310-319-4552

May 8, 2025

Gregory Edward Gray
3183 Wilshire Ste196 K26
Los Angeles CA 90010

Dr. Brodsky,

Gregory Edward Gray (date of birth: 8/5/1953) is followed at the UCLA Neurology clinic for diagnoses of stroke, cervical spinal canal stenosis, neuropathy, cognitive impairment.  His last clinic visit with me was on 5/1/2025.

Mr. Gray's symptoms can be worsened with psychological stress which may result in recrudescence of neurological symptoms.  It is important that psychological stress be kept a a minimum for Mr. Gray to optimize his physical and mental health.

Mr. Gray requires housing that is most appropriate for his needs, including that which is in close proximity to his primary care doctor and specialists. He continues to have stress regarding his living situation which has culminated in a fall on April 24, 2025 that occurred while boarding public transport resulting in trauma to his knee, head, and eye.  Mr. Gray would benefit most from housing that is safe and maintained in a clean and well kept manner.  In addition, Mr. Gray would benefit from reasonable accommodations and transportation resources - such as door-to-door transportation - to avoid any subsequent falls.

Given the complexity of his medical problems, such as difficulty with cognition, ambulation, and diabetes care, it is essential that Mr. Gray have housing and transportation services to facilitate his care, prevent adverse outcomes (such as recurrent stroke, heart attack, falls) and  prevent hospitalizations.

I again request that Mr. Gray be given an extension for 12 months (May 8, 2026) regarding clerical matters given that Mr. Gray focus on diagnostic testing and rehabilitation efforts.

If you have any questions or concerns, please don't hesitate to call.

Sincerely,

Alexan I. Yerevanian, MD

CC:
No Recipients

RE: Gray, Gregory -- CSN#: 90236514215                                 Page 1 of 1

MyChart® licensed from Epic Systems Corporation© 1999 - 2025

Name: Gregory Gray | DOB: 8/5/1953 | MRN: ▮▮▮▮▮ | PCP: Esther S. Yu, DO | Legal Name: Gregory Gray



**UCLA Health Downtown Los Angeles Endocrinology**
700 W 7TH ST
SUITE S270
LOS ANGELES CA 90017
Phone: 213-409-6687
Fax: 213-988-8390

May 7, 2025

To Whom It May Concern:

This letter is to attest to the current health status of Mr. Gregory Gray. Mr. Gray has been a patient under my care since 07/14/2022. His last clinic visit with me was on 05/07/2025.

Mr. Gray has multiple medical problems, including but not limited to type 2 diabetes, hypertension, hyperlipidemia, obesity, and a history of stroke. These medical problems require consistent medical care (for example, for appointments and lab work) and stable housing (for example, for the proper storage of medications).

Mr. Gray continues to experience significant psychological stress related to his housing situation, which has been exacerbated in recent months, culminating in a bad fall on 04/24/2025 while boarding a train on the way to his health club to exercise. He would benefit from appropriate transportation resources and reasonable accommodations to allow him to seek medical care and attend to activities of daily living.

It is my professional recommendation that Mr. Gray minimize unnecessary stress to optimize his physical and mental health and to reduce the harmful effects of an uncertain living situation on his physical and mental health.

Thank you for your time.

Sincerely,

Laura Sue, MD, MPH

RE: Gray, Gregory -- CSN#: 90237088541                                      Page 1 of 1

MyChart® licensed from Epic Systems Corporation© 1999 - 2025

MyChart® licensed from Epic Systems Corporation© 1999 - 2025

# CITY OF LOS ANGELES

#814

Los Angeles
Housing Department



Karen Bass, Mayor

Code Enforcement Division
1910 Sunset Blvd., Suite 300
Los Angeles, CA 90026
Tel: (310) 524-1230

LAHSA- Tamar Ganti
707 Wilshire Blvd 10th Flr
Los Angeles, CA 90017

Date: April 2, 2025
Case ID: 918747
APN: 5134017016

## NOTICE AND ORDER TO COMPLY
Sections 161.702 and 161.354, Los Angeles Municipal Code
Sections 17980 and 17980.6, California Health and Safety Code

Our records indicate you are the owner of the property located at **1317 S GRAND AVE**. An inspection of the premises has revealed conditions that affect the health and safety of the occupants and cause the building to be determined to be in violation of the City of Los Angeles Municipal Code. These conditions, their location on the premises, and the specific violation(s) of the Los Angeles Municipal Code (LAMC) and or California Health and Safety Code are described on the attached pages.

You, as the property owner, or responsible party, are ordered to eliminate all of the described conditions and diligently pursue the work necessary to eliminate any violations of the LAMC and Health and Safety Code on or before 5/9/2025.

Some of the work required to repair the building may require that you obtain a permit and request related inspections from the Department of Building and Safety. We strongly urge you to seek the services of qualified installers, properly licensed by the State Contractors License Board.

A re-inspection of the premises will be conducted on **Thursday, May 15, 2025** between **9:30 AM** and **11:30 AM**. You or your representative must be present to escort the Housing Inspector. Any and all units are subject to re-inspection and require the same uniform compliance throughout the premises. You must provide notice to all affected tenants not less than 24 hours prior to the scheduled inspection. The entire premises must be in full compliance with the Los Angeles Municipal Code.

If you have any questions or concerns regarding this notice/order/inspection, please feel free to contact us at the email/phone numbers provided below. Inspectors are best reachable by phone on weekdays from 7 to 9 am. *Si tiene preguntas, por favor contáctenos como se indica al final de esta notificación.*

| Inspector:<br>Gregory LeDuff | Email:<br>Gregory.Leduff@lacity.org | Inspector Phone:<br>(310) 524-1261 |
| Office Address:<br>1910 Sunset Blvd Suite #300 Los Angeles, CA 90026 | | Office Phone:<br>(310) 524-1230 |

Issuing Inspector:
Gregory LeDuff

Proof of Mailing – On 4/2/2025 the signee mailed a copy of this notice by First-Class Mail, postage prepaid, to the person(s) listed on the last equalized assessment roll.

*Gregory LeDuff*

As a covered entity under Title II of the Americans with Disabilities Act, the City of Los Angeles does not discriminate on the basis of disability and, upon request, will provide reasonable accommodation to ensure equal access to its programs, services and activities.

Form/NOC/06/03

APN: 5134017016

1 of 11

Outlook

**Re: REQUEST FOR FOLLOW UP ON ASSIGNMENT OF A HACLA ADVISOR PER INFORMATION FROM SHAKIRA YOUNG OF HACLA**

From  Gregory Edward Gray <gegcbg@outlook.com>
Date  Thu 4/3/2025 11:03 AM
To  roderick.fletcher@hacla.org <roderick.fletcher@hacla.org>
Cc  Emily.Rodriguez@hacla.org <Emily.Rodriguez@hacla.org>; Christina Lupo <Christina.Lupo@hacla.org>
Bcc  gegcbg@outlook.oom <gegcbg@outlook.oom>

4/3/25

Dear Mr. Fletcher:

Good morning.

I noticed that your email addressed me as " MR. GARY" but my last name is actually **"GRAY."**  I want to bring this to your attention for any future correspondence you/your colleagues may send to me and most certainly for any paperwork-past, present and future--concerning my business with HACLA.

I am also writing to you requesting the promised update on the assigning of a HACLA housing advisor.  I have not heard from HACLA since you last wrote to me on February 27th to inform me that my file was to be assigned to an advisor within 48 hours from the date/time of your email below.  Can you tell me what has caused the delay on this assignment of an advisor?

Thank you in advance for your prompt reply.

Sincerely,

Gregory Edward Gray

/cbg

---

**From:** Roderick Fletcher <roderick.fletcher@hacla.org>
**Sent:** Thursday, February 27, 2025 7:43 AM
**To:** Gregory Edward Gray <gegcbg@outlook.com>
**Cc:** Emily Rodriguez <Emily.Rodriguez@hacla.org>; Christina Lupo <Christina.Lupo@hacla.org>
**Subject:** RE: REQUEST FOR FOLLOW UP ON ASSIGNMENT OF A HACLA ADVISOR PER INFORMATION FROM SHAKIRA YOUNG OF HACLA

Good morning Mr. Gary

We are in the process of assigning your file to a new advisor within the next 48 hours. Once the assignment is complete, the advisor will reach out to you directly, and a letter will be sent confirming the new advisor.

Thank you for your patience



**Roderick Fletcher | Assistant Housing Manager**
e: roderick.fletcher@hacla.org
p: 833-422-5248
**Housing Authority of the City of Los Angeles**
**Emergency  Housing  Voucher Program (EHV)**
**Section 8 East Department**
2600 Wilshire Blvd, 2nd Fl
Los Angeles, CA 90057
w: hacla.org

---

**From:** Gregory Edward Gray <gegcbg@outlook.com>
**Sent:** Wednesday, February 26, 2025 8:08 PM
**To:** Roderick Fletcher <roderick.fletcher@hacla.org>
**Cc:** Emily Rodriguez <Emily.Rodriguez@hacla.org>; Christina Lupo <Christina.Lupo@hacla.org>
**Subject:** Fw: REQUEST FOR FOLLOW UP ON ASSIGNMENT OF A HACLA ADVISOR PER INFORMATION FROM SHAKIRA YOUNG OF HACLA
**Importance:** High

2/25/25

Mr. Fletcher:

May I hear from you regarding the assignment of a housing manager from your division?  This is my fourth request for this information.

Additionally, I am asking for more details regarding the lapse of time in processing my RFTA as detailed in the email thread below.

Do get in contact with me as quickly as possible.

Sincerely,

Gregory Edward Gray

/cbg

---

**From:** Gregory Edward Gray <gegcbg@outlook.com>
**Sent:** Monday, February 10, 2025 9:09 PM
**To:** roderick.fletcher@hacla.org <roderick.fletcher@hacla.org>
**Cc:** Emily.Rodriguez@hacla.org <Emily.Rodriguez@hacla.org>; Christina Lupo <Christina.Lupo@hacla.org>
**Subject:** Fw: REQUEST FOR FOLLOW UP ON ASSIGNMENT OF A HACLA ADVISOR PER INFORMATION FROM SHAKIRA YOUNG OF HACLA

2/10/25

Mr. Fletcher:

Due to medical challenges, I am dictating this correspondence:

This is my third attempt to reach you.

I am again making an urgent request for information regarding the assignment of a housing manager from your division of HACLA.

Additionally, I am asking for more details regarding the lapse of time in processing my RFTA as detailed in the email thread below.

Do get in contact with me as quickly as possible.

Sincerely,

Gregory Edward Gray

/cbg

---

**From:** Gregory Edward Gray <gegcbg@outlook.com>
**Sent:** Tuesday, February 4, 2025 9:58 AM
**To:** roderick.fletcher@hacla.org <roderick.fletcher@hacla.org>
**Cc:** Emily.Rodriguez@hacla.org <Emily.Rodriguez@hacla.org>; Christina Lupo <Christina.Lupo@hacla.org>; shakira.young@hacla.org <shakira.young@hacla.org>
**Subject:** Fw: REQUEST FOR FOLLOW UP ON ASSIGNMENT OF A HACLA ADVISOR PER INFORMATION FROM SHAKIRA YOUNG OF HACLA

2/4/25

Mr. Fletcher:

Please let me know about my urgent request as detailed below.

Sincerely,

Gregory Edward Gray

/cbg

---

**From:** Gregory Edward Gray <gegcbg@outlook.com>
**Sent:** Monday, February 3, 2025 4:32 PM
**To:** roderick.fletcher@hacla.org <roderick.fletcher@hacla.org>
**Cc:** shakira.young@hacla.org <shakira.young@hacla.org>; Christina Lupo <Christina.Lupo@hacla.org>; Emily.Rodriguez@hacla.org <Emily.Rodriguez@hacla.org>; roderick.fletcher@hacla.org <roderick.fletcher@hacla.org>
**Subject:** RE: REQUEST FOR FOLLOW-UP ON ASSIGNMENT OF A HACLA ADVISOR PER INFORMATION FROM SHAKIRA YOUNG OF HACLA

2/3/25


Roderick Fletcher
EHV Housing Manager
Housing Authority of the City of Los Angeles
2600 Wilshire Boulevard
Los Angeles, CA 90057


Dear Mr. Fletcher:

Due to medical challenges, I am dictating this correspondence:

I've been informed by your colleague, Ms. Shakira Young of HACLA, that you are responsible for assigning me a HACLA advisor.   On January 16th, Ms. Young advised me that:

"From the information in our system, it appears you have not been assigned an advisor.  I am emailing EHV housing manger Roderick Fletcher, to assign you an advisor.  Moving forward you should direct all questions to your assigned advisor."

I am also asking if you can provide me with information about my inquiry to your HACLA colleagues, Christina Lupo and Emily Rodriguez, to whom I wrote the following but never received a response:

 Outlook

## Fw: REQUEST FOR FOLLOW UP ON COMPLETION OF DOCUMENTS FOR H/ PACKAGE

**From** Gregory Edward Gray <gegcbg@outlook.com>

**Date** Thu 12/12/2024 10:51 AM

**To**    Christina.Lupo@hacla.org <Christina.Lupo@hacla.org>; Emily.Rodriguez@hacla.o <Emily.Rodriguez@hacla.org>

**Bcc**   gegcbg@outlook.com <gegcbg@outlook.com>; Ggpi1@aol.com <ggpi1@aol.cc

12/12/24

Christina Lupo/Emily Rodriguez
Housing Authority of the City of Los Angeles
2600 Wilshire Boulevard
Los Angeles, CA 90057

-via email:  *Christina.Lupo@hacla.org and Emily.Rodriguez@hacla.org*

Dear Ms. Lupo and Ms. Rodriguez:

Per the email correspondence below, I am writing to learn from you the point HACLA and LASHA/KRPM GROUP MANAGEMENT that triggered the lapse of ti HACLA's  September 6, 2024 request for leasing documents to facilitate appro documentation and subsequent activation of my federal housing voucher.

Thank you in advance for your prompt response.

Sincerely,

Gregory Edward Gray

/cbg

Thank you in advance for your prompt response as these matters are time-sensitive.

Sincerely,

Gregory Edward Gray

/cbg



**Santa Monica Neurology**
1801 WILSHIRE BLVD
SUITE 100
SANTA MONICA CA 90403
Phone: 310-319-5098
Fax: 310-319-4552

May 8, 2025

Gregory Edward Gray
3183 Wilshire Ste196 K26
Los Angeles CA 90010

Dr. Brodsky,

Gregory Edward Gray (date of birth: 8/5/1953) is followed at the UCLA Neurology clinic for diagnoses of stroke, cervical spinal canal stenosis, neuropathy, cognitive impairment.  His last clinic visit with me was on 5/1/2025.

Mr. Gray's symptoms can be worsened with psychological stress which may result in recrudescence of neurological symptoms.  It is important that psychological stress be kept a a minimum for Mr. Gray to optimize his physical and mental health.

Mr. Gray requires housing that is most appropriate for his needs, including that which is in close proximity to his primary care doctor and specialists. He continues to have stress regarding his living situation which has culminated in a fall on April 24, 2025 that occurred while boarding public transport resulting in trauma to his knee, head, and eye.  Mr. Gray would benefit most from housing that is safe and maintained in a clean and well kept manner.  In addition, Mr. Gray would benefit from reasonable accommodations and transportation resources - such as door-to-door transportation - to avoid any subsequent falls.

Given the complexity of his medical problems, such as difficulty with cognition, ambulation, and diabetes care, it is essential that Mr. Gray have housing and transportation services to facilitate his care, prevent adverse outcomes (such as recurrent stroke, heart attack, falls) and  prevent hospitalizations.

I again request that Mr. Gray be given an extension for 12 months (May 8, 2026) regarding clerical matters given that Mr. Gray focus on diagnostic testing and rehabilitation efforts.

If you have any questions or concerns, please don't hesitate to call.

Sincerely,

Alexan I. Yerevanian, MD


CC:
No Recipients

RE: Gray, Gregory -- CSN#: 90236514215                                    Page 1 of 1

MyChart® licensed from Epic Systems Corporation© 1999 - 2025

Name: Gregory Gray | DOB: 8/5/1953 | MRN: ███████ | PCP: Esther S. Yu, DO | Legal Name: Gregory Gray



**UCLA Health Downtown Los Angeles Endocrinology**
700 W 7TH ST
SUITE S270
LOS ANGELES CA 90017
Phone: 213-409-6687
Fax: 213-988-8390

May 7, 2025

To Whom It May Concern:

This letter is to attest to the current health status of Mr. Gregory Gray. Mr. Gray has been a patient under my care since 07/14/2022. His last clinic visit with me was on 05/07/2025.

Mr. Gray has multiple medical problems, including but not limited to type 2 diabetes, hypertension, hyperlipidemia, obesity, and a history of stroke. These medical problems require consistent medical care (for example, for appointments and lab work) and stable housing (for example, for the proper storage of medications).

Mr. Gray continues to experience significant psychological stress related to his housing situation, which has been exacerbated in recent months, culminating in a bad fall on 04/24/2025 while boarding a train on the way to his health club to exercise. He would benefit from appropriate transportation resources and reasonable accommodations to allow him to seek medical care and attend to activities of daily living.

It is my professional recommendation that Mr. Gray minimize unnecessary stress to optimize his physical and mental health and to reduce the harmful effects of an uncertain living situation on his physical and mental health.

Thank you for your time.

Sincerely,

Laura Sue, MD, MPH

RE: Gray, Gregory -- CSN#: 90237088541                                    Page 1 of 1

MyChart® licensed from Epic Systems Corporation© 1999 - 2025

MyChart® licensed from Epic Systems Corporation© 1999 - 2025

April 2, 2024


Paul Webster
Chairman and Chief Executive Officer
LA Alliance for Human Rights

*-via email:  pwebster@la-alliance.org*

Dear Mr. Webster:

Thank you for confirming that I may send materials to you that I want you to share with Judge Carter.

**I am providing you with a Google Docs link to my documentation detailed in the attachments.** The memorandum of notes will give you an overview of the current issues I face. The photographs are in order as they are referenced in this correspondence. Finally, the support documentation includes a table of contents describing letters, emails and any other materials shared.

As I told you yesterday, I have documentation that points to egregious acts that include: 1) public corruption in the Office of the Clerk;  2) falsification of health and housing records; 3) acts of intimidation; 4) gross negligence in protecting clients' rights under the HIPPA and PRIVACY ACT laws; 5) willful sabotage of clients' opportunities to move forward to secure permanent housing; 6) abandoning clients who need interim housing; and 7) placing clients in interim housing rife with unsanitary, unsafe conditions.  These activities have been reported to the proper investigative authorities and to the media.

In the March 18th transcript, Judge Carter also made reference to a group of children out helping other young people cope with the stresses of homelessness.  In that transcript, Judge Carter said: *"Four or five kids arrive, and young people, young adults let's say. And they've got bags. What are you doing? Well, we've got like a thousand sandwiches that we put together in the Boys and Girls Club and at the church up in Boyle Heights and to Salesian. And here are your wonderful young people of the future. America's in good hands…And they're going to go out to the street. And afterwards they're going to gather in a circle and ask what did you learn. And this is what they said. And this has to make you feel good. Kids went around and said: hope, love, and how fortunate they are after seeing skid row."*

This statement from Judge Carter particularly caught my eye.  I write to you as a creator, one who has spent more than three decades branding arts in education programs exclusively for underserved children and families.  Students in the programs I've developed have traveled across the country and the world, including performing in prestigious venues such as The John F. Kennedy Center for the Performing Arts during the first inaugural of President Barack Obama, the Summer Olympic Games in Atlanta and a month-long tour in South Africa at the invitation of the administration of South African President Nelson Mandela.

As with any successful enterprise, I have encountered obstacles that could have potentially halted these outstanding opportunities. However, the impediments that I am describing in this correspondence were engineered by an individual and his business associates who retaliated against me for my refusal to engage in pay-to-play schemes.

1

This is not new behavior for this individual.  As a prime example, one of the individual's business interests was sued by Department of Justice for alleged fraud. The case was eventually settled for nearly $40 million.

I share this information with you because I am aware of your background with the U.S. Department of Housing and Urban Development.  The individual I reference is affiliated with professional sports, real estate, casino gaming and is a beneficiary of HUD funding. This includes the funds that were used in the construction of a development project I spearheaded for underserved children and their families. *(See photo of construction site attached.)* But for the interference of the individual I have described, the construction for this project would have been completed.  Instead, I have battled an environment rife with corruption, mendacity and, in all cases, directly linked to the individual whose actions I have described.

The individual has strong monetary ties to congressional leadership and at least two previous White House administrations, having poured hundreds of thousands of dollars into their campaign coffers.  My refusal to engage in these pay-to-play schemes was met with sweeping interference by the individual and his cohorts in all aspects of my personal and professional life, even resorting to interfering in my students' unprecedented performance honoring President Obama.

At the 11th hour, while my students, parents and chaperones were still on our chartered bus entering Washington, D.C., I received a call from the office of a U.S. Senator who represents the district these students were from and whose campaign finance reports include contributions from the individual. The telephone call from the Senator's staffer informed me that our students were no longer invited to sit in the Senate gallery. Mind you, this activity had been planned months in advance.

Of course, our students and parents felt slighted. Bluntly put, it was a tone-deaf act committed against students largely from households that routinely felt left out. To minimize this impact, I had to quickly pivot to make alternate plans for the students and their parents. The kind of behavior by the Senator and other members of congressional leadership would escalate through increasing interference by this individual and his business associates. This includes my professional endeavors, not the least of which was the derailment of the nearly-completed construction of my development project to house arts in education programs for underserved children and families.

Despite two court rulings that afforded me the right to complete the project and expect the full financial package that was part of my organization's original development agreement, the individual thumbed his nose at the court, deliberately stalled the project's completion and, ultimately destroyed it by bulldozing it over. This was an act of bad faith, since the individual, through his real estate team, pledged to ensure the project's completion. The individual and his team represented that he was fully onboard but then, he acted in collusion with his business associates to sabotage the project and, in the process, worked to impugn my personal and professional reputation.

The impact of this activity greatly diminished our resources and stymied our program activities, including one to service military families that we had proposed to the foundation started by ██████████████████████████████████████ ███████████████

2

Our discussions with the individual's team included a promised interim turn-key space promised to be used to host our program for veterans. a promise that never materialized.  The military veterans project is one we would eventually share with the late Senator John McCain, hand-delivering correspondence to his office in December 2017.  Of course, in January 2018, it was announced that Senator McCain had been diagnosed with cancer.

Since my development project was funded by both public and private funds, including HUD support, I contacted city leadership to inform them of the problems I had encountered and wanted the city to investigate. The city generated a letter addressed to the individual and his business cohorts instructing them to follow through on their commitment to my project and to the city. That letter was wholly ignored.

I wrote to the city and again requested that follow up occur because the individual and his business cohorts were deliberately stalling completion of my development project. Soon thereafter, I received a call from a HUD representative.  When I returned the call, the HUD representative spoke to me in a hostile and threatening tone. It was only until I made it clear that I had information supported by documentation that the HUD representative altered his tone.

I told the HUD official about everyone who was involved in the disruption of my construction, how I had informed the municipality, how I had gone to court to protect the project and how I had documentation to support what I said. I forwarded by email and fax the documentation that I had to the HUD official. I did not hear from the HUD official again until a series of traumatic events unfolded.

Not long after my students' performance in Washington, D.C., at The Kennedy Center honoring President Obama, I was in contact with several governors and congressional members whose offices had expressed interest in replicating the program in their home states.  One of the contacts was former United Nations Ambassador and ███████████████████████ ███████████████████████████████

Another one of the states contacted was ███████ ████████████████ where we had been for several months caring for my wife's terminally ill mother. After my mother-in-law passed away, my wife and I remained to finalize her family's business affairs. While there, we were guests at an event for President Bill Clinton for which Secret Service pre-clearance was required.  I had an opportunity to take a photograph with the former President, who was very accommodating, allowing my wife to adjust the camera for the photograph. President Clinton held back his entourage and security team, telling me, *"Greg, don't worry about them. Just stay right here. I want to be sure you get your picture."*

During my stay in ████████████████████████, I communicated with the state governor's office to arrange for a meeting to discuss the Washington, D.C., project. On the morning we were driving to that meeting, my wife and I were suddenly surrounded by sheriff's deputies. The deputies stopped us and drew as many as a half-dozen guns on us. My wife was so traumatized by these events, that she had to be hospitalized. To this day, she suffers from the emotional distress caused by this traumatic event. I would subsequently suffer a stroke, requiring lifelong doctor's care, resulting not only from this incident but also from precursor events and those which would follow, including the refusal by officials to adhere to warnings from my doctor that their cumulative actions could result in a deadly stroke. I can only thank God that my

3

wife and I had the presence of mind to remain calm while weapons were aimed at us, for we might not be alive today.

The event with President Clinton had occurred just three weeks earlier. My wife had just applied to the Clinton School of Public Policy for graduate study (after her mother's passing) but was prevented from receiving and responding to her notification letter because of this life-altering event. Shortly afterward, in a face-to-face encounter with the HUD official, all he could do is shake his head, tell me he was sorry and that he would do everything he could to help me. I know that the individual I have described in this correspondence, along with his cohorts and the HUD official, were directly responsible for this horrendous act against me and my wife.

I would later find out that this group of people had falsified my name, address, etc., and, as a result, they committed a federal crime. As proof, I located a copy of a corporate resolution that had been part of a municipal file misrepresenting my company. The list of corporate officers had been falsified and HUD never checked the veracity of the document. My phone, computer, my wife's car and other personal belongings went missing and were never returned.

The juxtaposition of these encounters--having guns pulled on us only weeks before being cleared by the U.S. Secret Service--could not be more bizarre. The individual and his cohorts conjured up false allegations against us to cover up the fact that they were illegally using my company for their gain--a fact that, had it been made public, would have irreparably harmed their business interests, including their casino gaming licensing. Throughout the ensuing years, the individual and his associates have continued to run interference in every aspect of my life. To this day, the impact of these actions is ongoing because this individual does business nationwide, including in the State of California.

I came to California to produce a project of public service on the murder of George Floyd and the global outcry that followed.  The project was guided by the premise laid out in *Isaiah 61:*

*Isaiah 61: 1-3, 8: "The Spirit of the Lord God is upon me; because the Lord hath anointed me to preach good tidings unto the meek; he hath sent me to bind up the brokenhearted, to proclaim liberty to the captives, and the opening of the prison to them that are bound; To proclaim the acceptable year of the Lord, and the day of vengeance of our God; to comfort all that mourn; To appoint unto them that mourn in Zion, to give unto them beauty for ashes, the oil of joy for mourning, the garment of praise for the spirit of heaviness; that they might be called trees of righteousness, the planting of the Lord, that he might be glorified. ... For I the LORD love judgment, I hate robbery for burnt offering; and I will direct their work in truth, and I will make an everlasting covenant with them."*

I spent a year on the ground in Minneapolis, beginning in July 2020 (roughly seven weeks after Mr. Floyd was killed) executing research for the aforementioned project.  This included monitoring the first trial of one of four ex-police officers convicted and sentenced to prison for his role in Mr. Floyd's death.  It also included interviewing Minneapolis Police Chief Medaria Arradondo, who spent a great deal of time with me telling me about the racial climate of the city where he had served in law enforcement for more than 30 years. *(See photo attached.)*

4

International media present for the first verdict rendered in the murder of George Floyd also expressed interest in my project. On the day after the verdict, my wife and I were at the site in Minneapolis on 38th and Chicago where George Floyd was killed and where press from all over the world had gathered. A correspondent from Australia's Channel 9 interviewed me as part of the network's coverage. *(See photos attached.)*

Preceding my arrival to Los Angeles and less than a year before George Floyd's murder, my documentation regarding the actions of the individual with funding ties to Capitol Hill and previous White House administrations ultimately landed in the office of ███████████ ████████████████████████████████████████████████████ I also met with an official representing then-Senator ███████████ in a meeting in ██ Washington, D.C., Senate office. I also made contact with the office of former U.S. Attorney General ███ ███████

The civil rights violations involving the individual I reported were fully disclosed and accompanied by documentation (extracted from more than 500 pages) in a meeting I attended in ███████████ in Washington, D.C., in Congressman ███████████ Capitol Hill office. I reported to Congressman ███████████ and others how the individual literally bulldozed down the new home of my nonprofit organization dedicated to providing programming to underserved children and their families. I spearheaded the construction of this project, which took years to develop and was designed to house professional theatre and arts education programs for underserved youth.

In addition to Congressman ███████████ role as Chairman of the ███████████ ███████████, he was also a chief proponent of H.R.1, which sought to eradicate the use of dark money to influence public policy, a practice in which the individual I reported remains an active participant. In exchange for his political contributions, this individual has received billions of federal dollars and tax abatements benefitting his business interests across the board, including California. This includes a windfall the individual gained by acquiring Opportunity Zone status and more than $1 billion in tax benefits for the same tract in which my development project was located. The individual gained Opportunity Zone status for the tract following a more than $700,000 contribution to the Trump Inaugural and a White House meeting with former Treasury Secretary Steve Mnuchin.

In a ███ visit to Washington, D.C., I met with ███████████ ███████ ███████ who pledged to seek a major appropriation for the programs that were to be housed in the facility that I developed for children and families. My wife and I presented ███████████ ██████ with a plaque commemorating ███ support in hosting our Capitol Hill presentation of an original work commemorating the civil unrest of 1967 in cities across the country. *(See photo attached.)*

The meeting and presentation were significant because, at the time, ███████████ ███████ ██ ███████████████████████████ ███████ ██ ██████ ██ █████████████████ which was a major funder of my organization's programming and lead sponsor of the capital campaign to fund construction of my organization's new facility. As it happens, the headliner for the capital campaign launch was Delores Jordan, mother of former NBA superstar, Michael Jordan. ███████████████████████████████████

5



However, after pledging to support an allocation for the arts in education programs I developed to service children and families, ███████████████ failed to follow through. I would later learn that ██ helped to procure a multi-million-dollar federal allocation for the individual I have described in this correspondence. The Senator that I previously mentioned was also responsible for getting Senate approval for the allocation on behalf of this individual.

Roughly a month after I met with Congressman █████████ office, my wife and I were in a major auto accident and we were both seriously injured. My wife had to have surgery, endured a month in the hospital, and months in rehabilitation. I suffered at least two ischemic strokes, and multiple fractures in my back and also had to undergo rehabilitation. The police officer at the accident scene altered the report by misrepresenting what happened. However, records show that the other driver, who had a history of traffic violations, ran a red light, broadsiding my car, and pinning my wife inside.

While the attorney representing me corrected the information with the court, he never followed through on completing his representation by filing a lawsuit to recover our medical expenses and the cost of our vehicle loss. You should know that individual I reported to Congressman █████████ had casino interests █████████. I have every reason to believe the individual was involved in the accident, the inaccurate police report, and the attorney's sudden inability to return neither my phone calls and emails nor follow through on his representation.

The events I describe in this email and my notes attached reference a repeated pattern of abuse that my wife and I have endured at the hands of LAHSA and its service providers. I wrote about these incidents to, among others, Governor Gavin Newsom, Secretary of State Shirley Weber, Los Angeles Mayor Eric Garcetti, Los Angeles County Board of Supervisor Chairwomen Holly Mitchell, Janice Hahn and Lindsey Horvath, Los Angeles City Council President Paul Krekorian, Area Agency on Aging, Adult Protective Services and LAHSA CEO Dr. Valecia Adams Kellum and current Los Angeles Mayor Karen Bass.

In the case of Mayor Bass, I sent no less than ten emails to her regarding issues with the public service agencies affiliated with housing. She has never responded. I also forwarded correspondence to Mayor Bass while she was still a member of Congress and Chairperson of the Congressional Black Caucus. In that letter, █████████ I described to then-Congresswoman Bass the actions of the individual and his cohorts who derailed my construction project. The Mayor never responded.

Issues with the city originate from HACLA, the Housing Authority for the City of Los Angeles. I was forced to file a motion and complaint compelling HACLA to move on renewing housing documentation in a timely manner and to abide by the federal rules governing its HUD-funded housing programs. After I filed, HACLA produced the renewed documentation. Subsequently, HACLA violated its own internal policies by violating my rights

In the case of LAHSA, nine months ago, in June 2023, I sent a USPS registered letter with accompanying documentation to Dr. Valecia Kellum Adams. My described the myriad of problems I encountered with LAHSA and its service providers dating as far back as January 2022. I never received a response from either Dr. Adams or her administration.

6

According to the registered mail proof of delivery, the correspondence was received by Dr. Adams on June 26, 2023. My registered letter to Dr. Adams requesting assistance is copied below:

June 21, 2023

Dr. Va Lecia Adams Kellum

Chief Executive Officer

Los Angeles Homeless Services Authority

707 Wilshire Boulevard, Suite 1000

Los Angeles, CA 90017

Dear Dr. Adams Kellum:

Please find enclosed documentation that I requested be forwarded to you from the Office of Mayor Karen Bass and other officials with whom I have corresponded regarding the myriad of problems I have encountered in my efforts to secure permanent housing through LAHSA and its service providers.

As of this writing, I do not know whether you ever received said correspondence. As such, I am forwarding hard copies via U.S. Registered Mail in order that I may have confirmation of receipt through your direct signature.

As my matter is time sensitive, I thank you in advance for your prompt reply.

Sincerely,

Gregory Edward Gray

(213) 638-2039

Enclosures: HUD Email 4/24/23; HUD 2/22/23 Conference Call Notes, 15 Pages Total

7

While I would like to personally meet with you, due to my health challenges, I am unable to do so.  As I reiterated in my email to you yesterday, I want you to share my information with Judge Carter because I know that there is an upcoming court hearing on April 4th.  If there is anything additional that you or your legal team may need to advance my request, I will do my best to assist in this regard.

Thank you in advance for your time and consideration.  I look forward to hearing from you.

Sincerely,

Gregory Edward Gray

Attachments: Google Docs Link to Memorandum of Notes from Gregory Edward Gray, Photographs in Order of Reference in Correspondence and Support Documentation with Table of Contents for Pages 1-147

/cbg

8