UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al, | ) | Case No. 2:20-CV-02291-DOC-KES |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| CITY OF LOS ANGELES, et al, | ) | Wednesday, June 4, 2025 |
| | ) | |
| Defendants. | ) | 10:45 a.m. to 5:41 p.m. |
| | ) | |

TRANSCRIPT OF COMPLIANCE HEARING
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT COURT

Appearances:               See next page.

Court Reporter:            Recorded; CourtSmart

Courtroom Deputy:          KARLEN DUBOIS

Transcribed by:            JACQUELINE N. DENLINGER
                           Huntington Court Reporters
                              and Transcription, Inc.
                           301 North Lake Avenue
                           Suite 600
                           Pasadena, California  91101
                           (800) 586-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service



2

APPEARANCES:

For the Plaintiff          ELIZABETH ANNE MITCHELL, ESQ.
LA ALLIANCE FOR            MATTHEW DONALD UMHOFER, ESQ.
HUMAN RIGHTS:              Umhofer, Mitchell and King LLP
                           767 South Alameda Street
                           Suite 270
                           Los Angeles, California  90021
                           (213) 394-7979


For the Defendant          ANGELIQUE KAOUNIS, ESQ.
CITY OF LOS                Gibson, Dunn & Crutcher LLP
ANGELES:                   2000 Avenue of the Stars,
                           Suite 1200N
                           Los Angeles, CA 90067
                           (310) 552-8546

                           KAHN A SCOLNICK, ESQ.
                           Gibson Dunn and Crutcher LLP
                           333 South Grand Avenue
                           Los Angeles, CA 90071-3197
                           (213) 229-7000

                           MARCELLUS A MCRAE, ESQ.
                           Gibson Dunn and Crutcher LLP
                           333 South Grand Avenue
                           Los Angeles, CA 90071-3197
                           (213) 229-7675

                           Theano Evangelis Kapur
                           Gibson Dunn and Crutcher LLP
                           333 South Grand Avenue
                           Los Angeles, CA 90071-3197
                           (213) 229-7726

Intervenor Cangress        SHAYLA RENEE MYERS, ESQ.
doing business as          Legal Aid Foundation of Los
Los Angeles                Angeles
Community Action           1550 West 8th Street
Network (LA CAN)           Los Angeles, California 90017



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

3

WITNESSES

PAGE

MICHELE MARTINEZ
        Cross-Examination by Ms. Kaounis                  5
        Redirect Examination by Ms. Mitchell            117
        Direct Examination by Ms. Meyers                134
        Recross Examination by Ms. Kaounis              140

HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

4

Los Angeles, California; Wednesday, June 4, 2025

--o0o--

(Call to Order)


THE COURT:  Okay.  So, Counsel, we're back on the record.  All counsel are present.

Have you had enough time with Carlin (phonetic) for submission of your exhibits?

MR. SCOLNICK:  I'm sorry, Your Honor.  I missed that.  The exhibits?  We're finalizing now.  We're going to have it to your staff in the next ten minutes.

THE COURT:  So they're still not finalized?  Because I don't see how we argue this matter until that list is finalized.

MR. SCOLNICK:  Understood.  We're going to get it to you in ten minutes or so.

THE COURT:  Okay.

MR. SCOLNICK:  Thank you.

THE COURT:  All right.  Then we're back -- okay.  Then we're back on the record.  All parties are present.

If the Special Master would retake the stand.  Thank you.  The same oath applies that was administered to you yesterday.  Do you recall that oath?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Thank you very much.



5

Counsel, if you'd like to continue with cross-examination, please.

MS. KAOUNIS:  Yes, Your Honor.

Is the Special Master ready?

THE WITNESS:  I am.  Yes.

MS. KAOUNIS:  Okay.

MICHELE MARTINEZ,

was called as a witness, and having been previously sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MS. KAOUNIS:

Q    I want to turn back to your second report which is Exhibit 93.  On page 20 in the second bullet --

THE COURT:  I want you to please help me by putting that up on the screen.  Thank you so much.

BY MS. KAOUNIS:

Q    Under reconcile compliance, your report recommends implementing quarterly compliance audits accompanied by judicial oversight to avoid persistent miscalculations.  Do you see that?

A    Yes.

Q    Quarterly compliance audits are not a requirement of the settlement agreement; correct?

A    Can you restate your question?

Q    You understand that quarterly compliance



audits are not required by the settlement agreement?

A    Yes.

Q    On that same page under "clarify encampment resolution," the report states "ensure that the City programs for encampment removals are excluded unless accompanied by documented housing placements."  Do you see that?

A    Yes.

Q    Okay.  Again, though, the settlement agreement does not require documented housing placements for a program to be considered an encampment removal; correct?

A    It does require offering.

Q    Right.  And we established yesterday, right, the difference between offering and actually placing someone; correct?

A    Well, when you offer most likely they are going to take the bed if it's the appropriate accommodation.

Q    An offer is not the same thing as an acceptance; correct?

A    True.

Q    And encampment reduction to your knowledge is not defined in the settlement agreement; correct?

A    I think -- I have to go back but I do



believe the encampment they use the loss of definition, and I think it's in -- I would have to go back and read, but to my recollection, off the top of my -- I have to read the agreement again.

Q    Well, let me point you to Exhibit 25 under the terms in Section 1, is definitions.

A    Okay.

Q    You don't see encampment reduction defined there; correct?

A    Correct.

Q    Okay.  And you heard Mr. Szabo in his testimony define encampment reduction as the City taking possession of a tent, makeshift shelter, or vehicle.  Do you recall that testimony?

A    I do.

Q    Okay.  So using Mr. Szabo's definition, you're not saying that a care plus operation cannot achieve an encampment reduction; right?

A    That's -- I'm not in a position to answer that.  As you stated prior, I'm not an attorney.  It's not --

Q    Okay.

A    Thank you.

Q    On that same page, 20, the first bullet under address fiscal sustainability, it says, "mandate the

8

City to disclose funding gaps that could impact milestone commitments"; correct?

A    Correct.

Q    Okay.  The report doesn't describe what milestone it is referring to here; correct?

A    Correct.

Q    And the report doesn't identify which funding gaps it is referring to here; right?

A    No.  But specifically, speaking to the doubts of the beds --

Q    Okay.

A    -- of the 12,915.  A funding plan should be provided.

Q    Okay.  So your statement in -- with respect to funding gaps here is associated with the idea that there would be a funding gap in connection with creation of beds; is that -- do I understand your testimony correctly?

A    Per council meetings, housing and homeless committee meetings, there's been statements that there is not a funding mechanism for the doubts of the 12,915, which is -- in my report I have 3,000.  Obviously, in the 2025 quarterly report because of the addition of the Inside Safe beds, that delta now is 1,902 if my recollection serves me correct.



Q    You understand that a variety of people can speak at city council meetings; correct?

THE COURT:  Counsel, would you move the microphone just a --

THE WITNESS:  I'm speaking in particular to --

THE COURT:  Counsel -- just a moment.  Just a moment.

Would you move that microphone just a little bit closer to you?

MS. KAOUNIS:  Sure.

THE COURT:  Thank you.  I appreciate it.

MS. KAOUNIS:  Is that better?

THE COURT:  Better.  Thank you.

THE WITNESS:  I'm speaking particularly to the policy makers and the staff.

BY MS. KAOUNIS:

Q    May I --

A    I'm not speaking about the audience or the public.

Q    -- may I finish my question?

A    Sure.

Q    You understand a variety of people can speak at city council meetings; correct?

A    In particular, I'm speaking about the elected officials and the City staff.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

10

Q      But you understand that's the case; correct?

A      Of course.  Public can comment.

Q      And that doesn't mean that even if a city council member speaks at a meeting, that they're authorized to speak on the City's behalf with respect to the individual topic about which they're speaking; correct?

A      I'm going to disagree with that.

Q      Okay.

A      I'm a former elected official, and I understand the role that policymakers have.

Q      So it's your testimony that if one council member speaks and there are 15 districts that, that council member is giving the opinion of the entire city? Is that your statement?

MS. MITCHELL:  Objection.  Calls for speculation.  Lacks foundation.

THE COURT:  I'll allow the question, Counsel.

THE WITNESS:  It does not prevent the council member from giving their opinion.  They have every right.

BY MS. KAOUNIS:

Q      Right.  And that opinion is not necessarily the position --

A      It's not policy, but they have every right

to provide their opinion.

Q    Okay.  And speaking at the council meeting also does not mean that a person is necessarily informed on a particular topic; correct?

A    They have the right to deliberate.

Q    But you would agree with me that just because somebody speaks at a council meeting doesn't mean that they're necessarily informed on a particular topic?

MS. MITCHELL:  Objection.  Improper and incomplete hypothetical.

THE WITNESS:  It's not my position to answer that.  I'm not a staff member for the council members.

THE COURT:  Also, Counsel, when you ask that question, I'm not sure if you referred to city side or their district when they're speaking.  So --

MS. KAOUNIS:  Sure.

THE COURT:  -- I'm not precluding you from asking the question.

MS. KAOUNIS:  Sure.  I'm happy to break it down, Your Honor, and thank you for the clarification.

BY MS. KAOUNIS:

Q    You would agree that speaking at a council meeting doesn't mean that a person is necessarily informed on a particular topic as it relates to the City overall?

A    I cannot speak to that.



12

Q    Okay.  Speaking at a council meeting also doesn't mean that a person is correct about the facts on a particular topic as it relates to the City overall; right?

A    I cannot speak to that.

Q    You understand that the Alliance Settlement Agreement provides that it can only be modified in writing by the parties; right?

A    I'm not sure if I can answer that.  It's not my role.

Q    Okay.  Well, let's pull up Exhibit 25, if we could, and let's go to Section 18 which is on page 17, lines 14 to 16.

You see the bottom here that's highlighted that says, "Any alteration, change, or modification of or to this Agreement shall be made by written instrument executed by each party hereto in order to become effective."  Do you see that?

A    I do.  But you've made it very clear that I'm not an attorney, and it's not my role, and I don't have expertise in contract to interpret what it says.  But yes, I can read and I understand what it says.  Yes.

Q    Okay.  And in your understanding, taking into consideration that you're a lay person and you're not a lawyer --

A    Um-hum.

Q    -- you understand this to mean that the contract can only be modified by the parties in writing; correct?

A    That's what it says in the agreement.

Q    And this settlement agreement that we've been discussing, which is in front of you at Exhibit 25, is the Alliance settlement agreement; correct?

A    Yes.  That's what it states here.

Q    You understand that the Alliance settlement agreement, therefore, cannot be modified by statements made by city council members in a meeting; correct?

MS. MITCHELL:  Objection.  Vague.  Ambiguous. Lacks foundation.  Calls for speculation.  Calls for a legal conclusion.

THE COURT:  Overruled.  You can answer that if you have an opinion.

THE WITNESS:  Not my position to answer.

BY MS. KAOUNIS:

Q    Well, let me ask it a different way.  Is it your position that a city council member can stand up at a meeting and unilaterally modify the settlement agreement that is Exhibit 25?

MS. MITCHELL:  Same objections, Your Honor.

THE WITNESS:  I don't represent the City

14

council.

BY MS. KAOUNIS:

Q    So you don't have an opinion one way or another or an understanding, I should say, one way or another about whether a city council member can stand up at a meeting and unilaterally modify a contract --

MS. MITCHELL:  Same --

MS. KAOUNIS:  One second.

BY MS. KAOUNIS:

Q    -- between the City and the Alliance; is that correct?

A    I'm not an attorney.

MS. MITCHELL:  Same objection.

BY MS. KAOUNIS:

Q    You understand that the Alliance settlement agreement cannot be modified by words that are merely uttered in an unsigned --

A    It's not my role to interpret this agreement, as you told me in the past, because I'm not an attorney.

Q    Okay.  Let's go back to Exhibit 93, please.

You would agree that there's nothing in the settlement agreement pursuant to which the City has agreed it would disclose funding gaps that impact milestone



15

commitments; right?

A     Not in the agreement but in conversations, yes, that were had with the parties.

Q     And just to clarify for the record, are you referring to conversations in the context of mediation discussions?

A     No.

Q     Okay.

A     Actually, here in court, public hearings.

THE COURT:  Just a moment.

Do you have the right document that you're referring to on the screen?

MS. KAOUNIS:  Yes.  This is 93, Your Honor --

THE COURT:  Thank you.

MS. KAOUNIS:  -- I believe.  Yes.

BY MS. KAOUNIS:

Q     You would agree that there's nothing in the milestone stipulation where the City agrees that it has to disclose funding gaps that impact milestone commitments; correct?

A     No.  It just provides numbers.

Q     Going back to Exhibit 93 on page 20, under expanding oversight mechanisms, the report recommends the City develop a public facing compliance tracking system; correct?



16

A     Correct.

Q     Okay.  But there's no requirement of such a system in the settlement agreement with Alliance; correct?

A     Well, in many of the hearings the City and the county went back and forth with Your Honor here in regards to providing data publicly.  And the City and the City controller's office, and including the county, have now created public websites to provide information on funding, and transparency, and accountability, invoices of such, et cetera, regarding to this agreement.  And those two websites are public.

Q     I understand.  But if the City offers to do something more than it is contractually obligated to do, you would agree with me that, that doesn't mean that the settlement says it has to do that thing; correct?

MS. MITCHELL:  Objection.  Vague.  Ambiguous.  Calls for a legal conclusion.

THE COURT:  Do you understand the question?

THE WITNESS:  I do, but it's not my role to answer that question.

BY MS. KAOUNIS:

Q     Well, let me ask it a different way.  You and I enter a contract and I agree to pay you $100 to take a family photo of my family.  Okay?  You do a fabulous job

and I decide I'm going to give you a 25 percent tip.  Are we on the same page?

A    It's not my role to interpret hypotheticals.

Q    Well, I just want to see if we can understand the contractual obligation here since you're talking about different contractual provisions in the agreement.  So let's see if we can work through this, and you can tell me you can't answer it if that's the case.

If I provide you $125 as a result of you providing the service, you would agree with me that the contract didn't require me to give you $125.  It only required me to give you $100; right?

MS. MITCHELL:  Objection.  Improper, incomplete hypothetical, lacks foundation, and calls for speculation and a legal conclusion.

THE COURT:  You can answer it if you can.

THE WITNESS:  I'm not in a position to answer that.

BY MS. KAOUNIS:

Q    On the same page under urgent corrective actions, the report recommends that the City develop a formal funding plan; correct?

A    That's what it states.  Yes.

Q    And that's not a requirement of the



settlement agreement as far as you're aware; correct?

A   No.

Q   Okay.  In fact, the settlement agreement says funding of housing and shelter opportunities created by the City shall be at the City's sole discretion; right?

A   Correct.

Q   On page 21 you state that if certain units slash beds are absent from losses inventory, the City must provide comprehensive data on their location management and oversight; correct?

A   Yes.  That's what it states.

Q   And that's not a requirement of the Alliance settlement agreement --

A   Section 7.2 indicates that the parties were going to get a third party expert.  It's not my job to validate any of these beds to ensure the compliance of what they were going to report to the Court.  It is the responsibility of the City to provide the validation and verification of those beds being created.

Q   Let's go to 7.2.  That's Exhibit 25 for the record.  We're going to pull that up.

So why don't you go ahead and read 7.2 just to make sure we're both looking at the same text.

MS. KAOUNIS:  And for the record again, Exhibit 25 the Alliance settlement agreement.



THE WITNESS:  I see it.

BY MS. KAOUNIS:

Q    Okay.  Could you read that, please?

A    Yes.  "The parties will engage in a mutually agreed upon third party to provide data collection, analysis, comments, and regular public report on the City's compliance with the terms of this agreement. The City shall be responsible for paying all fees, if any, or for obtaining grants or other private funding, if needed."

Q    Okay.  And you understand that to mean exactly what it says, right, that the parties will engage a third party to provide data collection; correct?

A    Correct.

Q    Okay.  And the City will pay for that; correct?

A    Correct.

Q    And there's no reference here to the term burden; correct?

A    Well, it's the responsibility, as just mentioned.  It's my role to ensure the terms of the agreement, which they're supposed to provide in a quarterly report, is in compliance.  It is not my responsibility -- forget the word burden -- it is the responsibility of the City to provide the verification and



20

validation of the beds they are creating.  That's not my role.  And 7.2 has not been complied with.

Q    For the record, we're in 7.2 --

A    Have the parties engaged in a mutually agreed third party?  Can you provide to me anywhere in the docket or provide it to the Court that this section has taken place?

Q    Well, for the record, you do understand that the parties means both parties need to actually agree upon a third party to do that data collection; correct?

A    Correct.

Q    Okay.  So it's not the City's sole burden as you suggest it is; correct?

A    In regards to compliance, yes, it is.  To provide the documents, the data, to verify that those beds have been created or are in process.

Q    I want to make sure we're reading the same provision.

A    I'm reading the same provision.

Q    Your statement just now is that it's the City's burden to provide the data, but the provision we're looking at here at 7.2 says, "The parties will engage a mutually agreed upon third party to provide data collection."  Am I correct?

A    I used the word responsibility not burden.

Q    You used the word burden yesterday for the record.

A    But we're speaking about this today, and I used the word responsibility.

Q    Okay.  So your use of the term "burden" yesterday was incorrect then?

A    No.  But today, if you want and you're trying to validate what my statements are, I did not use the word burden.  I used the word responsibility today.

Q    Okay.  Let's go with responsibility today, understanding that burden doesn't appear in 7.2.

Just to be clear, your position is that this provision requires it is the City's responsibility to provide data, although the plain language of 7.2 says, "The parties will engage a mutually agreed upon third party to provide data collection"; correct?

MS. MITCHELL:  Objection.  Argumentative.  Calls for a legal conclusion.  403.

THE COURT:  You can answer the question.

THE WITNESS:  Your Honor, I cannot speak to communications that I've had with the parties here publicly in regards to 7.2.

MS. KAOUNIS:  I'm not sure I understand.  If the communications were public --

THE COURT:  She might be cautioning us that

there's been conversations concerning this with various elected officials.

MS. KAOUNIS:  Okay.

THE COURT:  I'll allow you to ask --

MS. KAOUNIS:  Sure.

THE COURT:  -- but I just warn you it's about --

MS. KAOUNIS:  Let's probe that.

THE COURT:  -- that --

MS. KAOUNIS:  Thank you.

THE COURT:  -- potentiality of opening a door here that you may not want to open.

BY MS. KAOUNIS:

Q   So are you suggesting by your testimony that you have had conversations with specific elected officials regarding the responsibility under 7.2?

A   I'm not going to answer that; not my role.

Q   On page 22 of your second report under court oversight you state that, "If the City does not present a detailed plan to address the systemic and structural issues identified by the A&M assessment at the next hearing on May 15, 2025, the Court may need to intervene."  Do you recall that?

A   Yes.  And that's based on the statement that the Court made to the parties that he wanted a plan from them.  And he, particularly Your Honor, addressed



those specifically to the elected officials that were present at the time.

Q   Okay.  And to be clear, though, there's no language in any document that the City ever agreed to in which it stated it was going to provide a detailed plan to address systemic structural issues in the assessment; right?

A   That's correct.

Q   And you submitted this report to the Court on May 14, 2025; correct?

A   Let me look at the date.  Date, May 13.

Q   Okay.  But it was filed with the Court, if I'm correct --

A   But you asked me when I submitted; I submitted it May 13.

Q   Okay.  Okay.  For the record, there's a docket entry number -- or docket entry date of 05/14/25 at the top of Exhibit 93.

So the deadline that you suggested on May 15 was two days after -- the deadline for the detailed plan was two days after you submitted this report to the Court; right?

A   Correct.

Q   On the same page in the middle under Special Naster recommendations, you recommended that the

City council establish a dedicated department to manage homelessness; correct?

A    Yes.

Q    And this department would develop and implement an independent homeless response system and consider becoming its own continuum of care; right?

A    A recommendation.  Yes.

Q    Okay.  And the words continuum of care system don't appear anywhere in the settlement agreement; right?

A    That's correct.

Q    At page 25 of Exhibit 93 under introduction, you state that the establishment of an independent fiduciary monitor appointed by the Court presents a strategic opportunity to rectify what you believe are systemic deficiencies in financial and management controls within the City's homelessness response system; right?

A    Yes, based on my observations and hearing the City council meetings, homeless, party committees, as well as the formation of the City homeless governance structure, reading that document, as well, and others.

Q    Okay.  But there is no reference in the Alliance settlement agreement to financial and management controls within the City's homelessness response system;

right?

A    That is correct.

Q    Okay.  And in fact --

MS. MITCHELL:  Excuse me, a belated objection.
Calls for a legal conclusion; lacks foundation.

BY MS. KAOUNIS:

Q    -- and in fact, the Alliance settlement
agreement does not commit the City to do anything with
regard to its homelessness response system; correct?

MS. MITCHELL:  Objection.  Calls for a legal
conclusion.  Misstates the settlement agreement.

THE WITNESS:  I'm not in a position to
answer that.

BY MS. KAOUNIS:

Q    Well, let's pull up the settlement
agreement.  Let's go back to Exhibit 25, please, and on
page 10, line 14, you'll see that there is a reference to
county responsibilities.  It's page 10 of the actual
settlement agreement.  I apologize.

THE COURT:  15.

MS. KAOUNIS:  Yes, 15.  Thank you.

BY MS. KAOUNIS:

Q    So you see where it says, "These county
responsibilities include, but are not limited to"?

A    Yes.



Q    And then if we go to the next page included under those bullets, at line 14, you'll see the reference to unified homelessness response center and increasing to at least ten the number of homeless outreach and mobile engagement teams; correct?

A    I cannot opine on that.  That's not something -- that's -- this is county obligations that were written by the City of Los Angeles and the parties not the County of Los Angeles.

Q    Okay.  On page 27 of your report, back to Exhibit 93, you recommended to systematically integrate the recommendations from the Alvarez & Marsal assessment into operation protocols overseen by the independent fiduciary duty; correct?

A    It's a recommendation.  Yes.

Q    Okay.  You're not aware of any agreement requiring the City to implement the recommendations of that assessment; correct?

A    This is a recommendation.

Q    And you can't point me to any agreement that the City made to implement the recommendations of that assessment; correct?

A    I cannot speak to this.  Communications are privileged.

Q    Okay.  And when you say communications are

privileged, I need to just probe the foundation for that. So --

A    There was discussions had with the A&M assessment team and the City of Los Angeles, and there were actually two elected officials present, which were Councilwoman Nithya Raman and Councilmember Bloomingfield in that meeting, and of course with the attorneys.  And there was -- I cannot go into what the discussions are, but there were conversations related to this.

Q    Okay.  Do you recall the date of those conversations, roughly?

A    If I could go to my notes, I can but I know it was sometime in April.

Q    Okay.  And just to be clear, you understand -- well, strike that.

You understand that the City in connection with the settlement agreement itself only agreed to pay for the assessment done by A&M; correct?

A    I would have to go back to the scope of work to read that.

Q    And when you say scope of work, you mean of --

A    Of the A&M assessment.  I don't have it in front of me, and I'm not 100 percent.  I'm still a little ill and so -- you know, and I don't have my notes before



28

me.  So I just can't recollect everything but, yeah, that scope of work was produced over 10 months -- 11 months ago.

MS. KAOUNIS:  Your Honor, may I have a moment?

THE COURT:  Certainly, if you'd like to consult with Counsel.

MS. KAOUNIS:  Thank you.

BY MS. KAOUNIS:

Q    A couple points of clarification.

Are you okay to proceed or are you too ill to proceed?

A    I can proceed.

Q    Okay.  If at any point you feel you need a break, please let us know.

A    Thank you.  I appreciate it.

Q    Okay.  And going back to the foundation for just a moment, I don't want to probe into settlement communications but you had mentioned that you'd like to go to your notes.

Are you able to tell me what documentation you would refer to in order to understand the scope of the City's obligations with respect to the Alvarez & Marsal assessment?  It's only if you know; if you can recall.

A    I can't recall.

Q    Okay.  You understand that LAHSA is not a

29

party to this settlement agreement; correct?

A    I am, but I am aware that LAHSA is a homeless administrator for the City of Los Angeles for some of its homeless programs and housing interventions. They're technically a subcontractor to the City of Los Angeles.

Q    Okay.  But to -- for the record to be clear --

A    For technical purposes, because that's what they are.

Q    Right.  LAHSA is not a party to the Alliance settlement agreement; correct?

MS. MITCHELL:  Objection.  Calls for a legal conclusion.  This was the subject of briefing.

THE COURT:  I'm going to sustain that, Counsel.

BY MS. KAOUNIS:

Q    You point to over $500 million administered throughout LAHSA that supposedly could not be definitively verified as potential noncompliance and mismanagement in your report; correct?

A    In the Alvarez & Marsal assessment, yes; recommendations, yes.

Q    It wouldn't surprise you that LAHSA and not the City of Los Angeles is the subject of many of the comments made in that report; correct?

30

MS. MITCHELL:  Objection.  Vague.  Ambiguous.

THE COURT:  That's fine, Counsel.  You can –

THE WITNESS:  Well, LAHSA is the custodial of data for the City of Los Angeles, so of course LAHSA would be included.  But ultimately, the responsibility falls squarely on the City of Los Angeles and not LAHSA.  So we are talking about the City of Los Angeles here today.  I have never referenced LAHSA being part of this agreement.  The key responsibility, regardless of who has their data, who's the custodial, that responsibility falls squarely on the City of Los Angeles.

BY MS. KAOUNIS:

Q    Okay.  And just to be clear, when you said "this agreement," for the record, you were referring to the Alliance --

A    The LA Alliance --

Q    -- settlement agreement?

A    -- settlement agreement.  Yes.

Q    Okay.  Going back to paragraph 93 of your recommendations.  The first paragraph, you recommended that the City council establish a dedicated department to manage homelessness; correct?

A    Correct.

Q    Okay.  You're aware that the City has approved the creation of the bureau of homelessness



oversight; right?

A      Yeah.  And performance management.  I'm very aware.

Q      Okay.  And you attended the City council meeting on May 22, 2025?

A      Online.

Q      Okay.  And you're aware that the budget approved in that meeting included the creation of the bureau of homelessness oversight; right?

A      Correct.

Q      Okay.  And you're aware that this bureau is intended to utilize staff from across city departments who are already working on homelessness under one umbrella; right?

A      Correct.  In particular, from the CAO's office that will be transferred to the LA Housing Department.

Q      Okay.

A      Yes.

Q      And you're aware that the bureau intends to bring together data and staff to improve performance and coordination across the City's homelessness response system; right?

A      Correct.

Q      Okay.  And --



A     And when you mean homelessness response system, do you mean the regional homeless response system or are you talking specifically about the City of Los Angeles component in the homeless response system?

Q     Forgive me if --

A     So I can restate my question.

Q     -- sure.  Sure.  Forgive me if my question was unclear.  I thought I said the City's homelessness response system, but if I didn't let me restate the question.

You're aware that the bureau intends to bring together data and staff to improve performance and coordination across the City's homelessness response system; right?

A     Correct.

Q     Okay.  So you'd agree that the action by the City council that approved the budget for this bureau would render superfluous, at least a portion of your recommendation, to create a department to address the City's homelessness response system; right?

A     I would have to go back to my notes, but it's not my understanding that there was actually a budget allocated to that specific new bureau.  But I would have to go back to my notes to be able to reference that.  So I cannot speak to if the City actually approved funding for

that specific bureau.

Q    Well, you understand that the bureau has been approved; correct?

A    Yeah.  I understand it's been approved, but there's a big difference of it being funded.

Q    And to the extent that the bureau is meant to provide one city department to oversee the homelessness response in the City, you would agree that, that is at least partially duplicative of the recommendation you made to also create a department for that purpose.; correct?

MS. MITCHELL:  Objection.  Argumentative.

THE COURT:  Overruled.  You can cast that opinion if you want.

THE WITNESS: Yeah.  My opinion is based on watching all those needs and watching the homeless and council committee meetings as they discuss this.  So yes.

BY MS. KAOUNIS:

Q    Okay.  In your report -- let's go to page 25, please -- in the first sentence recommends the establishment of an independent fiduciary monitor appointed by the Court; right?

A    Yes.  A recommendation.  Yes.

Q    And the City would pay for that monitor; right?

A    It's not my role to talk about that.  That

34

is up to the Court if it entertains that.  That's not my role.  I'm providing a recommendation.

Q    Okay.  Do you have any understanding as to who would pay for it?

A    It's not my role --

Q    Okay.

A    -- to answer that.

Q    You don't expect somebody other than the City to pay for it; correct?

A    It's not my role to answer that.

Q    You don't have any expectation about who would pay for it; is that right?

A    Not my role to answer that.

Q    Have you spoken to anyone about the possibility that you might be appointed as the fiduciary monitor in this case?

A    No.  I'm not qualified for that role.

Q    Okay.  Let's go to page 27 if we could of Exhibit 93.

In the first sentence under the second heading your report recommends to extend the current settlement agreement until 2029; correct?

A    Yes.  It's a recommendation based on the Court asking both the City and county to extend their agreements.

Q    Okay.  And you understand that the Alliance settlement agreement says the parties to the settlement would need to agree to extend it; correct?

A    When I'm reading the agreement that's what it says.

Q    Okay.

A    Yes.

Q    And on the same page of Exhibit 93, page 27, the third bullet under oversight, your report also recommends "to empower the Special Master, an independent fiduciary, to develop a transition strategy away from LAHSA."  Do you see that?

A    That's a recommendation.  Yes.

Q    Okay.  And that Special Master is you; right?

A    Correct.

Q    Okay.  So your report contemplates that you would be performing such oversight for some period of time after the parties' agreement ends in 2027; correct?

MS. MITCHELL: Objection.  Vague.  Ambiguous.  Calls for a legal conclusion.

THE COURT:  Do you understand the question?

THE WITNESS:  No.

Can you restate that?

BY MS. KAOUNIS:



Q    Oh, sure.

So your report contemplates that you would be involved in performing some type of oversight with respect to the parties' obligations that postdate the term of the agreement in June 2027; correct?

A    I cannot opine. The Court has not taken this into consideration.

Q    Okay. So you have not contemplated that you would have any involvement with regard to post-termination of the Alliance settlement agreement in this action?

A    It's not my role. It's a recommendation.

Q    I understand. But I'm asking you, you have not contemplated that you would be involved past June 2027 in any way with regard to the parties' relationship in this matter?

A    I don't know what the future holds, ma'am. I cannot speculate.

Q    Okay. You get paid on an hourly basis for your work in this matter; correct?

A    Correct.

Q    And you entered into an initial contract with the City regarding your work in July 2022; right?

A    Correct.

Q    And under that initial contract, you were

paid approximately $96.15 per hour; correct?

MS. MITCHELL:  Objection.  Relevance.

THE WITNESS:  I would have to go back but I --

THE COURT:  Just a moment.  Overruled.  You can ask those questions but -- ask the questions.

MS. KAOUNIS:  I have to do my job, Your Honor.

THE COURT:  No.  No.  Please.  You're more than welcome to.  I think you're getting into a very interesting territory because I surrounded myself with people who didn't accept payment for many years, almost seven years before to make sure they were virtuous.  And if you get into this area, you're going to find that she probably worked for free for about -- just because of interest -- for about five years.  And that's part of the record before, so I'm going to let you get into that but I think it's -- okay.  Counsel, you can ask your questions.

MS. KAOUNIS:  I'm aware of the pro bono work.

THE COURT:  Okay.  All right.  Please ask the question if you want to.

THE WITNESS:  My hourly rate was $90 per hour, not $96.

BY MS. KAOUNIS:

Q    Okay.  There was an annual cap of $200,000 per year in that initial contract; is that correct?

A    That is correct.



Q    And you operated under that agreement from July 2022 to June 2024; correct?

A    Correct.

Q    And during the first year you reached the annual cap; right?

A    I did not.

Q    Do you recall how close you got to it?

THE COURT:  I'm sorry, Counsel.  Could you say it a little bit slower?  Just re-ask the question.

MS. KAOUNIS:  Sure.

BY MS. KAOUNIS:

Q    In that first year, did you reach the annual cap?

A    I did not.

Q    Do you recall how close you got to it?

A    Not very close.

Q    How about in the second year, did you reach the annual cap?

A    No.

Q    Do you recall how close you got to it?

A    I would say 70 percent.

Q    Okay.  And in July 2024, you entered into a new agreement with the City; correct?

A    Correct.

Q    And that agreement is supposed to last



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

from June 2024 to June 2027; correct?

A    Correct.

Q    And under that agreement, your hourly rate went up for cost of living adjustment; correct?

A    Correct.

Q    And that rate is now $150 per hour; correct?

A    That is correct.

Q    And the annual cap for this new agreement is $300,000 per year; correct?

A    Correct.

Q    And during the past year, how much of that cap have you charged the City?

THE COURT:  Could you repeat that?

BY MS. KAOUNIS:

Q    During the past year, how much have you --how much have you charged the City?

THE COURT:  Thank you very much.  I appreciate it.

THE WITNESS:  $233,000.

BY MS. KAOUNIS:

Q    Okay.  Do you do any work outside of this case as a Special Master?

A    In this past year, 99 percent of my work has been pertaining to this case.



40

Q    Okay.  So if this case ended and you were no longer serving as a Special Master, you would go out and look for other work then?

A    Of course.

Q    Okay.

A    I've been offered jobs many times and I've declined

Q    The City right now pays for the work, though.  I'm not sure I established -- for the record -- the contract the City is paying for that; correct?

A    Correct.

Q    And as it relates to post-June 2027, have you offered to volunteer as a Special Master?

A    Most definitely, I would always do my very best.  I am a public servant.  I have been for my entire career, and I will continue to do whatever I can to help Angelinos and this entire region to address this problem. I'm committed and I have been committed.

I did pro bono work for Judge Carter as a Special Master from 2018 to 2022.  So that, I think, is a testament to my commitment to the unhoused community and to the City of Los Angeles, and County of Los Angeles, and the other 86 cities that I have been helping.  If they call to, you know, provide any kind of support, I've been open to that.

41

Q    Okay.  And just to be clear for the record, are you then suggesting that if you were to do work in this matter that post-dated June 2027, you would do so on a pro bono basis?

MS. MITCHELL:  Objection.  Calls for speculation.

THE WITNESS:  I did not say that.

BY MS. KAOUNIS:

Q    You testified yesterday that you were overseeing the A&M report.  Do you recall that?

A    Yes.

Q    Okay.  The scope of your services as covered by your contract with the City, however, doesn't mention overseeing the A&M report; correct?

A    Regardless of that, there were conversations here publicly if they were going to bring on someone else, another Special Master, to provide that assistance and to help the City of Los Angeles.  I offered and they agreed that I would oversee that on behalf of the City of Los Angeles.

Q    And just to be clear, when you say regardless of that, you agree that the scope of services does not include overseeing A&M -- the written document; correct?

A    Correct.

42

Q     Okay.  And then with regard to the statements that you just made about in court having discussions, do you recall the date of those discussions?

A     Not specifically, but they were -- if my recollection serves me -- it was sometime in April.

Q     Is that April 2025?

A     '24.  Yes.

Q     Oh, '24.  Okay.

A     April -- May.  Yes.  The Alvarez & Marsal contract was not signed until June because we went back and forth with the parties.

Q     And who on behalf of the City do you believe made a statement with regard to your oversight of the A&M contract, if you recall?

MS. MITCHELL:  Objection.  Vague.  Ambiguous.

THE COURT:  Overruled.

THE WITNESS:  I don't recall.

BY MS. KAOUNIS:

Q     Your report also recommends -- this is on page 28 -- mandating the creation of a new bed plan and strategies for encampment resolution ensuring endorsement by the LA Alliance; right?

A     That's what it says.  Yes.

Q     Okay.  This recommendation means that the City cannot implement a new bed plan or strategy for

encampment resolution without the endorsement of the unelected members of the LA Alliance; correct?

A    It's a recommendation.

MS. MITCHELL:  Objection.  Calls for a legal conclusion.

THE WITNESS:  Is my reading --

THE COURT:  Hold on.

MS. KAOUNIS:  I'm sorry.

THE COURT:  You're cutting each other off.  Overruled.

And you said this was a recommendation?

THE WITNESS:  Yes.  To the Court.  Yes.

THE COURT:  Okay.  Thank you.  I think we have a record now.

BY MS. KAOUNIS:

Q    But is my reading of this recommendation correct?

A    The recommendation, yes, to the Court.

Q    Okay.  Page 16, the last bullet, your report notes that it is understood it is the sole discretion of the City to choose its interventions; right?

A    Yes.

Q    And appointing a receiver would deprive the City of that discretion; right?

A    I'm not in a position to answer that.



Q    Okay.  You don't know one way or the other?

A    I'm not in a position to answer that.

Q    Okay.  I know that you stated you would not be considered for a receivership position.  If the Court were to appoint somebody to monitor the receivership, would you like to be considered for that position?

MS. MITCHELL:  Objection.  Relevance.

THE COURT:  That's used in two different ways. That assumes a receivership and also includes the monitor within the receivership.

Do you mean monitor or receivership or is the question you're asking assuming a receivership and monitor within that?  I just want to be sure.

MS. KAOUNIS:  Yes.

THE COURT:  Those are two different --

MS. KAOUNIS:  And I appreciate the clarification.

THE COURT:  Thank you.

BY MS. KAOUNIS:

Q    Assuming your receivership and then a monitor within that, would you like to be considered for the monitor position?

MS. MITCHELL:  Objection.  Relevance.



45

THE WITNESS:  I'm not in a position to answer that.  The Court hasn't taken a position.

BY MS. KAOUNIS:

Q    You don't know today whether you would accept or decline such a position; correct?

MS. MITCHELL:  Objection.  Asked and answered. Argumentative.

THE COURT:  And which position is that?

MS. KAOUNIS:  The monitor position.

THE COURT:  Monitor.  Thank you.  Overruled.

You can answer the question.

THE WITNESS:  Yeah.  I don't know what the future entails for me, personally.

BY MS. KAOUNIS:

Q    Okay.  And just so it's clear for the record, you have not had discussions with anyone about whether you would continue to play a role in this case after the current agreement with the parties -- between the parties ends?

A    I have not.

Q    Okay.  Let's go to page 29 of Exhibit 93.

You state in the report that while the Inside Safe program has contributed to interim housing placements, its implementation lacks alignment with equitable service distribution across council districts;

right?

A    I am not going to -- I spoke on this matter. It is something that I -- was this in my -- this report? Is this the 2025 report?

Q    Yes.

A    Okay. Great.

Q    This is docket 904 and Exhibit 93, page 29, of your report.

A    Due to the statements of the -- of Mayor Bass in regards to Inside Safe as it pertains to being -- being able to audit a program, specifically in the mayor's office, this is something that she stated in court that the controller doesn't have the ability to audit Inside Safe. And so I leave this question up now up to the Court, if it is going to include any kind of Inside Safe beds into this agreement because of the lack of ability to -- for the City controller to audit the Inside Safe program or any program within the mayor's purview.

MS. KAOUNIS: Okay. I'm going to move to strike as nonresponsive, and I'm going to --

THE COURT: No. The answer remains.

MS. KAOUNIS: -- retry that.

THE COURT: The answer remains, Counsel.

BY MS. KAOUNIS:

Q    I want to retry that question because I



think you may have misinterpreted my question.

You noted that while the Inside Safe program has contributed to interim housing placements, its implementation lacks alignment with equitable service distribution across council districts; right?

A    That's what it says.  Yes.

Q    So you're not saying that just because everyone cannot benefit from a program -- or everyone who is unsheltered cannot benefit from a program -- it shouldn't be offered; right?

A    Can you restate that?

Q    Sure.  Your conclusion here is not suggesting that because not everyone who is unhoused -- well strike that.  That was poorly worded.

You're not suggesting that because a program cannot be used by all unhoused persons that means that it shouldn't be offered; right?

A    I still don't understand your question.

Q    You would agree with me that some people are benefitted by Inside Safe; right?

A    What do you mean by people?

Q    Some unhoused individuals are benefitted by being brought inside through the Inside Safe program; correct?

A    Yes.



48

Q    And just because not all unhoused people are brought inside, that doesn't mean the program shouldn't be offered; correct?

A    Of course not.

Q    Going back to Exhibit 25 which is the settlement agreement, on Section 3.3, if we could pull that up for the record.

Okay.  And you see Section 3.3 does not say that beds must be equitably distributed; right?

MS. MITCHELL:  Objection.  Lacks foundation. Misstates the document.

THE WITNESS:  If you give me a minute, I think it's somewhere else in a different section, if I can read. Thank you.

BY MS. KAOUNIS:

Q    Sure.  Of course.

And while the witness is reading, I'm going to grab some water.

A    Yeah.  Now that I've had the chance to read 3.3, it says, "The City agrees to implement an approach of equitably distributing housing and shelter solutions throughout the City."

Q    Right.  And housing and shelter solutions is not the same thing as beds; correct?

A    That's your interpretation.  That's not

mine.

Q    Okay.  Well, you would agree with me that the word "beds" does not appear in Section 3.3; right?

A    The actual word does not.  No.

Q    Okay.  Let's go back to your report at paragraph -- I'm sorry, page 12.  This is Exhibit 93.

The report says that not all Inside Safe beds count towards compliance with the Alliance settlement agreement.  Are you aware of that?

A    Yes.

Q    Okay.  There's no explanation for the assertion that not all Inside Safe beds count towards compliance --

A    According to the CAO in his housing and homeless committee meetings, he stated originally, and he stated here in testimony, that originally because the program was fairly new, they didn't know what the duration of these beds would be, temporary or end up being long -- a longer term.  And so those discussions were had, not just here, but in council meetings and in the homeless and housing committee meetings.

Q    Okay.  Just to be clear, my question was there's no reference in your report to that -- to facts underlying that statement.  What I heard you just state is that you heard in testimony in this proceeding that Mr.

Szabo said what you just articulated; correct?

MS. MITCHELL:  Objection.

THE COURT:  You dropped your voice, Counsel. Would you re-ask that question --

MS. KAOUNIS:  Sure.  Sure.

THE COURT:  -- please?

BY MS. KAOUNIS:

Q    There's no explanation in your report for the assertion that not all Inside Safe beds count towards compliance today with the settlement; correct?

MS. MITCHELL:  Objection.  Lacks foundation. Argumentative.

THE COURT:  Counsel, what are you referring to, please?

MS. KAOUNIS:  My apologies, Your Honor.  I didn't hear.

THE COURT:  You said in this document.  You've got something up on the screen.  Should I be looking at this?

MS. KAOUNIS:  Yes.  Exhibit 93 in the report.

THE COURT:  And what are you referring to?  In other words, what page are you on?  I expect it to go on the screen so I can see.

MS. KAOUNIS:  Oh, I'm sorry.  Page 12 of the report.



THE COURT:  Is this page 12?

MS. KAOUNIS:  Yes.

THE COURT:  Okay.  And then highlight that for me, please.

MS. KAOUNIS:  It's the first bullet.  Right. There we are.

THE COURT:  Okay.  Thank you.

MS. KAOUNIS:  Um-hum.

THE COURT:  All right.  Re-ask the question. Thank you, Counsel.

MS. KAOUNIS:  Sure.

BY MS. KAOUNIS:

Q    There's no authority cited in your report for this assertion that the Inside Safe program -- that pursuant to the Inside Safe program not all beds count for its compliance under the Alliance settlement agreement; correct?

A    Can you restate your question?

Q    There's no source provided here to support the sentence that's highlighted that the Inside Safe program, while contributing to housing efforts, not all beds count towards compliance under the Alliance settlement agreement; correct?

A    I just stated the source, the CAO, the housing and homeless committee, council meetings that I



observed and I watched.

Q    Okay.  But to be clear, I'm speaking about the document itself; right?  There's nothing cited in the document itself; correct?

A    Yes.

Q    Okay.  And you can't point to any place in the Alliance settlement agreement to refute that if a bed is open and occupiable, it counts towards the Alliance settlement compliance; correct?

MS. MITCHELL:  Objection.  Calls for a legal conclusion.

THE COURT:  If you can answer that, you may.

THE WITNESS:  I'm not in a position to answer that.  It's up to the parties and the Court if they're going to accept those beds.

BY MS. KAOUNIS:

Q    Well, nothing in the Alliance settlement agreement prevents the City from changing its mind about which beds it decides to count towards compliance and which beds it will not count for its compliance; correct?

MS. MITCHELL:  Objection.  The document speaks for itself.  And calls for legal conclusion.

THE COURT:  You can answer the question, if you can.

THE WITNESS:  In my opinion, with the two bed

plans that have been provided by the City of Los Angeles, that speaks for itself.

BY MS. KAOUNIS:

Q    Okay.  But I want to just focus on the agreement for a moment, if we can.  Nothing in the Alliance settlement contract prevents the City from changing its mind about which beds it will count towards compliance and which beds it will not.

A    Then the question is why did the City create two bed plans?

MS. MITCHELL:  Well, I'll withdraw that objection then.

BY MS. KAOUNIS:

Q    May I just get an answer to the question?  Are you aware of whether such language exists in the agreement?

A    I'm going based on the two-bed plans that the City created.

MS. KAOUNIS:  I'm going to move to strike as responsive.

BY MS. KAOUNIS:

Q    Can you point me to any language in the settlement -- in the Alliance settlement agreement -- that prohibits the City from changing its mind about which beds it is allowed to count for purposes of compliance?



54

MS. MITCHELL:  Objection.  Calls for a legal conclusion.

THE COURT:  Does that also encompass administration precedent from Garcetti to Bass?  In other words, when you say the City changing, we've gone over a period of time between two different administrations so --

MS. KAOUNIS:  Yeah.

THE COURT:  -- when you ask that question -- I'm going to allow it -- I just want to understand with finiteness what you're asking.

MS. KAOUNIS:  I think it would, Your Honor.

THE COURT:  Okay.

MS. KAOUNIS:  Yeah.

THE COURT:  So the question basically is can the City -- if one mayor agrees to a certain, let's say the parameters of the bed plan, can the next mayor change that?

MS. KAOUNIS:  As long as the mayor --

THE COURT:  You ask the question.  My apologies.

MS. KAOUNIS:  Yeah.

THE COURT:  That's my confusion about the question.

MS. KAOUNIS:  Okay.  Okay.

BY MS. KAOUNIS:



Q    Can you point me to any language in the settlement agreement that prohibits the City from revisiting the manner in which it counts beds for purposes of compliance under the settlement agreement?

MS. MITCHELL:  Objection.  Calls for a legal conclusion.

THE COURT:  I'm going to let you answer that question.

THE WITNESS:  I'm not in a position to answer that.

BY MS. KAOUNIS:

Q    Okay.  So you can't point me to any provision as far you're aware?

MS. MITCHELL:  Objection.  Misstates the testimony.

THE COURT:  You can answer the question.

THE WITNESS:  I'm not in a position to answer that.

BY MS. KAOUNIS:

Q    The top of page 16 of your report, Exhibit 93, you note that the City's quarterly report docket 728 lists 3,018 beds slash units created, while your verified count -- or your verified inventory shows 3,033 beds, resulting in a discrepancy of 15 beds; right?

A    Correct.

56

Q    And if I'm reading this correctly, this means that the discrepancy was that the Special Master, yourself, actually found more beds that had been created not fewer beds than what the City had reported.  Is that accurate?

MS. MITCHELL:  Objection.  Vague as to found.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I'm just going based on what was in the quarterly reports.

BY MS. KAOUNIS:

Q    Right.  But I just want to clarify, what you're reporting here is that you actually found more beds than the City reported.

MS. MITCHELL:  Objection.  Vague as to found.

THE COURT:  Overruled.

THE WITNESS:  I didn't find.  It was in the report.  It was just not -- in the cumulative total it was not indicated.

BY MS. KAOUNIS:

Q    So your --

A    That's a big difference.

Q    -- so just to be clear for the record. Your assessment was that there were 15 more beds than what the City reported.  Is that accurate?



A    In the quarterly report, yes.

Q    Okay.  Page 17 of the report, first bullet, it says, "In 2024 approximately 2,000 beds were opened under the Alliance settlement.  This progress is concerning considering the settlement agreement which requires an additional 3,822 beds to be opened by the June 2027."  Do you see that?

A    Yes.

Q    Okay.  But you would agree with me that if 2,000 beds were opened in each of fiscal years 2025 and 2026, the City would exceed the bed creation goal of 3,822 beds under the Alliance settlement agreement by mid-June 2027; correct?

A    Can you repeat that?

Q    You would agree that if 2,000 beds were opened in each of fiscal years 2025 and 2026, the City would exceed the bed creation goal of 3,822 beds under the Alliance settlement agreement by mid-June 2027; correct?

A    I'm not in a position to answer that.

Q    Well, it's math; right?  2,000 beds a year, two years; right?

A    Well, there are many factors that take account in regards to the funding mechanism, the funding staff, going into -- I could go on and on, you know, about, you know, how the City funds, how long it takes,

58

the construction.  There's always going to be different timelines.  As I mentioned yesterday in my testimony, there are three specific projects that are in process that may not come to fruition in June 2027, and the City is monitoring those efforts because things change.  They're fluid.

Q    Okay.  But your report recognizes that in 2024 approximately 2,000 beds were open; correct?

A    The cumulative total from 2022 to the present time, yes.

Q    That's not what the report says.  The report says in 2024 approximately 2,000 beds were opened under the Alliance settlement.  Do you see that?

MS. MITCHELL:  Objection.  Argumentative.

THE COURT:  Overruled.  Answer the question.

THE WITNESS:  I do, but I'm speaking about the cumulative total.

BY MS. KAOUNIS:

Q    I understand, but I'm asking you about this sentence.  Your report recognizes that in 2024 approximately 2,000 beds were opened under the Alliance settlement agreement; correct?

A    That's what it states.  Yes.

Q    Okay.  So if the City would simply maintain its rate of bed creation from 2024 through the

59

end of the agreement, you would agree that 4,000 beds would be created under that same rate; correct?

    A    That's a hypothetical.  I'm not in the position to answer that.

    Q    Okay.  You would agree that if the City maintained its rate of bed creation from 2024, it should exceed its bed goal by approximately 175 beds; correct?

    MS. MITCHELL:  Objection.  Lacks foundation; calls for speculation.

    THE COURT:  Overruled.  You can answer it, if you can.

    THE WITNESS:  Same position as my last statement.

BY MS. KAOUNIS:

    Q    So you're not willing to agree that if the City maintains its bed creation rate, it will not -- it will exceed its goal?

    MS. MITCHELL:  Same objection.

    THE WITNESS:  I'm not in s position -- I use my same statements as prior.

BY MS. KAOUNIS:

    Q    And you're likewise not in a position then to state that the City won't reach its goal; correct?

    MS. MITCHELL:  Same objections, Your Honor.

    THE WITNESS:  I'm just going based on what was



stated in reports.

BY MS. KAOUNIS:

Q    So you're not in a position to state whether the City won't reach its goal; correct?

MS. MITCHELL:  Same objections, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  If the City provides the verification and validation of those beds that are in process or created, and provide it to the Court, then I could opine.

BY MS. KAOUNIS:

Q    So you're not in a position one way or another to opine about whether or not the City will meet its bed creation goal; is that your testimony?

A    I stick to my prior statement.

Q    I just want to clarify for the record.  Is that your testimony?

MS. MITCHELL:  Objection.  Asked and answered. And harassing the witness at this point, Your Honor.

THE COURT:  Overruled.  You can ask one more time if you'd like.

BY MS. KAOUNIS:

Q    You're not in a position to state one way or another whether the City will meet its bed requirement in June 2027; correct?



A    I'm in the same position as I stated in my last statement.

Q    And that is that you won't -- you're not in a position; correct?

A    I already stated my position.

Q    Okay.  You can't say that verification and data will not be provided as you requested by June 2027; right?

A    It has not been provided thus far.

Q    And we're two years from June 2027; correct?

A    That is correct.

Q    So you can't say whether the data and verification will be provided by that date or not; correct?

A    I'm going to leave that up to the Court to decide.

Q    There's no language in the settlement agreement that prevents the City from refining its policies from one administration to the next in regards to how it counts beds towards compliance.

THE COURT:  Counsel, I don't understand that.  That's ambiguous for me, the refining.

MS. KAOUNIS:  Okay.  Okay.

THE COURT:  I don't understand the question.



62

BY MS. KAOUNIS:

Q    You're not aware of any language in the settlement agreement that prevents the City from changing its mind from one administration to the next about how it counts beds in compliance with the settlement agreement; correct?

MS. MITCHELL:  Objection.  Vague.  Ambiguous.

THE COURT:  Overruled.

THE WITNESS:  I don't understand the question. Can you restate it?

BY MS. KAOUNIS:

Q    You're not aware of any language in the Alliance settlement agreement that prevents the City from changing its mind about which beds it will count towards compliance with the settlement agreement; correct?

MS. MITCHELL:  Objection, Your Honor, calls for a legal conclusion, asked and answered.

THE COURT:  No.  This is -- overruled.

THE WITNESS:  It talks about housing solutions. You told me beds were not included in this agreement.  So why are you referencing beds?

BY MS. KAOUNIS:

Q    I'm simply asking if you're aware of --

A    You just said --

Q    -- language --



63

Q    -- that in the agreement prior statements -- you've told me that beds were not in the agreement.  So which one is it?  Is it housing solutions or is it now beds --

Q    Okay.

A    -- that you're speaking of?

Q    So you would agree that there is no reference to beds and so there couldn't be a reference or prohibition in the Alliance settlement agreement on how the City from one administration to the other counts beds; correct?

MS. MITCHELL:  Objection.  Compound. Argumentative.  Misstates the testimony.  Calls for a legal conclusion.

THE COURT:  If you understand the question, you can answer the question.

THE WITNESS:  I do not.

THE COURT:  Okay.  All right.

BY MS. KAOUNIS:

Q    Well, we both agree that the settlement agreement doesn't reference beds; right?

A    Yes.

Q    So --

MS. MITCHELL:  Excuse me.  Objection as to the word "reference."



THE COURT:  Counsel, finish your question, please.

BY MS. KAOUNIS:

Q   So if we both agree that the settlement agreement does not use the term "beds," then we can both agree that there is no prohibition in the agreement that states the City is required to count beds a certain way or not during any given administration; correct?

MS. MITCHELL:  Objection.  Argumentative. Misstates the document.  Calls for a legal conclusion. Speculation.

THE COURT:  Overruled.  If you have an opinion, you can cast it.

THE WITNESS:  I'm not in a position to answer that.

BY MS. KAOUNIS:

Q   Page 18 of your report at Exhibit 93, last paragraph, first sentence says, "Judicial site evaluations through 2024 identified instances of unhoused individuals being relocated without proper adherence to formal dispute resolution procedures"; correct?

A   That's what it says.  Yes.

Q   The report doesn't identify where this is occurring; correct?

THE COURT:  I'm sorry, Counsel.  Could you say



that again?

BY MS. KAOUNIS:

Q    The report does not verify where this is occurring.

THE COURT:  Where this is?  I didn't hear the last part.

MS. KAOUNIS:  Where this is occurring.

THE COURT:  Thank you very much.  I'm sorry.

THE WITNESS:  No.  They're my observations out in the field.

BY MS. KAOUNIS:

Q    Okay.  And the report doesn't state when this is occurring; correct?

A    Correct.

Q    And the report doesn't state to whom this is occurring; correct?

A    Correct.

Q    You mentioned that these were your observations in the field.  Did you keep contemporaneous notes of those observations?

A    I kept notes.  Yes.

Q    And those notes have not been provided to the parties or the Court --

A    Correct.

Q    -- correct?



66

MS. KAOUNIS:  I would for the record, Your Honor, make a request that any notes that are not reflective of the deliberative process privilege or a mediation, that those be turned over to the Court and the parties.

MS. MITCHELL:  I think that violates numerous privileges, Your Honor, particularly --

THE COURT:  It's going to, Counsel, because a lot of information is conveyed to the Court.

MS. MITCHELL:  Yeah.

THE COURT:  And it's going to have the same privilege that the City is claiming.

MS. KAOUNIS:  Okay.

BY MS. KAOUNIS:

Q    You would agree with me that when you're trying to address an issue or solve a problem, it's helpful to know the details of that issue or problem; right?

MS. MITCHELL:  Objection.  Vague and ambiguous.

THE COURT:  Please restate that.  I don't understand the question.

MS. KAOUNIS:  Well, the Special Master has just identified -- or just confirmed -- that she didn't identify when the issue, where, or to whom this was occurring on page 18 of her report, and I'm simply --



THE COURT:  My apologies.  You can ask the question.

MS. KAOUNIS:  Sure.

BY MS. KAOUNIS:

Q    I'm simply asking, you would agree that when you're trying to address an issue or solve a problem, it's helpful to know the details of that issue or problem; right?

A    Yes.  But in the context of communications that I'm having, it's very difficult at times to be able to highlight all of this in a report, especially when I'm communicating with elected officials, with the unhoused community, and the Court.

Q    Okay.  But without the details of a particular observed event, it's not particularly informative to the City to just generally identify instances of unhoused individuals being relocated without supposed adherence to the formal dispute resolution process; right?

A    They had an opportunity in my '24 report and this report to communicate with me to expand my conversations, and in particular regarding this item.  I'm always happy to speak to the City of Los Angeles.  I've always made myself open and available to helping understand the issues.

68

Q      You would agree with me that if there were particular incidents that required attention or remediation, it would be helpful to call that out in the report so that the City could investigate it as soon as possible; correct?

A      I don't agree.

Q      Page 19 of the report, please, third bullet under encampment.

This makes reference to persistent reporting discrepancies.  Do you see that?

A      Yes.

Q      The report doesn't identify the specific reporting discrepancies; correct?

A      Yes.

Q      Okay.  And the report doesn't provide a basis for the statement that such errors are persistent; correct?

A      Can you restate your question?

Q      The report doesn't provide a basis for the statement that the reporting errors are in fact persistent; right?

A      There are inconsistencies in the -- in a lot of the quarterly reports.  They were fixed in the prior quarters and, as well, in 2024 there were some inconsistencies and we were able to address those.  And in

this report, there were some inconsistencies.

Q   Okay.  But it doesn't say that here.  It doesn't give the specifics here; right?

A   It does not.  No.

Q   Okay.  And the report also doesn't state whether these supposed discrepancies are material; right?

A   What do you mean by that?

Q   Well, the report doesn't explain whether these are overlooking a bed or two or overlooking a substantial number of beds or some other large figure that would impact, in your view, the City's ability to comply with its obligations under the Alliance settlement agreement; correct?

MS. MITCHELL:  Objection.  Vague and ambiguous.

THE COURT:  If you understand the question --

THE WITNESS:  I do not.

THE COURT:  -- you can answer it.

BY MS. KAOUNIS:

Q   The report doesn't say how large or small these discrepancies are; does it?

A   It does not.

Q   And in fact, when you raised a potential bed count discrepancy with the City in May of this year, the City attorney's office responded and provided you with an explanation; correct?



70

A     Yes.  They did.

Q     And --

A     For one council district, CD1.

Q     -- and in that same email the deputy city attorney told you to let the City attorney's office know if you needed additional information concerning the subject site; correct?

MS. MITCHELL:  Objection.  Vague and ambiguous. Lacks foundation.

THE COURT:  Do you understand the question?

THE WITNESS:  I do not.  Please rephrase.

BY MS. KAOUNIS:

Q     In that same email exchange that you had with the deputy city attorney's office, the City attorney's office told you if you had further questions to feel free and follow up; correct?

A     Yes.

Q     And you didn't follow up on that request; right?

A     I didn't because they helped with CD1.

Q     Okay.

A     Yes.

Q     Page 20 of your report, second bullet, under compliance refers to supposed persistent miscalculations that in your view require quarterly



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

compliance audits accompanied by judicial oversight; correct?

A    That's what it states.  Yes.

Q    The report does not identify what those persistent miscalculations are; correct?

A    Can you restate your question?

Q    You're not saying here what those persistent miscalculations actually are; right?

A    I mention in the tables -- there is reference, yes, in the tables in my report.

Q    So are you talking about a single miscalculation in your report or are you talking about persistent --

A    I'm talking about the table.  If you want to reference the table --

Q    Sure.

A    -- we could go to the key findings.

Q    And this is Exhibit 93; correct?

A    I don't know what your exhibit is.  I just have my report in front of me.

Q    Sure.

THE COURT:  Will somebody hand her a report? Are these the deltas they're referring to?

THE WITNESS:  No.  It's the report.  It's the table 1, city shelter compliance with 60 percent of PEH



standard based on city data provided to the Court.

THE COURT:  Okay.

THE WITNESS:  Quarterly reports.

BY MS. KAOUNIS:

Q     What page are you looking at?

A     15.

Q     15?

A     15.

Q     Okay.  So just to be clear for the record. It's your testimony that this table 1 at page 15 supposedly reflects persistent miscalculations by the City; is that right?

A     I say in my report it presents that there was independent review of potential overstatement in beds in process.

Q     Okay.  And that's different from persistent miscalculations; right?

A     I'm just stating what it says in my report.

Q     And you're not stating -- well, the report doesn't tie the supposed persistent miscalculations to compliance with the terms of the Alliance settlement agreement; correct?

A     Can you rephrase your -- I don't understand your question.

Q    Sure.  The report doesn't say that these supposed persistent miscalculations are somehow a violation of a specific provision of the Alliance settlement agreement; correct?

A    If the City can verify and validate its records, then there's no question here.

MS. KAOUNIS:  Would now be an okay time for a break?

THE COURT:  A perfect time.

MS. KAOUNIS:  Yeah.  Okay.

THE COURT:  Counsel, 20 minutes?

MR. SCOLNICK:  Yes.  Thank you.

MS. KAOUNIS:  Twenty minutes is fine.

THE COURT:  Twenty minutes.  All right.  Twenty minutes.  Thank you very much.

By the way, just as I paid the courtesy to Mr. Szabo, you can talk to any of the counsel if they want to talk to you.

(A recess was taken off the record.)

THE COURT:  Okay.  Counsel, we're going back on the record.

MS. KAOUNIS:  Yes, Your Honor.

MS. MITCHELL:  Yes, Your Honor.

THE COURT:  Okay.  Then we're back on.  We're on the record, Counsel.  Thank you.

74

All counsel are present.  The witness is present.

Continue your cross-examination, please.

MS. KAOUNIS:  Thank you, Your Honor.

BY MS. KAOUNIS:

Q    You're aware that the settlement agreement, Plaintiff's Exhibit 25, at paragraph 5, states that, "A dispute resolution process is required as to any dispute regarding the required number of housing or shelter solutions necessary to accommodate 60 percent of unsheltered city appropriate PEH in the City based on LAHSA's 2022 point in time count before enforcement under Paragraph 4 of the Agreement"; right?

A    Correct.

Q    Okay.  And paragraph 4 of the agreement discusses enforcement of public space regulations and ordinances; correct?

A    Yes.

Q    And there's no factual support cited in the report that the City is engaged in any enforcement under paragraph 4 relative to any persons experiencing homelessness; correct?

A    Can you restate that?

Q    There's no instances or examples cited in your report that the City is engaged in the enforcement



under paragraph 4 relative to persons experiencing homelessness; correct?

A    I still don't understand your question.

Q    There's no examples provided in the report of the City enforcing under paragraph 4 regulations against any homeless persons; correct?

A    What do you mean by enforcing?

Q    Well, engaging in the enforcement that is provided under paragraph 4; correct?

A    I cannot answer that.

Q    You're aware that the settlement agreement has a force majeure clause?

A    As you stated earlier, I'm not an attorney.

Q    But you're aware of Section 8.2; correct?

A    Yeah.  I've read it.  Yes.

Q    Okay.  And that clause provides that, "In the event of fires, floods, earthquakes, epidemics, quarantine restrictions, or other natural catastrophic occurrences, terrorist acts, et cetera, the obligations of the City are set forth in Section 3, 4, and 5 of this Agreement shall be paused, and the parties agree to meet and confer on any necessary and appropriate amendments to those obligations"; correct?

A    That's what it states there.



Q    Okay.  You understand -- and I'm only asking you for your understanding -- that the force majeure clause pauses the City's compliance obligations under the agreement in the event of fires, or other natural catastrophic occurrences, or a local emergency declared by the mayor; correct?

A    That's what it states here.  Yes.

Q    Okay.  And on January 7, Los Angeles experienced the Palisades fire; correct?

A    I don't know the specific date, but I know it was in January.

Q    Okay.

A    Yeah.  I'm not going to allude to a date that I'm not certain.

Q    Let's say for the record on or about January 7.  We can take judicial notice at a later time. Fair?

A    I'm still not -- I don't know -- I can -- I can look it up but I'm not going to give you a date that I'm not certain of.

Q    Okay.  On or about January 7, portions of Los Angeles also experienced severe windstorms; correct?

A    Santa Ana winds.  Yes.

Q    And on January 7, on or about January 7, Mayor Bass declared a state of emergency to amplify the

City's response to the devastating Palisades fire; correct?

A    I'm not aware of -- I'm not sure of the actual date.  So I cannot speak to that.

Q    But you are aware that at some point in early January, Mayor Bass declared a state of emergency in response to the Palisades fire; right?

A    Sometime in January.  Yes.

Q    Okay.  Knowing all of this, you didn't include any recommendations in your May 2025 report to address the fact that the City's obligation to comply under the agreement may be paused; right?

A    Yeah, because the parties were going back and forth, and there's motions to that, and I'm sure you've seen that on the docket, as it pertains to meet and confer.  That is something that's between the parties, obviously, not with me.  And I'm not sure if there was a resolution with that, so I did not speak to it.

Q    Okay.  So you're assessing the City's ability to comply with the Alliance settlement agreement by June 2027 without addressing that its obligations may have been paused because of the January 7 Palisades fire?

A    I cannot speak to that.  I'm not sure if they met and confer.

Q    Right.  My point is just that your

assessment in the report is not taking into account that the obligations may have been paused; right?

A    I cannot speak to that.

Q    Well, let me ask it differently.  You're not making any accommodations in the report suggesting that the City's obligations were paused because of the January 7 fire; correct?

A    Again, I cannot speak to that.

Q    Okay.  You can't speak to it one way or another?

A    Yeah.  In my '23 -- '24 report I spoke about the challenges and changes in city government, because I was aware of that and privy to that.  This issue, as I mentioned and I'll state again, this is a discussion that was out with motions on both sides as it pertains to this issue.  And I'm not sure if they moved forward with the meet and confer process, so I cannot speak to this issue.

Q    Okay.  Going back to the date you signed the report.  You signed the report on May 13, 2025; correct?

A    Yes.

Q    Prior to you signing and submitting the report to the Court, did anybody review the report?

A    Yes.



Q   Who reviewed it?

A   Judge Birotte.

Q   Okay.  Anyone else?

A   No, just Judge Birotte.

Q   Did Judge Birotte give you any feedback on the report?

A   What do you mean by feedback?

Q   Just comments, suggestions, things of that nature.

THE COURT:  Counsel, do you really want to go into this area?  I think maybe you ought to meet and consult about this for a moment.

MS. KAOUNIS:  Okay.  We can put a pause on it. I'll withdraw the question.

THE COURT:  All right.

MS. KAOUNIS:  I'll withdraw the question.

THE COURT:  No.  You're more than welcome to but --

MS. KAOUNIS:  I can confer --

THE COURT:  -- that door is going to be opened.

MS. KAOUNIS:  -- I can confer with my counsel after when we get to the end, if it's necessary.

THE COURT:  Okay.

BY MS. KAOUNIS:

Q   Your report does mention the January



80

fires; correct?

A    If you can please highlight that again. Where does it highlight that in my report?

Q    Well, let me ask a different question. Does your report mention the fires?

A    You know, I would have to go back.  I'm not going to remember every single thing that I wrote in this report.

Q    Okay.

A    I'm not sure if you're aware the amount of documents I read.  I'm sure when you downloaded the information just for a reason, I read thousands of documents.  Yes.

Q    Let me ask a different question.  Did you submit anything to the Court after the January 7 fires that addressed the fires in relation to compliance with the settlement agreement at all?

A    I'm not in a position to answer that.  Any communications with the Court, I don't have to provide those.

Q    Just to be clear, I'm talking about any filing that you could have made with this court.  Any submission that you made to this court that is not subject to any deliberative process privilege or any mediation privilege.  Are you aware of submitting anything to this

court that mentions the January 7 fires?

THE COURT: Are you including conversations, for instance, with Judge Birotte or this court? In other words, when you say submitting, there's a lot of different submissions.

BY MS. KAOUNIS:

Q   Okay. Just so we're clear for the record.

THE COURT: It could be text. It could be emails. It could be both courts involved; one court involved. That's my concern. So I'll extend the same privilege. By the same token, if you're opening that door, I'm not precluding you from it.

BY MS. KAOUNIS:

Q   I want to be very clear. I am not getting into mediation privilege. I am not getting into deliberative process privilege, any conversations that you're referring to with any elected officials.

THE COURT: Okay. You're just referring to this report --

MS. KAOUNIS: Yeah.

THE COURT: -- because it mentioned fires in this report.

BY MS. KAOUNIS:

Q   If there's something that was submitted to this court either on the docket or another public



82

document, a statement that was made in open court --

THE COURT: Counsel, that wasn't the question. The question was submitted to this court, and that's what I'm worried about.

MS. KAOUNIS: Let's break it down.

THE COURT: No. I think maybe you ought to meet and confer about that. That's -- I'm not precluding you. I want that on my record. But if that door opens --

MS. KAOUNIS: Okay.

BY MS. KAOUNIS:

Q    Did you submit any report at all to this court on the docket that mentions the fires?

A    I'm not in a position to answer that.

Q    You don't recall whether you submitted on the public docket any report that mentions the fires?

A    I never submit anything on the public docket beyond my report.

Q    Okay. Other than Judge Birotte, no one else commented on your report; correct?

A    No.

Q    The report was signed on the 13th and filed with the Court on 14 May; correct?

A    Correct.

Q    And on page 17, the last bullet, you state, "The referral system and challenges with what the

City is reporting versus county must be addressed by May 30, 2025."  Correct?

A    Yes.

Q    So you're stating that the City is supposed to comply within 16 days of the recommendations were made in this report; correct?

A    This has been a one year, ongoing conversation, learning and observation sessions, on this specific topic.  So I included it in my report because there has never been a resolution on this specific issue, and it still has not been resolved.

Q    Okay.  But your report is dated May 13; right?

A    Correct.

Q    And you're imposing or suggesting a compliance date of May 30; correct?

A    Recommendation.  Yes.

Q    Okay.  That's not a requirement of the Alliance settlement agreement; correct?

A    It's a recommendation.

Q    Page 20, the last heading and the first sentence, you state that "The City must provide beds and process construction permitting and/or delays timelines to the Court by May 30, 2025, to verify operational readiness before the June 2027 deadline."  Correct?



A      That's what it states.  Yes.

Q      And again, that is not a requirement of the Alliance settlement agreement.  That is a recommendation by you; correct?

A      A recommendation.  Yes.

Q      Page 23, the last bullet in the middle of the page, you state that, "The City should be ready to present a structured plan by May 27, 2025, to demonstrate readiness and accountability."  Correct?

A      That's what it states.  Yes.

Q      Okay.  And for the record that, too, is not a requirement of the Alliance settlement agreement --

A      A recommendation.

Q      Sorry?

A      A recommendation.

Q      That is a recommendation by yourself; correct?

A      Correct.

Q      Okay.  Without getting into the substance, you have provided the Court with periodic updates on the status of your reports; correct?

A      I've had communications with the Court, yes, weekly with -- yes.

Q      Okay.  And at times, those communications were with the parties; correct?

A     Yes.

Q     And at times those communications were without the parties; correct?

A     Correct.

Q     And all of those discussions would be reflected in your invoices that were provided to the City. Is that accurate?

THE COURT:  Just a moment.  All discussions with the Court and with the parties or separately?

MS. KAOUNIS:  Any of them.  Whether it be with the Court or the Court and the parties.

THE COURT:  Fine.  I understand.  Thank you.

MS. KAOUNIS:  Yeah.  Thank you.

THE COURT:  You can answer.

THE WITNESS:  No.  Because to be quite honest with you, I don't submit all my hours to the -- there's a tremendous amount more hours that I do submit of work that I do, whether it's communicating with the elected officials or with the other parties.  I don't always document that or submit for payment.

BY MS. KAOUNIS:

Q     Okay.  So then to be clear for the record. The invoices do not reflect all the work that you've done on this matter; is that what I'm to understand?

A     Yeah.  There's instances where I do not



submit where I have  5 -- 10- --15-minute conversation with an elected official or a city staffer.  I do not.

Q    Okay.  Sorry.  Go ahead.

A    I'm not in the business to -- I just think it's just a minor thing and I'm not going to charge the City for.

Q    Okay.

A    I just think it's the right thing to do.

Q    Okay.  And understanding that the Court has allowed witnesses to speak with Counsel and other people in the gallery throughout this proceeding, have you had communications with Plaintiff's counsel regarding the substance of your testimony or your report?

A    Yeah.  They contacted me and I had a -- I think it was a zoom or Teams -- I don't really know -- meeting in regards to the questions that they were going to ask me, and they also asked me to be concise.

Q    And when did that --

A    Because I do like to talk.  I think everybody knows that.

Q    You wouldn't be the only person.

And when did that occur?

A    Off the top -- I would have to go into my phone to get that.  It's in my phone.

Q    It was sometime in May?



A     Yes.

Q     Okay.  And other than --

A     It was a Friday.  I know it was a Friday.
I just don't know which Friday.

Q     Okay.

A     I have a pretty good memory but, you know,
I'm a little sick so I can't remember everything.

Q     Understood.  Understood.  And again, if
there's any point where you need to stop, just let me
know.

A     Will do.

Q     Okay.  Other than communications with
Counsel, was that with both counsel present, both
Plaintiff's counsel?

A     For the most part, the majority of the
conversation was with --

Q     Ms. Mitchell?

A     -- Ms. Mitchell and then I think he was
coming back from a flight or something and he joined for
the like the last 15 minutes, if I'm not mistaken,
Matthew.

Q     Okay.  And the subject matter generally
was the questions that you would be asked in the
proceeding; correct?

A     Correct.



Q    Okay.  And other than the conversations with Plaintiff's counsel in connection with preparing for your testimony, did you speak with counsel for the Intervenors, or counsel for the City, or counsel for the county, in preparation for your testimony?

A    No.

Q    Okay.  And you didn't speak with the Court in preparation for your testimony?

A    No.

Q    Okay.

THE COURT:  When you say the Court, I assume it's Judge Carter?  I'm not sure that, that may be accurate concerning Judge Birotte.

MS. KAOUNIS:  Let me clarify.

THE COURT:  Because I want to be sure that your record is clear; all party's are clear.  I don't know. I'm not a party to that but --

BY MS. KAOUNIS:

Q    In my catch-all question --

THE COURT:  Thank you.

BY MS. KAOUNIS:

Q    -- I asked whether you spoke with the Court.  Did you speak with Judge Carter in preparation specifically for your testimony in this matter?

A    No.



Q   Okay.  Did you speak with -- and I don't want to know the substance -- did you speak with Judge Birotte in connection with your testimony?  And I didn't mean to --

A   I don't think I have to answer that on my communications with who I'm speaking to.  Specifically, if it's Judge Birotte or not.

Q   Okay.  Yesterday you had a large stack of papers in front of you while you were testifying; correct?

A   I still have them before me today.

Q   Okay.  And those documents included documents with tabs and handwritten notes; correct?

A   There's really not handwritten notes, actually, on them.  They're just a little paper.  It's just so -- yeah.

Q   Oh, so they're just tabs?

A   Yeah.  Tabs.

Q   Okay.  During your testimony, you referred to several documentation; correct?

A   Correct.

Q   And I asked you for copies of those documents; correct?

A   Yes.

Q   And you didn't provide copies, but you instead provided me with clerk file numbers; correct?

A    Correct.  For three.

Q    And for the record, those clerk file numbers were 231, 022, 231, 182, and 240, 330; correct?

A    Can you repeat that again?

Q    Sure.  Those file numbers were 231, 022, 231, 182, and 240, 330; correct?

A    Correct.

Q    Okay.  And after you gave me the numbers, I explained that we needed the titles of those documents because the clerk file numbers are each associated with several documents; correct?

A    That is correct.

Q    And you said that you wouldn't be able to do that because you had to run and get your car.  Do you recall?

A    Yes.

Q    Okay.

A    Because I was locked out on Tuesday and had to wait for 30 minutes.  I didn't want that to happen to me again yesterday, especially because I'm sick.

Q    You're aware that on the LA City Clerk's Connect website, each of those clerk file numbers is associated with numerous documents; right?

A    Yes.

Q    Okay.  For example, you're aware that the

91

clerk file number 23-1022 is associated with 136 documents; right?

A     Um-hum.  Most likely, yes.

Q     And you have no idea sitting here, how many pages those 136 documents comprise; right?

A     No.  I would have to go back into my file. It's all on my phone.  As I mentioned, I could not print every single document here.  I just printed a few.

Q     Okay.  And you can't point me, sitting here today, to which portion of those documents you were relying on yesterday; right?

A     No.  I would have to go back to my phone and my notes.

Q     And then you're aware that clerk file number 23-1182 is associated with 21 documents; right?

A     Again, I would have to go back.  Yes.  So I would have to go back to -- yeah.  There are several document as you stated.  Yes.

Q     Okay.  And sitting here today --

A     You have motions from housing homeless -- I can go on and on.  Yes.  They keep track of all the specific things that are happening.  Yes.

Q     Okay.  And sitting here today, you don't know how many pages those 21 documents contain; correct?

A     No.  I would have to go to my phone.

Q    And you can't point me to which portion of those documents you were relying on yesterday; correct?

A    Only to these documents that are before me.  And as I mentioned, I can't have my phone or my notes, and again, I'm trying to conserve.  You know, I'm not going to print, you know, all these documents.  I read them from my phone or my computer.

This is actually the very first time that I actually printed this many documents.  I tend to -- couldn't -- you know, try to respect mother nature and the environment.

Q    You're aware that clerk file number 24-0330 is also associated with six documents; correct?

A    I would have to go and reference my phone.

Q    Okay.  It's multiple documents?

A    It's multiple documents.  Yes.

Q    And you have no idea sitting here today how many pages those six documents contained; correct?

A    No.  Not at the top off my head.  I would have to go back to my phone.

Q    Okay.  And you can't point me to which portion of the documents you were relying on yesterday; correct?

A    This specific one I can.  The formation of the City homeless governance structure?  Yes.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

Q    And which CF number is that?

A    240330.

Q    Okay.  And the title of the document, could you please read that?

A    Formation of a City Homeless Governance Structure.

Q    Okay.  And you have a page number that you were referring to yesterday

A    I can -- on the homeless response?  Yes. Page 3.  But at this point, again, you have the documents and I'm going to, you know, if you have the document you can read it yourself.

MS. KAOUNIS:  Just a moment, Your Honor.  If you don't mind.

BY MS. KAOUNIS:

Q    As part of your engagement, you were not tasked with interpreting which beds will be counted under the Alliance settlement agreement; correct?

MS. MITCHELL:  Objection.

THE COURT:  Yeah.

MS. MITCHELL:  Calls for speculation; calls for a legal conclusion; vague and ambiguous.

THE COURT:  Are you referring back to the Alliance agreement specifically or a task as a Special Master to the Court?

94

MS. KAOUNIS:  Alliance agreement, specifically.

THE COURT:  Thank you.  Overruled.

THE WITNESS:  For the Alliance agreement, yes; but with my interpretation with the Court, no.

BY MS. KAOUNIS:

Q    Okay.  I just want to make sure I understand.  So your testimony is that part of your job is to interpret which beds will be counted under the settlement agreement?

A    I don't understand your question.

Q    Let me see if I can rephrase it.

You have never been engaged by the City and the Alliance to interpret the terms of the settlement agreement to qualify certain beds as counting and certain beds as not counting; correct?

MS. MITCHELL:  Objection.  Misstates the terms of the settlement agreement.  Calls for speculation. Lacks foundation.  Potentially calls for privileged information.

THE COURT:  I'm not sure but I'm going to overrule the objection.

You can answer if you can.

THE WITNESS:  I cannot speak to that.

BY MS. KAOUNIS:

Q    Okay.  So you don't know one way or the



other whether you were tasked with identifying which beds count under the settlement agreement?

MS. MITCHELL:  Objection.  Misstates the testimony.

THE COURT:  I'm going to be cautious.

If you can answer the question, you may.

THE WITNESS:  If you referenced city documents, either they're a projected list or they're quarterly reports.  Those are the beds or units, as they call them, because that's what they use.  And in various documents, city documents, they use the word bed not housing solutions.  But for the purposes here, and specifically in their quarterly reports, they use bed slash unit.

And so those are the documents that they say that they are -- that beds that are in process or beds that have been created.  So yes, based on those documents –

BY MS. KAOUNIS:

Q    I think my question was unclear and I apologize.  You are not tasked with deciding which beds count towards the Alliance settlement agreement compliance and which do not; correct?

MS. MITCHELL:  Objection.  Misstates the settlement agreement; misstates the parties' agreement on the record several years ago; it also potentially calls

for privileged information; lacks foundation; calls for speculation.

MS. KAOUNIS:  Your Honor, that was clearly an instruction to the witness to refer to certain --

THE COURT:  I'm going to overrule the objection.

You can answer if you can.

THE WITNESS:  I'm not in a position to answer that, Your Honor.

BY MS. KAOUNIS:

Q    Okay.  And you've never been tasked with deciding what qualifies as an encampment reduction under the Alliance settlement agreement or not; correct?

MS. MITCHELL:  Same objections, Your Honor.

THE COURT:  Overruled.  You can answer.

THE WITNESS:  I'm not in a position to answer that, Your Honor.

BY MS. KAOUNIS:

Q    You believe that you are qualified to give recommendations regarding alleviating funding constraints; correct?

A    You stated yesterday that --

THE COURT:  As the Special Master, again?  I want to be certain.

MS. KAOUNIS:  Yes.

THE COURT:  I'll allow the question, Counsel.



THE WITNESS:  You stated yesterday that I'm not an expert.  So I'm not going to answer that question.

BY MS. KAOUNIS:

Q     Well, you --

A     Nor am I an attorney.

Q     -- you gave recommendations in your report to alleviate funding constraints; correct?

A     I can provide recommendations.  Yes.

Q     The Alliance settlement agreement, to your knowledge, does not say that the Special Master will decide what constitutes compliance with the agreement; correct?

A     The terms of the agreement does.

Q     The terms of which agreement?

A     Of the LA Alliance.

Q     So your testimony is that the terms of the Alliance settlement agreement say that the Special Master will decide what constitutes compliance with the settlement agreement?

A     That's not what I said.

Q     Oh.

A     The terms are in the agreement.

Q     Okay.  Okay.  Just to be clear.

So it's not your position that the Alliance settlement agreement gives you the authority to



decide what constitutes compliance under that agreement?

A    My job is to monitor.  Yes.

Q    Okay.  You recommended a thorough funding strategy is urgently needed to address funding constraints with the City; correct?

A    Yes.

Q    And you believe you're qualified to opine on the City's management of taxpayer funds; correct?

A    Is that as a Special Master or my previous experience?

Q    Well, regardless, it's your qualifications.  So do you believe you're qualified since you gave the recommendation?

A    I do.

Q    Okay.  In your time as councilwoman for Santa Ana, you were never criticized for handling taxpayer funds?

A    Yes.  Of course.

Q    You were?

A    What elected official is not?

Q    Okay.  In fact, you were personally criticized by the Orange County political press for what was described as a shocking pattern of living large at the public's expense, raising questions whether you had violated governmental travel policies, state disclosure



rules, or state's ethics laws; correct?

MS. MITCHELL:  Objection.  402, 403, Your Honor.

MS. KAOUNIS:  This goes directly to the funding and oversight recommendations, Your Honor, and credibility.

THE COURT:  If you want to ask that question, I'm going to allow it.  But you better go back and check with the City and Scott Marcus, et cetera, concerning engagement with the City, and all of this being an allegation.  And also, the Court's screening and confidence in her, and the engagement that the next person or entity was recommended at $700 an hour for pro bono rate.

Have you consulted with Scott Marcus concerning this?  Because the City is well aware of this, and that's what's disturbing to me that this inference is being raised now.  Now, be very careful with this.

I'm going to order you to meet and confer for just a moment.  If you're going to go down this path, I may not preclude you.  But if this is an attempt to destroy credibility, then we're going to have a number of people in here and you're not going to be claiming the privilege.  So go over and talk about this for just a moment.  Counsel, that's an order.  That's not a request.

MR. MCRAE:  Thanks.

100

THE COURT:  This is very dangerous now.

MS. KAOUNIS:  Your Honor, just so I can understand --

THE COURT:  Counsel, let me be very clear.  I'm requesting that you really discuss this for a moment.  If this door is opened voluntarily on your part, we may have quite a parade of city officials in here.

Please take your time with this.  And I'm not going to preclude you, but this has been very carefully discussed and these allegations were screened by the Court, were known by the City.  These were de minimis, Counsel.  So this inference, I really want you to consider now.

(A recess was taken off the record.)

MR. SCOLNICK:  Your Honor, I understand you asked for Counsel.

THE COURT:  I'd like to see counsel, please.

MR. SCOLNICK:  Okay.  The same -- the counsel that were meeting with the client?

THE COURT:  Counsel, please.  Yeah.

MR. SCOLNICK:  Okay.

THE COURT:  Yeah.  Sir?  Okay.  Thank you very much.

Counsel, in your discussions -- I want a record -- I'm not going to preclude that question.  Okay?  So you

know.  In fact, I don't quite know where that leads.  It may lead absolutely nowhere.  But upon reflection, I'm going to allow the question to be asked.

So you ask the question, Counsel, and I expect a response from the witness.

MS. KAOUNIS:  May I confer with my --

THE COURT:  Certainly.

MS. KAOUNIS:  -- lead counsel for one moment?

THE COURT:  And that's no iteration (phonetic) that any person is going to be called in the future, et cetera.  You're more than welcome to ask that question.

MR. SCOLNICK:  I didn't hear what you just said.

THE COURT:  That's no iteration from this point forward that any person would be called in the future.  It may not open up a parade of horribles (sic) or additional witnesses.

MR. SCOLNICK:  Okay.  That's what I --

THE COURT:  I want that clear.  You're entitled to ask that question if you choose.

MR. SCOLNICK:  Okay.

MS. KAOUNIS:  I'm going to withdraw the question, Your Honor.

THE COURT:  All right.

MS. KAOUNIS:  May I have one moment --

THE COURT:  Certainly.



MS. KAOUNIS:  -- to confer?

MS. KAOUNIS:  I'm going to seek the Court's guidance with this next line of questioning.

THE COURT:  I'm sorry?

MS. KAOUNIS:  I'm going to seek the Court's guidance with this next line of questioning.

THE COURT:  You know, I'm going to just have you ask the question.  Okay?

BY MS. KAOUNIS:

Q    You've been criticized for your own lack of accountability; correct?

MS. MITCHELL:  Objection.  402.  403.

THE COURT:  Overruled.

THE WITNESS:  That's irrelevant as my role as a Special Master.  If the City had an issue with me being the Special Master, they would not have entered into a second agreement for the remaining three years.  So I think my record speaks for itself.

BY MS. KAOUNIS:

Q    You believe you're qualified to make recommendations about accountability, though; correct?

A    Yes.

Q    And in 2016, you were criticized for missing nearly all of the meetings for committees you served on as Santa Ana's representative at Southern

California's main water agency; correct?

MS. MITCHELL:  Objection.  402.  403.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  That's a false statement.

BY MS. KAOUNIS:

Q    It was reported that you only attended 3 of 37 committee meetings you were assigned to; correct?

MS. MITCHELL:  Objection.  Relevance.  403.

THE WITNESS:  Those committee meetings were not mandatory.  I attended all the board meetings.  Big difference.

BY MS. KAOUNIS:

Q    It was actually reported that between May 2015 and your removal from the board in January 2016, you missed seven out of the nine water planning meetings; correct?

MS. MITCHELL:  Objection.  Relevance.  403.

THE COURT:  You can answer the question.

THE WITNESS:  I attended the board meetings.

BY MS. KAOUNIS:

Q    So that reporting was incorrect?  Is that your testimony?

A    I attended the board meetings.  You said planning meetings.  Very different.

104

Q    Okay.  So the reporting was correct then? You did actually miss seven of the nine --

A    I attended the board meetings.

Q    -- correct?

A    I don't recall, but I attended board meetings.

Q    And your attendance record on two of the committees on which you served was so bad that your fellow members voted to remove you from those committees less than a year after you were appointed; correct?

MS. MITCHELL:  Objection ; relevance; 403.

THE COURT:  You can answer the question.

THE WITNESS:  That's not a factual statement.

BY MS. KAOUNIS:

Q    Were you not removed from those committees by a vote of your fellow committee members?

MS. MITCHELL:  Same objection.  I'd just like a standing objection to this entire line of questioning, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I don't know what board members or who you're referring to.

BY MS. KAOUNIS:

Q    Were you not removed from those committees for which you missed the meetings?

A      What -- are you aware that I served on nine different committees?  That is from a regional perspective.  I also served on six city council committee meetings, plus being the vice mayor and the president at the time of the Southern California Association of Governments, and the president of the National Association of Latino Elected Officials.  So obviously, if you're asking me if I could attend every single meeting based on all those duties, obviously, that is not going to be the case.  So if you're speaking about my elected officials that I served with on the Santa Ana City Council, they did not want to serve on regional boards.  So I served on these regional boards here in the Los Angeles region.

Q      So you're not denying that --

A      Plus, my duties in the region in Orange County.

Q      -- so you're not denying that you were removed from the three committees for which you --

A      What committees are you speaking of, ma'am?

Q      Well, you were involved in several committees; correct?

A      I just mentioned nine.  Yes.

Q      Do you recall which committees those were?

A      Yes.

106

Q    Could you list them for us?

A    For the City of Santa Ana?  Those specific committee meetings?

Q    For --

A    Or the regional?

Q    -- for the water -- for the water agency.

A    Which water agency?

Q    The Southern California Regional Water Agency.

A    Which agency?

Q    The Southern California Water Board.

A    Do you mean the Metropolitan Water District; the MET?

Q    Let's get the article.  No.  No.  No. It's actually number -- give me one moment.

You're familiar with Voice of OC; correct?

A    Yes.

Q    Okay.  And you're familiar with the fact that there was an article done on November 3, 2016, concerning your --

THE COURT:  Could you speak up just a little bit louder?  Thank you.

BY MS. KAOUNIS:

Q    You're familiar with an article that was done concerning your attendance at various meetings?



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

A    That was in 2016, ma'am.  I'm not sure if you want me to remember that.  I cannot recollect from 2016.  It's been over six years.  Longer than six years.

Q    The OC Political reported that you had missed nearly all --

THE COURT:  Counsel, just a little louder, please, or pull the microphone closer.

BY MS. KAOUNIS:

Q    The OC Political had reported that you missed nearly all of the meetings for committees that you serve on as the City's representative of Southern California's main water agency.  Do you recall that?

MS. MITCHELL:  Renewing my standing objection to this entire line of questioning under 402, 403, Your Honor.

THE COURT:  You can answer.

THE WITENSS:  I don't understand the question.

BY MS. KAOUNIS:

Q    You were appointed to three committees on the water district board; correct?

A    Which water district board?  Can you please be very specific?

Q    The Metropolitan Water District of Southern California; correct?

A    Yes.

Q    And that included -- those committees included finance, legislation, and water planning; correct?

A    Yes.

Q    And in those three committees there were 37 meetings during your tenure; correct?

A    Yes.

Q    And you attended 3 of those 37 meetings?

A    I don't recall.

Q    You don't dispute the reporting that you only attended 3 of those 37 meetings; correct?

A    I don't recall.  It was long ago, ma'am.

Q    You did respond to the press about concerns over your expenditures as a member of the City council, but you did not respond to the press concerning your absenteeism from these meetings; correct?

MS. MITCHELL:  Renew the objection 402, 403, Your Honor.

THE WITNESS:  I don't recall.

MS. KAOUNIS:  Your Honor, please give me one moment.  I think I may be finished.

THE COURT:  Certainly.

MS. KAOUNIS:  Your Honor, I want to be very clear for the record.  Are you instructing that if I asked about expenditures while the Special Master was on the

City council or in another elected or appointed position, that would open the door to communications --

THE COURT:  No.  Ask her any question you'd like, Counsel.

MS. KAOUNIS:  Okay.

BY MS. KAOUNIS:

Q    I questioned you briefly before about the allegations that you had violated government travel policies, state disclosure rules, and state ethics laws. Do you recall that?

A    I don't.

Q    Do you recall allegations concerning a reported summer trip to Europe that cost taxpayers $53,000?

MS. MITCHELL:  Objection.  402.  403.

THE COURT:  You can answer that question.

THE WITNESS:  For what agency?

BY MS. KAOUNIS:

Q    This was while you were on the City council.

A    Yes.  But what agency was I representing when I went on that Europe trip?  Was it a regional entity or was it for the City of Santa Ana?

Q    Do you recall which agency --

A    Yes.  The Southern --

110

Q    -- you were representing?

A    -- California Association of Governments, SCAG.

Q    Okay.  And you were criticized for that expenditure of $53,000 in connection with that trip to Europe; correct?

MS. MITCHELL:  Same standing objection, Your Honor, to this entire --

THE WITNESS:  That's an allegation.  I'm not sure what you're speaking to of $53,000.  I don't know.

BY MS. KAOUNIS:

Q    That was a week-long trip to London and Milan; correct?

A    On behalf of SCAG, yes.  With SCAG staff, yes.

Q    And the allegations criticizing your trip concerned a separate taxpayer-funded trip, as well, for yourself and close to a dozen others at a cost of $15,551; correct?

A    That's a cumulative total with other elected officials, correct, from the region?  Including, I think, some Los Angeles council members at the time --

Q    And that was --

A    -- if I'm not mistaken.

Q    -- and that was in connection with a trip



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

that was near Vegas; correct?

A   Where?

Q   Las Vegas.

A   For what entity?

Q   You just said a moment ago it was in connection with the water board.  No?

A   I did not say -- no.  That's a misstatement.  I did not say the water board.

Q   Okay.  So just to be clear for the record. What was the prior trip in connection with?

A   I don't know.  I've been on many trips to Las Vegas on behalf of various different -- whether it be the City, whether it be different regional boards.

I'm not sure if you're aware the City of Santa is not a full-time position like the City of Los Angeles.  It is a part-time position.  And if you don't understand the magnitude when I served on nine regional boards while -- I did not get paid for a majority of those boards.  And specifically that you're speaking of in regards to the Metropolitan Water District, I was not compensated for those meetings.  So I just want to state that for the record.

Q   Okay.  You were not compensated except for the fact that you took a $53,000 trip; correct?

A   I did not take a 53,000.  That is a

112

cumulative total with other elected officials, including staff.

Q    In response to the article, you didn't deny taking the trip to Europe; correct?

A    No.  I went on behalf of the Southern California Association of Governments as president of the organization to understand transportation and specifically cordon bleu pricing, which the City of Los Angeles and this region was trying to move towards with LA Metro.

Q    And you didn't deny that you stayed at five-star hotels?

A    I'm not -- I don't know what hotels.  I don't recall.  I didn't make those reservations.  The SCAG staff made those.

Q    Okay.  And you didn't deny that the trip was paid for with federal money?

A    And again, those are allegations and I don't know what source of revenue was paid -- paid for what.  That was on behalf of the Southern California Association of Governments.

Q    You did say in response to the article that the trip to Europe was paid for by a federal grant in order to explore ways to reduce traffic in Southern California; correct?

A    Yeah.  The cordon bleu as I mentioned

prior. So yeah, I do have that recollection. Yes.

Q    And you told the reporter that, "Had I not gone, the grant would have likely funded the travel of a non-Orange County representative." Correct?

A    I don't recall. It's very -- a long time ago.

Q    Traffic in Southern California hasn't been solved; right?

A    I don't know. I'm no longer a policy maker.

Q    You have personal experience with traffic in California having been solved?

A    I served on the California Transportation Commission so, yes, throughout the state. Yes.

Q    So just to be clear. Your understanding is traffic has not been solved in California -- in Southern California; correct?

A    I did not say that.

Q    Well, do you --

A    I have experience with policy in regards to traffic conditions and/or other ways to mediate traffic congestion in the State of California in my role as the California Transportation -- as a California Transportation Commissioner appointed by Governor Newsom.

Q    It's really hard to try and solve the

problem of traffic in Southern California, if it ever can be solved; right?

A    I disagree.

MS. MITCHELL:  Objection.  This is so far afield of --

THE WITNESS:  Yes.

MS. MITCHELL:  -- what this case is about.  This is a 403 issue.  This is argumentative at this point.

MS. KAOUNIS:  I'll withdraw the question.

BY MS. KAOUNIS:

Q    I have just a question in relation to your payment.

You stated that you were a public official.  You were not paid for some of the meetings that you went to; is that right?

A    Correct.

Q    While you were employed by the City of Santa Ana,  you did receive income as a principal of a consulting firm; correct?

A    I don't understand your question.

Q    You received other income while you were employed by the City of Santa Ana; correct?

A    I wasn't employed by the City of Santa Ana.  I'm not sure what you're alluding to.  I was elected to the position.



Q    Right.  And while you were an elected official in the City of Santa Ana, you also received income as the principal of a consulting firm?

A    It's a part-time job, ma'am.  It's not a full-time job like in the City of Los Angeles.  So yes, you have to have a full-time job as a council member in the City of Santa Ana.  And I worked -- I was in a consulting firm.  I worked for the Orange County Alliance for a Healthy Community that was funded by the California Endowment for nine years.

Q    You made a public disclosure that you were the principal of a consulting firm during your term as a Santa Ana council member; correct?

MS. MITCHELL:  Renewed objection.  402.  403.

THE COURT:  You can answer.

THE WITNESS:  I don't know if it was prior to my role for the last nine years as the executive director for the Alliance.  I don't know what you're speaking to specifically.  What time period?

BY MS. KAOUNIS:

Q    Well, in --

A    I served for 12 years consecutively from 2006 to 2018.

Q    -- okay.  In 2018 you filed a public disclosure sating that you received compensation as both a



principal of a consulting firm, as well as the director of a "fiscal sponsor," with each ranging in compensation between $10,000 and $100,000 for that year.  Is that accurate?

A    I don't have my -- the information in front of me to answer that.  I don't recollect.

Q    You have no reason to believe that your public disclosures were inaccurate; correct?

A    They were not inaccurate.  No.  I don't have those disclosures in front of me.

MS. MITCHELL:  I just want to renew and make sure that the record is clear, when we look at this later, that I still have a standing objection for 402, 403.

MS. KAOUNIS:  Okay.  Thank you, Your Honor.

THE COURT:  Redirect?

MS. MITCHELL:  Sure.

THE COURT:  Do you need a break?

MS. MITCHELL:  You know what, Your Honor?  If we could take just five minutes so I can get a set up, I think that would be helpful.

THE COURT:  Yeah.  Ten minutes.  Thank you.  We're in recess.

(A recess was taken off the record.)

THE COURT:  Let's go back on the record.  Are we on the record?  Excellent.



117

So, Counsel, we're back on the record.

All counsel are present and this would be redirect.

And, once again, would you introduce yourself to the record just because we're on CourtSmart.

MS. MITCHELL:  Yes, Your Honor.  Thank you. Good morning.  I think it's still morning.  Elizabeth Mitchell on behalf of Plaintiff, LA Alliance for Human Rights.

                    REDIRECT EXAMINATION3

BY MS. MITCHELL:

Q    Ms. Martinez, did the City agree to your appointment as a monitor back in 2020 when this case first started?

MS. KAOUNIS:  Objection.  Relevance. Foundation.

MS. MITCHELL:  Let me rephrase the question. That was a bad question.

BY MS. MITCHELL:

Q    Did the City object to the Court's appointment of you as Special Master when this case first started back in 2020?

MS. KAOUNIS:  Objection.  Foundation.

THE WITNESS:  A  Not to my recollection.

THE COURT:  Overruled.



118

BY MS. MITCHELL:

Q   Did the City object to you continuing to serve as Special Master as this case was pending in 2021?

MS. KAOUNIS:  Objection.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  Not to my recollection.

BY MS. MITCHELL:

Q   Did the City agree to your appointment as monitor over this agreement to help the Court enforce and oversee this agreement in 2022?

MS. KAOUNIS:  Objection.  Foundation.  Calls for a legal conclusion.  Vague.

THE COURT:  Overruled.

THE WITNESS:   Yes.  I signed a contract agreement with the City of Los Angeles.

BY MS. MITCHELL:

Q   Okay.  And did the City recently renew that contract to have you continue to serve as monitor over this agreement to assist the Court through the continuation of this agreement until 2027?

MS. KAOUNIS:  Objection.  Vague.  Calls for a legal conclusion.  Foundation.

THE COURT:  Overruled

THE WITNESS:  Yes.

BY MS. MITCHELL:



Q     Approximately, how many public hearings have we had in this case since its inception in March 10, 2020?

MS. KAOUNIS:  Objection.  Relevance.

THE COURT:  I don't know what you mean by public hearings.

MS. MITCHELL:  Hearings in this case, Your Honor.  Status conferences, et cetera.

THE COURT:  In court?

MS. MITCHELL:  In court.  Yes.

THE COURT:  Not council meetings, et cetera?  In court?

MS. MITCHELL:  I'll clarify the question, Your Honor.  Thank you.

THE COURT:  Sure.

BY MS. MITCHELL:

Q     How many hearings or status conferences have we had here in court today regarding this case -- sorry.  How many hearings have we had in this case since 2020 which you have attended?

MS. KAOUNIS:  I'm sorry.  Could we hear that question again, Your Honor.

MS. MITCHELL:  Sure.

BY MS. MITCHELL:

Q     How many -- I don't want to call them all



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

hearings.  So I will say --

MS. MITCHELL:  Well, I'll call them hearings, Your Honor.

BY MS. MITCHELL:

Q    Special Master Martinez, if I refer to any time we have appeared on the record here in this court on these proceedings as hearings, will you understand that phrase?

A    Yes.

Q    Okay.  How many hearings have you attended in your role as either Special Master or monitor as part of this case?

A    I couldn't tell you a specific number, but it was several.

Q    Hundreds, maybe?

A    Potentially.  You know, off the top of my head, I don't know.

Q    Potentially thousands?

A    I wouldn't be able to tell you but there were a lot of -- a lot of hearings.

MS. KAOUNIS:  Objection.  Calls for speculation.

BY MS. MITCHELL:

Q    Has anybody from the City, prior to these evidentiary hearings, objected to your participation or appointment as Special Master or monitor in this case?

121

MS. KAOUNIS:  Objection.  Foundation.  Calls for a legal conclusion.  Vague.

THE COURT:  Overruled.

THE WITNESS:  Not to my recollection.

BY MS. MITCHELL:

Q    Okay.  Does the failure to attend some committee meetings nine years ago have anything to do with what we're here talking about in these evidentiary hearings from your perspective?

MS. KAOUNIS:  Objection.  Vague.  Calls for a legal conclusion.

THE COURT:  That's sustained.

THE WITNESS:  No.

MS. KAOUNIS:  The objection was sustained.

THE COURT:  Sustained.  Stricken.

BY MS. MITCHELL:

Q    How many hours per week on average since 2020, your appointment as Special Master in 2020, have you worked on the Los Angeles homeless issues?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  From what I submit to what I don't submit, you know, this is a 24/7 job.  I don't -- you know, I wouldn't be able to tell you -- you know, I don't turn on a clock or turn off a clock.  I'm working at all

122

hours.  There's times where I'm watching homeless and housing committee meetings at 12:00 o'clock or 1:00 o'clock in the morning, you know, to catch up or reviewing documents.

As many of you are aware, there's hundreds of documents on the issues of housing and homelessness. You know, so I wouldn't be able to tell you.  I have been -- I've done my very best to do the right thing, and that means that I don't, you know, submit every single minute, hour, to the City.  I do it because it's the right thing to do.

BY MS. MITCHELL:

Q   Would you be able to give us an estimate of the number of hours that you spend on the issue of Los Angeles homelessness between the hours that you do pro bono, that you don't charge anybody, the hours that you spend overseeing the City agreement, and the hours that you spend overseeing the county agreement, in total. Would you be able to give us an average estimate of the number of hours that you work on these issues per week?

MS. KAOUNIS:  Objection.  Calls for speculation. Relevance.

THE COURT:  Overruled.

THE WITNESS:  I can tell you, off the top of my head, no, but I could tell you that 99 percent of the time



I'm working seven days a week.

BY MS. MITCHELL:

Q    Would you estimate that it's more than 40 hours a week?

A    Yes.

Q    More than 50 hours a week?

MS. KAOUNIS:  Objection.  Relevance.

THE WITNESS:  Yes.

MS. KAOUNIS:  Relevance.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    And have you worked approximately, you know, more than 50 hours per week on these issues since you were appointed as Special Master in 2020, on average?

MS. KAOUNIS:  Objection.  Relevance.  Vague.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q    I'm sorry.  What was the answer?

A    Yes.

Q    Yes.  Okay.  Would you agree that in that process of the last five years, working so many hours, you have become very knowledgeable about the homelessness response system in Los Angeles?



124

MS. KAOUNIS:  Objection.  Calls for expert opinion.  Vague.  Foundation.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I have a good understanding of the system.  Yes.

BY MS. MITCHELL:

Q    More knowledge of the system than a lay person would have?

MS. KAOUNIS:  Objection.  Foundation. Relevance.  Vague.

THE COURT:  I don't know what a lay person has, Counsel.

BY MS. MITCHELL:

Q    Is the homelessness response system in your view in Los Angeles complicated?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  It's complex and very nuance.

BY MS. MITCHELL:

Q    In order to meet the -- for the City to meet its obligations under the settlement agreement, does there need to be a functioning homelessness response system in Los Angeles, in your opinion?

MS. KAOUNIS:  Objection.  Vague.  Asked and answered.  Calls for a legal conclusion.  Calls for

125

speculation.  Foundation.  Calls for expert opinion, if I didn't say that.

THE COURT:  Overruled.

THE WITNESS:  In my opinion, based on the components of the homeless response system specifically for the City of Los Angeles, and I've discussed this various times in many of the public hearings here and with the parties, that the regional system that the City of Los Angeles puts as housing solutions, or bed, or units, into the CES system does not function well for the City of Los Angeles.

BY MS. MITCHELL:

Q    Okay.  And in providing the recommendations that you provided in Exhibit 93, which is before you, and I'm specifically showing you page 20 but I'm referring to all of the recommendations, did you make these recommendations in order to suggest ways that the City could change the way it's operating in order to comply with the agreement?

MS. KAOUNIS:  Objection.  Vague.  Relevance. Calls for an expert opinion.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:   In my opinion, and yes, they are recommendations that I feel based on my observations and



learning sessions, communications with elected officials, hearing the homeless and housing committee meetings, and council meetings, these are some of the issues that have been brought up, and I believe these recommendations would fit the City of Los Angeles to address its components within the homeless response system.

BY MS. MITCHELL:

Q    And those recommendations are made in order to advise the City of how it could change its operations in order to meet the terms of the settlement agreement.  Is that right?

MS. KAOUNIS:  Objection. Vague.  Speculation.  Foundation.  Calls for a legal conclusion.  Calls for expert opinion.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  In my opinion, recommendations, yes.

BY MS. MITCHELL:

Q    Now showing you page 27 of Exhibit 93.  You were asked this question on Counsel's cross-examination regarding this phrase in your recommendation.  The full paragraph reads, "It is recommended to mandate the creation of a new bed plan and strategies for encampment resolution ensuring endorsement by the LA Alliance to promote consensus on operational objectives



aligned with the City's vision for homeless services."

Did I read that right?

A     Yes.

Q     Okay.  Now, ensuring endorsement by the LA Alliance, was that provision included in your recommendations in order to comply with the terms of the settlement?

MS. KAOUNIS:  Objection.  Leading.  Vague. Foundation.  Legal opinion.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.  This agreement is with the parties, the LA Alliance and the City of Los Angeles.

BY MS. MITCHELL:

Q     Showing you Exhibit 25, Section 5.2.  Does Section 5.2 provide for the City and Plaintiffs to agree to work together in good faith to resolve any concerns or disputes about plans, milestones, and deadlines provided?

MS. KAOUNIS:  Objection.  Calls for a legal opinion.  Foundation.  Vague.

THE WITNESS:  For what I'm reading here, yes.

BY MS. MITCHELL:

Q     And is that section that --

THE COURT:  Counsel, it's overruled.

MS. MITCHELL:  Thank you, Your Honor.

BY MS. MITCHELL:



128

Q   The section that you referred to as -- of Exhibit 93 that suggested that the City ensured endorsement by LA Alliance, was that intended to meet this section of the settlement agreement, Section 5.2?

MS. KAOUNIS:  Objection.  Leading.  Calls for a legal opinion.  Relevance.  Vague.  Speculation.

THE WITNESS:  Yes.

THE COURT:  Overruled.

THE WITNESS:  Where it states here that, "The City will provide the plans, milestones, and deadlines to Plaintiffs and the City, and Plaintiffs agree to work together in good faith to resolve any concerns or disputes about the plans necessary."

BY MS. MITCHELL:

Q   Thank you.  Showing you page 17, specifically regarding the recommendations that you made as your role as Special Master and monitor in this case.

MS. MITCHELL:  May I have a moment, Your Honor?

THE COURT:  Certainly.

BY MS. MITCHELL:

Q   There we go.  I showed you the wrong section.  I apologize.

So regarding the 3,822 beds that were not opened by -- or excuse me -- there was no plan for the 3,822 beds by the end of 2024, Counsel asked you some



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

questions about the City producing 2,000 beds per year for the next two years and whether that would satisfy the agreement.  Do you recall that line of questioning?

A    I do.

Q    Okay.  Based on your review of all of the City's documents, of the housing and homelessness committee, the city council meetings -- and I apologize, THE WITNESS.  What is the third city entity committee that deals with homelessness?  It's like an ad hoc committee.

A    The CAO, the homeless strategy committee meeting.

Q    The homeless strategy committee meeting. Thank you.

So between the homeless strategy committee meeting, and housing and homelessness committee meeting, the city council meetings, all of which you observed, have you seen any indication that the City actually has a plan to meet the delta to fulfill the agreement in this case?

MS. KAOUNIS:  Objection. Foundation.  The witness previously testified that she couldn't answer the question.  Also, assumes facts.  She said that the witness actually attended all of those meetings for those three individual groups.  Calls for a legal opinion.  Vague. Speculation.

THE COURT:  Overruled.

130

THE WITNESS:  Can you repeat your question?

BY MS. MITCHELL:

Q     Sure.  Based on your review of the documents and watching -- or attending or monitoring the various meetings, have you seen any evidence that the City has an actual plan to meet its delta to provide those beds, which it currently doesn't have a plan, by June 2027?

MS. KAOUNIS:  Same objections.  And argumentative.

THE COURT:  Overruled.

THE WITNESS:  I could only speak to what the City council and the staff continually trying to understand how they're going to be able to meet the LA Alliance agreement, and specifically the beds that they don't have a funding plan for.  That is a continue (sic) conversation.  Not only in the housing and homeless committee meeting, but obviously in the city council meetings, as well.

BY MS. MITCHELL:

Q     Thank you.

A     And recent budget discussions.

Q     Understood.  Thank you.

Showing you Exhibit 25 -- and thank you for bearing with me as we bounce back and forth.

HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

HCR

Specifically, focusing on Section 3.1 where the City has agreed to create a required number of housing or shelter solutions in those first two lines.  Do you see that?

A    Yes.

Q    Do you also refer to that phrase, "housing or shelter solutions" as beds?

MS. KAOUNIS:  Objection.  Misstates the document.

THE COURT:  Overruled.

THE WITNESS:   Yes.  In reference to the -- also the City quarterly reports, they don't use "housing" or "shelter."  They use "bed" or "units."

MS. KAOUNIS:  Also foundation.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    Did anyone from the City contact you to discuss your testimony prior to this hearing?

A    No.

Q    Had anybody from the City contacted you to discuss your testimony prior to this hearing, would you have met with them?

A    Yes.  Of course.  I've always had an open door with all the parties.  And every time they want -- wish to -- the City has wished to speak to me, I've always



made myself available.

Q    Showing you page 4 of the settlement agreement, Exhibit 25.

Specifically referring to the sentence from line 19 to line 21 regarding the Special Master, can you read that into the record, please, that I've highlighted?

A    "The parties acknowledge that the Court may in its sole discretion appoint one or more Special Masters to assist the Court in overseeing and enforcing this agreement."

Q    And do you -- and in fact, you were appointed as Special Master to assist the Court in this case; correct?

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q    And in issuing your last yearly report and this -- I will say your first yearly report which has been identified, and I believe introduced, as Exhibit 90, and the most recent yearly report, which has been introduced as Exhibit 93 -- in issuing those reports, are you fulfilling your obligation from your view to assist the Court in overseeing and enforcing this agreement?



MS. KAOUNIS: Objection. Vague. Foundation. Calls for a legal opinion. Calls for an expert opinion.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MS. MITCHELL:

Q    And aside from the occasional typo that we've talked about in Exhibits 90 and 93, as you sit here today, do you agree with everything that you included in those two reports?

A    Yes.

MS. MITCHELL: I have no further questions.

THE COURT: Ms. Myers?

MS. MITCHELL: I didn't realize it was you. I'm sorry. Go ahead. I'll set it up.

THE COURT: Do you need time to set up?

MS. MYERS: Just a couple minutes, Your Honor.

THE COURT: Do you need a recess or --

MS. MYERS: No. It'll literally be less than a minute. Not even that long. Thanks.

THE COURT: Okay.

MS. MYERS: Shayla Myers on behalf of the Legal Aid Foundation of Los Angeles for the Intervenors in this case.

Special Master Martinez, good morning.

THE WITNESS: Good morning.



134

MS. MYERS:  I just have a couple of questions for you.

DIRECT EXAMINATION

BY MS. MYERS:

Q    So in the course of both your examinations from both parties, you were asked a lot of questions related to Exhibit 93, your report.  In preparation for your testimony in this proceeding, did you review your report?

A    I skimmed through it.  Yes.  I skimmed through both of them.  I have them both handy here while we were in the court.  Yes.

Q    And you've been asked a lot of questions in the course --

A    Yes.

Q    -- in the course --

A    Yes.

Q    -- of the last day and today about that report.  Did any of the questions that you were asked, or anything that you reviewed in anticipation of this, change any of the conclusions that you made in your report?

MS. KAOUNIS:  Objection.  Vague.

THE WITNESS:  No.

THE COURT:  Overruled.

BY MS. MYERS:

Q    And then you also submitted an earlier report which is Exhibit 90.  And in the course of preparing for this examination in this hearing, did you review Exhibit 90, your earlier report?

A    Yes.  I skimmed through it.

Q    And you've been asked a lot of questions about the report in the course of the past couple of days. Did any of the questions, or anything that you reviewed, change any of the conclusions that you made in the report?

A    No.

Q    Really quickly, I'm going to ask you just a quick -- a couple of quick questions related to Exhibit 90.  And again, this is Docket 674, which is your earlier report to the Court -- your first report to the Court -- which was filed on February 29, 2024.

I'm going to show you specifically Table 2, which is the 60 percent encampment resolutions per council district target.  Are you familiar with this table?

A    Yes.

Q    What's your understanding of what this table is?

A    This is based on the encampment, milestones, or goals, whatever we want to call them, that the City provided per each council district.

Q    And you received this from the City; is

that correct?

A     The City.  Yes.

Q     Okay.  And it says in the paragraph before the table, it says, "On January 31, 2024, the city council approved the milestones."

Milestones refer to Table No. 2?

MS. KAOUNIS:  Objection.  Vague.  Calls for a legal opinion.

THE COURT:  Overruled.

THE WITNESS:  This is my table.  The City provided a different format of the 9,800 milestones, yes, that the City approved.

BY MS. MYERS:

Q     Okay.  But the contents in Table 2 match the milestones that the city council approved based on your understanding; correct?

MS. KAOUNIS:  Objection.  Vague.  Foundation. Hearsay.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MYERS:

Q     Okay.  And so when it says, "The City provided the confirmed proposal of 9,800 encampment reduction milestones over four years," that refers to Table 2; correct?



A    Yes.

MS. KAOUNIS:  Objection.  Vague.

THE COURT:  Overruled.

BY MS. MYERS:

Q    Did the City provide you any other documentation other than the table that was included as part of the encampment reduction plan that was approved by the city council?

MS. KAOUNIS:  Objection.  Vague.  Foundation. Relevance.

THE WITNESS:  Not to my recollection.

THE COURT:  Overruled.

BY MS. MYERS:

Q    And just for the record, this -- the table continues on to page 17.

When you look at this document it refers to encampment resolutions per council district targets; correct?

A    Correct.

Q    In the previous paragraph you refer to encampment reductions; correct?

A    Yes.

Q    For purposes of your reporting, have you used the term "reduction" and "resolution" interchangeably?



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

138

MS. KAOUNIS:  Objection.  Vague.  Calls for an expert opinion.

THE WITNESS:  Yes.

THE COURT:  Overruled.

BY MS. MYERS:

Q   And are you aware if the City has also --

THE COURT:  Let's slow down the question and answer.  I don't think there's a chance to lodge the objection before the answer is coming out.  So re-ask the question.

MS. MYERS:  The prior question?

THE COURT:  Yes.

BY MS. MYERS:

Q   So is it your understanding that the City of Los Angeles has also used the term "encampment reduction" and "encampment resolution" interchangeably?

THE COURT:  Just a moment.  Don't answer, please.

MS. KAOUNIS:  Objection.  Hearsay.  Calls for a legal opinion.  Relevance.

THE COURT:  Overruled.

Now, you can answer.

THE WITNESS:  Yes.  Per council meetings, housing and homeless committee meetings, yes, they have.

BY MS. MYERS:

139

Q    And also for purposes of the City's quarterly reports; correct?

A    Yes.

MS. KAOUNIS:  Same objections.

THE COURT:  Overruled.

BY MS. MYERS:

Q    When you provided this report to the Court, when you filed it, did you receive any corrections from the City of Los Angeles related to your referral of the -- in Table 90 to encampment resolutions?

MS. KAOUNIS:  Objection.  Relevance.  Foundation.  Vague.

THE COURT:  Overruled.

THE WITNESS:  I did not.

BY MS. MYERS:

Q    In fact, have you ever received any correction from the City of Los Angeles for your use of the term "resolution" interchangeably with the term "reduction"?

MS. KAOUNIS:  Objection.  Vague.  Calls for a legal opinion.  I'm sorry.  Assumes facts.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  Not to my recollection.

MS. MYERS:  Okay.  Thank you.  I have no further questions.



140

THE COURT:  Counsel, recross?  Would you like time to set up?

MS. KAOUNIS:  No.  Just a few short questions.

THE COURT:  No recess.  Okay.

MS. KAOUNIS:  Thank you.

RECROSS-EXAMINATION

BY MS. KAOUNIS:

Q    You were asked about whether the city had objected at any point to your appointment as a Special Master.  Do you recall that testimony?

A    Yes.

Q    Did you give the City any documents prior to your appointment disclosing any of the issues related to your fiscal responsibility, or trips, or attendance at committee meetings, that I examined you about previously?

MS. MITCHELL:  Objection.  Assumes facts.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  That's irrelevant.

BY MS. KAOUNIS:

Q    So the answer is you did not give the City any --

A    They never asked and it's irrelevant.  Why would they -- my prior elected position in -- no.

Q    So the answer is no?

141

A      They never asked.  That is correct.  No.

Q      You also testified about your meeting with Counsel.  How long was your meeting with the counsel for Alliance prior to your -- or in preparation for your testimony?

A      I don't recall.  I wouldn't be able to tell you.  Yeah.  I don't know.

Q      You could -- would you estimate that it was more than an hour?

A      I wouldn't be able to -- I'm not sure.  I can't tell you.  Yeah.  I don't -- I don't -- I wasn't looking at my watch, unfortunately.

Q      Well, you --

A      So when we ended, we ended and I moved on to the very next thing.  I actually was moving on to get ready to watch the council meeting.  So I had a lot of other things on my mind.

Q      Okay.  You don't recall whether you calendared it for an hour or a half day?

A      I could go and look at my phone and tell you what I calendared it for, if you'd like.

Q      Well, do you have a specific -- I'd be happy for you to do that, but I don't know if the Court would entertain that.

THE COURT:  What would you like?  Would you like

her to look at her phone?

BY MS. KAOUNIS:

Q    Yeah.  If you could tell us how long you did calendar for it, it would be helpful.

A    It was from 9:00 o'clock to 10:00 a.m.

Q    Okay.

THE COURT:  Would you come back so that we can hear your answer?

THE WITNESS:  It was a Friday from 9:00 o'clock to 10:00 a.m.

BY MS. KAOUNIS:

Q    Okay.  And you testified that generally you discussed the topics about what you would be testifying; correct?

A    Questions.  Yes.

Q    Okay.  And do you recall Counsel providing you with specific questions that you would be asked?

A    Off the top of my head, I don't have them specifically.  No.

Q    But there was a mock Q&A, so to speak, a mock question and answer during the call?

A    It wasn't really -- they asked me questions, but I don't think they asked me the answer -- asked me to answer.  No.

Q    So they gave you questions, sample



questions, that they might ask you while you were on the stand; correct?

A    Yes.  Based on my report, yes.

Q    Okay.  And to the best of your recollection, the subject matter of the questions were solely related to your report?

A    Predominantly, and the agreement.  Yes.

Q    Okay.  And the agreement is the settlement agreement, the Alliance settlement agreement; correct?

A    Um-hum.  Yes.

Q    And to the best of your recollection, do you recall referring to any other documents during that one-hour session in which you were preparing for your testimony?

A    Not that I recall.

Q    And did you -- are you planning to bill the City for that meeting?

THE COURT:  Would you -- would you say that slower?  I'm sorry.

BY MS. KAOUNIS:

Q    Are you planning to bill the City for that meeting?

THE COURT:  Okay.  Thank you.

THE WITNESS:  I'm not sure yet.

BY MS. KAOUNIS:



Q    Okay.  And did you --

A    I have not submitted my hours.  I have not reviewed any of that yet.  So - because I've -- we've obviously been here for the past now, I think, seven days. So I have not had the time to yet.

Q    -- and did you think that it was proper to meet with Plaintiff's counsel in preparation for your testimony without notifying the City or Intervenors that you would be doing so?

A    I didn't even notify the Court.  I just asked -- there are times I have meetings with the City and other parties, and I don't say that I, you know, I'm going to go and call the LA Alliance that I met -- that I had a meeting with the City of Los Angeles.  No.  I don't do that.

Q    I understand.

A    Unless I'm asked, but yeah.  No.

Q    I didn't mean to interrupt you.  Sorry.

I understood your prior testimony to say that you were willing to meet with the City or the Intervenors in preparation for your testimony if they had asked; correct?

A    Yes.  Of course.

Q    But you hadn't disclosed to the City or the Intervenors that you would be meeting with Plaintiff's

counsel in preparation for your testimony; right?

A    It's not my job to advise.  If they wanted -- knowing that we were going to have this hearing and my name was on the list to be a witness, the City and the Intervenors had the opportunity to contact me.  They had the list of who were the witnesses.

Q    You understand that the assistance that you are providing to the Court is not providing legal opinions as to what the Alliance settlement requires; correct?

A    That's not my role.  I'm not an attorney. You've state (sic) that many times.

Q    Okay.  And your understanding is that the Alliance settlement agreement only requires that the bed count and the encampment reductions be achieved, but it doesn't dictate how the bed count and encampment reductions are to be achieved; correct?

MS. MITCHELL:  Objection.  Beyond the scope. Vague.  Calls for speculation.  And calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Can you restate your question?

BY MS. KAOUNIS:

Q    Sure.  You understand that the Alliance settlement agreement requires that the bed count and the

encampment reductions be achieved; correct?

A   Yes.   Through the milestones that were provided by the City of Los Angeles.   Yes.

Q   Okay.   But the settlement agreement does not dictate how the City must achieve those bed counts and encampment reductions; correct?

MS. MITCHELL:  Objection.  Vague.

I'm sorry.  Were you done?

MS. KAOUNIS:  Now, I am.

MS. MITCHELL:  Okay.  Objection.  Vague.  Calls for a legal conclusion.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  My job is just on the compliance portion of the terms of the agreement.

BY MS. KAOUNIS:

Q   You have no reason to believe based on your review of the settlement agreement, the Alliance settlement agreement, and your work on this matter, that the agreement does dictate how the bed counts and the encampment reductions must be achieved; right?

MS. MITCHELL:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  Again, I'm not an attorney.  I'm not in the position to answer that.

BY MS. KAOUNIS:

Q    So you can't answer one way or another?

A    I'm not in a position to answer that.

Q    So if you make a recommendation to the Court regarding -- well, strike that.

MS. KAOUNIS:  Thank you.  I'm done.

THE COURT:  Do you want to consult with your colleagues to make sure?

MR. MCRAE:  We're done.

THE COURT:  Okay.  All right.  Thank you very much.  You may step down.

Where are we in terms of witnesses?

MS. MITCHELL:  Your Honor, we have no more witnesses from our perspective.  So subject to the introduction of exhibits into evidence which -- and that was submitted to chambers this morning -- the Plaintiffs rest.

THE COURT:  Okay.  What are your thoughts, Counsel.

MR. MCRAE:  Do you want the Intervenors to go first, Your Honor?

THE COURT:  It doesn't matter.

Ms. Myers?

Thank you, Counsel, that's the proper, I think, order.



Do you have any --

MS. MYERS:  Your Honor, we're not presenting any witnesses.  We weren't prepared to present any witnesses. Thank you.

THE COURT:  Okay.  Thank you.

Now, let me turn to --

MR. MCRAE:  Your Honor, the City will not be calling anymore witnesses at this point, and we agree with Counsel that the exhibit list has been submitted per the Court's instruction.

THE COURT:  Now, we need to go over that exhibit list; don't we?  I'd expect there to be some disagreements.

MR. MCRAE:  There are objections, Your Honor. Yes.

THE COURT:  We need to go through those, I think, one by one and make certain -- and I haven't had a chance to look at the exhibit list because we've been in session.  So perhaps we ought to turn to that next.

MR. MCRAE:  Whatever pleases the Court.  That's fine.

THE COURT:  I need that exhibit list, which I haven't had a chance to look at, and I'll probably need Carlin, also.

All right.  The first is the roadmap



149

binding term sheet.  Exhibit No. 136.  And the note I just received is the City is objecting to relevance.

MR. SCOLNICK:  Yes, Your Honor.

THE COURT:  All right.  Counsel?

MR. SCOLNICK:  This proceeding involves a question of whether the City is in violation of the Alliance settlement agreement and not the roadmap agreement, in our view, Your Honor.  That's the relevance objection.

MR. MCRAE:  Can I have one moment to confer with my colleague?  Just one quick second.

THE COURT:  Absolutely.

MR. SCOLNICK:  And just for the record, Your Honor, Section 2 of Exhibit 25, the Alliance settlement agreement, defines the parties and the County is not a party to the Alliance settlement agreement.

THE COURT:  Ms. Myers?

MS. MYERS:  No objections, Your Honor.

THE COURT:  LA Alliance?

MS. MITCHELL:  Well, Your Honor, the LA Alliance has submitted that the roadmap agreement has been violated, and we discussed this at this last hearing. Certainly, the City is objecting to standing, but that is a significant basis for us to push for the Court to find that there was a breach.  And so, I mean, I think it's

150

relevant on its face, Your Honor.

THE COURT:  It's received, Counsel.

185-1, which is the MOU between the County and City of Los Angeles.

Counsel, the City's objecting?

MR. SCOLNICK:  Yes, Your Honor.  Exhibits 2, 3, 5, and 22 are all on the same basis.  Those all deal with the roadmap agreement, Your Honor.  That's the relevance objection.

THE COURT:  All right.  Ms. Myers?

MS. MYERS:  No response, Your Honor.

THE COURT:  LA Alliance?

MS. MITCHELL:  Same argument as before, Your Honor.  It's inherently relevant because it forms the basis for one of the breaches that have been alleged in this hearing.

THE COURT:  1, 2, 3, 5, and 22 are received.

23, the A&M independent assessment of city-funded homelessness assistance programs.  Objection has been by the City for lack of foundation, hearsay, rule 403, and relevance.

Counsel?

MR. SCOLNICK:  That's right, Your Honor.  It is an out-of-court statement offered for its truth.  It's hearsay and it doesn't purport to find any violations of

the Alliance settlement agreement, and it's also, you know, it has all sorts of issues we talked about during the testimony.  So those are the -- those are the objections.

THE COURT:  Ms. Myers?

MS. MYERS:  No objections and will likely join the Plaintiffs in their response.

THE COURT:  Plaintiff?

MS. MITCHELL:  Yes, Your Honor.  This is a court-ordered audit which was part of a stipulated sanction imposed against the City last year.  I think there has been tremendous testimony regarding the audit today.  There was sufficient -- excuse me -- through this evidentiary proceeding there was significant foundation laid for its development.  The Court has also held a number of hearings on this issue, as well as provided Special Master Martinez to help oversee it.

I think it is inherently relevant, and certainly we would ask the Court to take judicial notice of this assessment.  I don't see how it could possibly be excluded under Rule 403, Your Honor.

THE COURT:  23 is received.

Exhibit 31 -- strike that.  Exhibit 36, the tracking chart of the City settlement.

Objections by the City concerning



relevance, argument, hearsay, lacks foundation, Federal Rule of Evidence 403.

Counsel?

MR. SCOLNICK:  Your Honor, this is a demonstrative created, we think, by Counsel.  The testimony wasn't clear on how that was created or who created it.  So it lacks foundation on that sense.  We also think it's irrelevant, and it's confusing, and prejudicial.

THE COURT:  Ms. Myers?

MS. MYERS:  No objection, Your Honor.

THE COURT:  LA Alliance?

MS. MITCHELL:  Yes.  Thank you, Your Honor. This is being submitted under Federal Rule of Evidence 1006.  It is a summary of the Exhibits 25 through 35. Excuse me.  No.  This is number 36.  Yes.  25 through 35. And there was significant testimony from -- specifically, Paul Webster, regarding how it was developed and the details contained therein.

THE COURT:  It's received.

37, LA Alliance's motion for order re settlement agreement and compliance.

MR. SCOLNICK:  Your Honor, this is a pleading filed in the case.  It's arguments of Counsel.  There's plenty of case law that says arguments of counsel are not



153

evidence.  In addition, there wasn't testimony about it.
So there's no foundation and, again, 403.

THE COURT:  Counsel, I'll short circuit that --
for both parties.  It's received.  I'll take judicial
notice of the Court's own docket and the filings, but I'm
not certain of the relevance of that, Counsel.  That can
be argued.

The 863-1 which should be Exhibit 38.  This
is the Mitchell declaration.

Once again, Counsel, lack of foundation.

I'm going to receive that.  Once again, it
could be argued it's already read by the Court.

MR. SCOLNICK:  And understanding there's no
testimony on what that was.

THE COURT:  Understood, Counsel.

MR. SCOLNICK:  Okay.  And we can go through --
it's the same document, just exhibits.  It's 38 all the
way through, I think, 45.  Same document.

THE COURT:  Each will be received, Counsel.
Simply judicial notice quite frankly can be argued.  I'm
not certain how the Court would apply that necessarily.

45 is the demand for breach of settlement
agreement, August 16, 2024, which is Exhibit G.
Relevance.  Lacks foundation.

MR. SCOLNICK:  It's the same objection.  This



wasn't introduced.  There wasn't testimony about it.

THE COURT:  It's received.  It's the Court's own filings.  It's already been read by the Court.

46 is Exhibit H, notice of violation of settlement agreement.  Same objection.  Lacks foundation.  Relevance.

Counsel?

MR. SCOLNICK:  Yes, Your Honor.  Same issue.  Just no testimony, and what that was, and it wasn't introduced.

THE COURT:  Received.

Concerning 48, the City of Los Angeles opposition to the motion for order of settlement agreement and compliance.

Counsel?

MR. SCOLNICK:  That's another pleading.  We think it's persuasive, but it's not evidence, Your Honor.

THE COURT:  Received.

49 is the LA Alliance's reply ISO motion for order re settlement agreement and compliance.  Once again, the same objections.  Relevance.  Lacks foundation.  Argument.  Hearsay.  403.

MR. SCOLNICK:  Same issue, Your Honor.

THE COURT:  Received.

Next is the Mitchell declaration.  It's



155

Exhibit 50.  It's 872-1.  The Court is taking judicial notice.  I've already read these documents, Counsel.  How they're applied is --

MR. SCOLNICK:  Understood.

THE COURT:  -- if any --

MR. SCOLNICK:  And we filed the document an hour or so ago just explaining our position that judicial notice of the existence of documents may be appropriate, but not for their truth.

THE COURT:  All right.  Thank you very much.

50 is received.

I assume the same is the objection to 51.  Also received.

MR. SCOLNICK:  Correct.

THE COURT:  Plaintiff's response re issues raised by the Court on March 27, 2025.  It's Exhibit 53.  Objections are relevance.  Lacks foundation.  Argument.  Hearsay.  403.

MR. SCOLNICK:  And same issue, Your Honor.  It's a pleading.

THE COURT:  All right.  It's received.

55 -- strike that.  54 is the Mitchell declaration.  Lacks foundation.

Counsel?

MR. SCOLNICK:  This one we believe was not



156

introduced or discussed during the evidentiary hearing.
If I'm wrong about that, Counsel will let me know.

THE COURT:  It doesn't matter.  I'm taking judicial notice of all the pleadings and filings with the Court, Counsel, for both -- all parties.

So it's received.

55 is the Exhibit 1, LAHSA's memo, TLS beds open to date.  Client served with the roadmap.  Relevance.  Lacks foundation.  And hearsay, again.

Counsel?

MR. SCOLNICK:  Same issue for 55 and 56, Your Honor.  It just wasn't introduced and, again, we just -- you know, any of these judicial notice rulings we would just object that it's being noticed for anything beyond its existence.

THE COURT:  Received, Counsel, as 55 and 56. Once again, the Court takes judicial notice of its own records.

On 66, opposition by the City to the motion for order re settlement agreement, compliance for sanctions.

66, Counsel, on relevance; is that correct?

MR. SCOLNICK:  Right, Your Honor.  The same issue.  It's a pleading.

THE COURT:  Received.



157

74 is LA Alliance's reply to the ISO motion for order re settlement agreement, compliance, and sanctions. Objections are relevance. Lacks foundation. Argument. Hearsay. Federal Rule of Evidence 403.

Counsel?

MR. SCOLNICK: The same issue. It's a pleading.

THE COURT: Received.

83 is the HUD audit re LAHSA. Objection relevance. Hearsay. Lacks foundation.

Counsel?

MR. SCOLNICK: We don't believe this was introduced along with 113.

THE COURT: It's been introduced a number of times, Counsel. It was in the prior proceeding with the Court, going back to the document -- going back to the docket. This was one of the docketed entries.

MR. SCOLNICK: Understood. And I was just referring to introduce during this evidentiary hearing.

THE COURT: It's received.

The -- 84 is the LA County auditor follow up review of LAHSA.

Same objection, Counsel?

MR. SCOLNICK: Same objection.

THE COURT: Received.

Next is the LA City Controller's audit,



158

improving LAHSA outreach program.

Same objection, Counsel?

MR. SCOLNICK:  And apologies, Your Honor.  I've lost track.  What exhibit number are we on?

THE COURT:  85.  I'm sorry.  So to go back.

MR. SCOLNICK:  Okay.

THE COURT:  83 and 84 are received, as well 74 and 66.

MR. SCOLNICK:  And we don't think this is relevant to the -- any alleged breach of the Alliance settlement agreement.

THE COURT:  Received.

86 is the LA City Controller's review of Proposition HHH.  Same objections.  Relevance.  Lacks foundation.

MR. SCOLNICK:  Same issue, Your Honor.

THE COURT:  Received.

The County of Los Angeles LAHSA audit, which is 87.  And from my record, 85 and 86 have been received.  This is the County of Los Angeles LAHSA audit.  Objections by the City, relevance.  Lacks foundation.  Hearsay.

Counsel?

MR. SCOLNICK:  Right.  And this is on the county and LAHSA, and so this is not the City of Los Angeles and



the Alliance Settlement, and also I don't believe there was a witness that talked about how this was prepared or who did it.

THE COURT:  Received.

88 is the HUD audit concerning LAHSA.

Same objections, Counsel?

MR. SCOLNICK:  Same issue, Your Honor.  It's LAHSA.

THE COURT:  Received.

89 is the LA City Controller's audit of the interim housing bed availability data.

Same objection, Counsel?

MR. SCOLNICK:  Same objection.  Not relevant to breach, or alleged breach, of settlement agreement.

THE COURT:  Overruled and it's received.

90, which is Special Master independent monitoring report year 1, which was just referred to.

Objections, Counsel?

MR. SCOLNICK:  Not relevant to alleged breach of the settlement agreement and it's hearsay.

THE COURT:  Received.

91 is the County of Los Angeles LAHSA audit.

Same objections, Counsel, by the City?

MR. SCOLNICK:  Yes.  Same issues with LAHSA.



160

Yes.

THE COURT:  It's received.

92 is the LA City Controller homeless audit permanent pathways to permanent housing.

Same objections, Counsel?

MR. SCOLNICK:  Yes.  It doesn't speak to breach or lack thereof of the settlement agreement.

THE COURT:  Received.

93 is the Special Master independent monitoring report and recommendations number 2.

Same objections, Counsel?

MR. SCOLNICK:  Yes.  Same as with 90.

THE COURT:  This is 93.

MR. SCOLNICK:  Correct.  But it goes 90, 93 of the Special Master report.  Same objections.

THE COURT:  Received.

95 is the 2022 Greater Los Angeles Homeless Count, City of Los Angeles Council District 2.

Counsel, this is 95.

MR. SCOLNICK:  The same.  Not relevant to breach.

THE COURT:  Received.

109 is the redesigned required lessons for permanent support of housing for skid row, housing trust buildings.



Same objections, Counsel?

MR. SCOLNICK:  Same objection, and we don't believe it was introduced in this evidentiary hearing.

THE COURT:  Received.  That's a public document and the Court was aware of this before, Counsel, as well.

113 is the City of Los Angeles' proposed bed plan, which was withdrawn.

Counsel, the same objections?

MR. SCOLNICK:  Same objection and it wasn't introduced as far as we know, and it was withdrawn.  So I don't know what the relevance is.

THE COURT:  Received.

114 is the LA Alliance milestones potential project list.

Relevancy?

MR. SCOLNICK:  The same issue with no relevancy to alleged breach.

THE COURT:  Received.

126 is the LA Alliance open bed charts.

Same objections on behalf of the City?

MR. SCOLNICK:  Same objection and I believe this is another demonstrative.  It's just argument, not evidence.

THE COURT:  Received.

The transcript of March 27 hearing motion



162

for SA.

Counsel, all of these are public records that have been posted.  This is received.

MR. SCOLNICK:  And that would go to 133, as well, I believe?

THE COURT:  That goes to -- well, let me go down to 133.  I don't think there's a 132.

MR. SCOLNICK:  Correct.

THE COURT:  133.  Yes.  It's received as well, Counsel.

And all prior transcripts of all proceedings are received.

140 is the City of Los Angeles and County of Los Angeles joint status report, MOU.

MR. SCOLNICK:  The same issue with the MOU roadmap not being at issue in this proceeding.  So relevance.

THE COURT:  It's received.

141 is the LAS article.  Now, this is the first issue that I have with some of these articles that are being referred to.

I'm going to be consistent about this.  The articles are going to be excluded or they're all going to be included, and so there's an advantage and disadvantage to both sides in a sense.  Some of them may have more

relevance so it may not be consistent with some of the rulings I make.  And this was the first one, I think, that caused problems between the parties.  I really do a substantial, and here apparently is an article concerning LA as to Nick Gerda, I believe.

MR. SCOLNICK:  Your Honor, maybe we can simply this by withdrawing the objection.

THE COURT:  That's pretty simple.  I'm just joking with you, Counsel.

MR. SCOLNICK:  I'm sorry, Your Honor.  I misunderstood.

THE COURT:  Counsel, go over and talk to the other counsel.

MR. SCOLNICK:  I'm sorry, Your Honor.  We have an exhibit that we would withdraw, depending on if Your Honor -- if Your Honor is going to treat all of them the same way.  We'd be happy to withdraw.  I apologize, Your Honor.  We do not withdraw our objection to the LAS article, Exhibit 141.

THE COURT:  Okay.

MR. SCOLNICK:  It's irrelevant.  And it's hearsay.  And it has a bunch out-of-court statements in there that can't be offered for their truth.

THE COURT:  So are you withdrawing your objection to it or are you still objecting to it?



164

MR. SCOLNICK:  To be clear, I apologize, we are still objecting to it.  The offer to withdraw was on a different -- on our own exhibit.  So that's -- apologies.

THE COURT:  But the point is you're still objecting to it?

MR. SCOLNICK:  We are still objecting to it.

THE COURT:  Okay.  Let me put a question mark.

142, final resolution of Proposition HHH.

Counsel?

MR. SCOLNICK:  Relevance and hearsay, Your Honor.  It's not -- it has nothing to do with the settlement agreement.

THE COURT:  Received.

143 is the high cost of homeless housing, review of Prop HHH.

Counsel?

MR. SCOLNICK:  The whole series that's coming on videos, I believe these are just snippets that were played for the Court, for some witnesses, where public officials made statements about homelessness at large.  So we don't think it's relevant.

THE COURT:  And I would assume that, that would go all the way on this page from 143 -- or 150, 151, 152, 153, 154, 155.

MR. SCOLNICK:  And --


HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

THE COURT:  No.  Let's just finish that page to begin with.

MR. SCOLNICK:  Yeah.  That is correct, Your Honor.

THE COURT:  Okay.  Now, let me hear from LA Alliance.

MS. MITCHELL:  Yeah.  And just to correct the record, what was submitted was not snippets.  Pursuant to the Court's request, the entire video has been submitted.  But these are certainly party opponent statements.  I think they're highly relevant to the extent they are talking about the issues that are directly at issue here today.

In particular, there are statements by various councilmembers and the mayor that are in direct conflict and serve as an impeachment to the testimony that was provided both regarding the sufficiency of the data and the integrity of the homelessness response system in Los Angeles.  There are also statements by both the CAO and members of the CAO's office that contradict Mr. Szabo's testimony here today.

So not only is it inherently relevant because it identifies issues that we are talking about today, it's also a party opponent admission.  It is self-authenticating, given that these all -- were all pulled

166

directly from the City's website and are still publicly accessible.

We have filed a request for judicial notice on all of these, and we'd ask that they all come in.

THE COURT:  Ms. Myers?

MS. MYERS:  We would join the Plaintiffs on this exhibit.

THE COURT:  143, 150, 151, 152, 153, 154, 155 are received.

150 is the video of the HHH meeting on January 29, 2025.

151 is the video of the HHH meeting on 02/12/2025.

152 is the video of the regular city council on 05/22/2025.

153 is the video of Mayor Bass' State of the City address on 2025.

154 is the video of the budget hearing on 05/01/2025.

And 155 is the homeless committee and poverty committee on September 9, 2021.

I represent to you that I recognize and I've heard most of these documents, but I can't recall prior in my moderating position.  But I'm not sure about 155.  I'm not certain from recollection if I recall that.

But each of those are received, Counsel. They're public documents.

Let's turn the page for a moment.

156, once again, is the homeless and poverty committee meeting of September 22, 2022.

The next is the housing and homeless committee of August 2, 2023.

And the next is the city council on May 22.

Counsel, same objection?

MR. SCOLNICK:  Same objection.  And again, on hearsay, Your Honor, there's a lot of people talking during a long meeting and they're certainly not all party opponents.  If you can take judicial notice of the fact that these happened, but not the truth of what was said.

THE COURT:  All right.  Thank you, Counsel.

Each of those are received.  156, 157, 158.

Now, the next issue that is of some concern are these hundred notes that came in on a subsequent day. I think Ms. Frost sat here for three or four days waiting to testify.

These notes have been read into evidence. They're already in the record.  The question is if the notes themselves would be allowed, and I think there was an objection concerning relevance, hearsay, lack of foundation.

168

MR. SCOLNICK:  Yes, Your Honor.  I mean, and quite literally, it's an out-of-court statement offered for its truth.  It's irrelevant, anyhow, because none of that testimony went to the alleged breach of the settlement agreement, and it was very unclear who prepared that.  It certainly wasn't just Ms. Frost.  And so the contributors were unclear and unnamed, other than the subteam.  So we think that it's excludable for all those reasons, in addition to 403.

THE COURT:  Okay.  Let me take that under submission while you go to lunch.

Intervenor's exhibit was 305.  There was a relevance objection by the City to the Care and Care Plus schedule.

So Counsel?

MR. SCOLNICK:  The timing and location of cleanings is irrelevant to the alleged breach of the settlement agreement.

THE COURT:  Ms. Myers?

MS. MYERS:  Your Honor, this is an exemplar of the types of schedules that are used by the City of Los Angeles and contain information about the Care and Care Plus program, which is part of the encampment resolution plan.

THE COURT:  Received.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

Defendant, City of Los Angeles, exhibits. The 2005 A&M engagement letter. There's no objection. The only -- the objection occurs 208, the government auditing standards under Federal Rule of Evidence 402, 403.

Counsel, I'm inclined to receive that.

MS. KAOUNIS: Your Honor, just to clarify for the record, I think you might have said 2005 instead of 2025. I may have misheard it.

THE COURT: I said -- if I did, I misspoke. I'm down to 208.

MS. KAOUNIS: Okay.

THE COURT: And 208 is the government auditing standards that you referred to. The objection is by LA Alliance. Received.

Well, Counsel, I'll hear your argument.

MS. MITCHELL: Sure. I mean, I don't see how the government auditing standards are relevant here. I think it's a waste of time and we'd submit on that.

THE COURT: All right. Received.

210, the agreement for the Special Master services. There's an objection by LA Alliance.

Counsel?

MS. MITCHELL: I'll withdraw our objection to that document, Your Honor.



170

THE COURT:  It's received.

The next is the 2011 renewal Special Master agreement.

MS. MITCHELL:  The Alliance will also withdraw its objection to that document.

THE COURT:  Received.

212, the Special Master invoice dated 04/04/25.

MS. MITCHELL:  Yes, Your Honor.  There were not questions that were asked about it, and I think it's inappropriate to introduce that on to the record at this time.  I think it does run into some privileged issues, in particular.  So we would object to having that invoice admitted as an exhibit.

THE COURT:  It's received.  In fact, all of these invoices can be received.

The email between the City of Los Angeles and LA Alliance revised milestones and plans dated 12/29/2023, which is 216.  Alliance objects under 403 and foundation.

MS. MITCHELL:  Yes, Your Honor.  216, 217, and 218, there is no dispute that they are authentic emails for what they purport to be.  The issue is that they are emails to and from attorneys, and there's been no testimony on the context.  There are a lot of sort of out-



171

of -context statements that are being made, and so we would certainly object to those emails being introduced, particularly for the truth of the matter.

THE COURT:  216, 217, and 218 are received, Counsel.

MR. SCOLNICK:  Thank you.

THE COURT:  Now, that leaves two matters I'd like to consider over the lunch hour.  I think it's 400 and the LAS article of May 15.

With those other rulings in abeyance for a very short period of time, are you prepared to argue this matter today?

MS. MITCHELL:  Yes, Your Honor.

MR. UMHOFER:  We are, Your Honor.

THE COURT:  Okay.  Then you know, my suggestion is you reconvene at 1:30.  Give yourselves at extra 15 minutes just to prepare.

MR. MCRAE:  Thank you, Your Honor.

MS. MITCHELL:  Thank you, Your Honor.

THE COURT:  That way you can have a good lunch, and get your notes together, have a break, and consult. Have a good lunch.

MS. MITCHELL:  Thank you, Your Honor.

MR. SCOLNICK:  Thank you, Your Honor.

(A recess was taken off the record.)



172

THE COURT:  Counsel, if you could have a seat for just a moment.  I'd like to address you with a couple of matters before we start.

I've given the parties widely latitude, but this case is fundamentally about ensuring compliance with the terms of the roadmap agreement and the LA Alliance settlement.  It's not a forum for political discourse.  And therefore, I'm not going to permit in these proceedings any devolvement into a platform for political posturing or personal commentary.

Accordingly, when you argue this matter to the Court, I'm directing the parties to refrain from making any statements regarding their views of any political figures associated with this matter and to limit their arguments strictly to the legal and factual issues before the Court.

Next, I'm going to give you extended argument in one area besides the agreed upon format of 45 minutes, 45 minutes, 45 minutes, and 10 minutes.

Based on the evidence presented to this court during these hearings, this Court is concerned about the verification of the 2,679 beds that are reported by the City to comply with the roadmap agreement most recently in the April 15, 2025, status report, docket 891.

Laura Frost, previously Laura Collier,



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

testified that A&M could not verify a number of TLS beds due to expenditure gaps and missing addresses.  Ms. Frost also testified that some of the TLS addresses provided with the roadmap agreement and settlement were the same addresses listed for permanent supportive housing in the LA Alliance settlement reporting.

These issues raise serious concerns about the accuracy of the roadmap compliance reporting and potential double counting between the two agreements.  To ensure roadmap compliance, the Court is considering requiring the City to provide the following data on the TLS beds and the roadmap reporting.

1.  The HMIS identifier.

2.  Verification that this HMIS identifier is also logged into the CES system.

3.  Address of the lease being paid for.

4.  The move-in date for the lease being paid for.

5.  The current occupancy status of each TLS slot.

I would require that this data be provided by June 11, 2025, at 5:00 p.m., in a spreadsheet format.

This Court would also require that the City compare the TLS addresses reported for roadmap with the

address reported for the LA Alliance settlement, and sign an affidavit stating whether there is any overlap of addresses in the reporting.

I'm going to give you each ten minutes after you consult with each other or internally to argue this matter.

I'd like to see Exhibit 141. I don't have that in a copy form in front of me. You can do that before the arguments begin and I make a final determination.

Exhibit 400 is not received because it was used only to refresh the witness' memory and as a rebuttal attack on A&M assessor's credibility. But this has already been read into the record, and Counsel can refer back to Laura Frost's testimony related to this document.

And finally, I don't know what your briefing schedule is, but I'm going to hold to June 16 because I need time as I stated to you. And therefore, my tentative schedule is that LA Alliance is to file their brief by June 10, 2025.

That the City's responding brief is then due by June 13, 2025.

LA Alliance's reply is due June 16, 2025.

Now, for the Intervenors, giving that tentative schedule to Counsel -- and I'll listen once



again to their schedule -- you can decide in a few moments when you wish to submit your briefing.  You're in an interesting situation, and so give me your best input.

Now, I'm going to take a -- oh, you also asked about the page limitation.  35 pages.  I'm extending it from 25 to 35, but not 50 pages.  I've read all of your briefing now, and the issues are well-placed before the Court.

Now, I'm going to take five or ten minutes so you can discuss my tentative ruling to you, and then you'll commence with ten minutes concerning the issues I've raised with you

(A recess was taken off the record.)

THE COURT:  All right.  We're back on the record.  All counsel are present.  I'm going to turn to the City first, then to the Intervenors, then to LA Alliance.

So Counsel, your argument, please.

MS. EVANGELIS:  The City?

MR. MCRAE:  In closing?

THE COURT:  No.  It concerns the ten minutes I am giving you concerning the Court's concern about the roadmap agreement to argue this separately.  It's not included in the time period of 45 minutes each.

MS. EVANGELIS:  Thank you, Your Honor.  Theano



Evangelis on behalf of the City.

Thank you for outlining the information that you've requested. I just want to note that this information is actually with LAHSA. So we will request the information in writing immediately. We'll refer it back to the Court, of course. If there are any issues, we may ask for the Court's assistance or involvement there.

I just want to say first we're about to get into why we think that this is -- the roadmap agreement is of course irrelevant; that the Alliance doesn't have standing to enforce it; and also that the County has never alleged any breach. So for legal reasons, we think this is inappropriate.

We also want to point out, Your Honor, that there's been no evidence whatsoever of any of this double counting. There was some speculation and some questions raised, but there is no evidence whatsoever. So I would ask that we have a couple of extra days, until June 13. I think the Court asked for it by June 11. I would ask for the 13th to enable us to prepare this response, and that's also when our brief is due.

So I think at this point that was what I wanted to say in response to the Court's request.

THE COURT: Okay. Thank you very much.

Let me turn to the Intervenors, please.

MS. MYERS:  Thank you, Your Honor.  I would just say the Intervenor strongly supports the requirement that the City provide verification data here.  Time-limited subsidies are the way in which the City has fulfilled its obligations under the roadmap agreement to the tune of 30 percent of the beds allocated under the roadmap agreement. But Mr. Szabo testified that the normal methods of verifying the beds under the roadmap agreement don't exist for time-limited subsidies.  There is no record that the City relies on; that the public can rely on for purposes of verifying that.  So we strongly support the Court's efforts related to this.

I would just disagree with the City's position that there is no evidence in the record related to this.  Mr. Szabo testified that the City of Los Angeles is master leasing units that were just added to the quarterly reports.  Those master leased buildings are subsidized by time-limited subsidies.  And the only representation in this case that the time-limited subsidies are not counted towards the roadmap agreement is Mr. Szabo's testimony that those are excluded, but he wasn't aware of this particular issue before the questioning.  And this issue was not raised previously.

There's also Ms. Frost's testimony that came up in the course of this evidentiary proceeding.

So again, we strongly support that -- strongly believe that there is evidence, and sufficient evidence, in the record to support the Court's order on this point.

The only thing that I would say, Your Honor, is that I think it's important to provide this information to the parties, but we would ask that any information that ties HMIS identifiers or addresses is under seal, to the extent that it -- and I'm not sure how Your Honor is contemplating that this be provided to the Court. We just want to make sure that none of this information becomes public because it is related to unhoused folks who are not a party to the case.

THE COURT: Okay. Thank you. Let me turn to LA Alliance.

MR. UMHOFER: Your Honor, I will defer because I plan on addressing the legal aspects of this argument during our closing, our formal closing. So I'll defer that piece of it. But as to the factual piece, I just thought it would be helpful to lay out -- and I apologize while we're waiting for this to come up here -- I thought I would lay out and affirm the Plaintiff's concerns around this.

Exhibit 22 is the latest quarterly report on the roadmap. The first line of Exhibit 32 -- excuse me

-- Exhibit 22 reflects time-limited subsidies.  It reflects time-limited subsidies.

THE COURT:  Just a moment.  Are you putting something up on the screen?

MR. UMHOFER:  Yes.  I'm pulling it up right now, but I'm talking as I'm doing it so as not to delay matters unnecessarily.

THE COURT:  Well, Counsel, I just got done looking at this document.  So I'm familiar with it.

MR. UMHOFER:  Right.

THE COURT:  So please proceed.

MR. UMHOFER:  And so this is Exhibit 22.  This is where the Court's concern is, and this is where that number is that is the concern that Alliance has that the time-limited subsidies noted on the first line of Exhibit 22 total out to 2,679.

And if we go then to the last page of Exhibit 22 and we zoom in on those beds, and you do some basic math to subtract 26  -- just do 2,600 minus -- 7,624 minus 2,600, you are at 5,000, which is below the 6,700 that the City -- and even below the 6,000 that the City committed to.

So there's where the concern of course is.  And if we then go to Exhibit 23, which is the A&M report, pages 63 and 64 lay out the concerns around the time-

180

limited subsidies.  And so on page 63, the -- A&M noted that LAHSA's accounting records show that an additional 1.5 -- 151.2 million in services for the roadmap program was funded through other sources of funds.  The vast majority of this amount relates to TLS, time-limined subsidies, or are also known as rapid rehousing, and other funding sources providing more than half of the funding for TLS service provider contracts linked to the roadmap program.

Turning to page 63 -- excuse me -- turning over to page 64 and zooming in there, A&M notes that the largest discrepancy that they observed on this issue relates to TLS contracts.  LAHSA identified 95 contracts for the 2,293 scattered sites reported by the City as of June 30, 2024.  Of the contracts identified by LAHSA, approximately 70 percent did not report expenditures.  So you have that expenditure problem there, and then requested supporting work papers from LAHSA regarding the TLS bed count to investigate this discrepancy.

Further, in an effort to ensure all costs related to TLS were captured, however, LAHSA was unable to provide the requested documentation and instead furnished a memorandum that was not sufficient to permit reconciliation of the identified misalignment in contracts.  Therefore, A&M could not validate the reported

number of TLS beds or the total expenses necessary to support those beds.

Now, Ms. Frost added to that during her testimony. She added that by noting that the information she received from LAHSA omits basics, such as street addresses, and overlapped with sites under the Alliance settlement. That's testimony. Testimony is actual evidence.

There is evidence before this court. You have not only the insufficient evidence of spend, you also have these omissions of street addresses and you have the overlap in sites and potentially double counting between the roadmap agreement and the LA Alliance agreement.

So that's the state of the record here, Your Honor, and we share -- we share the Court's concerns about this, and we anticipate that there will be, you know, problems with the data, especially if LAHSA ends up being the source of the data on this. We look forward to receiving that data so that we can look at it and determine the details of the concerns raised by A&M around this issue. We have no objection to the Court's request for additional documentation on the schedule requested by the Court.

MR. MCRAE: Your Honor, given that there were comments about Mr. Szabo's testimony, could we have a one-

minute response to what we just heard?

THE COURT:  You can have more than that, Counsel.

MR. MCRAE:  Thank you.  And is it okay if I do it?

THE COURT:  Absolutely.  Then we'll have around round.  In other words, turn back to --

MR. MCRAE:  Sure.

THE COURT:  -- Ms. Myers, depending upon your comments, and turn back to LA Alliance.

MR. MCRAE:  Your Honor, first of all, in addition to obviously my joinder with the comments and arguments of my colleague, Ms. Evangelis, that we strenuously object to coupling the roadmap MOU with the Alliance settlement agreement, these agreements -- at least insofar as the Alliance settlement agreement is concerned -- has an integration clause.  And in addition to the integration clause being in paragraph 18, it also has a Section 2 that defines the parties.  And it's critically important, as we all know it's axiomatic, that once you have an integrated agreement no one can rewrite the parties' agreement, and conflate people who are not parties to an agreement and make them parties to an agreement, or import terms that would transgress the integration clause.

We are standing here talking about an agreement, in terms of the roadmap agreement, where the Alliance is not a party to the agreement.  The Intervenor is not a party to the agreement.  And the only parties to the agreement, as set forth in the recital to the MOU itself, are the City and the County of Los Angeles, neither of which has declared a breach.

So one might suggest that not only is it inappropriate, as Ms. Evangelis noted, for us to be talking about this, this issue isn't ripe.  It's not justiciable because there's not a controversy.  You need a case or controversy.  And if the parties to the agreement are in violent agreement that there is no breach, there is no case for controversy.  I would submit that this is perhaps even a jurisdictional bar to the Court hearing this issue, which is a nonissue.

In addition to that, we strenuously object to any mischaracterization of the record as to what Mr. Szabo said.  The record speaks for itself.  Those transcripts have been filed.

I would further note that even at the lectern, moments ago in an opportunity to say their peace with respect to the so-called concerns about double-counting and overlap, once again we heard the word "potential," which is tantamount to may, which is

184

tantamount to could be.  Obviously, the comments of Counsel are argument not evidence, but it bears noting that "may," and "could be," and "potential," have an even more tangential relationship to is and, obviously, cannot carry a burden of proof which at no point is in anybody else's court other than the Plaintiffs.

So the Alliance has no standing to be talking about the roadmap agreement.  Its concerns, respectfully, are irrelevant in terms of compliance with the roadmap agreement, which could not possibly be an issue where no party has claimed breach and those comments are equally applicable to the Intervenors.

THE COURT:  Thank you, Counsel.

Ms. Myers, do you have additional comments?

MS. MYERS:  No, Your Honor.

THE COURT:  LA Alliance, additional comments?

MR. UMHOFER:  Your Honor, I present to you the roadmap agreement.  I'm calling out Section 7.  And I don't fault Counsel for not necessarily focusing on this, new to the case and all, but the suggestion that the Court lacks jurisdiction when the agreement they signed specifically says this MOU is subject to enforcement by the Court.

Let's go to Exhibit 1, which is the term sheet.  It also speaks to the Court's role.  The parties



will submit this term sheet to the Court.  Now, the notion that you can look at this exhibit and claim that this court lacks jurisdiction, I would submit respectfully is laughable.  I would also submit that this court has specifically addressed this, and I'll talk about this in my closing briefly.  It'll save myself a little bit of time.  But the Court specifically held in a prior hearing that the Plaintiffs -- that this case -- that this agreement came about because of a case -- arose out of a case brought by the Plaintiffs and this court held that the Plaintiffs were the proper party to raise this.

So you're asked -- what they're asking is for the Court to reconsider what the Court has already held in a prior hearing in this case, and they're asking the Court to ignore Section 7 of the agreement that they signed which gives the Court jurisdiction.

I'll submit, Your Honor.

THE COURT:  All right.  Thank you, Counsel.

Exhibit 141 will be received for the purpose of showing the difficulty of receiving the data on the TLS beds but not for the truth.  It's impossible to cross-examine.  The person is obviously not going to be asked to testify.

Exhibit 400 is not received.  It was used only to refresh the witness' memory, and quite frankly I



think is rebuttal attack on the A&M assessor's credibility
brought by a compilation of people in A&M.  Counsel can
refer or go back to Laura Frost's testimony relating to
this document.  It's basically been read into evidence.

So Counsel, are you ready on behalf of the
Plaintiffs at this time for your 45-minutes?

MR. UMHOFER:  Yes, Your Honor.

THE COURT:  All right.  Please.

MR. UMHOFER:  Your Honor, while I'm getting
setting up -- set up, I wanted to address the issue of the
briefing schedule and make it -- and streamline it a bit
even more.

I believe the parties had already discussed
the possibility of -- or had already agreed to -- had
already agreed to a briefing schedule where the
Plaintiffs, who have already submitted a brief on
receivership, would forego an opening brief, and that the
City would submit its brief on June 9, 35 pages, and that
the Plaintiffs would submit a responsive brief to that on
June 16.

I believe I'm stating that correctly.
Counsel will correct me if I'm wrong.  But we're prepared
to do that and, obviously, Ms. Myers on behalf of the
Intervenors can brief on either time frame from our
perspective.

THE COURT: Yeah. Before that's confirmed, I'd like to hear from Ms. Myers on where she wants to fit into the schedule.

MS. MYERS: Yes, Your Honor. We had previously agreed amongst all of the parties that the Intervenors and the County, if they so choose, would file a responsive brief at the same time as the Plaintiff's reply brief and we wouldn't change that.

THE COURT: On the 16th?

MS. MYERS: On the 16th.

THE COURT: Okay. Well, Counsel, I'll put that in written form during the recess.

MR. UMHOFER: Okay, Your Honor.

THE COURT: Let me think about that. I think it sounds acceptable but --

MR. SCOLNICK: Your Honor, just to revisit the schedule. Your Honor put a schedule on the record. It's very helpful to us, obviously, to have a couple of days extra. We would appreciate that.

THE COURT: Well, Counsel, just a moment. Do you have an agreement or not?

MR. SCOLNICK: No. We don't at this point.

THE COURT: Okay. No. We're going to commence now with our arguments.

MR. SCOLNICK: Thank you, Your Honor.



188

THE COURT:  Otherwise, I'll set the schedule. Thank you.

MR. UMHOFER:  Breached and broken, Your Honor. That's what we're here to talk about today.  We're here to talk about the fact that the settlement agreements in this case, both the LA Alliance agreement and the roadmap agreement, were breached and that the system is broken and demands extraordinary judicial action.

I want to take you through the breaches briefly and then in greater detail, Your Honor.

The first -- there are four breaches we're going to focus on in our argument today.  The first, that the city violated its agreements to create and provide to the Plaintiffs a bed plan.  The first step required after the PIT count and that 60 percent number was set.

The second breach, that the City missed the Alliance bed milestones and has reported unverified beds.

Third, that the City missed the Alliance agreements encampment milestones and deadlines and has provided unverified reduction reports and numbers to the Court.

And fourth, the City has missed its numbers under the roadmap agreement, and as we just discussed, provided unverified beds in support of its report on the roadmap agreement.



We start, of course, with the settlement agreement in this case, Your Honor.  The settlement agreement that was reached in 2022, Exhibit 25.  That's the -- the key portions are in Section 5.  "5.1.  Within 30 days from the date of the information from the 2022 PIT Count is confirmed by LAHSA and released, the City will," mandatory language, "calculate the required number and provide its calculation to the Plaintiffs."

That was required and Mr. Szabo confirmed that, that was a mandatory requirement of this agreement, not that Ms. Szabo's interpretation of this agreement matters.  The plain language does.

So let's talk about the first breach, Your Honor.  Under Section 5.2, the City was required to create plans and provide the plans for beds.  A key moment where the City has to have a plan before it implements that plan through milestones and deadlines.  It has not created those plans, and it has not provided them to the Plaintiff.

Here's the language, 5.2, "Thereafter" -- after we got that PIT count set and that 60 percent number -- "the City will create plans and develop milestones and deadlines."  No dispute that the City -- for Mr. Szabo -- that the City was obligated to create that mandatory language.  The City will create those plans.

5.2 goes further.  In Sections and 1 and 3 it requires the City to create plans, and milestones, and deadlines for the City's creation of shelter and housing solutions in each council district and then -- and that's in (i).

And then under (iii), the City also had an obligation to create milestones and deadlines for the City's creation of shelter housing in the City -- at citywide level.  Sixty percent of the unsheltered in the city.  That's an obligation.  The City will provide, make a plan, and provide milestones and deadlines.

Then the City has an obligation under 5.2 to provide the plans.  Of course, we know again the City will.  The plain language of the agreement.  The mandatory language of the agreement.  They're required to provide those plans and, of course, because they were apparently trying to comply with some aspects of this agreement but not others, they did provide something of a plan in 2022.  But that plan was required to reach that 12,915 number.  If you read the requirement, it's you must create a plan for 60 percent citywide and in each district.  That's that 12,915 number.  They had to submit a plan that met -- that hit that 12,915 number.  They were 4,000 beds short in their 2022 plan.

And then, of course, they tried to throw in

a new plan in 2024.  And as the Court knows, here's the transcript of October 25, 2024, page 5, the City made quite a show of withdrawing that plan.  The City hereby withdraws the 2024 bed plan.  They have never submitted.  They've never provided it to the Plaintiffs.  They've never submitted to the Court a compliant bed plan.  They don't have a plan, and Mr. Szabo himself confirmed that on the stand.

This is the City's last quarterly report on bed creation.  Exhibit 35, right there you have it.  They only have a plan right now, apparently, to get up to 11,002.  We still don't know have the actual plan, but they seem to think they have one, but it still falls short of the plan number that they were required to create.  The City will create plans to house -- for housing and shelter of 60 percent of the 2022 PIT count.  They're still short.  And Matt Szabo confirmed repeatedly under cross-examination, Your Honor, that the City has no plan, and it certainly has provided no plan to the Plaintiffs or to the Court.  They have violated a key term of the agreement.

And very key -- because they're going to talk la lot about best efforts, Your Honor -- but this part of the settlement agreement does not have a best efforts modifier on it.  The City will create this plan.  Not the City will use its best efforts to create a plan.

There is no best efforts modifier on this element and they have violated it.  Right here it says it.  "The City will create plans." The words "best efforts" appear nowhere there.

And so whatever they're going to argue about best efforts, it doesn't apply to this violation, Your Honor.  They have breached the settlement agreement by not creating or providing a bed plan compliant with the agreement.

Breach number 2.  The City has an obligation.  The City will promptly employ its best efforts to comply with established plans, milestones, and deadlines for beds.  They have not done so, Your Honor. They have not complied with the milestones and deadlines, and they certainly haven't used their best efforts to do so.  And that's what the evidence shows.

Section 5.2, clear as day.  Plain language. Language that they're going to run away from when they stand up and start arguing.  The City will create plans and develop milestones and deadlines.  They had that obligation.

"And thereafter, the City will create plans and develop milestones and deadlines for (1) the creation of shelter in each council district up to 60 percent" -- at that minimum of 60 percent -- "in each council

193

district." And then again under 5.2, "in the city at large."

They have to meet milestones in both places. District by district and in the city at large. That's the plain language of the agreement.

Now, Exhibit No. 35 is their last report of their efforts to comply with that.

Exhibits 25 -- 26 through 35 are the City's reports. So starting with Exhibit 26, the first quarterly report submitted by the City, ending in Exhibit 35. And we summarize that in Exhibit 36. That's the summary we've indicated here.

And you see on the righthand side the many different places where the City has fallen short of those milestones and deadlines. No question that they have missed those milestones and deadlines on a quarterly basis and on a cumulative basis. This chart reflects that. This is, of course, before they changed their counting method, which we'll get to in a moment.

But before they changed their counting method on a cumulative basis, they were far short. That blue line is where they should be. The red line is where they are quarter after quarter. Falling short of their cumulative obligation to create beds under those milestones and deadlines that they agreed to. They set

the milestones and deadlines themselves and they missed them quarter, after quarter, after quarter.  Mr. Szabo confirmed it on the record.

The City failed to meet its cumulative milestones every quarter, including the most recent one. "Is that right, Matt Szabo, correct?  That's correct." The City's own witness confirming their violation of this agreement.

Now, we have created in Exhibit 126 additional charts that show that shortfall quarter after quarter.  They're supposed to be hitting 1,622 in that first quarter.  They're 901 beds short.  They make up some ground over time, but every quarter they're missing their cumulative milestones and deadlines as conceded by Mr. Szabo.  And you can see it right here.  Five different quarters where they fall short, quarter by quarter of their milestones and deadlines.  Again, under their original counting method.

Now, one of the other challenges you see is you look at Exhibits 26 and 35, and we've heard evidence of this.  There have been 2,000 beds, Your Honor, identified in the first report in 26 and then identified in the last report, 35.  2,000 beds have been stuck in process, mired in process, throughout the period of 2022 through 2025.

So the City is falling short even under its own reported numbers. But can we trust those numbers? The answer, unfortunately and sadly, is no, because you see the city is gaming the bed count now. You see that here. This chart illustrates how suddenly they find over 1,000 beds, nearly 2,000 new beds just in this last quarter, and we all heard the testimony about how they did it. Suddenly counting beds that they never had before. You see that sharp curve upward. By the way, even with those added beds they're still short.

They've never created as many beds in any quarter as they did in this last quarter when they knew this motion for receivership was coming. They scrambled. They gained the count. And they made up new beds to try to head off the sanctions that were being sought by the Plaintiffs.

There are several reasons why these new beds don't count, while this magical new approach isn't reliable and isn't worthy of reliance by the Court. These beds were never counted before. They're all under Inside Safe and there's huge problems with the verification, based on A&M's review of the Inside Safe beds.

Several of these master leases and occupancy agreements don't go through 2027, which Mr. Szabo confirmed was supposed to be his measuring stick for

adding these new beds.

The booking agreements, Your Honor.  The booking agreements in particular, they're one offs.  They don't create beds.  They're unverifiable.

And critically, when the City had an opportunity to put forward bed plans, the two that they put forward but never completed, that never added up to the 12,915 target, they never included these kinds of beds that they suddenly added in at the last minute, right before this hearing was to happen.

And all this is confirmed by the Special Master's report, Exhibit 90.  The Special Master cautioned the City that many of the new housing solutions in 2023 that are part of the Inside Safe program will not be counted toward the settlement agreement because they won't be occupiable after 2027.

You still have that problem.  That problem that keeps coming up.  A&M struggled to verify the beds.  You heard that through the testimony of Laura Frost.  You see that in the A&M report.  Twenty percent of the PSH sites were not found in LAHSA's system.  That source of truth that we heard about from Ms. Henry, who we'll talk about more in a moment, and the Special Master's report, Exhibit 93, her most report.

Alliance sites, several Alliance sites,

were not able to be located in the HMIS system. Again, that source of truth. They can't find the numbers in the source of truth. So we can't trust those numbers, Your Honor. And we know that, of course, because the A&M audit confirmed that. Poor data quality and integration. One of the primary obstacles faced by A&M was the inability to verify the number of beds the City reported on the roadmap and Alliance programs.

The City paid millions of dollars and had every opportunity to convince A&M that these beds were real and they failed, Your Honor. The Special Master -- again, the absence of comprehensive funding for the remaining bed deficit. That failure to even plan or have in process those 12,915 beds. Your Honor, the Special Master concluded that this is raising real concerns about the feasibility of meeting the obligations in the agreement by June 2027.

The City has not provided a clear methodology. Insufficient documentation found by the Special Master confirming what we already know. That the numbers can't be trusted.

Now, we heard from Emily Vaughn Henry on the first day of this evidentiary hearing. She testified on Tuesday, May 27, and she testified to something very troubling. That as the chief information officer of LAHSA

-- the place they're going to go to try to tell you about those roadmap beds, Your Honor, they just said they were going to do it -- they're going to go back to LAHSA and the CIO of LAHSA has told you that under the current leadership of LAHSA she was told back in 2023 that we need to do whatever we need to do to make the mayor look good. That was the tone that was set by the new leadership.

And that wasn't just a general statement. She gave specific and credible testimony about LAHSA's lack of an organizational data structure. In terms of having the foundational systems to manage data for the organization that's been in existence for 25 years, it just does not exist, and what you have now I call it smoke and mirrors. They're relying on something. A person who worked with that data for a living calls smoke and mirrors, and she talked about a lot of the data that was being collected was on those Excel spreadsheets and they weren't rooted in a source of truth  That HMIS system, that's where the data should be and should be kept. But that's not where LAHSA was going for the numbers being reported under Inside Safe and the numbers being reported under the Alliance agreement, Your Honor.

And when she, Ms. Henry, raised concerns about it and reported data that didn't make the mayor look good, according to Councilmember Bloomenthal, the data

wasn't pretty enough after she reported in October 2023. The data was taken away from the CIO and given to Bevin Kuhn, another person in LAHSA who kept the data on her computer. Not in that source of truth, HMIS, which the City has referred to repeatedly and had its witnesses refer to repeatedly over the course of this evidentiary hearing.

But that's not where the Inside Safe data was. The data that they're now relying on to close that gap between where they are and where they should be, that data isn't coming from HMIS. It's coming from a laptop run by a person who the Inside Safe data was given to, to take over after it was taken away from a person. And by the way, of course, that data got better once it was taken away and given to Bevin Kuhn and taken from her laptop.

So the City has not given the Court reliable data, but it also -- and the data that they've reported shows that they're short on their numbers. So did they apply their best efforts? Clearly, they have not.

And all we need to do, actually, to figure out what best efforts looks like, again, taking into account the questionability of the numbers reported on the roadmap data, is the roadmap agreement. The roadmap agreement moved fast. Under the roadmap agreement the

City claims to have created 6,700 beds in 18 months. That's best efforts, Your Honor.  Matt Szabo talked about it enthusiastically.

The purpose of the roadmap agreement was to establish through multiple means, as many means and as many means as possible an extraordinarily high number of beds in a very, very short period of time.  That's best efforts, Your Honor.  I mean, the fact that we agreed to 6,000 new beds over an 18-month period of time required the City to use every possible resource to pursue every possible pathway to get as many beds out as possible.

Now, we still have questions about the reliability of that, but there's no question that this is more like best efforts.  If they're required to use best efforts under the Alliance agreement, you'd think it would look a lot like what they did under the roadmap agreement.

But Mr. Szabo talked very differently when he talked about best efforts under the Alliance agreement. When he was asked about best efforts under the Alliance agreement, we have a very systematic approach.  They're making progress every reporting period toward the goal. We have a program that is fully funded.  We have efforts continually -- continual efforts to seek state funding, which is of course called for in the agreement.

A very different level of urgency when



talking about the Alliance agreement and it plays itself out, Your Honor.  Because if you look at what they were doing under the Alliance agreement, you see in just under two years, you see their bed milestone, their new beds per quarter.  1,700 plus 2,300, let's call that 4,000 beds in nearly two years.  You add those two numbers up.  This is the pace under the Alliance agreement.  But they were creating 6,000 beds in 18 months under the roadmap agreement.  So you have a measuring stick.  The City's own measuring stick.  Compare what they're doing under the Alliance agreement to what they did under the roadmap agreement, and you'll see that they're falling short of best efforts under that Alliance agreement.  The City's claimed roadmap, that creation was far faster than its Alliance bed creation.

And when you think about best efforts, you might think about, okay, we got a court-ordered audit which has concrete suggestions about how to improve things.  That might be another measure of best efforts.  But the deputy mayor for homelessness came in here and said she skimmed the report, and she couldn't come up with a specific example of anything the City did in response to this court-ordered audit.  That's no effort, Your Honor.  Not even close to best efforts.

We also presented additional best efforts



202

evidence. Brian Ulf talked about how 1,000 beds could be created in less than 12 months with confidence. John Maceri. These are people with real experience offering shelter, offering housing to people. A thousand beds in six months.

Elizabeth Funk talked about creating 1,000 beds in six months and the feasibility of doing so.

Michele Martinez talked about how she was involved with the creation of shelter -- of a large shelter in Orange County in 28 days.

And Lee Raagas talked about the other side of best efforts, which is the City's emphasis on PSH. PSH is too slow. If you're trying to create beds and meet milestones and deadlines, you have to move fast. That's what Matt Szabo was willing to do under roadmap agreement but not under the Alliance agreement.

The City's emphasis on PSH is too slow. It costs too much. We saw literally a building that's still in the works. $925,000 per unit and still in the works. And not done yet.

We saw unrealistic construction dates in the City's own data according to Lee Raagas who has a lot of experience with permanent supportive housing, and you even saw some of the Alliance buildings. The buildings that were in the Alliance bed plan or reported quarterly

under other City documentation, nothing's even been started yet.  Not applicable.  Construction start date not applicable.  Construction ending.  That is not best efforts, Your Honor.

At the end, we've produced evidence that the City has failed and fallen short of best efforts.  But the best efforts burden is really the City's.  All they did was present aspirational testimony from Matt Szabo.  That they're going to try really hard and they really think they can do it.  That is not best efforts.

And so under Section 5.2 the City has not only failed to meet those milestones and deadlines, but it has only failed to use best efforts to meet those, as Matt Szabo conceded they were required to do, despite what you're about to hear from Counsel.

The City is gaming the data rather than creating new beds.  That's another sign they're not in the best efforts place.  Why?  Because they're throwing up numbers like this at the very last minute, trying to close that gap through any means necessary.  Adding bed, after bed, after bed that they've never counted before, and you saw how flustered Mr. Szabo got when we played that testimony by his employee, Pedro, who talked about how these beds don't count.  And Mr. Szabo became very flustered.  One of the only times that he did on the

stand, because his employee admitted the truth.  That the City is counting beds that don't count.

And there's that argument of course that the City has discretion, but this is in the agreement. Don't let them point you away from this or try to convince you that this isn't there.  The City has that discretion only as long as the milestones are met.  And it makes no sense, Your Honor, if we've got to wait until June 2027 to figure out whether milestones are met.  Because if we're in June 2027 and the City has sole discretion only as long as those milestones are met, there will be no time to take that discretion away from the City.  This is in there for a reason.  The milestones, those quarterly milestones matter.  And if they aren't meeting them, they lose their discretion under the plain language of this agreement.  So that's breach number 2, Your Honor.  The City had to use its best efforts to comply with the milestones and deadlines and they haven't.

Breach number 3, Your Honor.  The City has an obligation under the settlement agreement to employ its best efforts to comply with milestones and deadlines for encampments.  So now we're moving from beds and a failure to meet milestones and deadlines under beds to a failure to meet milestones and deadlines and use best efforts to do so on the encampment font.

Again, 5.2 lights the way.  Plain language, the City will create those milestones and deadlines.  And under Roman II and IV, it's related to encampment reduction.  II, in each district encampment reduction in each district, and IV, encampment reduction citywide.  Required under the agreement.

We know that the City is reporting encampment numbers that are invalid.  And why?  Because we've already litigated this, and the Court has already made and reached a conclusion on this.  We submitted a brief, Exhibit 48.  Excuse me.  We submitted a brief.  The City submitted a responsive brief on this issue conceding that they're using this Care and Care Plus operations to be counted as encampment reductions and accusing us of trying to change the game on them.  The City is conceding that they're counting Care and Care Plus in that brief.

The Court after reading our brief and theirs reached a conclusion.  "The City may not report cleanups from programs such as Care or Care Plus" -- this is Exhibit 52 -- "as reductions to prove compliance with the settlement agreement because they are not permanent in nature."

The Court went on to say, "The City is only to report encampment reductions that have a more permanent meaning, such as individuals removed off the street and

given shelter or housing."

The Court has already decided this.  So the numbers -- they are reporting numbers in violation of the Court's interpretation of the plain language of the agreement.

What is a reduction, Your Honor?  You've already decided that and it's not Care and Care Plus.  So the numbers aren't valid and we don't have new numbers.  They've never reported new numbers that take out those Care and Care Plus.  In fact, it appears that those encampment reduction numbers are all Care and Care Plus.

But even if those figures were valid, even if what the City was putting forward were valid, and they're not based on the Court's Exhibit 52, the Court's determination, the City is short of its milestones.  And why?  Let's take a look.

This is Exhibit 47.  No dispute here that this is the City's encampment milestones.  And take a look right here, January to June 2023 and July to December 2023, the City proposed milestones and deadlines.  And then they submitted their reports, and their reports never referenced those time periods.  Reported nothing for those two time periods that they set milestones and deadlines for.  Complete silence from the City on that.

So if you look at their latest report that

seeks to be cumulative, that's Exhibit 63, their quarterly encampment report, look at where it starts.  It doesn't start in 2023.  It starts in 2024.  They report zero numbers in their quarterly reports on encampment reductions for two periods that they committed to making significant encampment reductions.  So you have zero reported encampment reductions in 2023.  Under the City's own numbers, those deeply flawed numbers, but nevertheless under the City's own numbers.

And so if we're talking about best efforts, Your Honor, first of all, if they're reporting Care and Care Plus, it's not even accurate but it's certainly not best efforts.  Because the reductions -- because they're not reporting actual reductions.  They're reporting cleanups.

But second, as to 2023, zero effort. Zero reporting of any numbers for two time periods that they committed to.

So breach number 3, Your Honor.  Check. The City has failed to use its best efforts to comply with the established milestones and deadlines that they set for themselves, Your Honor.  We didn't even edit them.

Breach number 4, and here we move to the roadmap agreement.  And I know we've already talked about this, so I'll move fairly quickly here.  But breach number

208

4 relates to missing and unverified new beds under the roadmap agreement.  No dispute.  Term sheet, Exhibit 1, contemplates 6,700 beds in 18 months.

Exhibit 2, the roadmap MOU also commits the City to 6,700 beds in 18 months.  But we just reviewed this, Your Honor.  In the A&M audit at page 64 there was no financial expenditures for 70 percent of the contracts reported by LAHSA on this.  And when they went to LAHSA and they asked about it, they could not validate the number of TLS beds.  And we share the Court's concerns about this.

Ms. Frost then went on to testify about the fact that there was found overlap.  Not potential.  They found overlap between Alliance beds and TLS beds.  That was not ambiguous testimony, Your Honor.  And it was not ambiguous testimony when Ms. Frost said that what she received often did not include street addresses.  And so those TSL beds could not be verified.

So you've got 2,000 plus TLS beds that can't be confirmed.  Two thousand less beds.  If those 2,000 less beds are indeed as A&M reported unverifiable, then the City is violating the roadmap agreement.  And once again, the City is going to talk a lot about best efforts but there's no best efforts language in that roadmap agreement.  None at all.  They can't fall back on

209

it.  They can't be saved by a best efforts argument under the roadmap agreement.

Now, and we know also,  putting aside the questions here, we also know that the City provided -- the City counted 2,000 beds that would've been created even if the City did nothing.  They already had other funding.  There was already other funding in existence.  Those beds were inevitable but the City counted it as the creation of new beds.  That's also a reason to find that the City has failed to comply with the roadmap agreement.  So that's breach number 4, Your Honor.

So we have again those four breaches, Your Honor.  No bed plan created or provided.  Missed Alliance bed milestones.  Unverified beds.  Missed Alliance encampment milestones and deadlines.  Unverified reductions.  And then, of course, those missing and unverified roadmap beds.  An extraordinary amount of evidence to show that the City is breaching both of those agreements.

But let's talk about the system being broken for a moment.  Because we're here, obviously, to talk about the breach, but now we're also here -- I know the City doesn't want to hear this -- but we're also here to figure out what to do about it.  What is the sanction? What is the consequence of the City breaching this

210

agreement?  Well, if the system is broken and the City can't fix it, then an extraordinary remedy is required.

Mayor Karen Bass, we heard it played in her State of the Union address, audits confirmed.  What's she talking about there?  She's talking about not only the A&M audit, but she's talking about 25 years of audits that came before.  Not just one audit.  Audits confirmed what we already knew.  The system is broken.  She said this a few months ago, Your Honor.  The system right now, two and a half years into her administration, remains broken by the mayor's own concession.

And she came into court here--  not during this evidentiary hearing but previously -- and she said -- she stood right over there -- and she said to the Court, "I know there's a lot in this A&M report.  I know there's a lot in this report that I agree with."  We don't know exactly what she agrees with because she didn't testify, but here she is saying there's a lot in that A&M report that she agrees with.  That stands in stark contrast to what the City has done over the course of this evidentiary hearing disagreeing with virtually every aspect of the A&M audit, even though their mayor agrees with a lot of it.

That A&M audit is replete with findings rooted in careful consideration based on evidence that the City itself provided and documented.  That the City itself

provided and had every opportunity to provide to A&M. Poor data quality. Unable to quantify the total amounts spent by the City. They found $2.3 billion but they couldn't count more because the City couldn't even provide the evidence of that. Disjointed continuum of care system.

A&M found limited financial oversight in performance monitoring. Lack of contractual clarity and accountability. Costs and service variability. And a lack of reconciliation that led to confusion about the total amount expended on homelessness and assistance services. These are the key findings of the report. The report that the mayor said she agreed to this court. In this court. The mayor said she agreed with a lot.

Now, what did the City do with this report? It skimmed it and then it spent this entire proceeding dismissing it.

Dr. Agonafer was asked, "You're the deputy and sitting mayor on homelessness. You just skimmed an audit, a court-ordered audit on homelessness?"? All she had to say was that she received a lot of emails and reports. The deputy sitting mayor on homelessness did not have the time to actually sit down and read carefully a court-ordered audit on homelessness in Los Angeles containing findings that the mayor agrees with.

212

The Special Master report confirms the system's broken.  47.8 of the individuals who exited emergency shelters were in their own housing, returned, or remained homeless, underscoring systemic failures in sustainable housing placements.

The Special Master goes on to say, "The absence of comprehensive funding plan for the bed deficit in this case, and the beds, units in progress raises concerns about the feasibility of meeting the obligations under the settlement agreement in this case."  So the Special Master's findings confirm what the audit found.

And then you have 25 years of audits preceding this.  Audits that my colleague, Ms. Mitchell, went through carefully with Mr. Szabo confirming what A&M said, what A&M has also concluded, and what the mayor has conceded that the system is broken.

What this hearing shows is that the City is not fixing that broken system.  It's simply doubling down on that broken system.

So the settlement agreement was breached, Your Honor.  That's what the evidence shows.  The system is broken.  That's what the mayor concedes.  And we submit that receivership is the only way to fix that broken system.

Now, I'm pulling up Docket Number 277,



which is the Court's decision, prior decision in this case imposing a preliminary injunction. And I'm pointing to that because the Court made legal conclusions that hold true in that decision, that hold true to this moment. It was reversed on standing grounds, but these legal conclusions hold true.

The Court identified Plata, a case that we've relied on heavily in our argument for a receivership. The Plata case guides this Court's exercise of its broad equitable authority. The District Court's decision underlying the Plata opinion are analogous. The Court said this back in 2021, "analogous to the circumstances of this case and provides support for broad and judicial relief." Relief like a receivership. The Court's equitable authority has powerful equitable authority even in the face of government budgetary concerns.

And anticipating the arguments you're about to hear, yes, there are financial considerations inherent in equitable relief from a governmental agency, but federal courts have an obligation to enforce the Constitution and the laws of the United States and, dare I say, settlement agreements entered into by cities under the supervision of a federal court. The City is breaching its agreements. The system is broken.

Now, you're about to hear a serious of arguments. I'm going to sit down for a little while. I'm going to predict -- make a few predictions.

You're going to hear the word aspirational a lot. You're going to hear that the agreements don't mean what they say. For reasons unfathomable, you're going hear about Grants Pass, which has no application to this case. You're going to hear that the City is doing great on homelessness. And you're going to hear that city officials should be permitted and allowed to continue to violate agreements entered into under the supervision of this court. And you're going to hear argument that the City officials should be allowed to continue to fail on homelessness. I'm going to suggest that the Court reject those arguments.

The final thing I'd ask the Court to keep in mind as it listens to the arguments of the City is that based on statistics, seven people dying a day -- seven plus -- on the streets of Los Angeles, people experiencing homelessness, over 60 people have died here in Los Angeles. People experiencing homelessness have died while this hearing has taken place. Women and children are sleeping on skid row in a safe place organized by Dewey Terry. And they've been doing so every night while this hearing has been going on.

I'm going to ask the Court to keep that in mind as we hear from the city.  Thank you, Your Honor.

THE COURT:  All right.  Counsel, would you like a recess?

Will you be next, Ms. Myers, or will the City?

MS. MYERS:  It'll be the Intervenors, Your Honor, and yes, a recess --

THE COURT:  Okay.  Do you want ten minutes or so to get set up?

MS. MYERS:  Yeah.  That'll be great.

THE COURT:  All right.  So we'll take a recess. Thank you.

(A recess was taken off the record.)

THE COURT:  We're back on the record.  All counsel are present.

And would you reintroduce yourself to the record and who you represent?

MS. MYERS:  Yes, Your Honor.  Shayla Myers, with the Legal Aid Foundation of Los Angeles on behalf of the Intervenors, Los Angeles Community Action Network and Los Angeles Catholic Worker.

THE COURT:  Please.

MS. MYERS:  Your Honor, the Intervenors in this case appreciate the opportunity to be here today.

Obviously, this proceeding has been different than the Intervenors expected when this court extended its ruling that the LA Alliance could enforce the orders by asking the Intervenors to participate in these proceedings.  But we appreciate Your Honor's opportunity to be here to make arguments, and also recognize the unique position that the Intervenors are in, in these proceedings and throughout the case.

The Intervenors, Los Angeles Community Action Network and Los Angeles Catholic Worker, have been a part of this case since the beginning advocating not only on behalf of the organizations, which have long standing relationships to the skid row community, but also on behalf of their members who represent hundreds of unhoused residents of skid row and the City.

They are the individuals who are the most impacted by the City's policies, by the City's practices, by the City's failures.  And by this City's decisions, for example, in this case to define encampment reductions as the seizure of tents, and makeshift shelters, and vehicles.  Because Your Honor, they are the owners of those tents, and makeshift shelters, and vehicles.  And they are also the individuals who are waiting for the 12,915 beds that the City committed to build in this case.

As Intervenors in this case, Your Honor has

noted repeatedly we are in a strange position of having to decide whether to side with LA Alliance, whether to side with the City, or to forge our own path, and that is often what happens.  And to an extent, that is the argument that we are going to make here today.

Intervenors have been repeatedly asked in the course of these proceedings by the press, by others, by our members, what the Intervenor's position is here. And the position is very, very clear.  The City of Los Angeles entered into a settlement agreement with the LA Alliance in June 2022, and the purpose of that agreement was to obligate the City to create 12,915 new beds and to set milestones and plans related to other aspects of the case.

Both the LA Alliance and the City have argued for purposes of these proceedings that the settlement agreement is at issue here, but we would disagree.  It's not the settlement that is at issue in these proceedings, because the LA Alliance is seeking sanctions against the City of Los Angeles pursuant to this court's authority.  And so what is actually at issue in these proceedings, particularly related to the settlement agreement, is this court's order incorporating by reference the agreement between the City and the LA Alliance, and the settlement agreement and the terms

therein.

This is not a distinction without a difference, Your Honor. It is incredibly important that this court entered an enforceable order in June 2022 that retained jurisdiction to enforce the terms of the agreement.

Perhaps, it's not surprising to anyone in this room that Intervenor's primary concern for purposes of this motion, and for purposes of enforcement of the settlement agreement, is the encampment reduction plan that the City of Los Angeles and its city council approved on January 31, 2024, that was provided to the LA Alliance, who also agreed to it. But what is missing from that chain is this court's approval of that agreement.

When this Court approved the agreement between the LA Alliance and the City of Los Angeles in June 2022, this court understood its obligation to review the settlement agreement and put its stamp of approval on that agreement, because that is what is required for this court to retain jurisdiction under Article 3 to enforce that agreement.

And so this Court held proceedings. This Court allowed the Intervenors and the public to object to that settlement agreement. The parties were allowed to submit briefs. The parties were required by this court to

justify the terms, to justify the legality of the terms, and critically -- and I keep going back to this point -- Intervenors were allowed to object.  Because there was an understanding, Your Honor, that when the Intervenors were allowed to join this case in March 2020, it is because they had defensible rights related to the issues and claims in this case.

So in January 2024 the parties reached an agreement related to the milestones and the encampment reduction plan.  But it was a private agreement.  It was not submitted to this Court for approval.  It did not go through a process.  And as a result, it was not incorporated into the order that is before this court today for purposes of the LA Alliance's compliance and sanctions that it is seeking from the Court.

And Your Honor, the City previously raised the ability of the LA Alliance and the Intervenors to seek enforcement of the agreement, the roadmap agreement and the settlement agreement, and particularly, Intervenor's ability to seek enforcement of the settlement agreement.

Your Honor, the authority to enforce the order rests with this court.  We stand here today, Your Honor, at the Court's invitation providing evidence and now argument about that, but the obligation of the Court to enforce its order rests with the Court's inherent

authority to enforce its order.  That is why we are here.
But it's also why we agree with the City of Los Angeles
that the encampment reduction plan does not count as an
enforceable order that the Court can issue sanctions
about.

Your Honor, that does not mean, of course,
that the Intervenors stand squarely aligned with the City
of Los Angeles.  Because for purposes of the encampment
reduction plan, we also agree with the LA Alliance and
also this court in terms of the interpretation of what
constitutes an encampment reduction plan.

The agreement incorporated by reference by
this court between the LA Alliance and the City of Los
Angeles from June 2022 requires the City of Los Angeles to
create a plan related to encampment reductions and to use
best efforts to abide by those plans and milestones.  And
it also reserves for this court the ability to review and
decide the conflicts between the parties about
interpretations of those plans and milestones.  So from
Intervenor's perspective, that is the issue that is solely
before this court.  That falls solely within the
jurisdiction of this court, and that the Court has already
addressed.

There is critical debate between the LA
Alliance and the City of Los Angeles about what it means

221

to reduce an encampment for purposes of this agreement. Plaintiffs argue that the City of Los Angeles is required to reduce encampments, to move people from encampments into beds. And in fact Your Honor has already ruled on this particular issue, agreeing with the Alliance.

But for purposes of this hearing and previously, the City of Los Angeles has taken a somewhat untenable position that the encampment reductions mentioned in the agreement mean solely the removal of a tent, a makeshift encampment, or a vehicle from the streets of Los Angeles. That definition of what it means to remove a tent, a makeshift encampment, or a vehicle from the streets of Los Angeles is critical not only for purposes of determining whether and to what extent the City is meeting its milestones, but also whether and to what extent unhoused folks' rights are protected for purposes of this agreement.

The City's definition of an encampment reduction or an encampment resolution -- because Your Honor those terms have been used interchangeably throughout this litigation by the City, by the Special Master, by this court, by Plaintiffs. The City's attempt now to define an encampment resolution as the removal of a tent, a makeshift shelter, or a vehicle completely ignores what it means to reduce an encampment.

Under the City's definition, an encampment reduction is counted any time a tent is thrown away, anytime an unhoused person's tent is seized by the City of Los Angeles, whether that tent is discarded or that tent is sent to storage for retrieval later by the unhoused resident.  It includes any vehicle that is towed by the City of Los Angeles as part of an RV operation, irrespective of why the vehicle is towed.  Completely irrespective of whether or not the tow is legal, whether the tow is overruled through a tow hearing, or whether or not the tow, the vehicle, is returned to the owner, and whether or not that vehicle returns back to the street.

The City's definition that they are putting forth in these proceedings are untenable.  It ignores the generally understood definition of encampment resolution as numerous witnesses attested to.  Mr. Szabo attested that there's a generally understood definition of encampment resolution.

The City of Los Angeles routinely engages in encampment resolution operations.  The documents provided between the parties specifically define what encampment resolution means.  It means providing shelter and housing opportunities to enforcement actions that help people get off the street.  It is clear from all of the evidence in the record that, that is what an encampment

resolution entails.  The only time the City has defined encampment resolution as something other than an operation to move people off the streets is for purposes of the encampment reduction plan, where they have defined it as the removal of a tent, makeshift shelter, or vehicle.

Your Honor, removing tents does nothing to reduce an encampment. By the plain language of the agreement, removing a tent is not reducing an encampment. Individuals from skid row testified that when the City takes tents in skid row, they give tents to people so that they have tents that they need to survive.  When the City takes tents from people in skid row, it just means that people like Barbara Brown have nothing except a cardboard box to sleep in overnight.

When a city takes a tent it just means that in the heat of the day in skid row that unhoused residents have nothing to shelter them.  But it doesn't mean that an encampment has been reduced.  It just means that unhoused folks have lost their belongings.

The City's primary justification and the argument that they have made, both in their opening and throughout the witness presentation in this case, that the City cannot rely, or did not intend to mean encampment resolutions to mean taking people off the streets and getting them into shelter is because the City can't

224

guarantee that people will come inside. But they can, Your Honor, guarantee the City can take away their tents, their makeshift shelters, and their vehicles.

Your Honor, that evidence is a complete and total disregard for the property rights and interests of the unhoused folks who own those tents, makeshift shelters, and vehicles. Because just as -- and the City gets it right on this point -- an unhoused person has to consent to come inside, an unhoused person has to keep a tent on the sidewalk. They have to park their vehicle illegally.

Your Honor, by interpreting the encampment reduction plan as removing tents, and makeshift encampments, and vehicles from the public right-of-way, the City of Los Angeles is effectively placing a quota for LA sanitation workers and LA DOT officers to seize unhoused people's belongings. To tow their vehicles.

Your Honor, using the Vehicle Code to tow vehicles and setting a quota that the City is now asking this court -- or that the Plaintiffs are now asking this court to enforce -- flies dangerously close to the California law prohibition on setting quotas for enforcement of the Vehicle Code. Because at bottom, that is precisely what the City of Los Angeles is doing. They are suggesting that in the course of these court

225

proceedings that the City of Los Angeles was entitled to set a quota for the removal of unhoused people's tents, makeshift shelters, and vehicles.

Your Honor, the City's argument that it cannot rely on third parties, i.e., on house folks, for purposes of the obligations to move people inside completely withers away.  If the City's other argument stands, which is that this is not an enforceable obligation under the settlement agreement but rather an aspirational milestone. Because if it is an aspirational milestone of the City of Los Angeles, then it is consistent with that aspirational milestone that the City would bring people inside.  And in fact, that is consistent with the City's representations about what is happening every day through the Inside Safe encampment reduction operations.

The City's own deputy mayor of homelessness and community health testified that when individuals are offered shelter they are likely to come inside.

Your Honor, Special Master Martinez who has spent years talking to folks on skid row said exactly the same thing.  That when individuals are offered shelter and that shelter is offered with trust, when trust is built, when the City does the hard work of outreach and connecting with people, they come inside.  And under those

circumstances, encampments are reduced.

And so, Your Honor, if the encampment reduction plan is as the City argues an aspirational milestone, then it's exactly consistent with the City's representation that they are engaging in encampment resolutions to move people inside. And in fact, Your Honor, it's entirely consistent with relying on Inside Safe as the City's premier encampment resolution operation. Because according to the City of Los Angeles, that is their best effort to bring people inside.

But, Your Honor, as I mentioned, this is largely beside the point. The definition of what constitutes an encampment reduction has already been decided by Your Honor. This issue was briefed, and Your Honor ruled that an encampment resolution means bringing people inside. It does not mean simply removing a tent, makeshift shelter, or vehicle from the public right of way.

The City of Los Angeles was well aware when it submitted its report to the Court that there was a dispute -- that this court had ruled on this dispute about the definition of what constitutes an encampment reduction, and yet the City of Los Angeles has continued to rely on its previous definition of encampment resolutions for purposes of reporting to the Court.

227

But, Your Honor, if there was an open question about what constitutes an encampment reduction, nothing about the evidence presented by either the Plaintiffs, or the City, or through Intervenor's questioning, should challenge the Court's ruling on this issue. The plain language of the settlement agreement, as well as the extrinsic evidence offered by the parties about what they intended, all support this court's definition already decided about what constitutes an encampment resolution.

Your Honor, the City disagreed with your ruling, but they did not seek reconsideration. They have not asked this court to reconsider it. They simply argued in these court proceedings and attempted to develop evidence related to it. That's both inconsistent with the Rules of Civil Procedure, but it's also placing the City in violation of the agreement because the City is not reporting, as it is required to do under the settlement agreement, the efforts that its taken to its milestones.

Your Honor, the City wants it both ways. They want to argue that the milestones are unenforceable, but also that the Court has no role in interpreting the agreement. That is untenable given this nature -- the structure of the agreement and the evidence put forth by both parties related to the intent.

Nothing about the City's definition of encampment resolution has ever come before this court. The fact that the parties as we sat here could not agree on what constituted the encampment resolution plan is a product of the parties' failure to bring that issue before the Court. And the City's continued argument effectively for a quota system, while ignoring the rights of the unhoused individuals who own the tents, makeshifts encampments, and vehicles are precisely why this court has oversight over the LA Alliance settlement agreement and the enforceable order that is currently before this court.

Throughout these proceedings this court has made it abundantly clear to all of the parties that the Court retained jurisdiction related to enforcement of the order, and also that any changes to the settlement agreement needed to both be consistent with Section 18 of the agreement, which the City has heavily relied on, but also needed to come before the Court. Because at bottom, we are here today on Plaintiff's sanction motion not because the parties entered into settlement agreements, but because Your Honor considered that agreement, approved the agreement, and incorporated it into an order issued by this court.

The one part of the agreement that the parties do agree constitutes an enforceable provision is

the obligation of the City of Los Angeles to construct 12,915 new -- Your Honor, to create 12,915 housing and shelter opportunities.  And just as with the encampment resolution plan, Intervenors are in an interesting position, Your Honor.

Intervenors routinely disagree with the Plaintiffs about the strategy necessary to reduce homelessness.  We strongly agreed with the Plaintiff's expert, John Maceri, who testified about throughput and the challenges that would come about if. as the Alliance has argued, the City constructed 12,915 new shelter beds tomorrow, and the challenges that would create to a system that didn't account for people to exit out of those shelters into permanent housing.

But, Your Honor, the fact that the LA Alliance, and Los Angeles Community Action Network, and LA Catholic Worker are engaged in inevitable dispute about what the best strategy is, is I believe precisely the City's point.  That individual parties that are to this lawsuit or in the public are not in the position to make decisions about what the City's policy should be about which beds the City should construct.  So to that point, the Intervenor strongly agreed with the City of Los Angeles.  The settlement agreement is airtight, Your Honor, in terms of the City's discretion about which beds

it should build to meet its obligation to create 12,915 housing and shelter solutions.

But that discretion, Your Honor, only goes so far, because the settlement agreement is also explicitly clear that the City must create 12,915 housing and shelter solutions.  The agreement, as many individuals testified, is silent on the definition of the term "create."  And in fact, when Intervenors objected to the settlement agreement and raised concerns about what constituted the creation of beds, attorneys for the City relied on the plain language of the term "create," arguing that the plain language of bringing something into existence was clear.  Not what the settlement requires.  That the City bring into existence 12,915 housing and shelter obligations.

Throughout the course of this -- these proceedings, the City has put forth evidence that the settlement agreement keeps discretion with the City in terms of how to meet its obligations under the settlement.  And while that may be true for all of the public policy reasons, it does not rest discretion with the City of Los Angeles to define "create" in a way that otherwise eviscerates the City of Los Angeles' obligation to add or bring into existence housing and shelter beds.  And I raise this issue, Your Honor, because it goes to one of

the other fundamental points at issue in this evidentiary hearing, which is the City's ability to validate the creation of beds that it has put forth in its reporting to this court.

The City of Los Angeles is counting units and representing to the Court that those units have been created for purposes of the settlement agreement.  But the City does not appear to agree that the term "create" places any obligation on the City of Los Angeles to bring shelter and housing solutions into existence.

To be clear, Your Honor, Intervenors are not objecting to the inclusion of beds like Highland Gardens, which was a tourist motel that the City turned into interim shelter.  The City took what was otherwise tourist facilities and turned it into an interim shelter. Or the Mayfair Hotel, Your Honor, which was empty and those beds were brought online.  But the City is also reporting beds from the The Stuart, a hotel -- a residential hotel -- out in the Pico Union area in Los Angeles.  And Mr. Szabo testified that the City was not considering what The Stuart Hotel or any of the other beds that the City master leased whether or not those beds were previously affordable housing or housing reserved for people who are unhoused before those beds were brought online by the City of Los Angeles, before the City

considered itself to have created those housing or shelter units.

And that disconnect, Your Honor, calls into question the City's justification for its inclusion of those beds.  And it gets to the heart of many of the concerns that have been raised throughout the course of these proceedings, whether it is the Special Master's concerns that she could not locate permanent housing beds in HMIS, or A&M's concerns that it, too, could not validate the beds.  To the roadmap agreement representations, Your Honor, over 2,000 time-limited subsidies.  The existence of which could not be validated.

Your Honor, it harkens back to the very beginning of this case when a county auditor found -- and this is an auditor, Your Honor -- found that the City of Los Angeles could not validate more than 20 percent of the beds the City listed, and the City lost out an $8 million bonus as a result.

Your Honor, as a result of these sorts of disputes and the lack of verification from the City of Los Angeles, it calls into question the City's adherence to the one term of the agreement that the City concedes it can be held to account for.

Your Honor, attorneys for the City -- I'll back up.  Accounting principles were referenced numerous

times within the context of the A&M assessments and the idea of replication. That replication of results is critical. Well, Your Honor, the City of Los Angeles submits quarterly reports every quarter to the City of Los Angeles that it itself verifies related to data and documentation. But Your Honor, after $3.5 million in nearly a year, A&M couldn't replicate those results.

The City was put on notice on March 27, 2025 -- and the draft report of A&M through questioning from Intervenors and this court -- that there were questions and concerns about the validation of the City's representation related to the bed count. The City had weeks to meet with A&M to provide documentation that the City -- that the CAO themselves said they had, that they relied on, for purposes of validation. And in those six weeks, the City of Los Angeles did not provide the verification that would've allowed A&M to replicate the City of Los Angeles' quarterly report.

Your Honor, the TLS issue and the roadmap agreement was even more clear that A&M could not replicate the City's results. Based on the data that had been provided to them, the City was on notice and given an opportunity to provide that data and the City failed to do so.

In the course of these proceedings a lot



234

has been talked about, about the homelessness delivery system. A lot has been talked about the fact that they systems are broken. I will say the Intervenors and their members understand that -- I would say better than most in the room, Your Honor -- that the systems are broken. That the policies are failing our most vulnerable members.

But I would also say, Your Honor, that this case is not, nor has it ever been, about a broken homelessness services delivery system. No case can fix the homelessness delivery system. And if the case wasn't about that at the beginning, it certainly is not about that for purposes of the settlement agreement. Because the LA Alliance and the City entered into a settlement agreement that defined the terms of the enforcement going forward. And I will say, Your Honor, that for purposes of what is going forward, that is what matters.

But, Your Honor, what appears in the settlement agreement is significant. It is important, and it's tangible, and it literally means tens of thousands of people coming inside.

Your Honor has the ability and the obligation to hold the City of Los Angeles accountable to the provisions that appear in the settlement agreement. Intervenors are concerned that sometimes the conversation about the homelessness delivery system moves this court,

235

moves the public attention away from the issues at hand. It was a significant agreement between the LA Alliance and the City of Los Angeles despite Intervenor's objection to bring 12,915 units online.

The Court has the opportunity and the ability to ensure that every single one of those units, that every single one of the housing and shelter solutions that the City is obligated to create are actually brought into existence for purposes of the agreement. Doing that, Your Honor, requires oversight. It requires not a receiver, but it requires verification and data. It requires more information, Your Honor, not less about the City's obligations.

And, Your Honor, I would suggest that time is of the essence related to this. We are days away from the expiration of the roadmap agreement, something that I know Your Honor feels deeply as we run up against the June 30, 2025, obligation. Because no actions were brought to enforce the roadmap agreement to ensure that those -- that the beds were actually created -- we're now in a position where the City is left to verify the existence of thousands of beds.

Your Honor, the City can under its inherent authority order further validation of the City's obligations under the agreement to ensure that each and

236

every bed is created.  To ensure that the City fulfills its obligation.  And to ensure that the individuals who will be served by this agreement, who will be brought inside by this agreement, are able to rest their heads in those beds.

Thank you, Your Honor.

THE COURT:  Counsel, thank you.

Counsel, why don't we take 15 minutes --or 10 minutes until you can get set up; okay?

And so the next argument will be by the City.  And will 4:00 o'clock be convenient for you?  I want to give you enough time to get situated.

MS. EVANGELIS:  Yeah.  Thank you.

THE COURT:  We'll see you at 4:00 o'clock. Thank you.

(A recess was taken off the record.)

THE COURT:  Okay.  We're on the record.  All counsel are present.

And, Counsel, would you reidentify yourself for the record, please?

MS. EVANGELIS:  Thank you, Your Honor.  Theano Evangelis for the City of Los Angeles.

THE COURT:  Thank you.

MS. EVANGELIS:  This proceeding is about one question and one question only.  Whether the City of Los



Angeles has breached its settlement agreement with the Alliance. Both the plain text of the agreement and all the evidence presented over the past week make clear that the answer to that question is no.

The Alliance has no interest in proving an actual breach of the settlement agreement. Instead of focusing on what actually matters here, the actual terms of the agreement, the Alliance has looked for obligations in all the wrong places. Most notably, the agreements whereas clauses reciting its general purpose. All through the last week we heard about that. They've turned to a separate contract between the City and the County, even though we've said time and time again the Alliance is not a party to that agreement and they have no standing to enforce it.

And the Alliance has sought to draw sweeping but unsupported inferences from the expressly limited performance assessment that A&M conducted. The Alliance also questioned witnesses for hours on wide ranging policy questions that have nothing to do, Your Honor, with the party's settlement agreement.

They put on evidence about competing visions of how to address the homelessness crisis. For example, we heard from one witness who favors tiny homes. We heard from another who favors shared housing. And yet,

still another favors pairing housing with services, such as substance abuse counseling. And the list goes on and on. In short, the Alliance has attempted to turn this narrow proceeding -- again, which is limited not only by the constraints of Article 3, the limits on jurisdiction of a federal court, but also the parties' agreement -- into a referendum on the City's policy choices relating to homelessness.

The Alliance seems to be good at second guessing. They apparently have their own policy wish list they're trying to impose on the people of Los Angeles. At every turn, Your Honor, they're trying to micromanage the City of LA's homelessness policy. But of course, this isn't a trial to decide disputed questions of public policy. It was supposed to be, and it must be, a focus proceeding to determine whether the City has complied with the actual terms of the settlement agreement. Policy debates are for elected officials and the voters who elect them, not for the Alliance, and not for this court proceeding. So I will focus today, Your Honor, on the Alliance agreement.

The past week -- I say week but I think it's been more -- has made abundantly clear that there is no evidence whatsoever to suggest, much less carry their burden to establish by a preponderance, that the City has

breached any obligation under that agreement.  The

Alliance simply has failed to satisfy its burden to

establish any breach and, honestly, it didn't even really

try.

There are three terms of the agreement that

are at issue here, and I'd like to first turn to Section

8.2, which of course is the clause that pauses the City's

obligations in the event of an emergency.

Then there are the ultimate deadlines in

Section 5.2, which requires that the City hit concrete

targets on encampment reduction and new beds in 2026 and

2027, respectively.

And third, there are the interim targets in

the same section which requires the City to use "best

efforts" to meet milestone goals along the way to

eventually hitting those bed creation and encampment

reduction targets.

So let me begin with Section 8.2.  The

Alliance did not even acknowledge this provision.  Their

silence on it was deafening.  So that should be the

beginning and the end of this court's analysis at this

stage.  It says two very important things.  First, if a

local emergency is declared in the event of a fire or

other natural catastrophe, and I'll quote, "the

obligations of the City as set forth in Sections 3, 4, and

240

5 shall be paused." It doesn't say may. It says shall.

Second, in the event of an emergency that provision says the parties agree to meet and confer on any necessary and appropriate amendments to the settlement agreement. Now, everyone in this courtroom knows that devastating wildfires tore through our city in January. They destroyed an area larger than the City of San Francisco. The City declared an emergency as a result. And fire is the very first danger expressly listed in the agreement.

This is exactly the circumstance that the agreement contemplates requires a pause. Section 8.2 means that the Alliance cannot show a breach as a matter of law of any supposed interim obligations at this stage, and the Alliance has an obligation to meet and confer regarding potential modifications to the agreement.

Now, let's discuss that obligation to meet and confer. Section 8.2 tells us exactly what the parties are supposed to do when we have a disaster like the fire. The City reached out to the Alliance and it did just that. It sought to meet and confer immediately and multiple times. The Alliance refused to engage in this required meet and confer. That itself is an independent reason why this entire hearing is premature and it cannot result in a finding that the City breached its obligations.

241

Your Honor, the Alliance is the one who is in breach of their obligations under the settlement agreement.  But let me be clear, and the evidence shows this.  The City has not taken its foot off the pedal.  It has not paused efforts, as Mr. Szabo testified, to comply with the settlement agreement even in the face of the declaration of emergency based on the wildfires.  The City has not paused its efforts, Your Honor.  The most recent budget continues to make homelessness a top priority, and that's despite the fiscal challenges and the severe cuts to other important initiatives.  The most recent quarterly report also shows that the City has closed the gap on bed creation milestones, and it has exceeded its reduction milestones.

So there's another reason why it's too soon to be talking about any breach of the Alliance agreement. The settlement agreement requires the City to meet targets on encampment reductions by the end of June 2026, and to meet targetd on bed creation by the end of June 2027.  And despite the fires, the evidence shows that the City is still on track to meet or exceed its ultimate obligations. It is simply too soon to be talking about any of this. And the Alliance did not put on any evidence showing that the City won't meet its targets in 2026 and 2027 nor could it.

As Diane Rafferty correctly conceded, it's impossible to know what will happen by the deadlines. She said that no one in the room can predict the future. She doesn't have a crystal ball, and the Alliance doesn't, either. Laura Frost doesn't either. None of us do.

And, Your Honor, concerns are not evidence. We heard a lot from the Alliance about concerns. They have the burden of proof. They have to prove by a preponderance that the City will not meet its obligations in two years. They have not done that. They cannot do that.

So meanwhile, I will turn to the testimony of City administrative officer Matt Szabo, who testified for several days. He's the person who knows better than anyone else what the City is actually doing to combat homelessness and to comply with the Alliance agreement. And he testified, and it was unrebutted, that the City will meet its future obligations. He testified that he has no doubt whatsoever that the City has every intention and every ability to meet its obligations by the end of the agreement. He testified that he was confident that the City would satisfy its obligation to create 12,915 beds by June 2027.

He also testified that he had no doubts that the City would accomplish 9,800 reductions of tents,

makeshifts shelters, and vehicles by June 2026.  And he testified that there is a complete commitment from the mayor and every councilmember to meet the City's obligations under the settlement agreement.  And the City is putting its money where its mouth is in the current budget.

Mr. Szabo explained at length how the City has not retreated at all from its commitment to comply with the agreement.  And more broadly, to make meaningful progress in reducing unsheltered homelessness on the streets of our city.  In fact, Mr. Szabo testified that the City is already moving forward with the bureau of homeless oversight inside the housing department.  And that bureau will be charged with managing and assessing data from LAHSA and evaluating performance.  And coincidentally, that's a proposal that the Special Master suggested and testified to.

So, Your Honor, because the Alliance can't prove that the City won't meet its concrete targets in the future, it's hung up on the concept of best efforts.  And according to the Alliance, because the City has supposedly fallen behind the intermediate milestones for bed creation, the City must not have engaged in best efforts to meet its contractual obligations.  But of course, the testimony we heard proves that the Alliance is completely

wrong.  And Your Honor, once again, they're trying to flip the burden.  The burden is on them to prove a lack of best efforts, and they can't do that.

The Court heard about the City's Herculean efforts and that testimony dooms the Alliance's claim that there's any lack of best efforts.  Mr. Szabo coordinates efforts across multiple parts of government.  We heard about the housing department, the sanitation department, the police department, and others including LAHSA.  And he does that to implement a multifaceted response to homelessness.  And as Mr. Szabo explained, these efforts have increased the availability of permanent supportive housing, of interim units, and of tiny homes.  And that shows the City's complete focus and commitment to advance projects as quickly as possible.

And the fact that Dr. Agonafer, with her distinguished background, has been appointed to serve as the first deputy mayor of homelessness and community health is itself proof that the City is engaged in best efforts to comply with the settlement.  And the City is making significant strides in addressing the homelessness crisis.

And Dr. Agonafer told the Court about the innovative Inside Safe program, which has successfully moved people and even entire encampment communities off

245

the streets.  It's gotten them resources that they need and it's put them on track toward permanent housing.  It's a success story.  As Dr. Agonafer explained, change is happening.  She explained that over 4,300 people have been brought in from the streets and more than 1,000 people have been housed in permanent housing.

And so I want to address the issue that we heard the Alliance really focus on here.  They're hung up on this concept of new counting and Inside Safe beds, Your Honor.  But of course, Mr. Szabo explained that after Inside Safe had become established and its longevity was established, the City decided to include those beds in its count.  And of course, there's no requirement whatsoever, no limitation on the City's discretion, to decide that those beds count.  And that was Mr. Szabo's testimony, Docket 955 at 275 to 277.

And so this criticism of Inside Safe, it's really Plaintiffs that seem to be troubled that the City has succeeded in complying, because it's robbed them from some of their complaints about all of the work that the City has done.  None of this, Your Honor, seems to be good enough for the Alliance.

According to the Alliance, the City hasn't engaged in best efforts because the Alliance would've chosen to do things differently.  They criticized the plan

that the City provided in 2022.  They say that, that wasn't good enough for them because it didn't propose 12,915 beds through 2027 and they flyspeck it and they don't like it.  They're trying to micromanage.  Of course, it's not up to them to argue they would've done things differently.  It's about what's required under the agreement and the terms of that agreement are limited.

So, Your Honor, the Alliance also complains that the Inside Safe program is too expensive.  But again, they're ignoring the dramatic results of that program. The Alliance has no right to second guess the decision of the City's elected officials that, that program is an approach that's worth investing in.

So I'd like to turn to the encampment reductions.  And the Alliance is arguing that, that doesn't count unless the removal of tents, makeshift shelter, or vehicle is of a permanent nature.  Now, the agreement does not impose any such limitation.  And how could it?  What would that even mean?  This is a limited agreement.  It doesn't get into all of this.  And what counts as permanent?  How long would a person have to be inside?  How long would their acceptance of shelter have to last?  This is unworkable.

And, Your Honor, Intervenors also don't like the encampment reduction provision in the settlement.



But interestingly enough, back in March they announced in open court the same understanding of the agreement that the City has, that -- I'll quote from Docket 681 at 79, that "9,800 encampments represents tents and people's possessions and doesn't represent bringing the people inside." So Your Honor, the Intervenors never liked that provision for that reason. But of course, at that time the Alliance never objected to that reading of the agreement. It always knew that the 9,800 encampment reductions target was just about reductions without a duration. It is not defined. And the City cannot be held liable for breaching a promise it never made.

Now, the City can do more. It is doing more. It wants to do more. But that doesn't obligate it under the settlement agreement to do more. Of course not.

So Mr. Szabo testified that the 9,800 number for encampment reductions would have been unworkable if the City could count a removal only if the person left the streets permanently. Of course, I'll say it again, the City has no way of knowing at the time of removing a tent, structure, or vehicle -- sometimes which poses a very serious safety and public health risk -- that a person will stay off the streets for a significant period of time. So that's the goal of Inside Safe to move people inside but it's a separate issue entirely from

what's required under the contract.

And to be sure, as we've heard this week, the City has made significant strides in transitioning people into permanent housing, as Dr. Agonafer confirmed. But requiring that encampment reductions be permanent would hamstring the City, Your Honor. It would make reporting reductions unduly complicated and incredibly burdensome. And the City would never have agreed to that number, if compliance depended on third party's independent choices to accept permanent shelter for some undefined period of time.

So at bottom, the Alliance disagrees with the how here. The how in a number of respects, including how the City will add the 12,915 beds. But the Alliance doesn't get a say in the how. The agreement, Your Honor, unambiguously gives the City sole discretion to choose among any and all shelter solutions.

And going back to the prior slide, we can see that flexibility reflected in paragraph 3.2 of the settlement agreement. It lists all the ways, including but not limited to, any housing or shelter solution. And it places no limits on prior uses. It doesn't say only new construction. It includes master lease apartments. It includes rental assistance. We heard -- and it says right there -- it even includes family reunification. The

City isn't counting that, but it would have every right to.  It says that in Section 3.2.

That flexibility was key.  And Mr. Webster admitted in his testimony yesterday that the agreement nowhere says that the City loses that discretion if the interim milestones are not met.  And Mr. Szabo explained that, that would've been a nonstarter because the City needed that flexibility, given changes, changes in election of a new mayor, new city council.  The City's policy priorities at any given time are up to the elected officials and the people of Los Angeles.  And that flexibility was enshrined in this agreement.

So it's not up to the Alliance, or the Intervenors, or anyone else for that matter, to decide how the City chooses to comply with the settlement agreement. And that's for good reason.  Because as we heard this past week, there are legitimate debates about the best approach to addressing the homelessness crisis, and the Alliance's own witnesses confirmed that.

We heard form Ms. Funk who champions tiny homes.  She thinks her approach is the best interim solution because permanent housing takes too long to build.

The Court heard from Mr. Ulf who thinks that shared housing is the key to transitioning people off

the streets, and he's done great work in that regard.

And the Court heard from Mr. Maceri who believes after all his years of experience that addressing homelessness requires cooperation across federal, state, county, and city governments, as well as service providers. And he admitted there's no one size fits all solution.

So the fact that not even the Alliance's own witnesses can agree on the right policy solution only underscores that reasonable minds can differ, and that's okay. Policy makers can weigh the pros and the cons in choosing which responses to prioritize at ang given time. The agreement enshrines that flexibility.

But we have to be guided by law here and not just policy, and the Alliance it seems, Your Honor, simply has buyer's remorse. They must not like what's in that agreement because they're asking the Court to rewrite it. Of course, the settlement could have outlined particular, specific types of beds and specified costs that the City would have to create, but the agreement says the opposite. It leaves those choices to the sole discretion of the City.

The settlement could have made the milestones strict deadlines, but the agreement did the opposite. It included a best efforts provision because

everyone involved knew the milestones might not be met at any given snapshot of time.

The settlement could have paired encampment reductions with the provision of permanent shelter, but the agreement did no such thing.

The settlement could have made its broad recitals about the goal of reducing homelessness into enforceable terms of the agreement but it didn't.  There is zero obligation in that contract to "fix the system."

The Alliance seems to like the MOU with the County better.  But they, the Alliance, signed a five-year deal.  They didn't get an 18-month deal.  So apparently, they would've preferred that, but that of course is not the same deal.

And here, what the Alliance is trying to do is effectively assign meaning to undefined terms that modify the agreement.  But of course, that agreement can't be modified except by a writing signed by all parties. And the City never agreed to all the modifications that they're now springing on everyone and trying to impose on us.  And the Court cannot impose definitions of contractual terms that are contrary to the expressed intent of the parties, and for which there is no evidence that the parties would have agreed to.  In fact, the evidence is entirely to the contrary.

The Court in this proceeding can only enforce terms that the City actually agreed to, promises it actually made, when there's an actual dispute with an actual party, and that is what bounds this proceeding. And after a week of testimony, the Alliance hasn't offered any evidence capable of proving a breach of the actual terms of the settlement agreement. And that's what matters here.

Now, because the Alliance can't demonstrate a breach of its agreement with the City, it's attempting to enforce the terms of the MOU agreement between the City and the County. The simple legal problem here is that the Alliance isn't a party to that agreement so it lacks standing to enforce it. The only parties that indisputably have enforceable rights under that agreement, the City and the County, have never alleged any breach. In fact, the County didn't even actively participate in these proceedings.

So where there's no disagreement, and no dispute, and no case or controversy between the City and the County, why are we even talking about that agreement? But even if it could enforce the MOU, the Alliance hasn't met its burden to establish a breach of that separate agreement.

The Alliance focuses on the City's promise



to provide beds.  They claim the City hasn't lived up to this promise because the A&M assessment noted that the City hadn't exclusively used its own funds instead of also using federal and state funding to meet its obligations. Now, that's a tortured reading of the word "provide," and it makes no sense whatsoever.

Mr. Szabo testified it would be nonsensical for the City to agree to fund the beds from a single source, from its general fund, and to forego federal and state funding sources.  Why would any of us want that?  No city operates that way.  No city would agree to operate that way ever.  And taking advantage of other available funds, Your Honor, is good stewardship of taxpayer dollars.  It's not breach of an agreement.  It's not something to be condemned and criticized, as the Alliance would have it.

The Alliance also suggest that the City's performance under the MOU must have fallen short because of supposed data issues at LAHSA.  But the evidence it presented was both limited and unreliable.  The Alliance relied on the A&M assessment, but of course that assessment did not follow any recognized standards that would allow others to evaluate its conclusions.  The assessment does not link its high level qualitative criticisms to any specific breach of either the Alliance

settlement agreement or the MOU.  It purports to identify potential risks not any materialized risks.  And it is, of course, of zero probative value because neither the assessment nor any of the audits speak to the City's compliance with any of its contractual obligations.

The Alliance called Ms. Vaughn Henry, a disgruntled former employee of LAHSA who hasn't worked there in almost two years.  But again, as Mr. Szabo explained, the City reports less than five percent of its beds based exclusively on LAHSA data.  Rather than provide this court with actual admissible evidence to support its suggestions of misconduct, the Alliance asked the Court to rely on irrelevant speculation about spreadsheets on a laptop and inflammatory accusations from someone who clearly has an ax to grind.

But, Mr. Szabo, who knows best, explained that the City is very conservative about what beds it reports to this court.  To the greatest extent possible, he testified he's certain that everything that is reported is verified and verifiable.  And the City is continuing to verify its data to ensure accuracy going forward.  And of course, the City has the burden -- does not, Your Honor, have the burden of proof.  Plaintiffs have the burden, and neither Plaintiffs nor Intervenors have ever offered any alternative bed count or encampment reduction numbers that

are different from the City's numbers.  It's all speculation.  It's all concerns.  It's all unfounded.  And it's all insufficient to carry a burden of proof by a preponderance.

All of us, including the City, care deeply about improving the situation of all those who are experiencing homelessness.  We acknowledge, Your Honor, that this issue is of utmost importance, and the City has made it a priority not just with its words but with its deeds.  On day one of her administration, Mayor Bass declared a state of emergency concerning homelessness. And working with the city council, they've invested immense resources to help our unhoused neighbors, treating them with dignity and compassion, and working toward long-term solutions to an issue that plagues cities across the country, as we heard Dr. Agonafer testify.  And it was very compelling.

These proceedings have also showcased, though, that there's no easy answer.  No easy solution to this challenge.  In fact, this trial has shown once again that even the people who know the most homelessness disagree about the best approach.

And, Your Honor, the Alliance was right about one thing in their opening.  I am going to bring up Grant Pass because I think it really drives the point

home.  There's one thing we can probably all agree on here.  That lawyers are not going to solve the homelessness crisis.  And court proceedings like this are not the way to decide the right answer to these policy questions.

That's what the Supreme Court wisely observed in <u>Grants Pass</u> when it told us many cities across the American West face a homelessness crisis.  The causes are varied and complex.  The appropriate public policy response is perhaps no less so.  Yes, people will disagree over which policy responses are best.  They make experiment with one set of approaches only to find later that another set works better.  They may find certain responses more appropriate for some communities than others, but in our democracy that is their right.  Nor can a handful of federal judges and proceedings like this begin to match the collective wisdom the American people possess in deciding how best to handle a pressing social question like homelessness.

So although the Alliance asked this Court to decide these questions, Your Honor, it's as though the Supreme Court were talking about this very proceeding.  This is very complex.  No one has the answers.  And certainly, it's not up to all of us to decide these huge issues right here.  It's up to local governments, elected

officials, and dedicated public servants like Mr. Szabo, and Dr. Agonafer. Not the Alliance. Not the Intervenors. And not this proceeding. Those elected officials are the ones who are best positioned to solve this problem.

So I will end, Your Honor, by addressing the Alliance's radical and unprecedented request for a receiver. Someone that the Alliance in their own words had said will become the homelessness czar for the city. Let's stop for a moment and think about that. It truly is stunning that they would suggest that, especially after all the evidence we heard this week. We should never even get to the remedy stage in the first place, because the Alliance hasn't come close to satisfying its burden of proving a breach, much less that the City is incapable of complying with the agreement's final targets in 2026 and '27. Nor has the Alliance, though, even attempted to prove the necessary violation of federal law which would be required before this court could override the very structure of state government in the way that they are asking it to.

It is clear that this radical remedy is only available where some state law conflicts with federal law like Keith v. Volpe, from the Ninth Circuit. But here, we're only talking about a settlement that's governed by California law. There's no constitutional

issue being decided by the Court.  There's no federal law issue.  It's a state law issue.

But more importantly, imposing a receivership would be a terrible setback for all the progress we heard about this week.  Deciding how to respond to the homelessness crisis is an incredibly difficult policy question.  I've said this time and again and so have many others.  It cuts across many disciplines.  It requires the input and collaboration of experts in housing, mental health, substance abuse, and more.  It requires immense coordination between not just city governmental departments, but the county, the state, the federal government.  A receiver would never be able to seamlessly take control of that complex system and generate immediate results.  We all know that's not how things work in the real world.

Instead, any receiver would have an enormous learning curve.  No receiver will have a quick fix to this problem because none exists.  Solutions will require hard work and investment over time.  And the City's leadership has shown that's exactly what they're doing.  But it's not going to be something that's solved by a receiver's magic wand.  We heard the Alliance suggest this, but they have not answered any of the enumerable and unending questions that would arise in the event of a

receiver.

Would the receive have the power to appropriate money form the City's general fund?  If so, how much?  And at what cost to other priorities?

Would the city council and the mayor have any say in the matter?  Would the receiver take control of the LA Housing Department?  The LA Police Department?  The LA Fire Department?  The Department of Sanitation?  And other city departments that are involved in the City's response?

Would the receiver be able to overwrite zoning laws?  How about building codes?  How about prevailing wage laws and other government contracting rules?  Environmental laws?  We didn't hear anything about those.

Would the receiver have a general mandate without any limitation or would the city council and the mayor have any say in determining what the receiver would do?  Would the receiver negotiate and coordinate with the county?  With the state?  And with the federal government?  Who would the receiver answer to?  How long would the receiver be in power?  What about the voters of the City of Los Angeles?  Would the receiver even have to answer to them in our democracy?

Would the receiver end Inside Safe?  Would

the mayor, and the deputy mayor, and the city council be powerless to stop that?  The questions are endless.  But the Alliance has no answers whatsoever.  They seem to not even have considered how this would work.  How any receiver could operate consistent with basis principles of democratic governance.  And it's significant that the Alliance has not identified any examples of a federal court imposing a receiver on a state or local government to act as an unelected czar to solve an ongoing, complex, and difficult public policy problem.  A problem that people of good faith have differing views as to the appropriate response.

At bottom, what the Alliance really wants here, Your Honor, is to dictate homelessness policy to the City.  But it's simply not the role of the Alliance to substitute its own policy preferences for those of our duly elected officials.

To the extent that these proceedings have become a referendum on homelessness policy, that is ultimately a question for the people of Los Angeles.  Not the Alliance.  And ultimately, not this court.  This court should deny the Alliance's motions seeking to enforce the settlement agreement, including, Your Honor, it's unconstitutional, unprecedented, and unlawful, and unjustified receivership request.

261

Thank you.

THE COURT:  Counsel, thank you.

About 10 -- 15 minutes, Counsel, and we'll return.  So you can set up.  You have ten minutes.

MR. UMHOFER:  Your Honor, I'm ready to go.

THE COURT:  All right.

MR. UMHOFER:  Your Honor, I think most of my predictions turned out to be correct about the City's arguments.  But I want to start with is talking about what the City could have done in this hearing and even in that argument.

The City could have explained why it hasn't to this day complied with the requirement, the unalloyed requirement, to create and provide a bed plan that meets the 12,915 goal.  The City hasn't done it.

The City has not explained why it missed its milestones or deadlines, offered no explanation whatsoever.

The City failed to explain why it never provided a single report of a single encampment reduction in 2023, even though it created milestones and deadlines for itself in 2023.

The City could have provided actual evidence of best efforts.  Perhaps, something more than Ms. Szabos commitment.


HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

The City could have proved that the numbers and the data aren't compromised.  But they didn't do any of those things, Your Honor.  Instead, they made a series of bad arguments, and let's run through them.

Bad argument number 1.  The whereas clauses in the agreement don't matter.  They're missing the point, Your Honor.  There is a clause, a whereas clause that's quite important, that makes it clear that the purpose of the agreement is to substantially increase the number of housing and shelter opportunities and reduce unsheltered homelessness in Los Angeles.  That's the purpose of the agreement.  They drafted that language, Your Honor.

The reason why that purpose is important is when you compare it to the City's tortured reading of the agreement, it is so at odds with that purpose that it cannot be credited.  Under the City's tortured reading, milestones and deadlines neither exist nor matter.  The agreement says milestones and deadlines but they don't matter, and the Court can't do anything about that.

Under the City's tortured reading, the City can do nothing until June 2027 and still be in compliance.  Mr. Szabo conceded that.  He conceded also that it's preposterous, but he conceded that the preposterous is consistent with this agreement and that cannot be in light of the purpose of the agreement.  The City insists that

it's enough that the City truly believes that it'll get there by 2027.  That also is not consistent with the purpose of the agreement.

You heard the questions.  Under the agreement, could the City stand up 12,915 beds the day before the expiration of the agreement and shut them down the day after?  And Mr. Szabo confirmed that that's the City's interpretation of the agreement.  Totally at odds with that crucial articulation of purpose.  And of course, the notion that the City -- that the Court cannot enforce anything under the agreement until 2027, I suggest that that's totally at odds with that purpose.  That focus purpose of getting the number of people on the streets down and getting the number of people in beds up.  That's what this purpose is for.

And so you have to -- when you're looking at the City's arguments you have to compare it to this purpose.  And those arguments that don't line up with this purpose, especially in light of the plain language of the agreement, should be rejected.

Bad argument number 2, Your Honor.  The fire pauses the agreement.  That's 8.2.  They're pointing to that to say that this whole court is out of order.  Let's talk about why 8.2 doesn't affect this hearing at all.

The City bears the burden on 8.2.  It hasn't proved that it's been triggered.  The Court may assess the application of 8.2.  It doesn't have to take the City's word for this.  The City's -- 8.2 contemplates a prospective forward looking pause in the agreement, but it does not immunize past violations.  There's nothing in 8.2 that says the Court can't look backward to see if the City was complying with the agreement before 8.2 was triggered.  This is all about a pause.  It says obligations under this agreement shall be paused.  A pause in obligation is neither a stop nor a pardon for past violations.  And Mr. Szabo himself confirmed.  Something that they conceded.  So I'm not even sure, given this Mr. Szabo's testimony and their adoption of it, if 8.2 is even triggered because Mr. Szabo said, and they credited, we have not paused efforts.  So they are not operating under 8.2.  They've conceded that, Your Honor.

Now, this whole idea of -- I just -- I'd invite the Court to look at Exhibits 217 and 218 on the meet and confer.  All 217 and 218 show is that the meet and confer effort happened after the City asked.  So there's no violation there.

Bad argument number 3.  Nothing matters until 2027.  Translation:  This court has no role to play in an agreement that it adopted jurisdiction over to

265

ensure the compliance with the agreement.  In fact, in the order it says specifically -- the Court's order that Intervenor's counsel referenced -- "The Court expressly retains exclusive jurisdiction to resolve any future disputes regarding the interpretation, performance, or enforcement of the agreement."  And the notion that this court has to sit on its hands until 2027?  That's what they're suggesting, Your Honor.  It's downright wrong.

Bad argument number 4.  The City's committed.  It's making strides.  Mr. Szabo was asked did the Alliance negotiate for commitments or for beds?  And he answered that question clearly.  The obligation is to establish the beds.

Bad argument number 5.  The Alliance is micromanaging.  This is a new one.  All we're doing, Your Honor, is reading the agreement and holding up a mirror to the City.  The City has that obligation to create plans.  It has to create plans for housing and shelter solutions, for the City, and each district in the City.  It has the obligation to provide those plans.  And the notion -- and all we're doing is asking the City to comply with that.  This is not micromanagement.  This is us asking the Court to do what it agreed to, which is to enforce and interpret the agreement over a five-year period.

And they're overlooking this critical



passage.  "The City may choose at its sole discretion any housing or shelter as long as the milestones are met."  So they can do what they want to get to the beds milestone by milestone, deadline by deadline.  But when they're not, Your Honor, their sole discretion goes away.  They negotiate it away, their sole discretion.  And they're not meeting those milestones, and Mr. Szabo confirmed that.  The Alliance is not micromanaging, Your Honor.  The City is failing to comply and we're holding them accountable.

Bad argument number 6.  The milestones are aspirational.  The City will -- the City will -- these are not aspirational.  It's mandatory.  Mr. Szabo conceded that the language in 5.1 is mandatory, and that language appears throughout 5.2, as well.

Bad argument number 7.  Best efforts.  Of course, we know that there's no best efforts limitation for creating and providing a bed plan.  They were required to do that not employ their best efforts.  That's in the agreement.  There's no best efforts language in the roadmap agreement.  They can't take refuge there.  The roadmap agreement simply requires the City will -- sound familiar? -- provide 6,700 new beds.

Bad argument number 8.  Encampment reductions don't count.  We heard this from both the City and the Intervenor.  I respectfully suggest that this is wrong.

5.2 requires the City to create milestones and deadlines for encampment reduction and then -- and so they were required to create those milestones and deadlines and they did.  Exhibit 65.  Exhibit 47, also.  There the encampment, milestones, and deadlines, the City was obligated under the agreement to create.  And the Court has specifically interpreted the settlement agreement to apply to those milestones and deadlines and make holdings around what those milestones and deadlines can and can't apply to in terms of what the City is doing.

Now, what the City and the Intervenors have overlooked is the definition that appears in 1.1 of the agreement.  The notion that this agreement is limited to its four corners is belied by the four corners of the agreement itself, which specifically says that the settlement agreement shall refer to this agreement and all associated documents.  I hereby present to you, Your Honor, the milestones associated documents.  The bed milestones and the encampment resolution milestones are obviously associated documents.

Not only that, Your Honor, the agreement clearly incorporated by reference the milestones and deadlines that were to be created.  It is permissible under the law to incorporate by reference documents that are created in the future, and that's precisely what

268

happened here when the agreement talked about the City creating those milestones and deadlines and then being bound to them.

Bad argument number 9.  The Alliance witnesses don't agree on the best approach to homelessness.  They're missing the point, Your Honor. There were many better options the City could have chosen. That's what those witnesses were here to say.  A whole panoply of different options, but the City didn't choose those options.  And it's now in breach because of that, and it's lost its discretion because of that.

Bad argument number 10.  No standing for the roadmap agreement.  I don't mean to belabor this, Your Honor.  Exhibit 2 specifically talks about this court enforcing that agreement.  They can't take that power away.  They agreed to give the Court that power.  Now, the Court had an opportunity to talk about this on May 15, and it specifically said that the roadmap agreement was entered into in direct response to the litigation brought by the Plaintiff, LA Alliance, and the Court held for all these reasons the Court can enforce and it finds it can enforce the agreement, and the Plaintiff, LA Alliance, is the proper party to argue this issue.  They're ignoring this court's prior holdings.

They made this argument on May 15, 2025.



The Alliance isn't a party, and the Court specifically said, "I've already resolved that issue."  You've already resolved the very issue they're arguing about, Your Honor.

Bad argument number 11.  Grants Pass.  I called it.  This is not Grants Pass, Your Honor.  I commend Counsel for their able arguments in the Grant Pass case, but we are not in Grants Pass.  We are in Los Angeles where the City has agreed to be bound by the terms of a settlement agreement.  This court has considered the City's agreement to be bound by the terms of that settlement agreement and held that the City cannot report clean ups by Care and Care Plus.  It's as simple as that.  Grants Pass was about constitutional limitations.  This case is about the breach of a settlement agreement.  Grants Pass has no place in this case.

Bad argument number 12.  The receivership would displace local official's authority.  My answer to that is exactly what we need.  I'm going cite the Court to itself, Docket 277.  This very argument was made and here's how the Court responded at that time.  "The Court, however, seeks to ensure accountability, promote action, and where there has been historic inaction."  No public interest is more paramount than protecting the lives of our citizens.  Not even the power of local officials to fail year after year on homelessness.

270

Plata's receivership, which was cited extensively by the Court in that order, is on all fours with this case. Tere was a settlement agreement. It was breached time and time again. The claims in that case were constitutional in nature, but the settlement agreement just like this one was breached and that was the basis of the receivership. And all those questions, those myriad of questions, it was a wonderful graphic, but all those questions were answered over time in Plata and they will be answered over time by this court in this case should the Court award a receivership.

We talked about the breaches, Your Honor. The evidence is powerful that every single one of these four breaches took place. The settlement is breached. The system is broken.

And I want to close by repeating the Court's words in its preliminary injunction order. "This court cannot idly bear witness to preventable deaths. This ever worsening public health and safety emergency demands immediate life-saving action. The City and County of Los Angeles have shown themselves to be unable or unwilling to device effective solutions to LA's homeless crisis."

Your Honor, those words are as true today as they were in the Court wrote them back in 2021. I

271

would urge the Court to find the City in breach and to place the City in receivership.

Thank you.

THE COURT:  First of all, I want to state on the record that I want to thank Counsel for the excellent briefing thus far and your excellent arguments.  It's been a pleasure.  I want to express that publicly to all of you folks who have worked so hard on this matter.

The second thing is I want to know what your position is from LA Alliance in terms of your opening brief.  I heard you had an agreement, then I heard you didn't have an agreement, and it makes a difference in terms of my timing and what I order in terms of a briefing schedule.

MS. MITCHELL:  Yeah.  If I can take a step backwards.  Originally, we had an agreement with the City, when we thought this was going to be a three-day hearing, that the Plaintiff's opening brief would be due on Tuesday, like a supplemental brief to what we already filed  The City's response would be due on the 9th and then we would file a reply on the 16th.

Now, as this hearing went long, we informed Counsel that because we had already briefed this issue substantially, we would waive any opening brief and refer to the prior pleadings.  And then the City would file its

opposition on the 9th, and we would file our response on the 16th.  So there would only be two pleadings.

I thought that, that agreement was still in effect.  It sounds like the City is withdrawing that agreement.  I still think that that's reasonable.  I don't believe -- because we've already submitted significant points and authorities on this issue, I don't know that we need another opening brief.  It would be like record citations, and we can do that in our reply, Your Honor.  So I still think we'd be willing to waive our opening brief or our moving papers, our supplemental brief, have the City file something on the 9th, have us respond on the 16th.  I think that's a fair briefing schedule.

THE COURT:  Let me turn to the City and then I'll turn to the Intervenor.

MS. EVANGELIS:  Thank you, Your Honor.  I think in light of the fact that we have had so many days of testimony and there's a lot of evidence, I don't think it would be fair for us to see the citation to evidence only in a reply brief we can't reply to.  So I don't think that, that briefing really fits with the circumstances now, that approach.  So I do think that the Court's suggestion that we have a normal opening brief, opposition, reply, makes more sense in light of all of the issues that have been aired.  And also, Your Honor, to

avoid sandbagging and any lack of opportunity to respond.

THE COURT:  Ms. Myers, what are your thoughts?

MS. MYERS:  Your Honor, I, too, was surprised that this issue was -- is being raised and that the City is now taking the position that we didn't have an agreement.  We hashed this out fairly significantly amongst the parties and came up with this agreement, understanding that we were going to do closings today and understanding that was the Plaintiff's position.

So we support the briefing schedule as it's proposed.  I would say as an alternative, perhaps the Court could require the City to file its brief on the 11th and allow the -- so that would give them an additional two days, and sort of split the difference.  But pushing for the briefing schedule-- they're pushing for -- that you proposed is dramatically different than what the parties agreed to.

MS. EVANGELIS:  And I think if we had -- I understand everything has been so much in flux.  Your Honor, if we had more time, the notion that we would be able to file a brief by the 9th seems unrealistic in light of all the time that has gone by.  So we're, you know, we're looking to the Court for the Court's guidance on what you would like, Your Honor.  But we would definitely want at least until the 13th, I would say, to file a brief

if we're going to be the first.

THE COURT:  I'll be right back with you then. Let me think that through for a moment.  Let me get a calendar and see what would be fair for all of us to get back to work, also immediately on this.

Let me raise another problem that has nothing to with your case.  One of the members of the City Attorney's office, a high ranking member, is applying for the bench.  And I've received an inquiry and apparently that member is relying somewhat on my input.  By the way, it would be very good.  Okay.  I don't know how important that is, but I didn't want to give that input -- it's due Friday.  And so if any party is uncomfortable with that, I'm happy to not give that input.  And I don't know how much that party is relying upon me, but that party's had extensive appearances in my court.  And you could guess who that is.

MS. MITCHELL:  Your Honor, the Alliance is also aware of this individual.  We have no objection.

THE COURT:  No objection.

MS. MITCHELL:  No objection.

THE COURT:  Ms. Myers, do you have any objection?

MS. MYERS:  I will abstain from providing an opinion on that, Your Honor.



275

THE COURT:  Okay.  Counsel, any objection?

MS. EVANGELIS:  No objection.

THE COURT:  Well, I think he'd be pleased with the input.  Okay.  So good.

All right.  Would you give us a few moments?  I'll be right back.

MS. EVANGELIS:  Thank you.

THE COURT:  We'll be right back with you in a few moments.

(A recess was taken off the record.)

THE COURT:  All right.  Counsel, thank you very much.  If you'd be seated.

We're back on the record.  All counsel are present.

I want to make certain before I set this schedule that there's been no further discussion or ability -- in other words, you want to govern yourselves or --any further thoughts?

MS. MITCHELL:  There's been no further discussion, Your Honor.

THE COURT:  Okay.  This is my best efforts.

Would you turn this around for just a moment?

I wanted to bring out a visual whiteboard so you could see it, but let me read this into the record

276

and then especially -- I'm concerned a little bit about the Intervenors because you got an interesting balance.

And so I've tried to -- and just give your request of 50 pages, which I wasn't inclined to do before.

So first, based on the evidence presented to the Court during the evidentiary hearing, the Court is concerned about verification of the 2,679 time-limited subsidies, TLS -- and I've read this to you before -- that are reported by the Court to comply with the roadmap agreement, most recently in the Court's status report dated April 15, 2025, Docket 891.

The Court's heard testimony from A&M assessment team that A&M could not verify a number of TLS beds due to expenditure gaps and missing addresses.

A&M also testified that some of the TLS addresses provided for roadmap were the same addresses listed for permanent supportive housing in the LA Alliance settlement reporting.

These issues raise serious concerns about the accuracy of the roadmap compliance reporting and potential double counting between the two agreements.

To ensure roadmap compliance, the Court hereby requires the City to provide the following data on the TLS beds and the roadmap reporting.

First, the HMIS identifier.

277

Next, the verification that this HMIS identifier is also logged in the CES system.

Next, the address of the lease being paid for.

Next, the move-in date of the lease being paid for.

And the current occupancy status of each TLS slot.

The Court requires the data to be provided by June 11, 2025, at 5 p.m. in a spreadsheet, format under seal.

The Court also requires that the City compare the TLS addresses reported for the roadmap with the addresses reported for the LA Alliance settlement and sign an affidavit stating whether there is any overlap of addresses in the reporting.

Further, the Court orders the following post-evidentiary hearing briefing schedule.

Plaintiff's opening brief is due Monday, June 9, at 3:00 p.m.  Thirty page limit.

The City's response is due Friday, June 13, 2025, at 3:00 p.m.  Fifty page limit.

Plaintiff's reply is due on Tuesday, June 17, 2025, at 3:00 p.m.  Twenty page limit.

The Intervenor's brief is due on June 17,

278

2025, at 3:00 p.m.  Fifty page limit.

And lastly, the County may also respond by Friday, June 17, 2025, at 3:00 p.m. with a 25-page limit.

I'm having that docketed this evening in a late-filing on our docket.

Other than that.  Thank you very much. Have a good evening.

MR. MCRAE:  Thank you, Your Honor.

MS. MITCHELL:  Thank you, Your Honor.

(Proceedings concluded)

-o0o-



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988

279

TRANSCRIPTIONIST'S CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          _____
JACQUELINE N. DENLINGER                          June 6, 2025


FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/Ann Bonnette
_____
ANN BONNETTE, CSR. NO. 6108, President
Huntington Court Reporters and Transcription, Inc.



HUNTINGTON COURT REPORTERS AND TRANSCRIPTION, INC.
(800) 586-2988