UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 221
Los Angeles, California 90017
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
matthew@umklaw.com
elizabeth@umklaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et al.*,<br><br>   Plaintiffs,<br><br>   v.<br><br>CITY OF LOS ANGELES, *et al.*,<br><br>   Defendants. | Case No. 2:20-CV-02291-DOC-KES<br><br>Assigned to Judge David O. Carter<br><br>**PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH**<br><br>Before: Hon. David O. Carter<br>Courtroom: 1 |

# TABLE OF CONTENTS

**PAGE**

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................1

I. Summary of the Evidence.................................................................2

    a.    Paul Webster........................................................................2

    b.    Emily Vaughn Henry ...........................................................5

    c.    Don Garza............................................................................7

    d.    Laura Frost ..........................................................................7

    e.    Diane Rafferty .....................................................................9

    f.    Matthew Szabo ................................................................. 11

    g.    Dr. Etsemaye Agonafer ..................................................... 16

    h.    Elizabeth Funk.................................................................. 17

    i.    Brian Ulf........................................................................... 18

    j.    Dewey Terry ..................................................................... 19

    k.    Lee Raagas ....................................................................... 20

    l.    John Maceri ...................................................................... 21

    m.    Michele Martinez ............................................................. 22

II. The Settlement Agreements Have Been Breached................................ 23

    a.    LA Alliance Agreement .................................................... 23

    b.    Roadmap Agreement......................................................... 24

III. The System is Broken..................................................................... 24

IV. Remedy for Breach ....................................................................... 25

V. Conclusion .................................................................................. 25

# TABLE OF AUTHORITIES

**CASE**                                                                                                                  **PAGE(S)**

*Bittner v. United States*,
   598 U.S. 85 (2023) .................................................................................................... 14

*Falkowski v. Imation Corp.*,
   132 Cal. App. 4th 499 (2005) ................................................................................ 14

*Regency Midland Constr., Inc. v. Legendary Structures, Inc.*,
   41 Cal. App. 5th 994 (2019) ................................................................................. 14

**REGULATIONS**

2 C.F.R. § 200.302 ......................................................................................................... 10

## MEMORANDUM OF POINTS AND AUTHORITIES

The seven-day evidentiary hearing held in this case distinctly demonstrated two things: (i) the Settlement Agreements have been breached, and (ii) the System is broken. The Roadmap Agreement was designed to rapidly increase the number of shelter and housing opportunities in the City of Los Angeles, thus providing significant relief to the unhoused (and housed) community. The LA Alliance/City Settlement Agreement was designed similarly but took the additional step of requiring not only beds to be established in a systematic manner according to the City's own established milestones, but also required that the City consistently engage, clean, and reduce encampments also according to the City's own established milestones. Thus, as beds went up, people would move into those beds, and encampments would go down. The City of Los Angeles has been in violation of both agreements for years and has taken and will take no steps to correct these issues without court intervention. Underpinning these failures is the wrecked homelessness response system—with patently insufficient data, financial, and substantive infrastructure in place to support the purpose of the agreements: to reduce unsheltered homelessness in a meaningful and significant way. (Ex. 25, Am. Fully Executed Stipulated Order of Dismissal ("Settlement Agreement") at Recitals, May 24, 2022, ECF No. 429-1.)[1] Thus, not only has the City breached the agreement, it *cannot fulfill* the terms nor the purpose of the agreement without a fundamental and monumental shift in the homelessness responsive system as designed. Court intervention is absolutely required to right this ship.

Plaintiff has submitted briefing on these subjects heretofore and refers to those pleadings and fully incorporates each as if fully set forth herein. (*See* Exs. 37, 49, 53, Mot. for Settlement Compliance, Reply, Resp. re Issues Raised by Court, ECF Nos. 863, 872, 899.) Rather than re-hash legal arguments which have already been made, Plaintiff refers herein to the evidence presented in support of Plaintiff's position which collectively

---

[1] All references to exhibits are those exhibits admitted at the evidentiary hearing.

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH*

demonstrates multiple breaches of both the Roadmap and Alliance Agreements and demands judicial intervention to rectify these serious issues.

## I.      Summary of the Evidence

### a.      Paul Webster

Mr. Webster, executive director for Plaintiff LA Alliance for Human Rights ("LA Alliance" or "the Alliance") set the table on behalf of the Alliance, identifying the specific breaches by the City of both the Roadmap and LA Alliance agreements.

<u>Failure to Produce Comprehensive Bed Plan</u>

The City identified, and LA Alliance agreed to, 12,915 as the number of beds required by the Alliance Settlement Agreement.  However, the City provided a proposed bed plan on November 9, 2022 which did not add up to the total bed commitment of 12,915: it only included 8,322 beds which was 4,593 beds short re the total number required. (Hr'g Tr. 38–43, June 3, 2025, ECF No. 969.) In the Fall of 2024, in response to Alliance pressure, the City proposed an updated bed plan but then withdrew it due to political pressure. Thus the City has still never produced a complete plan for the 12,915 beds as required by the Agreement. (Hr'g Tr. 30–31, May 27, 2025, ECF No. 947.)

<u>Failure to Meet Milestones and Deadlines for Bed Creation</u>

The City also provided Milestones and Deadlines for bed creation as required by the Agreement. (Ex. 25, Settlement Agreement § 5; Ex. 24, LA Alliance Milestones.) However, in tracking the City's reports against the Milestones and Deadlines (*see* Ex. 36, LA Alliance Tracking Chart), the City came consistently short of its obligations. The City only met its quarterly milestone twice out of 10 reporting quarters and has never, at any point since the inception of the Agreement, met its cumulative milestone. (Hr'g Tr. 32–43, May 27, 2025, ECF No. 947; Ex. 126, LA Alliance Open Beds Charts.) What the City did do in the last quarterly reporting period—after Plaintiff filed its Motion for Settlement Compliance—was add approximately 2,000 Inside Safe beds, including hotel/motel booking and occupancy agreements and various "master leased" properties used as "permanent" hotel/motel exits. (Hr'g Tr. 53–55, May 27, 2025, ECF No. 947.) These

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

beds—despite being established in 2023–24—have never been counted as part of the Alliance agreement.

The Milestones and Deadlines are not "optional" (Hr'g Tr. 24:9–17, June 3, 2025, ECF No. 969) and they were specifically intended to "secure a commitment" to build a specific number of beds so people experiencing homelessness ("PEH") could come inside off the street. (*Id*. at 25:1–6.) Establishment of those milestones and deadlines was important to confirm the City was demonstrating progress. (*Id*. at 26:16–19.) The City was afforded "sole discretion" to choose any housing and shelter project it wanted "as long as the milestones were met." (*Id*. at 32:1–16; *see also* Ex. 25, Settlement Agreement § 3.2.) This was heavily negotiated because Mr. Webster on behalf of the Alliance wanted to direct the City to focus its efforts for this Agreement on fast, low-cost options; however the final negotiated language afforded the City the discretion to choose the intervention but *only* to the extent the milestones were met; upon missing the Milestones, the City would lose this discretion. (Hr'g Tr. 30–32, June 3, 2025, ECF No. 969.)

<u>Failure to Demonstrate Compliance with Encampment Reduction Milestones</u>

The Alliance took no issue with the City's Encampment Reduction "plan" (Ex. 65, Mitchell Decl. ISO Mot. re Settlement Agreement Compliance, Ex. F, Encampment Plans & Milestones at 57–64) regarding the description of *how* the City intended to resolve encampments—by providing offers of alternative housing and shelter and cleaning the streets—but only the number proposed. (Hr'g Tr. 33–35, June 3, 2025, ECF No. 969.) The parties ultimately agreed on 9,800 encampment reductions by June of 2026. (Ex. 58, LA Alliance Milestone Goals.) The City began reporting on those numbers in 2024. The City has never reported any beds for 2022 or 2023. In reviewing the numbers reported by the City it became clear—and the City confirmed—that the City was counting CARE/CARE+ clean-ups as "reductions" which do not count under the Agreement. (Hr'g Tr. 72–75, May 27, 2025, ECF No. 947.) The City has not changed its process for "reductions" after the Court issued the order precluding counting CARE/CARE+ clean-ups as "reductions." (*Id*.)

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE
EVIDENTIARY HEARING ON SETTLEMENT BREACH*

<u>Missing Roadmap Beds</u>

The City had an obligation to produce 6,700 new beds as part of the Roadmap Agreement. (Ex. 1, Term Sheet; Ex. 2, MOU.) The most recent reported number of open and occupiable beds was 7,624. However, the A&M Assessment (Ex. 23) was unable to confirm the existence of the 2,293 scattered sites (Time Limited Subsidy or TLS beds) because there were no expenditures for 70% of the contracts and the other contracts could not be linked to specific slots. No evidence has been presented to the Alliance to explain how the City could create beds without expenditures. (Hr'g Tr. 90–93, May 27, 2025, ECF No. 947.)

<u>Purpose of the Agreement</u>

The purpose of the Agreement is "to substantially increase the number of housing and shelter opportunities in the City of Los Angeles and to address the needs of everyone who shares public spaces and rights of way in the City of Los Angeles, including both housed and unhoused Angelenos to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles." (*Id*. at 95:8–17; Ex. 25, Settlement Agreement at Recitals.) The purpose was important during negotiations because it was at base what the Alliance membership demanded. (Hr'g Tr. at 96, May 27, 2025, ECF No. 947.)

<u>Audit</u>

The audit was crucial to the Alliance because as the City was failing to report significant numbers of beds going up, and encampments going down, the Alliance sought to understand why, and whether the system was functioning as intended:

> We not only saw that a lot of our deepest concerns were completely founded, but they were even worse than what we had expected and what we saw according to the Alvarez and Marsal report was really a City programs and LAHSA programs that were in complete disarray and had no connection between the money that was being paid, the services being provided, and whether or not we were achieving substantial and meaningful reductions in unsheltered homelessness in the City of

4

Los Angeles.  (Hr'g Tr. 99:5–13, May 27, 2025, ECF No. 947; *see also id*. at 97–99.)

### b.      Emily Vaughn Henry

Ms. Henry, the former Chief Information Officer at LAHSA, testified that the data being produced by LAHSA was inherently unreliable, particularly regarding the Roadmap, Inside Safe, and point-in-time count programs. Her testimony it independently demonstrated that the reports being produced to this Court are not accurate.  This aligns directly with the A&M Assessment findings, particularly that A&M could not confirm the existence of thousands of TLS beds being reported as part of the Roadmap Agreement and thousands of permanent supportive housing (PSH) units being produced as part of both the Alliance and Roadmap Agreements. It also sheds incredible doubt on the accuracy of the Inside Safe data which the City is attempting to include in the Agreements for the first time—particularly for the unverifiable "booking agreements" which apparently were being paid for weeks as they went empty. This is particularly disturbing in light of the mayor's refusal to permit the Controller to audit that program. The City had the opportunity to present counter-evidence to Ms. Vaughn Henry's testimony—including proof that the data presented to this court has a "source of truth" such as HMIS, or proof that data systems and infrastructure have changed since Vaughn Henry was terminated—but they failed to do so, thus tacitly admitting the truth of her testimony.

Emily Vaughn Henry was the Chief Information Officer of LAHSA until she was fired in February 2024, because the CEO, Dr. Adams Kellum, stated she was "going in a different direction" and there were "issues with the data." (Hr'g Tr. 104–06, May 27, 2025, ECF No. 947.) Specifically, Dr. Adams Kellum wanted to keep the councilmembers happy because there was "a lot of noise" regarding data on inside safe. (*Id.* at 106–07.) She likened the data infrastructure at LAHSA to a brand new house without foundation or plumbing. (*Id*.) Regarding Inside Safe, she testified to City Council that the City was paying for motels and hotels that were vacant and was criticized because the data wasn't "pretty enough." (*Id*. at 108–09.) Two days later, the responsibility for managing and

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

reporting the data was taken away from her and given to Bevin Kuhn who was her subordinate with a "dotted line" to the CEO. (*Id*. at 110–11.) Thereafter Ms. Kuhn was the only one who managed the data; she kept it on an excel file on her laptop and it was published without any review or opportunity to challenge the "source of truth." (*Id*. at 113:13–21.) Ms. Henry was concerned because she saw a significant upwards inflection of the number of individuals being served versus what they reported just the month before. (*Id*. at 139:18–22.) She had started creating a program within HMIS to track the data but was stopped and told they were going to do it on an excel spreadsheet instead. (*Id*. at 138:10–139:1.)

The numbers being reported on Inside Safe were not coming from HMIS which would have been a "source of truth." (*Id*. at 110–14.) The data "resided with [Bevin Kuhn] on her computer, she produced them, wrote the narrative and published them" with no checks by any other person. (*Id*. at 114:14–21.) Ms. Henry also testified that she was told by the CEO that they needed to do whatever they could to make the mayor look good. (*Id*. at 115:16–18.) Vaughn Henry tried to replicate the data produced by Kuhn but could not. (*Id*. at 116:11–14.) The data was only being reviewed by Adams Kellum and chief of staff Rachel Johnson, despite Vaughn Henry being the supervisor of the unit. (*Id*. at 152:11–15.)

Ms. Henry was also part of the team responsible for producing data pursuant to the Roadmap agreement. The participants were not being tracked in HMIS so the data was inaccurate. (*Id*. at 126–27.) She informed the City that LAHSA does not have the data because it hadn't been tracked in HMIS as it was supposed to, and the reports were inaccurate that had been produced. Two days later she was fired. (*Id*. at 127:13–15.)

She has no faith in the data that was produced in this case because "we were not tracking the number of beds accurately in the HMIS system" and the data quality team was never finalized. (*Id.* at 130:6–10.) The result was that they were "looking at a piece of paper" and making representations that there were "15 beds" and "who's going to challenge that there's 15 beds." (*Id*. at 130:16–21.) Regarding the point-in-time count, "in

6

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

terms of having the foundational systems to manage data for an organization that's been in existence for 25 years it just does not exist. **And what you have now I call it smoke and mirrors**." (*Id.* at 132:7–11 (emphasis added).)

### c.    Don Garza

Don Garza, a long-time skid row resident, testified that the impact of the City's lack of produced beds has been substantial, with people dying unnecessarily.

Mr. Garza was in the military, discharged without benefits due to his mental health issues which developed after combat, became homeless and eventually moved into low-income housing in Skid Row. (*Id.* at 169:25–171:7.) If he lost his housing, which may occur, he'd be homeless.  (*Id* at 172:13–17.) Unsheltered people in Skid Row do not have access to safe, stable shelter. (*Id.* at 176:17–21.) People are waiting for months-to-years for housing; as a result of the City's failure to create enough beds, people are languishing and dying. (*Id.* at 177–79.) He was shocked when he saw the assessment results: "They didn't have to die.  That was enough money for housing. There's enough money for the shelters . . . [t]here's plenty." (*Id.* at 179:1–4.) Services are not making their way to the street. (*Id.* at 180:12–18.)

### d.    Laura Frost

Ms. Frost is a director with Alvarez and Marsal's ("A&M") public services division and was part of the team who conducted the assessment and authored the report admitted as Exhibit 23. (*Id.* at 185–87.) As a member of the team which focused entirely on the homelessness response system in Los Angeles for nearly a year, her insight and conclusions that (i) the City is not in compliance with the Roadmap and Alliance Agreements, and (ii) the system is not functional, are central to the hearing.

"[G]ood data is the foundation of good strategic decision-making. So if you don't have good data, it is difficult to determine whether your decisions are leading to its [sic] intended outcomes of potential waste of resources, right, such as the inability to determine whether the beds reported ultimately existed and whether services were being provided." (*Id.* at 197:16–22.) She confirmed that the City and LAHSA were unable to link payments

with outcomes, and the disjointed continuum of care, i.e. "fractured system," meant there was an increased "risk of failing to connect people experiencing homelessness to the right services at the right time." (*Id.* at 198:23–199:1.) Cash requests were just excel spreadsheets, which are inherently unreliable "with human errors and inaccuracies . . . ." (*Id.* at 202:4-11.) A&M was unable to verify expenses provided. (*Id.* at 202–04.) This heightened the risk of "potential asset misappropriation." (*Id.* at 206:1–4.) She confirmed that, in general, the City does not know how much it's paying to whom and for what. (*Id.* at 208.) There is no evidence that LAHSA or the City was verifying the services as opposed to just approving the invoices. (*Id.* at 209–10.) The City was unable to provide complete accounting records to even understand how money was spent, and on what. (*Id.* at 212.)

A&M was never able to verify the number of TLS beds reported because 70% of the contracts that were identified by LAHSA as being linked to the Roadmap TLS program had no expenditures at all, and the remaining 30% could not be linked to any specific slots. (*Id.* at 227–28.) Unlike shelter or permanent housing provided by the City, with TLS slots there is no physical location to verify so they had to look at contracts and identify expenditures. (Hr'g Tr. 7–8, May 28, 2025, ECF No. 949.) A&M specifically requested both the City and LAHSA to provide evidence sufficient to demonstrate the existence of the TLS beds, but what they produced did not actually demonstrate the beds' existence. (*Id.* at 16–19.) **LAHSA could not even provide street addresses or move-in dates for some of the slots, and others had addresses which overlapped with PSH sites under the Alliance Agreement.** (Hr'g Tr. 18–19, June 3, 2025, ECF No. 969.)

A&M also could not verify the Alliance and Roadmap PSH projects: 20% of the addresses were simply not found in LAHSA's Resource Management System. (Hr'g Tr. 235–37, May 27, 2025, ECF No. 947.) She corrected an error on page 225 of the Assessment (Exhibit 23) so the true sentence reads: "[A]pproximately 20 percent of the PSH sites identified as open were not easily identified within the RMS reports." (*Id.* at 236:18–25.) She clarified that by stating the sites were not "easily identified" what they meant was that the sites could not be found in the RMS system at all. (*Id.*; *see also* Hr'g

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE
EVIDENTIARY HEARING ON SETTLEMENT BREACH*

Tr. 224–25, May 28, 2025, ECF No. 949.) LAHSA's only response to A&M's finding was that it was working with the City's housing department (LAHD) to figure it out. (Hr'g Tr. 237–40, May 27, 2025, ECF No. 947.)

Ms. Frost confirmed that "to meet the goal . . . to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles . . . you need a functioning homelessness response system as defined as having proper resources, coordination, and oversight" and "as reviewed . . . we found the system was not functioning." (*Id*. at 217:14–218:20.) She expounded: "[W]e do not believe in the state that [the homelessness response system] was in that it could achieve a substantial and meaningful reduction [in unsheltered homelessness]." (*Id*. at 219:17–24.)

Finally, it is crucial to point out that nobody from the City has reached out to discuss potential solutions (*Id*. at 255–56) and even the City's extensive cross-examination failed to identify any problems with the ultimate conclusions; instead the City's cross examination focused on: inapplicable standards, the scope of the assessment, whether A&M kept and provided notes of every interaction, whether the city had an obligation to respond to the assessment, cost and time to implement recommendations, and A&M's inability to predict the future. (*See generally* Hr'g Tr. at 34–120; 186–220; 230–37, May 28, 2025, ECF No. 949.) The City did not and could not challenge any of the actual findings that were made by A&M. The City had every opportunity to present witnesses to counter any of these conclusions or demonstrate ways the assessment was wrong or outdated. By failing to do so, the City has admitted the truth of A&M's findings: that the City has breached both the Alliance and Roadmap Agreements and has a homelessness response system that is incapable of fulfilling both the terms and the purpose of the agreements.

e.    **Diane Rafferty**

Diane Rafferty, managing director for A&M, managed the team which provided the Assessment (Exhibit 23). (Hr'g Tr. 122–23, May 28, 2025, ECF No. 949.) She confirmed the accuracy of the assessment, disabused the City of its notion that the Assessment was unreliable because it was not a financial audit subject to irrelevant identified standards,

9

confirmed that LAHSA's method of comingling TLS funds without tracing and accounting for federal dollars spent violates federal law, described service providers that were not caring for their clients, and agreed that the homelessness response system in Los Angeles is fundamentally broken and does not provide the infrastructure necessary for the City to meet the terms of the agreement.

Ms. Rafferty explained that this assessment was not a financial audit, which would look at revenue and expenses, whether they are categorized correctly, and whether the profit and loss statements were balanced; that is different than looking at outcomes which the assessment did. (Hr'g Tr. 124, May 28, 2025, ECF No. 949.) A&M told the parties in advance that they were not conducting a financial audit and offered to bring in a CPA firm as a subcontractor to do a financial audit if the City wanted; **the City declined the offer**. (*Id*. at 125.) The City did not ask for an assessment which would adhere to "GAAS" or "GAGAS" because those are financial auditing standards inapplicable to this assessment which looked instead looked at outcomes. (*Id*. at 193.) "[A] financial audit . . . looks at numbers; does not look at the result of those numbers. It's a balanced accounting to make sure that you follow general principles of accounting. And that audit, you can absolutely have a clean audit and still have misappropriation of funds. I think we all know that." (*Id*. at 208–09.)

Regarding LAHSA's "braiding" of TLS funds, as described on pages 63–64 of the Assessment (Exhibit 23), LAHSA is violating federal law (2 C.F.R. § 200.302) which requires that it—as the recipient of federal grants—be able to trace the dollars they receive from HUD. (Hr'g Tr. 131–132, May 28, 2025, ECF No. 949.) LAHSA could not do so. (*Id* at 131–32; 209.)

Ms. Rafferty confirmed that from their perspective the "system" is broken: lack of data, inability to trace funds, inability for people to get services, insufficient or missing targets and job descriptions, disjointed communications. (*Id*. at 134–35.)  Ironically, having been excluded from court during Emily Vaughn Henry's testimony, Ms. Rafferty used the same analogy: it's like a house with totally faulty plumbing. (*Id*.) She also

10

described site visits to facilities run by service providers who complained about needing repairs due to resident theft and damage, lacked compassion and caring for the environment and people, and where A&M could not determine the beds, had minimal case management, and services were not being provided. (*Id*. at 138, 144–45.) She described the trouble at the sites she visited as "almost universal." (*Id*. at 145.)

While Ms. Rafferty was unable to conclude that there was actual fraud because she is not a forensic auditor, she questioned why funds could not be completely traced from beginning to end, and why they could not ever determine who was accountable for those funds. (*Id*. at 147.) She agreed with Ms. Frost's conclusion that the City of Los Angeles does not have in place a system capable of meeting the purpose of the settlement agreement, which was to meaningfully and substantially reduce unsheltered homelessness in Los Angeles. (*Id*. at 147–48.)

### f.     Matthew Szabo

Matt Szabo is the Chief Administrative Officer ("CAO") for the City of Los Angeles and was one of only two witnesses the City proffered in its defense, along with Dr. Etsemaye Agonafer. Mr. Szabo had much to say over the course of his testimony but could not escape basic facts about the LA Alliance Settlement Agreement:

1. Section 5.1:
    a. **imposes an obligation** on the City to calculate the "Required Number" of shelter/housing beds as defined in the agreement. ECF 949 at 263, and
        i. the City **met that obligation** by identifying 12,915 as the Required Number in 2022. (Hr'g Tr. 244, 252–53, May 28, 2025, ECF No. 949.)
2. Section 5.2:
    a. **imposes an obligation** on the City to "**create plans and develop milestones and deadlines** for" building the Required Number of beds both by council district (5.2(i)) and citywide (5.2(ii)) (*Id*. at 263–64); and

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH*

i. **the City only <u>partially</u> met that obligation** by creating an incomplete plan and developing milestones and deadlines for building the Required Number of beds. (*Id.* at 255.)

ii. Exhibit 24—the Milestones and Deadlines document—was submitted to Plaintiff "**in order to satisfy the City's obligations** under 5.2.1 [sic] and 5.2.3 [sic]" (*Id.* at 261–62.)

iii. Exhibit 114—the "potential project list" was provided to Plaintiff as the "plan" which **did not include all 12,915 beds**. (*Id.* at 89–92; Hr'g Tr. 91:18–21, June 2, 2025, ECF No. 959.)[2]

iv. The City later, in the Fall of 2024, submitted an updated bed plan which purported to fulfill its obligation, but later withdrew that plan. (Hr'g Tr. 119–120, May 29, 2025, ECF No. 953.)  No further proposed bed plan has been submitted. (*Id.* at 120–21.)

b. **Imposes an obligation** on the City to provide a plan, milestones, and deadlines for **encampment engagement**, cleaning, and reduction in each council district and citywide (Hr'g Tr. at 263–64, May 28, 2025, ECF No. 949); and

i. **The City met that obligation**—albeit 14 months late—in early 2025. (*Id.* at 262–63.)

c. **Imposes an obligation** on the City to "**promptly employ its best efforts**" to comply with established plans, milestones, and deadlines. (*Id.* at 264–65 ("Q: And do you agree that this sentence imposed an obligation on the City to employ its best efforts to comply with the established plans, milestones, and deadlines that we see in Exhibit 24? A: Yes, to the extent that best efforts isn't defined, we did agree to best efforts.").)

---

[2] Mr. Szabo confirmed the list was not complete but did not recall the exact number of beds included in the list. It was later provided by Paul Webster: the potential project list only included 8,322, 4,593 short of the 12,915 required.

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

        **i. The City has failed to meet its established milestones or deadlines for bed creation.** (Hr'g Tr. 95–96, May 29, 2025, ECF 953 ("Q: The City failed to meet its cumulative milestones every quarter, including the most recent one. Is that right? A: Correct. That is correct.").)

        **ii. The City is failing to properly report encampment reductions,** preventing the parties from knowing how many actual "reductions" there have been. (*Id.* at 129–31; Hr'g Tr. 73–75, 114, June 2, 2025, ECF No. 959.)

Whether the City has used its "best efforts" to comply with established plans, milestones, and deadlines was a central question during the evidentiary hearing. But for all its import, Mr. Szabo's counsel only asked him two questions about whether the City has used its "best efforts" to comply, eliciting a single answer spanning only 16 lines:

We have a systematic approach. We have been making progress every reporting period towards the goal. We have a program that is fully funded to provide permanent supportive housing. We have efforts, continual efforts, to seek state funding, which, of course, is called out for in the agreement. State funding that has been used to create additional interim units.

We received additional grants, even just last year secured a grant to develop 500 tiny homes and it is an ongoing process of siting, developing, constructing new housing. At the same time, as there is constant advocacy at the state level and federal level for new funding, at every level, in terms of from the Mayor herself and every member of the council, there is complete focus and commitment to secure the resources and to push the departments to get these projects up as quickly as possible. (Hr'g Tr. 49–50, June 2, 2025, ECF No. 959.)

Mr. Szabo also admitted that building all 12,915 beds right before the expiration of the agreement, and taking them down right after the expiration of the agreement, would be "inconsistent" with the purpose of the LA Alliance Settlement Agreement as identified in the recitals ("to achieve a substantial and meaningful reduction in unsheltered

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH*

homelessness in the City of Los Angeles.").[3] (Hr'g Tr. 250–51, May 28, 2025, ECF No. 949.) He could not identify a person or department who or which verifies whether services have been delivered other than noting there are "multiple levels of review." (*Id*. at 289–92.) He did not make any formal presentation and can't identify any informal discussions with the mayor or any city council member about the A&M Assessment. (*Id*. at 278–80; 298.) He largely blew off the A&M Assessment because it did not comply with technical standards despite the City agreeing it did not have to comply with those technical standards.  (Hr'g Tr. 9–10, May 29, 2025, ECF No. 953.) He disavowed knowledge of or otherwise ignoring warning signs about the significant dysfunction of LAHSA with 20+ years of public audits (including a 2024 LA County audit of LAHSA identifying 16 massive red flags which formed the basis, in part, for LA County's decision to withdraw $300 million in funding from LAHSA, and which was directly tied to use of Measure H funds which support the City's PSH projects through Intensive Case Management Services pursuant to the parties' agreements). (*Id*. at 22–67.)

The CAO's office just decided—after Plaintiff filed a Motion for Settlement Compliance—to start counting Inside Safe beds after two years of reporting to City Council that Inside Safe beds do not count for the purpose of the Alliance Agreement and even though the leases are not approved through June of 2027. (*Id*. at 97–99; 103–08.) Just months ago, both Mr. Szabo and his staff took the opposite position in front of the Housing and Homelessness Committee.  (*Id*. at 106–17.) Inside Safe beds consist of

---

[3] This is significant because the City is taking the inconsistent position that it is obligated to use its best efforts to meet the milestones and deadlines for bed creation (Szabo testimony, Hr'g Tr. 264, May 28, 2025, ECF No. 949) but at the same time is adamant that "there are no interim deadlines" and therefore the only obligation is to establish 12,915 before the end of the 5-year term in the agreement. (*Id* at 243–47.) When there are inconsistent interpretations of a contract, recitals are important to help interpret the meaning. *Bittner v. United States*, 598 U.S. 85, 91 (2023) (using Congress' statement of purpose to interpret meaning of statute); *Regency Midland Constr., Inc. v. Legendary Structures, Inc.*, 41 Cal. App. 5th 994, 998–99 (2019) ("Purpose can be illuminating when interpreting any written directive, because understanding what the parties were trying to accomplish by means of their words can help make sense of those words" and noting *Falkowski v. Imation Corp.*, 132 Cal. App. 4th 499, 509–13 (2005) "exemplifies purposive interpretation when it rejected on party's proposed interpretation because that interpretation 'failed to further the purposes' for which the contract was created.")

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE
EVIDENTIARY HEARING ON SETTLEMENT BREACH*

both occupancy agreements (master leasing an entire hotel) and booking agreements (paying for a room if a person needs it for an indeterminable period of time). (*Id*. at 97–99; 103.) The mayor will not permit the City Controller to audit any part of the Inside Safe program. (*Id*. at 112–13.)

Mr. Szabo also confirmed that a "resolution" involves the "removal of the—the living of people on the street." (Hr'g Tr. 235–36, May 30, 2025, ECF No. 955.)[4] He does not know if the new Inside Safe Master Lease "Permanent" beds are leased through June, 2027—but confirms the City would not exclude them just because they aren't fully leased. (Hr'g Tr. 75–77, June 2, 2025, ECF No. 959.) And importantly he testified that **there is an average of 34 fires at or around encampments every day in the City of Los Angeles**. (*Id*. at 26.)

Just as significant as what he testified to is what Mr. Szabo did not testify to:

- Failed to provide any testimony or evidence from any person or any document evidencing any attempts the City has made to actually meet the deadlines and/or pivot when planned projects were delayed to make sure other beds were established in time. For example, move to lower cost and faster housing or shelter models using the same funding source (HHH), significantly condense the PSH development process, including use of private equity, or otherwise evidence the type of focused and condensed effort the parties saw, for example, from the Roadmap Agreement.[5]   A "systematic approach" and

---

[4] This is significant because the City uses "reduction" and "resolution" interchangeable.  For example, in every City report where it purports to report encampment "reductions" under the Alliance Agreement, the document is titled "Encampment Resolution Data." (*See* Ex. 58, LA Alliance Encampment Milestones Goals.)

[5] *See, e.g.* Mr. Szabo's testimony on the effort required to accomplish the obligations of the Roadmap Agreement:
> [T]he purpose of this [Roadmap] agreement was to establish through multiple means, and as many means as possible, an extraordinarily high number of beds in a very, very short period of time. I mean, the fact that we agreed to 6,000 new beds over an 18-month period of time required the City to use every possible resource and pursue every possible pathway to get as many beds out as possible."
> (Hr'g Tr. 83:8–14, May 29, 2025, ECF No. 953.)

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH*

advocating for more funding are simply insufficient to demonstrate "best efforts." Neither the City nor Mr. Szabo made any effort to identify and explain the delays in the 2,000+ beds which have been "pending" on the City's list for nearly three years, and what the City has done to expedite or change strategies in light of the delays in order to meet the deadlines. Such a plodding, apathetic approach cannot possibly be construed as using one's "best efforts." (*See, e.g.* Ex. 53, Plaintiff LA Alliance's Response re Issues Raised by Court on March 27, 2025 at 13–14, ECF No. 899.)

- Failed to identify anything the City has done differently since June, 2024, when the A&M Assessment look-back period concluded which would make the report outdated or otherwise inapplicable.

- Failed to produce any evidence of any action the City has taken in response to the A&M Assessment.

- Failed to produce any evidence that Roadmap TLS beds identified were actually utilized despite the insufficiency of the contracts and data.

- Failed to explain why the City hasn't produced a compliant bed plan.

- Failed to produce evidence on any encampment reduction efforts in 2023.

- Failed to show that the City's data isn't compromised.

### g.    Dr. Etsemaye Agonafer

Dr. Etsemaye Agonafer is the Deputy Mayor for Homelessness and Community Health for the City of Los Angeles. (Hr'g Tr. 190, May 29, 2025, ECF No. 953.) She confirmed that the state of emergency on homelessness is still in effect. (*Id*. at 192.) Unhoused individuals should be "urgently" moved inside from the street "because the streets are not a waiting room." (*Id*. at 199.) Unfortunately she did not have a lot to add about the Roadmap Agreement, Alliance Agreement (she "skimmed" it—*Id*. at 204), or the A&M audit (which she also "skimmed" or "scanned"—*Id*. at 352–53). She confirmed that all the data she receives for the Inside Safe program, which she runs, comes from LAHSA, specifically from the team led by Bevin Kuhn. (*Id*. at 214–18.) She could not identify anything she or the City did to investigate Ms. Vaughn Henry's allegations

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

regarding the significant data issues at LAHSA. (*Id*. at 237–38.) She "assume[s]" that the data for Inside Safe is coming from HMIS. (*Id*. at 239–40.)

Dr. Agonafer could only provide a single definition of resolution, which is what they use with Inside Safe: that every person was engaged, offered and accepted shelter, and voluntarily relinquished their belongings. (*Id*. at 282.) The Mayor's office decides which Inside Safe properties receive encampment resolutions. (*Id*. at 271.) The City is no longer looking to bring more Inside Safe beds online. (*Id*. at 275–76.) Over 4,300 people have come inside through Inside Safe but couldn't confirm whether that included double-counting participants. (*Id*. at 281; 297–98.) She refused to answer the question about whether the homelessness response system in Los Angeles is broken. (*Id*. at 345–52.) As the Deputy Mayor for Homelessness and Community Health she only "scanned" the A&M Assessment to see if they described the Inside Safe program correctly. (*Id*. at 352–53.) Her excuse: "I receive a number of emails and reports on a day to day." (*Id*.) She couldn't identify a single thing the City is doing differently after "skim[ming]" the court-ordered audit. (*Id*. at 357.)

### h. Elizabeth Funk

Elizabeth Funk is the CEO of a nonprofit called Dignity Moves, and testified regarding alternatives and what "best efforts" from the City of LA might look like. Dignity Moves focuses on building interim supportive housing for PEH. (*Id*. at 155.) Unsheltered homelessness is solvable with creativity. Dignity Moves borrows or uses donated land, along with modular pre-fabricated units to increase the speed of the build while decreasing the cost. (*Id*. at 159–60.) It costs too much and takes too long to focus exclusively on permanent housing, and when people are left on the streets it is devastating both to them and to the community. (*Id*. at 161.) To house 4,000 people as quickly as possible, she'd find vacant sites, manufactured units of different types, and build the units within "months." (*Id*. at 163.) She gave the example of a build in San Francisco: start to finish in just four months. (*Id*. at 164.) The key is "political will and the municipality working closely with us to maintain that emergency spirit and that emergency mindset and get

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

people in quickly." (*Id*. at 164:8–11.) Some of her projects include significant philanthropic funding and land donations, like Santa Barbara where 2/3 of the funding was private. (*Id*. at 164–65.)

### i.    Brian Ulf

Brian Ulf is the CEO of SHARE Self-Help and Recovery Exchange which runs Collaborative Housing projects with peer support (aka case managers) across Los Angeles County. (Hr'g Tr. 193, 196–97, June 2, 2025, ECF No. 959.) He also testified to explain the alternatives available to the City and what "best efforts" to meet milestones might look like.

SHARE leases single family homes and duplexes, with two people per room for accountability and community; the residents vote on the rules that apply to the house. (*Id*.) The SHARE houses can be used as emergency shelter, transitional, or PSH. (*Id*.) They have immediate availability and offer sober living facilities as well. *Id*. at 198. Every resident pays "rent" through SSI, SSDI, a job, or rental assistance (TLS) from LAHSA, with the goal being that within a few months they are off rental subsidies and have an income of their own. (*Id*. at 198–202.) They currently have contracts with the City, County, and LAHSA. (*Id*. at 198–203.) In October 2018, SHARE made an offer to the City of Los Angeles to house 2,000 people for $8 million, but never received a response. (*Id*. at 205–06.)

To create 1,000 beds through SHARE it would cost between $23-$26 million, or $23,000-26,000 per bed per year. (*Id*. at 207–11.) However, because people move through their housing at approximately 1.6 per year, housing 1,000 people would cost closer to $16,000 per person. Once a person is stable enough to start paying rent through whatever source of income they have, the cost to house that person becomes zero for the government entity. (*Id* at 209–10.) If SHARE was given a contract and additional resources to increase their leasing division, he could add 1,000 beds "extremely quickly" meaning less than 12 months. (*Id*. at 215–17.)

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

On any given day there are 10,000 single family homes for rent throughout the County. There are no conditional use permits associated with collaborative housing, so there are few barriers to establishment. (*Id*. at 212.) Of the people in SHARE collaborative housing, only 4 percent returned to homelessness—an astonishing 96% success rate. (*Id*. at 219.)

### j.    Dewey Terry

Mr. Terry currently works for the Amity Foundation, and previously worked as a supervisor for Urban Alchemy, all in Skid Row.  (Hr'g Tr. 61–62, June 3, 2025, ECF No. 969.) His testimony, like Mr. Garza's, reflected the impact to the community of the City's multiple breaches. Mr. Terry regularly walks around Skid Row, not getting paid for it, but just because there's a lot of crime so he tries to make sure things are safer, especially for the women and children. (*Id*. at 62–63.) Undocumented families were recently bussed to Skid Row from Texas without tents or anything, so he helped provide them with tents and some protection. (*Id*. at 63–64.) He tries to make it cleaner, providing chemicals and water to clean the areas. He's provided 15,000 blankets since he's been in Skid Row. (*Id*.) He's found people frozen to death. (*Id*. at 64–65.) Over seven tons of trash is picked up twice a day every day in the area. (*Id*.)  They recently started 24-hour volunteer staff to try to protect the women, especially the older ones, from sexual attacks. (*Id*. at 66–67.) He's witnessed people dying in SROs, and no one is checking on them. (*Id*. at 67–68.)

Mr. Terry has been on Skid Row seven days a week for the last several years; there isn't enough shelter or housing.  Specifically the Cecil Hotel (*reported in the transcript wrongly as "Cesar Hotel") looks like a "travesty" with people smoking "base pipes" and security sitting there like it's nothing. (*Id*. at 69–70.) Most people who live or work in Skid Row have trauma because of what they've seen. (*Id*. at 71.) The wounds people have in the area are awful.  (*Id*. at 72.) The City needs to have places where people can go, and then permanent housing thereafter; there are so many women getting injured and it doesn't seem people care. (*Id*. at 72–74.) He's seen an increase in homelessness in Skid Row since January 2023, not decrease. (*Id*. at 74–75.) There's no after-care once people are in shelter

19

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE*<br>*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

or an SRO, to reacclimate them to normal life. (*Id*. at 76–78.) City Sanitation will clean up the streets but then people move right back in; there's no one actually caring for the people. (*Id*. at 78–80.) The City is pushing homeless individuals out of other places and into Skid Row; nobody is pushing them "in an area where they can live and thrive." (*Id*. at 81:4–14.)

### k.    Lee Raagas

Ms. Raagas was the CEO for Skid Row Housing Trust, having consulted with them before that, and has spent 30-35 years in the area of housing. (*Id*. at 225–26.)  She testified to the high cost and slow pace of the city's chosen interventions (PSH). In reviewing Exhibit 24 (the City's milestones), PSH makes up the majority of the City's projects. (*Id*. at 227–28.) Having run a non-profit which provided thousands of PSH units, one of the biggest downsides of PSH is speed to develop, implement, and house, with an estimate of 5.5-6.5 years from beginning of the application to full lease of the property.  (*Id*. at 228–230.) Start of construction to full lease-up is 4.5 years. (*Id*.) It's very expensive to develop, difficult to "match" with voucher holders, and expensive to operate. (*Id*. at 230–31.)

She was able to review the reported timelines for multiple Alliance projects in the pipeline and explains that the reported timelines for beginning to end of construction with purported opening dates of just months to a year after construction begins cannot be accurate or truthful (i.e. the project will actually take longer than reported). (*Id*. at 233–38.) She also identified the tremendous cost for these projects with one reflecting $925,995 *per unit*. (*Id*.) Ms. Raagas confirmed the significant problems identified in Exhibit 109 ("Redesign Required: Lessons for Permanent Supportive Housing from Skid Row Housing Trust Buildings") as true, particularly the unsustainable nature of the housing because they were "critically underfunded." (*Id*. at 241–43.) If she had to produce 1,000 beds quickly, she'd focus on interim shelter because it is faster and easier to build than PSH. (*Id*. at 243–46.)

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

**l.    John Maceri**

John Maceri is the CEO of The People Concern (TPC), one of the largest service providers in Los Angeles. (*Id*. at 119–20.) He testified regarding the broken homelessness system and what "best efforts" would look like in the City.

TPC provides street outreach, interim housing, PSH, and wraparound services. (*Id*. at 120.) In reviewing the list of Alliance sites, TPC operates 25 of the permanent housing sites plus 10 in development, and four interim sites, including two Inside Safe properties. (*Id*. at 121–22.) They operated interim Roadmap sites during the pandemic which are no longer open, and 1-2 Roadmap sites which were interim but have since converted to permanent sites. (*Id*.)

The homelessness response system in Los Angeles is very fragmented and siloed, with four different databases none of which are integrated. (*Id*. at 124–25.)  LAHSA has no authority to make decisions, it's a highly politicized system which is influenced by elected officials and their staff, and there's no overall vision or plan on how to reduce unsheltered homelessness. (*Id*.) Those difficulties manifest in the way people are referred into interim housing, the matching to PSH, blending various funding sources, there are many barriers to how we build housing, how to match people to units both on interim and permanent, and it's difficult to move individuals from street into shelters. (*Id*. at 125–26.)

The rules are ever-evolving and changing, some of which are related to funding sources with various requirements. (*Id*.) It takes too much time to build and lease up on the permanent housing side, so people get stuck in interim housing. (*Id*.) The system functions like "Groundhog Day," without looking at the system as a whole. (*Id*. at 127–28.) There needs to be more prevention, affordable housing, shared housing, and master leasing. (*Id*. at 128.) While permanent housing is important, the pendulum has swung too far so we are focusing too much on permanent and missing the opportunity to "house more people more quickly using other types of interventions." (*Id*. at 129–30.) "[T]he biggest failure in the system is that it is influenced too heavily by politics and not real leadership that has both the political will but also the authority to be able to make decisions." (*Id*. at 132:16–20.)

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

He reviewed the A&M report and has no high-level disagreements with the findings, confirming misaligned roles and confusion in how to get a person sheltered. (*Id*. at 133–34.) Building 1,000 beds in six months would be challenging but possible with focused effort, a plan, and "benchmarks that everyone working in the system is held accountable to." (*Id*. at 134–35.) He recommends looking at the system as a whole, focusing more on master leasing, adaptive re-use, modular units (like the ones Dignity Moves puts up) and exploring opportunities for private-public partnerships. (*Id*. at 138–41.) When asked whether, as a Provider with 25 years' experience in the field, he believes the City is using its best efforts, he answered "I believe we can be doing more." (*Id*. at 144–46.)

### m.   Michele Martinez[6]

Ms. Martinez was appointed as Special Master in this case in 2020 and again as monitor over the City agreement at the time of settlement in 2022 and the County agreement at the time of settlement in 2023. (*Id*. at 236–37.) She works nearly seven days a week, doing field observations, talks to the parties and unhoused community, hosts learning sessions, and monitors city council meetings, Housing and Homelessness Committee meetings, the strategy committee with CAO's office, and LAHSA meetings. She has dedicated herself to understanding the homelessness response system in the last five years. (*Id*. at 241–42.) In 2018 she was on City Council in Santa Ana and supervised the build of a homeless shelter in 28 days by streamlining the build and placing a permit inspector on site.  (*Id*. at 243–45.)

The City has not presented anything to confirm the TLS beds exist as represented in the Roadmap Agreement reports. (*Id*. at 248–55.) The City has not met its milestones for bed creation. (*Id*. at 255–56, 269–70.) Further, she was unable to do spot checks for some of the units identified in the December, 2024 Alliance report because those sites were not found in HMIS or RMS systems. She followed up with LAHSA and the City about the

---

[6] The transcript for Day 7 testimony was not available at the time of drafting this brief; Plaintiff reserves the right to supplement accordingly.

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

missing sites, but they have not gotten back to her and so she's been unable to verify the existence of those beds. (*Id*. at 258–61.)

The City has been unable to provide a methodology to support their data. (*Id*. at 262–63.) Because there has not been an updated bed plan by the City, and the new Inside Safe beds were never provided as part of a bed plan negotiated with Plaintiff, it is difficult to opine about whether the beds count towards the settlement agreement. (*Id*. at 266–67.) If the systemic and structural issues identified by A&M, by her own observations, and by the CLA in its own report do not get addressed, the "Court may need to intervene." (*Id*. at 271–73.) The system as a whole does not work for Los Angeles. (*Id*. at 273–74.) "[T]he City does not have the infrastructure in place to help bring together a system that would function to address the homeless response system specifically for the City of Los Angeles . . . ." (*Id*. at 275:16–25.) The City is considering opening a new bureau of oversight within Los Angeles Housing Department (LAHD); LAHD is the department was has failed to properly oversee and monitor LAHSA. (*Id*. at 277–83.) The City previously took the position, just before the most recent quarterly report, that Inside Safe beds that did not have a contract to June 2027 did not count towards the Alliance Agreement; the City is now counting those beds. (*Id*. at 290–92.)

## II.    The Settlement Agreements Have Been Breached

### a.    LA Alliance Agreement

It is undisputed that the City has failed to provide a complete bed plan, failed to meet its milestones and deadlines for bed creation, has failed to meet its milestones and deadlines for encampment reduction, and is conducting and reporting "reduction" efforts totally improperly. The evidence has further demonstrated that even the existing beds reported as part of the Alliance agreement cannot be confirmed (with both Special Master Martinez and A&M noting that a significant number of properties could not be found within LAHSA's system).

The biggest—and really only—dispute is whether the City has used its "best efforts" to meet its milestones and deadlines.  The evidence demonstrates unequivocally that it has

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

not. The only evidence presented by the City to demonstrate its efforts was Matt Szabo's 16-line testimony describing a "systematic" approach which involved looking for more funds. In contrast, multiple witnesses testified that alternatives are available which are faster and more economical, but the City is *choosing* to pursue the slowest, most expensive route. Best efforts is reflected in Michele Martinez's 28-day shelter build, Elizabeth Funk's 4-month modular housing project, Brian Funk's 1,000 shared housing units in less than 12 months, and John Maceri's 1,000 beds in 6 months with focused effort.

### b.    Roadmap Agreement

Equally concerning is A&M's report that it was unable to verify the nearly 2,000 Time Limited Subsidy beds reported as part of the Roadmap Agreement due to lack of expenditures in 70% of the contracts, failure to tie any number of slots to funding in the remaining 30%, incomplete addresses, missing move-in dates and even <u>overlapping addresses</u> with Alliance beds.  The City put on no evidence to refute these findings.

## III.    The System is Broken

Testimony was nearly unanimous that the homelessness response system in Los Angeles is broken. A&M fielded a 10-person team who spent nearly a year diving into the intricacies of this issue and concluded that the infrastructure does not exist to support the success of the agreement. Special Master Martinez who has spent over 50 hours per week for the last five years focusing on the homeless services response system has concluded that full systematic change is needed. Emily Vaughn Henry testified there is "no source of truth" to the data being provided to this court and in support of the City's efforts. Don Garza and Dewey Terry testified that the billions of dollars in homelessness spending is not reaching the streets. Dr. Agonafer meticulously avoided answering the question. And John Maceri, a respected CEO of one of the biggest service providers in the area, identified a litany of broken systems leading to a broken result. The City, rather than addressing its failures and the broken system head-on, is ignoring the red flags and careening headlong into the abyss of failed programs while death and destruction proliferate.

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH*

## IV.    Remedy for Breach

While Plaintiff believes firmly that the history of the City's constitutional failure on the homelessness crisis and its breaches of the Settlement Agreement fully justify the imposition of a Receivership, as argued heretofore (Exs. 37, 49, 53, Mot. for Settlement Compliance, Reply, Resp. re Issues Raised by Court, ECF Nos. 863, 872, 899), the City's conduct also warrants Court consideration of additional sanctions and remedies—along with or instead of a Receivership—including the following: (i) extension of Alliance and/or Roadmap Agreements for a minimum period of two years to ensure compliance and oversight; (ii) Appointment of Compliance and/or Fiduciary Monitor at the City's expense with full, immediate, and unfettered access to City and LAHSA data; (iii) Forensic Financial Audit; (iv) Forensic Data Quality Audit with mandate to adhere to recommendations; (v) orders to create a Skid Row plan, including immediate housing and sheltering of women, children, and families and ultimately extending to every unsheltered resident; (vi) City-funded investigation and report on data manipulation allegations; and (vii) an award of attorneys' fees both incurred in this matter to enforce the settlement agreement and prospectively for efforts related to the City's compliance with the Agreements.

## V.    Conclusion

Both the legal authority and the evidence point directly to the City's failures and the court's ability to remedy those failures.  Plaintiff respectfully requests this court find the City in breach of both agreements and impose significant remedies.

Dated: June 9, 2025              Respectfully submitted,

*/s/ Elizabeth A. Mitchell*
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Elizabeth A. Mitchell

*Attorneys for Plaintiffs*

*PLAINTIFF LA ALLIANCE'S OPENING BRIEF RE
EVIDENTIARY HEARING ON SETTLEMENT BREACH*