1    GIBSON, DUNN & CRUTCHER LLP
     THEANE EVANGELIS, SBN 243570
2      tevangelis@gibsondunn.com
     MARCELLUS MCRAE, SBN 140308
3      mmcrae@gibsondunn.com
     KAHN A. SCOLNICK, SBN 228686
4      kscolnick@gibsondunn.com
     BRADLEY J. HAMBURGER, SBN 266916
5      bhamburger@gibsondunn.com
     ANGELIQUE KAOUNIS, SBN 209833
6      akaounis@gibsondunn.com
     PATRICK J. FUSTER, SBN 326789
7      pfuster@gibsondunn.com
     333 South Grand Avenue
8    Los Angeles, California  90071-3197
     Telephone:  213.229.7000
9    Facsimile:   213.229.7520

10   HYDEE FELDSTEIN SOTO, SBN 106866
     VALERIE L. FLORES, SBN 138572
11   ARLENE N. HOANG, SBN 193395
     JESSICA MARIANI, SBN 280748
12   200 North Main Street, City Hall East, 6th Floor
     Los Angeles, California  90012
13   Telephone:  213.978-7508
     Facsimile:   213.978.7011
14   Email: arlene.hoang@lacity.org

15   *Attorneys for Defendant*
     *CITY OF LOS ANGELES*

16

17              IN THE UNITED STATES DISTRICT COURT

18           FOR THE CENTRAL DISTRICT OF CALIFORNIA

19   LA ALLIANCE FOR HUMAN RIGHTS,        CASE NO. 2:20-cv-02291 DOC (KES)
     et al.,
20                                        Honorable David O. Carter,
                                          United States District Judge
21              Plaintiffs,
                                          **POST-EVIDENTIARY HEARING**
22        v.                              **BRIEF OF DEFENDANT CITY OF**
                                          **LOS ANGELES**
     CITY OF LOS ANGELES, a Municipal
23   entity, et al.,

24              Defendant.               Action Filed:    March 10, 2020

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

BACKGROUND .................................................................................................. 6

    I.    The LA Alliance sues over homelessness in Los Angeles, this Court issues a preliminary injunction, and the Ninth Circuit vacates the injunction. ............................................................................................ 6

    II.   The City enters into a Memorandum of Understanding with the County. ....................................................................................................... 7

    III.  The City settles with the Alliance. ............................................................ 7

    IV.  The Alliance seeks further relief from the Court, including that the City be placed into receivership. ................................................................. 8

    V.   This Court holds an evidentiary hearing. ................................................ 10

LEGAL STANDARD ......................................................................................... 11

ARGUMENT ...................................................................................................... 12

    I.    The City did not breach its Settlement Agreement with the Alliance. .................................................................................................. 12

        A.   The Alliance, not the City, has breached the Agreement. ............. 12

            1.   Section 8.2 paused the obligations that the Alliance is attempting to enforce. ......................................................... 13

            2.   The Alliance violated its contractual meet-and-confer obligation. ............................................................................. 15

        B.   The City has not anticipatorily breached its ultimate obligations under the Agreement. .................................................. 16

        C.   The City has provided a bed plan to the Alliance .......................... 19

        D.   The City did not breach the best-efforts provision for interim milestones. ..................................................................................... 20

            1.   The City used best efforts to meet bed milestones. .............. 21

Gibson, Dunn &
Crutcher LLP

i

# TABLE OF CONTENTS

**Page**

2.     The City used best efforts to meet encampment-clearance milestones. ........................................................... 27

E.     The Alliance cannot prove breach through the Agreement's recitals. ......................................................................... 31

II.    The Alliance is not entitled to any relief under the MOU with the County. ...................................................................................... 32

A.     The Alliance lacks Article III standing to enforce the MOU. ....... 32

B.     The Alliance is a nonparty that has no rights under the MOU. ...... 34

C.     The City fully complied with the MOU. ....................................... 35

III.    The Alliance is not entitled to any of the remedies it seeks. ................... 37

A.     Imposing a receivership would be an unconstitutional and unwarranted remedy for any breach. ............................................. 38

1.     Receivership is categorically unconstitutional in this context. ....................................................................... 38

2.     The Alliance has not demonstrated extraordinary circumstances that could justify receivership. .................... 42

B.     The Alliance's belated request for additional remedies is meritless. ..................................................................................... 47

C.     If the Court is inclined to impose any remedy, it should enter a stay pending appeal. .................................................................. 49

CONCLUSION .................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alameda County Land Use Ass'n v. City of Hayward*,
38 Cal. App. 4th 1716 (1995) ...................................................................27

*Ariz. Christian Sch. Tuition Org. v. Winn*,
563 U.S. 125 (2011)....................................................................................33

*Arizona v. United States*,
567 U.S. 387 (2012)....................................................................................45

*Autotel v. Nev. Bell Tel. Co.*,
697 F.3d 846 (9th Cir. 2012) .....................................................................47

*Bingman v. Ward*,
100 F.3d 653 (9th Cir. 1996) .....................................................................48

*Botefur v. City of Eagle Point*,
7 F.3d 152 (9th Cir. 1993) ................................................................. 11, 40

*Brooke v. Ashna Inc.*,
2024 WL 3537861 (C.D. Cal. July 11, 2024) ...........................................47

*Brown v. Plata*,
563 U.S. 493 (2011)....................................................................................41

*Brown v. Sierra Nevada Mem'l Miners Hosp.*,
849 F.2d 1186 (9th Cir. 1988) ...................................................................18

*Cal. Pines Property Owners Ass'n v. Pedotti*,
206 Cal. App. 4th 384 (2012).......................................15, 20, 23, 24, 25, 30

*Cam-Carson, LLC v. Carson Reclamation Auth.*,
82 Cal. App. 5th 535 (2022) ......................................................................44

*City of Los Angeles v. Santa Monica Baykeeper*,
254 F.3d 882 (9th Cir. 2001) .....................................................................30

*Copeland v. Baskin Robbins U.S.A.*,
96 Cal. App. 4th 1251 (2002) ....................................................................15

POST-EVIDENTIARY HEARING BRIEF OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

Gibson, Dunn &
Crutcher LLP

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3
4
*County of Ventura v. City of Moorpark*,
24 Cal. App. 5th 377 (2018) .................................................................... 27

5
6
*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .............................................................................. 19

7
8
*Dixon v. Barry*,
967 F. Supp. 535 (D.D.C. 1997) ............................................................ 41

9
*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .............................................................................. 46

10
11
*Edwards v. California*,
314 U.S. 160 (1941) .............................................................................. 46

12
13
*EEOC v. R.J. Gallagher Co.*,
181 F.3d 645 (5th Cir. 1999) ................................................................. 23

14
15
*Fireman's Fund Ins. Co. v. Workers' Comp. Appeals Bd.*,
189 Cal. App. 4th 101 (2010) ................................................................ 26

16
17
*Glover v. Johnson*,
855 F.2d 277 (6th Cir. 1988) ........................................................... 42, 43

18
19
*Goonewardene v. ADP, LLC*,
6 Cal. 5th 817 (2019) ...................................................................... 34, 35

20
*Gould v. Lambert Excavating, Inc.*,
870 F.2d 1214 (7th Cir. 1989) ............................................................... 11

21
22
*Grants Pass v. Johnson*,
603 U.S. 520 (2024) ..................................................................... 4, 5, 47

23
24
*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) ....................................................................... 42, 46

25
26
*Guardians Ass'n v. Civ. Serv. Comm'n of New York City*,
463 U.S. 582 (1983) .............................................................................. 35

27
28
*Hartzell v. Marana Unified Sch. Dist.*,
130 F.4th 722 (9th Cir. 2025) ................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

*Heston v. Farmers Ins. Grp.*,
    160 Cal. App. 3d 402 (1984) ................................................................. 30

*Hewlett-Packard Co. v. Oracle Corp.*,
    65 Cal. App. 5th 506 (2021) ................................................................. 16

*Keith v. Volpe*,
    118 F.3d 1386 (9th Cir. 1997) .............................................. 32, 39, 40

*Kelly v. Wengler*,
    822 F.3d 1085 (9th Cir. 2016) ............................................................. 47

*Klamath Water Users Protective Ass'n v. Patterson*,
    204 F.3d 1206 (9th Cir. 1999) ............................................................. 35

*LA Alliance for Human Rights v. County of Los Angeles*,
    14 F.4th 947 (9th Cir. 2021) ................................................... 7, 42, 50

*Lake Almanor Assocs. L.P. v. Huffman-Broadway Grp., Inc.*,
    178 Cal. App. 4th 1194 (2009) ........................................................... 35

*LaShawn A. v. Kelly*,
    887 F. Supp. 297 (D.D.C. 1995) ........................................................ 42

*League of Residential Neighborhood Advocates v. City of Los Angeles*,
    498 F.3d 1052 (9th Cir. 2007) ...................................................... 40, 45

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*,
    51 F.3d 982 (11th Cir. 1995) .............................................................. 11

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................ 33

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ............................................................................ 44

*Matsuda v. City and County of Honolulu*,
    512 F.3d 1148 (9th Cir. 2008) ............................................................ 27

*Melendres v. Skinner*,
    113 F.4th 1126 (9th Cir. 2024) .................................................... 42, 43

POST-EVIDENTIARY HEARING BRIEF OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

# TABLE OF AUTHORITIES

**Page(s)**

*Missouri v. Jenkins,*
    495 U.S. 33 (1990)................................................................43, 45

*Morgan v. McDonough,*
    540 F.2d 527 (1st Cir. 1976)..............................................41, 42

*Mullane v. Cent. Hanover Bank & Tr. Co.,*
    339 U.S. 306 (1950)....................................................................48

*Murphy v. NCAA,*
    584 U.S. 453 (2018)....................................................................39

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.,*
    523 F.3d 1051 (9th Cir. 2008) ..................................................25

*New York v. United States,*
    505 U.S. 144 (1992)....................................................................46

*NFIB v. Sebelius,*
    567 U.S. 519 (2012)....................................................................38

*Nken v. Holder,*
    556 U.S. 418 (2009)....................................................................50

*O'Sullivan v. Griffith,*
    153 Cal. 502 (1908)....................................................................31

*Oasis W. Realty, LLC v. Goldman,*
    51 Cal. 4th 811 (2011)................................................................16

*Orr v. Bank of Am., NT & SA,*
    285 F.3d 764 (9th Cir. 2002) ....................................................11

*Parsons v. Ryan,*
    949 F.3d 443 (9th Cir. 2020) ......................................11, 47, 49

*Pennhurst State Sch. & Hosp. v. Halderman,*
    465 U.S. 89 (1984)......................................................................40

*Plata v. Schwarzenegger,*
    2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ..........................43

vi

POST-EVIDENTIARY HEARING BRIEF OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

# TABLE OF AUTHORITIES

**Page(s)**

*Plata v. Schwarzenegger*,
 603 F.3d 1088 (9th Cir. 2010) ................................................................. 43

*Printz v. United States*,
 521 U.S. 898 (1997) ................................................................................ 45

*Rider v. City of San Diego*,
 18 Cal. 4th 1035 (1998) ........................................................................... 44

*Sabetian v. Exxon Mobil Corp.*,
 57 Cal. App. 5th 1054 (2020) .................................................................. 31

*Samica Enters., LLC v. Mail Boxes Etc. USA, Inc.*,
 637 F. Supp. 2d 712 (C.D. Cal. 2008) .................................................... 23

*Shaw v. Allen*,
 771 F. Supp. 760 (S.D. W. Va. 1990) ...................................................... 41

*Sullivan v. Dollar Tree Stores, Inc.*,
 623 F.3d 770 (9th Cir. 2010) ................................................................... 18

*Taylor v. Johnston*,
 15 Cal. 3d 130 (1975) .............................................................................. 17

*Thole v. U.S. Bank N.A.*,
 590 U.S. 538 (2020) ................................................................................ 33

*Tobe v. City of Santa Ana*,
 9 Cal. 4th 1069 (1995) ............................................................................. 27

*Traer v. Domino's Pizza LLC*,
 2023 WL 6369712 (C.D. Cal. June 29, 2023) ......................................... 30

*TransUnion LLC v. Ramirez*,
 594 U.S. 413 (2021) ................................................................................ 33

*Triple-A Baseball Club Assocs. v. Ne. Baseball, Inc.*,
 832 F.2d 214 (1st Cir. 1987) .............................................................. 23, 24

*Turner v. Goolsby*,
 255 F. Supp. 724 (S.D. Ga. 1965) ........................................................... 41

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

*U.S. Ecology v. California,*
  129 Cal. App. 4th 887 (2005) ................................................................. 23

*U.S. Tr. Co. of New Jersey v. New Jersey,*
  431 U.S. 1 (1977) ...................................................................................... 27

*United States v. Blackburn,*
  992 F.2d 666 (7th Cir. 1993) ................................................................... 18

*United States v. Diaz,*
  876 F.3d 1194 (9th Cir. 2017) ................................................................. 25

*United States v. Guam,*
  2008 WL 732796 (D. Guam Mar. 17, 2008) .......................................... 41

*Va. House of Delegates v. Bethune-Hill,*
  587 U.S. 658 (2019) .................................................................................. 32

*Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n,*
  443 U.S. 658 (1979) ....................................................................... 38, 40, 41

*Winter v. Natural Res. Defense Council, Inc.,*
  555 U.S. 7 (2008) ...................................................................................... 46

*Wisconsin Bell, Inc. v. United States ex rel. Heath,*
  145 S. Ct. 498 (2025) ............................................................................... 35

**Constitutional Provisions**

U.S. Const. art. III ................................................................................ 3, 32, 34

U.S. Const. amend. X ..................................................................................... 38

Cal. Const. art. XI, § 5 ................................................................................... 39

Cal. Const. art. XI, § 7 ............................................................................. 27, 39

**Statutes**

28 U.S.C. § 1292(a)(2) ................................................................................... 49

Cal. Civ. Code § 1068 .................................................................................... 31

Gibson, Dunn &
Crutcher LLP

POST-EVIDENTIARY HEARING BRIEF OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

# TABLE OF AUTHORITIES

**Page(s)**

Cal. Civ. Code § 1717(a) ................................................................................... 49

Cal. Civ. Code § 3399 ....................................................................................... 47

Cal. Civ. Proc. Code § 1856(e) ......................................................................... 29

**Regulations**

2 C.F.R. § 200.302 ............................................................................................. 36

45 C.F.R. § 164.502 ........................................................................................... 49

**Rules**

Fed. R. Civ. P. 65(a)(2) ..................................................................................... 11

Fed. R. Evid. 803(8)(A) ..................................................................................... 18

Fed. R. Evid. 803(8)(B) ..................................................................................... 18

**Other Authorities**

Los Angeles City Charter art. II, § 205(a) ........................................................ 39

Los Angeles Charter art. II, § 231 ..................................................................... 39

Los Angeles Charter art. II, § 240 ..................................................................... 39

1 Witkin, Summary of California Law § 889(b) (11th ed. 2025).................................. 17

# INTRODUCTION

Every day, the City of Los Angeles makes progress toward resolving the homelessness crisis.  It is a government-wide effort that has the commitment of every elected official and every general manager of the City's many departments, and requires coordination and cooperation with the federal government, the State, the County, and the Los Angeles Homeless Services Authority (LAHSA).  The Settlement Agreement with the LA Alliance for Human Rights (the Alliance for short) is one part of this multifaceted response to the problem of homelessness, but it does not give the Alliance the ability to control the "system" or make decisions on important questions of public policy that are reserved for the City's elected officials and, ultimately, the voters.

What is before this Court is whether the City has breached the Settlement Agreement with the Alliance.  It has not.  The City is on track to meet its obligations under the Agreement to provide 12,915 shelter and housing solutions and to reduce 9,800 tents, makeshift shelters, and vehicles, all the while taking into account its available resources, the restrictions attached to outside sources of funding, the policy priorities of elected officials and voters, and engagement with the community.  The Alliance is not satisfied with *how* the City has made this progress, particularly when it comes to investing in permanent supportive housing (which the Alliance deems to be too expensive and too slow).  But the City did not—and could not—sign over its policymaking discretion to the Alliance.  The Court should reject the Alliance's overreach, hold that the City has not breached its obligations, and decline to impose any of the sweeping remedies the Alliance seeks.

If any party has breached the Settlement Agreement, it is the Alliance.  Section 8.2 states that, in the event of a serious natural disaster like a fire or a declared emergency, the City's obligations are paused, and the parties must meet and confer to discuss potential changes to those obligations.  After one of the most destructive fires in California history, the Section 8.2 pause automatically went into effect, but the Alliance refused to meet and confer in good faith.  The Alliance even took the position that the

POST-EVIDENTIARY HEARING BRIEF OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

City's obligations were paused only so long as fires were still burning, despite the continuing declared emergencies, the cleanup of dangerous and hazardous debris, and the lockdown of Pacific Palisades.  Instead of meeting and conferring, the Alliance filed a series of motions about the City's supposed noncompliance with the Agreement, requesting a series of increasingly intrusive remedies, the last of which was the appointment of a receiver who would, according to the Alliance, become the "homelessness czar" for the entire City.  The Alliance was obligated to honor the contractual "pause" and to discuss in good faith how the devastating fires affected the parties' Agreement—rather than seek unprecedented relief and millions in fees.

The Alliance's requests for relief were extremely premature and had no basis in the Settlement Agreement.  At the seven-day evidentiary hearing, the Alliance floated a long list of unsupported and unsupportable theories as to how the City allegedly breached the Agreement.  Sometimes, the Alliance claimed that the City breached its "spirit."  At other times, the Alliance suggested the City had violated the Agreement because it had chosen the wrong types of shelter or service providers.  And at still other times, the Alliance claimed that the entire system for addressing homelessness (State, County, City, and LAHSA) is so broken that it must be reconstituted by a receiver with expansive powers—a radical attempt to strip policymaking authority from City officials (who are empowered by the federal and California Constitutions and the City Charter to represent the public) and to appoint an unaccountable homelessness czar.

A court of limited jurisdiction is not a forum for the sort of policy debates that precede a local election.  This Court resolves cases and controversies, and the controversy here is whether the City breached its contractual obligations.  Consider what the City actually agreed to:  under a Memorandum of Understanding with the County, providing 6,700 beds open and occupiable through the end of June 2025; and under the Settlement Agreement with the Alliance, providing 12,915 beds by the end of June 2027, removing 9,800 tents, makeshift shelters, cars, and RVs by the end of June 2026, and using its best efforts to hit milestones en route to those final goals.  The evidence

presented at and since the hearing confirms that the City has kept its promises.

Start with the MOU, which is also called the Roadmap agreement. The MOU was between the City and County—not the Alliance, which lacks Article III standing to enforce the MOU. And the City didn't breach the MOU in any event. Nothing in that agreement requires the City to reject outside sources of funding when providing beds, as the Alliance claims. The City also didn't provide just 6,700 beds; it provided close to 7,500. The Alliance has called those figures into question based on the Alvarez & Marsal assessment. That assessment was inadmissible hearsay and unreliable expert evidence that followed no recognized standards—and its absence of sound methodology was thoroughly exposed on cross-examination. In any event, when the Court ordered the City to confirm the accuracy of its reporting, the A&M assessment's litany of "potential" concerns and unquantified "risks" fell flat: Based on information provided by LAHSA, the figure reported at the hearing was off by just 1.9% (142 beds were erroneously included in the most recent Roadmap agreement quarterly report, Dkt. 891-1). The City has exceeded its bed target under the MOU by almost 800 beds and performed all its obligations to the County (which has never argued the City is in breach). Neither the Alliance nor this Court has any basis to extend the MOU beyond the expiration date of June 30, 2025, that the City and County negotiated.

The City also has fully complied with the Settlement Agreement. It has already provided, or is in the process of providing, more than 11,000 new beds. And the City has no doubts about its ability to provide the additional 1,900 beds necessary to reach the final target of 12,915. The City has spent and remains committed to spending more than $300 million a year on homelessness efforts—despite a serious funding crisis that resulted in substantial layoffs and will be formalized in the near future by a declaration of a fiscal emergency. As City Administrative Officer Matthew Szabo testified, the City and its leadership are confident the City will hit the required bed target by June 2027.

The Alliance is also wrong that the City has been shirking its obligation to reduce tents, shelters, cars, and RVs by counting mere cleanings as reductions. Mr. Szabo

explained that the City counts the removal of a tent, shelter, car, or RV *only* when one of those things is destroyed as a hazard or removed from public spaces. He also testified that the City is on track to complete at least 9,800 such removals by the end of June 2026. And neither the Agreement nor any evidence supports the proposition that the removal of tents, makeshift shelters, and vehicles counts only if accompanied by an offer of shelter, let alone one that keeps a person off the streets permanently.

That leaves the Alliance's last remaining theory—that the City hasn't used its "best efforts" to achieve milestones en route to its encampment-reduction goal in 2026 and its bed goal in 2027. The Alliance seems to think that using "best efforts" to hit milestones requires *actually hitting* the milestones. But "best efforts" is a term of art that requires parties only to go to reasonable lengths to accomplish a goal. And parties include that term of art in their agreements when they foresee that contingencies might stand in the way of achieving their mutual aims. To be sure, the Alliance believes the City would have provided more housing if only it had adopted different strategies or used different providers. It called several witnesses to the stand and asked them how quickly and cheaply they could build and operate tiny homes or shared housing for unhoused residents. But that testimony is all irrelevant. The parties agreed only on what targets the City would try to hit, not *how* it would try to hit them. The Agreement gives the City "sole discretion" to choose from a wide array of housing options. The Alliance cannot substitute its (or anyone else's) policy preferences for the City's.

If the evidentiary hearing illustrated anything, it's that there is no end to the good-faith disagreements reasonable people can have about the best approach to addressing homelessness. Some favor tiny homes, others shared homes, and still others hotels and motels. Cities should be free to choose among them—and other options besides. That's what the Supreme Court emphasized just last year in *Grants Pass v. Johnson*, 603 U.S. 520 (2024): "Yes, people will disagree over which policy responses are best; they may experiment with one set of approaches only to find later another set works better; they may find certain responses more appropriate for some communities than others. But in

our democracy, that is their right.  Nor can a handful of federal judges begin to 'match' the collective wisdom the American people possess in deciding 'how best to handle' a pressing social question like homelessness."  *Id.* at 560.  The Settlement Agreement reflects that sensible approach by giving the City "sole discretion" to choose how to make beds available to move people off the streets.  And the evidence demonstrates that the City will hit its targets in 2026 and 2027.  The City has not breached the Agreement.

Because the Alliance hasn't proved a breach, the Court shouldn't reach the question of remedy.  But if it does, a receivership is categorically off the table.  Federal courts may appoint receivers only to remedy violations of *federal* law.  There is no claimed violation of federal law here, only a state-law breach-of-contract claim.  The appointment of a receiver thus would violate the principles of federalism embodied in the Tenth Amendment, which reserves for States (and by extension their political subdivisions) all powers not expressly granted to the federal government.  No law grants federal courts the authority to take over management of municipal governments, either directly or through a delegate appointed as a "receiver."  In any event, the Alliance hasn't proved the extraordinary circumstances necessary to displace the City's local government in favor of a judicially imposed regime of the sort the Alliance seeks.

The Alliance also says almost nothing to justify the potpourri of remedies it proposes for the first time in its post-hearing brief, including extending the Settlement Agreement, directing the City to pay for still more reports and submit to yet more monitoring, and to pay counsel for the Alliance millions more in fees.  There is no contractual basis for the Alliance's new wish list.  The Settlement Agreement says nothing about extending its term.  It provides for the appointment of a special master but otherwise is silent on efforts to monitor the City's compliance.  And it also says nothing about paying the Alliance additional fees for efforts to enforce the Agreement.  Even though the City has funded the Special Master for years, the Alliance demands even more monitoring, more information, and millions more in fees for its efforts.  But the City, having agreed to provide a certain number of beds by June 2027 and a certain

number of encampment reductions by June 2026, should be left free to devote its resources to delivering on those promises—and its efforts outside the Agreement to make housing available—rather than to dragging its counsel and top officials into court repeatedly and to tackling endless requests that are far afield of the Agreement.

The Court should find that the City has not breached the Settlement Agreement or the MOU, and it should not order any remedy. If the Court is inclined to order any remedy, it should stay its order pending appeal.

## BACKGROUND

### I.    The LA Alliance sues over homelessness in Los Angeles, this Court issues a preliminary injunction, and the Ninth Circuit vacates the injunction.

Historically, LAHSA has been most directly responsible for most efforts to address homelessness in Los Angeles. But dozens of City departments and thousands of City employees also have been and are dedicated to and involved in the City's efforts to reduce homelessness and remove encampments, including City employees in the Offices of the Mayor, the City Attorney, every Councilmember, and the City Administrative Officer, as well as employees in nearly every Department, including Housing, Building and Safety, Finance, Community Investment for Families, Disability, Civil and Human Rights, Economic and Workforce Development, Police, Fire, Sanitation, Street Services, General Services, and Transportation.

In March 2020, nine plaintiffs, including the Alliance (which describes itself as a coalition of unnamed Los Angeles businesses and residents), sued both the County and City of Los Angeles, but not LAHSA. Dkt. 1. The Alliance alleged that local policies had exacerbated the problems caused by homelessness in Los Angeles, and especially in Skid Row. *E.g.*, *id.* ¶¶ 39, 56–57. Other local organizations, including the Los Angeles Community Action Network, intervened in the case, which (they argued) might affect their rights under a settlement agreement with the City. Dkt. 25, 29.

Later, this Court issued an order requiring extensive financial disclosures from the County and the City and briefing on the "outer limit of the Court's structural equitable

remedy power" and "all equitable remedies available to the Court that would require the City . . . to take action to provide relief to the homeless community." *LA Alliance for Human Rights v. County of Los Angeles*, 14 F.4th 947, 953–54 (9th Cir. 2021). The Alliance moved for a preliminary injunction requiring the County and City to end the problem of encampments in Skid Row. *Id.* at 954. This Court granted that motion and ordered, among other things, "the escrow of $1 billion to address the homelessness crisis, offers of shelter or housing to all unhoused individuals in Skid Row within 180 days, and numerous audits and reports." *Id.* at 952; *see also id.* at 955–56. The Ninth Circuit stayed the injunction pending appeal and ultimately held that this Court had abused its discretion in issuing the injunction. *Id.* at 957.

## II.    The City enters into a Memorandum of Understanding with the County.

In October 2020, the County and the City entered into the MOU, which clarified their respective "roles, responsibilities and financial relationships necessary to create housing or shelter" for vulnerable unsheltered people, including those over 65 and those living near highway overpasses. Dkt. 185-1 at 1. Among other things, the City agreed to make thousands of new beds available for such people, and the County agreed to contribute millions of dollars over five years to that effort. *Id.* at 4–5. The County and the City are the only parties to the MOU. *Id.* at 1, 9. The agreement expires on June 30, 2025. *Id.* at 1. The County has never contended the City has fallen short of its obligations under the MOU or sought any relief from this Court.

## III.    The City settles with the Alliance.

In May 2022, after the Ninth Circuit vacated the preliminary injunction, the Alliance settled with the City. Dkt. 429-1. That deal is both structured and described as a "Settlement Agreement," not a consent decree. *Id.* at 6. The Alliance agreed to dismiss its claims with prejudice. *Id.* § 14. The Agreement states that the City:

- must make available the housing "needed to accommodate sixty percent" of unhoused people who are appropriate for shelters (for example, those who do not have "a severe mental illness"), *id.* § 3.1;

- must "create plans and develop milestones and deadlines" for that 60% target, as well as "encampment engagement, cleaning and reduction in each Council District," to "provide the plans, milestones and deadlines to Plaintiffs," and to "promptly employ its best efforts to comply with established plans, milestones, and deadlines," *id.* § 5.2; and

- may exercise its "sole discretion" to choose "any housing or shelter solution," *id.* § 3.2.

Following the 2022 Point-in-Time count, the City committed to provide 12,915 beds by June 13, 2027. Dkt. 904 at 15–16. In November 2022, the City provided a plan for more than 8,000 of those beds. Dkt. 863-4. The Alliance also proposed, and the City agreed to, the target of 9,800 reductions of tents, makeshift shelters, cars, and RVs by June 30, 2026. Dkt. 668-1 at 82–84; Dkt. 713 at 2–3.

The Agreement provides that "the Court shall have continuing jurisdiction to oversee and enforce this Settlement Agreement." Dkt. 429-1 § 2. The Agreement accounts for the possibility that achievement of the City's targets may be derailed by natural disasters or other contingencies. A force majeure clause provides that, "[i]n the event of fires," among other things, "the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations." Dkt. 429-1 § 8.2.

## IV. The Alliance seeks further relief from the Court, including that the City be placed into receivership.

The Alliance has filed a series of motions seeking compliance with the Settlement Agreement. It first did so in February 2024, alleging that the City hadn't provided targets for reducing homeless encampments and had provided fewer beds than promised. Dkt. 668. The motion called for an order requiring the City to pay the Alliance some $6.4 million as sanctions for supposed noncompliance; the payment would supposedly "fund the Alliance's efforts to ensure accountability for the remaining four years of the Agreement." *Id.* at 13–14. The City responded that it had fully complied with the

Agreement, and that the Alliance's mere wish that the City had acted even faster was no basis for any relief, much less an order forcing the City to pay millions of dollars to the Alliance's lawyers.  Dkt. 669 at 12.  The parties eventually resolved their differences, with the City agreeing to pay for an assessment ordered by this Court (ultimately costing millions) and to pay the Alliance's fees and costs.  Dkt. 713 at 3.

In September 2024, the Alliance moved for an order requiring "settlement compliance" by compelling the City to provide details about its efforts to reduce encampments.  Dkt. 767.  The Alliance contended that the City's reporting on those efforts was "confusing and inconsistent," and that unsheltered people were being moved from one place to another, without receiving offers of temporary or permanent housing. *Id.* at 3–4.  The City opposed that relief, contending that nothing in the parties' Agreement required the reporting the Alliance was demanding.  Dkt. 774 at 3–5.

In January 2025, a fire reduced much of Pacific Palisades to ash, and other nearby fires inside and outside of the City, including the Eaton Fire in Altadena, put pressure on emergency services and rendered more people homeless overnight.  On January 7, 2025, immediately after the outbreak of the Palisades Fire, the City declared a state of emergency.  Request for Judicial Notice (RJN), Ex. A.  The City has extended that declaration, *id.*, Ex. B, C, and has not yet declared an end to the state of emergency.

On January 15, counsel for the City emailed counsel for the Alliance, explaining that "the City's obligations as provided in Section 8.2 are hereby paused" as a result of the "ongoing fires and wind storms, which are impacting personnel and resources."  Dkt. 872-2 at 2.  Nine minutes later, counsel for the Alliance responded:  "I think we've sufficiently satisfied our meet-and-confer obligations at this time.  I don't find the city's reasons for not hitting milestones compelling, nor does the city have any explanation for its failure to provide the bed plan as required.  I don't think a second meet-and-confer is needed."  *Id.*  The Alliance had a similar response to a further attempt by the City to meet and confer in March.  The Alliance disagreed that "the wildfire emergency has created a necessity for any necessary and appropriate amendments to the settlement

1    obligations." Dkt. 964-12 at 323.

2         Instead of meeting and conferring with the City about the impact of the fires, the

3    Alliance filed another motion seeking injunctive relief in February 2025. Dkt. 863. The

4    Alliance asked this Court to find that the City had breached the Settlement Agreement,

5    to set a target for compliance, and to identify "clear consequences for non-compliance

6    in the form of monetary and injunctive measures." *Id.* at 16. In response, the City

7    explained that any motion was premature; the City's obligations were paused, and the

8    City in any event couldn't have breached the Agreement because "the date by which the

9    City committed to create 12,915 beds is more than two years away in June 2027."

10   Dkt. 871 at 5–6, 8–9.

11        On March 24, this Court addressed in part the first of the two pending motions,

12   ruling that the City "may not report clean-ups" as encampment reductions "because they

13   are not permanent in nature." Dkt. 874 at 2.

14        On May 8, the Alliance filed an unauthorized 39-page brief (not styled as a

15   motion) asserting that "[i]n light of the City's failures to meet the terms of the

16   Agreement, . . . no further options remain but receivership." Dkt. 899 at 1.

17   **V.    This Court holds an evidentiary hearing.**

18        From May 27 through June 5, the Court held an evidentiary hearing to gather

19   evidence bearing on whether the City has complied with its contractual obligations to

20   provide new beds and reduce the number of tents, makeshift shelters, cars, and RVs.

21        City Administrative Officer Matthew Szabo explained that the City has satisfied

22   its obligation to provide 6,700 beds under the MOU. The total number of beds was in

23   fact "approximately 8,000." Dkt. 959 at 69:13–24. After the hearing, the City submitted

24   data provided by LAHSA substantiating the existence of the 2,679 Time-Limited

25   Subsidy (TLS) beds reported under the MOU and identified the mistaken inclusion of

26   142 beds in the most recent Roadmap agreement quarterly report (Dkt. 891-1), leaving

27   the City well above the 6,700 mark. Dkt. 980 ¶¶ 4–5.

28        Mr. Szabo testified that the City is also on track to meet or potentially exceed its

1   bed obligations under the Settlement Agreement.  Dkt. 959 at 69:25–70:12.  The City

2   has provided 6,724 beds, and is in the process of provided 4,278 more, Dkt. 892-1 at 6—

3   altogether, only about 1,900 beds short of the 12,915 beds the City must provide by the

4   end of June 2027.  The City has also committed "more than $300 million of [its] general

5   fund towards . . . homelessness efforts."  Dkt. 955 at 295:13–21.  Mr. Szabo is confident

6   that the City will be able to close the 1,900-bed gap by the end of the Settlement

7   Agreement.  Dkt. 955 at 279:7–14; *accord, e.g.*, Dkt. 959 at 35:23–36:11.

8           Mr. Szabo also addressed the City's efforts to reduce the number of tents,

9   makeshift shelters, and vehicles.  The City counts the removal of only those tents or

10  other shelters that the Department of Sanitation "takes possession of, takes custody of,

11  and removes from the public right of way," Dkt. 955 at 146:8–21, and the City counts

12  the removal of only those cars and RVs that are brought to the City impound lot, *id.* at

13  179:16–180:11.  The City is on track to perform at least 9,800 reductions of tents,

14  makeshift shelters, cars, and RVs by June 2026.  Dkt. 959 at 41:3–13.

## LEGAL STANDARD

16          The Alliance, as the party moving to enforce the terms of a settlement agreement,

17  has the burden to prove it was breached.  *E.g.*, *Parsons v. Ryan*, 949 F.3d 443, 471 (9th

18  Cir. 2020); *see also* Dkt. 969 at 361:2–4, 361:22–23, 362:9–10 (Alliance's counsel

19  acknowledging that Alliance "bear[s] the burden").  State law governs the interpretation

20  and enforcement of settlement agreements even when a party settles federal claims.

21  *Botefur v. City of Eagle Point*, 7 F.3d 152, 156 (9th Cir. 1993).  Here, both agreements

22  state they are governed by California law.  Dkt. 185-1 § X; Dkt. 429-1 § 23.

23          The Alliance seeks an order placing the City into receivership.  Dkt. 899.  To

24  prove its entitlement to that form of permanent injunctive relief, the Alliance can rely

25  only on admissible evidence.  *See, e.g.*, *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*,

26  51 F.3d 982, 985 (11th Cir. 1995); *Gould v. Lambert Excavating, Inc.*, 870 F.2d 1214,

27  1218 (7th Cir. 1989); *see also* Fed. R. Civ. P. 65(a)(2); *Orr v. Bank of Am., NT & SA*,

28  285 F.3d 764, 733 (9th Cir. 2002).

**ARGUMENT**

## I.    The City did not breach its Settlement Agreement with the Alliance.

Seven days of testimony at the evidentiary hearing confirmed that only one party has breached the Settlement Agreement: the Alliance. In moving to compel compliance with Section 5.2, the Alliance proceeded heedless of Section 8.2's pause of the City's obligations and has defied its duty to meet and confer about any necessary amendments to those obligations. The Alliance also hasn't remotely carried its heavy burden of proving that the City has fallen short of its obligations. The Alliance has jumped the gun in arguing that the City has breached its duty to provide 12,915 shelter and housing solutions by June 2027 and to reduce 9,800 tents, makeshift shelters, and vehicles by June 2026, as well as its duty to provide a plan for how the City will close the gap to 12,915 beds over the next two years. The only ripe issue is whether the City has used "best efforts" so far in providing beds and reducing encampments—and undisputed evidence shows that the City has.

### A.    The Alliance, not the City, has breached the Agreement.

If the evidentiary hearing has demonstrated anything, it's that the Alliance is the party that has breached the Agreement—specifically, Section 8.2. The parties specified that, "[i]n the event of fires," among other disasters, "the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations." Dkt. 429-1 § 8.2. In January, two of the most destructive fires in California history swept through the Los Angeles area, burning much of Pacific Palisades to the ground. Several other fires broke out at the same time, including the Hurst Fire in Sylmar.

Under Section 8.2, the City's obligations to comply with the Agreement were automatically paused as a result of those fires, *and* the Alliance separately had a duty to meet and confer. The City repeatedly invited a discussion about the impact of the fires on the Agreement, but to no avail. The Alliance refused to acknowledge that the fires changed anything or to consider any amendments to the City's obligations. The Alliance

then filed a motion for injunctive relief on February 20, less than three weeks after the Palisades Fire had finally been contained. Dkt. 863. Then, in early May, the Alliance followed up that effort with an unauthorized 39-page brief asking the Court to impose a receivership on the City. Dkt. 899. By seeking drastic relief when the City's contractual obligations are "pause[d]," and by refusing to meet and confer under Section 8.2, the Alliance is the only party that has breached the Agreement—and the Alliance's own breach precludes it from claiming a breach by the City.

### 1. Section 8.2 paused the obligations that the Alliance is attempting to enforce.

On January 7, 2025, immediately after the outbreak of the Palisades Fire, the City declared a state of emergency. RJN, Ex. A; *see* Dkt. 959 at 61:17–62:5. Six days later, the City updated that declaration of emergency, noting that the Palisades Fire had already spread over "a geographical area larger than San Francisco or Boston" and that other fires had broken out in the City, including the Hurst Fire. RJN, Ex. B. The City has yet to declare an end to the state of emergency, and Governor Newsom extended certain state-of-emergency protections until July 1, 2025. RJN, Ex. C; Dkt. 959 at 62:3–5.

Following the declaration of emergency, the City has consistently taken the position that Section 8.2 means what it says and has automatically paused the City's obligations to comply with the Agreement. *E.g.*, Dkt. 871 at 5. The Alliance, by contrast, took the position that Section 8.2 lasted only so long as fires were burning, never mind the billions of dollars in property and infrastructure damage, and other economic impacts that unfortunately persist. In March, the Alliance asserted that "the emergency is no longer pending," Dkt. 872 at 12, and that Section 8.2 didn't apply because "the fires are out now," Dkt. 878 at 55:13. This Court disagreed with the Alliance's position, explaining that, "under 8.2, you're going to find that I'm going to be gracious and work with you because regardless of what L.A. Alliance may say, this does cause a hiatus." Dkt. 878 at 31:9–12. The Court also told Mayor Bass that Section "8.2 gives [her] the authority . . . to declare an emergency," and that "the fire victims

have to take priority, period." Dkt. 878 at 62:5–14. And the City now faces a fiscal emergency that is likely to last at least a year. RJN, Ex. D at 142.

Even though the enforcement of its obligations is indisputably and automatically "paused" due to the fires (and will remain so after the forthcoming Resolution of Fiscal Emergency), the City has nonetheless continued to work toward achieving the agreed number of encampment reductions by the end of June 2026 and the agreed number of new beds by the end of June 2027. City Administrative Officer Matthew Szabo testified that the City has "not paused efforts to comply with the settlement agreement, even in the face of the declaration of emergency based on the wildfires in January." Dkt. 959 at 37:14–20. The City remains on track to meet or exceed its targets by the deadlines. But what the City has been doing despite the pause and in the face of an unprecedented natural disaster isn't the point. What matters is that, as a legal matter, the Alliance cannot establish the breach of obligations that are currently suspended.

In its closing statement, the Alliance contended that Section 8.2 paused the City's obligations only from the start of the fires, and that it therefore may sue for any breaches that accrued before then. Dkt. 976 at 264:1–12. That theory is inconsistent with Section 8.2 itself, which makes clear that "natural catastrophic occurrences" such as "fires" not only pause the City's obligations but also require the parties to reevaluate what those obligations should be in the first place. Section 8.2 states that the parties must "meet and confer on any necessary and appropriate amendments to those obligations." Dkt. 429-1 § 8.2. The Alliance's theory that Section 8.2 operates only prospectively from the time of a natural disaster also depends on another misreading of the agreement—namely, the theory that the City was required to hit every milestone before the end of the Agreement. The Agreement doesn't say that either; it creates fixed targets that the City must hit in 2026 and 2027, Dkt. 429-1 §§ 3–4, and it requires the City to "employ its best efforts to comply with established plans, milestones, and deadlines," *id.* § 5.2. To use "best efforts" to achieve a target doesn't necessarily mean hitting it. *See infra*, at 23–24. And what qualifies as "best efforts" depends on "the context of the

circumstances in a particular case," *Cal. Pines Property Owners Ass'n v. Pedotti*, 206 Cal. App. 4th 384, 393 (2012)—including limitations on what the City can accomplish in light of diminished resources or other practical impediments following a disaster.

### 2. The Alliance violated its contractual meet-and-confer obligation.

On January 15, counsel for the City emailed counsel for the Alliance, explaining that "the City's obligations as provided in Section 8.2 are hereby paused" as a result of the "ongoing fires and wind storms, which are impacting personnel and resources." Dkt. 872-2 at 2. Nine minutes later, counsel for the Alliance responded: "I think we've sufficiently satisfied our meet-and-confer obligations at this time. I don't find the city's reasons for not hitting milestones compelling, nor does the city have any explanation for its failure to provide the bed plan as required. I don't think a second meet-and-confer is needed." *Id.* Next month, the Alliance moved for an injunction ensuring compliance with the settlement, Dkt. 863, and the month after, the Alliance rebuffed another attempt to meet and confer under Section 8.2, refusing to make any "counter-proposal" and denying that "the wildfire emergency has created a necessity for any necessary and appropriate amendments to the settlement obligations," Dkt. 964-12 at 323. And then in May, the Alliance filed its brief seeking to place the City in receivership. Dkt. 899.

Because the Alliance has refused to meet and confer with the City about "any necessary and appropriate amendments to [the City's] obligations" in light of the fires, Dkt. 429-1 § 8.2, the Alliance itself breached the Agreement. The Alliance may claim that it sent an email or two or joined a phone call, but it indisputably was never willing to accept that the City's obligations could have changed as a result of the fires. Going through the motions didn't satisfy the Alliance's obligation to meet and confer. When parties "are under a contractual compulsion to negotiate . . . the covenant of good faith and fair dealing attach[es]" and requires a meaningful effort to reach agreement. *Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251, 1250 (2002). Given its ongoing and uncured breaches of both Section 8.2 and the covenant of good faith and fair dealing, the Alliance is in no position to demand compliance with a deal it didn't

honor itself. *See, e.g.*, *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (contract claims require proof of "performance or excuse for nonperformance").

**B.    The City has not anticipatorily breached its ultimate obligations under the Agreement.**

The Alliance's claim that the City has breached the Settlement Agreement is plainly unripe because the City's deadlines are far in the future.  The City has agreed to provide 12,915 "housing and shelter solutions" over a five-year term that ends on June 13, 2027, Dkt. 429-1 §§ 2, 3.1; *see* Dkt. 775-1 at 1, and to accomplish 9,800 encampment "reduction[s]" by June 2026, Dkt. 429-1 § 5.2; *see* Dkt. 668-1 at 72.  The Agreement has "no interim deadlines." Dkt. 949 at 245:1–6.  This Court should reject the Alliance's premature claims of breach because "'the time specified therein for performance has [not] arrived.'" *Hewlett-Packard Co. v. Oracle Corp.*, 65 Cal. App. 5th 506, 550 (2021).

The Alliance speculates that the City has anticipatorily breached the Agreement because the City "cannot both support the current projects and pay for the new housing and shelter solutions required by the [Agreement]." Dkt. 872 at 3.  But as Mr. Szabo testified, the City is on track—and has every intention—to meet or exceed its bed obligations under the Agreement. *E.g.*, Dkt. 959 at 69:25–70:12.  The City has already provided 6,724 beds, and 4,278 more beds are in process.  Dkt. 892-1 at 6.  When one tallies up those numbers, the City is three years (or around 60%) of the way into the Agreement's term, and has already opened or is in process on 11,002 beds, which represents 85% of the total required by June 2027.  Dkt. 959 at 47:12–24.

The City remains "completely committed" to its obligation to open 12,915 new beds by June 2027.  Dkt. 955 at 255:3–25, 278:18–14.  The Mayor and "every member of the City Council" stand behind authorizing the projects and funds necessary for the City to comply with the Agreement. *Id.* at 278:18–21.  Even despite the fiscal emergency that has caused the City to make "severe cuts" to "very high priority departments," the City has still committed over $300 million of its general fund toward its efforts to curb homelessness. *Id.* at 295:13–21.  And the flexibility in what qualifies

as a shelter or housing solution will allow the City to comply with its settlement obligations regardless of any turnover of elected and appointed officials that may or may not occur in the future. *Id.* at 297:2–7. In the face of this evidence, the Alliance has come nowhere close to proving "a clear, positive, unequivocal refusal to perform" or "conduct equivalent to an unequivocal refusal to perform." *Taylor v. Johnston*, 15 Cal. 3d 130, 137–39 (1975). Rather than repudiating its obligations under the Agreement, the City has expressly embraced them. That is dispositive, because under California law "there is no implied repudiation unless the promisor actually puts it out of his or her power to perform." 1 Witkin, Summary of California Law § 889(b) (11th ed. 2025).

The City also is properly counting certain Inside Safe beds under the Agreement, which preserved the City's "sole discretion" to choose "any housing or shelter solution," including "hotels/motels." Dkt. 429-1 § 3.2. Everything about the Inside Safe beds "is consistent with the requirements in the settlement." Dkt. 953 at 107:3–108:21. While the Alliance attacks the recent inclusion of Inside Safe beds in the City's reporting of its compliance with the Agreement, the record shows why the City began to count such beds only recently. The City created the Inside Safe program in 2022 through an emergency order of the Mayor, and initially obtained funding on an ad hoc basis. Dkt. 955 at 275:20–276:8. Given the City's preference for conservative data reporting, it did not begin reporting Inside Safe beds until it assured itself of "the longevity of the program," which had been demonstrated by its third year through consistent funding commitments. Dkt. 953 at 109:12–110:5. Nor does anything in the Agreement limit the City to listing beds only when the City knows for certain that the beds will remain continuously in existence through June 2027. The recent fires illustrated that none of us can count on a specific bed or physical structure lasting for years into the future. If any Inside Safe bed goes offline before June 2027, the City will replace it with another housing or shelter solution. *Id.* at 107:3–108:21; Dkt. 955 at 277:13–279:25.

The Alliance's newfound criticism (Dkt. 977 at 14–15) of the City's counting of Inside Safe beds is not only meritless, but also contrary to its prior position. The Alliance

1    itself said in a December 2023 email that "Inside Safe beds" should count toward the

2    City's obligations because the Settlement Agreement does not require "that a specific

3    bed created must stay available for the term of the settlement," so long as the City

4    "create[s] at least another bed to maintain capacity." Dkt. 964-10 at 4–5. The Alliance's

5    flip-flop is a desperate attempt to conjure up any justification to wrest control over the

6    City's homelessness programs from elected officials.

7        The Alliance also cannot prove a breach of the Agreement through its criticism of

8    LAHSA's data reporting. For starters, LAHSA provides data for less than five percent

9    of the beds included in the City's most recent quarterly report. Dkt. 959 at 33:12–16.

10   The City also never agreed *not* to use LAHSA under the Agreement. LAHSA is—and

11   was at the time of the Agreement's execution—the designated Continuum of Care

12   provider in Los Angeles County. And the alleged issues with that small sliver of

13   reported data also are supported primarily by inadmissible and unreliable hearsay—the

14   Alvarez & Marsal assessment.

15       Contrary to the Alliance's contention, the A&M assessment does not fall within

16   any valid hearsay exception, including the exception for public records. Dkt. 941 at 2.

17   The Federal Rules exempt from the rule against hearsay the "record[s] or statement[s]

18   of a *public* office" only if the record or statement "sets out: (i) the office's activities;

19   (ii) a matter observed while under a legal duty to report, . . . or (iii) in a civil case . . .

20   factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)

21   (emphasis added). The A&M assessment doesn't fit within this exception because it

22   wasn't prepared by a "public office" and has never been adopted by the City. *Id.* Courts

23   have declined to admit similar privately prepared reports as public records. *E.g.*, *United

24   States v. Blackburn*, 992 F.2d 666, 672 (7th Cir. 1993); *Brown v. Sierra Nevada Mem'l

25   Miners Hosp.*, 849 F.2d 1186, 1189–90 (9th Cir. 1988). The A&M assessment also

26   "lack[s] sufficient guarantees of trustworthiness." Fed. R. Evid. 803(8)(B). A&M

27   prepared its report "with a view to possible litigation," which cuts against its use as

28   hearsay. *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 778 (9th Cir. 2010).

The assessment also is unreliable because it was not "a formal review or audit in accordance with any applicable accounting standards."  Dkt. 905 at 3.  A&M did not comply with (or even purport to comply with) generally accepted government auditing standards (GAGAS), generally accepted accounting principles (GAAP), or any other standards for independence, competence, objectivity, accuracy, and integrity in government audits.  These standards are not mere formalities—they ensure a reliable foundation that allows others to evaluate any conclusions.  Because A&M did not apply any methodology recognized in the "relevant [expert] community," its conclusions are inadmissible not only as hearsay but also as unreliable expert evidence under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594 (1993).  And in any event, the A&M assessment merely raised potential concerns and did not prove any actual breach.

### C.    The City has provided a bed plan to the Alliance.

The Alliance is wrong to argue that the City breached Section 5.2 of the Agreement by not providing a bed plan.  Dkt. 872 at 2.  The Agreement requires the City to "create plans . . . for," among other things, its "creation of shelter and housing solutions to accommodate" 12,915 people across the City.  Dkt. 429-1 § 5.2(iii).  The City did just that when it provided a plan in November 2022 for over 8,000 shelter and housing solutions, Dkt. 863-4, as the Alliance concedes, Dkt. 977 at 2.

The Alliance insists the City was required in November 2022 to "produce a complete plan" for providing every last one of the 12,915 shelter and housing solutions that the City must establish by June 2027.  Dkt. 872 at 2.  But that's not what the parties agreed to.  As an initial matter, the Agreement does not set any hard deadline for plans.  Dkt. 429-1 § 5.2.  It also does not define "plan" as a proposal to provide all 12,915 solutions.  In ordinary English, a person can have multiple incremental plans on the way to an ultimate goal.  A college senior with a five-year goal to become a lawyer might first develop a plan for tackling the LSAT, then sketch out a plan for applying to law schools, and finally nail down a plan for getting hired as a lawyer.  The City, too, provided the Alliance a plan in November 2022 for providing around 80% of the shelter

and housing solutions and has ample time to provide a further plan after the "pause" ends, after this Court resolves the parties' disagreement over the meaning of the Agreement, and after the City finalizes how it will meet its remaining obligations.

The Alliance's contrary theory that the City had to immediately commit to a full bed plan in November 2022 is irreconcilable with Section 3.2 of the Agreement, which gives the City the "sole discretion" to choose how it establishes beds over the life of the Agreement. Dkt. 429-1 § 3.2. Needless to say, a lot has changed since November 2022—a new mayoral administration, turnover at the City Council, and newly available federal and state funding sources, not to mention a catastrophic wildfire and a fiscal emergency. Dkt. 953 at 109:20–110:13; Dkt. 959 at 49:1–50:15, 124:20–125:9; Dkt. 955 at 270:9–271:7. Section 3.2 reflects that the City retained full discretion to experiment with different policy options and isn't "pigeonhole[d]." Dkt. 955 at 268:3–10. Projects often have multiple funding sources, and "things can fall through." *Id.* at 268:10–22. Interpreting the word "plan" to require a complete, upfront blueprint for every shelter and housing solution would eviscerate the Agreement's flexibility by requiring the City to commit, years in advance, to pursuing certain housing options at the expense of other, more viable opportunities that may present themselves later.

### D.  The City did not breach the best-efforts provision for interim milestones.

Searching for any justification for its premature assertions of breach, the Alliance ultimately rests its case on a theory that the City has not "employ[ed] its best efforts" to meet "milestones" for beds and encampment reductions. Dkt. 429-1 § 5.2; *see* Dkt. 977 at 23. Because the Settlement Agreement does not define "best efforts," that term takes its ordinary meaning under California law: The City "must use the diligence of a reasonable person under comparable circumstances"—nothing less, but also nothing more. *Cal. Pines*, 206 Cal. App. 4th at 394. As the City established at the evidentiary hearing, it has diligently pursued shelter and housing solutions and encampment reductions. In fact, the City is on track to comply with the Agreement's ultimate

requirements in June 2026 and June 2027.  There is thus no basis for this Court to declare a breach midway through the Agreement's term on the theory that the City should be even more ahead of schedule than it already is.

### 1.    The City used best efforts to meet bed milestones.

The City has used its best efforts to open shelter and housing solutions and to move many others through the pipeline toward being open and occupiable.  Although the City has fallen short of interim milestones, it has invested in permanent supportive housing that is expected to open in the next two years and will push the City past the 12,915 mark.  The Alliance's main theory of breach is quantity over quality:  that the City should have frontloaded the production of quicker, cheaper forms of interim shelter and housing.  The Alliance's attempt to control how the City prioritizes shelter and housing under the Agreement rests on a mistaken understanding of the best-efforts provision, is contrary to the City's retention of sole discretion over what kind of shelter or housing to provide, and would violate the Constitution's reserved-powers doctrine.

The City's past performance reflects its best efforts.  In the three years since the City entered the Settlement Agreement, it has provided thousands of beds, and has thousands more in process.  Dkt. 959 at 35:1–8.  The most recent quarterly report shows 6,724 beds were open as of March 31, 2025, and another 4,278 beds were in progress, for a total of 11,002 beds.  Dkt. No. 892-1 at 6.  The fact that the City has a large proportion of beds planned to open in the latter half of the five-year contract term is a direct result of the City's policy to prioritize permanent supportive housing— specifically, projects with a functional life over 20 years—rather than short-term solutions, such as rent subsidies.  Dkt. 959 at 101:16–25.  These permanent supportive housing solutions are not the cheapest or quickest option.  To the contrary, they are capital intensive and take several years to complete even under a best-case scenario. Dkt. 969 at 132:7–15.  But there is also evidence that such permanent supportive housing results in the best outcomes for unhoused people, including lower rates of returning to homelessness as compared to interim solutions.  Dkt. 905 at 120.  And even while the

City has prioritized high-quality permanent housing solutions, the quarterly reports show that the City has made steady progress toward closing the gap for its cumulative milestones and is on track to comply with the requirement to have 12,915 open beds by June 14, 2027.  Dkt. 955 at 279:10–14; Dkt. 959 at 36:4–10.

The City's ongoing investment of substantial resources underscores that its best efforts continue apace.  Mr. Szabo testified that the City—including the Mayor, City Council, and other City leaders—is fully committed to providing all the beds required under the Settlement Agreement.  Dkt. 955 at 255:4–21, 278:18–21.  Even in the face of devastating wildfires that will severely affect the City's finances, the City's current proposed 2025 budget devotes substantial funds to complying with the Alliance Settlement Agreement.  *Id.* at 255:11–17; Dkt. 959 at 37:18–20.  The budget also would create a Bureau of Homelessness Oversight to increase accountability as to how funds are spent.  Dkt. 959 at 37:21–38:10.  The budget makes these commitments to addressing homelessness despite imposing cuts on other essential functions and requiring broad layoffs.  Dkt. 955 at 255:3–21.

Those actions amply satisfy the City's contractual obligation to use best efforts to meet bed milestones.  As Mr. Szabo summed it up:

> We have a systematic approach.  We have been making progress every reporting period towards the goal.  We have a program that is fully funded to provide permanent supportive housing.  We have efforts, continual efforts, to seek state funding, which, of course, is called out for in the agreement. State funding that has been used to create additional interim units.  We received additional grants, even just last year secured a grant to develop 500 tiny homes and it is an ongoing process of siting, developing, constructing new housing.  At the same time, as there is constant advocacy at the state level and federal level for new funding, at every level, in terms of from the Mayor herself and every member of the council, there is complete focus and commitment to secure the resources

and to push the departments to get these projects up as quickly as possible.

Dkt. 959 at 49:25–50:15. The Alliance does not dispute the above facts. Dkt. 977 at 13.

The Alliance misinterprets the best-efforts provision to require the City to achieve "great things" in "minimal time." Dkt. 899 at 9. But the Agreement does not require the City to make "every conceivable effort" to meet milestones or to "ignore its own interests" along the way. *Cal. Pines*, 206 Cal. App. 4th at 394. No one could question that the City has exerted great effort in opening 6,724 beds and investing to bring 4,278 more online. Dkt. No. 892-1 at 6. If courts have been loath to find a breach of a best-efforts provision even when a party makes "little effort" or only "some effort" to comply, *Triple-A Baseball Club Assocs. v. Ne. Baseball, Inc.*, 832 F.2d 214, 228 (1st Cir. 1987) (first quote); *Samica Enters., LLC v. Mail Boxes Etc. USA, Inc.*, 637 F. Supp. 2d 712, 718 (C.D. Cal. 2008) (second quote), then there is no basis to declare a breach when the City is making significant progress toward its ultimate obligations. The best-efforts provision acknowledged that the City might *not* hit the milestones and does not allow the Alliance to micromanage the City if there is any interim shortfall.

The Alliance correctly observes that best-efforts analyses are context dependent, Dkt. 899 at 9, but it is wrong about how context affects the analysis here. If anything, the complexity of government projects should make the best-efforts standard more forgiving, not less. This matters because courts construe best-efforts clauses "'in light of [the promisor's] ability and the means at its disposal,'" *EEOC v. R.J. Gallagher Co.*, 181 F.3d 645, 652 (5th Cir. 1999), and any context-specific analysis would consider competing demands on the City's resources and other challenges unique to government actions. *U.S. Ecology v. California*, 129 Cal. App. 4th 887 (2005), illustrates the proper application of a best-efforts provision in this context. In that case, California had committed to using its best efforts to timely acquire a low-level radioactive waste disposal site in 1989. *Id.* at 894. California still had not acquired the site a decade later because coordinating the project across multiple levels of government in face of fierce

POST-EVIDENTIARY HEARING BRIEF OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

1  legal and political opposition proved too great a challenge. *Id.* at 894–97. Even so, the
2  trial court ruled that California had satisfied its contractual obligation to use best efforts
3  during that period and did not breach the best-efforts provision until Governor Davis
4  expressly repudiated the project after taking office. *Id.* at 898–99.

5      The Alliance also argues that the City did not use best efforts because other forms
6  of interim shelter and housing may have been cheaper or quicker to build—such as the
7  warp-speed construction of a shelter modeled on a Jordanian refugee camp for Syrians
8  fleeing a civil war. Dkt. 899 at 8; *see* Dkt. 977 at 23–24. During the evidentiary hearing,
9  this Court correctly rejected attempts to compare Los Angeles even to other areas in
10  California. Dkt. 953 at 167:1–4. And of the available alternatives within Los Angeles,
11  the best-efforts provision does not require the City to choose the "best" form of shelter
12  or housing solution to maximize its odds of clearing a milestone. In *California Pines*, a
13  rancher and association of property owners shared the rights to use a reservoir, and the
14  rancher was free to take water from the lake as long as he used his "best efforts" to
15  maintain the water level. 206 Cal. App. 4th at 388. When water levels in the lake
16  dropped, the association claimed that the rancher could have done more to keep the lake
17  full, such as reducing his water usage with a more efficient delivery system or refraining
18  from irrigating when cattle were in the field (which, the court noted, was "not best
19  practice"). *Id.* at 389–90. But the rancher's efforts to keep the lake full were at least
20  "reasonable"—and thus good enough to comply with the best-efforts provision. *Id.* at
21  395; *see Triple-A Baseball,* 832 F.2d at 227–28 ("[I]t is clearly erroneous for a court to
22  speculate as to what other steps the party should have taken."). Arguments that the City
23  could have proceeded differently (such as by investing in projects other than Inside Safe)
24  are beside the point.

25      The Alliance relies on testimony from service providers Elizabeth Funk, Brian
26  Ulf, and John Maceri for its theory that the City has not used best efforts. *See, e.g.*,
27  Dkt. 977 at 17. The City has objected to such improper expert testimony. Dkt. 937. The
28  Alliance's witnesses lack the scientific, technical, or specialized knowledge necessary

to testify about what constitutes the "best efforts" of the government of the second-largest U.S. city. But even if these service providers were experts under Rule 702, they still couldn't testify about the meaning of "best efforts" because the Ninth Circuit "has repeatedly affirmed that 'an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law.'" *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017). Such legal conclusions are routinely excluded. *E.g.*, *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008).

The Alliance's claim that the best-efforts provision required the City to forgo permanent supportive housing in favor of clearing milestones with temporary options conflicts with other provisions of the Agreement. The Alliance may well believe that immediate, short-term solutions are the best options for the City's homelessness response, but the Agreement doesn't obligate the City to adopt the Alliance's preferred policies. The Agreement provides exactly the opposite, allowing the City to use its "sole discretion" to choose "any housing or shelter solution." Dkt. 429-1 § 3.2. Under fundamental principles of contract interpretation, "a best efforts clause must be reconciled with other clauses in the contract to the extent possible." *Cal. Pines*, 206 Cal. App. 4th at 393. The Agreement thus preserves the City's sole discretion to decide the mix of housing and shelter solutions—and then the City must use best efforts to provide its chosen solutions. The City properly exercised this discretion when it invested in long-term permanent housing, rather than quick, temporary fixes.

The Alliance overlooks that the best-efforts provision does not and cannot override other constraints on the use of any funding allocated to shelter and housing solutions under the Settlement Agreement. As Mr. Szabo explained, the City carefully considered its options based on many factors, including Angelenos' authorization of significant expenditures on permanent housing through Measure HHH in 2016. Dkt. 955 at 297:18–25. Measure HHH authorized funding only for "brick and mortar facilit[ies]," and there was a "policy decision that predated the Alliance settlement" to use such funds "almost exclusively on permanent housing." Dkt. 959 at 101:16–25,

POST-EVIDENTIARY HEARING BRIEF OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

Gibson, Dunn & Crutcher LLP

103:12–16.   The City's decision to take advantage of funds that had already been earmarked for permanent supportive housing is proof of best efforts, not of their absence.

Moreover, the Alliance is wrong to argue that the City "lose[s] [its] discretion" over the type of shelter or housing solution to provide if the City falls short of any milestone.  Dkt. 977 at 3.  The Alliance has seized on the language giving the City "sole discretion" to choose any housing or shelter option "as long as the Milestones are met." Dkt. 429-1 § 3.2.  The "as long as" clause means only that each option (tiny homes, master-leased apartments, etc.) can count the same toward the ultimate goal; the Alliance doesn't get to complain that the City makes progress toward a milestone one way rather than another.  The Alliance's contrary reading would negate the best-efforts provision. The parties recognized and agreed that the City doesn't need to hit every (or any) milestone as long as it employs best efforts.  Yet the Alliance's current argument would mean that even if the City is indisputably using its best efforts, failing to meet even a single milestone would deprive the City of discretion for the duration of the Agreement. Unsurprisingly, Intervenors agree that the Agreement is "airtight" on the City's sole discretion to choose any or all shelter and housing solutions.  Dkt. 976 at 229:24–230:2.

Even if the "as long as" clause were ambiguous, "[e]xtrinsic or parol evidence" would be admissible "to explain [any] ambiguity."  *Fireman's Fund Ins. Co. v. Workers' Comp. Appeals Bd.*, 189 Cal. App. 4th 101, 111 (2010).  Mr. Szabo, the City's lead negotiator, testified that the City did not agree—and never would have agreed—to relinquish its policymaking discretion over what kind of shelter or housing to prioritize. *E.g.*, Dkt. 959 at 131:12–132:5.  The City anticipated it was "likely" that "milestones would be missed" yet could not "allow this agreement to supersede a public process" for approving shelter or housing projects that often "takes longer" than expected and is necessary for "elected officials to engage the public in an appropriate way in order to successfully not just build the housing, but secure public support for these efforts, even well beyond this settlement agreement."  *Id.* at 53:5–20.  And even the Alliance's executive director, Mr. Webster, admitted that the City does not "lose[] its discretion"

1  if it misses interim milestones.  Dkt. 969 at 56:21–57:8.

2      Reading the "as long as" language to transform the milestones into a ticking time

3  bomb for the City's policy discretion would also contravene the Constitution.

4  Section 3.2 is "[s]ubject to Constitutional requirements and legal mandates."  Dkt. 429-

5  1 § 3.2.  Under the Constitution's reserved-powers doctrine, the government has no

6  "power to enter into binding contracts not to exercise its police power in the future."

7  *U.S. Tr. Co. of New Jersey v. New Jersey*, 431 U.S. 1, 24 n.21 (1977); *see, e.g.*, *County*

8  *of Ventura v. City of Moorpark*, 24 Cal. App. 5th 377, 389 (2018).  The California

9  Constitution vests the City with authority to "make and enforce within its limits all local,

10  police, sanitary, and other ordinances and regulations not in conflict with general laws."

11  Cal. Const. art. XI, § 7.  And crafting homelessness policy is undeniably part of that

12  power.  *Tobe v. City of Santa Ana*, 9 Cal. 4th 1069, 1108–09 (1995).  While the Ninth

13  Circuit has upheld best-efforts provisions, if interpreted modestly, under the reserved-

14  powers doctrine, *Matsuda v. City and County of Honolulu*, 512 F.3d 1148, 1154 (9th

15  Cir. 2008), the Alliance's brazen attempt to strip policymaking authority from the Mayor

16  and City Council through the best-efforts provision violates that doctrine, *see Alameda*

17  *County Land Use Ass'n v. City of Hayward*, 38 Cal. App. 4th 1716, 1725 (1995)

18  (invalidating best-efforts provision that caused "an impermissible divestment" of local

19  government's "power and obligation to enact legislation").

20      In short, the City did not violate the best-efforts provision in prioritizing

21  permanent supportive housing.  And the Settlement Agreement did not—and could

22  not—permit the Mayor and City Council to surrender their responsibility to craft a

23  homelessness policy that reflects the will of their constituents.

24      **2.**    **The City used best efforts to meet encampment-clearance**

25  **milestones.**

26      The City also hasn't breached the best-efforts provision for encampment

27  reductions.  The City is on track to meet the relevant milestones and has properly counted

28  each reduction according to the Agreement.  In the most recent quarterly report for

March 31, 2025, the City had performed 6,129 encampment reductions, with 1,424 reductions occurring in the first quarter of 2025 alone.  Dkt. No. 892-2 at 2.  The reduction schedule sets a goal for the City to perform 6,800 reductions by June 30, 2025, Dkt. 668-1 at 85, meaning the City is on track to meet this goal, and needs to perform just 671 reductions in the second quarter of 2025 to achieve 6,800—less than half as many as occurred in the first quarter, Dkt. 892-2 at 2.  The City is also on track to achieve its total of 9,800 reductions by June 2026.  Dkt. 959 at 40:3–13.

These reported numbers reflect the number of "tents, makeshift shelters, cars, and RVs" taken into custody by the City, as reflected in the parties' agreement.  Dkt. 668-1 at 82; *see also* Dkt. 713 at 2–3.  The City did not, as the Alliance has speculated, count as a "reduction" the mere shifting of a tent, makeshift shelter, car, or RV to make space for a CARE or CARE+ cleaning to occur.  Dkt. 863 at 14.  The evidence on that score is unrebutted:  Mr. Szabo explained that any of these actions would not result in the tent, makeshift shelter, car, or RV being taken into the City's custody, and thus would not be counted.  Dkt. 955 at 146:9–21.  He also testified that the Department of Sanitation provides photographs showing tents and makeshift shelters taken into custody, allowing the City to verify the reported numbers.  *Id.* at 168:11–13.  And the Department of Transportation provides records regarding removal of cars and RVs.  *Id.* at 180:9–11.

The Settlement Agreement does not require an offer of shelter or housing, let alone an accepted one, for the City to count an encampment reduction.  The Agreement itself does not define what qualifies as a "reduction" of an "encampment" and instead directs the City to develop a "plan" in good-faith consultation with the Alliance.  Dkt. 429-1 § 5.2.  As lead negotiator, Mr. Szabo testified that the parties never agreed that an encampment reduction must be linked with an offer of housing or an acceptance of an offer of housing.  Dkt. 959 at 23:10–20.

The City has consistently taken the position that, although it "work[s] to provide interim housing for every unsheltered individual," "providing interim shelter is not required" under the Agreement's encampment-reduction provision.  Dkt. 668-1 at 48.

Although the City initially proposed to the Alliance that it would conduct reductions only when "there are bed available to match with encampment residents" as a policy justification for choosing among encampments, *id.* at 69, the Alliance rejected that additional limitation in favor of counting the removal "tents, makeshift shelters, RVs, vans, and cars" under LAHSA's definition of "encampment," *id.* at 6, ¶ 14 & n.2.  The City acquiesced to the Alliance's demands, upping the offered number of reductions to 9,800 defined solely in terms of removed "tents, makeshift shelters, cars, and RVs." *Id.* at 82.  That later agreement also nowhere states that a reduction does not count if the City removes a tent or makeshift shelter and a person later decides to obtain and use a *different* tent or makeshift shelter somewhere on the streets of Los Angeles.  In fact, back in March 2024, counsel for Intervenors announced in open court (without any objection from the Alliance) the same understanding of the encampment-reductions agreement that the City has always had—that the "9,800 encampments represents tents and people's possessions" and "doesn't represent bringing the people inside."  Dkt. 681 at 79:17–18.  That was the agreement the City reached with the Alliance, and all those involved—the Alliance, the City, and Intervenors— had the same understanding.  *See* Cal. Civ. Proc. Code § 1856(e) ("course of performance" relevant to interpreting written terms of contract).  The Alliance has changed its tune now only because it is seeking any excuse it can find to justify its receivership request.

The City acknowledges that this Court made an initial determination in a brief order that the "reduction" must be "permanent in nature," meaning "unhoused individuals are moved off of the street and given shelter or housing."  Dkt. 874 at 2.  Respectfully, that interpretation has no basis in the plain meaning of "reduction" or the parties' intent.  The City has "reduced" a tent or vehicle even if a person later procures a different tent or vehicle—just as the City would "reduce" homelessness by providing housing to a person, even if a different unsheltered person enters Los Angeles from another jurisdiction.  *Cf.* Dkt. 750 at 61:14–21 (Court hypothesizing that Los Angeles could be "flooded" by people from other jurisdictions with nowhere to stay).

The evidentiary hearing also has revealed that a "permanence" requirement for encampment reductions is unworkable and something that the City would not have agreed to (especially at the 9,800 figure on which the Alliance insisted). As Dr. Agonafer explained, the City's homelessness response does not coerce people to accept shelter involuntarily but instead recognizes and respects the free will of people to reject an offer of housing, or to return to the location from which their encampment was removed. Dkt. 953 at 343:11–20. And Mr. Szabo was clear that the City "never would have agreed" to terms, including a vague permanence requirement for reductions, that depend on factors outside the City's control, such as independent actions by third parties. Dkt. 959 at 24:10–19.

Intervenors are wrong to suggest that limitations on reconsideration bind this Court to its initial determination. Dkt. 976 at 227:11–16. This Court "'possesses the inherent procedural power to reconsider'" its interpretation of the encampment-reduction provision in light of evidence that was presented during the evidentiary hearing about the Settlement Agreement's negotiations. *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001); *see, e.g.*, *Hartzell v. Marana Unified Sch. Dist.*, 130 F.4th 722, 741 (9th Cir. 2025); *Traer v. Domino's Pizza LLC*, 2023 WL 6369712, at *15 (C.D. Cal. June 29, 2023). The Court may consider all this evidence when making a final determination about the definition of "encampment reduction." *Heston v. Farmers Ins. Grp.*, 160 Cal. App. 3d 402, 412–13 (1984) (considering testimony about negotiations when interpreting ambiguous contract term).

But even if this Court adheres to its initial interpretation of what qualifies as a reduction of a tent, makeshift shelter, or vehicle, the City still used best efforts in logging reductions under its reasonable interpretation of the encampment-reductions provision. A best-efforts provision requires only "usual or reasonably diligent efforts"—not the ability to predict the future. *Cal. Pines*, 206 Cal. App. 4th at 392. Although the City tries to place homeless people with shelter or housing during encampment reductions, the City acted diligently under its good-faith interpretation of its agreement with the

Alliance to reduce 9,800 tents, makeshift shelters, and vehicles was not contingent on an offer of shelter or housing, much less an accepted one that keeps the person off the streets permanently. The City also diligently continued to log encampment reductions under that same interpretation in the latest quarterly report as it awaited a final resolution of the Alliance's motions and prepared to present testimony substantiating its interpretation of the Agreement.

### E. The Alliance cannot prove breach through the Agreement's recitals.

Unable to establish any breach of the terms of the Settlement Agreement, the Alliance resorts to claiming that the City has failed to abide by prefatory language in the Agreement's recitals. *E.g.*, Dkt. 977 at 1. The pertinent recital (one of seven) states that the parties sought "to substantially increase the number of housing and shelter opportunities in the City of Los Angeles, and to address the needs of everyone who shares public spaces and rights of way in the City of Los Angeles, including both housed and unhoused Angelenos, to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles." Dkt. 429-1 at 7. There is no legal basis for the Alliance's attempt to read a freestanding obligation into this recital.

"The law has long distinguished between a 'covenant' which creates legal rights and obligations, and a 'mere recital' which a party inserts for his or her own reasons into a contractual instrument." *Sabetian v. Exxon Mobil Corp.*, 57 Cal. App. 5th 1054, 1069 (2020). Recitals may "assist the construction" of an unclear contract term. Cal. Civ. Code § 1068. But they do not create greater or different obligations than those clearly articulated in a contract's substantive terms. *E.g.*, *O'Sullivan v. Griffith*, 153 Cal. 502, 506 (1908) ("A covenant or warranty is never implied from a mere recital.").

Even if the Agreement's recital did create independent obligations, it would not matter because the City has not breached them. The "substantial and meaningful reduction in unsheltered homelessness" contemplated by the Agreement refers to the City's obligations to provide 12,915 shelter and housing solutions. The Alliance argues that allowing the City to count reductions of encampments without a simultaneous offer

of housing that keeps a person off the streets permanently would be inconsistent with the Agreement's stated purpose. Dkt. 863 at 14. But reducing encampments encourages people living there to seek out alternative housing and shelter, which serves the Agreement's goal of "meaningful[ly] reduc[ing]" the unsheltered homeless population. Dkt. 429 at 7. Reducing encampments, even without an offer of housing, also creates greater access to "public spaces and rights of way" for "both housed and unhoused Angelenos," just as the prefatory language states. *Id.* The recital cannot justify imposing on the City an unworkable permanence requirement that appears nowhere in Section 5.2 or the parties' later agreement setting an ultimate obligation of 9,800 reductions.

## II.     The Alliance is not entitled to any relief under the MOU with the County.

The Alliance has asserted that the MOU between the County and the City required the City to fund 6,700 beds solely out of its general fund instead of taking advantage of other sources of funding that LAHSA "braided" together. Dkt. 899 at 11. This Court should deny the Alliance any relief under the MOU for three independent reasons. First, the Alliance lacks Article III standing to enforce the MOU. Second, the Alliance isn't a party to the MOU and has no rights to enforce it. Third, the Alliance has not met its burden to prove that the City has violated MOU.\*

### A.     The Alliance lacks Article III standing to enforce the MOU.

The first problem with the Alliance's attempt to enforce the MOU is its lack of Article III standing. The Alliance relies solely on the City's and County's agreement that this Court would retain ancillary jurisdiction to enforce the MOU. Dkt. 185-1 § VII; *see* Dkt. 976 at 184:17–185:4. But the City did not and could not "waive[ ]" the "jurisdictional requirement" of standing. *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662–63 (2019); *see Keith v. Volpe*, 118 F.3d 1386, 1390 (9th Cir. 1997) (applying Article III standing limitations where district court retained jurisdiction over consent decree). Article III requires an "irreducible constitutional minimum of

---

\* Intervenors likewise put on no evidence that they suffered an injury under Article III or that they have rights under the MOU that they can enforce.

standing": a concrete and particularized injury in fact that is traceable to the defendant's challenged conduct and redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The Alliance also "must demonstrate standing for each claim that they press and for each form of relief that they seek" because "standing is not dispensed in gross." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

The Alliance has not offered any evidence that it has suffered a concrete and particularized injury caused by the supposed violation of the MOU—specifically, any harm from the allegation that the City itself covered only 30% of the costs for around 2,000 of the more than 7,500 beds. Dkt. 899 at 11–12. The Alliance challenges LAHSA's practice of "braid[ing]" the City's $14 million contribution with other funding sources (such as federal and state dollars) to pay for the beds. *Id.* at 11. But the Alliance is "not able to sufficiently answer the question: 'What's it to you?'" *TransUnion*, 594 U.S. at 423. There's no evidence that the City's funding mechanism for the Roadmap beds caused the Alliance any "physical or monetary injury." *Id.* at 425. Nor does the Alliance's abstract objection to purported "financial mismanagement," Dkt. 899 at 12, support standing because the Alliance didn't suffer any resulting financial injury, *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 542–43 (2020). Instead, the Alliance presses an unusual version of a taxpayer suit—where the taxpayer complains that the government has been *too* protective of the public fisc in seeking alternative funding. *Cf. Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134–35 (2011) (holding that taxpayers generally lack standing to challenge even unconstitutional government spending).

The Alliance's own pizza analogy (Dkt. 899 at 11) demonstrates its lack of standing. If Person A agreed to provide 10 pizzas for Person B's party at $10 each, covered $30 of the total cost, and then relied on other legitimate means of payment (a contribution from generous parents, a coupon, etc.) for the remaining $70, neither Person B nor the well-fed guests would have any basis to complain about how Person A secured funding behind the scenes to cover all the agreed-upon pizzas. Their complaints would be even more puzzling if Person A bought extra pizzas using other sources of

money.  The same is true here:  The City agreed to provide 6,700 beds and, stretching its dollars by tapping multiple funding sources, ultimately provided nearly 7,500.  Dkt. 959 at 69:16–20; *see* Dkt. 980 ¶¶ 4–5.  That is an unalloyed good for all, not a concrete, actual injury in fact to anyone, much less the Alliance specifically.

In fact, the Alliance is perhaps in the worst position imaginable to assert a concrete injury from how the City secured funding for the Roadmap beds.  The gist of the Alliance's argument is that the City spent less setting up the Roadmap beds than the City otherwise would have if it eschewed federal and state funding.  But any dollar saved in establishing the Roadmap beds is a dollar that could potentially go toward more housing and shelter solutions, or toward reducing encampments, under the Settlement Agreement with the Alliance.  The Alliance could have only benefited—not been injured—by the braiding of funds to get more bang for less City buck.  The Court should therefore decline to entertain the Alliance's claim of breach of the MOU because it lacks Article III standing to pursue such a claim.

### B.    The Alliance is a nonparty that has no rights under the MOU.

The Alliance lacks not only Article III standing but also any rights under the MOU.  That agreement expressly had two parties:  the City and the County.  Dkt. 185-1 at 1.  And those parties made bilateral promises to each other—the City to "provide" a certain number of beds, and the County to assist the City with "funding services" for those beds.  *Id.* § III(A)–(B).  Because the Alliance isn't a party to this contract, it has no authority to enforce the contract unless (1) the Alliance would benefit from the MOU; (2) the "motivating purpose" of the City and County when entering into the contract was to benefit the Alliance; and (3) enforcing the MOU at the Alliance's behest is "consistent with the objectives of the contract and the reasonable expectations of the contracting parties."  *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 821 (2019).

The Alliance strikes out on all three elements.  First, the Alliance hasn't shown that the funding mechanism is a contractual benefit that the Alliance can enforce.  *See supra*, at 33.  Second, the Alliance has no evidence that the City and County were

motivated to benefit the Alliance when they agreed to the MOU. Governments presumptively contract to further the public interest, and private entities "may not enforce the contract absent a clear intent to the contrary." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 1999); *see, e.g.*, *Guardians Ass'n v. Civ. Serv. Comm'n of New York City*, 463 U.S. 582, 603 n.24 (1983) (stating that "a party who contracts with a government agency . . . is generally *not* subject to contractual liability to a member of the public" for breach of contract); *Lake Almanor Assocs. L.P. v. Huffman-Broadway Grp., Inc.*, 178 Cal. App. 4th 1194, 1200–01 (2009) (similar). And third, "permitting third party enforcement" would undermine "the parties' contracting goals." *Goonewardene*, 6 Cal. 5th at 831. The County and City entered the MOU to determine intergovernmental obligations and expressly *not* to "resolve th[is] Action." Dkt. 185-1 § III. Allowing a bystander like the Alliance to rove in search of a breach of the MOU would undercut that purpose.

### C.    The City fully complied with the MOU.

Even if the Alliance could enforce the MOU, that would not change the result because it has not satisfied its burden to prove a breach of the MOU. The Alliance contends that the City has breached the MOU because it hasn't exclusively paid for every bed it promised to "provide" from the City's general fund. Dkt. 899 at 10–11. But the Alliance's conception of "provide" conflicts with the "ordinary meaning" of the word, which "means to 'supply,' to 'furnish,' or to 'make available.'" *Wisconsin Bell, Inc. v. United States ex rel. Heath*, 145 S. Ct. 498, 505 (2025). The Alliance doesn't dispute that the City made new beds available under the MOU. Dkt. 899 at 10–11. Instead, the Alliance takes issue with the fact "that LAHSA 'braided' the City funding with 'other' funding to 'stretch' those funds" in providing the beds. *Id.* at 11.

The City "provide[s]" the beds by arranging for their funding, even without paying out of pocket for all of them. As the Supreme Court explained earlier this year, "a simple intermediary can sometimes also 'provide' things to a recipient." *Wisconsin Bell*, 145 S. Ct. at 507. A school district, for example, provides lunches to its students,

even if it uses funds from the state and federal government to do so.  A public hospital provides services to people who can't afford them, even if the government foots most or all of the bill.  And by the same token, the City provided all the required beds by designating LAHSA to administer the program with a pool of funds from various sources.  As Mr. Szabo testified, "it would make absolutely no sense" for the City to "limit the funding sources" available to fulfill its obligations under the MOU.  Dkt. 953 at 85:5–7.  The City's ability to provide beds for its most vulnerable citizens while preserving its general fund demonstrates good stewardship of taxpayer dollars, not a shirking of its responsibility under the MOU.  The City should be applauded for its efforts—not criticized.

The Alliance also misreads the MOU's requirement that the City is "responsible for all costs" associated with providing the beds in the agreement.  Dkt. 185-1 § III(E).  Again, nothing in the MOU suggests that the City must use its general funds to fulfill this responsibility.  This language instead confirms the limits of *the County's* financial responsibility for the agreement (to make substantial, but fixed, annual contributions toward services to support the new beds).  The MOU did not purport to limit *how* the City could discharge its responsibility for the costs:  from its own treasury, federal grants, state funds, private philanthropy, or otherwise.  And the Alliance knows that a mix of funding is the norm.  After all, it agreed in the Settlement Agreement that the City had "sole discretion" over "[f]unding" and could take advantage of the full range of available resources.  Dkt. 429-1 § 8.1.  The City never agreed to forgo those same sources in the MOU.  This Court should reject the Alliance's attempt to enforce a nonexistent (and nonsensical) limitation.

The Alliance makes a drive-by accusation that "LAHSA is violating federal law" by "braiding" federal funds with other funds under the TLS program.  Dkt. 977 at 10 (citing 2 C.F.R. § 200.302).  But as Diane Rafferty of A&M admitted, "HUD itself acknowledges braiding as a commonly accepted practice that it, in fact, encourages in order to give flexibility to maximize the use of funds and to fill in gaps when a single

1   source cannot pay for all costs needed to operate a program." Dkt. 949 at 36:22–37:2.

2   The Alliance does not explain how LAHSA could be violating federal law by following

3   HUD's own advice, much less how that bears on the City's compliance with the MOU.

4       The record also forecloses any inference that Roadmap beds do not exist based on

5   A&M's difficulty verifying their existence from expenditure records. Dkt. 977 at 8.

6   A&M reviewed only a small sample of LAHSA's contracts in reaching its conclusion

7   that the City had not spent money on certain contracts. In reality, A&M's incomplete

8   data survey was merely unable to account for certain expenditures. The City has since

9   substantiated, with data provided by LAHSA, the existence of the TLS beds and

10  identified the erroneous inclusion of 142 beds in the most recent Roadmap quarterly

11  report (Dkt. 891-1), placing the City at 7,482 Roadmap beds, nearly 800 more than its

12  obligation to provide 6,700 beds. Dkt. 980 ¶¶ 4–5.

13  **III.    The Alliance is not entitled to any of the remedies it seeks.**

14      The Court should compel the Alliance to remedy its breach of Section 8.2 of the

15  Settlement Agreement by meeting and conferring with the City on "any necessary and

16  appropriate amendments" to that Agreement. Dkt. 429-1 § 8.2. Even in the event that

17  this Court excuses the Alliance's ongoing breach and determines that the City has

18  breached the Settlement Agreement or MOU, any remedy should be no broader than

19  necessary to compel future compliance and should respect the agreements' other terms,

20  including the City's sole discretion under the Settlement Agreement and the five-year

21  term of the MOU, which expires on June 30 of this year.

22      The Alliance shoots for the broadest remedy: receivership. That radical remedy

23  would violate the Constitution and principles of equity. The Alliance also is not entitled

24  to any of the random assortment of other remedies that it requests for the first time in its

25  post-hearing brief and that are not authorized by the Settlement Agreement. But if this

26  Court is inclined to impose any relief, it should stay its ruling pending appeal given the

27  high likelihood of reversal, the grave harm the City would suffer without a stay, and the

28  strong public interest in safeguarding democracy for Angelenos.

**A.    Imposing a receivership would be an unconstitutional and unwarranted remedy for any breach.**

This Court has no authority to appoint a receiver because the Alliance has not proved a federal-law basis to override the structure of state government.  Nor has the Alliance carried its heavy burden of demonstrating extraordinary circumstances justifying receivership, which would threaten to undo the progress that the City has made and continues to make on a complex public-policy issue that the Constitution reserves for the people's elected leaders.

**1.    Receivership is categorically unconstitutional in this context.**

The Alliance's radical receivership request conflicts with both the U.S. and California Constitutions.  Federal courts can "displace local enforcement" powers only "if necessary to remedy the violations of *federal* law found by the court." *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 695–96 (1979) (emphasis added).  Because the Alliance has alleged only a state-law claim that the City breached the settlement agreement, this Court categorically lacks authority to displace the City's officials with a court-appointed receiver.

All powers that the Constitution does not delegate to the federal government "are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  Unless state action violates the Constitution or a federal law, States retain their sovereign authority (also called the "'police power'") to "perform many of the vital functions of modern government—punishing street crime, running public schools, and zoning property for development, to name but a few." *NFIB v. Sebelius*, 567 U.S. 519, 535–36 (2012) (opinion of Roberts, C.J.).  The Tenth Amendment's reaffirmation of federalism principles "ensure[s] that powers which 'in the ordinary course of affairs, concern the lives, liberties, and properties of the people' [are] held by governments more local and more accountable than a distant federal bureaucracy." *Id.* at 536 (quoting The Federalist No. 45, at 293 (C. Rossiter ed. 1961) (J. Madison)).

The California Constitution likewise prizes local democratic accountability for

local affairs.  The people of California ratified provisions that empowered "any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs" and every charter city to "make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."  Cal. Const. art. XI, §§ 5, 7.  In turn, the City Charter adopted by the voters of Los Angeles vests executive power in a Mayor who "exercise[s] management authority over all departments, agencies and appointed offices of the City" and "[a]ll legislative power of the City" in the City Council, "subject to the power of veto or approval by the Mayor."  Los Angeles Charter art. II, §§ 231, 240.  The voters also guaranteed their ongoing say in the City's direction through elections by setting four-year terms for the Mayor and Councilmembers.  *Id.* § 205(a).

The technical-sounding word "receiver" should not mask the undemocratic and unconstitutional nature of the Alliance's request.  The Alliance is asking this Court to arrogate power that the Tenth Amendment reserves to California and that the California Constitution has conferred on the City's elected representatives.  And the Alliance is asking this Court then to reassign that power to a judicially selected replacement.  But nothing in the U.S. Constitution or the California Constitution permits a federal official to assume local executive powers over the City of Los Angeles or to dictate local legislative policy concerning homelessness to the Mayor and Councilmembers.  Any such attempt by this Court or a handpicked receiver to take control of the City would therefore commandeer the City's legislative and executive power in violation of the Tenth Amendment.  *Murphy v. NCAA*, 584 U.S. 453, 473–74 (2018).

The Alliance's receivership request also conflicts with the Ninth Circuit's holdings that federal courts cannot disregard state law or rework the structure of state government to enforce a settlement agreement.  In *Keith*, for example, a district court entered a "contractual consent decree" that attempted to "override valid state laws regulating outdoor advertising that [were] not in conflict with any federal law."  118 F.3d at 1392.  The Ninth Circuit reversed the district court's order enforcing the consent

decree under the Tenth Amendment, which does not allow the district court to "supersede California's law unless it conflicts with any federal law." *Id.* at 1393. Likewise, in *League of Residential Neighborhood Advocates v. City of Los Angeles*, 498 F.3d 1052 (9th Cir. 2007), the Ninth Circuit reiterated that "a settlement agreement cannot be a means for state officials to evade state law," including local ordinances. *Id.* at 1055. A federal court can approve a remedy overriding such state law "only when the federal law in question mandates the remedy contained in the settlement." *Id.* at 1058. These cases reflect a general principle that federal courts cannot ignore federalism limitations in attempting to enforce obligations that arise under state law. *E.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (holding that federal courts cannot hear claims against "state officials on the basis of state law" because such an action "does not vindicate the supreme authority of federal law").

Both *Keith* and *Residential Neighborhood Advocates* categorically foreclose receivership as a remedy here. Again, the interpretation and enforcement of settlement agreements, even when they dispose of federal claims, is a question of state law. *Botefur*, 7 F.3d at 156. California law expressly governs both the Settlement Agreement with the Alliance, Dkt. 429-1 § 23, and the MOU with the County, Dkt. 185-1 § X. The Alliance dismissed its federal claims against the City with prejudice, Dkt. 429-1 at 2–4, and has not attempted to set aside that dismissal or to prove any theory that the City violated the federal Constitution or any federal statute. These settlement compliance proceedings thus have nothing to do with the "supreme authority of federal law" and concern only whether the City has "conform[ed] [its] conduct to state law" in the form of the Settlement Agreement. *Pennhurst*, 465 U.S. at 106. Because no "federal law" "mandates" receivership here, this Court lacks authority to appoint a receiver. *Residential Neighborhood Advocates*, 498 F.3d at 1058; *cf. Wash. State Com. Passenger Fishing*, 443 U.S. at 695–96 (suggesting that Supremacy Clause allowed a district court to "assum[e] direct supervision" of state-regulated industry "if necessary to remedy the violations of federal law").

The Alliance's near-exclusive reliance on *Brown v. Plata*, 563 U.S. 493 (2011), as the source of this Court's authority to appoint a receiver exposes the lack of precedential support for such a remedy to forestall purported state-law violations of a settlement agreement. Dkt. 899 at 1–7.  That decision arose from two separate cases (*Coleman* and *Plata*) in which district courts had made repeated findings of Eighth Amendment violations over almost two decades concerning medical care in California's prisons.  563 U.S. at 506.  In *Coleman*, the district court appointed a special master in 1995, who found in 2007 that constitutional violations were ongoing and worsening. *Id.* at 507.  In *Plata*, "the State conceded that deficiencies in prison medical care violated prisoners' Eighth Amendment rights" and "stipulated to a remedial injunction." *Id.*  The district court appointed a receiver four years later only after determining that the "'constitutional deficiencies'" persisted despite the injunction.  *Id.* at 507–08.  As this Court has recognized, the extraordinary remedies (including receivership) in *Plata* were "necessary to remedy a *constitutional* violation."  Dkt. 277 at 102 (emphasis added) (quoting *Plata*, 563 U.S. at 553).

Every other receivership case cited by the Alliance (Dkt. 899 at 4–7, 25) likewise involved an adjudicated violation of federal law. *Wash. State Com. Passenger Fishing*, 443 U.S. at 693, 695 (suggesting receiver could overcome "state recalcitrance" in remedying persistent violations of federal treaties); *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990) (appointing receiver to "achieve compliance with a constitutional mandate" in county jail); *Morgan v. McDonough*, 540 F.2d 527, 534 (1st Cir. 1976) (appointing receiver to implement desegregation orders issued under Equal Protection Clause); *Turner v. Goolsby*, 255 F. Supp. 724, 730 (S.D. Ga. 1965) (same).  Although the Tenth Amendment's federalism principles protect only States and their subdivisions, courts assured themselves of a federal-law basis to impose receivership even over Guam and the District of Columbia. *United States v. Guam*, 2008 WL 732796, at *6 (D. Guam Mar. 17, 2008) (appointing receiver to stop violations of federal Clean Water Act); *Dixon v. Barry*, 967 F. Supp. 535, 551 (D.D.C. 1997) (allowing receivership for local-

law violations because "an explicit directive from Congress" required the District to comply with the district court's order in that case); *LaShawn A. v. Kelly*, 887 F. Supp. 297, 315 (D.D.C. 1995) (relying on a "federal liability basis for its imposition of a full receivership" over the District's child-welfare system).

The Alliance itself underscored during its closing argument why *Plata* and its other receivership cases have no conceivable relevance to this case at this stage:  This proceeding is "about the breach of a settlement agreement," not "about constitutional limitations."  Dkt. 976 at 269:13–14.  Exactly.  There is no live claim under the federal Constitution or any federal law.  *See supra*, at 40.  And this Court has power only "to grant relief on 'the merits of the case or controversy before it'"—the state-law claims about breach of the Settlement Agreement—and cannot order a remedy that is a "mismatch" with those state-law claims.  *LA Alliance*, 14 F.4th at 957.  The upshot is that receivership is completely out of bounds in this proceeding.

### 2. The Alliance has not demonstrated extraordinary circumstances that could justify receivership.

Even if receivership could be on the table here despite the lack of a federal-law basis, the Court should still deny that request because the Alliance has not come close to justifying that "invasive equitable remed[y]."  *Melendres v. Skinner*, 113 F.4th 1126, 1136 (9th Cir. 2024).  Courts have recognized that "the substitution of a court's authority for that of elected and appointed officials is an extraordinary step warranted only by the most compelling circumstances."  *Morgan*, 540 F.2d at 535; *see, e.g., Glover v. Johnson*, 855 F.2d 277, 285 (6th Cir. 1988).  There's nothing compelling about the Alliance's bid for receivership, which (1) is not the least intrusive means of ensuring compliance with the Settlement Agreement, (2) would improperly sweep far beyond the Agreement itself, and (3) would undermine the public interest.

First, the Alliance cannot demonstrate that "'traditional principles of equity jurisdiction'" support its receivership request.  *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).  One longstanding principle is that

that the Alliance must show that there is "no alternative" to "circumvent[ing]" the City's structure of government. *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990); *see, e.g.*, *Glover*, 855 F.2d at 286 (reversing receivership order because plaintiffs could not demonstrate that there was "no less intrusive means of bringing about compliance" with injunction). The district court in *Plata*, for instance, unsuccessfully sought to compel compliance with an injunction for three years and canvassed all other potential remedies before deciding that "nothing short of receivership" could "remedy the violation of [the plaintiffs'] constitutional rights." *Plata v. Schwarzenegger*, 2005 WL 2932253, at *23–28 (N.D. Cal. Oct. 3, 2005). Here, the Alliance has skipped over all other remedies—even denying that there was any meaningful pause or obligation to meet and confer in earnest under Section 8.2 of the Settlement Agreement—and rushed straight to receivership, eschewing the graduated enforcement that shows "a proper respect for the integrity and function of local government institutions." *Jenkins*, 495 U.S. at 51.

The Alliance's disregard of alternative remedies is all the more unwarranted because the City's officials are "ready, willing, and . . . able" to comply with the Settlement Agreement. *Jenkins*, 495 U.S. at 51. As Mr. Szabo testified, the City is on track to meet or exceed its obligations to provide 12,915 housing and shelter solutions by June 2027, even if Inside Safe beds are excluded from the count. Dkt. 955 at 278:8–12, 286:12–15. The City also has been exceeding its milestones and is on track to accomplish 9,800 reductions of tents, makeshift shelters, and vehicles by June 2026. Dkt. 959 at 41:3–13. Receivership is a last resort "for taking over other governmental agencies that could not or would not comply with the law." *Melendres*, 113 F.4th at 1136 (quoting *Plata v. Schwarzenegger*, 603 F.3d 1088, 1093 (9th Cir. 2010)). Yet the Alliance would have this Court displace the City's officials as a *first* resort before the City's contractual obligations have even matured under the Settlement Agreement.

Second, there is no practical way to impose an effective receivership that would not sweep far beyond the supposed breaches of the Settlement Agreement—and into constitutionally perilous territory. Equitable relief should be "no broader than necessary

to achieve its desired goals." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).  The Alliance has suggested that the receivership could have the "limited purpose" of "bring[ing] the City into compliance with its bed and encampment obligations" under the Agreement.  Dkt. 899 at 25.  But if this Court were to appoint a receiver to manage only the City's compliance with the Settlement Agreement, then there would be *more* fragmentation—federal government, state government, the County, LAHSA, and the City, *plus* a federally appointed receiver—within Los Angeles.  A receiver would be another misplaced joint in what A&M viewed as a "[d]isjointed Continuum-of-Care [s]ystem" and would further undermine the development of "a unified homelessness strategy."  Dkt. 905 at 5, 7.  The Alliance put on no evidence that the "system" would work better with yet another entity in the mix.

The alternative the Alliance envisions is a receiver who would act as a "homelessness czar," Dkt. 878 at 74:15–16, and disregard the jurisdictional lines separating the City, the County, and LAHSA within the larger "homelessness response system," Dkt. 899 at 25, 28.  But any supposed breaches of the Settlement Agreement could not justify a receivership that subverts the sovereign authority of the City, *see supra*, at 38–42, much less that of the County, LAHSA, or the State, none of whom is even a party to the Agreement, *see* Dkt. 429-1 § 1.5 (defining "Parties" as "specifically the City of Los Angeles and Plaintiffs" and stating expressly that the County is not a party).  Nor is LAHSA the City's alter ego because the City and County share co-equal control of LAHSA.  Dkt. 899-3 § 4(c)(1); *see, e.g.*, *Rider v. City of San Diego*, 18 Cal. 4th 1035, 1044 (1998) (rejecting alter-ego theory where "City officials ma[d]e up only half of [the joint-powers authority's] governing board"); *cf. Cam-Carson, LLC v. Carson Reclamation Auth.*, 82 Cal. App. 5th 535, 545–48 (2022) (treating joint-powers authority as alter ego because the city appointed all the authority's officials and had disregarded its separate identity).  Put simply, this Court cannot take a wrecking ball to the structure of state government in pursuit of enforcing the Agreement.

The never-ending questions concerning the scope of the receiver's authority also

range far beyond the interjurisdictional relationships among the City, the County, LAHSA, and State. For example:

- Could the receiver appropriate money from the City's general fund, cut funding from other programs, or impose taxes to pay for the receiver's initiatives? *But see Jenkins*, 495 U.S. at 51 (reversing district court's attempt to impose a tax increase on school district).

- Could the receiver take over the Office of the City Administrative Officer to assume the reporting obligations and outreach with City council districts? Dkt. 955 at 21:2–16; Dkt. 959 at 48:6–13, 60:18–25. The Housing Department to review contracts with LAHSA for shelter and housing? Dkt. 949 at 241:15–22. The Sanitation Bureau to oversee reductions of tents and makeshift shelters? Dkt. 959 at 61:6–16. The Transportation Department to oversee reductions of vehicles? Dkt. 955 at 42:6–7. The Police Department to ensure safety during outreach for placement into shelter or housing and during encampment reductions? *Id.* at 21:19. Or the Fire Department, which has put out 75,000 fires over the past six years (34 a day on average) in encampments? Dkt. 959 at 26:4–7. *But see Printz v. United States*, 521 U.S. 898, 928 (1997) (local government employees cannot be "'dragooned'" by federal government because States "remain independent and autonomous within their proper sphere of authority").

- Could the receiver override zoning laws, building codes, prevailing-wage laws, government-contracting rules, and environmental laws? *But see Residential Neighborhood Advocates*, 498 F.3d at 1056 (rejecting attempt to "circumvent applicable zoning laws" through court-approved settlement agreement).

- Could the receiver bar entry of migrants into encampments from buses sent by the governors of other States? *See, e.g.*, Dkt. 969 at 63:14–19 (describing new arrivals from Texas who have "nowhere to go"). *But see Arizona v. United States*, 567 U.S. 387, 409–10 (2012) (States generally lack authority to enforce

immigration laws); *Edwards v. California*, 314 U.S. 160, 174 (1941) (States cannot bar entry of nonresidents from another State).

- Could the receiver end Inside Safe even though there is no claim that the program violates the Constitution or federal law? *But see New York v. United States*, 505 U.S. 144, 161 (1992) (federal government cannot "'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program'").

Through its receivership request, the Alliance seeks a "systemic restructuring" of the City's response to a pressing policy question. Dkt. 899 at 26. That request is not only deeply undemocratic but also hopelessly vague. The Alliance does not offer—and does not have—answers to any of the questions above.

Third, receivership (like other equitable remedies) is improper when it would disserve the "public interest." *Grupo Mexicano*, 527 U.S. at 326 (citation omitted); *see, e.g.*, *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). That intervention here would be a terrible setback for the City's progress in developing housing and shelter solutions both inside and outside the Alliance program. Any comprehensive response requires the input and collaboration of experts in housing, mental health, substance abuse, and more, as well as immense coordination among city, county, state, and federal governments in addition to service providers. Dkt. 969 at 166:17–167:17. And even for the Settlement Agreement in particular, the Office of the City Administrative Officer coordinates with numerous City departments to facilitate compliance. *See supra*, at 45. Any receiver would face an enormous learning curve, and could never seamlessly take control of that complex system and deliver immediate results.

The public interest also does not favor dispensing with democracy in Los Angeles to advance private plaintiffs' interest in enforcing a settlement agreement. Deciding how to respond to homelessness is a difficult policy question that cuts across many disciplines and requires tradeoffs with other legitimate governmental interests. The

Alliance advances one simplistic perspective on what the City should do: prioritize cheaper, quicker interim shelters and housing over Inside Safe and permanent supportive housing. Dkt. 899 at 8. Its own witnesses disagree with that black-and-white view, Dkt. 969 at 137:7–11, as do Intervenors, Dkt. 976 at 229:6–24. But the ballot box—not the courtroom—is where Americans resolve such disputes. Because there are no easy answers, "people will disagree over which policy responses are best" and "may find certain responses more appropriate for some communities than others"—"in our democracy, that is their right." *Grants Pass v. Johnson*, 603 U.S. 520, 560 (2024). This Court should not deprive Angelenos of that right through a receivership.

**B.    The Alliance's belated request for additional remedies is meritless.**

After biting off more than it could chew with receivership, the Alliance rattles off a wish list of new obligations for the City that are "remedies" only in the loosest sense of the word: (1) extension of the Settlement Agreement and MOU, (2) creation of a plan to house everyone on Skid Row, (3) a monitor, two audits, and an investigation, and (4) attorneys' fees. Dkt. 977 at 25. The Alliance did not brief the legal basis for any of these remedies and has forfeited any ability to make new arguments in reply. *See Brooke v. Ashna Inc.*, 2024 WL 3537861, at *5 (C.D. Cal. July 11, 2024) ("[A]rguments raised for the first time in a reply brief are waived." (quoting *Autotel v. Nev. Bell Tel. Co.*, 697 F.3d 846, 852 (9th Cir. 2012)).

**1.** This Court has no basis to extend either the Settlement Agreement or the MOU. That remedy would be a contract reformation, which California contract law would not allow under these circumstances, Cal. Civ. Code § 3399, and which would violate the term that any "modification of or to this Agreement shall be made by written instrument executed by each party," Dkt. 429-1 § 18. Extension thus would be a sanction possible only after a civil-contempt proceeding with full procedural protections, including proof "by clear and convincing evidence" that the City "'violated a specific and definite order of the court.'" *Parsons*, 949 F.3d at 454; *see, e.g.*, *Kelly v. Wengler*, 822 F.3d 1085, 1097 (9th Cir. 2016). The Alliance has never invoked the clear-and-convincing-

1   evidence standard, much less satisfied that demanding burden.  As to the Agreement,

2   the Alliance did not prove clearly and convincingly that the City will be unable to meet

3   its bed and encampment-reduction obligations by June 2027 and June 2026,

4   respectively.  *See supra*, at 16–17.  The Alliance also fell far short of clear and

5   convincing proof that the City did not maintain at least 6,700 Roadmap beds during the

6   MOU's term.  *See supra*, at 35–37.  And even if the Alliance had made that showing,

7   extending the MOU would still be impermissible because the Court could not extend the

8   City's obligation to maintain the beds without also extending the County's obligation to

9   pay the City $60 million a year to support services for the beds.  Dkt. 185-1 § III(B).

10  Extending only the City's obligation to maintain the beds would be a punitive sanction

11  allowable (if at all) only for criminal contempt, *Bingman v. Ward*, 100 F.3d 653, 656

12  (9th Cir. 1996), but extending the County's obligation would deprive the County of fair

13  notice that this proceeding could lead to such a sanction and the opportunity to present

14  evidence required by the Due Process Clause, *Mullane v. Cent. Hanover Bank & Tr.*

15  *Co.*, 339 U.S. 306, 314 (1950).  Either way, extension of the MOU would be unlawful.

16      **2.**  The Alliance's request for a "Skid Row plan" for sheltering and housing every

17  resident of that area is a complete non sequitur from the alleged breaches.  The City

18  agreed to develop plans on a citywide and district-by-district basis for beds, not for Skid

19  Row in particular.  Dkt. 429-1 § 5.2.  The City never agreed to create a plan for "every

20  unsheltered resident" of any area, Dkt. 977 at 25, a category that sweeps far beyond the

21  Agreement's definition of city-shelter-appropriate persons, Dkt. 429-1 § 1.4.  The

22  Alliance asks this Court to write a new maximalist term into the Agreement that the

23  Alliance never could have won through negotiation.

24      **3.**  The Alliance's grab bag of City-funded research proposals—a monitor,

25  financial audit, data-quality audit, and investigation of LAHSA—likewise are not

26  permissible remedies for a breach of contract under California law.  The Agreement

27  authorized this Court to appoint a special master but went no further to authorize

28  monitors, audits, or investigations, let alone on the City's dime.  Dkt. 429-1 § 2.  They

are therefore out of bounds in this breach-of-contract proceeding.  And those measures would be vastly overbroad in any event, such as the Alliance's request for "full, immediate, and unfettered access to City and LAHSA data," Dkt. 977 at 25, in violation of HIPAA and other data privacy protections, *see, e.g.*, 45 C.F.R. § 164.502 (providing regulations for the disclosure of protected health information).

**4.** The Alliance is not entitled to attorneys' fees even in the event of a breach.  California law allows attorneys' fees in a contract action only "where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded . . . to the prevailing party."  Cal. Civ. Code § 1717(a).  The Agreement required the City to pay a set amount of attorneys' fees as part of the settlement but does not provide for attorneys' fees in enforcement actions.  Dkt. 429-1 § 15; *cf. Parsons*, 949 F.3d at 459–60 (affirming attorneys' fees because settlement agreement authorized recovery for fees for successful enforcement).  This Court has no authority to award fees absent agreement of the parties.

### C.    If the Court is inclined to impose any remedy, it should enter a stay pending appeal.

The receivership sought by the Alliance would have serious legal and practical consequences for the City, depriving it of the ability to control its own affairs.  Because the City doesn't believe the Court has the power to impose a receivership, and because it believes a receivership is not in the best interests of the residents of Los Angeles, the City would appeal from any order imposing a receivership.  *See* 28 U.S.C. § 1292(a)(2) ("orders appointing receivers" are appealable).  The City also will appeal from any order awarding the Alliance less drastic injunctive relief that is not contemplated expressly in the Settlement Agreement.

If this Court grants the Alliance any relief, including the appointment of a receiver, it should stay that order pending appeal.  Four factors bear on the propriety of a stay pending appeal: (1) the City's likelihood of success on appeal, (2) the irreparable harm the City would suffer absent a stay, (3) the Alliance's harm from a stay, and (4) the

public interest.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  "The first two factors . . . are the most critical."  *Id.*

This Court has already acknowledged that intrusive remedies like the imposition of a receivership would give rise to "a great chance of a reversal."  Dkt. 878 at 104:9–16.  The arguments presented in this brief on the questions of breach and remedy underscore that the City has a strong likelihood of prevailing on appeal.  The balance of harms also favors the City.  Drastic interference with its basic operations would lead to immense disruption and rob City residents' elected representatives of control over public funds, programs, and employees, not to mention the City of its sovereignty.  *See supra*, at 42–47.  The Alliance, by contrast, will not be harmed by the delay necessary to resolve any appeal by the City.  The evidence shows that the Alliance is going to get exactly what it bargained for in the form of beds and encampment reductions.  *E.g.*, Dkt. 955 at 278:8–12, 286:12–15; Dkt. 959 at 41:3–13.  If the unprecedented and undemocratic step of appointing a receiver were ever necessary, it should happen only after the Ninth Circuit and U.S. Supreme Court have had an opportunity to weigh in.

Before the City's last appeal in this case, this Court declined to enter a stay, and the City successfully moved for an emergency stay in the Ninth Circuit.  *LA Alliance*, 14 F.4th at 956–57.  The Court should stay its ruling straightaway this time to permit the City to exercise its appellate rights it relinquishes authority over a large swath of City functions to a receiver or complies with any other intrusive remedy.  At a minimum, the Court should enter a stay until the Ninth Circuit can consider a request for a stay pending appeal, so as to avoid burdening the Ninth Circuit by forcing it to act on an emergency basis.

## CONCLUSION

The Court should find that the City hasn't breached the Settlement Agreement or MOU and should not order any remedy.  If the Court is inclined to order any injunctive remedy, it should stay its order pending appeal.

1    DATED: June 13, 2025                    Respectfully submitted,

2                                            GIBSON, DUNN & CRUTCHER LLP

3
                                             By: /s/ Theane Evangelis
4                                                 Theane Evangelis

5                                            GIBSON, DUNN & CRUTCHER LLP
                                             THEANE EVANGELIS, SBN 243570
6                                              tevangelis@gibsondunn.com
                                             MARCELLUS McRAE, SBN 140308
7                                              mmcrae@gibsondunn.com
                                             KAHN SCOLNICK, SBN 228686
8                                              kscolnick@gibsondunn.com
                                             BRADLEY J. HAMBURGER, SBN 266916
9                                              bhamburger@gibsondunn.com
                                             ANGELIQUE KAOUNIS, SBN 209833
10                                             akaounis@gibsondunn.com
                                             PATRICK J. FUSTER, SBN 326789
11                                             pfuster@gibsondunn.com
                                             333 South Grand Avenue
12                                           Los Angeles, California 90071-3197
                                             Telephone: 213.229.7000
13                                           Facsimile: 213.229.7520

14                                           HYDEE FELDSTEIN SOTO, SBN 106866
                                             VALERIE L. FLORES, SBN 138572
15                                           ARLENE N. HOANG, SBN 193395
                                             JESSICA MARIANI, SBN 280748
16                                           200 North Main Street, City Hall East, 6th
                                             Floor
17                                           Los Angeles, California 90012
                                             Telephone: 213.978-7508
18                                           Facsimile:  213.978.7011
                                             Email: arlene.hoang@lacity.org
19
                                             *Attorneys for Defendant*
20                                           *CITY OF LOS ANGELES*

21

22

23

24

25

26

27

28