UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 221
Los Angeles, California 90017
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
mumhofer@umklaw.com
emitchell@umklaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, *et al.*, <br><br> Defendants. | Case No. 2:20-CV-02291-DOC-KES <br><br> Assigned to Judge David O. Carter <br><br> **PLAINTIFF LA ALLIANCE'S REPLY BRIEF RE: EVIDENTIARY HEARING ON SETTLEMENT BREACH** <br><br> Before:  Hon. David O. Carter <br> Courtroom: 10A |

## TABLE OF CONTENTS

PAGE

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................1

I.    The Settlement Agreements Have Been Breached. .................................................2

    a.    Incomplete Bed Plan ................................................................................2

    b.    Insufficient and Unverified Alliance Beds..............................................4

        i.    City Has Failed to Demonstrate It Used Its Best Efforts To Meet Milestones and Deadlines ....................................................................4

        ii.    Reported Beds Cannot Be Verified .......................................................8

        iii.    Inside Safe Beds Do Not Qualify. .........................................................9

    c.    Insufficient and Noncompliant Encampment Reductions ........................10

    d.    Insufficient and Unverified Roadmap Beds .............................................13

        i.    Plaintiff Has Standing to Raise This Issue ...........................................13

        ii.    City Has Breached the Roadmap Agreement ........................................15

    e.    Section 8.2 is Inapplicable and Plaintiff Amply Met and Conferred..........17

        i.    Alliance Met its Meet-and-Confer Obligations ...................................17

        ii.    The City Has Disclaimed Any Need for an Emergency "Pause."....17

II.    The System is Broken. .............................................................................................19

    a.    Judicial Intervention is Required. .............................................................19

    b.    The Court Has Inherent Equitable Power to Enforce Federal Orders ........20

    c.    The City's Cited Cases are Irrelevant .......................................................21

    d.    Receivership is The Necessary Equitable Remedy for the City's Institutional Failure ................................................................................22

    e.    Other Remedies Proposed by the Alliance are Equally Appropriate..........24

III.    Conclusion .............................................................................................................25

*PLAINTIFF LA ALLIANCE'S REPLY BRIEF RE:*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

## TABLE OF AUTHORITIES

**CASE** **PAGE(S)**

*Alisal Water*,
326 F. Supp. 2d ...............................................................................................23

*Bittner v. United States*,
598 U.S. 85 (2023) ...........................................................................................11

*Bloor v. Falstaff Brewing Corp.*,
601 F.2d 609 (2d Cir. 1979)...............................................................................5

*Brown v. Plata*,
563 U.S. 493 (2011)....................................................................................22, 23

*Cahill v. Insider Inc.*,
131 F.4th 933 (9th Cir. 2025) ..........................................................................14

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)...........................................................................................24

*F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*,
244 F.3d 1128 (9th Cir. 2001) .........................................................................24

*Falkowski v. Imation Corp.*,
132 Cal. App. 4th 499 (2005) ..........................................................................11

*Frew ex rel. Frew v. Hawkins*,
540 U.S. 431 (2004)....................................................................................20, 21

*Hutto v. Finney*,
437 U.S. 678 (1978)..........................................................................................24

*K.C. ex rel. Erica C. v. Torlakson*,
762 F.3d 963 (9th Cir. 2014) ...........................................................................20

*Kelly v. Wengler*,
822 F.3d 1085 (9th Cir. 2016) ....................................................................20, 24

*Kokkonen v. Guardian Life Ins. Co.*,
511 U.S. 375 (1994).........................................................................................20

*League of Residential Neighborhood Advocates v. City of Los Angeles*,
498 F.3d 1052 (9th Cir. 2007) ....................................................................21, 22

*Local No. 93 v. City of Cleveland*,
478 U.S. 501 (1986)....................................................................................21, 22

*PlayMedia Sys., Inc. v. Am. Online, Inc.*,
171 F. Supp. 2d 1094 (C. D. Cal. 2001) ...........................................................8

*Regency Midland Constr., Inc. v. Legendary Structures, Inc.*,
41 Cal. App. 5th 994 (2019) ............................................................................11

*PLAINTIFF LA ALLIANCE'S REPLY BRIEF RE:
EVIDENTIARY HEARING ON SETTLEMENT BREACH*

*Reilly v. Inquest Tech., Inc.*,
218 Cal. App. 4th 536 (2013) ...................................................................................8

*Samica Enters., LLC v. Mail Boxes Etc. USA, Inc.*,
637 F. Supp. 2d 712 (C.D. Cal. 2008) ....................................................................5

*Stone v. City & County of San Francisco*,
968 F.2d 850 (9th Cir. 1992) .................................................................................24

*Turay v. Seling*,
108 F. Supp. 2d 1148. (W.D. Wash. 2000)............................................................23

*United States v. Gov't of Guam*,
No. 02-00022, 2008 WL 732796 (D. Guam Mar. 17, 2008)..................................23

*Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*,
443 U.S. 658 (1979)....................................................................................20, 22, 23

**RULES**

Federal Rule of Civil Procedure 71 ...............................................................................14

**OTHER AUTHORITIES**

Reduce, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/reduce
(last visited Mar. 13, 2025) ....................................................................................10

Benjamin Oreskes, *If elected mayor, Rep. Karen Bass wants to house 15,000 homeless
people in first year*, Los Angeles Times (Jan. 15, 2022, 7:00 AM),
https://www.latimes.com/homeless-housing/story/2022-01-15/la-mayor-candidate-
karen-bass-homeless-plan. ....................................................................................18

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

The City has violated the plain language of both the City/County MOU ("Roadmap Agreement") and the LA Alliance Settlement Agreement ("SA"), and those violations continued to this day:

- After promising that "the City will create plans" and "provide the plans … to Plaintiffs" for "the City's Creation of shelter and/or hosing to accommodate a minimum of 60 percent of unsheltered City Shelter Appropriate PEH in each council district" and "in the City," the City never created or provided a plan to do so.

- After agreeing that "the City will promptly employ its best efforts to comply with established … milestones, and deadlines" for bed creation, the City has never met its cumulative milestone, failed to most quarterly milestones, manipulated the numbers of beds reported, and clearly failed to use best efforts to meet those milestones and deadlines.

- After pledging that "the City will promptly employ its best efforts to comply with established … milestones, and deadlines" for encampment reduction, the City failed to meet any milestones, and reported numbers improperly counted cleanings, and therefore failed to use best efforts to meet those milestones and deadlines.

- After promising in the Roadmap Agreement to establish 6,700 "new beds," the City counted approximately 1,700+ beds for which there were no City expenditures, which were already paid for through other sources, and for which the data was unreliable.

Beyond these breaches, testimony and reports from A&M, the Special Master, Skid Row Advocates, Service Providers, and even a former LAHSA executive all confirm what the mayor and many city councilmembers have also stated in open court and in public meetings: the homelessness response system in Los Angeles is broken. The infrastructure does not exist to support the agreement. The data is inherently unreliable, financial

1

tracking nonexistent, the services are unverified, fraud is likely, and there is no accountability for performance of any of it. The SA presupposed the existence of a functional homelessness responsive system, and a functional system is necessary for the purpose of the SA to be fulfilled. Unfortunately the City's official position has been to put blinders on and refuse to address the serious systemic deficiencies. The Court has given plenty of warnings and tried multiple lesser measures, but to no avail. The City either cannot or will not change course. The Court now must use its discretion to impose a receiver and/or some other remedial measures to ensure that both the terms and the purpose of the SA are fulfilled.

## I.      The Settlement Agreements Have Been Breached.

### a.      Incomplete Bed Plan

The City has never provided the Plaintiff a bed "plan" that complies with the plain language of Section 5.2—that is, a plan to establish beds for 60 percent of PEH as determined by the required number (12,915 total beds.) The City does not deny its 2022 plan (Ex. 114, Alliance Potential Project List) provided to the Plaintiff and Court under Section 5.2 was incomplete, accounting for only 8,322 beds, leaving a delta of 4,593. (Hr'g Tr. 42:8–43:7, June 3, 2025, ECF No. 969.) Instead, the City argues it did not have an obligation to create and provide a fulsome plan, claiming vaguely that "a person can have multiple incremental plans." (City's Post-Evidentiary Hr'g Br. "City Br.") 19:24–25, June 13, 2025, ECF No. 983.) But the plan language of Section 5.2 required the City to provide a plan for 12,915 beds (by district and citywide). The parties did not agree to "multiple incremental plans" and there is nothing about Section 5.2 of the SA that permits an incomplete plan to be provided. (Ex. 25, SA at § 5.2.) Indeed, a complete plan was necessary to enable the City and Plaintiffs to "work together in good faith to resolve any concerns or disputes" and to "consult with the Court for resolution, if necessary." (*Id*.) The SA mandates a plan to be established to ensure a thoughtful process that is vetted and followed, with sufficient funding and in an appropriate timeline, and so that equitable distribution (as required by Section 3.3) could be evaluated. (Ex. 25, SA at §§ 3.3, 5.2.)

Now, because the City has failed to properly plan for its shelter and housing creations, it has scrambled to find other interventions in a desperate attempt to show progress, including recently identifying nearly 2,000 Inside Safe Hotel/Motel and master lease programs. This fly-by-night approach even purports to include "booking agreements" which not only are totally unverifiable, they include such minimal provision as providing a single room for a single unhoused individual for a single night—yet the City attempts to cite that as a bed creation contributing to its obligation. (Ex. 35, City SA Quarterly Report, Apr. 15, 2025, ECF No. 892-1; Hr'g Tr. 248:22–250:14, May 27, 2025, ECF No. 947.) At no point have any of these "new" beds been included in any plan provided to Plaintiff or the Court, which would have permitted the "City and Plaintiffs . . . to work together in good faith to resolve any concerns or disputes" and "consult with the Court" if necessary. (Ex. 25, SA at § 5.2.) By failing to provide a complete bed plan, the City attempts to evade oversight and accountability which is exactly the thing the "plan" requirement was intended to avoid.

True, the City in the SA was afforded "sole discretion" to choose the intervention type subject to Plaintiff's review and approval of the plan and "as long as the Milestones are met." (*Id.*) Because the City has failed to comply with its obligation to provide an actual plan, it has deprived Plaintiff of the ability to vet the plan and unsurprisingly has resulted in both the City's failure to meet its milestones and now inclusion of beds which do not meet the requirements of the SA. Had the City created a compliant plan, it would have been required to strategize about the intervention types, the timing for bed creation, and most importantly the funding required. Because the City failed to do any of these things (beyond what it had already planned through HHH), it is making up interventions that clearly do not comply, claiming it can create beds at the last minute before the agreement expires (yet admitting that would be inconsistent with the purpose of the SA: ECF 949 250:19-251:8), and has voted itself into financial ruin without planning for any way in which it can actually fulfill the terms of the SA. Each of the City's failures can be tied directly to its failure to provide a complete plan at the outset—or ever.

*PLAINTIFF LA ALLIANCE'S REPLY BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

The City also has no funding to create 12,915 beds, as it has announced repeatedly in public committee meetings and in court. (Ex. 37, LA Alliance Mot. for Order re Settlement Agreement Compliance at 5–11, Feb. 20, 2025.) In claiming there is no need to be concerned, the City rests its entire case on Mr. Szabo's lip-service claim that the City is "committed" and "has every intention" of meeting the future terms of the Agreement despite having no plan and no funding to do so. But Mr. Szabo also acknowledges that as an appointee he is fungible. ("I don't know that I'll be CAO tomorrow"), and the Mayor and City Council may also be replaced in the upcoming election. (Hr'g Tr. 130:1–133:2, June 3, 2025, ECF No. 959.)  So Mr. Szabo's, the Mayor's, and City Council's personal commitments are meaningless without a bed and funding plan. Unfortunately "commitments" don't suffice to fulfill the plaint language of the agreement.

**b.     Insufficient and Unverified Alliance Beds**

**i.     <u>City Has Failed to Demonstrate It Used Its Best Efforts To Meet Milestones and Deadlines</u>**

The City admits it has failed to hit its bed-creation milestones. (City Br. 21:6–7) ("[T]he City has fallen short of interim milestones . . ..") In fact, its shortfall has been significant at every juncture: anywhere between 30% and 62% below its cumulative milestone throughout the agreement which reflects *thousands* of missing. (Ex. 37, Mot. for SA Compl. 11–12; Exs. 26–36, City SA Quarterly Reports, Ex. 126, LA Alliance Open Beds Charts.) The City claims it has "diligently pursued shelter and housing solutions" (City Br. 20:26–28) but put on <u>no evidence</u> during the hearing to support its claim.

To make up for this evidentiary shortfall, the City argues "past performance reflects best efforts," the City has invested "substantial resources" and the City remains "fully committed" to fulfilling its obligations (*Id*. at 21-22) but there was no <u>actual evidence</u> about what the City has done in an attempt to fill its own milestones that it set for itself. One need only look at the type of evidence one would expect to see at such a hearing to recognize the City's claims as mere illusions: an explanation for why **46 projects representing 2,845 beds** have been "in process" since 2022 and what the City has done

*PLAINTIFF LA ALLIANCE'S REPLY BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

to condense those timelines, exploration by the City of alternative measures that were less time-intensive to meet the interim milestones while permanent projects were being built, how partners like service providers or funders failed to perform due to no fault of the City's, perhaps a Request For Proposal (RFP) or two on public-private partnerships to make up financial shortfalls, etc. The list of potential evidence the City *could have* put on to demonstrate best efforts *but did not* is both endless and demonstrates that it *cannot* put on such evidence because it *did not* do any of these things. It did nothing to condense timelines for long projects, it did not explore alternative measures that were less time intensive, it cannot point to a single extrinsic factor beyond its control to justify its delay, and it never explored public-private partnerships or other lower cost, creative models to move the ball forward.

"A 'best efforts' provision requires a party to make such efforts as are reasonable in light of that party's ability and the means at its disposal and of the other party's justifiable expectations . . . .'" *Samica Enters., LLC v. Mail Boxes Etc. USA, Inc.*, 637 F. Supp. 2d 712, 717 (C.D. Cal. 2008) (citations omitted). "Best efforts" is more than "good faith": "Good faith is a standard that has honesty and fairness at its core and that is imposed on every party to a contract. Best efforts is a standard that has diligence as its essence and is imposed only on those contracting parties that have undertaken such performance. The two standards are distinct and that of best efforts is the more exacting." *Id*. (citation omitted); *see also Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614 (2d Cir. 1979) ("In the court's judgment, [Defendant's] misfeasances and nonfeasances warranted a conclusion that, even taking account of [Defendant]'s right to give reasonable consideration to its own interests, [Defendant] had breached its duty to use best efforts"). In *Bloor*, the court explained that "Plaintiff was not obliged to show just what steps [the defendant] could reasonably have taken . . . [i]t was sufficient to show that [the defendant] simply didn't care … so long as that course was best for [the defendant]'s overall profit picture." *Id*.

*PLAINTIFF LA ALLIANCE'S REPLY BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

The sole evidence the City proffers to suggest it has used its best efforts is Matt Szabo's 16-line testimony describing: 1) a systematic approach, 2) progress, 3) funded permanent supportive housing (PSH), 4) efforts to seek additional funding, 5) advocacy for new funding, and 6) "focus and commitment" to "secure the resources" and "push departments to get these projects up as quickly as possible." (Hr'g Tr. 49:25–50:15, ECF No. 959.) Compare that with the testimony of John Maceri, Elizabeth Funk, Brian Ulf, Lee Raagas, and even Special Master Martinez who all described ways to overcome bureaucratic slog and hit established milestones with focused and diligent effort. And compare Mr. Szabo's 16-line "best efforts" proffer to his own testimony on the Roadmap efforts: "[T]he purpose of [the Roadmap Agreement] was to establish through multiple means, and as many means as possible, an extraordinarily high number of beds in a very, very short period of time.  [It] required the City to use every possible resource and pursue every possible pathway to get as many beds out as possible." (Hr'g Tr. 8–14, May 29, 2025, ECF No. 953.) No such effort has been demonstrated by the City in pursuing its projects under the SA.

Contrary to the City's argument, the Alliance is not attempting to direct City policy decisions, but rather hold the City accountable for *its own established milestones and deadlines in this case*. The City claims it has the "sole discretion" to choose the housing or shelter solutions, that the City must use HHH funds "almost exclusively on permanent housing," and that the Alliance does not get to choose its "preferred policies." (City Br. at 25.) But these arguments fail for at least two reasons: i) The City is *choosing* to use HHH funds and *choosing* to build permanent housing—it is not required to do either and 2) by the plain language of the SA the City has lost "sole discretion" to choose the interventions because it has failed to meet its milestones.

*First*, there is no obligation within the SA for the City to use Proposition HHH money or any other source of funds to complete its obligations—the City is choosing to use those funds. And it is choosing to focus nearly exclusively on PSH, despite the language of the proposition explicitly permitting use for shelters and City officials

6

recommending it. (Hr'g Tr. 94:2–10, ECF No. 959; Ex. 142, City Council Resolution at Ex. 1, June, 29, 2016; Ex. 143, City Controller, Report of Prop HHH, Oct. 8, 2019 (recommending the City "[P]ut a greater focus on innovative practices to save time and money, including ways to reduce costs . . . and consider using any savings achieved for temporary shelters, bridge housing, hygiene centers and other service facilities to address more immediate needs.") The City has made a "policy decision" to use HHH funds to fulfill its obligations in this case, and to focus those funds nearly exclusively on PSH. (City Br. 25:26–28.) But the City, in so choosing, has pursued the most expensive and slowest solutions, apparently knowing it was "likely" that "milestones would be missed" but doing nothing to change that fact. (*Id*. at 26:22–27.) It simply has not taken its obligations seriously, and in so doing is flouting the orders and authority of this Court.

*Second,* the clear language of the SA establishes that the City loses "sole discretion" over the housing or shelter solution it chooses if the Milestones are not met. (Ex. 25, SA § 3.2 ("the City may choose, at its sole discretion, any housing or shelter solution . . . as long as the Milestones are met.") This is not the dramatic and unconstitutional "ticking time bomb" the City claims because it has nothing to do with restraint of police power or divestiture of policy-making abilities. (City Br. at 27.) This provision only encompasses what solutions would count towards the City's obligations *in this case*. What the City chooses to do outside this case is a separate and unrelated inquiry, one which largely does not involve the Alliance. The City is free to pursue solutions that take decades to put together—but could not count those solutions towards its progress in this case. The City's belated interpretation of the clause clearly conflicts with the Alliance's understanding and specific negotiation to divest the City of "sole discretion" under this Agreement if the City failed to live up to its end of the bargain. (Hr'g Tr. 29:5–30:10, ECF No. 969 ("[T]he Alliance wanted to provide the City with as much opportunity and discretion in carrying out their commitment to the settlement so they could use any means available to them as long as those activities resulted in making progress towards the milestones and that these milestones were actually met." And "Q: Was it the Alliance's position that if the City was

7

not meeting its milestones for bed creation, the City would lose discretion to, for example, choose a housing or shelter solution if it was too slow, etcetera? A: Correct.")   And regardless, extrinsic evidence (here, of the negotiators' intents) is irrelevant because the plain language of the SA is clear: the City has lost its "sole discretion" to choose any solutions it wants towards its obligation because it has not met its milestones. *See, e.g. PlayMedia Sys., Inc. v. Am. Online, Inc.*, 171 F. Supp. 2d 1094, 1114–25 (C. D. Cal. 2001) ("The first step in contract interpretation is to look at the 'plain meaning' of the contract language. . . . [I]f after considering extrinsic evidence the court finds the language of the contract is not reasonably susceptible to the asserted interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract.); *Reilly v. Inquest Tech., Inc.*, 218 Cal. App. 4th 536, 557 (2013) ("[E]xtrinsic evidence is not relevant when the contract appears unambiguous on its face.")

ii.      Reported Beds Cannot Be Verified

In addition to the City's failure to meet the bed creation milestones, and failure to demonstrate best efforts towards those milestones, neither A&M nor the Special Master have been able to verify the beds even exist. Laura Frost testified that approximately 20% of the PSH beds created as part of the Alliance and Roadmap agreements could not be located within LAHSA's Resource Management System (RMS) (Hr'g Tr. 235:7–237:24, May 27, 2025, ECF No. 947; Hr'g Tr. 224:1–225:19, May 28, 2025, ECF No. 949.) Separately, Special Master Martinez sent a list to LAHSA of 48 sites for her to spot-check, nearly half of which (20) did not exist within LAHSA's system. (Hr'g Tr. 258:6–24, ECF No. 969.) Despite advising the City of the issue, she has not received any response from the City or LAHSA explaining the lack of facilities within the system.  (*Id*. at 260:2–14.)

LAHSA's inability to explain or rectify these issues is hugely problematic because while the City maintains the PSH sites, and the County provides intensive case management services (ICMS), it is LAHSA who matches unhoused individuals with the units (including backfilling vacancies after initial placement). And if LAHSA does not even have a record of these facilities—or is unwilling to do the basic investigation to

8

address the discrepancy—the Court can have no faith that the units are being properly filled and reported to the court (assuming they do exist). And even more problematic is the City's failure to address this issue during the evidentiary hearing—for example presenting evidence demonstrating the units do in fact exist, or presenting a witness from LAHSA or the Housing Department (LAHD) to explain how the data errors have been rectified.  This feeds into the larger data issues addressed by the A&M assessment and other historic audits, and the testimony of Emily Vaughn Henry, which have laid bare LAHSA's extraordinary failures of data and infrastructure.

iii.     Inside Safe Beds Do Not Qualify.

In a last-ditch attempt to close the milestone gap after the Alliance filed its Motion for Settlement Agreement Compliance, the City added approximately 1,700 beds from the Mayor's Inside Safe program to its latest quarterly report. (Ex. 35, City SA Quarterly Report, Apr. 15, 2025; (Declaration of Elizabeth A. Mitchell ("Mitchell Decl.") ¶ 7, Ex. B, Inside Safe Distribution Chart.) These 1,700 beds include hotel/motel occupancy agreements (where the City master leases the entire property), hotel/motel booking agreements (when the City agrees to pay for a single room for an unhoused individual for an indeterminate period of time), and master-leased permanent supportive housing projects (for individuals transitioning out of the hotel/motels). (Hr'g Tr. 103:2–18; 147:4–21, ECF No. 953. Neither the Court nor Plaintiff were notified about the City's intention, and none of the projects appeared on the 2022 proposed project list. (*Id*. at 118:15–119:7.) And even with those beds, the City still falls short of its cumulative milestone total.

For the last two years, members of the City Council, and in particular those on the City's Housing and Homelessness Committee, lamented that Inside Safe was being run in a way that was incompatible with the SA. The Alliance agreed with that criticism and regularly encouraged the City to shift its priorities and resources to be able to include these beds. (Ex. 216, Email from S. Marcus, Dec. 29, 2023.) But the City has not changed the way it is running the program, has not shifted it out of the Mayor's office or otherwise subjected to Controller oversight, and has not planned adequately for those projects with

9

short-term leases. The Inside Safe sites are not equitably distributed throughout the City as required by the SA. (Ex. 25, SA § 3.3; *see* Mitchell Decl. Ex. B, Tracking Chart (identifying the distribution of Inside Safe projects per council district, with a heavy emphasis on CD8 (22.61%), CD9 (14.14%), CD 13 (17.76%) and CD14 (14.51%)). And given the testimony from Emily Vaughn Henry and the Mayor's refusal to submit the Inside Safe program to auditing by the City Controller, the Court can have no faith about the accuracy of the data being reported about the Inside Safe program. (Hr'g Tr. 113:4–21, 138:4–139:22, ECF No. 947; Hr'g Tr. 112:13–113:2, ECF No. 953.)

The booking agreements in particular are wildly unverifiable. As recently as February 2025, the CAO's office confirmed that booking agreements would never be able count towards the Alliance settlement requirements (Ex. 151, Videotape, Housing and Homelessness Comm. Timestamp 1:25:48, Feb. 12, 2025, noting the CAO was working to "transition a number of booking agreements to occupancy agreements" in order to "count towards the Alliance Settlement.") These booking agreements are different than occupancy agreements which master-lease entire buildings and therefore have a physical unit to confirm. (Hr'g Tr. 103:2–7, ECF No. 953.) In contrast, booking agreements can last for as little as a single day or several months. (Hr'g Tr. 248:22–250:21, ECF No. 947.) The only way to "verify" the bed is to check invoices, but those only confirm that payment was requested and made but not that someone actually stayed there. (*Id.*) This is the exact issue Emily Vaughn Henry testified about to City Council immediately before she was removed from data oversight of Inside Safe: that the City was paying for vacant beds for weeks without anybody knowing because nobody was tracking the numbers. (*Id.* at 108:6–109:2; 154:6–15.)

c.   **Insufficient and Noncompliant Encampment Reductions**

As a preliminary matter, even the City's own reporting puts it far behind in reductions.[1] But even more importantly, the City is blatantly and intentionally

---

[1] (*See* Exs 60–63 (reports) and Ex. 59 (summary chart).) They failed to report any encampment reductions at all in 2022 and 2023 and are thousands behind in 2024.

*PLAINTIFF LA ALLIANCE'S REPLY BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH*

misrepresenting "Encampment Reduction" numbers to the parties and the Court. It is treating CARE/CARE+ cleanups as "reductions" anytime a tent is thrown away or makeshift shelter is dismantled and discarded, regardless of whether there have offers of shelter or some other justification or demonstration of "permanent" reductions. (Hr'g Tr. 129:9–130:15, ECF No. 953; Hr'g Tr. 73:2–74:18, ECF No. 959.) This is inconsistent with both the Court's order on this issue and the plain meaning of the term "reduction." It is inconsistent with the entire history of the parties' discussions and understanding regarding the nature of "reductions." And it is inconsistent with the purpose of the SA because interpreting the terms in this manner cannot "achieve a substantial and meaningful reduction in unsheltered homelessness."[2]

*First,* this Court has already ruled that "cleaning an area, only to have unhoused individuals move back in without offers of shelter or housing, is not a "resolution" or encampment "reduction" and shall not be reported as such. . . . Thus, the City is only to report Encampment Reductions that have a more permanent meaning such that unhoused individuals are moved off of the street and given shelter or housing." (Ex. 81, Order at 2, Mar. 24, 2025.) This is consistent with the plain meaning of the term "reduction" which means to "decrease" or "diminish in size, amount, extent, or number." Reduce, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/reduce (last visited Mar. 13,

---

[2] [T]he purpose of this Agreement is to substantially increase the number of housing and shelter opportunities in the City of Los Angeles, and to address the needs of everyone who shares public spaces and rights of way in the City of Los Angeles, including both housed and unhoused Angelenos, to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles.
(Ex. 25, Am. Fully Executed Stipulated Order of Dismissal ("Settlement Agreement" or "SA") Recitals at 2, May 24, 2022, ECF No. 429-1.) As noted in the Opening Brief, when there are inconsistent interpretations of a contract, recitals are important to help interpret the meaning. *Bittner v. United States*, 598 U.S. 85, 91 (2023) (using Congress' statement of purpose to interpret meaning of statute); *Regency Midland Constr., Inc. v. Legendary Structures, Inc.*, 41 Cal. App. 5th 994, 998–99 (2019) ("Purpose can be illuminating when interpreting any written directive, because understanding what the parties were trying to accomplish by means of their words can help make sense of those words" and noting *Falkowski v. Imation Corp.*, 132 Cal. App. 4th 499, 509–13 (2005) "exemplifies purposive interpretation when it rejected on party's proposed interpretation because that interpretation 'failed to further the purposes' for which the contract was created.")

11

2025). The City has failed to file a motion for reconsideration within the time prescribed by Local Rule 7-18, nor does the City's argument meet any of the substantive requirements of 7-18. Yet it seeks within its opposition—filed nearly two months after the Court's order—to have the court reconsider its order based on nothing more than complaints and disagreements. The Court should not entertain this request.

*Second,* the City's new interpretation of "reductions" as nothing more than destruction of abandoned or relinquished items without the need for further engagement with the residents of those encampments also does not reflect the understanding of the parties during the negotiations of the SA nor a year-and-a-half later when the City was finally coerced into providing its encampment engagement, cleaning, and reduction plans. Each iteration of the plan included descriptions of how the City intended to reduce encampments in a way that was more permanent in nature—i.e. a true "reduction."  (*See,* Ex. 65, Mitchell Decl. ISO Mot. for SA Compl. Ex. C-1, at 29) ("In order to resolve an encampment, the City must ensure there are beds available to match with encampment residents and that service providers have the capacity to provide case management and other services;"); Ex. C-2, at 37) (same); Ex. D, at 52 (same); Ex. F, at 61 (same); Ex. G, at 67 ("The City . . . will work to provide interim housing for every unsheltered individual . . . ."); Ex. I, at 72 (chastising LA Alliance for having "no faith in the City's ability or willingness to comply with its proposal because in part "of the City's past year of success doing the <u>actual work</u> to reduce encampments and bring people inside.") (emphasis in original).) Notably, the "plan" the City claims as the established one (Hr'g Tr. 213:11–215:15, May 30, 2025, ECF No. 955), explicitly commits to offers of shelter to each individual. (Ex. 65, Mitchell Decl. Ex. F, at 61.) The Alliance's only objection to that plan was the low number of encampments the City proposed to resolve, not the way it did so. (Hr'g Tr. 36:2–37:2, ECF No. 969; *see also* Ex. 216, Email at 4 (Alliance's counsel noting "our main objection [to the City's plan] was the milestones and deadlines.").) The City at no point provided any plan which only included temporary removals of encampments such as CARE/CARE+ clean-ups. Even counsel for the City, Scott Marcus, noted in an email

12

in December of 2023 that the City "should be close to [1,200 encampment reductions every six months] once the final tally from Inside Safe is completed" evidencing that the parties throughout the negotiations treated Inside Safe operations—encampment resolutions—as reductions. (*Id*. at 3.) This intent is likewise reflected in Section 7.1 of the SA which requires the City to report numbers of PEH engaged, numbers of housing/shelter opportunities offered and why rejected if at all, and number of encampments remaining in each district. (Ex. 25, SA § 7.1) (the City has failed to report on these metrics). The ultimate demonstration of the parties' understanding is the title of the reports themselves: every report submitted to the City on this issue is titled "encampment resolution" making no distinction, as the City tries to do now, of "resolutions" versus "reductions." (Exs. 60–63, City SA Encampment Reports.)

*Finally*, the City's new interpretation of "reduction" is nonsensical in light of the purpose behind the SA. Removing tents and other sheltering items from the public right of way without separate offers of shelter/housing or some other resolution (like family reunification), does nothing to "achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles" because the same people remain on the street with the all the property and health hazards that come with public dwelling. (Ex. 25, SA at Recitals.) To be clear, the Alliance has no objection to consistently cleaning the streets while removing trash and items which pose a health hazard—something which is separately called for in the SA. But "engagement" and "reductions" are also identified separately and must be treated thus in order to actually accomplish the purpose of the SA.

> **d.    Insufficient and Unverified Roadmap Beds**
>
> **i.        Plaintiff Has Standing to Raise This Issue**

Once again this Court has already resolved the issue of Plaintiff's standing to raise issues related to the Roadmap Agreement and once again the City improperly seeks to move this Court, through its opposition, to reconsider the Court's ruling without filing a motion for reconsideration or otherwise respecting any of the requirements thereof under Local Rule 7-18. It has provided no new facts nor law nor demonstrated that the Court

13

failed to consider facts or law already before it and therefore such a request is not only untimely, but also improper.

The City wrongly contends that the Roadmap Agreement was a "bilateral" Agreement having nothing to do with Plaintiff. In fact, the Roadmap Agreement was reached ONLY in response to this Court's preliminary injunction order which arose out of this case brought by Plaintiff and has directly impacted Plaintiff's rights and interests. (*See* Hr'g Tr. 23:17–25:1, May 15, 2025, ECF No. 909; *see also* Fed. R. Civ. P. 71 ("When an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party."). And the Roadmap Agreement was not only subject to this Court's enforcement (Ex. 2, City-County MOU § VII), it also was entered into specifically to induce this Court to dissolve the preliminary injunction, subject to re-introduction should the parties not satisfy the terms. (Ex. 1, Binding Term Sheet § 7 ("[T]he parties will respectfully request the Court to entertain an oral motion . . . that the Preliminary Injunction dated May 22, 2020 be vacated without prejudice, subject to the Court's later consideration of reinstatement of the Preliminary Injunction should the parties fail to comply with the terms identified above."); Order re MOU, June 18, 2020, ECF No. 138 ("The Court retains jurisdiction to monitor and enforce the terms of the Binding Term Sheet" and "The Preliminary Injunction Order . . . is hereby vacated without prejudice subject to the Court's later consideration of reinstatement of the Preliminary Injunction should the parties fail to comply with the Binding Term Sheet.").)  Even if the Alliance lacks standing to raise these issues (it does not), the Court has independent authority to review this matter because the Court has independent jurisdiction to monitor and enforce the agreement. *See, e.g. Cahill v. Insider Inc.*, 131 F.4th 933, 938 (9th Cir. 2025) ("The Supreme Court has long recognized that a district court possesses inherent powers that are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. Those powers include the inherent authority of a court to enforce its orders by whatever means, the authority to manage its dockets and courtrooms with a view toward

14

the efficient and expedient resolution of cases, and the authority to correct that which has been wrongfully done by virtue of its process.") (cleaned up.)

ii.    City Has Breached the Roadmap Agreement

The City's violation of the Roadmap Agreement, unbeknownst to Plaintiff and the Court, began in at least 2021 and continues today. The City's recent submission (Szabo Decl., June 11, 2025, ECF No. 980), purporting to verify most (but not all) Time Limited Subsidy beds it is reporting, raises serious concerns about the quality of the data and does not ameliorate the fact that the City is counting beds provided by others as its own. The Binding Term Sheet, the terms of which were further defined in the parties' MOU, required the City to provide 6,000 "new" beds. (Exs. 1 & 2.) Beginning on July 15, 2021, the City began reporting hundreds, and then later thousands, of TLS beds. (*See* Ex. 53, Pl.'s Resp. at 10–11, May 8, 2025.)  Roughly 1/3 of the City's "new" beds reported under the Roadmap Program are TLS. (*Id.*)

A&M spent months attempting to verify the TLS beds but ultimately could not, with missing expenditures, contracts not linked to slots, missing street addresses and move-in dates, and overlapping Alliance projects. (*See* Pl.s' Opening Br. at 8, June 9, 2025, ECF No. 977.) In response to an order by this Court, last week the City filed a declaration by Mr. Szabo, providing a list of all addresses, including 12 which overlapped with Alliance beds, and dis-including 130 "Scattered Sites" which apparently were already encompassed by the 2,679 identified in Line 1. Because the parties do not have the lists provided to A&M (Plaintiff has separately requested permission to obtain those lists from the Court), it is impossible to understand how the City/LAHSA were unable to come up with these lists over period of several months, and unable to produce the same or similar lists to members of the media over several more months (*see* Ex. 141)[3] yet was able to turn around this data within a period of days to the City to produce to this court. But one

---

[3] Ex. 141, Nick Gerda, *LA city officials told a court they were adding new beds for unhoused people. But auditors couldn't verify of 1,200 of them*, LAist (May 15, 2025, 4:05 PM).

*PLAINTIFF LA ALLIANCE'S REPLY BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

thing is certain from the testimony elicited over a number of days, from multiple witnesses: this Court cannot trust the data coming from LAHSA. It is, in unrebutted the words of Emily Vaughn Henry "smoke and mirrors" with no "source of truth" because the data is not being accurately tracked. (Hr'g Tr. 125:16-126:13, 132:7-11; 151:19-25, ECF No. 947.) Even what was produced by the City recently contained inconsistencies and overlap that had never been caught despite years of reporting. What the data does demonstrate is that at least 20% of the TLS beds the City is paying for are outside the City of LA, some as far away as Kern County, Riverside, and Orange County. (Mitchell Decl. Exs. C & D.) This supports the conclusion that these are not the City's beds, but rather beds supported by the TLS system as a whole.

Regardless, even if the data were trustworthy and accurate, the massive issue of the use of comingled or "braided" funding remains unresolved. The City claims the City has "provided" the beds by "arranging for their funding" (City Br. at 35) but cites to no evidence to show that the City did so. It did not elicit testimony from a single person nor produce a single grant agreement, contract, or other document purporting to evidence that the City did *anything* to obtain those funds. The City produced no evidence that, for example, those funds coming from the federal, state, and county governments were "matching" funds such that they would not exist in LAHSA's TLS account but for the City's contribution. The City produced no evidence that it created the program, solicited the funds for its use, or in any other way contributed to those funds coming into Los Angeles. Presumably if the evidence existed, the City would have produced it. Only one conclusion remains: two-thirds of the beds claimed by the City as "TLS" beds would have existed *regardless of the Roadmap Agreement*. They aren't "new" beds "provided" by the City. The City is simply taking credit for them—like Person A who buys 3 pizzas but tells the party he paid for all 10. Certainly the party-goers are happy they got 10 pizzas, but it would still be a lie to claim the 3-pizza-purchaser had anything to do with the remaining 7. Had Person A actually bought the 10 pizzas he was tasked with doing, the party would be enjoying 17 pizzas and not 10. (*See* Pl.'s Resp. at 11, ECF No. 899.)

16

**e.    Section 8.2 is Inapplicable and Plaintiff Amply Met and Conferred**

i.    <u>Alliance Met its Meet-and-Confer Obligations</u>

Lacking nay legitimate refuge for its multiple breaches of the agreements in this case, the City leverages the recent, tragic fires to district from its own malfeasance. But its counsel, being new to the case, has the case history entirely backwards. The City and the Alliance did in fact meet and confer, more than once, about the impact of the fires on the SA, and the City failed to respond to emails requesting further information. (Mitchell Decl. ¶¶ 4–6, Ex. A; Ex. 218, Email from A. Hoang, Mar. 28, 2025.) That the Alliance has not agreed to amend the SA to accommodate the City's request to add the Roadmap beds—the same request it made in the fall of 2024 before the fires—is not evidence of a failure to meet and confer, but a failure to agree to modified terms after meeting and conferring. The SA does not require Plaintiff to agree to proposed modified terms, but only to "meet and confer about any necessary and appropriate amendments." (Ex. 25, SA § 8.2.) The Alliance did so, on more than one occasion and over the course of several weeks, even meeting with Special Master Martinez and Judge Birotte. (Mitchell Decl. ¶ 6; Exs. 217–218, Emails.) The City has provided no support for its claim that "The City repeatedly invited a discussion about the impact of the fires on the Agreement, but to no avail." (City Br. 12.) It cannot. There is not a single instance when the City has requested to meet about the emergency that the Alliance has refused.

Moreover, Plaintiff's refusal to go along with the City's ruse to justify the same SA modifications the City proposed months prior to the fire has no bearing on whether the City has breached its obligations. The City has not filed a motion to compel anything from Plaintiff and therefore its allegations of failure to meet and confer are irrelevant and an improper attempt to distract from the issues at hand: whether the City has breached its obligations, and what the Court should do about it.

ii.    <u>The City Has Disclaimed Any Need for an Emergency "Pause."</u>

The City confirmed during the hearing that it has not "paused" its obligations under the SA. ("We have not paused efforts to comply with the settlement agreement, even in

17

the face of the declaration of emergency based on the wildfires in January." (Hr'g Tr. 37:18–20, ECF No. 959.) And the City claims it can meet its obligation to produce 12,915 beds by June, 2027 regardless of the impact on the fires. ("[T]he commitment is there from the City Council and the Mayor and the funding as well. So I'm completely confident that . . . whether we stick with the same Inside Safe beds that we're reporting now, that—that we'll meet the 12,915." (Hr'g Tr. 279:10–14, ECF No. 955.) Yet the City disingenuously claims its obligations are paused anyway, to avoid the accountability the SA requires and demands. (City Br. 13–15.)

The City's financial woes long pre-date the fire. Just months ago, the CAO identified a $100 million funding gap in paying for existing beds, not even accounting for the need to create an additional 3,800 beds under the SA, and the Special Master warned of the projected deficits over a year ago. (*See* Ex. 37, Pl.s' Mot. for SA Compl. 3–4, 7–11, ECF No. 863; Ex. 49, Pl.s' Reply at 5–7, ECF No. 872.) These budget deficits were foreseeable, particularly in light of the City's decision over the last two years to approve massive pay increases for its civilian and sworn personnel, yet the City has done nothing to pivot away from its chosen course of expensive and slow housing—which has not and cannot meet the milestones and deadlines required in this case.

The declaration of emergency surrounding the Palisades fire is not the only, or even first, declaration of emergency relating to this case. In fact, the City has been operating under a declaration of emergency regarding homelessness since Mayor Bass took office in December 2022. (Hr'g Tr. 134:6–10; 192:13–23, ECF No. 953.) Yet, aside from granting the mayor extraordinary powers, including awarding no-bid contracts on projects which the mayor's office exclusively controls, the Mayor's office has not acted like homelessness is the emergency it is. No "FEMA-style response" has occurred.[4] The recent fire in the Pacific Palisades neighborhood of Los Angeles was no doubt devastating in

---

[4] Benjamin Oreskes, *If elected mayor, Rep. Karen Bass wants to house 15,000 homeless people in first year*, Los Angeles Times (Jan. 15, 2022, 7:00 AM), https://www.latimes.com/homeless-housing/story/2022-01-15/la-mayor-candidate-karen-bass-homeless-plan.

*PLAINTIFF LA ALLIANCE'S REPLY BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

several ways, but it cannot be used as a politically or legally convenient excuse for the City to evade accountability when the City itself has acknowledged that no "pause" has taken place. The financial crisis the City now faces is of its own making, was reasonably foreseeable, and the fire cannot be used as a cover for the City's bad choices which has led them directly into breach of the SA.

## II. The System is Broken.

The evidentiary hearing was replete with testimony that the City's homelessness response system itself is not functional from any perspective. The only testimony the City presented about any concrete steps it has taken to address the systemic dysfunction was that it intends to bring coordination for homelessness response under LAHD—the very department which was tasked with, and wholly failed to, oversee LAHSA's contracts over the last several years. (Hr'g Tr. 277:23–278:24; 282:25–283:7, ECF No. 969.) And the City opted not to present any elected official or representative from LAHD—only the CAO from whom the responsibility is being stripped. The City cannot or is unwilling to address the massive systemic and structural deficiencies underpinning its failures—this Court is well within its authority to impose a receivership in addition to other remedies proposed. (Ex. 53, Pl.'s Resp. 1–28, ECF No. 899.)

### a. Judicial Intervention is Required.

The City's argument contending this court is constitutionally prevented from instituting a receiver is a masterclass in misdirection. It seeks to reframe its defiance of a binding federal court order as a mere state-law contract dispute, thereby wrapping itself in the banners of federalism and local control to excuse its own non-performance. This position is not only contrary to our constitutional structure, but it also presents a dangerous proposition: that a government entity can trade the dismissal of serious federal claims for a set of promises made to a federal court and then treat that court's subsequent order as a toothless document, unenforceable by any meaningful remedy.. As the Supreme Court has repeatedly held, federal courts are not powerless spectators to defiance; they are not "reduced to issuing injunctions against state officers and hoping for compliance. Once

19

issued, an injunction may be enforced." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004). All parties have an "unequivocal obligation to obey" federal court orders while they remain in effect. *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 696 (1979).

The central issue is not whether there has been a new violation of a federal statute, but whether this Court has the authority to effectuate its own judgment. The answer, grounded in bedrock principles of equity and the Supremacy Clause, is an unequivocal yes. The City's persistent non-compliance is an affront to the authority of this Court, and it has the inherent equitable power—and duty—to fashion a remedy that ensures its orders are not rendered a nullity. This power enables a court "to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *K.C. ex rel. Erica C. v. Torlakson*, 762 F.3d 963, 966 (9th Cir. 2014) (citations omitted). As in *Torlakson*, the district court here specifically retained jurisdiction over the Settlement Agreement. Thus, any breach of the SA "would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist." *Id.* at 967 (quoting *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994).

**b.    The Court Has Inherent Equitable Power to Enforce Federal Orders**

When the City's agreement was incorporated into the Stipulated Order of Dismissal, it became the command of a federal court. (Stipulated Order of Dismissal, May 24, 2022, ECF No. 429.) As the Ninth Circuit held in *Kelly v. Wengler*: "When a court's order dismissing a case with prejudice incorporates the terms of a settlement agreement, the court retains ancillary jurisdiction to enforce the agreement because a breach of the incorporated agreement is a violation of the dismissal order." 822 F.3d 1085, 1095 (9th Cir. 2016). Thus, the "federal question" is not whether the City has newly violated some external statute, but whether it is in violation of this Court's own order.

The Supreme Court's unanimous decision in *Frew v. Hawkins* is dispositive. There, state officials argued—just as the City does here—that a consent decree could not be enforced without a new finding that they had violated the underlying federal statute. The

*PLAINTIFF LA ALLIANCE'S REPLY BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

Supreme Court flatly rejected this argument: "The decree is a federal-court order that springs from a federal dispute and furthers the objectives of federal law . . .. Enforcing the decree vindicates an agreement that the state officials reached to comply with federal law." 540 U.S. at 438-39 (emphasis added). The *Frew* Court confirmed that "[f]ederal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced." *Id.* at 437, 440 (explaining such decrees are hybrid instruments, having "elements of both contracts and judicial decrees."). The City cannot now claim that the very order it asked this Court to enter lacks the force of federal law.

**c.    The City's Cited Cases are Irrelevant**

The City relies on cases like *NFIB v. Sebelius*, *Keith v. Volpe*, and *League of Residential Neighborhood Advocates v. City of Los Angeles* to argue that this Court is powerless to act. Its reliance on these cases is misplaced, as they address a government's use of a settlement to authorize an illegal act and do not stand for the proposition that a government can hide behind general state law principles as an excuse for failing to perform a legal obligation memorialized in a lawful federal order. Those cases correctly hold that a government entity cannot, by way of a settlement agreement, do something that would have been illegal for it to do outside of litigation, such as circumventing mandatory public hearing laws—i.e., acts that are *ultra vires*. *League*, 498 F.3d 1052, 1057 (9th Cir. 2007). But the City's obligation under the SA is not an illegal or unauthorized act. It is a fundamental and lawful exercise of its municipal power. The issue is not the legality of the City's promise—an issue not even raised by the City—but its failure to perform that legal promise.

The City's argument that a receivership would violate the Tenth Amendment by "commandeering" local functions fundamentally misunderstands the nature of this proceeding. The City is not being commandeered to administer a federal program. Rather, it is being held to account for its own voluntary commitments. It was the City that negotiated the terms of the SA and asked this Court to give it the force of a federal order. As the Supreme Court noted in *Local No. 93 v. City of Cleveland*, 478 U.S. 501 (1986),

21

"it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all." *Id.* at 522. Enforcing a self-imposed obligation is not commandeering; it is ensuring the integrity of the judicial process.

Moreover, the *League* decision itself carves out the very exception that applies here, recognizing that a decree can override state law "upon properly supported findings that such a remedy is necessary to rectify a violation of federal law." *Id.* at 1058. The original lawsuit, alleging grave constitutional violations, and this Court's subsequent approval of a decree designed to remedy those alleged violations, provides precisely that necessary federal predicate. The City cannot extinguish federal claims via settlement and then leverage the resulting absence of an adjudicated violation as a defense to enforcement, particularly when those constitutional violations remain.

Because the City is in violation of a federal order, the City's argument tied to the Supremacy Clause also provides no defense. As the Supreme Court held in *Washington v. Fishing Vessel Ass'n*, 443 U.S. 658 (1979), "State-law prohibition against compliance with the District Court's decree cannot survive the command of the Supremacy Clause... [The state agencies], as parties to this litigation, may be ordered to prepare a set of rules that will implement the Court's interpretation . . . even if state law withholds from them the power to do so." *Id.* at 695. All parties, including the City, have an "unequivocal obligation to obey" this Court's orders. *Id.* at 696.

**d.    Receivership is The Necessary Equitable Remedy for the City's Institutional Failure**

The appointment of a receiver is an extraordinary remedy, but it is one born of necessity from a record of profound and persistent non-compliance. The City's multi-year record of unfulfilled promises and missed deadlines despite ample lesser measures demonstrates precisely the kind of systemic, institutional failure that makes such a remedy not only appropriate, but essential. (*See, e.g.* Ex. 53, Pl.'s Resp. 1–28, ECF No. 899.)

This Court's decision in *Brown v. Plata* provides a powerful guide, and its logic applies with full force. 563 U.S. 493, 511 (2011). There, the Supreme Court affirmed a

receivership because years of less intrusive measures had failed to cure the State's institutional failure. *Id.* at 511. And while that case dealt with Eighth Amendment violations, the principle is directly applicable: when a state has "for years been unable or unwilling" to remedy unconstitutional conditions, extraordinary measures are not only permissible but necessary. *Id.* The same logic applies here. The City's chronic non-compliance is not a series of isolated missteps; it is an institutional failure that lesser remedies have not and cannot cure. [5] The power to take direct control when a party is recalcitrant is the ultimate tool in a court's equitable arsenal. *See, e.g.*, *Alisal Water*, 326 F. Supp. 2d at 1014 (appointing a receiver after finding defendants had (1) a long history of violations; (2) "adopted an inordinately combative stance against legitimate regulatory oversight"; (3) "repeatedly failed to accept responsibility for their conduct, seeking instead to shift blame to others"; and (4) lacked both "managerial competence" and "financial wherewithal" to comply). As the Supreme Court confirmed in the *Washington* fishing cases, a federal court may even "assume direct supervision" and "displace local enforcement" when necessary. 443 U.S. at 695–96. The problems here warranting such action by this Court are not unlike those the court found in appointing a receiver for the Government of Guam after years of non-compliance with a consent decree, where the problem was a "highly dysfunctional, largely mismanaged, overly bureaucratic, and politically charged solid waste system, which this Governor has inherited from past administrations, is beyond correction by conventional methods." *United States v. Gov't of Guam*, No. 02-00022, 2008 WL 732796, at \*1 (D. Guam Mar. 17, 2008).

It bears emphasis that the SA is not a license for the City to perpetuate a state of affairs so dire that its continuing violation of the Agreement also constitutes ongoing

---

[5] *See also cf. Turay v. Seling*, 108 F. Supp. 2d 1148, 1154–55. (W.D. Wash. 2000) (the district court found state officials in contempt after years of non-compliance with an injunction, noting a history of "footdragging which has continued for an unconscionable time" and that the "chief cause of non-compliance... has been the State's failure to provide needed resources.") *Id.* at 1153, 1154–55; *Id.* at 1159 (the test for contempt, the court stated, is "whether the defendants have performed 'all reasonable steps within their power to ensure compliance' with the order.") (citation omitted).

*PLAINTIFF LA ALLIANCE'S REPLY BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH*

constitutional violations. State officials have the "primary responsibility for curing" such conditions. *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978), abrogated on other grounds by *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42 (2024)). Where, as here, those officials "fail in their affirmative obligations"—a failure made tragically tangible by the fact that at least seven people are dying on the streets of Los Angeles every day—"judicial authority may be invoked." *Id.* And it is settled law that "otherwise valid state laws or court orders cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme." *Stone v. City & County of San Francisco*, 968 F.2d 850, 862 (9th Cir. 1992).

e.   **Other Remedies Proposed by the Alliance are Equally Appropriate.**

The City's fulmination over the LA Alliance's additional proposed remedies fails to factor in the fundamental authority this Court has to enforce both the Roadmap and LA Alliance Agreements. The Court's power to determine sanctions and remedies here flows freely from City's express agreement to the Court's continued jurisdiction over both the Roadmap and LA Alliance agreements. *Wengler*, 822 F.3d at 1094. And the capaciousness of that power cannot be cabined in the manner proposed by the City. Indeed, "all federal courts are vested with inherent powers enabling them to manage their cases and courtrooms effectively and to ensure obedience to their orders." *F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991) (courts have discretion to "fashion an appropriate sanction for conduct which abuses the judicial process").

Courts have ordered the very kind of remedies and sanctions suggested by the LA Alliance in similar circumstances. In a Section 1983 case involving this very Court, the Ninth Circuit affirmed this Court's findings of settlement agreement violations and blessed its decision to extend the term of the settlement agreement. *Wengler*, 822 F.3d at 1098 ("The court's conclusion that the extension of the entire agreement was suitably tailored to correct CCA's non-compliance was thus not an abuse of discretion."). In that same case, the Ninth Circuit affirmed this Court's award of enhanced attorneys' fees as

24

*PLAINTIFF LA ALLIANCE'S REPLY BRIEF RE*
*EVIDENTIARY HEARING ON SETTLEMENT BREACH*

prevailing parties. *Id.* at 1105 ("[W]e conclude the district court did not abuse its discretion in enhancing the attorney's fees award to ensure that it was adequate to attract competent counsel in comparable cases"). And the City has previously agreed to the payment of attorneys' fees for its prior violations of the LA Alliance agreement (Jt. Stip. to Resolve Mot. for Order re SA Compl. at 3, Apr. 4, 2024, ECF No. 713 ("The City agrees to pay the LA Alliance's fees and costs."))—having done so, it cannot now be heard to suggest that attorneys' fees are verboten.

Similarly, the investigations and reports proposed by the LA Alliance are no different in kind from the audit the city stipulated to (but now clearly regrets). (*Id.* at 3 ("The City agrees to pay for the Court-ordered audit.").) As for Skid Row, the Court previously ordered more sweeping remedies than the ones proposed now by Plaintiff (Order Granting PI Mot., Apr. 20, 2021, ECF No. 277), and while the Ninth Circuit reversed that order on standing grounds, it did not question the Court's broad authority to remedy constitutional wrongs in the manner articulated in the Court's Order. There remains ample authority and evidence to support the limited Skid Row efforts proposed by the LA Alliance—the undisputed testimony of Dewey Terry alone is enough. The City's suggestion that the Court should stand idly by while the City violates a court-supervised settlement and women and children suffer on Skid Row is unfortunate, yet emblematic of the City's failure and hubris in the face of the homelessness crisis.

## III.    Conclusion

Both the legal authority and the evidence support a finding by the Court that the City is in breach of both agreements, and this Court has authority to impose receivership and any other remedies it deems just in the circumstances. Plaintiff respectfully requests this Court do so.

Dated: June 17, 2025                 Respectfully submitted,

                                                    */s/ Elizabeth A. Mitchell*
                                                    UMHOFER, MITCHELL & KING, LLP
                                                    Matthew Donald Umhofer
                                                    Elizabeth A. Mitchell
                                                    *Attorneys for Plaintiffs*

*PLAINTIFF LA ALLIANCE'S REPLY BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH*