Shayla R. Myers (SBN 264054)
Isabelle M. Geczy (SBN 349594)
**LEGAL AID FOUNDATION**
**OF LOS ANGELES**
1550 W. 8th St
Los Angeles, CA 90017
Tel: (213) 640-3983
    (323) 801-7990
Email: smyers@lafla.org
    igeczy@lafla.org

Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Ave.
Santa Monica, CA 90401
Telephone: (310) 393-3055
Email:  carolsobel@aol.com

*Attorneys for Intervenors*
*Additional Counsel listed on next page*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et. al*.<br>                Plaintiff(s),<br><br>    v.<br><br>City of Los Angeles, *et. al*.<br>                Defendant(s). | CASE NO.: 2:20-CV-02291-DOC-KES<br><br>Hon. David O. Carter<br><br>**INTERVENORS' POST EVIDENTIARY HEARING BRIEF RE: SETTLEMENT BREACH**<br><br><br>Action Filed:  March 10, 2020 |

*Additional Counsel*

Catherine Sweetser (SBN 271142)
**SCHONBRUN SEPLOW HARRIS
& HOFFMAN, LLP**
11543 W. Olympic Blvd.
Los Angeles, CA 90064
Tel: (310) 396-0731
Email: catherine.sdshhh@gmail.com

Brook Weitzman (SBN 301037)
William Wise (SBN 109468)
**ELDER LAW AND DISABILITY
RIGHTS CENTER**
1535 E. 17th Street, Suite 110
Santa Ana, California 92705
Tel: (714) 617-5353
Email: bweitzman@eldrcenter.org
Email: bwise@eldrcenter.org

*Attorneys for Orange Catholic Worker*

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

## **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................4

II.     FACTUAL BACKGROUND...................................................................5

        A.      Settlement Agreement between LA Alliance and the City of Los
                Angeles.................................................................................................6

        B.      Development of Plans and Milestones.................................................8

        C.      Sanctions Motions ...............................................................................9

        D.      Evidentiary Hearing ..........................................................................10

III.    ARGUMENT..............................................................................................11

        A.      The Court's June 2022 Order, not the Settlement, Forms the Basis of
                Plaintiffs' Motion for Sanctions.......................................................11

        B.      Evidence Overwhelmingly Supports this Court's Interpretation of the
                Encampment Reduction Plan .............................................................13

                1.      The Plain Language of the Settlement Agreement Supports this
                        Court's Encampment Resolution Order.......................................15

                2.      The Evidence Presented by Both Parties Supports this Court's
                        Encampment Resolution Order.....................................................16

                3.      Seizing Unhoused People's Belongings Relies on the Actions
                        of Others.......................................................................................19

                4.      Agreement by the Parties to an Encampment Resolution Plan
                        Did Not Create a Binding Obligation for the City.......................22

        C.      The City Has Not Substantiates its Bed Count, Despite Ample
                Opportunity to Do So .........................................................................24

        D.      The Court Should Order Additional Verification of the City's
                Creation of Housing and Shelter Solutions........................................26

IV.     CONCLUSION...........................................................................................29

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

## TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page**

*Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598 (2001) ..................................................12

*Fitzpatrick v. City of Los Angeles*, CV 21-6841JGB (SPx), 2024 WL 3464174 at * (C.D. Cal. June 13, 2024)..........................................21

*Garcia v. City of Los Angeles*, 11 F.4th 1113 (9th Cir. 2021)...................................21

*Jeff D. v. Andrus,* 899 F.2d 753 (9th Cir.1989) ........................................................13

*Kelly v. Wengler*, 979 F. Supp. 2d 1237 (D. Idaho 2013) ...................................13, 27

*Labor/Community Strategy Center v. Los Angeles Cnty. Metropolitan Transp. Authority*, 564 F.3d 1115 (9th Cir. 2009) .........................................13

*Lavan v. City of Los Angeles,* 693 F.3d 1022 (9th Cir. 2012) ...........................20, 21

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986)..............................................................................12

*Mitchell v. City of Los Angeles*, Case No.: CV 16-01750 SJO (GJSx), 2016 WL 11519288 (C.D. Cal., 4/13/2016)......................................................21

*United Commercial Ins. Service, Inc. v. Paymaster Corp.*, 962 F.2d 853 (9th Cir. 1992) .....................................................................19

*U.S. v. Armour & Co.,* 402 U.S. 673 (1971)...............................................................22

*U.S. v. Asarco Inc.*, 430 F.3d 972 (9th Cir. 2005) ......................................................13

*U.S. v. Montrose Chem. Corp. of Ca.*, 50 F.3d 741 (9th Cir. 1995).........................12

*U.S. v. State of Or.*, 913 F.3d 576 (9th Cir. 1990) ................................................11, 12

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983) .................................................11

*Wolf v. Superior Court,* 114 Cal.App.4th 1343, 1358 (2004) .................................18

**Constitutional Provisions**

Cal. Const. Art. I, § 7 ...................................................................................................20

Cal. Const. Art. I, § 13 .................................................................................................20

U.S. Const. Amend. IV .................................................................................................20

U.S. Const. Amend. XIV ..............................................................................................20

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

**Statutes**

Ca. Veh. Code § 22650 ..................................................................................................20

Ca. Veh. Code § 22651 ..................................................................................................20

Ca. Veh. Code § 41600 ..................................................................................................21

Los Angeles Municipal Code § 41.18 ............................................................................20

Los Angeles Municipal Code § 56.11 ............................................................................20


**Rules**

Fed. R. Civ. P. 60 ......................................................................................................4, 13

Fed. R. Civ. P. 41(a)(2) ..............................................................................................7, 8

C.D. Cal. Civil L.R. 77-5.2.2 ..........................................................................................9

- 3 -

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

## I.    INTRODUCTION

Intervenors submit the following brief, in accordance with this Court's May 27, 2025 order, extending its prior order to allow Intervenors to participate in the enforcement of the Settlement Agreement and Roadmap Agreement.  As this Court has repeatedly noted, Intervenors stand in the unique position as a party to the litigation and representing the unhoused residents most impacted by the agreement, but not a party to either the Roadmap Agreement or the Settlement Agreement.  Intervenors did not participate in the settlement negotiations that are at issue in the litigation, but still are deeply impacted by the results of those negotiations.  And they stand to be the most impacted by the Court's rulings in this case, whether the Court issues a receivership, as requested by the Plaintiffs, or allows the City to be incentivized through what would effectively be a court-mandated quota, to remove the tents, makeshift shelters, and vehicles they rely on to survive.  With this in mind, Intervenors make three arguments related to the Evidentiary Hearing and pending sanctions motions.

First, although the City  argues that the Settlement Agreement is simply a private agreement between the parties, this ignores the parties' explicit decision to request this Court retain jurisdiction to oversee and enforce the agreement.  By granting the parties' request and incorporating the Settlement Agreement into the Court's June 14, 2022 Order Approving Stipulated Dismissal and Proposed Settlement, this Court transformed the parties' private agreement into an order from this Court, subject to the Court's inherent authority to enforce its own orders and modify (or refuse to modify) the agreement as necessary and justified.  *See* Fed. R. Civ. Pro. 60.

Second,  the Settlement Agreement explicitly provides that the Court will resolve disputes between the parties related to the milestones and plans created by the City pursuant to Section 5.2.  After the parties disagreed about what constituted an "encampment reduction" for purposes of that section, this Court ruled that the City could count only reductions that resulted in individuals moving inside.  Despite this agreement, the City concedes that it ignored the ruling and continued to report tents, makeshift

- 4 -

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

shelters, and vehicles that were removed, without any regard for the individuals residing in the encampment. There is no justification for the City's disregard of the Court's ruling, and nothing about the evidence amassed during the evidentiary hearing suggests otherwise. On the contrary, the evidence firmly supports this Court's March 24, 2025 ruling.

Finally, the evidence presented by all parties at the hearing has established that the City's verification of its compliance with the Roadmap Agreement and the Settlement Agreement through the simple listing of beds "created" is not only insufficient but also at times inaccurate and not replicable by the entities brought in by the Court to oversee compliance with the agreements. Rather than proving compliance, the lack of transparency in the City's quarterly reporting is covering up ambiguities and disagreements between the parties. Given the record developed at the evidentiary hearing and the outstanding questions about the City's progress towards compliance with the Settlement Agreement, the Court can and should interpret the reporting provisions of the Settlement Agreement to require additional reporting sufficient to verify the creation of beds, including the steps taken by the City to create those beds, or in the alternative, modify the Settlement Agreement to require additional data and reporting.

## II.    FACTUAL BACKGROUND

The Plaintiffs filed this action on March 10, 2020 against the City and County of Los Angeles, alleging that the City and County had created nuisances in Skid Row related to homeless encampments on the streets. Complaint, Dkt. 1.Shortly after the complaint was filed, Los Angeles Community Action Network and Los Angeles Catholic Worker were allowed to intervene to represent themselves as organizations serving unhoused people in Skid Row, as well as their members, unhoused residents in Skid Row who were impacted by the City's homelessness policies and that could be subject to any enforcement actions that resulted from the resolution of the litigation. Order Granting Ex Parte Application to Intervene, Dkt. 29.

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

A.    **Settlement Agreement between LA Alliance and the City of Los Angeles**

On April 1, 2022, after two years of litigation, Plaintiffs and the City of Los Angeles informed this Court that they had reached a preliminary Settlement Agreement and asked this Court to stay the litigation as it pertained to the City. Notice of Preliminary Settlement Agreement and Stipulation to Stay Litigation as to Defendant City of Los Angeles Only, Dkt. 408.

In the Settlement Agreement, as relevant here, the City agreed to create housing or shelter solutions equal to or greater than "the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate PEH within the City based on LAHSA's 2022 Point in Time count." Exh. 25, ("Agreement"), Section 3.2. Under Section 5: Milestones and Deadlines, it stated that after calculating the required number of housing or shelter solutions, the City "will create plans and develop milestone and deadlines for: (i) the City's creation of shelter and housing solutions to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in each Council District as determined by the Required Number; (ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District; (iii) the City's creation of shelter and/or housing to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number; and (iv) the City's plan for encampment engagement, cleaning, and reduction in the city." *Id.* at Section 5.2. The Settlement Agreement went on to state that "the City will provide a report setting forth the milestone and deadlines" and the court would be tasked with deciding disputes about the milestones and deadlines *Id.* The settlement contemplated that the Court would retain jurisdiction to oversee and enforce the settlement for a period of five years. The parties requested the Court incorporate the Settlement Agreement into a Stipulated Order of Dismissal and dismiss the case as to the City of Los Angeles.

After submission of the Settlement Agreement to this Court on May 19, 2022, the Court invited any party and the public to submit comments or objections by May 31, 2022. Proceedings: Settlement Conference, Civil Minutes, Dkt. 423. Intervenors submitted

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

objections to the agreement. Intervenors' Objections to Plaintiffs' and Defendant Los Angeles's Stipulated Order of Dismissal, Dkt. 434. The County submitted a response too, and a non-party filed their opposition to the agreement as well. The County of Los Angeles' Response to Settlement Between Plaintiffs and City of Los Angeles, Dkt. 432; Opposition of Non-Party AIDS Healthcare Foundation to Proposed Partial Settlement of Case, Dkt. 428.

This Court held a hearing on June 9, 2022, where the Plaintiffs and the City offered argument in favor of the Settlement Agreement and both the Intervenors and the County were heard on their objections to the Agreement. Following the hearing, on June 14, 2022, the Court issued its Order Approving Stipulated Dismissal and Proposed Settlement, Dkt. 445, incorporating in full the Settlement Agreement executed by the Plaintiffs and the City. Through this order, the Court retained jurisdiction for a period of five years to enforce terms of the Settlement Agreement. *Id.* at 3.

The County of Los Angeles was not a party to the Settlement Agreement reached between the Plaintiffs and the City of Los Angeles. *Id.* In its June 14, 2022 order, the Court expressly stated that the action would proceed against the County. *Id.*

Though the County did reach a preliminary Settlement Agreement with the Plaintiffs on September 15, 2022, and both the Plaintiffs and the County submitted a Stipulation for Voluntary Dismissal with Prejudice Pursuant to FRCP 41(a)(2), Dkt. 485, requesting this Court to dismiss the action against the County, on October 17, 2022, as they had reached a Settlement Agreement, this Court did not approve of the contents of the agreement. On January 17, 2023, in the Civil Minutes for the Hearing Regarding County Settlement Agreement, Dkt. 518, this Court wrote that they were "concerned that the County Settlement Agreement lacks concrete milestones and accountability," and that as written, the agreement was a private settlement. Dkt. 518 at 8. A Settlement Agreement acceptable to this Court was ultimately reached by the County and Plaintiffs on September 29, 2023, with multiple addendums made to the agreement as it had initially been presented to the Court. Joint Submission of Second Addendum to Settlement Agreement

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

and Stipulation for Voluntary Dismissal with Prejudice Pursuant to FRCP 41(a)(2), Dkt. 646. The Court entered the order, approving the settlement and retaining jurisdiction to enforce this order as well.

### B.   Development of Plans and Milestones

In accordance with the Settlement Agreement, the City was required to calculate the Required Number within 30 days from the day that LAHSA confirmed the 2022 Point in Time Count. After the publication of the 2022 Point in Time Count, the City timely provided this Required Number to the Court and the Plaintiffs in October 2022. Defendant City of Los Angeles' Quarterly Status Update Pursuant to Settlement Agreement Between the LA Alliance for Human Rights and the City of Los Angeles, Dkt. 483; Opposition of Defendant City of Los Angeles to Motion for Order Re Settlement Compliance and Sanctions, Dkt. 669, p. 3.

Following the election of Mayor Bass and a new administration, the City and Plaintiffs agreed that the City would provided district-specific encampment milestones by October 1, 2023. Joint Stipulation to Resolve Motion for Order Re: Settlement Agreement Compliance and Sanctions, Dkt. 713, p. 2, ¶ 3. On October 3, 2023, the City sent the Plaintiffs a proposal for "Encampment Engagement, Cleaning, and Resolution" which did not contain district-by-district deadlines or milestones. *Id.* at p. 3, ¶ 4. When the Plaintiffs brought this to the attention of Special Master Martinez, she ordered the two parties to meet and confer. *Id.* at ¶ 6.

When the parties were still unable to resolve the matter through meeting and conferring, they requested that the Court resolve the issue, at which time the City expressed interest in number in Plaintiffs' "milestone number of 9,782." *Id.* The Court requested the City provide revised milestones by December 29, 2023; the City in turn proposed the revised milestone number of 12,000 encampment reductions on December 29, but it did not include milestones broken down district-by-district. *Id.* The parties then met again on January 4, 2024 in the company of Mayor Bass, as well Chief Administrative Officer Szabo and others; following this meeting the City proposed encampment

milestones of 9,800 over a 5-year term. *Id*. at ¶ 7. In turn, Plaintiffs proposed 12,000 encampment reductions over a 5-year term, or 9,800 encampment reductions over a 4-year term, in addition to addressing targeted encampments (Skid Row and Highland Park) and pay sanctions. *Id.* On January 10, 2024, the City agreed to 9,800 encampment reductions, with district-by-district milestones, over a 4-year term, but did not agree to targeting specific encampments or monetary sanctions. *Id.* The City then presented the 9,800 encampment reduction plan and milestones to the City Council on January 31, 2024, "which approved them without delay." *Id*. at ¶ 8.

### C.    Sanctions Motions

On February 2, 2025, the Plaintiffs filed under Seal a motion for sanctions against the City of Los Angeles, arguing that the City had been in willful violation of the Settlement Agreement for 14 months. Plaintiffs' Application for Leave to File Under Seal Motion for Order Re Settlement Agreement Compliance and Sanctions, Dkt. 663; Local Rule 77-5.2.2. After the intervenors objected to the filing under seal, the Plaintiffs re-filed their brief and exhibits, making the motion and exhibits available to the public and the intervenors for the first time after the close of business on February 7, 2024. Intervenors' Opposition and Objection to Plaintiffs Motion for Sanctions, Dkt. 670, p. 10, n.3. This was the first time the Plaintiffs or the City publicly disclosed the existence of the Encampment Reduction Plan, which had already been approved by the City Council.

Following the filings, the Court held several hearings; with the City and the Plaintiffs stipulating on April 4, 2024 in their Joint Stipulation to Resolve Motion for Order Re: Settlement Agreement Compliance and Sanctions, Dkt. 713. Under the Joint Stipulation, the City agreed to pay for a Court-order audit; the City and Plaintiffs agreed to meet at least once a month to discuss any issues concerning settlement progress; the City agreed to pay Plaintiffs' fees and costs; and the City and the Plaintiffs requested the Court hold the hearing on the motion in abeyance until they could report back the to the Court the City Council's action on the matter.

Over the following year, the Plaintiffs returned to the Court to seek further

intervention as to the Encampment Resolution Plan. On September 4, 2024, Plaintiffs filed a Motion for Order Re Settlement Agreement Compliance, wherein they asked the Court to order the City to report the locations and dates of each encampment resolution. Dkt. 767, p. 4. On February 20, 2025, Plaintiffs filed a Second Motion for Order Re Settlement Agreement Compliance, wherein they alleged the City breached the Settlement Agreement multiple times through the lack of provision of a bed plan for the 12, 915 beds, failing to meet bed production milestones, and failing to meet encampment reduction numbers. Dkt. 863. The Plaintiffs contended that the City was using Care and Care+ cleanups to impermissibly meet the encampment reduction milestones. Dkt. 863, p. 13-14.

On March 24, 2025, the Court held that per the terms of the Settlement Agreement, the City may not report cleanups from programs such as Care and Care+ as reductions for compliance purposes, because they are not permanent in nature. Order Re Plaintiff's Motion Re Settlement Agreement Compliance [767], Civil Minutes, Dkt. 874, p. 2. The Court went on to order that the City was to only report Encampment Reductions that "have a more permanent meaning such that unhoused individuals are moved off the street and given shelter or housing." *Id.*

The City did not seek reconsideration of the order or modification of the Settlement Agreement based on the Court's interpretation. The City did, however, later that week, during the hearing held March 27, 2025, verbally object to the Court's ruling. Hearing Re: Motion for Order Re Settlement Agreement Compliance, Dkt. 878, 109:09-110:07. Going forward, the City failed to amend milestones submitted in April 2025, did not change its reporting for the most recent quarter, and did not acknowledge the Court's March 2025 ruling.

**D.     Evidentiary Hearing**

The Court set an evidentiary hearing on compliance with the Settlement Agreement and the Roadmap MOU Agreement for May 27, 2025. Proceedings: Status Conference, Civil Minutes, Dkt. 908, p. 2. On the first day of the evidentiary hearing, the Court ruled

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

orally that Intervenors were to participate in the proceeding fully. Evidentiary Hearing Re Compliance with the LA Alliance Settlement Agreement and the Roadmap MOU Agreement, Dkt. 947, 06:19-22. The evidentiary hearing proceeded for seven days, during which time the City and the Plaintiffs called witnesses to offer testimony pertaining to compliance and settlement breach.

## III.    ARGUMENT

### A.    The Court's June 2022 Order, not the Settlement, Forms the Basis of Plaintiffs' Motion for Sanctions

When this Court granted the parties request to approve the settlement and enter a stipulated order of dismissal, incorporating the terms of the Settlement Agreement into an order and retaining jurisdiction to oversee and enforce the provisions of the order, this transformed the Settlement Agreement from simply a private agreement between two parties into an order enforceable by this Court. By approving the agreement (over objections by other parties) and incorporating the terms of the settlement into an order of the Court, the parties consented to (and in fact asked for) this Court to remain involved to oversee the agreement, resolve disputes, and enforce its terms.  Along with continuing jurisdiction, this placed the agreement and its terms squarely within the Court's inherent authority to enforce its own orders.  It also took away the parties' ability to modify the agreement on their own, without court oversight and approval.

The City states, yet again and without argument or support, that the order is not a consent decree.  *See* Post Evidentiary Hearing Brief of Def. City of LA, Dkt. 983, p. 7; *see also* Def. City of LA's Reply to Objection to Settlement Agreement, Dkt. 438. Regardless of the name given to it by the parties, the order entered by the Court had all of the hallmarks of a consent decree. "A consent decree is 'essentially a Settlement Agreement subject to judicial policing,'' *United States v. State of Or.*, 913 F.3d 576, 580 (9th Cir. 1990) quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983). The parties requested, and this Court agreed to incorporate the settlement into the "order of dismissal," Dkt. 421-1 at 2, and in doing so, "retain[ed] exclusive jurisdiction" for five

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

years to enforce it. *See e.g., Oregon*, 913 F.3d at 580 (noting that "[c]onsent decrees are often designed to be carried out over a number of years"). The agreement also gives the Court significant oversight of the City's compliance with the order. *See e.g.*, Agreement at 4 (providing that the Court will maintain continuing jurisdiction to "oversee and enforce" the agreement, including to appoint "at its sole discretion" a Special Mater responsible for "overseeing and Enforcing this Agreement); 11 and 12 (creating a mechanism for the Court to approve the City's implementation of "public space regulations and ordinances" in a given City Council District or City-wide); 18 (giving the Court oversight over whether the consent decree conflicts with orders issued by other courts); 23 (giving the Court oversight to decide disputes between the parties). These are hallmarks of a consent decree, judicial approval and ongoing judicial oversight, are present in the agreement. *See Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 604 n. 7 (2001) ("Private settlements do not entail the judicial approval and oversight involved in consent decrees").

The Court also did not simply approve the settlement without consideration, but instead, held a hearing, listened to objections (including objections by Intervenors), and found that the agreement was "fair, reasonable, and adequate." Only then, did the Court approve the Settlement Agreement and incorporate it by reference into an order that allowed the Court to retain jurisdiction over the settlement for five years, to "oversee" and "enforce" the order. Order Approving Stipulated Dismissal and Proposed Settlement, Dkt. 445 at 3. Far from "rubber stamping the order," *U.S. v. Montrose Chem. Corp. of Ca.*, 50 F.3d 741, 747 (9th Cir. 1995), the Court continued to exercise its judicial authority in deciding to enter the order and grant the parties' request to enforce it. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986). Taken together, the contents of the agreement along with the judicial imprimatur of approval and enforcement leave the Order Approving the Stipulated Dismissal at issue in this case indistinguishable from a consent decree. *Oregon*, 913 F.3d at 580; *Buckhannon* 532 U.S. at 604 n. 7.

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

But whether the parties call the Court's order a "Stipulated Order of Dismissal" or a consent decree is largely beside the point. *See generally Kelly v. Wengler*, 979 F. Supp. 2d 1237 (D. Idaho 2013) (discussing the possibility of a Settlement Agreement being, for practical purposes, a consent decree but ultimately declining to decide the issue because it was not necessary for resolution of the case), aff'd, 822 F.3d 1085 (9th Cir. 2016). In either case, for purposes of interpretation and enforcement, the Order is treated as a contract and interpreted under California law. *U.S. v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005) ("Without question courts treat consent decrees as contracts for enforcement purposes); *Jeff D. v. Andrus,* 899 F.2d 753, 759 (9th Cir.1989). ("The construction and enforcement of Settlement Agreements are governed by principles of local law which apply to interpretation of contracts generally."). But just as importantly, it is also treated as an order for purposes of the Court's inherent authority to oversee that interpretation and enforcement, as well as the Court's ability to modify the agreement. *See* Fed. R. Civ. Pro. 60(b); s*ee also Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016). The Court's authority to modify an order exists when circumstances have changed, including when the changes in circumstances occurred as the result of substantial violations of the order itself. *Labor/Community Strategy Center v. Los Angeles Cnty. Metropolitan Transp. Authority*, 564 F.3d 1115, 1120–21 (9th Cir. 2009).

**B.     Evidence Overwhelmingly Supports this Court's Interpretation of the Encampment Reduction Plan**

Section 5.2 of the Settlement Agreement required the City to create plans and milestones related to "encampment outreach, cleaning, and reduction." Agreement, Section 5.2. According to the undisputed evidence of both witnesses for the City and the Plaintiffs, the Plaintiffs and the City reached an agreement in January 2024 that the City would use its best efforts to reduce encampments by 9,800, and that a single tent, makeshift shelter, or vehicle would constitute an "encampment" for purposes of reaching the goal. The parties did not, however, reduce the "encampment resolution plan" to a signed writing, by the parties, nor did the parties either seek approval of the Encampment

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

Resolution Plan from the Court or move to amend the Court's June 2022 order to include the Encampment Reduction Plan as an enforceable provision in the order. In fact, the plan was not made public at all.

The plan became public only after the Plaintiffs moved for sanctions in February 2024 and disclosed publicly, for the first time, the existence of the Encampment Resolution Plan and the parties' meet and confer efforts related to the approval of the plan. In response, Intervenors objected that the plan had not been approved by the Court and therefore, could not be the basis for sanctions. Intervenors also strongly objected to the attempt by the Plaintiffs to target specific encampments for "resolution," and the focus on counting unhoused people's belongings, rather than individuals, for purposes of the plan. Intervenors did not, however, weigh in on what constituted a "resolution" or "reduction" for purposes of the plan.

Over the next six months, as the Plaintiffs sought further court intervention related to the Encampment Resolution Plan, it became clear that the City and Plaintiffs had different definitions of what would count as a "reduction" for purposes of the Encampment Resolution Plan. The Plaintiffs argued that a reduction occurred only when an individual in an encampment was given shelter, Plaintiffs' Second Motion for Order Re Settlement Agreement Compliance Dkt. 863, p. 13-14; the City counted any tents, makeshift encampments, or vehicles removed from the public right of way, irrespective of whether the owner of the vehicle, tent, or shelter remained unhoused (or even if the tent, vehicle, or shelter had been abandoned and therefore, had no owner at all).

Consistent with this Court's express authority under Section 5.2 of the Settlement Agreement to resolve disagreements between the parties about plans and milestones, this Court ruled in March 2025 that "the City is only to report Encampment Reductions that have a more permanent meaning such that unhoused individuals are moved off of the street and given shelter or housing." Order Re Plaintiff's Motion Re Settlement Agreement Compliance ("Encampment Resolution Order"), Dkt. 874 at p. 2. Rather than seeking reconsideration of the order or a modification of the Settlement Agreement based on the

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

Court's interpretation, the City simply verbally objected to the Court's ruling at the next hearing and then promptly ignored the ruling. Not only did did the City fail to amend the previously-submitted milestones when it submitted its next quarterly report in April 2025, it did not change its reporting for the most recent quarter, or even acknowledge the Court's March 2025 ruling.

Now, after the Plaintiffs have sought sanctions against the City for its violation of the Court's order, the City concedes that it has continued to count the removal of any tents or makeshift shelters during the City's encampment cleanups, without any regard for why the tent or makeshift shelter was removed and with total disregard for whether the owner of the encampment remains on the street. Likewise, the City has been counting vehicles impounded during "RV operations," without regard for the owner of the RV. In response to the sanctions motion, the City belatedly argues that the Court's Encampment Resolution Order was incorrect and the Court should reconsider its ruling and adopt the City's interpretation of Encampment Reduction Plan. Dkt. 983, p. 28-29.

The City finds no support in either the plain language of the agreement or the evidence presented during the Evidentiary Hearing.

      **1.**      **The Plain Language of the Settlement Agreement Supports this Court's Encampment Resolution Order**

The City argues that, as a stand-in for reducing or resolving encampments, that the City can simply remove tents, makeshift shelters, and vehicles from the public right of way. That is inconsistent with the plain language of the agreement, which speaks to "reduction," not "removal." To support its position, the City argues that "'reduce' homelessness by providing housing to a person, even if a different unsheltered person enters Los Angeles from another jurisdiction." Dkt. 983 at 39. On the contrary— homelessness is not 'reduced' simply by housing some people, while even more people fall into homelessness. By that account, the City has reduced homelessness every year, as they have moved thousands of people inside, even though the official point int time count continues to rise.

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

This example demonstrates precisely why the City's position with regards to the removal of tents, makeshift shelters, and vehicles is inconsistent with the plan language of the agreement. Remove is not the same as reduce, and in fact, the Settlement Agreement does not contain the word remove.

### 2. The Evidence Presented by Both Parties Supports this Court's Encampment Resolution Order

Even if the plain language of the Settlement Agreement does not, on its own, resolve the dispute between "remove" and "reduce," the extrinsic evidence put forth by the parties overwhelmingly supports this Court's Encampment Resolution Order.

Throughout the settlement compliance period, the parties and this Court have used the term "encampment resolution" and "encampment reduction" interchangeably. The Settlement Agreement itself refers to "encampment engagement, cleaning, and reduction." Agreement, Section 5.2(ii), (iv). On the other hand, the City's quarterly reporting of compliance with the plan put forth pursuant to Section 5.2 refers to "encampment resolution data." *See e.g.*, Exh. 302, p. 10. Likewise, Special Master Martinez testified that she has used the term "reduction" and "resolution" interchangeably, and that it was her experience, observing city council meetings that the City used the terms interchangeably as well. Dkt. 137:23-138:3; 138:13-139:3. And in fact, no one from the City had corrected her for using resolution instead of reduction to date. *Id.*

Whether referring to encampment reductions or resolutions, the City has repeatedly and consistently defined the terms consistent with the generally understood definition of an encampment resolution, and this is true throughout the parties' negotiations related to the adoption of the plan. Based on the evidence presented at the evidentiary hearing and in prior filings with the Court, the City presented Plaintiffs with a proposed plan for encampment engagement, cleaning, and reduction, appropriately entitled "Encampment Engagement, Cleaning, and Resolution Plans and Milestones." Exh. 65, p. 64-71. The eight page document includes the City's process for "encampment resolutions," which requires the City "ensure there are beds available to match with encampment residents"

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

"in order to resolve an encampment.  Exh. 65, p. 69.  The same document also describes the "general goals of encampment, engagement, cleaning, and reduction" to include, among others as "eliminat[ing] street encampments, including RV encampments." *Id.*, p. 70-71.

According to the evidence in the record, the parties accepted the City's proposal as to the plan for cleaning and engagement, but Plaintiffs rejected it as to the plan and milestones for encampment reductions. *See* Dkt. 955, 219:16-20.  However, the evidence also shows that the Plaintiffs' rejection of the "encampment resolution plan" stemmed not from the process of reducing encampments, but rather, the way the number encampments were counted for purposes of the City's milestones.  While the City's initial proposal focused on counting encampment resolution operations, see e.g. Exh. 65, Exh. F, p. 69, the parties subsequently agreed to count the numbers of individual homes impacted by the resolution operation—and using "tents, makeshift shelters, and vehicles" as a stand-in for the people brought inside during the encampment resolutions, an approach consistent with LAHSA's use of the "tents makeshift shelters and vehicles" in the Point in Time Count. Dkt. 969, 45:6-11.  The City points to no evidence in the record that the parties' discussion about how to count the number of encampments reduced by the City's encampment resolutions addressed, let alone completely upended the understanding of what constituted "reduction" for purposes of the agreement.  In fact, in the letter Mr. Szabo identified as part of the "encampment reduction plan" approved by the City Council, *see* Dkt. 955, 219:1-8, Scott Marcus, counsel for the City, specifically ties encampment reductions to bringing people inside: "[t]he actual work done by the City to reduce encampments citywide has been more successful than any period of time prior to the 2022 Settlement Agreement being executed.  Thousands of our unsheltered neighbors left the streets and came inside." Exh. 65, Exh. I, p. 82.  The letter goes on to state that "because of the City's past year of success doing the actual work to reduce encampments and bring people inside. Indeed, last year the City reduced encampments in greater numbers than ever before." *Id.* p. 82-83.  Nowhere in the letter, which the City identified as the Encampment Resolution

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

Plan itself, does the City disavow its prior description of encampment reductions as "bringing people inside."

In fact, throughout the evidentiary hearing, the City's own witnesses define encampment resolutions consistent with the definition of "encampment reduction" adopted by this Court. Dr. Agonafer, the City's witness and Deputy Mayor of Homelessness and Community Health, described an encampment resolution "as a person-centered, community-centered voluntary program where you meet each individual in their community where they are and voluntarily bring them indoors." Dkt. 953, 302:2-5. She also described an encampment as being resolved when "the team went out with all of the departments, with LAHSA, with County, and voluntarily brought everyone indoors." *Id.* *2*82:7-1. Likewise, Mr. Szabo, who negotiated the settlement on behalf of the City, defined the term "encampment resolution" as a generally understood term to mean "the removal of the…living of people on the streets." In other words, "they're referring to the encampment that was there today, isn't there tomorrow." Dkt. 955, 235:24-236:1.

The process of encampment resolutions, described by the City in negotiations with the LA Alliance is consistent with encampment resolution programs like Inside Safe, and consistent with how the term is generally understood in the context of homeless services delivery. *See Wolf v. Sup. Court,* 114 Cal.App.4th 1343, 1358 (Cal.App. 2 Dist., 2004) (terms in a contract are interpreted according to their common usage, but can be interpreted as understood within a specific context of trade usage where applicable). This is a far cry from the City's position now, that an encampment reduction or resolution is simply the removal of a tent, makeshift shelter, or vehicle, without any consideration of the owner of those items and whether they move inside or remain on the streets, or even whether the tent was discarded by the owner as trash, sent to storage and retrieved by its owner, or immediately replaced by a community group in Skid Row. *See* Dkt. 955, 146:9-147:24. The evidence shows that the City and the debated and discussed the number of encampments that should be reduced under the City's plan, as well as how to count encampments for that purpose. But there is no evidence in the record that the parties

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

disavowed that discussion and reached an agreement that would allow the City to count the removal, without more, of a tent, makeshift shelter, or RV, as a reduction of an encampment.

### 3. Lawfully Seizing Unhoused People's Belongings Relies on the Actions of Third Parties

The only argument advanced by the City to support its interpretation of "encampment reduction" is its post-hoc justification that the City would not agree to a binding settlement obligation that relies on other people's actions to meet that goal, Dkt. 983 at 30. The only evidence it puts forward to support this argument is testimony from the City's CAO that he "wouldn't ever agree that the City would be obligated to somehow force people to accept a provision of service if they did not want to accept it." Dkt. 959 at 24:14-16.

First, the party's subjective intent is irrelevant to the interpretation of contract terms, where, as here, that intent is unexpressed. *United Commercial Ins. Service, Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992). Instead, the relevant intent is the objective intent of the parties, "manifested in the agreement and by surrounding conduct" *Id.* There is no evidence in the record that the City expressed its intent to adopt only provisions in the Settlement Agreement that it could control. On the contrary, the creation of 12,915 housing and shelter solutions requires the support and cooperation of countless agencies and entities that are outside the City's direct control (including LAHSA, private developers who are actually building the housing, the voters who will elect the city council and mayor who must approve and fund these projects, etc). As Mr. Szabo testified, most of the projects "created" by the City were paid for at least in part with outside funding, and the success of projects partially funded by the City rely on the procurement of that additional funding. To suggest, as the City now argues, that it " 'would never have agreed' to terms that depend on factors outside the City's control" belies Mr. Szabo's own testimony that compliance with the Settlement Agreement relies on funding and support from countless agencies and entities, wholly outside the City's control (to say nothing of

- 19 -

the City leaders elected after the settlement was approved and who may have or even run on different views about the City's plan to meet the Plaintiffs' goals).

Likewise, the definition advanced by the City for "reductions" of encampments also relies on the actions of third parties, namely, the unhoused owners of the property at issue. Even though the City may suggest it is wholly within its control to seize 9,800 tents, makeshift encampments, and vehicles, this flies in the face of decades of court rulings against the City of Los Angeles related to unhoused people's belongings, which recognize that the City may take unhoused people's belongings only in limited circumstances and consistent with property rights afforded unhoused people under the U.S. and State constitutions. *See Lavan v. City of Los Angeles,* 693 F.3d 1022, 1025-26 (9th Cir. 2012). The suggestion that moving people inside implicates unhoused people's rights, but removing unhoused people's belongings does not implicate their rights, and the City's failure to recognize those rights, illustrates the City's significant misunderstanding of the property interests at stake when the City takes unhoused people's belongings, including their vehicles.

Under the City's municipal code, state law, to say nothing of the U.S. and state constitutions, the City is prohibited from seizing unhoused people's tents, makeshift shelters, and vehicles, except in limited circumstances—which are largely outside of the City's control. *See e.g.,* Los Angeles Municipal Code Section 56.11; Ca. Veh. Code § 22650; U.S. Const. Amend. IV, XIV; Cal. Const. Art. I, § 7, 13. And unhoused residents are entitled to have tents and makeshift shelters in the public right of way, provided they abide by certain time, place, and manner restrictions. LAMC Section 56.11; 41.18. So the City's authority to seize tents is limited to instances in which an unhoused person stores their belongings in violation of the municipal codes or otherwise abandons or discards them—all conduct within unhoused individual's control.

Likewise, state law places significant limitations on when and under what circumstances the City can impound vehicles. *See* Ca. Veh. Code § 22650. Those instances are limited to when, for example, a vehicle is unregistered, left standing on a

- 20 -

highway in a way that obstructs traffic, or in the case of an RV operation, is left on the street in violation of a "no parking sign." *See e.g.,* Ca. Veh. Code § 22651(o), (b) (l). Again, even accepting the City's definition of "encampment reductions," the City's ability to seize vehicles, and therefore, meet its obligations under the Settlement Agreement would rest with unhoused people and their actions, despite Mr. Szabo's testimony that he would never have adopted such a provision.

The City's advocacy of a plan that counts the removal of unhoused people's belongings by LA Sanitation and LADOT is effectively asking this Court to use its federal authority to enforce a quota for sanitation workers and parking enforcement officers to seize unhoused people's belongings. The City's refusal to acknowledge the property interests at stake is precisely why quotas like the ones advocated by the City here have long been recognized as inherently problematic.  In fact, the California Vehicle Code expressly prohibits the use of quotas tied to enforcement of the Vehicle Code.  See Ca. Veh. Code § 41600 *et seq.*  While enforcing the vehicle code through towing is not expressly prohibited, the rationale against enforcement quotas applies with equal (if not greater) force when the law is enforced through impounding people's vehicles or belongings, rather than issuing parking citations.  This is particularly true where, as here, the City of Los Angeles has been found, repeatedly, to have violated unhoused people's rights when seizing their belongings and their vehicles.  See e.g., *Lavan*, 693 F.3d at 1025-26; *Garcia v. City of Los Angeles*, 11 F.4th 1113, 1119 (9th Cir. 2021); *Mitchell v. City of Los Angeles*, Case No.: CV 16-01750 SJO (GJSx), 2016 WL 11519288 (C.D. Cal., 4/13/2016) (preliminary injunction preventing the City from seizing and destroying unhoused people's belongings, including tents); *Fitzpatrick v. City of Los Angeles*, CV 21-6841JGB (SPx), 2024 WL 3464174 at * (C.D. Cal. June 13, 2024) (finding the City of Los Angeles violated plaintiff's rights under the Fourth Amendment when it towed her vehicle without a warrant).

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

**4.      Agreement by the Parties to an Encampment Resolution Plan Did Not Create a Binding Obligation for the City**

The City's argument that the Court's Encampment Resolution Order is incorrect because the City would not have agreed to be bound to a requirement to bring people inside fails for yet another reason: it assumes that the agreed-upon number of Encampment Reductions is now a binding provision in the Settlement Agreement.  It is not.  Under the plain language of the agreement, the City was required only to come up with a plan for encampment reductions and then, to employ its "best efforts" to comply with that plan. Agreement, Section 5.2.  This is compared to the obligation to create housing units, which the City did explicitly agree to do.  The binding obligation to create beds comes not from the milestones and plans in Section 5.2, but rather, an entirely separate section of the agreement.  Section 3.1 of the Settlement Agreement explicitly provides that "[t]he City agrees to create a Required Number of housing or shelter solutions, which is equal to, but (in the City's discretion) may be greater than, the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate PEH within the City based on LAHSA's 2022 Point in Time count."  There is no similar provision regarding encampment reductions. *See U.S. v. Armour & Co.,* 402 U.S. 673, 679 (1971) (noting that if the parties had intended to include a specific term in the consent decree, they would have included it in the agreement and refusing to add a term not included in the plain language of the agreement).  In fact, the only time "encampment reduction" appears in the settlement agreement is in Section 5.2, when the City agreed that it would "create plans and develop milestones and deadlines" for the reduction of encampments. After it has done so, the City agreed to "promptly employ its best efforts to comply with established plans, milestones, and deadlines."  Agreement, Section 5.2.  The City's argument that "best efforts" language in Section 5.2 does not create a binding obligation is equally availing with regards to the plan for encampment resolutions as it is to meeting the milestones along the way to reaching the actually enforceable obligation to "create the Required Number of housing or shelter solutions" under Section 3.1 of the agreement.

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

To the extent the parties intended the 9,800 number to be a "binding agreement" between the parties, nothing prevents the parties from treating it as such, but the record is clear that neither side took the necessary steps to make it binding. The agreed-upon 9,800 number was never reduced to a signed writing by both parties, as required by Section 18 of the Settlement Agreement. Dkt. 969, 49:3-5. In fact, there is considerable disagreement between the parties about which documents even make up the agreed-upon Encampment Reduction Plan. *Compare, e.g.,* Dkt. 969, 47:10-18 (Paul Webster identifying only chart containing the encampment milestones as the Encampment Resolution Plan); Dkt. 955, 219:1-8 (Matt Szabo, identifying the chart and a letter from Scott Marcus as the plan approved by the City Council).

Nor was the agreement submitted to the Court for approval, even though doing so would be necessary to modify the Court's order and to satisfy the due process requirements afforded parties like the Intervenors, who are impacted by the agreement but not parties to the agreement. Notably, the parties anticipated that submitting the plans and milestones would be necessary to make the provision binding. *See* Agreement, FN1 (acknowledging that the parties may need to submit for approval by the Court a new agreement that includes the specific required number and milestones and deadlines). So while the City is correct that it cannot force unhoused residents to accept shelter, that is beside the point, since the Settlement Agreement does not create a binding obligation to reduce encampments, let alone to reduce encampments by the agreed upon 9,800.

Instead, when properly understood as a requirement to use "best efforts" to fulfill the encampment reduction milestones, rather than a binding obligation, any remaining argument the City has about "forcing people to accept shelter" simply evaporates. The City's own witnesses testified that encampment resolution programs like Inside Safe are the City's best efforts to bring people inside, thereby reducing encampments as required by Section 5.2 of the Settlement Agreement. As Dr. Agonafer testified, when the City does its best work to build trust and relationships with unhoused residents, most people do in fact, come inside. Dkt. 953, 343:11-12, 14-20; 210:21-211:5.

- 23 -

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

**C.     The City Has Not Substantiated its Bed Counts, Despite Ample Opportunity to Do So**

Throughout this litigation, the City's accounting of beds provided under the Roadmap Agreement and the Settlement Agreement has been called into question. From the County's initial audit of the City's compliance with the Roadmap Agreement, which found discrepancies between the City's reporting and the beds it could verify, *see* Joint Status Report of Defendant City of Los Angeles and County of Los Angeles re Memorandum of Understanding, Dkt. 373, Exh. C; to the current assessment by A&M, which found that beds could not be validated, Exh. 23 ("One of the primary obstacles was the inability to verify the number of beds the City reported under the Roadmap and Alliance Programs"); to the Special Master's annual report, which noted that she too could not verify the existence of beds reported by the City, Exh. 93. The City's response to each of these findings has been disagreement with the conclusions, the approach, or both, but not verification of the bed counts themselves. Most recently, in keeping with this approach, the City's response to A&M's assessment and its key finding that it could not verify the beds has been to dismiss the findings and undermine the approach, casting aspersions on the standards and practices A&M employed, even though the City agreed to those standards and practices when it acquiesced *and paid for* the assessment. The City casts doubts on A&M's ability to interpret the data it was given, but failed to explain the data or supplement it when A&M raised questions about the City's bed counts. ; Dkt. 969, 173:16-21.

The City offers no explanation for its failure to address this issue before A&M finalized its assessment. The City was put on notice, more than six weeks before the assessment was finalized, during the initial hearing related to the Assessment, that A&M did not have sufficient data to verify the creation of all beds required under the Roadmap Agreement and the beds the City reported as progress towards compliance with the Settlement Agreement. *See* March 27, 2025 Transcript, Dkt. 878. The Court provided the parties an opportunity to meet with A&M before the assessment was finalized. *See* Order

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

Setting Hearing on May 15, 2025, Dkt. 880 ("By scheduling the hearing for May, the Court is providing an opportunity for anyone with methodological concerns or other input to raise their issues directly with A&M before the hearing"); Dkt. 969, 173:16-21. Yet despite A&M's explicit openness to meet and receive additional data from the City, the City failed to address A&M's concerns about the single obligation the City concedes it has under the settlement: the sufficiency of the data related to the City's progress in meeting its obligation to create 12,915 beds.  Dkt. 969, p. 177:18-178:14.  During the evidentiary hearing, Mr. Szabo repeatedly defended the City's quarterly reports by saying that the CAO's office verified its quarterly reports. Dkt. 955, p. 264:25-265:4. Yet when put on notice that A&M did not have sufficient data to do so, the CAO's office failed to provide the data or evidence it used to "verify" its reports.  Dkt. 969, p. 177:18-178:14; Dkt. 253, p. 64:24-65:9.

As the City's lawyers repeatedly pointed out through the questioning of the A&M team, a key component of auditing standards is the provision of data to allow for the replication of results; see e.g., Dkt. 949, p. 90:7-91;1, yet it is the City that has failed on that point, time and time again—no third party tasked with overseeing the City's compliance with the Settlement Agreement has been able to replicate the verifications the City has purportedly done of its quarterly reports.

The lack of sufficient data to recreate the City's reporting is exacerbated by the fact that the City has not been transparent about what role the City must play in "creating" new housing and shelter solutions for them to count towards the City's obligation under the Settlement Agreement. While the City has maintained, with ample support in the plain language of the Settlement Agreement, that it maintains complete discretion to choose the type of "housing and shelter solutions" it will "create," the City does not retain discretion when it comes to actually "creating" new housing and shelter opportunities.  In fact, in response to objections about the vagueness of the term "create," the City itself has long argued that the agreement binds the City to "bring into existence" "new" housing and shelter solutions. *See* Defendant City of Los Angeles' Reply to Objections to Its

- 25 -

Settlement Agreement with Plaintiffs, Dkt. 438, p. 9.

The evidentiary hearing has illuminated the fact that what it means to "bring new housing and shelter units into existence" is up for debate with the City. For example, the City has begun master-leasing existing apartments, hotels, and motels—beds the City surely did not "bring into existence." *See* March 30, 2025 Transcript, Dkt. 955, 103:16-104:02. The City has not identified or even considered whether those units were already covenanted "affordable" or existed as affordably units prior to the City leasing the units or turning them into affordable housing. *Id.* at 108:21-115:04. If the beds were already covenanted affordable, this would certainly call into question whether the City "brought into existence" new housing solutions, simply by leasing beds that may already have existed as affordable units. Likewise, the City has now conceded that it double-counted some TLS slots under the Roadmap Agreement that were used to pay for apartments created for the LA Alliance settlement through master leasing. Declaration of Matthew W. Szabo in Response to June 5, 2025 Amended Order Requiring City Verification of TLS Reporting, Dkt. 980, ¶ 4. While this double-counting may not have pushed the City below the required units under the Roadmap Agreement, it both violates the City's obligation to accurately report compliance with the agreement and yet again calls into question the sufficiency of the City's verification process.

**D.     The Court Should Order Additional Verification of the City's Creation of Housing and Shelter Solutions**

In light of the City's ongoing challenges providing verification of the beds it has reported for purposes of compliance with the Roadmap Agreement and the Settlement Agreement, which was brought to light only after a costly and time-consuming seven day evidentiary hearing, this Court can and should require additional reporting and verification of the City's progress towards meeting its obligations under the Settlement Agreement. Doing so is consistent with the language of the Settlement Agreement. Even if it were not, the City's record of misreporting gives this Court the inherent authority to modify the terms of its order to ensure compliance with the agreement.

First, the Settlement Agreement itself allows the Court to require additional reporting and verification by the City. Section 7 of the Settlement Agreement provides that "the City will provide quarterly status updates to the Court regarding its progress with this Agreement." Agreement, Section 7.1. The agreement goes on to list items that must be included, but that list is not exclusive. Because the reporting is aimed at the Court and is not an exhaustive list, the Court could and should require the City to include documentation sufficient to verify the existence of the beds created under the agreement, the City's contribution to the bed that gave rise to the City's representation that it "created" the bed, and to resolve any disputes that further documentation and information may uncover.

To the extent the City has argued that expanding the City's reporting obligations is inconsistent with the terms of the agreement (which it is not), the Court also has the authority to modify that agreement to ensure compliance. *See Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016). Given the City's failure to substantiate the bed counts in both the Roadmap Agreement and the Settlement Agreement, an order requiring further documentation is a minor modification of the Court's order that is "suitably tailored to the change in circumstances" stemming from the City's failures in reporting. *Id.*

Ordering additional data and verification of the City's bed count will help ensure compliance with milestones en route to the City's fulfillment of the Settlement Agreement by June 2027. Without verification of the beds that the City is now counting towards the agreement, there will be no way to ensure that, on June 30, 2027, the City is in compliance with the agreement, or to identify and resolve issues with the City's interpretation of the agreement (like interpreting encampment reductions to include the removal of tents, rather than moving people inside).

In the course of the evidentiary hearing, the City has attempted to present evidence that will assuage this Court's concerns that it will meet its obligations under the agreement, but that evidence amounts to little more than an assurance from the City, through its CAO, that it will do so. *See* Dkt. 983 at 21 (arguing that the City will meet its obligations because

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

the City's CAO, Matt Szabo, "is confident the City will be able to close the 1,900 bed gap by the end of the Settlement Agreement"). Dkt. 983 at 21. The City can no more predict the future than the LA Alliance, which the City criticized throughout the hearing for predicting the City would not meeting its obligations. Regardless of how certain Mr. Szabo is that City leadership is committed to meeting its obligations, he is also well aware that the commitment to meeting the obligations of the settlement rests with City leadership, that every project requires the cooperation of the City Council. Dkt. 959, p. 117:7-14. Regardless of whether the current city council is in support of fulfilling its obligations under the settlement (a fact that was certainly at issue in this hearing), there is a municipal election between now and then. *Id.* 129:2-10. And the success or failure of housing projects rests on the elected officials. *Id.* 117:7-14. For example, after a contested race in Council District 11, one project the City was counting on to provide 69 units of housing towards its settlement obligations, had to be removed from the City's "in process" list because it was effectively killed by the City, after years in development. *Id.* 124:12-19. The new council member, Traci Park, had opposed the project during her campaign for city council, and the project died after she was elected. *Id.* 124:20-127:7.

The majority of the City Council is up for election in 2026, along with the mayor. *Id.* 130:11-14. Because of term limits, the makeup of the City Council will undoubtedly change. *Id.* Mr. Szabo testified he did not even know if he would be CAO tomorrow, let alone through June 2027. *Id.* 133:2.

The City's compliance with its obligation to create 12,915 housing and shelter opportunities requires incremental progress towards that goal, even if the City and the Alliance disagree about whether that progress is subject to incremental enforcement. The Court can and should order more robust incremental monitoring and verification of that progress, to ensure that the expiration of the Court's jurisdiction in June 2027 does not leave the Court and the parties without recourse to address disputes existence or eligibility of housing and shelter beds "created" by the City.

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH

## IV.    CONCLUSION

While the parties continue to disagree about the breadth of the City's obligations under the agreement, the undisputed reality is that the City committed to bringing more than 10,000 new shelter and housing units online by June 2027. In a City with tens of thousands of unhoused residents desparate to move inside, the contribution of those beds is significant. This Court can and should ensure that every single one of the beds the City is obligated to create is actually created, and it can and should take the steps necessary to ensure that is accomplished. For the foregoing reasons, Intervenors request the Court affirm its March 24, 2025 ruling regarding encampment resolutions and join Plaintiffs' request for the Court to order the City to provide documentation sufficient to verify the existence of the beds created as part of the Settlement Agreement, and the steps taken by the City that justify the its representation that it created the housing and shelter opportunities.

Dated: June 17, 2025

Respectfully submitted,
Legal Aid Foundation of Los Angeles

/s/ Shayla Myers
Attorney for Intervenors

INTERVENORS' BRIEF RE EVIDENTIARY HEARING ON SETTLEMENT BREACH