**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| LA Alliance for Human Rights, et al.<br>　　Plaintiffs,<br><br>　　　　v.<br><br>City of Los Angeles, et al.<br>　　Defendants. | **Case No.  2:20-cv-02291-DOC-KES**<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTIONS FOR SETTLEMENT COMPLIANCE [767, 863]** |

## I.    INTRODUCTION

This case stands at the intersection of law and life—where the limits of judicial power confront the urgency of human suffering.

For decades, the homelessness crisis in Los Angeles has been shaped by indifference, avoidance, and bureaucratic inertia. From Skid Row to suburban storefronts, the suffering is no longer isolated. It has become a defining feature of the City's daily life. With nearly seven unhoused individuals dying each day, what once passed as a policy debate has become a moral

reckoning. Communities bear the weight of it—businesses, schools, families, first responders—all impacted by a crisis that touches every corner of Los Angeles.

The agreements now before the Court represent a collective attempt to move beyond paralysis towards progress. Yet even these agreements reveal a deeper truth: that progress has been halting, fractured, and often too slow to meet the scale of suffering on the streets.

Plaintiffs in this case ask the Court to declare the system irreparably broken. They argue that only the imposition of a receivership can meet this moment. But the Court is not a policymaker. It cannot be. Its role is narrower, but no less vital: to uphold the promises made to the public, to enforce the agreements signed, and to ensure transparency and accountability in their execution.

In 2021, the Court warned that it could not idly bear witness to preventable deaths. That warning still echoes. But it must now be read alongside the Supreme Court's caution in *City of Grants Pass, Oregon v. Johnson,* 603 U.S. 520 (2024), that federal courts cannot substitute their judgment for the democratic will of a community grappling with complex and deeply human questions. 603 U.S. 520 (2024). As that Court recognized: "Homelessness is complex." *Id.* at 524. Its causes are many and so too must be its solutions.

But that complexity cannot serve as an excuse. Flexibility in how the City meets its obligations does not mean those obligations can be ignored. The Court cannot fix the system. But it can be sure the City is held to what it promised to repair.

This case is not a referendum on homelessness policy. It is a test of integrity, governmental accountability and whether, in the face of death and despair, the law can still serve life.

## II.    BACKGROUND

### A. Initiation of the Present Litigation

The Plaintiffs in this case are the LA Alliance for Human Rights (the "Alliance"), a non-profit membership association, and its members who are business owners in the City of Los Angeles and residents of the City and County of Los Angeles (collectively, "Plaintiffs"). *See generally* Complaint ("Compl.") (Dkt. 1) and First Amended Complaint ("FAC") (Dkt. 361).

Plaintiffs sued the City of Los Angeles ("City") and the County of Los Angeles ("County") on March 10, 2020, for alleged violations of California law, the California Constitution, the Americans with Disabilities Act, the Rehabilitation Act, and the United States Constitution through 42 U.S.C. §1983. *See generally* Compl. Plaintiffs challenged the City and County's approach to the street homelessness crisis, including the lack of sufficient shelter and proliferation of encampments on public rights of way. *Id*. Plaintiffs sought immediate shelter for those living on the streets and the clearing of encampments. *Id*.

On March 18, 2020, the Court granted Los Angeles Catholic Worker ("LACW") and Los Angeles Community Action Network's ("LA CAN") Application to Intervene in this litigation, represented by the Legal Aid Foundation of Los Angeles and other counsel. Order Granting Intervenors' Ex Parte Application to Intervene as of Right (Dkt. 29). LA CAN is a grassroots, non-profit organization that has operated on Skid Row and throughout the City for decades to organize and advocate for the unhoused community. It intervened on behalf of hundreds of its members who are unhoused in the City. LACW is an unincorporated lay Catholic community which operates a soup kitchen and provides services on Skid Row. LACW and LA CAN (collectively "Intervenors") have been actively involved in the litigation since the Court granted intervention.

**B. Roadmap Agreement**

On May 15, 2020, this Court issued a Preliminary Injunction ("Preliminary Injunction") (Dkt. 108). This Preliminary Injunction directed the relocation of those individuals' experiencing homelessness and living under underpasses, and near freeway entrance and exit ramps. Preliminary Injunction at 1-2. Central to this directive was the Court's growing concern over the significant public health risks posed by living adjacent to freeways—particularly during the then-ongoing global Covid-19 pandemic. *Id.* at 2. Following drug overdose and heart disease, traffic-related injuries were the third leading cause of death among people experiencing homelessness.[1] Throughout this litigation, Intervenors repeatedly told this Court that people

---

[1] New Public Health Report Shows Sharp Rise in Mortality Among People Experiencing Homelessness, County of Los Angeles Public Health Media (May 12, 2023), https://lacounty.gov/2023/05/12/new-public-health-report-shows-sharp-rise-in-mortality-among-people-experiencing-homelessness/ (last visited June 23, 2025).

experiencing homelessness ("PEH") face a life expectancy more than twenty years shorter than the general population. The Court's Preliminary Injunction was informed by evidence that any plan which failed to reduce the number of unhoused individuals living near freeways or major road systems would only worsen this already devastating loss of life. The dangers are not abstract; they include fires beneath freeway overpasses, individuals falling from overpasses to their deaths, and people being struck by vehicles.

In recognition of the City and County's legislative and policy-making authority, the Court invited input from the Parties before the Preliminary Injunction took effect. *Id.* at 7. The Court in a later Order clarified that the Preliminary Injunction would remain in effect regardless of ongoing settlement discussions and ordered housing to be offered to relocate individuals residing within 500 feet of freeway infrastructure by September 1, 2020. *See* Minute Order and Preliminary Injunction ("Second Order re Preliminary Injunction") (Dkt. 123) at 5, 10. To ensure compliance, the Court required periodic status reports. *Id.* at 13.

In response to the Preliminary Injunction, the County filed a Joint Request for Order to Mediate (Dkt. 124), which the Court granted and appointed the Honorable André Birotte Jr. as the mediator. Order Appointing Mediator (Dkt. 125). As a result of mediation, the City and County reached an agreement that was memorialized in a "Binding Term Sheet *subject to the Court's approval.*" Joint Stipulation for Order Requesting Hearing to Approval Binding Term Sheet (Dkt. 134) at 2 (emphasis added). This Binding Term Sheet required the City to provide 6,700 beds within 18 months to house or shelter: (1) PEH residing within 500 feet of freeway overpasses, underpasses, and ramps within the City of Los Angeles; with priority given to (2) PEH aged 65 or older within the City, and (3) other vulnerable PEH within the City. Evidentiary Hearing Exhibit # 1 ("Ex. 1") ("Binding Term Sheet") (Dkt. 136) at 1.

In exchange for the Court vacating the Preliminary Injunction, the City and County agreed to execute all necessary documents to implement the Binding Term Sheet and stipulated that it was "*subject to court approval, monitoring, and enforcement.*" Joint Stipulation Requesting the Court Approve the Binding Term Sheet and Vacate the Preliminary Injunction (Dkt. 137) (emphasis added). At the Parties' request, on June 18, 2020, the Court approved the

Binding Term Sheet, retained jurisdiction to monitor and enforce, and vacated the Preliminary Injunction—subject to reinstatement if the Parties failed to comply. Order Re: Joint Stipulation for Order Requesting the Court Approve the Binding Term Sheet and Vacate the Preliminary Injunction (Dkt. 138).

After about four months of scheduling conferences and meditation sessions, Judge Birotte ordered the Parties to report on their progress towards the development of a Memorandum of Understanding ("MOU") to govern their Binding Term Sheet. Order for City and County of Los Angeles to Meet, Confer, and File a Joint Report Re: Status of MOU (Dkt. 183). On October 9, 2020, the City and County reached an agreement on a MOU. Evidentiary Hearing Exhibit # 2 ("Ex. 2") ("Roadmap MOU") (Dkt. 185-1). The Binding Term Sheet and Roadmap MOU have together been referred to as the "Roadmap Agreement."

According to the City and County, the Roadmap MOU clarified the historic agreement between the City and County to provide, within eighteen months, 6,700 beds and services for PEH within the City of Los Angeles. *See generally* Ex. 2. The Roadmap MOU, which incorporated the terms of the Binding Term Sheet, clarified the responsibilities of the City and County in further defining and implementing the terms of the Binding Term Sheet. *Id.* at 4. The Roadmap MOU is set to terminate on June 30, 2025. *Id.* at 1.

More specifically, under the terms of the Roadmap MOU, the City agreed to deliver a total of 6,700 beds—comprised of 6,000 "New Beds"[2] and 700 "Other Beds."[3] *Id.* at 4. Of these beds, the City committed to providing 5,300 New Beds within ten months of June 16, 2020, and an additional 700 New Beds within 18 months of June 16, 2020. *Id.* The 700 Other Beds were to be provided within the initial 10-month period. *Id.* The precise mix and location of New Beds and Other Beds was to be determined at the City's sole direction. *Id.* at 5.

---

[2] The Roadmap MOU explicitly defines "New Beds" as beds: "(i) not previously captured in any agreement or plan between the PARTIES, and (ii) opened on or after the date of the Binding Term Sheet (i.e., June 16, 2020). New Beds may include any combination of the following: (i) purchased and/or leased motel/ hotel rooms by the City; (ii) rental assistance, including rapid rehousing, but only for the duration of the assistance; (iii) sprung structures or tents; (iv) safe parking; (v) safe sleeping; (vi) scattered site or permanent supportive housing; (vii) ABH [A Bridge Home] beds; and (viii) other innovative modes of housing or shelter. Family reunification is not included as a New Bed under this MOU." *Id.* at 4.
[3] "Other Beds" are defined as beds that may be "previously captured in an agreement or plan between CITY and COUNTY." *Id.*

The County also pledged a one-time $8 million dollar incentive if the City opened and made occupiable 5,300 new beds within ten months from June 16, 2020—an incentive the City ultimately forfeited due to the County's inability to verify the existence of the City's beds. *Id.* at 5; Evidentiary Hearing Exhibit # 140 ("Ex. 140") ("Joint Status Report of Defendants Re: MOU") (Dkt. 373) at 4-5. Additionally, the County agreed to funding for the first year up to $53 million and up to $60 million annually for years two through five. Ex. 2 at 4.. The County also committed to offering a suite of "mainstream services" to PEH in City-established facilities. *Id.* at 6.

Pursuant to the Roadmap MOU, the City agreed to certain reporting requirements but stated that "if the Court requires different and more extensive reporting than what is set forth below, then the Parties agree to provide reporting as required by the Court and not in this MOU." *Id.* The first reporting requirement directed the City to submit a "Bed Plan" by August 1, 2020, describing how it would establish the specified New Beds and Other Beds. *Id.* Next, the City agreed to submit written quarterly status reports ("Roadmap Quarterly Reports"), beginning no later than October 15, 2020, detailing its progress in providing beds and services pursuant to the Roadmap Agreement. *Id.* at 7. The County, in turn, committed to reporting on funds disbursed and the delivery of services for PEH residing in facilities established by the City under the MOU. *Id.* at 7-8. The MOU explicitly states that it is "subject to enforcement by the Court" and that the City and County agreed to the submission of the Roadmap MOU to the Court. *Id.*

## C. LA Alliance Settlement Agreement

Following extensive negotiations and numerous mediation sessions, Plaintiffs and the City reached a Settlement Agreement in May 2022, resolving only the claims against the City in Plaintiffs' First Amended Complaint. *See* Notice of Lodging, Settlement Agreement (Dkt. 429-1). This Settlement Agreement followed an earlier preliminary settlement between Plaintiffs and the City. *See* Notice of Preliminary Settlement Agreement and Stipulation to Stay Litigation (Dkt. 408). After holding a hearing on the Settlement Agreement, the Court approved the stipulated dismissal and proposed settlement between Plaintiffs and the City on June 14,

2022. Order Approving Stipulated Dismissal and Proposed Settlement (Dkt. 445). The Court dismissed the claims against the City with prejudice, incorporated the terms of the Settlement into its Order, retained jurisdiction for a period of five years to enforce the terms of the Agreement, and appointed Special Master Michele Martinez as the Monitor to "assist the Court in overseeing and enforcing this Agreement." *Id.* at 3. In its Order, the Court stated: "The Settlement Agreement creates a structure and enforcement mechanism for the City to create a substantial number of new beds for people experiencing homelessness. While this Agreement is not a solution to homelessness, it is a concrete step toward improving the lives of our neighbors who are currently suffering on the streets." *Id.* at 2.

One of the recitals in the Settlement Agreement states: "the purpose of this Agreement is to substantially increase the number of housing and shelter opportunities in the City of Los Angeles, and to address the needs of everyone who shares public spaces and rights of way in the City of Los Angeles, including both housed and unhoused Angelenos, to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles." Evidentiary Hearing Exhibit # 25 ("Ex. 25") ("Settlement Agreement") (Dkt. 429-1), at 2.

The Settlement Agreement required the City to "create a Required Number of housing or shelter solutions, which is equal to, but (in the City's discretion) may be greater than, the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate PEH within the City based on LAHSA's [Los Angeles Homeless Services Authority] 2022 Point in Time count." Ex. 25, § 3.1. Further, the City was required to calculate the "Required Number." *Id.* §5.1. The City met that obligation by calculating 12,915 as the Required Number in 2022. Evidentiary Hearing Transcript ("Tr."), 244, 252-253, May 28, 2025 (Dkt. 949).

The requirement that the City "create" 12,915 "housing or shelter solutions" is subject to the following term:

> the City may choose, at its sole discretion, any housing or shelter solution including but not limited to tiny homes, shared housing, purchased or master-leased apartments, hotels/motels, or other buildings, congregate shelters, permanent supportive housing, rental assistance/rapid rehousing, family reunification, sprung

structures or tents, safe parking, safe sleeping/camping, affordable housing, and interim housing (including A Bridge Home beds), as long as the Milestones are met.

Ex. 25, §3.2. Further, the "City agrees to implement an approach of equitably distributing housing and shelter solutions throughout the City." *Id*. §3.3.

Section 5.2 of the Settlement Agreement provides:
Thereafter the City will create plans and develop milestones and deadlines for: (i) the City's creation of shelter and housing solutions to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in each Council District as determined by the Required Number; (ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District; (iii) the City's creation of shelter and/or housing to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number; and (iv) the City's plan for encampment engagement, cleaning, and reduction in the City. The City will provide the plans, milestones and deadlines to Plaintiffs, and the City and Plaintiffs agree to work together in good faith to resolve any concerns or disputes about the plans, milestones, and deadlines, and will consult with the Court for resolution, if necessary. The City will provide a report setting forth the milestones and deadlines. The Parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines.

Ex. 25, § 5.2.

The City agreed to "provide quarterly status updates to the Court regarding its progress with this Agreement, including the number of housing or shelter opportunities created or otherwise obtained, the number of beds or opportunities offered, and the number of beds or opportunities currently available in each Council District." *Id*. §7.1. Further, the "Parties will engage a mutually agreed-upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of this Agreement. The City shall be responsible for paying all fees, if any, or for obtaining grants or other private funding, if needed." *Id*. §7.2. The Agreement also provides that "Funding of housing and shelter opportunities created by the City shall be at the City's sole discretion." *Id*. §8.1.

The Agreement provides an emergency term stating:
In the event of fires, floods, earthquakes, epidemics, quarantine restrictions, or other natural catastrophic occurrences; terrorist acts, insurrections or other large scale civil disturbances; or any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council under the authority vested in them by

the Los Angeles City Charter and Los Angeles Administrative Code (or other applicable ordinances, resolutions, or laws), the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations.

*Id*. § 8.2.

The Agreement also states, "The Parties agree that the duration of the Agreement shall be five (5) years, during which point the Court shall have continuing jurisdiction to oversee and enforce this Settlement Agreement." *Id*. § 2.

**D. Appointment of Special Master**

The Court first appointed Judge James L. Smith (retired) as a Special Master in this case. The Court then appointed on a volunteer basis Michele Martinez as the Special Master on April 24, 2020. Order Appointing Special Master (Dkt. 79); *see also* Tr., 236-237, June 3, 2025 (Dkt. 969). Upon approving the Settlement Agreement with the City in 2022, the Court appointed Special Master Martinez as the Monitor to "assist the Court in overseeing and enforcing this Agreement." Order Approving Stipulated Dismissal and Proposed Settlement (Dkt. 445), at 3; *see also* Tr., 237, June 3, 2025. Special Master Martinez's role includes but is not limited to observing and monitoring in the field almost seven days a week, talking to the Parties, talking to unhoused people, meeting with homeless outreach workers and service providers, hosting learning sessions with the Parties, attending city council meetings, attending other city meetings on homelessness, and attending LAHSA meetings. Tr., 237-242, June 3, 2025.

Special Master Martinez has provided two reports to the Court and Parties regarding the Parties' compliance with the Settlement Agreement. The first report was filed on February 29, 2024, and covered the first year of the Settlement with the City from July 1, 2022, through December 31, 2023. Independent Monitoring Report Year One (Dkt. 674). The second report was filed on May 14, 2025, and covered the period from January 1, 2024, until December 31, 2024. Evidentiary Hearing Exhibit # 93 ("Ex. 93") ("Special Master Independent Monitoring Report and Recommendations No. 2") (Dkt. 904). In her most recent report, Special Master Martinez warned that funding shortfalls put the City at serious risk of not being able to meet its Settlement obligations in 2027. *Id*. at 29. Based on her observations and communications with

the Parties, she recommended that the Court require independent reviews for all city-reported bed/unit figures to ensure data accuracy, that the beds/units in process undergo immediate milestone verification to determine their status, and that quarterly compliance checks validate newly reported beds. *Id*. at 17. She also recommended that the Court appoint an independent fiduciary monitor to oversee the City's accounting procedures based on the concerning Alvarez and Marsal ("A&M") Assessment findings discussed below. *Id*. at 25. If significant progress was not made with the additional oversight, Special Master Martinez recommended "that the court

consider transitioning to full receivership." *Id*.

In addition to Special Masters Smith and Martinez, the Court and Parties have often worked with Judge Birotte to negotiate and facilitate compliance with the Settlement Agreement. Judge Birotte was first appointed as a mediator in this matter on May 29, 2020, upon the request of the City and County. Order Appointing Mediator (Dkt. 125). The Court also appointed the Honorable Jay C. Gandhi (retired) to monitor a separate settlement agreement, not at issue here, between Plaintiffs and the County. Order on Joint Submission of Second Addendum to Settlement Agreement and Stipulation for Voluntary Dismissal (Dkt. 646).

**E.  History of Homelessness Audits in the City and County of Los Angeles**

The findings of the recent court-ordered A&M Assessment are not new—they are the latest entry in a decades-long record of systemic dysfunction. For nearly twenty years, oversight bodies have repeatedly identified the same fundamental failures: poor fiscal oversight, inadequate contract management, and a chronic inability to ensure accountability for public funds. Each report has reinforced a troubling pattern: that rather than taking accountability and making changes, the longstanding deficiencies have been left to persist and deepen.

Many of the reports, summarized below, center on LAHSA's operational shortcomings. LAHSA, a Joint Powers Authority formed in 1993 through an agreement between the City and County of Los Angeles, was created specifically to coordinate and implement the region's response to homelessness. *See* Evidentiary Hearing Exhibit # 56 ("Ex. 56") ("LAHSA JPA

Agreement, Feb. 28, 2001") (Dkt. 899-3). In addition to its local mandates, LAHSA is designated as the Continuum of Care ("CoC") for Los Angeles under federal law, which makes it responsible for administering a comprehensive homelessness response in accordance with U.S. Department of Housing and Urban Development ("HUD") regulations. HUD CoC Program Interim Rule, 24 CFR Part 578. Functionally, LAHSA is the primary entity responsible for implementing the funding provided by the City for homelessness-related services. On behalf of both the City and County, LAHSA manages resources and oversees the delivery of critical programs. To evaluate whether the City and County have fulfilled their obligations under the Roadmap Agreement or Settlement Agreement without examining LAHSA's performance is akin to trying to diagnose a stalled car without inspecting the engine.

The creation of LAHSA has, at times, enabled a cycle of blame-shifting. When data inconsistencies or compliance issues arise, the City points to LAHSA. In turn, LAHSA attributes its problems to a lack of information or cooperation from the City. This dynamic has fostered a system in which responsibility is routinely deflected, allowing both entities to evade accountability, with no single party willing to take responsibility.

Here, the Court provides a brief overview of prior public-facing audits to illustrate the depth and persistence of the systemic issues underscored by the recent A&M Assessment.

In 2001, a HUD audit of LAHSA's supportive housing program reviewed whether LAHSA operated a CoC grant in accordance with the approved application, HUD requirements, and other federal requirements. Evidentiary Hearing Exhibit # 82 ("Ex. 82") ("HUD Audit re LAHSA") at 1. This audit found that LAHSA violated grant agreements by failing to conduct onsite monitoring of service providers and failing to conduct any formal monitoring of subgrantees prior to awarding renewal grants. *See generally id.*

In 2007, HUD's Regional Inspector General audited LAHSA following allegations of mismanagement and misuse of HUD funds. *See generally* Evidentiary Hearing Exhibit # 83 ("Ex. 83") ("HUD Audit re LAHSA") (Dkt. 882-1, Exhibit A). The audit found that LAHSA failed to conduct on-site fiscal monitoring and did not perform the required 100% source documentation desk reviews for at least two project sponsors. *Id.* at 1. Of the two sponsors

reviewed, one sponsor charged ineligible expenses, while the other lacked documentation to support its cash match due to poor financial controls. *Id.* As a result, LAHSA failed to ensure HUD funds were used properly and effectively. *Id.* at 2. The 2007 audit thus recommended that LAHSA be required to comply with HUD regulations. *Id.*

In response to an April 10, 2018, directive from the Los Angeles County Board of Supervisors, the County Auditor-Controller issued a report evaluating LAHSA's fiscal operations and capacity to manage Measure H funds.[4] *See generally* Evidentiary Hearing Exhibit # 84 ("Ex. 84") ("LA County Auditor Follow Up Review of LAHSA"). This County audit provided sixteen recommendations aimed at improving accountability and operational efficiency. *See generally* Ex. 84. These were ranked from Priority 1 to Priority 3 based on the severity and likelihood of negative impact if left unaddressed. *Id.* at 1 n.1. Of these sixteen recommendations, eight were designated Priority 1 level of concern. *See generally id.* The issues ranked Priority 1 are summarized as follows:

- inadequate staffing levels to meet their workload
- retroactive contracting, which resulted in sub-recipients providing services without having an executed contract in place
- inadequate cash flow to pay sub-recipients, delaying payments to sub-recipients
- missing documentation verifying access to all eligible cash advances
- late reimbursement claims to funding sources
- aged receivables that were not followed up on promptly, causing cash request delays
- lack of management oversight in fiscal operations

*Id.* at 1-10. LAHSA responded to all eight Priority 1 findings with either "agree," "concur," or "partially concur," acknowledging the need for corrective action. *See id.* These specific issues—such as providing services without contracts, missing verifying documentation, and a lack of management oversight—not only reflected serious gaps in LAHSA's operations at the time, but would later resurface in subsequent reviews, signaling a persistent pattern of dysfunction.

---

[4] Measure H funds are derived from a quarter cent sales tax approved by Los Angeles County voters in 2017 to support homelessness-related services and housing initiatives.

In August of 2019, Los Angeles City Controller Ron Galperin issued a report and set of recommendations aimed at improving LAHSA's homelessness outreach program. Evidentiary Hearing Exhibit # 85 ("Ex. 85") ("LA County Auditor Follow Up Review of LAHSA") at 1. The report concluded that LAHSA failed to meet five City outreach goals for fiscal year 2018-2019. *Id.* at 6. This failure included housing placement rates as low as four percent (target was 10); substance abuse treatment rates of just six percent (target was 25); mental health treatment of just four percent (target was 25); placements from streets to shelter was 14 percent (goal was 20); and LAHSA did not report on the goal of data accuracy. *Id.* at 1-2. The Controller also found that LAHSA used unclear metrics to track outreach efforts and submitted reports with data quality issues and inconsistencies—raising concerns about the agency's ability to measure performance and accurately report result to stakeholders. *Id.* at 5. Ultimately, just as other reports concluded, this report found that LAHSA needed enhanced transparency and accountability. *Id.*

Again, in October of 2019, City Controller Ron Galperin released a report pursuant to Proposition HHH, a ballot measure that authorized the City to issue up to $1.2 billion in general obligation bonds to help subsidize and develop up to 10,000 supportive housing units for individuals and families experiencing homelessness. *See generally* Evidentiary Hearing Exhibit # 86 ("Ex. 86") ("LA City Controller Review of Proposition HHH"). Proposition HHH required the Controller to conduct financial audits of the program. *Id.* at 2, n.1. The audit revealed that high costs and slower-than-anticipated pre-development and construction timelines had significantly impeded the City's ability to fulfill the measure's goals. *Id.* Notably, the report found that the average costs of constructing HHH-funded units exceeded the median sale price of a market-rate condominium in the City of Los Angeles and even surpassed the cost of a single-family home in Los Angeles County. *Id.* at 5. A major contributing factor was the disproportionately high share of "soft costs," which accounted for approximately forty percent of total project costs—compared to just eleven percent for actual land costs. *Id.*

In 2021, the Committee for Greater Los Angeles[5] released a report stating, "[t]he road to this point is paved with broken promises and new initiatives that fill us with hope when adopted but fail to fully reach their objectives." Amended Order Re Documents Referenced by the Court (Dkt. 882-3, Exhibit C) ("2021 Committee for Greater LA Plan for Homelessness Governance in Los Angeles") at viii. The report further proposed a new governance structure to address homelessness in the region. *Id.* at 2. The report identified the core issue as the absence of a centralized authority capable of aligning fragmented efforts toward a unified mission, stating that Los Angeles lacks a central governance structure that can "draw our disparate best efforts to a common mission." *Id.* The report also found that while LAHSA's role and funding have expanded over time, the agency remains caught between the City and County—preventing it from effectively coordinating the region's overall homelessness response. *Id.* at 18. Finally, the report emphasized a lack of comprehensive, outcome-driven data, noting that decision-makers lack access to credible, shared information necessary to understand the full scope of the crisis. *Id.* at 22.

In 2022, the HUD Office of the Inspector General, conducted a review of LAHSA's administration of the Continuum of Care ("CoC") Program. *See* Evidentiary Hearing Exhibit # 88 ("Ex. 88") ("HUD Audit re LAHSA"). A CoC is an integrated system intended to guide homeless individuals and families through a comprehensive network of housing and services aimed at preventing and ultimately ending homelessness. *See id.* at 39. This report found that LAHSA failed to meet key goals and objectives under the program. *Id.* at 1. Specifically, it did not utilize $3.5 million in CoC grant funds, allowing the funds to expire; failed to adequately support costs related to the Homeless Management Information System (HMIS) and planning grants; and did not timely submit required annual performance reports. *Id.*

In 2021, the LA County Auditor-Controller released a series of four reports.[6] These reports identify unresolved issues previously stated in the past audits above. *See generally*

---

[5] The Committee for Greater LA assembled a group of fifteen (15) civic leaders in April 2020 to prioritize the recovery of LA County's most marginalized communities. The Committee worked in partnership with the UCLA Luskin School for Public Affairs and the USC Equity Research Institute to produce the *No Going Back* report.

[6] County of Los Angeles, Arlene Barrera, Auditor-Controller, Los Angeles Homeless Services Authority – Measure H – Contracting Operations Assessment Review (Report #X18703) – First Follow-Up Review (Feb. 5, 2021), https://file.lacounty.gov/SDSInter/bos/supdocs/148452.pdf ("County of Los Angeles 2021 Reports").

County of Los Angeles 2021 Reports. For example, they point to staffing and oversight issues, problems with paying providers late, failing to make reimbursement requests, and insufficient financial controls. *See generally id.* The reports identify as unresolved the same staffing and oversight issues previously identified. *See generally id.*

In 2023, Los Angeles City Controller Kenneth Mejia conducted an audit that examined LAHSA's management of interim housing data. *See generally* Evidentiary Hearing Exhibit # 89 ("LA City Controller Audit Interim Housing Bed Availability Data"). It found widespread data entry issues related to participant enrollments, exits, and bed attendance. *Id.* at 1. LAHSA also failed to follow up with providers regarding discrepancies in point-in-time sheltered homeless counts, and a significant number of shelters reporting low bed utilization rates. *Id.* Critically, LAHSA's bed availability tracking system was deemed so unreliable that the agency depended on daily census emails rather than its designated reservation system. *Id.* The audit noted that more than seven years after being tasked with developing such a system, LAHSA still had not implemented it. *Id.* at 6. This audit recommended that the City collaborate with LAHSA to take new steps to create a functioning shelter and bed availability system and improve the data quality that supports the existing shelter system. *Id.* at 2. This audit highlighted that the City currently lacks a centralized database that tracks interim housing availability and criteria for entry for interim housing sites. *Id.*

In 2024, City Controller Mejia conducted another audit focused on City-funded interim housing programs operating between 2019 and 2023, evaluating their performance and the outcomes of residents exiting these programs. *See generally* Evidentiary Hearing Exhibit # 92 ("Ex. 92") ("LA City Controller Homelessness Audit: Pathways to Permanent Housing") at 1. The findings were stark: fewer than 20% of people in interim housing transitioned to permanent housing, while over 50% returned to homelessness or exited to unknown destinations. *Id.* In addition, one in four interim beds (the gateway to permanent housing) went unused, costing taxpayers an estimated $218 million dollars. *Id.* The audit found severe data quality issues which made "meaningful evaluation of system performance difficult, impedes LAHSA's ability to hold underperforming service providers accountable, and prevents the City from making

informed decisions about where to direct future spending." *Id.* at 2. This audit concluded that LAHSA's poor project management, monitoring, and data quality required urgent remediation. *Id.*

In 2024, County Auditor-Controller Oscar Valdez conducted a review of LAHSA's finance, contracts, risk management, grants management, and compliance functions. Evidentiary Hearing Exhibit # 91 ("Ex. 91") ("County of Los Angeles LAHSA Audit") at 1. This report identified sixteen different issues. *See generally id.*

These sixteen issues are summarized below:

1. **LAHSA did not establish agreements for working capital advances**
   - Between fiscal years 2017-18 and 2019-20, LA County advanced LAHSA $82.5 million in Measure H working capital advances to support Measure H operations, and LAHSA distributed $50.8 million to service providers. These funds were given without formal repayment agreements, and service providers were allowed to retain advances across fiscal years. LAHSA retained the remaining $31.7 million to support internal operations. As of July 2024, only $2.5 million (5%) has been recovered due to subrecipient cash flow issues and delayed recoupment efforts. Without formal agreements and stronger controls, there is a significant risk that LAHSA may not recover all funds or repay the County in full. *Id.* at 1-2.

2. **LAHSA did not recoup annual cash advances**
   - LAHSA provides annual cash advances to service providers with the expectation of year-end repayment but has failed to consistently recover these funds. As of July 2024, $15 million in advances remain outstanding, with $8 million carried over from prior years—including $409,000 owed by service providers no longer under contract. This has created an $8 million cash deficit. While LAHSA tracks these amounts as receivables in their accounting records, the lack of effective recovery efforts and controls

increases the risk that these funds—originally intended for active programs—may never be recovered. *Id.* at 2-3.

### 3. LAHSA had inadequate contract data

- o LAHSA uses the Enterprise Grants Management System (EGMS) to manage subrecipient contracts but cannot produce an accurate or consistent list of active contracts. As of May 2024, reported contract totals varied widely across five different EGMS listings, none of which matched the claimed total of 1,273 active contracts. LAHSA also failed to track key contract data, such as execution dates and accurate term dates, leading to discrepancies and retroactive contract issues. *Id.* at 3-4.

- o The audit reviewed a sample of eight contracts and noted that: all contracts did not capture the date they were signed by the parties and executed, six of the contracts had terms and dates in EGMS that did not match the actual contract, and four of the contracts had dates in the contracts that were inaccurate which led to inaccurate reporting in EGMS. *Id.*

- o This lack of reliable data hinders effective oversight and creates significant risks, including payment delays, service disruptions, administrative inefficiencies, and lack of stakeholder trust. *Id.*

### 4. LAHSA had inadequate controls over cash advances

- o LAHSA lacked basic financial controls over cash advances. It did not use separate, interest-bearing accounts by funding sources, failed to assess service provider's repayment history before giving them more cash advances, did not reconcile advances quarterly, and lacked clear recoupment policies. Despite these deficiencies, LAHSA began implementing a new funding model involving larger and more frequent cash advances. As of September 2024, LAHSA received over $115 million in Measure H funds under this model. Without stronger controls, there is a heightened risk that funds may be misused or remain uncovered. *Id.* at 4-5.

**5. LAHSA inappropriately used funds**

- o As a pass-through agency, LAHSA is generally required to wait for reimbursement from funders before paying service providers. However, in fiscal year 2023-24, LAHSA used funds from unrelated government sources to pay service providers before receiving reimbursement, including $126,168 for a HUD program and $31,770 for County program. This practice constitutes a misuse of funds, undermines financial controls, and risks cash flow issues and potential penalties from funders. LAHSA must stop using funds across programs to ensure compliance and protect the integrity of its financial operations. *Id.* at 5-6.

**6. LAHSA made late payments to service providers**

- o Between July 2023 and May 2024, LAHSA failed to pay service providers on time in 38% of reviewed cases, despite having received the necessary funds. Some payments were delayed by over fifty business days even when Measure H or state advances were available. LASHA cited cash flow issues, but prior failures to recoup advances contributed to ongoing deficits. These delays violate LAHSA's own payment timelines (fifteen business days) and can disrupt critical services. Improved cash flow management is needed to ensure timely payments and program stability. *Id.* at 6-7.

**7. LAHSA had record-keeping deficiencies**

- o LAHSA used internal reports to track Measure H working capital advances but failed to maintain accurate and complete records. A review of twelve service providers representing $34.6 million revealed that LAHSA understated advances by over $500,000 for two service providers and lacked supporting documentation for $5 million in disbursements. These deficiencies were attributed to staff turnover and system changes. Without

accurate accounting, LAHSA risks misusing funds and may struggle to recover all advances and repay the County in full. *Id.* at 7-8.

**8. LAHSA had retroactive contracts**

o  In fiscal year 2023-24, the audit reviewed a sample of eight contracts and noted that seven were executed retroactively, with delays ranging from 23 to 170 days after the contract start date—an average delay of 73 days after the contract start date. While some delays stemmed from late funder approvals, many were due to avoidable internal inefficiencies at LAHSA, such as delays in creating contracts and finalizing budgets even after funding was approved. These delays increased the risk of liability, as service providers may provide services without formal agreements in place and can lead to delayed payments and operational disruptions. *Id.* at 8-9.

**9. LAHSA had an inadequate contract monitoring plan**

o  LAHSA's fiscal year 2023-24 Contract Monitoring Plan lacked essential controls and processes needed for effective subrecipient oversight. While appropriate risk factors were identified, LAHSA did not use a documented or systematic method to assess overall risk, relying instead on informal institutional knowledge. The agency also failed to actively track the status of monitoring review, making it difficult to assess progress or evaluate performance. Additionally, LAHSA lacked procedures to promptly incorporate newly executed contracts into the plan and did not ensure that all service providers were monitored for programmatic compliance—over half (51%) of planned reviews omitted such checks. These deficiencies create gaps in oversight and increase the risk of undetected noncompliance, misuse of funds, and failure to deliver critical services. *Id.* at 9-10.

**10. LAHSA had a lack of contract monitoring standards**

○ LAHSA's contract monitoring function lacks sufficient standards for conducting and documenting reviews. In a sample of ten contract monitoring reviews for fiscal year 2023–24, LAHSA failed to maintain adequate workpapers for any of the reviews—one review had no documentation at all, and the remaining nine lacked clear support for the conclusions drawn. Additionally, none of the reviews showed evidence of supervisory oversight. Without proper documentation and review, it is unclear whether service providers complied with contract terms. These deficiencies significantly increase the risk of undetected misuse of funds, unverified service delivery, and noncompliance with contract requirements. *Id.* at 11-12.

**11. LAHSA had delays with reimbursement claims**

○ LAHSA's reimbursement and invoicing processes suffer from significant delays, impacting both their own operations and those of their service providers. Of the thirteen reimbursement claims reviewed, one was submitted to the County 214 days after the billing month—far exceeding the 30-day deadline in LAHSA's Operating Agreement—and another to HUD was delayed by 144 days. These delays were attributed to service provider's late invoicing and internal reconciliation lags. In a review of twenty monthly subrecipient invoices to LAHSA, 60% were not submitted on time, despite no external barriers. These delays jeopardize LAHSA's cash flow, complicate funder budget cycles, and risk underutilization of allocated funds. Strengthening invoice monitoring and addressing systemic failures is essential. *Id.* at 12-13.

**12. LAHSA did not complete planned audits**

○ LAHSA failed to complete any of its planned internal audits in fiscal year 2022-23, and only began two of four in fiscal year 2023-24, both late in

the year. Despite claiming to follow internal audit standards, it did not notify leadership about these deviations as required. This lack of follow-through raises concerns about the effectiveness of LAHSA's internal audit function and increases the risk that errors, fraud, or operational issues go undetected. *Id.* at 13-14.

### 13. LAHSA did not complete an internal audit risk assessment

o   LAHSA's Internal Audit Unit did not complete a required annual risk assessment to inform its FY 2023–24 audit plan, instead recycling the prior year's plan due to capacity issues. This failure violates internal audit standards and increases the risk that emerging or high-priority issues may be missed, potentially leading to misallocated audit resources. *Id.* at 14.

### 14. LAHSA failed to have internal audit independence

o   LAHSA's Director of Risk Management also serves as Chief Audit Executive (CAE) and oversees multiple other functions, including legal operations and investigations. This dual role raises concerns about independence and objectivity, as required safeguards to prevent conflicts were not formally documented. Additionally, LAHSA's Internal Audit Charter, last updated in 2018, does not reflect the CAE's expanded responsibilities or the safeguards required under the new 2024 Global Internal Audit Standards. This creates a risk that the Internal Audit Unit may not operate with full impartiality. *Id.* at 14-15.

### 15. LAHA had no quality assurance and improvement program

o   LAHSA did not have a Quality Assurance and Improvement Program (QAIP) in place for its Internal Audit Unit, as required by professional standards. Without this program—meant to ensure consistent quality through internal and external assessments—the internal audit function is at risk of underperformance and failing to meet industry standards. Although management stated they intend to establish a QAIP and complete

assessments in fiscal year 2024–25, the absence of one at the time of review undermines the credibility and effectiveness of the audit function. *Id.* at 15.

### 16. LAHSA did not establish key performance indicators

o  LAHSA had not established key performance indicators (KPIs) for their Internal Audit Unit at the time of review, limiting their ability to measure and improve performance. However, in May 2024, LAHSA introduced a new policy for developing and implementing KPIs across all functions. Without KPIs currently in place, LAHSA's ability to assess whether it is effectively meeting its objectives is diminished. *Id.* at 15-16.

To summarize, the sixteen issues demonstrated significant deficiencies in LAHSA's fiscal oversight and internal controls. *See generally id.* Notably, LAHSA awarded $50.8 million in Measure H working capital cash advances to subrecipients without repayment agreements. *Id.* The agency also failed to recover annual advances as required. *Id.* at 1. Despite having sufficient funds, LAHSA did not pay subrecipients in a timely manner, failed to maintain adequate records for working capital advances, and was unable to produce comprehensive contract data to assess whether contracts were executed timely or retroactively. *Id.* at 2. Lastly, the audit found that LAHSA lacked a sufficient contract monitoring plan to provide effective oversight of its subrecipients. *Id.* at 9.

The Special Master in her testimony referenced a 2025 report authored by the Chief Legislative Analyst, Sharon M. Tso. Tr., 272-73, June 3, 2025. This report focused on the formation of a city homelessness governance structure and identified significant structural deficiencies[7]. Chief among them was the absence of centralized oversight—no single entity or office is tasked with developing and implementing homelessness policy. *See generally* CLA Report. Instead, responsibilities are scattered across numerous individuals and departments. *Id.* The report also noted the lack of a unified forum for policy and program development, leaving

---

[7] Sharon M. Tso, Chief Legislative Analyst, Formation of a City Homelessness Governance Structure (Apr. 22, 2025) (report on file with the Chief Legislative Analyst, City of Los Angeles) ("CLA Report").

even routine administrative issues without a clear resolution process. *See id.* at 9. For example, multiple City departments manage contracts with varying degrees of involvement, creating confusion and inconsistency. *See id.* at 10. This fragmentation extends to fiscal oversight and data management, where inconsistent documentation practices across departments further hinder coordination. *See id.* Most critically, the report underscored the absence of unified strategic leadership, despite persistent failures and evolving challenges. *See id.*

Taken together, these audits paint a consistent and deeply troubling picture of chronic operational failures in Los Angeles' approach to homelessness—failures which culminate in the most recent findings of the Alvarez and Marsal Assessment.

**F.  Alvarez and Marsal ("A&M") Assessment**

On February 7, 2024, Plaintiffs filed a Motion for Order Re Settlement Agreement Compliance and Sanctions ("Motion for Sanctions") seeking sanctions against the City for alleged non-compliance with the Settlement Agreement. Motion for Order for Settlement Agreement Compliance and Sanctions (Dkt. 668). The Court held an evidentiary hearing on the Motion for Sanctions beginning on March 7, 2024 (Dkt. 673, 677). Following several additional hearings on Plaintiffs' Motion for Sanctions in March 2024, Plaintiffs and the City agreed to a "comprehensive financial and performance audit of the City of Los Angeles's homelessness programs." Notice of Filing of Audit Scope (Dkt. 697). The Court adopted the proposed audit scope with revisions on March 22, 2024. Minutes of Motion to Enforce the Settlement Agreement and for Sanctions (Dkt. 698); *see also* Notice of Filing of Corrected Revised Audit Scope (Dkt. 700). Plaintiffs supplemented their Motion for Sanctions on April 1, 2024. Supplement to Motion for Order for Settlement Agreement Compliance and Sanctions (Dkt. 706).

On April 4, 2024, Plaintiffs and the City submitted a Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713). The Joint Stipulation provided that the City agreed to pay for the Court-ordered audit, the Parties would meet at least once a month about Settlement Agreement compliance, and the City

agreed to pay Plaintiffs' fees and costs.[8] Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713). The Parties and Court considered who would conduct the audit of the City's programs during hearings on April 4, 2024 (Dkt. 715) and April 5, 2024 (Dkt. 718). On April 8, 2024, the Court approved the Parties' Joint Stipulation to resolve Plaintiffs' Motion for Sanctions and selected A&M to conduct the audit (Dkt. 724). The City and Court signed an engagement letter with A&M which was filed with the Court on May 20, 2024. Updated Engagement Letter for Assessment of the City of Los Angeles's Homelessness Programs (Dkt. 743). The engagement letter was amended later in September 2024. City's Signed Copy of Amendment to Engagement Letter Between A&M and the Court (Dkt. 779). The County also signed an engagement letter with A&M to voluntarily provide data and support related to the A&M Assessment of the City's homelessness programs. County Engagement Letter with A&M (Dkt. 849).

The A&M financial and performance assessment of the City's homelessness assistance programs was limited in scope to June 1, 2020, through June 30, 2024 ("Lookback Period"). The Assessment focused on appropriation and expenditures of funds through the City under the Roadmap Program (pursuant to the Roadmap MOU), the Alliance Program (pursuant to the LA Alliance Settlement Agreement), and the Mayor's Inside Safe Program (collectively the "City Programs") during the Lookback Period. A draft of the assessment was released to the Parties on March 3, 2025, an amended draft released March 4, 2025, and a second amended draft released March 6, 2025 (Dkt. 866, 867, 870). The County filed a response to the second amended draft on March 21, 2025 (Dkt. 873). The Court held a hearing on that draft on March 27, 2025, at which the Parties commented on the draft (Dkt. 877). The Court then set a hearing for May 15, 2025, in order for the Parties to have ample time to raise issues or errors in the draft with A&M before it was finalized (Dkt. 880). During that time, there was extensive communication between Special Master Martinez, A&M, and the Parties about the A&M assessment. For example, A&M met with representatives from the City about findings in the draft assessment; however, the City failed to provide A&M with missing data which had been

---

[8] The Court informed Plaintiffs and the City that it was prepared to make a finding of bad faith on the part of the City if the Parties had not reached a Stipulation to resolve Plaintiffs' Motion for Sanctions. Tr., 17, March 8, 2024 (Dkt. 684).

requested to verify program spending and the existence of housing reported. Tr., 175-178, June 3, 2025 (Dkt. 969). On May 14, 2025, A&M's final assessment was released to the Parties. At the hearing on May 15, 2025, the Court adopted the assessment as final (Dkt. 906).

A&M found significant problems in its assessment of the City programs. Evidentiary Hearing Exhibit # 23 ("Ex. 23") ("A&M Independent Assessment of City-Funded Homelessness Assistance Programs" or "Assessment") (Dkt. 905), at 3. The findings included the following:

- Due to poor data quality and integration, A&M was unable to verify the number of beds the City reported under the Roadmap and Alliance Programs. *Id*. at 4.

- A&M identified about $2.3 billion of funding related to the City Programs during the Lookback Period but was unable to fully quantify the amount spent by the City based on the data provided by LAHSA and the City. *Id*.

- A&M found that distinct referral and data systems across the City, County, and LAHSA created a siloed continuum of care system that caused confusion and a lack of transparency. *Id*. at 5.

- A&M found that the City and LAHSA's financial oversight and performance monitoring of service provider contracts was extremely limited. For example, there was little to no verification of the quality or provision of services based on what was contracted for. *Id*.

- A&M's review of contracts between the City, LAHSA, and service providers revealed broad terms, conflicting responsibilities, and wide discretion afforded to service providers in spending. *Id*. at 5-6.

- A&M found significant variability between the costs and services provided by different service providers across the City Programs. *Id*. at 6-7.

- A&M found that the City did not reconcile actual spending or contractual obligations with its budget allocations and funding. *Id*. at 7.

Although the A&M Assessment was not a formal accounting audit, its findings were consistent with the decades of government audits and other reviews of the City and LAHSA's

homelessness spending and programs. A&M confirmed that the problems that had plagued the City's homelessness programs for years also extended to the programs overseen by this Court.

Of particular concern were A&M's findings related to the City's compliance reporting required by the Roadmap MOU and LA Alliance Settlement Agreement. A&M could not verify the City's reported number of time-limited subsidies ("TLS") under the Roadmap MOU because 70% of the TLS contracts provided by LAHSA did not report financial expenditures for fiscal year 2023-24. *Id*. at 64. A&M repeatedly requested more information from the City and LAHSA to verify TLS slots but did not receive it. Tr., 7-8, 19-21, May 28, 2025 (Dkt. 949). The TLS documentation provided to A&M was also missing many addresses and some TLS addresses overlapped with those reported as permanent supportive housing ("PSH") under the Alliance Settlement. Tr., 99, June 3, 2025. A&M also could not verify PSH sites reported under the Roadmap MOU and Alliance Settlement. Assessment, 114-116. About 20% of the PSH sites reported as open to the Court could not be found at all in LAHSA's Resource Management System ("RMS"). *Id*. at 114-115; Tr., 235-37, May 27, 2025 (Dkt. 947).

The City argues that the A&M Assessment is inadmissible hearsay. While the Court's findings and conclusions here do not rely solely on the Assessment, the Court is unquestionably permitted to consider the Assessment because it was a court-ordered report agreed to by the Parties, paid for by the City and County, based on data from the City, County, and LAHSA, and written in consultation with the Parties. Moreover, there was extensive testimony during the evidentiary hearing on the Assessment's findings by the authors of it.

## G. Systemic Change and Receivership Request

Here Plaintiffs go beyond arguing that the City has breached its obligations under the Roadmap MOU and LA Alliance Settlement Agreement. Plaintiffs argue that the City has breached and is incapable of coming into compliance because of systemic failures in the homelessness system. Plaintiff's Response Re Issues Raised by the Court on March 27, 2025 ("Plaintiffs' Receivership Brief") (Dkt. 899). These failures are so egregious and pervasive, according to Plaintiffs, that the only path towards compliance is a receivership over the City's homelessness response and funding. *Id*. Plaintiffs insist that "the system is broken" and city

leadership is unwilling or incapable of fixing it. *Id*. Plaintiffs seek far more than enforcement of contractual obligations. They seek a complete overhaul of the system and transfer of power to a receiver. *Id*.

To support their receivership argument, Plaintiffs rely on the history of audits and the A&M Assessment discussed above. *Id*. at 13. Plaintiffs also rely on elected officials' public recognition that the system is broken and recent events to show that there are no solutions left short of a receivership. In a March 27, 2025 hearing, Mayor Bass said, "I ran because I knew the system was broken and I wanted to come here and I wanted to make a difference." Tr., 44-45, March 27, 2025 (Dkt. 878). County Supervisor Barger also stated, "The system is broken." *Id*. at 50. The County Board of Supervisors voted on April 1, 2025, to move more than $300 million in upcoming Measure A funds out of LAHSA to a new county agency set to open in July 2026, but Plaintiffs argue that the new agency will simply recreate LAHSA's "culture of unaccountability and lack of transparency." Plaintiffs' Receivership Brief at 22. Plaintiffs also highlight recent scandals involving the LAHSA CEO, her alleged favoritism in hiring, her relationship with Mayor Bass, funds given to her husband's non-profit, and her ultimate resignation in April 2025. *Id*.

Plaintiffs argue that the City has no plans to make changes and continues to fund the Mayor's Inside Safe program despite its significant expense compared to cheaper interim housing and shelter options. *Id*. at 23. They argue that no substantive changes are being made by the City Council. A recent City Chief Legislative Analyst report entitled "Formation of a City Homelessness Governance Structure" presents some options for consolidating the City's homelessness system, but no concrete actions have been taken on it so far. *Id*. at 24; *see also* CLA Report. Finally, Plaintiffs argue that the City is in crisis as evidenced by the increased number of people living on the streets and long record of mismanagement of resources. Plaintiffs' Receivership Brief at 24. In response to City and County proposals for change, they say, "It is unclear at this point whether any such efforts [to reform by the City and County] will be fruitful or whether they are just moving deck chairs around on the Titanic." *Id*.

To solve the crisis, Plaintiffs recommend the following:

The receiver's authority should at minimum include program management (including redirecting remaining HHH funds and City/grant funding into cost-effective solutions), financial oversight (including negotiating directly with County for funding), encampment resolution efforts, and streamlining collaboration between the City, County, and LAHSA (in whatever form it continues to exist) to accomplish the goals of the Settlement Agreement. Depending on the type and purpose of the receivership, establishment for a defined term (*e.g.*, 3–5 years) would be appropriate, with the goal of returning control to the City once compliance is achieved.

*Id*. at 28.

## H. Procedural History of the Present Motions

Plaintiffs filed their Motion for Order for Settlement Agreement Compliance on September 4, 2024 (Dkt. 767). The City filed its Opposition on September 11, 2024 (Dkt. 774) and Plaintiffs filed a Reply on September 18, 2024 (Dkt. 776). The Court held hearings on October 8 and October 16, 2024, on Plaintiffs' Motion. The Parties also engaged in extensive negotiation and mediation with Special Master Martinez and Judge Birotte. At the request of the Parties, the Court resolved Plaintiffs' Motion partially by clarifying the definition of encampment reduction in the LA Alliance Settlement Agreement on March 24, 2025 (Dkt. 874).

Plaintiffs filed a second Motion for Order for Settlement Agreement Compliance on February 20, 2025 (Dkt. 863). The City filed its Opposition on March 6, 2025 (Dkt. 871). Plaintiffs filed their Reply on March 13, 2025 (Dkt. 872) which raised for the first time a request for a receivership over the City. The Court heard oral argument regarding the Motion on March 27, 2025 (Dkt. 877). Plaintiffs filed additional briefing on their request for a receivership over the City on May 8, 2025 ("Plaintiffs' Receivership Brief") (Dkt. 899). The City filed objections to Plaintiffs' Receivership Brief on May 13, 2025 (Dkt. 903). The Court then held an evidentiary hearing on Plaintiffs' two Motions for Settlement Agreement Compliance from May 27 through June 4, 2025. Plaintiffs, the City, and Intervenors participated in the evidentiary hearing. The County was present throughout and able to participate but chose not to.

After the close of evidence, the Court requested specific data from the City, which was not provided during the hearing, to verify its reporting of TLS slots under the Roadmap MOU (Dkt. 967, 973). Plaintiffs filed their Opening Brief on the Evidentiary Hearing ("Plaintiffs' Brief") on June 9, 2025 (Dkt. 977). The City filed the data requested by the Court under seal on June 11, 2025 (Dkt. 980, 981). The City filed its Post-Evidentiary Hearing Brief ("City Brief") on June 13, 2025 (Dkt. 983). Plaintiffs filed their Reply ("Plaintiffs' Reply") on June 17, 2025 (Dkt. 984). Intervenors also filed their brief ("Intervenors' Brief") (Dkt. 985) and the County filed its brief ("County Brief") (Dkt. 986) on June 17, 2025.

## III.    LEGAL STANDARD

"[T]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004) (quoting *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992)); *see also Knudsen v. C.I.R.*, 793 F.3d 1030, 1035 (9th Cir. 2015) ("A settlement is a contract, and its enforceability is governed by familiar principles of contract law.") (citation omitted). Here, both the LA Alliance Settlement Agreement and the Roadmap MOU state they are governed by California law. Ex. 2 § X; Ex. 25 § 23.

Under California law, the intent of the parties determines the meaning of the contract. Cal. Civ. Code §§ 1636, 1638. The relevant intent is "objective," meaning that it is manifested in the agreement and surrounding conduct, rather than parties' subjective beliefs. *United Com. Ins. Serv. Inc.*, 962 F.2d at 856; *Laws. Title Ins. Co. v. U.S. Fidelity & Guar. Co.*, 122 F.R.D. 567, 569 (N.D. Cal. 1988) (applying California law). Therefore, a party's unexpressed true intent is not relevant to interpretation. *United Com. Ins. Serv. Inc.*, 962 F.2d at 856; *Union Bank v. Winnebago Indus.*, 528 F.2d 95, 99 (9th Cir. 1975); *City of Mill Valley v. Transamerica Ins. Co.*, 98 Cal. App. 3d 595, 602–03 (1979).

The settlement should be interpreted "to give effect to the mutual intention of the parties." *Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1265 (1992) (in bank). Additionally, the whole of the settlement "is to be taken together, so as to give effect to every part, if

reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641; *see also Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 279 (9th Cir. 1992) ("specific provisions ordinarily qualify the meaning of the general provisions").

## IV.    DISCUSSION

Plaintiffs argue that the City is in breach of its obligations under the LA Alliance Settlement Agreement and Roadmap MOU.

### A.    Roadmap Agreement

One of the breaches alleged by Plaintiffs is missing beds under the Roadmap Agreement. Plaintiffs' Brief at 4. Specifically, Plaintiffs cite the A&M Assessment, which states that "A&M could not validate the reported number of TLS beds or the total expenses necessary to support those beds." Ex. 23 at 64. In response, the City argues that Plaintiffs are not entitled to any relief under the Roadmap MOU for three reasons: (1) Plaintiffs lack Article III standing to enforce the Roadmap MOU, (2) as a nonparty, Plaintiffs hold no rights under the MOU; and (3) the City has fully complied with its obligations. City Brief at 32-35.

#### 1.    The Roadmap MOU is Enforceable by the Court

The City contends that Plaintiffs lack standing to enforce the Roadmap Agreement because Plaintiffs are not a signatory to it. That argument misunderstands the basis of this Court's continuing jurisdiction. Plaintiffs need not be a party to the Roadmap MOU in order for the Court to enforce it. The Binding Term Sheet was not a private contract entered into in isolation—it was a judicially sanctioned substitute for the ongoing Preliminary Injunction. In approving the Binding Term Sheet, the Court expressly stated and incorporated into an Order that the agreement was "subject to court approval, monitoring, and enforcement." Ex. 1 at 2. Moreover, when the Court vacated its Preliminary Injunction, it did so conditionally—specifically reserving the right to reinstate injunctive relief if the parties failed to fulfill their obligations under the Binding Term Sheet. Order re Joint Stipulation Requesting the Court Approve the Binding Term Sheet and Vacate the Preliminary Injunction (Dkt. 138). Thus, the Binding Term Sheet is subject to continuing judicial oversight and enforcement.

The same is true of the Roadmap MOU, which was the natural outgrowth of the Binding Term Sheet and delineated how the City and County would divide implementation responsibilities. The Roadmap MOU was filed "in accordance with the Court's authority to monitor the agreement reached between the parties." Order for City and County to Meet, Confer, and File a Joint Report re: status of MOU (Dkt. 183). Importantly, the MOU itself explicitly states: "[t]his MOU is subject to enforcement by the Court. Promptly upon execution, Parties agree to submit this MOU to the Court." Ex. 2 at 8.

Because both the Binding Term Sheet and Roadmap MOU were incorporated into judicial orders and submitted to this Court, any breach of their terms constitutes a violation of this Court's Orders and is therefore under this Court's jurisdiction. *See In re Bard IVC Filters Prod. Liab. Litig.,* 81 F.4th 897, 907 (9th Cir. 2023)(reasoning that a participation agreement between a law firm and a MDL plaintiff's steering committee was within the district court's ancillary jurisdiction because it was incorporated into a court order and a district court has jurisdiction to determine whether one of its orders has been violated); *In re Volkswagen "Clean Diesel" Mktg., Sales Prac., and Prods. Liab. Litig.,* 975 F.3d 770,775 (9th Cir. 2020) (holding that because the district court expressly retained authority to "ensure compliance" with the settlement agreement's terms it is well within its jurisdiction to determine whether that agreement has been breached). And as the Ninth Circuit reaffirmed in *Cahill v. Insider, Inc.,* 131 F.4th 933, 938 (9th Cir. 2025), federal courts possess inherent powers to enforce their court orders and "correct that which has been wrongfully done by virtue of its process."

Accordingly, this Court has both the express and inherent authority to determine whether the City or County has breached the Roadmap Agreement, regardless of whether Plaintiff was a formal signatory or has standing.

### 2. Alleged Breach and Lack of Accountability in Roadmap Agreement

In determining whether the Roadmap Agreement has been breached, the Court begins by examining its governing terms and the extensive concerns surrounding data verification. The relevant provisions of the Binding Term Sheet and Roadmap MOU are set forth below.

### a. Number of Beds Required

Under the Roadmap Agreement, the City agreed to provide a total of 6,700 beds within 18 months. Ex. 1 at 1. The required schedule was as follows:

- 5,300 New Beds (not covered by existing agreements) within 10 months of June 16, 2020
- 700 additional New Beds within 18 months of June 16, 2020; and
- 700 Other Beds (already under existing agreements) within 10 months of June 16, 2020.

*Id.* In total, the City committed to establishing 6,700 beds under the Roadmap Agreement by the 18-month deadline. *Id.*

The Roadmap MOU further delineated the respective obligations of the City and County. It expressly states that the City is responsible for all costs—including capital, operating, and other related expenses—associated with the 6,000 New Beds and 700 Other Beds. Ex. 2 at 5. The precise mix and location of the beds however were left to the City's sole discretion. *Id.*

### b. Required City Status Reports

The Roadmap MOU also imposed clear reporting obligations on the City to ensure transparency and accountability in meeting its bed commitments. Specifically, the City was required to submit the following to both the County and the Court:

- Bed Plan (due August 1, 2020), outlining each Council District's plan for establishing the required New Beds and Other Beds;
- Quarterly Reports, beginning no later than October 15, 2020, detailing the City's progress over the preceding three months. Each report was due within 30 days of the quarter's end;
- Bed Count Reports, due at least 90 days prior to the annual payment dates for years two through five, specifying the number of existing beds and those projected to be open within 60 days of the payment date;

- Annual Reports, documenting the total City funding used to support services for New Beds during the prior fiscal year.

Ex. 2 at 6-8. The Roadmap MOU anticipated that the City and County were each to contribute approximately 50% of the average cost of providing services to PEH in the City-established New Beds. *Id.* at 6-7.

### c. A&M Assessment Findings

The A&M Assessment reviewed four of the City's Roadmap Quarterly Reports, with the most recent report examined covering the quarter ending June 30, 2024. Ex. 23 at 18. That report indicated 7,429 open and occupiable New Beds and 792 open and occupiable Other Beds under existing agreements. *Id.* (citing Dkt. 756-1). The City's latest Roadmap Quarterly Report, dated for the quarter ending March 31, 2025, reported an increased total of 7,624 open and occupiable New Beds and 792 open and occupiable Other Beds. Quarterly Status report of the City (Dkt. 891-1).

Based on these Roadmap Quarterly Reports, the A&M Assessment concluded that the City appeared to have met its obligations under the Roadmap Agreement. Ex. 23 at 18. The Assessment further found that the Roadmap Agreement facilitated the creation of a diverse mix of shelter and housing interventions, encompassing both long-term and short-term solutions. *Id.* at 33.

The Assessment highlighted that from the inception of the Roadmap Agreement through June 30, 2024, approximately $829 million had been appropriated to support the Roadmap Agreement's interim housing solutions. *Id.* at 50. Besides interim housing and TLS, the bed count also included sixteen PSH locations. *Id.* In total, $105.8 million in City funds were committed to PSH projects included under the Roadmap Agreement, with most of these funds sourced from Proposition HHH. *Id.*

But the A&M Assessment did identify general and significant inconsistencies in LAHSA's financial reports under the Roadmap Agreement. For example, LAHSA could not clearly identify all service provider contracts[9] and expenditures tied to the Roadmap

---

[9] Service providers deliver homelessness services funded by the City or County through contracts managed by LAHSA. *See* Ex. 23 at 47. The City and LAHSA established "named" contracts related to the Roadmap Agreement and Alliance

Agreement. *Id.* at 4. There were notable mismatches between LAHSA's financial data, and the separate files provided to A&M to identify service provider contracts. *Id.* at 64. This discrepancy made it difficult for A&M to determine which contracts were active and funded by the City, complicating efforts to accurately track expenditures. *Id.* at 4.

### d. Location of Beds under Roadmap Agreement

One dispute about the Roadmap Agreement concerns the location of beds reported. The Roadmap MOU states that the individuals to be housed under the MOU were to be "PEH within the City of Los Angeles." Ex. 2 at 1. As to the location of the beds provided, however, it expressly states that the "precise mix and location of New Beds and Other Beds will be determined at City's sole direction." *Id.* at 5.

Plaintiffs argue that at least 20% of the TLS beds appear to be located outside the City's geographic boundaries and contend that such placement suggests these are not City Beds, but actually part of a broader TLS system. Plaintiffs' Reply at 16. But Plaintiff has offered no evidence that the individuals placed in these beds were not originally unhoused persons within the City of Los Angeles. Nor have they identified any language that restricts the location of the beds themselves—only the origin of those being served.

There may be legitimate policy concerns about using City resources to house individuals in distant counties such as Kern, Riverside, or Orange. But those concerns fall outside the scope of the legal question presented. Under the plain terms of the MOU, the City retains sole discretion over bed placement. So long as the individuals served were unhoused within the City of Los Angeles, the physical location of the TLS beds—whether inside or outside City limits—does not constitute a breach.

### e. Overview of Time-Limited Subsidies (TLS) and the City's Lack of Verification

The heart of the Parties' dispute regarding the Roadmap Agreement is the verification and funding of TLS, previously known as Rapid Re-Housing. TLS provide participants with case management and financial assistance—including rental or leasing subsidies—for up to

---

Settlement, meaning contracts relevant to the Roadmap Program were named "Roadmap Program" to easily identify them. *Id.*

twenty-four months. Ex. 23 at 48. Unlike other housing options, TLS subsidies are generally not tied to a specific location. *Id.* Instead, TLS allows participants to work with case managers and Housing Navigators to secure and maintain stable housing in the private rental or affordable housing marking. *Id.* LAHSA characterizes TLS subsidies as designed to "fill the needs of people who do not need a deeper level of support that can be found in our other permanent housing programs such as Permanent Supportive Housing."[10] TLS programs are administered through service provider contracts managed by LAHSA. Ex. 23 at 48.

The A&M Assessment revealed that 55% of TLS funding came from non-Roadmap sources. *Id.* at 63. LAHSA acknowledged that it could not meaningfully distinguish TLS beds funded solely by the City from those supported by other fund sources or mixed funding streams. *Id.* at 63-64. LAHSA reported to A&M a total of 2,293 TLS "Scattered Site" beds as part of the Roadmap Agreement, yet approximately 70% of the related contracts for these TLS showed no financial activity in fiscal year 2023-24. *Id.* at 64. A&M requested documentation to reconcile these figures, but LAHSA only submitted a high-level memo lacking financial information or contract details. *See* Evidentiary Hearing Exhibit # 55 (Ex. 55) ("LAHSA Memo TLS Beds Open to Date and Clients Served in Roadmap Reports"). As a result, A&M could not verify the number of TLS participants or the corresponding expenditures. Ex. 23 at 64.

When pressed by the media, LAHSA eventually sent a spreadsheet showing that only 673 of the 2,293 TLS beds had City-subsidized costs—roughly 30%. *See generally* Evidentiary Hearing Exhibit # 141 (Ex. 141) ("LAist Article dated 5.15.25"). LAHSA tried to explain this funding by claiming that it expanded TLS by combining City funds with other funding sources. Plaintiffs contend that the language of the Roadmap MOU prohibits such "braiding" of funding. The language of the Roadmap MOU concerning funding states:

> Except as otherwise stated in this MOU, or to the extent COUNTY is responsible for costs in an agreement or plan between the PARTIES other than this MOU, CITY is responsible for all costs, including capital costs, operating costs, and/or other expenses associated with the 6,000 New Beds and 700 Other Beds described herein.

---

[10] LAHSA Time-Limited Subsidy (TLS) Programs, Los Angeles Homeless Servs. Auth. (Sept. 23, 2022, last updated Dec. 18, 2024), https://www.lahsa.org/news?article=896-lahsa-time-limited-subsidy-tls-programs.

Ex. 2 at 5.

Plaintiffs assert that this language obligates the City to fully fund each of the New Beds it reports. Plaintiffs' Reply at 15-16. They argue that the inclusion of 2,293 TLS beds in the Roadmap Report is misleading because financial records show that only a portion of those beds were funded by City dollars. *Id.* And they argue that this practice of combining or "braiding" City funds with other sources to count a bed as City-provided violates the express terms of the MOU and is false reporting. *Id*.

The City disputes Plaintiffs' interpretation, arguing that the term "provide" does not require the City to directly fund every bed, but simply to supply, furnish, or make them available. City Brief at 35. Rather, the City argues that arranging for the beds' availability through third-party or mixed funding sources satisfies this obligation under the Roadmap Agreement. *Id.* And it argues that the clause holding the City "responsible for all costs" merely defines the County's lack of financial responsibility and does not prohibit the City from leveraging external funding. *Id.* at 36.

In sum, the Parties fundamentally disagree over what it means to provide beds and the extent to which the City must directly fund each New Bed reported under the Roadmap Agreement.

The County opposes any extension of the Roadmap Agreement, arguing that it has fully complied with its obligations and that extending the Agreement would hinder its evolving efforts to address homelessness. County Brief at 2, 5. The County emphasizes that Plaintiffs have not alleged any breach of the Roadmap Agreement by the County. *Id.* at 5. Also, the County argues that the original terms of the Roadmap Agreement no longer reflect the current costs of operating interim housing. *Id.* And the County states that they have adopted a new strategy focused on stronger oversight, accountability, and alignment of homelessness services. *Id.* These strategies include: the creation of the Executive Committee on Regional Homeless Alignment (ERCHA) and Leadership Table on Regional Homeless Alignment; plans to streamline LAHSA and centralize services under a new County department launching in January 2026; and that the County Auditor-Controller's office is reviewing the City's reported

TLS data. *Id.* at 5-6. In sum, the County contends that the Roadmap Agreement should not be extended because it would bind the County to an outdated framework when it is actively implementing more effective solutions.

### f. Analysis of Alleged Breach

At the heart of this evidentiary record lies a persistent problem: the inability to verify the City's reported data. Laura Frost, a Director at A&M who helped lead the A&M Assessment, testified that neither the City, nor LAHSA provided adequate documentation showing that the reported TLS beds were newly created. Tr., 18, June 3, 2025. She explained that approximately 70% of the contracts LAHSA initially identified as creating new beds lacked any associated spending details. *Id.* This was compounded by inconsistent internal contract data that failed to specify how many beds were authorized, created, or utilized. *Id.* at 19. Further, the reported address and site rosters failed to align with the number of beds reported; in some cases, the addresses even overlapped with those also being reported under the Alliance Settlement. *Id.* at 19, 99.

These verification issues are not new, in fact they were raised in open court months prior to the Evidentiary Hearing. During a hearing on March 27, 2025, these issues were openly discussed, and the Parties were invited to discuss the findings of the A&M Assessment with A&M or provide the missing data. *See* Tr., 108, March 27, 2025. But even after this hearing, the Chief Administrative Officer ("CAO") of Los Angeles still failed to provide A&M with the data necessary to confirm whether the TLS beds had been created under the Roadmap Agreement. Tr., 179, June 3, 2025. The evidentiary record also contains no testimony or exhibits from the City directly addressing or rebutting these concerns. Instead, the evidentiary record reflects a consistent lack of cooperation and responsiveness—an unwillingness to provide documentation unless compelled by court order or media scrutiny. And rather than spending taxpayer dollars on finding the missing data or striving to provide verification, the City fought with the findings and methods of the A&M Assessment, the same methods they agreed to and paid for.

A&M's findings are not isolated. During the Evidentiary Hearing, the October 2021 Audit by the Los Angeles County Auditor-Controller was entered into the record. Tr., 87, June 2, 2025. This audit, commissioned to determine whether the City had accurately reported New Beds to receive an $8 million incentive bonus from the County, similarly concluded that the City failed to accurately report beds in accordance with the Roadmap MOU. Evidentiary Hearing Exhibit # 140 ("Ex. 140") ("Joint Status Report of Defendants Re: MOU"). A sample review of 1,106 beds found that 28% of those beds were not actually open and occupiable, and the City could not provide documentation to confirm that another 24% were either. *See generally id.* These findings are also echoed by the Special Master's annual report, which likewise could not verify the existence of many beds the City claimed under the Roadmap. *See* Ex. 93 at 10. Despite all this, the City chose to put on no evidence during the seven-day hearing to substantiate its Roadmap reporting.

In an effort to preserve resources, the Court provided the City with one final opportunity to cure its evidentiary deficiencies. After the close of evidence, it issued an Order directing the City to produce a comprehensive spreadsheet containing key data for each of the 2,679 TLS slots and 130 scattered-site beds it claimed to have created under the Roadmap Agreement. Amended Order Requiring City Verification of TLS Reporting (Dkt. 967). This data—long requested by A&M but previously withheld—was finally produced only by Court Order. In disclosing this data, the City also came clean that there was some double counting or false reporting. *See* Declaration of Matthew W. Szabo re Court's Directive ("Szabo Decl.") (Dkt. 980) at 1-2. But even omitting these beds, there were still key data points given for the necessary amount of TLS slots. Thus, in light of this, the Court holds that there is not sufficient evidence to find a breach under the Roadmap Agreement.

The Court's primary concern is ensuring the creation of shelter or housing for PEH—not arbitrating disputes over financing strategies or the definition of terms. But the Court not finding a breach at this time does not equate to an acceptance of the City's lack of accountability and verification. To belabor litigation over the Roadmap Agreement any further

would only redirect resources away from urgently needed housing efforts and into sanctions or further litigation over receivership.

Yet even in making that finding, the Court expresses deep skepticism. The data produced was not proactively disclosed in the name of transparency but was instead submitted under pressure, and only after the threat of judicial remedy loomed. Without accurate data, the public is left to rely on the assurance of public officials who have already presided over repeated reporting failures.

Ultimately, the Court's decision not to declare a breach reflects judicial restraint, not confidence. The pattern is clear: documentation is withheld until exposure is imminent, public accountability is resisted until judicially mandated, and the truth of reported progress remains clouded by evasive recordkeeping. As the Court observed, these failures have undermined public trust and judicial trust alike. While the Court has accepted the City's latest data to avoid derailing housing efforts, it makes clear that such acceptance should not be mistaken for vindication. The City's compliance rests on shaky ground, upheld not by verifiable facts, but by the last-minute declarations of its own officials. If the Roadmap Agreement has taught us anything, it is that seeking accountability with the City of Los Angeles is like chasing the wind.

**B. LA Alliance Settlement Agreement**

    **1.   Overview**

Plaintiffs argue that the City is in breach of its obligations under the Settlement Agreement in three ways. *See generally* Plaintiffs' Reply. First, the City has not met Section 5.2's obligation to create a bed plan. *Id*. at 2-4. Second, the City has failed to employ its best efforts to meet its bed creation milestones under Section 5.2. *Id*. at 4-10. Third, the City has failed to use best efforts to meet its encampment reduction milestones under Section 5.2. *Id*. at 10-13.

In response, the City contends that Plaintiffs' arguments are premature as it has until June 13, 2027, to provide 12,915 "housing or shelter solutions" and until June 30, 2026, to achieve 9,800 encampment "reductions." City Brief at 16. The City also argues that finding a breach is premature because Section 8.2, which provides for a pause of its obligations during

emergencies, was triggered by the Mayor's continued declaration of emergency during the January 2025 wildfires in the City. *Id*. at 13. Alternatively, the City argues that it has employed best efforts and is in full compliance with the Settlement Agreement. *Id*. at 19-31.

### 2. Interim Breaches of the LA Alliance Settlement Agreement

While the Court does not find at this time that the City has breached the Settlement Agreement as a whole, the City has failed to meet critical internal obligations under the Agreement. In order to ensure compliance moving forward and the City's success in 2027, the Court details the City's significant failures, clarifies the City's obligations, and institutes greater safeguards below. Transparency, accuracy, and accountability are essential to compliance.

### a. Outdated and Incomplete Bed Plan

The Settlement Agreement required the City to "create a Required Number of housing or shelter solutions, which is equal to, but (in the City's discretion) may be greater than, the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate PEH [persons experiencing homelessness] within the City based on LAHSA's 2022 Point in Time count." Ex. 25, §3.1. Further, the City was required to calculate the "Required Number." *Id*. §5.1. It is undisputed that the City met that obligation by calculating 12,915 as the Required Number in 2022. Tr., 244, 252-253, May 28, 2025 (Dkt. 949).

Plaintiffs argue that the City has failed to fulfill Section 5.2, which requires the City to "create plans" and "provide the plans" to Plaintiffs, because the City currently has no plan detailing how it intends to reach the 12,915 required shelter or housing solutions. Plaintiffs' Reply at 2-3.

Section 5.2 of the Settlement Agreement provides:

> "Thereafter the City will create plans and develop milestones and deadlines for: (i) the City's creation of shelter and housing solutions to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in each Council District as determined by the Required Number; (ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District; (iii) the City's creation of shelter and/or housing to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number; and (iv) the City's

> plan for encampment engagement, cleaning, and reduction in the City. The City will provide the plans, milestones and deadlines to Plaintiffs, and the City and Plaintiffs agree to work together in good faith to resolve any concerns or disputes about the plans, milestones, and deadlines, and will consult with the Court for resolution, if necessary. The City will provide a report setting forth the milestones and deadlines. The Parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines."

*Id.* §5.2.

In November 2022, the City provided a "bed plan" titled "Potential Project List as of 11/9/2022" that listed projects to partially fulfill its obligation to create 12,915 solutions under the Agreement. Evidentiary Hearing Exhibit # 114 ("Ex. 114") ("LA Alliance Milestones Potential Project List"); Tr., 88-93, May 29, 2025 (Dkt. 953). Matthew Szabo, the Chief Administrative Officer of the City, testified that the plan did not provide projects totaling 12,915 solutions. Tr., 88-93, May 29, 2025. The November 2022 plan includes about 8,000 shelter and housing solutions. Ex. 114.

On August 30, 2024, the Court ordered the City to provide a "detailed written version of the proposed bed plan" that had been discussed by Szabo in court the day prior. Order Re: Bed Plan (Dkt. 765). On September 12, 2024, the City submitted its proposed plan. Evidentiary Hearing Exhibit # 113 ("Ex. 113") ("City of Los Angeles Proposed Bed Plan") (Dkt. 775). The plan proposed transitioning 2,500 Roadmap MOU beds to count towards Alliance Settlement obligations once the Roadmap MOU expired in June 2025. *Id.* After meeting with the County, Special Master Martinez, and Judge Birotte, the City withdrew its September 2024 bed plan in October of that year. Tr., 119-120, May 29, 2025. Since then, no additional or updated bed plan has been produced to Plaintiffs or the Court. *Id.* at 120-121; *see also* Tr., 267, June 3, 2025 (Dkt. 969).

The City argues that it met its obligation by providing the November 2022 plan because the Settlement Agreement does not require that there be a single, complete plan to create 12,915 beds and no hard deadline to provide such a plan. The City maintains that it has ample time to provide an updated plan after the emergency "pause" under Section 8.2 ends, the Court

resolves disputes over the Agreement, and the City finalizes how it will create the remaining beds. City Brief at 19-20.

The Court agrees with the City that there may be multiple plans and they may be iterative. However, with only two years to go, the City must provide an updated bed plan detailing how it intends to meet its obligation to create 12,915 housing or shelter solutions by the end of the Settlement term. The City's reliance on an outdated and incomplete plan from November 2022 of only about 8,000 beds runs the risk that the City will not sufficiently plan to fund the beds.

The City seems to suggest that requiring a plan would unfairly commit it to a specific strategy. That is not so—the City may update the plan as needed. Because elected officials change and funding sources change, the plan will not be set in stone. Such flexibility was agreed to in Section 3.2 giving the City "sole discretion" to choose the type of housing or shelter solution. Requiring a plan now, even if it is later changed, is consistent with the Court's August 30, 2024 Order and the terms of the Settlement. It will also ensure that the City is successful in 2027. The City shall provide such a plan to Plaintiffs and the Court by October 3, 2025.

### b. Missing Shelter and Housing Solution Milestones

Plaintiffs argue that the City has not employed its "best efforts" to create the 12,915 required shelter or housing solutions and that it has consistently missed its own milestones for bed creation. Plaintiffs' Reply at 4. The City concedes that it "has fallen short of interim milestones" but maintains that it has used best efforts to create thousands of beds and is on track to exceed the required 12,915 beds by June 2027. City Brief at 21. The City's most recent quarterly report shows 6,724 beds were open as of March 31, 2025, and another 4,278 beds were "in process." Evidentiary Hearing Exhibit # 35 ("Ex. 35") (City Quarterly Status Report April 15, 2025") (Dkt. 892-1), at 6. Plaintiffs argue that the City has incorrectly prioritized investment in permanent supportive housing which is too slow and too expensive. Plaintiffs' Reply at 7. Plaintiffs, however, do not set the City's housing policy and the Settlement Agreement left the type of solution to the City's "sole discretion." Ex. 25, §3.2.

That being said, it is undisputed that the City did not meet the milestones for shelter and housing creation that it set for itself. The City provided Plaintiffs with a chart of "Alliance Milestones" for shelter and housing solution creation for each quarter of each fiscal year from fiscal year 2022-23, until 2026-27. Evidentiary Hearing Exhibit #24 ("Ex. 24") ("Housing-Shelter Alliance Milestones") (Dkt. 863-5). The City has consistently missed those milestones according to its quarterly reports. Each missed milestone inflicted material harm to the public and those living on the streets who were denied shelter or housing:

- January 17, 2023: The City reported 721 beds open as of the quarter ending December 31, 2022, short of its target of 1,622 (56% deficit). City Quarterly Status Report, Ex. A, at 7, Jan. 17, 2023 (Dkt. 516-1). **The City failed to shelter 901 Angelenos as promised.**

- April 21, 2023: The City reported 935 beds open as of the quarter ending March 31, 2023, out of a target of 2,482 (62% deficit). City Quarterly Status Report, Ex. A, at 7, Apr. 21, 2023 (Dkt. 539-1). **The City failed to shelter 1,547 Angelenos as promised.**

- July 17, 2023: The City reported 1,748 beds open as of the quarter ending June 30, 2023, out of a target of 3,700 (53% deficit). City Quarterly Status Report, Ex. A, at 8, July 17, 2023 (Dkt. 598-1). **The City failed to shelter 1,952 Angelenos as promised.**

- October 16, 2023: The City reported 2,347 beds open as of the quarter ending September 30, 2023, out of a target of 4,138 (43% deficit). City Quarterly Status Report, Ex. A, at 8, Oct. 16, 2023 (Dkt. 652-1). **The City failed to shelter 1,791 Angelenos as promised.**

- January 16, 2024: The City reported 2,810 beds open as of the quarter ending December 31, 2023, out of a target of 5,190 (46% deficit). City Quarterly Status Report, Ex. A, at 8, Jan. 16, 2024 (Dkt. 660-1). **The City failed to shelter 2,380 Angelenos as promised.**

- April 15, 2024: The City reported 3,018 beds open as of the quarter ending March 31, 2024, out of a target of 5,688 (47% deficit). City Quarterly Status Report, Ex. A, at 8, April 15, 2024 (Dkt. 728-1). **The City failed to shelter 2,670 Angelenos as promised.**

- July 15, 2024: The City reported 4,017 beds open as of the quarter ending June 30, 2024, out of a target of 5,950 (32% deficit). City Quarterly Status Report, Ex. A, at 8, July 15, 2024 (Dkt. 757-1). **The City failed to shelter 1,933 Angelenos as promised.**

- October 18, 2024: The City reported 4,455 beds open as of the quarter ending September 30, 2024, out of a target of 6,235 (29% deficit). City Quarterly Status Report, Ex. A, at 6, Oct. 18, 2024 (Dkt. 797-1). **The City failed to shelter 1,780 Angelenos as promised.**

- January 22, 2025: The City reported 4,815 beds open as of the quarter ending December 31, 2024, out of a target of 6,714 (nearly 30% deficit). City Quarterly Status Report, Ex. A, at 5, Jan. 22, 2025 (Dkt. 858-1). **The City failed to shelter 1,899 Angelenos as promised.**

- April 15, 2025: The City reported 6,724 beds open as of the quarter ending March 31, 2025, out of a target of 6,782 (1% deficit). Ex. 35 (Dkt. 892-1), at 6. **The City failed to shelter 58 Angelenos as promised.**

These milestones are not optional or aspirational. They are crucial benchmarks to ensure the City succeeds in 2027. If all of the City's shelter and housing solutions are backloaded and the City continues to miss its targets, the City runs the risk of rushing to create solutions and not meeting its obligations in 2027 at the cost of those waiting for shelter. Incremental progress and accountability are the key to mitigating that risk.

Additionally, each missed milestone represents a missed opportunity to shelter residents living and dying on the streets. Although the City reports that it has nearly reached its goal in the last status report due to the recent inclusion of Inside Safe beds, the City delayed creating shelter and housing solutions for thousands of people as promised from 2023 to 2025. The

suffering—from hypothermia to heat stroke, from gangrene leading to amputations to hepatitis, from scabies to insect infestation, and from sexual violence to rat bites—that resulted from that delay cannot be undone. Therefore, the City shall submit to the Court an updated milestones document that comports with its updated bed plan by October 3, 2025.

### c. Creation of Housing or Shelter Solutions

Section 3.1 requires the City to "create a Required Number of housing or shelter solutions" but the Settlement Agreement does not define what it means to "create" solutions. Ex. 25. During the evidentiary hearing, Intervenors raised this issue and questioned whether certain solutions in the City's compliance reporting had been "created" by the City. *See* Tr., 97-105, May 30, 2025 (Dkt. 955). CAO Szabo did not know what the status was of several buildings before the City purchased or master-leased them and included them in the City's compliance reporting. *Id*. For example, he did not know whether the Stuart Hotel was previously available to house homeless individuals before the City entered into an occupancy agreement to use it as interim housing. *Id*. at 99-102.

Intervenors argue that the City must clarify what role it plays in creating the shelter and housing solutions it is counting towards its obligations. Intervenors' Brief at 25. Further, Intervenors argue that the City must consider and identify whether units counted were already covenanted as affordable units because if they were, the City did not "create" them. *Id*. at 26.

Intervenors highlight that the City itself has already defined "create" in response to Intervenors' initial objections to the Settlement Agreement:

> The word 'create' indicates that the City will create new beds that are not already in existence. *See, e.g.*, Webster's Dictionary, https://www.merriam-webster.com/dictionary/create ('create' means 'to bring into existence' and 'to produce or bring about by a course of action or behavior'; Black's Law Dictionary, 6th Ed. 1990 ('create' means 'to bring into being; to cause to exist; to produce'). Therefore, the Intervenors' concern 'that the City could count existing shelter beds or housing units towards the number of shelter beds needed to reach the 60% threshold' (ECF No. 434 at 22) is wrong.

City of Los Angeles' Reply to Objections to the Settlement Agreement (Dkt. 438), at 9 (emphasis in original).

Despite the City's own assertion that "create" means "new" beds, the City is currently counting numerous units that already existed before the Settlement Agreement. The question then is how the City caused those units to come into existence as housing or shelter solutions for people experiencing homelessness. The City's reporting does not answer this question and the City provided no clarification during the seven days of the evidentiary hearing.

For clarity moving forward, the Court holds that "create" means, as the City previously said, to bring into existence as a shelter or housing solution for people experiencing homelessness. Beginning in the quarterly report slated for October 2025, the City shall include an explanation for each unit that already physically existed prior to the Settlement Agreement of how the City contributed to bringing that unit into existence as a shelter or housing solution for people experiencing homelessness as opposed to its prior use. For example, the City might explain that a hotel was formerly vacant or market rate until the City began master leasing rooms for people experiencing homelessness. Because the City was not able to provide any explanation for its counting of previously existing units during the evidentiary hearing and has not submitted any since, this further explanation is necessary to ensure compliance moving forward.

### d. Inside Safe Reporting

Plaintiffs argue that beds contracted through Inside Safe booking agreements should not be counted toward the City's Settlement obligations. Inside Safe is an interim housing program run through the Mayor's office. Inside Safe beds are contracted through either occupancy agreements, which entail the master leasing of an entire hotel, or booking agreements, which pay for a hotel room for individuals on an as needed basis. Tr., 97-99, 103, May 29, 2025 (Dkt. 953). Plaintiffs argue that beds contracted with booking agreements should not count because they are for an indeterminate amount of time and may not be contracted for through the Settlement Agreement's full term. Plaintiffs rely heavily on the fact that the City did not count Inside Safe beds contracted for through booking agreements, as opposed to occupancy agreements, until recently because they were not booked through June 2027.

Indeed, in the City's Housing and Homelessness Committee meeting earlier this year, the CAO's staff reported to the committee that it was not counting any Inside Safe beds that were not contracted through June of 2027. Tr., 106-108, May 29, 2025. But then, beginning in the City's most recent status report for the quarter ending March 31, 2025, the City began to report all of its Inside Safe beds toward its Alliance Settlement obligations regardless of the contract duration. Ex. 35. To be clear, the nearly 2,000 bed increase reported from the status report in January 22, 2025, to the status report in April 15, 2025, is due to the inclusion of more Inside Safe beds *not* the creation of new beds. To explain this, the City's decision to count all the Inside Safe beds, CAO Szabo testified that the Inside Safe program has matured and all Inside Safe beds are fully compliant with the Settlement. Tr., 106-107, May 29, 2025. He testified that it was never his office's position that they could not be counted, it was merely their decision not to count them. *Id*.

The terms of the Settlement allow the City to count Inside Safe beds whether they are contracted through occupancy or booking agreements and whether they are contracted for through June 2027 or not. The Settlement explicitly allows the City to count "hotels/motels" and leaves the type of housing or shelter solution to the City's "sole discretion." Ex. 25, §3.2. It has long been understood by both the Court and the Parties that the beds need not be static so long as 12,915 beds exist in June 2027. The City highlights that Plaintiffs made this point themselves in a December 29, 2023 email to the City:

> We have noted, several times, that while the City is required to increase and maintain its bed capacity through the first half of 2027, that does not mean that a specific bed created must stay available for the term of the settlement. Instead, should a specific bed no longer be available (i.e. an interim facility which is only leased for 12-36 months), the City may create at least another bed to maintain capacity and avoid bed reduction.

Evidentiary Hearing Exhibit # 216 ("Ex. 216") (Dkt. 964-10), at 4-5. This position is consistent with the Plaintiffs' continued demand that the City prioritize interim housing and shelter over permanent supportive housing.

While the City has flexibility in deciding which solutions to create, the Court is committed to ensuring that each of the 12,915 beds ultimately exists. CAO Szabo testified

about the Inside Safe booking agreements: "Of course, if they're temporary, if the beds come offline before June of 2027, our obligation would be to replace those beds, of course, because our understanding is that there's no obligation that the beds are static. We have to establish the total number of 12,915." Tr., 108, May 29, 2025. The Court will hold the City to this promise.

### e. Data Reporting and Verification

Special Master Martinez's reports and the A&M Assessment have shown that it is extremely difficult, if not impossible, to verify the housing and shelter solutions that are reported by the City to meet its obligations. The Court receives numbers of shelter and housing solutions created by the City in its quarterly reports with no documentation to substantiate the numbers. When errors are found in the data reported, the City has repeatedly ignored the errors or attacked the messenger instead of engaging with and correcting the issues. This pattern has persisted for years and is untenable if the City is to succeed in meeting its obligations by 2027.

The City's inability or unwillingness to verify its reporting or even explain how it counts and reports solutions was on stark display during the evidentiary hearing. At no point during the costly and time-intensive seven-day hearing did the City attempt to substantiate its reporting which had been called into question by Special Master Martinez, in addition to other witnesses, and which A&M had not been able to replicate.

Special Master Martinez's first report covering the period July 1, 2022, through December 31, 2023, put the City on notice that it needed to improve its data gathering and reporting to be successful. *See* Independent Monitoring Report Year One (Dkt. 674), at 21. Special Master Martinez reiterated this concern in her second report and highlighted her inability to verify the City's beds. For example, Special Master Martinez often performs spot checks on housing or shelter sites reported by the City. Tr., 257-258, June 3, 2025. She was unable to check twenty sites listed in the City's December 2024 report because they were not part of the HMIS system. *Id*. at 258; *see also* Ex. 93 at 21. After following up with LAHSA and the City about those sites, Martinez still has not received a response. Tr., 258-261, June 3, 2025.

After over a year of work by ten professionals, A&M was also not able to replicate the City's reporting to the Court. A&M concluded that "one of the primary obstacles was the inability to verify the number of beds the City reported under the Roadmap and Alliance Programs." Assessment at 4. By releasing multiple drafts of the A&M assessment and providing the Parties with over six weeks to meet with the A&M team before finalizing the Assessment, the Court gave the City ample time to correct A&M or substantiate its reporting. Instead of providing the specific data requested by A&M to verify reporting, the City did nothing. Again, during the evidentiary hearing, the City chose to dismiss A&M's findings and attempt to undermine A&M's credibility instead of simply providing the data or explaining its reporting to the Court. The City wasted significant time during the hearing berating A&M for not adhering to certain governmental accounting standards even though the City *agreed to* the standards used by A&M and *paid for* the Assessment to resolve Plaintiffs' previous sanctions motion. In short, the City has been on notice for years that its data collection and reporting is woefully insufficient but continues to ignore its responsibility to report accurate numbers to the Court.

The inability to verify the City's reporting is a serious roadblock to compliance. In addition to the recent evidentiary hearing, confusion over and inconsistencies within the reporting have led to dozens of informal conferences, mediation sessions, and hearings throughout this litigation. Significant time and resources have been spent by all the Parties in debating and litigating details of the City's reporting. Days of the evidentiary hearing in May and June could have been avoided if the City had simply provided the data requested of it or put on witnesses to explain its reporting. For this reason, the Court seeks to limit further confusion and pave a smoother road to compliance by requiring the Parties to choose a third party to monitor reporting as was originally agreed to in the Settlement.

The Settlement Agreement provides that the "Parties will engage a mutually agreed-upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of this Agreement. The City shall be responsible for paying all fees, if any, or for obtaining grants or other private funding, if needed." Ex. 25, §7.2.

In Special Master Martinez's first monitoring report, she underscored the importance of Section 7.2. She reported that:

> Initial discussions were initiated with the City and the Alliance, yet it appears that a third party has not been hired to gather the crucial data required for this agreement. It is paramount that the City adheres to these vital provisions to ensure full compliance with all aspects of the agreement. While deadlines may not be specified, it is crucial for the City to disclose details about its existing data collection systems and make the data gathering, analysis, and feedback easily accessible for transparency and accountability purposes.

Independent Monitoring Report Year One (Dkt. 674), at 19-20. The Parties have never fulfilled Section 7.2.

To address verification failures, the Parties shall meet and confer on a third-party Monitor by August 22, 2025, and, subject to the Court's approval, select the Monitor by September 12, 2025. Subject to the Parties' input, the Monitor will at least be responsible for reviewing the City's data prior to publication of its quarterly reports, verifying the numbers reported, engaging with the Parties and LAHSA to resolve data issues, and providing public reports on data compliance. The Monitor shall have full access to the data that the City uses to create its reports to the Court. To streamline disputes over verification and compliance, the Court also orders that the Parties attend an in-person court hearing after the submission of each quarterly report. This accountability measure will ensure that disagreements are efficiently resolved as they arise.

Additionally, the Court reemphasizes the importance of public transparency which goes hand in hand with accountability and Settlement compliance. The Court has requested for years that the City and County maintain public websites with third-party service provider contracts and invoices for homelessness services. After creating such websites, the City and County have previously failed to keep them updated. *See* Order Setting Hearing for June 6, 2024 (Dkt. 744). Again, the Court requests that the City update its public website to include all service provider contracts and invoices particularly those tied to beds reported under the Settlement Agreement. The Monitor shall review and provide guidance on public accessibility to the contracts and invoices.

### f.  Encampment Reduction Milestones

Section 5.2 requires the City to "create plans and develop milestones and deadlines for…(ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District…" Ex. 25, §5.2. In January 2024, the City and Plaintiffs agreed to the goal of 9,800 reductions of tents, makeshift shelters, cars, and RVs by June 30, 2026. Evidentiary Hearing Exhibit # 65 ("Ex. 65") (Dkt. 668-1), at 82–84; Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713), at 2–3. In the City's most recent quarterly report, the City had performed 6,129 encampment reductions as of March 31, 2025. Evidentiary Hearing Exhibit # 63 ("Ex. 63") ("Alliance Settlement Agreement Encampment Quarterly Reports") (Dkt. 892-2), at 2. Plaintiffs argue that the City is not meeting its encampment reduction milestones because it is improperly counting cleanings under Care and Care+ operations as reductions and that its reporting violates the Court's March 24, 2025, Order defining reductions. The City maintains that it is not required to make offers of shelter or housing as part of its encampment reduction plan.

In response to the Plaintiffs' Motions for Settlement Agreement compliance, the briefing on the Motions, and several hearings, the Court clarified on March 24, 2025, what may be counted as a reduction by the City. Evidentiary Hearing Exhibit # 52 ("Ex. 52") (Order re Plaintiff's Motion re Settlement Agreement Compliance") (Dkt. 874). The Court held the following:

> For clarity, the Court holds that per the terms of the Settlement Agreement there is a distinction in providing milestones and deadlines for encampment clean-ups and Encampment Reductions. The City may not report clean-ups from programs such as Care or Care+ as Reductions to prove compliance with the Settlement Agreement because they are not permanent in nature. The Court agrees with Plaintiff that cleaning an area, only to have unhoused individuals move back in without offers of shelter or housing, is not a "Resolution" or Encampment "Reduction" and shall not be reported as such. Thus, the City is only to report Encampment Reductions that have a more permanent meaning such that unhoused individuals are moved off of the street and given shelter or housing.

*Id*. (internal citations omitted).

The Court further stated that it would decide the details of encampment reduction reporting and the metrics necessary at a later date. *Id*.

The Court's Order was consistent with its express authority under Section 5.2 to resolve disputes about the plans, milestones, and deadlines and its authority to enforce the Settlement. Despite the Court's Order in March, the City never filed a motion for reconsideration or modification of the Settlement Agreement based on the clarification. The City merely orally objected to the Order at the March 27, 2025 hearing and then proceeded to ignore the Order. The City failed to amend its prior reports to the Court and willfully disobeyed the Order in its April 15, 2025 quarterly status report. Based on the evidence presented at the evidentiary hearing, the Court reaffirms its previous Order and again clarifies the following for the City.

To count encampment reductions under the Settlement Agreement, each reduction must be accompanied by an offer of shelter or housing to the individual or individuals whose tent, makeshift shelter, or vehicle is removed. Individuals need not accept the offer, but an offer of available shelter or housing must be made. If a tent, makeshift shelter, or vehicle is abandoned and the owner cannot be found, such an offer would be impracticable and is not required. It is also impracticable for the City to track whether the person offered shelter or housing remains housed indefinitely for the purposes of the Settlement Agreement.

This definition of reduction is consistent with the City's representations to the Plaintiffs throughout the litigation including the City's reliance on Inside Safe encampment resolutions and interchangeable use of the terms "resolution" and "reduction." The City's current position that reductions only consist of the removal of tents, makeshift shelters, and vehicles is new and flies in the face of its own plans and promises.

The Parties and this Court have used the term "encampment reduction" and "encampment resolution" interchangeably. The City's own quarterly reporting is titled "Encampment Resolution Data." *See e.g.*, Ex. 63. Special Master Martinez also testified that she has used "reduction" and "resolution" interchangeably, has observed the City doing the same in city council meetings and its reporting, and has not been corrected by the City for using the terms interchangeably. Tr., 137-139, June 4, 2025 (Dkt. 976).

Whether using reduction or resolution, the City has routinely defined the term consistent with the Parties' understanding of an encampment resolution which includes offers of shelter or housing. The City's October 3, 2023 plan submitted to the Plaintiffs titled "Encampment Engagement, Cleaning, and Resolution Plans and Milestones" explicitly includes matching available beds to encampment residents as part of encampment resolutions and reductions. Ex. 65, at 64-71. The City's eight-page plan details the City's "encampment resolution" process: "In order to resolve an encampment, the City must ensure there are beds available to match with encampment residents and that service providers have the capacity to provide case management and other services." *Id*. at 69. Each page of the plan has the heading "LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC" which confirms the City's intent to use this plan to comply with its agreement with the Plaintiffs to conduct 9,800 encampment reductions.

The City argues that the October 3, 2023 plan was just a proposal that was rejected by Plaintiffs. City Brief at 29. That is misleading. There is evidence that Plaintiffs rejected the number of reductions and the deadlines in the City's plan but not the mutual understanding of what an encampment reduction was and entailed. The City never corrected or changed its plan of how encampment reductions were defined and carried out so when the City and Plaintiffs reached their agreement on 9,800 reductions, the plan promised by the City remained intact and all Parties proceeded with that understanding.

During the evidentiary hearing, there was extensive testimony on the Mayor's Inside Safe program from CAO Szabo and Dr. Etsemaye Agonafer, the Deputy Mayor for Homelessness and Community Health. Under Inside Safe, an "encampment resolution" occurs when individuals living outside are offered interim housing and voluntarily accept it. Evidentiary Hearing Exhibit # 44 ("Ex. 44") (Dkt. 863-7), at 42-45. The Mayor's Office of Housing and Homelessness Solutions stated: "Following an encampment resolution, the same outreach teams monitor the original location for re-population, engage with new or old residents at the site, and offer housing as it becomes available." *Id*. at 44.

CAO Szabo testified that merely shifting encampments during cleanings under Care and Care+ is not counted as reductions but rather the reduction numbers reported represent tents,

makeshift shelters, and vehicles that are removed and taken into the City's custody. Tr., 145-146, May 30, 2025 (Dkt. 955). Szabo testified that the encampment reductions reported to the Court are based on Care, Care+, and Inside Safe operations. *Id*. at 147. Because Inside Safe's encampment resolutions necessarily entail offers of interim housing, at least some of the encampment reductions reported to the Court should have been accompanied by an offer of shelter or housing, but that number is unknown.

The City has consistently represented to Plaintiffs that encampment reductions and resolutions are the same thing and that both include offers of shelter or housing just as the Mayor's Inside Safe program does. The City's attempt to unilaterally change its definition of encampment reduction now ignores its past conduct and promises, the Court's prior Order, and the plain meaning of the Settlement Agreement. Based on the definition of encampment reduction articulated by the Court above, the City shall report its updated encampment reduction data beginning in the October 2025 quarterly status report.

The Monitor provided for in Section 7.2 will also be responsible for reviewing whether offers of shelter or housing were made to those whose belongings are counted as encampment reductions. It is expected that the City be able to provide the name of the shelter or housing that was offered and available for each encampment reduction, but the details of what documentation is required will be finalized by the Monitor in consultation with the Parties.

### 3. Section 8.2 Emergency Provision

Section 8.2 of the Alliance Settlement Agreement states:

In the event of fires, floods, earthquakes, epidemics, quarantine restrictions, or other natural catastrophic occurrences; terrorist acts, insurrections or other large scale civil disturbances; or any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council under the authority vested in them by the Los Angeles City Charter and Los Angeles Administrative Code (or other applicable ordinances, resolutions, or laws), the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations.

Ex. 25 at 10. The City invokes this clause, arguing that its obligations under the Settlement Agreement are currently paused due to the ongoing State of Emergency

declared by the Mayor in response to the 2025 wildfires. According to the City, because that emergency declaration has not been rescinded, the operative obligations are suspended. City Brief at 13.

Plaintiffs dispute this interpretation. They contend that any "pause" authorized under Section 8.2 was limited to the duration of the fires and that invoking the emergency clause beyond that time constitutes an attempt to "avoid the accountability the Settlement Agreement requires and demands." Plaintiffs' Reply at 18.

Further escalating the dispute, the City accuses Plaintiff of breaching the Agreement by failing to honor the required meet-and-confer process before seeking judicial enforcement. City Brief at 15. In support, the City points to email correspondence allegedly demonstrating Plaintiffs' unwillingness to engage in discussions. *Id.*

There is no question that the Palisades Fire and Eaton Fire were catastrophic events that profoundly affected many Angelenos. It is also not the Court's role to second-guess the City's emergency declarations absent clear evidence of bad faith. Here, Plaintiff has not offered sufficient evidence for the Court to find that the emergency declaration is no longer operative or was improperly invoked. As such, the Court must defer to the City's position that the Agreement's obligations are currently paused under Section 8.2 because of the state of emergency declaration.

That said, the Settlement Agreement also imposes a duty on both parties to meet and confer in good faith to determine the necessary adjustments during any such pause. The Court reiterates that this responsibility remains ongoing and mutual. Resorting to the Court for answers that should first be addressed collaboratively under the Agreement only undermines its purpose. The Parties are therefore expected to continue engaging in good faith to define the scope and terms of any pause moving forward.

It is important to note that the invocation of Section 8.2 does not excuse the City from its ongoing responsibilities—particularly with respect to accurate reporting and verification of beds. The pause provision is not a blanket exemption from compliance. The data verification issues predated both the January 2025 fires and the resulting

emergency declaration. Accordingly, the Court will not permit the City to use this emergency as a pretext to avoid its obligations under the Settlement Agreement. This pause only applies to obligations that are truly impacted by the emergency, not to longstanding failures in transparency, accountability, or compliance.

### C. Remedy for Breaches

The City breached the LA Alliance Settlement Agreement in four ways. The City failed to provide a plan for how it intends to create 12,915 shelter or housing solutions. For years, the City consistently missed its shelter and housing creation milestones. The City also improperly reported encampment reductions and disobeyed the Court's order on encampment reductions. Finally, the City flouted its reporting responsibilities by failing to substantiate its reporting and failing to provide accurate and comprehensive data when requested by the Court, Special Master Martinez, the Parties, and A&M.

To remedy the City's failures, each Party recommends a different solution. Special Master Martinez recommends an independent fiduciary monitor to track and oversee spending, manage contracting, and perform other oversight tasks. Ex. 93, at 25-27. The Plaintiffs demand a receivership and/or some combination of the following:

> (i) extension of Alliance and/or Roadmap Agreements for a minimum period of two years to ensure compliance and oversight; (ii) Appointment of Compliance and/or Fiduciary Monitor at the City's expense with full, immediate, and unfettered access to City and LAHSA data; (iii) Forensic Financial Audit; (iv) Forensic Data Quality Audit with mandate to adhere to recommendations; (v) orders to create a Skid Row plan, including immediate housing and sheltering of women, children, and families and ultimately extending to every unsheltered resident; (vi) City-funded investigation and report on data manipulation allegations; and (vii) an award of attorneys' fees both incurred in this matter to enforce the settlement agreement and prospectively for efforts related to the City's compliance with the Agreements.

Plaintiffs' Brief at 25. The Intervenors, on the other hand, advocate for "more robust incremental monitoring and verification." Intervenors' Brief at 28.

### 1. Reaffirming LA Alliance Settlement Obligations

The interim breaches of the LA Alliance Settlement Agreement committed by the City necessitate course correction now in order to avoid an overall breach of the Agreement in 2027.

To facilitate compliance and greater oversight, the City is ordered to do the following as previously detailed in each section above:

- Provide the Parties and the Court with an updated "bed plan" for how it intends to meet its obligation to create 12,915 shelter or housing solutions by October 3, 2025[11]

- Provide the Parties and the Court with updated bed creation milestones consistent with the updated bed plan by October 3, 2025

- Beginning in the quarterly status report slated for October 2025, the City shall include an explanation for each unit that already physically existed prior to the Settlement Agreement of how the City "created" that unit, meaning contributed to bringing that unit into existence as a shelter or housing solution for people experiencing homelessness as opposed to its prior use

- Meet and confer with Plaintiffs on selecting a third-party Monitor by August 22, 2025, and select this Monitor by September 12, 2025, subject to the Court's approval

- Attend in-person court hearings after the submission of each quarterly status report starting with the October 2025 quarterly report on November 12, 2025

- Report encampment reduction data consistent with the Court's definition beginning in the October 2025 quarterly report and provide accompanying data on shelter or housing offers to the Monitor

Notably, each of the above requirements are actions that the City was already under an obligation to do. Failure to comply with these orders may result in sanctions.

### 2. Attorney's Fees for Plaintiffs and Intervenors

The City's refusal to provide updated plans, meet its milestones, correct its encampment reduction numbers, and verify its reporting has unnecessarily and unfairly wasted the resources of the Parties and the Court. By consistently refusing to provide explanations and verification of its reporting, the City has forced Plaintiffs into the position of investigating and monitoring

---

[11] These deadlines are in recognition of the Los Angeles City Council's summer recess from July 2 through July 29, 2025.

the numbers reported. Special Master Martinez and A&M were appointed and paid to undertake that role, but the City has stalled and blocked them too from achieving meaningful review. The City blames its complex administrative structure and the added layer of LAHSA bureaucracy for its failures instead of complying and providing the required data. Days of the evidentiary hearing could have been avoided if the City had simply substantiated its own reports. The City refused to do so even during the seven-day hearing. Obfuscation and delay cannot be tolerated.

Federal courts possess certain "inherent powers," not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.,* 370 U.S. 626, 630-31 (1962). This authority includes the ability to "fashion an appropriate sanction for conduct that abuses the judicial process." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44-45 (1991). An assessment of attorney's fees is a "less severe sanction" that is "undoubtedly within a court's inherent power as well." *Id.* (citing *Hutto v. Finney,* 437 U.S. 678, 689, n.14 (1978)). This narrowly defined power can be exercised in certain circumstances. *Id.* (citation omitted). One such circumstance is assessing attorney's fees as a sanction for the "willful disobedience of a court order." *Id.* (citing *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 259 (1975)). Another circumstance is awarding attorney's fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 45-46 (citation omitted). In this last instance, if a Court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party." *Id.* at 46 (citation omitted). This circumstance also extends to when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." *Id.*

The Supreme Court has made clear that such a sanction has to be compensatory in nature rather than punitive. *Goodyear Tire & Rubber Co. v. Haeger,* 581 U.S. 101, 102 (2017) (citing *Mine Workers v. Bagwell,* 512 U.S. 821, 826-30 (1994)); *see also Lake v. Gates,* 130 F.4th 1054, 1059 (9th Cir. 2025) (applying *Goodyear* when reviewing a district court's sanctions). Simply, this means the fee award can only redress the wronged party for losses sustained, it may not impose an additional amount as punishment for the sanctioned party's misbehavior. *Id.*

at 108 (citation omitted). Thus, this Court must track the compensation to the wrong and the loss resulting from that wrong. *Id.* A compensatory sanction must be "calibrated to the damages caused by the bad-faith acts on which it is based." *Id.* (citations and quotations omitted). This kind of causal connection is appropriately framed as a but-for test where the complaining party may recover "only the portion of his fees that he would not have paid for but the misconduct." *Id.* at 109 (citation omitted).

Unlike the Special Master and A&M, Plaintiffs are not paid to monitor the City's compliance. Plaintiffs have diligently and persistently raised important issues to the Court's attention. As a sanction for the City's noncompliance, including disobeying the Court's order on encampment reductions, Plaintiffs' efforts should be compensated. Based on Intervenors' active role in the evidentiary hearing and briefing, the Court will require that the City pay attorney's fees to both Plaintiffs and Intervenors if Plaintiffs and Intervenors are able to show how they have been harmed by the City's conduct and the resulting losses to them under the law. Under similar circumstances, the City previously agreed to pay Plaintiffs' fees and costs on the verge of the Court's finding of bad faith and sanctions. *See* Tr., 17, March 8, 2024 (Dkt. 684); Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713).

Plaintiffs and Intervenors may submit motions for attorney's fees by July 25, 2025, at 5 p.m. The City's opposition is due by 5 p.m. on August 15, 2025, and Plaintiffs' and Intervenors' replies are due by 5 p.m. on August 29, 2025.

### 3.    Receivership

Appointment of a receiver over state or local government functions by a federal court is an extreme and "invasive equitable remedy" only available in limited situations. *Melendres v. Skinner*, 113 F.4th 1126, 1136 (9th Cir. 2024). Receivership is typically the last resort after all other less intrusive remedies have been exhausted. Before imposing a receivership, federal courts have favored a gradual approach incrementally ramping up compliance measures such as monthly status conferences, sanctions, appointment of a special master or monitor, and issuing general consent orders. *See Dixon v. Barry*, 967 F. Supp. 535, 554 (D.D.C. 1997); *see also*

*Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at *26 (N.D. Cal. Oct. 3, 2005). Only then, if "nothing short of receivership" can remedy constitutional violations, courts turn to receivership. *Plata*, 2005 WL 2932253, at *23.

Weighing all of the options, this is not the time for a receivership over the City's homelessness response system. Although democracies can be inefficient and even wasteful, only the voters of Los Angeles have the power to elect representatives to solve these problems. Public pressure has recently led the City and the County to begin to make structural reforms to the homelessness system including withdrawing funding from LAHSA and forming new agencies. Plaintiffs speculate that these impending, massive changes will not make a difference; but, the people and their elected officials have the right to try.

The Supreme Court recently summarized this principle:

Homelessness is complex. Its causes are many. So may be the public policy responses required to address it. … Almost 200 years ago, a visitor to this country remarked upon the 'extreme skill with which the inhabitants of the United States succeed in proposing a common object to the exertions of a great many men, and in getting them voluntarily to pursue it.' 2 A. de Tocqueville, Democracy in America 129 (H. Reeve transl. 1961). If the multitude of amicus briefs before us proves one thing, it is that the American people are still at it. Through their voluntary associations and charities, their elected representatives and appointed officials, their police officers and mental health professionals, they display that same energy and skill today in their efforts to address the complexities of the homelessness challenge facing the most vulnerable among us.

Yes, people will disagree over which policy responses are best; they may experiment with one set of approaches only to find later another set works better; they may find certain responses more appropriate for some communities than others. But in our democracy, that is their right. Nor can a handful of federal judges begin to 'match' the collective wisdom the American people possess in deciding 'how best to handle' a pressing social question like homelessness.

*City of Grants Pass, Oregon v. Johnson*, 603 U.S. 520, 560 (2024).

The multitude of solutions available to handle the homelessness crisis in Los Angeles and the Court's deference to voters and policymakers does not, however, excuse noncompliance by the City. Flexibility with how to meet its obligations does not mean the obligations are optional. The Court takes the City's commitments seriously and will not permit

noncompliance. The City voluntarily agreed to resolve claims and issues in this matter through a promise to create new housing and shelter solutions for those languishing on its streets. Nearly seven unhoused community members die each day in the County of Los Angeles. These deaths are preventable and represent a moral failure by all of us. The City's Settlement Agreement that this Court oversees is only one response, as the Supreme Court put it, to this complex problem. The Settlement Agreement is a critical step, nonetheless.

**D. Conclusion**

Every day, the people of Los Angeles wake up to the sight of human suffering in every part of the City—people sleeping on sidewalks, searching for safety, shelter, or just a place to use the bathroom. And every day, those living on the streets wake to another morning of uncertainty, exposed to danger, stripped of privacy, dignity, and hope.

Unhoused individuals hear about programs and promises. They hear that hundreds of millions are being spent, that homelessness is being addressed, that success is being claimed. Yet many still cannot find a bed, a bathroom, or a hot meal. Their lived reality does not match the headlines.

Angelenos, too, are asked to believe. They vote to tax themselves in hopes of helping their suffering neighbors. They give willingly because they want change. But every day, they see less money in their pockets for groceries and more suffering on the streets. This gap between sacrifice and visible results erodes public trust and deepens collective grief.

People turn to the Court, hoping it holds the solutions—that the law can bend to save lives. But if solving homelessness were as simple as issuing a ruling, it would have been solved long ago. So the Court must focus on what it can control: the promises made, and whether they are being kept. The agreements in this litigation were meant to be a turning point in this crisis. Yet a review of the record reveals missed milestones, neglected obligations, and a troubling lack of oversight. That neglect carries real consequences, borne most heavily by those with the least, by the people whose lives depend on those promises being fulfilled.

The remedies here are not punishment. They are progress. The Court institutes a monitor to oversee compliance and ask the hard questions on behalf of Angelenos. It mandates

quarterly, in-court hearings, beginning November 12, 2025, and continuing as needed, to ensure these commitments are honored.

The Court wants the City to succeed. Because when the system fails, people die. And when it works—even slowly—lives are saved.

## V.    DISPOSITION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motions for Settlement Agreement Compliance (Dkt. 767, 863).


DATED: June 24, 2025

*David O. Carter*

DAVID O. CARTER

UNITED STATES DISTRICT JUDGE