Shayla R. Myers (SBN 264054)
Isabelle M. Geczy (SBN 349594)
**LEGAL AID FOUNDATION OF LOS ANGELES**
1550 W. 8th St
Los Angeles, CA 90017
Tel: (213) 640-3983
　　 (323) 801-7990
Email: smyers@lafla.org
　　　 igeczy@lafla.org

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et. al*.<br>　　　　Plaintiff(s),<br><br>　　v.<br><br>City of Los Angeles, *et. al*.<br>　　　　Defendant(s). | CASE NO.: 20-CV-02291-DOC-KES<br><br>Hon. David O. Carter<br><br>**INTERVENORS' NOTICE OF MOTION AND MOTION FOR AWARD OF ATTORNEYS' FEES**<br><br>*[Filed Concurrently herewith Declarations of Shayla Myers and Carol Sobel]*<br><br>Courtroom: 1 |

*Additional Counsel*

Catherine Sweetser (SBN 271142)
**SCHONBRUN SEPLOW HARRIS & HOFFMAN, LLP**
11543 W. Olympic Blvd.
Los Angeles, CA 90064
Tel: (310) 396-0731
Email: catherine.sdshhh@gmail.com

Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Ave.
Santa Monica, CA 90401
Telephone: (310) 393-3055
Email: carolsobel@aol.com

*Attorneys for Intervenors*

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that pursuant to this Court's June 24, Order Granting in Part and Denying in Part Plaintiffs' Request for Sanctions, Dkt. 991, Intervenors move for an award of fees and costs incurred because of the City's misconduct. As outlined in the accompanying brief and declarations and support thereof, Intervenors were harmed by the City's conduct and seek fees and costs incurred as a result of that harm.

Plaintiffs' motion is based on this Notice of Motion, the complete files and records in this action, the Memorandum of Points and Authorities, supporting declarations and exhibits filed and served concurrently herewith, and on any oral argument to be made at any hearing on the motion.

Dated: August 4, 2025                Respectfully submitted,

LEGAL AID FOUNDATION OF LOS ANGELES

/s/ *Shayla Myers*
Shayla Myers

\

## **TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................6

II. ARGUMENT........................................................................................................8

    A. The Payment of Intervenors' Attorneys Fees Incurred as a Result of Its Bad Faith Conduct is an Appropriate Sanction....................................8

    B. The Amount of Fees are Extremely Reasonable, Especially Given Intervenors' Role in the Enforcement Proceedings ...............................12

        1. The amount of hours spent by Intervenors' counsel is extremely reasonable..................................................................13

        2. Intervenors' rates are reasonable ...................................................14

III. CONCLUSION..................................................................................................18

**INTERVENORS' MOTION FOR ATTORNEYS' FEES**

# Table of Authorities

**Cases**

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ................................................................8

*Davis v. City and Cnty. of San Francisco*, 976 F.2d 1536 (9th Cir. 1992) ...........12, 14

*Eldredge v. EDCare Management, Inc.*, 766 Fed.Appx. 901 (11th Cir. 2019) .........13

*Emerson v. Dart*, 900 F.3d 469 (7th Cir. 2018) ......................................................... 12-13

*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017) ..........................8, 9, 12

*Jordan v. Multnomah Cnty.*, 815 F.2d 1258 (9th Cir. 1987) ...................................12, 14

*Perdue v. Kenny A. ex rel. Winn.*, 559 U.S. 542 (2010) ................................................12

*Seattle Sch. Dist. No. 1 v. State of Wash.*,
633 F.2d 1338 (9th Cir. 1980) .......................................................................................7

*Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982) .........................................7

**Statutes**

42 U.S.C. § 1983 ................................................................................................................6

42 U.S.C. § 1988 ................................................................................................................7

## I. INTRODUCTION

Pursuant to this Court's June 24, 2025 Order Granting in Part and Denying in Part Plaintiffs' Motions for Settlement Compliance, Dkt. 991 ("Sanctions Order"), Intervenors Los Angeles Community Action Network and LA Catholic Worker seek an award of attorneys fees and costs incurred as a result of the misconduct outlined in Court's order.

As the record in this litigation illustrates, Intervenors have been an active participant in this litigation since this Court granted their *ex parte* application to intervene before the first hearing in March 2020. Dkt. 29; Sanctions Order. Intervenors have participated in every hearing over the past five years. And although Plaintiffs and the City excluded Intervenors from settlement negotiations that resulted in the Order Approving Stipulated Dismissal and Proposed Settlement, Dkt. 445 (Settlement Order), at the center of this sanctions fight, intervenors participated in the Court's approval process and have been equally involved in the lengthy post-settlement compliance period. As a result of Intervenors' constant participation in the case there has been an active voice for unhoused residents at every hearing. They have raised concerns and objections that have shaped the litigation and settlement compliance, including most significantly as of late, during the evidentiary hearing held by this Court from May 27 to June 4, 2025.

Counsel for Intervenors have conservatively spent more than 2,000 hours participating in this litigation. At the blended rate sought by the LA Alliance and paid by the City to its outside counsel, Gibson Dunn and Crutcher, that is over $2.5 million in uncompensated time. To date, Intervenors have not sought attorneys' fees or costs, even though their intervention in the lawsuit was originally in part to defend a settlement agreement between Intervenors and the City that arose under 42 U.S.C. Section 1983 and specifically protected unhoused people's rights in Skid Row. Dkt. 1, ¶¶ 168, 186; Dkt. 29 at 3. The rights protected by that settlement, and the rights Intervenors have sought to protect by their intervention in this case stem from the U.S.

and California Constitutions. *See* Dkt. 25 at 8; 29 at 4, n. 1; *see* S*eattle Sch. Dist. No. 1 v. State of Wash.*, 633 F.2d 1338, 1350 (9th Cir. 1980), aff'd sub nom. *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982).[1]

In this instance, however, in light of the City's violation of the prior Courts' orders, the extraordinary and unanticipated drain on resources caused by the seven day evidentiary hearing in which Intervenors were an active and necessary participant, and the Court's reliance on Intervenors' evidence and arguments to issue sanctions, Intervenors now seek approximately $200,000 in fees and costs. *See* Myers Dec. ¶ 11-13, Exh. A-C.[2] These fees and costs compensate Intervenors for the time spent participating in the evidentiary hearing, responding to briefs, and filing these motions. The fees were incurred only because of the City's violations of this Court's June 14, 2022 Settlement Order and therefore serve to compensate Intervenors for the harm caused by those violations.

Compared to the fees sought by the LA Alliance, Dkt. 1051 and the fees paid by the City to its own counsel to defend against the sanctions, Dkt. 1051-1, ¶ 10, Exh. E, Intervenors' fees are a bargain, especially compared to Intervenors' outsized contributions at the hearing. Intervenors developed a significant amount of evidence cited by the LA Alliance in its briefs. And more importantly, the same is true for the Court's June 24, 2025 which relied on much of Intervenors' evidence as well as arguments they advanced during the hearing and in their brief. *See e.g.*, Sanctions Order at 26, 37, 45-46, 52-54. In fact, much of what the Court ordered is the relief Intervenors requested. *See* Dkt. 985 29 (interpreting the definition of "create" to align

---

[1] Although the Court already found sanctions are justified under its inherent authority, Intervenors join LA Alliance's argument that fees may also be awarded under 42 U.S.C. Section 1988. To the extent the Court finds an award of attorneys fees warranted under Section 1988, Intervenors would also be entitled to fees for the reasons articulated in *Seattle School Dist. No. 1*, 633 F.2d at 1350.

[2] Intervenors also intend to see fees related to the Reply brief and any hearing associated with this motion, and will supplement the requested fees along with the Reply.

**INTERVENORS' MOTION FOR ATTORNEYS' FEES**

with the City's prior representations, increased monitoring and transparency, and to confirm the criteria for encampment reductions).

Intervenors have actively participated in the settlement enforcement proceedings going back to when the Encampment Resolution Plan was initially disclosed, including meeting with the auditors from A&M and reviewing and actively participating in hearings related to the scope of work, progress, and finally draft of the audit. *See e.g.,* Dkt. 768 (August 29, 2024) 36:04-42:23), Dkt. 828, Tr. (November 21, 2024) 105:25-107:12; Dkt. 850, Tr. (January 7, 2025) 71:23-72:10; Dkt. 878, Tr. (March 27, 2025) 84:17-88:05; Myers Dec. ¶ 16. However, Intervenors seek fees starting only from the beginning of the evidentiary hearing. The fees and costs sought therefore include only 1) the evidentiary hearing; 2) Intervenors' brief in support of sanctions; and 3) this fees motion and anticipated reply. By seeking only fees directly related to the hearing and subsequent briefing, the amount sought is well below the amount that would compensate Intervenors for the work actually undertaken to combat the City's violations of the Court's order. *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017). And as such, it is well within the Court's "inherent authority" to grant these fees as a compensatory sanction, because the City's conduct is unquestionably the proximate cause of incurring these fees. Moreover, the fees sought for the hearing and subsequent briefing are exceptionally reasonable, in fact extremely low, compared to the fees sought or paid by the other parties in the litigation for the same amount of time and the same caliber of performance.

## II.  ARGUMENT

### A.  The Payment of Intervenors' Attorneys Fees Incurred as a Result of Its Bad Faith Conduct is an Appropriate Sanction

As this Court highlighted in its June 24, 2025 Sanctions Order, the Court has "inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Goodyear,* 581 U.S. at 107; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991) (highlighting the historic

grounds for awarding attorneys fees—all of which are applicable here). Among the sanctions a Court has the inherent authority to issue is "an order . . . instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side." *Goodyear,* 581 U.S. at 107 (internal quotation marks omitted). *Id.* This Court's inherent authority easily includes granting fees to Intervenors, who participated in the hearing pursuant to an order by this Court, allowing the Intervenors to conduct examination in the matter. Dkt. 947, Tr. (May 27, 2025), 16:6-15. This ruling expanded on the Court's prior ruling related to the LA Alliance's enforcement of the Roadmap agreement, to which the City objected. Neither party objected to the Court's ruling. *Id.* Intervenors were from that point an active and necessary party in the sanctions hearing.

Because the fees are awarded as sanctions, the standard for whether fees can properly be awarded for specific legal work in the course of litigation is whether the City's misconduct was the "but for" cause of that legal work. *Goodyear,* 581 U.S. at 107. Here, there is no dispute that the evidentiary hearing was caused by the City's misconduct, which resulted in the Court's Sanctions Order. But the incurring of attorneys fees is even more closely linked to the City's bad faith than simply its violation of the settlement agreement. The need for the evidentiary hearing stemmed directly from the City's intransigence related to providing transparency and accountability about its compliance with the Settlement Order. As the Court has already pointed out, "the City's refusal to provide updated plans, meet its milestones, correct its encampment reduction numbers, and verify its reporting has unnecessarily and unfairly wasted the resources of the Parties and the Court." Sanctions Order at 57. Specifically, the evidentiary hearing was required because the City refused to verify information related to its compliance with the terms of the Settlement Order, despite concerns raised by every other third party tasked with recreating the City's verification of its own compliance. *Id.* The City had ample opportunity to avoid the need for an evidentiary hearing, simply by providing A&M, the Special Master, and the Court with data sufficient to verify its purported compliance. When it refused to do so, it caused Intervenors, Plaintiffs, the Special

Master, and the Court to spend seven court days developing a record about the City's failure to verify the beds, rather than simply examining the City's data the City relies on when it purportedly verifies the existence of the beds.

Likewise, the City could have avoided the need for an evidentiary hearing to develop the record related to whether and how the City was actually "bringing new beds into existence" when it reported that it had created shelter and housing opportunities pursuant to the agreement. *See* Sanctions Order at 45-46. Intervenors raised this issue repeatedly, and in response to Intervenors' response, "what was the City's contribution to the creation of that housing that allowed it to be counted toward the bed count," Dkt. 768, Tr. (August 29, 2024) 89:23-25, counsel for the City responded that while "can't tell . . .as I sit here this moment exactly what the contribution was to each bed. I'm happy to look into that further" and promised to look into it. Dkt. 768, Tr. (August 29, 2024) 90:2-5, 13-17. Yet when Intervenors' counsel followed up a month later, the City provided a non-committal response and then ignored subsequent communications. Myers Dec. ¶ 19, Exh. E. The the City's unwillingness to provide transparency and accountability led to the need for the parties and the Court (to say nothing of City taxpayers) to expend significant resources to uncover the deficiencies int the City's performance.

Finally, and most relevant to Intervenors' concerns in the litigation, the parties spent days litigating the definition of "encampment resolution," even though the Court had already ruled that "encampment resolution" did not mean the City could simply count the tents and makeshift encampments it discarded and the RVs it towed away towards its Encampment Resolution goals. Dkt. 874 at 2. Instead, the Court ruled that the settlement required the City to offer an unhoused person shelter for it to count towards the City's Encampment Reduction numbers. *Id*. The City had taken the former position in the first year of reporting related to the Encampment Resolution Plan. After Plaintiffs raised the issue and Intervenors lent support to their position, the Court rejected the City's interpretation of the Settlement Agreement in favor of Plaintiffs' and

1. Intervenors' interpretation. Mediating disputes between the parties about the
2. interpretation of this specific provision was a task the Parties specifically requested the
3. Court undertake when it sought approval of the Settlement Agreement. Dkt. 445, 429-
4. 01, Section 5.2 ("[T]he parties will consult with the Court for resolution, if necessary"
5. of "any concerns or disputes" about the plans). Yet instead of accepting the Court's
6. clarification, the City continued to rely on its own definition of "encampment
7. resolutions" for purposes of reporting. The Court found that the City's continued use of
8. the incorrect definition in its reporting violated the Settlement Approval Order and the
9. Court's order clarifying the interpretation of the agreement. "The City's attempt to
10. unilaterally change its definition of encampment reduction ignores its past conduct and
11. promises, the Court's prior Order, and the plain meaning of the Settlement Agreement."
12. Sanctions Order at 51. The City's decision to ignore the Court prior order and continue
13. to report under the prior definition was the "but for" cause of much of the work during
14. the hearing. This is especially true for Intervenors, who joined the case specifically to
15. ensure that unhoused people were not criminalized and subject to increased
16. enforcement as a result of this litigation. *See* Dkt. 29.
17.       This Court has already found that the evidentiary hearing was required because
18. the City refused to substantiate its data and abide by the Court's earlier ruling
19. interpreting the agreement. Intervenors were harmed by the loss of attorney time and
20. resources that could have been expended in other ways far more beneficial to its
21. members than having to ensure the City complied with the Court's Settlement Order.
22. The need to participate in the hearing was especially disruptive to Intervenors' counsel,
23. who did not have notice that they would be an active participant, and therefore, it was
24. incredibly challenging to accommodate the demands placed on Intervenors' counsel in
25. such a short order.
26.       Attorneys for Intervenors had to put other work on hold to participate in the
27. hearing. Myers Dec. ¶¶ 14-15. The attorneys representing Intervenors work on issues
28. related to criminalization of homelessness, and during the time allotted for the hearing,

they could not advance affirmative litigation intended to vindicate Intervenors' rights or the rights of their members. *Id.* Nor could their lawyers advance affirmative litigation brought to vindicate other clients' rights. *Id.* Likewise, while attorneys were in court, they were not representing unhoused residents facing termination from shelters or providing know your rights materials to unhoused shelter residents. *Id.* They could not participate in community meetings or advance legal research aimed at addressing larger issues impacting unhoused residents, including Intervenors and their members. *Id.*

Legal services attorneys who provide legal services to low income residents are a finite resource, Myers Dec. ¶ 18, Exh. D, and tying up an entire litigation team to spend seven days in an evidentiary hearing that "could have been avoided if the City had simply substantiated its own reports." Sanctions Order at 58, harms the Intervenors and their lawyers. Myers Dec. ¶¶ 14-15. As such, they are entitled to the award of the reasonable attorneys fees incurred as a result of the City's misconduct, to compensate them for that harm. *Goodyear,* 81 U.S.at 107.

    **B.**    **The Amount of Fees are Extremely Reasonable, Especially Given Intervenors' Role in the Enforcement Proceedings**

Intervenors seek $201,182.50 in fees and $160.00 in costs incurred as a result of the City's bad faith conduct. The fees are based on a lodestar calculation of "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Davis v. City and Cnty. of San Francisco*, 976 F.2d 1536, 1545–46 (9th Cir. 1992) (cleaned up) *vacated in part on other grounds by Davis v. City and Cnty of San Francisco*, 984 F.2d 345. The "lodestar approach has achieved dominance in the federal courts" and is "the guiding light of [the Supreme Court's] fee-shifting jurisprudence." *Perdue v. Kenny A. ex rel. Winn.*, 559 U.S. 542, 551 (2010). *See also Jordan v. Multnomah Cnty.*, 815 F.2d 1258, 1262 (9th Cir. 1987) (there is still a "[a] strong presumption . . . that the lodestar figure represents a 'reasonable' fee"). Likewise, the lodestar is an appropriate approach when determining the amount of fees to award in response to a sanctions award. *Emerson v. Dart*, 900 F.3d 469, 473 (7th Cir.

2018) (approving of a district court's calculation of sanctions using the lodestar); *see also Eldredge v. EDCare Management, Inc.*, 766 Fed.Appx. 901 (11th Cir. 2019) (applying lodestar calculation for determination of the amount of fees to award as sanctions).

As outlined below, Intervenors' requested fee award is based on a reasonable number of hours, multiplied by a reasonable rate, which this Court should award.

### 1. The amount of hours spent by Intervenors' counsel is extremely reasonable

First, the number of hours the City caused Intervenors to expend by its conduct and for which the Intervenors seek compensation is slightly less than 250 hours of billable time, a remarkably low number of hours given the amount of work that was required of Intervenors' counsel in a very short amount of time. Intervenors fully participated in a seven day evidentiary hearing that ran 8-10 hours per day for the length of the hearing, conducting examinations of nearly every witness, including long examinations of key witnesses that resulted in the development of an evidentiary record that supports this Court's Sanctions Order. They also submitted a nearly 40 page post-hearing brief, marshalling that evidence and advancing arguments that were ultimately relied on by the Court to issue sanctions against the City. Dkt. 985. And they have prepared and are submitting this request for fees.

Intervenors were staffed by only one Senior Litigator who handled all aspects of the hearing, questioned each witness, presented a closing argument, and was primarily responsible for drafting Intervenors' post-hearing brief and this motion; one junior attorney who assisted with the limited hearing preparation that was possible and drafting of the two briefs; and a paralegal and law clerk who assisted with the day-to-day matters during the hearing. This is less even than the LA Alliance, which staffed the case with four attorneys, and significantly less than the City of Los Angeles, which staffed the case with no less than seven attorneys from an outside firm and two to four attorneys from the City Attorney's office.

Intervenors nonetheless exercised billing judgment, Myers Dec. ¶ 9, primarily by seeking fees only related to the evidentiary hearing and related briefs, but none of the related proceedings or preparation that contributed to Intervenors' ability to participate at the last minute in the hearing. Intervenors also do not seek compensation from any of the other co-counsel representing the Intervenors who consulted but did not staff the hearing; other LAFLA attorneys and staff who consulted on the case during the hearing, including lead counsel for litigation related to the Venice Dell affordable housing project; and counsel responsible for the enforcement of the Wiggins Settlement, which preserves affordable housing in Skid Row through 2032. Finally, Intervenors exercised billing discretion by not billing for paralegal work performed by the litigation attorneys who worked through the night to prepare for the evidentiary hearing.

### 2. Intervenors' rates are reasonable

Here, Plaintiffs' requested fee award is based on a "reasonable hourly rate" consistent with the prevailing market rate. *Jordan*, 815 F.2d at 1262. "Reasonable fees are calculated according to the prevailing market rates in the relevant community . . . with close attention paid to the fees charged by lawyers of reasonably comparable skill, experience, and reputation." *Davis,* 984 F.2d at 1545-46. For purposes of determining the reasonable rate based on the prevailing rates charged in the community, "it is irrelevant if the party seeking fees "is represented by private or nonprofit counsel." *Blum v. Stenson*, 465 U.S. 886, 897 (1984).

Here, the rates sought by Intervenors are extremely reasonable. Intervenors do not seek a blended rate, but instead, seek billing rates for the two attorneys who worked on the case that are well within the range of rates awarded by courts for legal work in complex civil rights cases and well below the billing rates of attorneys at large area law firms. *See* Declaration of Carol Sobel ¶¶ 31, 33-42, Exh. 1-7, *see also* 1015-1, ¶ 11, Ex. F. Specifically, Intervenors seek an hourly rate of $1025 for Ms. Myers and an hourly

rate of $600 for Ms. Geczy. These rates are less than the "discounted" blended rate for the City of Los Angeles's outside counsel, Gibson Dunn and Crutcher. *See* Dkt. 1015-1, ¶ 10, Ex. E. In fact, the hourly rate for Intervenors' lead counsel is equal to or less than the standard hourly rate for a first or second year associate at their firm. *Id.* And the rate sought for Ms. Geczy is only slightly more than the billed rate for paralegals in this case. *Id.*

Lead Counsel Shayla Myers graduated Order of the Coif from UCLA Law School in 2008 with specializations in Critical Race Studies and Public Interest Law and Policy. Myers Dec. ¶¶ 2-4. She then clerked for the Honorable Sandra Ikuta on the United States Court of Appeals for the Ninth Circuit. Ms. Myers was awarded the Skadden Fellowship to provide legal services to homeless LGBTQ people in Hollywood. After working directly with unhoused clients for three years, she spent two years at a civil rights firm in Los Angeles litigating complex class actions and civil rights cases before joining the Legal Aid Foundation of Los Angeles. Ms. Myers has spent over a decade at LAFLA, leading significant housing and civil rights litigation on behalf of low income tenants and unhoused people. She is currently the Senior Attorney in the Unhoused People's Justice Project and oversees legal work on behalf of unhoused residents in Los Angeles, both through significant systemic litigation in both Federal and State Court and direct services to unhoused residents facing termination from interim housing programs and the seizure and destruction of their vehicles.

Ms. Myers is a recognized expert on homelessness and the legal issues facing unhoused residents and routinely is invited to speak on these topics. She also leads and participates in research on a number of substantive areas of law impacting unhoused residents, including as relevant here, the towing of RVs and vehicles, tenant rights in interim housing, and the use of Time-Limited Subsidies. She frequently serves as a guest lecturer at area law schools and the UCLA Geffen School of Medicine on the intersection of law and homelessness. In 2024, Ms. Myers was awarded the UCLA

School of Law Margaret Levy Fellowship related to her work on criminalization of homelessness.

Isabelle Geczy is a 2022 UCLA School of Law graduate where she was Chief Articles Editor of the UCLA Law Review.  Myers Dec. ¶ 5. She is currently a staff attorney in the Unhoused People's Justice Project at Legal Aid Foundation of Los Angeles.  In addition to participating in systemic litigation on behalf of unhoused residents, Ms. Geczy directly represents unhoused residents in facing termination from interim housing programs and other services in Los Angeles.  Prior to joining LAFLA, Ms. Geczy worked at a civil rights law firm and was the Pretrial Justice Fellow with the Criminal Justice Program at UCLA School of Law.

The Legal Aid Foundation of Los Angeles (LAFLA) is one of the largest public interest law firms in Los Angeles.  Myers Dec. ¶¶ 6-9. For over 95 years, LAFLA has represented low income residents in a wide range of substantive areas of law and has deep expertise on the complexity of the legal issues facing low income communities, from civil rights to homelessness prevention, veterans benefits, immigration, and workers rights. The Unhoused People's Justice Project combats the criminalization of homelessness and advances the civil rights of unhoused people by bringing complex civil rights litigation in state and federal court, as well as providing direct representation to unhoused residents in shelters and living in their vehicles.  UPJP provides some of the only dedicated legal services in Los Angeles to unhoused residents in shelters and other interim housing programs, which are designed to disrupt the cycle that moves people from the streets to the shelter and back onto the streets, a cycle that exacerbates the homelessness crisis in Los Angeles.

LAFLA has one of the largest and oldest and largest legal programs addressing housing justice. Nearly one half of the Foundation's staff are dedicated to preventing homelessness by representing low income tenants through eviction proceedings.  That work has been a cornerstone of LAFLA's work in the community since the founding of the Eviction Defense Center in the 1980s.  Housing justice attorneys also focus on

housing preservation, including representing the Los Angeles Community Action Network in enforcing a settlement that has preserved affordable housing in Skid Row for decades.

In addition to housing justice, attorneys at LAFLA are experts in veterans' benefits, language access, immigration law, government benefits, reentry, and domestic violence, all of which impact unhoused residents and intersect with issues at stake in this litigation. Attorneys at the Legal Aid Foundation have engaged in significant systemic litigation across substantive areas impacting low-income members of the community, including litigating the lead cases related to Welfare and Institutions Code Section 17000, upon which the LA Alliance litigation was built. All of this substantive expertise across LAFLA made it possible for Intervenors' counsel to participate in the evidentiary hearing with no time to prepare.

Intervenors do not seek a multiplier for their fees, but certainly the facts and circumstances of Intervenors' participation would justify one here. *See Parsons v. Ryan,* 949 F.3d 443, 466 n. 14 (9th Cir. 2020); *Kelly v. Wengler*, 822 F.3d 1085, 1100 (9th Cir. 2016). The substantive expertise of Intervenors' counsel and their law firm was reflected throughout the hearing, from eliciting testimony from the City's witnesses about Inside Safe Program, CARE+ Operations, Time-Limited Subsidies, and specific housing developments and projects to identifying compliance issues that, because of the City's lack of transparency, had not previously been disclosed. *See e.g.,* Sanctions Order at 45. Intervenors' counsel did so with no time to prepare and only a fraction of the attorneys and legal support (and therefore legal fees) of the City's outside counsel. Intervenors succeeded in the arguments they advanced, resulting in an order issuing much of the relief they sought, including more transparency in reporting, a clarification of the definition of "create," and a confirmation that "encampment reductions" means more than a Court-mandated quota for discarding people's property and instead may result in more people in shelters.

### III. CONCLUSION

For the foregoing reasons, Intervenors request this Court grant Intervenors' request for fees and costs and award the requested amount of fees incurred during Intervenors' participation in the evidentiary briefing, the subsequent post-hearing briefing, and briefing on fees (including the fees sought to reply to the City's anticipated opposition and any hearings that may be required).

Dated: August 8, 2025　　　　　Respectfully submitted,

LEGAL AID FOUNDATION OF LOS ANGELES

/s/ _____
Shayla Myers

*Attorneys for Intervenors*