# EXHIBIT D





# The Justice Gap:
## The Unmet Civil Legal Needs of Low-income Americans

**APRIL 2022**



LSC | America's Partner for Equal Justice

LEGAL SERVICES CORPORATION

## About the Legal Services Corporation

The Legal Services Corporation (LSC) was established by Congress in 1974 to promote equal access to justice. LSC operates as an independent 501(c)(3) non-profit corporation and currently serves as the nation's single largest funder of civil legal aid for low-income individuals. More than 90% of LSC's total funding is currently distributed to 132 independent non-profit legal aid programs with 877 offices across the country. LSC's mission is to help provide high-quality civil legal aid to low-income people. To learn more about LSC, please visit www.lsc.gov.

### Board of Directors

**John G. Levi**
*Chairman*

**Fr. Pius Pietrzyk, O.P**
*Vice Chair*

**Robert J. Grey Jr.**

**Matthew Keenan**

**Abigail Lawlis Kuzma**

**Victor B. Maddox**

**John G. Malcolm**

**Laurie Mikva**

**Frank X. Neuner Jr.**

**Julie A. Reiskin**

**Gloria Valencia-Weber**

### Officers

**Ronald S. Flagg**
*President*

**Carol A. Bergman**
*Vice President for Government Relations and Public Affairs*

**Rebecca Fertig Cohen**
*Chief of Staff and Corporate Secretary*

**Will A. Gunn**
*Vice President for Legal Affairs and General Counsel*

**Lynn A. Jennings**
*Vice President for Grants Management*

**Deborah Moore**
*Chief Financial Officer and Comptroller*

**James J. Sandman**
*President Emeritus*

## Project Team

**Sarah John**, SJ Democracy Research
*Project manager and data analyst*

**Mary C. Slosar**, Slosar Research
*Writer and research consultant*

## Legal Services Corporation

Daniel Bernstein
Bristow Hardin
Ronké Hughes
Lynn Jennings
Jordan Layton
James Scruggs
Holly Stevens

## Report Design

**Dino Stoneking**, Stoneking Studios

## Acknowledgments

LSC acknowledges the generous support of the William and Flora Hewlett Foundation, the John D. and Catherine T. MacArthur Foundation, the Andrew W. Mellon Foundation, and the Reynolds Family Foundation for funding for this study. Funders do not determine the research findings of LSC research projects.

LSC would also like to acknowledge NORC at the University of Chicago for conducting the 2021 Justice Gap Measurement Survey using its probability-based AmeriSpeak® Panel.

## Suggested Citation

Legal Services Corporation. 2022. *The Justice Gap: The Unmet Civil Legal Needs of Low-income Americans*. Prepared by Mary C. Slosar, Slosar Research, LLC.

Unless specifically noted, all information contained herein is in the public domain and may be used and reprinted without special permission. Citation of this source is required.

Case 2:20-cv-02291-DOC-KES   Document 1022-6   Filed 08/08/25   Page 5 of 89   Page ID #:29262

# Contents

**7** Executive Summary

**12** Section 1: Introduction

**20** Section 2: Today's Low-income America

**30** Section 3: The Prevalence of Civil Legal Problems

**42** Section 4: Seeking and Receiving Legal Help

**56** Section 5: Comparing Income Groups

**68** Section 6: Reports from the Field

**80** Endnotes



# Visit justicegap.lsc.gov

On LSC's justice gap study website, visitors can download and print the report, see videos about the justice gap and the impact of civil legal aid, learn more about the study's methodology, and access additional summaries of study findings related to the pandemic, U.S. regions, subpopulations of interest, and other topics.



## Executive Summary

# Low-income Americans do not get any or enough legal help for 92% of their substantial civil legal problems.







### Low-income America
About 50 million Americans have household incomes below 125% of the poverty threshold – including more than 15 million children and nearly 8 million seniors.*

### Civil legal needs
Civil legal needs typically involve securing and protecting basic needs, such as housing, education, health care, income, and safety.

### The justice gap
The justice gap is the difference between the civil legal needs of low-income Americans and the resources available to meet those needs.

*Data source: U.S. Census Bureau's Current Population Survey, 2021 Annual Social and Economic (ASEC) Supplement.

### The 2022 Justice Gap Study
The Legal Services Corporation (LSC) is pleased to share findings from its 2022 Justice Gap Study. This study provides a fresh assessment of low-income Americans' civil legal needs and the extent to which their legal needs are met. Additionally, its timing allows an examination of the justice gap in the context of the COVID-19 pandemic, which has had disproportionate effects on this population. The study leverages LSC's "intake census" conducted among LSC-funded legal aid organizations as well as a nationally representative survey of more than 5,000 adults conducted by NORC at the University of Chicago using its AmeriSpeak® Panel.



## The Prevalence of Civil Legal Problems



Most low-income households have dealt with at least one civil legal problem in the past year – and many of these problems have had substantial impacts on people's lives.

**3 in 4 (74%)** low-income households experienced 1+ civil legal problems in the past year.

**2 in 5 (39%)** experienced 5+ problems, and 1 in 5 (20%) experienced 10+ problems.

**Most common types of problems:** consumer issues, health care, housing, income maintenance.

**1 in 2 (55%)** low-income Americans who personally experienced a problem say these problems substantially impacted their lives – with the consequences affecting their finances, mental health, physical health and safety, and relationships.

Data source: 2021 Justice Gap Measurement Survey.

## Seeking and Receiving Legal Help



Most low-income Americans do not get any or enough legal help for their civil legal problems – and the cost of legal help stands out as an important barrier.

**1 in 4 problems:** They seek legal help for only 1 out of every 4 (25%) civil legal problems that impact them substantially.

**1 in 2 (46%)** of those who did not seek legal help for one or more problems cite concerns about cost as a reason why.

**1 in 2 (53%)** does not know if they could find and afford a lawyer if they needed one.

**92% = survey-based justice gap:** They do not get any or enough legal help for 92% of the problems that have had a substantial impact on them.

Data source: 2021 Justice Gap Measurement Survey.

**LSC** | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION



## Comparing Income Groups

Compared to low-income Americans, those with higher incomes have fewer barriers to getting legal help.*

**They seek help more often:** People with higher incomes are more likely to seek legal help for problems with substantial impact (32% vs. 25% of problems).

**Their justice gap is smaller:** They are less likely to go without any or enough legal help for problems with substantial impact (78% vs. 92% of problems).

**They have better access:** They are more likely to be confident that they could find and afford a lawyer if they needed one (73% vs. 45%).

**They believe in the system:** They are more likely to believe that they can use the civil legal system to protect and enforce their rights (59% vs. 39%).

*These statements compare people at or above 400% of FPL with people at or below 125% of FPL.
Data source: 2021 Justice Gap Measurement Survey.



## Reports from the Field

LSC-funded organizations do not have enough resources to meet the current demand for civil legal aid in the communities they serve.*

**1.9 million requests for help:** Low-income individuals approach LSC-funded organizations for help with an estimated 1.9 million civil legal problems in a year.

**1 in 2 requests turned away:** These organizations must turn away 1 out of every 2 (49%) requests they receive due to limited resources.

**1 in 2 problems fully resolved:** Even when they can provide some assistance, these organizations have the resources to fully resolve only 1 out of every 2 (56%) problems.

**1.4 million problems = intake-based justice gap.** All in all, LSC-funded organizations are unable to provide any or enough legal help for an estimated 1.4 million civil legal problems (or 71% of problems) that are brought to their doors in a year.

*These statements are only about problems that are eligible for legal assistance from LSC-funded organizations.
Data source: LSC's 2021 Intake Census.


America's Partner for Equal Justice
LEGAL SERVICES CORPORATION



## Geographic Focus

**● West**

**11.1 million people** below 125% of poverty.

**72% of households** had 1+ civil legal problems in the past year.

**�illll Midwest**

**9.2 million people** below 125% of poverty.

**75% of households** had 1+ civil legal problems in the past year.

**● Northeast**

**7.4 million people** below 125% of poverty.

**74% of households** had 1+ civil legal problems in the past year.

**● South**

**22.2 million people** below 125% of poverty.

**75% of households** had 1+ civil legal problems in the past year.

Data sources: 2021 Justice Gap Measurement Survey and the U.S. Census Bureau's Current Population Survey, 2021 Annual Social and Economic (ASEC) Supplement.

## Special Focus

 **Seniors**

**7.6 million seniors** below 125% of poverty.

**70% of senior households** had 1+ problems in the past year.

 **Veterans**

**1.6 million veterans** below 125% of poverty.

**76% of veteran households** had 1+ problems in the past year.

 **Children (<18 yrs)**

**15.2 million children** below 125% of poverty.

**83% of households** with children had 1+ problems in the past year.

 **People in Rural Areas**

**8 million people** below 125% of poverty in rural areas.

**77% of rural households** had 1+ problems in the past year.

 **People with High Housing Costs**

**15 million households** with high housing costs have annual incomes below $25,000.

**84% of households** with high housing costs had 1+ problems in the past year.

 **Survivors of Domestic Violence**

**98% of households** with recent domestic violence had 1+ problems in the past year (in addition to their problems involving domestic violence).

Data sources: 2021 Justice Gap Measurement Survey and various other sources (see Section Two in full report).



**Impact of the COVID-19 Pandemic**

# 33% of low-income Americans experienced at least one civil legal problem linked to the COVID-19 pandemic in the past year.

The types of civil legal problems most likely to be attributed to the COVID-19 pandemic are those involving income maintenance, education, and housing.



### Income maintenance

**32% of income maintenance problems are pandemic-related.**
Examples: difficulty accessing unemployment insurance or receiving COVID stimulus payments.



### Education

**31% of education problems are pandemic-related.**
Examples: difficulty attending school or accessing technology to participate in virtual learning.



### Housing

**27% of housing problems are pandemic-related.**
Examples: problems involving foreclosure, eviction, and safe living environments.

Additionally, the data suggest that income disparities in the justice gap between low- and higher-income Americans are exacerbated for pandemic-related civil legal problems. See Section Five for a fuller discussion of this noteworthy finding.

Data source: 2021 Justice Gap Measurement Survey.





**Section 1**

# Introduction

Every day, millions of low-income Americans grapple with civil legal problems, which often involve basic needs like safe housing, access to health care, child custody, and protection from abuse. Most "go it alone" when dealing with these problems – without legal information, advice, or representation to help them resolve their problems in the civil legal system. The 2022 Justice Gap Study from the Legal Services Corporation (LSC) provides a fresh assessment of low-income Americans' civil legal needs and the extent to which they are met.

## Introduction

The phrase "with liberty and justice for all" in the Pledge of Allegiance represents a fundamental ideal of this country. Yet, the reality of America's justice system does not live up to this ideal. The United States is facing an access-to-justice crisis that disproportionately impacts our society's most vulnerable. Despite our pledge of "with liberty and justice for all," it is still the case that one's access to justice in our nation too often depends on how much money one has.

In criminal cases, legal assistance is a right. Americans accused of a crime are given legal counsel if they cannot afford it. In contrast, one generally has no right to counsel in civil matters where people might risk losing their homes, livelihoods, health care, or children.[1] Indeed, most low-income Americans must "go it alone" when grappling with civil legal matters – without access to legal information, advice, or representation to help them resolve the matter in our legal system. The result is an expansive "justice gap" – defined by the Legal Services Corporation (LSC) as the difference between the civil legal needs of low-income Americans and the resources available to meet those needs.

# The justice gap is the difference between the civil legal needs of low-income Americans and the resources available to meet those needs.

This report shares findings from LSC's 2022 Justice Gap Study. The 2022 study provides a fresh assessment of low-income Americans' civil legal needs and the extent to which their legal needs are met. Its timing is particularly important because it allows us to consider the justice gap in the context of the COVID-19 pandemic, which has had disproportionate effects on this population. Additionally, this study sheds light on how low-income Americans' experiences seeking legal help compare with the experiences of Americans with higher incomes.

## Background

### Legal Services Corporation

Established by Congress in 1974, LSC is the single largest funder of civil legal aid for low-income individuals in the nation. Its mission is to promote equal access to justice in the United States and provide high-quality civil legal assistance to low-income individuals. LSC distributes more than 90 percent of its total funding to 132 independent nonprofit legal aid organizations with 877 offices across the United



States and its territories. These organizations provide legal assistance to low-income individuals grappling with civil legal problems related to basic needs, such as housing, health, employment, family, and safety.

### LSC's Justice Gap Research

The 2022 Justice Gap Study is LSC's fourth justice gap study since 2005. LSC's first two studies (from 2005 and 2009) showed how limited resources make it impossible for LSC-funded legal aid organizations to meet all of the legal needs that low-income individuals bring to them. LSC's 2017 study explored the justice gap through a similar lens but did not stop there. That study also included a nationally representative survey of low-income American households to better understand people's experiences dealing with civil legal problems more generally – regardless of whether they seek legal help. LSC largely modeled the 2022 study after the 2017 study, but also expanded the design to include higher-income groups and additional topics.

## Study Methodology

The 2022 study leverages two primary data sources: the 2021 Justice Gap Measurement Survey and LSC's 2021 Intake Census. We provide an overview of the methodologies used to produce the data below. Readers can find additional details about the study's methodology on the study website: justicegap.lsc.gov.

### 2021 Justice Gap Measurement Survey

LSC contracted with NORC at the University of Chicago (NORC) to conduct a survey of more than 5,000 U.S. adults using its nationally representative, probability-based AmeriSpeak® Panel. The survey included a sample of n=2,003 adults from households at or below 125% of the federal poverty level (FPL) and a sample of n=3,305 adults from households above 125% of FPL. To maximize representation, NORC administered the survey using two modes (telephone and web) and in two languages (English and Spanish). NORC fielded the survey for seven weeks from October 15 to December 4, 2021.

LSC's central objectives for the 2021 survey were twofold:

- Measure the prevalence of civil legal problems among low-income Americans, and

- Assess the extent to which low-income Americans receive the legal help necessary to resolve their civil legal problems.

Additionally, LSC designed the 2021 survey to also explore the impact of the COVID-19 pandemic on civil legal needs; identify potential barriers to seeking and receiving legal help; and evaluate differences in experiences across income groups.

The survey design included a flexible survey logic that allowed us to gather detailed



information about people's civil legal needs at three different levels: at the individual level, at the household level, and at the level of specific civil legal problems. Additionally, NORC's approach to sampling and statistical weighting ensures that estimates are representative at all three levels.

### LSC's 2021 Intake Census

Consistent with its previous justice gap studies, LSC conducted an intake census among all LSC-funded legal aid organizations as part of this study. For the 2021 Intake Census, each organization tracked the requests for assistance that it received over a four-week period starting October 4, 2021. For each request meeting LSC eligibility requirements, organizations documented whether they were able to provide any legal help and, if so, whether it would be enough to resolve the problem. If they were unable to provide any legal help, they documented the reason why.

These data allow us to estimate the total number of eligible civil legal problems that low-income Americans bring to LSC-funded organizations over the course of a year. They also allow us to estimate the proportion of these problems that organizations are unable to serve fully or at all due to limited resources.

### Additional Data Sources

The 2022 study also leverages three other (preexisting) data sources. Section Two of this report uses recent data from the U.S. Census Bureau to describe the low-income population in the United States. Wherever possible, we use estimates from the 2021 Annual Social and Economic Supplement (ASEC) of the Current Population Survey (CPS). In other cases, we use estimates from the 2019 American Community Survey (ACS). Finally, Section Six of this report uses information from recent LSC Grantee Activity Reports to describe some aspects of LSC-funded organizations' case activity.

## This Report

### Report Overview

The study's findings are organized into the following five sections:

**Section 2: Today's Low-income America –** Using recent data from the U.S. Census Bureau, this section describes the current low-income population in the United States. More specifically, it explores the size of this population, who is most likely to have household incomes at this level, and how this population compares with the general U.S. population.



**Section 3: The Prevalence of Civil Legal Problems –** Using data from the 2021 Justice Gap Measurement Survey, this section presents findings on the prevalence of civil legal problems among low-income households, the types of problems they face, and how civil legal problems impact their lives.

**Section 4: Seeking and Receiving Legal Help –** Using data from the 2021 Justice Gap Measurement Survey, this section presents findings on how often low-income Americans sought and received civil legal help in the past year, the types of legal help they sought, and potential barriers to seeking and receiving legal help.

**Section 5: Comparing Income Groups –** Leveraging the 2021 Justice Gap Measurement Survey's sample of households above 125% of FPL, this section compares the experiences of low- and higher-income Americans in seeking and receiving civil legal help. More specifically, it compares their likelihood to seek legal help, their likelihood to receive the help they need, and their potential barriers to getting help.

**Section 6: Reports from the Field –** This section looks at the justice gap through the lens of LSC-funded organizations' efforts to help address the civil legal needs of low-income individuals. Using data from LSC's 2021 Intake Census, this section estimates the number of problems that low-income individuals bring to LSC-funded legal aid organizations in a given year and the extent to which these organizations are able to help resolve these problems with the limited resources at their disposal.

## Special Reporting Features

Each of the above-mentioned sections also includes the following special reporting features:

**"Impact of the COVID-19 Pandemic" spotlights –** These pages present findings that consider the relevant data and topics with respect to the circumstances surrounding the COVID-19 pandemic.

**"Geographic Focus" snapshots –** These pages present key findings by U.S. region. We follow the U.S. Census Bureau's conventions in grouping states into the following four regions: West, South, Midwest, and Northeast.[2]

**"Special Focus" snapshots –** These pages present key findings for six subpopulations of interest: seniors aged 65 years or older, veterans, people from rural areas, minor children aged 18 years or younger, survivors of domestic violence, and people facing high housing costs.[3]

**Client stories –** The report presents client stories throughout to help readers put the data in perspective of the very real challenges impacting people's livelihoods, families, safety, and general well-being.[4] To protect the identity of clients, we do not use their actual names or photos.[5]



**Important Notes**

**Terminology:** In this report, "Americans" generally refers to adults living in the United States; in Section Two, it also includes children. We use "low-income" to describe anyone with a household income at or below 125% of FPL or below 125% of the poverty threshold. At times, we use "substantial problems" to refer to civil legal problems that survey respondents say impacted them substantially (i.e., "very much" or "severely").

**Base sizes:** Base sizes are noted in all charts and tables. Bases with fewer than 200 observations are marked with an asterisk (*).

**Units of analysis:** The units of analysis and sets of observations used for the estimates vary throughout the report. For example, some survey results are based on respondents (or their households), some are based on their civil legal problems, and others are based on subsets of respondents, households, or problems. Readers are encouraged to pay close attention to information describing the units of analysis and relevant sets of observations.

**Comparisons with the 2017 study:** Given differences in the design of the two studies, we caution against direct comparisons of precise estimates.[6] Comparisons of general magnitude are fine. Additionally, it is important to note that much of the analysis in this report focuses on the subset of civil legal problems that impacted people's lives *substantially* whereas the 2017 report focused on problems that had any degree of impact.

# Study Findings in Brief

The findings of this study are consistent with LSC's 2017 study regarding the prevalence of civil legal problems among low-income Americans, their likelihood to seek legal help, and indicators of the justice gap based on survey and intake census data. With its expanded and improved design, this study goes beyond the 2017 study to also provide new insights regarding potential barriers to getting legal help, the role of the COVID-19 pandemic, and key differences between low-income Americans and those with higher incomes. Study findings are briefly summarized below.

## Prevalence of Civil Legal Problems and Seeking Legal Help

This study finds that nearly three-quarters (74%) of low-income households have experienced at least one civil legal problem in the past year. Additionally, 38% of low-income Americans have personally experienced a civil legal problem that substantially impacted their lives in some way. Even for these "substantial" problems, they only sought legal help 25% of the time.

Concerns about the cost of legal help stand out as an important barrier to seeking legal help. Nearly one-half (46%) of those who did not seek legal help for one or more problems cite concerns about cost as a reason why. Additionally, more than one-half (53%) of low-income Americans doubt their ability to find a lawyer they could afford if they needed one.



Over the course of a year, low-income individuals will approach LSC-funded legal aid organizations for help with an estimated 1.9 million civil legal problems that are eligible for assistance. They will receive some legal help for 51% of these problems, but even then, they will only receive enough legal help to resolve their problem about one-half (56%) of the time.

The following key findings from this study speak to the magnitude of the justice gap in 2022:

- Low-income Americans did not receive any legal help or enough legal help for 92% of the problems that substantially impacted their lives in the past year.

- LSC-funded organizations are unable to provide any or enough legal help for 71% of the civil legal problems brought to them; this translates to an estimated 1.4 million problems over the course of a year.

## Income Group Comparisons

This study has uncovered at least two interesting sets of insights related to differences in experiences by income. The first set relates to findings about differences in potential barriers to getting one's legal needs met. Compared to low-income Americans, we find that those at or above 400% of FPL tend to have more positive views of the civil legal system and how it can help people like them. Additionally, we find that people at or above 400% of FPL are much more confident in their ability to find and afford a lawyer if they needed one.

The second set relates to income disparities evident in the survey-based measure of the justice gap. When it comes to problems that do not have much impact, this measure of the justice gap is similar across income groups, with people not receiving any or enough legal help for 93% to 94% of these problems. An income disparity emerges, however, when we look at problems with substantial impact. For those at or above 400% of FPL, the estimated justice gap shrinks significantly (93% versus 78%) while it essentially stays the same for low-income Americans (94% versus 92%).

## Civil Legal Problems Related to the COVID-19 Pandemic

This study finds that one-third (33%) of low-income Americans experienced at least one civil legal problem related to the COVID-19 pandemic in the past year. Among those most likely to experience a pandemic-related problem are those from households with children, single parents, renters, and/or someone struggling with a substance use disorder. Additionally, low-income Americans report that most of their collective problems involving unemployment benefits and eviction are related to the pandemic in some way. Finally, we find that income disparities in the justice gap are exacerbated for civil legal problems related to the COVID-19 pandemic.





**Section 2**

# Today's Low-income America

Typically, legal aid organizations can use LSC funds only to serve the legal needs of people with household incomes at or below 125% of the federal poverty level. These people make up the set of "low-income Americans" of central focus in this report. To provide a fuller picture of this population, this section offers a glimpse of who today's low-income Americans are. Using recent data collected by the U.S. Census Bureau, it explores how many Americans have low household incomes, where they live, and how they compare with the general U.S. population.



**ABOUT THE DATA:** This section leverages two U.S. Census Bureau data sources. Whenever possible, we use the 2021 Annual Social and Economic Supplement (ASEC) of the Current Population Survey (CPS) because it is the most current data available – providing poverty estimates based on 2020 income and household information. We use the 2019 American Community Survey (ACS) 1-year Estimates where 2021 CPS ASEC data are not available.

The income categories in these two data sources are based on the U.S. Census Bureau's poverty thresholds. Note that poverty thresholds are different from the poverty guidelines published by the U.S. Department of Health and Human Services, which are used to determine one's percent of federal poverty level (FPL) and eligibility for LSC-funded legal assistance. Please also note that the U.S. Census Bureau reports on household incomes below 125% of the poverty threshold rather than household incomes at or below 125% of FPL (which is how income eligibility for LSC-funded services is defined).

Some additional data sources are used for the "Special Focus" populations at the end of this section; we note these accordingly. The unit of analysis in this section is individuals.

## About 50 million Americans have household incomes below 125% of the poverty threshold, including more than 15 million children.

In 2022, household incomes below 125% of the poverty threshold ("of poverty" hereafter) correspond to annual incomes below $34,500 for a family of four or $17,500 for an individual.[7] Fifteen percent of Americans live in households with annual incomes below these levels. This translates to approximately 50 million low-income Americans, including approximately 15.2 million children (<18 years old).

**Figure 2A. Low-income Americans' share of state populations in 2021[8]**



Percent of state populations with household incomes <125% of poverty

○ <12%
○ 12%- 16%
● >16%

LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

As Figure 2A depicts, low-income Americans make up larger shares of some states' populations than others. The states with the highest proportions of low-income residents include Mississippi (24%), New Mexico (23%), Louisiana (21%), and Oklahoma (20%). If we look at population counts (instead of proportions), the states with the largest populations naturally stand out as having the highest numbers of low-income residents. For example, California alone has about 5.9 million low-income residents, Texas has about 5.4 million, Florida has about 3.9 million, and New York has about 3 million.

# About 50 million Americans have household incomes below 125% of the poverty threshold.

### People living in rural areas are more likely to have low household incomes than people in other areas.

Most Americans live in suburban or urban areas,[9] and those with low incomes are no exception. Combined, suburban and urban areas are home to approximately 42 million low-income people whereas only about 8 million low-income people live in rural areas. Note, however, that this low population count for rural low-income Americans is driven by the fact that not many Americans live in rural areas more generally. As a matter of fact, people living in rural areas are actually more likely than others to have low incomes: 19% of the rural population has a household income below 125% of poverty compared to 15% of the combined suburban/urban population.[10]

### Compared to non-Hispanic Whites, Blacks and Hispanics are more than twice as likely to have household incomes below 125% of poverty.

As Figure 2B shows, Blacks and Hispanics are much more likely to have low incomes compared with non-Hispanic Whites and Asian Americans. Indeed, more than one-quarter (26%) of all Blacks and nearly one-quarter (23%) of Hispanics live in households with incomes below 125% of poverty.



That said, given the relative sizes of the racial and ethnic groups in the United States, the low-income, non-Hispanic White population (~21.4 million) far outnumbers the size of the low-income populations among Hispanics (~14 million), Blacks (~11 million), and Asian Americans (~2.3 million).

**Figure 2B. Proportion of racial/ethnic groups with household incomes below 125% of poverty** [11]



Percent of U.S. racial/ethnic populations

## One in five American children lives in a low-income household.

More than one-fifth (21%) of all American children live in households with incomes below 125% of poverty. This translates to about 15.2 million children in total. Additionally, children are disproportionately represented in the low-income population compared to the general population. See Figure 2C which presents the distribution of children under 18 years old, adults between 18 and 64 years old, and seniors (65 years or older) for the low-income and general populations in the United States. As the figure shows, children make up a nearly one-third (31%) of the low-income population but less than one-quarter (22%) of the general population.

**Figure 2C. Distribution of age: low-income versus general U.S. population** [12]



Percent of individuals

● Low-income population   ● General population

LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

# 21% of children in the U.S. live in households with incomes below 125% of the poverty threshold.

## Low-income women and girls outnumber low-income men and boys in the United States.

There are approximately 5.7 million more women and girls with low incomes than men and boys. There are roughly 27.8 million women and girls, and roughly 22.1 million men and boys who live in low-income households. These numbers reflect the fact that women and girls are disproportionately represented in the low-income population (which is 56% female) compared to the general population (which is 51% female). See Figure 2D. Additionally, it is worth noting that a majority (58%) of all the low-income households with children are headed by single women.[13]

**Figure 2D. Distribution of males and females: low-income versus general U.S. population**[14]



|  | Female | Male |
|---|---|---|
| General population | 51% | 49% |
| Low-income population | 56% | 44% |

Percent of individuals



**Client Story**

**Cathy • Georgia • Eviction.** Cathy's financial troubles began when work reduced her hours at the beginning of the pandemic. She was already behind on bills when she was involved in a car accident that left her injured so badly that she could no longer work. She eventually got so far behind that she faced a monthly threat of eviction. The Atlanta Legal Aid Society connected Cathy to a local rental assistance program that helped her pay back rent and also helped her secure Social Security Disability Insurance benefits to pay for food and other necessities.



Case 2:20-cv-02291-DOC-KES    Document 1022-6    Filed 08/08/25    Page 27 of 89
Page ID #:29284

## Compared to the general adult population, low-income adults are disproportionately less likely to have a college degree and more likely to have never graduated high school.

Figure 2E presents the distribution of educational attainment for the general and low-income adult (18 years or older) populations in the United States. As the figure shows, one in five (20%) low-income adults has less than a high school education (or equivalent), which is more than twice the rate for the general adult population (9%). In the same vein, only 13% of low-income adults have a college education compared with 31% of the general adult population.

**Figure 2E.** Distribution of education: low-income population versus general U.S. population[15]



Less than high school: Low-income 20%, General 9%
High school or GED: Low-income 44%, General 36%
Some college: Low-income 23%, General 24%
College degree or more: Low-income 13%, General 31%

Percent of adults
● Low-income population   ● General population



# Impact of the COVID-19 Pandemic

**The COVID-19 pandemic has had devastating and disproportionate effects on low-income Americans.**

In addition to the direct health impacts of the COVID-19 virus on low-income families and communities,[16] the pandemic has also had unprecedented consequences for their economic situations, housing security, mental health, physical safety, food security, access to education, and many other aspects of their lives.[17]

To provide a sense of some of the challenges low-income Americans still face a full two years into the pandemic, we share some results from the U.S. Census Bureau Household Pulse Survey's most recent week of data collection at the time of writing this report (Week 43: March 2 – 14, 2022).[18]  The statistics below correspond to people with annual household incomes less than $25,000.

 **Finances**

## 23% of low-income
households lost employment income in the previous four weeks.

 **Food Security**

## 26% of low-income
households did not always have enough food to eat in the previous week.

 **Housing**

## 18% of low-income
renter households were behind on rent payments.

 **Mental Health**

## 36% of low-income
adults experienced anxiety symptoms on seven or more of the previous 14 days.

 America's Partner for Equal Justice — LEGAL SERVICES CORPORATION

## GEOGRAPHIC FOCUS

This snapshot presents estimates for the proportion of populations with household incomes below 125% of poverty for each of the four Census regions in the United States. All estimates come from the Current Population Survey (CPS) 2021 Annual Social and Economic Supplement (ASEC).[19] The unit of analysis is individuals.



**Midwest**

**14%** of the population in the Midwest is below 125% of poverty.

**9.2 million** children and adults.

**Northeast**

**14%** of the population in the Northeast is below 125% of poverty.

**7.4 million** children and adults.

**West**

**14%** of the population in the West is below 125% of poverty.

**11.1 million** children and adults.

**South**

**18%** of the population in the South is below 125% of poverty.

**22.2 million** children and adults.

LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

**SPECIAL FOCUS**

This snapshot presents estimates for the proportion of populations with household incomes below 125% of poverty for each of the six subpopulations of special interest in this report. With the exception of the estimate for survivors of domestic violence, all estimates come from recent U.S. Census Bureau data sources.[20] The unit of analysis is individuals.

 **Seniors**

# 7.6 million

seniors have household incomes below 125% of poverty.

 **People in Rural Areas**

# 8 million

people living in rural areas have household incomes below 125% of poverty.

 **Veterans**

# 1.6 million

veterans have household incomes below 125% of poverty.

 **People with High Housing Costs**

# 15 million

households with high housing costs have annual household incomes of less than $25,000.

 **Children (<18 yrs)**

# 15.2 million

children live in households with incomes below 125% of poverty.

 **Survivors of Domestic Violence**

The rate of intimate partner violence for women is nearly **3 times higher among those in the lowest income quartile** versus those in the highest.





**Section 3**

# The Prevalence of Civil Legal Problems

A significant majority of low-income American households have faced at least one civil legal problem in the past year, and most have had to deal with multiple problems. These problems typically relate to essential needs like housing, health care, and providing for their families. Using data from the 2021 Justice Gap Measurement Survey, this section presents findings on the prevalence of civil legal problems among low-income households, the most common types of problems they face, and the impact these problems have on their lives.



**ABOUT THE DATA:** The findings presented in this section come from the Justice Gap Measurement Survey conducted at the end of 2021 and are based on that survey's nationally representative sample of low-income households. The survey presented respondents with an extensive list of problems that typically raise justiciable civil legal issues ("civil legal problems" henceforth) and asked them to indicate whether they and/or anyone else in their household had experienced each problem in the past 12 months. The survey explored a total of 81 distinct problems, which are grouped into 10 categories for the purposes of this report. Respondents' answers about their and other household members' experiences make it possible to estimate how common various civil legal problems are at the household level. The primary unit of analysis in this section is households.

## Prevalence of Civil Legal Problems

**Most low-income American households faced one or more civil legal problems in the past year.**

The 2021 Justice Gap Measurement Survey assessed the prevalence of 81 distinct civil legal problems among low-income households. The results indicate that an estimated 74% of low-income households experienced at least one civil legal problem in the past year – with many households dealing with multiple problems. As Figure 3A shows, about three in five (62%) households experienced two or more problems, about two in five (39%) experienced five or more, and a shocking one in five (20%) of all low-income households experienced 10 or more problems in the past year.

# 74% of low-income households experienced at least one civil legal problem in the past year.

**Figure 3A. Number of civil legal problems experienced by low-income households in the past year[21]**



Percent of low-income households  |  n=2,003



## Types of Civil Legal Problems

Figure 3B presents the prevalence rates for the six most common types of civil legal problems among low-income households. The dark blue bars correspond to the proportion of all low-income households that experienced a given type of problem. The occasional red bars correspond to subpopulations of particular interest for a given type of problem. For example, the chart shows the percent of all low-income households that experienced a housing-related problem (33%) as well as the percent of renter households that experienced this type of problem (43%).

**Figure 3B.** **Percent of low-income households experiencing common types of civil legal problems[22]**



| | |
|---|---|
| Consumer issues | 50% |
| Health care | 39% |
| Income maintenance | 34% |
| Housing | 33% |
| Renter households (n=1,194) | 43% |
| Family & safety | 26% |
| Households with children <12 yrs (n=699) | 44% |
| Education | 19% |
| Households with students (n=925) | 42% |

Percent of households | n=2,003

**Client Story**



**Barbara • Pennsylvania • Domestic Violence.** Barbara's ex-husband was abusing their two children. She had a protection order against him for herself, but she could not get the authorities to believe her about the child abuse. She spent all of her savings and her parents' savings to pay for a private attorney to help her case, but she eventually ran out of money. Meanwhile, the abuse continued. Eventually, a women's crisis shelter connected Barbara to Neighborhood Legal Services Association, who helped her successfully build a case to demonstrate the abuse and protect her children.

**The two most common types of civil legal problems among all low-income households relate to consumer issues and health care.**

 **Consumer issues.** One-half (50%) of low-income households experienced a problem related to consumer issues. Common problems in this area include difficulties with medical debt (affecting 26% of all low-income households), having utilities disconnected (18%), dealing with harassment from creditors (16%), and falling victim to a scam (15%).

 **Health care.** Nearly two in five (39%) low-income households experienced a problem related to health care in the past year. Common problems in this area include difficulty getting insurance to cover needed health care (affecting 20% of all low-income households), being billed incorrectly for medical services (16%), and difficulty accessing necessary health care from providers (12%).

**Other common types of civil legal problems relate to essential needs, such as income maintenance, housing, education, and family and safety.**

 **Income maintenance.** More than one-third (34%) of all low-income households experienced a problem related to income maintenance in the past year. These problems center on people's difficulty accessing benefits to supplement their income and meet their household's basic needs. Common problems in this area include difficulty accessing food stamps and Temporary Assistance to Needy Families (TANF) (affecting 17% of all households), difficulty with their COVID stimulus payment (16%), and difficulty claiming or keeping unemployment benefits (13%).

# 43% of low-income, renter households experienced at least one civil legal problem related to housing in the past year.

 **Housing.** One-third (33%) of all low-income households experienced a civil legal problem related to housing in the past year. As Figure 3B on the previous page shows, renter households are disproportionately likely to experience these types of problems. Indeed, 43% of renter households experienced a housing problem in the past year (compared to 23% of homeowner households;[23] result not shown in chart). Common problems among renter households include a landlord failing to keep the property in good repair (affecting 26% of renter households), falling behind on rent or being threatened with eviction (18%), and disputing the terms of a lease (18%).



 **Family and safety.** About one-quarter (26%) of all low-income households have experienced at least one problem related to family matters or personal safety. The prevalence is significantly higher among households with children under 12 years old (44%). The most common problems across all households in this area include experience with domestic violence (affecting 10% of all households), problems collecting or paying child support (9%), and separation or divorce (9%).

 **Education.** Nearly one in five (19%) low-income households has experienced a civil legal problem related to education in the past year. When we look solely at households with a student in school, this incidence rate more than doubles to 42%. Common problems among households with a student in school include difficulty attending remote classes due to lack of technology (affecting 21% of these households), inadequate supplies or equipment for school (17%), and inadequate protection from threats or harassment from other students (17%).

**Table 3A.** **Additional types of civil legal problems experienced by low-income households**[24]

| Type | Prevalence | Example problems |
|---|---|---|
| **Employment** | 23% | Unsafe working conditions, unfair or discriminatory treatment in the workplace, and difficulty getting paid for work |
| **Official records** | 16% | Difficulty obtaining government-issued documents and expunging something from a criminal record |
| **Wills & estates** | 14% | Setting up an advance medical directive, will, or power of attorney |
| **Disability** | 10% | Difficulty accessing services and experience with abuse |

n=2,003



# Vicious Cycle of Civil Legal Problems

## Households that experienced issues with eviction or domestic violence are disproportionately more likely to face multiple problems.

Consistent with other research about the dynamics of poverty and civil legal issues, the 2021 Justice Gap Measurement Survey finds that households that have to deal with certain types of issues tend to encounter even more problems.[25] This pattern can feed a vicious cycle of civil legal problems that is difficult to interrupt without legal help. The survey data point to two poignant examples of this dynamic: households that have dealt with issues related to eviction and/or domestic violence are disproportionately more likely to have experienced multiple problems in the past year. See Figure 3C below.[26]

**Figure 3C.** **Prevalence of civil legal problems for low-income households facing eviction and domestic violence[27]**



**All households**
(n=2,003)
39%
20%

**Eviction households**
(n=228)
81%
58%

**Domestic violence households**
(n=225)
87%
62%

Percent of low-income households

● 5 or more problems    ● 10 or more problems

LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

# The Impact of Civil Legal Problems

## In the past year, more than one-third of low-income Americans experienced a civil legal problem that substantially impacted their lives.

We consider a problem's impact to be "substantial" if the respondent says the problem affected them "very much" or "severely" (as opposed to "moderately," "slightly," or "not at all"). The survey finds that more than one-third (38%) of low-income Americans personally experienced at least one civil legal problem that has had a substantial, negative impact on their household overall.

Figure 3D presents the percent of low-income Americans who experienced civil legal problems with a substantial negative impact in various aspects of their lives. As the figure shows, the most common impacts were on finances and mental health. Indeed, 35% report substantial impacts on their household's financial situation, and 31% report the same for their or other household members' mental and emotional health.

## 35% of all low-income Americans experienced a problem that has substantially impacted their household's financial situation in the past year.

**Figure 3D.** Percent of low-income Americans experiencing civil legal problems with substantial impacts in various aspects of their lives[28]



Overall — 38%
Financial situation — 35%
Mental & emotional health — 31%
Physical health & safety — 25%
Relationships — 21%

Percent of individuals | n=2,003



**Problems relating to housing, employment, income maintenance, and family and safety stand out as the most impactful types of problems overall.**

Narrowing our focus to only those low-income Americans who personally experienced problems in the past year (as opposed to all low-income), we see that more than one-half (55%) say at least one of their problems substantially impacted their lives overall. Some types of problems tend to impact people more than others. Figure 3E shows the percent reporting a substantial negative impact among those who personally experienced various types of problems. At least one-half of those personally affected by the following types of problems reported a substantial impact on their lives: housing (54%), family and safety (52%), employment (51%), and income maintenance (50%).

Civil legal problems had a substantial negative effect on **55%** of those who personally experienced a problem in the past year.

**Figure 3E.** Percent of low-income Americans experiencing substantial impacts from civil legal problems, by problem type[29]



Percent of low-income individuals who personally experienced at least one problem in a given category
*Small base size



# Impact of the COVID-19 Pandemic

**One-third (33%) of all low-income Americans personally experienced at least one civil legal problem related to the COVID-19 pandemic in the past year.**

This translates to nearly one-half (47%) of all the low-income Americans who experienced one or more problems overall. Those most likely to experience a COVID-related problem track with our common understanding of who has been most affected by the pandemic. Among those that experienced at least one problem in the past year, those most likely to attribute their problems to the pandemic come from the following types of households: household in which someone struggles with substance use disorder (SUD) (64% attribute at least one of their problems to the pandemic), single-parent households (57%), households with children <12 years old (57%), and renter households (51%). See Figure 3F.

**Figure 3F.** Percent of low-income Americans attributing recent civil legal problems to the pandemic, by household characteristics[30]



**47%**
All individuals
(n=1,466)

**64%**
From households
with SUD
(n=187)*

**57%**
From single-parent
households
(n=416)

**57%**
From households with
children <12 yrs
(n=552)

**51%**
From renter
households
(n=919)

Percent of low-income individuals who experienced at least one problem

The types of problems people are most likely to blame on the pandemic also track with our common understanding of how the pandemic has affected people. For example, respondents attribute nearly one-third (32%) of all their income maintenance problems to the pandemic, 31% of their education problems, and 27% of their housing problems. Looking at specific problems, more than one-half of low-income Americans attribute their problems related to unemployment benefits (52%) and eviction (56%) to the pandemic.



## GEOGRAPHIC FOCUS

This snapshot presents the percent of low-income households in each region that experienced 1 or more, 5 or more, and 10 or more problems in the past year. All estimates come from LSC's 2021 Justice Gap Measurement Survey.[31] The unit of analysis is households.



**Midwest** (n=534 households)

**75%** had **1+ problems.**

**45%** had **5+ problems.**

**23%** had **10+ problems.**

**Northeast** (n=257 households)

**74%** had **1+ problems.**

**34%** had **5+ problems.**

**15%** had **10+ problems.**

**West** (n=402 households)

**72%** had **1+ problems.**

**38%** had **5+ problems.**

**18%** had **10+ problems.**

**South** (n=810 households)

**75%** had **1+ problems.**

**39%** had **5+ problems.**

**21%** had **10+ problems.**

LSC | America's Partner for Equal Justice

LEGAL SERVICES CORPORATION

## SPECIAL FOCUS

This snapshot presents the percent of low-income households for each subpopulation of interest that experienced 1 or more, 5 or more, and 10 or more problems in the past year. All estimates come from LSC's 2021 Justice Gap Measurement Survey.[32] The unit of analysis is households.

 **Senior Households** (n=593)

**70%** had **1+ problems.**

**31%** had **5+ problems.**

**14%** had **10+ problems.**

 **Rural Households** (n=419)

**77%** had **1+ problems.**

**40%** had **5+ problems.**

**23%** had **10+ problems.**

 **Veteran Households** (n=242)

**76%** had **1+ problems.**

**44%** had **5+ problems.**

**27%** had **10+ problems.**

 **Households with High Housing Costs** (n=826)

**84%** had **1+ problems.**

**49%** had **5+ problems.**

**26%** had **10+ problems.**

 **Households with Children (<18 yrs)** (n=889)

**83%** had **1+ problems.**

**52%** had **5+ problems.**

**30%** had **10+ problems.**

 **Households with Recent Domestic Violence⁺** (n=225)

**98%** had **1+ problems.**

**87%** had **5+ problems.**

**62%** had **10+ problems.**

⁺These estimates exclude problems related to domestic violence


LEGAL SERVICES CORPORATION



**Section 4**

# Seeking and Receiving Legal Help

While a significant majority of low-income Americans faced at least one civil legal problem in the past year, they rarely sought legal help. And even when they sought legal help, they typically did not get as much help as they needed. Using data from the 2021 Justice Gap Measurement Survey, this section presents findings on how often low-income Americans sought and received legal help in the past year, the types of legal help they sought, and potential barriers to seeking and receiving legal help.



**ABOUT THE DATA:** The 2021 Justice Gap Measurement Survey asked respondents to provide details about their experiences seeking and receiving legal help for problems they had personally experienced in the past year. The survey only asked for detail on problems that had a negative impact on respondents' lives overall (i.e., negatively affected them "slightly," "moderately," "very much," or "severely" overall); the survey did not ask for detail on problems that affected respondents "not at all."

The vast majority of respondents (92%) personally experienced 10 or fewer problems that impacted their lives to some extent, and these respondents were asked to provide details for all of these problems. In the case that respondents experienced more than 10 problems that impacted their lives, the survey selected a subset of 10 of their problems about which to ask details. To maximize the potential for learning about problems relating to veterans, disabilities, housing, and family issues, these types of problems were given priority for inclusion if they met the other criteria.

The primary unit of analysis in this section is problems.[33] The focus is exclusively on problems that respondents personally experienced (i.e., excluding problems experienced by other household members) and problems that negatively impacted respondents overall to some extent (i.e., excluding problems that impacted them "not at all"). Note that the primary unit of analysis changes to the individual in the discussion about barriers at the end of the section.

## Seeking Legal Help

### Low-income Americans rarely seek legal help for their civil legal problems.

Low-income Americans sought legal help for 19% of their collective civil legal problems in the past year. As Figure 4A shows, they were slightly more likely to seek legal help for problems that impacted them substantially (25% of problems impacting them "very much" or "severely") compared to less impactful problems (14% of problems affecting them "slightly" or "moderately").

**Figure 4A. Percent of problems for which low-income Americans sought legal help in the past year[34]**



| | Did not seek legal help | Sought legal help |
|---|---|---|
| **All problems** (n=5,784) | 81% | 19% |
| **Problems with substantial impact** (n=2,674) | 75% | 25% |
| **Problems with less impact** (n=3,110) | 86% | 14% |

Percent of problems



LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

# Low-income Americans sought legal help for 25% of the civil legal problems that substantially impacted them in the past year.

## People are more likely to seek legal help for problems that are more obviously "legal" like those involving legal documents and court proceedings.

Figure 4B presents the percent of civil legal problems for which low-income Americans sought legal help in the past year by problem type. As the figure shows, people were most likely to seek legal help for problems relating to family and safety (33%) and to wills and estates (41%).[35] Compared to the other problems explored in the survey, these types of problems might be considered more obviously "legal" in nature. For example, many family and safety problems involve the courts, such as those related to child custody, divorce, and protection from violence. Similarly, the problems in the wills and estates category involve official legal documents and often involve court proceedings as well.

**Figure 4B. Percent of problems for which low-income Americans sought legal help, by problem type[36]**



| 41% | 33% | 29% | 22% |
|---|---|---|---|
| **Wills & estates** (n=64)* | **Family & safety** (n=690) | **Disability** (n=171)* | **Housing** (n=1,107) |
| 20% | 19% | 18% | 14% |
| **Employment** (n=466) | **All problems** (n=5,784) | **Official records** (n=165)* | **Consumer issues** (n=1,472) |
| 14% | 13% | 13% | |
| **Income maintenance** (n=626) | **Health care** (n=675) | **Education** (n=348) | |

Percent of problems experienced in each category

*Small base size



## The types of legal help that low-income Americans seek from lawyers reflect the wide variety of ways legal professionals can help people with these types of problems.

Figure 4C presents the various types of help low-income Americans wanted when they talked to a lawyer about their civil legal problems in the past year. The most common type of legal help sought was legal advice about specific situations (59% of the times they sought legal help). Other common types of help sought include representation in court (39%) and help filling out legal forms and documents (35%).

**Figure 4C. Percent of problems for which low-income Americans sought various types of legal help from lawyers[37]**



Percent of problems about which individuals talked to a lawyer
n=822

## Even when they seek legal help, low-income Americans often do not get all of the help they need.

Looking at all of the problems for which low-income Americans sought legal help, they say that they did not receive all of the help needed for nearly two-thirds (64%).[38] If we narrow our focus to only those problems that affected them substantially, we find a similar result: low-income Americans did not receive all of the help they needed for 66% of these substantial problems.[39]

LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

# Survey-based Measure of the Justice Gap

The survey results allow us to estimate a survey-based measure of the justice gap among low-income Americans.[40] To do so, we first identify the full set of problems low-income Americans experienced in the past year and then identify the set of these problems for which they did not receive any legal help or did not receive enough legal help.



$$\text{Justice Gap} = \frac{\text{(problems not receiving any legal help)} + \text{(problems not receiving enough legal help)}}{\text{all problems experienced}}$$

We define each part of this measure below:

- **All problems experienced:** All personally experienced problems that impacted respondents to some extent in the past year.[41]

- **Problems not receiving any legal help:** The subset of problems for which they did not seek any legal help.[42]

- **Problems not receiving enough legal help:** The subset of problems for which they sought legal help but did not receive as much as they needed.[43]



**Nancy • New Jersey • Disability.** Nancy, an elderly disabled woman, lived in public housing for seniors, a placement that she risked losing. When she lost her identification documents, she fell behind on rent because she did not know how to access her bank account without them. She asked Essex-Newark Legal Services (ENLS) for help, but they lost contact with Nancy when the pandemic hit. An ENLS staff member eventually tracked her down and found that she had been isolated for several months – surviving on food donations and still housed only because evictions were not allowed. ENLS helped her get a new I.D. card, and she is now up-to-date on rent and safe.

**Low-income Americans either do not receive any legal help or do not receive enough legal help for the vast majority of their civil legal problems.**

Figure 4D presents the survey-based justice gap measure for low-income Americans among three sets of problems: all of the civil legal problems they experienced, problems with substantial impact, and problems with less impact. As the figure shows, low-income Americans did not receive any or enough legal help for 93% of all of their problems. Interestingly, this estimate is essentially the same whether we look at problems with substantial impact (92%) or problems with less impact (94%).

**Figure 4D.** Percent of problems for which low-income Americans did not receive any or enough legal help in the past year (i.e., survey-based justice gap measure)[44]



| | |
|---|---|
| All problems (n=5,784) | 93% |
| Problems with substantial impact (n=2,674) | 92% |
| Problems with less impact (n=3,110) | 94% |

Percent of problems experienced

Low-income Americans did not receive any legal help or enough legal help for **92%** of the problems that substantially impacted them in the past year.

LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

# Barriers to Seeking and Receiving Legal Help

The survey data allow us to explore three types of potential barriers to seeking and receiving legal help:

- **Knowledge barriers:** We look at the extent to which people know that legal professionals can help resolve the types of civil legal problems explored in this survey.

- **Attitudinal barriers:** We explore people's beliefs about the civil legal system and how it relates to people like them.

- **Cost barriers:** We consider the extent to which the (real or perceived) cost of receiving legal help might pose a barrier to getting it.

## There is a low level of awareness around the fact that lawyers can help resolve many of the everyday civil legal problems people face.

For each civil legal problem that they personally experienced, respondents indicated whether they thought it was a type of problem that a lawyer or other legal professional could help resolve. The results point to a low level of awareness about how legal professionals can help. As Figure 4E shows, low-income Americans did not know if a lawyer could help resolve 74% of their problems. Indeed, they did not think a lawyer could help with 44% of their problems and were not sure for another 30%. Among low-income Americans with at least one reported problem, only 5% knew that a legal professional could help resolve all of the types of problems they experienced; the vast majority (95%) either did not think a legal professional could help or were not sure for at least one problem.

**Figure 4E.** Low-income Americans' beliefs about whether a lawyer could help resolve their civil legal problems[45]



| Believe lawyers could help 24% | Not sure 30% | Do not believe lawyers could help 44% |

74%

Percent of problems experienced  |  n=9,306



## Most low-income Americans hold uncertain or negative perceptions of the civil legal system and how it relates to them.

The survey asked respondents to indicate the extent to which they agreed or disagreed with the following three statements about the U.S. civil legal system:[46]

- The civil legal system can help people like me solve important problems like those discussed in this survey.

- People like me are treated fairly in the civil legal system.

- People like me are able to use the civil legal system to protect and enforce their rights.

Figure 4F presents the percent of low-income Americans who agree, disagree, or are indifferent/unsure when it comes to these statements. As the figure shows, a minority (ranging from 28% to 40%) agrees with the statements, but most people either disagree or are indifferent/unsure. For example, only 28% of low-income Americans agree with the statement, "People like me are treated fairly in the civil legal system." Forty-six percent are either indifferent or unsure, and another 24% disagree.

**Client Story**



**George • Virginia • Elder abuse.** George is an elderly veteran with serious health issues. He had a caregiver who was neglecting and abusing him – in addition to stealing from him. Once Adult Protective Services became involved, they referred George to Blue Ridge Legal Services (BRLS). BRLS attorneys helped him revoke the abuser's previous power of attorney and get new powers of attorney in place with trusted family members. BRLS also helped George file a civil case against his abuser, which resulted in a settlement of $40,000. Additionally, BRLS helped George and the police document the stolen money and property, resulting in a parallel criminal case against George's abuser.

LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

# Only 28% of low-income Americans believe that people like them are treated fairly in the U.S. civil legal system.



**Figure 4F. Low-income Americans' attitudes about the U.S. civil legal system[47]**

| | Agree | Not sure or indifferent | Disagree |
|---|---|---|---|
| System can help people like me solve important problems | 40% | 45% | 14% |
| People like me are treated fairly in the system | 28% | 46% | 24% |
| People like me can use the system to protect & enforce rights | 39% | 42% | 18% |

Percent of individuals  |  n=2,003

## More than one-half of low-income Americans doubt they could find and afford a lawyer if they needed one.

The survey asked respondents how confident they are that they would be able find a lawyer or other legal professional that they could afford if they needed help on a serious civil legal problem, such as preventing an eviction, foreclosure, or the loss of custody of a child. Figure 4G presents the corresponding results. As the figure shows, less than one-half (45%) of low-income Americans express confidence that they could find a lawyer that they could afford while 53% either have low confidence or are not sure.



# 53% of low-income Americans do not know if they would be able to find a lawyer that they could afford if they needed help with a serious civil legal problem.

**Figure 4G. Low-income Americans' confidence in their ability to find a lawyer that they could afford**[48]



| Extremely/ very confident 24% | Somewhat confident 21% | Not very/ not at all confident 32% | Not sure 21% |

45%            53%

Percent of individuals | n=2,003

## Many low-income Americans cite cost as a reason for not seeking legal help in the past year.

Among those who did not seek legal help for at least one of their recent civil legal problems, nearly one-half (46%)[49] cited concerns about cost as a reason why. There is also evidence to suggest that concerns about cost stood in the way of others' ability to get all of the help they needed. Indeed, among those who sought legal help but did not get all that they needed for one or more problems, 61% say one of the reasons was that it was too expensive to get more help.[50]

LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

# Impact of the COVID-19 Pandemic

**Low-income Americans did not receive any or enough legal help for 91% of the pandemic-related civil legal problems that substantially impacted their lives.**

Low-income Americans sought legal help for 22% of the substantial problems that they attribute to the COVID-19 pandemic in the past year.[51] Consistent with broader findings, two common reasons cited for not seeking legal help for these problems were concerns about cost and the belief that lawyers could not help with these problems.[52]

All in all, low-income Americans did not receive any legal help or enough legal help for 91% of the pandemic-related problems that impacted them substantially. Figure 4H below presents estimates for the survey-based justice gap measure for the three types of problems most frequently attributed to the pandemic (i.e., income maintenance, education, and housing).

**Figure 4H.** **Percent of substantial, pandemic-related problems for which low-income Americans did not receive any or enough legal help in the past year (i.e., survey-based justice gap measure)[53]**



All pandemic-related problems with substantial impact (n=946): **91%**

Income maintenance (n=141)*: **97%**

Education (n=66)*: **96%**

Housing (n=231): **94%**

Percent of pandemic-related problems experienced with substantial impact

*Small base size



## GEOGRAPHIC FOCUS

This snapshot presents key statistics about the likelihood of low-income Americans seeking and receiving legal help for each of the four Census regions in the United States. All estimates are based exclusively on civil legal problems with substantial impacts and come from LSC's 2021 Justice Gap Measurement Survey.[54] The unit of analysis is problems.

 **Midwest** (n=752)

Sought legal help for **25% of substantial problems.**

Did not receive any or enough legal help for <span style="color:red">**93% of substantial problems.**</span>

 **Northeast** (n=261)

Sought legal help for **29% of substantial problems.**

Did not receive any or enough legal help for <span style="color:red">**88% of substantial problems.**</span>



 **West** (n=558)

Sought legal help for **29% of substantial problems.**

Did not receive any or enough legal help for <span style="color:red">**92% of substantial problems.**</span>

 **South** (n=1,103)

Sought legal help for **21% of substantial problems.**

Did not receive any or enough legal help for <span style="color:red">**92% of substantial problems.**</span>



## SPECIAL FOCUS

This snapshot presents key statistics about the likelihood of low-income Americans seeking and receiving legal help for the six subpopulations of interest throughout this report. All estimates are based exclusively on civil legal problems with substantial impacts and come from LSC's 2021 Justice Gap Measurement Survey.[55] The unit of analysis is problems.

 **Seniors** (n=222)

Sought legal help for **26% of substantial problems.**

Did not receive any or enough legal help for **91% of substantial problems.**

 **Individuals from Rural Areas** (n=593)

Sought legal help for **21% of substantial problems.**

Did not receive any or enough legal help for **94% of substantial problems.**

 **Individuals from Veteran Households** (n=366)

Sought legal help for **34% of substantial problems.**

Did not receive any or enough legal help for **84% of substantial problems.**

 **Individuals with High Housing Costs** (n=1,507)

Sought legal help for **21% of substantial problems.**

Did not receive any or enough legal help for **95% of substantial problems.**

 **Individuals from Households with Children (<18 yrs)** (n=1,500)

Sought legal help for **24% of substantial problems.**

Did not receive any or enough legal help for **90% of substantial problems.**

 **Recent Survivors of Domestic Violence** (n=666)

Sought legal help for **29% of substantial problems.**

Did not receive any or enough legal help for **88% of substantial problems.**





**Section 5**

# Comparing Income Groups

Leveraging the 2021 Justice Gap Measurement Survey's sample of households above 125% of the federal poverty level, this section compares the experiences of low- and higher-income Americans in seeking and receiving legal help for recent civil legal problems. More specifically, it compares their likelihood to seek legal help, their likelihood to receive the help they need, and their potential barriers to getting help.



**ABOUT THE DATA:** The data in this section come from the 2021 Justice Gap Measurement Survey and its nationally representative samples of low- and higher-income Americans. The section focuses on comparing the results for different income groups across some of the same survey items explored in Section Four – including items used to estimate the survey-based justice gap measure and items that tap into potential knowledge, attitudinal, and cost barriers to getting legal help. This section uses two primary units of analysis: problems and individuals.

## Comparing Income Groups

While the main focus of this study is to better understand low-income Americans' civil legal needs, the 2021 Justice Gap Measurement Survey also included a nationally representative sample of individuals with household incomes above 125% of FPL. The primary purpose of this higher-income sample was to explore how experiences with civil legal problems might differ by income. For the purposes of this report, we group individuals into the following three categories based on their household income and household size:

- At or below 125% of FPL

- Between 125% of FPL and 400% of FPL

- At or above 400% of FPL

Table 5A presents the approximate annual incomes that correspond to each of these income groups for a typical family of four and a typical individual.[56]

**Table 5A.** **2022 annual household income levels for income groups of interest[57]**

|  | Family of four | Individual |
|---|---|---|
| **125% of FPL or below** | $34,688 or less | $16,988 or less |
| **Between 125% and 400% of FPL** | $34,689 to $111,000 | $16,989 to $54,360 |
| **400% of FPL or above** | $111,001 or more | $54,361 or more |

This section focuses primarily on comparisons between people at or below 125% of FPL ("low-income Americans") and people at or above 400% of FPL ("higher-income Americans"). This offers the sharpest comparison given that household income often fluctuates, and people who are in the middle income group today could very well be in the lower or higher income group tomorrow.



# Comparing Likelihood to Seek and Receive Legal Help

**In general, the likelihood to seek legal help is higher for problems with substantial impact, and this pattern is more pronounced among people with higher incomes.**

Table 5B summarizes each income group's likelihood of seeking legal help in the past year for three groups of problems: all problems, problems with substantial impact, and problems with less impact. As the table shows, people are more likely to seek legal help for problems with substantial impact. We see this "impact differential" across all three income groups.

**Table 5B. Percent of problems for which people sought legal help, by income**[58]

|  | All problems | Problems with substantial impact | Problems with less impact |
|---|---|---|---|
| **125% of FPL or below** | **19%** (n=5,784) | **25%** (n=2,674) | **14%** (n=3,110) |
| **Between 125% and 400% of FPL** | **20%** (n=5,666) | **30%** (n=2,177) | **14%** (n=3,489) |
| **400% of FPL or above** | **18%** (n=1,231) | **32%** (n=320) | **13%** (n=911) |

Figure 5A charts the impact differential for each income group's likelihood to seek help; this is the difference between their likelihood to seek legal help for problems with substantial impact and those with less impact. As the figure shows, the impact differential is larger for people with higher incomes. For low-income Americans, the impact differential is 11 percentage points; they seek help for 25% of their problems with substantial impact and 14% of those with less impact. The impact differential for those at or above 400% of FPL is 19 percentage points; this group seeks legal help for nearly one-third (32%) of their problems with substantial impact and for 13% of those with less impact.

**Figure 5A. Impact differential in likelihood to seek legal help, by income**[59]



*This impact differential is the difference (in percentage points) between the percent seeking help for problems with substantial impact versus problems with less impact.*



## Among higher-income Americans, the survey-based justice gap measure is significantly smaller for substantial problems.

Table 5C presents the survey-based justice gap measure for the three income groups. As a reminder, this measure reflects the percent of problems that do not receive any legal help or enough legal help. As the table shows, the survey-based justice gap measure for low-income Americans stays relatively flat regardless of impact level (94% versus 92%). Meanwhile, for those at or above 400% of FPL, it is significantly lower for problems with more impact (93% versus 78%). This translates to an "impact differential" of 15 percentage points for higher-income Americans compared to a differential of only three percentage points for low-income Americans. Figure 5B shows these impact differentials in chart form.

**Table 5C.** Percent of problems for which people did not receive any or enough legal help in the past year (i.e., survey-based justice gap measure), by income[60]

|  | All problems | Problems with substantial impact | Problems with less impact |
|---|---|---|---|
| **125% of FPL or below** | 93% (n=5,784) | 92% (n=2,674) | 94% (n=3,110) |
| **Between 125% and 400% of FPL** | 90% (n=5,666) | 86% (n=2,177) | 93% (n=3,489) |
| **400% of FPL or above** | 90% (n=1,231) | 78% (n=320) | 93% (n=911) |

**Figure 5B.** Impact differential in survey-based measure of the justice gap, by income[61]



| | |
|---|---|
| <=125% of FPL | 3PP |
| >125% and <400% of FPL | 7PP |
| >=400% of FPL | 15 PP |

Percentage points (pp)

*This impact differential is the difference (in percentage points) between the survey-based justice gap measure for problems with substantial impact versus problems with less impact.*

LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

Among higher-income Americans, the survey-based justice gap measure is smaller for problems with substantial impact; among low-income Americans, it stays the same no matter how impactful the problem might be.

## Comparing Potential Barriers

Section Four of this report examined results for low-income Americans on survey measures that tap into three types of potential barriers: knowledge, attitudinal, and cost. Below, we compare the results on the same measures for low-income Americans versus higher-income Americans. Overall, we find that higher-income Americans tend to have more positive attitudes toward the civil legal system and are more confident that they could find and afford legal help if they needed it.

**The three income groups are similar when it comes to their likelihood to believe that a lawyer could help resolve their civil legal problems.**

Figure 5C presents the survey results for all three income groups regarding whether they think a lawyer (or other legal professional) could help resolve their civil legal problems. Respondents answered this question for each of the problems they personally experienced in the past year. As the figure shows, there are only slight



**Client Story**

**Judy • Montana • Family.** When her daughter died unexpectedly, Judy became the legal guardian for her two grandchildren, including a grandson with autism. Soon after her daughter's death, her grandson's Social Security Disability Insurance (SSDI) was suddenly terminated, and Judy did not know how to get him the services he needed without it. She was desperate to find a solution for her family, but knew she could not afford an attorney. A friend referred her to Montana Legal Services Association and their attorneys were able to collect the documentation necessary to appeal the SSDI decision. Judy's grandson's benefits were reinstated.



differences by income. Regardless of income, most Americans either did not think that lawyers could help them with these sorts of problems (44% to 47%) or they were not sure about it (19% to 30%).

**Figure 5C.** **Beliefs about whether a lawyer could help resolve their civil legal problems, by income[62]**



Percent of problems experienced

## People with higher incomes tend to have more positive views of the civil legal system and how it relates to people like them.

Figure 5D presents the percent of individuals who agree with three statements about the U.S. civil legal system and how it might support "people like [them]." Overall, these results point to significant differences in attitudes about the civil legal system across income groups. Indeed, compared to low-income Americans, those at or above 400% of FPL are much more likely to agree with all three statements. We see the biggest differences with regard to the statement, "People like me are able to use the civil legal system to protect and enforce their rights" – with 59% of those at or above 400% of FPL agreeing versus 39% of low-income Americans.

LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

**Figure 5D.** **Percent agreeing with various statements about the U.S. civil legal system, by income**[63]



System can help people like me solve important problems
- 40%
- 47%
- 54%

People like me are treated fairly in the system
- 28%
- 32%
- 45%

People like me can use the system to protect & enforce rights
- 39%
- 49%
- 59%

Percent of individuals

● <=125% of FPL (n=2,003)   ● >125% and <400% of FPL (n=2,318)   ● >=400% of FPL (n=987)

## Compared to low-income Americans, those with higher incomes are generally more confident in their ability to find a lawyer that they could afford.

One of the most striking findings from Section Four of this report is the fact that fewer than one-half (45%) of low-income Americans expressed confidence in their ability to find a lawyer that they could afford if faced with a serious civil legal problem. Figure 5E presents the percent of individuals from all three income groups who express the same level of confidence (i.e., they are "somewhat," "very," or "extremely confident"). As the figure shows, nearly three-quarters (73%) of those at or above 400% of FPL say they are at least somewhat confident. This is a striking figure compared to that of the low-income group; indeed, higher-income Americans are a full 28 percentage points more likely than low-income Americans to express this confidence (73% versus 45%).



**Client Story**

**Gloria • Washington, D.C. • Veteran.** Gloria is a veteran with post-traumatic stress disorder (PTSD). Her veteran benefits were not enough to make ends meet, and she was repeatedly denied the Social Security Disability Insurance and other benefits that she was entitled to due to her PTSD. She was appealing the denials of benefits on her own – without any legal help. Attorneys from Neighborhood Legal Services Program of the District of Columbia took her case and were able to secure the benefits she needed to pay rent and take care of her other needs.

# 73% of higher-income Americans are confident in their ability to find a lawyer they could afford while only 45% of low-income Americans say the same.

**Figure 5E.** **Percent confident in ability to find a lawyer they could afford, by income[64]**



Percent of individuals

LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

# Impact of the COVID-19 Pandemic

**Income disparities in the justice gap are exacerbated for civil legal problems related to the COVID-19 pandemic.**

Compared to low-income Americans, those with higher incomes are less likely to have experienced a civil legal problem related to the COVID-19 pandemic. While one-third (33%) of low-income Americans experienced at least one problem related to the pandemic, this is true for only 18% of those at or above 400% of FPL.[65]

Table 5C presents the survey-based measures of the justice gap for all problems with substantial impact – breaking them out by whether they were related to the pandemic.

**Table 5C.** **Survey-based justice gap measure for pandemic-related and other problems with substantial impact, by income[66]**

|  | All problems with substantial impact | Pandemic-related problems with substantial impact | Other problems with substantial impact |
|---|---|---|---|
| **125% of FPL or below** | **92%** (n=2,674) | **91%** (n=946) | **92%** (n=1,728) |
| **Between 125% and 400% of FPL** | **86%** (n=2,177) | **81%** (n=723) | **88%** (n=1,454) |
| **400% of FPL or above** | **78%** (n=320) | **68%** (n=103)* | **84%** (n=217) |
| **"Income disparity" in percentage points (pp)** | **14**PP | **23**PP | **8**PP |

*Income disparity represents the difference (in percentage points) between the survey-based justice gap measure for those at or below 125% of FPL versus those at or above 400% of FPL.*

*Small base size

Looking at the column for pandemic-related problems, we see that this measure of the justice gap is much lower among those at or above 400% of FPL compared to low-income Americans. Low-income Americans do not receive any or enough legal help for 91% of the pandemic-related problems that substantially impacted them. Meanwhile, those at or above 400% of FPL do not receive any or enough legal help for 68% of these problems. This translates to an income disparity of 23 percentage points (91% versus 68%). Table 5C also makes clear that this income disparity is significantly greater for pandemic-related problems compared to other problems (23 versus 8 percentage points).



LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

## GEOGRAPHIC FOCUS

This snapshot presents the percent of people in each of the four U.S. Census regions who express **confidence in their ability to find and afford a lawyer** if they need help resolving a serious civil legal problem. All estimates come from LSC's 2021 Justice Gap Measurement Survey.[67] The unit of analysis is individuals.

 **Midwest**

At or below 125% of FPL (n=534):
**43% are confident.**

Between 125% and 400% of FPL (n=558):
**59% are confident.**

At or above 400% of FPL (n=258):
**76% are confident.**

 **Northeast**

At or below 125% of FPL (n=257):
**52% are confident.**

Between 125% and 400% of FPL (n=284):
**60% are confident.**

At or above 400% of FPL (n=177):*
**71% are confident.**



**West**

At or below 125% of FPL (n=402):
**40% are confident.**

Between 125% and 400% of FPL (n=529):
**59% are confident.**

At or above 400% of FPL (n=253):
**70% are confident.**

**South**

At or below 125% of FPL (n=810):
**47% are confident.**

Between 125% and 400% of FPL (n=947):
**58% are confident.**

At or above 400% of FPL (n=299):
**74% are confident.**

LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

## SPECIAL FOCUS

This snapshot presents the percent of the subpopulations of interest who express **confidence in their ability to find and afford a lawyer** if they need help resolving a serious civil legal problem. All estimates come from LSC's 2021 Justice Gap Measurement Survey.[68] The unit of analysis is individuals.

 **Seniors**

At or below 125% of FPL (n=369):
**60% are confident.**

Between 125% and 400% of FPL (n=481):
**72% are confident.**

At or above 400% of FPL (n=128):*
**87% are confident.**

 **Individuals from Rural Areas**

At or below 125% of FPL (n=419):
**45% are confident.**

Between 125% and 400% of FPL (n=412):
**56% are confident.**

At or above 400% of FPL (n=93):*
**77% are confident.**

 **Individuals from Veteran Households**

At or below 125% of FPL (n=242):
**51% are confident.**

Between 125% and 400% of FPL (n=416):
**69% are confident.**

At or above 400% of FPL (n=174):*
**76% are confident.**

 **Individuals with High Housing Costs**

At or below 125% of FPL (n=826):
**40% are confident.**

Between 125% and 400% of FPL (n=617):
**51% are confident.**

At or above 400% of FPL (n=82):*
**53% are confident.**

 **Individuals from Households with Children (<18 yrs)**

At or below 125% of FPL (n=889):
**40% are confident.**

Between 125% and 400% of FPL (n=918):
**53% are confident.**

At or above 400% of FPL (n=252):
**70% are confident.**

 **Recent Survivors of Domestic Violence**

At or below 125% of FPL (n=177):*
**45% are confident.**

Between 125% and 400% of FPL (n=112):*
**48% are confident.**

At or above 400% of FPL
**(not enough data to produce estimate)**

*Small base size


LEGAL SERVICES CORPORATION



**Section 6**

# Reports from the Field

Sections Four and Five examined the justice gap through the lens of people's personal experiences dealing with specific civil legal problems. This section looks at the justice gap through a different lens: legal aid organizations' experiences trying to help low-income individuals with their civil legal problems. Using data from LSC's 2021 Intake Census, this section estimates the number of problems that low-income individuals bring to LSC-funded legal aid organizations over the course of a year and the extent to which these organizations are able to help resolve these problems with the limited resources at their disposal.



**ABOUT THE DATA:** The findings in this section come from LSC's 2021 Intake Census. As part of this four-week-long intake census conducted in October 2021, LSC-funded organizations tracked all of the times individuals requested legal help from their organizations. They tracked which problems they were able to serve fully, to some extent, and not at all. The resulting data permit an estimate of the intake-based measure of the justice gap. This measure focuses on the extent to which LSC-funded organizations are able to provide any or enough legal help for the civil legal problems low-income individuals bring to their doors. The unit of analysis in this section is problems.

## Requests for Legal Help

### Over the course of a year, low-income individuals approach LSC-funded legal aid organizations for help with an estimated 1.9 million civil legal problems.

As a general rule, to be eligible for LSC-funded legal help, an individual must have a household income at or below 125% of FPL,[69] and their civil legal problem cannot be related to an issue prohibited by LSC regulations, such as abortion, euthanasia, and class-action litigation.[70] For the purposes of this report, we call civil legal problems that meet these criteria "eligible" problems.[71]

During LSC's four-week 2021 Intake Census, low-income individuals approached LSC-funded organizations with approximately 147,000 unique eligible problems.[72] Assuming these four weeks represent intake activity for a typical four-week period in the year, this translates to an estimated 1.9 million eligible problems over the course of a year.

Low-income individuals approach LSC-funded legal aid organizations for help with an estimated 1.9 million civil legal problems annually.

### In reality, the number of civil legal problems requiring legal help among low-income individuals in the United States is much greater.

Impactful as it is, we also know that the estimate of 1.9 million for the number of civil legal problems low-income individuals bring to LSC-funded organizations grossly underestimates the amount of need. It is impossible to know how much this number underestimates the broader need, but we know there are several reasons to expect it to be a gross underestimation. The most important reasons include the following:



**Completing the intake process:** LSC's 2021 Intake Census counts only problems that went through the full intake process to determine eligibility; this does not include situations in which people approach legal aid organizations in contexts without formal intake processes (e.g., help desks through community partnerships) or situations in which people do not make it through the intake process due to time constraints or other issues that arise.

**Help-seeking behavior:** Section Four of this report showed that low-income Americans seek legal help from any legal professional (not just legal aid) for an estimated 19% of their problems (25% of their problems with substantial impact), which would suggest that the 1.9 million estimate represents a very small slice of the actual civil legal need.

**Limited universe:** The 1.9 million figure corresponds only to the number of problems presented to legal aid organizations funded by LSC; while LSC is the largest funder of civil legal aid in the country, there are also many other legal aid organizations serving low-income communities that operate outside of LSC's network.

## Providing Legal Help

**LSC-funded organizations are able to provide some degree of legal help for about one-half of the eligible civil legal problems brought to them.**

LSC's 2021 Intake Census data indicate that LSC-funded organizations are able to provide legal help for one-half (51%) of the eligible problems low-income individuals bring to them. See Figure 6A. This translates to nearly 1 million distinct civil legal problems over the course of a year.

**Figure 6A.** Percent of eligible problems receiving legal help from LSC-funded organizations[73]



| Did not receive any legal help 49% | Received some degree of legal help 51% |
| --- | --- |
| An estimated 938,000 problems annually | An estimated 975,000 problems annually |

Percent of problems  |  n=146,724



# With the resources currently available, LSC-funded organizations are able to provide legal help for one-half of the legal problems brought to their doors.

## Legal help is generally provided through one of three forms: information and resources, brief services and advice, or extended services.

Table 6A provides an overview of the level and types of legal help legal aid organizations provide. The figures in the table represent the percent of eligible civil legal problems served that receive each type of legal help, according to LSC's 2021 Intake Census. The table shows that LSC-funded organizations provide extended services for about one in five (21%) of the eligible civil legal problems they are able to serve. They provide brief services and advice to about one-half (51%) of the problems they serve and general information and self-help resources to 28%.

**Table 6A.** Legal help provided by LSC-funded organizations[74]

| | |
|---|---|
| **General information and self-help resources**<br><br>**28%**<br>**of problems** | **Providing general legal information and self-help materials related to an individual's type of civil legal problem.**<br><br>Examples:<br>• Giving guidance on how to complete legal forms/documents.<br>• Explaining the requirements on how to file for custody or apply for benefits. |
| **Brief services and advice**<br><br>**51%**<br>**of problems** | **Providing brief services and/or advice that are specific to an individual's civil legal problem and situation.**<br><br>Examples:<br>• Providing advice about how to handle a custody hearing.<br>• Writing a demand letter to a landlord to repair a rented home. |
| **Extended services**<br><br>**21%**<br>**of problems** | **This includes a wide variety of legal assistance specific to an individual's civil legal problem that requires extensive attention.**<br><br>Examples:<br>• Preparing complex legal documents (e.g., advance directives, appeals for benefits, real estate documents).<br>• Representing a client in court, in administrative proceedings, or in interactions with third parties. |

LSC | America's Partner for Equal Justice
LEGAL SERVICES CORPORATION

The level of legal help an organization dedicates to a given problem depends on at least two factors: the type of help needed in order to resolve a problem and the resources available to meet that need.

### Problems related to housing and to family and safety make up nearly two-thirds of all the problems receiving legal help from LSC-funded organizations.

Figure 6B shows the distribution of problems receiving legal help across problem categories. This distribution is based on the LSC's 2021 Intake Census data, but it is worth noting that it tracks very closely with LSC's recent Grantee Activity Reports data and the pattern of the total case services provided by LSC-funded organizations in recent years.[75]

Nearly two-thirds (64%) of all the problems receiving legal help from LSC-funded organizations are either related to housing (36%) or related to family and safety (28%). Readers might recall from Section Three of this report that while these are not the most common types of problems experienced by low-income Americans (see Figure 3B), they are the types of problems most likely to have a substantial impact (see Figure 3D). Additionally, LSC-funded organizations often prioritize these types of problems in the case acceptance guidelines they develop in order to maximize the potential impact of the limited resources at their disposal.[76]

**Figure 6B.** Distribution of the types of problems receiving legal help from LSC-funded organizations[77]



Percent of problems served | n=65,757



# Problems related to <span style="color:red">housing and family/safety</span> make up the majority of problems receiving legal help from LSC-funded organizations.

**Even when they are able to provide legal help, LSC-funded organizations often lack the resources to help people fully resolve their civil legal problems.**

Given the resources available, LSC-funded organizations are often unable to provide enough legal help to fully resolve people's civil legal problems. Indeed, they are not able to provide all the legal help needed for an estimated 44% of the problems they serve. This estimate is based on organizations' reports of whether they have already provided enough help to fully resolve a problem or whether they expect to be able to do so given the resources they can devote to it. See Figure 6C.

**Figure 6C.** Percent of problems served that will receive enough legal help to resolve the issue[78]

| NOT ENOUGH Not expected to receive enough legal help to resolve problem **44%** | ENOUGH Expected to receive enough legal help to resolve problem **56%** |
|---|---|
| An estimated 428,000 problems annually | An estimated 547,000 problems annually |

Percent of problems served | n=74,795

**Client Story**



**Eleanor • Ohio • Employment.** The pandemic upended Eleanor's work providing entertainment for weddings and other local events. At first, she did not panic – trusting that unemployment insurance (UI) would help her stay afloat until things went back to normal. When her application for UI was repeatedly denied, she did not know how she would make ends meet. She did not seek legal help at first because she did not think she could afford it. A friend referred her to the Legal Aid Society of Cleveland (LASC), where attorneys helped her successfully appeal for UI and helped her get back on her feet.



# Intake-based Measurement of the Justice Gap

## Due to limited resources, LSC-funded legal aid organizations are unable to provide any legal help for about one-half of the eligible civil legal problems brought to their doors.

Figure 6A showed that LSC-funded organizations are not able to provide any legal help to 49% of the eligible problems brought to them. This translates to an estimated 938,000 problems turned away over the course of a year. More than one-half (52%) of these problems are turned away because they fall outside of the priority guidelines organizations develop to maximize use of limited resources. Another 18% fall within the priority guidelines but are turned away due to insufficient funds to provide service.

The remaining 30% are turned away for reasons that are best described as ways that people can often "fall through the cracks." These are civil legal problems that organizations hope to be able to serve but are unable to due to difficulty maintaining contact with the potential client (or some other similar challenge). Securing legal help and following through with the many tasks required is a cumbersome process; this is true for anyone, and even more so for individuals and families who are also dealing with the challenges of poverty. With sufficient resources to dedicate to intake, follow-up, and additional hands-on support for people expressing a need for legal help, legal aid organizations could avoid – or at least minimize – losing these opportunities to serve people's legal needs.

## LSC-funded organizations are unable to provide any or enough legal help for an estimated 1.4 million eligible problems brought to their doors over the course of a year.

In Section Four, we used the 2021 Justice Gap Measurement Survey data to generate a survey-based measure of the justice gap. That measure focused on the extent to which low-income Americans received any or enough legal help for all of their civil legal problems. Here, we use LSC's 2021 Intake Census data to generate another measure of the justice gap. This measure focuses on the extent to which LSC-funded organizations are able to provide any or enough legal help for the civil legal problems low-income individuals bring to their doors.

As already established, LSC's 2021 Intake Census indicates that low-income individuals likely seek legal help from LSC-funded organizations for more than 1.9 million problems annually. Seven out of every 10 (71%) of these problems will either not receive any legal help or not receive enough legal help to be fully resolved. Over the course of a year, this translates to an estimated 1.4 million problems that will not get any or enough legal help. Table 6B summarizes the various data points that inform this intake-based measure of the justice gap.



Case 2:20-cv-02291-DOC-KES    Document 1022-6    Filed 08/08/25    Page 77 of 89
Page ID #:29334

# LSC-funded organizations are unable to provide any or enough legal help to resolve an estimated 1.4 million eligible problems brought to their doors in a year.

**Table 6B.** **Components of the intake-based measure of the justice gap**[79]

|  | **Count from LSC's 2021 Intake Census** | **Proportion of eligible problems** | **Annual estimate** |
|---|---|---|---|
| **Total eligible problems** | 147,000 | 100% | 1,913,000 |
| **Problems receiving some but not enough help** | 33,000 | 22% | 428,000 |
| **Problems not receiving any legal help** | 72,000 | 49% | 938,000 |
| **Problems not receiving any or enough legal help** (i.e., the intake-based justice gap measure) | 105,000 | 71% | 1,366,000 |

**Client Story**



**Pippa • Alabama • Employment.** When the pandemic hit, Pippa could no longer start her new job as a census collector for the U.S. Census Bureau; her job offer was suspended indefinitely. Unable to find any other work during the pandemic, she was struggling financially. Her application for Pandemic Unemployment Assistance (PUA) was denied under the assumption that her inability to work was not caused by the pandemic. Legal Services Alabama helped her collect the documentation and make the case that the suspension of her job offer was indeed caused by the pandemic. Pippa was approved for PUA, which helped her make ends meet until her census collector job eventually started.



# Impact of the COVID-19 Pandemic

**The pandemic presented new challenges for the ways LSC-funded organizations reach and serve low-income individuals and families.**

Like most other office-based organizations, most LSC-funded organizations went remote starting in the spring of 2020. The shift to remote work had important implications for many areas of their work, including the following:

 **Resources.** Many organizations had to invest substantial resources in "teching up" for remote work – acquiring new technology and equipment, training staff on how to use it, and establishing new protocols to manage communication and data systems. Fortunately, the financial cost of most of these technological upgrades was largely covered by the funding LSC received under the CARES Act. However, the transition to remote work used other resources (e.g., staff's time) that would have otherwise been dedicated to providing legal services.

 **Courts.** Throughout the country, many courts closed or moved to virtual formats for a period of time during the pandemic. This had wide-reaching consequences for legal aid organizations. For example, this led to backlogs in the courts that are still affecting how quickly civil legal cases are processed to this day. Additionally, both legal aid attorneys and their clients had to figure out how to effectively navigate court proceedings held online. This was particularly challenging for clients, many of whom have limited access to the internet.

 **Outreach and education.** Organizations had to figure out new ways to conduct outreach and education in their communities. This work focuses on raising awareness about individuals' rights, how to find legal help, and general information about common civil legal issues – and had traditionally been done mostly in person. During the pandemic, many organizations recast parts of their outreach efforts into virtual events and social media activity. The pandemic also led some organizations to create new community partnerships or to strengthen existing ones as a way to reach more people.

Likely owing in large part to the above challenges, LSC-funded organizations ended up closing fewer cases in 2020 compared to the prior year. It is important to note, however, that this decrease in cases does not generalize across all types of problems. Indeed, compared to 2019, LSC-funded organizations actually closed more cases related to income maintenance, employment, and domestic violence during the first year of the pandemic.[80]



## GEOGRAPHIC FOCUS

This snapshot shares results from LSC's 2021 Intake Census for each of the four U.S. Census regions. All estimates are based on the information provided by LSC-funded organizations in each region during the four-week intake census conducted in October of 2021. The unit of analysis is problems.

 **Midwest**

Approximately **417,000** eligible problems brought to LSC-funded organizations annually.

They are unable to provide any or enough legal help for **73%** of these problems.

● **Northeast**

Approximately **387,000** eligible problems brought to LSC-funded organizations annually.

They are unable to provide any or enough legal help for **72%** of these problems.



● **West**

Approximately **407,000** eligible problems brought to LSC-funded organizations annually.

They are unable to provide any or enough legal help for **78%** of these problems.

 **South**

Approximately **655,000** eligible problems brought to LSC-funded organizations annually.

They are unable to provide any or enough legal help for **69%** of these problems.

**LSC** | America's Partner for Equal Justice

LEGAL SERVICES CORPORATION

## SPECIAL FOCUS

This snapshot shares information about the types of cases and people served by LSC-funded legal aid organizations as they relate to the six subpopulations of interest in this report. With the exception of the information shared about rural areas, these snapshot figures come from a preliminary analysis of LSC's 2021 Grantee Activity Reports data. The unit of analysis varies.[81]

 **Seniors**

In 2021, LSC-funded organizations provided legal help to **138,000** seniors.

 **Rural Areas**

In partnership with Equal Justice Works, LSC has placed **190** law student fellows in **64** legal aid organizations serving rural clients through the Rural Summer Legal Corps (RSLC) program since 2016.

 **Veterans**

In 2021, LSC-funded organizations provided legal help to **36,000** veteran households.

 **People with High Housing Costs**

In 2021, LSC-funded organizations handled more than **300,000** cases related to housing.

 **Children (<18 yrs)**

In 2021, LSC-funded organizations served households that included more than **730,000** children combined.

 **Domestic Violence**

In 2021, LSC-funded organizations closed more than **148,000** cases involving domestic violence.



# Endnotes

[1] While not common, the right to counsel for civil legal matters exists in some places and for some types of legal matters. For example, the right to counsel exists for eviction cases in the states of Connecticut, Maryland, and Washington and in several cities. For the most up-to-date information on the civil right to counsel, see: http://civilrighttocounsel.org/.

[2] The regional categorization used by the U.S. Census Bureau can be found here: https://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf.

[3] We define these groups in the following ways for the purposes of this report: "seniors" typically refers to people who are 65 years or older, though information based on LSC's Grantee Activity Reports treats anyone 60 years old or older as a "senior;" "veterans" refers to anyone who has served in the military, military reserves, or national guard; for survey data, "rural" refers to nonmetro counties as coded in the U.S. Department of Agriculture (USDA) Economic Research Service's 2013 Rural-Urban Continuum Codes (see: https://www.ers.usda.gov/data-products/rural-urban-continuum-codes/documentation/); for U.S. Census data, "rural" refers to nonmetro areas; "children" refers to individuals under 18 years old; for survey data, "recent survivors of domestic violence" refers to individuals who report having experienced domestic violence in the past 12 months; someone is considered to have "high housing costs" if they spend more than 50% of their household income on housing expenses (consistent with the definition used by the U.S. Department of Housing and Urban Development).

[4] The client stories are based on information that LSC-funded organizations have shared with LSC to provide examples of how the provision of legal assistance impacted clients.

[5] Note that some of the client stories featured in this report are also featured in study-related videos hosted on the study website: justicegap.lsc.gov. The clients featured in the videos authorized the use of their images and names for the purposes of the videos.

[6] See NORC's 2021 Justice Gap Measurement Survey technical report for details about the differences between the 2017 and 2021 surveys; this report can be found on the study website: justicegap.lsc.gov.

[7] Source: U.S. Census Bureau, *Table: Poverty Thresholds for 2021 by Size of Family and Number of Related Children Under 18 Years* (accessed in April 2022); the household income for a family of four assumes the family consists of two adults under 65 years old with two dependent children, and the household income for an individual assumes the individual is under 65 years old.

[8] Source: U.S.  Census Bureau, Current Population Survey, 2021 Annual Social and Economic Supplement (CPS ASEC). *Table POV46: Poverty Status by State: 2020* (accessed in March 2022).

[9] An estimated 87% of the general U.S. population lives in a metropolitan area; source: U.S. Census Bureau, Current Population Survey, 2021 Annual Social and Economic Supplement (CPS ASEC). *Table POV40 (by region): Age, Sex, and Household Relationship of People by Region and Residence – Ratio of Income to Poverty Level: 2020* (accessed in March 2022).

[10] Source: U.S. Census Bureau, Current Population Survey, 2021 Annual Social and Economic Supplement (CPS ASEC). *Table POV40: Age, Sex, and Household Relationship of People by Region and Residence – Ratio of Income to Poverty Level: 2020* (accessed in March 2022).

[11] Source: U.S. Census Bureau, Current Population Survey, 2021 Annual Social and Economic Supplement (CPS ASEC). T*able POV01: Age and Sex of All People, Family Members and Unrelated Individuals: 2020* (accessed in March 2022).

[12] Source: U.S. Census Bureau, Current Population Survey, 2021 Annual Social and Economic Supplement (CPS ASEC). *Table POV01: Age and Sex of All People, Family Members and Unrelated Individuals: 2020* (accessed in March 2022).

[13] Source: U.S. Census Bureau, Current Population Survey, 2021 Annual Social and Economic Supplement (CPS ASEC). *Table POV04: Primary Families by Age of Householder, Number of Children, and Family Structure: 2020* (accessed in March 2022).



14 Source: U.S. Census Bureau, Current Population Survey, 2021 Annual Social and Economic Supplement (CPS ASEC). *Table POV01: Age and Sex of All People, Family Members and Unrelated Individuals: 2020* (accessed in March 2022).

15 Source: U.S. Census Bureau, 2019 American Community Survey (ACS); estimates were produced through IPUMS USA database (accessed March 2022): Ruggles, S., Flood, S., Foster, S., Goeken, R., Pacas, J., Schouweiler, M., Sobek, M. 2021. IPUMS USA: Version 11.0 [dataset]. Minneapolis, MN: IPUMS.

16 See, for example: Chen, J. T., & Krieger, N. 2021. Revealing the Unequal Burden of COVID-19 by Income, Race/Ethnicity, and Household Crowding: US County Versus Zip Code Analyses. *Journal of Public Health Management and Practice: JPHMP, 27 Suppl 1, COVID-19 and Public Health: Looking Back, Moving Forward*, S43–S56; Quan, D., Luna Wong, L., Shallal, A., Madan, R., Hamdan, A., Ahdi, H., Daneshvar, A., Mahajan, M., Nasereldin, M., Van Harn, M., Opara, I. N., & Zervos, M. 2021. Impact of Race and Socioeconomic Status on Outcomes in Patients Hospitalized with COVID-19. *Journal of General Internal Medicine, 36*(5), 1302–1309; Finch, W. H., & Hernández Finch, M. E. 2020. Poverty and Covid-19: Rates of Incidence and Deaths in the United States During the First 10 Weeks of the Pandemic. *Frontiers in Sociology*, 5, 47.

17 With the help of the Institute for Research on Poverty at the University of Wisconsin-Madison, the Office of the Assistant Secretary for Planning & Evaluation (ASPE) in the U.S. Department of Health & Human Services (HHS) produced a brief summarizing the impact of the first year of the pandemic on low-income families: *"The Impact of the First Year of the COVID-19 Pandemic and Recession on Families with Low Incomes"* (September 2021) (https://aspe.hhs.gov/sites/default/files/2021-09/low-income-covid-19-impacts.pdf).

18 Source: U.S. Census Bureau, Household Pulse Survey, Week 43 (March 2 – 14). Tables: *Employment Table 1, Food Sufficiency and Food Security Table 1, Health Table 2a, and Housing Table 1b* (accessed in March 2022).

19 Source: U.S. Census Bureau, Current Population Survey, 2021 Annual Social and Economic Supplement (CPS ASEC). *Table POV40: Age, Sex, and Household Relationship of People by Region and Residence – Ratio of Income to Poverty Level: 2020* (accessed in March 2022).

20 The information on this page that pertains to seniors, households with children, and people in rural areas come from: U.S. Census Bureau, Current Population Survey, 2021 Annual Social and Economic Supplement (CPS ASEC), various tables (accessed in March 2022); the information pertaining to veterans comes from: U.S. Census Bureau, 2019 American Community Survey (ACS) and the estimates were produced through IPUMS USA database (accessed March 2022): Ruggles, S., Flood, S., Foster, S., Goeken, R., Pacas, J., Schouweiler, M., Sobek, M. 2021. IPUMS USA: Version 11.0 [dataset]. Minneapolis, MN: IPUMS; the information that pertains to people with high housing costs comes from: U.S. Census Bureau, 2019 American Housing Survey (AHS) using the *AHS Table Creator* in March 2022 (national 2019 housing costs by household income, no filters); the information that pertains to survivors of domestic violence comes from: Bonomi, A. E., Trabert, B., Anderson, M. L., Kernic, M. A., & Holt, V. L. 2014. Intimate partner violence and neighborhood income: a longitudinal analysis. *Violence against women*, 20(1), 42–58.

21 Source: 2021 Justice Gap Measurement Survey; results based on count of respondents' reports of problems personally experienced and experienced by others in household in the past year from among 81 distinct problems. Note that a given problem can only be counted once per household. For a full list of the 81 problems, see the questionnaire on the study website: justicegap.lsc.gov.

22 Source: 2021 Justice Gap Measurement Survey; for information about how specific problems were categorized into problem types, see NORC's 2021 Justice Gap Measurement Survey technical report on the study website: justicegap.lsc.gov.

23 Source: 2021 Justice Gap Measurement Survey; n = 1,194 homeowner households.

24 Source: 2021 Justice Gap Measurement Survey; note that the prevalence rate of experiencing a problem related to disability is 16% for households with someone who either has a disability or cares for a loved one who does (n=1,152 households).



[25] For example, see: Pleasence, P., Balmer, N.J., Buck, A., O'Grady, A., and Glenn, H. 2004. Multiple justiciable problems: common clusters, problem order and social and demographic indicators. *Journal of Empirical Legal Studies*, 1(2): 201-329; Desmond, Matthew. 2017. *Evicted: Poverty and Profit in the American City*. Penguin Books; Tobin Tyler, E., Lawton, E., Conroy, K., Sandel, M. and Zuckerman, B. 2011. P*overty, Health and Law: Readings and Cases for Medical-legal Partnerships*. Durham, NC: Carolina Academic Press.

[26] Note that, here, "eviction households" refers to households for which a respondent reported that they or another household member had experienced a civil legal problem related to eviction in the past year (e.g., falling behind on rent or receiving an eviction notice); likewise, "domestic violence households" refers to households for which a respondent reported that they or another household member had experienced domestic violence of some sort in the past year.

[27] Source: 2021 Justice Gap Measurement Survey; note that the estimates for eviction households reflect problems *in addition to* eviction-related ones (problems related to eviction are not included in the count); the same is true for estimates for domestic violence households – they are *in addition to* problems involving domestic violence.

[28] Source: 2021 Justice Gap Measurement Survey; Q4A – Q4E; Q4A: *Overall, how much would you say this problem has negatively affected you or others in your household?* Q4B – Q4E: *How much has this problem negatively affected the [impact area] of/for you or any other person in your household? Impact areas: physical health or safety, mental or emotional health, financial situation, relationships with family members and others)*; response options for Q4A – Q4E: *severely, very much, moderately, slightly, not at all*. Note that survey items Q4B – Q4E were not presented to respondents who answered "not at all" to Q4A; to produce the proportions in this figure for the entire low-income sample of individuals, we assume these respondents would have answered "not at all" to Q4B – Q4E and code them accordingly (this increases the denominator used in estimates and potentially leads to an underestimation of the proportion of people who were substantially impacted in those specific areas).

[29] Source: 2021 Justice Gap Measurement Survey; the results in this figure are based on Q4A (see previous endnote for question wording and response options). For a given category, the percentage reported reflects the proportion of individuals — among all who personally experienced at least one problem in that category — who indicated that at least one problem in the category had negatively affected them "very much" or "severely" overall.

[30] Source: 2021 Justice Gap Measurement Survey; Q3: *Do you think this problem was related to the COVID-19 pandemic or circumstances surrounding the COVID-19 pandemic?* Response options: yes, no, not sure. For each set of individuals (differentiated by characteristics of their households), the percentage reported reflects the proportion of individuals — among all those in the set who personally experienced at least one problem — who indicated that at least one of their personally experienced problems was related to the COVID-19 pandemic. Note that "households with children < 12 yrs" are actually households with parents of children < 12 years old; it is possible that the children do not actually live in the same household.

[31] Source: 2021 Justice Gap Measurement Survey.

[32] Source: 2021 Justice Gap Measurement Survey; note that we consider a respondent's household to have "recent domestic violence" if the respondent indicated that they or someone else in the household had experienced a problem involving domestic violence in the past 12 months; note also that "households with children (<18 yrs)" are actually households with parents of children < 18 years old; it is possible that the children do not actually live in the same household.

[33] Note that several estimates related to seeking legal help in this section differ from those presented in NORC's technical survey report because our analysis includes some observations that were not included in the analysis informing that report; more specifically, we include cases where the respondent initially said they did not speak with a legal professional in Q5, but later indicated that they had unsuccessfully tried to speak a legal professional in Q6.

[34] Source: 2021 Justice Gap Measurement Survey; we count a respondent as having sought legal help for any problem for which they answered "yes" to Q5 or "I tried, but I wasn't able to talk to a legal professional" to Q6. Q5: *At any time while you were dealing with this problem, did you do any of the following? Talk to a lawyer or legal professional about the problem. Response options: yes, no. Q6: Why haven't you talked to a lawyer or other legal professional about this problem? I tried, but I wasn't able to talk to a legal professional.*



35 This finding is consistent with 2017 results – but note that the 2017 Justice Gap report discussed problems related to children and custody as separate from other family matters.

36 Source: 2021 Justice Gap Measurement Survey; Q5 and Q6 (see endnote 34).

37 Source: 2021 Justice Gap Measurement Survey; Q8: *What kind of legal help did you want when you decided to talk to a lawyer or other legal professional?* Response options: *learning where to look for legal information online; help filling out a legal document or form; handling communication with the other people involved in the issue (including demand letters); legal advice about your specific situation and what actions you should take; help negotiating with the other people involved in the issue; representation by a lawyer or other legal professional in court, including filing court documents; other; none of the above.* Note: these estimates correspond only to the set of respondents who said that they spoke to a legal professional for a given problem in Q5; it does not include people who indicated that they tried to speak to someone but were not able to do so in Q6.

38 Source: 2021 Justice Gap Measurement Survey; Q10: *As of today, have you been able to get as much legal help with this issue as you wanted?* Response options: yes, no; base n=1,059 problems.

39 Source: 2021 Justice Gap Measurement Survey; Q10 (see previous endnote); base n=635 problems.

40 For more information about this survey-based measure of the justice gap – including how it might underestimate or overestimate the justice gap – please see the additional information provided on the study website: justicegap.lsc.gov.

41 Reminder: As discussed in the "about the data" information for this section, the number of problems considered was capped at 10 problems per respondent; readers can find additional information on the study website: justicegap.lsc.gov.

42 This is based on items Q5 and Q6 in the 2021 Justice Gap Measurment Survey.

43 This is based on item Q10 in the 2021 Justice Gap Measurement Survey.

44 Source: 2021 Justice Gap Measurement Survey; additional details on how the survey-based estimates of the justice gap were produced can be found on the study website: justicegap.lsc.gov.

45 Source: 2021 Justice Gap Measurement Survey; Q2 (see previous endnote).

46 See NORC's 2021 Justice Gap Measurement Survey technical report for a discussion of the measurement strategy for these survey items, including a consideration of the utility of agreement scales in this case.

47 Source: 2021 Justice Gap Measurement Survey; Q16 – Q18: *To what extent do you agree or disagree with the statement below? People like me are able to use the civil legal system to protect and enforce their rights; people like me are treated fairly in the civil legal system; the civil legal system can help people like me solve important problems like those discussed in this survey.* Response options: *strongly agree, somewhat agree, neither agree nor disagree; somewhat disagree; strongly disagree.* Numbers do not total to 100% due to rounding and a small percent of respondents who did not provide a response.

48 Source: 2021 Justice Gap Measurement Survey; Q15: *How confident are you that you would be able find a lawyer or other professional that you could afford if you needed help on a serious civil legal problem, such as preventing an eviction, foreclosure, or the loss of custody of a child?* Response options: *extremely confident, very confident, somewhat confident, not too confident, not at all confident.* Numbers do not total to 100% due to rounding and a small percent of respondents who did not provide a response.

49 Source: 2021 Justice Gap Measurement Survey; n=1264; Q6: *Why haven't you talked to a lawyer or other legal professional about this problem? I was worried about the cost.*

50 Source: 2021 Justice Gap Measurement Survey; n=110* (*small base); Q11: *Why haven't you gotten all the legal help you wanted? Too expensive to get more help.*

51 Source: 2021 Justice Gap Measurement Survey; n=946; Q5: *At any time while you were dealing with this problem, did you do any of the following? Talk to a lawyer or legal professional about the problem.* Response options: *yes, no.*

52 Source: 2021 Justice Gap Measurement Survey; Q6, n=621 respondents; 38% and 33% of low-income Americans offered these reasons, respectively, to explain why they did not seek help for one or more of their COVID-attributed problems.



**Endnotes**

53 Source: 2021 Justice Gap Measurement Survey.

54 Source: 2021 Justice Gap Measurement Survey; results regarding seeking legal help come from items Q5 and Q6; results regarding receiving any or enough help are based on the survey-based justice gap measure.

55 Source: 2021 Justice Gap Measurement Survey; results regarding seeking legal help come from items Q5 and Q6; results regarding receiving any or enough help are based on the survey-based justice gap measure; note that "households with children (<18 yrs)" are actually households with parents of children < 18 years old; it is possible that the children do not actually live in the same household.

56 Note that these figures are based on the poverty guidelines for the 48 contiguous states and the District of Columbia; they are separate guidelines for Hawaii and Alaska.

57 Source: 2022 Poverty Guidelines from the Department of Health and Human Services as published in the Federal Register (January 21, 2022), Vol. 87, No. 14 (https://www.govinfo.gov/content/pkg/FR-2022-01-21/pdf/2022-01166.pdf).

58 Source: 2021 Justice Gap Measurement Survey; Q5: *At any time while you were dealing with this problem, did you do any of the following? Talk to a lawyer or legal professional about the problem.* Response options: *yes, no.*

59 Source: 2021 Justice Gap Measurement Survey; this impact differential was calculated by subtracting the percent seeking help for problems with less impact from the percent seeking help for problems with substantial impact for each income group. See Table 5B for the numbers used in the calculation.

60 Source: 2021 Justice Gap Measurement Survey; additional details on how the survey-based estimates of the justice gap were produced can be found on the study website: justicegap.lsc.gov.

61 Source: 2021 Justice Gap Measurement Survey; this impact differential was calculated by subtracting the survey-based justice gap measure for problems with less impact from the survey-based justice gap measure for problems with substantial impact for each income group. See Table 5C for the numbers used in the calculation.

62 Source: 2021 Justice Gap Measurement Survey; Q2: *In your opinion, is this a type of problem that a lawyer or other legal professional could help resolve?* Response options: yes, no, not sure.

63 Source: 2021 Justice Gap Measurement Survey; Q16 – Q18: *To what extent do you agree or disagree with the statement below? People like me are able to use the civil legal system to protect and enforce their rights; people like me are treated fairly in the civil legal system; the civil legal system can help people like me solve important problems like those discussed in this survey. Response options: strongly agree, somewhat agree, neither agree nor disagree; somewhat disagree; strongly disagree.* See NORC's 2021 Justice Gap Measurement Survey technical report for a discussion of the measurement strategy for these survey items. Figure reports percent saying they strongly agree or somewhat agree.

64 Source: 2021 Justice Gap Measurement Survey; Q15: *How confident are you that you would be able find a lawyer or other professional that you could afford if you needed help on a serious civil legal problem, such as preventing an eviction, foreclosure, or the loss of custody of a child? Response options: extremely confident, very confident, somewhat confident, not too confident, not at all confident.* Figure reports percent saying they are at least somewhat confident.

65 Source: 2021 Justice Gap Measurement Survey; Q3: *Do you think this problem was related to the COVID-19 pandemic or circumstances surrounding the COVID-19 pandemic? Response options: yes, no, not sure.* n=1,466 for <=125% of FPL, n=549 for >=400% of FPL.

66 Source: 2021 Justice Gap Measurement Survey; additional details on how the survey-based estimates of the justice gap were produced can be found on the study website: justicegap.lsc.gov.

67 Source: 2021 Justice Gap Measurement Survey; Q15: *How confident are you that you would be able find a lawyer or other professional that you could afford if you needed help on a serious civil legal problem, such as preventing an eviction, foreclosure, or the loss of custody of a child? Response options: extremely confident, very confident, somewhat confident, not too confident, not at all confident.* Figures in this snapshot reflect the percent saying they are at least somewhat confident.

68 Source: 2021 Justice Gap Measurement Survey; see previous endnote. Also note that "households with children (<18 yrs)" are actually households with parents of children < 18 years old; it is possible that the children do not actually live in the same household.



69 Note that while the overwhelming majority of individuals served by LSC-funded organizations have household incomes at or below 125% of FPL, LSC regulations allow funds to be used to serve individuals with incomes up to 200% of FPL; see 45 CFR § 1611.5(a) (3) and (4).

70 For information about current statutory and regulatory restrictions on the use of LSC funds, please see the overview on LSC's website: https://www.lsc.gov/about-lsc/laws-regulations-and-guidance/lsc-restrictions-and-other-funding-sources.

71 It is important to note that, for the purposes of this analysis and report, we exclude requests for assistance that were not accepted due to conflicts of interest. These cases are technically "eligible" based on the criteria presented in this report, but LSC-funded organizations are nonetheless unable to serve them due to conflicts of interest. These cases constitute a very small portion of the overall requests for assistance. Note that other LSC publications include these cases in their analysis and estimates and therefore might have slightly different estimates.

72 Throughout this section, all counts and estimates include "pending" cases; organizations have determined that these cases were eligible for assistance, but had not yet determined whether or how much service the cases would receive. There were 17,730 pending cases (out of a total of 146,724 eligible cases). For the purpose of this analysis, these cases were distributed proportionately across service categories.

73 Source: LSC's 2021 Intake Census.

74 Source: LSC's 2021 Intake Census.

75 For example, see Figure 4.2A in LSC's 2020 "By the Numbers" publication; Lim, L., Layton, J., Abdelhadi, S., Bernstein, D., Ahmed, R. 2021. *LSC By the Numbers: The Data Underlying Legal Aid Programs* (2020). Legal Services Corporation, Washington, D.C.

76 LSC-funded organizations conduct comprehensive legal needs assessments in their communities on a regular basis to inform these guidelines.

77 Source: LSC's 2021 Intake Census. These figures reflect only the cases for which the level of service was determined (i.e., pending cases are not included).

78 Source: LSC's 2021 Intake Census.

79 Source: LSC's 2021 Intake Census; the counts and estimates are rounded to the nearest thousand. Annual estimates are projected counts for the entire year, assuming that the intake census four-week period represents a typical four-week period for intake activity. The annual estimates were produced this way: (count) x (52.14/4) = annual estimate.

80 Source: Lim, L., Layton, J., Abdelhadi, S., Bernstein, D., Ahmed, R. 2021. *LSC By the Numbers: The Data Underlying Legal Aid Programs* (2020). Legal Services Corporation, Washington, D.C.

81 The information corresponding to the cases, households, and individuals served by LSC-funded organizations in 2021 comes from LSC's preliminary analysis of 2021 Grantee Activity Report (GAR) data. GAR is the largest and longest-running data collection effort on civil legal aid in the United States. Since 1976, LSC has recorded and reported data from grantees in a variety of ways. Topics include grantee staffing, finances, case services, and more. Data collection occurs in the first quarter of each year. LSC reports GAR data in its annual "By the Numbers" publication; the 2021 publication is forthcoming. The information about the Rural Summer Legal Corps program comes from: Lim, L., Layton, J., Abdelhadi, S., Bernstein, D., Ahmed, R. 2021. *LSC By the Numbers: The Data Underlying Legal Aid Programs* (2020). Legal Services Corporation, Washington, D.C.



LSC | America's Partner
for Equal Justice
LEGAL SERVICES CORPORATION



**For more information:**

justicegap.lsc.gov

Carl Rauscher, Director of
Communications and Media Relations
Legal Services Corporation
3333 K Street NW, Washington, DC 20007
202.295.1615
www.lsc.gov

**Follow LSC @**
Like us on Facebook at
facebook.com/LegalServicesCorporation

Follow us on Twitter at
twitter.com/LSCtweets

View us on YouTube at
youtube.com/user/LegalServicesCorp

LSC | America's Partner
for Equal Justice

LEGAL SERVICES CORPORATION