**F I L E D**
CLERK, U.S. DISTRICT COURT

09/03/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ kdu _____ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.<br><br>Plaintiff,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.<br><br>Defendant. | Case No. LA CV 20-02291-DOC(KESx)<br><br>Judge:  Hon. David O. Carter<br><br>**SPECIAL MASTERS REPORT** |

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LA ALLIANCE FOR HUMAN RIGHTS, et al.,    Case No. 2:20-CV-02291-DOC-KES

Plaintiffs,

v.

CITY OF LOS ANGELES, et al.,                        Assigned to Judge David O. Carter

Defendants

LOS ANGELES COUNTY SPECIAL MASTERS' REPORT

Pursuant to the standing order of Judge David O. Carter, Special Masters Michele Martinez and Thomas Goethals submit this report to the Court concerning recent compliance by the County of Los Angeles with the parties' 2022 settlement agreement.

Michele Martinez

Special Master

Email: Michele@MicheleCMartinez.com

Thomas Goethals

Special Master

Email: justicegoethals@adrservices.com

Dated September 2, 2025

1.  Introduction

In 2020, plaintiffs, LA Alliance for Human Rights (the Alliance), filed suit in the United States District Court in the Central District of California against the City of Los Angeles (the City) and County of Los Angeles (the County), alleging multiple causes of action related to the alleged crisis involving people then experiencing homelessness in the City and County of Los Angeles. The lawsuit sought declaratory and injunctive relief. The case was assigned to Judge David O. Carter.

In May 2022, the Alliance reached a settlement agreement with the City; it was agreed that the terms of the settlement would bind the parties for five years—from June 2022 through June 2027. Judge Carter approved the agreement in June 2022. The Court appointed Michele Martinez to act as its Special Master to monitor and enforce the terms of the settlement. Martinez has served as the Court's Special Master for the City since the date of her appointment.

The Alliance then settled its claims with the County. The parties agreed the settlement would be binding for four years. Judge Carter also approved this second settlement agreement. The Court appointed retired Judge Jay Gandhi as its Special Master to monitor and enforce the terms of that agreement.  In October of 2023, Michele Martinez accepted the Court's appointment to serve as co-Special Master with Judge Gandhi to monitor and enforce the County settlement agreement. Her appointment as co-Special Master for the County expires on September 30, 2025.

Judge Gandhi served as the Court's co-Special Master for the County until he resigned the position in 2025. In June of this year, Judge Carter appointed retired Justice Thomas Goethals to succeed Judge Gandhi as the Court's co-Special Master to monitor and enforce the settlement agreement as to the County. Since his appointment Justice Goethals has served as co-Special Master for the County with Michele Martinez. Beginning on October 1, 2025, Justice Goethals will be the sole Special Master for the County.

Subsequent to his approval of the settlement agreements, Judge Carter directed his Special Masters for the City and the County to file annual reports which

evaluate the parties' compliance with the terms of those agreements. Special Master Martinez has filed two reports related to the City. This report is the first Special Master submission which focuses on the County's compliance with its settlement agreement.

The County has submitted quarterly status reports; those reports have been authored by the County's representatives. This is the first independent report prepared for the Court by its co-Special Masters to evaluate the County's performance to date. It is filed to comply with the Court's directive. Special Master Goethals anticipates that henceforth annual reports related to the County's performance will be filed.

Justice Goethals has spent the weeks since his appointment working with Judge Carter and Special Master Martinez to absorb the massive amount of information that has been generated by this litigation related to the relevant history of homelessness in the City and the County, and the parties' efforts to deal with the homelessness issue. That process is a work in progress. As a result, this report may not be as detailed as will be future reports. To date, Justice Goethals has benefited from his review of hundreds of pages of documents, numerous conversations and meetings with Judge Carter and Special Master Martinez and counsel for the parties, site visits, and the observations made and conclusions reached by Judge Carter in his June 2025 ruling related to the City's compliance with the settlement agreement.

2. Background

Pursuant to the terms of its 2022 settlement agreement with the Alliance, the City is required to provide shelter and housing for people experiencing homelessness (PEH), and street engagement related to encampments. The County is required to provide supportive services for City housing clients and to respond to housing client contacts and service requests from City-funded outreach workers to County departments. In partnership with the City, the County must also provide high service-need beds—including mental health and substance use disorder beds—enriched residential care for adult residential facilities, multidisciplinary teams (MDTs), and Homeless Outreach Mobile Engagement (HOME) teams.

To ensure transparency and accountability, the settlement agreement requires the County to submit quarterly reports detailing its efforts in each of these areas. These reports should address:

--Supportive services provided to City housing clients.
--Housing client contacts and service requests from City outreach teams.
--Referrals to high-service-needs beds and their outcomes.
--Deployment and targeting of multidisciplinary and HOME teams.
--The development and operational status of mental health and substance use disorder beds.
--Referrals and placements into enriched residential care facilities.
--Collaborations with the City on locating land available for housing.
--Advocacy for additional state and federal funding to support PEH with serious mental illness or substance use disorders.

Since he approved the City and County settlements, Judge Carter has charged his Special Masters with the responsibility to monitor the parties' compliance with their terms. In light of the size of the City and the County, the number of people currently experiencing homelessness, and the number of agencies providing services, monitoring is a complex process. Numbers provided by the County have proved difficult to in dependently verify. Nonetheless, the Special Masters recognize the County's efforts to date to comply with the settlement agreement, and its recent structural reforms—including the creation of its own Department of Homeless Services and Housing—as a promising foundation for long-term systemic changes.

3. Recent Performance by Los Angeles County

We summarize below the County's self-reported activities between September 2023 and June 2025. While the County has regularly submitted the quarterly reports required by the settlement agreement, this marks the first time—pursuant to Judge Carter's directives and consistent with the ongoing guidance of Special Master Martinez—that the County is being formally directed to verify and validate the data it submits to the Court.

The Special Masters believe that, in collaboration with the Court and the parties, data contained in future reports must be substantiated by verifiable documentation. Establishing clear standards for validation and transparency of all data supplied by the County are an essential part of the Special Masters' mandate from the Court. Providing such data will likewise be an essential part of the County's obligation as it files future quarterly reports pursuant to the terms of the settlement agreement. The Special Masters are determined to work with the County to achieve that goal.

The County reports the following achievements:

--deployment of 34 Multi-Disciplinary Teams (MDT) and 10 Homeless Outreach and Mobile Engagement teams, within the City and the County.

--development of up to 1,994 new Mental Health/Substance Disorder Services (SUD) beds.

--approval at least 468 referrals to Enriched Residential Care (ERC), and activation of at least 313 subsidies for individuals with complex needs.

--the delivery of services by the County at many City-funded sites.

--Homeless Management Information System (HMIS) updates.

--the County reports that 1,500 High Service Needs Beds are on line. 1000 of these beds are within the City.

--establishment of the Emergency Centralized Response Center (ECRC).

--formation of the Department of Homeless Services and Housing, set to begin operations in January 2026.

4. Concerns Expressed by the City and the Alliance

The City and the Alliance have raised questions related to the County's recent compliance with its obligations created by the settlement agreement. The City raised its concerns in a report dated April 2025 from its Chief Legislative Analyst. The Alliance's concerns are set forth in a November 2024 letter from its

counsel. The Special Masters also have received recent emails from counsel for both the Alliance and the County which raise additional concerns about compliance issues. These issues were broached during an in-person meeting conducted by the Special Masters with counsel for the parties and intervenors on August 15, 2025. Another meeting with counsel which will focus on the same issues is scheduled for September 9, 2025.

Concerns raised by the City and the Alliance include:

--insufficient verification of service delivery and bed allocation.
--fragmented coordination and tracking of outreach efforts.
--restricted HMIS access and geographic misalignment.
--low housing and treatment referral rates and a lack of follow up after a referral is made.
--chronic unreliability of compliance data due to a lack of related documentation.

The Special Masters conclude these concerns are largely well-founded, and that they reflect systemic issues rather than isolated failures.  These issues underscore the importance of strengthening coordination between the City and the County in order to achieve data integrity and service responsiveness.

5.  The County's Quarterly Status Reports

The quarterly reports filed to date with the Court by the County consistently assert its full compliance with the terms of the settlement agreement. However, without including any relevant supporting documentation, these claims by the County remain unverifiable. Judge Carter has consistently emphasized that self-reported data must be verified and validated. This report marks the first formal request from the Special Masters for the County to meet that standard. We have not concluded the data supplied is inaccurate. Rather, we lack sufficient documentation to confirm its accuracy. What the Court and its Special Masters require is demonstrable proof, based on verifiable data, that beds are delivered and county outreach teams are operating as required.

Exhibits submitted by the County to date lack source data and audit trails which impedes the Court's ability to assess compliance. Field inspections by the Court and the Special Masters, given the size of the City and the County and the scope

of services provided, cannot substitute for documentation. The County must supplement its reports with reliable, verifiable data to build trust and credibility with the Court. Data transparency is essential to ensure that all reported progress reflects actual progress made by the boots on the ground.

Exhibits C and D attached to the County's most recent status report dated July 30, 2025) demonstrate the problem. In fine print Exhibit C lists "Mental Health/Substance Disorder Beds...For the Period Ending June 30, 2025." Thereafter, dozens of provider names, bed numbers, dates, and addresses are listed. The source of the data is not provided so its reliability cannot be assessed. Similarly, Exhibit D provides a list of "Enriched Residential Care for ARF and RCFE Beds...For the Period Ending June 30, 2025." That heading is followed by many pages of data, again finely printed, identifying referral sources, facilities providing either adult residential facility (ARF) or residential care facility for the elderly (RCFE) placement, the specific type of facility involved, facility addresses, and the dates an individual moved into the facility. It is not possible from these exhibits to determine the reliability of the information provided. Data transparency is essential to establishing its reliability.

6. Recommendations

As observed above, this is the first time the County is being formally directed— pursuant to Judge Carter's orders and consistent with prior informal guidance supplied by Special Master Martinez—to verify and validate the data it submits in its quarterly reports.

Immediate actions required:
--include source documentation data in future quarterly reports.
--distinguish between procedural milestones (e.g. timely submission of reports and contract execution dates) and substantive outcomes (outreach conducted, services performed, people housed).
--increase transparency around provider-level data.

Suggested structural improvements:
--where feasible, engage third-part auditors or evaluators to validate third-party metrics.
--develop HIPAA-compliant verification protocols.

--convene a collaborative session with the parties and the Special Masters to create feasible documentation standards and verification protocols.

The Special Masters acknowledge the County's efforts to build referral infrastructure, including through HMIS updates, naming conventions, and outreach worker training programs. Verification by the Court of service delivery nonetheless remains contingent on the County's ability to link reported outcomes to specific individuals, providers, and service events. Exhibits A through E in the County's most recent report reflect likely progress, but they still lack the source documentation necessary to confirm substantive compliance with the requirements of the settlement agreement. Exhibit E, for example, reflects 48 referrals made by City outreach workers. Many include comments such as "unable to reach client" or "in progress." Such comments provide the Court with no audit trail.

To support the County's efforts and to ensure that the Court is able to fulfill its oversight obligations, the Special Masters propose meeting with the parties at their earliest opportunity in order to establish a path forward for data verification and validation. At this session the Special Masters and the parties can clarify expectations and identify feasible documentation pathways to ensure that future quarterly reports filed by the County are transparent. The Special Masters' goal is not to contest the County's reported progress; it is to build a mutually understood reporting system that will allow the Court to confirm that the County's claimed substantial compliance with the settlement agreement is well-founded.

7. Conclusion: Expectations and a Collaborative Path Forward

As the Court recently observed, compliance by a party with a settlement agreement in this case cannot be assessed solely based on that party's self-reported data. The Special Masters recognize that Judge Carte's comments in this regard related to questions of compliance related to the City's performance, rather than that of the County. But the obligation to verify and validate self-reported data has been consistently emphasized by Judge Carter and reinforced by Special Master Martinez. This report marks the first formal request that the County meet that standard. The obligation to report verifiable data rests with the County, not as a punitive measure, but as a part of its commitment to transparency and accountability.

As Judge Carter wrote "(w)ithout accurate data, the public is left to rely on the assurance of public officials who have already presided over repeated reporting failures." He later added, "The pattern is clear: documentation is withheld until exposure is imminent, public accountability is resisted until judicially mandated, and the truth of reported progress remains clouded by evasive recordkeeping. These failures have undermined public trust and judicial trust alike."

The Special Masters acknowledge the County's efforts to comply with the terms of the settlement agreement. We also recognize the complexity of verifying certain data—particularly that involving health services, housing placements, and interagency coordination. We do not suggest the County has engaged in any intentional manipulation or misrepresentation of the data. Rather, we make our recommendations with the hope that the County will provide the Court with reliable data that will allow Judge Carter at some point to make findings of compliance.

The Special Masters intend to work with the Alliance and the County to develop feasible, HIPAA-compliant verification protocols that are clearly understood by the parties. Beginning with the next reporting cycle, the County is encouraged to submit a package related to each obligation area that includes verifiable data. Alternative validation methods will be considered collaboratively when a need is shown. Under those circumstances, the Special Masters' goal will remain the same: to provide the Court with data transparent enough to allow it to conduct its independent review. Our aim remains to finalize protocols that will balance transparency with operational feasibility and legal compliance without placing an unreasonable burden on the County or its service providers.

We acknowledge the budgetary challenges currently faced by the County. These challenges are real, and they are compounded by threats from the Trump administration to "defund" portions of the County's homeless outreach and service programs. Only time will tell how future federal action will impact the County's financial ability to comply with the terms of the settlement agreement. The Special Masters will continue to closely monitor this situation.

On a more positive note, the Special Masters conclude the County's decision to move on from the Los Angeles Homeless Services Authority (LAHSA), and to establish its own Department of Homeless Services and Housing, as well as the opening of the County's Emergency Centralized Response Center (ECRC), which

should centralize and better coordinate the County's efforts to move people experiencing homelessness off the streets and into housing, are positive steps. These reform measures portend well for progress by the County in its effort to eradicate homelessness and comply with the promises it made to the citizens of Los Angeles County when it executed the settlement agreement.

Dated September 2, 2025

Respectfully submitted

Michele Martinez
Special Master

Thomas Goethals
Special Master