UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) | CASE NO: 2:20-cv-02291-DOC-KESx |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Los Angeles, California |
| vs. | ) | |
| | ) | Tuesday, September 16, 2025 |
| CITY OF LOS ANGELES, ET AL., | ) | |
| | ) | (9:05 a.m. to 11:55 a.m.) |
| Defendants. | ) | |

STATUS CONFERENCE RE MONITOR SELECTION

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:               SEE PAGE 2

Courtroom Deputy:          Karlen Dubon

Court Reporter:            Recorded; CourtSmart

Transcribed by:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

**APPEARANCES:**

| | |
|---|---|
| For Plaintiffs: | ELIZABETH A. MITCHELL, ESQ. |
| | MATTHEW UMHOFER, ESQ. |
| | Umhofer Mitchell & King |
| | 767 S. Alameda Street, Suite 270 |
| | Los Angeles, CA 90021 |
| | 213-394-7979 |
| | |
| For Defendants: | JENNIFER M. HASHMALL, ESQ. |
| | LAUREN M. BRODY, ESQ. |
| | Miller Barondess, LLP |
| | 1999 Avenue of the Stars, Suite 1000 |
| | Los Angeles, CA 90067 |
| | 310-552-4400 |
| | |
| | JESSICA MARIANI, ESQ. |
| | Los Angeles City Attorney's Office |
| | 200 N. Main Street, Room 675 |
| | Los Angeles, CA 90012 |
| | 213-978-6952 |
| | |
| | KAHN A. SCOLNICK, ESQ. |
| | BRADLEY J. HAMBURGER, ESQ. |
| | Gibson Dunn & Crutcher |
| | 333 South Grand Avenue |
| | Los Angeles, CA 90071 |
| | 213-299-7000 |
| | |
| For Intervenor: | SHAYLA R. MYERS, ESQ. |
| | Legal Aid Foundation of LA |
| | 7000 S. Broadway |
| | Los Angeles, CA 90003 |
| | 213-640-3983 |
| | |
| Special Master: | MICHELLE MARTINEZ |
| | |
| Also present: | ASHLEY BENNETT |
| | RON GALPERIN |
| | DANIEL GARY |
| | KENNETH MEJIA |
| | ALEJANDRO PALMA |
| | CHANDLER PARKER |
| | MARIA ROSAS |

**Los Angeles, California; Tuesday, September 16, 2025; 9:05 a.m.**

                    **(Call to Order)**

        THE COURT:  First of all, good morning.

        ALL:  Good morning.

        THE COURT:  Counsel, are you ready to go into a session this morning?  Comfortable?

        ALL:  Yes, Your Honor.

        THE COURT:  Okay.  Then we're in session on Case No. 20-0229-1, LA Alliance for Human Rights versus City of Los Angeles, et al.  And, counsel, just remain seated.  Pretend you're like in state court, so make your appearance.

        MR. UMHOFER:  Good morning, Your Honor, Matthew Umhofer for -- on behalf of the LA Alliance.  My colleague Ms. Mitchell will be here shortly.

        THE COURT:  Okay.  Thank you very much, counsel. Mira, why don't we start with you.

        MS. HASHMALL:  Good morning, Your Honor, Mira Hashmall here for the County of Los Angeles.

        THE COURT:  Okay.

        THE CLERK:  Oh, one more, one more.

        MS. HASHMALL:  Good morning, Your Honor, Mira Hashmall here for the County of Los Angeles.

        THE COURT:  Okay.  Great, thank you.

        MS. BRODY:  Lauren Brody also here for the County.

        THE COURT:  Nice seeing you.

**4**

MR. SCOLNICK:  Morning, Your Honor, Kahn Scolnick for the City of Los Angeles.

THE COURT:  Pleasure.

MR. HAMBURGER:  Good morning, Your Honor, Bradley Hamburger on behalf of the City of Los Angeles.

THE COURT:  Okay.

MS. MARIANI:  Good morning, Your Honor, Jessica Mariani on behalf of the City.

THE COURT:  Pleasure.  It's nice seeing you.

MS. MYERS:  Good morning, Your Honor, Shayla Myers on behalf of the intervenors.

THE COURT:  My apologies, Shayla.  Back to you.

First of all, I didn't realize the connection but I know your brother, you actually look alike, because I think it's President of the Federal Bar Association of Orange County. I wanted to disclose this to all of you.  I just sat in a board meeting, but I want you to know that there was -- as an attendee and a member.

You brought two names to the table so far, the McKinsey Group and Ron Galperin.  And I assume that you're in the same position today, this morning, and there's been no change in terms of any earlier conversations; is that correct?

MR. UMHOFER:  What's reflected in -- sorry, Your Honor, I need to stay seated, but --

THE COURT:  Okay.  I'm not trying you, but you're in

EXCEPTIONAL REPORTING SERVICES, INC

the same position, correct.

MR. HAMBURGER:  Old habits, yes.

THE COURT:  Could I ask what the McKinsey Group is charging the City?  Because in my limited knowledge, that's a relatively expensive undertaking.

MR. HAMBURGER:  Yes, Your Honor.  We haven't gotten that far down the road on McKinsey.  What -- just to set some of the background how we came up with these names.  We've started --

THE COURT:  I'm going to get to that in a moment.

MR. HAMBURGER:  Okay.

THE COURT:  I'm just asking you a simple question.

MR. HAMBURGER:  On that question, we haven't explored that yet, and we haven't, at least the City has not reached out to anybody specifically at McKinsey.  We have contacted Mr. Galperin.

THE COURT:  By the way, just have a seat.  Be comfortable.  I know it's uncomfortable for you, but you can use the lectern, I'm just trying during flu season to stop the cross-polonization.  So if you --

MR. HAMBURGER:  Yes, Your Honor.

THE COURT:  -- want to use the lectern, please do so when it's appropriate.  But otherwise, you're more than welcome to just be seated.

Any idea, and I'm going to tell you why in a moment,

**6**

okay, what criteria did you use in discussing the McKinsey Group?  Can either side help me?  And I know that may be confidential from your standpoint, but this isn't a settlement conference --

MR. HAMBURGER:  Yeah.

THE COURT:  -- and I think that the adversarial process isn't going to work very well and eventually selecting a data monitor.

MR. HAMBURGER:  So just to clarify, the proposal, at least as the City understood it, was either -- not both McKinsey and Mr. Galperin.  It was two options.  The way that came about is we met and conferred extensively with the Alliance.  We wanted to come with a joint proposal for Your Honor's consideration.

Many names were considered and proposed by both sides.  Either the Alliance or the City had various objections to various names.  I believe the Alliance proposed McKinsey and had identified them as, you know, their consulting and accounting firm that has, you know, substantial capabilities.  And I recognize they are quite expensive.

And I believe Ms. Mitchell had identified that they had done some work in the area homelessness and had at least had something on their website about that.  But from the City's perspective, I know you have questions about McKinsey, we believe Mr. Galperin, he's our first choice and I think it

makes a lot of sense.  But I'll stop there and let the Alliance speak.

THE COURT:  Without inquiring too much further, what I'm concerned about also is if we met and agree -- if we reach an agreement here, there's another player involved.  The City Council's approval.  First, that takes some time.  And second, they could reject any sum and we went through that process with the appointment of A&M.  Originally we all knew it was 2.8 to 3.2, but the City came back with 2.2.

The Court was concerned at that time because I didn't want that limitation and I felt that was a limitation when everybody had chosen A&M and then we ran into budget problems.  And I don't want to see you folks reaching an agreement here in good faith, you know, try to work together, and then having the City Council reject this in a couple of weeks.  It's a waste of your time and I'm calling back into session going through the same.  So think about that for a while.

Is the City attorney here?

MR. HAMBURGER:  We have representatives from the City Attorney's office.  I do not believe the City Attorney herself is here.

THE COURT:  Who's the City attorney here?  Oh, of course, you are.

MS. MARIANI:  Good morning, Your Honor.

THE COURT:  If we reach an agreement, you know,

working together, how do we have some guarantee that that isn't wasted over two or three weeks or however long this gets to the Council with further delay?  What's your wisdom?  Help me.

MS. MARIANI:  Your Honor, our office would certainly help to prioritize getting it on the agenda and making the recommendation and so we would hope to facilitate it in that manner.

THE COURT:  So ultimately it'll be the person or party in the City Attorney's office that makes the recommendation to the Council.  Then, of course, it's in the Council's hands.

MS. MARIANI:  It would then be in the Council's hands, yes, Your Honor.

THE COURT:  Okay.  So this has to be frankly with your approval today.

MS. MARIANI:  From my office, yes.

THE COURT:  And do you have authority today to make that kind of representation?

MS. MARIANI:  That we will certainly make the recommendation to Council and help to prioritize --

THE COURT:  No, but do you have that --

MS. MARIANI:  -- it.

THE COURT:  -- authority today?  In other words, it's good faith --

MS. MARIANI:  Yes, yes.

**9**

**THE COURT:**  -- if we all eventually landed with a person that we thought was agreeable.  Can you make that representation today that this is something or do you need to make a phone call?

**MS. MARIANI:**  I can make a representation as I think we did in the filing that was already submitted.

**THE COURT:**  Okay.  Let me talk to you for a moment about McKinsey and a couple of concerns that the Court might have and this isn't to -- while I'm curious about the criteria you used.  McKinsey as you know was an advisor on the Purdue Pharma litigation, which was the manufacturing of OxyContin.

And that was allegedly a major factor in escalating the opioid epidemic.  In 2013 McKinsey recommended strategies to turbocharge the sales of OxyContin, allegedly even while the public health crisis was becoming known.

There was a record settlement, as you know, in December of 2024 and McKinsey agreed to pay $650 million to the U.S. Department of Justice to resolve both the criminal and civil investigation into its actions after partner pleaded guilty to obstruction of justice.

Now, this isn't to criticize McKinsey as a group.  It's a large organization, I understand that.  Also there has been a civil settlement of over a billion dollars.  The congressional reports found that there was a conflict involving Purdue Pharma and the U.S. Food and Drug Administration

concerning proper disclosure.

It's going to take three of us to come to an agreement, LA Alliance, the City and the Court. And I'm really uncomfortable with that recommendation. But as I read 7. -- no, you'll get all day. As I read 7.2, the Court, I read this, as I can't unilaterally impose my will or my choice on each of you, in fact, if each of you reach an agreement, it also requires my acceptance. But I'll work with you on that, if we get there. Fair enough?

**MR. HAMBURGER:** Yes.

**THE COURT:** The second concern I have is not a concern at all, in fact, a compliment because I'd worked with Ron Galperin before concerning his previous work that he's done for the City as the auditor/controller. He wrote some very interesting reports about the cost of housing first at the time and somewhat with those reports, the Court cited those reports in fact in its history concerning this litigation, along with HUD and a whole series of background requests for investigation.

But he also ran for a statewide office. I don't know if he's upwardly mobile, which good for him if he is. I don't know what his future looks like in terms of the City, because anybody who enters into this arena is going to come out, let's say, scathed, all of us are.

And I'm concerned that he lacks the technical

expertise.  So I'm going to ask what criteria you relied upon a few moments in discussing Galperin.  And let me say to you also in transparency that I've had an army of volunteers, up to the time of the appointment of the Special Master Michelle Martinez in this case, she had volunteered her time in Orange County, in Santa Barbara without a fee for over three and a half years.

She worked the first year and a half or two here without any pay.  That army included Mr. Los Angeles in the past, Councilman Tom LaBonge, Pastor Don, just a myriad of people who literally volunteered themselves.  And initially when I got involved in this journey, both in other counties and this county I wanted to surround myself with people who had nothing to do with any payment.  Not that receiving payment is non-virtuous, it's just that I knew that people were in it for only one reason.  They wanted to make the system better.

So you didn't see the, what I call in the name in lights coming forward with the Court.  And when we were walking the riverbed and other people, we were meeting -- or other locations, I think 27 encampments and 5,000 people initially, a lot more now, I started to meet on this incredible journey a goodness of a lot people who just wanted to make it better, not receiving any compensation, any public acclaim.  Literally had an army of them.  Okay?

That changed with the Special Master, which was the first paid position.  And so now I'm not leery, but I question

at any time payment and the information I'm receiving if there's a past intertwining with the City or with LA Alliance and on Ron Galperin I'm not sure where he stands now in the technical expertise.  And this is the way I initially define what is satisfactory to the Court.

The stated monitor needs to have experience with real time data auditing and timestamp validation.  In addition they need to have applied knowledge of data integrity and source attribution protocols.  This includes the ability to assess whether reported data is accurate, complete and traceable to its original source, whether it's through timestamp documentation, system logs or field level records.

The Court believes that the monitor should be fluent in protocols that distinguish verified data from estimates of placeholders and capable of validating that all figures are supported by primary evidence.  I think that this expertise is essential, not only for technical auditing, but for moving forward with public trust which we all want.  We need the taxpayers to vote for Measure A and other, we need them to have confidence in what we're doing.

So I think we're together on all of that.  It's not an adversarial issue.  I think it's essential not only for technical auditing but for maintaining this public trust.  And essentially what's required is a data analyst who has the capacity to not just collect data, which Michelle Martinez

could probably do with her present or another choice in this area. And maintaining that that data collection is accurate.

And for example, is the data at issue best modulated or modeled by normal distribution or binomial distribution. And the monitor will need I think minimally to compute such metrics as the main variance and standard deviation to analyze the data for purposes of evaluating consistency across data sets.

And frankly I don't want to be burdened vetting technical experts. We had what I call a beauty pageant when all parties agreed to A&M. We actually had them come into court. That was our best choice at the time by agreement of all parties.

And what I fear is that we won't reach an agreement between the two of you and then the Court is either forced to act unilaterally which I think is against 7.2 and not appropriate, or we reach a stalemate where the Court will act and just, you know, send it to the appeal amongst many issues, but have a record of the inability of counsel to come together and reach an agreement. That's what I'd like to avoid. Okay?

Next, this -- well, some examples I was thinking through is A&M because we all selected A&M to begin with, and I know the City probably is displeased because you've stated that with the eventual report, I understand that. Daniel Gary (phonetic), who, Mira, you and I have worked with, but you've

forgotten -- you might have forgotten, but Mira in good faith represented that on behalf of her client, it would take a month to get certain systems on line.  I can't disclosed too much, but I worked with him overseas at the highest levels of government, which I really don't want to discuss, with both administrations.

And I know his expertise on behalf of the country, in fact, he's either in Turkey or Barcelona right now.  And so I was wondering, who possibly could be better than somebody like Daniel Gary who, Mira, remember you were kind enough to get the technical staff in right away, I want to thank you for that.  All of you folks got together within three hours, we had an outline of how to get it up and running, it saved us a month of time.  Okay?  And he's available by phone.

I agree with LA Alliance when you say in your brief, quote, the appointed monitor will need to be assisted by a team with requisite data, technical -- technological and infrastructure training, knowledge and experience of the City's costs.

And I'm questioning why make the taxpayers pay more money when they need to, by not selecting a monitor, who has these qualities either he or she, themselves?  Because by simply selecting a monitor we're going to go through another -- and, Coda (phonetic), I thank you for being here, I'll be right with you, we won't hold you up.

I don't want to go through another hearing where then we get into a debate about what the -- what this is about, because I'm just calling you into court every single week, okay.  So I'd like to get that in a perfect world decided today and get that technical expertise.  And I think A&M and/or Daniel Gary have that.  Now I can't impose my ruling on you, but that's who I'm comfortable with right now.

But I'm at your beck and call.  If you don't agree, I think 7.2 doesn't let me unilaterally oppose that.  Now hold on, counsel, you're going to have all day, I promise you. You've got the rest of the day, I'll go get some coffee and you can have the whole day.

What criteria did you use and was this criteria discussed in putting forth these two names?  Because I'm concerned about the lack of technical expertise with Galperin and I'm worried about any past entanglements with the City or future entanglements going forward and with the McKinsey Group, although I will put on the record is probably an outstanding record, just the past history of this I don't think is going to be acceptable to the Court.

Now, I'm going to take turns for whatever comments, so I'll start with plaintiff.  I'll turn to the City.  I'll turn to Ms. Myers on behalf of the intervenors.

**MS. MITCHELL:**  Sure, thank you, Your Honor.  I can say that the Alliance did propose both A&M and Daniel Gary and

the City was not amenable to either of those.

THE COURT:  Okay.  We'll discuss that again today. Who else did you propose?

MS. MITCHELL:  Oh, I'd have to go back to my list. We had a --

THE COURT:  Well, go get your list.  Let's go down this list of folks because frankly I know that John Sheeran's (phonetic) out there and David Grunwald (phonetic) who applied for LAHSA and I understood did very well in the process with LAHSA, I think he was second to the appointee.  There's a host of people out there who are literally willing to pitch in from mental health expertise to HMIS.  And but for the City may see a tremendous amount of money.  Maybe we could put in a team that far undercuts, you know, whatever McKinsey was going to charge.  Okay?

MS. MITCHELL:  So, Your Honor, I'm pulling it up right now.  I can -- first before I get to that point, as I'm scrolling through to get the list, I can tell you that I did speak with McKinsey yesterday, with the McKinsey team yesterday.  I do believe they have the technical and data capabilities.

THE COURT:  Okay.

MS. MITCHELL:  However, they as a policy of the organization will not serve as a monitor in terms of adjudicating compliance or non-compliance.  That's a corporate

policy they have.  So they felt that they could participate in a supporting role, under somebody, to help but would not be able to serve as a high level monitor.

So if the City is amenable to that, we can talk about that and maybe they would serve as a supporting role to Ron Galperin, but that's a separate conversation.  I just wanted to let the Court know I did have a conversation.

**THE COURT:**  I'll let you discuss that.  But you know my reluctance in terms of the opiate settlement --

**MS. MITCHELL:**  Yes.

**THE COURT:**  -- and knowing that some of the City money that was received came from the opiate settlement.  You had about $250 million in reserve coming out of that settlement which since is no longer available.

**MS. MITCHELL:**  Yes, no, I understand that.

Some of the issue -- when we looked at, you know, who was capable and I have to be honest, Your Honor, the order I think was a little bit vague in terms of scope, so I did have a conversation with A&M.  They sent over to me a document.  They were interested in being a monitor, but because they spent ten months in the data, they felt like there was a lot of clarification needed and help for whomever the data monitor was going to be.  So I did have some conversations about that and what would be technically required.

**THE COURT:**  Have you shared that though with the City

**18**

thus far and Shayla?

MS. MITCHELL:  I have not.  I just got permission last night to share it, because it was labeled confidential. And so at that point, I didn't feel like I could.  I'm happy to e-mail that to them so they can take a look at it.

I share the Court's concerns about controller Galperin.  I have reached out, have not been able to contact with him.  However, based on my past experiences with him, based on the independence with which I believe he operated his organization when he was the city controller, I think that he would have the requisite level of independence.

THE COURT:  Who is he?

MS. MITCHELL:  Ron Galperin.  My concern is only on the technical expertise and I have not been able to connect with them.  And so to the extent that whomever the monitor is, I don't know that a single person could do this, Your Honor, even Daniel Gary.

So I do think that there needs to be a team in place, given the significant issues with data and infrastructure that we have seen.  So even with someone like Ron Galperin who I believe to be very good and very independent, I believe he would need a supportive team.  And I think that we can work with the City as far as what that looks like.

Now, obviously I would want to have a conversation with him to confirm the independence and the comfort level, but

I do think something like a Daniel Gary or an A&M and even McKinsey and I recognize the Court's concerns and those are valid concerns, but a data and technological team supporting Mr. Galperin I think is what is needed.

THE COURT:  Okay.

MS. MITCHELL:  I'm sorry, would the Court like me to share the names that we proposed?

THE COURT:  Yeah, I would.

MS. MITCHELL:  So we had previously, I think the City had proposed Rand that was the --

THE COURT:  Just a moment, Rand?

MS. MITCHELL:  Yes.

THE COURT:  All right.  Now, this has nothing to do with Rand, but full disclosure, just before I went to Vietnam Rand wrote a report for all of us young marines, it was interesting.  I won't say anything more.  So I have that personal experience with Rand, but a great amount of respect as an institution since that time.  Okay?  But I'm a little concerned about just my fairness in that regard, because it had some dramatic indicative problems with it.  Regardless Rand?

MS. MITCHELL:  Rand was one.  But the City raised --

THE COURT:  Okay.  And that has nothing to do with that past experience, but I wanted to disclose that to you.

MS. MITCHELL:  Thank you, Your Honor.  The Alliance was concerned because there were significant contracts between

Rand and the City that we didn't feel was appropriate in an independent context.  Same with USC and UCLA.  They have some phenomenal programs.

THE COURT:  USC and UCLA, they're going to cooperate?

MS. MITCHELL:  No.  You were asking for the ones who were raised.

THE COURT:  Okay.  Now, USC.  Who was suggested at USC?

MS. MITCHELL:  There was a number of organizations at USC, not a single person.  We were looking at departments but again, Your Honor, that was quickly dismissed because of the significant relationships that the City --

THE COURT:  Okay.  What about UCLA?

MS. MITCHELL:  Same with UCLA.  We looked at a number of departments but was quickly dismissed because of the --

THE COURT:  One of those, the Luskin Institute?

MS. MITCHELL:  I'm sorry?

THE COURT:  Was one of those the Luskin?

MS. MITCHELL:  Luskin was one, correct.

THE COURT:  Okay.

MS. MITCHELL:  Jan Perry was one that was raised.

THE COURT:  She's the former councilman out in the 14th?

MS. MITCHELL:  She was councilwoman of what ultimately became CD14.  I think there was some redistricting

**21**

that happened.

THE COURT: Okay.

MS. MITCHELL: And she was actually, I think, until the end going to be on the list and then the city withdrew its agreement.

THE COURT: Okay.

MS. MITCHELL: But I think she -- I don't think that she has the data or technological capabilities, but I do think she has a tremendous amount of insight into the City but would need a team to help.

THE COURT: Okay.

MS. MITCHELL: And then Tim Campbell was one that was raised, but in full disclosure, he has worked with the Alliance in the past and I think that the City then didn't feel comfortable with Tim even though he does have the technical capabilities.

THE COURT: Sure.

MS. MITCHELL: The City raised EY, which was formerly Ernst & Young, which we were not comfortable with for the same contract reasons. We, the Alliance, raised Price Waterhouse Cooper, I think is the full PWC, but there is ongoing litigation with the City and PWC, so that was obviously not -- out.

THE COURT: Okay.

MS. MITCHELL: And I think that is the totality of --

oh, there was -- I'm sorry, Neil Gatnick.  Neil Gatnick, who has --

THE COURT:  Who?  I'm sorry.

MS. MITCHELL:  His name is Neil Gatnick.  He is an attorney in New York, so not local, but has served in a monitor capacity multiple times and reached out to us independently.

THE COURT:  Does he have the technical expertise though, because there I've got the windshield time without the benefit of the, well, okay.

MR. UMHOFER:  Your Honor, I believe he'd be in the same position as a Ron Galperin, which is that he has extensive monitorship experience federally and locally, but does not -- but would need a data team.

THE COURT:  Okay.  Well, thank you.

MS. MITCHELL:  Yeah.  I think that's the totality.

THE COURT:  Okay.  Let me turn to the City (indisc.) your thoughts.  The lectern is yours.

MR. HAMBURGER:  Thank you, Your Honor.  So just to give you some insight on why we landed on Ron Galperin, we, as you can tell, the parties proposed a lot of names.  Our first choice was a group at Rand.  There's Jason Ward at Rand, and he has a team, a lot of very capable people that have data expertise, are scientists, have technical backgrounds, yet also have the policy expertise.  So that was our first choice.

It became very clear early on that the Alliance was

**23**

going to veto any group that had some relationship with the City.  And the problem there, from our perspective, was we're the second largest City in the country.  There's all sorts of unrelated activities that the city is engaged in, but that is why we ended up -- why we proposed, you know, multiple organizations like UCLA, groups at USC, Rand of course, Ernst & Young.  And the Alliance position was if there's any contracting between the City and those entities, that they were just not going to stipulate.

And what we were trying to do, Your Honor, is come with a unified joint proposal.  The City would still be fine with Rand.  That was our number one choice.  We thought they had the right skill set.  I understand the Court's comments, but we think the people that are working at RAND now on these issues would be well suited.  It could kill --

THE COURT:  By the way, I've overcome that.  In other words -- but if I state it, then I can be fair.

MR. HAMBURGER:  Yes.

THE COURT:  It's when you hide something in even your own subconscious, and I just have to say that that has some tragic consequences.  But this is a new era, new group.  But I'm a little afraid of what I call the -- I want to call them McNamara whiz kids for want of a better term.  I'm a little afraid of the people who aren't willing to get down on the streets, take a look, because then they're simply espousing a

**24**

position.  Okay?  And I'm going to need some boots on the ground.

MR. HAMBURGER:  Yeah, well, I think there are individuals at Rand who have studied these issues, and I can't testify about their experience going down on the ground --

THE COURT:  Time out.  I haven't seen them.

MR. HAMBURGER:  But yes.

THE COURT:  By the way, there's a murder today, two and a half hours ago over on 5th Street.  Young man stabbed numerous times, 26 years old.  So let's just start the case with -- day with some tragic news.

MR. HAMBURGER:  That's awful news.

THE COURT:  Yeah.

MR. HAMBURGER:  On Ron Galperin, we proposed Ron Galperin because we think he has unique knowledge of the City globally, which is a differential from Jan Perry, who her knowledge is focused on her district.

THE COURT:  Jan Perry or Ron Galperin, and here's my concern.  If it's linked with somebody like Daniel Gary or A&M, and I've got that technical expertise that I'm confident in, I'm going to buy in.  You're not going to have opposition from me.  But I'm not turning this over with my acquiescence to an entity like Rand or Luskin or anybody else and then having them get my technical expert who I have no experience with and no confidence in.  It's like subcontracting.  I have no barometer.

And this is more than just check a box.  I need this technical -- this person is critical to me.

So Jan Perry, I don't think is critical necessary. Galperin's not, but that technical expertise is critical in this.

MR. HAMBURGER:  Yeah, Your Honor, can I -- I think there may be a need for technical expertise at some level, but I also think there's a different level of expertise because this isn't just a -- but the problem, you know, here in terms of assessing the data isn't just about mathematical modeling or, you know, complex accounting things.  That may be a necessary component of this.  I also think that there's just the basics of knowing what programs are out there, where the data is.  We have multiple agencies, multiple entities.  You have LAHSA that controls most of the data.  And so our thinking was that Mr. Galperin, given his knowledge of the City generally, he knows how the City works, plus he has experience running an organization that is focused on auditing, knows numbers.  And it may be the case that he will say that he needs a team.  We think it would be most effective that if a technical team was selected, that it's somebody that he's, you know, is comfortable working with, somebody he's worked with perhaps in the past, or at least is open to working with.

And I'll just say the City attorney did reach out to Mr. Galperin.  He is interested in serving in this role.  We

**26**

wouldn't have proposed him if he wasn't.  But -- and we did give his contact information to the Alliance, but I guess they haven't been able to connect yet.

But in terms of, you know, what the City proposed, we had a lot of entities that we were open to.  We did have misgivings about A&M based on the -- what happened at the evidentiary hearing in the report previously.  I understand that in the past, the City did consent to A&M.  But I think now it would be better -- the City's position would be better to get a different entity.  And we did think that we shouldn't be ruling out entities like Rand or USC or UCLA merely because they do unrelated business with the City.

I mean, it'd be shocking if UCLA and USC and Rand, given they're based in the community, didn't have any connections on unrelated matters.  It would be one thing if it was a related matter, but unrelated matters, we think that is basically holding too high of a standard.  And so we would urge the Alliance to reconsider, in particular RAND, because we think that was something the City was number one choice.

**THE COURT:**  My guess is that you won't reconsider nor will the LA Alliance, but we'll get to that in just a moment.

**MR. HAMBURGER:**  Yes, Your Honor.

**THE COURT:**  Or we'll see if we can.  Ms. Myers, were you a part of this conversation between the City and the LA Alliance?

**27**

MS. MYERS: We were not, Your Honor.

THE COURT: Would you please come up to the lectern or just remain seated? I'd like to get your input. By the way, I want to thank you for your briefing on the record concerning the receivership issues.

MS. MYERS: Thank you, Your Honor.

THE COURT: Very insightful.

MS. MYERS: We're happy to address any of the issues that the Court feels like it would be important to make our appearance on.

THE COURT: No, I just want to get your input. Let me tell you my concerns. I really am pushing for some entity outside the Los Angeles area. I don't have the same confidence, the doubling up with the data monitor and what I call a more public figure is going to make me comfortable.

MS. MYERS: And Your Honor --

THE COURT: And so -- and I'm worried about the intertwining, and I know that regardless of the City's disagreement with A&M, that they were very independent, however they came out. I'm particularly interested in Daniel Gary because I know his expertise on behalf of the United States, far beyond and he's not local. He's got no connection with any of your folks, except with that one occasion when he was in court and he happened to be visiting on some other unrelated business. And when you called the technical people in, we got

**28**

that up and running in three and a half hours instead of a month, and I found good faith on both sides.

So I don't think I'm going to be signing off unless I can get somebody in the data monitoring field with this technical expertise.  So I partially disagree with the City.  I don't need just another figurehead.  I would appreciate somebody who knows the community.  I mean, maybe even Michelle can double up and do that.  But if not, it may simply be too much.  Maybe we need Ron Galperin, A&M, Jan Perry.  I know Dr. Sheeran's (phonetic) interested.  I know that -- I think the second in the LAHSA go-around, David was interested. You've got a huge army of people out there wanting to work at a discounted rate, quite frankly.

**MS. MYERS:**  Your Honor, I think we share the perspective that this is the type of work that someone who is deeply invested in Los Angeles and the issues that are facing Los Angeles would be critical.  And the reason why we say that is that these are complex issues, certainly.  The homelessness delivery system is an incredibly complex system.  But the issue facing the monitor is actually relatively straightforward in terms of ensuring the City's compliance with the settlement agreement.  And one of the things that I would strongly urge the Court to consider is subject matter expertise related to homelessness and housing.  I appreciate your perspective, Your Honor, related to data verification --

THE COURT: Why not both? In other words, I'm a little leery of turning this over to a large entity like RAND, Luskin, who I don't know who they're using, when I could combine a Jan Perry and a Daniel Gary or a Ron Galperin and a Daniel Gary or something where I've got both.

MS. MYERS: And, Your Honor, I think interveners do not share the concern related to an organization like RAND, USC, or UCLA. And in fact, I would strongly encourage Your Honor to consider one of those institutions. And the reason why we say that, and I think, Your Honor, you've pointed this out numerous times when you encouraged A&M to refer to Luskin and to reach out to some of the institutional knowledge that exists on the ground.

Los Angeles and right now what is happening in Los Angeles is fertile ground for research, and we have amazing institutions doing really powerful work on the impacts of homelessness. The entities that are doing that work are in a position to be able to monitor the discreet elements of the settlement agreement with a depth of knowledge that we think is necessary. Your Honor, one thing -- one concern that we have about A&M --

THE COURT: Let me break in right there for a moment though. Some of these institutes have taken different positions. For instance, the mayor has taken a more hybrid position from housing first and to also shelter. Okay. I

**30**

think that's had a tremendous benefit in terms of dealing with the tens of thousands of people on the street because when I first came to the city, it was a housing only model.  You and I had arguments about that, debates, et cetera, early on.  And I think with transparency, so we share with the group that our initial disagreement in the meeting was, unlike Boise, which might have 50 people and we could have a housing first approach, you and I disagreed because the Court was presented with a problem of thousands of people on the street and how do we get them into shelter with documentation, et cetera, but we had then a housing first model.

I think the mayor has successfully changed that into a more hybrid model with shelter because I can't have -- the Court can't face the problem of literally tens of thousands of people trying to find something better than a cardboard box if I was only dealing with housing first and the tremendous cost, because there I could serve, and the City could serve hundreds, maybe thousands, but a few thousand, and the rest were sitting on the street.  Now, you and I had a robust disagreement about that.  I respect your opinion.

You believe that housing first is something that should occur, and I respect that.  We just disagreed, so counsel know about that.  I might take a different position, by the way, if it was a smaller community in terms of housing first, but here with the tens of thousands of people, you and I

argued, if not over across the street years ago about that.

I've got some embedment, though, in Luskin, for instance.  Luskin has some folks that were involved in the housing first model.  I can name them, but I don't want to, because it was a good faith noble effort.  Let me say that to begin with.  And some of the folks that settled this early litigation, you know, going back to Jones, et cetera, were housing first advocates and were part of that containment policy.  Hold on.

This Court is never going to allow, and at the chance of taking this to the circuit and being recused, going back to a containment policy that this City had, where we took minorities down to Skid Row and the rest of the districts, quite frankly, and I'll name them for you if you want, and some of the council people, literally have dumped in Council District 14.  That's not going to happen again.  And we've got some primary advocates over at Luskin that were part of that process.

Now, that's noble, let me say at the time.  Do you want to go further?  Happy to.

**MS. MYERS:**  I mean, Your Honor, I would just say that, for example, council member Perry voted on numerous of the policies --

**THE COURT:**  Exactly.  I'm not saying --

**MS. MYERS:**  So those kinds of policy decisions that

people have made in the past, if that's going to disqualify folks, then certainly that should disqualify council member Perry --

THE COURT:  No.

MR. MYERS:  -- certainly should disqualify council member Galperin.

THE COURT:  No, but I'm not going to put somebody into office with just one perspective, like housing first only or shelter only.  I need a cross, you know, cross-thinking about how the system's going to work in a functional way.  So I don't want an advocate for all shelter or criminalization or housing first.

MS. MYERS:  And then, Your Honor, I think that would certainly disqualify the politicians that have been put forward.  And that is our concern --

THE COURT:  It may.

MS. MYERS:  -- is that the individuals that have been put forward, council member Perry, with all due respect, lodged some very significant votes that many people would consider detrimental or beneficial, but certainly weighed in on one side of these debates.

THE COURT:  I want you involved in this discussion.  As the intervener, I think you have greater responsibilities that maybe the Court in the past and the parties have placed with you.  That doesn't mean, though, that your input is going

**33**

to be guided by the Court, right?

              **MS. MYERS:**  Sure.

              **THE COURT:**  Okay?  Be prepared for that.  But I think that that wisdom would be helpful in hearing from you. Eventually this -- the way 7.2 is drafted, the parties are actually the City and LA Alliance.  And if they do come to a meeting of the minds, I think I'm duty-bound to accept that, but how much confidence I have in that and how active I am or non-active in the future really depends upon whether we can meet this confidence level.  Otherwise, the federal court's going to be right back involved.  Okay?  And if I don't have confidence in this, so there's my misgiving, okay, about Luskin in particular, RAND, USC maybe, maybe something else at UCI or UCLA.  I don't know.  Berkeley's too far.  Stanford too far.  But I'm looking for a combination.

      As long as I get that technical, I'm not as concerned on the what I call the infrastructure.  Quite frankly, I've got free volunteers.  Don, raise your hand.  He knows the city just as well as Michelle does.  Okay?  I could get all the expertise I need in terms of HMIS, the whole system at any time.  I could save you a ton of money, quite frankly, a huge amount.  But that's up to you.  But I know one thing, McKenzie charges a lot, and if we're going down that road, if I'm the counsel, I'm not sure I'm approving that, and now we've just wasted time. So how are we going to resolve this?

**MR. HAMBURGER:** Yeah, so Your Honor, I think the Alliance -- I mean, I would urge the Alliance to reconsider its blanket position.

**THE COURT:** No, no, no, we're not going to do that because they would urge you to reconsider and we're back and forth.

**MR. HAMBURGER:** Okay. Well --

**THE COURT:** You know -- do that privately, please. Go have a conversation.

**MR. HAMBURGER:** I may do that privately.

**THE COURT:** We're not going to do that publicly and put them in the spot, and they're not going to put you in the spot.

**MR. HAMBURGER:** Well, I think the parties would benefit after hearing the Court's concerns and helpful suggestions, can we meet and confer?

**THE COURT:** Okay. Here's my concern. You give me Daniel Gary or A&M and I will give you the political, intuitive figure that you accept, because that way I think that that's going to be the most important flow of information and far different than what we've had to do in the past. And if I don't have that confidence, then you've got a third party not agreeing. So A&M or Daniel Gary and then pick Jan Perry or Ron Galperin or Dr. Sheeran, I'll get them on the phone or David Grumwald. I'll give you a list of names of people who want to

**35**

become involved.  In fact, they'll probably discount the rest.  Don, how much are you willing to work for?

**UNIDENTIFIED SPEAKER:**  Zero.

**THE COURT:**  Zero.  Now, hold on.  I just want to tell you, I never expected at my age to end the last part of my career on this incredible journey, and I want to leave on a positive note.  I have met incredible people who aren't even asking a cent to just get involved for the goodness of Los Angeles, and that's a really positive thing, isn't it, on this journey?  I mean, it's absolutely inspiring.

I've witnessed -- I tell you stories about Skid Row and they've got 10,000 masks and they've distributed them during the fire and they all vote on the street down on -- with Kevin and Rick and half the people out here.  They hold a street meeting and deciding in West L.A. those folks up in the Palisades got burned out of homes.  Maybe they could use the mask.  So you've got the poorer communities, which is an incredible story about this City getting in a truck and driving it over to West L.A. to try to distribute it to people who got burned out of Palisades.  By the way, my daughter got burned out of Palisades.  She's doing fine.  So don't worry, but yeah, I mean, is that a good story about our city?  I mean, shouldn't we be proud of that?

You give me the technical expertise of the people I have confidence in independent of Gary and A&M and I'll give

you whatever other choice you want to work with and let's narrow it and choose that people because I think we can save a ton of money if we do that. Okay? A lot of money. McKenzie's going to charge you, by the way.

MR. HAMBURGER: Yeah, we understand, Your Honor. We need to speak with our client.

THE COURT: Sure. I'm sitting right here. Go talk to him.

MR. HAMBURGER: Okay.

THE COURT: Yeah, we're not leaving today. I mean tonight. And by the way, I've quit inviting your clients. Okay? No problem, but they should be here. They should be in this room making decisions.

So why don't we take a recess, because I'd like to hear from the controller. You might want to stay or have one of your team stay or we can listen to the controller for a moment because I want you to be on your way in just a moment. I want to thank you for being here.

So Michelle, do you have anything to add? I can't hear you. You're going to have to use a microphone, Michelle.

SPECIAL MASTER MARTINEZ: Yes, Your Honor.

THE COURT: No, no, no come to the microphone. Yeah. We're not going to do that. Usually I have you up here with me.

SPECIAL MASTER MARTINEZ: Yes, Your Honor, if we

**37**

could have the controller because he does need to get back to work.

THE COURT:  That's just what I said.

SPECIAL MASTER MARTINEZ:  Great.  Thank you.  And he has a presentation.

THE COURT:  Yeah, well, please come on up here and it's good to see you and thank you.  Remember you're always invited.  I'm never ordering you here.  Okay?

And eventually I'm going to ask LAHSA, who's our LAHSA of representative again, thank you.  Have a seat for a moment.  I wish your director was here, but I'm not ordering that at the present time.  I'd like to meet her.

And eventually, LAHSA, eventually I'm going to ask if the City's broke what we're doing with the $37 million we haven't recovered so far, and I want to be blunt about that, and I'm going to go over every name who hasn't paid.  And I compliment you on these recently constructed contracts but they are an after-the-thought contract frankly, and I am concerned that there were no milestones met.  There were no contractual obligations until the LA Times and this Court discovered it. I've got a concern that this money was just going to float.

So when you say you're broke, I'm going to ask where the $37 million is just to start with.

MR. UMHOFER:  Could we get a little technical -- we just --

**38**

THE COURT:  Well, I'm going get off the bench then so -- until you get that set up just so you're not pressed.  Okay?  Don't worry about that.  So, counsel, if you want to take just five or ten minutes right now just to let them get set up technically for this presentation.  Okay?  Would you just call me back -- counsel, just tell me when that's ready to go.

**(Recess taken at 9:51 a.m.; Reconvened at 9:58 a.m.)**

THE COURT:  Then all the parties are present, counsel, except A&M.  Would somebody get them?  Be kind enough.  Michelle, could you help me?  Could you ask A&M to come out?

SPECIAL MASTER MARTINEZ:  I don't think we have A&M, Your Honor.

THE COURT:  No, they're not here? Okay,  could you ask the L.A. Alliance to come on out?

MS. MITCHELL:  I'm right here, Your Honor.

THE COURT:  Where are they?  Oh, I didn't see you.  I saw the controller.  I'm sorry.

MS. MITCHELL:  Oh, that's okay.

THE COURT:  Okay, please.  So we're back on the record.  All the parties are present, and counsel?

MS. MITCHELL:  Your Honor, before we get started, I did want to mention, I actually forgot, I did propose the current controller as well on the list, and that was not accepted.

**39**

THE COURT:  Okay.

MS. MYERS:  Your Honor, I just need to find a screen that I can see the screen that's actually working.

THE COURT:  Okay, well, let's have the controller make his presentation.  I know you're busy and have to get back to work.

MR. MEJIA:  All right.  Well, thank you, Your Honor, for having me.  So, you know, our task in this is to create a website that is transparent to the public about how the City is spending their money in regards to the Alliance settlement, the freeway agreement roadmap, and Insight Safe.  And so we've been tracking these payments since 2024, and so you can see so far how much funds we've been able to track.  And this is in cooperation with the CAO and LAHD as they -- LAHD is the housing department -- as they provide us a list of these payments.  And so you can just see the amount of spending.  So --

THE COURT:  Wait just a moment.  Carla, could you help me with this screen?  I want to turn the monitors towards counsel and the audience.  And, Counsel, do you want one of these monitors turned around so you can see or are your screens working?  I want to make sure.

MS. MITCHELL:  They're working.

THE COURT:  Just a moment.  Counsel, are your screens working?

**MS. MITCHELL:** And, Your Honor, yes, ours are and the audience's.

**THE COURT:** Okay.

**MS. MITCHELL:** I think it's just the back ones that weren't.

**THE COURT:** Let me get this up. Just a moment. Michelle, are your screens working, Dawn? Okay. And remember, under 7.2, as long as you're talking, I don't think the Court has any authority, in other words, to impose anything on either party, L.A. Alliance or the City. So if you reach an accommodation, no matter what my thoughts are, that's going to be accepted by the Court. I think I read that very clearly. It's when we get into an impasse that I don't know quite where that leads us.

Okay. Okay, Counsel, thank you very much. Now it's on my screen also.

**MR. MEJIA:** Great. Great. So, you know, just going this over with you all again for those who haven't been here, basically this is the summary sheet so far. And we made this website with the idea that it is easy to use and easy to understand. So if you wanted to go down or click on a certain, you know, program, you could easily click on, you know, for example, Insight Safe, 119 million spent so far. You go here, you could see a breakdown of the service providers by, you know, through a pie chart. You could see it all here. And if

you scroll down even more, this is where you actually get into sort of the details. You know, we made this payment on February 1st. This was the sub-recipient. This was the amount. And then this is the reference.

And basically you could actually, if there is a hyperlink, you could actually click on each one. And then this will actually show you the invoice details or what was provided as the backup support for that amount. So anyone could go in and see what we are paying for. In addition, if you click on this amount here, you could also see sort of a breakout of, you know, what district it was --

THE COURT: Just a moment. Let me interrupt you.

MR. MEJIA: Sure.

THE COURT: For counsel, I just made a statement that, once again, I read 7.2 that if each of you reach an agreement, then the Court has no jurisdiction nor ability to impose unilaterally anything on you. So I want that very clear. If you do reach an agreement, I'm duty bound to accept that. Understood?

I'm just telling you transparently some of my concerns, but those could be easily overcome if each of you agree. So let me finish with the assessor right now. He needs to go back to work.

MR. MEJIA: Thank you.

THE COURT: Why don't you go back to the very

beginning.  I know you're speeding through this.

MR. MEJIA:  Sure, sure, sure.  No, and I have time, Your Honor, so.

THE COURT:  Let's go down to a summary again.

MR. MEJIA:  Sure.  So for everyone joining us, this is our homeless dashboard, and part of our homeless dashboard is we created a specific section, a website, that we were asked to create sort of a transparency website on homelessness spending, particularly related to the Alliance settlement, the Freeway Agreement, and Insight Safe for payments starting since 2024.

THE COURT:  Now, let's slow down.  Alliance Settlement Program, $6,715,826.  What does that represent?

MR. MEJIA:  So what you could actually do is if you want to know what that $6.7 million is, you could actually click, and it will take you to the details section when the payments were made, and you could actually click on the -- if there is a hyperlink, you could click on it, and you could see the invoice as to what was given to us, and then you can scroll down and see all the details if you wanted to.

We actually made it easier.  If you click on this right here on the amount, it's more of a high level if you didn't want to go into the details, but you could see the breakout on, you know, it's for PATH, it's for CD4, Highland Gardens, for the months of November to December, and this is

the breakdown on how much, you know, the money was split, so 53 percent rent, 20 percent security, and so on and so forth.

THE COURT: Let's stop just a moment. And if you go down again just a little bit.

MR. MEJIA: Yeah, so if you scroll down a little bit. So the top part breaks out the financial, you know, entries and the accounts, and then down here what we wanted to do was tie it to the performance metrics of that period that the payment covered, so that way you could tie the money to the performance and so you could see how many new enrollments there were. By the way, all of these were provided by LAHSA, and we're making it, you know, accessible to the public.

THE COURT: Thank you. Would you take the second category then on the first slide?

MR. MEJIA: The second category is --

THE COURT: Insight Safe, $119,336,840. Once again, slowly walk us through that.

MR. MEJIA: Correct. So I just clicked on it, and it took us to the Insight Safe portion. And at the top, we created a high-level pie chart summary of the different sub-recipients or service providers, just so you all could see who the city is paying, servicing Insight Safe. Please let me know if you want me to keep scrolling down or if you want me to stay here.

THE COURT: Just stay there for just a moment. And

now if you scroll down.

**MR. MEJIA:**  And then if you scroll down, we get into the similar section where you saw, you know, more of the details on what we're paying for.  So, you know, if I clicked on one, for example, if I click on this one, the amount here is the same thing.  It will break out how much is, you know -- which location it was, what period did it cover, what was the breakdown of, you know, where it went to in terms of financials.  And then on the bottom, we don't have metrics available on this one because I believe they didn't -- for 2024, it was not readily available at that time.  But pretty much here, though, you could see the same thing that you saw up there.

The one thing that I do want to point out is if there is a link on the contract, you could actually click on it.  I know one thing that the Court wanted and others wanted is you wanted the contract posted.  So we actually post the contracts, if available, to match where that payment would fall under.  So you could see it here.  It's 400 pages long, but if you wanted to read it all, you could.

**THE COURT:**  I see.

**MR. MEJIA:**  So, you know, all together what we have is we have the invoice, we have the contract, and we have, you know, sort of a breakdown of what that amount gets down to.

**THE COURT:**  Excellent.  Could you turn back to the

master page again?

MR. MEJIA:  Sure.  So if we go back to here, next is this one.

THE COURT:  So the freeway agreement, that's for the 6,700 -- $180,517,093.

MR. MEJIA:  So if you click on it here, same thing.  And for information that we do have, we try to fill it in.  So you could click on each one.  It will give you the invoice as well.  If you wanted to see the details, it will show you everything you want.  Click on the contract.  It will give you the contract as well.  These are pretty big files.  Yeah, so this one was 540 pages.  So you could just, you know, if you wanted to see the contract, and then obviously here if you click on this, it will show you the breakdown on, you know, where it was.

THE COURT:  Take me down from salaries and wages. Take me right there.  That's good enough.  Just a moment.  What's overhead allocation?

MR. MEJIA:  That I would have to look into the actual invoice details to find out what they're including as overhead. I wouldn't know at the top of my head.

THE COURT:  Thank you.  All right.  Take me back to the master page again, would you?

MR. MEJIA:  Sure.  And then I'll just show this real quick.  Here are the performance metrics on the bottom.

**46**

THE COURT:  I see.

MR. MEJIA:  And then the last part is part of roadmap, but we broke it out because it sort of has its own, you know, little section, but it's the safe parking side of roadmap.  So this one, if I click on it, 1.5 million.  This one we actually have all the details for so far, but you could see the breakout on how much we've spent so far through May 2025 for safe parking.

THE COURT:  So consistently staff salaries and security are two of your primary expenses, aren't they?  Seems to be consistent across the board.

MR. MEJIA:  Uh-huh.

THE COURT:  Okay.  All right, thank you.  Please continue.

MR. MEJIA:  Great.  And same thing for safe parking. If you scroll down, we actually presented this one a little differently because there aren't that many, but you could go from side to side.  You could click on each month if you want to see the actual invoice and see the details on, you know, the backup.  Similar to what you all have seen over there.  Also provides performance metrics to how many spaces they have, how much space was utilized during that time.  So, you know, 48 percent, 34 percent of those spaces were utilized, things like that.  How many, you know, clients exited housing, the average length of stay.

So, you know, the whole idea of this website for everyone here is just so you all could see what the City is spending the money on and dig in for yourself.  The one thing, Your Honor, that I would like to spend a little bit of time on is just sort of discussing our progress and challenges with upkeeping this website, if that's okay.

THE COURT:  Please.

MR. MEJIA:  So a lot of this work that you see here, which is great, you know, our office loves doing this, but we are hitting some hurdles in developing this website because it does require a lot of manual work, a lot of, you know, making sure that the data, including sensitive data, confidentiality, and if you saw some of those examples, some of these invoices are like 200 pages.  Some of these contracts are 400 pages.  And so right now, we have a two-person team who is doing all of that and putting all this together.

THE COURT:  Why are we having to go through the issue concerning privacy?  Why isn't this being (indisc.) --

MR. MEJIA:  Yeah, so that was one thing we brought up to LAHSA.  If we can -- if they could actually, you know, black out those portions of the invoice, and I think the idea was everyone wanted full transparency.  And so they didn't want to be, and I don't want to speak for them unless they're here, but the idea was full transparency and we didn't want anything to be blacked out if, you know, there would be a concern that

something would be hidden and they didn't want that.

So we essentially get everything raw.  And so we have to make sure that when we post it up, it doesn't go down.

THE COURT:  There was a dispute initially between the parties and LAHSA and your office concerning transparency.  And I had requested all of the parties to come to my court, and we would sort that out quickly with guidelines.  All the parties then reached an agreement, and that's where the Court was left.  So I was never involved in trying to sort out those privacy issues, but certainly under HIPAA there are privacy issues.  But I'm wondering why your staff has to do all that work when LAHSA can do that work and deliver that to you if we had clearer guidelines.  So I leave that to the parties to consider because it's draining on your resources.

MR. MEJIA:  Right, and I think that's one of the -- so that's one piece of why this can take a long time is because we have to actually, when we do get the data, we have to go through it all and redact a lot.  In addition, there is a delay sometimes when we get the data, so some of this information may not be up to date because we are waiting.

But my team created a quick PowerPoint, if I could show it to you real quick, just so we could show you all the process in which we go through it.

THE COURT:  Please.

MR. MEJIA:  So I'm going to bring up our deputy

controller of finance and our director of homelessness, Ashley, as well to sort of give you all this quick presentation and just tell me when to --

**MS. ROSAS:**  Good morning, everyone.  My name is Maria Rosas.

**THE COURT:**  Good morning.  Let's move that microphone closer to you and make sure that you can be heard.

**MS. ROSAS:**  So we just put together a quick financial process presentation on how we get the information and what our office is going through and the challenges that we're experiencing.

So LAHD CAO provide a list of payments that are made by the City for these programs, and our team is in charge of looking through the transactions and getting further detail from our internal systems like FMS.  So we gather the payment backup documents that are provided by LAHSA, which will include both PDFs and their Excel mapping files that have information on service provider, encampment sites, contract numbers, and everything related to the cash request.

From there, our team further extracts that from LAHSA's files and submits to them, this is the backup that we need for all of the service providers that were paid out through this cash request, and this is what this is pertaining to.  In addition, please also provide us the contracts.

So this list is then sent to LAHSA again to provide,

one, the subcontractor service provider invoices that tie to the amounts paid and the related contracts.  So this is just an example of the list that we get from LAHD/the CAO, which is internal data that breaks down by program, what was paid out, when it was paid out, what the document ID number is for, our internal FMS system, which is the system that we use to have all of the payment information, accounts payable, accounts receivable, and all of that.

So this is the initial process of it, and this is quite fast because it is internal information that we have. From here, I do take the document ID number, put it into FMS, pulled out the actual physical files that are in the backup, and then we go and create the next page, I think you can see.

THE COURT:  Let me stop.  With this labor-intensive effort, are you able to keep up with the information that LAHSA is giving you or are you constantly falling behind?  Because this is labor-intensive.  In fact, you're using Excel spreadsheets.

MS. ROSAS:  Correct.  There's a lot of manual work from our part and our team.  The biggest obstacle that we're coming across is LAHSA being able to provide us documents in a timely manner.  We actually do have data that's been outstanding for over nine months and they have not provided --

THE COURT:  Let me ask the City, the County, you, the interveners, anybody, the following.  One of the ideas behind

**51**

this was transparency, accountability, and keeping or gaining the public trust.  And so when you send out a request for proposal, the hope for was that if that became a contract, that it was posted on the website so we could see the number of clients that were being serviced, what kind of services they were obtaining, and it gave better data to everyone to make good decisions.

If there's a nine-month delay potentially, that means that the public's not getting information in a timely fashion.  And so therefore, by the time a decision-maker gets the process, the mayor, the council, the board, et cetera, they have a huge time lag in making an effort to make these good decisions.  How is that speeded up between you and LAHSA?  In other words, the only thing that I've been able to think of is the LAHSA might be doing their front-end work with clear guidelines on privacy, et cetera, HIPAA, and giving you that data in that form.  But what else could be done?

**MS. ROSAS:**  So one of the things that Controller Mejia and our team did propose to see if we can do this in the future is that when this information, meaning if you still get the backup right now, this is what is submitted by LAHSA, which is a cash request.  This is the only thing submitted.  They do not submit service provider invoices.  So if we were to get the service provider invoices along with these cash requests, then it would make it easier for us to reconcile and have the

information off in the beginning.  So that is something that Controller Mejia can speak on.

MR. MEJIA:  So the idea is once LAHSA requests payment from the City, we tell them to include this up front with that.  So that way it's all tied together instead of us having to pull from this and then break it out and then send it to them again to send it to us separately, which, you know, could take nine months or so.  So include everything already in the payment request.

THE COURT:  I see.  Thank you.

MS. ROSAS:  So as I mentioned, this is the cash request that is submitted by LAHSA to the City for payment.  It does have information of the subcontractor, the original budget, the year-to-date expenditure, and what is currently being requested for payment, but you'll notice that it does not have information on the actual expenditures being paid out.  So that is why we pulled this and then request the service provider invoices.

This is a list of what our team prepares and sends back to LAHSA.  You'll see that it's a little cleaner and it's already in an Excel manner.  This is all manually done by us, so we'll break down the service provider, the encampment site, the contract number that is listed in the cash request, and the amount.  They then are supposed to provide us with both the contract, the service provider invoice that are tied to these

payments made.

So looking at the service provider invoices, I think Controller Mejia looked through some of them when he was showing you the site.  In addition to that, there are -- when you look through the invoices, there are differences in what is being paid as funding sources.  So we'll have like HHAP 3, 2, 4, and that is all broken down in the PDF file, but it's not necessarily broken down in any other way.

So for us to look -- every time we look at an invoice, we have to check the funding source and make sure that it's tying directly to what is being paid for that particular line item.  And you'll see in the bottom an example of something that LAHSA does provide, which further gives us the city contract number, the cash request number, and any funding source that they may list out.

This is just an example of what a service provider invoice would look like.  These are all PDFs, so our team does have to go in there and extract it.  If we're able to extract easily to Excel format, then it makes it a little bit easier, but most of the time they are not, so it's all manually put into an Excel file.

So our team then reviews all of the information, makes sure that the amounts that are provided by the service provider, GL details tied to the cash request amount, that then ties to the mapping file that LAHSA provides, and only then can

**54**

we put that detailed information into our website, which is -- I put there an example of what it looks like on our website, but that requires a lot of extensive work on our end, and it's all manual.

This is an example of a mapping file that LAHSA provides us. So you'll see it's all Excel based. They provide a list of invoices, a list of the funding sources. You'll see in the bottom one it says Roadmap HHAP3, so our team goes through every single invoice, makes sure it ties for that particular month, and for the total amount that is being requested for that line item, because it is important to note that each line item will include sometimes six, seven, eight months' worth of payments, so we have to look through all of those invoices.

So just a brief overview on the reconciliation process. So for our team, we do have the information that we have to have in order to even begin the reconciliation is the payment made by the City, the cash request file that LAHSA submits, the Excel mapping file that LAHSA is to provide to us. They also should be providing a funding source Excel file for us to further reconcile by the funding source, and the service provider invoices.

Only once we've received all of this information can we begin the reconciliation process, and everything does have to match to one another. And after all of this, this is when

we begin the process of looking through and redacting the invoices, and Ashley can speak to that front.

MS. BENNETT:  Good morning.  My name is Ashley Bennet.  I'm the Director of Homelessness at the Controller's Office.

THE COURT:  Good morning.

MS. BENNETT:  So after all of those previous steps comes one of the most time-consuming things in this process, which is the redaction of invoices, and I think Kenneth showed a brief example earlier, but these files range anything from 60 pages to like 1,500 pages.

THE COURT:  Just a little slower.

MS. BENNETT:  Oh, sorry.  They range from 60 pages to 1,500 pages, all with a lot of sensitive information about staff, about clients.  So we go through and we scrub this data, or scrub this sensitive information from these documents so it can be posted publicly.

And I have been the person that has been working on this, and just because of the time-consuming nature of the entire process thus far, when we were finally able to get to this point, it took a couple of months to get through all of these different invoices to get them ready to post publicly. So that's just one of the things that we wanted to highlight --

THE COURT:  Just a little slower.

MS. BENNETT:  I'm so sorry.  That's something that we

just wanted to highlight is the time consuming nature of this entire process that we have to go through from beginning to end, from the financial piece to the contract piece.  I also handle the contracts piece, and that should be something that is relatively easy on the front end.  When we provide that Excel file to LAHSA to just send us the contracts that match the transactions, and that has been painstakingly difficult.

It took us about five months from the time that we sent those requests to get all the contracts that we needed matched up to those transactions.  So that is pretty much it for my part of the process, but we just wanted to highlight kind of the time-consuming nature of it all.

**THE COURT:**  Just thank you very much.  It's quite a learning process.  It's very much appreciated.

Do you have any questions on behalf of L.A. Alliance or the City or the County concerning this presentation?  So let me turn to L.A. Alliance.

**MS. MITCHELL:**  No, not at this time, Your Honor. Thank you.

**THE COURT:**  On behalf of the City?  Any questions you have?

**UNIDENTIFIED SPEAKER:**  No, Your Honor.

**THE COURT:**  On behalf of the County?

**UNIDENTIFIED SPEAKER:**  No questions, Your Honor.

**THE COURT:**  Has this been a cooperative effort?  I

know that we -- Ms. Myers, I just humbly apologize.  Ms. Myers, do you have questions?

MS. MYERS:  I do have a question, Your Honor.  I would just be interested to know if usage of the website is tracked.  Do you have any metrics about how frequently people are actually accessing this website?

MR. MEJIA:  Yeah, we could pull that data and provide an update, but yeah, we should be able to have tracking on how often people use it.  I just have to ask our tech team.

THE COURT:  Matt Szabo made a commitment on behalf of the City to cooperate.  You made a commitment in my presence to cooperate with the City when there was a little bit of friction.  Are the two of you cooperating?

MR. MEJIA:  Yeah, the CAO LAHD and us, we're good.

THE COURT:  Okay.

MR. MEJIA:  I think it's just -- we're -- it's external.  It's out of the city, you know.

THE COURT:  Okay.  Well, then let me pay a compliment to all of the folks involved.  This is the first website that the Court's aware of that seems to be starting to function on the public's behalf, and for accounting and transparency, you have my compliments.  I worry about the time delay because what it's going to do is continue to subject the City, potentially the County, LAHSA, you to the citizen who says, well, what's the value if it's nine months old?  In other words, always

**58**

subject to criticism in terms of (indisc.) that were paid and never the compliment being paid for making the effort.

So let me start with a compliment for making the effort, it's simple as that.  It would be extraordinarily helpful if you, the City, the County, LAHSA, whomever is able to shorten this process because then the public officials have the benefit of making time, data-driven decisions close in time to receiving this and to be able to respond in a positive way as elected officials.  So on one hand, I hope that you can shorten that time period, but it's not the Court's jurisdiction.  The Courts have been consistent, though, that accountability and transparency have to be at the foremost.  I think you've started down that road.

So do you have any questions?  If not, I'm going to move on.  Could you give a hard copy with this of this?

**MR. MEJIA:**  Of the PowerPoint?

**THE COURT:**  Could you -- yeah, could you -- your PowerPoint.  Just send it to us.  Would that be okay?  Michelle, do you have questions?  Yeah, Michelle may have some questions.

**SPECIAL MASTER MARTINEZ:**  So I had the opportunity to have a zoom meeting with the controller's office and I do believe that we do need some form of resolution and I know it's not within your jurisdiction, Your Honor, but I think I made it very clear to you.  They cannot continue on this path.  It is

overconsuming their office and they only have two people doing this.

THE COURT:  Okay.

SPECIAL MASTER MARTINEZ:  And so they need either LAHSA is going to participate and give them the data that they need.  They're going to redact the information in those contracts or those invoices to help the controller move forward with this process, or if not I just think at this point and I understand your accountability and transparency, they cannot continue.  They cannot sustain this.

So I want to be very clear.  And another point that I wanted to make under the L.A. Alliance and how much money has been spent and that the biggest piece under the L.A. Alliance is the permanent and supportive housing.  And there's not -- there's no data that it's even there.  That's just interim housing.

And so that other big piece you now have to deal with HACLA, you now need to deal with LA Housing Department and, you know, being able to get the different funding streams from Triple H, the different state and federal other funding mechanisms.

So when we're talking about specifically the LA Alliance case, it's imperative because the majority of the beds that have been created under the LA Alliance's 5,680 permanent supportive housing units.  The other interim housing is only

1,760.

So if we really focus on the LA Alliance we're really -- this is a drop in the bucket in to getting the appropriate data that we need of what money's being spent in regards to creating these beds.

**THE COURT:**  Thank you very much.

**SPECIAL MASTER MARTINEZ:**  You're welcome.

**THE COURT:**  I missed that.  I missed the interim versus permanent.  Ms. Myers, questions?

**MS. MYERS:**  I mean, Your Honor, I think it actually hits on even greater points to Michelle's point is that the interim housing that's listed is actually only 143 units at Highland Gardens that accounts for the 6,700,000 units.

And I'm concerned, Your Honor, I will say --

**THE COURT:**  Just a moment, 143 units 6 million?

**MS. MYERS:**  Yeah, that's the interim -- most of the data that is here for the Alliance settlement program goes to the Highland Gardens, which is an interim housing program for 143 units.

My concern, Your Honor, is when you look at the number, 6,700,000 that is a lot of money certainly, but if you don't know the nominator and I think we've been saying this of 143 units, you really don't know anything about what that money is.

**THE COURT:**  I see.

**MS. MYERS:** And, Your Honor, I would just say as we're moving towards a different phase of settlement compliance and the appointment of a monitor, I would say perhaps that the monitoring of the settlement could be wrapped up in the public transparency and take some of the load off of the controller's office with this.

And the reason why I ask, Your Honor, about how often this website is visited, if very few people have access to this website, know it exists, or are going to use it in its current form, but a significant amount of the controller's resources are going to it as opposed to what the democratically elected controller would spend those resources on. Your Honor, I'm concerned about that allocation of resources that it's actually -- it's pulling away from other transparent work of the City, when Your Honor is appointing a monitor whose job is to do this specific work and can put forward the work of transparency that everyone I think, this side of the table certainly fought for in the evidentiary hearing, that transparency.

The monitor could do that work, perhaps far better than the controller is being tasked with doing, with pulling two members of the controller's already small staff away to do this. That -- I didn't speak to them in advance, I'm just advocating on their behalf related to this.

**THE COURT:** But then does that transfer the cost what

the City would be paying to this monitor?  In other words, wouldn't it raise the expense to the City?  It would seem what we're doing because of the overwhelming nature of this to the controller with the present staff we're shifting costs to the data monitor or other monitor and the City should be aware of that.

**MS. MYERS:**  But, Your Honor, the City is already paying for the cost of this because we, taxpayers, pay for the controller's office.  Right.  So the City is already paying for it, we're just paying for it through allocating it to a specific office within the City was never tasked with settlement compliance.

**THE COURT:**  Okay.

**MS. MYERS:**  And, Your Honor, I would say that the citizens of Los Angeles also have a right to know the cost of this litigation and I think that's one of those things that has been -- that has come up a lot in the press, that the public is speaking about.  Your Honor has addressed it.  The cost of this litigation is very, very high.

**THE COURT:**  Uh-huh.

**MS. MYERS:**  But the public doesn't have any transparency about the costs, for example, to the controller's office of this litigation and effectively they're doing settlement monitoring and compliance work right now without the taxpayers being aware at all of that cost.

And I would say just on the duplication point, if the controller's office is doing monitoring work and the City is paying for an outside monitor, it's a duplication of cost that's not increasing transparency and could create conflicts, Your Honor, when if the controller comes up with a different position than for example the monitor does, then the controller's office is working outside of Your Honor's oversight outside of settlement compliance, oversight, that conflict doesn't help the public with its transparency issues. I think it actually undermines the legitimacy of these proceedings.

**MR. UMHOFER:**  Your Honor, can I just add, I do think the monitor's going to be doing this work.  The monitor is going to be doing this work anyway and so I don't know that there will be a duplication of effort.  The monitor has to gather this information anyway to do its job well.

And so I tend to agree that the monitor might have to incur some additional expense to take over the website obligations, but the data that they're collecting is going to be this kind of data and so I don't anticipate there being -- if the monitor takes this over, that that would impose additional significant costs.

**THE COURT:**  The Court has no jurisdiction over this issue.  But it's a tremendous learning process because there is some overlap and related to the appointment of this data

monitor under 7.2.

So let's do this.  We're all aware of this conversation.  How you choose to convey that back to the head of LAHSA or the Mayor or the Council, I leave that to your wisdom or the Board.

But we've heard it and what's nice about this we've heard about it in the room, there's no solution today to it, but Michelle, I want to personally thank you.  I missed the interim nature of that.

So let's do this.  There's a hearing in November. I'm going to invite you again at that time to make the same presentation.  That gives a little bit of time for discussion behind the scenes and see if this can be rectified.  And it also plays into any duplication and hopefully saving some taxpayer money.

Is there any reason why we shouldn't thank the controller?

**MR. MEJIA:**  So we have 312 visitors in the past 30 days.  And then close to 4,000 in the past year.

**THE COURT:**  Oh, that's good.

**MR. MEJIA:**  So we --

**THE COURT:**  That's an admirable start from --

**SPECIAL MASTER MARTINEZ:**  I would say mostly.

**THE COURT:**  -- a curtain to -- yeah.

**MR. MEJIA:**  No, that's not true.

THE COURT: Let the record reflect that --

MR. MEJIA: Unique, unique.

THE COURT: Yeah.

UNIDENTIFIED: You've done a phenomenal job. You've done a phenomenal job. Really you really have.

MR. MEJIA: Thank you. And, Your Honor, I think, you know, to everyone here we don't mind doing this. We just need help. You know, we just need staff because we do this work, right. We want to provide the transparency and accountability because we are independent. And so, you know, we don't mind. It's just -- it just takes a long time and we need more staff and cooperation from the outside.

THE COURT: And the parties need to hear that the Court's complimentary. I've bore down on occasion, but for the City, Mr. Szabo was in an adversarial position with a controller, you've come together on this I think. And I think that's admirable, okay. The question is now how do we get these resources and increase this transparency. And also, not real time, but get as close to real time so folks can make the best decision. And I think it's an excellent start. Let's leave it at that until November.

But I'm going to invite you back in November and make this presentation or another presentation and see what -- how this matriculates up the chain of command to the City, the County, LAHSA and you, okay? Nothing will get resolved today

except I've gained a lot of wisdom.  I think we all have.  Okay.  All right.

Can the Court excuse the controller with our appreciation?

**MS. MITCHELL:**  Your Honor, just briefly.  They keep referring to cooperation from the outside and I just want to be clear that we're talking about LAHSA, am I right, like where they're having -- still having trouble getting data from LAHSA.

**MR. MEJIA:**  Correct.

**MS. MITCHELL:**  Which I again I think this is something that the data monitor hopefully can help address and can work closely with the controller's office.  And I also want to reference the briefing that we submitted earlier this year where we do believe the Court has jurisdiction over LAHSA.

So to the extent these issues are continuing and it does bring in the data monitor, et cetera, I think the Court does have jurisdiction.

**THE COURT:**  Well, I believe that also, pursuant to the original agreement and it was in 2000 and I displayed it the last time.  I can get the exhibit number out of a box, but we'll leave that for the present time.  Okay?

**MS. MITCHELL:**  Thank you, Your Honor.

**THE COURT:**  I want to thank you for being here.  It was an excellent presentation.  I want to thank your staff, I think on behalf of the public it's admirable.

**67**

MR. MEJIA:  Thank you.

THE COURT:  All right.  Now, let me go back for just a moment before I hear from LAHSA for the City, have you had any discussion?  Is there any potential resolution of this?

MR. HAMBURGER:  I think there is.  We've proposed to the Alliance that we would agree to Mr. Galperin with Mr. Gary.

THE COURT:  Okay.

MR. HAMBURGER:  Subject to Council approval.

THE COURT:  Absolutely.

MR. HAMBURGER:  Yes, but with the recommendation that we mentioned before.

THE COURT:  And maybe we can keep the costs down a little bit too.  I think Gary will be willing to negotiate with you.

MR. HAMBURGER:  So we proposed that.  We haven't heard back from them.

THE COURT:  Well, they're about to accept I think, aren't they?

MR. HAMBURGER:  I hope so.

MR. UMHOFER:  Your Honor, we have a preliminary good feeling about that.  We haven't talked to either of these individuals -- these folks and the City has, so we're going to need to talk to them.

THE COURT:  Okay.  Do you want me to get them on the phone?

MR. UMHOFER:  We can do that.

MS. MITCHELL:  That'd be great.

THE COURT:  I've got them right here.  In fact, I've got half the City right here.  Who do you want on the phone, the Mayor, the Council, Gary, who do you want?

MS. MITCHELL:  So, Your Honor --

THE COURT:  I've got all the numbers.

MS. MITCHELL:  Specifically I think we need to talk to Ron Galperin and Daniel Gary, that's who we need to speak to.  Call Ron Galperin, mobile.

THE COURT:  And you'll have that conversation private.  I just want to get ahold of him, make sure he's around, then talk to Daniel Gary.

MR. GALPERIN:  You must be mind reading because --

THE COURT:  No, hold on.  Ron, before you say anything, you're being recorded.  You know, I'm on a speakerphone and everybody is applauding, just kidding you.

Hey, listen, I want them to talk to you privately. They may have come to an agreement concerning you being one of the primaries along with Daniel Gary.  I haven't had the two of you talk, I've kept that separately, but could you go have a separate conversation with them by phone out of my presence in just a moment?

MR. GALPERIN:  Yeah, I got a phone message this morning, which I didn't have a chance to call back on, but my

intent was to do so today.

THE COURT:  Well, I hadn't called you, so one of the parties must have.  I've been --

MR. GALPERIN:  It was one of the parties.

THE COURT:  Okay.  Yeah, they're going to call you in just a couple of minutes.  Do you have his mobile?  I don't want to say that on the record.  Do you have his number?

MS. MITCHELL:  I have a phone number.  I can talk to the --

THE COURT:  Ron, could you call somebody from the City or somebody from LA Alliance and just whoever.  You folks can set up that conversation with Ron, right?

MS. MITCHELL:  If -- Your Honor, if the Court is amenable to sharing his cell phone number --

THE COURT:  Nope, I'm not.  Not without his permission.

MR. GALPERIN:  I'm hearing in the background, I didn't hear the voice in the background.

THE COURT:  Well, that's --

MR. GALPERIN:  I can tell you that the call that I got was from Elizabeth Mitchell.

MS. MITCHELL:  Okay.  Then I do have his number and we connect separately.

MR. GALPERIN:  So that's who I'm supposed to call back.

THE COURT:  Yeah, they're going to call you back. Let both sides have some leeway, under 7.2 if they agree, then I agree, it's as simple as that.  Okay.  So they're going to call you in just a moment.  Okay?  Bye-bye.

MR. GALPERIN:  All right.  Thank you.

THE COURT:  Call Daniel Gary, mobile.  I'm going to short circuit, you know, going back to our office, because that way you can take it back to the City, getting an idea of what they're charging, et cetera.

MR. GARY:  Hey, Judge.

THE COURT:  Hold on.  Listen, you're in court on the record for a moment.  The City and the LA Alliance is here and they're prepared to accept you with the caveat, obviously both parties need to talk to you and I want that to be outside of my presence.

So I'm going to give the number to both parties, just so that they can reach you in about ten minutes to a half an hour.  Would that be acceptable?

MR. GARY:  Of course, Your Honor.

THE COURT:  Okay.  And you're out of the country still?

MR. GARY:  I'm still out of the country.

THE COURT:  Okay.  I don't want to know the location, okay.  Okay.  Well, listen, I'll get that to them, and then I'll reconvene after they've talked to you, and if there's an

agreement then we'll go forward.  Okay?

Okay.  Listen, I'm going to hang up now.  They'll be with you in 30 minutes.  Okay.

Why don't you both come up just informally.  Let me write this down and then destroy it, because -- we'll go off the record, I'm just giving counsel a phone number right now.

**(Pause)**

**THE COURT:**  Why don't we turn to counsel to make those phone calls, but I want to invite LAHSA up for just a moment and thank you for your courtesy in terms of being here.

By the way, I'd love to meet your director some time, your new director.

**MR. PARKER:**  Yes.

**THE COURT:**  Not a requirement, just a request, okay.  And it's nice to see you.

**(Pause)**

**MR. PARKER:**  Good morning, Your Honor, Chandler Parker on behalf of LAHSA.  I am here also with Alejandro Palma --

**THE COURT:**  Pleasure, thank you, gentlemen.  Appreciate it.

**MR. PARKER:**  He's the director of grant management and compliance, so.

**THE COURT:**  Okay.  Come up.

**MR. PARKER:**  And so we're here to answer any

questions the Court --

THE COURT: Now, you sent me an e-mail last night. I'm not certain -- it came into my chambers, I'm not certain if counsel were privy, so why don't you just read this documentation into the record and what you stated to the Court because I'm not sure when it came in last evening, if you were on that e-mail chain. I just can't remember. Did the City receive anything from LAHSA?

MR. HAMBURGER: We have a copy of it.

THE COURT: Okay. Did LA Alliance?

MS. MITCHELL: Yes, Your Honor.

THE COURT: Shayla, did you get anything?

SPECIAL MASTER MARTINEZ: No, Your Honor.

THE COURT: Well then we're going to -- County, did you get anything?

MS. BRODY: We did receive some -- an update on the LAHSA recoupment --

THE COURT: Right.

MS. BRODY: -- efforts yesterday evening if that's what you --

THE COURT: Okay. Well, let's just make sure. Why don't you make a record of this, okay.

MR. PARKER: Okay. Yes, we submitted --

THE COURT: It started with 50.8 then we collected about 13, then we collected 200,000 a little over, then we

**73**

collected 2.7.  So we have roughly $35 million out there.

MR. PARKER:  That's correct.  And we submitted an update, this is based on data as of September 2nd, 2025.  We --

MR. PALMA:  If I can --

MR. PARKER:  Yeah, go ahead.

MR. PALMA:  Your Honor, I'm going to try to give an overview.  The update we provided was an updated recoupment effort from the May submission.

THE COURT:  Right.

MR. PALMA:  So just to -- right, okay.  So we have a list of 34 service providers.  I'm not going to go into the list unless Your Honor requests us too, but just to give an overview.  Of the 34, we can confirm that 30 of these 34 have made a good faith effort.  They have recouped some amount of the outstanding balance.

So as Your Honor will recall, we do have 50.8 million roughly of Measure H working capital that was issued originally to 34 service providers.  In our last report we had presented a balance of 35.8 million.  The current balance we're presenting is 33.7 million.  This represents a recoupment effort of 2,000 -- a little over $2 million.

Now, this is the amount recouped from the May report that we issued to the Court.

THE COURT:  And that's in addition to the 13 approximately --

**74**

MR. PALMA:  Exactly.

THE COURT:  -- then the 200,000 between June and April --

MR. PALMA:  Right.

THE COURT:  -- I believe and then another 2 million.

MR. PALMA:  Exactly.

THE COURT:  About 2.4.

MR. PALMA:  Exactly.  And perhaps just to have -- if there are specific questions on service providers we would be happy to answer them, just to give perhaps a slight overview of the 34.  We do have 15 service providers that actually recouped in this period between May and September.  So service providers, 15 service providers actually sent in check or through electronic transfer.

12 service providers that had previously sent in an amount, again via check or electronic transfer didn't do so this time, we do note however, that the last reporting to the Court was in May, which represents the end of the fiscal year. Some of these service providers, the staff is impacted, they're smaller and it's the start of the fiscal year.

And LAHSA's currently contracting, in the process of contracting out.  I'm not trying to justify that 12 service providers didn't --

THE COURT:  No, that's fine.

MR. PALMA:  -- but it does make sense in terms of the

EXCEPTIONAL REPORTING SERVICES, INC

period.

There are four service providers that we are working that haven't initiated yet their recoupment. I would note that of the 34 we do have agreement letters of repayment for 33 of them. The 34, there is one service provider that requested more time because for two reasons, one they were undergoing an audit and two they wanted to understand exactly the amounts, because these Measure H working capital amounts were issued years and years ago, 2018, 2019.

So they actually basically wanted to make sure that everything aligns with their records. And we expect that letter to be signed with the service provider, which would be the last one by the end of this month.

THE COURT: Thank you. Let me get something out of this box behind me for just a moment. Okay?

(Pause)

THE COURT: First of all, let me start by thanking you for being here, okay.

Do you have any questions on behalf of LA Alliance?

MR. UMHOFER: Not at this time, Your Honor.

THE COURT: On behalf of the City?

MR. HAMBURGER: No, Your Honor.

THE COURT: On behalf of the County?

MS. HASHMALL: No questions, Your Honor.

THE COURT: Shayla?

**MS. MYERS:**  No questions, Your Honor.

**THE COURT:**  All right.

Are these actual cash return or are they in kind services they are counting?

**MR. PALMA:**  I won't -- don't want to misspeak, but some I can confirm that some of these are actually electronic transfer and some of them are check.  I would have to note if some of them are recoupments on active contracts.  I could have -- we could have a response to that question --

**THE COURT:**  Wait till November.  I'm going to ask that in November.

**MR. PALMA:**  Yeah, that's good to --

**THE COURT:**  What is actually being returned and what are in kind payments or in kind, in like.

**MR. PALMA:**  Your Honor, if I may, just to confirm in cases where the service provider says I can't, I opt to not send in a cash payment either electronically or a check, some of them do opt for the check, if they have an active contract and they submit invoices and those are appropriately, there is the last recourse of basically just saying, okay, well you're not going to receive cash payment from these invoices, because you have an outstanding Measure H working capital balance.  So those would be the last effort.

If that happens, it wouldn't be that we're actually in service payments, we're basically just saying, LAHSA would

have reimbursed you X amount of dollars, but because you have an outstanding Measure H working capital, because you're not, for whatever reason and it's confirmed then we would say we're not going to reimburse you.

THE COURT:  Well, I'll leave that to you.  Once again the Court became concerned, because it didn't expect providers to ask these questions, because they're providers.  I didn't know if the City was going to ask these questions.  LAHSA certainly wasn't going to ask these questions, that's in good faith I understand.  And so it was left to ask these questions.

MR. PALMA:  Absolutely.

THE COURT:  And what attracted the Court was about the same time the Los Angeles Times was involved.  The Court had also discovered the $50.8 million, I think the Times was actually ahead of the Court in that regard.  And what was of concern at that time, which you gentlemen can't respond to, was the fact that this money was provided with no contract and no milestones.

Since then you represent that you have contracts now in place.  And the concern was overall, however you measure this money from Triple H to whatever funding source, it all goes towards homelessness.

And so it was the County's report that is in the opinion that I wrote, that really summarized a lot of these concerns.  And that report was on November 19th of 2024 and the

first finding was, that of the 82.5 million in Measure H working capital advances, in which LAHSA awarded $50.8 million to various subrecipients beginning in 2017 to 2018 to address the cash flow needs, the subrecipients were allowed to retain these advances across multiple fiscal years and were not required to pay the funds annually.

The County then went on in that report to state, however, LAHSA did not establish formal agreements with subrecipients to determine how and when the working capital advances would be repaid.

So the first question was, you know, was this simply going to go by the wayside for a period of time because there are no milestones, there's no accountability.  And forgiven and forgotten, you know, ten years after this was provided to these providers.  The recoupment at that time was only $2.5 million. So you've substantially increased that recoupment.

The second finding was that LAHSA specifically approved $15 million in outstanding cash advances, that money by and large had not been returned.

Third was that LAHSA was unable to produce accurate lists of all their contracts with EGMS, specifically while LAHSA indicated they had 1,273 active contracts as of May 2024, then you ran five different contract listings through EGMS and identified various contract totals ranging from 676 to 1,078.

At that time, you know, the Court expressed, I was

concern on the public that we even knew the number of contracts out there.  The finding by the County was that LAHSA was not tracking key data in EGMS or maintaining and then they were maintaining inaccurate data, all of the things that A&M was saying and HUD was saying was a whole history of saying the same thing starting in 2007.

And that's why A&M's report wasn't shocking to the Court.  Because almost every entity was saying the same thing, in fact, sometimes I wondered why we even had a performance evaluation of A&M because all this road marker saying exactly the same thing from the Blue Ribbon Commission to the County, to the Assessor, Controller.

What was of concern was in that finding in number 3, that all the contracts EGMS reports do not capture the dates.  Now, you remember when I first became involved, I won't name the entity, but I saw one contract in 2022 where the provider just wrote, one line, $248,000, gave no dates and no information.

And every time Michelle and I touched or just delved into this initially we became very concerned about what happened to that 600 million in 2018, 2019 unaccounted for.  Now, that doesn't mean fraud.  It doesn't mean services weren't provided, it's just -- of the six contracts, 75 percent the EGMS did not match the dates on the actual contract.  That's the finding by the County in number 3.

**80**

Four, the eight contracts, and remember they only monitored eight contracts, the term dates start -- dates actual contracts were adequately inaccurate.  Now, no criticism of you, okay, I know you're trying to make advances.

So the assessment by the County in their report was mirrored by A&M and HUD and the Blue Ribbon Committee headed by Miguel Santano (phonetic), yeah, all consistent before we ever got to the A&M report.  So the A&M report wasn't shocking.

And the statement is, do not have reliable and accurate information about fundamentally contracting merits, such as the quantity, timeliness in terms of their active contracts.  And so you've heard a discussion today about what the Court needs from the data monitor.

Number four was the inadequate controls over cash advances, LAHSA did not have other basic controls in place to ensure cash advances were appropriate properly accounted for and safeguarded.  As of September 6th, 2024 the County had already provided LAHSA with $115,658,400 in Measure H advances.

And number five, caused concern on everybody's part.  Number five was the inappropriate use of funds.  As a pass through government agency LAHSA submits reimbursement claims to its funders and must typically wait to be reimbursed before remitting payments to their subrecipients, unless other resources, such as cash advances are made available by the funders.

However, we noted instances where LAHSA paid the subrecipients prior to receiving reimbursement from funders, who did not provide cash advancements to make these payments, LAHSA used funds received from other government funders.

And the impact noted under number 5 was using funds received from one government funder to pay for services provided under another government funder's contract/grant constitutes the misuse of those funds. And it increases the risk that funder payments are not available for the purposes they were claimed to be received.

Now, I won't go on. There's other. I understand now that you have contracts in place; is that correct?

MR. PALMA: Yes, sir. Yes, Your Honor.

THE COURT: Okay. And will have a payment schedule that you believe will be met by I think 2027?

MR. PALMA: Yes, Your Honor.

THE COURT: And so therefore I think the public's entitled to know whether in-kind services versus cash reimbursement, everybody wants the providers to continue to provide so.

And under number seven, I'll finish this with the -- also the subrecipients, 36 recipients received this 34.6 million of the 50.8. But of the few entities that were monitored, the -- there was an understated amount of working capital advances to two subrecipients of $505,591 and did not

provide advanced request approval and disbursement documents to eight of the subrecipients of another 5 million.  And the impact is the increased use -- risk of misuse and/or misappropriation of funds if accounting records do not reflect actual amounts disbursed.  And working capital advances may hinder LAHSA's ability to accurately, effectively recover all the funds and fully repay the County.

I know there are different strengths.  I know, you know, Measure A obviously is coming on board, H, HHH, et cetera, but all this money goes into something called homelessness and trying to advance the wellbeing of the citizens including the homeless.

Let's leave this on the table.  I want to thank you for being present.  I'd love to meet your director at some time.  That can be informally or formally, it doesn't have to be here in court, but there's permission for that, okay?

**MR. PALMA:**  Thank you.

**THE COURT:**  And you can present if you want to.  All right.  Gentlemen, thank you very much for being here.

**MR. PARKER:**  Thank you, Your Honor.

**THE COURT:**  Let's leave this for November.  I'm going to request your presence once again.

Okay.  Counsel, I've finished the items that I wanted to talk to you about.  Do you have any new business to raise, otherwise I'll remain in session until you've talked to both

Ron and Daniel.

MR. UMHOFER:  Your Honor, I think Ms. Mitchell is out making those phone calls.

THE COURT:  Yeah, I'm just going to reconvene.  We'll just wait and I'll go through the lunch hour if needed to, so.

MR. UMHOFER:  That's fine with Alliance, Your Honor.

THE COURT:  Okay.

MR. SCHOLNICK:  Nothing else from us.

THE COURT:  I'll just be in the back room.  So I'd like to give you the afternoon free if we reach an agreement. I don't need lunch.  Do you need lunch?

So if we can, you know, if we can reach an agreement, let's free you up and get you back to your offices, okay?  Now, let me turn to the City.  Anything you'd like to state till we come back on the record?

MR. HAMBURGER:  No, nothing, Your Honor.  We'll make any calls that we need to make.

THE COURT:  Right.

MR. HAMBURGER:  We think we can get this done promptly.

THE COURT:  Okay.  And, Mira, how about you?

MS. HASHMALL:  Nothing to add, Your Honor.

THE COURT:  Shayla?

MS. MYERS:  Nothing to add, Your Honor.

THE COURT:  And I'm at your disposal.  I'm just in

the back, okay.

(Recessed at 11:05 a.m.; reconvened at 11:52 a.m.)

THE COURT:  Counsel, are you comfortable going back on the record?

MR. HAMBURGER:  Yes, Your Honor.

THE COURT:  If we need to, can we go into the lunch hour to give you the afternoon back?

MR. HAMBURGER:  Yes, Your Honor.

THE COURT:  I don't know how long this will take.

Now, we're back on the record in the LA Alliance for Human Rights versus the City of Los Angeles.  And, counsel, you have made your appearances, I'll turn the lectern over to each of the parties.

MS. MITCHELL:  Thank you, Your Honor.  I was able to speak with both Ron Galperin and Daniel Gary during the break. And we are from the Alliance perspective very comfortable with them.  I understand Daniel Gary has a good staff that can assist him with the technical and the data issues and I spoke to Mr. Galperin about kind of a partnership, and how I think that having somebody that's familiar with the issues in LA, the infrastructure, the homelessness response system, the budgets, all of that is important and how that can inform the data issues and vice versa.

So from the Alliance perspective, we're very comfortable with both of them.

**THE COURT:**  Okay.  Let me turn to the City.  Counsel?

**MR. HAMBURGER:**  Yeah, we're in agreement.  No objection.  We spoke with Mr. Gary and we've spoken with Mr. Galperin before.

**THE COURT:**  Well, I don't think that the County has --

**MS. HASHMALL:**  We have no position on this, Your Honor.

**THE COURT:**  Shayla?

**MS. MYERS:**  We were not involved in any of the conversations, so I don't have any further opinion.

**THE COURT:**  Okay.  All right.  Then I'm going to accept this and thank the parties for this good faith negotiation.  I want that on the record.  I think we can move forward and hopefully save a little bit of money as well.  Okay?

**MR. HAMBURGER:**  And, Your Honor, just for the record I want to make clear again, it has to be subject to Council approval, from the City's perspective, but again what we've said before.

**THE COURT:**  And I'm hoping that the Council approves, because I don't know anymore cost effective way to get there.  All these other entities from McKinsey on down are going to charge much more, but I'll leave that to the Council.  That's up to them.

**MR. HAMBURGER:** I just needed to state it for the record.

**THE COURT:** Well, do you have any time frame, because it takes a while to get on the Council record and I'm going to have the November hearing, and if we've reached this agreement, I don't want this to come up again in November.

**MS. MARIANI:** Understood, Your Honor. And as I represented before, our office will certainly work to prioritize getting this on the agenda.

**THE COURT:** Okay. Let's just leave that in good faith. Thank you very much.

**MS. MARIANI:** Thank you.

**THE COURT:** I just have one last thing. We had a Special Master's payment on the agenda for today. And going forward, I want to ensure the Special Masters and all the reported parties are paid on time. Okay?

**MR. HAMBURGER:** Yes, Your Honor.

**THE COURT:** Good afternoon. Thank you very much for your courtesy today.

**(Proceedings concluded at 11:54 a.m.)**

**\* \* \* \* \***

87

## CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                September 17, 2025

              Signed                                Dated


*TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**