UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 221
Los Angeles, California 90017
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
matthew@umklaw.com
elizabeth@umklaw.com

*Attorneys for Plaintiffs*

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
   tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
   mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
   kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
   bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
   akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
   pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

[*Additional Counsel on Following Page*]

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, a Municipal entity, et al., <br><br> Defendant. | CASE NO. 2:20-cv-02291 DOC (KES) <br><br> Honorable David O. Carter, United States District Judge <br><br> **JOINT REQUEST TO COURT RE THIRD-PARTY MONITOR AND SCOPE OF WORK** <br><br> Action Filed:     March 10, 2020 |

JOINT REQUEST TO COURT RE THIRD-PARTY MONITOR AND SCOPE OF WORK

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978-7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

Plaintiffs LA Alliance for Human Rights et al. (the "Alliance") and the City of Los Angeles submit this Joint Report to update the Court regarding the status of the City Council's approval of the third-party Monitor contemplated by Section 7.2 of the Settlement Agreement and the Court's June 2025 Order, and to request the Court's review and resolution of the issue pursuant to Section 24 of the Settlement Agreement. The City's proposal for the scope of work is attached as **Exhibit A**, and the Alliance's proposal is attached as **Exhibit B**.

The parties set forth their respective positions below on the selection of the Monitor and the scope of work.

## I.    <u>SELECTION OF THE MONITOR</u>

### a.  THE CITY'S POSITION

As noted in the Parties' prior Joint Report, the City Council was scheduled to vote on two proposed Monitors, Ron Galperin and Daniel Garrie, at its October 7, 2025 meeting.  Dkt. 1041.  There was a discussion about this issue during the City Council's closed session on October 7.

The City is no longer amenable to having Mr. Garrie serve as a Monitor, given his unduly expansive and overly broad proposed scope of work, his unnecessarily large and expensive proposed team, and his refusal to provide a budget—all especially important considerations given limited resources and the ongoing fiscal emergency that the City is facing.  The City is amenable to considering instead having former City Controller Galperin and current City Controller Kenneth Mejia serve as the Monitors, subject to City Council approval.

Following the closed session on October 7, the City Council did not take final action or vote on the two proposed Monitors; it referred the matter to the Housing and Homelessness Committee.  Voting on a proposed Monitor must await resolution of the Parties' impasse over the scope of the Monitor's duties (discussed below), enabling the City to assess and budget for the additional expense of complying with the Settlement Agreement.

JOINT UPDATE TO COURT REGARDING THIRD-PARTY MONITOR AND REQUEST FOR COURT TO DETERMINE SCOPE OF WORK FOR THIRD-PARTY MONITOR

On October 8, the City conveyed a proposal to the Alliance of having Controller Mejia and Mr. Galperin serve as the Monitor, subject to City Council approval. The Alliance, however, has refused to agree to Controller Mejia and Mr. Galperin serving as Monitors together, even though the Alliance has not objected to either Controller Mejia or Mr. Galperin separately. Indeed, the Alliance previously agreed that Mr. Galperin would be a suitable Monitor *without any co-Monitor*, and it expressed no concerns about Mr. Galperin's ability to do the job, *see* Dkt. 1033. Now, the Alliance has proposed that Controller Mejia and Mr. Garrie serve as the Monitors. The City is not amenable to this proposal, particularly given the concerns with Mr. Garrie stated above. Because the City is in a declared Fiscal Emergency and is responsible for paying the Monitor, the City's closely related concerns about scope and cost should be given due consideration. And the City disagrees with the Alliance's unfounded suggestion that either former Controller Galperin or Controller Mejia lack the sufficient technical skill to serve as a Monitor.

The Alliance has suggested that the Court should nonetheless force the City to agree to have Controller Mejia and Mr. Garrie serve as the Monitor—or even to have Mr. Garrie serve as the sole Monitor. That position is contrary to the Settlement Agreement, in which the parties agreed to "engage a *mutually agreed-upon* third party to provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of this Agreement." Dkt. 429-1 at 9 (emphasis added). Moreover, the Court already recognized at the September 16 hearing that it "can't unilaterally impose [its] will or [its] choice on each of you." Dkt. 1034 at 10; *see also id.* at 15 ("I can't impose my ruling on you"); *id.* at 40 ("And remember, under 7.2, as long as you're talking, I don't think the Court has any authority, in other words, to impose anything on either party, L.A. Alliance or the City."); *id.* at 41 ("[T]he Court has no jurisdiction nor ability to impose unilaterally anything on you."). That conclusion makes sense not only in light of the plain language of Section 7.2, but also because the

Gibson, Dunn & Crutcher LLP

2

JOINT REQUEST TO COURT RE THIRD-PARTY MONITOR AND SCOPE OF WORK

City will be required to pay the fees of the Monitors. There is no basis to force the City to pay for Monitors that the City Council have not approved.

Finally, the Alliance is wrong to assert that the City "is now in violation of a court order." This Court's June 24 Order directed that "the Parties shall meet and confer on a third-party Monitor by August 22, 2025, and, subject to the Court's approval, select the Monitor by September 12, 2025." Dkt. 991 at 50. The City did both of those things—it met and conferred with the Alliance well before August 22, and on September 12, it identified a Monitor that the City and the Alliance had both found acceptable (Mr. Galperin), subject to City Council approval (Dkt. 1033). But at the hearing on September 16, this Court stated that it was not prepared to approve Mr. Galperin to serve as the Monitor on his own; this Court proposed a brand-new candidate—Mr. Garrie—and the City agreed to take the Court's co-Monitor proposal to the City Council. The City has since done so, as explained above. In other words, the City exactly did what this Court ordered it to do. There is no Court order stating that the City would be in breach of some obligation if the Monitor is not approved in time to weigh in on the October 2025 quarterly report.

### b. THE ALLIANCE'S POSITION

The City agreed to Messrs. Garrie and Galperin as joint monitors on September 16—nearly one month ago. The City has since dragged its feet in submitting the issue to City Council and has now continued the vote twice before sending the issue to committee—essentially a refusal to vote. Whether intentional or coincidental, the City will not have a third party data monitor in place to review its pending quarterly report as required by the Court's June order. Dkt 991. The City is now in violation of a court order *again* and appears set on timing out the remainder of the settlement period while doing as little as possible to move its obligations forward.

The Alliance proposes that Mr. Daniel Garrie, Esq. be appointed as monitor with Ron Galperin in a supporting role to navigate the difficult systems within the City, as agreed on September 16. However, if the City is concerned about budgetary issues—

Gibson, Dunn & Crutcher LLP

3

JOINT REQUEST TO COURT RE THIRD-PARTY MONITOR AND SCOPE OF WORK

surprising given its publicly disclosed $6 million spend on outside counsel in this case—the Alliance would also accept appointment of Mr. Daniel Garrie, Esq as the sole monitor with the City Controller Kenneth Mejia as the designated point of contact within the City.

The lengthy assessment produced earlier this year by A&M (Dkt 905), which was stipulated to and paid for by the City as a sanction for its prior breaches and bad faith, clearly laid out how broken the City and LAHSA's data infrastructure system is, including an inability to trace billions of dollars, a siloed and confusing referral process so that an unknown number of beds go empty every night, no verification of services rendered by providers, no contract accountability or verification, inability to detect fraudulent charges, disparate data systems, and massively unequal provision of services. Dkt 905 at 4-7; *see also* Dkt 899 13-17. Special Master Michele Martinez also noted "discrepancies . . . between reported units and actual availability" (Dkt 904 at p. 16), failure by the City to "provide a clear methodology for compiling and reconciling reported figures," (*id.* at p. 21) "data inconsistencies," (*id.*) and "missing inventory." (*Id.*) The evidentiary hearing held in May and June of this year compounded those findings, with the former LAHSA deputy chief information officer and data officer testifying that the "data infrastructure [of LAHSA] was never really built to match the level of funding that was being received" and that the data infrastructure system was like a seeing a "brand new house, []open[ing] the door and there's no foundation." Dkt 947 at 107. Diane Rafferty, managing director at A&M and one of the authors of the assessment, likewise testified that the "processes are extremely broken" and used the analogy of an older home with plumbing that is so bad that "eventually you have to say, I think we need to have new plumbing in the house." Dkt 949 at 134.

It is undisputed that the data and technology infrastructure supporting the City and LAHSA's homelessness response system is not functional. The Court recognized this in its order granting Plaintiff's motion for settlement compliance, noting "the City

Gibson, Dunn & Crutcher LLP

4

JOINT REQUEST TO COURT RE THIRD-PARTY MONITOR AND SCOPE OF WORK

has been on notice for years that its data collection and reporting is woefully insufficient but continues to ignore its responsibility to report accurate numbers to the Court." Dkt 991 at 49. As such, the data Monitor appointed by the Court must have significant expertise in identifying and resolving data and technology infrastructure crises. To the extent an accurate reporting network does not exist, the Monitor must be in a position to address and resolve the deficiencies in order to do the job.  Daniel Garrie—a well-known and very well-respected forensic data and technology expert—is positioned to do exactly that. And he is a neutral third party, having no current or historical relationship with any of the parties, and has previously worked with the Court in similar circumstances.

The City voices three concerns regarding Mr. Garrie: 1) his "unduly expansive and overly broad proposed scope of work," 2) his "unnecessarily large and expensive proposed team," and 3) his "refusal to provide a budget."  These are strawman arguments. Mr. Garrie's proposed scope of work was based on his initial thoughts after reading the Court order and Assessment; the actual scope of work is still to be determined by the Court as described further *infra*. The City's desire to limit the Monitor's scope is not coterminous with the identity of the Monitor. Likewise, Mr. Garrie's proposed team is not only appropriate for the job, it also no more expansive or expensive than a combination of Messrs. Mejia and Galperin. Finally, any refusal to provide a budget was based on the outstanding scope of work—it is impossible to estimate a job when one does not yet know what that job would entail.

The City's proposal—former Controller Ron Galperin paired with current Controller Kenneth Mejia—makes no sense.  Not only would the co-appointment be duplicative of the relevant expertise, the City would still have to pay for Mr. Galperin to add a team or contract with data and technology experts *and* would need to pay for additional positions within Mr. Mejia's office which is chronically underfunded. Moreover, while the Alliance respects both Mr. Galperin and Mr. Mejia, neither are true neutral third parties: Mr. Galperin is the former controller of the City of Los

Gibson, Dunn &
Crutcher LLP

5

JOINT REQUEST TO COURT RE THIRD-PARTY MONITOR AND SCOPE OF WORK

Angeles with significant friends and contacts still within the City, and Mr. Mejia is an elected official of the City who cannot legally be appointed by the Court as a third party monitor.  The Alliance previously agreed to Mr. Galperin—but only on the condition that he be permitted to partner with or hire a team with the appropriate technical capabilities.

The City submits this joint report, acknowledging that the parties are at an impasse and asking for court resolution yet at the same time suggests that the Court does not have the ability to appoint a monitor if the parties do not agree. *Supra* p. 2. The City's position is wrong on its face. Section 24 of the Settlement Agreement explicitly provides: "In the event that the Parties are unable to resolve the dispute within a reasonable time after the [meet and confer], Plaintiffs or the City may, pursuant to the Order, submit the matter to the Court for review and decision." The parties are plainly at an impasse and the issue is properly before the Court to decide. Any suggestion that, because the City is paying for the work means the Court cannot decide the issue, is absurd; Section 7.2 mandates that the City pay for the third-party data monitor and the Court now has the authority to make the decision as to who that monitor will be.

## II.    SCOPE OF WORK

### a.  THE CITY'S POSITION ON SCOPE OF WORK

The Parties are at an impasse over the scope of work for the Monitor, and the City submits that resolution of that dispute is a necessary predicate to the City Council rendering an informed decision on who will serve as the Monitor, particularly given that the expense of the Monitor is directly tied to the scope of work.

Section 7.2 of the Settlement Agreement and the Court's June 2025 Order provide the authority for the Monitor and define the appropriate scope of the Monitor's duties. Through the Settlement Agreement, the Parties agreed to "engage a mutually agreed-upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of this Agreement."  Dkt. 429-1 at 9.

Gibson, Dunn &
Crutcher LLP

JOINT REQUEST TO COURT RE THIRD-PARTY MONITOR AND SCOPE OF WORK

The role of the Monitor was further defined in the Court's June 2025 Order, which provided that the Monitor:

- Will be responsible for reviewing the City's data prior to publication of its quarterly reports, verifying the numbers reported, engaging with the Parties and LAHSA to resolve data issues, and providing public reports on data compliance.

- Shall have full access to the data that the City uses to create its reports to the Court.

- Shall review and provide guidance on public accessibility to relevant service provider contracts and invoices, particularly those tied to beds reported under the Settlement Agreement.

- Will be responsible for reviewing whether offers of shelter or housing were made to those whose belongings are counted as encampment reductions

Dkt. 991 at 50, 54. Taken together, the Settlement Agreement and June 2025 Order set out a clear role for the Monitor to provide oversight and verification of the City's compliance with the Settlement Agreement.

The City has proposed a scope of work (attached as Exhibit A) that tracks the Settlement Agreement and the Court's June 2025 Order, and would allow the Monitor to perform the oversight functions the Parties and the Court envisioned. In addition to authorizing the Monitor to perform the required functions, the City's proposed scope of work also ensures that the Monitor will have access to all information in the City's possession, custody, or control to carry out the required functions. Specifically, the Monitor would have access to "any relevant raw data that is sourced in any City department and to which the City has access." Ex. A at 3. The City's proposal also permits the Monitor to perform necessary field work and to observe CARE+ operations. *Id.* at 4.

By contrast, the scope of work proposed by the Alliance—which incorporates much of Mr. Garrie's expansive proposed scope of work, *see* Dkt. 1042 at 7–8—is an improper attempt to expand the role of the Monitor beyond what the parties agreed to or

Gibson, Dunn & Crutcher LLP

7

what the Court has ordered.  For example, the Alliance has proposed that the Monitor will not have just a forward-looking role, but will also "verify all bed and unit figures which have been historically reported."  Ex. B at 8.  Not only is that task not set out in either the Settlement Agreement or the Court's June 2025 Order, but it essentially calls on the Monitor to unnecessarily duplicate the work that was already performed by A&M at great expense to the City and the work that has been performed by Special Master Martinez, also at the City's expense.

The Alliance also proposes that the Monitor will "provide fiduciary oversight of accounting and expenditures"—even though that role was not contemplated by the Settlement Agreement or the Court's order, and it is entirely unclear what this "fiduciary oversight" would entail.  The Alliance has not identified where this additional responsibility comes from or what it would entail, and there is no basis to expand the role of the Monitor beyond what the Parties agreed or the Court Ordered, so the Court should decline to do so.  Likewise, the Alliance has proposed that the Monitor will resolve "infrastructure issues."  *Id.* at 6.  But the Alliance does not specify what it means by "infrastructure issues," how the Monitor would resolve those issues, what authority the Monitor has to do so, or why any of this is necessary in light of the work of A&M and the work of Special Master Martinez.

The Alliance's attempt to inject new duties for the Monitor beyond those the Parties agreed to and the Court has ordered appears to be a backdoor attempt to obtain the inappropriate receivership that this Court has already rejected.  Moreover, the Alliance's improper injection of additional, poorly defined duties into the Monitor's role will not only drive up the costs of this effort at a critical time for the City's finances, but it will ensure yet another round of litigation over the meaning of these new terms and tasks, likely including another fee request from the Alliance.  The Court should reject this effort for the reasons acknowledged in this Court's June 2025 Order and adopt the scope of work proposed by the City attached as Exhibit A.

Gibson, Dunn &
Crutcher LLP

JOINT REQUEST TO COURT RE THIRD-PARTY MONITOR AND SCOPE OF WORK

## b. THE ALLIANCE'S POSITION ON SCOPE OF WORK

The City's proposed scope of work is so limited it would effectively prevent the Monitor from doing its job. As noted above, the Monitor has the unenviable task of working with a broken data infrastructure system and may be required to address those faults in order to complete the requisite "collection, analysis, comments, and . . . report[ing]" as required by Section 7.2 of the Settlement Agreement. Moreover, the data Monitor should have been in place since the City first started reporting its compliance metrics in 2022; therefore the Monitor must have the ability to retroactively access reports and confirm the veracity thereof. It is uncontested that neither Special Master Martinez nor the 10-person team at A&M have been able to do so thus far, and to validate the reported metrics to date, third party verification of those metrics must be done. The Monitor would have no ability to evaluate the veracity of ongoing, cumulative reporting without first accessing and verifying historical reporting.

In drafting the Alliance's proposed Scope of Work, attached as Exhibit B, the Alliance used the City's proposed template, eliminated the restrictive barriers (preventing direct access to data, declining any role in verification data received from LAHSA, explicitly limiting the field work to *only 10 hours per month* when a single day's visit takes that much time, and failing to provide any details about how the monitor may verify offers prior to encampment reduction), and incorporated Mr. Garrie's suggestions about how he could best effectuate the goals of the Court's Order.

Contrary to the City's representation *supra*, the Court did not limit the Monitor duties as articulated; rather the Court noted in its order that, "subject to the Parties' input, the Monitor will *at least be* responsible for [delineated items.]" Both Section 7.2 of the Settlement Agreement and the Court's Order (Dkt 991) left significant room for additions and modifications as needed. The Alliance's modifications of the City's proposal and addition of Mr. Garrie's helpful suggestions are all reasonable and necessary for the Monitor to do its job in light of the significant evidence which has

Gibson, Dunn & Crutcher LLP

JOINT REQUEST TO COURT RE THIRD-PARTY MONITOR AND SCOPE OF WORK

been disclosed this year between the A&M Assessment, the Special Master Report, and the seven-day evidentiary hearing.

The Alliance respectfully requests the Court expedite ruling on these two issues to permit the appropriate Monitor to be placed and begin its role in ensuring accurate reporting moving forward. Alternatively, the Alliance requests a hearing as soon as possible to discuss these issues and make a determination.

DATED: October 10, 2025                    UMHOFER, MITCHELL & KING LLP


By: _/s/ Elizabeth A. Mitchell_
Elizabeth A. Mitchell
*Attorneys for Plaintiffs*


GIBSON, DUNN & CRUTCHER LLP

DATED: October 10, 2025

By: _/s/ Theane Evangelis_
Theane Evangelis

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

Local Rule 5-4.3.4 Attestation

I attest that all counsel of record concur in this filing's content and have authorized the filing.

By: _/s/ Theane Evangelis_
Theane Evangelis

JOINT REQUEST TO COURT RE THIRD-PARTY MONITOR AND SCOPE OF WORK