# Exhibit B

Scolnick Decl. Ex. B - 109

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LA ALLIANCE FOR HUMAN RIGHTS, )
et al.,                        )
                               )
            Plaintiffs,        )  CASE NO.
                               )  2:20-cv-02291 DOC (KES)
        v.                     )
                               )
CITY OF LOS ANGELES, a         )
Municipal entity, et al.,      )
                               )
            Defendant.         )
_____)


REPORTER'S TRANSCRIPT OF REMOTE

MEET-AND-CONFER PROCEEDINGS

FRIDAY, AUGUST 22, 2025


REPORTED BY:

LENA MESCALL, CSR NO. 13018, RPR

JOB NO. 7550786

REPORTED REMOTELY FROM IRVINE, CALIFORNIA

PAGES 1 - 91

Page 1

Scolnick Decl. Ex. B - 110

REMOTE APPEARANCES OF COUNSEL:

FOR THE PLAINTIFFS:
      UMHOFER, MITCHELL & KING LLP
      BY:  ELIZABETH MITCHELL, ESQ.
      767 South Alameda Street, Suite 270
      Los Angeles, California 90021
      213.394.7979
      Elizabeth@umklaw.com


FOR DEFENDANT CITY OF LOS ANGELES:
      GIBSON, DUNN & CRUTCHER LLP
      BY:  MARCELLUS McRAE, ESQ.
              KAHN A. SCOLNICK, ESQ.
              BRADLEY J. HAMBURGER, ESQ.
      333 South Grand Avenue
      Los Angeles, California 90071
      213.229.7000
      mmcrae@gibsondunn.com
      kscolnick@gibsondunn.com
      bhamburger@gibsondunn.com


      LOS ANGELES CITY ATTORNEY'S OFFICE

      BY:  VALERIE L. FLORES, ESQ.
              ARLENE N. HOANG, ESQ.
              JESSICA MARIANI, ESQ.

      North Main Street, City Hall East, 6th Floor
      Los Angeles, California 90012
      213.978.7508
      Valerie.Flores@lacity.org
      Arlene.hoang@lacity.org
      Jessica.mariani@lacity.org

Page 2

Scolnick Decl. Ex. B - 111



I N D E X

SESSIONS

FRIDAY, AUGUST 22, 2025                                    PAGE

AFTERNOON SESSION                                           4

Page 3

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 112

REPORTED REMOTELY FROM IRVINE, CALIFORNIA;

FRIDAY, AUGUST 22, 2025, 1:01 P.M. TO 2:41 P.M.

MR. HAMBURGER:  Do we want to go on the record?

MS. MITCHELL:  Yes, we can go on the record.

MR. SCOLNICK:  Fair enough.  Just to note for the record then that the -- this is being transcribed by a court reporter and the parties have agreed to that.

MR. McRAE:  By the way, I had the volume off. So if anyone said anything to me and I didn't respond, I don't want to come across as rude.  I didn't hear you.

MS. MITCHELL:  You're good, Marcellus.

MR. HAMBURGER:  Nobody said anything.

MR. McRAE:  Excellent.

MR. SCOLNICK:  You didn't miss much.

Okay.  All right.  Well, you want to get rolling through our punch list?

MS. MITCHELL:  Let's do it.  I was just trying pull up the stuff from last time.  Obviously, I was not present for your meet-and-confer.  I was on a plane, but I did read the transcript.  I sent over, you know, my thoughts after reading the transcript and the Alliance's position on a lot of things that you raised.

So I think you got where we're at.  I think that we should start with the monitor, because that is

Page 4

Scolnick Decl. Ex. B - 113

the one thing that we were Court-ordered to do today, or at least by today.

So where are you guys at with that?

MR. HAMBURGER:  Okay.  We can start there.  So we still think that RAND would be a good choice, and we've suggested multiple people there.  We can provide a list of contracts -- and Arlene will correct me if I'm misstating it -- but I believe it's over the last five years that the City has had with RAND.

It's -- we have a spreadsheet that I can send to you so you can take a look at that, and I believe there are kind of contract numbers, which are public.

But, Arlene or Valerie, let me know if I'm misstating any of that.  Is that correct?

MS. HOANG:  That's all correct.

MS. FLORES:  That's correct, yes.

MR. HAMBURGER:  Okay.  So we can provide that to you.  I can actually email it to you -- hold on a second.  I can email it to you after this call.  We just wanted to make sure -- we just got it.  So we will send that over.

MS. MITCHELL:  Okay.

MR. HAMBURGER:  On A&M, the City is not open to working with A&M, given the concerns we have about its approach so far in this case, which we've briefed and

Page 5

Scolnick Decl. Ex. B - 114

kind of came out at the hearing.  These were concerns the City had before Gibson Dunn got involved.  But regardless, these are -- A&M would not be a good fit, in our view.

Mr. Campbell, we think, because of the work with the Alliance, that he isn't a suitable choice for a monitor.  I understand you don't think it's an issue, but the City does.

MS. MITCHELL:  No, I get it.  I do understand the City's position on that.  I would take the same position if I were you.  I would just -- I would just urge you to maybe just have a conversation with him, you know, if -- because I don't think we are going to agree on RAND.

I am happy to look at the spreadsheets that you guys sent over.  I just think that they are too intertwined with what the City and the County to be able, you know -- even if they are independent, I think there's the perception of impropriety.  Like, I just don't think that they're the right fit, because of all the various contracts that they have had.

But any -- I'd encourage you to have a conversation with Tim.  Like, he -- I think other than A&M, he's probably the best fit.  He'd probably need a team, but I think that he -- if anyone understands both

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 115

the homeless service provision as well as the data

issues.  And I think those are the two that are missing

from others, other than A&M, who spent, you know, ten

months doing that.  And so, you know, if you guys

don't -- aren't open to considering him at all, I

understand that, but I would encourage you to at least

have a conversation with him.

MR. HAMBURGER:  Yeah.  I don't believe we are.

Valerie, you can correct -- jump in if you

disagree.

But I don't think we are.  I think on RAND,

that is partially why we think RAND.  It's not because

of a relationship we have with RAND, generally.  It's

largely because we think they have kind of a unique set

of qualifications.

Because there are for folks there that know

about homelessness policy issues, but also have the

scientific background and the experience to deal with

data.  So that's why I suggested them.

On the person from JAMS, Garrie, we don't think

he has the right background, and we also think he will

be pretty expensive anyway.  So we are concerned about

cost; so we don't think he's a good option.

On Jan Perry --

MS. MITCHELL:  Do you even know how much he

Page  7

Scolnick Decl. Ex. B - 116

costs?

MR. HAMBURGER:  I don't know, but I know that -- I know JAMS, generally, they're pretty expensive.  But we also --

MS. MITCHELL:  He would work for the County for free.

MR. HAMBURGER:  Okay.  Well, if he's said he's going to do it for free, maybe we can revisit it.  But even then, I think we have concerns about that he doesn't really -- that the background isn't exactly right.  The idea here -- you know, I think the monitor needs a broader perspective than just being a data person, because that's not just -- like, the data isn't the -- like, this isn't, like, doing regressions or anything.  This is --

MS. MITCHELL:  That's true.

MR. HAMBURGER:  -- about getting data from the right people, largely, and entities.  And largely, it's data that the City itself does not have personally.  It's about getting it from entities like LAHSA.

Jan Perry -- we are considering Jan Perry.  I guess, one question we have is, is that just something that you've -- you know, are just -- has she expressed an interest, or is that just something you just came up with, because we just want --

Page 8

Scolnick Decl. Ex. B - 117

MS. MITCHELL:  No.  I mean, I know Jan through, like, various things; right?  She's been in and around the City for the last couple of decades.  And so she's really familiar with City issues, and I like that about her.

Someone else brought her name up.  I know she ran for some seat and didn't get it.  And so I don't know what she's doing now.  She's -- last I spoke to her, she was doing, like, a -- oh, my gosh.  What -- what are those districts called?  The tax -- the special tax districts?  Do you guys know what I'm talking about?

MS. FLORES:  Business improvement districts?

MS. MITCHELL:  No.  It's eFITS or something, like, where they tax themselves to -- I'll think about it.

Anyway, she was doing something like that for a nonprofit.  I, candidly, don't know that she knows, like, data and technology that well.  I don't know that she doesn't.  I just don't know that she does.

But she was raised to me from somebody, you know, that knows the City and knows the infrastructure really well.  And so would be able to help in that capacity.  I have not spoken to her.

If you guys are open to it, I can reach out to the last contact information I have about her and see if

Page 9

Scolnick Decl. Ex. B - 118

it's something that she's willing to consider.

MR. HAMBURGER:  Well, I don't know -- I mean, Valerie, if that's okay for them to reach out, I guess that's -- you know, I'll leave that up to you, Valerie.

Because I know where we left it in our discussions with the relevant people at the City is that we were considering her, but we haven't -- basically, you know, we are not ready to say "yes."  But, I guess, it can't hurt, unless Valerie says no, for you to ask her if she'd be at all interested.  Because if she's not interested, then --

MS. MITCHELL:  Then you might as well stop considering it.

MR. HAMBURGER:  Correct.

MS. MITCHELL:  Yeah.  That's fine.  I'll reach out to her.

MR. HAMBURGER:  Hearing no objection from Valerie, I think we can do that, or you can --

MS. MITCHELL:  Okay.

MR. HAMBURGER:  On USC and UCLA, like, we have no issue with -- depending on the specific person, I mean, we think that they kind of fall on the -- kind of the category of a -- you know, institutions that have, you know, the kind of people that would be -- have, like, the right background and the right --

Page 10

Scolnick Decl. Ex. B - 119

MS. MITCHELL:  Yeah.

MR. HAMBURGER:  So, I guess, the issue there is, is there an individual that you might have in mind or -- you know, because we're -- obviously, can't just -- can't have the monitor be the entirety of USC and UCLA.

MS. MITCHELL:  Yeah.

MR. HAMBURGER:  Or even a group.  It would have to be an individual or so.

MS. MITCHELL:  Yeah.  Sure.

MR. HAMBURGER:  And, obviously, if it's an individual who has, like, a particular, like, you know, group or whatever, I assume that they would rely on their colleagues.  But --

MS. MITCHELL:  There's an individual at UCLA -- I mean, you guys might disqualify him because we was retained as an expert for us years ago, when we were getting ready for trial -- I mean, it's been so long.  I don't even quite remember the context.

But I think I was putting together a second PI, or something like that, against the City or the County. And so we had retained him -- an entity that worked with him on a report.  But it ultimately didn't go anywhere because we ended up settling.

And I honestly don't remember if it was against

Page 11

Scolnick Decl. Ex. B - 120

the City or County.  I'd have to go back and take a look
at it.  And I think he was with UCLA.  But he does a ton
of stuff with the City as well.  Like, he partners with
the City, and he's just really knowledgeable on
homelessness issues.

He's somebody that I could figure out who that
was -- I mean, I literally can't even remember his name,
as I sit here today, but I can think about it and I can
send him your way.  Just -- you just would have to know
the history, you know, in the interest of full
disclosure.

MR. HAMBURGER:  Yeah.

Go ahead, Kahn.

MR. SCOLNICK:  I mean, I would imagine that
someone who's been retained as an expert witness for the
Alliance is probably not a -- it's a nonstarter, I would
think.

MS. MITCHELL:  Yeah.

MR. SCOLNICK:  Is it Ben Henwood or Seth
Watson-Pickens.

MS. MITCHELL:  Is it Ben Henwood?  No.  I
know -- like, just through general -- this general
context of, like, we've all been around.  I think Ben's
with USC, right, or Westwood UCLA --

MR. SCOLNICK:  I thought we were talking about

Page 12

USC.  Sorry.  You meant UCLA?

MS. MITCHELL:  Yeah.

MR. SCOLNICK:  I'm not --

MS. MITCHELL:  We all know each other.  It's all, like, a very incestuous -- like, all the L.A. homelessness researchers -- like, they're all in it, in various things.

But, no, I was not talking about USC.  I was talking about UCLA.  The gentleman that I --

MR. SCOLNICK:  All right.  Well, just send us the name --

MS. MITCHELL:  -- was talking about was UCLA.

MR. SCOLNICK:  Sorry.  Send us the name and we will think about it.  But I -- just for the sake of putting a stake in the ground, I would imagine a retained expert is probably problematic.

MS. MITCHELL:  Yeah.

MR. HAMBURGER:  But if there's somebody like that at UCLA or USC, I mean, I think that -- from the City's perspective, which is why we ask -- we suggested RAND, is we think that you're going to need somebody that has a background in the policy issues, generally, and has some familiarity with -- with the Los Angeles government and knows --

MS. MITCHELL:  Yeah.

Page 13

Scolnick Decl. Ex. B - 122

MR. HAMBURGER:  -- you know, knows about the City and the County government, but also knows about these programs, knows the terminology, isn't going to have to learn all that, but then also is at -- the reason why we thought academic-focused people would be the right fit, because they also probably are competent enough or have colleagues that are competent enough to -- to the extent there are data issues or things like that, they can -- they'll have a team to deal with that.

And so because they're -- you know, they're analytical kind of scholars.

MS. MITCHELL:  Yeah.

MR. HAMBURGER:  So that was -- that was our proposal for RAND.  We did not -- like, it didn't even -- until, you know, it was raised in the last meet-and-confer call, none of us even thought of -- you know, like, we're going to RAND because there are -- because we do so much business with RAND.  It was only because of exactly what I said, which was, we thought that they had kind of unique capabilities.

MS. MITCHELL:  Yeah.

MR. HAMBURGER:  But I also think that the City is open to somebody at UCLA or USC, you know, depending on who it is.

And so if there are people that you think might

Page 14

Scolnick Decl. Ex. B - 123

be interested -- and we'll go back and we'll think -- you know, I know Matt Szabo couldn't be on this call, but I think he may have some ideas about people at either UCLA or USC that might work.  But, obviously, it's easier if it's somebody you're already okay with and then we just have to then get approval on our side.  So I do appreciate the suggestions.

On the person you suggested, the New York lawyer, Gitnick?

MS. MITCHELL:  He reached out to us.

MR. HAMBURGER:  Okay.

MS. MITCHELL:  He knows Matt from some other -- I want to say they were -- maybe they were at Skadden together or something.  I don't quite remember the connection, but he --

MR. HAMBURGER:  Your Matt, not Matt Szabo?

MS. MITCHELL:  No.  My Matt, Matt Umhofer.  And they do a bunch of -- or they had.  They've done a bunch of, like, monitoring-type work, and somehow he got wind of this and reached out to Matt and wanted to throw his name in.  I don't know him.  I don't, candidly, know that he's, like, the right fit for it, but because he self-volunteered, I at least wanted to disclose that.

MR. HAMBURGER:  Okay.  Yeah, we'll consider it.  And the one -- I can tell you right now, the one, you

Page 15

Scolnick Decl. Ex. B - 124

know, hurdle is that, you know, I think it's better to have somebody who is local, frankly, largely because I think logistically it's easier, but more so because I think, that, you know, honestly, I think we all recognize L.A. is a little bit different than other cities.  Every municipality is a little bit different.  And so I'm not saying somebody outside of L.A. couldn't do this work, but we also think it -- if there is a -- somebody, a right fit who is local, that might be better.

MS. MITCHELL:  Yeah.  I don't disagree with you.  I mean, you can -- obviously, the issues that you have with Tim or with this other gentleman, who I'm still -- I'm going through my files to try to figure out who he even was, we have the same issues with RAND.  I just think that we need somebody that's like a true neutral third party that does not have any connections with either of the parties.

So I don't -- I don't see -- oh, Randall Kuhn, K-u-h-n.  That's his name.  He's done really cool stuff.  I actually don't think he was ultimately going to be an expert witness, now that I found him.  He wasn't -- he was never an expert.  He'd agreed to give us a declaration, because he had a really good report that we wanted to give in evidence.  But he was -- he's an

Page 16

associate professor -- at least as of 2022, he was an associate professor at UCLA Fielding School of Public Health.

MR. SCOLNICK:  Still is, according to the website.

MR. HAMBURGER:  Okay.  Great.  We will take him -- his name back.

So, I guess, we just all need to do some more homework on this, and we will send you the RAND spreadsheet.

MS. MITCHELL:  Okay.

MR. HAMBURGER:  And if you need more information, let us know.  But that's information we have about our connections with RAND and the City's connections with RAND.

I don't believe any of them have to do with homelessness issues, but I didn't look very closely at the spreadsheet.

So, Arlene, I don't know if you looked at it, and you were able to confirm that.

MS. MITCHELL:  She says she doesn't know.

MR. SCOLNICK:  The spreadsheet will speak for itself.

MR. HAMBURGER:  The spreadsheet will speak for itself, and, yeah -- but, yeah, so we will get that over

Page 17

Scolnick Decl. Ex. B - 126

to you.

MS. MITCHELL:  Okay.  If you want, you know, I'm happy to have a conversation with the RAND folks if you want to connect me, and so, you know -- and I can always take that back and say, hey, here's the spreadsheet.  This is my conversation.  You know, either the Alliance is comfortable or not comfortable with it.  So I'm happy to have that conversation.

I think one thing we might consider, because I do think that a single person is going to be difficult, which is why a team like RAND or UCLA or USC would be easier, is, like, a partnership, like a pairing -- and I'm not saying these are the right people, but hypothetically a Daniel Garrie, who's got the technological and data infrastructure knowledge with a Jan Perry, who's got, like, the city infrastructure knowledge, something like that might be the better fit.  But we can do some more digging on USC, UCLA, and if you want to connect me to RAND folks, I'm happy to talk to them.

MR. HAMBURGER:  Okay.  Yeah.  Why don't I circle back on that because I want to make sure they -- I don't think we've reached out to RAND about this yet.  We -- I believe that there may have been a -- well, I did -- I know there was a team that we had that RAND had

Scolnick Decl. Ex. B - 127

been -- had sent to us a while back, and I listed those team members.  But we haven't reengaged with them on that, because we wanted to meet with you first to see if, like, you had issues with RAND, and -- and you did.

But, yes -- but I -- you know, obviously, we don't have objections for you -- you know, if you want to talk to the people that are on that list, I can resend that if it would be helpful when I send the spreadsheet.  I think it was in the first email I sent about the monitor, the list of specific people.

MS. MITCHELL:  Okay.

MR. HAMBURGER:  And they -- but I just want to warn you, they will likely -- this may -- this will likely be news to them.

MS. MITCHELL:  Okay.

MR. HAMBURGER:  And so that's fine, you know, because we -- you know, I know we would like to use RAND if -- and they have some -- I think they may have some recollection of previous outreach, but no recollection since Judge Carter's order specifically.  And so they may not have an idea about it specifically, and so -- but I don't have an objection as far as you talking to them and find out if they are interested.

MS. MITCHELL:  Okay.  I will -- okay.  I will probably do that.  I think that I have some -- have had

Page 19

Scolnick Decl. Ex. B - 128

some contact with Jason Ward in the past on some of

these issues, but it's been a while.  So I probably

will, if you're -- I mean, I'll probably just reach out

to Jason.  I might just reach out to Daniel Garrie also.

I haven't spoken to him.  I don't know that he's

available.  I just know he was, you know, helpful in

other circumstances and that he's worked with

Judge Carter in the past and has done technology stuff

with him.  So --

          MR. HAMBURGER:  I can say on Garrie, like,

we -- you know, I was -- I was -- we had a couple of

concerns.  I think we have broader concerns with him.

So I don't want to get too far into them right now, but

we've had, in other matters, experiences with him that

were not ideal.

          MS. MITCHELL:  Like, you, the City, or you,

Gibson Dunn?

          MR. HAMBURGER:  Gibson Dunn.  So my

recommendation would be -- would be not to use him.

So -- and I don't think -- since we are going to be

involved, I think it's -- you know, I think that if

there's somebody else like him, I think that would be

better if that's where -- the route you want to, you

know, propose.

          But -- so that -- to be --

Page 20

Scolnick Decl. Ex. B - 129

MS. MITCHELL:  Well --

MR. HAMBURGER:  -- full transparency, that -- that issue.  And we don't think he's the right fit, and he also, I think, is going to be very expensive.  And maybe he'll do it for free, but at that point, I don't even know if we want to have somebody do it for free.  We want somebody who's actually going to do it correctly.

MS. MITCHELL:  Yeah.  I don't know either.  But I will just tell you, because I know he's worked with Judge Carter in the past and this issue came up when we were dealing with the L.A. County website, if we don't reach an agreement, I'll bet you that Judge Carter is going to want to work with Daniel Garrie.  I'm just putting that out there.

So if there are, like, real concerns, if there's real conflict issues or competency issues, it'd be good for me to know that ahead of time because, otherwise, he's going to be a subject that I would -- I would bet would come up in court.

MR. HAMBURGER:  Well, I'm hopeful that we can reach an agreement on who would be the monitor.  I think it's going to work better for everybody if we have an agreement.

MS. MITCHELL:  Yeah.

Page 21

Scolnick Decl. Ex. B - 130

MR. HAMBURGER:  So, hopefully, we don't get a situation like that, yeah.

And Jason Ward, of course, was the -- you know, the main person that we had recommended; so -- that we had flagged at RAND.

MS. MITCHELL:  Okay.  I'll try to connect with him.  I will make that -- I don't know the rest of those people, but I'm fairly certain that I can't do Jason Ward.  And I know that I have had idealogical differences with Ben Henwood in the past, just FYI. So -- and I know he's over at USC.  I don't know that the Alliance would agree to him.

MR. HAMBURGER:  Okay.

MS. MITCHELL:  So --

MR. HAMBURGER:  Okay.  Do we want to -- and I note you said you disagree that the monitor's, you know, obligations should be the ones in the order.  We -- I guess we will have to agree to disagree on that.  We think the order is pretty clear, but, you know, we can deal with that later.

On the timing of the reports, I mean, I'm hoping you would be reasonable about that.

MS. MITCHELL:  What do you mean the timing of the reports?  What are we talking about?

MR. HAMBURGER:  Well, we had asked for -- to

Page 22

Scolnick Decl. Ex. B - 131

extend the timing on the quarterly reports, and you were suggesting that, you know, it's premature to discuss that and were reluctant to agree to anything beyond 30 days, I thought.  But maybe I am wrong about that.

MS. MITCHELL:  Yeah, I think we -- it's hard -- that's hypothetical.  I mean, right now, what are you guys at, like, 15 days?  I don't have, like, particularly strong of opinions about this.  I think that the data monitor is going to probably have to get in there and look at things.

But, also, I think the idea is that they will be in there, like, simultaneously.  So I think we have to first figure out who the monitor is, and then we can have that conversation.  Could be a zero delay.  It could be that they say, "What are you talking about?  I need at least 60 days."

Like, I just think that this conversation is premature, until we know who that monitor is or what that monitor is, and we can have that conversation.

MR. HAMBURGER:  Okay.  So I think that takes care of the monitor stuff.  And I will commit to getting you the RAND spreadsheet right after this call.

MS. MITCHELL:  Okay.

MR. HAMBURGER:  Okay.  So why don't we go to 8.2 then?

Page 23

MR. SCOLNICK:  Before you do that, just -- when is the next report due?

MS. MITCHELL:  It's quarterly; so I think you guys are, what, probably October.

MS. HOANG:  The quarter ends September 30th.

MS. MITCHELL:  Yeah.  So October 15th is the next.

MR. SCOLNICK:  Well, like, so we can't go that long.  I mean, in the -- you know, the next couple of weeks, we should try to reach agreement because that will start the clock running at the end of September, whether it's 15 days or 45.

MS. MITCHELL:  Well, I mean, as I sit here today, we don't have a monitor.  There's zero reason for you to have an extension; so no.  But if -- once we get a monitor in place, it looks like we're going to have a second layer of review on top of that, then, obviously, some extension makes some sense.

MR. SCOLNICK:  I understand.  I mean, it's also just more of a courtesy that we're asking for, because our people are telling us they need more time to get this done.  Even without a monitor, it's just -- it's hard.  But I think maybe we'll just table this for now. I'm putting on your radar that this is -- we just don't understand what the urgency is, if it's, you know, an

Page 24

Scolnick Decl. Ex. B - 133

extra week or two.

MS. MITCHELL:  Well, who's saying it's hard?  Like, what is hard about it?

MR. SCOLNICK:  No.  I'm saying that this is important data that we are trying to get right and that's the goal of all of this.  And so having a little bit of extra time to make sure that everyone who is involved is signing off on it is important.

We haven't been through the process, really.  I mean, we had -- Gibson Dunn has been involved for one of those reports, but we would appreciate just a little bit of time, a little bit of breathing room after the end of the quarter.  That's all.

MS. MITCHELL:  Oh, well, see, that's a different thing than what you guys -- you -- what I had understood was that you guys were asking for extra time for the data monitor review.  And that's why I was saying it's pretty --

MR. SCOLNICK:  Not solely.

MS. MITCHELL:  So you're saying you need extra time because the City is going to generate the reports and Gibson Dunn wants to separately review and make sure that it's valid data.  I can understand that.  I'm happy to give you an extra week or whatever.

MR. SCOLNICK:  It's all those things; right?

Page 25

Scolnick Decl. Ex. B - 134

It's just -- that's right.  So let's just -- I wanted to put it on your radar because --

MS. MITCHELL:  Okay.

MR. SCOLNICK:  -- you weren't in the last call and there was -- maybe some of that nuance was missed in the transcript.

MS. MITCHELL:  Yeah.

MR. SCOLNICK:  But let's continue to talk about that.

MS. MITCHELL:  Sure.  Just let me know.

MR. SCOLNICK:  Okay.

MR. HAMBURGER:  Okay.  So on 8.2, meet-and-confer, so that's the other reason for this call -- one of the other reasons for this call.

You know, you sent us comments, and we can maybe just go through them and I can give you my reactions to them.

So, I guess, in your preamble, you don't -- thank you for making your position clear.  And I just want to make sure it's clear that your current -- by "you," the Plaintiffs, the Alliance -- is not -- does not believe that any modifications are warranted and are not proposing any modifications in light of the Section 8.2 events, the three separate events --

MS. MITCHELL:  Well, that's not what my email

Page 26

Scolnick Decl. Ex. B - 135

said.  First off, I think the ICE raids -- that the -- does not suffice.  The fiscal emergency, I'm not sympathetic to, for all the reason heretofore stated.

But the fires, I do understand.  I think the Court's order was pretty clear that, like, it's a temporary pause, and we have to understand, like, when's the pause going to be over and what does that mean; right?  And I haven't heard that from the City.

But what I said in the email is I don't think that any modifications to your obligations are necessary.  If you're telling me what you need is more time, then we can have that conversation.  But particularly, like, the affordable housing substitutions and stuff, that's not something that we're amenable to, nor do I think that the emergency requires it.

MR. HAMBURGER:  Okay.  So a couple of things.

MR. McRAE:  Can I ask a couple of questions?  I just want to break this up, because I think these are very different issues.

I mean, the first issue is:  I think we may have a misunderstanding or a different interpretation as to what the invocation means.

MS. MITCHELL:  The invocation of the emergency under 8.2?

MR. McRAE:  Yeah, yeah.  The emergency.

Page 27

Scolnick Decl. Ex. B - 136

As we see it, you have no say-so whatsoever as to the validity or merits of the invocation.

Now, we can disagree about that, but the way that we read the agreement is we invoke the emergency. No one is required, as I understand it, to have the Alliance or its counsel come in and weigh in on whether they think the emergency is meritorious, to try to quantify the gravity of the circumstances that precipitated the invocation.

And so I think that's a pretty important sort of conceptual starting point, because that's also different from the question of whether the modifications are something that you would be amenable to effecting by agreement. Those are two separate issues.

The first one is: Is there an invocation? That's undisputed. It's already happened. And as we interpret the agreement and understand it, from the moment that the invocation occurs, it's in place.

So I think we first need to understand: Do you have a contrary understanding of those points, about the --

MS. MITCHELL: Yeah, of course, I do. Of course, I do.

MR. McRAE: -- unilateral invocation of the -- okay.

Page 28

Scolnick Decl. Ex. B - 137

And, again, not to waste time, is this something that maybe there's a document or a brief where you've already laid out your position?  Because I'm not going to try to put you on the spot and ask you to give us a dissertation on the basis for that disagreement.  If you've already documented it, you can just point us to where it is.  I think we can deal with it that way.

And then separate from that, just so to make sure that we complete the meet-and-confer, are you saying that, putting aside the conceptual question of whether or not the Alliance gets to weigh in on what we regard to be the City's sovereignty in terms -- in discretion, in terms of whether or not to invoke an emergency -- are you saying that even assuming, for the sake of argument, that you agreed that it is a unilateral non, you know, negotiable, nonparticipatory invocation on the part of the Alliance, that even if you agreed with that, you don't think that the circumstances merit any modification of the obligations?  Because those are two totally separate questions.

MS. MITCHELL:  Okay.  So as I understand it -- and I was just pulling up the Court's order, because he has some, like, pretty clear language about this issue, which I think is -- trumps what you think and what I think.

Page 29

Scolnick Decl. Ex. B - 138

And what the Court says is, "The settlement agreement imposes a duty on both parties to meet and confer in good faith to determine the necessary adjustments during any such pause.  The parties are expected to continue engaging in good faith to define the scope and terms of any pause."

To me, that's not a, City gets to do whatever it wants, because that's not 8.2 says.

And then the next paragraph is, "It is important to note that the invocation of Section 8.2 does not excuse the City from its ongoing responsibilities, particularly with respect to accurate reporting and verification of beds.  The pause provision is not a blanket exemption from compliance.  The data verification issues predated both the January 2025 fires and the resulting emergency declaration.  Accordingly, the Court will not permit the City to use this emergency as a pretext to avoid its obligations under the settlement agreement.  This pause only applies to obligations that are truly impacted by the emergency, not to longstanding failures and transparency, accountability, or compliance."

MR. McRAE:  Well, that largely sounds hypothetical because it assumes that the City is invoking these emergencies pretextually, which it is

Page 30

Scolnick Decl. Ex. B - 139

not.

It also, in no way, is inconsistent with the concept that, if there is a pause, hard stop, who invokes the pause?  Is that subject to debate as to whether or not there's been a pause?  Nothing that you read is inconsistent with that.

As far as the rest of it, which is, the parties need to discuss, probably for mutual edification, how long is the pause?

Okay.  If that's what it says, that's what it says.  I think that's what we're doing.  Again, that's completely different from who gets to decide if there's a pause and is the pause invocation automatic?

So the rest of this is discussing, which I think we are trying to do, what -- how long of a pause are we talking about?

And by the way, we could have disagreements with respect to that.  But I think that's part of the meet-and-confer process, as well as the second layer of this, which is, well, are there any modifications to the obligations that you would be amenable to, in light of the invocation of any number of the emergencies or the invocations that have been declared, or is the meet-and-confer exhausted because categorically, the Alliance opposes any modification whatsoever based on

Page 31

Scolnick Decl. Ex. B - 140

the invocation?

MS. MITCHELL:  I feel like we're filibustering at this point.

MR. McRAE:  And be sure to meet and confer?

MS. MITCHELL:  I feel like I heard these hypothetical sort of questions in the transcript or I read them.  I saw that you were kind of trying to pose these questions.  I think it's irrelevant, honestly, Marcellus.  Like, I think the question is --

MR. McRAE:  I'm just asking are you opposed to any modification?  That's not a hypothetical--

MS. MITCHELL:  Okay.  Well, no, you filibustered for, like, three pages, probably, in the transcript --

MR. McRAE:  No, no.  I've parsed distinction in the language you read in saying --

MS. MITCHELL:  And now you -- hold on.  It's -- Marcellus, I'm sorry.  It's my turn to talk --

MR. McRAE:  -- that it didn't contradict what I was saying.

MS. MITCHELL:  Okay.  So you broke apart a couple of issues.  You asked a bunch of hypotheticals, and then you ended on a question.  So if the only thing that I am here to talk about is are we opposing modifications, I already answered that in my email,

Page 32

Scolnick Decl. Ex. B - 141

which is, I don't think any of the modifications that you're proposing have -- you know, make a whole lot of sense.

We're not amenable to that.  I don't think that they're related to the emergency that is being declared. Whether or not it's unilateral or not, I think it's irrelevant.

What I have suggested is if the City is saying it needs more time to complete its obligation, it's something that we would consider.  But other than the more time, I don't see that any other modifications are relevant to the emergency declaration.

MR. HAMBURGER:  Yeah.  So can I explain --

MR. McRAE:  Real quickly --

MR. HAMBURGER:  Can I touch on that -- Marcellus -- Marcellus --

MR. McRAE:  Real quickly.  Real quickly.

And just to be clear, it wasn't filibustering. You read a passage from an order.  I explained why that passage, in no way, was inconsistent with the distinctions I was parsing between the invocation of the emergencies and whatever collateral discussions followed that.

That wasn't filibustering.  That was responding to you reading that passage.

Page 33

Scolnick Decl. Ex. B - 142

Brad, please.

MR. HAMBURGER:  Yeah.  So I think there's a bit of a -- and, look, I understand this may be your position, and we're just going to have to disagree.  But I think that there's a conceptual, you know, disagreement here about the nature of these emergencies.

And so our position is, is that we've had three separate events that have imposed substantial costs on the City that were unexpected.  But regardless, whether they were unexpected or not, they're the exact sort of events that the parties agreed could necessitate necessary and appropriate amendments to the obligations.  That's language directly from 8.2.

And it's not just about timing, and it's not just about how long a pause would -- would last.  What's happened is, is that there's been -- you know, I think it's beyond dispute there's been a substantial amount of costs that have been imposed on the City due to the fires.

There's been, likewise, substantial amounts of costs -- I know you said -- I don't understand why it's your position, but, you know, you seem to be belittling the ICE-related incidents.  There was significant civil disturbances and protests and which necessitated real hard-dollar costs in the form of overtime, additional

Page 34

Scolnick Decl. Ex. B - 143

unexpected overtime for LAPD and other City officials and agencies.

And then the third one at -- you know, and your email speaks of it, but, you know, there has been a fiscal emergency declared by the City. I understand, from a political perspective or policy perspective, you think this is a fiscal emergency that the City caused itself. But the reality is there is a fiscal emergency. It exists. And a fiscal emergency was specifically contemplated as one of the triggers for a pause, but not only a pause, a good faith -- in the words of Judge Carter -- meet-and-confer about any necessary and appropriate amendments to the obligations under the agreement.

And so what we have proposed are a -- we think a modest number of modifications that go directly not just to the timing, but go to the new fiscal reality that the City faces, given three events in the past year, where you have substantial amount of costs that have been imposed on the City and you have a fiscal emergency that's going to lead to layoffs and various other things as a result.

And particularly on the encampment obligations -- and we can also talk about the affordable housing units -- we think that -- encampment reductions,

Page 35

Scolnick Decl. Ex. B - 144

rather -- we think that, you know, there are modifications warranted given the fiscal costs to the City of complying with the obligations as construed by Judge Carter, at least with respect to the encampments. And we think we can have a separate debate about the affordable housing.

But just so our position is clear, the focus of our modification proposals are reducing the fiscal burden of the obligations, not just extending the time to complete the obligations.

MS. MITCHELL:  Okay.  I understand your position.  Setting the fires aside, the fiscal emergency is something that has been anticipated for years.  If Matt were on the call, Matt Szabo, he would say that. He's been warning the City Council for years that these certain choices that the City Council is making is going to put it in a fiscal emergency.  Yet the City Council did -- like, I watched that happen.

So -- and then the City's continuing to make policy choices, particularly around homelessness, that is exacerbating this.  So I don't think that the City gets to make expensive choices and then claim inability to comply due to poverty.  That's -- so that I'm trying to be very clear about it, and I was very clear in my email what our position is on fiscal emergency.

Page 36

Scolnick Decl. Ex. B - 145

That's -- I think there's very clear reasons why we are not sympathetic.  The City can make alternative choices.

Regarding the civil unrest, as you want to call it, protests like this happen all the time in the City of Los Angeles.  This is the nature of the city.  I mean, I can go back over the last decade and name a dozen different similar protests.  I don't think that the fiscal impact on the City through the ICE raids has been that significant.  It has been something, you know, but there's always something in the City of Los Angeles.  So I don't see the fiscal impact of that making that big of a difference.

So -- but, again, if it's more time to complete obligations, like, we can have that, but reducing the obligations, which is what the City is trying to do, does feel pretextual to me, and it's not something that we will agree to.

MR. HAMBURGER:  Yeah, understood.  I sent you -- we sent you a document on the ICE-related protests.  This is a public document -- we sent it to you -- where it, you know, documents -- it's dated June 20th, 2025.  It's attached to the email that Kahn sent you on August 6th, 2025.  And it documents, you know, a cost of $17.3 million needed to cover additional expenses that had been incurred and -- and largely due

Page 37

Scolnick Decl. Ex. B - 146

to overtime.

And I understand you think that this was not a big event.  I think everybody who lives in the city would disagree.  And I think it was national news, if you might recall.  But we may have to just argue with that before Judge Carter about whether this counts as a civil disturbance.  I think it does.

But in any event, I'd like to direct you to that, because we did provide evidence of that.

MR. McRAE:  I just have a question.  While there are protests in the city, I can't seem to recall the last time the National Guard was sent out on the streets of Los Angeles.

I don't know if you would know that off the top of your head, Liz.  Was it in this century?

MS. MITCHELL:  I don't think that's the relevant inquiry.

MR. McRAE:  Oh, I think that's absolutely relevant because that's the anomaly that escalates the fiscal consequence of the emergency.  It doesn't exist in a vacuum.  So in all fairness, it's the comparison of proverbial apples with oranges to not recognize that.  That is highly anomalous, number one.  I mean, anybody with a passing knowledge of the history of this city is going to know that.

Page 38

I think the other thing is that I am curious about something.  How do you guys reconcile the discretion that the Court acknowledged that the City has under the agreement with respect to how it satisfies its housing obligations, which, obviously, could include a more expensive option?  In other words, that's not to be penalized by the negative thing --

MS. MITCHELL:  But you can't choose -- that's a choice.  That's a choice that's being made.  You don't get to choose the most expensive option --

MR. McRAE:  But I didn't finish --

MS. MITCHELL:  -- and tell me you're broke.

MR. McRAE:  I didn't finish my question.

MS. MITCHELL:  It's a choice.

MR. McRAE:  I didn't finish --

MS. MITCHELL:  It's a choice.

MR. McRAE:  I didn't finish my question.  So it's kind of hard to answer the question when I haven't finished it.

So I said how do you reconcile that discretion, which, again, the Court has very unequivocally recognized?  It's one of the areas where we think that you guys actually lost, quite frankly, in the effort to suggest that the City did not have that discretion.  The agreement says what it says.  How do you reconcile that

Page 39

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 148

with, if the City properly exercised its discretion to use an option that it thinks is superior and not surprisingly it might be superior and cost more money, with then having not one fiscal issue, but several at the same time which drains resources and re- -- it's just math.  There's only so much money.

And so if you have the discretion, you exercise the discretion, and then other unforeseen things happen that causes the City to have less resources to cover more things.  How is that -- how is that reconciled with the fact that, of course, the City can exercise the discretion to satisfy the obligations the way that it wants to?  It almost makes it seem like the City has to be perfect and have powers of Nostradamus to say, if you are going to exercise a more expensive option, you better make sure that there's nothing else that comes in that could possibly cause that to be problematic or to strain resources.  I'm just curious.  Like, how do you guys see that?

MS. MITCHELL:  I don't even know what your question is right now.

MR. McRAE:  I think that answers it.  Okay.

MR. HAMBURGER:  Okay.  Do we want to go talk about some of the specifics?  Because we made the various proposals, and then you sent an email responding

Page 40

Scolnick Decl. Ex. B - 149

to them.  I think there might be one agreement -- and this wasn't really even a modification.  It was mainly could we reach an agreement on the TLS subsidies.

It sounds like you potentially will agree to that.  I can tell you that, you know -- and I think your suggestion was let's assess it when the bed plan is submitted.  That's fine, I think.

MS. MITCHELL:  No, no.  I -- it's even better than that.  It's -- the concern is the role that the City has had in identifying the TLS beds.  That was the concern, the roadmap concerns we have.  Same concern remains.  So that's the one.  And then also the data verification given the loss of (unclear).

So if you can resolve those two, no issue from us on the TLS.

MR. HAMBURGER:  Okay.  Great.  That's good to hear, yeah.  My understanding is the City is still working on its plans regarding the TLS slots that we would be counting under the Alliance agreement.  But we are contemplating that they would potentially be solely funded by the City.  So that should assuage any concerns about grading or whatnot that you had with respect to the roadmap agreement --

MS. MITCHELL:  Okay.

MR. HAMBURGER:  -- without conceding that we'd

Page 41

Scolnick Decl. Ex. B - 150

have to do that.  But my understanding from talking with, you know, CAO is that that is potentially the plan we are going down.

MS. MITCHELL:  Okay.

MR. HAMBURGER:  And then on the tracking, you know, we want to be -- we have accurate tracking.  So that's something we are willing to work with you with.

MS. MITCHELL:  Do you know how many TLS beds you'd be looking at?

MR. HAMBURGER:  I don't --

MS. MITCHELL:  I know the whole --

MR. HAMBURGER:  I don't know if Jessica or Valeria or Arlene knows yet.  I think -- they are shaking their heads "no."

We couldn't hear you, Jessica, but --

MS. MARIANI:  Just "no."

MR. HAMBURGER:  Okay.  But we are working on it, and so that -- they'll likely be a part of the plan. And then once we have a better sense of it, you know, we're happy to discuss about how they'll be tracked and explain how they will be tracked.

MS. MITCHELL:  Okay.

MR. HAMBURGER:  And, hopefully, there will be a way that, you know, we can give you assurances that they're actually existing, they are happening, and they

Page 42

Scolnick Decl. Ex. B - 151

are being funded.

MS. MITCHELL:  Great.

MR. HAMBURGER:  Okay.  On affordable housing, I was a little bit confused about your position on this. This is another one where we basically just wanted a confirmation and not really a modification.  And so I think you have the settlement agreement up and maybe Judge Carter's order up, but I'm sure you probably have the settlement agreement close at hand.  You know -- and I just want to flag this for you.

MS. MITCHELL:  Yeah, please do.

MR. HAMBURGER:  In 3.2, it specifically says -- and this maybe goes back to what Marcellus was saying about the discretion issue -- it specifically identifies affordable housing.  It's on lines 12 and 13 on page 5 of the settlement agreement as one of the ways in which --

MS. MITCHELL:  I don't see where it says "affordable housing."  Oh, you're right.  On page 14 and 15.

MR. HAMBURGER:  Yeah.  So we kind of took your response here as proposing a modification in the wrong direction, in making it more onerous for the City to comply.  And I will also, you know, just explain -- I think I explained this to Matt.

Page 43

Scolnick Decl. Ex. B - 152

MS. MITCHELL:  Yeah.

MR. HAMBURGER:  And you don't have to make a decision now.  I know you're going to have to talk with Matt.  We're not proposing to count all affordable housing.  Affordable housing has various definitions.  There are various categories.

And I believe it's the 30 percent of the local median, you know, poverty line.  So we're talking about people that are really on the edge of, you know, being unhoused.  And I think this is something, just stepping back, like, why are we all on this call?  Why are you doing this case?

We think of affordable housing not just as laudable, we think it's an essential part of the solution to the homelessness crisis.

MS. MITCHELL:  Yeah.

MR. HAMBURGER:  And we think that the City has made substantial efforts with respect to that.  And so we think the City, you know, is allowed to use its discretion to have some of its -- and, obviously, it's not going to be all the units -- but some of the units under its agreement with you be affordable housing of a particular variety.

Now, if there's a different variety of affordable housing you want to come back with or there's

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 153

something else you want to propose, but we were just taken aback a bit by the wholesale rejection, given, you know, what the agreement actually says.  So --

MS. MITCHELL:  No, you're right.  You're right.  I stand corrected.  I did not -- I did not remember including affordable housing in that agreement.  I am surprised that that is in the agreement, to be quite honest.

But you -- I stand corrected on that.  I do see that it references affordable housing.  If -- now that I see that -- and thank you for pointing that out -- give me a day or so to take a closer look at that.  Because we know when we're negotiating this, this is intended to be housing for unsheltered individuals, and I don't see affordable housing as being housing for unsheltered individuals.

The agreement says what it says, though.  So, you know, we will stand by the agreement if that's in there.  But if you could just give me a day or so to take a second look at that and make sure that I understand what's going on now that I see the "affordable housing" reference in the agreement.

MR. HAMBURGER:  That's much appreciated.

MS. MITCHELL:  Yeah.

MR. HAMBURGER:  Okay.  On -- we talked about

Page 45

the fiscal emergency already; so I don't think there's anything to be said about that.

On encampment reduction, so, you know, the fundamental -- you know, the fundamental problem with the request for more information about the reductions that have been reported right now is that the City did not understand the reduction requirement in the way that Judge Carter ultimately interpreted it. And so there was not the sort of --

MS. MITCHELL: And I'll tell you the reason I am not sympathetic to those explanations is because I negotiated those with Scott and Matt. And we were all on the same page about what that was counting. They were counting Inside Safe reductions.

And so I'm just having a hard time now being sympathetic to this explanation from the City, which is not what we had all discussed in 2023 -- 2022, 2023. So that's -- those are -- and I don't want to say they've fallen on deaf ears -- but I'm just saying, like, I was in those negotiations and no one else on this call was.

This is not what was intended. What was intended was always the encampment reduction. So I tried to make that pretty clear in my email.

MR. McRAE: But so was Matt. And even though he's not here, we, obviously, have the benefit of his

Page 46

Scolnick Decl. Ex. B - 155

understanding.  And that understanding was what was set forth in the hearing, which was that, obviously, there was a negotiation where the number of encampments would not have been what it was had it been tethered to offers of housing.  And I think that --

MS. MITCHELL:  That was never communicated to me.

MR. McRAE:  Well, we can agree to disagree about that.  And, again, I am, obviously, speaking from the benefit of having spoken to someone who not only was in the negotiations, but testified about it in the hearing.  And that's what he said at the hearing.

So I don't think that we need to participate in that to have a recall of what was said at the trial.  If where we are is we've exhausted the meet-and-confer on that, you have explained why you're not sympathetic to that, you have a contrary recollection to the one that -- as to which there was testimony elicited at the hearing.

Brad, I think maybe it makes sense to go to your next point.

MR. HAMBURGER:  Yeah, I think so.  You know, we -- we understand you disagree with our interpretation and what we said.

But in any event, I think what we can say -- so

Page 47

Scolnick Decl. Ex. B - 156

this isn't an issue of we're not willing to tell you how many are -- were paired with offers of shelter or that were paired -- you know, that were -- you know, what Judge said about, you know, abandoned or when offers of shelter were made and refused, the kind of clarifications he had in his most recent order.

The problem is we -- it's not that we were holding that back. What the problem is, is that, you know, we were not specifically counting that in that way. That said --

MS. MITCHELL: Don't you -- I'm sorry. Don't you guys track Inside Safe encampment resolutions? Like, that -- again, this was the conversation in 2023, was literally, Scott saying to me, "Hey, I think we are almost there with our Inside Safe resolutions. Like, we're in a good spot."

So as far as I had understood, starting 2023, you're tracking your Inside Safe resolutions and, therefore, you should have some number to give me, which --

MR. HAMBURGER: So I was --

MS. MITCHELL: -- I am sorry, Bradley, if I could just add -- which is why very soon after you guys started reporting some reductions, it came to my attention, like, these aren't -- this isn't the way we

Page 48

Scolnick Decl. Ex. B - 157

negotiated them.  This isn't -- you're not reporting them the right way.

So that's why I am surprised that you guys can't give me a number, because my understanding for the last two years is that you are tracking those.

MR. HAMBURGER:  So I was about to tell you --

MS. MITCHELL:  Oh, I'm sorry.

MR. HAMBURGER:  -- what we could potentially provide you.  You know, one is, we can tell you and we can quantify Inside Safe operations and reductions related to those.

MS. MITCHELL:  Okay.

MR. HAMBURGER:  But that is not all of the ones that we've reported, because we also reported reductions that were accompanied by CARE and CARE+ cleanups, which, as I think you know, there are offers of services, including shelter, that are made with them, but we were -- because we didn't think it was a requirement, we were not specifically tracking, specifically tracking, you know, this tent or makeshift shelter we removed as part of our CARE+ cleanup, was then accompanied, we wrote it down, that somebody gave offer of shelter.

But I think you can -- you know, the cleanups that were happening were real cleanups.  They weren't just as, you know -- I mean, I think we hopefully

Page 49

Scolnick Decl. Ex. B - 158

clarified that at the hearing and in other communications.

They weren't just, you know, taking a tent and moving it across the street and counting that as a removal. That was never what was going on. But, you know, we don't have, you know, a way to say 100 percent certainty, yes, this tent was removed after an offer of shelter was made, but we think it -- you know, that was the practice, you know, generally, that their services were offered as part of those cleanups.

And then the other thing that we can give you some more specific data on, in addition to Inside Safe would be operations-directed RVs, where the policy was, from the City, was when there was an individual in an RV, what was to make an offer of shelter. We are in the process of determining, you know, what we can do in order to quantify this.

I know you mentioned estimates in your -- you know, in your email. I think this is going to be along the lines of estimates. I think -- you know, and so I guess in meet and conferring on this, you know, I think because we're in the Section 8.2 world, you know, regardless of what Judge Carter read -- you know, or has said, you know, I think that we have the space to modify the agreement. I think there's a good reason to modify

Page 50

Scolnick Decl. Ex. B - 159

the agreement to count some of the, if not all, of the existing reductions.

We would submit that all of them could -- should count. But I think, in terms of advancing the meet-and-confer -- and maybe you're just going to reserve judgment until we give you some more data --

MS. MITCHELL: Yeah.

MR. HAMBURGER: -- but I think there's a range between zero and 6,129. And we just want to make sure what your -- you know, eventually, get your position. Is your position going to be, you know, no, unless you -- you know, it's going to be zero unless -- you know, we will count some or none or whatnot.

MS. MITCHELL: Yeah.

MR. HAMBURGER: That's where we are, yeah.

MS. MITCHELL: Yeah. You are correct, but I'm going to have to reserve judgment till I understand what you're going to give me, you know. I think that the Inside Safe cleanups -- the Inside Safe resolutions count. I don't see any reasons why they shouldn't count. They were paired -- as far as I know, offers of shelter, persons given offer, whether they took it or not, the encampments were resolved. That's sort of the definition that we're working with.

And so I am -- I'm happy to count those Inside

Page 51

Scolnick Decl. Ex. B - 160

Safe resolutions, as long as my understanding is the same as your understanding of what they are. Those clearly count.

The rest of it, I have to see your explanation and understand where you're at with your estimations or, you know, however you want to do it, whether it's information from LAHSA or whatever.

I mean, this does kind of go right into your reporting obligations from 7.1, which is -- was on my list that the City has never reported. But you can see how these were designed to go hand in hand; right?

It's how we designed it in 2022, how we designed it in 2023, in order to identify the encampments, report on the encampments, how many offers have been made, et cetera.

And so, you know, again, the City should have been tracking this, because you had an obligation to track it since the inception of the agreement back in 2022, but if you haven't been tracking it, then if you can just get me whatever your best estimate is and whatever your explanation or basis is for that belief, then we will consider it.

But certainly, I can tell you, I do believe that the Inside Safe resolution should count, to the extent they are what I believe they are.

Page 52

Scolnick Decl. Ex. B - 161

MR. HAMBURGER:  Okay.  That's helpful.  And then on the -- you know, the going-forward number, and just to be clear, what we were proposing was to modify the agreement given that, in light of the emergencies and the fiscal situation of the City, if the -- if you are -- and I understand this is always what you believed that the deal was -- but I can tell you the people at the City do not believe that was the deal.  But in any event, water under the bridge in some respects.

The proposal was, you know, 400 reductions tethered to offers of shelter specifically and otherwise meeting Judge Carter's, you know, interpretation of the -- of it.

I understand you don't like the 400.  I can propose that we could potentially consider if you would sign off on it or you would agree and that would be the agreement, the modification, and the going-forward goal would be to double that number but give it over another year.  So you would extend the encampment reduction goal to 2027, June 2027, but it would be 800 as opposed to 400.

And so that is, you know, something that I'd like you to consider.  And that 800, again, would be of the variety of, you know, that comply with Judge Carter's ruling.  So that is, I guess, the other

Page 53

Scolnick Decl. Ex. B - 162

proposal we would have for you, which is new.

MS. MITCHELL:  I -- no.  I can say, like, I -- I can say I'll take it back to my client and propose this to my client and see what my client says.  But, like, I can tell you right now it's not going to be an agreement.

I mean, as far as I can tell, even if we counted your 6,000 resolutions, you'd have, what is that, another 2,700 reductions, like -- but we are not even -- we can't count the 6,000 reductions because they're not real reductions, in our view, which has always been our view.  So then to say 400 or 800, even that is not -- we want what we bargained for.

I don't see why that number should be reduced. The reason it was such a hard-fought bargain and the reason it was, you know, four months of significant debate with Mercedes Marquez -- Matt stepped in certainly at the end, but Scott was present as well -- was because they were trying to use numbers like this. And we said this is woefully below the need.

In 2022, when we entered into this agreement, it was a very different understanding than what is happening now.  It was a different administration, certainly.  And I recognize that administrations turn over and, you know, there are different priorities, but

Page 54

everything switched when the administration switched.

And so what we are saying is, no, we want what we originally bargained for, which is a step-by-step encampment resolutions, beds go up, bodies go into beds, bodies come off of the streets.  That's what we bargained for in 2022.  So a 400 or even 800 reduction number is just going to be woefully insufficient for us.

MR. HAMBURGER:  Okay.  And what about -- I guess you have no response, or you're not taking into account the fiscal emergency or any of that.  Like, you think the City should --

MS. MITCHELL:  I mean, I think that's why I said if you need more time to do it, that might be something that we would consider, but to meet your full numbers.

MR. HAMBURGER:  Okay.  I guess I get your position.  Okay.  And you -- okay.  We will work on seeing if we can get you more data about the 6,129 that we already reported.

Okay.  Does anybody else on our team want to talk about the encampment issues?  Because, otherwise, I think we're done with the two issues that -- the two big issues, the shelter solutions and the encampment reductions.

Valerie?

Page 55

Scolnick Decl. Ex. B - 164

MS. FLORES:  The only thing I wanted to ask was more specificity on paired with an offer.  We have a routine practice of doing outreach before all CARE and CARE+ cleanings.  And is that insufficient to prove that we had outreach workers out, you know, doing everything that outreach workers do?  Sometimes it's an offer of shelter, and sometimes it's just trying to get someone, you know, into the system.  Or it has to be, "We have a bed for you right now at this location"?  Just so I am clear because --

MS. MITCHELL:  Well, I think, on that point, the Court has weighed in on that.  And so I think my opinion is less important than the Court's opinion.

MS. FLORES:  So I can get an understanding and now that meeting and conferring --

MS. MITCHELL:  Yeah.

MS. FLORES:  -- we could agree that we can count the removals of tents, RVs, and makeshift shelters if they were paired with outreach prior to the removal of those items.

MS. MITCHELL:  I think I have to understand more of the outreach, Valerie.  So as I understand it and from my understanding, not just talking to people that have done CARE and CARE+, but also from the testimony at trial, the outreach that's done prior -- so

Page 56

Scolnick Decl. Ex. B - 165

first off with CARE operations, my understanding is there is not -- it's not necessarily paired with outreach. I could be wrong, and I'm open to being wrong on that.

CARE+ is typically paired with outreach, sometimes ahead of time, sometimes at the same time, but that's not always, to your point, "Here's an offer of shelter or housing." It's like, "Hey, let me just put your name on the list, and I'll get you, you know, on the list." And I don't think that would be sufficient.

MS. FLORES: But even in the situation where there isn't a bed. So there's no --

MS. MITCHELL: Right. I think that's the point. If you don't have anything to offer them, that doesn't count.

MS. FLORES: Yeah, but we are getting the person into the system, so they could be eligible for a bed when it comes up, and we are removing the tent or makeshift shelter at that point.

MS. MITCHELL: But they are not going anywhere. Like, they're not going inside. They are not -- and part of what we talked about is like family reunification -- right -- or getting them into, like, a mental health or hospital bed, if they need it; getting them into a shelter bed, if they need it; pairing them,

Page 57

Scolnick Decl. Ex. B - 166

you know, with a place to go, not just taking away their stuff.  So I think just getting into the system is not going to be sufficient, no.

MS. FLORES:  Well -- and, also, because the outreach often -- and we don't track it this way -- but the outreach often results in somebody saying, "No, I don't want to get into the system.  No, I don't even want -- if you have a bed for me tonight, I don't want it."

MS. MITCHELL:  Yeah.  That would be fine.  That would be sufficient.  That would count, as long as there was an offer that was made.

MS. FLORES:  But, again, so the outreach, you know, happens.  So any beds that are available and appropriate are offered, and if not, people are put in the system.  And even with all of that, some people won't engage, but there's been this effort made.

So, I guess, I just want to hear that unless there's -- we can -- that showing that we've done outreach, as was available on that day, offered whatever we could, tried to get other people just in the system, that even if we can prove there was that type of outreach, this is insufficient even under a meet-and-confer agreement to count the -- whatever tents or makeshift shelters we eliminated from the --

Page 58

Scolnick Decl. Ex. B - 167

MS. MITCHELL:  Yeah, I mean, I think you're saying -- there's, like, a few different things packed into that sentence.  So certainly if there's, like, a real-time offer which is made and it's either refused or accepted, an offer of shelter or, like I said, family reunification or, you know, a treatment bed -- like, all of that would be fine.  If there's a real-time offer made and it's either accepted or rejected, I think that's sufficient.  That's clear.  I think everybody is clear on that.

I think if a -- if an offer was made a few days before and they said "no" and you say, "Okay.  We'll be back in two days and, like, we're clearing this area," they said "no" -- okay, well, the offer was made two days before, and I think that's fine.

I think if it's, "Hey, we don't have anything for you, but we're going to take your stuff and put you on a list," that's not fine.

So I think as long as an offer of some type of bed or a place for that person to go has been made within a reasonable period of time prior to that removal, that would count.

MR. HAMBURGER:  Okay.  What about the second part of Judge Carter -- I mean, you know, in Judge Carter's order, he does acknowledge that if, you

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 168

know, a tent has been -- or a makeshift shelter has been abandoned, you know, that would count. And so there may be some -- in the data we do have, there may be some, you know, data from the sanitation department that let's us be confident that there was a notice presented about, you know, there's going to be a -- you know, this area is going to be cleaned, and then when we get there, there's nobody there.

MS. MITCHELL: Yeah.

MR. HAMBURGER: And so they remove the area. Is that something that you would count as a removal under your --

MS. MITCHELL: I mean, honestly, if you were just asking me before this order, I would say, no, I don't see why that counts. But that's Judge Carter's order and that's Judge Carter's order, and so he'll give you credit for that one.

MR. HAMBURGER: We will try to give you data on that too within --

MS. MITCHELL: And I will admit that he did so, and I'll defer.

MR. HAMBURGER: Okay. So we'll give you -- try to give you data on that too. And then I guess -- you know, I would -- I know you're going to take it back to the 800. But maybe you should take it back if -- you

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 169

know, I can't make you make a counterproposal, but if you want to make a counterproposal that's, you know, some -- some combination of 800 reductions with offers of shelter combined with some amount that are of the abandoned tents that I just described, maybe there's a deal we can have on that, but -- but, you know --

MS. MITCHELL:  I can tell you we can't -- we're not going to come up with an offer until we have whatever data you've got.  So you give me that --

MR. HAMBURGER:  Okay.  We'll get you --

MS. MITCHELL:  -- we will digest it and come back to you.

MR. HAMBURGER:  Great.  Wonderful.  We will get you that data.

Okay.  That's, I think, all I have unless anybody else has anything, Jessica, Arlene, Marcellus, Kahn?

MR. SCOLNICK:  No.

MR. HAMBURGER:  I know you have things you want to raise, Liz.

MS. MITCHELL:  Yes.  Okay.  So if we are done with those -- oh, and I'm sorry, the emergency pause, there was -- there are pending questions that we had posed both from -- that Matt had posed that I reincluded in the email, as well as, I think, questions that the

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 170

Court has of what exactly is paused, in the City's view, and what obligations does the City have and not have at this point and when does this pause end.

MR. HAMBURGER: Yeah. So I can speak to that.

So our position is, is that the plain text of Section 8.2 explains what is pause, which is -- it says, "The obligations of the City as set forth in Sections 3, 4, and 5 of this agreement are paused."

MS. MITCHELL: Okay.

MR. HAMBURGER: So we are going to go with the plain text of the agreement.

In terms of the duration, I mean, if we have a meet-and-confer and we come to a modification, I think that the reasonable, you know, explanation or the way that the provision should work is that the modifications should alleviate the need for a pause because that's the point of the modification.

But I do think that, you know, otherwise, I think that, you know, absent agreement on a modification, I think that the pause would continue at least until the emergency at issue is rectified, although, again, we don't think it's necessarily a timing issue, but more an impact of the substantive impact of the emergency on the going-forward ability of the City to comply with the obligations, which is why

Page 62

Scolnick Decl. Ex. B - 171

the whole point of this is a meet-and-confer in good faith, as Judge Carter mentioned, in order to find out whether there's modifications that can be made to reduce the burden on the City.

Because the fiscal emergency, for example, is not going to go away tomorrow.  It is a thing that exists.  I know you disagree with the causes or you think the City is to blame for it or you -- they spend too much money on employees or whatnot.  Those are not things that, you know --

MS. MITCHELL:  I would never say that to City employees.

MR. HAMBURGER:  Well, your colleague said that. He mentioned -- Matt mentioned that at the last call, that one of the -- his problem with the -- I believe, and it's on the transcript; so it doesn't really matter what I recall -- but I believe he specifically mentioned raises that the City gave to employees as being a -- you know, part of this theory that you-all have about self-inflicted wound, essentially, on the fiscal emergency.

But we don't need to get into that debate.  I think that the issue is, is that the pause was triggered by the three separate events.  And the fiscal emergency one is, at minimum, is ongoing, but the City, obviously,

Page 63

Scolnick Decl. Ex. B - 172

is still dealing with the fallout from the fiscal consequences of both the fires and of the civil unrest earlier this year.

MS. MITCHELL:  Okay.  So in your view, just so I am clear -- and I understand Sections 3 and 4 and 5, if we reached an agreement, that should alleviate the need for a pause.  If we don't reach an agreement, it's paused indefinitely or until the, like, City Council says that the emergency is over or what?

MR. HAMBURGER:  Yeah.  I don't know.  I am hopeful that we will be able to reach the modifications.

MS. MITCHELL:  Okay.

MR. HAMBURGER:  That's, what, 8.2?  I mean, I think if the meet-and-confer ends and there is -- your position is that, you know, nothing we're asking for is, you know, sufficient, then, you know, maybe we need to have some litigation before the Court about what you could do next.

I am hopeful that we can -- you know, we're here.  We have, you know, a lot of our team here.  We're willing to, you know, hopefully, reach some arrangements.  I know Judge Carter would prefer it if we can solve our differences without his intervention.

But, yeah, I mean, I think that the fiscal emergency, at minimum, is something that is an ongoing

Page 64

Scolnick Decl. Ex. B - 173

issue.  And so maybe we need to ask the Court to modify the agreement.  But right now, I think we're in the stage of the agreement is paused and we are meeting and conferring in good faith.

That being said, obviously, we are still complying with, you know, the agreement, to the extent possible and feasible.  You know, we've made quarterly reports.  We've, you know, participated in the proceedings before Judge Carter, obviously.

I think mostly, what he was talking about with reporting doesn't go away.  Okay.  But I think he did acknowledge that some pause is warranted.  And so it may be just something for further litigation, but I am cautiously optimistic that maybe we'll be able to agree on something.

MS. MITCHELL:  Okay.  I appreciate the optimism.  I think let's just keep talking on that.

MR. HAMBURGER:  Great.

MS. MITCHELL:  So for my issues, obviously, the dispute resolution process, we were meeting quite frequently in 2022 and, I think, early 2023 on the dispute resolution, like, designing a dispute resolution process.

That fell off -- I think that fell off.  If you have been reading all of, like, the backstory, because

Page 65

Scolnick Decl. Ex. B - 174

the City wouldn't give us encampment reduction numbers, as a result of a meeting that we had with Mercedes and a couple of other folks, it was tabled because there was supposed to be, like, a full evaluation of each district and they were going to come back to us with a strategy.

Like, that never happened, and then we started the fight about the encampment reductions because, then, there was, like, a blanket refusal to even identify reductions by Ms. Marquez.

And so the Section 6 dropped off. I think it's -- it is part of the agreement, and I think that the process needs to be -- I think it needs to be reengaged.

What is your position thereon?

MR. HAMBURGER: I think our position is, is that this is a mutual obligation.

MS. MITCHELL: Yeah.

MR. HAMBURGER: So, you know, if we're not doing it, you're not doing it --

MS. MITCHELL: Yeah, no, I agree.

MR. HAMBURGER: I am not aware of a refusal to engage in it. So if there were discussions before, I guess, we could resume them.

I think one point is that I am not -- I don't believe the City is using the street engagement strategy

Page 66

Scolnick Decl. Ex. B - 175

as part of the performance of its -- its performance of this disagreement.

So query whether this dispute resolution process really even is something that we need to engage in. But if you want to discuss a dispute resolution process, we are -- we can discuss a dispute resolution process. I can say I'm not personally prepared to -- to discuss it today. I don't know if you are.

It's probably something that we need to talk with Valerie and Arlene and Jessica about and others at the City. And I probably -- you know, whoever's going to have the discussion with you, we probably need to, you know, get up to speed about whatever the proposals had been before and where we were before.

MS. MITCHELL: I can recirculate the last proposals, which I don't even know who all was on emails. I think it might have just been Scott and Michelle and I. Matt might have been on the emails as well -- Matt Szabo. And so I can -- I can finally recirculate those.

But this -- this does kind of illustrate the point, that this was the intention from the beginning -- right -- which was, shelters go up. We do, like, a district-by-district, even block-by-block encampment reduction, and as we engage individuals, we go through

Page 67

Scolnick Decl. Ex. B - 176

this dispute resolution process.  And the goal was to reduce litigation, litigation impact on the City.

And so instead of people getting upset and suing the City, you know, we have this whole process by which they can have this dispute resolution.  And so we're able to funnel litigation away from the City, was part of the goal.

So I will recirculate the last emails I have on this issue.  I'll probably have to go back to my old email address.  I just realized I was at a different firm at the time.  So I will pull those back up and recirculate, because I do think that this is worthwhile.

MR. HAMBURGER:  Okay.  Anybody else have anything on that?

Okay.  Next?

MS. MITCHELL:  Okay.  Section 7.1.

MR. HAMBURGER:  Yes.  So a couple of things on this, is that we think -- well, two things.  Several of the things that you outlined here are things that the agreement speaks of the commitment of the City to work with LAHSA to include, to the extent possible.  We don't -- we think that many of these things, LAHSA does not have or cannot give us.  You know, particularly, like, the numbers who have accepted offers of shelter, the number engaged, number of rejected offers of

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 177

shelter, and why the offers were rejected.

We're not aware that LAHSA has that granular of data, but we can definitely -- or the number of encampments in each council district.  But to the extent they have that, we're happy to go back to them and see if they can -- if they can get that.

MS. MITCHELL:  I think that the obligation on the City is a little bit more active, though.  It is not just, like, "Hey, do you have it?  If not, we are not reporting it."  It's that the City is supposed to be working with LAHSA to get that information and to make sure that LAHSA is gathering that information and including it and then including in those reports.

So I think the City has a lot more active of a role than you're representing.  I think you have to make sure that LAHSA is gathering that information and that's included in these reports.

MR. HAMBURGER:  Yeah.  I don't think it says that, but I understand that's your interpretation of it.  I mean, I think it says we'll work with them and to the extent possible --

MR. McRAE:  So doesn't that also presuppose that the City can make LAHSA actually do something?

MS. MITCHELL:  You can.

MR. McRAE:  That word "make."

Page 69

Scolnick Decl. Ex. B - 178

MS. MITCHELL:  You can.

MR. McRAE:  I'm sorry, what?

Well, what was your basis for saying that?

MS. MITCHELL:  It's a joint powers authority. Half of your commission comes from the City.  It takes direction from the City.  That's what LAHSA does.

MR. McRAE:  It's still a separate entity, and when you talk about having a -- making a separate entity -- you're talking about actual human beings here. This isn't like, you know, moving automatons.  I mean, these are people.

So to say that you can make people do something, I am just saying, practically, when you're talking about this not theoretically, but practically, it assumes --

MS. MITCHELL:  Right.  But I think that it says you will work with them --

MR. McRAE:  -- don't believe exist.  I don't think that's a foundation.

MS. MITCHELL:  Have you worked with them?

MR. McRAE:  Brad, do you want to -- I mean, I don't know if you have anything --

MR. HAMBURGER:  My understanding is, is that when -- in preparation of these reports, the City, and particularly the CAO, is constantly working with LAHSA

Page 70

Scolnick Decl. Ex. B - 179

to get the data for these reports.  Arlene and Jessica could probably speak to that more -- with more knowledge than I could.

But my understanding is there is, you know, extensive efforts made to get data from LAHSA.  And that is the source of the data, largely, that is in the reports.

But, Arlene or Jessica, do you want to confirm that?

MS. MARIANI:  Yes.  You're correct.

MS. MITCHELL:  Have you -- can I ask this, Jessica and Arlene?  Have you asked them to collect and report the number of PEH engaged, the number of PEH with separate offers of shelter, housing, et cetera?

MS. MARIANI:  My understanding is that was requested early on.  And since this is the first that you've raised it, I am not sure if it has been sought again.

But the understanding was that, like Brad pointed out, LAHSA doesn't track this type of information to this level of granularity that you are now looking for.

MS. MITCHELL:  I mean, to be fair, we were looking for it in 2022, but we just never got it.  And you're right that we didn't raise it until now.  That is

Page 71

Scolnick Decl. Ex. B - 180

true.

So is the City planning on doing anything further on this?  Like, how else are you guys now going to work with LAHSA to report this information?

MR. HAMBURGER:  Yeah.  I think we can go back to LAHSA and we can have a meeting, and I am happy to, you know, make myself available, and so I think we should -- we can commit to doing that.

And, you know, but I think I want to reiterate Marcellus's, you know, comments that, you know, there's only so much we can, but we will go at it again, if that's --

MS. MITCHELL:  I believe in you, Brad.

MR. HAMBURGER:  Thank you.

MS. MITCHELL:  I feel like you can do it.

MR. HAMBURGER:  So then the other question -- okay.  Go ahead.

MS. MITCHELL:  There's other stuff in here that's -- that doesn't specify the City will work with LAHSA, such as the number of beds or opportunities offered, the number of beds or opportunities currently available in each council district.

I think, also, there's an encampment, you know, reference in there.  I think that's stuff that the City has without reference to LAHSA; so --

Page 72

Scolnick Decl. Ex. B - 181

MR. HAMBURGER: Yeah. So our position on that is -- so the encampment part is in the LAHSA part, but our position is that we have been reporting these things and maybe there's just a distinction between -- you know, maybe there's, you know, a terminology or semantic distinction.

But we think that the reporting on the shelter and housing opportunities that we've created are ones that have been obtained and are being offered and that we also break them down by council district, is my understanding.

MS. MITCHELL: Oh, I see. You're saying -- okay. So I read this differently. Like, when I say the number of beds or opportunities offered, I read it similar to the conversation Valerie and I were just having about, like, an offer of a bed, whether it's rejected or not, this was an offer, and that's what's supposed to be tracked. You're saying when beds are attained, you consider that your offer?

MR. HAMBURGER: Well, I think they're offered if they're open and available. So I think there could be a distinction between beds that are -- you know, they're there, but they're not ready to be occupied. So we have them, but we're not -- they're not occupied and not open. I do think that when we say we list the ones

Page 73

Scolnick Decl. Ex. B - 182

that are -- or, you know, are open, that that is, yes, offered in the sense of this is -- this is being offered to the world.

And I think that is -- falls naturally from the distinction between the first sentence and the second sentence in the -- I don't want, you know, to be -- you know, do a textual analysis here, but, you know, the --

MS. MITCHELL:  I mean, I think there's a difference --

MR. HAMBURGER:  Because there are specific offers of shelter -- huh?

MS. MITCHELL:  Like, they're, obviously, listed.  I mean, I wrote it.  So I can have my own opinion about what it means.  But they're, obviously, listed separately.  So you have how many created, how many offered, how many available.  Like, these are three separately delineated things that you're supposed to be reporting on.

So not -- I don't think creations count as offerings.  I think they're two separate things, including how many have been offered.  Like, how many offers have been made and how many open beds are there, I think, was supposed to be the intent.  But I can see how maybe that is less than clear.  But I think that these are three separate things that are supposed to be

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 183

reported.

MR. HAMBURGER:  Yeah.  Well, I mean, there are three things listed.  I mean, I think there are -- maybe that there are three separate things that are supposed to be reported, but that there's a -- the Venn diagram is completely overlapping, and it's just a circle because 1 and 2 are the same, even though theoretically they could be different.  I kind of tried to explain how they theoretically could be different.  But that -- usually, what we've been reporting are ones that are open, and so that we think that they've been obtained and they've been offered, because they're being made available.

And I do think I -- just to finish my thought on the second sentence, I think that the more detail about offers, acceptances of offers, number of offers that have been made, number of rejected, why housing things were offered -- that's granular data that I don't believe exists and we can go back to LAHSA and see if they can get it or -- or what would it entail, whether it's possible.

But I think that is the kind of -- if that's how you're interpreting the first sentence, we would just disagree.  We think that -- you know, that there's a reason why there's more specificity in the second one.

Page 75

Scolnick Decl. Ex. B - 184

And I understand you wrote this and maybe you had something else in your mind.  I'm just reading it -- I'm reading it, not having written it.  I'm sure there's probably a, you know, no construing against the drafter kind of, you know, laws or whatnot --

MS. MITCHELL:  Yeah.

MR. HAMBURGER:  -- somewhere, proof it has the normal stuff.

MS. MITCHELL:  Yeah.

MR. HAMBURGER:  Everything does.  So -- so -- but, look, I think on this is, you know, maybe where we can leave this for today is that we are going to go back to LAHSA and set up a meeting with them to discuss all things data with respect to 7.1.

And if there's something like -- if you want to, you know, tell us specifically, like, what you're really looking for, I can tell you it's very -- and I don't believe the City would have agreed to it -- it's -- you know, without knowing that LAHSA could get it, but -- but, like, counting every single offer, just given the ways in which offers are made, that is very difficult.

And I don't know if Valerie, Jessica, or Arlene who -- who have more familiarity with how offers are made for the shelter -- the shelters and housing

Page 76

Scolnick Decl. Ex. B - 185

solutions that the City's created are, but they are not -- you know, this isn't like a one-stop shop where it's all the City doing it.  You know, there are -- opportunities are made, and then people get routed to them in a variety of pathways.

And so accounting for how many offers have been made -- and if you're interpreting the offer like, you know, there was an apartment and they offered it to 12 people, and then eventually the 12th person took it -- you know, I don't know if anybody is writing down every single, you know, I had 12, 11 unsuccessful offers, and I don't think -- I don't even know if that's something that we could even feasibly collect.

But I want to pause for a second --

MS. MITCHELL:  Yeah.  I mean, I --

MR. HAMBURGER:  -- for Jessica and Arlene to chime in.

MS. MITCHELL:  Okay.  I'll wait.  I'll wait. Go ahead.

MR. HAMBURGER:  Yeah.

MS. FLORES:  Again, I think until we -- I think LAHSA doesn't track that, and we can certainly raise that with LAHSA when we meet.  But there's already a lot of responsibility on the outreach workers for data collection.  So we have to live with realities in terms

Page 77

Scolnick Decl. Ex. B - 186

of what is feasible for LAHSA to collect, and we will put this on the list.

MR. HAMBURGER:  Yeah.

MS. MITCHELL:  Yeah.  I mean, I can say the way that this was designed when we were having our conversations in 2021 and 2022 was that it would be a district by -- like, a holistic effort.  Again, shelters go up, offers are made, people go into the shelters, and it would be far more organized than honestly it is right now.

When this was envisioned four -- three to four years ago, it was designed to be a holistic effort such that offers are being tracked and it's being done in a methodical way.  That's, obviously, not how the City is doing things now.  But that's the way it was designed and that's why this agreement is written this way, such that offers are supposed to be tracked.

MR. HAMBURGER:  Yeah.  So our -- I mean, what the City's been focused on is -- oh, sorry, Valerie.  Go ahead.

MS. FLORES:  What I was going to say is there were a lot of things about the agreement that don't track with how things work in the real world.  And the fact that the City isn't the entity making the offers makes our ability to track any of the offers very

Page 78

Scolnick Decl. Ex. B - 187

difficult.

We do rely on LAHSA, which is the continuum of the CARE for the city.  And so just because a shelter goes up doesn't mean the City has perfect control over who goes in there, who gets offered beds in there.

So, again, the agreement was written the way it was written, and we're trying our best now to interpret it in light of how the system actually functions.

MS. MITCHELL:  Well, the City helped design this.  This was not unilateral, Valerie.  I wrote this with Matt and with Scott.  Like, we were all in this together, in these conversations with the City Council, with LAHSA.  Like, this wasn't done in a bubble.

And so I can tell you that was the -- how things were envisioned in 2021 and 2022.  Obviously, as I have indicated, things have shifted, and things are being done differently.  But that's the way it was written, was that the offers would be tracked.

MR. HAMBURGER:  Yeah.  And I think our position is, is that the City -- first of all, the City's been focused on making a difference in the real world, which is creating the housing and shelter opportunities.  And I think that's actually what you really care about rather than just, you know, paperwork.

But I think our legal position, just to be

Page 79

Scolnick Decl. Ex. B - 188

clear, is that we are complying with 7.1, and that offering -- by creating these opportunities that are actually not just -- they don't exist in theory, not just that we've, you know, built the building, but we've actually offered it to the community, and people are in it or can be in it, and that satisfies 7.1.  And we think that's what 7.1 means, that first sentence.  And maybe you intended something different, but that's, I think, what the language says.

And I think it's just -- it flows from -- because, otherwise, why do you need everything else in the second sentence, which is the harder, more granular data, which I would love to have.  I think we all would love to have, you know, perfect insight into what everybody is doing on the ground.  But this is a city of millions of people with thousands of people experiencing homelessness.  And, you know, this is data that is difficult to get.  And I think that's the reality Valerie is talking about.

But, look, I -- we will commit to having a discussion with LAHSA about this and getting you as much data as, you know, that we can feasibly get to the extent possible in accordance with 7.1.

MS. MITCHELL:  Thank you.  So that I understand, the City's position is that it is complying

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 189

with the first sentence in the current reporting that there's no additional report that needs to happen from the first sentence. And then from the second sentence, the City will reengage with LAHSA to see if it can get that information. Is that -- do I have that correct?

MR. HAMBURGER: Yes, you do.

MS. MITCHELL: Okay. I disagree respectfully that the City is complying with the first sentence, but I will wait until I get back -- you know, hear back about what LAHSA can do to reengage. It may be that we can just be happy with what we're getting, if we can get additional information from LAHSA and don't need to, you know, fight about it any further.

MR. HAMBURGER: Great. Okay. Section 9 was the other one you raised and Section 10.

MS. MITCHELL: Yeah.

MR. HAMBURGER: So Section 9's the County. I mean, I think our response to that is that it's a -- it's a mutual obligation as well. And so I understand you want us to do more with the County. So --

MS. MITCHELL: Well, and I -- if I can expound on that a little bit. I want you to do more with you, if I can be frank. Like, I think there is a big disconnect in the -- from the Mayor's office versus the council districts.

Page 81

Scolnick Decl. Ex. B - 190

Like, City attorneys work with the Mayor's office and the CAO.  And I have had the same criticism, and Matt and I have talked to Matt Szabo, and I have talked about this for years.

Like, you guys are working with the Mayor's office and we are -- we hear from council districts, by the way, who call us to complain about what's happening with the Mayor's office.

So it's a regular issue where, like, there's no boots-on-the-ground response.  And so a good example of that is when we were in that County meet-and-confer last week, and I am, like, well, what is the City's position?  Is the City getting the services it needs?

You guys can't answer that question because the Mayor's office doesn't know.  The council districts know.  Your service providers know.

And so in order for -- like, I want to be like Jerry Maguire right now; right?  Like, help me help you in order to know that we are holding the County accountable and that you guys and the City is getting the services.  You've got to be better, like, partners in this.

You have to be more active participants in understanding what's actually happening, boots on the ground, so that we can make sure that people are getting

Page 82

Scolnick Decl. Ex. B - 191

helped, because we all agree that the numbers that are coming from the County are not great.  But for us to actually diagnose the problem and for us, especially, to be on the forefront of fighting this fight on your behalf, because the City can't and won't engage with the County directly, publicly on these issues, like, I think we need the City to be more actively involved with its council district and its service providers.

We started to do that in these listening sessions; right?  But none of that is on the record and it's few and far between.  And so whatever system needs to happen for the City to be more engaged with itself, I think, will benefit all of us in holding the County accountable.

MR. HAMBURGER:  Okay.

MS. MITCHELL:  So I think you guys are welcome to have that conversation and we can readdress it next week or what -- you know, however we want to do that. But that's really our position, is, like, the County, separate and apart from the mental health beds and substance use disorder beds that we'll call them the treatment beds and the board and care beds.  Those are -- those are clear brick-and-mortar, mostly, issues that we can hold them accountable.  But so much of the other County's -- you know, the County obligations were

Page 83

Scolnick Decl. Ex. B - 192

designed to assist the City. And so -- and, again, 2022 was a very different time, with a very different administration.

And so there was a lot of focus on, like, we've got to get what we can get from the County. After the election, it turned into, let's be a much more cooperative nature from the City. And so what's happening is the City is not getting what it needs, but isn't speaking up publicly.

And we've always said, from the beginning, like, we're willing to be the bad guy here to go after the County, but we need more help from the City to do that.

MR. HAMBURGER: Okay. I hear you on all of that. You know, you are claiming a breach of Section 9. So, you know, I think just --

MS. MITCHELL: I don't know that I said the word "breach," but if I did, I don't disagree that I don't think that the City is doing what it needs to do. But I am not here to, like, file anything with the Court at the moment. But I do think that we can work better together to hold the County accountable, but we can't do it because we don't have the information the City has.

MR. HAMBURGER: Okay. Well, why don't we -- I mean, we need to talk amongst ourselves about that. And

Page 84

Scolnick Decl. Ex. B - 193

I know we already have, you know, the County meeting with the monitor. So I think this overlaps a lot, but I understand what you're saying.

On Section 10, on affordable housing, you know, it's a mutual provision as well.

MS. MITCHELL: Uh-huh.

MR. HAMBURGER: So that's -- I guess, you know, what is the plan to -- you know, what are we not doing? What do you want us to do? And what -- you know, this is kind of a -- it's kind of a unique provision because it talks about cooperating to identify and reduce barriers to building more affordable housing. So it's, you know, aspirational, in some sense.

But is there something actionable that, you know, you're proposing that we should do --

MS. MITCHELL: Yeah. This was a heavily negotiated section, but I think what we can -- where we can start, because things have changed in the last several years, if the City can identify, from its perspective, the barriers to building more affordable housing, I think we can respond. And then maybe we can work together on that.

We, as you can imagine, get a lot of outrage from developers who are trying to put together affordable housing projects and other things and are

Page 85

Scolnick Decl. Ex. B - 194

very frustrated with the City. And so this was one of those goals of, like, let's all work together in a very cooperative way to try to make things better and easier for -- to put up housing.

And so I think that the City can start with what it's done over the last couple of years, because I have not been in the affordable housing role for the last couple of years and we can go from there.

MR. HAMBURGER: Okay. I think that's going to have to be another thing that we discuss and we'll -- we can get back to you. I don't want to commit that we will give you a list. If they could say it's a mutual thing, if there are -- it sounds like you have specific complaints of developers that have issues. If you want to give us that, we could ask people about that, perhaps. But I am reluctant to commit to anything because I haven't really had discussions with Valerie, Jessica, Arlene, or other stakeholders about that. So that's all I have for you right now.

MR. SCOLNICK: I wasn't part of the negotiations. It's pretty vague. So I don't know exactly what we are supposed to do, but, you know, we can --

MS. MITCHELL: Well, I think it was left intentionally vague, Kahn, if I am being honest.

Page 86

Scolnick Decl. Ex. B - 195

MR. SCOLNICK:  Fair enough.  And it's always great that affordable housing is part of the solution for homelessness.  So anyhow --

MS. MITCHELL:  Noted.

MR. HAMBURGER:  Okay.  I think we've gone -- we've gone through my list.  I think we went through your list too, because my list and your list were the same, because I was working off your email.

MS. MITCHELL:  Yes.  I was also working off of my email, and I do think that we have hit all of those things.

So as I understand it, just so we can talk about action items, I am going -- this is what I have listed for myself.  I am going to try to reach out to Jan Perry.  I had Daniel Garrie on the list, but maybe I don't need to reach out to him if the City -- if he's just a no-go for the City no matter what.  Jason Ward. So I'll try to connect with those people to have that conversation.

I have -- I am going to recirculate the dispute resolution information.  You guys are going to be talking to LAHSA to get the additional information.  And you guys are going to be getting me the TLS information that I asked for.  You're going to get me the affordable housing unit plan, whatever that looks like, so that I

Page 87

can take a look at it and I can talk to my people over the next day or so, hopefully.  And then you're going to get me the calculation on encampment reductions, both actual from Inside Safe and whatever estimations that you can get beyond Inside Safe.

Does that sound right?

MS. FLORES:  Yeah.  The only thing is when you mentioned getting something from LAHSA, again, we are going to ask, and that might be different than getting.  But we will circle back with what we learned from LAHSA.

MS. MITCHELL:  Okay.  And just to be totally clear, it's our position that the City has -- needs to have an active role in getting LAHSA to do that.  But I also understand the City's position.  You know, so we can -- we can table that fight.  If you guys can just talk to LAHSA first, then come back to me and let me know what is possible from existing circumstances, and then we can have that further conversation.

MR. HAMBURGER:  And, I guess, I am confused -- maybe I just -- you used a different label for it and I'm just not recalling what it was.  But you said we owed you -- we were going to give you an affordable housing plan?

MS. MITCHELL:  Oh, yeah, regarding the affordable housing units.  You've asked to use

Page 88

Scolnick Decl. Ex. B - 197

affordable housing as part of the settlement agreement compliance.  You pointed out to me that section that I was missing --

MR. HAMBURGER:  Yeah.

MS. MITCHELL:  -- of the settlement agreement. I told you I needed to take a minute, now that I saw that, give me 24 hours or so to wrap my head around it and come back to the thought.  But I was hoping, in the meantime, because you said that the affordable housing units that you would be using were, like, some specific type of affordable housing unit.  So I was hoping for more detail about that.

MR. HAMBURGER:  Yeah.  I can -- I can tell you that.  That was in the email that we sent, but I will re-up it.  It was in our initial email about all of this.  But I will include that in the email, just so you have it in one place, where I am going to send you the RAND and stuff.

But it's a -- it's a formulation of the -- I can tell it to you now.  It's 30 percent or less of a local area median income.  It's the -- the word in this area is called extremely -- it's -- you have affordable housing units for extremely low-income persons.  So those with 30 percent or less of a local area median income.

Page 89

Scolnick Decl. Ex. B - 198

MS. MITCHELL:  Do you have -- do you have anything on it?  Do you have, like, a -- is there, like, some landing page you can send me to, or some description that the City has or a --

MR. HAMBURGER:  I may have to get back to you on that.  I can -- I'll see if -- there may be something in my email, but if not, we're going to have to circle back and get that from somebody at -- who knows something more about affordable housing.

But I can tell you that this is -- if you just Google "extremely low-income persons" and then "affordable housing," like, this is, like, I believe it's almost a federal -- it may be a federal definition, but yes.

MS. MITCHELL:  Okay.  Okay.  That would be helpful.  Thank you.

MR. HAMBURGER:  Okay.

MR. McRAE:  Thank you.

MR. HAMBURGER:  Thank you, all.  Bye.

MS. MITCHELL:  Have a great weekend, guys.

(The proceedings concluded at 2:41 P.M.)

*  *  *

Page 90

Scolnick Decl. Ex. B - 199

STATE OF CALIFORNIA        )

                          )     ss.

COUNTY OF ORANGE           )


        I, Lena Mescall, Certified Shorthand Reporter,
Certificate No. 13018, for the State of California,
hereby certify:
        I am the person that stenographically recorded
the transcript of proceedings held on Friday, August 22,
2025.
        The foregoing transcript is a true record of
said proceedings.




Dated: 8/25/25




*lenajmescall*


        LENA MESCALL, CSR NO. 13018, RPR

Page 91

Scolnick Decl. Ex. B - 200

[& - accurate]

| & | | | |
|---|---|---|---|
| **&** | **2023** 46:17,17 | **5** | **91** 1:25 |
| **&** 2:4,11 | 48:13,17 52:13 | **5** 43:16 62:8 | **a** |
| **0** | 65:21 | 64:5 | **a&m** 5:23,24 |
| **02291** 1:6 | **2025** 1:17 3:4 | **6** | 6:3,24 7:3 |
| **1** | 4:2 30:15 | | **aback** 45:2 |
| **1** 1:25 75:7 | 37:22,23 91:9 | **6** 66:10 | **abandoned** |
| **10** 81:15 85:4 | **2027** 53:20,20 | **6,000** 54:8,10 | 48:4 60:2 61:5 |
| **100** 50:6 | **20th** 37:22 | **6,129** 51:9 | **ability** 62:24 |
| **11** 77:11 | **213.229.7000** | 55:18 | 78:25 |
| **12** 43:15 77:8 | 2:15 | **60** 23:16 | **able** 6:18 9:22 |
| 77:11 | **213.394.7979** | **6th** 2:21 37:23 | 17:20 64:11 |
| **12638** 91:17 | 2:7 | **7** | 65:14 68:6 |
| **12th** 77:9 | **213.978.7508** | **7.1** 52:9 80:1,7 | **absent** 62:19 |
| **13** 43:15 | 2:22 | **7.1.** 68:16 | **absolutely** |
| **13018** 1:22 | **22** 1:17 3:4 4:2 | 76:14 80:6,23 | 38:18 |
| 91:5,18 | 91:8 | **7550786** 1:23 | **academic** 14:5 |
| **14** 43:19 | **24** 89:7 | **767** 2:6 | **acceptances** |
| **15** 23:7 24:12 | **270** 2:6 | **8** | 75:16 |
| 43:20 | **2:20** 1:6 | **8.2** 23:25 26:12 | **accepted** 59:5,8 |
| **15th** 24:6 | **2:41** 4:2 90:21 | 26:24 27:24 | 68:24 |
| **17.3** 37:24 | **3** | 30:8,10 50:22 | **accompanied** |
| **1:01** 4:2 | **3** 62:7 64:5 | 62:6 64:13 | 49:15,21 |
| **2** | **3.2** 43:12 | **8.2.** 34:13 | **accordance** |
| **2** 75:7 | **30** 23:4 44:7 | **8/25/25** 91:14 | 80:23 |
| **2,700** 54:9 | 89:20,24 | **800** 53:20,23 | **account** 55:10 |
| **2021** 78:6 | **30th** 24:5 | 54:12 55:6 | **accountability** |
| 79:15 | **333** 2:14 | 60:25 61:3 | 30:22 |
| **2022** 17:1 | **4** | **9** | **accountable** |
| 46:17 52:12,19 | **4** 3:5 62:8 64:5 | **9** 81:14 84:15 | 82:20 83:14,24 |
| 54:21 55:6 | **400** 53:10,14,21 | **9's** 81:17 | 84:22 |
| 65:21 71:24 | 54:12 55:6 | **90012** 2:22 | **accounting** |
| 78:6 79:15 | **45** 24:12 | **90021** 2:6 | 77:6 |
| 84:1 | | **90071** 2:14 | **accurate** 30:12 |
| | | | 42:6 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 201

**[acknowledge - area]**

| | | | |
|---|---|---|---|
| **acknowledge** 59:25 65:12 | 36:6 43:3,15 43:19 44:4,5 | 64:6,7 65:2,3,6 66:11 68:20 | 38:13 |
| **acknowledged** 39:3 | 44:13,22,25 45:6,10,15,22 | 78:16,22 79:6 89:1,5 | **anomalous** 38:23 |
| **action** 87:13 | 85:4,12,20,25 | **ahead** 12:13 | **anomaly** 38:19 |
| **actionable** 85:14 | 86:7 87:2,24 88:22,25 89:1 | 21:18 57:6 72:17 77:19 | **answer** 39:18 82:14 |
| **active** 69:8,14 82:23 88:13 | 89:9,11,22 90:9,12 | 78:20 | **answered** 32:25 |
| **actively** 83:7 | **afternoon** 3:5 | **al** 1:4,8 | **answers** 40:22 |
| **actual** 70:9 88:4 | **agencies** 35:2 | **alameda** 2:6 | **anticipated** 36:13 |
| **actually** 5:18 | **ago** 11:17 78:12 | **alleviate** 62:16 64:6 | **anybody** 38:23 55:20 61:16 |
| 16:21 21:7 39:23 42:25 | **agree** 6:13 22:12,18 23:3 | **alliance** 1:4 6:6 12:16 18:7 | 68:13 77:10 |
| 45:3 69:23 79:8,23 80:3,5 | 37:17 41:4 47:8 53:16 | 22:12 26:21 28:6 29:11,17 | **anyway** 7:22 9:16 |
| 82:24 83:3 | 56:17 65:14 66:20 83:1 | 31:25 41:19 | **apart** 32:21 83:20 |
| **add** 48:23 | **agreed** 4:8 | **alliance's** 4:22 | **apartment** 77:8 |
| **addition** 50:12 | 16:23 29:15,18 34:11 76:18 | **allowed** 44:19 | **appearances** 2:1 |
| **additional** 34:25 37:24 | **agreement** 21:13,22,24 | **alternative** 37:2 | **apples** 38:22 |
| 81:2,12 87:22 | 24:10 28:4,14 | **amenable** 27:14 28:13 | **applies** 30:19 |
| **address** 68:10 | 28:17 30:2,19 | 31:21 33:4 | **appreciate** 15:7 25:11 65:16 |
| **adjustments** 30:4 | 35:14 39:4,25 41:1,3,19,23 | **amendments** 34:12 35:13 | **appreciated** 45:23 |
| **administration** 54:23 55:1 | 43:7,9,16 44:22 45:3,6,7 | **amount** 34:17 35:19 61:4 | **approach** 5:25 |
| 84:3 | 45:17,18,22 | **amounts** 34:20 | **appropriate** 34:12 35:13 |
| **administrations** 54:24 | 50:25 51:1 52:18 53:4,17 | **analysis** 74:7 | 58:15 |
| **admit** 60:20 | 54:6,21 58:24 | **analytical** 14:11 | **approval** 15:6 |
| **advancing** 51:4 | 62:8,11,19 | **angeles** 1:7 2:6 | **area** 59:13 60:6 |
| **affordable** 27:13 35:24 | | 2:10,14,18,22 13:23 37:5,10 | 60:10 89:21,22 89:24 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 202

**[areas - blanket]**

**areas** 39:22

**argue** 38:5

**argument** 29:15

**arlene** 2:20 5:7 5:13 17:19 42:13 61:16 67:10 71:1,8 71:12 76:23 77:16 86:18

**arlene.hoang** 2:23

**arrangements** 64:22

**aside** 29:10 36:12

**asked** 22:25 32:22 71:12 87:24 88:25

**asking** 24:20 25:16 32:10 60:14 64:15

**aspirational** 85:13

**assess** 41:6

**assist** 84:1

**associate** 17:1,2

**assuage** 41:21

**assume** 11:13

**assumes** 30:24 70:15

**assuming** 29:14

**assurances** 42:24

**attached** 37:22

**attained** 73:19

**attention** 48:25

**attorney's** 2:18

**attorneys** 82:1

**august** 1:17 3:4 4:2 37:23 91:8

**authority** 70:4

**automatic** 31:13

**automatons** 70:10

**available** 20:6 58:14,20 72:7 72:22 73:21 74:16 75:13

**avenue** 2:14

**avoid** 30:18

**aware** 66:21 69:2

**b**

**back** 12:1 15:1 17:7 18:5,22 19:1 37:6 43:13 44:11,25 48:8 52:18 54:3 59:13 60:24,25 61:12 66:5 68:9,11 69:5 72:5 75:19 76:12 81:9,9 86:11 88:10,16 89:8 90:5,8

**background** 7:18,21 8:10 10:25 13:22

**backstory** 65:25

**bad** 84:11

**bargain** 54:15

**bargained** 54:13 55:3,6

**barriers** 85:12 85:20

**based** 31:25

**basically** 10:7 43:5

**basis** 29:5 52:21 70:3

**bed** 41:6 56:9 57:12,18,24,25 58:8 59:6,20 73:16

**beds** 30:13 41:10 42:8 55:4,4 58:14 72:20,21 73:14 73:18,22 74:22 79:5 83:20,21 83:22,22

**beginning** 67:22 84:10

**behalf** 83:5

**beings** 70:9

**belief** 52:21

**believe** 5:8,11 7:8 17:16 18:24 26:22

44:7 52:23,25 53:8 63:15,17 66:25 70:18 72:13 75:19 76:18 90:12

**believed** 53:6

**belittling** 34:22

**ben** 12:19,21 22:10

**ben's** 12:23

**benefit** 46:25 47:10 83:13

**best** 6:24 52:20 79:7

**bet** 21:13,20

**better** 16:1,10 18:17 20:23 21:23 40:16 41:8 42:19 82:21 84:21 86:3

**beyond** 23:3 34:17 88:5

**bhamburger** 2:16

**big** 37:11 38:3 55:22 81:23

**bit** 16:5,6 25:7 25:11,12 34:2 43:4 45:2 69:8 81:22

**blame** 63:8

**blanket** 30:14 66:8

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 203

[block - city]

block  67:24,24
board  83:22
bodies  55:4,5
boots  82:10,24
brad  34:1
  47:20 70:21
  71:19 72:13
bradley  2:13
  48:22
breach  84:15
  84:18
break  27:18
  73:10
breathing
  25:12
brick  83:23
bridge  53:9
brief  29:2
briefed  5:25
broader  8:12
  20:12
broke  32:21
  39:12
brought  9:6
bubble  79:13
building  80:4
  85:12,20
built  80:4
bunch  15:18,18
  32:22
burden  36:9
  63:4
business  9:12
  14:18

bye  90:19

**c**

calculation
  88:3
california  1:2
  1:24 2:6,14,22
  4:1 91:1,5
call  5:19 14:16
  15:2 23:22
  26:4,14,14
  36:14 37:3
  44:11 46:20
  63:14 82:7
  83:21
called  9:10
  89:22
campbell  6:5
candidly  9:17
  15:21
cao  42:2 70:25
  82:2
capabilities
  14:20
capacity  9:23
care  23:21
  49:15,15,21
  56:3,4,24,24
  57:1,5 79:3,23
  83:22
carter  20:8
  21:11,13 35:12
  36:4 38:6 46:8
  50:23 59:24
  63:2 64:22
  65:9

carter's  19:20
  43:8 53:12,25
  59:25 60:15,16
case  1:5 5:25
  44:12
categorically
  31:24
categories  44:6
category  10:23
cause  40:17
caused  35:7
causes  40:9
  63:7
cautiously
  65:14
central  1:2
century  38:15
certain  22:8
  36:16
certainly  52:23
  54:18,24 59:3
  77:22
certainty  50:7
certificate  91:5
certified  91:4
certify  91:6
cetera  52:15
  71:14
changed  85:18
chime  77:17
choice  5:5 6:6
  39:9,9,14,16
choices  36:16
  36:20,22 37:2

choose  39:8,10
circle  18:22
  75:6 88:10
  90:7
circumstances
  20:7 28:8
  29:18 88:17
cities  16:6
city  1:7 2:10,18
  2:21 5:9,23 6:2
  6:8,17 8:19 9:3
  9:4,21 10:6
  11:21 12:1,3,4
  14:2,22 18:16
  20:16 25:21
  27:8 30:7,11
  30:17,24 33:8
  34:9,18 35:1,5
  35:7,18,20
  36:3,15,16,17
  36:21 37:2,4,5
  37:8,10,15
  38:3,11,24
  39:3,24 40:1,9
  40:11,13 41:10
  41:17,21 43:23
  44:17,19 46:6
  46:16 50:14
  52:10,16 53:5
  53:8 55:11
  62:2,7,25 63:4
  63:8,11,18,25
  64:8 66:1,25
  67:11 68:2,4,6
  68:20 69:8,10

Page 4

Scolnick Decl. Ex. B - 204

[city - confirmation]

69:14,23 70:5
70:6,24 72:2
72:19,24 76:18
77:3 78:14,24
79:3,4,9,12,20
80:15 81:4,8
82:1,13,20
83:5,7,12 84:1
84:7,8,12,19,23
85:19 86:1,5
87:16,17 88:12
90:4
**city's** 6:10
13:20 17:14
29:12 36:19
62:1 77:1
78:19 79:20
80:25 82:12
88:14
**civil** 34:23 37:3
38:7 64:2
**claim** 36:22
**claiming** 84:15
**clarifications**
48:6
**clarified** 50:1
**cleaned** 60:7
**cleanings** 56:4
**cleanup** 49:21
**cleanups** 49:15
49:23,24 50:10
51:19
**clear** 22:19
26:19,20 27:5
29:23 33:18

36:7,24,24
37:1 46:23
53:3 56:10
59:9,10 64:5
74:24 80:1
83:23 88:12
**clearing** 59:13
**clearly** 52:3
**client** 54:3,4,4
**clock** 24:11
**close** 43:9
**closely** 17:17
**closer** 45:12
**collateral** 33:22
**colleague** 63:13
**colleagues**
11:14 14:7
**collect** 71:12
77:13 78:1
**collection**
77:25
**combination**
61:3
**combined** 61:4
**come** 4:11
21:20 28:6
44:25 55:5
61:8,11 62:13
66:5 88:16
89:8
**comes** 40:16
57:18 70:5
**comfortable**
18:7,7

**coming** 83:2
**comments**
26:15 72:10
**commission**
70:5
**commit** 23:21
72:8 80:20
86:11,16
**commitment**
68:20
**communicated**
47:6
**communicati...**
50:2
**community**
80:5
**comparison**
38:21
**competency**
21:17
**competent** 14:6
14:7
**complain** 82:7
**complaints**
86:14
**complete** 29:9
33:9 36:10
37:13
**completely**
31:12 75:6
**compliance**
30:14,22 89:2
**comply** 36:23
43:24 53:24
62:25

**complying** 36:3
65:6 80:1,25
81:8
**conceding**
41:25
**concept** 31:3
**conceptual**
28:11 29:10
34:5
**concern** 41:9
41:11,11
**concerned** 7:22
**concerns** 5:24
6:1 8:9 20:12
20:12 21:16
41:11,21
**concluded**
90:21
**confer** 1:16
4:20 14:16
26:13 29:9
30:3 31:19,24
32:4 35:12
47:15 51:5
58:24 62:13
63:1 64:14
82:11
**conferring**
50:21 56:15
65:4
**confident** 60:5
**confirm** 17:20
71:8
**confirmation**
43:6

Page 5

Scolnick Decl. Ex. B - 205

**[conflict - currently]**

conflict  21:17
confused  43:4
  88:19
connect  18:4,19
  22:6 87:18
connection
  15:15
connections
  16:17 17:14,15
consequence
  38:20
consequences
  64:2
consider  10:1
  15:24 18:9
  33:10 52:22
  53:15,23 55:14
  73:19
considering  7:5
  8:21 10:7,13
constantly
  70:25
construed  36:3
construing
  76:4
contact  9:25
  20:1
contemplated
  35:10
contemplating
  41:20
context  11:19
  12:23
continue  26:8
  30:5 62:20

continuing
  36:19
continuum
  79:2
contract  5:12
contracts  5:7
  6:21
contradict
  32:19
contrary  28:20
  47:17
control  79:4
conversation
  6:12,23 7:7
  18:3,6,8 23:14
  23:17,19 27:12
  48:13 73:15
  83:17 87:19
  88:18
conversations
  78:6 79:12
cool  16:20
cooperating
  85:11
cooperative
  84:7 86:3
correct  5:7,14
  5:15,16 7:9
  10:14 51:16
  71:10 81:5
corrected  45:5
  45:9
correctly  21:8
cost  7:23 37:24
  40:3

costs  8:1 34:8
  34:18,21,25
  35:19 36:2
council  36:15
  36:16,17 64:8
  69:4 72:22
  73:10 79:12
  81:25 82:6,15
  83:8
counsel  2:1
  28:6
count  44:4 51:1
  51:4,13,20,21
  51:25 52:3,24
  54:10 56:18
  57:15 58:11,24
  59:22 60:2,11
  74:19
counted  54:8
counterpropo...
  61:1,2
counting  41:19
  46:13,14 48:9
  50:4 76:20
counts  38:6
  60:15
county  6:17 8:5
  11:21 12:1
  14:2 21:12
  81:17,20 82:11
  82:19 83:2,6
  83:13,19,25
  84:5,12,22
  85:1 91:2

county's  83:25
couple  9:3
  20:11 24:9
  27:16,17 32:22
  66:3 68:17
  86:6,8
course  22:3
  28:22,23 40:11
court  1:1 4:8
  5:1 21:20 30:1
  30:17 39:3,21
  56:12 62:1
  64:17 65:1
  84:20
court's  27:5
  29:22 56:13
courtesy  24:20
cover  37:24
  40:9
created  73:8
  74:15 77:1
creating  79:22
  80:2
creations  74:19
credit  60:17
crisis  44:15
criticism  82:2
crutcher  2:11
csr  1:22 91:18
curious  39:1
  40:18
current  26:20
  81:1
currently  72:21

Page 6

Scolnick Decl. Ex. B - 206

**[cv - dispute]**

| | | | |
|---|---|---|---|
| **cv** 1:6 | **decade** 37:6 | **determine** 30:3 | 28:3 34:4 38:4 |
| **d** | **decades** 9:3 | **determining** | 47:8,23 63:7 |
| **d** 3:1 | **decide** 31:12 | 50:16 | 75:24 81:7 |
| **daniel** 18:14 | **decision** 44:3 | **developers** | 84:18 |
| 20:4 21:14 | **declaration** | 85:24 86:14 | **disagreement** |
| 87:15 | 16:24 30:16 | **diagnose** 83:3 | 29:5 34:6 67:2 |
| **data** 7:1,19 | 33:12 | **diagram** 75:5 | **disagreements** |
| 8:12,13,17,19 | **declared** 31:23 | **difference** | 31:17 |
| 9:18 14:8 | 33:5 35:5 | 37:12 74:9 | **disclose** 15:23 |
| 18:15 23:9 | **defendant** 1:9 | 79:21 | **disclosure** |
| 25:5,17,23 | 2:10 | **differences** | 12:11 |
| 30:14 41:12 | **defer** 60:21 | 22:10 64:23 | **disconnect** |
| 50:12 51:6 | **define** 30:5 | **different** 16:5,6 | 81:24 |
| 55:18 60:3,4 | **definitely** 69:3 | 25:15 27:19,21 | **discretion** |
| 60:18,23 61:9 | **definition** | 28:12 31:12 | 29:13 39:3,20 |
| 61:14 69:3 | 51:24 90:13 | 37:7 44:24 | 39:24 40:1,7,8 |
| 71:1,5,6 75:18 | **definitions** 44:5 | 54:22,23,25 | 40:12 43:14 |
| 76:14 77:24 | **delay** 23:14 | 59:2 68:10 | 44:20 |
| 80:13,17,22 | **delineated** | 75:8,9 80:8 | **discuss** 23:2 |
| **dated** 37:21 | 74:17 | 84:2,2 88:9,20 | 31:8 42:20 |
| 91:14 | **department** | **differently** | 67:5,6,8 76:13 |
| **day** 45:12,19 | 60:4 | 73:13 79:17 | 86:10 |
| 58:20 88:2 | **depending** | **difficult** 18:10 | **discussed** 46:17 |
| **days** 23:4,7,16 | 10:21 14:23 | 76:22 79:1 | **discussing** |
| 24:12 59:11,13 | **described** 61:5 | 80:18 | 31:14 |
| 59:15 | **description** | **digest** 61:11 | **discussion** |
| **deaf** 46:19 | 90:4 | **digging** 18:18 | 67:12 80:21 |
| **deal** 7:18 14:9 | **design** 79:9 | **direct** 38:8 | **discussions** |
| 22:20 29:7 | **designed** 52:11 | **directed** 50:13 | 10:6 33:22 |
| 53:7,8 61:6 | 52:12,13 78:5 | **direction** 43:23 | 66:22 86:17 |
| **dealing** 21:12 | 78:12,15 84:1 | 70:6 | **disorder** 83:21 |
| 64:1 | **designing** | **directly** 34:13 | **dispute** 34:17 |
| **debate** 31:4 | 65:22 | 35:16 83:6 | 65:20,22,22 |
| 36:5 54:17 | **detail** 75:15 | **disagree** 7:10 | 67:3,5,6 68:1,5 |
| 63:22 | 89:12 | 16:11 22:16,18 | 87:20 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 207

**[disqualify - especially]**

**disqualify** 11:16
**dissertation** 29:5
**distinction** 32:15 73:4,6 73:22 74:5
**distinctions** 33:21
**district** 1:1,2 66:4 67:24,24 69:4 72:22 73:10 78:7 83:8
**districts** 9:10 9:11,12 81:25 82:6,15
**disturbance** 38:7
**disturbances** 34:24
**doc** 1:6
**document** 29:2 37:19,20
**documented** 29:6
**documents** 37:21,23
**doing** 7:4 8:14 9:8,9,16 31:11 44:12 56:3,5 66:19,19 72:2 72:8 77:3 78:15 80:15 84:19 85:8

**dollar** 34:25
**double** 53:18
**dozen** 37:7
**drafter** 76:4
**drains** 40:5
**dropped** 66:10
**due** 24:2 34:18 36:23 37:25
**dunn** 2:11 6:2 20:17,18 25:10 25:22
**duration** 62:12
**duty** 30:2

**e**

**e** 3:1
**earlier** 64:3
**early** 65:21 71:16
**ears** 46:19
**easier** 15:5 16:3 18:12 86:3
**east** 2:21
**edge** 44:9
**edification** 31:8
**effecting** 28:13
**effort** 39:23 58:17 78:7,12
**efforts** 44:18 71:5
**efits** 9:13
**either** 15:4 16:18 18:6 21:9 59:4,8
**election** 84:6

**elicited** 47:18
**eligible** 57:17
**eliminated** 58:25
**elizabeth** 2:5,7
**email** 5:18,19 19:9 26:25 27:9 32:25 35:4 36:25 37:22 40:25 46:23 50:19 61:25 68:10 87:8,10 89:14 89:15,16 90:7
**emails** 67:17,18 68:8
**emergencies** 30:25 31:22 33:22 34:6 53:4
**emergency** 27:2,15,23,25 28:4,7 29:14 30:16,17,20 33:5,12 35:5,7 35:8,9,21 36:12,17,25 38:20 46:1 55:10 61:22 62:21,24 63:5 63:21,24 64:9 64:25
**employees** 63:9 63:12,18

**encampment** 35:23,25 46:3 46:22 48:12 53:19 55:4,21 55:23 66:1,7 67:24 72:23 73:2 88:3
**encampments** 36:4 47:3 51:23 52:14,14 69:4
**encourage** 6:22 7:6
**ended** 11:24 32:23
**ends** 24:5 64:14
**engage** 58:17 66:22 67:4,25 83:5
**engaged** 68:25 71:13 83:12
**engagement** 66:25
**engaging** 30:5
**entail** 75:20
**entered** 54:21
**entirety** 11:5
**entities** 8:18,20
**entity** 1:8 11:22 70:7,9 78:24
**envisioned** 78:11 79:15
**escalates** 38:19
**especially** 83:3

Page 8

Scolnick Decl. Ex. B - 208

[esq - filibustering]

esq 2:5,12,12
  2:13,19,20,20
essential 44:14
essentially
  63:20
estimate 52:20
estimates 50:18
  50:20
estimations
  52:5 88:4
et 1:4,8 52:15
  71:14
evaluation 66:4
event 38:3,8
  47:25 53:9
events 26:24,24
  34:8,11 35:18
  63:24
eventually
  51:10 77:9
everybody
  21:23 38:3
  59:9 80:15
evidence 16:25
  38:9
exacerbating
  36:21
exact 34:10
exactly 8:10
  14:19 62:1
  86:22
example 63:5
  82:10
excellent 4:14

excuse 30:11
exemption
  30:14
exercise 40:7
  40:11,15
exercised 40:1
exhausted
  31:24 47:15
exist 38:20
  70:18 80:3
existing 42:25
  51:2 88:17
exists 35:9 63:7
  75:19
expected 30:5
expenses 37:25
expensive 7:22
  8:4 21:4 36:22
  39:6,10 40:15
experience 7:18
experiences
  20:14
experiencing
  80:16
expert 11:17
  12:15 13:16
  16:22,23
explain 33:13
  42:21 43:24
  75:8
explained
  33:19 43:25
  47:16
explains 62:6

explanation
  46:16 52:4,21
  62:14
explanations
  46:11
expound 81:21
expressed 8:23
extend 23:1
  53:19
extending 36:9
extension 24:15
  24:18
extensive 71:5
extent 14:8
  52:25 65:6
  68:21 69:4,21
  80:23
extra 25:1,7,16
  25:20,24
extremely
  89:22,23 90:11

f

faces 35:18
fact 40:11
  78:24
failures 30:21
fair 4:6 71:23
  87:1
fairly 22:8
fairness 38:21
faith 30:3,5
  35:11 63:2
  65:4
fall 10:22

fallen 46:19
fallout 64:1
falls 74:4
familiar 9:4
familiarity
  13:23 76:24
family 57:22
  59:5
far 5:25 19:22
  20:13 31:7
  48:17 51:21
  54:7 78:9
  83:11
feasible 65:7
  78:1
feasibly 77:13
  80:22
federal 90:13
  90:13
feel 32:2,5
  37:16 72:15
fell 65:24,24
fielding 17:2
fight 66:7
  81:13 83:4
  88:15
fighting 83:4
figure 12:6
  16:14 23:13
file 84:20
files 16:14
filibustered
  32:13
filibustering
  32:2 33:18,24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 209

[finally - go]

**finally** 67:19
**find** 19:23 63:2
**fine** 10:15
19:16 41:7
58:10 59:7,15
59:18
**finish** 39:11,13
39:15,17 75:14
**finished** 39:19
**fires** 27:4 30:15
34:19 36:12
64:2
**firm** 68:11
**first** 19:3,9
23:13 27:1,20
28:15,19 57:1
71:16 74:5
75:23 79:20
80:7 81:1,3,8
88:16
**fiscal** 27:2 35:5
35:7,8,9,17,20
36:2,8,12,17,25
37:8,11 38:20
40:4 46:1 53:5
55:10 63:5,20
63:24 64:1,24
**fit** 6:3,20,24
14:6 15:22
16:9 18:17
21:3
**five** 5:8
**flag** 43:10
**flagged** 22:5

**floor** 2:21
**flores** 2:19 5:16
9:12 56:1,14
56:17 57:11,16
58:4,13 77:21
78:21 88:7
**flows** 80:10
**focus** 36:7 84:4
**focused** 14:5
78:19 79:21
**folks** 7:16 18:3
18:19 66:3
**followed** 33:22
**forefront** 83:4
**foregoing**
91:10
**form** 34:25
**formulation**
89:19
**forth** 47:2 62:7
**forward** 53:2
53:17 62:24
**fought** 54:15
**found** 16:22
**foundation**
70:19
**four** 54:16
78:11,11
**frank** 81:23
**frankly** 16:2
39:23
**free** 8:6,8 21:5
21:6
**frequently**
65:21

**friday** 1:17 3:4
4:2 91:8
**frustrated** 86:1
**full** 12:10 21:2
55:14 66:4
**functions** 79:8
**fundamental**
46:4,4
**funded** 41:21
43:1
**funnel** 68:6
**further** 65:13
72:3 81:13
88:18
**fyi** 22:10

**g**

**garrie** 7:20
18:14 20:4,10
21:14 87:15
**gathering**
69:12,16
**general** 12:22
12:22
**generally** 7:13
8:3 13:22 50:9
**generate** 25:21
**gentleman** 13:9
16:13
**getting** 8:17,20
11:18 23:21
57:16,23,24
58:2 68:3
80:21 81:11
82:13,20,25
84:8 87:23

88:8,9,13
**gibson** 2:11 6:2
20:17,18 25:10
25:22
**gibsondunn.c...**
2:15,16,16
**gitnick** 15:9
**give** 16:23,25
25:24 26:16
29:4 42:24
45:11,19 48:19
49:4 50:11
51:6,18 53:18
60:16,18,22,23
61:9 66:1
68:23 86:12,15
88:22 89:7
**given** 5:24
35:18 36:2
41:13 45:2
51:22 53:4
76:21
**go** 4:4,5 11:23
12:1,13 15:1
23:24 24:8
26:16 35:16,17
37:6 40:23
47:20 52:8,11
55:4,4 58:1
59:20 62:10
63:6 65:11
67:23,25 68:9
69:5 72:5,11
72:17 75:19
76:12 77:19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 210

[go - happens]

78:8,8,19
84:11 86:8
87:17
**goal**   25:6 53:17
53:19 68:1,7
**goals**   86:2
**goes**   43:13 79:4
79:5
**going**   6:13 8:8
13:21 14:3,17
16:14,21 18:10
20:20 21:4,7
21:14,19,23
23:9 24:16
25:21 27:7
29:4 34:4
35:21 36:16
38:25 40:15
42:3 44:3,21
45:21 50:5,19
51:5,11,12,17
51:18 53:2,17
54:5 55:7
57:20,21 58:3
59:17 60:6,7
60:24 61:8
62:10,24 63:6
66:5 67:11
72:3 76:12
78:21 86:9
87:13,14,20,21
87:23,24 88:2
88:9,22 89:17
90:7

**good**   4:12 5:5
6:3 7:23 16:24
21:18 30:3,5
35:11 41:16
48:16 50:25
63:1 65:4
82:10
**google**   90:11
**gosh**   9:9
**government**
13:24 14:2
**grading**   41:22
**grand**   2:14
**granular**   69:2
75:18 80:12
**granularity**
71:21
**gravity**   28:8
**great**   17:6
41:16 43:2
61:13 65:18
81:14 83:2
87:2 90:20
**ground**   13:15
80:15 82:10,25
**group**   11:8,13
**guard**   38:12
**guess**   8:22 10:3
10:8 11:2 17:8
22:18 26:18
50:21 53:25
55:9,16 58:18
60:23 66:23
85:7 88:19

**guy**   84:11
**guys**   5:3 6:16
7:4 9:11,24
11:16 23:7
24:4 25:15,16
39:2,23 40:19
48:12,23 49:3
72:3 82:5,14
82:20 83:16
87:21,23 88:15
90:20

**h**

**h**   16:20
**half**   70:5
**hall**   2:21
**hamburger**
2:13 4:4,13 5:4
5:17,23 7:8 8:2
8:7,17 10:2,14
10:17,20 11:2
11:8,11 12:12
13:18 14:1,13
14:22 15:11,16
15:24 17:6,12
17:24 18:21
19:12,16 20:10
20:18 21:2,21
22:1,13,15,25
23:20,24 26:12
27:16 33:13,15
34:2 37:18
40:23 41:16,25
42:5,10,12,17
42:23 43:3,12
43:21 44:2,17

45:23,25 47:22
48:21 49:6,8
49:13 51:8,15
53:1 55:8,16
59:23 60:10,18
60:22 61:10,13
61:19 62:4,10
63:13 64:10,13
65:18 66:15,18
66:21 68:13,17
69:18 70:23
72:5,14,16
73:1,20 74:10
75:2 76:7,10
77:16,20 78:3
78:18 79:19
81:6,14,17
83:15 84:14,24
85:7 86:9 87:5
88:19 89:4,13
90:5,17,19
**hand**   43:9
52:11,11
**happen**   36:18
37:4 40:8 81:2
83:12
**happened**
28:16 34:16
66:6
**happening**
42:25 49:24
54:23 82:7,24
84:8
**happens**   58:14

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 211

**[happy - including]**

happy 6:15 18:3,8,19 25:23 42:20 51:25 69:5 72:6 81:11
hard 23:5 24:23 25:2,3 31:3 34:25 39:18 46:15 54:15
harder 80:12
he'll 21:5 60:16
head 38:15 89:7
heads 42:14
health 17:3 57:24 83:20
hear 4:11 41:17 42:15 58:18 81:9 82:6 84:14
heard 27:8 32:5
hearing 6:1 10:17 47:2,12 47:12,19 50:1
heavily 85:16
held 91:8
help 9:22 82:18 82:18 84:12
helped 79:9 83:1
helpful 19:8 20:6 53:1 90:16

henwood 12:19 12:21 22:10
heretofore 27:3
hey 18:5 48:14 57:8 59:16 69:9
highly 38:23
history 12:10 38:24
hit 87:10
hoang 2:20 5:15 24:5
hold 5:18 32:17 83:24 84:22
holding 48:8 82:19 83:13
holistic 78:7,12
homeless 7:1
homelessness 7:17 12:5 13:6 17:17 36:20 44:15 80:17 87:3
homework 17:9
honest 45:8 86:25
honestly 11:25 16:4 32:8 60:13 78:9
hopeful 21:21 64:11,19
hopefully 22:1 42:23 49:25 64:21 88:2

hoping 22:22 89:8,11
hospital 57:24
hours 89:7
housing 27:13 35:25 36:6 39:5 43:3,15 43:19 44:5,5 44:13,22,25 45:6,10,14,15 45:15,22 47:5 57:8 71:14 73:8 75:17 76:25 79:22 85:4,12,21,25 86:4,7 87:2,25 88:23,25 89:1 89:9,11,23 90:9,12
huh 74:11 85:6
human 1:4 70:9
hurdle 16:1
hurt 10:9
hypothetical 23:6 30:24 32:6,11
hypothetically 18:14
hypotheticals 32:22

**i**

ice 27:1 34:23 37:8,19
idea 8:11 19:21 23:11

ideal 20:15
idealogical 22:9
ideas 15:3
identifies 43:15
identify 52:13 66:8 85:11,19
identifying 41:10
illustrate 67:21
imagine 12:14 13:15 85:23
impact 37:8,11 62:23,24 68:2
impacted 30:20
important 25:5 25:8 28:10 30:10 56:13
imposed 34:8 34:18 35:20
imposes 30:2
impropriety 6:19
improvement 9:12
inability 36:22
inception 52:18
incestuous 13:5
incidents 34:23
include 39:5 68:21 89:16
included 69:17
including 45:6 49:17 69:13,13 74:21

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 212

**[income - june]**

| | | | j |
|---|---|---|---|

**income** 89:21 89:23,25 90:11
**inconsistent** 31:2,6 33:20
**incurred** 37:25
**indefinitely** 64:8
**independent** 6:18
**indicated** 79:16
**individual** 11:3 11:9,12,15 50:14
**individuals** 45:14,16 67:25
**inflicted** 63:20
**information** 9:25 17:13,13 46:5 52:7 69:11,12,16 71:21 72:4 81:5,12 84:23 87:21,22,23
**infrastructure** 9:21 18:15,16
**initial** 89:15
**inquiry** 38:17
**inside** 46:14 48:12,15,18 49:10 50:12 51:19,19,25 52:24 57:21 88:4,5
**insight** 80:14

**institutions** 10:23
**insufficient** 55:7 56:4 58:23
**intended** 45:13 46:21,22 80:8
**intent** 74:23
**intention** 67:22
**intentionally** 86:25
**interest** 8:24 12:10
**interested** 10:10,11 15:1 19:23
**interpret** 28:17 79:7
**interpretation** 27:21 47:23 53:12 69:19
**interpreted** 46:8
**interpreting** 75:23 77:7
**intertwined** 6:17
**intervention** 64:23
**invocation** 27:22,23 28:2 28:9,15,18,24 29:17 30:10 31:13,22 32:1 33:21

**invocations** 31:23
**invoke** 28:4 29:13
**invokes** 31:4
**invoking** 30:25
**involved** 6:2 20:21 25:8,10 83:7
**irrelevant** 32:8 33:7
**irvine** 1:24 4:1
**issue** 6:7 10:21 11:2 21:3,11 27:20 29:23 40:4 41:14 43:14 48:1 62:21,23 63:23 65:1 68:9 82:9
**issues** 7:2,17 9:4 12:5 13:22 14:8 16:12,15 17:17 19:4 20:2 21:17,17 27:19 28:14 30:15 32:22 55:21,22,23 65:19 83:6,23 86:14
**it'd** 21:17
**items** 56:20 87:13

**j** 2:13
**jams** 7:20 8:3
**jan** 7:24 8:21 8:21 9:1 18:16 87:15
**january** 30:15
**jason** 20:1,4 22:3,9 87:17
**jerry** 82:18
**jessica** 2:20 42:12,15 61:16 67:10 71:1,8 71:12 76:23 77:16 86:18
**jessica.mariani** 2:24
**job** 1:23
**joint** 70:4
**judge** 19:20 20:8 21:11,13 35:11 36:4 38:6 43:8 46:8 48:4 50:23 53:12,25 59:24 59:25 60:15,16 63:2 64:22 65:9
**judgment** 51:6 51:17
**jump** 7:9
**june** 37:22 53:20

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 213

**[k - learn]**

| k | | | |
|---|---|---|---|

**k**  16:20
**kahn**  2:12
  12:13 37:22
  61:17 86:25
**keep**  65:17
**kes**  1:6
**kind**  5:12 6:1
  7:14 10:22,22
  10:24 14:11,20
  32:7 39:18
  43:21 48:5
  52:8 67:21
  75:8,22 76:5
  85:10,10
**king**  2:4
**know**  4:21 5:13
  6:13,18 7:3,4
  7:16,25 8:2,2,3
  8:11,23 9:1,6,8
  9:11,17,18,19
  9:21 10:2,4,5,8
  10:23,24 11:4
  11:12 12:9,10
  12:22 13:4
  14:1,10,15,17
  14:23 15:2,2
  15:21,21 16:1
  16:1,4 17:13
  17:19,21 18:2
  18:4,6,25 19:5
  19:6,16,17,17
  20:5,6,6,11,21
  20:24 21:6,9
  21:10,18 22:3

22:7,9,11,11,16
22:19 23:2,18
24:9,25 26:10
26:15 29:16
33:2 34:5,16
34:21,22 35:3
35:4 36:1 37:9
37:21,24 38:14
38:14,25 40:20
41:5 42:2,6,8
42:11,12,19,24
43:9,24 44:3,8
44:9,19 45:3
45:13,18 46:3
46:4 47:22
48:3,3,4,9 49:9
49:16,20,23,25
50:3,6,6,8,9,16
50:18,19,20,21
50:22,23,24
51:10,11,12,13
51:18,21 52:6
52:16 53:2,10
53:12,22,24
54:16,25 56:5
56:8 57:9 58:1
58:14 59:6,24
60:1,2,4,6,6,24
60:24 61:1,2,6
61:19 62:14,18
62:19 63:7,10
63:19 64:10,15
64:16,16,19,20
64:21,22 65:6
65:7,8 66:18

67:8,11,13,16
68:4,23 70:10
70:22 71:4
72:7,9,10,10,23
73:5,5,22 74:1
74:6,7,7 75:24
76:4,5,11,16,19
76:23 77:2,3,8
77:10,10,11,12
79:24 80:4,14
80:17,22 81:9
81:13 82:15,16
82:16,19 83:18
83:25 84:15,16
84:17 85:1,1,4
85:7,8,9,13,15
86:21,22 88:14
88:17
**knowing**  76:19
**knowledge**
  18:15,17 38:24
  71:2
**knowledgeable**
  12:4
**knows**  9:17,21
  9:21 13:24
  14:1,2,3 15:12
  42:13 90:8
**kscolnick**  2:16
**kuhn**  16:19

| l | | | |
|---|---|---|---|

**l**  2:19
**l.a.**  13:5 16:5,7
  21:12

**la**  1:4
**label**  88:20
**lacity.org**  2:23
  2:23,24
**lahsa**  8:20 52:7
  68:21,22 69:2
  69:11,12,16,23
  70:6,25 71:5
  71:20 72:4,6
  72:20,25 73:2
  75:19 76:13,19
  77:22,23 78:1
  79:2,13 80:21
  81:4,10,12
  87:22 88:8,10
  88:13,16
**laid**  29:3
**landing**  90:3
**language**  29:23
  32:16 34:13
  80:9
**lapd**  35:1
**largely**  7:14
  8:18,18 16:2
  30:23 37:25
  71:6
**laudable**  44:14
**laws**  76:5
**lawyer**  15:9
**layer**  24:17
  31:19
**layoffs**  35:21
**lead**  35:21
**learn**  14:4

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 214

[learned - mcrae]

learned  88:10
leave  10:4
  76:12
left  10:5 86:24
legal  79:25
lena  1:22 91:4
  91:18
level  71:21
light  26:23
  31:21 53:4
  79:8
likely  19:13,14
  42:18
likewise  34:20
line  44:8
lines  43:15
  50:20
list  4:17 5:7
  19:7,10 52:10
  57:9,10 59:18
  73:25 78:2
  86:12 87:6,7,7
  87:7,15
listed  19:1
  74:13,15 75:3
  87:14
listening  83:9
literally  12:7
  48:14
litigation  64:17
  65:13 68:2,2,6
little  16:5,6
  25:6,11,12
  43:4 69:8
  81:22

live  77:25
lives  38:3
liz  38:15 61:20
llp  2:4,11
local  16:2,9
  44:7 89:21,24
location  56:9
logistically
  16:3
long  11:18 24:9
  31:9,15 34:15
  52:1 58:11
  59:19
longstanding
  30:21
look  5:11 6:15
  12:1 17:17
  23:10 34:3
  45:12,20 76:11
  80:20 88:1
looked  17:19
looking  42:9
  71:22,24 76:17
looks  24:16
  87:25
los  1:7 2:6,10
  2:14,18,22
  13:23 37:5,10
  38:13
loss  41:13
lost  39:23
lot  4:23 33:2
  64:20 69:14
  77:23 78:22
  84:4 85:2,23

love  80:13,14
low  89:23
  90:11

**m**

made  39:9
  40:24 44:18
  48:5 49:17
  50:8 52:15
  58:12,17 59:4
  59:8,11,14,20
  63:3 65:7 71:5
  74:22 75:12,17
  76:21,25 77:4
  77:7 78:8
maguire  82:18
main  2:21 22:4
make  5:20
  18:22 22:7
  25:7,22 26:20
  29:8 33:2
  36:19,22 37:2
  40:16 44:2
  45:20 46:23
  50:15 51:9
  61:1,1,2 69:11
  69:15,23,25
  70:12 72:7
  82:25 86:3
makes  24:18
  40:13 47:20
  78:25
makeshift
  49:20 56:18
  57:19 58:25
  60:1

making  26:19
  36:16 37:11
  43:23 70:8
  78:24 79:21
marcellus  2:12
  4:12 32:9,18
  33:16,16 43:13
  61:16
marcellus's
  72:10
mariani  2:20
  42:16 71:10,15
marquez  54:17
  66:9
math  40:6
matt  15:2,12,16
  15:16,17,17,20
  36:14,14 43:25
  44:4 46:12,24
  54:17 61:24
  63:14 67:18,19
  79:11 82:3,3
matter  63:16
  87:17
matters  20:14
mayor's  81:24
  82:1,5,8,15
mcrae  2:12 4:9
  4:14 27:17,25
  28:24 30:23
  32:4,10,15,19
  33:14,17 38:10
  38:18 39:11,13
  39:15,17 40:22
  46:24 47:8

Page 15

Scolnick Decl. Ex. B - 215

[mcrae - modify]

69:22,25 70:2 70:7,18,21 90:18

**mean** 9:1 10:2 10:22 11:16,18 12:7,14 13:19 16:12 20:3 22:21,23 23:6 24:9,13,19 25:10 27:7,20 37:6 38:23 49:25 52:8 54:7 55:12 59:1,24 60:13 62:12 64:13,24 69:20 70:10,21 71:23 74:8,13 75:2,3 77:15 78:4,18 79:4 81:18 84:25

**means** 27:22 74:14 80:7

**meant** 13:1

**median** 44:8 89:21,24

**meet** 1:16 4:20 14:16 19:3 26:13 29:9 30:2 31:19,24 32:4 35:12 47:15 50:21 51:5 55:14 58:24 62:13 63:1 64:14 77:23 82:11

**meeting** 53:12 56:15 65:3,20 66:2 72:6 76:13 85:1

**members** 19:2

**mental** 57:24 83:20

**mentioned** 50:18 63:2,14 63:14,17 88:8

**mercedes** 54:17 66:2

**merit** 29:19

**meritorious** 28:7

**merits** 28:2

**mescall** 1:22 91:4,18

**methodical** 78:14

**michelle** 67:18

**million** 37:24

**millions** 80:16

**mind** 11:3 76:2

**minimum** 63:25 64:25

**minute** 89:6

**missed** 26:5

**missing** 7:2 89:3

**misstating** 5:8 5:14

**misunderstan...** 27:21

**mitchell** 2:4,5 4:5,12,18 5:22 6:9 7:25 8:5,16 9:1,13 10:12 10:15,19 11:1 11:7,10,15 12:18,21 13:2 13:4,12,17,25 14:12,21 15:10 15:12,17 16:11 17:11,21 18:2 19:11,15,24 20:16 21:1,9 21:25 22:6,14 22:23 23:5,23 24:3,6,13 25:2 25:14,20 26:3 26:7,10,25 27:23 28:22 29:21 32:2,5 32:12,17,21 36:11 38:16 39:8,12,14,16 40:20 41:8,24 42:4,8,11,22 43:2,11,18 44:1,16 45:4 45:24 46:10 47:6 48:11,22 49:7,12 51:7 51:14,16 54:2 55:12 56:11,16 56:21 57:13,20 58:10 59:1 60:9,13,20

61:7,11,21 62:9 63:11 64:4,12 65:16 65:19 66:17,20 67:15 68:16 69:7,24 70:1,4 70:16,20 71:11 71:23 72:13,15 72:18 73:12 74:8,12 76:6,9 77:15,18 78:4 79:9 80:24 81:7,16,21 83:16 84:17 85:6,16 86:24 87:4,9 88:11 88:24 89:5 90:1,15,20

**mmcrae** 2:15

**modest** 35:16

**modification** 29:19 31:25 32:11 36:8 41:2 43:6,22 53:17 62:13,17 62:20

**modifications** 26:22,23 27:10 28:12 31:20 32:25 33:1,11 35:16 36:2 62:15 63:3 64:11

**modify** 50:24 50:25 53:3

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 216

[modify - obtained]

65:1
**moment** 28:18
84:21
**money** 40:3,6
63:9
**monitor** 4:25
6:7 8:11 11:5
19:10 21:22
23:9,13,18,19
23:21 24:14,16
24:22 25:17
85:2
**monitor's**
22:16
**monitoring**
15:19
**months** 7:4
54:16
**mortar** 83:23
**moving** 50:4
70:10
**multiple** 5:6
**municipal** 1:8
**municipality**
16:6
**mutual** 31:8
66:16 81:19
85:5 86:12

**n**

**n** 2:20 3:1
16:20
**name** 9:6 12:7
13:11,13 15:21
16:20 17:7
37:6 57:9

**national** 38:4
38:12
**naturally** 74:4
**nature** 34:6
37:5 84:7
**necessarily**
57:2 62:22
**necessary**
27:11 30:3
34:12 35:12
**necessitate**
34:11
**necessitated**
34:24
**need** 6:24 13:21
16:16 17:8,12
23:16 24:21
25:20 27:11
28:19 31:8
47:13 54:20
55:13 57:24,25
62:16 63:22
64:7,16 65:1
67:4,9,12
80:11 81:12
83:7 84:12,25
87:16
**needed** 37:24
89:6
**needs** 8:12 33:9
66:12,12 81:2
82:13 83:11
84:8,19 88:12
**negative** 39:7

**negotiable**
29:16
**negotiated**
46:12 49:1
85:17
**negotiating**
45:13
**negotiation**
47:3
**negotiations**
46:20 47:11
86:21
**neutral** 16:17
**never** 16:23
47:6 50:5
52:10 63:11
66:6 71:24
**new** 15:8 35:17
54:1
**news** 19:14
38:4
**non** 29:16
**nonparticipat...**
29:16
**nonprofit** 9:17
**nonstarter**
12:16
**normal** 76:8
**north** 2:21
**nostradamus**
40:14
**note** 4:6 22:16
30:10
**noted** 87:4

**notice** 60:5
**nuance** 26:5
**number** 31:22
35:16 38:23
47:3 48:19
49:4 53:2,18
54:14 55:7
68:25,25 69:3
71:13,13 72:20
72:21 73:14
75:16,17
**numbers** 5:12
54:19 55:15
66:1 68:24
83:1

**o**

**objection** 10:17
19:22
**objections** 19:6
**obligation** 33:9
52:17 66:16
69:7 81:19
**obligations**
22:17 27:10
29:19 30:18,20
31:21 34:12
35:13,24 36:3
36:9,10 37:14
37:15 39:5
40:12 52:9
62:2,7,25
83:25
**obtained** 73:9
75:11

Page 17

**[obviously - owed]**

| | | | |
|---|---|---|---|
| **obviously** 4:19 | 75:16,16,16 | 64:4,12 65:11 | **opposing** 32:24 |
| 11:4,11 15:4 | 76:21,24 77:6 | 65:16 68:13,15 | **optimism** 65:17 |
| 16:12 19:5 | 77:11 78:8,13 | 68:16 72:17 | **optimistic** |
| 24:17 39:5 | 78:17,24,25 | 73:13 77:18 | 65:14 |
| 44:20 46:25 | 79:18 | 81:7,14 83:15 | **option** 7:23 |
| 47:2,9 63:25 | **office** 2:18 | 84:14,24 86:9 | 39:6,10 40:2 |
| 65:5,9,19 | 81:24 82:2,6,8 | 87:5 88:11 | 40:15 |
| 74:12,14 78:14 | 82:15 | 90:15,15,17 | **orange** 91:2 |
| 79:15 | **officials** 35:1 | **old** 68:9 | **oranges** 38:22 |
| **occupied** 73:23 | **oh** 9:9 16:19 | **once** 24:15 | **order** 19:20 |
| 73:24 | 25:14 38:18 | 42:19 | 22:17,19 27:5 |
| **occurs** 28:18 | 43:19 49:7 | **onerous** 43:23 | 29:22 33:19 |
| **october** 24:4,6 | 61:22 73:12 | **ones** 22:17 | 43:8 48:6 |
| **offer** 49:22 | 78:19 88:24 | 49:13 73:8,25 | 50:17 52:13 |
| 50:7,15 51:22 | **okay** 4:16 5:4 | 75:10 | 59:25 60:14,16 |
| 56:2,6 57:7,14 | 5:17,22 8:7 | **ongoing** 30:11 | 60:16 63:2 |
| 58:12 59:4,5,7 | 10:3,19 15:5 | 63:25 64:25 | 82:17,19 |
| 59:11,14,19 | 15:11,24 17:6 | **open** 5:23 7:5 | **ordered** 5:1 |
| 61:8 73:16,17 | 17:11 18:2,21 | 9:24 14:23 | **organized** 78:9 |
| 73:19 76:20 | 19:11,15,24,24 | 57:3 73:21,25 | **originally** 55:3 |
| 77:7 | 22:6,13,15 | 74:1,22 75:11 | **outlined** 68:19 |
| **offered** 50:10 | 23:20,23,24 | **operations** | **outrage** 85:23 |
| 58:15,20 72:21 | 26:3,11,12 | 49:10 50:13 | **outreach** 19:19 |
| 73:9,14,20 | 27:16 28:25 | 57:1 | 56:3,5,6,19,22 |
| 74:2,2,16,21 | 29:21 31:10 | **opinion** 56:13 | 56:25 57:3,5 |
| 75:12,18 77:8 | 32:12,21 36:11 | 56:13 74:14 | 58:5,6,13,20,23 |
| 79:5 80:5 | 40:22,23 41:16 | **opinions** 23:8 | 77:24 |
| **offering** 80:2 | 41:24 42:4,17 | **opportunities** | **outside** 16:7 |
| **offerings** 74:20 | 42:22 43:3 | 72:20,21 73:8 | **overlapping** |
| **offers** 47:4 48:2 | 45:25 49:12 | 73:14 77:4 | 75:6 |
| 48:4 49:16 | 53:1 55:8,16 | 79:22 80:2 | **overlaps** 85:2 |
| 51:21 52:14 | 55:17,17,20 | **opposed** 32:10 | **overtime** 34:25 |
| 53:11 61:3 | 59:12,14,23 | 53:20 | 35:1 38:1 |
| 68:24,25 69:1 | 60:22 61:10,15 | **opposes** 31:25 | **owed** 88:22 |
| 71:14 74:11,22 | 61:21 62:9 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 218

[own - points]

| own  74:13 | participated 65:8 | peh  71:13,13 | personally  8:19 67:7 |
|---|---|---|---|
| **p** | particular 11:12 44:23 | penalized  39:7 | persons  51:22 89:23 90:11 |
| p.m.  4:2,2 90:21 | particularly 23:8 27:13 | pending  61:23 | perspective 8:12 13:20 |
| packed  59:2 | 30:12 35:23 | people  5:6 8:18 | 35:6,6 85:20 |
| page  3:4 43:16 43:19 46:13 90:3 | 36:20 68:23 70:25 | 10:6,24 14:5 14:25 15:3 | pi  11:20 |
| pages  1:25 32:13 | parties  4:8 16:18 30:2,4 | 18:13 19:7,10 22:8 24:21 | pickens  12:20 |
| paired  48:2,3 51:21 56:2,19 57:2,5 | 31:7 34:11 | 44:9 53:7 56:23 58:15,16 | place  24:16 28:18 58:1 59:20 89:17 |
| pairing  18:12 57:25 | partners  12:3 82:21 | 58:21 68:3 70:11,12 77:4 | plain  62:5,11 |
| paperwork 79:24 | partnership 18:12 | 77:9 78:8 80:5 80:16,16 82:25 | plaintiffs  1:5 2:3 26:21 |
| paragraph 30:9 | party  16:17 | 86:15 87:18 88:1 | plan  41:6 42:2 42:18 85:8 |
| parsed  32:15 | passage  33:19 33:20,25 | percent  44:7 50:6 89:20,24 | 87:25 88:23 |
| parsing  33:21 | passing  38:24 | perception 6:19 | plane  4:20 |
| part  29:17 31:18 42:18 | past  20:1,8 21:11 22:10 | perfect  40:14 79:4 80:14 | planning  72:2 |
| 44:14 49:21 50:10 57:22 | 35:18 | performance 67:1,1 | plans  41:18 |
| 59:24 63:19 66:11 67:1 | pathways  77:5 | period  59:21 | please  34:1 43:11 |
| 68:7 73:2,2 86:20 87:2 | pause  27:6,7 30:4,6,13,19 | permit  30:17 | point  21:5 28:11 29:6 |
| 89:1 | 31:3,4,5,9,13 31:13,15 34:15 | perry  7:24 8:21 8:21 18:16 | 32:3 47:21 56:11 57:7,14 |
| partially  7:12 | 35:10,11 61:22 62:3,6,16,20 | 87:15 | 57:19 62:3,17 63:1 66:24 |
| participants 82:23 | 63:23 64:7 65:12 77:14 | person  7:20 8:13 10:21 | 67:22 |
| participate 47:13 | paused  62:1,8 64:8 65:3 | 15:8 18:10 22:4 57:17 59:20 77:9 91:7 | pointed  71:20 89:2 |
| | | | pointing  45:11 |
| | | | points  28:20 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 219

[policy - quarterly]

policy  7:17
13:22 35:6
36:20 50:13
political  35:6
pose  32:7
posed  61:24,24
position  4:23
6:10,11 26:19
29:3 34:4,7,22
36:7,12,25
43:4 51:10,11
55:17 62:5
64:15 66:14,15
73:1,3 79:19
79:25 80:25
82:12 83:19
88:12,14
possible  65:7
68:21 69:21
75:21 80:23
88:17
possibly  40:17
potentially
41:4,20 42:2
49:8 53:15
poverty  36:23
44:8
powers  40:14
70:4
practically
70:13,14
practice  50:9
56:3
preamble  26:18

precipitated
28:9
predated  30:15
prefer  64:22
premature  23:2
23:18
preparation
70:24
prepared  67:7
present  4:20
54:18
presented  60:5
presuppose
69:22
pretext  30:18
pretextual
37:16
pretextually
30:25
pretty  7:22 8:3
22:19 25:18
27:5 28:10
29:23 46:23
86:21
previous  19:19
prior  56:19,25
59:21
priorities  54:25
probably  6:24
6:24 12:16
13:16 14:6
19:25 20:2,3
23:9 24:4 31:8
32:13 43:8
67:9,11,12

68:9 71:2 76:4
problem  46:4
48:7,8 63:15
83:3
problematic
13:16 40:17
proceedings
1:16 65:9
90:21 91:8,11
process  25:9
31:19 50:16
65:20,23 66:12
67:4,6,7 68:1,4
professor  17:1
17:2
programs  14:3
projects  85:25
proof  76:7
properly  40:1
proposal  14:14
53:10 54:1
proposals  36:8
40:25 67:13,16
propose  20:24
45:1 53:15
54:3
proposed  35:15
proposing
26:23 33:2
43:22 44:4
53:3 85:15
protests  34:24
37:4,7,20
38:11

prove  56:4
58:22
proverbial
38:22
provide  5:6,17
38:9 49:9
providers
82:16 83:8
provision  7:1
30:13 62:15
85:5,10
public  5:12
17:2 37:20
publicly  83:6
84:9
pull  4:19 68:11
pulling  29:22
punch  4:17
put  26:2 29:4
36:17 57:8
58:15 59:17
78:2 85:24
86:4
putting  11:20
13:15 21:15
24:24 29:10

q

qualifications
7:15
quantify  28:8
49:10 50:17
quarter  24:5
25:13
quarterly  23:1
24:3 65:7

Page 20

Scolnick Decl. Ex. B - 220

**[query - regard]**

query  67:3
question  8:22
  28:12 29:10
  32:9,23 38:10
  39:13,17,18
  40:21 72:16
  82:14
questions  27:17
  29:20 32:6,8
  61:23,25
quickly  33:14
  33:17,17
quite  11:19
  15:14 39:23
  45:7 65:20

**r**

radar  24:24
  26:2
raids  27:1 37:8
raise  61:20
  71:25 77:22
raised  4:23
  9:20 14:15
  71:17 81:15
raises  63:18
ran  9:7
rand  5:5,9 6:14
  7:11,12,13
  13:21 14:14,17
  14:18 16:15
  17:9,14,15
  18:3,11,19,23
  18:25 19:4,17
  22:5 23:22
  89:18

randall  16:19
range  51:8
rather  36:1
  79:24
reach  9:24 10:3
  10:15 20:3,4
  21:13,22 24:10
  41:3 64:7,11
  64:21 87:14,16
reached  15:10
  15:20 18:23
  64:6
reactions  26:17
read  4:21 28:4
  31:6 32:7,16
  33:19 50:23
  73:13,14
readdress
  83:17
reading  4:22
  33:25 65:25
  76:2,3
ready  10:8
  11:18 73:23
real  21:16,17
  33:14,17,17
  34:24 49:24
  54:11 59:4,7
  78:23 79:21
realities  77:25
reality  35:8,17
  80:18
realized  68:10
really  8:10 9:4
  9:22 12:4

16:20,24 25:9
  41:2 43:6 44:9
  63:16 67:4
  76:17 79:23
  83:19 86:17
reason  14:5
  24:14 26:13
  27:3 46:10
  50:25 54:15,16
  75:25
reasonable
  22:22 59:21
  62:14
reasons  26:14
  37:1 51:20
recall  38:5,11
  47:14 63:17
recalling  88:21
recent  48:6
recirculate
  67:15,20 68:8
  68:12 87:20
recognize  16:5
  38:22 54:24
recognized
  39:22
recollection
  19:19,19 47:17
recommendat...
  20:19
recommended
  22:4
reconcile  39:2
  39:20,25

reconciled
  40:10
record  4:4,5,7
  83:10 91:10
recorded  91:7
rectified  62:21
reduce  63:3
  68:2 85:11
reduced  54:14
reducing  36:8
  37:14
reduction  46:3
  46:7,22 53:19
  55:6 66:1
  67:25
reductions
  35:25 46:5,14
  48:24 49:10,14
  51:2 53:10
  54:9,10,11
  55:24 61:3
  66:7,9 88:3
reengage  81:4
  81:10
reengaged  19:2
  66:13
reference  45:22
  72:24,25
references
  45:10
refusal  66:8,21
refused  48:5
  59:4
regard  29:12

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 221

**[regarding - right]**

| | | | |
|---|---|---|---|
| **regarding** 37:3 41:18 88:24 | **removals** 56:18 | **requirement** 46:7 49:18 | **responsibility** 77:24 |
| **regardless** 6:3 34:9 50:23 | **remove** 60:10 | **requires** 27:15 | **rest** 22:7 31:7 31:14 52:4 |
| **regressions** 8:14 | **removed** 49:20 50:7 | **researchers** 13:6 | **result** 35:22 66:2 |
| **regular** 82:9 | **removing** 57:18 | **resend** 19:8 | **resulting** 30:16 |
| **reincluded** 61:24 | **report** 11:23 16:24 24:2 52:14 71:13 72:4 81:2 | **reserve** 51:6,17 | **results** 58:6 |
| **reiterate** 72:9 | | **resolution** 52:24 65:20,22 65:22 67:3,5,6 68:1,5 87:21 | **resume** 66:23 |
| **rejected** 59:8 68:25 69:1 73:17 75:17 | **reported** 1:21 1:24 4:1 46:6 49:14,14 52:10 55:19 75:1,5 | **resolutions** 48:12,15,18 51:19 52:1 54:8 55:4 | **retained** 11:17 11:22 12:15 13:16 |
| **rejection** 45:2 | **reporter** 4:8 91:4 | **resolve** 41:14 | **reunification** 57:23 59:6 |
| **related** 33:5 34:23 37:19 49:11 | **reporter's** 1:15 | **resolved** 51:23 | **review** 24:17 25:17,22 |
| **relationship** 7:13 | **reporting** 30:13 48:24 49:1 52:9 65:11 69:10 73:3,7 74:18 75:10 81:1 | **resources** 40:5 40:9,18 | **revisit** 8:8 |
| **relevant** 10:6 33:12 38:17,19 | | **respect** 30:12 31:18 36:4 39:4 41:22 44:18 76:14 | **right** 4:16 6:20 7:21 8:11,18 9:2 10:25,25 12:24 13:10 14:6 15:22,25 16:9 18:13 20:13 21:3 23:6,22 25:5 25:25 26:1 27:8 40:21 43:19 45:4,4 46:6 49:2 52:8 52:11 54:5 56:9 57:13,23 65:2 67:23 70:16 71:25 78:9 82:18,18 83:10 86:19 |
| **reluctant** 23:3 86:16 | **reports** 22:21 22:24 23:1 25:11,21 65:8 69:13,17 70:24 71:1,7 | **respectfully** 81:7 | |
| **rely** 11:13 79:2 | | **respects** 53:9 | |
| **remains** 41:12 | | **respond** 4:10 85:21 | |
| **remember** 11:19,25 12:7 15:14 45:5 | **representing** 69:15 | **responding** 33:24 40:25 | |
| **remote** 1:15 2:1 | **request** 46:5 | **response** 43:22 55:9 81:18 82:10 | |
| **remotely** 1:24 4:1 | **requested** 71:16 | | |
| **removal** 50:5 56:19 59:22 60:11 | **required** 28:5 | **responsibilities** 30:12 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 222

**[right - shaking]**

88:6
**rights**  1:4
**roadmap**  41:11
  41:23
**role**  41:9 69:15
  86:7 88:13
**rolling**  4:17
**room**  25:12
**route**  20:23
**routed**  77:4
**routine**  56:3
**rpr**  1:22 91:18
**rude**  4:11
**ruling**  53:25
**running**  24:11
**rv**  50:15
**rvs**  50:13 56:18

**s**

**safe**  46:14
  48:12,15,18
  49:10 50:12
  51:19,19 52:1
  52:24 88:4,5
**sake**  13:14
  29:15
**sanitation**  60:4
**satisfies**  39:4
  80:6
**satisfy**  40:12
**saw**  32:7 89:6
**saying**  16:7
  18:13 25:2,4
  25:18,20 29:10
  29:14 32:16,20
  33:8 43:14

46:19 48:14
55:2 58:6 59:2
70:3,13 73:12
73:18 85:3
**says**  10:9 17:21
  30:1,8 31:10
  31:11 39:25,25
  43:12,18 45:3
  45:17,17 54:4
  62:6 64:9
  69:18,20 70:16
  80:9
**scholars**  14:11
**school**  17:2
**scientific**  7:18
**scolnick**  2:12
  4:6,15 12:14
  12:19,25 13:3
  13:10,13 17:4
  17:22 24:1,8
  24:19 25:4,19
  25:25 26:4,8
  26:11 61:18
  86:20 87:1
**scope**  30:6
**scott**  46:12
  48:14 54:18
  67:17 79:11
**seat**  9:7
**second**  5:19
  11:20 24:17
  31:19 45:20
  59:23 74:5
  75:15,25 77:14
  80:12 81:3

**section**  26:24
  30:10 50:22
  62:6 66:10
  68:16 81:14,15
  81:17 84:15
  85:4,17 89:2
**sections**  62:7
  64:5
**see**  9:25 16:19
  19:3 25:14
  28:1 33:11
  37:11 40:19
  43:18 45:9,11
  45:14,21 51:20
  52:4,10 54:4
  54:14 60:15
  69:5 73:12
  74:23 75:19
  81:4 90:6
**seeing**  55:18
**seem**  34:22
  38:11 40:13
**self**  15:23 63:20
**semantic**  73:5
**send**  5:10,20
  12:9 13:10,13
  17:9 19:8
  89:17 90:3
**sense**  24:18
  33:3 42:19
  47:20 74:2
  85:13
**sent**  4:21 6:16
  19:1,9 26:15
  37:18,19,20,23

38:12 40:25
89:14
**sentence**  59:3
  74:5,6 75:15
  75:23 80:7,12
  81:1,3,3,8
**separate**  26:24
  28:14 29:8,20
  34:8 36:5
  63:24 70:7,8
  71:14 74:20,25
  75:4 83:20
**separately**
  25:22 74:15,17
**september**  24:5
  24:11
**service**  7:1
  82:16 83:8
**services**  49:16
  50:9 82:13,21
**session**  3:5
**sessions**  3:2
  83:10
**set**  7:14 47:1
  62:7 76:13
**seth**  12:19
**setting**  36:12
**settlement**  30:1
  30:19 43:7,9
  43:16 89:1,5
**settling**  11:24
**several**  40:4
  68:18 85:19
**shaking**  42:14

Page 23

Scolnick Decl. Ex. B - 223

[she'd - stuff]

she'd 10:10
shelter 48:2,5
  49:17,20,22
  50:8,15 51:22
  53:11 55:23
  56:7 57:8,19
  57:25 59:5
  60:1 61:4
  68:24 69:1
  71:14 73:7
  74:11 76:25
  79:3,22
shelters 56:18
  58:25 67:23
  76:25 78:7,8
shifted 79:16
shop 77:2
shorthand 91:4
showing 58:19
side 15:6
sign 53:16
signature 91:17
significant
  34:23 37:9
  54:16
signing 25:8
similar 37:7
  73:15
simultaneously
  23:12
single 18:10
  76:20 77:11
sit 12:8 24:13
situation 22:2
  53:5 57:11

skadden 15:13
slots 41:18
solely 25:19
  41:20
solution 44:15
  87:2
solutions 55:23
  77:1
solve 64:23
somebody 9:20
  12:6 13:18,21
  14:23 15:5
  16:2,7,9,16
  20:22 21:6,7
  49:22 58:6
  90:8
soon 48:23
sorry 13:1,13
  32:18 48:11,22
  49:7 61:22
  70:2 78:19
sort 28:10 32:6
  34:10 46:9
  51:23
sought 71:17
sound 88:6
sounds 30:23
  41:4 86:13
source 71:6
south 2:6,14
sovereignty
  29:12
space 50:24
speak 17:22,24
  62:4 71:2

speaking 47:9
  84:9
speaks 35:4
  68:20
special 9:10
specific 10:21
  19:10 50:12
  74:10 86:13
  89:10
specifically
  19:20,21 35:9
  43:12,14 48:9
  49:19,19 53:11
  63:17 76:16
specificity 56:2
  75:25
specifics 40:24
specify 72:19
speed 67:13
spend 63:8
spent 7:3
spoke 9:8
spoken 9:23
  20:5 47:10
spot 29:4 48:16
spreadsheet
  5:10 17:10,18
  17:22,24 18:6
  19:9 23:22
spreadsheets
  6:15
ss 91:1
stage 65:3
stake 13:15

stakeholders
  86:18
stand 45:5,9,18
start 4:25 5:4
  24:11 85:18
  86:5
started 48:24
  66:6 83:9
starting 28:11
  48:17
state 91:1,5
stated 27:3
states 1:1
stenographic...
  91:7
step 55:3,3
stepped 54:17
stepping 44:10
stop 10:12 31:3
  77:2
strain 40:18
strategy 66:5
  66:25
street 2:6,21
  50:4 66:25
streets 38:13
  55:5
strong 23:8
stuff 4:19 12:3
  16:20 20:8
  23:21 27:14
  58:2 59:17
  72:18,24 76:8
  89:18

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 224

**[subject - thing]**

**subject** 21:19 31:4
**submit** 51:3
**submitted** 41:7
**subsidies** 41:3
**substance** 83:21
**substantial** 34:8,17,20 35:19 44:18
**substantive** 62:23
**substitutions** 27:13
**suffice** 27:2
**sufficient** 57:10 58:3,11 59:9 64:16
**suggest** 39:24
**suggested** 5:6 7:19 13:20 15:8 33:8
**suggesting** 23:2
**suggestion** 41:6
**suggestions** 15:7
**suing** 68:4
**suitable** 6:6
**suite** 2:6
**superior** 40:2,3
**supposed** 66:4 69:10 73:18 74:17,23,25 75:4 78:17 86:22

**sure** 5:20 11:10 18:22 25:7,22 26:10,20 29:9 32:4 40:16 43:8 45:20 51:9 69:12,16 71:17 76:3 82:25
**surprised** 45:7 49:3
**surprisingly** 40:3
**switched** 55:1,1
**sympathetic** 27:3 37:2 46:11,16 47:16
**system** 56:8 57:17 58:2,7 58:16,21 79:8 83:11
**szabo** 15:2,16 36:14 67:19 82:3

**t**

**table** 24:23 88:15
**tabled** 66:3
**take** 5:11 6:10 12:1 17:6 18:5 45:12,20 54:3 59:17 60:24,25 88:1 89:6
**taken** 45:2
**takes** 23:20 70:5

**talk** 18:19 19:7 26:8 32:18,24 35:24 40:23 44:3 55:21 67:9 70:8 84:25 87:12 88:1,16
**talked** 45:25 57:22 82:3,4
**talking** 9:11 12:25 13:8,9 13:12 19:22 22:24 23:15 31:16 42:1 44:8 56:23 65:10,17 70:9 70:14 80:19 87:22
**talks** 85:11
**tax** 9:10,11,14
**team** 6:25 14:9 18:11,25 19:2 55:20 64:20
**technological** 18:15
**technology** 9:18 20:8
**tell** 15:25 21:10 39:12 41:5 46:10 48:1 49:6,9 52:23 53:7 54:5,7 61:7 76:16,17 79:14 89:13,20 90:10

**telling** 24:21 27:11
**temporary** 27:6
**ten** 7:3
**tent** 49:20 50:3 50:7 57:18 60:1
**tents** 56:18 58:24 61:5
**terminology** 14:3 73:5
**terms** 29:12,13 30:6 51:4 62:12 77:25
**testified** 47:11
**testimony** 47:18 56:25
**tethered** 47:4 53:11
**text** 62:5,11
**textual** 74:7
**thank** 26:19 45:11 72:14 80:24 90:16,18 90:19
**theoretically** 70:14 75:7,9
**theory** 63:19 80:3
**thereon** 66:14
**thing** 5:1 18:9 25:15 32:23 39:1,7 50:11 56:1 63:6 86:10,13 88:7

Page 25

**[things - track]**

| | | | |
|---|---|---|---|
| **things** 4:23 9:2 13:7 14:8 23:10 25:25 27:16 35:22 40:8,10 59:2 61:19 63:10 68:17,18,19,19 68:22 73:3 74:17,20,25 75:3,4,18 76:14 78:15,22 78:23 79:15,16 79:16 85:18,25 86:3 87:11 | 28:19 29:7,18 29:24,24,25 31:11,15,18 32:8,9 33:1,4,6 34:2,5,16 35:7 35:15,25 36:1 36:5,21 37:1,7 38:2,3,4,7,16 38:18 39:1,22 40:22 41:1,5,7 42:13 43:7,25 44:10,13,14,17 44:19 46:1 47:5,13,20,22 47:25 48:14 | 73:7,20,21,25 74:4,8,19,20,23 74:24 75:3,11 75:14,15,22,24 76:11 77:12,21 77:21 79:19,23 79:25 80:7,9 80:10,13,18 81:18,23 83:6 83:13,16 84:16 84:19,21 85:2 85:17,21 86:5 86:9,24 87:5,6 87:10 | 29:1 33:9,11 36:9 37:4,13 38:12 40:5 46:15 55:13 57:6,6 59:4,7 59:21 68:11 84:2 |
| **think** 4:24,24 5:5 6:5,7,13,16 6:18,20,23,25 7:2,11,11,12,14 7:20,21,23 8:9 8:11 9:14 10:18,22 11:20 12:2,8,17,23 13:14,19,21 14:22,25 15:1 15:3 16:1,3,4,4 16:8,16,21 18:9,10,23 19:9,18,25 20:12,20,21,21 20:22 21:3,4 21:22 22:19 23:5,8,11,12,17 23:20 24:3,23 27:1,4,9,15,18 27:20 28:7,10 | 49:16,18,23,25 50:8,19,20,21 50:24,25 51:4 51:8,18 55:11 55:12,22 56:11 56:12,21 57:10 57:13 58:2 59:1,8,9,11,15 59:16,19 61:15 61:25 62:13,18 62:19,20,22 63:8,23 64:14 64:24 65:2,10 65:11,17,21,24 66:10,11,12,15 66:24 67:17 68:12,18,22 69:7,14,15,18 69:20 70:16,19 72:5,7,9,23,24 | **thinks** 40:2 **third** 16:17 35:3 **thought** 12:25 14:5,16,19 23:4 75:14 89:8 **thoughts** 4:22 **thousands** 80:16 **three** 26:24 32:13 34:7 35:18 63:24 74:16,25 75:3 75:4 78:11 **throw** 15:20 **till** 51:17 **tim** 6:23 16:13 **time** 4:19 21:18 24:21 25:7,12 25:16,21 27:12 | **timing** 22:21,23 23:1 34:14 35:17 62:23 **tls** 41:3,10,15 41:18 42:8 87:23 **today** 5:1,2 12:8 24:14 67:8 76:12 **together** 11:20 15:14 79:12 84:22 85:22,24 86:2 **told** 89:6 **tomorrow** 63:6 **ton** 12:2 **tonight** 58:8 **took** 43:21 51:22 77:9 **top** 24:17 38:14 **totally** 29:20 88:11 **touch** 33:15 **track** 48:12 52:18 58:5 71:20 77:22 78:23,25 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Scolnick Decl. Ex. B - 226

**[tracked - used]**

| | | | |
|---|---|---|---|
| **tracked** 42:20 42:21 73:18 78:13,17 79:18 | **turn** 32:18 54:24 | **understand** 6:7 6:9 7:6 24:19 24:25 25:23 | **unforeseen** 40:8 |
| **tracking** 42:5,6 48:18 49:5,19 49:19 52:17,19 | **turned** 84:6 | 27:4,6 28:5,17 28:19 29:21 | **unhoused** 44:10 |
| **transcribed** 4:7 | **two** 7:2 25:1 28:14 29:20 41:14 49:5 55:22,22 59:13 59:14 68:18 74:20 | 34:3,21 35:5 36:11 38:2 45:21 46:7 47:23 51:17 52:5 53:6,14 56:21,22 64:5 69:19 76:1 80:25 81:19 85:3 87:12 88:14 | **unilateral** 28:24 29:16 33:6 79:10 |
| **transcript** 1:15 4:21,22 26:6 32:6,14 63:16 91:8,10 | | | **unique** 7:14 14:20 85:10 |
| **transparency** 21:2 30:21 | **type** 15:19 58:22 59:19 71:20 89:11 | | **unit** 87:25 89:11 |
| **treatment** 59:6 83:22 | **typically** 57:5 | | **united** 1:1 |
| **trial** 11:18 47:14 56:25 | **u** | **understanding** 28:20 41:17 42:1 47:1,1 49:4 52:1,2 54:22 56:14,23 57:1 70:23 71:4,15,19 73:11 82:24 | **units** 35:25 44:21,21 88:25 89:10,23 |
| **tried** 46:23 58:21 75:8 | **u** 16:20 | | **unrest** 37:3 64:2 |
| **triggered** 63:23 | **ucla** 10:20 11:6 11:15 12:2,24 13:1,9,12,19 14:23 15:4 17:2 18:11,18 | | **unsheltered** 45:14,15 |
| **triggers** 35:10 | | | **unsuccessful** 77:11 |
| **true** 8:16 16:16 72:1 91:10 | **uh** 85:6 | **understands** 6:25 | **upset** 68:3 |
| **truly** 30:20 | **ultimately** 11:23 16:21 46:8 | **understood** 25:16 37:18 48:17 | **urge** 6:12 |
| **trumps** 29:24 | | | **urgency** 24:25 |
| **try** 16:14 22:6 24:10 28:7 29:4 60:18,22 86:3 87:14,18 | **umhofer** 2:4 15:17 | **undisputed** 28:16 | **usc** 10:20 11:5 12:24 13:1,8 13:19 14:23 15:4 18:11,18 22:11 |
| | **umklaw.com** 2:7 | **unequivocally** 39:21 | |
| | **unclear** 41:13 | **unexpected** 34:9,10 35:1 | **use** 19:17 20:19 30:17 40:2 44:19 54:19 83:21 88:25 |
| **trying** 4:18 25:5 31:15 32:7 36:23 37:15 54:19 56:7 79:7 85:24 | **under** 27:24 30:18 35:13 39:4 41:19 44:22 53:9 58:23 60:12 | | **used** 88:20 |

Page 27

Scolnick Decl. Ex. B - 227

**[using - work]**

| | | | |
|---|---|---|---|
| **using** 66:25 89:10 | **w** | **warranted** 26:22 36:2 65:12 | **weighed** 56:12 |
| **usually** 75:10 | **wait** 77:18,18 81:9 | **waste** 29:1 | **welcome** 83:16 |
| **v** | **want** 4:4,11,16 | **watched** 36:18 | **went** 87:6 |
| **v** 1:6 | 8:25 15:13 | **water** 53:9 | **westwood** 12:24 |
| **vacuum** 38:21 | 18:2,4,19,22 | **watson** 12:20 | **whatnot** 41:22 51:13 63:9 76:5 |
| **vague** 86:21,25 | 19:6,12 20:13 | **way** 4:9 12:9 | **whatsoever** 28:1 31:25 |
| **valeria** 42:13 | 20:23 21:6,7 | 28:3 29:7 31:2 | **when's** 27:6 |
| **valerie** 2:19 | 21:14 22:15 | 31:17 33:20 | **whoever's** 67:11 |
| 5:13 7:9 10:3,4 | 26:20 27:18 | 40:12 42:24 | **wholesale** 45:2 |
| 10:9,18 55:25 | 37:3 40:23 | 46:7 48:10,25 | **willing** 10:1 42:7 48:1 64:21 84:11 |
| 56:22 67:10 | 42:6 43:10 | 49:2 50:6 58:5 | **wind** 15:19 |
| 73:15 76:23 | 44:25 45:1 | 62:14 78:4,14 | **witness** 12:15 16:22 |
| 78:19 79:10 | 46:18 51:9 | 78:15,16 79:6 | **woefully** 54:20 55:7 |
| 80:19 86:17 | 52:6 54:13 | 79:17 82:7 86:3 | **wonderful** 61:13 |
| **valerie.flores** 2:23 | 55:2,20 58:7,8 | **ways** 43:16 76:21 | **word** 69:25 84:18 89:21 |
| **valid** 25:23 | 58:8,18 61:2 | **we've** 5:6,25 | **words** 35:11 39:6 |
| **validity** 28:2 | 61:19 67:5 | 12:23 18:23 | **work** 6:5 8:5 15:4,19 16:8 21:14,23 42:7 55:17 62:15 68:20 69:20 70:17 72:4,19 78:23 82:1 |
| **variety** 44:23 44:24 53:24 77:5 | 70:21 71:8 72:9 74:6 76:15 77:14 81:20,22 82:17 83:18 85:9 86:11,14 | 20:14 34:7 47:15 49:14 58:19 65:7,8 73:8 75:10 80:4,4 84:4,10 87:5,6 | |
| **various** 6:21 9:2 13:7 35:21 40:25 44:5,6 | **wanted** 5:20 15:20,23 16:25 19:3 26:1 43:5 56:1 | **website** 17:5 21:12 | |
| **venn** 75:5 | **wants** 25:22 30:8 40:13 | **week** 25:1,24 82:12 83:18 | |
| **verification** 30:13,15 41:13 | **ward** 20:1 22:3 22:9 87:17 | **weekend** 90:20 | |
| **versus** 81:24 | **warn** 19:13 | **weeks** 24:10 | |
| **view** 6:4 54:11 54:12 62:1 64:4 | **warning** 36:15 | **weigh** 28:6 29:11 | |
| **volume** 4:9 | | | |
| **volunteered** 15:23 | | | |

Page 28

Scolnick Decl. Ex. B - 228

**[work - zero]**

| | |
|---|---|
| 84:21 85:22 86:2 | 13:17,25 14:12 14:21 15:24 |
| **worked**  11:22 20:7 21:10 70:20 | 16:11 17:25,25 18:21 21:9,25 22:2 23:5 24:6 |
| **workers**  56:5,6 77:24 | 26:7 27:25,25 28:22 33:13 |
| **working**  5:24 41:18 42:17 51:24 69:11 70:25 82:5 87:8,9 | 34:2 37:18 41:17 43:11,21 44:1,16 45:24 47:22 51:7,14 51:15,16 56:16 |
| **world**  50:22 74:3 78:23 79:21 | 57:16 58:10 59:1 60:9 62:4 64:10,24 66:17 |
| **worthwhile** 68:12 | 66:20 69:18 72:5 73:1 75:2 |
| **wound**  63:20 | 76:6,9 77:15 77:20 78:3,4 |
| **wrap**  89:7 | 78:18 79:19 |
| **writing**  77:10 | 81:16 85:16 |
| **written**  76:3 78:16 79:6,7 79:18 | 88:7,24 89:4 89:13 |
| **wrong**  23:4 43:22 57:3,3 | **year**  35:19 53:19 64:3 |
| **wrote**  49:22 74:13 76:1 79:10 | **years**  5:9 11:17 36:13,15 49:5 78:12 82:4 85:19 86:6,8 |

| x |
|---|

| | |
|---|---|
| **x**  3:1 | **york**  15:8 |

| y | z |
|---|---|

| | |
|---|---|
| **yeah**  7:8 10:15 11:1,7,10 12:12,18 13:2 | **zero**  23:14 24:14 51:9,12 |

Page 29

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127
Scolnick Decl. Ex. B - 229