LAW AND FORENSICS
DANIEL B. GARRIE
  *daniel@lawandforensics.com*
10665 Durland Ave NE
Seattle, Washington 98125
Telephone:  855.529.2466

*Monitor*

**F I L E D**
CLERK, U.S. DISTRICT COURT

11/03/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ kdu _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA Alliance for Human Rights, *et al.*,<br><br>          Plaintiffs,<br><br>   vs.<br><br>City of Los Angeles, *et al.*<br><br>          Defendants. | Case No. 2:20-CV-02291-DOC-KES<br><br>Honorable David O. Carter<br>United States District Judge<br><br>**STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025**<br><br>Action Filed:       March 10, 2020 |

TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Pursuant to the Court's October 14, 2025 Order Resolving Third-Party Monitor Appointment and Scope of Work (Dkt. 1048) ("Order Appointing Monitor"), the Monitor submits this Status Report for October 2025 ("Status Report").

**I.     Overview**

This interim Status Report updates the Court and the Parties on the Monitor's efforts to "provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of [the Parties' Settlement] Agreement" (Dkt. 421-1). The Court subsequently explained that the Monitor:

- will 'at least be' responsible for reviewing and verifying the [C]ity's data prior to publication, resolving data issues, and providing public reports on data compliance;
- will have full access to the data the City uses to create its reports;
- shall review and provide guidance on public accessibility to the City's contracts and invoices;
- will confirm that shelter or housing offers were made with respect to the encampment reductions

(Dkt. 1048 at 2, *citing* Dkt. 991 at 50) ("Monitor's Duties").

As detailed further below, in the almost three weeks since the Order Appointing Monitor, the Monitor has made an effort to fulfill the Monitor's Duties efficiently. However, the procedural process requested by counsel for the City ("City Counsel") has slowed progress. The City Counsel instructed the Monitor not to contact any City employees directly. Instead, all communications must pass through City Counsel in the first instance: City Counsel rejected the Monitor's proposed compromise to copy counsel. The necessary consequence of this restriction is an increase in the time and costs associated with executing the Monitor's Duties.

Page 1

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

At present, the Monitor has only been able to engage in the *scheduling* of scoping interviews with key City subject matter experts. No interviews have occurred. In addition, the Monitor's review of the publicly reported summary (*i.e.,* not source) "Intervention Data" in the City's quarterly reports indicated numerous data collection, definition, and reporting issues that must be addressed before any analysis can be performed.

Thus, despite his best efforts to streamline communications and effort, and notwithstanding the Court's directive that "[t]he City must make arrangements with the Monitor so he can meet the forthcoming November 12, 2025 deadline for an initial assessment" (Dkt. 1048, at 2), the Monitor does not anticipate being able to provide a substantive update to the Court at that hearing.

## II. Monitor's Efforts to Obtain Access to Staff and Information

Immediately after learning of the Court's appointment, the Monitor[1] initiated outreach to start the process of assessing the City's systems and data related to persons experiencing homelessness ("PEH"). The morning of October 15, 2025, the Monitor communicated with Special Master Michele Martinez ("Special Master"), who suggested that the Monitor reach out to City Controller Mejia ("Controller Mejia") to discuss the Order Appointing Monitor. The Monitor emailed Controller Mejia later that day seeking an introductory meeting.

The next day, on October 16, 2025, the Monitor engaged in a video conference call with Controller Mejia and his staff. The attendees discussed the Monitor's Duties and the Court's instruction that Controller Mejia "will support [the Monitor], without further cost to the City, in the execution of his role by facilitating data access and coordination." (Dkt. 1048, at 4). In addition to providing an overview of his office's efforts, Controller Mejia expressed his willingness to assist the Monitor, including helping to identify and connect the Monitor to relevant City subject matter

---

[1] References to the Monitor regarding communications are inclusive of his staff.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

experts.

On October 18, 2025, the Monitor emailed the City's Chief Administrative Officer, Matt Szabo ("CAO Szabo") after receiving his contact information from Controller Mejia. *See* **Exhibit 1**. The Monitor sought clarifying information regarding the Intervention Data in the City's Quarterly Report for the period ending September 2025 (Dkt. 1051) ("September 2025 Report"). *See* **Exhibit 1**. Specifically, the Monitor attached an Excel workbook that included the following tabs (*aka* worksheets): three (3) identical questions about each entry in the Intervention Data table; six (6) questions about the City's data systems; and ten (10) general questions. *Id.* In addition, the Monitor requested an interview the following week, on October 23, 2025, with CAO Szabo "or a member of your team who can answer these questions." *Id.*

On October 21, 2025, City Counsel Scolnick emailed the Monitor regarding the data and scheduling request to CAO Szabo, stating that the Monitor had "pos[ed] several hundred questions and request[ed] various in-person interviews." *See* **Exhibit 2**. Noting that "[t]he City is a represented party in this litigation," City Counsel wrote, "[p]lease do not contact City officials or employees directly. If you'd like to speak with City officials or employees, please make those requests through counsel, and we can coordinate." *Id.* City Counsel Scolnick also referenced the City's impending appeal of the Order Appointing Monitor and request for a stay pending appeal, stating "[t]he City reserves all rights regarding your work as a Monitor and any fees you may later seek to charge the City." *Id.*

That same day, the Monitor responded to City Counsel Scolnick's email. *See* **Exhibit 3**. The Monitor agreed to "ask the court to clarify how it expects me to communicate with the City's staff: directly or through its attorneys." *Id.* Highlighting that the Order Appointing Monitor specifically directs the Monitor to collaborate with Controller Mejia, the Monitor asked City Counsel to confirm "which City officials and employees you represent and whether your representation

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

extents to [Controller Mejia]." *Id.* The Monitor pointed out that he had sent CAO Szabo "twenty-four questions cover[ing] straightforward topics with which the City is intimately familiar and that it should be able to answer easily." *Id.* The Monitor closed the email by emphasizing the urgency of the request due to the demanding timeline set by the Court and stating that "[t]he City's prompt response to these questions will help us move forward collaboratively and efficiently." *Id.*

On October 22, 2025, City Counsel Scolnick responded. *See* **Exhibit 4**. First, he requested that City Counsel be notified if the Court "direct[s] you to engage in direct outreach and/or contact with City officials and employees other than Controller Mejia." *Id.* (emphasis in original). Second, while noting that "Controller Mejia . . . just like every other City official and employee" is "represented by the "City . . . and by Gibson Dunn in this litigation," City Counsel Scolnick "consent[ed] to" the Monitor's direct communication with him. *Id.* However, City Counsel stated that "we are not consenting to your direct communications with any other City official or employee." *Id.* Third, City Counsel Scolnick indicated that the City could not fully answer the Monitor's questions about the September Quarterly Report, questioning "whether this level of detail is actually required to verify the quarterly report data" and noting that "[t]he CAO also does not have all of the information readily available for each 'System / Dataset' Listed." *Id.* Finally, regarding setting an interview with CAO Szabo, City Counsel stated the interviewee would be out of the country until October 31, 2025, and requested pushing the meeting until the following week. *Id.*

On October 24, 2025, the Monitor and City Counsel Scolnick engaged in a volley of numerous emails regarding correspondence protocol (*e.g.*, who to copy on what emails, the City's objection to "*ex parte* communications with counsel for any of the parties," what to do if privileged communications are accidentally emailed, etc.). *See* **Exhibit 5** (email chain). In the final email related to that chain, Plaintiff's counsel stated that they "are happy to waive ex parte communications [involving the

Page 4

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

Monitor] . . . [because] [t]hat's how things have historically been done over the last five years." But since "the City's lawyers are now insisting on being involved in every communication, then we also need to be included." *See* **Exhibit 6**.

On October 27, 2025, City Counsel Scolnick emailed the Monitor "preliminary information in response to your various questions to the CAO's office" regarding the September Quarterly Report. *See* **Exhibit 7**. Noting the compressed time schedule, City Counsel Scolnick stated that "the City has not had sufficient time to fully evaluate these responses with all relevant stakeholders for completeness and accuracy." *Id.* He also wrote that the City "would appreciate being kept on communications with LAHSA as well." *Id.*

On October 28, 2025, Controller Mejia emailed City employee Edwin Gipson to facilitate a meeting between him and the Monitor. *See* **Exhibit 8**. Referencing the email protocol discussed in **Exhibit 7**, Controller Mejia included "all Alliance counsel (the City's, Alliance, intervenors) in th[e] email." *Id.* City Counsel Scolnick sent a response to the original recipients "[d]ropping Mr. Gipson from th[e] chain" and stating that all communications from the Monitor or Controller Mejia "should be made through the City's counsel and then we can coordinate." *See* **Exhibit 9**. The Monitor responded, apologizing for the inconvenience and noting that "it was [his] understanding that Mr. Mejia was permitted under the [Order Appointing Monitor] to coordinate the meetings with the City." *See* **Exhibit 10**. The Monitor stated that he "will seek immediate clarification from the Court regarding Mr. Mejia's involvement." *Id.*

In a separate branch of that email chain on the same day, the Monitor formally requested that City Counsel Scolnick "[p]lease work with . . . my team to co-ordinate the meeting" with Mr. Gipson. *See* **Exhibit 11**. City Counsel Scolnick responded "[w]ill do." *See* **Exhibit 12**.

On October 31, 2025, having not received a response from City Counsel Scolnick, the Monitor sent a follow-up email to schedule the meeting with Mr.

Page 5

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

Gipson. *See* **Exhibit 13**. City Counsel Scolnick responded "[y]es, I had been waiting to hear from you. Will check and get back to you." *See* **Exhibit 14**. Later that day, City Council emailed: "I learned that Mr. Gipson is out of the office until Monday, so we'll touch base with you as soon as we hear back from him on Monday." *See* **Exhibit 15**.

### III.    Information Gathering Efforts

As the above communications establish, the Monitor has encountered numerous issues in obtaining information from the City. The City has required that the Monitor funnel all requests for information or meetings through City Counsel. *See* **Exhibits 2-4**. The City extended this restriction to "any *ex parte* communications with counsel for any of the parties," *see* **Exhibit 5**, despite such communications being the *status quo* for the previous five years. *See* **Exhibit 6**. City Counsel also applied these limitations to Controller Mejia, notwithstanding the directive in the Court's Order Appointing Monitor that the Controller provide support "by facilitating data access and coordination." *See* **Exhibits 8-9**.

The City's procedural requirements have delayed the Monitor in his ability to perform Court-appointed duties. Channeling all requests through City Counsel necessarily introduces temporal lag and material inefficiencies. Therefore, the Monitor has yet to meet any City staff; the first meeting, with CAO Szabo, is scheduled for today, November 3, 2025.

In sum, the City, through its counsel, has delayed the Monitor's timely execution of his Court ordered responsibilities.[2]

### IV.    Data Concerns

A review of the summary Intervention Data that attend the City's quarterly reports raises several questions about the collection, definition, and reporting of the

---

[2] By requiring all communications to flow through counsel rather than permitting direct engagement with City staff, the City has delayed data collection, postponed interviews, and constrained the Monitor's ability to meet Court-imposed deadlines.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

underlying data.

The Monitor attempted to obtain answers to some of these questions in his first query to the City. *See* **Exhibit 1**. The City's "initial responses were prepared under a compressed scheduled" and without the benefit of "sufficient time to fully evaluate the[m] with all relevant stakeholders for completeness and accuracy." *See* **Exhibit 6**. Giving proper deference to this caveat, the responses are inadequate. For example, the Monitor asked the following regarding the entries on the Intervention Data table: "From which City system(s)/database(s) were the reported 'Units/Beds,' 'Status,' and 'Open & Occupiable Date' generated?" *See* **Exhibit 1** at 3-16. Rather than identify the underlying *system(s) or database(s)*, the City responded with statements regarding the *entity* that collected the data (*e.g.*, "The Los Angeles Housing Department provides the 'Units/Beds' and 'Status' information," "Data is confirmed quarterly by HACLA Asset Management staff," "CAO maintains records of the beds, status, and open and occupiable date," "Information was confirmed by the Community Investment for Families Department (CIFD)," etc.). *See* **Exhibit 6** at 24-25.

The Monitor also asked specific questions about ten (10) systems and datasets, including who the system owner was, how frequently the data is updated, and how data governance is handled. *See* **Exhibit 1** at 17-19. The City's responses were circumscribed and also deferred to a third-party data maintainer (*e.g.*, "LAHSA is the system owner") for key datasets like the Homeless Management Information System ("HMIS"). *See* **Exhibit 6** at 24-25. In addition, although the Monitor's questions sought information on each of the ten (10) systems identified, the City's responses to some of the questions regarding these systems was to not provide sufficient and/or appropriate technical details. *Id.*

Several of the Monitor's questions concerned the City's definition and count of PEH, in part because the September 2025 Report did not include data on "Total PEH Served." (Dkt. 1051, Exhibit A). Instead, the City's entry for this column of

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

data was either "Pending" or blank (*i.e.*, an empty field). *Id.* By way of explaining the missing data, in Footnote 2 to Exhibit A of the September 2025 Report, the City wrote:

> This Quarterly Report does not include information regarding the number of persons experiencing homelessness served by the current intervention opportunities. The City has not been able to collect and verify that information in the time provided to complete this Report. The City is continuing to work to collect that information, and will supplement this Report when it is able to do so.

*Id.* at 10. However, the City's prior quarterly reports included PEH information.

One of the Monitor's questions about PEH inquired how the City defines the term. The City responded that it "uses HUD's definition of homelessness, which can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/four-categories/." *See* **Exhibit 6** at 27. But the HUD link identifies four (4) categories of homelessness, not a definition of PEH. This distinction illustrates the problem with the City's response. For example, it is not clear how the City identified and counted the second HUD category, "Imminent Risk of Homelessness," which captures the risk of a future loss of a primary residence. Similarly, the City's referral to the third HUD category "Homeless Under Other Federal Statutes," requires the Monitor to perform an iterative search of federal law. Adding to the lack of definitional clarity, the HUD website notes that "HUD has not authorized any CoC to serve the homeless under Category 3."

More fundamentally, the City's responses highlight a core concern with the quarterly reports; they provide summary data on three quantitative measures (*i.e.*, "Units/Beds," "Status," and "Total PEH Served") that the City cannot readily define, provide basic information about, or confirm are treated consistently across reporting entities. For example, the City-provided definition of "Units/Beds" does not actually

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

define either term, instead using the terms themselves in the "definition." **Exhibit 6** at 27 (Definition of Units/Beds: "Number of units/beds serving people experiencing homelessness counting toward Settlement requirements."). The utility of this definition, particularly its use of the phrase "*serving* people experiencing homelessness," is further called into question by the lack of any data in the "Total PEH Served" column of the September 2025 Report. (Dkt. 1051, Exhibit A). It begs the question of how a unit or bed can be counted as serving PEH if there are no data about the number of PEH being served.

**V.    Conclusion**

The Monitor has not yet interviewed any City staff and has been unable to gain sufficient data and/or information about the City's data collection, management, analysis, and reporting methods.[3] In short, the Monitor does not anticipate having sufficient information to give a substantive report at the upcoming November 12, 2025 hearing.

Dated:  November 3, 2025                    Respectfully submitted,

                                            /s/
                                            Daniel B. Garrie
                                            Law and Forensics
                                            *Data Monitor*

---

[3] There are also real-world impacts on the Monitor's ability to perform his duties efficiently and effectively that flow from the City's Ex Parte Application for Stay of Order Appointing Daniel Garrie as Monitor (Dkt. 1054) and the related appeal (Dkt. 1053). City Counsel Scolnick informed the Monitor that "[t]he City reserves all rights regarding your work as a Monitor and any fees you may later seek to charge the City." See Exhibit 2. In other words, until the Court and the Ninth Circuit make a final determination, the City challenges both the validity of the Monitor's appointment and any interim fees that the Monitor incurs.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025