**F I L E D**
CLERK, U.S. DISTRICT COURT

11/7/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ kdu _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.<br><br>Plaintiff,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.<br><br>Defendant. | Case No. LA CV 20-02291-DOC(KESx)<br><br>Judge:  Hon. David O. Carter<br><br>**SPECIAL MASTER'S REPORT** |

1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

LA ALLIANCE FOR HUMAN RIGHTS, et al.,
Plaintiffs,
v.
CITY OF LOS ANGELES, et al.,
Defendants.

Case No. 2:20-cv-02291-DOC-KES
Assigned to: Hon. David O. Carter
Referred to: Special Master Michele Martinez

Submitted by: Michele Martinez, Special Master
Date: November 10, 2025

RE: INTERIM ASSESSMENT OF CITY COMPLIANCE UNDER DKT. 991 AND SETTLEMENT AGREEMENT

The attached Interim Assessment of City Compliance under Dkt. 991 is respectfully submitted by Special Master Michele Martinez to inform the Court of the City of Los Angeles's response to the October 30, 2025 inquiry. This update documents procedural and substantive deficiencies ahead of the November 12 hearing and is not a final compliance determination. The Special Master's full Quarter 3 report will be submitted by November 12, 2025 in accordance with the reporting schedule under Dkt. 991.

This assessment is grounded in the City's obligations under both the Court's enforcement order (Dkt. 991) and the Settlement Agreement, which together define the requirements for verified data, milestone validation, and oversight cooperation. The submission is intended solely for judicial review.

Respectfully submitted,
Michele Martinez
Special Master

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

LA ALLIANCE FOR HUMAN RIGHTS, et al.,
Plaintiffs,
v.
CITY OF LOS ANGELES, et al.,
Defendants.

Case No. 2:20-cv-02291-DOC-KES
Assigned to: Hon. David O. Carter
Referred to: Special Master Michele Martinez

INTERIM ASSESSMENT OF CITY COMPLIANCE UNDER DKT. 991 AND SETTLEMENT AGREEMENT

Submitted by: Michele Martinez, Special Master
Date: November 10, 2025

**Purpose of Submission**

This interim assessment is submitted to inform the Court of the City of Los Angeles's response to the Special Master's October 30, 2025 inquiry. It outlines procedural and substantive deficiencies that currently prevent the Special Master and Data Monitor from verifying the City's self-reported compliance under Dkt. 991 and the Settlement Agreement. This is not a final compliance determination.

The Special Master's final Q3 report will be submitted by November 12, 2025, in accordance with the Court's reporting schedule.

**Summary of Findings**
The City submitted a written response on November 6, 2025 at 8:47 p.m. PST. While procedurally responsive, the submission was neither timely nor substantively adequate. It arrived a full week after the Special Master's inquiry and failed to provide the verified data, milestone documentation, or validation necessary for oversight.
As a result:
• The Special Master can complete portions of the Q3 compliance assessment, but several sections will remain incomplete due to missing documentation and lack of verification
• The Data Monitor cannot validate the City's reported progress without access to underlying data and milestone materials
• The Court lacks the full evidentiary record needed to determine substantive compliance under Dkt. 991 and the Settlement Agreement

**Oversight Limitations**

Despite procedural engagement, the City has not provided the materials required to fulfill its obligations under Dkt. 991 and the Settlement Agreement. Specifically:

• No verified PEH data by Council District
• No documentation linking shelter/housing offers to encampment reductions
• No milestone validation materials
• No timeline for submission of missing data

These omissions directly impede the Special Master's ability to assess compliance and the Data Monitor's ability to validate reported outcomes.

**Procedural Posture vs. Substantive Cooperation**

Monitor Daniel B. Garrie's November 3, 2025 Status Report identified barriers to access and cooperation. In response, the City:

• Defended its procedural routing through counsel
• Asserted no obstruction
• Cited its pending ex parte application to stay the Monitor's appointment
• Claimed ongoing cooperation

However, the Monitor has not received the data or access needed to perform his duties.

Monitor's Statement and City's Response (Dkt. 1064)
The City's response reflects a pattern of procedural acknowledgment without substantive delivery. Examples include:
• Conditional cooperation ("if Monitor appointment is not stayed")
• Deflection on key terms ("unclear what 'milestone validation' means")
• Routing all Monitor inquiries through counsel
• Lack of engagement with oversight officers

This posture has delayed verification, increased costs, and obstructed oversight.

**Procedural Timeline**
• Quarterly Report Submitted: October 15, 2025
• Special Master Inquiry Issued: October 30, 2025
• Monitor Garrie Status Report Submitted: November 3, 2025
• City Response to Monitor (Dkt. 1064) Submitted: November 4, 2025
• City Response to Special Master Inquiry Submitted: November 6, 2025 at 8:47 p.m. PST
• Court Hearing Scheduled: November 12, 2025
• Final Special Master Report for Q3 to be submitted by November 12, 2025

**Unanswered Questions**

The Special Master's October 30 inquiry included six questions. The City's response did not provide:

1. Verified PEH data (Section 7.1)
2. Documentation of shelter/housing offers (Section F)
3. Milestone validation materials (Section 7.2)
4. Clarification on "created" units in Exhibit B
5. Status of coordination with LAHSA
6. Timeline for submission of missing data

These gaps prevent oversight officers from completing their reviews.

**Verification Challenges**
The City's quarterly report submitted on October 15, 2025 was incomplete. It lacked critical data required under Dkt. 991 and the Settlement Agreement, including verified PEH counts, milestone documentation, and shelter offer tracking. These omissions directly triggered the Special Master's formal inquiry on October 30, 2025.

As stated in Monitor Daniel Garrie's November 3, 2025 Status Report, the Monitor has not received the underlying data necessary to validate the City's reported progress. He noted:

"The City has not provided the raw data or milestone documentation required to validate its quarterly report."

This absence of source data prevents the Monitor from confirming whether shelter placements, encampment reductions, or unit creation figures are accurate. The Monitor also reported delays in access and procedural barriers that have increased costs and impeded oversight.

While the City may argue that the Monitor did not formally request specific datasets, the obligation to provide verifiable documentation is embedded in Dkt. 991 and the Settlement Agreement. The Monitor's filing makes clear that the lack of access is not due to omission on his part, but due to the City's failure to produce the necessary materials.

Without verified data, the Special Master and Data Monitor cannot confirm compliance, and the Court lacks the evidentiary record required to assess the City's progress.

The City has had several months since the June 2025 order to coordinate with LAHSA and validate its figures. The absence of verified data and documentation constitutes a substantive failure to comply.

**Exhibits**

To support this assessment, the following documents are attached:

• Exhibit A – Special Master's October 30, 2025 inquiry to the City of Los Angeles
• Exhibit B – City of Los Angeles's written response, submitted November 6, 2025 at 8:47 p.m. PST
• Exhibit C – Monitor Daniel B. Garrie's Status Report dated November 3, 2025
• Exhibit D – City of Los Angeles's response to Monitor Garrie's report (Dkt. 1064)

These exhibits provide the factual basis for the findings outlined above and reflect the current limitations in oversight and verification.

**Final Note**

This assessment is submitted to assist the Court in evaluating the completeness and integrity of the City's response. The Special Master and Data Monitor remain unable to perform their oversight roles due to missing documentation, lack of verified data, and absence of milestone validation.

The City's procedural posture has not translated into substantive cooperation. The Special Master's questions remain unanswered, and the oversight process remains stalled.

This submission is intended solely to inform the Court's oversight and does not constitute a recommendation for relief or enforcement.

Respectfully submitted,
Michele Martinez
Special Master

# EXHIBIT A

FILED
CLERK, U.S. DISTRICT COURT

10/31/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____kdu_____ DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.<br><br>Plaintiff,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.<br><br>Defendant. | Case No. LA CV 20-02291-DOC(KESx)<br><br>Judge: Hon. David O. Carter<br><br>**SPECIAL MASTERS REQUEST** |

1

RE: REQUEST FOR UPDATES ON CITY OF LOS ANGELES QUARTERLY REPORT (Q3 2025)

TO THE COURT AND ALL PARTIES:

Please take notice that on October 30, 2025, the Special Master transmitted the attached formal request for updates to the City of Los Angeles and the Parties via email. The request pertains to the City's October 15, 2025 Quarterly Report, covering the reporting period ending September 30, 2025.The request seeks written responses by November 6, 2025 to support the Special Master's review of compliance, verification, and validation under the Settlement Agreement and Dkt. 991. A copy of the request is attached hereto as Exhibit A.

A copy of the request is attached hereto as Exhibit A.

Respectfully submitted,
Dated: October 31, 2025
Michele Martinez
Special Master

Exhibit A- Special Master's Request for Updates (October 30,2025)

**DATE:** October 30, 2025
**FROM:** Michele Martinez, Special Master
**RE:** Request for Updates – Q3 2025 Compliance Review
**Subject:** Request for Updates on Settlement Obligations – October 2025 Quarterly Report
**TO:** Counsel for the City of Los Angeles

Dear Counsel,

As I prepare to submit my Special Master's report reviewing the City's self-reported data for the third quarter of 2025 (reporting period ending September 30, 2025), I am requesting updates on several outstanding obligations under the Settlement Agreement and Dkt. 991.

Please provide written responses to each section below so I may accurately reflect the status of implementation and compliance.

I will need your response by **November 6, 2025**, as I will be submitting my report to the Court in advance of the **November 12th hearing**.

## I.    Section 7.1 – Reporting on PEH Served

The City's October 15, 2025 Quarterly Report is currently under review for compliance, verification, and validation pursuant to Dkt. 991 and the Settlement Agreement.

**The report states:**
"This Quarterly Report does not include information regarding the number of persons experiencing homelessness served by the current intervention opportunities. The City has not been able to collect and verify that information in the time provided to complete this Report."

**However, Section 7.1 of the Settlement Agreement requires quarterly updates on:**
- Housing or shelter opportunities created
- Opportunities offered
- Opportunities currently available
- Number of persons experiencing homelessness (PEH) served in each Council District

**Please confirm:**
- Whether the City has requested this data from LAHSA
- When the verified PEH served data will be submitted

## II.     Section F – Encampment Reduction Reporting (per <u>Dkt. 991</u>)

**In the City's July 15, 2025 Quarterly Report (<u>Dkt. 1011-1</u>), the City acknowledged:**
"The Court directed the City to 'report its updated encampment reduction data beginning in the October 2025 quarterly status report.' … The City thus is not including encampment-reduction data in this quarterly status report, but will endeavor to provide that information in the quarterly report slated for October 2025…"

Despite this commitment, the October 15, 2025 report does not include Q3 2025 data (July–September), nor does it explain why that data is missing. The Court's directive was issued on June 24, 2025, providing the City with a full quarter to begin tracking reductions consistent with the Court's definition.

The Monitor appointed under Section 7.2 will be responsible for reviewing whether offers of shelter or housing were made to individuals whose tents, makeshift shelters, or vehicles are counted as encampment reductions.

**The City is expected to:**
- Provide the name of the shelter or housing offered and available for each encampment reduction
- Support this with documentation, with specific requirements to be finalized by the Monitor in consultation with the Parties

**Please confirm:**
- When the City will submit Q3 2025 encampment reduction data consistent with the Court's definition
- Whether the City has prepared or intends to provide documentation of shelter or housing offers for each reported reduction
- Whether the City intends to provide the name of the shelter or housing offered for each reduction, as expected by the Court
- Whether the City has consulted with the Monitor or Plaintiffs regarding documentation protocols

## III. Section E – Verification and Validation (per <u>Dkt. 991</u> and October 14, 2025 Minute Order)

Section 7.2 of the Settlement Agreement requires the Parties to engage a mutually agreed-upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance. The City is responsible for funding this monitor.

<u>**Dkt. 991**</u> **(June 24, 2025) states:**

"To address verification failures, the parties shall meet and confer on a third-party Monitor by August 22, 2025, and subject to the Court's approval, select the Monitor by September 12, 2025, to oversee quarterly compliance checks and milestone validation." (<u>Dkt. 991 at 50</u>)

"Subject to the Parties' input, the Monitor will at least be responsible for reviewing the City's data prior to publication of its quarterly reports, verifying the numbers reported, engaging with the Parties and LAHSA to resolve data issues, and providing public reports on data compliance. The Monitor shall have full access to the data that the City uses to create its reports to the Court." (<u>Dkt. 991 at 50</u>)

"To streamline disputes over verification and compliance, the Court also orders that the Parties attend an in-person court hearing after the submission of each quarterly report. This accountability measure will ensure that disagreements are efficiently resolved as they arise." (<u>Dkt. 991 at 50</u>)

On October 14, 2025, the Court appointed **Daniel Garrie as the Monitor** and designated **Controller Kenneth Mejia as liaison**, without further cost to the City. Mr. Mejia is tasked with facilitating data access and coordination at Mr. Garrie's discretion. (Minute Order, Oct. 14, 2025, pp. 4–5)

**The Court reiterated that the Monitor's role is not ceremonial or advisory. It requires:**
- Real-time data auditing and timestamp validation
- Applied knowledge of data integrity and source attribution
- Verification that reported figures are supported by primary evidence
- Capacity to distinguish verified data from placeholders or estimates

On October 22, the City filed a notice of appeal and an ex parte application for a stay of that appointment (<u>Dkt. 1054</u>), asserting that the appointment was made without its consent or City Council approval. The City also cited concerns about cost, scope, and the independence of elected officials.

On October 23, 2025, Plaintiffs filed their opposition to the City's ex parte application for a stay (<u>Dkt. 1055</u>), arguing that the City had jointly submitted the dispute to the Court under Section 24 of the Settlement Agreement and that the Court acted within its authority in appointing the monitor.

**Please confirm:**
- Whether the City intends to provide requested data to Mr. Garrie and Controller Mejia upon receipt of specific requests

- Whether any verified data is expected to be available for review prior to the November 12 hearing
- Whether the City anticipates supporting an initial assessment from the monitors, even if full validation is not yet possible
- Whether the City has taken any steps to internally assess or verify the reported bed and unit figures, pending third-party validation
- Whether any milestone-related data has been reviewed or documented in a way that could support future validation efforts
- How the City is currently ensuring accuracy and transparency in its reported figures

As of this writing, Mr. Garrie has communicated with the city to meet with City staff and submitted preliminary questions, but no underlying data has been provided for verification or milestone validation. With the November 12 hearing approaching, it is unclear whether Mr. Garrie or Controller Mejia will receive the necessary data in time to conduct an initial assessment. As the Special Master, I will not be in a position to confirm verification and validation of the City's Q3 2025 reported figures under Section 7.2 unless the underlying data is provided and the monitor is able to conduct an initial review.

## IV. Section 8.2 – Emergency Pause and Meet-and-Confer Obligation

Section 8.2 of the Settlement Agreement allows for a pause in obligations during declared emergencies, provided the Parties meet and confer on any necessary and appropriate amendments:

"In the event of fires, floods, earthquakes, epidemics, quarantine restrictions, or other natural catastrophic occurrences; terrorist acts, insurrections or other large scale civil disturbances; or any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council… the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations." (Dkt. 429-1 § 8.2) This provision applies only to Sections 3, 4, and 5 — housing/shelter creation, engagement, and milestones. It does not apply to Section 7 (reporting) or Section 7.2 (monitor oversight).

**The Court reaffirmed this in Dkt. 991:**
"The Settlement Agreement also imposes a duty on both parties to meet and confer in good faith to determine the necessary adjustments during any such pause. The Court reiterates that this responsibility remains ongoing and mutual. Resorting to the Court for answers that should first be addressed collaboratively under the Agreement only undermines its purpose." (Dkt. 991 at 55)

**The Court further clarified:**

"The invocation of Section 8.2 does not excuse the City from its ongoing responsibilities—particularly with respect to accurate reporting and verification of beds. The pause provision is not a blanket exemption from compliance." (<u>Dkt. 991 at 55</u>)

**The City is required to:**
- Declare an emergency
- Meet-and-confer with Plaintiffs

While the City referenced Section 8.2 in its ex parte application for a stay (<u>Dkt. 1054</u>), citing wildfires, civil unrest, and a fiscal emergency, the October 15, 2025 Quarterly Report does not indicate that Section 8.2 has been formally invoked. No record of a meet-and-confer or proposed amendments has been shared with the Special Master or the Court.

**Please confirm for the record:**
- What date the City invoked Section 8.2
- Whether the City and Plaintiffs have met and conferred as required
- What adjustments, if any, are being proposed

Thank you for your attention to these matters. I look forward to your response by **November 6, 2025**.

Respectfully,
Michele Martinez
Special Master

Exhibit A

# EXHIBIT B

# GIBSON DUNN

November 6, 2025

Michele Martinez
Special Master

Re:    LA Alliance v. City of Los Angeles, Case N. 2:20-cv-2291-DOC
Response to October 30, 2025 Request from Special Master

Dear Special Master Martinez:

Please see below responses to the questions raised in your October 30, 2025 correspondence.

**I.      Section 7.1 – Reporting on PEH Served**

- **Whether the City has requested this data from LAHSA**

Yes, the City has requested this data.  Representatives from the City Administrative Office met with LAHSA this week.

- **When the verified PEH served data will be submitted**

Verified PEH served data will be submitted once the City has received the data it needs to verify those numbers and has verified that data.

**II.     Section F – Encampment Reduction Reporting**

- **When the City will submit Q3 2025 encampment reduction data consistent with the Court's definition**

Encampment reduction data for July 1 through September 20, 2025 consistent with the Court's definition was submitted with the City's last quarterly report.  Dkt. 1051-3.

- **Whether the City has prepared or intends to provide documentation of shelter or housing offers for each reported reduction**

As contemplated by the Court's June 24, 2025 order, Dkt. 991 at 54, the City intends to work with Mr. Garrie to provide available data on this topic (unless his appointment is stayed by Judge Carter or the Ninth Circuit).

**Gibson, Dunn & Crutcher LLP**
333 South Grand Avenue  |  Los Angeles, CA 90071-3197  |  gibsondunn.com

**GIBSON DUNN**

Michele Martinez                                                                    November 6, 2025
                                                                                              Page 2

- **Whether the City intends to provide the name of the shelter or housing offered for each reduction, as expected by the Court**

As contemplated by the Court's June 24, 2025 order, Dkt. 991 at 54, the City intends to work with Mr. Garrie to provide available data on this topic (unless his appointment is stayed by Judge Carter or the Ninth Circuit).

- **Whether the City has consulted with the Monitor or Plaintiffs regarding documentation protocols**

The City has not yet had discussions with Mr. Garrie or Plaintiffs regarding this topic.

III.    **Section E – Verification and Validation**

- **Whether the City intends to provide requested data to Mr. Garrie and Controller Mejia upon receipt of specific requests**

Unless the order appointing Mr. Garrie and Controller Mejia is stayed by Judge Carter or the Ninth Circuit, the City intends to provide available data that it has in its possession in response to appropriate requests from Mr. Garrie and Controller Mejia.

- **Whether any verified data is expected to be available for review prior to the November 12 hearing**

The City does not know what you mean by "verified data" in this context.  In any event, the City has not received any requests from Mr. Garrie to provide any "verified data" prior to the November 12 hearing.  To the extent such a request is received, the City will work in good faith to understand exactly what is being requested and to provide responsive data that it has in its possession.

- **Whether the City anticipates supporting an initial assessment from the monitors, even if full validation is not yet possible**

The City does not know what you mean by "initial assessment," "full validation," or "supporting." To the extent you are asking about Mr. Garrie's initial efforts, the City has already and will continue to respond to requests from Mr. Garrie unless his appointment is stayed by Judge Carter or the Ninth Circuit.

- **Whether the City has taken any steps to internally assess or verify the reported bed and unit figures, pending third-party validation**

All bed and unit data are confirmed by the responsible agency or City department using the agency's/department's protocols before being added to the list for quarterly reporting.  CAO routinely reviews and checks the reported bed and unit figures before that information is reported to the Court.  CAO staff cross reference data provided using available documents resources and confirm information with the responsible agency or City department as needed (the relevant

# GIBSON DUNN

Michele Martinez                                                November 6, 2025
                                                                        Page 3

agencies or departments are Los Angeles Housing Department (LAHD), Housing Authority of the City of Los Angeles (HACLA), Los Angeles Homeless Services Authority (LAHSA), and Community Investment for Families Department (CIFD)).  CAO staff also review invoices for hotel/motel booking agreement sites to confirm the number of rooms used for interim housing at the sites during the quarterly reporting period, and also review invoices for hotel/motel occupancy sites to confirm the number of contracted rooms used for interim housing as opposed to administrative purposes.  Any updates to bed/unit numbers from prior quarterly reports are noted using footnotes.

Documents reflecting City funding approvals and other Council actions are available on the Council File Management System https://cityclerk.lacity.org/lacityclerkconnect/). In addition, the Prop HHH Progress Report Dashboard on the Los Angeles Housing Department website provides public reporting on many of the Permanent Supportive Housing sites (https://housing.lacity.gov/housing/hhh-progress-dashboard).

- **Whether any milestone-related data has been reviewed or documented in a way that could support future validation efforts**

The City does not know what you mean by "milestone-related data" or "future validation efforts," and accordingly cannot respond to this question without further explanation.

- **How the City is currently ensuring accuracy and transparency in its reported figures**

Please see the above response regarding the City's validation process.

IV.    <u>Section 8.2 – Emergency Plans and Meet-and-Confer Obligation</u>

- **What date the City invoked Section 8.2.**

Nothing in the Settlement Agreement requires the City to "invoke" Section 8.2.  Rather, Section 8.2 provides that in the event of any of the enumerated events, "the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement *shall* be paused." (Emphasis added.)  Three events sufficient to trigger Section 8.2 have occurred this year, with the Palisades Fire in January 2025, the City's response to the large-scale civil disturbances in June 2025, and the declared fiscal emergency in July 2025.  The City has repeatedly raised with Plaintiffs' counsel the obligations under Section 8.2, the implication of the emergencies, and proposed modifications to the Settlement Agreement since at least February 2025.

- **Whether the City and Plaintiffs have met and conferred as required.**

The City and Plaintiffs have met and conferred on at least three occasions regarding the emergencies triggering Section 8.2 and the resulting need to modify the Settlement Agreement. While the City has made a reasonable proposal for modification of the Settlement Agreement, Plaintiffs have refused to consider it or to propose any alternative reasonable modifications.

**GIBSON DUNN**

Michele Martinez

November 6, 2025
Page 4

- **What adjustments, if any, are being proposed**

The City has proposed that the encampment reduction obligation in the Settlement Agreement be modified such that (a) all 6,129 reductions the City reported through March 31, 2025 count towards the total number of reductions required, and (b) the City would satisfy the remaining encampment reduction obligation by completing 400 additional encampment reductions consistent with the Court's interpretation of the Settlement Agreement by the current completion deadline.  The City has not requested, nor does it need, any modification of the current shelter creating obligation.  Plaintiffs have rejected that proposal, dispute that any of the emergencies the City has identified warrant any modification to the Settlement Agreement, and have not proposed any reasonable alternative modifications.

# EXHIBIT C

LAW AND FORENSICS
DANIEL B. GARRIE
 *daniel@lawandforensics.com*
10665 Durland Ave NE
Seattle, Washington 98125
Telephone:  855.529.2466

*Monitor*

**F I L E D**
CLERK, U.S. DISTRICT COURT

11/3/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ kdu _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA Alliance for Human Rights, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> City of Los Angeles, *et al.* <br><br> Defendants. | Case No. 2:20-CV-02291-DOC-KES <br><br> Honorable David O. Carter <br> United States District Judge <br><br> **STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025** <br><br> Action Filed:     March 10, 2020 |

TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Pursuant to the Court's October 14, 2025 Order Resolving Third-Party Monitor Appointment and Scope of Work (Dkt. 1048) ("Order Appointing Monitor"), the Monitor submits this Status Report for October 2025 ("Status Report").

## I.    Overview

This interim Status Report updates the Court and the Parties on the Monitor's efforts to "provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of [the Parties' Settlement] Agreement" (Dkt. 421-1). The Court subsequently explained that the Monitor:

- will 'at least be' responsible for reviewing and verifying the [C]ity's data prior to publication, resolving data issues, and providing public reports on data compliance;
- will have full access to the data the City uses to create its reports;
- shall review and provide guidance on public accessibility to the City's contracts and invoices;
- will confirm that shelter or housing offers were made with respect to the encampment reductions

(Dkt. 1048 at 2, *citing* Dkt. 991 at 50) ("Monitor's Duties").

As detailed further below, in the almost three weeks since the Order Appointing Monitor, the Monitor has made an effort to fulfill the Monitor's Duties efficiently. However, the procedural process requested by counsel for the City ("City Counsel") has slowed progress. The City Counsel instructed the Monitor not to contact any City employees directly. Instead, all communications must pass through City Counsel in the first instance: City Counsel rejected the Monitor's proposed compromise to copy counsel. The necessary consequence of this restriction is an increase in the time and costs associated with executing the Monitor's Duties.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

At present, the Monitor has only been able to engage in the *scheduling* of scoping interviews with key City subject matter experts. No interviews have occurred. In addition, the Monitor's review of the publicly reported summary (*i.e.*, not source) "Intervention Data" in the City's quarterly reports indicated numerous data collection, definition, and reporting issues that must be addressed before any analysis can be performed.

Thus, despite his best efforts to streamline communications and effort, and notwithstanding the Court's directive that "[t]he City must make arrangements with the Monitor so he can meet the forthcoming November 12, 2025 deadline for an initial assessment" (Dkt. 1048, at 2), the Monitor does not anticipate being able to provide a substantive update to the Court at that hearing.

## II.   Monitor's Efforts to Obtain Access to Staff and Information

Immediately after learning of the Court's appointment, the Monitor[1] initiated outreach to start the process of assessing the City's systems and data related to persons experiencing homelessness ("PEH"). The morning of October 15, 2025, the Monitor communicated with Special Master Michele Martinez ("Special Master"), who suggested that the Monitor reach out to City Controller Mejia ("Controller Mejia") to discuss the Order Appointing Monitor. The Monitor emailed Controller Mejia later that day seeking an introductory meeting.

The next day, on October 16, 2025, the Monitor engaged in a video conference call with Controller Mejia and his staff. The attendees discussed the Monitor's Duties and the Court's instruction that Controller Mejia "will support [the Monitor], without further cost to the City, in the execution of his role by facilitating data access and coordination." (Dkt. 1048, at 4). In addition to providing an overview of his office's efforts, Controller Mejia expressed his willingness to assist the Monitor, including helping to identify and connect the Monitor to relevant City subject matter

---

[1] References to the Monitor regarding communications are inclusive of his staff.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

experts.

On October 18, 2025, the Monitor emailed the City's Chief Administrative Officer, Matt Szabo ("CAO Szabo") after receiving his contact information from Controller Mejia. *See* **Exhibit 1**. The Monitor sought clarifying information regarding the Intervention Data in the City's Quarterly Report for the period ending September 2025 (Dkt. 1051) ("September 2025 Report"). *See* **Exhibit 1**. Specifically, the Monitor attached an Excel workbook that included the following tabs (*aka* worksheets): three (3) identical questions about each entry in the Intervention Data table; six (6) questions about the City's data systems; and ten (10) general questions. *Id.* In addition, the Monitor requested an interview the following week, on October 23, 2025, with CAO Szabo "or a member of your team who can answer these questions." *Id.*

On October 21, 2025, City Counsel Scolnick emailed the Monitor regarding the data and scheduling request to CAO Szabo, stating that the Monitor had "pos[ed] several hundred questions and request[ed] various in-person interviews." *See* **Exhibit 2**. Noting that "[t]he City is a represented party in this litigation," City Counsel wrote, "[p]lease do not contact City officials or employees directly. If you'd like to speak with City officials or employees, please make those requests through counsel, and we can coordinate." *Id.* City Counsel Scolnick also referenced the City's impending appeal of the Order Appointing Monitor and request for a stay pending appeal, stating "[t]he City reserves all rights regarding your work as a Monitor and any fees you may later seek to charge the City." *Id.*

That same day, the Monitor responded to City Counsel Scolnick's email. *See* **Exhibit 3**. The Monitor agreed to "ask the court to clarify how it expects me to communicate with the City's staff: directly or through its attorneys." *Id.* Highlighting that the Order Appointing Monitor specifically directs the Monitor to collaborate with Controller Mejia, the Monitor asked City Counsel to confirm "which City officials and employees you represent and whether your representation

Page 3

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

extents to [Controller Mejia]." *Id.* The Monitor pointed out that he had sent CAO Szabo "twenty-four questions cover[ing] straightforward topics with which the City is intimately familiar and that it should be able to answer easily." *Id.* The Monitor closed the email by emphasizing the urgency of the request due to the demanding timeline set by the Court and stating that "[t]he City's prompt response to these questions will help us move forward collaboratively and efficiently." *Id.*

On October 22, 2025, City Counsel Scolnick responded. *See* **Exhibit 4**. First, he requested that City Counsel be notified if the Court "direct[s] you to engage in direct outreach and/or contact with City officials and employees other than Controller Mejia." *Id.* (emphasis in original). Second, while noting that "Controller Mejia . . . just like every other City official and employee" is "represented by the "City . . . and by Gibson Dunn in this litigation," City Counsel Scolnick "consent[ed] to" the Monitor's direct communication with him. *Id.* However, City Counsel stated that "we are not consenting to your direct communications with any other City official or employee." *Id.* Third, City Counsel Scolnick indicated that the City could not fully answer the Monitor's questions about the September Quarterly Report, questioning "whether this level of detail is actually required to verify the quarterly report data" and noting that "[t]he CAO also does not have all of the information readily available for each 'System / Dataset' Listed." *Id.* Finally, regarding setting an interview with CAO Szabo, City Counsel stated the interviewee would be out of the country until October 31, 2025, and requested pushing the meeting until the following week. *Id.*

On October 24, 2025, the Monitor and City Counsel Scolnick engaged in a volley of numerous emails regarding correspondence protocol (*e.g.*, who to copy on what emails, the City's objection to "*ex parte* communications with counsel for any of the parties," what to do if privileged communications are accidentally emailed, etc.). *See* **Exhibit 5** (email chain). In the final email related to that chain, Plaintiff's counsel stated that they "are happy to waive ex parte communications [involving the

Page 4

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

Monitor] . . . [because] [t]hat's how things have historically been done over the last five years." But since "the City's lawyers are now insisting on being involved in every communication, then we also need to be included." *See* **Exhibit 6**.

On October 27, 2025, City Counsel Scolnick emailed the Monitor "preliminary information in response to your various questions to the CAO's office" regarding the September Quarterly Report. *See* **Exhibit 7**. Noting the compressed time schedule, City Counsel Scolnick stated that "the City has not had sufficient time to fully evaluate these responses with all relevant stakeholders for completeness and accuracy." *Id.* He also wrote that the City "would appreciate being kept on communications with LAHSA as well." *Id.*

On October 28, 2025, Controller Mejia emailed City employee Edwin Gipson to facilitate a meeting between him and the Monitor. *See* **Exhibit 8**. Referencing the email protocol discussed in **Exhibit 7**, Controller Mejia included "all Alliance counsel (the City's, Alliance, intervenors) in th[e] email." *Id.* City Counsel Scolnick sent a response to the original recipients "[d]ropping Mr. Gipson from th[e] chain" and stating that all communications from the Monitor or Controller Mejia "should be made through the City's counsel and then we can coordinate." *See* **Exhibit 9**. The Monitor responded, apologizing for the inconvenience and noting that "it was [his] understanding that Mr. Mejia was permitted under the [Order Appointing Monitor] to coordinate the meetings with the City." *See* **Exhibit 10**. The Monitor stated that he "will seek immediate clarification from the Court regarding Mr. Mejia's involvement." *Id.*

In a separate branch of that email chain on the same day, the Monitor formally requested that City Counsel Scolnick "[p]lease work with . . . my team to co-ordinate the meeting" with Mr. Gipson. *See* **Exhibit 11**. City Counsel Scolnick responded "[w]ill do." *See* **Exhibit 12**.

On October 31, 2025, having not received a response from City Counsel Scolnick, the Monitor sent a follow-up email to schedule the meeting with Mr.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

Gipson. *See* **Exhibit 13**. City Counsel Scolnick responded "[y]es, I had been waiting to hear from you. Will check and get back to you." *See* **Exhibit 14**. Later that day, City Council emailed: "I learned that Mr. Gipson is out of the office until Monday, so we'll touch base with you as soon as we hear back from him on Monday." *See* **Exhibit 15**.

## III.    Information Gathering Efforts

As the above communications establish, the Monitor has encountered numerous issues in obtaining information from the City. The City has required that the Monitor funnel all requests for information or meetings through City Counsel. *See* **Exhibits 2-4**. The City extended this restriction to "any *ex parte* communications with counsel for any of the parties," *see* **Exhibit 5**, despite such communications being the *status quo* for the previous five years. *See* **Exhibit 6**. City Counsel also applied these limitations to Controller Mejia, notwithstanding the directive in the Court's Order Appointing Monitor that the Controller provide support "by facilitating data access and coordination." *See* **Exhibits 8-9**.

The City's procedural requirements have delayed the Monitor in his ability to perform Court-appointed duties. Channeling all requests through City Counsel necessarily introduces temporal lag and material inefficiencies. Therefore, the Monitor has yet to meet any City staff; the first meeting, with CAO Szabo, is scheduled for today, November 3, 2025.

In sum, the City, through its counsel, has delayed the Monitor's timely execution of his Court ordered responsibilities.[2]

## IV.    Data Concerns

A review of the summary Intervention Data that attend the City's quarterly reports raises several questions about the collection, definition, and reporting of the

---

[2] By requiring all communications to flow through counsel rather than permitting direct engagement with City staff, the City has delayed data collection, postponed interviews, and constrained the Monitor's ability to meet Court-imposed deadlines.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

underlying data.

The Monitor attempted to obtain answers to some of these questions in his first query to the City. *See* **Exhibit 1**. The City's "initial responses were prepared under a compressed scheduled" and without the benefit of "sufficient time to fully evaluate the[m] with all relevant stakeholders for completeness and accuracy." *See* **Exhibit 6**. Giving proper deference to this caveat, the responses are inadequate. For example, the Monitor asked the following regarding the entries on the Intervention Data table: "From which City system(s)/database(s) were the reported 'Units/Beds,' 'Status,' and 'Open & Occupiable Date' generated?" *See* **Exhibit 1** at 3-16. Rather than identify the underlying *system(s) or database(s)*, the City responded with statements regarding the *entity* that collected the data (*e.g.*, "The Los Angeles Housing Department provides the 'Units/Beds' and 'Status' information," "Data is confirmed quarterly by HACLA Asset Management staff," "CAO maintains records of the beds, status, and open and occupiable date," "Information was confirmed by the Community Investment for Families Department (CIFD)," etc.). *See* **Exhibit 6** at 24-25.

The Monitor also asked specific questions about ten (10) systems and datasets, including who the system owner was, how frequently the data is updated, and how data governance is handled. *See* **Exhibit 1** at 17-19. The City's responses were circumscribed and also deferred to a third-party data maintainer (*e.g.*, "LAHSA is the system owner") for key datasets like the Homeless Management Information System ("HMIS"). *See* **Exhibit 6** at 24-25. In addition, although the Monitor's questions sought information on each of the ten (10) systems identified, the City's responses to some of the questions regarding these systems was to not provide sufficient and/or appropriate technical details. *Id.*

Several of the Monitor's questions concerned the City's definition and count of PEH, in part because the September 2025 Report did not include data on "Total PEH Served." (Dkt. 1051, Exhibit A). Instead, the City's entry for this column of

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

data was either "Pending" or blank (*i.e.*, an empty field). *Id.* By way of explaining the missing data, in Footnote 2 to Exhibit A of the September 2025 Report, the City wrote:

> This Quarterly Report does not include information regarding the number of persons experiencing homelessness served by the current intervention opportunities. The City has not been able to collect and verify that information in the time provided to complete this Report. The City is continuing to work to collect that information, and will supplement this Report when it is able to do so.

*Id.* at 10. However, the City's prior quarterly reports included PEH information.

One of the Monitor's questions about PEH inquired how the City defines the term. The City responded that it "uses HUD's definition of homelessness, which can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/four-categories/." *See* **Exhibit 6** at 27. But the HUD link identifies four (4) categories of homelessness, not a definition of PEH. This distinction illustrates the problem with the City's response. For example, it is not clear how the City identified and counted the second HUD category, "Imminent Risk of Homelessness," which captures the risk of a future loss of a primary residence. Similarly, the City's referral to the third HUD category "Homeless Under Other Federal Statutes," requires the Monitor to perform an iterative search of federal law. Adding to the lack of definitional clarity, the HUD website notes that "HUD has not authorized any CoC to serve the homeless under Category 3."

More fundamentally, the City's responses highlight a core concern with the quarterly reports; they provide summary data on three quantitative measures (*i.e.*, "Units/Beds," "Status," and "Total PEH Served") that the City cannot readily define, provide basic information about, or confirm are treated consistently across reporting entities. For example, the City-provided definition of "Units/Beds" does not actually

Page 8

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

define either term, instead using the terms themselves in the "definition." **Exhibit 6** at 27 (Definition of Units/Beds: "Number of units/beds serving people experiencing homelessness counting toward Settlement requirements."). The utility of this definition, particularly its use of the phrase "*serving* people experiencing homelessness," is further called into question by the lack of any data in the "Total PEH Served" column of the September 2025 Report. (Dkt. 1051, Exhibit A). It begs the question of how a unit or bed can be counted as serving PEH if there are no data about the number of PEH being served.

**V.     Conclusion**

The Monitor has not yet interviewed any City staff and has been unable to gain sufficient data and/or information about the City's data collection, management, analysis, and reporting methods.[3] In short, the Monitor does not anticipate having sufficient information to give a substantive report at the upcoming November 12, 2025 hearing.

Dated:  November 3, 2025                    Respectfully submitted,

/s/
Daniel B. Garrie
Law and Forensics
*Data Monitor*

---

[3] There are also real-world impacts on the Monitor's ability to perform his duties efficiently and effectively that flow from the City's Ex Parte Application for Stay of Order Appointing Daniel Garrie as Monitor (Dkt. 1054) and the related appeal (Dkt. 1053). City Counsel Scolnick informed the Monitor that "[t]he City reserves all rights regarding your work as a Monitor and any fees you may later seek to charge the City." See Exhibit 2. In other words, until the Court and the Ninth Circuit make a final determination, the City challenges both the validity of the Monitor's appointment and any interim fees that the Monitor incurs.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

# EXHIBIT D

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
   tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
   mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
   kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
   bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
   akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
   pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978-7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, a Municipal entity, et al., <br><br> Defendant. | CASE NO. 2:20-cv-02291 DOC (KES) <br><br> Honorable David O. Carter, United States District Judge <br><br> **DEFENDANT CITY OF LOS ANGELES'S RESPONSE TO STATUS REPORT OF MONITOR DANIEL B. GARRIE (DKT. 1062, 1063)** <br><br> Action Filed:    March 10, 2020 |

Gibson, Dunn & Crutcher LLP

DEFENDANT'S RESPONSE TO STATUS REPORT OF MONITOR DANIEL B. GARRIE
2:20-cv-02291 DOC (KES)

Daniel Garrie's November 3, 2025 Status Report (Dkt. 1062, 1063) is riddled with mischaracterizations that accuse the City of delaying and impeding the progress of the Monitor and increasing the cost of that work.  The City files this response to correct the record.

Mr. Garrie takes issue with the "procedural process" the City has requested.  But the City has simply asked that Mr. Garrie direct any requests for information from City officials or employees to the City's counsel, rather than directly contacting those officials or employees without involving the City's counsel (as Mr. Garrie had attempted to do initially with City Administrative Officer Matt Szabo).  There is nothing improper or unusual about the City's request.  Because the City is a represented party in this litigation, City officials and employees are represented by counsel in connection with this case.  Therefore, it is entirely appropriate to expect that if Mr. Garrie wants information from the City—including information from any specific City official or employee—he should direct his inquiry to the City's counsel to facilitate the request.

More importantly, Mr. Garrie's status report provides zero evidence of any delay, inability to obtain information, or added cost resulting from the City's request.  To the contrary, the documents attached to Mr. Garrie's status report show that the City's counsel has responded promptly and professionally to his requests for information and taken steps to facilitate interviews with the City officials and employees that Mr. Garrie has requested.  *See* Ex. 4 (Oct. 22 Email from K. Scolnick offering dates for interview of Mr. Szabo); Exhibit 7 (Oct. 27 Email from K. Scolnick offering additional dates for interview of Mr. Szabo).  If anything, having the City's counsel involved should lead to better coordination and efficiency—giving Mr. Garrie and his staff a single point of contact for making requests to City officials and employees.

Finally, the City's reservation of its rights, appeal, and pending ex parte application to stay Mr. Garrie's appointment are an appropriate exercise of the City's rights, and similarly not a cause of any unwarranted delay, as Mr. Garrie wrongly suggests.  Dkt. 1063 at 9 n.3.  And while the City maintains that the Court's appointment

Gibson, Dunn & Crutcher LLP

DEFENDANT'S RESPONSE TO STATUS REPORT OF MONITOR DANIEL B. GARRIE
2:20-cv-02291 DOC (KES)

order should be stayed, it has cooperated with Mr. Garrie in the interim and will continue to do so unless there is a stay by this Court or the Ninth Circuit.

DATED: November 5, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _/s/ Kahn A. Scolnick_
Kahn A. Scolnick

_Attorneys for Defendant_
_CITY OF LOS ANGELES_

Gibson, Dunn &
Crutcher LLP

2

DEFENDANT'S RESPONSE TO STATUS REPORT OF MONITOR
2:20-cv-02291 DOC (KES)