# Exhibit B

| | |
|---|---|
| **From:** | Elizabeth Mitchell |
| **To:** | Hamburger, Bradley J.; Scolnick, Kahn A.; Matthew Umhofer |
| **Cc:** | Evangelis, Theane; McRae, Marcellus; Fuster, Patrick J.; Biché, Tim |
| **Subject:** | RE: LA Alliance v. City of LA |
| **Date:** | Tuesday, September 2, 2025 2:16:00 PM |

Hi Bradley:

I spoke with Jan Perry and she is willing to serve but as we discussed does not have the technical background so would need to work with a team (either chosen by us or by her).  As we mentioned, we are not comfortable with RAND given the history with the City, and the City has declined to use Daniel Garre though no reason was provided. We maintain that either A&M or someone like Jan (with City knowledge) paired with someone like Daniel Garre (with the data understanding) would be the best fit. However, in the interest of compromise we've been working on finding other teams/groups that might work:

- McKinsey & Co: https://www.mckinsey.com/industries/public-sector/our-insights/homelessness-in-los-angeles-a-unique-crisis-demanding-new-solutions
- PWC - Similar to A&M, they work with public/private organizations to solve challenges, conduct audits—however, I don't know if they've ever looked at homelessness in LA or have the technical capability to handle the role.  Also I believe the City may still have a conflict with the organization.

If the City has others please let us know ASAP, as we have only 10 days left to solve this problem or the Court will impose a monitor of its choosing.

After reviewing the agreement per our discussion, we withdraw our objection to counting affordable housing as previously articulated; however, because this agreement is at its core intended to provide housing/shelter to unsheltered PEH, please provide some description of 1) the source of funding for the units, and 2) how they are being used to either prevent individuals from falling into homelessness or as a permanent housing exit from homelessness.

Please advise on the status of:

- Reporting the additional information requested from LAHSA pursuant to Section 7.1.
- Updated TLS information (how you are paying for and tracking the beds).
- Calculation on encampment reductions, both actual from Inside Safe and/or whatever estimations you have.
- The status of the claimed 8.2 emergencies.

Thanks,
Liz

---

**From:** Elizabeth Mitchell
**Sent:** Sunday, August 24, 2025 3:45 PM
**To:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Scolnick, Kahn A. <KScolnick@gibsondunn.com>; Matthew Umhofer <matthew@umklaw.com>
**Cc:** Evangelis, Theane <TEvangelis@gibsondunn.com>; McRae, Marcellus <MMcRae@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>; Biché, Tim

1

<TBiche@gibsondunn.com>
**Subject:** RE: LA Alliance v. City of LA

Hi Bradley,

After reviewing the contract list, I don't think we need to separately speak to Jason Ward.  I don't think the Alliance would be comfortable with RAND as the monitor unless they partnered with a third party to maintain accountability

---

**From:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>
**Sent:** Friday, August 22, 2025 4:52 PM
**To:** Elizabeth Mitchell <elizabeth@umklaw.com>; Scolnick, Kahn A. <KScolnick@gibsondunn.com>; Matthew Umhofer <matthew@umklaw.com>
**Cc:** Evangelis, Theane <TEvangelis@gibsondunn.com>; McRae, Marcellus <MMcRae@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>; Biché, Tim <TBiche@gibsondunn.com>
**Subject:** RE: LA Alliance v. City of LA

Liz:  This is the information re: RAND contracts I mentioned.

**Bradley J. Hamburger**
Partner

T: +1 213.229.7658 | M: +1 818.219.3917
BHamburger@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

---

**From:** Elizabeth Mitchell <elizabeth@umklaw.com>
**Sent:** Friday, August 22, 2025 11:07 AM
**To:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Scolnick, Kahn A. <KScolnick@gibsondunn.com>; Matthew Umhofer <matthew@umklaw.com>
**Cc:** Evangelis, Theane <TEvangelis@gibsondunn.com>; McRae, Marcellus <MMcRae@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>; Biché, Tim <TBiche@gibsondunn.com>
**Subject:** RE: LA Alliance v. City of LA

One more potential monitor:

Neil Getnick: https://getnicklaw.com/our-team/neil-v-getnick/

---

**From:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>
**Sent:** Friday, August 15, 2025 5:05 PM

2

**To:** Elizabeth Mitchell <elizabeth@umklaw.com>; Scolnick, Kahn A. <KScolnick@gibsondunn.com>; Matthew Umhofer <matthew@umklaw.com>
**Cc:** Evangelis, Theane <TEvangelis@gibsondunn.com>; McRae, Marcellus <MMcRae@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>; Biché, Tim <TBiche@gibsondunn.com>
**Subject:** RE: LA Alliance v. City of LA

Yes, we intend to have the session transcribed by a court reporter.

**Bradley J. Hamburger**
Partner

T: +1 213.229.7658 | M: +1 818.219.3917
BHamburger@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

---

**From:** Elizabeth Mitchell <elizabeth@umklaw.com>
**Sent:** Friday, August 15, 2025 4:22 PM
**To:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Scolnick, Kahn A. <KScolnick@gibsondunn.com>; Matthew Umhofer <matthew@umklaw.com>
**Cc:** Evangelis, Theane <TEvangelis@gibsondunn.com>; McRae, Marcellus <MMcRae@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>; Biché, Tim <TBiche@gibsondunn.com>
**Subject:** RE: LA Alliance v. City of LA

That works.  Please circulate an invite.  Will you also have this session transcribed?

Another question to add re: the City's "pause": when will it end, in the City's view?

Have a good weekend,
Liz

---

**From:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>
**Sent:** Friday, August 15, 2025 4:03 PM
**To:** Elizabeth Mitchell <elizabeth@umklaw.com>; Scolnick, Kahn A. <KScolnick@gibsondunn.com>; Matthew Umhofer <matthew@umklaw.com>
**Cc:** Evangelis, Theane <TEvangelis@gibsondunn.com>; McRae, Marcellus <MMcRae@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>; Biché, Tim <TBiche@gibsondunn.com>
**Subject:** RE: LA Alliance v. City of LA

Liz:  Great to see you today.  Can we do 1 pm next Friday, August 22?

3

**Bradley J. Hamburger**
Partner

T: +1 213.229.7658 | M: +1 818.219.3917
BHamburger@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

---

**From:** Elizabeth Mitchell <elizabeth@umklaw.com>
**Sent:** Thursday, August 14, 2025 3:44 PM
**To:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Scolnick, Kahn A. <KScolnick@gibsondunn.com>; Matthew Umhofer <matthew@umklaw.com>
**Cc:** Evangelis, Theane <TEvangelis@gibsondunn.com>; McRae, Marcellus <MMcRae@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>; Biché, Tim <TBiche@gibsondunn.com>
**Subject:** RE: LA Alliance v. City of LA

Oh, I was proposing that we move forward with tomorrow and set another time as well, but if you want to reschedule tomorrow altogether that's fine.

Can we find a solid 2-3 hours? Happy to host at our office to facilitate conversation if that's possible.

Our available times:

- In person:
    - Monday, 8/18: 10am-4pm
    - Wednesday, 8/20: 1pm-3pm
    - Thursday, 8/21: 2:30-5pm
- Virtual (in addition to the above):
    - Thursday, 8/21: 8am-11am
    - Friday, 8/22: 9am-11am; 1pm-3pm

If none of these work, please provide your dates/times and I'll see what we can do to make it work.

Best,
Liz

---

**From:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>
**Sent:** Thursday, August 14, 2025 3:29 PM
**To:** Elizabeth Mitchell <elizabeth@umklaw.com>; Scolnick, Kahn A. <KScolnick@gibsondunn.com>; Matthew Umhofer <matthew@umklaw.com>

4

**Cc:** Evangelis, Theane <TEvangelis@gibsondunn.com>; McRae, Marcellus <MMcRae@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>; Biché, Tim <TBiche@gibsondunn.com>
**Subject:** RE: LA Alliance v. City of LA

Liz:  Thanks for sending this.  We agree that a further conference next week rather than tomorrow afternoon would be more productive, so we will take down the conference for tomorrow and revert with times we can do next week (it will likely be tomorrow before I can send you proposed time).

**Bradley J. Hamburger**
Partner

T: +1 213.229.7658 | M: +1 818.219.3917
BHamburger@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

---

**From:** Elizabeth Mitchell <elizabeth@umklaw.com>
**Sent:** Thursday, August 14, 2025 2:06 PM
**To:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Scolnick, Kahn A. <KScolnick@gibsondunn.com>; Matthew Umhofer <matthew@umklaw.com>
**Cc:** Evangelis, Theane <TEvangelis@gibsondunn.com>; McRae, Marcellus <MMcRae@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>; Biché, Tim <TBiche@gibsondunn.com>
**Subject:** RE: LA Alliance v. City of LA

Bradley,

I've had the opportunity to review the transcript from the meet-and-confer August 7, and am expounding on the issues raised therein, as well as your questions about the additional issues we've raised since 7/25.  As always, feel free to reach out directly if you have any clarifying questions.  Multiple questions were raised about whether we have any proposed modifications, which we do not.  Fundamentally we do not believe the emergencies you've identified in any way provide a sufficient basis for the City to decrease its commitments.  However, to the extent the City requires additional time to meet its obligations due to the emergencies/pauses you've identified, that's probably fair—maybe it's a concomitant extension of the agreement for all time which is paused. Lets discuss.

On a higher level, I think a lot of these issues can be resolved once you provide your updated bed plan and we can discuss as required.  It could be that we are fighting a shadow battle when we actually can get behind what you are proposing.  Rather than talk in hypotheticals, it is far easier to address solid proposals.  When can you get that

5

to us?

On the topics raised in the meet-and-confer:

TLS Subsidies
- As a general proposition, the Alliance does not have an objection to TLS beds being used to satisfy part of the settlement agreement requirements.  However, the issue is with the source of funding and whether a percentage of those beds would exist regardless of City participation. The LAHSA tracking mechanisms are obviously another huge source of contention given the absurd lengths required just to verify the existence of the beds.
  - Funding: it isn't clear to us at all that the City has the right to count all the beds it counted under the Roadmap Agreement.  The County/State/Federal funding to our understanding was going to fund those TLS slots *regardless* of anything the City was doing.  Those were not matching funds, they weren't grant funding that the City applied for and obtained, and they weren't under a program organized by the City.  It appears LAHSA was getting money directly from various sources, combining them into a single account, and the City was counting all of the beds funded therefrom as City beds.  While the Court ultimately declined to find a violation based on this issue, the Alliance will not recognize these slots unless **the City can identify what role the City has had in obtaining and increasing the number of beds from what would be in existence regardless.  If you can get that plan to us, we will consider it.**
  - Tracking:  there needs to be a better mechanism in place than what we've witnessed so far.  LAHSA's data is unquestionably a mess.  **Please provide us the plan for tracking these beds that will actually allow us/the court to verify the existence of those beds**.

Affordable Housing Units
- The City's obligation is to provide homeless housing and shelter solutions specifically to meet the needs of the unsheltered population.  Affordable housing is not a bad policy choice, and one the City is free to make, but it does not belong in this settlement.

Fiscal Emergency
- The irony of the City claiming a fiscal emergency cannot be lost on your client.  The City voted in billions of dollars in sworn and civilian pay increases over the last two years despite massive red flags and warnings by Mr. Szabo that those choices were going to send the City into the red, made the *choice* to dedicate funds to the most expensive homeless housing solutions, and yet Mr. Szabo testified on the record that there was no fiscal crisis just two months ago. I'm not sure how to take the declaration of emergency seriously under that scenario. This financial cliff is one that has been anticipated for years yet the City continued to make choices that sent it in that direction.  One cannot buy exclusively Gucci and credibly claim poverty.  Again, if you need additional time to meet your obligations, we'll consider it but given the City's ongoing decisions, historical choices, and disavowal by your CAO of any fiscal crisis, it's hard to give significant credence to the City's claims of emergency.

<u>Encampment Reductions</u>
- 6,129 Reductions
  - You've asked us to accept that all 6,129 reported reductions counts towards the City's 9,800 committed goal. Our question to you is **how many valid encampment reductions there have actually been to date, such that the Court's definition has been satisfied**? i.e. reductions of a more permanent nature such as the person has been sheltered, placed in a medical bed, reunited with family, etc. We do want to give the City credit for what the City's already done.  When I was negotiating with Scott Marcus on this issue in the fall of 2023, the City was tracking its Inside Safe metrics, and it was understood that's how the City would be meeting its 9,800 goal. In fact, Scott believed that they would be nearly 1/3 of the way there at the end of 2023. So if you can get us those metrics, that's a good starting point for what we are willing to accept.
  - If the City is unable to tell us the number it has accomplished under the Court's definition, please tell us that and we can go from there.  Perhaps provide some estimation of what the City has accomplished (1,000? 2,000? Based on what information?) so we can discuss.  We do not believe that the City's declared emergencies reduces the City's overall obligation but may afford the City additional time to accomplish its obligations depending on the circumstances.
- 400 Reductions
  - To Matt's point from the meet-and-confer, this is a non-starter.  It's not dissimilar from what the City was originally proposing in 2023 which the Alliance rejected.  It is woefully below the need.  The City and Alliance agreed on systematic and significant encampment reduction and we expect that to happen.  Given the crises you have outlined, if the City needs more time to accomplish these goals, we are willing to consider it.
- Separately, you have a fundamental misunderstanding of how the negotiations happened on the encampment reductions.  You can see just by looking at the reporting obligations under Section 7.1 that the City's shelter, outreach, and encampment reduction efforts were always designed to go together—otherwise the reporting obligations make no sense. The 9,800 reduction number always intended to represent outreach operations to get people inside or otherwise off the street, which is reflected in the multiple in-person meetings we had on the subject, the emails, and the various iterations of the plans the City submitted. At no point during discussions with the Alliance did the City announce its intention to decouple the encampment reduction number from outreach. Given this history, we are unsympathetic to complaints now that the Court's definition—which is what the parties always understood during discussions—is different than the City's understanding.

<u>Monitor</u>
- As we noted, we have an issue with the City hiring RAND given the significant partnership and funding the City has provided for RAND over the last several years.  That said, can you provide a list of all the partnerships and funding between the City and RAND over the last decade? Perhaps it isn't as extensive as we understand it to be.
- I recognize the City has an objection to A&M but before GDC was involved A&M had a very good relationship with the City and I believe genuinely wants to see their work produce fruit. A&M spent over a year going through the City's data and is by

7

far in the best place to 1) be able to help define a scope of what the data monitor would look like and 2) participate as the monitoring agency.  If the City isn't open to A&M participating as the monitor, is the City open to working with A&M to further refine the scope of the monitor's activities?
- Other options which have been suggested to us:
    - Tim Campbell – he is a semi-retired professional auditor, having managed I think Torrance's performance audit program and occasionally writes for CityWatch.  He was involved in early oversight of A&M.  From the data side of things, he probably knows more about the City's homeless data than any other person/entity outside of the City other than A&M.  Full disclosure: he's done some work with the Alliance in the past, never paid, to help us understand the data and budgets.  But it's been a couple of years, and I don't see any conflict at this point.  He would likely need to bring on additional assistance to do this job.
    - Daniel Garrie – he works for JAMS as a mediator/special master and specializes in data-related issues.  He helped LA County work out their website issues last year in this case, and he was appointed as a discovery referee in an arbitration I was tangentially involved in several years ago that involved data management issues. I've never had a personal conversation with him, but he's been suggested to me as someone who is highly qualified though he would likely need to have a team to help him.
    - Jan Perry – former LA Councilwoman and general manager of LA's economic and workforce development department.  I don't know how well she knows data issues, but she does know the City of LA very well and would be able to navigate the department issues, though she would also likely need a team to assist.
    - USC/UCLA are considerations as well, but those raise the some concerns as RAND.  We welcome additional thoughts.
- As far as timing to produce the reports, we think that's a premature analysis, and will depend on the monitor's perspective.  It may be that there doesn't need to be additional time, or that 30 days is sufficient.
- Regarding the scope, we don't think the court's order is sufficiently clear, and any monitor is going to want more direction and detail about what they are actually doing.  We don't agree with your limitations.

<u>Emergency Pause</u>
- Our question is how the City views its obligations in light of the self-declared emergencies under Section 8.2.  What obligations does the City have and not have at this point, in the City's view?

<u>From 7/25 email:</u>

- Section 6: Dispute Resolution Process: The parties early on were engaged in multiple planning sessions but those stopped and should be re-engaged. *This issue is self-explanatory.  We need to re-engage on designing this dispute resolution process.*
- Section 7.1: The City has an ongoing obligation to report in its quarterly status updates many things which it is not currently reporting, including:
    - Number of beds/opportunities offered *City has never reported this*
    - Number of beds/opportunities currently available *City has never reported this*
    - Number of PEH engaged *City has never reported this*

8

- o Number of PEH who have accepted offers of shelter/housing *City has never reported this*
  - o Number of PEH rejected offers and why offers were rejected rejected *City has never reported this*
  - o Number of encampments in each council district *City has never reported this.*
- Section 9: Ensuring the County is complying with its obligations *The City has not been cooperative with holding the County accountable for doing the identified things, and needs to be more of an active participant in this. The County is also failing in its obligations, particularly in the service and outreach front, and its impacting the City significantly (i.e. the City has to spend money on its own mental health and IMD teams. That's the County's responsibility, and the City needs to be clear about what it isn't getting from the County)*
- Section 10: Identification of barriers in affordable housing. *This is self-explanatory.*

I think all of this is going to take far more than 2 hours, so we may want to get another date/time on the books right away. Please suggest some times that work for your team.

Thanks,
Liz

---

**From:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>
**Sent:** Monday, August 11, 2025 3:20 PM
**To:** Elizabeth Mitchell <elizabeth@umklaw.com>; Scolnick, Kahn A. <KScolnick@gibsondunn.com>; Matthew Umhofer <matthew@umklaw.com>
**Cc:** Evangelis, Theane <TEvangelis@gibsondunn.com>; McRae, Marcellus <MMcRae@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>; Biché, Tim <TBiche@gibsondunn.com>
**Subject:** RE: LA Alliance v. City of LA

Thanks, Liz. We'd like to stick to a 2 pm start time on Friday given the availability of others on our team. We can send around a Zoom link.

I am aware of your July 25 email; what I was requesting was more detail about the basis for your list of purported violations. For example, what is the Alliance contending the City is not doing with respect to Section 9 (the same could be said about the other sections of the agreement that you reference)?

**Bradley J. Hamburger**
Partner

T: +1 213.229.7658 | M: +1 818.219.3917
BHamburger@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

9

**From:** Elizabeth Mitchell <elizabeth@umklaw.com>
**Sent:** Monday, August 11, 2025 2:13 PM
**To:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Scolnick, Kahn A.
<KScolnick@gibsondunn.com>; Matthew Umhofer <matthew@umklaw.com>
**Cc:** Evangelis, Theane <TEvangelis@gibsondunn.com>; McRae, Marcellus
<MMcRae@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>; Biché, Tim
<TBiche@gibsondunn.com>
**Subject:** RE: LA Alliance v. City of LA

I think the City will be present at the 8/15 10am meeting with Special Master
Goethals, correct? Lets meet directly after (which I suppose could be 2pm but hopefully
is earlier).  I'm currently scheduled to be in court Thursday morning but if that changes
I can let you know.

Regarding the "myriad issues" I sent those to you on 7/25, but I'll include them again
below.  Our positions are pretty clear, and I'm not sure what else you're looking for
here but if you have specific questions I can answer them.  I know Matt also committed
to putting a couple of things in writing during your meeting last week, and we'll get
those to you in the next day or so.

............
From 7/25 email:

In addition to the City's 8.2 request, we'd also like to use this time to meet and
confer regarding appointment of the data monitor pursuant to the Court's order
and the parties' Agreement (Section 7.2), including both (a) identification of
potential monitors and (b) scope of monitorship.  We'd also like to meet and
confer regarding other provisions of the Settlement Agreement which have been
ignored or otherwise are not being followed, specifically:
- Section 6: Dispute Resolution Process: The parties early on were engaged in
  multiple planning sessions but those stopped and should be re-engaged.
- Section 7.1: The City has an ongoing obligation to report in its quarterly
  status updates many things which it is not currently reporting, including:
  o Number of beds/opportunities offered
  o Number of beds/opportunities currently available
  o Number of PEH engaged
  o Number of PEH who have accepted offers of shelter/housing
  o Number of PEH rejected offers and why offers were rejected rejected
  o Number of encampments in each council district
- Section 9: Ensuring the County is complying with its obligations
- Section 10: Identification of barriers in affordable housing.

Thanks,
Liz

**From:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>