UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) ) | CASE NO: 2:20-cv-02291-DOC-KESx |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Los Angeles, California |
| vs. | ) | |
| | ) | Wednesday, November 12, 2025 |
| CITY OF LOS ANGELES, ET AL., | ) | ( 9:01 a.m. to 10:44 a.m.) |
| | ) | (11:12 a.m. to 12:26 p.m.) |
| Defendants. | ) | ( 1:41 p.m. to  2:10 p.m.) |
| | | ( 2:14 p.m. to  2:21 p.m.) |

HEARING RE:

STATUS CONFERENCE RE QUARTERLY REPORT [DKT.NO.1061];

ORDER TO SHOW CAUSE RE CONTEMPT CITY OF LOS ANGELES [DKT.NO.1066];

MOTION FOR ATTORNEYS' FEES [DKT.NO.1022];

APPLICATION TO STAY [DKT.NO.1054]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:            SEE PAGE 2

Courtroom Deputy:       Karlen Dubon

Court Reporter:         Recorded; CourtSmart

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, TX 78468
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES</u>:


For Plaintiffs:              ELIZABETH A. MITCHELL, ESQ.
                             MATTHEW UMHOFER, ESQ.
                             Umhofer Mitchell & King
                             767 S. Alameda Street, Suite 270
                             Los Angeles, CA 90021
                             213-394-7979


For Defendants:              JENNIFER M. HASHMALL, ESQ.
                             Miller Barondess, LLP
                             1999 Avenue of the Stars, Suite 1000
                             Los Angeles, CA 90067
                             310-552-4400

                             JESSICA MARIANI, ESQ.
                             Los Angeles City Attorney's Office
                             200 N. Main Street, Room 675
                             Los Angeles, CA 90012
                             213-978-6952

                             KAHN A. SCOLNICK, ESQ.
                             BRADLEY J. HAMBURGER, ESQ.
                             Gibson Dunn & Crutcher
                             333 South Grand Avenue
                             Los Angeles, CA 90071
                             213-299-7000

For Intervenor:              SHAYLA R. MYERS, ESQ.
                             ISABELLE GECZY, ESQ.
                             Legal Aid Foundation of LA
                             7000 S. Broadway
                             Los Angeles, CA 90003
                             213-640-3983


Special Master:              MICHELLE MARTINEZ
                             JUSTICE TOM GOETHALS


Also present:                DANIEL GARY
                             ARLENE HOANG
                             KENNETH MEJIA

**Los Angeles, CA; Wednesday, November 12, 2025; 9:01 a.m.**

**(Call to Order)**

THE COURT:  Thank you for your courtesy, if you'd be seated.  We'll call this case to order.  I hope all of you had a good weekend and a good Veterans Day.  And I'd like to have your appearances beginning with the LA Alliance, please.

MS. MITCHELL:  Good morning, Your Honor.  Elizabeth Mitchell, Umhofer, Mitchell and King, on behalf of LA Alliance for Human Rights and plaintiffs.  With me is also my partner, Matthew Umhofer.

THE COURT:  Why, thank you.  And let's start with the City, please.

MR. SCOLNICK:  Good morning, Your Honor.  Kahn Scolnick for the City of Los Angeles.

MR. HAMBURGER:  Good morning, Your Honor.  Brad Hamburger, also on behalf of the City of Los Angeles.

THE COURT:  Thank you.

MS. MARIANI:  Good morning, Your Honor.  Jessica Mariani on behalf of the City of Los Angeles.

THE COURT:  Okay, thank you very much.  And on behalf of the County.

MS. HASHMALL:  Good morning, Your Honor.  Mira Hashmall here for the County.

THE COURT:  And on behalf of the intervenors.

MS. MYERS:   Good morning, Your Honor.  Shayla Myers

on behalf of the intervenors.

**MS. GECZY:**  Good morning, Your Honor.  Isabelle Geczy on behalf of the intervenors.

**THE COURT:**  Nice meeting you.  Let me introduce the persons in the jury box, if you haven't met them.  Daniel Gary is here as the monitor, and he's available to you, of course, at any time.  Michelle Martinez is the special master.  Justice Tom Goethals is with us, having joined us after Judge Gandhi, I believe he had a conflict.

I'd like to cover the following items today in this order: the attorney's fees, issues that have been briefed, the October quarterly report, the order to show cause in re: contempt of the City of Los Angeles, and the motion to stay.  We're going to start this morning with the attorney's fees.

And before this Court is LA Alliance's and Intervenor, the Legal Aid Foundation of Los Angeles, respective motions for attorney's fees based on this Court's June 24th order.  The parties have had a chance to brief the Court on the papers, and now I'd like to hear oral arguments.  And in these oral arguments, I'd like them complete.  There's no time limit, and there'll be two rounds.  So it doesn't matter who starts, and I'll ask who would like to begin and who would like to end, but there'll be two rounds.

**MS. MITCHELL:**  Thank you, Your Honor.  Mr. Umhofer is

handling the argument on behalf of plaintiffs.  So we would ask the intervenors could go ahead and start, and we will go second, if that's okay.

THE COURT:  All right.

MS. MITCHELL:  Thank you.

THE COURT:  If there's anything, though, that wasn't raised in the papers, and you're bringing up it now for the first time, you're more than welcome to do so, but would you alert me that this was not in your papers, that this is something that you didn't have a chance to brief or a new argument?  And I find no fault with that.

MS. MITCHELL:  Thank you, Your Honor.

THE COURT:  Hopefully everything in your oral arguments is founded in your papers, and if you do want to bring up something new, I'm not going to foreclose that.  I want to continually repeat that.  You've told me that you'd like to begin with the intervenors or the City.  Who'd like to -- in other words, who'd like to -- since there's two rounds, who'd like to begin the arguments concerning attorney's fees?

MR. UMHOFER:  Your Honor, I think we started this, so I'm happy to begin on behalf of the plaintiff, LA Alliance for Human Rights.  Your Honor, we have set things forth, I think, in great detail.  The City has briefed it.  We've replied.

THE COURT:  I'm not interested.  I'm interested in a complete and thorough oral argument.

**6**

**MR. UMHOFER:** Of course, Your Honor.

**THE COURT:** So I want you to pretend that I haven't read your briefing, which I have.

**MR. UMHOFER:** Of course, Your Honor. Your Honor, we are the prevailing party. We have been the prevailing party at least three times now. The City has paid attorney's fees to us twice already, and so there's no question that on our motion to enforce the settlement agreement, following the hearing, the Court issued an order that found the City in violation, violations that we claimed, the Court found in our favor and found four separate violations with several different subcategories that render us the prevailing party under 1983 and 1988.

We think that that is all the Court needs to do, read its own order, conclude we're the prevailing party, and award us fees. So in terms of entitlement, yes or no to fees, the answer is found in your order and 1983, 1988, and the case law that establishes that a prevailing party, which includes, and let me make this very clear, includes a party that is monitoring compliance with a settlement agreement, that makes you a -- and when you do so successfully, in fact, I think there's some question in the law as to whether you need to be successful. As long as you're monitoring compliance with a settlement agreement or consent decree, then you are a prevailing party.

We, in the course of seeking to monitor compliance, successfully proved multiple violations by the City, and the court issued an order on those lines.  That follows a whole slew of litigation that proceeded in which the City agreed to pay us $700,000 as attorney's fees when the City utterly failed and acted in bad faith, as noted by the court on the record, concerning encampment reductions.  And by the way, we're still here on that issue.

So very simple, the Court's order, which the Court is intimately familiar with, it found in our favor we did prevail on four different issues.  The City even admits in public comments that we did prevail.  The only thing it says is we didn't prevail on everything.  We didn't get the receivership we wanted.  Well, that doesn't make us a not prevailing party.  We did prevail in proving the violations, and we did prevail in acquiring significant additional measures and additional monitoring efforts, and we find ourselves now with a data monitor that we didn't have previously, and we find ourselves with the Court seeking additional compliance measures all arising out of the settlement agreement that the City entered into willingly.

So there's no question that we're a prevailing party, and there's no question that prevailing parties are entitled under 1983 and 1988.  I'm going to put aside -- I'm going to get to the amount in a moment, Your Honor.  The Court also, in

**8**

its order, invited us to brief --

**THE COURT:**  I just want to -- I'm sorry for the interruption.  And the comptroller -- Mr. McHugh, the comptroller has joined us also.  Thank you.  And his staff. Please continue.

**MR. UMHOFER:**  The Court also noted in its order the possibility of awarding fees as a sanction.  We believe that there's ample record to do that here, but for the reasons that we set forth in our brief, which I'll explain now, I want to give you a complete argument.  We don't think that that's the best path.  The Court, I think, took great care to issue an order that required no more than the City comply with the agreement it entered into.  It is, by definition, a non-appealable order.  We have filed with the Court our motion to dismiss the appeal because that order found several violations, but simply intensified the Court's oversight into compliance with the existing obligations under the agreement.

There's nothing new in the Court's order other than a more focused effort to ensure the City complies with the agreement.  That's non-appealable, but it's also, I think, very straightforward in the approach, and so because that order is not appealable, if the Court were to go down the path of the additional sanction, which the Court hasn't imposed yet, the Court has imposed no sanctions on the City yet, especially arising out of our motion for compliance with the order and our

hearing, to award attorney's fees as a sanction opens up, plays right into the City's delay and obfuscate and try to defeat this settlement agreement strategy through appellate efforts and through slow-rolling things.

We now have two appeals that have been filed from non-final orders already by the City, and arising out of this order to show cause, there will probably be a third, if the Court were to make any order, that the City didn't like.  So we have the City playing a delay game.  They are clearly under instructions from the City.  These are very good lawyers over at Gibson Dunn.  They're just doing what they're being asked to do.  But they are clearly under a new set of instructions.

Before, we had incompetence bordering on bad faith that led to the original sanctions order arising out of the encampment reduction and the $700,000 attorney's fees payment, because, again, the City recognized then we were the prevailing party on that issue.  We had shown that the City had failed to do what it promised to do on encampment reductions.  But when this evidentiary hearing came on board and we got a new set of very, very good attorneys in, and the City started paying exorbitant amounts for those attorneys, they deserve every penny, but it's a lot for a City that's claiming to be under fiscal crisis, we saw a new strategy.  And that new strategy is to object hundreds of times, slow things down, feign compliance, especially after that hearing and the Court's

10

order.

And so what we're seeing right now is, and appeal, and appeal, and seek to stay, which is something the Court has in front of it as well, an effort to stay, part of the Court's orders around this. So you see the game. And awarding sanctions, attorney's fees as sanctions, plays into the City's hands of, let's go up on appeal, and not only let's appeal the amount of attorney's fees or what have you, but let's get into the findings of the Court, which they're very eager to do, around the violations and get the Ninth Circuit looking at those. If the Court goes with prevailing party, the court of appeals won't be looking at the underlying question of whether -- the detailed underlying questions of whether there's violations. The court of appeals would only be looking at, are these guys, the plaintiffs, the interveners prevailing parties or not? And they clearly are.

It's a binary question that is answered clearly by your order. And the Ninth Circuit wouldn't, in that circumstance, have license to go into questions about details about the violations that the City wants to get into. So awarding attorney's fees under a prevailing party status, as opposed to with sanctions, we believe is perfectly warranted and avoids the City's efforts to continue to delay things. And I would say that part of that delay is, you've got a small firm, you've got a public interest firm, they're not on one

side or the other, I don't mean to suggest that they are, but they're seeking attorney's fees as well, on behalf of the interveners, and you've got one of the biggest firms in the country.  And we are absolutely outgunned, Your Honor.

And an appellate process that allows them to drag out and dig into your findings, which again, didn't change anything about their obligations.  It just reaffirmed their obligations.  We think we're going to win the motion to dismiss the appeal.  If they want to appeal on the basis of, are we a prevailing party or not, it's a binary choice, we'll get a mem dispo.  I'm not concerned at all about the appellate risk around that, but I am concerned about playing into the City's appellate game with an order for attorney's fees arising for historical attorney's fees requests that arises out of sanctions and is based on sanctions.

We also have the issue of prospective attorney's fees that we've put forward support for.  We can do this a couple of different ways, Your Honor.  We can keep coming back on attorney's fees and asking for attorney's fees again and again.  We're fine doing that.  We can do it on a monthly basis.  If they're concerned about prospective attorney's fees, that's fine.  We'll submit requests for attorney's fees on a regular basis going forward.  But let me be very clear.  We thought when we entered into this settlement agreement, we'd have a City that planned on compliance with that agreement.  And as we

**12**

well know from just reading the history of the Court's order, knowing the history of this case, the City started not complying immediately.  And so my small firm has to bear the burden uncompensated of policing the City on homelessness.  It is an immense burden.  It takes 10 lawyers on their side to defend what they're doing.  So it is an immense burden, and it is unexpected and uncalled for.

And so if we're going to be expected to do that, we darn well should be getting attorney's fees, because we keep prevailing.  We keep showing that they're not doing what they need to be doing.  So that deals with our entitlement, yes or no, to attorney's fees.  And then it just becomes a question of reasonableness.

We put forward a number that is based on our hourly rates, which are a discount off of our top rates.  The City loves to point out that we sought fees in another case at historical rates that are lower, but we regularly charge the rates that we have asked for, which is, by the way, happens to be the blended rate that the City is paying Gibson Dunn.  And at that rate, it's $1.6 million over, I think, a year and a half.

Now, the City spent $1.8 million, more than that, in 10 days getting ready for the hearing and participating in the hearing.  So, by contrast, our fee request at 1.6 is reasonable, and the rates that we are asking for are

reasonable. They are the rates we charge other clients, and they are the rates that we can get in the market, and there are cases that hold those rates to be reasonable.

The next question, then, is do we -- is there a multiplier? And we think there should be, Your Honor, because we're being asked to do something extraordinary. As I said, we're being asked in the face of massive resistance by both a City bureaucracy and a very, very good law firm, and a lot of people from that law firm billing a lot on this case, a lot more than we are, in order to ensure that the City just does what it promised it would do, what its elected leaders voted to promise to do.

Its elected leaders voted for this agreement, and now the City has spent years undermining it in all the ways the Court laid out and the ways that still play out today, with a special master and a data monitor just struggling to get basic documents from the City, basic information to be able to do their jobs, and they're compensated, and we're not. They should be compensated. I know that there are some issues there, but at least the City has agreed to pay them.

So we are looking for a multiplier because of the extraordinary burden that we're asked to undertake, the extraordinary results that we have achieved. The City says it's trying to meet its obligations. Imagine if this agreement didn't exist, what would the City be doing? Would the City

really be reducing the encampments that they're reducing? Absolutely not.  This case is dragging the City along toward compliance and toward doing the floor, as the Court has always said, of what it should be doing on homelessness, the floor, and it can barely get to the floor.  And so the multiplier we're asking for, Your Honor, I want to confess that we're backing into it.  The multipliers can be anywhere from one to four is a fair range under the law.  The Ninth Circuit is blessed one to four X multipliers.

The City is paying a private law firm, despite the fact that they have very capable City attorneys who have worked this case for years.  The City has decided, made a decision, to pay very good lawyers a lot more money.  That amount is about $6 million.  If you take 1.6 and you multiply it by 3.75, that gets us to 6 million.  We're asking for attorney's fees that are commensurate with what the City is paying its attorneys to oppose us.  We are outmanned and outgunned.  We need the ability to put in the work that's necessary to deal with what the City is doing.  The City is not operating on a blank slate.  The City is operating on a history of problematic conduct in this case.  We're going to have to keep doing this, but we have done it remarkably for a very long time.

And so if they're going to take multiple appeals and they're going to force us to defend multiple appeals, which is their right, where we've prevailed, and they're going to fight

**15**

us at everything and fail to respond to email after email about compliance as we get into this, yeah, we're going to need a lot to be able to deal with this onslaught.  And the only way that we're up against a very large army here, we're a very small army, and the only way we can do that is if we are compensated for the work that we do.  And so what we're asking for is a 3.75 multiplier, which puts us at 6 million, 3.75 times the 1.6 we billed.  That puts us on equal footing with what the City has chosen to pay the very good attorneys on the other side of this case, and they'll prove they're very good over the course of this hearing, I'm sure, but we're entitled to that.

And as far as prospective, I am happy to just take that off the table as a proposal.  I don't want to ask for prospective fees.  What I want there to be is a mechanism established for us to continue to come back as a prevailing party, monitoring this agreement and seek attorney's fees on a regular basis going forward.  The City can look at that.  There will be motion practice around it.  There will be a reasonableness exercise around that that we're happy to engage in because I don't want to give the City more strings to pull out here.

So while I think we're entitled to prospective fees, I think the better course here is to award us the multiplier that we're asking for, which will replenish our stock, our munitions, and allow us to fight the battle that we're fighting

and winning on a regular basis as a prevailing party, and that we are afforded the opportunity to every 60 days, every 90 days, to seek additional attorney's fees on a going forward basis.

Again, I hope I don't have to do it, but it's clear I'm going to have to.  It's clear this firm is going to have to, given the City's conduct here that we're going to be getting into.  Your Honor, I'll take any questions, but that's the sum and substance of the argument.

**THE COURT:**  All right, why don't you check with your colleague for just one moment?

**(Pause)**

**MR. UMHOFER:**  The only other thing I'd say, I've mentioned appeals a couple times, Your Honor, and if and when we prevail on appeal, we'll seek attorney's fees in that context.  We're not going to be seeking attorney's fees for the appeal.  I will say also, we're not afraid of an appeal around any of this stuff.  We think the Court made very clear findings.  We think we proved our case as far as the violations are concerned, but what we're concerned about is the delay associated with that.  And a prevailing party appeal is a very different appeal than a sanctions appeal that the Ninth Circuit gets into in a different way.  And so we believe that should the City choose to appeal any -- if the Court orders fees and if the City chooses to appeal, it's a very different appellate

process, and it's shorter and more efficient, and we'll be able to get what we're up, what we're entitled to, should the Court award fees and continue to move forward and continue to defend the settlement against the City's onslaught.

Thank you, Your Honor.

**THE COURT:** All right, thank you. Was the City going to argue next or the intervenors?

**MR. HAMBURGER:** I'd be happy to argue, and then maybe we can deal with the intervenors, but --

**MS. MYERS:** I mean, it may be more straightforward for intervenors to go, and then the City can respond, but I mean, I don't --

**MR. HAMBURGER:** That's fine.

**THE COURT:** The intervenors, thank you.

**MS. MYERS:** Yes. Shayla Myers on behalf of the intervenors, and I'm with the Legal Aid Foundation of Los Angeles. Our argument is fairly straightforward. The amount of fees that we're seeking at this Court's invitation is obviously significantly more straightforward than the plaintiff's. The intervenors are primarily seeking sanctions -- seeking attorney's fees in the amount of approximately $250,000 as a sanction for the City's misconduct. And when we say the City's misconduct, we refer to the willful disobedience and bad faith that this Court already found in the order, and we think the issue before the Court is relatively straightforward.

The Court found, after a significant evidentiary hearing, that the City willfully disobeyed its court order.  We also believe that there's substantial evidence to support a finding of bad faith relative to the City's compliance with the settlement agreement, which we would remind the Court and the City is actually a court order.  That's an issue that has been briefed and discussed, and this court has ruled on. The settlement agreement as it is is a court order.  The Court entered it at the request of plaintiffs and the City in order for the Court to retain jurisdiction and authority to enforce its own order.

That's what the parties asked for, and that's what the Court did after significant consideration, after objections from intervenors, after a significant briefing on the particular issue and thoughtfulness from the Court, the Court entered an order.  And the sanctions motion that was before the Court in June was about the City's compliance with that order, as well as subsequent orders related to compliance with the settlement order.  And that's what Your Honor found.

The Court found that the City disobeyed that order, and so the Court entered an order accordingly.  And as part of that order, the Court issued a suggestion to intervenors and plaintiffs that we would be entitled to fees if we could prove that the City's misconduct in violating those orders harmed intervenors.  That was the task before the intervenors and the

plaintiffs, and we put that forward in our moving papers.  We spelled out the harm to the intervenors, which was a significant drain on the very limited resources that are afforded to intervenors in the form of attorney resources.

Your Honor, attorneys' fees as a sanction is relatively straightforward.  As Your Honor mentioned in the order, it is a generally understood and less severe sanction as a result of a party's misconduct, because it's a recognition that the party's misconduct causes harm to the parties who are forced to come into court to help the Court enforce that order. That's what attorney's fees are in this court, and that is amply supported by the order that you issued and the briefing by the plaintiffs and the intervenors.

We think sanctions is the right approach for this, and a lot has been talked about in appellate review, I think, perhaps not surprisingly, because of the City's change in approach by bringing issues to the Ninth Circuit.  They're certainly entitled to do that, but we would say that the sanctions orders are subject to abuse of discretion, and the record fully supports any sanctions order and the terms of fees that the Court wishes to order.

I would just address the specific issue of willful disobedience that the City raises.  Your Honor, the Court found that the City willfully disobeyed the Court's order related to the encampment reduction, and I raise that because the City has

conceded that that was the area where the Court's order on sanctions is most clear, related to willful disobedience.  The City attempts to get out of the Court's finding of willful disobedience by saying they simply didn't have enough time to abide by the Court's order when they filed their status report that directly violated the Court's order previously.  But, Your Honor, the record is clear that the City intended to violate the March 24th order when they filed that report.  The City had ample opportunity to address the Court's order, to ask for reconsideration, to state that they disagreed with it, that they were having a hard time complying with it.  The City did none of that.  They simply violated the order and submitted a report that went against the Court's order.

They're objecting because the Court called them out on that violation quickly.  That's about duration of the City's violation, not the extent of that violation.  And the reason why I raise that is because I think it continues to support and suggest all of the continued violations that we are seeing from the City related to the Court's orders and monitoring.  The Court's order is also replete with references to the types of bad faith and delay related to settlement compliance that supports the Court's award of attorney's fees.

There are consistent instances supported in the record of the City's delay related to compliance with the settlement order in this court, and that forms the basis of the

need for the evidentiary hearing as well.  The City raises issues with interveners asking for attorney's fees at the Court's invitation with the suggestion that interveners are here voluntarily.  Well, I would go back to the Court's original 2020 order related to this case and the Court's reasoning for allowing interveners to participate in the case.

It was mandatory intervention, Your Honor, because this Court sought to undermine and violate, because the actions in this case had the potential to undermine and violate unhoused people's rights, which is why interveners have participated in this case, as you well know, uncompensated since March of 2020.  Interveners will continue to participate in this case uncompensated because that is our obligation as community organizations whose members are deeply impacted by this, and here as the lawyers, as their lawyers, that is our role.

But what we are not expected to do, Your Honor, and I think this is what your attorney's fees order recognizes, is we are not required to participate in evidentiary hearings that shouldn't have had to happen in the first place, but for the City's misconduct.  That's why, Your Honor, sanction is appropriate.  It is under the Goodyear standard articulated by the Supreme Court that this Court is well within its authority and its inherent power to issue as a sanction attorney's fees to parties who have to participate in long, arduous, seven-day

evidentiary hearings to prove misconduct that the City has already found, to re-litigate issues that this Court has already ruled on.  That is why, Your Honor, we believe offered the interveners the opportunity to seek fees, and that's what we're doing here.

There is more than evidence to support Your Honor's ruling of willful disobedience, and the fees that we are seeking in the amount of roughly $250,000, particularly in light of the amount of fees that are being paid across the board in this case, are more than reasonable.  We would note that the City does not contest either the reasonableness of the amount of the fees that we are seeking, the number that we are seeking, in terms of the reasonableness of the amount of time that was expended, and also the City has not contested the issue that Your Honor asked the parties to brief, which was harm to the interveners.

That's the issue that Your Honor asked us to brief, that's the issue that we briefed and addressed in our moving papers.  The City did not contest that.

And the last point that I would make is that the City made a number of arguments related to the types of fees that we were entitled to seek, in particular the issue of fees on fees. Your Honor, the rulings that the City relies on were all cases that came out before the Supreme Court's decision in Goodyear, in which the Supreme Court made it very, very clear that the

**23**

court had the inherent authority to issue any fees that are the but-for cause of the City's -- of the party's misconduct when it comes to sanctions, and that's what fees on fees would be in this case.  The interveners would not have had to brief the issue of attorney's fees had the City not engaged in the misconduct.  And any of the earlier rulings that they're relying on stem from earlier versions of Rule 11, the sanctions ruling.

The Supreme Court in Goodyear was very clear what the standard is.  We met that standard in our request for fees, and we believe that they directly stem from the City's misconduct, which is why we're seeking them here.  Thank you.  And if Your Honor has any questions, I'm happy to answer them, or can come back.

THE COURT:  I'll hear the first round.

MS. MYERS:  Thank you, Your Honor.

THE COURT:  Thank you very much.  Why don't you check with your colleague for just a moment, make certain you've covered the areas you'd like to.

MS. MYERS:  We're good.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.  Would the City then argue next, please?  Thank you.

MR. HAMBURGER:  Thank you, Your Honor.  Bradley Hamburger on behalf of the City.  The Alliance here is seeking millions of dollars.  It's expanded, actually, today, its

**24**

request by $2.5 million.  It is seeking $6 million that it wants paid by the taxpayers on top of the millions of dollars they have already received.  But that request does not follow at all from what this Court instructed them to do, and from this Court's order in June, which they did not seek reconsideration of.

I want to start with the Court's order, because I think that really solves most of the issues here that counsel for the Alliance raised.  So the Court's order was very, very clear about what the Court was contemplating.  It's on page 59, Docket 991.  It ordered -- it invited, rather, plaintiffs and the intervenors, and I will agree the intervenors did follow this part of the order, and unlike the Alliance, said, after a discussion on the previous page of the Chambers v. Nasco case and the Goodyear Tire case from the Supreme Court, which Ms. Myers mentioned, the Court was very specific.  Based on intervenors' active role in the evidentiary hearing and briefing, the Court will require the City to pay attorney fees to both plaintiffs and intervenors if plaintiffs and intervenors are able to show how they have been harmed by the City's conduct and the resulting losses to them under the law.

That's the legal test the Court identified.  That was the task that the Alliance -- we expected the Alliance to, and I assume the Court expected the Alliance to follow.  They did not like that standard.  They don't want fees under the

Goodyear standard, which requires them to show specific harms related to specific willful disobedience or bad faith.  And remember, this is all under a civil contempt arrangement, a theory, which needs to be proven by clear and convincing evidence.  They do not want to have to fit themselves within the constraints of the Goodyear case.  They do not want to fit themselves within the constraints of civil contempt.  Instead, they -- instead of following what the court asked for, they wanted all of their fees, all of them, including for unsuccessful efforts to obtain a receivership, which the Court rejected, unsuccessful efforts to have the mayor and members of the City council forced to testify at the evidentiary hearing, they want all of that included.

And even more, they wanted prospective fees, which I'm glad to hear my friend has now taken off the table and they wanted a 2.5 multiplier, which now today, for the first time, they've increased to a 3.7 multiplier on a completely arbitrary basis.

My colleague spent more time talking about the fees of my firm and the actions of my firm and the lawyers representing the City than it did their own today.  That's because they didn't -- in neither briefing nor today, can they actually do what the Court asked them to do, which is to trace specific expenses that the Alliance incurred and tie it to specific rulings that the Court made.  And the Court made it

**26**

very clear what it was contemplating, said it right on page 58 and 59, and specifically identified a particular order, the encampment reduction order, the March interpretation of that obligation.

So the backdrop to all of this is the Court's order. So I want to start with the Court's order. So what do the plaintiffs do? What does Alliance do instead of following what the Court was expecting and what the Court outlined? It instead says that the proper rubric here, the proper test is awarding prevailing party fees under Section 1988. The problem for the Alliance is there's a very recent Supreme Court case, which is there's one case on this issue that I commend to the Court would be the Lackey decision from just last term, 2025, 604 U.S. 192.

And I will admit that there are Ninth Circuit case law before this decision may have some, which is almost I think all the cases that the Alliance cites on this issue, may have been some lack of clarity. But I think Lackey really clarifies the issue. The specific issue there was does get -- obtaining a preliminary injunction, does that allow, make you a prevailing party if the end result of the preliminary injunction is that the government defendant changes their behavior? The Supreme Court said no. Preliminary injunction is not enough, but they said more than that. I'm quoting from page 203 and 204. Very clear.

**27**

A plaintiff prevails under the statute when a court conclusively resolves a claim by granting enduring judicial relief on the merits that materially alters the legal relationship between the parties.  We didn't have that here.  We didn't have a trial.  This was a settlement with no admission of liability.

Now, the Court does go on to say, and we acknowledge this, that a consent decree can also count and make somebody a prevailing party.  But the difference here is, and this is I think a significant clarification, a consent decree and a settlement are not the same thing.  Our position is that while the parties did agree to allow the Court to have super continuing jurisdiction to enforce the settlement agreement, we did not agree to a consent decree, which is a distinct thing, and the Court previously in the -- Supreme Court in the Buchanan decision distinguished between settlement agreements generally and settlement agreements that resulted in specifically a consent decree.  That's not what we have here.

I recognize that the settlement agreement was memorialized in a court order and that the parties agreed to have the Court retain jurisdiction, but it's not a consent decree.  So under the Lackey decision, we would submit the request for prevailing party fees under 1988 is a nonstarter.  And to the extent that the Court is going to rely on earlier Ninth Circuit's decisions, I would really recommend that the

EXCEPTIONAL REPORTING SERVICES, INC

Court look at the Lackey decision and the Buchanan decision and look at how the Ninth Circuit had previously interpreted the Buchanan decision in a way that is contrary to how Lackey interpreted it, specifically on page 207 of the Lackey decision where it reaffirms what Buchanan said, which is identify two scenarios, an actual final judgment on the merits or specifically a settlement that results in a consent decree, which is not what we have here.

So that takes 1988 off the table, and that's almost all of what counsel argued in the motion, and it's almost all of what counsel argued today. That is what would eliminate a multiplier, this multiplier concept. That's not a concept you get under the Goodyear compensatory damages. It would obviously take away any prospective fees, which I think is improper in any event.

So then what is the test? What should the Court be looking at? Well, we did the work that the Alliance refused to do, which is what we tried to do is we tried to identify, based on the billing records that they submitted, which there were many redactions and there's significant block billing, what we did the best we could, we spent a decent amount of time doing this, we tried to say, we don't think it was our obligation, but we tried to identify what portion of the massive amount of fees, basically all the time they were working for months and months and months, what could be tied to something specific

under the Goodyear standard?  What but-for loss could they prove?  We did that in our brief, we outlined it.  It is significantly lower than the 3.5 million.  It's significantly lower than that 6 million, and it's tied to a specific order that the Court, we disagree with this, but we respect the Court's decision, it's tied to the encampment reduction order and the purported violation of that order.

If you focus on that, you get down to a maximum, and we outlined this in our brief, so I won't go over it too much, around $98,413.  That is what we could tie using reasonable estimates to specific loss to a specific order.  So we think at most, the Court should award that amount and not these 3.5 million or the 6 million that they have requested, which would be unreasonable without any legal basis and would fly in the face of the Goodyear standard that both we and the intervenors and the Court had previously said applied.

So on the Goodyear standard, I just want to, the Goodyear case, which the Court cites, it says, this is the holding of the Supreme Court, the but-for causation standard generally demands that a district court assess and allocate specific litigation expenses, and you have to tie them to the specific things that the Court is finding that were done in bad faith and then the expenses that resulted from that bad faith or willful disobedience of a court order.

Now, we don't think -- our position is that the Court

**30**

did not find, we believe the Court -- we agree that the Court found breaches of the settlement agreement, but the Court's order does not purport to apply a contempt standard, does not purport to apply a clear and convincing evidence standard, and so we believe that there hasn't been a showing, and Alliance hasn't made that showing.  But I'm happy to go through, and I think I will now, because the Court asked for full argument, go through the specific bases that potentially could give rise to a contempt sanction, could potentially be the basis for compensatory damages or compensatory sanction under the Goodyear case.

I think the main one, the only one in our view that even gets close to being in that category is the report that was filed after the March 2025 encampment reduction order, and that's the only order that the Court specifically identifies, identified on page 59 of Docket 991.  In March, in late March, I believe it was March 24th, the Court held that the City could not report mere encampment cleanups as reductions.  But even after that ruling, I would submit that the City's obligations remained unclear.  In fact, the Court elaborated on and provided additional guidance in its June order, and so at the time, right after the March 2025 order was entered, the City did not have a full understanding of what that order required. For example, one specific example is that the Court later clarified in its June order that the City could count abandoned

**31**

tents.  That counted under the Court's framework, even if there's no offer of shelter because nobody is there.

But even assuming -- so our position is that that order was not sufficiently definite, at least to rise to the standard that you need for contempt, which is a very high standard, at least for the standard that you need for bad faith misconduct.  We're talking about serious violations of orders.

We think that the City's approach to that order was substantially justified in light of all the circumstances.  The encampment cleanup data the City reported was collected from January 1st, 2024 to March 31st, 2025.  So it was just a week after, most of the data was before the Court's order.  Only seven days after the Court's order, we had to then report on that data.

Now, I understand the Court believes our interpretation of the encampment reduction was wrong.  We had testimony at the hearing.  I know the Court's heard it from Mr. Szabo.  The City, in good faith, believed that it had not agreed to an encampment reduction that needed -- offers a shelter paired with each tent, makeshift shelter, vehicle that was removed.  But the mere fact of a disagreement about that issue does not rise to the level of willful disobedience or bad faith.

The City had received the Court's instruction, and -- but did not have the data to meet the Court's order because it

had been collecting data based on what it understood the obligation to be.  Now, I understand the Court found that to be a violation of its order, but you can find a violation of the order without it rising the level of contempt and without it being willful, without it being not substantially justified.

Under the circumstances here, you get an order, and then you have data that doesn't comply with the order, which would take time to get to reconstruct, and we've tried to do it now.  We can't really do it.  We've tried our best to reconstruct it.  And you've seen in our latest quarterly report, which we'll talk about later today, the information we have shows a lower number of reductions because the goalposts have been moved, in our opinion.  But in any event, that order cannot, in our opinion, cannot justify contempt sanctions under the standards under Chambers v. Nasco.

And so the Court should not issue any sanctions with respect to that order.  But even if I'm wrong about everything I said, that is the only order that's clear and definite that could possibly be a basis for a contempt sanction and awarding fees.  And we've done the math, and it works out to a much lower amount than the $6 million that my friend has asked for here today.

There are four other violations, or three other violations to the court, and the Court's familiar with this, so I won't go through them in that much detail.  But I would

**33**

submit, and I think it's important, I think there's a reason why the Court didn't identify them specifically when it talked about attorney's fees, because none of these are of the sort of willful violations of specific and definite court orders.  None of these are bad faith.

Regarding the bed plan, nothing in the agreement says that the existing bed plan expires.  There wasn't any deadline to submit an updated bed plan.  We've now submitted another bed plan pursuant to the Court's order.  I will also note that Section 8.2, in our view, and I think the Court has recognized Section 8.2 was in effect at minimum because of the fires.  We believe there's been two other events that have triggered it, as we've briefed in our papers.  So the bed plan obligation, there's no basis to find us in contempt and order fees under the inherent power for the bed plan.

For sheltering and housing milestones, the agreement required the City use best efforts to hit the milestones.  The City disputes that missing a milestone is a breach of the agreement.  But even if missing milestones was a breach, that doesn't rise to the level of contempt.  And in fact, there has been substantial progress to hit these milestones.  The City is, as you heard from Matt Szabo, the City is committed to fulfilling its obligations under this agreement and creating the housing and shelter solutions.

There was no evidence of deliberate disobeying of

**34**

this order.  Alliance doesn't point to any of such evidence.  At minimum, this was a situation of substantial compliance, at most negligence.  That is not what justifies sanctions under the Chambers standard and under the Goodyear standard.

Data reporting verification, very similar arguments.  There's no specific order that the Court identified with respect to data reporting violations.  The City has provided substantial data in this case.  Many of the issues with data reporting, specifically that A&M found, were with LAHSA, which is not the City, and punishing the City for third-party conduct would violate basic due process rights and fundamental principles of fairness.

So of the four violations, which is really what the Court's analysis should focus on, we think none of them rise to the level of civil contempt.  And I know the court knows this, but I'll just remind the Court.  The standard for civil contempt, and this is from the Ninth Circuit's decision in Dual-deck Video Cassette.  One, violation of a court order.  Two, beyond substantial compliance.  Three, not based on a good faith and reasonable interpretation of the order.  And four, by clear and convincing evidence.

That is a high standard.  Of the breaches that the court found in its June order, at best, the encampment reduction order is the only basis that could even potentially

satisfy the Dual-deck standard, the standard for contempt, and even on that, I think in light of the circumstances, in light of the issuance of the order in March 24th, 2025, seven days before the end of the quarter, the fact that the City continued reporting based on its own understanding, its prior understanding, what it believes is its correct understanding of the encampment reduction obligation, does not rise to the level of contempt. It was based on a good faith and reasonable interpretation of the order in light of the circumstances. It was at minimum substantial compliance, and I don't know how it harmed the Alliance, especially now that we have reported consistent with the Court's further interpretation of the encampment reduction obligation, which occurred only in the June order, which provides substantial clarity on that issue.

We think that it would be an abuse of discretion and reversible error to order a fees as a contempt sanction, just like it would be to order fees under a prevailing party standard in light of the Lackey case.

I'll talk very briefly because I don't think it's very relevant, but I want to address that. I don't want to leave it unaddressed. Very briefly about counsel for the Alliance's references to our appeals and his suggestions, I guess, on strategy to avoid you -- Your Honor creating an appealable order.

First of all, counsel called this a game, that we are

engaged in a game.  We are not engaged in a game.  We are in a court of law.  We, the city, is exercising its rights to appeal.  And my friend is just wrong about the appellate jurisdiction issues, which we've explained in the Ninth Circuit, and they really are not for this court.  But I want to explain just briefly their position on the appellate jurisdictional issues.

Their position is we never get to appeal.  Never.  You can issue all sorts of orders and never do we get to appeal.  They're wrong about that.  They keep ignoring an essential case.  And I know this is really far beyond the attorney's fees, but it was a significant part of counsel's presentation.  So I just want to inform the court.  And if the court is interested, we filed a full opposition to their motion to dismiss in the Ninth Circuit that the Court could review.  But they keep ignoring an essential Ninth Circuit case.  And it's ironic they ignore it because they cite two earlier decisions from the case.  It's the <u>Flores v. Garland</u> case.  It's 3 F.4th 1145.

And it outlines why -- in the post-judgment context, that when you have an order that has real-world significance and resolves an issue with real-world significance, that you can take an appeal of that order.  We believe that your June order did that.  We believe that your order appointing Mr. Gary has done that, which is why we filed these appeals.  These are

not frivolous appeals.  They are not a delay tactic.  They are an exercise of the City's rights to due process and to seek appellate review.

I don't know what this has to do with attorney's fees, but I didn't want to leave this unaddressed.  This is not a strategy of delay.  This is the City availing itself of its right to appeal.

I think counsel suggested it was relevant because he believes that if you award fees under 1988, we wouldn't be able to appeal that.  Counsel's wrong.  I think that no matter what the Court does, if the Court awards fees, it would be an appealable order.  It resolves that issue.  It has real-world significance.  The Flores case -- that's the language from the Flores case.

The real-world significance is we'd have to send money, taxpayer dollars, to the Alliance.  So that would be an appealable order.  And we think it would be part and parcel of the appeal that we've already taken of the June order.

Just briefly on the interveners, we explained this in our brief.  The interveners, they follow the Court's order in some sense in that they try to apply the Goodyear standard. They try to identify conduct.  But their focus is largely on proving bad faith and not disobedience of an order.  I think it's almost exclusively that, as we point out in our opposition.

I would just note to the Court that bad faith is a very, very high standard.  And there's simply no evidence of bad faith, let alone clear and convincing evidence of bad faith, to justify an award of sanctions.  What we have here is a City that is attempting to comply with the settlement.  And we have a plaintiff that is looking at every turn to poke holes in compliance, raise technicalities, as they did earlier this week.

In any event, there's no evidence that there has been a scheme or some sort of attempt to raise clearly frivolous arguments, legally unreasonable, and without any legal foundation.  We did not do that.  We have not done that.  We had a lengthy evidentiary hearing.  We had substantial briefing.  The court heard significant amounts of argument.  We have not been engaged in frivolous conduct.  We have not been raising legally unreasonable or without foundation positions in this case.  We have been not engaged in an improper purpose.  And these are the tests for bad faith.

Under the Primus Auto case from the Ninth Circuit, which we cited in our brief, 115 F.3d 644.  And it's really important.  I mentioned this before.  This isn't just a recklessness standard.  It's not a negligent standard.  Bad faith requires something more egregious, and we don't have that here.  And the Court's order does not find that.  But if it did, at most it's for the encampment reduction order, which

with due respect, we do not believe there was a violation of. But the Court -- I understand the Court disagrees, at most, you should -- like with the Alliance, you should only award the intervener's fees specifically tied to that.  That is the only ruling that comports with the Goodyear standard.  It's the only ruling that would award but for compensatory fees, which is what Goodyear requires.

So unless the Court has any questions.

**THE COURT:**  Why don't you check with your colleagues and make sure you're satisfied with your argument.

**MR. HAMBURGER:**  Thank you, Your Honor.

**THE COURT:**  All right.  Now, counsel, would you like a break or would you like to continue on and finish the issue concerning attorney's fees?

**MR. UMHOFER:**  Continue, Your Honor.

**THE COURT:**  All right.  Please.

Oh, I'm sorry.  I don't think the county would have anything to argue, but I wanted to make certain for the record.

**MS. HASHMALL:**  No, Your Honor, nothing from the County.

**THE COURT:**  I don't think this is your dispute.

Okay.  All right.  Thank you very much.

And would you identify yourself for the record one more time just because we're on CourtSmart.

**MR. UMHOFER:**  Matthew Umhofer on behalf of the LA

**40**

Alliance.

The pattern is clear, documentation is withheld until exposure is imminent, public accountability is resisted until judicially mandated, and the truth of reported progress remains clouded by evasive recordkeeping.  These failures have undermined public trust and judicial trust alike.

That's bad faith and that's what this Court found in the order.  That's on page 39 of this Court's order.  My colleague appears to have missed that part of this Court's order and also page 57 of the Court's order, where the Court gets into attorney's fees and starts in this manner.

The City's refusal to provide updated plans, meet its milestones, correct its encampment reduction numbers and verify its reporting has unnecessarily and unfairly wasted the resources of the parties and the Court.

By consistently refusing to provide explanations and verification of its reporting, the City has forced the plaintiffs into the position of investigating and monitoring the numbers reported.  That's what this Court has held.

Now, if you look at the Ninth Circuit's decision, which I know my colleague would rather avoid the Ninth Circuit's rulings on the issue of 1988 and 1983, in Prison Legal News v Schwarzenegger, the Ninth Circuit held Section 1988 authorizes plaintiff to recover attorney's fees for monitoring state official's compliance with the parties'

settlement agreement.  We didn't hear that from counsel.

That case hasn't been overruled by <u>Lackey</u>, it hasn't been overruled by <u>Buchanan</u>, which I'm glad to hear counsel's moved away from after attempting to defend it, even though the Ninth Circuit has rejected their interpretation of <u>Buchanan</u>.

By the way, <u>Prison Legal News v Schwarzenegger</u> also said although this case involves a settlement agreement, not a consent decree, the difference is immaterial, not overruled by <u>Lackey</u>.

In both contexts monitoring serves the same purpose, causing defendants to fulfill their obligations more speedily and readily and that's why under Section 1988 we're entitled to attorney's fees, under the Ninth Circuit clear standard in <u>Prison Legal News v Schwarzenegger</u>.

Now, counsel suggested we haven't complied with the Court's order by attempting to meet the good year standard.  I think counsel missed page 5 to 7 of our motion and pages 7 to 9 of a reply in which we actually do explain why all the things the Court held, this litany of violations the Court set forth justifies and is a but for cause of everything we've had to do.

We wouldn't have had to do none of the work that resulted in $1.6 million worth of billing that counsel went through and tried to parse.  That's not how it works under attorney's fees by the way.  It's all part of an effort to deal with the City's obfuscation and delay which the Court found.

But for that obfuscation and delay none of those bills get generated. None of those hours get spent. We have set forth our obligation. We embrace the good year standard in our briefing and we've met it. We don't think the Court has to go there, the Court can belt and suspenders it if it wants. My colleague Ms. Myers is probably right, that the standards are just as clear, but the Court has found bad faith. The Court has found delay and obfuscation. We're already there under its agreement.

All the Court would have to do is announce that those things were proved during the hearing, which they were by clear and convincing evidence, and then it would be reviewed under an abuse of discretion standard. Of course, the City has appeal, of course, the City has a right to appeal. Of course, the City had a right to put the parties through a lengthy evidentiary hearing. But as the Court noted in its hearing, the evidentiary hearing would have been unnecessary had the Court (sic) just done what it was supposed to do and not require the intervenors and the plaintiffs to spend an extraordinary amount of time over the last year and a half and in the intervenor's case, in the last five years, policing the City's compliance with this agreement.

Your Honor, we have been in this courtroom since COVID trying to get the City to do the right thing by the city in the street. The City points to numbers that it cannot back

up.  And that we have serious doubts about it.

This is not a game, but the City is gaming things, just read the Special Master's report.  Just read the report of Daniel Gary, just read the e-mail the City send Daniel Gary last night, refusing to give access to systems that are -- that he needs access to to verify this data, that the City keeps putting forward without supporting.

Your Honor, Mr. Hamburger did a remarkable job under very difficult circumstances to make it look like the City's complying, but we all know it's not.  The Court already found that.  It continues to not comply.  This effort that we are engaged in will continue and it costs me and my firm an extraordinary amount of time and energy uncompensated.

If the Court thinks we only deserve $1.6 million when they're getting 6 million to defend, fine.  Your Honor, it sounds remarkable for counsel to argue that we're not entitled to fees when we are clearly a prevailing party, but we are and we will continue to fight, even if the Court zeroes us out from this request, because we're trying to get the City to do what it otherwise wouldn't do.  And we wouldn't be here if the City would just do what it agreed to do.  Thank you, Your Honor.

THE COURT:  Would you check with your colleague please?

(Pause)

MR. UMHOFER:  We're good, Your Honor, thank you.

**44**

**THE COURT:** And to the intervenors, please, and once again because we're on CourtSmart, would you just reidentify yourself.

**MS. MYERS:** Yes, Your Honor.

Thank you, Your Honor, Shalya Myers with the Legal Aid Foundation of Los Angeles on behalf of the intervenors.

I just want to address a few of the points and I'll address some of the arguments that were made towards the plaintiffs, just to the extent that they apply to intervenor's arguments as well.

First of all, and I think we adequately addressed this in the papers, but since Mr. Hamburger raised it, I'll just say it here, his attempts to relegate intervenor's arguments to simply an argument about bad faith rather than the entirety of the City's misconduct is putting far too a point on the tasks that was given to intervenors.

Mr. Hamburger acknowledges that the Court asked intervenors to demonstrate harm and that's what was required of us. So the suggestion that we abandoned an argument about willful disobedience, ignores the task in front of the intervenors.

There's no question, Your Honor, and I think they've acknowledged it that the Court found willful disobedience, but also made reference to a significant amount of other misconduct.

Intervenor's motion refers throughout to that misconduct.  Using bad faith as a shorthand rather than the standard because the path in front of intervenors was not to identify support for finding of willful disobedience, the Court already did that.

And I think the City's attempts yet again and to get another bite at the apple to not accept the Court's rulings and to argue again and again about those underlying orders is exactly why we are here.  And exactly what constitutes the City's willful disobedience with regards to the encampment reduction plan.

Your Honor makes rulings.  The City doesn't like them and they attempt to reargue them and they attempt to force the parties to reargue them, rather than abiding by them and doing what the City is now doing, which is seeking appellate review. Completely appropriate, as it would have been to seek a reconsideration of Your Honor's orders, but that's not what the City did with regard to the encampment resolution.

So the City's attempts to pigeon hole intervenor's arguments should not be well taken.  It's not the task at hand. I'm glad the City recognizes that we stuck to Your Honor's order in briefing on these particular issues.

I want to talk just briefly about the willful disobedience and the City's attempt to get out of its violation of the encampment reduction plan by suggesting that it's April

**46**

2025 report, which completely ignored this Court's March order with anything other than willful disobedience.

Your Honor, the City makes reference to the Dual Deck standard and the substantial compliance with the Court order. Your Honor, the City interpreted the encampment reduction plan in a way that was untenable.  It was not supported by any evidence in the record.  It was not supported by the parties' intent or the plain language of anything that was submitted to the Court related to the encampment reduction plan.

But that's what the City used for months in submitting the encampment -- its reports related to the encampment reduction plan.  And if the Court had found the City in violation of the settlement agreement by it's -- relying on that interpretation, then perhaps they would have an argument under Dual Deck, that they were not willfully disobeying a court order.

That's not what happened, Your Honor.  The City abided by a definition that was untenable, that LA Alliance called them out, intervenors made arguments.  The Court ruled that the City's interpretation was incorrect and rather than adopting the Court order, the City simply flouted that order and relied on its ongoing interpretation without making any consideration whatsoever to the Court's ruling.

And again, Your Honor, the fact that the evidentiary hearing came shortly thereafter and that was the mechanism by

which the Court found the City's willful disobedience, that they weren't allowed to violate the court order for a long time, and only a short amount of time had to do with timing of the evidentiary hearing, not the City's willfulness in disobeying that court order.

The City also repeatedly points to the fact that they were not acting in bad faith related to all of the other actions that the Court pointed to in its order related to bad faith. And, Your Honor, part of the standard related to bad faith is delay of the enforcement of the court order, and I think the City's misconduct related to its treatment of the audit, related to representations by the City's attorneys with regards to specific issues that intervenors raised, for example, about what it means to create.

Intervenors asked those questions. The City's attorneys represented that they would provide responses and never did. The record is replete with those kinds of delays that require the evidentiary hearing to get to the bottom of what the data issues were.

Your Honor, the Court required a seven day hearing to cut through the types of delays and enforcement of the court order and that is exactly the types of bad faith and the types of misconduct that courts have relied on to issue the less severe sanction of attorney's fees.

Because of the but for causation standard in

Goodyear, but for the City's delay, but for the City's conduct related to all of the other attempts by this Court to ensure enforcement of its settlement -- of the settlement order, the Court would not have required an evidentiary hearing, the extreme remedy of an evidentiary hearing to cut through.  And that's why Your Honor has offered the less severe sanction of attorney's fees to intervenor and the plaintiff.

Finally, Your Honor, with regards to the misconduct, the City consistently points to LAHSA as a third party and I just want to make this point.  While LAHSA is a joint powers entity and a third party as it stands, the joint powers entity of the County and the City, the City decided that it would relegate the data collection that was necessary for settlement compliance to LAHSA.

Assuming for purposes of this that LAHSA would be construed as a third party, it doesn't matter that the third party is not fulfilling its obligations, because LAHSA didn't enter into a settlement agreement with plaintiffs and an enforceable order by this Court, the City did.  And if the City is relying on a third party, the City doesn't simply get to pay that the third party failure to comply should absolve it of its obligations.  It is the City's obligations that they failed to fulfill.

And finally, Your Honor, the Court relies on Goodyear to argue that the City should cut intervenor's fees and simply

points to just the encampment resolution plan for the basis of the fees.

Your Honor, even if the Court decides to grant the attorney fees based on the violation of the encampment reduction plan and the clear willful disobedience by the City in its reporting, the Court doesn't have to, as the City suggests, take such a fine point on it as to relegate fees for the evidentiary hearing only to the part of the evidentiary hearing that related to the encampment reduction plan.  And that's particularly salient, Your Honor, for intervenor's participation.

Your Honor, I think it's clear that intervenor's participation in this case relates substantially to the City's seizure and destruction of its members belongings through the encampment reduction plan.  And the intervenor's participation related to the evidentiary hearing was about ensuring that the City is abiding by its obligations and not continuing to violate on house people's rights and that was entirely the City's -- the intervenor's participation in the underlying evidentiary hearing, as well as the other types of data violations.

Your Honor, I don't think that the Court took a -- made such fine points in making the rulings that it did.  The Court looked at, as the Court does, the entirety of the City's conduct and Good Year does not, by any stretch of the

**50**

imagination require the type of auditing of the records that Mr. Hamburger said that his firm did, related to our records, but rather requires a sense of rough justice, as the Court in Good Year says.

The Court is given the ability to look at the overall sense of the suit and what is required.  Your Honor, it is the City's misconduct overall that led to the evidentiary hearing, because the evidentiary hearing and the intervenor's requirement to participate is the but for cause of all of the fees that were incurred here, which is why we are seeking and only seeking fees for the evidentiary hearing.

**THE COURT:**  Why don't you check with your colleague just for a moment, to make sure you're satisfied with your argument.

**MS. MYERS:**  Thank you, Your Honor.

**THE COURT:**  All right.  City.

**MR. HAMBURGER:**  Thank you, Your Honor, just a brief points.  First on the request for 1988 fees.  Counsel referenced pre-Lackey Ninth Circuit decisions, our position is as we explained in our briefing is that Lackey did effectively overrule those decisions, to the extent they could be read as authorizing fees for all work performed in connection with a settlement of a 1983 claim, that did not result in a consent decree which is the scenario we have here.

We believe that an order granting them 1988 fees

**51**

would violate the Supreme Court's latest word on this issue and its interpretation of its prior precedent.  So on that one -- and it would also as I began my argument, it would go beyond the scope of what the Court was contemplating in the June order.

Counsel said they did make an attempt to apply the Good Year standard.  Their result is completely contrary to that standard.  The result is they get all of their fees.

Ms. Myers was quoting from the Good Year test and she notes correctly that it is a -- the Court says it's basically to do rough justice.  But the Court was very clear that the approach that the City employed in its opposition briefs is the right kind of approach.

The Court said a district court, you know, can look at a category of expenses, that's what we did, we tried to find expenses that were related to the encampment reduction order as an alternative basis, as opposed to all of the fees for everything, including unsuccessful things, including a substantial part of that, as the Court knows, a substantial part of the evidentiary agreement was at all about the Alliance agreement, but was about the other agreement that was expiring at the end of the evidentiary hearing, at the end of June. They want all of it.  They've made no attempt to parse anything out.

And so we agree it's a rough justice standard, but it

**52**

has to be tied to specific categories and what we have -- we did was we even explained our reasoning, we used a percentage approach that we think comes out to an award that comports with Good Year.

Good Year also said that's only in a very exceptional case you can award all fees under the but for test.  And it gave an example, it gave the Chambers case versus a NASPA (phonetic) cases as an illustration of a case where you can award all fees as the Alliance is requesting.

And there they said, they could award such a fee because literally everything the defendant did, his entire course of conduct throughout, and indeed proceeding the litigation was part of a sword scheme to dispute a valid claim.

Now Your Honor ruled on the face of the order, their motion was granted in part and denied in significant part.  As everybody knows, the main request in their briefing and at the hearing was an unprecedent receivership, the Court correctly refused to enter that remedy.

So the idea that everything that was done in the case from the perspective of the City with respect to the evidentiary, every single thing, including substantial amounts of litigation that had nothing to do with the Alliance settlement agreement, all of it should be what was the but for -- to satisfy the but for test under Good Year.  I submit it does not.

The standard here is a standard that is an exacting standard.  These are sanctions and the Alliance didn't want to do the work.  They want fees under 1988, they want a multiplier, they want $6 million.  And they were very clear about why they wanted that.

They want ammunition.  That's not the point of compensatory sanctions under the Chambers' standard, they want ammunition.  The people on the street, there's a reference to the people on the street, that's what we're all here about, right.  This is about solving a critical problem.  They are not helped by enriching counsel for the Alliance.  Sending millions of taxpayer dollars is -- does not help anybody get housing.  It doesn't help solve the problem, and it's not what the Court was contemplating.  It was contemplating a surgical award of specific fees.

And we would submit that the Court was contemplating award of fees particularly related to the encampment reduction order and I will just briefly because Ms. Myers raised it, I'll just point out two things about the March order and in the subsequent order in June.

So the Court did rule in March and on March 24th that it agreed with the plaintiffs, that cleaning an area and have unhoused individuals move back in without offers of shelter or housing is not a resolution or encampment reduction and shall not be reported as such.  And it -- the Court said, the City's

**54**

only to report reduction with a more permanent meaning.  That's what the Court said.

But it also took everything else -- the rest of the motion under submission and it didn't just in the June order just say I'm not revisiting this issue, I'm not saying anything more about this issue.

The Court -- and we appreciate the Court providing additional guidance, this is on page 52 of Document 991, where the Court specifically clarifies and provides additional guidance that's found nowhere in the March order. Specifically, the Court goes on to say that individuals need not accept an offer of shelter, that was not in the March order.

The Court says, they can't make shift shelter or a vehicle that is abandoned and the owner cannot be found, it would be impractical to make an offer.  And so it's not required to make an offer of shelter.

And then the Court also said the City's under no obligation to ensure that a person where a shelter offer has been made and accepted is housed indefinitely.  So the Court clarified significantly the encampment reduction obligation.

Now, Your Honor knows the City still disagrees with the Court's interpretation of it.  And we think it's contrary to the intent of the parties as Matt Szabo testified at the evidentiary hearing.  But the Court did not fully resolve this

**55**

issue about the meaning of an encampment reductions order until June.

And so at least under a contempt standard, where we're talking about willful disobedience, not substantial compliance, I would submit under circumstances here where you have an initial order and then a clarification order in June, that the interim report from the City does not rise to the level of contempt and that none of the conduct rises to the level of bad faith within the meaning of the contempt case law, much less has been proven by clear and convincing evidence, which is the standard.

So with that, unless the Court has any questions, I'd submit.

THE COURT:  Why don't you check with your colleagues please.

MR. HAMBURGER:  I think we're good, Your Honor.

THE COURT:  All right.

What are the attorney's fees charged by Gibson Dunn and how are those broken out between your associates and your partners?

MR. HAMBURGER:  Your Honor, we have an agreement that is a blended rate for all attorneys involved.

THE COURT:  What are your -- is that agreement?

MR. HAMBURGER:  It's $1,295 per hour.

THE COURT:  Is that for your associates as well?

**56**

MR. HAMBURGER:  Yes.

THE COURT:  Is that rate also for an associate who is out of law school, let's say a year or two or three?  In other words, are you seeing your partners billing at $1,295 per hour and you're also billing an associate at the same rate?

MR. HAMBURGER:  Under this agreement, it's a blended rate, so all attorneys working on the matter with the agreement with the City are being charged the same amount.

THE COURT:  I'm sorry.  Blended rate means that a partner could be charging 1,750, a blended rate it could be --

MR. HAMBURGER:  No.

THE COURT:  So that's not correct.  So once again I'm going to ask a very simple question.  Are all of the 10 or 15 lawyers involved billing at $1,295 per hour, yes or no?

MR. HAMBURGER:  Yes.

THE COURT:  All right.  Thank you.

Now, would you put up the LAist article to begin with?  All right.

When I'm deciding rates versus when Ms. Myers requests $1,025.

MS. MYERS:  Yes, Your Honor.

THE COURT:  And LA Alliance requests -- just a moment.

MR. UMHOFER:  Your Honor, it's the same 1,295 rate that Gibson --

**THE COURT:** Yeah, 1,295.

It was reported in LAist on August 27th of 2025 by Aaron Shrake (phonetic) quote and I'll put the quote up for you in just a moment, because I don't want to rely on a prior newspaper article but I do want to have rates charged by various counsel.

Quote, that the City agreed in May to pay $900,000 over a two year period but racked up more than $2 million in legal fees beyond what Council had originally authorized without telling Council members, end of quote.  LAist also reported, quote, the firm had 15 attorneys working on the case, each of whom is billing the City $1,295 an hour.

Is it on the screen?  All right.

And that quote is on the screen in the bottom paragraph.  The initial $90,000 covered the first few days of work, end of quote.  LAist also reported that the budget committee did not know the initial $900,000 had been exceeded until LAist reached out to them for comment.

Would you put up the Los Angeles Times article?

You can put it up on the Elmo if you want to.

**(Pause)**

**THE COURT:** All right.  The Los Angeles Times article by David Zahniser states that quote -- the Los Angeles -- strike that.  That the Council approved a fivefold increase after Gibson Dunn billed the City $1.8 million for two weeks of

**58**

legal work with 15 of its attorneys billing nearly $1,300 per hour.  This contract for an additional $5 million is only the current fiscal year, which ends in 2026.

In the LAist article they stated that they obtained this information through a Freedom of Information Act.  Do you have that contract with you today?

**MR. HAMBURGER:**  I do not have that contract with me.

**THE COURT:**  Where is that contract?

**MS. MITCHELL:**  Your Honor, I believe it was attached to Mr. Umhofer's declaration filed with the --

**THE COURT:**  I saw that, but I want to verify this. They're the party.  Is this the correct attachment to Mr. Umhofer's documents?  Because I don't want to rely upon a newspaper article, but I think that in looking at reasonable rates between counsel, that --

**MR. HAMBURGER:**  Which exhibit was it?

**THE COURT:**  Let's see if you can two stipulate to that, otherwise I'll want your contract and want you to produce it.

**MR. HAMBURGER:**  We've made no evidentiary objections.

**THE COURT:**  I'm sorry, did you hear my question?

**MR. HAMBURGER:**  You want -- no, I did not, Your Honor.

**MS. MITCHELL:**  Exhibit E.  Would you like --

**MR. HAMBURGER:**  I have it.

**MS. MITCHELL:**  It's Exhibit E to Mr. Umhofer's declaration, filed on July 25th of 2025.

**THE COURT:**  Let's see if you can stipulate to that, if not, I'm going to order you to produce your contract.

**MR. HAMBURGER:**  Yeah.  We can -- this -- we can agree that this is the document it purports to be.

**THE COURT:**  Are you stipulating that this is your contract?

**MR. HAMBURGER:**  I don't know if it is the only contract, but I can stipulate that this is an agreement between the City and Gibson Dunn.

**THE COURT:**  Are there 15 attorneys billing?  Are there 15 attorneys billing through your firm?

**MR. HAMBURGER:**  Right now?

**THE COURT:**  No, at any time during this case?

**MR. HAMBURGER:**  There may have been at times, that number of attorneys that have billed to this matter, yes.

**THE COURT:**  All right.  And once again to confirm, then your two senior partners, who initially argued at the evidentiary hearing, they're billing at 1,295 per hour.

**MR. HAMBURGER:**  Correct.  Yeah, that's on page --

**THE COURT:**  And an associate with your firm for a small period of time would also be billing $1,295 per hour?

**MR. HAMBURGER:**  Yes, there's one rate applied to all attorneys under the agreement.

THE COURT:  I understand that.  Answer my question, please.  Did you hear my question?

MR. HAMBURGER:  Yes.

THE COURT:  What was my question?

MR. HAMBURGER:  Would a young attorney be billing that $1,295 rate, and yes, every attorney including first year associate, second year associate to the most senior partner is billing at the same rate of $1,295.

THE COURT:  If the Court awarded attorney's fees in this matter, why wouldn't Ms. Myers have the same rate as minimally lead counsel for either LA Alliance at 1,295 or an associate at your firm?  She's billing $1,025.  Why wouldn't the Court find that they should be minimally $1,295 for Ms. Myers?

MR. HAMBURGER:  Well, I think the main reason is that's the rate that she requested.

THE COURT:  Okay.

MR. HAMBURGER:  Second, I would just say that the blended discounted hourly rate is -- sets one rate for all attorneys, but with the understanding that it represents a significant discount for almost all of the attorneys working on the matter.  And that's laid out on page 23 of Exhibit E to counsel's declaration.

THE COURT:  Well, I haven't decided anything, but I'm very curious about the attorney's fees and the rates and the

**61**

tragedy of this is that quite a bit could have occurred on behalf of the homeless and the citizens of this City with the $5.9 million you're charging for one year and whatever attorney's fees I award if I award attorney fees for LA Alliance and the intervenors.

So for one year, we're potentially 8 to $10 million, aren't we?  How much good, without you responding to me, could have been accomplished on the public's behalf with compliance by the Court's orders?  And certainly saving lives and for the benefit of our general public.

All right.  For LA Alliance I've got a question for you and you're going to have to look at a couple of documents. I want you to look at Document 1015 if you can pull that up. And if not, I can read it to you.  It will be page 6 of 28. And I think that, Ian, we can do that for them and pull up that document so all of you can read that for a moment.

But I'll say to you that on line 21 of that document it reads as follows, plaintiff's counsel's hours yield a total of 1,092 -- I'm sorry, strike that, $1,392,818 in attorney's fees.  Just a moment, let me get this document pulled up.  And while we're pulling up that document, along with $44,257.21 in costs.

Now, this initial request before your multiply is about 20 percent of what -- and I'm simply going to refer to you from now as the City attorney.  You're acting on the City

attorney's behalf.  You're basically the City attorney making these decisions.  So this has been relegated to you.

On Document 1027 -- let them catch up, let's pull this up first.  1015.  Okay?  And I want you to go to page 6 of 28.  Yeah.  And you can see on line 21 that $1,392,818.  Can all of you follow that?

**MR. UMHOFER:**  Yes, Your Honor.

**THE COURT:**  Okay.  And I want you to turn to Document 1027.  And let's pull that up.  And, Ian, would you go to page 6 of 30?

And down to line -- well, 21 through 23.  There on August 29th the request is for $1,600,633 in fees and $45,467.21 in costs.  What was the increase between the approximate $1.392 million and the $1.6 million and what was the increase in the costs, which are de minimis?

So I understand how you're getting to 1.6 initially in your argument from the initial 1.3 and it may be self-evident, but I want to get a record of it.

**MR. UMHOFER:**  Yes, Your Honor.  The difference is in the work that's been done in the interim.  And so if I'm looking at -- I apologize, I am in document -- I'm not on the same page.  I'm at Document 1027, page 6 and there's no reference to 1.6 million there, so I just want to get to the same page as the Court where you're reading off the 1.6 number.

**UNIDENTIFIED:**  Page 1.

MR. UMHOFER:  It's page 1?

THE COURT:  It's page 1?

UNIDENTIFIED:  One of the three.

THE COURT:  On the filing document, it's 6 of 30.

MR. UMHOFER:  Got it, yes, Your Honor.

THE COURT:  And go down to line 22.

MR. UMHOFER:  So the difference is laid out -- the difference is simply the additional work that we've done.

THE COURT:  So when I look at your original request in Document 1015 filed on July 25th --

MR. UMHOFER:  Yes, Your Honor.

THE COURT:  -- that 1.392 has increased to 1.6.  In Document 1027 August 29th, because of that month, additional work; is that correct?

MR. UMHOFER:  Several months of additional work, Your Honor.

THE COURT:  All right.  The next question for the parties --

MS. MITCHELL:  Your Honor, if I can just add to that because my colleague didn't do the reply, I did.  The original motion was only for work through June 30th.  The fees submitted was through June 30th.  And so in the reply we added the additional both July and August to the motion, thank you.

THE COURT:  You previously argued for a multiplier before today's presentation that was less than the multiplier

**64**

than I'm hearing today in court.  Tell me the reasoning.

MR. UMHOFER:  Your Honor, we set forth the permissive range and we suggested a multiplier of 2.5 previously.  I think there's a couple of different reasons, I think part of it touches on what the Court just covered, which is the additional information that has come out since about how much money the City is spending.  And we think that that establishes a reasonableness, so the test under 1988 is reasonableness.

And so the additional information that's come out, the Court, you know, put up and we put forward through the LAist and others about how much the money is spending on this, alters the reasonable calculus at the time.  We wrote a motion I believe, we were at 1.8 million that the City had spent over 13 days.  We were at 1.6 for over 18 months, but now we have this additional information.

We're also, to be frank, in terms of dealing with, you know, the reasons for a multiplier, which is the extraordinary effort and the extraordinary results that are being obtained, we're being required, what has happened in the interim also is that the City has adopted a new strategy of feigned compliance but fail to comply.

And that -- and so we're going to have to push through that and I'm not anticipating at this moment any future awards.  So what we're trying to do is be compensated for the work we're doing and the multiplier we think, the factors under

the multiplier warrant the -- and the new information about what the City is spending warrants -- I mean, the City could avoid all this if they'd just comply, right.  Wouldn't have to spend a single cent on Gibson or us, but if the City's not going to comply and continue to engage in the delay game that the Court has identified in its order, we think the multiplier is appropriate.  But again, it's in the Court's discretion so we defer to the Court.

**THE COURT:**  Today and the arguments before the Court is you've somewhat walked away from the perspective, fees that you noted in your briefing, and relied more upon a multiplier.  I'm going to ask both of you, and I'll ask the City, does your fee arrangement of additionally $900,000 and then quickly going beyond that without Council approval, aren't you incentivizing litigation because if there was cooperation, much of these fees would not be necessary.

And what I'm concerned about when I looked at your papers asking for perspective fees, if the City hasn't done exactly the same thing in terms of a $5.9 million one year fee agreement with the City's attorney, hasn't this simply incentivized and curtailed any opportunity here to reach an accommodation between the parties and to decrease these extraordinary costs.

I'm going to address that to the City.

**MR. HAMBURGER:**  Your Honor, we -- the numbers that

you've been talking about are not flat rates that we get no matter what we do.  They are essentially a cap, a budget.  We hope that there -- we do not have to spend that many -- that number of fees and --

THE COURT:  Where would I -- counsel, where would I verify that?  In other words, I have an exhibit in front of me, so therefore it may be appropriate that I order all of your fee arrangements produced with the City, they would be available under the Freedom of Information Act and there's no reason that the press should have to chase those.

Are you willing to do that voluntarily or should I make an order?

MR. HAMBURGER:  If they are publicly available -- if they're available through -- we'd have to ask the City attorney.

THE COURT:  Well call her.  I'll wait.  I'm waiting.  You are the City attorney right now, this has been relegated to you by the City attorney and I want to know if Gibson Dunn is making these decisions or the City attorney.  Where is she?

Counsel, I'm going to take a recess.  That's an order, call her.  Get an answer.

**(Recessed at 10:44 a.m.; reconvened at 11:12 a.m.)**

THE COURT:  We're back on the record.  All counsel are present.

MS. MYERS:  Your Honor, we're having a technical

**67**

issue so we're just going to move over there to avoid it, if that's okay.

MS. SPEAKER:  She's going to come join us, Your Honor.

THE COURT:  All right.  Fine.  All right.

My assumption, since you're acting as the City Attorney, is the city attorney is aware of these proceedings, the mayor is aware of these proceedings, and I'm going to find that the counsel present is aware of the proceedings, so I don't hear in the future that there's any lack of communication with any of these entities; am I clear?

(No audible response.)

Am I clear?

MR. SCOLNICK:  You're clear, Your Honor.

THE COURT:  All right.  Thank you very much.

What's your response to turning over all of the agreements now?  Because there seemed to be some intimation that there were other agreements

MR. SCOLNICK:  Your Honor, we've spoken with our client.  We are willing to turn over -- there's two agreements is my --

THE COURT:  Will you?  Just a moment.  Two agreements.  I said all agreements.

MR. SCOLNICK:  The two agreements is all agreements, Your Honor.

**68**

**THE COURT:** So all agreements are two agreements.  So in the future, if this goes up on appellate review, there's not any new document submitted that wasn't before the Court.

**MR. SCOLNICK:**  That is correct.

**THE COURT:**  Thank you very much.

**MR. SCOLNICK:**  Thank you.  And, Your Honor, for the record --

**THE COURT:**  When will that occur?

**MR. SCOLNICK:**  Pardon me?

**THE COURT:**  When will that occur?

**MR. SCOLNICK:**  As soon as today.

**THE COURT:**  Okay.  Thank you.

**MR. SCOLNICK:**  Your Honor, and just for the record, I am not acting as city attorney.  The city attorney is an elected official in Los Angeles.  I --

**THE COURT:**  I don't see her.

**MR. SCOLNICK:**  -- am outside counsel --

**THE COURT:**  I don't see her.  You are the city attorney.  They've delegated this to you and, therefore, --

**MR. SCOLNICK:**  Well, --

**THE COURT:**  -- it gives a now segment and the city attorney will not claim that they didn't have information and acting on the city's behalf; am I clear?

**MR. SCOLNICK:**  Correct, we will --

**THE COURT:**  Thank you very much.

**69**

MR. SCOLNICK:  -- inform our client of --

THE COURT:  Counsel, you may --

MR. SCOLNICK:  -- these proceedings --

THE COURT:  -- be seated, thank you.

MR. SCOLNICK:  Thank you.

THE COURT:  Now, I'm going to receive both the LA Council delay decision on the $5 million more from *LAIst* and the *LA Times* article that I refer to for the record.

But I want it very clear, I'm not relying on these for any findings or issues that I resolve in the future.  I have a stipulation between the parties concerning Exhibit E.

And now I have a representation by the city attorney that all agreements will be produced.  And that way we'll negate any freedom of information acts in the future.

I'll take this matter under submission concerning attorneys' fees.

I want to turn to the quarterly report and take up that issue.  This Court's concern has always been that accurate data is essential to ensure that services are being provided in accordance with the settlement agreement and this Court's orders, and to ensure that the services are reaching people who truly need them.

Every day homeless people are dying because they're unable to access essential services.  And this Court's goal has always been to try to make a positive difference and try to

**70**

help these people get more of these services and help our public as well, the Los Angeles citizens.

And the data that comes in these quarterly reports is essential to see that these services are being provided.  I'm very comfortable as a court making the connection that every day that there is delay in getting accurate information, there are people dying as a result of this delay.

And every day this delay goes on, the deprivation may seem as small as one person failing to receive one bed, one housing opportunity.  But this person's now at risk and in danger that would not have occurred with accurate and timely reporting.

So I'm very comfortable stating that there is a human cost to this delay.

My goal is always to help people.  And it's unfortunate that the instant strategy seems to be delay, delay, delay.  It's going to kill people that the city could have helped.

And the Court had hoped this would be a more collaborative effort.  But it's not too late because all the parties' goals should be really aligned here.  And we'll get into that and the third statement when we discuss the contempt proceedings and how we're going to proceed, if at all.

So let's turn to the quarterly report.  I think we need to hear from the city and the county here.  And also I

**71**

want the monitor to be heard to the extent that there may be input. And Mr. Mejia, who I appreciate your attendance.

I also assume LA Alliance wants to be heard on this issue.

And so I want to go back to a filing in just a moment. And, Ian, I'll need you again to help me with this probably.

So we need to cover a few things. I've reviewed all the filings once again. And there's some things we need to touch on.

The city's requirement that all communications be funneled through its outside counsel and whether that requirement is delaying access to essential information; the delays in the monitor's ability to schedule interviews with key personnel; the city's failure to identify systems or databases that is the source of the unit bed status and open and occupiable date metrics; a lack of key information regarding the ten, I believe it's now 11 systems, and databases that the monitor inquired with the city about; the city's lack of reporting total PEH served; the lack of definition of units, beds, status, and total PEH served; the lack of documentation or shelter housing offers for encampment reductions; issues with milestone-related data; and whether an emergency has been invoked under 8.2 of this settlement agreement and what affect it's had on the obligations.

My understanding is that that emergency has recently been lifted by the mayor.  So those issues and more should be touched upon.

But -- yeah, have pull up 1034.  And just a moment.  No, no, we're going to pull up first 850, document -- counsel, I'm going to refer you to document 850.

And I'll slow down because I've spent hours with this, as well as you have.  So 850, if you'd be kind enough to pull that up.

Do you have it?

MR. SCOLNICK:  I don't, Your Honor.  What is the 850?

THE COURT:  Well, it's a transcript.

MR. SCOLNICK:  If you give me -- well, --

MS. SPEAKER:  I can --

THE COURT:  January 8th, 2025.

MR. SCOLNICK:  Thank you.  I have it now, Your Honor.

THE COURT:  Okay.  Thank you very much.

Counsel, do you have it with LA Alliance?

MS. MITCHELL:  Yes, Your Honor.

THE COURT:  Ms. Myers, do you have it?

MS. MYERS:  Yes, Your Honor.

THE COURT:  Okay.  One of the most interesting revelations that the Court has was the auditor controller's position where initially it was argued that the auditor controller could not -- strike that, it's controller, my

apologies -- could not examine the city because of the charter.

The Court had pointed out at that time that for 35 years that this city -- or more this city has never had a forensic audit.

And the reason for that is that any mayor could sweep this under his or her pants or skirts and, as such, shield any outside audit or any look at finances.

I'll read to you -- I could read to you incessantly, but I'll start at page 50, line seven:

"THE COURT:  Well, time out, time out.  I'm not joking.  Where do we look for that answer?  Who's going to be the leader here, the mayor, chairman of the board, LAHSA, who's going to be the central authority that makes this decision so that the public has access?

"Because right now we've created the perfect political non-responsible position by dividing this out between the county, the city, and LAHSA.

"And Miguel Santano wrote some great -- that committee did some great work on this that everybody ignored.

"I mean, where do we get these websites transparent? Help me with that.  Or do I eventually have to do something about this.

"MR. MEJIA:  We've asked LAHSA because as the

EXCEPTIONAL REPORTING SERVICES, INC

**74**

controller, we can ask for the details and we wanted it going forward.  But from my understanding, it's a resource constraint issue for them to provide it.

"THE COURT:  So we're paying bills.

"MR. MEJIA:  Yes.  We're cutting blank checks."

Now, that's only a portion of this discussion finds the controller in a very unenviable position of coming forth stating that he would like to do a forensic audit of Inside Safe and other programs.

If you then turn to document 1034, it's another transcript.  And I'll only read a portion of this.  I'll read from Ms. Bennett and then --

**(Judge/Mr. Speaker confer.)**

**THE COURT:**  Just give me one moment.  Yeah.

And if you recall, although he was the city attorney, now Gibbs and Dunn, weren't present, what we were trying to do was get a transparent website.

And the reason for that was that it was hard for this Court to understand how providers were bringing information to LAHSA in a non-uniform nature literally with, one, I won't name them, one line, no date, a request for $248,000.  That's your documentation that the city paid out.

Also facing us at the time was a county audit where we didn't know even the number of contracts.  Five iterations had been run.  The number of contracts allegedly came back

**75**

between 600 and 1200, someplace in that range.  We didn't even know the number of contracts.

At the same time, one of the newspapers had discovered a $50.8 million amount paid to providers with no timetable for repayment, no milestones, no contracts.  Those have been subsequently produced, and I believe only through the pressure of this litigation.

The lack of uniformity in reporting to LAHSA alone, let alone this constant refrain that the city somehow is trifurcated or bifurcated from LAHSA when the mayor sits on the LAHSA board, completely intertwined, has led this Court to make the finding that the city is the responsible person here as the entity that will or will not be accountable.

All right.  Now, go to page -- on page 55, no, bottom.  Mr. Bennett, line 25:  "I'm sorry that something" -- and this is up on the board.  Can you read it?

**MR. SPEAKER:**  No.

**THE COURT:**  All right.

**(Mr. Speaker/Judge confer.)**

**THE COURT:**  I'm sorry.  That's something that we just wanted to highlight is the time-consuming nature of this entire process that we have to go through from beginning to end from the financial piece to the contract piece.

I also handle the contract piece that should be something that is relatively easy on the frontend.  When we

provide that Excel file to LAHSA to just send us the contracts that match the transactions, that has been painstakingly difficult.

Now, what the auditor controller had testified to previously -- and I'll let him speak today about his prior concern in having to write blank checks -- was that all of us seem to be in accord.

And, frankly, before your entry that we wanted to work together in terms of transparency, and we wanted to get, when the request for proposal was completed, the contracts up on the board.

And the reason is that those contracts that turn from a request for a proposal now had milestones and who was to be serviced.  And everybody was on board.

I'll give you Szabo's testimony if you like.  Until your entry.

So apparently you've received additional instructions from someone, the mayor or the council, and you're now acting as the city attorney.  It's not too late.

The public should minimally have these contracts when they return a request for proposal immediately publishable on a public website.  Politicians should be able to see if these milestones are being met.

And that's not just for the homeless.  That's for the entire population of Los Angeles, so people can see with

transparency how their money is being spent.  That has changed significantly unfortunately.

I'll say to you as the acting city attorney in this matter, it's not too late.  But that'll be your choice.

Now, I'm going to invite the city controller to make whatever statements you like to.  And I welcome your presence here today.

I previously complimented you on making a tremendous effort in terms of getting this documentation up.  But I know your staff has been severely cut.  You've already made that representation.

And remember you both agreed when you reached the dispute resolution was -- just a moment.  You both finally came to me after a significant period of time with a joint statement, which I'll put up on the board, that you could not resolve the choice of the monitor.  And I'll display that for you.  That calls into question then sections 24.

And the reasonableness of the city going through three city council meetings in over a month and then referring this back to a subcommittee, which is delay and unreasonable.

So, therefore, when you argue to the Court that the city has to agree, that has to be reasonable.  And that month-delay and three council meetings and then referral back to a subcommittee does not appear to be reasonable, especially after representations to the Court.

**78**

So put up the third party monitor, okay.  Can you see this on your screens?

**MR. SCOLNICK:**  I cannot, Your Honor.

Can you see it?

**MR. SCOLNICK:**  No, Your Honor.

**THE COURT:**  No.  Technology then.

**MR. SCOLNICK:**  Now I think it's coming up.

**THE COURT:**  We'll take our time.  I want this to go up on the screen.

**MR. SCOLNICK:**  We can see it now.

**THE COURT:**  Can you now?

**MR. SCOLNICK:**  Yes.

**THE COURT:**  LA Alliance?

**MR. SPEAKER:**  Yes.

**MS. SPEAKER:**  Yes, Your Honor.

**THE COURT:**  Let's go back to that document where it was.

**(Judge/Mr. Speaker confer.)**

**THE COURT:**  Plaintiffs LA Alliance for Human Rights and the City of Los Angeles submit this joint report to update the Court regarding the status of the city council's approval of the third party monitor, contemplated by Section 7.2 of the settlement agreement, and the Court's June 25th -- strike that -- June, 2025 order, and to request the Court's review and resolution of the issue pursuant to Section 24 of the

settlement agreement.

Keep going.

And then we went through a -- the city's amenable to considering instead of having former city controller Galperin and current controller Mejia to serve as monitors, and current -- the city is amenable to considering instead of having former city controller Galperin and current city controller Mejia to serve as monitors, subject to the city council approval.

And then go back.  No, I'm sorry.  Thank you very much, Ian.  I appreciate it.  Can you go out?

And then LA Alliance proposed Daniel Gary be appointed as monitor with Ron Galperin in supporting role to navigate the difficult systems within the city agreed to on September 16th.  However, the city's concerned about budgetary issues.

So the Court tried to take that into account.

Remember, at one time before you were involved, we had a discussion about a law firm that's very prestigious acting as the special master in this matter.

That law firm was charging your rates.  So the Court tried to hold the cost down, as it did here, and Mejia seemed to be a good person who understood the systems, etcetera, to gather the information for the data monitor.

Now keep going back up this way.  No, no.  Thanks a lot, Ian, appreciate it, very much appreciate it.  I need this.

Just a minute.

Give me one moment, counsel.  I've got boxes of material.  I'll be right with you.

Well, counsel, both of you -- no.  Counsel, you're going to help the Court just because the volume of material I have on my desk.

Find the documents where you came to the Court -- it's up in the upper portion of the latter page where you simply say that you can't reach a resolution in this matter.

     (Pause)

          MR. HAMBURGER:  I believe it's the first page of this document.

          THE COURT:  No, no, there's others, counsel.  You're very clear about it.  You came to the Court.  And I'll make a record of this when I write if I need to.  But I've got two boxes in back of me.

     (Judge/Mr. Speaker confer.)

          THE COURT:  Well, that's one of the places, counsel.  But you mentioned it again.  That's all right.  I'll write about it.  For my record, that's sufficient.  I can find the latter portion in another document.

     (Pause)

          MS. MITCHELL:  Your Honor, looking at docket 1045, the -- at the very top the parties "request the Court's review and resolution of the issue."  Is that what the Court is

referring to?

THE COURT: Yes. But there's another section also which I'll find later on. I don't want to take any more of your time.

So auditor -- or the controller, Mr. Mejia, you have the lectern if there's anything you'd like to say, other than the Court appreciates your appearance today.

MR. MEJIA: Thank you very much, Your Honor.

You know, I just wanted -- oh, my name is Kenneth Mejia, City Controller of Los Angeles.

Thank you, Your Honor, for having me.

You know, I've been coming to this courtroom for over a year already.

THE COURT: Yeah.

MR. MEJIA: And I think to your point mentioned the, you know, an hour ago, my role in this role as an elected official, as a independent controller auditor is to make sure that at the end of the day, we are helping our unhoused community, people experiencing homelessness.

And I want to assure you that is why we always volunteered ourself. Any time you asked if, you know, who could be the auditor, who could be the monitor, who could create this website, my office has always said, yes, we could do it.

And we have always been willing to because, like I

said, we want to help people.

And in my role as the controller, I could see where those tax dollars are going.  And that's why I really wanted to really get involved here.

And so, you know, recently in your order two months ago, you made us be the liaison for the third party monitor.

And we have -- as city controller, we have been doing our role the best as we can trying to facilitate, you know, data collection, doing our best to facilitate meetings that -- because that's what we're doing.

I know when you talk to monitor Gary, you know, you could ask him.  We've been doing our best as city controller to facilitate this monitoring work.

And, you know, there -- from my point of view from what we've seen is, yes, there -- we are running into some hiccups, right.

Even when I tried to facilitate meetings, I -- and, I mean, if everyone's seen the emails, we have to go through a bunch of people, a bunch of lawyers and everything just to do my role as liaison.

So I want you to know that for me, I'm taking my role seriously.

As the person who sees all this data, who's done two audits already on homelessness, which touches on homelessness data, you know, we're here to continue to do this work and to

assist, whether it's as the liaison to monitor Gary or if, you know, the city makes the decision to fund us to help take on this role as monitor.  We'd be willing to do that because we do this work, we are independent.

The point I'm trying to make is I'm dedicated to do this, and my staff is dedicated to do this.  And so we're here to just make sure at the end of the day all this work we're doing can ultimately have a benefit to the unhoused community.

**THE COURT:**  You probably know the systems and the money streams in a sense better than anyone as the present controller, certainly better than the past controller.  And both sides have agreed to you.

We're depend upon you getting that information for Mr. Gary, gathering that stream, if you will, because as recently as last night, I received information about ten going to maybe 11 streams.  But I'll let Mr. Gary speak to that in a few moments.

Would you remain just a moment?  Do you have anything else you'd like to say, other than the Court's appreciation?

And I think the city's appreciation also because this portion doesn't cost the taxpayer any money.  And that's a benefit to the city.  And I think the public should be very appreciative of that.

Is there anything else you'd like to say?

**MR. MEJIA:**  No, Your Honor.

**84**

**THE COURT:**  Thank you.  Would --

**MR. MEJIA:**  That's pretty much --

**THE COURT:**  -- you remain a few moments, okay?

Mr. Gary, let me introduce you to your colleagues here.  He's come out from New York.  He of course as you know has donated his windshield time.  In other words, he's not charging flying out here.  But I'm going to order him to charge from this point forward if there's any further delay.

So, Mr. Gary, the lectern's yours for whatever you'd like to say.

**MR. GARY:**  So Daniel Gary.

So first I want to thank Kenneth --

**THE COURT:**  Use the mic.  We can't hear.

**MR. GARY:**  First, I'd like to thank Kenneth Mejia and his team helping us figure out the right people and the hiccups aside has been an invaluable resource in trying to navigate.

Frankly, all -- I'm neutral.  I'm a third party.  All I'm trying to do is validate the data that's going into these reports.

I asked several simple questions to figure out what systems the city's -- is using.  And last night we got an email clarifying some systems and the like.

So I don't know if it's 11, four, five, six.  But before I can give an estimate or provide any real things, we need to know what actual systems are being used to actually

**EXCEPTIONAL REPORTING SERVICES, INC**

calculate the data that is being reported on.

THE COURT:  Right.

MR. GARY:  And from where I sit, it looks like on top of that, there's a -- I don't know if it's a disconnect or how you want to describe it.  But the city tells me to talk to LAHSA.  LAHSA -- but LAHSA isn't an actual party.

What we need is the actual access to the source data to validate the information going in to the report for the city.

I want to credit the -- there's been some hiccups, but we're -- I think we're figuring it out.

I think it would be -- I haven't had honestly a chance to review all the information I got in the last ten or 12 hours.

But at the end of the day, all we're looking for as an initial outlay is what systems are used, how are they built and designed, so we can then determine what data is being used to calculate and provide the numbers that are being reported to the city.  And then from there we can figure out the other pieces of it.

And we've subsequently tried several times.  Due to scheduling issues with the city, individuals, and the likes, we've just finally made headway into -- and I haven't read the email in full disclosure, to I think narrowing what are the systems, and then waiting on further information from the city

as to who the actual owners are for the specific systems on the call list, if they're new systems.

If there aren't new systems, then I think the city's identified the individuals. I just got an email last night, I don't know, like 12 hours ago or something like that. So I'm not exactly sure.

But the takeaway being is that we are trying to make forward progress, but it is proving to be a bit heady, headwinds. But I think we're, you know, on our way.

**THE COURT:** All right. Would you remain for just a moment? I've got a couple questions I'm going to --

**MR. GARY:** Of course.

**THE COURT:** -- ask the parties in just a moment --

**MR. GARY:** Okay.

**THE COURT:** -- to try to move this along --

**MR. GARY:** Okay.

**THE COURT:** -- because I thought up to recently this was a cooperative effort, until I made the findings after our last hearing. So if you'd stay with us for just a moment.

**MR. GARY:** Sure.

**THE COURT:** All right.

**MR. GARY:** Can I go back or you want me to stay here?

**THE COURT:** Well, I would just have a seat right there for a moment, --

**MR. GARY:** All right. Sounds --

**THE COURT:** -- save you some time.

So first I'm going to ask if you would look at the docket number 1051-1 filed October 15th, 1051-1 filed October 15th.

And we're going to put that up. And I can take any of the pages, so why don't we take page two of seven. Why was the past information that has been provided on all of the past quarterly reports in this effort that show total PEH served in the last column removed from the October quarterly report?

As of yesterday, this is the document submitted to the Court concerning pending. And yet in all prior reports the Court had a number.

And I'll show you that because last -- yesterday you finally submitted suddenly after the OSC in re contempt was issued by the Court the next document, which causes me concern that you're simply reacting to pressure being applied.

This is the document submitted recently. Why?

**MR. SCOLNICK:** The timing of the supplemental document filed last night had absolutely zero to do with the OSC, Your Honor.

The information was listed as pending when we filed the reports. Both Plaintiff and Special Martinez had followed up with us promptly and asked what's going on.

And we told them that there was additional verification going on by the CAO's office. That process was

complete yesterday.  We filed this as soon as we got it.  But so that's what happened.

THE COURT:  Why the sudden change?  I received this information in the past.

MR. SCOLNICK:  Because there's -- the information changes.  There's --

THE COURT:  Because you're redefining.

MR. SCOLNICK:  No, no, no, Your Honor.  The PEH number changes from report to report.  And the CAO's office needed to verify the number before reporting it in this last report.

THE COURT:  Then would you turn to the next page for just a moment, these questions.  And put that up, please.

All right, 7.1, a year and a half or more into this agreement, and LA Alliance, the intervenors, all parties have been waiting for this information which would appear from their perspective to be an absolute violation of the settlement agreement.

Other than your argument that you have to consult with LAHSA, I'm directly asking you, one, the number of beds, opportunities offered as opposed to obtained, do you have that information, yes or no?

MR. SCOLNICK:  Your Honor, we believe it's on the report.

THE COURT:  Show us.

MR. SCOLNICK:  The -- it's the last page of the report or the penultimate page of these reports lists a total for units beds open to date.

THE COURT:  I'll let the parties respond to that.  So your answer is yes.

MR. SCOLNICK:  Yes.

THE COURT:  Okay.  Two, the number of beds or opportunities currently available in each council district.  That comes from 7.1.  Do you have that information?

MR. SCOLNICK:  It is on the report, Your Honor.  Each address is listed by council district, and the total number of units and beds open are on the report.

THE COURT:  So I could check that yes.

MR. SCOLNICK:  That's a yes.

THE COURT:  Three, the number of PEH engaged; do you have that information, yes or no?

MR. SCOLNICK:  Your Honor, the number of PEH served we believe is a proxy for engaged.  The report does list the PEH served.

THE COURT:  I can check that yes.

MR. SCOLNICK:  Yes, as I explained.

THE COURT:  Four, the number of PEH who have accepted offers of shelter or housing; do you have that information?

MR. SCOLNICK:  I -- let me just -- one moment, Your Honor.  Your Honor, in 7.1 that is listed as to the extent

possible.  And we do not have that information.

THE COURT:  Have you made an inquiry --

MR. HAMBURGER:  I would -- Your Honor, can I just add on that?  The PEH served number, obviously in order to be served you have to have accepted an offer.  So that provides some of that information.

So both three and four in your chart are we believe may be subsumed within the PEH served number.  But it is also part of the agreement that it is to the extent possible.  And the --

THE COURT:  And since we've had a --

MR. HAMBURGER:  -- obligation was to work with LAHSA.

THE COURT:  And, counsel, since we've had a year and a half to comply with this, --

MS. SPEAKER:  Two and a half years.

THE COURT:  -- to the extent possible over a year and a half.

MR. HAMBURGER:  We have reached -- the city has reached out to LAHSA and had discussions, including --

THE COURT:  No, you are LAHSA, counsel.  The city is responsible for this.  Quit segmenting out LAHSA.

MR. HAMBURGER:  I disagree as a legal matter but I understand the Court's position.

THE COURT:  Then answer my question.

MR. HAMBURGER:  We have not reported that data other

**91**

than as I said --

THE COURT:  What efforts did you make and when did you make them to obtain this information?  We've been waiting a year and a half.

MR. HAMBURGER:  My understanding is there've been multiple discussions with LAHSA to obtain this information --

THE COURT:  Who and when?

MR. HAMBURGER:  I was not a party to those discussions.  My understanding --

THE COURT:  And how do you make that representation?

MR. HAMBURGER:  I can tell you, Your Honor, I have been on -- I want to be careful because it may be privileged.  But I can tell the Court that the -- and I believe we told Special Master Martinez --

THE COURT:  Now, counsel, this is not privileged.  Who gave you this information and who reached out to LAHSA?

MR. HAMBURGER:  The CAO, city administrative office, --

THE COURT:  Who?  That's a big office.

MR. HAMBURGER:  I don't know who specifically was involved in those meetings.

THE COURT:  So you don't know, do you?  You have some representation from somebody we can't verify about some reach out to somebody in LAHSA.  All right.  Thank you, counsel.

The number of PEH who have rejected offers of shelter

**92**

or housing and why offers were rejected, number five.

MR. HAMBURGER:  We don't have that.

MR. SCOLNICK:  It's the same answer.  We don't have that, Your Honor.

THE COURT:  All right.  Well, thank you.

And the number of encampments in each council district.

MR. SCOLNICK:  We do not have that, Your Honor.

THE COURT:  All right.

THE COURT:  Why don't --

MR. HAMBURGER:  I will note for the record, Your Honor, on four, I don't believe the no is -- there's been an "X" placed on the no.

And I believe that as I said, the PEH served is a proxy for acceptance of offers because you cannot have been served unless you accepted an offer.

THE COURT:  All right.  Thank you, counsel.

This rolls into the discussion about the OSC in re contempt.  I keep saying to you it's not too late.  But I've made my findings concerning obstruction, delay, willfulness in my order.  That will go up to the circuit.

But remember we have A and M making virtually the same representations to the Court.  We have a history of documents that we went through.

So before we begin this discussion concerning the OSC

re contempt, I'd like to remind that all parties that I haven't made up my mind, but I'm extraordinarily concerned now.

This isn't going to be just another settlement agreement. I'm going to ask for oral arguments today on this OSC in re contempt because I want to understand better what's hindering compliance.

And you can also respond to counsel's representation, if you'd like to, in those six questions I've asked, Ms. Myer (sic) or LA Alliance.

And issues this Court's concerned with is both the special master and the data monitor are facing some challenges surrounding noncompliance and impedance of the special master and monitor's responsibility under the agreement and settlement compliance order, which the city's already on notice of for my settlement compliance order in document 991 from June.

And many of the issues, including a lack of data transparency, go back much longer to the same complaints from A and M. And they may be in this court once again as witnesses subject to our discussion today.

I made further observations and findings after the seven-day evidentiary hearing in June in docket 991.

And I stated:

"The pattern is clear. Documentation is withheld until exposure is imminent. Public accountability is resisted until judicially mandated. And the truth of

reported progress remains clouded by evasive recordkeeping.

"As this Court has observed, these failures have undermined public trust and judicial trust alike. When errors are found in the data reported, the Court has repeatedly" -- sorry.  "The city has repeatedly ignored the errors or attacked the messenger instead of engaging with and correcting the issues.

"This pattern has persisted for years, and it's untenable if the city is to succeed in meeting its obligations by 2027.

"The city's inability or unwillingness to verify its reporting or even explain how it counts and reports solutions was on stark display during the evidentiary hearing.

"At no point during the costly and time-intensive seven-day hearing did the city attempt to substantiate its reporting which had been called into question by Special Master Martinez, in addition to other witnesses, and which A and M had not been able to replicate.

"In short, the city has been on notice for years that its data collection and reporting is woefully insufficient, but continues to ignore its responsibility to report accurate numbers to this

Court.

"The inability to verify the city's reporting is a serious roadblock to compliance.  In addition to the recent evidentiary hearing, confusion over, and inconsistencies within the reporting have led to dozens of informal conferences, mediation sessions, and hearings throughout this litigation.

"Finally, the city flouted its reporting responsibility by failing to substantiate its reporting and failing to provide accurate, comprehensive data when requested by the Court, by Special Master Martinez, the parties, and A and M."

And on November 7th, I've issued an OSC in re contempt.

Now, playing into all this -- and I'm not sure yet -- on November 11th, believe in the *Daily Journal* I note that Judge Fischer is going through some type of proceeding in this -- in her matter.

And I haven't reached out to her.  But I'm going to take judicial notice, and I want to read that transcript.  And the reason for that is that I will refer back to a *Los Angeles Times* article, Doug Smith, April 16, 2024.  If you will pull that up.

And this is not evidence yet but we may be going through a very stringent hearing.

And I've also told you, and you as city attorney may not be aware of this, but Dean Pregerson and I have had discussions prior to your involvement, and it's on the record, concerning his having to issue an OSC in re contempt during -- for the jail issues. And now Judge Fischer is involved in some action.

And so up on the screen, if you would go to the underlying -- go right here. I'll read the entire paragraph.

While a federal judge has found that Los Angeles city officials altered evidence to support the city's defense against allegations that it illegally seized and destroyed homeless people's warning, that the city will likely face sanctions following a forensic examination, U.S. District Court Judge Dale Fischer wrote in an order that the city had not only altered, modified, or created documents relevant to the city's claim -- but this is what I've underlined. But it also failed to produce legitimately requested documents.

I sincerely hope that this is not a pattern. But I think a hearing may be needed.

And if you'd go to the next -- alleged doctoring occurred during Mayor Eric Gardy's (sic) administration, Myers said, although delays in producing documents have continued since Karen Bass became mayor.

One of the allegations here and a constant refrain and the findings by this Court previously with A and M is the

city did delay, did so willfully and obstructed.

I'm proposing that we have a hearing for a couple reasons. And then you two can discuss this out of my presence for a few moments.

First, I don't think due process has taken place, nor should you be ready on either side today.

Number two, you should have time to subpoena whoever witnesses you want, A and M to the mayor. And we'll go through the apex doctrine again if we need to.

Number three, it gives the city a chance to come into compliance.

Last warning. You can produce these documents or say that you don't have them, and then we start a new leaf.

But delay will no longer be countenanced.

And by setting this hearing for as early as next Wednesday, you'll have a very limited period of time to produce these documents that should have been available to you over the last year and a half.

It may negate that hearing. If you don't have them, say you don't have them and we can turn a new leaf. But if you've got them, then produce them.

And here's why. I could do the following. I could take LA Alliance's request and simply set another date two or three weeks from now for you to produce documents.

But after walking through this with A and M, I'm

afraid that we'll reach once again further delay.  And by setting a hearing, it will give you a definite time period to produce these or say you don't have them.  And maybe we can move forward.

But otherwise I'm suggesting a hearing as of early as next Wednesday.  And I want you to meet and confer for a moment in the back of the court.

I'm going to sit here and wait to see if you two can come up with any better idea because this hearing would involve OSC in re contempt, those specific obligations that have been alleged you haven't fulfilled, and also the delay that is apparently trying to be brought to the Court's attention.

Now, I'm going to turn this over to Ms. Myer, LA Alliance, to argue anything that the city has stated concerning the six questions or any representations.  I'll turn back to the city after that.

**MS. MITCHELL:**  Thank you, Your Honor.

The Court keeps saying it's been a year and a half.  It's actually been three and a half years that we have not had this information.

So looking at the settlement agreement, which was an order by this Court, Section 7.1 calls for the city to report the number of housing or shelter opportunities created or otherwise obtained, which I would say it has to the extent that the data can be relied upon.

But then it separately calls for the number of beds or opportunities offered.  These are two separately delineated items separated by a comma.  They cannot be combined into a single item as we have been stating over and over.

And then the number of beds or opportunities currently available would be the ones that are open and unoccupied, meaning they are by the dictionary definition of the term available.

And neither of those second two things have ever been reported, the number of beds or opportunities offered and the number of beds or opportunities currently available in the council district.  That is not reliant on LAHSA within the agreement.

Separately, the agreement states the city will work with LAHSA to include in the quarterly status updates to the extent possible, not to the extent reasonable, not to the extent we have one meeting and see what happens, but to the extent possible a number of delineated things, the number of PEH engaged, which is a separately delineated item from the number of PEH who have accepted offers of shelter or housing, which is separately delineated from the number of PEH who have rejected offers of shelter or housing, and why offers were rejected.

And then finally, the number of encampments in each district, which of course has never been reported and has been

the subject of much discussion in this court because the city has never done what it's supposed to do.

So these are separately delineated items.

And I will also state we just want this.  We just want the data, Your Honor.  We just want the city to do what it is obligated to do.  And we have been asking for this I mean frankly since this settlement agreement was entered into in May of 2022.

We raised this issue again in July of 2025.  And three months later we still don't have any progress updates on what's going on.

Multiple emails, multiple inquiries have gone ignored.  This is what we're talking about, Your Honor.  This is the delay, delay, delay.

And it does seem as if the city has shifted tactics intentionally.  A year ago it was not this.  A year ago there was at least cooperation and engagement and discussions about how to move forward on these issues.  That's not happening.

I can't even get a response to basic inquiries on these issues.  The most I have gotten, I think two days ago I was told that they met with -- the city met with LAHSA last week.  That's the most I've gotten.  I don't know anything else.  I'm not getting any interaction at all.

And so I recognize, you know, that counsel has a difficult client.  I get that.  I previously had the same

client, Your Honor.  I understand the issues that are involved, and it is complicated, it involves meetings.

But there has been a shift in tactics to lack -- complete lack of cooperation in what we have seen in the last year.

And the lack of data, the lack of information, the lack of cooperation, the delay, the non-responsiveness, the avoidance has been experienced now by myself, by A and M, by Special Master Martinez, and now by Mr. Gary; although he may be making some progress in that regard.

This is untenable.  It is three and a half years into this agreement and we're still fighting over these really basic things.

So I wholeheartedly disagree with counsel that some of these are being reported.

I agree that the number of housing or shelter opportunities created or otherwise obtained is being reported to the extent that the data is reliable.

And I recognize there are some changes that are happening.  And I would suggest that the changes that are happening in the numbers being reported are because we are now looking closely at the data because Mr. Gary has been appointed, right.

If the Court looks at the numbers -- one moment, Your Honor.  If the Court looks at the report that was filed on July

**102**

15th by the city, specifically I am looking at docket 1011-1. That's Exhibit A, reporting the quarter ending June 30th of 2025.  Just line one they reported 91 beds with 91 PEH served.

Looking at the updated report from October, docket 1072, the total PEH served has dropped to 86.  And that historically has been a total report, right, meaning the PEH served in its entirety, and now suddenly those number are changing.

Same with suddenly the units and beds are changing.

And I would suspect that's because these number are now being looked at closely and being reported probably more accurately --

**THE COURT:**  Sure.

**MS. MITCHELL:**  -- than they were before.  And I want to give the city credit for doing their due diligence in looking at them, which perhaps hasn't been done before.

**THE COURT:**  Sure.

**MS. MITCHELL:**  But the numbers have changed as a result of inquiring on the data.

I think going back to Section 7.1, Your Honor, these are separately negotiated for and delineated items which the city has always had an obligation to report.

The city is not reporting them by very definition. The city has never reported them.  And every attempt to get the city to engage on this issue has been met with delay and

EXCEPTIONAL REPORTING SERVICES, INC

obfuscation.

So for that reason we are asking for the Court, "A," to resolve this issue under Section 24, and also set an OSC re contempt for the delay and obfuscation that we have experienced.

I'm happy to answer additional questions that the Court has.

THE COURT:  I want to hear from Ms. Myer next.  And I'll say to each of you, to the extent and -- help me, counsel. To the extent your argument to the Court has been to the extent -- I want the exact wording.  You're working with LAHSA.  It's in 7.1.  Can you pull that up and just read it to me?

MR. SCOLNICK:  Oh, yes.  I think it's to the --

THE COURT:  To the extent --

MR. SCOLNICK:  -- extent possible.

THE COURT:  Yeah.  So let's find out.  Let's get some witnesses in from LAHSA and see what that extent -- it's been over the last year and a half.

And therefore if LAHSA's involved or the city's involved, then the city's at fault.  You're responsible, not LAHSA.

MS. MITCHELL:  And, Your Honor, one additional note. The items negotiated for in 7.1 of what was intended to be reported is consistent with the parties' original intent --

THE COURT:  I know.

**104**

**MS. MITCHELL:** -- entering into this agreement in 2022 of beds going up, significant outreach is happening, people are moving into these beds and off of the street.

And we maintained that from the beginning, which was consistent with the encampment reduction requirements, etcetera.

So you can see from 7.1 all of this has always been intended to tie into together. The city has shifted it to an entirety differently direction.

**THE COURT:** Okay.

**MS. MITCHELL:** Thank you.

**THE COURT:** Ms. Myer.

**MS. MYERS:** Thank you, Your Honor.

And I just want to echo the Plaintiffs' concern related to this.

And I'm a little bit shocked at Mr. Hamburger's representations about what data is being reported because it -- what the city has been reporting is quite frankly not what was requested.

I think to Ms. Mitchell's point, it's very clear that the data that should be reported under the plain language of 7.1 is about people.

And the data that's being reported primarily by the City of Los Angeles in the data reports are about the beds that were created. That makes sense given the city's obligations of

12,915 beds.

But for purposes of accountability, those beds being filled and also in terms of accountability related to capacity, Your Honor, having this additional information under 7.1 is critical.

There are a number of additional issues related to how they're interpreting the data that I just want to flag because I think it will become even more clear how the city's representation that it has presented this data is simply not accurate.

So Ms. Mitchell pointed out that the number that is being presented as the total number of people being served, that number has typically been the number of people that are being served, the total number that -- of people that have been served over time for each of those beds.

That is a very different number than the number of people who are offered shelter, who accept shelter, and who reject shelter in a single quarter, Your Honor.

The -- what was negotiated for in terms of quarterly reports is that that information would be broken down by quarter.

And I stress this, Your Honor, because the issue of people moving through these shelter beds has been an incredibly important aspect of how we think about addressing the homelessness crisis.

**106**

And so if the Court, Plaintiffs, got the benefit of the bargain here, what we would be able to see in terms of the number of people who were being offered shelter beds would be an indication of how often people are cycling through those beds, right.

So if there are 91 shelter beds and we know the number of people who were offered shelter beds, right, and then we see the number of people who were actually served by those shelter beds, we can derive more information about how that -- how those shelter beds are being used.

But the way the city is presenting it, there's no way to actually break down that data.

And I think this comes back to the significant issues here of obfuscation where data is negotiated for, data is expected, data is asked for, something different is given, and then there's a representation that the data that's given somehow can replace the data that was bargained for and requested.

So similarly the number of people engaged, Your Honor, is not the same as the number of people served. The number of people engaged is an outreach issue.

And that's been presented throughout when the city has talked about both the city and -- both the city's outreach workers. So that datapoint is very significant and very different than the number of people served.

Likewise, the number of people who have offered -- who have accepted offers of shelter and housing, I understand, Your Honor, that the city would like the number of people offered and accepted shelter to be the same as the number of people who are served by that housing.

I can appreciate from the outside why that may seem to be the same number.  But they're in fact very, very different numbers because an individual can be offered shelter and never actually move into that shelter.

And that issue is incredibly significant given Your Honor's interpretation of the encampment reduction plan which relates to offers of shelter.

So the city can take the position that every person who is offered shelter received that shelter and is served by it.  But unless the city is presenting both of those numbers, we will never know.

Likewise, the number of people who rejected offers of shelter and why those offers are rejected, I think we can all indicate are different numbers.

But it's problematic, Your Honor, that the city is suggesting that the number of people served, actually in those beds is the same as offered or accepted.

And we raise that because we are -- from the outside, as third parties, to the extent that we are third parties to this, we're increasingly concerned about the ways in which the

city's has represented that beds exist that don't actually exist.

And the point of the monitor is to dig in.  If the city doesn't acknowledge the differences in the data, then we are never going to get to the heart of those particular issues.

And, Your Honor, I have a very significant concern related to the encampment reduction plan and the city's report that I'd like to raise now because I think it's appropriate.

**THE COURT:**  Please.

**MS. MYERS:**  Your Honor, the Court and -- was very, very clear that the city could count tents, RVs, and makeshift encampments that were abandoned.  That's not what the city is counting, Your Honor.

The city is counting tents, makeshift shelters, and RVs that are unattended, Your Honor.  Those numbers are fundamentally different from every way you could possibly count.

And yet despite this Court's clear order that the city could count abandoned tents and nothing else, which Mr. Hamburger has specifically referenced twice this morning in talking about your order, despite that explicitly clear order by your -- by the Court, the city's quarterly report says it is continuing to account for tents, RVs, and makeshift encampments that are unattended.

And, Your Honor, I cannot stress more strongly the

difference between unattended and abandoned.  Abandoned means a person has given up a possessory interest in that tent and it has been discarded.

Unattended means a person simply isn't there.  And the city knows this.  The city's been subject to litigation about this particular point for decades and subject to court orders on this issue for decades, Your Honor.

And if you look at 1051.3 and the footnote that they provided, which tells us what they're counting, that they are counting unattended when removed, meaning the person was present with the personal property who asserted or claimed interest over the personal property.

They're saying that the person simply wasn't there.

And, Your Honor, I think I raise this with the strength that I am raising this because it is so directly contrary to your order and is exactly what the city was doing previously that I think we are -- quate frankly we're shocked that the city continues to engage in this kind of conduct related to its reporting, and specifically related to the encampment reduction plan.  There is simply no justification for the city counting unattended.

And, Your Honor, we would also stress that this definition of unattended means that somebody has a tent, and they come to your court to watch the court proceeding.  And they tell their neighbor, hey, neighbor, watch my tent, I'm

**110**

going to court, right.

That tent is unattended because the person isn't there to claim a possessory interest over it.

Now, if the city throws away that tent, they get to count it.  They are counting it as an encampment reduction plan.  That definition is part of Los Angeles Municipal Code 5611.  It is part of ongoing litigation in another courtroom, Your Honor.

So they know the difference between abandoned and unattended.  And so I wanted to raise that here, Your Honor, because I think that it does bring up issues, and it's specifically related to the Court's -- or to the annual -- or to the quarterly report.

I'm happy to answer any questions about either of those issues but thank you.

**THE COURT:**  The city, please.

**MR. SCOLNICK:**  Thank you, Your Honor.

We're talking about a few different things here.  I know nothing of judge -- I truly know nothing about Judge Fischer's case.  I know that there's been a history about A and M, and the court has made findings about that.

As I understand today's proceeding and the OSC, it is about working with the monitor, working with Mr. Gary and --

**THE COURT:**  Are you willing to do so?

**MR. SCOLNICK:**  Yes, we have been, Your Honor.  And

**111**

that's a fundamental misimpression.

I think I'm encouraged by Mr. Gary's statements today that he sees progress.

To be clear, I'll say it very plainly, there are no documents that anybody has asked for that we have not turned over.

Mr. Gary has asked about some fundamental structure questions and big picture questions.  I cannot snap my finger and get answers to that.  But we've timely and promptly responded.

I can tell you personally I've spent a lot of time in the last three weeks chasing down answers, trying to set up interviews.

Mr. Gary has gotten a bunch of initial information, and he's had multiple interviews now with Mr. Szabo, over an hour of his time.

He's got another one tomorrow.  He's got another one set up tomorrow, it's with a different person from the CAO's office.  We are trying our best to facilitate this.

I just reject the proposition that the strategy here is delay.  I know there's a history here, and the Court has made findings about it.

But we are trying to do everything we can short of just having the monitor, you know, go into city hall and start taking over systems to understand what he wants and to get him

**112**

what he wants.

And, again, I think we're on the right path, Your Honor, I really do.  Okay.

With respect to the 7.1 issues, again, that was not the purpose of today's proceeding.  We talked to you about how the -- our interpretation has been.  These are new issues raised that have not been raised until a brief filed on Monday.

We've had a couple years of this and nobody's ever taken issue with these things.  So we will look into them, we'll have a conversation about what's available.

With respect to the issue Ms. Myers just raised about abandonment versus the abandoned tents, my understanding is that there's notice.

At all times -- the only ones we count are the ones that there's notice posted that these will be removed.  And then there's some period of time, and I cannot represent to the Court exactly what that time is.  I can find out.

But there -- this is not just randomly someone goes to the -- a court hearing or someone goes to lunch and their tent is gone.  This is a process where there's notice posted, some period of time, and that is considered abandoned.

I think that's it unless there's something else to address, Your Honor.

Again, I just fundamentally take issue with the notion that we have been intentionally delaying the monitor's

work.  I'm acting as a lawyer for the --

THE COURT:  Counsel, I've already made those findings in a prior order.  This is a new proceeding.

MR. SCOLNICK:  Yes.

THE COURT:  But that prior order is pretty indicative to the city with specific findings about delay and obstruction quite frankly, and willfully doing so.  I hope that this is not a pattern.

But I think the proceedings next week, let's take the evidence, let's see what occurs.

MR. SCOLNICK:  Understood --

THE COURT:  Now I'm going to propose to all of you the following as you go to lunch.

I tentatively am prepared to set and begin the OSC in re contempt proceedings next Wednesday.  That will give the city time, if they choose, to come into compliance if they believe that they're out of compliance or to take the present position that they have.  Let's see what that evidence presents.  But that will give seven days.

I can slow those proceedings down if there's difficulty getting different people in here from LAHSA, etcetera.

But what I'm fearful of now after a year and a half or two years is setting another deadline with another problem or another redefinition and two or three weeks have gone by and

**114**

now we find ourselves constantly regurgitating quite frankly what should have been accomplished a long time ago.

This can be resolved cost effectively.

Mr. Gary has already donated hours to fly out here. Mr. Mejia, as the controller, is a freebee. Thank you.

The Court's done everything it can to decrease the cost to the city, although the city doesn't seem to be of the same mind.

The other concern I have is the city's representations, so you're on notice, that there have been reach-outs to LAHSA.

I'm going to be very curious about those witnesses and what they have to say when they occurred, and why when those reach-outs have occurred over this last two years, this information hasn't been disclosed. So you're on notice about that. And I want witnesses on the stand and under oath.

Now, that's going to require you to serve summons. And trust me, people will be here. I have a way of getting them here very quickly. Am I clear?

(No audible response.)

Am I clear?

**MR. SCOLNICK:** Yes, Your Honor.

**THE COURT:** Am I clear?

**MR. SCOLNICK:** We --

**MR. HAMBURGER:** Your Honor, can I inquire about --

THE COURT:  No, you can't.  Am I clear?

MR. HAMBURGER:  On that --

THE COURT:  I can get people here.

MR. HAMBURGER:  -- point, yes, you are.

THE COURT:  There's two ways to come to court: voluntarily or involuntarily.

When we start these proceedings, you have these witnesses available so we're not wasting your time and my time.

Now, we may have to slow down over Thanksgiving. We're not going to disturb people.

But I tentatively am prepared to start this proceeding because I think now it would be a benefit after hearing representations by all counsel to get a clear record of what conversations are taking place, with who.  And we may be going through the whole apex doctrine again.  I hope not.

But, all right, I'm going to take the stay up after lunch.  And I want to wish you a best of lunch.  And if it's agreeable with you, you need at least an hour, so can we reconvene at 1:30; would that be acceptable?

MS. MITCHELL:  Yes, Your Honor.

THE COURT:  Acceptable.  Thank you very much.

Then, Mr. Hamburger, if you'd like to address the Court at that time, or if you'd like to do that now, I didn't mean to cut you off but you were cutting me off.

MR. HAMBURGER:  Your Honor, I know you're -- we're

about to break, but -- and maybe we can take this up at the beginning, but I am -- just would like clarity about the subject of the evidentiary hearing that you're proposing.

THE COURT:  I will be very clear about that after lunch.

MR. HAMBURGER:  Okay.  Thank you, Your Honor.

THE COURT:  And I'm asking you to meet and confer -- in fact, I'm ordering you to meet and confer and have a discussion about this so you can set the parameters.  And maybe you can agree.  But this evidentiary hearing will be going forward, counsel.  Thank you.

MR. SCOLNICK:  Thank you.

(Court in recess at 12:26 p.m.; reconvened at 1:41 p.m.)

THE COURT:  Be seated and thank you very much for your courtesy.  And I'm going to turn on the microphone.

All right.  There's just a few other items that I want to address and then I'll turn the lectern back to any of you who wish to address the Court.

Counsel for the City represented that 7.1 obligations were not raised or were only raised for the first time today. I reference counsel to Document 674, which I've had pulled because my memory is very good about this, filed on February 29th, 2024, Special Master's first report.

Quote, the City is missing other key progress areas that must be reported to the Court and the public quarterly.

**117**

The City has yet to provide the Court with the following information:  The number of PEH who have accepted offers of shelter or housing; the number of PEH who have rejected offers of shelter or housing and why offers were rejected, the number of encampments in each council district.

Counsel, do you wish to correct?

MR. SCOLNICK:  I do, Your Honor.  I --

THE COURT:  Nice and loud now.

MR. SCOLNICK:  Sorry.  I spoke with Special Master Martinez over the break and she reminded me that that was in the record.  I misspoke.  I was referring to the filing --

THE COURT:  All right.  Thank you very much.

MR. SCOLNICK:  -- this week.  That's all I'm referring to.

THE COURT:  Now, I'm going to take the stay under submission because I want to hear more about the hearing which will commence next Wednesday.  And I wanted to then call to your attention some of the concerns you have about special master's duties.  And her monitoring that you've raised with the Court and the payment of her approximately $100 per hour.

One of your complaints was that when Special Master Martinez under her duties for the road map agreement, when monitoring different locations to try to get verification, which we're trying to get here, Alvarez & Marsal represented to the Special Master that there were allegedly a documented 88

spaces at a particular location and Special Master Martinez has those e-mails.

It was related to Alvarez & Marsal and subsequently to Special Master that half of the slots were empty and it had been empty since April. Ms. Martinez was told that half of those slots had not only been shut down in April at the order of the City and LAHSA.

But the City continued to pay full amounts for all 84 slots, so do the math, that's 5,000, $300 per slot per month, 45 extra spaces not occupied, about $238,000. Is the City's position when the Special Master notes obvious fraud and that the documents don't match, that you are bringing forth to this Court that Ms. Martinez should disregard that and not report this to the Court when you try to curtail her monitoring activities? And if so, I want to get the City Attorney in here immediately.

**MR. SCOLNICK:** That is not the City's position?

**THE COURT:** What is your position then because your e-mails disclose quite a difference? Would you like those read into the record?

Ms. Martinez, read those e-mails into the record.

And I'm going to ask you again, are you counting this as fraud?

**MR. SCOLNICK:** Understood, Your Honor.

**SPECIAL MASTER MARTINEZ:** Your Honor, do you mean the

119

(inaudible)?

THE COURT:  Yeah, I want the return e-mail where Gibson & Dunn makes the following position which I've gone back and looked at, but I'd rather have you read it into the record. And the question will be, when obvious fraud is available, is this your response on behalf of the City Attorney and the City of Los Angeles?

MR. SCOLNICK:  I'm certain it's not, but I'd like to hear the e-mail.

THE COURT:  You're going to.

SPECIAL MASTER MARTINEZ:  This is just the e-mail regarding my invoice, Your Honor, I'm kind of -- I need some clarity.  Which e-mail are you speaking of?

THE COURT:  During the recess you called to my attention the response from Gibson & Dunn and that response was the notice that the City has complained -- was -- just a moment.  The City has taken the position, quote, and I wrote this down, that the City monitor or monitors that the Special Master has no authority or basis to review or provide any assessment of the City's compliance with the City and County road map MOU.  That the City's responses to the Special Master inquiry regarding sites under the road map MOU should be viewed to waive any and all -- and if you'd just read that verbatim.

SPECIAL MASTER MARTINEZ:  I just want to clarify that for the record, that did not come from Gibson & Dunn.  You

**120**

asked me for an example of some of the duties and I read into the -- I gave you the e-mail that was provided by the City Attorney Arlene Hoang --

THE COURT: I'm sorry.

SPECIAL MASTER MARTINEZ: -- over this specific issue.

THE COURT: My apologies, counsel, this is from the City attorney. This is not your e-mail. This is from Arlene Hoang, the City Attorney. So I want you to hear this response from the city attorney when you weren't involved in the case.

MR. SCOLNICK: Understood.

THE COURT: All right. And then let's get the city attorney in here and see if this is her statement. Why don't you read that verbatim from the city attorney about your position in terms of non-monitoring and reporting these empty bed spaces.

And, counsel, be patient. This is quite an e-mail chain. It took me most of the lunch hour. So for the record, is not Gibson Dunn. But you are the City now.

MR. SCOLNICK: I'm the City's counsel, Your Honor.

THE COURT: You are City counsel now, that's right.

MR. SCOLNICK: I'm not the City counsel, the City attorney now.

THE COURT: You are City counsel, thank you.

SPECIAL MASTER MARTINEZ: I can't see with my

glasses.

THE COURT:  Take your time.

SPECIAL MASTER MARTINEZ:  I'm sorry, I'm having a difficult time with my glasses on.

THE COURT:  Because your position on behalf of Gibson Dunn is the monitor should be limited and you've complained about her efforts to verify, so we're going to have a discussion about that in just a moment, because she's operating under my direction.

MR. SCOLNICK:  Understood.  And we're talking --

THE COURT:  So this is discussions between Gibson Dunn, the City attorney, and me.

MR. SCOLNICK:  I'm happy to have that discussion, Your Honor.

THE COURT:  And she will report fraud, counsel.  But I want you to hear the response from the City.

(Pause)

SPECIAL MASTER MARTINEZ:  Here it is.  My apologies. It's actually from Jessica --

THE COURT:  No, this for the record is not Gibson Dunn --

SPECIAL MASTER MARTINEZ:  Yeah, it was on --

THE COURT:  -- so you have my apologies on the record.  This is the city attorney, but you're acting in the City Attorney's place today.  So here is the response from

**122**

Ms. Hoang on behalf of the City Attorney when this empty bed spaces are discovered about $250,000 a month.

SPECIAL MASTER MARTINEZ: Good afternoon. The City maintains --

THE COURT: No, just -- nice and slow and louder.

SPECIAL MASTER MARTINEZ: Good afternoon. The City maintains that the Special Master has no authority or basis to review or provide any assessments of the City's compliance with the City/County Road Map MOU and the City's response to the Special Master inquiries regarding sites included in the City's reporting under the City/County Road Map MOU.

THE COURT: A little bit slower please.

SPECIAL MASTER MARTINEZ: The City and County Road Map MOU should not be viewed to waive any rights held by the City, specifically the City does not intend to waive and expressly reserves all rights with respect to the scope of inquiries by the Special Master which do not pertain to the settlement agreement between the City and the plaintiffs. With that said, we are still looking into your questions about the safe -- the site, but can confirm that the hours of operations for those -- they provide hours the City currently -- I don't want to disclose the site.

THE COURT: No, don't disclose who gave you that information. We'll turn that over to some other authorities.

MR. SCOLNICK: Would you like me to respond, Your

**123**

Honor?

THE COURT: She's not going to -- no, not yet. She's not going to disclose the source.

MR. SCOLNICK: Okay.

THE COURT: That'll go to other authorities.

MR. SCOLNICK: I'm sorry, what was the question?

THE COURT: You've taken the position that my monitor is inappropriately monitoring these sites when the City is not. I'd like to hear your position on that and especially when fraud is discovered, if she's to close her eyes to this, because this is by order of the Court and it appears to me that you're trying to limit her duties, which quite frankly would be contemptuous.

MR. SCOLNICK: Understood, Your Honor. As Your Honor noted, that is not an e-mail I wrote, so I don't know what the thinking behind it was.

THE COURT: You are the City. I can wait till the City Attorney gets here. Why don't you call her.

MR. SCOLNICK: That wasn't the City Attorney who wrote that either, Your Honor.

THE COURT: Who's Arlene Hoang?

MR. SCOLNICK: It was someone who works for the City Attorney's Office.

THE COURT: Oh, okay.

MR. SCOLNICK: Okay. But, I mean, the distinction,

**124**

the City Attorney is an elected official.

THE COURT:  Well, do you want to get Arlene Hoang in here then and find out who she talked to about this?  This is an obvious limitation on the Court's authority.  This smacks directly at my authority and my special master will not be limited in terms of fraud.

UNIDENTIFIED:  Your Honor --

THE COURT:  No, counsel, I'm speaking to him now.

MR. SCOLNICK:  This is Arlene Hoang, Your Honor.

THE COURT:  Arlene?  What is this all about?  Well, welcome to the club, what is this all about, because they're trying to limit my special monitor or my special master.  She operates on my authority and it appears, and I'll put you under oath, it appears that this is a limitation and I did not include this originally in the A&M assessment, although I was tempted to because it came at the last moment.  What is all this about?

MR. SCOLNICK:  I apologize, Your Honor, this is not -- sorry, this is Jessica.  Sorry.

THE COURT:  Absolutely, this is not Arlene Hoang.

MR. SCOLNICK:  Understand.  Understand.

THE COURT:  I know who Arlene Hoang is and this is not Arlene Hoang and Arlene Hoang works for the City Attorney's office.

MR. SCOLNICK:  Correct, Your Honor.

**125**

THE COURT:  All right.  Then I have nothing to say to you.  I'll put Arlene Hoang under oath.

MS. HOANG:  Your Honor, I believe Special Master Martinez actually said the e-mail came from me.  I don't remember it in detail without seeing a copy.

THE COURT:  Well, go over and look at it.  No, go over look at it --

MS. HOANG:  Okay.  I certain can.

THE COURT:  -- because this -- no, go over and look at it.  That's an order.

MS. HOANG:  The one thing --

THE COURT:  Get up out of your seat.  That's an order.  Go over and look at it and refresh your recollection.

MS. HOANG:  Okay.

THE COURT:  Because what this involves is a continuation now of Gibson & Dunn City Attorney trying to limit my special monitor or my special master from monitoring obvious fraud.  And we're going to have a real discussion about this and my authority.  And you can go through each complaint you have, and by the way, she hasn't been paid since September and I've ordered her to prepare a report about the lateness of the City up to 83 days of non-payment.  I want to hear why.

MS. HOANG:  Your Honor, it -- the e-mail does reflect the City's position that --

THE COURT:  I'm sorry, I can't hear you.

**126**

MS. HOANG: Your Honor, the e-mail does reflect the City's position that the special master was -- her role was to look into compliance with the settlement agreement as opposed to the MOU road map agreement. That's what the first part of the e-mail pertained to.

The second part, which was not entirely read into the record did provide much of the information that was requested by the special master and it also indicated that we were looking into the issue, because of course, this is a discrepancy --

THE COURT: How have you done looking into that?

MS. HOANG: -- we do want to know about it.

THE COURT: No, just a moment. How have you done looking into this? How have you done? What have you done to look into this?

MS. HOANG: Well, I mean --

THE COURT: No, just a moment. We're looking into it. What have you done to look into this?

MS. HOANG: The issue --

THE COURT: What have you done to look into this? Do I need to repeat it?

MS. HOANG: Conferring with our client, which I --

THE COURT: Who?

MS. HOANG: -- you know, to a certain extent would be privileged and I'm concerned to be in any sense to be waiving

EXCEPTIONAL REPORTING SERVICES, INC

that.

THE COURT:  Have you taken any action concerning these $250,000 a month payments to dead slots not being used?

MS. HOANG:  Of course, that is part of the inquiry.

THE COURT:  Where -- I'll put you under oath in just a moment.  Who made the inquiry?  In other words, don't get in too deep.

MS. HOANG:  Your Honor, all I can say is that I know that we certainly take --

THE COURT:  You don't know if there's been an inquiry made, do you?

MS. HOANG:  There has been --

THE COURT:  Be very careful.  Who?

MS. HOANG:  My understanding is that there has been follow up.  I don't know the extent to which and who precisely did any inquiries.

THE COURT:  All right.  Now, let's deal with the special master.  She has devoted four years, if you don't know that, without pay until this special master position came open.  Originally Hueston Hennigan was going to be the firm that took this on at about $1,000 an hour.  The City came to this Court, if you don't know, and wanted to save costs.  So instead of Hueston Hennigan hiring Special Master Martinez at $1,000 an hour, she undertook this at $100 an hour.  She worked for free initially for four years as most of the people around me have,

and I told you before I had virtual around me from Mr. LA, Tom Lavonne (phonetic), a rapt of people out here, who out of the goodness of their heart didn't accept money.

It appears initially that you're trying to limit my special master in terms of inquiry and I want to hear now the specific complaints you have against her and her efforts and why she hasn't been paid for September and October.  And why you're constantly late as much as 87 days and now you are the City.

**MR. SCOLNICK:**  Your Honor, I -- with due respect am not the City.  I do not cut the checks.  I do not know the answer.  Special Master Martinez --

**THE COURT:**  Okay.  I have patience.  Why don't we call the city attorney then.

**MR. SCOLNICK:**  May I answer the question, Your Honor?

**THE COURT:**  Certainly.

**MR. SCOLNICK:**  Special Master Martinez e-mailed us I believe last week and said she had not been paid, that the payment was late.  I said I'd look into it.  I looked into it, I promptly got back to her and I was told that the check had been cut and it was on the way.  If it has not been received yet, that is news to me today.  I -- it -- I could ask the Special Master if she has not been paid.

**THE COURT:**  Why are you constantly late?  Why are you so much as to 87 to 83 days late in your payments?

MR. SCOLNICK:  I do not, Your Honor.

THE COURT:  Well, who do I inquire of?

MR. SCOLNICK:  You can ask me and I'll find out.

THE COURT:  Go make a call.  I'll be sitting here. In other words, I don't want to go through this again.  It was promised to me before that this was resolved when she wasn't being paid in August or whatever the date was and now we're right back around with you making a series of demands, including my conversations with her.  Those are privileged, counsel.

If you want to open them up and Mayor Bass coming in here and having her conversations, I'm happy to do with that, and I'll put Special Master Martinez with full disclosure.

MR. SCOLNICK:  I don't believe we're asking about the substance of any of your conversations.

THE COURT:  Why don't you read out what your concerns are on the record.

MR. SCOLNICK:  I believe we just asked for detail on the bills.

THE COURT:  No, no.  Ms. Martinez, would you read out their concerns?

SPECIAL MASTER MARTINEZ:  Yes.

This is not from Mr. Scolnick, it's actually from Mr. Hamburger.

THE COURT:  Okay.  Mr. Hamburger.  Are these your

concerns, Mr. Hamburger?

SPECIAL MASTER MARTINEZ:  It was on November 5th.

THE COURT:  Just a moment.  Are these your concerns?

MR. HAMBURGER:  These are the concerns of my client.

THE COURT:  But you wrote them.  And who gave you direction to write these concerns?

MR. HAMBURGER:  It was -- well, it's privileged, but my client.

THE COURT:  The Mayor?

MR. HAMBURGER:  The Mayor did not direct -- well, I don't want to get into privilege, but I did not have a discussion with the Mayor --

THE COURT:  President of the City Council?

MR. HAMBURGER:  -- about this.

I did not have a discussion with the President of the City Council.

THE COURT:  The City Attorney?

MR. HAMBURGER:  Not the City Attorney, elected city attorney, members of the City Attorney's Office.

THE COURT:  Who?  Well, let's read out the demands you're making for a moment.

SPECIAL MASTER MARTINEZ:  Do you just want --

THE COURT:  Let's get a clear record instead of all these e-mails flying back and forth.

SPECIAL MASTER MARTINEZ:  Number one, for time spent

monitoring homeless sites, please identify the sites you monitored, how much time you spent at each site and what specifically you did to monitor those sites.

Number two, for community --

THE COURT:  Just a little bit slower.  Mr. Hamburger, what's your concern here?

MR. HAMBURGER:  Our client wanted additional details.

THE COURT:  Who's your client?

MR. HAMBURGER:  The City and specifically the City Attorney's Office.

THE COURT:  Who in the City?  Yeah, big bureaucracy, who?  Who are you speaking to?

MR. HAMBURGER:  Who am I speaking to?

THE COURT:  Yes, who are you speaking to?

MR. HAMBURGER:  Primarily Valerie Flores.

THE COURT:  Okay.

MR. HAMBURGER:  At the City Attorney's Office.

THE COURT:  And how high up is she in the City Attorney's Office?

MR. HAMBURGER:  She's -- to my understanding, she's fairly high up in the City Attorney's Office.

THE COURT:  Right.  Must have talked to the City Attorney.

MR. HAMBURGER:  I don't believe I had a discussion with the City Attorney about this specific e-mail.

**132**

THE COURT: Okay. Now, do you have any future concerns about her monitoring?

MR. HAMBURGER: We don't have concerns about her monitoring, the question was the detail on her invoice, like what sites she was monitoring.

THE COURT: What are you concerned about at $100 an hour, what are you concerned about the detail on her invoice that's missing?

MR. HAMBURGER: It's exactly what's said in the e-mail.

THE COURT: What are you concerned about? You wrote this.

MR. HAMBURGER: My client was concerned about --

THE COURT: No, you, what are you concerned about, you wrote this?

MR. HAMBURGER: I -- well, my client, I represent a client in this case. We were interested we -- what -- if you look at the invoice it just says monitoring homelessness sites, homeless sites. We were interested in which sites she's going to.

THE COURT: She's not going to disclose those sites to you certainly before she goes to them. Is that understood?

MR. HAMBURGER: Yeah, we weren't talking about in advance. We were talking about it on invoices that are for the previous month. But, Your Honor.

**133**

THE COURT:  Well, we're going to go through each one of these now because this could be viewed as a limitation or an attempted limitation on the City's part.

The second request that they have, Ms. Martinez.

SPECIAL MASTER MARTINEZ:  For communications with Judge Carter or communications with Judge Carter and clerks, please identify the subject matter of the communication with Judge Carter and the nature of the communications --

THE COURT:  What would you --

SPECIAL MASTER MARTINEZ:  -- verbal, written, and et cetera.

THE COURT:  Just a moment.  What would you like to ask me?  Do you want my communication with my special master?  What are you interested in?

MR. HAMBURGER:  No, we wanted -- we're asking for details of the work performed.

THE COURT:  No, you're not, you're asking for communication.

MR. HAMBURGER:  That is what she's billing for, the City for, taxpayers, not me, the taxpayers.

THE COURT:  Well, just a moment and who's -- what's her name again?  What's -- you say my client and you say a lady.  What's the lady's name again?

MR. HAMBURGER:  Are you talking about who is in the City Attorney's Office that we talked with?

**134**

THE COURT: Yeah, who's asking about my communications, you, the City Attorney, who?

MR. HAMBURGER: This was a communication -- this e-mail was sent on behalf of the City of Los Angeles --

THE COURT: No, no, that's a big entity. Who?

MR. HAMBURGER: This was approved by the City Attorney's office.

THE COURT: So the City Attorney of Los Angeles approved this?

MR. HAMBURGER: I don't believe she approved this directly.

THE COURT: Well, indirectly?

MR. HAMBURGER: It was done with -- in consultation with attorneys that work for the City Attorney's office and I do worry about privilege and so I want to be very careful here.

THE COURT: And I worry about any act on your part that has any limitation on a direct order from this Court and my monitor and my special master. Am I clear?

MR. HAMBURGER: You're very clear, Your Honor. That was not the intent of this e-mail. The intent was to ask for further detail about work that was performed in the past.

THE COURT: That is not a communication between the special master and the Court.

MR. HAMBURGER: That is what she billed us for.

THE COURT: So she billed it for, so you just did it,

because she --

MR. HAMBURGER:  All we were asking for, Your Honor, was and just to be clear, we weren't saying she couldn't do those things.

THE COURT:  She's going to do those things.

MR. HAMBURGER:  Understood, Your Honor.  That is not what we were asking for.

THE COURT:  And she's going to report obvious fraud.  Am I clear about that?

MR. HAMBURGER:  That is a hundred percent fine, Your Honor.  We're not suggesting otherwise.

THE COURT:  And so far it appears on the road map agreement that the City took the position to not have this come forward, on the road map agreement, and I have this reported, we've got some other e-mails for you.  We spent a lot of time on this.  What's your third request, Mr. Hamburger?

MR. HAMBURGER:  We asked for -- there's communications with the data monitoring team that are being billed to the City.

THE COURT:  Say that again slowly please.

MR. HAMBURGER:  For the items in the invoice that said communications with data monitor team, we just were asking for additional details, including the subject matter of the communications and the nature of the communications.  Were they e-mails, were they phone calls --

**THE COURT:** It's interesting --

**MR. HAMBURGER:** -- were they meetings.

**THE COURT:** Mr. Hamburger, it's interesting to me that my special master told me that you went back through three years of all of her reports. And all of those reports come to the Court with my signature. I look at each of those personally. And in the last three years, what three years ago or two years ago, there was an overage paid by the City of about what $6,000?

**SPECIAL MASTER MARTINEZ:** I think it was -- yeah.

**THE COURT:** In other words, your office or somebody in the City Attorney's Office decided and I applaud it, to meticulously go through all of the records that Special Master of this Court and through the fault of the City, you actually paid her an overage of $6,000. You called that to her attention immediately. She repaid that willingly, no problem. And yet you're not wanting to undertake a forensic audit of the City. Doesn't that strike you as odd that we would monitor a special master to this degree, and have the City take the position that we're not going to take a look at the hundreds of millions of dollars being spent?

Now, I can ask that of the Mayor if I want to and I can ask that of your City Attorney. I choose not today. But I think we need to reach an accommodation very quickly about the role of my special master and she will not only monitor this,

**137**

she will report fraud immediately to this Court.

MR. HAMBURGER: We --

THE COURT: Do we have any disagreement with that?

MR. HAMBURGER: None at all, Your Honor.

THE COURT: Do you have any disagreement with that?

MR. SCOLNICK: No, not at all, Your Honor.

THE COURT: Thank you. And I presume that the City Attorney is not going to have any disagreement with reporting fraud to this Court?

MR. HAMBURGER: Of course not, Your Honor.

THE COURT: I am ordering you to continue on with your monitoring duties. Am I clear?

SPECIAL MASTER MARTINEZ: Yes, Your Honor.

THE COURT: And any interference by the City or any communication is to be directed to me? Am I clear? Not to my special master.

MR. SCOLNICK: Yes, Your Honor.

THE COURT: You will directly communicate with me if you have a complaint concerning any of her performance and I will resolve that here in court with you.

MR. SCOLNICK: And not performance, but about the invoices. Do I direct that to the Court too?

THE COURT: Absolutely.

MR. SCOLNICK: Understood.

THE COURT: Now, tell me what's wrong with her

invoices again?

MR. HAMBURGER:  Your Honor, it --

THE COURT:  Because I would love to have the same scrutiny of the City.  So whatever we lay down for the special monitor, let's lay down for the City in just a moment.

MR. HAMBURGER:  I don't know exactly what you mean by that, Your Honor, but --

THE COURT:  Well, I can be very clear.

MR. HAMBURGER:  Okay.  The e-mail was simply inquiring for entries that were -- such as monitoring homeless sites and talked generally about communications.  We were simply asking could she provide more details.

Your Honor, I understand you're not going to order that.  We withdraw the request.

THE COURT:  Okay.  Fair enough, withdrawn, understood.

MR. HAMBURGER:  And in terms of the invoices --

THE COURT:  Now pay her.

MR. HAMBURGER:  Yes.  And --

THE COURT:  Today.

MR. HAMBURGER:  I will talk with the --

THE COURT:  Today.  This has gone on long enough, you're not delaying payments any longer.  You're not waiting 83 days, you're not going to try any intimidation or anything concerning my special master.  That's a direct affront to this

**139**

Court.  You will pay her immediately.

Now, I'm going to sit here, go cut the check.

MR. HAMBURGER:  Your Honor, I'm not in charge --

THE COURT:  Go cut the check.

MR. HAMBURGER:  I can't, Your Honor.

THE COURT:  Mr. Mejia, can you cut a check?

Good.  I'm tired of waiting 83 days.  I'm tired of having people who are working at $100 an hour, have a silent message through some of your e-mails that could be perceived as intimidating.  Now, I'll stop this inquiry if you're withdrawing this.

MR. HAMBURGER:  We're withdrawing it, Your Honor.

MR. SCOLNICK:  We're withdrawing it.

THE COURT:  Okay.  That is withdrawn.  Forgiven and forgotten.  Don't do that again.

MR. HAMBURGER:  Understood, Your Honor.

THE COURT:  Understood?

MR. SCOLNICK:  Understood, Your Honor, and --

THE COURT:  Understood, yes or no?

MR. HAMBURGER:  Yes, Your Honor.

THE COURT:  All right.  Thank you very much.  Now I'll wait.  I'll come back as soon as we cut that check. We're in recess.

(Recessed at 2:10 p.m.; reconvened at 2:14 p.m.)

THE COURT:  Okay.  Then we're back in session,

counsel, and it was related to me informally, Mr. Mejia, that the checks are being cut; is that correct?  Controller Mejia, that the checks were being cut?

MR. MEJIA:  Yes.

THE COURT:  Then I don't think it's necessary to remain until 5 o'clock, without representation I think we've resolved that matter.

All right.  I'm going to be open for input, but the only input is, first of all, we will be proceeding on this contempt hearing next Wednesday.  If you have input about the way you'd like that conducted, further notice, et cetera, I'm happy to hear and entertain that.  So, counsel.

MR. SCOLNICK:  Ms. Mitchell is going to address one of these issues first.

MS. MITCHELL:  Your Honor, pursuant to the Court's recommendation we met and conferred in the back of the courtroom over lunch time --

THE COURT:  Okay.

MS. MITCHELL:  -- and I am going to be meeting with the CAO's office and LAHSA regarding the 7.1 obligations no later than Tuesday.  Because of that, I don't know that for our purpose, for the OSC Re 7.1 issues that an evidentiary hearing on that issue is required.

I think what we can do -- and I want to be clear that that issue, the 7.1 issue in the OSC Re sanctions on 7.1 is

**141**

different obviously than what the Court ordered. Those are two separate things.

THE COURT: Those are the six issues that I put up on the board.

MS. MITCHELL: Correct. And so regarding the 7.1 my suggestion is that we go forward with the meeting. I will meet with -- I know at minimum, Matt Szabo will be there and Gita O'Neill, interim CEO of LAHSA will be present as well as any individuals that are necessary to resolve the 7.1 issues. That'll happen no later than Tuesday.

So my suggestion is that I report back to the Court on that issue and that we table that part of the OSC until I'm able to meet with them and report to the Court.

THE COURT: I'm going to decline to do that and the reason for this is, this has gone on for a year and a half. Mr. Szabo can meet with you if he wants tonight. But you'll go forward on the 7.1 issues next Wednesday.

MS. MITCHELL: Okay.

THE COURT: If you resolve them, report that to me immediately and I can vacate the hearing.

MS. MITCHELL: Okay.

THE COURT: But what I'm not going to do is set this over again because I think during Thanksgiving week if these hearings start, we're not going to finish. And so I want to give you folks your Thanksgiving off with your family that

**142**

week, I don't know if you're catching a plane, you know, do no harm, if you don't have to do harm, you've got kids, et cetera, and airplanes are a little expensive these days if they're even up and flying.

So we're going to start that hearing. Now, if you represent to me the two parties, that you've resolved the 7.1, I don't need to make a further inquiry. I normally trust my counsel, okay, I --

**MS. MITCHELL:** We have not resolved it.

**THE COURT:** -- don't need to know the particulars, but I need a sign off from the City and LA Alliance that 7.1's been resolved, otherwise you go forward.

**MS. MITCHELL:** Thank you, Your Honor.

**THE COURT:** Now, there's another contempt out there though, that is this consistent delay.

**MS. MITCHELL:** Correct.

**THE COURT:** All right. Going forward, counsel --

**MS. MITCHELL:** Thank you, Your Honor.

**THE COURT:** -- thank you very much. Now, what time would you like, 9 o'clock?

**MR. SCOLNICK:** For the --

**THE COURT:** And get your subpoenas out there. These subpoenas will be argued and now you're on the Court's time. I'm done waiting for politicians frankly. And I'm done waiting for LAHSA. When you schedule these people, have them here.

**143**

MR. SCOLNICK: This is the monitor issue, Your Honor?

THE COURT: No.

MR. SCOLNICK: What are we talking about, I'm sorry?

THE COURT: This is OSC and Re contempt concerning delay and obstruction, counsel.

MR. SCOLNICK: Delay as to what though, Your Honor? I believe we're talking about the issues that the special master and the monitor filed in their reports. That was the basis I understood. Is there more than that?

THE COURT: No, counsel.

MR. SCOLNICK: Okay. That's what I'd like clarity on, Your Honor.

THE COURT: All right. Thank you very much.

MR. SCOLNICK: Sure.

THE COURT: It's self-evident. This is what the Court has been talking about consistently with we can reach an agreement, we were previously cooperating before you entered this case frankly, I thought we were making headway, the City has now taken a different position and what we're not going to have now is agreements reached, I want a full hearing of these contacts with LAHSA, who we're talking to, your inability to make communication, and by you, I mean the City over two years, all this has been delayed.

So conduct yourselves as you want. I think our notice is rather clear. I don't think I need to define it and

**144**

I'm not going to keep redefining it, so.  Now, is there anything further?  That way, if you resolve it by the way, I'll call off the hearing, I'll trust you.

MR. HAMBURGER:  Your Honor, can I just ask for clarity for the record?

THE COURT:  No, you can't, counsel, thank you very much.  You can put that in writing and I'll give you clarity in writing from now on.

MR. HAMBURGER:  Thank you.

MR. SCOLNICK:  Thank you.

THE COURT:  All right.  But do that tonight --

MR. SCOLNICK:  Yes.

THE COURT:  -- and I'll be back to you probably tonight.

MR. SCOLNICK:  Thank you.

THE COURT:  All right.  Ms. Mitchell.

MS. MITCHELL:  No, Your Honor, we would like the ex parte Re resolved today if possible.

THE COURT:  I'm not going to do that, I need more information.  I haven't decided that issue in terms of the merits yet.  A lot of this has to do with attorney's fees, if I find willfulness here, then I might be finding willfulness over on the contempt side.  It's too early.

On the stay, I want to keep an open mind about this contempt.  There's certain things that have caused me great

concern, but I want to hear evidence, and I want to hear witnesses under oath.

MS. MITCHELL: Thank you, Your Honor.

THE COURT: And that includes now politicians potentially.

Okay. Counsel, anything further on behalf of intervenors?

Counsel, Mr. Hamburger, you look stunned.

MR. HAMBURGER: Yeah. I want to be clear, we filed an ex parte application to stay your order appointing the monitor pending our appeal of that order.

THE COURT: That's right.

MR. HAMBURGER: And that has been fully briefed now.

THE COURT: That's right. I'm delaying that.

MR. HAMBURGER: You're delaying that. So you're --

THE COURT: Yes, I am.

MR. HAMBURGER: -- not issuing a stay?

THE COURT: I'm not issuing a stay at this present time, no, I'm waiting to see more evidence about whether a stay is necessary or not. I want more information and that'll come out partially during the hearing.

Any further questions?

All right. Thank you very much, we're in recess. 9 o'clock nest Wednesday.

**(Proceedings concluded at 2:21 p.m.)**

146

## CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    November 13, 2025

         **Signed**                                          **Dated**


*TONI HUDSON, TRANSCRIBER*