UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) CASE NO: 2:20-cv-02291-DOC-KESx |
| | ) |
| | ) CIVIL |
| Plaintiffs, | ) |
| | ) Los Angeles, California |
| vs. | ) |
| | ) Wednesday, November 19, 2025 |
| CITY OF LOS ANGELES, ET AL., | ) (10:11 a.m. to 11:28 a.m.) |
| | ) (12:49 p.m. to  1:56 p.m.) |
| Defendants. | ) ( 2:19 p.m. to  3:56 p.m.) |
| | ) ( 4:19 p.m. to  5:02 p.m.) |

HEARING RE:

STATUS CONFERENCE RE QUARTERLY REPORT [DKT.NO.1061];

ORDER TO SHOW CAUSE RE CONTEMPT CITY OF LOS ANGELES
[DKT.NO.1066];

APPLICATION TO STAY [DKT.NO.1054]


BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE


**APPEARANCES:**            SEE PAGE 2


Courtroom Deputy:        Karlen Dubon

Court Reporter:          Recorded; CourtSmart

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988


**Proceedings recorded by electronic sound recording;
transcript produced by transcription service.**

2

<u>APPEARANCES</u>:


For Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                         MATTHEW UMHOFER, ESQ.
                         Umhofer Mitchell & King
                         767 S. Alameda Street, Suite 270
                         Los Angeles, CA 90021
                         213-394-7979

For Defendants:          JENNIFER M. HASHMALL, ESQ.
                         LAUREN M. BRODY, ESQ.
                         Miller Barondess, LLP
                         1999 Avenue of the Stars, Suite 1000
                         Los Angeles, CA 90067
                         310-552-4400

                         THEANO EVANGELIS KAPUR, ESQ.
                         POONAM KUMAR, ESQ.
                         MARCELLUS A. MCRAE, ESQ.
                         KAHN A. SCOLNICK, ESQ.
                         Gibson Dunn & Crutcher
                         333 South Grand Avenue
                         Los Angeles, CA 90071
                         213-299-7000

For Intervenor:          SHAYLA R. MYERS, ESQ.
                         Legal Aid Foundation of LA
                         7000 S. Broadway
                         Los Angeles, CA 90003
                         213-640-3983

Special Master:          MICHELLE MARTINEZ

1                              INDEX

2   MODE                                              PAGE

3   OPENING STATEMENT

4   BY MS. EVANGELIS KAPUR                              14

5   BY MS. MITCHELL                                     33

6   BY MS. MYERS                                        43

7

8   PLAINTIFFS' WITNESSES      DIRECT    CROSS     REDIRECT   RECROSS

9   PAUL WEBSTER

10    BY MS. MITCHELL          50

11    BY MS. MYERS                       101

12    BY MS. KUMAR                       110

13

14  MERCEDES MARQUEZ

15    BY MR. UMHOFER          139/176              192

16    BY MS. KUMAR                       185

17

18

19

20

21

22

23

24

25

**4**

1        <u>Los Angeles, CA; Wednesday, November 19, 2025; 10:11 a.m.</u>

2                        **(Call to Order)**

3            **THE COURT:**  Call the matter of L.A. Alliance for

4    Human Rights, et al. v. City of Los Angeles, case 20-02291.

5        **(Discussion on another matter)**

6            **MS. MITCHELL:**  Your Honor, while we are getting set

7    up, there is one housekeeping matter that we can address with

8    the Court.

9            **THE CLERK:**  We haven't made appearances, so if

10   everyone can say their names when they speak.

11           **MS. MITCHELL:**  Sure.

12           **THE COURT:**  Tell me when we're on the record.  We're

13   on the record?  All right, thank you.  Counsel, we're on the

14   record.  And once again, we'll call LACV, 20-2291, LA Alliance

15   for Human Rights v. City of Los Angeles.  And your appearances,

16   please.

17           **MS. MITCHELL:**  Thank you, Your Honor.  Elizabeth

18   Mitchell from Umhofer, Mitchell & King on behalf of Plaintiff

19   LA Alliance for Human Rights.  With me is also Matthew Umhofer

20   and Paul Webster, Executive Director of LA Alliance.

21           **THE COURT:**  On behalf of the City, please.

22           **MS. EVANGELIS KAPUR:**  Good morning, Your

23   Honor.  Theano Evangelis, on behalf of the City.

24           **MS. KUMAR:**  Good morning, Your Honor.  Poonam Kumar

25   on behalf of the City.

1          **MR. MCRAE:**  Good morning, Your Honor.  Marcellus

2    McRae, appearing on the behalf of the City.

3          **MR. SCOLNICK:**  And good morning, Your Honor, Kahn

4    Scolnick, on behalf of the City.

5          **MS. HASHMALL:**  Good morning, Your Honor.  Mira

6    Hashmall, for the County of Los Angeles.

7          **MS. BRODY:**  This is Lauren Brody for the County.

8          **MS. MYERS:**  Good morning, Your Honor.  Shayla Myers

9    on behalf of the intervenors.

10         **THE COURT:**  All right, we started with the request

11   for a housekeeping matter.

12         **MS. MITCHELL:**  Yes, Your Honor.  The parties have

13   filed a joint scheduling request.  Interveners have a conflict.

14   They have a trial tomorrow.

15         **THE COURT:**  We'll get to that in a moment, counsel.

16   Thank you very much.

17         **MS. MITCHELL:**  Well, one -- I'm sorry, Your Honor.

18   One of the issues is we have witnesses available by Zoom and

19   there is a limited period of time.  So if the Court is

20   considering the Zoom testimony, then I need to be able to send

21   her the link because I think she's going to be our first

22   witness.

23         **THE COURT:**  Counsel, thank you very much.

24         **MS. MITCHELL:**  Thank you, Your Honor.

25         **MR. MCRAE:**  Your Honor, may I approach just to get

6

1    things set up from an exhibit --

2         **THE COURT:**  Certainly.  Tell me when I can get

3    started.  All right.

4         The Court's going to begin.  The City has long shown

5    a pattern of defiance of settlement agreement and the deadlines

6    contained within it with performance or performative compliance

7    only resulting in the wake of court hearings.  The plaintiffs

8    and the City effectuated their settlement agreement on May 19th

9    of 2022 and after several months of delay by the Los Angeles

10   Homeless Services Authority, LAHSA, the City calculated the

11   required number, that is the total number of beds it must

12   provide under the agreement based on the point in time count on

13   October 6th, 2022, and it provided it to plaintiffs.

14        After another month of delay on November 11th, 2022,

15   the City emailed plaintiffs its proposed plans, milestones, and

16   deadlines for beds, quote, creation of shelter and housing

17   solutions under Section 5.2(i) and 5.2(iii), settlement

18   agreement at page eight.  But the City provided no plans,

19   milestones, and deadlines for encampments, engagement,

20   cleaning, and reduction of encampments in each council district

21   or citywide pursuant to 5.2, and I'll say two or (ii), and

22   5.2(iv).

23        This was the City's first instance of noncompliance

24   amongst many more to come regarding Section 5.2.  Plaintiffs

25   waited to bring this delay to the Court's attention until after

1   January 17th of 2023, a hearing on the county settlement at

2   which the new mayor would appear and discuss their new plans.

3   But the City did not update its encampment milestones and

4   deadlines after the January 17th hearing.  After several

5   delays, plaintiffs met with the City represented by Scott

6   Marcus, David Michaelson, and Mercedes Marquez, along with

7   Alliance representatives Daniel Conway and Paul Webster on

8   March 8th and again on March 15th, 2023, to discuss the City's

9   noncompliance with the agreement.

10          On March 15th, 2023, the City, through then Chief

11  Housing and Homeless Officer Mercedes Marquez, claimed that the

12  City had significant plans designed to produce compliance with

13  Sections 5.2(ii) and (iv).  Specifically, Marquez assured

14  plaintiffs that the City had already put out an RFQ, request

15  for quote or request for qualification for service outreach

16  providers, would be fully staffed with an assigned service

17  outreach provider for each district by July 1st, 2023, and

18  would have each district fully assessed, which was described as

19  identifying the numbers of unsheltered PEH, plus a description

20  of the needs of various groups, including an estimate of the

21  number of individuals with serious mental illness and substance

22  abuse disorder in each district.

23          By September 30th, 2023, Ms. Marquez proposed that

24  once that effort was complete, the City would provide the

25  Alliance's proposed encampment milestones and deadlines by

1    October 1st, 2023.  Plaintiffs agreed to the extension

2    regarding the City's need to provide encampment deadlines by

3    October 1st, 2023.  The City missed that deadline as well.

4           Two days later, or after October 1st, the City

5    emailed plaintiffs, its encampment engagement, cleaning and

6    resolution proposal that contained no proposed deadlines or

7    milestones at all.  With the City in clear violation of the

8    agreement and its subsequent, Daniel Conway, Paul Webster, and

9    plaintiffs met with, once again, the City, represented by Scott

10   Marcus, David Michaelson, and Mercedes Marquez about the City's

11   violation of the agreement.

12          Ms. Marquez admitted that the City never hired

13   preferred service outreach providers for encampment reduction

14   in each district, had not had each district assessed, and had

15   done nothing towards these commitments.  This was the third

16   instance of the City refusing to comply with Section 5.2(ii)

17   and (iv).  On November 29th, 2023, the City submitted an

18   updated encampment engagement, cleaning and reduction plan to

19   the court and counsel.  Once again, it did not comply with

20   Section 5.2.  The City proposed to resolve at least two tent

21   and makeshift shelter encampments and at least three RV

22   encampments involving at least 100 individuals per month for

23   the first six months of 2024 and thereafter aim to increase to

24   three tent and makeshift shelter encampments and four

25   RV encampments involving at least 150 individuals per month for

1   the second half of 2024.

2           There were two major problems with this proposal.

3   First, it was facially noncompliant with Section 5.2 because it

4   ignored the requirement that the City propose milestones and

5   deadlines for encampment reduction in each district.  You'll

6   see that at settlement agreement, page 8.  This marked the

7   fourth instance of the City refusing to comply with Section

8   5.2(ii).  Second, at a rate of 1,800 individuals citywide per

9   year, the plan would not meaningfully reduce the numbers of the

10  32,680 unsheltered persons experiencing homeless in Los

11  Angeles.

12          Still unable to move the City into compliance, the

13  Alliance again requested that the Court resolve the

14  matter.  The Court set a hearing date for resolution of this

15  dispute for December 14th, 2023.  As the hearing approached,

16  the City made a series of proposals involving commitments to

17  generate 9,782 resolutions, two encampment tents, makeshift

18  shelters, RVs, vans, and cars over a five-year period,

19  including the entire agreement.  The City committed to

20  submitting the new numbers in writing to the Court and

21  plaintiff by the end of the month.  The City did not, however,

22  comply with Section 5.2(ii)'s requirement of established

23  district-by-district encampment milestones.

24          On December 29th, 2023, the City unilaterally

25  increased its proposed encampment reduction commitment to a

1  minimum of 12,000 tents, makeshift shelters, cars, vans, and

2  RVs for the term of the settlement agreement, an increase from

3  the previously agreed to 9,782 resolutions.  The City imposed

4  no conditions on this 12,000 encampment reduction number.  It

5  did not condition the 12,000 on anything from the plaintiffs.

6  It did not suggest that the 12,000 was contingent upon the

7  plaintiffs giving up the district-by-district demands of

8  Section 5.2(ii).

9          Still, the City did not thereafter provide district-

10  by-district encampment reduction numbers as required by Section

11  5.2(ii).  This was the fifth instance of the City's failure to

12  comply.  On January 4th, the Alliance represented by Paul

13  Webster, Matthew Umhofer, Elizabeth Mitchell met with the City

14  represented by Mayor Bass, Chief Housing and Homeless Officer

15  Lourdes Castro Ramirez, Chief Administrative Officer Matthew

16  Szabo, Counsel to the Mayor David Michaelson, and Chief

17  Assistant City Attorney Scott Marcus.  At this meeting, the

18  parties discussed mutual goals and the Mayor and staff

19  explained their focus on citywide efforts.  No council member

20  was present.

21          During that meeting, the City withdrew its

22  unconditional commitment to 12,000 encampment reductions and

23  suggested that the 12,000 number was conditioned on an Alliance

24  agreement to abandon the district-by-district requirements of

25  Section 5.2(ii).  The City then declared that if the Alliance

1    insisted on district-by-district numbers as required by Section

2    5.2(ii), the City would only commit to 5,300 encampment

3    resolutions.  The Alliance explained, as it had for the entire

4    prior year, that the district-specific numbers were required

5    under the settlement agreement and were necessary for

6    accountability.  No agreement was reached at this meeting.

7           Two days later, on January 6th of 2024, the City,

8    David Michaelson, emailed counsel for the Alliance stating for

9    the first time, quote, the City will update the encampment

10   reduction goal to 9,800 and provide district-by-district

11   milestones, end of quote.  The City then provided for the first

12   time and 14 months after it was required to, proposed

13   milestones and deadlines for each district throughout the City.

14          The Alliance began assessing these new district-by-

15   district numbers and learned that they were not the product of

16   any consultation with the City council members who represent

17   those districts.  So these were therefore not real district-by-

18   district numbers that reflected the needs and agreement of each

19   district representative in the City.  This was the sixth

20   violation of Section 5.2(ii).

21          On March 8th, 2024, the Court held a hearing during

22   which Mr. Marcus stipulated to the facts regarding the

23   representations by Ms. Marcus to the plaintiffs.  At that

24   hearing, the Court put the City on notice that it believed it

25   was misleading the plaintiffs and constituted bad faith.  This

12

1    Court specifically commented at the time, quote, I've reached

2    the decision that plaintiffs were misled.  This is bad faith on

3    the March 8th, 2024 hearing.

4              So here we are.  Today's scheduled for evidentiary

5    hearing in the OSC in re contempt.  Now, counsel, you've said

6    that you have folks by video.  I would prefer to hear live

7    testimony concerning demeanor, et cetera.  I make the value

8    judgments concerning credibility.  There's been numerous

9    requests for different witnesses not being available until

10   December 2nd or 3rd or 4th.  So obviously, the hearing is going

11   to go over.  Who do we have today who can take the witness

12   stand and testify under oath in court?

13             **MS. MITCHELL:**  Thank you, Your Honor.  There are four

14   witnesses who are present live who can testify today.

15             **THE COURT:**  All right.  Let's get started.  Call your

16   first witness, please.

17             **MS. MITCHELL:**  Your Honor, can I ask some

18   clarification about the witnesses that are available via Zoom?

19   Is the court not inclined to hear virtual testimony?

20             **THE COURT:**  I'm not inclined to hear virtual

21   testimony.

22             **MS. MITCHELL:**  Thank you, Your Honor.  So because the

23   parties filed a request due to scheduling issues involving

24   intervenor's trial, it would be then my request that we get

25   through all the live testimony we can today and then resume on

13

1    December 1st when the remaining witnesses can be available to

2    testify live.

3             THE COURT:  I have so many commitments on your part

4    that I don't wish to disturb.  First, I think Ms. Myers has a

5    court proceeding tomorrow.  On Thursday, obviously, you'll be

6    at that proceeding.

7             MS. MYERS:  Thank you, Your Honor.

8             THE COURT:  You're only available Friday

9    morning.  I'm not sure what counsel's schedule is, and I really

10   don't want to hold you if you've got family and friends and get

11   over the Thanksgiving recess.  My clerks told me you almost had

12   a heart attack when I said next Tuesday, you won't be in

13   session next Tuesday.  Okay?  So plan your family.

14            Now, I'm going to get started.  Call your first

15   witness.

16            MS. MITCHELL:  Thank you, Your Honor.  I think there

17   was some request for opening statement.  Would you like to be

18   heard?

19            MS. EVANGELIS KAPUR:  Yes.

20            MS. MITCHELL:  Go ahead.

21            MS. EVANGELIS KAPUR:  Thank you, Your Honor.  Theane

22   Evangelis on behalf of the City.  Your Honor, I believe Your

23   Honor was reading from something.  I don't have a copy of it,

24   and I just wanted to --

25            THE COURT:  You'll have a transcript of it, counsel.

14

1    Thank you.

2           **MS. EVANGELIS KAPUR:**  Thank you.  What was that that

3    Your Honor was reading?  Was that the Court's findings?  Or I

4    just want to understand.

5           **THE COURT:**  Counsel, thank you very much.  What's

6    your next request, please?

7           **MS. EVANGELIS KAPUR:**  Thank you.  May I address the

8    Court?  May I address the Court?

9           **THE COURT:**  Please.

10          **MS. EVANGELIS KAPUR:**  Thank you.  Good morning, Your

11   Honor.  Theane Evangelis, again, on behalf of the City of Los

12   Angeles.

13          So I'd like to start, Your Honor, with the single

14   most important fact about this case, and that is that the City

15   of Los Angeles has made enormous strides in creating thousands

16   of housing solutions since the settlement, bringing thousands

17   of people in off the streets.  Homelessness is declining in Los

18   Angeles, and it's thanks to the hard work of so many in the

19   City.  And the City isn't done yet.  It's working tirelessly to

20   help unhouse people throughout the City.  It's opening new

21   permanent and interim housing solutions and working with a wide

22   array of public and private entities to connect people with the

23   services they need.

24          But this hearing, Your Honor, isn't about the City's

25   efforts to combat homelessness.  It's about the City's

1    reporting of those efforts.  The Alliance wants this Court to

2    hold the City in contempt, not because it has failed to create

3    the housing it has promised, but instead over the supposed

4    inadequacy of its reports.  But the evidence will show, Your

5    Honor, that the City's conduct is worlds away from the sort of

6    bad faith conduct that might support a finding of contempt.

7            But before I get into the facts, I have to start with

8    the law, Your Honor, and it's specifically with the very high

9    legal standard that the Alliance has to satisfy here for the

10   Court to hold the City in contempt.  Sanctions for civil

11   contempt may be imposed only if clear and convincing evidence

12   shows a litigant willfully violated a specific and definite

13   court order.  The City will demonstrate that there is no

14   evidence, much less clear and convincing evidence, that would

15   meet that high bar.  And as the Ninth Circuit made clear in

16   Dual-deck, the Alliance bears the burden of proof at this

17   hearing because it is the party alleging civil contempt, and

18   that burden remains the same even after the Court's show cause

19   order.

20           Now for the facts.  Again, what's at issue here today

21   isn't what the City is doing to create beds for those

22   experiencing homelessness, and it's making enormous strides in

23   that regard.  It's about whether the City is doing enough to

24   report on those efforts, specifically under Section 7.1 of the

25   parties' settlement agreement.  The City's reporting is not

16

1  sanctionable by any measure, and for three reasons in

2  particular.

3          First, the reporting substantially complies with the

4  terms of the agreement.  Every quarter, Your Honor, the City is

5  reporting in great detail the number of beds available and the

6  number of people served in over 200 locations, along with an

7  explanation of how each new location came online and which

8  council district the beds are in.  The Alliance doesn't like

9  the way the City has been conveying that information, but the

10 evidence will show that all the necessary substance is right in

11 there.

12         And in fact, this is critical, Your Honor.  I want to

13 pause here for a minute because the special master's report

14 from February 2024 agreed that the City was reporting the

15 number of housing or shelter opportunities created, the number

16 of beds or opportunities offered, and the number of beds or

17 opportunities currently available in each council district.  In

18 other words, Your Honor, the special master's report agreed

19 that the City was satisfying the first three reporting

20 obligations under Section 7.1.

21         And now, more than a year and a half later, the

22 Alliance is taking issue with that conclusion.  But they didn't

23 even raise this objection until the summer.

24         Second, Section 7.1, like lots of this agreement,

25 isn't a model of clarity, which makes the prospect of contempt

1  sanctions completely inappropriate here.  The provision

2  contains a number of terms that the parties evidently

3  understand differently now.  What constitutes an offer?  What

4  about an available bed?  What does it mean to report certain

5  metrics to the extent possible?

6          The City's reading of each of these terms, which I

7  will go through, does not and cannot reflect bad faith.  And

8  despite any ambiguity, the City is actively working with the

9  alliance, with interveners, with the special master, and LAHSA,

10  to settle on a common understanding that will inform future

11  reporting.

12          Third, although it's true that the City hasn't

13  reported every item listed in Section 7.1, that's because the

14  agreement specifies that, quote, the City will work with LAHSA

15  to include some of those items, quote, to the extent possible.

16  That is critical.  And it's those items that have not been

17  included in the reports.  And that's something the agreement

18  itself contemplated might happen.

19          So the Alliance has claimed that the City made zero

20  effort until recently to work with LAHSA on 7.1 reporting.  But

21  the evidence today will show the opposite.  The City contacted

22  LAHSA about 7.1 starting in 2023, and it has had multiple

23  conversations with LAHSA representatives since then.  The

24  Alliance's speculation is wrong.  And that's all it is, pure

25  speculation.  And the evidence will show that it's not the

 1    truth.

 2             Nonetheless, the City has remained willing to work

 3    with them and with the other stakeholders in this case to

 4    explore the ways that we can improve on the already robust

 5    reporting.  And the City is pleased to report, Your Honor, that

 6    on Monday, just two days ago, it had a very productive dialogue

 7    with LAHSA, the Alliance, the intervenors, Special Master

 8    Martinez, and we're working together on a path forward.  But

 9    the bottom line here is that the City has made significant

10    progress in the fight against homelessness.

11             It has been backing those efforts up also with

12    extensive and incredibly detailed reports.  What's more, it's

13    made consistent efforts to work with LAHSA to expand that

14    reporting.  And it's now clear that those efforts will lead to

15    further enhancements in LAHSA's reporting capability.  The City

16    has been operating in good faith, and its conduct comes nowhere

17    close to clearing the extremely high bar necessary for

18    contempt.

19             But before I walk through the evidence, I would like

20    to register the City's objections to the timing and what I

21    understand to be the scope of this hearing, Your Honor.  So

22    this is an unexpected hearing.  It was scheduled a week

23    ago.  The City respectfully submits that the important and

24    complicated issues in this contempt proceeding are ill-suited

25    to a snap trial.  But the City has done its very best to

19

1   prepare on short notice.  And as for the scope of the hearing,

2   Your Honor, the City renews the objections that it set forth in

3   writing yesterday.

4           This hearing should cover only Section 7.1 of the

5   settlement agreement.  There is no reason to revisit the

6   stipulated facts from March 2024.  Those issues, Your Honor,

7   have already been adjudicated, nor should this hearing address

8   any claim of alleged delay in cooperating with Mr. Gary.  The

9   order appointing Mr. Gary as a monitor, of course, has been

10  stayed by the Ninth Circuit.  And as the Supreme Court held

11  earlier this year in DHS v. DVD, no court may hold a party in

12  contempt for violating an order that has been stayed by a

13  higher court.

14          So turning to Section 7.1, what's the yardstick for

15  measuring the City's compliance and reporting under Section

16  7.1?  Well, civil contempt requires, and I'm going to quote

17  from the Ninth Circuit's decision in Dual-deck here,

18  disobedience to a specific and definite court order by failure

19  to take all reasonable steps within the party's power to

20  comply.  Those are the words of the Ninth Circuit.  So what

21  does that mean?

22          It means a party is not in contempt if its action is,

23  quote, based on a good faith and reasonable interpretation of

24  the court's order.  A party is also not in contempt if it

25  substantially complied with an order.  So to make a finding of

1    contempt here today, Your Honor, the Court must determine by

2    clear and convincing evidence that the City violated a court

3    order, did not achieve even substantial compliance with Section

4    7.1, did not act based on a good faith and reasonable

5    interpretation of that order.  But, Your Honor, the evidence

6    today will show that the City has substantially complied with

7    Section 7.1.

8          It has acted in good faith and pursuant to a

9    reasonable interpretation of that provision.  So there's no

10   basis to hold the City in contempt for any violations, nor is

11   there any reason to hold the City in contempt to secure

12   compliance with a different interpretation of Section 7.1.

13         So, as I mentioned, just two days ago, the parties

14   all met with the Special Master and with LAHSA.  We discussed

15   Section 7.1 and what the Alliance wants, what data it's asking

16   for.  That meeting confirmed, Your Honor, that there are

17   multiple ways to read 7.1 in good faith, and it set the stage

18   for significant further reporting, based on the provision of

19   additional data from LAHSA, which we are looking forward to.

20         But because the City has been operating in good

21   faith, and because steps are being taken to achieve enhanced

22   reporting, there's no cause for sanctions now.  So Section 7.1

23   requires the quarterly reporting of seven figures, four of

24   which require the City to work with LAHSA to report certain

25   data to the extent possible.  Again, to the extent possible.

1              The evidence will show that the City is satisfying

2    that obligation.  At the very least, it's been operating in

3    good faith.  We can tell that, Your Honor, because the Alliance

4    never raised any objection, not until just a few months ago,

5    and the Alliance conceded during a meet and confer discussion

6    in August that it hasn't raised the Section 7.1 issue until

7    now.

8              And again this is critical that the initial special

9    master report from February 2024 stated clearly that the City

10   was complying with the first three obligations of Section 7.1,

11   and we went through those: the number of housing opportunities

12   created, the number of beds offered, and the number of beds

13   available in each council district.

14             he special master agreed, found no problem with the

15   City's reports.  So there's no pattern of non-compliance

16   here.  In fact, it's the opposite.  And at most, we're only

17   talking about very recent conversations between the Alliance

18   and the City regarding what the Alliance wants, what more the

19   City can do, and the City is working on enhancing the

20   reporting.

21             And starting with the three things listed in Section

22   7.1, the first three that I just mentioned, again that the

23   special master agreed we were complying with.  The agreement

24   calls for reporting of the number of housing or shelter

25   opportunities created or otherwise obtained.  Now everyone

1    agrees that the City has satisfied this requirement.  And Your

2    Honor, that is the most critical part of Section 7.1.  We know

3    that because the entire purpose of this settlement agreement is

4    to substantially increase the number of housing and shelter

5    opportunities in the City of Los Angeles.  That's what this is

6    all about.

7              And the City has faithfully reported on its progress

8    in this area. And the quarterly status report that covered the

9    period ending in September of this year indicated, Your Honor,

10   that more than 8,400 people experiencing homelessness have been

11   served.  That is great news.  The City has created

12   approximately 8,000 beds that remain in service.  That's also

13   great news.  And there are more than 5,000 beds in progress.

14   And when those beds come online, Your Honor, the City will

15   surpass the agreement's requirement of creating 12,915 beds by

16   June 2027 and that is terrific.  That is the core of the

17   settlement agreement.

18             The second item listed in Section 7.1 is the number

19   of beds or opportunities currently available in each council

20   district.  Now the evidence today will show that the City is

21   also in compliance with this obligation.  The status report

22   lists the council district where each shelter is located, along

23   with the number of beds and the number of people experiencing

24   homelessness served there.  So that is satisfied.

25             Third, Section 7.1 calls for reporting the number of

23

 1   beds or opportunities offered.  The City has always read that

 2   word to mean the number of open beds the City has created.  In

 3   other words, the number of beds on offer.  And remember, the

 4   special master agreed with our report.  This is a reasonable

 5   construction of the term.  It's one that we all use in everyday

 6   life.  When I go to a restaurant, they may offer three lunch

 7   specials.  It's the same idea.

 8           So again, we understood the special master in her

 9   report to have found this to be consistent with our

10   obligations.  So the Alliance is arguing that the word offered

11   should be read to mean the number of beds that were

12   specifically offered to particular people.  But LAHSA has

13   explained that it has no way of counting the number of offers

14   specifically extended to specific people experiencing

15   homelessness, and it would need to build new information

16   systems to track that information.  It doesn't exist.

17           So at most, the settlement agreement is ambiguous on

18   this point, if you credit the Alliance's interpretation at all,

19   which we think is wrong, but the City acted in good faith under

20   a reasonable understanding of the word offered.  It reported

21   what it could.  The number of people served, which, your

22   conservative proxy, for the number of offers made to people,

23   because obviously, if a person has been served, then it was

24   only in response to an offer that they expected -- accepted,

25   excuse me.  So the City has chosen the most verifiable way of

1    reporting offers.  And the true number, of course, has to be

2    higher.

3            We know that not all offers are accepted, but the

4    figures provided by the City provide an indisputable lower

5    bound for that number.  So providing a conservative number on

6    the number of offers, Your Honor, which the initial special

7    master's report didn't question, can't reflect bad faith.

8            So let's talk about working with LAHSA.  Section 7.1

9    provides that the City will work with LAHSA to include in the

10   quarterly status updates, to the extent possible, four more

11   figures.  So what does that mean?  Work with LAHSA to the

12   extent possible.  These are clear acknowledgments, Your Honor,

13   that it may not be possible for the City to produce these

14   figures on its own and that makes sense.

15           The evidence will show that the City isn't the

16   repository of detailed records of interactions with people

17   experiencing homelessness.  LAHSA is.  LAHSA and the City are

18   distinct entities, as we've all discussed many times.  And the

19   City doesn't control LAHSA.  But the evidence will show that

20   the City did ask LAHSA what it could report more than two years

21   ago.  The evidence will also show that conversations about what

22   LAHSA reported continued over the next two years.  In other

23   words, the Alliance is totally wrong when it asserts that the

24   City didn't even talk to LAHSA about these issues until

25   recently.

1           The facts don't come close to supporting a finding of

2    contempt.  The City isn't LAHSA.  And if the Court believes

3    that there are shortcomings in the data that LAHSA is

4    collecting and reporting, the City can't legally be held in

5    contempt for those shortcomings by a third party.  That's black

6    letter law.

7           The question isn't whether the City could, in some

8    abstract, theoretical world, in an alternate universe, create

9    and fund a completely new system to report new data.  Just

10   about anything is theoretically possible in an alternate

11   universe.  But the City can't be held in contempt for not

12   pushing the limits in that regard, regardless of cost or

13   technical difficulty.  If it could, then the limitation in the

14   agreement, to the extent possible, would be illusory.  But, of

15   course, it's in there for a reason.

16          So, at the very least, the phrase, to the extent

17   possible, might be ambiguous and it doesn't support the kind of

18   clear and definite obligation that could serve as a sound

19   predicate for contempt sanctions.

20          So I'd like to turn to what the City actually did in

21   connection with the four, to the extent possible, reporting

22   items, and why that conduct satisfies the City's good faith,

23   reasonable interpretation of its obligations under Section 7.1.

24   So, first, the agreement states, to the extent possible, the

25   City is to report the number of PEH engaged.

26

1              So the City has been focused on outcomes, Your

2    Honor.  It has been reporting the number of people experiencing

3    homelessness who were served.  Again, if someone has been

4    served, that necessarily means he or she has been engaged.

5    That's a first step.  So, again, the City has chosen a

6    conservative and verifiable and imminently reasonable way of

7    reporting engagements.

8              Second, to the extent possible, again, the City is to

9    report the number of people who have accepted offers of shelter

10   or housing.  The City is plainly in compliance here, based on

11   its reporting of the number of people experiencing homelessness

12   who were served.  Anybody who has been served must have

13   accepted an offer of shelter or housing.

14             Third, to the extent possible, again, the City is to

15   report the number of PEH who have rejected offers of shelter or

16   housing and why offers were rejected.  Now, Your Honor, the

17   City's understanding is that LAHSA does not track rejections of

18   offers of shelter or the reasons why they were rejected and

19   that's for good reason.  These inquiries may involve all kinds

20   of sensitive information, medical information, all kinds of

21   complex and difficult topics.  It would also be incredibly

22   difficult to accurately determine and report in any standard

23   way the reasons why offers were rejected by any individual

24   person.  So this sort of complexity is exactly why the

25   agreement says, to the extent possible.  That's why.

1          So fourth, to the extent possible, the City is to

2    report the number of encampments in each council district.  Now

3    again, the City's understanding is that LAHSA reports

4    encampments only on a county level.  The City, though, is

5    currently in active discussions with LAHSA about getting this

6    information on a council district level.  So that's good news.

7          So, Your Honor, let me turn to the stipulated facts

8    from 2024.  And Your Honor began by going through some of

9    those.  The City objects that those should even be part of this

10   proceeding for the reasons that we explained in our written

11   objections filed yesterday, but I would like to address them

12   briefly.

13         So the Court indicated in its order, clarifying the

14   scope of this hearing that it would consider past instances of

15   delay as a basis for holding the City in contempt today.  The

16   Court today went through some of that.  But the issues

17   addressed there have already been adjudicated.  In April 2024,

18   the City agreed to pay for the Alliance's fees and costs and

19   for the assessment by Alvarez & Marsal that cost millions of

20   dollars.

21         So as we've explained, Your Honor, there's no basis

22   for holding the City in contempt for what happened years ago

23   and has already been resolved.  That's old news.  The good news

24   now is that the City has made extraordinary progress since

25   then.  It's served more than 8,000 people, has more than 8,000

1    beds online, more than 5,000 in progress.  Your Honor, these

2    numbers reflect Herculean efforts to combat homelessness, not a

3    pattern of delay or obstruction.

4           So I'd like to turn to the issues identified in the

5    reports of Mr. Gary and Special Master Martinez.  Now, we don't

6    believe that these should be the subject of today's hearing,

7    but the Court has signaled that it will focus on those

8    topics.  So, again, as the City laid out in its request for

9    clarification that it filed on Saturday and the objections it

10   filed yesterday, Mr. Gary's appointment has been stayed by the

11   Ninth Circuit, so it cannot be enforced by civil contempt

12   sanctions.

13          The Supreme Court reminded us of this this year.  So

14   the City renews its objection to any contempt hearing that's

15   premised directly or indirectly, Your Honor, on the City's

16   compliance with a state order.  And I say directly or

17   indirectly because Special Master Martinez has registered

18   complaints about the City's interactions with Mr. Gary.

19          So the origin of the complaints doesn't matter, but

20   the subject matter does, and that's off limits.  In any event,

21   there's no basis for imposing sanctions on the City for its

22   conduct in connection with Mr. Gary.  So even though the City

23   maintains that Mr. Gary's appointment was improper, and even

24   though it's challenged that appointment, the evidence will show

25   that it nonetheless promptly responded to all of his requests

29

1    and made City employees available for him to interview until

2    the Ninth Circuit stayed his appointment.

3            So I believe there are four claims made by Special

4    Master Martinez and Mr. Gary, and I'll tick through them.

5    First, Special Master Martinez faulted the City for submitting

6    a written response to her October 30th inquiry only after a

7    full week.  But, Your Honor, that's exactly the deadline she

8    herself set for the City.  She asked for a response by November

9    6th, and the City sent her its response on that date.  So I

10   don't understand how a party could be held in contempt and

11   sanctioned for complying with the deadline.

12           Second, Special Master Martinez has claimed that the

13   monitor has not received the data needed to perform his duties,

14   but when she wrote those words, Mr. Gary hadn't actually asked

15   for any data.  He was engaging in preliminary conversations

16   with the City about accessing various data systems so he could

17   pull the data himself.  There's no reason to sanction the City

18   for not complying with requests that were never made.

19           So third, Special Master Martinez and Mr. Gary

20   contend that the City has imposed, quote, barriers to access

21   and cooperation, chiefly by asking that communications with

22   City employees be routed through counsel.  Well, that just

23   isn't true.  The City responded to nearly all of his emails

24   within 24 hours, and to some in just a matter of minutes.  The

25   evidence will show that.  The City took longer than that when

30

1   it responded to Mr. Gary's initial email that he sent to

2   Mr. Szabo on a Saturday.  The City responded through counsel on

3   Tuesday, but that doesn't come close to a pattern of

4   inexcusable delay or refusal to work with a court-appointed

5   monitor.

6           But more importantly, the City's request, Your Honor,

7   was to protect its right to counsel, and there is no evidence

8   that it caused any delay.  And it's reasonable, Your Honor, for

9   the City to protect its rights in this adversarial litigation.

10  This case remains very active.  The City is constantly under

11  fire here from multiple parties.  We are at this moment in the

12  midst of what amounts to the second trial in just a few months.

13  So given the many ambiguities in the agreement, the

14  disagreements about the parties' positions, the participation

15  of counsel in any conversations is essential.  So the City's

16  good-faith efforts to protect its right to counsel cannot

17  legally be a basis for contempt.

18          Fourth, Mr. Gary and Special Master Martinez have

19  also said that the City didn't provide, their words, verified

20  data.  But these complaints do not demonstrate bad faith, not

21  even close.  It wasn't clear to the City what verified means,

22  but the City did provide accurate data on the number of persons

23  experiencing homelessness who were served in last week's

24  supplemental report.  And, Your Honor, taking extra time to

25  make sure the numbers reported are accurate is the opposite of

1    bad faith.

2            So before I conclude, I would like to briefly address

3    the Alliance's proposed remedies here.  They've suggested that

4    the court impose, and I believe evidently is a sanction for

5    contempt, a number of new obligations on the City that it never

6    agreed to, including unrealistic response deadlines.  Some of

7    those purported remedies, Your Honor, such as extension of the

8    settlement agreement, are unrelated to any conceivable basis

9    for contempt.

10            The City is open to discussions with the Alliance

11   about potential modifications to the agreement.  But the City

12   objects to the Alliance's efforts yet again to encourage the

13   Court to rewrite the parties' agreement.  The agreement has

14   provisions governing modification, including an integration

15   clause that requires mutual consent.  And it also has Section

16   8.2, which requires meeting and conferring about amendments to

17   the City's obligations in light of certain events.  But that's

18   not what this proceeding is about.

19            Your Honor, the City looks forward to working with

20   the Alliance, with the intervenors, with Special Master

21   Martinez, and a monitor.  But it respectfully submits that the

22   constant threat of contempt and sanctions are not a productive

23   way to move forward, and they're not a way to help the many

24   people experiencing homelessness in our community.

25            The Alliance faults the City for defending itself.

1    Yes, the City has appealed from this court's orders.  Yes, the

2    City has challenged Mr. Gary's appointment.  Yes, it has

3    exercised a great deal of caution in interacting with opposing

4    counsel, with Special Master Martinez, and with Mr. Gary.  But

5    the City has a right to do all those things, and it is

6    abundantly reasonable to exercise that right under these

7    circumstances.

8            This is a closely watched case, Your Honor, in which

9    the City is in constant jeopardy.  The City urges the Court to

10   turn down the heat, to stop putting the City's homelessness

11   policy on trial, and to encourage the parties to work together.

12   The parties can do that.  They can come to a reasonable

13   understanding of the City's obligations under an agreement that

14   we should all acknowledge isn't a model of clarity.

15           Given how productive their recent conversation was,

16   the parties have every reason to expect that there is a path

17   forward, and that path forward doesn't require a finding of

18   contempt and yet another appeal.  The City is making great

19   progress in its efforts to provide shelter and housing for its

20   most vulnerable residents.  We shouldn't let minor squabbles

21   over reporting obligations, especially those that the City has

22   actually satisfied, stand in the way of the City's work.

23           So we look forward to presenting our case

24   today.  Thank you, Your Honor.

25           **THE COURT:**  Thank you, Counsel.  Counsel, do either

1    of the other parties wish then to make an opening statement on

2    behalf of LA Alliance or the intervenors?

3          **MS. MITCHELL:**  Sure, Your Honor, and we will be

4    brief.  This hearing arises from the Court's order to show

5    cause on two related issues.  The first is the City's

6    persistent pattern of delay, obstruction and gamesmanship in

7    implementing and demonstrating compliance with the settlement

8    agreement and this court's orders.  And the second is the

9    City's specific failure to comply with Section 7.1's core

10   reporting obligations: the number of beds or opportunities

11   offered, the number of beds or opportunities currently

12   available in each council district, the number of PEH who have

13   rejected offers of shelter and why, and the number of

14   encampments in each council district.

15          Now, my colleague conceded that these metrics have

16   never been reported.  There are seven obligations in the

17   agreement.  The first three do not require interaction with

18   LAHSA.  The second four require some engagement with LAHSA to

19   report those metrics to the extent possible.  However, LAHSA is

20   not the only one in control of those metrics.  The CAO's office

21   actually has access to HMIS and also runs its own outreach

22   programs.

23          The evidence in this case will not show that there

24   was any due diligence whatsoever to make any effort to report

25   these metrics.  In fact, the first outreach was in October of

1    2023, to my understanding, and that was a year and a half after

2    the agreement was entered.  And regardless of engagements, no

3    metrics have been reported, and any metrics that need to be

4    reported are still somewhere between six months to a year out

5    from even being possible.

6           Now, that concession, which we expect Ms. Kuhn to

7    discuss in more detail when she testifies and is able to

8    testify here live, Your Honor, is important because by the mere

9    concession that reporting all of these metrics are

10   possible with enough lead time to develop the infrastructure,

11   means that there is a path, which means that there is a

12   possibility from the agreement where it says to the extent

13   possible, the fact that my colleague has admitted that there is

14   a path necessarily means that it is possible, which necessarily

15   means the City's obligations started in 2022 and they have been

16   in active violation since that moment.

17          When the Court issued its June 24th, 2025 order, ECF

18   991, it framed this case.  Complexity cannot serve as an

19   excuse.  Flexibility in how the City meets its obligations does

20   not mean those obligations can be ignored.  The Court cannot

21   fix the system, but it can be sure the City is held to what it

22   promised to repair.  This case is not a referendum on

23   homelessness policy.  It is a test of integrity, governmental

24   accountability, and whether in the face of death and despair,

25   the law can still serve life.  That same question of integrity

1   and accountability, Your Honor, is what brings us here today.

2   Because even after that order, even after years of warnings,

3   the City still treats transparency and oversight as burdens to

4   be managed, rather than obligations to be honored.

5           The Court made it very clear that flexibility and how

6   the City meets its obligations does not mean those obligations

7   can be ignored and that emergencies and complexity cannot serve

8   as an excuse to abandon transparency and accountability.  And

9   that's essentially what we just heard, Your Honor, is that

10  these issues are hard and complex, and therefore we should not

11  be accountable for demonstrating compliance.

12          The City in practice has continued to respond to any

13  oversight efforts with delay, resistance, and partial

14  compliance.  In the same order, the Court, speaking about the

15  roadmap agreement, concluded that while it would accept the

16  City's data to avoid derailing housing efforts, quote, such

17  acceptance should not be mistaken for vindication, end

18  quote.  The Court warned that the City's compliance rests on

19  shaky ground and that seeking accountability with the City of

20  Los Angeles is like chasing the wind.

21          That is the backdrop for today's hearing.  It is not

22  in a vacuum.  The special master's reports and monitor status

23  reports show that even after that warning, the City continued

24  on the same path, offering procedural engagement, but

25  withholding information and access needed to verify compliance.

36

1              The Court gave the City a very clear path.  Select a

2    data monitor by September 12th, subject to the Court's

3    approval.  Provide the monitor with full access to the data so

4    he could review it prior to publication, and attend quarterly

5    hearings starting November 12th to review the reporting with

6    the monitor to discuss concerns with the parties.

7              Instead, we see the same pattern.  Delaying the

8    City's council process and internal delays slowed the monitor

9    appointment and sidelined plaintiffs in key scope discussions.

10   Rather than moving quickly to empower the courts neutral, the

11   City treated the monitor as another negotiation point.

12             After specifically asking the Court to absolve the

13   party's dispute and upon the Court appointing Mr. Gary, a

14   neutral that was previously agreed to by the City, the City's

15   first instinct was not to welcome accountability, to make sure

16   that the most people are served with the City's precious

17   resources, but to spend money on yet another appeal and seek a

18   stay of the oversight structure, the opposite of opening its

19   books and cooperation.

20             The monitor status report also explained that every

21   request for information and every effort to meet with staff was

22   funneled through City litigation council, a choice they are

23   legally permitted to make.  But it is a stark departure from

24   how the parties have operated for the last five years.  It was

25   a self-imposed bottleneck that predictably slowed, filtered,

37

 1    and sometimes blocked the monitor's ability to do the job the

 2    Court ordered him to do.  And to be clear, the DVD case does

 3    not stand for the proposition that after a court has stayed the

 4    appointment of a monitor, that actions that were taken prior to

 5    the stay are irrelevant, particularly for considerations of

 6    delay and impedance of enforcement of a court order, which is

 7    what we are here to discuss.

 8            The special master ultimately concluded that despite

 9    months of opportunity, the City had not provided the materials

10    required to fulfill the reporting and verification obligations

11    the Court imposed.  There was no verified PEH data by council

12    district at first, and when the special master followed up to

13    ask why, the City effectively blew her off.

14            There was no encampment reduction data consistent

15    with the Court's directives, and there was no milestone

16    documentation that could be validated, and no concrete timeline

17    when any of this would be delivered.  In other words, the City

18    continued to do exactly what the Court condemned in its order,

19    offering just enough process to avoid an outright breach

20    finding while delaying and actively obstructing accountability

21    and the purpose of the agreement.  In so doing, they continued

22    to keep compliance on shaky ground and force third parties to

23    chase the wind of accountability.

24            To this day, they have not provided the special

25    master with fulsome answers to the questions she recently

1  posed, including what has changed in the data calculations and

2  methodologies from historical reports to current calculations.

3  This is critical, Your Honor, because the report that was just

4  submitted, the supplemental report, is vastly different in the

5  numbers reported than what had previously been reported to the

6  Court.  One example of that, and we will hear testimony about

7  that, I believe, today, is line entry number 17, which talks

8  about a VA permanent supportive housing unit that was put up by

9  the City in 2022.  Every single report the City has

10 consistently reported, it has established 59 beds, and there

11 are 59 PEH, or people experiencing homelessness, served.

12          In the City's most recent report, it changed that

13 number to only 31 people served for 59 beds, and those are

14 cumulative numbers, Your Honor.  That means in the last three

15 years, that facility has sat 50 percent vacant.  These are

16 critical changes, and I think as Special Master Martinez

17 inquired, there's still no clarity as to why these numbers have

18 changed, how the methodologies have changed, how the

19 verification has changed, and we would submit, Your Honor, that

20 the numbers were only finally checked after the data monitor

21 began requesting access to the data.

22          Courts have an inherent power to address these very

23 types of abuses, including, quote, when a party shows bad faith

24 by delaying or disrupting the litigation or by hampering

25 enforcement of a court order.  That's from the Chambers

1    case.  The Court should use that inherent power to address the

2    City's consistent avoidance of its responsibility, and to be

3    clear, Your Honor, this is not a new issue.  We have been

4    seeing consistent delay and attempts to hamper enforcement of a

5    Court's order since day one, and the Court will hear evidence

6    of that today.

7            Turning to Section 7.1, we talked about the seven

8    targets that the City is required to provide.  These

9    requirements directly reflect the parties' original intentions,

10   particularly when considered in conjunction with the other

11   provisions of the agreement to increase shelter and housing

12   capacity, engage with unhoused individuals living on the

13   street, and move individuals into that shelter and housing,

14   thereby reducing encampments.

15           The City here did not stumble on an obscure

16   technicality, as is suggested by the City.  It failed to

17   provide what the settlement calls out expressly, what the

18   parties negotiated for expressly, and what the Court has

19   highlighted repeatedly as essential to transparency and

20   accountability: hard data on the City's shelter efforts,

21   encampment engagement efforts, and outreach efforts.

22           The City has had three-and-a-half years to track and

23   report these metrics.  Section 7.1 was negotiated with the

24   City, it was not imposed on the City.  It was specifically

25   designed by the two of them together to work as a reporting and

40

 1  data metric.  This is not a new, nor surprising, nor ambiguous

 2  requirement.  These are requirements that have been in place

 3  since day one.  Plaintiffs raised it in October 2023, when the

 4  conflict first arose about the City's failure on encampment

 5  reductions.

 6          You'll see that in a new email that just came to

 7  light today, to the Alliance anyway, between LAHSA and the City

 8  originally asking about the capabilities for these efforts.

 9  They never provided the data they got from LAHSA, but at least

10  they asked, I suppose.

11          The special master also raised this issue in her

12  first annual report, highlighting the failure.  Plaintiff

13  raised it again in September of 2024, during the second motion

14  for settlement agreement compliance.  The special master

15  highlighted it again in her second annual report, and plaintiff

16  raised it again in July of 2025.  All of this, and we didn't

17  get clear answers on what's even possible until just last week,

18  three-and-a-half years in.

19          It is absurd that it takes a motion to the Court for

20  sanctions just for the City to set up a meeting.  The same

21  pattern appears with encampment reduction data and milestones

22  that this Court emphasized in Docket 991.  The Court required

23  the City to track encampment reductions using a definition the

24  court prescribed and begin reporting updated reduction data in

25  October 2025.  The City acknowledged that requirement in its

41

1   July filing, saying it would endeavor to provide the

2   information.  Yet the data reported does not include that

3   information, and when special master was asked, she was told it

4   would be provided to special master Gary, and special master

5   Gary was prevented access from accessing the data.

6          Once again, the City is asking the Court to accept a

7   general promise that is complying, being only about 25 percent

8   of the way there, and without any evidence.

9          The City claims that this -- the City doesn't control

10  LAHSA, it's not the City's fault.  That's what we just heard,

11  but the City actually is LAHSA.  It makes up 50 percent of the

12  commission, and in fact, in emails that we will see that were

13  provided to the Alliance today, the City had quite a bit of

14  access to LAHSA, and LAHSA responded to all data requests

15  promptly.  There was consistent engagement, and in fact, not

16  all outreach is even done through LAHSA, and yet the metrics

17  still have not been reported.

18         In fact, the City does track encampments through its

19  Department of Sanitation, and in fact, LAHSA does track council

20  district encampments, but stopped keeping those up to date when

21  the County stopped funding LAHSA, a fact that we just

22  discovered two days ago.

23         Your Honor, the evidence in this phase will focus on

24  only two questions.  Has the City complied with Section 7.1's

25  reporting requirements?  Has the City honored the oversight

1    structure the Court set up, and the parties set up, or has it

2    continued the pattern of delay and obstruction the Court has

3    found in the past and throughout this litigation?

4         We expect the evidence to show that the City has had

5    more than enough time and notice to put in place basic systems

6    to track its outreach efforts, that instead of embracing the

7    monitor and special master as tools to not only demonstrate

8    compliance, but assure itself that its own resources are being

9    used appropriately, the City treated them as adversaries to be

10   managed, routing requests, delaying access to staff and data,

11   responding late and partially.  Neither the monitor, nor the

12   special master, nor this Court can answer with confidence the

13   question the settlement was supposed to resolve: is the City

14   actually doing what it promised in the places and at the scale

15   it promised to do?

16        It is exactly the situation this Court warned against

17   when this Court wrote that it cannot idly bear witness to

18   preventable deaths.  Numbers matter, because numbers equal

19   people, and when we aren't tracking numbers, fraud, waste, and

20   abuse abound, and people die.

21        At the close of this hearing, on a full record, LA

22   Alliance will ask the Court to order remedies that do what the

23   Court's order already said the case must do.  Restore integrity

24   and accountability to this process.  Ensure that delay and

25   obfuscation stop being cost-free options.  Our clients, and

1  both the housed and unhoused communities at large, were

2  promised more than aspirational rhetoric, Your Honor.  They

3  were promised measurable action, verified by data, overseen by

4  this court.  Three years into the settlement, the City still

5  fights oversight harder than it fights homelessness.  We should

6  not still be litigating over whether the City has to provide

7  the data or comply with oversight measures. It should be doing

8  the work and proving it.  The evidence will show it has not,

9  and we will ask the Court to act accordingly.  Thank you.

10        **THE COURT:**  Thank you, Counsel.  Ms. Myers, do you

11  have a statement you'd like to make?

12        **MS. MYERS:**  Yes, Your Honor, just a few brief

13  statements.  This is Shayla Myers with the Legal Aid Foundation

14  of Los Angeles on behalf of the intervenors.

15        We would echo much of what the plaintiffs have raised

16  in this case.  This issue, the City of Los Angeles asks the

17  City, the Court, to acknowledge that it has made great

18  progress.  The problem is, Your Honor, that it asks the Court

19  to take its word that it has made great progress.

20        If you walk down the streets of Skid Row, if you walk

21  down the streets of South Los Angeles, it's not clear to many,

22  many people that the City has made great progress.  And part of

23  what the plaintiffs negotiated in the settlement, part of what

24  the intervenors have been fighting for, part of what the

25  intervenors are fighting for on a daily basis is evidence of

1    what the City says occurs.

2            The City's counsel suggests that the data that was

3    negotiated for can be collapsed unto itself, that what is

4    really at issue is how many people are served.  But the data

5    requests, the requirements of the City of Los Angeles is to do

6    more than simply tell the Court and the public who has been

7    served.  It is to tell the Court and the public, the

8    plaintiffs, the intervenors, not just who has been served, but

9    who hasn't been served, why they have not been served, what the

10   true state of affairs on the streets of Los Angeles are.  That

11   is part of what was negotiated for, it's part of what the City

12   committed to, and it's part of the reason that we are here.

13   It's because the City has consistently refused to participate

14   in the transparency that has been required by the settlement

15   agreement that was sought at the beginning of this case, and

16   that the parties in this case have continued to fight about

17   throughout this litigation.

18            I would say first and foremost, Your Honor, just a

19   point of clarification that the standard for contempt at issue

20   here is not bad faith, nor is it willful disobedience.  It is

21   simply whether or not the City complied with a court order.

22   The City seeks to have the Court rely on willful disobedience

23   and bad faith as if that is what was required when the City

24   doesn't abide by a court order.  That's the standard for

25   sanctions, Your Honor.  That's the fight we had last week.  But

45

1    that is different than the issue that is before the Court.

2              Your Honor issued an OSC re contempt.  And so the

3    question is, first and foremost, whether or not the City

4    complied with a court order.  If the answer is no, the City

5    failed to comply with a court order, then the Court can engage

6    in the question of why not.  If there were a few technical

7    violations, which I don't think is what is before the Court,

8    then the Court can ask if the City's technical violations,

9    minor technical violations, were the results of a good faith

10   interpretation and reasonable interpretation of that court

11   order.

12             But first and foremost, the question is, did the City

13   abide by the court order without a showing of willful

14   disobedience, without a showing of bad faith?  And I think the

15   witnesses in this case will clearly show that the City did not

16   abide by the court order at issue here and that justifies a

17   finding of contempt.

18             Your Honor, the City is asking to turn down the heat

19   in these proceedings.  There is huge value in that.  There was

20   a beneficial conversation on Monday related to some of these

21   issues.  But to Ms. Mitchell's point, that conversation

22   happened years after the fact.

23             And, Your Honor, it's important to note that one of

24   the reasons why the parties, the plaintiffs, the intervenors,

25   keep having to come before Your Honor, why the special master

46

1    and why the monitor keep having to raise these issues, is that

2    the City has been engaged in a practice of

3    obfuscation.  There's no doubt that there are ambiguities

4    written within the settlement agreement on specific

5    issues.  The Court will decide whether or not that applies to

6    7.1.  But the City, throughout this litigation, at every

7    attempt by plaintiffs, by intervenors, by this Court, by the

8    special master, by the monitor, by every party that has

9    attempted to hold the City accountable, has been blocked by

10   even beginning to ask the questions about what the City is

11   interpreting the settlement to mean when it reports to the

12   Court.

13          Your Honor, I stood here many, many times asking the

14   City of Los Angeles, what did you mean when you submitted this

15   report?  What did you mean when you said offer?  What did you

16   mean when you said served?  What did you mean when you said

17   create?  What did you mean when you said you resolved an

18   encampment?  And part of the reason that we are here, Your

19   Honor, is because the City has refused time and time and time

20   again to provide answers to those questions.

21          If there are ambiguities between the parties, then

22   those ambiguities need to be brought to light.  They need to

23   resolve those ambiguities.  They need to bring those issues

24   before the Court if there is a dispute so that we can get to

25   the real work of actually monitoring what is happening on the

1    street.  And the intervenor stands here with a particular

2    interest in this issue, Your Honor.

3            We have raised our concern throughout this litigation

4    that the encampment reduction plan and the City's

5    interpretation of the encampment reduction plan would be used

6    simply to erase the visible evidence of homelessness on our

7    streets and hide the fact that homelessness is not getting

8    better.

9            If the City was allowed to rely on a definition of

10   encampment resolution that simply allowed it to throw away

11   tents and makeshift encampments and RVs that are the best

12   evidence to people who are housed that there is homelessness on

13   our streets.  If the City's interpretation of the agreement

14   were allowed to stand, the City would simply be allowed to

15   erase the best evidence the public has that homelessness

16   continues to exist and that the City has not made the progress

17   that the attorneys argue that they have made in this case.

18           Your Honor, we had an evidentiary hearing that had to

19   get to the root of how the City was even defining what

20   constitutes an encampment reduction plan as opposed to having

21   the type of discussion that the City now argues we need to be

22   having to resolve these ambiguities.  The time has passed, Your

23   Honor, for some of these discussions.  The time exists now for

24   the Court to ensure that the City is held to account for the

25   transparency that was negotiated for, that the City is not

1    allowed to hide behind its interpretations, unreasonable as

2    they may be, related to its compliance with this agreement.

3    Thank you.

4            THE COURT:  Counsel, with your permission, why don't

5    I send you to lunch right now before your first witness?  We've

6    been in session since 7:30, and I'm a little afraid if you call

7    the first witness, we're just interrupting partway through.  So

8    could you return in five minutes?  Just kidding you.  How long

9    do you need?  Hour?

10           MS. MITCHELL:  Whatever's convenient for the Court.

11           THE COURT:  Hour and 15 minutes?

12           MS. MITCHELL:  That's fine, Your Honor.

13           THE COURT:  Let's be safe.  Let's just take, what

14   does 12:45 look like to you?  I'll give you an extra 15

15   minutes, okay?  We'll see you at 12:45.  Go have a good lunch,

16   and we'll start with the first witness.

17           **(Recessed at 11:27 a.m.; to reconvene at 12:49 p.m.)**

18           THE COURT:  Now we're back in session.  All counsel

19   are present.  Before I begin to consider the evidence in this

20   matter, I want to make sure we all understand the purpose of a

21   civil contempt hearing.  The purpose of this hearing is to

22   determine whether or not the City has complied with a court

23   order, not to punish the City for any past noncompliance.

24   Civil contempt is remedial, criminal contempt is punitive.

25   We're dealing in this hearing with potential civil contempt.

1          So counsel, your first witness, please.

2          MS. MITCHELL:  Thank you, Your Honor.  We call Paul

3   Webster to the stand.

4          THE COURT:  Thank you, sir.  Would you raise your

5   right hand, please?

6          PAUL WEBSTER, PLAINTIFFS' WITNESS, SWORN

7          THE COURT:  Thank you, sir.  Would you please take

8   the witness stand?  The entrance to the witness box is closest

9   to the wall.  If you'd be seated, sir.  After you're

10  comfortably seated, would you face the parties and would you

11  state your full name, please?

12          THE WITNESS:  My name is Paul Webster.

13          THE COURT:  Would you spell out an abundance of

14  caution your first name?

15          THE WITNESS:  P-A-U-L.

16          THE COURT:  And your last name, sir?

17          THE WITNESS:  W-E-B-S-T-E-R.

18          THE COURT:  Thank you.  Direct examination by First

19  Alliance (sic).

20          MS. MITCHELL:  Thank you, Your Honor.

21          THE COURT:  I'm sorry, LA Alliance, my apologies.

22          MS. MITCHELL:  That's okay.  I missed the First

23  Alliance, Your Honor.

24          THE COURT:  No.  Occasionally, for my record, there's

25  a case involving First Alliance.  You're too young to know this

1    case.  But it involved the subprime industry and the debacle

2    that occurred leading to the bankruptcy.  And we literally had

3    18 attorney generals in my court at all hours across the

4    country.  It was a precursor of this debacle that everyone

5    should have seen coming.

6              So if I say, for my record, First Alliance, I

7    apologize.  I always mean LA Alliance.  Okay?

8              **MS. MITCHELL:**  Thank you, Your Honor.  And also, for

9    the record, we did file a request for judicial notice yesterday

10   in this matter for a number of items on the Court's docket and

11   matters which are public record, which we will rely on as well.

12             **THE COURT:**  Okay.

13             **MS. KUMAR:**  Objection.  Your Honor, we would object

14   to the mass admission of all of the documents in that request

15   for judicial notice.  Not all of them are judicially

16   noticeable, but happy to consider the exhibits as counsel --

17             **THE COURT:**  We'll go over them.  We've got plenty of

18   time.

19             **MS. MITCHELL:**  Thank you, Your Honor.

20                         **DIRECT EXAMINATION**

21   **BY MS. MITCHELL:**

22   Q    Okay.  Just to sort of get us up to speed, Mr. Webster,

23   can you please tell me what your current occupation is?

24   A    I am the executive director of the LA Alliance for Human

25   Rights, and I'm also a senior fellow with the Cicero Institute.

1  Q    And how long have you been the executive director of LA

2  Alliance for Human Rights?

3  A    A little over four years.

4  Q    Since 2021; is that right?

5  A    That is correct.

6  Q    Did you help negotiate the settlement agreement in this

7  case?

8  A    I did.

9  Q    Showing you Exhibit 25, we can go to the first page.  Is

10  this the settlement agreement that was negotiated in this case,

11  or at least one of the versions that was submitted to the

12  Court?

13  A    Yes.

14  Q    Focusing you, for our purposes today, specifically on

15  Section 7.1, relating to status updates.  Do you see that on

16  the screen in front of you?

17  A    I do.

18  Q    Okay.  And can you briefly tell us, well, were you

19  involved in negotiating the language included in 7.1?

20  A    Yes, I was.  Yes, I was.

21  Q    Okay.  And why did LA Alliance -- well, let me take a step

22  back.  Mr. Webster, you are here today in your personal

23  capacity, correct?

24  A    Correct.

25  Q    Are you also here today as a person most knowledgeable on

Webster - Direct / By Ms. Mitchell                    52

1   behalf of Plaintiff LA Alliance for Human Rights?

2   A    I am.

3          **MS. KUMAR:**  Objection, Your Honor.  PMK has no

4   involvement at a hearing of this sort.  It's a deposition tool.

5          **THE COURT:**  Overruled.

6   **BY MS. MITCHELL:**

7   Q    Why did the LA Alliance negotiate for these specific data

8   metrics?

9          **MS. KUMAR:**  Objection, Your Honor.  It lacks

10  foundation.  Relevance.

11         **THE COURT:**  Overruled.

12         **THE WITNESS:** Why did we argue for these -- or why did

13  we negotiate for these specific metrics?

14  Q    Correct.

15  A    I think the most significant reason is because what our

16  constituents and what we've experienced in Los Angeles has been

17  a lot of promises being delivered with respect to homelessness,

18  a lot of promises about how the homelessness was going to be

19  resolved and what efforts were going to be taken by the City

20  and the County.  And frankly, our constituents didn't feel that

21  those promises were reliable.  So during the settlement

22  negotiations, we negotiated for specific metrics and milestones

23  so that we could determine whether or not those promises would

24  actually result in real outcomes and so that we could have

25  essentially a stake in the ground, if you will, by which we

Webster - Direct / By Ms. Mitchell                          53

1   could measure whether or not the City and the County is

2   performing with respect to our lawsuit.

3   Q    How was this agreement as a whole intended to work?

4          MS. KUMAR:  Objection, Your Honor.  Calls for a legal

5   conclusion, hearsay, relevance.

6          THE COURT:  Overruled.

7          THE WITNESS:  So the challenge with homelessness is

8   that one specific action item or program, if you will, doesn't

9   necessarily address the entirety or the comprehensive nature of

10  what's going on in the streets.  What we intended to do was to

11  create a comprehensive plan that would include places for

12  people to go, treatment and services for those individuals once

13  they get there, and the result would be a reduction in the

14  number of people that were suffering and dying on the streets.

15         So the idea was really kind of a three-legged stool

16  approach, if you will.  One component was units, beds, places

17  where you could direct people so that they could actually have

18  somewhere to go.  Second was what happens when they get

19  there.  In other words, the ability to engage in treatment, the

20  ability to engage in services, the ability to engage in all

21  manner of what's needed to help people stabilize, to overcome

22  some of their behavior and health challenges, and maybe even to

23  move on into self-sufficiency so that they can get out of these

24  beds and go into market-rate housing.

25         And the whole point was the third leg of the stool

1    was so that way that there would be movement, that there would

2    be a larger pipeline so that the people who were suffering on

3    the streets could actually get to a place where they can get

4    stability, that they could get the help that they need, and

5    whether or not they stay there in housing, where they move on

6    is subject to that.  But we wanted to really put --

7              **MS. KUMAR:**  Objection, Your Honor, to the use of the

8    word we.

9              **THE WITNESS:**  The LA Alliance --

10             **THE COURT:**  I couldn't hear you, Counsel.

11             **MS. KUMAR:**  Objection, Your Honor.  He can testify on

12   his own behalf but can't testify on behalf of others.  We would

13   object to any reference to the word we.

14             **THE COURT:**  Overruled.

15             **MS. KUMAR:**  And, Your Honor, I just ask for a

16   standing objection to this --

17             **THE COURT:**  Counsel, this is obviously an engagement

18   with the --

19             **THE WITNESS:**  I mean, I could say the LA Alliance

20   because I represent the LA Alliance, correct?

21             **THE COURT:**  No, it's overruled.

22             **THE WITNESS:**  Okay.  So the point was -- is by having

23   metrics and milestones, we can determine how well the City and

24   the County were performing in terms of those three legs of the

25   stool.

Webster - Direct / By Ms. Mitchell                                55

1    BY MS. MITCHELL:

2    Q    So pointing you towards the first metric identified, it

3    should be highlighted there on the screen, the number of

4    housing or shelter opportunities created or otherwise

5    obtained.  Why was this metric important?

6              MS. KUMAR:  Objection, Your Honor.  Relevance.

7              THE COURT:  Overruled.

8              THE WITNESS:  This metric was important just so that

9    we can gauge whether or not the City is actually creating the

10   number of housing shelter beds that they committed to create.

11   BY MS. MITCHELL:

12   Q    Okay.  Showing you the next metric, the number of beds or

13   opportunities offered.  Why is this metric important?

14             MS. KUMAR:  Objection, Your Honor.  Calls for legal

15   conclusion and relevance.

16             THE COURT:  Overruled.

17             THE WITNESS:  The reason that this metric is

18   important is because out of the universe of people who are

19   experiencing homelessness, we wanted a better -- the LA

20   Alliance wanted a better understanding of what actually was

21   being offered, what actually was being solicited for people who

22   were on the streets so that they could move into a different

23   place.

24   Q    And what is the difference in this between beds, housing,

25   or shelter opportunities obtained versus the number of beds or

EXCEPTIONAL REPORTING SERVICES, INC

1    opportunities offered?

2            MS. KUMAR:  Objection, Your Honor, calls for a legal

3    conclusion.

4            THE COURT:  Overruled.

5            THE WITNESS:  So obtained would be the function of

6    the City actually creating something that didn't already

7    exist.  So, a unit, a shelter bed, something that they would

8    actually create.  And the number of opportunities offered is

9    just because an outreach worker offers somebody a shelter bed

10   or offers someone a housing unit, it doesn't necessarily mean

11   that they're going to take them up on that offer.

12   **BY MS. MITCHELL:**

13   Q    Next metric, the number of beds or opportunities currently

14   available in each council district.  What does this mean and

15   why is it important?

16           MS. KUMAR:  Objection, Your Honor.  Calls for legal

17   conclusion, lacks foundation.

18           THE COURT:  Overruled.

19           THE WITNESS:  So this metric really speaks to, on a

20   council district level, what is currently available.  In other

21   words, if an outreach worker comes across somebody who's in

22   need of housing and services, whether or not there's

23   quote/unquote room at the inn, whether or not that bed that's

24   offered can actually be, can be populated by an individual on

25   the street.  So and this happens across the country in various

Webster - Direct / By Ms. Mitchell                          57

1   continuums of care, where they have an idea of what the

2   universe of beds or units are, and whether or not those things

3   are available or they're filled with individuals.

4           MS. KUMAR:  Objection, Your Honor.  Move to strike

5   that last portion as lacking foundation regarding what happens

6   across the country.

7           THE COURT:  Overruled.

8   BY MS. MITCHELL:

9   Q    Next metric, the number of PEH engaged.  What does this

10  mean and why is it important?

11          MS. KUMAR:  Same objections, Your Honor.

12          THE COURT:  Overruled.

13          THE WITNESS:  So this metric is important because we

14  want to know what the universe is of people experiencing

15  homelessness who are actually contacted and become participants

16  of the City, or the continuum of care, or however you want to,

17  we would say specifically the City because the City's listed

18  here.  But the number of participants that the City has engaged

19  in to offer them whatever housing and services.  Oftentimes,

20  outreach workers on the street will ask somebody if they need

21  help, and whether or not they say yes, I need help.  And they

22  become enrolled in this process of trying to get them help.  So

23  that's what engagement means.

24  Q    The next metric, the number of PEH who have accepted

25  offers of shelter or housing.  What does this mean and why is

1    this important?

2              **MS. KUMAR:**  Objection, Your Honor.  Same objections,

3    lacks foundation and calls for a legal conclusion.

4              **THE COURT:**  Overruled.

5              **THE WITNESS:**  So this is important because by

6    understanding the universe, in other words, like the

7    denominator, we also want to know how many people are actually

8    acting on those offers by outreach workers or other entities

9    that are trying to help people get off the streets.  So it's

10   important to have that ability to be accountable because it's

11   one thing to offer people housing, shelter, services, and it's

12   another thing for saying, okay, I'll accept that.

13             So from just a data analytics perspective, it gives

14   you a ratio of who is ready to accept offers.  You know, the

15   next one, why are they refusing or how they are refusing?  So

16   it gives you an idea of how effective your outreach efforts

17   are.

18   **BY MS. MITCHELL:**

19   Q    Next metric, the number of PEH who have rejected offers of

20   shelter or housing and why offers were rejected.  What does

21   this mean and why is it important?

22             **MS. KUMAR:**  Objection, Your Honor.  Same objections,

23   lacks foundation and calls for a legal conclusion.

24             **THE COURT:**  Overruled.

25               **THE WITNESS:**  So the reason that this is important

Webster - Direct / By Ms. Mitchell                                    59

1   is because it's good to know from a data analytics perspective

2   what your universe is and how many people are going to be

3   accepting an intervention and how many people are rejecting an

4   intervention.  And the reason that that's important is because

5   if you're holding the City accountable for, for example,

6   resolving homeless encampments, and you know that there have

7   been efforts to offer people an opportunity to get out of a

8   homeless encampment and into shelter or into housing, and

9   you've had wholesale rejections of these things, that's

10  important to know because it allows you to scrutinize how these

11  offers were being made, what are some of the needs of the

12  people who are rejecting, and people experiencing homelessness

13  reject offers for a whole myriad of reasons.

14          And so you can actually determine what the needs are

15  of the people on the street.  For example, if people say, well,

16  I'd like to go into a shelter, but I have a pet and I can't

17  bring my pet into a shelter.  That gives the City important

18  feedback to know maybe it would be a good idea to start

19  creating shelters that accept pets.  It's just a functional way

20  to determine if their programming and if their outreach efforts

21  are effective.

22  **BY MS. MITCHELL:**

23  Q    And the last one, the number of encampments in each

24  council district.  What does this mean and why is it important?

25          **MS. KUMAR:**  Objection, Your Honor.  Lacks foundation

Webster - Direct / By Ms. Mitchell                                   60

1    and calls for legal conclusion.

2            **THE COURT:**  Overruled.

3            **THE WITNESS:**  The reason that this metric is

4    important is you've got to know how big of a challenge you're

5    working with.  We know in the City of Los Angeles that there

6    are certain council districts that have a lot of homeless

7    encampments and other council districts that have less homeless

8    encampments.

9            In order to hold the City accountable and to

10   understand how well these outreach efforts are working, you

11   need to have essentially a denominator that describes the

12   universe, so that you can determine what progress can be made

13   based on what that universe is.

14   **BY MS. MITCHELL:**

15   Q    Last I want to focus you on this phrase, to the extent

16   possible.  Are you familiar with HMIS?

17   A    I'm very familiar with HMIS.

18   Q    And how did you become very familiar with HMIS?

19   A    Well, I served as the senior policy advisor on

20   homelessness to the U.S. Department of Housing and Urban

21   Development Secretary Ben Carson and in the process of becoming

22   very knowledgeable about HUD's programs and HUD's data

23   tracking, I became very familiar.  I studied the statute, the

24   federal statute, I studied the federal guidance.  I studied the

25   federal regulation and became very familiar with what HMIS did,

Webster - Direct / By Ms. Mitchell                          61

1  what its purpose was, and what data is being collected and

2  reported through HMIS.

3  Q    What does HMIS stand for?

4  A    Homelessness Management Information System.

5  Q    And does HMIS have the capability of tracking and

6  reporting the data that's required in 7.1?

7            **MS. KUMAR:**  Objection, Your Honor, lacks foundation,

8  calls for an expert opinion and legal conclusion.

9            **THE COURT:**  Overruled.

10            **THE WITNESS:**  It absolutely has the capacity to

11  collect and track and report the information.  HMIS is a --

12  it's a data collection and reporting system.  HUD has

13  promulgated guidelines for continuance of care on the minimum

14  standards and the minimum requirements within an HMIS system.

15  And HUD has explicitly provided flexibility and opportunity for

16  continuums of care to add on to the data fields and what it is

17  that they can collect and report.

18            So it's very flexible and it has significant power to

19  collect and report whatever data the continuum of care believes

20  is important.

21  **BY MS. MITCHELL:**

22  Q    Are you familiar whether LAHSA uses HMIS?

23            **MS. KUMAR:**  Objection, Your Honor, lacks foundation.

24            **THE COURT:**  Overruled.

25            **THE WITNESS:**  I know for a fact that they use HMIS.

Webster - Direct / By Ms. Mitchell                    62

1    If they didn't use HMIS, they couldn't get any federal funding.

2    Q    And LAHSA is the continue of care, correct?

3    A    They're the collaborate applicant for the continuum of

4    care for Los Angeles County.

5    Q    Okay.  I'm going to try to do this.  I'm showing you side

6    by side Exhibit 25 along with Exhibit 401.  Do you recognize

7    Exhibit 401?

8    A    I do.

9    Q    Have you seen it before?

10   A    I have.

11   Q    What is it?

12   A    This is the quarterly report on units, beds and people

13   experiencing homelessness served through the City's efforts to

14   create units and beds.

15   Q    And this particular one is for the quarter ending June

16   30th of 2025; is that right?

17   A    That's correct.

18   Q    Looking at this report and comparing the City's reporting

19   with its obligations under 7.1, has the City included the

20   number of housing or shelter opportunities created or otherwise

21   obtained in this report?

22            MS. KUMAR:  Objection, Your Honor, calls for

23   speculation and calls for an expert opinion, calls for a legal

24   conclusion and relevance.

25            THE COURT:  Overruled.

Webster - Direct / By Ms. Mitchell                    63

1                 THE WITNESS:  Yes.

2                 MS. KUMAR:  Your Honor, I'd have a standing objection

3       to what I assume is going to be the line of questioning to

4       come.  I'd ask for that.

5                 THE COURT:  I'm sorry, counsel?

6                 MS. KUMAR:  I'd ask for a standing objection to the

7       line of questioning that I assume is about to come.

8                 THE COURT:  You have a standing objection, counsel.

9       Overruled.  And would you repeat the question then so I can

10      hear the answer?

11                MS. MITCHELL:  Yes, Your Honor.

12      BY MS. MITCHELL:

13      Q    The number of housing or shelter opportunities created or

14      otherwise obtained, is that metric reported in the City's

15      reports?

16      A    Yes.

17      Q    Where is it reported?

18      A    In the column that is titled unit/beds.

19      Q    The number of beds or opportunities offered, is that

20      included in the City's report?

21      A    No, it is not.

22      Q    The number of beds or opportunities currently available in

23      each council district, is that included in the City's report?

24      A    No, it is not.

25      Q    The number of PEH or persons experiencing homelessness

1  engaged, is that included in this report?

2  A    No, it is not.

3  Q    The number of PEH who have accepted offers of shelter or

4  housing, is that included?

5  A    Yes.

6  Q    Where is that included?

7  A    Under the column that reads, total PEH served.

8  Q    Now, is that in your opinion an exact match, the PEH

9  served with the number of PEH who have accepted offers of

10 shelter or housing?

11        **MS. KUMAR:**  Objection, Your Honor, same objection.

12 It calls for speculation, it calls for a legal conclusion,

13 improper expert opinion and leading.

14        **THE COURT:**  Overruled.

15        **THE WITNESS:**  No.

16 **BY MS. MITCHELL:**

17 Q    Why not?

18 A    Well, the number of PEH served in -- on this report

19 basically describes the number of people experiencing

20 homelessness who are served by these specific housing

21 opportunities, units and beds.

22        There are a whole other population of people experiencing

23 homelessness that are offered housing and services, oftentimes

24 services only that wouldn't be reflected in this report.

25 Q    The number of PEH who have rejected offers of shelter or

Webster - Direct / By Ms. Mitchell                          65

1    housing and why offers were rejected, is that included in this

2    report?

3    A     No.

4    Q     The number of encampments in each council district, is

5    that included in this report?

6    A     No.

7    Q     In any of the reports that you have reviewed -- well, let

8    me ask this question.  Have you reviewed every single report

9    that the City has issued related to this case?

10   A     Yes.

11   Q     And have you ever seen any of those metrics other than the

12   number of beds or opportunities offered and somewhat the number

13   of PEH with accepted offers of shelter or housing, other than

14   those two metrics, have you ever seen the City report this

15   information anywhere related to this case?

16         MS. KUMAR:  Objection, Your Honor, calls for

17   speculation, calls for a legal conclusion, calls for an

18   improper expert opinion and compound.

19         THE COURT:  Overruled.  You may answer.

20         THE WITNESS:  I'm looking here in 7.1, because I have

21   seen reports that indicate the number of homeless encampments

22   resolved, but I don't see -- I have not seen a report of those

23   numbers in regards to what's excluding the two categories you

24   mentioned in 7.1.

25   //

1   **BY MS. MITCHELL:**

2   Q    So when you're saying the number of encampments resolved,

3   is that the same thing as the number of encampments in each

4   council district?

5   A    No.

6   Q    Okay.  So to be clear, have you ever seen the City report

7   those metrics in 7.1, other than the two you identified?

8            **MS. KUMAR:**  Objection, Your Honor, same objection.

9            **THE COURT:**  Overruled.

10           **THE WITNESS:**  No.

11  Q    Let's move on to October of 2022 on the City -- after the

12  City certified its point in time count and provided the

13  Alliance with a list of milestones and deadlines.  Do you

14  recall that time?

15  A    I do.

16  Q    And at that time in October to November of 2022, did the

17  milestones and deadlines that the City provided include

18  milestones and deadlines for encampment reductions?

19           **MS. KUMAR:**  Objection, Your Honor, beyond the scope

20  of this hearing and the notice provided to the City and

21  relevance.

22           **THE COURT:**  Overruled.  Answer the question please.

23           **THE WITNESS:**  No.

24  //

25  //

1    BY MS. MITCHELL:

2    Q    What did the Alliance do next in regards to this issue, if

3    anything?

4    A    Well, the Alliance wanted to wait and we wanted to wait

5    because we knew that an election was coming up, we knew that --

6    you know, there was going to be a new mayor installed and we

7    had wanted to wait to see what the plans were for that mayor

8    with respect to their homeless strategy and their strategy

9    regarding homeless encampments in the City.

10   Q    By January of 2023, had the City (sic) gotten anything

11   from the City in terms of milestones and deadlines for

12   encampment reduction?

13          MS. KUMAR:  Objection, Your Honor, beyond the scope

14   of the hearing notice that the City was provided, relevance,

15   and lacks foundation.

16          THE COURT:  Overruled, please answer the question.

17          THE WITNESS:  No.

18   BY MS. MITCHELL:

19   Q    What, if anything, did the Alliance do next?

20   A    Well, we wanted to get answers from the City.  We wanted

21   to see if they would be responsive to this matter after the

22   election and specifically to know when they would start

23   collecting data and the City was nonresponsive.

24   Q    Okay.  At some point did the City or did the Alliance have

25   a meeting with the City about this issue?

1    A    Yes, many times.

2    Q    Okay.  In March of 2023, did the Alliance -- was the

3    Alliance promised that the City would be evaluating the council

4    districts?

5            MS. KUMAR:  Objection, Your Honor, calls for

6    speculation, hearsay, beyond the scope, proper scope of this

7    hearing.

8            THE COURT:  Overruled.

9            THE WITNESS:  Yes.  We had meetings with members of

10   the Bass administration and the CAO's office and we were

11   promised essentially a comprehensive evaluation of encampment

12   numbers per council district.  We were promised that a third

13   party evaluator would be -- that there would be an RFP or an

14   RFQ issued and a third party evaluator would be selected in

15   order to determine the number of homeless encampments per

16   council district, and that there would be milestones and

17   metrics that corresponded with those council districts.

18   BY MS. MITCHELL:

19   Q    Okay.  Do you know if the Alliance then sent an e-mail

20   summarizing that meeting?

21   A    Correct.

22   Q    Okay.  Showing you what has been marked as Exhibit 307 and

23   I'm on page 24, there's what purports to be a summary of that

24   meeting at the very top there.  Do you see that, where it

25   starts, in our last meeting?

Webster - Direct / By Ms. Mitchell                    69

1          **MS. KUMAR:**  Objection, Your Honor, calls for

2   speculation, lacks foundation, and hearsay.

3          **THE COURT:**  Overruled.

4          **THE WITNESS:**  Yes, I see it.

5   **BY MS. MITCHELL:**

6   Q    Okay.  Can you read that paragraph into the record?

7   A    Yes.

8          **THE COURT:**  And read that slowly please.

9          **THE WITNESS:**  I will.  In our last meeting, we talked

10  about the RFQ that the City had put out for a list of qualified

11  service outreach providers and that the City expects to be

12  fully staffed with the district's chosen providers by July 1st

13  (please correct me if I got the verbiage wrong).

14          We also discussed that the City could commit to

15  having each district fully assessed and get us a list of

16  proposed milestones and deadlines within three months

17  thereafter (October 1st).

18  Q    Did the Alliance get that list of proposed milestones and

19  deadlines on October 1st?

20  A    We did not.

21  Q    In fact, did the City ever get qualified service or

22  outreach providers identified for each district to your

23  knowledge?

24  A    No.

25  Q    Did the City have the occasion to evaluate the unhoused

1    and encampment needs in each district by September?

2              MS. KUMAR:  Objection, Your Honor, lacks foundation

3    as to whether the City had the opportunity to evaluate anything

4    and vague.

5              THE COURT:  Overruled.

6              THE WITNESS:  Yes, they had an opportunity.

7    BY MS. MITCHELL:

8    Q    I think my question was, did they?

9    A    Oh, they did not.

10   Q    So after October 1st when the milestones and deadlines

11   were received, what happened after that?  And I know I'm asking

12   you to go back two years, so please just use your best

13   recollection.

14   A    Yeah, yeah.  After October 3rd of 2023, we received a

15   document that was essentially a plan for encampment engagements

16   and the various services or entities from the City that are

17   charged with addressing people experiencing homelessness that

18   are unsheltered and living on the street.

19        The -- it was a fairly comprehensive document in terms of

20   the process, by which the City was hoping to engage these

21   encampments and these individuals.  However, that document

22   didn't produce any milestones or metrics.

23   Q    After seeing they didn't produce any milestones or

24   metrics, can you summarize the meetings that occurred from

25   October through January of 2023, October 2023 to January of

Webster - Direct / By Ms. Mitchell                           71

1   2024 between the Alliance and the City?

2          MS. KUMAR:  Objection, Your Honor, lacks foundation,

3   lacks personal knowledge and hearsay.

4          THE COURT:  Overruled.

5          THE WITNESS:  We asked for many meetings from the

6   City.  The City was positively inclined but never really got

7   around to setting up meetings.  We had Zoom meetings, we had

8   personal meetings, it just -- it was very clear to me that the

9   City was using some kind of delay and avoidance tactics --

10         MS. KUMAR:  Objection, Your Honor, as to what the

11  City was doing.  It calls for speculation, lacks foundation.

12         THE COURT:  Overruled, this is your personal opinion.

13         THE WITNESS:  That's correct, thank you.  It was very

14  clear to me that the City was really just delaying and was not

15  interested in meetings with us seriously and actually providing

16  any metrics and milestones that would be actionable.

17  BY MS. MITCHELL:

18  Q    In January of 2024 the Alliance actually met with the

19  Mayor of Los Angeles; is that right?

20  A    That's correct.

21  Q    Do you recall who all was in that meeting?

22         THE COURT:  All right.  Would you put up the document

23  here?

24         MS. MITCHELL:  The letter?

25         THE COURT:  No, 307.  Just a moment.

Webster - Direct / By Ms. Mitchell                          72

1          **MS. MITCHELL:**  Would you like me to zoom in, Your

2    Honor?

3        **(Pause)**

4          **THE COURT:**  Just give me one moment, counsel.

5        **(Pause)**

6          **THE COURT:**  All right.  Please proceed, thank you.

7          **MS. MITCHELL:**  Thank you.  One moment, Your Honor.

8    **BY MS. MITCHELL:**

9    Q    Showing you -- this is still Exhibit C and it's on page

10   24.  Is this the encampment engagement, cleaning and resolution

11   with no milestones or metrics that you were referring to?  307?

12   A    That's correct.

13   Q    And there were several versions of this particular

14   document that were passed back and forth; is that right?

15   A    That's correct.

16   Q    Okay.  Now, going back to my question of January 1st --

17   I'm sorry, January 4th, I believe, did you answer my question

18   who was present in the meeting?

19   A    I did not.

20   Q    Okay.  If you recall, to the extent you recall, who was

21   present in that meeting?

22   A    I think just to refresh my memory, was that the meeting

23   that we held on the east side of city hall?

24          **MS. KUMAR:**  Objection, Your Honor, I don't believe

25   the witness should be asking questions.  He should testify to

1    what he could remember.

2              **THE WITNESS:**  If it was the meeting --

3              **THE COURT:**  Is there something --

4              **THE WITNESS:**  -- on the east side of the city hall,

5    it was the Mayor, the mayor's counsel, it was -- I think it was

6    Lourdes Castro Ramirez, I think it was myself, Daniel Conway,

7    Elizabeth Mitchell.  I think the mayor's counsel was there, as

8    well as Scott Marcus was there and I think Mercede Marquez was

9    there.

10             **MS. KUMAR:**  Objection, Your Honor, lacks foundation

11   based on the witness' statement that he can't remember.

12             **THE COURT:**  Overruled.

13   **BY MS. MITCHELL:**

14   Q    Would looking at the exhibit, the letter summarizing the

15   statement of events refresh your recollection as to the date of

16   the various meetings?  Don't look at the screen right now, I'm

17   asking you.

18   A    I apologize.

19   Q    The letter that we looked at earlier summarizing the dates

20   of events --

21   A    Oh, yes.

22   Q    -- would help refresh your recollection?

23   A    Oh, yes.  It was pretty -- I know that we were engaging

24   with the City at the highest levels to try to come to a

25   resolution on whether or not we would get milestones and

1  metrics on encampment resolutions.

2  Q    So moving forward to January 4th, I'm showing you -- we're

3  still on Exhibit 307, page 25.

4  A    Uh-huh.

5  Q    Take a look at that and see if it refreshes your

6  recollection as to who was present at the meeting.

7  A    Yeah.  So, yeah, Matthew Umhoff was there, I think I hit

8  everybody else, Steven --

9            MS. KUMAR:  Objection, Your Honor.

10            THE COURT:  Just a moment.

11            THE WITNESS:  -- Michaelson, I recall that.

12            THE COURT:  Just a moment.  I want you both to slow

13  down.

14            THE WITNESS:  Okay.

15            MS. KUMAR:  Objection, Your Honor, this is non-

16  responsive.  The question was whether it refreshes his

17  recollection, he's now just reading from --

18            THE COURT:  Counsel, overruled.  Does this refreshes

19  your recollection --

20            THE WITNESS:  Yes, it does.

21            THE COURT:  -- yes or no?

22            THE WITNESS:  Yes, it does.

23            THE COURT:  All right.  Can you state who was at that

24  meeting and do that slowly.

25            THE WITNESS:  It was myself, it was Elizabeth

1    Mitchell.

2              **THE COURT:**  Just a moment.

3              **THE WITNESS:**  It was Matthew Umhoffer.

4              **THE COURT:**  Just a moment.  You're there?

5              **THE WITNESS:**  Yes.

6              **THE COURT:**  Who else, slowly?

7              **THE WITNESS:**  Ms. Mitchell.

8              **THE COURT:**  Next?

9              **THE WITNESS:**  Matthew Umhoffer.

10             **THE COURT:**  Next?

11             **THE WITNESS:**  Mayor Bass.

12             **THE COURT:**  Next?

13             **THE WITNESS:**  Mayor Bass's attorney.

14             **THE COURT:**  Who's that?

15             **MS. MITCHELL:**  Is it Michaelson?

16             **THE WITNESS:**  It's David Michaelson.

17             **MS. KUMAR:**  Objection, Your Honor, counsel is

18   testifying.

19             **MS. MITCHELL:**  We've all been here for five years, we

20   all know David Michaelson is the Mayor's counsel.

21             **THE COURT:**  Well, just a moment, is it really a

22   contention that David Michaelson was there or not, counsel?

23             **MS. KUMAR:**  Your Honor, the --

24             **THE COURT:**  I'm sorry, counsel.  Was Mr. Michaelson

25   there or not, do you know?

1          **MS. KUMAR:**  I don't personally know, the document

2    says --

3          **THE COURT:**  Okay.  Well, we'll spend some time on

4    that.  How are we going to resolve that Mr. Michaelson was

5    there or not?

6          **MS. KUMAR:**  I don't have a problem with him

7    testifying --

8          **THE COURT:**  Counsel, counsel, if we're getting to

9    this, I'm happy to take all the time we need.  How do we get

10   it?  Do we get him there, what do we do?

11         **MS. KUMAR:**  No, Your Honor, I think the question is

12   whether who was --

13         **THE COURT:**  Counsel, was he there or not?  According

14   to your records?

15         **MS. MITCHELL:**  Yes, Your Honor.

16         **THE COURT:**  Okay.  Thank you very much, let's move

17   on.

18         So Mr. Michaelson was there.

19         **THE WITNESS:**  That's right.

20         **THE COURT:**  Who else?

21         **THE WITNESS:**  Matt Szabo was there.

22         **THE COURT:**  Just a moment.  I said go slowly.  After

23   Mr. Szabo, who else?

24         **THE WITNESS:**  I know that Lourdes Castro Ramirez was

25   there.

1          **THE COURT:**  Just a moment.  Who else?

2          **THE WITNESS:**  And Scott Marcus with the City

3    Attorney's Office.

4          **THE COURT:**  Wait just a minute.

5          All right.  Thank you.  Your next question, counsel?

6          **MS. MITCHELL:**  Thank you.

7    **BY MS. MITCHELL:**

8    Q    Did the City make an offer at that meeting?

9    A    Yes, they did.

10   Q    What was the City's offer, if you recall?

11   A    The City's offer was that they were going to implement --

12   that the City was going to implement a wholesale new approach

13   to getting people off the street and that it was proposing a

14   rejection of the council-by-council approach and going with the

15   citywide approach, so that the Mayor's office could have a

16   greater, I guess authority than the city council district

17   approach.

18        They also offered that they would remove, I think it was

19   12,000 homeless encampments through this new approach and if

20   the LA Alliance would accept that proposal.

21   Q    Did the Alliance accept the proposal?

22   A    No, we did not.

23   Q    Why not?

24   A    The reason that we rejected the proposal was because the

25   original settlement language focused on council district --

1          **MS. KUMAR:**  Objection, Your Honor, relevance as to

2     why the Alliance rejected this proposal.

3          **THE COURT:**  Overruled.  Answer the question, please.

4          **THE WITNESS:**  The original settlement language was

5     focused on council district by council district.  And the

6     reason that we were focused on council district by council

7     district was because our constituents, the folks who lived in

8     those council districts wanted to hold the City accountable.

9          So if the City was going to say well, we're going to

10    reject that council district approach and we're going to just

11    focus on the City at large, it would have made it much more

12    difficult for us and our constituents to hold the City

13    accountable.

14          In other words, if there are constituents who are

15    concerned about homeless encampments or people experiencing

16    homelessness in, you know, I'll just say Council District A,

17    but the Mayor's office is focusing on Council District B, we

18    wanted to make sure that there was some equitable performance,

19    or at least that there was performance in all council districts

20    so that the folks who we consider our constituents would be

21    able to see some performance and experience some relief with

22    respect to the crisis of homelessness in their neighborhoods

23    and in their communities.

24    **BY MS. MITCHELL:**

25    Q    So going a little bit further down into that agreement,

 1  give me one second.  Do you see the highlighted sentence?

 2  A    I do.

 3  Q    Can you read that highlighted sentence into the record

 4  please?

 5  A    I will.  Given the constant delay, unfulfilled agreements,

 6  and total denial of other agreements, my client has no faith in

 7  the ability or willingness of the City of Los Angeles to comply

 8  with the proposed milestones and deadlines moving forward.

 9  Q    So this was written in January of 2024.  Moving forward a

10  year and a half to today, do you still believe that that

11  sentence applies?

12         MS. KUMAR:  Objection, Your Honor, relevance, lacks

13  foundation.

14         THE COURT:  Overruled.  You can answer the question.

15         THE WITNESS:  Yes.

16  BY MS. MITCHELL:

17  Q    Yes, you understand the question or yes, did you answer?

18  A    Yes, I understand the question and, yes, I believe that

19  that statement applies today.

20  Q    Why?

21  A    Because --

22         MS. KUMAR:  Objection, Your Honor, relevance.

23         THE COURT:  Overruled.

24         THE WITNESS:  Because we're in court today arguing

25  over whether the City has actually fulfilled and performed the

1    commitments that they agreed to in the settlement instead of

2    actually, you know, analyzing the performance that they've

3    done.

4            We don't -- after the constant delays, after the

5    constant finger pointing between who's responsible for what

6    data, after meet and confer, after meet and confer, after meet

7    and confer, these critical matters to address homelessness in

8    Los Angeles and get people off the streets and get them into

9    shelter beds or housing units has been essentially, you know,

10   delayed.  And that -- and that's a concern.

11           We sued the City, the LA Alliance brought a lawsuit

12   against the City and the County because they wanted to see

13   action.  And when the action was delayed, when we had to

14   continually approach the Court, and we had responses only when

15   on the eve of a court hearing or the eve of a sanction or

16   something, that was the only time we could get responses.

17           So, yes --

18           **MS. KUMAR:**  Objection, Your Honor, move to strike,

19   this calls for speculation, lacks foundation.

20           **THE COURT:**  Overruled.

21           **THE WITNESS:**  So I still have no faith in the ability

22   or the willingness of the City of Los Angeles to comply with

23   the proposed milestones and deadlines.

24   //

25   //

Webster - Direct / By Ms. Mitchell                              81

1   **BY MS. MITCHELL:**

2   Q    The Alliance decided to file a motion for sanctions at

3   that time; is that right?

4   A    That's right.

5   Q    Why?

6             **MS. KUMAR:**  Objection, Your Honor, relevance.

7             **THE COURT:**  Overruled.

8             **THE WITNESS:**  We filed a motion for sanctions because

9   LA Alliance has -- was essentially doing the City's job in

10  holding it accountable and verifying its numbers or trying to

11  verify its numbers instead of monitoring the progress and the

12  City -- the progress that the City had made.

13            We had been delayed.  We'd had to engage, we had to

14  spend money.  We had to verify.  We had to basically chase

15  after the City in order for them to just simply comply with the

16  settlement agreement.

17  Q    Now you attended multiple hearings in this case; is that

18  right?

19  A    That's correct.

20  Q    You're aware that after or are you aware that after the

21  Alliance filed its motion for sanctions that this Court found

22  the City acted in bad faith.

23  A    That's correct.

24  Q    Are you aware that the Court found that the plaintiff, LA

25  Alliance was misled?

Webster - Direct / By Ms. Mitchell                          82

1   A    That's correct.

2            MS. KUMAR:  Objection, Your Honor, hearsay,

3   relevance.  This has already been adjudicated.

4            THE COURT:  Would you repeat your question?

5   BY MS. MITCHELL:

6   Q    Are you aware of whether this Court has found that the LA

7   Alliance was misled?

8   A    Yes.

9            THE COURT:  The objection's overruled.

10  Q    You can --

11  A    Yes, I'm aware that the Court found that LA Alliance was

12  misled by the City of Los Angeles.

13  Q    Let's go ahead and turn to Exhibit 319, the stipulated

14  facts regarding the request for qualification agreement.  Do

15  you see this?

16  A    I do.

17  Q    Are you familiar with this document?

18  A    I am.

19  Q    And this was actually signed by both myself on behalf of

20  the LA Alliance and Scott Marcus on behalf of the defendant

21  City of Los Angeles; is that right?

22  A    That's correct.

23  Q    Was this the basis for the Court's finding of bad faith,

24  if you know?

25  A    That's correct.

1   Q    And that ultimately resulted in the City stipulating to

2   sanctions; is that right?

3              MS. KUMAR:  Objection, Your Honor, lacks foundation.

4              THE COURT:  Overruled.

5              THE WITNESS:  Yes.

6   BY MS. MITCHELL:

7   Q    What were -- what was the stipulated sanction or sanctions

8   as a result of the City's bad faith?

9   A    I think there was some monetary sanctions that were

10  requested by the Court and also there was the finding of bad

11  faith and being misled and then there was also an order for a

12  third party auditor to come in and begin to do financial

13  overview, programmatic overview, essentially it was a process

14  by which we would -- what the Court would ask a third party

15  auditor or assessment organization to come in and start looking

16  at some of the information and the financials and the programs

17  to get an assessment of how the City is performing.

18  Q    And the auditor or assessment ultimately turned out to be

19  Alvarez and Marsal; is that right?

20  A    That's correct.

21  Q    So let's turn to Alvarez and Marsal.  Were you on the

22  oversight committee overseeing or helping to oversee Alvarez

23  and Marsal, I'll refer to them as A&M, A&M's assessment?

24             MS. KUMAR:  Objection, Your Honor, beyond the scope

25  of the hearing from anyone's statement that this is relevant

1   to.

2            **THE COURT:**  Overruled.

3            **THE WITNESS:**  Yes.

4   **BY MS. MITCHELL:**

5   Q    Were you copied on e-mails to and from A&M regarding the

6   assessment?

7   A    Yes.

8   Q    Did you participate in hearings where A&M was reporting

9   its progress?

10  A    Yes.

11  Q    Did you have calls with A&M about its progress?

12  A    Yes.

13  Q    Was, in your opinion, the City cooperative with A&M?

14            **MS. KUMAR:**  Objection, lacks foundation, speculation,

15  relevance as to what this witness' opinion is of the City's

16  compliance.

17            **THE COURT:**  Overruled, only subject to a motion to

18  strike with further foundation, but you can cast your opinion.

19            **THE WITNESS:**  Ask the question again.

20  Q    The question was, was the City, in your opinion,

21  cooperative with A&M?

22  A    No.

23  Q    And what is the basis for that opinion?

24  A    The basis for that opinion is the multiple attempts by A&M

25  to get information from the City to track down data.  Their

Webster - Direct / By Ms. Mitchell                    85

1  expressions of frustration that it took so long to eventually

2  get information that was non-responsive to the objective of the

3  assessment, yeah.

4          **MS. KUMAR:**  Objection, Your Honor, move to strike,

5  that doesn't explain what the foundation for that statement is,

6  merely conclusory.

7          **THE COURT:**  Overruled.

8  **BY MS. MITCHELL:**

9  Q    Were you done with your answer?

10 A    I was.

11 Q    What types of delays did you see, if any?

12 A    The delays that I was aware of was when A&M asked the City

13 or asked LAHSA specific questions, they didn't get answers.

14 They asked close-ended questions with requests for data or with

15 requests to explaining processes and received, you know, non-

16 responsive or we'll have to look into that or we'll get back to

17 you, or this isn't the responsibility of the City, all kinds of

18 excuses from simply responding to the questions of A&M.

19         **MS. KUMAR:**  Objection, Your Honor, lacks foundation,

20 it's improper argument from the witness, and Your Honor, we'd

21 ask for all of this move to strike and a standing objection to

22 this entire line of questioning.

23         **THE COURT:**  Overruled, but I would ask all counsel --

24 and you saw e-mails; is that correct?

25         **THE WITNESS:**  I read e-mails.  I spoke with the

1    investigators --

2           THE COURT:  All right.

3           THE WITNESS:  -- we had Zoom meetings.

4           THE COURT:  Do you have those e-mails?

5           THE WITNESS:  I do.

6           THE COURT:  All right.  Okay.  Then, counsel, you'll

7    meet and confer and these will be disclosed to both parties

8    that they ask, okay.  Counsel, are you aware of these e-mails?

9           MS. KUMAR:  I don't know what e-mails he's referring

10   to, Your Honor.

11          THE COURT:  We'll make those available to both

12   parties.

13          MS. KUMAR:  And I would object, Your Honor, to

14   hearsay, if he's just merely repeating what he has read in a

15   document.  He hasn't established how he himself knows, has

16   personal knowledge of that --

17          THE COURT:  Subject to a motion to strike for further

18   foundation.  We'll get to those e-mails out to all the parties.

19   We can slow this hearing down.

20          MS. MITCHELL:  Thank you, Your Honor.  I believe the

21   City was included in many of those e-mails as well.

22          THE COURT:  Okay.  Was the City --

23          MS. KUMAR:  He doesn't know which e-mails.

24          THE COURT:  Was the City -- just a moment.  Counsel,

25   was the City included in these e-mails?

1          **MS. KUMAR:**  I don't know which e-mails we're talking

2     about, Your Honor, and he's vaguely referencing e-mails --

3          **THE COURT:**  Okay.

4          **MS. KUMAR:**  -- of no date.

5          **THE COURT:**  We've got time.  It'll slow the process

6     down, so all of you will have all the information that's

7     needed.

8          **MS. MITCHELL:**  Thank you, Your Honor.

9          **THE COURT:**  But let's get to the truth and we can

10    take our time doing that for both sides.

11         **MS. MITCHELL:**  Thank you, Your Honor.

12         **THE COURT:**  Okay.

13    **BY MS. MITCHELL:**

14    Q    Did A&M --

15         **THE COURT:**  Just a moment.  You say these e-mails had

16    the City copied them?

17         **MS. MITCHELL:**  I think some of them.

18         **THE WITNESS:**  In many of them.  They were mostly e-

19    mails from Alvarez & Marsal --

20         **THE COURT:**  We'll have -- then you'll disclose that

21    to both parties, those e-mails during the recess that we take.

22         **MS. KUMAR:**  Your Honor, I do have to object to

23    Ms. Mitchell volunteering factual information from the lectern.

24         **THE COURT:**  All right.

25         **MS. KUMAR:**  It's improper, Your Honor.

1          **THE COURT:**  Overruled.  And the City will also

2    produce those e-mails so I have all the e-mails you have

3    concerning this, and the City, I'd like to see all the e-mails

4    that you're copied on.

5          **MS. KUMAR:**  Your Honor, we still don't know what e-

6    mails we're talking about, but we'll meet and confer with

7    counsel.

8          **THE COURT:**  We'll have time.

9          **MS. MITCHELL:**  Obviously not including the privileged

10   e-mails, that's not what we're talking about, but besides the

11   attorney/client communications I think we can certainly --

12   Mr. Webster can certainly produce e-mails, the City can produce

13   all the e-mails with Alvarez and Marsal.

14         **THE COURT:**  If there are e-mails going back and

15   forth, obviously privileged e-mails would not be included.  But

16   A&M must have these e-mails, he's represented the City was

17   copied on some of these e-mails and you've apparently are

18   participating in some of these e-mails.  I'd just like due

19   process so we all see what e-mails, so I'm letting you cast an

20   opinion subject to a motion to strike, further foundation, but

21   let's get all these e-mails.

22         **MS. MITCHELL:**  Thank you, Your Honor.

23         **THE COURT:**  Thank you.

24   //

25   //

1   **BY MS. MITCHELL:**

2   Q    To your knowledge, did A&M ever ask to continue the

3   deadline for deliverance of the assessment?

4           **MS. KUMAR:**  Objection, Your Honor, hearsay, lacks

5   foundation.

6           **THE COURT:**  Overruled.

7           **THE WITNESS:**  Yes.

8   Q    And was that in court?

9   A    Yes.

10  Q    And what was the basis for their request to ask to move

11  the deadline to deliver their assessment?

12          **MS. KUMAR:**  Objection, Your Honor, lacks foundation

13  for this witness knowing what Alvarez and Marsal knew?

14          **THE COURT:**  Well, counsel, the Court can take

15  judicial notice of that.  We actually have these in the

16  transcripts.  Overruled.

17          **THE WITNESS:**  They requested an extension of the

18  deadline because they weren't getting information that they

19  requested from the City.

20  **BY MS. MITCHELL:**

21  Q    Moving on to the encampment reduction reporting, I'm

22  showing you what has been marked as Exhibit 60.  Do you

23  recognize this?

24  A    I do.

25  Q    And what is it?

1   A    This is a quarterly report from the City on encampment

2   resolutions ending June 30th, 2024.  As I recall, this is the

3   first quarterly report for encampment reductions that was

4   provided.

5   Q    Did this quarterly report, this Exhibit B that the City

6   provided cause any concerns for you?

7   A    Yes.

8   Q    Why?

9           **MS. KUMAR:**  Objection, Your Honor, relevance.

10          **THE COURT:**  Overruled.

11          **THE WITNESS:**  The first concern was up until June

12  30th, 2024 we received zero quarterly reporting on encampment

13  reductions.  And so I was concerned that the numbers were --

14  didn't include reductions up until -- you know, was this just

15  this quarter, from January 1st to June 30th.  Was the City

16  going to maintain this low number of encampment resolution

17  after it knew since 2022, two years previous that this was the

18  point of the portion of 7.1.

19          So the low numbers of encampment resolutions

20  concerned me.  The other thing that concerned me was there was

21  no way to verify these numbers.  There was no addresses, there

22  was no specifics in terms of where these encampment resolutions

23  occurred and to what extent.

24          So we had constituents who were eager to learn of

25  encampment reductions in their council districts, in their

1   neighborhoods, in their communities and frankly a lot of these

2   numbers were, you know, they scratched their head and said we

3   don't see this performance, so we're wondering if these numbers

4   are even true.

5            MS. KUMAR:  Objection, Your Honor, hearsay as to what

6   other people told this witness.

7            THE COURT:  Yeah, I'm going to sustain that

8   objection.  I don't know who they are in this conversation.

9            THE WITNESS:  I'm referring to constituents of the LA

10  Alliance, people in the community that, you know, whether they

11  support us through donations or they're interested in our

12  actions, in our lawsuit, who would voluntarily, you know, call

13  me or send me e-mail messages.

14           THE COURT:  I'm going to sustain the objection.

15           MS. KUMAR:  Move to strike, Your Honor.

16           THE COURT:  That portion is stricken, counsel.

17           MS. KUMAR:  Thank you.

18  BY MS. MITCHELL:

19  Q    Did the Alliance ever ask the City for locations and dates

20  to verify the data that it was reporting in these encampment

21  reduction --

22  A    Yes.

23  Q    -- of reports?

24  A    Yes, it did.

25  Q    And did the City then provide the locations and dates to

Webster - Direct / By Ms. Mitchell                              92

1    verify the numbers?

2    A    No, they did not.

3    Q    Was the Alliance concerned or have a suspicion that the

4    City was using sanitation numbers to produce these numbers?

5           MS. KUMAR:  Objection, Your Honor, leading, lacks

6    foundation, speculation.

7           THE COURT:  Overruled, you may answer.

8           THE WITNESS:  Yes, we were concerned.

9           THE COURT:  Just a moment.

10          THE WITNESS:  I apologize?

11          THE COURT:  No, just one moment.  I want to make a

12   note.

13          All right.  Your next question, counsel, thank you.

14   BY MS. MITCHELL:

15   Q    Did the City provide that data?

16   A    On the difference between encampment resolutions and

17   street cleanings?

18   Q    No.  Did the City provide the location and date data?

19   A    No, they did not.

20   Q    Did the Alliance ask the City if it was using sanitation

21   numbers, if you know?

22   A    Yes.

23          MS. KUMAR:  Objection, hearsay.

24          THE COURT:  Overruled.  You can answer the question.

25          THE WITNESS:  Yes.

Webster - Direct / By Ms. Mitchell                              93

1   Q    And what was the City's --

2          THE COURT:  Just a moment.  Reask the question, you

3   were speaking over the top of each other, so let's all slow

4   down and reask the question.

5          MS. MITCHELL:  Thank you.

6   BY MS. MITCHELL:

7   Q    Are you aware of whether the Alliance inquired as to

8   whether the City was using sanitation numbers and sanitation

9   cleanings to report these reductions?

10          MS. KUMAR:  Objection, Your Honor, hearsay.

11          THE COURT:  Overruled.

12          THE WITNESS:  Yes.

13   Q    And how did you become aware of that?

14   A    We had talked about it in court actually.  It became the

15   subject of court testimony on whether or not what was defined

16   as an encampment resolution.

17   Q    Turning to Exhibit 405.  I think I can do this.

18          Which is the most recent refiled report on October 15th of

19   2025 --

20          MS. KUMAR:  Objection, Your Honor, that's incorrect.

21   There's a supplemental report filed after.

22          MS. MITCHELL:  I don't think on encampments.  Well,

23   I'll let you testify.

24   Q    Is this the most recent report on encampment reduction

25   data that the City has filed to your knowledge?

1    A    Yes.

2    Q    Let me back up.  In June of 2025, are you aware of this

3    Court's order after the seven day evidentiary hearing that we

4    had?

5    A    Yes.

6    Q    Are you aware that this Court ordered the City to start

7    reporting encampment reduction metrics consistent with his

8    order that there must be some type of permanent resolution,

9    such as an offer of shelter or housing prior to resolving the

10   encampment?

11   A    Yes.

12   Q    All right.  So showing you this exhibit, Exhibit 405, do

13   you know if the City is accurately reporting encampment

14   reduction reporting at this time?

15          MS. KUMAR:  Your Honor, lacks foundation, calls for

16   speculation.

17          THE COURT:  Overruled, you can cast your opinion.

18          THE WITNESS:  No, I don't know if these are accurate.

19   BY MS. MITCHELL:

20   Q    Why not?

21   A    We can't verify these numbers.  We couldn't -- I mean, it

22   doesn't matter if they put a million encampment reductions in a

23   council district.  There's no way to verify these.

24   Q    Has the Alliance asked for data underlying these

25   reductions?

1    A    Yes.

2    Q    And did the Alliance get that data underlying these

3    reductions?

4    A    No.

5    Q    How many -- let's see if I can zoom in to this part.  How

6    many reductions have they reported as of this last reporting

7    period?

8    A    2,265.

9    Q    And what is the Alliance -- excuse me, what is the City's

10   obligation in this case relating to encampment reductions?

11   A    9,800.

12   Q    And that is by what date?

13   A    That's by, is it June of 2026.

14   Q    So what is the differential, if you can do the quick math?

15   A    It's about --

16   Q    Roughly.

17   A    -- 7,600, 7,535.

18   Q    Something like that.

19   A    Yes.

20   Q    Moving forward, back to Section 7.1 are you aware of

21   whether the Alliance reached out to meet and confer on the

22   City's failure to report metrics pursuant to Section 7.1?

23        MS. KUMAR:  Objection, Your Honor, lacks foundation,

24   speculation.  There's no evidence that this witness was a

25   participant in any of this?

1          THE COURT:  I'll let you lay a little bit more

2    foundation of how you're aware, that's pretty broad.  In other

3    words, did you talk to somebody?  Were you part of this?

4    Counsel, rephrase your question.

5    BY MS. MITCHELL:

6    Q    Yeah, my question was are you aware.

7          THE COURT:  Are you aware, but that is such a wide --

8    is this with conversation with LA Alliance?  I have no

9    foundation for this.

10         THE WITNESS:  I was aware that our legal counsel was

11   making every effort --

12         THE COURT:  Okay.

13         THE WITNESS:  -- to --

14         THE COURT:  So it's legal counsel, it's not just --

15         THE WITNESS:  Correct.

16         THE COURT:  -- off the street.

17         THE WITNESS:  Right.

18         THE COURT:  All right.  Overruled.

19   Q    Okay.

20         MS. MITCHELL:  One moment, Your Honor.

21         MS. KUMAR:  Your Honor, if the witness is going to

22   testify based on what his counsel told him, we would ask for

23   the same reasons we just talked about for due process reasons

24   to have access to have all of these communications.  He's just

25   acting as a microphone for counsel.

1          **THE COURT:**  There was foundational, counsel, you'll

2   have cross-examination.

3          **MS. MITCHELL:**  May I proceed, Your Honor?

4          **THE COURT:**  Please.

5   **BY MS. MITCHELL:**

6   Q    Showing you an e-mail where the City, lots of City lawyers

7   are included in this e-mail, have you seen a copy of this e-

8   mail?

9   A    I have.

10  Q    This is Exhibit 373 for the record and what is this e-

11  mail?

12         **MS. KUMAR:**  Objection, Your Honor, lacks foundation,

13  he is not a recipient of this e-mail.

14         **THE COURT:**  I'm sorry, counsel, I couldn't hear you.

15         **MS. KUMAR:**  Objection, Your Honor, lacks foundation,

16  speculation, he is not a recipient of this e-mail.

17         **THE COURT:**  Does the City have this e-mail in their

18  possession?

19         **MS. KUMAR:**  Yes, Your Honor, but the question is

20  whether this witness has the capacity to testify to this

21  document.

22         **THE COURT:**  Overruled.

23         **THE WITNESS:**  I'm sorry, what was the question, am I

24  aware of this e-mail?

25  //

Webster - Direct / By Ms. Mitchell                          98

1   **BY MS. MITCHELL:**

2   Q    Yes.  Have you seen this e-mail?

3   A    I have.

4   Q    And were you aware that counsel was attempting to meet and

5   confer with the City as of at least July 25th of 2025 on the

6   City's failures relating to Section 7.1?

7            **MS. KUMAR:**  Your Honor, objection, speculation as to

8   what counsel was intending to do.

9            **THE COURT:**  Overruled.

10           **THE WITNESS:**  Yes.

11  Q    Have you -- are you aware of whether any meet and confers

12  ever took place over the last three months on the City's

13  failure to report metrics under Section 7.1?

14  A    No.

15           **MS. KUMAR:**  Objection, Your Honor, same objections

16  and I'd ask for a standing objection to this.  This is an

17  attempt of counsel to testify through a lay witness who has no

18  personal knowledge of these e-mails or documents.

19           **THE COURT:**  Overruled.

20           **MS. KUMAR:**  And I'd just ask for a standing objection

21  to save time, Your Honor.

22           **THE COURT:**  Standing objection, counsel.

23           **THE WITNESS:**  No, they did not meet and confer.

24  //

25  //

Webster - Direct / By Ms. Mitchell                          99

1    **BY MS. MITCHELL:**

2    Q    You don't believe they met and conferred?

3    A    No.

4    Q    Are you aware of whether the -- let me ask this question.

5    Going back to October of 2022 or even before, when the

6    agreement was entered into in April or May of 2022, did the

7    City ever reach out to discuss the terms identified in Section

8    7.1?

9         **MS. KUMAR:**  Objection, Your Honor, foundation as to

10   what the City reached out to an unknown person three years ago.

11        **THE COURT:**  If you're aware of that, you can answer

12   the question.

13        **THE WITNESS:**  No.

14   **BY MS. MITCHELL:**

15   Q    To your knowledge, has the City ever reached out

16   proactively to the LA Alliance to meet and confer about what it

17   seemed to think were ambiguous terms contained in Section 7.1?

18        **MS. KUMAR:**  Objection, speculation as to what the

19   City did and to whom it reached out to anyone at the Alliance.

20        **THE COURT:**  Overruled, you can answer the question.

21        **THE WITNESS:**  No.

22   Q    Are you aware of any efforts that the City has ever made

23   to track the metrics provided for under Section 7.1?

24        **MS. KUMAR:**  Objection, lacks foundation for this

25   witness' testimony of what the City has or has not done.

Webster - Direct / By Ms. Mitchell                    **100**

1          **THE COURT:**  Overruled.  You can answer the question.

2          **THE WITNESS:**  I am aware that they attempted to track

3   housing and shelter opportunities.  I'm aware that they

4   attempted to track encampment resolutions, but there are a

5   number of things in 7.1 that I'm not aware that they tracked.

6   **BY MS. MITCHELL:**

7   Q    And has anybody from the City, anybody from the City

8   contacted you personally to talk about ambiguous terms that

9   they allege were contained in Section 7.1?

10  A    No.

11  Q    Have you been in any meetings involving any discussions

12  about ambiguous terms in Section 7.1?

13  A     No.

14          **MS. MITCHELL:**  I think I have no further questions at

15  this time, Your Honor.

16          **THE COURT:**  Cross-examination?

17          **MS. KUMAR:**  Your Honor, could we ask for just a short

18  recess?

19          **THE COURT:**  Absolutely.  Now, do you want to go next

20  or do you want the intervenors?  How -- what's the agreement

21  between you two?

22          **MS. KUMAR:**  How about we -- I would propose that the

23  intervenors go next, if they have questions.

24          **THE COURT:**  Ms. Myers, what's your preference.

25          **MS. MYERS:**  That's fine, that's consistent with what

Webster - Cross / By Ms. Myers                                    **101**

1   we did last time, so that's fine with me.

2          **THE COURT:**  All right.  I think it's consistent.

3   Let's have intervenors next and that way you both can.  Okay.

4   All right.  Counsel, 15 minutes is acceptable, but make it a

5   quarter after the hour, that gives you 20 minutes to use the

6   restroom and relax.  All right.  Thank you, sir, please step

7   down.

8          **(Recessed at 1:56 p.m.; reconvened at 2:19 p.m.)**

9          **THE COURT:**  Have a seat, thank you very much, folks.

10  It's very much appreciated.  Have a seat.  Now we're back in

11  session.  All counsel are present, the parties are present, the

12  witness has retaken the stand and this would be questions by

13  intervenor, by Shayla Myers.

14         **MS. MYERS:**  Thank you, Your Honor.  This is Shayla

15  Myers on behalf of the intervenors.

16                          **CROSS EXAMINATION**

17  **BY MS. MYERS:**

18  Q    Mr. Webster, I just have a couple of questions for you.

19       Going back to the status updates and particularly 7.1 and

20  the metrics that the LA Alliance negotiated for the settlement

21  agreement, when you were talking about your understanding of

22  the metrics, the four metrics at the end of provision 7.1,

23  which is the City will work with LAHSA to include in a

24  quarterly updates, to the extent possible on those four

25  particular metrics, is it your understanding that jurisdictions

Webster - Cross / By Ms. Myers                                    **102**

1    normally collect these metrics?

2              **MS. KUMAR:**  Objection, lacks foundation, speculation.

3              **THE COURT:**  Overruled, you can answer the question.

4              **THE WITNESS:**  It depends.  It depends who's asking.

5    So in my work, as I talk with the decision-makers, whether

6    they're governors or governor's offices, mayors, city council

7    members, they're very interested in these metrics.  If I'm

8    talking with continuums of care that are interested in these

9    metrics, but sometimes there's challenges with respect to how

10   they collect the data and how they report the data and

11   whether -- and how costly it is.

12             So there -- as an advocate, I'm advocating for more

13   of this kind of data collection and data reporting and

14   transparency, so that we actually know what is going on on the

15   ground with respect to offers and acceptances and rejection.

16   So it's kind of burgeoning area that I think more and more

17   jurisdictions are interested in.

18   **BY MS. MYERS:**

19   Q    And why do you think jurisdictions are interested in this

20   particular data?

21             **MS. KUMAR:**  Objection, Your Honor, lacks foundation,

22   speculation.

23             **THE COURT:**  Would you repeat that?  That was a little

24   quick, I didn't hear the full question.

25   Q    And why do you think jurisdictions are particularly

Webster - Cross / By Ms. Myers                               **103**

1    interested in this type of data?

2              **THE COURT:**  Overruled, you can answer the question.

3              **THE WITNESS:**  I think jurisdictions are interested in

4    this particular data, because the data that they're receiving

5    typically through point in time counts, typically through

6    continuums of care reports don't give decision-makers enough

7    information about whether or not programs are effective and how

8    they are actually impacting individuals that are in need of

9    housing and services and assistance.

10   **BY MS. MYERS:**

11   Q    So looking at the specific data point and the number of

12   people experiencing homelessness that are engaged, is it your

13   understanding that that data point is a commonly understood

14   data point in homeless services?

15             **MS. KUMAR:**  Objection, Your Honor, lacks foundation,

16   speculation.

17             **THE COURT:**  Overruled, you can answer the question.

18             **THE WITNESS:**  Yes.

19   Q    And so the next data point, the number of PEH who have

20   accepted offers of shelter or housing, is it your understanding

21   that that particular data point is a commonly understood data

22   point in homeless services?

23   A    Yes.

24             **MS. KUMAR:**  Objection, Your Honor, lacks foundation,

25   vague, legal conclusion, speculation.

Webster - Cross / By Ms. Myers                                    **104**

1            **THE COURT:**  Overruled.

2            **THE WITNESS:**  Yes.

3    Q    And the number of people experiencing homelessness who

4    have rejected offers of shelter or housing, is it your

5    understanding that that is a commonly understood data point for

6    purposes of homeless services?

7            **MS. KUMAR:**  Objection, Your Honor, same objection.

8            **THE COURT:**  Overruled.

9            **THE WITNESS:**  Yes.

10   **BY MS. MYERS:**

11   Q    And the number of encampments, is it your understanding

12   that that is a commonly understood data point for purposes of

13   homeless services?

14           **MS. KUMAR:**  Same objections, Your Honor.

15           **THE COURT:**  Overruled.

16           **THE WITNESS:**  Yes.

17   Q    And this data point specifically related to why offers

18   were rejected, would you say that that is a commonly understood

19   data point for purposes of homeless services?

20           **MS. KUMAR:**  Objection, Your Honor, same objection.

21           **THE COURT:**  Overruled.

22           **THE WITNESS:**  I think it is a commonly understood

23   data point.  I think it's a -- it can be a complicated data

24   point, but again it really depends on how this data is being

25   collected and how it's being analyzed.  And truly it depends on

Webster - Cross / By Ms. Myers                              **105**

1    jurisdiction by jurisdiction in terms of why offers of housing

2    and services are being rejected.

3              **MS. KUMAR:**  Objection, Your Honor.  He just said that

4    it depends on the jurisdiction, I would move to strike anything

5    about common understanding since that undermines that entire

6    premise.

7              **THE COURT:**  All right.  Thank you, counsel, the

8    answer stands.

9    **BY MS. MYERS:**

10   Q    And why is it that the reason why offers are rejected is

11   an important data point for purposes of homeless services from

12   your perspective as the executive director of the LA Alliance?

13             **MS. KUMAR:**  Objection, Your Honor, speculation.

14             **THE COURT:**  Overruled.

15             **THE WITNESS:**  I think that this is an important data

16   point because it gets to the performance of existing programs

17   and existing initiatives.  If -- I'll give you an example.

18             In the City of Chico, California created a sanctioned

19   campground.  The campground was remote, it was -- had no

20   transportation services.  It was in my view a lot of gravel, a

21   lot covered with gravel with a chain-link fence around it.

22             **MS. KUMAR:**  Objection, Your Honor, any testimony

23   about other jurisdictions is simply not relevant to this

24   proceeding.

25             **THE COURT:**  What are you trying to illustrate with

1    this example?

2           THE WITNESS:  I'm trying to illustrate why people

3    would reject offers of services.  If the accommodations are not

4    appealing, if the accommodations are -- lack any kind of real

5    services, you could offer all you want and people are going to

6    say I don't want to go there.

7           THE COURT:  Okay.  There's no further -- that's

8    sufficient.  Let's move on.

9           MS. MYERS:  Okay.

10          THE COURT:  And by the way, one of my kids went to

11   Chico State and never missed a party, proof of attendance,

12   okay, so near Pioneer Park.  All right.  Counsel.

13   BY MS. MYERS:

14   Q    And in your experience, are these four data points, are

15   they data points that are frequently sought after by advocates

16   who are working in the realm of homeless services?

17          MS. KUMAR:  Objection, Your Honor, lacks foundation,

18   speculation as to the whole host of advocates in this space.

19          THE COURT:  Overruled.  You can answer the question.

20          THE WITNESS:  In my perspective, I think these are

21   data points that are becoming more and more important as people

22   see the deficiencies and the types of available data and

23   information that exists, to try to explain whether or not

24   homelessness programs and homelessness assistance are actually

25   having the intended desired effect that they were designed to

Webster - Cross / By Ms. Myers                              107

1    do.

2    Q    And when you negotiated these for the collection of this

3    data, was that what you had in mind when you were specifically

4    adding these provisions to the settlement agreement?

5    A    Correct.  We wanted to make sure that this is important

6    data that would demonstrate the performance of the City and how

7    it would respond to the crisis of homelessness in Los Angeles.

8              MS. KUMAR:  Objection, Your Honor, move to strike as

9    to relevance.

10             THE COURT:  Overruled.

11             MS. MYERS:  No further questions, Your Honor, thank

12   you.

13             THE COURT:  Then cross-examination by the City

14   please.

15             MS. KUMAR:  Yes, Your Honor.

16             THE COURT:  And would you state your name for the

17   record one more time.

18             MS. KUMAR:  Sure, Poonam Kumar on behalf of the City,

19   Your Honor.

20             THE COURT:  Thank you.

21             MS. KUMAR:  Before I begin, I just want to make a

22   couple of notes and objections for the record, Your Honor.  I

23   would start with where the Court began in this hearing with a

24   recitation of facts.  It appears the Court was referring to

25   possibly a prior filing from the Alliance several years ago,

Webster - Cross / By Ms. Myers                                    **108**

1    the City, of course, would object to the recitation of those

2    facts, the reliance on those facts, because they are not

3    stipulated to, they are arguments by counsel and any decisions

4    based on it.

5               I would also reiterate the objections that

6    Ms. Evangelis stated at the beginning of this hearing as to the

7    scope of this hearing, as to Mr. Gary, as to the stipulated

8    facts in 2024, and then through the course of Ms. Mitchell's

9    opening, and of course, the direct of Mr. Webster, we have had

10   numerous other topics referenced, including but not limited to

11   encampment reductions plans, 5.2, A&M, oversight restructure, a

12   November 11th, 2025 supplemental report that postdated the

13   Court's OSC and several other matters, we would object to any

14   of those being the scope of this hearing.

15              The City was provided no notice of those, and of

16   course being provided notices of fundamental due process ground

17   certainly with regards to holding the City in contempt.  We've

18   had no ability to prepare for rebutting any of those facts.

19   And it has been significantly prejudiced by its inability to do

20   so.

21              We'd also object on the fact that this has already

22   been litigated and resolved, which we'll talk about again.  And

23   I would ask that we have a standing objection to anything that

24   is beyond the scope of what the Court puts in its order subject

25   to the earlier statements of Ms. Evangelis.

Webster - Cross / By Ms. Myers                                    **109**

1              Lastly, Your Honor, I would move to strike

2    Mr. Webster's testimony on the following grounds.  He testified

3    about unidentified, unproduced e-mails en masse, hearsay,

4    there's due process violations.  We have no ability to confront

5    that and we will be asking for production of all of the

6    communications between counsel and Mr. Webster related to the

7    scope of his testimony.

8              He testified extensively about we and spoke

9    collectively about the Alliance, it's not proper.  There is no

10   30(b)(6) or PMKs in trials or hearings.  The witness' testimony

11   must be based on his personal knowledge.

12             He testified at length about his personal opinions,

13   it's simply not relevant, it's improper opinion.  He testified

14   extensively beyond the issues of the scope of this hearing,

15   upon which the City was put on notice, as I said before and the

16   witness was allowed to be a microphone for counsel and make

17   arguments and testified as an improper expert.

18             So on these bases and the basis of all of my

19   objections during his testimony, we'd move to strike his

20   testimony in whole.

21             **THE COURT:**  All right.  Counsel, do you have

22   questions?  Those objections are noted.  And Mr. Webster will

23   be available for recall.  We're going to move very slowly so in

24   terms of due process, I imagine a number of items are going to

25   be produced.  You'll have plenty of time, he'll be available.

Webster - Cross / By Ms. Kumar                                110

1          **MS. KUMAR:**  Thank you, Your Honor.  That was going to

2   be my last request.  Appreciated.

3                          **CROSS EXAMINATION**

4   **BY MS. KUMAR:**

5   Q    Good afternoon, Mr. Webster.  I want to -- we talked about

6   a lot during your direct examination and so I want to talk -- I

7   want to start by talking about many of the events that started

8   in 2022 and through 2024 that you talked about in your direct

9   examination.

10       You talked about a motion that the Alliance filed in

11  February of 2024, asking for settlement agreement compliance

12  and sanctions against the City.  Do you recall that?

13  A    I do.

14  Q    Okay.  And that is at Docket 668 and is the Plaintiffs'

15  Exhibit 305.

16          **MS. KUMAR:**  If we could put that up.  Defendants'

17  Exhibit 305.  Or no, sorry, Plaintiffs' Exhibit 305, sorry.

18          **UNIDENTIFIED:**  I'm sorry, I don't have that one.

19          **MS. KUMAR:**  Okay.  No problem.  We can get you a hard

20  copy.

21  Q    Do you recall that there was a motion filed, you recall,

22  right, for compliance and for sanctions; is that right?

23  A    Yes.

24  Q    And the basis of that motion were numerous things that

25  happened in 2023 and 2023 -- 2022 and 2023; is that right,

Webster - Cross / By Ms. Kumar                              **111**

1   Mr. Webster?

2   A    Yes, you mean 2023 and 2024, is that what you're saying?

3   Q    Between 2022 and February of 2024 there was a motion filed

4   for a series of things that the Alliance believed were in non-

5   compliance on the City's part; is that right?

6   A    Correct.

7   Q    And that motion was filed in February of 2024 at Docket

8   668 and one of the things mentioned in that motion, amongst

9   many, was a series of meetings held in March of 2023.  Do you

10  recall that?

11  A    Yes.

12  Q    Okay.  Now, as a result of after filing that motion, the

13  parties actually entered into a stipulation, did they not?

14  A    Yes.

15  Q    Okay.  And that stipulation was filed on April 4th, 2024.

16  Do you recall that?

17  A    I believe this is the stipulation that was signed by

18  Elizabeth Mitchell and the City attorney Scott Marcus.

19  Q    Okay.  And there was actually ultimately a filing --

20  A    Is that correct?

21  Q    -- in court with that stipulation.  Do you recall that?

22  A    Yes, I believe that stipulation was filed in court.

23  Q    Okay.  And that's Docket 713.

24        **MS. KUMAR:**  And I'm going to ask for that to be

25  brought up, that's Plaintiffs' Exhibit 326.

Webster - Cross / By Ms. Kumar                    **112**

1          There we go.

2          So sorry, so this is the stipulation.  Your Honor,

3    I'd ask the Court to take judicial notice and move it into

4    evidence as a court record obviously.

5    **BY MS. KUMAR:**

6    Q    It's entitled joint stipulation to resolve motion for

7    order regarding settlement agreement compliance and --

8          **THE CLERK:**  Pull the microphone closer to you.

9          **MS. KUMAR:**  Sure.

10   **BY MS. KUMAR:**

11   Q    And sanctions.  Do you see that?

12   A    I do.

13   Q    Okay.  And that was filed by both parties, both the City

14   and the -- it was filed by the City, but if we turn to the last

15   page of this document, it was signed by both the City

16   Attorney's office, as well as your counsel, Elizabeth Mitchell.

17   Do you see that?

18   A    I do.

19   Q    Okay.

20         **MS. KUMAR:**  And if we go back to the second page for

21   a moment.  Sorry, the first page, apologies.

22   Q    We -- it says here at the beginning that the LA Alliance

23   and the City respectfully submit the following stipulation to

24   resolve plaintiffs' motion for order re settlement agreement

25   compliance and sanctions; is that right?  Did I read that

Webster - Cross / By Ms. Kumar                                    **113**

1    correctly?

2    A    I think that's what it says.

3    Q    Okay.  And then it proceeds to talk about a series of

4    things including those March 2023 meetings that you talked

5    about; isn't that right?

6    A    Yes.

7    Q    Then if we turn to page 4 of this document -- oh, sorry,

8    just pausing right here, we -- here in paragraph 6 there's a

9    reference for 5.2, do you see that?

10   A    I do.

11   Q    And in paragraph 4, we see a reference to the RFQ in

12   January 2023.  Do you see that?

13   A    I do.

14   Q    Okay.  And then in the paragraph 7, we see there was a

15   reference to that January 2024 meeting with the Mayor; is that

16   right?

17   A    That's what it looks like.

18   Q    And then on page 8, there's a discussion of encampment

19   reduction plan and milestones and what the City did and did not

20   do according -- is that right?

21   A    Paragraph 8?

22   Q    Yes, paragraph 8.

23   A    Correct.

24   Q    Okay.  And so the stipulation reads based on the foregoing

25   facts, the parties agree to resolve the motion by making the

Webster - Cross / By Ms. Kumar                                    **114**

1    following stipulations.  Did I read that correctly?

2    A    I think so.

3    Q    Okay.  And so what happened is the City agreed to pay for

4    the court ordered audit that you talked about; is that right?

5    A    Uh-huh.

6    Q    Okay.  Agreed to meet once a month.  Do you see that?

7    A    Yes.

8    Q    C, the City agreed to pay the Alliance's fees and costs;

9    isn't that right?

10   A    Yes.

11   Q    Okay.  So the City did, in fact, pay you as a result of

12   this stipulation; isn't that right?

13   A    Yes.

14   Q    Okay.  And you are now at this hearing asking for

15   additional funds; isn't that right?

16   A    Yes, I think that's part of our motion.

17   Q    Okay.  And again, this stipulation and the payment of

18   those funds was to resolve all of the matters raised in your

19   motion for compliance, agreement compliance and sanctions;

20   isn't that right?

21        **MS. MITCHELL:**  Objection, calls for a legal

22   conclusion.

23        **MS. KUMAR:**  Your Honor, the witness --

24        **THE COURT:**  Overruled, overruled, you can answer the

25   question.

Webster - Cross / By Ms. Kumar                                    **115**

1           **THE WITNESS:**  I can't make a determination of -- on

2    that question.

3    **BY MS. KUMAR:**

4    Q    You're not able to determine whether or not your motion

5    for settlement compliance and sanctions was resolved by the

6    stipulation?

7           **MS. MITCHELL:**  Objection, Your Honor, calls for a

8    legal conclusion.

9           **THE COURT:**  Overruled, you can answer, you can cast

10   your opinion.

11          **THE WITNESS:**  I can't make a determination of whether

12   it resolves all of the concerns that we had.  I see that it

13   resolves eight paragraphs' worth of concerns that we had that

14   were presented on that particular -- in that particular

15   stipulation.  But I think what -- yeah.

16   **BY MS. KUMAR:**

17   Q    Okay.  So, Mr. Webster, if we could go back to page 2 of

18   this exhibit.

19   A    Uh-huh.

20   Q    It says at the very beginning right before paragraph one,

21   plaintiffs LA Alliance for Human Rights, that's you, right,

22   you're testifying over our objection as a PMK for that

23   organization; is that right?

24   A    Correct.

25   Q    Okay.  Plaintiffs LA Alliance and defendant City of Los

Webster - Cross / By Ms. Kumar                              **116**

1   Angeles, those are the parties to the settlement, correct?

2   A    Uh-huh.

3   Q    Respectfully submit the following stipulation to resolve

4   plaintiffs' motion for order re settlement agreement compliance

5   and sanctions.  Isn't that right?

6   A    That's correct.

7   Q    Okay.  Does it say partially resolved, Mr. Webster?

8   A    No.

9   Q    It says resolved; is that right?

10  A    It says, resolved plaintiffs' motion for order re

11  settlement agreement, compliance and sanctions.  It doesn't say

12  all.

13  Q    Okay.  But it does say to resolve the motion that your

14  organization brought, correct?

15  A    Correct.

16  Q    Which is at Docket --

17  A    Yeah, that's not what you asked.

18  Q    Okay.  Well, I think there's a transcript, we'll go back

19  and take a look at that.

20       Okay.  Mr. Webster, we'll go on to talk about 7.1.  You

21  testified quite a bit about 7.1.  To be clear, you have never

22  been employed by the City of Los Angeles; is that right?

23  A    No.

24  Q    And you've never been employed by LAHSA; is that right?

25  A    No.

Webster - Cross / By Ms. Kumar                                117

1    Q    And you can't speak or act on behalf of the City; is that

2    right?

3    A    No.

4    Q    Okay.  And you can't act and speak on behalf of LAHSA; is

5    that right?

6    A    Not at all.

7    Q    Okay.  And so you can't testify in any way as to what the

8    City thought during negotiations of the settlement agreement,

9    can you?

10   A    No.

11   Q    And you can't testify as to what LAHSA thought during any

12   negotiations over the agreement, correct?

13   A    That's correct.

14   Q    Now, you testified a lot about your opinions over what was

15   in 7.1 and that's what they were, your opinions; is that right,

16   Mr. Webster?

17           **MS. MITCHELL:**  Objection, vague and ambiguous as

18   to --

19           **THE COURT:**  Overruled.

20           **MS. MITCHELL:**  -- objection.

21           **THE COURT:**  If you understand the question, you can

22   answer it.

23           **THE WITNESS:**  There are opinions and there are also

24   my professional expertise.

25   //

Webster - Cross / By Ms. Kumar                                    **118**

1    BY MS. KUMAR:

2    Q    But were you testifying today as an expert, Mr. Webster?

3    A    I'm testifying as the executive director of the LA

4    Alliance and the expertise that goes along with that, yes.

5    Q    Okay.  But these are your opinions, Mr. Webster, your

6    opinions, correct?

7    A    They're -- yeah, they're my advocacy and policy analysis

8    recommendations with respect to the LA Alliance.

9    Q    Okay.  So they are your advocacy, correct?

10   A    That's right.

11   Q    Okay.  And your policy pronouncements, correct?

12   A    That's right, that made it into a settlement with the City

13   of Los Angeles.

14   Q    Your advocacy made it into a settlement, is that what

15   you're saying?

16   A    Well, when we were negotiating the settlement and they

17   said -- and I was asked, what kind of data do you think should

18   be included in the settlement, that is the result of the

19   question.  So I responded and this is the data that I

20   recommended be included in the settlement.

21   Q    Okay.  Well, we're going to talk about that data.

22        Let's take a look at 7.1, if we can.  This is the

23   provision we've been spending a lot of time talking about

24   today, Mr. Webster.

25        So as your counsel went through there are seven components

Webster - Cross / By Ms. Kumar                                    **119**

1   of 7.1.  We're going to start with the number of housing or

2   shelter opportunities created or otherwise obtained.  It is

3   your opinion, as you testified on direct, that the City has

4   been reporting this particular data point; is that right?

5   A    They've issued reports that have the number of housing and

6   sheltered opportunities created or otherwise obtained.

7   Q    Okay.  And then the next one is the number of beds or

8   opportunities offered; is that right?

9   A    That's what it says.

10  Q    Okay.  And you -- your contention is that the City has not

11  been reporting this figure; is that right?

12  A    I have seen no reports on the number of beds or

13  opportunities offered.

14  Q    Okay.  And you said -- and just to be clear, nowhere in

15  this agreement does the word -- is the word offered defined; is

16  that right?

17  A    Not that I know of.

18  Q    Okay.  And then the next is the number of beds or

19  opportunities currently available in each council district and

20  it's your opinion that the City has not been complying with

21  this provision either; is that right?

22  A    That is correct.

23  Q    Okay.  Is anywhere in this agreement that the word

24  available is defined in the agreement?

25  A    Not that I know of.

Webster - Cross / By Ms. Kumar                                    120

1   Q    Okay.  Next it says the City will work with LAHSA to

2   include in the quarterly status reports to the extent possible;

3   is that right?

4   A    That's what it says.

5   Q    The first one is the number of PEH engaged.  Do you see

6   that?

7   A    I do.

8   Q    Okay.  No where in this agreement does it say who is to be

9   engaging with the persons experiencing homelessness; is that

10  right?

11  A    No, I don't think it does say that.

12  Q    Okay.  And nowhere in this agreement does it say where the

13  engagement has to happen for it to be tracked.

14  A    Not that I could tell.

15  Q    Okay.  And the word engaged is also not defined; is that

16  right?

17  A    No, it's not.

18  Q    Okay.  And the next is the number of persons experiencing

19  homelessness who have accepted offers of shelter or housing, do

20  you see that?

21  A    I sure do.

22  Q    Okay.  The agreement doesn't define the geographic scope

23  in terms of where the offer has to have been accepted; is that

24  right?

25  A    No.

Webster - Cross / By Ms. Kumar                                         121

1   Q    Okay.  And it doesn't tell -- it doesn't define the

2   location of the shelter or housing, does it?

3   A    No.

4   Q    Okay.  It also doesn't define who has to be making the

5   offers, does it?

6   A    No.

7   Q    And it doesn't say whether the offers have to be made for

8   specific beds created by this settlement agreement; isn't that

9   right?

10  A    Not specifically.

11  Q    Okay.  I just want to turn your attention just before

12  that, to the extent possible, is that phrase defined anywhere

13  in the agreement?

14  A    Not that I could tell.

15  Q    And you negotiated this agreement, right?

16  A    I was a party.

17  Q    Okay.  The next raises the number of PEH who have rejected

18  offers of shelter or housing and why the offers were rejected.

19  Do you see that?

20  A    Of course.

21  Q    Okay.  Again, the agreement does not say who had to have

22  made the offer; is that right?

23  A    That's right.

24  Q    Okay.  It doesn't say where the offer should have been

25  made; isn't that right?

Webster - Cross / By Ms. Kumar                    **122**

1   A    That's right.

2   Q    And it doesn't say that the offer has to be for a bed

3   created by an agreement; isn't that right?

4   A    That's right.

5   Q    Okay.  You also spent a fair amount of time talking about

6   the -- that you didn't get data to verify -- oh, excuse me, I'm

7   sorry, the number of encampments in each council district.  Do

8   you see the -- is the manner in which the City is supposed to

9   report on that specific metric, is that defined specifically

10  anywhere in the agreement?

11  A    No.

12  Q    Okay.  You also talked on direct about how you have no way

13  of verifying this data; isn't that right, or anything the City

14  reports; is that right?

15  A    That's right.

16  Q    You being the Alliance; is that right?

17  A    That's correct.

18  Q    Now we're talking just about 7.1 here, Mr. Webster.  Is

19  there any requirement that the City actually produce the

20  underlying data to you in 7.1?

21  A    Are you saying that there's nothing in this paragraph that

22  says it specifically has to come to the LA Alliance?

23  Q    That there is nothing that requires the City to produce

24  data to you at the Alliance verifying the data underlying --

25  the information that is reported in the quarterly reports.

Webster - Cross / By Ms. Kumar                           **123**

1    A    No.

2    Q    Now, Mr. Webster, in addition to the sanctions you got in

3    2024 there was also an evidentiary hearing a few months ago;

4    isn't that right?

5    A    That's right.

6    Q    Okay.  And it lasted for several weeks; isn't that right,

7    Mr. Webster?

8    A    It did.

9    Q    And one of the major topics and you were present for that

10   hearing?

11   A    For most of it.

12   Q    Okay.  And one of the topics discussed at that hearing was

13   about the A&M audit; isn't that right?

14   A    I believe so.

15   Q    And, in fact, people from A&M testified at the hearing at

16   length; isn't that right?

17   A    They did.

18   Q    Okay.  And the Court rendered an opinion and an order

19   after that hearing; isn't that right?

20   A    Right.

21   Q    Now, you were sitting in the hearing for that portion, do

22   you recall the provision 7.1 being discussed?

23   A    I believe it was, I can't recall specifically but I

24   believe it was.

25   Q    You can't recall as you sit here?

Webster - Cross / By Ms. Kumar                              **124**

1    A    I can't recall specifically, but I believe it was.

2    Q    Okay.  But you recall who talked about it?

3    A    No.

4    Q    Okay.  Now, you know that the special master in this case

5    is supposed to oversee the City's compliance; is that right?

6    A    Monitor.

7    Q    Monitor the City's compliance, okay.

8    A    Correct.

9    Q    Has the Alliance ever filed an objection to the special

10   master's report, any of her reports?

11   A    I don't believe we have.

12   Q    Next, you testified about discussion between your lawyers

13   and the City regarding 7.1 during your direct.  Do you remember

14   that?

15   A    Yes.

16   Q    In particular we put up -- your counsel put up her

17   declaration, which I believe is Plaintiffs' Exhibit 372, if I'm

18   not mistaken.  Nope, never mind.

19        Well, we'll start with Exhibit A which she showed you,

20   which is Plaintiffs' Exhibit 373.

21        If we turn to the next page.

22   A    Uh-huh.

23   Q    This is the e-mail that your counsel showed you during

24   your direct; is that right?

25   A    Yes.

Webster - Cross / By Ms. Kumar                    **125**

1    Q    Okay.  Could you tell me where in this document you're

2    copied on the e-mail?

3    A    I'm not.

4    Q    In fact, you're not a recipient of the e-mail, correct?

5    A    That's right.

6    Q    You're not a sender of the e-mail; isn't that right?

7    A    That's right.

8    Q    And, in fact, you testified that the only way you know

9    about this e-mail is through your counsel; isn't that right?

10   A    That's what I said.

11   Q    Okay.  And have you produced to the City in the spirit of

12   transparency your e-mails and communications with your counsel?

13   A    I've not been called upon to do so.

14   Q    Okay.  But if you would, you would comply with that

15   request, wouldn't you?

16        **MS. MITCHELL:**  Objection, Your Honor.  This is

17   improper inquiry into attorney/client privileged information.

18        **MS. KUMAR:**  Your Honor, counsel waived that by asking

19   him to testify about what counsel told him on the stand.

20        **MS. MITCHELL:**  I certainly did not, Your Honor.

21        **THE COURT:**  That's not a waiver, counsel.  And if

22   we're going to get into that area, be careful on both sides,

23   because if I open up that box, it's going to be coal and coal

24   for both of you.

25        **MS. KUMAR:**  Your Honor, the City has not even closely

Webster - Cross / By Ms. Kumar                                126

1   come close to waiving that privilege but this witness is

2   testifying to things that his counsel told him.

3          **THE COURT:**  Counsel, it's up to you.  You can proceed

4   the way you choose.

5          **MS. KUMAR:**  Understood, Your Honor.

6   **BY MS. KUMAR:**

7   Q    So you're not copied on this e-mail; isn't that right?

8   A    That's correct.

9   Q    Okay.  Now, the next exhibit is Exhibit B to the

10  declaration, which is Plaintiffs' Exhibit 374.  If we go to the

11  next page, are you copied on this e-mail, Mr. Webster?

12  A    No.

13  Q    Okay.  You're not a recipient or a sender of the e-mail;

14  isn't that right?

15  A    That's correct.

16  Q    So again you're testifying based on what your lawyers have

17  told you; isn't that right?

18  A    No.

19  Q    You're not testifying based on what your lawyers have told

20  you.

21  A    That's correct.

22  Q    To the extent you have any knowledge of this e-mail it's

23  based on what your lawyers have told you; is that right?

24  A    That's incorrect.

25  Q    Do you have knowledge of this e-mail?

Webster - Cross / By Ms. Kumar                         127

1  A    I do.

2  Q    Okay.  And how did you gain knowledge of that e-mail?

3  A    My counsel and I we share information including e-mails

4  that the City and other parties, you know, share with one

5  another --

6           MS. MITCHELL:  Objection, Your Honor, this is

7  starting to go into attorney/client privileged information.

8           THE COURT:  Overruled.  This is how he gained his

9  knowledge about the e-mail, overruled.

10  BY MS. KUMAR:

11  Q    You can continue.  You said your counsel and you exchange

12  e-mails and discuss things about it, is that how you gained

13  knowledge of this e-mail?

14  A    We share all kinds of information with respect to this

15  case, absolutely.

16  Q    Okay.  So you gained the knowledge about this e-mail

17  through your counsel; is that right?

18  A    Yeah.

19  Q    Okay.  Next, I'm going to show you Exhibit 370 -- Exhibit

20  C to the declaration, 375.  Now, this is a transcript of a meet

21  and confer.  You referenced meet and confer sessions between

22  the City and counsel, didn't you?

23  A    I did.

24           MS. MITCHELL:  Objection, Your Honor, misstates the

25  testimony.  I believe the witness said he did not recall any

Webster - Cross / By Ms. Kumar                                128

1    meet and confer.

2          MS. KUMAR:  He was testifying to the fact that there

3    were, in fact, no meet and confers, which necessarily implies

4    that he knew what the substance of the meet and confer was.  He

5    also just testified that he talked at length with his counsel

6    and gains knowledge that way.  So I'm asking whether or not he

7    is aware that there was a meet and confer on August 22nd, 2025.

8          THE COURT:  Overruled.  You can answer the question.

9          THE WITNESS:  I do know that there were several meet

10   and confers, some of which I participate in and some of which I

11   do not.

12   BY MS. KUMAR:

13   Q    Okay.  And so are you aware that there was a meet and

14   confer on August 22nd, 2025?

15   A    Not specifically.

16   Q    So you have no memory of that; is that right?

17   A    I do not.

18   Q    Are you aware, Mr. Webster, that your counsel has told

19   city council in a meet and confer on August 22nd, 2025 that she

20   was raising compliance of 7.1 for the first time this summer?

21   A    No.

22   Q    Okay.  We next turn to Exhibit D to Ms. Mitchell's

23   declaration.  This is Exhibit 380 -- 376.  Mr. Webster, you are

24   not a recipient of this e-mail, are you?

25   A    That's correct.

Webster - Cross / By Ms. Kumar                    **129**

1   Q    Okay.  And you are not a sender either; is that right?

2   A    Correct.

3   Q    Next, Plaintiffs' Exhibit 377, again you are not a

4   recipient or a sender of this e-mail; isn't that right?

5   A    That's correct.

6   Q    Would it be fair to say that every document attached to

7   Ms. Mitchell's declaration regarding the compliance of 7.1 you

8   did not participate, receive, or send any of the

9   communications?

10  A    I did not send or receive any of those communications,

11  that is correct.

12  Q    Okay.  The only way you have knowledge of those is through

13  your counsel.

14       **MS. MITCHELL:**  Objection, I think that misstates the

15  testimony as far as knowledge.

16       **THE COURT:**  Overruled, you can answer the question.

17       **THE WITNESS:**  As I said before, I have knowledge

18  through my counsel because we've talked about a number of

19  different matters that pertain to the case.

20  **BY MS. KUMAR:**

21  Q    I'd like you to point to Exhibit 307, which your counsel

22  talked about during your direct.

23       **MS. KUMAR:**  If we could put that up.  Plaintiffs' --

24  it's a letter, Plaintiffs' 307.  Do you have a copy of that?

25       **UNIDENTIFIED:**  Is this Plaintiffs' 307?  Oh, this is

Webster - Cross / By Ms. Kumar                                    **130**

1   307 on the docket.

2          **MS. KUMAR:**  Oh, okay.  Sorry, thank you.  No, this

3   is -- you can take this down.

4   Q    Do you recall testimony about a letter that your counsel

5   wrote to the City about the lead up to the 2024 stipulated

6   facts.  Do you recall testifying about that?

7   A    Yes.

8   Q    About meetings that were happening with the City?

9   A    Yes.

10  Q    Okay.  And that letter was sent by your counsel, right; is

11  that right?

12  A    I believe so.

13  Q    And the City didn't make any representations in that

14  letter; isn't that right?

15         **THE COURT:**  Counsel, would you repeat that just a

16  little slower?

17         **MS. KUMAR:**  Sure.

18  **BY MS. KUMAR:**

19  Q    The City made no representations in that letter; isn't

20  that right?

21  A    That's correct.

22  Q    These are advocacy on behalf of the Alliance by your

23  counsel; isn't that right?

24  A    Sure.

25  Q    Now, you talked a lot about delay in your opinion on the

1    City's part.  Do you recall that?

2    A    I do.

3    Q    Okay.  You would agree, Mr. Webster, that you have met

4    with city officials.

5    A    I have.

6    Q    You've met with them in person; isn't that right?

7    A    I have.

8    Q    You have had zoom meetings with them; isn't that right?

9    A    Correct.

10   Q    You have had -- you personally have met with the mayor;

11   isn't that right?

12   A    I have.

13   Q    And you have personally met with people on the mayor's

14   staff; isn't that right?

15   A    I have.

16   Q    And you have met with members of the City Attorney's

17   office; isn't that right?

18   A    Yes.

19   Q    Okay.  You would agree that you've had engagement at the

20   highest levels of the City; isn't that right?

21   A    I believe I have.

22            **MS. KUMAR:**  Can I have a moment, Your Honor?

23            **THE COURT:**  Certainly.  Consult with your team.

24        **(Pause)**

25   //

Webster - Cross / By Ms. Kumar                              **132**

1   **BY MS. KUMAR:**

2   Q    Mr. Webster, just a moment.  We were talking about a

3   series of e-mails and meet and confers and discussions about

4   7.1 and also you testified about negotiations leading up to

5   7.1.  Do you recall all of that?

6        You would agree that you as the Alliance representative

7   has not been a party to every conversation between your counsel

8   and the City and between the City and your counsel about

9   homelessness and this settlement; is that right?

10  A    Of course not.

11  Q    Okay.  So your information is limited to what you learned,

12  either through counsel, or in your own personal knowledge from

13  meetings or conversations you had; isn't that right?

14            **MS. MITCHELL:**  Objection, misstates the testimony.

15            **THE COURT:**  Overruled, you can answer the question.

16            **THE WITNESS:**  Yes, my information is limited to what

17  I know and what I participate in and the conversations I have

18  with my counsel.

19  **BY MS. KUMAR:**

20  Q    So you couldn't possibly know, could you, whether the City

21  had said or not said anything in all of its conversations about

22  this settlement; isn't that right?

23  A    Of course.

24  Q    Okay.  So you wouldn't know, isn't it true, whether the

25  City ever expressed at any point in time questions about what

Webster - Cross / By Ms. Kumar                    **133**

1    these terms mean in 7.1; isn't that right?

2    A    Would you repeat that please?

3    Q    So since you can't know everything the City has ever said

4    to anyone representing the Alliance, related to this

5    settlement, isn't it fair to say, Mr. Webster, that you also

6    couldn't say whether the City ever expressed concern about the

7    ambiguity or contents of Section 7.1?

8         **MS. MITCHELL:**  Objection, vague.

9         **THE COURT:**  Do you understand the question?

10        **THE WITNESS:**  I think so.

11        **THE COURT:**  Then you may answer, overruled.

12        **THE WITNESS:**  What I know is what the City has

13   demonstrated to me.  And what the City has demonstrated to me

14   is that they have not proactively in an engaging way cooperated

15   with our inquiries in our admonitions to get metrics and

16   milestones and other important provisions of the settlement

17   agreement resolved.

18        **MS. KUMAR:**  I'm going to move to strike, Your Honor,

19   as nonresponsive.  That was not my question.

20        **THE COURT:**  Overruled.

21   **BY MS. KUMAR:**

22   Q    Mr. Webster, just if you could follow me.  I'm asking just

23   to confirm, you cannot know what the City has or has not said

24   at every point in time since the settlement agreement has --

25   was negotiated and since the time of its negotiation; isn't

Webster - Cross / By Ms. Kumar                            **134**

1   that right?

2   A    I think I've already agreed to that.

3   Q    Okay.  So during the period of negotiation, were you a

4   part of every single meeting with the Alliance and the City

5   regarding the terms of 7.1?

6   A    No.

7   Q    Okay.  So you would not know, would you, Mr. Webster, if

8   there were discussions during those negotiations about the

9   contours of 7.1 and whether there was ambiguity; isn't that

10  right?

11  A    That's correct.

12  Q    And you weren't a member of all meetings between the

13  Alliance and your counsel and the City after the settlement was

14  executed; isn't that right?

15  A    Correct.

16  Q    And so you would have no way of knowing whether or not the

17  City at any point expressed concerns or questions about the

18  scope of 7.1; isn't that right?

19  A    I think I would know.

20  Q    But you couldn't possibly know because you didn't

21  participate in every single meeting and conversation between

22  your lawyers and the City, you agree with me, right?

23  A    I also wasn't party to conversations internally within the

24  City and LAHSA and everything, so all I know is what was

25  demonstrated to me by the City which is typically in the form

Webster - Cross / By Ms. Kumar                                    **135**

1    of some type of written communication.

2    Q    Okay.  So it would be in a written communication of what -

3    - a back and forth between the Alliance and the City about what

4    those parties thought at a given point in time; isn't that

5    right?

6    A    Correct.

7    Q    Do you have any written communications from your time

8    negotiating this agreement, to demonstrate that your meaning,

9    as you testified on direct, was the meaning that the parties

10   understood?

11   A    Yes.

12   Q    You do?  Have you produced those?

13   A    I could.

14   Q    Okay.  And who are those communications with, Mr. Webster?

15   A    They were typically with my counsel.

16   Q    Okay.

17        **MS. KUMAR:**  So we would demand production of those e-

18   mails, Your Honor.  He's testifying that he understands that

19   there were written communications about this.

20        **MS. MITCHELL:**  Your Honor, counsel can't elicit that

21   testimony and then claim that he's waived attorney/client

22   privilege.  That's obviously not what's happening here, Your

23   Honor.

24        **MS. KUMAR:**  I simply asked who he had those

25   communications with that he's testifying about.

Webster - Cross / By Ms. Kumar                                    136

1          MS. MITCHELL:  The question was, are there any

2    written documentations about what this means and his testimony

3    was it was with his counsel.  That is in no sense a waiver such

4    that those should get produced.

5          THE COURT:  I'm going to decline any attorney/client

6    exchange and you can bring this back to my attention later.

7          MS. KUMAR:  Okay.

8          THE COURT:  But at the present time I don't believe

9    those documents should be forthcoming, because they're

10   privileged.  As long as there were communication between you

11   and your client.

12   BY MS. KUMAR:

13   Q    Let me ask you this, Mr. Webster, are you aware of any

14   written documentation from the Alliance to the City that

15   explain the meaning of 7.1 in the way you described on your

16   direct examination?

17   A    No.

18   Q    You have no written documentation; isn't that right?

19   A    I don't believe so.

20   Q    And you have no written documentation of the City agreeing

21   in any communication between the City and the Alliance in

22   writing agreeing with the definitions you described on your

23   direct examination; isn't that right?

24   A    That's right.

25          MS. KUMAR:  Nothing further, Your Honor.

1          **THE COURT:**  Any redirect examination?  And this would

2    be LA Alliance.

3          **MS. MITCHELL:**  I have no further questions, Your

4    Honor.

5          **THE COURT:**  In light of that, Ms. Myers, on behalf of

6    intervenors?

7          **MS. MYERS:**  No, Your Honor.

8          **THE COURT:**  On behalf of the City?

9          **MS. KUMAR:**  No, Your Honor, we just ask that he be

10   subject to recall, Your Honor.

11         **THE COURT:**  Well, he'll be here in all likelihood or

12   around.  I'm going to place all of the witnesses on recall.  I

13   don't know how long this is going to take, whether it's days or

14   weeks or a month, but you're subject to recall.  In fact, I'm

15   probably going to reopen you as a witness and many other

16   witnesses if counsel requests, okay?

17         **THE WITNESS:**  Thank you, Your Honor.

18         **THE COURT:**  And whether you're personally here or

19   not, you're to remain available and we'll set that date later

20   this evening.  I'm trying to take into account Thanksgiving,

21   some of the witnesses who are available to testify due process.

22   Okay?

23         **THE WITNESS:**  Okay.

24         **THE COURT:**  I want to thank you.  Counsel, your next

25   witness, please.

```
 1            MS. MITCHELL:  I think there's an agreement that

 2   Mercedes Marquez will be called next.

 3            THE COURT:  I'm sorry?

 4            MS. MITCHELL:  Mercedes Marquez is here to testify.

 5            THE COURT:  Mercedes Marquez, if you'd step forward,

 6   please.

 7            Thank you.  If you would help her step through the

 8   double doors.  Well, we don't have double doors there.  Thank

 9   you, Ms. Marquez.  Would you be kind enough to raise your right

10   hand.  Karlin is our clerk, she will administer an oath to you.

11          MERCEDES MARQUEZ, PLAINTIFFS' WITNESS, SWORN

12            THE COURT:  Thank you.  Would you please be seated

13   here in the witness box and the entrance, Ms. Marquez, is to my

14   immediate right and closest to you.

15            And make sure you're comfortable.  And if you would

16   be so kind just to face the parties.  And would you state your

17   full name, please.

18            THE WITNESS:  Mercedes Marquez.

19            THE COURT:  And would you spell your first name,

20   please?

21            THE WITNESS:  M-E-R-C-E-D-E-S.

22            THE COURT:  And your last name, please?

23            THE WITNESS:  M-A-R-Q-U-E-Z.

24            THE COURT:  All right.  Thank you.  This would be

25   direct examination by LA Alliance and would you identify
```

1   yourself as counsel --

2            MR. UMHOFER:  Of course, Your Honor.

3            THE COURT:  -- because we're on CourtSmart.

4            MR. UMHOFER:  Good afternoon.  Matthew Umhofer on

5   behalf of LA Alliance, the plaintiffs in this case.

6                    **DIRECT EXAMINATION**

7   BY MR. UMHOFER:

8   Q    And good afternoon, Ms. Marquez.

9   A    Good afternoon.

10  Q    Are you here pursuant to a subpoena?

11  A    I am.

12  Q    You work for the City, correct?

13  A    Yes.

14  Q    What was your most recent role with the City?

15  A    I served as chief of housing and homelessness solutions in

16  the office of Mayor Karen Bass.

17  Q    During what time period?

18  A    11 months, December 12th, 2022 to I believe November 17th,

19  2023.

20  Q    So you left November 17, 2023; is that correct?

21  A    I believe that was my last day.

22  Q    Was your departure your choice or the City's?

23            MS. KUMAR:  Objection, Your Honor, relevance.

24            THE COURT:  What's the relevance, counsel?

25            MR. UMHOFER:  Bias, if she was fired by the City.

1      **THE COURT:**  I may let you come back with a question,

2  but at the present time I'm going to sustain the objection.

3      **MR. UMHOFER:**  I understand, Your Honor.

4  **BY MR. UMHOFER:**

5  Q   Did you receive any settlement payments from the City

6  following your departure?

7      **MS. KUMAR:**  Objection, Your Honor, relevance.  I

8  would also note for the record that Ms. Marquez's testimony,

9  dates of service make her -- the scope of her testimony

10 entirely irrelevant to the purpose of this proceedings for the

11 reasons previously discussed and any settlement, any payments,

12 confidential or privacy, and just plainly irrelevant.

13      **THE COURT:**  I may let you come back to that question.

14 I'm going to sustain the objection at the present time.

15 **BY MR. UMHOFER:**

16 Q   Are you under any obligation pursuant to any agreement

17 with the City to cooperate with the City in any way?

18      **MS. KUMAR:**  Objection, Your Honor, relevance.

19      **THE COURT:**  Overruled, you may answer the question.

20      **MR. UMHOFER:**  I'm sorry.

21      **THE COURT:**  You may answer the question.

22      **THE WITNESS:**  No.

23 Q   Did you enter into any agreements with the City related to

24 your departure?

25      **MS. KUMAR:**  Objection, Your Honor, same objection,

Marquez - Direct / By Mr. Umhofer                           **141**

1   privacy, confidentiality, relevance.

2          **THE COURT:**  I'm not certain of the relevance yet,

3   counsel, so I'm going to sustain the objection at this time.

4   But if you bring an offer of proof after your examination or

5   during, I may allow it.

6          **MR. UMHOFER:**  I understand, Your Honor.  Okay.

7          **THE COURT:**  At the present time, I'm going to sustain

8   that objection.

9   **BY MR. UMHOFER:**

10  Q    Your job title again, that job title you had with the

11  City, is that the only job title you had with the City?

12  A    This last piece of employment, yes.

13  Q    Okay.  And that title again was?

14  A    Chief of housing and homelessness solutions.

15  Q    Can you briefly describe your responsibilities in that

16  job?

17  A    In the 11 months that I worked for the Mayor, my

18  overwhelming responsibility and focus was on designing,

19  implementing Inside SAFE.

20  Q    Inside SAFE is what?

21  A    Inside SAFE is a Mayor's office initiative, now a City of

22  Los Angeles initiative focused on bettering the community,

23  bettering lives of those that are homeless by resolving

24  encampments and helping them in many, many ways, including

25  interim housing and services.

Marquez - Direct / By Mr. Umhofer                    **142**

1   Q    Were you involved in the drafting or the City's

2   finalization of the settlement agreement in this case?

3   A    No, I believe this case was settled before I came to the

4   City.

5   Q    Was the -- did you -- were you aware during your time in

6   that role that this agreement existed?

7   A    Yes.

8   Q    And I'm showing Exhibit 25.  During your time in that

9   role, did you review the settlement agreement in this case?

10  A    I believe that I did but I don't recall actually anymore,

11  that would have been about three years ago and I don't even

12  know if I read the entire thing.  I believe I was briefed by

13  the City Attorney's office.

14  Q    Were you responsible in the role you just described with

15  assisting the City in complying with this agreement?

16  A    No.

17  Q    Turning to Section 5.2 of the agreement.  There's a

18  reference here to milestones and deadlines, do you see that?

19  A    I do.

20  Q    And do you see that under 5.2 number 2, there's an

21  obligation for the City to create plans to develop milestones

22  and deadlines for and I'm skipping to number 2, the City's plan

23  for encampment engagement, cleaning and reduction in each

24  council district.  Do you see that there?

25  A    I do.

Marquez - Direct / By Mr. Umhofer                    **143**

1        **MS. KUMAR:**  Objection, Your Honor, it lacks

2   foundation.  She just said she doesn't know if she even saw --

3   the testimony she said she wasn't responsible for overseeing

4   the City's compliance and it's beyond the scope of this

5   hearing.

6        **THE COURT:**  Overruled.

7   **BY MR. UMHOFER:**

8   Q    And do you see also that there is under 4, the City will

9   create plans and develop milestones, deadlines for the City's

10  plan for encampment engagement, cleaning and reduction.  Do you

11  see that there?

12  A    I see it, yes.

13  Q    Do you recall reviewing that language during your time?

14  A    I do not.

15  Q    You do not?

16  A    I -- no, as I said I'm telling you this would have been

17  three years ago, I don't recall, no.

18  Q    Have you ever before today met with Elizabeth Mitchell

19  who's seated to my left?

20  A    I have met Elizabeth Mitchell.

21  Q    Have you spoken to Elizabeth Mitchell over the phone or on

22  a zoom?

23  A    We did a zoom call.

24  Q    Okay.  Do you recall that the meetings and conversations

25  you had and participated in with Ms. Mitchell related to

Marquez - Direct / By Mr. Umhofer                          **144**

1    encampment reduction?

2             **MS. KUMAR:**  Objection, Your Honor, hearsay, lacks

3    foundation.

4             **THE COURT:**  Overruled, you may answer the question.

5             **THE WITNESS:**  I recall only one zoom call with

6    Ms. Mitchell, and no, I don't remember.

7    **BY MR. UMHOFER:**

8    Q    Do you recall an in person meeting with Ms. Mitchell as

9    well?

10   A    I recall one in person meeting, but I believe that when we

11   had that meeting I was no longer the chief of housing and

12   homeless solutions.

13   Q    What was your role at that time?

14   A    I believe when that meeting took place, I had agreed that

15   I would stay two weeks as a transition with the new chief, who

16   was sitting next to me, Lourdes Castro Ramirez.  So I was

17   actually not in any authority on that day.

18   Q    Do you recall having any involvement in assisting the City

19   in complying with this agreement?

20   A    No, I was not responsible for this in any way.

21   Q    That was -- it's different.  I asked a different question.

22   Do you recall having any involvement in assisting the City in

23   complying with this agreement?

24   A    I don't really know what that means involvement.  Do you

25   want to be more specific?

Marquez - Direct / By Mr. Umhofer                                    **145**

1   Q    Did you participate in meetings that related to this

2   agreement in any way?

3   A    Could be, but to tell you the truth at this point, the

4   meetings that I recall were always with counsel.

5   Q    Okay.  And I want to make it very clear.  I do not want to

6   hear what was said in any conversation that you had with

7   counsel.  So I want to be very clear, I'm not attempting to

8   intrude on any privileged communications.

9        Besides communications with counsel, do you recall

10  speaking with anybody else within the City about compliance

11  with this agreement or the contents or the City's obligations

12  under this agreement?

13  A    Outside of conversations that took place in the context of

14  counsel, none others stand out.  It's not that perhaps I did,

15  but that at this point, I don't recall anymore.

16  Q    Pulling up Exhibit 75, Plaintiffs' Exhibit 75.

17       **MR. UMHOFER:**  May I have a moment, Your Honor?

18       **THE COURT:**  You may.

19       **MR. UMHOFER:**  Thank you.

20     **(Pause)**

21  BY MR. UMHOFER:

22  Q    Pulling up Exhibit 75 and this is under Docket No. 672,

23  page 16 of 26 and it's marked at the bottom Exhibit M page 12.

24       Do you see up at the top here, and I'll call this out for

25  us so we can see this closely, that this an e-mail marked -- an

Marquez - Direct / By Mr. Umhofer                    **146**

1    e-mail from March 2023.  Do you see that there?

2    A    I do.

3    Q    Do you see your e-mail address here as one of the

4    recipients of this e-mail?

5    A    Yes, along with two attorneys I do.

6    Q    And this is an e-mail from Ms. Mitchell to Scott Marcus,

7    David Michaelson and you among others, correct?

8    A    Yes.

9    Q    And there's a reference here, and it is addressed to, the

10   e-mail itself is addressed to Scott Davies -- David and

11   Mercedes and it says, in our last meeting we talked about the

12   RFQ that the City has put out for a list of qualified service

13   providers, and that the City expects to be fully staffed with

14   the district's --

15            **THE COURT:**  Counsel, just a little slower.

16            **MR. UMHOFER:**  Sure, apologies, Your Honor.

17   Q    In our last meeting, we talked about the RFQ that the City

18   has put out for a list of qualified service outreach providers,

19   and that the City expects to be fully staffed with the

20   district's chosen providers by July 1st.  Do you see that

21   there?

22   A    I do.

23   Q    Do you recall having a meeting in which there was a

24   discussion of an RFQ about a list of qualified service and

25   outreach providers, related to the milestones and deadlines in

Marquez - Direct / By Mr. Umhofer                          **147**

1    this case?

2          **MS. KUMAR:**  Objection, Your Honor.  We again object

3    to beyond the scope and ask for a standing objection to this

4    witness' entire testimony.

5          **THE COURT:**  Overruled.  Please answer the question.

6          **THE WITNESS:**  I believe that this may be in response

7    to the one zoom call.

8    **BY MR. UMHOFER:**

9    Q    And so you were involved in -- does this refresh your

10   recollection that you were involved in a zoom call in which

11   there was a discussion about an RFQ the City had put out?

12   A    You know, I -- generally yes.

13   Q    And there's a reference here to the list of proposed

14   milestones and deadlines within three months as well.  Do you

15   see that there?

16   A    I do see it.

17   Q    Do you recall that the City was under an obligation to get

18   a list of proposed milestones and deadlines?

19         **MS. KUMAR:**  Objection, Your Honor, lacks foundation,

20   speculation and legal conclusion.

21         **THE COURT:**  Overruled.

22         **THE WITNESS:**  Actually I don't.  I was not

23   responsible, as I said, for any of this and so I don't.

24   //

25   //

Marquez - Direct / By Mr. Umhofer                    **148**

1    **BY MR. UMHOFER:**

2    Q    Why were you in the meetings then?

3            MS. KUMAR:  Objection, Your Honor --

4            THE WITNESS:  I really frankly don't --

5            MS. KUMAR:  -- speculation.

6            THE COURT:  Overruled, counsel.

7            THE WITNESS:  This is what I can tell you.  I

8    believe, I don't know it to be true, but I did not ask for a

9    meeting.  So it wasn't me.  I think it may have been

10   Ms. Mitchell who asked for the meeting, I don't recall, so I

11   don't want to put words in her mouth or mine, I don't really

12   recall how the meeting came about.

13   **BY MR. UMHOFER:**

14   Q    Do you recall being asked to attend the meeting?

15   A    I recall that in a meeting with counsel --

16   Q    Okay.  Wait, stop.  I don't want to know what was said

17   just between you and counsel.  So let's stop there.

18   A    The only thing I can tell you about any of this happened,

19   any discussion took place in a conversation with counsel.

20   Q    I understand that.  But also with Ms. Mitchell as well,

21   correct?

22   A    Oh, you asked me how I came to have the meeting.

23   Q    I understand, okay.  So counsel -- you had a conversation

24   with counsel, I'm not asking about the contents, and then after

25   that you attended this meeting, correct?

Marquez - Direct / By Mr. Umhofer                                   **149**

1   A    Generally, yes, I would say.

2   Q    Did you wonder why you were there?

3         **MS. KUMAR:**  Objection, relevance.

4         **THE COURT:**  I think it's ambiguous, counsel, reask

5   the question.

6   **BY MR. UMHOFER:**

7   Q    This did relate to your job responsibilities, correct,

8   attending this meeting, correct?

9   A    No, it did not.  I have said to you before that I was not

10  responsible for the management of the settlement agreement.

11  Q    I understand that.  Different question.

12  A    I don't think so.  This is about everything having to do

13  with the settlement agreement, so.

14  Q    Right.  And so my question is and has been were you

15  involved in discussions related to the settlement agreement,

16  and based on this e-mail the answer is yes, correct?

17  A    I told you that any discussion I had relating to the

18  settlement agreement was with counsel.

19  Q    You were also --

20  A    I've said that now three times.

21  Q    I understand.  You were also involved in discussions

22  involving counsel and my co-counsel Ms. Mitchell concerning the

23  agreement, correct?

24  A    One zoom call, yes.

25  Q    And one in person meeting, correct?

Marquez - Direct / By Mr. Umhofer                          **150**

1   A    As I was no longer the chief, yes.

2   Q    Now, were you -- did you understand during or after this

3   meeting whose responsibility it was to manage the RFQ?

4           **MS. KUMAR:**  Objection, Your Honor, lacks foundation.

5   She's already said she doesn't remember, vague, and relevance.

6           **THE COURT:**  Overruled.

7           **THE WITNESS:**  I generally understood that it was the

8   Office of the CAO that was responsible for this.

9   **BY MR. UMHOFER:**

10  Q    How did you arrive at that understanding?

11          **MS. KUMAR:**  Objection, Your Honor, to the extent it

12  involves any discussions with counsel.

13          **THE COURT:**  Overruled.

14          **THE WITNESS:**  That's exactly what I would say, it all

15  involved discussions with counsel.

16  Q    Was anybody from the CAO in this particular meeting that

17  was described in this e-mail?

18  A    No, that I remember, no.

19  Q    Dave Michaelson works directly for the Mayor, correct?

20  A    He is an attorney for the Mayor, yes.

21  Q    So the only people participating in this meeting are Scott

22  Marcus, who was with the City Attorney's Office, correct?

23  A    Well, I believe he was chief counsel for the City

24  Attorney's Office on this case at the time.

25  Q    Yes, understood.  And David Michaelson who worked for the

Marquez - Direct / By Mr. Umhofer                    **151**

1   Mayor directly, correct?

2   A    Correct.

3   Q    And you, correct?

4   A    I believe that is correct.

5   Q    And nobody from the CAO's office was in this meeting,

6   correct?

7   A    What is a bit misleading here, is that they were meetings

8   of counsel and perhaps others that I can't discuss with you,

9   but.

10  Q    Were -- was anybody who didn't work for the City involved

11  in any of those meetings with counsel and present?

12          **MS. KUMAR:**  Objection, Your Honor, lacks foundation,

13  vague, relevance.

14          **THE COURT:**  Overruled.

15          **THE WITNESS:**  Are you asking me if at the time of the

16  meeting or meetings, there was someone present who was not an

17  employee of the City?

18  **BY MR. UMHOFER:**

19  Q    Yes.

20  A    No.

21  Q    Was there anybody from say the County present at the

22  meetings you just described where counsel was present?

23  A    No.

24  Q    So while not asking for the content of those meetings you

25  were saying there were other meetings where the CAO's office

Marquez - Direct / By Mr. Umhofer                               **152**

1    was present along with counsel where the topic, again I don't

2    want to know the contents, but the topic of this settlement

3    agreement was discussed.

4              **MS. KUMAR:**  Objection, Your Honor, this is privileged

5    and also it's plainly irrelevant to the scope of this

6    testimony.  This testimony is irrelevant to this hearing, both

7    because it's beyond the scope of anything and it's already been

8    adjudicated.

9              **THE COURT:**  Overruled.  Answer the question please.

10             **THE WITNESS:**  Would you ask it again?

11   **BY MR. UMHOFER:**

12   Q    Sure.  In those meetings that you just described, again

13   not asking about the content, was the CAO's office, these other

14   meetings that involved counsel, was the CAO's office present?

15   A    I would say I'm talking about one meeting, not meetings.

16   Q    Okay.

17   A    Okay.  So I'm talking about one meeting and, yes, the

18   CAO's office was present with counsel in that meeting.

19   Q    And again, not asking for the content, but when you walked

20   out of that meeting did you understand that you were in charge

21   of the RFQ?

22             **MS. KUMAR:**  Objection, Your Honor, that's plainly

23   asking for what she was informed by by counsel.  It's

24   privileged.

25             **THE COURT:**  Would you repeat that question, counsel?

Marquez - Direct / By Mr. Umhofer                          **153**

1          **MR. UMHOFER:**  Okay.

2    Q    Again not asking what was said during the meeting, but

3    when you walked out of that meeting, did you understand that

4    you were in charge of the RFQ that is referenced here in this

5    e-mail?

6          **THE COURT:**  You can --

7          **MS. KUMAR:**  Objection --

8          **THE COURT:**  -- answer that question, overruled.

9          **THE WITNESS:**  I was not responsible for the RFP back

10   then, not before, not after, not ever.

11   **BY MR. UMHOFER:**

12   Q    Who was?

13   A    The CAO's office was.  The office within the City family

14   that spoke to me about anything having to do with this.  Who

15   else might have been involved through the CAO I could not tell

16   you.  I don't know is what I --

17   Q    Were you involved at all, putting aside in charge of, were

18   you involved at all in the RFQ?

19   A    No.

20   Q    Were you informed during your time with the City at all,

21   other than in the meetings that we've described, about the RFQ

22   and its status and not asking about counsel, so no counsel

23   stuff?

24   A    Do you mean in the entire time that I was at the Mayor's

25   office did I ever receive any information about the RFQ?

Marquez - Direct / By Mr. Umhofer                        **154**

1   Q    About this RFQ, yes, again but not from counsel, exclude

2   counsel from this answer.

3   A    I cannot be -- I don't remember now if when I received any

4   information about this RFQ, I believe counsel was present.

5   Q    I don't want to know about those.

6        What -- do you know whether this RFQ ever got off the

7   ground?

8            **MS. KUMAR:**  Objection, Your Honor, she just said that

9   she can't -- only knows about the RFQ, she's not sure if she

10  ever had conversations outside of counsel, so it'd be

11  privileged, vague as to time, and relevance again, beyond the

12  scope and it's already been adjudicated.

13           **THE COURT:**  Overruled.

14           **THE WITNESS:**  Can you pull down the screen and show

15  me again what you say the RFQ is about?

16  **BY MR. UMHOFER:**

17  Q    Sure.  There's a reference here to -- I don't know if you

18  can see that in the first paragraph.

19  A    Yes, I can see it now, thank you.  Let me read it.

20       Now, if you would please ask your question again now that

21  I read it.

22  Q    Do you know if this RFQ ever got off the ground?

23  A    I don't know if -- when you say this RFQ --

24  Q    Yeah.

25  A    -- which RFQ you're talking about, but I do recall that an

Marquez - Direct / By Mr. Umhofer                    155

1    RFQ related to outreach and qualified service providers was

2    issued through the CAO's office.

3    Q    Do you know what happened with it?

4    A    Ultimately I left the City before that was resolved, and

5    no, I don't know.

6    Q    And again, you weren't involved in that RFQ that you

7    recall that issued from the CAO's office, correct?

8    A    I was not involved in designing it and issuing it and

9    reviewing it or anything else having to do with the RFQ.

10   Q    Going to Exhibit N of Exhibit 75 and I'm going to go to

11   the end of the e-mail chain first.  It looks like the e-mail

12   chain begins with at the bottom there with the e-mail we just

13   saw.  In our last meeting, we talked about the RFQ.  Do you see

14   that there?  That's the e-mail we just saw, correct?

15   A    Yes, I see it.

16   Q    And moving upward from there, are you copied on a

17   subsequent e-mail from Scott Marcus which appears here at the

18   bottom, that's your e-mail address there, correct?

19   A    Yes, it is.

20   Q    You're copied there on an e-mail that Scott Marcus -- I

21   apologize, one moment.

22       So Scott Marcus writes back to Liz, we will discuss your

23   e-mail internally and get back to you.  Do you see that there?

24   A    I do.

25   Q    Did you participate, again not asking for content, did you

Marquez - Direct / By Mr. Umhofer                    **156**

1   participate in discussions internally about that e-mail?

2   A    I don't think so, no.  And I would want to just say to

3   you, when he says we, he means City family we and that involves

4   meetings with counsel.

5   Q    I understand.  And this is actually from counsel.  We see

6   another e-mail here on April 17th a few weeks later that says

7   good morning, Liz, you're copied on it, correct?

8   A    I see my e-mail, yes.

9   Q    And it says, yes, we discussed again this morning and

10  hoped to be getting back to you soon.  Do you recall whether

11  around that time you were part of discussions related to the

12  RFQ?

13  A    Honestly, no, I don't.  I mean, can I just say so much so

14  that I don't even know when it was issued.

15  Q    I understand.

16  A    I wasn't told it was issued, so.

17  Q    I understand.  And then on April 27th, Elizabeth Mitchell

18  follows up and says, I don't want to bring this to the Court,

19  but we're nearly a month after I sent the follow up e-mail and

20  I haven't heard back from the City.  Please let me know the

21  City's position ASAP.  Do you see that there?

22  A    I --

23          **MS. KUMAR:**  Your Honor, counsel's testifying, she

24  says she doesn't remember these meetings, she doesn't remember

25  this e-mail, it lacks foundation.

Marquez - Direct / By Mr. Umhofer                    **157**

1        **THE COURT:**  Overruled, counsel.

2    **BY MR. UMHOFER:**

3    Q    And you're copied on the following e-mail where Mr. Marcus

4    says, sorry for the delay.  Correct?

5    A    I see my e-mail address there, yes.

6    Q    And then there's a lengthy, somewhat lengthy e-mail from

7    Mr. Marcus after he apologizes for the delay speaking to some

8    of the issues that are raised here.  And there's an offer by

9    him at the end of the e-mail to discuss, correct?

10        **MS. KUMAR:**  Objection, Your Honor.  Counsel's just

11   reading the e-mails.  The witness says she has no knowledge of

12   these e-mails, it lacks foundation.

13        **THE COURT:**  Overruled, counsel.

14        **THE WITNESS:**  You know, you're now even asking me if

15   I am involved in whether an extension of time is warranted,

16   okay.  I am not the attorney, okay.  I was not involved in the

17   RFQ or in the back and forth between counsel about whether she

18   should have an extension of time.  These things that as soon as

19   I saw anything like that would be immediately off my radar, not

20   my job.

21        So that the fact that Mr. Marcus is courteous and is

22   keeping the e-mail chain going as many people do beyond its

23   usefulness, I see my name there.  But this was not my work, so

24   I really don't know anything about extensions of time or

25   involvement in the RFQ.

Marquez - Direct / By Mr. Umhofer                    **158**

1          I believe I've said to you now that the office that I

2    interfaced with regarding the RFQs, if it's the same one, is

3    actually Matt Szabo's office.

4    **BY MR. UMHOFER:**

5    Q    So this is not your job, right?

6    A    I've said it now four or five, maybe six times --

7    Q    And I may ask you --

8    A    -- no.

9    Q    -- to say it again.  But --

10   A    Right.

11   Q    -- the -- your job again title was what?

12   A    I worked for the Mayor.

13   Q    Yes.  And --

14   A    So my job was chief of housing and homelessness solutions,

15   which meant that I was focused on the new endeavors and the

16   issues that the Mayor brought to bear when she was elected.

17   That was overwhelmingly Inside SAFE, but it was also executive

18   directives of having to do with planning processes.  It was

19   also working with City agencies on doing everything possible to

20   cut down the time and the -- all of the bureaucracy so that

21   people could be processed into housing from motels and from

22   encampments.

23        That -- everything having to do with that, is what I did.

24   And let me tell you, that was a lot of responsibility.  Not

25   responsibility for an RFQ that had to do with a settlement that

Marquez - Direct / By Mr. Umhofer                    **159**

1  was reached before I got there and in which I had no

2  responsibility for administering.

3  Q   So you're the chief of housing and homelessness for the

4  Mayor, but you had zero responsibility for complying with an

5  agreement concerning homelessness and housing.

6          **MS. KUMAR:**  Objection, Your Honor, argumentative.

7          **THE COURT:**  Phrase that as a question, Counsel.  It's

8  a statement.

9  **BY MR. UMHOFER:**

10 Q   Am I correct that your title was the chief of housing and

11 homelessness but you did not see it as your job to be involved

12 in any way in complying with a settlement agreement that

13 related to homelessness and housing?

14         **MS. KUMAR:**  Objection, Your Honor.  Argumentative and

15 I think she's testified several times about what her position

16 was and what her role entailed.

17         **THE COURT:**  Overruled.

18         **(To the Witness):**  Please answer the question.

19         **THE WITNESS:**  Your Honor, I would just have to say

20 the way that that question --

21         **THE COURT:**  Thank you very much.  Please answer the

22 question, if you can.

23         **THE WITNESS:**  That's offensive.  You're saying two

24 different things.  Now, one thing is if I have any care or

25 responsibility generally as a member of the City family for

Marquez - Direct / By Mr. Umhofer                                    **160**

1  things that happen in the city.  Another is if I have specific

2  responsibility for the administration or monitoring or anything

3  having to do with the settlement.

4           I did not have responsibility in any way for the

5  monitoring, right, administration, or following through with

6  all of the things that that requires on the settlement itself.

7           Was I generally aware of the settlement?  Absolutely.

8  I've already testified that I was briefed about it.  I provided

9  the professional courtesy to Ms. Mitchell to meet with her and

10 meet her.  But I am not the person or the office responsible.

11          In the City of Los Angeles when the City Council

12 agrees to certain things they decide who it is that is going to

13 follow up.  In this situation with the settlement it was the

14 CAO's office before we arrived and that is how it maintained

15 itself through the entire time, at least that I was there.  If

16 that has changed now, I do not know.

17 **BY MR. UMHOFER:**

18 Q    Do you recall that the RFQ related to an assessment of

19 each encampment in each district with deadlines and milestones?

20          **MS. KUMAR:**  Objection, Your Honor.  She's already

21 said she doesn't remember this RFQ or this email.

22          **THE COURT:**  Overruled.

23          **THE WITNESS:**  You're asking me now about what?  I'm

24 sorry again.

25 //

Marquez - Direct / By Mr. Umhofer                              **161**

1   BY MR. UMHOFER:

2   Q    I'm just asking you do you recall whether the RFQ related

3   to the City's efforts to assess each district with deadlines

4   and milestones concerning encampments?

5   A    No, actually to that level of detail I don't.  I remember

6   only the level of general detail that you showed me previously,

7   which was about outreach, things like that, but I don't recall

8   this.

9   Q    Do you recall in the meetings with Ms. Mitchell,

10  Mr. Marcus, and Mr. Michaelson the City promising to provide an

11  assessment for each district concerning encampments pursuant to

12  an FR -- RFQ?

13          **MS. KUMAR:**  Objection, Your Honor.  Lacks foundation

14  and beyond the scope of this hearing.  It's already been

15  adjudicated.

16          **THE COURT:**  Overruled.

17          **THE WITNESS:**  I have now said a number of times there

18  was one meeting, not meetings, one meeting via Zoom, and other

19  than the generality of what you showed me in the follow up

20  email from Ms. Mitchell I don't -- this is three years ago now

21  pretty much, I don't recall any more detail.

22  BY MR. UMHOFER:

23  Q    So -- but again, one Zoom meeting, one in-person meeting,

24  and these emails, correct?

25  A    I don't recall the emails other than the first one at all.

Marquez - Direct / By Mr. Umhofer                    **162**

1  Q    So you recall the -- so your involvement on this issue was

2  limited to two meetings, one Zoom, one in-person, with

3  Ms. Mitchell, a meeting involving counsel and the CAO's office,

4  and at least the email you recall, correct?

5  A    Okay, now that's a whole bunch of questions.

6  Q    Sure.  It is.

7  A    Can you break that down one by one?

8  Q    Okay.  You were involved in a Zoom meeting on this issue,

9  correct?

10 A    I was involved in a Zoom meeting and pursuant to the email

11 you showed me I clearly remember there was a discussion about

12 an RFQ.  The rest of it, actually I really don't know.

13 Q    And then there was an in-person meeting involving

14 Ms. Mitchell about this, correct?

15 A    There was an in-person meeting after I was no longer the

16 chief and to tell you the truth I don't remember if it included

17 the RFQ.

18 Q    And then there was a meeting involving the CAO's office

19 and counsel that related to the RFQ that you recall as well,

20 correct?

21 A    I want to be careful there.  I recall certainly a meeting

22 about that but there were many meetings over time to discuss a

23 briefing on where this case was, not necessarily about this

24 particular subject but more broadly.  Whenever there was a

25 hearing there would be some kind of a briefing.  I don't recall

Marquez - Direct / By Mr. Umhofer                    **163**

1   when they took place, I don't recall how many there were, and I

2   don't recall anymore any detail about what the sub matters may

3   have been.

4   Q    Are you aware that the City entered into a joint

5   stipulation concerning the Settlement Agreement compliance and

6   sanctions in April of 2024?

7            **MS. KUMAR:**  Objection, Your Honor.  This is after her

8   time with the City, lacks foundation.

9            **THE COURT:**  Overruled.

10           **THE WITNESS:**  I have never seen this before.

11  **BY MR. UMHOFER:**

12  Q    Are you aware that the City did issue the RFQ in January

13  2023 but did not finalize the RFQ process?

14           **MS. KUMAR:**  Objection, Your Honor.  She's already

15  said she doesn't remember, lacks foundation.

16           **THE COURT:**  Overruled.

17           **THE WITNESS:**  I don't remember that an RFQ was issued

18  in January of 2023.

19  **BY MR. UMHOFER:**

20  Q    Are you aware of whether the City had each district fully

21  assessed to help establish appropriate milestones under the

22  Settlement Agreement?

23           **MS. KUMAR:**  Objection, Your Honor.  Lacks foundation,

24  beyond the scope.

25           **THE COURT:**  Overruled.

Marquez - Direct / By Mr. Umhofer                    **164**

1              **THE WITNESS:**  I don't remember that.

2    **BY MR. UMHOFER:**

3    Q    I'm pointing you to Exhibit 307, Exhibit C1, Page 24.

4    This is Docket Number 668-1.  Have you ever seen this document

5    before?

6    A    Not that I know of.

7    Q    Did you have any involvement in -- do you want to have a

8    moment to review the document more, in more detail?

9    A    What is the date of the document?

10   Q    Let's see if we can figure it out for you.

11             The document is not dated.  I'm going to -- you

12   didn't write this document, correct?

13   A    No.

14   Q    And you don't recall reviewing this document, correct?

15   A    I don't know what it is, honestly.

16   Q    It has a title called Encampment Engagement, Cleaning, and

17   Resolution.  Do you see that there?

18   A    I see the title but I don't know what kind of document it

19   is.

20   Q    If you -- is the -- there's an iPad there.  Do you see the

21   iPad to your left?

22   A    I do.

23   Q    To your right.  I apologize.  On the left-hand side there

24   should be a list of exhibits.  You can scroll down quickly to

25   Exhibit 307.

Marquez - Direct / By Mr. Umhofer                    **165**

1  A    It might take a while.

2  Q    I understand and I'm happy to approach if it's helpful.

3  A    Three zero seven?

4  Q    Yes.

5      **(Pause)**

6  A    This has a date of March 4th, 2024.  I no longer worked at

7  the City.

8  Q    Understood.  If you go 29 pages into that document, to

9  Page 29 of that document.

10 A    Un momento.

11 Q    Yes.

12 A    Did you say 22?

13 Q    29.  There's page numbers at the top.

14 A    Flipping around.  You may need --

15     **MR. UMHOFER:**  Can I -- Your Honor, may I approach to

16 help her find that?

17     **THE COURT:**  Yeah.

18     **MR. UMHOFER:**  Thank you.

19     **MS. KUMAR:**  Your Honor, can I ask -- the date is

20 listed in the declaration that accompanies that.  Can I ask

21 that Counsel show that to the witness if we're going to be

22 showing her documents like this?

23     **THE COURT:**  I'm sorry, Counsel?

24     **MS. KUMAR:**  I'm saying Counsel represented that there

25 was no date on the document, but the declaration before that

Marquez - Direct / By Mr. Umhofer                              **166**

1    does indicate the date of the document.

2            **THE COURT:**  Okay.

3        **(Counsel assists Witness)**

4    **BY MR. UMHOFER:**

5    Q    Could you take a moment to just scroll through that

6    document and let me know when you've done that?

7        **(Pause)**

8    A    I have no idea who prepared this document.  I did not.

9    And once I left in November of 2023 I never engaged with anyone

10   regarding this case at all, except for the day when

11   Ms. Mitchell subpoenaed me with less than 24 hours' notice.

12   Q    Were you still with the City on October 3rd, 2023?

13   A    I was.

14   Q    And so if I just -- allow me to scroll up here to

15   Ms. Mitchell's declaration on this point.  Counsel asked me to

16   illustrate when this document was produced.  It says here that

17   it was produced on October 3rd, 2023, and that would have been

18   while you were still with the City, correct?

19           **MS. KUMAR:**  I believe it's Exhibit C, Counsel.

20           **MR. UMHOFER:**  Thank you.  You are quite right about

21   that.  I'll take her to Exhibit C then.

22       **(Pause)**

23   **BY MR. UMHOFER:**

24   Q    So Exhibit C reads a letter I drafted on January 8th,

25   2024.  You were no longer with the City at that point, correct?

Marquez - Direct / By Mr. Umhofer                    **167**

1  A    I was not with the City after November of 2023.

2  Q    So if we go down to Exhibit D.  Let me pull that up for

3  you here.

4       **(Pause)**

5            Okay, so here is Exhibit D.  This is I believe a

6  slightly different document.  Do you see that there?

7  A    Yes.

8  Q    It is also entitled Encampment Engagement, Cleaning, and

9  Resolution, correct?

10 A    Yes.

11 Q    And if we go back to Ms. Mitchell's declaration, that

12 document was produced, Exhibit D, as of October 3rd, 2023.  You

13 would have been with the City at that time, correct?

14 A    Yes.

15 Q    But you do not have any recollection of this Encampment

16 Engagement, Cleaning, and Resolution document, correct?

17 A    Not at all.

18 Q    And proceeding to Exhibit E.

19      **(Pause)**

20           Something happened with the screen here.  Are you

21 seeing anything on the screen?  It's dark --

22 A    No, it's dark.

23 Q    -- correct?  Yeah.

24      **(Pause)**

25           Okay.  Apologies for the technical issues.

Marquez - Direct / By Mr. Umhofer                    **168**

1          This is an email dated October 19th, 2023, and you

2     are copied on it, correct?

3     A    I am.

4     Q    Okay.  It is an email from Ms. Mitchell, correct?

5     A    Yes, that's what it indicates.

6     Q    And it sets forth a dispute regarding a violation of the

7     Settlement Agreement, correct?

8               **MS. KUMAR:**  Objection --

9               **THE WITNESS:**  I don't know what it says.

10              **MS. KUMAR:**  -- lacks foundation and also beyond the

11    scope for an issue that has already been adjudicated.

12              **THE COURT:**  Overruled.

13    **BY MR. UMHOFER:**

14    Q    So you were with the City at this time, correct?

15    A    Yes.

16    Q    And the email begins "We write to you to notify you of a

17    dispute regarding the City of Los Angeles's violation of the

18    Settlement Agreement, specifically Section 5.2."  Do you see

19    that there?

20    A    I do.

21    Q    Do you recall receiving this email?

22    A    No.

23    Q    Do you recall discussing this email, again I don't want to

24    know the contents, but discussing this email with anybody in

25    the City aside from counsel?

Marquez - Direct / By Mr. Umhofer                          **169**

1            **MS. KUMAR:**  Objection, Your Honor.  I don't see the

2    relevance of this line of inquiry.

3            **THE COURT (To the Witness):**  You may respond.  You

4    may answer the question.

5            **THE WITNESS:**  I guess I would say that I recall being

6    in a briefing about a dispute, but I don't recall anymore what

7    the subject matter was.

8    **BY MR. UMHOFER:**

9    Q    And this was while you were still with the City, correct?

10   A    Yes, with counsel, but I really don't recall the subject

11   matter.

12   Q    Was --

13   A    I know there was a dispute but I don't remember what it

14   was about.

15   Q    Was the CAO's office there?

16   A    I don't recall.  Probably, but I don't recall.

17   Q    Were you involved in any way in responding to this email?

18   A    No.

19   Q    Were you involved in -- let me step back.

20           Did you ever talk -- aside from communications where

21   counsel was present, did you ever have any conversations with

22   the mayor herself regarding the Settlement Agreement?

23           **MS. KUMAR:**  Objection, Your Honor.  Relevance and

24   also deliberative process privilege.

25           **THE COURT:**  I'm a little leery of that, Counsel.

Marquez - Direct / By Mr. Umhofer                    **170**

1  **BY MR. UMHOFER:**

2  Q    Do you recall having conversations without counsel present

3  with Mr. Szabo about the Settlement Agreement?

4  A    I don't.

5  Q    Did you and Mr. Szabo talk outside the courtroom today

6  before your testimony?

7  A    Yes, we said hello to one another.

8  Q    Did you discuss your testimony in any way?

9  A    Not in any way.

10  Q    Mr. Szabo is the head of the CAO's office, correct?

11  A    As far as I know, he is.

12  Q    When you received this email did you believe that this was

13  his responsibility, not yours?

14        **MS. KUMAR:**  Objection, Your Honor.  Lacks foundation.

15  She's already said she doesn't remember this email.

16        **THE COURT:**  Overruled.

17        **(To the Witness):**  You may answer the question.

18        **THE WITNESS:**  I don't remember receiving this email

19  so I can't answer your question within the context of the

20  email.  But as I've said, anything having to do with the

21  Settlement Agreement would have been in the jurisdiction first

22  responsibility within the CAO's office, as was agreed to

23  between the CAO's office I imagine and the City Council before

24  the mayor was elected.

25  //

Marquez - Direct / By Mr. Umhofer                    **171**

1    **BY MR. UMHOFER:**

2    Q    There's nobody from the CAO's office on this email,

3    correct?

4    A    I don't know all the names for that.

5    Q    Mr. Szabo's not on the email, correct?

6    A    He is not on the email.

7    Q    In fact, you are the only non-lawyer at the City on this

8    email, correct?

9    A    Well, crazily, I am a lawyer.

10   Q    I apologize.

11        **(Laughter)**

12   A    But I am the only non-lawyer of record.

13   Q    Understood.  Understood.

14        Do you remember being in a meeting with counsel,

15   Mr. Michaelson, and Ms. Mitchell in which you disclosed that

16   the City never hired preferred service outreach providers for

17   encampment reduction in each district?

18        **MS. KUMAR:**  Objection, Your Honor.  Lacks foundation,

19   leading, this is Counsel's witness --

20        **THE COURT:**  Overruled.

21        **MS. KUMAR:**  -- he's testifying.

22        **(To the Witness):**  You may answer the question,

23   please.

24        **THE WITNESS:**  I don't remember that.

25   //

Marquez - Direct / By Mr. Umhofer                                    **172**

1   **BY MR. UMHOFER:**

2   Q    Do you recall saying anything like that?

3   A    No.

4   Q    Do you recall saying that nothing had been done toward the

5   City's commitments regarding encampment reduction during that

6   meeting?

7           **MS. KUMAR:**  Objection, Your Honor.  Assumes facts not

8   in evidence and then Counsel is testifying.

9           **THE COURT:**  Overruled.

10          **(To the Witness):**  You may answer the question,

11  please.

12          **THE WITNESS:**  I don't know what meeting you're

13  talking about.

14  **BY MR. UMHOFER:**

15  Q    There were only two meetings, a Zoom meeting and an in-

16  person meeting involving Ms. Mitchell, correct?

17  A    As far as I remember, yes.

18  Q    And in either of those meetings do you recall saying in

19  effect that the City never hired outreach providers for

20  encampment reduction?

21  A    I don't.

22          **MS. KUMAR:**  Objection, Your Honor.

23          **THE COURT:**  I'm sorry, I didn't hear the question.

24          **THE WITNESS:**  I do not remember that.

25          **THE COURT:**  And your answer?

Marquez - Direct / By Mr. Umhofer                    **173**

1          **THE WITNESS:**  I don't remember.

2          **THE COURT:**  You do not remember.

3          **THE WITNESS:**  I don't remember that topic.

4    **BY MR. UMHOFER:**

5    Q    Were you involved in any discussions not involving counsel

6    concerning encampment reductions related to the Settlement

7    Agreement at any time during your time at the City?

8    A    I don't recall.  That doesn't mean that someone didn't say

9    something to me passing, but I don't recall any meeting where

10   the subject of the meeting without counsel was the Settlement

11   Agreement.

12   Q    Do you recall how many meetings you were involved in where

13   the subject, I'm not asking what was said during the meetings,

14   where the subject of the Settlement Agreement was discussed

15   with counsel present?

16         **MS. KUMAR:**  Objection, Your Honor.  Privileged

17   information.

18         **MR. UMHOFER:**  I'm not asking for the content of the

19   meetings.  I'm just asking if the subject --

20         **THE COURT:**  You may answer the question, please.

21         **THE WITNESS:**  I don't recall how many meetings in the

22   11 months, but this is -- Judge, this is a guess.  Three to

23   five, perhaps, in 11 months.

24   //

25   //

Marquez - Direct / By Mr. Umhofer                              **174**

1   **BY MR. UMHOFER:**

2   Q    But to be clear, you did not consider compliance with this

3   Settlement Agreement to be part of your job?

4            **MS. KUMAR:**  Objection, Your Honor.  Asked and

5   answered.

6            **THE COURT:**  Overruled.

7            **(To the Witness):**  Please answer the question.

8            **THE WITNESS:**  Well, let me go back for a minute.  I

9   didn't say to you -- in terms of the question you asked me, my

10  response about three to five meetings, you shouldn't assume

11  that I was the only person there.

12  **BY MR. UMHOFER:**

13  Q    I am not.

14  A    Okay.  So I was not the only person there.

15  Q    Of course.  A meeting requires more than one person,

16  correct?

17  A    Rumor has it.  But I guess to be more precise, I was not

18  the only City employee present at those meetings.

19  Q    Okay.

20  A    So they were general briefings, not meetings where someone

21  was talking to me about something I would do.  Why can I be

22  sure of that?  Because I was not responsible for the RFQ.

23  Q    And you were not responsible for compliance with the

24  Settlement Agreement?

25  A    I was not responsible for the administration or management

Marquez - Direct / By Mr. Umhofer                    **175**

1  of the Settlement Agreement and what the City was doing.

2  Q    Not your job, correct?

3  A    Not my job.

4           **MR. UMHOFER:**  Just a moment, Your Honor?

5       **(Pause)**

6           **MS. MITCHELL:**  May we have just a moment, Your Honor?

7  Thank you.

8           **THE COURT:**  You'd like a recess for the parties?

9           **MS. MITCHELL:**  Maybe five minutes.

10          **THE COURT:**  Okay.  Why don't we take a brief recess

11  then.  Why don't we say 15 minutes, all right?  We'll return at

12  ten after the hour.  Thank you.

13          **MS. MITCHELL:**  Thank you, Your Honor.

14      **(A recess was taken from 3:56 p.m. to 4:19 p.m.; parties**

15  **present)**

16          **THE COURT:**  We're back in session.

17          **(To the Witness):**  Would you be kind enough to retake

18  the witness stand, please?

19      **(Witness resumes stand)**

20          **MR. UMHOFER:**  May I proceed, Your Honor?

21          **THE COURT:**  Please.

22          **MR. UMHOFER:**  Thank you.

23      **(Clerk confers with Court)**

24      **(Pause)**

25          **THE COURT:**  All right, thank you, Counsel.  The

Marquez - Direct / By Mr. Umhofer                    **176**

1    witness has returned to the stand.  All counsel are present.

2    Your continued direct examination, please.

3                **MR. UMHOFER:**  Thank you, Your Honor.

4                    **DIRECT EXAMINATION (CONTINUED)**

5    **BY MR. UMHOFER:**

6    Q    Ms. Marquez, you recall coming to hearings related to this

7    case and before Judge Carter in the past, correct?

8    A    I do.

9    Q    How many?  How many hearings in this case did you attend?

10   A    I don't recall the exact number, but I do remember two.

11   Q    Why did you come?

12   A    I came and accompanied the mayor.

13   Q    Why?

14               **MS. KUMAR:**  Objection, Your Honor.  Relevance.

15               **THE COURT:**  Overruled.

16               **THE WITNESS:**  She asked me to.

17   **BY MR. UMHOFER:**

18   Q    Did she say why she asked you to?

19               **MS. KUMAR:**  Objection, Your Honor.  Deliberative

20   process, relevance.

21               **THE COURT:**  If you're driving at her official

22   capacity, you can just ask that, Counsel.

23   **BY MR. UMHOFER:**

24   Q    You were here in your official capacity, yes?

25   A    Yes.

Marquez - Direct / By Mr. Umhofer                    **177**

1    Q    In fact, you and I met at one of those hearings, correct?

2    I'm --

3    A    No offense, but I don't remember.

4    Q    Let's stipulate I'm a forgettable person.  But just in

5    case this refreshes your recollection, I'm pointing you to

6    Exhibit 406.  I sent you an email on September 28th, 2023,

7    saying good to see you this morning, would love to continue

8    that conversation, with the subject matter settlement.  Do you

9    see that there?

10   A    I do.

11   Q    Does that refresh your recollection at all about me?

12   A    Not at all.

13   Q    Okay.  Do you recall being involved in conversations about

14   setting up a meeting between the City and the County related to

15   this case?

16        **(No audible response)**

17            There is an email in front of you.  I don't know if

18   that refreshes --

19   A    Yeah, I'm looking at it.  I don't recall the email but I

20   do recall the issue of -- I don't know what this is about so I

21   can't say that I understand -- at this point Alliance, City,

22   County, I don't know what the problem would have been at the

23   time.

24   Q    You said you did recall an issue though.  Do you recall

25   what that issue was?

Marquez - Direct / By Mr. Umhofer                    **178**

1    A    Yes.

2    Q    What was that issue?

3         **MS. KUMAR:**  Objection, Your Honor.  Relevance.

4         **THE COURT:**  Overruled.

5         **THE WITNESS:**  It would have been early on.  I think

6    well before May.  It could have been into May.  I don't know.

7    But this was about whether the County would settle.

8    **BY MR. UMHOFER:**

9    Q    And this is --

10   A    With you all.

11   Q    And this is an email in May of 2023 that Ms. Mitchell sent

12   to you and David Michaelson, correct?

13   A    I don't recall it, but I see it.

14   Q    And do you recall being invited to a meeting in April of

15   2023 regarding LA Alliance milestones and deadlines?

16   A    I don't.

17   Q    And do you recall in March of 2023 being involved in

18   discussions around the Alliance County Agreement with the

19   LA Alliance and other individuals within the City?

20        **MS. KUMAR:**  Objection, relevance, assumes facts not

21   in evidence.

22        **THE COURT:**  Overruled.

23        **THE WITNESS:**  I -- that question seems like there's a

24   lot of things in there.  Could you break it down?

25   //

Marquez - Direct / By Mr. Umhofer                           **179**

1   **BY MR. UMHOFER:**

2   Q    Could I break it down?  Why don't you just take a look at

3   this email that I put in front of you.  It's dated March 7th.

4   It's part of Exhibit 406.  See if this -- do you recall this

5   email?

6   A    I don't.

7   Q    Do you recall trying to organize a meeting or being

8   involved in a meeting involving Supervisor Hahn's office and

9   discussions between the City and the County?

10  A    I remember going to Supervisor Hahn's office on one

11  occasion.  I don't recall when it was, but I recall a meeting.

12  I don't know if this is what -- if this is in reference to that

13  or not.  I don't know if they're connected.

14  Q    Was the meeting related to this case?

15  A    Yes.

16  Q    And do you remember the subject of that meeting?  What was

17  being discussed?

18  A    Wouldn't they please agree to settle.

19  Q    Okay.  You mean the County, correct?

20  A    Yes.

21  Q    Why -- do you understand why you were involved in that

22  meeting?

23           **MS. KUMAR:**  Objection, relevance.

24           **THE COURT:**  Overruled.

25           **THE WITNESS:**  Because it was in the City's interest

Marquez - Direct / By Mr. Umhofer                    **180**

1   that they settle.

2   **BY MR. UMHOFER:**

3   Q    And that was in your official capacity that you

4   participated in that meeting, correct?

5           **MS. KUMAR:**  Objection, Your Honor.  Privilege and the

6   deliberative process as to what was going on in the City's

7   mind.

8           **THE COURT:**  Overruled.

9           **THE WITNESS:**  I can only tell you that the City was

10  in need of County services in order to properly serve those

11  individuals that were brought in from the street and so our

12  interest was in making sure that there were robust services in

13  order to service our clients.

14  **BY MR. UMHOFER:**

15  Q    And you were hopeful that the County -- you were hopeful

16  that the County would settle in a manner that would facilitate

17  the provision of those services, correct?

18          **MS. KUMAR:**  Objection, Your Honor.  Relevance,

19  deliberative process privilege, and potentially attorney-client

20  privilege.

21          **THE COURT:**  Overruled.

22          **THE WITNESS:**  It really wasn't about what I hoped.

23  **BY MR. UMHOFER:**

24  Q    There is another email that I have up here from February

25  of 2023.  David Michaelson says:

Marquez - Direct / By Mr. Umhofer                    **181**

1              "Liz, I've lost track of time.  Did we talk right

2              after your last email?  If so, once you can get

3              Mercedes the info re the County contract Mercedes

4              will contact Chair Hahn's staff -- chief of staff to

5              clear the deck for Karen to come down."

6          Do you see that there?

7    A    I do.

8    Q    Do you remember what this is about?

9    A    Well, I'm looking at what he says the subject.  The

10   subject line is MHSA homelessness mental health beds.

11   Q    And do you remember why you were involved in contacting

12   Chairperson Hahn's office?

13   A    I don't remember why it came down to me but, as I said,

14   this was about whether they would settle, I believe.  This was

15   about the beds that were required.  And we needed beds in order

16   to service our clients.

17   Q    Mental health beds, correct?

18   A    Correct.

19   Q    Does the name Karen Larsen ring a bell?

20          **THE COURT:**  I'm sorry, Counsel.  Would you repeat

21   that?

22   **BY MR. UMHOFER:**

23   Q    Does the name Karen Larsen ring a bell, with the Steinberg

24   Institute?

25   A    No, and I was not involved in any communication with the

Marquez - Direct / By Mr. Umhofer                          **182**

1  Steinberg Institute.

2  Q    And so the Karen referenced in -- the Karen referenced in

3  David Michaelson's email for Karen to come down, was that Karen

4  Larson from the Steinberg Institute?

5        **MS. KUMAR:**  Objection, lacks foundation, speculation

6  about what David Michaelson meant.

7        **THE COURT:**  Overruled.

8        **THE WITNESS:**  I don't know.

9  **BY MR. UMHOFER:**

10 Q    Did Mr. Michaelson ask you to contact Chairperson Hahn's

11 office to clear the deck for Karen to come down?

12       **MS. KUMAR:**  Objection, lacks foundation, relevance.

13       **THE COURT:**  Overruled.

14       **THE WITNESS:**  I don't recall anything about that.

15 **BY MR. UMHOFER:**

16 Q    Understood.

17       And again Exhibit 406, was this another email that

18 you were included on concerning mental health, mental health

19 beds related to this case?

20       **MS. KUMAR:**  Objection, Your Honor.  Lack of

21 foundation.

22       **THE COURT:**  Overruled.

23       **THE WITNESS:**  I'm reading.

24       It seems to be related to the mental health beds,

25 yes.

Marquez - Direct / By Mr. Umhofer                              **183**

1    **BY MR. UMHOFER:**

2    Q    So do these emails refresh your recollection that you did

3    have some involvement and participation in this case in the

4    City's and the County's participation in this case?

5              MS. KUMAR:  Objection, Your Honor.  Assumes facts not

6    in evidence, speculation.

7              THE COURT:  Overruled.

8              THE WITNESS:  I'm looking at the date.  So we had

9    been there 60 days and the issue about whether the County would

10   settle or not was a big one.  From the City's point of view, we

11   needed services.  And so only to that degree was I involved.

12   This is how I -- why I am saying to you working on something

13   that has to do with whether the County will settle so that we

14   get services is not the same as being responsible for

15   administering whatever the City agreed in its settlement, which

16   I was not involved in at all.  They're two very separate

17   things.

18   **BY MR. UMHOFER:**

19   Q    But the County getting to a place of settlement in this

20   case and providing services did relate to your job as chief of

21   housing and homelessness, correct?

22             MS. KUMAR:  Objection, Your Honor.  Relevance.

23             THE WITNESS:  Not -- actually not really.  It's not

24   about whether it related to my job.  It's about whether I

25   thought the settlement would make sense for people.  Not about

Marquez - Direct / By Mr. Umhofer                    **184**

1   my job.  I was not responsible for the administering of the

2   case of the settlement.  Right?  So no, they're not related.

3   **BY MR. UMHOFER:**

4   Q    Your participation in conversations about the County

5   potentially settling had nothing to do with your job at the

6   City?

7   A    Not with my specific tasks, no.  I would not be, for

8   instance, the person who would follow up with the County once

9   they settled.  And indeed, after the County settled and agreed

10  to a much higher number of beds, as the Judge recalls all that

11  (indisc.).  I was not involved in discussing with the County in

12  any way how they would make good on those beds.  That moved,

13  then once it's a settlement, away from me.  I had nothing to do

14  with it and never had a single conversation with the County

15  about what they agreed to in their settlement about the beds

16  and how they would be provided after the case settled.

17  Q    That was not your job.  That was the CAO's job, correct?

18  A    You know, that I can't even say who that job was.  I don't

19  know.  I actually don't know.

20          **MR. UMHOFER:**  Okay.  No further questions at this

21  time.

22          **THE COURT:**  And on behalf of the Intervenors,

23  Ms. Myers?

24          **MS. MYERS:**  No questions, Your Honor.

25          **THE COURT:**  Then back to the City, please.

Marquez - Cross / By Ms. Kumar                                    **185**

1              **MS. KUMAR:**  Thank you, Your Honor.

2                        **CROSS EXAMINATION**

3    **BY MS. KUMAR:**

4    Q     Good afternoon.  It's been some time, could you remind us

5    what your -- when you began working for the City in 2022?

6    A     I began December 12th, 2022.

7    Q     And when did your employment with the City end?

8    A     I believe it was November 17th, 2023.

9    Q     And in that time period what was your title?

10   A     Chief of housing and homelessness solutions for

11   Mayor Karen Bass.

12   Q     Could you just describe in a little detail what your roles

13   were in that job?  What were the various things you were

14   responsible for?

15   A     I would say that my responsibilities had a lot to do with

16   being the first one in.  So while that job continues in some

17   way I believe in the City, it is different to be the one that

18   walks in the door than being the one who takes it over some

19   years later when there is a program.

20             So when I come in with the mayor my job was to set

21   the parameters of what Inside Safe would be.  Most people, when

22   they think about that program, are focused entirely on those

23   outreach workers that actually approach those that are homeless

24   on the street and work with them to agree to give up their

25   tents and other things in favor of housing.  My job was much

Marquez - Cross / By Ms. Kumar                              **186**

1    more expansive because behind that there was no program.  That

2    meant that there were no standards for motels.  It meant that

3    there was -- there were no motels that were already contracted.

4    It meant that we had to worry about where all the motels would

5    be.  We had to discuss how we would finance them.  We had to

6    discuss how we would process them.  We had to discuss how we

7    would review them.  We had to discuss, particularly between the

8    CAO and the mayor's office, how we would go about all of the

9    standards of invoicing.  Right?  All of those things that are

10   involved with multiple properties and multiple service

11   providers I was responsible for with staff and a team.  Many,

12   many people.  Not me by myself at all.  A team of many people.

13   Q    How many were on your team?

14   A    When I first started, me.

15   Q    And over your time at the City?

16   A    And over time at the City I would say a core group that

17   worked with me on administration and all these policy issues,

18   maybe not more than ten people.

19           And then my job was also then to work on the design

20   of the first budget for the mayor that would contain the

21   ability to work through all these things.  It also included the

22   budgets for the different agencies.  Right?  So housing, what

23   the City's contribution would be to LAHSA, all these many

24   different things.

25           It also included, my job, working with City Council

Marquez - Cross / By Ms. Kumar                                    187

1   offices.  Because before the mayor arrives many City Council

2   members and their staffs had done enormous amounts of work on

3   these issues and so it was important to learn what they were

4   doing, to respect what they were doing, to add value to what

5   they were doing at the same time that we were attempting to

6   build up a city-wide program, right, that would now lead to

7   something.

8            As I continued to work you then run into the

9   problems.  The bureaucracy is legendary.  And my job was to

10  ferret out those things that were in the way of us being able

11  to process applications so that people could move from motels

12  to permanent supportive housing, but not only from Inside Safe,

13  from all of the interim housing sites, how we could make it

14  easier.  It also meant speaking to the federal government.  It

15  meant speaking to the state government.  It meant working with

16  the county government to seek funding in all kinds of ways,

17  competitions, any way you mean it I was doing it in order to

18  bring us forward.  And always in an attempt to move with the

19  City Council to the things that they were doing and seeking

20  advice and all kinds of things to make this better.  Those are

21  the types of things that I had to do.

22  Q    And as chief housing and homelessness solutions, chief of

23  the housing and homelessness solutions, would you agree with me

24  that there are many aspects to the crisis of homelessness that

25  the City is experiencing?

Marquez - Cross / By Ms. Kumar                    **188**

1   A    Yes.

2   Q    Okay.  And that there is no single solution to this

3   crisis, is that right?

4   A    There is no single solution to this crisis.

5   Q    So in your job as chief of housing and homelessness

6   solutions, was your job to administer every aspect of the

7   City's homelessness policy?

8   A    No.

9   Q    Could one person actually do that?

10  A    No.

11  Q    And so in your job on a day-to-day basis when you were

12  with the City for that 11-month period how many meetings would

13  you say you attended a day on average?

14  A    Ten.

15  Q    Per week?

16  A    No, per day.

17  Q    Okay, per day, ten per day.  So maybe 50 during the

18  business week?

19  A    Could be.  Yeah, could be.

20  Q    Okay.  Could you tell us how many emails you may receive

21  in the course of any given week?

22  A    Many.

23  Q    More than ten?

24  A    Oh, certainly.  I mean --

25  Q    More than a hundred?

Marquez - Cross / By Ms. Kumar                                    **189**

1   A    The kind that leaves your inbox quite full.

2   Q    Now, Counsel asked you a lot of questions about the

3   settlement and your relationship to the settlement.

4   A    Yes.

5   Q    You were aware of the settlement when you joined the

6   mayor -- when you joined the City, isn't that right?

7   A    I became aware of it after I joined, yes.

8   Q    Did you have any role in negotiating the settlement before

9   it was signed?

10  A    No.

11  Q    And then did you have -- were you ever tasked by anyone at

12  the City to oversee the City's compliance with the Settlement

13  Agreement?

14  A    No.

15  Q    Counsel showed you a number of email -- I would just say

16  Counsel asked you a question that you took some offense to on

17  direct, Ms. Marquez.  Let me just ask you, is the issue of

18  homelessness one that's important to you?

19  A    Very much.

20  Q    And it's one that you've spent a significant portion of

21  your career working toward, isn't that right?

22  A    Yes.

23  Q    And are you proud of the work you accomplished while with

24  the City?

25  A    It was an absolute privilege to serve.

Marquez - Cross / By Ms. Kumar                          **190**

1    Q    And do you view -- do you view it -- strike that.

2          Do you view it in any way as some sort of personal

3    slight that you weren't the one responsible for overseeing the

4    City's compliance with this agreement?

5    A    No.

6    Q    Do you have an awareness based on your time with the City

7    of who would have been principally involved in negotiating the

8    Settlement Agreement?

9    A    Yes.

10   Q    Who is that?

11   A    My understanding is that Matt Szabo took the lead for the

12   City.

13   Q    And then would the City Council's office have also been

14   involved?

15   A    That I don't know enough about.

16   Q    Okay.

17   A    But I do know that was consultation with the City Council

18   members and that they cared deeply about it.

19   Q    And what about the counsel for the City as well?

20   Attorney's Office, excuse me.

21   A    Yes.  Mr. Marcus, I believe.

22   Q    Counsel showed you a number of emails during the course of

23   your direct examination.  Ms. Marquez, are you still employed

24   with the City?

25   A    No.

Marquez - Cross / By Ms. Kumar                                    **191**

1  Q    Do you have any access to your emails?

2  A    No.

3  Q    From your time with the City, when you worked for the

4  City, do you have any access to those emails?

5  A    No.

6  Q    Do you have any access to your calendar from when you

7  worked at the City?

8  A    No.

9  Q    Have you, since you left the City in November of 2023,

10  talked to anyone at the City until this moment about -- in

11  substance about this settlement agreement?

12  A    No.

13  Q    And in your direct examination, did Counsel, in the emails

14  that he showed you, did you see any emails in which you were

15  the only recipient from the City on the email?

16  A    No.

17  Q    And in fact there were numerous emails in which there

18  were -- Scott Marcus was on the email, correct?

19  A    Yes.

20  Q    And David Michaelson was on the email; isn't that right?

21  A    Correct.

22  Q    And you don't recall seeing a single email in which you

23  were the only recipient; isn't that right?

24  A    No.  And it would have been inappropriate.

25  Q    And do you recall any meetings in which you were the only

1   participant with anyone from the Alliance?

2   A    No.

3   Q    And Ms. Marquez, it's now been about two years since you

4   left the City; is that right?

5   A    Exactly two years --

6   Q    And some of the emails are from early 2023 so bordering on

7   three years now; is that fair?

8   A    It is.

9   Q    Do you have a crisp recollection of every meeting you

10  attended while you were employed at the City and every email

11  you received?

12  A    As I said, there were many meetings a day.  No.

13          **MS. KUMAR:**  One moment, Your Honor.  Nothing further

14  at this time.

15          **THE COURT:**  Any redirect examination by LA Alliance?

16          **MR. UMHOFER:**  Your Honor, I'm going to go into the

17  place that we started with that you said we could revisit later

18  and ask a few questions.  I understand there will be objections

19  to them.  I'm not ignoring anything around that, I just want to

20  get to the bottom of it.

21                       **REDIRECT EXAMINATION**

22  **BY MR. UMHOFER:**

23  Q    Were you terminated from the City, Ms. Marquez?

24          **MS. KUMAR:**  Objection, Your Honor, relevance and

25  privacy, confidentiality.  It's no relevance to this question.

1          **MR. UMHOFER:**  Your Honor, may I be heard?

2          **THE COURT:**  Please.

3          **MR. UMHOFER:**  Your Honor, the witness has testified

4    in a way that I think the City thinks it's helpful to it based

5    on the lack of actual cross examination.  I think her demeanor

6    suggests a bias in favor of the City and I think that we need

7    to understand which way this bias goes.  If she was terminated,

8    does she have a settlement agreement with the City, did she get

9    money from the City?  That all goes to bias.  If this witness

10   got money from the City arising out of her departure, that does

11   matter to the credibility and the weight of her testimony.  If

12   the Court doesn't think it does, no problem, I don't have to go

13   into it but I think it does.

14         **THE COURT:**  Goes to credibility.  You can ask the

15   question.

16         **MS. KUMAR:**  Your Honor, may I be heard?

17         **THE COURT:**  Overruled, Counsel.

18         **MS. KUMAR:**  Your Honor, may I be heard?

19         **THE COURT:**  You may, of course, set your record.

20         **MS. KUMAR:**  Sorry, Your Honor?

21         **THE COURT:**  Set your record.  Of course you may.

22         **MS. KUMAR:**  Oh, Your Honor, I just have to

23   strenuously object to this.  This witness is here.  She's been

24   subpoenaed at the direction of the Court.  She has no relevance

25   to this hearing.  The stipulated facts that purportedly relate

Marquez - Redirect / By Mr. Umhofer                    **194**

1  to some meetings that she was involved in, has been resolved by

2  this court and the Alliance has been paid for it, it has been

3  adjudicated.  She has come here in compliance with the subpoena

4  and there is no reason to invade her privacy, harass her and

5  ask her questions of a personal nature like this, simply in a

6  fishing expedition to try to impugn her character.  There's

7  just simply no relevance of it.

8          **MR. UMHOFER:**  Your Honor, on the relevance point, I

9  just -- I mean counsel for the City understand why they need to

10 make this argument but this notion that this is irrelevant,

11 that the City's failure to comply with its promises, its

12 misleading the Alliance for quite some time --

13         **THE COURT:**  I'm going to overrule the objection.  You

14 can ask the question.

15 **BY MR. UMHOFER:**

16 Q    Were you terminated from the City?

17 A    No.

18 Q    Were you asked to leave?

19 A    No.

20 Q    Was your departure from the City your choice?

21 A    Yes.

22 Q    Did you submit a letter of resignation?

23 A    I don't remember.

24 Q    How did you announce, how did you effect your departure

25 from the City?

1   A    Well, you know I've been an employee of the City before.

2   The last time before this one that I was a member of the City

3   family, I left at the end of 2013.  And in -- sometime in 2014,

4   I took retirement.  That means that I receive a pension from

5   the City of Los Angeles.  When you receive a pension from the

6   same government entity, there are rules.  I'm not an expert so

7   I'm not going to lay it out to you but there are rules about

8   how a former employee, now the pensioner, can return to work

9   and help out the City.  That is what we did.  There are rules -

10  - you'll have to look them up yourself -- about how many hours

11  a former employment, pensioner, can work in a fiscal year.

12          When I agreed to come and set aside my consultancy,

13  at I would say quite a cost to me personally, I did it out of

14  an absolute commitment to justice.  The Mayor knew, as did

15  everyone else, that I would only be able to serve for that time

16  period because for what -- you know just Kismet (phonetic), she

17  began in the middle of one fiscal year and the next six months

18  would go into a new fiscal year, which would allow me to work

19  as an hourly employee without a single benefit in each of those

20  times.  That is what I did.  So I left, as everyone knew in the

21  Mayor's office, because I had completed the time that was

22  appropriate under the rules of the pension system.

23  Q    So you're -- it's your testimony that you had to leave at

24  that point.  You couldn't continue in your position?

25  A    Absolutely.

Marquez - Redirect / By Mr. Umhofer                    **196**

1  Q    Do you recall receiving from any superior, criticism of

2  your performance in your role during your time in your job?

3          **MS. KUMAR:**  Objection, Your Honor, relevance,

4  invasive.

5          **THE COURT:**  Sustained.

6  **BY MR. UMHOFER:**

7  Q    Did you raise any issues with the City related to your

8  departure about your treatment by the City?

9          **MS. KUMAR:**  Objection, Your Honor, relevance.

10         **THE COURT:**  Sustain the objection, Counsel.

11 **BY MR. UMHOFER:**

12 Q    Did you receive any money from the City related to your

13 departure?

14         **MS. KUMAR:**  Objection, Your Honor, relevance, asked

15 and answered.

16         **THE COURT:**  I'm going to sustain it.  Counsel, you

17 can ask if there's any nexus between the October 3rd

18 statements.  I'll allow you to get into that but the

19 generalized questions now I'm sustaining.

20 **BY MR. UMHOFER:**

21 Q    Was one of the reasons why you left the City because you

22 failed to do what you needed to do related to the settlement in

23 this case?

24         **MS. KUMAR:**  Objection, Your Honor.  Assumes facts not

25 in evidence, argumentative.

Marquez - Redirect / By Mr. Umhofer                         **197**

1          **THE COURT:**  I'm not sure I understand the question.

2   **BY MR. UMHOFER:**

3   Q    Was one of the reasons why you left, the fact that you

4   were responsible for some aspect of compliance with the

5   settlement agreement and failed to perform?

6          **MS. KUMAR:**  Objection, Your Honor.  Argumentative,

7   assumes facts not in evidence.

8          **THE COURT:**  Does this relate to the --

9   **BY MR. UMHOFER:**

10  Q    Anything related to this case.  Was this case and your

11  involvement or lack of involvement in this case, or your

12  performance or lack of performance in this case, one of the

13  reasons why you departed the City?

14         **MS. KUMAR:**  Objection, Your Honor.  The witness has

15  already --

16         **THE COURT:**  I'm going to sustain it.  It's too broad,

17  Counsel.  I thought the gist of the stipulation originally were

18  the statements made by the witness concerning not fulfilling

19  5.2.

20         **MR. UMHOFER:**  And that's what I'm getting at, Your

21  Honor.  I can be more specific.

22         **THE COURT:**  Well it's too broad.  I don't -- it's way

23  too broad, Counsel.

24         **MR. UMHOFER:**  Okay, Your Honor.

25  //

Marquez - Redirect / By Mr. Umhofer                198

1   BY MR. UMHOFER:

2   Q    Was your departure from the City related in any way to

3   Section 5.2 of the settlement agreement?

4          MS. KUMAR:  Objection, Your Honor.  Asked and

5   answered and argumentative.

6          THE COURT:  Overruled.  You can answer that question.

7   A    I had no responsibility for the administration of the

8   settlement.

9   Q    Was your departure from the City related in any way to

10  Section 5.2 of the settlement agreement?

11         MS. KUMAR:  Objection, Your Honor.  Asked and

12  answered.

13         MR. UMHOFER:  Asked but not answered.

14         THE COURT:  Overruled.  You can answer the question.

15  A    No.

16  Q    Do you have any agreement with the City that relates to

17  your departure?

18         MS. KUMAR:  Objection, Your Honor.  Asked and

19  answered.

20         THE COURT:  I'm going to sustain the objection,

21  Counsel.

22  BY MR. UMHOFER:

23  Q    Is there anything in any agreement with the City and you

24  related to your departure, that relates to Section 5.2 of the

25  settlement agreement?

1          **MS. KUMAR:**  Objection, Your Honor.  Asked and

2   answered, invasive, harassment.

3          **THE COURT:**  I believe she's answered no, Counsel.

4          **MR. UMHOFER:**  I'm not sure she has, Your Honor.

5          **THE COURT:**  Well the previous answer was no, wasn't

6   it?

7          **THE WITNESS:**  No.

8          **MR. UMHOFER:**  No further questions, Your Honor.

9          **THE COURT:**  Okay.  Thank you.

10          On behalf of the Intervenor?

11          **MS. MYERS:**  No, Your Honor.

12          **THE COURT:**  On behalf of the City?

13          **MS. KUMAR:**  No, Your Honor.

14          **THE COURT:**  I'm going to leave you on call but we'll

15   be courteous.  This may conclude quickly but if you're needed

16   back in court, we'll be courteous and give you adequate notice

17   but so far you and all the other witnesses will be on call to

18   the Court.  And we'll renew the record in case I have any

19   additional questions.

20          **THE WITNESS:**  I appreciate that, Your Honor.

21          **THE COURT:**  Thank you very much.  You may step down.

22      (Witness stepped down)

23          Counsel, your next witness, please?

24          **MS. MITCHELL:**  Well, I think the only other witness

25   that's currently present is Ms. Martinez.  I'm not sure if

200

1    she's feeling well enough to testify.  We talked about

2    getting --

3            THE COURT:  No, she'll be lengthy as well as some of

4    the others.  Then what's your suggestion?  When would you like

5    to reconvene in this matter?  What are your thoughts?  Why

6    don't you two -- why don't all the sides get together.

7            I know, Ms. Myers, you have a matter I think you told

8    me tomorrow.

9            MS. MYERS:  You'll be there.

10           MS. KUMAR:  Your Honor, the parties had conferred --

11   and please correct me, counsel -- that I think December 1st,

12   all of the witnesses will be back in town from their travels

13   and will be available to testify and so --

14           THE COURT:  What day of the week is December 1st?

15           MS. KUMAR:  It's a Monday.

16           MS. MYERS:  Your Honor, it might be helpful if we

17   conferred given that we have not made it through.  So it might

18   be helpful if we follow your guidance and actually confer.

19           MS. KUMAR:  Okay.  Your Honor, we'll confer.

20           THE COURT:  Just talk.  I'll just sit here while you-

21   all confer.  And then you've got a number of exhibits you want

22   the Court to receive this evening.

23       (Pause; counsel confers)

24           Counsel, while you're discussing this, we're coming

25   back -- in other words, we can be in session anytime this week

201

1    or next week if you choose but from all the input I've gotten,

2    so many of your witnesses aren't available until after

3    Thanksgiving.  And under the Eighth Amendment, we ought to all

4    have Thanksgiving, right?  So why don't we do this.

5         Why don't we think about Tuesday or Wednesday of that

6    week and the reason for that is I've got a huge calendar coming

7    back on Monday and I'm afraid you're going to be sitting as you

8    were today and that would be impolite.  So either the 2nd or

9    3rd.

10        And by the way, as far as due process, no problem.

11   We'll be here a long time if we need it until all of us are

12   satisfied with due process.  We're going to have more due

13   process than we could possibly imagine.

14        MS. KUMAR:  Thank you, Your Honor.  We appreciate

15   that.

16        THE COURT:  So you tell me.

17        MS. KUMAR:  Do you want us to tell you today or

18   should we confer and then let your courtroom deputy know?

19        THE COURT:  Sure.  I'm sitting here.

20        MS. KUMAR:  We'll do it today.  Okay.

21        (Pause; counsel confer)

22        And counsel, I know on the 4th it might be a good

23   date to start just because we're coming back on another case.

24        (Court and Clerk confer)

25        So if you're here by 9:00 o'clock, I think that would

1    be a decent day.

2            MS. MITCHELL:  On December 4th?

3            THE COURT:  December 4th.

4            MS. MITCHELL:  Daniel Conway is only available the

5    1st and the 2nd and he goes out of town again.

6            THE COURT:  Well then we'll do it the 2nd.

7            MS. MITCHELL:  So we're talking about the 2nd right

8    now, Your Honor.

9            THE COURT:  2nd.  If we fill the day, fine.  If we

10   get -- if you have other witnesses, we can recess until they're

11   available.

12       (Pause; counsel confer)

13           MS. MITCHELL:  Your Honor, we're just confirming that

14   Mr. Szabo is available on December 2nd.  That looks like it's

15   going to be a good day.

16           I think the only other issue --

17           THE COURT:  Even if he's not, if Mr. Conway is

18   available, we can certainly get through him.

19           MS. MITCHELL:  Sure.

20           THE COURT:  And if Mr. Szabo is tied up we can work

21   around his schedule on the 2nd or the 3rd or the 4th.

22           MS. MITCHELL:  That works, Your Honor.

23           We also have Bevin Kuhn who will be available to

24   testify.

25           THE COURT:  On the 2nd?

1          **MS. MITCHELL:**  On the 2nd.  I believe at least one of

2    the A&M members may be available to testify on the 2nd.  If the

3    City wants to cross-examine me on my declaration, I am

4    certainly available, Your Honor.  I think we're just

5    doublechecking availability.

6          **MR. MCRAE:**  I think it will just take a second, Your

7    Honor.  I think it will just take a second, Your Honor, if

8    that's okay.  Thank you.

9          **MS. MITCHELL:**  Oh.  Your Honor, the only other issue,

10   Daniel Gary indicated he would communicate with the Court about

11   his scheduling so I don't have his availability.

12         **THE COURT:**  I don't either.

13         **MS. MITCHELL:**  Okay.

14         **THE COURT:**  So --

15         **MS. MITCHELL:**  I'll reach out directly to him.

16         **THE COURT:**  Can you reach out?

17         **MS. MITCHELL:**  Yes, thank you.

18         **THE COURT:**  What I don't want is these folks from out

19   of town standing around so ...

20       (Pause; counsel confer)

21         **MS. MITCHELL:**  It looks like December 2nd works, Your

22   Honor, for everybody.  The only question mark is Daniel Gary

23   and I will communicate directly with him along with the City.

24         **THE COURT:**  Okay.  What time?  7:30 okay?

25         **MS. MITCHELL:**  Works great for me, Your Honor.

204

1          THE COURT:  Okay.  7:30 then.

2          MR. MCRAE:  7:30 a.m. here on the 2nd?

3          THE COURT:  Yeah.  The big hands on the seven; little

4   hand's on the 30.  Right.  7:30, okay?

5          MR. MCRAE:  Appreciate it.

6          THE COURT:  Okay, thank you very much.

7          MS. MITCHELL:  Thank you, Your Honor.

8          MS. KUMAR:  Thank you, Your Honor.  Happy holidays,

9   everyone.

10      (Proceeding adjourned at 5:02 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

205

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Signed

November 21, 2025

Dated

*TONI HUDSON, TRANSCRIBER*