UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) ) | CASE NO: 2:20-cv-02291-DOC-KESx |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Los Angeles, California |
| vs. | ) | |
| | ) | Tuesday, December 2, 2025 |
| CITY OF LOS ANGELES, ET AL., | ) | ( 7:53 a.m. to  8:49 a.m.) |
| | ) | ( 9:14 a.m. to 11:04 a.m.) |
| Defendants. | ) | (11:25 a.m. to  1:00 p.m.) |
| | | ( 2:29 p.m. to  2:41 p.m.) |

EVIDENTIARY HEARING –

ORDER TO SHOW CAUSE RE CONTEMPT CITY OF LOS ANGELES
[DKT.NO.1066]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:                    SEE PAGE 2

Courtroom Deputy:          Karlen Dubon

Court Reporter:            Recorded; CourtSmart

Transcribed by:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>**APPEARANCES:**</u>

| | |
|---|---|
| For Plaintiffs: | **ELIZABETH A. MITCHELL, ESQ.**<br>**MATTHEW UMHOFER, ESQ.**<br>**Umhofer Mitchell & King**<br>**767 S. Alameda Street, Suite 270**<br>**Los Angeles, CA 90021**<br>**213-394-7979** |
| For Defendants: | **LAUREN M. BRODY, ESQ.**<br>**Miller Barondess, LLP**<br>**1999 Avenue of the Stars, Suite 1000**<br>**Los Angeles, CA 90067**<br>**310-552-4400**<br><br>**POONAM KUMAR, ESQ.**<br>**MARCELLUS A. MCRAE, ESQ.**<br>**KAHN A. SCOLNICK, ESQ.**<br>**Gibson Dunn & Crutcher**<br>**333 South Grand Avenue**<br>**Los Angeles, CA 90071**<br>**213-299-7000** |
| For Intervenor: | **SHAYLA R. MYERS, ESQ.**<br>**Legal Aid Foundation of LA**<br>**7000 S. Broadway**<br>**Los Angeles, CA 90003**<br>**213-640-3983** |
| Special Master: | **MICHELLE MARTINEZ** |
| Also Present: | **PAUL WEBSTER** |

3

INDEX

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DANIEL CONWAY | | | | |
| BY MR. UMHOFER | 6 | | 34/43/52 | |
| BY MS. KUMAR | | 25 | | 41 |
| BEVIN KUHN | | | | |
| BY MS. MITCHELL | 55/126 | | | |
| BY MS. MYERS | | 138 | | |
| BY MR. SCOLNICK | | 183 | | |

**Los Angeles, California; Tuesday, December 2, 2025; 7:53 a.m.**

**(Call to Order)**

THE COURT: LA Alliance for Human Rights v. City of Los Angeles, Case No. 20-02291.

And, counsel, because we're back on CourtSmart -- first of all, I hope all of you had a wonderful Thanksgiving holiday with your families. Counsel, would you make your appearance, though? We're back on CourtSmart, so I need to get a record of who's here today.

MS. MITCHELL: Good morning, Your Honor. Elizabeth Mitchell, Umhofer, Mitchell & King on behalf of plaintiff LA Alliance. I am here with my co-counsel, Matthew Umhofer, as well as Paul Webster, executive director for LA Alliance.

THE COURT: Thank you very much. Good morning. And, counsel, on behalf of the City.

MR. MCRAE: Good morning, Your Honor. Marcellus McRae, Gibson, Dunn & Crutcher, appearing on behalf of the City of Los Angeles. I'm here with my partners, Kahn Scolnick and Poonam Kapur (sic).

THE COURT: Great. Thank you very much. And, then, counsel, on behalf of the County.

MS. BRODY: This is Lauren Brody from Miller Barondess on behalf of the County.

THE COURT: And on behalf of interveners, please.

MS. MYERS: Good morning, Your Honor. Shayla Myers

on behalf of the intervenors.

THE COURT: Okay. Thank you, counsel. Your next witness, please.

MR. MCRAE: Excuse me, Your Honor. I want to correct something. I misspoke. It's Poonam Kumar. I said Kupar -- I conflated Theano -- and never mind. Sorry.

THE COURT: Anytime that happens, co-counsel rise to the occasion to correct counsel. That's fine.

MS. KUMAR: I'm just going to storm out, Your Honor, now.

THE COURT: Counsel, your next witness, please.

MR. UMHOFER: Your Honor, the Alliance calls Daniel Conway.

THE COURT: Thank you very much. Mr. Conway, would you raise your right hand? Take your hand out of your pocket, please. Thank you.

**DANIEL CONWAY, PLAINTIFFS' WITNESS, SWORN**

THE COURT: Thank you, sir. If you'd approach the witness box, the entrance is closest to the wall. I want you to watch this step. For some reason, we have about a six-inch rise here. If you'd be seated, sir. And if you're comfortably seated, would you face the parties? Would you state your full name, please?

THE WITNESS: My name is Daniel Michael Conway.

THE COURT: Would you spell your first name, sir?

Conway - Direct / By Mr. Umhofer                                    **6**

THE WITNESS:  D-A-N-I-E-L.

THE COURT:  And your last name, sir?

THE WITNESS:  C-O-N-W-A-Y.

THE COURT:  Conduct your examination, please, by LA Alliance.

MR. UMHOFER:  Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MR. UMHOFER:**

Q    Mr. Conway, what do you do for a living?

A    I work in politics.

Q    And what is your relationship with the LA Alliance?

A    I began with the LA Alliance in 2019 as a policy advisor.

Q    Have you held any other roles within the LA Alliance?

A    I currently serve as a board member.

Q    Were you involved with the LA Alliance back in 2022 and 2023?

A    Yes, I was.

Q    You departed from the Alliance -- from a paid role with the Alliance.  I'm sorry.  Were you compensated for your time with the Alliance?

A    I was initially.

Q    Are you being compensated anymore by the Alliance?

A    No, I am not.

Q    When did you depart a compensated role with the Alliance?

A    November of 2023.

Conway - Direct / By Mr. Umhofer                    **7**

Q    Were you involved with meetings and communications with the City during the 2022 to 2023 time period related to the LA Alliance?

A    I was.

Q    What was your role within the LA Alliance in terms of engagement with the City?

A    I played an ongoing role just in the communications and negotiations with the City.

Q    What sorts of folks -- did you engage with lawyers or other kinds of folks at the City?

A    All of the above.  From the City attorney's office to the CAO's office to the mayor's office to counsel offices.

Q    Now, do you recall that in 2022 a settlement was reached between the City and the LA Alliance in this matter?

A    I do.

Q    Do you recall that as part of that resolution, a first step was required which was for a point in time count to occur so that the math could be done and milestones and deadlines could be set under the agreement?

         **MS. KUMAR:**  Objection, Your Honor.  Relevance, leading, lacks foundation.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  I do recall that.

//

//

**BY MR. UMHOFER:**

Q    And do you recall that it took some time for the point in time count to be completed?

A    It did.

Q    Now, following the point in time count, did you understand that the City had an obligation under the agreement to come up with milestones and deadlines for both encampment reduction and shelter and housing?

        **MS. KUMAR:**  Objection, Your Honor.  Calls for a legal conclusion.  Relevance, lacks foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes, that is my recollection.

**BY MR. UMHOFER:**

Q    And do you recall that -- I'm going to ask you to look at what's already been marked as Exhibit 307.  Do you recall that the City in November of -- apologies, Your Honor.  Are you seeing that up on your screen?

A    Yes.

        **THE COURT:**  Ms. Myers, if you need to, we can turn that.  Are your screens working?

        **MS. MYERS:**  No, it is not.

        **THE COURT:**  Yeah, let's make sure.  Just a moment.  For the City and the County, are your screens working?

        **MS. KUMAR:**  Yes, Your Honor.

        **THE COURT:**  County?

**UNIDENTIFIED SPEAKER:**  Yes.

**THE COURT:**  LA Alliance, are your screens working?

**MS. MITCHELL:**  Ours are working fine, Your Honor.

**THE COURT:**  Just a moment.  I couldn't hear you.  Are your screens working?

**MR. UMHOFER:**  Yes.  The screens are working down here, except for, apparently, over here.

**MS. MYERS:**  Yes, except for the intervenors.

**THE COURT:**  Okay, now all the screens are working. Okay, there we go.  Now, re-ask the question, please.

**MR. UMHOFER:**  May I proceed, Your Honor?

**THE COURT:**  Please.

**BY MR. UMHOFER:**

Q    Do you recall that around November of 2022, the City provided the document that's marked as Exhibit B to Exhibit 307 that's up on the screen here?

**MS. KUMAR:**  Objection, Your Honor.  Lacks foundation, leading.

**THE WITNESS:**  I do recall seeing this document.

**THE COURT:**  Just a moment.  Is your objection that he's not physically present?  I don't understand the lack of foundation.  I'm assuming that these documents are shown internally within LA Alliance, within the City.

**MS. KUMAR:**  Well, I don't think that foundation has been laid, Your Honor. There's been no foundation as to what

he's seen, what he knows, or how he knows it.

THE COURT:  All right.  Ask a few more questions concerning foundation.

BY MR. UMHOFER:

Q    Did you receive documents during the course of your work with the foundation that came from the City?  Excuse me --

A    Yes, with the Alliance.

Q    With the Alliance.

A    Yes.  Yes, with the Alliance.  Correct.

Q    And do you remember receiving in or around November 2022, a proposed -- a set of proposed milestones and deadlines for shelter and housing from the City.

A    I know we received lists of materials, but no we did not get the types of -- we did -- we weren't able to get the timelines and milestones in 2022.

Q    Okay, looking at Exhibit 307B, do you see a date on that?

A    I see.  Oh, yes.

Q    What's the date?

A    November 2022.

Q    Okay, and on this document, do you see anything that relates to encampment reduction?

MS. KUMAR:  Objection, Your Honor, lacks foundation. He still hasn't said whether he knows what this document is and how he knows it.

THE COURT:  Overruled.  You can answer the question,

Conway - Direct / By Mr. Umhofer                    **11**

sir.

THE WITNESS:  Frankly, no.  I mean, there's just list of addresses, but there's no -- nothing about encampment reduction specifically.

BY MR. UMHOFER:

Q    Are you familiar with the term PSH?

A    Yes.

Q    What does that stand for?

A    Permanent supportive housing.

Q    And I -- and so does this appear to be a list of housing milestones and deadlines?

MS. KUMAR:  Objection, Your Honor, leading and counsel's testifying.  The witness should be identifying what he knows, lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes, at the time, we were kind of just given this as, again, just a list.  It wasn't -- it wasn't a strategy or anything that was heading in the direction that the Alliance was looking for.

Q    Do you recall in -- so this is -- so do you call in November of 2022 or at any time in 2022 seeing milestones and deadlines from the City for encampment reductions?

A    No.

Q    Was there an election in 2022 in LA?

A    Yes, there was.

Conway - Direct / By Mr. Umhofer                    **12**

Q     And who was elected mayor?

A     Karen Bass.

Q     Were you aware of any decision-making within the Alliance about what to do regarding the timing of things in light of the election of Mayor Bass?

          **MS. KUMAR:**  Objection, Your Honor.  Relevance.

          **THE COURT:**  Overruled.  First of all, before you answer that, were you part -- were you present when these decisions were being made?

          **THE WITNESS:**  Yes, sir.

          **THE COURT:**  All right.  Overruled.  You can answer the question.

          **THE WITNESS:**  Regarding the election of Mayor Bass?  Essentially, yeah, we recognize just the reality that with a change in administration that we were going to have a new mayor implementing this agreement, and so we both kind of recognize that on the front end and then post-election wanted to give the new administration a little -- a little grace period to settle in, but we were, you know, looking forward to working with them.

**BY MR. UMHOFER:**

Q     Now looking at Exhibit 307 -- Exhibit C to Exhibit 307, have you reviewed this letter from Ms. Mitchell to David Michelson concerning Alliance milestones and encampment reductions?

A    Yes, I have.

Q    Have you reviewed the timeline set forth in that letter concerning the events surrounding encampment reduction?

**MS. KUMAR:**  Objection, Your Honor.  Hearsay and lacks foundation.

**THE COURT:**  Overruled.

**THE WITNESS:**  Yes, I did review this letter and it's consistent with my recollection.

**BY MR. UMHOFER:**

Q    Now, were you involved in communications with the City about encampment reduction from 2022 to 2023?

A    Yes, I was.

Q    Who at the City did you speak with concerning encampment reductions during that time period?

A    As I mentioned before, we dealt with a wide variety of people from the City Attorney's Office to the CAO's office to the mayor's office to counsel offices.

Q    Were you involved in Zoom meetings regarding encampment reduction?

A    Yes.

Q    Do you recall whether you were involved in any Zoom meetings in March of 2023 concerning encampment reductions?

A    I was a part of meetings at that time.

Q    What do you recall about those zoom meetings concerning encampment reduction?

**MS. KUMAR:**  Objection, Your Honor.  Hearsay.

**THE COURT:**  Overruled.

**THE WITNESS:**  So we had an initial Zoom meeting with the City Attorney's Office, but essentially the new administration, Mercedes Marquez, David Micheelson, a few other folks.

**THE COURT:**  I want you to slow down.

**THE WITNESS:**  Oh, sorry, sir.

**THE COURT:**  Mercedes Marquez.

**THE WITNESS:**  Mercedes Marquez.

**THE COURT:**  Just a moment.  David Michaelson.  Who else?

**THE WITNESS:**  Scott Marcus, I believe, was part of that initial conversation.

**THE COURT:**  Thank you.

**BY MR. UMHOFER:**

Q    How many Zooms were there in March of 2023 to your recollection concerning encampment reduction with the City?

A    I recall two.

Q    What happened at the first meeting?

A    The first one was essentially a meet and greet.

Q    Who participated in that?

A    The individuals that I just mentioned.

Q    Was there anybody during that meeting who spoke more for the City than the others on the subject of encampment

Conway - Direct / By Mr. Umhofer                    **15**

reduction?

A    Yes.  Ms. Marquez, I would say, did most of the talking at that point, since she was kind of the new player and kind of representing the administration's approach in view to homelessness.

            **MS. KUMAR:**  Objection, Your Honor.  Lack foundation as to what Ms. Marquez's role was.

            **THE COURT:**  Overruled.

**BY MR. UMHOFER:**

Q    Did you have an understanding of what Ms. Marquez's role was?

A    Yes.  While I don't remember her specific title, essentially, she was introduced as Mayor Bass's new homelessness czar.

Q    Were there people from the CAO's office present at that initial March 2023 Zoom?

A    I don't specifically recall because members of the CAO's office had been involved kind of throughout these conversations, including Matt Szabo, the CAO himself.

Q    Do you recall whether Matt Szabo was on that first Zoom?

A    I want to say yes, but again, this was several years ago.  And like I said, Matt was involved in a number of these conversations.

Q    How about the second Zoom?  What do you recall from that one?

A    The second zoom was more substantive in that essentially the administration, and again, specifically led by Ms. Marquez, made it clear that they had --

**MS. KUMAR:**  Objection, Your Honor.  Hearsay, Your Honor.

**THE COURT:**  Overruled.

**THE WITNESS:**  -- big plans for encampment reduction and made it very clear that this was something that the Bass administration was planning to pursue regardless of the LA Alliance lawsuit and settlement.

**BY MR. UMHOFER:**

Q    Did Ms. Marquez make any representations about her background?

A    She did.  She made it clear that she had a deep wealth of experience having started off as a litigator, working on like housing rights and things like that, and then moving on to being, I think, an official in the Clinton administration, working at the state level.  So she made it clear that she had a very prominent and successful career kind of working in housing policy and homelessness.

Q    Were members of the CAO's office present for that meeting?

A    I believe so, yes.

Q    And what, if anything, did any representative of the City say that the City was going to do regarding encampment reduction?

Conway - Direct / By Mr. Umhofer                    **17**

MS. KUMAR:  Objection, Your Honor.  Hearsay.  Lacks foundation.

THE WITNESS:  I mean, we were essentially --

MR. UMHOFER:  Sorry.  Hold on one second.

THE COURT:  You can answer the question.

BY MR. UMHOFER:

Q   Go ahead.

A   I mean, essentially, we were told that we would have benchmarks and timelines by that fall.

Q   Was there a reference to something called an RFQ?

A   Yes, so we were told by Ms. Marquez that there was an RFQ going out from the City, essentially looking for service providers who could do the on-the-ground work of encampment reduction.

Q   Was there a discussion, any discussion, of a district-by-district approach in the RFQ?

MS. KUMAR:  Objection, Your Honor.  Hearsay.

THE WITNESS:  Yes, the district --

MR. UMHOFER:  I'm going to just ask you to wait for the judge to rule --

THE WITNESS:  I'm sorry.

MR. UMHOFER:  -- after there is an objection before you give your answer.

THE WITNESS:  I'm sorry.

THE COURT:  Overruled.  You can answer the question,

please.

THE WITNESS:  Yes, the discussion of district-by-district versus going centrally, kind of doing it centrally through the mayor's office, was one of the central issues that we were kind of discussing at the time.

BY MR. UMHOFER:

Q    Did you understand from what was said at that meeting what the RFQ was for?

MS. KUMAR:  Objection, Your Honor.  Lacks foundation.

THE COURT:  Overruled.  You can answer the question, please.

THE WITNESS:  Yes, it was to solicit and -- what's the word I'm looking for -- to hire service providers who could basically do encampment reductions on a citywide basis.

Q    And did the City promise anything by a certain time coming out of that meeting?

MS. KUMAR:  Objection, Your Honor.  Hearsay.

THE COURT:  Overruled.

MS. KUMAR:  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes, we were told that we were going to have a strategy with benchmarks and timelines in place, I believe, by third quarter of that year.  So, like I said, fall.

Q    Do you recall whether those benchmarks and timelines that were promised would be district by district or citywide?

Conway - Direct / By Mr. Umhofer                **19**

A     Citywide.

Q     Was there also any discussion of whether the RFQ would gather information district by district regarding encampment reductions?

        MS. KUMAR:  Objection, Your Honor.  Leading.  Counsel is testifying.

        THE COURT:  Overruled.

        THE WITNESS:  So yes, the issue of data collection again had been central to the Alliance from the beginning of -- basically, we just wanted to be able to understand not just that the work was being done but that it was being done successfully and impactfully, right, so that it wasn't just a matter of going out and talking to people and handing water bottles, but that you were actually placing them in shelter and giving them you know the wraparound services that they needed.

**BY MR. UMHOFER:**

Q     Do you know whether the LA Alliance received milestones and deadlines for encampment reduction of any sort by October 1, 2023?

A     We did not.

        MS. KUMAR:  Objection, Your Honor.  Lacks foundation.

        THE COURT:  Overruled.  I'm sorry.  You spoke over the top of each other.  That's overruled.  Answer the question.

        THE WITNESS:  We did not.

//

Conway - Direct / By Mr. Umhofer                    **20**

**BY MR. UMHOFER:**

Q    Do you recall there being a meeting in the fall of 2023 with representatives from the City?

A    I'm sorry repeat the question.

Q    Do you recall there being a meeting after October 1, 2023 with representatives of the City concerning encampment reduction?

A    Yes.

Q    Who was present at that meeting?

A    That meeting we had a number of representatives from the CAO's office as well as the mayor's office.

Q    Was that meeting or in person or over Zoom?

A    That meeting was in person.

Q    Was Matt Szabo present?

A    He was.

Q    Was Mercedes Marquez present?

A    So the meeting that I'm recalling right now was when Lourdes, I think her last name is Ramirez, when her -- when Mercedes successor took over and was introduced, so I don't -- I don't recall if Mercedes was still there at that time.

Q    Do you recall a meeting in the fall of 2023 where Mercedes Marquez talked about encampment reduction?

         **MS. KUMAR:**  Objection, Your Honor.  Leading and counsel is showing a document to prompt an answer.  It's on the page in front of him.

EXCEPTIONAL REPORTING SERVICES, INC

**MR. UMHOFER:** Your Honor, the document's already been discussed by him and authenticated by him.

**MS. KUMAR:** Your Honor, he's being asked for his recollection and being prompt by a document in front of him. It's improper.

**THE COURT:** Would your recollection be refreshed by looking at something?

**THE WITNESS:** Yes, Your Honor.

**THE COURT:** Well, take this down for just a moment and counsel you can refresh his recollection if he doesn't recall.

**BY MR. UMHOFER:**

Q    Do you recall a meeting in the fall of 2023 where Mercedes Marquez talked about encampment reduction efforts?

A    Yes.

**MS. KUMAR:** Objection, Your Honor. Leading. We're now leading -- counsel is now leading him into recollection.

**THE COURT:** Overruled. Answer the question, please?

**THE WITNESS:** You know, there was multiple meetings that happened throughout this time, but yes I do. Particularly, I remember a meeting with Ms. Marquez where essentially they came back and said we weren't able to kind of put together the plan with the benchmarks and timelines we promised because it turns out it's more complicated than we realized and I'll just never forget that.

Conway - Direct / By Mr. Umhofer                    **22**

MS. KUMAR:  Objection, Your Honor.  Hearsay.  Move to strike.

THE COURT:  I'm sorry.  I couldn't hear you, counsel.

MS. KUMAR:  Objection, Your Honor.  Hearsay.  Move to strike.

THE COURT:  Overruled.  Now I want you to slow down.

THE WITNESS:  I'm sorry, Your Honor.

THE COURT:  And I  want you to slow down.  I want those questions reasked.

MR. UMHOFER:  Of course, Your Honor.

BY MR. UMHOFER:

Q   So do you recall a meeting in November -- excuse me, in the fall of 2023 involving Ms. Marquez and encampment reduction?

A   Yes.

Q   Was it in person or over Zoom?

A   It was over Zoom.

Q   Do you recall what Ms. Marquez said about encampment reduction during that meeting?

A   Yes.

MS. KUMAR:  Same objection, Your Honor.  Hearsay.

THE COURT:  Overruled.

MR. UMHOFER:  Your Honor, it's a party admission. Just want to create the record.

THE COURT:  Now, just a moment.  I want to slow this

Conway - Direct / By Mr. Umhofer                    **23**

way down.

MR. UMHOFER:  Okay.

THE COURT:  Overruled.  I'm going to hear your answer and then we're all going to take a breath and we're going to get the next question, then we'll get the next objection.  Your question.

MR. UMHOFER:  Yes, Your Honor.

BY MR. UMHOFER:

Q    What did Ms. Marquez say about the City's efforts concerning milestones and deadlines for encampment reduction during that fall 2023 meeting that you recall?

A    Essentially that it was more complex than she had realized to address homelessness at scale in Los Angeles.

Q    Did Ms. Marquez make any representations about what the City had done with the RFQ process that it had talked about in March of 2023?

A    It didn't happen.

Q    Did she give an explanation as to why it did not happen?

A    No.  Essentially it was complicated.

Q    Was Matt Szabo present when Ms. Marquez made these statements?

A    I believe so.

Q    Do you recall anything that Mr. Szabo said during that meeting?

A    Not specifically.

Conway - Direct / By Mr. Umhofer                    **24**

Q    Who was speaking more, Mr. Szabo or Ms. Marquez during that meeting?

A    Ms. Marquez.

Q    During your time you departed, the -- you testified that you departed in late 2023 from your paid role with the LA Alliance.  During -- before that happened, do you recall whether the Alliance actually received milestones and deadlines for encampment reduction district by district from the City?

A    I believe we did right around the time that I was ending my day-to-day role.

Q    Were you involved in conversations with the City in December and January?

A    I was still playing a role with the Alliance at that time.

Q    But you had taken another job at that point; is that right?

A    Correct.

         MR. UMHOFER:  Give me a moment, Your Honor.

     **(Pause)**

         MR. UMHOFER:  No further questions at this time, Your Honor.

         THE COURT:  Intervenors?

         MS. MYERS:  No questions, Your Honor.

         THE COURT:  City?

         MS. KUMAR:  Yes, Your Honor.

         THE COURT:  And once again, because we're on

CourtSmart, we'll just re-identify yourself.

MS. KUMAR:  Sure, Your Honor.  Poonam Kumar on behalf of the City.

**CROSS EXAMINATION**

**BY MS. KUMAR:**

Q    Good morning.  You are today the vice president of government relations at the California Grocers Association; is that right?

A    I'm actually no longer with the Grocers Association.

Q    Did you join the California Grocers Association in about November 2023?

A    Correct.

Q    When did you leave?

A    Last month.

Q    Okay.  And for the California Grocers Association, you were responsible for managing the association's advocacy before the state legislature, regulatory agencies, and local municipalities; is that fair?

A    Correct.

Q    And you managed their government relations staff, their contract lobbyists, and their PAC; isn't that right?

A    Correct.

Q    You're a lobbyist right, Mr. Conway?

A    Not currently.

Q    You were previously a registered lobbyist for the state of

California, were you not?

A    Yes.

Q    And you are not currently an employee of the LA Alliance for Human Rights; is that right?

A    Correct.

Q    And have you ever been a W-2 employee of the Alliance?

A    I've never been an employee of the Alliance.

Q    You were actually consulting with them from your own strategic consulting organization; isn't that right?

A    Correct.

Q    And you were paid for your consulting role by the Alliance; is that right?

A    Correct.

Q    You were paid hourly?

A    No.

Q    Were you played a flat rate?

A    Not really.  It frankly -- it fluctuated.

Q    But you were paid, Mr. Conway?

A    Yes, I was paid.

Q    Okay, and you are currently a member of the Board of Directors of the Alliance; is that right?

A    Correct.

Q    Along with Elizabeth Mitchell?

A    Yes.

Q    Okay.  And you -- during the time you worked for the LA

Alliance, you worked on their public relations and lobbying strategy, didn't you?

A    I mean frankly I oversaw most things that didn't involve lawyer-to-lawyer discussions.

Q    Okay, but among the things you did was to oversee their PR, their public relations and lobbying strategy; isn't that right?

A    There was no lobbying strategy involved.

Q    How about their PR strategy, Mr. Conway?

A    I certainly spoke to members of the media.

Q    Okay.  And you understand, right, that the Alliance is a group of business owners in Los Angeles; isn't that right?

A    Frankly, the makeup of the Alliance is more broad and diverse than that.

Q    But there are business owners that make up the LA Alliance; isn't that right?

A    There are business owners that are involved, yes.

Q    Okay.  And the LA Alliance seeks donations from the public, don't they?

A    Correct.

Q    And you were never a lawyer for the Alliance; is that right?

A    No.

Q    And you never had responsibility for the negotiation of the settlement with the City, did you?

Conway - Cross / By Ms. Kumar                    **28**

A    I was involved in negotiations but I was not one of the attorneys.

Q    Okay.  And you never had responsibility for helping the Alliance ensure that the settlement agreement was implemented, did you?

A    I'm not sure I understand your question.

Q    Did you ever have primary responsibility in ensuring that the settlement the Alliance reached with the City was properly implemented?

A    I mean, to the extent that that's the role of an attorney, no.

Q    Okay.  So you testified to a series of meetings in the fall of 2022 and early 2023 on direct; is that right?

A    Yes.

Q    Okay.  And you talked, for example, about the timeline of encampment milestones; isn't that right?

A    I don't know if I understand the question.

Q    The timeline of the City providing the Alliance information about milestones related to encampment reductions, isn't that right?

A    You're saying the timeline for the timeline?

Q    You testified on direct about the timing of whether or not the City provided the Alliance with its timeline.

A    Correct.

Q    Okay.  And you testified about meetings that you

Conway - Cross / By Ms. Kumar                      **29**

participated in 2023 with representatives of the City; isn't that right?

A    Correct.

Q    And you testified about the RFQ; is that right?

A    Yes.

Q    And you testified about your memory of what was said about the RFQ; isn't that right?

A    Yes.

Q    And I believe you said on direct that the RFQ, quote, didn't happen; is that right?

A    I believe I said that, yes.

Q    Okay.  Are you aware that the RFQ was, in fact, issued, Mr. Conway?

A    Yes.  To clarify, it did not happen at the time frame that had been promised.

Q    Oh, so your testimony now is that it did happen?

A    I just clarified, yeah.

Q    Okay.  So it did happen, it just, according to you, didn't happen on the timeline that you were promised; is that right?

A    Correct.

Q    Okay.  So would it -- are you aware that the Alliance stipulated the RFQ was, in fact, issued in early 2023?

A    No.

Q    Would looking at a stipulation, refresh your recollection as to those facts?

A    Sure.

Q    Let's take a look at Exhibit 326, please.  Just a moment, Your Honor, some technical difficulties.  Do you see Exhibit 326, which is Docket 713, in front of you, Mr. Conway?

A    Yes.

Q    Okay.  And it is entitled "Joint Stipulation to Resolve Motion for Order re: Settlement Agreement Compliance and Sanctions."  Did I read that correctly?

A    Yes.

Q    Okay.  And if we turn to Page 3 of this document, or 4, rather, Page 4, Your Honor.  Do you see on the bottom a signature by Elizabeth Mitchell?

A    Yes.

Q    And that would be the attorney for LA Alliance, correct?

A    Yes.

Q    And also a signature by Scott Marcus; is that right?

A    Yes.

Q    Representative of the City Attorney's Office.

A    Uh-huh.

Q    If we turn now to page 3 of the PDF, page 2 of the stipulation, and on paragraph 4, Mr. Conway, do you see where it says, "The City did issue the RFQ in January 2023 and received proposals by March 2023"?  Did I read that correctly?

A    Yes.

Q    Okay.  So, in fact, the RFQ did happen in early 2023 at

Conway - Cross / By Ms. Kumar                    **31**

least once; isn't that right?

A    I mean, apparently, but I think the point is that the actions attached to the RFQ didn't happen.

Q    Okay.  But, Mr. Conway, you testified on direct, did you not, that the RFQ didn't happen?  And so I'm clarifying now that, Mr. Conway, it did, in fact, happen, correct?

A    Yeah.  And I guess to clarify my prior statement, again, it didn't happen as in the City failed to perform.  In general, when it comes to reducing homelessness.

Q    Okay.  So your testimony is actually that the City just failed in general?

A    I mean, if you're asking me to summarize.

Q    Okay.  But I'm asking you now about the RFQ, Mr. Conway. You testified on direct that the RFQ, quote, didn't happen. But I'm asking you now, Mr. Conway, it did, in fact, happen, the RFQ; is that right?

A    Yes.

Q    Okay.  Thank you.  Now, you talked about the encampment milestones.  I would like to turn your attention to Exhibit 306.  Sorry, one moment.  Exhibit 306, Docket 668.  Okay. Mr. Conway, I'm directing your attention to Exhibit 306, which is Docket 668.  Do you see this in front of you?  It's a motion for order re: settlement agreement compliance and sanctions filed by the LA Alliance.  Do you see that?

A    Yes.

Conway - Cross / By Ms. Kumar                                    **32**

Q    Okay.  If we turn to page 3 of the PDF, there's the table of contents for the motion.  Do you see that?

A    Yes.

Q    Okay.  And one of the table of contents is settlement agreement requires milestones and deadlines; isn't that right?

A    Yes.

Q    And it also says City violated the milestones; isn't that right?

A    Yes.

Q    Okay.  And it went on to say, ask for the court to issue an order for -- requiring the City to comply with the terms of the settlement agreement.  Do you see that?  Section 4?

A    Yes.

Q    Okay.  So you would agree with me, would you not, that this motion asked -- discussed at length encampment milestones, correct?

A    I'm sorry.  Repeat your question.

Q    This motion discussed the City and the Alliance's discussions about encampment milestones, correct?

A    If you're asking me to base that on the table of contents that you presented to me, that appears to be the case.

Q    Okay.  Now I'd like to turn your attention to Exhibit 326, Docket 713.  And this is that document we were just looking at, Mr. Conway, joint stipulation to resolve motion for order re: settlement agreement, compliance, and sanctions.  Do you see

that?

A    Uh-huh.

Q    Is that a yes?

A    Yes.

Q    Okay.  And if we turn to page 2.

THE COURT:  Just a moment, Counsel.  You have Docket 713, but you had an exhibit number attached, which I missed.

MS. KUMAR:  Oh, sure.  It's Exhibit 326, Your Honor.

THE COURT:  Thank you very much.  Appreciate it.

**BY MS. KUMAR:**

Q    If we turn to page 2, at the very top, Mr. Conway, it reads, plaintiffs, LA Alliance for Human Rights, and defendant, City of Los Angeles, respectfully submit the following stipulation to resolve plaintiffs' motion for order re: settlement agreement, compliance, and sanctions.  Did I read that correctly?

A    I believe so.

MS. KUMAR:  Okay.  One second, Your Honor.  So if we could put that -- sorry, one second, Your Honor.  No further questions at this time, Your Honor.

THE COURT:  Just a moment.  Then back to LA Alliance, please.  Redirect.

//

//

//

**REDIRECT EXAMINATION**

**BY MR. UMHOFER:**

Q    Mr. Conway, do you remember every single fact related to the encampment reduction issue with the City from 2022 to 2023?

        **MS. KUMAR:**  Objection, Your Honor.  Lacks foundation.

        **THE COURT:**  I don't understand the question.

Q    Do you remember every single fact concerning this -- LA Alliance and the City's communications about encampment reduction from 2022 to 2023?

        **MS. KUMAR:**  Objection, Your Honor.  Lacks foundation.  I candidly don't understand how anyone could know every fact.

        **THE COURT:**  Well, I don't either.  I think we can all stipulate to it, maybe with all the witnesses.  You can answer that question.

        **THE WITNESS:**  I do not recall every single fact.

**BY MR. UMHOFER:**

Q    Would it refresh your recollection to review in detail the joint stipulation concerning the timeline of the LA -- of the encampment reduction communications with the City that was just shown to you?

A    Yes.

Q    On the iPad in front of you, could you find your way to Exhibit 326 and take a moment to review that carefully?  And if you need help, just let me know.

Conway - Redirect / By Mr. Umhofer                    **35**

(Pause)

MS. KUMAR:  Your Honor, I guess I would just ask for the record, what are we -- are we refreshing Mr. Conway's recollection about something in particular or just educating him on all of the facts related to the encampment milestones?

MR. UMHOFER:  Your Honor, the witness has indicated that it would refresh his recollection to review the joint stipulation concerning the encampment reduction communications. That's what he's doing.

MS. KUMAR:  Refreshing his recollection as to what?  Usually there's a question that precedes the refreshment of recollection.

MR. UMHOFER:  I don't believe there's any obligation to establish anything more than the document would refresh his recollection.

MS. KUMAR:  But, Your Honor, usually what happens is the questions asked, the witness says, I don't recall, and then counsel asks whether would there be a document that would refresh your recollection.  We're not in the business, usually, Your Honor, of educating witnesses so that they can testify in the manner consistent with what counsel wants.

MR. UMHOFER:  Your Honor, I asked a question about whether he recalled everything.  He does not.  He's refreshing his recollection.  Then I'm going to answer a question.  So I did exactly what counsel suggested.  I asked a question, he

Conway - Redirect / By Mr. Umhofer                    **36**

said he didn't recall, he's now refreshing his recollection.

If counsel has a problem with the question, obviously she can object, but I think I'm proceeding properly in terms of refreshing recollection.  And I know counsel disagrees, but I'll leave it at that.

MS. KUMAR:  Your Honor, I certainly disagree.  I mean, if that were the process, then we could ask everyone whether they remember everything and then give them an encyclopedia upon which they read it and then testify about the contents of the encyclopedia.  That's certainly not the way the rules of evidence work.

MR. UMHOFER:  I'm still asking him to testify based on his recollection refreshed by the document that counsel showed him, Your Honor.

MS. KUMAR:  I stand by my objection, Your Honor.  I don't need to elongate this process.

BY MR. UMHOFER:

Q    Have you had a chance to review that in detail, Mr. Conway?

A    Yes, I have.

Q    Now, putting that aside for the moment, just answer my questions based on your own recollection as refreshed by that document or anything else.  Did Mercedes Marquez promise that an RFQ would be put out that would be fully staffed and would go district by district in terms of encampment reduction?

A    Yes.

Q    Was that promise made in March of 2023?

A    Yes.

Q    Did Ms. Marquez promise during that meeting to have encampment reduction milestones and deadlines provided by October 1st of 2023?

A    Yes.

Q    Did the City provide milestones and deadlines for encampment reduction by October 1st of 2023?

A    No.

Q    Do you recall what Ms. Marquez said about whether the RFQ process had happened or not during the fall 2023 conversation you testified to previously?

        **MS. KUMAR:**  Objection, Your Honor.  Asked and answered.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I'm sorry.  Repeat the question.

**BY MR. UMHOFER:**

Q    Do you recall what Ms. Marquez said about whether the RFQ process had happened when she spoke to you in the fall of 2023?

A    Yes, it had happened.

Q    And what had happened specifically to your recollection according to Ms. Marquez?

A    Essentially that they had put out the bids, had gotten responses, but again, essentially the issue they were having

was that it was just the scale and the complexity of it was more than they had anticipated.

Q    Did Ms. Marquez say whether they had completed the RFQ process that she described in March of 2023?

       MS. KUMAR:  Objection, Your Honor.  Leading.  Counsel is clearly trying to get the witness to testify in a particular way.

       THE COURT:  Overruled.

       THE WITNESS:  Yes.

BY MR. UMHOFER:

Q    What did she say about whether the RFQ process described in March of 2023 had been completed or not?

A    That it had been completed.

Q    Did she say whether that RFQ process had led to the generation of encampment milestones or deadlines?

       MS. KUMAR:  Objection, Your Honor.  Leading.

       THE COURT:  Just a moment.  You said that the RFQ process had been completed, and are you referring to the conversation in March or in October?

       THE WITNESS:  I'm sorry, Your Honor.  Repeat that question.

       THE COURT:  Yeah.  You said the RFQ process had been completed, and are you referring to the March conversation you have with Ms. Marquez or are you referring to the October?

       THE WITNESS:  In March, the promises were made.  In

Conway - Redirect / By Mr. Umhofer  **39**

October, we were informed that the promises were not kept.

Q    In what manner were the promises not kept based on what Ms. Marquez said?

MS. KUMAR:  Objection, Your Honor.  It calls for a legal conclusion.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I'm sorry.  Repeat the question.

BY MR. UMHOFER:

Q    In what manner were the promises not kept, the promises made in March 2023?  In what manner did Ms. Marquez say the promises were not kept when you spoke to her in the fall of 2023?

A    Basically, that they didn't have the framework in place and the people in place to actually implement a plan.

Q    Did Ms. Marquez provide any detail during that meeting about why the City wasn't able to keep the promise?

A    Yes, essentially that it was more complex and challenging than she had anticipated.

Q    Did she say anything specific about why it was more challenging than she anticipated?

A    I mean, I think there was a number of factors involved from the fact that they had -- initially, the settlement had been implemented district by district through the council offices.  They were looking to centralize that.  That had created some friction.  There was ongoing issues with the

county in terms of the county agreeing to provide its services. And then ultimately, they just weren't able to actually get the service providers in place that they needed to do what they had promised in terms of kind of going district by district and, you know, creating the encampments and also collecting the data.

Q    Did she say anything about what she had learned about the encampments and the residents in the encampments?

A    Yes, she made comments essentially about the fact that, you know, there was criminals and, you know, that basically it was dangerous and there was people there who needed to be protected and things like that.

Q    Did Ms. Marquez indicate whether she was aware of that fact in March of 2023 when she made the promises?

A    She indicated that this was essentially new information. Again, it was just very striking at the time to kind of be told a year into this administration they came back and said, hey, it's really bad and really complicated.  And we were like, we know that's why we filed this lawsuit three years ago.

        **MR. UMHOFER:**  No further questions at this time.

        **THE COURT:**  Intervenors?

        **MS. MYERS:**  No, Your Honor.

        **THE COURT:**  City?

        **MS. KUMAR:**  Yes, Your Honor.

//

**RECROSS EXAMINATION**

**BY MS. KUMAR:**

Q    Okay, Mr. Conway, you talked about a March 2023 meeting with Ms. Marquez and others from the City; is that right?

A    Yes.

Q    And during that meeting, Ms. Marquez said the City was going to do an RFQ process; isn't that right?

A    Correct.

Q    And now we all agree that, in fact, the RFQ was issued, correct?

A    Yes.

Q    In fact, it was issued in January -- the first time in January of 2023; isn't that right?

A    Yes.

Q    Okay.  So it was already been issued by the time Ms. Marquez says that they are going to issue the RFQ?

A    Yes.

Q    Okay.  So it was true.  You would agree?  What she told you was true?

A    Yes.

Q    Okay.  So and then they go through the RFQ process and they complete the RFQ process, correct?

A    Correct.

Q    Okay.  But then Ms. Marquez tells you that it was more complicated and challenging than she and others at the City

Conway - Recross / By Ms. Kumar                    **42**

anticipated to find a vendor to complete the work; isn't that right?

A    Correct.

Q    And actually, you agreed with that.  It is, in fact, more complicated and challenging, right?

A    I agree that it's complicated and challenging, but I think it's doable, which is, again, why we brought this lawsuit in the first place.

Q    How many RFQs have you issued in your job as a PR strategist, Mr. Conway?

A    So I was formerly the chief of staff to the mayor of Sacramento for three years.  And while I did not -- I was not the person who physically issued the RFQs and RFPs and things like that, I'm pretty familiar with the process, having served.

Q    How many RFQs have you yourself issued, Mr. Conway?

A    I personally have not issued any.

Q    And how many RFQs have you issued related to district-by-district assessments of encampments?

A    I have not had the opportunity to do that at this time.

Q    Okay.

        THE COURT:  Just a moment.  Was this Steinberg, who you were the chief of staff for?

        THE WITNESS:  It was Mayor Kevin Johnson, who preceded Darrell Steinberg.

        THE COURT:  Kevin Johnson.  All right.  There's been

EXCEPTIONAL REPORTING SERVICES, INC

Conway - Redirect / By Mr. Umhofer                    **43**

a number of mayors, counsel, so Johnson.  All right.  Thank you.

**BY MS. KUMAR:**

Q    And then in October of 2023, when Ms. Marquez tells you that it's complicated and challenging, she tells you that new information that she wasn't aware of had come to light that made it complicated and challenging.  Isn't that right?

A    Essentially.

Q    Yeah, new information she wasn't aware of in March of 2023 in that first meeting you described?

A    Yes.

       **MS. KUMAR:**  Okay.  Nothing further, Your Honor.  I would just state for the record, as we did at the last hearing, that we'd object to this testimony and any testimony related to this issue as it has been resolved by the Court and the Alliance pursuant to the stipulation in 2024.

       **THE COURT:**  All right.  Thank you.

       Any other questions before the gentleman leaves?

       **MR. UMHOFER:**  Yes, Your Honor.

       **THE COURT:**  I'll give you one more round each if you have a few more questions.

                    **FURTHER REDIRECT EXAMINATION**

**BY MR. UMHOFER:**

Q    Mr. Conway, do you have a specific recollection about whether the RFQ process was finalized or not?

Conway - Redirect / By Mr. Umhofer    **44**

A    I don't.

Q    Would it refresh your recollection to review the joint stipulation on that point?

A    Yes.

MS. KUMAR:  Objection, Your Honor.  Asked and answered.  This has already been resolved by the Court.  Add payment to the Alliance.

THE COURT:  Overruled.

**BY MR. UMHOFER:**

Q    If I could direct you to paragraph 4, if you could read paragraph 4 of the joint stipulation, let me know when you've done that.

A    This is Exhibit 326.

Q    326, yes.

A    Paragraph 4?

Q    Yes.

A    Starting with although?

Q    Yes, just read it to yourself.

**(Pause)**

THE COURT:  Well, counsel, you can put that up.  I want to see that also.

Q    Do you have a recollection of whether an RFQ was issued?

THE COURT:  Counsel, just a moment, please.

MR. UMHOFER:  Sorry, Your Honor.

**(Pause)**

THE COURT:  Thank you, counsel.  Your question, please.

Q    Do you now recall whether an RFQ was issued or not?

A    Yes.

Q    Was an RFQ issued by the City for encampment reduction?

A    Yes.

Q    Was an RFQ finalized?  Was the RFQ process finalized by the City, yes or no?

A    No.

Q    Did the City have each district fully assessed concerning encampment reduction?

A    No.

MS. KUMAR:  Objection, Your Honor.  Asked and answered and stipulated to.

THE COURT:  Overruled.  I didn't hear the answer.

THE WITNESS:  No.

BY MR. UMHOFER:

Q    I'm going to go to the bottom of this document.  Do you recall being shown by counsel the part that talked about resolving this motion?

A    I'm sorry, repeat the question.

Q    Do you recall being asked by counsel for the City about the resolution of this encampment reduction issue?

A    Yes.

Q    As part of that resolution, did the stipulate -- did the

Conway - Redirect / By Mr. Umhofer                **46**

City stipulate that it had not done what it promised to do on encampment reduction?

MS. KUMAR:  Objection, Your Honor.  Calls for a legal conclusion.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Yes.

Q    In your mind, was this inconsistent with the promises made by the City in the settlement agreement?

MS. KUMAR:  Objection, Your Honor.  Relevance as to what was happening in his mind and calls for a legal conclusion.

THE COURT:  Overruled.  Answer the question, please.

THE WITNESS:  Repeat the question, please.

BY MR. UMHOFER:

Q    In this 00 in your mind, was this encampment reduction issue and the City's conduct inconsistent with its obligations under the settlement agreement?

A    Absolutely.

MS. KUMAR:  Objection, Your Honor.  Calls for a legal conclusion.

THE COURT:  Overruled.  Restate the answer.  I couldn't hear it.

THE WITNESS:  Absolutely.

THE COURT:  Thank you.

Q    In your understanding as a board member of the LA

Alliance, have there been other violations by the City of the settlement agreement?

MS. KUMAR:  Objection, Your Honor.  Calls for a legal conclusion.  Lacks foundation.

THE COURT:  That's preliminary.  You can get into what those are, but just a general question in that regard is not acceptable to me.

Q    Have you reviewed the Court's order following the evidentiary hearing early this year concerning violations of the settlement agreement?

MS. KUMAR:  Your Honor, beyond the scope now on --

THE COURT:  Yeah.  That's beyond the scope, counsel. I don't know that he would be qualified on that matter.  I think he's here testifying about the March through October events that you allude to in your request for sanctions.

MR. UMHOFER:  Understood.

BY MR. UMHOFER:

Q    Is it your view that the City's conduct from 2022 to 2023 regarding encampment reduction was part of a pattern of City violations of the settlement agreement?

MS. KUMAR:  Objection, Your Honor.  Argumentative. Lacks foundation.  Relevance.  And calls for a legal conclusion.  And this is the ultimate question for the fact finder here.

THE COURT:  What I'm concerned with is if you'd have,

Conway - Redirect / By Mr. Umhofer                              **48**

if this opinion was cast, it would be so broad, including recent decisions that the Court has made that you wouldn't be a part of.  And I'm a little concerned about any answer that you might give concerning pattern unless it's within the confines of the LA settlement Alliance agreement that you dealt with from 2022 to 2023.  And I'm assuming your answer would probably be yes.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Well, I'm not -- I don't want to answer that yet.  So I'll strike that.  The question I would have is if that was allowed as a general answer on your part, what foundation you would have, you know, for this, what I call or you call or counsel calls an alleged pattern.  And if so, I'll let you answer that in the confines of the settlement agreement that you dealt with from 2022 to 2000 -- when did you leave 2024?

THE WITNESS:  November of 2023 was when my day to day role --

THE COURT:  All right.  You'll be confined to that area.  Do you understand?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  And your answer to that question is?

THE WITNESS:  Can I ask a question, Your Honor, which is, I guess, just to clarify, I mean, I started with the

EXCEPTIONAL REPORTING SERVICES, INC

Conway - Redirect / By Mr. Umhofer                                      **49**

Alliance in late 2019.  So I guess in terms of patterns of behavior with the City, I could speak from that, but would you like me to speak --

THE COURT:  As long as you're employed.  What I don't want you doing is going beyond what you may know now concerning other orders that this Court has issued or opinions that this Court has issued that you now are relying upon hearsay or you've read and become a pseudo expert.  You're confined to that period of employment, and I'll allow that from 2019.  But this case didn't really start until after 2019.

And then if so, I'm going to want to hear eventually what the basis of this opinion is, what alleged pattern you feel so that subject to cross-examination and my ability to discern if this is really a pattern or not.  Okay?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  So --

MR. UMHOFER:  Your Honor, can I lay some additional foundation?

THE COURT:  Certainly.

MR. UMHOFER:  Your Honor, can I lay some additional foundation in light of the Court's observations?

THE COURT:  Yeah, please.

BY MR. UMHOFER:

Q    Mr. Conway, have you remained a director of the LA Alliance?

Conway - Redirect / By Mr. Umhofer                    **50**

THE COURT:  Counsel, I'm going to short circuit it. He's not going to go beyond the LA Alliance period where he was employed.  I'm not going to allow him to get into decisions that the Court has made after his employment.  Other witnesses may testify to that.  I don't know.  And I'm concerned about his getting into such a broad scope and time period, but make your offer of proof.

Q    Mr. Conway, have you remained a director of the Alliance, a member of the board of the Alliance since your departure from your paid role in November of 2023?

A    Yes, I have.

Q    Have you remained in communication with the Alliance and its lawyers concerning the City's conduct and compliance with the settlement agreement?

A    Yes, I have.

Q    Have you reviewed communications between the LA Alliance and the City concerning compliance with the settlement agreement all the way up until today as a board member of the LA Alliance?

A    Yes, I have.

Q    And based on that role as an active board member of the LA Alliance, do you have an opinion about whether the City's conduct with respect to encampment reduction from 2022 to 2023 is part of a pattern of non-compliance by the City with the settlement agreement?

**51**

**MS. KUMAR:** Objection, Your Honor.  Lacks foundation, improper opinion regarding a legal conclusion, relevance.

**THE COURT:**  I'm going to take a recess for a moment, Counsel.  We'll come back in 20 minutes, okay?  Have a nice recess.

Sir, you may step down.  Thank you.

**(Recessed at 8:49 a.m.; Reconvened at 9:14 a.m.)**

**THE COURT:**  Mr. Conway, if you'd retake the stand, please.  We're back in session.  All counsel are present.  My ruling is as follows, I'm not going to allow further questioning concerning Mr. Conway's alleged expertise.  I think it lacks foundation and what he would do is potentially get into the A&M agreements and Mr. Gary's statements, the Special Master's statements.  It's for the Court to determine if there's a pattern or practice.

I think he's here as a factual witness concerning the events surrounding LA Alliance and the conversations with Mr. Szabo, Mercedes Marquez, David Michaelson, counsel for LA Alliance, and those statements are relevant.  I don't think he has the foundation, nor would I accept him as an expert concerning pattern or practice.

It's obvious that he feels that there's a practice at least concerning the LA Alliance dealings with the City in the time period that you were employed from these discussions, certainly in March through October in these Zoom meetings, but

Conway - Redirect / By Mr. Umhofer                        **52**

beyond that, I don't think further testimony concerning my

subsequent rulings is an appropriate matter for you.  Counsel.

       **MR. UMHOFER:**  Understood.

         **FURTHER REDIRECT EXAMINATION (CONTINUED)**

**BY MR. UMHOFER:**

Q    Last question, Mr. Conway, is it your understanding that

the Court ordered you to appear as a witness at this hearing?

A    Yes.  I was ordered to be here today.

       **MR. UMHOFER:**  No further questions, Your Honor.

       **THE COURT:**  Okay.  Then I think falling back to

intervenors.

       **MS. MITCHELL:**  No questions, Your Honor.

       **THE COURT:**  And back to the City.

       **MS. KUMAR:**  One second, Your Honor.

       **THE COURT:**  Certainly.  Take your time.

    **(Pause)**

       **MS. KUMAR:**  No further questions at this time, Your

Honor.

       **THE COURT:**  Now, Mr. Conway, I'm going to order you

as I am all the witnesses to be available.  And that means

you'll be ordered back to this court.  We'll be courteous about

that.  I think all of us are re-reading transcripts as we go.

I want to make certain due process is forthcoming for both

parties, so this may stretch over a little while, I'm not sure.

I'll talk to all counsel after all of the witnesses have

**53**

testified and get their respective positions about what they need or what the Court needs.  But you are subject to recall. Do you understand?

THE WITNESS:  I do, Your Honor.

THE COURT:  Thank you very much, sir, you may step down.

THE WITNESS:  Thank you, sir.

THE COURT:  Counsel, your next witness, please.

MS. MITCHELL:  Thank you, Your Honor.  The Alliance calls Bevin Kuhn to the stand.

THE COURT:  I'm sorry, my apologies?

MS. MITCHELL:  Bevin Kuhn.

THE COURT:  Okay.

MS. MITCHELL:  B-E-V-I-N, last name K-U-H-N.  I think her counsel just stepped out to go get her.

THE COURT:  Thank you.

**(Pause)**

THE COURT:  Thank you very much, if you'd be kind enough to step forward.  Would you be kind enough to raise your right hand, please.

**BEVIN KUHN, PLAINTIFFS' WITNESS, SWORN**

THE COURT:  Thank you.  If you'd be kind enough to come along the side of this railing, and the entrance to the jury's box is closest to this one.  I want you to be careful. Apparently we have mechanical, watch your step.

**54**

MR. PARKER: Good morning, Your Honor. My name is Chandler Parker. I represent LAHSA as well as the witness. I just wanted to introduce myself, since I'm --

THE COURT: Pleasure. Why don't you get a chair if it's needed, there's a chair right here, and why don't I as a courtesy put you right beside the witness. Would that be comfortable for you?

MR. PARKER: Yes, that's perfect.

THE COURT: That way in case you need to consult with her at any time, you're more than welcome to.

(Pause)

THE COURT: And, counsel, are you comfortable?

MR. PARKER: Yes, perfect.

THE COURT: All right. And if you need at any time to talk to your client, just inform the Court. I'll make sure you have that time.

MR. PARKER: Thank you.

THE COURT: Would you be kind enough to state your full name, please.

THE WITNESS: Bevin Emily Kuhn.

THE COURT: And would you spell your first name please?

THE WITNESS: B-E-V-I-N.

THE COURT: And your last name, please?

THE WITNESS: K-U-H-N.

**THE COURT:** And thank you.  Direct examination by LA Alliance.

**MS. MITCHELL:** Thank you, Your Honor.

**THE COURT:** And would you restate your name, just because we're on CourtSmart.

**MS. MITCHELL:** Yes, Your Honor, thank you, Elizabeth Mitchell on behalf of LA Alliance.

**THE COURT:** Thank you.

                    **DIRECT EXAMINATION**

**BY MS. MITCHELL:**

Q    Ms. -- is it Kuhn or Kuhn?

A    Kuhn.

Q    Okay.  Ms. Kuhn, what is your current position at LAHSA?

A    Yes, I'm the deputy chief analytics officer.

**THE COURT:** I'm sorry, the chief analytic officer?

**THE WITNESS:** Correct.

**THE COURT:** Why don't you move the microphone just a little bit closer to you so you don't have to bend down each time.  Is that more comfortable for you?

**THE WITNESS:** Yes, that's much more comfortable. Thank you, Your Honor.

**THE COURT:** Okay.  Now, you're the chief analytical officer; is that correct?

**THE WITNESS:** Yeah, the deputy chief analytical officer.

Kuhn - Direct / By Ms. Mitchell                    **56**

THE COURT:  Deputy chief.  Who's the chief?

THE WITNESS:  I report to the CPO, the chief program officer.

THE COURT:  Who's that?

THE WITNESS:  It's currently vacant, but about to be filled by Sophia Rice (phonetic).

THE COURT:  Okay.  Thank you very much.

THE WITNESS:  Yes.

THE COURT:  So you're it.

THE WITNESS:  Yes.  So then in her absence, I report directly to the CEO.

THE COURT:  Counsel.

MS. MITCHELL:  Thank you.

BY MS. MITCHELL:

Q    And just for the record, what is LAHSA?

A    LAHSA is the Los Angeles Homeless Service Authority.  We have joint powers authority established in 1993 by the City and the County to manage homeless services and the County of LA. We also are the lead COC, continuum of care lead as well for the Los Angeles continuum of care.

Q    And when did you join LAHSA?

A    I joined LAHSA in June of 2023.

Q    And where were you prior to joining LAHSA?

A    I worked at St. Joseph Center, a provider.

THE COURT:  Just a moment, I'm going to slow you down

Kuhn - Direct / By Ms. Mitchell                    **57**

just a little bit.  You joined in 2023.

           THE WITNESS:  Correct.

           THE COURT:  And where were you previously employed?

           THE WITNESS:  At St. Joseph Center.

           THE COURT:  St. Joseph Center, thank you.

Q    Did you work there with Dr. Adams Kellum?

A    Yes.

Q    And when Dr. Adams Kellum became CEO of LAHSA, is that when you joined her in 2023?

A    I did not join when she moved over, no.

Q    How long after Dr. Adams Kellum started at LAHSA did you move over into your position in LAHSA?

A    She left in January and I believe she started officially in March and I joined in June.

Q    And what was your first position when you joined in June?

A    Senior advisor of data management and IT.

Q    And were you promoted in February of 2024?

A    I was given an interim position in February of 2024.

Q    And what was that interim position?

A    Deputy chief analytics officer.

Q    And then when did you become the full time deputy chief analytics officer or the permanent deputy chief analytics officer?

A    In September of 2024.

Q    And then in February of 2024 when you became the acting

Kuhn - Direct / By Ms. Mitchell                      **58**

deputy chief analytics officer, is that when Emily Von Henry

had left LAHSA?

A    Correct.

Q    I'm showing you what has been marked as Exhibit 25, which

is a copy of the settlement agreement that was entered into

between the City and the Alliance in this case.  Have you seen

this particular document or some representation of the

settlement agreement?

A    Yes.

Q    I'm going to point you over to Section 7.1, the -- where

it says status updates and this is page 14 of 28 on Exhibit 25.

Do you see that?

A    Yes.

Q    Okay.  Now, the City, I'm going to blow this up a little

bit, the City has an obligation in the settlement agreement to

provide a series of data points under Section 7.1.  Do you see

that?

A    Yes.

          **MR. SCOLNICK:**  Objection, leading and calls for a

legal conclusion.

          **THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q    When he says overruled, you can answer.

A    Oh, sorry.  Yes.

Q    So I'm -- what I'm going to do and just to kind of set the

stage for you, I'm going to take you through each of the data points the City is required to produce and we'll talk about whether that's something that LAHSA is able to do.

So the first one under Section 7.1 is the number of housing or shelter opportunities created or otherwise obtained. Do you see that?

A     Yes.

Q     Okay.  Is that something that LAHSA works with the City of Los Angeles to report to this Court as part of the settlement agreement?

          **MR. SCOLNICK:**  Objection, lacks foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  The City of Los Angeles sends us a template to which we fill out for Alliance reporting.

**BY MS. MITCHELL:**

Q     Okay.  And what information, to your knowledge, do you put into the template to fill out for Alliance reporting?

          **THE COURT:**  Just a moment.  I want to make sure I heard that correctly.  Does the City send you this template, or do you have the template?

          **THE WITNESS:**  The City sends us the template.

          **THE COURT:**  All right.  Just a moment.

          All right.  Now, what was your question, counsel, I'm sorry?

Q     Let me go ahead and direct you, so it's a little bit

easier, to Exhibit 26.  I think this is the first one.  Do you see that there on the screen, it says Alliance settlement agreement quarterly report on the top?

A    Yes.

Q    Are you familiar with this report?

A    Yes.

Q    When you say that the City sends over to LAHSA a template that LAHSA inputs, is this what the template looks like that you were sent?

A    It's very similar.

Q    Can you explain to us how it is similar and how it is different?

A    Okay.  Yes, this is the exact template.

Q    Okay.  And what information does LAHSA provide the City for the City to be able to include in this quarterly report?

A    The last column, total PEH served.

Q    So just moving up to the right, where it says total PEH served, and at the very first row, we've got 15.  That's what you're talking about?

A    Correct.

Q    Okay.  And what about other information, I'm just blowing it up here so it's a little easier to see, so for example, Council District, intervention type, project type, address, beds, status, open and occupiable date, and beds open to date.  Does LAHSA provide any of that information?

Kuhn - Direct / By Ms. Mitchell                                **61**

A      What comes to my department is this template completed with just the PEH served open.

THE COURT:   Just a moment.  I'm not sure I understood that answer.  I want to understand this chart.  And who's supplying the information.

THE WITNESS:   Yeah.  We don't -- I do not -- my department does not complete any of the information in this chart except for the last column, which is total PEH served.

THE COURT:   Just a moment.

All right.  Thank you, counsel, please continue.

**BY MS. MITCHELL:**

Q      So Exhibit 26 that I have up on the screen, this was, I think this was the first quarterly report that was filed by the City of Los Angeles and it's dated January of 2023.  Were you working -- well, let me ask this question.  Were you at LAHSA in January of 2023?

A      No.

Q      Okay.  So we'll show you maybe a more recent one, Exhibit 35.  This one was filed in April of 2025.  Were you working at LAHSA at this point?

A      Yes.

Q      To your knowledge, has the way that LAHSA fills out these quarterly reports changed from when you started in 2023 to today?

MR. SCOLNICK:   Objection, lacks foundation.

**THE COURT:**  Overruled.

**THE WITNESS:**  Not to my knowledge.

Q   So from when you started to today, the only thing that LAHSA provides as part of this report is still the total PEH served; is that right?

**MR. SCOLNICK:**  Leading.  Leading, Your Honor.

**THE COURT:**  Overruled.

**THE WITNESS:**  There is a second tab that I think it says occupancy as of.  But, yes, we provide total PEH served and then we also provide them with occupancy as of.

**BY MS. MITCHELL:**

Q   What do you mean by occupancy as of?

A   So if the report is due on 9/30, we provide them with the total occupancies of the total people who are in a bed or in a unit as of the report date.

Q   Okay.  And just to kind of blow this up a little bit. There's -- there are two columns on the right.  The far right says total PEH served and then the second to right says open and occupiable date.

A   Uh-huh.

Q   That's different than what you're saying this occupied as of?

A   Correct.

Q   And do you see that tab occupied as of in this Exhibit 35?

A   I do not.

Kuhn - Direct / By Ms. Mitchell                              **63**

Q     When you say tab, is this like on an Excel sheet?

A     Correct.

Q     Okay.  And -- all right.

When you provide this information, total PEH served, is that a cumulative number or is that a snapshot minute in time number?

A     It's a cumulative number of the quarter I believe.

Q     So it's just for the quarter, not since the beginning of the reporting, or since it opened?

A     I need to double-check with my associate director on that.

THE COURT:  Do you want to do that?  Is that person here?  Is there something that would refresh your recollection? You're more than welcome to have that person come up or go and --

**BY MS. MITCHELL:**

Q     Who is your associate director?

A     Brian Brown.  Can you text him, Paul, or give me my phone?

THE COURT:  Do you want to step down and talk to him? Sure.

THE WITNESS:  Okay.

**(Pause)**

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Pleasure.  And your answer is?

THE WITNESS:  Yes, we have two tabs in the report that we receive.  One has the master leasing, which is part of

Kuhn - Direct / By Ms. Mitchell                                **64**

the Alliance reporting and for that the PEH served is the point in time, how many people are occupying the master lease units at the time that the report is due.

Q    When you say master leasing, are you referring to what we call TLS or time limited subsidies?

A    No, it's the -- it could be time limited subsidies and it could be PSH.

Q    Okay.

A    Master leasing --

Q    Okay.  And I'm sorry, you said that's a snapshot?

A    It's a snapshot of that day, when the report is due, so it's usually, you know, 9/30 or the end of the quarter.

Q    Okay.  Is there a difference?

A    Yes.  There's another tab that has all the interim housing sites that are captured under the Alliance settlement.  For those, we do from the open and occupiable date, total PEH served from the open and occupiable date to the end of the reporting period.

Q    Okay.

A    And I will say for a caveat for that, the open and occupiable date for many of like the Inside Safe sites is not the date they actually opened, but the date that they actually became eligible for Alliance reporting, so we're not backdating people who were served before they counted Inside Safe in Alliance reporting.

Q    Okay.  So master leasing you provide a snapshot, for interim you provide cumulative from the open and occupiable date.  What else?

A    And that's it.

Q    Only those two?

A    Yes, for master -- yes.  Can I provide clarification --

Q    Sure, please.

A    -- on what master leasing is?

Master leasing is a unit acquisition strategy, so it's an entire building and in a master leased building, you can have many housing subsidies supporting that.  So you have PSH programs and time limited subsidy programs in that building.  So in a master leasing building, you could have many programs there, but we're counting for everyone in that building regardless of what housing subsidy is paying for their housing.

Q    Okay.  So --

THE COURT:  Just a moment.

MS. MITCHELL:  Yes.

THE COURT:  So when I see open and occupiable date, in the first column of June 30th, 2022, the 91 that I'm reading is cumulative from June 30th, 2022 to the reporting date of March 31st, 2025 on this document; is that correct, yes or no?  Simple question.

THE WITNESS:  No.

THE COURT:  No.  Now, explain why.

THE WITNESS:  I believe because -- I believe this one is a PSH site so it would be -- it might be a point of the -- it would be a point in time I believe.

THE COURT:  I want to make it even simpler.  The quarter ending March 31st, 2025 --

THE WITNESS:  Uh-huh.

THE COURT:  -- when did that quarter begin?

THE WITNESS:  Could you repeat yourself, Your Honor?

THE COURT:  Yeah, when the quarter begin?  It ended March 31st, when did it begin?

THE WITNESS:  January 1st, 2025.

THE COURT:  Does the 91 represent those three months?

THE WITNESS:  Because it is -- no.

THE COURT:  Does the 91 -- no, of course not, of course not, a simple question.  It represents greater than the three months in this quarter, correct?

THE WITNESS:  No, Your Honor.

THE COURT:  Well, you just said that the 91 doesn't represent January to March.  The 91 extends further back in time, doesn't it?

THE WITNESS:  For the permanent housing, it's who is housed on that day the report is completed, so it's just one day at the end of the quarter.  So it's saying that there's 91 people housed on March 31st, 2025.

THE COURT:  I understand that.  But the point is,

EXCEPTIONAL REPORTING SERVICES, INC

that those 91 people didn't just become open and occupiable on January 1st through March 29th or 31st, those 91 people are over a greater period of time than those three months, aren't they?

THE WITNESS:  Correct, Your Honor.

THE COURT:  Simple question.  Of course they are.

And I'm trying to find out how far back that 91 figure extends.  So I can do it the simple way.  Does it extend to December?

THE WITNESS:  No, Your Honor.

THE COURT:  Does it extend to November?

THE WITNESS:  No, Your Honor.

THE COURT:  October?

THE WITNESS:  No, Your Honor.

THE COURT:  So it could extend all the way back to June 30th of 2022, couldn't it?

THE WITNESS:  Correct.

THE COURT:  Simple question.  All right, counsel.

BY MS. MITCHELL:

Q    Thank you for that clarification.  I guess I'm a little confused now.

THE COURT:  Take your time now.  Michelle Martinez, if you want to -- understands it implicitly.

MS. MITCHELL:  Thank you.  So --

THE COURT:  For both counsel, do you want somebody to

talk to, go talk to my Special Master, she's got it memorized.

Q   So, Ms. Kuhn, as I understand what you just testified, the PSH or master leasing, such as what we have highlighted here in row number 1, when you're providing a snapshot in time for these PEH served, it is literally just the number of PEH occupying those beds as of March 31st, 2025?

A   Correct.

Q   Okay.  So you're not going all the way back, like let's say for example, somebody was in a bed in 2023, was there for six months and then left for whatever reason, and then a new person came in, you're not reporting all of the historical data.

A   No.

Q   You're only reporting the very last moment, March 31st, 2025 occupation.

A   Correct.

Q   Why?

A   That was -- I would have to double-check, there's so much back and forth history of what has been requested from us, so I would need to double-check what was requested from us specifically.

        THE COURT:  That's okay, we've got all the time in the world.  Do you want to make a call?

        THE WITNESS:  Yes.

        (Pause)

Kuhn - Direct / By Ms. Mitchell                    **69**

THE COURT:  You can step down if you want privacy.

(Pause)

THE WITNESS:  Thank you, Your Honor.  We were instructed to.

BY MS. MITCHELL:

Q    By the City of Los Angeles.

A    Correct.

Q    And that was after speaking with Mr. Brown, that was your understanding?

A    Yes, Brian Brown, he's our associate director of analytics and reporting.

Q    I hesitate to ask this next question.  But do you know why you were instructed to report it differently?

A    I do not.

MR. SCOLNICK:  Object -- sorry, belated objection, foundation and calls for speculation.

THE COURT:  Overruled.

MR. SCOLNICK:  And argumentative.

THE COURT:  Overruled.

THE WITNESS:  I do not.

Q    So looking at line 18 which I have highlighted, that's the first interim housing unit that's reported and that one it looks very different in the reporting, as far as the PEH served.  Do you see that the number is much greater?

A    Yes.

Kuhn - Direct / By Ms. Mitchell                    **70**

Q    And is that because those are cumulative numbers?

A    Correct.

Q    Going back to the settlement agreement, specifically Section 7.1 as we were discussing, so when the number of housing and shelter opportunities created or otherwise obtained, that is not something that LAHSA has a hand in reporting to this Court; is that right?

A    Correct.

Q    Going to the next data point, the number of beds or opportunities offered, do you know what that means?

        **MR. SCOLNICK:**  Objection, calls for a legal conclusion.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  We had originally interpreted that as PH served.

**BY MS. MITCHELL:**

Q    When you say we had originally interpreted that, who's the we?

A    So we get the template from the City and we populate PH served.  After further discussion earlier this month with the City and other individuals in this courtroom, we were clarifying what that exactly meant.  When I read opportunities offered as a data analytics professional working with HMIS, I interpret that as the number of people who were offered a bed and because the only way to account for that in HMIS is to know

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Direct / By Ms. Mitchell                      **71**

that someone took that bed, that's the only way to report that. That I think is how we are reporting it.

Q    Okay.  Let me ask this more directly.  Can LAHSA track currently the number of beds or opportunities offered as opposed to those that are created or obtained?

A    We cannot.  We can track the number of opportunities offered for a subset of sites.

Q    Okay.  And when you say subset of sites, are those offers made through CES or TLS?

A    They are offers made through CES, TLS, or to any LAHSA matched interim housing site.

Q    Okay.  And just for the record, what is CES?

A    Coordinated entry.

Q    Coordinated entry system?

A    Correct, coordinated entry system.

Q    And what is TLS?

A    Time limited subsidy.

Q    And so when you say you can report offers made through CES, TLS or what was the third one?

A    Interim housing sites matched through -- interim housing sites that are matched by LAHSA, which is all LAHSA funded interim housing sites that serve adults and youth.

Q    Okay.  And regarding offers made through CES and when we say offers, we're talking about an offer of a bed, in shelter or permanent housing.

Kuhn - Direct / By Ms. Mitchell **72**

A    Coordinated entry system just deals with permanent supportive housing.

Q    Okay.  So an offer made through CES, are you aware, and we'll go back to Exhibit A, if any of these facilities that are identified in the City's quarterly reports are matched through CES?

        **MR. SCOLNICK:**  Objection, lacks foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I would need to get more information on each site.

**BY MS. MITCHELL:**

Q    Okay.  Are you aware of whether any of them are matched through CES?

        **MR. SCOLNICK:**  Same objection, lacks foundation.

        **THE COURT:**  Overruled.  Can you answer the question?

Q    Are you aware if -- whether any of the sites identified are matched through CES?

A    As master lease sites, they have many housing subsidies in them, so I am sure within a master lease site, there are some housing subsidies that go through CS, but I cannot be a hundred percent confident in that until I review the portfolio of each of the sites and who's currently living there.

Q    Would it be fair to say that some are matched through CES and some are not?

        **MR. SCOLNICK:**  Objection, lacks foundation.

**THE COURT:** Overruled.

**THE WITNESS:** It could be fair to say that.

Q    So showing you row 14, I'd say 13 and 14 there's two interim housing sites identified.  Do you know whether these are LAHSA interim housing sites?

A    Highland Gardens is matched through LAHSA interim housing.

**THE COURT:** I'm sorry, I didn't hear, would you repeat that, I apologize?

**THE WITNESS:** Yes, Your Honor, sorry.  Highland Gardens is matched through LAHSA's matching process.

**BY MS. MITCHELL:**

Q    Okay.  What about number 14, this 101 Colingua (phonetic)?

A    The Inside Safe sites are matched by the mayor's office.

Q    Okay.  So are -- what about HACLA, if there is a HACLA site, a housing -- well, what does HACLA stand for?

A    Oh, gosh, Housing Authority of the City of Los Angeles.

Q    That's what I think it is too.  Are any HACLA sites matched through CES, TLS, or LAHSA interim housing?

A    HACLA has many subsidies.  HACLA funds lots of different permanent housing.  Many of HACLA's permanent housing subsidies go through a coordinated entry system, but it's not through the interim -- it's not an interim housing site, so.

Q    So -- and I'm sorry just to because I don't think I quite understood.  So some of HACLA sites are matched through CES and some are matched in other ways; is that right?

Kuhn - Direct / By Ms. Mitchell                    **74**

A     Yeah.  And HACLA doesn't necessarily have sites, right, they pay for housing subsidies, and so they can be project based or tenant based.  And so sometimes it's a subsidy, it's a pool of resources that can pay for rents.

That pool of resources sometimes goes through our coordinated entry system, the same with our project based sites which are physical sites that people can move into, that also pays for the subsidies, those also go through our coordinated entry system.  But not all of HACLA resources go through our coordinated entry system.

Q     What about LAHD, what does LAHD stand for?

A     Los Angeles Housing Department.

Q     And are Los Angeles Housing Department beds matched through the LAHSA system?

A     That would -- I don't know.

Q     Are you aware of whether the City has its own outreach teams that make offers of beds or shelter opportunities that aren't managed by LAHSA?

A     Can you repeat the question?

Q     Are you aware of whether the City of Los Angeles has its own separately funded outreach teams that are not managed by LAHSA?

A     I would not know that.

Q     Does LAHSA manage Inside Safe outreach teams?

A     Not all of Inside Safe outreach teams, no.

Kuhn - Direct / By Ms. Mitchell                    **75**

**THE COURT:**  I'm sorry, would you repeat that, you dropped your voice.  I want to hear that again.

**BY MS. MITCHELL:**

Q    Does LAHSA manage Inside Safe outreach teams?

A    We -- not all of them.

Q    Are you aware of whether individual Council districts have their own paid outreach teams?

A    Yes.

Q    And do you know any specific districts off the top of your head?

A    I do not.

Q    Do you know whether those Council district specific outreach teams are managed through LAHSA?

A    Not that I am aware of, but I am not the expert in all the programmatic activities.

Q    So any offers that were made by City funded outreach teams or Inside Safe outreach teams that are not managed through LAHSA, LAHSA would not have the ability to report that offer; is that right?

A    The only way we are able to report an offer is if it is a matched bed.  So regardless of who's doing the outreach it's a matter of how the interim housing -- it's less about who's doing the straight outreach and more about how the beds are being matched.

In order to track offers, there has to be the technology

Kuhn - Direct / By Ms. Mitchell                    **76**

built to send an offer via a technology platform to capture that that offer was made to an individual specific person.  And so regardless of who's doing the street outreach, the only way that we could track that an offer was made and would be through the beds are matched through LAHSA's interim housing portfolio, which is all youth and adult beds that LAHSA funds, with the exception of Inside Safe.

Q    As far as the offers that LAHSA can report, offers of beds or opportunities, have you ever been asked by the City to include that information in quarterly reports?

          **MR. SCOLNICK:**  Objection, vague and relevance.

          **THE COURT:**  Overruled, you can answer the question. Please answer the question.

          **THE WITNESS:**  No, we have not.

**BY MS. MITCHELL:**

Q    Now, you and I were in a meeting on November 17th --

A    Uh-huh.

Q    -- just a couple of weeks ago talking about these issues; is that right?

A    Correct.

Q    Who all was in that meeting, if you recall?

A    It was representatives from the City, the City attorneys, yourself, individuals from my -- from LAHSA, including our CEO, the intervenor.

Q    A lot of folks.

A    Lots of folks.

Q    Was Special Master Michelle Martinez in that meeting?

A    Oh, yes, of course.

Q    Have you and I ever met or spoken about these issues prior to November 17th of 2025?

A    No.

Q    After that meeting, did I send an e-mail summarizing the conversation?

A    Yes.

Q    Showing you a copy of Exhibit 544 and I'm on page 5, I'm just looking at the bottom of that section where it says November 17th, 2025 at 4:59 p.m.  Do you see that?

A    Yes.

Q    Do you see where it says, thanks for the call today, everyone?

A    Yes.

Q    Do you recall seeing this e-mail?

A    Yes.

Q    Okay.  I'm going to go ahead and go to the next page where it follows and there was a number of -- I'm on page 6 and I think it concludes on page 7 where there was a summary and a number of questions that followed.  Do you see that?

A    Yes.

Q    Did you have an opportunity to review that e-mail?

A    Not in depth, but I have read it.

Q    Okay.  Was there anything about that e-mail, that summary of that meeting that you felt either at the time or now was wrong or inconsistent in that meeting?

          **MR. SCOLNICK:**  Objection, lacks foundation.  It's not a transcript, Your Honor, and calling for a legal conclusion.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Could you repeat your question please?

Q    Sure.  In reviewing that e-mail and you can take time to review it now if you'd like, was there anything about that e-mail where I was summarizing that meeting and the next steps that you felt was wrong or inconsistent?

     Would you like the opportunity to read the entire e-mail?

A    I can read quickly.  Can you go to the first page really quickly?

Q    Sure and we'll blow it up.  Just let me know when you want to go to the next page.  I'm on page 5.

A    Okay.  Next page.

     Okay.  You can go down.

     Okay.

Q    Next page?

A    Yes, please.

     Yes.  I think it is accurately represented with the exception and the big asterisk of the time frames therein for the development of the ability to track some of these things, these items.

Kuhn - Direct / By Ms. Mitchell                    **79**

Q    Okay.  Can you describe what's inaccurate?

A    In order to develop a technology solution to track why someone has rejected an offer, there's various different scoping and we have to develop the work -- the scope of the product, develop the work flows and train the system and we have over 8,000 users who use our HMIS and so to make sure that everyone is trained appropriately and the documentation, the timelines may vary in development.  And often times when you develop a technology product, you think it's good, and then you test it, and then you find an issue with it, and that delays the launch a couple of weeks.  And then you test it again.

So there's always some wiggle room in the timelines for how long it would take to develop and launch the technology needed to accurately and entering the system to capture this information.

So I think the timelines are approximate and somewhat accurate, but just want to give the asterisk that they are not fully delineated at this point.

Q    Sure.  So the timelines provided are just an estimate, but could vary.

A    Yes, correct.

Q    Okay.  That's fair.  So now after I sent that e-mail do you recall that Michelle Martinez subsequently -- Special Master Martinez sent another e-mail at 9:08 p.m.

MR. SCOLNICK:  And before we get there, Your Honor,

EXCEPTIONAL REPORTING SERVICES, INC

Kuhn - Direct / By Ms. Mitchell                    **80**

just renewing my objection that a lot of what was in Ms. Mitchell's e-mail is legal argument and it's improper and lacks foundation to ask this witness to opine on legal arguments in the letter.

THE COURT:  Thank you.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q   Okay.  And I'll ask the same question.  Was there anything in the summary of or in the e-mail that Special Master Martinez provided that you felt was wrong or inaccurate?  And if you'd like an opportunity now to review as well, we can do that.

A   That would be great.

Q   Okay.

MR. SCOLNICK:  And same objection to the extent this includes legal interpretations and argument, just not truly factual information.

THE COURT:  Overruled.

THE WITNESS:  Okay.  Next page, please.

BY MS. MITCHELL:

Q   I'm just going to blow it up for ease.  Just let me know if you want me to move it down.

A   Uh-huh.

Can you scroll down please?

THE COURT:  Would you stop at that page for just one moment?  I want to make a note.

Kuhn - Direct / By Ms. Mitchell                          **81**

        **THE WITNESS:**  The next page as soon as we're ready.

        **THE COURT:**  Just a moment, counsel.

        **THE WITNESS:**  Yeah.

    **(Pause)**

        **THE COURT:**  All right.  Thank you, counsel.

Q    All right.  Let's go to the next page.  And just for clarification, I'm still on Exhibit 544, now on page 3.

        **THE COURT:**  And just one moment, counsel, if you'd leave it on that page for just a moment.

    **(Pause)**

        **THE COURT:**  All right.  Thank you.

**BY MS. MITCHELL:**

Q    Are you ready to go further down the page, Ms. Kuhn?

A    Yes.

    You can go to the next page.

        **MS. MITCHELL:**  Your Honor, may I move to the next page?

        **THE COURT:**  Please.

        Just one moment, please.

    **(Pause)**

        **THE COURT:**  Thank you.

Q    Going to the bottom of page 4.

        **MS. MITCHELL:**  May I move to the next page, Your Honor?

        **THE COURT:**  Please.

Q    And I think this just summarizes and there's some questions.  Well, let me let you review that briefly.

         **THE COURT:**  And just a moment, if you'd remain on that page for one moment.

    **(Pause)**

         **THE WITNESS:**  Okay.

         **THE COURT:**  All right.  Thank you.

Q    Ms. Kuhn, after reviewing Special Master Martinez's summary, was there anything about that summary that you believe was wrong or needs to be corrected?

         **MR. SCOLNICK:**  Same objection, Your Honor, to the extent there's lots of legal interpretations in there, lacks foundation, calls for an inappropriate legal conclusion.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  Can we go point-by-point?

**BY MS. MITCHELL:**

Q    Sure.  So let's start with number 1, so this is -- I'm on page 2 of Exhibit 544 and I'll make it larger.  Is there anything about point 1 that you believe needs to be corrected or changed?

         **MR. SCOLNICK:**  Same objection, Your Honor.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  No.

Q    Point two, is there anything about point two that you believe needs to be corrected or changed?

Kuhn - Direct / By Ms. Mitchell                **83**

**MR. SCOLNICK:** And objection also to the extent this purports to be Special Master Martinez's understanding and this witness would have no foundation for knowing whether that's accurate or not.

**THE COURT:** Overruled.

**THE WITNESS:** No.

Q   Okay. And, Ms. Kuhn, just to clarify, I'm just asking for you to take a look at these summaries and from your perspective, if there's anything that's wrong or different than needs to be changed about this, okay?

**MR. SCOLNICK:** Same objection, Your Honor.

Q   Point number 3.

A   For point number 3, to provide clarification, we had interpreted current -- so for point number 3 we had a robust discussion around what available means, because there's lots of different ways to interpret that. And so available could mean how many beds exist in the system, the inventory, or available could mean home and you're actually available to go into that date, and so I think around this, as is Special Master Martinez explains, explaining the standard definition of available needs to happen, but I just wanted to emphasize that discussion did occur.

And, yes, that's my only comment there.

Q   Okay. Thank you. Is it your understanding -- well, we'll -- I'll come back to this question. Let's go to point number

4, number of PEH engaged.

A    So engagement data is collected, outreach programs are spa level and county-wide program that don't abide by city boundaries, because we're covering a whole area, which is our serve planning areas.

And so because of that, any people served within the City of Los Angeles specifically we rely on geo coding, so it's not specifically the encampment data or the engagement data that is spa level, but the entire program enrollment.

And so we do need -- that was my only point there.  And that city funded outreach, any outreach team can use HMIS and collect this information in HMIS.  I am not sure which city funded outreach teams, aside from the city funded outreach teams that go through LAHSA use HMIS.  And LAHD and HACLA I do not believe have outreach teams.

Q    Okay.  And I think we'll dive into this in a little bit more detail when we go back to the metrics, I just wanted to make sure that there was nothing about this summary that you believed was inaccurate.

          **MR. SCOLNICK:**  Same objection, Your Honor.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  No.  Other than that, I think there is a standard definition of engaged, because it's a homeless service.  I think the City just needs to -- no, I think that is a standard definition of engaged since it's --

**THE COURT:** You dropped your voice, I'm sorry, would you reanswer that please.

**THE WITNESS:** Yes.

**THE COURT:** I didn't hear a portion because you dropped your voice.

**THE WITNESS:** Apologies, Your Honor.

**THE COURT:** No, that's fine.

**THE WITNESS:** I think there is already an established definition of what engagement means.

**BY MS. MITCHELL:**

Q    And what is the established definition of what engagement means?

A    It is a street outreach term which means that they are connected to a higher level of service.  So it's when a person working with the street outreach worker engaged in case management beyond just life sustaining services.  So as a street outreach worker, I might be handing out water, food, hygiene products to develop rapport with the individuals that I'm working with.

And the minute that someone decides that they would like to work towards a housing pathway or other services that could help move them out of homelessness, that is when we mark a client as engaged within the outreach enrollment.  So it's the development of a case plan.

**MR. SCOLNICK:** And I'm going to object to the extent

this witness is being asked to opine on terms in the settlement, as opposed to just terms in her experience.

**THE COURT:**  Overruled.

**MR. SCOLNICK:**  It's a legal conclusion.

**THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q    Let's go to number 5, the number of PEH who accepted offers of shelter or housing.  Is there anything about this section that you think needs to be corrected?

**MR. SCOLNICK:**  Can I have a continuing objection to this line of questioning on the same grounds, Your Honor?

**THE COURT:**  You may.

**MR. SCOLNICK:**  Thank you.

**THE WITNESS:**  I agree that there needs to be -- yes, there needs to be more conversation around this subject because for me, if someone is served in Alliance reporting, because it has to do with households, I mean, it has to do with permanent housing and interim housing, when you accept an offer and when you're housed, it's one in the same.

Q    So going back to the exhibit we were looking at previously when we looked at the quarterly report and the column on the right, total PEH served, is that your understanding of the reference to PEH who have accepted offers of shelter or housing?

**MR. SCOLNICK:**  Objection, calls for a legal

conclusion.

THE COURT:  Overruled.

THE WITNESS:  You cannot be served in a housing program without having also accepted the offer of housing.  If you are in a housing program, you have accepted that offer of housing.

BY MS. MITCHELL:

Q    Sure.  So looking -- going back to Exhibit 544 where we were just at, at number 5, number of PEH who have accepted offers of shelter housing, is it your understanding that the metric PEH served is reporting the number of PEH who accepted offers of shelter or housing?

MR. SCOLNICK:  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Yes.

Q    Going to number 6, is there anything about number 6 that in this summary on Exhibit 544, page 3 that you believe needs to be corrected?  And I think it goes on to the next page, so I can go on to the next page when you're ready.

A    Please go on to the next page.  No, no comment.

Q    Okay.  And then what about number 7, is there anything about number 7 that you believe needs to be corrected?

A    We currently do track encampments, and we have a standard definition of encampments.  LAHSA has a standard definition and HMIS currently does track encampments.

Kuhn - Direct / By Ms. Mitchell                    **88**

Q    Okay.  What is the standard definition of encampments that LAHSA uses?

A    A group of five or more people in a similar area for two weeks or longer.

Q    And when did that become, if you know, the standard definition of an encampment?

A    At the beginning, end of 2024 and the beginning of 2025 is when we rolled out the encampment module.  Which in order to roll out the encampment module, in order to track encampments across the County of Los Angeles we had a series of working groups with all stakeholders to create that definition.

Q    When you say all stakeholders, who were the stakeholders, if you know?

A    Different members from the multi-disciplinary crisis response team at LAHSA, different members from the county's outreach leadership team and also direct street outreach workers, as well as members from street, LAHSA's access and engagement team, as well as individuals from the system's team that helps ensure that we have a coordinated system for entry, as well as HUD technical assistance.

Q    So HUD, the federal program, Housing of Urban Development that's what HUD stands for --

A    Correct, correct.

Q    -- and as well as LAHSA, the city, county and service providers, is that about right?

A     Correct.

Q     Okay.  So going back to Exhibit 25, Section 7.1 in the settlement agreement, we've talked about the number of housing or shelter opportunities created.  We've talked about the number of beds or opportunities offered, let's talk about the third metric that's required here, the number of beds or opportunities currently available in each council district.  Is that something that LAHSA currently has the capability of reporting?

        **MR. SCOLNICK:**  Objection, calls for a legal conclusion.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Are you referring to available as the inventory or available as the occupancy?

**BY MS. MITCHELL:**

Q     No.  There is one section for the number of housing or shelter opportunities created or obtained.  And there's a different section for the number of beds or opportunities available.

A     So we're referring to the occupancy, the current occupancy, the number -- like open beds on that day?

Q     If that's how you want to --

        **MR. SCOLNICK:**  I'm going to object -- sorry.  I'll object again.  We're having the witness construe the contract on the stand, Your Honor, it's not proper lay opinion.

**THE COURT:**  Overruled.

**THE WITNESS:**  I'm sorry what was your original question?

Q    Sure.  Does LAHSA have the capability of reporting the number of beds or opportunities currently available in each council district?

**MR. SCOLNICK:**  Relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  We can do that for any beds going through coordinated entry.  We can do it, which is our permanent supportive housing portfolio.  We can do it for any beds that are currently matched through LAHSA's interim housing matching portfolio, which includes all of LAHSA's funded beds for adult and youth with the exception of Inside Safe.

**BY MS. MITCHELL:**

Q    And so as we discussed, there are some beds that are Alliance, we'll call them Alliance beds, that you could not report on, but there are others you could report on; is that accurate?

A    Correct.

Q    Okay.  So going to the next metric, the number of PEH engaged and we talked about the definition of engaged, is that something that LAHSA could currently report on?

**MR. SCOLNICK:**  Objection, we're misstating the document and having an incomplete recitation of the requirement

Kuhn - Direct / By Ms. Mitchell                    **91**

and relevance and foundation.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  LAHSA can report on the number of PEH engaged in street outreach programs that are not specific and we can limit it to the City, but with very specific caveats and data limitations.

Q    Okay.  So let's talk about the caveats.  What are the caveats?

A    The majority of outreach is funded not through LAHSA, it's funded through the County and they use HMIS.  So we can pull the data out of HMIS.  But we are not overseeing those -- that team's work, so there's one limitation on that, although we do provide the training.

     Another is in order to limit someone's work and see where the work is being done, every time a street outreach worker interacts with a participant, they submit something called a current living situation.

     A current living situation records where that participant is living and the status of what that -- where that participant was living.  Are they unsheltered, are they housed, are they in interim housing.  That current living situation is important for two fold.  It helps us know where the work is being done, but it also helps feed a participant's homeless timeline, which then makes them for housing in the future, because it's validating that this individual is homeless, which then makes

Kuhn - Direct / By Ms. Mitchell                    **92**

them eligible for permanent supportive housing.

When outreach workers interact if they do not do that step of completing the current living situation, we would not where the work was being done.  And sometimes this is missed, as I mentioned, we have about -- we have the largest implementation of HMIS, probably the second largest in the country, we have 8,000 users.

I will say the second, within our database, the second largest bit of users, they have 4,000 users and that's the entire State of Washington.  So just a context on the size of our system.  The majority of those workers, a lot of those workers are outreach workers.

So in order to train, monitor and support all of those outreach workers, to make sure that they're accurately collecting all the different data points that are required to measure and also help move individuals on their homeless journey, requires huge amounts of training.

So when that is not completed, if they forget to complete the current living situations for various reasons, then we would not -- we would be under counting the amount of people who are engaged or who are working with outreach participants in the City.

Q    The CLS, the current living situation --

A    Uh-huh.

Q    -- that's recorded in HMIS.

A    Correct.

Q    And so if I understand you correctly if the service provider records NCLS, including the geo locations, meaning physically where they are --

A    Uh-huh.

Q    -- then that's something that LAHSA can report; is that right?

A    Correct.

Q    Does that extend the City funded outreach teams?

A    If they use HMIS.

Q    Let's go to the next.  The number of PEH who have accepted offers of shelter or housing, that since we talked about what LAHSA believes is the PEH served metric; is that right?

A    Correct.

        MR. SCOLNICK:  Objection, calls for a legal conclusion and relevance.

        THE COURT:  Overruled.

BY MS. MITCHELL:

Q    Let's go to the next metric.  The number of PEH who have rejected offers of shelter or housing and why offers were rejected.  Does LAHSA have the capability of reporting this metric?

        MR. SCOLNICK:  Can I have a standing objection on foundation and relevance and legal conclusions?

        THE COURT:  Yes.

MR. SCOLNICK:  And LAHSA is not a party to this agreement.

THE WITNESS:  No, we are not able to report on that at this time.

Q    Why not?

A    The infrastructure is not developed.

Q    Could the infrastructure be developed?

MR. SCOLNICK:  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  With time and money and priority setting, yes.

**BY MS. MITCHELL:**

Q    Going to the next metric, well let's go back.  Let's go back to that line.  The number of PEH who have rejected offers of shelter or housing and why offers were rejected.  You said with time, money and priority --

A    Uh-huh.

Q    -- this could be reported.  Can you explain that a little bit more?

MR. SCOLNICK:  Same objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  In order to collect why someone has rejected an offer, you need an integrated technology solution to capture this.  So, for example, with interim housing previously we were capturing interim housing in spreadsheets

Kuhn - Direct / By Ms. Mitchell                                  **95**

and making offers with phone calls, this was a couple of years ago.  Since then we have just recently moved our entire interim housing portfolio for LAHSA funded sites into a module, so all the interim housing sites that LAHSA funds are built out of HMIS, so you can see where people's rooms are, all of the exact beds.

When we make a match to someone and we connect someone with that interim housing we do it through an e-mail that allows them to schedule an intake appointment at the individual site with -- that they're getting matched to.  You need that kind of solution at a scale of our size, once again we have so -- we're dealing with such a large scale that in order to track it, you need to use technology to help track that.

So with that system developed, you could hypothetically if someone rejects an offer or does not take that offer you would have a history to collect why if someone rejects it.  Now someone could just not respond, so there's going to be a lot of just no responses, but you could give the person an opportunity to say like no.

But in order to do that, we have to build a work flow, we have to scope what are the drop downs that we want, what kind of answers do we want someone to say.  How do we want that information to be collected.  If it's an e-mail, if it's within HMIS and where are we going to collect that information.

So all of that scoping needs to happen, that's time, that's all my staff time, that's all the interim housing team's time, it's our service provider's time.  Then we need to develop and build out the work flows and then we need to train all the service providers on how to use that.

So when I say priorities, previously we've been focusing on let's be able to track current occupancy in all of our interim housing sites.  That was the biggest priority.  Now, and you can't do that and build something else at the same time, you have to balance the needs of the entire system.  And so as a system, we have to decide where do we want to focus our energy, where -- what is most important at the time, because the staff that we have to build up the work flows, the staff that we have to think of and design the system, the staff that we have to train and the capacity of our thousands of our service providers who are collecting this to obtain new work flows, retrain them is all limited.

And so as we build out HMIS, and as we make improvements to it, which we've made a lot of improvements in the last couple of years, we have to think about where do we want to put our resources in order to maximize the system.

And so when I say priorities, if we're only going to work -- well, for this particular one, if we wanted to get the rejection of offers, we actually need to build the whole inventory module first, which was a two and a half year

process. So at that point, we have to build that and now we can focus on now tracking potentially rejection of offers. But you have to have -- you know, you have to decide what you want to focus on and what's the best -- if we'd only been like, oh, we only want to track rejection of offers and we want to -- missed another opportunity to actually build a more wholistic system that can track all of interim housing, which then we can add features to.

**BY MS. MITCHELL:**

Q    Who sets the priority for LAHSA?

        **MR. SCOLNICK:**  Objection, vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Many people set the priority for LAHSA. LAHSA is governed by a board of commissioners that has five representatives from the County and five representatives from the City. In addition, there's the COC Board that handles and manages all of the continuum of care money that comes through. In addition, there is the coordinated entry policy council, coordinated entry policy council, CES policy council that manages how people are assessed, referred, assessed and matched and prioritized for permanent housing.

        There's also the HMIS committee. We also have all of our funders, we receive, you know, significant funding from the County and the City, so we get priorities from COHI, we get priorities -- we work with closely with DHS and DMH, we get

significant funding from the City, so we work with all of the elected members, all of the administrative bodies, and also our service providers and their needs, in addition to different requirements.

So we take all of that and come together in various bodies to make decisions about what priorities are set.

Q    If you had the funding and the priority direction, would you have been able to build out this infrastructure for the number of PEH who have rejected offers of shelter or housing and why offers were rejected back in 2022 or 2023?

**MR. SCOLNICK:**  Objection, calls for speculation and incomplete hypothetical?

**THE COURT:**  Overruled.

**THE WITNESS:**  Any request that we get we take with incredible weight, especially if it's coming from one of our funders, but even outside of that, because our aim is to serve the entire system regardless of funders.  I think it'd be really speculative to say what can and cannot be done in that time.  But I will say for this, for any of this, we would need to have developed the baseline infrastructure that we are working now before we could even talk about that.  And that's what we've been doing for the last two and a half years is building that baseline infrastructure around inventory for both our permanent supportive housing going to CS and our inventory -- interim housing inventory.

Kuhn - Direct / By Ms. Mitchell                    **99**

So it's I think even if it would have been said this is a priority, we would have needed to have said, like we need to build this other infrastructure first before we can even focus on this additional feature.

**BY MS. MITCHELL:**

Q   Has the City ever asked you to build the infrastructure to be able to report on the number of PEH who have rejected offers of shelter or housing and why offers were rejected?

**MR. SCOLNICK:**  Lack of foundation, relevance, and calls for a legal conclusion.

**THE COURT:**  Overruled.

**(To the Witness):**  You may answer the question.

**THE WITNESS:**  They have not explicitly asked us to build the infrastructure around that, no.

**BY MS. MITCHELL:**

Q   Going to the next metric, the number of encampments in each Council District, is this something that LAHSA currently has the capability of reporting?

A   Yes.

Q   Has anybody asked you to report the number of encampments in each Council District along with the City's quarterly reports?

**MR. SCOLNICK:**  Objection, lack of foundation and this witness is also here testifying in her personal capacity as someone with LAHSA that does not speak for LAHSA.

EXCEPTIONAL REPORTING SERVICES, INC

Kuhn - Direct / By Ms. Mitchell                    **100**

THE COURT:  Overruled.

BY MS. MITCHELL:

Q    You can answer.

A    Again, I do not speak for all of LAHSA and I have only been in my role, my current role since February 2024, but in 2023, the fall of 2023, they did ask if this is possible.

Q    Okay.  So let's talk about that.  Let's go over to -- let's start with Exhibit 409.

Hold on.  No, 547.  Let's go to 547.

Okay, showing you an email dated August 24th, 2023, from Megan Falcone to Emily Vaughn Henry with a cc to Edwin Gipson.  Have you seen this email before?

A    Yes.

Q    When was the first time you saw this email?

A    Maybe two days ago.

Q    Do you know -- well, who provided this email to you?

MR. PARKER:  Objection, attorney-client privilege.

BY MS. MITCHELL:

q    Without getting into any --

THE COURT:  Overruled.

(To the Witness):  Without the content of the conversation, who provided it to you?

It's overruled.  Thank you, Counsel.

(To the Witness):  Answer the question, please.

THE WITNESS:  My attorney did.

Kuhn - Direct / By Ms. Mitchell                    **101**

**THE COURT:** Thank you.

**BY MS. MITCHELL:**

Q    So this is dated August 24th of 2023.  Do you know when the City-Alliance settlement was entered into?

A    I do not.

Q    And there is a question here -- do you know who Megan Falcone is?

A    Yes.

Q    Who is she?

A    She works at the CAO's office.

Q    And who is Emily Vaughn Henry?

A    She's the former deputy chief information officer at LAHSA.

Q    All right.  And who is Edwin Gipson?

A    He works at the CAO's office.

Q    So both Ms. Falcone and Mr. Gipson work at the CAO's office?

A    Correct.

Q    So there's a request here for LAHSA to report quarterly to the extent possible on certain metrics.  Do you see that?

A    Yes.

Q    In August of 2023, remind me what your position at LAHSA was?

A    Senior advisor of IT and data management.

Q    Were you aware of this request in August of 2023?

Kuhn - Direct / By Ms. Mitchell                    **102**

A    I was not.

Q    Going to the last page, Page 4, there is an email from Megan to Emily Vaughn Henry with a cc to Edwin Gipson, Eugene Hunter (phonetic), Annabel Gonzalez (phonetic), and Kendra Leal (phonetic) purporting to thank Emily for a meeting.  Do you see that?

A    Yes.

Q    Do you recall, and this was dated September 15th of 2023, do you recall whether you were part of that meeting?

A    I was not part of that meeting.

Q    Were you aware at this time of discussions that were happening about LAHSA's reporting capability?

          **MR. SCOLNICK:**  Lacks foundation, Your Honor.

          **THE COURT:**  Would you repeat that question, please.

**BY MS. MITCHELL:**

Q    Were you aware at that time of the discussions that were surround -- that were happening surrounding LAHSA's reporting capability?

          **THE COURT:**  Can you answer that question?

          **THE WITNESS:**  With the specific points in this email?

**BY MS. MITCHELL:**

Q    Yes.

A    No.

Q    Okay.  Showing you what has been marked as Exhibit 543. It purports to be an email sent from Megan Falcone to you,

Kuhn - Direct / By Ms. Mitchell                    **103**

Bevin Kuhn, Brian Brown (phonetic), Ms. Gonzalez, do you know how to pronounce -- is that Simyrna?

A    Simyrna.

Q    Simyrna.  Simyrna Gonzalez, Edwin Gipson, Annabel Gonzalez, and Kendra Leal.  Do you see that?

A    Yes.

Q    And that's an email dated November 21st of 2023?

A    Correct.

Q    So this one is a little bit different.  I think it starts at the end, so you read it in time order.  So let's go to October 10th of 2023 there is an -- at 11:06 a.m. there's an email from Brian Brown.  And is that the same Brian Brown that you were speaking to earlier today?

A    That is correct.

Q    And Mr. Brown states, "Good morning, Megan."  Do you know which Megan he's addressing this email to?

A    Megan Falcone.

Q    In the City Administrative Office?

A    Correct.

Q    "I'm sharing data per the below request which Emily had relayed to our team."  Do you recall being cc'd on this email?

A    Yes.

Q    And the data that was shared are these four points:  the number of PEH engaged, the number of PEH who have accepted offers of shelter or housing, the number of PEH who have

Kuhn - Direct / By Ms. Mitchell        **104**

rejected offers of shelter or housing and why offers were

rejected, and the number of encampments in each Council

District.  Do you see that?

A    Yes.

         **MR. SCOLNICK:**  Objection, misstates the document.

That is the request.  That is not the data provided.

**BY MS. MITCHELL:**

Q    You and I spoke --

         **THE COURT:**  I don't understand.  I'm sorry, Counsel.

         **MR. SCOLNICK:**  Your Honor, the email says I'm sharing

data per the below request.  It does not purport to share all

of the data requested.

         **THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q    You and I spoke yesterday, we had a Zoom meeting.  Is that

right?

A    Yes.

Q    And in that meeting I asked you if you had a copy of this

data that was provided on September 30th of 2023 by Mr. Brown.

Is that right?

A    Yes.

Q    Okay.  I'm going to show you what has been marked as

Exhibit 409.  Do you recognize this?

A    Yes.

Q    Is this the data that was provided by Mr. Brown referenced

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Direct / By Ms. Mitchell **105**

in October 10th of 2023?

A    Yes.

Q    Okay.  Do you know what these tables are?

A    This is each Council District and the outreach, the number of outreach clients that have a current living situation within each Council District.

Q    So that CLS is the current living situation?

A    Correct.

Q    Okay.  And that is reported per district here, is that right?

A    Correct.

Q    Table 2 is clients engaged, is that right?

A    Correct.

Q    And what is that?

A    That is the total number of clients that were engaged within each Council District who also had a CLS.

Q    Table 3 has this title Exits to Permanent Housing Situations.  Is that exits from homelessness to permanent housing solutions?

A    I believe this is exits from the street outreach programs to permanent housing situations, so exits from homelessness to permanent housing.

Q    Okay.  And what is Table 4?

A    Those are exits to interim housing.

Q    What is Table 5?

Kuhn - Direct / By Ms. Mitchell                           **106**

A    Exits to other temporary situation including transitional housing.

Q    You referred to Table 4 as exits to interim housing.  It's titled Exits to Emergency Shelter.  Is that right?

A    Correct.

Q    Do those phrases mean the same thing to you, interim housing and emergency shelter?

A    Very similar.  Emergency shelter is how I'd define various types of interim housing.

Q    Okay.  And I'm sorry, going back to Table 5, Exits to Temporary Situation Including Transitional Housing, what is that?

A    Temporary situations could be anything from living with friends and family temporarily, it could be left to go to a hospital or other substance NIS clinic.  There's various different exit destinations.  This is all looking at the exit destination out of these outreach programs and so it's the various hard to find exit destinations that fall under temporary.

Q    Okay.  And then Table 6, Exits to Transitional Housing, what is that?

A    That's exits to transitional housing.

Q    So like a subset of the temporary solution.

A    Correct.  It's -- yeah.

Q    Okay.  This looks like it got cut off of it, but it says

Kuhn - Direct / By Ms. Mitchell                    **107**

Inside -- Table 7, Inside Safe Encampments.  Do you know what that is?

A    Yes, it is the total number of Inside Safe encampments by Council District.

Q    And what is an Inside Safe encampment versus a regular encampment, to your knowledge?

A    It's an encampment that has been targeted for resolution by the Inside Safe Initiative.

Q    Okay, I'm going to show you what is marked as Exhibit 410.

Well, I'm sorry, let's go back to the Inside Safe encampments.  Are there encampments as LAHSA defines encampments that are non-Inside Safe encampments?

A    There are many.

Q    Does LAHSA track that information as well?

A    We do now.  We did not at the time of this report.

Q    At the time it was only Inside Safe encampments were being tracked?

A    Correct.

Q    Understood.  So going to the next exhibit, 410, what is this -- 410, Exhibit 410, that was also part of the data that was provided by Mr. Brown on October 10th of 2023, is that right?

A    Correct.

Q    And what is Exhibit 410?

A    So in that file there are many different tabs and each tab

Kuhn - Direct / By Ms. Mitchell                   **108**

actually had the title of the report.  So if this is the tab

that says -- if this is coming from Tab 2, which I think says

engaged up at the top, because all the -- the table isn't

actually labeled on here.

Q    Let me take a pause.

A    Yeah.

Q    When you forwarded it to me it came in an Excel file, is

that right?

A    Oh, yes.  Excel file, yes, correct.

Q    Okay.  So when you refer to tabs, you're talking about

tabs in the different files?

A    Correct.

Q    So for evidence purposes, just so you know, it has to be

Bates stamped.

A    Yeah.

Q    So it was turned into a PDF.  But I'll refer you back to

Exhibit 409 so we can talk about the differences.

So is this -- is Exhibit 410 providing additional

detail to the tables that we see in Exhibit 409?

A    Yes.

Q    Okay.  So the different tables in 410 correspond with that

information that we see in 409 --

A    Yes.

Q    -- is that right?

A    Yes.

Kuhn - Direct / By Ms. Mitchell                          **109**

Q    Okay.  Was there anything in these tabs that was different than what we see in Exhibit 410 or is this just additional detail?  To your knowledge.

          MR. SCOLNICK:  Objection, lacks foundation.

          THE COURT:  Overruled.

          THE WITNESS:  I haven't reviewed these in depth. There might be a number that's different depending if you pulled the reports on a different date.  But they should be relatively similar.

**BY MS. MITCHELL:**

Q    Okay.  And just for clarification, there's different Council Districts and there's metrics Inside Safe and not ISP. What is ISP?

A    Non-Inside Safe.

Q    And is it like Inside Safe Program, is that what it stands for?

A    Yes.

Q    Okay.  Showing you Exhibit 411, what is Exhibit 411, if you know?

A    It's the memo about the data that we sent.

Q    So Exhibit 411 was also included in that email from Brian Brown on October 10th, 2023, to Megan Falcone of the CAO's office?

A    Correct.

          THE COURT:  All right, just one moment, I'd like to

Kuhn - Direct / By Ms. Mitchell                    **110**

make a note, please.

    **(Pause)**

        All right, thank you, Counsel.  Please continue.

        **MS. MITCHELL:**  Thank you.

**BY MS. MITCHELL:**

Q    I'm going to show you a side-by-side of Exhibit 25 with Exhibit 410.  So going through these, the number of clients with current living situation within the reporting period by CD -- and CD is Council District, is that right?

A    Correct.

Q    Okay.  Would that correspond to any of the metrics required under 7.1, to your knowledge?

        **MR. SCOLNICK:**  Objection, calls for a legal conclusion.

        **THE COURT:**  Overruled.

        **MR. SCOLNICK:**  And improper lay opinion.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  No.

**BY MS. MITCHELL:**

Q    What about the number of PEH engaged during the reporting period, would that correspond?

        **MR. SCOLNICK:**  Could I have a standing objection to this line of questioning, Your Honor?

        **THE COURT:**  You may.

        **MR. SCOLNICK:**  Same objection.  Also lacks foundation

Kuhn - Direct / By Ms. Mitchell                    **111**

and LAHSA is not a party to the Settlement Agreement.

　　　　　**THE COURT:**  Thank you.

　　　　　**THE WITNESS:**  It would be related to number of PEH engaged.

**BY MS. MITCHELL**

Q    Now looking at Tables 3 through 6 which reported a number of clients with exits to various places, would that be related to any of the metrics in 7.1?

A    No, I would not report on that reliably.

Q    What about Table 7, number of Inside Safe encampments per Council District?

A    It would be a very limited subset.

Q    Just Inside Safe encampments, right?

A    Uh-huh.

Q    And remind me when the non-Inside Safe encampments metrics began reported in HMIS.

A    We finished building up a module at the end of 2024 and in January 2025 the outreach teams went live with starting to operationalize in our coordination meetings tracking encampments and so it's gotten steadily more accurate since January.

Q    Now going back to Tables 3 to 6, you said you would not use that to report any of the metrics in 7.1.  What is that?

A    I guess destinations are not as reliable as seeing subsequent enrollment data.  So if you're going to see -- I

Kuhn - Direct / By Ms. Mitchell                    **112**

could report that someone exited to emergency shelter, but it's

not as accurate as seeing someone then enrolled in that

emergency shelter or interim housing program in HMIS.

Q    Got it.  So if you're reporting, for example, PEH served

when in a particular let's say interim housing, let's say

Highland Gardens for example, you would want to use the data

from Highland Gardens as opposed to the exit data, is that

right?

        **MR. SCOLNICK:**  Incomplete hypothetical and compound,

Your Honor.

        **THE COURT (To the Witness):**  Do you understand the

question?

    **(No audible response)**

        Overruled.

        **THE WITNESS:**  Yes, you'd want to use the Highland

Gardens.  Also, the exit destination does not state the exact

site they're going to.  It just says that they went to that

site -- went to an interim housing.

**BY MS. MITCHELL:**

Q    Okay.  The number of clients with a current living

situation, Table Number 1, how is that, if at all, related to

number of clients engaged, Table 2?

A    Number of clients engaged would be a subset of those with

a current living situation.  So anyone, if a street outreach

worker is working with someone they should have a current

Kuhn - Direct / By Ms. Mitchell                    **113**

living situation.  Even if they're just providing food, water, hygiene products, before they're engaged they could still have a current living situation.

Q    And to be clear, the current living situation, that's where the geolocation would be provided so that we know that those people live in the city of Los Angeles, right?

A    Correct.

Q    Okay.  So going back to that email chain, the data was provided September 30th of 2023 and on October 10th of 2023 there was a question by Megan Falcone, "Was the team able to determine if there is information" -- oh, thank you.  "Was the team able to determine if there is information HMIS on the number of encampments that have been identified in each Council District?"  Do you see that question?

A    Yes.

Q    And then it looks like on October 11th Megan is following up again.  Going to Page 15, we'll start at the beginning of the email, it looks like it starts on October 11th from Brian Brown and Mr. Brown is reporting the encampments -- the encampment reporting is available.  Is that accurate?

A    Yes.

Q    And you were cc'd on this email, is that right?

A    Correct.

Q    At the bottom of that email from Mr. Brown there is a section that reads "If partial 4118 encampment" -- well, let me

Kuhn - Direct / By Ms. Mitchell    **114**

take a step back.  "The team is working through the available

info" -- I'm going to restart this question.

Why don't you just go ahead and read the response

from Mr. Brown starting with "Hi, Megan."  You can go ahead and

read that out loud into the record.

A    "Apologies for missing" --

"Hi, Megan.  Apologies for missing that question

yesterday.  Instant Safe are the only regular

encampment shapes that we have tracked in HMIS and

have a definition in process for.  The team is

working through the available information on 4118 to

see if we can include that, but the data was

historically provided in a way that did not allow for

us to easily connect the data to identified

locations.  Given that isn't fully mapped we didn't

think it would be beneficial to include partial data.

If partial 4118 encampment is desired I can follow up

with the team, though it should also be noted that

those would all be former encampments as I understand

it, not current."

Q    Why don't you go ahead and read the second paragraph as

well.

A    "From what I recall from earlier Inside Safe planning

meetings, there is not a definition on the City end

as to what makes an area officially an encampment.

For any total count of current existing encampments my understanding was that we need a definition first and then we would work on setting up tracking based on that definition.  That would take some time but can definitely be explored further.  If we want to go that route I'll need to connect with some other colleagues in LAHSA in our access and engagement and other teams to make sure we're aligned and I have the latest information."

Q    Okay.  Are you aware, this is October of 2023, are you aware of whether the Alliance and the City were at that time talking about the encampment reduction metrics and milestones that were not provided to the Alliance as required?

        **MR. SCOLNICK:**  Lacks foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I am unaware what the City was doing at that time.

**BY MS. MITCHELL:**

Q    Okay.  Are you aware of whether it was ever explored further getting a definition and then working on setting up tracking based on that definition, as indicated in Brian's email?

        **MR. SCOLNICK:**  Lacks foundation and vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I am unaware what the City was doing at

Kuhn - Direct / By Ms. Mitchell                    **116**

that time.

**BY MS. MITCHELL:**

Q    Let's go -- I think next we have a response from you on October 11th of 2023.  And I'm on Page 13 of Exhibit 543 where it starts "Hi, Megan" at the bottom.  Do you see that?

A    Yes.

Q    Okay.  And then your response follows in which you indicate it's not possible to track specific encampments outside Inside Safe and halfway homes.  Do you see that?

A    Yes.

Q    And then you say "We hope to be able to better track encampments in late 2024 but requires a clear definition of encampment."  Do you see that?

A    Yes.

Q    What did you mean by that?

A    That there was a lot of scoping to be done, so in order to track encampments we have to have a common definition for an encampment.

Q    And was a definition provided, do you know?

        **MR. SCOLNICK:**  Objection, lacks foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  As the system leads, we worked to create a definition after that.  So in various meetings, the meetings that I referred to earlier when we were building out the encampment module, that is when that definition was

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Direct / By Ms. Mitchell                          **117**

created.

**BY MS. MITCHELL:**

Q    Okay.  And moving forward, same email, October 11th, 2023, at 2:07 p.m. Megan asks if there is a definition of engaged, referring to that Table Number 2.  Do you see that?

A    Yes.

Q    And above that is where it looks like you are providing the definition of engagement, is that right?

A    Correct.

Q    Was any alternative definition of engagement ever provided to you or anyone at LAHSA to your knowledge?

        **MR. SCOLNICK:**  Lacks foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  No.  The HUD standard definition.

**BY MS. MITCHELL:**

Q    Do you know when it became a HUD standard definition?

A    I do not, but the HUD data standards have been around for a long time.

Q    Showing you, we're still on the same email chain at Exhibit 543, on October 12th of 2023 there's additional follow up questions from Megan Falcone to you and Brian.  Do you see that?

A    Yes.

Q    Asking for clarification on each of the tables that were provided, is that right?

A    Yes.

Q    October 13th of 2023 it looks like an email from Emily Vaughn Henry with the statement we are working on our logic regarding the one thousand missing clients.  Do you know what that refers to?

A    I do not.

Q    What would -- do you have any idea what a thousand missing clients might be?

        **MR. SCOLNICK:**  Calls for speculation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I do not.

**BY MS. MITCHELL:**

Q    Okay.  Was anybody concerned about a thousand missing clients?

        **MR. SCOLNICK:**  Objection, argumentative and calls for speculation.

        **THE COURT:**  Sustained.

**BY MS. MITCHELL:**

Q    Now it looks like at that time there was additional information provided for encampment activity for Inside Safe and information regarding TLS.  Do you see that?

A    Yes.

        **THE COURT:**  Counsel, would you go back to the prior page for just one moment, please.

        **MS. MITCHELL:**  Would you like me to blow it up, Your

Kuhn - Direct / By Ms. Mitchell                    **119**

Honor?  The bottom portion?

THE COURT:  No.

MS. MITCHELL:  Okay.

THE COURT:  Just a moment.

(Pause)

All right, thank you.  Please continue.

BY MS. MITCHELL:

Q    And then there's a discussion on TLS clients and exits.
Do you see that?

A    Yes.

Q    Do you know if that was related to the City's reporting in
this case at all?

A    I do not.

Q    Okay.

THE COURT:  Just one moment, please.

(Pause)

Thank you.

BY MS. MITCHELL:

Q    Moving ahead to October 19th of 2023, there are some
questions it looks like were being answered by Emily, Emily
Vaughn Henry, and the question is encampment resolution data
outside of Inside Safe available on a city-wide basis not
broken down by CD, do you see that?

A    Yes.

Q    It talks about generating a hotspot based on the current

Kuhn - Direct / By Ms. Mitchell                    **120**

living situation of PEH.  What does that mean?

A    You can take --

MR. SCOLNICK:  Objection, lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  You can take all the current living situations and see where there's clusters of current living situations which hypothetically could say that there is an encampment there but there's various timestamps -- there's issues because someone might only have a current living situation once a month and so you have to decide how wide a time that you're going to cast to capture the appropriate hotspot.  But that's what you can do, you can take all that -- you can kind of map clusters of current living situations.

**BY MS. MITCHELL:**

Q    The next sentence "In addition, we do not collect CVRTM information at HMIS."  Do you know what CVRTM is?

A    No.

Q    Could that be vehicles, RVs, tents, and makeshift shelters?

MR. SCOLNICK:  Objection, calls for speculation.

THE COURT:  Overruled.

(To the Witness):  If it refreshes your recollection, you can answer that.  If it doesn't have any meaning to you, just say so.

THE WITNESS:  It could, but I'm not --

THE COURT:  Okay.

THE WITNESS:  -- a hundred percent sure.

BY MS. MITCHELL:

Q   Does that phrase vehicle -- I don't know what "C" is, but vehicles, RVs, tents, and makeshift shelters, does that metric mean anything to you?

MR. SCOLNICK:  Objection.  Counsel's again testifying.  This witness does not remember what that means and now she's telling the witness what she thinks it means and wants the witness to agree.  That's improper.

THE COURT:  I'm not sure --

MR. SCOLNICK:  Lacks foundation.

THE COURT:  I'm not sure, Counsel.

(To the Witness):  Do you have any idea what this means?  All right, your answer's no?

THE WITNESS:  No.

THE COURT:  All right, thank you.

BY MS. MITCHELL:

Q   My question's a little bit different though.  My question was that phrase, vehicles, RVs, tents, and makeshift shelters, does that metric sound familiar to you?

THE COURT:  Just a moment.

MR. SCOLNICK:  Same objection.

THE COURT:  Counsel, just one moment, please.

(Pause)

Kuhn - Direct / By Ms. Mitchell                    **122**

I'm afraid I've lost the question and I apologize. In addition we do not collect CVRTM, so it's speculation on her part as to what that means.

MS. MITCHELL:  If I --

THE COURT:  But your question now is?  What are you referring to?

MS. MITCHELL:  Yes, so if I may make a brief offer of proof, Your Honor.  LAHSA collects metrics based on vehicles, RVs, tents, makeshift shelters and reports that in the PIT count, the annual PIT count.  I'm wondering if that's what this could be.  If she's not familiar with that phrase or those metrics, that's fine.

THE COURT:  So you're not asking about the phrase, you're asking about?

MS. MITCHELL:  I mean we could -- just RVs, vehicles, tents, and makeshift shelters, if that metric is familiar --

THE COURT:  Okay.

MS. MITCHELL:  -- to this witness.

THE COURT:  All right.

(To the Witness):  You can answer that question.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q    And how is that metric familiar to you?

A    We talk about it a lot in homeless services, because there's different strategies for working with participants in

Kuhn - Direct / By Ms. Mitchell                                      **123**

RVs, but, as you mentioned, in the PIT count as well.

Q    Okay.  Are you familiar in that metric in counting

vehicles, RVs, or I think it's vans, vans, RVs, tents,

makeshift shelters, maybe cars, are you familiar with whether

that information is collected in HMIS?

         **MR. SCOLNICK:**  Same objection, Your Honor, as to

Counsel filling in definitions of terms.

         **THE COURT:**  Overruled.

         **(To the Witness):**  You can answer the question.

         **THE COURT:**  We do not.

**BY MS. MITCHELL:**

Q    Okay.  Going down to Number 2 there's a definition that's

provided --

         **THE COURT:**  Just a moment.  I want to be sure of the

answer.  I'm sorry.  So vans or vehicles, tents, makeshift

shelters are not included in HMIS, is that correct?  Does that

vary from Inside Safe to other programs?

         **THE WITNESS:**  Well, can I modify my answer?

         **THE COURT:**  Yeah, absolutely.

         **THE WITNESS:**  Okay.  HMIS is persons on track so we

track the people not necessarily the vehicles.  We don't have

just random vehicles.  In the encampment module with our new

system that just came online within an encampment you can note,

oh, there's 20 tents or five RVs, you can kind of collect that

information, but it's not connected to any specific individual.

Kuhn - Direct / By Ms. Mitchell                          **124**

And I wouldn't say it's reliable information to report on out of HMIS because HMIS mostly focuses on the person.

**THE COURT:**  Okay, thank you.

**MS. MITCHELL:**  Thank you.

**MR. SCOLNICK:**  Your Honor, if I may be so bold as to suggest a break for this witness, maybe five minutes?

**THE COURT:**  That's an excellent suggestion.  How about more than five minutes, Counsel?

Now listen, I've got a hearing I need to go through the lunchtime, so all of you have a good lunch, but I've got another hearing I need to conduct.  So why don't you take 15 -- would 20 minutes be okay for everybody, just so we have a good break?

**MR. SCOLNICK:**  Yes, Your Honor, and I would --

**THE COURT:**  So why don't we resume at 25 after then.

**MR. SCOLNICK:**  And I understand the witness has a 1:00 o'clock cutoff I believe.

**THE COURT:**  No, she doesn't.  Thank you very much.

**MR. SCOLNICK:**  She had a child obligation, Your Honor.

**THE COURT:**  Yes, she does.

**(To the Witness):**  You have a child?

**THE WITNESS:**  Yes.

**THE COURT:**  Absolutely, you have a 1:00 o'clock cutoff.

THE WITNESS:  Thank you so much.  Thank you, Your Honor.

THE COURT:  I've got another hearing.  Would all of you be willing to go through lunch and I can put that hearing off till 1:00 o'clock?

MS. MITCHELL:  That's fine with me, Your Honor.

THE COURT:  We can discuss that.

(To the Witness):  By the way, you're going to keep that obligation.

THE WITNESS:  Thank you so much, Your Honor.

THE COURT:  You've got a child?

THE WITNESS:  Yes.

THE COURT:  We'll do that.

THE WITNESS:  A four-year-old.  Thank you so much, Your Honor.

(Recessed at 11:04:39; reconvened at 11:25 a.m.)

THE COURT:  We're back on the record, all counsel and parties are present.  The witness is present.  Let me assure you, you've got childcare at 1 o'clock, you'll be there.  What time do you need to leave so you're comfortable?

THE WITNESS:  I need to leave at 1:00, please.  I need to pick up at 2 o'clock.

THE COURT:  At 1 o'clock, no matter where we are, you get up and walk out of this court; is that clear?

THE WITNESS:  Thank you, Your Honor.  I really

Kuhn - Direct / By Ms. Mitchell          **126**

appreciate that.

THE COURT:  Now, you may have to come back at some point because I don't know how long direct will continue and cross and redirect and recross.  But trust me, at 1 o'clock, you walk out.  Okay?

THE WITNESS:  Thank you, Your Honor.  I appreciate that.

THE COURT:  We'll make that comfortable for you.  Counsel, your continued questions, please.

MS. MITCHELL:  Thank you, Your Honor.

THE COURT:  And, counsel, if it's okay, we'll go through lunch, then I'll send you to lunch at 1 o'clock and I'll delay this other hearing to 1 o'clock.

**(Discussion regarding another case)**

THE COURT:  So, counsel, please continue.

MS. MITCHELL:  Thank you.

**DIRECT EXAMINATION (CONTINUED)**

BY MS. MITCHELL:

Q    Going back to Exhibit 543, which is this e-mail exchange we have been discussing, showing you an e-mail.  Oh, this is the same e-mail we were just looking at.  I think we can go -- well, I don't recall if we covered this already.  Number two, the definition of encampment was provided.  Do you see that?

A    Yes.

Q    Okay.  And there's a definition, five or more PEH and

Kuhn - Direct / By Ms. Mitchell                **127**

three-tenths makeshifts or vehicles within the 300-foot radius; is that right?

A     Yes.

          **THE COURT:**   Just one moment.  Let me make a note. All right.  Please continue.  Thank you.

Q     Okay.  And that's the same encampment definition that has been consistently used by LAHSA this entire time?

A     No.

Q     Where did this definition come from?

A     I don't know.  This is Emily's e-mail.

Q     Okay.  Do you know where it came from?

A     I am not aware.

Q     Okay.  November 9th of 2023, there were some follow-up questions from Megan asking about encampment information collected at the pit count and hotspot mapping.  Do you see that?

A     Yes.

Q     And then there was, looks like on November 15th of 2023, following up on the questions and then also asking for a document or website that references a definition of encampment.  Do you see that?

A     Yes.

Q     Okay.  Going further, looks like there was another follow-up from Megan asking sort of the same questions, the same three questions.  Going to the next on November 20th, 2023, it looks

Kuhn - Direct / By Ms. Mitchell                              **128**

like Emily Von Henry responds and says, during the night of the

count, we count all tents, vans, and makeshift shelters.

Hotspot mapping and planning are used to identify areas of

concentrated activities, but have not used it as an instrument

to determine encampment activity in council districts and

decree the city council passed a motion last year to include

the definition of encampment.  Do you see that?

A    Yes.

Q    And that's an email written by Emily Von Henry; is that

right?

A    Correct.

        **THE COURT:**  Just a moment.  Thank you.  Please

continue.

**BY MS. MITCHELL:**

Q    Looking at number two, where Ms. Von Henry states, we have

not used it as an instrument to determine encampment activity

in council districts, do you know what that means?

        **MR. SCOLNICK:**  Objection.  Lack of foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I don't want to stipulate on what Emily

means.

**BY MS. MITCHELL:**

Q    You don't want to speculate?

A    Yeah.  Speculate.

Q    Okay.  Does that mean anything to you as you sit here

today?

**MR. SCOLNICK:**  Objection.  Lacks foundation and relevance.

**THE COURT:**  Overruled.  You can answer that question.

**THE WITNESS:**  Can you go back to the number two, the question that she was asking?

Q    Going on page 3, number two, the question from Megan.

A    Yes.  Okay.  And go back to her answer, please.

Q    The question was, could it be used?  Emily's answer was, we have not used it.  Do you see that?

A    Yes.

Q    Okay.  Is it your opinion, let's say, as of November of 2023, that the hotspot mapping information could have been used to identify an approximate number of encampments in each council district?

A    It could not.

**MR. SCOLNICK:**  Objection.  Lacks foundation, relevance, and speculation.

**THE COURT:**  Overruled.  You can answer the question.

**THE WITNESS:**  It could not have been used.

**BY MS. MITCHELL:**

Q    Why?

A    It gets really complicated.  There are so many data points, so many CLSs.  Understanding a specific boundary of an encampment is very much a person activity as it is a technology

Kuhn - Direct / By Ms. Mitchell                    **130**

activity.  So you need the outreach coordination teams to work with the field teams on the ground, looking at all of the CLS data and also what they're actually seeing on the ground to draw encampments.  Even if you try to get a system, a computer, to try to group the hotspot data together to determine encampments, it gets very complicated.  We tried to do that several times using different codes, and it was not producing any accurate information because the distance really changes.  And, for example, encampments can also be social boundaries as well.  So that is why the hotspot data really is not good for defining encampments.  It can be a good basis for seeing where there might be an encampment forming, and that is what the outreach coordination teams use in coordination with the teams on the ground to be like, hey, it's looking like there's a lot of CLSs in this area.  It's looking like there's a lot of CLSs in this area, so we should go, like, is there an encampment forming?  And then the teams on the ground can be like, yes, they've been there for a while, and here is the suggested boundaries.  And those boundaries over time will change, as will the status, and then the encampment can disappear.

So that is why you can't really use hotspot data to draw encampments.  It's much more complicated than that, and you really need that human interaction with the technology to accurately capture that.

Q     0And that accurate capturing of encampment data using the

Kuhn - Direct / By Ms. Mitchell                    **131**

human information, that began in the spring of 2024; is that right?

A    No, in January 2025.

Q    January 2025.  When did the outreach coordinators begin tracking the encampment data information specifically?

A    Around January 2025, which was right when the fires were happening also.  So the technology became finalized, the workflows were finalized, all the encampment lifecycle, each encampment has a status it goes through.  Like it's known, it's planned for resolution, it's open, it's closed, and we're doing maintenance.  And so that whole workflow was defined at the end of 2024, and there was an initial effort to start mapping all the encampments at the end of 2024 with a big push starting in 2025.  However, because of the fires, it was a little bit delayed in its accuracy of building that out.

Q    Do you know why the efforts just began in the end of 2024?

A    Yeah.

        **MR. SCOLNICK:**  Lacks foundation, calls for speculation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes.  So we needed our vendor to create the technology infrastructure to track encampments.  In addition, we needed to have, as I've referred to before, a lot of our scoping meetings to not only develop out the workflows, but also the business requirements for how we want the system

Kuhn - Direct / By Ms. Mitchell     **132**

to function.  And when we did that initially back in January 2023, which actually my first month at LAHSA we worked on that in June of 2023, how to best track the encampments.  We then went to our vendor with a list of requirements that we needed the database to function, and it took them probably a year to build out those features in HMIS in order for us to use them.  And so that was in early 2024.  And then we used the summer and fall to build out, okay, now that we have these features, how do we want the workflows to happen?  What are our additional definitions?  And that's why the last couple months of 2024, we finally were able to launch the solution to go live in January 2025.

**BY MS. MITCHELL:**

Q    And when you talk about vendor, are you talking about the HMIS vendor?

A    Correct.

Q    And that's the vendor that helps provide the program for you to track the HMIS; is that right?

A    They provide the software.

Q    Software.  And so if I understood the timeline that you just explained, in June of 2023, you first asked the vendor to work on it; is that right?

A    Correct.

Q    And then it took them about a year to put that together; is that right?

A    Yes, various requirements.

Q    And then about six months or so for you guys to sort of finalize definitions and plans; is that right?

A    Correct.

Q    And then it was rolled out early 2025.

A    Correct.

Q    Okay.  Going back to this email chain, Exhibit 543, there's an email from Megan, looks like to Emily with a bunch of folks cc'd, November 21st of 2023 with this question, does LAHSA currently use this definition?  Well, I'll go back a page so we know what definition we're talking about.  So page 2, there's a reference to the definition.  Do you see that?

A    Yes.

Q    Do you know what definition that is?

A    The definition of --

        **MR. SCOLNICK:**  Objection.  Lacks foundation.

        **THE COURT:**  Overruled.  You can answer the question.

        **THE WITNESS:**  I assume it means the definition of encampments below.

**BY MS. MITCHELL:**

Q    Okay, so referring to number three, the definition of encampment?

A    I would assume that's what she's meaning.

Q    And then number one, there's a, I'm sorry, page 1, which is sort of the last email chain we have or the last email in

Kuhn - Direct / By Ms. Mitchell                          **134**

the chain we have.  There's a question, does LAHSA currently use this definition?  And that's November 21st of 2023.  Do you see that?

A     Yes.

Q     Do you know if there was ever a response to this email?

          **MR. SCOLNICK:**  Lacks foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Not that I'm aware of.

Q     Now, do you know whether there was any further discussion or questions on LAHSA's ability to present information under Section 7.1 between November 21st of 2023 and October of 2025?

          **MR. SCOLNICK:**  Vague.  Lacks foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Since I started working at LAHSA, the City has indicated the importance of tracking encampments and then the outreach efforts within the City limits.  This comes from the CLA's, the CAO's office, council member offices, and the Homeless Strategy Committee that the City hosts, that is Brown Act and publicly recorded where they're asking for this information.  On that committee is the CAO, the CLA, the mayor's office, and Councilmember Rahman herself.

**BY MS. MITCHELL:**

Q     My question was a little bit more specific though.  From November of 2023 to October of 2025, were there any other conversations with the City about specifically reporting the

Kuhn - Direct / By Ms. Mitchell                    **135**

metrics identified in Section 7.1?

          **MR. SCOLNICK:**  Same objection, lacks foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  That I personally am aware of related directly to 7.1, no.  But there are also 800 people at LAHSA.

**BY MS. MITCHELL:**

Q    Are you aware of any other conversations, whether you were personally involved or not, but are you aware of any other conversations between the City and LAHSA about reporting these metrics as required under Section 7.1?

          **MR. SCOLNICK:**  Lacks foundation and asked and answered.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Aside from the email that I received on October 28th of this year, no.

Q    Okay.  So between -- I'm just trying to get the dates right, between November 21st, 2023 and October 28th of 2025, you're not aware of any other discussions between the City and LAHSA about reporting metrics under 7.1?

          **MR. SCOLNICK:**  Same objection.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Specifically referencing 7.1, no.  The content they're in and the desire to be able to track, yes, in general.

//

Kuhn - Direct / By Ms. Mitchell                    **136**

**BY MS. MITCHELL:**

Q     What do you mean by in general?

A     The City has routinely asked in several occasions for the number of encampments and for us to track encampments.  The City has routinely asked on numerous occasions for the ability to report on PH engaged by council district and in the City of LA.  So, yes.

Q     And have those reports been provided to the City?

A     Yes.  The PH engaged by council district is on our public website.

Q     But have those reports been provided to the City?

        **MR. SCOLNICK:**  Objection.  Vague as to time.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  It's possible at some point, not that I'm aware of, but we receive over 3,500 requests for data reports a year.  And so as far as I know, it has not been, but it is possible that in some report, we have submitted some information.  But as far as I know, I'm not quite -- I don't think so.

**BY MS. MITCHELL:**

Q     Okay.  So if I understand your testimony right, there are -- there have been several conversations over the last two years about general metrics and data reporting, but not specifically relating to 7.1 to allow the City to report those metrics to the Court; is that right?

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Direct / By Ms. Mitchell                **137**

MR. SCOLNICK:  Objection.  Misstates the testimony.

THE COURT:  Overruled.

THE WITNESS:  Can you repeat your question?

Q    Sure.  So if I understand your testimony correctly, over the last two years, there have been many conversations about different types of data tracked and available, but there have been no conversations about the 7.1 metrics specifically to report to the Court; is that right?

MR. SCOLNICK:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  Aside from the templates we received from the City for Alliance reporting, no.

Q    And the templates you received from the City are the templates that we talked about earlier, showing you Exhibit 35, this template; is that right?  Where you fill in the PEH served?

A    Correct.

Q    Okay.  And to your knowledge, showing you Exhibit 543, where there was a request on August 24th, 2023, apparently for a number of these metrics, are you aware of a request for these similar metrics any time from the City to LAHSA prior to August 24th of 2023?

MR. SCOLNICK:  Vague, lacks foundation, and misstates the document.

THE COURT:  Overruled.

Kuhn - Cross / By Ms. Myers                                    **138**

THE WITNESS:  I am not.

MS. MITCHELL:  Okay.  May I have a moment, Your Honor?

THE COURT:  You may.

(Pause)

MS. MITCHELL:  I have no further questions at this time, Your Honor.

THE COURT:  Intervenors?

MS. MYERS:  Yes, Your Honor.

THE COURT:  And once again, would you state your name for the record?

**CROSS EXAMINATION**

BY MS. MYERS:

Q   Good morning, Ms. Kuhn.  My name is Shayla Myers.  I'm an attorney with the Legal Aid Foundation of Los Angeles, and I represent the intervenors in this case.  So you had mentioned that you had spoken to someone at the City of Los Angeles related to using a point in time for purposes of the quarterly reports, correct?

A   Correct.

Q   Who did you speak to at the City?

A   I believe it was Megan Falcone.  It was an email.

Q   Okay.  And where does Megan Falcone work?  Do you know?  Where in the city?

A   CAO's office.

Q    Okay.  And when did you speak with her?

A    It was an email, and I'd have to check my email correspondence.

Q    Okay.  That's fine for now.

A    Okay.

Q    Did you normally speak with Megan Falcone for purposes of communicating about the data that the City required for its quarterly reports?

MR. SCOLNICK:  Objection.  Vague.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Yes.  It's usually Megan that reaches out.

BY MS. MYERS:

Q    Okay.  And is there anyone else that you speak to for the City related to the quarterly reports?

A    Kendra Leal and Ed Gibson.

Q    Okay. And the first person, who is that?

A    Kendra Leal.

Q    And do you know where this person works?

A    At the CAO's office.

Q    Okay.  And Ed Gibson?

A    Also at the CAO's office.

Q    Okay.  As between the three of them, is there anyone that you routinely speak with?

A    About?  We also work with the mayor's office frequently.

Kuhn - Cross / By Ms. Myers **140**

In general or around this reporting?

Q    Just related.  I'm asking solely about the quarterly reports.

A    The mayor's office as well.

Q    Okay.  So as between the three individuals you mentioned in the CAO's office, is there anyone that you speak to more than the other two, or do you generally converse with the three of them?

        **MR. SCOLNICK:**  Objection.  Vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  It's very often three of them.  I end up seeing Ed a lot in different spaces as well, more so.

        **THE COURT:**  I'm sorry.  I missed one of the names.  I apologize.  Kendra Ariel (phonetic), Ed Gibson, and I didn't get the third name.

        **THE WITNESS:**  Megan Falcone.

        **THE COURT:**  Thank you.  My apologies.

**BY MS. MYERS:**

Q    And that's specifically related to the quarterly reports that you communicate with Ed Gibson more than the others?

A    No, I would say it's all equal at that point for the quarterly reports.

Q    Okay.  And do you routinely communicate with them over email, or do you have conversations with them as well?

A    Both, but the predominant communication is over email.

Q    Okay.  And when you are coming up with the data in response to the quarterly reports and the City's request for quarterly reports, who defines the criteria that you should use in pulling that data?

          **MR. SCOLNICK:**  Objection.  Vague.  Lacks foundation.

          **MS. MYERS:**  And this is talking specifically about the quarterly reports.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  The City does until -- so all report requests come into my analytics department.  So they process them, and my team is very good about when a request comes in, answering that request immediately.  And so the same with the lines, when the request comes in, the City was defining it until recently, and when we decided to have more robust conversations about the definitions in the quarterly reports and how we actually want to capture the data to make sure that we're all speaking the same language.

**BY MS. MYERS:**

Q    And why did you start having those more robust conversations about the definitions?

          **MR. SCOLNICK:**  Objection, lacks foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Because we got the request for the additional 7.1 -- the information in 7.1, and I also, many requests for reports from people who aren't working directly

with the data or the database often don't -- there's gaps in what they're asking for or they don't understand exactly what is asking for.  So at that point, especially given the public nature of this report and the importance of this report, I thought it was time for us to sit down and have a conversation about what we actually mean, especially since there was confusion in the additional data points requested.  There seemed to be overlap in some of the data that we were providing, so I wanted to make sure that we were speaking the same language and were all clarified on how we wanted to report on the data being requested.

**BY MS. MYERS:**

Q    And when did you decide to have those more robust conversations?

A    We decided at the end of October, and on November 5th, we met.

Q    And who met?

A    The CAO's office, attorneys from the city, as well as the mayor's office.

Q    And who was there for the CAO's office?

A    Ed Gibson, I believe Megan was there, yeah, Megan Falcone was there, and Kendra was there.

Q    Okay, and who was there for the mayor's office?

A    Dr. Etsemaye Agonafer.

Q    And do you have an understanding of why the mayor's office

Kuhn - Cross / By Ms. Myers                                    **143**

was there?

   **MR. SCOLNICK:**  Objection.  Lacks foundation, calls for speculation.

   **THE COURT:**  Overruled.

   **THE WITNESS:**  Yes, because Inside Safe is included in Alliance reporting now.

**BY MS. MYERS:**

Q Okay, and so the mayor's office was there to discuss the definitions related to Inside Safe?

A Correct.

   **MR. SCOLNICK:**  Calls for speculation.

   **THE COURT:**  Overruled.  Just one moment, please. Just one moment.  Please continue.

Q And after that November 5th meeting, did you have any subsequent meetings?

   **MR. SCOLNICK:**  Vague.

Q Related to the data definitions used in the quarterly reports with the CAO's office and the mayor's office?

   **THE COURT:**  Overruled.  You can answer.

   **THE WITNESS:**  We met on November 17th, as previously referenced, with everyone involved.

**BY MS. MYERS:**

Q So that was the larger meeting that included other parties in this litigation, including the intervenors and the plaintiffs, correct?

A    Correct.

Q    Did you have any other meetings with the City to discuss the definitions?  And just the City?

A    No, but we had outstanding items from -- no, we did not, because we had our plan moving forward from the November 5th meeting and the November 17th meeting.

Q    And you said you had outstanding items from that November 5th meeting?

A    Yeah.

Q    What were those outstanding items?

A    One, to write up the business requirements around the reports to make sure that we're all on the same page, and so we don't get in this situation in the future.  And two, to write up specifically how to better design Inside Safe programs so that we can -- now that they're part of Alliance reporting, be able to track the data that is needed for the reporting for Alliance connected to the Inside Safe.

Q    And what data is that?  Do you -- what is your understanding about what data that is related to Inside Safe?

A    So that would be who's getting offers of housing for Inside Safe, aside from just everyone in the encampment who's there, although that is actually trackable.  And then it's also tracking who is at each specific site.  So we can say this person is connected to an Inside Safe program, but at the current moment we can't say this is who's at each specific

Kuhn - Cross / By Ms. Myers                              **145**

Inside Safe site.

Q    And when you say Inside Safe site, what does that mean?

A    The hotels and motels.

Q    Okay.  And so right now you're working on tracking the offers of shelter through the Inside Safe encampment reductions; is that correct?

A    Yes.

Q    Okay.  And what do you mean by an offer of shelter?

A    That there is a bed available for someone to go into that day that the offer is made.

Q    Okay.  A  You mentioned the term business requirement. What is a business requirement?

A    It states exactly how we are going to pull the data and what our assumptions are and kind of the definitions.  So it has the definitions and all the stipulations of how we pull and process the data around a specific request.

Q    And you said you're working on writing out those business requirements for the LA Alliance data?

A    Correct.

Q    When you get these data requests that come into LAHSA, I think you said there are a significant number of them, do you often generate business requirements?

A    Yes, we do.  And we have standard definitions as they're published on our website.  For example, with our key performance indicators, we have whole documents around exactly

Kuhn - Cross / By Ms. Myers                    **146**

how we're pulling the data, how we're changing the data to get it to relate to itself, and how we're visualizing the data.  So anytime you see any report, we often have a memo attached to it to explain exactly how something was pulled, what our understanding of what is being requested.  So a definition.  So for example, exits to temporary housing.  And we'd say exits to temporary housing includes these specific exit destinations and we're only looking at exit destinations from a program, not subsequent enrollments in temporary housing programs.

Q    And have you ever created business requirements for the LA Alliance reporting before the business requirements that you're creating now?

A    No.

Q    Why not?

A    A couple of reasons.  One, we get sent -- we've been sent a template.  So previously we were getting sent a template and my team was responding and filling it out.  And it started small, just interim housing sites, and then it started to grow.  This is another reason.  As soon as -- in the early Alliance reporting, it was pretty straightforward.  It was interim housing sites, the number of people served.  That seemed really straightforward to us.  So we were just saying, okay, in this quarter, this is how many people were served from the date of operation.  So that was given to us by the City.  So we just completed it.

Kuhn - Cross / By Ms. Myers                    **147**

Then when they started -- when Inside Safe started being added to Alliance and the master leasing, it created a lot of confusion and questions.  And so as more questions started to bubble up, which is just in the last couple months, that's when -- and then additional requests were made from the 7.1 section, that's when we're like, okay, this is getting more complicated and we need to define our business requirements around this.

Q    So are there currently any business requirements drafted that relate to the LA Alliance reporting?

A    There are some drafted, yes.

Q    Have they been -- has the City signed off on them?

A    They have not yet.

Q    Okay.  So are they currently in draft form?

A    They're in draft form in my inbox for me to review before I send to the City, and I've been traveling for the past couple weeks, so.

Q    And what do those business requirements refer to?

A    All the points in 7.1.

Q    Okay.  And so the ones that refer to 7.1 are currently in your drafts, but they have not been circulated to the City or anyone else?

A    Correct.

Q    And they had never been drafted before now?

A    No, they hadn't.  Every time we submit an Alliance report, we submit some stipulations or memo around what has been

reported on.  But other than that, there's not an official

business requirements document, no.

Q    Who do you submit that memo to?

A    Megan Falcone in the CAO's office.

Q    Okay.  And do you know if that memo was made public?

A    I'm not sure.

Q    Okay.  What kind of information is contained in that memo?

A    I would have to open it up to read one.  What would be concluded is the timeframe, the period, like what -- how we calculated master lease.  So it would say, like, okay, master lease is calculated on the day of the report.  And interim housing is calculated from the date of occupancy to today's date or to the end of the report.  So it would do the specifications on, like, what was included or excluded.  Much like you saw in the outreach data that was sent, there was the memo that said, here's what the tables mean and here's how we calculated.

Q    And were those memos ever provided to the special master?  Do you know?

        MR. SCOLNICK:  It calls for speculation.

        THE COURT:  Overruled.

        THE WITNESS:  I'm not sure.

BY MS. MYERS:

Q    So from your perspective, did LAHSA ever provide those to the special master?

Kuhn - Cross / By Ms. Myers                    **149**

A    I don't believe so.

Q    Okay.  Do you know, did LAHSA ever provide them to -- first of all, do you know who A&M is for purposes of this litigation?

A    Yes.

Q    Okay.  What's your understanding of who A&M is?

A    They did an audit on homeless services.

Q    Okay.  And from your understanding, did LAHSA ever provide those memos to A&M?

        **MR. SCOLNICK:**  Lacks foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  LAHSA provided hundreds of data sets and information to A&M.  I am not quite sure if those were included or not.  There was, like I said, hundreds of data sets provided to A&M.

Q    If I wanted to know whether those memos were provided to A&M from LAHSA, who would I ask?

A    You would ask --

        **MR. SCOLNICK:**  Speculation.

        **THE COURT:**  Overruled.  You can answer the question, please.

        **THE WITNESS:**  You would ask our risk management department.

        **THE COURT:**  Risk management?

        **THE WITNESS:**  Uh-huh.  They handle all the intakes

Kuhn - Cross / By Ms. Myers                    **150**

from audits and all that stuff.  They were managing the Alliance, and they have a tracker.

**BY MS. MYERS:**

Q    So risk management handled the data production to A&M?

A    They handled the requests and documented all of the various requests because it was such a huge workload to respond to that, so we had one centralized body that was intaking all the requests that were coming in and then distributing to the respective departments to respond to the requests.

Q    Okay.  And those memos that LAHSA creates that they submit to the City, does that -- is a memo created for every quarterly report?

A    It should be.

Q    Okay.  And who creates that memo at LAHSA?

A    Brian Brown.

Q    Okay.  So just really quickly on the business requirements, can you tell us the data points that your that your team is creating business requirements for related to the LA Alliance?

A    It's all six data points in 7.1.  So number of offers obtained or like an available -- number of beds available, PH engaged, number of encampments.

        THE COURT:  Just a little bit slower.

        THE WITNESS:  Sorry, sorry.

        THE COURT:  Let's start over again.  Number of

Kuhn - Cross / By Ms. Myers                    **151**

offers, number of beds you said engaged.

        **THE WITNESS:**  Sorry, number of PEH engaged.

        **THE COURT:**  PEH engaged.  Okay.

        **THE WITNESS:**  Number of encampments by council district.

        **THE COURT:**  Okay.

        **THE WITNESS:**  Number of PEH served, but it's not called PEH served.  Number of offers obtained.  I already said that one, right?

        **THE COURT:**  No, I'm sorry.  Would you repeat that slowly?

        **THE WITNESS:**  Number of offers obtained, which will be number of people in the beds, essentially.

        **THE COURT:**  Sure.  Okay.

**BY MS. MYERS:**

Q   Okay, so just as to the six data points that are in 7.1, you're creating business requirements for each of those.

A   Yes, correct.

Q   Why are business requirements important?

A   To make sure that we all have a standard language and understanding about what is being asked and what is needed, and to ensure consistency in reporting from time to time and proper knowledge management of a report.  So if Brian leaves, I need the next Brian to be able to produce the exact same data in the exact same way.

Kuhn - Cross / By Ms. Myers                    **152**

Q    Okay.  Just looking back at the -- well, I'm going to go back to the master leasing definition.  You used a term master leasing that also appears in the LA Alliance reporting.  So can you just tell us how you define master leasing for purposes of LAHSA?

          **MR. SCOLNICK:**  Objection.  Also calls for expert opinion, and it's a lay witness, and this is also not LAHSA.  This is a witness who works for LAHSA.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Yes, I am not the chief program officer, but the master leasing is a unit acquisition strategy whereby you can lease an entire building because what we suffer from in Los Angeles is the ability to find housing for people and the ability for people to not be discriminated against when we're trying to get people into units based on credit score or other histories.  And so by acquiring a building, you have a set of units that are ready for people to rent that you are essentially master leasing.  So you take over the building, you lease out the building, and then you sublease essentially to the other participants that are moving in.  So it creates units that you can move people into, instead of having to search sometimes for months to find a unit and then a landlord that might reject your application anyway.

//

//

Kuhn - Cross / By Ms. Myers                153

**BY MS. MYERS:**

Q    And so when you spoke about master leasing, when you were talking about permanent supportive housing, does the term that you refer to as master leasing, would that include all of the permanent supportive housing that the City of Los Angeles reports on its quarterly reports?

        **MR. SCOLNICK:**  Lacks foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Is master leasing -- is your question is master leasing inclusive of all permanent supportive housing?

Q    That are included in the LA Alliance quarterly reports.

        **MR. SCOLNICK:**  Same objection.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I don't know.  Like -- sorry, repeat your question one more time.

Q    So previously you spoke about master leasing and interim housing.  And you spoke about master leasing related to the point in time.

A    Yeah.

Q    Right?  And then you also spoke about interim housing.

A    Uh-huh.

Q    And you spoke about time-limited subsidies.

A    Uh-huh.

Q    There is a large category of items that are -- or of

EXCEPTIONAL REPORTING SERVICES, INC

Kuhn - Cross / By Ms. Myers                     **154**

shelter opportunities that are reported in the LA Alliance

quarterly reports of permanent supportive housing.

A    Yes.

Q    And I'm trying to understand if when you speak about

master leasing, are you also including the permanent supportive

housing units that are listed in the quarterly report?

          **MR. SCOLNICK:**  Same objection.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I believe that the master leasing units

are the ones included in the quarterly reports, but once again

I'm just filling out the template that the City sends to us.

**BY MS. MYERS:**

Q    But when you fill out the templates, can you --

          **MS. MYERS:**  If I can just take a moment, Your Honor.

     **(Pause)**

          **MS. MYERS:**  I'm actually just going to pull up our

quarterly reports so we have a easy way to talk about this, I

just want to make sure we're clear on the --

Q    So I'm just going to show you what's been marked,

previously marked as Exhibit 35, which is a quarterly report.

So just No. 1 which is Council District 1, PSH, so Prop HHS,

and then it refers to 91 units or beds, the status is open, it

has an open and occupiable date and then it says the total PEH

served is 91.

     You were talking specifically before about master leased

units.  Would that include, for example, number one on this list?

A    Yes.

Q    Okay.  And I just want to make sure the record is clear. So when you were talking about the point in time count related to the total PEH served, that includes all of the permanent supportive housing units that are included in the quarterly reports?

A    Yes, correct, correct.

Q    Okay.

A    All PSH in the quarterly reports, whether they're master lease or not, are counted at the point of time.

Q    Okay.  If you know, does the City of Los Angeles count all units in an apartment or for purposes of the quarterly report?

          MR. SCOLNICK:  Lacks foundation.

          THE COURT:  Overruled.

          THE WITNESS:  So if there are 91 units at Washington View Apartments --

BY MS. MYERS:

Q    Uh-huh.

A    -- there's only 91 units.  So we can only count that.  We only have insight into who is in those units if they are in HMIS.  We don't have insight and there could be additional people in those buildings that we don't have insight to if they're not in HMIS.

Kuhn - Cross / By Ms. Myers                    **156**

Because master leasing is a unit, acquisition strategy, so you could have some other entity funding someone through a permanent housing subsidy and the supportive services, usually through ICMIS that is in that unit that is not in HMIS.

Q    And so that -- so how would that relate to the calculations that LAHSA is providing?

         **MR. SCOLNICK:**  Lacks foundation and improper hypothetical.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  So if you take Road 12 Rhinehurst (phonetic) if it could be that there's 40 beds, it could be that there is 40 people or there's 40 units, it could be that there is 40 people in those 40 units and that four of them are not in HMIS.

Q    And as a result, they would not be counted towards the people served.

A    Correct.

Q    And so HMIS tracks people and not units, correct?

A    Correct.

Q    Okay.

A    For permanent, depending on the type, but yes, it could track some, but not all, but it doesn't, yes.

Q    Okay.  So looking at No. 13 for example, where it says that there are 79 units and there are 68 people served.  Are you saying that we don't know anything about those additional

Kuhn - Cross / By Ms. Myers                    **157**

11 beds, other than there's no one who was in HMIS in those 11 beds?

**MR. SCOLNICK:**  Vague and misstates the testimony and lacks foundation.

**THE COURT:**  Do you understand the question?

**THE WITNESS:**  Yes.

**THE COURT:**  Overruled, you can answer it.

**THE WITNESS:**  I think depending on the type, yes, it could be -- if it's going through CS, then we would know that like they're occupied, but it gets complicated.  So we may not have insight.  It depends on each type of housing, like each building could have a different story, right.  So there could be additional people in those buildings, but I think if we're reporting, especially for our master lease buildings, we know who's in those buildings, so we should know the units are occupied.

It could be -- there are some PSH buildings that we don't have insight to.  So if there's -- it could be a PSH building and this, I don't know if it's on there, that could have some veteran resources.  So if you have 100 units in a PSH building and the City is paying for 80 of them for example, and the -- and veterans is paying for 20, we would only have insight to our data systems into 80 of those units, not the 20 that the VA is paying for, because they aren't tracked in HMIS and they aren't tracked in our resource management system.  We

**EXCEPTIONAL REPORTING SERVICES, INC**

would know the 80, but we wouldn't have a wholistic view of the whole building.

And I'm not saying that of these are -- exactly apply to that, because once again, I'd have to go building-by-building to understand the case of each building, but it is possible that sometimes we do not have insight.

In HMIS, we only have about 65 percent coverage of PSH and HMIS. We also have insight through our resource management system of any unit going through a coordinated entry system. So we could have coordinated entry and we can have whatever coverage there is HMIS. But there's a huge portion of the population that is not tracked in HMIS for the permanent supportive housing, because the resources do not go through coordinated entry, the resources do not go through HMIS.

And as a system, we struggle actually with reporting our permanent housing numbers, due to the fragmented infrastructure of our various data systems, which we are working to correct, but it's a long road.

**MR. SCOLNICK:** Your Honor, I'll interpose an objection that this line of questioning is outside the scope of this hearing.

**THE COURT:** Overruled.

**BY MS. MYERS:**

Q   So with regards to the permanent supportive housing and the HMIS data and what is captured, you said that for purposes

Kuhn - Cross / By Ms. Myers                    **159**

of the people served, you're only able to capture people who are placed in permanent supportive housing through CES and who are recorded in HMIS; is that correct?

A    Correct.

Q    And does the City of Los Angeles place all individuals from interim housing to permanent housing through CES?

         **MR. SCOLNICK:**  Lacks foundation.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  As part of the continuum of care, so yes, the City is part of -- out of LAHSA and the continuum of care, everyone within the City of Los Angeles, follows the continuum of care and CES policy guidelines on how to give access to permanent housing.

         And those, the CS policy council is a body of everyone in the county, service providers, public agencies, such as DMH, the VA, DHS, both the housing authorities, they set how people get identified, assessed, referred and prioritized for permanent housing.

         And so if you are in the City of LA in order to get access to CES, resources going through CES you follow that guidelines for that subset of resources.  There are other resources in the system like BASH (phonetic) for veterans, like FHSP, the flexible housing subsidy pool that do not go through that, that I do believe citizens of the city have access to. But I can only speak to the CS process.

Kuhn - Cross / By Ms. Myers                    **160**

**BY MS. MYERS:**

Q    And so LAHSA is only reporting the CES process for purposes of these numbers?

A    Yes, because that's the only data that we have access to.

Q    Okay.  So if an individual is placed, for example, on a project based Section 8 voucher that did not go through CES, that that project based Section 8 voucher is attached to measure HHH unit that is reported for purposes of the LA Alliance, is it your testimony then that the LAHSA would not then be able to report that individual as a person served by that unit?

        **MR. SCOLNICK:**  Compound and lacks foundation and unintelligible.

        **THE COURT:**  Just a moment.  Do you understand the question?

        **THE WITNESS:**  Could you repeat it?

Q    Sure.  So you have an individual who receives a project based --

        **THE COURT:**  Counsel, counsel, just a moment.  She's consulting with counsel for a moment.

        **MS. MYERS:**  I'll break this down so it's easier for the City's counsel to follow along.

**BY MS. MYERS:**

Q    So you have a project based Section 8 voucher, right?

A    Uh-huh.

Q    And you would attach the project based Section 8 voucher to a unit, correct?

A    Correct.

Q    Could that unit be one of the units that is reported on the LA Alliance as a unit?

MR. SCOLNICK:  Incomplete hypothetical, lacks foundation.

THE COURT:  Overruled, you can answer that question.

THE WITNESS:  It could be, that person could be occupying one of the master lease units, yes.

Q    Okay.  And so for example, that could be any number of the measure HHH units that are reported in the LA Alliance, correct?

MR. SCOLNICK:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  Correct.

Q    Okay.  Project based Section 8 units in the City of Los Angeles are not all allocated through the CES program, correct?

MR. SCOLNICK:  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  I am not an expert of all of HACLA's processes, but yes, but no, only their permanent supportive housing that's not Section 8.

//

//

**BY MS. MYERS:**

Q    And actually a significant number of project based Section 8 vouchers for the City of Los Angeles are now allocated outside of the CES process, correct?

MR. SCOLNICK:  Your Honor, can I have a standing objection?  This whole line of questioning is a deposition, it's not appropriate for this hearing.  It's outside the scope, so if I could just --

THE COURT:  You can have --

MR. SCOLNICK:  -- have a standing objection.

THE COURT:  -- a standing objection, thank you, counsel.

MR. SCOLNICK:  Thank you.

THE COURT:  You have a standing objection.

THE WITNESS:  I'm not -- I don't want to answer that.

Q    Okay.  But it's your testimony that only if the person in that unit went through the CES evaluation and placement, then only that person would be counted towards the LA Alliance reporting for purposes of people served.

MR. SCOLNICK:  Incomplete hypothetical, lacks foundation.

THE COURT:  Do you understand the question?

THE WITNESS:  Yes.

THE COURT:  You may answer.

THE WITNESS:  Yes, if you went to CS or you're part

Kuhn - Cross / By Ms. Myers    **163**

of TLS, because TLS is also in HMIS, so yes.

**BY MS. MYERS:**

Q    Okay.  And so it then the distinction between the units that are reported as open and occupiable and people served, is the difference accounted for because the individuals in those units are not through the CES system or HMIS system?

        **MR. SCOLNICK:**  Vague and lacks foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  It could, but it also could be that the unit is vacant.

Q    Okay.  And there's no way to know looking at this data whether there is a vacant unit or the individual who is served is simply not accounted for by LAHSA data, correct?

        **MR. SCOLNICK:**  Compound, lacks foundation and calls for speculation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Correct.

Q    Okay.  Is there a business requirement anywhere that explains how the number of individuals served is classified for purposes of these reports?

A    It has to be --

        **MR. SCOLNICK:**  Lack of foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I mean, we have our general requirements of how we count people served in interim housing

and permanent housing programs in general, which would be for interim housing it's if you're enrolled in the program and now with the inventory module, if it's a program in the inventory module attached to that.

For permanent housing, it's you're enrolled in the permanent housing program, whether it's TLS or PSH and you have a moving date entered in the enrollment, meaning that you are living in the unit.

**BY MS. MYERS:**

Q    So in -- so people served are actually people living in units, correct?

A    Correct.

Q    Okay.  Do you have a -- do you know how long it takes for a person to move into a shelter or move into a permanent housing unit after they accept a shelter bed?

**MR. SCOLNICK:**  Incomplete hypothetical, calls for speculation.

**THE COURT:**  Overruled.

**THE WITNESS:**  I think the last time I looked at our system, KPIs which are on the LAHSA website, if anyone would be interested, when you're looking at aggregate stays over interim housing it's about 275 days in interim housing before permanent housing is obtained.

Q    Okay.  So if an individual is in a permanent housing, they're offered permanent supportive housing unit --

Kuhn - Cross / By Ms. Myers                                      **165**

A      Uh-huh.

Q      -- and they accept that offer.

A      Uh-huh.

Q      How long does it take for that individual to move from that unit into the actual unit?

        **MR. SCOLNICK:**  Calls for speculation, incomplete hypothetical.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  That's a great question and we're just starting to get insight into that data as we bring together all these different data sources and we should be publishing soon publicly that information, but we're in the final fine-tuning it because previously a lot of this lived in Excel spreadsheets and a database that people didn't have access to, and HACLA and LACD datasets and so we've been working on those altogether to break up the points to see how long it takes for someone to accept an application.

        Right now we need give, you need to respond to an application within seven days once you're made an offer.  If it's going through CS, you have seven days to respond, two days to reject an offer and we have those in our KPIs for all of our programs to make sure that regardless of program if someone you were serving receives an offer of permanent housing, you're actively responding to that with the universal housing application.

Then from there, it's either certified or approved and I believe I'd have to pull up the dashboards, but there's a whole range of times that's approved and then it goes to the developers for certification and there's different times that it sits with the developers and then it goes to HACLA and then the housing authority, and LACDA for a certification and then it sits with them for a certain amount of time and then the person moves in.

But all of that data and the truncates and the span, because some people take a long time, some people take a short time.  It will all be available very shortly in our permanent supportive housing dashboards.

**BY MS. MYERS:**

Q    And when you say a short period of time, what would you consider to be short when you say that?

A    I think as a system, we just set it that from match to move in is three to four months.  And those standards were all set in the best practices standards of the care committee.  As a county, we set regional standards that we want to hold our system accountable to.

Q    Okay. And so three to four months, is that short, is that long, or is that your aggregate, like your average?

A    I don't know what the actual data is saying right now what the time frames are, but I would say three to four months is a good amount of time, in order to locate someone, get everyone

Kuhn - Cross / By Ms. Myers                **167**

through the housing application, once again getting them through not only the developer certification, but also the housing certification, all the various steps required to obtain permanent housing.

THE COURT:  Just one moment, please.

So you've got CourtSmart operating.  Karlen, go to lunch, okay.  All right.  Counsel, please.

BY MS. MYERS:

Q    So just looking at this, just again looking at that three to four months it's possible that it could be shorter, correct?

A    Yes.

Q    Okay.  Could it be a month?

A    I don't know.  I'd have to look at the data, but yes, hypothetically.

Q    Okay.  And it could be longer than four months.

A    Yes, absolutely.

Q    Okay.  And then you said it has to be certified or approved by HACLA.

A    It's a very long process to get housed.  Yes, yes, HACLA has various steps that they have to go through, which some representative from HACLA would be best to speaking through those steps.

Q    Just if a person accepts an offer of shelter or housing and then HACLA can like decline to certify that person for the housing unit, correct?

Kuhn - Cross / By Ms. Myers          **168**

MR. SCOLNICK:  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes, HACLA can decline matches or a person.

**BY MS. MYERS:**

Q   Okay.  And then you said the developer also has to certify?

A   Correct.

Q   Okay.  So then when the developer has to certify can they decline the match?

MR. SCOLNICK:  Incomplete hypothetical and lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  I'm less clear on that, but I would imagine so.  Yes, they can.

Q   Okay.  So both HACLA and the developer can decline a match for a person who has accepted an offer of housing.

A   Correct.

Q   And so if HACLA or the developer declines the match, if that person who has accepted the offer of shelter, that person will not move into that unit, correct?

MR. SCOLNICK:  Incomplete hypothetical.

THE COURT:  Overruled.

THE WITNESS:  Correct, that person returns to the community queue.

Kuhn - Cross / By Ms. Myers                                **169**

THE COURT:  I'm sorry, that person returns to the?

THE WITNESS:  Community queue.

THE COURT:  Thank you.

BY MS. MYERS:

Q    And so that person would not be served then by a unit, as you define served by a unit.

A    For PSH, then yes.

Q    Okay.  Are there any other reasons why a person who accepts an offer of shelter or housing would not actually be moved into that unit?

MR. SCOLNICK:  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  For PSH, yes, who accepts it, no. Oftentimes offers get rejected, but who accepts the offer and doesn't move in, I mean, all the various reasons why a developer or a -- the housing authority may decline a participant there's several reasons why that might happen in the process.  And also when people get matched, sometimes it's found out -- we thought that they were eligible for the housing and then upon deeper review of the documentation available, it turns out they're not, so you're offered a permanent housing, but when everyone was reviewing the documentation they find out that that was not accurate.  So various, there's a myriad of reasons why someone might get an initial offer and then either not be eligible or be declined by the various parties involved

along the steps.

Q   Okay.  Is it also possible that an individual will -- you said this is a three to four month process, correct?

A   Or longer, yes.

Q   Okay.  So is it possible that that person in that time period may move out of state?

MR. SCOLNICK:  Calls for speculation, incomplete hypothetical.

THE COURT:  Counsel, it's a little speculative, I mean a lot of things can happen to them.

Q   Isn't it the case that a lot of things can happen in the three or four months between the time a person accepts an offer and moves into the unit?

MR. SCOLNICK:  Same objection.

THE COURT:  Overruled.  You can answer generally.

THE WITNESS:  Yes.

BY MS. MYERS:

Q   You talked a little bit about hot spot data, what is hot spot data?

A   Hot spot data is when you aggregate a lot of individual data points to see kind of clusters of data sets.  So when you think of like a heat map, if anyone's familiar with that, so you look at a map and kind of like where there's more activity, it's like a darker red and maybe it gets lighter red as the activity spreads out or it's white where there's no activity

whatsoever.

Q    And so for purposes of hotspot data related to encampments --

A    Uh-huh.

Q    -- what is the hotspot data related to encampments, what does that refer to?

A    It's not necessarily related to encampments, it's just related to the activity of outreach workers.  So, yeah, it's just where outreach is doing its work, related to the current living situation.

Q    Okay.  And current living situation is CLS?

A    Correct.

Q    And what does that mean?

A    Current living situation is a HUD required field that is in street outreach programs that allows a street outreach worker to indicate where they're working with the client, but where the client is currently living and what the state of their living situation is.

So you say I'm here, and you drop a geo location, the client -- the participant is found here, and the participant is currently living in a place not meant for human habitation or is currently in emergency shelter or interim housing.

So it has the HUD standard definitions to say like this is what a person's current living situation or status is and where they are currently living.  As I said before, it's really

important to feeding someone's homeless timeline which then makes them eligible for permanent housing in the future.

Q    And that -- do the hotspot data collect CLS?

A    That is what we use to do the hotspot data, there's a -- yeah, that's what we use to do the hotspot data.

Q    And so is the hotspot data then, can you aggregate the hotspot data based on specific types of CLS?

          **MR. SCOLNICK:**  Vague and ambiguous.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Yes.

**BY MS. MYERS:**

Q    Okay.  So you could look at the hotspot data and you could say, CLS not -- and let me back up.  What are types of CLS that are listed that you are collecting?

A    It's just all the current housing destinations, so it's like are they permanently housed.  Like as an outreach worker I could go to a shelter because I've been working like with a person, and I want to go check in on that person, so I'm going to go check in on that person and I might say I'm at the shelter, and -- so I'm going to say, this person is at the shelter, I'm going to fill out a CLS and I'm going to say that they're -- the way they're living is an emergency shelter, which still makes them eligible for housing in the future, but you're saying as I see this person, this is where this person is living.

Kuhn - Cross / By Ms. Myers                    **173**

Q    So for folks who are unsheltered --

A    Uh-huh.

Q    -- who are on the streets, what type of CLS are tracked?

A    It would just be a place not meant for human habitation.
That's the field.

Q    Okay.  So can you aggregate the data in the hotspot data
that was collected for people who are living in places not fit
for human habitation?

A    Yeah.  And the hotspot data is kind of already aggregated
altogether, yes.

Q    Okay.  And so that would be a proxy for people who are
living in places that are not suitable for human habitation.

        **MR. SCOLNICK:**  Objection, calls for a legal
conclusion, improper lay opinion and lacks foundation.

        **THE COURT:**  Overruled.

**BY MS. MYERS:**

Q    And I'm not asking about the legal definitions anywhere.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  You can see where people are, but you
can't define encampments by that.

Q    Okay.  Let's get to the definition of encampment.  When
you say you can't define an encampment by that, what do you
mean?

A    As I explained in earlier testimony, an encampment is a
very -- you need outreach workers and outreach coordination to

really understand what an encampment is.

Q    Sure.

A    And also outreaches are doing, you know, they have their sites that they're visiting, right, you can't -- the average teams cover specific sites on specific days.  Like every Tuesday they go here, every Wednesday they go here.  When there's encampment resolution, they're over here.

Every time -- you could be in the same place all 30 days or even 60 days and I've only interacted with you one time in that 30 days, so I don't know if you're there or not between those 30 days.  And so -- or I could have missed a CLS, right, I could have forgotten to put you in the CLS.

Also the boundaries of the encampments have to be specified and that is best done with like on the ground, when you're saying, okay, this encampment goes here and here, okay, it kind of goes under this bridge and it kind of ends here.

Because if you're looking at hot spot data, you should have a cluster, but someone could accidentally drop a pin over here, when they're actually right here, and it's like how far apart do you get from a cluster, before you stop defining encampments.  And you have to draw specific shaped files for the encampments to have it clearly defined, which will evolve, grow and shrink over time.

And so in order to do that, you really do need that like human perspective on what's happening on the ground and not

just using like the data points.

Q    Sorry.  I'm asking for something very specific --

A    Yeah.

Q    -- so stepping back.

A    Yeah.

Q    Which is LAHSA has provided a definition of encampments, which is a group of five or more people in an area for two weeks or longer, correct?

A    Uh-huh.

Q    So when you -- as you sit here and testify, when you say it's difficult to track encampments, are you saying it is difficult to track a group of five or more people in an area for two weeks or more?

A    In 2023 it was difficult to track.  In 2024 it was difficult to track that.  With our current tools, it is possible to track that with outreach coordination fully implemented.

Q    Okay.  I'm literally just asking about the definition that you're using when you use the term encampment.

A    Yeah.

Q    Because we've talked today about the challenges --

A    Yeah.

Q    -- of terms and definitions and those kinds of things.  So I'm just trying to build a clear record here.

    When you say it is difficult to track encampments in 2023

--

A    Yeah.

Q    -- 2024 or it's not in 2025, are you saying it was difficult in 2023 to track encampments defined as five -- okay.

MR. SCOLNICK:  You can answer.

THE WITNESS:  Oh, sorry.

THE COURT:  Just a moment, that was unclear.  The answer was clear and I didn't hear the objection, so.

MR. SCOLNICK:  Asked and answered, Your Honor.

THE COURT:  All right.  Just a moment.  So reask the question and slow down just a little bit.

MS. MYERS:  Sure.

BY MS. MYERS:

Q    So when you were talking about 2023 it was difficult to track encampments.  In 2024 it was difficult to track encampments.  What I'm asking for purposes of the record and to be clear, when you say encampments, do you mean it was difficult to track five or more people in an area for two weeks or longer?

A    I would say yes it requires a lot of coordination and technology to be able to do that.

Q    And is that -- does that have to do with the definition of encampment?

A    It does not have to do with the definition of encampment. Any definition of encampment would have the same challenges,

Kuhn - Cross / By Ms. Myers                    **177**

unless you were just like -- unless you were only one person in an encampment.

Q   Okay.  Let's talk about one person.  If we're talking about one person or one tent, or one make shift or one RV.

A   So we don't track RVs or tents in HMIS.

**MR. SCOLNICK:**  Sorry, objection, incomplete hypothetical and again beyond the scope.

**THE COURT:**  Overruled.

**THE WITNESS:**  Also it still is challenging, if you have one person here and a cluster of people here, how far apart does that one person need to be from this cluster, in order to consider this person an encampment and this group of 20 people an encampment.  It gets very complicated.

And the way that the data presents, even if you're just doing one person, if you're going to just do one person, you might as well do PH served, right.

**BY MS. MYERS:**

Q   Sure.

A   So but if you're going to actually do accurate encampment counts, and I would say no one would argue that an encampment is one person, right, that's like a rough sleeper, or just one person, right, but an encampment could -- is -- even if you have it defined as one person or more, it's still really difficult to understand those boundaries and when to include and exclude different data points in the encampment to get a

**EXCEPTIONAL REPORTING SERVICES, INC**

count of encampments, without actually having a system, which is engaged with outreach coordination and the outreach service providers, to accurately map and monitor and update.

Q   So the hotspot data does track people and where they are, correct?

A   Correct.

Q   And it ties them with their current living situations, correct?

A   Correct.

Q   Okay.  All right.  Just going back quickly to HMIS data, is HMIS data the primary source of data that LAHSA deals with for purposes of the LA Alliance reporting?

A   There's HMIS.  There's RMS, which is the resource management system and there's At Folio (phonetic) which is the fiscal agent for the master leasing sites.

Q   Okay.  And what is the resource management system, what is the data that is pulled from that for purposes of the reporting?

A   The resource management system is where everyone who is matched to CS.  So if someone is -- if a building goes through CS, it's built out in the resource management system and that's where we do our matching to those units through RMS, in RMS.

And so if someone is connected, for example, to a unit that doesn't have a program in HMIS, but is like supported by the county and their champ (phonetic), you could see that they

were occupying a unit in RMS, but you wouldn't necessarily see them in HMIS, but that person would exist in HMIS, but the exact connection wouldn't necessarily be there.

Q   How would that person then be counted as a person served?

A   You would see that they're occupying a unit in RMS.  And so for a building, you could see that, okay, if 20 -- if there's 20 units in a building, you could see that there's 20 units in RMS and that all 20 of those units have someone occupied and the corresponding HMIS ID associated with that person.

Q   Do you know if every building that is in the City's reporting is in RMIS?

A   I don't know, I'd have to do a deeper dive on that.

Q   Who would know whether every building that is reported as permanent supportive housing is in RMS?

MR. SCOLNICK:  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  I mean LAHSA would, I just didn't review that before today.  Sorry, I've been meaning to look at that.

BY MS. MYERS:

Q   Okay.  So when LAHSA does the reporting, then LAHSA does not then look into the resource management system to ensure that it is there?

MR. SCOLNICK:  Objection, the witness is not LAHSA.

Kuhn - Cross / By Ms. Myers                    **180**

THE COURT:  Overruled.

THE WITNESS:  I -- we do look at RMIS if it is there or not, Brian should be looking at that.  But we can't -- once again, the addition of the master lease building is a new edition to the reporting that just came to our attention that we then to further define the exact places to look.

Q    But these permanent supportive housing units that you said fell into the reporting under master lease and these units have been part of the City's reporting since the beginning, correct?

MR. SCOLNICK:  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  Our initial Alliance reporting only had to do with interim housing sites, like the initial templates that we received, we only reported on interim housing.

Q    And when did that shift?

A    I'd have to look exactly at the reports.

Q    Okay.  You could look at the reports to find out when it shifted?

A    Yeah, of course.

Q    And how would you find out how it shifted, when it shifted?

A    I would look at the templates the City sent us.

Q    Okay.  So could you look back at the templates the City sent you and you could determine when the City required you to start reporting more than simply interim housing?

A    Correct.

THE COURT:  I'm sorry, you dropped your voice.  Would you state that again?

**BY MS. MYERS:**

Q    So the City would -- you could look at the templates to determine when the City asked you to report more than just interim housing.

A    Correct.

Q    Do you know if it was during the settlement compliance period in this case?  Okay.

MR. SCOLNICK:  Objection, vague.

THE COURT:  I didn't hear the answer, overruled. What was your answer?

THE WITNESS:  I did not.  I don't know.

Q    Okay.  And did the increased requirement for LAHSA to report more than just interim housing, did that happen more than once as in did the City add requirements for permanent housing and then at a different time, add the requirements for the master leasing or did it all happen at once?

MR. SCOLNICK:  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  I need to review the exact report templates.

//

//

Kuhn - Cross / By Ms. Myers                    **182**

**BY MS. MYERS:**

Q   Okay.  Is there anyone else at LAHSA who was more responsible for this particular aspect that would be better suited to answer these questions?

A   He would also have to review the report templates.  We get thousands of requests.  It's impossible to retain every single detail of the number of reports that we fill out.  I guarantee any of us would need them in front of us to look at it.

Q   Okay.  But you're the correct person to answer the question.

A   Yes, I am the correct person, I just need to see the reports, and then I quickly answer your question.

Q   Okay.

    **MS. MYERS:**  Those are all the questions I have now, thank you.

    **THE WITNESS:**  Yeah.

    **THE COURT:**  Counsel, just one moment.  Counsel, I know you're here on the restraining order concerning the alleged deportation on the Tren matter.  Counsel, are you present in the audience?

    Come up here for just a moment.  This is just a quick question about how much time you need, so I can send counsel to lunch.  If you need five hours, they'd love it, I'm just kidding you.  Okay.  How long do you need?

    **(The Court converses with counsel on another matter at**

EXCEPTIONAL REPORTING SERVICES, INC

Kuhn - Cross / By Mr. Scolnick                    **183**

**12:33 p.m. to 12:34 p.m.)**

THE COURT:  All right.  You're under no constraint to finish today, so take your time.

MR. SCOLNICK:  Understood.  Understood, Your Honor, and thank you.

THE COURT:  Just a moment, she's consulting with counsel.

MR. SCOLNICK:  Yes.  I don't know that I'll finish by 1 o'clock when you get to walk out of here, but I will do my best.

**CROSS EXAMINATION**

**BY MR. SCOLNICK:**

Q   Ms. Kuhn, I'm Khan Scolnick, I'm one of the lawyers representing the City of Los Angeles in this case.

There were a lot of terms you talked about today.  I want to ask about one of them, continuum of care.  What is that?

A   A continuum of care is a HUD grant program and it's how HUD gives us the majority of our homeless services funding and it is a regional planning body.  So it requires that communities together to create a continuum of care to create regional planning around homeless services.  And to have one plan that identifies, assesses, prioritizes and connects people to housing and other resources to move them on their journey towards housing.

Q    Is there a continuum of care in Los Angeles?

Kuhn - Cross / By Mr. Scolnick                 **184**

A     There -- in LA County there are four continuum of cares.

There is the continuum of care of Glendale, for Pasadena, for

Long Beach and then all other 85 cities and unincorporated

territories are part of the LA continuum of care.

Q     And that last continuum of care, the LA continuum of care,

does that include the City of Los Angeles?

A     It does.

Q     What is LAHSA's role with respect to the Los Angeles

continuum of care?

A     Yeah, we are the collaborative applicant, meaning that we

apply for HUD funding on behalf of the continuum of care and

manage that funding, as well as receiving proposals to then

distribute that funding to service providers, ranking and

distributing that, so that's a collaborative point.

    We also are the HMIS lead as designated in the continuum

of care charter, meaning that we are responsible for managing

for HMIS and we also are the managing body for CS policy

council so we staff and help convene CS policy council.

Q     Who's in charge of the Los Angeles continuum of care?

A     The Los Angeles continuum of care is -- so COC membership

is -- the COC membership, according to the charter, is

basically anyone, so we're all responsible.  And then the COC

board is the governing body over that.  And the COC board has

designated any matching policy and coordinated entry policy to

CS policy council.

Kuhn - Cross / By Mr. Scolnick                          **185**

Q    Okay.  Who is on, generally can you describe who is on the COC board for Los Angeles?

A    The COC board comprises a lot of different individuals from public agencies to service providers to individuals who lived experience, it's a plethora of individuals.

Q    Okay.  You also mentioned CES, what is that?

A    Coordinated entry is also mandated by HUD for the COC and each COC has to come up with a coordinated entry system, which is a standardized and documented way that people are identified, assessed, referred and prioritized for housing.  So it's very clear that everyone is on one system and it's clear how to move through that system.

     And because we have queues unfortunately, because there's less resources than there are people who need those resources, you have to create prioritization policies for who should get access to those housing resources first and why.

Q    And who is in charge of CES in Los Angeles?

A    The CS policy council.

Q    And generally who's on the CS policy council in Los Angeles?

A    It has representation from service providers.  It has representation from all four COCs, since we're all in the County of Los Angeles.  It has representations from public entities, such as the VA, DMH, Department of Mental Health, Department of Health Services, it has representation from lived

Kuhn - Cross / By Mr. Scolnick                                186

experience and I believe that's it, and a few others, but yes.

Q    And just so I'm clear, what is LAHSA's relationship to CES?

A    We staff it.  We run it.  We prepare all the documentations for it.  It's quite a large lift to do that.

Q    Would you agree with me that the homeless response system in Los Angeles County is complex and vast?

A    It's highly complex.

Q    In your experience, would the City of Los Angeles be able to provide a comprehensive homeless service on its own without any involvement from LAHSA?

        **MS. MITCHELL:**  Objection, vague, calls for speculation.

        **THE COURT:**  Do you understand the question?

        **THE WITNESS:**  Yes.

        **THE COURT:**  You can answer it, overruled.

        **THE WITNESS:**  The City of Los Angeles is part of the continuum of care.  As the continuum of care lead, LAHSA as the designated of the continuum of care lead, we are the recipient for the federal funding and the applicant for the federal funding for the region and managing that federal funding.

        So for all the federal funding coming into the COC, no, the City could not do that.

//

//

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Cross / By Mr. Scolnick                    **187**

**BY MR. SCOLNICK:**

Q    You mentioned HUD, the Department of Housing and Urban Development, what is HUD's role with respect to the Los Angeles continuum of care?

A    HUD funds it, they set the regulations and guideline around it.  They create the HUD data standards which governs HMIS and so they provide technical assistance to our community to create countywide strategies and planning, to make sure that our systems all connect to each other and that outreach flows into interim housing that flows into permanent housing.  So they're highly involved.  They also help us with our -- another point of the COC is the point in time count and the homeless inventory count, which is our homeless count.  So they also provide assistance with that as well.

Q    Would you agree that the homeless response system in the City of Los Angeles requires coordination among private actors, City actors, County actors and federal actors?

A    Yes.

Q    How about the state?

A    Yes, the state is also involved.  If you look at the leadership tables, like ECRA (phonetic) they have a representation from the Governor's office.

Q    What is that you referred to?

A    ECRA is -- it's one of the leadership bodies over homelessness.

Kuhn - Cross / By Mr. Scolnick                    **188**

Q    I believe you testified that LAHSA was formed in 1993; is that correct?

A    That is correct.

Q    I'm going to show you a document that has been marked as Exhibit 537.  Do you see that?

A    Yes.

Q    Are you familiar with this document, Exhibit 537?

A    Yes.

Q    What is it?

A    It's the joint powers agreement.

Q    Is this the document that creates LAHSA?

A    Yes, it is.

Q    To your knowledge, is this document Exhibit 537 the version of the joint powers agreement in effect today?

         **MS. MYERS:**  Objection, lacks foundation, calls for speculation, calls for a legal conclusion.

         **THE COURT:**  Overruled, if you know, you can answer it.

         **THE WITNESS:**  As far as I know.

**BY MR. SCOLNICK:**

Q    Okay.  Let's go to page 3 and I'll direct you to Section 4-A of this document, Exhibit 537.  Can you please read the text of Section 4-A?

A    Section 4, the authority.  A, creation of authority. Pursuant to the Act that is hereby created a new public entity,

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Cross / By Mr. Scolnick                    **189**

separate and apart from the parties, to be known as the Los

Angeles Homeless Services Authority.  The debts, liabilities

and obligations of the Authority do not constitute debts,

liabilities or obligation of the parties or either of them, or

of any associated party.

Q    Do you know who the parties are that this document refers

to?

A    I assume it's referring to the City of Los Angeles and the

County of Los Angeles.

Q    What is your understanding of what Section 4-A says?

          **MS. MYERS:**  Objection, lacks foundation, calls for a

legal conclusion, calls for speculation.  I would just say this

witness is not testifying as LAHSA, but in her capacity related

to data management.

          **MS. MITCHELL:**  Join.

          **THE COURT:**  Overruled, you can answer the question.

Your understanding of it.

          **THE WITNESS:**  It creates LAHSA, it forms LAHSA.

Q    And you testified that LAHSA has a, I believe it was a ten

member commission that oversees the organization, right?

A    Correct.

Q    And did you say that five of the members are appointed by

the City and five by the County?

A    Correct.

Q    Is all ten spots currently occupied?

Kuhn - Cross / By Mr. Scolnick                    **190**

A    I think one is vacant, but constantly changing, but yes.

Q    Does the commission have a chair?

A    Yes.

Q    And who is that?

A    Amber Sheikh.

Q    Was she appointed by the City or by the County?

      **THE COURT:**  I'm sorry, I'm sorry.  Just a moment.
Would you say again slowly?

      **THE WITNESS:**  Yeah, Amber Sheikh.

      **THE COURT:**  Once again.

      **THE WITNESS:**  Amber Sheikh.

      **THE COURT:**  Okay.  Thank you very much.

**BY MR. SCOLNICK:**

Q    Is that S-H-E-I-K-H?

A    I believe so.

Q    Okay.  Do you know whether Ms. Sheikh was appointed by the
County or the City?

A    She was appointed by the County.

Q    And I believe you touched on this a bit already, but can
you go over all sources of funding to LAHSA?

A    Yes, we get federal funding, state funding, county
funding, city funding and some local private funding, such as
from the Health Foundation.

Q    Did anything happen recently that changes LAHSA's funding?

A    Well, a lot of things have happened.  But in April of 2025

the County voted to remove its funding from LAHSA and they just put out their funding plan a couple weeks ago, maybe just a week ago, that articulates the full extent of the funding that they will be withdrawing.

Q    As far as you're aware, is this change in funding going to require a downsizing at LAHSA?

A    Yes, they'll be reducing probably by more than half.

Q    And just let me be clear on LAHSA's interactions with various organizations and agencies, how many organizations and agencies does LAHSA partner with?

        **MS. MYERS:**  Objection, lacks foundation, calls for speculation.  Again the witness is not testifying on behalf of LAHSA but only in her individual capacity.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  LAHSA works with -- we directly fund probably around a hundred agencies, give or take.  But as the system lead and HMIS lead, we're responsible for supporting all individuals and agencies supporting homeless services in the region.  In HMIS we have 420 agencies in HMIS alone supporting the 8,000 users that are using HMIS.

**BY MR. SCOLNICK:**

Q    Okay, thank you.  Let's get to HMIS.  Is data collection, in your experience at LAHSA, is data collection a significant part of the work?

A    Managing the database is a significant part of the work

Kuhn - Cross / By Mr. Scolnick                    **192**

that my team does, and all of our teams actually.  The data is entered though by the providers and the service providers on the ground.

Q    That was my next question.

A    Yeah.

Q    How many different sources of data are there in LAHSA's, let's say the HMIS system?

A    So you have 8,000 users entering data.  We also have data exchange.  We have an integration with Home, which is our fiscal agent for TLS, so we have them exchanging and entering data.  We have a data exchange with the County because of AB977.  The State requires that State funding is entered in HMIS so we have a data exchange with CHAMP, which is the other database the County uses.  In addition, we have data agreements with different health authorities, such as L.A. Care, the VA also.  We try to match and make sure that all veterans are accounted for on the veteran BNL to ensure that they have access to housing, so we have data exchanges with the VA as well.  In addition to like the 420 organizations and 8,000 users.

Q    Wow.  What is HMIS?

A    HMIS is the Homeless Management Information System.  It's a HUD required database.  So all programs funded by HUD need to enter the information in HMIS.  Because it is such a standardized, regulated, and known database many other entities

EXCEPTIONAL REPORTING SERVICES, INC

Kuhn - Cross / By Mr. Scolnick            **193**

use it and require it for funding.  Such as for State funding,

it is required that it goes through HMIS.  And any grant

administered through LAHSA also requires it to go through HMIS.

And a majority of other programs regardless of funding also use

HMIS, one thing because of its standardization.

Q    So am I correct that there's not just one HMIS across the

country, correct?

A    There is not.  There is just the database guidelines.

Q    Got you.  And you said I believe HUD is the entity that

requires the HMIS system to be used?

A    Correct.  And they set what you should and how you should

collect data.

Q    So HUD sets the minimum requirements or standards that

have to be present in an HMIS system?

A    Correct.

Q    And just to be clear, other cities and regions use a

version of HMIS as well, correct?

A    Correct.  There are many vendors that support HMIS.  So

for example, our vendor, there's about a little over 400 CoCs I

believe, and our vendor has about I think 70 or so CoCs using

their instance and so there's other vendors that have and

maintain HMIS.

Q    So fair to say that one version of HMIS is not going to be

identical necessarily to every other version?

A    The user experience and the customization differ by

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Cross / By Mr. Scolnick                    **194**

vendor.

Q    What kinds of features can differ between different vendors and different HMIS systems?

A    Well for example, the inventory module that allows us to track interim housing is not a HUD required field.  So our vendor created that and we're able to utilize that.

Encampment tracking is not a HUD required data element and, depending on the vendor, to have the infrastructure in order to track that and build out those shapes appropriately.

In addition, we have the ability to customize.  So every coordinated entry system has their own way of assessing people.  So we used to use the VI-SPDAT, now we use the LA HAT.  Another community might use a different tool.  Like every community gets to decide what they do and they build out those work flows in HMIS and so that's going to make it different depending on each community.

Q    In your view as LAHSA's deputy chief analytical officer, is there any sensitive data in the HMIS system?

A    There's incredibly sensitive data.  There's a lot of PII, personally identifiable information.

Q    How many different individuals' information are included in the HMIS system that LAHSA maintains?

A    Since 2012 we have about 900,000 profiles and about 208,000 of them right now are active in programs.

Kuhn - Cross / By Mr. Scolnick    **195**

Q    And it sounds like for each of those individuals there is PII in the system?

A    For the majority of them.

Q    If somebody outside of LAHSA wanted to access the HMIS system, how would that happen?

A    They would have to request access and access is granted and governed by our HMIS access policy.  All HMIS policies and procedures, including access, is governed by the CoC board.  So the CoC board determines what is approved and how -- and who should have access to HMIS.

And so currently in order to have access to HMIS you have to be a direct -- in order to have direct access to HMIS you have to be a direct service provider, meaning you're helping someone on their homeless journey towards housing, you have to be an administrative staff, which means that you're working with payments, reimbursements of payments, or you have to be a technical data staff working with integrated data systems.  So you have to meet those -- it's a role based access, those criteria.  If you meet those roles, then your agency has to submit an agency agreement with us and set up themselves as an agency, which takes on the liability and also the privacy and security standards outlined.  Then you have to go through many hours of training as a user to get access and also sign an HMIS agreement that also stipulates how to treat data securely and what the expectations are on you as a user.

Kuhn - Cross / By Mr. Scolnick                **196**

Q     This access limitation you just described, is that in a written policy?

A     Yes.

Q     What is the written policy?

A     HMIS policies and procedures can be found on our LAHSA website.

Q     If somebody does not meet one of the roles you just defined per the LAHSA data access policy, can they get access to the system?

A     They cannot.

Q     Is the City of Los Angeles an administrator of the HMIS system?

A     Yes.  Oh, no.  Sorry.  Apologies.

Q     The City of Los Angeles.

A     No, they are not.

Q     Who administers the HMIS system?

A     LAHSA.

Q     Do you understand that in the last couple of months the Court appointed somebody named Daniel Gary as a monitor in the case?

A     Yes.

Q     Are you aware of Mr. Gary requesting access to LAHSA's HMIS system?

A     Yes.

Q     And did LAHSA provide that access?

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Cross / By Mr. Scolnick                      **197**

A     We did not.

Q     Did LAHSA offer to provide something else instead?

A     Yes.

Q     What was that?

A     Data sets pertinent to the information specific to the Alliance lawsuit, so any data related to the individuals or units served under the Alliance lawsuit.

Q     Based on your experience, is giving somebody these data extracts an effective way to deliver the data that goes into the Alliance reporting?

A     It's the most effective way.  How data gets entered and how to extract it from a database is an entire career.  I have lots of specialists.  You know, we have HUD TA that's all over that as well.  So in order to train someone up and limit their access to the appropriate programs that they would need, and especially in the Alliance lawsuit where a service provider, we can limit their ability to pull reports based on the programs that they serve, but the Alliance lawsuit covers many different programs and many different service providers, so in order to know how to extract the data, what the names of the data elements are on the front end and the names of the data elements are when you're extracting it is quite complicated, and so it's much more efficient to say this is what we're looking for and for my team to produce a report with all the data points needed that are extracted from the database

Kuhn - Cross / By Mr. Scolnick                    **198**

directly and only pertinent to the caseloads attached to the

settlement.

Q    Is what you just described what LAHSA provides to the City

in connection with the quarterly reports?

A    We do not provide any identifiable information to the City

as they do not have access.  We provide aggregate information.

Q    And the direct access to the HMIS system you just

described and pulling data, that would require training?

A    Correct.

Q    Roughly, can you estimate how long it would take to train

someone on that?

A    To get access to HMIS is about eight hours of training and

then to understand how to pull the reports, the initial basic

training I think is around three hours, but then you still have

to understand the infrastructure of HMIS.  But to get access to

HMIS, about eight hours.

Q    But I thought you testified a few minutes ago that it

could be an entire career.

A    To actually understand, yes, it can be.

Q    Okay.  And what were you talking about when you said that?

A    If you want to know, for example, I want to pull if a

person's housed or not, you have to know, okay, this data field

is going to be called the move-in date and it lives on the

enrollment screen and I am going to pull it only for these

specific types of programs and so you have to understand the

relationship of the data to itself, how people are entering it, and how people -- so you have to understand the context of how people are entering it and you have to understand the structure of the database and you have to understand the reporting tools that we use to get it out.

Even for document readiness, if you want to say someone's document ready, you actually have to pull four different data fields -- or no, two different data fields from HMIS and then join it to a person's profile. You can't just pull one report. There's not one report that says Bevin is document ready. You have to pull my name, you have to pull my enrollment information, and you also have to pull different documents that are uploaded and you have to look at the specific names of thousands of documents, make sure you're pulling the right one, and then see do I have an SSN and an ID and relate them to each other and then that would say if they're document ready. So if someone wanted to know if someone was document ready it's much better to use the infrastructure that my team has built, which has taken almost two years of a team of data professionals to build, to be able to understand the current status of someone.

In addition, you have to understand all the HUD data standards, like what is the exit destination, what is the definitions of all the exit destinations, what does it mean, when is it better to look at an enrollment versus an exit

Kuhn - Cross / By Mr. Scolnick          **200**

destination from a program.

So, yes, there's entire careers based on all of these different specifics that would make it more efficient and more meaningful to engage in a conversation and produce the data tables needed.

Q    And that's why LAHSA offered the data tables to Mr. Gary?

A    Yes.

Q    I only have about four minutes so I'm just going to, just to touch on something very briefly before we let you go for the day, but I will resume later.  You testified already about the LA Alliance Settlement Agreement, correct?

A    Correct.

Q    And you understand the City prepares quarterly reports, status reports, that it files with the City -- files with the Court?

A    Yes.

Q    And the City gets some data from LAHSA to support those reports, correct?

A    Correct.

Q    And that's primarily the PEH served metric?

A    Correct.

Q    And what does PEH served represent?

A    It represents for interim housing the number of someone who stayed at that site, so they have an enrollment in that program which means that they stayed at that site.  And for

Kuhn - Cross / By Mr. Scolnick                          **201**

permanent housing, they're enrolled in the program and also have a move-in date entered, meaning that they have moved into the unit.

Q    And in your view as a data analyst for LAHSA, is that important information?

A    Yes.

Q    Why?

A    It's important to know how many people are being supported -- who are sheltered or are permanently housed.

Q    And LAHSA provides this information, I think you testified, in a template?

A    Yes.

Q    Why not just give the City direct access to HMIS so the City can get the information itself?

A    For the reasons I stipulated before.  I don't know if they would meet the criteria of the access policy.  Also they, as our funder, are paying us to maintain HMIS and the system and relying on our expertise to not be inefficient with government funding.  So they would have to learn how to pull all the data themselves, but that's what they pay us to do.

Q    Okay.  And next time we talk I'd like to go through Section 7.1 of the agreement but just want to be clear about something.  As far as you're aware, LAHSA is not a party to that Settlement Agreement, correct?

A    No, we are not.

Kuhn - Cross / By Mr. Scolnick          **202**

Q    And you're not a lawyer, correct?

A    I am not.

Q    So when you're testifying about certain terms, you're not offering legal opinions about what they mean in the context of the settlement?

A    One hundred percent not.

        **MR. SCOLNICK:**  I think that's a great place to stop, Your Honor.

        **THE COURT:**  You're done?  Okay.

        **(To the Witness):**  Let me ask you a personal question.  With childcare, what's more convenient for you, returning in the morning or the afternoon?  Do you have childcare every afternoon?

        **THE WITNESS:**  Yeah, today's just a special --

        **THE COURT:**  Then we'll be courteous.  We'll make sure we fit you in the morning, okay?

        **THE WITNESS:**  Yeah, thank you.

        **THE COURT:**  It's an obvious question, if I -- I have nine hours often time.  I can go from 6:00 to 10:00.  I'm just assuming that's not good for you, right?

        **THE WITNESS:**  That's a little early.

        **THE COURT:**  Okay.

        **THE WITNESS:**  I just have to drop her off.  I can drop her off at 7:30.

        **THE COURT:**  All right.

**203**

THE WITNESS:  That's the earliest I can.

THE COURT:  Okay.  Well listen --

THE WITNESS:  Yeah.

THE COURT:  -- thank you very much.  And we'll be courteous.  We'll consult with counsel about your return.

THE WITNESS:  I really appreciate it, Your Honor.

THE COURT:  We're kind of fighting for court space up here, so we'll be in session on Thursday but I can schedule additional sessions.

THE WITNESS:  Okay.

THE COURT:  Okay?

THE WITNESS:  I appreciate it.

THE COURT:  Thank you very much.  Why don't you step down now.

THE WITNESS:  Thank you.

    (Witness exits stand)

MR. SCOLNICK:  And before we break, Your Honor, we understand based on discussions with counsel that there are no more witnesses for today and we'd resume on Thursday, per the Court's order.

THE COURT:  Well just a moment.  Let's have it here on the record.

    (Pause)

        Sure there are.

MR. SCOLNICK:  Okay.

**204**

THE COURT: You're running my schedule now and when I retain a clerk, we've got limited space here. Go find them. So if Mr. Szabo's unavailable, get him here.

MR. SCOLNICK: Can you call Special Master Martinez?

THE COURT: No, no. I'm giving the order now. This is hard for this Court to stay in session with the limited space we have here. Go get him. Now you're working at my convenience. We're done with this discussion. We'll resume at 1:30.

MR. SCOLNICK: Can I just clarify that the witness exclusion rule is not in effect at this hearing though?

THE COURT: No, I will let every witness sit in the audience and listen to every other witness. I don't think it's going to change the testimony, quite frankly.

MR. SCOLNICK: Thank you, Your Honor.

THE COURT: So I'm not too concerned about one person hearing the other person's testimony.

MR. SCOLNICK: We'll see --

THE COURT: Yeah. Counsel, am I clear?

MR. SCOLNICK: Right, thank you, Your Honor.

THE COURT: Okay, thank you very much.

MR. SCOLNICK: Yes.

THE COURT: All right. I said 1:30, my apologies. We have at least until 2:00 o'clock, so we'll resume at 2:00 o'clock with this matter.

205

And I don't mean to be abrupt, but we're really having trouble getting court space here.  I'm having to reverse -- I've worked around your schedule thus far.  I've worked around availability of Mr. Gary of December 15th, I've worked around availability here, I don't think it's fair you pop this on the Court.

Counsel, sit down, please.  Be courteous.

2:30.  Okay?

All right, have a nice recess.

**(Proceeding recessed at 1:00 p.m.; reconvened at 2:29 p.m.)**

**THE COURT:**  Okay, counsel, have a seat.  We're back in session.  I reflected over the lunch hour.  Here are some of my initial thoughts, and let's see if we can work together.

First of all, it's 2:30, so whatever witness you could get in here would be de minimis.  Number two, I can work with the chief judge in space.  But as you know, we're here today.  I think Thursday we're up in 5.  I've lost track.  The following on the 15th, I'm not quite certain where we are.

The second is I don't want any witness coming in unprepared.  You each need time to prepare and talk to your witnesses.  And the third thing is I'd like to hear a little bit of continuity.  So the lady who testified today has got child care.  But can you work with me and kind of give me your thoughts about who you're going to call so I can call the chief

judge to get the court, and then I know if I -- first, I didn't have to go through lunchtime today, if I would have known, you know, I would have had the other party come in.

So you two talk for a moment. I don't want to hear from one party. It's called cooperation. Move towards each other. Okay? And I'll move at your time schedule just as long as I can set my time schedule. Tell me what you're thinking. Who's next? How long? Let me call the chief judge. Let me get the courts and I'll probably just send you home today. But can we get that lady back on Thursday so we have continuity and can we do that in the morning? She's got child care, but I've got a voter's rights case that has some interesting implications for -- and that's going to be at 7:30. I'd like you here, let's say, by 8:00 or 8:30 so that if it's short, which it may be, we're ready to go. If you have to sit half an hour, my apologies. So talk amongst yourselves and then give me some wisdom and I'll follow your lead. Okay?

MS. MITCHELL:  Thank you, Your Honor.

(Pause)

THE COURT:  And do you need to make any phone calls concerning any witnesses? If you do, let's take the time. Get on the phone with witnesses for a moment today. And that way I could call the chief judge because there's -- our space up here is really limited.

(Pause)

THE COURT:  By the way, if you need a half day, just tell me that in the future so I know.  Okay?  Just pay me the courtesy of saying, Judge, we're in session half a day.  Fine, then I can schedule other matters.

MR. MCRAE:  We will.  Thank you, Your Honor.

THE COURT:  Okay.

(Pause)

THE COURT:  And could you check -- by the way, just informally, could you check and see if the last witness -- the childcare.

MS. MITCHELL:  Yes.

THE COURT:  See if she's available Thursday morning.

MR. MCRAE:  That's what we're doing.

THE COURT:  Just pay her the courtesy.

MR. MCRAE:  That's what we're doing.  It'll take us a few minutes.  Thank you, Your Honor.

(Pause)

MS. MITCHELL:  I think we're ready, Your Honor.

(Pause)

THE COURT:  Okay, counsel, thank you for your courtesy.  What are your thoughts?

MS. MITCHELL:  Thank you, Your Honor.  So we have confirmed that Ms. Kuhn is available tomorrow -- I'm sorry, on Thursday.

THE COURT:  Now, let's stop with just her for a

moment.

MS. MITCHELL:  Yes.

THE COURT:  I don't know how long this voter rights argument is going to take because there are a number of interveners from the Women's League to the NAACP to et cetera.  It's blossoming.  So I don't want you here at 7:30.  I think I'd like to ask you to be here at 8:30.  It could be short, but I don't -- I think it's going to occupy an hour.  So there's no reason for you just to sit here needlessly.

But beyond that, I'd like to make certain that we get her on and off the stand and back for child care by 1 o'clock.  So I'm willing to go through lunch hour if we haven't finished.  No pressure on the City.  No pressure on your redirect and recross.  I think that three or four hours should give you enough time, shouldn't it, with her?

MS. MITCHELL:  Your Honor, my understanding is that Ms. Kuhn does not have child care limitations on Thursday, it was only today.  But there are a couple limitations that I wanted to advise the Court of on Thursday.  So intervenor's counsel, Ms. Myers, has a hard stop between 12:00 and 1:00, and Matt Szabo apparently can only testify until 2:00.  So what we would like to do is start Mr. Szabo at 8:30.  It's the City's witness.  The City will call him.  We'll finish with him and then get Ms. Kuhn on and off the stand on Thursday.

THE COURT:  Is that acceptable to both sides?  Does

**209**

that work for the City, the intervenors, and LA Alliance?

      **MR. MCRAE:**   Yes.

      **MS. KUMAR:**   Yes, Your Honor.

      **THE COURT:**   Wisdom says if you all agree to anything, I should abide by that.  I'm just joking with you, but done.  Okay.

      **MS. MITCHELL:**   And then on the 15th, Your Honor, there is I think that they want to recall Mr. Webster for like just a brief couple minutes.

      **THE COURT:**   Sure.

      **MS. MITCHELL:**   We obviously --

      **THE COURT:**   Do you want to do that out of order or at the end?  Because I may have questions of a number of these witnesses.  I may not.  I'm going over transcripts at night.  If you want to call Webster and you all agree, fine.

      **MS. MITCHELL:**   That's fine.  He will not be here on Thursday.  He's in Washington, D.C. on Thursday.

      **THE COURT:**   Okay.

      **MS. MITCHELL:**   So he'll be here on the 15th.  Diane Rafferty will also be here to testify in person on December 15th.

      **THE COURT:**   Okay.

      **MS. MITCHELL:**   And then we have obviously Special Master Martinez and Mr. Garrie who are here to testify on the 15th.  And that should be it.

**210**

THE COURT:  I forgot Garrie's schedule.  I know he's available the 15th.  I don't know about the 16th.  I could reach out again.  But it sounds like you're going to get to Garrie sometime at least later on the 15th.

MS. MITCHELL:  We could start with him first if he has time limitations.

THE COURT:  No, no, no, no, not at all.  All I'm saying is I'm going to ask if he's also available the 16th in case he has to hold over.  I'd like to get this -- I'd like to have some continuity.  So the more witnesses we can put in the same box, if you will, the better.  Does that work for all you folks?  Then why are you still here?  Just joking with you.

Listen, go home, drive safely and we'll see you at 8:30, right, on Thursday.  Okay?

MS. MITCHELL:  Thank you, Your Honor.

THE COURT:  And I'll work out with the chief judge.  I just don't know.  On Thursday, you've got the court, the 15th and 16th.

MS. MITCHELL:  Thank you, Your Honor.

THE COURT:  We'll work on it.  Okay.  Have a good day.

    **(Proceeding concluded at 2:41 p.m.)**

211

## CERTIFICATION


I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.



_____                    <u>December 3, 2025</u>

             **Signed**                                          **Dated**


*TONI HUDSON, TRANSCRIBER*