UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) | CASE NO: 2:20-cv-02291-DOC-KESx |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Los Angeles, California |
| vs. | ) | |
| | ) | Thursday, December 4, 2025 |
| CITY OF LOS ANGELES, ET AL., | ) | (10:12 a.m. to 11:17 a.m.) |
| | ) | (11:37 a.m. to 12:01 p.m.) |
| Defendants. | ) | ( 1:05 p.m. to  2:00 p.m.) |
| | | ( 2:52 p.m. to  3:59 p.m.) |
| | | ( 4:18 p.m. to  5:19 p.m.) |

EVIDENTIARY HEARING -

ORDER TO SHOW CAUSE RE CONTEMPT CITY OF LOS ANGELES
[DKT.NO.1066]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:             SEE PAGE 2

Courtroom Deputy:        Karlen Dubon

Court Reporter:          Recorded; CourtSmart

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES:


For Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                         MATTHEW UMHOFER, ESQ.
                         Umhofer Mitchell & King
                         767 S. Alameda Street, Suite 270
                         Los Angeles, CA 90021
                         213-394-7979


For Defendants:          LAUREN M. BRODY, ESQ.
                         Miller Barondess, LLP
                         1999 Avenue of the Stars, Suite 1000
                         Los Angeles, CA 90067
                         310-552-4400

                         POONAM KUMAR, ESQ.
                         MARCELLUS A. MCRAE, ESQ.
                         KAHN A. SCOLNICK, ESQ.
                         Gibson Dunn & Crutcher
                         333 South Grand Avenue
                         Los Angeles, CA 90071
                         213-299-7000


For Intervenor:          SHAYLA R. MYERS, ESQ.
                         Legal Aid Foundation of LA
                         7000 S. Broadway
                         Los Angeles, CA 90003
                         213-640-3983


Special Master:          MICHELLE MARTINEZ

3

**INDEX**

| DEFENDANTS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MATTHEW SZABO | 6/42/56 | | | |

**PLAINTIFFS' WITNESS**

BEVIN KUHN

| | | | | |
|---|---|---|---|---|
| BY MR. SCOLNICK | | 87 | | 176 |
| BY MS. MITCHELL | | | 110/181 | |
| BY MS. MYERS | | | | 141 |

**4**

**Los Angeles, California; Thursday, December 4, 2025; 10:12 a.m.**

--oOo--

THE COURT: And on the Weber matter, I know that you say you have other obligations. I'm happy to give up my lunch hour, but I want to finish Mr. Szabo today if possible. He has until two o'clock. So if I need to, I'm going to go through the lunch hour to finish that up. If you want to return on Monday, that's fine. If you want to fly back across country or you can go into a very late session tonight, but you'll be in a different location. Okay. So I leave that to your wisdom. So we can finish today, but it may be very late tonight, or we can resume next Monday, but I want one of you present just to listen to how this proceeding goes so you can judge your own time.

All right, counsel, if you'd be kind enough to make your appearances, please, on behalf of LA Alliance.

MR. UMHOFER: Good morning, Your Honor. Matthew Umhofer and Elizabeth Mitchell on behalf of the LA Alliance.

THE COURT: Be seated. On behalf of the City, please. And for the interpreter, thank you very much, sir.

MR. MCRAE: Marcellus McRae, Gibson, Dunn & Crutcher, appearing on behalf of the City of Los Angeles, along with my colleagues, Kahn Scolnick and Poonam Kumar.

THE COURT: All right, thank you. On behalf of the County?

**MS. BRODY:** Lauren Brody, Miller Barondess on behalf of the County of Los Angeles.

**THE COURT:** And intervenors?

**MS. MYERS:** Shayla Myers with the Legal Aid Foundation of Los Angeles on behalf of interveners.

**THE COURT:** Well, thank you. Mr. Szabo, if you'd come forward, please.

**MR. MCRAE:** Your Honor, may I approach with the iPads?

**THE COURT:** If you raise your right hand, sir.

**MATTHEW SZABO, DEFENDANTS' WITNESS, SWORN**

**THE COURT:** Thank you, sir, if you'd please be seated. After you're comfortably seated, would you face the parties and would you state your full name, sir?

**THE WITNESS:** Matthew Szabo.

**THE COURT:** Would you spell your last name, sir?

**THE WITNESS:** S-Z-A-B-O.

**THE COURT:** All right, now, Mr. Szabo, I know your time is limited. We're going to go through the lunch hour with your permission to try to free you up, but they told me you have until two o'clock, okay? All right, counsel, direct examination, please.

**MR. MCRAE:** May I proceed, Your Honor?

**THE COURT:** Please, and state your name just because we're on Court Smart. We certainly know who the parties are,

Szabo - Direct / By Mr. McRae                                        **6**

but Court Smart.

MR. MCRAE:  Marcellus McRae.

THE COURT:  Thank you.

MR. MCRAE:  Thank you.

THE COURT:  Direct examination by the City.

**DIRECT EXAMINATION**

**BY MR. MCRAE:**

Q    Mr. Szabo, thank you for appearing again.  You've extensively discussed your background at the prior evidentiary hearing in June of 2025, but for today's proceedings, can you please remind us of your current roles and responsibilities?

A    I serve as city administrative officer with the City of Los Angeles.  It's the central office for budget and finance. We also have broad operational responsibilities.  As it relates to this matter, we are also responsible for coordinating our compliance with the settlement.

Q    And do your duties include serving as a principal financial advisor for the mayor and the city council here in Los Angeles?

A    Yes.

Q    Do you assist the mayor in developing the annual budget and assist the city council in reviewing and approving the annual budget?

A    Yes.

Q    Are you also responsible for making revenue projections

**EXCEPTIONAL REPORTING SERVICES, INC**

and negotiating wages and benefits for the City's employees?

A    Yes.

Q    Now, sir, in your position as city administrative officer, do you have any responsibilities in your office regarding the City's ongoing efforts to reduce homelessness?

A    Yes, we do.

Q    And what, if you could tell us, does your office do relative to those efforts on behalf of the City to reduce homelessness?

A    We have a number of responsibilities, primarily from our principal financial responsibility.  We maintain and manage all of the various funding streams that we use to fund homeless interventions from the federal government, from the state, and then, of course, locally, our local dollars, our local special tax dollars, and our general fund.  We play the principal support role for the Inside Safe program as it relates to ensuring that that is funded.  That is a program run out of the mayor's office, but we play the principal support role in that.  We also manage the interim housing portfolio for the City.

Q    And, sir, I'm going to now show you Exhibit 25.  This is ECF 429, and we're going to turn to page 6.  Mr. Szabo, do you recognize this document?

A    I do recognize the document.

Q    Is this the Alliance Settlement Agreement?

Szabo - Direct / By Mr. McRae                    **8**

A     It is, yes.

Q     And, sir, were you personally involved in the negotiation of Exhibit 25?

A     I was.

Q     Is it fair to say that you were the principal negotiator on behalf of the City with respect to Exhibit 25?

A     Yes.

Q     And can you remind us who else was involved in the negotiations of Exhibit 25, the Alliance Settlement Agreement?

A     Well, I was representing the mayor and the council in my role as CAO, and the other principal negotiator was the City Attorney's Office.

Q     And, sir, since entering into the Alliance settlement, which is Exhibit 25, has your office also been involved in the implementation of Exhibit 25?

A     We have.

Q     Is it fair to say that your office has had primary responsibility for the City's efforts to comply with the Alliance settlement, which is Exhibit 25?

A     Yes.

Q     And, sir, are there other departments operated by the City that also contribute to the City's efforts to implement the Alliance settlement?

A     Yes.

Q     Sir, can you tell us what other departments focusing first

on those operated by the City that contribute to the City's

efforts to implement the Alliance Settlement Agreement?

A     Those operated, those as part of the City structure

itself, principally the housing department, and then to another

extent, the Bureau of Sanitation.

Q     Would it be fair to say that it's general services?

A     General services, yes.  Yes, general services and, of

course, all of the support departments as it relates to interim

housing.  But general services holds the leases and manages the

City's real estate portfolio.  So, yes, general services and

many others.  But it is principally housing, general services

and sanitation with the support of many other departments in

terms of the central services role.

Q     Would that also include the mayor's office?

A     Yes.

Q     Zoning?

A     In some cases, yes.

Q     Health?

A     Not so much health.  We have a health commission, but not

a health department.

Q     Pivoting away from departments operated by the City and

now asking you to address entities that are not operated by the

City, are there any entities that are not operated by the City

of Los Angeles that contribute to the City's efforts to

implement the Alliance settlement?

A    Yes.  There would be two, primarily.  One is the Housing Authority of the City of Los Angeles, which is a city agency to the extent that its governing board is appointed by the mayor. However, it is a separate and distinct entity from what we would refer to as the council control departments.  It has its own revenues, its own funding streams.  But it does have a board that is appointed by the mayor.  And then, of course, the Los Angeles Homeless Services Agency.  LAHSA.

Q    Okay.  And would, as far as entities not operated by the City of Los Angeles that contribute to the City's efforts to implement the Alliance settlement, would the County of Los Angeles be one of those entities?

A    The County is, to an extent.  We have a separate MOU with the County that supports the services provided by beds that we've established pursuant to the Alliance settlement.  So it's indirect.  They support the beds by covering the services costs on a reimbursement basis, and that's in a separate MOU that we have with them.

Q    And would HUD be another entity, not operated by the City of Los Angeles, that contributes to the City's efforts to implement the Alliance settlement?

A    Only tangentially, I would say.  HUD, there are dollars that the Housing Department receives from Housing and Urban Development that are used in part to support the Alliance settlement.

Szabo - Direct / By Mr. McRae                    **11**

Q    And earlier you mentioned a housing authority.  I want to make sure that since there's no shortage of acronyms, that we're clear on what you were referring to.  Did you already discuss HACLA as an entity that contributes to the City's efforts to implement the Alliance settlement?

A    The housing authority is often referred to as HACLA, Housing Authority of the City of Los Angeles.

Q    Thank you.  Let's now talk specifically about LAHSA.  Sir, would you agree with the statement that the City of Los Angeles actually is LAHSA?

            **MS. MITCHELL:**  Objection, leading.

            **THE COURT:**  Overruled.  You can answer the question.

            **THE WITNESS:**  LAHSA -- the City of Los Angeles is not LAHSA.  LAHSA is a joint powers authority.

**BY MR. MCRAE:**

Q    And does the City of Los Angeles have a seat on the board of LAHSA?

A    We do.

Q    And do you happen to know, sir, the total number of seats on the board of LAHSA?

A    There are ten seats.

Q    Do you know how many of the ten seats are occupied by the City of Los Angeles?

A    Five of the ten are appointed by the City.

Q    And do you know of the remaining or residual five of those

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Direct / By Mr. McRae                    **12**

ten seats who occupies those board seats on LAHSA?

A     The County of Los Angeles, one per supervisor.

Q     And, sir, does the City of Los Angeles on occasion work with LAHSA in efforts to reduce homelessness?

A     Yes.

Q     And so, given this working relationship and occupying five of the ten seats that the City has on the board of LAHSA, do you think it's fair to say that the City of Los Angeles controls LAHSA?

         **MS. MITCHELL:** Objection.  Leading.

         **THE COURT:** Overruled.  You can answer the question.

         **THE WITNESS:** We don't control LAHSA.  We work with LAHSA.

**BY MR. MCRAE:**

Q     Well, would it be fair to say that given that LAHSA and the City have this working relationship, that LAHSA and the City effectively operate like one and the same entity?

A     No, that is not fair to say.  We do not operate as one.  LAHSA operates as an independent agency from the City. We do have a working relationship with LAHSA, as does the County.  But LAHSA is a separate entity.

Q     And, sir, to your knowledge, has there ever been a time when the City of Los Angeles unilaterally controlled what events LAHSA decided to track regarding homelessness?

A     No, the City does not have any unilateral control over

Szabo - Direct / By Mr. McRae                    **13**

LAHSA.

Q    And has there ever been a time, to your knowledge, when the City of Los Angeles unilaterally controlled the manner in which LAHSA maintains whatever data it has regarding homelessness?

A    No, there's no unilateral control.

Q    And would your answer be the same that, to your knowledge, has there ever been a time when the City of Los Angeles unilaterally controlled how LAHSA reports data it has regarding homelessness?

A    My answer would be the same.

Q    Now, sir, we've been talking about unilateral control.  Has there ever been a time when the City of Los Angeles unilaterally controlled LAHSA's systems, data systems, where it stores and maintains data regarding homelessness?

        **MS. MITCHELL:**  Objection.  Vague as to unilaterally.

        **THE COURT:**  Do you understand the question?

        **THE WITNESS:**  I do.

        **THE COURT:**  You can answer it.  Overruled.

        **THE WITNESS:**  No.

**BY MR. MCRAE:**

Q    And on that subject about unilateral, you said there were 10 seats on this LAHSA board, five of which are occupied by the City of Los Angeles.  Does the City of Los Angeles control how the other five board seats occupied by LA County might vote on

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Direct / By Mr. McRae                    **14**

a given matter regarding LAHSA?

A    No, the City does not.

Q    And to your knowledge, has the City of Los Angeles had unrestricted access to all of LAHSA's data systems?

A    No.

Q    Did your office build LAHSA's data reporting infrastructure?

A    No.

Q    Does the City of Los Angeles fund LAHSA?

A    We do provide funds to LAHSA, yes.

Q    And do you know how much of LAHSA's funding has been provided per annum by the City of Los Angeles in the last four years in an approximate percentage per annum?

A    Approximately 40 percent, but I want to be clear about that.  Much of the funding, when we think about funding LAHSA, is pass-through funding.  That is to say LAHSA is a contracting agency that holds and manages contracts with service providers. So we fund the contracts that are held by LAHSA, but yes, about 40 percent of the entire budget for LAHSA is funded through the City.

Q    Now, once these funds are provided by the City of Los Angeles to LAHSA, does the City of Los Angeles have the ability to unilaterally demand that LAHSA distribute the funds in a specific manner?

A    As it relates to LAHSA's general budget, the way that it's

Szabo - Direct / By Mr. McRae                    **15**

structured -- so the answer is no, in part, and yes, in part.  And the reason I say yes, in part, is because LAHSA holds the contracts with the service providers, we do have a contract with LAHSA that governs that process.  LAHSA has their contracts with the service providers, and so there is some separation between the City and the service providers because we don't hold the contracts directly with the service providers, but we do have some influence over that.

There are dollars that LAHSA uses as a proportion of what we send to them, which are referred to as administrative dollars that are taken from each contract so that LAHSA can support its own general operations, and we do not control LAHSA's general operations.

Q    And, sir, if you work at LAHSA, is your employer the City of Los Angeles?

A    No.

Q    Who then is your employer if you work at LAHSA?

A    Your employer is the Los Angeles Homeless Services Agency.

Q    And circling back to this question about the use of funds provided by the City of Los Angeles to LAHSA, once those funds have been appropriated by LAHSA, does the City of Los Angeles have the ability to demand unilaterally that LAHSA spend those funds to comply with a particular data request from the City?

A    Not once the dollars are transferred.

Q    Now, does LAHSA have a CEO?

Szabo - Direct / By Mr. McRae                    **16**

A     Yes.

Q     And do you, Mr. Szabo, have the authority to terminate anyone at LAHSA?

A     No.

Q     Do you report to anyone at LAHSA?

A     No.

Q     Does anyone at LAHSA report to you?

A     No.

Q     Do you supervise any LAHSA employees?

A     No.

Q     Is your opinion on the performance of LAHSA employees solicited in any way?

A     Not from LAHSA.

Q     Sir, I want to move now to a discussion about a portion of Exhibit 25, which, and I should have asked this, Your Honor, I just want to make sure that everyone can see the screens, of course they can see the screens, that the screens are populated.

        **THE COURT:**  Are all the screens up?  Can you folks see them?

        **MS. MITCHELL:**  Yes.

        **THE COURT:**  Okay.

        **MR. MCRAE:**  Thank you, Your Honor.

//

//

**BY MR. MCRAE:**

Q    So, sir, drawing your attention to Exhibit 25, looking at Paragraph 7, I want to direct your attention to this language of 7.1, which has the heading "Status Updates."  First, sir, I want to ask, you're familiar with this language?

A    I am, yes.

Q    And, sir, you're familiar with the City of Los Angeles issuing quarterly reports in connection with its efforts to comply with the Alliance settlement?

A    I am, yes.

Q    And, sir, how many quarterly reports has the City of Los Angeles issued since the execution of the Alliance settlement?

A    We've issued 12, plus the supplemental report.  So 13 in total, beginning of January of 2023.  Every quarter since then.

Q    And is your office primarily responsible for preparing these quarterly reports?

A    Yes.

Q    Has your office had the responsibility since the inception of the Alliance settlement in preparing these quarterly reports?

A    Yes.

Q    Can you please give us an overview of what are the various steps that your office undertakes to prepare the quarterly reports in connection with Exhibit 25, the Alliance settlement?

A    Well, there are a number of steps for -- I mean, there are

several, several steps.  So the primary structure of the report is to provide information on the principal obligation of the settlement agreement, which is establishing the required number of beds.  In this case, it's 12,915.  We report on the beds that are open and occupiable, and we report on the beds that are in progress.  We have multiple steps and processes for each housing type as it relates to the beds in determining what is open and occupiable, in determining what's in progress, and verification steps for each.

Q    And, sir, I want to switch, if I can, from the manner in which the quarterly reports are presented to ask you, have the quarterly reports that you've described, have they been in substantially the same form from the time that your office started providing those reports?

A    Yes.

Q    And, sir, when did you first learn that the Alliance had some concerns regarding the manner in which the City of Los Angeles was reporting data in connection with Section 7.1?

A    As it relates to 7.1, I had no indication that there was a concern with the manner in which we were reporting that information until very recently in the last month.  Maybe it was October, November.  I don't remember exactly when, but it was recent.

Q    Now, you testified at an evidentiary hearing earlier this year in June.  Do you recall that, sir?

A      I do.

Q      Do you recall that you testified about the settlement agreement, which is Exhibit 25?

A      I do.

Q      Do you recall that you were on the stand, if memory serves, for approximately four days?

A      I do remember that.

Q      Do you recall being cross-examined by counsel for the Alliance?

A      Yes.

Q      During that testimony, how many times did counsel for the Alliance question you about the City's compliance with Section 7.1?

A      I don't believe I was asked a single question about 7.1.

Q      And during that four-day, approximately, day time period of you being on the stand in June, how many times did counsel for the intervenors question you about the City's compliance with Section 7.1 of Exhibit 25?

A      I don't believe I was asked any questions about 7.1 by the intervenors.

Q      And were there any questions from the Court about the City's compliance with Section 7.1 during your four-day testimony, approximately?

A      I DON'T recall any questions from the Court regarding 7.1.

Q      Now, let's move into the other portions of Section 7.1.

You see highlighted the first sentence, the City will provide quarterly status updates.  That's the salient language that's highlighted.  Then it goes on to say to the Court regarding its progress with this agreement, and I want to focus on that language for a moment.  Sir, when you reviewed Section 7.1 or when you review Section 7.1, is that language regarding its progress with the agreement in the context of talking about these quarterly status reports, is that language instructive to you in any way?

A     No, it is.

Q     How so?

A     Well, the reporting -- our quarterly reporting is to provide the Court and the plaintiffs and the intervenors and the public with our progress towards meeting the settlement agreement and meeting the obligations of the settlement agreement, and what that means is that what we report needs to relate to the obligations of the settlement agreement, rather than just information writ large.  So that provides guidelines as to, or an important guideline as to what type of information we're reporting and how it relates to our progress with the settlement agreement.  And again, principally the 12,915 beds that we are required to establish over five years.

Q     And, sir, when you refer to not providing information writ large, do you mean by writ large information unrelated to progress under the settlement agreement?

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Direct / By Mr. McRae                    **21**

A     Yes.

Q     Let's now move to the reference to a metric after the word including.  So for context, the City will provide quarterly status updates to the Court regarding its progress with this agreement, including the number of housing or shelter opportunities created or otherwise obtained.  Do you see that, sir?

A     I do.

Q     Do you have an understanding of what this term or phrase, number of housing or shelter opportunities created or otherwise obtained, means?

A     Yes.

Q     And from where is your understanding derived?

A     My understanding is derived from the -- I mean, from the entirety of the process of negotiating the settlement agreement.  It was principally about creating a required number of units.  And so for the purposes of created or otherwise obtained, what we are using is beds that are, as of the date of the report, created after June of -- June 14th of 2022, and open and occupiable for persons -- for use for, by persons experiencing homelessness.

Q     So can you please tell us what you understand the term housing or shelter opportunities created or otherwise obtained to mean, in the context of Section 7.1 here?

A     It means, and it's reported as the open and occupiable

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Direct / By Mr. McRae                                   **22**

beds or interventions in our report.  It's what's open.  It's what's been open, what we have created or caused to have been created over the term of the settlement.

Q    And has the City been reporting this metric of housing or shelter opportunities created or otherwise obtained, consistent with that understanding in the quarterly report since your office has been issuing them?

A    Yes.

Q    Let's take a look at Exhibit 502, which is ECF 1072.  And we are going to look at page 2.  This document purports to say that it is a quarterly report for the quarter ending September 30, 20 --

            **MS. MITCHELL:**  Counsel, what exhibit number?

            **MR. MCRAE:**  502, 502.

**BY MR. MCRAE:**

Q    And it says that it's a quarterly report, quarter ending September 30, 2025, intervention data dash supplemental report.  Sir, looking at Exhibit 502, page 2, can you tell us where on this quarterly report is the number of housing or shelter opportunities created or otherwise obtained reported?

A    That would be, for each site, that would be the, looks like the fifth column, where it says units, units slash beds, and the sixth column, which indicates that those beds are open.

Q    And, sir, let me now show you an earlier quarterly report, which is Exhibit 27.  This is ECF 539.  We are again on a page

Szabo - Direct / By Mr. McRae                            **23**

2.  This states that it is a quarterly report ending March 31st, 2023.  Sir, can you tell us where, looking at Exhibit 27, page 2, the City's quarterly report provides the number of housing or shelter opportunities created or otherwise obtained?

A    It would be the same, again, I think that's the sixth column and the seventh column.

Q    And so there's a reference here to -- you say the sixth column and next to that is a column on status.  Do you see that there's a parenthetical reference with a one underneath units and beds?

A    Yes.

Q    And, sir, can you tell us what that relates to, that number one?

A    That would relate to a footnote that would be provided at the bottom of the document.

Q    So can we go to Exhibit 503, which is going to be ECF 1051, and this is the non-supplemented quarterly report for the quarter ending September 30th, 2025.  And I want to direct your attention again to the column that says unit beds.  You see the parenthetical reference again, the number one, which you say is a footnote.  Do you see that there?

A    Yes.

Q    Now, if we could flip to pages 6 and 7 of this Exhibit 503, and we can have hopefully an enlargement of the font of these footnotes to the best of our ability.  Sir, do you see

Szabo - Direct / By Mr. McRae                                   **24**

there 28 numbered footnotes?

A     Yes.

Q     In this exhibit.  And can you tell us why do these quarterly reports contain this volume of footnotes?

A     Well, for transparency's purposes, we want to be clear -- as clear as we can with the consumers of the information, certainly the Court, the plaintiffs, the intervenors, and the public about what it is that we're reporting.  So we typically provide extensive footnotes in each quarterly report.

Q     And, sir, are you aware of any order that requires the quarterly reports to contain all of these footnote disclosures?

A     No.

Q     But the City did it anyway?

A     Yes.

Q     And do you agree with the assertion that the City has been opposed to transparency regarding the data it has reported relative to its ongoing efforts to comply with the Alliance Settlement Agreement, including the quarterly reports?

A     Absolutely not.

Q     Why, sir?

A     I mean, the team, you know -- well, I'll first say that those that are responsible for preparing this report, including myself, are absolutely committed to providing as much accurate information as we possibly can and making clarifications if clarifications need to be made.  The team that work in the

CAO's office, and broadly, but specifically as it relates to our homelessness division and those that are assigned to this work, are extraordinarily dedicated and highly skilled, highly competent public servants.  And, you know, the CAO's office is not a -- you know, it's not a place for when people typically will start out in the City.  You have to have a high level of training, high level of skill.  It is a central financial office of the City, and the analysts that work in my office are perfectionists and they want to provide the best possible work whenever possible.

Q    And, sir, let me ask you, in addition to providing these quarterly reports regarding efforts to comply with the Alliance settlement agreement, are there other efforts that you're aware of that the City has taken with respect to transparency regarding its reporting and ongoing efforts to comply with the agreement?

A    Well, as it relates to transparency, excuse me, far beyond the quarterly reports, of course, we have extensive -- we issue extensive reporting on the housing that's produced related to this settlement agreement.  We have reports to the city council.  We have multiple hearings at the Housing and Homelessness Committee.  We have hearings at full council, on occasion at the Homeless Strategy Committee.  There are multiple levels of hearings there, specific to separate reports on our compliance with the Alliance settlement.  But even

Szabo - Direct / By Mr. McRae                          **26**

beyond that, there are multiple, multiple, multiple reports, hundreds of reports that have been produced, considered, voted on, approved by various levels of the City that my office prepares in support of actually establishing this housing.  So we have separate reports for the Inside Safe Program.  We have separate reports for our other interim housing.  We have separate reports for our Prop HHH permanent supportive housing. We have layers and layers of appropriate oversight, including a Citizen's Oversight Committee, an Administrative Oversight Committee, and then the Council Committee, and then the full council to review, consider, and approve the funding and the plans that make these -- the creation of these units and compliance with this settlement agreement possible.

Q    Sir, let me now direct you to a quarterly report from 2024, which is Exhibit 31.  Exhibit 31 being ECF-728, and again, we're going to be looking at page 2.  This is for the quarter ending March 31, 2024, and can you tell us, again, now looking at this document, where in this quarterly report does the City provide the number of housing or shelter opportunities created or otherwise obtained?

A    It provides that information in the sixth column and the seventh column.

Q    And do you see it has the same footnote 1 that we've discussed?

A    It does.  I do see that.

Q    And by the same, I mean there is a footnote there, not asking you whether the individual 28 that we saw before are exactly the same in every report.  To the best of your knowledge, has the number of housing or shelter opportunities created or otherwise obtained been reported by the City in each and every one of the quarterly reports it submitted under the Alliance agreement?

A    Yes, in every report.

Q    And has it been reported in the same manner in each of the reports that the City has issued?

A    Yes.

Q    Let's move to the second metric of 7.1 in this first sentence, which reads the number of beds or opportunities offered.  Now, sir, in looking at the number of beds or opportunities offered, and we are in Exhibit 25, which is the Alliance settlement agreement, did you see a definition of the term "offered" in the Alliance settlement agreement?

A    No.

Q    Have you ever seen a court order in this case that purports to define what offered means in the context of Section 7.1 of Exhibit 25?

A    I have not.

Q    Nonetheless, sir, do you have an understanding of what this term "offered" means in the context of number of beds or opportunities offered?

Szabo - Direct / By Mr. McRae                                    **28**

A     Yes.

Q     What is your understanding of what the number of beds or opportunities offered in Section 7.1 here in Exhibit 25 means?

A     My understanding is that it is consistent with what the City is able to report on its own.  It is what are the beds or opportunities that we have made available, that we have provided, that are being offered in this case citywide.

Q     And when you say offered, are you familiar with the expression "on offer"?

A     I have heard that expression, yes.

Q     Do you interpret the number of beds or opportunities offered to mean on offer?

A     Yes, that would be a good way of saying it.

Q     And when I asked you earlier about the first metric, what was the basis for your understanding of number of housing or shelter opportunities created or otherwise obtained, you answered, would the basis of your understanding of the number of beds or opportunities offered be the same as the basis of your understanding for the number of housing or shelter opportunities created or otherwise obtained?

        **MS. MITCHELL:**  Objection.  Unintelligible and leading.

        **THE COURT:**  I'm sorry, I didn't hear the objection?

        **MS. MITCHELL:**  Unintelligible and leading, Your Honor.

Szabo - Direct / By Mr. McRae                    **29**

THE COURT:  Do you understand the question?

THE WITNESS:  I do.

THE COURT:  You can answer it.

THE WITNESS:  Yes.

**BY MR. MCRAE:**

Q    Thank you.  Now, let's move into a discussion about this section.  Mr. Szabo, can you tell us why you understand the words number of beds or opportunities offered to mean on offer?

THE COURT:  I'm sorry, you dropped your voice.  Could you repeat that question?

MR. MCRAE:  Yes.

Q    Mr. Szabo, can you tell us why you have the understanding that the phrase "number of beds or opportunities offered" means on offer?

THE COURT:  Means what, counsel?

MR. MCRAE:  Beds on offer, O-N, followed by O-F-F-E-R.

THE WITNESS:  That has been our understanding that is consistent with our primary obligation of the settlement agreement, which is to create and to offer 12,915 beds or other units or other opportunities over the course of the settlement agreement.  It is -- the reason that I, you know, number one, that's consistent with the central obligation of the settlement agreement.  It is what the City would reasonably be able to provide within data that we have and we control, not data that

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Direct / By Mr. McRae          **30**

is controlled by other entities.  And it is how we have reported, you know -- we have reported it in the same manner 13 times since January of 2023 for 34 months straight, 35 months straight, and there hasn't been any challenge or objection to it.

So after the first report, as we reported it that way, we continue to report it that way, and I believe that I had the -- it was fair to believe that we were reporting it accurately, as no one raised any objection to how we were reporting that metric.  And so we created the systems and we reinforced the systems to continue reporting it that way.

**BY MR. MCRAE:**

Q    And, sir, has the City been reporting this metric of number of beds or opportunities offered consistent with that understanding in the quarterly reports since the City has been issuing them?

A    Yes.

Q    I'd like to show you Exhibit 502, which is EFC 1072.  And we again are on page 2. Can you tell us where in this quarterly report, which is for the period -- quarter ending September 30, 2025, is the number of beds or opportunities offered listed?

A    Yes.

Q    And where is that?

A    That would be in columns six and columns seven.

Q    Now, sir, aren't those the same columns that you told us

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Direct / By Mr. McRae                                    **31**

were the location of the report on the metric, which was the number of housing or shelter opportunities created or otherwise obtained?

A    It is.

Q    And can you tell us why this units, beds, and status columns, why those columns are populated with data that provides the answer to both the number of housing or shelter opportunities created or otherwise obtained and the number of beds or opportunities offered?

A    Because those two columns provide the reporting for both of the metrics requested.

Q    So does it happen to be the case that the number of beds or opportunity to these offered are the number of beds or opportunity on offer?  Let me rephrase.  Is it the case that the number of housing or shelter opportunities created or otherwise obtained is the number of beds or opportunities offered, at least in these reports?

        **MS. MITCHELL:**  Objection.  Calls for a legal conclusion, leading, unintelligible.

        **THE COURT:**  Do you understand the question?

        **THE WITNESS:**  I do.

        **THE COURT:**  You can answer it.  Overruled.

        **THE WITNESS:**  The answer is yes.  And in reporting the information this way, the intention was to provide the information requested in both the first and second metric of

Szabo - Direct / By Mr. McRae **32**

this first sentence of 7.1.

**BY MR. MCRAE:**

Q    Now, sir, have you ever read the phrase, the number of beds or opportunities offered, to mean the number of times that a given bed or opportunity was offered to a person experiencing homelessness?

A    I haven't read that within the context of this reporting requirement, no.

Q    And do you think that that interpretation of number of beds or opportunities offered would be reasonable?

        **THE COURT:**  Would be what, counsel?

        **MR. MCRAE:**  Reasonable.

        **THE WITNESS:**  If there was the intent that that's what it meant and clarity provided, look, this was a term that wasn't defined.  If it was defined in another way, then presumably that would be a reasonable interpretation.  But it wasn't, and so we did not, we took it to mean what is being offered citywide based on what we have created.

**BY MR. MCRAE:**

Q    Are you aware of an existing tracking mechanism that would record each time any person is offered a given bed or unit?

A    No, not tied to particular beds or units broadly.  And no, actually, I don't believe specific individual offers are tracked in that manner.

Q    And so, sir, just to parse this, are you reading the

number of beds or opportunities offered as different from the number of times a given bed or opportunity is offered?

A    Yes.

Q    Now, if someone wanted to understand how many offers of a given bed or unit had been made to a person experiencing homelessness, is there anything in these quarterly reports that, even if not completely or fully, might speak to that metric?

A    So in effort to provide a clearer picture about the actual benefits derived from the creation of these beds, although it was not required by the settlement, we did begin in January of 2023 reporting a metric of persons experiencing homelessness served.

Q    And let us focus, since we have it on the screen, we have Exhibit 502, and I believe we've just had highlighted in the first row of Exhibit 502 the reference to PEH served.  Do you see that?

A    Yes.

Q    Sir, is that the column, the additive column that you were referring to that you say that the City began to adopt at some later point and include in the quarterly reports?

A    Yes.

Q    And do you see that there's a footnote reference there next to the PEH served?

A    Yes.

Q    And can you, before we get to the footnote -- well, actually, why don't we take a look at the footnote?  If you can pull that up.  We're going to look at the footnote on pages 6 and 7, and actually, it's going to be page 6.  And if we could enlarge, and I think we have it here on the screen, footnote 2. Does this purport to provide a definition, sir, or at least explanation, rather, of the number of PEH served column?

A    It does.

Q    And does it set forth the constituent elements of the number of PEH served?

A    It does.

Q    And can you tell us, do you regard this number, PEH served, in the quarterly reports as under-inclusive of the number of offers of beds or units to persons experiencing homelessness?

A    It would very likely be -- it is almost certainly under-inclusive.

Q    Why?

A    Because we -- the -- if -- for -- on both sides of the metric, so we have -- we're reporting the person served for permanent housing as the units that are -- that we've created that are actually leased, that have a person in them living. And, again, it's permanent housing, so the idea is that they should, they would be in there over time.  Interim housing, the, we report that a little differently because the purpose of

Szabo - Direct / By Mr. McRae                **35**

interim housing is to bring people in off the street, and then,

ideally, there would be turnover.

So for permanent housing, we report how many -- how many

people are leased up in these units at the end of the quarter.

For interim housing, it is how many intakes, how many times,

how many people have been served over time with that interim

housing, which is designed for turnover.  The reason that that

would be under-inclusive is it is common that a person who is

living on the street would need to be offered an opportunity

multiple times before they would accept it.  It is not

possible -- it was not possible for us to report that, but in

reporting person served, that also covers, if we were looking

at defining -- looking at how many people were offered, anyone

who is leased up in a permanent supportive housing unit or

anyone who was in an interim housing unit would have been

offered that bed or opportunity.

Q    Now, sir, we've talked about how the City reports on the

number of beds or opportunities offered in a report for the

most recent quarter.  Let me show you Exhibit 27.  And Exhibit

27 is ECF 539.  This is a quarterly report for the period

ending March 31, 2023.  And, sir, can you tell us, will we find

the number of beds or opportunities offered again in the

units/beds column of this exhibit?

A    Yes, columns 6 and column 7.

Q    Let me show you now Exhibit 31, which is ECF 728.  This is

page 2.  It's a quarterly report for the quarter ending March 31st, 2024.  And, sir, here as well in this exhibit is the data point, the number of beds or opportunities offered, stated in the same column of units/beds.

A     Yes.

Q     To the best of your knowledge, has this metric, the number of beds or opportunities offered, been reported by the City in each and every one of the quarterly reports it has submitted under the Alliance settlement agreement, which is Exhibit 25?

A     Yes, in every report.

Q     And has this metric, the number of beds or opportunities offered, been reported in the same manner in each of the reports we've discussed?

A     Yes.

Q     Now, let me move to the third metric in the first sentence, which is the number of beds or opportunities currently available in each council district.  Now, as far as the term currently available, focusing on that language, do you see any definition of the words currently available in the Alliance Settlement Agreement?

A     No.

Q     Are you aware of any court order that purports to explain or define currently available as it's used in Section 7.1 of the settlement agreement?

A     No.

Q    Do you nonetheless, sir, have an understanding of what the term "currently available," and let's take it in full context, the number of beds or opportunities currently available in each council district, do you have in mind an understanding of what that term means?

A    Yes.

Q    And is the basis of your understanding the same basis that you've described with other terms that we've been talking about here in Section 7.1?

A    Yes.

Q    Can you tell us what your understanding of the term, the number of beds or opportunities currently available in each council district is?

A    My understanding, and we have reported as such, which is the number of beds or opportunities created and offered in each council district.

Q    And sir, if we take a look at Exhibit 502, ECF 1072, we go to page 2, can you show us where in the City's quarterly report here for this period ending September 30, 2025, where it purports to provide the data point, the number of beds or opportunities currently available in each council district?

A    That would be columns 2, column 6, and column 7.

Q    And for the record, tell me if I've got this right, column 2 says council district, correct?

A    Correct.

Szabo - Direct / By Mr. McRae                    **38**

Q    You next follow that with column 6, sir?

A    Yes.

Q    And that would be units/beds, correct?

A    Yes.

Q    And then finally, column 7, which says status.

A    Correct.

Q    And sir, can you tell us if we were to aggregate columns 1, 6, and 7, how would one calculate the number of beds or opportunities that exist, and here we're talking about council district one?  How would one do that in these quarterly reports?

A    In the table that we provide, it would be the -- you would look at all of the units and beds, which are open in each council district.  So I would look at all of the lines that are marked with council district one.  And of those beds that are indicated, the status is the status indicating that they are open, then that would be the number of beds per council district, the number of beds or opportunities currently available in each council district.

Q    And to get a total, would it simply be a function of math?  You would calculate all of the entries that say council district one and look at the information on a seriatim basis for column 6 and 7, and then have a cumulative total?

A    Yes.

Q    Now, have you ever read this phrase, number of beds or

EXCEPTIONAL REPORTING SERVICES, INC

opportunities currently available in each council district, to

mean how many beds are currently unoccupied?

A    No.

Q    Why not?

A    Again, that is -- that is a -- let me back up.  The

reason -- the reason that I've never read it that way is, I

think, my reading, the City's reading has been that this

section, particularly this first sentence of those reporting

requirements, is they are all related to the principal

obligation of establishing beds.  So there was no discussion or

there was -- there's nothing in the settlement as I read it

that requires any sort of real time vacancy reporting.  And

furthermore, these are quarterly reports, and it would not make

sense to report that kind of information on a quarterly basis.

Certainly, it would make sense to report what are the beds that

are -- that were created and are available for use in each

council district, because the idea is that we are establishing

these beds and these beds are going to be open for at least the

entirety of the term of the settlement.  But to report on a

quarterly basis an attempt at real time vacancy rates wouldn't

make any sense.  I mean, even the report is due to the Court on

the 15th.

     And it would, the day that that report was issued, that

data would be stale, certainly as it relates to interim

housing, because that's a data point that would be changing all

Szabo - Direct / By Mr. McRae                    **40**

the time.  So it wouldn't follow -- it wouldn't make sense.

This, again, is how we've been reporting it, and until very

recently, there hasn't been any challenge that what we were

reporting wasn't what the settlement agreement was asking for.

Q    Sir, are you aware of any real time tracking mechanism in

terms of when a given bed is available?

A    There are various mechanisms.  There are various systems

that LAHSA has at its avail that they have been building and

improving over time.  There is, as it relates to the Inside

Safe program, the mayor's office certainly keeps track of the

availability in beds that are under lease for the City for

purposes of conducting encampment resolutions.  But in terms

of, at the time that this settlement agreement was made, was

entered into, there certainly wasn't the capacity for that kind

of -- I don't believe there was the capacity for that kind of

information, and it is something that LAHSA has been working to

improve.

Q    And sir, we've, throughout our discussion here this

morning, looked at quarterly reports in prior periods to

September -- the quarter ending September 30, 2025.  Would it

be the case that in the quarterly reports that have been issued

by the City since the inception of the Alliance settlement,

that the number of beds or opportunities currently available in

each council district has been reported in the same manner in

those other quarterly reports as you've described here for

**EXCEPTIONAL REPORTING SERVICES, INC**

Exhibit 5?

A     Yes.

Q     502, I believe this is.  Excuse me, this is Exhibit, yes, 502.  Thank you.

          **MR. MCRAE:**  Your Honor, I'm going to move to a different topic.  Well, I'm going to move to the second sentence of Section 7.1.  I'm happy to keep going.  I know we've been going a little over an hour.  I didn't know if the Court --

          **THE COURT:**  Do you want to take a recess?

          **MR. MCRAE:**  Five minutes, Your Honor, and we --

          **THE COURT:**   Well, how about more than that?  Okay?  How about 15 or 20 minutes, counsel?

          **MR. MCRAE:**  Thank you, Your Honor.

          **THE COURT:**  So you can use the restrooms, et cetera.  All right.  Sir, thank you.  You may step down and have about 20 minutes, okay?  Thank you.

          **MS. MYERS:**  Your Honor, just a reminder that the parties agreed that we would take a recess from 12:00 to 1:00 because we had a scheduled call, and I just want to make sure that we're still able to do that.

          **THE COURT:**  Thank you for reminding me.  So folks on the voter registration case, if you've got representatives here, I can give up my lunch.  Why don't we go from 12:00 to 1:00 and see how far we get?  And for the person who has

another obligation, I think you're with the NAACP.  You could

argue first, if you'd like to, in terms of rebuttal after DOJ

is done, okay?

          **UNIDENTIFIED SPEAKER:**  So, to be clear, you're

saying --

          **THE COURT:**  I'm sorry, counsel.  I can't hear you.

So, counsel, go take your recess now.  Let me have this

discussion with other counsel.  Thank you.

     **(Recessed at 11:17 a.m.; reconvened at 11:37 a.m.)**

          **THE COURT:**  Counsel, thank you for your courtesy. If

you'd be seated for just a moment.  Mr. Szabo, if you would

take the stand, please.  Counsel, this would be continued

direct examination by the City.

          **MR. MCRAE:**  Thank you, Your Honor.

                    **DIRECT EXAMINATION (CONTINUED)**

**BY MR. MCRAE:**

Q    Mr. Szabo, let's go back to Exhibit 25.  I want to direct

your attention now to the second sentence of Exhibit 25,

Section 7.1, which reads in the first part, the City will work

with LAHSA to include in the quarterly status updates to the

extent possible, and then what follows are a series of

metrics.  I want to talk to you about this language, this first

dependent clause of Section 7.1, the second sentence.  Sir,

when you see the City will work with LAHSA, let's just start

with that.  Do you have an understanding of what that means?

A    Yes.

Q    And is that language of significance to you in terms of how you read what the City is committing to do here as far as reporting on these metrics in the second sentence?

A    Yes, very much so.

Q    Can you explain to us how the language, the City will work with LAHSA, is instructive to you in terms of how you read and understand what the City is undertaking here in the second sentence?

A    So, number one, it is an acknowledgement that the information requested is not under the control of the City.  The data is not within the control of the City.  And so we would need to rely on an outside entity, which was not party to the settlement, to provide the information.  Further, working with LAHSA is the obligation to do what we could to see if LAHSA could provide this information, if they had the capacity to do it, et cetera.  Our obligation was to work with LAHSA.

Q    And, sir, do you see that the language, the City will work with LAHSA, do you see that language in the first sentence relative to the commitment that the City will provide quarterly status updates?

A    No.

Q    Let's move to the language that precedes the colon in the second sentence that says, to the extent possible, and read

Szabo - Direct / By Mr. McRae                    **44**

this in conjunction.  The City will work with LAHSA to include

in the quarterly status updates, comma, to the extent possible.

Sir, do you have an understanding of that phrase, to the extent

possible, in the context of Section 7.1?

A    I do.

Q    And do you see anywhere in Section 7.1 where the term, to

the extent possible, in this context is defined?

A    No.

Q    Are you aware of any court order in this matter that

defines, to the extent possible, in the context of Section 7.1?

A    No.

Q    And for that matter, are you aware of any court order that

defines what work with LAHSA means?

A    No.

Q    Similarly, are you aware of a definition of what work with

LAHSA constitutes under Section 7.1 of the settlement agreement

in the settlement agreement?

A    No, it's not defined.

Q    So, sir, focusing on the to the extent possible language,

can you tell us what your understanding is of that language

relative to what it is the City is committing to do here?

A    So my understanding and the nature of this portion of the

settlement, based on my perspective from participating in its

negotiation, is that there was acknowledgment that, A, this

information, this data, isn't controlled by the City.  We would

**EXCEPTIONAL REPORTING SERVICES, INC**

need to work with someone else in order to provide it.  There was an acknowledgment that, to the extent possible, is an acknowledgment that, A, LAHSA may not be able to provide it. Number two, if they were not able to provide it, the City wouldn't be in a position to unilaterally require it.  And, C, it may be impossible to provide all together.  So the obligation is to work with LAHSA, which we do, to determine if it's at all possible and if it is possible, if it was data that could be provided, to provide it.

Q    Now, sir, if you take a look at this language, the City will work with LAHSA to include in the quarterly status updates, to the extent possible.  Do you read this language as contemplating that what may be possible to report may change over time?

A    Yes.

Q    Can you explain that?

A    Well, the, what may be possible to report, LAHSA, particularly in the area of data collection and reporting, LAHSA has been improving over the last few years, in the recent history.  The last -- the current CEO and the last CEO made it a priority to improve their capacity to collect and report relevant data.  At the time of the settlement, it was, there was a great frustration with data that we were able to secure from LAHSA, we being, and I'm talking now outside of the settlement.  So, over time, sure, things -- you could

implement, systems could improve, you can implement new systems.  So, that's -- yes, it could be -- it could change. What's possible could change over time.

Q    But honing in on that language, have you ever interpreted the words "to the extent possible" in the context of this agreement to mean anything that is theoretically possible?

A    No.

Q    Why not?

A    Well, because certainly there is no -- there is nothing that instructs or requires the City to make what is not possible, possible if it were theoretically possible.  Again, the acknowledgement was, or the instruction was to work with LAHSA to include in our reports if it were possible to include.  And so, you know, you could come up with whatever scenario, anything is theoretically possible.  But so, no, we didn't in any way consider that it was a -- and it wasn't -- and it wasn't a hard requirement.  And we wouldn't, by the way, we wouldn't have agreed to that.  The information that's being requested here was in -- squarely within the purview of LAHSA. And at the time, we knew it would be likely difficult or there could be difficulty, so we wouldn't have committed the city to do something that we knew through -- based on an agency outside of the City, we potentially couldn't make good on.

Q    So for instance, do you read the language to the extent possible to mean anything that's possible, regardless of the

amount of money and time it might take to effectuate?

A     No.

Q     Do you see anywhere in Section 7.1 -- well, let's just go back to the language.  The City will work with LAHSA to include in the quarterly status updates to the extent possible.  I want to focus your attention on the words "to include."  Do you see anywhere in Section 7.1 of the settlement agreement where the City must work with LAHSA to create the metrics that are described there, as opposed to including them?

A     No.

Q     Now, as far as you know, sir, is the City in a position to report data that doesn't exist?

A     No.

Q     Now, did you ever understand the second sentence of Section 7.1 in Exhibit 25 to mean that the City had to report the data described in the second sentence even if LAHSA didn't have the data?

A     No, absolutely not.

Q     Why not?

A     Well, because that's not what it says, number one, and if that were the term that was intended, we would not have agreed to that.  We would not have agreed to that.  It was a consistent and clear position of the City that what we were agreeing to in the settlement agreement was within the City's purview, at least largely within the City's purview to

effectuate, and we would not have agreed to anything that would have required us to work with LAHSA to create a system that doesn't exist to report data that doesn't exist.  There are too many variables there for us.  We would never have agreed to that, and we didn't agree to that.

Q    And did you at any point, sir, understand this language about working with LAHSA to the extent possible to mean that the City would be in violation of the second sentence of Section 7.1 to the extent that LAHSA did not maintain the data needed to satisfy these reporting requirements?

**MS. MITCHELL:**  Objection.  Calls for a legal conclusion.

**THE COURT:**  Overruled.  You can answer that question.

**THE WITNESS:**  No.

**BY MR. MCRAE:**

Q    Why not?

A    Because, number one, that was my intent in agreeing to this language.  I would not, and I said -- as I stated, it was a consistent position, an insistence that we wouldn't put the City in a position to violate the agreement if the agreement called for or required or obligated the City to do things outside of its purview, and this is clearly outside of the purview of the City, this information requested, and I wouldn't have agreed to any language or any provision that would have put us in violation of the settlement agreement if we weren't

able to produce it if it were something that were outside the purview of the City.  So this language is, to me, is clear.  The intent was clear.  This is language that was requested.  It was information that was requested, but it was clearly acknowledged that the City doesn't own it.  The City doesn't control it.  The City would have to work with an outside agency, and that it might not even be possible, even if we work with the outside agency, to produce this information.

Q    Sir, let's focus on the first metric that's described after the words "to the extent possible" here in Section 7.1 in the second sentence.  It says the number of PEH engaged.  Do you see that?

A    Yes.  Yes.

Q    And do you see a definition of the words PEH engaged anywhere in the Alliance settlement agreement?

A    No.

Q    And have you seen any order of this Court defining the term PEH engaged?

A    No.

Q    Do you have an understanding of what that term means in the context of this Section 7.1?  Or let me rephrase the question.  Do you have an understanding of the term PEH engaged?

A    I do.

Q    What is your understanding of the term, the number of PEH

Szabo - Direct / By Mr. McRae                **50**

engaged?

A     My understanding of the term PEH engaged, although I am not the expert in this area, it is a term that is used by outreach workers.  And engagement means that the outreach that they are conducting results in engaging the person experiencing homelessness with some kind of a case plan.  It doesn't necessarily mean housing, but it means that they are essentially in the system, that they are working with them, and they have the ability to come back to them to make sure that there's progress along a case plan that is being established by the agency.

Q     So, sir, we've talked about the first sentence of Section 7.1 and the second sentence of Section 7.1, but I want to ask you, when you look at the first sentence and it says, the City will provide quarterly status updates to the Court regarding its progress with this agreement, and then you see the City will, in the second sentence, work with LAHSA to include in the quarterly status updates.  Did you read the language "in the quarterly status updates" in the second sentence to be the same quarterly status updates in the first sentence of Section 7.1?

A     Yes.

Q     And did you carry into the second sentence of Section 7.1 this concept of providing an update regarding progress under the agreement?

A     Yes.

**MS. MITCHELL:**  Objection.  Leading.

**THE COURT:**  I'm sorry, I didn't hear the objection.

**MS. MITCHELL:**  Objection.  Leading.

**THE COURT:**  Overruled.  You can answer the question.

**THE WITNESS:**  Yes, I did.

**BY MR. MCRAE:**

Q    How did that understanding that 7.1 was about regarding progress under the agreement inform how you viewed what was being committed here in the second sentence of Section 7.1?

A    It informed my understanding to the extent that everything, all of the information that is being requested needs to tie back to the obligations of this agreement.  And so, in this case, for PEH engaged, it would be how many PEH were engaged as it relates to or in conjunction with the housing or shelter opportunities created pursuant to this agreement.

Q    And, sir, has the City been reporting on the number of PEH engaged in the quarterly reports that the City has been issuing since the inception of the settlement agreement?

A    We have not been able to report on that specific metric. However, part of the reason that we have included PEH served was our effort to get as close as we could to that -- to answering that or to providing that metric because that every person experiencing homelessness that was served by the units that were provided also would have been engaged, as well as

Szabo - Direct / By Mr. McRae                    **52**

also would have been given an offer.

Q    Let's unpack that.  Let's start at the very top of what you were saying.  When I asked you, have you been -- has your office been reporting the metric PEH engaged, the number of PEH engaged in each of the quarterly reports, you said no.  I want to ask you why.

A    It would not be possible, and we did work with LAHSA to determine whether this was possible to report.  It wouldn't be possible to report PEH engaged exclusive to the opportunities created by the settlement, period.  It would not be possible to report that because the --

Q    Why?

A    It oftentimes, or it is rare, there are exceptions and we can talk about that, it is rare that when an engagement happens between an outreach worker and a person experiencing homelessness, that if there is an engagement made, that is going to be tied from the beginning to a particular housing type.

Q    Why?

A    Because the engagement, as I said, and again, I'm not the expert, but the engagement is the process of engaging, bringing the person experiencing homelessness into a case plan, and you don't know at that point what is necessarily the best housing type for that individual.  It could be an interim -- it could be interim housing that is provided by this settlement.  It

**EXCEPTIONAL REPORTING SERVICES, INC**

could be interim housing that wasn't provided by the settlement.  It could be straight to permanent housing that's provided by the settlement, or permanent housing that is outside of the settlement.  There would be no way to filter each individual engagement by housing type because that engagement happens before that housing type would be determined in most cases.

Q    Now, sir, you also said that while the City has not provided a report on PEH engaged, that the City has endeavored to nonetheless report a different metric.  What were you referring to there as this other metric?

A    The metric I was referring to was the metric that we have been reporting since January of 2023, that hasn't been required explicitly by the settlement agreement, which is PEH, Persons Experiencing Homelessness Served.

Q    And why has the city been reporting that metric in connection with this discussion here about the second sentence of Section 7.1?

A    We've been reporting that because it was our best effort to provide this information requested, to provide the data requested as it relates to the settlement agreement.  It was the Persons Experiencing Homelessness Served by the beds created will also tell you how many people were engaged related to the units provided by the settlement.  It would tell you how many people have accepted offers of shelter or housing related

Szabo - Direct / By Mr. McRae                          **54**

to the units created by the settlement agreement.  So it was our best efforts to provide that information in a way that was specific to the settlement agreement and in a way that we could verify and report with confidence.

MR. MCRAE:  Your Honor, it is 12 o'clock on the button.

THE COURT:  That's fine, counsel.  Then would 1 o'clock be acceptable?  1:15?  What's acceptable, everyone?

MR. MCRAE:  Yes, Your Honor.  Whatever pleases the Court.

THE COURT:  Well, over the lunch hour, if you have time just to meet and confer, just in the interest for planning for the events in the future and for a courtesy to counsel for planning purposes, I want you to run over a list of the remaining witnesses at the end of the day.  And again, all those witnesses -- all the witnesses will be subject to recall and I'll ensure that each party is provided due process and everyone has an opportunity to ask all the questions you want to ask.  But for each of the witnesses who's yet to finish their initial testimony, just please run over who is requesting the witness to appear, how long you think the witness will take.  And I won't strictly hold you to your time estimate, but I've got to get courts.  In other words, you see today we're in 5.  Who knows where we are the next time?  Hopefully back in the ceremonial court.

**55**

So the chief judge has been very gracious, but we're floating from court to court.  And also just as a courtesy, so you have all the time you need for all the planning purposes, just sketch that out for me, okay?  Because right now the next date I have is December 15th.

          **MR. MCRAE:**  Yes, Your Honor.

          **THE COURT:**  Okay.  Now go have a nice lunch.

          **MR. MCRAE:**  Thank you, Your Honor.

          **THE COURT:**  At 2 o'clock, you get up and walk out of here.  You said you had a plan at 2 o'clock?

          **THE WITNESS:**  Yes.  Yes, Your Honor.

          **THE COURT:**  I could lose track of time.  Don't worry about that.  So 2 o'clock, make it known to me you have another engagement.

          **THE WITNESS:**  I will.

          **THE COURT:**  That's fair.  All parties told me.

          **THE WITNESS:**  Appreciate it.  Thank you.

          **THE COURT:**  So let's try 1 o'clock, counsel, so we can have a meaningful hour.

          **MR. MCRAE:**  Yes, Your Honor.

          **THE COURT:**  Okay?  Thank you.

     **(Recessed at 12:01 p.m.; reconvened at 1:05 p.m.)**

          **THE COURT:**  We're back on the record.  Is that correct, Ian, Megan?

          We're on the record?

**THE CLERK:**  (inaudible)

**THE COURT:**  All right.  All counsel are present, Mr. Szabo is present.  Counsel, continue direct examination please.

**MR. MCRAE:**  Thank you, Your Honor.

**DIRECT EXAMINATION (CONTINUED)**

**BY MR. MCRAE:**

Q    Mr. Szabo, good afternoon, sir.

And we were talking about the metric PEH served being reported in the quarterly reports that the City has filed. Sir, did you recently learn that the Alliance had some concerns about how the City was reporting this metric of PEH served in its quarterly reports?

A    Yeah, I -- excuse me, I do believe they raised some concerns.

Q    And when did you first learn of those concerns from the Alliance?

A    Well, there were concerns I believe that were raised in our last, following our last initial quarterly report.  That would be the quarterly report for the quarter ending September 30th, 2025.  Because we did not report PH served and indicated we would report those numbers in a subsequent supplemental report.

Q    Now, Mr. Szabo, I want to turn to the second metric that's described in the second sentence of Section 7.1 in Exhibit 25,

Szabo - Direct / By Mr. McRae                    **57**

which is the number of PEH who have accepted offers of shelter

or housing.  Do you see that, sir?

A     I do.

Q     And do you have an understanding of what that term means?

A     I do.

Q     And by that term, I mean the highlighted clause, the

number of PEH who have accepted offers of shelter or housing.

Sir, can you tell us what your understanding is of the

number of PEH who have accepted offers of shelter or housing?

A     My understanding is that that's the number of persons

experiencing homelessness who have accepted offers of shelter

or housing pursuant to this agreement, as this again this

report is regarding our -- the City's progress with this

agreement.

So the number of PEH, so that would be the number of PEH

who have accepted offers of shelter or housing into beds or

opportunities established pursuant to the settlement agreement.

Q     And, sir, now I'd like to show you Exhibit 502, which is

ECF 1072 on page 2 of that exhibit.  And, sir, is this document

the quarterly report for the Alliance settlement agreement for

the quarter ending September 30, 2025 also indicated it is a

supplemental report?

A     That is correct.

Q     And, Mr. Szabo, if you could can you tell us where on the

City's quarterly report in Exhibit 502 we can find what the

Szabo - Direct / By Mr. McRae                                    **58**

City is reporting as the number of PEH who have accepted offers

of shelter or housing?

A     That is represented in the persons experiencing

homelessness served, which is the ninth column.

Q     And with that columns being highlighted at this point,

that is the column that also has the reference to footnote 2?

A     Correct.

Q     Now, sir, can you tell us if we take a look at -- I think

we talked about this footnote earlier, can you tell us why PEH

served is being reported by the City in the quarterly reports

for the metric the number of PEH who have accepted offers of

shelter or housing?

A     Because it is our best effort to present that information

or to report that information.  Every person experiencing

homelessness served by the units established pursuant to this

agreement are persons experiencing homelessness who have

accepted offers of shelter or housing into units or

opportunities established pursuant to this agreement.  It was

our best way of providing that information to the Court and to

the plaintiffs and to the intervenors.

Q     Now again, sir, when we're talking about Exhibit 502, if

we could go back up to the top of page 2 of Exhibit 502, again,

focusing on supplemental quarterly report, with that word

supplemental report, had there been a prior quarterly report

prepared and issued by the City of Los Angeles for the same

quarter ending September 30th, 2025?

A    Yes, there was.

Q    And can you tell us why this prior report for the period ending September 30, 2025 was then supplemented in the form of what we're now looking at which is Exhibit 502?

A    It was supplemented because the report, the initial report which was submitted on October 15th, 2025 did not include the persons experiencing homelessness served, it did not include PEH served.  We did not report that data in that initial report.

Q    And why is that?

A    And that is because as the report was being compiled and developed it was brought to my attention that there was an issue in our verification process and there was a discrepancy between what was being reported by service providers and what we was -- and what we were able to verify in HMIS.

     And so I made the decision to with -- I made the decision that instead of reporting data that we had reasonable confidence could be inaccurate, to hold that information back to continue our verification process and to provide the accurate information as soon as we possibly could and that's what we did.

Q    Sir, why didn't you just report the data that you thought was inaccurate?

A    That's not what we do in the CAO's office.  It would have

Szabo - Direct / By Mr. McRae                **60**

been a -- it would have been in my view a violation of our obligation to report information that to the best of our knowledge and ability is accurate.

I had information -- I knew that there was a discrepancy in the data.  We were not able to resolve that discrepancy by the time that report was due to the Court.  So instead of reporting information that there was a likelihood -- that had a high likelihood to be inaccurate, I decided to withhold it, withhold any reporting until we were certain that all of the data that we were reporting on this data set was accurate date.

Q    Let me now show you Exhibit 503, which is ECF 1051 on page 2.  Now, a moment ago we looked at the last column of the last quarterly report that we were looking at, which was total PEH served.  I want you to look at that column here and Exhibit 502 or excuse me, 503.  Thank you.

And in looking at Exhibit 503, do you see any entries under total PEH served?

A    I see two entries.

Q    And what does it say?

A    They both say pending.

Q    Okay.  And so now we can go back and take a look at Exhibit 502, which is ECF 1072, page 2.  We juxtaposed those on the screen for your convenience.

Now, I'm looking at the column titled total PEH served where there was formerly an entry of pending in this

**EXCEPTIONAL REPORTING SERVICES, INC**

supplemental report, which is Exhibit 502, do you now see it populated with numbers instead of the name pending?

A    I do.

Q    And why is that the case?

A    That's because in the intervening period between issuing the first report and issuing the supplemental report, we were able to level of my satisfaction to verify the data for persons experiencing homelessness served by the units that we were reporting and so we included that data as we have with our prior reports.

Q    And, sir, how much time to the best of your recollection had passed between the original quarterly report for this quarter ending September 30th, 2025 and the version of Exhibit 503 and this supplemental report we're looking at, which is Exhibit 502, how much time had elapsed between the preparation of those two documents?

A    It was a little more than three weeks.

Q    Now, let's move on to the next metric in the discussion of the second sentence of Section 7.1.  It says the number of PEH who have rejected offers of shelter or housing and why offers were rejected.

Now, sir, in looking at this language, let's talk about first of all, do you have an understanding of what this term means and by this term I mean the number of PEH who have rejected offers of shelter or housing or why offers were

Szabo - Direct / By Mr. McRae                      **62**

rejected?

A     I'm sorry, do I have an understanding?

Q     Yes, sir.

A     Yes, I do.

Q     What is your understanding?

A     My understanding is that the requested information is how many times a person experiencing homelessness was offered, but then rejected an offer of shelter or housing that has been created by this settlement agreement.  And then the same, a reason as to why in each instance those offers were rejected.

Q     Now, sir, this language we've been focusing on in the second sentence of Section 7.1 of Exhibit 25 says the City will work with LAHSA to include in the quarterly status updates this metric, amongst others, to the extent possible.

Can you tell us if the City of Los Angeles has been including in the quarterly reports the number of PEH who have rejected offers of shelter or housing and why offers were rejected?

A     We have not been including that information.

Q     Why not?

A     We haven't been including that information because as a result of our work with LAHSA we've determined that it was not possible.

Q     Can you further explain that?

A     That is a metric that outreach workers that are employed

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Direct / By Mr. McRae                 **63**

by LAHSA or contracted through LAHSA do not collect.  They've consistently said that's not something that they track.  Their interest is to keep going back and back and back to the individual until they are ready and able to accept any services or, in this case, an offer of shelter or housing if it's available.  And they don't have a mechanism for tracking why each individual offer was rejected.

Furthermore, as discussed previously, tying the offers, any offer to specific units created, not just created by the City itself, but created by the City and pursuant to the settlement agreement was not something that they had the capacity to track.  They just didn't -- they didn't do it and they were not in a position to dedicate the resources to try to start capturing rejected offers and why offers were rejected. That was outside of the scope of their mission and they made that clear.

Q   So have offers, rejected offers of shelter by PEH -- let me start that over.

So has the number of PEH who have rejected offers of shelter or housing and why offers were rejected ever been reported in the City's quarterly reports up to this point?

A   No.

Q   And, sir, when was the first time that you learned that the Alliance had any concerns about whether the City was reporting this metric?

A     The first time I was made aware was the first time any issues were raised, to my knowledge, regarding 7.1 and that would have been again within the last month and a half.

Q     Let's move now to the last metric in the second sentence of Section 7.1 which refers to the number of encampments in each council district.

Sir, do you have an understanding of what that term means?

A     I do.

Q     What is your understanding, sir?

A     Subject to the definition of an encampment, it would be the number of whatever we were defining as an encampment.  In each -- that is present in each council district, and in this case, on a quarterly basis.

Q     Now, sir, if we take a look at Section 7.1, do you see how in each sentence of Section 7.1 the reference is to quarterly status updates?

A     Yes.

Q     Do you know whether LAHSA reports the number of encampments in each council district in a manner that would allow your office to report this metric on a quarterly basis?

A     They do not.

Q     Can you explain that?

A     The outreach that is paid for by the City but employed by LAHSA does not typically count encampments at all.  It is -- that has been made very clear over time by officials at LAHSA

that their focus is on people and not on things that are in the public right of way.

There is, of course, an understanding that there is a desire to capture this information.  We certainly engaged LAHSA on this issue.  We asked for, you know, we asked for ways in which they could provide this information.

There was an effort to collect this information in the annual point in time count, but we determined that that information, the information collected and reported in the point in time count was not sufficient to meet the required data in this section of the settlement agreement.

Q    And why is that, sir?

A    There are a number of reasons.  Number one, the point in time count is as its name suggests, it is a count that is taken at one point in time annually.  It happens typically in January and then it is not reported -- it is not reported until June or sometimes July, or I believe it had been reported even later one year.

So as it relates to our quarterly obligation, reporting encampments in a quarterly report based on information that was collected in January in any given year, and not reported until June of any given year, would -- that information would immediately be stale and inaccurate.

And as it relates to quarterly reports, it would be inaccurate as much as -- it would be as much as a year old or

even as much as 18 months old, by you know, the last report before the new information came out.

Furthermore, we -- there -- we had questions about the reliability of the data.  The data is largely collected by volunteers and it is based on volunteers walking around areas of the City and reporting what they see.  And we felt that there were -- there was significant potential or significant risk for errors in that data, particularly as it relates to extrapolating numbers district-wide based on the whole.

So they do a lot of projecting and extrapolating when they're reporting, when they're trying to report a small data set, they look at the large data set, and then they extrapolate how many people there may be in any given subsector.  We just felt there was too much risk and too much -- too many issues with the accuracy or potential accuracy of that data to report it in compliance with this request.

Q    Mr. Szabo, does your office make an effort to verify the data that we've been discussing that includes the metrics discussed in Section 7.1?

A    Yes, we do.

Q    And in the context of your office trying to verify the data regarding Section 7.1 in the quarterly reports, can you tell us whether the manner in which your office verifies the data in the quarterly reports, does that depend on the type of unit or bed?

Szabo - Direct / By Mr. McRae                          **67**

A     It does.

Q     Can you explain to us in what way does the type or unit or bed under consideration that's reported in the quarterly reports impact the manner in which your office seeks to verify that data point prior to its inclusion in the quarterly reports?

A     Well, for each housing type, there would be different ways to collect and validate the data.  So as an example, I'll just use two of the most prevalent housing types that we're reporting in compliance.  One is permissive supportive housing, either through the HHH program or through other means, through the housing department.

In that case we have, we'll say the 6,000 or so, I think 6,500, close to 6,500 units of permanent supportive housing that we're reporting out of the 8,000, maybe it's a little bit less than that, maybe 6,200.  We have -- we get information from the housing department.  We then -- we have information in some cases from general services from the housing department.

We have information from the HHH oversight board, we make sure that's all consistent, but then we also work with the Housing Authority because the Housing Authority controls the vouchers for the lease up, the subsidies for the leasing of these units.

So we verify and check the lease up data of the utilization of the project based voucher that is controlled

with the Housing Authority with the information on the unit from the housing department and make sure that there are no inconsistencies in what we're reporting.

That by the way is oftentimes we have some fluctuation in the -- you know, in the multiple footnotes that we provide.  We might say, well there's one less unit because we received information that from either the Housing Authority or the housing department that they may have removed, we do the double-check.

As it relates to interim housing, for example, the majority of interim housing that we're reporting is through the Inside Safe program.  So we have data on the leases of the units.  We have data on the -- from the service providers on how many people they are serving in those units.

And then we have -- then we cross check that with data that is in HMIS that we do have access to, to verify and make sure that if we're reporting a unit that is open and occupiable that we have an active lease, we have a service provider that's reporting that there was an actual person using that unit, and then that information is also verified through HMIS.

So two different processes, but trying to get to the same place with multiple checks on the validity of the data.

Q    And, Mr. Szabo, just to clarify the record, that was illustrative rather than exhaustive in terms of the efforts of your office to verify data that goes into the quarterly

reports?

A    Correct.  Those are just two examples.

Q    Sir, let's move on to this.  You're aware, as we've discussed, you said that you recently became aware of some concerns that the Alliance has regarding the City's reporting of Section 7.1 metrics.

Let me ask you, do you believe that the City of Los Angeles has acted in good faith with regard to implementing the Alliance settlement?

          MS. MITCHELL:  Objection, calls for a legal conclusion.

          THE COURT:  I'll let you cast that as a personal opinion.

          THE WITNESS:  Absolutely, yes.

BY MR. MCRAE:

Q    Why?

A    I have -- we have the entire City organized from the top to the bottom around our objective of meeting this goal.  Not only has my office organized to report faithfully every quarter accurate information, but we're just talking -- we've been talking about reporting, but what we haven't been talking about is the fact that on the substance of what this settlement is about we've actually made consistent progress, every quarter since we reached the settlement to reaching the goals.

And as a result, we are now on track to not just meet but

Szabo - Direct / By Mr. McRae                    **70**

exceed the 12,915 requirement.  We are not only overall with

the units that are open and occupiable and in progress, but

actually we are now ahead of our milestones for the second

quarter in a row on the units that are actually open.

    And that has taken a considerable amount of focus and

effort and resources and so at every level of City government,

from the elected officials, to those that are responsible for

implementing and effectuating our compliance we are aligned and

we're working towards the goal and the results do speak for

themselves.  We are ahead of schedule.

Q    And, sir, you've parsed a distinction between what the

City has done relative to implementation of the settlement

agreement and the reporting of what the City has done, as

described in Section 7.1.

    I want to specifically focus you on whether you believe

the City has acted in good faith, with regards to its reporting

under Section 7.1 of the settlement agreement.

          **MS. MITCHELL:**  Same objection, Your Honor, calls for

a legal conclusion.

          **THE COURT:**  I'll let you cast your personal opinion.

          **THE WITNESS:**  Sure.  Again, yes.  We've again

reported every quarter to the very best of our ability accurate

information, to the greatest extent that we can.  I've already

acknowledged that we -- there is some information, particularly

as it relates to the Section of 7.1 that says, to the extent

possible we would provide it.

We -- there is some of that information that we haven't reported, but we haven't reported it after determining that it was not possible to report.  And in other cases, we have worked to report a different metric that could closely provide that information even though that information wasn't obtainable exactly as it was in the settlement agreement.

So it wasn't possible, but even at that point we didn't say okay it's not possible, we provided something that could get us close as we could which we were not required to do, but we did it anyway, because we were committed to be as open and transparent and to comply as closely as we possibly could with the requirements of the settlement.

**BY MR. MCRAE:**

Q   Sir, do you have an idea of how much time you and your office spend on compliance with the Alliance settlement agreement and the Court orders?  And if it would help you to estimate that in intervals of a week or a month, whatever, is most amenable to you, do you have any sense of what that estimate would be?

**MR. MCRAE:**  Your Honor, I'm sorry, I believe there's a gentleman from the Marshal Service --

**THE MARSHAL:**  Your Honor, I'm sorry to interrupt, are you allowing cell phones and laptop computers to be used in this section today?

THE COURT:  I don't understand.

MR. MCRAE:  He asked if you're allowing cell phones and laptops to be used in the gallery.

THE COURT:  What are they doing with it?

MR. MCRAE:  He's asking what are they doing with it?

THE COURT:  If it's the press and they're trying to take accurate notes, that's fine.

THE MARSHAL:  Well, he told me in the corner you're allowing everyone to use them today, so.

THE COURT:  Recordings aren't allowed in federal court, are they, counsel?

THE MARSHAL:  No.

THE COURT:  I'm unaware of any allowance of that.  So if there's a recording being made, just courteously ask you not to, okay.  But other than that --

THE MARSHAL:  Okay.

THE COURT:  -- most of the folks here are the community are press, I trust you.

THE MARSHAL:  Okay.  Thank you for the verification, sir.

THE COURT:  Thank you for calling that to my attention.  Let's continue on.  I appreciate it.  Thank you.

MR. MCRAE:  Thank you, Your Honor.

//

//

**BY MR. MCRAE:**

Q    Mr. Szabo, I am -- I can't believe I'm going to ask you this, what were we talking about?

A    How many hours.

Q    Yes, thank you, sir.

        THE COURT:  How much time was spent in compliance on either a weekly --

        MR. MCRAE:  Thank you.  Thank you, Your Honor.

Q    Do you have an answer?

A    So I don't think I could give you an answer off the top of my head, but it is constant, it is daily.  I have, as I said, an entire division of my office that's dedicated to in some part complying with this case, either complying with this settlement, either in the reporting and verification or the work of actually make sure that the units are established, funded and open on time.  It's -- it is a central focus of the work of our homelessness division.

Q    Sir, do you agree with the assertion that the City has withheld reporting under Section 7.1 in the quarterly reports unless it was faced with a court hearing?

A    Not at all, no.

Q    You don't agree with that?

A    I don't.

Q    Why not?

A    I don't because we have done everything that we could to

Szabo - Direct / By Mr. McRae                                    **74**

report that information every quarter since January of 2023 with the exceptions that are clearly provided for in 7.1 which is if it wasn't possible.  We worked with LAHSA, we did what we were supposed to do, in some cases it wasn't possible.

It says, to the extent possible, so in those areas we didn't report it because it was not possible.  And that is, in my view, complying to exactly with what the 7.1 asks for.

Q   Do you agree with the assertion that the City of Los Angeles has resisted public accountability by not documenting its compliance with the Alliance settlement unless it was mandated by this Court?

A   No.

Q   Why not?

A   Because we have been documenting our compliance with the settlement agreement every quarter since January of 2023 as required and in addition to that, dozens upon dozens upon dozens of other reporting with public hearings, public bodies where there were public hearings regarding our compliance with the settlement agreement.

And by the way, beyond just the quarterly reporting, we've submitted multiple bed plans for consideration.  We've -- I've gone personally to the City Council to get those bed plans approved.  We have taken every effort to ensure that not only we're in the position to comply, but that progress is known publicly.

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Direct / By Mr. McRae                    **75**

Q    Sir, do you think it's accurate to say that the City is resisting reporting data in the quarterly reports in circumstances where the City does not have the data in the first place?

A    No.

Q    Why not?

A    We do everything we can to report what we are required to report.  And in the areas where we haven't reported, it's because there has been a reason.  We've again in my estimation, beyond good faith effort to provide the information that has been required in the quarterly reports, has been requested by the Special Master and we've done as much as we can as best we can throughout.

Q    Do you agree with the assertion that the City has engaged in evasive recordkeeping relating to reporting its progress under the Alliance settlement agreement?

A    No.

Q    Why not?

A    And I'm not even sure, I don't know what that means.  Our recordkeeping is as transparent as it can be.  We're reporting on every unit that we've established to the best of our ability as accurately as possible in a manner that is checked and rechecked.  I don't even understand what evasive recordkeeping could mean.  That's absolutely not true.

Q    And, sir, since learning of the Alliance's concerns

Szabo - Direct / By Mr. McRae                    **76**

regarding the City's reporting with respect to Section 7.1 of the Alliance agreement, did you participate in a conversation involving Section 7.1 with among others, persons representing the Alliance on or about November 17th of this year?

A    I did, yes.

Q    And do you recall who else participated in that discussion, to the best of your ability?

A    To the best of my ability, there were a lot of people on the call.  I know that the plaintiffs' counsel was certainly on the call.  The counsel for the intervenors was on the call. There were -- certainly I was on the call, members of my office were on the call.  I believe the Special Master was on the call.  There may have been more, I don't recall exactly.

Q    Were representatives from LAHSA also --

A    Yes, I'm sorry, representatives from LAHSA were on the call.

Q    And do you have a recollection of what was discussed, I don't mean a stenographic or verbatim transcript, but do you have a recollection of what was discussed in that call?

A    Yes, in general it was each of the reporting requirements or requests contained in Section 7.1 of the settlement agreement.

Q    And did you come to that meeting in good faith in hopes of finding a way forward relative to resolving any disputes with respect to the City's reporting under Section 7.1?

Szabo - Direct / By Mr. McRae                    **77**

A     Yes.

Q     And is it your understanding that these conversations will continue?

A     It is my understanding and certainly my hope.

         **MR. MCRAE:**  Your Honor, I'm going to segway to a different topic right now.  I just want to say for the record that my talking about Mr. Gary or the stipulation in 2024, we're not waiving any of the objections that we've asserted throughout this proceeding to the propriety of those topics being included in this hearing.  But since there's been no ruling excluding them and we felt the need to make a record notwithstanding those objections, I will proceed.  But I just wanted to say for the record that that is not in conflict with or a waiver or forfeiture of those objections as to the more limited scope that we've asserted.  And with that preamble, I will segway.

Q     Sir, has your office been working with Mr. Gary and his staff?

A     We have, yes.

Q     And did Mr. Gary reach out to your office to ask about how your office gets the data for the quarterly reports?

A     Yes.  Yes, he did.

Q     And did you respond to Mr. Gary?

A     We did.

Q     And what did you tell Mr. Gary?

**EXCEPTIONAL REPORTING SERVICES, INC**

A     Well, the -- Mr. Gary had a number of requests, a number of requests that were made.  We responded with as much information as we could provide.  I believe it was on October 27th, I don't remember exactly when the request was made, but we responded with as much as we could by October 27th.

We responded with additional information a week later on November 3rd.  We responded with additional information a week later as we were able to obtain what he was asking us to produce.

Q     And, sir, did you have an opportunity to discuss with Mr. Gary whether there were different data systems and different formats that feed the information used to create the quarterly reports?

A     Yes.  He had questions about what systems we used.

Q     And if you could, can you explain to us how long does it take your office approximately to prepare these quarterly reports in each iteration?

A     The quarterly reports -- the preparation of the quarterly reports really it's ongoing.  As new information is obtained, as new units are opened, as that -- that work is always happening because we know we need -- we know we're going to have to do a report the next quarter, so we're always -- we have systems in place to capture this information as we proceed through the quarter.  So it would be hard for me to say how long it takes to prepare, they're always being prepared.

Q    And does the dynamic of different systems in different formats pose any challenges in synthesizing that information to include it in these quarterly reports?

A    It can in some cases.  There is not -- obviously there is not a singular LA Alliance settlement agreement database that, you know, we are the hub that is pulling the information from many sources and that's fine.  It is sometimes a challenge, yes, but we navigate it or we know how to do that.

Q    Sir, I want to switch gears now and I want to talk to you about an RFQ process and I want to ask do you recall -- let me just show you a document if I may, which is Exhibit 319.  And this should be ECF 678.  We're at page 1.

     And, sir, if I could direct your attention.  There's a recital in the first paragraph and it speaks for itself, but in pertinent point it discusses how there were communications between the LA Alliance and certain persons in the City of Los Angeles in two different dates in March 2023, March 8 and March 15th respectively.  Do you see that?

A    Yes.

Q    Now, just to clear this up, you weren't -- and you didn't participate in those discussions; is that right?

A    I did not.

Q    If we move forward to about the middle of the first paragraph here in this exhibit, which is 319, we see that there is a discussion about the City had already put out an RFQ,

Szabo - Direct / By Mr. McRae                **80**

parenthetically described or quote, for quest or request for

qualification, close paren.

 And, sir, are you familiar with this request for, I'll

just call it RFQ for service/outreach providers that are

described in this Exhibit 319?

A I am, yes.

Q And can you tell us to the best of your recollection what

you understood this RFQ for service outreach providers to

entail?

A So the request, the RFQ was issued by my office and

actually there were multiple, because we do have different

types of outreach that we were seeking to contract for.  And

the goal was to contract directly with service providers who do

this work so that we could have direct access to more and

better information about what is going on on the streets of the

City of Los Angeles as it relates to unsheltered homelessness.

 And the goal was to once we received the responses to

contract directly and to fund in the fiscal '23/'24 budget the

outreach so that the entire city would be covered with outreach

that would directly report to the city rather than having to go

through LAHSA.

Q And is it your understanding, let's just talk about these

RFQs, are RFQs something that your office issues on a regular

basis?

A We do.

Q    Are there certain protocols or steps that your office typically pursues with regard to issuing RFQs for service providers?

A    Yes.

Q    And with respect to this particular RFQ, you've told us the purpose.  This RFQ was it related, as you say, to the City's efforts to fully assess the districts in the manner that you've described here?

A    Yes, that would have been included in the work that we were asking them to bid on.

Q    And to the best of your recollection, sir, do you recall when the RFQ that is referred to here in Exhibit 309 -- excuse me, 319, when was that RFQ first prepared, do you recall that?  Or actually, do you recall when it was first discussed?

A    It was first discussed in mid-2022, I mean, it had been discussed for some time.  There was no -- there hadn't been a decision made yet because we didn't know what the landscape looked like, but it was being discussed as something that we were looking to prepare for to implement starting in July of 2023 in the new fiscal year.

Q    Now, sir, did you contemplate that this district-by-district assessment would contribute to the City's efforts to comply with certain parts of the Alliance settlement?

A    Yes.

Q    And was the Alliance settlement agreement the only impetus

Szabo - Direct / By Mr. McRae                          **82**

for this RFQ?

A    It wasn't the only impetus, but it was a major consideration for -- in the decision to move forward with this process.

Q    And was the RFQ for the service providers that are described here in Exhibit 319, was that only issued one time?

A    No, we issued a total of four.  We issued two RFQs for general outreach and then we issued two RFQs, I believe one of them was an RFB, a request for bids on outreach which would be specific to sanitation, so that would have been teamed up with sanitation during cleanings.

Q    And so by March 15th, 2023 which is one of the dates that's referenced here in Exhibit 319, had this RFQ that is the subject of this first paragraph in Exhibit 319, had it already been issued at least the first time?

A    By March 15th?

Q    2023, yes, sir.

A    2023, yes.  By March 15th, 2023 all of the RFQs had been issued by that point.

Q    Sir, why would the City issue this RFQ four times?

A    We issued the RFQ four times because there was an intent, we were committed to securing contracts and executing contracts directly with service providers to provide outreach that would be accountable and responsible to the City along with the scope of required services that the City would dictate essentially.

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Direct / By Mr. McRae                83

We were committed to doing that.

Q    And to put a finer point on it, what I'm asking is, was there a reason why after the issuance of the first RFQ and let me proceed with this logically, did the City get responses after the first time it issued the RFQ?

A    We did get responses.

Q    Why didn't the process end at that point with a selection of a vendor after the first issuance of an RFQ and a response was coming?

A    There were two reasons.  One is that the responses varied widely in what kind of services were being offered, but more importantly we did not receive enough responsive bids to cover the entire City.  The service providers bid for only certain geographic areas and we didn't receive enough responses that would allow us to cover the whole city with outreach.

Q    How about the second time, Mr. Szabo, that the City issued an RFQ, did it also get responses at that point, in response to the second RFQ?

A    We did.

Q    Why didn't the process end with a selection of a vendor in that pool of applicants?

A    For the same reasons.

Q    How about the third time, Mr. Szabo, that the City issued an RFQ, did it get responses the third time?

A    It did.  We did issue the -- four RFQs in -- together, so

we issued two RFQs at the same time for sanitation in general and then we issued another round, sanitation in general in both cases, so we got similar responses.  Some bid on one and then not the other, but in all four cases that happened at two points in time, late 2022 and early 2023, the bids were not -- we did not receive responsive bids that would have allowed us to cover the whole city.

Q    And does it occasionally happen in your experience that the City issues RFQs but doesn't receive adequate responses to select a vendor?

A    It happens from time to time.

Q    And is the typical reaction by the City in those instances to issue another round in the manner that you did here?

A    That's exactly what we did.

Q    And did the City handle the RFQ process here in connection with how it might be helpful to the settlement agreement in the same way that it's handled other RFQs in your tenure?

A    We did.

Q    Did the City undertake the RFQ process in connection with trying to facilitate working with the Alliance settlement agreement in good faith in your view?

A    We did.

Q    Was there money that was allocated in connection with the RFQ that was contemplated?

A    There was, in fact, we -- so our office issued the RFQs.

Szabo - Direct / By Mr. McRae                                    **85**

It was suggested that our office would hold those contracts and so the City Council, the Mayor proposed, and the City Council approved, moving $9 million which otherwise was going to LAHSA to my office for what was intended to be -- to fund those contracts.

Q    And so instead of going to the RFQ where a portion of those funds that you described used to fund LAHSA's outreach efforts?

A    I'm sorry, can you repeat the question?

Q    Yes.  Instead of being used in connection with the RFQ, was a portion of the funds that you described used to fund LAHSA's outreach efforts?

A    Yes, it was.  We actually ended up funding -- in the budget, we funded LAHSA for six months, assuming a transition period, but then ultimately funded them for the second half of the fiscal year.

Q    And did the rest of the money that you described, did it go back to the general fund?

A    It went back to the general fund, yes.

Q    And so did the City endeavor to complete the RFQ process in good faith, in your view, sir?

A    We did.

        **MR. MCRAE:**  Your Honor, it's 2 o'clock.  I'm mindful of Mr. Szabo's time.

        **THE COURT:**  All right.  Thank you very much.

THE WITNESS:  Thank you.

THE COURT:  Go about your business and then we'll contact you after I talk to counsel.

THE WITNESS:  Appreciate it, thank you.

THE COURT:  Thank you very much.

Counsel, why don't you take a recess.  I'd like to finish off this other matter.  Why don't we see you in about 45 minutes, just to make sure.

MR. MCRAE:  Thank you, Your Honor.

THE COURT:  All right.  Thank you very much.

**(Recessed at 2:00 p.m.; reconvened at 2:52 p.m.)**

THE COURT:  Counsel, thank you for your courtesy.  If you'll be seated, we're back on the record, all counsel are present.

And Counsel, you were going to recall Ms. Bivens, is that correct?

MR. SCOLNICK:  Bevin Kuhn, correct.

THE COURT:  I'm sorry, I mispronounced that.

MR. SCOLNICK:  Yes.  We'd like to call Bevin Kuhn back to the stand.

THE COURT:  Yeah.  Counsel, I'll be right back.

MR. SCOLNICK:  Sure.

THE COURT:  Just one moment.

**(Pause from 2:52 p.m. to 2:54 p.m.)**

THE COURT:  Counsel, we're back in session.

Ms. Bevins, if you'd be kind enough to retake the stand.  And counsel's with you.

If there's not a chair, just bring a chair over (inaudible).  And this time we've lowered that sufficiently, there's no (inaudible).

THE WITNESS:  Thank you.

**(Witness retakes the stand.)**

THE COURT:  And, counsel, once again, would you identify yourself for the record because we're on Court Smart?

MR. SCOLNICK:  Certainly, Your Honor.  Kahn Scolnick for the City.

THE COURT:  All right.  And this is continued direct examination; is that correct?

MR. SCOLNICK:  It is correct.  It's cross technically but yes.

THE COURT:  I'm -- well, I'm sorry, cross.  Please.

MR. SCOLNICK:  Yes.  Thank you, Your Honor.

Good afternoon, Ms. Kuhn.

THE WITNESS:  Good afternoon.

**BEVIN KUHN, PLAINTIFFS' WITNESS, RECALLED, PREVIOUSLY SWORN**

**CROSS EXAMINATION (RESUMED)**

**BY MR. SCOLNICK:**

Q    You realize you're still under oath, correct?

A    Yes.

Q    I'd like to pick up where we left off on Tuesday, which

Kuhn - Cross / By Mr. Scolnick                                **88**

was with section 7.1 of the Alliance settlement agreement.

That's Exhibit 25.  You see it on the screen?

A     Yes.

Q     You were questioned about this provision on your direct

examination, and I just want to go through each of the metrics

and ask you a few questions about each.  And I'll start with

the number of PEH engaged; do you see that?

A     Yes.

Q     In your examination by the Alliance's lawyer on Tuesday,

you were asked a series of questions about an email exchange in

October of 2023; does that ring a bell?

A     Yes.

Q     And in that exchange LAHSA provided the City with some

information about the number of PEH engaged; is that right?

A     Correct.

Q     Was that information specific to the Alliance settlement

or was it just PEH engaged across the City?

A     It was just PEH engaged across the City.

Q     Between October, 2023 and October of 2025, did you have

any discussions with anyone affiliated with the City about

LAHSA's ability to report on the number of PEH engaged?

A     Yes.

Q     How many discussions like that did you have?

A     I would say between 25 to a hundred, depending on -- we're

always talking about outreach strategies, the number of people

engaged, and how to quantify that.

Q    And is the number of PEH engaged across the City something that's currently -- LAHSA's currently able to report?

A    Yes.

Q    And is that information publicly available?

A    Yes.

Q    Where could someone find that information?

A    On the LAHSA website.

Q    How long has that information been available on LAHSA's website?

A    Since June of 2024.

        THE COURT:  I'm sorry, will you repeat that?

        THE WITNESS:  June of 2024.

        THE COURT:  Thank you.

BY MR. SCOLNICK:

Q    So does that mean for roughly a year and a half anyone with a computer can go on -- and an internet connection can go on LAHSA's website and find the number of PEH engaged across the City of Los Angeles?

A    Yes, that is correct.

Q    If, for instance, the Alliance's lawyers asked you to give them a tutorial on how to find that information on LAHSA's website, would you be willing to do it?

        MS. MITCHELL:  Objection, argumentative.

        THE COURT:  Well, yeah, in the form, that's

argumentative.  You could ask it a different way with same information, counsel.

MR. SCOLNICK:  Sure.

BY MR. SCOLNICK:

Q    If anybody in this courtroom asked you to give them a tutorial on how to locate the PEH engaged information on LAHSA's website, would you be willing to do that?

A    Yes, I would.

Q    Okay.  And, again, that's PEH engaged writ large in the City, not specific to the Alliance settlement, correct?

A    Correct.  It is PEH engaged in street outreach that is working throughout the City.

Q    Thank you.  Let's move on to the next metric, which is the number of PEH with accepted offers of shelter or housing.

Q    Between October of 2023 and October of 2025, have you been involved in any discussions with anyone affiliated with the City about the ability of LAHSA to report this information?

A    Yes.

Q    And how many of those discussions were you involved in?

A    I will give the same rough estimate, around 25 to a hundred conversations, give or take.

Q    So focusing on the beds that are affiliated with the Alliance settlement, okay, are you with me?

A    Yes.

Q    Is it your understanding that the calculation of PEH

Kuhn - Cross / By Mr. Scolnick                    **91**

served is the same thing as PEH who've accepted offers of

shelter or housing?

        **MS. MITCHELL:**  Objection, vague, ambiguous, calls for

a legal conclusion.

        **THE COURT:**  I just need more foundation.  Is this her

opinion, how is she forming this?

        **MR. SCOLNICK:**  Sure.

**BY MS. MITCHELL:**

Q    So, Ms. Kuhn, in your understanding as the chief data

analytics officer who has discussions with the City of Los

Angeles concerning the metrics in 7.1, I'm asking your

understanding is whether the PEH served metric is the same

thing as the number of PEH who've accepted offers of shelter or

housing.

        **MS. MITCHELL:**  Objection, lacks foundation, --

        **THE COURT:**  I'll sustain that objection.

        **MS. MITCHELL:**  -- potentially calls for hearsay.

        **THE COURT:**  Who's she talking to.

        **MR. SCOLNICK:**  Okay.

**BY MR. SCOLNICK:**

Q    Do you have an understanding, Ms. Kuhn, of what the phrase

number of PEH who've accepted offers of shelter or housing

means?

A    Yes.

Q    And how did you get that understanding?

Kuhn - Cross / By Mr. Scolnick                                **92**

A    The standard way of reporting who has accepted offers of housing and shelter for homeless services would be to look at who is in those beds at any given time.

So -- and then -- yeah, so that to me when you say who's accepted a bed, the only way to measure that in the system is to look at who's in that -- in a bed, in a particular bed when you're --

THE COURT:  No, the confusion here, is this your own summation and belief or did you have a conversation with somebody and the standard was given to you?

THE WITNESS:  I would say it's generally accepted way that we are reporting in homeless services.  So it's also how I -- my personal opinion.  But I think across the board this is generally how we report about in homeless services as well.

BY MR. SCOLNICK:

Q    So would you agree with me, based on your understanding of this phrase, number of PEH who've accepted offers of shelter or housing, that that is the equivalent of PEH served?

A    Yes.  And given especially the technology capacity, yes.

Q    Okay.  And as far as you know, has the City been reporting PEH served data for the Alliance beds in its quarterly reports?

A    The template we receive from the City, we fill in PEH served for each interim housing and master lease site in the template that we receive.

Q    By the way, this is not one of the metrics in 7.1.  But I

Kuhn - Cross / By Mr. Scolnick                    **93**

want to ask you about offers, not accepted offers or rejected offers, just offers made.  Is LAHSA able to track the total number of offers of housing or shelter made in Los Angeles?

A     We are not.

Q     Why not?

A     For one, LAHSA only funds a portion of the interim housing beds and shelters in the system.  And there are many other databases and entities that fund interim housing.

And so in addition, all of the different workings of all the different street outreach teams, we don't have the technology, infrastructure to track when every single offer is made, especially because, once again, there's a lot of different systems and funders who fund interim housing sites.

Q     Can you give us examples of some of those other funders and system owners?

A     Sure.  DHS has interim beds, Department of Health Services has interim beds that they fund.

The Department of Mental Health has beds as well that they are supporting and funding.

There's also substance use beds I believe through SAPC.

And then there should -- could be one -- faith-based organizational beds as well.

Q     Okay.  Thank you.  Let's move on to the next metric that is in 7.1, which is number of PEH who've rejected offers of shelter or housing and why; do you see that?

Kuhn - Cross / By Mr. Scolnick                **94**

A     Yes.

Q     And between -- same question.  Between October of 2023 and October of 2025, have you been involved in discussions with anyone affiliated with the City of Los Angeles about LAHSA's ability to report this information?

A     For rejected offers?

Q     Yes.

A     Yes.

Q     Can you estimate how many such discussions you had?

A     Over the summer we had a workgroup to better understand how to match people to permanent housing and to revise our prioritization policy on matching people to permanent housing, of which members of the City took part in, in which we discussed also in that the desire to track why people would reject permanent housing.

So this past summer we had maybe six meetings, and some of those meetings covered the need to track why someone would reject offers of permanent housing.

          **THE COURT:**  I'm sorry.  I don't understand.  You said over the summer.  Is that this last summer, 2025 or 2024 or what?

          **THE WITNESS:**  Yeah, apologies, 2025.

          **THE COURT:**  Okay.  Thank you very much.

//

//

**BY MR. SCOLNICK:**

Q    Is this metric, the number of PEH who've rejected offers of shelter for housing and why offers were rejected, something that you've been working on at LAHSA even before this year, 2025?

A    I would say no.  We've been focused on building the other infrastructure.

Q    Okay.  Is LAHSA currently able to report on the number of PEH who've rejected offers of shelter or housing and why those offers were rejected?

A    No, we are not.

          **THE COURT:**  I'm sorry, I didn't hear your answer.

          **THE WITNESS:**  No, we are not.

**BY MR. SCOLNICK:**

Q    Why not?

A    For a couple reasons.  So for -- the only way that we are able to track rejections of offers of shelter is if we have a way to systematically track at scale the number of offers made and who's receiving those offers, which means we have to have the technology there to send out an offer and record electronically why someone is rejecting said offer.

     In order to do that, we also need to know all the beds that are in the system.

     And previously, two years ago, you know, we were all Excel-based.  And it's taken us two years to move everything

Kuhn - Cross / By Mr. Scolnick                    **96**

into the inventory module just for interim housing alone.

And so -- and in September of this year we just launched our matching system that does -- like we send out matches through a standard email and receive those matches back through HMIS.

And so it's just now that we would be able to add additional features to that technology to understand why people are rejecting those offers.

But once again it would be limited to a subset of beds that are matched through LAHSA's matching system, which is just the adult and youth portfolio of LAHSA-funded beds, with the exception of Inside Safe.

So mostly it's about building the technology infrastructure, and then also training all of the users.  And as I stated in my previous -- on Tuesday, we have about 8,000 users.

And not all of them are using the interim housing system, but I would say all of street outreach plus interim housing sites are.

So making sure that everyone has a standardized approach and way to use the technology also takes time.  So it's on our roadmap, but it's not there yet.

And for permanent housing, it's the same situation.  We had a lot of tech debt and so what we're trying to do is modernize the entire system and move out of Excel spreadsheets

EXCEPTIONAL REPORTING SERVICES, INC

Kuhn - Cross / By Mr. Scolnick                    **97**

and use business intelligence tools and our databases, our standardized databases to capture, prioritize, and match people so we can better capture why people are rejecting offers instead of it just being in a million different email boxes.

And so that's hard to understand, right?  If I'm just having a conversation email exchange, I can't just extract that at scale to the size of Los Angeles.  So we just had to be building the technology.

Q    So you -- I think you said it was on your roadmap; is that right?

A    That is correct.

Q    Does that mean that it's -- that this metric, the number of PEH who've rejected offers of shelter or housing and why the offers were rejected, that this something LAHSA is currently unable to do but working towards?

A    Correct, for the LAHSA-funded interim housing beds and for any permanent housing that goes through the coordinated entry system, which is what the purview of LAHSA over to control.

Q    So that that would not be inclusive of all the Alliance beds.

A    I am unsure about the permanent housing.

Q    Okay.  Generally speaking would you agree with me that LAHSA can focus only on a limited number of program and data improvements at a given time based on resource constraints?

MS. MITCHELL:  Objection, calls for speculation, and

vague.

THE COURT:  Sustained.

MR. SCOLNICK:  I'll move on.

**BY MR. SCOLNICK:**

Q    Let's go to the last of the four metrics, number of encampments in each council district.  Going back to the October, 2023 timeframe and the emails you discussed on Tuesday, as of October, 2023 was LAHSA able to provide a full and accurate count of all the number of encampments in each council district?

A    We were not.

Q    What did the -- what at that time in October, 2023 was LAHSA able to provide regarding encampments?

A    Just Inside Safe encampments or campments (sic) that were targeted for Inside Safe resolution.

Q    So between that time period, October, 2023 and October of this year, 2025, did you have any discussions with individuals affiliated with the City about the ability to report all encampments in each council district?

A    Yes.

Q    Can you estimate how many such discussions you had?

A    I'm going to have to be vague again and say 25 to a hundred.  It's -- since my first day of starting at LAHSA it's been clear priority that we need to track interim housing beds and encampment resolution work.

Kuhn - Cross / By Mr. Scolnick                **99**

Q    And when did you start at LAHSA again?

A    June, 2023.

Q    Okay.  As of today, can LAHSA report the number of encampments in each council district?

A    Yes, we can.

Q    And when did that become available?

A    The technology and workflows are final -- were established at the end of 2024.  And the -- it came online in 2025, January, 2025.

        **THE COURT:**  I'm sorry, just a moment.  And once again, very slowly, when this come online?

        **THE WITNESS:**  In January, 2025.

    **(Pause)**

**BY MR. SCOLNICK:**

Q    And when this came online in January of 2025, were you immediately confident in the accuracy of the data you were getting?

A    I was not.

Q    Why not?

A    For many reasons.  One, it's a new technology.  With any new system rollout, you have to make sure that the training that you've been administering is correct.

    And at a system of our scale, the largest unsheltered population in the nation, and the size of the County of LA, making sure that all the outreach teams and the outreach

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Cross / By Mr. Scolnick          **100**

coordination is working succinctly takes time.

In addition, the fires happened right in January.  And that threw everyone off as they started to really focus on doing emergency response to the fires.

And then we went through homeless -- so there's just a various series of things that as the system gets up -- as with any technology tool, even with our inventory module, we saw a slow gear-up as providers started to get on board, and making sure that those systems were working.  So it takes a little while for technologies to take hold.

Q    What point in time would you say you were confident in LAHSA's ability to accurately report the number of encampments in each council district?

A    I would say around probably July of 2025, six months after launch feels like a safe place.

Q    Ms. Kuhn, do resource constraints have any impact on LAHSA's data reporting relative to homelessness?

A    Could you repeat the question?

Q    Sure.  I'm asking whether resource constraints at LAHSA have any ability on -- have any impact on the ability to report data relative to homelessness.

A    Yes, of course.

Q    What are those impacts?

A    Well, you need the staff to build out the workflows.  You need the staff to pull the reports and analyze them.  And you

Kuhn - Cross / By Mr. Scolnick                          **101**

also need the people in the field to be working to collect and

receive the information as well.

    And so if any one of those parts -- and the training team

to train.  So if any one of those bodies isn't well-resourced

or you don't have the staff to do it then, yes, you are

absolutely limited.

Q    Yeah, I think you spoke the other day about your HMIS

vendor; do you remember that?

A    Yes.

Q    And when LAHSA wants to make changes or improvements or

additions to its reporting of information, does that often

involve conversations with a vendor for HMIS?

A    Absolutely.  We have a very close relationship with our

vendor.  We work with them daily.

    Any enhancements, for example even with the encampment

module, before we could use it for our encampment resolution

efforts, they had a place -- they had just rolled out a place

to track encampments.

    But once again, because of the complexity of LA and what

we needed it to do in order to track encampments and encampment

resolution efforts, we had them -- we needed to have them add

additional features.

    And then that took -- and pay for the development of those

additional features.  And then that took time.

    And they actually weren't able to roll those out until end

Kuhn - Cross / By Mr. Scolnick                              **102**

of Q1, early Q2, 2024, which is why we kind of scoped

(inaudible) what we need in June of 2023.  And it took them

about a year to roll those out.  And then it took us another

year to get all of our workflows together.

So, yes, any changes to the database is beyond what the

vendor offers is -- comes with a price.

Q    So is the price in terms of money?

A    Yes.  And then there's obviously the time.  But, yes, the

price in terms of money.

Q    Thank you.  All right.  In your testimony on Tuesday you

also discussed a meeting you had in November of this year,

November 17; do you recall that?

A    Yes.

Q    And that meeting involved various stakeholders talking

about section 7.1 of the Alliance settlement.

A    Correct.

Q    Is it your understanding that the City arranged for that

meeting?

A    Yes, I believe so.

Q    And did it take place on Zoom?

A    Yes, it did.

Q    About how long did the meeting last?

A    About an hour.

Q    Did you understand -- well, what was your understanding of

the purpose of that meeting?

Kuhn - Cross / By Mr. Scolnick                    **103**

A    To go through section 7.1 and understand exactly what people meant by the requested data in that section --

Q    And --

A    -- and what the intention was.

Q    -- am I right that Ms. Mitchell was at that meeting representing the Alliance?

A    That is correct.

Q    And she was able to ask you questions.

A    Yes, she was.

Q    And you answered them.

A    Yes, of course.

Q    Was Shayla Meyers in that meeting representing the intervenors?

A    Yes, she was.

Q    And did Ms. Meyers ask you questions?

A    Yes, she did.

Q    Did you answer them?

A    Yes, of course.

Q    Was Special Master Martinez in that meeting?

A    Yes.

Q    Did Special Master Martinez ask you questions?

A    Yes.

Q    And you answered them.

A    Yes.

Q    During this November 17 meeting did people have differing

Kuhn - Cross / By Mr. Scolnick                **104**

interpretations of the language in section 7.1?

A    Yes, they did.

          **MR. SCOLNICK:**  Let's put 7.1 on the screen again,
Exhibit 25.

Q    Can you give any examples of terms in section 7.1 for
which people at the meeting gave different interpretations?

          **MS. MITCHELL:**  Objection, relevance and hearsay.

          **MR. SCOLNICK:**  Your Honor, her -- this is relevant at
least to her state of mind.  But this whole thing is about the
compliance with the settlement agreement and efforts to get
everyone on the same page regarding section 7.1.

          Ms. Kuhn was asked multiple questions about emails
that were sent describing what was said in that meeting.  So
I'm allowed to ask her her recollection of what people said.

          **MR. MCRAE:**  Your Honor, can we have one moment to
confer just real briefly?

          **MS. MITCHELL:**  And while that's happening, Your
Honor, I don't think that that's how the hearsay rules work.

          It's still an out-of-court statement that's being
offered for the truth of the matter about the different
parties' positions on terms.  And it's the parties' position
having nothing to do with this witness's state of mind.

          **MR. SCOLNICK:**  This -- Your Honor, this is a
percipient witness and I just want to get the testimony about
what was said by different people, not for the truth of it but

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Cross / By Mr. Scolnick                    **105**

just that there were differing interpretations because we're in a contempt proceeding, and we have to have a definite and clear order that the City has violated.

So if we can get evidence that people had different interpretations, that is relevant to our inquiry.

**THE COURT:**  I think those people can specifically testify if you'd like to.  But it's hearsay through this witness.  So you're not precluded from this area but you are precluded from this witness.

**MR. SCOLNICK:**  Okay, Your Honor, --

**THE COURT:**  That's hearsay.

**MR. SCOLNICK:**  -- I can move on.

**THE COURT:**  So produce those witnesses and that'll be fine.

**MR. SCOLNICK:**  Okay.

**THE COURT:**  So if Shayla Meyers want to testify, Elizabeth wants to testify, you want to testify.

**MR. SCOLNICK:**  But we will seek to avoid that.  But for the --

**THE COURT:**  No, --

**MR. SCOLNICK:**  -- I'll move on.

**THE COURT:**  -- that way we'll have it firsthand, okay?

**MR. SCOLNICK:**  I'll move on.

**THE COURT:**  Thank you very much.

Kuhn - Cross / By Mr. Scolnick                    **106**

MR. SCOLNICK:  Okay.

BY MR. SCOLNICK:

Q    On Tuesday Ms. Mitchell asked you questions about emails that she and Special Master Martinez sent to the City's lawyers following that November 17 meeting, correct?

A    Correct.

Q    And you recall getting asked those questions.

A    Yes.

MR. SCOLNICK:  And let's show on the screen Exhibit 544, just the first page.

Q    Is this the exhibit you were asked about?

A    Yes.

Q    And the Alliance's lawyer, Ms. Mitchell, asked you to read her email and comment on what she wrote.

A    Yes.

Q    And Ms. Mitchell also asked you to read Special Martinez -- Special Master Martinez's email and comment on what she wrote in her email.

A    Yes.

Q    And we've already confirmed I believe that you're not a lawyer, correct?

A    I am not.

Q    And so when you testified about Ms. Mitchell's email, Exhibit 544, you weren't opining on the accuracy of her interpretations of any of the provisions in section 7.1, were

Kuhn - Cross / By Mr. Scolnick                                    **107**

you?

MS. MITCHELL:  Objection, vague, ambiguous.

THE COURT:  That's sustained.  I thought the question was directed towards the content and whether this was the correct summation of what had occurred.

MR. SCOLNICK:  Well, I think the witness was asked whether she disagrees with anything in the email.  And I'm just clarifying that the witness was not offering legal opinions about what either --

THE COURT:  You can ask the question.

MR. SCOLNICK:  Thank you.

THE COURT:  I want to be as broad as I can.  Go ahead and ask it, please.

MR. SCOLNICK:  Thank you.

**BY MR. SCOLNICK:**

Q    When you were reviewing and answering questions about Exhibit 544 and Ms. Mitchell's email, am I correct that you were not offering opinions on whether Ms. Mitchell's legal interpretations were accurate?

A    I was not.

Q    The same question as to Special Master Martinez's interpretations of the various provisions in 7.1

A    No.

THE COURT:  Just for my record, I never took it to be a legal interpretation, counsel.

Kuhn - Cross / By Mr. Scolnick                           **108**

MR. SCOLNICK:  Understood.  Thank you.

BY MR. SCOLNICK:

Q    Now, the City actually sent a letter in response to

Ms. Mitchell and Special Master Martinez's emails, didn't it?

A    Yes, they did.

Q    And the City sent that letter on Monday, December 1st,

correct?

A    That is correct.

Q    That was the day before you testified.

A    That is correct.

MR. SCOLNICK:  Let's bring up Exhibit 551.

Q    Is this the letter the City sent on December 1st in

response to Special Master Martinez and Ms. Mitchell?

A    Yes.

Q    Ms. Mitchell didn't show you this letter, did she?

A    No.

Q    And she didn't ask any questions about it, did she?

A    No.

MR. SCOLNICK:  You can take it down.

Just a couple of concluding questions, Ms. Kuhn.

Q    Am I right that you've worked in the homeless services

sector for the better part of a decade?

A    Yes, that is correct.

Q    And you have a master's degree from USC.

A    That is correct.

EXCEPTIONAL REPORTING SERVICES, INC

Kuhn - Cross / By Mr. Scolnick                    **109**

Q    With that advanced degree, you must have other options.
Why do you spend so long working in the homeless services
sector?

A    For me, I've always been called to nonprofit work and
public sector work.  And I can't imagine spending 20, 40, 60 or
hours or more of my time doing anything else other than
building systems and programs that serve our most vulnerable
population.

          **MR. SCOLNICK:**  Thank you very much.  I have no
further questions at this time.

          **THE COURT:**  Okay.  Who would I turn to next?  We turn
to Intervenors or LA Alliance?

          **MS. MITCHELL:**  I can go, Your Honor.

          **THE COURT:**  I think we've fallen in that pattern
but --

          **MS. MITCHELL:**  Yeah.

          **THE COURT:**  -- if you want to change it, that's
fine --

          **MS. MITCHELL:**  No, that's fine.

          **THE COURT:**  -- at any time.  So --

          **MS. MITCHELL:**  Thank you.

          **THE COURT:**  This would be LA Alliance.  Are you ready
to proceed with cross?

          **MS. MITCHELL:**  Sure.

          **THE COURT:**  All right.  Thank you.

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Redirect / By Ms. Mitchell                **110**

MS. MITCHELL:  Just briefly.

MR. SPEAKER:  Redirect.

(Ms. Mitchell/Mr. Scolnick confer.)

MS. MITCHELL:  May I have a moment just to get set up, Your Honor?

THE COURT:  Certainly.

(Pause from 3:20 p.m. to 3:21 p.m.)

REDIRECT EXAMINATION

BY MS. MITCHELL:

Q    Okay.  Ms. Kuhn, did you speak with lawyers for the City in the last couple days?

A    Yes, I did.

Q    And when was that?

A    Yesterday.

Q    Who specifically from the City did you meet with?

A    Kahn.

Q    Mr. Scolnick?

A    Yes, Mr. Scolnick, sorry.

Q    And how long did you two speak for?

A    Thirty minutes, maybe 45 minutes.

Q    Okay.  This letter that was sent on December 1st, 15 days after the meeting, the November 17th meeting, did you see -- prior to the City responding on December 1st, did you see any other response from the City regarding our meeting on November 17th?

Kuhn - Redirect / By Ms. Mitchell          **111**

A     I did not.

Q     Okay.  And did you have a chance to read this letter?

A     I did.

Q     And did you see any substantive refutation of what occurred of the summaries by myself or by Ms. Martinez by the City?

          **MR. SCOLNICK:**  Objection, vague and calls for a legal conclusion.

          **THE COURT:**  Do you understand --

          **MR. SCOLNICK:**  And lack of foundation.

          **THE COURT:**  Do you understand the question?

          **THE WITNESS:**  Can you ask again?

          **MS. MITCHELL:**  Sure.

          **THE COURT:**  I'm sorry.

          **THE WITNESS:**  Oh, sorry, no.

          **THE COURT:**  No, do you understand the question?

          **THE WITNESS:**  (No audible response.)

          **THE COURT:**  No.  Okay.  Would you repeat it, please?

**BY MS. MITCHELL:**

Q     Did you see in the letter -- and feel free to take a minute and take a look at the letter if you like.  But did the City -- when you read it, did the City deny the accuracy of the summaries that were provided by myself and by Ms. Martinez in the letter?

          **MR. SCOLNICK:**  Your Honor, same objection.  And I was

Kuhn - Redirect / By Ms. Mitchell                    **112**

precluded from asking this -- the witness to comment on what other people said in -- either in writing or in verbally.

THE COURT:  No, overruled.

MS. MITCHELL:  This is --

THE COURT:  You can ask -- you can answer that question.

THE WITNESS:  I've read it maybe one time through so -- or two times through maybe, so I'd have to re-read it to double-check.

THE COURT:  Why don't you take the time.

THE WITNESS:  Okay.

THE COURT:  Just re-read it.

MS. MITCHELL:  Sure.  Ms. Kuhn, would you like me to zoom in at all?

THE WITNESS:  No, I'm okay.

MS. MITCHELL:  Okay.

THE WITNESS:  Okay.  Next page, please.

**(Pause)**

MS. MITCHELL:  And just for the record, the witness has conferred with counsel.

MR. SCOLNICK:  We'd also object that the document speaks for itself, Your Honor.

THE WITNESS:  Okay.  You can go to the next one. Okay.  Yeah, next slide, next page.  Okay.  Next page, please. Okay.  Next page.  And then it got into the questions.  Okay.

Kuhn - Redirect / By Ms. Mitchell                          **113**

All right.  Could you repeat your question?

**MS. MITCHELL:**  Sure.

**BY MS. MITCHELL:**

Q    Did you see the City in anywhere in this letter stating that the factual summaries of what occurred was wrong?

**MR. SCOLNICK:**  Same objections.

**THE COURT:**  Overruled.

A    No.  I would say it speaks to everyone's differing opinions of -- yeah, I think it speaks to the conversation that was had.

Q    And on -- you mentioned that there was a meeting that you had with -- on November 5th with City folks that -- where representatives from the Plaintiffs and from the Intervenors were not present.

And you mentioned on cross that the -- there was a plan to come into compliance with 7.1  Can you describe that a little bit more fully?

**MR. SCOLNICK:**  Misstates the testimony.

**THE COURT:**  I'm sorry, I didn't hear the objection.

**MR. SCOLNICK:**  Misstates the testimony.

**THE COURT:**  Would you repeat the question?

**MS. MITCHELL:**  Sure.

**BY MS. MITCHELL:**

Q    You mentioned, and I believe that this is what you said I think two days ago, and if it's not, please correct me, that

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Redirect / By Ms. Mitchell                    **114**

you met with the City to develop a plan to come into compliance with section 7.1 and that a plan had been at least started.

My question to you was, can you describe that plan a little more fully?

**THE COURT:** Yeah, the objection's overruled.

A    Yeah.  So, one, we went through each of the datapoints in that meeting and said what is and is not possible.  We clarified and had a robust discussion leading up to the November 17th, many of which the same conversations were had.

So, for example, with PEH engaged, we need to clarify like that is like a straight outreach term, right.  And kind of the same conversations we had with you on November 17th.

Then there's other because Inside Safe is now part of Alliance reporting, we needed to have a way to make sure that the system tracking Inside Safe is robust and set up enough, especially in relation to hotels that are managed with booking agreements instead of occupancy agreements because we don't rent out the whole motel.

It's not a standard interim housing site.  Every day they just have a block of potential 20 rooms.  And it could be one set of 20 rooms one day, one set of 20 rooms the other day, and it changes by the minute.  And the technology isn't there to easily take those rooms on and offline like that.

So because of the adding the Inside Safe to Alliance reporting and the need to report more accurately by site in a

Kuhn - Redirect / By Ms. Mitchell                    **115**

court proceeding, we needed to come up with a plan for how to better develop the infrastructure and rebuild the Inside Safe motels so that we can capture it site by site instead of just provider by provider, especially for those sites using booking agreements.

So that was part of it was actually had a better capture PEH served.  We talked about that, too.  So those are some of the roadmaps that we came in, yeah.

Q    And you said rebuild the motels.  You mean rebuild the data covering the motels; is that right?

A    Yes, apologies, not the physical structures themselves --

Q    Okay.

A    -- but rebuild the infrastructure within HMIS.

Q    Thank you.  So going to the number of beds or opportunities offered, the -- and just to clarify this, LAHSA could report that today for any facilities or for any individuals who have been matched or provided offers through CES, through the TLS system, or through any LAHSA-run interim facilities; is that right?

A    I say today specifically for LAHSA-matched interim housing sites only.  And then the other -- even for PEH, we're working on that.  But once again it's still too email-based and not captured sufficiently enough in our database systems.  But we will be --

THE COURT:  Want you to speak just a little bit

EXCEPTIONAL REPORTING SERVICES, INC

slower, okay?

THE WITNESS:  I'm so sorry.  I have that problem.

THE COURT:  Yeah.  No, why don't you re-ask or --

THE WITNESS:  Okay.

THE COURT:  -- answer that just a little slower.

THE WITNESS:  Okay.

So for LAHSA-matched interim housing sites, yes, we can track that.  And that feature became available in September when we rolled out our new matching system.

For anyone going through permanent housing, I would say we would need a little bit more time to quickly aggregate and digest that information.

It goes back to all of the kind of lifts we're doing around how we're doing matching for permanent housing and making sure that's a more robust system and has stronger technology behind it.

So for -- but, yeah, for anyone matched through LAHSA's interim housing sites -- LAHSA's interim housing beds, we could do it.

**BY MS. MITCHELL:**

Q   Okay.  Now, regarding the number of beds or opportunities currently available in each council district, same question. My understanding is that LAHSA could start reporting this immediately for those three categories of shelter or housing opportunities; is that right?

Kuhn - Redirect / By Ms. Mitchell **117**

A    That is -- for the number of beds available for interim housing, yes.  But not for the Inside Safe program at this time.  We can report by -- not by site but we can report like how many people are served but not the number --

THE COURT:  Just one moment, slow you down again.

THE WITNESS:  All right.

THE COURT:  Okay.  I want you to re-ask --

THE WITNESS:  Apologies.

THE COURT:  -- re-answer the question.  And I want you to re-answer it slowly, please.

THE WITNESS:  Okay.

For interim housing beds that are going through LAHSA's interim housing matched system, we can report occupancy.  We actually have that on our public website.

We give it daily to all of the -- the providers and our public elected offices can see those reports daily.  And on the public we update it monthly.  And so there is that ability to do that.

BY MS. MITCHELL:

Q    Okay.

A    Inside Safe is not part of that group right now, and that is also something that we talked about, wanting to make sure that we can build the infrastructure.

And it's not just about the infrastructure, it's also aligning the workflows, making sure that the mayor's office and the

CEO's office and the providers --

THE COURT:  I want you to slow down again.  I want you to re-answer that question.  Okay.  Start again.  Okay. I'm --

THE WITNESS:  From the beginning?

THE COURT:  -- trying to take good notes.  Yeah.

THE WITNESS:  Okay.

THE COURT:  I've got to slow you down.

MR. SCOLNICK:  Okay.

THE COURT:  Okay.

THE WITNESS:  So -- from the beginning.  For beds going through LAHSA's interim housing matching system, we can track that.  We have -- we use the inventory module.  And we have providers putting people in and out of units and beds every single day as people move in and out of those units.

Because of that, we have real time occupancy data for any beds that are LAHSA-funded in the adult and youth portfolio.

THE COURT:  But you mentioned Inside Safe in your --

THE WITNESS:  Yes.

THE COURT:  -- last answer.

THE WITNESS:  Yes.

THE COURT:  That you're not reporting on, are you?

THE WITNESS:  No.  So for Inside Safe --

THE COURT:  Just a moment.  That's very simple.

THE WITNESS:  Correct.  No, --

Kuhn - Redirect / By Ms. Mitchell                    **119**

THE COURT:  -- Okay.  That was --

THE WITNESS:  -- we are not.

THE COURT:  -- part of your answer.  You're not reporting on Inside Safe, are you?

THE WITNESS:  No, not the occupancy level.

THE COURT:  Okay.  Just a moment, just a minute.  All right.  Thank you.  Please continue.

MS. MITCHELL:  Okay.

BY MS. MITCHELL:

Q    Inside Safe occupancy is tracked by the City; is that right?

A    I don't want to comment on where Inside Safe occupancy is tracked.  But in the mayor's office matches to Inside Safe beds.

Q    Okay.  Not LAHSA.

A    No.

Q    And for HACLA beds, or section eight beds, that's also done by -- not by LAHSA, correct?

A    For section eight beds, no.  But there are several HACLA resources that come through coordinated entry system, which we do match to.

Q    When you report PEH served, which you mentioned in the template that you're given is the one column that your office fills out, are you reporting PEH served for every single entry on that template?

Kuhn - Redirect / By Ms. Mitchell          **120**

A     We do not get -- our -- we get a specific template from the City.

Q     Sure.  Let me --

A     The template from the City does not have all of those PSH units on it.

Q     So, wait, can you say that again?

A     LAHSA does not report on every single PSH unit in this list.  We only report on master leasing units or units in master leased buildings.

Q     So there are, for example, permanent supportive housing facilities on this list that don't -- that you don't report on; is that right?

A     Correct.

Q     Okay.  Do you know approximately how many facilities you report on?

A     Maybe 11.

Q     Okay.  And the remaining facilities you don't know who reports on those or who fills that information in.

A     I don't.

THE COURT:  Just a moment.  Would you repeat that again?

THE WITNESS:  I don't know.

THE COURT:  No, the question before.  How many facilities do you report on on this list?

THE WITNESS:  About ten or 11 for the PSH sites.

Kuhn - Redirect / By Ms. Mitchell          **121**

**MS. MITCHELL:**  Okay.  And --

**THE COURT:**  No, just a minute, counsel.

I want to know what list you're referring to.  What list are you referring to?

**THE WITNESS:**  Sorry --

**THE COURT:**  You said you report on ten approximately on this list.

**THE WITNESS:**  Yes.

**THE COURT:**  For my record, what's the list?

**THE WITNESS:**  On this -- ten -- if -- sorry, on the address locations.  So ten locations from this list on the screen (inaudible) --

**MS. MITCHELL:**  And just --

**THE WITNESS:**  Oh, sorry, in Exhibit 35.

**MS. MITCHELL:**  Yeah.

**BY MS. MITCHELL:**

Q   And just to clarify so that we're on the same page, --

**THE COURT:**  Exactly.

Q   -- Exhibit 35 contains --

**THE COURT:**  Thank you.  So how many --

Q   -- 210 --

**THE COURT:**  Just a moment.  How -- and slow down, --

**MS. MITCHELL:**  Yes.

**THE COURT:**  -- both of you, please.

How many are on this list approximately?  You don't

Kuhn - Redirect / By Ms. Mitchell                    **122**

have to count each one but I'd like to get a rough number for my record.

      **THE WITNESS:**  I think about 210, if the row labels are numbered correctly.

      **THE COURT:**  Two hundred and ten.  And how --

      **THE WITNESS:**  Correct.

      **THE COURT:**  -- many do you report on?

      **THE WITNESS:**  About ten or 12.

      **THE COURT:**  Okay.  Just a moment.

    **(Pause)**

      **THE WITNESS:**  If this is --

      **THE COURT:**  No, just --

      **THE WITNESS:**  -- but there's -- oh, sorry.

      **THE COURT:**  -- a minute.  I'll be right with you.

      **THE WITNESS:**  There's interim housing on there, too, yeah.  Sorry.

      **THE COURT:**  Now you can add anything you like to.  I didn't mean to --

      **THE WITNESS:**  Thank you.

      **THE COURT:**  -- cut you off.

      **THE WITNESS:**  Sorry.  I forgot that this list also includes interim housing.  So we do have I think 47 interim housing sites we report on, and only ten to 12 permanent housing sites that we report on.

      So to be clarified -- and I'm not quite sure since

Kuhn - Redirect / By Ms. Mitchell                    **123**

they're not sorted how many are permanent on here or how many

are interim housing.  But we do report on about 47 interim

housing sites.

THE COURT:  Okay.  Thank you very much.  Out of the

210.

THE WITNESS:  Yes.

THE COURT:  Okay.  Thank you.  I've got it.

**BY MS. MITCHELL:**

Q    And that 47 includes Inside Safe beds.

A    Yes.

**MR. SCOLNICK:**  Got it.

Q    So, for example, I think it's number 17 on this list --

no, 18, Highland Gardens, that's one that you report on, right?

A    Yes, correct.

Q    Okay.  So if my math is correct, that leaves somewhere

around 150 sites that are on this list that you don't report

on; is that right?

A    Yeah, give or take.

**(Pause)**

Q    Regarding the number of PEH engaged -- and I think you

might have mentioned this on Tuesday.  But the phrase

"engaged," is that a HUD-defined term?

A    Yes, it is.

Q    And do you know when HUD established the word "engaged" as

a defined term?

Kuhn - Redirect / By Ms. Mitchell                **124**

A     I do not.

Q     When did you begin working in the homeless services area?

A     Twenty nineteen, 2018, 2019.

Q     Okay.  And at that time do you know if the word "engaged" had been defined by the federal government?

A     Yes.

Q     Yes, it had?

A     Yes, it had.

Q     Okay.  And that is also a metric to -- LAHSA could today provide a report on City PEH engaged as long as the caseworkers were properly dropping geo locations to make sure it was within the City; is that right?

          **MR. SCOLNICK:**  Incomplete hypothetical.

          **THE COURT:**  You understand the question?

          **THE WITNESS:**  Yeah.

          **THE COURT:**  You can answer it.  Overruled.

A     Yes, as long as a street outreach worker is -- drops the current -- completes the current living situation which drops the geo location, we can report if that client was engaged and if that client had been in the City.

Q     Does this cover City-funded outreach workers that do not get managed by LAHSA?

A     If they use HMIS.

          **THE COURT:**  I'm sorry, would you say that again?

          **THE WITNESS:**  If they use HMIS.  Anyone who is not

EXCEPTIONAL REPORTING SERVICES, INC

Kuhn - Redirect / By Ms. Mitchell                **125**

using HMIS we cannot report on.

And it's up to the funder to determine which database of record they use unless it's a HUD-funded or LAHSA-funded, we mandate -- I mean, we're the funder so we mandate HMIS use.

**BY MS. MITCHELL:**

Q    Regarding the number of PEH who have rejected offers of shelter or housing, I understand that recording the why of the rejection would take a couple of months to get the infrastructure in place.

Can you explain why it would take a couple months to get the infrastructure in place to start reporting the why of why the offers were rejected?

A    Yeah.  For interim housing, one, I need to convene a scoping session with stakeholders.

So interim housing providers or interim housing leadership, and our systems leadership, as well as my data team, just to talk about like to make sure that we're capturing all the facets, right.

You don't want to develop a tool that isn't well-thought out and doesn't have input from everyone who'd be using it to make sure we're not missing something.

So to schedule that, to bring everyone together given everyone else's, you know, fitting into all the work, and then I have to have the team build the feature, and then we have to test it.

Kuhn - Redirect / By Ms. Mitchell                    **126**

And at the same time the training teams have to update all of our training resources around the interim housing module and how to accept a match or not.

And then we have to train the providers that are using the tool to make sure that they appropriately record why someone would be declining within the system.

Q    Okay.  And how much longer or how long approximately would it take to get the infrastructure in place to track rejections of permanent housing?

A    That also will take a little bit longer time, probably around six to 12 months.

And I say that because we're currently working on lifting up the infrastructure around permanent housing.

So where interim housing for LAHSA-matched beds already has a match mechanism where we're sending out a match that's -- and that match is communicating directly with HMIS so we can recapture information back, our permanent housing doesn't have that infrastructure built yet.

And it's not currently sitting in HMIS, and so it's -- it gets more complicated to do that.  And so we have to build up other infrastructure first before we're able to add that particular feature.  So I would say it's about like a six to 12-month timeline.

Q    Okay.  And then what about tracking Inside Safe offers; how long would that take LAHSA to get up and running?

Kuhn - Redirect / By Ms. Mitchell                    **127**

A    Yeah, that's going to take a little bit longer too because we have to make sure that we're all in agreement of how to manage the booking with the sites of booking agreements versus occupancy agreements.

We need to make sure that the workflows for how the mayor's teach is doing their matching and how the CEO's team is doing their reconciliation for the hotels is aligned.

And then we need to make sure that the providers are also trained.  So that we have to build out a little bit.  I would also say around six months to do that as well.

Q    And is that the same for TLS offers as well, time limited subsidies?

A    Yes.  And, I mean, right now, I mean, well, the City just funded more TLS, but yes.

THE COURT:  Could you answer that again, please, a little louder and slowly, please?

A    Yes.  It will take about that -- about six months, too, for TLS.

Q    Now, regarding the number of encampments in each council district, I understand that you have the capability today as you discussed on cross examination.

But in June of 2023 is when the direction was first provided to the HMIS vendor from LAHSA to start building out that capability; is that right?

A    We provided enhancements we needed to their technology

that they had built to track encampments.  And we needed enhancements made to it in order to track encampments at the scale.  But, yes, in June of 2023 is when that began.

Q    And why did that start in June of 2023?

A    In December of 2022 Mayor Karen Bass was elected and started the Inside Safe program which started massive encampment resolution efforts.

And so it was the first time we really as a system wanted to track encampments across our system and how they were changing, and understanding once we brought people inside, how many of them moved to permanent housing.

So you had to create reporting cohorts and really have a dynamic way of tracking that.

I'm sure it was of interest before.  It's always been of interest.  When I was at a provider, you know, I was asked like how --

**THE COURT:**  No, you're going to re-answer that question, please.

**THE WITNESS:**  Sorry.  Okay.  Yeah.

**THE COURT:**  Start again.

**THE WITNESS:**  So --

**THE COURT:**  But please a little bit more slowly.

**THE WITNESS:**  Yeah.

So I think it's always been of interest to track the number of encampments.

Kuhn - Redirect / By Ms. Mitchell                    **129**

But when Mayor Bass was elected and the focus became on encampment resolution -- and shortly after that the County started Pathway Home.

And so there was a significant desire and need to track people who were attached to specific encampments and how they moved through the system.

In addition, we had SNOFO funding and other funding sources that was directly -- that offered permanent housing if you were attached to encampments.

And so because of the emphasis and the shift in policy to focus on encampments, we really needed to track them better at scale.

And just to have a wholistic picture of the nature of encampments as well in the system.

Q   So when was the first time you were asked to track encampments in this way and develop this module?

        **MR. SCOLNICK:**  Vague, Your Honor.

        **THE COURT:**  Overruled.

A   It was part of the reason why I was hired at LAHSA, because I was doing direct work -- doing encampment resolution work, and was building a data system to track and monitor encampment resolution work and how to track encampments.

So part of the reason I was hired to work at LAHSA was to be able to take that technology infrastructure to scale and build it out in HMIS.

EXCEPTIONAL REPORTING SERVICES, INC

Kuhn - Redirect / By Ms. Mitchell                    **130**

And that's why when I started in June, my first week was probably a meeting with the vendor to help describe how do we better track encampments and build that infrastructure.

The hardest thing when you're tracking encampment cohorts is understanding who's attached to what encampment.  Everything else is much easier.

But it's not a program.  An encampment is not a program. The programs are street outreach, interim housing, permanent housing, benefits programs.

Encampment resolution is a cohort of people that are moving through the system.  So you're not doing a program enrollment necessarily.

And so there was no way to attach a flag, if you will, to say this person is in this encampment, and this is what we all call the encampment.

And everyone has different names.  And naming the encampment is also biggest -- a huge challenge when doing encampment resolution.  Making sure that we're all referring --

        **THE COURT:**  Now you're going to have to slow down, you're going to start again, please.

A    Naming the encampment is the hardest thing -- is also really hard when doing encampment resolution because there could be multiple names for an encampment.

So we have to make sure when the mayor's office says Figueroa and we say Figueroa, we're talking about the exact

Kuhn - Redirect / By Ms. Mitchell                    **131**

same shape and jack (sic) same file.

And encampment tracking also requires building out shapes in HMIS and other geospatial indicators, which is why it's a little bit more of an advanced tool, and it took time for the vendor to build.

Q    And prior to that, LAHSA had the ability to report -- and I think we talked about this a little bit on -- with my colleague, Ms. Meyers, the aggregate hotspot reports; is that right?

A    Yeah.  You could do hotspots.  You can't track encampments that way because -- but you can look on a map and see like there's different hotspots.

Q    Okay.  And describe for us again what a hotspot is.

A    Yeah.  It's a heatmap.  So a heatmap is like you have a map, and wherever there's a concentration of datapoints or concentration of people, the color would become darker.

So if you're using red, it might be a really dark red. And as there's less people, it might be lighter red or become white, so you can see that there's no people there.

And so as -- the closer the individuals or the datapoints are together, the darker the colors on the map are.  And this is also on our public website, too.  You can actually see that.

Q    And how long has the hotspot mapping capability been in existence at LAHSA?  If you know.

A    I mean, we've -- we started building -- I can't speak to

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Redirect / By Ms. Mitchell **132**

before my time.  But we started building those hotspot maps

probably in -- between around February to April of 2024, and

then published the first one on our website on -- in June,

2024.

Q    Showing you -- we talked a bit about this -- Exhibit 409,

the data that was provided in response I think is -- was it

Bryan Brown; is that the individual at your office?

A    Correct.

Q    Okay.  So by Bryan Brown to Meghan Falcone of the CIAO's

office, upon request, this is a series of tables, including

CLS, numbers engaged, exits, etcetera; do you see that?

A    Yes.

Q    After this was produced to Ms. Falcone in the fall of

2023, did you see any other tables like as -- were any other

tables like this requested by the City?

        **MR. SCOLNICK:**  Lack of foundation.

        **THE COURT:**  We'll let you know about -- you can

answer that question.

        **THE WITNESS:**  Yeah.

        So we produce a lot of reports for the City.  But in

particular, in this late fall and early -- and winter of that

year is when we started to really engage Councilmember Raman's

office around the need to track this and have it readily

available to every single councilmember.

        So we worked really closely with her office to make sure

**EXCEPTIONAL REPORTING SERVICES, INC**

that this information would be available.

Q    Okay.  My question was a little bit --

A    Okay.

Q    -- different, though.  Did anybody after the fall of 2023 ask you to reproduce this data for the -- in these -- well, let me restate that question because I sort of drifted off there.

Did anybody after the fall of 2023 ask you to reproduce these tables and these data for the purposes of reporting it?

        **MR. SCOLNICK:**  And lacks foundation.  And to the extent the witness is being asked about LAHSA as opposed to her individually, objection.

        **THE COURT:**  Overruled.

A    It's possible.  I would have to review all of the requests we received.

Q    Has anybody asked you to do that?

A    No.

        **MS. MITCHELL:**  Who found -- so one second, please, Your Honor.

Q    All right.  Let's show you -- we talked a bit about this email exchange where this data was provided, and it says data per 9/28 request.

This is from Meghan Falcone to Emily Vaughn Henry with a series of CCs, including you.  And we talked about this a couple days ago.  Who found this email?  Where did this email come from?  If you know.

Kuhn - Redirect / By Ms. Mitchell                    **134**

MR. SCOLNICK:  Vague.

MR. SPEAKER:  It's attorney-client privileged.

**BY MS. MITCHELL:**

Q    Well, without telling me the content --

THE COURT:  Just a moment.

Q    -- of any conversations, I don't want to know what you talked to counsel about, but my question was if you know who found this email?

THE COURT:  No, overruled.  You can answer the question.

MR. SCOLNICK:  And lacks foundation.

THE COURT:  Overruled.

A    Bryan Brown did.

Q    Was this the only email on this subject that Bryan Brown found, to your knowledge?

MR. SCOLNICK:  Calls for speculation and relevance.

THE COURT:  To your  knowledge, you can answer that.

A    I believe so.  But he didn't -- the ask was to find what his earliest conversations was.  And I asked him because he was in the -- he was working in the role before -- like because I was just a senior advisor at the time, and he deals --

MS. MITCHELL:  Sure.

A    -- with all the data requests.  I said, hey, what was the --

THE COURT:  Slow down.

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Redirect / By Ms. Mitchell          **135**

          **THE WITNESS:**  Sorry.

          What was the earliest correspondence you have around

the content in 7.1.  And this is what he produced.

**BY MS. MITCHELL:**

Q    I understand.

A    Yeah.

Q    So would you have the capability of going back to see if

there were additional conversations regarding 7.1 and

additional asks regarding 7.1?

          **MR. SCOLNICK:**  Lacks foundation, calls for

speculation.

          **THE COURT:**  Overruled.

A    I imagine so.

Q    Okay.  Can I ask you to do that and send anything to me

and to my colleagues?  Or I will share it if you do.

A    The -- whose emails?  Anyone's or just from me?

Q    Sure.  I was --

A    Just direct me and --

Q    Yeah.  I would say directly to you or to Bryan Brown.

Well, let me ask this question.  Are -- were those -- would

it -- would questions like these with queries about 7.1

reporting go to you and Bryan Brown or is there somebody else

that's more appropriate --

          **MR. SCOLNICK:**  Calls for --

Q    -- to look for?

Kuhn - Redirect / By Ms. Mitchell                **136**

MR. SCOLNICK:  Calls for speculation, lacks foundation.

THE COURT:  Overruled.  You answer the question.

A    It would go to me or Bryan Brown, or it could have also gone to Emily Vaughn Henry before she left LAHSA.

Q    Okay.  So same question.  Would you be able to search for any of those emails regarding 7.1 requests to you, to Bryan Brown, or to Emily Vaughn Henry's email?

MR. SCOLNICK:  Lacks foundation, especially to the extent we're talking about the data retention at LAHSA and what this witness can find other people's emails.

THE COURT:  Overruled.

A    I would have to get permission from my IT department and to go into someone else's email.

THE COURT:  Well who has the authority to do this so we don't take a lot of time with it now?

THE WITNESS:  That would probably be our CEO would have to --

THE COURT:  Okay.

THE WITNESS:  -- give me permission.

THE COURT:  Do we need to get that person in here?

THE WITNESS:  No.  I can --

THE COURT:  Okay.  How do we accomplish --

THE WITNESS:  -- work with them.

THE COURT:  -- that quickly?  In other words, we're

EXCEPTIONAL REPORTING SERVICES, INC

Kuhn - Redirect / By Ms. Mitchell                    **137**

going to eventually --

THE WITNESS:  Yes.  I can --

THE COURT:  -- get this, okay.

THE WITNESS:  -- work with them, yes.

THE COURT:  You want to make a phone call, etcetera, saves a lot of time.

THE WITNESS:  I'm sure she'll be fine with it.

THE COURT:  Okay.

THE WITNESS:  Yeah.

THE COURT:  We resolved that then.

THE WITNESS:  Okay.

THE COURT:  Saved --

THE WITNESS:  Perfect.

THE COURT:  -- a lot of time.

MS. MITCHELL:  Thank you.

**BY MS. MITCHELL:**

Q    So to your knowledge are these the only data tables related to 7.1 that were ever disclosed?

MR. SCOLNICK:  Calls for speculation.

THE COURT:  Overruled.  You can answer the question.

I mean, I get lots of people in here.  I'm trying to save some time.

THE WITNESS:  Yeah.

THE COURT:  If you're not representative here, that's no problem.  I've got lots of time.

Kuhn - Redirect / By Ms. Mitchell                    **138**

A    Yeah, to my knowledge, yes, except with the exception of in 7.1, there's a lot of clarifications, right.  You have PEH -- anything -- any of the Alliance reporting that we did has some of the content in 7.1.

     But for PEH engaged, that specific section then, yes, this is all I am aware of any reports we've sent to them.

          **THE COURT:**  Okay.  Now just a moment.  All right.  Thank you.  Please continue.

          **MS. MITCHELL:**  Thank you.

**BY MS. MITCHELL:**

Q    And just a point of clarification, because you caveated for this specific section PEH engaged, and I think the datapoints were for more than PEH engaged, it was for these four.

     And I'm specifically looking at Exhibit 543, page 17, the number of PEH engaged, the number of PEH who have accepted offers of shelter or housing, the number of PEH who have rejected offers of shelter or housing, and why offers were rejected, and the number of encampments in each council district.

     So I just wanted to specify I'm talking about all four of those datapoints.

A    Okay.  For number one, I believe for PEH engaged, I believe that was the only datapoint, aside from the City having access to that as well, any given time via the dashboards.

**EXCEPTIONAL REPORTING SERVICES, INC**

Kuhn - Redirect / By Ms. Mitchell      **139**

Q     Okay.

A     For number of people who have accepted offers or shelter, since that in our minds was the same thing as PEH served in the shelter housing, we provide that in quarterly reports.  And we also provide that in emergency declaration reports.

In several reports to the City, we have provided that, given different population types and requirements.  But for specifically for the Alliance, every quarterly report for the Alliance that we've submitted has had that.

For PEH who have rejected offers or shelter of housing, we have not sent that.  As we have discussed, we do not track that.

The number of encampments in each council district, I also believe we have not sent that.

Q     Okay.  And when you get data requests from the City, do you comply with those data requests as a matter of course?

**MR. SCOLNICK:**  Objection.  Vague as to data requests and you.

**THE COURT:**  You understand the question?

**THE WITNESS:**  I do.

**THE COURT:**  You understand the question?

**THE WITNESS:**  I do.

**THE COURT:**  Overruled.  You can answer it.

A     LAHSA and myself tries to comply as much as possible with any request coming.  As I've stated before, we get thousands of

**140**

requests in.  But of course with any stakeholder or any member of the public, we comply with that request as much as possible.

MS. MITCHELL:  Okay.  May I have just a moment, Your Honor?

THE COURT:  Certainly.

MS. MITCHELL:  I don't have any further questions. Thank you.

THE COURT:  Okay.  Turn to Intervenors, Shayla Meyer.

MS. MEYERS:  I do have a couple questions, Your Honor, thank you.

MR. SCOLNICK:  Can we see if the witness maybe needs a break?

THE COURT:  I'm sorry?

MR. SCOLNICK:  I'm suggesting maybe we ask the witness if she needs a break.

THE COURT:  Would you like a break?

THE WITNESS:  Sure.

THE COURT:  Okay.  Well why don't you step down then. And how long would you like?

THE WITNESS:  Three minutes or five minutes.

THE COURT:  No, no.

THE WITNESS:  Five minutes?

(Laughter)

THE COURT:  How about a little longer; how about 15 minutes, okay?

**141**

THE WITNESS:  That'd be great, thank you.

THE COURT:  Go relax, and we'll see you in a little while.  Thank you.

(Recess taken from 3:59 p.m. to 4:18 p.m.)

THE COURT:  Thank you for your courtesy.  If you'd please be seated.  We're back in session.  All counsel and the parties are present.  And this is Ms. Myers on behalf of the intervenors and the witness is on the stand, Ms. Benitz.

MS. MYERS:  Thank you, Your Honor, Shayla Myers from the Legal Aid Foundation of Los Angeles on behalf of the intervenors.

**RECROSS EXAMINATION**

BY MS. MYERS:

Q    So, Ms. Kuhn, I'm going to direct your attention to a document that we looked at numerous times, which is the settlement agreement in this case and perhaps not surprisingly, Section 7.1.

So obviously you answered some questions from the City related specifically 7.1 and so I'm going to ask some additional follow up questions related to that.

So one of the first aspects that you were asked is about engagement, is the number of PEH engaged.  Do you see that in the agreement?

A    Yes.

Q    And you said that LAHSA now tracks this citywide; is that

EXCEPTIONAL REPORTING SERVICES, INC

**142**

correct?

A    Correct.

Q    And you mentioned a dashboard on the LAHSA website.

A    Correct.

Q    And how long has that dashboard been available?

A    Publicly since June of 2024.

Q    Okay.  And has the City ever contacted LAHSA to provide the information that is available on that website to the Court as part of the reporting for the LA Alliance?

         **MR. SCOLNICK:**  Lacks foundation.

         **THE COURT:**  Overruled.  You can answer the question.

         **THE WITNESS:**  It has not.

**BY MS. MYERS:**

Q    Okay.  So I'm going to ask a couple of questions about the number of PEH who have accepted offers of shelter or housing. And so you indicated that you had met numerous times to talk with the City about this particular data set, correct?

A    Correct.

Q    Okay.  And you also testified that this particular data set is the same as the number of people served as reported in the quarterly reports, correct?

A    Correct.

Q    Okay.  But on Tuesday you testified that the number of -- that a person who accepts an offer of housing is not the same as a person who is served in housing, correct?

MR. SCOLNICK:  Misstates the testimony.

THE COURT:  Overruled.

Q    Technically, practically.

A    For permanent -- you're referring to when we were talking about the permanent supportive housing process?

Q    Exactly.

A    And how you could get an offer, but HACLA or the Housing Authority and/or the developer could potentially decline the application in the process?

Q    Exactly.

A    Okay.  Yes, then yes, that is correct.

Q    Okay.  So it is a correct statement that a person who accepts an offer of housing is not necessarily going to be served by that housing.

A    For permanent supportive housing, yes.  For interim housing, when the offer -- I don't know a case where we would offer a bed that isn't available for that person especially for LAHSA beds, which accept everyone regardless.

Q    Can you say that again?

A    Yeah.  So LAHSA has no barriers to entry to its beds, so there is no -- unlike permanent supportive housing that has multiple qualifications, eligibility requirements and reasons why someone --

THE COURT:  Just a little slower, okay?

THE WITNESS:  And reasons why someone might not be

**144**

eligible for said permanent supportive housing, but for LAHSA's

interim housing beds, we do not offer a bed and then take

that -- for that night and then that bed not be available.

**BY MS. MYERS:**

Q    You can't attest though to Inside Safe, can you?

        **THE COURT:**  I'm sorry, would you reask that, counsel?

Q    You cannot make that attestation for Inside Safe, correct?

A    No, because we are not tracking the offers made.  With the

exception that we know that anyone who was part of an

encampment resolution when they go in to shelter, we can -- we

know that any one part of that encampment resolution that goes

into shelter, obviously was made an offer, but other than that.

Q    So it's sort of a rectangle and square issue, is that a

square is a rectangle, but a rectangle is not necessarily a

square?

        **MR. SCOLNICK:**  Vague.

        **THE COURT:**  I'm sorry, counsel, would you reask that

question a little bit slower?

        **MS. MYERS:**  Sure.

Q    So a rectangle is -- a square is a rectangle, but a

rectangle isn't always a square, you're familiar with that

concept, correct?

        **MR. SCOLNICK:**  Vague, Your Honor.

        **THE COURT:**  Well, counsel, I don't know how it

applies to housing, but whatever.

145

THE WITNESS:  I agree with what you said.

MS. MYERS:  I'll get there, I promise.

THE WITNESS:  Okay.  Continue, yeah, I guess.

BY MS. MYERS:

Q    Okay.  So a person is served in housing was necessarily offered or accepted an offer of shelter, correct?

A    Yeah, anyone who is served in housing had to be offered that housing, correct.

Q    But it is not the case that a person who accepted an offer of housing has been served by housing, correct?

MR. SCOLNICK:  Incomplete hypothetical.

THE COURT:  Overruled.

THE WITNESS:  Possibly, but I have no data on that.

Q    But you did testify on Tuesday about a number of circumstances in which a person is -- accepts an offer of housing and then is not actually served by that housing, correct?

A    Yes, and -- yes.

Q    And that would include, for example, when HACLA turns down a certification, correct?

A    If we're talking about permanent housing, yes.

Q    Yes, okay.  And let's talk about master leasing, so the record's clear on this point.

A    Uh-huh.

Q    LAHSA handles master leasing, correct?

A    Correct.

Q    So is it the case for master leasing that a person may be accept an offer on a master leased unit and then not actually move into that unit?

MR. SCOLNICK:  Incomplete hypothetical.

THE COURT:  Overruled.

THE WITNESS:  Master leasing is not a housing subsidy program.  Master leasing is a unit acquisition program, so you don't get matched to a master leasing building, you get matched to the housing subsidy and the supportive services paying for that permanent supportive housing unit.

So you would be matched to, for example, a subsidy pool and it's in that process that you're going through and then you can get connected to live in a master leased site.

**BY MS. MYERS:**

Q    And in that process, it's possible that a person would accept an offer of housing and not actually move into the unit, correct?

MR. SCOLNICK:  Calls for speculation.

THE COURT:  Overruled, you can answer the question.

THE WITNESS:  It's the same process as all PSH, so.

THE COURT:  I'm sorry, say that again please.

THE WITNESS:  It's the same process for all PSH, going through CES.

Q    So, yes, the answer is yes.

147

A    Correct.

Q    Okay.  So when you testified earlier in response to questions about the City of Los Angeles and LAHSA's decision to equate the acceptance of an offer of housing with people served --

A    Uh-huh.

Q    -- when was that decision made?

        MR. SCOLNICK:  Misstates the testimony.

        THE COURT:  Overruled.

        THE WITNESS:  So we get the template from the City that says fill in PEH served and we fill that in.

BY MS. MYERS:

Q    Uh-huh.

A    When we met at the end of October and we -- or on November 5th with the City, we talked about that more in depth and we said this is the only -- to us, that is what it meant, if you accept an offer you were in the bed.  And so that is when we had more nuanced discussion about what that exactly meant.

        THE COURT:  And to be clear for my record, that's October of 2025.

        THE WITNESS:  Yes.  Sorry it was November 5th of 2025.

        THE COURT:  I'm sorry, November 5th, my apologies.

Q    So LAHSA had been reporting, as requested by the City, the number of people served in a unit, correct?

**148**

A    Correct.

Q    And in October of 2025, LAHSA had a conversation with the City in which LAHSA and the City agreed that people served was the same as accepting an offer of housing.  And I would just note that counsel -- that the witness is conferring with her counsel, for the record.

MR. SCOLNICK:  Object, lacks foundation and misstates testimony.

THE COURT:  Overruled, you can answer the question.

THE WITNESS:  I'm sorry, can you repeat the question, there's so much back and forth.

BY MS. MYERS:

Q    Sure.  So you met and prior to -- let me just back up.

LAHSA was reporting people served --

A    Uh-huh.

Q    -- as part of a template that was provided by the City of Los Angeles, correct?

A    Correct.

Q    And in October of 2025, you met with the City of Los Angeles and discussed the fact that people served was the same as number of people who have accepted offers of shelter or housing; is that correct?

A    On November 5th, we met and discussed, had an in depth conversation of what that would mean and that was what we concluded and then we took that to our November 17th meeting to

EXCEPTIONAL REPORTING SERVICES, INC

have more robust conversations which is when we understood that you an additional interpretation of that as well and other parties.  Which is why business requirements are so great in the beginning.

Q    Is there a business requirement that equates people served with number of people or people experiencing homelessness who have accepted offers of shelter or housing?

A    That is how we would interpret it, because there's no other way to track it right now.  So you're right, technically if you're going to conflate, yes, there are people who get rejected.  But we don't currently have the ability to report on that.

Q    That's not what I asked.

A    Yeah.

Q    So I asked if there's a business requirement that equates these two data points?

          MR. SCOLNICK:  Objection, vague.

          THE COURT:  Overruled.

          THE WITNESS:  Where?  In what context?  There's a million different business requirements for everything.  That's why they're so important to define for a specific data request.

BY MS. MYERS:

Q    And that is why I am asking if there is one for this particular data point.

A    I would have to review thousands of documents of business

requirements we have for all of our reports to answer that question. And I'm not trying to be evasive. I literally would have to review them.

Q Okay.

A Yeah.

Q But you previously testified that there are -- that there were previously no business requirements related to the LA Alliance's data sets, correct?

A Specifically for LA Alliance, correct. For this -- if this particular phrase showed up in another request and if there's a business requirement that defines it, maybe. But specifically for LA Alliance, correct, we do not have business requirements established.

Q Okay. It's important to have business requirements for the use of terminology that may not be technically consistent but are the terms that are used for purposes of homeless services provision, correct?

MR. SCOLNICK: Vague and compound.

THE COURT: Do you understand the question? It may be compound, but do you understand the question?

THE WITNESS: Yes.

THE COURT: You can answer.

THE WITNESS: Yes, business requirements are essential.

//

151

BY MS. MYERS:

Q    Okay.  And you said previously that this was a commonly understood way to interpret people served, was to equate people served with accepting offers of shelter, correct?

A    Correct.

Q    Okay.  How would we find out if there was a business requirement that LAHSA has related to this particular data point?

        MR. SCOLNICK:  Asked and answered.

        THE COURT:  I'm sorry, I didn't hear, counsel.

        MR. SCOLNICK:  Asked and answered.

        THE COURT:  Overruled.  You can answer please.

        THE WITNESS:  I probably would have to look through our hundreds of pages documents around our business requirements.

BY MS. MYERS:

Q    And do you -- and how do you keep your business requirements?

        MR. SCOLNICK:  Relevance.

        THE COURT:  Overruled.

        THE WITNESS:  On our SharePoint.

Q    And are they labeled by the contents?  Are they labeled by data sets, how are they relevant?

        MR. SCOLNICK:  Relevance.

        THE COURT:  Overruled.

**152**

THE WITNESS:  By report.

Q    Okay.  So if you, for example, quarterly reports, they would be labeled by that type of report.

A    Correct.

Q    Okay.  Can you think of any other data source, any other data request or reports that LAHSA has used or created that equates people served with accepted offers of housing or shelter?

A    I would have to confer with my team.

Q    But as you sit here today, you can't think of a report that uses this commonly understood housing -- homeless services provision type of data.

A    I --

MR. SCOLNICK:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I would have to confer with my team.

BY MS. MYERS:

Q    Okay.  And before November 5th, do you remember discussing these two data points and the relationship between the two with the City of Los Angeles?

A    No, we did not discuss this.

Q    Okay.  Going on to the -- this is the side point from the City's questions, so I'm going to treat it as a side point as well, which is about offers of shelter, it's not specifically listed here, but we're talking about offers of shelter.

EXCEPTIONAL REPORTING SERVICES, INC

**153**

Counsel for the City asked if LAHSA was able to track the total numbers of offers made citywide and I understand your testimony is that LAHSA cannot track the total number of offers, tracked citywide?

A    To interim or permanent housing?

Q    Either.

A    Correct.

THE COURT:  Would you repeat that more slowly?

THE WITNESS:  To interim housing or permanent housing and the answer is neither for both.

BY MS. MYERS:

Q    Okay.  So just to have --

A    I just want to be really specific about the type, because each program type has really specific work flows.

Q    You're getting to my next --

THE COURT:  Just a moment.  I'm going to slow you way down both of you.  Please answer that again more slowly.

THE WITNESS:  For interim housing and permanent housing we do not track citywide offers to all interim housing available and all permanent housing available to city residents.

Q    And you've hit on exactly my next set of questions, because the City asked about citywide, but I want to talk specifically about individual types of housing.

You can track offers of housing per building, correct?

EXCEPTIONAL REPORTING SERVICES, INC

154

A    If the building goes through CES it's possible, but it's very challenging to aggregate it right now because it also still goes out through wait a system (phonetic) that is not easily aggregable.

Q    Okay.  And you can do it for interim housing, individual interim housing locations?

A    For people who go through Los Angeles Homeless Services Authority interim housing match system for any adult or youth beds that are funded through LAHSA that are not Inside Safe we can track that as of September.

Q    Okay.  So for some subsets of the LA Alliance housing and shelter opportunities LAHSA could provide data related to this -- related to offers of shelter, correct?

A    Yes.

Q    Okay.  And likewise for those data sets, if you can track offers, can you also track acceptance of those offers, separate and apart from service?

        MR. SCOLNICK:  Incomplete hypothetical and vague.

        THE COURT:  Do you understand the question?

        THE WITNESS:  I do.

        THE COURT:  You can answer, thank you.

        THE WITNESS:  Yes, we can track that we sent a match, we said you're matched, and we can see that that person then subsequently entered a bed.  So, yes, you could see that you were matched and that you entered a bed.  You can also see that

EXCEPTIONAL REPORTING SERVICES, INC

155

you were matched and that you did not enter a bed, so yes.

Q    Okay.

THE COURT:   Just a moment.

All right.   Please continue, thank you.

BY MS. MYERS:

Q    And that's limited solely to LAHSA matched beds, so that would not include Inside Safe, correct?

A    Correct.

Q    And just for purposes of the record, and I'm guilty of this too, you're nodding some of your answers and I'm jumping over you with next questions, can you say them verbally so the court reporter can catch them?

A    Yes, correct.

Q    Thank you so much.

Okay.   So moving on to rejected offers.   So you testified previously that you could, for purposes of rejected offer data, you now have the capacity to collect that data, correct?

A    Yes.   We have the capacity to add the feature for interim housing, LAHSA matched beds, we have the capacity to add the feature of why someone would reject a bed.   It would still take a few months to build out and train, but we could start to work on that.

Q    And have you been asked to do that?

MR. SCOLNICK:   Objection, vague.

THE COURT:   Overruled.

**MR. SCOLNICK:** And lacks foundation.

**THE COURT:** Overruled.

**THE WITNESS:** I don't -- for permanent housing, yes. For interim housing, I don't -- aside from all of the conversations that have been around 7.1, no.

**BY MS. MYERS:**

Q   Okay. So for permanent housing I asked in the past if you were asked, who asked you?

A   The CES policy council and everyone who sits on that.

Q   Okay. Was the City involved in that request?

A   Yes, the City sits on CES policy council.

**THE COURT:** I'm sorry, would you answer it again more slowly.

**THE WITNESS:** Representatives from the City sit -- yes, representatives from the City sit on CES policy council.

Q   And does the City have the capacity to ask that -- to request that data outside of their spot on the CES policy council?

**MR. SCOLNICK:** Lacks foundation, calls for a legal conclusion and vague.

**THE COURT:** Do you know the answer to that without answering?

**THE WITNESS:** No.

**THE COURT:** Do you know the answer to that question?

**THE WITNESS:** Could you ask the question again?

THE COURT:  Reask it.

Q    Can the City of Los Angeles ask LAHSA to start collecting that data separate and apart from their position on the CES policy council?

MR. SCOLNICK:  Same objection.

THE COURT:  Overruled, you can answer if you know it.

THE WITNESS:  Anyone from the City could ask anything of LAHSA, to answer your question very directly.

BY MS. MYERS:

Q    Okay.  And has the City asked for that?

A    For interim housing I do not believe so.

Q    For permanent housing.

A    Oh, for permanent housing, yes, it was -- so remember when I talked about the work group that we did over the summer trying to update prioritization policies to get more in alignment and part of that work which was led by the City and the City's team was also to make sure that people in the neighborhoods for permanent housing were getting built were actually getting into those beds, and how can we make sure our matching policy is reflective of that.

So communities see the return on the investment and that people can stay in the neighborhoods that they want to live in. In that work, it was also we need to understand why the request -- and also from our matches, from a logistical perspective, we need to know why someone doesn't want to go.

158

When we give them a match to permanent housing, why someone rejects that is really important for our team to be able to collect on an aggregate scale, so we don't rematch them, like it could be a safety reason or they don't like the building, and we need to be able to understand that, or maybe they were -- the application was declined by the Housing Authority because for any various reasons.  We need people to capture that so that we don't rematch them to buildings that they're either ineligible for or not able to live in.

And so, of course, that was the big ask of that entire group of like how can we capture that.  Because right now it's captured often times in e-mails with our matchers, which is great, but if that matcher isn't communicating with this other matcher or it's two years down the road, you know, we don't know.  And that's something that we've been working with is how do we build that infrastructure where we can capture all of the responses for the -- we have 36,000 people on our community queue waiting for permanent housing.

How do we capture, when we're making thousands of matches, people's responses and why in a way that once again we can take to the scale that Los Angeles demands.  And so, yes, in that whole work group it's why people are not accepting the housing has come up quite up a bit.

Q    And that idea of why people aren't accepting housing, you do indicate that on an individual client-by-client basis was

important, but is it fair to say it's also important on the systems-wide basis to understand why people are rejecting housing?

A     Absolutely, but that's --

MR. SCOLNICK:  Vague.

THE WITNESS:  I'm sorry.

MR. SCOLNICK:  Vague.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  That's -- yes.  That's where the aggregate comes in, right.  It's meaningful for the participant.  That's what really actually matters.  But at the end of the day too, for the system to design a better system, we need that information in aggregate to be like, huh, why is it --

THE COURT:  Will you please slow down?

THE WITNESS:  Sorry.  We need that information at the aggregate in sum because when you say, wow, a lot of, you know, this building seems to not be favorable or a certain subset of people are not being served by our matching system.  And I think that's something in general we need to look at who isn't getting matched and we're in the process of building out transparently to have those dashboards available transparently who isn't getting into permanent housing.  And is there a particular person who or subset of people who are constantly getting turned away and/or personally rejecting offers and why

**160**

that is and how do we build programs to better serve those people, so yes.

At a system level, it's incredibly important to understand that. It's just that we have so many priorities, you have to build base infrastructure if you're making up, protect it, and so you have to build other infrastructure and it's a give and a take. I only have so many people on my team. I can only move so fast to build out quality products and we're limited and constrained in resources, which is why we have to pick and choose.

And for the past two years, it's been let's get interim housing into the inventory module so we actually know where people are and can actually track real time occupancy.

**BY MS. MYERS:**

Q   So going back to what drove the City led team to help LAHSA move its data forward, can you just, what was that City led team?

A   Yeah. So for about over a year, the City has really been much more engaged with the homeless strategy committee.

**THE COURT:** You said over the last year?

**THE WITNESS:** Yeah, or if not beforehand, really focusing on performance data. If anyone listens in to the homeless strategy committee, you can see that every single month we do a set of performance evaluation analyzing how is interim housing performing. How is the City's investments and

time limited subsidies performing.  How is the permanent supportive housing portfolio performing.

And the City, for example, when we started bringing up permanent supportive housing it gets very complicated very fast because it's not just LAHSA and the matchers.  You have the developers, you have the housing authorities, you have the service providers and everyone has different ways that they're tracking information about a participant.

THE COURT:  All right.  Just a moment.

(Pause)

THE COURT:  All right.  Thank you very much.  Counsel, please continue.

BY MS. MYERS:

Q    And the homeless strategy, that's a City body, correct?

A    Correct, that's a City body.

Q    Okay.  So in response to the City body LAHSA has been working on increasing its capacity to collect data, correct?

A    Yes.  And it's also a desire -- I mean, the City body is, yes, in response to the City body, they have been really working and leveraging a lot of the infrastructure that we developed in helping us refine it, to make sure that they're getting what they need to do appropriate performance management and we're doing that hand-in-hand.

When we identify issues as a whole, for example, we notice that there was a particular provider that was having high exits

162

to unknown from their shelters.  So then we go in --

THE COURT:  Go a little bit slower, a particular provider who was having --

THE WITNESS:  Who was having --

THE COURT:  -- high exits to?

THE WITNESS:  Unknown destinations, which means they were --

THE COURT:  Unknown destinations.

THE WITNESS:  Yes.

THE COURT:  All right.  Thank you.

THE WITNESS:  Which means that they were at higher rates than others, so then we can go hand-in-hand with our funder and LAHSA, the grant administrator to the provider and say, hey, we've noticed you seem to be exiting participants from your shelters at a higher rate than other people, can we talk about the practices you're doing.  And let's go to this other provider and say, you're not -- what practices are you --

THE COURT:  I'm sorry, could you just slow down just a little bit.

THE WITNESS:  Yeah.  We can go -- it's the afternoon, my coffee's really amped up.

Okay.  We can go to another provider and say, wow, you're really doing good work, you know, your people are staying in your shelter and you're also getting, you know, we're seeing like that there's good practices happening.  What

**163**

are you doing right and how can we connect you with this other

provider.

And so with the City's partnership, because it's

really important to have your funder go hand-in-hand with you,

that is what kind of a partnership that's coming out of the

homeless strategy committee.

**BY MS. MYERS:**

Q    And so the City of Los Angeles is a significant funder of

LAHSA, correct?

MR. SCOLNICK:  Vague.

THE WITNESS:  Correct.

THE COURT:  I'm sorry, would you repeat that,

counsel?

Q    The City of Los Angeles is a significant funder of LAHSA,

correct?

MR. SCOLNICK:  Vague.

THE COURT:  Overruled.

THE WITNESS:  Yes, it's one of our funders.

Q    And do you know approximately how many of LAHSA's

contracts are contracts with the City of Los Angeles?

A    I do not.

Q    Is it 10 percent?

MR. SCOLNICK:  Calls for speculation.

THE WITNESS:  Yeah.

THE COURT:  Do you have any idea?

**164**

THE WITNESS:  No, it's -- no.

Q    Okay.  When the City of Los Angeles contracts with LAHSA to provide services, the City of Los Angeles maintains responsibility and oversight of that contract, correct?

MR. SCOLNICK:  Calls for a legal conclusion.

THE COURT:  Overruled, you can answer that question.

THE WITNESS:  Yes, LAHSA is responsible for the performance management of its contracts.

BY MS. MYERS:

Q    And the City of Los Angeles sets the contract requirements for that contract, correct?

A    I'm not an expert on the contracting mechanisms.

Q    Are you familiar with scopes of required services?

THE COURT:  I'm sorry, would you repeat that please?

MS. MYERS:  I'm asking if she's familiar with scope of required services.

THE COURT:  Scope of required services.

MR. SCOLNICK:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I'm familiar with the scope of required services that we give to our providers in our contracts.

Q    And what is the scope of required services?

A    It outlines our expectations for them.

Q    Who drafts the scope of required services?

A    We do.  LAHSA does.

**165**

Q    And do you do that in consultation with the City of Los Angeles when it's a City of Los Angeles contract?

MR. SCOLNICK:  Vague.

THE COURT:  Overruled.

THE WITNESS:  As a system, we try to have one standard set of services, but yes, we do work closely with our funders to make sure that they're aligned, but we do the majority of the lift there.

BY MS. MYERS:

Q    But asking about whether or not the City of Los Angeles specifically not just funders, but the City of Los Angeles specifically has oversight over the scope of required services?

MR. SCOLNICK:  Vague.

THE COURT:  Do you understand the question?

THE WITNESS:  I do.

THE COURT:  You can answer it.

THE WITNESS:  I'm going to say that all about the development of scope of required services is under the systems and under the program officer, deputy chief program officer department.  So I don't want to testify on the record about something that I'm not a hundred percent sure of the level of involvement or not they have in that.

Q    And who would know?

MR. SCOLNICK:  Calls for speculation.

Q    If you know at LAHSA.

THE COURT:  Overruled.

THE WITNESS:  Probably the deputy chief program officer.

Q    And in the scope of required services, those often require service providers to track key performance indicators, correct?

A    Correct.

Q    And who sets the key performance indicators?

A    LAHSA does in partnership with our funders.

Q    So for city contracts, there would be LAHSA in partnership with the City of Los Angeles.

MR. SCOLNICK:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Correct.

BY MS. MYERS:

Q    Okay.  I'm going to just direct your attention to Exhibit 403 which is the latest quarterly report for the City of Los Angeles and you've looked at this a few times during your testimony.  Are you familiar with this document?

A    Yes.

Q    And you previously testified that you received this as a template with the total PEH served blank, correct?

A    Correct.

Q    Okay.  But in your testimony earlier today, you testified that you actually only provide the total PEH served for a subset of the housing units that are listed here, correct?

**167**

A    Correct.

Q    Okay.  So I'm going to show you, just so we have a clear record about what you provide, I'm going to show you what's been marked as Exhibit 98 -- 398, apologies.  This is page 27.  You had previously testified that you had provided the number of -- the people served for ten or -- roughly ten of master lease buildings.  So I'm showing you what's a list of master lease buildings.  Are these the master lease buildings that you provide, that LAHSA provides that people served data to the City?

A    Yes, this is the template we receive.

Q    Okay.  And then you fill in -- and so these 11 units that are listed are the ones that LAHSA provides the number of people served --

A    Yes.

Q    And so it is the case that all of the individuals -- oh, go ahead.

A    We're just talking about permanent supportive housing, correct?

Q    Yes.

A    Okay.  Cool.

Q    And so LAHSA provides the data of people served for the permanent supportive housing units for all of the beds that are listed here; is that correct?

A    Correct.

Q    And then going back to this template then, LAHSA also provides the data for the interim housing units that are listed, correct?

A    Correct.

Q    Does LAHSA also provide the data for time limited subsidies?

A    There are no time limited subsidies on the Alliance report so far, so no.

Q    If the City of Los Angeles adds time limited subsidies to the reports, would the City of Los Angeles provide data for that, do you know?

        **MR. SCOLNICK:**  Incomplete hypothetical, calls for speculation.

        **THE COURT:**  Overruled, you can answer that question.

        **THE WITNESS:**  Should I answer?

        **THE COURT:**  If the City of Los Angeles --

        **THE WITNESS:**  If the City --

        **THE COURT:**  -- had time limited subsidies, would the City provide the data.

        **THE WITNESS:**  If the City chooses to contract through LAHSA and uses HMIS, then yes.

**BY MS. MYERS:**

Q    For the road map agreement, did the city contract through LAHSA?

        **MR. SCOLNICK:**  Relevance, beyond the scope of this

EXCEPTIONAL REPORTING SERVICES, INC

**169**

hearing.

THE COURT: Overruled, you can answer the question.

THE WITNESS: Yes.

Q   Okay.  And so I'm just pointing you to number 209 on this list, which is the time limited subsidies it listed.

THE COURT: I'm sorry, counsel, would you repeat that question slowly?

MS. MYERS: Sure.

BY MS. MYERS:

Q   Just pointing you to number 209 on this report where it lists time limited subsidies.  And you haven't provided data because it simply is listed as in process; is that correct?

MR. SCOLNICK: Objection, lacks foundation.

THE COURT: Overruled.

THE WITNESS: Correct, we have not activated that yet.  We're in the process of activating those slots.

Q   Okay.  So do you know then if LAHSA is going to provide the contracting services for the time limited subsidies?

MR. SCOLNICK: Calls for --

THE COURT: I'm sorry, would you -- just a moment. Would you repeat that question more slowly please?

MS. MYERS: Sure.

Q   Do you know then if LAHSA is going to provide the contracting services for these time limited subsidies?

MR. SCOLNICK: Calls for speculation.

170

THE COURT: Overruled.

THE WITNESS: I'm not in the latest conversations around the contracting, but I believe so.

Q   Okay. Just clarifying, you said this -- LAHSA is in the process of activating them, so I'm trying to understand what that means.

A   Yes. So, yes, I believe there's conversations. I think the teams are meeting. I know that the teams are meeting with the City to discuss how to best activate these sites.

THE COURT: I'm sorry, would you repeat that more slowly?

THE WITNESS: Yes. I know that there are work groups happening that I am not a part of to activate the 2,000 sites. So I am -- 2,000 slots. I'm not quite sure where they are in that process because I'm not directly involved with that work.

THE COURT: When you said 2,000 slots?

THE WITNESS: Yeah, so 2,000 units or households.

THE COURT: Okay.

BY MS. MYERS:

Q   Do you know if the City of Los Angeles contacted LAHSA related to the data requirements from 7.1 prior to entering into the settlement agreement?

MR. SCOLNICK: Lacks foundation, vague as to contact.

THE COURT: I'd like to hear the question again I'm sorry.

MS. MYERS:  Sure.

Q    Do you know if the City of Los Angeles contacted LAHSA related to the data provisions, the data that was requested in Section 7.1 of the settlement agreement before the City entered into the settlement agreement?

THE COURT:  No, overruled, you can answer it.

MR. SCOLNICK:  And also, Your Honor, the witness wasn't even at LAHSA.

THE COURT:  I understand that.

THE WITNESS:  Yeah, I wouldn't know.  That was like in 2022, correct?

THE COURT:  Uh-huh.

THE WITNESS:  Yeah, I wouldn't know.

BY MS. MYERS:

Q    Okay.  Do you know who would have worked with the City of Los Angeles based on your organizational understanding of LAHSA who would have been in contact with the City of Los Angeles related to the data requirements for the settlement agreement?

MR. SCOLNICK:  Objection, calls for speculation.

THE COURT:  Overruled, if you've seen any documents, et cetera.

THE WITNESS:  No, I don't.

THE COURT:  I didn't think so.

THE WITNESS:  Yeah.

MS. MYERS:  If we can take just one second, Your

Honor.

THE COURT:  Certainly.

(Pause)

Q    When did you join LAHSA?

A    June of 2023.

Q    And when did you first become aware of the LA Alliance

settlement agreement?

A    Sometime between then and now.  I probably -- I got more

intimately aware of it, I mean, the e-mails that was coming in,

I was probably more aware of the Alliance settlement in -- when

I took over my role as deputy chief and wasn't senior advisor

anymore.

THE COURT:  And once again, when was that?

THE WITNESS:  In February 2024.

THE COURT:  Thank you very much.

**BY MS. MYERS:**

Q    Were you part of the meetings this summer with the City of

Los Angeles related -- or last year, related to the increasing

for data that you spoke about previously?

THE COURT:  I'm sorry, would you repeat that more

slowly.

Q    Were you part of the conversations with the City of Los

Angeles related to data that you previously described?

MR. SCOLNICK:  Vague.

THE COURT:  Do you understand the question?

173

THE WITNESS:  No.

THE COURT:  All right.  I'll have her repeat it.

Q    Sure.  You previously described the City's teams working with LAHSA to revamp the way it collects data related to encampments.

A    Yeah.

Q    Okay.  Were you part of those conversations?

A    Yes, at many different times, yes.

Q    Okay.  How often were those conversations conducted?

A    Any amount of -- I would say I would have been part of some of those conversations, not all of those conversations.  I have a staff of 55 people --

Q    Sure.

A    -- I would say the reason why I gave my estimate of 25 to 100, is because I know I meant probably at least in the past two years once a month at minimum with at one time with some City official about this, if not multiple times a week, depending on the push for data or the need for data or whatever is coming up.

Q    Were there weekly meetings that were held as part of this group?

A    Which group?

Q    This group, the City's team that convenes to work on the data.

A    There's so many city teams I don't -- so for like I work

**174**

with the performance management around homeless strategy

committee, our team has weekly meetings with them, if not every

other week or monthly meetings.  They end up about being weekly

meetings if not almost every day touch points or every few day

touch points.

Q    Okay.  And you said there's other data teams that are

meeting frequently to discuss data requirements from the City

of Los Angeles, correct?

A    We meet with all council members who all have -- 15

council members have data requests.  We meet regularly with the

mayor's office that has regular data requests.  CLA has regular

data requests.  CAO has regular data requests.  It's not just

my team that is ingesting those, we also have our government

affairs team who is constantly communicating with those actors

as well, in addition to our CEO and other leadership bodies

that are directly engaging with those actors as well.  And

every single director at LAHSA also receives different requests

for information around those programs from all of those actors

at any given time.

Q    How often have the data requests of 7.1 been discussed in

these meetings?

A    I would not be able to quantify that.

Q    How often -- are there written agendas for these meetings?

        **MR. SCOLNICK:**  Vague.

        **THE COURT:**  I'm sorry, would you repeat the question?

Q     When you have these meetings, do the majority of them have written agendas?

          MR. SCOLNICK:  Lacks foundation.

          THE COURT:  Overruled.

          THE WITNESS:  That's a good question for a government affairs team who leads all the meetings with all the different council members.  Oftentimes there's agendas, I don't know if they're solid or not, but I can't speak to what our government affairs team is doing.  It depends on the meeting.  Sometimes it's impromptu phone calls or conversations.  Sometimes it's set agendas beforehand, it's literally you're asking about every -- you're asking about like the entire body of work that we do.  And it's very varied.

**BY MS. MYERS:**

Q     And the weekly meetings related to the homeless strategy teams, are there agendas for those meetings?

A     Not set agendas, not always standing, and I'm not always in attendance of those.  Actually for the majority of times I'm not in attendance of those.

Q     Are there written agendas, that's what I'm asking.

A     I would have to go look back.  I don't believe so because I think we're tackling each subject at hand.  So okay, we're going to talk about this, like how can we better report on time limited subsidies, how can we better capture PEH engaged, so it's really mostly just talking through the most recent problem

**176**

or subject at hand or reviewing the presentation that is going to come before the committee and getting insight and points into that.  There's really not a standing agenda, in that we're constantly -- it's -- those are dynamic spaces.

Q    Okay.

MS. MYERS:  Those are all the questions that I have for now, thank you.

THE COURT:  Then redirect by the City?

**RECROSS EXAMINATION**

BY MR. SCOLNICK:

Q    Good afternoon, Ms. Kuhn.  I just have a couple of questions for you.  I'd like to start with Exhibit 502 which I believe is going to be the most recent supplemental quarterly report.  Yes.

As I understood your testimony you, LAHSA, provides PEH served data for a subset of the 220 entries on this report, is that your testimony?

A    Yes.

Q    But all of the entries, all the rows do have PEH served numbers associated with them, correct, on this report?

A    Correct.

Q    Do you know where the City gets the PEH served information for the units that are not from LAHSA?

A    I could hypothesize that maybe LAHD, LA Housing Department of HACLA, but I am really not sure exactly, yeah.

Q     Okay.  The Alliance's counsel asked you about a meeting that you had with me, do you recall that?

A     Yes.

Q     Did you also have a meeting with Ms. Mitchell from the Alliance?

A     Yes.

Q     And was I there?

A     Not the November 17th one, yes, if it was --

Q     No, I'm sorry.

A     Yeah.

Q     Let me clarify.  We're talking about meeting to prepare for testimony in the court, did you have a meeting with Ms. Mitchell that did not include me?

A     Yes.

Q     And Ms. Mitchell was able to ask you questions.

A     Yes.

Q     And you answered them.

A     Yes.

Q     Did you provide documents to Ms. Mitchell?

A     We did.

Q     Okay.  I believe you testified that for some of the LAHSA matched beds, LAHSA is now able to identify the offers made for that -- for those beds; is that right?

A     Correct.

Q     And is that as of September of this year?

**178**

A     Correct.

Q     Before September of this year, LAHSA could not do that?

A     Correct.

Q     Okay.

          **MR. SCOLNICK:**  Can we pull up Exhibit 25, Section 7.1, the settlement agreement?

Q     Does the word match appear in Section 7.1?

A     It does not.

Q     How about the phrase matched beds?

A     It does not.

Q     Okay.  You gave some time estimates I believe, something like 6 to 12 months in terms of the rejected offer data; is that right, that you would take another 6 to 12 months to be able to track rejected offers and the why.

A     Correct and that's still limited to a subset of programs.

Q     That estimate, 6 to 12 months is that based on the resources and technology that LAHSA has today?

A     Yes.

Q     So does it take into account all the way you've been doing over the last two years to get to where you are right now?

A     Yes.

Q     If I would have asked you that same question two years ago, how long would it take to be able to report rejected offers, do you know if it would have been the same answer?

          **MS. MITCHELL:**  Objection, calls for speculation.

179

THE COURT:  I'll let you cast an opinion about that.

THE WITNESS:  Okay.  It's my opinion, but I think I would have said two and a half years or two years, because we -- you have to build the infrastructure to track the matching and to track the beds efficiently before you could even add the additional features.

BY MR. SCOLNICK:

Q    And going back to today, the 6 to 12 month estimate, does that assume that the funding remains constant?

A    Yes, it does.

Q    And that no intervening priorities come up?

A    Yes, it does.

Q    And it assumes no major disasters like fires.

A    Yes, it does.

Q    Okay.  Do you know how much money all of these upgrades that you've been talking about to LAHSA's systems over the last two years cost?

A    It's hard to quantify.  I would say to run the data management department at LAHSA including the entire training team that trains the entire COC, that builds out all of the apps, that manages HMIS, the 8,000 users and the 22,000 requests we get in from users for support and doing all of the reporting and analytics and building that dashboard, that is about a $12 million, and including the software itself which is very expensive, that's about $12 million annually.  And that

180

does not count the time from all the programs teams, the

service providers, and the various governance bodies that help

shape all of these policies, yeah, yeah.

Q    You were asked a few minutes ago about the temporal period

between the November 17th meeting that we all had and the

City's letter on December 1.  Do you remember that?

A    Yes.

Q    Was I the primary person interfacing with the Alliance and

the intervenors in those communications?

          MS. MITCHELL:  Objection, calls for speculation,

vague.

Q    You were on the e-mails, correct?

A    Yes.

Q    Were the e-mails with me?

A    I believe so.

Q    Okay.  And this time period between November 17th and

December 1, did Thanksgiving fall during that period?

A    Yes.

Q    Were you aware that my daughter had surgery during that

period?

A    I was not.

          MR. SCOLNICK:  I have no further questions.

          THE COURT:  Cross-examination?

          MS. MITCHELL:  Briefly, thank you, Your Honor.

//

**FURTHER REDIRECT EXAMINATION**

**BY MS. MITCHELL:**

Q    You indicated, sorry I'm a bit shorter than my friend on the other side, you indicated an approximate two year estimate if you had been asked the question regarding building up the infrastructure on recording the rejections --

A    Uh-huh.

Q    -- just now.  With unlimited resources, would that time frame be condensed?

        **MR. SCOLNICK:**  Incomplete hypothetical, calls for speculation.

        **THE COURT:**  I don't know what unlimited resources are, but.

Q    With additional funding would that time frame be condensed.

        **THE COURT:**  Okay.  Yeah, additional funding, adequate funding.

        **MR. SCOLNICK:**  Incomplete hypothetical, vague.

        **THE COURT:**  You can answer it.

        **THE WITNESS:**  Unclear, there's still only a very few number of people who can drive work and design systems and who understand the programmatic implementations and the technical requirements needed to move something forward.  It's something that limits us today.  Right.  I need the same person in every single meeting and so the higher up the staff that understand

**182**

it, there's still a limited number of people.

So it's hard for me to answer that because if you brought me and we paid for 20 developers to come today, it would still take me time to explain what is needed, and I would still have to go to all the experts in the field and query their time and you can't duplicate experience, you can't duplicate intimate understanding of the complex homeless service system and how to build technology solutions that mirror that.  So it's really hard for me to answer that.

BY MS. MITCHELL:

Q    Well, there are COCs, a couple of hundred COCs throughout the country; is that right?

A    There's over 400 COCs throughout the country.

Q    Thank you.  400 COCs and how many HMIS vendors are there?

A    I don't know how many HMIS vendors are there.

Q    But there's multiple, right?

A    Yes.

Q    Not just one.

A    Correct.

Q    What's the name of the vendor that LAHSA uses?

A    Bit Focus.

Q    Bit Focus.

THE COURT:  I'm sorry, would you say that more slowly.

THE WITNESS:  Bit Focus.

**183**

BY MS. MITCHELL:

Q    Is that B-I-T Focus, Bit Focus?

A    Correct.

Q    Do you know how many other COCs that focus supports?

A    70.

Q    70.  So that leaves roughly 330 other COCs that might be with a different HMIS vendor; is that right?

A    Yeah, correct.

Q    So the limitation is both expertise and funding, is that correct to say?

A    Correct.

Q    So with additional expertise and additional funding, that time frame could be condensed; is that true?

        **MR. SCOLNICK:**  Incomplete hypothetical, calls for speculation.

        **THE COURT:**  Overruled, you can answer that.

        **THE WITNESS:**  You still have to have the expertise of the vendor.  Even when we give our vendor more money they struggle to perform, because they still need the staff.  And to hire someone and train them, it takes time.  You can't just pick someone out of thin air and have them integrate into a team or a technology solution and have them hit the ground running.

        So if everyone in the world stopped what they were doing --

**184**

**BY MS. MITCHELL:**

Q    Sure.

A    -- and did this, then yeah.  But then there would be people on the street suffering because we don't actually know where they were.  We wouldn't have LA Care integrated with HMIS because we would be focusing on tracking rejections and referrals, right.

Q    Okay.  Ms. Kuhn --

A    So it's like there's consequences to that.

Q    I'm sorry.  That -- go ahead.  That wasn't my question.

A    Yeah.

Q    My question is not about consequences --

A    Yeah.

Q    -- my question is if you had unlimited resources, additional funding and additional expertise, a thousand extra people helping you with this, would that condense the funding or excuse me, would that condense the timeline or is it your testimony that regardless of the amount of resources thrown at this issue, it would always have taken you two years --

A    No.

Q    -- to develop this infrastructure?

        **MR. SCOLNICK:**  Objection, this is an incomplete and an absurd hypothetical and compound and argumentative.

        **THE COURT:**  Why don't you reask that.  It's got multiple parts to it.

**MS. MITCHELL:** Sure, sure, we'll break it down.

**BY MS. MITCHELL:**

Q   My question is very simple. With additional funding, unlimited additional funding, let's say however much is needed, $100 million and an additional thousand people, is it your opinion as you sit here today with all of that additional funding and extra manpower, it would still take two years to develop the infrastructure that we're talking about to record the why of rejections?

**MR. SCOLNICK:** Incomplete hypothetical, calls for speculation and asked and answered.

**THE COURT:** Overruled. I'll let you cast the two years, you can expound upon this if you want to.

**THE WITNESS:** It might have taken less than two years, but I'm unclear, I don't know.

**BY MS. MITCHELL:**

Q   You don't know. That's fair.

**MS. MITCHELL:** Thank you, Your Honor, I have no further questions.

**THE COURT:** Ms. Myers, questions?

**MS. MYERS:** No questions, Your Honor.

**MR. SCOLNICK:** No questions, Your Honor.

**THE COURT:** I'm going to ask you to remain on call, in fact, order you to remain on call. I'm not quite sure if we'll get back to you, but we'll be courteous, I promise you.

Okay?  And if you have childcare, we'll always take that into account, okay?  So I'm glad you were able to leave yesterday.

THE WITNESS:  Yeah, yeah, thank you.

THE COURT:  All right.  Counsel, where are we now?

MR. HAMBURGER:  Brad Hamburger on behalf of the City. We have no more witnesses for today.  Counsel discussed at the break as Your Honor ordered, the remaining witnesses my understanding are Matt Szabo.

THE COURT:  Szabo will be returning, of course.

MR. HAMBURGER:  Yeah, returning to continue the direct examination by Mr. McRae.  Mr. Gary, Special Master Martinez, Ms. Rafferty, is that all?

UNIDENTIFIED:  Mr. Webster.

MR. HAMBURGER:  Oh, Mr. Webster as well, recall Mr. Webster.  So those are the remaining witnesses that the parties have.  Yeah, so one question that we all had was whether or not the Court can have a day next week.  Matt Szabo is available --

THE COURT:  I can't make that commitment to you right now.  I've set aside days, the 2nd, the 4th, the 15th, that's about the best I can do I think.

MR. HAMBURGER:  Okay.  Well --

THE COURT:  Well, we'll make that convenient further, but it'll give you plenty of time.  So I'm suggesting we resume on the 15th when we have this scheduled and then who would be

**187**

the witnesses on that day?  Who could we --

MR. HAMBURGER:  So I think we could do all of the witnesses, I doubt they'll all finish with the exception of Mr. Szabo.  Mr. Szabo --

THE COURT:  When is he available?  I'm trying to hear this, you know, with some continuity.

MR. HAMBURGER:  Yeah, I think the 19th is the day that would work for us for Mr. Szabo.

THE COURT:  Is that a Friday?

MR. HAMBURGER:  Or next week.

THE COURT:  No, counsel, I've already indicated I don't think for next week.  I have --

MR. HAMBURGER:  What about the 18th?

THE COURT:  Maybe.  I don't want to make that commitment and then back out on you.

MR. HAMBURGER:  Okay.

THE COURT:  All right.  Now, I've got the 15th.  If we can't finish, then I've got to see what the schedules are of different witnesses and so do you.  So I would expect to hear, as I indicated, Mr. Szabo with some continuity, and Ms. Rafferty, Webster and then Gary and Martinez or Martinez and Gary.

MS. MITCHELL:  Your Honor, I think the issue that I'm hearing from the City is that Mr. McRae is not available on the 15th and we need to finish Mr. Szabo.  So we were hoping to get

**188**

that wrapped up.  If it's a court issue, I think we could all come down to Orange County if that's the concern is finding facilities.

THE COURT:  No, that's not the concern.  It's just moving the calendars around.  You have no idea what's happening behind the scenes.

MS. MITCHELL:  No, I understand, Your Honor.

THE COURT:  You're getting a small glimpse of that today.

MS. MITCHELL:  Yeah, no, I understand.

THE COURT:  Also there's some other issues involved. If we resumed on the 15th, could we hear from minimally Rafferty and Webster?

MS. MITCHELL:  Of course.

THE COURT:  Have we made those calls?  Can we --

MS. MITCHELL:  No, I already know that those two are both available on the 15th.

THE COURT:  Okay.  So on the 15th we could from Rafferty, recall Webster --

MS. MITCHELL:  Sure.

THE COURT:  -- and then there's no possibility of Mr. Szabo on the 15th?

MR. HAMBURGER:  Not really.  That --

THE COURT:  No, that's fine.  I understand.

MR. HAMBURGER:  But we -- Mr. Gary I believe is

**189**

available that day we understand and Ms. Martinez.

THE COURT: Well, I want to complete Szabo. I want to hear the two witnesses, the Special Master and Gary as I indicated in my minute order to you, that comes as no surprise. I have to check both of their availability, Martinez is here, so she can indicate if she's available.

Gary I'm not certain of. He's been out of the country.

MR. HAMBURGER: Special Master Martinez told us that she may have information.

THE COURT: Well, just a moment. And that -- let's put it this way, it'll work out, it's just going to work out.

MS. MITCHELL: Great.

THE COURT: On the 15th though minimally we're going to hear Rafferty, we're going to hear Martinez. I don't know that I'm going to have or ask Gary to fly in on that day then. He's in and out of the country on behalf of our government.

MS. KUMAR: So, Your Honor, can I just clarify, you said Ms. Rafferty and Martinez or did you mean Mr. Webster?

THE COURT: I mean, I'm sorry, Mr. Webster. Thank you, I appreciate that. Webster and Rafferty. I'm going to then wait for Szabo. Is there any other date that week? If not, this could go over into January very quickly.

MR. HAMBURGER: The 18th or the 19th, we would prefer the 19th, but you said the 19th -- the 18th --

**THE COURT:** Is that a Friday?

**MR. HAMBURGER:** The 19th is a Friday.

**THE COURT:** No. That's --

**MR. HAMBURGER:** The 18th then.

**THE COURT:** If you're agreeable to the 18th finishing off Szabo and you can commit to that, then I'll start making some calls and I'll start moving things around.

**MR. HAMBURGER:** Yes, Your Honor.

**THE COURT:** Then I'm not sure what we're going to do with Gary. I'll make that or have Michelle make that call and see if he's available. There's some indication he may not be available, there was only one small period of time that was on the 15th and I got information about that -- let me check that, okay. Otherwise we may be over the first of the year.

Okay. So see you on the 15th. Now what time? In other words, if we can finish, you don't have to resume --

**MR. HAMBURGER:** Whatever the Court prefers, Your Honor.

**THE COURT:** Well, you don't want my hours, trust me. Counsel, you do not want to say that.

**MS. KUMAR:** 9 a.m., Your Honor.

**MR. HAMBURGER:** We keep similar hours.

**MS. KUMAR:** I think hopefully I can speak for counsel, that I think those two witnesses should be able to complete in a single court day, Your Honor.

THE COURT:  I do too.  In other words, there's no reason to start at 7:30 --

MS. KUMAR:  Correct, Your Honor.

THE COURT:  -- if we don't have to.  We can start at 8:30 it might be a little bit better and as long as we can complete both Rafferty and Webster that day, which I think we can.

MS. KUMAR:  I think -- I agree, Your Honor.

THE COURT:  And then if we can set aside the 18th, I can commit to you I think on the 18th.  There's a couple of things I can do, but the 18th, okay.  Then I've got to check because there's a good possibility that Gary and Martinez that are testifying, you don't want to really be here Christmas week, do you?  I see enthusiasm.

MR. SCOLNICK:  No, Your Honor.

THE COURT:  Okay.  Well, take care of your families.

MS. KUMAR:  I'm sure, Your Honor, we could figure something out.

THE COURT:  Okay.  Let me talk to both of them and supposedly the last two witnesses, okay, that could be the first week of January.

Now, just informally not being too inquisitive, hopefully you've got some vacation plans, you've got family, et cetera, okay.  Under the Eighth Amendment, the Court doesn't want to inflict any cruel and unusual punishment, okay.

192

Tell me when you're flying out, though, like you've got family and sometimes you get a better airfare on like a Thursday, you know.  Have you ever traveled Christmas time?

MS. MITCHELL:  Your Honor, between Ms. Umhofer and I we are gone out of the country December 25th to January 9th.

THE COURT:  Okay.  How about you folks?  Until January what?

MS. MITCHELL:  9th.

THE COURT:  Okay.  That helps me in terms of talking to -- yeah.

MS. KUMAR:  I think we can use that timeline, Your Honor, we can make ourselves before and after that.

THE COURT:  Okay.  How about you folks, are you okay?

MS. KUMAR:  Yeah.

THE COURT:  Okay.  So let's not suggest that Christmas week.  Trust me, I've got to be here, I don't want you here.

MS. MYERS:  And, Your Honor, I'm flying out on the 23rd with those discounted rates, so.

THE COURT:  When will you back?

MS. MYERS:  I'll be back on the 27th, but.

THE COURT:  Okay.  So can I talk to Gary or have Ms. Martinez or somebody talk to Gary about his schedule, because he's flying out for free, by the way, he's not charging you.  And let's -- let me see if there's a date, January 9th

193

and then get back to you.

MS. MITCHELL:  January 9th is a Friday.

THE COURT:  After January 9th.

MS. MITCHELL:  So it'd have to be after.

THE COURT:  Yeah, after.

MS. MITCHELL:  Yeah.

THE COURT:  Okay.  I promise.  Okay.  Well then we'll see you on the 15th, we'll see you at 8:30, right.  And try to find us in the courthouse, we don't know where we'll be, I'm just joking with you, we'll get some place that we can all land, okay.  So have a good recess and we'll be back to you.

MR. SCOLNICK:  Thank you, Your Honor.

THE COURT:  Good night now.

(Proceedings concluded at 5:19 p.m.)

* * * * *

EXCEPTIONAL REPORTING SERVICES, INC

194

**CERTIFICATION**


I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.



_____                    December 5, 2025

        **Signed**                                    **Dated**


*TONI HUDSON, TRANSCRIBER*