UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) | CASE NO: 2:20-cv-02291-DOC-KESx |
| | ) | |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Los Angeles, California |
| vs. | ) | |
| | ) | Monday, December 15, 2025 |
| CITY OF LOS ANGELES, ET AL., | ) | ( 8:35 a.m. to  9:49 a.m.) |
| | ) | (10:18 a.m. to 12:09 p.m.) |
| Defendants. | ) | (12:16 p.m. to 12:19 p.m.) |
| | | ( 1:36 p.m. to  1:49 p.m.) |

EVIDENTIARY HEARING -

ORDER TO SHOW CAUSE RE CONTEMPT CITY OF LOS ANGELES
[DKT.NO.1066]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**               SEE PAGE 2

Courtroom Deputy:         Karlen Dubon

Court Reporter:           Recorded; CourtSmart

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

**APPEARANCES**:


For Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                         MATTHEW UMHOFER, ESQ.
                         Umhofer Mitchell & King
                         767 S. Alameda Street, Suite 270
                         Los Angeles, CA 90021
                         213-394-7979


For Defendants:          POONAM KUMAR, ESQ.
                         KAHN A. SCOLNICK, ESQ.
                         Gibson Dunn & Crutcher
                         333 South Grand Avenue
                         Los Angeles, CA 90071
                         213-299-7000


For Intervenor:          SHAYLA R. MYERS, ESQ.
                         Legal Aid Foundation of LA
                         7000 S. Broadway
                         Los Angeles, CA 90003
                         213-640-3983


Special Master:          MICHELLE MARTINEZ

3

**INDEX**

| PLAINTIFFS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DIANE RAFFERTY | 5 | 26 | 63 | -- |
| PAUL WEBSTER | 67 | 102/155 | 159 | -- |

**4**

**Los Angeles, California; Monday, December 15, 2025; 8:35 a.m.**

--oOo--

THE COURT:  And we'll go back on the record in the LA Alliance matter.  And, counsel, if you'd like to make your appearances, please.

MS. MITCHELL:  Good morning, Your Honor.  Elizabeth Mitchell, Umhofer, Mitchell, and King on behalf of plaintiff, LA Alliance for Human Rights.  My colleague, Matthew Umhofer, will be here shortly.

THE COURT:  Okay, thank you.  On behalf of the City, please.

MS. KUMAR:  Good morning, Your Honor.  Poonam Kumar from Gibson Dunn on behalf of the City and with me at counsel table is Kahn Scolnick, also from Gibson Dunn.

THE COURT:  Thank you.  And on behalf of the intervenors, please.

MS. MYERS:  Shayla Myers with the Legal Aid Foundation of Los Angeles for the intervenors.

THE COURT:  You had two witnesses you had scheduled for today.  Who would you like to call?

MS. MITCHELL:  Diane Rafferty.

THE COURT:  Thank you very much. If you step forward, please. And if you come between the double, well, there are no double doors, so.  If you raise your right hand, please.

//

**DIANE RAFFERTY, PLAINTIFFS' WITNESS, SWORN**

THE COURT:  Thank you.  If you'd please be seated here in the witness box, it's just to my right.  And watch this slight incline.

**(Pause)**

THE COURT:  And if you'd be kind enough to seat yourself and face counsel, would you state your full name?

THE WITNESS:  Diane Rafferty.  R-A-F-F-E-R-T-Y.

THE COURT:  Counsel, direct examination.

MS. MITCHELL:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MS. MITCHELL:

Q    And Ms. Rafferty, we -- to the extent we are showing you exhibits, they will appear on your screen.  But if you want to look through them more closely, we've provided the iPad that has all the exhibits as well.

Now, Ms. Rafferty, I understand you testified here not too long ago in an evidentiary hearing, but just to orient the record, can you please describe what -- your employment?

A    For my company?

Q    Yes.

A    Yes.  I'm a managing director with Alvarez & Marsal.  I'm based out of Los Angeles.  Our company is based out of New York and D.C.

Q    Okay.  And were you part of a team that conducted an

Rafferty - Direct / By Ms. Mitchell                        **6**

assessment on homelessness programs in the City of Los Angeles?

A    Yes.

Q    And what was your role in that assessment?

A    I was the lead on that engagement over a team of approximately 10 people, give and take.  Towards the end of the engagement, there were five of us.

Q    And when you say you were the lead, what does that mean?

A    I directed the team in the effort to ensure that we were contractually compliant with our statement of work, overall dealing with staffing, making sure where people were scheduled, understanding each of their roles.

Q    How long did that assessment last?

A    We were engaged starting in May of '24, and we ended, I think it was November.  But we ended actually in early '25.

Q    2025.  Were you delayed in delivering that assessment at all?

A    We were.

Q    And why?

        **MS. KUMAR:**  Objection, Your Honor.  Lacks foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  When we originally had the engagement, we created a data request to ensure that when we generated this report, we had the information we needed to comply with the statement of work.  There were multiple delays from the City, from LAHSA, from LA County.  We did have to come to court and

Rafferty - Direct / By Ms. Mitchell                    **7**

request support to get a lot of the data that we were looking for due to the delays.

**BY MS. MITCHELL:**

Q    And I'm going to show you what's marked as Exhibit 23.  Do you recognize this?

A    I do.  This is our report.

Q    Okay.  And do you see a date on the very top?  It's kind of the same color, but I'll try to zoom in for you so it's a little bit easier for you to see.

A    The date it was docketed or filed?

Q    Yeah.

A    Yes, May 14th, '25.

Q    Okay.  Were there a couple iterations that were released prior to the final report?

A    There were.  I mean, we had some draft reports.  We normally do do that.  We create a couple of drafts, vet those drafts.  Sometimes before we create a final report, we're still waiting for additional information.

Q    Okay.  Now, you mentioned delays or difficulties from the City of Los Angeles, and that's one of the things that I want to focus you on today.  Can you describe briefly those delays or difficulties?

        **MS. KUMAR:**  Objection, Your Honor.  Vague.  Lacks foundation.

        **THE COURT:**  Overruled.  You may answer, please.

**THE WITNESS:** Some of the delays, when we started this engagement, we weren't sure a lot of times who owned the data. Beginning when we first looked at this, I mean, as LAHSA is part of Los Angeles, it was, okay, where do we go and look for this information? Sometimes it was just delays in responding to emails. Sometimes it was information we requested came to us which wasn't the information we requested.

Going through multiple people, sometimes people would say, no, this other person has that information, so we'd have to contact another person for the information. There might be delays in their response, either from email or phone calls. We had numerous, numerous team Zoom calls, mostly with LAHSA, trying to understand if they knew what our request was asking and try to understand from them the difficulty in getting responses back.

**BY MS. MITCHELL:**

Q   I'm going to ask you about some specific departments. Was the Housing Authority of the City of Los Angeles part of your assessment?

A   Yes.

Q   Did you ever have difficulty getting information from the Housing Authority of the City of Los Angeles?

A   If you describe delays, nothing was prompt from anyone. It was either difficult to get the information or understanding what the delays were caused by. I think I

testified this before.  When we asked for information to generate any kind of report, there's usually three buckets of why there's a delay.  Either someone doesn't want to give you the data, someone doesn't understand where the data is, or they don't understand themselves how to generate that data for the request.  So we try to work with all the parties to understand first that they understand what our data requests were.

I think there was confusion in the beginning.  So it's hard to look down and say where each delay generated.  There were just a lot of delays, and that's why we had to come to the Court and express our frustration to get that information from all the parties.

**BY MS. MITCHELL:**

Q    Okay.  I want to go ahead and show you what's been marked as Exhibit 414.  That's Docket 761.

A    Yes.

Q    This is a court order that was released, I think, identifying a letter that you wrote.  Have you seen a copy of this order?

A    Yes.

Q    Okay.  I'm going to go to page 2.  I'm going to blow it up just a little bit so it's easier to read, but if you want to see a closer version or you want me to blow anything up, please let me know.  Is that your signature at the bottom of page 2?

A    It is.

Q    All right.  So just looking at that first paragraph, can you read that first paragraph starting with "this letter"?

A    This letter, along with the attached schedule A&M overview of data delays and complication provides additional clarification and context regarding the recent developments communicated in our letter dated October 11th, 2024.  As noted in this correspondence, we provided an update on the status of the final report and detailed the developments that have impacted its delivery.

Q    All right.  Let's go to the next paragraph.  Can you read that paragraph, please?

A    To enhance --

          THE COURT:  Pull that up just a little bit on the screen, would you please?

          MS. MITCHELL:  There we go.

          THE COURT:  Thank you.

          THE WITNESS:  Okay.  To enhance transparency and ensure clarity, we've prepared a schedule of highlight specific key examples referenced in the letter dated October 11th, 2024. This document aims to contextualize the information shared in the previous letter and to offer further insights into the circumstances, specifically data delays, coupled with the condition and complexity of the data impacted in the report.

//

//

**BY MS. MITCHELL:**

Q   Okay.  What was the reason for submitting this letter, if you recall?

A   There were a couple of reasons.  One, we wanted the court to be aware of why these delays were happening because we thought we would be able to generate this report a lot sooner than we did.  Also, we were running out of funds.  When we originally quoted this project, we accepted a little bit lower than what we thought the fees would be, but we had a full team continuing to work because of the delays.

Q   Let's go to the next page.  Page 3, do you recognize this page?

A   I do.

Q   What is it that we're looking at, generally?

A   So we wanted to provide more detailed issues on why the task and the deliverables were impacted due to the delays.

Q   Identifying the first one, is that big enough for you to read?  Or would you like me to zoom in a little bit more?

A   No, I can read it.

Q   Okay.  Here's what it looks like, the task.  I'll just read the first part.  Obtain an understanding of homelessness, assistance services provided, and/or obligated under each program and the responsible party.  And you list City and LAHSA.  Can you describe that a little bit more?

A   A lot of times when we were asking for data, it would go

Rafferty - Direct / By Ms. Mitchell                    **12**

back between the City and LAHSA.  Sometimes LAHSA would refer us to the City.  Sometimes the City would refer us to LAHSA, depending on what the data was.

Q    And to get maybe a little bit bigger, let's see.  The paragraph next to that first entry, can you read those two paragraphs into the record, and then I'm going to ask some questions about it.

A    Sure.  A&M team was tasked with assessing homeless assistance services provided across the programs.  To do this, the team needed to trace the flow of funds from key parties, LA City and LAHSA, to service providers and their contracts.  However, challenges arose because neither the City nor LAHSA had process that clearly tracked expenses by program or service.  Therefore, while all parties have been generally responsive to the data requests, A&M team undertook an iterative process of receiving data, reviewing data, and working with the parties to address any gaps or discrepancies in the data received, which in some cases led to additional data requests.  To illustrate, the A&M team initially submitted 26 data requests to the City and 27 data requests to LAHSA. The current number of data requests is 71 and 67 respectively.

Q    Okay.  I want to focus first on the statement that is contained within this letter to address any gaps or discrepancies in the data received.  Can you explain that?  What gaps or discrepancies were contained?

**EXCEPTIONAL REPORTING SERVICES, INC**

Rafferty - Direct / By Ms. Mitchell                **13**

A    Some of the information after we requested would come to us, but it wasn't complete so -- or it was difficult to decipher.  And so when we would go back and say, you know, we'd have lots of conversations, lots of emails, making sure that they understood the request, but there was a lot of back and forth.  It wasn't clear cut.  And anything we asked for, we had to clarify.  We're not saying every piece of information was delayed, but there were a lot of delays.

Q    You mentioned earlier, I think your testimony was that you would send emails or data requests and you would get partial responses.  What did you mean by that?

A    If we sent -- some of the emails are pretty extensive, like 1 through 10 or 1 through 12.  Sometimes we'd get a response back for one or two, but not the entire 12.  So it had to kind of go back and forth, re-requesting, making sure that they understood our request.

Q    There's a statement here, well, all parties have been generally responsive to the data requests.  Do you see that?

A    Yes.

Q    Do you still agree with that statement that all parties were generally responsive to the data requests?

A    I think they were trying to be responsive to our -- I think there were times where people were trying to say, okay, is this what you're asking for?  And this is what we're going to try and get you.  We never ran into anybody being like

Rafferty - Direct / By Ms. Mitchell                    **14**

obstinate or angry with us.  I think they were generally trying to help us.  That's where we kind of got to maybe they just don't have the data or maybe there were a lot of changes and maybe that one person who had that data was no longer there.  We weren't really sure.

I think they were generally responsive to us.  There's kind of an etiquette out there in business.  You usually need to respond to requests within 48 hours.  A lot of times there were delays in responding to us, but we don't have insight to how busy they were or what their other priorities were.  But I think they were trying.  I think there was an attempt.  The biggest problem we had was some of the data that we got still wasn't based on the request that we asked for.

Q    What does that mean?  Some of the data that you got wasn't based on the request you asked for?

A    One thing we were trying to look at was how contracts are fulfilled and how, when money is paid on a contract, how does the City -- how does everyone know that that service has been fulfilled?  And we never really could -- it was just vague.  It was just, we would ask and there was just no response.

Q    Okay.  I'm going to show you another section of this letter down at the bottom, where it says quantify/analyze cash reimbursements from the City to LAHSA for service provider expenses.  Do you see that?

A    Yes.

Rafferty - Direct / By Ms. Mitchell                    **15**

Q    Okay.  And can you read that section into the record?

A    The A&M's team's assessment include analyzing the cash request process between City and LAHSA.  The complex process involved compiling and tracking each service provider's contract for these cash, well it doesn't say for, these cash requests, submission to the City, accounting for payments received by the City, required multiple follow-up meetings and additional data requests to ensure a thorough understanding of the data provided to A&M.

Additionally, on September 9th, 2024, A&M received C114656, underlined, City recovery roadmap request number two from the City and began analyzing this data.  The A&M team subsequently discovered that this is an outdated version of the file and a corrected file was provided on October 29th that A&M service the issue, causing network rework of several analysis. Discussions with LAHSA regarding cash request processes are ongoing.

So this was an example of requesting data, helping clarify what the request was, and then receiving information that either wasn't complete or was not based on the original request.

Q    Now, this letter that you submitted, page 3, is this a comprehensive description of every delay or difficulty that A&M had or are these given by way of example?

A    Given by example.

**EXCEPTIONAL REPORTING SERVICES, INC**

Q    Okay.  Now going back to 415 --

         MS. MITCHELL:  Actually may I have one moment, Your

Honor?

**BY MS. MITCHELL:**

Q    Let's actually go back a little bit further to -- you

mentioned that you had to go to the court with some of your

concerns.  Now this is an order dated August 22nd of 2024.  Do

you see this?

A    I do.

Q    Okay.  Have you seen this order before?

A    I have.


that.  The actual text down at the bottom.  Is this what you

were referring to when you said you had to go to the Court to

talk about the delays and the difficulties that A&M was having

getting the information?

A    Correct.

Q    Okay.  And what, if anything, did the Court do in

response?

         MS. KUMAR:  Objection, Your Honor, lacks foundation.

         THE COURT:  Overruled.

         THE WITNESS:  Besides, well, they were supportive of

us.  I mean, they were basically telling the parties to respond

to us.

//

**BY MS. MITCHELL:**

Q    Okay.  At some point, did data requests have to start going directly to the Court, so the Court could issue those data requests?

A    Yes.

Q    And why was that done?

A    To hopefully expedite the process so we could get the report done.

Q    Okay.  Let's go to -- this one is dated August 29th of 2024.  This is another order that was issued by the Court.  Have you seen this order before?

A    I have.

Q    All right.  I'm going to --

        THE COURT:  Just a moment.  What exhibit number is this, counsel?

        MS. MITCHELL:  Thank you, Your Honor.  This is Exhibit 415.

        THE COURT:  The prior one, August 22nd, was 415, wasn't it?

        MS. MITCHELL:  The prior one was 414.

        THE COURT:  414, my apologies.  And this is 415.

        MS. MITCHELL:  415, correct.  This is --

        THE COURT:  And the docket number is.

        MS. MITCHELL:  Docket 763.

        THE COURT:  Would you go back to the prior so I have

this in my notes.  The prior was August 22nd, 2024, Exhibit

414.  The docket number was 761.

            **MS. MITCHELL:**  Correct.

            **THE COURT:**  All right.  Please continue.  Thank you.

            **MS. MITCHELL:**  Thank you.

**BY MS. MITCHELL:**

Q    Okay.  So now we're on Exhibit 415, Docket 763, dated

August 29th of 2024.  Okay, and I'm going to show you -- I'm on

page 2, which is called status update and preliminary

observations.  What was this document?  I'm sorry.  Did you

have a hand in preparing this document?

A    I did.

Q    And what is this document?

A    This was basically a status report.  We wanted to inform

the Court where we were on generating this report because we

knew we would not meet the original deadline that we had for

our report.

Q    And why wouldn't you meet the original deadline?

A    There were a lot of delays getting the information we

needed and getting comprehensive data based on our requests.

Q    Okay.  Showing you page 7, there are key challenges

identified.  The first one states incomplete and disaggregate

financial data produced by the City and LAHSA, L-A-H-S-A, which

stands for Los Angeles Homeless Services Authority.  Can you

describe the incomplete and disaggregate financial data?

Rafferty - Direct / By Ms. Mitchell                    **19**

A    Some of the information we received, we couldn't tie it to certain requests.  So understanding there were a lot of data requests of the City and LAHSA, understanding they also have full time jobs, we were trying to be gracious in delays, but a lot of the things that we got were incomplete.  So we had to go back and request those multiple times.

Q    And then the second one here identified is incomplete financial documentation for services rendered.  Can you describe that, please?

A    That pertains to a lot of the contracts with the service providers, trying to understand where that contract repository was, how were they tracking who was a service provider, how was the service provider contracted.  And I think the largest part was how did the City and LAHSA understand that that service provider was providing that service?  So we couldn't tell.

One thing, and I think it's been stated in the court and it was also stated by the controller, if an invoice was submitted, the City and LAHSA, there was a pairing with the invoice to the contract.  I don't think, in our interpretation, anyone was overpaid.  They were basically paying the invoice and checking the contract.  Our request was how do you know the service has been provided?

The other issue we had, what we felt that was incomplete financial documentation, there was no system of invoicing.  There was no standard template for invoicing to understand that

there was some electronic repository of understanding invoices coming in and payment going out.  So it just was not complete.

Q    Is this one area where you had to keep going back to the City or LAHSA for additional information?

A    Yes.

Q    Number three, lack of information on which service contracts relate to the beds created under Roadmap and Alliance.  Can you describe that, please?

A    We could not find how certain contracts related to the beds that were created.  It was not clear cut on a service provider and exactly what they were providing, especially under Roadmap and Alliance.  We couldn't tell by the invoicing process and the monitoring of these contracts if they were related to the beds being created.

Q    Is this another area where you had to keep going back to the City and LAHSA for additional information?

A    We did, but I think we learned early on there wasn't a system.  So we could keep asking it, but really, honestly, they didn't have the information.

Q    Incomplete and inaccurate HMIS produced by the City and LAHSA.  Can you describe that?

A    Once again, requesting certain information either came to us in different chunks or it wasn't complete.  There were inaccuracies.  We had someone on our team who works in our Disputes and Investigation Division, who was really responsible

for looking at this and felt there were inaccuracies in the data.

Q    I asked earlier about the Housing Authority of the City of Los Angeles.  What is your -- how do you understand the Housing Authority of the City of Los Angeles to be involved in the LA Alliance settlement or Inside Safe settlement or Roadmap settlement issues?

        **MS. KUMAR:**  Objection, Your Honor.  It lacks foundation, speculation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I think for us, I don't think it was totally clear.  Honestly, I mean, I'm just being honest.  It was -- it's a very disjointed system.  I mean, we testified in court, and I know people made fun of me for the spaghetti contract, but comment.  It's very difficult to kind of understand who owns which piece of all this puzzle.  There's a lot of back and forth between accountability and responsibility.  So it was just confusing to say, well, we can absolutely tell you exactly who's accountable for what.  Understanding this is a very, very complicated process, how funds come in, and there's a lot of services being provided, but it was never really clear to us sometimes as who is overall accountable for a lot of these programs.  We just couldn't tell.

//

**BY MS. MITCHELL:**

Q     Did you ever have difficulty getting information from the Housing Department of the City of Los Angeles?

A     Yes.

Q     Did you have difficulty getting information from the Los Angeles Police Department?

A     That's a big yes.

Q     Why do you say that's a big yes?

A     It was brought up that originally when we were looking at different parts of the City that are affected by the homelessness and the programs and lack of having people placed in permanent housing, the stretch that it occurs for the Los Angeles Fire Department and the Los Angeles Police Department. So we wanted to talk to them about how they track funds related to homelessness, understanding that would be difficult to do. I think we gave the example of if the police respond to a domestic dispute, they respond to that domestic dispute. If those two people in that dispute are not housed, is that related to homelessness? We understood it was difficult.

     We were referred to, and I don't quite remember the name of the group in the Los Angeles Police Department. They have a small homeless division, and we met with them, and they said they do not track this. They do not track over time. They do not. It's just a service they provide for the citizens in the City. They said there's probably a cost involved, but we don't

Rafferty - Direct / By Ms. Mitchell                    **23**

track it.

So we reported on that, and then we later learned.  There were reports where they were monitoring additional funds being spent due to the unhoused population in the City.  So we did ask.  We asked those that we were told to make the request.  The information we got was not complete.  Obviously, no one informed us there was other information out there, including a generated report about the projected spending for LAPD.

Q   Did you have difficulty getting information from the mayor's office?

A   There weren't too many requests to the mayor's office.  We spoke to the mayor directly at one time to introduce ourselves, so she kind of knew what work we were trying to do.  A lot of times, the mayor's office would just refer us to LAHSA.

Q   Did you have difficulty getting information from the CIO's office?

A   I would think that the information that we got from the CIO's office was actually a little bit better and more timely.

Q   Did you have difficulty getting information from LAHSA?

A   We did.

Q   Did the City ever justify its delays by complaining about the lack of clarity in the agreement or vague definitions contained in the agreement?

MS. KUMAR:  Objection, Your Honor, leading, vague,

speculation.

THE COURT:  Overruled.  You may answer the question, please.

THE WITNESS:  They never expressed to us that the information we were requesting was confusing.  Our sense was it was really difficult for them to find the information or sometimes we would ask for certain things and they would say, well, we just don't track that, or we don't have a database to track that.  And so I think a lot of it was they were trying to scramble a little bit, trying to -- I think their intent was to try and help us, but they never said to us directly that our request was confusing, or they didn't understand our request.  Sometimes it was clarity, because I understand some of our requests were a little extensive, but we could always explain to them why we were asking for something.

I think they did ask us sometimes, is the request per the scope, which I think is appropriate to make sure that we weren't asking for something we shouldn't be asking for.  So to understand our contract and in the data request to make sure they could get us what we were asking for, I think part of it a lot had to do with delays.  I mean, there were sometimes, you know, weeks between a request and a response.

BY MS. MITCHELL:

Q    When you say they would ask you, is the request per scope, what does that mean?

Rafferty - Direct / By Ms. Mitchell            **25**

A    I think sometimes when we were asking for things, making sure that we were not asking for something that we shouldn't be asking for, just clarifying, hey, why are you asking for that? There was one conversation that, oh, you're asking for this, but really you need to be asking for something specific, as we call it, something different.  So those conversations were going back and forth to make sure to clarify our request and to see if they could get us the information.

Q    But as I understood your testimony, they would ask, like, why you need something.  Was that --

A    Correct.

Q    Okay.  And how often were you asked why you needed information?

        MS. KUMAR:  Objection, Your Honor.  Lacks foundation.

        THE COURT:  Overruled.

        THE WITNESS:  I probably can't put a number on it.  It was in a few conversations.

        MS. MITCHELL:  May I have a moment, Your Honor?

        THE COURT:  Please.

    **(Pause)**

        MS. MITCHELL:  I have no further questions at this time.  Thank you.

        THE COURT:  And the intervenors?

        MS. MYERS:  No questions, Your Honor.

        THE COURT:  City?

**EXCEPTIONAL REPORTING SERVICES, INC**

**MS. KUMAR:**  Yes, Your Honor.  Thank you.

**CROSS EXAMINATION**

**BY MS. KUMAR:**

Q    Good morning, Ms. Rafferty.  You are the managing director of A&M's Public Sector Services Department; is that right?

A    There are more than one managing director.  So the Division of Public Sector Services, I'm over division for Healthcare Delivery and Compliance.

Q    Okay.  And you are a co-leader of the firm's Public Health and Human Services practice; isn't that right?

A    Correct.

Q    But you're not a lawyer; is that right, Ms. Rafferty?

A    I'm not a lawyer.

Q    Okay.  The A&M assessment was a retrospective assessment; isn't that right?

A    Correct.

Q    Okay.  The point of the assessment was to look back at the City's homelessness programs over a period of time to assess those; isn't that right?

A    Correct.

Q    Okay.  And that look-back period was June 2020 to June 30th, 2024; is that right?

A    Correct.

Q    Okay.  So in other words, by the time you started working on this project, the entire period of review was in the past;

is that fair?

A    Correct.

Q    So now the assessment we just looked at, the final written assessment, was issued in May 2025; is that right?

A    Correct.

Q    And your work ended, I suspect, with your testimony in June 2025.  Does that sound right?

A    I believe so.  Yes.

Q    Okay.  And have you had any significant involvement in the matter since that time?

A    We were actually -- we came in and gave testimony after our engagement ended.

Q    Okay.  Sorry.  After your testimony this summer, did you have any substantial involvement in this matter after that time?

A    No.

Q    Okay.

          **THE COURT:**  And that would be summer of 2025.

          **MS. KUMAR:**  Yes, Your Honor.

**BY MS. KUMAR:**

Q    And that testimony you're referring to, Ms. Rafferty, is this summer, the summer of 2025?

A    Correct.

Q    Okay.  And since your testimony, I believe it was in the end of May, beginning of June.  Does that sound about right, of

Rafferty - Cross / By Ms. Kumar **28**

2025?

A    It does.

Q    Okay.  And so since that time, you haven't spoken to anyone at the City about this assessment, have you?

A    No.

Q    And you haven't completed, I think as you said, any further work on behalf of the Court; isn't that right?

A    We have not.

Q    Okay.  So given the scope of A&M's written assessment, would you agree with me that A&M could not and did not reach any opinions on the current state of the City's homelessness programs?  I mean, as of now, December 15th, 2025.

A    Correct.

Q    Okay.  And in fact, A&M didn't reach any opinions about the City's homelessness programs as they existed at any point in 2025; is that fair?

A    It's hard to answer that question because when we were working with the City and LAHSA and the County in 2025, even though you're correct, our review was a retrospective review. There were never comments that we've fixed that or we have a new data system for that year because we were still involved in 2025.  So no one ever said to us, we understand you're looking back.  We don't maybe have that information looking back, but we've resolved that looking forward.  That -- we did not get the sense that while we were working with the City, the County

EXCEPTIONAL REPORTING SERVICES, INC

Rafferty - Cross / By Ms. Kumar                  **29**

and LAHSA, things had been resolved.  But you're correct.  We only looked back.

Q    You were -- but the scope of your assessment from which you would never deviate is -- was focused on a period that ended in 2024; is that right?

A    Correct.

        **MS. MITCHELL:**  Objection.  Vague, ambiguous as to we would never deviate.

        **THE COURT:**  Do you understand the question?

        **THE WITNESS:**  I think so.

        **THE COURT:**  Okay.  You can answer --

**BY MS. KUMAR:**

Q    The scope of your written assessment and your work was prescribed in engagement letters and you yourself wrote it in the written assessment A&M did; isn't that right?

A    Yes.

Q    And that period was retrospective ending in 2024, right?

A    Yes.

Q    So it wasn't part of your scope of your assessment to figure out what the status of the programs were in the latter half of 2024 or anytime in 2025; is that fair?

A    That was not in our contract.  Correct.

Q    So it would be fair, Ms. Rafferty, that the A&M assessment did not and could not have addressed the City's current compliance with the Alliance Settlement Agreement; isn't that

Rafferty - Cross / By Ms. Kumar                    **30**

right?

A     Correct.

Q     Okay.  And in fact, the City's compliance with the Alliance settlement at any point in 2025 was not within the scope of the assessment; is that fair?

A     Correct.

Q     And I think as you testified in the past, the word compliance doesn't appear anywhere in the written definition of the scope of the A&M assessment.  Does that sound right?

A     Compliance in the sense --

Q     Compliance with the Alliance settlement.

A     Oh, correct.

Q     Okay.  So that was not part of the A&M's assessment.

A     Correct.

Q     Scope, right.  Okay.  Now, you talked a little bit during your direct examination about data issues that you and your colleagues at A&M experienced when trying to get information from the various parties involved.  I want to talk about that a little bit.  In its assessment, A&M concluded that there were limitations on homelessness available in the City; isn't that right?

A     As far as the number of unhoused or --

Q     Just the limitations on the data that was available. There were limitations.  Is that fair, Ms. Rafferty?

A     Correct.

Q    Okay.  For example, I think as you just testified, A&M concluded that there were multiple and fractured information systems across the City, the County, and LAHSA; is that fair?

A    That's fair.

Q    So that was what was existing at the time you did your assessment.  Those fractured systems existed when you all did that assessment; is that right?

A    Correct.

Q    Okay.  And that you and A&M made a number of recommendations about how to improve those systems; isn't that right?

A    Yes.

Q    And in fact, your assessment was, in some ways, to change those systems from the state in which they existed to change the way in which data was compiled and reported; isn't that right?

A    Yes.

Q    Okay.  So as the data existed, in your view, there were limitations; isn't that right?

A    Yes.

Q    Okay.  Now, do you recall any provision in the Alliance settlement that -- where the City committed to develop certain data systems to respond to A&M's requests?

A    No.

Q    Okay.  Now, one of the recommendations that A&M came to

Rafferty - Cross / By Ms. Kumar                    **32**

was that the City, County, and LAHSA should consider developing and adopting consistent data definitions.  Do you recall that?

A     Yes.

Q     Okay.  But do you recall any provision in the Alliance Settlement Agreement where the City committed to developing and adopting consistent data definitions?

        **MS. MITCHELL:**  Objection.  Calls for a legal conclusion.

        **THE COURT:**  Overruled.  You can answer that question if you know.

        **THE WITNESS:**  I do not believe so, no.

**BY MS. KUMAR:**

Q     Now, A&M also recommended that the City, the County, and LAHSA consider integrating databases to the extent allowed, given data privacy rules and existing laws.  Does that sound right?

A     Correct.

Q     Okay.  But do you recall any provision in the Alliance settlement where the City committed to integrating databases to the extent allowable with data privacy rules and existing laws?

        **MS. MITCHELL:**  Objection.  Calls for a legal conclusion.

        **THE COURT:**  If you know the answer, you can answer.

        **THE WITNESS:**  Correct.

//

Rafferty - Cross / By Ms. Kumar                      **33**

**BY MS. KUMAR:**

Q    And by correct, do you mean it wasn't in the Alliance settlement to your recollection; is that fair?

A    Not to my knowledge, no.

Q    Okay.  Now, in its written assessment, A&M did discuss how central LAHSA was to the data reporting in the homelessness area; isn't that fair?

A    Yes.

Q    Okay.  And one of the things A&M commented on in the written assessment was that there were differences in the governance structure between the City and LAHSA, correct?

A    Correct.

Q    So, for example, the City is arranged by council district. Do you recall that being in the written assessment?

A    Yes.

Q    While LAHSA uses service planning areas or SPAs; is that right?

A    Yes.

Q    Okay.

          **THE COURT:**  I'm sorry, counsel.  They use?

          **MS. KUMAR:**  Service planning areas, otherwise known as SPAs.  Yeah, exactly.

          **THE COURT:**  SPAs.  Okay.  Thank you.  All right.

//

//

Rafferty - Cross / By Ms. Kumar                    **34**

**BY MS. KUMAR:**

Q    And, Ms. Rafferty, A&M concluded that these differences in the governance structures made it harder to evaluate outcomes at the council district level.  Do you recall that?

A    Yes.

Q    Okay.  And you don't recall seeing any commitment by the City in the Alliance settlement to change how the outcomes were tracked at the council district level, do you?

A    Correct.

Q    Okay.  And by correct, you mean you don't recall seeing that; is that right?

A    No, I don't.

Q    Just for clarity of the record, Ms. Rafferty, I'm asking, is it fair to say that when you say correct, you mean you don't recall seeing that commitment in the Alliance settlement?

A    I do not.

        **MS. MITCHELL:**  Objection.  Calls for legal conclusion.

        **THE COURT:**  Overruled.

**BY MS. KUMAR:**

Q    Now, you testified on direct that you didn't always get the data that you all requested.  That was in part because some of the data didn't exist; isn't that right, Ms. Rafferty?

A    Sometimes we were told the data didn't exist.  Sometimes we were told that certain data had to be pulled out of certain

Rafferty - Cross / By Ms. Kumar                    **35**

systems.  The systems weren't very user-friendly.  Sometimes we were referred to a certain person.  Maybe that person thought the other person had the data.  So we were never told it was just one general thing of -- we just knew it was difficult.  It was for multiple reasons.

Q    And one of those reasons was the data didn't exist, right?  You were told that, right?

A    Yes.  In certain situations, we were told the data just they never collected it.  They never looked for it.

Q    Okay.  And, Ms. Rafferty, you testified at the prior hearing that to cure the data problems that existed, that would require starting from the ground up.  Do you recall testifying to that?

A    I do, and that was an opinion.

Q    Okay.  And that is your opinion, right?

A    Correct.

Q    Okay.  And you understand, you worked at a consulting firm and have a lot of experience with organizations and institutions.  You understand that starting from the ground up would require the devotion of time and resources; isn't that fair?

A    That's fair, yes.

Q    Okay.  And those resources would include financial resources; isn't that fair?

A    Yes.

Rafferty - Cross / By Ms. Kumar                    **36**

Q    And time from employees of the County, the City, and LAHSA, who, as I think you testified on direct, have other day jobs; isn't that fair?

A    Correct.  But some of the folks we're talking about, that was their job.

Q    But they also have jobs in compiling to report on things separate and apart from restarting data systems; isn't that fair, Ms. Rafferty?

A    I would assume so.

         **MS. MITCHELL:**  Objection.  Vague, ambiguous as to they, these people.

         **THE COURT:**  Overruled.  Do you understand the question?

         **THE WITNESS:**  I do.

         **THE COURT:**  Okay.  Please answer then.

         **THE WITNESS:**  We were not -- we never asked for each person's job description.  I think whatever job you have, you're usually busy.  So we were sensitive, like I said earlier, we were sensitive to adding to someone's burden.  But there are certain people that, by title, my assumption would be that they are responsible for this data, or understanding that the data is accurate so it can be used.  We were never told, you know, it's like my comment of you need to start from scratch.  A lot of companies will use employees that they have and just say, okay, we're going to be able to collect the data

electronically, AI systems.  A lot of companies out there are still using the same staff.  But, yes, is there energy and effort required to look at your data systems?  Absolutely.

BY MS. KUMAR:

Q    And that would be energy and effort by the City, LAHSA, and the County.  Isn't that fair, Ms. Rafferty?

A    That's fair.  Correct.

Q    And as Ms. Mitchell went over with you, multiple divisions within each of those entities; isn't that right?

A    Correct.

Q    And you would agree that you've never read anywhere in the Alliance settlement where the City committed to change it -- to devote the necessary financial and other resources to change its data systems related to homelessness?

        MS. MITCHELL:  Objection.  Calls for legal conclusion.

        THE COURT:  Overruled.  You can answer the question.

        THE WITNESS:  Correct.

BY MS. KUMAR:

Q    And you've never read anywhere in the Alliance's settlement where the City agreed to change the way it collected information?  Do you?

        MS. MITCHELL:  Objection.  Calls for legal conclusion.

        THE COURT:  Overruled.  You can ask the question.

THE WITNESS:  Correct.

Q    And there's nothing to your knowledge in the Alliance settlement that required the City to devote the time and resources in the manner that A&M proposed; isn't that right?

MS. MITCHELL:  Objection.  Calls for legal conclusion.

THE COURT:  Overruled.  Please re-answer.

THE WITNESS:  That's correct.

Q    In fact, there's actually no requirement that the City actually file any of A&M's recommendations; isn't that right?

MS. MITCHELL:  Can I just have a standing objection to her interpretations of the Alliance agreement, Your Honor?

THE COURT:  You may.

MS. MITCHELL:  Thank you.

THE WITNESS:  Not to my knowledge, no.

BY MS. KUMAR:

Q    Okay.  Now, Ms. Mitchell asked you a lot of questions about purported delay in responding to A&M's requests.  Now, all of your comments on direct related to delay, those apply to the City, County, and LAHSA.  Is that fair, Ms. Rafferty?

A    I would also include LAPD.

Q    Okay, and LAPD.  But all of those entities, right?

A    Correct.

Q    And just so that we all know, for A&M's written assessment, A&M issued a significant number of data requests.

Rafferty - Cross / By Ms. Kumar          **39**

Would you agree with me?

A    I would.

Q    Yeah.  To the City, does 72 sound about right to you,
Ms. Rafferty?

A    It's in the ballpark, yes.

Q    Okay.  And you have a lot of experience working in a
consulting firm, working with large organizations, companies,
and institutions, don't you?

A    I do.

Q    Okay.  And in your experience, it's not unusual, is it,
for it to take time, particularly with the voluminous data, for
that data to be compiled and produced; isn't that right?

A    That would depend on the company, the company -- the
requests for us, and the data being requested.  If some
companies can produce data within 24 hours.

Q    But it's not unusual for sometimes for it to take longer
than that; isn't that right, Ms. Rafferty?

A    I'm trying to think based on my experience in the
companies that I've worked for in the last five years.  It's --
now with everything being electronic and with AI programs able
to pull data, it's usually pretty quick.

Q    Is it your testimony that every request you've given in
the last five years to every company has been responded to
within 24 hours?

A    I would say no.

Rafferty - Cross / By Ms. Kumar                    **40**

Q    Okay.  And you said electronic systems and AI.  Do you have any knowledge of whether the City uses AI currently in their data systems?

A    I do not.

Q    Okay.  And all of the data is not actually electronically collected; isn't that right?

A    That's correct.

Q    In fact, that was one of the problems, right?

A    Correct.

Q    And so one of the reasons companies you work with now are able to respond quicker is because they, as you just said, they are using electronic systems; isn't that right?

A    Correct.

Q    As you also said, how quickly data can be compiled also may depend on what other priorities the individuals to whom the request has been made are juggling at that particular time; isn't that fair?

A    That's a fair statement.

Q    Okay.  And you would agree with me that, for example, the CAO has responsibilities outside of responding to requests from A&M; isn't that fair?

A    That's fair.

Q    In fact, they have a fair number of responsibilities in the City; isn't that fair, Ms. Rafferty?

A    I would assume so.  I've never sat with them doing their

job, but I would assume that's correct.

Q    And in addition to the requests from the City, A&M also issued about 75 requests to LAHSA; isn't that right?

A    Approximately, yes.

Q    And LAHSA is an entity independent from the City of Los Angeles; isn't that right?

A    I think you need to describe for me what's independent.  I mean, would LAHSA exist if LA City didn't exist?

Q    Well, why don't we look at your written assessment where you talked about LAHSA.

A    Yeah.

Q    If we could pull up Exhibit, I believe it's 23, at page 130 please.  Do you see that on your screen in front of you?

A    I do.

Q    And do you see in Section 5.2, Ms. Rafferty, under "Governance and Accountability"?

A    Yes.

Q    Okay.  And it says there, and this is the A&M written assessment, is that fair?  Is that right?

A    Yes.

Q    Okay.  It says LAHSA was established in response to litigation in the '80s and early '90s.  Did I read that correctly, that first clause correctly?

A    Yes.

Q    And its authority derives from the JPAA, dated December

Rafferty - Cross / By Ms. Kumar          **42**

17th, 1993, executed between the City and the County.  Did I read that correctly?

A     Correct.

Q     And the JPAA, that's the Joint Powers Authority Agreement, does that sound right?

A     Yes.

Q     Okay.  And then the sentence reads, this foundational agreement permits LAHSA to exercise its powers independently from the City and the County, coordinating existing services for the PEH previously operated separately by the City and County.  Did I read that correctly?

A     Yes.

Q     So would you agree with me, Ms. Rafferty, that LAHSA exercises its powers independently from the City and the County?

        **MS. MITCHELL:**  Objection.  Calls for a legal conclusion.

        **THE COURT:**  Sustained.

**BY MS. KUMAR:**

Q     Your Honor -- Ms. Rafferty, is it fair to say that A&M concluded in its written assessment, as stated in this page before you, that LAHSA exercises its powers independently from the City and the County?

A     They do, but I'd like to clarify that.

Q     Ms. Rafferty, I'm just asking, is that what it says in the

EXCEPTIONAL REPORTING SERVICES, INC

Rafferty - Cross / By Ms. Kumar                    **43**

written assessment?

A    Yes.

         **MS. MITCHELL:**  Objection, Your Honor.  The witness should be able to answer that question.

         **THE COURT:**  Finish your answer, please.

         **THE WITNESS:**  Yes, they function independently, but there is still cross-accountability for funds for the homelessness in Los Angeles.  If LAHSA is not functioning correctly, then that reflects -- I mean, the mayor has been in here, the city council has been here, everyone is invested in the program.  Yes, they have the ability under the joint powers agreement to be an independent entity, but that doesn't mean there isn't some relatability or relationship between the City and the County and LAHSA.

**BY MS. KUMAR:**

Q    So there's a relationship.  That sounds fair, Ms. Rafferty.  There's a relationship between the City and the County and LAHSA, right?

A    Correct.

Q    And in fact, LAHSA's board of governors is half City and half County; isn't that right?

A    Correct.  Correct.

Q    But the City on its own, to your knowledge, are they able to unilaterally demand LAHSA take or not take certain actions?

         **MS. MITCHELL:**  Objection.  Calls for a legal

Rafferty - Cross / By Ms. Kumar                    **44**

conclusion.

          **THE COURT:**  Sustained.

          **MS. KUMAR:**  Your Honor, she's been testifying about her knowledge of LAHSA.  It's fair for me to be able to inquire into what her source of knowledge and her understanding of that is.

          **THE COURT:**  Thank you, counsel.

**BY MS. KUMAR:**

Q    Okay, Ms. Rafferty.  Now you testified in, or actually, in response to these requests, I think 72 to the City and 75 to LAHSA, A&M did, in fact, receive a substantial volume of information; isn't that right?

A    We did.

Q    Okay.  But as you've talked about, there were some challenges in collecting that data; isn't that right?

A    Correct.

Q    And some of that data was pretty complex; isn't that right?

A    Complex in the way of receiving information that was unreadable or not related to the request or not sequential, such as dates.  Yes, it was difficult.  It was difficult data to analyze.

Q    But in your opinion, the folks with whom you worked with, including at the City, were trying to help A&M; isn't that right?

Rafferty - Cross / By Ms. Kumar                                    **45**

A      I believe so.  I mean, I think of the good in people.

Q      But you testified to that on direct --

A      Yes.

Q      -- that the City, LAHSA, and the County, their intent was to help A&M; isn't that right?

            **MS. MITCHELL:**  Objection, Your Honor.  I don't think that the witness was finished with her answer.  And I think counsel had jumped in --

            **THE COURT:**  I want to make sure you've finished your answer.

            **THE WITNESS:**  Okay.  I think there was.  But also, I mean, we had the Court behind us also.  I mean, I think they were trying to help us.  I think there was a push to help us.  But I think once we came to court and explained it was very difficult to get information, they seemed more willing to kind of work with us.

**BY MS. KUMAR:**

Q      So your testimony is that the City was only willing to work with you after the Court pushed?  Is that your testimony?

A      I think it was -- it prompted them to maybe respond a little quicker.

Q      Okay.  And so that was -- that prompting from the Court was in August of 2024; isn't that right?

A      Correct.

Q      Okay.  Can I direct your attention to Exhibit 554, please?

Rafferty - Cross / By Ms. Kumar                **46**

554.

THE COURT:  And what, I'm sorry, counsel, if you'd go back on the docket number, so I can --

MS. KUMAR:  It's not a docket, Your Honor.  It's an email.

THE COURT:  Would you go, please go back to the first page you just put up.

MS. KUMAR:  Oh, no, no.  Sorry.  That was the incorrect document that first appeared on the screen.

Q    Ms. Rafferty, we could just blow up the first part of this.  This is an email.  Could you tell us what the date of the email is?

A    July 1st, 2024.

Q    And that was before the hearing we just talked about in August of 2024; is that right?

A    Correct.

Q    Okay.  And you are a recipient on this email; is that right?

A    Correct.

Q    Okay.  And the email is from Michelle Martinez, who's the special master in this case; is that right?

A    Correct.

Q    Okay.  And its subject line is A&M updates.  Do you see that?

A    I do.

Rafferty - Cross / By Ms. Kumar                **47**

Q    Okay.  If we could scroll down a little.  Ms. Martinez writes, I'm pleased to provide you with an update on the ongoing financial and performance assessment.

THE COURT:  Counsel, just a little slower.

MS. KUMAR:  Sorry, Your Honor.

THE COURT:  Thank you.

**BY MS. KUMAR:**

Q    I am pleased to provide you with an update on the ongoing financial and performance assessment conducted by the A&M team.  Do you see that at the end of the first paragraph?

A    I do.

Q    And then she goes on to say, firstly, I extend my gratitude to the City for its invaluable support in coordinating interviews and obtaining the necessary data from LAHSA.  Do you see that?

A    I do.

Q    Did I read that correctly?

A    Correct.

Q    And then she goes on to say, furthermore, I wish to express my appreciation to LAHSA for its cooperation in providing essential City data to A&M.  Did I read that correctly?

A    Correct.

Q    And then she goes on to say, I also deeply appreciate the unwavering commitment and patience exhibited by the A&M

**EXCEPTIONAL REPORTING SERVICES, INC**

Rafferty - Cross / By Ms. Kumar                    **48**

team.  That's your team; is that right?

A     It is.

Q     Okay.  So now she goes further down.  The first point is interviews data collection.  Do you see that?

A     I do.

Q     In the second bullet it says, the City has conscientiously submitted all required data and LAHSA has shared the majority of their data.  Did I read that correctly?

A     You did.

Q     Okay.  And this was in July of 2024; isn't that right?

A     Correct.

Q     And now this -- you and your colleagues at A&M have testified or spoken to the Court, addressed the Court on numerous occasions during the time of your assessment; isn't that fair?

A     We have.

Q     Okay.  And isn't it true that your colleague at A&M, Laura Frost, testified earlier that the City, LAHSA, and the County were responding in good faith to A&M's data requests?

A     Yes.

Q     Okay.  And you would agree with her, wouldn't you?

A     She was kinder than I was.

Q     Do you think -- do you believe as you sit here, Ms. Rafferty, that the City acted in bad faith with regard to A&M's requests?

Rafferty - Cross / By Ms. Kumar                    **49**

MS. MITCHELL: Objection. Calls for legal
conclusion.

THE WITNESS: That is such a general term.

THE COURT: Just a moment. You can answer that
question. Overruled.

THE WITNESS: Okay. It's -- all requests? Every
request? You're saying either it's all good or it's all bad?
Is that what you're asking me?

BY MS. KUMAR:

Q    Generally speaking, Ms. Rafferty, would you say that the
City was acting in bad faith with requests to the A&M
assessment?

A    Not for every request, no.

Q    Okay. And generally, actually, as we saw in your direct
examination, the City was generally responsive to A&M's
requests; isn't that right?

A    Delayed, but responsive.

Q    Okay. And your colleague, Laura Frost, testified that the
City, LAHSA, and the County responded in good faith to A&M's
data requests; isn't that right?

A    Yes. It just wasn't timely. But, yes.

Q    Okay. And, in fact, Ms. Frost testified that all of the
parties --

THE COURT: Counsel, just a moment. You dropped your
voice. I'm sorry.

**THE WITNESS:** Oh, I'm sorry. Just not timely. But, yes.

**BY MS. KUMAR:**

Q   Okay. In that email in July 2024, did Special Master Martinez talk about untimely responses to A&M?

A   Not that I saw in the email, no.

Q   In fact, didn't she describe that the City had conscientiously responded to all of A&M's requests?

**MS. MITCHELL:** Objection. Lacks foundation as to Michelle Martinez's email.

**MS. KUMAR:** We can put it back up on the screen, Your Honor.

**THE COURT:** No, that's not the issue. Whether she's casting an opinion about this email? Is that what you're asking her to do?

**MS. KUMAR:** I'm simply asking, didn't the email from Special Master Martinez state that the City conscientiously responded to A&M's requests as of July of 2024?

**THE COURT:** That's sustained, counsel. Sustained.

**BY MS. KUMAR:**

Q   If we could put back up on the screen, Exhibit 554, in that first bullet, does it say from Special Master Martinez, the City has conscientiously submitted all required data? Did I read that correctly, Ms. Rafferty?

A   That's in Ms. Martinez's email.

Rafferty - Cross / By Ms. Kumar                          **51**

Q    Thank you.  One of the times that you talked about that you addressed the Court was in August of 2024, is that right?

THE COURT:  Counsel, there's two of those in August.

MS. KUMAR:  Okay, but at the end of August, August 28th, I believe, 2024.  Does that sound about right?

THE COURT:  Counsel, just one moment, please.  It's August 22nd and August 29th.  Documents 761 and 763, which are you referring to?

MS. KUMAR:  I'm referring to Docket 768.  Let's see if we can pull that up.  This is the transcript, Your Honor, of those proceedings.

THE COURT:  Now, counsel, I'm lost.  You referred to --

MS. KUMAR:  August 29th, 2024.

THE COURT:  Let me finish, please.  What's confusing to me is on direct examination, there was Docket 414, there's Docket 761.  That's August 22nd, 2024.  There was Exhibit 415, Docket 763, August 29th.

MS. KUMAR:  Yes.

THE COURT:  Counsel, are you referring to one of those two documents?

MS. KUMAR:  I am not, Your Honor.

THE COURT:  Thank you.  Please.

MS. KUMAR:  I believe counsel is referring to the minute order related to these proceedings.  I'm now talking

Rafferty - Cross / By Ms. Kumar                **52**

about the actual transcript.

THE COURT:  Well, that wasn't clear.

MS. KUMAR:  Okay, sorry.  I will --

THE COURT:  What you said, quote-unquote, were two documents.  That's what's confusing.

MS. KUMAR:  I --

THE COURT:  So you're going back to a transcript.

MS. KUMAR:  Yes, Your Honor, I will endeavor to be more precise.

BY MS. KUMAR:

Q    You addressed the Court on August 29th, 2024.  Do you recall that, Ms. Rafferty?

A    I do.

Q    And do you recall saying in those proceedings that no one at the City, County, or LAHSA was holding back information from A&M?

A    Do I recall?  Not exactly, no.

Q    Okay.  If we could help, if we could take a look at your testimony.  If we look at page 10, lines 6 through 7, and is it fair to say it's not necessarily that anybody is holding back on us?  Did I read that correctly?

A    Correct.

Q    And you also said in that same hearing that in your view, no one was intending not to give A&M information.  Does that sound familiar?

Rafferty - Cross / By Ms. Kumar                    **53**

A    It does.  Can I ask a question?

Q    Sure.

A    On the last that you just, can you scroll down to what else I said?

Q    Sure.

A    Thanks.  I was -- I just wanted to make sure that where I say it's -- that we are making sure we are asking the right questions and getting the information goes back to -- there was a lot of clarification.

Q    Okay.

A    Yeah.  I'm not saying that -- I've said this before in court.  I would never want to intentionally think someone intentionally wasn't giving us information.  Was it difficult to get?  Yes.  Was the data not complete?  Yes.  I think as we went along in writing our report, you know, they made themselves available for phone calls.  They made themselves available to talk to us and clarify.  There was just a lot of delays.  And like I said before, a lot of the data we received was not usable.

Q    But as you testified in direct, the City, the County, and LAHSA were trying to help A&M; isn't that right?

A    Correct.

Q    And a big focus of this hearing, Ms. Rafferty, is in fact on the intent.  So that's why we're focused on this issue.  Now I want to then talk about your testimony in October -- on

**EXCEPTIONAL REPORTING SERVICES, INC**

Rafferty - Cross / By Ms. Kumar                    **54**

October 2nd, 2024, another time that you addressed the court.
Does that sound familiar to you?

A    It does.

Q    Okay.  And I think in that testimony, like you've said today, you said a lot of people we've worked with are really trying to be helpful.  Does that sound right to you?  I'm happy to pull it up if it would be helpful.

A    Yes.  No, I do recall that.

Q    And that includes people at the City; isn't that right?

A    Yes.

Q    Okay.  And then two weeks later at a hearing on October 16th, 2024, your colleague, Ms. Brown, stated that A&M had pretty good responses from the City to our data requests.  Do you recall that?

A    Yes.

Q    And then at a hearing on November 21st, 2024, your colleague, Ms. Collier, who I think may also be Ms. Frost --

A    Correct.

Q    -- stated that all parties have been generally responsive to data requests.  Do you recall that?

A    Yes.

Q    Now, I would like to talk about Exhibit 416 that Ms. Mitchell went over with you, if we could pull that up.  And if we could go to the third page of this document, which is the chart.  Okay.  So I know it's small, but if we could

Rafferty - Cross / By Ms. Kumar                    **55**

actually -- if Ms. Rafferty, if your eyes will permit, I first want to draw your attention to the second column of party. And I'd like you to confirm for me how many of these rows have the City identified as the responsible party? And we can scroll down for you.

A     Three.

Q     Okay. So it's fewer than half of these have the City as the responsible party. Does that sound right?

A     Correct.

Q     Okay. And so then this first one says, obtain an understanding of homelessness assistance services provided and/or obligated under each program and the responsible party. Do you see that?

A     Yes.

Q     And on the right side -- and then in the type of delay, it says deficiency non-existent data. Do you see that in the third column?

A     In the third column -- which, yeah, sorry. Yes.

Q     Okay. And then in the explanation column, which is the fourth column, there's a longer explanation, but I'd like to direct your attention to two different parts. The first is the last sentence of the first paragraph. However, challenges arose because neither the City nor LAHSA had processes that clearly tracked expenses by program or service. Did I read that right?

A     Yes.

Q     Okay.  So the existing data tracking of the City and LAHSA didn't allow for the data to be produced in the manner A&M was requesting; is that fair?

A     Correct.

Q     Okay.  And then in that second paragraph, it says, while all parties have been generally responsive to the data requests.  Do you see that?

A     Yes.

Q     And then it describes that your team chose to take an iterative process in requesting data; isn't that fair?

A     Yes.

Q     And that was A&M's choice, right?

A     Yes.

Q     And part of that is because --

          **THE COURT:**  Counsel?  Counsel, just a little slower, please.

          **MS. KUMAR:**  Sure.  Sorry, Your Honor.

          **THE COURT:**  Thank you.

**BY MS. KUMAR:**

Q     And part of the reason is because A&M is trying to understand what data exists and what data responses are even possible; isn't that right?

A     Correct.

Q     And so you ask a question, you receive data, and then

maybe you ask another question; is that fair?

A    Yes.

Q    At a very high level.

A    Yes.

Q    Okay.  So let's now move down to the next time the City is mentioned.  In the fifth row, it says, the task is quantify, analyze sources, and uses cash disbursements of funds by program, type of expense, and fiscal year.  Do you see that?

A    Yes.

Q    Okay.  Then if we look at the type of delay, it says complex data.  Did I read that correctly?

A    Yes.

Q    Okay.  So the data in this instance was complex; isn't that right?

A    Correct.

Q    And then if we look at the explanation, it says, A&M originally requested accounting detail from the City related to expenses under the programs.  Do you see that?

A    Yes.

Q    Okay.  And if we fast forward, it says, after discussion with the City, it was determined that the roadmap programs appropriations are reported within the CAO funding recommendation reports.  And then it goes on to finish that sentence.  Did I read that correctly?

A    Yes.

Rafferty - Cross / By Ms. Kumar                    **58**

Q    So you had -- you and your team had ongoing discussions with the City; is that fair?

A    Correct.

Q    And then, sorry, if we pull that back up, the last sentence said, however, the complexity of these appropriations necessitated multiple follow-up meetings and additional data requests to understand how the appropriations are processed within the City's accounting system.  Did I read that correctly?

A    Yes.

Q    So you sent out a request, you had certain questions, and the City had multiple follow-up meetings with you and your team; is that fair?

A    They did.

Q    And then, as we just talked about, you issued additional data requests in that iterative process; isn't that right?

A    Correct.

Q    Okay.  And ultimately, the challenge here, and the delay, was because it was complex to both understand the data that existed and that could be compiled for A&M's review; isn't that fair?

A    That's fair, yes.

Q    Okay.  And then let's look at the last time the City's mentioned, the second to last column.  The task is, quantify, analyze cash reimbursements from the City to LAHSA for service

Rafferty - Cross / By Ms. Kumar                    **59**

provider expenses.  Did I say -- did I read that correctly?

A     Yes.

Q     And then, here it says, complex -- the reason for delay, is complex data, incomplete data.  Did I read that right?

A     Yes.

Q     Okay.  So if we blow up the explanation here, and this is what Ms. Mitchell showed you, again, in the second sentence, A&M comments that these are complex processes, isn't that right?

A     Yes.

Q     And they involve compiling and tracking each service provider contract under these cash requests.  Did I read that correctly?

A     Yes.

Q     And at the end of that sentence, again, A&M notes that these complex data systems required multiple follow-up meetings and additional data requests to ensure a thorough understanding of the data provided to the A&M team.  Did I understand that?

A     Yes.

Q     And again, the City made itself available for multiple follow-up meetings and responded to additional data requests; isn't that right?

A     Yes.

Q     And then A&M notes that A&M received a file that you talked about on direct and began analyzing the data.  That file

was received on September 9th, 2024; is that right, Ms. Rafferty?

A    Yes.

Q    And then it says the team subsequently discovered this was an outdated version of the file.  Do you have any reason to believe that anyone purposely sent A&M an outdated version of the file?

          **MS. MITCHELL:**  Objection calls for speculation.

          **THE COURT:**  Well, you can cast your personal opinion.

          **THE WITNESS:**  I wouldn't know.

**BY MS. KUMAR:**

Q    Okay, but you have no reason to believe they did, do you?

          **MS. MITCHELL:**  Same objection.

          **THE COURT:**  Well, it's been asked and answered also, counsel.

**BY MS. KUMAR:**

Q    Okay.  And then it says a corrected file was provided on September 29th, 2024; do you see that?

A    Yes.

Q    And it says after A&M surfaced this issue.  Does that sound right?

A    Yes.

Q    It doesn't say here when A&M surfaced the issue, does it?

A    No.

Q    So now let's talk about the final report that A&M

Rafferty - Cross / By Ms. Kumar                      **61**

issued.  That was issued in May of 2025; isn't that right?

A    Correct.

Q    Okay.

          **THE COURT:**  Counsel, before we get into that, let's take a recess for a couple minutes, okay?

          **MS. KUMAR:**  Sure.

          **THE COURT:**  Because you'll be a while on that, won't you?

          **MS. KUMAR:**  No, I only have like a few more questions, Your Honor.

          **THE COURT:**  No recess then.

          **MS. KUMAR:**  Okay.

          **THE COURT:**  If you want to finish a block of time, that's fine.

          **MS. KUMAR:**  Okay.

**BY MS. KUMAR:**

Q    In that report, Ms. Rafferty, A&M concluded that all parties, including the City, tried to provide A&M timely data in response to its request, didn't it?

A    Yes.

Q    Okay.  And in fact, let's pull up the A&M written assessment at Exhibit 23, page 32.  And then A&M concluded that all parties, including the City, tried to provide A&M complete data in response to its request; isn't that right?

A    Yes.

**EXCEPTIONAL REPORTING SERVICES, INC**

Rafferty - Cross / By Ms. Kumar          **62**

MS. MITCHELL:  I'm going to belatedly object as to calls to speculation as to what parties were trying to do.

THE COURT:  Overruled.  No rule.  You can answer the question.

THE WITNESS:  I think that statement related to our conversations, people seemed trying to support us.

BY MS. KUMAR:

Q   So if we look at the last paragraph in the written assessment, it says, all parties endeavored to provide -- that's okay.

THE COURT:  What page was that?

MS. KUMAR:  Page 32.

BY MS. KUMAR:

Q   Ms. Rafferty, in A&M's final written assessment, A&M concluded that all parties endeavored to provide timely, complete, and accurate data.  Did I read that correctly?

A   Correct.

Q   And that ultimately there were delays due to variations in data sources, reporting formats, and production timing introduced complexities and contributed to delays.  Did I read that correctly?

A   Yes.

MS. KUMAR:  One second, Your Honor.

(Pause)

MS. KUMAR:  Nothing further from the City, Your

Honor.

THE COURT:  Why don't we take a 20-minute recess, okay?  And then we'll come back for redirect, recross.  Thank you.

MS. KUMAR:  Thank you, Your Honor.

THE COURT:  Thank you very much.  Step down.  Please be careful.

**(Recessed at 9:49 a.m.; reconvened at 10:18 a.m.)**

THE COURT:  Counsel, thank you for your courtesy.  If you'd be seated, please, then we're back in session.  Ms. Rafferty, you'd retake the stand, please, thank you.

Okay.  And, counsel, the witness has returned to the stand.  Ms. Rafferty is seated.  This would be redirect examination.

MS. MITCHELL:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

**BY MS. MITCHELL:**

Q   Ms. Rafferty, during July, August, September, October of 2024, were you still trying to get compliance from the City?

MS. KUMAR:  Objection, Your Honor, as to -- vague as to compliance speculation.

THE COURT:  Overruled.

THE WITNESS:  Yes, we were still trying to get information that we had requested during that time.

//

Rafferty - Redirect / By Ms. Mitchell                 **64**

**BY MS. MITCHELL:**

Q    Would it have been helpful to your efforts to get information to criticize the City in open court?

**MS. KUMAR:**  Objection, Your Honor, speculation.

**THE COURT:**  Do you understand the question?

**THE WITNESS:**  I do.

**THE COURT:**  You may answer it, overruled.

**THE WITNESS:**  As a consultant, we do try and work with both parties when we're brought in.  We do try and be supportive and helpful.  It doesn't really help us to be accusatory or question things in an unprofessional manner.  We -- even though we didn't get all the data we were looking for, when we did get it, we were thankful and we appreciated it.

I think we were trying to be supportive of their efforts, even though sometimes it didn't -- we didn't get the information that we needed.  That's just -- that's a lot to do with my company's culture.  We're a large company.  We're privately held.  We're run by the same owners who started it in 1983, that's just part of our professional behavior.

**BY MS. MITCHELL:**

Q    Have you ever heard the phrase it's easier to catch flies with honey than vinegar?

A    Yes.

**MS. KUMAR:**  Your Honor, relevance.

**THE COURT:**  Sustained, counsel.

**BY MS. MITCHELL:**

Q    Okay.  Why do you find it to be easier to be nice to individuals from whom you are attempting to get compliance on data requests?

**MS. KUMAR:**  Objection, Your Honor, relevance.

**THE COURT:**  Overruled, goes to state of mind.  You can answer that.

**THE WITNESS:**  In my personal opinion, I think when you're adversarial with anyone, you meet more resistance.  My background is to try and be collaborative and not heavy handed in any engagements that we work with.  We do try -- especially when we're trying to collect data or information or trying to have an understanding of events, it's much easier to try and work with someone than be un -- what I would consider unprofessional.

**BY MS. MITCHELL:**

Q    When you say what I would consider unprofessional, what does that mean?

A    I don't think there's any reason to argue or be accusatory or tell someone they're not doing their job or -- it doesn't lead to better collaboration.  I think we were frustrated.  I think our team was frustrated in trying to get some of this information, understanding why the information wasn't flowing in a timely manner, but we never said to anyone, unless I don't

think there is anybody that would contradict us, that we were difficult to work with or accusatory of saying something like you don't know what you're doing.  I mean, we just wouldn't say something like that.

I think we were really appreciative when we did get information or we finally got a call scheduled.  I think we were trying to be supportive of the efforts.  We're just not -- it's just -- it's not my personality.  It's usually not a role of a consultant to be adversarial.

**MS. MITCHELL:**  No further questions at this time, Your Honor.

**THE COURT:**  Intervenors?

**MS. MYERS:**  No questions, Your Honor.

**THE COURT:**  And back to the City, please.

**MS. KUMAR:**  Nothing further at this time, Your Honor.

**THE COURT:**  All right.  Would you remain call in case the parties need any of the witnesses back, but we'll be courteous and it probably won't be until January, so we'll reach out to you if you're needed back in court.  Okay?

**THE WITNESS:**  I will.

**THE COURT:**  Now, be careful stepping down.

And, counsel, your next witness please.

**MS. MITCHELL:**  Thank you, Your Honor.  We call Paul Webster to the stand.

**THE COURT:**  All right.  Mr. Webster, we'd previously

Webster - Direct / By Ms. Mitchell                    **67**

administered an oath to you some time ago.  Do you recall that

oath?

        **MR. WEBSTER:**  Uh-huh.

        **THE COURT:**  Same oath applies, sir.  Once again,

would you be careful.

        Once again, though, would you state your name for the

record because we're back on CourtSmart.

        **MS. MITCHELL:**  Sure.

        **MR. WEBSTER:**  My name is Paul Webster.

        **THE COURT:**  And would you spell your last name, sir.

        **MR. WEBSTER:**  W-E-B-S-T-E-R.

        **THE COURT:**  Mr. Webster was the first witness, he's

now being recalled.  Counsel, direct examination.

        **MS. MITCHELL:**  Thank you, Your Honor.

    **PAUL WEBSTER, PLAINTIFFS' WITNESS, PREV. SWORN**

            **DIRECT EXAMINATION**

**BY MS. MITCHELL:**

Q    Mr. Webster, during your testimony earlier in this hearing

you recall talking about the City in your opinion delaying

A&M's investigation.

A    That's correct.

Q    And do you recall indicating that your opinion was based

on meetings, discussions, hearings and e-mails you received?

A    That's correct.

Q    And did you have the occasion to go back and search your

e-mails for discussions of delays?

A     I did.

Q     And what did you find?

A     I didn't find them.  Much in terms of delays.

Q     Okay.  What did the e-mails you searched for generally reflect?

          **MS. KUMAR:**  Objection, Your Honor, hearsay.

          **THE COURT:**  Overruled, you can answer the question.

          **THE WITNESS:**  The e-mails that I searched were mostly scheduling, trying to, you know, get on calendar with various parties and also some discussion about the A&M process and, you know, answering questions about that since I was on kind of the committee to -- that formed this scope of work.

**BY MS. MITCHELL:**

Q     Do you want to amend your earlier opinion?

A     No.

Q     Why not?

          **MS. KUMAR:**  Objection, Your Honor, relevance.

          **THE COURT:**  Overruled, you can answer the question.

          **THE WITNESS:**  Because I felt like the City was delaying its production of information relating to the data, the assessment and milestones and metrics that are in the settlement.

Q     Do you still hold the opinion that the City intentionally was delaying A&M in its efforts to assess the City's

homelessness response system?

MS. KUMAR:  Objection, Your Honor, speculation as to his opinion as to what the City was doing.

THE COURT:  Overruled.

THE WITNESS:  I do feel that the City was intentionally delaying this.  In my view, they were dragging their feet and making it difficult to respond to, in my view, relatively obvious requests.

Q   Okay.  Does the fact that you don't have any e-mails talking about that change your opinion?

A   No.

Q   So what is that opinion based on?

A   It's based on discussions.  It's based on sitting in court listening to, for example, the A&M representatives constantly having to ask the City for information and expressing their frustration.

Q   Okay.  I want to turn your attention to some of the things that Mr. Szabo testified to while he was here on December 4th of 2025 earlier this month.

MS. MITCHELL:  May I have a moment, Your Honor?

THE COURT:  Certainly.

(Pause)

BY MS. MITCHELL:

Q   Mr. Szabo testified that the settlement agreement reporting was limited to Alliance bed related activity.  Do you

agree with that statement?

MS. KUMAR:  Objection, Your Honor, relevance.

THE COURT:  Overruled.

THE WITNESS:  No.

Q    Why not?

A    Because the purpose of the reporting was so much more than just the creation of beds.  It was also addressing outreach activities, encampment resolution activities, and beds.

Q    Okay.  I'm going to show you -- this is Docket 1102, this is Mr. Szabo's testimony on December 4th.  And there is a statement here that,

"Our quarterly reporting is to provide the Court and plaintiffs and the intervenors and the public with our progress toward meeting the settlement agreement and meeting the obligations of the settlement agreement, rather than just information at large.  So that provides guidelines as to or an important guideline as to what type of information we're reporting and how it relates to our progress with the settlement agreement.  And again, principally the 12,915 beds that we are required to establish over five years."

Do you agree with that statement?

A    I agree with everything except for that last sentence, that principally the 12,915 beds.

Webster - Direct / By Ms. Mitchell                    **71**

Q    And why is, in your opinion, that last statement wrong?

A    Because I don't -- there was no indication that there was any kind of prioritization of the creation of beds in our negotiations or in the settlement.

Q    What was the settlement about in your mind?

          **MS. KUMAR:**  Objection, Your Honor, relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  The settlement attempted to accomplish three things, the creation of beds and the monitoring of milestones and metrics for the City in the creation of those beds; the outreach activities and in other words, the efforts of the City to engage people who are homeless and experiencing homelessness in Los Angeles and to offer them housing, beds and services; and third, to engage in encampments and encampment reductions so that there would be fewer encampments on the street and we would have cleaner and safer streets.

**BY MS. MITCHELL:**

Q    Okay.  I'm going to show you the next page, page 21, another statement by Mr. Szabo.  Line 16 to 17 referring to the agreement,

          "It was principally about creating a required number

          of units."

     Do you see that?

A    I do.

Q    And you still disagree with that statement?

**EXCEPTIONAL REPORTING SERVICES, INC**

Webster - Direct / By Ms. Mitchell                    72

A    I do.

Q    For the same reasons?

A    That's correct.

Q    In the settlement agreement itself, is there any statement that one obligation is more important than other obligations that are required?

        MS. KUMAR:  Objection, Your Honor, calls for a legal conclusion.

        THE COURT:  Overruled.

        THE WITNESS:  No.

BY MS. MITCHELL:

Q    Okay.  Did the city ever express during negotiations that one obligation is more important or more principal than the other obligations it committed to?

        MS. KUMAR:  Objection, Your Honor, lacks foundation, speculation.

        THE COURT:  Overruled.

        THE WITNESS:  No.

Q    I'm going to turn to page 28.  There's a question of Mr. Szabo about the expression, on offer, and that he interpreted the number of beds or opportunities offered as required to be reflected in Section 7.1 to mean on offer.  Did you read this part of the transcript?

A    I did.

Q    Have you ever heard the phrase on offer in relation to the

EXCEPTIONAL REPORTING SERVICES, INC

Webster - Direct / By Ms. Mitchell                    **73**

settlement?

A     No.   This transcript was the first time I ever heard that phrase.

Q     During the negotiations of the City, did the phrase on offer ever appear?

          **MS. KUMAR:**  Objection, Your Honor, lacks foundation, speculation as to all conversations related to the agreement.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  No, it did not appear.

**BY MS. MITCHELL:**

Q     What does -- and I'm going to refer us back to Exhibit 25, which is a copy of the settlement agreement between the parties in this case, looking specifically at page 14 of Exhibit 25 and looking at Section 7.1, what is required to be reported by the City regarding the number of beds or opportunities offered?

          **MS. KUMAR:**  Objection, Your Honor, speculations, lacks foundation.

          **MS. MITCHELL:**  It was actually a bad question also, let me ask the question again.

**BY MS. MITCHELL:**

Q     The phrase, the number of beds or opportunities offered as reflected in Section 7.1, what does that mean?

          **MS. KUMAR:**  Objection, Your Honor, lacks foundation for this witness to speak to what it means.

          **THE COURT:**  Overruled.

**THE WITNESS:**  It means how many times the City and its outreach workers would offer a bed or opportunity -- a bed to people who are experiencing homelessness.

**BY MS. MITCHELL:**

Q    Mr. Webster, you helped negotiate this agreement; is that right?

A    That's correct.

Q    How long have you been working in the homeless services industry, I'll call it?

A    About 15 years.

Q    And what did you do prior to working as the executive director of LA Alliance?

A    I was the senior policy advisor on homelessness for the United States Department of Housing & Urban Development.

Q    And what did you do before that?

A    I was my own advocate for homeless policy reforms and I worked at a homeless service provider.

Q    Is the phrase, the number of beds or excuse me, let me say this.  Is the phrase an offer of shelter or housing the word offer, is that a commonly used term in the homeless services context?

A    Yes.

Q    And as the principal negotiator with the City of Los Angeles was there ever any confusion about what -- was there ever any confusion expressed about what this term, the number

Webster - Direct / By Ms. Mitchell                    **75**

of beds or opportunities offered meant?

MS. KUMAR:  Objection, Your Honor, lacks foundation, speculation for this witness to testify of what others thought.

THE COURT:  Well, this is his own opinion, overruled.

THE WITNESS:  I did not ever hear any confusion or concern about the term offered.

BY MS. MITCHELL:

Q   Going back to the transcript of Mr. Szabo, now testifying that this meant, on offer -- let me ask you this, I think I asked this question earlier, do you know what the phrase on offer means?

A   No.

Q   Did Mr. Szabo interpret it or describe what on offer means in his testimony?

A   I think he attempted to.  It wasn't very clear to me in his testimony.

Q   Going to page 29, Mr. Szabo testified that the understanding of this on offer as opposed to what it actually says offered --

MS. KUMAR:  Objection, Your Honor, argumentative.

MS. MITCHELL:  Can I finish the question?

THE COURT:  Just restate the question, just say it again.

//

//

Webster - Direct / By Ms. Mitchell                    **76**

**BY MS. MITCHELL:**

Q    Okay.  This interpretation -- well, the question is on offer, it's not regarding offered, so do you see where it says by Mr. McRae beds on offer?

A    Yes.

Q    Line 16.  The witness answers the question about the bed being on offer and he explains in line 22,

"It's consistent with the central obligation of the settlement agreement."

Do you understand what he meant by that?

**MS. KUMAR:**  Objection, Your Honor, relevance, lacks foundation as to what this witness' testimony about what another witness thought.

**THE COURT:**  Yeah, it's speculation about what Szabo means, he can cast his own opinion as a negotiator in this, counsel.

**BY MS. MITCHELL:**

Q    Does that opinion --

**MS. MITCHELL:**  Thank you, Your Honor.

Q    Does that opinion provided by Mr. Szabo that being on offer is consistent with the central obligation of settlement agreement?  Does that mean anything to you?

A    No.

Q    Why not?

A    Well, firstly --

EXCEPTIONAL REPORTING SERVICES, INC

MS. KUMAR:  Objection, relevance.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  Thank you.  Well, firstly, I don't believe it was the central obligation of the settlement agreement.  And secondly, the creation of the beds was the metric, the creation of 12,915 beds is the metric.  A process measure that was included in 7.1 of the settlement agreement was how well is the City performing in creating these beds and filling these beds by engaging people experiencing homelessness on the street and encouraging them to accept these beds.

Q    The metric, the number of beds or opportunities offered that we see here, and again I'm showing you Exhibit 25 in Section 7.1, the number of beds or opportunities offered, is that limited just to the beds created in the Alliance agreement?

MS. KUMAR:  Objection, Your Honor, lacks foundation and speculation.

THE COURT:  Overruled, you can answer that question.

THE WITNESS:  No.

BY MS. MITCHELL:

Q    Are there other references to outreach in the settlement agreement?

A    Yes.

Q    Where would we find other references other than Section 7.1 to outreach in the settlement agreement?

Webster - Direct / By Ms. Mitchell                    **78**

A    I think it's -- is it section -- I think it's Section 4, there's a number of details and terms of the City's agreement to engage in outreach activities.

Q    Showing you Section -- I'm on page 10 of Exhibit 25, starting with street engagement, Section 4, is that what you're referring to?

A    That's correct.

Q    And why don't you go ahead and read those first lines for us after 4.1.

A    City will continue to offer shelter or housing to City shelter appropriate people experiencing homelessness within the City and enforce public space regulations and health and safety laws consistent with its own protocol (street engagement strategy).

Q    Does Section 4.1 say the City will continue to make shelter or housing on offer?

A    No.

Q    Does the word on offer appear anywhere -- the phrase on offer appear anywhere in the settlement agreement?

A    No.

Q    Going over to the next page, it looks like we're in the middle of a sentence, so I'll just complete that, the health and safety laws consistent with its own protocol (street engagement strategy) and the next one, and constitutional requirements.  Do you see that?

**EXCEPTIONAL REPORTING SERVICES, INC**

Webster - Direct / By Ms. Mitchell                **79**

A      Yes.

Q      Can you read the next sentence for us please?

A      No enforcement of public space regulations shall be taken against any individual unless that individual has first been offered an opportunity for housing or shelter or to relocate consistent with applicable laws.

Q      And why is this Section 4.1 or how is Section 4.1 related to Section 7.1 if at all?

                **MS. KUMAR:**  Objection, Your Honor, lacks foundation.

                **THE COURT:**  Overruled.

                **THE WITNESS:**  It's related because in order to have a fair understanding of the City's performance in creating beds, 12,915 and engaging people who are experiencing homelessness so that they can get off the street and in clearing encampments resolving encampments, you need to balance the creation of the beds with the offers.  You can't offer people something, an opportunity for housing or shelter when none exists, and as later on in I think Section 4, there was a component that would trigger Municipal Code 4118 in terms of enforcement.

                So understanding the number of beds that existed, the number of offers being made, the number of encampments being cleared all had -- they were all the same priority and they were all contingent on whether a council district or the City as a whole would begin to enforce 4118.

//

Webster - Direct / By Ms. Mitchell                    **80**

**BY MS. MITCHELL:**

Q    Is there anything in Section 4, or let's be specific, Section 4.1 that requires those offers to be made of LA Alliance settlement specific beds?

A    No.

Q    Going further down on that same page, Section 4.2, at the end of the page there's a sentence starting with even.  Can you read that for us please?

A    Even after the City creates adequate and appropriate housing and shelter opportunities for 60 percent of unsheltered city shelter appropriate, people experiencing homelessness in a council district, no enforcement action shall be taken against any individual suspected of violating a public space regulation or ordinance unless that individual has first been offered adequate and appropriate, next page, shelter or housing and/or to relocate to an alternative location consistent with applicable laws in this agreement, except for time, manner, place regulations, such as LAMC 4118 and similar ordinances, which may be enforced immediately and without such notice at any time.

Q    Okay.  So going back to the question regarding the offers and why offers are required to be reported in Section 7.1, how is that related to what we see, if at all, in Section 4.2 about the limitations on enforcement?

                 **MS. KUMAR:**  Objection, Your Honor, lacks foundation.

**EXCEPTIONAL REPORTING SERVICES, INC**

THE COURT:  Overruled.

THE WITNESS:  So by keeping track of offers, by keeping track of who's being offered by how many offers you're able to determine whether or not enforcement of 4118 can proceed.

BY MS. MITCHELL:

Q    Going back to Section 7.1, the next metric, the number of beds or opportunities currently available in each council district.  Do you see that?

A    I do.

Q    In your understanding and experience, can a bed or opportunity be available if it is occupied?

MS. KUMAR:  Objection, Your Honor, lacks foundation.

THE COURT:  Can you restate that, counsel, will you say that again?

MS. MITCHELL:  Sure, Your Honor.

Q    In your experience and in your understanding, can a bed or opportunity be available if it is occupied?

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  No, it cannot.

BY MS. MITCHELL:

Q    Why not?

A    Because you're offering a place for someone to go and typically two people can't occupy the same bed.

Q    Depending on the size of the bed, though, right?

A    Most homeless service providers think discreetly in terms of one bed, one individual.

Q    Okay.  Thank you.  Let me go back to the transcript that we were looking at earlier, which is Docket No. 1102 and I'm now on page 39.

        **MS. MITCHELL:**  May I have a moment, Your Honor?

        **THE COURT:**  Certainly.

    **(Pause)**

**BY MS. MITCHELL:**

Q    There's a statement by Mr. Szabo,

        "There's nothing in the settlement as I read it that

        requires any sort of real time vacancy reporting."

    And that's on lines 11 and 12.  Do you see that?

A    I do.

Q    Do you agree with that statement?

        **MS. KUMAR:**  Objection, Your Honor, relevance.

        **THE WITNESS:**  Yes and no.  There is nothing in the settlement that specifically says you will report the number of vacancies.  But again, it comes back to this concept of understanding numerators and denominators.  If you know that you have a number of beds or a number of opportunities and a number -- and a proportion of those are occupied, you can do the -- it's not a difficult calculation to say so how many beds are available, which is the same thing as a vacancy.

//

**BY MS. MITCHELL:**

Q    Okay.  And going back to Section 4 of what we talked about of the settlement agreement, why was knowing the current availability important in this settlement agreement?

**MS. KUMAR:**  Objection, Your Honor, lacks foundation, relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  By understanding the availability it triggers whether or not a council district or the City would reach 60 percent of the number of people experiencing homelessness in that council district or citywide so that enforcement measures 4118 would begin.  Would proceed.

Q    Okay.  Going back to Section 7.1 and focusing again on the City's obligation to report the number of beds or opportunities currently available in each council district, other than in reference to Section 4, was there any other reason why this metric was required to be reported?

**MS. KUMAR:**  Objection, Your Honor, calls for a legal conclusion, foundation, relevance.

**THE COURT:**  Do you understand the question?

**THE WITNESS:**  Yes.

**THE COURT:**  You may answer it, overruled.

**THE WITNESS:**  The reason that the number of beds or opportunities currently available in each council district was to be reported, was so that each council district and the

constituency of each council district could understand the progress that the City is making and when that council district would reach the 60 percent of the number of people experiencing homelessness as reported in the 2022 point in time count, so that enforcement measures of 4118 could commence.

**BY MS. MITCHELL:**

Q    Was there any concern with providing or building too many beds or too few beds in relation to people experiencing homelessness?

        **MS. KUMAR:**  Objection, Your Honor, lacks foundation and vague as to any concern.

        **THE COURT:**  I think I missed part of that question. I was taking a note, I apologize.  Could you reask that.

        **MS. MITCHELL:**  That's okay.

Q    My question was, was there any concern about building too many beds or too few beds in relation to the people experiencing homelessness in different council districts?

        **MS. KUMAR:**  Same objection, Your Honor.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yeah, there was concern.  I mean first of all constituents in city council districts wanted to know if the City was making progress in their council districts, so they wanted to know if beds were indeed being created.

        Also, I repeatedly in doing meetings all across Los Angeles would say, you know, the milestone and metrics for all

of these things, in terms of the creation of beds and the

resolution of encampments aren't ceilings, they're floors.

So there's nothing to prevent the City from exceeding

these milestones and metrics so that they could offer even more

beds, because we know, you know, 12,915 is just a fraction of

the point in time count and it's just a fraction of the 2022

unsheltered homelessness count.

**BY MS. MITCHELL:**

Q    Is the number of beds or opportunities currently available

in each council district intended to reflect only beds that

were built or obtained as a result of this agreement?

**MS. KUMAR:**  Objection, Your Honor, calls for a legal

conclusion, relevance, foundation.

**THE COURT:**  Overruled.

**THE WITNESS:**  No.  In fact, the reporting that the

City did, the quarterly reports cited the source, was this a

HHH funded bed, was this a Road Map bed, what specific kind of

a bed was indicated.

Q    During negotiations, during settlement negotiations was

there some concern expressed by the City about whether a

building in some council districts would be too many and

building in other council districts would be too few?

**MS. KUMAR:**  Objection, Your Honor, lacks foundation,

hearsay.

**THE COURT:**  Overruled.

**THE WITNESS:** Yes.  There was this concept that was brought up as a concern of equitable distribution and so the concern was that the City would build a greater proportion of beds or units in certain council districts and leave other council districts with fewer than -- fewer numbers of beds or fewer interests.  And so the concern was that you would have some council districts that be kind of considered, you know, this is where people are housed who are experiencing homelessness, but in other council districts there wouldn't be.

And so there was a specific concern.  We had these conversations about this concept of equitable distribution of distributing beds for people expressing homelessness throughout the City equitably.

**THE COURT:**  Counsel, I would literally interject, but the record if you go back will reflect with the negotiations between Garcetti, LA Alliance that Judge Birotte was involved. And what you'll find was a deep concern at that time about flooding district 14 and the concern that was brought to my attention concerning those negotiations were the flooding of 14 from other districts.  And the disparity involving the minority population and go back and check the record, because I'm aware of that and I want to disclose that through Judge Birotte and some of the negotiations.

And also I think that the record will reflect also that there was an attempt at that time for citywide settlement

Webster - Direct / By Ms. Mitchell                    **87**

that was turned down.  Go back and check the record but I'm pretty confident that back in the transcripts you'll find that there was an attempt by Judge Birotte, the Court, special master and all to reach a decision by settlement, that was turned down.  And therefore this district-by-district was negotiated at the time.

So I'm aware of that and I want to disclose that because it came through Judge Birotte in terms of I think a 2 o'clock negotiation at one point right here in this courthouse with the parties.

**MS. MITCHELL:**  Thank you, Your Honor.

**BY MS. MITCHELL:**

Q    And in that context, Mr. Webster, why was the number of beds or opportunities currently available in each council district important?

**MS. KUMAR:**  Objection, Your Honor, lacks foundation, calls for a legal conclusion.

**THE COURT:**  Overruled, counsel.  This goes to that disparity, in fact, I've written about that in an earlier opinion, the Court's deep concern about the download of minority populations into one district quite frankly from other districts, you'll find that in the earlier opinions, including the Road Map agreement.  This Court was deeply concerned about that.

**THE WITNESS:**  Could you repeat the question?

**BY MS. MITCHELL:**

Q    With that context, Mr. Webster, why was the number of beds or opportunities currently available in each council district important?

A    The number of beds and opportunities currently available was important to determine whether or not, first of all, the City was producing beds per council district.  They're making progress on the metrics and milestones.

Second of all, it's important to determine whether or not this -- an inequitable distribution, too many units in one district versus another, could be seen.  So the quarterly reports are intended to be an iterative process where we could see the progress that the City is making.  And if there were an indication of an inequitable distribution then that could be brought up and it could be an issue that the parties could resolve.

Q    By interpreting this metric to mean all opportunities, I guess provided, as opposed to unoccupied, does that meet those goals?

        **MS. KUMAR:**  Objection, Your Honor, calls for a legal conclusion.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Could you repeat that?

//

//

Webster - Direct / By Ms. Mitchell                    **89**

**BY MS. MITCHELL:**

Q   Yeah, it was a little bit of a weird question, let me rephrase that.  So with the City's interpretation that its obligation was to provide the full number of beds and opportunities that were provided as opposed to available, does that interpretation meet the goals of this metric?

MS. KUMAR:  Same objection, Your Honor.

THE COURT:  The way it's phrased concerning the City, counsel, you're going to have to rephrase that.  I'm going to sustain the objection.  What's his -- in other words, he's a negotiator, Szabo is allegedly a negotiator --

MS. MITCHELL:  Sure, let me --

THE COURT:  -- he can cast his own opinion about it, but not what the City's thinking.

Q   Let me go back Mr. Szabo's testimony that the -- on page 39 that this Section 7.1 does not require the City to report vacancies.  So by reporting all beds as opposed to vacancies, does that meet the purpose in your mind of this Section 7.1?

MS. KUMAR:  Same objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Yeah, I think reporting all beds including vacancies would provide an opportunity for the public and obviously us as parties to determine whether or not they're meeting this goal, whether or not they're fulfilling this part of the settlement agreement.

EXCEPTIONAL REPORTING SERVICES, INC

**BY MS. MITCHELL:**

Q    Well, you just said all beds including vacancies.  Is it your understanding that the City has to report, and I'll highlight this, the number of housing or shelter opportunities created otherwise obtained separately from the number of beds or opportunities currently available?

         **MS. KUMAR:**  Objection, Your Honor, lacks foundation.

         **THE COURT:**  Overruled.

         **MS. KUMAR:**  Also legal conclusion.

         **THE COURT:**  Overruled, you can answer that, sir.

         **THE WITNESS:**  I think they should report both.  I think they --

Q    My question to you, Mr. Webster, is they should report both together or are they separate metrics?

         **MS. KUMAR:**  Objection, Your Honor, leading, relevance, calls for a legal conclusion.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  I think they should be reported separately.

Q    Okay.

A    And the reason they should be reported separately is that the public has a right to know the number of housing or shelter opportunities created in their council district, so that they know if it's meeting that equitable distribution and they should also know the number that are available, so that they

EXCEPTIONAL REPORTING SERVICES, INC

Webster - Direct / By Ms. Mitchell                    **91**

can determine whether or not they've reached the threshold to enact 4118.

The interesting thing about this section on 4118 in Section 4 is just because you -- you can't say 60 percent without understanding what the remaining 40 percent is. So if you say, we've created beds for 60 percent of the people experiencing homelessness in a council district, according to the point in time count, you're obviously saying and we did not create an additional 40 percent. We haven't met that threshold, and that's obviously a statement of need.

Q    Looking at the Section 7.1, and just to that first sentence there, I want to walk you through the three separately delineated requirements. So first, and I'll write like a 1 there, do you see that?

A    Uh-huh, yes.

Q    The number of housing or shelter opportunities created or otherwise obtained. Do you see that?

A    Yes.

Q    And then second, the number of beds or opportunities offered. Do you see that?

A    Yes.

Q    And then third, the number of beds or opportunities currently available in each council district. Do you see that?

A    Yes.

Q    Would you agree that those are three separate metrics?

Webster - Direct / By Ms. Mitchell                    **92**

A     I would.

          **MS. KUMAR:**  Objection, Your Honor, calls for a legal
conclusion.

          **THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q     Would you agree that those are three different data points
that are required to be reported?

          **MS. KUMAR:**  Objection, same objection, and lacks
foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Yes.

Q     If the City is reporting all three of those metrics in a
single data point, would that be consistent with their
obligations under Section 7.1?

          **MS. KUMAR:**  Objection, Your Honor, calls for a legal
conclusion.  Is the ultimate issue in this hearing.

          **THE COURT:**  Overruled, you can answer the question.
This is your opinion.

          **THE WITNESS:**  Yeah, not in my opinion.

Q     Okay.  Going back, well going forward, the second
sentence, the City will work with LAHSA.  During negotiations
did the City ever express confusion about what working with
LAHSA meant?

A     Not that I --

          **MS. KUMAR:**  Objection, Your Honor --

**EXCEPTIONAL REPORTING SERVICES, INC**

THE WITNESS:  Not that I know.

MS. KUMAR:  -- lacks foundation.

THE COURT:  I'm sorry?  Both of you spoke over the top of each other.  Would you reask the question and then wait for your answer, we'll get the objection.

So your question again.

MS. MITCHELL:  Oh, I'm sorry.

BY MS. MITCHELL:

Q    Did the City ever express confusion about what the phrase working with LAHSA meant?

THE COURT:  And now the objection?

MS. KUMAR:  Objection, Your Honor, lacks foundation and hearsay.

THE COURT:  Overruled, you can answer the question.

THE WITNESS:  Not that I ever heard.

Q    Going to this metric, the number of PEH engaged.  Again, with your background, training and experience in homeless services, is the word engaged a commonly used word or phrase?

A    Absolutely.

Q    And did the City ever express confusion about what the word engaged means?

MS. KUMAR:  Objection, Your Honor, lacks foundation, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  No, not that I know of.

EXCEPTIONAL REPORTING SERVICES, INC

**BY MS. MITCHELL:**

Q    Turning your attention back to Mr. Szabo's testimony and again this is Docket 1102 and we're going to move on to page 52.  Starting with question -- excuse me, starting with line 2 there's a question,

"Has your office been reporting the metric PEH engaged, the number of PEH engaged in each -- the quarterly reports?"

Do you see that question?

A    I do.

Q    And there's an answer,

"It would not be possible to report that."

And then down on lines 20, starting at 20, and there's an answer by Mr. Szabo,

"That the engagement is a process of engaging or bringing the person experiencing homelessness into a case plan."

Let me pause.  Do you agree that that is an appropriate definition of engaging a person experiencing homelessness?

**MS. KUMAR:**  Objection, Your Honor, calls for a legal conclusion.

**THE COURT:**  Would you restate that question?

**MS. MITCHELL:**  Yes.

//

//

**BY MS. MITCHELL:**

Q   There's a definition of Mr. Szabo that engagement is the process of engaging, --

          **THE COURT:**  I'm sorry, that's where I lost you.  What line are you on?

          **MS. MITCHELL:**  I'm on line 21, Your Honor.

          **THE COURT:**  All right.  Just a moment.  I was looking at the prior answer.  Just a minute.

          All right.  Now, what's your question please?

Q   Do you agree that the definition Mr. Szabo provides, the process of engaging is or bringing the person experiencing homelessness into a case plan is an appropriate definition of engaging?

          **MS. KUMAR:**  Objection, Your Honor, it calls for a legal conclusion and argumentative.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I think it is, I think it's part of it.

**BY MS. MITCHELL:**

Q   Going to the next page, there's a statement by Mr. Szabo in the same answer, starting on line 4,

          "There would be no way to filter each individual

          engagement by housing type because that engagement

          happens before that housing type would be

          determined in most cases."

     Do you see that?

A     I do.

Q     Is that your understanding as well that typically an engagement happens prior to assigning a housing type?

A     It can.  It often does.

Q     Okay.  Is it your understanding of the City's reporting requirements that the City's obligation to report PEH engaged needs to be tied to a specific housing type?

A     No.

Q     Why not?

        **MS. KUMAR:**  Objection, Your Honor, lacks foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I don't think that was our interest in terms of engagement.  I think our interest was just in determining if the City was actually doing -- performing its outreach activities and to what scale they were performing those outreach activities.

**BY MS. MITCHELL:**

Q     And going back to Section 7.1, is there anything in Section 7.1, I can put it back on the screen if you'd like to see it again, that requires the City to tie the PEH engaged metric to housing offers?

A     No, there's not.

Q     Okay.  Let's go back to Section 7.1.  The next metric after the number of PEH engaged is the number of PEH who have accepted offers of shelter or housing.  Do you see that?

Webster - Direct / By Ms. Mitchell          **97**

A     I do.

Q     And do you understand that report to be the number of people experiencing homelessness who have accepted offers or shelter of Alliance shelter or housing?

A     No.

Q     Why not?

A     Because it's absent in the sentence.

          **MS. KUMAR:**  Objection, Your Honor, move to strike as a legal conclusion.

          **THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q     Did the City ever at any time express confusion about its obligation to report this metric?

          **MS. KUMAR:**  Objection, Your Honor, lacks foundation and hearsay.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  NO.

Q     Okay.  Going to the phrase, to the extent possible, do you see that in the sentence there on line 9?

A     Yes.

Q     Do you understand that at -- when this settlement agreement was entered into in 2022 that there were -- there were not systems capable of capturing some of this information?

A     Yes and no.

Q     Please explain your answer.

EXCEPTIONAL REPORTING SERVICES, INC

A    Yes, there -- the systems existed.  The systems existed to capture any information the City or the continuum of care would want to capture.  Whether or not they actually created those fields and actually actively captured them, is another question.

Q    Do you have an understanding of whether, to the extent the system needs to be updated to capture the required data, the City had an obligation to do that.

        **MS. KUMAR:**  Objection, Your Honor, calls for a legal conclusion, lacks foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes, I believe they did have an obligation to update it and include these metrics.

**BY MS. MITCHELL:**

Q    And to your knowledge, was that ever done?

        **MS. KUMAR:**  Objection, Your Honor, lacks foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Not to my knowledge.

Q    Do you know whether or not LAHSA or the City currently track the number of encampments in each council district?

        **MS. KUMAR:**  Objection, lacks foundation.

        **THE COURT:**  Just a moment.  I didn't hear the question fully, would you ask again?

        **MS. MITCHELL:**  Yes.

//

**BY MS. MITCHELL:**

Q    Do you know whether the City of Los Angeles or LAHSA currently track the number of encampments in each council district?

    **MS. KUMAR:**  Objection, lacks foundation.

    **THE COURT:**  Overruled.

    **THE WITNESS:**  I don't believe they do.

Q    Do you know whether the City or LAHSA currently track the number of PEH who have rejected offers of shelter or housing and why?

    **MS. KUMAR:**  Objection, lacks foundation.

    **THE COURT:**  Overruled.

    **THE WITNESS:**  I don't believe they do.

Q    And I think we touched on this the first time around in your testimony, but why is that specific metric important?

    **MS. KUMAR:**  Objection, relevance.

    **THE COURT:**  Overruled.

    **THE WITNESS:**  Would you clarify what metric you're talking about?

**BY MS. MITCHELL:**

Q    Yeah, the number of PEH who have rejected offers of shelter or housing and why.

A    Sure.  That's an important metric because it speaks to the effectiveness of the outreach and it also speaks to what they were offered and what they rejected.  And it also demonstrates

Webster - Direct / By Ms. Mitchell                **100**

that -- and we know this, this is true in the literature, this is true, you know, HUD makes this clear in its guidance that there are a number of individuals experiencing homelessness that are -- that require additional services, they require different interventions.

We know in the national literature that there are individuals experiencing homelessness that have serious mental illnesses, that refuse offers of help.  The same thing with folks with chronic addictions, they refuse offers of help.

So I think that's an important metric to understand to determine whether or not your interventions are the right interventions and whether they're effective in reducing the number of people who are living and dying on the street.

Q    Going back to your description about what this agreement was fundamentally about, and I think you said, and correct me if I'm wrong, Mr. Webster, three things.  Was it housing or shelter, outreach and encampment reduction; is that right?

A    Those are the three things I said earlier.

Q    And is this reporting in Section 7.1 consistent with those three things?

        **MS. KUMAR:**  Objection, Your Honor, lacks foundation, calls for a legal conclusion.

        **THE COURT:**  Overruled, this is your opinion, you may answer.

        **THE WITNESS:**  Yeah, I think 7.1 does touch on the

Webster - Direct / By Ms. Mitchell                **101**

number of beds and shelter opportunities created, so I think that's important.  It does touch on outreach in terms of the number of offers.  I don't think it touches on the number of encampments that are resolved.

**BY MS. MITCHELL:**

Q     That's, in fact, dealt with earlier in Section 5.2; is that right?

A     That's correct.

          **MS. MITCHELL:**  May I have a moment, Your Honor?

          **THE COURT:**  You may.

     **(Pause)**

          **MS. MITCHELL:**  I have no further questions at this time, Your Honor.

          **THE COURT:**  Ms. Myers?

          **MS. MYERS:**  No questions from the intervenors, thanks.

          **THE COURT:**  To the City?  Would the City like a recess before you start or would you like to use this time before lunch?

          **MS. KUMAR:**  Yeah, we can use this time before lunch, Your Honor.

          **THE COURT:**  Okay.  Brief recess then?  Or do you want to start?

          **MS. KUMAR:**  I think we can start, Your Honor.

          **THE COURT:**  All right.  You'll call the recess then.

Webster - Cross / By Ms. Kumar                                    **102**

**CROSS EXAMINATION**

**BY MS. KUMAR:**

Q    Good morning, Mr. Webster.

A    Good morning.

Q    You last testified in this case on November 19th, 2025; isn't that right?

A    Correct.

Q    And your testimony touched a number of different matters related to this hearing; isn't that right?

A    In general, yeah, I'd agree with that.

Q    You testified, as you just did just now about your interpretation of Section 7.1; is that right?

A    I believe I did.

Q    And you testified about whether your opinion, whether the City has complied with its obligations under Section 7.1; isn't that right?

A    I think I did.

Q    And you also testified about a series of meetings that occurred between the Alliance and the City in 2023, didn't you?

A    Yes.

Q    And you also testified about a sanctions motion that the Alliance filed in 2024; isn't that right?

A    I believe I did.

Q    Now, all of the testimony you gave was under oath; isn't that right?

Webster - Cross / By Ms. Kumar                      **103**

A    Yes.

Q    You were sworn to tell the truth before you begin testifying; isn't that right?

A    What I swore.

Q    And that was the same oath that the Court administered today or reminded you that you remained under oath; isn't that right?

A    Yeah.

Q    Okay.  So let's talk a little bit about the testimony you gave.  You testified that in your opinion the City did not cooperate with A&M; isn't that right?

A    Yes.

Q    Okay.  And --

A    I -- yeah, I think.  Yeah --

Q    I'm happy to show you your testimony, Mr. Webster --

A    -- I think it's pretty obvious.

Q    -- if that would make it easier.

A    No, I agree that they didn't cooperate with A&M, they were delaying, they were frustrating, they didn't have data that they should have, yeah.

Q    So -- but I'm asking about your prior testimony.  You previously testified on November 19th, 2025 that the City did not cooperate with A&M; isn't that right?

A    That's right.

Q    And you testified that the basis for this opinion were e-

**EXCEPTIONAL REPORTING SERVICES, INC**

Webster - Cross / By Ms. Kumar     **104**

mails; isn't that right?

A     That's right.

          **MS. MITCHELL:**  Objection, misstates the testimony.

          **THE COURT:**  Overruled, you can answer the question.

          **THE WITNESS:**  Yeah, my recollection I thought I had e-mails that indicated that they weren't being cooperative, the City wasn't being cooperative.

**BY MS. KUMAR:**

Q     And you thought and you testified under oath that these e-mails showed all kinds of excuses from the City; isn't that right?

A     I think I testified that I had e-mails that showed that the City was delaying and that we had conversations about their delay.

Q     And you testified in your direct in November that you were copied on these e-mails; isn't that right?

A     I had some e-mails that were copies, yeah, some e-mails where I was a recipient among other folks, sure.

Q     But you testified on November 19th, 2025 that you had -- that you were copied on e-mails showing the City was delaying in response to the requests from A&M; isn't that right?

          **MS. MITCHELL:**  Objection, misstates the testimony. This is not a memory test.  I think if she wants to show the transcripts, that would be more appropriate.

          **THE COURT:**  Overruled, you can answer the question,

Webster - Cross / By Ms. Kumar                              **105**

sir?

THE WITNESS:  Yeah, I believe I had those e-mails, correct.

**BY MS. KUMAR:**

Q    And you test -- and then the Court actually asked you whether you saw those e-mails; isn't that right?

A    I believe that I had those e-mails.

Q    But I'm asking you a question, Mr. Webster, isn't it true that in November of 2025, the Court asked you whether you had seen the e-mails that you claimed showed delay from the City to A&M?

MS. MITCHELL:  Objection, misstates the testimony.

THE COURT:  Overruled.

THE WITNESS:  I believe, yeah.  If the Court says that -- if the court transcripts reflect that he, the Court asked if I had seen those e-mails and I answered affirmatively, then that's how I answered.

Q    But why don't we just show your testimony.  Let's pull up Docket 1090, which is Exhibit 407.  And let's go to page 84.

I want to direct your attention to lines 5 through 7.  You were asked on direct in your testimony in November,

"Were you copied on e-mails to and from A&M regarding the assessment?"

Isn't that right?

A    Yes.

Webster - Cross / By Ms. Kumar **106**

Q    Okay.  And now, I'd like to direct your attention to page 85 at the very bottom, lines 23 to 25, after you testified that in your view the City was delaying in e-mails, the Court asks you,

"You saw these e-mails; is that correct?"

And you responded,

"I read e-mails."

Did I read that right?

A    Yes, you did.

Q    Okay.  And then the Court asked you whether you had those e-mails; isn't that right?  If we go to the next page --

MS. MITCHELL:  Objection, lacks foundation, calls for speculation, I think it also skips a lot of testimony, Your Honor.

MS. KUMAR:  Your Honor, I'm --

THE COURT:  Overruled.

MS. KUMAR:  -- directing you to --

Q    Mr. Webster, to page 86 of the transcript --

THE COURT:  Counsel, did you hear my ruling?

MS. KUMAR:  Sorry?  Yeah, I did.

THE COURT:  Okay.

MS. KUMAR:  Yeah, yeah, I'm just repeating it for --

THE COURT:  You don't want me --

MS. KUMAR:  -- this --

THE COURT:  You don't want to talk me out of the

EXCEPTIONAL REPORTING SERVICES, INC

ruling, do you?

MS. KUMAR:  No, no, I don't, Your Honor.

THE COURT:  All right.  Overruled, thank you.

**BY MS. KUMAR:**

Q    Mr. Webster, on page 86, line 4, the Court asks you,

"Do you have those e-mails?"

And you said,

"I do."

Isn't that right?

A    That's what it says and I do have e-mails from --
correspondence with A&M and others regarding the City and data
and appointments and scheduling, I have a number of e-mails.

Q    But you said, did you not, Mr. Webster, in your testimony
of November of 2025 that these e-mails were the basis for your
conclusion that the City did not cooperate with A&M and had
delayed in its response.

MS. MITCHELL:  Objection, misstates the testimony,
Your Honor, it speaks for itself.

THE COURT:  Overruled.

THE WITNESS:  You haven't shown me in my testimony
where I'm saying that those e-mails are e-mails that say that
I -- that led me to the conclusion that A&M was or the City was
delaying.

//

//

Webster - Cross / By Ms. Kumar                    **108**

**BY MS. KUMAR:**

Q    Okay.  Let's look at page --

A    You've showed me my testimony that says I agree that I have e-mails.

Q    Okay.  Let's go back, preceding this, page 85.  You said,

        "What type --"

    On line 11 the question was,

        "What type of delays did you see?"

    Is that right?  Do you see that?

A    I see that.

Q    And you give a long response, the delays that I was aware of and all of these examples.  Do you see that?

A    Yes.

Q    Okay.  I then object if we could zoom out or scroll down, and then you say,

        "Overall but I would ask all counsel you saw the

        e-mails directly related to your testimony about

        delays."

    Isn't that right, Mr. Webster?

A    I don't see where it says isn't that right, Mr. Webster. Could you -- are you looking at --

Q    No, no, I'm asking you now.

A    -- number 23?

Q    I'm asking you now, that the Court asked you whether you saw the e-mails that purported to show delay.  Didn't the Court

EXCEPTIONAL REPORTING SERVICES, INC

Webster - Cross / By Ms. Kumar                    **109**

ask you that at line 24 on page 85?

A    It says,

"You saw e-mails."

And I said,

"I read e-mails."

Q    Okay.  So let's go back to another version of your

testimony, how about page 85.

MS. KUMAR:  If we could zoom out, if we could go to

the prior page.  And then if we could go that --

Q    You said in line -- page 84, question (sic) 20, the

question was,

"Was the City in your opinion cooperative with A&M?"

You answered,

"No."

Right?

A    That's correct.

Q    Okay.  And then you were asked,

"What's the basis of that opinion?"

And you said,

"Multiple attempts by A&M --"

MS. KUMAR:  Then if we go to the next page.

Q    Okay.

"-- they were nonresponsive."

You were talking about e-mails there, weren't you,

Mr. Webster?

Webster - Cross / By Ms. Kumar     **110**

A    Not specifically.

Q    You weren't talking about e-mails there.

A    It doesn't show it in the testimony.  You said that I was asked that if I felt that the City was not cooperative and I replied, no, I don't think they were cooperative.  And then you asked me what's the basis, and I said the multiple -- everything that you just said.  I don't see e-mails in any of this back and forth.

Q    You don't -- your testimony is that in November of 2025, you never testified that there were e-mails showing delay?

        **MS. MITCHELL:**  Objection, Your Honor.

        **THE WITNESS:**  You're not asking me that.

        **MS. MITCHELL:**  Hold on, Mr. Webster.  Objection, Your Honor.  There's -- the witness needs to be allowed to finish his testimony.  They're interrupting each other.

        **THE COURT:**  Finish your testimony.

        **THE WITNESS:**  You're showing me my testimony from one section about e-mails and you're trying to tie it to this question about the basis of my opinion.

**BY MS. KUMAR:**

Q    Okay.  And --

        **THE WITNESS:**  And you're not showing that the basis of my opinion on lines -- on this argument, on these questions starting at line 20 is that there were e-mails.

Q    Okay.

**EXCEPTIONAL REPORTING SERVICES, INC**

Webster - Cross / By Ms. Kumar                **111**

A    And your previous -- the previous transcript, said did you receive e-mails and you said yes, I saw e-mails.

Q    Okay.  So let's go back to page 85.  We'll walk through your testimony in detail, Mr. Webster.

You testified what -- about what kinds of delays you saw; isn't that right?

A    That's right.

Q    Okay.  I objected for lacks foundation.  Do you see that?

A    Yes.

Q    And then the Court in reference to the earlier conversation about e-mails says,

"You saw these e-mails?"

And you said,

"I read e-mails."

Isn't that right?

A    It doesn't say you saw these e-mails, it says,

"You saw e-mails; is that correct?"

And I answered,

"I read e-mails.

Q    Okay.  And then we go to the next page, and the Court asks you,

"Do you have those e-mails?"

And you say,

"I do."

Do you see that?

Webster - Cross / By Ms. Kumar                    **112**

A     I do.

Q     The Court then asks that the e-mails be disclosed to both parties; isn't that right?

A     That's what it says.

Q     Okay.  And then I make a motion to strike for further foundation, right; isn't that right?

        The Court actually says,

                "Subject to motion to strike for further foundation,

                we'll get those e-mails to all the parties."

        Isn't that right?

A     That's what it says.

Q     The Court was directing you to produce e-mails that showed delay from the City to A&M; isn't that right?

A     I think the Court was asking me to show e-mails.

Q     Your testimony is it has nothing to do with e-mails generally, it was not about e-mails from delay, that's not your testimony?

A     That's what you just showed on the screen.  You showed that I had -- I wanted to know what the -- in my opinion was the source of the -- in my opinion the delay and the frustration with the City and I testified to that.  The Court said,

                "Do you have e-mails?"

        And I said,

                "Yes, I have e-mails."

Webster - Cross / By Ms. Kumar                          **113**

Q    Right.  So the source of your conclusion about the -- of the supposed delay from the City to A&M included e-mails; isn't that right, Mr. Webster?

A    That's part of my source.

Q    Okay.

A    That's part of mine, yeah.

Q    Okay.  And then the Court asked you a number of questions about whether you had e-mails; isn't that right?

A    Yes.

Q    And you said you had those e-mails; isn't that right?

A    Yes.

Q    The Court then ordered you to provide those e-mails to the City because I had objected on the fact that I didn't have those e-mails; isn't that right?

     And you, in fact, searched your e-mails, didn't you, Mr. Webster?

A    That's correct.

Q    And in that search you found nothing in the e-mails from A&M regarding the City delays; isn't that right?

A    That's correct.

Q    Okay.  And so ultimately you produced to the City zero e-mails that supported your supposed conclusion about the City delaying A&M; isn't that right?

A    No, that's not right.

Q    You produced -- did you produce e-mails to the City,

Webster - Cross / By Ms. Kumar                    **114**

Mr. Webster --

A    I produced --

Q    -- after your --

A    I produced no e-mails.  I produced --

Q    Can I --

A    -- no e-mails because I couldn't find any e-mails with that content in it.

Q    Mr. Webster, I'm asking you a specific question.

         **MS. MITCHELL:**  I'm sorry, Your Honor, I don't think he was done with his answer.

         **THE COURT:**  I think you're two are speaking on the top of each other, so let's all slow down, ask your question, please.

**BY MS. KUMAR:**

Q    Mr. Webster, after your testimony in November of 2025 when the Court orders you to produce e-mails to the City that purported to show delay from the City to A&M, you produced nothing; is that right?

A    I produced no e-mails --

Q    And you were unable --

A    -- that had that content.

Q    -- to find any such e-mails; isn't that right?

A    That's correct.

Q    And you produced the City zero e-mails of any sort; isn't that right, after your testimony in November of 2025?

Webster - Cross / By Ms. Kumar                     **115**

A    I wasn't asked to produce e-mails of any sort.

Q    But you were never able to produce, find or produce any e-mails that supported your conclusion that the City had delayed in responding to A&M; isn't that right?

A    That's right.

**MS. KUMAR:**  Your Honor, I'd renew the City's motion to strike Mr. Webster's earlier testimony.  He's testified extensively about these e-mails, they don't exist, and I don't believe his earlier testimony should be allowed in.

**MS. MITCHELL:**  Objection, Your Honor, this has gone back and forth and back and forth, I think his testimony can stand.  His testimony was based on e-mails, on hearings, on conversations, on Zoom meetings and e-mails were one component of it.  He looked at e-mails and doesn't have e-mails reflecting delay.  I think that the testimony stands, Your Honor.  There's no reason to strike.

**MS. KUMAR:**  Your Honor, the whole colloquy during the last hearing was about whether there were e-mails and that's why the Court asked that Mr. Webster produce those e-mails, that he was basing his opinion on to the City.  No such e-mails have been produced and, in fact, he's admitting that no such e-mails exist.

**MS. MITCHELL:**  Well, and again, Your Honor, counsel is misstating the basis of the testimony.  It was e-mails, literally in the transcript, on page 84, it was e-mails, it was

Webster - Cross / By Ms. Kumar                     **116**

hearings, it was in person conversations, it was Zoom meetings.

I think the testimony stands how it is.  He looked at e-mails, has no e-mails reflecting delay, let's move on.

**MS. KUMAR:**  Your Honor, I stand by my earlier argument, we specifically -- the Court specifically allowed us to preserve ruling to allow us to obtain these e-mails.  There are no such e-mails.  I would move to strike.

**THE COURT:**  I want to make sure you're both exhausted, so your turn on behalf of LA Alliance.

**MS. MITCHELL:**  I think I could just say the same thing over and over again, Your Honor.

**THE COURT:**  Well, that's fine.

**MS. MITCHELL:**  It is what it is.

**THE COURT:**  All right.  Your motion's denied, counsel.  This goes to credibility.

**MS. KUMAR:**  Okay.  So let's talk a little bit more about credibility.

**BY MS. KUMAR:**

Q    You understand that the Court is relying on the evidence that it receives in this hearing to reach its decision in this matter; isn't that right?

A    Yes.

Q    And included in that is testimony; isn't that right, Mr. Webster?

A    Would you repeat that?

EXCEPTIONAL REPORTING SERVICES, INC

Q    And included among the kinds of evidence the Court is going to rely on is testimony; isn't that right?

A    Sure.

Q    And some of that testimony is your testimony; isn't that right?

A    Yes.

Q    You testified in November and you're testifying again today; isn't that right?

A    That's right.

Q    And you're testifying about what the City complied with, when and how, didn't you just testify about that?

A    Yes.

Q    Okay.  And you testified about your opinion on those things, right?

A    I did.

Q    And you're hoping that the Court will side with your opinion; isn't that right?

        **MS. MITCHELL:**  Objection, vague, ambiguous, lack of foundation, frankly relevance as to hope.

        **THE COURT:**  Overruled.  I think that's obvious.  So you can answer the question.

        **THE WITNESS:**  Could you repeat the question?

**BY MS. KUMAR:**

Q    You're hoping that the City -- that the Court, excuse me, will side with your opinion on whether the City is complying

Webster - Cross / By Ms. Kumar                    **118**

with the agreement; isn't that right?

A    Yeah.

Q    Okay.  You're not a neutral party in this?

A    We're the plaintiff.

Q    Right.

A    We sued the City and the County because we didn't think they were doing the right thing, obviously I have an opinion.

Q    Okay.  And you have -- and you're not objective; isn't that fair, Mr. Webster?

        **MS. MITCHELL:**  Objection, vague, ambiguous.

        **THE COURT:**  That's pretty vague, sustained.

**BY MS. KUMAR:**

Q    You don't like how the City has handled the homelessness crisis in Los Angeles; isn't that fair?

        **MS. MITCHELL:**  I'll stipulate to that, Your Honor.

        **THE COURT:**  You can answer that.  I think --

        **THE WITNESS:**  We sued the City and the County because we didn't like the way that the City and the County was handling the homelessness policy and actually getting people off the street.

Q    So you would agree with me, you don't like how the City has handled the homelessness crisis?

A    No, I think the City is failing how they're handling the homelessness crisis.  I think they're failing in seven deaths a day on the streets.  I think they're failing with homeless kids

Webster - Cross / By Ms. Kumar                    **119**

on the street in skid row, I think they're failing to produce

the amount of housing and shelter that's required.  Yeah,

they're failing.

Q    Okay.  And it's the Alliance, that you're the executive

director of is seeking specific relief in relation to this

hearing; isn't that right?

A    Yes.

Q    And among that is monetary sanctions; isn't that right?

A    That's right.

Q    And the Alliance's request is for money to be paid to the

Alliance; isn't that right?

          **MS. MITCHELL:**  Objection, calls for a legal

conclusion.

          **THE COURT:**  Money to be paid to -- counsel, I missed

that last portion, I apologize.

          **MS. KUMAR:**  Sure.

          **THE COURT:**  Would you restate that again?

**BY MS. KUMAR:**

Q    Among the requests that are being asked is for the City to

pay monetary sanctions to the Alliance; isn't that right?

          **MS. MITCHELL:**  Same objection, Your Honor, calls for

a legal conclusion.

          **THE COURT:**  No, overruled.  You can answer the

question.

          **THE WITNESS:**  This is what I want.  I want the City

Webster - Cross / By Ms. Kumar                                      **120**

to begin to change their policies so that fewer people are

homeless next year than they are next year.  That fewer deaths

occur on the street next year than this year.  And I want the

City instead of taking us to Court over every jot and tittle

and concern, that they would actually say, yes, we screwed up,

we have not done a good job, we have harmed people who are

experiencing homelessness, we've harmed residents, we've harmed

businesses, and stop with prosecuting all this minutia in

court, but instead actually change their policies and start

getting the resources to the street to help people.  That's

what I want.

**BY MS. KUMAR:**

Q    Mr. Webster, you filed a request, your organization in

which you are the executive director requested that the Court

hold the City in contempt; isn't that right?

A    That's right.

Q    And you asked for monetary sanctions; isn't that right?

        **MS. MITCHELL:**  Same objection, calls for a legal

conclusion.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes.  If the City --

Q    Okay.

A    -- would just do the things that they agreed to do with

the settlement, we wouldn't have to spend all this money, our

attorneys wouldn't have to on a pro bono basis go after --

spend all of this effort to demonstrate that the City hasn't lived up to its agreements in the settlement.

Q    Okay.  So let's talk about the Alliance a little bit. In -- as of today, you are a board member; isn't that right?

A    Yes, I am a board member.

Q    Okay.  Currently the Alliance board has no members who are employed by an organization providing direct services to the unhoused population; is that right?

A    That's correct.  That's not what we do --

Q    Okay.

A    -- we're not a service providing organization.

Q    You also have no members that currently experience homelessness; isn't that right?

        MS. MITCHELL:  Objection, vague, as to members?  Are we talking about --

        MS. KUMAR:  Members of the board of directors.

        THE COURT:  Overruled.

        THE WITNESS:  No.

Q    Okay.  And you would agree with me that the Alliance and the lawyers stands to financially benefit from the City being held in contempt in this proceeding, correct?

        MS. MITCHELL:  Objection, vague, ambiguous as to financial benefit.

        THE COURT:  That's vague.  I'm taking that two ways, financial and benefit, is this the recoupment of attorney's

EXCEPTIONAL REPORTING SERVICES, INC

Webster - Cross / By Ms. Kumar                              **122**

fees or --

       **MS. KUMAR:**  Monetary sanctions, Your Honor.

       **THE COURT:**  -- time expended.

       Yeah, I'm sustaining that, counsel.

       **MS. KUMAR:**  Okay.

**BY MS. KUMAR:**

Q    And this isn't the first time that the Alliance asked for monetary sanctions; isn't that right?

A    No.

Q    You asked for sanctions back in 2024; isn't that right?

A    Yes.

Q    And your initial request was that the City should pay the LA Alliance for Human Rights $100,000 per week, isn't that right, for a period of between November of 2022 and January of 2024; isn't that right?

A    I believe so.

Q    Okay.  So that would be about $6.4 million to the Alliance; isn't that right?

A    Yes.

Q    Ultimately the City paid the Alliance $725,000; isn't that right?

       **MS. MITCHELL:**  Objection, misstates the record.

       **THE COURT:**  Well just a moment.  I'm not certain what that amount was.  There was a settlement between the parties. You can stipulate to whatever that figure was.

Webster - Cross / By Ms. Kumar                    **123**

**MS. KUMAR:**  The amount was 700 -- we can show a City Council resolution.

**THE COURT:**  Step over and talk to each other about that, let's see if a stipulation can be reached.

**(Pause)**

**THE COURT:**  There may be costs in there also, counsel, I don't know if there's interest.  That settlement took place between the parties after I --

**MS. MITCHELL:**  I'm sorry, Your Honor, we will stipulate to the amount of --

**THE COURT:**  Just a moment.  That settlement took place after I had made a record that I was prepared to find the City had violated this agreement and this why Mayor Bass placed a call to the Court.

So those negotiations then, in a sense, after I'd made that record, took place and you both came back with a settlement.  I wasn't part of those negotiations, so I don't know what your amount is.

**MS. KUMAR:**  Yeah, I think we can agree as to the amount.  I think Ms. Mitchell's point which I'm happy to stipulate to is there were other parts ordered as part of that agreement.

**MS. MITCHELL:**  It was not just about money, Your Honor.

**THE COURT:**  No, I understand that.  It was much more

than that.  So why don't you state your perspective position about what this settlement was about because Judge Birotte to my knowledge was not involved in this.  This was between the parties.  This came to the Court as a request to sign off after I was prepared to find that there had been violations in this matter.

MS. KUMAR:  All I'm asking is did parts of the settlement involve a payment of $725,000 to the Alliance.

THE COURT:  A part of the settlement?

MS. KUMAR:  Yes.

THE COURT:  That's your question?  Okay.  You can answer that question.

THE WITNESS:  Yes.

BY MS. KUMAR:

Q    Okay.  What was the LA Alliance's revenue for 2024?

A    I want to say it was about -- I'd have to really, you know, I'd have to look at our tax returns I want to say 2024 I think it was less than $200,000 in total donations.

Q    Okay.  Well, you haven't yet publicly released your 2024 tax returns; isn't that right?

A    Just got filed last month.

Q    Okay.  So let's take a look at one that is publicly available.  Let's look at 2022.  Do you recall what the revenue was in that year?

MS. MITCHELL:  Objection, beyond the scope and

Webster - Cross / By Ms. Kumar                **125**

relevance, Your Honor.

MS. KUMAR:  Your Honor, we're going into bias and this witness is financially motivated to testify in a particular way and I think where the money goes is relevant to this inquiry.

MS. MITCHELL:  Your Honor, we will stipulate that Mr. Webster is biased in favor of plaintiffs' position.  I don't think that's a question here.

THE COURT:  All right.

MS. KUMAR:  Your Honor, the degree to which he is biased and how he would personally benefit is certainly an area that the Ninth Circuit has repeatedly said is open to cross-examination.

THE COURT:  So are you asking the donations in 2022?

MS. KUMAR:  I'm asking whether or not -- I want to know where the money for the Alliance goes, some of which goes to Mr. Webster and the other board members and I would like to be able to inquire into how they use their funds, which also goes into the fact that we are repeatedly here at the Alliance's request for more monetary sanctions from the City.

THE COURT:  I don't think the last portion is relevant.  I'll let you get into the general donations, counsel, 200,000 in 2024, 2022, you can ask what the donations are, but beyond that.

MS. KUMAR:  Well, let's look at the 2022 tax returns,

EXCEPTIONAL REPORTING SERVICES, INC

if we can in 2023.

**BY MS. KUMAR:**

Q    So in that year, you received $246,166 as reported in your tax return; isn't that right, Mr. Webster?

A    Yes.

Q    And you solicit donations from the public, don't you?

A    That's right.

        **MS. MITCHELL:**  I'm sorry, which year is this, counsel?

        **MS. KUMAR:**  2022.

        **THE COURT:**  This is 2022.

Q    And you solicit donations from the public; isn't that right?

A    That's right.

        **MS. KUMAR:**  So if we could turn the page and keep going.  Going.

Q    Okay.  In 2022, Mr. Webster, you received a salary of about $87,000; isn't that right?

A    No, it wasn't a salary.

Q    I'm sorry, you received a reportable compensation of $87,000; isn't that right?

A    Yes.

Q    And you worked an average of one hour per week; isn't that right?

A    Well, no, that's not right.  That's -- I mean, I worked a

Webster - Cross / By Ms. Kumar                 **127**

lot of hours.

Q   Okay.  So on your tax return, which you signed under the penalty of perjury, you listed the average hours per week that you worked to be one hour; isn't that right?

A   On average, sometimes I work more, sometimes I work less, it really depends on the circumstances.  This is a part-time 1099 position for me.

Q   Mr. Webster, on your 2022 tax returns for the Alliance, did you or did you not say that you worked on average one hour per week on the portion that is before you on the screen?

A   Yeah, that's what on our 1099.

Q   Okay.

        **MS. KUMAR:**  Now zooming out.  Going to the next page.

Q   Okay.  So --

        **MS. KUMAR:**  Sorry, keep going.  Sorry, let me just try this.  If I could have a moment, Your Honor.

        **THE COURT:**  Just a moment, counsel.

**BY MS. KUMAR:**

Q   All right.  Let's turn to Schedule L of the 2022 tax return.

        **MS. KUMAR:**  I don't have a page number, I'm sorry, Todd, if you'd keep going.  Just scroll through.  Keep going. Keep going.  Keep going.  Keep going.  There we go.

Q   In this 2022 tax return, you also disclose that you paid $129,771 to Conway Strategies; isn't that right?

Webster - Cross / By Ms. Kumar                **128**

A    That's right.

Q    And Daniel Conway testified in this hearing.

A    That's right.

Q    He's also a board member of the Alliance; isn't that right?

A    That's right.

Q    And you also paid 20, just shy of $22,000 to Hal Bastion (phonetic); isn't that right?

A    That's right.

Q    And you paid him a commission on fundraising; isn't that right?

A    That's right.

Q    So you paid him a commission for his assistance in fundraising; isn't that right?

A    That's what I said.

Q    Okay.  So he's also a board member; isn't that right?

A    That's right.

Q    So in 2022, the Alliance paid its own board members about 90 percent of its annual revenue from donation; isn't that right, Mr. Webster?

         **MS. MITCHELL:**  Objection, lacks foundation, as to Mr. Webster's status in 2022.

         **THE COURT:**  Overruled.  You can answer the question.

         **THE WITNESS:**  Yeah, we spent most of our revenue on fundraising on policy analysis, on engagement, that's what we

Webster - Cross / By Ms. Kumar                                    **129**

spend our money on.

**BY MS. KUMAR:**

Q    And 90 percent of the funds that the Alliance solicited from the public went to board members; isn't that right?

A    That's right.  The board members do most of the work.

Q    Okay.  And nowhere in your 2022 tax return is there a reference to a donation by the Alliance charitable to any sort of direct services, organization reflecting homelessness; isn't that right?

A    We're an advocacy and educational organization, we do not provide direct services.

Q    So I would be correct that there's no donation to any organization like that in 2022 tax return?

A    No.

Q    Okay.  Nor the 2021 tax return?

A    We don't provide services, nor do we donate to organizations that provide services.

Q    Okay.  So it would be fair to say that the Alliance has never made a charitable donation to an organization that provides direct services to the unhoused community in Los Angeles, correct?

A    Nope.

Q    Okay.  Now, the February 2024 motion wasn't the last time the Alliance sought payment from the City; isn't that right?

A    I can't recall.

Webster - Cross / By Ms. Kumar                    **130**

Q    Well, in February of this year, the Alliance filed yet another motion for an order regarding settlement compliance; isn't that right?

A    Yes.

Q    And you authorized the filing of that motion as the executive director.

A    Yes.

Q    And in that motion, the Alliance again asked this Court to issue monetary measures against the City; isn't that right?

A    Yes.

Q    So again asking for payment from the City; isn't that right?

A    That's right.

Q    And at that hearing you testified again, isn't that right, the ultimate hearing that was scheduled on that motion, you testified again?

A    I'd have to have my memory refreshed.

Q    Do you recall testifying this summer, May and June of this year --

A    Yes.

Q    -- in this court?

A    Yes.

Q    Okay.  And then after that hearing, did the Alliance ask the City to pay 1.4 million in attorney's fees and costs; isn't that right?

A    Yes.

Q    And that 1.4 million included money payable to you; isn't that right?

A    Yes.

Q    In fact, you signed a declaration in support of that motion, claiming you spent over 200 hours working on enforcement of the City settlement agreement; isn't that right?

A    I'd have to see it, but I'm not going to dispute that I earned, you know, testified.

Q    Well, let's show it to you so there's no confusion.

A    Yeah.

Q    Let's look at Docket 1015-3.  This is your declaration, is it not, Mr. Webster, in support of the Alliance's motion?

A    Yes.

Q    Okay.  And if we go to the last -- to Exhibit A of this document, the very last page actually --

        **THE COURT:**  And what document number, I apologize, counsel?

        **MS. KUMAR:**  1015-3, Your Honor.

        **THE COURT:**  Thank you.

**BY MS. KUMAR:**

Q    Is it fair to say that you are seeking $40,000 in relation to this motion for attorney's fees; isn't that right?

A    That's right.

Q    Okay.  And that was based on about 200 hours of work,

Webster - Cross / By Ms. Kumar                    **132**

based on this spreadsheet on the left-hand side.

A    That's right.

Q    And even though in the tax return for 2021 to 2023 you told the IRS under penalty of perjury, you averaged no more than one hour per week; isn't that right?

        **MS. MITCHELL:**  Objection, relevance as to 2021 versus 2025.

        **THE COURT:**  Yeah, there's a difference between the years, but I'll let you answer the question.

        **THE WITNESS:**  What was the question?

**BY MS. KUMAR:**

Q    In your tax returns for the year 2021 to 2023 you told the IRS that you averaged about one hour per week of work on behalf of the Alliance; isn't that right?

A    Yeah, that's right.

Q    And then after filing this initial request for attorney's fees, the Alliance filed another brief asking to increase the amount of money it was seeking; isn't that right?

A    I'd have to be --

Q    Okay.

A    I'd have to recall that.

Q    Well, let's look at Docket 1027.  Previously it was 1.4 million as we just talked about.  127 --

        **UNIDENTIFIED:**  1027?

        **MS. KUMAR:**  1027, sorry, excuse me, 1027.  I'm sorry.

Webster - Cross / By Ms. Kumar                           **133**

THE COURT:  Just a moment, counsel.  This has Docket No. 1026 at the top.

MS. KUMAR:  Yeah.  We've now switched to the correct document, Your Honor.

THE COURT:  All right.  Thank you.

MS. KUMAR:  And then if we go to the next page, to the first -- keep going.

**BY MS. KUMAR:**

Q    Okay.  Here we go.  On that first page -- sorry, it's page 6 of the PDF, lines 21 to 23, now the Alliance was seeking $1.6 million in fees; isn't that right?

A    Okay.  Yes.

Q    Is that right?  Okay.

And then the Alliance actually asked for that number to increase even more; isn't that right?

A    You'd have to refresh my memory on that.

Q    Okay.  Let's look at the transcript from the November 12th hearing at Docket 1076.  Let's look at page 15 of that transcript.

MS. KUMAR:  Okay.  If we go back a page, just so Mr. Webster can see who's speaking at that time.  Keep going until we identify the speaker.

Q    Okay.  It's Mr. Umhofer that's addressing the Court; isn't that right?

A    That's right.

**EXCEPTIONAL REPORTING SERVICES, INC**

Webster - Cross / By Ms. Kumar                    **134**

**MS. KUMAR:**  Okay.  So now let's go to page 15, line 6 through 8.

**BY MS. KUMAR:**

Q    Mr. Webster, now a motion that started at 1.4 million in this line, line 6 through 8, your counsel asked for $6 million in attorney's fees; isn't that right?

A    That's right.

Q    And that's for the evidentiary hearing that happened in May or June of this year of 2025; isn't that right?

A    Yes.

Q    Okay.  And in addition to the fee for $6 million, your attorneys reserved the right to continue to ask for more money every 60 to 90 days; isn't that right?

A    I don't know if that's right or not.

Q    Let's look at page 15, lines 22 through 25 and page 16, line 1 through 4.  If you'd read the portion in front of you, Mr. Webster.

A    I see, yes.

Q    Did your attorneys ask to repeat their request for attorney's fees every 60 and 90 days from here on out?  Is that what it says?

A    Yeah, I think what we're asking for is that if the City continues to just drag us into court and have us, you know, prepare, then we deserve compensation from them for not living up to the settlement agreement.

Webster - Cross / By Ms. Kumar          **135**

Q    Okay.  So you said drag us into court.  Did the City file the motion for why we're in the hearing today for?

A    No.

Q    It was, in fact, the Alliance that asked for contempt --

A    Yeah.

Q    -- and monetary sanctions against the City; isn't that right?

A    That's right.

Q    Okay.  So we're here because of the Alliance's motion; isn't that right?

A    Yeah, the Alliance's motion for contempt against the City of Los Angeles --

Q    Right.

A    -- for not doing what they did in the settlement agreement.

Q    And you filed one in February of 2024 --

A    For not doing --

Q    -- like we talked about?

A    -- what we did --

Q    And then --

A    -- committed to in the settlement agreement again.

Q    And you got paid for that one, right?

A    For not doing what the City was supposed to do in the settlement agreement.

Q    And then another motion in February of 2025; isn't that

**EXCEPTIONAL REPORTING SERVICES, INC**

Webster - Cross / By Ms. Kumar                    **136**

right?

A    For not doing what they were committed to do in the settlement agreement.

Q    And, Mr. Webster, you're asking for $6 million for that hearing, right?

A    Because the City refuses to do what they committed to do in a settlement agreement.

Q    And now again, about three months or four months after this last hearing, your attorneys filed another motion asking for more monetary sanctions on new issues; isn't that right?

A    Because the City continues to not -- to fail to do what they committed to do that's written in the settlement agreement.

Q    But you did file that about a month, about three months after the last hearing another motion; isn't that right, I just want a yes or no, Mr. Webster.

A    Yes.

Q    Okay.  And so the -- one of the main bases for this hearing is the City's compliance with Section 7.1; isn't that right?

A    Yes.

Q    And you testified a fair amount about that, I'm going to come back to that in a moment.  But you claim that the City has never been in compliance with Section 7.1; isn't that right?

A    I claim that the City provided some data in quarterly

reports and that we've attempted time after time after time to get better data, data that reflects reality and, yes, in our view, their compliance with 7.1 has been questionable at best and non-compliant at worst.

Q    But the first time your -- the Alliance raised this as an issue for a meet and confer with the City was in July of 2025; isn't that right?

        **MS. MITCHELL:**  Objection, misstates the record and lacks foundation with this witness.

        **THE COURT:**  You can answer that, if you know the answer.

        **THE WITNESS:**  We have been trying to get the City to comply and report accurate numbers from when they started reporting numbers, quarterly reports.

**BY MS. KUMAR:**

Q    Okay.  So let's take a look at Docket 1070, page 2, footnote 1.

        **MS. KUMAR:**  This is a -- I'm sorry, we can go to the front page so you can see what it is.  This is a plaintiffs at LA Alliance's request.

Q    Do you see that?

A    I do.

Q    Okay.  You're the executive director; is that right?

A    That's right.

Q    Okay.  So let's go to page 2, footnote 1.

Webster - Cross / By Ms. Kumar                    **138**

THE COURT:  Counsel, just a moment, for my record once again the exhibit number?

MS. KUMAR:  Exhibit -- it's Docket 1070, Exhibit -- we'll call it 556.

THE COURT:  Just a moment, 556?

MS. KUMAR:  And it's Docket 1070, Your Honor.

THE COURT:  I know Docket 1070, but was this previously marked as 556 then?

MS. KUMAR:  No, it's being marked for the first time, Your Honor.

THE COURT:  That's fine, 556.

BY MS. KUMAR:

Q    If we go to page 2, footnote 1, second sentence, in this case, plaintiff first requested to meet and confer about this issue on July 25th, 2025 and actually spoke with the City on August 22nd, 2025.  Did I read that correctly?

A    Yes.

Q    For the first time, the Alliance sought to meet and confer about the City's compliance with Section 7.1 was in July of 2025; isn't that right?

A    I know that we've asked for meet and confers all along previous to 2025.

Q    Let me ask you a question, Mr. Webster, you're testifying under oath again, right, just to be clear, Mr. Webster?

A    Yeah.

EXCEPTIONAL REPORTING SERVICES, INC

Q    Okay.  And your attorneys file things on behalf of your

organizations, do they not?  You authorized this filing?

A    Do you mind if I confer with my counsel?

Q    Well, is it a question of privilege?

A    No.

Q    Otherwise -- so then I would object to you conferring with

your counsel to figure out what to say, Mr. Webster.

A    That's not what I'm asking for.  I know that we have met

and conferred.  I know that we have had numerous conversations

with the City prior to 2025.

Q    Okay.  So just for the record, in this docket, in front of

you in footnote 1, is it not the case that your lawyers

represented that the plaintiff first requested to meet and

confer about this issue on July 25th, 2025?  Do you see that?

        **MS. MITCHELL:**  Objection, the document speaks for

itself, Your Honor.

        **THE COURT:**  Well, that's not the issue.  You're using

the word first.  And he's answering that there are other

conversations concerning this.  Between the two of you, I don't

see the word first.

        **MS. KUMAR:**  It's right there, Your Honor, on the

second line, the fifth word highlighted.  In this case,

plaintiff first requested.

        **THE COURT:**  Counsel, just a moment, let me look at

that.

Webster - Cross / By Ms. Kumar                    **140**

Thank you.  Overruled.  You can ask the question, please.

**BY MS. KUMAR:**

Q    Mr. Webster, your attorneys represented in a filing to this Court that in this case, plaintiffs first requested to meet and confer about this issue on July 25th, 2025; isn't that what it says?

MS. MITCHELL:  Objection, lacks foundation.  You can answer the question.

THE WITNESS:  That's what it says.

Q    Okay.  And then there was a meet and confer on August 7th, 2025; isn't that right?

A    I believe so.

Q    And you were present at that meet and confer, were you?

A    I believe I was, but I don't know, I'd have to look at my calendar.

MS. MITCHELL:  I'm going to object as to lack of foundation inquiring about this transcript.

MS. KUMAR:  Okay.  We can go to the next page.

THE COURT:  I don't know what this is.  It's not --

MS. KUMAR:  It's a transcript of the meet and confer, Your Honor.

THE COURT:  Counsel, just a moment.  Does it have an exhibit number?

MS. KUMAR:  We can mark it as Exhibit 557.

EXCEPTIONAL REPORTING SERVICES, INC

Webster - Cross / By Ms. Kumar                    **141**

THE COURT:  All right.  Just a moment.  Let's slow down.  That's the second time.  I want exhibit numbers and/or a docket number if it matches up, this is simply an exhibit; is that correct?

MS. KUMAR:  Yes, Exhibit 557, yes.

THE COURT:  And it's been previously marked?

MS. KUMAR:  No, Your Honor.

THE COURT:  All right.  What number would you like?

MS. KUMAR:  557, Your Honor.

MS. MITCHELL:  I'm sorry, counsel, what was the date of this?

MS. KUMAR:  August 7th.

BY MS. KUMAR:

Q    Do you see that it lists you as a participant in this meet and confer, Mr. Webster?

A    It does.

Q    Now, do you recall Section 7.1 coming up at any point during this meet and confer?

A    I don't have any recollection.

Q    If I proffered to you that if you were to control F for Section 7.1 there would be no hits, do you have any reason to dispute me on that?

A    I guess not.

Q    And isn't it true that in this meet and confer, City -- counsel for the City asked whether there were any other issues

EXCEPTIONAL REPORTING SERVICES, INC

Webster - Cross / By Ms. Kumar                          **142**

your lawyer wanted to raise and your lawyer said no, let's

convene on another day.

         MS. MITCHELL:  Objection, lacks foundation, Your

Honor, I think if she wants to ask about the transcript, she

can do that.

         THE COURT:  Sustained.  Sustained.

BY MS. KUMAR:

Q    Let's see.  Okay.  So let's go to page 79.  Do you see

where it says Mr. Umhofer, we'll reconvene, if we run out of

time, we'll reconvene with lead counsel.  Do you see that, the

very last line?

A    Yeah.

Q    Okay.  And your counsel did not raise Section 7.1 at that

meet and confer, did they?

         MS. MITCHELL:  Objection, lacks foundation.

         THE WITNESS:  I haven't read this entire transcript.

I don't know what they raised and what they didn't raise.

         MS. KUMAR:  Okay.  Well, we can direct the Court to

that later.

Q    The Section 7.1 was discussed at an August 22nd, 2025 meet

and confer.  Do you recall that?

         MS. MITCHELL:  Objection --

         THE WITNESS:  No.

         MS. MITCHELL:  -- lacks foundation.

Q    Okay.  You weren't a part of every single meet and confer,

Webster - Cross / By Ms. Kumar                          **143**

were you?

A    No.  I wasn't part of every single meet and confer.

Q    Okay.  So from asking for a meet and confer on this issue for the first time in July 25th, 2025 you're now seeking monetary sanctions from the City on that issue; isn't that right?

           **MS. MITCHELL:**  Objection, vague, ambiguous, lacks foundation.

           **THE COURT:**  First of all, I'm not sure.  I haven't seen these documents.  Does this -- is he included in this meeting, counsel?

           **MS. MITCHELL:**  No, Your Honor.

           **MS. KUMAR:**  We're not talking about a meeting anymore.  We can take this down.

           **THE COURT:**  Well, no, counsel, this is getting confusing now.  Just slow down.  On the August 22nd, 2025 that's not Exhibit 557?

           **MS. KUMAR:**  No, it's not, Your Honor.  He said he doesn't remember it, so I took it down.

           **THE COURT:**  All right.  All right.

           **MS. KUMAR:**  Okay.

           **THE COURT:**  Okay.

**BY MS. KUMAR:**

Q    So we walked through a filing that says that your attorneys first sought to meet and confer on this issue 7.1 on

                    **EXCEPTIONAL REPORTING SERVICES, INC**

Webster - Cross / By Ms. Kumar                    **144**

July 25th, 2025.  Do you recall that?

A    No, I don't recall that.

Q    Okay.

         **MS. KUMAR:**  Can we look again at --

         **THE WITNESS:**  Are you referring to the footnote?

Q    Yes.

A    Okay.  I remember that that's what the footnote says, yes.

Q    Okay.  So that July 25th, 2025 and now in October of 2025
the Alliance filed a motion seeking monetary sanctions related
to the City's compliance with Section 7.1; isn't that right?

A    I believe so.

Q    Okay.  The third or fourth time that the Alliance is
seeking money from the City; isn't that right?

         **MS. MITCHELL:**  Objection, argumentative.

         **THE COURT:**  You can answer the question, overruled.

         **THE WITNESS:**  Yes.

**BY MS. KUMAR:**

Q    Okay.  So let's talk about Section 7.1 and your testimony
today.

         **THE COURT:**  Just a moment, counsel.  It's almost 12
noon, why don't we go to lunch.

         **MS. KUMAR:**  I only have a few more minutes so I think
we may have a chance, Your Honor.

         **THE COURT:**  I'm happy to go to the lunch hour, if
it's a block of time if you think you can --

Webster - Cross / By Ms. Kumar                **145**

MS. KUMAR:  I think it'll be a few minutes, Your Honor.

THE COURT:  All right.

BY MS. KUMAR:

Q    Okay.  So --

MS. KUMAR:  Hold on a second.

Okay.  All right.  My wiser counsel is telling me maybe a break makes sense, Your Honor.

THE COURT:  Everybody's hungry, right?  All right. Now, have a seat for a second.  Let me just ask you both a couple of questions.  At the beginning of this hearing, you both stated or I believe the City stated that you believed you'd had a very protective meeting when this hearing started. I don't know what that means.  I don't know if the two of you are still talking to each other, or if that is simply a statement and there's no further attempts to resolve this matter between the two of you.  Where do we stand?  In other words --

MS. KUMAR:  Sure, Your Honor.

THE COURT:  -- is there some behind the scenes progress being made because this hearing is about, not punishing, but attempting if there is non-compliance to get the City into compliance, that's their ultimate objective.

MS. KUMAR:  Yeah.  No, I appreciate that.

THE COURT:  So knowing that, my question is, behind

the scenes is something taking place that's meaningful because the City represented to me that there were meaningful discussions going on.  And if that's the case, do you need the intercession of Judge Birotte or if it's not the case and this is simply a statement about meaningful discussions and it's going no place, what's going on behind the scenes here?

**MS. KUMAR:**  Sure.  Thank you, Your Honor.  So as I had previously represented to the Court, the first time we had a meeting was two days, like maybe the day before we started this --

**THE COURT:**  Uh-huh.

**MS. KUMAR:**  -- initially despite months of requests.

There were -- I believed it to be a productive meeting.  I think that was like November -- or excuse me, December 1st.

**THE COURT:**  What's happened since then?

**MS. KUMAR:**  Nothing.  I mean, if I can expound on that, Your Honor.

**THE COURT:**  Well, let's hear the other side.  Just the demeanor from one of the counsel shaking his head, which is inappropriate, but thank you very much.

**UNIDENTIFIED:**  I'm sorry, Your Honor.  I couldn't help it.

**THE COURT:**  No, no, it's not you, counsel.  I just loved demeanor from the audience.

147

MS. MITCHELL: Can I continue, Your Honor?

THE COURT: Yeah, thank you.

MS. MITCHELL: Thank you. So we had an initial meeting. There was a summary and I think the Court saw this, there was a summary e-mail of that meeting that was sent out on that day, saying essentially let's move forward. We didn't receive a response from the City until 15 days later and that response essentially said, that they are not doing anything wrong and that there was no further intent to comply with 7.1.

THE COURT: Okay. Now --

MS. MITCHELL: Based on that, we don't see --

THE COURT: Let me ask this --

MS. MITCHELL: -- it being helpful.

THE COURT: -- in other words, if there's nothing meaningful that is going to transpire, then I'm not going to inquire further. If there's something meaningful as you represented to me, then what is that?

MR. SCOLNICK: Your Honor, I fundamentally disagree with my colleague's characterization. There was a meeting I think it was two days before, an hour plus meeting where maybe for the first time -- the 22nd? Yeah, sorry, there were meet and confers, I think we're talking specifically about the productive meeting that we described before at --

THE COURT: At the beginning, you said that there was -- in an opening statement by your colleague --

**148**

MR. SCOLNICK:  Yes.

THE COURT:  -- I forget her -- I apologize, but in the opening statement, there was a statement to the Court that there had been a meeting that was meaningful and the inference was that this might be ongoing.  I'm simply inquiring whether there is an effort by the parties to meet and confer if this is really productive as was represented.

MR. SCOLNICK:  Yeah, and very briefly, Your Honor, just to summarize.  Yes, there was a productive meeting. Following that meeting, Ms. Mitchell and Special Master Martinez summarized the meeting and asked various questions, I think maybe Ms. Kuhn asked about those e-mails.

On December 1st, the City provided a lengthy response to the various questions and issues raised.  That was 15 days ago or 14 days ago.  We have not heard back from either Special Master Martinez or from the Alliance about the various issues we raised.  The City remains open to continuing to discuss.

A lot of these disputes as to 7.1 I personally believe can be worked out if we can get some common language and common ground as to what we're supposed to be reporting. But at this point, the ball is in their court to tell us whether they want to move forward or whether we're going to keep doing this.

MS. MITCHELL:  I'm happy to respond, Your Honor.  May I?

THE COURT:  Please.

MS. MITCHELL:  Yep, and you know, we can certainly put this letter response up so the Court can see it, if the Court wants to see it.  But the response is essentially, you know, lack of accountability, it's not our job to fix the systems, if data doesn't already exist we're not going to require data --

THE COURT:  Have I seen that letter before?

MS. MITCHELL:  I don't think it has been put up, Your Honor.

THE COURT:  Put it up on the Elmo.

MS. MITCHELL:  Sure.

THE COURT:  Let's see what your positions is or are, I'm sorry.  And, Ms. Myers, you're standing are you just -- do you want to speak?

MS. MYERS:  I mean, the intervenors have been part of those conversations.  We hadn't previously been part of many of the conversations, but we have been, we were there on the November 17th meeting.

THE COURT:  No, just a little slower.  Would you say that again slowly.

MS. MYERS:  We were there at the November 17th meeting and throughout this proceeding, the parties have referred to the fact that intervenors were there and participated, so we obviously have a perspective on how that

150

occurred and what's ongoing.

THE COURT:  What's your perspective?

MS. MYERS:  Your Honor, I do think that it was a productive meeting.  I would agree with that.  There was an opportunity I think to hash out some of these definitions.  And I think Ms. Kuhn in the course of her testimony indicated that she had started to work with the City about some of these definitions.

The intervenors are somewhat frustrated, Your Honor, that what we requested on that meeting --

THE COURT:  Of who?

MS. MYERS:  Of the City.

THE COURT:  Okay.

MS. MYERS:  And LAHSA are the business requirements, Your Honor, these definitions that are being used to pull up the data.  We think that there is not a lot of meeting of the minds related to some of the definitions that appear in the settlement.  And some of the definitions related to the data. And so we simply asked, let's have some clarity to ensure that everyone is talking, rather than across each other, but together.

We haven't gotten that information from the City and I think it's intervenor's position that in the course of this hearing the City has taken some positions about what definitions they're using for purposes of data, that are

**151**

incredible, to say the least, Your Honor.  And so I think that has --

THE COURT:  Examples.

MS. MYERS:  For example, saying on offer, Your Honor, as opposed to offers of shelter or saying that accepting an offer of shelter is the same as being serviced by that bed.

And I think because there has been that disconnect between the definitions that are being used by the City and the plain language of the settlement, that have come out in the course of these proceedings, from intervenor's perspective it's difficult to imagine that the parties will be able to reach agreement about what should be collected going forward.

Because I think the City keeps making the argument fairly that contempt proceedings are about going forward, but again, some of the positions they've taken about definitions, Your Honor, or the lack of definitions has been -- has made it challenging and I think would be challenging to come back to.

THE COURT:  When the parties entered this settlement, it was between LA Alliance and the City.  LAHSA is not a settling party in this.  And the position of the City has been thus far, the portrayal of LAHSA as a separate entity.

As each of you point the finger at the other party for not receiving a response from the City and then the ball being back in their court, in attempting to get compliance, is it productive since the representation was made about this

**152**

meeting, literally on the eve of this hearing, for further negotiations between the parties?

Now, why don't you folks just have a seat for just a moment and why don't you talk about that.  Because if it's meaningless and the walls have been drawn, then you know, I need to know that and I won't inquire further.

If there's anything that -- productive that could come out of this, the second question is, if you reach disagreement over terms, then doesn't that come back to the Court in terms of Section 24?

And if so, I'd like to know what those disagreements are.  For instance, you raised the word verification.  I'm very specific in my order concerning verification and there's been a concern on the City's part about quote/unquote what that means.  To me that's a rather common term and I haven't gotten verification yet from the City, so you're on fair warning, and I'm concerned about the inaccuracies that have appeared over and over again concerning the history of quarterly reporting to the Court.

But I want to give the parties every opportunity to rectify that if possible and to come into compliance.  So is any further meeting of any value and why don't you two not only talk to your colleagues, but why don't you just gather at the back of the courtroom for a moment, because that might be a waste of your time and I'm happy to resolve this matter.

153

So talk to each other for just a moment.  I'm just going to sit here and watch and not listen.

**(Recessed at 12:09 p.m.; reconvened at 12:16 p.m.)**

**THE COURT:**  We're back on the record.  I have four counsel standing.  What am I about to hear?  I'm just joking with you.

**MS. MITCHELL:**  We could row Shambo for who goes first, that would be helpful.

No, I -- it sounds like further conferring would be helpful, Your Honor.  I don't know that we can resolve all of the disputes, but I think we may be able to resolve some of them for reporting moving forward.

**THE COURT:**  All right.  I'll eventually make a decision in this matter, but if there's any progress that can be made between the parties, the Court would always prefer that progress to take place.  But if it's not a meaningful discussion, and I don't mean resolving all the issues, but possibly narrowing some, then I don't want to waste your time.

But it was represented to me that there was a meaningful discussion, from your perspective it's too little too late, from your perspective it's an effort.  If we really care about all the citizens of Los Angeles and the homeless community, as part of the citizenry, then anything that you can do to narrow these issues, but I think under Section 34 or 24, I'm sorry, I am the ultimate decider if you truly reach an

**154**

impasse.

When you signed these agreements, this was an agreement between the parties.  So I'm going to send you to lunch.  We're going to finish your examination between now and midnight, I'm just joking, after that we'll recess.  Mr. Szabo you told me is available Thursday, so I've preserved.  Is that morning or afternoon?  Can the City help me because I'll reconvene --

**MS. KUMAR:**  I'll have to check at the lunch hour, Your Honor.

**THE COURT:**  Would you let me know because I've got to once again make accommodation for a court.  You had different vacation schedules.  You're not back, Ms. Myers, until January 6th?

**MS. MYERS:**  Oh, no, Your Honor, I'll be back on the 27th.  I think that might have been plaintiffs.

**THE COURT:**  You're back?

**MS. MITCHELL:**  January 9th.

**UNIDENTIFIED:**  It's before January 9th, the 2nd.

**THE COURT:**  Okay.  In which account my special master was able to confirm that Daniel Gary is available on January 12th.  And I'll double-check that, because of all of your schedules, but I would propose that in going forward the January 12th would be the next date.  And if necessary, why don't we also reserve January 13th, okay?

Webster - Cross / By Ms. Kumar                    **155**

Now, why don't you go to lunch and why don't we come back.  Would 1:30 be acceptable to you folks?

MS. MITCHELL:  Yes, Your Honor.

THE COURT:  Do you need longer, just to refresh yourselves or are you okay?

MS. KUMAR:  That's fine, Your Honor.

MS. MITCHELL:  1:30 is great.

THE COURT:  Okay.  We'll see you at 1:30 then. Mr. Webster, why don't you step down, sir.  We'll see you at 1:30, thank you.

**(Recessed at 12:19 p.m.; reconvened at 1:36 p.m.)**

THE COURT:  We're back on the record, counsel.  Thank you for your courtesy.  Mr. Webster, if you would retake the stand, please.  Once again, watch this.

And, counsel, continue cross-examination.  Once again, because we're on CourtSmart, just re-identify yourself for the record.

MS. KUMAR:  Of course, Your Honor.  Poonam Kumar from Gibson Dunn, on behalf of the City.

THE COURT:  Thank you.

**CROSS EXAMINATION (RESUMED)**

**BY MS. KUMAR:**

Q   Mr. Webster, on your direct examination, you spoke at length about Section 7.1 and about what you understood the purpose of the settlement agreement between the Alliance and

EXCEPTIONAL REPORTING SERVICES, INC

Webster - Cross / By Ms. Kumar                                156

the City was.  Do you recall that?

A    I do.

Q    Okay.  If we could pull up the Exhibit 25, please.  PDF, page 7.

          MS. KUMAR:  This is Docket 429, Your Honor.  25.

          THE COURT:  But what's -- and the exhibit number again?

          MS. KUMAR:  Exhibit 25, Docket 429.

          THE COURT:  All right.  Thank you.

          MS. KUMAR:  And if we could turn to page 7 of the PDF.

BY MS. KUMAR:

Q    Mr. Webster, I'm going to direct your attention to lines 10 through 15, where it states, the purpose of this agreement is to substantially increase the number of housing and shelter opportunities in the City of Los Angeles and to address the needs of everyone who shares public spaces and rights of way in the City of Los Angeles, including both housed and unhoused Angelenos, to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles.  Did I read that correctly?

A    Yes.

Q    Now, I'd like to next direct your attention to Section 7.1 in particular, which is on page 9 of this same document.  Mr. Webster, you testified as to your interpretation of Section

Webster - Cross / By Ms. Kumar                    **157**

7.1 on direct; is that right?

A    That's right.

Q    I'd like to talk about the first.  It says, the City will provide quarterly status updates to the Court regarding its progress with this agreement; is that right?

A    Yes.

Q    Did I read that correctly?

A    Yeah.

Q    So the quarterly reports were to update the Court regarding progress on the agreement; is that fair?

A    Yes.

Q    Okay.  And then the first metric is the number of housing or shelter opportunities created or otherwise obtained. Mr. Webster, you agree the City has been reporting this metric; is that correct?

A    Yes.

Q    Okay.  The next one is the number of beds or opportunities offered, and you spent some time talking about that on your direct.  Mr. Webster, the word offered here is not defined in this agreement; isn't that right?

A    I don't think it needs to be.

Q    I understand --

A    It's a commonly used term.  It's not defined because it doesn't need to be.

Q    Mr. Webster, I'm asking you, is the word offered defined

in this agreement?

A    No.

Q    Okay.  And then if we could turn to the next metric, the number of beds or opportunities currently available in each council district.  Is the word available defined in this agreement?

A    No.  Again, it doesn't need to be.  It's common.

Q    And you would agree with me that the word vacancy appears nowhere in Section 7.1; is that right?

A    That's right.

Q    Now, you also talked about Sections 4.1 and 4.2; isn't that right?

A    Sure.

Q    So we're on pages 5 and 6 of the agreement.  Would you agree with me, Mr. Webster, that Sections 4.1 and 4.2 do not have reporting requirements; is that right?

A    That's right.

Q    And Sections 4.1, 4.2 do not reference 7.1 at any point in their text; is that right?

A    No, they don't.

Q    They do not; is that right?

A    That's what I said.

Q    And then if we look at Section 7.1, Mr. Webster, and that's again on page 14, Mr. Webster, do you see any reference to Sections 4.1 or 4.2 within Section 7.1?

Webster - Redirect / By Ms. Mitchell                **159**

A    No.

MS. KUMAR:  Hold on.  One second, Your Honor.  Nothing further at this time, Your Honor.

THE COURT:  You know, I've neglected the County on each occasion, and I didn't mean to be discourteous.  If at any time that you want to join, you're more than welcome to.

MS. BRODY:  Thank you, Your Honor.  We have nothing for this witness, or in general for --

THE COURT:  All right.  And remind me, just raise your hand because it's been really between the three parties so far.

MS. BRODY:  Yes, thank you, Your Honor.

THE COURT:  And this would be redirect examination by LA Alliance.

MS. MITCHELL:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

**BY MS. MITCHELL:**

Q    Mr. Webster, you were asked on cross-examination about your e-mails.  In that same section of your testimony back in November, did you indicate that there were other things that you relied on to form your opinion other than just the e-mails?

A    Yes.

Q    What else formed the foundation for your opinion?

A    My appearance at court hearings, conversations that I've had, meetings that we've had.

Webster - Redirect / By Ms. Mitchell                    **160**

Q    I mean, I hesitate to even ask this, Mr. Webster, but was it your intent in any way to misrepresent the content of emails from a year or two ago?

A    No.  I thought I had some emails, and I looked back, and I didn't.

Q    Okay.  How many hours a week would you estimate that you're working for LA Alliance currently?

A    Currently?  About five hours.

Q    Five hours per week?

A    Per week.  Yeah.

Q    How much are you getting paid by LA Alliance to do your work currently?

A    I'm not.  I'm not.

Q    You're not getting paid?

A    That's right.

Q    And you have another full-time job; is that correct?

A    That's correct.

Q    How much is the LA Alliance paying its lawyers in this case?

A    Nothing.

Q    Have you ever written me a check?

A    Never.

Q    Why is the LA Alliance asking for monetary sanctions against the City?

A    The Alliance is asking for monetary sanctions because it's

**EXCEPTIONAL REPORTING SERVICES, INC**

Webster - Redirect / By Ms. Mitchell     **161**

the only way so far that the City has actually been prompted to move and to agree to something substantive.

Q   Do you know how much the City's lawyers are getting paid to be here today?

**MS. KUMAR:**  Objection, Your Honor.  Relevance.

**THE COURT:**  Overruled.  You can answer the question.

**THE WITNESS:**  I think they're getting paid $1,200 an hour per lawyer.

**BY MS. MITCHELL:**

Q   And do you know what the City's contract is currently for its counsel to participate in this case?

A   I think the contract is $6 million or thereabouts.

Q   Did you raise data issues or did you participate in data issues -- excuse me, let me withdraw that and rephrase.  Did you participate in any meetings wherein you raised concerns about data that the City was producing any time over the last three years?

A   Yes, constantly.

Q   Okay.  And setting aside conversations that you and I have had, because that's privileged, what type of data issues have you raised outside of conversations that you and I have had?

A   I've raised issues with whether the data is correct.  I've raised issues with how the data is aggregated and reported. I've raised issues with whether we -- I mean, it's, you know, for example, with encampment resolutions, you know, where --

Webster - Redirect / By Ms. Mitchell                 **162**

how many people per encampment resolution each encampment

resolution represents.  I've raised issues with the reliability

of the point in time count as a baseline.  I've raised a lot of

data issues.

Q    Would it be fair to say that there have been a lot of data

issues related to the City's compliance with this agreement

since 2022?

    **MS. KUMAR:**  Objection, Your Honor.  Lacks foundation.

    **THE COURT:**  Overruled.

    **THE WITNESS:**  Yes.

**BY MS. MITCHELL:**

Q    Are you in every meeting that your attorney is in with the

City of Los Angeles?

A    No.

Q    I should have asked this question earlier.  Is any board

member currently getting paid to your knowledge for

participating in LA Alliance?

A    None.

Q    Is -- let me -- let me show you what has been marked and

we've talked about consistently, Exhibit 25, the agreement, and

feel free to take a minute and look through the agreement if

you'd like, but is there anything in the agreement that

requires the Alliance to raise issues about compliance in order

for the City to comply with specific provisions?

    **MS. KUMAR:**  Objection, Your Honor.  Calls for a legal

Webster - Redirect / By Ms. Mitchell                **163**

conclusion.

THE COURT:  Just a moment.  Do you understand the question?

THE WITNESS:  No, could you repeat it?

Q    Sure.  Is there anything about the agreement that requires the Alliance to raise specific issues in order for the city to comply with the provisions in the agreement?

MS. KUMAR:  Objection, Your Honor.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  No, there's nothing in the settlement agreement that relies on the Alliance to raise an issue for the City to comply with it.

MS. MITCHELL:  May I have a moment, Your Honor?

THE COURT:  You may.

(Pause)

MS. MITCHELL:  I think I'm done, Your Honor.  I have no further questions.  Thank you.

THE COURT:  Ms. Myers, on behalf of the intervenors, do you have questions?

MS. MYERS:  No, Your Honor.

THE COURT:  Any cross -- I'm sorry, recross on behalf of the City.

MS. KUMAR:  Nothing from the City, Your Honor.

THE COURT:  Okay.  Sir, thank you very much.  You may

**164**

step down.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  Counsel, does that conclude your witnesses for today?

MS. MITCHELL:  Yes, it does.

THE COURT:  Were you able to check as a courtesy to Mr. Szabo on his availability Thursday?

MS. MITCHELL:  I was, Your Honor.  He's available Thursday morning.  At least the City, although others should chime in, of course, would suggest maybe starting at 9:00 a.m. if that's amenable to the Court, but --

THE COURT:  Just a moment.  He may have obligations. Could we start at 7:30 so he's back with the City at a reasonable time?  Because I can't gauge how long he's on the stand.

MS. MITCHELL:  Yeah, he will make himself available when the Court needs him available, but --

THE COURT:  How about a humane compromise, 8 o'clock? Does that work?

MS. MITCHELL:  That's fine, Your Honor.

THE COURT:  I see the enthusiasm.  Let's start at 8 o'clock, and that way if Mr. Szabo needs to get back, there's not another session, okay?

Now, how are all of you holding up?  I'm asking that

in a very nice way.  Focused?  Everyone's absolutely alert. Okay, then have a nice couple days, and we'll see you on Thursday, okay?

And I'm going to recheck once again about January 12th, but right now, tentatively, please hold that date, and maybe the 13th also, okay?

**MS. MITCHELL:**  Thank you, Your Honor.  Does the Court have a courtroom for us on Thursday yet?  Should I withdraw that question?

**THE COURT:**  By the way, as an aside, I'm desperately trying to keep you down here.  One of the things I was doing last week was to make sure you're not traveling down the road an hour or so, so that's why I'm switching cases, and when you suggested last Thursday, we had a calendar that we moved to 20 cases down there so you're not having to come down the road. It's easier for me to come to you than it is for all of you folks to come to me.  That's why.  So Thursday just couldn't work.

Counsel, because of Karlen, we have courtroom 5.

**MS. MITCHELL:**  Thank you, Karlen.  Thank you, Your Honor.

**THE COURT:**  What is it?  5D.  All right, thank you.  We'll see you at 8 o'clock on Thursday.

**(Proceeding concluded at 1:49 p.m.)**

166

## CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    December 16, 2025

          Signed                                          Dated


*TONI HUDSON, TRANSCRIBER*