UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) CASE NO: 2:20-cv-02291-DOC-KESx |
| | ) |
| | ) CIVIL |
| Plaintiffs, | ) |
| | ) Los Angeles, California |
| vs. | ) |
| | ) Thursday, December 18, 2025 |
| CITY OF LOS ANGELES, ET AL., | ) ( 8:07 a.m. to  9:33 a.m.) |
| | ) (10:04 a.m. to 10:25 a.m.) |
| Defendants. | ) (10:43 a.m. to 11:58 a.m.) |
| | ) ( 1:09 p.m. to  2:06 p.m.) |
| | ) ( 2:26 p.m. to  4:29 p.m.) |
| | ) ( 4:55 p.m. to  5:42 p.m.) |
| | ) ( 5:46 p.m. to  6:02 p.m.) |

EVIDENTIARY HEARING –

ORDER TO SHOW CAUSE RE CONTEMPT CITY OF LOS ANGELES
[DKT.NO.1066]


BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE



**APPEARANCES:**              SEE PAGE 2


Courtroom Deputy:        Karlen Dubon

Court Reporter:          Recorded; CourtSmart

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

APPEARANCES:

For Plaintiffs:            ELIZABETH A. MITCHELL, ESQ.
                          MATTHEW UMHOFER, ESQ.
                          Umhofer Mitchell & King
                          767 S. Alameda Street, Suite 270
                          Los Angeles, CA 90021
                          213-394-7979

For Defendants:           MARCELLUS A. MCRAE, ESQ.
                          BRADLEY J. HAMBURGER, ESQ.
                          Gibson Dunn & Crutcher
                          333 South Grand Avenue
                          Los Angeles, CA 90071
                          213-299-7000

                          LAUREN M. BRODY, ESQ.
                          Miller Barondess
                          2121 Avenue of the Stars
                          Suite 2600
                          Los Angeles, CA 90067
                          310-552-4400

For Intervenor:           SHAYLA R. MYERS, ESQ.
                          Legal Aid Foundation of LA
                          7000 S. Broadway
                          Los Angeles, CA 90003
                          213-640-3983

Special Master:           MICHELLE MARTINEZ

**3**

**INDEX**

| DEFENDANTS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MATTHEW SZABO | 5/72 | 111/152/243 | | |
|   COURT INQUIRY | 54 | | | |

**4**

**Los Angeles, California; Thursday, December 18, 2025; 8:07 a.m.**

**(Call to Order)**

THE COURT:  All right, thank you very much, Counsel. If you'd be seated, then we're back in session.  Counsel are present, but we're on CourtSmart again.  So as we resume, if you identify yourself and who you represent, so please.

Mr. Szabo, good morning.  If you'd be kind enough to retake the stand, please.  And this courtroom apparently has a defective box.  And apparently Judge Wright has people testify from down here, but if you don't mind, let's try this.  Yeah, and be careful.

Please be seated.

**MATTHEW SZABO, DEFENDANTS' WITNESS, PREVIOUSLY SWORN**

THE WITNESS:  Thank you.

THE COURT:  And once again, sir, would you state your full name?

THE WITNESS:  Matt Szabo.

THE COURT:  And would you spell your last name, please?

THE WITNESS:  S as in Sam, Z as in zebra, A-B-O.

THE COURT:  And you recall the oath that was administered on the last occasion.

THE WITNESS:  Yes.

THE COURT:  Thank you, sir.  Counsel.

MR. MCRAE:  Do we make appearances first, Your Honor?

EXCEPTIONAL REPORTING SERVICES, INC

THE COURT:  Please.

MR. MCRAE:  I think I said that for the record.  Do you want the plaintiffs to go first?

MR. MITCHELL:  Good morning, Your Honor.  Elizabeth Mitchell and Matthew Umhofer.  Umhofer, Mitchell, and King on behalf of Plaintiff L.A. Alliance.

MR. MCRAE:  Marcellus McRae and Bradley Hamburger, Gibson, Dunn & Crutcher, appearing on behalf of the City of Los Angeles.

MS. MYERS:  Shayla Myers from the Legal Aid Foundation of Los Angeles on behalf of the intervenors.

THE COURT:  There you are.

MS. BRODY:  This is Lauren Brody on behalf of the county.

THE COURT:  And the council.

MR. MCRAE:  May I proceed, Your Honor?

THE COURT:  Please.

MR. MCRAE:  Thank you, Your Honor.

**DIRECT EXAMINATION (RESUMED)**

BY MR. MCRAE:

Q    Mr. Szabo, on December 4th, you testified that you -- hang on one second here.  Mr. Szabo, do you recall testifying regarding bed creation being the primary purpose of the Alliance Settlement Agreement?

A    I do, yes.

THE COURT:  Could you pull that microphone just a little closer to you?

MR. MCRAE:  Certainly.

THE COURT:  And then would you restate that question again, please?

MR. MCRAE:  Yes, Your Honor.

BY MR. MCRAE:

Q    Mr. Szabo, do you recall your testimony regarding bed creation being the primary purpose of the Alliance Settlement Agreement?

A    I do, yes.

Q    And when you said that, sir, were you suggesting that bed creation was the only purpose of the Alliance Settlement Agreement?

A    No.  No, I wasn't.

Q    So why did you say you viewed the creation of beds as the primary purpose of the Alliance Settlement Agreement?

A    Well, I said that because throughout the process to get to the settlement, the objective -- this is in my view, of course -- the objective was to create a framework whereby the City would be required to establish a certain number of beds.  And once we created that threshold number of beds, in this case it was 60 percent of the unsheltered population in the 2022 pit count of persons experiencing homelessness that were appropriate for City shelter, that the City, if it wished

Szabo - Direct / By Mr. McRae                                    **7**

to proceed with enhanced camping or encampment restriction procedures, it would be allowed to do so.  That was the main structure and the main framework.  Build the housing for a threshold number of individuals who are living on the streets as of a certain time, and that that would or could facilitate enhancements to the City's policies as it relates to keeping the public right-of-way clean and clear of encampments.

Q    And, sir, let me direct your attention now to Exhibit 557, which is going to be ECF 1111, which should be -- if we can go to the bottom of page 69, lines 23 through 25, and we'll go to the top of page 70, lines 1 through 8.

And for the record, my understanding is that this is the transcript of the proceedings that took place, this being Exhibit 557 and ECF 1111, the transcript of the proceedings that took place on December 15th.

So, sir, you'll see in the section that I called out to you that Mr. Webster testified earlier this week that he disagreed with your testimony that the Section 7.1 reporting obligations were intended to reflect the City's quarterly progress in implementing the Alliance Settlement Agreement.

Sir, can you explain for us why you understood that the reporting obligations in Section 7.1 were intended to provide quarterly updates regarding the City's implementation of the Alliance Settlement Agreement?

A    Yes, just one moment, though.  I don't see what you have

up there.  Can you repeat the exhibit?  I need to pull it up here.

Q    You know, let me make an inquiry with respect to the logistics.

MR. MCRAE:  Your Honor, I'm not -- I, like you, was a little disoriented this morning when I saw the juxtaposition of where we were all sitting.  Oh, there is a monitor.  Thank you.

**BY MR. MCRAE:**

Q    Mr. Szabo, do you now see the reference to the Exhibit 557, ECF 1111 to which I was referring?

A    I do, yes.

Q    Okay.  And do you need me to repeat the question, sir?

A    If you could, please.

Q    Sure.  I was explaining that you can see here that Mr. Weber testified that he disagreed with your testimony that the Section 7.1 reporting obligations were intended to reflect the City's quarterly progress in implementing the Alliance Settlement Agreement.  And I wanted you to explain why you understood that the reporting obligations in Section 7.1 were intended to provide quarterly updates regarding the City's implementation of the Alliance Settlement Agreement.

A    Well, I mean, first and foremost, it's because that's what it says, and that's what we negotiated.  That's what I read.  It said that we were -- as I recall, it states at the

Szabo - Direct / By Mr. McRae                                    **9**

beginning that the reporting requirements of 7.1 are related to

or we are reporting on the progress of the Settlement

Agreement.  So the obligations of the Settlement Agreement

primarily, as I stated, in terms of what the City needed to do

as opposed to what the City needed to report or set milestones

for, et cetera, it was primarily about the creation of the beds

and meeting that required number of beds.  So our reporting is

all related to the beds that are created.

Q    So let me, in fact, show you Exhibit 25, and if we could

take a look at Section 7.1 of Exhibit 25.  And in salient part,

if you look at the first sentence, it says, the City will

provide quarterly status updates to the Court regarding its

progress with this agreement.  And then it goes on to say

including, and there's the first sentence, and you see the

second sentence.  Sir, when you were talking about context and

the understanding that the City was to report on its progress

with the agreement on a quarterly basis, is the language in 7.1

in the first sentence what you were referring to?

A    That is what I was referring to, yes.

Q    Is that qualifying language in the first sentence of

Section 7.1 also what informed your understanding of the

reporting obligations in the second sentence of Section 7.1?

A    Yes.

Q    Now, sir, did you ever understand Section 7.1 to require

the City to provide quarterly reports regarding all of the City

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Direct / By Mr. McRae                    **10**

of Los Angeles' efforts to address homelessness beyond the Alliance Settlement Agreement?

A    No, I didn't.

Q    Are you aware of any court order that states that Section 7.1 of the Alliance Settlement Agreement requires the City to report on its efforts to address homelessness even beyond those effectuated under the Alliance Settlement Agreement.

A    No.

Q    Mr. Szabo, let me turn your attention back to Exhibit 557, which is ECF 1111, this time reading from pages 91, line 11, through page 92, line 19.  Do you have that in front of you, sir?

A    Yes.

Q    So Mr. Weber testified earlier this week that the City cannot satisfy its reporting obligations in the first section of 7.1 with a single data point.  Let me explore with you a few questions.  First, Mr. Szabo, does the City of Los Angeles offer all of the beds that it has created under the Alliance Settlement Agreement?

Q    We do once they're open and occupiable, yes.

Q    And, sir, is this the reason that the City's quarterly reports uses the same number to report both the number of housing or shelter opportunities created or otherwise obtained and the number of beds or opportunities offered, which are the first two metrics mentioned in the first sentence of section

7.1?

A    Yes.

Q    Now, in order to figure out the number of beds or opportunities that are currently available in each council district in the context of Section 7.1, do you have to start with the total number of beds reported in the first two metrics in the first sentence of Section 7.1?

A    Yes.  Those provide the citywide numbers, yes.

Q    And do you then, in the effort to determine the number of beds or opportunities currently available in each council district, take the total number and allocate it on a per council district basis?

A    Yes.

Q    And, Mr. Szabo, do the quarterly reports that the City has prepared, pursuant to the Alliance Settlement Agreement, contain only one data point for all of the metrics in Section 7.1?

A    Well, no.  There's multiple data points that are reported in the quarterly report.

Q    Let's take a look at Exhibit 502, which is ECF 1072. Mr. Szabo, you should see Exhibit 502, ECF 1072, and we're looking at page 2 of that document.  And to be more precise, it's actually ECF 1072-1.  Now, Mr. Szabo, are we looking at the supplemental report for the quarter ending September 30, 2025?

Szabo - Direct / By Mr. McRae                          **12**

A    Yes, that's right.

Q    And sir, can you, using this exhibit, illustrate your point that the City does not report a single data point in response to the reporting requirements set forth in Section 7.1? Let me rephrase the question.  Can you use this exhibit to illustrate that the City reports more than one data point in reporting on the metrics set forth in Section 7.1?

A    Yes.

Q    Please proceed.

A    So if we are looking at the, for example, the number of beds available per council district, we would look at -- well, first, we would look at the second column that shows each -- that indicates which site or where the site is located in which council district.  We would then look at the, I guess that would be the sixth column, which shows how many beds there are.  And then we would look at the seventh column, which is the status.

So if it's open, then we would be -- you would look at the status, you'd look at the number of beds, and then you would look at the council district.  And in the attachment, it would -- those three points would tell you how many beds are available per council district for that quarter.

Q    And is there another data point there, PEH served?

A    Yes.

Q    And, sir, has the City ever suggested that it could use a

Szabo - Direct / By Mr. McRae                    **13**

single data point to report on all of the 7.1 metrics in the quarterly report?

A    No.

Q    Has the City consistently used multiple data points to report on the Section 7.1 metrics in the quarterly reports?

A    Yes.

Q    And, sir, do the City's quarterly reports contain information that would allow the reader to evaluate how beds or opportunities are created under the Alliance Settlement Agreement -- let me rephrase.  Do the City's quarterly reports contain information that would allow the reader to evaluate how the beds or opportunities created under the Alliance Settlement Agreement are distributed throughout the City?

A    Yes.

Q    And do the quarterly reports also contain information that would allow the reader to evaluate how beds created under the Alliance Settlement Agreement are planned to be distributed going forward?

A    Yes, it does.  That would be the in-progress classification.

Q    So, sir, looking at Exhibit 502, which should still be on the screen, ECF 1072-1, page 2, can you show us how a reader could look at this quarterly report to determine how beds or opportunities created under the Alliance Settlement Agreement are distributed throughout the City and plan to be distributed

Szabo - Direct / By Mr. McRae                                    **14**

throughout the City?

A    So, on the section that you have on the screen, all of the beds show as open.  So those are what is actually open.  We indicate for each site, of course, the number of beds, the council district, which would give you a general idea of how the beds are distributed, and then we also provide the specific -- we also provide the address where possible.  There are some cases where it's scattered and we aren't able to provide the address, but in many cases we provide the address.  And then later in the document when we indicate the beds that are in progress, and that would indicate to the reader, the Court, the plaintiffs, the intervenors, the distribution, the planned distribution of beds that we intend to cite as complying with our obligation once they are open and occupiable.

Q    And, Mr. Szabo, let me switch gears here, does Exhibit 502, ECF 1072-1, or any other quarterly reports show the number of beds or opportunities that are unoccupied at any given moment?

A    It just shows the beds that are unoccupied?

Q    Let me rephrase the question.

A    Yeah.

Q    Is there a column or section of the quarterly reports that purports to state which beds are unoccupied at any given time?

A    No.

Szabo - Direct / By Mr. McRae                    **15**

Q    Why is that, sir?

A    Well, so for -- we -- in effort to provide a more complete picture about how the beds are being used, although it was not and is not required, we have been reporting since our initial report in January of 2023, PEH served, persons experiencing homelessness served.  That is, we feel, the best way we can indicate how these beds are being used.

For permanent housing, almost by definition, the goal is for that unit to be used on a permanent basis.  So we report how many of those units are leased and have a person experiencing homelessness using that unit as a permanent home. We report that under our persons experiencing homelessness served metric.  For the interim housing, because the purpose of interim housing is temporary, the idea is that you would have turnover, that it would be a temporary place for someone to stay in the interim while they're waiting for permanent housing, waiting for that opportunity.  We report how many intakes that unit -- that bed or unit has received since it was open and occupiable.

So it's two forms, but it's getting at what the purpose of each type of housing is.  As it relates to -- look, we've been reporting that from the beginning.  And if the objective was somehow to provide in a quarterly report real-time occupancy data, that wouldn't make any sense at all because it's a quarterly report that even by the time we submit it to the

Court, we submit it the 15th of the month following that quarter, that data would be stale.  It wouldn't be usable for anyone to say, okay, ah, here's what's available now.  It would be immediately stale upon submitting that to the Court.  So we've never considered that obligation to be a real-time occupancy report.  It's been available.  We've used available as these are the units that are available for use by the City to house people on an interim basis or on a permanent basis.

Q    And sir, is this specter of staleness that you described were unoccupied to be adopted in the manner that you identified, is that a function of the constant changing of who occupies a bed?

A    Certainly for interim housing, absolutely.  At any given time, I mean, and the goal is to have turnover in interim housing.  So although we want -- we do want to fully utilize the beds that we've established, the goal is to have turnover as quickly as we can.  And so there will always be -- there should always be availability and we should be working to create availability in our interim housing stock.

Q    And are you aware of any feasible way for the City to report on the number of unoccupied beds at any given time that would be current in real time when a quarterly report was submitted?

A    No.

Q    And, Mr. Szabo, does the Alliance Settlement Agreement,

Szabo - Direct / By Mr. McRae                    **17**

which is Exhibit 25, define the word available as unoccupied?

A     No.

Q     In fact -- well, does the word unoccupied appear anywhere in the Alliance Settlement Agreement?

A     Not to my knowledge, not to my recollection.

Q     And are you aware of any court order adopting Mr. Webster's interpretation of Section 7.1 that the City is required to provide in each quarterly report the number of beds or opportunities that are currently open at the time the quarterly report is submitted?

          **MS. MITCHELL:**  Objection.  Misstates the testimony.

          **MR. MCRAE:**  I'll rephrase, Your Honor.

**BY MR. MCRAE:**

Q     Are you aware of any court order that adopts an interpretation that Section 7.1 requires the City to provide in each quarterly report the number of beds or opportunities that are currently open at the time of the quarterly report?

          **MS. MITCHELL:**  Objection.  Misstates the testimony.

          **THE COURT:**  Do you understand the question?

          **THE WITNESS:**  I do.

          **THE COURT:**  You may answer it.

          **THE WITNESS:**  No.

Q     Mr. Szabo, in looking at Section 7.1 of Exhibit 25, if we could have that back on the screen.  So if you, sir, look at the first sentence of Section 7.1, the second metric listed

there is the number of beds or opportunities offered.  Do you see that, sir?

A    Yes.

Q    Now, when your office has interpreted that reporting requirement for purposes of preparing the quarterly reports, have you interpreted the word "number" in that dependent clause, the number of beds or opportunities offered, as pertaining to beds or opportunities or offered?

            **MS. MITCHELL:**  Objection.  Vague.

            **THE COURT:**  Sustained.

**BY MR. MCRAE:**

Q    Okay.  Sir, you see the word number in that sentence?

A    Yes.

Q    When you read that phrase, the number of beds or opportunities offered, what do you understand the word number to be referring to?

A    To beds or opportunities.

Q    Why is that?

A    Well, principally because that's what it says, but also because, as I stated previously, the primary obligation of the settlement, the primary obligation of the City is to establish a required number of beds or opportunities.

Q    And, sir, is it feasible currently for the City to report the number of times a given bed were offered under the Alliance Settlement Agreement?

Szabo - Direct / By Mr. McRae                    **19**

A     It is not.

Q     Why not?

A     It's not because we do not track, and by we, I mean broadly, the outreach workers that are employed through LAHSA, though, in some cases, the City directly, in some cases, the County.  We don't track the number of offers that are rejected. The general goal is to offer -- to the extent a bed is available that would meet the needs of a person experiencing homelessness, is to offer that bed in as many ways as is required until the person is ready to accept the bed.  We don't track the number of offers rejected.  We do, and we do report on the number of offers accepted.  And again, that gets to our point around the persons experiencing homelessness served.  How are these beds being utilized?  How many offers are accepted is also reflected in PEH served.

Q     Sir, you testified earlier in this proceeding that for purposes of the quarterly reports, you interpret the term offer as used in Section 7.1, or rather offered, to mean on offer.  Do you agree with an interpretation that the word offered means the number of times that a bed is offered?

          **MS. MITCHELL:**  Objection.  Leading.

          **MR. MCRAE:**  Do you agree with it?

          **THE COURT:**  It is leading, but you can answer the question.

          **THE WITNESS:**  No, that's not how I've interpreted

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Direct / By Mr. McRae          **20**

it.  That's not how we've reported it.

**BY MR. MCRAE:**

Q    Were you ever confused about the meaning of the word offered in the context of Section 7.1, sir?

A    No.

Q    Has your office consistently interpreted the word offered to mean on offer in the context of reporting on Section 7.1 in the quarterly reports?

A    Yes.

Q    And are you aware of any provision of the settlement agreement that adopts a definition of the term offered as the number of times a bed is offered?

A    I'm not.

Q    Are you aware of any court order that prescribes that the word offered in Section 7.1 means the number of times a bed is offered?

A    I'm not.

Q    Sir, you also testified earlier that the majority of the offers of beds or shelters are made by service proprietors who report to LAHSA rather than the City.  Does the City of Los Angeles have offers of beds that it in some instances makes directly?

A    In some instances, yes.

Q    In which instances are those, sir?

A    That would principally be related to the Inside Safe

program.

Q    Can you tell us why the City has not reported in the quarterly reports the number of offers made through Inside Safe as the total number of beds offered in the quarterly reports?

A    Well, two reasons.  Number one, it would be incomplete.  And number two, as I stated, we don't keep a running count of how many offers are rejected.  The objective of the outreach workers that are employed by the City and the objective of the outreach workers employed by service providers and by LAHSA directly is to provide the best possible pathway for the individual living on the street to a sheltered situation.  And they're not tracking and they don't track how many times an offer is rejected.

Q    Sir, would the City be willing to report an incomplete number of beds offered in the form of Inside Safe beds in the quarterly reports on a going forward basis if requested to do so by the Alliance?

A    If requested to do so by the Court and if agreed with the Alliance, certainly.

Q    Mr. Szabo, do you recall testifying earlier that the reference, if we could have, we still have Section 7.1 up, if we look at the second sentence, right after to the extent possible, you see the reference to the number of PEH engaged.  Do you see that, sir?

A    Yes.

Q    And do you recall testifying earlier that you construed this reference to the number of PEH engaged as being guided by the language in the first sentence of Section 7.1 that the City's going to provide quarterly reports regarding its progress under the agreement?

A    Yes.

Q    Now, sir, can you tell us why you believe that it makes sense to read this obligation where the City will work with LAHSA to include in the quarterly status updates to the extent possible the number of PEH engaged as being read in connection with the obligation to report on the City's progress under the agreement on a quarterly basis?

        **THE COURT:**  Would you repeat that, counsel?  Just the same question.  I missed the last question.

        **MR. MCRAE:**  I know.  As I was sitting there, Your Honor, I was thinking, I'll give it a try.

        **THE COURT:**  I don't have real time, that's why.

        **MR. MCRAE:**  I'll give it a try to try to recreate that.

**BY MR. MCRAE:**

Q    Mr. Szabo, can you explain to us why you felt it made sense to read this language, the City will work with LAHSA to include in the quarterly status updates to the extent possible the number of PEH engaged as being guided by the first sentence that says the City will provide quarterly status updates to the

Court regarding its progress with this agreement?

A    Again, plainly because that's what it says.  I mean, the paragraph says quarterly status updates to the Court regarding its progress with this agreement.  It's clear to me that if the request is that we're going to report to the extent possible PEH engaged, it would be in relation to our progress with this agreement, meaning it would be in relation to the beds that we have established as a result of this agreement.

Q    Are you aware of any court order that says that in reporting on PEH engaged under Section 7.1 that the City is not limited to PEH engaged in connection with the Alliance Settlement Agreement?

A    No.

Q    Mr. Szabo, do you agree with the assertion that at the time the parties -- well actually let me contextualize this.  Let's take a look again at Exhibit 557, ECF 1111, and we'll go to pages 97 and 98.  And in salient part, we will start on page 97 with line 18.  And why don't we move forward a bit, go down a little bit more.  Thank you.  Thank you.

So you see in line 18 here, Mr. Webster's testifying in substance that there were systems in place at the time the parties entered into the Alliance Settlement Agreement that could capture all the metrics listed in Section 7.1.  And I want to ask you, sir, do you agree that as of the time that the parties entered into the Alliance Settlement Agreement, the

Szabo - Direct / By Mr. McRae                      **24**

City of Los Angeles had data systems in place that would capture all of the metrics identified in both sentences of Section 7.1?

A    No, we certainly did not.

Q    Why not, sir?  Let me -- that was an imprecise question.

A    Sure.

Q    Why don't you agree?

A    I don't agree because the City of Los Angeles certainly didn't have data systems in place to report on the second sentence of 7.1.  And I know that LAHSA, in part, doesn't have data systems in place even today to report on, for example, the number of offers rejected.  And so that, yes, we did not have those systems in place.

Q    And during your tenure as City administrator, has Mr. Webster ever worked in your office?

A    No.

Q    And as far as you are aware, has Mr. Webster ever worked for LAHSA?

A    No.

Q    Has Mr. Webster ever had a role in preparing any of the City's quarterly reports?

A    No.

Q    Has Mr. Webster ever had a role in collecting the data that your office uses to prepare the quarterly reports?

A    No.

Szabo - Direct / By Mr. McRae                **25**

Q    Mr. Szabo, does the City have the ability to unilaterally update or change any data systems that it relies on to prepare the quarterly reports that the City does not itself operate?

A    No.

Q    Sir, did you at any time understand the Alliance Settlement Agreement to be a means to achieve every objective regarding homelessness that anyone ever had?

A    No.

Q    Do you view the Alliance Settlement Agreement as a means to achieve the specific obligations in that agreement?

A    Yes.

Q    Mr. Szabo, on December 4th, do you recall testifying that you first became aware of the Alliance having concerns about the City not reporting Section 7.1 metrics about four to six weeks prior to your December 4th testimony of this year?

A    Yes, I recall that.

Q    Now, sir, are you ruling out the possibility that you were notified a few months prior, in approximately July or in July 2025, that counsel for the Alliance expressed that the City was not reporting on Section 7.1 metrics?

        **MS. MITCHELL:**  Objection leading.

        **THE COURT:**  Overruled.  You can answer the question.

        **THE WITNESS:**  No, that's possible.

//

//

Szabo - Direct / By Mr. McRae                    **26**

**BY MR. MCRAE:**

Q    But when was the first time that you spoke with persons representing the alliance to learn about the reasons for the Alliance's concerns about the City's reporting on Section 7.1 metrics?

A    That would have been in the -- we had a meet and confer in November.  Sometime in November, I believe.

Q    Would that have been November 17th of 2025?

A    Yes.

Q    And was this also the first time that you had -- that you discussed with the special master the special master's concerns?  And let me rephrase that.  And was this also the first time that you learned the reasons behind the special master's concerns about the City's reporting on Section 7.1 metrics in this same November 17th, 2025 meeting?

A    I'm sorry, could you repeat that?

Q    Yes.  And was this also the first time that you learned of the reasons behind the special master's concerns about the City's reporting on Section 7.1 metrics in this same November 17, 2025 meeting?

A    I think the reasons, yes, the special master had mentioned 7.1 in prior communications.

Q    And, sir, to your knowledge, has LAHSA's capabilities to track and report on Section 7.1 metrics changed over time?

A    Yes.

Szabo - Direct / By Mr. McRae          **27**

Q     Including to this very day?

A     Yes.

Q     And do you and your office make ongoing efforts to learn about LAHSA's capabilities to track and report on Section 7.1 metrics?

A     Yes, we do.

Q     Now, prior to October and November of 2025, do you recall participating in an August 7th, 2025 meeting with, among others, Mr. Umhofer as counsel for the Alliance to discuss the Alliance's concerns regarding implementation of the Alliance Settlement Agreement?

          **THE COURT:**  Counsel, I'm sorry, would you repeat that date again?

          **MR. MCRAE:**  August 7th, 2025.

          **THE COURT:**  Thank you.

          **THE WITNESS:**  Yes, I recall that meeting.

**BY MR. MCRAE:**

Q     And prior to that August 7th, 2025 meeting, did you have an understanding that the Alliance wanted to discuss various concerns that it had regarding compliance with the Alliance Settlement Agreement?

A     Yes, I did.

Q     Now, focusing on this August 7th, 2025 meeting, to the best of your recollection, did Mr. Umhofer raise any concerns in that meeting about the City's reporting on Section 7.1

Szabo - Direct / By Mr. McRae                    **28**

metrics?

A    Not as I recall, no.

Q    And following this August 7, 2025 meeting, did you learn of efforts to schedule a meeting with counsel for the Alliance, the special master, LAHSA, and the City, and others to specifically discuss the City's reporting on Section 7.1 metrics?

A    Yes, that was the November meeting.

Q    The November 17th, 2025 meeting, sir?

A    Yes.  Yes.

Q    And I'm not asking you to give us a stenographic recitation of what happened in that meeting, but can you tell us some of your takeaways from that exchange with the special master, counsel for the Alliance, amongst others, in that November 17th, 2025 meeting?

A    That meeting was almost entirely, I think, entirely focused on 7.1, and there was extensive discussion around the parties' interpretation of the meaning of the metrics that were requested in 7.1.  There was discussion with LAHSA about its capabilities on what it could report, what it couldn't report, what it was making progress towards in terms of its capability to report.

There was absolutely, for certain takeaway, was that there was disagreement among multiple parties who have been steeped in this case for the last, you know, since 2020, about the

EXCEPTIONAL REPORTING SERVICES, INC

meaning of the metrics or the intent of the metrics and the information requested in 7.1.  So there was -- we had a full discussion about, well, it could mean this or no, we believe it means this, you know, this definition of the term offer or this definition of the term available, and there was not agreement on any of that amongst multiple parties on the call.

Q    Sir, is the City willing to continue to engage in these clarifying discussions regarding the parties' respective understanding of the provisions in Section 7.1 of the Alliance Settlement Agreement?

A    We certainly are.

Q    Mr. Szabo, let me --

            **THE COURT:**  I missed your answer.

            **THE WITNESS:**  I said we are, yes.

            **THE COURT:**  You are.

            **THE WITNESS:**  Absolutely.

**BY MR. MCRAE:**

Q    Mr. Szabo, on December 4th, sir, of this year, do you recall testifying about your understanding regarding LAHSA's ability to report on various 7.1, Section 7.1 metrics in the Alliance Settlement Agreement?

A    Yes.

Q    Now, Mr. Szabo, why does the City report PEH served in its quarterly reports in addressing the metric, the number of PEH who have accepted offers of shelter or housing?

A    Because we feel that's the best way we can indicate to the court, to the plaintiffs and the public, that the best way we can indicate which -- how many offers of shelter or housing were accepted in relation to the obligation of the settlement, in relation to the units that have been established as a result of this settlement.

Q    And sir, has your office reported PEH served in its quarterly reports from the time that that data point became available?

A    Yes, since our first quarterly report.

Q    And, Mr. Szabo, let me telescope this.  Does the metric PEH engaged, does that update the City's progress towards implementing the Alliance Settlement Agreement in your understanding?

A    Not if the definition of PEH engaged is intended to be citywide engagements or engagements in any circumstance for any reason by any outreach staff employed by any entity in the City.  It would be far beyond what this settlement agreement provides.

Q    So has your office endeavored to include data in the quarterly reports that does update the City's progress in implementing the Alliance Settlement Agreement?

A    Yes.

Q    Now, sir, are you aware of whether LAHSA publicly reports data regarding PEH engaged, at least currently?

Szabo - Direct / By Mr. McRae                                    **31**

A     Yes, they do.

Q     And do you happen to know how long LAHSA has been publicly reporting PEH engaged?

A     I don't know when they first started reporting it, but I know the information has been available since 2023.

Q     Now, from the time that the City has been preparing quarterly reports, has the City included publicly available data in those reports that is unrelated to the Alliance Settlement Agreement?

A     We have not.

Q     Now, provided that your office has a comfort level with the accuracy of LAHSA's publicly reported PEH engaged data, would the City be willing to report LAHSA's publicly reported PEH engaged data in its quarterly reports going forward if asked to do so by the Alliance?

A     We absolutely would.  And, in fact, we currently report that data citywide and by council district in a different report to the city council.  It's a public report.  We have no problem reporting it.  We have been reporting it since the mayor declared a state of emergency on homelessness.  We submit quarterly reports to the council for them to extend that state of emergency.

      And as part of that reporting, we report the number of PEH engaged citywide and by council district.  We'd be happy to include it in the quarterly reports.  We just didn't feel that

Szabo - Direct / By Mr. McRae                    **32**

it was responsive to the obligations, which is why we use the PEH served, which gets to engagements that have led to housing in the units that were established by this settlement.

THE COURT:  I'm not going to intercede, but I'm going to ask either counsel for any of the parties to give me a time frame.  In other words, what I'm hearing is representation that there might be some possibility of reporting, but the Court's been waiting three years for a monitor.  I'd like to hear the time frame if the City is willing to move forward that this reporting would take place in each of these categories, so I know if there truly is a possibility of progress.

MR. MCRAE:  Certainly, Your Honor, and if I may --

THE COURT:  Counsel, thank you very much.  I'll leave that to each of you.  I'm very clear about that.

MR. MCRAE:  No, no, I --

THE COURT:  But I promise.  I've been waiting three years now.

MR. MCRAE:  I understand that.  What wasn't clear is when the Court would like that and in what form?  I just want to make sure --

THE COURT:  I'd like that now from the witness stand from Mr. Zabo.  In other words, I'm hearing this opportunity, possibly, but I've heard so many promises for so long and the court now is three years --

MR. MCRAE:  Okay.

Szabo - Direct / By Mr. McRae                          **33**

THE COURT:  -- without a monitor.  And unless you can give me that, I don't have any time frame.  I don't really know if there is progress, and I'd like to see that progress.  Now you're scowling, counsel, for the record --

MR. MCRAE:  No, I'm not scowling.

THE COURT:  Please ask or not ask that.  I leave that to --

MR. MCRAE:  I'm not scowling. Your Honor.  I'm just  -- I'm happy to do this.

THE COURT:  Thank you.  Thank you very much, counsel.

MR. MCRAE:  I was just confused by the Court's question.

THE COURT:  Counsel, thank you very much.  I don't need clarification.  I've been clear.

BY MR. MCRAE:

Q   Mr. Szabo, let's take this one step at a time.  With respect to offers that are rejected, you've testified that to your knowledge, no one tracks that number; is that correct?

A   That's correct.

Q   Okay.  So would you be speculating if I were to ask you, when do you think someone might track that number in a form that would be reliable that the City could report on it.

A   I don't have -- I don't have the information available to give me the confidence to make to make a hard commitment on that particular metric.  I couldn't -- I wouldn't feel

Szabo - Direct / By Mr. McRae                              **34**

comfortable doing that.  I don't have the confidence that we'd be able to provide that information on a specific timeline.  I'm not saying that we wouldn't work towards it if requested, but that's just not data that is available that I could say we could report in our next quarterly report on.  I couldn't commit to that because I'm not -- I don't have confidence that the systems are in place.

Q   Mr. Szabo, in order to be able to answer the question with respect to all of the metrics in 7.1, as to when those metrics that are not currently being reported on could be conceivably reported on, would you need to consult with the various persons and entities that contribute to that data, which include entities that are beyond the unilateral control of the City?

A   I would, and I would also request -- I would also need clarification because, again, I think in -- I believe we are reporting to the greatest extent possible on most of the metrics.  If there's a different definition of the requested information with clarity on that, I would definitely -- I would need some time and I could come back with some commitment on timing.

Q   Thank you for that clarification.  Let me parse that a bit.  My question was initially addressed at using the City's interpretations that it has been operating under since the execution of the Alliance Settlement Agreement, would you be prepared as you sit here now to opine or give an answer as to

**EXCEPTIONAL REPORTING SERVICES, INC**

the capabilities of the various entities within the City as well as external to the City in terms of their ability to report on items that are not being reported under the City's definition of those various metrics?

A    I couldn't do that today.

Q    Okay.  And so that was my question, sir.  I just wanted to establish that.  And if you had the opportunity to consult with those various participants and inform yourself with respect to those capabilities, might you be able to provide some insight on that point?

A    Yes.  And I would -- yes.

Q    And just so that we understand this, are we talking about, you know, having to talk to like one person to get the answer to that question or would this be a fairly broad range of people?

A    It certainly would extend beyond one person.  There'd be multiple entities that I would need to consult with.

Q    Are we talking about one data system or would it be multiple data systems that would have to be conferred and synthesized in order to be able to respond to that question?

A    Multiple.

Q    Now, you injected actually another layer, which I want to make sure that we're clear on, which is -- were you saying, sir, that in order to approach that question of when metrics could be reported on, that at least in some instances, to the

extent that there's disagreement, that the question of when something might be reportable by the City or some third party might in part depend on which interpretation is adopted for that metric?

**MS. MITCHELL:**  Objection.  Vague.  Unintelligible.

**THE COURT:**  You understand the question.

**THE WITNESS:**  I do.

**THE COURT:**  You may answer it.

**THE WITNESS:**  And yes.

**BY MR. MCRAE:**

Q    And do you presently have the ability or the prescience to say what interpretation might be adopted on a given metric in order to determine the timetable for the ability to report on that metric?

A    No, I would respond to whatever is required by the Court.

Q    All right.  Thank you.  Now, sir, are there departments within the City of Los Angeles that have encampment data?

A    Yes.

Q    Which departments in the City have encampment data?

A    The Bureau of Sanitation has some encampment data.  They have broader cleanliness data, but they do track, in some cases, tents, makeshift shelters.

Q    And is it your view that the data obtained by the City's Sanitation Department enables the City to report on the number of council -- excuse me, the number of encampments per council

district as set forth in the second sentence of Section 7.1?

A     No, it would be incomplete.

Q     And, sir, are you aware of whether LAHSA currently --
well, let me rephrase.  Are you aware of whether LAHSA has data
regarding the number of encampments by council district?

A     LAHSA has been -- this is an area where I've previously
mentioned there has been continuous improvement in LAHSA's
capability to collect and report data.  Their capabilities are
much better today, but as of today, I don't believe they are
able to report real-time data on encampments.

Q     And, sir, since the time that the City has been preparing
quarterly reports, has it included any data from LAHSA
regarding the number of encampments by council districts in
those reports?

A     We have not.

Q     And do you have any understanding of why?

A     Again, the capabilities of gathering data on encampments
and reporting on encampments has been improving over time.  I
would say it became a focus of LAHSA concurrent with the new
administration, concurrent with the development of the Inside
Safe program.  And so it has been -- they have been working to
build those systems and have made great progress, but that was
not available at the time that we started issuing the quarterly
reports in 2023.  And they have made significant progress, and
I do believe we will be able to report that information in the

very near future.

Q    And has your office requested that LAHSA provide it the number of encampments by council districts so that that data could be included in future quarterly reports?

A    Yes, we've requested that, and we started requesting that back to 2023.

Q    Has that request by your office been made to LAHSA more than once?

A    Yes.

Q    And provided your office has a comfort level with the accuracy of the data provided by LAHSA, is the City willing to include LAHSA's number of encampments in each council district in its quarterly reports on a going forward basis?

A    Yes, we are.  As soon as the capability is there and we have confidence in the data, yes.

Q    Does the data with respect to PEH served, which is a metric that is -- excuse me, which is a data point that is contained in the city's quarterly reports, does that PEH served number all come from LAHSA?

A    No.

Q    What else, or rather, where else does the City obtain the data that forms or that comprises PEH served that the City provides in its quarterly reports?

A    We get some of the data from the Housing Department, some of the data from the Housing Authority.  We use --

Szabo - Direct / By Mr. McRae                    **39**

THE COURT:  Just a moment.  Those are interchangeable, HACLA?

THE WITNESS:  Yes, HACLA, the Housing Authority, which has control.

THE COURT:  When you say Housing Authority, you are referring to HACLA?

THE WITNESS:  HACLA, Housing Authority, yes, that's right.  Housing Authority is HACLA and when I refer to the Housing Authority and HACLA, I am referring to, they control the Section 8 vouchers.  Housing Department is responsible for the production, they run the HHH, Permanent Supportive Housing Program, and so we get information from those two entities to determine the number of units that are currently leased, that are currently in use on the permanent housing side.  On the interim housing side, we get most of that information from LAHSA, but we also verify it ourselves through HMIS, which we have access to ourselves.

BY MR. MCRAE:

Q    And is it fair to say, sir, that the City gathers PEH served data from LAHSA and other entities and then combines that data into a singular number that's reported in the quarterly reports?

A    Yes, a singular data set, yes.

Q    And with respect to the number of PEH who have rejected offers of shelter or housing, can we have Section 7.1 of

Exhibit 25 up on the screen for context; and I'll start that question from the top.  Looking at the second sentence of Section 7.1, reading after to the extent possible colon, and the second metric that's mentioned, with respect to the number of PEH who have accepted, excuse me, the third metric, the number of PEH who have rejected offers of shelter or housing and why offers were rejected, do you know if any city department tracks that information?

A    No.  No city department tracks that information.

Q    Do you know if HACLA or any other non-LAHSA entity that contributes information that's used in the quarterly reports tracks the number of PEH who have rejected offers of shelter or housing and why those offers are rejected?

A    No.

Q    And again, my question was imprecise.  Are you saying you don't know that one way or the other or to your knowledge, no one does that?

A    To my knowledge, no one tracks that metric.

Q    Do you know if -- so, sir, would you agree with the assertion that the City has the ability to report any Section 7.1 metric that LAHSA is unable to report on because the City has access to HMIS?

        **MS. MITCHELL:**  Objection.  Vague and ambiguous.

        **THE COURT:**  Would you repeat that?

        **MR. MCRAE:**  Sure.

Szabo - Direct / By Mr. McRae                41

**BY MR. MCRAE:**

Q    Sir, would you agree with the assertion that the City should be able to report any Section 7.1 metric that LAHSA is unable to report because the City has access to HMIS?

        **THE COURT:**  I'm going to sustain that objection.  I don't understand the question.  I apologize.

**BY MR. MCRAE:**

Q    Sir, do you believe that in any instance where LAHSA cannot report on a Section 7.1 metric, the City has the ability to report on that metric because the City has access to HMIS?

        **MS. MITCHELL:**  Objection.  Vague and ambiguous.

        **THE COURT:**  Do you understand the question?

        **THE WITNESS:**  I do.  I do.

        **THE COURT:**  I'm going to allow you to answer it.

        **THE WITNESS:**  Okay.  We have limited access to HMIS and if LAHSA, working with the service providers who are making the face-to-face contact with the persons living on the street, are unable to provide that information to us because they don't track that information, we couldn't, from our position in the CAO's office, attempt to recreate that.  We need to rely on the service providers that are actually having the interaction with the individuals on the street and information that they're reporting.  And if they're not reporting that, we can't invent it ourselves.

Q    Do you agree with the assertion that in instances where

Szabo - Direct / By Mr. McRae                    **42**

LAHSA is unable to report on a Section 7.1 metric, the City can do so by virtue of information it has from its own outreach programs?

A     No.

Q     Why not?

A     No.  It's limited.  Most of the outreach is conducted through either LAHSA employees itself, outreach workers that work for LAHSA, or outreach workers that are employed through service providers by the County, or outreach workers that are employed through service providers that are on contract with LAHSA that are paid for by the City.  We have a very limited number of outreach workers that work directly for the Inside Safe program, but again, that is limited to just the operations that are conducted through the Inside Safe program, which is not representative of all of the efforts and certainly not representative of all of the work that is done to house people in the units created as a result of the settlement.

Q     So, sir, in those instances where LAHSA is unable to report on a Section 7.1 metric, do you agree that the City has access to that information independent of LAHSA, but has simply failed to report it?

        **MS. MITCHELL:**  Objection.  Vague and ambiguous.

        **THE COURT:**  Would you repeat that question?

        **MR. MCRAE:**  Sure.

//

Szabo - Direct / By Mr. McRae                    **43**

**BY MR. MCRAE:**

Q    Sir, in any given instance where LAHSA cannot report on a Section 7.1 metric, do you agree that the City has access to that information independent of LAHSA, but has simply failed to report it?

MS. MITCHELL:  Objection.  Vague and ambiguous.  It's compound.

THE COURT:  I'm going to sustain the objection.

**BY MR. MCRAE:**

Q    Mr. Szabo, is it your understanding that in instances where the City hasn't reported on a Section 7.1 metric in its quarterly reports, that the City has access to the information, but has just failed to report it?

MS. MITCHELL:  Objection.  Vague, ambiguous, and compound.

THE COURT:  I think -- I understand that question.  You can answer it.

THE WITNESS:  No.

THE COURT:  It goes to intent.

Q    Mr. Szabo, does the Alliance Settlement Agreement singularly capture all of the City of Los Angeles' efforts to reduce homelessness?

A    No, it doesn't.

Q    Why not?

A    The Settlement Agreement is, first of all, came into

EXCEPTIONAL REPORTING SERVICES, INC

existence in 2022.  It focuses on a specific required number of units that we're obligated to create over a five-year period. We've been working towards meeting that goal.  We've made great progress meeting that goal, but that, and this is part of the challenge overall, is meeting the goal of creating the housing required by the Alliance Settlement has not meant that we have discontinued all of our other efforts to address homelessness. We have continued all of our other efforts to address homelessness and taken on the obligations of the Alliance Settlement, and those other efforts include, certainly include, all of the roadmap beds, which we have largely kept open, even after the expiration of that agreement, include all of the beds that predate the settlement agreement and predate the roadmap, including permanent housing, including interim housing.  We fund, at significant expense, street outreach, street medicine, street hygiene, showers, laundry, other types of services that we believe are necessary to contribute to part of the solution, not all of the solution, of course, that aren't contemplated in any way in the settlement agreement.

But the City has made a policy decision and a financial decision to keep those services running and to keep funding those services and not to close down beds, even though they're not required by the settlement agreement, because they believe it is the right thing to do to maximize the number of beds that are available for persons experiencing homelessness.  That's

been a policy decision, but it is far beyond the obligations of this particular settlement agreement.

Q    Does the City of Los Angeles have unlimited resources to reduce homelessness?

A    We do not.

Q    And sir, at the time that the Alliance Settlement Agreement was created, did the City have in existence data systems that contained information regarding homelessness?

A    We did have data systems related to homelessness, yes.

Q    Are you aware of any provision in the Alliance Settlement Agreement that requires the City to fund new data systems to report on metrics described in the Alliance Settlement Agreement?

A    No.

Q    Are you aware of any provision in the Alliance Settlement Agreement that requires the City to create new data systems in fulfilling its obligations under the Alliance Settlement Agreement?

A    No.

Q    Are you aware of any provision in the Alliance Settlement Agreement that requires the City to change its data systems in order to fulfill obligations under the Alliance Settlement Agreement?

A    No.

Q    Are you aware of any threats to the City's resources that

it uses in seeking to reduce homelessness in the last three years or so?

THE COURT:  I'm sorry, would you repeat that?

MR. MCRAE:  Yes, Your Honor.

THE COURT:  Please.

BY MR. MCRAE:

Q    Are you aware of any threats to the City's resources -- let me rephrase the question.  Are you aware of any events in the last three years that have threatened the City's resources that it uses in seeking to reduce homelessness over the last -- during that period?

A    There have been multiple events, multiple occurrences that have impacted the City's ability and impacted the City's resources that we have available to us to address homelessness, multiple.

Q    Can you give us some examples?

A    There's a number.  So on the financial front, we are not the County of Los Angeles.  We have a very limited number of dollars that come to the City that are dedicated for homelessness, as an example.  The voters passed a measure to a half-cent sales tax for homeless services.  The vast majority of those dollars go --

THE COURT:  Is that Triple H?

THE WITNESS:  That is actually -- that was -- I'm referring to Measure A.

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Direct / By Mr. McRae                    **47**

**THE COURT:**  A, not Triple H?

**THE WITNESS:**  Not Triple H, but I will address Triple H in a moment.  So Measure A doubled the tax.  It's now a half-cent sales tax.  The vast majority of those dollars go to the County of Los Angeles, nearly 600 million for services.  There is a small portion that goes to the City of Los Angeles.  It's called the Local Solutions Fund.  It goes to the City of Los Angeles and other cities, and that's $53 million.  That's what we're getting out of Measure A directly to fund services for all of these beds.

And really, everything that we're talking about, the outreach, to keep these beds open, those are all -- we need flexible dollars for that.  So that is extremely limited, and there is not availability for us to access more on the services side.

Judge mentioned, you mentioned Triple H.  That was a bond measure that was passed by the voters in 2016.  It was $1.2 billion.  We put it to good use.  We're on track to create a total of 10,000 units of permanent housing.  That has -- we literally, just this week, issued our last, or we will be issuing, rather, our last issuance under that authority.  So that bonding authority has essentially expired.

We get dollars from the state under the HHAP program.  And we have --

//

**BY MR. MCRAE:**

Q    I'm sorry, sir, is that an acronym?

A    It is an acronym.  It is the Homeless Housing Assistance and Prevention program.  It has been a series.  We are now heading into our seventh year of one-time grants that we've received from the state.  In the last budget, they reduced the funding for the HHAP program from a billion dollars to 500 million.  So we don't know how that will ultimately affect the dollars that the City gets, but it could cut the dollars that we get in half.

At the same time, costs have been going up across the board.  Service provider costs have been going up.  So we've been struggling to maintain service levels as they've increased 30 percent, 40 percent, in some cases 50 percent, with fewer dollars available to us than we had a few years ago.  And in the middle of all that, we've been facing major budget challenges related to the economic conditions, related to the wildfires that we had in January, and have been working to maintain to the best of our ability funding, not just the level of funding, but the level of services that we've been -- and the outputs that we've been providing on the homelessness front at great cost -- at great cost to the City's general fund.  And that has required decisions which have included the mayor last year submitting a budget with 1,600 layoffs, the council adopting a budget with more than 600 layoffs, all the while

maintaining the funding for our homelessness efforts.  So the elected leaders in the City have faced extraordinary financial challenges, but have maintained homelessness as a central funding priority.

Q    Sir, to put a finer point on it, you mentioned the wildfires.  Are you referring to the January 2025 LA wildfires?

A    Yes.

Q    Did that consume resources of the City of Los Angeles financially?

A    Yes, it did.

Q    Did it consume other resources of the City of Los Angeles in responding to those fires?

A    Yes, time and resources.

Q    Is that still ongoing?

A    I'm sorry?

Q    Is that still ongoing?  The City using resources in order to deal with the consequences of those fires?

A    Yes.

Q    You also, just so that I understand this -- has the City, did it declare a fiscal emergency, the city council in June of 2025?

A    Yes.

Q    And again, still in the year 2025, do you recall if there was a deployment of the National Guard in the City of Los Angeles?

Szabo - Direct / By Mr. McRae                               **50**

A      Yes, there was.

Q      Was that around June of 2025 or in June of 2025?

A      Yes.

Q      Did that also consume resources of the City?

A      In response to the immigration activities, the immigration enforcement activities consumed an enormous amount of resources.  It required significant LAPD response.

Q      And at the time that you executed -- at the time that the City executed the Alliance Settlement Agreement, let me direct your attention to Exhibit 25, Section 8.2.  Now, sir, I want to have you take a look at the first sentence here.  It says, in the event of fires, floods, earthquakes, epidemics, quarantine restrictions, or other natural catastrophic occurrences, terrorist acts, insurrections, or other large-scale civil disturbances, or any local or fiscal emergency declared, and then it goes on to say by whom and what the effect would be. So first of all, are you familiar with this section 8.2 of Exhibit 25?

A      I am, yes.

Q      Did you negotiate this language?

A      Yes.

Q      As the primary negotiator for the City in the Alliance Settlement Agreement?

A      Yes.

Q      Why did you negotiate this language in the Alliance

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Direct / By Mr. McRae                         **51**

Settlement Agreement?

A    Well, for a few reasons.  Primarily, this settlement was reached largely in the middle of COVID, and I was responsible for -- I was in a management role as the City responded to the COVID emergency and was very aware of the extraordinary stress that that put on the City's ability to meet even its most basic obligations because of what COVID required -- the restrictions that that COVID placed on all people, all movement of people.

     And so I wanted to ensure that there was force majeure provision in the event of unforeseen circumstances that through no fault of the City would restrict the City's ability to comply.  Our intention was to comply with this agreement. That's why we agreed to it and -- but if external forces limited our ability to comply with the agreement, I wanted the agreement to reflect -- to acknowledge that and to create a process that would allow for alternatives in those events.

Q    Would you include the January 2025 LA wildfires, the National Guard and Marine deployment, and the fiscal emergency declared by the City Council all in 2025 as among the unforeseen circumstances that you just described, that you envisioned would trigger the provision in Section 8.2?

A    Yes.

Q    And, sir, let's actually focus on that pause language.  So we've already taken a look at the introductory statement of what might trigger Section 8.2, and do you see where it says,

Szabo - Direct / By Mr. McRae                    **52**

the -- in other words, in the event of any of these proceeding things occurring, given that this is disjunctive with the use of the word or, in order to link these various things, it says the obligations of the City as set forth in Sections 3, 4, and 5 of this agreement shall be paused, and then it says and the parties agree to meet and confer on any necessary and appropriate amendments to those obligations.

Let's focus on this pause language.  Now when you negotiated Section 8.2, did you understand that it meant that the City's declaration of emergency, let's say, would not take effect unless the Alliance agreed with the invocation of the emergency?

A     No.

Q     And did you understand when you negotiated Section 8.2 that the City's declaration of effect -- of emergency, excuse me, would not take effect unless the Court agreed with the declaration?

A     No.

Q     And when you saw the word and you negotiated the word shall be paused, did you understand that there had to be any further steps that had to take place for the obligations in Section, 3, 4, and 5 to be paused other than one of the events described in Section 8.2 happening?

A     No.

Q     And was it your understanding that anyone could veto the

Szabo - Direct / By Mr. McRae                    **53**

City's declaration of emergency under Section 8.2?

A    No, not outside of the City Council.

Q    And in looking at the meet-and-confer language in Section 8.2, has the City endeavored to have meet-and-confer discussions with representatives of the Alliance regarding Section 8.2?

A    We have.

Q    What is your understanding of the results of those efforts?

A    There were no results of those efforts.  There was not an acknowledgement that there should be either a pause or any necessary appropriate amendments to the obligations.

Q    And when you say not an acknowledge, you mean by representatives of the Alliance?

A    Yes.

         **MR. MCRAE:**  Your Honor, I'm going to be moving to a different section now.  We've been going for an hour-and-a-half --

         **THE COURT:**  Would you like a recess?

         **MR. MCRAE:**  I would, Your Honor.

         **THE COURT:**  What are your time constraints today?  I started to resume at 7:30, but I could see counsel on both sides were a little concerned with my 7:30 call, so it's 8 o'clock.

//

What do you have today?  In other words --

THE WITNESS:  I'm available as long as you need me.

THE COURT:  Today?  Okay.  That lets counsel know. All right.  Counsel, 20 minutes then.  Thank you.  Sir, you may step down.

UNIDENTIFIED SPEAKER:  Ten?

THE WITNESS:  Okay.  Thank you.

MR. MCRAE:  I think he said 20.

UNIDENTIFIED SPEAKER:  Okay.  Thank you, Your Honor.

**(Recessed at 9:33 a.m.; reconvened at 10:04 a.m.)**

THE COURT:  All right.  Thank you.  Mr. Szabo, if you'd retake the stand, please.

Counsel, if all of you folks would be seated for just a second.

I want you to understand the purpose once again of the civil contempt proceeding and that's to determine if the City has complied with the Court's order, not to punish you. Do you understand that?  Do you understand that?

THE WITNESS:  I do, yes.

THE COURT:  Three years have elapsed without a monitor in place.  That is a key provision because not only compliance I think we would all hope that we put systems in place that far transcend the settlement agreement, that you can make good decisions about.

I've heard for the first time today representations

Szabo - Court Inquiry                                    **55**

by you concerning possibly a path forward.  I've asked what those timeframes are because in the past I've heard many representations and I need timeframes.

Is the City with a passage of three years without a monitor in place willing to work with the Court and voluntarily extend jurisdiction?  In other words, we have a five year settlement agreement and over three years have elapsed without a monitor being in place.  My question is very simple.

**THE WITNESS:**  To voluntarily --

**MR. MCRAE:**  Your Honor, I'm sorry.  Your Honor, just for --

**THE COURT:**  I'm sorry, I apologize.  This time I really would appreciate not being cut off.

**MR. MCRAE:**  I didn't cut you off --

**THE COURT:**  Thank you very much.

**MR. MCRAE:**  -- I just wanted to lodge an objection to the question that it calls for a legal question and it might involve attorney/client privilege and deliberative process privilege.

**THE COURT:**  That's overruled.  I'm asking you, I don't have the mayor here, I haven't ordered here in.  I've requested her presence, but you represent the City apparently. Are you willing to work with the Court with these new representations and voluntarily consent to extended jurisdiction?

**EXCEPTIONAL REPORTING SERVICES, INC**

THE WITNESS:  Your Honor, I would be willing to commit -- well, I believe and I am confident that the City will comply with the requirements of the settlement agreement.

THE COURT:  I'm sorry, that's not my question.

THE WITNESS:  I understand, Judge.  I understand.

THE COURT:  All right.

THE WITNESS:  I would be willing to commit to working with the Court and the plaintiffs on updated timelines for reporting, that would be satisfactory to the Court.

THE COURT:  It was more than just reporting, there were new representations made today that might bring the City into at least compliance or further compliance.  And it was eluded during the opening statement when you weren't here that progress had been made in the November meeting.  But I haven't heard what that progress was and each of the parties got into finger pointing about what that progress would be and how the other party hadn't followed through.

I'm trying to avoid bringing the mayor in, but --

THE WITNESS:  Right.

THE COURT:  -- you're here and the question is very simple.  The idea is to get the City into compliance, you have to work with the City for the benefit of the public and actually not only comply, but hopefully I would think from your part put systems in place that we all want.

So when the settlement agreement runs its course, the

elected officials have something that they can really work with, for the good of all of us, okay, the citizens.  And are you willing to extend the Court's jurisdiction voluntarily?

**THE WITNESS:**  Judge, I agree that there was progress made at the November meeting and I would -- and before making any commitment on the jurisdiction, I would like to be able to continue that progress and get to a place, because as I said, Judge, I do believe, I believe that we've made -- I know we've made great progress towards meeting the requirements of the settlement.  The City is organized around meeting those requirements on the timeline dictated by the settlement and the issues as it relates to the 7.1 reporting, I think are resolvable.

It is my view that we have been reporting as we understood.

**THE COURT:**  I don't mean to interrupt you --

**THE WITNESS:**  Yeah.

**THE COURT:**  -- my question was very simple.

**THE WITNESS:**  Yes.

**THE COURT:**  I mean it's very simple.  Is the City willing to extend jurisdiction because, Matt, we haven't had in place this monitor for over three years.

**MR. MCRAE:**  I renew my objection.

**THE COURT:**  Thank you very much.  It's overruled, counsel.

Szabo - Court Inquiry                                    **58**

MR. MCRAE:  Can I add to my objection?

THE COURT:  Counsel, please, you've interrupted and I've been very courteous.  I'm going to let you make your objection, but this has gone on repeatedly.  You've put him on the stand, my question is simple, make your objection, please, I want to be courteous to you.

MR. MCRAE:  This witness does not have the legal authority or capacity to agree to a modification of the settlement agreement.

THE COURT:  Thank you.  Then let him answer that, counsel.  That's a little leading, but if that's your position, state it and tell me what we have to do because obviously as a courtesy I haven't ordered the Mayor here.  I haven't ordered the president of the council in, but they put you on the stand on behalf of the City.  So where do I go for that answer, how do we get that answer, and I'm very respectful of your position that there are things now that can be done to bring this hopefully into compliance or much better compliance, in other words, try to work together.  But three years have gone by, no monitor in place.

THE WITNESS:  Judge, I would like the opportunity to continue to work with the Court and the plaintiffs to ensure that our reporting requirements are satisfactory or satisfactorily met and before that opportunity would -- is afforded, I couldn't agree to -- I couldn't agree to

recommending any extension of the terms of the settlement.

**THE COURT:** So the answer simply is, there's no agreement voluntarily by the City for any extension of the Court's jurisdiction after three -- over three years of a monitor not being in place.

**MR. MCRAE:** I renew all of my objections.

**THE COURT:** Thank you, counsel, overruled.

**THE WITNESS:** We have attempted, Judge, to have the monitor in place. There hasn't been -- you know, there were multiple reasons why the monitor wasn't in place, principally we had a discussion well over a year and a half ago that we were prepared to move forward, but that's not on the City.

We were prepared to move forward, we had proposed a monitor.

**THE COURT:** Matt, can we get away with the fault finding on both parties' parts, you know, the finger pointing that's gone back and forth. That doesn't help the citizens of Los Angeles. The question is, this was a fundamental part of this settlement, this monitor. All of the parties agreed to it, you agreed to the terminology, so did the other party, each will claim it doesn't need definition, but it's very clear.

My simple question is, with these representations that you've made today, this is the first time I've heard, you know, representations about going forward in some of these areas that are in disagreement. I mean I'm hopeful, I'd like

Szabo - Court Inquiry                                              **60**

to be hopeful.  But I don't see after the passage of over three and a half years how this is meaningful when the promise is being made with no timeline and the position could be, Judge, we've made these statements, but I can't tell you how long it will take and the agreement runs without the monitor ever being implemented.

I mean, reverse our positions for a moment.  I think you might find that to be unreasonable.  And to carry this out, if we're going to work together in good faith, then I'm wondering why there isn't a voluntary extension of some time, to implement the statement you made today.

**THE WITNESS:**  Your Honor, I'm -- as you've stated and I did, I see on a go forward basis, I think we could certainly come to an understanding of what would be required to be reported.  And I'm also very comfortable in the absence of a monitor whether we move forward with a monitor for the remaining two years or not, I'm very comfortable working with the Special Master who has been very involved in evaluating the City's progress and I think with her involvement and working with the plaintiffs, I feel confident that we can come to an understanding of what is required to be reported to the Court under the settlement.

And I am very confident that the City will meet the primary obligations of the settlement in establishing the required number of units.  That does not require, we do not

need an extension in time or jurisdiction for that, we will meet those obligations.

THE COURT:  The 8.2 provisions that were raised occurred in 2025.  This settlement came into effect long before these extraordinary events in our City's history.  You have to understand I'm looking very closely at what occurred in 2023 and 2024 as 8.2 is put before the Court which I'm well aware of.

All right.  Counsel, your cross-examination please.

MR. MCRAE:  He's our witness, Your Honor, this is continue direct examination.

THE COURT:  Oh, I'm sorry, you were moving on to another area, I apologize.

MR. MCRAE:  Thank you, Your Honor.  And for the record, Your Honor, I said this when we were talking about another topic the last time we were here with Mr. Szabo and I'm moving to another topic now involving the cooperation with Mr. Gary.  Our understanding is that obviously that appointment of Mr. Gary has been stayed --

THE COURT:  I'm sorry, you're dropping your voice.

MR. MCRAE:  Our understanding is that the Ninth Circuit has stayed this appointment of monitor Gary, but to the extent that the Court considers this issue of cooperation with Mr. Gary to be a live issue --

THE COURT:  No, it's your statement, counsel, and I

don't mean to interrupt you, it's not Mr. Gary, it's the overall issue regarding a monitor.  And the Ninth Circuit may choose, decide Mr. Gary's appropriate or there may be another monitor, but eventually we're going to face this issue and I'm very concerned that the settlement agreement is running without compliance concerning a monitor.  And as each party points the finger at each other, I don't care to get into that discussion.

The end result is we're past three and a half years with one of the most meaningful things our citizens could have and that is a system in place and simple compliance.  Now, questions?

**MR. MCRAE:**  Yes.  And, Your Honor, I wasn't revisiting what the Court was discussing in its colloquy with Mr. Szabo, I was actually making a separate point.  Which is as I understood and maybe the Court can disabuse me, the scope of this hearing I believe that one of the features that the Court mentioned in its clarifying order before we commenced this proceeding was that cooperation with monitor Gary was one of the issues under the consideration.

Now if I were mistaken on that point, then -- and if the parties could stipulate to this with the Court's permission, if that issue of cooperation with Mr. Gary as opposed to the colloquy the Court had with Mr. Szabo about a monitor notionally or conceptually, if the issue of cooperation with Mr. Gary is off the table, then I don't need to proceed

with these questions.  I'm asking for clarification, Your

Honor.  I just want to make sure that I make the record.

THE COURT:  I have no understanding of what you just said, counsel, I apologize.

MR. MCRAE:  Okay.

THE COURT:  It's nonsensical to me.

MR. MCRAE:  Okay.  Well, I apologize for that, Your Honor.

THE COURT:  This is a general question, try to avoid bringing the mayor in or anybody else as a courtesy about these statements that you've eluded to or your colleague did in the opening statement to this Court.  And that was, Judge, in November we made tremendous progress.  The other side points back and says, no, we didn't.

Today in good faith I'm hearing for the first time and that's a positive, this is good, that there's certain things that the City is willing to do to come into compliance. I'm trying to work with you in that regard.  So it's not to punish you, it's that if we can get this into compliance, compliance means no sense if there's no time left.

If we have months left and you can't get me a time frame right now, and I'm not disrespectful of that, I understand you may need to check with other people.  It's the holiday season, for goodness sakes.  I want to give you every opportunity to do that.  But if there's a hope of going forward

with compliance, it's not to punish you.  It's to get compliance with the Court's order or in good faith get as close as we can.

And if we can't work together on that, then I don't see without some extension how we have enough time to have anything meaningful other than a new representation today for the first time.  So I'm not chiding you, thank you, but that's up to you and apparently if you need to talk to the Mayor, more than happy to.

If council says you may not have the authority, council president, should I bring them into court?  In other words, your counsel has said, Judge, Mr. Szabo doesn't have any authority.  Should I bring them into court, Mr. Szabo?

**THE WITNESS:**  I don't believe that's necessary.

**THE COURT:**  Do you have the authority?

**THE WITNESS:**  I can speak for the Mayor and the Council on this matter.

**THE COURT:**  But you don't have the authority without speaking to the Mayor or Council; is that correct, to a voluntary extension?

**MR. MCRAE:**  I'm going to object again that this calls for a legal conclusion --

**THE COURT:**  Thank you, overruled.

**MR. MCRAE:**  -- and perhaps privilege, attorney/client privilege, the deliberative process, lack of foundation.

**THE COURT:**  Thank you, overruled.

**THE WITNESS:**  The position of the City, Your Honor, is we believe that we're making progress towards compliance and we would like to work with the Court and the plaintiffs and the special master on resolving the issues that have been raised at this hearing.

We believe we can get a resolution, including, Your Honor, if it is to discuss and -- discuss what the plaintiffs, an alternative monitor that we can get into place as soon as possible, I'm -- we can -- I'm very open to having that conversation on behalf of the City.

**THE COURT:**  You know my first choice originally, and I'd hoped that the parties would agree, and I don't mean a choice, but hope was that it would be A&M because I thought they would save a lot of money.

They came back with a contra-report concerning the City.  But that report by A&M simply mirrored the HUD reports, Galperin's report, et cetera, if you go through all of those reports, they almost said the same thing.  You and I can disagree about that, but I've spent more time with these reports than I can possibly imagine as a jurist.

Hopefully that was to save some money for the City without reduplicating a new entity.  Number two, I was deeply concerned at the time with the argument Shayla Myers raised with different entities becoming the monitor, because I didn't

need another A&M report, I needed a specialist, a data monitor.

I need that outside the purview of the City.  I don't want people who are doing business, have done business or will do business in the centra with the City.

I'm going to leave this with the Circuit in terms of the data monitor.  I've talked to Judge Birotte and he's actually available and willing to narrow the issues or attempt to narrow the issues in light of the representations previously made by other co-counsel for the City about these alleged or the alleged progress made in November, but the parties then were in conflict in my court about that progress.

He's available, but it has to be with the principals. You can have representation, but I has to be at the Mayor's level, the President of the Council's level so I'm not looking in the future to some attorney signing off.  And you know I've insisted upon that in the past.  I didn't think progress could be made unless it's the top level of the City government along with the Court.

THE COURT:  All right.  Counsel, your questions please.

MR. MCRAE:  Your Honor, may I have a chance to confer with my colleagues?

THE COURT:  Certainly.

MR. MCRAE:  Thank you.  And perhaps may I also invite counsel for the intervenors and counsel for the plaintiffs in

**67**

our discussion?

THE COURT: Sure. Do you want me to step down for a moment so you have that time?

MR. MCRAE: Sorry, Your Honor?

THE COURT: Do you want me to step down so you have a little bit of time?

MR. MCRAE: Oh, you don't have to step down, Your Honor, we're happy to go in the back, we don't want to trouble the Court.

THE COURT: Why don't you summon me when you're done with your conversation.

MR. MCRAE: Thank you, Your Honor.

THE COURT: Mr. Szabo, why don't you step down for just a moment.

THE WITNESS: Okay. Thank you.

(Recessed at 10:25 a.m.; reconvened at 10:43 a.m.)

THE COURT: We're back on the record. Thank you for your courtesy, if you'd be seated. And before we continue, both of you requested a resolution, both parties requested a resolution of the attorney fee or fees and that will issue shortly. The Court's been inundated but obviously this proceeding is entirely different than the encampment and attorney fees issues. So I will just notify you that this will issue very quickly.

All right. Counsel, your questions, please.

MR. MCRAE: Your Honor, I do have a notification for the Court about something if I may --

THE COURT: Please.

MR. MCRAE: -- based on our colloquy.

The parties, counsel for the Alliance, counsel for the intervenors, counsel for the City took the opportunity to speak over the break. The parties are amenable to meeting with Judge Birotte in order to facilitate discussions, in an effort to make progress on the reporting of metrics in Section 7.1.

The parties are also willing to have those discussions take place very soon, subject obviously to Judge Birotte's availability. As the Court accurately predicted, the last time we were here, some individuals have holiday plans --

THE COURT: Sure.

MR. MCRAE: -- and therefore --

THE COURT: Sure.

MR. MCRAE: -- it would have to be, if we have the inclusion of those counsel before Christmas. But the parties are willing to do that.

So I just wanted to pass that along to the Court. I'm ready to proceed and again, I'll be brief on this point. I am now going to go into my next set of questions with Mr. Szabo.

THE COURT: Well, just a moment --

MR. MCRAE: Yep.

**THE COURT:**  -- I want to make certain because there's been a back and forth between the parties, representations made by each party.  I want to turn first of all to Shayla Myers, you haven't been able to participate in many of these discussions.  As an intervenor, I'm not quite certain, you know, where that lies.  But I need you minimally available, depending upon Judge Birotte and if he wants to hear from the intervenors.  What's your schedule over the holidays?

**MS. MYERS:**  Your Honor, since -- for the past few months the intervenors have been included in the conversations.

**THE COURT:**  Okay.

**MS. MYERS:**  And so we -- it is our understanding we would participate based on those conversations.  I am available through the morning of the 23rd.  I'm not available after the 23rd, but then after the 27th.

**THE COURT:**  December 23rd and then after the 27th.

**MS. MYERS:**  Yes.

**THE COURT:**  The reason for that is, Judge Birotte is available for most of the holidays when I talked to him, but I'm not sure the specific days.  I'm going to be available and around.  Michelle Martinez will be available and around.

What's the schedule on behalf of the City?  Who's the primary negotiator in terms of -- and also, you know my strong feeling that attorneys don't control this, you can advise, but this has to come from the Mayor and the Council at that level,

**70**

because when I sign a document, I expect the same courtesy.

MR. MCRAE:  Your Honor, to respond to the Court's question, I think that we would have to confer --

THE COURT:  With their schedule?

MR. MCRAE:  Yes.

THE COURT:  That's fair enough.

MR. MCRAE:  And report as early as today if possible, so that this Court can move on from that point.

THE COURT:  Sure.  And if you could do that --

MR. MCRAE:  Yes.

THE COURT:  -- and I know it's difficult, but I would simply remain in session because I'd like to go to Judge Birotte then and be that intermediary, so that we're not coming back again to simply sort out a date.

MR. MCRAE:  And, Your Honor, while we're proceeding here I'll have my colleagues confer in real time, so we can dual track this --

THE COURT:  Okay.

MR. MCRAE:  -- and hopefully get an answer very soon.

THE COURT:  Although I believe that the principals should participate, Mr. Szabo.  I think they're going to need your wisdom also.  What's your schedule over the holidays?

THE WITNESS:  I can be available through the morning of the 24th.

THE COURT:  Okay.  And after that, just in case, I

don't know Judge Birotte's schedule.

THE WITNESS:  After that it will be -- after that I am out of town until the 30th.

THE COURT:  Until the 30th?

THE WITNESS:  Yes.

THE COURT:  Okay.  Thank you.  What's the availability, Ms. Mitchell or Mr. Umhofer.

MS. MITCHELL:  So we are available -- when are you leaving town?  So Mr. Umhofer leaves on December 25, leaves the country.

THE COURT:  I'm sorry, use that microphone, I apologize.

MS. MITCHELL:  Sure.  Matt -- Mr. Umhofer leaves on December 25th and returns January 4th.  I --

THE COURT:  January 26th to the 4th, that's --

MS. MITCHELL:  Yes, he's out of the country.  I am out of the country December 29th to January 9th.  I can be available -- both of us can be available via Teams, Zoom kind of thing, but it's not going to be in person, we're unfortunately both out of the country.

THE COURT:  I need you to meet with each other and come up as a courtesy to all of you and your families frankly with some agreeable dates that I can present to Judge Birotte and we wouldn't be back in session until January 12th anyway.

So, you know, just as a courtesy to all of you folks

over the holidays and your families, so you have all the resources available and you're not in the position of making a representation without consulting with the Mayor and the President of the Council.

If you can give me the availability of the Mayor and the Council President, that would be helpful and I will remain in session today and hopefully get that information. And if you can't get it to me, tell me, and I can reconvene.

So let's continue.

**MR. MCRAE:** Thank you, Your Honor. And again for the record, we're now going to be proceeding into a topic regarding cooperation with Mr. Gary specifically, without waiving the City's objections to the inclusion of that topic in this hearing for reasons including, but not limited to the stay by the Ninth Circuit.

**DIRECT EXAMINATION (CONTINUED)**

**BY MR. MCRAE:**

Q   Mr. Szabo, I'd like to switch gears now to discuss a third party monitor. You're aware that on or around October the 14th of this year, Daniel Gary was appointed by this Court to serve as the monitor under the Alliance settlement agreement.

A   Yes.

Q   And in your role as CAO for the City of Los Angeles did Mr. Gary reach out to you to request information?

**THE COURT:** I'm sorry, would you -- I couldn't hear

Szabo - Direct / By Mr. McRae                    **73**

you.

Q    In your role as CAO, did Mr. Gary reach out to you to request information?

A    He did, yes.

Q    And did Mr. Gary reach out and request to speak with you?

A    He did, yes.

Q    Let me show you Exhibit 511 and we're on page 1 of page 511.  Do you have that in front of you, sir?

A    I do, yes.

Q    Is Exhibit 511 a true and correct copy of the October 18th, 2025 e-mail you received at 3:12 a.m.?

A    It appears to be, yes.

Q    Okay.  And this is from Mr. Gary, right?

A    Correct.

Q    And this would be on a Saturday, was it, October 18th, do you see the date that says S-A-T, SAT?

A    Yes, Saturday.

Q    And was this e-mail, which is Exhibit 511 on a Saturday at 3:12 a.m. the first time Mr. Gary requested to speak to you?

A    Yes, that's correct.

Q    And here was Mr. Gary asking for your availability to speak on October the 23rd, which would be a few days after October the 18th?

A    Yes, that's correct.

Q    And, sir, were you able to meet with Mr. Gary on October

Szabo - Direct / By Mr. McRae                    **74**

the 23rd as he requested?

A     I was not.

Q     And why is that, sir?

A     I believe I was -- I was not available.  I may have been
out of the country at that time.  I was out of the country on
that date, I believe.  I would need to check, but I know I
wasn't available that day.

Q     And did you eventually schedule an interview with
Mr. Gary?

A     Yes.  Yes, I did.

Q     Now, I'd like you to take a look at Exhibit 514 and we're
going to have Exhibit 514 in front of you.  This is an October
22nd, 2025 e-mail sent at 6:15 p.m.  And do you see at the --
if we're looking at pages 5 and 6 of Exhibit 514, do you see at
the bottom of this e-mail that counsel for the City writes to
Mr. Gary to say that you would make yourself available on
October the 31st of this year?

A     Yes.

Q     And, sir, was it a true statement that you were out of the
country at the time that the October 18th e-mail which was
Exhibit 511 had been sent and that you would return on October
the 31st?

A     I don't believe I was out on the country on the 18th, but
I was the week of -- the week prior to -- the week of -- the
week ending on the 31st.  I was out that entire week and

weekend.

Q    I see.  Thank you for that correction.

The e-mail states, finally as for an interview with Mr. Szabo he'll be, a contraction for he will be, not was, out of the country next week and gets back on Friday, October 31st. Was that correct at the time, sir?

A    That's correct.

Q    Okay.  Thank you.  Now, did you have an interview with Mr. Gary on November the 3rd, 2025?

A    Yes, I did.

Q    And did you -- was this an in person meeting or did you dial into the meeting?

A    It was a Zoom or Teams meeting, I can't remember which.  I think it was a Zoom.

Q    And were you willing to answer Mr. Gary's questions that were posed to you in that meeting?

A    I was.

Q    And did Mr. Gary proceed with that interview on November 3rd, 2025?

A    We had a short conversation and he recommended that we reschedule to another time.

Q    Were you driving to an appointment at that time?

A    I was.  I had an ophthalmology appointment that I had to attend, I could not move and so I was on my way to that appointment, but I made it clear to him that I did not want to

move the meeting, so I could take the meeting on my way to the appointment.

Q    And did you schedule another time to speak with Mr. Gary?

A    Yes.  Yes, we did.

Q    Now, take a look, sir, if you will at Exhibit 519.  Is Exhibit 519 a true and correct copy of an e-mail you received on November 3rd, 2025 at 2 --

           **MR. MCRAE:**  If we go to page 2 actually, thank you.

Q    Is this an e-mail that you received on November 3rd, 2025 at 2:54 p.m. on the day of your initially scheduled interview with Mr. Gary?

A    Yes, it appears to be.

Q    Now, in this e-mail on page 2 do you see where an individual by the name of Sonya Morgan asks when you will be able to speak again?

A    Yes.

Q    And is it your understanding that Ms. Morgan is an employee of Mr. Gary's or a colleague of Mr. Gary's?

A    Yes, in some form, yes.

Q    And do you see in reading this Exhibit 519 that counsel for the City responds on the first page of Exhibit 519 that same day, when Ms. Morgan makes this request and confirms that you would be able to speak with Mr. Gary later that week?

A    Yes.

Q    Okay.  And, sir, did your interview with Mr. Gary go

Szabo - Direct / By Mr. McRae                    **77**

forward as planned after Exhibit 519 was sent?

A     Yes, it did.

Q     Did that interview take place on November the 7th, 2025?

A     Yes, I believe it did.

Q     How long did that interview that you had with Mr. Gary last on November 7th, 2025?

A     I believe it was just short of an hour.

Q     Okay.  And do you have a recollection at least topically of what matters or issues were discussed in that interview that you had with Mr. Gary on November 7th, 2025?

A     Generally, yes, I have a recollection.

Q     Tell us to the best of your recollection the things that you discussed with Mr. Gary then.

A     We generally discussed the process for preparing the reports and specifically what systems that the City relies on to collect the data that -- collected the data that we report in the quarterly reports.

It was a more general conversation.  The -- Mr. Gary had previously submitted a number of questions that my office responded to, so he had many of the answers that he was seeking and we were having a discussion about data systems and who controlled those data systems, et cetera.

Q     Did your discussion with Mr. Gary on that date also include what other city departments are involved in the process of preparing the data that goes into the quarterly reports?

A      I believe so, yes.

Q      And did you tell Mr. Gary anything about the systems your office relies on to prepare the quarterly reports?

A      Yes, we discussed the systems that we rely on and the entities that own those systems.

Q      What were some of the entities that you described?

A      Principally LAHSA, the Housing Department and the Housing Authority, HACLA.

Q      And did you discuss with Mr. Gary what your team and the CAO office does with the data that it receives from these various contributors after your office receives it?

A      Yes, in general terms.

Q      And what did you convey?

A      I'm sorry?

Q      And what did you convey to Mr. Gary along those lines?

A      I conveyed the process, the process that we use to collect and receive the information from the other entities and verify that information.

Q      And during the interview that took place on November the 7th, 2025 did Mr. Gary ask you any questions about the City Attorney's involvement in the preparation of quarterly reports?

A      Yes.  Yes, he did.

Q      And do you recall what he asked you?

A      I believe he asked what role the City Attorney has, yes, what role the City Attorney has in preparing the reports and so

I clarified the difference between the document which is submitted to the Court, which is prepared by the City Attorney versus the attachments and the information which is collected and that report is compiled by the CAO's office.

Q    Did counsel for the City object to Mr. Gary's question when he posed it about the City Attorney's role in the preparation of the quarterly reports?

A    Yes, I believe that happened.

Q    And do you recall what that objection was on the grounds of attorney/client privilege?

A    I believe it was, yes.

Q    Did Mr. Gary drop the inquiry and move on at that point?

A    I believe so.  I believe so.  I don't recall dwelling on that at great length.

Q    Sir, did you schedule a third interview with Mr. Gary?

A    I did.

Q    Let's take a look at Exhibit 525.  And we're going to look at page 1.  And, sir, do you see, is this a true and correct copy of a November 6th, 2025 e-mail sent to, among others, you, where you were copied on this e-mail?

A    Yes.

Q    And do you see where counsel for the City, retained counsel for the City says in the paragraph that we're looking at here, under the name Sonya, for the follow up call next week, Mr. Szabo is available Thursday morning, 11/13, from 9

a.m. to 11 a.m. and again 1 p.m. to 2:30 p.m.  Do you see that?

A    Yes.

Q    So is this the case then that on November the 6th, which was the day before your second interview, counsel for the City had already provided your availability for a third interview?

A    That's correct.

Q    And did this third interview go forward as scheduled?

A    It did not.

Q    Now, let's take a look at Exhibit 539, page 1.  Is this a true and correct copy of a November 12th, 2025 e-mail sent to you at 5:08 p.m. by Sonya Morgan?

A    Yes, it appears to be.

Q    And, sir, could you please take a look at the paragraph under Dear All, does it say, following today's hearing we are hopeful that we can proceed without having to interview Mr. Szabo tomorrow, and as such, we will cancel the scheduled meeting tomorrow.  However, if a follow up interview becomes necessary, we will reach out again.  Do you see that?

A    Yes, I do.

Q    So with respect to this next interview, it was Mr. Gary's office that canceled the interview.

A    Yes.

Q    And after canceling this interview, did Mr. Gary make any efforts to reschedule any other interviews with you?

A    No, he did not.

Szabo - Direct / By Mr. McRae                                **81**

Q    And did Mr. Gary request to speak with anyone else in your office at any time?

A    Yes, he did.

Q    So let's take a look at Exhibit 516.  Sir, is Exhibit 516 a true and correct copy of an October 31st, 2025 e-mail sent to you at 3:41 p.m.?

A    It appears to be, yes.

Q    Okay.  And why don't we look at page 5 of Exhibit 516.  Do you see that this is an e-mail --

         **MR. MCRAE:**  And why don't we move up one page before this so that we can capture the sender, Mr. Mejia.

Q    Do you see that, Kenneth Mejia as the sender --

A    Yes.

Q    -- where it says from?

A    Yes.

Q    Bottom of the page.  And then if we go to the next page on page 5 we'll see the body of the e-mail dated October 28th, 2025.  This is Exhibit 516 that says, Ed, that would be Edwin Gipson to whom that's addressed; is that right, sir?

A    That's correct.

Q    Edwin Gipson is someone who works in your office; is that true, sir?

A    That is true.

Q    It says, Ed, the Alliance monitor has reached out to request a meeting with you to discuss Alliance related matters.

In accordance with my role, I am writing to link you with monitor Gary.  Do you see that?

A     Yes, I do.

Q     There's another paragraph but I'm reading the first paragraph.  Do you recall if there was any request by counsel for the City that Mr. Gary reach out in the first instance to counsel for the City for interview requests and data requests, rather than just contacting City employees directly?

A     Yes, that request was made.

Q     And could you take a look at Exhibit 516 on page 4, the upper portion of page 4?  You can see is this e-mail by counsel for the City containing that request that if Mr. Gary would like to speak with or get information from any City official or employee other than Mr. Mejia in Mr. Gary's capacity as a monitor, that the request should be made through the City's counsel and that then it could be coordinated.  I'm synthesizing, that's not a direct quote, but do you see that?

A     Yes, I do.

Q     And did Mr. Gary eventually direct a request to speak with Mr. Gipson to counsel for the City?

A     I believe he did, yes.

Q     Sir, did you have any objection to Mr. Gary speaking with Mr. Gipson, provided the request was directed through counsel for the City?

A     No objection.

Q    In addition to scheduling three interviews with Mr. Gary, speaking with him for approximately an hour, and permitting others in your office to be interviewed, did you do anything else to provide Mr. Gary with data regarding the City's quarterly reports?

A    Certainly.  We provided, as I said, prior to any of the interviews he requested a large amount of information and that information was provided to Mr. Gary in three tranches.  It was -- there were a number of questions he had on a number of our entries in our quarterly reports.  It was, as I recall, something in the range of 600 questions.  And we provided as much information as we could get.  I want to say it was the first week of November and then we followed up with additional information the week following and then we followed up with additional information the week following that.  So in three --

THE COURT:  Just a moment.

THE WITNESS:  Yes.

THE COURT:  You said 600 questions?

THE WITNESS:  Yes.  It was --

THE COURT:  Separate questions?

THE WITNESS:  They were -- I believe there were three questions that he had per line in our report, there were about 200 lines that he had.

THE COURT:  All right.  Counsel, I'm aware of this document through the Special Master, I'll disclose that.  These

Szabo - Direct / By Mr. McRae                                **84**

were repetitive questions, these aren't separate 600 questions.

These are questions to numerous witnesses that are the same

repetitive three to six questions; is that correct?

        **THE WITNESS:**  That's correct.  The same question per

line.

        **THE COURT:**  That's correct, all right.  I don't want

the record to reflect that these were 600 separate questions,

these are the same repetitive questions to numerous witnesses,

counsel.

        **MR. MCRAE:**  Well, Your Honor, I'm not going to agree

with that.  I don't think that's accurate.

        **THE COURT:**  Yeah, it is, counsel, because in the

document you filed with the Circuit that I read, you portrayed

this as 600 separate questions.  These are repetitive

questions.  Go back and look.  They're the same questions to

numerous witnesses.

        **MR. MCRAE:**  I'm actually going to ask the witness

about the document.  We can look at it together, so let me do

that.  Why don't we go to Exhibit 511.

**BY MR. MCRAE:**

Q    Mr. Szabo, sir, do you see here this is a -- the same

document we looked at earlier, 3:12 a.m., Saturday, October

18th, 2025 e-mail.  I want to draw your attention to the second

paragraph that's highlighted, that says, accordingly I have

attached a spreadsheet containing specific questions that

Szabo - Direct / By Mr. McRae                          **85**

require responses concerning the data contained in that report.

Do you see that?

A    I do.

Q    And why don't we take a look at page 3 of Exhibit 511, if

we can.  When we enhance this so that at least I can read it.

Now, sir, let's focus on the far right-hand corner that

says monitor Gary's questions.  Do you see that, sir?

A    I do, yes.

Q    Do you see that in the first line -- that's imprecise.  In

the first row, the three questions read what they read, which

the record will speak for itself what those questions are.

Now, is it your understanding that with respect to

different locations that are contained in this document these

three questions are repeated with respect to the various

locations that are described?

A    Yes, that's correct.

Q    And I believe you in your exchange with the Court made the

point that there were a set number of questions three in

number, were you saying that those three questions were

repeated with respect to the different locations reflected in

the document?

A    Yes, they were.  The questions were repeated per entry.

Q    Now, let me ask you a different question.  Was it the case

that in responding to these three questions, with respect to

however many locations there were, I believe you said 600, I'm

Szabo - Direct / By Mr. McRae                    **86**

just doing the math, let's say it's 200, were you able to

simply give the same answers to the three questions in one

location with respect to the other 199 or so locations?

A     No.

Q     Okay.  So is the idea that even if the questions were

repetitive, you had to answer the repetitive questions

commensurate with the number of questions there were about

different locations?

A     Yes.

Q     Now, sir, when you received this e-mail with this

attachment --

          **MR. MCRAE:**  Can we take down the highlighting here?

Thank you, I appreciate that.

Q     Let's just review these columns, so we can socialize this.

The far left column has the word number.  What do you

understand that to be conveying, number, what type of number?

A     I believe that that is the number of the entry.

Q     Okay.  Council District, is that self-evident, sir, is

that the Council District where this particular data point

resides?

A     Correct.

Q     Intervention type, what does intervention type mean?

A     Intervention type refers to the type of housing, whether

it's permanent supportive housing or a various form of interim

housing, tiny home villages, leased, motel, et cetera, we

Szabo - Direct / By Mr. McRae                    **87**

indicate that on our reports.

Q    Is that what PSH stands for, sir, permanent supportive housing?

A    That's correct.

Q    Project type, what does that convey?

A    Project type refers to the program if there's a program associated with establishing that housing type, that type of housing.  In this case, for these entries, all of the permanent supportive housing that is established for entries 1 through 6 was established through the Proposition HHH Bond Program.

Not all of our permanent supportive housing is established through that bond program.  We have another pipeline as well, so that just indicates where the principal funding came from.

Q    And then you have units -- sorry, address location, we can move away from that, units, beds, what does that convey?

A    That is the number of units or beds that are open and occupiable per -- as of the date of this report.  I'm assuming he took this from our most recent quarterly report.

Q    And then you have the open and occupiable date that follows and then lastly PEH served total by the time that you get to the various questions; is that right, sir?

A    Correct.

Q    The three questions --

A    Correct.

Q    -- that are repeated.

**EXCEPTIONAL REPORTING SERVICES, INC**

Now -- so when you received this set of questions from Mr. Gary, did you already have at your fingertips the answers to these questions applied across these various properties already compiled in a form that you could provide a response?

A    No, certainly not compiled.

Q    Why not?

A    Well, because I -- there was -- I had no way of anticipating the questions that Mr. Gary was planning to ask. We have much of the information and we had to compile the information in order to present it to him in the form that he had requested.

Q    Did you think it was going to take time to fully gather the responses to these requests in Exhibit 511?

A    Yes, absolutely yes.

Q    And why is that?

A    People have to do the work.  He has asked, as was stated, although he's asking the same question per entry per site, the answers are in many cases different and so there wasn't a situation where we were -- where we could just copy and paste the same answers to all the questions.

Each individual site would have, not necessarily a unique funding source, but each site could have a different funding source and we needed to pull that information and verify that information, the supporting documentation we would need to verify what supporting documentation that we had to support the

Szabo - Direct / By Mr. McRae    **89**

existence of those beds.  He's asked for contracts or invoices or permits or loan agreements, et cetera.  So we would need to verify that.  And the same thing with the city systems.

So each -- for each site we needed to go in and find the information.  We had most of the information, but it just took dozens of staff hours to compile this information.

Q    Did you delay at any point in providing responses to these requests in Exhibit 511?

A    No, to the contrary we -- staff in our office essentially sidelined the rest of their work so they could focus on providing answers to these questions timely.

Q    Did you make any attempt to prevent Mr. Gary from getting responses to any of these requests in Exhibit 511?

A    No.

Q    How soon after receiving this request, which is Exhibit 511 seeking responses to these requests, did you and your office begin to compile responsive information?

A    As soon as we received it.  As soon as I received -- well, when I received the e-mail.  I didn't read his first e-mail the morning that he sent it, I was asleep at the time, but I forwarded it -- I forwarded the request to counsel and I forwarded the request to my staff as well.

Q    Sir, do you have an estimate of how long it took your team to provide the information requested in Exhibit 511?

A    It took dozens of hours for sure, dozens of hours over a

Szabo - Direct / By Mr. McRae                    **90**

period of three weeks.  As I said, we provided the information in tranches and we wanted to provide information as soon as we could.  But it took dozens of hours and it's -- you know, we did -- we don't have additional staff for special data requests, it was the same staff that are responsible for managing everything else in our homelessness portfolio, all of the reporting requirements, everything related to Inside SAFE, all of that.

Q   Let's take a look at Exhibit 514, page 1.

And, sir, do you recognize this as a true and correct copy of an e-mail sent by counsel for the City on which you're copied to Mr. Gary dated October 27th, 2025?

A   Yes, it appears to be.

Q   So let's go into the body of the document, which is in the -- I want to go to the second paragraph.

      **MR. MCRAE:**  To pull that up, if we can highlight that or at least enlarge it.

Q   Do you see where it says, also as requested, we're providing the attached preliminary information in response to your various questions to the CAO's office.  Do you see that?

A   Yes.

Q   Do you also see the statement that, please understand that these initial responses were prepared by -- under a compressed schedule at your request and the City has not had sufficient time to fully evaluate these responses with all relevant

Szabo - Direct / By Mr. McRae                **91**

stakeholders for completeness and accuracy.  Do you see that?

A     Yes.

Q     And there's a reservation of rights to supplement this. Did you agree with those statements made here?

A     Yes.

Q     And why don't we turn to the attachment to this e-mail which is Exhibit 514.

        MR. MCRAE:  If we can flip a few pages here to get to that.

        THE COURT:  I'm sorry, counsel, would you raise your voice just a little.  I couldn't hear the question.

        MR. MCRAE:  Sorry.  Could we please proceed in Exhibit 514 to the attachment that is described as the preliminary information in response to Mr. Gary's various questions to the CAO's office.  Thank you.

**BY MR. MCRAE:**

Q     It's up on the screen, sir.  Or let me ask you, Mr. Szabo, is this attachment that we're seeing which is page 11 of Exhibit 514, is it your understanding that this is the attached preliminary information in response to various questions by Mr. Gary to the CAO's office?

A     Could we -- thank you.  I don't -- actually I don't know if it is.  I don't -- the answers are not providing.

        MR. MCRAE:  Yeah, let's keep moving.

        THE WITNESS:  Yeah, there we go.

**EXCEPTIONAL REPORTING SERVICES, INC**

**MR. MCRAE:** Let's enlarge this document.

Q    And can you, sir, now see that we have several columns and rows here.  Starting on the left we have system/data set and, sir, can you tell us what that conveys?

A    Yes, it identifies the data system that we rely on to provide that information.

Q    And then if you move to the right, the next column says City (LAHD, LAHSA, HACLA coordination).  What is that conveying, sir?

A    That's conveying the entity that owns the data system.

Q    And the next column, sir, says data purpose.  What is that conveying?

A    That is conveying the purpose of the system from which we are gathering the data.

Q    If we move to the next column, do you see key questions/ -- forward slash, clarifications.  What is that conveying, sir?

A    That is additional information that is -- that was requested by Mr. Gary.

Q    And the final column, what do you understand that to be?

A    That final column in the initial responses that we provided to the questions in the column just previous.

Q    Did Mr. Gary convey to you in writing or otherwise any surprise by the City's statement that these responses were preliminary in nature, due to the compressed schedule in which they had to provide them?

Szabo - Direct / By Mr. McRae                **93**

A     No.

Q     And did Mr. Gary when you -- when counsel for the City provided Exhibit 514 including the responses to Mr. Gary's questions, did Mr. Gary convey to you any accusations that the City was delaying his efforts to get information responsive to his requests?

A     No, he didn't.  He actually seemed very appreciative of our time.

Q     Did Mr. Gary say to you that he looked forward or did he convey to you that he looked forward to additional information that your office could provide?

A     Yes.

Q     Now, in addition to the efforts to cooperate with Mr. Gary that we've already discussed, can you tell us anything else that you and your office did to facilitate Mr. Gary's review of data underlying the quarterly reports?

A     In addition to providing answers to his questions, we also walked through with him what -- we tried to help him get a better understanding of what were the relevant systems.  He had -- for example, he did have a number of questions about systems that were not relevant or not used or are not used to provide the quarterly reports.  So we walked him through that and attempted to help him understand the true account of how the information is gathered, collected and verified.

Q     Sir, let me direct your attention to Exhibit 527.  Sir, in

Szabo - Direct / By Mr. McRae                                    **94**

looking at pages 2 and 3 of Exhibit 527, do you see at the

outset an e-mail from Ms. Sonya Morgan dated November 7th, 2025

wherein Ms. Morgan states, to amongst others, you, I am

reaching out on behalf of monitor Gary, based on the

discussions and materials reviewed to date, it appears that

there are 11 systems in use across the City and LAHSA that may

be related to the data in this matter.  Do you see that?

A     I do, yes.

          **MR. MCRAE:**  Would you go to the next portion of this

piece of correspondence from Ms. Morgan?

Q     And do you see that Ms. Morgan then purports to identify

the various systems to which she's referring.

A     Yes.

Q     Now, sir, one of the systems that Ms. Morgan is referring

to --

          **MR. MCRAE:**  If we can go to the next page of this e-

mail.  And by this e-mail, for the record, we're in Exhibit

527.  We started on page 2, we're moving to page 3.  So can we

enhance page 3?  Thank you.

Q     So one of the systems that Ms. Morgan identifies is, if

you look at No. 9 of the enumerated systems, City Financial

Systems (FMS, Work Day), CAO/controller/fiscal oversight and

payment systems.  Do you see that?

A     I do, yes.

Q     Sir, do you know what City Financial Systems is?

EXCEPTIONAL REPORTING SERVICES, INC

A    Well, I think City Financial Systems is describing FMS and Work Day.  FMS is our financial management system and Work Day is our personnel and position control system.

Q    Has your office ever used either FMS or Work Day to report metrics described in the Alliance settlement agreement in the quarterly reports?

A    No.

Q    Did you explain that to Mr. Gary?

A    Yes, we did.

Q    Did you have any concerns, sir, about turning over access to all of the City's financial and personnel management systems to Mr. Gary and his team?

A    Yes.

Q    What concerns?

A    Well, primarily it is our citywide personnel human resources position control system has zero relationship to the matters discussed and our compliance with the settlement.  That is a -- and we would have serious concerns about opening up personnel records to the then -- to Mr. Gary as it relates to this review.  We're talking about personal -- personnel records of every city employee, private information that would be highly concerning and we conveyed that.

FMS is our primary system for the -- all City finance, all transactions.  And again, that is -- there are select individuals that have access to that system and that also --

Szabo - Direct / By Mr. McRae                                **96**

it -- we would have serious reservations about handing over the -- handing over access to the City's primary financial management system.

Q    Sir, if we turn back to Exhibit 514, and let's go to page 28 of Exhibit 514, just to focus us here, this is the document containing the City's preliminary responses to Mr. Gary's questions.  Do you recall that?

A    Yes.

Q    And is this document looking at page 28, does this list information that you provided about certain data systems to Mr. Gary?

A    Yes, it does.

Q    And if we look at the second to last row on this chart, does the City have a response to Mr. Gary's request for information about City Financial Systems, FMS/Work Day?

A    Yes, we do.

Q    And what is the City's response?

A    Our response is that those systems are not used for our quarterly reports to the Court.

Q    Do you recall Mr. Gary saying anything in response to the City's response that City Financial Systems, FMS/Work Day are not used in preparing the quarterly reports?

A    I don't remember exactly what he said.  He may have asked. He may have had some follow up questions as to verify our response there.  I don't exactly recall.

Q    Sir, after the City in its responses, preliminary responses to Mr. Gary's request pointed out that the citywide financial and personnel management systems were not used for the quarterly reports, did Mr. Gary still send a request to your office seeking access to those systems on November 7th, 2025?

A    Yes, he did.

Q    So let's take a look at Exhibit 531.  Sir, is Exhibit 531 a correct copy of a series of e-mail exchanges dated November 12th to the 14th, 2025 on which you were copied?

A    Yes, it appears to be.

Q    And is this e-mail that we're looking at here, which is on page 1 a November 12th, 2025 e-mail from Sonya Morgan addressed to, it says counsel, but you're copied on it, it says, following today's hearing please provide our team with direct access to the following systems, it enumerates systems.  And I want to direct your attention to where it says, if the City is not able to provide direct access, please take all necessary steps to facilitate our immediate access.  Do you see that?

A    I do.

Q    So were all of these systems that are enumerated in this Exhibit 531 in this e-mail from Ms. Morgan that we're looking at, were all of these systems to which Ms. Morgan is requesting direct access, systems that are operated by the City?

A    No.

Szabo - Direct / By Mr. McRae                    **98**

Q    Did you explain that point to Ms. Morgan?

A    Yes.  Yes, we did.

Q    And again, drawing your attention to where it says, if the City could -- is not able to provide direct access, please take all necessary steps to facilitate our immediate access.

My question on that, sir, did anyone from the monitor's office ask you whether it was possible to facilitate access to systems that the City did not operate immediately?

A    No.  No, I don't believe they did.

Q    Was the City in a position to unilaterally grant immediate access to non-City controlled systems?

A    No.

Q    And looking at Exhibit 531, can you tell us as you look at the enumerated systems here some of the examples of systems that are not under the City's control, that are discussed in this Exhibit 531?

A    Yes.

Q    And what are they, sir?

A    The systems that are not under the City's control are RMS, HMIS, and LAHSA inventory management system.

Q    Okay.  And, sir, I'd like you to take a look at, again staying within this e-mail on pages 1 and 2, this e-mail being Exhibit 531, if we go to the very bottom of page 1 of Exhibit 531 do you see where it says -- yes, in the highlighted portion here in this response by counsel to the City addressed to

EXCEPTIONAL REPORTING SERVICES, INC

Mr. Gary and Ms. Morgan, the City has made clear to LAHSA that there's no objection to providing you access to these databases and systems.  We have encouraged them to provide you with access.  Do you see that?

A    I do.

Q    Was that a true statement of your office's and the City's -- well, was it a true statement?

A    That is a true statement.

Q    Sir, at any point, Mr. Szabo, did you instruct anyone in your office to withhold information from Mr. Gary or members of his team?

A    Not at any point.

Q    At any point, sir, did you instruct anyone in your office to not cooperate with Mr. Gary or his team?

A    No.

Q    What instructions did you provide individuals working in your office relative to responding to Mr. Gary's various requests?

A    Only to gather, to compile answers to Mr. Gary's questions and to provide them as soon as possible, as soon as we could.

Q    Let's move on to Exhibit 361, ECF 1063.  For the record, this document is titled status report of monitor Daniel B. Gary for October 2025, says it has a file date of November 3rd, 2025.  Do you see that, sir?

A    Yes.

Szabo - Direct / By Mr. McRae **100**

Q    Let's turn to page 2 of Exhibit 361, ECF 1063.

Let me direct your attention to line 23 that says, however, the procedural process requested by counsel for the City (City counsel) has slowed progress.  And then the sentence, there's a sentence after that, and then it says, instead, all communications must pass through City counsel in the first instance: City counsel rejected the monitor's proposed compromise to copy counsel, the necessary consequence of this restriction is an increase in time and costs, associated with executing the monitor's duty.  Do you see that?

A    I do.

Q    Sir, do you agree with Mr. Gary's complaint that his request for meetings or information be -- excuse me.

Do you agree with Mr. Gary's complaint that his request for meetings or information be directed to counsel for the City has slowed progress in responding to him?

A    No, I don't.

Q    Why not?

A    I don't believe so because number one, as a representative of the City I have a right to confer with counsel in matters relating to the settlement.  And I'm not going to waive that. And that should be understood by Mr. Gary.

So to suggest that going through a process of conferring with counsel is slowing the process I think is an inaccurate representation.  That is the process.  Furthermore, we've

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Direct / By Mr. McRae                     **101**

responded promptly to his requests.  His requests for

information, his requests for scheduling of interviews.  I've

made myself available, I've opened my calendar and provided as

much access that he's requested for my own personal time, time

of my staff and I instructed my staff who has enormous

responsibility to set those responsibilities aside so that we

could respond to Mr. Gary's requests for information as quickly

as we possibly could.

Q    And, sir, I want to direct your attention to page 7 of

Exhibit 1063 where it says channeling -- this is line 17

through 20 of page 7.  Channeling all requests through City

counsel necessarily introduces time lag and material

inefficiencies.

     Let's pause on that for a second.  Now, following on what

you just said about wanting to confer with counsel when

receiving a request from Mr. Gary, can you think of any reason

why there would be a different time period to respond to

Mr. Gary if he complied with the City's request to coordinate

with City counsel in the first instance, or if he came directly

to you and then you conferred with City counsel before

responding to him?

A    I mean, I suppose it would be faster if he just contacted

counsel directly.

Q    Now, sir, do you see the statement, therefore the monitor

has yet to meet with any City staff.  The first meeting with

Szabo - Direct / By Mr. McRae                    **102**

Mr. Szabo is scheduled for today.  You talked about that November 3rd meeting with Mr. Gary; is that correct?

A    Yes.

Q    And that did take place.

A    It did.

Q    And do you agree with Mr. Gary's assertion that channeling all requests through counsel introduced a temporal lag and material inefficiencies resulting in delaying your meeting with him?

A    No.

Q    And, sir, do you see anywhere where Mr. Gary purports to quantify what lag he's referring to?

A    No.

Q    Do you see any place where he explains or quantifies what material inefficiencies he's referring to?

A    No.

Q    Do you see anywhere where he purports to -- he being Mr. Gary, explain how had he simply been able to speak to you first and then you confer with counsel, how that would result in any difference in terms of the City's response to his request?  Do you see anywhere where he does that?

A    No.

Q    So let's take a look at page 8 of Exhibit 361, which is ECF 1063.  Now, do you see here, sir, starting in line 3 where it says the City's initial responses were prepared under a

Szabo - Direct / By Mr. McRae          **103**

compressed schedule.  And that statement is in quotes.  And

actually, to contextualize this, we're going to go back to the

first sentence at line 2.

It says, the monitor attempted to obtain answers to some

of these questions in his first query to the City, see Exhibit

1.  Do you see that?

A     I do, yes.

Q     And do you then see where it says the City's, in quotes,

initial responses were prepared under a compressed schedule,

end of quote.  Do you see that?

A     I do.

Q     And then further, and without the benefit of quote,

sufficient time to fully evaluate them with all relevant

stakeholders for completeness and accuracy.  Do you see the --

and end of quote?

A     Yes.

Q     Okay.  And do you see where it says, given proper

deference to this caveat, the responses are inadequate.  Do you

see that?

A     I do.

Q     Sir, do you agree with Mr. Gary that your team's initial

responses to the list of questions that he sent which we

discussed were inadequate?

A     No.  And -- no, I don't.

Q     Why not?

Szabo - Direct / By Mr. McRae                **104**

A    Look, we -- there were -- there was a significant volume

of questions that he asked that we needed to compile responses

to.  It is important for us to verify the information, any

information that comes from our office and we also wanted to

turn the information over to Mr. Gary as quickly as possible.

So it's appropriate that we get him the information.  I

thought it was appropriate that we turn over as much

information as quickly as we could and reserve the right to

amend the information as we continue to evaluate for accuracy.

I think that's completely appropriate, especially since, you

know, our interest was to get him the information as quickly as

possible and not to wait until every answer was completely

verified for all of his questions before sending him anything.

I actually think that wouldn't -- that would be

inconsistent with any kind of -- that would be inconsistent

with our desire to comply with the monitor.

Q    And, sir, let me direct your attention to Exhibit 361, ECF

1063 at page 8.  And I want to direct your attention to lines

19 through 21.

**MR. MCRAE:**  Can we expand this to line 22?  I want to

make sure I'm not reading part of a sentence.  Thank you.

Okay.

Q    Sir, do you see where it says, the City's responses were

circumscribed and also deferred to a third party data

maintainer (e.g. "LAHSA is the system owner") for key datasets

EXCEPTIONAL REPORTING SERVICES, INC

like the homeless management information system, in quotes

HMIS.  Do you see that, sir?

A    Yes.

Q    Now, do you agree with Mr. Gary's assertion here that your office deferred to third parties for certain datasets that he requested access to?

A    Well, he asked questions -- he asked who the system owner was.  He asked how frequently the data is updated, how the data governance is handled, that's his own claim.  LAHSA is the system owner.  He asked that question.  We provided a true response to his question and as it relates to the other information about how the system is maintained, it is both true and appropriate that we would refer him to the system owner.

Q    Sir, in your view, is the word deferred an accurate description of the City's relationship to control over data systems that it doesn't operate?

A    To the extent that we don't have the capacity that we -- if we don't -- if we're not the system owner, it's not appropriate for us to be answering questions about the maintenance of the system.  So I don't -- I think it's appropriate that we would ask him to direct his questions to the system owner.

Q    Let me direct your attention to pages 8 and 9 of Exhibit 361, ECF 1063, line 26 is where it starts on page 8, it continues on to line 2 on the next page.  And actually I'm

Szabo - Direct / By Mr. McRae                    **106**

going to be ending on line 1 on page 9.

Several of the monitor's questions, it reads, concern the City's definition and count of PEH, in part because the September 2025 report did not include data on quote, total PEH served, end of quote, there's a docket reference there. Instead the City's entry for this column of data was either quote, pending, end of quote or blank (i.e., an empty field). Do you see that?

A    I do, yes.

Q    And do you agree that the City in preparing the initial version of the quarterly report ending September 2025 did list PEH served information as pending?

THE COURT:  I'm sorry, counsel, could you raise your voice just a little bit?

MR. MCRAE:  I'm sorry, Your Honor.

THE COURT:  Thank you.

BY MR. MCRAE:

Q    Why don't we take a look, I think it's Exhibit 503 if you can recall that without too much trouble, it may help.

So taking a look at Exhibit 503, page 1, actually page 2, is it the case, sir, that the City did indicate in the initial version of the quarterly report, in quarter 2025 ending September 30, 2025 that PEH served information was pending?

A    We did indicate that, yes.

Q    Now, you -- did you talk about why that was the case when

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Direct / By Mr. McRae                 **107**

you were last here on December the 4th?

A     I did.

Q     And I don't need you to repeat that testimony, but let me

just ask you this.  Did the City within a month or so after

issuing this version of Exhibit 503, did it also then proceed

to issue --

          **MR. MCRAE:**  If we can have it put up, Exhibit 502.

Q     -- which was a supplemental report that did populate the

total PEH served with numbers?

A     We did, yes.

Q     And let's take a look at Exhibit 361, ECF 1063 at page 9.

      And, sir, I want to direct your attention to lines 11

through 23.  And are you seeing here that Mr. Gary is taking

note or stating that the City had not provided a clear -- I'm

looking for the words here.

      Well, how about we do this.  Do you see here a discussion

by Mr. Gary regarding certain terms that the City has used?

A     I do, yes.

Q     And do you see in pertinent part, lines 11 through 12

says, one of the monitor's questions about PEH inquired how the

City defines the term?

A     Yes.

Q     And you see how at this point, from lines 12 through 23,

Mr. Gary discusses his thoughts about how those terms are used

by the City.  Do you see that?

Szabo - Direct / By Mr. McRae          **108**

A     Yes.

Q     So, sir, do you think that the manner in which the City has conveyed for example, how PEH is used by the City, do you think the City has conveyed how it uses and understands the word PEH in the context of these quarterly reports has been unclear?

A     No, I do not believe it's unclear.

Q     Do you believe that the City has been inconsistent in the quarterly reports, in terms of how it uses the term PEH?

A     No.

Q     And is it your understanding --

        **MR. MCRAE:**  If we could go back to Exhibit 502, for example and why don't we turn the page to the second page and why don't we keep flipping till we get to the footnotes.  And why don't we expand the footnotes on page 6, so that all of us can read them.

Q     And, sir, do these footnotes in Exhibit 502 and other quarterly reports in the City actually explain in footnote 2 what number PEH served refers to?

A     Yes.  Yes, it does.

Q     Now, are you aware of anything that prevented from Mr. Gary or his team from asking your office for additional clarification of anything, if they needed it?

A     Nothing at all.

Q     And let's take a look at Exhibit 361, ECF 1063, page 9.

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Direct / By Mr. McRae                           **109**

And let's take a look at, I believe it's a footnote, if we could look at that.  I guess we have to go to page 9 for that.

There it is, footnote 3.  There are also real world impacts on the monitor's ability to perform his duties efficiently and effectively that flow from the City's ex parte application for stay of an order appointing Daniel Gary as monitor and related appeal.  It has other language there, that's the first sentence.

Sir, do you agree with the assertion that the City exercising its legal challenges to the appointment of Mr. Gary in any way impaired his ability to get information and perform work for the City?

A    No, not at all.

Q    And why is that, sir?

A    Well, that didn't impact any decisions, any response, any work that happened on our side in the CAO's office at least, as long -- while he was -- while that order was effective we responded to Mr. Gary's questions as quickly as we could, as completely as we could and provided as much information as he asked as quickly as he could.  So it had no impact whatsoever on our posture and in our commitment to respond to the monitor.

          **MR. MCRAE:**  Your Honor, may I have a moment?

          **THE COURT:**  Certainly.

          **MR. MCRAE:**  Your Honor, subject to Mr. Szabo being recalled, I have nothing further for him at this point.

**EXCEPTIONAL REPORTING SERVICES, INC**

**110**

THE COURT:  What time would all of you folks like to reconvene?

MR. MCRAE:  1.

MS. MITCHELL:  That's fine, Your Honor.

THE COURT:  1 o'clock.  Thank you very much.

MS. MITCHELL:  Thank you.  Thank you, Your Honor.

THE COURT:  Thank you.

(Recessed at 11:58 a.m.; reconvened at 1:09 p.m.)

THE COURT:  We're back on the record.

Counsel, thank you for your courtesy.  All counsel is seated, the parties are present.

And was it -- Mr. Szabo, if you'd be kind enough, you retake the stand.  My apologies.

(Witness retakes the stand.)

And the witness has returned to the witness stand. This would be cross examination.

MS. MITCHELL:  Cross examination.

THE COURT:  Cross?

MR. SPEAKER:  Yes, sir.

MS. MITCHELL:  Yes.

THE COURT:  Cross examination by the --

MR. SPEAKER:  Yes, Your Honor.

THE COURT:  I mean, strike that, by LA Alliance. Thank you.

MS. MITCHELL:  May I proceed, Your Honor?

THE COURT:  Please.

CROSS EXAMINATION

**BY MS. MITCHELL:**

Q    Now, Mr. Szabo, you were present during settlement
negotiations in this case; is that right?

A    I was present, yes.

MR. MCRAE:  Objection, vague as to time and
settlement negotiations.

THE COURT:  I'm sorry?

MS. MITCHELL:  There was --

MR. MCRAE:  It's vague --

MS. MITCHELL:  -- an objection.

MR. MCRAE:  -- as to what settlement negotiations and
time.

THE COURT:  Overruled.

**BY MS. MITCHELL:**

Q    Okay.  You were the chief negotiator on behalf of the
City; is that right?

A    That's correct.

Q    And your lawyer at the time, Scott Marcus, was also a
participant in those negotiations; is that true?

MR. MCRAE:  Objection, lack of foundation as to
Mr. Szabo's lawyer.

THE COURT:  Overruled.

//

Szabo - Cross / By Ms. Mitchell                    **112**

**THE WITNESS:**  Mr. Marcus represented the City Attorney's office.

**BY MS. MITCHELL:**

Q    The -- there were representatives from the Alliance that participated in these settlement negotiations; is this right?

A    The representatives of the Alliance meaning the counsel for the Alliance, yes.

Q    Yes.  So looking -- and we talked a lot about the Section 7.1.  This is language that was specifically negotiated between the City and the Alliance; is that true?

A    Correct.

Q    So this was not language that the Plaintiffs unilaterally imposed upon the City; is that correct?

        **MR. MCRAE:**  Objection, vague.

        **THE COURT:**  Overruled.

A    It's just language that was in part of the settlement agreement, yes.

Q    Okay.  And the City agreed to this language, true?

A    Correct.

Q    Now let's look at the first sentence here.  There are three separate metrics I'm going to identify under Section 7.1.  I'm in Exhibit 25.

     So the first metric being the number of housing or shelter opportunities created or otherwise obtained; do you see that?

A    I do.

Szabo - Cross / By Ms. Mitchell                **113**

Q    And there's a comma after the word "obtained;" is that right?

A    That is correct.

Q    And there's a second metric, the number of beds or opportunities offered; is that right?

A    Correct.

Q    And there's a comma after the word "offered" in that second metric; is that right?

A    Correct.

Q    And then there's a third metric, the number of beds or opportunities currently available in each council district; is that right?

A    That is correct.

Q    And those are three separate metrics, true?

        **MR. MCRAE:**  Objection, lack of foundation, and it's a hypothetical.

        **THE COURT:**  Overruled.

A    It's reporting requirements for -- it's -- it is -- there are different ways of describing a measurement.

Q    Are they three different ways of describing the same thing?

        **MR. MCRAE:**  Objection, calls for a hypothetical and a legal conclusion.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  They could be asking for different

Szabo - Cross / By Ms. Mitchell                    **114**

information that may result in the same number, so it -- in

case it could be the same thing or it could not.  It depends.

**BY MS. MITCHELL:**

Q    It depends on what?

A    Well, we -- for example, the number of housing or shelter

opportunities created or otherwise obtained could be different

than the number of beds or opportunities offered if we are not

offering all of the beds or opportunities that we've created.

Q    Okay.  So let's go ahead and I'll show you let's say

example -- Exhibit 31.  Exhibit 31 is quarterly report that the

City submitted for the quarter ending March 31st, 2024.  This

is docket 728-1.

     Now, those three metrics that we just talked about are all

reported on this report where?

          **MR. MCRAE:**  Objection, vague.

          **THE COURT:**  Overruled.

A    The metrics for -- or the number of beds or -- I'm sorry,

the number of housing or shelter opportunities created or

otherwise obtained are reflected in the sixth column where it

says units and beds.

     It's -- the number is reflected in the sixth column, along

with the fifth column which shows the location --

Q    I highlighted units and beds, that's right?

A    Yes.

Q    And in the fifth column, --

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell                    **115**

A    Yes.

Q    -- address and location.

A    Correct.

Q    And where else?

A    And the -- I guess that's the seventh column which --

           **THE COURT:**  I'm sorry, could you --

A    -- states that it's open --

           **THE COURT:**  I'm sorry.  Could you repeat that again?

A    I'm sorry.  I believe I was counting the columns.  I'm sorry.  I believe it's the seventh column, the column that says status.  That is responsive to that metric, as well as the eighth column, which is the open and occupiable date.

Q    Okay.  And I have -- so the address location, the units beds, the status, and the open and occupiable date.

A    Correct.  Those -- that -- the information provided in those columns are responsive to that first metric.

Q    Okay.  And to that first metric, the number of housing or shelter opportunities created or otherwise obtained are reported collectively in these four metrics.  Looking at Exhibit 31, is that right?

A    Correct.

Q    So turning to -- focusing on the second metric or datapoint that's identified in 7.1, the number of beds or opportunities offered, where's that reported?

A    That would be reported -- in the manner in which we are

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell **116**

reporting it, it is reported in the fifth column, the sixth

column, the seventh column, and the eighth column.

Q    So the same columns.

A    The same columns, correct.  And there's a reason why

that's the same.

Q    Sure.

A    But the reason is we have been -- although we could report

the number of beds offered as a different number as the number

of beds created, we have from time to time adjusted the number

in that sixth column if some of the beds have been out of

service or they fluctuated.

     Best example, of course, is the booking agreements and

Inside Safe.  Those fluctuate by design.  We only report the

number that were used.

     So we could report a different number because it is

possible to create more beds than are offered.

     But in the way that we've reported this from the beginning

has been consistent as in we have taken down the number of beds

that are created, if they're not available, open, occupiable,

and available, and offered to the persons experiencing

homelessness.

Q    Okay.  And so you would agree, Mr. Szabo, that in all of

the reports that you have submitted in this case, you have

never reported separate metrics for offered as opposed to open

and occupiable.

**MR. MCRAE:** Objection, misstates the witness's testimony. The document speaks for itself. Calls for a legal conclusion.

**THE COURT:** Overruled.

**THE WITNESS:** No. I don't agree with that necessarily. I agree that -- and my position is since our first report in January of 2023, the information collectively provided in the attachments, and this particular attachment, the form in which we provided the information, is responsive to both the first and second metric in 7.1.

**BY MS. MITCHELL:**

Q And in every single report, they've been identical, true? You've never reported them as different numbers; is that right?

**MR. MCRAE:** Objection, vague.

**THE COURT:** Overruled.

A That's correct. We've reduced the number of created or otherwise obtained if they have not been available, open, and occupiable.

Q Okay. And let's go to the third metric, the number of beds or opportunities currently available in each council district; where is that reported in this report?

A That is reported in the second column.

Q Council district here.

A Correct.

Q Okay.

Szabo - Cross / By Ms. Mitchell                    **118**

A      The fifth column.

THE COURT:  I'm sorry, which column?

THE WITNESS:  Column five.

THE COURT:  Five, thank you.

BY MS. MITCHELL:

Q      Where it says --

A      Column six.

Q      -- address and location.

A      I'm sorry, yes, correct.

Q      Okay.

A      Column six, units, beds.

Q      Okay.

A      Column seven, status.  And column eight, open and occupiable date.

Q      So all the same columns with the addition of a council district column as well; is that right?

A      That's correct.

Q      Okay.  And where on Exhibit 31 do you inform Court and counsel that you're reporting all three metrics in the exact same columns?

MR. MCRAE:  Objection.  The document speaks for itself.

THE COURT:  Overruled.

THE WITNESS:  We -- it's -- we're informing the Court with the information provided in the attachment.  I -- that's

what the -- we're informing the Court of the units and beds that have been established and are available and have been offered in each council district.

**BY MS. MITCHELL:**

Q    Mr. Szabo, in -- the very first report in this case was January, 2023; is that right?

A    That is correct.

Q    Okay.  And prior to January of 2023, did you look at Section 7.1, see that there were three separate metrics, and choose to report them in the same columns without mentioning it to the Court or to counsel?

        **MR. MCRAE:**  Objection, it's compound, it calls for a legal conclusion, it's argumentative, and it's vague.

        **THE COURT:**  Overruled.

A    I -- you know, that was a few years ago.  There was significant conversation at the beginning of the settlement, certainly with the special master.

     There was an understanding that the special master was -- would be reviewing our reports and reporting to the Court our level of compliance.  And it was within that context.

Q    Okay.  My question to you, though, Mr. Szabo, was a little bit different.  Did you personally look at the three separate metrics that we just talked about in Section 7.1 and make the decision to report them all together as the same metric in the same columns?

**MR. MCRAE:**  Objection, misstates the witness's testimony, lack of foundation, vague, calls for legal conclusion, and argumentative.

**THE COURT:**  Overruled.

**THE WITNESS:**  I believe that our reports to the Court satisfied all three requested metrics.

**BY MS. MITCHELL:**

Q    Okay.  Prior to putting together this report did you look at the data that you were supposed to be reporting in Section 7.1?

**MR. MCRAE:**  Objection, vague.

**THE COURT:**  I'm sorry, counsel, I couldn't hear you.

**MS. MITCHELL:**  Prior --

**MR. MCRAE:**  I said vague.

**MS. MITCHELL:**  Oh.

**THE COURT:**  No, no, the objection, --

**MR. MCRAE:**  Oh, sorry.

**THE COURT:**  -- I didn't get the objection.

**MR. MCRAE:**  Vague.

**THE COURT:**  Overruled.

A    Are you asking whether I reviewed the reports that we submitted?

Q    No.  I'm asking whether prior to putting together the very first status report in this case, which was in January of 2023, did you first review Section 7.1 to see what metrics you were

supposed to be reporting to the Court?

A    I reviewed 7.1 and the entire document.

Q    Okay.  And you made the decision to report those three metrics together in the status report.  That was your choice.

        **MR. MCRAE:**  Objection, that's unintelligible.  It's also lacking foundation, and it's vague.

        **THE COURT:**  You may answer the question.

        **THE WITNESS:**  I was responsible for approving the reports and the information provided to the City Attorney and ultimately provided to the Court.

**BY MS. MITCHELL:**

Q    Okay.  So was it you personally who made the choice, Mr. Szabo, to report all three metrics together in the reports as opposed to reporting them separately?

        **MR. MCRAE:**  Objection, as phrased, unintelligible.  It's vague, it's compound, and it's argumentative.

        **THE COURT:**  Overruled.

A    I approved the format of our reports as in my judgment compliant with the metrics requested in 7.1.

Q    Who made the decision, whether it's from your office, counsel, whoever it was, who made the decision to report the three separate metrics called for in that first sentence of Section 7.1 together in these reports as opposed to separately?

        **MR. MCRAE:**  Objection, distinction without a difference.  It misstates the witness's testimony.  It lacks

Szabo - Cross / By Ms. Mitchell                    **122**

foundation.  It's argumentative.  And it's vague.

THE COURT:  Overruled.

THE WITNESS:  I made the decision to present the reports as the reports were presented.

**BY MS. MITCHELL:**

Q    Who put this report together?

A    My office puts the reports together.

Q    Do you know who in your office put it together?

A    I -- the individuals that are involved in gathering the information has changed over time.  Staff -- you know, there's staff turnover all the time.  I've been there since this settlement was made and approved all of the reports myself.

Q    Okay.  So let's go to the very first one, Exhibit 26, which is the January 17th of 2023 report.  Do you specifically -- and if you don't know the answer, that's okay.

Do you specifically know who in your office put this report together, the first draft of this report, for you to subsequently approve?

MR. MCRAE:  Objection, relevance.

THE COURT:  Overruled.

A    Again, going back to what would have been January of 2023, I would have to go back and look at records of folks that were on staff at the time.

Q    Okay.  And since you approved this report, who made the decision not to inform the Court and counsel that all the

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell                    **123**

metrics that you were required to report under 7.1 were all

being lumped together in the same columns?

            **MR. MCRAE:**  Your Honor, that's argumentative.  It

also assumes facts and misstates testimony, lacks foundation,

and it's compound.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  Our obligation was to provide a

quarterly report to the Court, which we did.  Our obligation

was to provide the report.  We provided the report with the

information that you see here.

**BY MS. MITCHELL:**

Q    Mr. Szabo, by reporting all three metrics in the same

columns without delineating the three separate metrics, without

separately reporting the three separate metrics, and without

informing the Court and counsel that's what you were doing,

wasn't that misleading?

            **MR. MCRAE:**  Your Honor, that's argumentative.  It

assumes there was any obligation to parse in the manner counsel

is saying.  It lacks foundation.  It's vague, and it's

argumentative.

            **THE COURT:**  Overruled.

A    The opposite of misleading.  The information is all there

for everyone to digest and to absorb and to common on and to

object to, should they wish to.  All the parties, the public,

the intervenors, the special master, that information was

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell                    **124**

provided.

And we proceeded to report in this same general format, hearing no objections, by the way, between the first report and the second report, or the second or the third, or the third or the fourth.  We proceeded in this manner.

So we felt that it was our good faith effort to comply with the required metrics of 7.1.

There was no objection at the time.

The special master, in her first report, said that we were compliant with the first section of 7.1, and so we proceeded.

Q    But you would agree in fact, Mr. Szabo, that you were reporting all three metrics, all combined, into the same report, and at no point prior to these proceedings had you informed anybody that you were reporting all of these metrics together as opposed to separately, true?

**MR. MCRAE:**  Objection, this is asked and answered now.

**THE COURT:**  Overruled.

**MR. MCRAE:**  It's argumentative.

**THE COURT:**  Overruled.

**MR. MCRAE:**  It assumes facts, and it's vague, and it misstates the witness's testimony.

**THE COURT:**  Overruled.  You can answer the question.

**THE WITNESS:**  I'm not quite sure what the expectation is.  We provided a report.  We were in constant communication

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell                          **125**

with the special master.

If we were informed by the special master that the report was insufficient or there was confusion over how we were reporting those three metrics, we certainly would have had a conversation with the special master, with the Plaintiffs' attorneys, with the intervenors.

To the contrary.  We reported in this manner for a full year.  The first annual report by the special master said explicitly that we were compliant with our requirement to report these three metrics, as we were reporting them.

The manner in which we were reporting didn't change and so we proceeded with that understanding that what we were reporting was compliant with the settlement agreement.

**BY MS. MITCHELL:**

Q    Mr. Szabo, I'm going to show you -- let's go to Exhibit 25.  This is the settlement agreement between the two parties.  Where in the settlement agreement is the chase the city clause?

THE COURT:  I'm sorry, would you state that again?

MR. MCRAE:  Your Honor, that's argumentative.

THE COURT:  I couldn't hear the question.

MS. MITCHELL:  Sure, Your Honor.  Where in the settlement agreement is the chase the city clause?

MR. MCRAE:  Your Honor, that's unintelligible and it's argumentative.

THE COURT:  Overruled.

Szabo - Cross / By Ms. Mitchell                    **126**

**MS. MITCHELL:**  I'll rephrase, Your Honor.

**MR. MCRAE:**  It's just --

**THE WITNESS:**  Where in the settlement agreement does it say that the City doesn't have to comply with its obligations unless the Alliance calls the City out on it?

**MR. MCRAE:**  Your Honor, that question calls for a legal conclusion and assumes legal obligations to parse out language.  It's vague.  It lacks foundation.  And it's argumentative.

**THE COURT:**  Overruled.

**THE WITNESS:**  I don't understand what you're saying.  Is there -- is -- there would be a -- there should be a clause in the agreement that eliminates all -- I don't understand your question.

Q    Sure.  My question to you, because you keep raising this fact that the Alliance didn't raise it, which we'll get to a little bit later.

But my question to you is, is there any provision in the settlement agreement -- feel free to take some time to look through it if you want -- that states the City does not have to comply with its obligations until and unless the Alliance calls them out on their violations?

**MR. MCRAE:**  Your Honor, assumes that there are obligations that haven't been complied with in the settlement agreement.

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell                    **127**

MS. MITCHELL: I'm going to object to speaking objections and coaching the witness.

MR. MCRAE: I'm not. I'm making an objection. It also is argumentative. It lacks foundation. And it calls for a legal conclusion.

THE COURT: You understand the question.

THE WITNESS: I -- honestly, I really don't. I think --

THE COURT: Counsel, re-ask it.

MS. MITCHELL: Sure. One more time.

BY MS. MITCHELL:

Q   Where in the settlement agreement, Mr. Szabo, is the requirement or the clause that states the City does not have to comply with its obligations until and unless the Alliance calls them out on it?

MR. MCRAE: Objection, Your Honor. It's argumentative, assumes a legal conclusion. It misstates the evidence and the record, and it's argumentative.

THE COURT: Overruled. You can answer the question.

A   I don't see a clause that in any way restricts counsel's ability to raise objections with anything that the City has reported since our first report.

If there's a restriction there, you can please point it out to me. But I don't see any restriction on any ability for you, for the -- for Plaintiffs' counsel or the intervenors to

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell    **128**

raise any objections.

Q    I appreciate what you did there, Mr. Szabo.  But my question was different, and I'm going to ask it again.  Where in the agreement is the clause that states anything to the effect of the City doesn't have to comply with its obligations until and unless the Alliance calls them out on it?

MR. MCRAE:  Objection.  It's argumentative.  It assumes facts.  It calls for a legal conclusion.  It misstates the witness's testimony.

THE COURT:  Overruled.

MR. MCRAE:  And asked and answered.

THE COURT:  Overruled.

THE WITNESS:  With the qualification that I am not in any way conceding that there -- we did not comply with 7.1, the clause that was just proposed for the first time is not in the settlement agreement.

MS. MITCHELL:  Okay.  Let's move on.

BY MS. MITCHELL:

Q    You -- it's your testimony that all the reporting that we've identified in Section 7.1 has to be tied to the City's principal obligation of providing beds; is that right?

MR. MCRAE:  Objection, mischaracterizes the witness's testimony.

THE COURT:  Overruled.

A    I've said that the manner in which we have reported the

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell                    **129**

metrics in 7.1 has been to -- has been within the context of

reporting on our progress with the agreement.

And the agreement principally obligates the City to create

units of housing based on the point in time count -- for the

2022 point in time count.

So that is how we have been attempting to -- that's how we

have been reporting the information that is requested in 7.1.

Q    And, again, where in this agreement, Mr. Szabo, does it

state that the principal obligation of the City is to provide

beds as opposed to any number of the other obligations that are

provided for in this agreement?

**MR. MCRAE:**  Objection, argumentative, calls for a

legal conclusion.

**THE COURT:**  Overruled.

**THE WITNESS:**  It -- where does it state that?  It

states that in the settlement agreement, the -- there is a

great deal of -- besides the fact that this was the main issue

that was subject of the discussions, which I can't, won't go

into, it is the obligation of the City to create at great cost

12,915 beds that didn't exist prior to this -- to the

settlement agreement.

And the other obligations are in -- either in support of

that or are not in the category of things that the City needs

to create from the ground up.

//

Szabo - Cross / By Ms. Mitchell                    **130**

**BY MS. MITCHELL:**

Q    Okay.  My question was a little bit different, though.
Where in the settlement -- let me take a step back.  You would
agree there are a number of obligations spelled out in the
settlement agreement that the City has to do; is that right?

          **MR. MCRAE:**  Objection, calls for a legal conclusion.

          **THE COURT:**  Overruled.

A    There are a number of obligations.

Q    And one of those obligations is to create a certain number
of beds, which we've later identified as 12,915; is that right?

A    Correct.

Q    In addition to that obligation, the City has an obligation
to meet milestones and metrics for encampment reductions; is
that true?

          **MR. MCRAE:**  That calls for a legal conclusion.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I'm sorry.  Could you repeat that
question?

          **MS. MITCHELL:**  Sure.  We'll start here.

**BY MS. MITCHELL:**

Q    Section three of the settlement agreement, page ten of
Exhibit 25, Section 3.1 obligates the City to create 60 percent
shelter or housing capacity needed to accommodate 60 percent of
unsheltered City shelter appropriate PEH within the City based
on the 2022 point time count; is that right?

EXCEPTIONAL REPORTING SERVICES, INC

          **MR. MCRAE:**  Objection, the document speaks for itself, and calls for a legal conclusion.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  That's correct.

**BY MS. MITCHELL:**

Q    Okay.  Section four talks about street engagement; is that right?

          **MR. MCRAE:**  Vague, and the document speaks for itself, calls for a legal conclusion.

          **THE COURT:**  Overruled.

A    That's correct.

Q    Okay.  And starting at Section 4.1, the paragraph that starts with the City, please read that into the record.

A    "City will continue to offer shelter or housing to city shelter appropriate PEH within the city and enforce public space regulations and health and safety laws consistent with its own protocol."

     And then it says in parenthesis:  "Street engagement strategy."

Q    I think it continues into -- on the next page.

A    "And constitutional requirements."

Q    Okay.  And then so the City has an obligation to continue to offer shelter and housing, correct?

          **MR. MCRAE:**  Objection, document speaks for itself, and calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  That -- the line that I read in its complete form was referring to the City's street engagement strategy.

MS. MITCHELL: Correct.

THE WITNESS:  And that's important because the street engagement strategy was -- is larger than just one piece of what was just read.

BY MS. MITCHELL:

Q    Sure.  Section 4.2 talks about council districtwide engagement.  Can you summarize the section for us if you can?

MR. MCRAE:  Objection, that calls for a legal conclusion to summarize the provision of a contract.

THE COURT:  Overruled.

A    I'm going to take a minute to review it.

Q    Maybe I'll ask a more specific question.  Let's focus on -- and if you do want a moment to read through it, obviously, Mr. Szabo, please let me know.  But let's focus on starting in line ten.  Let's start on line ten, that first sentence.

Once there are sufficient shelter or housing solutions to accommodate 60 percent of unsheltered city shelter appropriate PEH, the city in its sole discretion may implement and enforce public space regulations.

Do you see that?  And I didn't read the entire sentence, I sort of summarized.  Do you see that section?

Szabo - Cross / By Ms. Mitchell          **133**

A       I do see that, yes.

         **MS. MITCHELL:**  Okay.

         **MR. MCRAE:**  I'd also further object that these sections are beyond the scope of this hearing, 4.2, 4.1, and the other points of discussion other than 7.1 that have been the topic of this examination.

         **THE COURT:**  No, overruled.

         **THE WITNESS:**  So Section 4.2 in essence permits the City once it's hit its 60 percent goal in the City's discretion to start enforcing citywide encampment -- anti-encampment laws; is that essentially correct?

         **MR. MCRAE:**  Objection, calls for a legal conclusion. And counsel is testifying.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  It contemplates that the settlement and -- again, this is for the -- this is a legal determination.

    But the settlement and the Court that approved the settlement would allow the City to enhance the public space regulations that were currently on the books in 2022 to allow them to be applied to an entire council district as opposed to a specific location, which was and is the practice under 41.18.

**BY MS. MITCHELL:**

Q    Okay.  So then going down to Section 24, there's a line that starts, even after; do you see that?  Even after the City.

A       I see that, yes.

Szabo - Cross / By Ms. Mitchell                    **134**

Q    Can you read that for us, please?

A    Even after the City creates adequate and appropriate housing and shelter opportunities for 60 percent of unsheltered city shelter appropriate PEH in a council district, no enforcement action shall be taken against any individual suspected of violating a public space regulation or ordinance unless that individual has first been offered adequate and appropriate --

        **MS. MITCHELL:**  I'll go to the next page.

A    -- shelter or housing and/or to relocate to an alternative location, consistent with applicable laws and this agreement, except for time, manner, place, regulations, paren, such as LAMC 41.18 or similar ordinances, close parens, which may be enforced immediately and without such notice at any time.

Q    Okay.  So the Section 4.2, as we've discussed and as you mentioned, would permit the City to I think enforce enhanced measures or enhance measured, I'm not sure the phrase you used, for the public space clearances maybe once it hits 60 percent, with a caveat that even after the City created enough shelter, no enforcement action can be taken unless there were certain offers that were made first.  Is that an adequate summary?

        **MR. MCRAE:**  Beyond the scope of this hearing, calls for a legal conclusion, lack of foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  This is providing parameters on a

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell                    **135**

future potential scenario that should the 60 percent threshold be met in a particular council district and should the City wish to amend its municipal code to allow for enforcement of public space regulations within that entire council district, that in that future potential situation, that even in that case there would still be a requirement that an offer of shelter be made before conducting the enforcement action.

So it's conditioning a potential future scenario that could play out, that could -- that we could proceed with once the threshold numbers were met.

**BY MS. MITCHELL:**

Q    Okay.  And then going on to Section 4.3, it's the same concept but citywide as opposed to district by district; is that right?

**MR. MCRAE:**  Objection, counsel's testifying, and it calls for a legal conclusion, lack of foundation.

**THE COURT:**  Overruled.

A    It -- 4.3 conveys similar -- provides similar parameters as the prior section does, only on a citywide basis.  That is correct.

Q    Moving on to section five, milestones and deadlines, it's looking specifically at Section 5.2.  This section requires the City to create plans and develop milestones and deadlines for creation of shelter and housing solutions as well as plans for encampment, engagement, cleaning, and reduction in each council

Szabo - Cross / By Ms. Mitchell    **136**

district, and then those same things citywide; is that about right?

MR. MCRAE:  Objection, calls for a legal conclusion, and counsel is testifying.

THE COURT:  Overruled.

THE WITNESS:  That's correct.

BY MS. MITCHELL:

Q    Okay.  So where in any of these sections or anywhere else -- well, would you agree that the words "primary obligation" do not appear in this document?

MR. MCRAE:  Objection, argumentative.

THE COURT:  Overruled.

A    The obligation to create shelter and housing is the clear primary obligation of the settlement agreement.

The other items that you have mentioned either refer to the City's current practices that would not be changed, or reporting requirements, or plans that we would need to submit and to which we would only -- which we would have -- which we agreed to employ best efforts to meet.

We did not have any of that -- any kind of qualification on any of that for the creation of the shelter and housing. That is the commitment that is clear and unqualified that we'd need to create that number of units of housing.

Q    Okay.  So my question was, would you agree that nowhere in this document are the words "primary obligation" or "central

Szabo - Cross / By Ms. Mitchell                    **137**

obligation?"

  **MR. MCRAE:**  Objection, compound and argumentative.

  **THE COURT:**  Overruled.

  **THE WITNESS:**  Other than it being the first obligation, no, those words don't appear.

**BY MS. MITCHELL:**

Q    Well, in section three, right?  Not section one or two. It's appears first in section three; is that right?

  **MR. MCRAE:**  Objection, vague.

  **THE COURT:**  You understand the question?

  **THE WITNESS:**  Yeah.  I --

  **THE COURT:**  Overruled.

A    I believe, yes, it does appear in section three.

Q    Okay.  So meaning the City's agreement to create housing appears in section three, but the words "primary obligation" don't appear anywhere in this document, including in section three, correct?

  **MR. MCRAE:**  Asked and answered, and argumentative.

  **THE COURT:**  Overruled.

A    Correct.

Q    Okay.  So it is the City's opinion that that is the City's primary obligation.  It's not contained in the agreement, true?

  **MR. MCRAE:**  Objection, that's compound, asked and answered now for the third time, and --

  **THE COURT:**  Overruled.

**EXCEPTIONAL REPORTING SERVICES, INC**

MR. MCRAE:  -- it's argumentative.

THE COURT:  You can answer, sir.

THE WITNESS:  The creation of nearly 13,000 units of housing that did not exist prior to the settlement agreement is -- it is the City's position.  But I think that that is clear, it is self-evident.  That is our primary obligation.  We have to create those units of housing.

We're reporting on those units of housing quarterly.  We have organized our funding mechanisms and our systems in order to meet those obligations.  That is the primary obligation of this settlement.

And to the extent that it is possible, we're reporting information as it relates to the creation and usage of those units.

**BY MS. MITCHELL:**

Q    I'm going to ask the question again, Mr. Szabo.

You agree that that is the City's interpretation that that is the primary obligation.  It is not -- that focus or emphasis or the words "primary obligation" are not found anywhere in this agreement.

MR. MCRAE:  That is multiple --

Q    True?

MR. MCRAE:  -- compounds.  It's also asked and answered.  And it's argumentative.

THE COURT:  Overruled.

**THE WITNESS:**  I think you know that I can't go -- I can't speak to the conversations that led to the settlement agreement, so I won't do that.

It is and it was always considered the primary obligation of the City.  The words "primary obligation" do not appear in the settlement document.

It is the first obligation in our -- under section three, and is establishing the required number and creating that number of housing.  It's what we spent years talking about.

**BY MS. MITCHELL:**

Q    So section three talks about housing.  Section four talks about street engagement.  And section five addresses milestones and deadlines for housing, shelter, and encampment engagement; is that right?

**MR. MCRAE:**  Asked and answered.

**THE COURT:**  Overruled.

A    Yes.  Those are the titles of the sections.

Q    And of those obligations, it's your opinion that housing and shelter is the primary obligation.

**MR. MCRAE:**  Asked and answered multiple times, and argumentative.

**THE COURT:**  Overruled.

A    It is absolutely.

**MS. MITCHELL:**  Okay.  Going to Section 7.1 -- now, I want to just be very clear because it was not clear to me on

Szabo - Cross / By Ms. Mitchell **140**

direct.  I was hearing your representations for the first time of what the City can or is going to do.  So I want to go through each one of these metrics.

MR. MCRAE:  Your Honor, I object to the preamble about what counsel's understandings are.  It's not relevant.  And it's argumentative.

THE COURT:  Oh, it's -- counsel, just restate the question.

BY MS. MITCHELL:

Q   Mr. Szabo, go -- looking at Section 7.1, you would agree that the City is currently reporting the number of housing or shelter opportunities created or otherwise obtained; is that true?

A   I certainly agree with that.

Q   Okay.

A   Yeah.

Q   The second metric, the number of beds and/or opportunities offered.  Now, it is your testimony that that actually -- that that phrase actually means on offer, not offered; is that right?

A   My testimony is that it is asking for the number of beds or opportunities offered, as in provided, as in caused to come into existence and -- by the settlement agreement and available for use by persons experiencing homelessness.

Q   Okay.  Well, I think you just referred to the other

metrics.  You said available, which is metric number three, and caused to come into existence, which I think is number one, created or otherwise obtained --

MR. MCRAE:  Your Honor, again, this is recitals by counsel of what counsel thinks.  It's inappropriate, and it's argumentative.

THE COURT:  Overruled.

BY MS. MITCHELL:

Q   So focusing on the word or the number of beds or opportunities offered, it's your testimony that that means on offer, as in like muffins on a tray just being out on offer as opposed to a communication or an action that happens when you physically offer somebody something; is that right?

MR. MCRAE:  Your Honor, that is unintelligible, it's argumentative, it's obtuse, and it's compound.

MS. MITCHELL:  Well, I'm going to object to the objections at this point but --

THE COURT:  Overruled.

MS. MITCHELL:  -- continue.

A   Yes.  Without -- I am not agreeing to compare housing to muffins.  But it is the beds or opportunities that the City is offering to the system for use to house people who need housing.

Q   Okay.  And without any admission by you that what it actually means, is the number of opportunities offered, as in a

Szabo - Cross / By Ms. Mitchell                    **142**

verb communication to another person, is that a metric that the

City can and will be reporting moving forward as far as actual

offers made to a person?

         **MR. MCRAE:**  It's vague and it's compound, and it

calls for speculation.  It's an incomplete hypothetical.

         **THE COURT:**  Overruled.

     **(Pause)**

         **THE WITNESS:**  That is -- I think that is something

that we need -- we would need to continue to discuss in meet-

and-confer as we did in our November meeting.

     The -- not only, again, does that interpretation of

opportunities offered, not only is that inconsistent with our

understanding and how we've been reporting, but there -- I

think there are legitimate challenges to reporting the metric

as you just described it.

         **MS. MITCHELL:**  Okay.  And we'll get back to that.

I'm just trying to figure out what the City is -- can and is

willing to do now.

Q    So the third metric, the number of beds or opportunities

currently available -- and we'll talk about what that means in

your interpretation in a minute -- but assuming that that means

actually available, unoccupied, is that a metric that the City

can and will be reporting on a going forward basis?

         **MR. MCRAE:**  It's lacking foundation, it's a

hypothetical, it calls for speculation, it calls for legal

Szabo - Cross / By Ms. Mitchell                    **143**

conclusion, and it's vague.

THE COURT:  Overruled.

THE WITNESS:  If the Court determines that on a go-forward basis the City is to report on the number of beds currently occupied and unoccupied among the universe of beds that have been created pursuant to this agreement, I believe that is something that we could report.

MS. MITCHELL:  Okay.  And then going next to the next metric -- and, again, we'll talk about like the definitions and all of that in a minute.  I'm just trying to understand what the City is able and willing to do at the moment.

Q    The number of PEH engaged, now, again, assuming that this is a citywide metric not tied to Alliance beds, as you testified and we'll get to, is that a metric that the City can and will be reporting on a going forward basis?

MR. MCRAE:  Your Honor, I object to all of these hypotheticals to Mr. Szabo.  It lacks foundation.  It calls for speculation.  And they're incomplete hypotheticals.  And also object to the extent it calls for a legal conclusion.

THE COURT:  Overruled.

MR. MCRAE:  And object to the extent it involves deliberative process privilege.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry, could you --

MS. MITCHELL:  Sure.

Szabo - Cross / By Ms. Mitchell                    **144**

**THE WITNESS:** -- repeat?  Thank you.

**MS. MITCHELL:**  Sure.

**BY MS. MITCHELL:**

Q    Looking at the metric that's highlighted, the number of PEH engaged, assuming that that refers to citywide metrics and not engagements tied to Alliance beds, is that a metric that the City can and will be reporting on a moving forward basis?

**MR. MCRAE:**  Objection, Your Honor, also that Mr. Szabo doesn't unilaterally determine the City's response to the --

**THE COURT:**  Well, we have --

**MR. MCRAE:**  -- settlement agreement.

**THE COURT:**  -- we -- this discussion about, you know, what we could move forward with.  Overruled.

A    So the -- I need to -- the reason that that metric wasn't reported is because the PEH engaged, we did not have the capacity to tie that back to the beds that were created as a result of this settlement agreement.

And that is why that metric wasn't reported.  And in this case, it says to the extent possible.  And it wasn't possible to report that metric specific to the beds in the settlement.

If the definition of number of PEH engaged as authorized by the Court is PEH engaged, citywide engagements, we have the capacity to report on that.

And, in fact, we have been -- I'll just say we would be

Szabo - Cross / By Ms. Mitchell          **145**

happy to work with you and the Court on how that is reported in that -- in the event that that is how the -- that metric would be defined.  We could do that.

          **MS. MITCHELL:**  Okay.

Q    So then the next one is the number of PEH who have accepted offers of shelter or housing.  Assuming that is the definition of what it purports to be, the number of people who have accepted offers of shelter or housing, is that a metric that the City can and will be reporting moving forward?

          **MR. MCRAE:**  It's an objection that it assumes facts, it's compound, it calls for a legal conclusion, and it's a hypothetical with the assuming of a definition.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  So I believe that we are reporting that currently --

**BY MS. MITCHELL:**

Q    With the PEH served number.

A    With the PEH served number, yes.

Q    Okay.  If the Court were to order you or the interpretation was to be not PEH served but the numbers of PEH unhoused, still unsheltered individuals who have accepted offers of shelter, so a little bit different than people who are being served, is that a metric the City can and will be producing?  Or I should just say can produce on a move forward basis?

Szabo - Cross / By Ms. Mitchell                **146**

**MR. MCRAE:**  Your Honor, unintelligible.  And it's compound and it's vague.  And it calls for a legal conclusion.  And --

**THE COURT:**  I --

**MR. MCRAE:**  -- it's an incomplete hypothetical.

**THE COURT:**  I understand the question.  Overruled.

**THE WITNESS:**  The reason I'm going to go back to PEH served is that by definition, that metric, it's the number of people who are leased up in permanent housing -- for permanent housing or the number of intakes that we have for interim housing.

So it is my definition the number of PEH who have accepted offers of shelter or housing.

Again, it's offers of -- accepted offers of shelter or housing into the units that the settlement agreement has created.

And, again, I -- everything about the settlement to me is we are going to agree to create housing so people could be -- who are currently unhoused could be housed in those units that the settlement requires us to create.

So the metric that we're reporting currently is telling you exactly that.  How many people are leased up in permanent housing that's -- that has been made available by this -- by the settlement agreement, and how many intakes do we have in the interim housing.

And we do want to have multiple -- obviously multiple people accepting offers to the same bed because we want to have that turnover.

I could report it, but it -- I'm already reporting it. It's the same information, it's the same metric.

**MS. MITCHELL:** My question's a little bit different. And I understand your position, fully understand your position that it is the same metric.

Q   But if the Court were to interpret it differently, that PEH served is not the same metric, and instead the metric is people who have been -- made an offer of shelter or housing and have accepted that offer, right, maybe for whatever reason they don't end up getting housed or sheltered, maybe somebody passes away in the meantime, whatever the reason is, but the slightly different metric of just somebody that has accepted an offer, is that something the City has the capability of reporting moving forward?

**MR. MCRAE:** Objection, Your Honor. It assumes that there is a distinction with a difference. It also is vague as phrased. It's a hypothetical. It calls for a legal conclusion.

**THE COURT:** Overruled.

**MR. MCRAE:** And it's speculative.

**THE WITNESS:** As I'm sitting here on the stand, that truly would be something more appropriate for a meet-and-confer

Szabo - Cross / By Ms. Mitchell                    **148**

process or --

**BY MS. MITCHELL:**

Q    Okay.

A    -- a mediation process because there -- as I said, there are concerns about whether we could secure the information on -- let me back up.

We can verify that the offer was accepted.  And I would have confidence in providing that information based on the actual placements in the housing.  That's how we would be able to verify it.

If an offer is made and then for whatever reason a person experiencing homelessness changes their mind but then comes back, there are logistical issues that I think would be appropriate for us to work out in a mediation process.

Q    That's --

A    I would want to answer -- truly, we tried to provide the best possible information that would be responsive to this within our capacity.

MS. MITCHELL:  Yeah, no, and I appreciate that.  I'm not trying to trick you on any of this.  I'm just trying to understand the City's position on the capability at the moment.  So --

THE COURT:  Could I ask one question --

MS. MITCHELL:  Sure, Your Honor.

THE COURT:  -- if we're trying to move forward.

EXCEPTIONAL REPORTING SERVICES, INC

**MS. MITCHELL:**  Thanks for asking my permission.

**THE COURT:**  Right now that's quarterly.  Right now that might be a quarterly report because you've got a huge fluctuation, understood.

That would be subject to negotiation.  In other words, LA Alliance might take or Ms. Meyers might take the position of quicker, and that might be difficult.

So you can move forward with this.  But what might be subject to negotiation is what kind of time period would be reasonable concerning both parties because you do have a fluctuation.  And you don't want to get caught in a daily necessary.

**THE WITNESS:**  Right.

**THE COURT:**  But that could be negotiated potentially. I mean, not that you'd agree but back and forth.

**THE WITNESS:**  I'd be happy to discuss --

**THE COURT:**  So Judge Birotte could take a look at that.

**THE WITNESS:**  I'd be happy to discuss that, sure.

**THE COURT:**  Okay.  Counsel, go on.

**MS. MITCHELL:**  Thank you, Your Honor.

**BY MS. MITCHELL:**

Q    The next metric, the number of PEH who have rejected offers of shelter or housing and why offers were rejected; is that something the City has the capability of reporting moving

Szabo - Cross / By Ms. Mitchell                    **150**

forward?

THE COURT:  Just a moment, counsel, let me make a note.  All right.  Thank you.

You please answer.

MR. MCRAE:  That question calls for speculation, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  No, that metric we -- the City does not have the capability of reporting.

BY MS. MITCHELL:

Q    And then the final metric, the number of encampments in each district, is that something that the City has the capability of reporting on the moving forward basis?

MR. MCRAE:  Same objection, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  So this is a metric that I feel confident that we would be able to report in a manner that we could validate that we would be comfortable with the accuracy of the data in the -- I would say in the very near future. It's not -- we're not in a position today, but in the very near future.

And once we have that capability and it could be appropriately validated, we would absolutely be -- we would -- we will report that consistent with the settlement agreement as soon as we have that capability and can validate that data.

**151**

MS. MITCHELL:  Okay.  All right.  Let's move on.

MR. MCRAE:  Can I request that we take a five-minute recess?  We've been going a little over an hour.

THE COURT:  Counsel, is that acceptable?

MR. MCRAE:  Is that okay?

MS. MITCHELL:  I mean, I'd prefer to keep going but if we need a quick break, that's --

THE COURT:  Well, if it's a restroom break, --

MR. MCRAE:  Yes, Your Honor.

THE COURT:  We're usually going about an hour and 15 minutes to an hour and a half so --

MR. MCRAE:  Yes.  That's okay --

MS. MITCHELL:  That's fine, --

THE COURT:  Yeah.

MS. MITCHELL:  -- Your Honor.

MR. MCRAE:  Thank you.

THE COURT:  You -- just a moment.  It's your examination.  You call the time --

MR. MCRAE:  Okay.

THE COURT:  -- within reason.  Do you want to go forward?  If so, go forward five or ten more minutes --

MS. MITCHELL:  It's --

THE COURT:  -- and then we'll take a break.

MS. MITCHELL:  It's fine, Your Honor.  We can take a break --

THE COURT:  Okay.

MS. MITCHELL:  -- now.  It's totally fine.

THE COURT:  Let's take a recess then.

MS. MITCHELL:  Five minutes would be great, thank you.

THE COURT:  Step down.  Thank you very much.

**(Recessed at 2:06 p.m.; reconvened at 2:26 p.m.)**

THE COURT:  All right, thank you.  We're back in session.  All counsel are present.  I thank you for your courtesy.

And Counsel, cross examination, please.

MS. MITCHELL:  Thank you, Your Honor.

THE COURT:  Continued cross.

MS. MITCHELL:  Thank you.

**CROSS EXAMINATION (CONTINUED)**

**BY MS. MITCHELL:**

Q    Okay, Mr. Szabo, looking specifically at Section 7.1, the number of beds or opportunities offered, and you have previously testified that your interpretation of this means that it's on offer.  Is that right?

A    Correct.

Q    What does on offer mean to you?

A    On offer means that it is -- they are units that are provided for use by the homeless system to house those who need housing.

Q    You agree that the phrase on offer doesn't appear in the Agreement, true?

THE COURT:  Counsel, would you restate that a little louder?  I didn't hear.

MS. MITCHELL:  Yes.

**BY MS. MITCHELL:**

Q    I said you would agree, Mr. Szabo, that the phrase on offer does not appear anywhere in the Agreement, is that right?

A    That's correct.

Q    And when was the first time you heard the phrase on offer in connection with the Alliance litigation?

MR. MCRAE:  Objection, assumes facts that it was heard.

THE COURT:  Overruled.

THE WITNESS:  That I don't recall.  I don't know.

**BY MS. MITCHELL:**

Q    Was it in communications with Plaintiffs?

MR. MCRAE:  Objection, lack of foundation, calls for speculation --

THE COURT:  Overruled.

MR. MCRAE:  -- and asked and answered.

THE COURT:  Overruled.

**(To the Witness):**  You may answer.

THE WITNESS:  I don't -- I don't believe it was with communications with Plaintiffs --

Szabo - Cross / By Ms. Mitchell                    **154**

**BY MS. MITCHELL:**

Q    Have you ever used --

A    -- no.

Q    -- the phrase on offer in connection with the Alliance

litigation with Plaintiffs?

        **MR. MCRAE:**  Objection, vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I don't -- I believe I've used the term

offered.

**BY MS. MITCHELL:**

Q    Collinsdictionary.com is where I found this phrase and it

defines on offer as something being available to be used.  Do

you think that's an appropriate description of that phrase as

you're using it today?

        **MR. MCRAE:**  Objection, lack of foundation, it calls

for a legal conclusion, and relevance as far as a dictionary in

terms of the meaning of this Agreement.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I think I've used a similar definition.

**BY MS. MITCHELL:**

Q    And available to be used, you would agree that's an

adjective, correct, something that's describing a noun?

        **MR. MCRAE:**  Objection, lack of foundation, calls for

a legal conclusion --

        **THE COURT:**  Overruled.

Szabo - Cross / By Ms. Mitchell           **155**

MR. MCRAE:  -- argumentative.

THE COURT:  Overruled.

THE WITNESS:  Yes (indisc.)

**BY MS. MITCHELL:**

Q    And you would agree that the phrase or the word offered is a different part of speech, it's a verb, right, or a past tense verb?

MR. MCRAE:  Objection to the grammar lesson, vague and ambiguous, lack of foundation --

THE COURT:  Overruled.

MR. MCRAE:  -- calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  I would agree with that.  I would agree with that and -- but -- I'm sorry.  Yes, I would agree with that, that it is a verb.

**BY MS. MITCHELL:**

Q    So it's an entirely different part of speech.  It's an adjective, on offer, and there's a verb offered.  True?  Two different parts of speech.

MR. MCRAE:  Objection, argumentative.

THE COURT:  Overruled.

THE WITNESS:  The term offered, the verb offer or offered has multiple definitions.

//

//

Szabo - Cross / By Ms. Mitchell                **156**

**BY MS. MITCHELL:**

Q    It is a verb, true?  Or a past tense verb?

          **MR. MCRAE:**  Vague.

          **THE COURT:**  I didn't hear.  I'm sorry, Counsel.

          **MR. MCRAE:**  I said vague.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I don't -- I don't actually -- I don't agree that it's necessarily a past tense verb.

**BY MS. MITCHELL:**

Q    Do you agree that it's a verb?  That an offer to -- like an offer, the word offered is past tense.  Do you think -- do you agree with that statement?

          **MR. MCRAE:**  Objection, asked and answered.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I'm sorry, could you repeat that?

**BY MS. MITCHELL:**

Q    Is the word offered past tense, Mr. Szabo?

          **MR. MCRAE:**  Objection, calls for a legal conclusion, lack of foundation, and asked and answered.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I don't believe so.  I don't -- not in this -- not in this sense it is not.  How many opportunities are currently offered.  How many opportunities are currently offered, that is --

//

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell                    **157**

**BY MS. MITCHELL:**

Q    Does the word currently appear in this sentence that's highlighted, in this phrase that's highlighted?

        **MR. MCRAE:**  Argumentative.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  No, it's not.

Q    So the number of beds or opportunities offered, you don't agree that that's past tense?

        **MR. MCRAE:**  Objection, asked and answered, calls for a legal conclusion, lack of foundation, argumentative.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Not in this case.

Q    So you think it's what's currently on offer, present tense?  That's your interpretation as you sit here today?

A    It is my interpretation and it's within the context of the other metrics in that -- in that sentence all relate to beds, all relate to things.  They don't relate to actions.  It's beds offered, opportunities created, opportunities available.  It's all referring to number of beds.  It's all referring to beds. It's not referring to anything else.  That's why -- it means that to me and that's how we've been reporting it.

Q    The word offer can be a verb or a noun, do you agree with that?

        **MR. MCRAE:**  Objection, relevance, argumentative.

        **THE COURT:**  Overruled.

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell                    **158**

THE WITNESS:  It can be a verb or a noun, yes.

BY MS. MITCHELL:

Q    Yes, you agree with that statement?

MR. MCRAE:  Same objections.

THE COURT:  I'm sorry, I didn't hear the question --

MR. MCRAE:  I said same objections, Your Honor.

THE COURT:  -- and I didn't hear the objection.

The question again, please.

Q    Do you agree with the statement that an offer can be a verb or a noun?

MR. MCRAE:  Objection, relevance --

THE COURT:  Overruled.

MR. MCRAE:  -- lack of foundation.

THE WITNESS:  It could be a verb or a noun, yes.

Q    Now, the word offer appears elsewhere in the Agreement, is that right?

A    It does.

Q    So let's go to -- we're on -- this is still Exhibit 25, we're on Page 8 of 28.  Line 27 there is a reference to, the second part of that, of that sentence, will not preclude the City from making an offer of shelter or housing to an individual, do you see that phrase?

MR. MCRAE:  Your Honor, can the witness have the benefit of being oriented to what part of the Agreement we're talking about here?

THE COURT:  I thought it was Page 2, Line 27.

MR. MCRAE:  No, I mean like a section, whether it's a recital or a definition of terms.

THE COURT:  Certainly.

MS. MITCHELL:  Sure.

MR. MCRAE:  Exactly.

MS. MITCHELL:  Sure.

THE COURT:  Certainly.

MS. MITCHELL:  I mean --

MR. MCRAE:  Thank you.

MS. MITCHELL:  -- if Counsel wants to testify --

MR. MCRAE:  No, I don't want to testify.  I want the witness to be given a fair opportunity to know where this --

THE COURT:  Thank you both for your --

MS. MITCHELL:  Thank you.

THE COURT:  -- conversation with each other.

MS. MITCHELL:  Page --

THE COURT:  Let's move along now.

MS. MITCHELL:  Thank you, Your Honor.

BY MS. MITCHELL:

Q    Page 2, Section 1, under definitions, 1.4, city shelter appropriate, and then going to the next section, which is describing city shelter appropriate, the bottom of Page 3 refers to an offer of shelter housing.  Do you see that?

MR. MCRAE:  Objection, the document -- lack of

Szabo - Cross / By Ms. Mitchell                    **160**

foundation as phrased.

THE COURT:  Overruled.

THE WITNESS:  Yes, I see that.

BY MS. MITCHELL:

Q    What does that mean?

MR. MCRAE:  Objection, calls for a legal conclusion, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  In this case it is referring to a person and so it is using offer as something that would be provided to an individual.

BY MS. MITCHELL:

Q    An action, correct?  A shelter or housing is offered to a person.  An action has to take place.  You agree with that?

MR. MCRAE:  Objection, compound, vague, argumentative.

THE COURT:  Overruled.

THE WITNESS:  I agree that that is how -- well, that is how it appears to be used in this case in this section to me, yes.

BY MS. MITCHELL:

Q    And that is different than the phrase on offer, true?

MR. MCRAE:  Objection, argumentative, lack of foundation.

THE COURT:  Overruled.

**THE WITNESS:**  It is -- it is different as it applies to what is being provided to an individual, yes.

**BY MS. MITCHELL:**

Q    Going on to Section 4, 4.1, the City will continue to offer shelter or housing to city shelter appropriate PEH.  Do you see that phrase?

A    I do, yes.

Q    Okay.  And what does that mean?

**MR. MCRAE:**  Objection, calls for a legal conclusion, lack of foundation.

**THE COURT:**  Overruled.

**MR. MCRAE:**  And beyond the scope.

**THE COURT:**  Overruled.

**THE WITNESS:**  In this case it is referring to offer in the sense that it is provided to an individual, city shelter appropriate PEH would be provided an opportunity, it's using the case in this case an opportunity to be housed.

**BY MS. MITCHELL:**

Q    So an action, correct?  An action has to happen for a city shelter appropriate PEH to be offered shelter, true?

**MR. MCRAE:**  Objection, argumentative, lack of foundation --

**THE COURT:**  Overruled.

**MR. MCRAE:**  -- calls for a legal conclusion.

**THE WITNESS:**  I've already stated that offer can be

Szabo - Cross / By Ms. Mitchell                    **162**

used in many different ways.  And I also don't see a definition

of offer.

**BY MS. MITCHELL:**

Q    I'm asking for your interpretation of this word in this

context.

A    That's right, and so I gave you my interpretation in this

context, as I gave you my interpretation of the same word in a

different context which had a different meaning.

Q    All right, let's go to Section 4.2.  We're on Page 6,

Line 28, the very bottom, no enforcement action shall be taken

against any individual suspected of violating a public space

regulation or ordinance unless that individual has first been

offered adequate and appropriate, and I think we go to the next

section, shelter, housing, and/or to relocate.  Do you see that

phrase?

A    I --

Q    Specifically I'm going to ask you about the phrase offered

adequate and appropriate shelter or housing.  On the bottom of

Page 6, what does offered adequate and appropriate shelter or

housing mean to you in this context?

            **MR. MCRAE:**  Objection, lack of foundation, calls for

a legal conclusion, and beyond the scope of this hearing.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  Again, in this case because it is

referring to an individual, a person, offer is being used as

Szabo - Cross / By Ms. Mitchell                **163**

providing an offer to that individual to be housed.

**BY MS. MITCHELL:**

Q    So an action, correct?

       **MR. MCRAE:**  Objection --

Q    An action has to be taken?

       **MR. MCRAE:**  -- asked and answered and vague.

       **THE COURT:**  Overruled.

       **THE WITNESS:**  In this case it's -- it is a verb.

Q    And then in 4.3 we have the same reference, no enforcement action shall be taken against an individual unless that individual has first been offered adequate and appropriate shelter.  Do you see that section?  On Line 23 and 24?

A    Could you highlight it please?  Thank you.

       I do see that, yes.

Q    And so you would agree that that is also in reference to a verb, a past tense verb, something had to have happened in order for a person to have been offered adequate shelter or housing.  Do you agree with that statement?

       **MR. MCRAE:**  Objection, lack of foundation, calls for a legal conclusion, and out of the scope of the hearing.

       **THE COURT:**  Overruled.

       **THE WITNESS:**  Yes, once again this refers to an individual and so it is -- offer in this case is being used as a verb, past tense verb, providing an individual an opportunity to be housed.

**BY MS. MITCHELL:**

Q    So you would agree in this context if let's say there was simply a number of shelter or housing opportunities on offer, that would not be sufficient to meet the obligations under this section?

        **MR. MCRAE:**  Objection, it calls for speculation, it's a hypothetical, it's also an incomplete hypothetical, it lacks relevance, it's beyond the scope of this proceeding.

        **THE COURT:**  Overruled.

        **MR. MCRAE:**  I'm sorry, and calls for a legal conclusion.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I don't -- I actually don't understand how it would be -- how it would be used.  I mean this statement is talking about providing an individual with an opportunity to be housed in shelter or housing and so this is offer -- the word offer I believe is appropriately used here and it has different meanings and the meaning that I take from this is that action, it is providing this opportunity to an individual.

**BY MS. MITCHELL:**

Q    Okay, so let's go back and read the whole clause or the whole phrase here.  No enforcement action shall be taken against any individual suspected of violating a public space regulation or ordinance unless that individual has first been offered adequate and appropriate shelter or housing.  So do you

see that phrase in context now?

A    I do.

Q    And would you agree that if a particular shelter or housing opportunity was simply on offer, that would not be sufficient to meet the City's obligations prior to enforcing public space regulations under this section?

        **MR. MCRAE:**  Objection, unintelligible, lack of foundation, calls for a legal conclusion, vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Because there's no definition of offer the hypothetical that you just proposed wouldn't make sense in this case.

**BY MS. MITCHELL:**

Q    Why not?

A    Because of the context of this section that you've highlighted.  It's talking about providing something to an individual.

Q    Providing a specific offer of housing or shelter, correct?

A    Yes.

        **MR. MCRAE:**  Objection, calls for speculation, lack of foundation.

        **THE COURT:**  Overruled.

Q    Now, previously in this -- in these proceedings you testified that a person who's living on the street would need to be offered an opportunity multiple times before they would

Szabo - Cross / By Ms. Mitchell                                **166**

accept it.  Do you recall saying that?

MR. MCRAE:  Objection, mischaracterizes the witness's testimony.

THE COURT:  Overruled.

THE WITNESS:  No, I'm not -- I wouldn't say -- I'm not trained in homeless engagement and outreach.  What I believe I said was that it is -- that my understanding is that it is a typical part of the process to provide an offer of housing to an individual multiple times before it would be accepted.

BY MS. MITCHELL:

Q    Okay.  And you agree that the housing or shelter has to actually be offered in order for a person to accept that offer? Is that true?

MR. MCRAE:  Objection, incomplete hypothetical, vague, calls for a legal conclusion, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MITCHELL:

Q    And typically in most shelters and particularly current supportive housing facilities an individual can't simply walk in off the street and get housed or get sheltered, is that right?

MR. MCRAE:  Objection, lack of foundation, vague, calls for speculation.

**THE COURT:** Overruled.

**THE WITNESS:** I know there are some -- there could be some sites that allow for that, but typically, certainly within the context of the housing that we're talking about in the Settlement Agreement, it would require outreach engagement, yes.

**BY MS. MITCHELL:**

Q   Okay.  So despite that it requires outreach engagement for a person to accept shelter and despite the fact that four separate times there are reference to offers or offered in this section other than 7.1, it's still your testimony, Mr. Szabo, in 7.1 the phrase offered here is not a verb but is in fact an adjective or description of a noun, is that right?

**MR. MCRAE:** Your Honor, that's compound, it's argumentative, also calls for a legal conclusion, and it's misstating what Section 7.1 says.

**THE COURT:** Overruled.

**THE WITNESS:** It is.

**BY MS. MITCHELL:**

Q   So offered here in Section 7.1 means something different than everywhere else it's referenced, true?

**MR. MCRAE:** Objection, that calls for speculation, it's argumentative, and lacks foundation.

**THE COURT:** Overruled.

**THE WITNESS:** It does because in every other instance

Szabo - Cross / By Ms. Mitchell                    **168**

that you cited offer is referring to something provided to an individual.  In this case offer is referring to a bed.  Everything in the first sentence is referring to beds.  Everything in the second sentence is referring to individuals, including a request to provide information about PEH who have accepted offers of shelter or housing.  If it was intended to be an offer in the context -- in the context that you cited in the other -- in the other areas of this agreement, it would have been in the second sentence and it would have been something that was an obligation of LAHSA because that's where it would be appropriately required.  Not in the first sentence that's talking about the beds the City has responsibility to create.

**BY MS. MITCHELL:**

Q    Who are the beds and opportunities being offered to?

          **MR. MCRAE:**  Objection, vague.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  They're offered -- again, there are multiple definitions of offered.  In this case it's offered to -- for use by the homeless services system.  In some cases it's permanent housing, permanent housing providers.  Interim housing, service providers that work for interim housing.  And it is creating the compliment of beds that are available to be used to house people.

//

Szabo - Cross / By Ms. Mitchell          **169**

**BY MS. MITCHELL:**

Q   Mr. Szabo, to whom are the beds that -- the beds being offered to?

        **MR. MCRAE:**  Asked and answered.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Again, you're using the -- I think you're using a different definition of offered than is contemplated in the first sentence.  It's being offered -- in this case these are beds that are being offered in and of themselves to the City of Los Angeles, to service providers, to nonprofit agencies that run permanent housing.  That's -- that is the context for this sentence.

        In the second sentence these are offers, I believe that offered is being used in a different way as it relates to something provided to an individual, a person experiencing homelessness, which they would accept or reject.

**BY MS. MITCHELL:**

Q   So your testimony is the number of beds or opportunities offered refers to being offered to homeless provide -- homelessness providers and the city at large, but not to individuals --

        **MR. MCRAE:**  Objection --

Q   -- that's right?

        **MR. MCRAE:**  -- compound, lack of foundation.

        **THE COURT:**  Overruled.

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell        **170**

THE WITNESS:  The context is how many beds are offered in the city, how many beds are offered as a result of this Settlement Agreement.

**BY MS. MITCHELL:**

Q    Wouldn't you agree that every housing or shelter opportunity created or otherwise obtained is necessarily being offered to the homeless service providers in the City of Los Angeles?

MR. MCRAE:  Objection, incomplete hypothetical.

THE WITNESS:  I'm sorry.  Can you repeat that?  I'm sorry.

**BY MS. MITCHELL:**

Q    Sure.  Wouldn't you agree that every housing or shelter opportunity created or otherwise obtained are necessarily already being offered to homeless services providers in the City of Los Angeles?

MR. MCRAE:  Objection, lack of foundation, argumentative, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Like I said as part of our earlier conversation when you were reviewing the reports, it is possible that opportunities that are created may not be -- may not be currently offered as the -- as of the reporting deadline.

//

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell                    **171**

**BY MS. MITCHELL:**

Q    True or false, every housing or shelter opportunity created or otherwise obtained is ultimately offered to the homeless service providers in the City of Los Angeles?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

MR. MCRAE:  And lack of foundation.

THE WITNESS:  These are quarterly reports. Information fluctuates from quarter to quarter.  So I can't answer a true or false for -- in the manner that you've proposed it.  It's a quarterly report.  It is possible that we -- that opportunities that we create would be different than the opportunities offered.

**BY MS. MITCHELL:**

Q    But it's never fluctuated, has it?

A    It hasn't because we have made the decision to reduce the number of opportunities created to the extent that those opportunities created have -- are no longer in or for some reason out of service, under repair, whatever.  We've reduced those numbers.

But that is what my understanding is.  Beds are opportunities created.  Those that are offered and then the same thing with those that are currently available.  It's a continuation of the same discussion.  How many beds have you created, how many are offered of those beds that are created,

Szabo - Cross / By Ms. Mitchell                    **172**

how many are available of those in each Council District?

So that's how we've reported it.  All I can tell you is this is how we understand the language, this is how we've reported it, this is how we reported it for four consecutive quarters, and the Special Master deemed that we were in compliance with Section 7.1.  And if there is a different interpretation that the Court is asking us to come to, we're happy to work with you and amend the manner in which we report. I don't have any issue with that at all.  I'm just explaining to you why we reported the way that we did.  It wasn't -- it wasn't because we didn't want to report it, we were reporting that information with our quarterly reports --

Q    You were reporting --

A    -- as we understood it.

Q    You were reporting that information in the exact same way and the exact same place for all three metrics, true?

**MR. MCRAE:**  Your Honor, this was covered this morning.  This is asked and answered now.

**THE COURT:**  Overruled.

**THE WITNESS:**  The manner in which we constructed our reports was responsive to each of the items identified, each of the metrics requested in the first sentence of 7.1.

**BY MS. MITCHELL:**

Q    Let's move on to available.  So the very next metric that we have is the number of beds or opportunities currently

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell                    **173**

available in each Council District.  Do you see that?

A     I do, yes.

Q     Now, that has the word currently in it, right?

A     Yes, it does.

Q     And the previous metric did not have the word currently in it, true?

A     That is correct.

Q     And again, available is being reported, the number of beds or opportunities available being reported in the same metric as those offered and those obtained.  Yes?

          **MR. MCRAE:**  Objection, vague and confusing.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  This metric is reported Council District specific.

**BY MS. MITCHELL:**

Q     Now, so in your mind the only difference between this metric -- the available in each Council District or the opportunities offered in total, the only difference is that it specifies the Council District, is that right?

          **MR. MCRAE:**  Objection, lack of foundation, calls for a legal conclusion, and argumentative.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  That's how we've constructed -- we've constructed our reports to include the Council District designation to be responsive to this section of 7.1, yes.

Szabo - Cross / By Ms. Mitchell                    **174**

**BY MS. MITCHELL:**

Q     And it's your testimony that that metric doesn't refer to unoccupied beds or shelter opportunities, true?

A     That is -- that was our understanding.  That's how we have been reporting it and that's how we've been reporting it consistently since 2023.

Q     Merriam-Webster Dictionary defines unoccupied -- or excuse me, defines available as present or ready for immediate use. Do you agree with that definition?

       **MR. MCRAE:**  Objection, Counsel's testifying, lack of foundation, relevance.

       **THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q     There was actually a second part.  I can read the full and you can tell me if you agree or not.

       There's two definitions:  present or ready for immediate use and accessible or obtainable.  Do you agree with those definitions?

       **MR. MCRAE:**  Same objections, Your Honor.

       **THE COURT:**  Overruled.

       **THE WITNESS:**  That sounds, it sounds about right to me.  I've not -- I don't have any background in dictionary writing, so, but it sounds about right.

//

//

Szabo - Cross / By Ms. Mitchell                           **175**

**BY MS. MITCHELL:**

Q    Let me give you a hypothetical, Mr. Szabo.  You call a hotel and you say how many rooms do you have available and they say we have five rooms available.  What would you take that to mean?

         **MR. MCRAE:**  Objection, Your Honor.  It's an incomplete hypothetical and it's also lacking relevance.

         **THE COURT:**  Overruled.

         **(To the Witness):**  You may answer the question.

         **THE WITNESS:**  If it's in that context, I think it would be -- I think I would expect that to be the unoccupied definition.

**BY MS. MITCHELL:**

Q    Now, you previously said it wouldn't make any sense to report vacancy because the data would be stale the moment you reported it.  Do you recall saying that?

A    I did.  I do recall saying that, yes.

Q    That's actually also true for PEH served, isn't that true?

         **MR. MCRAE:**  Objection, vague.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  I don't think -- I don't think necessarily.  I don't think that's necessarily the same because PEH served, as you know, the majority of our -- the majority of our -- of the beds compliant with obligations of the settlement are permanent housing and, again, by definition permanent

Szabo - Cross / By Ms. Mitchell                    **176**

housing is supposed to be more -- ideally, they're in that housing for longer than a quarter and it's reasonable that if it's leased up then that information remains to be -- remains current quarter to quarter.

The definition or the manner in which we're reporting PEH served in -- for interim housing refers to how many times there's been turnover in those beds, how many times a bed has been used.  So that information is cumulative and it should -- it should be increasing over time since the time that it's been established.

**BY MS. MITCHELL:**

Q    Showing you Exhibit 29, Line 18.  That's a interim housing for Highland Gardens, is that right?

A    Yes.

Q    And you show 143 beds and 259 PEH served.

**MS. MITCHELL:**  And just for clarification for the Court, this is Exhibit 9 -- excuse me, this is Exhibit 29, which is Docket 652.  The date on that is October 16th of 2023. Just for context.

**BY MS. MITCHELL:**

Q    So going back to Line 18 and on housing PEH served, you would agree that the moment that you report that, which is 15 days after the quarter ends, that number, 259, may be stale?

**MR. MCRAE:**  Objection, calls for speculation, lack of foundation.

Szabo - Cross / By Ms. Mitchell                  **177**

**THE COURT:**  You dropped your voice and I didn't hear the last portion.

**MS. MITCHELL:**  I said --

**THE COURT:**  That number is?

**MS. MITCHELL:**  Stale.

**THE COURT:**  Stale.  Thank you.

**MR. MCRAE:**  Calls for speculation, lack of foundation.

**THE COURT:**  Overruled.

**THE WITNESS:**  I don't agree with that.  You're talking about two entirely different concepts.  I don't -- two entirely different concepts.

**BY MS. MITCHELL:**

Q    Is it true, Mr. Szabo, that at the time you submitted this there may or may not have been 259 people served?  Maybe there was 263, maybe four additional people had been served in the 15 intervening days between the time the quarter ended and the time this report was submitted.

**MR. MCRAE:**  Objection, compound, lack of foundation, vague, calls for speculation.

**THE COURT:**  Overruled.

**MR. MCRAE:**  And relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  That is possible.

//

**BY MS. MITCHELL:**

Q    But you still report it, true?

A    We report that, yes, and it's -- and it is also true that if a bed is opened a week after we submit the -- or if a bed is reported a week after the reporting deadline and we report the quarterly report on the 15th, then we wouldn't report that bed either.  But that's because this is -- this is a cumulative statistic.  It's not -- you're not looking for what is the real time availability of beds that could be used today to house somebody.

**BY MS. MITCHELL:**

Q    Showing you Exhibit 25, Section 7.1.  Where does it say real time availability in this section?

          **MR. MCRAE:**  Objection, argumentative.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I'm sorry?

**BY MS. MITCHELL:**

Q    You used -- you've used the phrase with me now real time and you've used the phrase previously with counsel real time.  I'm saying where is real time, the words or phrase real time in this Agreement?

          **MR. MCRAE:**  Objection, vague as phrased.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  It's not in there.  It's not in there and it doesn't -- it doesn't -- and I agree that it shouldn't

Szabo - Cross / By Ms. Mitchell                    **179**

be in there because we're talking about quarterly reports.

**BY MS. MITCHELL:**

Q    But it's a little bit different than like a website that you can update in real time, as opposed to a retrospective report, is that true?

          **MR. MCRAE:**  Objection, relevance and incomplete hypothetical.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I think a website would be a more appropriate -- a more appropriate mechanism to convey information about beds that are currently unoccupied, as opposed to currently available, in each Council District, which -- so yes, you're -- this is part of the reason that we are reporting -- that we reported this information as we did, because it doesn't make sense to report unoccupied, currently unoccupied data in a quarterly report.  It would be more appropriate for a website that could be updated in real time or daily.

          But having -- but reporting information about how many beds are available for use in each Council District as in how many beds have been made available that are being used to serve the population experiencing homelessness, that is appropriate for a quarterly report.

//

//

Szabo - Cross / By Ms. Mitchell                    **180**

**BY MS. MITCHELL:**

Q    Something isn't available to be used if it's occupied, is it?

         MR. MCRAE:  Objection, argumentative.

         THE COURT:  Overruled.

         THE WITNESS:  I totally disagree with that because when you establish -- when you establish interim housing, the purpose of interim housing is to turn that unit over as quickly as you can.  So when we're talking about Inside Safe, for example, many of those hotel rooms are occupied but when we're planning on how many operations those hotels can sustain or can support we're not -- we don't say, okay, well, we've got 80 percent occupancy currently in motels for Inside Safe so therefore we could only -- we can only do 20 percent more operations.  There is an assumption that this is a resource that we can use on an ongoing basis that will turn over, hopefully frequently, so that we can continue to use that same resource to help as many people as possible per bed.

**BY MS. MITCHELL:**

Q    But you would agree that something is not available for use, Mr. Szabo, if it is occupied?

         MR. MCRAE:  The same, it's the same question.  It's asked and answered.

         THE COURT:  Overruled.

         THE WITNESS:  I just thoroughly disagree with that.

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell                     **181**

**BY MS. MITCHELL:**

Q    Okay, so --

A    I could repeat, if you'd like.

Q    Yeah, no, that's fine.

Is it your understanding that service providers tend to put two people in a single bed?

**MR. MCRAE:**  Objection, argumentative, Your Honor.

**THE COURT:**  That's a little argumentative, Counsel.

**(To the Witness):**  But you can answer.

**THE WITNESS:**  That is not typical, but putting two people in a single room is.

**BY MS. MITCHELL:**

Q    My question was a single bed.

A    That was your question and in some cases -- and, in fact, currently we are considering double occupancy for some of the beds -- for some of the units.  So I do appreciate that point. Yeah, sometimes we can expand the number, the use, even if a bed -- even if a unit is occupied.

Q    Okay.  We're talking about units.  Units are different than beds, true?

**MR. MCRAE:**  Objection, incomplete hypothetical.

**THE COURT:**  Overruled.

**(To the Witness):**  You can answer that.

**THE WITNESS:**  Yes, but we're reporting units or beds and, as I said, there -- sometimes you can expand the number of

Szabo - Cross / By Ms. Mitchell          **182**

opportunities or the number of beds that could be available

with a single unit.

**BY MS. MITCHELL:**

Q    Going back to Section 4, street engagement.  The City will

continue to offer shelter or housing to city shelter

appropriate PEH within the city.  Do you see that?

        **MR. MCRAE:**  Objection, beyond the scope.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I do see that, yes.

**BY MS. MITCHELL:**

Q    And can the City offer shelter or housing to city shelter

appropriate PEH if it's occupied?

        **MR. MCRAE:**  Objection, it's vague, lack of a

definition, it's beyond the scope, it calls for a legal

conclusion, and it's a hypothetical.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  This is -- so this is one section of

the Settlement Agreement that is -- this section is referring

to the current -- at the time the current policies and

regulations as it related to street engagement.  So this is,

this is specific to maintaining the City's, the City's current

strategy, at least at the time.  So I don't -- this is --

this is -- this is a different section.  But could you repeat

your question?

**BY MS. MITCHELL:**

Szabo - Cross / By Ms. Mitchell          **183**

Q     I think I'll move on.

A     Thank you.

Q     Going to Section 4.3, citywide engagement.  There is a provision which we talked about previously:  Even after the City creates adequate and appropriate housing and shelter opportunities for 60 percent of the number of unsheltered city shelter appropriate PEH within the city, no enforcement action shall be taken against an individual suspected of violating a public space regulation or ordinance unless that individual has first been offered adequate and appropriate shelter or housing. Do you see that phrase?

          **MR. MCRAE:**  Objection, beyond the scope of this hearing.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Yes, I do.

**BY MS. MITCHELL:**

Q     Would knowing how many beds or shelter opportunities are available be relevant to this metric in Section 4.3?

          **MR. MCRAE:**  Objection, relevance is a legal term, calls for a legal conclusion, it lacks foundation, it's an incomplete hypothetical, and it's vague.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Again, this is -- the section is referring to a future situation that could occur once our obligation, our primary obligation to establish housing has

been, has been met.  So this is -- the reporting obligations were ongoing since the beginning.  This is referring to what would happen after we've complied with the Agreement.

**BY MS. MITCHELL:**

Q    I recognize that and thank you for that caveat.  My question was a little bit different in that if there were no shelter opportunities available, meaning unoccupied, if every single bed in the city was occupied and there was no availability, would that be relevant to the interpretation of this section?

        **MR. MCRAE:**  Objection, it's an incomplete hypothetical.

        **THE COURT:**  Overruled.

        **MR. MCRAE:**  It's --

        **MS. MITCHELL:**  Let me --

        **MR. MCRAE:**  Let me complete my objection.  It's -- unless you're withdrawing the question.

        **MS. MITCHELL:**  I was going to rephrase it, but you can keep going.

        **MR. MCRAE:**  No, if you're going to rephrase it, that means you're withdrawing it, so I'll wait and then make objections.

**BY MS. MITCHELL:**

Q    Okay, so if all beds are occupied are there any beds to be offered, Mr. Szabo?

Szabo - Cross / By Ms. Mitchell                    **185**

MR. MCRAE:  Objection, if is a hypothetical, it's an incomplete hypothetical, it calls for a legal conclusion, and it's vague.

THE COURT:  Overruled.

MR. MCRAE:  And it's beyond the scope.

THE COURT:  Overruled.

THE WITNESS:  If all beds are?

BY MS. MITCHELL:

Q    Occupied.

A    Are occupied….

Q    Are there any beds that can be offered?

MR. MCRAE:  Same objection.

THE WITNESS:  I -- the -- if the -- if we're reporting occupancy of beds on a quarterly basis that has -- and in any given quarter all of the beds were occupied at the date of the report, that does not mean that all of the beds would be unavailable to be offered to people throughout the entirety of the next quarter.  In fact, it almost certainly does not mean that.

BY MS. MITCHELL:

Q    Okay, so my question was a little bit more focused.  If all beds are occupied, meaning none are available, can any offers be made?

MR. MCRAE:  Objection, Counsel is testifying as to the meaning of the term, it's an incomplete hypothetical, it

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell **186**

calls for a legal conclusion, and speculation, it's beyond the

scope.

THE COURT:  Overruled.

THE WITNESS:  If on any given day every bed is

occupied, then under that hypothetical situation on that day at

that hour there would not be anything available to be offered

to an individual.

BY MS. MITCHELL:

Q   Let's move on.  The City will work with LAHSA is the start

of the next phrase, which you spoke about with your counsel.

You indicated that the City has no unilateral control over

LAHSA.  Do you recall that testimony?

A   I do, yes.

Q   You agree that the City has some control over LAHSA, is

that true?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  I would state it as the City has

representation on LAHSA's governing board.

BY MS. MITCHELL:

Q   Fifty percent representation, in fact, true?

A   That is true.

Q   And that's five commissioners, is that right, out of ten?

A   That is correct.

Q   And those commissioners can make motions, is that right?

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell                    **187**

A      That is my understanding.

Q      They can vote, is that true?

        MR. MCRAE:   Objection, lack of foundation and calls

for --

        THE COURT:   Overruled.

        MR. MCRAE:   -- a legal conclusion.

        THE COURT:   Overruled.

        **(To the Witness):**   You may answer the question.

        THE WITNESS:   Yes, commissioners can vote.

**BY MS. MITCHELL:**

Q      They can recommend to establish commissions, is that

right?

        MR. MCRAE:   Objection, lack of foundation.

        THE COURT:   Overruled.

        THE WITNESS:   The bylaws, I would need to review the

bylaws.   I think that might be -- that might be in the -- that

might be with the chair, but I need to look at the bylaws on

that.

**BY MS. MITCHELL:**

Q      In conjunction with the five members appointed by the

County, the City and the County together direct LAHSA policy,

is that true?

        MR. MCRAE:   Objection, vague.

        THE COURT:   Overruled.

        THE WITNESS:   The representatives appointed by the

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell                    **188**

City and those appointed by the County, yes, are the governing board of LAHSA.

**BY MS. MITCHELL:**

Q    The City provides funds for LAHSA, true?

A    That is true.

Q    Historically it's been about 40 percent of LAHSA's budget, is that right?

A    That is about -- that is correct, yes.

Q    Now, the County has recently withdrawn or is planning on withdrawing funds that I understand to be about $300 million. Do you understand that metric to be true?

A    Yes, that's my understanding.

Q    Do you know at that point then what percentage of funds City -- what percentage of the LAHSA -- let me rephrase that.

        After the County has withdrawn that funding, are you aware of what percentage of LAHSA budget City will be funding?

        **MR. MCRAE:**  Objection, it's an incomplete hypothetical and it's vague and it calls for speculation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I would need to -- I haven't done that math exactly, but it would be -- it would be high, it would be -- it would be north of 80 percent.

**BY MS. MITCHELL:**

Q    The money that City provides to LAHSA, it pays for specific activities, is that true?

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell          **189**

MR. MCRAE:  Objection, vague, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  Some of our funds -- well, our funds are dedicated to specific purposes.  The majority of our funds are dedicated to contracting with service providers.

**BY MS. MITCHELL:**

Q    And when it's paying, and I said specific activities, you used a different phrase.  What was the phrase you used?

A    I'm sorry.

MR. MCRAE:  Objection, vague.

**BY MS. MITCHELL:**

Q    Okay, I'll just ask the question.  You correct me if I'm using a different phrase.

For the specific activities that the City is funding, the City can direct how it wants its money to be spent, is that right?

MR. MCRAE:  Objection, calls for a legal conclusion, it's also vague.

THE COURT:  Overruled.

THE WITNESS:  So in the case of -- so in part.  There are some funds that go to LAHSA for LAHSA operations, which are -- which are specific.  So for example, that go to the homeless engagement teams.  Those are outreach workers that work directly for LAHSA, they're employees of LAHSA.  There are other -- the majority of our dollars goes to LAHSA for

Szabo - Cross / By Ms. Mitchell                    **190**

contracting mostly for providing services to interim housing to service providers.  So there's essentially a pass-through.  The service providers have a contract, have contracts with LAHSA, the City has a contract with LAHSA that governs how the interaction will work between LAHSA and the service providers, and so we pay into that contract with LAHSA, then LAHSA contracts with the service providers for -- to provide services, again mostly interim housing, but for other uses as well.

**BY MS. MITCHELL:**

Q    Okay.  So if I understand your testimony, the City has contracts with LAHSA, I think you said that governs the interactions between LAHSA and the service providers.  Is that right?

A    It governs -- it governs the relationship between the City and LAHSA as it relates to LAHSA's contracting with the service providers.  So it isn't -- there are two sets of contracts between the service providers and LAHSA and LAHSA and the City.

Q    All right.  Okay, let's move to the phrase to the extent possible.  Does it say here to the extent reasonable?

        **MR. MCRAE:**  Objection, argumentative.

        **THE COURT (To the Witness):**  Do you understand the question?

        **THE WITNESS:**  Yes.  It doesn't say that.

//

Szabo - Cross / By Ms. Mitchell            **191**

**BY MS. MITCHELL:**

Q    Does it say to the extent the City feels like it?

        **MR. MCRAE:**  Objection, argumentative, Your Honor.

        **THE COURT:**  Well, Counsel, we could go through the whole -- you know.  Let's -- I'll let you ask that question, Counsel, but then let's --

        **MS. MITCHELL:**  Thank you, Your Honor.

        **THE COURT:**  -- let's move on.

        **MS. MITCHELL:**  Thank you.

A    It doesn't say that.

Q    Just to the extent possible, true?

A    It does say to the extent possible.

Q    And there are no limitations placed on to the extent possible within this document, true?

        **MR. MCRAE:**  Objection, Your Honor.  That calls for a legal conclusion.

        **THE COURT:**  Overruled.

A    It doesn't say that.  It doesn't say to the extent possible untethered to any other potential, anything that is theoretically possible with any amount of resources that could potentially be expended.  It doesn't say that.  It says to the extent possible.

Q    And there are no limitations within this document to that phrase, to the extent possible, true?

        **MR. MCRAE:**  Objection, that calls for a legal

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell                **192**

conclusion, and it's asked and answered.

THE COURT:  Overruled.

THE WITNESS:  I think the phrase itself is a limitation.

BY MS. MITCHELL:

Q    How is the phrase itself a limitation?

A    It says to the extent possible.

Q    So that's the limitation.

A    Yes.

MS. MITCHELL:  Okay.  Thank you.

Q    Going to the number of PEH engaged, the next metric -- and by the way.  Let's look at this we'll work with LAHSA to include in the quarterly status updates to the extent possible. Would you agree that this section, this entire sentence is largely about outreach?

MR. MCRAE:  Objection, lack of foundation, vague.

THE COURT:  Overruled.

MR. MCRAE:  Calls for a legal conclusion.

THE COURT:  Overruled.

A    It is about people.

Q    Outreach to people.

A    Outreach is part of -- it doesn't actually use the word "outreach."  It's referring to interactions with people.

Q    With people experiencing homelessness.

A    With people experiencing homelessness, yes.

Szabo - Cross / By Ms. Mitchell                **193**

Q    And the City funds a number of outreach teams through LAHSA; is that true?

MR. MCRAE:  Objection, vague, lack of foundation.

THE COURT:  Would you repeat that?  You dropped your voice.

**BY MS. MITCHELL:**

Q    The City funds a number of outreach teams through LAHSA; is that true?

MR. MCRAE:  Vague, lack of foundation.

THE COURT:  Overruled.

A    No, it is true, yes.

Q    And LAHSA manages those teams for the City; is that right?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

A    In part.  There are -- as I said, there are outreach teams that are directly employed with LAHSA.  And there are outreach teams that work in the City that are funded by the County, that report to the County.  And there are outreach teams that are deployed by service providers that contract with LAHSA.

So in part, they manage directly, but not exclusively.

Q    Okay.  So if I understand you, they contract with service providers who do outreach, and then they have their own outreach teams; is that what you were saying?

A    Correct.

Q    Okay.  And then the City separately has its own outreach

**EXCEPTIONAL REPORTING SERVICES, INC**

teams, correct, that it doesn't manage through LAHSA?

A    The City has a limited staff of outreach workers specific to Inside Safe.

Q    Do council districts employ any outreach teams?

            **MR. MCRAE:**  Objection, vague.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  Council districts, the -- manage -- each council district manages its office differently as it relates to how it organizes itself around its office's homelessness response.

       It is typical that they have liaisons with the outreach workers that work in each council district.

       Council offices also have used funds that are under their control to contract with LAHSA for multidisciplinary teams, for example, which are contracted again through service providers.

**BY MS. MITCHELL:**

Q    It is -- I wouldn't say -- although, again, each office is handled differently.  I wouldn't say that there are outreach workers in council offices, but --

Q    Okay.  So --

A    But, again, I'm not sure how every office has organized itself.

Q    Okay.  So there may be council districts that directly employ outreach workers, you just don't know of them specifically.

**MR. MCRAE:**  Objection, lack of foundation, it's a hypothetical, calls --

**THE COURT:**  Overruled.

**MR. MCRAE:**  -- for speculation.

**THE WITNESS:**  The classification of council aide is broad and is intended to be broad.  So the duties assigned to council aides could include a number of activities.

So that's why I'm not ruling that out as -- but it's -- as it relates to outreach, it -- the typical process is that there are a number of outreach workers that are employed in each of the three ways -- actually four ways that I just described, LAHSA directly, service providers, County funded, or City funded, County MDTs.

Sometimes that money comes directly from council offices, and their work is dedicated to that council district.

**BY MS. MITCHELL:**

Q   Maybe I'm not asking the question the right way.  What I'm trying to get at, Mr. Szabo, is whether any council districts specifically contract with service providers directly for outreach in their district.

**MR. MCRAE:**  Objection, vague, lack of foundation.

**THE COURT:**  Overruled.

A   So, again, I don't -- I also don't -- I'm trying to be responsive.  But I think the question isn't clear because if a council office is going to contract directly with outreach

Szabo - Cross / By Ms. Mitchell                    **196**

workers, that would still typically go through LAHSA.

Q    Okay.

A    So the contract would be held by LAHSA but that office would through my office pay LAHSA.

Q    Okay.  That is helpful.  So --

A    Yeah.

Q    -- to your knowledge, the only non-LAHSA managed outreach teams are through Inside Safe or some MDT teams that might go through the County; is that fair?

MR. MCRAE:  Objection, compound, misstates the witness's testimony, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  That seems right to me.  I don't want to say that that's exhaustive, but that's -- that is -- that seems about right to me.

**BY MS. MITCHELL:**

Q    Okay.  So how many -- if you know, how many outreach workers are in Inside Safe or employed by Inside Safe directly?

MR. MCRAE:  Lack of foundation and vague.

THE COURT:  Overruled.

A    I actually don't know that right now.

Q    Do you have an estimate?  Is it like five or 50?  Any range?

MR. MCRAE:  Objection.

A    No.  I --

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell                    **197**

MR. MCRAE:  Calls for speculation.

THE WITNESS:  I'm sorry.

MR. MCRAE:  I said calls for speculation.

THE COURT:  I'm sorry, I didn't hear the last part of the answer.

THE WITNESS:  So --

MS. MITCHELL:  Go ahead and answer.

THE WITNESS:  I believe it is in the range of 15.

THE COURT:  Fifteen, one, five.

THE WITNESS:  I believe.  But I don't -- I would need to verify that.  I don't know.

THE COURT:  Okay.

THE WITNESS:  And I really don't know.  It's -- but it's not a hundred.

MS. MITCHELL:  Okay.  That's -- I think that's fair.

**BY MS. MITCHELL:**

Q    So let's go to the number of PEH engaged.  You previously described with your counsel your understanding of engagement. Engagement means that the outreach that they are conducting results in engaging the person experiencing homelessness with some kind of case plan; do you recall saying that?

MR. MCRAE:  Objection, mischaracterizes the witness's testimony.

THE COURT:  Overruled.

THE WITNESS:  I believe I said something close to

Szabo - Cross / By Ms. Mitchell          **198**

that as I was conveying LAHSA's definition.  It is a defined

term for LAHSA-funded outreach.

**BY MS. MITCHELL:**

Q    And that was the definition at the time the settlement

agreement was entered into; is that right?

          **MR. MCRAE:**  Objection, vague, lack of foundation.

          **THE COURT:**  Overruled.

A    I believe that's the case.

Q    To your knowledge has the definition changed at all over

the last several years?

          **MR. MCRAE:**  Objection, vague and lack of foundation.

          **THE COURT:**  Overruled.

A    That I don't know.

Q    So your testimony is that all the reporting under Section

7.1 has to be tied to the beds that you are creating under this

agreement; is that true?

          **MR. MCRAE:**  Objection, asked and answered at the

outset.

          **THE COURT:**  Overruled.

A    That is -- that was our posture, that was our

understanding.  That's how we have attempted to report these

metrics.

Q    Okay.  And the actual language is progress with this

agreement, your interpretation is progress with the principal

obligation of the agreement, which is beds; is that fair?

Szabo - Cross / By Ms. Mitchell          **199**

MR. MCRAE:  Objection, mischaracterizes the witness's testimony.

THE COURT:  Overruled.

THE WITNESS:  It is correct, yes, that the primary obligation of this agreement is to create the 12,915 beds, and that the data reported in our status reports, in our status updates is -- should be related to those beds.

BY MS. MITCHELL:

Q   Your testimony is also that it's impossible to report this metric because when people are engaged, they're not necessarily engaged related to specific beds; is that right?

MR. MCRAE:  Objection, mischaracterizes the witness's testimony.

THE COURT:  Overruled.

A   It -- when there is engagement, it is not always -- it is not the case that engagement -- that all engagements are tied to specific beds, that the engagements don't necessarily lead immediately to a housing solution.

In some cases, as I said, in the case of Inside Safe, that is a case where there are specific beds and there is outreach that is conducted specific to those beds.  But that is not the universal standard.

Q   Okay.  And your testimony therefore is that it's not possible to report PEH engaged exclusive to the opportunities created to the settlement for that reason; is that right?

Szabo - Cross / By Ms. Mitchell   **200**

A    Correct.  It wouldn't be possible for us to provide a complete picture, a complete reporting for all engagements specific to the beds that we report quarterly.

Q    And you're -- now, you're aware that LAHSA can in fact report these metrics as it relates to citywide engagement, true?

A    Yes.

        **MR. MCRAE:**  Objection, vague.

        **THE WITNESS:**  Oops.

        **THE COURT:**  Overruled.

**BY MS. MITCHELL:**

Q    And LAHSA has actually provided those metrics to you in terms of citywide engagement; is that right?

        **MR. MCRAE:**  Objection, vague.

        **THE COURT:**  Overruled.

A    Yes, they have.

Q    And you -- and the City never reported those citywide engagement numbers to the Alliance, true?

        **MR. MCRAE:**  Objection, vague.

        **THE COURT:**  Overruled.

A    We did not report those citywide numbers in our quarterly reports.

Q    And you didn't report them because it wasn't tied to the Alliance beds; is that right?

        **MR. MCRAE:**  Objection, mischaracterizes the witness's

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell                    **201**

testimony.

THE COURT:  Overruled.

THE WITNESS:  That's correct.  We reported them in other forms.  We reported those numbers to the City council.

We were -- we made those numbers public, also on a quarterly basis, by the way.  But we didn't report them in the Alliance quarterly reports because we couldn't tie the aggregate numbers to the beds established pursuant to this settlement.

**BY MS. MITCHELL:**

Q    So it's your testimony the City knowingly entered into an agreement it knew it could never meet; is that right?

MR. MCRAE:  Objection, mischaracterizes the witness's testimony, and argumentative.

THE COURT:  Overruled.

A    That is not my testimony, and that is exactly why our obligation under the section of 7.1, number one, is to work with LAHSA.  That's the obligation, to work with LAHSA.

And it is qualified with that phrase that you cited earlier, to the extent possible.

So if we are working with LAHSA and determine that it is not possible as a result of working with LAHSA, it is not in my view a requirement to report information that is not possible to obtain.

Q    Mr. Szabo, it -- follow me here.  If the definition of

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell          **202**

engagement necessarily means a case plan, and that doesn't

necessarily mean tied to a bed, and you're interpreting this to

mean that you only report the number of PEH engaged tied to a

bed, doesn't it follow that it would never have ever been

possible under your definition to report the number of PEH

engaged?

        **MR. MCRAE:**  That is compound, it assumes facts, it

lacks foundation, it calls for speculation, and calls for a

legal conclusion, and --

        **THE COURT:**  Overruled.

        **MR. MCRAE:**  -- it's argumentative.

        **THE COURT:**  No, overruled.

        **THE WITNESS:**  Our obligation was to work with LAHSA

to determine whether reporting the metric as requested was

possible.  And if it was possible, to report it.

**BY MS. MITCHELL:**

Q    But under your interpretation, you knew at the time you

entered into this that it was impossible, true?

        **MR. MCRAE:**  Objection, asked and answered, and

argumentative.  And --

        **THE COURT:**  Overruled.

        **MR. MCRAE:**  -- misstates the witness's testimony.

        **THE COURT:**  No, you can answer the question, sir.

A    I don't necessarily -- you know, as we've discussed and as

hopefully we will discuss if we have an opportunity to talk

with Judge Birotte, there -- capabilities can evolve over time. And in some areas, what was impossible to report in 2022 could be possible to report on a go-forward basis.

So I don't think that -- you know, we understood this is a five-year agreement.  And our obligation was to work with LAHSA to include, to the extent possible, these -- this information.

So we have no -- obviously we agreed to the settlement. We were certainly willing to work with LAHSA, and we did work with LAHSA.

Our definition of PEH engaged is as it relates to this -- to the beds in this agreement.  But we certainly have no objection to reporting aggregate information if that's what is requested by the Court or the Plaintiffs.

We can report that.  We have been reporting that, just in a different forum.  So that's -- I don't think there's a -- I honestly don't see the issue here.

It's we couldn't report it in the way that we had hoped to report it, so we didn't.  But if we're broadening the definition, we can certainly work with Plaintiffs and the Court on that.

Q    And there's a way to report it that is possible, which is the citywide metrics, true?  And then there's a way that makes it impossible to report, which is tying it to Alliance beds. And the City is choosing to interpret it in the impossible way; is that right?

Szabo - Cross / By Ms. Mitchell                    **204**

MR. MCRAE:  Your Honor, that is argument.  It --

THE COURT:  Do you understand -- excuse me.  Do you understand the question?

THE WITNESS:  I do.  I mean, I do.

MR. MCRAE:  Can I finish my objections before he answers?

THE COURT:  No, I wanted to make sure he understood the question.

MR. MCRAE:  Right.

THE COURT:  Now raise your objection, counsel.

MR. MCRAE:  Thank you.  It's argument.  It also is counsel testifying as to what is or is not possible.  It's compound.  There's an "or" in the question.  It calls for speculation.  And there's a lack of foundation.  And it calls for a legal conclusion.

THE COURT:  Overruled.

Do you recall the question?  It can be restated.

THE WITNESS:  And, I'm sorry, I'm going to ask you --

THE COURT:  Yeah, no, let's get it restated.  It was a lengthy question --

THE WITNESS:  Yes.

THE COURT:  -- or lengthy objection --

THE WITNESS:  Thank you.

//

//

Szabo - Cross / By Ms. Mitchell **205**

**BY MS. MITCHELL:**

Q    So there's a way --

THE COURT:  -- so restate the --

Q    -- to report this data which is possible, which is the citywide metric.  And there's a way which is impossible to report this data, which is tied to Alliance beds.  And the City is choosing the impossible way; is that true?

MR. MCRAE:  Same objections.

THE COURT:  Overruled.

A    We worked with LAHSA to determine whether it would be possible to report this information specific to the beds.  It isn't, it wasn't, it isn't.  We haven't reported it that way. We didn't include it in our reports starting in January of 2023.

No objections were raised.

Special master was aware of our reports.  We proceeded with the understanding that we were complying with this section.  In fact, even in the special master's first annual report, this item wasn't even addressed at all, as I recall.

And if we were instructed to report the citywide metric at any point from January, 2023 on -- moving forward, we could have done that.

We were actually -- we were literally reporting that citywide metric to the City council, also with quarterly reports, at the same time, also starting at the same time,

Szabo - Cross / By Ms. Mitchell                    **206**

around January of 2023.

So there was no reason for us to -- we would not have objected to that.  But we -- our definition was specific to the beds created by this settlement.

**MS. MITCHELL:**  I took the document off because I could tell it was distracting you.  I'll show it to you.  This is Exhibit 90, Special Master Martinez's independent monitoring report, year one.  I'm on page 18.  This is section seven.  Do you see that?

**THE WITNESS:**  Yes.

**BY MS. MITCHELL:**

Q    And special master actually did identify that the City's failed to report the number of PEH engaged, true?

**MR. MCRAE:**  Your Honor, that's a mischaracterization of the document.

**THE COURT:**  Overruled.

**(Laughter)**

**THE WITNESS:**  Could you advance the page?

A    All right.  So she was recounting the obligation.  She then says we have complied with the first sentence.

The -- she says that we have complied with the number of housing opportunities created, beds or opportunities offered and beds or opportunities currently available in the council districts, which is what we took as, okay, how we're reporting it is correct, so let's continue to do what we're doing.

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell          **207**

And then she does say we have yet to provide the Court with the following information.

**BY MS. MITCHELL:**

Q   That's fair.  Was there a specific conversation with Special Master Martinez about these issues?

        **MR. MCRAE:**  Objection, vague.

        **THE WITNESS:**  But could I finish the --

        **MS. MITCHELL:**  Oh, I'm sorry.  I --

        **THE WITNESS:**  Yea.

        **MS. MITCHELL:**  -- didn't mean to interrupt.  Please continue.

A   It's just she doesn't address the PEH engaged, doesn't say that we did or didn't.  She certainly didn't say.  She identified three areas that we have yet to provide the Court with information.

That doesn't include -- that includes the encampments, the rejected offers, and the accepted offers, but not the PEH engaged.

        **MS. MITCHELL:**  Thank you for that clarification.

Q   Did you have a specific conversation with Special Master Martinez about these metrics?

        **MR. MCRAE:**  Objection, vague.

        **THE COURT:**  Overruled.

A   I don't recall.  We had multiple conversations in the early part of the settlement reporting process.

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell **208**

Q    Going back to PEH engaged, what steps, if any, has the City taken to ensure that those outreach teams in the City's control are collecting this data in order to report it?

MR. MCRAE:  Objection, vague, and lack of foundation.

THE COURT:  Overruled.

MR. MCRAE:  And assumes facts.

A    I would have to -- I'm quite sure that that information is collected.  But, as I said, it's only on a limited basis as it relates to Inside Safe alone.  So under any circumstances, reporting that information would be incomplete at best.

MS. MITCHELL:  That wasn't my question, though, Mr. Szabo.  And if your answer is you don't know, that's fine.

Q    What steps has the City taken to collect and report that data, the number of PEH engaged, from the outreach workers that the City does have direct supervision over?

MR. MCRAE:  Objection, Your Honor, lack of foundation and vague, and assumes facts, calls for a legal conclusion.

THE COURT:  Overruled.

A    We haven't reported that information as it would be incomplete.

Q    Do you have the information?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

A    The number of engagements related to Inside Safe is something that is tracked, yes.

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell     **209**

Q    Okay.  But the City has chosen not to report it because it can't report the other metrics; is that right?

MR. MCRAE:  Objection, mischaracterizes the witness's testimony, and vague.

THE COURT:  Overruled.

A    It would be -- if we were to report just the engagements as it relates to Inside Safe beds, it would be incomplete.

But, again, if that is the request of the Court, if that is something that we come to an agreement on, that would be an acceptable compliance with this section because that is what is possible.  We would be happy to work with you on a way that we could report that information.

MS. MITCHELL:  Okay.

A    As it relates to Inside Safe.

MS. MITCHELL:  Thank you.

Q    Going on to the number of PEH who have accepted offers of shelter or housing, and that's in your interpretation housing or shelter pursuant to this agreement; is that right?

A    That's correct.

Q    You would agree that Section 4.1 regarding the City's street engagement strategy is part of the agreement.

A    Section 4.1 refers to a preexisting policy.  It is in the agreement.  But that street engagement strategy wasn't agreed to as a result of the settlement.

Q    But it is part of the agreement, true?

Szabo - Cross / By Ms. Mitchell                **210**

A     It --

         MR. MCRAE:  Objection --

A     -- references -- yes, 4.1 references the City's existing street engagement strategy.

Q     City will continue to offer shelter or housing to city shelter appropriate PEH, etcetera.  That's -- I read that correctly in Section 4.1.

         MR. MCRAE:  Objection, Your Honor.  It's beyond the scope.

         THE COURT:  Overruled.

A     Yes.

Q     And that's part of this agreement, true?

         MR. MCRAE:  Asked and answered, Your Honor.

         THE COURT:  Overruled.

A     Yes.

Q     And looking at section five, milestones and deadlines where the City will create plans and develop milestones and deadlines for the creation of shelter and housing and encampment engagement cleaning and reduction and use best efforts to comply with those plans, milestones, and deadlines, that's part of this agreement, true?

         MR. MCRAE:  Objection, Your Honor, argumentative.  Also, calls for a legal conclusion.

         THE COURT:  Overruled.

A     It is, yes.

Szabo - Cross / By Ms. Mitchell          **211**

MS. MITCHELL:  Let's move on to the next section.

Q    The number of -- well, I'm sorry, the -- let's -- the last metric, the number of PEH who have accepted offers of shelter or housing.  It's your interpretation that the City reporting PEH served is that metric; we've established that, correct?

A    That's correct.

Q    Okay.

A    That represents that number.

Q    Okay.  So going on.  The number of PEH who have rejected offers of shelter or housing and why, you previously testified that the requested information here is how many times a person experiencing homelessness was offered but then rejected an offer.

We've talked about this offer versus on offer here.  And your interpretation is this is an actual offer of shelter; is that right?

MR. MCRAE:  Objection, --

MS. MITCHELL:  Let me --

MR. MCRAE:  -- mischaracterizes --

MS. MITCHELL:  That was a terrible -- I agree with you, Marcellus.  Let me ask that one again.

**BY MS. MITCHELL:**

Q    Your interpretation here is that this metric is asking for how many times a person experiencing homelessness was offered but then rejected an offer; what does that mean?

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell **212**

MR. MCRAE: Objection, calls for a legal conclusion.

THE COURT: Overruled.

THE WITNESS: I suppose I could just restate that. This metric is requesting the number of persons experiencing homelessness. Again, it's related to an individual or a number of people who have rejected offers of shelter, who were provided an opportunity to be housed and rejected that opportunity.

**BY MS. MITCHELL:**

Q   Okay. And it's your belief that the offers referred to here are different than the beds or opportunities which were on offer earlier in this paragraph; is that right?

A   Is a different -- it's a different definition of offer. But, again, consistent with our interpretation of the requirements, it would still be tied to the beds created.

Q   And you testified that as a result of our work with LAHSA, we've determined that it was not possible. When did you work with LAHSA to determine that it was not possible?

MR. MCRAE: Objection, vague, not possible is vague.

THE COURT: Overruled.

A   We've been working with LAHSA on an ongoing basis.

Q   At what point -- when did you first meet with LAHSA to determine whether this reporting metric was possible?

MR. MCRAE: Objection, vague.

THE COURT: Overruled.

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell          **213**

THE WITNESS:  So the -- we've been working with LAHSA on an ongoing basis that predates this settlement agreement.

But we've been working with LAHSA as it relates to this -- to these obligations back to our -- back to 2023, when we first started as we were issuing our initial reports.

MS. MITCHELL:  May I have a moment, Your Honor?

THE COURT:  Certainly.

BY MS. MITCHELL:

Q    I'm going to show you Exhibit 547 which is an e-mail from Megan, is it Falcon or Falcone?  How do you pronounce her last name?

A    Falcone.

Q    Falcone.  From Megan Falcone to Emily Vaughn Henry and cc'ing Edwin Gipson dated August 24th of 2023.  Have you seen this e-mail before?

MR. MCRAE:  Objection, Your Honor, lack of foundation -- well.  I'll let the question proceed.

THE WITNESS:  I'm not -- I wasn't copied on this e-mail but I believe I've seen this e-mail.

Q    Were you aware and I'm sorry Megan Falcone and Edwin Gipson work in your office, right, in the CAO's office?

A    That's correct.

Q    And you were CAO at this time?

A    That's correct.

Q    This is an e-mail, purports to be an e-mail from Megan in

EXCEPTIONAL REPORTING SERVICES, INC

your office informing Ms. Vaughn Henry that as part of the

Alliance settlement agreement the City will be required to

report quarterly to the extent possible and then identifies a

series of metrics.  Do you see that?

A    I do, yes.

Q    Is this your office's first attempt to work with LAHSA to

get this data?

          **MR. MCRAE:**  Objection, argumentative, lack of

foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I don't know because there was turnover

in our homelessness unit.  I had a different chief when I first

became CAO and when this agreement was made.

**BY MS. MITCHELL:**

Q    When did you become CAO?

A    I became CAO in July of 2021.

Q    And you said you had a different chief, what was the

chief's name?

A    I'm sorry, yes, chief is a term that we use for the heads

of our divisions.  The chief of the homelessness group in --

when in the initial months of this settlement or leading up to

the settlement and in the initial months of the settlement was

Brian Buckner.

Q    And when did Mr. Buckner leave?

A    I don't remember the exact date.  I don't remember the

exact date.  I want to say it was mid-2023, early -- it was in '23.

Q    Okay.

A    Maybe March, April.  I don't recall.  I'd have to look.

Q    That's okay, that's okay.  Do you have any idea if anybody from your office reached out to LAHSA to determine these metrics prior to August 24th of 2023?

          **MR. MCRAE:**  Objection, vague and lack of foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  It's very possible.  It's very possible.  As I said Brian was the lead and was developing our early processes for reporting.  So it's possible, it's likely, I just don't know.

**BY MS. MITCHELL:**

Q    Have you seen any e-mails referencing these metrics prior to August 24th of 2023?

          **MR. MCRAE:**  Objection, vague, lack of foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I have not.

Q    Okay. Do you have any calendar entries, let's say with LAHSA, anybody from LAHSA to talk about these metrics and how LAHSA can start reporting these metrics with the City?

          **MR. MCRAE:**  Lack of foundation, compound, vague.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I would need to review that.

Szabo - Cross / By Ms. Mitchell                    **216**

Q    Okay.  Have you let's say searched, have you done a search for Mr. Buchner's e-mails to determine if he had previously been working on this issue prior to leaving the City?

A    Buckner?

Q    Buckner, thank you.

A    I don't -- no, I don't have direct access to his e-mails, but as I said -- and even if I did, that is not -- it wouldn't be conclusive as to whether there was any communication.  At the time we made the settlement, we had something called the unified homelessness response center, which was housed at the emergency management department that he frequently -- that he created as part of this work, where we had representatives of LAHSA and City departments.

     We were trying to get the county to be part of that and so as it relates to the early days, certainly in 2022, there was a lot of face-to-face communication by design between our office and LAHSA.  So if there wasn't an e-mail that doesn't mean in any way that there wasn't communication.  They were sitting next to each other in a pretty close space frequently.

Q    Okay.  But just to be clear, you have no evidence or knowledge as you sit here today of any outreach that actually happened prior to August 24th, 2023 regarding these issues; is that right?

          **MR. MCRAE:**  Objection, it's compound and it's vague.  It calls for a legal conclusion and it's asked and answered.

Szabo - Cross / By Ms. Mitchell                **217**

THE COURT:  Overruled.

THE WITNESS:  I don't have an e-mail, but the other items I told you I would need to look at in terms of calendar appointments, et cetera.

**BY MS. MITCHELL:**

Q    But you don't have any of them here today, true?

A    I don't have that in front of me right now, no.

Q    Showing you Exhibit 543, which is -- and I'm on page 17, so the last in time e-mail that's dated October 10th of 2023, is an e-mail from Brian Brown at LAHSA to Megan, I believe Megan Falcone providing some data related to these metrics through September 30th of 2023.  Do you see that?

A    I do see that.

Q    Have you ever seen this e-mail before?

A    I don't -- it doesn't look familiar to me.

Q    Okay.  And do you know if you were copied on this e-mail chain?

A    I don't know, it's possible.

Q    You testified that as a result of our work with LAHSA we've determined that it was not possible.  So my question originally to you is what work with LAHSA.

MR. MCRAE:  Objection, unintelligible, what was not possible, relative to what?

THE COURT:  Do you understand the question?

THE WITNESS:  I actually didn't.  Could you repeat

the question please?

**BY MS. MITCHELL:**

Q    Yeah.  You testified as a result of our work with LAHSA we've determined that it was not possible.  My question to you is, what work with LAHSA, what -- how did you work with LAHSA to determine it was not possible to report these metrics?

          **MR. MCRAE:**  Vague as to it and which metric at which time.

          **THE COURT:**  Overruled, you can answer that question.

          **THE WITNESS:**  Our office has interaction with LAHSA on a daily basis.  I mean, it is literally our work, so you're asking what is the definition of work with LAHSA, we interact with LAHSA on a daily basis on a number of issues.

          Some that include topics addressed in the settlement, many that don't, but we work with LAHSA on a daily basis.

**BY MS. MITCHELL:**

Q    Okay.  So can you identify any work with LAHSA that you have done, I'm not talking about your office, that you have done to determine that reporting on this metric is not possible?

          **MR. MCRAE:**  Vague again as to which metric.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I've had a number of conversations and I have been in a number of meetings where they have represented that offers rejected is not something that they could report.

Szabo - Cross / By Ms. Mitchell **219**

Q    Okay.  Do you have any written documentation of this?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  It's possible that there was some indication but in -- it's possible, I just don't know.

Q    Are you aware that Bevin Kuhn testified in an earlier proceeding that it actually is possible to build the infrastructure to report this data, they would just time to build it and priority?

MR. MCRAE:  Objection, mischaracterizes the witness' testimony.

THE COURT:  Overruled.

MR. MCRAE:  And counsel is testifying.

THE COURT:  You can answer the question, sir.

THE WITNESS:  That would not surprise me.  There's been improvements in LAHSA's data collection consistently over the last several years.

BY MS. MITCHELL:

Q    And so to the extent LAHSA, through Bevin Kuhn, has testified that it actually is possible they just need time to do it, is that something the City now intends to do?

MR. MCRAE:  Objection, it's an incomplete hypothetical.  It lacks foundation, mischaracterizes the witness' testimony that is Ms. Kuhn, also calls for a legal conclusion.

**THE COURT:**  Overruled.

**THE WITNESS:**  If it is in fact possible and LAHSA has the capability of implementing the system, the systems required to report that information accurately in a way that we could verify I would have no issues with reporting it at all.

Q    When were you told they don't have a mechanism for tracking this?

**MR. MCRAE:**  Objection, vague.

**THE COURT:**  Overruled.

**THE WITNESS:**  This is something that they have -- I can't give you a date that they've consistently stated as this is not something that we count, this is not something that we have -- that rejected offers is not something that we have fields for in our data systems, et cetera.  It's on multiple occasions.

**BY MS. MITCHELL:**

Q    Have any of the LAHSA commissioners appointed by the City raised this issue up in any LAHSA meeting in order to start tracking this data so the City can report it?

**MR. MCRAE:**  Objection, vague, confusing, lack of foundation.

**THE COURT:**  If you know, you can answer the question.

**THE WITNESS:**  I don't know.

Q    Have you ever asked any of the City commissioners to raise this issue in a LAHSA meeting so that LAHSA can start tracking

Szabo - Cross / By Ms. Mitchell          **221**

this data, so that the City has the ability to report it?

        **MR. MCRAE:**  Objection to the extent this calls for privileged communications.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I don't believe I've had a conversation with commissioners about this issue.

**BY MS. MITCHELL:**

Q    Are you aware of anybody in the City of Los Angeles who has any communication with any LAHSA commissioner asking them to raise this issue so that LAHSA can start tracking the data so the City can report it?

        **MR. MCRAE:**  Objection, it's an incomplete hypothetical.  Counsel is testifying that all it would take is asking, it assumes facts, it lacks foundation and it's vague.

        **THE COURT:**  Overruled.  The question was aware you aware.

        **THE WITNESS:**  Sure.  Under no circumstances would I be aware of all communications that happen at any time by anyone to any number of commissioners; however, it would also be our office has relationships with the staff that work at LAHSA and that's the appropriate line of communication as it relates to this type of work.

Q    Okay.  So has anybody, are you aware of any communication, I understand that you don't know all communications, I'm asking if you are aware of any communication from your staff then

Szabo - Cross / By Ms. Mitchell                    **222**

directing LAHSA or asking LAHSA to start collecting this data so that they can report it to the Court, pursuant to your obligations under Section 7.1?

      **MR. MCRAE:**  Objection, counsel's testifying as to what the obligations are, which is inappropriate --

      **THE COURT:**  Overruled.

      **MR. MCRAE:**  -- it assumes facts and calls for a legal conclusion.  It lacks foundation.

      **THE COURT:**  Thank you, overruled.  You can answer the question.

      **THE WITNESS:**  Well, I think you just showed me an e-mail from 2023 that suggests that and as I stated, that doesn't -- that to me is not conclusive that that was the first communication, as there was different staff that were in place prior to 2023 that would have been responsible for communication with LAHSA on these matters.

**BY MS. MITCHELL:**

Q   Okay.  Showing you Exhibit 547 again, this e-mail from Megan Falcone.  Is this the only e-mail that you are aware of asking about these metrics?

      **MR. MCRAE:**  Objection, lack of foundation.

      **THE COURT:**  Overruled.

      **THE WITNESS:**  This is the e-mail that I've seen, but I do not know -- I don't know if there are other e-mails that relate to these metrics, I don't know.

Szabo - Cross / By Ms. Mitchell          **223**

Q    Okay.  So I'll ask a more broad question then.  Are you
aware of anybody in the City, whether LAHSA commissioners,
LAHSA appointed commissioners, anybody in your office ever
asking LAHSA to start collecting this data so it can be
reported?

         **MR. MCRAE:**  Objection, assumes facts that that's the
case, lacks foundation, calls for a legal opinion and it's
vague.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  Anyone ever asking LAHSA to start
collecting data so that it could be reported?

**BY MS. MITCHELL:**

Q    Correct.

A    I mean certainly there's been -- there has been on
multiple levels ongoing conversations as it relates to
encampments.

Q    I'm so sorry, Mr. Szabo, can you repeat that?  Are you
aware of any communications asking for this information?

A    Without specificity, I'm aware that there have been --
there certainly has been conversations with LAHSA as it relates
to improving their capacity to report data on encampments.
That's been an ongoing process and at multiple levels.

Q    Well, this isn't talking about encampments, this is
talking about PEH who have accepted offers of shelter -- excuse
me, PEH who have rejected offers of shelter or housing and why

offers were rejected.

So I'm going to ask the question again.  Are you aware of anybody in the City or appointed by the City who has ever asked LAHSA or directed LAHSA to start recording this data or collecting this data so that it could be reported to the Court?

MR. MCRAE:  Vague, what data?

THE COURT:  Overruled, you can answer the question.

THE WITNESS:  I mean, I've had that conversation.

BY MS. MITCHELL:

Q   So you have specifically asked LAHSA to start collecting this data?

A   I have asked them what it would take if -- in order to do that because it's not currently possible and so I've had conversations about, you know, what would be required.  Is this -- are we talking, you know, how much time, how much resources.  I have had those conversations.

Q   Okay.  And when was the first time you had that conversation?

A   I don't recall.  I don't recall the date that I've had that conversation.

Q   Is it in the last one year, three years?

MR. MCRAE:  Objection, asked and answered, calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  It would have been in the last year

because this is something that has been consistently, no, we don't do that.  The answer we had been getting is this is not something we do, this is not something our outreach workers do and it's just -- it's not part of the program.  That's been -- that has been every discussion that I've had related to this has resulted in that.  And so I've been -- you know, we have been pushing them on a number of areas, including encampments, but you're asking specifically about offers rejected and, you know, that is again, it's not possible.  We haven't been reporting it because it hasn't been possible.  It might be that's compliant with the obligation here, because it has not been possible.

There have been turnovers in leadership at LAHSA and as they've been improving their data and as they have -- as new leadership has taken the helm, there's a greater openness to moving into this direction.

**BY MS. MITCHELL:**

Q    Who said it was not possible?

A    I'm sorry?

Q    You said they said it was not possible.  Who said it was not possible?

A    On multiple levels for the last several years.  This is not something -- this is something that they've consistently stated it's not something that they do, it's not something that outreach workers do, it's not something they've even intended

Szabo - Cross / By Ms. Mitchell                    **226**

to require, but I think there is a greater openness so that again, this is something that I think would be appropriate.  It isn't possible today, it wouldn't be possible next week, but this is something that I think would be appropriate for discussion with Judge Birotte if there were a meet and confer on this item.  I feel like we can get to some sort of a timeline.

Q    I appreciate that, Mr. Szabo, I'm just looking retrospective because you've talked about a number of metrics and I'm just asking about this specific metric, number of PEH who have rejected offers of shelter or housing and why.

Who said that was not possible?  Give me the name of one person, you said multiple levels, one person.

A    I'm not going to give you the name of one person.  It's been consistently communicated over the last several years.

Q    Can you give me the name of any person that said that?

A    No.

Q    Can you give me any date that that was said?

A    Multiple dates throughout the several years --

Q    Can you give me one --

A    -- but I cannot give you a date.  Again, we work with LAHSA on a daily basis.  There are -- we meet with LAHSA for various reasons literally daily.

Q    Who sets the policy for LAHSA?

                **MR. MCRAE:**  Objection, it's vague, lack of foundation

EXCEPTIONAL REPORTING SERVICES, INC

and calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  LAHSA has a board of directors.  LAHSA has an executive director, I believe the title is CEO now.

BY MS. MITCHELL:

Q     Board of commissioners?

A     Board of commissioners, excuse me.

Q     And the board of commissioners sets policy for LAHSA; is that right?

MR. MCRAE:  This is asked and answered, Your Honor.

THE COURT:  You can answer the question.

THE WITNESS:  The board of commissioners certainly approves policy typically, as it is typical with a -- in any organization, proposals are brought to the board by the executive staff.

Q     And so when you're being told this isn't what we do or something to that effect, did you ever ask any of the City appointed board of commissioners to raise this as an issue to direct LAHSA policy to start doing this?

MR. MCRAE:  Objection to the extent that this gets into deliberative process, privilege and/or attorney/client privilege also relevance --

THE COURT:  Overruled.

MR. MCRAE:  -- also it's vague.

THE COURT:  Overruled.

EXCEPTIONAL REPORTING SERVICES, INC

**MR. MCRAE:**  Oh, and it's asked and answered too.

**THE COURT:**  Thank you.  You can answer the question, sir.

**THE WITNESS:**  I don't believe so.

**BY MS. MITCHELL:**

Q    Number of encampments in each council district.  Now, this is a metric that actually can be reported by LAHSA; is that true?

**MR. MCRAE:**  Objection, vague as to time.

**THE COURT:**  Would you restate that, I didn't hear the question?

**MS. MITCHELL:**  Yes, Your Honor.

Q    The number of encampments in each council district, this is a metric that can be reported; is that true?

**MR. MCRAE:**  Objection vague as to time.

**THE COURT:**  Overruled.

**THE WITNESS:**  This is something that LAHSA -- this is an area where LAHSA has improved over time and this is an area where at the beginning of the settlement agreement they were not able to report.  They're certainly in the last since 2023 there's been a much greater focus on data as it relates to encampments.  And they've been working to improve their capacity to report on encampments.

There -- again, they have been making improvements. I think they are -- well, I know that they are very close to

being able to report with a high level of accuracy data regarding encampments, broken down by council district.

My understanding is that it is not quite ready yet, but they are currently collecting this information and in the very near future we will have the capacity to report this information on a council district basis.

**BY MS. MITCHELL:**

Q    As of 2023, you were at minimum able to report encampments per council district identified for Inside SAFE encampment clean ups; is that right?

**MR. MCRAE:**  Objection, lack of foundation, calls --

**THE COURT:**  Overruled.

**MR. MCRAE:**  -- for speculation.

**THE COURT:**  You can answer the question, sir.

**THE WITNESS:**  Well, I think if you're referring to Inside SAFE, Inside SAFE encampments identified for clean up that's different than number of encampments in each council district.

I think numbers that were provided on that specific to Inside SAFE, again if you're referring to the information that I believe you're referring to, it was very limited and it is -- was in no way a representation of the totality of encampments in any given -- in any particular council district or citywide.

Q    But my question was, as of 2023, you were at minimum able

Szabo - Cross / By Ms. Mitchell          **230**

to report on the encampments identified for clean up for Inside

SAFE; isn't that true?

     **MR. MCRAE:**  Objection, beyond the scope of Section

7.1, lack of foundation.

     **THE COURT:**  Overruled.

     **THE WITNESS:**  Is there a report that you could direct

me to?  Because again, there is a number of --

**BY MS. MITCHELL:**

Q    Exhibit --

A    Yes, thank you.

Q    Yeah, Exhibit 409, this is Table 7, Inside SAFE

encampments, this was attached to the e-mail you looked at

earlier identified as Exhibit 543.  Let me double-check that.

    Yeah, let me just show you this real quick.  So this is

Exhibit 543 the e-mail on October 10th of 2023 from Brian Brown

to Megan Falcone sharing information.  And Exhibit 409 as we've

established is the data that was provided --

     **THE COURT:**  I'm sorry, could you go back one page

please?  You had a page up --

     **MS. MITCHELL:**  Yes, Your Honor.

     **THE COURT:**  -- just before this.  Just a moment.

    Just a minute.

    Thank you.

Q    So this is Exhibit 543 and the date of that e-mail is

October 10th of 2023 and the associated data that was provided

with that e-mail is Exhibit 409, which includes clients with

CLS.  Living situation?  And then outreach clients engaged, so

the total number of clients engaged is Table 2, various exits

from homelessness.  And then the Table 7, as has been testified

to here by Bevin Kuhn is the Inside SAFE encampments.  Have you

seen this before?

A    Yes, I have.

Q    Okay.  So my question to you is, as of October of 2023,

the City at minimum could have been reporting the number of

Inside SAFE or excuse me, encampments per council district

identified for potential Inside SAFE clean ups; isn't that

true?

      **MR. MCRAE:**  Objection, Your Honor, it assumes that it

was called for, so it calls for a legal conclusion, it lacks

foundation, it's vague and it calls for speculation.

      **THE COURT:**  Overruled.

      **THE WITNESS:**  So I would -- no.  This information was

not what was requested in the settlement agreement.  And

furthermore, this information is badly incomplete as it relates

to being representative of encampments in the city.

      As an example, for Council District 14, which

includes skid row, it shows two encampments.  If we would have

reported as an effort to comply with Section 7.1 that there are

two encampments in skid row that would not be in any way

accurate or consistent with the truth or any obligation under

Szabo - Cross / By Ms. Mitchell        **232**

the settlement and I'm quite sure you would have raised

significant objections to that.

**BY MS. MITCHELL:**

Q    But my question to you is a little bit different,

Mr. Szabo.  As of October of 2023 you were at minimum able to

report encampments that were targeted for clean up pursuant to

Inside SAFE; isn't that true?

        **MR. MCRAE:**  Objection, asked and answered and

argumentative.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes, we had a list of 27 encampments in

2023.

Q    Okay.  And you did not report that with your quarterly

reporting, true?

A    We did not.

Q    Now, when will the encampment per council district metric

be reported to the Court?  When is that going to start?

        **MR. MCRAE:**  Objection, calls for speculation, lack of

foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I can only say as soon as possible.  We

had a meeting on this, a public meeting on this specific issue

on December 11th and I asked that question specifically and

directly when we could -- when we could be in a position to

publicly report this information.

Szabo - Cross / By Ms. Mitchell          **233**

And I have seen a draft of what it could look like, but it is not yet ready.  They're still -- we still need to work through the information.  LAHSA still needs to work through the information on a -- you know, to ensure that it is accurate.

I think again in the near future.  I don't -- I can't commit to the next quarterly report, which would by the end of, you know, this month.  But again, this is a timeline we could work this out with Judge Birotte, but I can just tell you that we are very close to having that capability and we have a commitment to provide that information as soon as we can provide that information in a manner that we can validate.

**BY MS. MITCHELL:**

Q    Are you aware that Bevin Kuhn testified this encampment data has been available since early 2025?

**MR. MCRAE:**  Objection, mischaracterizes the witness' testimony.

**THE COURT:**  Overruled.

**THE WITNESS:**  I'm not aware of her testimony, but I'm not -- that doesn't surprise me.  They have been improving their capacity and capability to collect information on encampments.

Q    The Department of Sanitation collects data on encampments.

A    They -- it collects data, it collects some data on encampments on tents, makeshift shelters, et cetera, yes.

Szabo - Cross / By Ms. Mitchell                          **234**

Q    And why hasn't that been reported to the Court?

A    That's -- it would be incomplete information.  That information is obtained as part of a broader cleanliness survey and it is information that is collected by sanitation employees.  We certainly feel more comfortable that in reporting encampments that that should be done with an outreach function.

     So again, it goes to completeness of the information and we're not comfortable with the information and the data collected by sanitation.

Q    But sanitation does collect data on tents and makeshift shelters.

A    That is true, yes.

Q    How long has sanitation been collecting data on tents and makeshift shelters?

A    The manner in which they've collected data has evolved over time, but they've been collecting data certainly connected to their clean up operations for several years.

Q    Does anybody track RVs in the City of Los Angeles?

          **THE COURT:**  I'm sorry, could you repeat that?

          **MS. MITCHELL:**  RVs.

Q    Does anybody in the City of Los Angeles track RVs?

          **MR. MCRAE:**  Objection, relevance and beyond the scope --

          **THE COURT:**  Overruled.

Szabo - Cross / By Ms. Mitchell                **235**

MR. MCRAE:  -- of this hearing and lack of foundation.

THE COURT:  Thank you.  You can answer that question.

THE WITNESS:  RVs are -- there are RV operations that are coordinated through employees in my office that involve multiple departments.  Those are -- the operations are developed in concert with council offices.  There is information that is -- again, there is information that's reported in some form in an unreliable form in the annual point in time count report, but again that information, when reported is again not only six months or more old, from when it was collected, it is also not reliable as it relates to a district-by-district breakdown.

**BY MS. MITCHELL:**

Q    Does the LA Department of Transportation collect information on RV encampments?

MR. MCRAE:  Relevance, grounds, scope, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I believe they have some information on that, yes.

Q    Now, you indicated that the 15-ish members of Inside SAFE outreach team collect information on a number of PEH engaged, do they also collect information on the number of PEH who have accepted offers of shelter or housing?

Szabo - Cross / By Ms. Mitchell                    **236**

**MR. MCRAE:**  Objection, vague, lack of foundation.

**THE COURT:**  Overruled.

**THE WITNESS:**  Yes, and we report that.

Q    Does that same team collect information on the number of PEH who have rejected offers of shelter or housing and why offers were rejected?

A    I don't believe they -- excuse me, I don't believe they do.

Q    Does anybody within Inside SAFE outreach workers or otherwise, collect information on the number of encampments in each council district?

**MR. MCRAE:**  Objection, lack of foundation and vague.

**THE COURT:**  Overruled.

**THE WITNESS:**  My understanding is that they have information about information regarding encampments in council districts as it relates to potential operations.

**BY MS. MITCHELL:**

Q    Wasn't it your testimony that you didn't found out about -- that the Alliance took issue with your reporting until recently; is that right?

**THE COURT:**  Could you repeat that --

**MR. MCRAE:**  Objection.

**THE COURT:**  -- just a little bit more slowly, a little louder, please?

**MS. MITCHELL:**  Yes, thank you, Your Honor.

Szabo - Cross / By Ms. Mitchell          **237**

Q    It's your testimony, Mr. Szabo, that you didn't find out the Alliance took issue with your reporting until recently; is that right?

         **MR. MCRAE:**  Objection, mischaracterizes the witness' testimony and vague as to recently.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  I did not understand that there was -- I did not understand the -- that there was a disagreement over the definition of some of the terms that we had been reporting on for the last two years until recently when we had the opportunity to meet and confer over those items.

**BY MS. MITCHELL:**

Q    That was in November; is that right?

A    Correct.

Q    And are you aware that the Alliance actually brought this issue back up in 2024?

         **MR. MCRAE:**  Your Honor, that's counsel testifying. That's lacking foundation, that's argument.

         **THE COURT:**  Overruled.

         **MR. MCRAE:**  Assumes facts.

         **THE COURT:**  Thank you, you may answer the question.

         **THE WITNESS:**  Not to my recollection, but.

Q    Showing you Exhibit 80.  This is a motion or a reply in support of a motion that was filed in September of 2024.  I'm going to point you to page 2, which is identified as page 3 I

Szabo - Cross / By Ms. Mitchell                **238**

think on the docket.

THE COURT:  Just a moment.  What docket number is it?

MS. MITCHELL:  This is Docket 776, Your Honor.  And I'm on page 3 of 7.

THE COURT:  Okay.  It's 776 and the exhibit number is 80?

MS. MITCHELL:  Exhibit 80.

THE COURT:  And the page is?

MS. MITCHELL:  Page 3, according to the docket pagination.

THE COURT:  All right.  Thank you.

MR. MCRAE:  I'm sorry, what was that exhibit again, Your Honor?

MS. MITCHELL:  80.

MR. MCRAE:  80, thank you.

BY MS. MITCHELL:

Q   Can you read that footnote, please, starting on line 26?

A   The City is failing to report the specific metrics of the number of beds or shelter opportunities currently available in each council district, the number of PEH engaged, the number of PEH who have accepted offers of shelter and housing, the number of PEH who have rejected offers of shelter and housing and why offers were rejected, and the number of encampments in each council district.

Q   There's a second line there as well.

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell                    **239**

A     Reporting these metrics would go far in meeting the City's obligations to provide sufficient information to enable parties to evaluate compliance.

          **MR. MCRAE:**  Your Honor, objection.  This is out of a brief, it's not evidence, and it's not sent to Mr. Szabo.

          **THE COURT:**  Overruled.

          **MR. MCRAE:**  So this lacks foundation, it's pure argument by counsel and it doesn't have an evidentiary value.  Pleadings don't have -- briefs don't have evidentiary value.

          **THE COURT:**  Thank you, overruled.

**BY MS. MITCHELL:**

Q     Have you seen this before, Mr. Szabo?

A     I don't believe so.

Q     Did anybody raise this issue or brought this issue to your attention that the Alliance was taking issue with the City's reporting?

          **MR. MCRAE:**  Objection, lack of foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I mean we've had ongoing conversations about the City's reporting for some time and the -- we've had multiple, multiple, multiple conversations regarding establishment of milestones and this hasn't been raised.  This specific issue has not been raised to me in the context of those ongoing conversations.

Q     But the Alliance raised this issue over a year ago, right,

**EXCEPTIONAL REPORTING SERVICES, INC**

I mean, this is September 2024.

MR. MCRAE:  Your Honor, same objections.  It's asked and answered.  This is just argument.

THE COURT:  Overruled.

THE WITNESS:  Yeah.  Again, this wasn't -- I don't believe that I've seen this document.

**BY MS. MITCHELL:**

Q    Okay.  And then are you aware that this issue was raised with your lawyers in December of 2024 in a meet and confer where Special Master Martinez was present?

MR. MCRAE:  Your Honor, that's counsel testifying again without foundation.  It's saying, are you aware that this happened, that's improper.

MS. MITCHELL:  And I object to the speaking objections.

MR. MCRAE:  Your Honor, this is improper, counsel.

THE COURT:  All right.  Thank you both very much, overruled and you can answer the question.  Are you aware of this in December of 2024, from Special Master Martinez?

THE WITNESS:  Again, can you repeat the question?

Q    Yes.  Are you aware that this issue was raised with your lawyers in December of 2024 at a meet and confer where Special Master Martinez was present?

MR. MCRAE:  Renew that objection, as well as to the extent this invades attorney/client privilege.

Szabo - Cross / By Ms. Mitchell          **241**

THE COURT:  As far as the privilege is concerned it's sustained, so the question is are you aware of this?  Special Master Martinez's report, you referred to it before, are you aware of this in December --

THE WITNESS:  Well, I'm certainly familiar with Special Master Martinez's report.  I think -- I'm not sure if the counsel is asking --

THE COURT:  Let's have her reask that to be certain.

THE WITNESS:  Sure.

THE COURT:  Counsel, reask your question.

MS. MITCHELL:  Yeah.

BY MS. MITCHELL:

Q    Are you aware that the Alliance took issue with the City's failure to report the required metrics in December of 2024 during a meet and confer with your lawyers in December of 2024?

MR. MCRAE:  It assumes facts, it's counsel testifying, it lacks foundation, it calls for speculation.

THE COURT:  Overruled.

MR. MCRAE:  And also to the extent it invades the attorney/client privilege.

THE COURT:  All right.  Thank you.  You may answer the question.

THE WITNESS:  I'm not aware.

Q    Okay.  And then are you aware this issue was raised again with your lawyers in July of 2025?

Szabo - Cross / By Ms. Mitchell                    **242**

**MR. MCRAE:**  Same objection as to lack of foundation.

**THE COURT:**  Overruled.

**THE WITNESS:**  I believe there was some communication that preceded a meet and confer that we had over a selection of a monitor that may have included some reference to 7.1 and other -- among other items.

**BY MS. MITCHELL:**

Q    Are you aware that the Alliance got no substantive response at all from the City for four months until after this motion was filed?

**MR. MCRAE:**  Your Honor, that's argument as to substantive, it also calls for a legal conclusion or some other type of analysis, it lacks foundation, and it's vague and it's argumentative.

**THE COURT:**  Overruled, you can answer that if you know.

**THE WITNESS:**  I'm not aware of the timeline of the responses to filings.

Q    The first meeting you and I had on this issue was November 17th; is that right?

A    I believe that's the case, yes.

**MS. MITCHELL:**  Your Honor, this may be a good time for a break.  I think I might be almost done.

**THE COURT:**  Okay.  Why don't we take 20 minutes, thank you.

Szabo - Cross / By Ms. Mitchell                    **243**

MS. MITCHELL:  Thank you.

THE COURT:  Sir, you may step down.

THE WITNESS:  Thank you.

**(Recessed at 4:29 p.m.; reconvened at 4:55 p.m.)**

THE COURT:  Back on the record and if you'd be seated.  Thank you, counsel, for your courtesy.  We need time this evening when you finish to just have a discussion for about 15 or 20 minutes in terms of scheduling, et cetera.  So take us as far as you can, but I think about 5:30, I need a few moments with the folks.

UNIDENTIFIED SPEAKER:  Yes, Your Honor.

THE COURT:  Okay.  Hopefully you'll be done today.

MS. MITCHELL:  May I proceed, Your Honor?

THE COURT:  If not, we'll be courteous and reschedule at your convenience.  Okay.

**CROSS EXAMINATION (CONTINUED)**

BY MS. MITCHELL:

Q    Mr. Szabo, you previously testified that your team is absolutely committed to providing as much accurate information as we possibly can.  Do you recall that?

A    Yes, I do.

Q    And that your team is extraordinarily dedicated and highly skilled and perfectionists.  Do you recall that?

A    Yes.

Q    And do you recall testifying that you have layers and

layers of oversight?

A    I'm sure I said that, yes.

Q    And do you recall similar testimony earlier this year during the evidentiary hearing or last evidentiary hearing, you testified that your team is conservative and you are certain that everything that is reported is verified and verifiable.

        **MR. MCRAE:**  Objection.  Context and vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes, I agree with that statement.

**BY MS. MITCHELL:**

Q    You also testified that you want to be precise and, quote, I have confidence that the numbers that we're reporting are accurate.  Do you recall that?

A    Yes.

Q    But it turns out the numbers you were reporting were not accurate; is that true?

        **MR. MCRAE:**  Objection.  Vague as to what numbers over what period of time.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  What are you referring to?

Q    I'm going to show you what has been marked as Exhibit 417, Docket 980.  This is the declaration of Matthew Szabo in response to June 5th, 2025, amended order dated June 11th, 2025.  Do you recall this declaration?

A    I do, yes.

Q    And in this declaration, and I'm on page 2 of 3 as far as docket numbers go, in paragraph 4, you indicated that the reporting that you guys had been issuing to the Court on the TLS beds were actually wrong; is that right?

          **MR. MCRAE:**  Your Honor, objection.  This is about the roadmap agreement.  This has nothing to do with the scope of this proceeding, so it lacks foundation.  It's beyond the scope, beyond the order that the Court entered that delineated the issues for this hearing.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Can you repeat the question?

**BY MS. MITCHELL:**

Q    Sure.  Regarding -- this is regarding the roadmap agreement.  After reviewing the numbers, it turned out that 130 scattered sites of rapid rehousing or shared housing that the City was reporting should not have been separately listed because they were already subsumed within other TLS reporting; is that right?

          **MR. MCRAE:**  Objection, Your Honor.  Same objections.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  That's correct.

**BY MS. MITCHELL:**

Q    And likewise, your staff compared the addresses in the spreadsheets with LA Alliance addresses and found that 12 of the beds were actually overlapping; is that right?

Szabo - Cross / By Ms. Mitchell                    **246**

**MR. MCRAE:**  Same objections, Your Honor.  Can I have a standing objection to all of the questions about this document and questions directed to the roadmap agreement?

**THE COURT:**  You may.  Overruled.

**THE WITNESS:**  Yes, that's correct.

**BY MS. MITCHELL:**

Q    Now, around the same time, Special Master Martinez visited a safe sleep site for which the City was reporting 88 beds and found there were only 35 or 40 tents; is that right?

**MR. MCRAE:**  Objection.  Lack of foundation.  Vague.

**THE COURT:**  Overruled.

**THE WITNESS:**  Yes, I believe that's correct.

Q    And do you recall that your attorney's -- and I'm showing you Exhibit 396, your attorney's response was simply that the Special Master has no authority or basis to review or provide any assessments of the City's compliance.

**MR. MCRAE:**  Objection.

Q    Were you aware of that?

**MR. MCRAE:**  Beyond scope.  Also, the repeated reference to Mr. Szabo's attorney.

**THE COURT:**  Overruled.

**THE WITNESS:**  Am I aware of this?  I was not copied on this email.

Q    But were you aware of the email was my question?

A    Not specifically, not the contents of the email, no.

Q    Were you aware that the City attorney, I believe this was Jessica Mariani, indicated that the City would look into the questions about the safe sleep site, but never did?

        **MR. MCRAE:**  Objection, Your Honor.  That assumes facts.  It's argument.  It's counsel testifying.

        **THE COURT:**  Overruled.  You may answer the question.

        **MR. MCRAE:**  And it lacks foundation and calls for speculation.

        **THE COURT:**  Thank you.  You may answer the question.

        **THE WITNESS:**  I'm sorry, the last part of that was that, but never did?

        **MS. MITCHELL:**  Correct.

        **MR. MCRAE:**  Same objections.

        **THE COURT:**  Overruled.  You may answer the question.

        **THE WITNESS:**  No, I believe this site was -- I believe we did investigate the situation at this safe sleep site, rather.

**BY MS. MITCHELL:**

Q    Okay.  Are you aware at the last hearing on November 12th -- not the last hearing, one of the last hearings on November 12th this year, Ms. Mariani actually stated on the record that she did not have a follow-up meeting regarding this issue?

        **MR. MCRAE:**  Objection.  Lack of foundation, calls for speculation.  And again, counsel is testifying about what

someone else said purportedly.

THE COURT:  Overruled.

THE WITNESS:  I'm not -- I can't speak to what the City attorney stated.  My office did look into this.

BY MS. MITCHELL:

Q    And what did you discover?

MR. MCRAE:  Objection to the extent that it calls for attorney-client privilege communication.

THE COURT:  Overruled.  You can answer the question, please.

THE WITNESS:  We discovered that, and I don't have the numbers in front of me, but that there -- that the service provider did, in fact, reduce the number.

THE COURT:  Sir, you dropped your voice.  Service provider did in fact --

THE WITNESS:  The service provider did in fact reduce the number of spaces that were available for use.

Q    Showing you what has been marked as Exhibit 402.  This is Docket 105-1.  So it's the quarterly report for the quarter ending September 30th of 2025.  Your staff had to take an extra month to verify the reporting that happened in this case; is that right?

MR. MCRAE:  Objection, vague.  As to reporting of what?

THE COURT:  Just a moment.  First of all, does this

Szabo - Cross / By Ms. Mitchell                    **249**

have an exhibit number again?

          **MS. MITCHELL:**  Yes, Your Honor.  This is Exhibit 402.

          **THE COURT:**  402, and it's docket, I can't see it,

29 --

          **MS. MITCHELL:**  1051-1.

          **THE COURT:**  105-1.

          **MR. MCRAE:**  Yeah, Your Honor, counsel was just

conferring.  And at some point, we need to harmonize that we,

in some instances, have the same document that has different

exhibit numbers.  We will, in due course, confer, seek to have

a unified set of references and provide that information to the

Court and the clerk.

          **THE COURT:**  I look forward to that, but let's use

this time while you're here, Mr. Szabo.  And counsel, once

again, your question?

**BY MS. MITCHELL:**

Q    Yes.  So in this report, which was filed October 15th of

2025, we have, for the first time, the total PEH served on the

right listed as pending; is that right?

A    That's correct.

Q    You testified that it was brought to your attention that

there was an issue in our verification process; is that right?

A    That's correct.

Q    You discovered a discrepancy?

A    That's correct.

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell                    **250**

Q    What was the discrepancy?

A    The discrepancy was the number of PEH served as reported by the service providers compared to the PEH served that we could verify in HMIS.

Q    And how did this discrepancy come to your attention?

A    It came to my attention through my office.  It was reported up to me.

Q    By whom?

A    Through my staff.  We have regular staff meetings.  I don't remember exactly who brought it to my attention, but it was in a staff meeting.

        THE COURT:  Are all the parties aware that this was also captured in the Los Angeles Times, LAist, and a number of papers?  It came to my attention through a special master who showed me a series of articles.  Are you aware of those articles for the press about this?

        THE WITNESS:  Your Honor, are you referring to the safe sleep site?

        THE COURT:  I'm referring to the site with the number of beds that were missing.

        THE WITNESS:  Yes, I'm familiar with those articles.

        THE COURT:  Okay. Because it came from a number of sources, through your office, but you're aware of the press?

        THE WITNESS:  Yes.  Yes.

//

Szabo - Cross / By Ms. Mitchell          **251**

**BY MS. MITCHELL:**

Q    So now this is a few months later.  This is not referring to the safe sleep site; is that right, Mr. Szabo?

        **MR. MCRAE:**  Objection.  Vague as to what we're talking about.

        **THE WITNESS:**  If the question is referring to the data issues that led us to submit to the Court a quarterly report with the PEH serve data as pending, yes, that was reported to me through my office as they were preparing the quarterly report, which we filed on the 15th of October.

**BY MS. MITCHELL:**

Q    And how did they discover the discrepancy?

        **MR. MCRAE:**  Objection.  Relevance.

        **THE COURT:**  Overruled.

        **MR. MCRAE:**  Calls for speculation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  They have access to HMIS.  They have limited access to HMIS and they were not able to -- and there was a discrepancy between the number of intakes reported through HMIS and the number of intakes reported by the service providers serving those sites.

Q    Was this the first time your office had cross-referenced with HMIS?

        **MR. MCRAE:**  Objection.  Calls for speculation, lack of foundation, and relevance.

THE COURT:  Overruled.

THE WITNESS:  No, I don't believe so.

Q    So, now there were discrepancies not just in a single site, but in multiple sites; is that right?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  Yes, there was -- I don't know the number of sites, but there were multiple sites, yes.

BY MS. MITCHELL:

Q    What kind of access do you have in HMIS?

MR. MCRAE:  Objection, vague as to time, vague as to access.

THE COURT:  Overruled.

THE WITNESS:  I don't have access to HMIS myself.

Q    Thank you for clarifying.  Your office, what kind of access to HMIS does your office have?

MR. MCRAE:  Lack of foundation and vague.

THE COURT:  Overruled.  We've already had testimony about this before.

THE WITNESS:  Sure, it's limited and I -- honestly, I would need to confer with staff to give you the exact level of authorization that they have.

Q    Who in your staff?

A    I would talk to the staff members that have access to that system.  There are a number of staff that have access to that

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell                     **253**

system.  I don't know if it's at varying levels.

Q    Now, as we have discussed previously, or actually maybe not with you, Mr. Szabo, the PEH served metric, and we'll go, let's say, to Exhibit 35, which is dated April 15th of 2025.  So this PEH served metric, you report that differently for permanent supportive housing than you do for interim housing; is that right?

        **MR. MCRAE:**  Can we just have the document shown to the witness?

        **THE WITNESS:**  Yes, that's --

**BY MS. MITCHELL:**

Q    So for permanent supportive housing, what you report is a snapshot in time, right, at how many units were leased at the very end of the quarter; is that true?

A    That is correct.

Q    And for interim housing, you report the cumulative numbers, so from the beginning of the settlement or as soon as the facility opened all the way to today; is that true?

A    That's correct.  The number of intakes that each of the units at that site are responsible for, yes.

        **THE COURT:**  You know, would you ask that again?  I want to be certain in my notes that I, once again, absorb this.  I don't have real time here, so I apologize.

**BY MS. MITCHELL:**

Q    Yes.  So for permanent supportive housing, you provide a

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell                    **254**

snapshot in time.  So the very last day of the reporting

quarter, you pull the number of units that are leased and

provide that number for PEH, for permanent supportive housing,

is that true?

A     That's correct.

Q     And for interim housing, you provide the cumulative

numbers, meaning from the moment that facility was open and

occupiable to today; is that right?

A     That's correct.  We report the number of individual

intakes that site has accommodated from when it opened to the

end of the reporting period.

Q     So taking a look, and we will focus on -- let's look at

line 18.  It's one of the only interim housing on the first

pages, Highland Gardens.  So you have 143 beds, and on this

metric, you're reporting 412 PEH served; is that right?

A     That's -- yes, that's correct.

Q     And that's a cumulative number from when it opened on

December 27th of 2022 to the end of the quarter that you're

reporting for; is that right?

A     That is the intent, yes, that's correct.

Q     One line, let's say above it, the VA building 207, so line

17, we have 59 beds and 59 PEH.  Do you see that?

A     Yes.

Q     And that specific metric is the snapshot metric showing

that all those beds were filled; is that right?

Szabo - Cross / By Ms. Mitchell                       **255**

A    That's correct.

        THE COURT:  Just one moment.

        MS. MITCHELL:  Would you like me to bring that back up?

        THE COURT:  Would you go back to that line, just one minute.  All right, thank you.

        For counsel's edification, also in my record, I've got a case involving the Veterans Administration.  I've been to this building before, and that's compounds, just so you know. I'm well aware of this campus and well aware of building 207, 208, 209, just so I'm transparent about that.

        MS. MITCHELL:  Thank you, Your Honor.

**BY MS. MITCHELL:**

Q    Now, this metric is consistently the -- I'll go back to number 17, since that's the one, excuse me, 18, since we were just looking at it, Highland Gardens.  Because that's a cumulative number, it only goes up; is that right?

A    It should only go up, it should.

Q    And for a permanent supportive housing facility like the VA, it should stay fairly stable because it's by definition permanent; is that right?

        MR. MCRAE:  Objection.  Vague as to fairly --

        THE COURT:  Overruled.

        THE WITNESS:  Again, it should, unless there are units that are taken out of service for one reason or the

EXCEPTIONAL REPORTING SERVICES, INC

other, renovations, et cetera.

Q    Now, let's go to Exhibit 28, sorry.  I apologize 29. We're looking at 29.  So, line 1, we have the Washington View Apartments, and there are 91 units and 91 PEH served.  Do you see that?

A    Yes.

Q    Okay, so if we go to Exhibit 30, line 1, we again see 91 units and 91 PEH served.  See that?

A    Yes.

Q    Going to Exhibit 31, line 1, same thing, Washington View Apartments, 91 units, 91 PEH served.  And I'll just go through all of them quickly.  Exhibit 32, line 1, 91 units, 91 PEH served.  Do you see that?

A    Yes.

        THE COURT:  Just one moment, counsel.  Just one minute, please.  All right.  Please continue.

BY MS. MITCHELL:

Q    Exhibit 33, Washington View Apartments, we see 91 units and 91 PEH served.  Do you see that?

A    Yes.

Q    Exhibit 34, Washington View Apartments, we see 91 units and 91 PEH served.  Do you see that?

A    Yes, I do.

Q    Exhibit 35, line 1, Washington View Apartments, 91 units and 91 PEH served.  Do you see that?

Szabo - Cross / By Ms. Mitchell          **257**

A    Yes.

Q    Let's go to the next in time one, which is actually Exhibit 401, line 1, Washington View Apartments, 91 units and 91 PEH served.  Do you see that?

A    Yes.

Q    The next one we have is Exhibit 402, Docket 1051, Washington View Apartments, 91 units and total PEH served is pending.  Do you see that?

A    Yes.

Q    On Exhibit 403, for the first time, we have Washington View Apartments with 91 units and 86 PEH served.  Do you see that?

A    Yes.

Q    Is it your testimony today that all the prior reporting was accurate, which consistently showed the same number of units and the same PEH across the board every single quarter for the last three years and suddenly we have a loss of 5 PEH?

        **MR. MCRAE:**  Objection.  Compound, lack of foundation, argumentative.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  It's possible that the -- it's possible that a number of the leases or the vouchers were discontinued for various reasons.  I would need to look into the specifics on this item, but it's  possible that in the period of time over that last quarter that there were five units taken out of

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell                    **258**

service or the vouchers expired.

**BY MS. MITCHELL:**

Q   Okay.  Let's go back to Exhibit 29, and let's look at another one.  Let's look at the Chesterfield, line 3.  Do you see that?  42 units and 42 PEH served.  You see that?

A   Yes.

THE COURT:  Wait just a moment.  All right.  Thank you.

**BY MS. MITCHELL:**

Q   Exhibit 30, Line 3, Chesterfield 42 units, 42 PEH served. Do you see that?

A   Yes.

Q   Exhibit 31.  Chesterfield 42 units, 42 PEH served.  Do you see that?

A   Yes.

Q   Now, for the sake of time, we can just go right to -- we'll go to 35 and take a look at Exhibit 35.  Chesterfield 42 units, 42 PEH served.  Do you see that?

A   Yes.

Q   Exhibit 401, which is the report dated 715 Chesterfield reflects 42 units and 42 PEH served.  Do you see that?

A   Yes.

Q   And now suddenly on Exhibit 43 the Chesterfield reports only 34 PEH served after three consecutive years of full Occupation.  Do you see that?

**THE COURT:**  Just one moment, counsel.  Let me catch up with you.  34.  All right.  Thank you.

**THE WITNESS:**  Yes, I see that.

Q    Now I can represent to you and we can have people that testify to this and we can compare them, but dozens of these numbers have changed.  Are you a -- well, let me rephrase that. Are you aware that dozens of these numbers of total PEH served and the PSH units have changed for the first time this quarter when for the last three years, they have been consistently reported as fully occupied?

**MR. MCRAE:**  Objection.  Vague, lack of foundation --

**THE COURT:**  Overruled.

**MR. MCRAE:**  -- and also relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  Yeah, I'm aware that we have -- that we reviewed the current information and provided the numbers that that we can verify -- that were verifiable by the end of that quarter.

**BY MS. MITCHELL:**

Q    Now when was it brought to your attention that there was this discrepancy?

**MR. MCRAE:**  Objection.  Asked and answered.

**THE COURT:**  Overruled.

**THE WITNESS:**  It was -- I don't remember exactly but it was as we were preparing the quarterly report for -- I guess

Szabo - Cross / By Ms. Mitchell                          **260**

that would have been the end of the first quarter -- the first quarterly report of -- excuse me, the quarterly report ending September 30th.

Q   And the data monitor was appointed in early October; is that right?

        **MR. MCRAE:**  Objection.  Relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I believe so.

**BY MS. MITCHELL:**

Q   The discrepancies aren't just limited to permit supportive housing, they're also reflected in the interim housing reporting as well; is that right?

        **MR. MCRAE:**  Vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I would need to look at what you're referring to as it relates to discrepancies.  Discrepancy, you're talking about -- there's discrepancy in the data?

Q   Let's just look at the -- let's look at what the data shows and you can tell me what it means.

A   Sure.

Q   So looking at Exhibit 401, which is Docket 1011-1, which was filed 7/17 of '25, let's take a look at Highland Gardens, which is line 18.  You see that it says 143 beds with 425 PEH served?

A   Yes

Szabo - Cross / By Ms. Mitchell   **261**

Q    Let's look at Highland Gardens in Exhibit 403, which was the supplemental report that was filed by your office.  Now, these are cumulative numbers that for the first time actually went down, isn't that right?

MR. MCRAE:  Objection.  Foundation

THE COURT:  Overruled.

MR. MCRAE:  Vague

THE COURT:  Overruled.

**BY MS. MITCHELL:**

Q    Do you want to see 401 again?

A    Yes, please.

Q    Okay.  So this says PEH served 422.  This one in line 18 had 425.  Do you see that?

A    Oh, yes, I do.

Q    So the report that was issued in July showed a cumulative number as of July of 425, but then in November, the cumulative number was reduced by three people.  Do you see that?

A    I do see that.  Yes.

Q    How did that happen?

MR. MCRAE:  Objection.  Vague.

THE COURT:  Overruled.

MR. MCRAE:  And relevance.

THE COURT:  Overruled.

THE WITNESS:  We reported the information that we could verify at the at the time of the report.  That's all I

Szabo - Cross / By Ms. Mitchell **262**

can say.  It is typical that we that we update information as it's -- it is sometimes the case when we're talking about now nearing 11,000 units that there will be and there has been updates on information and we report those as soon as we're aware of the new information.

So I would -- again, I would need time to look into the specific reason behind the three bed reduction in -- or rather the three person reduction in person served, but I just know that if there is -- if there is new information provided, if there's new information that is verified by our office, we're going to update that information.

**BY MS. MITCHELL:**

Q   If I told you there were dozens of these discrepancies in these reports, where the numbers have been changed, would that surprise you?

**MR. MCRAE:**  Objection.  Relevance, also vague.

**THE COURT:**  Overruled.  You can answer that.

**THE WITNESS:**  So I wouldn't refer to them as discrepancies.  I would refer to them -- if it's new information, if it's information that's been reported, it's the information that we were able to verify at the end of that quarter or in this case, this may have been the supplemental at the time of issuing the supplemental.

Q   How do you report Inside Safe booking agreements?

**MR. MCRAE:**  Objection.  Vague.

Szabo - Cross / By Ms. Mitchell          **263**

**THE COURT:**  Overruled.

**THE WITNESS:**  In terms of persons served or in terms of beds created?

Q    In terms of PEH served.

**THE COURT:**  I'm sorry.  You dropped your voice.

**BY MS. MITCHELL:**

Q    In terms of PEH served.  In other words, is that a snapshot number or a cumulative number?

A    That should be a -- that should be a cumulative number.

Q    Let's look at line 37, Highland Park Motel, do you see line 37 on here?

A    Yes.

Q    Okay.  What's the cumulative PEH served there?

A    Looks like that's 48.

Q    Showing you 403 Highland Park Motel line 37, what's the cumulative number there?

A    That says 32.

Q    Looking at 501, line 29, Hotel Silver Lake.  Do you see that?

A    Yes.

Q    What's the cumulative number that's reported there?

A    That's -- it says 83.

Q    Showing you Exhibit 403, Hotel Silver Lake.  What's the cumulative number there?

**MR. MCRAE:**  Objection, Your Honor, to this line of

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Mitchell          **264**

questioning.  We're literally just reading documents.

THE COURT:  Overruled.

THE WITNESS:  It says 66.  It would be helpful to be able to review the document in total because it looks like there are multiple footnotes related.

BY MS. MITCHELL:

Q    If you want time, you can access it on the iPad.  I can also just show you the footnotes if you'd like to do that.

A    If you can point me to the exhibit number.

Q    403.

(Pause)

THE WITNESS:  Yes, so the footnotes do attempt to indicate that what we're reporting for PEH served are -- we indicate that they're conservative numbers, that they do fluctuate, and that the tracking model from LAHSA is improving or expanding.  As it relates to PEH served, particularly with booking agreements that fluctuate, there is, and we have -- there has been new information and updated information, and we're reporting the information as best as we can on a quarterly basis, but I do expect numbers to fluctuate in the future.

Q    These are cumulative numbers, true?

MR. MCRAE:  Objection.  Argumentative.

Q    It's what you just testified to.

THE COURT:  Overruled.

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Mitchell                **265**

MR. MCRAE:  Objection.  Mischaracterizes the witness's testimony and vague.

THE COURT:  Overruled.

THE WITNESS:  Yes, they should be cumulative, and if the information -- if the data changes for various reasons, and sometimes it does, we report that change in the data.

BY MS. MITCHELL:

Q    But these cumulative numbers should never go down, true?

MR. MCRAE:  Your Honor, this is argumentative, and it's asked and answered.

THE COURT:  Overruled.  You can answer that question, please.

THE WITNESS:  So if we are made aware of new information that suggests that previously reported information needs to be adjusted, I feel like we have an obligation to adjust that information, to adjust that data in our reporting.

This is -- as it relates to this kind of information that we are securing from service providers through LAHSA, and it does rely on HMIS as well, it is to be expected that there may be some fluctuations in the data.

We report the data as best we can at the end of the quarter, and if there is new information or if there is a concern with the previously reported information, excuse me, our policy is to update that information and attempt to explain the change in the footnotes.  So it's our best effort to

EXCEPTIONAL REPORTING SERVICES, INC

provide the most accurate information, and should you have questions about it, the reason that we footnoted it is so that we can provide that and provide additional information if you want additional information as to why it went down.  Excuse me.

Q    Where do the footnotes explain why the cumulative numbers went down here?  What footnotes should we look at?

MR. MCRAE:  Objection.  Argumentative, and ask and answered.

THE COURT:  Overruled.

THE WITNESS:  I believe it says that there was a certain number of properties where the numbers were reduced, a certain number of sites where the PEH had a downward adjustment from a prior quarterly report.  These are conservative numbers, and they may increase in the future based on expanded tracking -- based on an expanded tracking module from LAHSA.

**BY MS. MITCHELL:**

Q    Okay, we were looking at line 9, Hotel Silver Lake, I can put it back up, and you went to the footnotes and said the footnotes explained.  My question is, which footnotes should we look at to see why the cumulative numbers for the first time have gone down?

MR. MCRAE:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  In footnote 33, we indicate that there was a downward adjustment, and that there was a downward

adjustment because the numbers were conservative, and they may go up in the future based on our review of the available data.

Q   You said footnote 33, seven sites had a downward adjustment in number of PEH served data from the prior quarterly report.  These are conservative numbers, and they may increase.  So where does it explain why the number of PEH served went down?

MR. MCRAE:  Objection, Your Honor, out of context, and also ask and answered.

THE COURT:  Overruled.  Thank you.  You may answer the question.

THE WITNESS:  It indicates the change.  It draws your attention to the change.  If there's a specific question about a specific site, that's information that we could provide.

BY MS. MITCHELL:

Q   What did you do differently in this report that you've never done before?

MR. MCRAE:  Objection.  Assumes facts and is argumentative and relevance.

THE COURT:  Overruled.

THE WITNESS:  As I said, there was a discrepancy in the reporting between the service providers and what we were able to verify in HMIS, and it was a large discrepancy, where smaller discrepancies we would expect potentially, and those would be resolved to the best of our ability.  So that's the

reason why we pulled back and didn't include that number for PEH served in that quarterly report because there was a large discrepancy.

Q    Did you ever discover the cause of the large discrepancy?

**MR. MCRAE:**  Objection.  Vague and irrelevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  I don't know if we have discovered the cause.  I don't want to speculate.  I have some initial indications, but I would need to verify that before I could commit to it.  But there was a discrepancy between the service providers and HMIS data.

**BY MS. MITCHELL:**

Q    But my understanding is you've always checked, cross-checked with HMIS what service providers are doing.  So my question is, what did you do differently this time to double check or verify or whatever took you an extra three to four weeks?

**MR. MCRAE:**  Objection.  Compound.  Objection to the preamble about what counsel understands, it's just not relevant.  It's also argumentative and it assumes facts.

**THE COURT:**  Overruled.  You may answer the question.

**THE WITNESS:**  We, in an effort to provide the Court with a supplemental report, an updated report, as soon as we could, we took the most conservative approach to reporting the PEH served.  It may increase, as I said, and as the footnotes

state, as we continue to work with LAHSA on their tracking system.  But I can just say that we weren't able to connect all of the intakes that were being reported by the service providers to the beds that we were reporting as open and occupiable.

And so it created the situation that we needed to reconcile.  It was a large discrepancy.

**BY MS. MITCHELL:**

Q    And was this the first time that you've compared those two numbers?

**MR. MCRAE:**  Objection, vague.

**THE COURT:**  Overruled.

**THE WITNESS:**  It was the first time that we had a large discrepancy that raised questions about whether we should report the information to the Court.  There was also a disagreement, I would just say, between the service providers and the information that we were able to verify through HMIS.  They believed that their records were correct.  So out of not just an abundance of caution, but until we were able to reconcile, A, I directed staff to not include those numbers in our initial quarterly report, and B, directed staff to take the most conservative approach to reporting the numbers in the supplemental.

Q    So did you do anything to try to understand the difference and to try to verify, or did you just take the lower of the two

Szabo - Cross / By Ms. Mitchell    **270**

numbers and use that one?

        **MR. MCRAE:**  Objection.  Compound and unintelligible.

        **THE COURT:**  Did you understand the question?

        **THE WITNESS:**  Somewhat, yes.  Yes, of course, there is an ongoing and there was an effort to understand the difference and to understand why there was a discrepancy. They're still working through that.  They were still working through that by the time we issued the supplemental report, which is why we indicated that the numbers are likely to go up, but we wanted to be careful not to over-report if there was a discrepancy.

        I do believe that the numbers will be adjusted upward in future reports, but we're still working through that.  That's all I can say at this time.

**BY MS. MITCHELL:**

Q    Are you planning on going back and reviewing prior reports to determine accuracy?

        **MR. MCRAE:**  Objection.  Vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I'm sorry, could you repeat that?

Q    Are you planning to go back and review prior reports submitted to the Court to verify for accuracy?

A    We will be reviewing all of the PEH data, PEH served data to ensure that it's accurate on a go-forward basis.

Q    Showing you Exhibit 403, this total PEH served as of

September 30th, 2025.  My understanding is that this number

8,414 is all of those numbers, the PEH served numbers compiled

together.  Is that accurate or is that inaccurate?

A    That should be the total number of both the permanent

supportive housing and the interim housing.

Q    So going back, this number that we have in the far right

column, that's the total number, right?

          **MR. MCRAE:**  Objection.  Vague.

**BY MS. MITCHELL:**

Q    Is that -- when it says total PEH served as of September

30th, 2025, is that snapshot or cumulative?

          **MR. MCRAE:**  Objection.  Compound and vague.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Well, it's both because it's a

different -- we're using a snapshot number for permanent

housing and a total intake number for interim housing.

Q    You're using two different metrics for two different

housing and compiling them into a single metric of total PEH

served, right?

          **MR. MCRAE:**  Objection.  Argumentative, misstates the

record, assumes facts, and vague.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  We've been clear about how we've been

calculating PEH served since our first report in 2023.

Q    My question is --

Szabo - Cross / By Ms. Mitchell                    **272**

UNIDENTIFIED SPEAKER:  Hey, Liz, can I just ask.
It's now about 5:40.  Do we have a sense of --

MS. MITCHELL:  This is like my last.

UNIDENTIFIED SPEAKER:  Okay.

MS. MITCHELL:  I'm like -- I'm just about done.

BY MS. MITCHELL:

Q    So my question was a little bit different.  You're taking some snapshot and some cumulative numbers and putting them all together and reporting them in a single metric of total PEH served as of September 30th, 2025; is that right?

MR. MCRAE:  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  That reflects the PEH, the total number of PEH served that we're reporting.  Yes.

MS. MITCHELL:  Thank you, Your Honor.  May I have a moment?

THE COURT:  Certainly.

(Pause)

MS. MITCHELL:  I have no further questions at this time.

THE COURT:  Counsel, I need a little bit of time with all of you folks.  I don't see how you're going to complete redirect this evening.  We still have the intervenors.

Daniel Gary is available January 12th, and I'd like to keep him coming on that date.  Obviously, you'll be

EXCEPTIONAL REPORTING SERVICES, INC

returning to the stand, but we'll be courteous.  We'll reach out and make that comfortable for you and your professional duties.

Could I have one moment, counsel?  I'll be right back with you.

Could I see Tom?  Could I see both of my law clerks?  And if you'd remain just a moment, Mr. Szabo.

**(Recessed at 5:42 p.m.; reconvened at 5:46 p.m.)**

**THE COURT:**  Thank you for your courtesy.  Because there's --

**MR. MCRAE:**  Your Honor, can the witness step down?

**THE COURT:**  I want Mr. Szabo here.

Can you put up that PowerPoint?  I've got an overlap between the West LA VA Campus veteran case and some of the issues that are coming up here.  And because the West Los Angeles veterans case is up on appeal, I've been very careful to take -- and I've been very inactive on that case.

In Building 207 -- first of all you know that veterans homelessness has actually gone up in Los Angeles, don't you?  Do you know that, Mr. Szabo?

**THE WITNESS:**  Yes.

**THE COURT:**  Okay.  We would expect the, I'm going to call them permanent supportive housing or for want of a better word, we would expect stability basically in this long term stability, wouldn't we?  In other words, unlike interim

**274**

housing, permanent housing often has stability.  Correct?

THE WITNESS:  Yes, that's the goal.

THE COURT:  In Building 207 there was a document that was shown or eluded to and, counsel, each of you go back to the testimony about Building 207.

Line 17, Building 207, if you recall had 59 beds.  58 of those beds have been listed as beds occupied by veterans.  One of those beds is the house manager at 207.  By the way, Judge Pregerson was very active out there, 207 is a conversion that he started a long time ago with 208 now and 209.  It's a campus and you might not be aware of this, I'll take you out there if you want, but it's got a point and I note your objections but -- by the City.

Shangri-La is a service provider, are you aware who Shangri-La is?

THE WITNESS:  Yes, generally.

THE COURT:  Are you aware that they were flipping property?

THE WITNESS:  I've read those reports.

THE COURT:  Okay.  And I also wrote about that, do you recall, in an opinion I issued?

THE WITNESS:  Yes.

THE COURT:  Talking about corruption.  Do you recall that?

THE WITNESS:  Yes.

**275**

THE COURT:  HACLA is in a sense, for want of a better word, the outreach for the City, correct?

THE WITNESS:  HACLA --

THE COURT:  We can take a while with this if you want to, but I'm --

THE WITNESS:  Yeah.

THE COURT:  -- not being articulate, but HACLA is somewhat the placement entity.

THE WITNESS:  The placement entity for the project based vouchers, yes, for permanent housing, that's correct.

THE COURT:  You're looking at VA Building 207 quarterly report April -- I'm sorry March 31st, 2025.  Do you see that?  All of you folks?

MS. MITCHELL:  Yes, Your Honor.

THE COURT:  Okay.  Now, I want to show you another report.  In the VA Building 207 on the September report are PEH served drops from 59 to 31.  That's a drop of 28 veterans and the point of PSH housing is to provide much needed stability. The numbers may go down by one or two, but usually people are not leaving PSH housing because of the stability it provides.

And so one example of the discrepancy in the VA Building 207 is what you're looking at on the projection.  And since 2023 the City has reported that the site has remained in full occupancy at 59 units.  However, in this recent quarterly report from the City on September 30th, 2025 that number

**276**

drastically dropped to nearly half of what the number reported as 31.

And there was not an adequate response that I've received yet on why fewer veterans are able to access PSH housing. So while the goal is not to put you on the spot and maybe I'll wait for the VA campus case to come back, I just want to understand what's really going on here, what we're talking potentially 30 veterans who are getting their life together and settling into a permanent home and now facing homelessness again.

And HACLA which is the city entity did my placement and also Shangri-La which was there was widespread notoriety and publicity about flipping property is also the provider and now under indictment.

What's going on? Help me, Mr. Szabo. I'm trying to desperately understand this in both the VA case and the City case and fortunately I've got an involvement with both of them.

MR. MCRAE: Your Honor, may I make my objection now?

THE COURT: Please make your objection and then I -- please, more than welcome.

MR. MCRAE: Your Honor, my objection is that I don't understand -- the question what's going on.

THE COURT: Okay. I can be more specific. How can we have a drop in 30 veterans and if you can't answer it, just tell me you can't answer it. But I was going to bring this up

on the VA case when jurisdiction came back to me in some form, but HACLA, the City entity is involved and not only placement but servicing with Shangri-La and I wrote about this corruption before.  And you recall that.

MR. MCRAE:  So if I may, it is a different question.

THE COURT:  Now state your objection, please, and I'll be very courteous.

MR. MCRAE:  Thank you.  So my objection is I don't -- as far as the scope of this hearing, the Court is now talking about issues about corruption which to my knowledge --

THE COURT:  I'm telling you also about the discrepancy in the figures, because this goes to a huge drop that the City is involved in with veterans through HACLA.  Now, if you're confused we'll bring Mr. Szabo back and I'll be courteous.

MR. MCRAE:  It's not just --

THE COURT:  But hold on now, your objection is noted.  If you can help me in any way, I really need to understand this, because otherwise, I'm coming right back to the VA and asking the same questions.  What's going on here?  If you know and can you help me?

THE WITNESS:  Judge, I could help you.  I don't have the details today.  But I would be happy to come back.  I could get that information for you.

THE COURT:  Okay.  Let's wait.

THE WITNESS:  Okay.

THE COURT:  In fairness, take a look at it.

THE WITNESS:  Okay.  I will.

THE COURT:  You've got the City in a sense -- well, let's just leave it at that.  I want to be courteous about that, we'll have plenty of time.

All right.  So why don't you step down, we'll be courteous.  We'll find you.  By the way, have a good holiday.

THE WITNESS:  Okay.  Thank you.  You too, thank you.

THE COURT:  Okay.  How are we doing reaching out so I can contact Judge Birotte tonight?  He's somewhat waiting.  What information do you have?

MR. HAMBURGER:  It seems based on counsel's schedule that Monday, the 22nd would be the best day and basically the only day because --

THE COURT:  And if not Monday, I have no idea, you know, placing a call to him on Thursday, he's got kids, et cetera.  He's around the holidays but he didn't specify the date.  If not Monday, what's our back up date?

MR. HAMBURGER:  I don't know if there is one based on counsel's travel, but you let me know.

MR. UMHOFER:  Your Honor, we're available on the weekend as well.  We're eager to have these conversations and to make ourselves available so between now --

THE COURT:  What day is the 21st?

MR. HAMBURGER:  That's Sunday I believe.

THE COURT:  Sunday?  And you're available what day?

MR. HAMBURGER:  Monday, the 22nd.

THE COURT:  The 22nd?

MR. HAMBURGER:  Yeah.  And then I believe Shayla is -- Ms. Myers, apologies, is traveling on the 23rd in the morning.

THE COURT:  Okay.  We're not going to disturb that. Let's assume that that wasn't possible, so I'm not bringing you back to court.  What's the next date, would it be early January?

MR. HAMBURGER:  It may be when Ms. Mitchell comes back after January 9th.

MS. MITCHELL:  Yeah, I mean, certainly, Your Honor, I'm back in the country the night of January 9th.  We can be available over the week, Mr. Umhofer can stand in for me and I'm happy to join by Zoom, all of that can happen.

THE COURT:  Let me reach out to Judge Birotte, okay. He's got family also, but he's willing, you know, during hours, normal hours to be involved.  So our back up would be January 9th or after, or are you coming back, Ms. Mitchell, on January 9th?

MS. MITCHELL:  I land at 8:30 p.m. on January 9th.

THE COURT:  Okay.  Then it would be -- well, it'd be January 11th.

**MS. MITCHELL:**  Your Honor, we can --

**MR. HAMBURGER:**  You decide that, Mr. Umhofer would be available, is there a day that you would be available before the 9th?

**MR. UMHOFER:**  I'm back on the 4th, so we could assist --

**THE COURT:**  Just a moment, we're going to make this simple.  I want all of your resources available on both sides.

**MR. UMHOFER:**  Yes.

**THE COURT:**  Now what about the Mayor, what about the Council President?  In other words, I've heard counsel, but remember the principals have to be involved.  And that's what you were going to reach out to, that's what you represented you'd find out for me.

**MR. HAMBURGER:**  So my understanding is that Mr. Szabo can be there on the 22nd.

**THE COURT:**  No, I'm sorry, the principals.  We're going to --

**MR. HAMBURGER:**  Yeah.  I do not believe --

**THE COURT:**  Judge Birotte and I talked about this.

**MR. HAMBURGER:**  -- the principals can be there on Monday, the 22nd.  I believe that, my understanding and Matt maybe could speak to this, that if there is -- there's way to contact the principals during the day as necessary.

**THE COURT:**  On the 22nd?

MR. HAMBURGER: Yes, that is my understanding.

THE COURT: Are they available that day to meet with Judge Birotte?

MR. HAMBURGER: No, I do not believe the Council or the Mayor are available, that's my understanding.

THE COURT: Let me say again, we need the principals there. That's the Mayor, the Council President, that's what I asked you to reach out and find out about. And I don't want to concoct an order.

MR. HAMBURGER: I do not believe they are available on the 22nd. We were trying to --

THE COURT: When are they available?

MR. HAMBURGER: I do not know when they are available.

MR. MCRAE: Your Honor, as a point of clarification, isn't the Court asking for people that have the authority to speak for those principals? In other words if it's literally physically --

THE COURT: No, I'm very clear. Counsel --

MR. MCRAE: -- having as Council person there for example, if you have someone who's authorized to speak on their behalf, why doesn't that accomplish the same purpose?

THE COURT: Thank you, counsel. I'll simply make an order then if you can't reach a definite date between the two of you.

MS. MITCHELL: We'll circulate some dates, Your Honor, and we can include the Court on that. We can also include Judge Birotte in that if that's helpful. We're happy to coordinate that.

THE COURT: All right. But we need the principals available, that's the Mayor and the Council President, we'll be courteous. There may be ways to communicate with them, but if there is a resolution, we need to be confident it's going forward at the highest level.

MS. MITCHELL: Understood, Your Honor.

THE COURT: Okay. And so when would you like to coordinate with each other so I can let you go tonight and get back to me?

MS. MITCHELL: We can do that via e-mail tonight and tomorrow morning.

THE COURT: Fair enough?

MR. MCRAE: Yes.

THE COURT: Okay. Now, second, I've instructed Mr. Scolnick --

MR. HAMBURGER: He had a commitment. He needed to leave.

THE COURT: And Ms. Mitchell approached Special Master Martinez and you'd asked about her report. I've instructed her not to prepare her report until most of the witnesses, if not all of the witnesses have testified. I want

EXCEPTIONAL REPORTING SERVICES, INC

everything, as the Court is hearing, also heard by my Special Master. So I wanted to indicate that to you.

MS. MITCHELL: There was also a question, Your Honor, we also discussed the letter, there was a letter that the City had sent and Special Master Martinez represented that she was waiting until after these proceedings were done to respond to that letter, which is about 7.1 and that kind of thing.

THE COURT: I just knew from her that there'd been an approach informally to her, I didn't have a record of that. I wanted it clear that I've instructed her to wait.

MS. MITCHELL: Understood, thank you, Your Honor.

THE COURT: Until all of the evidence is before the Court. Then what time would you like to convene on the 12th? It sounds like that's the earliest date we can get back into session? Is 8 o'clock okay with you folks?

MS. MITCHELL: 8 o'clock is fine.

THE COURT: Okay. Now, listen, have a wonderful holiday, with you all and all of your family.

MS. MITCHELL: Thank you, Your Honor, you as well.

THE COURT: Thank you very much. And we'll communicate with you and we'll get some orders out next week.

**(Proceedings concluded at 6:02 p.m.)**

**\* \* \* \* \***

284

# CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>December 19, 2025</u>

         **Signed**                                  **Dated**


*TONI HUDSON, TRANSCRIBER*