GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
  mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
  kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
POONAM G. KUMAR, SBN 270802
  pkumar@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
  pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978.7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>CITY OF LOS ANGELES, a Municipal entity, et al.,<br><br>　　　　　Defendant. | CASE NO. 2:20-cv-02291 DOC (KES)<br><br>Honorable David O. Carter,<br>United States District Judge<br><br>**DEFENDANT CITY OF LOS ANGELES'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT**<br><br>Date:　　February 9, 2026<br>Time:　　8:30 a.m.<br>Location: Courtroom 10A<br><br>Action Filed:　March 10, 2020 |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 4

    I.    The Settlement Agreement provides relief in the event of emergencies that impact the City's financial condition. ........................... 4

    II.    Since entering into the Settlement Agreement, three Section 8.2 events have occurred. .................................................................... 4

        A.    The most destructive wildfire in state history rips through Pacific Palisades in January 2025. .................................................. 4

        B.    Large-scale civil disturbances occur in June 2025 in response to ICE activity. .................................................................. 5

        C.    The City declares a fiscal emergency in July 2025. ....................... 6

    III.    The Alliance fails to meet and confer in good faith about modifications to the Settlement Agreement, as required by Section 8.2. ................................................................................................. 7

ARGUMENT .......................................................................................................... 10

    I.    Section 8.2. of the Settlement Agreement has been triggered three separate times. .................................................................... 10

    II.    The Alliance has breached the Settlement Agreement by failing to meet and confer in good faith regarding modifications to the agreement in light of the Section 8.2 events. ........................................... 13

    III.    In light of the three Section 8.2 events and the Alliance's bad faith, the Court should modify the Settlement Agreement as the City has proposed. ................................................................. 17

CONCLUSION ....................................................................................................... 18

i

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

## Cases

*AIU Ins. Co. v. Super. Ct.*,
   51 Cal. 3d 807 (1990) ................................................................................................. 10

*Anderson v. Holder*,
   673 F.3d 1089 (9th Cir. 2012) ..................................................................................... 5

*Copeland v. Baskin Robbins U.S.A.*,
   96 Cal. App. 4th 1251 (2002) ..................................................................................... 14

*Evitts v. Lucey*,
   469 U.S. 387 (1985) .................................................................................................... 17

*Locke v. Warner Bros., Inc.*,
   57 Cal. App. 4th 354 (1997) .................................................................... 3, 13, 14, 15

*Newsom v. Trump*,
   141 F.4th 1032 (9th Cir. 2025) (per curiam) ............................................................. 11

*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*,
   112 Cal. App. 5th 519 (2025) ............................................................................... 13, 14

*Pasadena Live, LLC v. City of Pasadena*,
   114 Cal. App. 4th 1089 (2004) ................................................................................... 14

*Randall v. Yakima Nation Tribal Ct.*,
   841 F.2d 897 (9th Cir. 1988) ...................................................................................... 17

*Third Story Music, Inc. v. Waits*,
   41 Cal. App. 4th 798 (1995) ....................................................................................... 14

## Statutes

28 U.S.C. § 1291 ................................................................................................................ 17

## Rules

Fed. R. Evid. 201(b)(2) ...................................................................................................... 5

## Other Authorities

Jorge L. Ortiz, *'A new reality': Price tag for LA fires pegged at $65 billion, report says*, USA Today (July 22, 2025) ...................................................... 11

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

Shane Phillips, *The Palisades and Eaton Fires: Neighborhood Data and Potential Housing Market Effects*, UCLA Lewis Center for Regional Policy Studies (Feb. 12, 2025)..................................................................................................... 11

Gibson, Dunn &
Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER
RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

**INTRODUCTION**

The Alliance has for years filed motions in this Court pushing for what it views as strict compliance with the terms of the parties' Settlement Agreement. But there is one provision of that Agreement that the Alliance has zero interest in complying with: Section 8.2. That section provides that "[i]n the event of fires," "large scale civil disturbances," or "any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council," the City's core obligations, including creating shelter and housing solutions and engaging, cleaning, and reducing encampments, "*shall be paused*," and the parties are required "to meet and confer on any necessary and appropriate amendments to those obligations." Dkt. 429-1 § 8.2 (emphasis added). Even though three separate, catastrophic, pause-triggering events occurred this year alone, the Alliance refuses to concede that any of them is a basis for modifying the City's obligations. This Court should find that the Alliance has failed to meet and confer in good faith, and it should order a necessary and appropriate amendment that meaningfully reduces the City's obligations in light of the fiscal impacts of these three Section 8.2 events.

Section 8.2 falls under the heading "Funding," which reflects the parties' awareness that the City's efforts to combat homelessness require significant resources—resources they were counting on when they signed the Agreement, but that might for reasons outside the City's control no longer be available when the time for performance comes due. Three of those reasons came to pass just this year: (1) in early January 2025, the costliest wildfire in American history, the Palisades Fire, reduced a large portion of Los Angeles to ash and required an unprecedented commitment of hundreds of millions of dollars from the City's coffers; (2) in June 2025, tens of thousands of people flocked to downtown Los Angeles to protest against federal immigration policy, requiring the City to spend another $32 million just to fund LAPD's response to the unrest (a figure that doesn't account for the additional unexpected costs for the damage to City buildings,

Gibson, Dunn & Crutcher LLP

1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

infrastructure, and equipment); and (3) in July 2025, the Mayor and Council, short on revenue and very long on unexpected expenses, declared a fiscal emergency. Any one of those three events was enough to trigger Section 8.2, pausing the City's core obligations and requiring the parties to meet in good faith to work out an appropriate modification of the agreement. Nevertheless, the City continued to voluntarily perform—to the best of its ability—under the Settlement Agreement.

The Alliance refuses to acknowledge the plain text of Section 8.2, or that Section 8.2 has been triggered, or to accept or propose *any* modifications of the City's obligations under the Settlement Agreement—even though the Settlement Agreement contemplates modifications in the event of unforeseen fiscal challenges like those imposed by the wildfires, civil unrest, and a fiscal emergency. In the Alliance's view, the impacts of the January fires went away the moment the flames were extinguished, and the civil unrest became immaterial as soon as demonstrators were no longer gathering downtown in droves. The Alliance was dismissive of these major events, contending that it was "absurd to think that the City can unilaterally pause" the Agreement "based on a fire that happens on a street corner," Scolnick Decl., Ex. B[1] at 15–16—even though the Palisades Fire burned an area the size of the entire City of San Francisco. The Alliance also described the City's fiscal emergency as both "contrived" and the City's fault, equating the City's agreement to provide long-overdue cost-of-living adjustments to its employees to "buy[ing] exclusively Gucci." Scolnick Decl., Ex. C, Ex. F at 9. And the Alliance has refused even to consider agreeing to a substantive modification of the City's obligation unless the City gives the Alliance something to which it is not entitled, namely, a relinquishment of the City's statutory right to appeal from the Court's June 2025 order.

The Alliance is operating in bad faith. Section 8.2 is obviously and undeniably in

---

[1] A court reporter transcribed the parties' August 7, August 14, and October 30 conferences. The City is submitting those transcripts with this motion. *See* Scolnick Decl., Exs. B, D, F.

Gibson, Dunn & Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

effect. That provision is, as it declares, a safety valve when unforeseen events have long-term effects on available "Funding"—not an ephemeral pause as fires blaze across the City or protestors numbering in the tens of thousands flock downtown. If the biggest wildfires in the history of Los Angeles, massive protests that were the single biggest national news story for a week, and a declared fiscal emergency backed by audited financial statements do not trigger Section 8.2, then nothing ever could. And because Section 8.2 has been triggered, the Alliance is duty-bound to negotiate over a meaningful modification of the City's obligations to match the City's fiscal challenges. Courts routinely hold that when an agreement specifies a duty to negotiate and one side refuses to meaningfully participate in negotiations and instead "merely [goes] through the motions of purporting to 'consider'" the other side's proposals, that's a breach. *E.g.*, *Locke v. Warner Bros., Inc.*, 57 Cal. App. 4th 354, 365 (1997). Here, the Alliance has categorically refused even to entertain any possibility of modification and has instead sought to extort the City into giving up its appellate rights.

This Court should find that the Alliance has refused to meet and confer in good faith, and it should order meaningful amendments to reduce the City's obligations under the Settlement Agreement, in keeping with the text and purpose of Section 8.2. Specifically, the Court should modify the Settlement Agreement to permit the City to satisfy its encampment-reduction obligation in the very modest manner requested by the City, which was to count all reported reductions through March 31, 2025, and require 400 additional reductions by the June 2026 deadline. This modification is reasonable given the increased and unforeseen costs of pairing offers of shelter with encampment reductions and the three separate Section 8.2-triggering events, each of which has created significant financial strain in its own right. And it is within the Court's authority under Section 24 of the Settlement Agreement to resolve disputes pertaining to the "interpretation, performance, and enforcement" of the Agreement. Dkt. 429-1§ 24.

Gibson, Dunn & Crutcher LLP

3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

## STATEMENT OF FACTS

**I.      The Settlement Agreement provides relief in the event of emergencies that impact the City's financial condition.**

Under Section 3 of the Settlement Agreement, the City agreed to make available the housing "needed to accommodate sixty percent" of unhoused people who are appropriate for shelters as of a 2022 count of unhoused people.  Dkt. 429-1 § 3.1.  Under Section 4, the City agreed not to enforce "public space regulations" against anyone "unless that individual has first been offered an opportunity for housing or shelter or to relocate consistent with applicable laws." *Id.* § 4.1.  Under Section 5, the City agreed to "create plans and develop milestones" for the achievement of the obligations in Section 3, including for "encampment engagement, cleaning, and reduction." *Id.* § 5.2.

Recognizing that the obligations in Sections 3, 4, and 5 would require significant spending to accomplish, the parties expressly addressed what would happen if events outside the City's control impacted its ability to fund the obligations.  Section 8.2 of the Agreement, under the heading "**Funding**," provides that:

> In the event of fires, floods, earthquakes, epidemics, quarantine restrictions, or other natural catastrophic occurrences; terrorist acts, insurrections or other large scale civil disturbances; or any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council under the authority vested in them by the Los Angeles City Charter and Los Angeles Administrative Code (or other applicable ordinances, resolutions, or laws), the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations.

Dkt. 429-1 § 8.2.

This Court approved the Settlement Agreement.  Dkt. 445.

**II.     Since entering into the Settlement Agreement, three Section 8.2 events have occurred.**

**A.      The most destructive wildfire in state history rips through Pacific Palisades in January 2025.**

Starting on January 7, 2025, Los Angeles experienced the most catastrophic

Gibson, Dunn & Crutcher LLP

4

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

wildfires in its history.  Scolnick Decl., Ex. A-2.[2]  The Palisades Fire burned through 24,000 acres and damaged or destroyed over 7,800 structures, causing Mayor Karen Bass to issue a Declaration of Local Emergency.  *Id.* at 2.

Managing the wildfires required a sustained deployment of emergency services, along with the diversion of key personnel and resources from other City programs.  In a February 2025 report, the City Administrative Officer identified over $300 million in expenditures above the 2024-25 adopted budget, largely attributed to increased Fire Department expenditures for responding to wildfires.  *Id.*  This Court even recognized in late June that "the Agreement's obligations are currently paused under Section 8.2" due to the fires.  Dkt. 991 at 55.  Nevertheless, the City voluntarily kept creating beds for people experiencing homelessness in accordance with the Settlement Agreement.

**B.    Large-scale civil disturbances occur in June 2025 in response to ICE activity.**

Starting on June 6, 2025, recurring protests associated with the Federal Immigration and Customs Enforcement (ICE) actions in the greater Los Angeles region impacted the City.  Scolnick Decl., Ex. A-1 at 1.  Over the course of several days, thousands of National Guard troops and hundreds of U.S. Marines were deployed to Los Angeles, and Mayor Bass imposed a curfew for downtown.  LAPD announced a citywide tactical alert and required officers to put in overtime.  *Id.* at 2.  The City also incurred costs associated with cleanup and with damage to structures and equipment.  *Id.* at 5.  A report submitted by the CAO's office estimated that the total additional police

---

[2] The City requests that the Court take judicial notice of the three government reports attached to the Scolnick Declaration filed in support of this motion:  The Office of the City Administrative Officer's report regarding the June 2025 civil unrest (Exhibit A-1); the draft resolution declaring fiscal emergency submitted by the City Attorney to the City Council (Exhibit A-2); and the action of the City Council passing that resolution (Exhibit A-3).  Judicial notice of government records containing facts that can "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" is appropriate.  Fed. R. Evid. 201(b)(2); *see, e.g.*, *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) (legislative history and reports and records of administrative bodies are judicially noticeable government records).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

Gibson, Dunn & Crutcher LLP

costs associated with the June 2025 demonstrations exceeded $32 million. *Id.*

### C.     The City declares a fiscal emergency in July 2025.

The wildfires and civil unrest were emergencies triggering Section 8.2 in their own right, but the far-reaching financial implications of those events helped precipitate a third crisis: the declaration of a fiscal emergency in July 2025 for the entire fiscal year of July 2025 through June 2026. Nevertheless, the City kept creating beds for its unsheltered residents.

The factors leading to the City's fiscal crisis have been well documented in reports from the City Administrative Officer. In October 2024, the first report for fiscal year 2024–25 projected that City revenue would miss projections by over $50 million because of decreased business and transient occupancy taxes. Scolnick Decl., Ex. A-2 at 1. The report also anticipated roughly $216 million in overspending, driven in part by Fire Department and General Services Department expenses. *Id.*

Things only got worse in the second report for fiscal year 2024–25, released in December 2024. That report projected $296 million in unplanned expenditures and warned of a significant reduction to the City's Reserve Fund. *Id.* at 1–2. The third report for fiscal year 2024–25—the first issued after the devastating January wildfires—noted a second increase in unplanned expenditures to about $300 million. *Id.* at 2. It estimated that the City's revenue was now expected to fall $100 million or more below projections. *Id.*

In response, the Mayor and City Council reduced appropriations by $76 million and imposed hiring constraints, causing significant service impacts and limiting the City's ability to plan for longer-term projects. *Id.* at 2–3. And in June 2025, when civil unrest erupted across the City, the City's already-strained finances were pushed further into the red, necessitating a loan of up to $17 million from the reserve fund to pay for LAPD overtime. Scolnick Decl., Ex. A-2 at 1.

Due to these ongoing challenges, on June 24, 2025, the City Council voted

Gibson, Dunn &
Crutcher LLP

6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER
RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

unanimously to pass a resolution declaring a fiscal emergency. Scolnick Decl., Ex. A-3. The Mayor approved the resolution on July 3, 2025. *Id.* This declaration reflects a real and measurable shortfall in the City's projected revenue that has triggered hiring freezes and the elimination of 614 positions to ensure that the City can continue to provide essential public health and safety services. Scolnick Decl., Ex. A-2. Throughout all of the City's cutbacks—and even though the Settlement Agreement was automatically paused under Section 8.2—the City kept creating the beds it agreed to create under the Agreement.

### III. The Alliance fails to meet and confer in good faith about modifications to the Settlement Agreement, as required by Section 8.2.

On January 15, 2025, shortly after the Palisades Fire began, the City notified the Alliance that Section 8.2 had been triggered. Dkt. 872-2. Counsel for the Alliance did not acknowledge the City's mention of Section 8.2. *Id.* After that initial invocation of Section 8.2, the City repeatedly attempted to meet and confer with the Alliance regarding the events triggering Section 8.2, the impact of those events on the City's finances, and the resulting need to modify the Settlement Agreement. The City reached out to the Alliance again in February and March, but the Alliance would not agree to any modifications of the Agreement. Dkt. 964-11; Dkt. 964-12.

Following the June evidentiary hearing and the Court's resulting order, the City again attempted to meet and confer with the Alliance regarding Section 8.2. Scolnick Decl., Ex. A. Ahead of the initial meet-and-confer call, the City sent documents supporting its position that the various emergencies had significantly impacted the City's finances and setting out the City's proposed modification of the Settlement Agreement. *Id.*

During the first meet-and-confer call, on August 7, 2025, the City's requested modifications did not include a reduction in the number of housing solutions. Instead, the City proposed that the Alliance agree to allow the City to count 6,129 previously reported encampment reductions toward its obligations under the Settlement

Gibson, Dunn &
Crutcher LLP

Agreement—even though not all of those reported reductions met the Court's recent interpretation of "encampment reduction." Scolnick Decl., Ex. B at 39. The Alliance said that proposal was an "easy no" and that there was "no possible way" it could agree to modify the City's encampment-reduction obligations "until [it has] numbers reported that are compliant with the Court's [June 2025] order." *Id.* at 39–40. According to the Alliance, and in the face of the unambiguous language of Section 8.2, "none of [the emergencies identified by the City] . . . alters or should alter the obligations of the City." *Id.* at 21. The Alliance resisted the City's view that certain obligations are paused under the agreement because it would be "absurd to think that the city can unilaterally pause . . . based on a fire that happens on a street corner." *Id.* at 15–16. When asked if there might be some number of reductions that the Alliance would agree to count, the Alliance responded that the "answer is zero number. . . . No modification." *Id.* at 44. The City further proposed that it would satisfy its encampment-reduction obligations under Section 5.2 of the Settlement Agreement by completing 400 additional encampment reductions by the June 2026 deadline, within the new meaning of "reductions" established by the Court in June. *Id.* at 47–48. The Alliance said it was "leaning no" on that proposal. *Id.* at 49.

Following the August 7 call, counsel for the Alliance sent the City an email reiterating that the Alliance would not propose any modifications and "[f]undamentally . . . [did] not believe the emergencies [the City] identified in any way provide a sufficient basis for the City to decrease its commitments." Scolnick Decl., Ex. C. In the Alliance's view, the fiscal emergency was entirely of the City's making, so the City must cut other programs or services rather than making any amendments to the obligations in the settlement. Counsel for the Alliance even stated that "[o]ne cannot buy exclusively Gucci and credibly claim poverty"—equating the City's decision to provide cost-of-living adjustments to hard-working employees with buying luxury goods. *Id.* The Alliance also pushed back on the City's request to count all 6,129

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER
RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

Gibson, Dunn &
Crutcher LLP

encampment reductions that had been reported and called the City's request to satisfy the Agreement by completing 400 additional reductions "a non-starter." *Id.*

The Alliance maintained this position during a second discussion on August 22, 2025. The Alliance was "not sympathetic" to the City's fiscal emergency and declared that the June civil disturbances "do[] not suffice" to trigger Section 8.2. Scolnick Decl., Ex. D at 27. Despite the rare declaration of a curfew, the Alliance said "protests like this happen all the time" and that the "fiscal impact" has not been "significant," even in the face of documentation showing that the protests cost the City $32 million in unexpected police costs alone. *Id.* at 37; *id.*, Ex. A-1. The Alliance also said no modifications to the Agreement were necessary as a result of the fires. *Id.*, Ex. D at 27. The City stated that it would be willing to commit to 800 encampment reductions by June 2027; counsel for the Alliance said she would "see what [her] client says," but could "tell [the City] right now it's not going to be an agreement." *Id.* at 54.

On October 16, 2025, counsel for the City emailed counsel for the Alliance to follow up about Section 8.2. Scolnick Decl., Ex. E. In response to the Alliance's concerns that the City's current reporting was not compliant with the Court's June 2025 order, counsel for the City informed counsel for the Alliance that the City had made 1,465 encampment reductions within the meaning of the Court's June 2025 order: 313 encampment reductions accompanied by an offer of shelter and 1,152 removals of abandoned tents or makeshift shelters. *Id.* Counsel for the City also again sent the documentation it had previously shared with the Alliance regarding the fiscal emergency and the fiscal impacts of the fires and the civil disturbances. *Id.*

Nonetheless, the Alliance rejected the City's proposals at the next Section 8.2 discussion on October 30, 2025. Once more, the Alliance denied that the City has experienced any emergency satisfying Section 8.2. Scolnick Decl., Ex. F at 9. It labeled the fiscal emergency "contrived," asserted that the civil unrest had no fiscal impact, and contended that the fires don't count because they stopped burning months ago. *Id.* at 9.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

Gibson, Dunn & Crutcher LLP

The Alliance again refused to count the 6,129 previously reported reductions toward the City's obligation. *Id.* at 7. As for the number of reductions needed for the City to satisfy its obligations, the Alliance indicated that "there is a world" where it would accept "some number of reductions in combination with an extended time . . . *if the City will dismiss the appeal*." *Id.* at 11 (emphasis added). Counsel for the Alliance also made clear she was "not authorized" to agree to any change in the number of reductions the City must make. *Id.* at 17.

To date, the City has proposed modest modifications and only to its encampment-reduction obligations. It has not proposed any modifications to its housing-and-shelter-solution obligations. Yet the Alliance has not agreed to or suggested any material modification of the Settlement Agreement under Section 8.2 that wouldn't require the City to dismiss its appeal. Instead, the Alliance sees Section 8.2 emergencies as an opportunity to ask for more, proposing that the City forgo its appellate rights in exchange for potential modifications and agreeing only to an extension of the deadline for satisfying the encampment-reduction obligation from June 2026 to June 2027, without modifying the actual number of reductions needed. *Id.* at 8, 10.

## ARGUMENT

### I. Section 8.2. of the Settlement Agreement has been triggered three separate times.

Contract provisions should be interpreted according to their "'clear and explicit' meaning" and "in their 'ordinary and popular sense.'" *AIU Ins. Co. v. Super. Ct.*, 51 Cal. 3d 807, 822 (1990). And here, Section 8.2 means exactly what it says: in the event of emergencies, including "fires," "large scale civil disturbances," or "any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council," the City's obligations under the Settlement Agreement "shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations." Dkt. 429-1 § 8.2. Section 8.2 demonstrates an understanding that the City's financial obligations—and thus its ability to meet the obligations it agreed to in

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER
RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

Gibson, Dunn &
Crutcher LLP

May 2022—could change dramatically if any of the expressly contemplated events occurred.  The parties agreed to negotiate in good faith if complying with the Agreement would cause undue strain on the City's budget.

The City has experienced three separate events expressly set out in Section 8.2.  First, there were "fires," one of several listed "natural catastrophic occurrences."  Dkt. 429-1 § 8.2.  The Palisades Fire was devastating by any metric.  It caused an estimated $37 billion in economic losses—making it by far the costliest fire in California history.  Jorge L. Ortiz, *'A new reality': Price tag for LA fires pegged at $65 billion, report says*, USA Today (July 22, 2025).  The fire claimed 12 lives and destroyed more than 6,600 structures—many of them residential—"increas[ing] the urgency of increasing homebuilding in denser, more central, lower-risk communities throughout the region."  Shane Phillips, *The Palisades and Eaton Fires: Neighborhood Data and Potential Housing Market Effects*, UCLA Lewis Center for Regional Policy Studies (Feb. 12, 2025).  The fire also resulted in millions in unanticipated City expenses (e.g., about $15 million for erosion control and debris removal alone).  Dkt. 983-6 at 53.

Second, there were "large-scale civil disturbances" in the form of significant protests against federal immigration policy.  Dkt. 429-1 § 8.2.  The protests were national news from the beginning, and the unprecedented deployment of the National Guard to Los Angeles without Governor Newsom's consent further inflamed tensions.  Protests across the City lasted for over a week and required a police response that cost the City $32 million.  Scolnick Decl., Ex. A-1 at 5; *see also Newsom v. Trump*, 141 F.4th 1032, 1041–43 (9th Cir. 2025) (per curiam) (describing the protests).

These events only worsened the City's dire financial situation, further depleting its rapidly dwindling Reserve Fund and precipitating the declaration of a fiscal emergency.  If the City's financial footing was uncertain in 2022 when the parties negotiated the Agreement and expressly anticipated a potential fiscal emergency, it became unimaginably worse after the January 2025 fires and civil unrest.  If one of the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER
RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

most destructive wildfires in state history, large-scale civil disturbances in response to federal immigration policy, or the declaration of a fiscal emergency are insufficient to trigger Section 8.2, the provision is meaningless.

The Alliance takes the view that Section 8.2 remains in effect only at an emergency's inception. It has suggested that the wildfires don't count because they are no longer burning, Scolnick Decl., Ex. F at 9, and has described protests that remained in the national news for weeks and that triggered a curfew as run-of-the-mill demonstrations that "happen all the time," *id.*, Ex. D at 37. But this illogical conception of Section 8.2 would render the provision a nullity and disregard what the parties clearly contemplated—that a catastrophic wildfire or large-scale civil disturbance could alter the City's financial situation so significantly that the parties would "meet and confer on any necessary and appropriate amendments to" the City's Settlement Agreement obligations. Dkt. 429-1 § 8.2. That's why the parties put meet-and-confer obligation under the heading of "Funding" and left the pause in place pending modifications instead of lifting the pause as soon as firefighters or protestors go home. *Id.*

The Alliance is also wrong to suggest that the City's fiscal emergency does not trigger Section 8.2. The Alliance claims the crisis is either "contrived" or, to the extent it's real, can be blamed on the City's taste for "Gucci." Scolnick Decl., Ex. F at 9; Scolnick Decl., Ex. C. But nothing in Section 8.2 suggests that it applies only in the event of a fiscal emergency that the Alliance deems legitimate or earned. The City never agreed to make the Alliance the monitor of its democratically elected leaders' management of the public fisc. The Alliance's take on Section 8.2, like its bid to put the City in receivership, underscores that the Alliance wants to use the Settlement Agreement to undermine the democratic will of Angelenos.

As the Court acknowledged earlier this year, "[t]here is no question that the Palisades Fire and Eaton Fire were catastrophic events that profoundly affected many Angelenos." Dkt. 991 at 55. That one emergency was enough for the Court to "defer to

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

Gibson, Dunn & Crutcher LLP

the City's position that the Agreement's obligations are currently paused under Section 8.2 because of the state of emergency declaration." *Id.*  The fires, civil unrest, and fiscal emergency—three events specifically enumerated in Section 8.2, which all happened in one year—have unquestionably paused the City's obligations and require the Alliance to meet and confer in good faith regarding alterations to the Settlement Agreement.

## II.    The Alliance has breached the Settlement Agreement by failing to meet and confer in good faith regarding modifications to the agreement in light of the Section 8.2 events.

Despite the substantial fiscal fallout from unprecedented fires, the large-scale civil disturbances, and the formal declaration of a fiscal emergency, the Alliance continues to assert that these are "contrived" emergencies, Scolnick Decl., Ex. F at 9, and to stonewall reasonable proposals for modifications.  This recalcitrance violates its implied duty to negotiate in good faith regarding "any necessary and appropriate amendments" to the City's obligations under Sections 3, 4, and 5 of the Settlement Agreement.

The Court's June 24 order was clear that Section 8.2 imposes an "ongoing and mutual" "duty on both parties to meet and confer in good faith" during a pause. Dkt. 991 at 55.  And it is blackletter law that "every contract" imposes an implied duty of good faith "in its performance and its enforcement." *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 112 Cal. App. 5th 519, 556 (2025) (cleaned up).  The duty of good faith requires parties not only to "refrain from doing anything which would render performance of the contract impossible," but also to "do everything that the contract presupposes that [they] will do to accomplish its purpose." *Id.*  Where the "cooperation" of a party is "necessary for successful performance of an obligation," a "promise to give that cooperation" is implied. *Id.*

The duty of good faith "'finds particular application . . . where one party is invested with a discretionary power affecting the rights of another,'" such as the discretion to accept or reject a proposal. *Locke v. Warner Bros., Inc.*, 57 Cal. App. 4th 354, 365 (1997).  Without it, an agreement to negotiate or consider a proposal would be

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER
RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

Gibson, Dunn &
Crutcher LLP

an unenforceable "illusory" promise. *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 804 (1995). Thus, when parties "are under a contractual compulsion to negotiate . . . the covenant of good faith and fair dealing attach[es]" and requires a meaningful effort to reach agreement. *Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251, 1260 (2002). When there is a contractual duty to negotiate, each party is "required to consider proposals submitted by" the other party—and to do so in good faith. *Pasadena Live, LLC v. City of Pasadena*, 114 Cal. App. 4th 1089, 1093 (2004).

California courts routinely find breaches of the implied covenant of good faith when there is a contractual obligation to negotiate, including in response to a force majeure event, but one of the parties makes no meaningful effort to compromise. In *Oakland Bulk & Oversized Terminal*, a company entered into an agreement with the City of Oakland to develop a shipping terminal. 112 Cal. App. 5th at 525. The agreement had a force majeure clause that, if triggered, permitted either party to "seek an extension of time to perform its obligations with notice to the other party." *Id.* at 529. The company sent Oakland letters invoking the force majeure provision, but Oakland "did not provide any substantive responses to the letters" and instead asserted that the business was in default for failing to meet its milestones under the agreement. *Id.* at 538. The Court of Appeal affirmed the trial court's conclusion that Oakland breached the agreement because its decision to issue a notice of default "instead of substantively responding" to the force majeure claims "demonstrate[d] [Oakland]'s lack of good faith." *Id.* at 537, 539.

In *Locke*, an agreement between a director and a studio required the director to submit to the studio any proposals for films she was interested in developing before any other studio, and the studio could then approve or reject the submission. 57 Cal. App. 4th at 358. The Court of Appeal held that a triable issue of fact existed over whether the studio breached the agreement by "categorically refusing to work with [the director], irrespective of the merits of her proposals." *Id.* at 365. The "evidence call[ed] into

Gibson, Dunn &
Crutcher LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER
RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

question whether [the studio] had an honest or good faith dissatisfaction with [the director]'s proposals, or *whether it merely went through the motions of purporting to 'consider' her projects*." *Id.* (emphasis added).

The Alliance has exhibited bad faith by "categorically refusing" the City's proposals to modify its encampment-reduction obligations under Section 5.2 of the Settlement Agreement in light of the events triggering Section 8.2. *Locke*, 57 Cal. App. 4th at 365. Despite the City's providing extensive documentation of the ongoing fiscal emergencies and lingering impacts of the fires and civil unrest, the Alliance has minimized those events in bad faith—suggesting that the fiscal emergency is "contrived" because paying cost-of-living increases to civil servants is the equivalent of buying a luxury handbag, Scolnick Decl., Ex. F at 9, that headline-news protests "happen all the time" and the recent unrest didn't have a significant fiscal impact, *id.*, Ex. D at 37, that the fires don't count because they are no longer burning, *id.*, Ex. F at 9, and that the Palisades Fire was no different from a minor blaze on a "street corner," *id.*, Ex. B at 15–16. As a result, each of the City's good-faith proposals has been a dead end with the Alliance:

- During the August 7 call, the City proposed that the Alliance agree to allow the City to count 6,129 previously reported encampment reductions toward its obligations under Section 5.2 of the Settlement Agreement. Scolnick Decl., Ex. B at 39. The Alliance said that proposal was an "easy no." *Id.*

- During the same call, when asked if there is a number of reductions that the Alliance would agree to count, the Alliance responded that the "answer is zero number. . . . No modification." Scolnick Decl., Ex. B at 44.

- Again during the same call, the City proposed that it would satisfy its encampment-reduction obligations by completing 400 additional encampment reductions by the June 2026 deadline, in keeping with this Court's interpretation of "reductions." *Id.* at 47–48. The Alliance said it was "leaning no" on that

Gibson, Dunn &
Crutcher LLP

15

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER
RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

proposal. *Id.* at 49. And it said the proposal was a "non-starter" in an email following the call. Scolnick Decl., Ex. C.

- During the August 22 call, the City stated that it would be willing to commit to 800 new encampment reductions by June 2027, but counsel for the Alliance said that "it's not going to be an agreement." Scolnick Decl., Ex. D at 53–54.

- During the October 30 call, the Alliance again said that counting the roughly 6,000 previously reported reductions toward the City's obligation was "not something we are willing to do." Scolnick Decl., Ex. F at 7. Ignoring its contractual obligation to negotiate *modifications* to the encampment-reduction obligations in good faith, the Alliance rejected the City's proposal on the basis that it is inconsistent with the City's *current* obligations. *Id.* And the Alliance maintained this position even after the City addressed the reporting concerns the Alliance raised on the August 7 call by informing it that the City had made 1,465 encampment reductions within the meaning of the Court's June 2025 order. Scolnick Decl., Ex. E; *id.* Ex. B at 39–40.

The Alliance has not only swatted down all of the City's suggestions but also refused to make any specific proposals of its own for any material modification *of the City's obligations*, seeking benefits for itself (the party not impacted by the force majeure) instead. The Alliance vaguely said that "there is a world" where it would accept "some number of reductions in combination with an extended time," but only "if the City will dismiss the appeal" from the Court's June 2025 order. Scolnick Decl., Ex. F at 11. That proposal—that the City must dismiss an entirely unrelated appeal to obtain the Alliance's consideration of modifications contemplated by Section 8.2—is not only outrageous gamesmanship, but also further evidence of the Alliance's bad faith. When the parties agreed to Section 8.2, they contemplated modifications that would be necessary to ease the City's burden in the event of an emergency. But now, after *three* different emergencies expressly contemplated by Section 8.2 have come to pass, and

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER
RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

after the City has repeatedly asked the Alliance to come to the negotiating table in good faith, the Alliance has made clear that a *new* concession by the City on unrelated matters is a necessary precondition to any modification. It apparently sees the City's emergencies as an opportunity for leverage. And worse yet, the concession it wants—that the City dismiss the appeal—is an affront to the City's basic due-process rights. *Randall v. Yakima Nation Tribal Ct.*, 841 F.2d 897, 900–01 (9th Cir. 1988) (citing *Evitts v. Lucey*, 469 U.S. 387, 393 (1985)) ("when a right to appeal is provided," that right becomes protected by the Due Process Clause); 28 U.S.C. § 1291 (creating right to appeal from "all final decisions" of United States district courts).

By refusing to meet and confer in good faith, either by considering the City's reasonable proposed modifications to its encampment-reduction obligations under Section 5.2 or by proposing its own reasonable modifications, and by attempting to extort the City to forgo unrelated statutory rights, the Alliance has breached Section 8.2 of the Settlement Agreement.

### III. In light of the three Section 8.2 events and the Alliance's bad faith, the Court should modify the Settlement Agreement as the City has proposed.

It is beyond dispute that three of the exact emergencies contemplated by the parties in Section 8.2—a devastating fire, large-scale civil unrest, and a declared fiscal emergency—have occurred and that reasonable modification of the Settlement Agreement is warranted under the clear terms of that agreement. The City has repeatedly proposed reasonable modifications to adjust its obligations under the Settlement Agreement to account for the dramatic and ongoing financial impact of these three events, specifically that: (1) all 6,129 reductions the City reported through March 31, 2025, count toward the reduction obligation under the Agreement, even though they don't all meet the Court's interpretation of that obligation in its June order; and (2) the City will satisfy its reduction obligation by completing 400 additional reductions in keeping with the Court's order by the June 2026 deadline. The City continues to prioritize the creation of beds for its unsheltered residents and has not requested—

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER
RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

despite ongoing budget woes—any modification of its shelter-creation obligations.

The limited modifications requested by the City are reasonable and necessary in light of the severe emergencies described above. Pairing each encampment reduction with an offer of housing adds considerable, unanticipated costs to compliance because the City's data infrastructure is not designed to track housing offers and encampment reductions in tandem. Based on the City's assessment of the additional costs of pairing offers and reductions and the City's precarious financial footing after a year of unprecedented challenges, the City believes that 400 additional reductions would honor the spirit of the settlement agreement without putting undue financial strain on an already-burdened local government.

Because the Alliance has neither agreed to these modifications nor proposed any alternative reasonable modifications, the City requests that the Court find the Alliance in breach and order that the Settlement Agreement be amended as requested.

## CONCLUSION

The Court should grant this motion, find the Alliance has breached the Settlement Agreement by failing to meet and confer in good faith, and modify the parties' Settlement Agreement to permit the City to discharge its encampment-reduction obligations under the Settlement Agreement by counting all reported reductions through March 31, 2025, and requiring 400 additional reductions by the June 2026 deadline.

DATED: December 19, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _/s/ Theane Evangelis_
Theane Evangelis

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER
RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT

Gibson, Dunn &
Crutcher LLP