**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| LA Alliance for Human Rights, et al.<br>    Plaintiffs,<br><br>      v.<br><br>City of Los Angeles, et al.<br>    Defendants. | **Case No. 2:20-cv-02291-DOC-KES**<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES [1015] AND GRANTING INTERVENORS' MOTION FOR ATTORNEYS' FEES [1022]** |

Before the Court is Plaintiff LA Alliance for Human Rights' Motion for Attorneys' Fees (the "Alliance's Motion" or "All.'s Mot.") (Dkt. 1015) and Intervenors Los Angeles Community Action Network and LA Catholic Worker's Motion for Attorneys' Fees ("Intervenors' Motion" or "Ints.' Mot.") (Dkt. 1022) (collectively, with Alliance's Motion, the "Motions"). The City of Los Angeles opposes both Motions. For the reasons below, the Court **GRANTS IN PART** Alliance's Motion (Dkt. 1015) and **GRANTS** Intervenors' Motion (Dkt. 1022).

Plaintiff negotiated a legally enforceable settlement with the City and County of Los Angeles that the Court has been monitoring. This agreement requires the City to actually address the homelessness pandemic at its doorstop. The Court found in its June 2025 order that the City breached its agreement in four ways:

> The City failed to provide a plan for how it intends to create 12,915 shelter or housing solutions. For years, the City consistently missed its shelter and housing creation milestones. The City also improperly reported encampment reductions and disobeyed the Court's order on encampment reductions. Finally, the City flouted its reporting responsibilities by failing to substantiate its reporting and failing to provide accurate and comprehensive data when requested by the Court, Special Master Martinez, the Parties, and A&M.

Settlement Compliance Order (Dkt. 991) at 56.

Plaintiff and Intervenors' advocacy to enforce the settlement agreement and their vigilance and tenacity in alerting the Court to breaches of the agreement has caused this Court to conclude Plaintiffs are the prevailing party.

Therefore, The Intervenors, Los Angeles Community Action Network and LA Catholic Worker are awarded $201,182.50 in fees and $160.00 in costs. Plaintiff is awarded $1,600,633.00 in attorney's fees and $5,067.21 in costs.[1]

## I.  INTRODUCTION

### A.    Present Litigation

The Plaintiff in this case is the LA Alliance for Human Rights (the "Alliance" or "Plaintiff"), a non-profit membership association, whose members are business owners in the City of Los Angeles and residents of the City and County of Los Angeles. *See generally* Complaint ("Compl.") (Dkt. 1); First Amended Complaint ("FAC") (Dkt. 361). Plaintiff sued the City of Los Angeles ("City") and the County of Los Angeles ("County") on March 10, 2020, for alleged violations of California law, the California Constitution, the Americans with Disabilities Act, the Rehabilitation Act, and the United States Constitution through 42 U.S.C. §1983. *See generally* Compl. The Alliance filed suit against the City and County because of the street homelessness crisis and sought immediate shelter for those living on the streets and the clearing of encampments. *Id*.

On March 18, 2020, the Court granted Los Angeles Catholic Worker ("LACW") and Los Angeles Community Action Network's ("LA CAN") Application to Intervene in this litigation, represented by the Legal Aid Foundation of Los Angeles and other counsel. Order Granting Intervenors' Ex Parte Application to Intervene as of Right (Dkt. 29). LACW is an unincorporated lay Catholic community which operates a soup kitchen and provides services on Skid Row. LA CAN is a grassroots, non-profit organization that has operated on Skid Row and throughout the City for decades to organize and advocate for the unhoused community. LACW

---

[1] The Court finds these fees reasonable as explained below. Initially, Gibson Dunn charged the City $900,000 which within two weeks expanded to $1.8 million, and then again to $3.2 million. David Zahniser, *Lawyers who hit L.A. City with whopping bill on homeless case to get millions more*, L.A. Times (Sept. 17, 2025 3:50 p.m. PT), https://www.latimes.com/california/story/2025-09-17/gibson-dunn-crutcher-los-angeles-homeless. Fifteen attorneys worked at a rate of $1,295 for weeks. Aaron Schrank, *LA council delays decision on $5M more for law firm in homelessness lawsuit*, LAist (Aug. 27, 2025 3:13 p.m.), https://laist.com/news/housing-homelessness/gibson-dunn-legal-bills-city-homelessness-millions-city-council. Subsequently, the latest agreement is for $5.9 million dollars (Dkt. 1073). These limited efforts by Gibson Dunn in no way compare to the months and years spent by a small law firm and a legal nonprofit.

and LA CAN (collectively "Intervenors") have been actively involved in the litigation since the Court granted intervention.

**B.        The Importance Of The City's Reporting And Monitoring Compliance**

The City has committed to taking steps to resolve the homelessness crisis both in this case and in other arenas.[2] The City attempts to explain its difficulties in addressing the crisis as a simple byproduct of the bureaucratic and segmented processes of the City. However, the City's activities with regard to homelessness can too often be viewed via the lens of lack of oversite and corruption. In 2021, this Court wrote the following:

> The disconnect between politicians' public statements about the severity of this [homelessness] crisis and the actual efforts made to fund effective solutions is growing. Recent investigations into City-funded housing projects for the homeless demonstrate that a lack of government oversight has allowed the proliferation of corruption. In at least two separate instances with two different developers, reports indicate that developers of taxpayer-funded affordable housing projects have purchased properties before turning around and reselling those properties to themselves at higher prices in order to artificially inflate their project budgets and, in turn, the amount of public money that they receive.
>
> These cases, of which there are almost certainly more to be discovered, indicate that the City has turned a blind eye to corruption as money is being siphoned off from funds that taxpayers voted to allocate to the homeless population.

Preliminary Injunction Order (Dkt. 277) at 42.[3]

---

[2] *See, e.g.*, *Mayor Bass Appoints Herself To LAHSA Commission*, LAHSA (Oct. 13, 2023), https://www.lahsa.org/news?article=938-mayor-bass-appoints-herself-to-lahsa-commission.

[3] This Order cites to several news articles on the subject. *See* Preliminary Injunction Order at 41-43 (citing Anna Scott, *How a City - Funded Homeless Housing Project Became a Sink Hole for Public Money*, KCRW (Dec. 10, 2020), https://www.kcrw.com/news/shows/greater-la/hhh-motel-george-gascon/30-million-motel-homeless-shelter-prop-hhh-taxpayer-oversight-la; David Zahniser, Emily Alpert Reyes, & Joel Rubin, *L.A. City Councilman Jose Huizar charged in federal corruption probe*, L.A. Times (June 23, 2020) https://www.latimes.com/california/story/2020-06-23/jose-huizar-arrest-corruption-city-hall-fbi-investigation; Donna Evans, *$3.7 Million Plan Proposed to Clean Up Skid Row*, DT News (Apr. 8, 2014)

The Court went on to write that "[t]he improper relationship between City Hall and real estate developers is neither isolated nor new" and that "[t]he FBI has been investigating possible corruption in City Hall since 2017, a probe that has led to the prosecution of real estate consultants, political fundraisers, and even, most notably, former Councilmember Jose Huizar, whose council district included Skid Row."[4] Specifically, "[i]n June 2020, Huizar was arrested by federal agents for using his position to cover up illegal activities such as accepting bribes from real estate developers,"[5] and the Los Angeles Times reported that "[i]nvestigators said Huizar reduced the amount of affordable housing required inside the development after receiving key financial benefits . . . ."[6]

Unfortunately, it appears that the City's problems have not ceased in the succeeding years. A recent news article concluded that the Weingart Center, "[o]ne of L.A.'s biggest homeless service providers has been awarded over $100 million in taxpayer funds while failing to comply with federal audit mandates."[7] The Weingart Center was also at the center of a real estate deal in 2023 in which "Brentwood landlord and developer Steven Taylor, bought [a] property on Shelby Drive in 2023 for $11.2 million."[8] However, "[a]t the time of his purchase, a company owned by Taylor was already in escrow to sell the complex to Weingart Center, a major homeless housing provider, for more than double what he paid."[9] In fact, "[t]he $27.3

---

[footnotes]

http://www.ladowntownnews.com/news/3-7-million-plan-proposed-to-clean-up-skid-row/article_e25e730a-bf51-11e3-ac54-0019bb2963f4.html).

[4] Preliminary Injunction Order (Dkt. 277) at 42.

[5] *Id.* at 42-43 (citing Libby Denkmann, *Timeline: Follow The FBI's Sweeping LA City Hall Corruption Investigation Through The Years*, LAist (May 18, 2020), https://laist.com/2020/05/18/los-angeles-city-hall-fbi-corruption-investigation-timeline-englander-huizar.php).

[6] Preliminary Injunction Order (Dkt. 277) at 43 (quoting David Zahniser, *Downtown Developer Will Pay $1.2 Million in L.A. City Hall Corruption Case*, L.A. Times (Jan. 7, 2021), https://www.latimes.com/california/story/2021-01-07/downtown-developer-will-pay-1-2-million-in-l-a-city-hall-corruption-case).

[7] Nick Gerda, *LA nonprofit got over $100 million from taxpayers despite failing audit requirements*, LAist (Nov. 26, 205 5:00 a.m.), https://laist.com/news/housing-homelessness/la-homelessness-nonprofit-got-over-100-million-from-taxpayers-despite-failing-audit-requirements.

[8] Nick Gerda, *Inside a secretive $27M property deal to add unhoused beds that's now under federal investigation*, LAist (Nov. 26, 2025 5:00 a.m.), https://laist.com/news/housing-homelessness/secretive-27-million-property-deal-to-add-homeless-beds-now-under-federal-investigation.

[9] *Id.*

million to pay for that acquisition came from taxpayer grant funds authorized by city and state officials."[10] Taylor has since been indicted.[11]

In another recent arrest, "Cody Holmes, 31, a Beverly Hills man who was the CFO of affordable housing developer Shangri-La" was accused of several instances of illicit activity.[12] Specifically, "[p]rosecutors said Holmes and Shangri-La submitted fake balance sheets to the state" and used grant funds "to pay credit card bills for American Express accounts associated with Holmes."[13] In a state court lawsuit, Holmes was also accused of "embezzling housing money and spending it on personal extravagances, including tickets to the Coachella Valley Music and Arts Festival, jewelry, and rent for a Beverly Hills mansion."[14]

Unfortunately, Shangri-La is a name that is very familiar to the City and this Court.[15] Last year, in this Court's companion case dealing with Los Angeles's VA campus, the Court wrote that, "Shangri-La was the leaseholder and developer for [VA] buildings 205, 208, and 209" and had "come under [increased] public scrutiny after a recent civil suit brought by the Attorney General of California."[16] This increased scrutiny was long overdue. Back in 2018, Shangri-La participated in a scheme where developers for a facility for homeless veterans in LA's Westlake neighborhood purchased and resold the property in the same day to "artificially inflate their project budget[] and, in turn, the amount of public money that they receive."[17] KCRW uncovered this unscrupulous activity two years later in 2020 and found that "most of the more than $30 million pumped into the renovation of this rundown motel has gone to its

---

[10] *Id.*

[11] Andrew Khouri, Alene Tchekmedyian, and Doug Smith, *DOJ accuses real estate executives of fraud in homeless funding*, L.A. Times (Oct 16, 2025 2:11 p.m.), https://www.latimes.com/california/story/2025-10-16/doj-accuses-people-of-fraud-in-homeless-funding.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *See Powers v. McDonough*, 748 F. Supp. 3d 842, 858 (C.D. Cal. 2024), *aff'd in part, vacated in part, remanded,* No. 24-6338, 2025 WL 3718737 (9th Cir. Dec. 23, 2025).

[16] *Id.*

[17] Preliminary Injunction Order (Dkt. 277) at 42 (citing Steve Chiotakis, *How a city-funded homeless housing project became a sink hole for public money*, KCRW (Dec. 10, 2020), https://www.kcrw.com/shows/greater-la/stories/30-million-motel-homeless-shelter-prop-hhh-taxpayer-oversight-la).

former owners, who, right before the sale, were sued by public interest attorneys for illegally evicting tenants."[18]

Despite the public notoriety of Shangri-La's fraudulent activity, it continued to receive public funding. For example in April 2020, the VA Building 208 project was "issued $18.5 million in tax-exempt bonds and another $2.075 million in 2023, supplemented by $11.66 million from Proposition HHH funds" by the City. [19] Further, "the city of Thousand Oaks and Shangri-La won a $26.7 million Homekey grant in 2022 to convert a Quality Inn to 77 units of permanent housing."[20] California Attorney General Rob Bonta's filed suit in 2024 where he sought to "claw back $114 million in state grants that Shangri-La Industries received during the pandemic from the [state's] celebrated Homekey program."[21]

The fact that Shangri-La's self-dealing activities were able to continue unabated for so long with public funding is symptomatic of the fact that all too often the City has turned a blind eye to problems and issues in its homeless programs. And yet, the City continues to count these tainted units towards its commitments.

The City's own recent reports in this litigation also reveal inconsistencies and variances that justify the Court's concern about the reliability of the data it has received. For example, in recent testimony the City Administrative Officer, Matthew Szabo, opined that permanent supportive housing facilities should report fairly stable levels of Persons Experiencing Homelessness ("PEH") served because they are permanent by definition and the number reported is the number of units leased: "…it should, unless there are units that are taken out of service for one reason or the other, renovations, et cetera." Dec. 18, 2025 Hearing Tr. (Dkt. 1020) at 253:25-254:5, 255:19-256:1. During the same hearing he also testified that interim housing types report the cumulative number of PEH Served and that thus the number "should

---

[18] Preliminary Injunction Order (Dkt. 277) at 42 (quoting Steve Chiotakis, *How a city-funded homeless housing project became a sink hole for public money*, KCRW (Dec. 10, 2020), https://www.kcrw.com/shows/greater-la/stories/30-million-motel-homeless-shelter-prop-hhh-taxpayer-oversight-la).

[19] Cece Woods, *The Shangri-La Scandal: How LA's Homeless Crisis Fueled a Political Payoff Pipeline*, The Current Report (Oct. 17, 2025), https://thecurrentreport.com/shangri-la-political-pay-off-scandal/.

[20] Jeanne Kuang, *California housing projects for homeless on hold as developer defaults*, CalMatters (updated Jan. 12, 2024), https://calmatters.org/housing/homelessness/2023/12/california-homeless-developer-investigation/.

[21] Jeanne Kuang, *California sues homeless housing developer for $114 million*, CalMatters (Jan. 12, 2024), https://calmatters.org/housing/2024/01/california-homeless-housing-lawsuit/ (citing *Cal. Dep't of Hous. & Urb. Cmty. Dev. v. Shangri-La Indus. LLC*, Case No. 24STCV00629 (L.A. Sup. Ct . Jan. 9, 2024)).

only go up." *Id.* at 254:5-11, 255:14-18. Despite this, the City reports demonstrate unusual discrepancies for both interim housing facilities and permanent supportive housing facilities. Several permanent supportive housing types were reported as going from full occupancy, to a pending occupancy number, and then to less than full occupancy:

- VA Building 207 went from reported full occupancy of 59 (Dkts. 858-1, 892-1, 1011-1) to pending (Dkt. 1051-1) to a reported occupancy of 31 (Dkt. 1072-1).
- Washington View Apartments went from reported full occupancy of 91 (Dkts. 858-1, 892-1, 1011-1) to pending (Dkt. 1051-1) to a reported occupancy of 86 (Dkt. 1072-1).
- Chesterfield went from reported full occupancy of 42 (Dkts. 858-1, 892-1, 1011-1) to pending (Dkt. 1051-1) to a reported occupancy of 34 (Dkt. 1072-1).

Similarly, interim housing types reported a drop in the reported cumulative number of PEH served, despite the fact that this number as Szabo said, "should only go up." Dec. 18, 2025 Hearing Tr. (Dkt. 1020) at 254:5-11, 255:14-18.:

- Highland Gardens reported an increase in its reported cumulative numbers from 396 for the quarter ending December 31, 2024 (Dkt. 858-1) to 412 for the quarter ending March 31, 2025 (Dkt. 892-1) to 425 for the quarter ending June 30, 2025 (Dkt. 1011-1), before reporting pending (Dkt. 1051-1) and then a drop to 422 for the quarter ending September 30, 2025 (Dkt. 1072-1).[22]
- Highland Park Motel reported cumulative numbers from 24 for the quarter ending March 31, 2025 (Dkt. 892-1) to 48 for the quarter ending June 30, 2025 (Dkt. 1011-1), before reporting pending (Dkt. 1051-1) and then a drop to 32 for the quarter ending September 30, 2025 (Dkt. 1072-1).
- Hotel Silver Lake reported cumulative numbers from 63 for the quarter ending March 31, 2025 (Dkt. 892-1) to 83 for the quarter ending June 30, 2025 (Dkt. 1011-1), before reporting pending (Dkt. 1051-1) and then a drop to 66 for the quarter ending September 30, 2025 (Dkt. 1072-1).

---

[22] The Court notes that this drop is significant because the cumulative numbers should have continued their pattern of increase from 425, but instead experienced a drop.

Given that these issues were addressed for the first time in the recent October quarterly report, it appears that the verification problems are not going away. Accordingly, the Court continues to view the City's reported numbers skeptically.

It is worth noting that the City's unreliability when it comes to documents and reports extends beyond this case. In 2024, Judge Dale Fischer "found that Los Angeles City officials altered evidence to support the City's defense against allegations that it illegally seized and destroyed homeless people's property."[23] Specifically, "records documenting what was taken during cleanups and the legal authorization for the seizure were altered or created up to two years after the cleanup occurred and in some instances just days before they were turned over to the plaintiffs."[24] The City's alleged misconduct in that case stretches to "erasing metadata, submitting altered documents as PDFs to hide the changes, and misrepresenting the record."[25]As a result, this means that Plaintiff and Intervenors have had to play the role of watchdog in this case. Their attorneys deserve to be compensated for having to fulfill this role.

**C.    The Agreements At Issue[26]**

Plaintiff's and Intervenors' Motions concern transparency and accountability in three critical areas:

1. The Roadmap Agreement

2. The Settlement Agreement

3. Inside Safe

The Court summarized each of these agreements in its Settlement Compliance Order that serves as the basis for the Motions.

**1.    The Roadmap Agreement**

On May 15, 2020, this Court issued a Preliminary Injunction ("Preliminary Injunction") (Dkt. 108). This Preliminary Injunction directed the relocation of those individuals

---

[23] Doug Smith, *A federal judge has found that L.A. city officials doctored records in a case over homeless camp cleanups*, L.A. Times (April 16, 2024 3:00 a.m. PT), https://www.latimes.com/california/story/2024-04-16/a-federal-judge-has-found-that-l-a-city-officials-doctored-evidence-in-a-case-over-homeless-camp-cleanups.
[24] *Id.*
[25] Skylar Romero, *Judge threatens to summon LA mayor over discovery in encampment suit*, Daily Journal (Nov. 11, 2025), https://www.dailyjournal.com/article/388497-judge-threatens-to-summon-la-mayor-over-discovery-in-encampment-suit.
[26] The summaries of these agreements are abridged versions of those given in the Court's Settlement Compliance Order (Dkt. 991), at 3-9.

experiencing homelessness and living under underpasses, as well as near freeway entrance and exit ramps. Preliminary Injunction at 1-2. Central to this directive was the Court's growing concern over the significant public health risks posed by living adjacent to freeways— particularly during the then-ongoing global Covid-19 pandemic. *Id.* at 2. At the time, traffic-related injuries were the third leading cause of death among people experiencing homelessness.[27] After more than four months of scheduling conferences and mediation sessions, Judge Birotte ordered the Parties to report on their progress towards the development of a Memorandum of Understanding ("MOU") to govern their Binding Term Sheet. Order for City and County of Los Angeles to Meet, Confer, and File a Joint Report Re: Status of MOU (Dkt. 183). On October 9, 2020, the City and County finally reached an agreement on a MOU. Evidentiary Hearing Exhibit # 2 ("Roadmap MOU") (Dkt. 185-1). The Binding Term Sheet and Roadmap MOU have together been referred to as the "Roadmap Agreement."

According to the City and County, the Roadmap MOU clarified the historic agreement between the City and County to provide, within eighteen months, 6,700 beds and services for PEH within the City of Los Angeles. *See generally* Ex. 2. More specifically, under the terms of the Roadmap MOU, the City agreed to deliver a total of 6,700 beds—comprised of 6,000 "New Beds" and 700 "Other Beds." *Id.* at 4.

Pursuant to the Roadmap MOU, the City agreed to certain reporting requirements but stated that "if the Court requires different and more extensive reporting than what is set forth below, then the Parties agree to provide reporting as required by the Court and not in this MOU." *Id.* The first reporting requirement directed the City to submit a "Bed Plan" by August 1, 2020, describing how it would establish the specified New Beds and Other Beds. *Id.* Next, the City agreed to submit written quarterly status reports ("Roadmap Quarterly Reports"), beginning no later than October 15, 2020, detailing its progress in providing beds and services pursuant to the Roadmap Agreement. *Id.* at 7. The County, in turn, committed to reporting on

---

[27] *New Public Health Report Shows Sharp Rise in Mortality Among People Experiencing Homelessness*, County of Los Angeles Public Health Media (May 12, 2023), https://lacounty.gov/2023/05/12/new-public-health-report-shows-sharp-rise-in-mortality-among-people-experiencing-homelessness/.

funds disbursed and the delivery of services for PEH residing in facilities established under the MOU. *Id.* at 7-8.

### 2.    The Settlement Agreement

Following extensive negotiations and numerous mediation sessions, Plaintiff and the City reached a Settlement Agreement in May 2022, resolving only the claims against the City in Plaintiffs' First Amended Complaint. *See* Notice of Lodging, Settlement Agreement (Dkt. 429-1). The Court approved the stipulated dismissal and proposed settlement between Plaintiffs and the City on June 14, 2022. Order Approving Stipulated Dismissal and Proposed Settlement (Dkt. 445).

One of the recitals in the Settlement Agreement states: "the purpose of this Agreement is to substantially increase the number of housing and shelter opportunities in the City of Los Angeles, and to address the needs of everyone who shares public spaces and rights of way in the City of Los Angeles, including both housed and unhoused Angelenos, to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles." Evidentiary Hearing Exhibit # 25 ("Settlement Agreement") (Dkt. 429-1), at 2.

The Settlement Agreement required the City to "create a Required Number of housing or shelter solutions, which is equal to, but (in the City's discretion) may be greater than, the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate PEH within the City based on LAHSA's [Los Angeles Homeless Services Authority] 2022 Point in Time count." Ex. 25, § 3.1. Further, the City was required to calculate the "Required Number." *Id*. §5.1. The City calculated 12,915 as the Required Number in 2022. Evidentiary Hearing Transcript ("Tr."), 244, 252-253, May 28, 2025 (Dkt. 949).

The Agreement also states, "The Parties agree that the duration of the Agreement shall be five (5) years, during which point the Court shall have continuing jurisdiction to oversee and enforce this Settlement Agreement." *Id*. § 2.

### 3.    Inside Safe

Inside Safe is a housed within the Mayor's Office, in contrast to the City's other programs which are cross-agency and interface directly with LAHSA. *See Inside Safe*, City of

Los Angeles: Mayor's Office, https://mayor.lacity.gov/InsideSafe. Under Inside Safe, the "Mayor's Field Intervention Team (FIT), a multidisciplinary team with backgrounds in lived-experience of homelessness, policy, public health, community advocacy, and substance-use recovery" engages with those in "designated encampment[s]" and places them into interim housing solutions with the goal of an ultimate transition to permanent housing. *See id.* The program has numerous deficiencies and transparency issues, which are detailed below.

**D.      The A&M Audit[28]**

On February 7, 2024, the Alliance filed a Motion for Order Re Settlement Agreement Compliance and Sanctions (Dkt. 668) seeking sanctions against the City for alleged non-compliance with the Settlement Agreement. Following several hearings and briefing on this issue, Plaintiff and the City agreed to a "comprehensive financial and performance audit of the City of Los Angeles's homelessness programs." Notice of Filing of Audit Scope (Dkt. 697). The City also agreed to pay for the Court-ordered audit, meet at least once a month about Settlement Agreement compliance, and pay Plaintiff's fees and costs. Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713). Alvarez and Marsal ("A&M") was selected as the auditor. City's Signed Copy of Amendment to Engagement Letter Between A&M and the Court (Dkt. 779).

A&M's audit was limited in scope to June 1, 2020, through June 30, 2024 ("Lookback Period"). The Assessment focused on appropriation and expenditures of funds through the City under the Roadmap Program (pursuant to the Roadmap MOU), the Alliance Program (pursuant to the LA Alliance Settlement Agreement), and the Mayor's Inside Safe Program (collectively the "City Programs") during the Lookback Period.

A&M's assessment went through several drafts and all Parties, including the City, were given time to raise any issues or errors. *See generally* (Dkts. 866, 867, 870, 873, 877). However, the City failed to provide A&M with missing data which had been requested to verify program spending and the existence of housing reported. June 3, 2025 Hearing Tr. (Dkt. 969) at 175-178. On May 15, 2025, the Court adopted the final assessment (Dkt. 906).

---

[28] The summary of the A&M audit is also an abridged version of what was contained the Settlement Compliance Order, at 23-26.

A&M's assessment found significant issues with the City's homelessness programs. Evidentiary Hearing Exhibit # 23 ("Ex. 23" or "A&M Independent Assessment of City-Funded Homelessness Assistance Programs" or "Assessment") (Dkt. 905), at 3. Specifically, A&M found that: it could not verify the City's reporting of the number of beds under the Roadmap and Alliance Programs due to poor data quality and integration; it could not fully quantify the City's spending of the $2.3 billion in funding that it received during the Lookback Period; the siloed continuum of care system caused confusion and a lack of transparency; the City and LAHSA's financial oversight and performance monitoring of service provider contracts was extremely limited; these service provider contracts did not have uniform terms or scope; there was wide variance costs and services between different service providers; and the City did not reconcile actual spending or contractual obligations with its budget allocations and funding. *Id.* at 3-7.

Of particular concern were A&M's findings related to the City's compliance reporting required by the Roadmap MOU, LA Alliance Settlement Agreement, and Inside Safe. A&M could not verify the City's reported number of time-limited subsidies ("TLS") under the Roadmap MOU because 70% of the TLS contracts provided by LAHSA did not report financial expenditures for fiscal year 2023-24. *Id.* at 64. A&M repeatedly requested more information from the City and LAHSA to verify TLS slots but did not receive it. Tr., 7-8, 19-21, May 28, 2025 (Dkt. 949). The TLS documentation provided to A&M was also missing many addresses and some TLS addresses overlapped with those reported as permanent supportive housing ("PSH") under the Alliance Settlement. Tr., 99, June 3, 2025. A&M also could not verify PSH sites reported under the Roadmap MOU and Alliance Settlement. Assessment, 114-116. About 20% of the PSH sites reported as open to the Court could not be found at all in LAHSA's Resource Management System ("RMS"). *Id.* at 114-115; Tr., 235-37, May 27, 2025 (Dkt. 947).

A&M also identified specific issues with the Mayor's Inside Safe program. For example, "due to the nature of the Inside Safe Program and its operations, it was not possible to calculate an enrollment rate given the lack of clarity regarding the total number of beds served by these

contracts." A&M Independent Assessment of City-Funded Homelessness Assistance Programs (Dkt. 905), at 3

A&M's findings were consistent with previous audits performed of the City, LAHSA, and their associated programs and entities. *See* Settlement Compliance Order at 10-23.[29] Of note, these audits uncovered significant and substantial issues with LAHSA's management of its finances and issues with its record-keeping. *Id.* In short, A&M's audit was consistent with a plethora of previous audits and assessments of the City and LAHSA dating back decades. Thus, A&M's audit was not the unveiling of hitherto unforeseen issues, but rather yet another finding that long identified issues still remain ever present and ongoing. The need for change is clear and, unfortunately in the instant case it has fallen to the Alliance and Intervenors to be the force for such change.

### E.    Settlement Compliance Briefing

The Court's Settlement Compliance Order followed numerous iterations of briefing seeking different relief and pointing out various issues with the City's undertakings under the Agreements. The first Motion for Settlement Compliance was filed on September 4, 2024 by the Alliance. The City filed its Opposition on September 11, 2024 (Dkt. 774) and the Alliance filed a Reply on September 18, 2024 (Dkt. 776). The Court held hearings on October 8 and October 16, 2024. The Parties also engaged in extensive negotiation and mediation with Special Master Martinez and Judge Birotte. At the request of the Parties, the Court resolved the Motion partially by clarifying the definition of encampment reduction in the LA Alliance Settlement Agreement on March 24, 2025 (Dkt. 874).

This did not resolve all the issues however, and the Alliance filed a second Motion for Settlement Compliance on February 20, 2025 (Dkt. 863). The City filed its Opposition on March 6, 2025 (Dkt. 871). The Alliance filed its Reply on March 13, 2025 (Dkt. 872). In this

---

[29] For these numerous and substantial audit findings, a fulsome summary can be found in the Settlement Compliance Order (Dkt. 991) at pages 10-23. These audits include: a 2001 HUD audit, *id.* at 11; a 2007 audit by HUD's Regional Inspector General, *id.* at 11-12; a 2018 audit by the County Auditor-Controller, *id.* at 12; an August 2019 report by Los Angeles City Controller Ron Galperin, *id.* at 13; an October 2019 report by City Controller Ron Galperin, *id.* at 13; four reports by the LA County Auditor-Controller in 2021, *id.* at 14-15; a 2021 report by the Committee for Greater Los Angeles, *id.* at 13; a 2022 review by the HUD Office of the Inspector General, *id.* at 14; a 2023 audit by Los Angeles City Controller Kenneth Mejia, *id.* at 15; a 2024 audit by City Controller Mejia, *id.* at 15-16; a 2024 review by County Auditor-Controller Oscar Valdez, *id.* at 16-23.

-14-

Reply, the Alliance requested for the first time that the Court implement the severe remedy of appointing a receiver to manage the City. The Court heard oral arguments regarding the Motion on March 27, 2025 (Dkt. 877) and the Alliance filed additional briefing regarding their request for a receivership over the City on May 8, 2025 ("Receivership Brief") (Dkt. 899). The City filed objections to the Receivership Brief on May 13, 2025 (Dkt. 903). The Court then held an evidentiary hearing on the two Motions for Settlement Compliance from May 27 through June 4, 2025. The Alliance, the City, and Intervenors participated in the evidentiary hearing, but the County only appeared and did not argue.

### F.    Resolution Of Settlement Compliance Issues

#### 1.    Roadmap Agreement Issues

The Roadmap Agreement called for the creation of 6,700 beds. Settlement Compliance Order at 32. The Alliance alleged that there are missing beds under the agreement. Settlement Compliance Order at 30. Specifically, they pointed to the A&M Assessment, which states that "A&M could not validate the reported number of TLS beds or the total expenses necessary to support those beds." *Id.* (quoting Assessment at 64).

Central to the dispute was the inability to verify the City's data to confirm that the reported TLS beds were newly created. *Id.* at 37. Despite numerous requests and opportunities, the City failed to provide the necessary data for these TLS beds to demonstrate that they met the requirements under the Roadmap Agreement. *Id.* "Instead, the evidentiary record reflect[ed] a consistent lack of cooperation and responsiveness—an unwillingness to provide documentation unless compelled by court order or media scrutiny." *Id.* Indeed, "rather than spend[] taxpayer dollars on finding the missing data or striving to provide verification, the City fought with the findings and methods of the A&M Assessment, the same methods they agreed to and paid for." *Id.* A report entered into the record during the June 2, 2025 evidentiary hearing also showed that the City failed to report beds as required by the Roadmap Agreement. *Id.* at 38.

Eventually, the Court "issued an Order directing the City to produce a comprehensive spreadsheet containing key data for each of the 2,679 TLS slots and 130 scattered-site beds the

-15-

City claimed to have created under the Roadmap Agreement." *Id.* at 38 (quoting Amended Order Requiring City Verification of TLS Reporting (Dkt. 967)). In response to this directive, the City finally produced the sought TLS data. Settlement Compliance Order at 38. In finally revealing this data, the City "came clean that there was some double counting or false reporting." *Id.* (citing Declaration of Matthew W. Szabo re Court's Directive (Dkt. 980) at 1-2). However, even omitting these beds, there was still enough data to substantiate the required TLS slots. Settlement Compliance Order at 38. Thus, the Court "h[eld] that there is not sufficient evidence to find a breach under the Roadmap Agreement." *Id.*

But the Court did not excuse the City for its lack of substantiation:

> The Court's primary concern is ensuring the creation of shelter or housing for PEH—not arbitrating disputes over financing strategies or the definition of terms. But the Court not finding a breach at this time does not equate to an acceptance of the City's lack of accountability and verification. To belabor litigation over the Roadmap Agreement any further would only redirect resources away from urgently needed housing efforts and into sanctions or further litigation over receivership.

*Id.* at 38-39.

### 2. Settlement Agreement Issue: Bed Plan

The first alleged issue with respect to the Settlement Agreement dealt with the City's reporting obligations under Section 5.2 of the Agreement. The Alliance argued that "the City has failed to fulfill Section 5.2, which requires the City to 'create plans' and 'provide the plans' to Plaintiffs, because the City currently has no plan detailing how it intends to reach the 12,915 required shelter or housing solutions." Settlement Compliance Order at 40. By the time of the Settlement Compliance Order, the City had only submitted a "bed plan" in November 2022, which included about 8,000 shelter and housing solutions. *Id.* at 41. The City also produced a supplemental bed plan on September 12, 2024, but then withdrew this bed plan. *Id.* Thus, for two years, the City did not provide any bed plan showing how it intended to fulfill its

obligations. The City argued that it was not under an obligation to produce a single, comprehensive bed plan and could simply provide an updated plan in the future. *Id.* at 41-42.

The Court held that the City may use iterative plans to fulfill its obligations under Section 5.2 and that "the City may update the plan as needed," but that "the City's reliance on an outdated and incomplete plan from [over two years ago in] November 2022 of only about 8,000 beds runs the risk that the City will not sufficiently plan to fund the beds." *Id.* at 42. As such, the Court ordered the City to provide an updated bed plan by October 3, 2025. *Id.*

The City submitted its Updated Bed Plan on October 3, 2025 (Dkt. 1040), three years after its last submission. Given that the Updated Bed Plan relies on TLS slots—and the aforementioned verification issues with TLS beds in other areas—the Court also ordered that "because of the difficulties inherent to verifying and documenting TLS slots, the Special Master will need to facilitate the verification of TLS bed usage. Therefore, the Monitor is **ORDERED** to verify the City's compliance regarding its use of the TLS slots, with assistance as needed from the Special Master" (Dkt. 1052).

### 3.    Settlement Agreement Issue: Milestones

Next, the Alliance submitted that the City has not employed "best efforts" to create the 12,915 housing and shelter solutions, and that it frequently failed to meet its own milestones. Settlement Compliance Order at 42. In contrast, the City argued that it has used "best efforts" and despite the missed milestones was on track to satisfy the required 12,915 new beds and housing solutions. *Id.* The Court then summarized how "it is undisputed that the City did not meet the milestones for shelter and housing creation that it set for itself" and "has consistently missed those milestones according to its quarterly reports." *Id.* at 43. Despite the City making progress and getting closer to hitting each of its set milestones, "[e]ach missed milestone inflicted material harm to the public and those living on the streets who were denied shelter or housing." *Id.* As such, the Court concluded that "[t]hese milestones are not optional or aspirational" and that if "the City continues to miss its targets, the City runs the risk of rushing to create solutions and not meeting its obligations in 2027 at the cost of those waiting for shelter." *Id.* at 44. Because "each missed milestone [also] represents a missed opportunity to

shelter residents living and dying on the streets" the Court ordered the City to submit an updated milestones document by October 3, 2025.

The City eventually submitted its Updated Milestones on October 3, 2025 (Dkt. 1040). The Court also expressed concern over the usage of TLS slots and ordered the City "to specifically document the usage of TLS slots in its submission regarding the milestones. The City's milestone submissions must reflect not only the cumulative number of TLS slots but also the timing of their creation and deployment" (Dkt. 1052).

### 4.     Settlement Agreement Issue: "Create"

The next issue raised to the Court is that Section 3.1 requires the City to "create a Required Number of housing or shelter solutions," but the Settlement Agreement does not define what it means to "create" solutions. "Intervenors argue[d] that the City must consider and identify whether units counted were already covenanted as affordable units because if they were, the City did not 'create' them." Settlement Compliance Order at 45. The Court also concluded that the City's reporting did not demonstrate how the City "created" units that physically existed before the Settlement Agreement. *Id.* at 46. As such, the Court ordered that "[b]eginning in the quarterly report slated for October 2025, the City shall include an explanation for each unit that already physically existed prior to the Settlement Agreement of how the City contributed to bringing that unit into existence as a shelter or housing solution for people experiencing homelessness as opposed to its prior use." *Id.*

The City submitted explanations in its October quarterly report that it filed (Dkt. 1051). However, until the Monitor can verify these explanations they are provisional and unverified.

### 5.     Settlement Agreement Issue: Inside Safe Reporting

Plaintiff next put forth that the beds contracted through Inside Safe booking arrangements should not be counted toward the City's obligations under the Settlement Agreement. The "mayor's office administers the [Inside Safe] program." May 29, 2025 Hearing Tr. (Dkt. 953) at 112:13-20; *see* December 2, 2025 Hearing Tr. (Dkt. 1100) at 73:13 ("The Inside Safe sites are matched by the mayor's office.") Inside Safe beds are an interim housing solution that contracts through either occupancy agreements, which entail the master leasing of

an entire hotel, or booking agreements, which pay for a hotel room for individuals on an as needed basis. May 29, 2025 Hearing Tr. (Dkt. 953) at 97:15-99:10; 103:1-18.

The Inside Safe program was not previously included in the City's quarterly reports, but the City began including these beds beginning with its "status report for the quarter ending March 31, 2025." Settlement Compliance Order at 47. As such, "the nearly 2,000 bed increase reported from the status report in January 22, 2025, to the status report in April 15, 2025, is due to the inclusion of more Inside Safe beds *not* the creation of new beds." *Id.*

The Court acknowledged that the Inside Safe beds may be included in the City's obligations under the Settlement Agreement, but that "the Court is committed to ensuring that each of the 12,915 beds ultimately exists," including Inside Safe beds. If an Inside Safe bed comes offline before the end of the settlement term then it is the City's obligation to replace those beds. *Id.* at 47-48.

### 6.    Settlement Agreement Issue: Data Verification

The Court turned to the issues with validating and verifying the City's reported data. The Court first determined that "it is extremely difficult, if not impossible, to verify the housing and shelter solutions that are reported by the City to meet its obligations" and that this issue has been well-documented by Special Master Michele Martinez's reports and the A&M assessment. Settlement Compliance Order at 48. Indeed, "[t]he Court receives numbers of shelter and housing solutions created by the City in its quarterly reports with no documentation to substantiate the numbers." *Id.* And "[w]hen errors are found in the data reported, the City has repeatedly ignored the errors or attacked the messenger instead of engaging with and correcting the issues. This pattern has persisted for years and is untenable if the City is to succeed in meeting its obligations by 2027." *Id.* In fact, the City had been put "on notice" of its data verification deficiencies since "Special Master Martinez's first report covering the period July 1, 2022, through December 31, 2023." *Id.*

The Court would also note the importance of getting verified data for purposes of the Settlement Agreement:

> The inability to verify the City's reporting is a serious roadblock to compliance. In addition to the recent evidentiary hearing, confusion over and inconsistencies within the reporting have led to dozens of informal conferences, mediation sessions, and hearings throughout this litigation. Significant time and resources have been spent by all the Parties in debating and litigating details of the City's reporting. Days of the evidentiary hearing in May and June could have been avoided if the City had simply provided the data requested of it or put on witnesses to explain its reporting. For this reason, the Court seeks to limit further confusion and pave a smoother road to compliance by requiring the Parties to choose a third party to monitor reporting as was originally agreed to in the Settlement.

*Id.*

The Alliance and City filed a Joint Report on October 10, 2025 "to update the Court regarding the status of the City Council's approval of the third-party Monitor" and "to request the Court's review and resolution of the issue pursuant to Section 24 of the Settlement Agreement." *Id.* at 1 (quoting Joint Report (Dkt. 1045) at 1). Specifically, the Parties stated that they were at an impasse and could not agree on a Monitor. Order Resolving Third-Party Monitor Appointment and Scope of Work (Dkt. 1048) at 1-4. The Court resolved the Parties' dispute under Section 24 and appointed Daniel Garrie to the Monitor position with Kenneth Mejia, current Los Angeles City Controller, assisting "by facilitating data access and coordination, per Daniel Garrie's discretion." *Id.*

The Court's Order appointing Daniel Garrie and Kenneth Mejia is currently on appeal before the Ninth Circuit and the appointments are stayed pending that appeal.

### 7.     Settlement Agreement Issue: Encampment Reductions

The next issue before the Court was the City's responsibilities with respect to the encampment reductions. Section 5.2 of the Settlement Agreement requires the City to "create plans and develop milestones and deadlines for . . . (ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District . . . ." Pursuant to this provision,

the City and the Alliance agreed to the goal of 9,800 reductions of tents, makeshift shelters, cars, and RVs by June 30, 2026. Evidentiary Hearing Exhibit # 65 (Dkt. 668-1), at 82–84; Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713), at 2–3. However, the Alliance argued that the City was not "meeting its encampment reduction milestones because it is improperly counting cleanings under Care and Care+ operations as reductions and that its reporting violates the Court's March 24, 2025, Order defining reductions." Settlement Compliance Order at 51. Conversely, "[t]he City maintain[ed] that it is not required to make offers of shelter or housing as part of its encampment reduction plan."

However, at the time of the Settlement Compliance Order, the Court had already defined previously what is required to qualify as an encampment reduction. "In response to the Plaintiffs' Motions for Settlement Agreement compliance, the briefing on the Motions, and several hearings, the Court clarified on March 24, 2025, what may be counted as a reduction by the City." *Id.* (quoting Evidentiary Hearing Exhibit # 52 ("Order re Plaintiff's Motion re Settlement Agreement Compliance") (Dkt. 874).

The Court also determined that "[t]his definition of reduction is consistent with the City's representations to the Plaintiffs throughout the litigation including the City's reliance on Inside Safe encampment resolutions and interchangeable use of the terms 'resolution' and 'reduction.'" *Id.* In fact, the City's then-current "position . . . fl[ew] in the face of its own plans and promises." *Id.* The Court also concluded that "encampment reductions" and "encampment resolutions" are the same thing, and that the terminology used was of no import. *Id.* at 52-54. In short, "[t]he City's attempt to unilaterally change its definition of encampment reduction now ignores its past conduct and promises, the Court's prior Order, and the plain meaning of the Settlement Agreement." *Id.* at 54.

### G. Material Benefits Brought About By Plaintiff and Intervenors

The Court summed up the above findings as follows:

> The City breached the LA Alliance Settlement Agreement in four ways.
>
> The City failed to provide a plan for how it intends to create 12,915 shelter

or housing solutions. For years, the City consistently missed its shelter and housing creation milestones. The City also improperly reported encampment reductions and disobeyed the Court's order on encampment reductions. Finally, the City flouted its reporting responsibilities by failing to substantiate its reporting and failing to provide accurate and comprehensive data when requested by the Court, Special Master Martinez, the Parties, and A&M.

Settlement Compliance Order at 56.

The Court then determined that the Alliance's request for a receivership was not the appropriate remedy because "[w]eighing all of the options, this is not the time for a receivership over the City's homelessness response system." *Id.* at 60. However, the Court did order that the City would be required to take a number of specific steps to course correct from the breaches it identified. *Id.* at 56-57. The Court ordered the City to do following:

- Provide the Parties and the Court with an updated "bed plan" for how it intends to meet its obligation to create 12,915 shelter or housing solutions by October 3, 2025
- Provide the Parties and the Court with updated bed creation milestones consistent with the updated bed plan by October 3, 2025
- Beginning in the quarterly status report slated for October 2025, the City shall include an explanation for each unit that already physically existed prior to the Settlement Agreement of how the City "created" that unit, meaning contributed to bringing that unit into existence as a shelter or housing solution for people experiencing homelessness as opposed to its prior use
- Meet and confer with Plaintiffs on selecting a third-party Monitor by August 22, 2025, and select this Monitor by September 12, 2025, subject to the Court's approval
- Attend in-person court hearings after the submission of each quarterly status report starting with the October 2025 quarterly report on November 12, 2025
- Report encampment reduction data consistent with the Court's definition beginning in the October 2025 quarterly report and provide accompanying data on shelter or housing offers to the Monitor

Settlement Compliance Order at 57.

The Court also determined that the Alliance and Intervenors should be justly compensated for their efforts in bringing about compliance by the City if they could demonstrate that such payment was justified. *Id.* at 57-59. Therefore, the Court ordered the Parties to file briefing on attorneys' fees.

The Alliance and Intervenors' unyielding advocacy brought about significant and material benefits to the Los Angeles community. Specifically, as a result of their work the following has occurred:

- The City finally submitted an updated bed plan.
- The City finally submitted updated milestones.
- Confusion over the meaning of the term "create" in the Settlement Agreement has been resolved and the City has begun to explain in its quarterly reports how it is "creating" housing that physically existed before the Settlement Agreement.
- The Court set hard deadlines and appointed a data monitor to verify the City's data in its submission. This appointment is currently stayed by the Ninth Circuit.
- The City's willful disobeyance of the Court's March 24, 2025 order defining "encampment reductions" was pointed out and this definition was reaffirmed. The City began to report updated encampment reduction numbers.

The Alliance and Intervenors "have diligently and persistently raised important issues to the Court's attention." Settlement Compliance Order at 59. As a result, they deserve to be compensated. Indeed, the City previously agreed to pay Plaintiffs' fees and costs under similar circumstances. *See* March 8, 2024 Hearing Tr. (Dkt. 684); Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713).

Perhaps, the entire "evidentiary hearing in May and June could have been avoided if the City had simply provided the data requested of it or put on witnesses to explain its reporting." *Id.* at 49. The City's continued obfuscation required the Court to order the City to show cause why it should not be held in contempt and resulted in the current evidentiary hearing.[30]

---

[30] It goes without saying that the fees in this Order are in no way connected to the ongoing evidentiary hearing. The Court is denying Plaintiff's request for prospective fees.

## II. ATTORNEYS' FEES BRIEFING

On June 24, 2025, the Court issued its Settlement Compliance Order (Dkt. 991). In this order, the Court asked the Alliance and Intervenors to submit motions for attorneys' fees and the Court set a briefing schedule. Settlement Compliance Order at 59. On July 21, 2025, the Court granted the Parties' stipulation defining a separate briefing schedule for Intervenors' Motion (Dkt. 1013).

The Court heard oral argument on the Motions on November 12, 2025.

## III.    LEGAL STANDARD

### A.    42 U.S.C. § 1988

In an action brought pursuant to 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C. § 1988(b)."[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437; *see also Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013) ("The prevailing party has the burden of submitting billing records to establish that the number of hours it has requested are reasonable."); *Carson v. Billings Police Dep't*, 470 F.3d 889, 891 (9th Cir. 2006). "The party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the . . . facts asserted by the prevailing party in its submitted affidavits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1397–98 (9th Cir. 1992)).

"The Supreme Court has stated that the lodestar is the 'guiding light' of its fee-shifting jurisprudence, a standard that is the fundamental starting point in determining a reasonable attorney's fee." *Van Skike v. Dir., Off. of Workers' Comp. Programs*, 557 F.3d 1041, 1048 (9th Cir. 2009) (quoting *City of Burlingtion v. Dague*, 505 U.S. 557, 562 (1992)); *see also Hensley*, 461 U.S. at 433. Accordingly, a district court is required "to calculate an award of attorneys' fees by first calculating the 'lodestar' before departing from it." *Camacho*, 523 F.3d at 982

(quoting *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1028 (9th Cir. 2000), *as amended* (Nov. 2, 2000)). "The 'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Camacho*, 523 F.3d at 978 (quoting *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1149 n.4 (9th Cir. 2001)); *see also Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008) ("The number of hours to be compensated is calculated by considering whether, in light of the circumstances, the time could reasonably have been billed to a private client."); *Caudle*, 224 F.3d at 1028; *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996), *opinion amended on denial of reh'g*, 108 F.3d 981 (9th Cir. 1997). Applying these standards, "a district court should exclude from the lodestar amount hours that are not reasonably expended because they are 'excessive, redundant, or otherwise unnecessary.'" *Seachris v. Brady-Hamilton Stevedore Co.*, 994 F.3d 1066, 1083 (9th Cir. 2021) (internal citation and quotation marks omitted). A district court "has a great deal of discretion in determining the reasonableness of the fee." *In re Smith*, 586 F.3d 1169, 1173 (9th Cir. 2009) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1398 (9th Cir. 1992)). Where "a voluminous fee application is filed in exercising its billing judgment the district court is not required to set forth an hour-by-hour analysis of the fee request." *Gates*, 987 F.2d at 1399. In those instances, "the district court has the authority to make across-the-board percentage cuts. . . in the number of hours claimed. . . as a practical means of trimming the fat from a fee application." *In re Smith*, 586 F.3d at 1174 (quoting *Gates*, 987 F.2d at 1399).

**B.     Contempt Sanctions**

As the Court previously mentioned in its June 2024 ruling (Dkt. 991):

> Federal courts possess certain "inherent powers," not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962). This authority includes the ability to "fashion an appropriate sanction for conduct that abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). An assessment of attorney's fees is a "less severe sanction" that is "undoubtedly within a court's inherent

power as well." *Id.* (citing *Hutto v. Finney*, 437 U.S. 678, 689, n.14 (1978)). This narrowly defined power can be exercised in certain circumstances. *Id.* (citation omitted). One such circumstance is assessing attorney's fees as a sanction for the "willful disobedience of a court order." *Id.* (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 (1975)). Another circumstance is awarding attorney's fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 45-46 (citation omitted). In this last instance, if a Court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party." *Id.* at 46 (citation omitted). This circumstance also extends to when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." *Id*

The Supreme Court has made clear that such a sanction has to be compensatory in nature rather than punitive. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 102 (2017) (citing *Mine Workers v. Bagwell*, 512 U.S. 821, 826-30 (1994)); see also *Lake v. Gates*, 130 F.4th 1054, 1059 (9th Cir. 2025) (applying *Goodyear* when reviewing a district court's sanctions). Simply, this means the fee award can only redress the wronged party for losses sustained, it may not impose an additional amount as punishment for the sanctioned party's misbehavior. *Id.* at 108 (citation omitted). Thus, this Court must track the compensation to the wrong and the loss resulting from that wrong. *Id.* A compensatory sanction must be "calibrated to the damages caused by the bad-faith acts on which it is based." *Id.* (citations and quotations omitted). This kind of causal connection is appropriately framed as a but-for test where the complaining party may recover "only the

portion of his fees that he would not have paid for but the misconduct." *Id.* at 109 (citation omitted).

The Court now turns to the burden of proof required for a finding of bad faith or willful disobedience of a court order. The Ninth Circuit has not yet expounded on the burden of proof required for a finding of bad faith and sanctions. *Lahiri v. Universal Music & Video Distrib. Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010). Even if the burden of proof lies closer to the standard of clear and convincing evidence, there could be such a finding in the present matter. The civil contempt standard for establishing willful disobedience of a court order is clear and convincing evidence. *Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1108 (D. Idaho 2013) (citing *Battaglia v. United States*, 653 F.2d 419, 422 (9th Cir. 1981).

## IV. DISCUSSION

Plaintiff requests $1,600,633.00 in fees and $45,467.21 in costs. (Dkt. 1027 at 24).  The Court will conduct a prevailing party analysis first and then determine the lodestar amount.

### A.    Prevailing Party

The Court concludes that Plaintiff is the prevailing party. A prevailing party is one who succeeds on any significant issue in the litigation, resulting in a "material alteration of the legal relationship of the parties." *Tex. State Tchrs. Ass'n v. Garland Indep. School Dist.*, 489 U.S. 782, 792–93 (1989). The Ninth Circuit has found that a party can "prevail" where the party enters into a legally enforceable private settlement agreement against Defendants." *Richard S. v. Dep't of Developmental Servs. Of State of California*, 317 F.3d 1080, 1086 (9th Cir. 2003) (citing *Barrios v. California Interscholastic Fed'n*, 277 F.3d 1128, 1134 (9th Cir. 2002)). Here, Plaintiff is entitled to attorney's fees for monitoring Defendant's compliance with the settlement agreement. *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 451 (9th Cir. 2010).  The Court has summarized all the benefits brought about by the motions for settlement compliance above. *See* Section I.H.

Plaintiff and Intervenors' advocacy in alerting the Court to breaches of the settlement agreement "meaningfully alters the legal relationship between [the] parties . . . [because] it allows one party to require the other party 'to do something it otherwise would not be required

-27-

to do.'" *Jankey*, 537 F.3d at 1130 (quoting *Fischer*, 214 F.3d at 1118). Therefore, Plaintiff and Intervenors are the prevailing party.

Defendant argues that there is no entitlement to attorneys' fees because the Alliance dismissed their § 1983 claims with prejudice and entered into a settlement agreement, pointing to caselaw allowing attorney's fees only for consent agreements. All. Opp'n (Dkt. 1023) at 22. Citing *Lackey v. Stinnie*, Defendants argue that stipulation to dismissal of § 1983 claims precludes Plaintiff from being the prevailing party. *Id.* at 20. However, at issue in *Lackey* was whether a preliminary injunction can conclusively resolve the rights of parties on the merits and can confer prevailing party status as a result. *Lackey v. Stinnie*, 604 U.S. 192, 201 (2025). The Supreme Court ultimately found that the trial court's preliminary injunction did not qualify plaintiffs as the prevailing party because the preliminary injunction represented only "temporary success at an intermediary stage of the suit." *Id.* at 668-69. In sharp contrast is the present case where Plaintiff achieved a legally enforceable settlement agreement that the Court has been monitoring. This settlement agreement requires the City to actually address the homelessness pandemic on its doorstep and is not only an interim step in the litigation.

Additionally, the Court finds unpersuasive Defendant's argument that settlement agreements do not convey prevailing party status given guidance from the Ninth Circuit finding the contrary. In *Prison Legal News v. Schwarzenegger*, the Court found the differences between a settlement agreement and consent decree "immaterial" under Section 1988 because both lead to defendants fulfilling their obligations 'more speedily and reliably.' *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 451 (9th Cir. 2010). Here, Plaintiff and Intervenors have been monitoring the City's breaches of the settlement agreement and have been instrumental in holding the City accountable to the very settlement agreement it signed. The Court reiterated this in its opinion following the seven-day evidentiary hearing held in May 2025, where it found that "by consistently refusing to provide explanations and verification of its reporting, the City has forced Plaintiff into the position of investigating and monitoring" and spending hundreds of hours litigating the City's many failings. Settlement Compliance Order at 57-58.

**B.    Lodestar**

Plaintiff seeks a total fee amount based on its calculated lodestar. Defendants dispute the fee amount, arguing that Plaintiff's hourly rates are excessive, that Plaintiff utilizes block billing, that Plaintiff's billing entries are too heavily redacted, and that as such, the lodestar should also be reduced. *See generally* All. Opp'n. Defendants also argue that Plaintiff's ask for attorney's fees are too expansive because their billing entries include events that occurred before the Court issued its Settlement Compliance Order (Dkt. 991). *Id.* at 14.

The Court first turns to Plaintiff's hourly rates and billing entries. Then the Court turns to Plaintiff's counsels' hours and whether any further lodestar adjustments need to be made.

### 1.    Plaintiff's Billing Rates

A "reasonable hourly rate" for purposes of determining the appropriate lodestar figure "is ordinarily the 'prevailing market rate in the relevant community.'" *Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016) (citation omitted). The Ninth Circuit has "repeatedly held that the determination of a reasonable hourly rate is not made by reference to the rates actually charged to the prevailing party." *Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 946 (9th Cir. 2007). "Rather, billing rates 'should be established by reference to the fees that private attorneys of an ability and reputation comparable to that of prevailing counsel charge their paying clients for legal work of similar complexity.'" *Id.*

Plaintiff requests an hourly rate of $1295 for their counsel. All. Reply at 16. The Court finds these rates reasonable. Plaintiff's counsel has extensive experience working on complex civil litigation matters in federal court. All. Mot. at 9. Their requested rate of $1295 falls within the range of what their firm—Umhofer, Mitchell & King—charges for partners. *Id.* at 9. The firm's standard rate for partners in 2025 was $1250 per hour, with present matters ranging from $700 to $1450 for partners. Declaration of Matthew K. Umhofer ("Umhofer Decl.") (Dkt. 1015-1) ¶ 15. As a direct comparison, Defendant's counsel is also being paid a blended rate of $1295 for this matter, which they characterized as a discount. Nov. 12, 2025 Hearing Tr. (Dkt. 1076) at 59:18-60:23. Therefore, the Court finds that Plaintiff's request for $1295 per hour is reasonable.

## 2.    Plaintiff's Billing Entries

In the Ninth Circuit, "[t]he number of hours to be compensated is calculated by considering whether, in light of the circumstances, the time could reasonably have been billed to a private client." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008). Compensation can be awarded for expenses arising from the ligation of attorney's fees. *Kinney v. Int'l Bhd. of Elec. Workers*, 939 F.2d 690, 694 (9th Cir. 1991). A district court should exclude hours that are "excessive, redundant, or otherwise unnecessary." *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1203 (9th Cir. 2013). "[W]hen faced with a massive fee application the district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure 'as a practical means of trimming the fat from a fee application.'" *Gates v. Deukmejian*, 987 F.2d 1392, 1399 (9th Cir. 1992).

Defendants argue that the Court should make across the board cuts to Plaintiff's request because Plaintiff is asking for compensation on matters they did not prevail on or are unrelated to the May 2025 hearing. All. Opp'n at 17. The Court finds this argument unpersuasive because Plaintiff is entitled to attorney's fees and costs for related claims that involve "a common core of facts," even if these claims were unsuccessful. *Thorne v. City of El Segundo*, 802 F.2d 1131, 1141 (9th Cir. 1986). The test for making this determination is whether the relief sought under the unsuccessful claim "is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised." *Id.* Defendants cite to Plaintiff's unsuccessful request for a receivership and withdrawal of subpoenas for Mayor Bass and Councilmembers Rodriguez and Park as failed claims with no relation to the relief granted by this Court. All. Opp'n at 23. Even though Plaintiff was not ultimately successful in every single claim, their advocacy during these hearings and push for transparency brought to light the City's deficiencies in fulfilling the promises it made to both its residents and this Court.

Defendants further argue that Plaintiff's block billing and redacted entries make it difficult to understand exactly what work Plaintiff's attorneys preformed. All. Opp'n at 14. "Block billing is the time-keeping method by which each lawyer and legal assistant enters the

total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 945 n. 2 (9th Cir. 2007). The fee applicant bears the burden to document the time for which compensation is requested. *Id.* at 945–46. A district court may therefore impose reductions if it is unable to attribute hours to one or another task because of, for example, block billing. *Id.* at 948. The Court does not find reductions necessary in this matter. The City does not point to any specific entries that they deem to be block billed or too heavily redacted. The Court having reviewed Plaintiff's entries also does not find examples of expansive block billing by Plaintiff.

### 3. Lodestar Multiplier

Plaintiff is asking for a lodestar multiplier of 2.5. All. Mot. at 19. Multipliers are awarded for factors not already accounted for in the lodestar calculation. *Perdue v. Kenny A.*, 559 U.S. 542, 553 (2010). Plaintiff cites to factors such as "(5) the customary fee, . . . (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases" as not being accounted for in the lodestar calculations. " *Kelly 1*, 7 F. Supp. 3d at 1081.

Plaintiff's counsel has persevered through prolonged litigation. And Plaintiff's counsel has had to advance costs, with no guarantee of success, for the City's repeated noncompliance and refusal to commit to transparency regarding its efforts to combat homelessness. While acknowledging these factors, the Court will not be applying a multiplier at this time. Plaintiff's counsel should be justly compensated for the significant time and labor they have dedicated to this case and the Court finds that the lodestar calculation, absent a multiplier, adequately does so.

### 4. Prospective Fees

Plaintiff asks the Court for prospective fees they anticipate accumulating as they continue to hold the City accountable for the commitments it made in the Settlement Agreement. All. Mot. at 19. While acknowledging significant noncompliance by the City in the

past, and the expenses associated with monitoring (that the City could have reduced through its compliance) the Court declines to award prospective fees.

The Court believes that future compliance is possible. The City can choose to adhere to the agreement it made with Plaintiff. Should Plaintiff incur future attorney' fees and expenses in monitoring compliance, it may file another motion for attorney's fees.

### 5.    Fees Award for Paul Webster

Paul Webster is the part-time executive director for LA Alliance and Plaintiff is seeking fees for his time. All. Mot. at 10. Mr. Webster has previous experience working as Senior Policy Advisor at the U.S. Department of Housing and Urban Development and has prior experience working on homelessness policy on the local, state, and federal levels. *Id.* The Court understands that Mr. Webster has spent significant time monitoring City compliance and assisting counsel in enforcing the Settlement Agreement. *Id.* However, the Court declines to exercise its discretion at this time to award consulting fees for Mr. Webster as a sanction. *See Barnes v. Dalton*, 158 F.3d 1212, 1215 (11th Cir. 1998).

### 6.    Lodestar Calculation

The Court now moves to the lodestar calculation. The lodestar figure submitted by Counsel is $1,600,633.00 for attorney's fees and $45,467.21 for costs. This lodestar includes the time Plaintiff spent litigating their request for attorney's fees, and the sought costs include fees for Mr. Webster. *See* Declaration of Matthew Donald Umhofer (Dkt. 1015-1), Ex. A; Declaration of Elizabeth Mitchell (Dkt. 1027-1), Ex. A.[31] For lodestar calculation purposes, the Court finds these amounts are reasonable.

---

[31] The Court has combined the two tables provided by the Alliance for ease of reference.

| Name | Title | Rate Billed | Total Amount Billed | Total Time Billed |
|---|---|---|---|---|
| Elizabeth Mitchell | Partner | $1,295.00 | $988,473.50 | 763.3 |
| Matthew Umhofer | Partner | $1,295.00 | $300,440.00 | 232 |
| Diane Bang | Counsel | $1,295.00 | $67,372.00 | 52 |
| Eugene Lim | Associate | $1,295.00 | $42,217.00 | 32.6 |
| Adam Snyder | Associate | $1,295.00 | $7,381.50 | 5.7 |
| Madeline Matson | Paralegal | $500.00 | $78,750.00 | 157.9 |
| Jon Powell | Paralegal | $500.00 | $51,850.00 | 103.7 |
| Patrick Nitchman | Paralegal | $500.00 | $41,750.00 | 83.5 |
| Jennifer Mitchell | Paralegal | $500.00 | $2,500.00 | 5 |
| Ingrid Nitchman | Admin | $150.00 | $8,430.00 | 56.2 |
| Omid Rahimdel | Law Clerk | $150.00 | $11,625.00 | 77.5 |
| **Grand Total** | | | $1,600,633.00 | 1,564.30 |

## C.     Costs

Plaintiff seeks $45,467.21 in costs. (Dkt. 1027 at 1). Prevailing parties are entitled to having their cost reimbursed. *Dawson v. City of Seattle*, 435 F.3d 1054, 1070 (9th Cir. 2006). Having reviewed Plaintiff's submission, the Court approves these costs, absent compensation

for Mr. Webster as discussed above. Therefore, the total amount of costs awarded is $5067.21.[32]

### D.    Intervenors

The Intervenors, Los Angeles Community Action Network and LA Catholic Worker, seek $201,182.50 in fees and $160.00 in costs. Ints.' Mot. at 7. They have been active and invaluable participants in the proceedings, especially those for post-settlement compliance. Intervenors directly represent unhoused people on Skid Row and have connected the lived experiences of their clients to the proceedings, focusing the proceedings to the reality on the ground. Their expertise and commitment to serving Los Angeles' unhoused population, demonstrated by their participation in every hearing over the last five years, deserves compensation.

Intervenors are asking for fees and costs associated with the May 2025 evidentiary hearing, Intervenors' brief in support of sanctions, and the present fees motion, including subsequent replies. Ints.' Mot. at 8. Under 42 U.S.C. § 1988, the Court awards Intervenors their sought $201,182.50 in attorneys' fees. Like Plaintiff, Intervenors have devoted substantial time and effort to this litigation, as well as in settlement monitoring. As such, Intervenors are entitled to attorneys' fees as well. *See Seattle Sch. Dist. No. 1 v. State of Wash.*, 633 F.2d 1338, 1350 (9th Cir. 1980).

Defendant argue that Intervenors are not entitled to fees under § 1988 for the same reasons they cited for Plaintiff. Int. Opp'n at 3. Additionally, Defendants argue that Intervenors did not prove a violation of the Settlement Agreement or the resolution of a § 1983 claim in their favor, resulting in to prevailing-party status. *Id.* For the reasons stated above when discussing Plaintiff, the Court disagrees. Intervenors' extensive evidence and advocacy during hearings have played a significant role in holding the City accountable to its commitments and the Court relied on Intervenors' briefing for its June 2025 opinion.

Intervenors seek an hourly rate of $1025 for Ms. Myers and an hourly rate of $600 for Ms. Geczy. Ints.' Mot. at 14-15. These rates are entirely reasonable. Indeed, these proposed

---

[32] Plaintiff submitted that they had $3,847.21 in costs between October 2024 and June 2025. All. Mot., Ex. C. Plaintiffs further submitted they had $1,220 in costs from July 2025 to August 2025. All. Reply, Ex. C.

rates are less than the blended rate for the City of Los Angeles's outside counsel, as well as the counsel for LA Alliance. Therefore, having reviewed the line items submitted by Intervenors, the Court grants $201,182.50 in fees and $160.00 in costs.

### E.       Inherent Powers Legal Analysis

Though Intervenors and Plaintiffs are entitled to attorney's fees under 42 U.S.C. § 1988, attorneys' fees can also alternatively be awarded on the basis of the court's inherent authority to fashion attorney's fees as sanctions. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). The Court can assess attorney's fees for the 'willful disobedience of a court order'" or for litigation conduct undertaken "'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 258–59 (1975). The Court finds that attorney's fees should be assessed in both instances in the present matter.

Defendants argue that the Court should not issue attorney's fees as sanctions, mistakenly interpreting the Court's June 2025 order, where the Court stated, "As a sanction for the City's noncompliance, including disobeying the Court's order on encampment reductions, Plaintiffs' efforts should be compensated." Settlement Compliance Order at 59. The question before the Court is not whether sanctions are warranted, because that was extensively opined upon in the Settlement Compliance Order. Rather, Plaintiff and Intervenors were tasked by the Court to "show how they have been harmed by the City's conduct and the resulting losses to them under the law." Settlement Compliance Order at 59. Both Plaintiff and Intervenors have successfully fulfilled this burden. Therefore, the Court will only briefly address Defendant's arguments that sanctions cannot be issued.

Plaintiff and Intervenors demonstrated that attorney's fees should be awarded because the City displayed both a willful disobedience of two court orders and acted in bad faith, vexatiously, wantonly, or for oppressive reasons. The two court orders the City defied are the Settlement Agreement (Dkt. 429-1) and the March 24, 2025 Order (Dkt. 874). The Court found in its Settlement Compliance Order, which Plaintiff further points to, demonstrations on how the City acted in bad faith, vexatiously, wantonly, or for oppressive reasons, All. Reply (Dkt. 1027) at 9-10:

- "The pattern is clear: documentation is withheld until exposure is imminent, public accountability is resisted until judicially mandated, and the truth of reported progress remains clouded by evasive recordkeeping. As the Court observed, these failures have undermined public trust and judicial trust alike." Settlement Compliance Order at 39.

- "[T]he City has repeatedly ignored the [data] errors or attacked the messenger instead of engaging with and correcting the issues. This pattern has persisted for years and is untenable . . . . The City's inability or unwillingness to verify its reporting . . . was on stark display during the evidentiary hearing. At no point during the costly and time-intensive seven-day hearing did the City attempt to substantiate its reporting which had been called into question by Special Master Martinez, in addition to other witnesses, and which A&M had not been able to replicate." *Id.* at 48.

The City's bad faith in complying with the Settlement Order has caused significant costs to Plaintiff and Intervenor. This bad faith played a substantial role in the May 2025 evidentiary hearing that both Plaintiffs and Intervenors spent time and effort litigating. But this bad faith predates the evidentiary hearing. The City's repeated bad faith noncompliance is the but for cause in both the Plaintiff's and Intervenors' efforts to hold the City accountable in multiple prior hearings. *See generally* Settlement Compliance Order. The City's bad faith is clear and sanctions are warranted.

Additionally, the Court also finds assessing attorney's fees as a sanction appropriate due to the City's willful disobedience of multiple court orders. First, the settlement agreement is itself is a court order, having been incorporated into the Court's dismissal order under *Kokkonen*. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994). As the Court already found in its June 2025 order, the settlement agreement was violated in four ways:

> The City failed to provide a plan for how it intends to create 12,915 shelter or housing solutions. For years, the City consistently missed its shelter and housing creation milestones. The City also improperly reported encampment reductions and disobeyed the Court's order on

encampment reductions. Finally, the City flouted its reporting responsibilities by failing to substantiate its reporting and failing to provide accurate and comprehensive data when requested by the Court, Special Master Martinez, the Parties, and A&M.

Settlement Compliance Order at 56.

The Court found these breaches applying a clear and convincing standard. *See generally id*. But for the City's breaches, the Court would need not have conducted its seven-day evidentiary hearing in May 2025. Further, the City refused to verify its compliance data submitted to the Court, as required by the Settlement Agreement. But for this noncompliance, Plaintiff and Intervenors would not have spent resources trying to bring the City into compliance.

The Court has already found that the City defied the Court's March 24, 2025 Order (Dkt. 874). In its Settlement Compliance Order, the Court said "The City's attempt to unilaterally change its definition of encampment reduction now ignores its past conduct and promises, the Court's prior Order, and the plain meaning of the Settlement Agreement." Settlement Compliance Order at 54. The City's defiance of the March 24, 2025 Order was a but for cause of much of the evidentiary hearing in May 2025. The hearing revealed clear and convincing evidence that the City willfully ignored the March 2025 Order. Having fulfilled their burden, the Court therefore awards, on an alternative basis to § 1988, Intervenors and Plaintiff attorney's fees due to the City's sanctionable conduct.

## V. CONCLUSION

The $1,600,633.00 million and $201,182.50 the Court awards to Plaintiff and Intervenors respectively is reasonable, especially in light of the approximately $5.9 million that the City's outside counsel is charging. This is the same case, and the fees the Court awards are well within the realm of reasonableness. Accordingly, the Court **GRANTS IN PART** Plaintiff's Motion and **GRANTS** Intervenors' Motion.

As the Court noted above, this case is about far more than the reporting of metrics. Quite simply, it is about providing housing and shelter to unhoused people and getting them off the street. As laid out above, there have been numerous instances of fraud and corruption proliferating unabated within the homelessness-industrial complex. Without accurate data and reporting, the Court must take the City at its word. The Court declines to do so.

"[B]y consistently refusing to provide explanations and verification of its reporting, the City has forced Plaintiff into the position of investigating and monitoring" and spending hundreds of hours litigating the City's many failings. Settlement Compliance Order at 57-58. It has fallen to Plaintiff, Intervenors, and journalists to point out the deficiencies in the City's reporting. Plaintiff and Intervenors must be compensated for this.

DATED:      January 6, 2026

_David O. Carter_

DAVID O. CARTER

UNITED STATES DISTRICT JUDGE

-38-