**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                    Date:  January 14, 2026

Title: LA ALLIANCE FOR HUMAN RIGHTS, ET AL., V. CITY OF LOS ANGELES, ET AL.

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

| Karlen Dubon | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):   SUPPLEMENTAL NOTICE TO OSC IN RE CONTEMPT – CITY OF LOS ANGELES**

On November 7, 2025, this Court filed and served an OSC In Re Contempt on the City of Los Angeles arising out of its alleged misconduct related to the 2022 settlement agreement in this matter. In that OSC notice this Court ordered the City of Los Angeles to appear before it on November 12, 2025 "to show cause why it should not be held in contempt."

Later in November 2025, in response to a request for clarification by the City of Los Angeles, this Court filed its Order Responding to City's Request for Clarification.

On November 12, 2025, this Court began to hear testimony related to the allegations contained in the notice and clarification. That contempt hearing continues.

Based upon newly reported information, there is reason to believe that the City of Los Angeles may have engaged in additional, previously unknown misconduct related to the 2022 settlement agreement when the City knowingly, willfully and intentionally misrepresented material facts to the Court.

Specifically, the Court is concerned that a vote may have been taken by the City Council in violation of the Brown Act. This Court is also concerned about the City's representation that

the City Council had passed the homeless encampment reduction plan that was a critical and material issue before the Court. The Court has recently become aware of reports published in the mainstream media that suggest the City Council never voted to pass such a resolution. This Court has received and reviewed a ruling written and filed by Judge Curtis Kin who sits on the Los Angeles County Superior Court. In his ruling, Judge Kin found that in January of 2024 the City of Los Angeles violated the state of California's well-established Brown Act as it considered and took action on the homeless encampment reduction resolution that is at issue here.

Since the current contempt hearing is in recess, rather than initiate a new OSC proceeding against the City of Los Angeles, in the interest of judicial economy, the Court elects to supplement its prior notice to add this new factual allegation to the current OSC proceeding.

The Parties are **ORDERED** to preserve all evidence in this matter. The Parties are also **ORDERED** to lodge a copy of Judge Kin's briefing schedule in this matter by Wednesday, January 21, 2026 at 12:00 p.m.

It is therefore ordered that the City of Los Angeles shall appear before this Court at a time and place to be determined by the Court that will afford the City of Los Angeles an adequate opportunity to prepare itself to respond to this new allegation.

This Court again invites Mayor Karen Bass and Council President Marqueece Harris-Dawson to be present for these proceedings.

Judge Kin's ruling is attached to this Order as Exhibit A. A Los Angeles Times article covering this issue is attached as Exhibit B.

The Clerk shall serve this minute order on the parties.

Initials of Deputy Clerk: kdu

# EXHIBIT A

FILED
Superior Court of California
County of Los Angeles

JAN 05 2026

David W. Slayton, Executive Officer/Clerk of Court

By: M. Mort, Deputy

**Superior Court of California**
**County of Los Angeles**

CANGRESS,

                                    Petitioner,

vs.

CITY OF LOS ANGELES,

                                    Respondent.

Case No.   25STCP00261

**RULING ON VERIFIED PETITION FOR WRIT OF MANDATE**

Dept. 86 (Hon. Curtis A. Kin)

Petitioner CANGESS, dba Los Angeles Community Action Network, petitions for a writ of mandate declaring that respondent City of Los Angeles ("City") violated the Ralph M. Brown Act ("Brown Act") during its January 31, 2024 and May 1, 2024 meetings and ordering that City disclose certain information pertaining to those meetings. For the reasons that follow, the Court finds that the City violated the Brown Act.

## I.   BACKGROUND

### A.   The LA Alliance Federal Litigation

In response to growing homelessness impacting City, in March 2020, a group of business and property owners in Skid Row, as well as individual property owners and residents, initiated a federal lawsuit against the City and the County of Los Angeles ("County"), *LA Alliance for Human Rights v. City of Los Angeles*, No. 2:20-cv-02291 (C.D. Cal. Mar. 16, 2020) ("*LA Alliance* Action"). Plaintiffs in the *LA Alliance* Action alleged that the City and County failed to take necessary steps to clear homeless encampments and sought an injunction that would compel the clearing of those encampments. (AR 920-30.) Petitioner intervened in the *LA Alliance* Action in order to protect the interests of its unhoused members and avoid them being criminalized and losing their belongings. (AR 1010-17.) The district court granted petitioner intervention as a matter of right, reasoning that the *LA Alliance* Action

1

could undermine a settlement petitioner had reached with the City in a prior federal action.[1] (AR 1013-15.)

Following the Ninth Circuit's reversal of the district court's "sweeping preliminary injunction" in the *LA Alliance* Action (*see LA Alliance for Human Rights*, 14 F.4th 947), LA Alliance amended its complaint, adding several different causes of actions against the City and the County. (AR 1329.) After the City and County moved to dismiss the amended complaint (AR 1515), the district court ordered the parties to engage in mandatory settlement talks. (AR 1517-18.) Through these efforts, the City reached a preliminary settlement agreement with LA Alliance in spring 2022. (AR 1019.) By June 2022, the district court approved this settlement. (AR 1027, 1520, 1522.) In return for dismissal from the *LA Alliance* Action (AR 1027), the City agreed to "create and develop milestones and deadlines" over a five-year period for (1) the City's creation of 12,915 shelter and housing units and (2) "the City's plan for encampment engagement, cleaning, and reduction in each Council District" and in the City. (Opp. at 7:19-22; AR 1026-29, 1312.) Per the agreement, the district court retained jurisdiction to oversee and enforce the agreement, and the City was required to submit quarterly updates to the court. (AR 1308, 1313.)

The County was not a party to the settlement between LA Alliance and the City, but, in September 2022, the County entered into a preliminary agreement with the City to work together to address homeless services and develop a memorandum of understanding between them toward that end. (AR 817, 1314-16.)

Months later, the County and LA Alliance reached their own settlement, which the district court initially rejected in April 2023. (AR 1374-75, 1400-01, 1525-32.) By September 2023, those parties reached a new settlement agreement. (AR 1031-38, 1533, 1537, 1544.) In that agreement, "the County expressly agreed to support the settlement agreement between LA Alliance and the City. The County agreed to provide access to County health care data; to dedicate or prioritize various types of County beds for the homeless in the City; to increase homeless outreach teams; to work with the City to create new housing on publicly owned land; and to fund, in an amount to be determined by the City and County, supportive services for those in City housing under the City's settlement." (Opp. at pg. 9:4-9; AR 1035, 1042–43.) On September 29, 2023, pursuant to the settlement and stipulation between LA Alliance and the County, the district court dismissed the remainder of

---

[1]    In *Mitchell v. City of Los Angeles*, No. 2:16-cv-01750 (C.D. Cal.), petitioner alleged that City was violating the U.S. Constitution through its practice of clearing the homeless and their property. "The *Mitchell* settlement, [applied] for three years to certain blocks in the Skid Row area, limit[ed] the City's ability to clear or destroy the property of unhoused people and requires notice of any cleanups." (*LA Alliance for Human Rights v. City of Los Angeles* (9th Cir. 2021) 14 F.4th 947, 953.)

2

the *LA Alliance* Action. (AR 1077-79, 1078.) The district court agreed to retain jurisdiction to oversee and enforce their settlement agreement. (AR 1079.)

### B.   Closed Sessions Following Settlement in *LA Alliance* Action

Following dismissal of the City from the *LA Alliance* Action, the City Council has met eleven times in closed sessions in connection with that federal action. (AR 179-82.)

#### 1.   *January 31, 2024 Closed Session*

By January 2024, LA Alliance had threatened to move for sanctions against the City due to the City's purported failure to meet certain obligations under the settlement agreement. (AR 1111-14.) LA Alliance demanded City agree to pay $1 million and accept its encampment reduction plans. (AR 1111-14.) On January 31, 2024, City Council held a closed session pursuant to Government Code § 54956.9(d)(1) for the stated purpose of "confer[ring] with its legal counsel" regarding the *LA Alliance* Action. (AR 306.) Following the meeting, no actions were reported. (AR 173 at ¶ 10, 179-82, 328.)

On February 2, 2024, LA Alliance filed a motion for sanctions as it had threatened. (AR 1546, 1084-86.) On April 4, 2024, LA Alliance and the City filed a joint stipulation indicating their resolution of the sanctions motion. In that joint stipulation, the parties stated: "The 9,800 encampment reduction plan and milestones were presented to the City Council on January 31, 2024, which approved them without delay." (AR 1178.) The City also agreed to pay LA Alliance's attorney's fees and costs and pay for a Court-ordered audit of the homelessness programs. (AR 1178, 1549.)

When petitioner subsequently requested from the City Clerk's Office details regarding the January 31, 2024 closed session and approval of the encampment reduction plan ("ERP"), the City did not respond. (AR 172 ¶¶ 4-6 & 9.)

#### 2.   *May 1, 2024 Closed Session*

In the September 2022 preliminary agreement between the City and County, the County agreed to provide support for various obligations the City had undertaken as part of its settlement agreement with LA Alliance. (AR 818-21.) The City and County also indicated that their preliminary agreement would be used to "inform the development of a Memorandum of Understanding (MOU) between the City and the County, which will be submitted to the City Council and Mayor, and the Count Board of Supervisors, for approval." (AR 818.)

On May 1, 2024, the City Council held a closed session, citing Government Code § 54956.9(d)(1) as the basis for "confer[ring] with its legal counsel" regarding the *LA Alliance* Action. (AR 429-30.) Following this meeting, nothing was immediately reported. (AR 173 at ¶ 11, 179-82, 450-51.)

3

One day later, during a May 2, 2024 hearing before the district court in the *LA Alliance* Action, counsel for the City confirmed that an MOU had been entered into between the City and County. (AR 1183.) An inter-departmental correspondence from the City's Chief Administrative Office to the City Council, dated May 31, 2024, recounts that his office "met with Council over the course of several closed sessions to discuss the negotiations with the County over the final terms of the MOU" and that "[t]he MOU was executed on May 2, 2024." (AR 823.) The approved MOU was filed in a separate City Council file, but no votes were registered. (AR 172, 178.)

Under the MOU (AR 852-66), the County agreed to the following: (1) "reimburse the City for the interim housing beds created under the City's settlement and [ ] provide public assistance and mental health services to the individuals using those beds"; (2) "contract for and fund similar services for the permanent supportive housing units that the City was establishing under the City's settlement, and [ ] prioritize referrals to County-funded or County-operated units"; (3) "assign[] the exact number of outreach and multi-disciplinary teams for the City's use, just as the City's settlement had requested"; and (4) "give the City access to County-funded high service need beds and priority access to beds meant for those with mental health and substance use disorders, consistent with the City's settlement." (Opp. at 10:10-18.) The MOU will expire based on the timeline set forth in the City's settlement with LA Alliance and caps the County's funding for certain obligations at $259 million. (*Ibid.*)

### C.    The Petition for Writ of Mandamus

On January 24, 2025, petitioner filed its verified petition for writ of mandate. On March 17, 2025, respondent filed its answer. On September 23, 2025, petitioner filed its opening brief and appendix of evidence. On October 21, 2025, respondent filed its opposition brief and its own appendix of evidence. On November 5, 2025, petitioner filed its reply and supplemental appendix of evidence.

## II.    RELEVANT LAW

### A.    CCP § 1085

Petitioner seeks a traditional writ of mandamus pursuant to CCP § 1085. (Pet. at 2:5-7.) "There are two essential requirements to the issuance of a traditional writ of mandate: (1) a clear, present and usually ministerial duty on the part of the respondent, and (2) a clear, present and beneficial right on the part of the petitioner to the performance of that duty." (*California Assn. for Health Services at Home v. State Dept. of Health Services* (2007) 148 Cal.App.4th 696, 704.) "An action in ordinary mandamus is proper where...the claim is that an agency has failed to act as required by law." (*Id.* at 705.)

4

An agency is presumed to have regularly performed its official duties. (Evid. Code § 664.) "The petitioner always bears the burden of proof in a mandate proceeding brought under Code of Civil Procedure section 1085." (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1154.)

## B.    The Brown Act

The purpose of the Brown Act is to ensure the public's right to attend public meetings, facilitate public participation in all phases of local government decision making, and curb misuse of the democratic process by secret legislation of public bodies. (*Chaffee v. San Francisco Library Commission,* (2004) 115 Cal.App.4th 461, 469; *Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors* (1968) 263 Cal.App.2d 41, 50.) The Brown Act "is a remedial statute that must be construed liberally so as to accomplish its purpose." (*Shapiro v. Board of Directors,* (2005) 134 Cal.App.4th 170, 181 [citing *Epstein v. Hollywood Entertainment Dist. II Bus. Improvement Dist.,* (2001) 87 Cal.App.4th 862, 869].)

To implement the legislative purpose of the Brown Act, section 54953 provides for open meetings, stating: "All meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of the legislative body of a local agency, except as otherwise provided by this chapter." (Gov. Code § 54953(a); *see Los Angeles Times Communications v. Los Angeles County Bd. of Supervisors* (2003) 112 Cal.App.4th 1313, 1321.) The City is a "local agency" under the Brown Act.  (Gov. Code § 54951.) The Brown Act "requires the meetings of such bodies to be open to the public, held on a regular schedule, and conducted in accordance with an agenda available in advance of the meeting." (*Olson v. Hornbrook Community Services Dist.* (2019) 33 Cal.App.5th 502, 514; *see* Gov. Code §§ 54950-54954.)

The Brown Act does not prevent a legislative body from holding a closed session to confer with legal counsel regarding pending litigation. The legislative body of a local agency is permitted to hold closed sessions during a regular or special meeting to confer with, or receive advice from, its legal counsel regarding pending litigation "when discussion in open session concerning those matters would prejudice the position of the local agency in the litigation." (Gov Code § 54956.9(a).) Litigation is considered pending when formal litigation proceedings have been initiated, there is significant exposure to litigation, or the legislative body is deciding whether to initiate litigation. (Gov. Code § 54956.9(d).) Prior to holding a closed session pursuant to section 54956.9, the legislative body must identify on the agenda the litigation that will be discussed, unless doing so would jeopardize the agency's ability to effectuate service of process or conclude existing settlement negotiations. (Gov. Code § 54956.9(g).)

5

Other than what is provided for in section 54956.9, all other expressions of the lawyer-client privilege are abrogated with respect to public meetings under the Brown Act. (Gov. Code § 54956.9(b).) Section 54956.9(a) is the exclusive expression of the lawyer-client privilege for purposes of conducting closed-session meetings. (*Id.*) Section 54956.9 was added to the Brown Act in 1984 to close a case law loophole that permitted a local legislative body to confer in closed session with counsel exempt from the Brown Act. (*The Brown Act: Open Meetings for Local Legislative Bodies*, (Cal. Atty. Gen. 2003) p. 37.)

## III.    DISCUSSION

### A.    Evidentiary Objections

City objects to Exhibits A through I in petitioner's appendix of evidence on the grounds that they constitute hearsay and have not been properly authenticated. (City Objections at 3.) The Court OVERRULES these objections, as petitioner does not submit the articles contained in Exhibits A through I for the truth of their contents; rather, they are submitted to demonstrate the public interest associated with respondent's encampment reduction plan. Furthermore, these exhibits are sufficiently authenticated through Samantha Lachman's declaration. (*See* Lachman Decl. ¶¶ 2-10.)

### B.    Merits

It is undisputed that City is permitted to confer with its counsel during closed meetings to discuss litigation strategy or settlement positions. (*See* Reply at 5 [acknowledging City Council is not barred "from conferring with its counsel in closed session about subjects like litigation strategy or settlement positions"].) However, what the City cannot do under the Brown Act is formulate and approve policy decisions in a closed session outside the public eye merely because such decisions are in furtherance of a settlement agreement.

Government Code § 54950 is unmistakably clear that "[i]t is the intent of the law that [local legislative bodies'] actions be taken openly and that their deliberations be conducted openly." Notwithstanding this intent, Government Code § 54956.9 provides that local legislative agencies are exempt from holding a public meeting in situations where they need to confer with legal counsel regarding pending litigation "when discussion in open session concerning those matters would prejudice the position of the local agency in the litigation." (Gov. Code § 54956.9(a).) "Conferring with counsel on these matters necessarily includes deciding on a course of action and instructing or authorizing counsel to pursue it." (*Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 799.)

The "pending litigation" exemption of section 54956.9 does not explicitly provide for entry into or approval of settlements in closed session, but it has been construed as allowing a city council to do so. (*Trancas Property Owners Assn. v. City*

6

*of Malibu* (2006) 138 Cal.App.4th 172, 186.)  However, like all Brown Act open-meeting exemptions, "this implied exemption is subject to narrow construction." (*Ibid.*; *see Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 917 ["Statutory exceptions authorizing closed sessions of legislative bodies are construed narrowly and the Brown Act 'sunshine law' is construed liberally in favor of openness in conducting public business"].)  "[A]s 'emphasized' in the Attorney General's manual on the Brown Act, 'the purpose of [section 54956.9] is to permit the body to receive legal advice and make litigation decisions only; *it is not to be used as a subterfuge to reach nonlitigation oriented policy decisions.*' (Cal. Dept. of Justice, Off. of Atty. Gen., The Brown Act (2003), p. 40.)" (*Trancas,* 138 Cal.App.4th at 186, emphasis added.)

As explained by the Court of Appeals in *Trancas*, there are narrow limits to the section 54956.9 pending litigation exemption relating to settlements such that a city council cannot meet in closed session merely because the business at hand relates to a settlement:

> [T]he exemption cannot be construed to empower a city council to take or agree to take, as part of a non-publicly-ratified litigation settlement, action that by substantive law may not be taken without a public hearing and an opportunity for the public to be heard. As a matter of legislative intention and policy, a statute that is part of a law enacted to assure public decision-making, except in narrow circumstances, may not be read to authorize circumvention and indeed violation of other laws requiring that decisions be preceded by public hearings, simply because the means and object of the violation are settlement of a lawsuit.

(*Ibid..*)  The *Trancas* court thus held:

> [U]nder section 54956.9, governing bodies may discuss with their counsel, in closed session, any settlement proposals or terms they deem worthy of consideration. And they generally may agree to such terms and settlements in closed session. What they may not do is decide upon or adopt in closed session a settlement that accomplishes or provides for action for which a public hearing is required by law, without such a hearing.

(*Id* at 187.)

City unconvincingly argues that *Trancas* undermines petitioner's position because the *Trancas* court concluded that the closed-session approval of the settlement agreement in that case was void because "*other* laws" provided that the land use entitlements in the settlement were required to be approved by public zoning hearings. (Opp. at 15.) To begin with, City ignores the fact that *Trancas* held "the Brown Act violation arises independently" from

7

the violation of "extrinsic laws requiring public hearings" in that case. (*Trancas*, 138 Cal.App.4th at 186.)  Further, while *Trancas* adopted the plaintiff's view that the section 54956.9 exemption did not apply to the adoption of a settlement agreement that includes "decisions intrinsically required by law to e made after public hearings (*e.g.*, grant of a zoning variance)," the *Trancas* court expressed no view on the plaintiff's other argument that the exemption also does not apply to adoption of a settlement agreement with "provisions for action that would ordinarily be subject to the Brown Act's meeting requirements (*e.g.*, rescission of the final map disapproval)" (*id.* at 185), which resembles the situation here.

What is instructive for this Court's analysis is that *Trancas* counsels that the pending litigation exemption should be read narrowly and that such "narrow construction" of the section 54956.9 exemption means closed session discussions and actions with respect to settlement are to allow for confidential legal advice to "make litigation decisions *only*" and not to reach non-litigation, policy decisions. (*Trancas*, 138 Cal.App.4th at 186 [citing Cal. Dept. of Justice, Off. of Atty. Gen., The Brown Act (2003), p.40], emphasis added.)  Indeed, it is noteworthy that the *Trancas* court applied the exemption so narrowly that it concluded even a litigation decision to accept a certain settlement agreement falls outside the exemption where terms of the settlement are required by law to be subject to public hearing.  Surely then, mere discussion and action relating to a settlement but not involving litigation decisions is insufficient to invoke the pending litigation exemption for settlement in accord with *Trancas*.

Here, the Court does not find that the types of actions and decisions that occurred during the closed sessions on January 31, 2024, and May 1, 2024 are of the type that fall within the narrowly construed pending litigation exemption to the Brown Act, even though both related to the settlement of the *LA Alliance* Action.  As discussed above, the City has admitted that the City Council approved a 9,800 encampment reduction plan (ERP) on January 31, 2024 and approved an MOU with the County in a closed session prior to May 2, 2024.[2] (AR 1178, 1183; *see also* AR 823.) While it is true these actions arise from obligations undertaken pursuant to the City's settlement agreement in the *LA Alliance* Action (*see* AR 1312 [Settlement Agreement § 5.2]; 1314-16 [Settlement Agreement § 9]), they are ultimately nonlitigation oriented policy decisions about how to effectuate the City's settlement obligations.  They are not litigation decisions concerning the *LA Alliance* Action that depend on the advice of counsel and evaluation of the strength or weakness of the City's litigation position.  Indeed, such actions by the City are far afield from the types of closed session litigation decisions recognized in an Attorney General opinion as falling within section 54956.9's exception, such as whether to file a lawsuit, add or

---

[2]    In its briefing, City does not contest that it took such actions during the City Council closed sessions on January 31, 2024, and May 1, 2024.

delete causes of action, file a cross complaint, or advance a particular affirmative defense, which are "decisions to be made based upon the advice of counsel and the strength and weakness of the particular case." (*See* 75 Ops. Cal. Atty. Gen. 14 (1992), 1992 WL 469698.)

In fact, the MOU itself disavows that it is part of any litigation decision, stating that it "does not arise from a legal obligation and does not resolve any litigation." (AR 853.) Furthermore, as stated by City's counsel to the district court in the *LA Alliance* Action, the MOU was not part of the case and did not require the Court's approval. (AR 1183, 1190.)  It is also hard to credit City's contention that approval of the ERP and MOU here implicated the need for consultation with counsel that the pending litigation exemption was meant to safeguard, as the City has since held a public meeting to make the nonlitigation oriented policy decision to approve a bed plan, which was also an obligation the City had undertaken pursuant to its settlement obligations in the *LA Alliance* Action.  (*See generally*, Supp. Appendix Exs. 57-61.)

The Court is likewise unpersuaded by City's attempt to characterize its January 31, 2024 closed-session approval of the ERP as protected consultation with counsel to settle LA Alliance's threat of sanctions in the *LA Alliance* Action.  As discussed above, approving the ERP was, at its core, a nonlitigation oriented policy decision on how to meet City's obligation to develop a "plan for encampment engagement, cleaning, and reduction" per its settlement agreement. (AR 1312.) While failure to adopt an ERP certainly bore risks of breaching the agreement and potential sanctions for so doing, the decision over what ERP to adopt was not a litigation decision involving evaluation of the strengths and weaknesses of either LA Alliance's or the City's positions or need for advice of counsel concerning litigation of the *LA Alliance* Action. Moreover, if one were to adopt City's view that adoption of the ERP during the January 31, 2024 closed session was permissible to approve a settlement under section 54956.9, then the City's closed session action still runs afoul of the Brown Act due to failure to disclose the ERP and its substance as required by Government Code § 54957.1, which requires that "[t]he legislative body of any local agency *shall publicly report* any action taken in closed session and the vote or abstention on that action of every member present" for any approval given for settlement of pending litigation.  (Government Code § 54957.1(a)(3), emphasis added.) It is undisputed that City made no such required public report.  (AR 173 at ¶¶ 10-11.)

Accordingly, for all the foregoing reasons, the Court finds that the City's approval of the ERP and MOU during closed sessions on January 31, 2024, and May 1, 2024 violated the Brown Act, as such actions do not fall within the limited exemption to the Brown Act under section 54956.9 for closed-session discussion and approval of settlements for pending litigation.

9

## IV.   CONCLUSION

The petition is GRANTED. Pursuant to Local Rule 3.231(n), petitioner shall prepare, serve, and ultimately file a proposed judgment and form of writ in accordance with this ruling.


Date:  January 5, 2026

_____
HON. CURTIS A. KIN

10

# EXHIBIT B

### Los Angeles Times

CALIFORNIA

# L.A. violated open meeting law with plan to clear homeless encampments, judge rules

Los Angeles City Atty. Hydee Feldstein Soto speaks at Will Rogers State Beach in April.  (Carlin Stiehl/Los Angeles Times)



**By David Zahniser**
Staff Writer  |  𝕏 Follow

Jan. 10, 2026 3 AM PT

- A Superior Court judge said the city ran afoul of the Ralph M. Brown Act by approving a plan for removing 9,800 homeless encampments behind closed doors.

- The encampment plan was part of a larger effort to comply with a 2022 legal settlement with the L.A. Alliance for Human Rights.

The city of Los Angeles violated the state's open meeting law when council members took up a plan to clear 9,800 homeless encampments behind closed doors, a judge ruled this week.

In a 10-page decision, L.A. County Superior Court Judge Curtis Kin said the City Council ran afoul of the Ralph M. Brown Act by approving the encampment strategy during a Jan. 31, 2024, closed session.

The encampment plan was part of a larger effort by the city to comply with a legal settlement with the L.A. Alliance for Human Rights, which had sued over the city's handling of the homelessness crisis.

Kin, in his ruling, said the city is allowed under the Brown Act to confer with its attorneys in closed-door meetings to discuss legal strategy.

"However, what the City cannot do under the Brown Act is formulate and approve policy decisions in a closed session outside the public eye merely because such decisions are in furtherance of a settlement agreement," Kin wrote.

Karen Richardson, a spokesperson for City Atty. Hydee Feldstein Soto, said her office had no comment on the decision, which was issued earlier this week.

The ruling delivered a victory to the Los Angeles Community Action Network, which advocates for homeless residents and had sued the city over the closed-door deliberations.



CALIFORNIA

**Homeless advocates sue L.A., saying city leaders violated the state's open meeting law**

Aug. 30, 2025

Lawyers for LA CAN have warned that the city's goal of removing 9,800 encampments over four years has created a quota system that could make sanitation workers more likely to violate the property rights of unhoused residents. Under the agreement, the city must reach its encampment removal target this summer.

"The City Council approved an extremely controversial plan to clear almost 10,000 encampments entirely in secret," said Shayla Myers, the group's attorney. "They never disclosed the plan before they voted on it, or even after, and the only one they disclosed the plan to was the business community."

Lawyers for the city have offered contradictory explanations for what transpired during the Jan. 31, 2024, meeting. Now, LA CAN is seeking a court order requiring that the city produce all records — including audio of the closed-door deliberations — to show what transpired.

The city's strategy for clearing 9,800 encampments has become a major sticking point in its long-running legal battle with the LA Alliance. U.S. District Court Judge David O. Carter ruled that a tent discarded by sanitation workers can only count toward the city's numerical goal if its owner has been offered housing or shelter first.

Feldstein Soto's legal team, in a memo to the council, said later that the judge had "reinterpreted" some of the city's settlement obligations.

In this week's ruling, Kin found that the city violated the Brown Act a second time in May 2024, when the council went behind closed doors to take up another agreement — this one between the city and L.A. County on the delivery of homeless services.

The LA Alliance first sued the city and county in 2020, alleging that too little was being done to address the homelessness crisis, particularly in Skid Row. The city settled the case two years later, agreeing to create 12,915 new shelter beds or other housing opportunities by June 2027.

After that deal was struck, the city began negotiating an accompanying agreement with the LA Alliance to reduce the number of street encampments. Those talks dragged on for more than a year.



**CALIFORNIA**

**A federal judge weighs turning L.A. city's homelessness programs over to a receiver**

June 16, 2025

The LA Alliance ran out of patience, telling Judge Carter in February 2024 that the city was 447 days late in finalizing its plan and should be sanctioned. The group submitted to the court a copy of the encampment removal plan, saying it had been approved by the City Council on Jan. 31, 2024.

Video from that day's meeting shows that council members went behind closed doors to discuss the LA Alliance case. When they returned, Deputy City Atty. Jonathan Groat said there was nothing to report from the closed session.

LA CAN demanded that the city produce any vote tally on the encampment plan. The city declined to do so, saying there was no vote.

"To this day, [we] still don't know who voted for it, or even if a vote was taken at all," Myers said.

Lawyers for the city have argued that they were not required to issue any report from that closed session meeting. They also have said that the Brown Act allowed the two

agreements — the one on encampment removals and the other with the county — to be discussed behind closed doors.

Carter ruled last year that the city had failed to comply with the terms of its settlement agreement with the L.A. Alliance. On Tuesday, he ordered the city to pay $1.6 million to cover the group's legal fees.

The judge also instructed the city to pay about $201,000 for fees incurred by LA CAN and the LA Catholic Worker, which have intervened in the LA Alliance case.

On Thursday, lawyers for the city notified the court that they intend to appeal the order to pay the various groups.

## More to Read

**L.A. city told the court there were 88 beds at a homeless shelter, but 44 of them were missing**

Nov. 14, 2025



**L.A. vowed to remove 9,800 encampments. But are homeless people getting housed?**

July 9, 2025



**Judge declines to take power over L.A. homeless programs away from city leaders**

June 25, 2025



 **David Zahniser**

David Zahniser covers Los Angeles City Hall for the Los Angeles Times.

Copyright © 2026, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information