UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., ) | CASE NO: 2:20-cv-02291-DOC-KESx |
| ) | CIVIL |
| Plaintiffs, ) | |
| ) | Los Angeles, California |
| vs. ) | |
| ) | Monday, January 12, 2026 |
| CITY OF LOS ANGELES, ET AL., ) | ( 9:41 a.m. to 10:06 a.m.) |
| ) | (10:24 a.m. to 12:01 p.m.) |
| Defendants. ) | (12:07 p.m. to 12:31 p.m.) |
| | ( 1:55 p.m. to  2:46 p.m.) |
| | ( 3:04 p.m. to  4:06 p.m.) |

EVIDENTIARY HEARING -

ORDER TO SHOW CAUSE RE CONTEMPT CITY OF LOS ANGELES
[DKT.NO.1066]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**            SEE PAGE 2

Courtroom Deputy:        Karlen Dubon

Court Reporter:          Recorded; CourtSmart

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES:


For Plaintiffs:              ELIZABETH A. MITCHELL, ESQ.
                            MATTHEW UMHOFER, ESQ.
                            Umhofer Mitchell & King
                            767 S. Alameda Street, Suite 270
                            Los Angeles, CA 90021
                            213-394-7979


For Defendants:              MARCELLUS A. MCRAE, ESQ.
                            BRADLEY J. HAMBURGER, ESQ.
                            POONAM KUMAR, ESQ.
                            Gibson Dunn & Crutcher
                            333 South Grand Avenue
                            Los Angeles, CA 90071
                            213-299-7000


                            LAUREN M. BRODY, ESQ.
                            Miller Barondess
                            2121 Avenue of the Stars
                            Suite 2600
                            Los Angeles, CA 90067
                            310-552-4400


For Intervenor:              SHAYLA R. MYERS, ESQ.
                            Legal Aid Foundation of LA
                            7000 S. Broadway
                            Los Angeles, CA 90003
                            213-640-3983


Special Master:              MICHELLE MARTINEZ

Also Present:                JUSTICE TOM GOETHALS

3

INDEX

| DEFENDANTS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MATTHEW SZABO | | | | |
| BY MS. MYERS | | 21 | | |
| | | | | |
| PLAINTIFFS' WITNESS | | | | |
| DAVID GARRIE | | | | |
| BY MR. UMHOFER | 104 | | | |
| BY MR. MCRAE | | 136 | | |

| EXHIBIT | RECEIVED |
|---|---|
| 568 | 157 |

**4**

<u>Los Angeles, California; Monday, January 12, 2026; 9:41 a.m.</u>

(Call to order)

(Pause from 9:41 a.m. to 9:45 a.m.

THE COURT:  I'm going to take a break just because we've been in session since 7:30 on other matters in just a moment.  But make your appearances for just a moment, and then we'll be back in about ten or 15 minutes.

MS. MITCHELL:  Good morning, Your Honor.  Elizabeth Mitchell, Plaintiffs, here on behalf of LA Alliance, as well as my colleague Matthew Umhofer.

MR. UMHOFER:  Morning, Your Honor.

MR. MCRAE:  Good morning, Your Honor.  Marcellus McRae, Gibson, Dunn, and Crutcher, appearing on behalf of the City of Los Angeles, with Poonam Kumar --

THE COURT:  Thank you.

MR. MCRAE:  -- as well as Bradley Hamburger.

THE COURT:  Okay.  Thank you.

MS. MYERS:  Good morning, Your Honor. Shayla Myers on behalf of the Intervenors.

THE COURT:  Okay.

MS. SPEAKER:  Judge, one more appearance, please.

(Laughter)

THE COURT:  The County.

MS. BRODY:  If I must, this is Lauren (inaudible) --

THE COURT:  Do me a favor, hit the button.

**MS. BRODY:** Lauren Brody from Miller Barondess on behalf of the County of Los Angeles.

**THE COURT:** Yeah. Well, first of all, I hope all of you had a good holiday with your families, had a chance just to renew, you know, the goodness over the holidays.

I want to start with a compliment today. And I'm showing you a picture. Does anybody know what this is? This is a quiz.

**MR. SPEAKER:** It's a what, Your Honor? I'm sorry.

**MS. SPEAKER:** Quiz.

**THE COURT:** Does anybody know what this picture is?

(No audible response.)

Don't worry. The reflection will be that all counsel are knowledge. It's for my record.

Unrelated to this matter, when the Court was first involved, I heard from -- Michelle, I don't know. I don't want to ever misstate, but anywhere from eight to ten council district members on the Los Angeles Council.

Judge, we're not getting the services we need from the LAHSA and, therefore, the County. And that came to us through -- I can name the names, or at least five or six of them offhand.

And the complaint was that the services weren't getting out to the individual counsel district. And the further that those councils were, whether they were Lee or Bob

**6**

in the valley or Monica -- and I forget the gentleman.  There's so many.  At that time Joe Buscaino (phonetic) down in San Pedro, Gil Sedillo.

And you know that I made the comment after visiting the LAHSA offices that I would never go back to those offices again because of the ostentatiousness of those offices.

And that comment was rightly or wrongly based on the fact that so much input I was getting from the council members at the time, that if they could get LAHSA out of the centralized location, which I inappropriately named the Taj Mahal, that they only had them at best an hour or two, they brought water, and did nothing.

And I'll put people on the stand if you don't believe it.

I want to compliment the County.  And convey this back to the board.  This is your new office.

And I want to thank Justice Goethals -- and, Tom, I'm going to ask you to come down here for a moment.  Just take a microphone.  Come on down.  You didn't know I was going to put you on the spot.

Because you're moving out to the community, this is your office on Seventh and Maple.  It's nondescript, it's serving the community.  You're in the community.  You're seeing skid row, you're seeing other places.  And this is a real effort on the County's part to disburse and get out on the

street.

And I think the new person involved in Sarah. I'm not sure.

**MS. SPEAKER:** Yes.

**MS. SPEAKER:** Yeah. The director's name is Sarah Mahin.

**THE COURT:** Yeah. Would you just -- you know, when I see something like this -- we were down there this morning early. When I see something like this, you need to hear from the Court not on behalf of the council necessarily.

But I guarantee if the council was here, they would be saying the same thing. You would have their compliments for moving out of the expensive high-rise over here and getting out in the community.

Folks, if you haven't had a chance to visit, you know, just go down and drive by. It's really a tremendous progress, and I want you to hear that.

**MS. SPEAKER:** We appreciate that, Your Honor.

**THE COURT:** Yeah. Convey that over to the board, would you? Just -- and convey that on behalf of everybody, just not the Court but the City and everybody. I think that they would join in the disbursal of these services.

The second thing before I take a recess is that my law clerks brought to my attention an article in the *Los Angeles Times* by David Zahniser. And put this upon the ELMO,

**8**

Ian, would you for a moment?

I'm going to ask you a couple questions preliminarily.

And, Tom, while they're doing that, would you describe what you saw out there?  Because Justice Goethals has taken to the street also.

So you've got a hands-on approach now between the Court, Michelle -- but we've got limited resources -- and Justice Goethals.  So describe what you've seen down there on your journey and County.

**MR. GOETHALS:**  I'll just take a minute.  I have met most of you informally but I haven't met you all formally.  My name is Tom Goethals.

I recently retired from the California Court of Appeal where I sat for eight years.  Before that, I was a superior court trial judge for 15 years.  Before that, I practiced for 25 years as a lawyer.

And Judge Carter, when I returned, asked me to --

**THE COURT:**  Well, just a moment.  He was also in charge of death penalty cases after I was in charge of death penalty cases in the district attorney's office, so he specialized in complex murder cases.

**MR. GOETHALS:**  Our backgrounds are somewhat similar, --

**THE COURT:**  Yeah.

**9**

**MR. GOETHALS:** -- for better or worse.  Anyway, we've been friends for almost 50 years, in addition to that.

Anyway, when I retired, Judge Carter asked me to assume the responsibility of being the special master with respect to liaison-ing with the county.  I've been doing that for six months.

This is unique litigation, I would tell you all.  You've seen me sitting here every day during this current hearing.  It is a very steep learning curve, as I'm sure you all know.  But I'm coming up to speed.

I have been down on the road, the skid row area, a number of times with Judge Carter and without him.  I was there last Thursday because the County has recently spun off its agency from LAHSA.

And they keep changing the name, so I'll get this wrong I'm sure, but I think it's currently the County Homeless Services and Housing Agency.

And I wanted to go meet -- I've spoken to her on the phone several times, but I wanted to go meet her after January 1st, when the new agency began to work, and so I arranged to do that last week.

And I met with the director.  And she told me where she was.  And I -- at the corner of Seventh and Maple, not too far from here.

And I was a little surprised about that.  I arrived

**10**

and found the building that you just saw a picture of at the corner of Seventh and Maple.  It looks nothing like any kind of County agency that I've ever been to before.  You go inside and there's a lot of empty cubicles because it's a brand new County agency.  But they're working on the ground.

I had the opportunity then to go out in the field for the first time.  Usually when I've been there before, I've either been with Judge Carter or I've been by myself or with other people.

But I went out into the field for a couple hours with a multidisciplinary team, a so-called MDT team; also with an HOM team.

And I have to say that I am not as dumb as I look.  I know they sent me out with probably their best MDT team and their best HOM team.

And I walked around for several hours actually with a medical doctor who's a psychiatrist who works for the County and treats the people who are on the street, which was a very enlightening thing to see.

And I was encouraged.  Again, I'm not as dumb as I look.  I'm not Pollyanna.  I would expect the County to try to put its best foot forward, and I think it did.

After that, we went out to see interim housing.  I'd wanted -- I'd asked to see an interim housing facility.  And we went to the nicest interim housing facility probably west of

the Mississippi in the United States of America.

I laughed as I walked up.  If Brian is here -- he usually is here -- today, I haven't seen him in the back.

**MS. SPEAKER:**  He's back there.

**MR. GOETHALS:**  He may be back there.  This really was a beautiful facility.  I guess it's an example --

**THE COURT:**  And by the way, there's nothing wrong with that, thank you.

**MR. GOETHALS:**  No.  I was just going to say I guess this was an opportunity for me to see what is possible.

But I also asked the resident manager on site if this is the nicest interim housing facility he has ever seen in his six years of working with the County, and his boss was standing there, and he was a little uncomfortable.

But eventually he said by far this is the nicest place he's ever seen or ever worked.

So it has been an interesting journey so far.  I'm fortunate to be involved.  I thank Judge Carter for the opportunity.

But we all have a lot of work to do.  So thank you for the opportunity to be involved, Judge Carter.  And I --

**THE COURT:**  Yeah.

**MR. GOETHALS:**  -- thank Lauren, you, for setting up the meeting.  And we're going to do that on a regular basis.

I may not be in the field as often as my co-special

master, Michelle Martinez, who's out there all the time, embarrassing me, but I have other things to do.

But I am going to be out there.  And it's always a very educational opportunity.  And I thank you and Sarah for giving me the time.

**THE COURT:**  And thank you.  Just -- if you just remain there for a moment.

From the Court's perspective, I don't care if that was the nicest or middle.  It doesn't matter.  I just want to thank you for getting the special master out on the street, seeing these teams firsthand.

And it's extraordinarily beneficial to us to get off this bench and to see in real life work.

And I think that these teams from the report back to me really deserve the praise for these folks out on the street doing the everyday job.

And if you'd pass that back, that's the second compliment I'd like to start with today.  And let those kids out there know, heck of a great job, and thank you.

And part of that's come through the expansion in the County settlement agreement, which isn't before the Court, an expansion of these teams when we went from the hundred to the thousand to the 3,000 plus 500 elderly.

But those teams were part of that expansion.  So that's the second thing that I'd like to recognize.

The third thing is, if you don't know this, you know anything about ICE'S activities on skid row, counsel?  Shayla Meyer does certainly.  But, well, let's get all up to speed as a family, okay?

Look, I don't know how to say this other than to just say it.  You know that the community has kept the lid on in terms of race.  You know that historically the skid row was predominantly Black ethnicity.  And we've written about the disparity concerning the minority population.

But recently because of -- and I'll put it out on the table -- Governor Abbott in shipping people out from Texas, particularly of Hispanic origin, I could have taken you down there with the community with Rick and Kevin and Dawn and half the community, and you could have watched the buses from Texas drop off these families, primarily Hispanic origin.

They were promised a lot to come to California.  And I think we've been afraid to talk about that.

The end result is California graciously -- and I mean that, graciously accepted these folks rather than putting them on buses and shipping them back to Texas with those dramas.

But one of the things that happened in the community was as these folks got off, they had children.  And historically the community on skid row, for all the talk about violence, etcetera, has a lot of virtue to it also.

And one of the virtues was that the community was

**14**

determined not to have children, especially at the time with the high Black ethnicity on the row, have children on the row.

And I think that the City and the County and the community itself did a pretty good job back in the day of trying to get the kids off the street.

But there was a lot of notoriety about children for a long time.  And it went along with the hospital dumping that was taking place from the valley.

That's tough if you're a Black or Hispanic or Caucasian American to be on the street and want services that they believe haven't been supplied.

And then to see folks come in from another state where quite frankly there's a rush to make sure that you take care of the families and the kids first.

And I have to tell you, there's a lot of conversation that took place on Town Street between the community -- and one of the virtues when you talk about this community is that there was a conscious decision made in the community that it didn't matter what ethnicity these kids were, that the community was going to take care of them.

And the community, primarily Black Americans, walked these kids to the bus stop to make certain that they weren't harmed.

Now, these were Hispanic folks and Black folks who are part of the community of skid row.  But primarily the Black

population who felt that they had a legitimate concern and complaint that they, government, we were servicing illegals in a sense and not serving the traditional American in whatever plight that they were in.

I think that the community deserves a real recognition just in terms of the humanity of being willing to serve children and families first.  And that's what they've tried to do.

And I don't think that that virtue has gone noticed.  And maybe you're not even aware of it.

But that was a really a boiling point that could have come to the surface with just strife over something that we don't want to deal with, and that's, you know, just ethnicity and race.  And the community really came together on that.

Okay.  Now, the third thing is, I need help from the County.  Remember the $50.8 million?

(No audible response.)

Some of you don't know what we're talking about.  Unrelated to this matter, but I constantly said I want to have an accounting of that $50.8 million that was disbursed without any contract --

**MS. BRODY:**  You're referring to the LAHSA audit.

**THE COURT:**  Exactly.  The LAHSA -- the 2024 LAHSA audit.  In fact, the -- it was the County's audit.  And you'll start in the first section, you mentioned it, and then it drops

**16**

down to the 50.8.

MS. BRODY: Understood. Yes.

THE COURT: And I took the time one time to read out all of the different providers and what was owing and what was paid.

And when your audit first came out, there were -- I think there'd been two and a half million dollars repaid. But we didn't know if that was in-kind services or money.

We went through kind of a drama show where we read that out a couple times. And one of those, as you know, was Adams Kellum and her husband.

And we tried to trace what had been repaid because I was constantly hearing we're short of money. And if we were short of money, I was very -- and this is before Gibson Dunn was involved. You folks were involved in this at the time.

And I wanted to know what kind of payback this was occurring. And eventually we had LAHSA come in and they said they'd paid back about 12 to $13 million.

I let that drop two occasions ago because we got involved in this hearing and I wanted to focus on the City.

I'd still like to hear an accounting from LAHSA, as I requested before, of where we stand today and what's been paid back, and whether that's in-kind or whether that's money, because if we're short of money, we've got at least $37 million out there floating around.

Whether it's City or County or the COC, it's all homeless.

And I was a little discouraged and concerned when I read initially there was no contract, no milestones, and allegedly some kind of agreement after the fact to pay this money back.

You don't have to gather that today.  But I would appreciate that from the County in some period of time, maybe within the next two weeks.  Would that be acceptable?

**MS. BRODY:**  Understood.  I'll have to confer with the County.  It was LAHSA that was typically providing those updates to the Court.

**THE COURT:**  Yeah.

**MS. BRODY:**  And that was the County's understanding --

**THE COURT:**  But remember what Lindsay said.

**MS. BRODY:**  -- of who had responsibility --

**THE COURT:**  What Lindsay said, what did Lindsay say?  Lindsay Horvath.

**MS. BRODY:**  No, correct.

**THE COURT:**  No, let's hear what she said.  What did she say?

**MS. BRODY:**  That LAHSA is us.  So --

**THE COURT:**  Thank you very much.  Okay.

**MS. BRODY:**  But we can provide a filing to the Court

**18**

as to --

THE COURT:  Yeah.

MS. BRODY:  -- the update on that.

THE COURT:  And LAHSA represented that they would break that down to in-kind versus cash, okay, because in-kind is always an interesting discussion.

Okay.  Up on the phone -- upon the screen, would you switch to the article that my law clerks found?  Do you have it, Ian?  Okay.  I don't see it on the screen, though.

MR. UMHOFER:  Your Honor, it's up on our screens.

THE COURT:  No.  This is a picture that I've got of the -- Ian, it's not.  Okay.  There you go.  Yeah.  Pardon the folded down condition, but I want to thank my law clerks for finding this.

And I'm going to request that the parties get Judge Kin's decision for the Court.  I'd like to read that over the lunch.  It comes out of the State Court.

And I want to discuss this with you further and hear your position concerning this because in the encampment reduction, if there's a Brown violation, then this either didn't take place, as Ms. Myers is concerned about and wants the audio, or did take place.

And either way, if it did take place, it still is now an illegal Brown violation and it has to go before a public forum.

Is the Court supposed to accept this encampment reduction from the City -- don't answer it now.  I want to discuss this with you at 3:30 or 4:00 so we can get some witnesses on the stand.

Is the Court supposed to then accept this encampment reduction, which is a Brown violation, or does the Court have nothing in a sense that's verifiable that it can look to? Because we had 417 days initially before the January 31st representation one of the folks -- encampment.

Now, this is just an article.  But I'd like to see what Judge Kin said.

And I'd like you to help the Court and find out what his scheduling date is for the release of any audio, when is that scheduled for or he's made a decision, because as of Saturday, I'm reading this, it's Sunday, but I have no -- now, no comment now.

I don't want to detract Mr. Szabo from getting you on the stand and getting you back to work and getting Daniel Garrie here, okay.

Now, we need to take a 15-minute recess.  But we'll re-raise this.  At 4:00 o'clock this afternoon, or a little earlier, Judge Birotte said he's available.  So I'm going to recess at that time.

I've got matters at 12:00 o'clock, but I may put those over until 4:00 or 5:00 o'clock.  But they're three or

four-hour matters.

So we're in recess for 15 minutes.  We'll come back. Mr. Szabo will call you at that time.

**(Recess taken at 10:06 a.m.; reconvened at 10:24 a.m.)**

**THE COURT:**  So is Mr. Szabo here because we'll put him on the stand?

We're back on the record and all counsel are present, the parties are present.  Mr. Szabo, would you retake the stand?  You recall the oath that was administered some time ago, don't you?  I'm not going to readminister the oath, as long as you're aware of it.  Thank you, sir.

We're back on the record.  Mr. Szabo has retaken the stand.  This is continued cross-examination by Ms. Myers on behalf of intervenors.

**MS. MYERS:**  Yes, Your Honor, if I can just have one minute.

**THE COURT:**  Certainly.  And let's see if we -- at all possible, we can finish and conclude his testimony by noon. I've got another extensive matter at noon, but if we need to, I'll try to go through the noon hour.  If you have duties, we'll recess at noon, because I know, you made me aware of the time period, I thank you for that.  But hopefully we can wrap it up on both parties' parts, okay.  If you can stay a little longer I'll give up my lunch hour if we are close to concluding it.  Fair enough?  Okay.  Ms. Myers.

**MS. MYERS:**  Thank you, Your Honor, Shayla Myers on behalf of the intervenors.  And this is the start of our cross-examination with Mr. Szabo.

**CROSS EXAMINATION**

**BY MS. MYERS:**

Q    Mr. Szabo, thank you so much for coming back to these proceedings.  During your initial testimony for the City of Los Angeles you testified that the City does not have unilateral control over LAHSA data.  Do you remember that testimony?

A    Yes.

Q    What did you mean by unilateral control?

A    LAHSA is a separate and distinct agency with its own governing board, its own chief executive officer, and staff that reports to that management structure.  So the City can request that LAHSA report in certain ways, but it cannot -- it doesn't and cannot direct as if it were directing its own city -- its own departments.

Q    As if it is directing its own city departments.  But the City does have some control over the data that LAHSA collects, correct?

        **MR. MCRAE:**  Objection, vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I don't agree with that.  The City -- LAHSA is governed by its own board and has a separate executive officer which is not appointed in the same manner that general

Szabo - Cross / By Ms. Myers                    **22**

managers are appointed.  So to use the word control I disagree with that.

**BY MS. MYERS:**

Q    So 40 percent of LAHSA's funding comes from the City of Los Angeles, correct?

          **THE COURT:**  Counsel, would you say that just a little slower?

          **MS. MYERS:**  Sure.

Q    40 percent of the City's -- of LAHSA's budget comes from the City of Los Angeles roughly, correct?

          **MS. MYERS:**  Objection, mischaracterizes the record.

          **THE COURT:**  Overruled.  I think testimony was 40 percent before, I think this is retracing it and I thought that if the County withdrawn that it went to 80 percent.

          **MS. MYERS:**  Let me just back up.

**BY MS. MYERS:**

Q    How much of LAHSA's budget comes from the City of Los Angeles?

A    In this fiscal year, approximately 40 percent.

Q    Okay.  And the City has five seats on the LAHSA Board, correct?

A    That's correct.

Q    When the -- and most of the LAHSA funding that comes from the City of Los Angeles is through pass through contracts, correct?

A     I'm sorry, it's through?

Q     Pass through contracts.

THE COURT:  Pass through.

THE WITNESS:  I'm not sure I understand.  Most of the money that comes through?

**BY MS. MYERS:**

Q     Most of the money that the City gives to LAHSA is for pass through contracts, correct?

MR. MCRAE:  Objection, lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  LAHSA is in part a contracting -- a contracted administrator for contracts with service providers. So if that is the definition -- if that's your definition of pass through, yes, we use LAHSA as a contract administrator.

Q     So LAHSA administers contracts for the City of Los Angeles, correct?

A     Yes.

Q     And does the City of Los Angeles have a role in establishing what the contents of those contracts?

MR. MCRAE:  Objection, vague, and also to the extent it calls for a legal conclusion.

THE COURT:  Overruled, you can answer the question, overruled.

THE WITNESS:  So the City of Los Angeles has a contract with LAHSA and then LAHSA has contracts with service

Szabo - Cross / By Ms. Myers                              **24**

providers.  There is a process and there has been -- there have been processes through which LAHSA has updated their contracts, but again, the contracts with the service providers are between LAHSA and the service providers.  The City has a contract with LAHSA that governs its relationship as the contract administrator.

**BY MS. MYERS:**

Q    Yes, I understand that LAHSA has a contract with the service provider, but in terms of the content of those contracts, does the City of Los Angeles have a role in establishing with the content of those contracts are between the service provider and LAHSA?

             **MR. MCRAE:**  Objection, vague and lack of foundation.

             **THE COURT:**  Do you understand the question, sir?

             **THE WITNESS:**  I believe so.

             **THE COURT:**  All right.  You may answer.

             **THE WITNESS:**  I believe so.  We typically will request the housing department, which holds the contract with LAHSA to execute contract amendments as it relates to -- for example, if we're to bring on a new interim housing site and the contract was to go to a certain service provider, that contract would be amended both between the City and LAHSA and between LAHSA and the service provider to provide service and allow -- to provide a vehicle for the City to pay LAHSA, which would in turn pay the service provider for that additional

service.  So it's a -- it is a three step process.

Q    So for the example you gave of an interim housing site that, for example, gets stood up in a specific council district, does the City have a role in choosing which service provider gets that contract?

          MR. MCRAE:  Objection, vague, lack of foundation, it's a hypothetical --

          THE COURT:  Overruled.

          MR. MCRAE:  -- and to the extent it calls for a legal conclusion.

          THE COURT:  You may answer the question, sir.

          THE WITNESS:  LAHSA does -- LAHSA selects the service providers.  We do have some role, but it would be a -- it depends on the case, it would be a case-by-case basis.

**BY MS. MYERS:**

Q    Give us an example of what a role -- what the City's role would be in a specific contract?

          MR. MCRAE:  Objection, it's beyond the scope of this proceeding, it's also an incomplete hypothetical and it calls for speculation.

          THE COURT:  Overruled, you can answer the question, sir.

          THE WITNESS:  In some cases, if it is an expansion of service that is already being provided by a service provider then the instruction would be that they continue to use the

Szabo – Cross / By Ms. Myers                        **26**

existing contract as an example, and that would be an

instruction that would be given through LAHSA to the service

provider as part of the instructions for the contract

amendments.

Q    Are you familiar with the term scope of required services?

        **MR. MCRAE:**  Objection, calls for a legal conclusion.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I am, yes.

**BY MS. MYERS:**

Q    What is the scope of required services as it relates to

LAHSA contracts with service providers?

        **MR. MCRAE:**  Same objection.

        **THE WITNESS:**  What is the scope of required services?

I would not be able to recite the scope of required services.

Q    Just asking generally what a scope of required services

is, as it relates to a contract with LAHSA.

        **MR. MCRAE:**  Same objection, calls for a legal

conclusion, lack of foundation and beyond the scope of this

proceeding.

        **THE COURT:**  Overruled and if you'd like a standing

objection, you can have it.  If you want it individually,

that's fine, but we're trying to get Mr. Szabo back so if you

want to --

        **MR. MCRAE:**  I understand.

        **THE COURT:**  -- take that time, that's fine.  Counsel.

Szabo - Cross / By Ms. Myers                    **27**

THE WITNESS:  It is -- the scope of required services is typically, typically because there can be amendments to it, but it's typically a standard provision that service providers need to follow in order to obtain the contract to provide services for interim housing or another -- in this case, it would be interim housing.  To provide interim housing on behalf of the City through LAHSA.

BY MS. MYERS:

Q   It's a description of the services that are being provided pursuant to the contract, correct?

MR. MCRAE:  Objection, lack of foundation.

THE COURT:  Overruled, you can answer the question, sir.

THE WITNESS:  Yes, it's the standard requirements for delivering service.

Q   Does the City of Los Angeles have approval authority over the scope of required services for contracts that LAHSA enters into with service providers as part of the City's contract with LAHSA?

MR. MCRAE:  Objection, compound, lack of foundation, vague and calls for a legal conclusion.  And, Your Honor, I would take a standing objection, but I honestly don't know what the scope of the topic is.

THE COURT:  For my records, you're more than welcome to make any indication.

Szabo - Cross / By Ms. Myers                    **28**

MR. MCRAE:   Okay.

THE COURT:   I'm just indicating to you that the time is being taken and the inconvenience lies in your hands and other counsel's hands.

MR. MCRAE:   Thank you, Your Honor.

THE COURT:   I'm trying to get him out of here, but overruled, you can answer the question, sir.

THE WITNESS:   The Council has been -- there have been reports to Council advising the Council of the scope of required services that had been developed by LAHSA, but in coordination with the City and the County.  So there have been some -- there have been reports.  I cannot recall at this time whether there was an instruction to approve the scope of required services or whether the Council is being advised.  I would need to look at that.

**BY MS. MYERS:**

Q    I'm going to show you what's been marked as Exhibit 25 in these proceedings.  I'm sure you're well familiar with this. This is the settlement agreement entered into by the City and the LA Alliance in this case.

And so just drawing your attention to number 7, the status updates and particular, the sentence, the City will work with LAHSA to include in the quarterly status updates to the extent possible --

THE COURT:   Just a little slower.

Szabo - Cross / By Ms. Myers                    **29**

**MS. MYERS:** Sure.

Q    -- and then there are a number of statistics that we discussed a number of times in these proceedings.  Just giving you a sense of what I'm going to ask you about.

You had a hand in negotiating these data points, correct?

A    I had a hand in negotiating -- I don't know necessarily what you mean by data points, but the language, yes.

Q    The specific data points -- the number of PEH engaged, the number of PEH who have accepted offers of shelter or housing, the number of PEH who have requested offers of shelter or housing and why offers were rejected and the number of encampments in each Council district.  Those are the specific data points that I'm asking about Mr. Szabo.

A    Yes, I had a hand in negotiating the settlement agreement.

Q    And specifically those data points?

A    To the extent that they're part of the settlement agreement, yes.

Q    Okay.  Did you speak to anyone at LAHSA before you entered into settlement negotiations related to these data points about whether or not LAHSA could collect this data?

**MR. MCRAE:** Objection, relevance.

**THE COURT:** Overruled.

**THE WITNESS:** I don't recall.  It was -- I don't recall specifically whether that took place, as the drafts were being exchanged.

BY MS. MYERS:

Q    So you negotiated a settlement agreement that says that the City will work with LAHSA regarding specific data points, but as you sit here today, you can't recall whether you had a conversation with anyone at LAHSA about whether it was possible to collect those data points before you entered into the settlement agreement?

MR. MCRAE:  Objection, vague as to you, is it him personally or the City?

THE COURT:  Overruled, you can answer the question, sir.

THE WITNESS:  The language that we -- what we agreed to is a commitment to work with LAHSA, to include the following data points to the extent possible.  The commitment that was made in the settlement agreement was to work with LAHSA.  It was a -- we were agreeing to a future commitment over the term of the settlement to work with LAHSA, to the extent possible, or to provide that information to the extent possible.

BY MS. MYERS:

Q    Thank you, Mr. Szabo, I understand what the language says, but I'm asking a different question.  I'm asking whether you entered into -- had a conversation with LAHSA about the possibility of collecting these data points before you entered into a settlement agreement that said you would work with LAHSA related to these data points.

EXCEPTIONAL REPORTING SERVICES, INC

MR. MCRAE:  Same objection, it's vague as to you.

THE COURT:  Overruled.

THE WITNESS:  As I said, I don't recall, but I'm pointing out that the commitment was to work with LAHSA to determine whether these data points were possible to provide and if they were possible, to provide them.

**BY MS. MYERS:**

Q   Certainly, Mr. Szabo, we all have the settlement agreement in front of us, so I'm just trying to get at what went into the City's understanding of these data points before you entered into a good faith settlement agreement saying that you would work with LAHSA related to these.

So if you don't recall whether you had a conversation with LAHSA, who else within the City of Los Angeles would have had a conversation with LAHSA related to whether or not these data points were possible?

MR. MCRAE:  Objection it calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  I don't know.  I don't -- like I said I can't -- I don't recall all the conversations that were had in the lead up to the settlement agreement.

Q   Are there any documents out there that would refresh your recollection about whether or not you had a conversation with LAHSA about whether or not these data points were possible before you entered into a settlement agreement with the

Szabo - Cross / By Ms. Myers                 **32**

Alliance related to these data points?

             **MR. MCRAE:**  Objection, vague, lack of foundation,

assumes facts.

             **THE COURT:**  Overruled.

             **THE WITNESS:**  I can't comment.  I don't know whether

there are any documents in existence anywhere that could

possibly refresh my memory.  It's possible, but I don't know.

**BY MS. MYERS:**

Q    Okay.  Let me move on to the reporting of the LA Alliance

settlement agreement.  I'm showing you what's been marked as

Exhibit A -- I'm sorry, Exhibit 502, which is Document 1072.1.

Are you familiar with this document?

A    I am familiar with the document, yes.

Q    And for the record, what is this document?

A    This document appears to be the supplemental report for

our quarterly report for the quarter ending September 30th,

2025.

Q    And I know this is a supplemental report, but is this

similar to the other quarterly reports in terms of the contents

of the report that you had provided throughout the course for

the settlement term?

             **MR. MCRAE:**  Objection, vague.

             **THE COURT:**  Overruled.

             **THE WITNESS:**  This is a similar format, yes.

//

**BY MS. MYERS:**

Q    Okay.  I'm going to show you the last page.  There are a number of footnotes in this document, correct?

A    There are a number of footnotes, yes.

Q    Why is -- and, in fact, there are 36 footnotes, correct?

A    That's right.

Q    Why does the City, just going back just to ensure we have the foundation for this, your office has a hand in submitting these reports, correct?

A    Yes.

Q    And your office has a hand in drafting these reports.

A    Yes.

Q    So you're familiar with the content of these reports.

A    I am, yes.

Q    Okay.  So why does the City provide footnotes in these reports?

A    We provide footnotes to provide more detail where we believe it's necessary to explain changes in information, any additional information that we think might be helpful to the consumer of the information to better understand the information.

Q    And you previously testified that one of the reasons for the footnotes is to provide as an accurate of information that's possible related to the reports, correct?

A    I believe so, yes.

Szabo - Cross / By Ms. Myers                    **34**

Q    And is one of the reasons why you provide the footnotes to provide clarification related to the definitions that the CAO's office is using related to the reports?

A    In some cases, yes.

Q    Just looking at page 6 of 7 of this report, you list out the addresses of the buildings that are included in the LA Alliance reporting, correct?

A    On most of the sites we do, some we don't.

Q    Why does the City list out the buildings?

A    Why do we list the buildings?

Q    Yes.

A    To indicate the location of the site.

Q    And why does the City do that?  Is it required by the settlement agreement?

        **MR. MCRAE:**  Objection, that calls for a legal conclusion and lack of foundation, speculation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I'm -- whether the addresses are required by the settlement agreement, I don't believe the addresses are required by the settlement agreement, but we provide those to indicate to the Court and to the special master which sites we're referring to.

**BY MS. MYERS:**

Q    And why do you provide that information?

A    We -- the addresses we provide the information because

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Myers                    **35**

it's useful information to indicate which site we're talking about.  I don't quite understand.

Q    Is it to provide transparency to the Court?

          **MR. MCRAE:**  Objection, vague.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  That is one reason, yes.

Q    And going back to the settlement agreement in Section 7.1. Throughout these proceedings, you've testified about the -- what you understood the number of beds or opportunities offered to mean.  What is your understanding of what that means for purposes of the City's reporting?

          **MR. MCRAE:**  Objection, asked and answered --

          **THE COURT:**  Overruled.

          **MR. MCRAE:**  -- cumulative.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  The number of beds or opportunities offered?

**BY MS. MYERS:**

Q    Yes.

A    We have been reporting that as the number of beds or opportunities which are offered, which are being offered, which are provided for use by the homeless service system and by use of those persons experiencing homelessness who need housing or shelter.

Q    And you previously testified that you interpret that to

Szabo - Cross / By Ms. Myers                          **36**

mean on offer, right, the number of beds on offer; is that correct?

A     That is -- that's correct, yes.

Q     So looking back at the reporting for 502, has the City ever provided a footnote providing an explanation of the City's use of the term on offer for purposes of the reporting for 7.1?

A     I don't believe so, but I don't recall at this moment every footnote we've submitted in each of our 12 reports.

Q     You previously testified that there were multiple definitions of offered in the settlement agreement, correct?

A     There are multiple definitions of the --

          **MR. MCRAE:**  Objection, mischaracterizes the document and testimony and lack of foundation.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  There are multiple definitions of the term offer in -- and it depends entirely on the context in which that term is used.

**BY MS. MYERS:**

Q     But you never provided a footnote definition to inform the Court or the parties or the public which definition of offered you were using for purposes of these reports then, correct?

          **MR. MCRAE:**  Objection, it's argumentative.  Assumes there was an obligation to do that.  It calls for speculation and a legal conclusion, lack of foundation.

          **THE COURT:**  Overruled.

EXCEPTIONAL REPORTING SERVICES, INC

**THE WITNESS:**  We've -- as you pointed out, we have reported information in our quarterly reports consistently since January of 2023.  And that information has been available to the Court, the plaintiffs, to you, the special master, and not only was this issue not raised until recently, but the special master in her first annual report indicated that we were complying with that Section of 7.1.

So everything that we were led to believe is that this Court, the plaintiffs and yourself believed that we were complying with 7.1.

**BY MS. MYERS:**

Q   So again, I appreciate your comments, Mr. Szabo, about the record, but I'm asking a different question.  I'm asking whether or not you ever provided a footnote explanation to the Court, the plaintiffs, me, Special Master Martinez or the public about which definition of offer you were using for purposes of these quarterly reports.

**MR. MCRAE:**  Same objections.

**THE COURT:**  Overruled.

**THE WITNESS:**  We didn't do that because --

Q   Okay.

A   -- we did not believe there was a need to.  There was no question and there was no questions raised about how we were reporting that section of 7.1, not until recently.

Q   So you're saying there were no questions until recently

Szabo - Cross / By Ms. Myers                                    **38**

about whether or not you were using the term on offer as opposed to offered for purposes of interpreting the report.  Is that your testimony?

MR. MCRAE:  Objection, mischaracterizes the witness' testimony.  It's compound with the conjunction or, it lacks foundation and it calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  The requirement is to comply with the reporting of -- the reporting requirements of 7.1.  And as no issues were raised about our -- the manner in which we were complying with that section of 7.1, we did not feel that there was a need to provide clarification on something that seemed to be clear to the Court and the Special Master and the plaintiffs and the intervenors.

BY MS. MYERS:

Q    Okay.  So let me go back to 7.1.  And so 7.1 the number of PEH who have accepted offers of shelter or housing.  Do you see that as a data point in the 7.1?

A    Yes, I do.

Q    Okay.  And so going back to the report, it's your testimony that the final column, the column most to the right and total PEH served is the data point in the reports that represents the people who have accepted shelter, correct?

MR. MCRAE:  Objection, mischaracterizes testimony.

THE COURT:  Yes.  We've used PEH served as a -- to --

as information that we were able to provide that could get as close as possible to that data point because by definition the PEH served, as we defined it in the footnotes means that the -- those individuals were offered shelter or housing.

Q   The data point that you testified though is accepted shelter, correct?

A   I'm sorry, accepted, that's what I meant.

Q   Okay.  It is the case, however, that people experiencing homelessness who are served by housing does not include every person who has accepted shelter, correct?

A   I'm sorry, could you repeat that?

Q   It is the case that PEH served does not include every person who has accepted shelter, correct?

        **MR. MCRAE:**  Objection, vague and lack of foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  It depends on the universe of what you're talking about.  I -- I mean, we're -- the reason we're using PEH served is because we were -- it is a metric that would allow us to tie those reporting requirements to the beds provided pursuant to the settlement agreement.

        Is it possible that some persons experiencing homelessness accepted shelter or housing at one point and then between that point and the point in which they were placed in the bed or the unit of housing, then later declined it's -- that's -- I suppose that's possible.  But that's -- again,

that's theoretical.

**BY MS. MYERS:**

Q    Are you familiar with the process that it takes after a person has accepted housing for them to move into the housing?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  There's not one process.

Q    So are you familiar with the processes by which a person may accept housing and then is moved into that housing?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  I am familiar with the process, but my office does not manage that process.

**BY MS. MYERS:**

Q    So you're aware though that a person can accept housing, and then for example, as Ms. Kuhn testified, not be certified for that housing and therefore not move into it, correct?

MR. MCRAE:  Objection, beyond the scope of the proceeding.  It's also a hypothetical, assumes facts.

THE COURT:  Overruled.

THE WITNESS:  That's possible.

Q    And it's also possible that a person could pass away in the months between when a person accepts housing and when they're served by that housing, correct?

MR. MCRAE:  That's possible is a hypothetical, it

Szabo - Cross / By Ms. Myers                                **41**

calls for speculation, lack of foundation.

   **THE COURT:** Overruled, you can answer the question.

   **THE WITNESS:** It's theoretically possible.

Q A person could be displaced from where they were living and a service provider could no longer reach them so they can't actually move into the housing, correct?

   **MR. MCRAE:** Objection, incomplete hypothetical, it's compound, it's also beyond the scope of the proceeding.

   **THE COURT:** Overruled.

   **THE WITNESS:** It's theoretically possible.

**BY MS. MYERS:**

Q And so, in fact, there are a number of reasons that are not just theoretical, but actually that a person might accept housing and not actually move into those -- into the housing, correct?

   **MR. MCRAE:** Objection, that is also hypothetical. It lacks foundation and it calls for speculation.

   **THE COURT:** Overruled, you can answer the question.

   **THE WITNESS:** It is theoretically -- all of those are theoretically possible, yes.

Q In fact, your office has no idea whether that actually occurs, correct?

   **MR. MCRAE:** Objection, relevance to whether a hypothetical occurred.

   **THE COURT:** Overruled.

**THE WITNESS:** We've chosen and we elected to use PEH served as I said as our best effort, our best good faith effort to comply with that requirement because it's a metric that we are reasonably able to verify as it relates to the beds that have been provided pursuant to the settlement agreement.

It represents the -- what -- because there are so many variables, as you stated, our best effort to provide that information pursuant to the -- related to the beds that were established pursuant to the settlement agreement.

**BY MS. MYERS:**

Q   Okay. That was not my question. My question was, there is a difference between the number of people who are accepting housing and the number of people who are served by housing, but your office does not verify the difference, correct?

**MR. MCRAE:** That's argumentative, it also lacks foundation and assumes there's a distinction. It calls for speculation, lack of foundation.

**THE COURT:** Overruled, you may answer the question.

**THE WITNESS:** Yeah, that was maybe not your question, but that was my answer because that is what we do. That is what we are trying to provide. We're trying to provide the best possible information that we're able to verify as it relates to the beds that have been provided, have been created pursuant to the settlement.

Q   And unfortunately, Mr. Szabo, I'm asking the question so

Szabo - Cross / By Ms. Myers                                    **43**

we're -- I'm entitled to answers to the questions that I'm

asking, which I know you're on a time constraint, I understand

you have to leave by noon --

        **THE COURT:**  No, if need be we can bring him back, but

I was hoping to wrap him up today.

        **MS. MYERS:**  Yes, Your Honor, I was --

        **THE COURT:**  Okay.  But you're not on a time

constraint, none of the parties are.

**BY MS. MYERS:**

Q    So, Mr. Szabo, I'm going to ask you specific questions and

we can move this along if you can answer the questions that I'm

asking.

     How did you provide explanation about the different --

about the fact that you were using people served to quantify

the specific data points, people accepting housing?

        **MR. MCRAE:**  Objection, vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Again, I'm sorry, could you repeat

that, how did we --

Q    How did you provide explanation to the Court, the

plaintiffs, intervenors, Council or Special Master Martinez

that you were choosing to use people served to stand in for the

data points accepting offers of shelter?

A    Well, we provided information, we do provide information

on the quarterly reports as to what PEH served means, what the

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Myers                                    **44**

definition is.  And that definition includes intakes to interim

housing and that definition includes leases with permanent

housing, which as I said, by definition, means that there were

offers made and offers accepted related to those units.

Q    Okay.  So again, asking a different question.  How did you

provide the information to the relevant parties, including the

Court, Special Master Martinez, the plaintiffs, the

intervenors, the public that you were using people served as a

stand in for the specifically negotiated data point of people

accepting offers of shelter?

          **MR. MCRAE:**  Argumentative, Your Honor and asked and

answered.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Yeah, I -- we provided footnotes

defining what PEH served means.

**BY MS. MYERS:**

Q    Can you please point me to the footnote that informs the

Court, the plaintiffs, the intervenors, the Special Master that

you were using PEH served as a stand in for the negotiated data

point of accepting offers of shelter in 7.1?

     It's in front of you.  The footnotes are in front of you,

so if there is a footnote, can you point it to us?

A    Right.  Well there -- number one, there's nothing in front

of me right now.

Q    Okay.  Apologies.  There you go.

Szabo - Cross / By Ms. Myers                    **45**

A    And as I said, now for the third time, we provided -- we
provide a footnote on -- that gives you the definition of what
PEH served means and if it's not here, it is in a --

Q    Do you need the next page?

A    It might be on the next page.  I don't know if it's on
this document or if it's in another document.

Q    Here's 502, here are the footnotes.

A    Yeah, that would be footnote number 2.

Q    Number -- can you just read that for the Court?

A    Sure.  The number reported under number of PEH served
column is as follows, depending on the intervention project
type, one number of PEH units leased as of the quarter and date
for PSH interventions; two, total number of intakes for interim
housing interventions.

Q    So this is the footnote that you're pointing to in
response to my inquiry about how you informed the Court and the
parties that you were used PEH served as a stand in for the
negotiated data point of people accepting offers of shelter.

         **MR. MCRAE:**  Objection to the stand in
characterization.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  That's -- that is the definition of PEH
served, yes, that's --

**BY MS. MYERS:**

Q    Yes, that's not my question, Mr. Szabo.  So my question

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Myers                      **46**

is, is it your testimony then that this footnote number 2 is what you used to inform the Court, the parties, the Special Master and the public that PEH served was the stand in for people accepting offers of shelter, the negotiated data points in 7.1?

      **MR. MCRAE:**  Same objections, Your Honor.

      **THE COURT:**  Overruled.

      **THE WITNESS:**  Yes.  This footnote and all of the data that's provided for each of the sites that we're reporting, yes.

**BY MS. MYERS:**

Q   Okay.  So I'm going back to Exhibit 25, which is the settlement agreement, so I'm going back to the beginning of the settlement agreement.

Mr. Szabo, you were responsible for helping the City of Los Angeles negotiate this agreement with the plaintiffs; is that correct?

A   Yes.

Q   And so you're familiar with the contents of the settlement agreement.

A   Yes.

Q   Were you involved in the decision about which terms to define within the settlement agreement?

      **MR. MCRAE:**  Objection, it's vague as to whether it's literally the definition section of the agreement.

EXCEPTIONAL REPORTING SERVICES, INC

**THE COURT:** Overruled.

**THE WITNESS:** I was involved in the settlement agreement, typically the attorneys take the lead on the terms section of the agreement, but I was involved.

**BY MS. MYERS:**

Q    In looking at the settlement agreement, how many terms are defined?

A    I don't -- just very quickly as you ran through that, it looks as though you skipped the next page, it looks like six; is that right?

Q    I mean I can go through it as slow as you need me to.

A    So there are four terms on this page.  And two terms on this page.  So it looks like six.

Q    And as you understand it, are those the number of terms that were defined in the settlement agreement, those six terms?

**MR. MCRAE:**  The document speaks for itself, Your Honor.

**THE COURT:**  Appears to be so, yes.

Q    And were you involved in the decision about which terms to define?

A    Again, this is, you know, a document that was drafted by the City's counsel and the plaintiffs' counsel.  So while, yes, I was involved, but in terms of determining what terms needed to be defined terms, that is part of the job of counsel.

Q    Were you able to weigh in about what terms you thought

Szabo - Cross / By Ms. Myers                           **48**

needed to be defined?

        **MR. MCRAE:** Objection to the extent it calls for divulging attorney/client privilege.

        **THE COURT:** Just a moment. Would you slow that question down and repeat it, please?

        **MS. MYERS:** Sure.

**BY MS. MYERS:**

Q    Were you involved in determining which terms needed to be defined?

        **THE COURT:** Overruled. You can answer that.

        **THE WITNESS:** I wouldn't -- again this is a document which was drafted by counsel. This section is -- you know, my involvement was representing the City, Council and the Mayor on the substance of the terms of the settlement, not necessarily the definition of terms or which terms to define, that's I think appropriate to leave, you know, to the lawyers to do that work. But I was involved in -- you know, I'm not saying I wasn't involved in it, I certainly was, but you know, the definition of terms was not -- you know, that was something that was developed after the main points of the agreement were discussed and agreed to, which was what I was principally responsible for.

Q    Your office is responsible for the reporting on compliance with the settlement agreement, correct?

A    Yes.

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Myers                                **49**

Q    And so your office is responsible for determining whether specific actions are compliant with the settlement agreement for purposes of that reporting, correct?

          **MR. MCRAE:**  Objection.  That calls for a legal conclusion.  It also assumes facts and lacks foundation.

          **THE COURT:**  Overruled.  You can answer the question, sir.

          **THE WITNESS:**  Sure.  We provide the quarterly reports, we coordinate the quarterly reports and provide the information to the best of our ability as compliant with the settlement agreement.

          There are certainly processes to discuss, whether there are disagreements about definition of terms that may be undefined in the agreement or questions about the contents of our quarterly reports, which we've engaged in over the multiple times over the term of this settlement.

**BY MS. MYERS:**

Q    So if a definition -- if there's a question about a definition and that is not included in the settlement agreement, one of the six defined terms is not included, then how does your office determine what the definition of that term is?

          **MR. MCRAE:**  Your Honor, it's an incomplete hypothetical, it lacks foundation.  And by definition, calls for speculation.

                    **EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Myers                          **50**

THE COURT:  Overruled.

THE WITNESS:  We rely on what we believe was the intent of that language in the settlement agreement.  And if it's not a defined term, it's -- we've provided the information that we believe is compliant and as I said, there's a process that is provided for.  If there's a disagreement about that or if there is a challenge to that, that process has been used multiple times through the -- since 2022.

BY MS. MYERS:

Q   Because the City is required to create housing and shelter opportunities, correct?

MR. MCRAE:  Objection.  That calls for a legal conclusion, it also is vague as phrased and the document speaks for itself.

THE COURT:  Overruled.

THE WITNESS:  Yes.

Q   And does the settlement agreement define the term create?

MR. MCRAE:  Objection, calls for a legal conclusion.

THE COURT:  Just a moment, would you repeat that?  That was a little quick, I didn't hear the last portion.

MS. MYERS:  Sure, Your Honor.

Q   Does the settlement agreement include a definition for the term create?

MR. MCRAE:  Calls for a legal conclusion, the document speaks for itself.

EXCEPTIONAL REPORTING SERVICES, INC

**THE COURT:**  Overruled.

**THE WITNESS:**  Create I don't believe -- is not a defined term, is not a defined term, but there is significant content and explanation of about what that means.  That in -- I believe it's Section 3.1 and 3.2.

**BY MS. MYERS:**

Q    Let's go to 3.1 and 3.2 so you can point me to that.

3.1 and 3.2 is before you.  So tell me where it defines the term create.

**MR. MCRAE:**  Objection, mischaracterizes the witness' testimony.

**THE COURT:**  Overruled.

**MR. MCRAE:**  And the document speaks for itself.

**THE COURT:**  Thank you.  You may answer the question.

**THE WITNESS:**  Sure.  3.2 provides the context about what that means, right.  So 3.2 says the manner in which we can choose of the types of housing, so it provides allowable housing types and then it also provides a definition of what I -- maybe I shouldn't use the word definition, but it allows the City to -- or it provides the context for how the City needs to fund the units, in this case it says they may be government funded or privately funded.

So it -- you know, that it would allow the City to count as created the units even without funding the units directly with public dollars, for example, it says that they

may be privately funded.

So that's -- it provides -- 3.2 provides the context for what create means.

Q    Well you discussed funding, but tell me how that relates to creating?

MR. MCRAE:  Objection, it's also beyond the scope of this proceeding and it --

THE COURT:  Overruled.

MR. MCRAE:  -- lacks foundation, calls for a legal conclusion.

THE COURT:  Thank you.  You may answer the question, sir.

THE WITNESS:  You could -- one could potentially and now is theoretical, since we're going to have a theoretical conversation it looks like about a lot of things, the -- that creating could be limited to the City having some level of funding, it could mean that the City has to fund exclusively, those would be theoretical examples for how you could limit what create means.  In this case, it means that as relates to funding, it could mean anything.  The City could pay -- could fund exclusively, the City could use state funds, federal funds, or no public funds, could use private funds, for example, as long as the offer is adequate for the individual.

So it's -- it -- I mean, theoretically it could have been more narrow, but it wasn't, so it provided guidance to us

Szabo - Cross / By Ms. Myers                        **53**

for how we could provide the required number.

**BY MS. MYERS:**

Q    Sure.  And I appreciate you talking again at length about funding, I'm asking about something different, but I'll move on.  Shelter and housing solutions, is that term defined in the settlement agreement?

        **MR. MCRAE:**  Objection, the document speaks for itself and calls for a legal conclusion.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Well, we're looking at 3.2 and --

**BY MS. MYERS:**

Q    I'm looking for a definition of housing or shelter solutions.

A    Right.  So --

        **MR. MCRAE:**  Again, the document speaks for itself as to what the definitions are.

        **THE COURT:**  Overruled.  Do you recall the question?

        **THE WITNESS:**  I do, I do.

        **THE COURT:**  Okay.  You may answer, thank you, sir.

        **THE WITNESS:**  As we have just established, it is not a defined term, if that is your question.  But 3.2 provides extensive examples for what would be allowable or eligible to be counted as a housing or shelter solution.

Q    Okay.  So the closest that you can point us to a definition of housing or shelter solutions is 3.2; is that

Szabo - Cross / By Ms. Myers                    **54**

correct?

MR. MCRAE:  Objection, it mischaracterizes the witness' testimony as to definition, it calls for a legal conclusion and the document speaks for itself, it lacks foundation.

THE COURT:  Overruled.  Do you recall the question? She can repeat it.

THE WITNESS:  Yes, I do.  3.2 discusses the range of eligible shelter and housing solutions, which is helpful.

BY MS. MYERS:

Q    Which is helpful for what?

A    Helpful in understanding what the settlement agreement means by shelter or housing solutions.

Q    Okay.  And I'm pointing you to the term milestones and deadlines.  Are you familiar with the term milestone and deadlines as it appears in the settlement agreement?

MR. MCRAE:  Objection, beyond the scope of this narrow proceeding.

THE COURT:  Overruled.

THE WITNESS:  Yes.

Q    And is that term defined in the settlement agreement?

MR. MCRAE:  Same objections, Your Honor, the document speaks for itself.

THE COURT:  Overruled.

THE WITNESS:  Again, it is not a defined term, but

EXCEPTIONAL REPORTING SERVICES, INC

there's discussion about milestones and deadlines.

Q    And where would we find that in the settlement agreement?

        MR. MCRAE:  Again, the document speaks for itself.

Q    I'm just looking for where we would find the definitions of these terms, Mr. Szabo.

        MR. MCRAE:  And again, it assumes that there are definitions and you can just read the document and see where the definitions are.

        MS. MYERS:  I --

        THE COURT:  Overruled, answer the question, sir.

        THE WITNESS:  It's -- there's discussion throughout the document, but I can't go through and identify every area where there's context provided for milestones and deadlines.

BY MS. MYERS:

Q    Well, Mr. Szabo, we're having a proceeding related to definitions that the City is using related to terms in the settlement agreement, so I'm trying to get an understanding beyond the terms where the City is finding those definitions that you're applying to these terms, that's why I'm asking you specifically.

     So miles (sic) and deadlines, where would you find the definition that you would pull from for purposes of your interpretation of the settlement agreement for purposes of the reporting?

        MR. MCRAE:  Your Honor, I would move to strike the

Szabo - Cross / By Ms. Myers                    **56**

rather long wind up before that pitch, which was the question

about what this proceeding is.

THE COURT:  Overruled.  You can answer the question.

MR. MCRAE:  And also I object to the question.

THE COURT:  Thank you.

THE WITNESS:  So as you established because there are

limited number of defined terms in the settlement, we -- the

document itself required us to look at the context of each of

the sections and to report based on our good faith, best effort

to report that information based on the context, in large part

because there were limited definitions.

**BY MS. MYERS:**

Q    And so if there was a limited definition, then the City

came -- and you in the reporting came up with your own

definition that you then applied for purposes of that

reporting, correct?

A    No.

MR. MCRAE:  Objection, it's a hypothetical, calls for

speculation.

THE COURT:  Overruled.

THE WITNESS:  No.  I -- the City did not come up with

its own definitions.  The City reported to -- in good faith to

our best efforts on what we believed, to the extent that we

could, what we believed the settlement agreement was asking

for.

Szabo - Cross / By Ms. Myers                    **57**

And again, as you stated, there were very -- the defined terms were limited to six, so we had to use the rest of the document to suggest to us what data we should report, based on some of the things that were being asked for.

**BY MS. MYERS:**

Q    And that's what the City did by using the term on offer, correct?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  That's certainly how we came to the conclusion to provide that information the way we did, yes.

Q    And where in the settlement agreement, did you pull from in determining the use of the phrase on offer as a stand in for offered for purposes of 7.1?

MR. MCRAE:  Objection, mischaracterizes the testimony, also the word stand in is vague and argumentative.

THE COURT:  Overruled.

THE WITNESS:  So as I think we've established the term offer has multiple definitions.  It could be used as a noun or a verb.  It could be used -- and we went through the -- those discussions in previous testimony.  The context -- because it wasn't a defined term, we had to use the context of the section in which it was provided, in which it was included and that's what we did.

So we looked at where offer was requested in what

section of the settlement agreement and that led us to a different definition than how offer was used in other sections of the settlement agreement.

**BY MS. MYERS:**

Q   Did you discuss that with any of the other parties in the case before you reported that -- this interpretation by the City?

A   We reported it and we reported it the same way on 12 consecutive quarterly reports.

Q   But did you point out that that is what you were reporting in those 12 consecutive reports, that you were interpreting the word offered to mean on offer?

        **MR. MCRAE:**  Objection.  Your Honor, the intervenors aren't even a party to this agreement, so this is not relevant. It also lacks foundation and it's beyond the scope of these proceedings.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yeah, I don't -- we're not obligated to do that.  We were obligated to report, which we did, and the plaintiffs and the special master and the intervenors have had every opportunity to raise questions or concerns, objections and until recently as it relates to that section, 7.1, no objections were raised and to the contrary, the special master indicated in her first annual report that we were complying with that section.

So we were on every measure, it is reasonable for us to believe that we were in compliance.  It was we provided that information with our good faith, best effort to provide what it was asking for, and that was validated both directly and indirectly by the lack, total lack of objections that were raised until recently.

**BY MS. MYERS:**

Q    So again, I appreciate your response, but it's not an answer to my question.  So I'm asking you if and how you let the parties know that you were interpreting offered to mean on offer.

       **MR. MCRAE:**  Objection, Your Honor, it's argumentative and again, beyond the scope of the proceeding, lack of foundation.

       **THE COURT:**  Overruled.

       **THE WITNESS:**  And my issue there is that the suggestion is that we had an obligation to do so, which we didn't.

Q    I'm not --

A    Which we didn't.  So to ask me if we didn't do something that we weren't required to do, my answer to you was I'm answering you by telling you what we did do and how we came to that conclusion.  And if there were issues raised, we would have addressed them.

Q    So I can interpret then, since that's what you would like

EXCEPTIONAL REPORTING SERVICES, INC

Szabo - Cross / By Ms. Myers                              **60**

me to do, I can interpret from your answer, based on what you did do that you did not inform the parties that offer means on offer, correct?

MR. MCRAE:  Objection as to parties.  There's only one other party to the agreement and it's also cumulative and asked and answered and argumentative.

THE COURT:  Overruled.

THE WITNESS:  You could make whatever interpretation you'd like.

**BY MS. MYERS:**

Q   So I would like a correct interpretation for the record, Mr. Szabo.  So is it correct that you did not inform the Court, the plaintiffs, the intervenors, the special masters in this case, that you were interpreting the word offer to mean on offer; is that correct?

MR. MCRAE:  Your Honor, relevance.  It assumes that there was an obligation to do so.

MS. MYERS:  It does not assume.  Now --

MR. MCRAE:  It's irrelevant.

THE COURT:  Thank you both.  Overruled, you can answer the question.

THE WITNESS:  I continue to disagree with that because in -- we report to the Court and the plaintiffs and the intervenors quarterly.  We provide the information and that information is provided in a certain way and in my view that is

Szabo - Cross / By Ms. Myers                    **61**

informing the Court and the plaintiffs and intervenors and the special master how we're interpreting that information, how we're interpreting those metrics, because we're reporting the data.

So I disagree.  I think we're reporting -- I think we're advising on how we're interpreting that information in our quarterly reports.

**BY MS. MYERS:**

Q   Okay.  So again, putting aside obligation, putting aside your interpretation, did you inform the Court, the plaintiffs, the County, the intervenors, special master that you were defining the term offered to mean on offer?

**MR. MCRAE:**  Asked and answered for now the third time.

**THE COURT:**  Overruled.

**THE WITNESS:**  I believe we informed all of those parties every quarter since January of 2023 in our quarterly report.

Q   Okay.  Let's just have a clear record then.  Point out to me please where you informed the Court, the plaintiffs, the intervenor, the County, the special masters in the quarterly report that information, just so it's clear.

**MR. MCRAE:**  Your Honor, again this is asked and answered and it is very argumentative, it's beyond the scope, it's also irrelevant.

Szabo - Cross / By Ms. Myers                                **62**

THE WITNESS:  It's in the reports, it's in Attachment A of each report.

Q    In front of you.

A    It's in attachment A of each report, where we identify the sites, the type -- the housing type and the number of units.

Q    Okay.  So sites, housing type and number of available units is how you identify to the Court, the plaintiffs, the intervenor, counsel, the County and the special masters that the City was interpreting offer to mean on offer, correct?

MR. MCRAE:  Asked and answered, Your Honor, argumentative and irrelevant.

THE COURT:  Overruled.

THE WITNESS:  Yes, the quarterly reports provided our best effort response to that requested information.

BY MS. MYERS:

Q    Okay.  I'm going to switch topics a little bit.  You testified during your previous direct examination by the City that the City had kept road map agreement beds open, correct?

MR. MCRAE:  Objection, irrelevant to this proceeding. It's beyond the scope.

THE COURT:  Overruled.

THE WITNESS:  Yes, but -- yes.  I did testify to that.

Q    Okay.  How many beds has the City kept open?

MR. MCRAE:  Objection, vague.

THE COURT:  Overruled.

THE WITNESS:  And so that -- and so I do want to maybe qualify my last answer, I don't recall exactly what I said, but I probably would have said largely or the majority or almost all of the road map beds opened because there's some natural demobilization that happens, leases expire, et cetera. So I want to -- I just want to be clear about that, that we haven't kept all road map beds open, but that has been the case even during the term of the road map.  We were constantly adding beds and taking beds out of service as the situation dictated.

So I can't tell you exactly how many of the -- you would have to define what you're looking for in terms of out of what population of road map beds would you be talking about that are still open.

**BY MS. MYERS:**

Q   I'm just referring to your previous testimony where you testified about the beds from the road map agreement being kept open, I'm just asking how many beds out of the road map agreement are still open.

MR. MCRAE:  Same objection, beyond the scope, relevance.

THE COURT:  Overruled.

THE WITNESS:  Yeah, all I can tell you is without specific numbers that they were largely or the vast, vast

Szabo - Cross / By Ms. Myers                                    **64**

majority were kept open, that is to say there was no effort by the City to shut down beds at the expiration of the road map agreement, even though we weren't required to keep those beds open, there was no effort to shut down beds.  There was, to the contrary, effort to go into the City's general fund after all of our state funding and federal funding, et cetera was exhausted to keep those beds open, even in the midst of a major financial challenges, but the Mayor and the Council believed it was the right thing to do.

So out of the 7,000 or so beds, most all of them are still open.  There are some that have been -- as I said, I don't want -- I want to be precise here, because there are some beds that have been taken off line out of necessity, but most of those 7,000 beds are still open.

**BY MS. MYERS:**

Q    So a significant portion of the road map beds were time limited subsidies, correct?

**MR. MCRAE:**  Objection, relevance and beyond the scope of this proceeding.

**THE COURT:**  Overruled.

**THE WITNESS:**  Approximately 2,000.

Q    Yes.  So how many of those time limited subsidies are still in operation?

**MR. MCRAE:**  Same objection, beyond the scope of the proceeding, relevance.

EXCEPTIONAL REPORTING SERVICES, INC

**THE COURT:**  Overruled.  It wasn't about 23 or 2,400 and about 1,600, we didn't have information about, wasn't that our concern?

**THE WITNESS:**  Yeah.  Well, the -- I couldn't answer that question exactly.  I don't have that information.

**THE COURT:**  That's okay, that's okay.

**THE WITNESS:**  Yeah, I don't have that information right in front of me because I don't know of those TLS slots how many are still being used today.  I would have to get that information.

**BY MS. MYERS:**

Q   Well, Mr. Szabo, you testified of the 6,700 that the majority, the vast majority, in fact most of those beds were still in operation, but 2,300 of them are time limited subsidies, correct?

**MR. MCRAE:**  Objection, relevance, beyond the scope.

**THE COURT:**  Overruled.

**THE WITNESS:**  Again, I would need to refer to the -- to our last road map report.  I don't have that right now.

Q   So when you just testified that the vast majority, most of the beds were still in operation, was that excluding time limited subsidies then?

**MR. MCRAE:**  Same objections.

**THE COURT:**  Overruled.

**THE WITNESS:**  Well, we're talking about 7,000

interventions.

Q    Sure.

A    So including 2,000 or so time limited subsidies.

Q    Sure.

A    So, yes, I mean, my testimony still stands.  The vast majority are still in operation.

Q    And when you say vast majority are still in operation, are you including time limited subsidies?

        MR. MCRAE:  Same objections, Your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  Like I said, I don't have the -- I can't recall the information right now as to how many of those time limited subsidies are still being used.

BY MS. MYERS:

Q    So you testified based on your personal knowledge that the vast majority of beds are still in operation, so all I'm asking, Mr. Szabo, is whether that vast majority includes time limited subsidies, that's -- I'm just trying to understand your testimony here today.

A    Sure.

        MR. MCRAE:  Objection, asked and answered, lack of foundation at this point.

        THE COURT:  You can answer the question, sir.

        THE WITNESS:  So beds are different than subsidies.  And speaking to the beds, as I said, we have not and we did not

Szabo - Cross / By Ms. Myers     **67**

shut down any beds for purposes of saving money or because our obligation would have allowed us to shut those beds down.  I can't speak to time limited subsidies.  Again, I would need to refer to our -- I just don't have that information right now.

**BY MS. MYERS:**

Q    So when you testified then that the vast majority of beds were still in operation, you were referring only to the beds, not the time limited subsidies that counted towards that 7,000; is that correct?

        **MR. MCRAE:**  Objection, lack of foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I wasn't testifying only to the beds, only to the beds.  But I just, like I said, I can't tell you -- the time limited subsidies are two year subsidies.  I don't know how many of those are still being used today.

Q    Is that information available to the City?

A    Yes, it is available.

Q    So if I wanted clarification for purposes of this record to your previous testimony about the fact that the City kept beds opened and I wanted specific numbers related to that, you could get that number for the Court, correct?

        **MR. MCRAE:**  Objection, compound, lack of foundation and beyond the scope of this proceeding.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I could, yes.

Szabo - Cross / By Ms. Myers                                        **68**

Q    Okay.  When you testified about 7.2 and specifically the monitoring of the settlement agreement and specifically the ways in which the City verifies the data that is provided in the quarterly reports, you said that the City uses HMIS data; is that correct?

THE COURT:  Would you restate that just a little slower?

MS. MYERS:  Sure.

**BY MS. MYERS:**

Q    When you said that the CAO's office verifies the data in the quarterly reports, you said that the CAO's office relies on HMIS data; is that correct?

A    In some cases.

Q    Okay.  And what are those cases?

A    Those are -- would be typically interim housing as it relates to the hotels and motels for Inside Safe.

Q    And what is the specific data points that the City uses HMIS to verify for the hotels and motels that it reports in its quarterly reports?

A    We would use that for determining persons served.

Q    And what do you use specifically in HMIS to determine persons served?

A    What do we -- HMIS is able to -- we're able to verify that the individual tied to the site.

Q    You're able to identify -- verify that an individual is

Szabo - Cross / By Ms. Myers                    **69**

tied to a site?

A     Is tied to a site, yes.

Q     And is that for purposes of verifying the total PEH served data point in the reports?

A     Correct, that's what I said, it's to verify PEH served.

Q     Okay.  So you use HMIS to verify the number of people served in each of the interim housing sites that are hotels and motels for Inside Safe; is that correct?

A     I believe that's correct, although I don't -- I don't want to say for every single one, I'm not sure, but that's the area that we use it, but I believe that's the case.

Q     And what do you use in HMIS to verify that?

A     I don't know what -- you mean what field we use?

Q     What portion of HMIS is the data base you use?

A     I don't know what portion we use.

Q     Okay.  Who does that verification?

A     There are members of my staff that have that.  I don't have a HMIS access myself.

Q     And which members of the staff would that be?

A     There are a number of members that have access.

Q     And which members of the staff would that be?

         **MR. MCRAE:**  Objection, relevance.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  I have a team and I don't have a list of the -- of all the members that have access to HMIS.

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Myers                              **70**

**BY MS. MYERS:**

Q    Do you know any of them?

A    I do.

Q    What are their names?

A    Nope.

          **MR. MCRAE:**  Same objection, relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I have a number of people that have access to HMIS.

**BY MS. MYERS:**

Q    Yes.  And what are their names?

A    That could be provided.  I don't have that with me right now.

Q    So you don't know the names of the individuals who have HMIS access but you could provide it; is that correct?

          **MR. MCRAE:**  Same objection, relevance.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I could provide it.

Q    Okay.  What is the job title of the individuals who have HMIS access that verify the data for purposes of --

          **MR. MCRAE:**  Objection.

Q    -- this report?

          **MR. MCRAE:**  Relevance, Your Honor.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  It is the regional outreach

Szabo - Cross / By Ms. Myers                    **71**

coordinators.

THE COURT:  I'm sorry, I didn't hear, regional?

THE WITNESS:  I'm sorry, regional outreach

coordinators, referred to as ROCs.

THE COURT:  Thank you.

BY MS. MYERS:

Q    Okay.  So the regional outreach coordinators are the staff

within your -- within the CAO's office that have access to HMIS

and that verify the data that is provided under PEH served, for

purposes of the Inside Safe hotels and motels?

A    In some cases, yes.

Q    So you added that caveat, so I want to understand what you

mean by in some cases.  Are there -- can you clarify what you

mean by in some cases?

A    I don't -- there may be -- it is typically limited to

Inside Safe, so I'd say hotels and motels, but typically it's

Inside Safe where we would verify.

Q    So in some cases means there are -- there may be other

types of hotels and motels.

A    That's what I mean, it's not necessarily exclusive.

Q    Okay.  But it is exclusive to the regional outreach

coordinators, that are the individuals within your staff that

have access to HMIS that verify this data, correct?

A    Yes.

Q    And as you sit here, you can't tell us what data fields or

**EXCEPTIONAL REPORTING SERVICES, INC**

reports are used in HMIS to verify this data?

MR. MCRAE:  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  No, I can't tell you that.

**BY MS. MYERS:**

Q    Okay.  You previously testified that there was a discrepancy in the number of intakes that were reported in HMIS and the number that were reported by service providers, correct?

A    That is correct, I did.

Q    And how many discrepancies were uncovered?

A    There were -- there was substantial discrepancies.  It was in the hundreds, as in -- and what I mean is there was a difference between the number of persons served that were being reported by the service providers versus what was verifiable.  And the reason for that is that the Inside Safe operations are service provider oriented, not site oriented, so each service provider was providing all of the people that they had served, that wasn't necessarily tied to sites and we wanted to ensure that it was tied to sites and we were getting different numbers from the data that was tied to the sites.  And that was the discrepancy that led us to withhold the information on the initial quarterly report.

Q    And when was that discrepancy uncovered?

A    Oh, that would have been uncovered, and this is part of

Szabo - Cross / By Ms. Myers                                73

the challenge of the work that my office is required to do, you know, we get the information after the end of the quarter and we have 15 days to report to the Court.  So it would have -- the information would have been made available to us some time around the seventh day of the 15-day window and then we would proceed and verify over the next week.  So it would have been some time in that early October time frame.

Q    This is the first time that your office uncovered that discrepancy.

A    It was, to my knowledge, yes.

Q    And the process that led to the verification and identification of the discrepancy, had the City engaged in that process for prior quarterly reports?

          MR. MCRAE:  Objection, vague and relevance.

          THE COURT:  Overruled.  You can answer that question.

          THE WITNESS:  I believe so, yes.

BY MS. MYERS:

Q    The discrepancies were not uncovered until this report; is that correct?

          MR. MCRAE:  Objection, asked and answered.

          THE COURT:  Overruled.

          THE WITNESS:  Not to my knowledge.

Q    Have you gone back and verified the prior reports?

          MR. MCRAE:  Objection, vague.

          THE COURT:  Do you understand the question?

Szabo - Cross / By Ms. Myers **74**

THE WITNESS:  Well, as -- could you be more specific as it --

Q    Yes.

A    Go ahead.

Q    You identified the discrepancies with regards to the current reporting.  The City has submitted quarterly reports since 2022 related to the settlement agreement, correct?

A    Yes.

Q    And did the City engage in the verification process where each of those reports that then led to the identification of the discrepancy in this report?

MR. MCRAE:  Objection, unintelligible as phrased.

THE COURT:  Do you understand it, sir?

MR. MCRAE:  Also compound and vague.

THE COURT:  Just a minute.  Do you understand the question, I want to make sure?

THE WITNESS:  I believe I do.

THE COURT:  Reask the question just to be certain, counsel.  I understand it, but I want to make sure the witness does.

THE WITNESS:  Okay.

BY MS. MYERS:

Q    Sure.  There's three years of quarterly reports the City has submitted, correct?

A    Yes, that's correct.

EXCEPTIONAL REPORTING SERVICES, INC

Q    Is this the first one that the City had to redo for purposes of this amount of data, the hundreds of discrepancies the City identified?

MR. MCRAE:  Objection as phrased, redo. Mischaracterizes the record --

THE COURT:  Overruled.

MR. MCRAE:  -- and argumentative.

THE COURT:  Overruled, you can answer the question.

THE WITNESS:  So I will again not say -- I would push back on the term redo because --

THE COURT:  Just substitute supplemental.

THE WITNESS:  It was -- issuing a supplemental, we withheld the information because we did not have enough time to determine what was the cause of the discrepancies that we were seeing.  And so instead of reporting information that we knew was likely to be inaccurate, we held it back and issued a supplemental report.

This is -- this was information that was -- the discrepancies were specific to the Inside Safe beds, which we had only been reporting since our third quarterly report.  Our third quarterly report of 2025.

**BY MS. MYERS:**

Q    And so the supplemental report just adjusted the Inside Safe numbers?

A    No, the supplemental report -- we withheld all of the PEH

Szabo - Cross / By Ms. Myers                    **76**

served data and so we issued new data which was again to the best that we could verify by the time we issued the supplemental report.  We do expect, as we indicated in the report, that they were conservative numbers that we expected would increase, and that in the following report, as we're able to verify the numbers.

So we submitted the numbers that we were confident with and so we did reduce some of the others as well.

Q    And why did you release those other numbers, that's not related to the Inside Safe?

A    Right.  There were some -- there were a few others that we reduced based on the information that we had.  When we held back the Inside Safe numbers, we also did additional review on the others and so there were some others that we reduced as well.

Q    Did you identify discrepancies of those other numbers as well that caused the reduction?

A    There were in a handful of cases, there was -- I wouldn't say discrepancies, but there was information that we -- well, I would say yes, if there was a discrepancy we went with the lower number pending our ability to verify, to conduct additional verification.

Q    Okay.  Going back to my -- the questions that started this, this is the first time that you have withheld numbers and then issued a supplemental report, correct?

Szabo - Cross / By Ms. Myers                    **77**

A     Yes, that's right.

Q     Okay.  The verification that your office did that led to the identification of the discrepancies, had the City engaged in that verification process for prior reports?

        **MR. MCRAE:**  It mischaracterizes the record and it's also been asked and answered at this point.  This is now the second time.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  For interim housing, again it was the first time we were seeing the difference, the big difference.  So, yes, we had engaged in that before, but this was the first time that we saw a big difference between what the service providers were showing and what HMIS was showing.

**BY MS. MYERS:**

Q     So did your office investigate the basis for that discrepancy?

        **MR. MCRAE:**  Objection, vague.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  We have and we're continuing to do that as we're preparing our next quarterly report.

Q     So what was the cause of this new volume of discrepancies that you identified for this quarterly report, but never identified before when you engaged in the same verification process?

        **MR. MCRAE:**  Objection to new volume of discrepancies,

EXCEPTIONAL REPORTING SERVICES, INC

it presupposes that there were prior discrepancies in any volume, it lacks foundation and it's argumentative.

THE COURT:  Overruled.

THE WITNESS:  So there were, as I said, there's -- the service providers reported, have been and have reported the persons served that have been reported by service provider, as opposed to by site.

So we wanted to get the information by site, for which we use LAHSA and HMIS to verify that.  And so this was the first time there was a large discrepancy between what LAHSA and HMIS were showing and what the service provider was showing.  And I'm sorry, I don't --

BY MS. MYERS:

Q    What's the reason for that discrepancy that occurred this time when -- right, this moment in time, you identified a significant number of discrepancies.

A    Yeah.

Q    What was the reason for the discrepancy, for identifying the discrepancy now as opposed to every other time you've used the same verification process for all the other reports?

A    So --

MR. MCRAE:  Objection, it assumes the factual circumstances were the same.

THE COURT:  Overruled.

MR. MCRAE:  Lacks foundation.

**THE COURT:** Thank you. You may answer the question.

**THE WITNESS:** I'll have more to say about that when we issue our next quarterly report, but there was a gap between the service providers. They weren't reporting all of the persons served as tied to each site. Again, I can't -- I don't want to speculate as to what we'll ultimately report, but we will -- we've been working with LAHSA and we expect that the numbers that we've reported, as we indicated was likely, will increase in our next quarterly report.

**BY MS. MYERS:**

Q   Okay. I'm going to turn your attention to Exhibit 405, which is Exhibit C. This is Exhibit C of Docket entry 1005.1-3. Do you recognize this document?

A   I do, yes.

Q   And what is this document?

A   This is the encampment reduction data that was provided in our quarterly report, which we filed on October 15th, pursuant to the Court's order for limiting the numbers reported to those that were accompanying with an offer of shelter, or unoccupied or abandoned.

Q   What is your understanding of the Court's -- you said unoccupied or abandoned, what is your -- where did that understanding of the Court's order come from?

**MR. MCRAE:** Objection, vague as to what understanding we're talking about.

Szabo - Cross / By Ms. Myers                    **80**

THE COURT: Do you understand the question? You can reask it.

THE WITNESS: Yeah. No, I understand. It was the -- the Court made clarification as -- in its order and I don't remember the date of the order, as to what it would accept as encampment reductions. That's what I'm referring to, but I don't recall the exact language.

BY MS. MYERS:

Q   But it's your understanding that the City can report unoccupied or abandoned; is that correct?

MR. MCRAE: Your Honor, I'm going to object as beyond the scope. We have an order clarifying the scope of this proceeding. This topic is not part of it.

THE COURT: Overruled, you can answer the question.

THE WITNESS: That's my understanding.

Q   Okay. And so this number represents the numbers that are appearing in each of these columns represent the number of encampments that were reduced by the City either because a person was offered shelter or because a tent was unoccupied or abandoned; is that correct?

MR. MCRAE: Objection, beyond the scope of this proceeding, relevance.

THE COURT: Overruled.

MR. MCRAE: Lack of foundation.

THE COURT: You may answer the question.

**EXCEPTIONAL REPORTING SERVICES, INC**

Szabo - Cross / By Ms. Myers                    **81**

THE WITNESS:  Yes.

Q    Okay.  Does the City keep a breakdown of how many of the tents, makeshift encampments and RVs that are counted here are the result of an offer of shelter?

MR. MCRAE:  Objection, beyond the scope of this proceeding?

THE WITNESS:  We do, yes.

BY MS. MYERS:

Q    Okay.  And so does the City keep a tally of the number that are reported here of tents, makeshift encampments or RVs that were reduced because they were unoccupied?

MR. MCRAE:  Your Honor, can I have a standing objection to this line of questioning, including but not limited to numbers of removals that are unattended tents and makeshift shelters?

THE COURT:  Certainly, thank you.  You may answer the question.

THE WITNESS:  We do.

MR. MCRAE:  And the objection is on the basis that it's beyond the scope and relevance, thank you, Your Honor.

MS. MYERS:  And I would just clarify Mr. McRae's objection, I've been using the word unoccupied, not unattended, because that was the word that Mr. Szabo used.

MR. MCRAE:  I would expand my standing objection to include any iteration unoccupied, unattended, abandoned, et

Szabo - Cross / By Ms. Myers                                    **82**

cetera relative to encampment reductions as not being within

the scope of the clarification order issued by this Court on

the scope of this proceeding.

          **THE COURT:**  All right.  Thank you.  You can answer

the question.

          **THE WITNESS:**  Could you repeat the question, I'm

sorry?

**BY MS. MYERS:**

Q    You actually answered the question.

A    I answered, okay, thank you.

Q    So looking at the numbers that you pulled up here the --

for the encampment reduction plan and these numbers -- this

reporting relates to the approved encampment reduction plan,

correct?

          **MR. MCRAE:**  Same objection.

          **THE WITNESS:**  Yes.

Q    Okay.  When the City counts an encampment reduction for

purposes of this, are there City operations that are associated

with the removals of tents, makeshift encampments, or RVs, are

there types of City operations?

          **MR. MCRAE:**  Objection, compound.  It's vague and

beyond the scope.

          **THE COURT:**  Do you understand the question, sir?  I

want to make sure.

          **THE WITNESS:**  I do.

THE COURT:  Okay.  You may answer, overruled.

THE WITNESS:  Yes, there are types of operations.

Q    What operations does the City use to reduce encampments that are then counted towards the encampment reduction plan?

MR. MCRAE:  Same objections.

THE COURT:  Overruled.

THE WITNESS:  Well, actually, I mean it depends on the definition of operation.  Encampment reductions are all executed by the Bureau of Sanitation through their Care or Care Plus program.  In some cases, those are associated with other efforts to provide shelter or housing like Inside Safe.  In some cases, the cleanup activities are not associated with Inside Safe.

BY MS. MYERS:

Q    Okay.  So every time there was an encampment reduction that is listed in the encampment reduction plan, it occurred as part of a Care or Care Plus clean up; is that accurate?

MR. MCRAE:  Objection, lacks foundation, beyond the scope, relevance.

THE COURT:  Overruled.

THE WITNESS:  It would be a Care or Care Plus operation that either was or wasn't associated with Inside Safe.

Q    Okay.  Are there City employees offering shelter at Care or Care Plus operations?

THE COURT:  Would you repeat that just a little more slowly please?

MS. MYERS:  Sure.

Q   Are there City employees offering shelter at Care or Care Plus operations?

MR. MCRAE:  Objection, vague, lack of foundation and beyond the scope of the proceeding.

THE COURT:  Overruled, you can answer the question please.

THE WITNESS:  Not City employees.

BY MS. MYERS:

Q    Okay.  Are there other individuals who are not employed by the City who are offering shelter?

MR. MCRAE:  Lack -- same objections.

THE COURT:  Overruled.

THE WITNESS:  Yes, there are.  We have LAHSA employed outreach that accompanies Care and Care Plus operations.

Q    Do they accompany every Care and Care Plus operation?

MR. MCRAE:  Same objection, lack of foundation, vague.

THE COURT:  Overruled.

THE WITNESS:  I don't know if -- I don't know if they accompany every Care and Care Plus operation.  We -- through our contract with LAHSA we do fund homeless engagement teams that are assigned to sanitation for the purpose of accompanying

Care and Care Plus operations.

Q    Are they employed for the purposes of accompanying Care and Care Plus operations to offer shelter or to provide other types of services?

        **MR. MCRAE:**  Objection, compound, lack of foundation and beyond the scope.

        **THE COURT:**  Do you understand the question?

        **THE WITNESS:**  I do.

        **THE COURT:**  Okay.  You may answer, thank you.

        **THE WITNESS:**  In some cases they offer shelter.  In some cases they offer other services.  They offer what -- I'll just leave it at that.  In some cases, they offer shelter, in some cases they provide other kind of outreach.

**BY MS. MYERS:**

Q    So is whether or not LAHSA the HET teams are present part of the City's calculation when it comes to calculating whether to count an encampment reduction for purposes of this reporting?

        **MR. MCRAE:**  Objection, vague, lack of --

        **THE COURT:**  Overruled.  You can answer the question please.

        **MR. MCRAE:**  Lack of foundation and also beyond the scope and relevance.

        **THE COURT:**  All right.  Thank you.

        **THE WITNESS:**  No, it's not whether the HET teams are

**86**

present that determines whether we include that reduction in this report.  It is, as is noted, whether an offer of shelter was made or if the tent or make shift shelter was unattended.

THE COURT:  And, Mr. Szabo and counsel, would you bear with me for just a moment.

MS. MYERS:  Sure.

THE COURT:  It's 12 o'clock and we've represented, you know, that you be available till 12, so if you have other duties, but stay with me a moment, I'm happy to give up the lunch hour if you want to stay or if we're close to finishing this.  So let's just wait.

I want to call two additional matters for a moment.

**(Court heard other matters at 11:59 a.m.; reconvened at 12:01 p.m.)**

THE COURT:  Do you need to leave now for another engagement, if so, you're going to?  So till 12:30.  Counsel, he stay till 12:30.  Can we go forward and see how much we can accomplish?

MR. MCRAE:  Sure, I was going to ask for a break just briefly.

THE COURT:  Well, that would take 15 minutes, counsel, but fine, if you want a break.

MR. MCRAE:  I mean, it could be five, Your Honor, I could try to accelerate it.

THE COURT:  No, I'll just sit here, go take a break.

MR. MCRAE:  Is that okay?

THE COURT:  Absolutely, yeah.

MR. MCRAE:  Thank you.

THE COURT:  If you want to step down to take a restroom break, why don't you step down.  Counsel, why don't we have five or ten minutes, okay, for a restroom break.

Counsel, there's no reason you have to finish today, I'm just -- while we've got him, if it's possible --

UNIDENTIFIED:  Okay.  He's just going to the restroom, Your Honor.

THE COURT:  No problem.

(Recessed at 12:01 p.m.; reconvened at 12:07 p.m.)

THE COURT:  I've got a couple questions I'd like to ask you, not subject of concerning this, but just getting your best wisdom to help the Court in scheduling.  One question though is you've argued, not you, but the City has argued in the past that the Inside Safe beds should be counted in the settlement agreement and the obligation to create more than the 12,900 new PEH beds.  And you know from my prior opinion that I've stated that that was valid.  You recall that?

MR. SZABO:  Yes.

THE COURT:  Okay.  One of the reasons is, regardless of the disagreements, I think I want the broadest definition, not the narrowest.  But by the same token, it seems that if I count these PEH beds from Inside Safe, then -- as part of this

**88**

12,915 required by the settlement agreement, then those beds should be subject to the same independent verification, or I'll substitute the word accuracy requirement.  Do you agree or disagree with that?

In other words, if I'm counting, I'm counting as much as possible in good faith.  But if I'm counting Inside Safe, shouldn't I have the same verification and accuracy as the other beds that are being created?

**MR. MCRAE:**  I'm going to object that it calls for a legal conclusion and lack of foundation.

**THE COURT:**  Thank you very much.  Could you answer that, sir?

**MR. SZABO:**  Judge, we would be comfortable with the same standard of verification for any of the beds that we provide to the Court.

**THE COURT:**  I'm going to discuss with counsel later today an opinion that just came out last week that you may not be familiar with from a state court judge, Judge Kin.  I've just been able to skim that opinion.  It was supplied to the Court in the morning hours by one of counsel to my clerk.  It involves the encampment reduction and a ruling by the state court colleague that the Brown Act had been violated in the January 31st, 2024 closed session.  Are you aware of that notoriety or that decision at all?

**MR. SZABO:**  I read the L.A. Times story.

**THE COURT:**  Yeah, I did too.  And I just got the opinion this morning.  So for both of us, we're absorbing it.  When the parties were in my court, they initially agreed to Ron Galperin and Daniel Garrie as the monitors.  I don't know if you know that.  And in that agreement, it was represented by the City attorney who was present that they would get this on the council, and the intonation is I can get the exact words, but, you know, as quickly as possible.  And what occurred was over a month's period of time, this was scheduled three times on the city council's agenda.  No vote was taken the first time, no vote was taken the second time.  And on the third occasion, instead of a vote, they referred it back to subcommittee.

As a court, I'm thinking after the representation that we would get this on the council's agenda.  But -- and after the agreement in my court, subject to the council's approval, you can imagine the Court being perplexed at how much time that was going to take going back to subcommittee.  And then council came to us with the provision that, Judge, we can't decide this.  And we'll have a disagreement about that, probably.  But under Section 24, the Court should decide that.  They both stipulated to that.  And then I decided, Daniel Garrie, I think you're -- the City had suggested a Mejia, which I accepted also.

If I don't have, because of these Brown Act

violations, an encampment resolution approved by the council, how long is it going to take to get this back to the council for public hearing because it may be argued to the Court that I don't have an encampment resolution right now.  And I need your wisdom about that because it depends upon, you know, what I do.

Okay, think about that for a moment.  The third thing is I want to ask counsel to help me with the scheduling on the appeal by the City concerning Mr. Garrie's status as the monitor.  On the stay, my memory was it would be argued sometime in February.  I've got it someplace in this stack of papers, but --

MR. MCRAE:  I'm checking the date right now.

THE COURT:  Yeah.

MR. HAMBURGER:  Your Honor, there's no argument.  I believe our brief is due in February.

THE COURT:  Okay.

MR. HAMBURGER:  The stay --

THE COURT:  Give me the briefing schedule.  In other words, when would this be ripe for decision by the circuit?

MR. HAMBURGER:  Our brief is due February 13th.

THE COURT:  Okay.

MR. HAMBURGER:  It depends on whether the Alliance or intervenors seek an extension, but normally it would be 30 days thereafter.  It would be March 16th would be the response date,

assuming no extension, and then 21 days after is the reply.

THE COURT:  What date?  I mean, 21 days.  Help me.

MR. HAMBURGER:  21 days after March 16th.  I'd say that's early April.  And that assumes no extensions.

THE COURT:  Okay.  No, hold on.  Let's slow down. April what?

MR. HAMBURGER:  Does anybody have a computer?  March 16th and then 21 days.

MR. MITCHELL:  The 6th of April, Your Honor.

THE COURT:  I'm sorry?

MR. HAMBURGER:  April 6th.

THE COURT:  April 5th.  Okay.  Now that assumes no extensions.

MR. HAMBURGER:  April 6th and assumes no extension on either of those two briefs.

THE COURT:  Did you say five or six?

MR. HAMBURGER:  Six.

THE COURT:  Six.  Thank you.

In the circuit's stay, there was -- one of the colleagues or their colleagues who issued a dissent, and you're aware of that, that the Court should go forward, basically.

MR. HAMBURGER:  I'm aware that there was a dissenting opinion.

THE COURT:  Yeah.  What that basically said is trust the trial court and that dissenter objected to the stay.

**92**

MR. HAMBURGER:  Yes, there was a dissent.

MR. SPEAKER:  All right.  Okay.  We're aware of that.

THE COURT:  If Mr. Garrie was confirmed by the circuit, then much of his testimony today would be relevant if he was the monitor, and many of the things going forward might be worked out.  And I could give you examples of that in the future just to move forward.

But if he wasn't, then we would be starting all over again with a new monitor, wouldn't we?  In other words, the circuit doesn't approve Mr. Garrie and we come back again to a new monitor.

Let me take a recess for just a moment and think about that so you folks can get some food, but I'm trying to figure out what moves this forward in terms of an eventual monitor after what is going to be approaching four years with no monitor in place.

And remember, you folks entered into -- oh no, counsel, sit down there for a moment.  I'm being courteous. Just have a seat.  I've got lots of time.  We all have time to consult.  I wouldn't do that to you folks.

What's of concern is, in your settlement, you both agreed to a monitor, and I don't see anything that this Court has enacted other than taking a much more hands-on approach to making certain we get a monitor in place than what you folks agreed to.  So when you look at my remedies, I didn't want to

impose, when I wrote the original opinion, anything substantially outside what you'd agreed to in 7.1 or 7.2. I just wanted a monitor now in place that you'd both agreed to, but the Court being much more involved in making certain that we move forward before this runs out in the summer of 2027.

If we could get moving on that, I think we could move together and resolve a lot more of the problems, quite frankly. The second -- so I don't know if you could answer when this is going to go back on, but now, with the Brown Act violation, this is going to have to be a public, and needs to be a public discussion with the counsel, but if you don't schedule it quickly, then I've got to resolve that.

And number two, eventually I have to decide, and I want to read Judge Kin's opinion again, why, in light of the Brown Act violation found by the state court judge, there's any encampment resolution planned before the Court at the present time. So, Counsel, why don't we have a thoughtful discussion of that later? You can make any comment you want to now, but I think I'd rather toss that out to you, because I don't know what I'm going to do yet, and due process, if I supplement this with additional contempt proceedings, then I'd want to have due process in light of this issue concerning the Brown violations.

So, Counsel, for the last ten minutes or so now, you two wanted to discuss it. Why don't you, no, just one moment. You wanted to talk to your co-counsel. Please discuss

whatever you want to do.  Just bear with us a moment.  This may make a difference what you would --

        **(Pause)**

        **MR. HAMBURGER:**  Your Honor, just briefly on the order that you referenced from the state court, I'm familiar with it.  We're not parties.  We're not counsel in that case.  We don't represent the City in that case, but we've obviously become familiar with it, like the Court has.  Our understanding is that it is not a -- there's not been any writ issued.  I think that's --

        **THE COURT:**  Of course not.  I'm just getting --

        **MR. HAMBURGER:**  Yeah, and so it's a bit premature to understand what is going to happen in that case --

        **THE COURT:**  Guess what -- counsel, just a moment. That's silly.  He's going to issue a writ eventually.  They're assigned this.  So eventually this is coming to us, and all I'm asking of the courtesy, because it depends upon what I do, what your best estimate might be in terms of getting this on the council, because before when I had the two special masters agreed to, this went -- this went over a month, three scheduled hearings with the council, and then referred back to subcommittee after the City attorneys stating in my court, you know, the words weren't best efforts, but I'll pull the words. They were pretty definite about getting this done.  And then the folks came to me with this inability to resolve it.

And I think people have forgotten that this was an agreement in my Court to begin with, subject to the council's approval, and the council takes a ridiculous period of time, frankly, and then refers it back to subcommittee.

**MR. HAMBURGER:** Your Honor, I was just saying that the scope of whatever remedy is issued may depend on what ultimately gets issued, and then the City, I have no information about this, but the City obviously could appeal any order and could seek a stay of the order. I don't know what's going to happen. So I just submit that it's premature to discuss the impact of this ruling right now.

**THE COURT:** Well, then I'm making rulings. In other words, I'm getting your best efforts because I'm going to be making some kind of ruling if this has import to the Court, and so I'm trying to get this out front so we can think about it. And now, Ms. Myers, you also sprung into action, so why don't you go over there with Mr. Hamburger. No, you two stand side-by-side. It's a beautiful sight. I'm just kidding for the record, but I have two advocates who are opposed. What are your thoughts?

**MS. MYERS:** Well, Your Honor, Shayla Myers, on behalf of the intervenors, Intervenor Kangris (phonetic) was also the petitioner in the Brown Act case, and I represent Kangris in that case, so I am happy to speak to it is premature to speak to the remedies that have been issued.

**96**

As Your Honor knows, the Court issued a ruling finding that the City had violated the Brown Act on two occasions, Your Honor, related to this case, both with regards to the encampment reduction plan and the approval of a memorandum of understanding with the County.  We have not yet filed the proposed judgment with the Court or the writ that our clients intend to seek.

We have provided in the initial proceeding, in the initial pleadings, what the proposed remedies that the petitioners were seeking, Your Honor.  What I would say is relevant for these proceedings is that the underlying representation by the City of Los Angeles in a declaration to this court and then in subsequent testimony was that the City of Los Angeles, the city council, approved the encampment reduction plan, and yet when the petitioner, intervenors in this case, asked the City clerk for the vote, the City attorney's office represented that no vote was taken.

In subsequent proceedings in this Court, Your Honor, as you know, the intervenors asked questions related to the approval of the encampment reduction plan, which the City refused to answer.  There were questions specifically about the process by which the City approved, the city council approved the encampment reduction plan, and they would not answer pursuant to the suggestion that it was protected by the Brown Act.  So for the intervenors' perspective, we think that there

is an open question about the process the city council used to approve it.

That remains an open question that was asked in discovery in the Brown Act petition.  The City has refused to answer the question, what process the city council used to approve the encampment reduction plan if they didn't vote on it.  So, Your Honor, I'm raising that because this isn't necessarily simply a question of remedies in the Brown Act petition, but it is also about the availability of information to the public about what occurred during those proceedings.

**THE COURT:**  But the availability of that information lies in Judge Kin's court, doesn't it?  In other words, Judge Kin will fashion the remedy.  This Court won't fashion the remedy in terms of requiring the audio that is spoken about in this Los Angeles Times article.

**MS. MYERS:**  Yes, Your Honor.  The petitioners in that case are seeking remedies related to the disclosure of what occurred.  Now, the consequences of what occurred during that meeting, I think, are squarely before Your Honor.

**THE COURT:**  But if I made orders requiring disclosure, for instance, of the audio of this closed-door session, do I have that jurisdiction or authority, or does that still uniquely lie with Judge Kin, my state court colleague?

**MS. MYERS:**  Your Honor, yeah, we haven't taken a position related to the federalism issues or those kinds of

things.  But I will tell you that petitioner, intervenor, went to the state court because of the City's consistent representation that it was covered by the Brown Act and their belief that it was not.  Judge Kin will rule about the disclosure, and once that occurs, we think it will be in your court.

THE COURT:  And what I'm looking for is some kind of --

MS. MYERS:  Timing?

THE COURT:  -- time frame --

MS. MYERS:  Sure.

THE COURT:  -- because I've got now two issues before me.  One is the question I've thought about recently, and that is out of deference to the circuit, should I continue?

Counsel, have a seat for just a moment.

MS. MITCHELL:  I just need to plug this in.

THE COURT:  Okay.

MS. MITCHELL:  Thank you.

THE COURT:  You'll all have time for conversations. Out of deference to the circuit, should I continue to proceed in this matter when some of these questions may be moot if we're starting all over again with a special master?  I have no answer to that right now.  I've been reflecting upon that.

And now with this new information, is this subject to a supplemental contempt in this matter?  And I'd like to

discuss that with you further this afternoon when I've had time to read Judge Kin's opinion a second time because I've just skimmed it up on the bench.  I haven't read it thoroughly.

So -- and finally, I want to walk through two scenarios with you.  First of all, from your perspective, you might question whether a vote was ever taken, so you want the audio of that session.  Hold on.  That's scenario number one. If that's the case, I wouldn't have an encampment resolution before me as represented.

The second, though, is what I was asking Mr. Szabo. Assume it's the other that a vote was taken, but because of the city's violation of the Brown Act, then this has to go back into a public forum by law, and there has to be a public hearing.  And what I'm trying to gauge is, in that case, how long it would take the City to get this into a public forum with a public hearing, because my past interaction with representations made by the City attorney, that Judge, we're going to get these two monitors, Garrie and Galperin, over to the City, and that we have three different occasions where this is put on the calendar over a month's period of time, and then refer back to a subcommittee.

So you can understand my concern, okay?  You don't have to say a word about that, but at least -- I can't have that occur.

All right, now, you're going to go to lunch because I

100

see how hungry you are, and I need about -- well, I'm going to discuss this with you at 1:30.  I'm going to continue on, so would each of you bring me something to eat?  I'm just joking with you.  Now, don't do that.  That's ex parte.

But go to lunch, and I'll use up my lunch hour to try to accommodate counsel, because they've got about three hours' worth of hearings, okay?  Now, I also know you were going up to see Judge Birotte today.  I talked to my colleague on Friday evening, and here's what I don't want.  Judge Birotte, and I'll put this on the record, is an extraordinary colleague.  He told me that he was with you until 1:00 a.m. in the morning on the last occasion.  He has a hearing today for about 30 or 45 minutes, and he said it would be best if you came up at 4 o'clock.

Listen, we'll stay all hours.  If you're making progress on this, ultimately, that's what we all want.  Simple as that.  What's good for the citizens here?  What's good for the homeless?  What's good for the residents of -- citizens of Los Angeles?  If we narrow this in any way, the Court wants to work with you in that.  Please don't keep him to 1 o'clock, though.

**MR. HAMBURGER:**  Your Honor, I think --

**THE COURT:**  No, hold on.  I'm on a roll now.  No, just wait just a minute, okay?

Number two, if you need to, come back tomorrow, okay,

EXCEPTIONAL REPORTING SERVICES, INC

**101**

and see what his schedule is.  But it makes a difference because Mr. Garrie has flown in pro bono.  He's not charging you for this, and I need to set up his schedule because he's just told me.  Your availability, Mr. Garrie?

MR. GARRIE:  I'm in trial.

THE COURT:  Louder.

MR. GARRIE:  I'm in trial from I think January 26th all the way through March 9th.

THE COURT:  With two different colleagues, so how do I interfere with that?  So if we don't get him completed today, which we're obviously probably not going to, so let's think about that.

Why don't you go to lunch?  Because I have some other business with folks, and we'll see you at 1:30.

MR. UMHOFER:  Your Honor, I'm sorry.  Before we go to lunch, you just mentioned tomorrow.  I think it would be helpful for everybody to know now if --

THE COURT:  Okay, just a moment.  Folks in the audience, just a moment.  Folks, sit down.

MR. UMHOFER:  I think it'd be helpful to know now if we can whether you plan on continuing this hearing tomorrow because everybody's trying to figure that out.

THE COURT:  I don't know.  I'm trying to get you back to work, Mr. Szabo.  I've got at least two or three hours, no matter what they say with Wishtoyo, it's an incredible case.

I've got another hour with counsel, but I'm trying to put you as first priority, and it's getting hard.  So I don't know.

MR. UMHOFER:  Thank you, Your Honor.

THE COURT:  Go to lunch.  Mr. Szabo, thank you for your courtesy.  Thank you very much.

**(Recess taken at 12:31 p.m.; reconvened at 1:55 p.m.)**

THE COURT:  Okay.  Counsel, let me ask you just something informally as we go back on the record.  Did Judge Birotte indicate the hours he's available to you today?  Did he give you any time parameters?  I just know that he said about 4 o'clock, Dave.  Send them up at that time.

MS. KUMAR:  I believe he said he's available other than a short appearance he has at 3:30.

THE COURT:  Yeah.  He said he had about a half hour hearing.

MS. KUMAR:  Yeah.  And so I think he was available other than 3:30 to 4:00.

THE COURT:  But he didn't say how long he'd go tonight, et cetera.

MS. KUMAR:  We had provisionally agreed to about two hours just so that nobody was doing another 1:00 a.m.

THE COURT:  Okay.  Let me talk to him tonight or have him call me.  If you're making progress, I need to know that in terms of his availability.  So I don't want to start.  So we'll talk about that at the end of the day.

**MS. MITCHELL:** That's fine, Your Honor. I think we had anticipated a full court day today, and then we would go to Judge Birotte's court after that.

**THE COURT:** That's right.

**MS. MITCHELL:** Okay.

**THE COURT:** Yeah. Okay. Oh, sorry. Then we're back on the record. All counsel are present. The parties are present. And, Mr. Garrie, I'm going to ask you to take the stand. You've been kind enough to fly in. And is Karlen here? Okay.

**UNIDENTIFIED SPEAKER:** I'm just going to use the restroom for two seconds.

**THE COURT:** Yeah.

**(Pause)**

**THE COURT:** All right. Thank you, sir. Would you raise your right hand?

**DANIEL BENJAMIN GARRIE, PLAINTIFFS' WITNESS, SWORN**

**THE COURT:** Thank you very much. If you'd be seated. After you're comfortably seated, would you face the parties and state your full name, sir?

**THE WITNESS:** Daniel Benjamin Garrie.

**THE COURT:** And would you spell your last name, sir?

**THE WITNESS:** G-A-R-R-I-E.

**THE COURT:** All right. Direct examination, please, by L.A. Alliance.

Garrie - Direct / By Mr. Umhofer                    **104**

MR. UMHOFER:  Yes, Your Honor.

**DIRECT EXAMINATION**

**BY MR. UMHOFER:**

Q    Good afternoon, Mr. Garrie.

A    Good afternoon.

Q    Do you recall when you were appointed as a monitor in this case?

A    I don't remember the exact day, but if you give me my initial report I filed, I can answer that question for you.

Q    We'll make sure you have that.

THE COURT:  And pull that microphone just a little bit.  Just, yeah.  A little closer.  Thank you.

MR. UMHOFER:  So I'm presenting what's been marked as Exhibit 356.  It is docket number 1048.  And can you read the title there in bold next to proceedings in chambers?

MS. MITCHELL:  Your Honor, may I approach with the iPad?

THE COURT:  Certainly.

THE WITNESS:  I think there's a -- I have a printed copy right there.  Oh, thank you.  "Order Resolving Third-Party Monitor Appointment and Scope of Work."

**BY MR. UMHOFER:**

Q    And as we move down to the, I want to say last page of that, sorry.

THE COURT:  So this is docket 1048?

**EXCEPTIONAL REPORTING SERVICES, INC**

Garrie - Direct / By Mr. Umhofer                                    **105**

MR. UMHOFER:  1048, Your Honor.

THE COURT:  Thank you.

BY MR. UMHOFER:

Q    And scrolling to the end, is this the document in which you were appointed the monitor, the data monitor in this case?

A    I take your word for it, yes.

Q    And what's the date up at the top there?

A    October 14th, 2025.

Q    And does that comport with your recollection of the date upon which you were appointed the monitor?

A    Yeah.  It started a little bit before with some back and forth emails with the parties, but I believe as it states, my official appointment was on October 14th.

Q    And am I correct that the bottom of this page under monitor appointment, it reads the court appoints Daniel Garrie to the monitor position.  That's you, right?

A    That is me.

Q    Okay.  What did you do?  When were you, by the way, informed of this appointment?

A    That day or right around then.

Q    What did you do next?

A    I think I reached out to introduce myself at a high level to Kenneth Mejia, who was working alongside me.  He's the Los Angeles City Controller.  So I just reached out to introduce myself, get the ball rolling.  I read a lot.  There's a lot of

Garrie - Direct / By Mr. Umhofer                    **106**

filings in this case.  So I tried to familiarize myself with the basics of the case and the specific to around what I was being tasked with resolving.

Q    Did you review the Court's order concerning the Docket 991, which was the order that the court, where the court set forth its demand that the parties implement a data monitor?

A    I do remember reading that.

Q    Okay.  And eventually you issued this report on November 3rd, 2025.  Is that the report you're referring to just a moment ago?

A    Yes.

Q    What were you trying to accomplish with this report?

A    Just provide a status update.  I was also -- there was other deadlines involved, and I wanted to inform the Court that I wasn't going to be in a position to meet the deadline.  I think it was November 14th of providing my analysis.

Q    Once you reviewed documents related to the case, what were your priorities in terms of what you wanted to accomplish as a monitor initially?

A    So I think -- so I mean, I wanted to accomplish the four or so specific tasks that the Court identified in the order, which was, you know, I think it was reviewing and verifying the data prior to publication.  So my understanding was prior to the City submitting it, I needed to review the data prior to the publication.  So that was one big thing.  Then the other

Garrie - Direct / By Mr. Umhofer                    **107**

things, if my memory serves me right, is that provide further

guidance on public --

          **MR. MCRAE:**  Excuse me, Your Honor, I'm sorry to

interrupt.  If the witness is reading from something, could we

know what it is?  And maybe I'm wrong, he's not reading from

something, but it appears it is.

          **THE WITNESS:**  I was just looking down.

          **MR. MCRAE:**  Okay.  Thank you.

          **THE COURT:**  Just a moment.  Counsel, please come up

here for just a moment.

          **MR. MCRAE:**  Okay.  To where?

          **THE COURT:**  Just over here, just a moment, both of

you.  Come on.  From both sides.  I didn't see, so let's take a

look.  Make a record of what he has in front of him.

          **MR. MCRAE:**  Just the physical copy of the document

that was provided.

          **THE COURT:**  Yeah.

          **MR. MCRAE:**  Thank you.  I didn't know what it was,

Your Honor.

          **THE COURT:**  Okay, thank you.  So he has Docket 1048,

which is his report?

          **THE WITNESS:**  Yeah, she provided it.

          **THE COURT:**  Okay, thank you.  Please continue.

          **THE WITNESS:**  I wasn't reading, but yeah.

//

**BY MR. UMHOFER:**

Q    What you have in front of you is docket 1063, which is your report, correct?

A    Yes, it is.  Let me just verify it.  But yeah, this is my printed -- yes, it is.

Q    Were you reading from it or anything else when you were giving your answer just a moment ago?

A    No, I was looking down.

Q    Okay.  What was important to you to get from the City in order to perform the role, as you understood it, as the monitor?

A    So the basis of my effort is to get the source data, as we call it, or the data that underlies the numbers that they were submitting to the City, or the data that the City was relying upon to then submit it to the Court.  So the underlying information about their PEA, just the many different data points that the City was relying upon in its submission to the Court in the filings, or the reporting, actually, to the special master.

        **MR. MCRAE:**  Your Honor, can I renew a standing objection to this being a topic of this inquiry because of the Ninth Circuit stay?  In other words, by this I mean any inquiries about what Daniel Garrie did or didn't do during the period he was a monitor.  We object.  We did object in writing. I'm renewing the objection that it's stayed, so therefore we

Garrie - Direct / By Mr. Umhofer          **109**

shouldn't even be doing this.

THE COURT:  Well, I'm going to overrule that, but I'm curious.  His name appeared on a joint submission, I thought, initially for eight witnesses that the parties put down, and I didn't know which party put down which witness.  I just had eight witnesses.

MR. MCRAE:  And that was also subject to our objection that he shouldn't be testifying at all.  So in the event that the Court overruled the objection and issued a clarification order saying that this was going to be part of the proceeding, that didn't moot or negate our objection.  And if the Court insisted on proceeding with this, then obviously we would have the right to examine the witness just like anybody else did, but again, without waiver of our objection, which I've stated again.

MR. UMHOFER:  And, Your Honor, if I could just make the record.

THE COURT:  Go ahead.

MR. UMHOFER:  There is a distinction between what happened before the stay for the purposes of determining whether the City was complying with the Court's order and cooperating with the monitor and after.  We, as the plaintiffs here, agree that anything that happened after the Ninth Circuit initiated the stay is not relevant to this hearing.  But what happened in that distance between the appointment and when the

stay was issued is relevant to determining the questions that the Court put forward as the subject of the hearing, which include cooperation, delay, concerning Mr. Garrie.  So just --

**MR. MCRAE:**  We think that's a specious distinction because the stay means that the appointment ab initio is stayed.  So to try to parse a distinction to before the Ninth Circuit came down or after, the stay and one of the grounds for the objection is that there was a lack of mutual agreement on this appointment would mean that from the beginning it was invalid.  So I understand that's an argument, but to say that that's a distinction that's in the law or in the fact, we strenuously disagree with that.

**MR. UMHOFER:**  And the Ninth Circuit did not void the appointment ab initio.  So that -- the words ab initio --

**THE COURT:**  I'm sorry.  Would you pull that just a little bit closer?

**MR. UMHOFER:**  The Ninth Circuit did not void the appointment ab initio.  The Ninth Circuit simply issued a stay. And so we have a disagreement about that.  We're just making a record.  I'll move on with my questioning if we're done.

**MR. MCRAE:**  I've made my record.

**BY MR. UMHOFER:**

Q    So, Mr. Garrie, why was it important to get access to the source data?

A    Well, as a data monitor, if you bring up the actual order

Garrie - Direct / By Mr. Umhofer                    **111**

appointing it, there's very specific language in 991, I think

it is, if you wouldn't mind bringing it up just so I can -- I

want to be precise with the words I'm using.

Q    Sure.  Give me just a moment to pull that up.  Is this the

order document 991, which is Exhibit 395?  Is that the one

you're referring to?

A    I am.  I think midway down or somewhere in the order,

there's a set of specific, if you go down, down.

Q    We're moving on down.  Just give me a moment, please.

          **THE COURT:**  Why doesn't somebody just give him the

document?  It would be easier.

**BY MR. UMHOFER:**

Q    All right.  Here we go.  If we get to page 49, I believe,

there's a reference down at the bottom to the settlement

agreement provides that the parties will engage in mutually

agreed upon third party to provide data collection, analysis,

comments, and regular public reports on the City's compliance

with the terms of the agreement.

A    The goal, as it says, right, is compliance with the --

sorry.

Q    Sorry.  Let me clear that out.

A    -- compliance with the terms of the agreement.  And

specifically, there's several things that are discussed and set

out.  There you go.  So then responsible for reviewing the

City's data prior to publication of its quarterly reports.  So

EXCEPTIONAL REPORTING SERVICES, INC

Garrie - Direct / By Mr. Umhofer                    **112**

in order to review the City's data, one thing you have to see is the data upon which it's based, right?  If I say, you know, what's the answer, and you say four, is it three plus one?  Is it two plus two?  Is it four plus zero?  How did I get there, right?

And so I needed to look at what we'll call the underlying data because of that.  And also because it explicitly states in the next part, verifying the numbers reported.  So verifying the numbers reported, again, is not only looking at what they're saying, but looking at where those numbers come from, based upon what.  Where is it coming from, right?  And then the third thing is engaging with the parties and LAHSA to resolve data issues.

So we didn't exactly get to that part, unfortunately.  But and then provide public reports on data compliance.  So that's what, you know, my understanding.  So the most thing I have to do is get access to the underlying data from LAHSA, from Care Plus -- there's HACLA, LAHSA.  There's 10 or so systems that the City identified, and 20 plus -- the questionnaire I gave, where they said there were hundreds of questions when there was really like three questions for each of their systems and their locations, and a handful of other questions that were general.

But basically identify how they're generating the data that's feeding into the report, and then evaluate the data that's being output from those systems to corroborate the

Garrie - Direct / By Mr. Umhofer                    **113**

information they're representing to the Court.

Q    In the time between when you were appointed and when the Ninth Circuit issued its stay, were you able to get access to that source data?

A    No.

Q    Did you attempt to?

A    Yes.

Q    Why weren't you able to get access to the data?

A    Well, there's --

MR. MCRAE:  Objection.  Lack of foundation, calls for speculation.  It's also vague as phrased.  We're talking about a lot of different data here.

THE COURT:  I'll let you ask that initially as an overarching question, but I think counsel's correct.  We have the right to know what specific areas there are issues in.

MR. UMHOFER:  Understood, Your Honor.  Were you able to get --

THE COURT:  It might be helpful to the Court also for both parties going forward, whether Mr. Garrie is the monitor or not, eventually by the Ninth Circuit's determination what issues or problems would be reoccurring if they would reoccur. So maybe we'll have that discussion also.  Okay.  Let's see where we go with this.  Counsel, please.

//

//

Garrie - Direct / By Mr. Umhofer            **114**

**BY MR. UMHOFER:**

Q    Mr. Garrie, were you able to get access to any source data from the City relevant to the Court's order regarding you as the monitor?

A    No, I was not.

Q    And why not?

MR. MCRAE:  Same objection.  It doesn't cure it.  Any source data, there's different systems operated by the City, not operated by the City.  The term data hasn't been defined. It's just hopelessly vague.

THE COURT:  This is overruled, counsel.  It's an overarching foundational question.  You can answer that, sir.

THE WITNESS:  So it's a complicated set of data elements that feed into the report the City files.  So you have LAHSA, HACLA, sanitation.  There's a litany of them.  And each one of them, the City wasn't able to provide the data from the systems outside of -- and then there was one system, which was the inside system, which Comptroller Mejia had access to, but had limited access and it wasn't the right access for what we were looking at.  But the net-net is that we were told to go talk to LAHSA, talk to HACLA.  And the City, and Counsel Scolnick, I don't think he's here, in his defense, they were working with to try to get access to the data, but the City itself didn't have the underlying data.

And I think there's an email I wrote that sort of

EXCEPTIONAL REPORTING SERVICES, INC

Garrie - Direct / By Mr. Umhofer                    **115**

outlines all of this.  I think it was in November 14th.  I don't remember the exact day, but I'm sure you received the email as well as counsel for the City that outlined the systems and then the City's response.  And the City was very clear about what -- they didn't control the data LAHSA has.  And LAHSA has access to multiple systems that underlie the data that the City is reporting to the Court on.

So it's basically, I guess at the end of the day, the City doesn't actually control the data, the source data.  They get data from everybody else and then they compile it all.  And I think as Mr. Szabo testified earlier today, there are members on his team that have read-only access or access to HMIS to verify a subset of the information that was submitted, but when we -- and he informed us of that as well, but which precipitated why we needed to fill out the -- we filed with the Court a protective order with the hopes that we could get similar access, but LAHSA had an issue with that as well.  Then the City basically told me as a data monitor to work with LAHSA, HACLA and whoever else to get the data.  So I never got any of it.

**BY MR. UMHOFER:**

Q    So going to page 2 of your report, let's go through the sequence of events here.  So am I correct that after learning of the appointment, you reached out to assess the system's data related to persons experiencing homelessness?

Garrie - Direct / By Mr. Umhofer                                **116**

A    Yes.

Q    And you communicated with Ms. Martinez, special master?

A    Yes, I did.

Q    And then you reached out to Mr. Mejia, all in the same day, correct?

A    Yes.

Q    What happened the next day?

A    We had a video conference with Comptroller Mejia and basically, in fairness to Mr. Mejia or Comptroller Mejia, he made his team and himself and the resources available to help us with this endeavor and identify the right people and all of those things and to connect me with the relevant City officials because I obviously am not in a position to know who all the right City officials were.

Q    What was discussed during that video conference?

A    Effectively that, right?  How do we -- what's a process by which most efficient to identify the right people and get access to the data and systems as efficiently and cost-effectively as possible?

Q    What happened next?

A    Counsel for the City -- well, I think actually I was provided Mr. Szabo's contact information and I contacted him and then seeking clarification on the intervention reports.  And then that's Exhibit 1, right?  And then I attached an Excel spreadsheet and sent it over to him with,

let's just be clear, three identical questions about each entry in the intervention data table. These are questions that was not intended to increase a burden. I would assume the City had these, they're standard questions. And then the six questions about the City's data systems and then there was some general questions.

And then I requested an interview the following week with CAO Mr. Szabo and then he emailed -- we went back and forth, saying that I had -- he interpreted the spreadsheet as being hundreds of questions when it was -- we can agree to disagree, but you can look at the spreadsheet yourself. It was just basic system information. Again, my goal here is just to get the data and to get the data, I need to know about the systems from which the City is building. Like in order to -- I need to know how the City's building. So we went there and then --

Q    Can we pause for a second?

A    Yeah.

Q    Can I -- I'm pulling up, I believe, Exhibit 362, which I believe is Exhibit 1.

A    Yeah.

THE COURT: Just a moment, what exhibit number, counsel?

MR. UMHOFER: This is Exhibit 362, Docket 1063-1.

THE COURT: Yeah, that would help me. With docket 1062-1, okay.

Garrie - Direct / By Mr. Umhofer                    **118**

**BY MR. UMHOFER:**

Q    Is this the email you sent to Mr. Szabo attaching that spreadsheet?

A    I don't believe so.  I think this was, oh yeah, it is.  I attached a spreadsheet, say, in the second paragraph containing specific questions that require responses concerning the data and yeah, that's it.

Q    And what was the purpose of those -- of that spreadsheet and those questions?

A    Well, it's, you know, it's to, I need to get the data and identify the systems from which they go through, right?  Because without that, I'm spinning my wheels.

Q    And going to page 3 of that exhibit, is this the spreadsheet that you talked about?

A    Yeah, and if you see this, those three questions in the orange column, right?  From which city, and I think it's worth reading for the record, the question was from which City systems databases were the requested units, beds, status, and open and occupiable date generated?  That's question one. Second question, what supporting documentation, contracts, invoices, permits, so on and so forth is available for this address or location?  Third, what funding sources were used for this address location and how was City participation verified? And those are the same three questions I asked for them, all the way down.

Garrie - Direct / By Mr. Umhofer                    **119**

Q    Did you intend to inflict a hundred questions on the City in this, or hundreds of questions on the City in this spreadsheet?

A    No, I truly thought that --

           **MR. MCRAE:**  Objection.  Sorry, objection.  It's irrelevant, intend to inflict, it's irrelevant.  The document speaks for itself.  It's math, three questions times 200 different properties is 600.

           **THE COURT:**  Overruled.

           **THE WITNESS:**  So the questions were questions I assume the City could have easily answered and had available to answer and should be able to answer based on the fact that the data in the report it was providing to the City.  It was not intended to create an undue burden to the City to provide this information, given that they're already asserting, here's the address, here's the number of units and beds.  And so, they're already saying we have this information, all I was asking for was the underlying information.

Q    Did you believe, based on what you knew, that this information would be readily available to the City?

           **MR. MCRAE:**  Objection.  It's a lack of foundation and speculation.  He couldn't possibly know what was on the system, so therefore it's irrelevant, what he expected.

           **MR. UMHOFER:**  Your Honor, I've got to --

           **THE COURT:**  Overruled.  You answer the question,

Garrie - Direct / By Mr. Umhofer          **120**

please?   You can answer the question, sir.

THE WITNESS:  Answer the question?

THE COURT:  Yeah, please.

THE WITNESS:  Can you re-ask the question, counsel?

BY MR. UMHOFER:

Q    When you issued this spreadsheet, did you believe that this information, based on what you knew, would be easily accessible to the City for these locations?

MR. MCRAE:  Objection.  Speculation and irrelevance.

THE COURT:  Overruled.

THE WITNESS:  Based on my two decades of experience and expertise working with enterprise systems across the board, ranging from the Department of Justice, across big banks and et cetera, I assumed that this information would be readily accessible and easily accessible by the City.

BY MR. UMHOFER:

Q    What was the basis for that assumption?

A    I mean, I've done and looked at, I don't know, over the past two-plus decades, many different systems trying to figure, you know, answer questions about how do the outputs get generated in these things, and when you're -- and so, I mean, it's pretty standard enterprise documentation for a city, a government agency or whatever, to be able to answer some of these basic questions.

THE COURT:  When you're done today, whether you are

Garrie - Direct / By Mr. Umhofer                **121**

eventually the monitor or not, I'm going to ask counsel to inquire what would move us forward.  So assume for a moment that you weren't the monitor, that the circuit made a decision that you were not the monitor.  I'd like to hear going forward, so we can move forward, whether you're the monitor or not, how we would keep this going forward with another entity if it came involved.  So just your input, and then if we have another entity, I can talk to them in the future, okay?  So let's see what problems we have here.  Counsel?

MR. UMHOFER:  I'm sorry, Your Honor, would you like him to answer that question now?

THE COURT:  No.

MR. UMHOFER:  No, okay.

THE COURT:  We'll come back.

MR. UMHOFER:  Thanks for the clarification.

THE COURT:  I want to see how many areas of disagreement both of you have, whether he's the monitor or not.

BY MR. UMHOFER:

Q    So after you've issued the spreadsheet -- by the way, did you -- I'm sorry, after you issued the spreadsheet, what happened?

A    At some point, Counsel Scolnick, who I don't believe is present, from Gibson Dunn, introduced himself and requested that all communications with the City streamlined through him with regards to this endeavor.  Oh, there's the email right

EXCEPTIONAL REPORTING SERVICES, INC

Garrie - Direct / By Mr. Umhofer                    **122**

there.  On October 21st, 2025, Scolnick emailed me, not only telling me that there were hundreds of question, but that the City is represented party and he asked me not to contact any City officials or employees directly.  And he said, if I want to speak with -- if you'd like to speak with City officials or employees, please make these requests through counsel and we can coordinate.  And then he also referenced impending appeal.

Q    And so going to Exhibit 363, which is Docket 1063-2, is that the email from Mr. Scolnick that you just described?

A    Yes, it is.

        **THE COURT:**  Just a moment, counsel.

    **(Pause)**

        **THE COURT:**  All right, thank you very much.

**BY MR. UMHOFER:**

Q    What happened next?

A    Well, after that, the same day, I responded to counsel Scolnick's email and I just asked him to clarify how he expects me to communicate with the City staff because Comptroller Mejia shows you how connected I am to the City of LA, I assume was also a City employee and was I allowed to directly communicate with him or would my communications have to go through counsel Scolnick as well?  And so we would then resolve that issue. Counsel Scolnick said that I could directly communicate with Comptroller Mejia.

Q    And that was all on October 21st, correct?

A    Yeah, I believe so.

Q    What happened next?

A    Well, if you bring up just quickly Exhibit 3 because I just want to make sure I --

Q    I've got up exhibit.  By the way, do you have all of the attachments to your report in front of you?

A    Yeah, I do.  They're printed.

Q    Are you using those to refresh your recollection?

A    Yeah, I'm just using them to refresh --

          **MR. MCRAE:**  Your Honor, if that's the case, that's not how you refresh recollection.  So can we have the witness turn the document face down?  And if he needs to have his recollection refreshed, the proper foundation can be laid.  And once the recollection is refreshed, you turn the document over so you're not reading the document.

          **THE WITNESS:**  I was just looking at the document on paper because I prefer paper over the screen, but it's fine, counsel.

          **THE COURT:**  No, if you want to look at paper, that's fine.  Just tell us when you're looking at the paper to refresh your recollection.

          **THE WITNESS:**  Okay.

          **THE COURT:**  Okay.

//

//

Garrie - Direct / By Mr. Umhofer                **124**

**BY MR. UMHOFER:**

Q    Looking at Exhibit 363 and Exhibit 3 within that, is this an email -- this is part of your email exchange on October 21st with Mr. Scolnick?

A    I believe so, let me just read it on the screen.  I just want to clarify the three.  Can you scroll down a little bit? Yeah, this is that email, that's correct.

Q    And then, is it your recollection that you had a subsequent email on the 22nd with Mr. Scolnick?

A    There were a lot of emails exchanged, I believe so.

        THE COURT:  Go up to the top of the document, that should be easily resolved, counsel.

**BY MR. UMHOFER:**

Q    Yeah, that is the top, so I'll keep moving forward. Following your back and forth with Mr. Scolnick, do you recall what happened next?

A    If you come back to my report, I can give you the exact days and times, but effectively -- so if you wouldn't mind bringing it back up so I can refresh my recollection.

Q    It's up.  I'm sorry, I took it off present.  There you go.

        THE COURT:  So we're on 1063-3; is that correct?

        MR. UMHOFER:  Your Honor, right now we're back on Exhibit 361, which is 1063-00.

        THE WITNESS:  And then I remember, then Scolnick -- Counsel Scolnick responded, which is Exhibit 4, and he

EXCEPTIONAL REPORTING SERVICES, INC

requested that I be notified of the court.  He wanted me to tell him what the Court was telling me, which I found a bit uncomfortable.  But then he noted that the Comptroller Mejia, just like every other City official employee, is represented by the City and by Gibson Dunn in this litigation.  I obviously am not an attorney here or acting in that capacity, so I was a bit confused, but he clarified when he said City Counsel Scolnick consented to the monitor's direct communication with him, that we're not consenting to your direct communication with any other City official or employee.

And then he indicated -- Counsel Scolnick indicated, that the City could not fully answer my questions about the September quarterly report.  And then he questioned whether the level of detail about what databases and systems and the likes was actually necessary to verify the quarterly report data, and then he disclosed that the CAO does not have all of the information readily --

**MR. MCRAE:**  Your Honor, I'm going to have to interpose an objection.  We've been over this.  The witness is not refreshing a recollection, he's just glancing down and reading in real time, and that's fine if he needs to have his recollection refreshed.  What he cannot do is sight read the document and put that into the record, because that's reading. That's not testifying from personal recollection.

So this should come down off the screen.  Once he

Garrie - Direct / By Mr. Umhofer                          **126**

tells us his recollection is refreshed, there's nothing up on the screen and then he testifies.  And if he needs to have his memory refreshed, he can look at it again and so forth --

THE COURT:  That's overruled, Counsel.  This is his own report with the attachments that the emails, the Court could take judicial notice of it.

MR. MCRAE:  So the record will reflect that the witness is reading the document, okay.

THE COURT:  No, the record will not reflect that because he's not reading the document on all occasions.  That's your summation.  Thank you.

Counsel, your next question.

BY MR. UMHOFER:

Q    And so turning over to Exhibit 363, Exhibit 4 to your report, is this the email exchange that you had with Mr. Scolnick on October 22nd?

A    Let me just read it one second.  Can you just scroll down a little bit?  Thank you.  This is that email.

Q    And there's a reference at the bottom to Mr. Szabo being out of the country. Was any further explanation given for his unavailability other than that he was out of the country?

MR. MCRAE:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  No.

//

**EXCEPTIONAL REPORTING SERVICES, INC**

Garrie - Direct / By Mr. Umhofer                    **127**

**BY MR. UMHOFER:**

Q    Why did you need to talk to Mr. Szabo?

A    Because I was informed by Comptroller Mejia that he was the person that pulled together the report.  And I spoke with Special Master Martinez and she also indicated that he was also -- his office was responsible for pulling together the report that was eventually filed with the City.

Q    Did the delay in your ability to communicate with Mr. Szabo between October 22nd and October 31st affect your ability to get the information you needed to carry out your responsibility?

        **MR. MCRAE:**  Objection, Your Honor.  It's leading, saying that there's delay.  It lacks foundation.  It's also argumentative.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes.

**BY MR. UMHOFER:**

Q    How so?

A    Well, without that information, we can't -- I don't know what to look at, what systems, who to talk to.  I have literally no technical underlying information to move the ball forward.

Q    Did the City offer Mr. Szabo to be available to talk with you or appear by remote at any point between October 22nd and the 31st?

Garrie - Direct / By Mr. Umhofer                    **128**

**MR. MCRAE:**  Objection.  Relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  No.

BY MR. UMHOFER:

Q    Did the City offer -- what dates did the city offer Matt Szabo to you in terms of communicating with him?

A    They indicated that he would return on the 31st and that if absolutely necessary, he may be available that afternoon, but that November the 3rd or 4th was ideal for him or better for him.  He would be in a better position to answer.

Q    When were you intending to file your report at that point with the Court?

A    I mean, up until like on time.

Q    Which was what date?

A    14th.  Ideally the 13th, I like to get in a little early.

Q    Do you remember what happened next?

A    There was an issue with the initial meeting that we attempted to schedule with Mr. Szabo and we had to reschedule it again.  There was a scheduling conflict.

Q    Do you remember when you were ultimately able to speak with Mr. Szabo?

A    If you bring up my report, I could give you the exact date, but it was November -- right after -- like if you bring up my report, I don't want to state the wrong day.

Q    Okay.  Will you let me know where in your report --

Garrie - Direct / By Mr. Umhofer          **129**

A     My screens doesn't show anything.

Q     I'll bring it up.  I apologize.

A     You've got to go down.  I don't -- I spoke with him in November, and then I think if you go back up, he -- when I spoke with Mr. Szabo, on whatever date it was, and if you go up in November, he suggested I speak to Mr. Gibson, who is a member of his team, and I spoke with him subsequently.

Q     What date was this report that we're looking at filed on?

A     November 3rd.

Q     Could you read the sentence at the bottom, at line, that begins at the end of line 18?

A     Therefore, the monitor has yet to meet any City staff.  The first meeting with CAO Szabo is scheduled for Monday, or for today, November 3rd, 2025.

Q     Did that meeting happen on that day?

A     No, unfortunately, there was a scheduling conflict with Mr. Szabo's schedule.

Q     Going back to October 22nd, you had this exchange with Mr. Scolnick on October 22nd.  Do you remember what happened in your efforts to carry out your responsibilities as the monitor after this exchange?

A     I mean, we didn't make a whole lot of progress.

Q     What happened on October 23rd?

A     There was another set of emails exchanged, where we were attempting to make forward progress, but we weren't very

Garrie - Direct / By Mr. Umhofer          **130**

successful.

Q     How about October 24th?

A     Same.

Q     Pulling up Exhibit 5, is this an email exchange involving you and Mr. Scolnick dated October 24th?

A     It is.

Q     I forgot there was a whole -- I didn't know how many lawyers were -- anyways, I had forgotten to include the Intervenor's counsel in my prior communications, and then there was this whole thing about ex parte communications and who wanted to be on them and the back and forth, so I ended up adding 25 different people to the email, so there was no ex parte communications.  And then I forwarded all my prior emails that I exchanged on this to intervenor's counsel as well with my apologies.

Q     What happened next?

A     I mean, the City objected to me having any ex parte communications with anybody, and then we kept trying to get the data.  I mean, that was my focus, frankly.  The screen went blank again.

Q     Yeah, I understand.  Pulling up what's been marked as Exhibit 365, which is Docket No. 1063-4, is this an email exchange that you have with Mr. Scolnick, including on Monday the 27th?

A     It appears, yes.  If you scroll down, I can tell you.

Garrie - Direct / By Mr. Umhofer                    **131**

There's just a litany of emails, and I don't want to.  That's

when we received the initial responses from the City, I

believe, preliminary information.

Q    Were they complete answers to the questions that you'd

asked?

A    No.

Q    How so?

A    I mean, they tell you, but basically they said they

couldn't vouch for the completeness and accuracy, and I was

really focused on the systems and the databases and the likes,

and there was no databases actually identified by the City at

all.

Q    How much time elapsed from the time you made the request

until you got these initial incomplete responses?

A    Several days.  I mean, I don't know the total number of

days, but -- when did I send the first email?

Q    I'm going to ask you that question, so if you need to

refresh your recollection.

A    I need to refresh my recollection.  I apologize.

Q    Would you like to review your report that's on paper in

front of you?

A    Yes, if you don't mind.

Q    I don't mind.

A    October 18th.  And what was the date again?  Was it the

27th that I got the answer?  So nine days.

**MR. MCRAE:** I'm sorry, Your Honor. I think that mischaracterizes the record because the question was the date of the data request.

**THE WITNESS:** It was on October 18th. I just looked.

**MR. MCRAE:** That was the date of a meeting, but all right, so be it.

**THE WITNESS:** No, no, counsel. I just checked Exhibit 1 where I attached the spreadsheet that was sent on October 18th. Well, let me double check. I don't want to be wrong, so apologies, counsel. Just let me refresh my recollection.

Yeah, October 18th. I made the initial inquiry on October 18th, and then so nine days later, I got the initial response. Again -- thank you.

**BY MR. UMHOFER:**

Q    Did that delay affect your ability to carry out your responsibilities as the monitor appointed in this case?

**MR. MCRAE:** Your Honor, objection. A lapse in time is not necessarily a delay. It is leading and argumentative to keep referring to the passage of time as delay. It implies something that isn't established in the record. It's leading and it's argumentative.

**THE COURT:** Overruled. Answer the question, please.

**THE WITNESS:** It prevented me from being able to do what I had been appointed to do as the data monitor.

Garrie - Direct / By Mr. Umhofer                    **133**

Q    Now, on the bottom of page 5 of your report, you say that on October 31st, 2025, having not received a response from City Counsel Scolnick, the monitor sent a follow-up email to schedule a meeting with Mr. -- I believe that's Szabo on the next page.  What did you mean when you said having not received a response?

A    Well, there was a litany of emails sent back and forth, and I guess one of my requests slipped through the cracks, and I wasn't able to get it scheduled.

Q    And then, again, you filed this response on what day?  Excuse me, this report on what day?

A    November 3rd, I think it was.  If you go up to the top, I believe it's November 3rd.  Maybe it's the 4th.

Q    Yeah.  All right.  Let me just go back this way here.  Okay.  Do you remember when the stay order was issued by the Ninth Circuit?

A    The 14th of November or the 15th?  I don't remember exactly.  But, again, if I can read my report, I think I reference -- I think it's the 14th of November.  I think it was 11 days after.

Q    In the time that elapsed between your issuance of this November 3rd report and the implementation -- the Court's implementation of that stay, were you able to make any progress in getting access to the source data from the City?

             **MR. MCRAE:**  Objection.  Vague.

**EXCEPTIONAL REPORTING SERVICES, INC**

Garrie - Direct / By Mr. Umhofer                    **134**

THE COURT:  Overruled.

THE WITNESS:  Unfortunately, we didn't make a lot of headway in getting actual access.  We did establish a process through which we were working through, which basically the City then told me to work with each of these different groups to try to get access to the underlying source data.  And then, depending on the group, the group's counsel would tell me, we can't give you the data, or you're not authorized to have the data.  I got different responses from different organizations, but Counsel Scolnick was attempting to help get access.

Q   During that time period, was there anything the City did that got in the way of your getting access to that data?

MR. MCRAE:  Objection.  Vague, argumentative.  Also calls for speculation, lack of foundation.

THE COURT:  Overruled.  You can answer the question.

THE WITNESS:  I'm not in a position to speak to what the City did or did not do.  What I can tell you is that the City didn't subpoena them.  The City didn't compel them.  The City didn't, you know -- there were different ways that one probably could have done it, but I truly don't know an answer to that question because what I can tell you is that we didn't get access.  And so, I mean, there are different tools that may have been available to the City.  I'd leave that to the City to answer.

MR. MCRAE:  Move to strike as utter speculation.

THE COURT:  Overruled.

MR. UMHOFER:  Your Honor, if I could just have a moment to consult with my colleague.

(Pause)

MR. UMHOFER:  Nothing further for this witness at this time, Your Honor.

THE COURT:  And the intervenors?

MS. MYERS:  No questions, Your Honor.

THE COURT:  Then to the City.

MR. MCRAE:  Your Honor, I'd like to get started, but can I excuse myself for a moment?

THE COURT:  Why don't we just take a recess right now?

MR. MCRAE:  Thank you.

THE WITNESS:  Can we take ten minutes?  I'm with counsel here.  Can we take ten minutes to use the facilities?

THE COURT:  About 15 minutes.  We'll see you at 3 o'clock.

THE WITNESS:  Thank you.

**(Recess taken at 2:46 p.m.; reconvened at 3:04 p.m.)**

THE COURT:  So we're back on the record.  All counsel are present, the parties are present.  And, counsel, this would be cross-examination --

MR. MCRAE:  May I proceed?

THE COURT:  -- but identify yourself again for

Garrie - Cross / By Mr. McRae                    **136**

CourtSmart.

      **MR. MCRAE:**  Marcellus McRae, Gibson Dunn & Crutcher appearing on behalf of the City of Los Angeles.  May I proceed?

      **THE COURT:**  Thank you, sir.  Cross-examination please.

**CROSS EXAMINATION**

**BY MR. MCRAE:**

Q   Mr. Garrie, let's clarify something.  You said in response to direct examination that your appointment as a monitor in this case was October 14th, 2025, but I believe you said that you started having e-mails before that.  Did I mishear you, sir?

A   Like I said conversations with what's his name, who is the other monitor?  I keep blanking on his name, I apologize.

      **THE COURT:**  May I suggest the answer for both of you?  Galperin.

      **THE WITNESS:**  Thank you.  Counsel Galperin e-mailed --

      **THE COURT:**  Save some time, Galperin.

      **THE WITNESS:**  -- me introducing himself and we -- like conversations, I can't cite to you chapter and verse, but Mr. Galperin -- counsel Galperin called me and we connected before the 14th.

//

//

**EXCEPTIONAL REPORTING SERVICES, INC**

Garrie - Cross / By Mr. McRae                    **137**

**BY MR. MCRAE:**

Q    So that we have a clear record here, you did not start working as a Court appointed monitor in this case until you became a Court appointed monitor on October 14th, 2025, correct?

A    That's -- yes, correct.

Q    So now you eluded to exchanges that you had with counsel, retained counsel for the City for certain data.  And you said that you learned in the course of those exchanges that there were a number of instances where the City did not control the data or have access to the data that you were requesting.  Do you recall that?

A    Yeah, something to that effect I believe I said.

Q    Now, you talked about these three questions that you asked about and we'll visit the exhibit, that were repeated in a number of rows, some 200 rows, each with different property addresses.  You're familiar with the document I'm talking about?

A    If you could -- I think I know what you're talking about, but there are a lot of spreadsheets, if you can just show me so I can --

Q    And we'll get to it, but I want to ask you this question.  You would agree with me that if I were to ask you the date of birth of everyone in this courtroom that is one question.  But unless we all share the same date of birth and the same year by

Garrie - Cross / By Mr. McRae                **138**

some remarkable coincidence, the answers to that question would

be as many as the number of people in this courtroom, right?

A    Yes, that would be correct.

Q    So one question can beget 50 answers, right?

A    One question can beget -- yes.

Q    Three questions could beget 600 different answers,

correct?

A    6,000, any, enumerable.

Q    So unless you understand the properties to which the

question is attached, you are really not capable of determining

how many different answers or how much work any given three

questions are going to yield, correct?

A    No.

Q    Now, sir --

A    No.

Q    -- let me ask you this, you have never worked with the

City of Los Angeles?

A    I do not believe I've ever employed by the City of LA.

Q    You say you don't believe.  You --

A    The City's owned lots of different things, but I don't --

I'm not aware if I ever -- my affirmative answer is I've never

been employed.

         THE COURT:  Counsel, just a moment.  I don't want you

to be caught by surprise.  For the County, you may not have

been here, but your colleagues were.  And if you go back

Garrie - Cross / By Mr. McRae                    **139**

through the record, there was an issue concerning the County's divulgence of information and it's before you were appointed and there's no reason for you to know about this, but it's in the record.

And the County was representing that they couldn't get some data and some issues resolved within 30 to 60 days. he was in the area, called down, they brought over members from the County, MIST or the technical team --

MS. BRODY:  I think you're --

THE COURT:  -- and we resolved it by 4:30 that afternoon.

MS. BRODY:  I believe that was the invoice website that Mr. --

THE COURT:  Yeah.

MS. BRODY:  -- Garrie --

THE COURT:  The invoice.

THE WITNESS:  Oh, that's right, I forgot.

MS. BRODY:  -- the County though.

THE COURT:  Yeah, so when you say the City, the County, both parties were involved, it got resolved, because we just called in the folks from the County, resolved by 4:30, saved 60 days.

MR. MCRAE:  Thank you, Your Honor.

THE COURT:  Okay.  I don't want you to get caught by surprise.

Garrie - Cross / By Mr. McRae                    **140**

THE WITNESS:  So can I --

MR. MCRAE:  Understood.

THE WITNESS:  -- fix my answer then?

BY MR. MCRAE:

Q    Let me rephrase the --

THE COURT:  Finish your answer.

Q    -- I mean, I'm not going to rephrase the question --

THE COURT:  Just a moment, counsel.  Finish your answer so we have it on the record.

THE WITNESS:  So I did at one point earlier in these proceedings pro bono help create a website working with the County and apparently the City was also involved for the posting of invoices relating to parts of these proceedings from some of the folks involved in this matter.  But I think it's -- I don't -- there's a lot of different matters, counsel, but I believe I did pro bono work for the City of LA, tangentially, possibly.

THE COURT:  And by the way, the City was involved in that conversation with the County, that's what I'm trying to impart to counsel.  I don't think Gibson and Dunn would know that.

MR. MCRAE:  Thank you for that.

BY MR. MCRAE:

Q    I painstakingly tried to make clear.  My question was whether you've ever been an employee of the City, which doesn't

exclude doing pro bono work, being an independent contractor, having a listening ear, I mean, any number of other things, specifically, sir, you've never been an employee of the City of Los Angeles, correct?

A   That is -- I believe that is correct.

Q   Now, you were questioned about a span of time from October the 22nd, 2025 to approximately November 3rd where there was an attempted discussion between you and Mr. Szabo and counsel asked you a question that had a premise in it about delay.

I want to direct your memory to your status report that you filed in this case.  There's no declaration attached to that status report on your part, is there?

A   Well, you're talking about the November 3rd?

Q   Correct.

A   I did not provide a declaration.

Q   And in addition to there not being a declaration, nor is there a quantification of any amount of time that you claim is delay, as a result of anything that the City of Los Angeles did or did not do, correct?

A   I don't know, I don't use the word delay, that is correct.

Q   Well, you may not use it in the report, but when counsel asked you the question about delay, did you not adopt his term delay in your answer?

A   I'd have to have my answer read back to me.

Q   So let's set the record straight.  You, in fact, don't use

Garrie - Cross / By Mr. McRae                    **142**

the word delay, according to you and your report, okay, duly noted.  Let's pivot to something else here.

A    I believe I'd have to read word-for-word.

Q    Let's put it this way.  Regardless of the verbiage in the report, your report does not contain a single statement of a quantity of time that it took you to do any task longer than it would have as a result of anything that the City did or did not do, true or false?

A    Not beyond what's stated in my report.

Q    Well, there's nothing stated in your report, in terms of specific quantity of time like a day, an hour, two weeks, et cetera.  So we can agree that there is no quantity of time associated with any delay assertions in your report, correct?

A    I'm more -- I think you're mischaracter -- I don't like -- the word delay isn't what I've used, but you're mischaracterizing.  I said I sent things on one day and got responses on another, I don't -- I take your word for the word delay is not in there, but there was, I made requests and received responses.  And there's time lapse in between them.

So I don't know how you're defining delay, but let me -- but for -- I want to answer the direct question, right, and I don't want to mischaracterize my testimony.  My testimony was that I sent e-mails and I got responses and that impeded my ability to fulfill the obligations and provide the response to the Court.

Garrie - Cross / By Mr. McRae                **143**

Q    You have no quantification in your report of how much less your purported progress towards these deadlines that you testified about would have been lessened had as a result -- had the City engaged in any conduct any differently than what you describe in your report, correct?

A    That's misstating what I state.

Q    No, that's not.  It's asking you a question that's not contained in your report.  So let me repeat the question or perhaps clarify.

Sir, what I'm saying to you is, when you say it impeded you completing certain tasks, you don't have any quantification of time by which the task that you set out to do were impeded as a result of anything that the City did or did not do, true or false?

A    There's no quantification stated in my report beyond what I state.

Q    When you say beyond what you stated, that presupposes that there is any quantification of time.  I'm saying to you as you sit there now as the author of the report, true or false, there is no quantification --

A    False.

Q    Okay.  Take your report and in terms of a quantification of time, as in days, hours, months, can you direct us to where you have a quantification of the amount of time --

A    Yes.

Garrie - Cross / By Mr. McRae                          **144**

Q    -- by which your delay was impeding.

A    Certainly.

Q    Go ahead.

A    Page 9, line 12, in short the monitor does not anticipate having sufficient information to give a substantive report at the upcoming November 12th, 2025 hearing.  That is the conclusion that I offer as a result of the material I describe and the incidents and communications I describe.

In fact, I can read the sentence above which says, the monitor has not yet interviewed any City staff and has been unable to gain sufficient data and/or information about the City's data collection, management analysis and reporting methods.

Then there's a footnote to 3.  And it says, there are also real world impacts on the monitor's ability to perform his duties efficiently and effectively the flow from the City's ex parte application for a stay of order, et cetera, et cetera, City Council Scholnick informed the monitor that quote, the City reserves all rights regarding your work as a monitor and any fees you may later seek to charge the City.  For the record, I have not charged the City to date.

See Exhibit 2.  In other words, until the Court and the Ninth Circuit make a final determination, the City's challenge -- the City challenges both the validity of the monitor's appointment and any interim fees that the monitor

Garrie - Cross / By Mr. McRae                    **145**

occurs.  That's footnote 3.

Q    Yes, sir, thank you.

A    And that --

Q    In response to my question, sir, you're telling me what you say is a conclusion, which is that you have not been able to or were not able to complete the task.  I'm asking you a different question, which is as a result of anything that you say the City did or did not do, you do not have a time estimate of what those actions or inactions contributed towards you're not being able to meet the deadline.

In other words, whether individually or collectively it resulted in a day more, two days more, three hours more, there's no specification of it.  It's just a conclusory assertion of, I'm not going to be able to meet this deadline.  Do you understand the difference?

**MR. UMHOFER:**  Objection, argumentative.  There's no question.

**THE COURT:**  No, overruled.  You can answer the question.

**THE WITNESS:**  I understand the question.

**BY MR. MCRAE:**

Q    Okay.  So -- and when you say you understand the question, you understand the difference between I'm not going to be able to meet a deadline versus as a result of these actions by the City it's taking me X amount of time longer towards making

**EXCEPTIONAL REPORTING SERVICES, INC**

Garrie - Cross / By Mr. McRae                    **146**

progress towards the deadline.  Do you understand that

distinction?

A    I understand the words you're saying.

Q    Okay.  You understand the words I'm saying.  And now I'm

saying, there's no statement in this report where you say it is

taking me or will take me X amount of more time to complete the

tasks that I've been asked to complete as a result of any

action or inaction from the City --

A    I would --

Q    -- true or false?

A    False.

Q    Okay.  Where is the quantity -- let's saw for X.  Can you

point us to the amount of time --

A    Page 2 --

Q    -- that you assert?

     All right.

A    -- line 1.  At present, the monitor has only been able to

engage, that's as of November 3rd.  That's the day I wrote it.

In the scheduling of scoping interviews with key City subject

matter experts.  No interviews have occurred.  In addition, the

monitor's review of the publicly reported summary; i.e., not

source, intervention data and the City's quarterly reports

indicated numerous data collection, definition and reporting

issues that must be addressed before any analysis can be

performed.

**EXCEPTIONAL REPORTING SERVICES, INC**

Garrie - Cross / By Mr. McRae **147**

Then next paragraph, thus despite his -- it should be my, but despite his best efforts to streamline communications, an effort -- not and effort, and notwithstanding the Court's directive, the City must make arrangements with the monitor so he can meet the forthcoming November 12, 2025 deadline for an initial assessment.

The monitor does not anticipate, that's as of November 3rd, being able to provide a substantive update to the Court at that hearing.

Q    And where's your calculation of the amount of time that that translates to?

A    Well --

Q    I need it in hours and can you point me to it in this document?

A    I can do the math if you'd like.

Q    Okay.  Well you can be doing that, let me move on to other parts, but we'll circle back to that.  But suffice it to say, when you say you can do the math, it means that you haven't done the math, correct?

**MR. UMHOFER:**  Objection, Your Honor, I do not believe the witness has been allowed to answer the question and was interrupted.

**MR. MCRAE:**  I mean, Your Honor, he just said he can do the math.  It means he hasn't done the math.  I'm going to move on.

Garrie - Cross / By Mr. McRae                **148**

THE COURT:  No, no, counsel, don't move on.  It's fine.

MS. MYERS:  And I would just join the objection --

THE COURT:  All right.  Now all of you, thank you very much.  Just a moment.  Just a minute.  Do you recall the question or I'll have counsel reask it.

THE WITNESS:  Can you just reask?

THE COURT:  Reask the question.

BY MR. MCRAE:

Q   Can you tell us where you identify with respect to everything that you just said -- well, actually you just said I can do the math, correct?

A   I did.

Q   Thank you.  All right.  Let me move on.

Sir, when did you first learn that you were being considered for a position as the monitor in this case?

A   I don't recollect the exact day, but in October of that -- I would say in October of 2025.

Q   How did you become aware that you were being considered for -- as a monitor in this case?

A   I don't recollect exactly if it -- who.  Whether it was Mr. -- what was his name again?  Sorry, thank you.  Counsel Galperin sent me an e-mail introducing himself or I heard from the parties via e-mail, one of the parties.  I can't remember the exact, but I received an e-mail from counsel as well.  I

Garrie - Cross / By Mr. McRae                    **149**

can't remember which counsel, but informing me that I was being considered possibly, it was along with Mr. Galperin or counsel Galperin.

Q    It was not -- was it anyone who was retained as counsel for the City, when you say counsel?

A    There are so many lawyers, counsel, I don't want to speak incorrectly.

Q    All right.  So let's take a look at Exhibit 395, which is ECF 991.

A    Do you have a printed copy?

Q    It's right on the screen.

     Sir, this document --

A    I haven't looked at it.  So can you let me look at it, please, counsel?

Q    I will.

A    Okay.

Q    I'm just giving context.

A    Okay.

Q    You literally spent an hour talking about this document on direct examination, so.

     MR. UMHOFER:  Your Honor, I'm going to object.  He's arguing with the witness.

     MR. MCRAE:  I'm not arguing, I'm just giving him the context.

     MR. UMHOFER:  And he's telling the witness what's

happening in the courtroom as opposed to asking questions,

which is what he's supposed to be doing.

          **MR. MCRAE:**  Your Honor, I withdraw the question.

**BY MR. MCRAE:**

Q    Sir, I haven't asked the question yet.  I just put the

document in front of you.

     This document which is the order -- well, actually let me

go to another document.  We can go to the exhibit --

A    Is Exhibit 395, Document -- Docket 991?

Q    It is.

A    Okay.

Q    But as you can see there in the top center of the

document.

A    Thank you.

Q    You were appointed as a monitor in this case on October

14th.  Do you recall that, right?

A    I do.

Q    Right.  And the only -- are you -- with respect to Exhibit

911, excuse me, with respect to this exhibit that we're looking

at which is Exhibit 395, ECF 991 --

A    This isn't ECF 991 on the screen.  Now it is.  Thank you.

          **THE COURT:**  395.

Q    Let's go ahead and take a look, I think you were looking

at page 60 of this document.  And these are the portions where

you were testifying at lines 10 through 19 regarding what you

Garrie - Cross / By Mr. McRae                                    **151**

felt were tasks that were delineated in this document.  Do you

recall that, sir, just an hour ago?

A    I recall saying -- speaking to that effect.  I believe

my -- this translates into what's in my November 3rd report

where there's four bullet points, so just to connect the dots,

but yes.

Q    So we have those points there and if we turn to page 54 of

this same document and we look at lines 14 through 16 --

A    Can I see the lines above it just so I have context,

counsel?

Q    Of course.  You can see that the -- at lines 14 and 16,

the Court also says that you'll be responsible or the monitor

will be responsible, not necessarily you, for reviewing whether

offers of shelter or housing were made to those whose

belongings are counted as encampment reductions.  Do you see

that language?

A    That was also within my appointment.

Q    Now, sir, apart from the portions that we've looked at in

this exhibit, in these particular sections that we just focused

on, you had no other responsibilities that you're aware of per

any orders of this Court; is that correct?

A    I don't like trafficking and absolutes, counsel, so not

beyond what I stated in my status report and --

Q    So meaning that apart from what we've just looked at,

there were no other orders of this Court that gave you any

Garrie - Cross / By Mr. McRae                    **152**

responsibilities as a monitor prior to your appointment being stayed, correct?

A    To being stated or stayed?

Q    Stayed.

A    Not beyond what I stated in my report.  I know -- in my report of November 3rd I set out the four things I believe just to be clear, but I think we're in agreement.

Q    And other than what you set out in your report, which was the November 3rd report, you're not aware of any other responsibilities that you ever had provided by this Court as a monitor, correct?

A    I'm not willing to say in totality, but --

Q    Well --

A    -- I believe that it accurately reflects my recollection as I sit here now.

Q    You just referred us to your report where you said nothing other than what's in my report.  I then asked you, so you're saying that other than what's in your report, you're not aware of any other responsibilities that you've been given as a monitor in this case up to the point that your appointment was stayed.  Is that true or false?

A    Well, there's 600 exhibits or 573 exhibits and I don't have them all memorized, so I'm not in a position to give you an absolute statement.  So I can only give you the statements I've offered in my answer, I have nothing further to add is my

Garrie - Cross / By Mr. McRae                                        **153**

answer, counsel.

Q    Your appointment in this case as monitor was not the first time Judge Carter has appointed you to serve as a neutral, right?

A    That is correct.

Q    In fact, Judge Carter has appointed you to serve as a special master in at least 14 other cases including some consolidated cases, right?

A    I don't know if it's 14, but a couple.

Q    Well, let's --

A    Sorry, counsel, I'm not done.  I've been appointed as a special master in dozens and dozens of cases all over the country.  I've served as a forensic neutral and special master before Judge Chhabria.  I've served as a court appointed special master for the --

Q    I'm not asking for you to --

A    Excuse me, counselor, can you please let me finish?

        **MR. MCRAE:**  Your Honor, could you instruct the witness to answer the question, I'm not asking him for a CV.

        **MR. UMHOFER:**  And I'm objecting --

        **THE COURT:**  Just a moment.  Finish your answer.  Sir, finish your answer.

        **THE WITNESS:**  So I've served as a special master in dozens and dozens of cases all over the United States, so I can't answer you as to the specific 14.  If you'd like to bring

up the list of each of the 14 we can discuss that, but I would -- I've served with Judge Peggy Lee and I've served with dozens of judges, so I don't know the total number of special master appointments that I can speak to that you are alleging I served with Judge Carter.  I've served several, I will acknowledge, I just don't know if 14 is correct.  So if you'd be so kind to show me each of the 14, I can gladly answer your question, counsel.

**BY MR. MCRAE:**

Q    Let's look at Exhibit 568.  This is a document, ECF -- this is Document 139, it's filed February 26th, 2024.  It's an amended order appointing Special Master Daniel Garrie and Judge Jim Smith.  You're familiar with this document, correct?

A    I am not.  If you could go to the end to make sure it's the same document it would be helpful for me --

Q    Sure.

A    -- if we could just go through that.

Q    Well before we do that, and I'm happy to do that, you see here in Section 1 it says, pursuant to Federal Rule of Civil Procedure 53 and the inherent authority of the Court, the Court hereby appoints Daniel Garrie and James L. Smith as special masters to assist the Court in this litigation.  Do you see that?

A    I see those words.

Q    Could you kindly go to the last page?

Garrie - Cross / By Mr. McRae                          **155**

A     Well, I'd like -- can you go through all of the pages, so I can make sure it's the correct document.

Q     I'm not going to do that, sir.

A     Then I can't answer your question, counsel.

Q     If you're refusing to answer the question, which I haven't posed yet, I don't know how you could do that.

          **MR. MCRAE:**  But, Your Honor, I just showed the witness the last page of the document.

          **THE COURT:**  Just a moment.  We're taking more time than necessary.  This is only eight pages, just skim through this quickly.

          **THE WITNESS:**  That's all I wanted to do.

          **THE COURT:**  Turn the pages quickly.

          **THE WITNESS:**  Okay.  Can you go to the first page and just skim through so I can see the document and it's --

          **THE COURT:**  Counsel, we can clear this up --

          **MR. MCRAE:**  Okay.

          **THE COURT:**  -- just -- we're wasting too much time. Just go through, just flip it very quickly.

          **THE WITNESS:**  Next page.

          **THE COURT:**  Take a look at it quickly.

          **MR. MCRAE:**  Happy to flip through it, go ahead.

          **THE WITNESS:**  Thank you.  Next page.

          **THE COURT:**  I think we can all take judicial notice of this.

Garrie - Cross / By Mr. McRae                    **156**

MR. MCRAE:  That's what -- yeah.

THE WITNESS:  Okay.  Next page.

THE COURT:  Counsel, can we just take judicial notice that he's appointed?

MR. MCRAE:  I've tried, Your Honor.  I simply asked him --

THE COURT:  No, no, let's save some time.

MR. MCRAE:  Yes, yep, fine.  I --

THE COURT:  I think we should take judicial notice that he was appointed on the Veterans Administration case involving the VA and he was involved and appointed along with other special masters, I think two others or three others on the oil spill off the coast.

So I know of two cases that I've appointed Mr. Garrie on.  The Huntington Beach oil spill --

THE WITNESS:  No, I agree for the two, but I don't know about 14.

THE COURT:  Well, no, I think we're talking about consolidated cases.  In other words, we consolidated a huge number of oil cases, VA cases, but my recollection, counsel, is we can take judicial notice there's at least two.  Those are the VA case.  And by the way, just for all of your edification, you might have somebody available on January 20th, there may be a lot of interlocking issues on the VA case with a status conference on that day, but I leave that to you and --

Garrie - Cross / By Mr. McRae                    **157**

**MR. MCRAE:**  Yeah.  Thank you, Your Honor.

**THE COURT:**  -- okay.  I just --

**BY MR. MCRAE:**

Q    So this is Exhibit 568 and rather than take --

**THE COURT:**  Can we just stipulate minimally to those two cases.

**MR. MCRAE:**  I want to admit it into evidence, Exhibit 568 as opposed to judicially noticing it.

**THE COURT:**  If you like, received.

**(Exhibit Number 568 received in evidence)**

**BY MR. MCRAE:**

Q    In any event, suffice it to say that that case, by the way is titled Jeffrey Powers, et al v Denis Richard McDonough, et al, Case No. 2:22-cv-08357 and there's also an order in December of 2021 in another case called James Whelan, et al v Amplify Energy Corp, et al, where you were appointed by Judge Carter as a special master in a set of consolidated cases.  Do you recall that?

A    I acknowledge the appointment, I don't know what -- how many cases were consolidated and the like, but Amplify, I was definitely the special master --

Q    All right.  Why don't we take a look --

A    -- one of three.

Q    Right.  And we're looking at this language here in Exhibit 570 --

Garrie - Cross / By Mr. McRae                              **158**

**THE COURT:** Counsel, that's the same case.  This is the oil case off of Huntington Beach.

**MR. MCRAE:** Okay.

**THE COURT:** Okay.  This is simply the consolidated, just to save all of you time, Amplify is joined with other defendants.  This is what we would refer to as the Huntington Beach oil spill.  And it has three special masters involved, Raveo Bryan (phonetic) who's former DOJ --

**MR. MCRAE:** Right.

**THE COURT:** -- who was in charge of the Sypan (phonetic) receivership.  Mr. Garrie who's present and Judge Jameson.

**BY MR. MCRAE:**

Q    And I think if we go to page 2 of this document, which is Exhibit 570, it'll set forth the number of consolidated cases and this is at lines 10 through 15.  Sir, do you count 12 cases there?

A    I was literally counting them.  So just give me a second.  Well, 12, correct.

Q    All right.  So we're up to 13 thus far.  Let's go to the next one.  Judge Carter also entered an order in another case titled, Hernando Abrams v Amplify Energy Corp (phonetic), 82302344DOCJDE, this is Exhibit 571 and this is dated March 4th, 2024.  This is ECF 19.

And, sir, do you recall Judge Carter appointing you as a

Garrie - Cross / By Mr. McRae                    **159**

special master in this matter as well?

A    I think it's the same case.  That's why I'm a little confused, it's all part of the same oil spill case, there were just a lot of, how do I put it, it was complicated because there was a class action and another one, and they all got consolidated.  So I look at it as a single plaintiff, but if this was an order issued separately for this one, then I agree with you, but it's tied to the Amplify case.  If that makes sense, counsel.

Q    And now we're going to talk about your status report again, that's Exhibit 361, which was ECF 1063.  So first off, let's go back to when you initially reached out in an effort to make contact with the City, you -- let's go to Exhibit 504.

So you reached out at 3:12 a.m. on a Saturday, October 18th, 2025 and sent an e-mail to Mr. Szabo and other people described in this e-mail, correct?

A    I don't think I was working at 3:12 in the morning, I think that's a timestamp issue.

Q    When you say this is a timestamp issue, you don't know whether you sent this e-mail at that time is what you're saying?

A    I'm saying at 3:12, it depends where you are in the world, but my -- the computer clock may have clocked it at 3:12 in the morning, but I don't think on October 18th at 3:12 I was working.

**EXCEPTIONAL REPORTING SERVICES, INC**

Garrie - Cross / By Mr. McRae                **160**

Q    It was a Saturday though, right?

A    Yeah.

Q    Okay.

A    Well, it would have been a Friday, three hours before -- I don't know where I was in the world is basically what I'm telling you.

Q    Okay.  And among other things in this exhibit you requested an interview with Mr. Szabo.

A    Yes.

Q    And you did not copy retained counsel for the City on this e-mail, correct?

A    As I mentioned I made a mistake, but yes, I did not.

Q    And in a later e-mail to counsel and why don't we take a look at Exhibit 513, and at Exhibit 513 --

A    I can't see.

Q    Yeah, it's coming up in a second.  This is not --

A    Oh, this says your question.

Q    This is 513.  Do you have it in front of you, sir?

A    I do, what's it attached to?  My apologies.

Q    It's an e-mail.

A    No -- okay, I got it.

Q    Are you ready to proceed, sir?

A    Is there two pages or just one?

Q    We'll get to that.

A    Okay.

Garrie - Cross / By Mr. McRae                    **161**

Q    This is an e-mail dated October 21st, 2025.  Do you see that, sir?

A    Yes, sir.

Q    This is an e-mail from you, correct?

A    Yes.

Q    You also ask for dates and times for an interview with Mr. Szabo, correct?

A    I have to see the entire e-mail, so if you'd go to the next page I can tell you.

Q    Yes, let's do that.

So let's look at -- in fact, and while you're looking at that, I want to direct your attention to the third to the last paragraph on this page.

A    I'm just going to first read the e-mail and then I'll direct my attention.

Okay.  And you said the third -- the first e-mail or the second one?

Q    I want to direct your attention to where you say, please provide by the end of the day tomorrow, October 22nd, 2025, a few dates and times when the City administrative officer (CAO), Matt Szabo will be available for an interview.  This will enable me to inform the Court that the City is cooperating and is working to meet the aggressive deadline that is set.

Those are your words, right, aggressive deadline?

A    Yes.

Garrie - Cross / By Mr. McRae                    **162**

Q    And, sir, you requested a response to this e-mail for the following day, correct, in other words, October 22nd, as we just read?

A    Yeah, I think it's not here, but yeah.

Q    When you say it's not here, we literally -- we read it, is that where it says --

A    End of day tomorrow.

Q    Correct.

A    I just didn't know which day this e-mail was sent.  You asked me October 22nd, I just didn't remember if that was the day because the one below is October 21st.

Q    Sir --

A    I'm just saying the timestamp.

Q    Let's take a look at Exhibit 514.  And you can see here, retained counsel for the City responds a day later, in other words within the time frame that you requested on October 22nd, 2025 and informing you --

A    That's not what I see on my screen, counsel.

Q    Okay.  What you have here is Exhibit 514, correct?

A    No, that's not what I have -- okay.

Q    Let's go back up the top, the full view of the document. Let's go to the --

A    They just changed documents.

Q    Right.  And, sir, isn't it true --

A    I'm confused, counsel, I see an e-mail here, just I want

Garrie - Cross / By Mr. McRae                    **163**

you to see what I see on my screen.  I see an e-mail from

counsel Skolnick that was sent on October 27th, 2025.  And the

e-mail we were looking was October 22nd, 2025.  Unless my

memory is wrong.

Q    And there's a --

A    You said a day later.

Q    Right.  But -- we can go back to that e-mail in a second.

A    Okay.

Q    The e-mail that -- to which this was a response.  But

there is a response to you that there was a request for

Mr. Szabo to be interviewed on several dates or, excuse me,

several times on the 4th.  Do you see that?

A    In this e-mail?

Q    Right there, where it says finally as per your request for

an interview with Mr. Szabo we can --

A    I see.  I see, yes, I see it here in the screen.

Q    Okay.

A    I'm sorry, I'm just confused as to which one we're talking

about.

Q    Do you also see --

A    If you could scroll down, I could see the whole context.

Q    Yeah, that's fine.

     And do you recall having a discussion if we actually go to

page 5, let's go to page 5 of Exhibit 514.

A    Can I see above this?

Garrie - Cross / By Mr. McRae                **164**

Q    Sure.  And we want to see the preceding page as well.

A    Yeah.

        **MR. MCRAE:**  In other words, can we go to the preceding page where this e-mail response starts.

Q    Okay.

A    Yeah, I remember.

Q    Now, you sent an e-mail on October 21st requesting a response on October 22nd, right?

A    Not in this e-mail but a different -- we looked at an earlier e-mail, that is correct where I made that request.

Q    And as you can see, if we go back to the prior page, on page 4 here of Exhibit 514, on October 22nd, the next day, which is the day after October the 21st, Mr. -- the counsel for the City responds to you, let's go to page 5 --

A    But counsel -- let me just set the record for you, counsel Scolnick responded in a timely fashion generally, politely, professionally and did a -- I have -- but that he was working with the City and so just for clarity.  But counsel Scolnick responded in a timely fashion, certainly.

Q    Let's get back to my question.

A    Okay.

Q    Which is we're -- counsel for the City responds in paragraph 4 of page 5 of Exhibit 514, finally as for an interview with Mr. Szabo, he will be out of the country next week and gets back on Friday, October 31.

**EXCEPTIONAL REPORTING SERVICES, INC**

Garrie - Cross / By Mr. McRae                           **165**

So now we've seen the exchange of the e-mails of October 21st where you ask for a response on the 22nd.  Mr. Scolnick -- excuse me, counsel for the City responded the next day.  Do you see that, right?

A    Yes, counsel Scolnick, yes, I do.

Q    And it goes on to say if it's critical to meet with Mr. Szabo that afternoon, we can arrange it, but otherwise we'd prefer the following Monday or Tuesday.  Please let us know. Do you see that?

A    I do.

Q    And, sir, nowhere in the e-mail here in these e-mail exchanges in Exhibit 514 do you see any refusal to produce Mr. Szabo for an interview, correct?

A    No, he was out of the country, he didn't refuse to produce him.

Q    And you don't know why Mr. Szabo was out of the country.

A    That's correct, I'm not aware of why Mr. Szabo was out of the country.

Q    And with respect to the colloquy that you had with counsel for the Alliance where there were questions about whether Mr. Szabo was offered by Zoom or other means, you have no idea whether any such offerings would have been feasible or practical.

A    That is correct.  He was out of the country, I don't know. He could be on vacation, he could have been working, I have no

EXCEPTIONAL REPORTING SERVICES, INC

Garrie - Cross / By Mr. McRae **166**

knowledge.

Q   And, sir, is it also correct that if we look at page 4 of Exhibit 514 you responded to counsel for the City two days later on October 24th, 2025 where you stated that someone in your office would arrange a video conference interview, that would be in this second sentence starting with someone.

A   Yes, I see that, those words.

Q   And it was then that retained counsel for the City followed up on October 27th, 2025, now we're on page 1 of Exhibit 514, where retained counsel for the City explains that finally as per your request to interview Mr. Szabo, we can do 1 to 2:30 on the 3rd or 4 p.m. on the 4th.  Do you see that?

Do you see those words on the page?

A   I see those words.

Q   And the interview with Mr. Szabo --

A   I just can't see the top of the e-mail to see the date, that's all, I was just trying --

Q   Sure.

A   -- to verify your statements.

Q   Let's take a look at the top of the page.

A   Sorry, counsel.

So I agree with the dates.  I couldn't see, sorry.

Q   And the interview that you wanted to have with Mr. Szabo actually took place -- well, excuse me.

There was an initial interview that was scheduled for

Garrie - Cross / By Mr. McRae                    **167**

November 3rd, 2025, correct?

A     Yes.

Q     And isn't it true that that initial interview occurred at that time.

A     Counsel, I don't -- Mr. Szabo took the interview driving his -- I mean, I'd prefer not to get into the details.  He had a conflict and we weren't able to proceed forward.  If the City is telling me that Mr. Szabo could have gone forward in that meeting, I'll happily go into further detail about what happened.  But I would -- if the City would like.

Q     You spoke to Mr. Szabo that day and due to a scheduling conflict, the meeting was rescheduled, correct?

A     Mr. Szabo took the call from his Tesla while he was driving to go see his doctor, because he had forgotten he had a doctor's appointment and I didn't think it was particularly safe for Mr. Szabo to be driving his car while enroute to a doctor and rather -- and answering my detailed and exhaustive questions with counsel and everybody on the phone.

I assume there had been some sort of scheduling issue or scheduling error where Mr. Szabo had not -- the communication between counsel from a scheduling perspective that resulted in him.  But if Mr. Szabo's position is that he was present for the meeting while he was driving his car to a doctor appointment, and that's how he attended for me to attend the meeting I would beg to differ.  So I canceled that meeting

**EXCEPTIONAL REPORTING SERVICES, INC**

because I didn't think it was appropriate for Mr. Szabo to be interviewed while driving his car on this topic.

So was that enough background clarification for you, counsel?

Q    I didn't mean background clarification.

MR. MCRAE:  And, Your Honor, I would move to strike, that was a diatribe that was a deep excursion from my question.

MR. UMHOFER:  Your Honor, I object, it was responsive.

MR. MCRAE:  It was not.  Your Honor, it was literally due to a scheduling conflict, the meeting was rescheduled and then we got ad hominins about a Tesla.

THE COURT:  I think we're taking too much time with this bickering back and forth.  Your next question, counsel.

BY MR. MCRAE:

Q    Mr. Garrie, Sonya Morgan is someone who works in your office, correct?

A    She is.

Q    Sonya Morgan actually sent an e-mail to counsel for the City thanking the City for scheduling that discussion that you had, correct?

A    I will take your word for it.  Sonya is impeccably polite because of her British upbringing.

Q    And isn't it true that if we take a look at Exhibit 518, Ms. Morgan after saying thank you for taking the time to meet

Garrie - Cross / By Mr. McRae                **169**

today, we appreciate your understanding.  Also, suggested several times at a later time for you to speak with Mr. Szabo, those times being set forth here in Exhibit 518, on page 2, correct?

A    That's the November 3rd e-mail, sorry, right here?  That's a --

Q    Correct.

A    And then this, what you're showing me is a text from that e-mail message?

Q    Correct.

A    Where she's responding to Scolnick's e-mail, yeah, two minutes later, yes.

Q    And, sir, on that same day counsel for the City suggested another time and date for that interview, this is going to be Exhibit 519, page 1, correct?

A    I don't know.

Q    Let's take a look here.  You can see here you have the date November 3rd, 2025, this is a same day exchange, retained counsel for the City suggests that Mr. Szabo can do a call on Friday.  You see that, right?

A    I see that's from Scolnick or was this to Sonya?  I wasn't -- I didn't read all the e-mails, but I do see it.

Q    And then we have Exhibit 521 where again in Exhibit 521 this is dated November 4th I believe we can go to the very top --

A    This is Mr. Gibson.

Q    And this is 521.

         **MR. MCRAE:**  Why don't we go to the first page.

Q    And is it your recollection then that Ms. Morgan then e-mailed counsel for the City asking for Mr. Szabo's availability for the next week for an interview?

A    Says I will --

Q    You can see Ms. Morgan's e-mail starts in the bottom.

A    Thank you for providing availability, I'll send out the counter invite for the Friday for Mr. Szabo.  So what was your question?  Can we go to the next page on the e-mail, just so I can see what it says?

     So what was the question, apologies?

Q    The question was directing you, do you see where Ms. Morgan then says, that you will most likely need a follow up session.  In anticipation, could you please follow up with Mr. Szabo to confirm his availability for the next week as well.

A    I see it, yeah.  I see those words.

Q    And then you spoke with Mr. Szabo on November 7th, correct?

A    I don't remember the day but I think that -- I take your word for it, I -- there's -- everything happened very closely together, so I don't remember when I spoke --

Q    That interview lasted --

Garrie - Cross / By Mr. McRae                     **171**

A     I think it's correct.

Q     That interview lasted approximately one hour, correct, on November 7th?

A     Yeah, I believe during the interview Mr. Szabo directed us to speak to Mr. Gibson.  Sorry, not Gibson or Gipson, I don't know how to pronounce his name name, G-I-P-S-O-N.

Q     On November 10, 2025 in Exhibit 525, if we can go to that, Ms. Morgan confirmed the time for Mr. Szabo's additional call with you for the following week, correct?  Do you see here page 1, Exhibit 525, Ms. Morgan to the group, where she states, thank you for providing Mr. Szabo's availability.  I will send out a calendar invite for Thursday, November 13th at 9:30 a.m.

A     I do.

Q     And, sir, if we take a look at Exhibit 539, we can see that Ms. Morgan on November the 12th sent another e-mail canceling the meeting scheduled with Mr. Szabo, correct?

A     That is correct.

Q     And, sir, on October the 28th, you sent an e-mail to counsel, retained counsel for the City requesting a meeting with Mr. Gipson, correct?

A     I will -- you have to show me the e-mail but I can take your word for it if you'd like.

Q     Let's go to Exhibit 515.  October 28th, 2025, Daniel Garrie and do you see there, you're requesting a meeting with Mr. Gipson.

Garrie - Cross / By Mr. McRae **172**

A    I do.

Q    And you stated that Ms. Morgan on your team would work with retained counsel to coordinate the scheduling of that meeting, correct?

A    It does state those words.

Q    Now, that was October the 28th, right?

A    That is correct.

Q    Now it wasn't until three days later, if we go down this page in Exhibit 515 where Ms. Morgan e-mails counsel for the City to schedule that interview, correct?

A    I don't know all the e-mails that went back and forth, so I don't know if this is the only e-mail, but it says October 31st from Scolnick in this e-mail not from Sonya, so I apologize, counsel.

Q    Sure.

        **MR. MCRAE:**  Let's go to the bottom of that, let's reduce this.

        **THE WITNESS:**  I'm just reading.

Q    It actually says, good morning.

A    Okay.  That wasn't -- I can't see the screen as well.

Q    Okay.  You see this is actually from Ms. Morgan, this being the October 31st, 2025 response?

A    Yeah, I do.

Q    Okay.  And then if we take a look at page 1 of Exhibit 515, actually 14 minutes later, after Ms. Morgan sends her e-

mail on October 31st, 2025, counsel for the City responds

saying, I have been waiting to hear from you.  Do you see that?

A    I do.

Q    And that same day, October 31st, 2025 retained counsel for

the City e-mailed Ms. Morgan and informed her that Mr. Gipson

was out of town until the following Monday, correct?

A    If you show me the e-mail I --

          **MR. MCRAE:**  Let's go to Exhibit 516, page 1.

Q    You should have that in front of you.

A    And that's from counsel Scolnick.  I can't see the dates

or whatever you were saying, but I do see the substance of the

e-mail, I just can't see the dates or times.

Q    And it's -- right.  And it says, Ms. Morgan, I learned

that Mr. Gipson is out of the office until Monday, so we'll

touch base with you as soon as we hear back from him on Monday.

You see that, right?

A    Yeah, October 31st, yeah.

Q    And on November 4, 2025 if we go to Exhibit 521 you see

here counsel for the City e-mailing Ms. Morgan and providing

Mr. Gipson's availability for an interview, correct?

A    On the 4th, yeah.

Q    And on November the 5th, if we go to Exhibit 522, at page

1, you see that Ms. Morgan confirmed November 13th, 2025 as a

date to have Mr. Gipson's interview, correct?

A    I see the e-mail.

Garrie - Cross / By Mr. McRae                    **174**

Q    And that interview, in fact, occurred.

A    I mean, and that's from the one from Sonya up top, right?

Q    Correct.

A    Yeah, correct.

Q    And this interview with Mr. Gipson actually occurred on November 13th, 2025, correct?

A    It did.

Q    And, sir, if we go back now to Exhibit 504, let's take a look at this, this is your October 18th e-mail where you purported to attach a spreadsheet containing questions that require responses concerning the data in that report, right?

A    That's what it says.

Q    Now, sir, in terms of whether the City actually had -- and, in fact, why don't we go to, I believe it's page 3 of Exhibit 504.  This was the document we were talking about earlier, sir, where the three questions could generate, and I think you maybe even eluded to -- I don't know if you said infinite but definitely a number of permutations in terms of the possible answers.  Do you recall that exchange?

A    Yeah.

Q    All right.  Now --

A    But -- okay, go ahead, counsel.

Q    So with respect to these questions we've got actually three different spreadsheets that are attached to this Exhibit 504, correct?

**175**

THE COURT: Counsel, let me ask both of you before you get into this area, I'm assuming that you're going to go past 4 o'clock?

MR. MCRAE: I would be, Your Honor.

THE COURT: Okay. Let me have a discussion then before you get into a new area --

MR. MCRAE: Sure.

THE COURT: -- partway through.

Are any of you able to stay and continue on with Mr. Garrie on the stand and also start your conference with Judge Birotte and we'll take another half hour or so, but I need to know that lead counsel are present to have something meaningful, but let me talk to you about a number of things. Maybe that's not wise because we're not going to finish today with redirect, recross, apparently you're coming back.

First of all, I'd like you to leave all of the e-mail correspondence that you have with the City, with Mr. Scolnick or anybody else with the Court.

MR. GARRIE: Okay.

THE COURT: And I'd like you to check your correspondence to make sure we have all of the correspondence between Mr. Garrie and the City. Okay?

Second -- and, counsel, have a seat for just a moment.

MR. MCRAE: Thank you, Your Honor.

**176**

THE COURT: Maybe we'll just recess now frankly because I'm not sure we're going to finish with Mr. Garrie.

I stated this morning that I was concerned, and at least considering whether to expand the scope of this contempt proceeding. If I do that, this Court would issue an amended notice so that all parties are apprised of the revised scope of the hearing. I'll absolutely give parties time to compare and address any new allegations.

I also have some timing issues that I want to consider and ponder. And that is, I want to give the Circuit time to resolve the City's appeal regarding the appointment of Mr. Garrie. And the other that's now arisen is whether to give my state court colleague Judge Kin time to determine the remedies in light of his ruling on the Brown Act violation in the state court.

So I think I need a little bit of time to sort that out frankly. And if I do decide to expand the proceedings, I want to make sure that the parties have time to prepare from a due process standpoint, so that would not be an issue, and I want a little bit of time to think about that.

I will issue a ruling in the next few days to provide some clarity on how we're going to proceed after I ponder this, and frankly, I've only read Judge Kin's ruling just briefly. I didn't go back and have time to read it on the bench because I've been engaged all day. But you should know that the Court

is strongly considering expanding the proceedings and perhaps continuing the resumption of this hearing at a later date.

So for now I'm going to vacate the hearing, certainly won't be in session tomorrow, so would you give my appreciation to Judge Birotte, and please, you know, send him home earlier than 1 o'clock in the morning, okay?

MR. GARRIE:  Your Honor, I just wanted to put one thing on the record.  So I had a chance to talk to Law and Forensic senior management and they've agreed to let me just donate my time and just charge for the team members for L&F if that has any impact of the cost concern for the City, I won't be charging for my time and the invoice, while none have been submitted to date, will be reflective of not charging for my time on any of the matter that I work regarding this because -- and for -- I just think it's an important cause.  I just wanted to put that on the record so there's no confusion when I submit the invoice and you see my hours, but the rate of zero, it's not because I'm an idiot, it's because that's what we decided to do.  That's all, Your Honor, I just wanted to put it up there.

THE COURT:  Thank you.  Wow.

That would be pro bono work then?

MR. GARRIE:  Yeah, as my wife says, working for free of life, yes, that is correct, Your Honor.

THE COURT:  Okay.  I'm trying to keep you from going

**178**

down the highway.  I'm trying to come up here, in fact, I might as well rent down the street.  Do you want to come to Orange County?

Well, let's leave that on the table.  Time out.  I'm trying to be courteous.  I'm going to be journeying up the road and let me say that there may be no meaning to the January 20th discussion concerning what we refer to the VA case.  But I would just strongly recommend that there be some representative from the County or the City possibly at that initial status conference because the inner machinations of the funding chains are interesting.

Listen, without further ado, would you thank Judge Birotte.  I'll be in the area, but I don't think I should be in the courthouse or near any of your discussions.  But I certainly don't think you have to go to 1 o'clock in the morning.  Those are my hours and you don't want to keep them, okay.

So I'll let you know after I ponder this when we'll resume, but this is the information I've gotten.  And giving deference and time to the Circuit to resolve this issue and, Mr. Hamburger, thank you, that really isn't going to occur before May, is it?

MR. HAMBURGER:  Given when briefing is scheduled to end, I highly doubt it.

THE COURT:  Mr. Garrie, would you step out some

**179**

place, out of our --

        **MR. GARRIE:**  Sure.

        **THE COURT:**  Just a moment, I want to ask you something.  This does not require an answer, just a thought. Oh, yeah, he's brought his colleague also I didn't realize that.

        When you discuss this matter with Judge Birotte, I know you're there on 7.1, are you also going to discuss 7.2 and if you are, that's acceptable to the Court.

        **MR. HAMBURGER:**  Your Honor, we -- at the previous session we did and --

        **THE COURT:**  I don't want to know.  I just don't --

        **MR. HAMBURGER:**  -- we are -- I won't tell you, but yes, that is a topic of discussion --

        **THE COURT:**  Today?

        **MR. HAMBURGER:**  -- amongst the parties, yes.

        **THE COURT:**  Remember this, next time if there's an agreement by the City in my court, Mr. Scolnick, I'd like to know that that's accepted by the City before we go through the delay that we went through last time.  So if you reach an accommodation, it's a little uncomfortable to get the representation that at the time Mr. Galperin and Mr. Garrie were acceptable, and then wait for the counsel to schedule it three times and then refer it back to a committee.  That's not good faith.

**EXCEPTIONAL REPORTING SERVICES, INC**

So if you do, I need to get some representation, from somebody, the City attorney or somebody that this is really going to occur and we're not going to go through that process. That's my only request.

Second, I've been trying to get an outside source not connected with the City, Mr. Mejia certainly is, he's the controller, I'm wondering in a sense, but he was supposed to be what I call a gatherer of information. I did that and I'm accepting that, because I think it saves a lot of money, okay.

Now, do you have any questions of the Court, if so, I'll get you up to Judge Birotte. Counsel, on behalf of LA Alliance?

MR. UMHOFER: Your Honor, I believe that Judge Birotte isn't available until 4 -- after 4:30. Am I right about that? After 4?

THE COURT: Well, I was told 4 o'clock --

MR. UMHOFER: Okay. All right. All right. Then we're --

THE COURT: -- a half hour --

MR. UMHOFER: -- good to go, Your Honor, thank you.

THE COURT: Okay. On behalf of the City, any questions?

MR. SCOLNICK: No.

THE COURT: Intervenors?

MS. MYERS: The only point I would say, Your Honor,

is that the intervenors and the petitioner in the Cangress (phonetic) matter in front of Judge Kin can keep the Court updated on the record with the timing as filings.  We just, to be transparent, Your Honor, we did not submit it because no judgment has issued, which is why we did not give the Court notice of it.  But certainly when a judgment is issued, we will issue -- we will file that with the Court.

THE COURT:  All right.  It came to my attention over the weekend in the LA Times.  I want to ponder that for a while.

All right.  Counsel, then anything further?  Justice Goethals, anything further?

MR. GOETHALS:  No, sir, thank you.

THE COURT:  Special Master?

MS. MARTINEZ:  Yes, Your Honor.  There is a report that is due -- the special master Michelle Martinez, special master Michelle Martinez.  I'm very loud -- special master Michelle Martinez.  There is a quarter four report due to the Court on January 15th.  I just want to make it clear that quarter three and quarter four, even though that the City submits, we all know per Docket 991 it says the City cannot submit its report until there is verification prior to publication.  That is very clear in that order, so I want to make it very clear that those reports are provisional until we have a data monitor on board.

**182**

So I just want to be very clear, because I know that my special master report is also -- needs to be due to the Court and you've requested for me to hold off until this contempt hearing. And I just want to be very clear that that is provisional as well.

**THE COURT:** All right. I'm going to do this so we have due process. These reports are provisional, because they're not verified, but these reports should continue coming to the Court.

Number two, I think we've heard from almost all of the witnesses, Ms. Martinez, so I'm going to now have you issue your report, so that when you take the stand, there's no surprises, it doesn't come to the parties, you know, two nights before, that way you've got plenty of time to look at it. So when she takes the stand, there's good cause and direct examination.

Folks, I wish you all the best, you'll hear from me some time this week, give me a little bit of time. Thank you very much, counsel, we're in recess.

**(Proceedings concluded at 4:06 p.m.)**

**\* \* \* \* \***

183

# CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          January 13, 2026

            Signed                                      Dated


*TONI HUDSON, TRANSCRIBER*