**FILED**
CLERK, U.S. DISTRICT COURT

Jan 15, 2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ pd _____ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.<br><br>Plaintiff,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.<br><br><br>Defendant. | Case No. LA CV 20-02291-DOC(KESx)<br><br>Judge:  Hon. David O. Carter<br><br>**SPECIAL MASTERS REPORT** |

1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LA ALLIANCE FOR HUMAN RIGHTS, et al.,**

**Plaintiffs,**

**v.**

**CITY OF LOS ANGELES, et al.,**

**Defendants.**

**Case No. 2:20-cv-02291-DOC-KES**

**SPECIAL MASTER'S QUARTERLY REPORT FOR QUARTER 3**

Submitted by:

**Michele Martinez**

**Special Master**

**Date: January 15, 2026**

Filed Pursuant to:

• Dkt. 429-1 (2022 Settlement Agreement)

• Dkt. 445 (Order Appointing Special Master)

• Dkt. 991 (Order Granting in Part and Denying in Part Plaintiffs' Motions for Settlement Compliance)

• Dkt. 1050 (Order Regarding Special Master Duties and Reporting Requirements)

• Dkt. 1048 (Order Resolving Third-Party Monitor Appointment and Scope of Work)

Submitted To:

**The Honorable David O. Carter**

United States District Judge

1

**EXECUTIVE SUMMARY**

This Report evaluates the City of Los Angeles's procedural compliance with the reporting, documentation, and verification requirements established by the Settlement Agreement and the Court's Orders for Quarter 3, 2025. Consistent with Dkt. 991 and Dkt. 1050, this assessment is limited to procedural compliance. Substantive compliance determinations must be based on Monitor-verified data, which is not available for this reporting period.

For Quarter 3, the record does not contain the raw data, source documentation, definitions, methodologies, district-level milestones, encampment-level documentation, or the full set of Section 7.1 metrics required for verification. According to the Monitor's November 3, 2025 Status Report (Dkt. 1063), the Monitor did not receive sufficient data or information regarding the City's data-collection, management, analysis, or reporting methods to perform verification. As a result, the Court does not have a Monitor-verified factual record for Quarter 3.

The City submitted two filings for the Quarter 3 reporting period: its initial Quarter 3 report on October 15, 2025 (Dkt. 1051), and a supplemental filing on November 11, 2025 (Dkt. 1072-2). The record does not contain a unified or reconciled dataset, nor the underlying materials necessary to verify either submission. Although Dkt. 991 required that a Monitor be selected by September 12, 2025, and that data be provided for pre-filing verification, the Monitor was appointed on October 14, 2025—one day before the City's filing deadline. The City filed its initial Quarter 3 report the following day, before verification could occur.

Following the City's filings, the Special Master issued a Request for Updates on October 30, 2025, an Interim Assessment on November 7, 2025, documenting procedural and substantive deficiencies ahead of the November 12 hearing, and a Data Clarification Memorandum on November 16, 2025. The record does not reflect that the underlying data, milestone documentation, or encampment-level materials requested in these communications were provided. On November 18, 2025, the City submitted materials describing how its October 15 and November 11 filings were prepared; these materials assisted in understanding the City's revisions but did not include the datasets or documentation required for verification under Dkt. 991.

Because the documentation necessary for verification was not provided, the Monitor was unable to validate the City's reported figures, and the Court does not have a Monitor-verified factual record on which to base substantive compliance determinations for Quarter 3. As stated in the Special Master's Interim Assessment (Dkt. 1065), the oversight process remains limited by the absence of documentation required for verification and the lack of milestone-validation materials.

Accordingly, this Report evaluates procedural compliance only, consistent with the Court's directives and the limitations of the record.

2

**INTEGRATED ANALYSIS AND FRAMEWORK FOR PROCEDURAL REVIEW**

The Settlement Agreement establishes a comprehensive structure of reporting, documentation, planning, and verification obligations that operate together to support the Court's oversight. The Court's June 24, 2025 Settlement Compliance Order (Dkt. 991) reinforced these obligations and clarified that the City must provide complete, consistent, and verifiable information sufficient for independent evaluation by the Monitor and the Court. Because the Court does not have a Monitor-verified factual record for Quarter 3, this Report evaluates procedural compliance only.

All findings in this Report are based on the materials submitted to the Court, the Monitor's November 3, 2025 Status Report (Dkt. 1063), the City's filings, transcripts of relevant hearings, and the City's written responses to the Special Master's inquiries regarding the Quarter 3 report and Section 7.1 reporting requirements. The analysis below explains the procedural framework governing Quarter 3 and the basis for the Special Master's procedural findings.

**A. The Settlement Agreement as an Interdependent Framework**

The Settlement Agreement establishes an interdependent structure designed to:

• increase housing and shelter opportunities,

• guide street-engagement practices,

• reduce unsheltered homelessness within the City of Los Angeles.

These obligations arise from the combined effect of Sections 3, 4, 5, and 7, as well as the Agreement's stated purpose of achieving a substantial and meaningful reduction in unsheltered homelessness. Section 2 provides that the Court retains continuing jurisdiction for the full five-year term to oversee and enforce compliance.

**1. Section 3 — Housing and Shelter Creation**

Section 3 requires the City to create the "Required Number" of interim housing and shelter opportunities and to document the type, availability date, population served, source, and changes in availability for each bed or unit. This documentation is necessary for the Monitor to verify the City's reported inventory.

**2. Section 4 — Engagement and Enforcement**

Section 4 requires documentation of outreach contacts, offers of shelter or housing, acceptances and rejections, reasons for rejection, and the availability of adequate alternatives before enforcement actions occur. The Court's June 24 Order clarified that the Monitor must review whether offers of shelter or housing were made to individuals whose belongings are counted as encampment reductions.

**3. Section 5 — Milestones and Planning**

3

Section 5 requires district-level and citywide milestones, timelines for bed creation, timelines for engagement and encampment resolution, and plans demonstrating how the City will meet its obligations. These materials must be documented and provided to the Court and the Monitor.

### 4. Section 6 — Dispute Resolution

Section 6 requires the Parties to participate in a structured dispute-resolution process, developed with the Court or the Special Master, for issues arising from the City's Street Engagement Strategy.

### 5. Section 7 — Reporting and Verification

Section 7.1 requires quarterly status updates containing specific metrics.

Section 7.2 requires the Parties to engage a third-party Monitor to verify the City's data prior to publication.

The Court's June 24, 2025 Order (Dkt. 991) clarified that the Monitor must:

• review the City's data prior to publication,

• verify the numbers reported,

• review whether offers of shelter or housing were made before encampment reductions,

• appear before the Court to present findings.

Verification requires raw data, source documentation, definitions, methodologies, and access to technical staff.

### 6. Special Master's October 6, 2025 Statement

The Special Master's October 6, 2025 Statement (Dkt. 1042) documented that Section 7.2 "has not been fulfilled" and that the absence of a third-party verification system constrained the Court's ability to enforce the Agreement as contemplated.

### B. Procedural Obligations Despite Section 8.2

Procedural obligations under Sections 3, 4, 5, 7, and Dkt. 991 remain in effect unless expressly modified by the Court. Section 8.2 allows the City to pause certain substantive obligations in Sections 3, 4, and 5 in the event of a formally declared emergency, but it does not suspend reporting, documentation, milestone, or verification requirements. The record does not reflect that the City invoked Section 8.2 for Quarter 3.

### C. Framework for Procedural Review in This Report

For Quarter 3, the Special Master evaluates procedural compliance using the following framework:

4

1.  Whether the record contains the information required under Sections 3, 4, 5, and 7.

2.  Whether the record contains documentation sufficient for independent verification under Section 7.2 and Dkt. 991.

3.  Whether the City's filings are internally consistent and reconcilable.

4.  Whether the procedural sequence necessary for the Court and the Monitor to evaluate substantive compliance was followed.

The Monitor's November 3, 2025 Status Report (Dkt. 1063) is not contradicted in the record and constitutes the only detailed account of what data and access were available for verification. After the Monitor began requesting data and documentation, the City's November 5, 2025 filing (Dkt. 1064) challenged aspects of the Monitor's Status Report and requested a stay of the appointment order. These filings occurred after the Monitor reported the absence of materials required for verification.

This sequence forms part of the procedural context in which verification did not occur for Quarter 3.

**D. Findings Limited to Procedural Compliance**

This Report evaluates procedural compliance only because the documentation required for verification was not provided. Substantive compliance—such as whether the City has created the Required Number of beds, made adequate offers of shelter or housing before enforcement actions, or achieved encampment reductions consistent with Dkt. 874—must be determined by the Court based on Monitor-verified data.

For Quarter 3, such verified data is not in the record.

**I. INTRODUCTION**

This Special Master's Report is submitted pursuant to the Court's June 24, 2025 Settlement Compliance Order (Dkt. 991) and the Court's subsequent order defining the Special Master's duties (Dkt. 1050). The purpose of this Report is to document the procedural status of the City of Los Angeles's Quarter 3 reporting under the Settlement Agreement for the period of July 1 through September 30, 2025.

Under Dkt. 991, the City's quarterly reporting must be supported by documentation sufficient for the Monitor to independently verify the City's submissions before publication. Because verification did not occur for Quarter 3, the Court does not have a Monitor-verified factual record for this reporting period.

This Report identifies the procedural gaps and documentation deficiencies that prevented verification, without assessing the substantive accuracy of the City's reported data or its performance under Sections 3, 4, 5, 7, or 8. This limitation applies only to this reporting period

and does not alter the Special Master's broader responsibilities under the Settlement Agreement and the Court's Orders.

## II. BACKGROUND AND PROCEDURAL CONTEXT

The Court's June 24, 2025 Settlement Compliance Order (Dkt. 991) established the framework for quarterly reporting, verification, and oversight. Under this structure, the City must provide the Monitor with the data and documentation necessary to verify its quarterly submissions before they are filed with the Court.

For Quarter 3, the Monitor was appointed on October 14, 2025, one day before the City's October 15 filing deadline. The City submitted its initial Quarter 3 report on October 15 (Dkt. 1051) and a supplemental filing on November 11 (Dkt. 1072-2). The record does not contain the underlying data, reconciled datasets, milestone documentation, or encampment-level materials required for verification under Dkt. 991.

Following these filings, the Special Master issued a Request for Updates on October 30, an Interim Assessment on November 7, and a Data Clarification Memorandum on November 16. The record does not reflect that the requested underlying data or milestone documentation was provided. On November 18, the City submitted materials describing how its October 15 and November 11 filings were prepared; these materials did not include the datasets or documentation required for verification.

Because the Monitor did not receive the documentation necessary to conduct verification, the Court does not have a Monitor-verified factual record for Quarter 3. This procedural context frames the scope of this Report.

## III. VERIFICATION FRAMEWORK

Dkt. 991 establishes the verification framework for the City's quarterly reporting under the Settlement Agreement. Under this framework, the City must provide the Monitor with the data, documentation, and access necessary to independently verify the accuracy of the City's quarterly submissions before they are filed with the Court. Verification is a procedural requirement and the mechanism through which the Court receives a reliable factual record for substantive compliance determinations.

To conduct verification, the Monitor must receive:

• raw data underlying all reported metrics

• definitions, methodologies, and data-collection processes

• documentation supporting Section 7.1 reporting

• documentation supporting Section 5.2 milestones

• encampment-level materials necessary to validate reported outcomes

6

• any additional information the Monitor identifies as necessary to confirm accuracy and completeness

The Monitor is responsible for reviewing these materials, resolving data issues with the Parties and LAHSA, and confirming the accuracy of the City's reported data. Monitor-verified data forms the factual record on which the Court evaluates substantive compliance.

This verification framework defines the procedural obligations assessed in this Report and provides the basis for determining whether the materials necessary for verification were present in the record for Quarter 3.

**SECTION IV — SUMMARY OF RELEVANT OBLIGATIONS UNDER SECTIONS 3–9**

### A. Section 3 — Housing and Shelter Creation

Section 3 requires the City to create or obtain the Required Number of housing or shelter opportunities and to document how each bed or unit was created or obtained. Section 3.2 requires reporting by Council District. Under Dkt. 991, the City must provide documentation showing how each unit that pre-dated the Settlement Agreement was "created" or "obtained" for purposes of Section 3. These materials must be provided to the Monitor for verification under Section 7.2.

Quarterly reporting under Section 7.1 must be tied to the milestones established under Section 5.2. This includes reporting whether the City is meeting district-level and citywide milestones for bed creation and providing documentation showing progress toward those milestones. Quarterly reporting must include district-level progress toward each Section 5.2 milestone; reporting only citywide totals does not satisfy the procedural requirements of Section 3 or Section 5.2. Reporting bed creation without connecting those figures to the milestones required under Section 5.2 does not satisfy the procedural requirements of the Settlement Agreement.

### B. Section 4 — Street Engagement and Enforcement

Section 4 requires the City to offer shelter or housing before enforcing public-space regulations. The City must document the number of individuals engaged, the offers made, and the outcomes of those offers. These materials must be provided to the Monitor for verification under Section 7.2.

### C. Section 5 — Milestones, Planning, and Deadlines

Section 5.2 requires the City to develop district-level and citywide milestones and deadlines for:

• bed creation

• encampment engagement

• encampment cleaning

7

• encampment reduction

These milestones must be provided to the Court and the Monitor. Section 5.2 milestones form the basis for evaluating progress under Sections 3 and 4. Quarterly reporting under Section 7.1 must therefore show whether the City is meeting its Section 5.2 milestones. Because Section 5.2 requires district-level milestones, the City must report milestone progress by Council District as well as citywide. District-level reporting is necessary to evaluate compliance with Section 5.2.

Under Dkts. 874 and 991, encampment-reduction milestones must reflect the Court's definition of a reduction, which requires that individuals whose tents, makeshift shelters, or vehicles are removed be offered available shelter or housing. Cleanings conducted under programs such as CARE or CARE+ may not be counted as reductions. Milestones must therefore be supported by documentation showing that reductions include offers of shelter or housing.

**D. Section 6 — Dispute Resolution**

Section 6 authorizes the Parties to raise disputes regarding the interpretation or implementation of the Settlement Agreement. The Court retains authority to resolve disputes regarding milestones, definitions, and reporting requirements. Dkts. 874 and 991 were issued pursuant to this authority.

**E. Section 7 — Reporting and Data Monitoring**

**1. Section 7.1 — Quarterly Status Updates**

Section 7.1 requires the City to report:

• the number of housing or shelter opportunities created or obtained

• the number of beds or opportunities offered

• the number of beds or opportunities available

• the number of PEH engaged

• the number of PEH who accepted offers

• the number of PEH who rejected offers and the reasons for rejection

• the number of encampments in each Council District

The City has historically reported a metric labeled "PEH served," which reflects the number of individuals who entered the beds or units created or obtained under Section 3. At the time, this metric was understood to represent utilization of the beds the City created or otherwise obtained. However, "PEH served" is not a Section 7.1 metric and does not identify the number of beds or opportunities offered, the number of PEH who accepted offers, or the number of PEH who rejected offers and the reasons for rejection. As a result, "PEH served" does not satisfy the offer-based reporting requirements of Section 7.1.

8

Section 7.1 reporting must also be tied to the milestones established under Section 5.2. For bed creation, this requires reporting whether the City is meeting district-level and citywide milestones. For encampment reductions, this requires reporting whether reductions align with the Court's definition in Dkts. 874 and 991 and whether the City is meeting its district-level and citywide encampment-reduction milestones. Where metrics relate to Section 5.2 milestones, the City must report them by Council District as well as citywide. District-level reporting is required to evaluate progress toward district-specific milestones.

## 2. Section 7.2 — Independent Verification

Section 7.2 requires the Parties to engage a third-party Monitor to verify the City's reported data. Verification requires:

• raw data

• source documentation

• definitions and methodologies

• encampment-level documentation

• access to technical staff

• consolidated reporting across LAHSA, HACLA, LAHD, and City-funded outreach teams

Without these materials, verification cannot occur.

## F. Section 8 — Emergency Conditions

Section 8.2 allows the City to pause certain substantive obligations under Sections 3, 4, and 5 in the event of a formally declared emergency. Section 8.2 does not suspend procedural obligations, including reporting under Section 7.1 or verification under Section 7.2. The record does not reflect that the City invoked Section 8.2 for Quarter 3.

## G. Section 9 — Coordination With County Services

Section 9 of the City Settlement Agreement does not impose obligations on the County of Los Angeles, which was not a party to that Agreement. Instead, Section 9 reflects the Parties' understanding that the County has independent responsibilities under state and federal law to provide services to PEH within the City, including mental-health, substance-use, medical, and social services. The City and Plaintiffs agreed to cooperate in supporting the County's provision of these services, but Section 9 does not create enforceable duties for the County.

Following the Court's approval of the County's separate Settlement Agreement in 2023, the County's service-related obligations are governed exclusively by that Agreement. These obligations are distinct from the City's responsibilities under the City Settlement Agreement and are not subject to verification under Section 7.2 of the City Settlement.

9

Coordination between City agencies, LAHSA, HACLA, LAHD, and County departments remains necessary to support consolidated reporting under Section 7.1 and to facilitate implementation of Sections 3 and 4. However, the City Settlement Agreement does not authorize the Court to enforce County performance through the City's quarterly reporting process.

**SECTION V — CLARIFICATION ON PROCEDURAL VS. SUBSTANTIVE COMPLIANCE**

The Court's Orders distinguish between procedural compliance—whether the City has submitted the information and documentation required under the Settlement Agreement—and substantive compliance, which concerns whether the City has met its operational obligations. Dkt. 991 emphasizes that the Monitor must review the City's data prior to publication, verify the numbers reported, and appear before the Court to present findings. These requirements presuppose that the City provides the documentation and data inputs necessary for verification.

Because the documentation required for verification was not provided, the Court does not have a Monitor-verified factual record for Quarter 3. As a result, this Report evaluates procedural compliance only.

**A. Procedural Compliance**

For purposes of this Report, procedural compliance refers to whether the record contains:

1.  **Quarterly reporting under Section 7.1, including:**

    -   beds or opportunities created, offered, and available

    -   PEH engagement, acceptances, rejections, and reasons

    -   encampment information by Council District

2.  **Documentation required for verification under Section 7.2 and Dkt. 991, including:**

    -   raw data

    -   source documentation

    -   definitions and methodologies

    -   access to technical staff

3.  **Documentation required under Section 3,**

    -   including bed and unit creation details.

4.  **Documentation required under Section 4,**

    -   including engagement logs, offer logs, acceptance/rejection data, and reasons for rejection.

5. **Milestone documentation required under Section 5,**

- including district-level and citywide milestones.

6. **Internal consistency across filings**

- including reconciliation of multiple submissions.

Procedural compliance does not involve evaluating the accuracy of the City's reported numbers or determining whether the City met its operational obligations.

## B. Substantive Compliance

Substantive compliance involves determinations such as:

• whether the City has created the Required Number of beds under Section 3

• whether adequate offers of shelter or housing were made before enforcement actions under Section 4

• whether the City has met its milestones under Section 5

• whether encampment reductions are consistent with the Court's definition in Dkts. 874 and 991, which requires that reductions include offers of available shelter or housing

• whether the City's self-reported data—including data related to bed creation, offers of shelter or housing, and encampment resolutions—is accurate, complete, and independently verifiable under Section 7.2

• whether unsheltered homelessness has been reduced

These determinations require Monitor-verified data. Because the Monitor did not receive the documentation required for verification, substantive compliance cannot be evaluated for Quarter 3.

## C. Effect of Missing Documentation

The Monitor's November 3, 2025 Status Report reflects that the Monitor did not receive:

• raw data

• source documentation

• definitions and methodologies

• encampment-level information

• access to technical staff

Without these materials, verification could not occur. Without verification, the Court does not have a factual record on which to base substantive compliance determinations.

11

**D. Scope of This Report**

Consistent with Dkts. 991 and 1050, this Report:

• evaluates procedural compliance only

• identifies documentation and reporting gaps

• explains how those gaps prevented verification

• does not assess the substantive accuracy of the City's reported data

• does not make findings regarding the City's operational performance

Substantive compliance review must await Monitor-verified data.

**SECTION VI — INTRODUCTION TO THE QUARTER 3 REVIEW**

This Report evaluates the City's procedural compliance with its reporting, documentation, and transparency obligations for Quarter 3 under the Settlement Agreement and the Court's Orders. The Court has emphasized that quarterly reporting must provide a complete, accurate, and verifiable record sufficient for the Monitor to independently validate the City's submissions and for the Court to assess compliance. Because verification did not occur for Quarter 3, this review is limited to procedural issues.

Under Dkt. 991, the City was required to meet and confer with Plaintiffs, select a third-party Monitor by September 12, 2025, and be prepared to provide complete data and documentation to the Monitor before submitting its quarterly report. The Monitor was appointed on October 14, 2025. The City submitted its Quarter 3 report the following day, before any verification process could occur.

The City's filings include a metric labeled "PEH served," which reflects the number of individuals who entered the beds or units created or obtained under Section 3. At the time, this metric was understood to represent utilization of the beds the City created or otherwise obtained. However, "PEH served" is not a Section 7.1 metric and does not identify the number of beds or opportunities offered, the number of PEH who accepted offers, or the number of PEH who rejected offers and the reasons for rejection. The City did not provide the offer-level documentation required to support the Section 7.1 metrics.

The City's quarterly and supplemental filings also do not connect reported bed creation or encampment reductions to the milestones required under Section 5.2. The record does not contain district-level or citywide milestone documentation for bed creation or encampment reduction, nor does it contain reporting showing whether the City is meeting or falling behind those milestones. Without milestone-based reporting, the Court cannot evaluate progress under Section 3 or Section 5.2.

12

## SECTION VII — FINDINGS

### Finding A — Section 3 (Bed Creation)

1. The City reported beds created and beds in progress but did not provide documentation showing how each bed was created or obtained, as required by Dkt. 991.

2. The City did not connect bed creation to district-level or citywide milestones required under Section 5.2.

3. Without milestone-based reporting, progress under Section 3 cannot be evaluated.

### Finding B — Section 7.1 (Quarterly Reporting Requirements)

The City submitted a Quarterly Status Report (Dkt. 1051) and a Supplemental Report (Dkt. 1072). These filings included summary tables reporting:

- the number of housing or shelter opportunities created or otherwise obtained
- the number of opportunities currently available
- the number of persons experiencing homelessness served by those opportunities
- encampment-reduction figures consistent with the Court's definition

These metrics are self-reported and represent only a portion of the information required under Section 7.1.

The City did not report the core Section 7.1 metrics necessary to evaluate progress or conduct verification, including:

1. the number of beds or opportunities offered
2. the number of PEH engaged
3. the number of PEH who accepted offers
4. the number of PEH who rejected offers and the reasons for rejection
5. consolidated reporting across LAHSA, HACLA, LAHD, and City-funded outreach teams
6. reporting tied to district-level or citywide milestones required under Section 5.2

The City did not provide the underlying data or documentation necessary for the Monitor to verify the accuracy, completeness, or reliability of the self-reported metrics.

### Finding C — Section 5.2 (Milestones)

1. The record does not contain district-level or citywide milestones for bed creation or encampment reduction.
2. The City did not provide the documentation necessary to determine whether it is meeting or falling behind its Section 5.2 milestones.
3. The City's quarterly reports list beds created and encampment reductions but do not connect these figures to Section 5.2 milestones.

13

4. Without milestone-based documentation, compliance with Section 3 and Section 5.2 cannot be evaluated.

### Finding D — Encampment Reductions

1. The City did not provide encampment-level documentation showing offers of available shelter or housing, as required by Dkts. 874 and 991.
2. The City did not provide documentation identifying the shelter or housing offered for each reported reduction.
3. The City did not provide consolidated encampment-level reporting across outreach teams.
4. The City did not tie encampment reductions to district-level or citywide milestones required under Section 5.2.
5. Without encampment-level documentation, compliance with the Court's definition of "encampment reduction" cannot be evaluated.

### Finding E — Section 7.2 (Verification)

1. The City provided summary metrics in Exhibits A to Dkts. 1051 and 1072 but did not provide the underlying datasets, case-level records, methodologies, or source documentation required for verification.
2. The Monitor did not receive access to technical staff or data systems necessary to validate the City's reported figures.
3. Because the underlying documentation was not provided, the accuracy and completeness of the City's self-reported metrics cannot be verified, and verification did not occur for Quarter 3.

### Finding F — Summary of Procedural Non-Compliance

The City did not:

• provide the full set of Section 7.1 metrics required by the Settlement Agreement
• provide offer-level documentation
• provide encampment-level documentation
• provide consolidated reporting across agencies
• provide district-level or citywide milestone documentation required under Section 5.2
• tie bed creation or encampment reductions to Section 5.2 milestones
• provide the underlying data required for verification under Section 7.2

### Finding G — Recommendations

1. The City should provide the full set of Section 7.1 metrics, including offer-level data.

2. The City should provide encampment-level documentation consistent with Dkts. 874 and 991.

14

3. The City should provide consolidated reporting across LAHSA, HACLA, LAHD, and City-funded outreach teams.

4. The City should connect quarterly reporting to district-level and citywide milestones required under Section 5.2.

5. The City should provide the raw data, source documentation, definitions, and methodologies required for verification under Section 7.2.

6. The City should provide district-level reporting for all Section 5.2 milestones.

## SECTION VIII — CONCLUSION AND NEXT STEPS

The Settlement Agreement and the Court's Orders establish a structured framework for quarterly reporting, documentation, milestone tracking, and independent verification. For Quarter 3, the record does not contain the underlying data, documentation, or milestone materials required to evaluate compliance with Sections 3, 4, 5, and 7 or to enable verification under Section 7.2 and Dkt. 991. Because the Monitor did not receive the data and documentation required for verification, the Court does not have a verified factual record on which to base substantive compliance determinations for this reporting period.

The City's filings included summary information regarding beds created or obtained, beds available, persons served, and encampment reductions. These metrics are self-reported and were not accompanied by the raw data, source documentation, definitions, methodologies, or encampment-level materials required for verification. Without these materials, the accuracy, completeness, and reliability of the City's reported metrics cannot be independently confirmed. As a result, substantive compliance cannot be evaluated for Quarter 3.

Because the Monitor's appointment is currently stayed pending review by the Ninth Circuit, verification cannot occur at this time. Substantive compliance review will remain provisional until a Monitor is authorized by the Court to resume verification and receives the underlying data and documentation required under Section 7.2 and Dkt. 991. Any future quarterly report will likewise remain provisional until verification can resume.

The Court has recently expressed concern regarding the accuracy and completeness of information provided by the City in related proceedings, underscoring the importance of verified data and the need for the underlying documentation required under Section 7.2 and Dkt. 991. This Report addresses only the procedural record before the Court and does not reach any substantive compliance determinations.

Consistent with the Settlement Agreement, the Special Master's appointment, and the Court's Orders, including Dkts. 991 and 1050, the Special Master will continue to monitor conditions across Council Districts, observe developments related to the City's obligations, and document progress and challenges so the Court has an accurate understanding of current conditions. All docket references cited in this Report are part of the public record, and the City's written responses to the Special Master's inquiries will be submitted to the Court.

15

**Respectfully submitted,**
**Michele Martinez**
Special Master
Date: January 15, 2026

16

## CERTIFICATE OF SERVICE

I am over the age of 18 and not a party to this action. My business address is the United States District Court, Central District of California.

On the date below, I caused the foregoing **Special Master's Quarterly Report for Quarter 3** to be served on all counsel of record via the Court's CM/ECF electronic filing system, which provides notice to all registered users.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 15, 2026, at Los Angeles, California.

**Michele Martinez**
Special Master

17