UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 221
Los Angeles, California 90017
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
mumhofer@umklaw.com
emitchell@umklaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, *et al.*,<br><br>Defendants. | Case No. 2:20-CV-02291-DOC-KES<br><br>Assigned to Judge David O. Carter<br><br>**PLAINTIFF LA ALLIANCE FOR HUMAN RIGHTS' OPPOSITION TO DEFENDANT CITY OF LOS ANGELES' MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT**<br><br>Date:        February 9, 2026<br>Time:        8:30 a.m.<br>Location:   Courtroom 10A<br><br>Complaint Filed:  March 10, 2020<br>SASC Filed:       July 15, 2022<br>Settlement Filed:  May 24, 2022 |

---

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT .........................................................................................................1

    A.    The Arguments the City is Not Making Are Telling ...................................3

    B.    LA Alliance Met and Conferred Extensively on Section 8.2 .......................4

    C.    The Two Cases Cited in the Motion Don't Save the City. .........................12

III.  CONCLUSION ....................................................................................................16

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE(S)**

*Butler v. Nepple,*
   54 Cal. 2d 589 (1960) ...........................................................................................................4

*Coral Farms, L.P. v. Mahony,*
   63 Cal. App. 5th 719 (2021) .................................................................................................3

*Doe v. G6 Hospitality Property LLC,*
   No. 25-cv-00347, 2025 WL 3537626 (W.D. Wash. Dec. 10, 2025)...........................5

*Fahey v. Wally's Las Vegas, LLC,*
   No. 25-CV-01044, 2025 WL 3519143 (D. Nev. Dec. 5, 2025) ..................................6

*In re Glumetza Antitrust Litig.,*
   Case No. 19-cv-05822, 2020 WL 3498067 (N.D. Cal. June 29, 2020) ......................6

*Jimenez v. Allstate Ins. Co.,*
   Case No. LA CV10-08486, 2018 WL 11362268 (C.D. Cal. Nov. 28, 2018) ............7

*Locke v. Warner Bros.,*
   fares no better. 57 Cal. App. 4th 354 (1997) .......................................................14, 15

*Nev. Power Co. v. Monsanto Co.,*
   151 F.R.D. 118 (D. Nev. 1993) ..............................................................................6

*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland,*
   112 Cal. App. 5th 519 (2025) .......................................................................12, 13, 14

*Shuffle Master, Inc. v. Progressive Games, Inc.,*
   170 F.R.D. 166 (D. Nev. 1996) ..............................................................................6

*U.S. E.E.O.C. v. Riviera Operating Corp.,*
   No. 04-cv-01257, 2006 WL 8088329 (D. Nev. Sept. 13, 2006) ..............................7

*W. Pueblo Partners, LLC v. Stone Brewing Co., LLC,*
   90 Cal. App. 5th 1179 (2023) ..................................................................................4

*Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.,*
   178 F. Supp. 2d 1099 (C.D. Cal. 2001) ...................................................................4

*Zahedi v. Liberty Mut. Ins.,*
   Case No. CV 24-5482, 2025 WL 1823305 (C.D. Cal. July 1, 2025).........................7

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The City's attempts to turn the tables and accuse Plaintiff LA Alliance of bad faith are a ridiculous distraction. It is the City who is requesting that Plaintiff simply accede to the complete evisceration of a key provision in the Settlement Agreement. Plaintiff has met and conferred on City's request to be relieved of its obligations and has reasonably rejected the City's remarkable request. The City has failed to justify its requested modifications and the motion should be denied.

The real reason for the City's motion is that the City has belatedly realized that the encampment reduction number of 9,800 (which the City proposed and agreed to in writing) is a bigger lift than it anticipated, and the City wants Plaintiff to collude with the City to reduce the encampment reduction number by a whopping 77 percent. LA Alliance's unwillingness to agree to such a dramatic reduction of a key Settlement Agreement obligation is not bad faith—it is sound judgment.

## II.    ARGUMENT

The City's latest effort to evade its obligations under the Settlement Agreement cannot be viewed in a vacuum. The City has shamelessly shirked multiple Settlement Agreement obligations in a manner that is well known to the Court. And on the specific issue of its encampment reduction obligations, the City has a long history of failing to do what is required under the Settlement Agreement.

First, the City delayed providing milestones and deadlines for encampment reduction. (Declaration of Elizabeth A. Mitchell ("Mitchell Decl.") ISO Pl.'s Mot. for Order re Settlement Agreement Compliance & for Sanctions, Dkt. No. 668-1, at ¶¶ 2–4.) Then, the City promised to engage service providers in developing a plan for district-by-district encampment reduction. (Joint Stipulation to Resolve Mot. for Order re: Settlement Agreement Compliance and Sanctions ("Joint Stip."), Dkt. No. 713, at ¶¶ 1–2; Mitchell Decl. at ¶¶ 5–6.) Then, after LA Alliance afforded the City additional time to develop its plan, the City failed to do what it assured LA Alliance it would do

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*

and failed to inform LA Alliance once that plan collapsed, thus capitalizing on an eight-month delay in fulfilling the terms of the Agreement. (Joint Stip. at ¶¶ 3–5; Mitchell Decl. at ¶ 9.) This course of conduct led to a court determination that the City had acted in bad faith and a stipulated sanction that included the payment of $725,000 in attorneys' fees. (Transcript of Proceedings, March 11, 2024; at 12:13-13; Joint Stip. at ¶ 8; Transcript of Proceedings, April 8, 2024, Dkt. 720, at 5:13-14.)

The City then failed to provide the Court with quarterly reports concerning its encampment reduction efforts, and, despite the clear language in the Settlement Agreement attempted to reduce its encampment reduction obligations through a warped reading of the Agreement terms. (Mot. for Order re Settlement Agreement Compliance, Dkt. No. 76; Def. City of LA's Opp'n to Pl.'s Mot. for Order re: Settlement Agreement Compliance, Dkt. No. 774; Reply ISO Mot. for Order re: Settlement Agreement Compliance, Dkt. No. 776.) This Court rejected the City's re-interpretation of its encampment reduction obligations, ordered the City to provide updated reporting consistent with the plain language of the Agreement, and reaffirmed the City's 9,800 encampment reduction number. (Order re Pl.'s Mot. re Settlement Agreement Compliance, Mar. 24, 2025, Dkt. No. 874.) The City then ignored the Court's order and failed to report its encampment reduction numbers consistent with the Court's order. (Order Granting in Part & Denying in Part Pl.'s Mots. for Settlement Compliance ("Order") Dkt. No. 991, at 57-58.) The City has appealed the Court's decisions concerning encampment reductions. (Notice of Appeal of Def. City of L.A., Dkt. No. 1014.)

It is obvious that the City was trying to escape its agreed to 9,800-encampment-reduction obligation well before the asserted "emergencies" arose. Having failed previously to convince the Court to relieve it of the fullness of its encampment reduction requirements, the City tries a new tack, seeking relief under Section 8.2 of the Settlement Agreement from its encampment reduction numbers based on asserted emergencies.

2

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*

## A.    The Arguments the City is Not Making Are Telling

To capture how ludicrous the City's argument is, it is helpful to begin with arguments the City is not making:

- The City is not arguing that it didn't agree to reduce or resolve 9,800 encampments.

- The City is not arguing that LA Alliance is legally required to relieve the City of its 9,800-encampment-reduction obligation.

- The City is not contending that it is impossible for the City to reduce the number of encampments in the City by 9,800.

- The City cites no law about *force majeur* clauses and what is needed to trigger them.

- The City makes no effort to connect its claimed emergencies with its encampment reduction/resolution efforts, including (i) how much it costs to resolve a single encampment; (ii) how the expenses arising out of the asserted emergencies compare to encampment reduction costs; and (iii) whether the emergency costs came out of the same budgetary bucket as encampment reduction.

- Finally, the City is not arguing that the fires or the protests actually caused the City to lose its ability to address encampments or had any impact on the City's capacity to resolve encampments. Indeed, the City fails to identify any causal link between the asserted emergencies and its encampment reduction capacity.

The City's failure to demonstrate any causal link between the claimed emergencies and its requested modifications is fatal to its claim. Courts interpret Settlement Agreements under the same principles that govern other contracts. *Coral Farms, L.P. v. Mahony*, 63 Cal. App. 5th 719, 726 (2021). When a party to a contract triggers the contract's *force majeure* provision(s), courts evaluate whether the event actually caused the party's performance to become impossible or unreasonably

3

expensive. *W. Pueblo Partners, LLC v. Stone Brewing Co., LLC*, 90 Cal. App. 5th 1179, 1188 (2023) ("[W]here a contract contains a *force majeure* provision, the 'mere increase in expense does not excuse the performance unless there exists "extreme and unreasonable difficulty, expense, injury, or loss involved."'") (quoting *Butler v. Nepple*, 54 Cal. 2d 589, 599 (1960)). The identified emergency or emergencies can only excuse the City's obligation where, "in spite of skill, diligence, and good faith on [Defendant's] part, performance became impossible or unreasonably expensive." *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1110 (C.D. Cal. 2001) (citation omitted). And "California law requires . . . that each event claimed to be a '*force majeure'* be beyond the control of the breaching party." *Id.* at 1111. The City does not even attempt to demonstrate extreme expense or difficulty in encampment resolutions due to the identified emergencies, fails to even allege "skill, diligence, and good faith" in attempting performance, and certainly cannot claim that at least the fiscal emergency was beyond its control given the long runway it had to address its financial woes before they became emergencies. (Mot. for Order re Settlement Agreement Compliance at 7–11, Feb. 20, 2025, Dkt. No. 863.)

The end result of the arguments not made by the City is that (i) the City is contractually obligated to reduce the number of encampments by 9,800; (ii) the LA Alliance has no obligation to accede to a reduction of that number; (iii) there is no actual proof that the emergencies require or justify a decrease in the City's encampment reduction obligation.

**B.     LA Alliance Met and Conferred Extensively on Section 8.2**

That leaves the City with the extraordinary argument it actually makes, which appears to be that its pre-existing desire to deflate or evade its encampment reduction obligations has been subsequently justified by unrelated emergencies, and that LA Alliance acted in bad faith by failing to meet and confer (despite *four* meet and confers and several written exchanges on the matter) and doing so in bad faith (apparently by

4

failing to be persuaded by the City's emergency-based arguments). The argument can't even survive its articulation.

While the City's argument is self-defeating, it is also inconsistent with both the evidence and the law. Buried in the City's brief is the necessary concession that LA Alliance did actually meet and confer with the City several times. Specifically, the parties met four times in 2025—on March 4, August 7, August 14, and October 30—in an effort to address the City's request for a modification under Section 8.2 of the Settlement Agreement based on emergencies experienced by the City.[1] The parties also exchanged multiple emails concerning their positions. (Declaration of Elizabeth A. Mitchell ISO Plaintiff's Reply re: Evidentiary Hr'g on Settlement Breach ("Mitchell Decl. re Settlement Breach") Ex. A, Email from A Hoang, dated Jan. 15, 2026, Dkt. No. 984-02; *see also* Declaration of Elizabeth A. Mitchell ("Mitchell Decl.") Exs. A–D, Emails re January-March 2025 meet-and-confers (filed concurrently); Skolnick Decl. Ex. A, Email dated Aug. 6, 2025, Dkt. No. 1122-03; Ex. C, Email dated Aug. 14, 2025, Dkt. No. 1122-08; Ex. E, Email dated Oct. 16, 2025, Dkt. No. 1122-10.)

This undisputed record of multiple meetings and written communications is the very definition of meeting and conferring. *Doe v. G6 Hospitality Property LLC*, No. 25-cv-00347, 2025 WL 3537626, at *2 (W.D. Wash. Dec. 10, 2025) ("The Local Civil Rules define a 'Meet and Confer' as 'a good faith conference in person or by telephone to attempt to resolve the matter in dispute without the court's involvement.'") (citation

---

[1] Defendant City wrongly identifies August 7, 2025 as the "first meet-and-confer call" and August 22, 2025 as the "second discussion." (Def. City of L.A.'s Mem. of P&A ISO Mot. for Order re Compliance with Section 8.2 of the Settlement Agreement ("City Mem.") at 2 n.1 & 7:25-26; 8:3-4 Dkt. No. 1122-01.)

Defendant ignores the parties' first meet-and-confer on this subject on March 4, 2025, wherein the City requested the Alliance agree to modify the Settlement Agreement under Section 8.2 to count 3,000 "Roadmap" beds towards the City's Settlement Agreement obligations. (*See* Mitchell Decl. & Exs. A–D; *see also* City Mem. at 7:16–18, Dkt. No. 1122-02 ("The City reached out to the Alliance again in February and March, but the Alliance would not agree to any modifications of the Agreement.") In response to the City's request, counsel for LA Alliance asked: "Can you please send me the proposed 3,000 beds you would migrate?" The City never responded. (Mitchell Decl. ¶ 4 & Exs. A–D; *see also* Mitchell Decl. re Settlement Breach & Ex. A–D, Dkt. Nos. 984-01 through 984-05.)

5

omitted)); *Fahey v. Wally's Las Vegas, LLC*, No. 25-CV-01044, 2025 WL 3519143, at *1 (D. Nev. Dec. 5, 2025) ("The meet-and-confer requirement 'may only be satisfied through direct dialogue and discussion in a face-to-face meeting, telephone conference, or video conference. The exchange of written, electronic, or voice-mail communications does not satisfy this requirement.'" (citation omitted).). Under the plain meaning of the phrase "meet and confer," LA Alliance met its meet-and-confer obligation.

Unable to demonstrate that LA Alliance did not actually meet and confer, the City claims LA Alliance did not meet and confer in good faith. The City is again wrong on both the law and the facts.

*First*, the law identifies the purpose of a meet and confer not as substantive, but procedural which allows parties "to meaningfully discuss each contested [] dispute in a genuine effort to avoid judicial intervention." *Shuffle Master, Inc. v. Progressive Games, Inc.,* 170 F.R.D. 166, 171 (D. Nev. 1996). The parties are obliged to "present to each other the merits of their respective positions with the same candor, specificity, and support during the informal negotiations as during the briefing of [] motions." *Nev. Power Co. v. Monsanto Co.*, 151 F.R.D. 118, 120 (D. Nev. 1993). Put differently, "the purpose of a meet and confer requirement is for the parties to engage in a meaningful dialogue about their respective positions on disputed issues to see whether they can resolve (or at least refine) the disputes without court intervention, saving time and money for the litigants as well as the court system." *In re Glumetza Antitrust Litig.*, Case No. 19-cv-05822, 2020 WL 3498067, at *5 (N.D. Cal. June 29, 2020). The LA Alliance's participation in four meetings and several written exchanges accomplished this purpose—the LA Alliance unquestionably engaged in meaningful dialogue about the City's position and its position concerning the City's proposed modifications under Section 8.2.

The meet-and-confer process here did not result in agreement. But meet-and-confer requirements "**do not require agreement**; instead they invite meaningful, good

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*

faith efforts to narrow disputes in order to conserve party and judicial resources." *Jimenez v. Allstate Ins. Co.*, Case No. LA CV10-08486, 2018 WL 11362268, at *6 (C.D. Cal. Nov. 28, 2018) (emphasis added); *see also Zahedi v. Liberty Mut. Ins.*, Case No. CV 24-5482, 2025 WL 1823305, at *5 (C.D. Cal. July 1, 2025) ("Local Rule 7-3, which requires a meet and confer process prior to the filing of a motion, does not require agreement; instead, it invites meaningful, good faith efforts to narrow disputes in order to conserve party and judicial resources."). The City's motion rests on the invalid, non-existent principle that LA Alliance was acting in bad faith because it did not <u>agree</u> to the City's proposed modification of the Settlement Agreement. *U.S. E.E.O.C. v. Riviera Operating Corp.*, No. 04-cv-01257, 2006 WL 8088329, at *1 (D. Nev. Sept. 13, 2006) ("A meaningful meet and confer does not require that the parties agree, only that they attempt, in good faith, to resolve their discovery issues without court intervention. After a reading of the parties' communications the court finds such a good faith effort was made."). As a matter of law, the lack of an agreement does not mean a meet and confer did not happen or was carried out in bad faith.

*Second,* the facts do not help the City either. The factual fulcrum of the Motion is the City's insistence that LA Alliance ignored, failed to respond, stonewalled, and refused to negotiate concerning the City's proposed negotiation. But the record exposes the insipidness of this insistence:

| City's Assertion | Evidence |
|---|---|
| LA Alliance was unresponsive to the City's meet and confer overtures | • January 8, 2025: LA Alliance responds to meet and confer request within an hour of City's email (Mitchell Decl. re Settlement Breach Ex. A, at 4); <br> • January 10–13: LA Alliance responds to meet and confer request within 44 hours of City's email (*Id.* at 2); <br> • March 25, 2025: LA Alliance responds to meet and confer request within 5 hours of City email (Declaration of Matthew |

7

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*

Donald Umhofer (Mitchell Decl. Ex. A, at 3);

- March 25, 2025: LA Alliance responds to meet and confer request within 5 minutes of City email (*Id.* at 2);

- March 27, 2025: LA Alliance responds to meet and confer request within 3 hours of City email (*Id.* at 1);

- July 24–25, 2025: LA Alliance responds to meet and confer request within 24 hours of City email (Mitchell Decl. Ex. B, at 13–14);

- July 27, 2025: LA Alliance responds to meet and confer request within 12 hours of City email (*Id.* at 12);

- July 30, 2025: LA Alliance responds to meet and confer request within 14 minutes of City email (*Id.* at 11–12):

- August 6–8, 2025: LA Alliance responds to meet and confer request within 48 hours of City email (*Id.* at 9–10):

- August 11, 2025: LA Alliance responds to meet and confer request within 3 hours of City email (*Id.* at 7–8);

- August 11–14, 2025: LA Alliance responds to meet and confer request within 72 hours of City email (*Id.* at 2–7);

- August 14, 2025: LA Alliance responds to meet and confer request within 15 mins of City email (*Id.* at 1–2);

- August 15, 2025: LA Alliance responds to meet and confer request within 20 mins of City email (*Id.* at 1);

- October 16–17, 2025: LA Alliance responds to meet and confer request within 16 hours of City email (Mitchell Decl. Ex. C, at 1–2);

- October 23, 2025: LA Alliance responds to meet and confer

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*

| | |
|---|---|
| | request within 6 hours of City email (Mitchell Decl. Ex. D, at 1). |
| LA Alliance was unwilling to meet and confer with the City | • In response to City request to modify agreement under Section 8.2 by double-counting 3,000 beds: "Can you please send me the proposed 3,000 beds you would migrate?" (Mitchell Decl. Ex. A, at 1.) The City never responded. (Mitchell Decl. ¶ 4.) |
| | • "I understand there were some things we agreed to do at the conclusion of the meet and confer, including putting some questions in writing, which we will get to you early next week. In the meantime, we'd like to get a new date/time on calendar to continue the meet and confer as I understand we didn't even get to the myriad issues the City isn't doing per the agreement." (Mitchell Decl. Ex. B, at 9.) |
| | • "Regarding the 'myriad issues' I sent those to you on 7/25, but I'll include them again below. Our positions are pretty clear, and I'm not sure what else you're looking for here but if you have specific questions I can answer them." (*Id.* at 7.) |
| | • "I think all of this is going to take far more than 2 hours, so we may want to get another date/time on the books right away. Please suggest some times that work for your team." (*Id.* at 6.) |
| | • "Can we find a solid 2-3 hours? Happy to host at our office to facilitate conversation if that's possible. [Proposing five dates and times.] If none of these work, please provide your dates/times and I'll see what we can do to make it work." (*Id.* at 2.) |
| | • "[W]e can block out the following times [providing three dates and times with 2-3 hours available]. If none of those work for you, please provide dates and |

9

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*

times the following week that work for your team and we'll find something that works." (Scolnick Decl. Ex. C, at 13, Dkt. No. 1122-8.)

- "Please provide me with the City's position regarding: 1) which of these emergencies does the City still claim is "active" and why, 2) exactly what obligations, if any, the City is "pausing" and on what basis— specifically what is it about each emergency that is necessitating a pause in which obligations? and 3) in light of our last two meet-and-confers about these issues, and recognizing the Alliance's position, what modifications or amendments is the City proposing based on these emergencies? It's been nearly three months since we began meeting and conferring on these issues and I'm not seeing any movement." (Mitchell Decl. Ex. C, at 1.)

- "Thank you for providing the City's reasonable estimate on reductions. Can you please describe to me in detail the basis for the determination and any underlying data relied upon to reach the conclusions? Assuming the validity of the number, that leaves 8,335 resolutions the City is required to make in the next eight months. Does the City reasonably believe that is possible? How? If not, please let us know the City's proposed modifications and how those relate to the City's claimed emergencies. We'd love to be part of the solution and cheer the City on to accomplish its obligations here, but the Alliance will not facilitate or enable the City's current lackadaisical approach to encampment reductions." (*Id.*)

10

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*

| LA Alliance didn't negotiate with the City re: its request for modifications under Section 8.2 | <ul><li>"Fundamentally we do not believe the emergencies you've identified in any way provide a sufficient basis for the City to decrease its commitments. However, **to the extent the City requires additional time to meet its obligations due to the emergencies/pauses you've identified, that's probably fair—maybe it's a concomitant extension of the agreement** for all time which is paused." (Mitchell Decl. Ex. B, at 3 (emphasis added).)</li><li>"If you guys want to give us actual information about how many actual reductions you've made that are compliant with the Court's definition, you guys can do that. **You don't have to, but you can do that, and then I'll consider a number.**" (Scolnick Decl. Ex. B, Meet & Confer Tr. 41:17–21, Aug. 7, 2025, Dkt. No. 1122-07 (emphasis added).)</li><li>"I don't know right now, because you guys aren't giving me the information I need to make an educated decision about whether, in the plaintiffs' view … it would be a reasonable modification to give you credit." (*Id.* at 46:15–19.)</li><li>"And so that's why I need that information, to figure out -- to exercise my discretion and the client's discretion and, you know, our collective discretion around whether that's a reasonable modification or not that we would agree to." (*Id.* at 46:24–47:3.)</li><li>"And so, no, those 6,000 reductions that the City has reported is not consistent with what it had an obligation to do, either in the original settlement agreement discussions or the subsequent encampment reduction discussions. So that's not something we are willing to do. **As we noted, we would be open to giving you credit for**</li></ul> |

11

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*

|  | **those that do count**." (Scolnick Decl. Ex. F, Meet & Confer Tr. 7:19–25, Oct. 30, 2025, Dkt. No. 1122-11 (emphasis added).) |
|---|---|

Simply put, the evidentiary record decimates the City's suggestion that LA Alliance failed to meaningfully participate in good faith in the meet and confer process. One party's lack of agreement to another party's effort to escape from its express obligations under a settlement agreement cannot be equated with a bad faith failure to participate in a meet and confer process.

If any party could be criticized for its failure to meet and confer in good faith here, it is the City. The City transparently sought to leverage awful but unrelated events to get what it had been trying to get for months before the events: out from under its promise to resolve 9,800 encampments. The City did so without ever producing evidence to establish a causal link between the emergencies and the City's ability to address encampments. And the City has not wavered from its proposed modification by a single digit (Scolnick Decl. Ex. F, Meet & Confer Tr. 17:4–15, Oct. 30, 2025, Dkt. No. 1122-11), and outright refused to consider LA Alliance's counter-offer to extend the deadline for encampment reduction. It is the City, not the LA Alliance, that refused to negotiate in good faith, and the reason for that is obvious: the City just doesn't want to comply with its encampment reduction obligations.

### C.     The Two Cases Cited in the Motion Don't Save the City.

The City's brief studiously sidesteps citations to actual case authority concerning good faith meet and confer obligations and instead focuses on two cases that (i) have no bearing here, and (ii) actually favor the Alliance upon inspection.

The City's favorite case appears to be *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 112 Cal. App. 5th 519 (2025), *review denied* (Sept. 17, 2025). It's a contract case, not a meet and confer case, so it sheds little legal light on the City's meet-and-confer contentions here. The passages cited by the City relate to a claim for breach of the implied covenant of good faith and fair dealing with respect to a

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*

contract—but the City has not sued LA Alliance for such a breach, and the City cites no authority that suggests that the analysis of whether a party met and conferred in good faith is the same as the analysis of a tort claim for a breach of the covenant of good faith and fair dealing. And the context of *Oakland Bulk* and a basic reading of the decision exposes the flaws in the City's reliance upon it.

*Oakland Bulk* involved a series of agreements between the City of Oakland and a private company to develop a cargo shipping terminal. The City of Oakland terminated the project, and Oakland Bulk sued, alleging, among other things, a breach of the implied covenant of good faith and fair dealing. At trial, the trial court found that the City of Oakland engaged in a pattern of delay designed to ditch the deal (a course of conduct that may sound familiar to this Court). The City of Los Angeles hangs its hat on platitudes from *Oakland Bulk* like parties should "refrain from doing anything which would render performance of the contract impossible," but also "do everything that the contract presupposes that [they] will do to accomplish its purpose" (City Mem. 13:18–21)—without ever even attempting to show that LA Alliance did anything to render performance under the Settlement Agreement impossible or failed to do things that the Settlement Agreement presupposed. Moreover, in *Oakland Bulk*, the private company claimed the City of Oakland had triggered the contract's *force majeure* clause by acting in a manner that made it impracticable or unreasonably difficult for the private company to perform its contractual obligations (*Oakland Bulk*, 112 Cal. App. 5th at 539–40)—here, LA Alliance has done nothing to prevent the City of Los Angeles from performing its obligations. The City is failing all on its own.

But the City's primary point in citing *Oakland Bulk* is to support the principle that a party violates its good faith "mak[ing] no meaningful effort to compromise," (City Mem. 14:8–10), pointing to language in *Oakland Bulk* about the City of Oakland failing to "provide any substantive responses to" letters written by the private company. 112 Cal. App. 5th at 538. But again, the City of Los Angeles makes no showing that the LA Alliance made no meaningful effort to compromise or that the LA

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*

Alliance failed to provide substantive responses. The LA Alliance offered a compromise to the City—that in light of the asserted emergencies, the City could have more time to come into compliance (Mitchell Decl. Ex. B, at 3)—and the City never gave any substantive response to that compromise offer. The LA Alliance substantively responded to the City's emergency assertions in writing and in three meet and confers by explaining why the City's evidence concerning the emergencies did not justify a reduction in the City's encampment reduction obligations under the agreement, and the City responded by insisting that its evidence was enough. (Mitchell Decl., at A, B.) By contrast, *Oakland Bulk* involved a party ignoring letters and refusing to respond to substantive assertions, setting the responses here far apart from the problematic conduct identified in *Oakland Bulk*.

That said, *Oakland Bulk* is instructive here, but not for the reasons the City suggests. The parallels between *Oakland Bulk* and this case are powerful: a City enters into a deal with a private party, and then embarks on a long trajectory of trying to tank the deal, violating contractual provisions, engaging in "continual delay" tactics, and seeking to neutralize federal court decisions. *Oakland Bulk*, 112 Cal. App. 5th at 528, 532. 535. The *Oakland Bulk* decision reads a lot like this Court's Order finding the City in violation of several provisions of the Settlement Agreement and its delay-based gamesmanship. (Order at 58, Dkt. No. 991 ("Obfuscation and delay cannot be tolerated.").) If anyone has breached an obligation of good faith and fair dealing concerning the Settlement Agreement, it is the City.

The City's citation to *Locke v. Warner Bros.* fares no better. 57 Cal. App. 4th 354 (1997). Again, the case says nothing about a party's good faith obligation to meet and confer—it is another breach-of-contract case involving a romantic relationship between Clint Eastwood and the plaintiff, Sondra Locke, and a settlement agreement that included a movie development deal under which Warner Brothers had the option (but not the obligation) to develop Locke's proposed movie projects. *Id.* at 358. Locke claimed that Warner Brothers breached the deal by "refusing to consider the projects

14

prepared by [Locke] and depriving [Locke] of the benefit of the bargain of the Warner-Locke agreement." Id. at 362–63 (citation omitted). Apparently, Clint Eastwood was behind Warner Brothers' refusal to consider Locke's proposed projects, which, needless to say, did not make Locke's day.

Locke is irrelevant here for many reasons, beginning with the fact that this case (i) is not a breach-of-contract case and (ii) does feature a failed romance between Hollywood stars. The City likes Locke because it talks about one party "refusing to work with" another and instead "merely went through the motions" of considering movie deals without actually considering them. (City Mem. 14:22–15:7.) But these excerpts ignore the vast differences between Locke and this case. First, the contractual obligation in this case is nothing like Locke's—LA Alliance has no obligation to afford the City anything like "the opportunity to direct and produce films and earn additional sums, and . . . promote and enhance a career," (Locke, 57 Cal. App. 4th at 364), and instead merely has an obligation "to meet and confer on any necessary and appropriate amendments to those obligations" when certain events occur. (Settlement Agreement § 8.2, Dkt. No. 421-1.) The LA Alliance's obligations here are procedural, not substantive as they were in Locke, and the LA Alliance has no obligation to afford the City any opportunity other than to meet and confer. But Locke also affirms a party's subjective right to reject another party's proposal under an agreement—which is precisely what the LA Alliance did here. Locke, 57 Cal. App. 4th at 364 ("Unquestionably, Warner was entitled to reject Locke's work based on its subjective judgment, and its creative decision in that regard is not subject to being second-guessed by a court."). And there is no evidence that the LA Alliance was not pretending to be dissatisfied "irrespective of the merits of [the City's] proposals"—to the contrary, the evidentiary record indicates that the LA Alliance had good faith, subjectively held reservations about the merits of the City's efforts to vaporize its encampment reduction obligations, one of the core obligations from the City in the Settlement Agreement. Id. at 364–65 ("However, bearing in mind the requirement that

15

subjective dissatisfaction must be an honestly held dissatisfaction, the evidence raises a triable issue as to whether Warner breached its agreement with Locke by not considering her proposals on their merits. . . . The above evidence raises a triable issue of material fact as to whether Warner breached its contract with Locke by categorically refusing to work with her, irrespective of the merits of her proposals."). LA Alliance did not categorically refuse to work with the City—it just didn't agree with the City, which it was legally entitled to do.

Because *Oakland Bulk* and *Locke* appear to be the best the City can do to muster legal support for its effort to escape from its Settlement Agreement obligations, and because those cases do not actually support the City's escape plan, the motion should be denied.

## III.   CONCLUSION

The City's effort to renege on its encampment reduction promises fails for one final, additional reason: remedy. Under Section 8.2, the only obligation is to meet and confer, and the City's only complaint is that LA Alliance failed to meet and confer. Even if the Court were to find that LA Alliance failed to meet and confer in good faith, the proper remedy would be to order both parties back into meeting and conferring, not to give the City a pass on a key obligation in the Settlement Agreement—unless, of course, Section 24's "dispute resolution" section applies to the entire agreement, a contention which the City argued vehemently against during the "data monitor" dispute and even filed an appeal thereon.

If Section 24's "dispute resolution" provision does apply to the entire Agreement, the Court could make a determination about whether the City's asserted emergencies have actually decimated the City's capacity to address encampments just months after the City's previous attempt to evade its encampment reduction obligations. Given the pattern of the City's attempts to thwart the Settlement Agreement, and zero evidence provided by the City to support its argument, a unilateral reduction in its encampment reduction requirements is an improper remedy.

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*

For the foregoing reasons, the motion should be denied.

Dated: January 16, 2026          Respectfully submitted,


                                   /s/ Matthew Donald Umhofer
                                   UMHOFER, MITCHELL & KING, LLP
                                   Matthew Donald Umhofer
                                   Elizabeth A. Mitchell

                                   *Attorneys for Plaintiffs*

*PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR ORDER RE COMPLIANCE WITH SECTION 8.2 OF SETTLEMENT AGREEMENT*