UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) CASE NO: 2:20-cv-02291-DOC-KESx |
| | ) |
| | ) CIVIL |
| Plaintiffs, | ) |
| | ) Los Angeles, California |
| vs. | ) |
| | ) Tuesday, February 10, 2026 |
| CITY OF LOS ANGELES, ET AL., | ) ( 9:02 a.m. to 11:32 a.m.) |
| | ) ( 1:02 p.m. to  3:00 p.m.) |
| Defendants. | ) |

HEARING RE:

ORDER TO SHOW CAUSE RE CONTEMPT CITY OF LOS ANGELES
[DKT.NO.1066];

MOTION TO ENFORCE A TERM OF THE PARTIES' SETTLEMENT AGREEMENT
[DKT.NO.1122]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**          SEE PAGE 2

Courtroom Deputy:      Karlen Dubon

Court Reporter:        Recorded; CourtSmart

Transcribed by:        Exceptional Reporting Services, Inc.
                       20079 Stone Oak Pkwy.
                       Ste 1105-237
                       San Antonio, TX 78258
                       361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES:**

| | |
|---|---|
| For Plaintiffs: | ELIZABETH A. MITCHELL, ESQ. |
| | MATTHEW UMHOFER, ESQ. |
| | Umhofer Mitchell & King |
| | 767 S. Alameda Street, Suite 270 |
| | Los Angeles, CA 90021 |
| | 213-394-7979 |
| | |
| For Defendants: | MARCELLUS A. MCRAE, ESQ. |
| | BRADLEY J. HAMBURGER, ESQ. |
| | POONAM KUMAR, ESQ. |
| | Gibson Dunn & Crutcher |
| | 333 South Grand Avenue |
| | Los Angeles, CA 90071 |
| | 213-299-7000 |
| | |
| | THEANO EVANGELIS, ESQ. |
| | Gibson Dunn & Crutcher |
| | 333 S. Grand Ave. |
| | Los Angeles, CA 90071 |
| | 213-229-7726 |
| | |
| | JENNIFER MIRA HASHMALL, ESQ. |
| | Miller Barondess |
| | 2121 Avenue of the Stars |
| | Suite 2600 |
| | Los Angeles, CA 90067 |
| | 310-552-4400 |
| | |
| For Intervenor: | SHAYLA R. MYERS, ESQ. |
| | Legal Aid Foundation of LA |
| | 7000 S. Broadway |
| | Los Angeles, CA 90003 |
| | 213-640-3983 |
| | |
| Special Master: | MICHELLE MARTINEZ |

**3**

**INDEX**

| INTERVENORS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SCOTT MARCUS | | | | |
| BY MS. MYERS | 64 | | 110/125 | |
| BY MS. MITCHELL | | 93 | | -- |
| BY MS. KUMAR | | 103 | | -- |

EXCEPTIONAL REPORTING SERVICES, INC

**4**

**Los Angeles, California; Tuesday, February 10, 2026; 9:02 a.m.**

--oOo--

THE COURT:  And we're back in session on the LA Alliance matter.  And, counsel, would you make your appearances beginning with the LA Alliance, then the City, then the intervenors please, and then the County.

MS. MITCHELL:  Good morning, Your Honor, Elizabeth Mitchell, Umhofer Mitchell & King on behalf of plaintiff LA Alliance.  My partner Matthew Umhofer will be here shortly.

THE COURT:  All right.  Thank you.  Counsel.

MS. EVANGELIS:  Good morning, Your Honor, Theano Evangelis on behalf of the City.

THE COURT:  Morning.

MR. MCRAE:  Good morning, Your Honor, Marcellus McRae on behalf of the City.

THE COURT:  Good morning.

MS. KUMAR:  Good morning, Your Honor, Poonam Kumar on behalf of the City.

THE COURT:  Good morning.

MR. HAMBURGER:  Good morning, Your Honor, Bradley Hamburger on behalf of the City.

THE COURT:  Good morning.

MS. MYERS:  Good morning, Your Honor, Shayla Myers on behalf of the intervenors.

THE COURT:  Morning.

**5**

**MS. HASHMALL:** Good morning, Your Honor, Mira Hashmall here for the County of Los Angeles.

**THE COURT:** Good morning.

Just to recap where we are today, the Court's become concerned about possible misrepresentations made by representatives of the City, related to the approval of the encampment reduction plan in January of 2024. This issue is separate and distinct from the issue being decided by Judge Kin in the state court. And after considering the briefing filed by counsel, this Court's inclined to believe it can resolve this issue without intruding on the state Brown Act litigation, pending before my colleague Judge Kin or the jurisdiction of the state court.

The issue regarding potential misrepresentations made by the City to this Court initially arose when the City attorney seemed to represent to this Court that a vote had been taken in closed session by the City Council on the encampment reduction plan on January 31st of 2024.

This representation was seemingly soon contradicted when the City attorney represented that there was nothing to report from the City Council's closed session that occurred that day.

There's been subsequent testimony before this Court that, in fact, no vote was taken. These contradictions and others lead to this inquiry about whether a vote was, in fact,

taken concerning the encampment reduction plan in closed session on January 31st, 2024.

I want to ensure that all parties and intervenors are provided with due process and the opportunity to be heard. So, counsel, I want to hear your thoughts and if it's acceptable to the parties, I'll begin with the City, moving to the intervenors or LA Alliance, your decision, and then a rebuttal round, a short rebuttal round by everyone after you've heard your respective positions.

So, counsel on behalf of the City.

**MS. EVANGELIS:** Good morning, Your Honor, Theane Evangelis on behalf of the City of Los Angeles and I appreciate the opportunity to be heard.

Your Honor, the City objects to this entire line of questioning. We've made our objections known to the Court. We've also filed a petition for relief from the Ninth Circuit. And the Ninth Circuit is considering that and has ordered briefing on it, which will be complete next week.

So we would ask the Court, if the Court is inclined to continue down this path, and especially if the Court wishes to hear witness testimony if that's what's on the table right now, we would ask at a minimum that we not proceed that far until we've heard from the Ninth Circuit.

We would also ask that the Court please specify what was the specific statement. So Your Honor has mentioned the

representation and I believe the Court said that the City seemed to represent that a vote was taken. Your Honor, we never represented that a vote was taken. So we will start there and just please ask the Court to point to what representation was made, because we've asked and we still have not gotten the who, what, when, where so that we can adequately respond to this issue.

So I would like to go through our objections, but as I've said, they are all presented to the Ninth Circuit and we would ask the Court to reserve ruling because, Your Honor, we respectfully disagree that this proceeding, that this inquiry can happen without completely nullifying the city's rights in the state court proceeding.

The two proceedings will be on a collision course. The only way to defend ourselves and to respond to the Court's concerns about what happened in that closed session, would be to discuss what happened in that closed session, which we cannot do.

We've explained that for a number of reasons. The Brown Act, attorney/client privilege, deliberative process privilege, legislative process privilege, and so forth. All of those issues are squarely presented in the state court proceeding.

But, Your Honor, I want to take a step back here and just express our bewilderment why this is a concern because

nobody is challenging the encampment reduction plan, nobody, not the City, not intervenors, not the Alliance, everyone agrees that that was a valid and binding plan. We're actually here on the 8.2 motion which is all about compliance with that plan. We've never taken the position that somehow that wasn't validly approved, that somehow that doesn't apply or that there's any infirmity with the encampment reduction plan. We might disagree about what it entails, but that's about the interpretation of it, not the validity of it.

So as an initial matter, there is nothing about the Cangress litigation in state court that could affect that. It's off the table.

So, Your Honor, I'll go back to what are the Court's concerns. There --

THE COURT: Counsel, would you mind for just one moment.

Sir, there's no photographs allowed in the federal court, so the CSO speak to the gentleman in the brown who's been taking photographs, please, and if necessary, remove him. Thank you. I apologize, counsel, there's no photographs and it has nothing to do with your presentation but it was distracting.

MS. EVANGELIS: Thank you, Your Honor.

So I'd like to go back to what was the --

THE COURT: No, no, it's the -- I'm sorry, I

**9**

apologize.  It's the gentleman behind him, right there.  Thank you very much.  The CSO is going to see you, sir, thank you very much.  And, counsel, I apologize for the interruption.

MS. EVANGELIS:  Thank you, Your Honor.

THE COURT:  Just a moment.  If you'd take the gentleman outside so we're not distracted it would be appreciated.  And, counsel, would you give us one moment, please.

And, sir, you're welcome to return once we're assured you have -- aren't taking anymore photographs.  Thank you very much.

(Pause)

THE COURT:  And, counsel, if you'd like to start at any place because of the interruption.

MS. EVANGELIS:  Thank you, Your Honor.  I'd like to go back to where the Court began here.  Because there is no representation in the record about a vote.  So that's the entire premise for this hearing, without that, there is really no reason for us to be having this proceeding so we're just still in the dark about where in the record that supposed representation was.

So we haven't found one.  We -- it's our position we never made any representation about a vote.  Our best guess was a joint stipulation that was filed on April 4th, 2024 which, of course, the Court is familiar with where the parties said that

9,800 -- the 9,800 encampment resolution plan and milestones was presented to the City Council on January 31st, 2024 which approved them without delay.

There's nothing about that statement that's untrue. It doesn't say whether a vote happened, whether a vote didn't happen, says nothing about a vote. Doesn't say anything about how approval happened, just says it was approved and it was and we can perceive there's no question that that plan is valid and binding.

So it's just not true that approval equals vote, there's no basis for that anywhere. No one said anything about a vote. Of course, Your Honor, when we're talking about closed sessions, just as a general matter, that's when the City Council receives advice from its -- from the City Attorney's Office, when legal advice is discussed, those are privileged communications, of course, lots of actions can be considered, discussed and approved through a lot of different ways, it doesn't mean there's a formal roll call vote like in a regular budget session of the City Council.

So -- and, Your Honor, how it was approved, what the contours of that was, who said what, none of that is properly before this Court, because actually that is subject to all of the privileges that have been raised by the City in the state court proceeding.

And, Your Honor, this is a classic case of -- for

Younger (phonetic) abstention.  This is a situation where there is a parallel state court proceeding that is ongoing, it implicates legitimate important state interests, maybe some of the most important state interests that there are, governance, what rules, legislative bodies abide by.

The legislature's -- the City Council's ability to prescribe its own rules, the state's interests in all of that, the Tenth Amendment concerns implicated by all this are very concerning to the City.

And so we take issue with intruding into that.  And if this Court proceeds down the path of inquiring into what happened, who said what, and all of that, that will have the effect of an injunction really of enjoining the state court proceeding of imposing something on the state court proceeding.

Judge Kin right now has not even issued a final judgment in that action.  There have been objections filed.  The parties are briefing it.  If, in fact, he orders the proceedings of that closed session to be disclosed, that would be a mandatory injunction.  The City has already indicated it will appeal.  Under state law, there's an automatic stay pending all appeals for mandatory injunctions.

So we are really a long time away from a final ruling in the state court matter.  So there is nothing to do here and, Your Honor, there's nothing to see here, because again I go back to the fact that no one's questioning the encampment

reduction plan.

So the -- all of this is really irrelevant. But, Your Honor, we're very concerned that the Court in your order yesterday said that you're concerned about a willful misrepresentation. That is very serious stuff. And we take it seriously. But there is no evidence in this record whatsoever that any representative of the City said anything that that representative thought was untrue or knew was untrue.

The encampment reduction plan was approved. Full stop. That's all that was said. And that's true. So it didn't say anything about it was approved according to certain procedures or in a particular way, it said nothing about a vote, it said nothing about any of that.

So, Your Honor, to the extent that we start probing all of those questions, we have serious, serious concerns. Again, we're running head long into the Cangress litigation. And so this is very important that we proceed carefully and there is no reason to hurry here. There is no urgency, there is no emergency, but if we begin asking witnesses questions about what was said in a closed session with counsel, with the City attorney representatives that were there, we are destroying all of these privileges. We are eviscerating the City's right to an appeal, all of its rights will be gone the minute a witness gets up on the stand and then is ordered to answer a question that will eviscerate all of those privileges.

**13**

And, Your Honor, it's a violation of state law for City employees and others to disclose the contents of a closed session.  So not only are we talking about the City's privileges, we're talking about personal jeopardy for a witness who comes in to this courtroom to start testifying.  I don't want to put anyone in that position.

For the Court to put someone in that position right now seems unnecessary, seems we should proceed with caution.  We should really not rush into this.

So I'll again say that nobody has ordered disclosure of anything that happened in that session and that will be litigated, that is being litigated right now.  And so in light of all of those privileges and concerns, we think we should proceed cautiously.

And, Your Honor, we have not had an opportunity to even brief these questions.  So intervenors yesterday mentioned the city charter.  Well, we think that the city charter actually doesn't say what they think it says in Section 2782 for example that talks about when the city attorney is managing litigation and it does so at the direction of the City Council and how that all plays out.  There's no mention of a vote.  But let us brief that question, Your Honor, we haven't had a chance to brief these privileges.

This is all just innuendo and assumptions and we don't even know what's at issue.  We really don't have a clear

target to even shoot at here.

So we think that it would be wise, Your Honor, at least to wait for the Ninth Circuit, at least to allow us to brief this question, at least to point out where in the record there's evidence of a misrepresentation, let us have an opportunity to truly defend ourselves.

And we really appreciate that we have the opportunity to be heard today, but there's no need for a compressed schedule.  There's no need respectfully, Your Honor, for us to move quickly within the next week to do things, to ring bells that can't be unrung.  This is the classic example of that problem so let's proceed cautiously.

So I also want to address the point that intervenors mentioned yesterday.  They said the City has already disclosed what occurred in session.  That -- nothing could be further from the truth than that statement, Your Honor, that's just wrong.  That's absolutely wrong.

To say that a client, we're all lawyers here, to say that a client approved a course of action doesn't disclose what you discussed with your client.  To say that a client didn't approve an action or didn't authorize someone to make a settlement or -- and so forth.  None of that discloses the substance of the communication.  This is serious stuff.  This is the core of attorney client privilege and no one has waived that.  We have not, we will not, Your Honor, waive that.

**15**

So we haven't disclosed any of that.  No one said what happened in that closed session and no one can say what happened in that closed session.  So, Your Honor, that waiver argument is just really -- there's no basis for it whatsoever.

So I would welcome any questions the Court has in and an opportunity to respond to intervenors, the Alliance, and anyone else who will be heard today, but Your Honor, I just want to again highlight that if we go down this path, we will be eviscerating all of the City's privileges, we will be destroying the City's right to appeal the state court proceeding.  We will be effectively enjoining Judge Kin from his decision in that case and from proceeding in the normal course.

So that litigation is ongoing, let's have an opportunity to brief this.  Let's pause for a minute.  Thank you.

**THE COURT:**  Counsel, I saw some notes being passed, why don't you consult with your colleagues for just a moment --

**MS. EVANGELIS:**  Thank you.

**THE COURT:**  -- as a courtesy, so you're certain you've covered the arguments in your opening.

**(Pause)**

**MS. EVANGELIS:**  Thank you.

**THE COURT:**  Thank you.  Then LA Alliance or intervenors, who would prefer to present next.

**16**

**MS. MYERS:**  That's what I think, so you got up, so.

**MR. UMHOFER:**  I know.

**MS. MYERS:**  Thank you, Your Honor.  Shayla Myers on behalf of the intervenor, LACAN.  I think it's important to note, Your Honor, that the Los Angeles Community Action Network who is an intervenor in this case and has been in this case since the beginning brought the Cangress litigation not as an intervenor in this case, but rather a member of the public that is extremely committed to the issue of transparency and particularly the issue of transparency when it comes to clearing 10,000 almost encampments from the street and ensuring that the politicians and the City are accountable for the decisions that they make.  That is the position that they took when they brought this Brown Act litigation, separate and apart from this case.

Certainly, Your Honor, the intervenors knew about the Brown Act violation as a result of this litigation, but their status as a petitioner in that case is separate and apart.  And as we noted in our filing yesterday, we don't disagree with the City's position that we should leave the Brown Act litigation to itself.

But, Your Honor, that does not mean that this Court does not have a role in interrogating the veracity of statements made by the City to this Court for purposes of resolving sanctions motions pending before the Court.

Your Honor, in the course of defending against a sanctions motion and a motion for settlement enforcement, the City of Los Angeles, through its -- the Assistant City Attorney Scott Marcus represented that the City Council approved the encampment reduction plan.  That statement and the stipulation that was submitted to this Court that resulted in the resolution of the settlement compliance motion and was a part of the resolution of that, that representation could not be more clear.  The City Council approved the encampment reduction plan without delay.

Your Honor, words have meaning.  The word approve means something.  When Scott Marcus from the City Attorney's Office represented to this Court that the City Council approved it, that meant without a doubt, that the City Council did it consistent with the City's obligations under its charter to approve actions.

And, Your Honor, I would point the City -- I would point the Court to the City charter, which states that as except as otherwise provided in the charter, action by the Council shall be taken by a majority vote of the entire membership of the Council.

And so, Your Honor, while the City did not say and the City Attorney's Office did not represent that a vote was taken, when the City Attorney's Office states that the City Council approved without delay a plan, it is implicit and

**18**

important that the Court can understand the respect that that was done consistent with the City charter.

And that, Your Honor, is the problem that we are having with the City of Los Angeles and that I think Your Honor has raised in the course of these contempt proceedings.  Is that the City of Los Angeles says things, and then when they are held to account for those representations, they inform the Court and the plaintiff and the intervenors and the public that the words they say mean something else.

Well, Your Honor, that's why we're here today is to ask that question, if the City Attorney's Office when they said that the City Council approved it meant something else, then we get to ask, what else did they mean.  Because the charter is very clear that approval means a vote.

And, Your Honor, the City absolutely should be held to account to answer that fundamental question.  When you said approved, what did you mean?  And, Your Honor, that does not need to impede into the privileges that the City continues to assert in the Brown Act litigation related to those closed -- that closed session.  That is about what the City Attorney's Office represented to this Court, what they meant when they said that they approved the encampment reduction plan.

And, Your Honor, I think it is important to note while the City's attorneys can say that the intervenors are wrong when we say they opened the door, the City Attorney's

EXCEPTIONAL REPORTING SERVICES, INC

Office represented what occurred during closed session.  The City Attorney's Office represented that the encampment reduction plan was approved in closed session.  And Your Honor is well within the authority of the Court to interrogate then what the City meant when it says those words and that can be done, Your Honor, without asking the question what was said in closed session.

If the City Attorney's Office can point to a process by which the encampment reduction plan was approved, it is separate and apart from the confines of the charter, then certainly they can do so.  And if they do so, then it's up to Your Honor to determine whether it was a misrepresentation to the Court that a vote occurred.

Your Honor, this issue arose because in the course of the Brown Act litigation, the Cangress asked for a disclosure of the vote.  And in response to the question, what was the vote, because that's how the charter says, actions have to be taken by the City Council and the City represented that an action was taken by the City Council, the City Attorney's Office represented that no vote was taken.

Your Honor, City Attorney's Office represented no vote was taken, which means, Your Honor, not only did they disclose that an approval was given, but they included details about how that approval was given, or in this case, how the approval was not given, Your Honor.  And that too is another

instance in which the City, when it is convenient for them, are opening the door to what occurred during that closed session.

Likewise, Your Honor, in the course of the litigation and in the course of the hearing, Matt Szabo testified that the encampment reduction plan was approved by the City Council. Your Honor, this is not just one instance or two instances, this is multiple instances in which the City when it supports their position is allowed to testify about what occurred or put forward evidence or represents about what occurred during that closed session, but when called to account about contradictory statements about what occurred during that closed session, the City claims that they can't disclose anything about that.

Your Honor, we are very clear about what the confines of the Brown Act case is about, you know, I have the honor of being counsel of record in both of these proceedings, and we would do nothing to interfere with the sovereignty of Judge Kin in those proceedings.  That case was brought for a very specific reason because it implicates as Ms. Evangelis says, very important state interests.

But those interests are not implicated by the very important federal interests at issue here, which is the sanctity and integrity of these court proceedings.  The City of Los Angeles should not be allowed to make material representations and contradict those material representations in other instances and not be held to account, or at least,

Your Honor, to question about what the City intended, what it meant when it said actions were taken.

Your Honor, these proceedings have gone on for months and I think the Court has recognized, I think all of the parties have recognized that much of what we are fighting about are what words mean.  That when the City makes representations and we attempt to hold them to account, the definitions shift like the winds as the court proceedings go.

The charter is very clear about the process by which the City Council can take actions.  And when the City Attorney's Office represents that those actions are taken, it is not on us as the parties opposing the City or Your Honor as the judge in these proceedings, to in those instances clarify every single question.  Words have to be given meaning and when the City comes back and says, words have different meanings, then it's well within Your Honor's authority and obligation to the sanctity of these proceedings to actually ask those questions what do those words mean when they say them.

Your Honor, again we completely agree that these are important issues.  We also agree, though, that these are issues that the Court is well within its authority and responsibility to be interrogating.

In terms of the timing of it, we don't take a position about whether or not the Court should wait for the Ninth Circuit related to this.  This issue has been outstanding

for quite a bit of time because there's not been a process by which to raise these issues.  We don't object to allowing the Ninth Circuit to rule on these particular issues, because of the potential concern that the City raises.  That said, we don't think that there's any merit whatsoever to the City's position.  And if the Court does choose to go forward, we do have specific questions and we would represent that we don't intend to ask questions specifically about what was said in closed session, what -- or those sorts of things.  We're simply asking for clarification about the inconsistencies related to the City's position and what it means for purposes of the City's representations in these proceedings.  Thank you.

**THE COURT:**  The same courtesy.  If you have anyone here --

**MS. MYERS:**  No one's asked, Your Honor.

**THE COURT:**  All right.  Thank you very much.  Now turn to LA Alliance.

**MR. UMHOFER:**  Thank you, Your Honor.  I just want to run through --

**THE COURT:**  And would you also once again state your name for the record.

**MR. UMHOFER:**  I'm sorry, Matthew Umhofer on behalf of the LA Alliance and thank you for hearing us on this issue.  I just want to run through the arguments that were made by the City.  None of them work.

The City pretends to be confused about what this is about. This Court has issued multiple orders specifically identifying its concern about whether a representation, a misrepresentation was made to the Court about the encampment reduction plan.

The City's known about this issue already because it's involved in the Cangress action, the Brown Act litigation, but it also knows because on January 14th, the Court issued an order about this. The City has had plenty of time and notice about what's going on here and about what the concern is.

And, of course, the City pretended to guess at what the representation was, but it knows exactly what the representation was. It was made in Docket No. 713 at paragraph 8, a stipulation that the City entered into to resolve one of its many, many failures to comply with the settlement agreement in this case.

And in paragraph 8, the 9,800 encampment reduction plan and milestones were presented to the City Council on January 31st, 2024, which approved them without delay. They said what happened.

The Court is concerned, the plaintiffs are concerned and the intervenors are concerned about whether that was true. Nobody's made a decision about that. We need to find the facts. The City wants to prevent this Court from inquiring into the facts that they put at issue. That's remarkable.

**24**

The City wants to both say what happened, but not say what happened.  They want to make representations to the Court, but be unable to back them up or explain them when asked questions about them.  It's a remarkable amount of hubris that the City thinks it's immune from questions around this kind of thing.  Immune from simply fact finding around this issue.

So the idea that they are confused about what's at issue here just doesn't stand up to the record here.  They know exactly what they're -- what this hearing is about and why the Court is concerned.  And it is their -- it is in the manner in which they've approved this, their last minute briefings, their runs to the Ninth Circuit that exposes their nervousness about this issue and fact finding into it.

So the next thing, next argument -- so the first argument was we're confused, Your Honor, we don't know what this is about.  They do, the Court has given adequate notice and they've had plenty of time to assess this issue and I don't believe they need more, but they are certainly asking for more and they're asking for more in two categories.

One, wait for the Ninth Circuit.  The Ninth Circuit already spoke.  The Ninth -- they asked to stop this hearing.  And last night the Ninth Circuit issued an order not granting that and simply -- and denying the administrative stay they requested, so the Ninth Circuit has spoken about whether a hearing should be stopped today.  We have an answer on that.

**25**

And so the next question is, should we wait for the Ninth Circuit to make a decision about their request, which is to stop this hearing and extraordinarily remove this Court from these proceedings.  The Ninth Circuit has set briefing days from now, we'll brief it, but the Ninth Circuit has spoken about whether this hearing can go forward.

They asked, the Ninth Circuit did not grant a stay of this hearing.  So this hearing, this fact finding alone can move forward.

They also asked, second, that we wait until the entirety, I think including appeals of the Brown Act litigation is concluded.  If we wait that long, Your Honor, through appeals, the settlement agreement will expire.  That is unacceptable.

The notion that we should wait until the Brown Act litigation is complete seems to be rooted in arguments based on Younger.  And you heard the reach, Your Honor, in the argument by the City.  The reach was, this is essentially going to enjoin what's happening in the Brown Act litigation to just ask questions about representations made in this Court and the truthfulness of it.  Essentially enjoining is what I heard, or words to that effect.  That's the reach, Your Honor, because it's not an injunction.

And the reason why they're putting it that way is because that's what's required to get Younger abstention.  To

get Younger abstention, they would have to show that the contemplated fact finding that would happen here would enjoin the state proceeding or have the practical effect of doing so. But let's be clear about what that hearing -- what the Brown Act litigation is about.

The Brown Act litigation is about whether the City violated the Brown Act by doing things in closed session. That question is not before the Court. The question before the Court is, what is the truth of the representations that the City has made, both in a stipulation filed with this Court which was pretty darned important to resolving a series of misleading statements by the City and which the Court relied on in resolving that issue. And then Mr. Szabo also took the stand during the proceedings and talked about how the City Council had voted on -- had approved the encampment reduction plan, his words were approved.

And so if we go to those statements, those can be found on Docket No. 555 -- excuse me 955, page 132 of 304. And he is asked,

"So this chart constitutes the encampment reduction plan that was approved by City Council, correct?"

Objections, overruled.

"I believe so, yes."

So we have a representation both in the stipulation

and in testimony and those are the two places that we've identified thus far.  The Court has certainly relied on the representation that the representations, and by the way, the questioning goes on by Ms. Myers and the answers continue concerning the approval of the encampment reduction plan on page 132 and 133.

And so we have these representations.  They are separate from the question of whether they should have -- whether what happened, this approval should have happened in closed session or open session.  The question here is, the City made a representation.  Was it true?  And that matters.

Look, Your Honor, I -- the one thing that I was happy to hear from the City is that they're not backing away from their commitments under the encampment reduction plan, although they actually are, because they've been trying to reduce encampment reduction obligations in this action and we have been pushing back on that.  They can't meet those numbers. They're way under where they need to be on that.  They are terrified of that 9,800 number, that commitment that they made in writing to this Court because they can't meet it.

So I'm glad to hear they're sticking with it, I'm glad to hear they're not backing off of it, but we are very concerned any representation that's been made by the City about that because it's such a critical piece.

We've entered into this agreement.  Let's create some

beds.  Let's reduce encampments humanely and let's do it right and let's get people out of encampments and into beds.  That's the point.  And a misrepresentation about one of those pieces is critically important to what we're trying to accomplish here.

And I would echo the arguments by Ms. Myers as well and submit to any questions by the Court.  If there are none, I'll sit down.

**THE COURT:**  On behalf of the County?

**MS. SOBEL:**  The County has no position on these issues, Your Honor.

**THE COURT:**  Rebuttal by the City?

**MS. EVANGELIS:**  Your Honor, may we have three minutes?

**THE COURT:**  Certainly.

**MS. EVANGELIS:**  Thank you.

**(Pause)**

**THE COURT:**  Okay.  We're back on the record.  And, counsel, this is the rebuttal by the City.  State your name again.

**MS. EVANGELIS:**  Thank you, Your Honor, Theane Evangelis on behalf of --

**THE COURT:**  Thank you.

**MS. EVANGELIS:**  -- the City.

Your Honor, I'd like to talk about the big reach

here.  We heard about a reach.  The biggest reach of all is the notion that the City made any representation about a vote.  What you just heard was nothing to substantiate that.  In fact, Ms. Myers said that it was implicit that there was a vote.  Implicit is not a willfulness representation.  It's not a misrepresentation at all.

So why are we here?  Nobody can point to any statement about a vote.  And, Your Honor, the notion that we are not on a collision course with state court is just absolutely untrue.  I mean, it is demonstrably false on what we just heard.  Ms. Myers said we need to interrogate the veracity of the City's statements about what happened in closed session.  They need to back up their statements said Mr. Umhof (sic), explain their statements.

How in the world can the City explain and defend itself that its statements about what Council approved in that closed session, how can it defend itself against the allegation that it misrepresented that without disclosing what happened in that closed session?

How could anyone say I didn't lie about this.  I'll tell you what really happened, I didn't lie.  I mean, that is absolutely ridiculous.  The notion that we could defend ourselves without disclosing what happened in that closed session.

And, Your Honor, that's exactly what Ms. Myers is

**30**

seeking as a remedy before Judge Kin.  That's the very remedy at issue that's being briefed.  She wants there to be full disclosure of everything that happened.  So that is exactly the remedy being sought in state court and it's exactly what we would need to do to defend ourselves.

And, Your Honor, to be ridiculed for guessing what statement is at issue here, I'm really offended by that.  Because no one has told us the statement.  So, Your Honor, the only statement that we've identified is that the City Council approved the encampment reduction plan.

So this shell game about what representation was made about approval or about votes and hiding the ball, why hide the ball.  We're just really trying to understand here what the allegations are so we can defend ourselves.  And still nobody has pointed to a single representation about a vote having happened.

There is no way to thread the needle of somehow walking the line between the state court proceeding and misrepresentations about the state court proceeding in federal court and the City charter, let's talk about that for a minute, Your Honor.  We've never had an opportunity to brief it.

Those are core state law issues, state interests.  And, Your Honor, the city charter only requires a vote when the City Council's approval is required by law.  And no City Council approval was required by law of the encampment

**31**

reduction plan.

So this is all just again improper.  And so we heard that there was just sheer speculation that approval is -- it's implicit.  It means a vote.  No, actually it doesn't.  People can approve things in lots of different ways, it can approve of things, they can disapprove of them, they don't have to take votes.  And that is certainly contemplated by the charter and by the way the City operates.

So it is really a fallacy and that fallacy is the basis for a potential inquiry into the heart of attorney/client privileged communications.  No one here is hiding anything.  Your Honor, we are protecting the privilege.  There is nothing more sacrosanct in our system of justice than the communications between a client and their counsel.  And so, yes, we will stand up for that because that is so important.  And that's our job here.  We have to.

So, Your Honor, the fact that we may have disclosed the result that a client approved of a course of conduct does not waive the privilege over the conversations that went into that decision.  Of course, it didn't.  That never is the case.

So also saying something didn't happen doesn't waive the substantive communications that went into considering whether it would happen.  This is all just so far afield.

And compliance with the City charter and with local laws, ordinances, state laws, none of those are federal

**32**

questions.  None of those are questions that we should be probing right now when there's a state court action that is probing the very same thing.  And, yes, that is exactly the case for a <u>Younger</u> abstention.  And Your Honor recited the perfect case about Brown Act violations in fact, it was <u>Lake Luciana v County of Napa</u>.  It was from the Northern District of California in 2009.  We cited it in our papers.

And in that decision there was no injunction by the district court, but there was the effective injunction, the effective derailing of a state court proceeding because it was asking the same questions and answering them in a way that would intrude on the prerogatives of a separate sovereign.  So that is exactly what <u>Younger</u> abstention requires.

So also, Your Honor, the first I heard about Mr. Szabo's testimony being at issue here was just now.  Nobody has said that was at issue.  Nobody put that in front of us and said, here's a misrepresentation.  We didn't have notice of that.  We're -- it wasn't a misrepresentation.  Again it was consistent, it was City Council approved.

But the notion that we knew what this was all about is just false.  So, Your Honor, we haven't had plenty of time, we just filed objections and we just got an order from the Court today, respectfully still not answering our questions about what the representations were.

And all of these questions, these are thorny legal

questions about state law, local city procedures, what's required, all of those again are the subject of tons of briefing and hearings and proceedings in state court, but we even haven't had even so much as a chance to brief them here, so why are we going to rush ahead to judgment, put witnesses on the stand and force them to answer questions that would divulge all of these -- the contents of a closed session, destroy these privileges, eviscerate our appellate rights.

So the only questions that would be asked, Your Honor, are questions about what happened in that closed session.  Because how else could the City defend itself.  I'll go back to that.  Because as I stand here today, I can think of no other way that we could defend ourselves than to say what actually happened and why that constituted approval and, of course, we cannot do that.  So this is an impossible position for us to be in.

So, Your Honor, this exactly what is going to be decided by the state court, and yes, we should wait, we should wait.  And, Your Honor, no one misrepresented anything to this Court.  There's absolutely no representation about a vote, innuendo, implicit statements, coded language, none of that amounts to proof or even an indication of a misrepresentation, not even a hint.

So we think this really should all be improper and out of bounds for this proceeding.  But, Your Honor, we would

ask for a minimum to brief it.  We can brief if simultaneously while the Ninth Circuit is considering it.  But let's all proceed with caution.  Thank you.

**THE COURT:**  And why don't you check with your colleagues for just a moment to make certain you've covered all of your arguments.

**(Pause)**

**MS. EVANGELIS:**  Thank you.

**THE COURT:**  Have you covered your arguments?  Thank you very much.  Ms. Myers.

**MS. MYERS:**  Thank you, Your Honor.  Shayla Myers on behalf of the intervenors.  Just a quick point of clarification related to one of the representations.

Actually, we did identify Mr. Szabo's testimony on page 7, including reference to the transcript by page citation. So that was very clearly represented to the City of Los Angeles related to this in the filing that we submitted to the Court, which you referenced many times.

**MS. EVANGELIS:**  Yesterday?

**MS. MYERS:**  Yes.  But, Your Honor, I think the issue before the Court is not about innuendo.  The issue before the Court is not what was intimated to the Court.  It's what was said to the Court.  Your Honor, the City Attorney's Office represented that the city council approved the Encampment Reduction Plan.  And, Your Honor, I do think it is very clear

and has been clear throughout the course of the past few days, certainly, if not longer, that that was what was at issue here. And I think your order is very clear that the issue is the City's representation about what occurred related to the approval of the Encampment Reduction Plan and the representation by the City that the city council approved the Encampment Reduction Plan.

And the question comes down to whether or not the city council approved the Encampment Reduction Plan.  And there is potentially, as the City wants to now argue, a question about whether a vote was required or not.  But the question remains, how did the city council approve the Encampment Reduction Plan?  That is the question before the Court for purposes of determining whether or not the city council actually approved it.  What was the process that was used? It's not about the conversation that the city council had with the City Attorney's Office.  It's not about why they chose the course of conduct that they chose.  It's about what course of conduct did the city council use to approve the Encampment Reduction Plan.

And then, Your Honor, is the question about whether that was sufficient for legal purposes to constitute an approval.  Your Honor, if the City wants to go down that path and argue that they could have engaged in a different process rather than what the charter requires, i.e., a vote, then the

City can make that argument.  But the City needs to disclose what process it used to approve the Encampment Reduction Plan. The City made the representation that it approved the Encampment Reduction Plan.  That did not come out in the course of any forced disclosure related to anything that is unrelated to whether or not the City was properly in a closed session related to the Brown Act.  The City made a representation in a sanctions proceeding in order to get out of a sanctions order by this Court.  They made a representation.  They chose to make that representation of their own volition.

And Your Honor has then the ability to test the veracity of that statement.  And that's what is at issue here, is the veracity of the statement that the city council approved it.  And the City cannot hide behind the Brown Act or Brown Act litigation and avoid an inquiry into whether or not the City actually did what it said to this Court that it did.  It would be premature to brief the issue of whether or not the City's process is sufficient under the city charter unless we know what that process actually was.  We know what it wasn't, because the City freely, when put to the test and questioned, disclosed what it didn't do.  And that's the problem, Your Honor, is the City is engaging in selective disclosure about what occurred.  And when the selective disclosure contradicts other selective disclosures about what occurs, the City wants to then argue that Your Honor's hands are tied.

**37**

There is no question that attorney-client privilege is incredibly important.  But, Your Honor, the suggestion that the sanctity of the federal court and the City's representations and the truthfulness of the City's representations is any less important is ridiculous.  If the City makes a representation of its own accord, to serve its own purpose, and there is contradictory evidence about the veracity of that statement, the suggestion that this Court's hands are tied about asking questions about what occurred to satisfy itself about what actually occurred is a complete abrogation of this Court's responsibility if the Court takes that into account.

The Court needs to know that when the City says -- when the City makes representations, that those statements are true.  After years of these courts' proceedings, we have had ample reason to be suspect about those representations.  And particularly in instances like this, when what appears to be at issue is the City applying its own definition about what it means for the city council to approve it.

The City wants to apply its own definition, Your Honor, about what it means to approve the Encampment Reduction Plan, then all we are asking, Your Honor, is an opportunity to ask that question.  If the City didn't mean that it approved it consistent with its obligations under the charter, then what did it mean when it said that it approved the Encampment

Reduction Plan?  That's what we need for purposes of continuing these proceedings.  That's what we are seeking for purposes of witness testimony today.  And that's what we believe is well within this Court's authority and does not impede in the state court proceedings.  Thank you.

THE COURT:  And you have no one else there that you need to consult with, correct?

MS. MYERS:  No, Your Honor.

THE COURT:  As a courtesy, then, back to LA Alliance, please.  Rebuttal.

MR. UMHOFER:  Thank you, Your Honor.  Matthew Umhofer again on behalf of the Alliance.

The message from the City is, trust us, there was no misrepresentation.  That's the message that was said.  Your Honor, there was no misrepresentation.  Let's find some facts, Your Honor.  Let's find some facts.

Now, the City wants to prevent that, and they have posed two sort of hurdles.  One is the privilege, and the privilege is important.  There's some very interesting questions about privilege raised by the fact that the City actually represented not just the outcome, but what happened in the room approved.  So in the context of the attorney-client privilege, if I say what happened in a room with my client and I say the client approved something, that is a disclosure, that is potentially a waiver.  But let's take this step-by-step,

**39**

Your Honor.  Let's get some fact-finding going.

They can assert the privilege and answer the questions.  If the Court concludes that there's waiver, the Court wants more briefing, we can do it at that point or after the witness is questioned.  So we can take it step-by-step. Let's get witnesses in here.  Let's find some facts.  They can assert the privilege.  If the Court orders people to answer over an assertion of privilege, then they have an opportunity for that witness to refuse, to bear the consequences of that, and to take it up to the Ninth Circuit.  That's the proper procedure, not to run to the Ninth Circuit before anything has happened.  There may be a way for us to navigate these hearings without intruding upon the privilege.  There may be a way for us to find those facts.

Counsel has already suggested one of those ways.  They can say what didn't happen.  There are many ways for us to navigate this, but finding a fact is something the City should not be afraid of, but they really seem to be.  I want to come back to Younger because it is at the core of their argument about why this Court shouldn't go any further and should wait for the Ninth Circuit and, indeed, wait for the entirety of the state proceedings, which conveniently would fall to conclude, including appeals, which would conveniently fall after this Court has lost jurisdiction over this case.

So I talked about one reason why under Younger that

they can't meet the requirements.  The Ninth Circuit has made it clear you've got to meet all four requirements.  And the last requirement imposed by the Ninth Circuit was, of course, that there would have to be essentially that proceeding here would be an injunction.  And that's not the case.  The Court is not considering enjoining any conduct right now.  The Court is considering whether the City misrepresented facts.  But another aspect of the Younger abstention, which I think is important here, is it's a federalism issue.  And the Ninth Circuit has specifically said that duplication, potential for duplication in federal court and state court, is not alone enough to prevent a federal court from proceeding.

And this is what the court said in Green v. City of Tucson, 255 F.3d 1086.  Since the possibility of duplicative litigation is the price of federalism, federal and state courts, the prospect of such duplication without more does not constitute interference with state court proceedings justifying a federal court's dismissal of a case properly brought within its jurisdiction or in this case, a federal court's contempt proceedings.

So all they have and their core argument is you might be deciding something.  There might be a duplicative ruling in this court and there, and the Ninth Circuit said that isn't enough alone.  The Ninth Circuit has gone on to say that there must be a vital interest at stake in the state proceeding.

EXCEPTIONAL REPORTING SERVICES, INC

It's beyond the norm.  The vital interest can't just be the state's judicial functions.  It can't be a state's generic interest in the resolution of a case.  It has to be specific.  It has to be of such universal value that the prompt resolution of the case is not cognizable for Younger abstention.  Rather, the interest at stake must go to the core of the administration of the state's judicial system and its importance must be measured by considering its significance broadly.  That's the Ninth Circuit speaking about that.

They haven't even tried to identify a vital interest other than the state court's proceedings, which is not enough, according to the Ninth Circuit.  So, Your Honor, neither the privilege nor Younger poses a burden or an obstacle to proceeding with fact-finding here.  They can assert their privileges.  We can work it through.  But what they can't do is prevent this Court from even engaging in fact-finding.

Let's find some facts, Your Honor, and if they're right that no misrepresentation was made, let's move forward together.  But given the history of this case, I think it's highly likely that there was a misrepresentation made.  And that's important, Your Honor.  And the Court has an independent obligation and right to inquire into candor to this Court.  And I would submit on that, Your Honor.

**THE COURT:**  On behalf of the County.

**MS. SOBEL:**  No position, Your Honor.

**42**

(Pause)

THE COURT:  Counsel, I'll have a decision with you or for you shortly, and we'll give everyone a chance for a brief recess.  But before we take that recess, perhaps it's best to go back, so we're all on the same page, to the January 31st, 2024 session.  And I'm going to take judicial notice of that session.  And Anne or Megan, would you put up that session?  And it will have the opening that will show January 31st of 2024.  And we'll show the recess to -- of this item, either item 21 or 22.  And then we'll show whatever representations were made, so that we have no disagreement about what was said that day.  And this will be brief, so that we all have the same genesis that's caused the Court's concern.

(Pause)

MR. MCRAE:  Your Honor, is this a statement that was made to the Court?

THE COURT:  Counsel, this will be so evident in just a moment.

(Pause)

THE COURT:  All right, Counsel, the first image that will come up on the screen is Los Angeles City Council agenda for January 31st, 2024, which you're viewing at this time.  You'll have adequate time for any objections or comments in just a moment.  And, Counsel, this is a rather lengthy meeting by the council.  And unless there's objection, I'll take

EXCEPTIONAL REPORTING SERVICES, INC

**43**

judicial notice of it.  But can you see this on the screens in front of you?

SPEAKER:  Yes, Your Honor.

THE COURT:  I want to make sure the screens are functioning.

MR. UMHOFER:  Yes, Your Honor, we can.

THE COURT:  Can you?  Okay.

(Pause)

(At 10:11 a.m., video played)

"SPEAKER:  -- says we've already met about it in committee, so we can go ahead and vote.  But at that moment, the public is not heard, typically.  And that's the problem, because there's a substantial change when you do announce, we're going to spend $50 billion filling a hole that Blumenfield created by overlooking the bicycle lobby or something.  But when that information comes out, the public has a right to say nay, yay, or hooray.  But it's not acceptable the way you do it now, so I'm going to have to -- I've said this to Corcoran before.  He doesn't seem to care, because he's, as he said the other day, his best-by date is approaching very quickly.  But this is not a system that works.  We showed you that the special meeting rules that you were breaking didn't work.  I encourage you to do the appropriate thing,

**44**

and like you should be doing with some of these recounts, mediate a resolution.

"SPEAKER:  Mr. Patton, your time has expired.

"SPEAKER:  Thank you very much. That'll close public comment on all agenda items and close general public --"

THE COURT:  Let's stop this tape for just a moment. You obviously recognize different council members.  Mr. Marcus of the City Attorney's Office is the gentleman to my right, to your left, standing by the door in a blue suit, red tie, and white shirt with his hand in his pocket.  Would you please continue now?  We're trying to identify the location where the counsel goes into closed session.

(At 10:13 a.m., video played)

"SPEAKER:  Mr. Clerk, what's now before us?

"SPEAKER:  Mr. President, the council may now vote on items 12 through 21.

"SPEAKER:  Okay.  12 through 21 are before us, members.  I see no members wishing to be heard, so let's go ahead and open the roll, close the roll, and tabulate the votes.

"SPEAKER:  Twelve ayes.

"SPEAKER:  Very good.  Is there any other business that can be taken up in open session?

"SPEAKER:  Not at this time, sir.  The council may

EXCEPTIONAL REPORTING SERVICES, INC

now proceed to closed session item 22.

"**SPEAKER:**  All right, let's go ahead and prepare the chambers for closed session, please."

**THE COURT:**  Now, there's a period of time in closed session.  You'll see this on the tape.  But instead of belaboring the time spent, we'll go to the end when the council comes out of closed session, so we all have the beginning of this issue before the Court.

**(At 10:14 a.m., video played)**

"**SPEAKER:**  All right, after a lengthy closed session discussion, the council is back now in open session.  Mr. City Attorney, is there anything to report from the closed session?

"**SPEAKER:**  There is not.

"**SPEAKER:**  And if I may, Mr. President, I'll call roll.

"**SPEAKER:**  Oh, thank you very much.  Let's call the roll, please, Mr. Clerk.

"**SPEAKER:**  Thank you, Mr. President.  Blumenfield, De Leon, Harris-Dawson, Hernandez, Hutt, Krekorian, Lee, McOsker, Padilla, Park, Price, Raman, Rodriguez, Soto-Martinez, Yaroslavsky.  Eleven members present in our quorum, Mr. President.

"**SPEAKER:**  Thank you very much.  Mr. City Attorney, again, is there any actionable

item that needs to be reported from closed session?

"**SPEAKER:**  No, Mr. President.  There is nothing to report out of closed session.

"**SPEAKER:**  Very good.  With that, Mr. Clerk, what's next before us?

"**SPEAKER:**  Council has motions for posting and referral."

**MR. MCRAE:**  Your Honor, did you want our objections now?

**THE COURT:**  Counsel, just one moment, please.

**(Pause)**

**THE COURT:**  Each of you have cited or referred to document 668-1, which was the declaration in support of the motion wherein the -- I'm sorry, Docket 713, my apologies -- where the statement of facts signed by the Chief Assistant City Attorney, Scott Marcus, then counsel of record for the City of Los Angeles in a joint stipulation stated, quote, that the 9,800 encampment reduction plan and milestones were presented to the city council on January 31st, 2024, which approved them without delay, and much of the argument today has centered around the word approved.

Upon further inquiry, in a response from the City of Los Angeles on November 27th of 2024, a contraposition was taken by Strefan Fauble on page 2 of document 1152-1, that regarding the January 31st, 2024 closed session, no settlement

**47**

or agreement was voted on or approved.  In fact, no vote was taken.  That's also found in document 668.  Strike that.  Once again, in document 773, page 3 and 4.

Subsequent to that, the Court had received a direct testimony, and could I have the -- well, document 955, if counsel would turn to that.  You've already referenced the statement by Matt Szabo that a vote was taken.

**SPEAKER:**  Your Honor, did you just say --

**THE COURT:**  Counsel, I'm sorry.  Please let me finish, and then I'll pay you all the courtesy and the time, okay, all the time you need without interruption.

And, Megan, if you'd help me again with this transcript.  I think I can find it.  And I refer you to page 126 of 955, where Mr. Szabo states in line 25 it was approved.  And this is referred to in lines 11 through 13.  Okay, and so then the Encampment Reduction Plan, you said that was approved by the city council, and Mr. Szabo, 25 answers, it was approved.  I want to think about your arguments concerning Younger obsession for a few moments, and certainly courtesy to the circuit.  So I want a little bit of time for reflection.

This has raised the issue of whether, in fact, a vote was even taken.  I tentatively believe that this can be resolved without intruding on the State Brown Act litigation pending before Judge Kin, but I very much appreciate your oral

arguments today, and I want to reflect on that once again after your arguments to the Court today.

And what's caused this concern is the potential misrepresentations by the City that once again initially arose with these contradictory statements, this Court needs to ensure due process and your opportunity to be heard, which is why I've opened this up for oral argument today.  And, in fact, I want time to tentatively consider that and come back to you in probably 20 minutes to half an hour.

I want due process.  I want to make certain that there's no confidentiality breach by the City, as you've alluded to, and whether the parties simply wish to rest on the state of this record or if we did proceed forward, who in fact would be called.  And in the briefing that I received in document 1152 on page 9, lines 7 through 12 or 7 through 10, it states that the intervenors have requested that Matt Szabo, Scott Marcus, Strefan Fauble appear at the hearing on February 10th.  The City has informed intervenors that Mr. Szabo is not available, but Mr. Marcus and Mr. Fauble are available.  And in footnote 3 that the City indicated it would object to the testimony of these witnesses.

You mentioned that the circuit was presented with a requested stay.  Was that yesterday or last evening you said?

**MS. EVANGELIS:**  Yes, Your Honor and --

**THE COURT:**  And what was the holding?  In other

**49**

words, I'd like to see what the circuit stated regardless of your representations on either side.

**MS. EVANGELIS:** Yes.

**THE COURT:** So that -- has the circuit stayed this proceeding?

**MS. EVANGELIS:** Your Honor, we requested a stay and the Ninth Circuit did not grant an administrative stay, but it did call for briefing and the brief -- the response to our petition is due in seven days, and then we have three days for a reply thereafter.

**THE COURT:** So the circuit has not stayed this proceeding, but it's called for briefing.

**MS. EVANGELIS:** That's correct.

**THE COURT:** Okay. Fair enough. Is there any disagreement that this is a portion at least that's been played in court of the January 31st, 2024, council meeting?

**MR. MCRAE:** Your Honor, respectfully, we didn't have any notice of this. We need to confer with our client and review this in full context --

**THE COURT:** Why don't you confer?

**MR. MCRAE:** -- to answer the Court's question as to whether we have an objection, as opposed to having a snippet.

**THE COURT:** All right. Sure. Well, why don't you do that? Then we'll take a recess and I think this is common counsel. It's -- every one of the city council meetings are

viewable by the public and why don't you call your client and see if they're objecting to this.

MR. MCRAE:  We can do that.  Can we state our other objections, though?

THE COURT:  Oh, absolutely.

MR. MCRAE:  Okay.  So for starters as I just indicated, we have filed at least two different requests to get a basic understanding not by deduction, not by us guessing.  That's not what due process is, but by asking the Court what exactly is the misrepresentation?  When was it made?  By whom?  Why does the Court think it's a misrepresentation?  And what is the legal and factual basis that's going to inform the landscape of the hearing?

We shouldn't have to get up here and be mocked because we have to guess at the answer to those questions and as we're sitting here now, we're hearing snippets out of documents.  We're hearing references to other people's testimony from briefs that were filed yesterday.  What -- why?  Why is there this shroud of mystery around this?  Give us an opportunity to fully digest whatever it is that is the source of concern for the Court and then set a briefing schedule to proceed in a logical, linear progression, starting with is there a legal basis to say that a vote must be taken for there to be approval?  Starting point.

If you don't have the answer to that question

legally, why are you even proceeding?  Because you're basically operating into assumption that there is a misrepresentation, when you haven't determined that the statement made could not be factually correct.  That's number one.

And then going beyond that, judicial notice as the Court knows is a vehicle only to take notice of the fact that something exists, not for the truth.  That's the point of judicial notice.  So if the Court is relying on whatever that was as a basis to make some decision, obviously we object, because it has an evidentiary limitation that's built into the doctrine of judicial notice.

Also, we had no idea who was speaking and as the Court started with its statement, this is a rather long proceeding.  Well, we clearly didn't have a chance to ingest all of that and to distill it to make a quick statement on whether we object to it, whether it's completely out of context, and more to the point, how many different items were the source of that meeting?  Meaning if the Court is trying to draw some type of deduction that something that it heard must mean that there's an inconsistency with something that was said, the -- one of the first questions is was any statement that was played in that snippet inexorably limited to a singular issue or maybe there were multiple issues where different courses of action could or could not have been taken.

Again, it's speculation and assumption because it cannot overcome the cognitive dissonance that you can defend a misrepresentation without disclosing speech. The -- we're literally -- after playing all of that in the exact same position of no one has answered the question other than uttering abstractions, how is the City to defend an alleged misrepresentation regarding what happened in a closed session without talking about what happened in the closed session? And we could start with, you know what, there are more than one ways to have approval, but who are we kidding? That's not going to satisfy the people pressing on this because it'll be then well, no, but how, and when, and what was said, meaning you are essentially making a distinction without a difference and asking for the content of that information.

I think the other point is the Court made reference to maybe it was inconsistency or seeming inconsistency. There are two statements that the Court made reference to. Matt Szabo saying approved and a letter from Mr. Fauble saying approved. How is that inconsistent with the stipulation? All three of them say approved.

I go back to Ms. Evangelis's question, where is the statement that someone made a misrepresentation? Also, where did someone say there was a vote? Now, here's what appears to be happening. You could try to fashion an inconsistency if you were to -- if you were to inject the statement approval that it

**53**

means vote, but if you're doing that, you're not actually properly determining whether or not there's an inconsistency or misrepresentation. You're creating a misrepresentation by operating on a factual assumption about what a word means and determining in advance, without the benefit of legal briefing, that it could only mean a vote. That's not a searching inquiry in terms of a factual basis for inconsistency or misrepresentation. Again, it's trying to basically create one for whatever reason, which is not really clear.

And so as far as -- you know, this whole point about you know, what is the -- how this connects to this? I asked the Court earlier. Was whatever we just saw, was that a representation to the Court? Because as I understood the impetus of the Court's concern was a misrepresentation to the Court. One would think that that would mean a misrepresentation to the Court. This is something that was said to the -- in the general public. And again, the full context we don't have the benefit of, so how is it even relevant to what was said to the Court or what wasn't said to the Court? And how many questions would we have to answer about the very thing that we all saw was in closed session to distill whether or not it indeed contains any probative information for this proceeding.

And so I -- we could not object more strenuously to

whatever that was that was just played.  Also, we object to why didn't we have notice of all of this before we came in here?  We've asked multiple times for it and I concur and join in everything that Ms. Evangelis said about can we please, as opposed to deciding whether somebody has to testify to something, have briefing.  This -- why is this any different than anything else where you determine issues to be decided?

Let's start with framing the legal landscape.  What is the salient and applicable law that governs this question?  How procedurally can we go about doing it?  Then we can ask do we even need evidence?  And if so, how do we do that while protecting appellate rights and rights to appeal?  Can we do that first?  And if we do that, then we can get to the question of whether or not we ever come to a point about taking evidence.  So those are our objections.

**THE COURT:**  Thank you.  I want to pay the other parties any opportunity to respond if you'd like to.

**MR. UMHOFER:**  Before I respond to that, Your Honor, I -- this is again Matthew Umhofer on behalf of the LA Alliance.  I do want to note that we have two people who were invited by the Court to attend, at least two.  I believe the first Assistant United States Attorney is here, Mr. Saley, and Mr. Hockman are -- is also here.  And I know we're focused on these arguments, but I do want to be respectful of their time.

**THE COURT:**  I want to thank you.  And also I believe

**55**

LAHSA is here as well.  And if you'd just identify yourself with the Court's appreciation.

MS. O'NEILL:  Sure, Your Honor.  Interim CEO, Gita O'Neill.

THE COURT:  Thank you very much.  It'll stop a lot of the misinformation.  You're here to personally hear firsthand about these proceedings, so I appreciate your presence.  And also, while you're here, I'd like to say to the County, I appreciate, and I think the public appreciates, your last notice to the Court concerning the attempted recovery of the $50.8 million that was distributed in 2018-19 with no milestones and no contracts.

And I think you've endeavored to bring the Court up to date about the attempts to recover those monies.  And from memory, I had noticed that there was initially about $2 million that had been recovered in some form when the Court took notice of this.  That's subsequently been reduced into the 40 million, 37 million, and it's represented about $30 million is still outstanding.  I'd ask if you'd be so kind to break that down into those in-kind contributions versus the cash contributions that have been recovered.  And I'm using contributions, and it was represented by another LAHSA official here two or three hearings ago.  I'd have to go back that they would attempt to do so, but in the last couple of hearings, we've moved on to other subjects.

**56**

And so I haven't come back to that, but if you could help the Court and the public in terms of whether those are in-kind repayments by providers or whether they're cash repayments, I'd appreciate that. But other than that, I appreciate the County's efforts in that regard.

**MS. HASHMALL:** Thank you, Your Honor. I'll convey that to my client.

**THE COURT:** All right, now, Mr. Umhofer, why don't you finish, and I'll turn to Ms. Myers.

**MR. UMHOFER:** Yes, Your Honor. I think two questions. I think the central question posed by the post was, I think, an objection to the video. Let's start with relevance. Is it relevant what happened before the city council in and around this apparent approval? Yes, it's absolutely relevant. The suggestion that this isn't even relevant is highly questionable.

The second question that sort of, I think I gleaned from counsel's passionate presentation was, shouldn't we start with briefing? And that's not typically how evidentiary hearings work. We do evidentiary hearings, and then we have briefing. They're complaining about notice. We think it's clear. It's up to the Court to determine whether they've had enough notice. We think they have. The Court's issued several orders. There's no mystery here.

The suggestion that the City would be surprised by a

city council meeting video seems a little bit far afield.  We think the video is acceptable as a subject of judicial notice.  The City will have time to process that because we won't finish this hearing today, and they will be able to brief it after.  The notion that we need rounds of briefing before, and then an evidentiary hearing, and then rounds of briefing after, I think, doesn't square with the proper procedure here.  So we would submit that evidence could be taken today from the two witnesses who are available.  The City can have time to process the video that the City owns and already has.  And we can proceed with this hearing, and then briefing can come after.  But there's no reason to stop this hearing from proceeding.

I would also note that, and I can read the text of the Ninth Circuit's decision last night.  I apologize, I mistakenly believe that this Court received decisions by the Ninth Circuit, and that is our fault for not notifying this court of decisions by the Ninth Circuit.  But what I can represent, we will get copies of that, of both the briefing that was submitted to the Ninth Circuit by the City.  We didn't have time, and we're not permitted to submit an opposing brief.  Then the Ninth Circuit issued its order last night, expressly denying an administrative stay of this hearing.  So we'll get that to the Court during the break.

**THE COURT:**  All right.  Thank you.  Ms. Myers?

**MS. MYERS:** Thank you, Your Honor. Cognizant that Your Honor wanted to take some time to review this, I'll just say one point about the statements by the City of Los Angeles, and sort of the shocking statement that I think sums up the issues that have been before the Court for the last few months. Is asking whether the Court can make a factual assumption about what a word means. Your Honor, we consistently have this fight in this court. The factual assumptions that underlie what a word means.

Mr. Marcus represented that the city council approved the encampment reduction plan. What we are here today, what our inquiry would be focused on, is what Mr. Marcus meant when he said the city council approved the encampment reduction plan. We can brief what the charter means, and I quoted the charter, but certainly what is at issue is what the city council did when it approved the encampment reduction plan. And with that on the table, Your Honor, then we can brief the question about whether or not that was sufficient for purposes of the charter to constitute approval. But without that information, then we lack the factual assumption about what a word means.

Your Honor, words do not exist in a vacuum. They exist within the legal confines, the plain understanding of those words. When the City says that the city council did something, i.e. approves something, and we have to be able to

rest assured that the City is relying on a reasonable interpretation of that word.  We have to know what the City meant, and that's what we would like to ask today.  And after that, then we can proceed with briefing.  Thank you, Your Honor.

THE COURT:  All right.  Well, I thank all of you. We'll be in recess for half an hour, please.  Thank you.

**(Recessed at 10:39 a.m.; to reconvene at 11:29 a.m.)**

THE COURT:  We're back on the record.  All counsel are present.  After thoughtful deliberation and consideration, this Court still believes it can resolve the misrepresentation issue without intruding into the State Brown Act litigation if the testimony in this Court is focused and limited and respectful of any applicable privilege claim.

So let's have Scott Marcus and Strefan Faubel, who the parties represented were available over this afternoon, have everyone go to lunch.  It's 11:30 now and let's extend that, but ordered to be back and present at 1:00 p.m. for their testimony.  And we'll hear very limited testimony on the issue of whether a vote was taken and what the word approval means if it was used.  We're going to get the facts out on this limited issue, but what's really an issue here is a very narrow issue that I've said repeatedly can be resolved quickly and is separate and distinct from the state court proceedings, that privileges can be protected by focusing on this very narrow

**60**

issue.

So I'd like to hear the facts on this issue, and we'll follow the evidence to find the truth in this matter. And once we have the facts, then we can have briefing on the legal effects of those facts and discuss the timing of that. So counsel, we'll be in recess until 1 o'clock. Thank you very much.

MR. MCRAE:  Your Honor, may I make one correction to something I said?  I would appreciate it because I want the record to be clear.  I need to correct something very briefly.

THE COURT:  Certainly.

MR. MCRAE:  When I was talking about the statement made by Mr. Fauble, the correction I need to make is that what he actually said, and I believe this is the letter that the court was referring to, that regarding the January 31st 2024 closed session, no settlement or agreement was voted on or approved.  And then it says in fact no vote was taken, therefore there could be -- excuse me, therefore, there could not be anything to report out of the January 31st, 2024, closed session.

So when I was responding to the snippet that we saw earlier, I believe I said that Mr. Fauble had said that the referring to the encampment reduction was approved.  That is not correct, at least as far as I'm seeing in this letter.  I want to be very clear.  I've read what he said and obviously

the City's position is the same, which is that that statement that no settlement or agreement was voted on or approved is not inconsistent with saying that the encampment reduction plan was approved.  Thank you, Your Honor.

**THE COURT:**  I expect that this document may become a part of the record, so there won't be any issue.  I want to thank you for being here.  We're going to have a hearing this afternoon.  I don't know if LAHSA's presence is needed or required.  You're always welcome, so you have first-hand knowledge, okay?  And for any of the other parties, the United States Attorney Nathan Hockman was here, et cetera.  If you choose to be, so be it, but otherwise, thank you for your courtesy, as well as LAHSA.  Thank you.

**(Recessed at 11:32 a.m.; reconvened at 1:02 p.m.)**

**THE COURT:**  All right, then we're back on the record.  All counsel are present.  The parties I believe are present.  And, counsel, who's present?

**MS. MITCHELL:**  I'm sorry, Your Honor?

**THE COURT:**  Who's present to testify?

**MS. MITCHELL:**  So I believe that Ms. Myers is going to be calling witnesses.

**MS. MYERS:**  Yes, for a change of pace, Your Honor, I'll be going first today.

**THE COURT:**  All right.

**MS. MYERS:**  We'll call Scott Marcus.

**62**

THE COURT: Thank you very much. Mr. Marcus, would you come forward, please. And, sir, would you be kind enough to raise your right hand, please?

**SCOTT MARCUS, INTERVENORS' WITNESS, SWORN**

THE COURT: Thank you, sir. Would you please be seated? And after you're seated, would you state your full name, please?

THE WITNESS: Scott Marcus.

THE COURT: Would you spell your last name, sir?

THE WITNESS: M-A-R-C-U-S.

THE COURT: Direct examination, please.

MS. KUMAR: Your Honor, may I just be heard?

THE COURT: Please.

MS. KUMAR: Your Honor, again, obviously, it's --

THE COURT: Would you use the microphone, though, or go to the lectern so we can hear you.

MS. KUMAR: Your Honor, just for the record, the City, of course, repeats its objections to any witnesses being called for all of the reasons that were discussed at length this morning, including but not limited to the fact that this threatens the Brown Act protections, of course, as well as the protections of the attorney-client privilege, the deliberative process privilege, the legislative privilege, and the official information privilege, as well as the other reasons set forth by my colleagues, Ms. Evangelis and Mr. McRae.

**63**

We'd also, Your Honor, just state for the record that we object to the Court's use of introduction sua sponte of the courts -- of the city council meeting that took place on January 31st, 2024. Of course, that was not previously introduced by any party to the City's knowledge, and it was the Court seemingly doing its own investigation, finding that video and showing it, and suggesting that that was a basis for a possible contradiction and for a contempt finding or willful misrepresentation finding.

So, Your Honor, we just state those objections for the record.

**THE COURT:** Let's take the last issue first concerning due process. The Court can move slowly in this matter, but the January 31st, 2024 video speaks for itself, but I won't receive it if there's an objection at this time. You can have a further foundation. Second, acts are not privileged. Confidential communications may be privileged, and the Court will be very careful in that arena. And finally, the record that I've made will suffice concerning the Brown Act, and the Court will pay deference and follow the law thoughtfully so that there's no interference with my colleague, Judge Kin, in the Superior Court. Counsel.

**MS. MYERS:** Thank you, Your Honor. Shayla Myers with the Legal Aid Foundation of Los Angeles on behalf of the intervenors.

**DIRECT EXAMINATION**

**BY MS. MYERS:**

Q    Good afternoon, Mr. Marcus.  Thank you for being here today.

A    Good afternoon.

Q    Are you currently employed by the City of Los Angeles?

A    Yes.

Q    And what is your job title?

A    My title is chief of the criminal branch.

Q    Is that within the City Attorney's Office?

A    Yes.

Q    Okay.  You were previously counsel of record in this case, correct?

A    I was one of the counsels of record in this case, yes.

Q    Do you know the dates where you were counsel of record?

A    I believe the case was filed sometime in February or March of 2000, and I continued in that role until roughly April or so of 2024.

Q    Just to clarify, do you mean 2020?

A    Yes.

Q    Okay.  Were you counsel of record when this case settled?

A    Yes.

Q    And were you involved in the settlement?

A    Yes.

Q    And so are you familiar with the settlement agreement in

Marcus - Direct / By Ms. Myers                                    **65**

this case?

A    Yes.

Q    Did you sign the settlement agreement?

A    I may have, I don't recall.

Q    Just give me one second.  I'm going to show you what's been previously marked as Exhibit 25.  You can just take a minute to look at this, starting here on page 6 of the document.  Is this a settlement agreement that you previously referred to?

A    Yes, it appears to be.

Q    Okay.  So I'm going to show you Section 5.2 of the settlement agreement.  This is under Section Milestones and Deadlines.  Are you familiar with this paragraph?

A    Yes.

Q    With regards to Section 5.2, where it says, thereafter the City will create plans and develop milestones and --

          **THE COURT:**  Just a little slower, counsel.

          **MS. MYERS:**  Sure.

**BY MS. MYERS:**

Q    Where it says, thereafter the City will create plans and develop milestones and deadlines, are you familiar with this paragraph?

A    Yes.

Q    To the best of your knowledge, did the City of Los Angeles create the plans and develop milestones related to this

provision?

A     Yes, I believe we did.

Q     And so specifically with regards to Section 5.2.2 and 4, those plans that it refers to refer to the City's plans for encampment engagement, cleaning and reduction, correct?

A     That's what it says, yes.

Q     And did the City create those plans and develop milestones and deadlines related to those two provisions of the settlement agreement?

          MS. KUMAR:  Objection, Your Honor.  It lacks personal knowledge.  I would just ask to the extent that this witness knows and can speak to that point.

          THE COURT:  Overruled.  You can answer the question.

          THE WITNESS:  I don't believe deadlines is included.

BY MS. MYERS:

Q     You don't believe deadlines were included in what the City created?

A     I don't believe deadlines are included in what was required under Paragraph 5.2.

Q     Where it says, thereafter, the City will create plans and develop milestones and deadlines?

A     I see that now.  Thank you.

Q     Okay.  So does that change your testimony about whether deadlines are included?

          THE COURT:  Counsel, just one moment.  A little bit

slower.  I can see already that it's too quick to record.

Q    So does that change your testimony about whether deadlines are included?

A    Yes.

Q    Okay.  So did the City create plans, develop milestones and deadlines consistent with the requirement under 5.2?

A    I believe we did, yes.

Q    Okay.  Do you know when the City created those plans?

A    We created and proposed different plans at different times.  I don't recall when the final plan was agreed to by the Alliance.

Q    Okay.  Were you counsel of record in this case on January 31st, 2024?

A    I was one of the counsels of record, yes.

Q    Was there a meeting of the Los Angeles City Council on that date?

A    Yes.

Q    Did you attend that meeting?

A    Yes.

Q    Did the city council meet in closed session to discuss the LA Alliance case during that meeting?

A    Yes.

Q    Were you present in the closed session meeting?

A    Yes.

Q    And were you there in your capacity as an attorney for the

City of Los Angeles in this matter?

A    Yes.

Q    Following that closed session meeting, the plaintiffs in this case filed a motion for settlement compliance against the City of Los Angeles, correct?

A    I recall the plaintiffs filing many motions for compliance.  I believe there was one in February of 2024, if that's the one you're referring to.

Q    Yes.  And if you know, was part of the sanctions motion that was filed in February of 2024 after that closed session meeting, based on what the LA Alliance perceived as a delay in approving the milestones and dates and deadlines in compliance with the settlement agreement?

A    Again, there were many motions that were filed.  I would have to look at the motion to see what was included and what wasn't.

Q    In terms of resolving one of the motions for settlement -- or for compliance, do you recall submitting a stipulation of facts to the court?

A    Yes.

Q    And that stipulation of facts was along with Ms. Mitchell, the counsel for the plaintiffs, correct?

A    Yes.

Q    And I'm going to show you what was previously marked as Exhibit 326.

THE COURT:  Can we put that up on the screen?

MS. MYERS:  Is it not up on the screen?

MS. MITCHELL:  It's on our screen, Your Honor.

THE COURT:  Do you have it?

THE WITNESS:  I have it, yes.

THE COURT:  All right.  Thank you.

BY MS. MYERS:

Q    And this is Docket 713 filed in this case.  Is this the stipulation that you were referring to?

A    It appears to be, yes.

Q    And I apologize, I have it in front of me.  I'm happy to scroll through if you need to, if you need to look at any other part of it to ensure that this is stipulation you're referring to.

THE COURT:  Counsel, would you repeat that just a little bit?

MS. MYERS:  Just offering to scroll through for Mr. Marcus to ensure that this is the stipulation that he was referring to.

BY MS. MYERS:

Q    Do you want me to scroll through?

A    I'm good.

Q    So this is the stipulation that you were referring to?

A    It appears to be, yes.

Q    So I want to refer to paragraph 7.  If you can just read

paragraph 7 to yourself, starting with the parties met on January 4th.

A     Okay.

Q     Just backing up a minute.  When you prepared this stipulation of facts, were you familiar with the facts that you were stipulating to?

            **MS. KUMAR:**  Objection, Your Honor.  Privilege.

            **MS. MYERS:**  I can go fact by fact, Your Honor, if that would be helpful.

            **THE COURT:**  Would you restate that question?

            **MS. MYERS:**  Mr. Marcus, were you -- do you have personal knowledge of the facts that you stipulated to in this declaration?

            **THE WITNESS:**  Yes.

            **THE COURT:**  He can answer the question.

**BY MS. MYERS:**

Q     So paragraph 7 says, two days after this meeting, the City proposed encampment milestones of 9,800, agreeing to and rounding up from the LA Alliance's proposed number of 9,782.  Do you have personal knowledge of that fact?

A     Yes.

Q     Did that occur?

A     Yes.

Q     And then later on in the paragraph it says, on January 10th, 2024, the City agreed to LA Alliance's demand for 9,800

Marcus - Direct / By Ms. Myers          **71**

encampment reductions, including district-by-district

milestones over four years, and rejected LA Alliance's other

demands.  Is that correct?

A     Yes.

Q     So is it accurate then that the City and the LA Alliance

agreed to the reduction plans and milestones on January 10th,

2024?

A     I believe this describes the process of the negotiations

that were ongoing at the time.  I don't recall if we reached

final agreement on all the terms by January 10th.

Q     Okay.  But with regards to when it says the City agreed to

LA Alliance's demand for 9,800 encampment reductions, is that

accurate?

A     Yes.  We agreed to the number, but we rejected other

demands that they made at the time.

Q     Okay.  And so paragraph 8 of the declaration states, 9,800

encampment reduction plan and milestones were presented to the

city council on January 31st, 2024.  Is that statement

accurate?

A     Yes.

Q     And were you present when the plan was presented to the

city council?

A     Yes.

Q     And then it says that the plan was approved without --

which approved them without delay, that the city council

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                          **72**

approved the plan and milestones without delay?

A     Yes.

Q     And did that approval occur on January 31st, 2024?

A     Yes.

Q     And the plan that was approved, the plan and milestones that you're referring to, is this what the LA Alliance and the City agreed to on January 10th, 2024?

A     Again, I can't recall if we reached agreement on all of the terms on January 10th.

Q     So I'm asking only about the plan and milestones that was approved by the city council on January 31st.

A     What was presented to council and approved by council was agreed to by the Alliance and the City.  Yes.

Q     On January 10th.

A     I don't recall if that -- I don't recall if we reached full agreement by the 10th or not.

Q     Okay.  And so the next statement where it says on February 1st, 2024, the milestones and deadlines agreed to on January 10th, 2024, were sent to plaintiff's counsel.  Does that refresh your recollection about whether or not the plan and milestone that we agreed to by the city council were agreed to on January 10th?

A     No, it does not.

Q     Okay.  So where it says that the 2020, the milestones and deadlines agreed to on January 10th were sent to plaintiff's

counsel, is it possible that that plan is different than the one that was approved by the city council?

A    No.

Q    Okay.  So the plan that was sent on February 1st was the plan that was approved by the city council on January 31st, 2024.  Is that correct?

A    Yes.

Q    Okay.  So then it would follow then that if both of these statements are true then, that the plan that was approved by the city council on January 31st is the milestones and deadlines that were agreed to on January 10th.  Is that correct?

A    It appears to be yes.

Q    So you have no reason to doubt the accuracy of this at this point?

A    Of the stipulation?  No.

Q    Okay.  And you have personal knowledge as to the facts of the stipulation?

A    Yes.

Q    Did the city council vote to approve the encampment reduction plan?

A    There was no vote.

Q    There was no vote.  So the city council did not vote to approve the plan.  How did the city council approve the plan?

**MS. KUMAR:**  Objection, Your Honor.  I would instruct

the witness not to answer to the extent the answer to that question --

THE COURT:  I'm not going to sustain it, but I'm going to take that under submission.  You don't have to answer that at the present time.  I want to think about that question.

**BY MS. MYERS:**

Q    What process --

THE COURT:  Can you mark that for the court reporter so I can see that question during the recess?  Thank you.

Q    What process did the city council use to approve the plan if it did not use a voting process?

MS. KUMAR:  Objection, Your Honor.  I would instruct the witness not to answer for the same reasons.

THE COURT:  I'm going to ask you not to answer that question for the present time until I have some time to think about this.

**BY MS. MYERS:**

Q    When you stated in this declaration to the Court that the city council approved that the milestones were presented to the city council on January 31st, which approved them without delay, what did you mean by the term approved?

MS. KUMAR:  Objection, Your Honor.  I would instruct the witness to answer only to the extent he can answer without revealing any information about what occurred in the closed session and without revealing and waiving any of the privileges

for which he does not have authority to waive at this time.

THE COURT:  I want to be very careful about any disclosure of any communications, but an act is substantially different.  And when this question is asked, I'm going to limit your answer to your subjective or your meaning or mindset about what approval meant.  I want to be very careful that your answer doesn't involve communication with members of the council.  Is that clear?  And if not, I'll restate that.

THE WITNESS:  No, that's clear.

THE COURT:  Thank you.  Then you can respond.

THE WITNESS:  I meant it was approved.

THE COURT:  I'm sorry, I didn't hear the answer.

THE WITNESS:  I meant it was approved.

BY MS. MYERS:

Q    And what did you mean by the term approved?

MS. KUMAR:  Objection, Your Honor. I would again instruct the witness not to answer to the extent doing so would disclose anything that occurred in closed sessions, actions or statements that occurred in closed sessions which were protected by the Brown Act and otherwise covered by all of the aforementioned privileges.

THE COURT:  This will be limited to what your subjective mindset was concerning the word approved and what it meant.

MS. KUMAR:  Your Honor, I would also object to the

Marcus - Direct / By Ms. Myers                    **76**

extent that that's work product or otherwise privileged because

Mr. Marcus, at the time we're asking what was in his mind, was

and remains counsel to the city.

THE COURT:  Overruled.  Counsel, you can answer, sir.

THE WITNESS:  I stand by the stipulation.

Q    That was my question, Mr. Marcus.

A    That is my answer, Ms. Myers.

Q    Well, that's not an answer to the question.  So what did you mean when you said approved?

A    I meant approved.

Q    Okay.  When you submitted this stipulation to the Court, were you aware that the city council had not voted to approve the encampment reduction plan?

MS. KUMAR:  Objection, Your Honor.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MS. MYERS:

Q    Are you familiar with the city council rules for the Los Angeles City Council?

A    Not particularly.

Q    I'm going to show you what I've marked as Exhibit 576.

MS. KUMAR:  Objection, Your Honor.  Witness just said he wasn't familiar with these.

MS. MYERS:  Yeah, so I'm going to show them to him.

EXCEPTIONAL REPORTING SERVICES, INC

**THE COURT:**  Overruled.

Q    So when you testified that the city council approved the encampment reduction plan, you were not familiar with the rules of the Los Angeles City Council.

**MS. KUMAR:**  Objection, Your Honor.  Misstates the witness's testimony.

**THE COURT:**  It was asked slightly differently or different than the first question.  Which question are you asking?  Just re-ask it.

Q    When you submitted the stipulation saying that the city council approved the encampment reduction plan, as the counsel of record for the City of Los Angeles, is it your testimony then that you are not familiar with the rules of the Los Angeles City Council?

A    I am familiar with some rules more than others.

Q    Let's go then to Rule 25.  I'm going to show you Rule 25.  Are you familiar with what the asterisk means for purposes of the city council rules?

A    I'm not.

Q    So we're clear.  So this is page 1 of the rules, which the asterisk below says, rules marked with an asterisk may not be suspended.  That's what it says, correct?

A    That's what it says, yes.

Q    I know you're familiar with that rule.

A    I wasn't until now, no.

Marcus - Direct / By Ms. Myers                **78**

Q    So I'm going to show you Rule 25.  It says ten members of the council shall constitute a quorum for the transaction of business, but a smaller number may adjourn from time to time until a quorum is present --

THE COURT:  Counsel, would you repeat that more slowly and start again, please?  It's too quick.

**BY MS. MYERS:**

Q    Ten members of the council shall constitute a quorum for the transaction of business, but a smaller number may adjourn from time to time until a quorum is present and may compel the attendance of the absentees.  Except as otherwise required by the Charter or other law or by these rules, where not inconsistent therewith, action by the council shall be taken by a majority vote of the entire membership of the council.  Are you familiar with that rule?

A    I see that rule.

Q    Were you familiar with that rule before I just read it to you?

A    I believe I was familiar with the general concept of the rule, maybe not the specific wording of the rule.

Q    Okay.  Do you know if you were familiar with that rule on January 31st, 2024?

A    The basic contours of the rule, yes.

Q    So that would mean that when you submitted the stipulation to the Court, you were familiar with the general contours of

this rule, correct?

A      Yes.

Q      So when you attested that the city council approved the encampment resolution plan, were you relying on any other specific council rule to support your statement that the city council approved the encampment reduction plan?

        **MS. KUMAR:**  Objection, Your Honor.  It's argumentative, and also there's no mention of city council rules anywhere in the stipulation.  It merely uses the word approved.

        **THE COURT:**  Overruled.  Overruled, you can answer the question, sir.

        **THE WITNESS:**  I did not have any city council rule particularly in mind when I filed the stipulation.

**BY MS. MYERS:**

Q      Okay.  Are you familiar with the Los Angeles City Charter?

A      Somewhat.

Q      Are you familiar with Charter Section 244?

A      Not by number.

Q      This is the section of the Charter that states, except as otherwise provided in the Charter, actions by the council shall be taken by a majority vote of the entire membership of the city council.  Are you familiar with that provision?

A      I'm familiar with the concept of that provision, yes.

Q      So when you attested that the city council approved the

encampment resolution plan, were you relying on Section 244 to attest that the city council had approved the encampment resolution plan?

A    I'm sorry, did you say attempted?

Q    When you attested.

A    I did not have any particular council rule in mind in filing the stipulation.

Q    How about provision of the city council Charter?

A    As counsel for the City, my actions are somewhat guided by provisions of the Charter as they relate to the City Attorney's Office and the handling of litigation.  And I think those are always in the back of our minds when we are conducting ourselves as counsel for the City.

Q    You attested in your stipulation that the city council approved the encampment reduction plan, correct?

A    Yes.

Q    So when you attested, when you stipulated that the city council approved the encampment reduction plan, were you making that statement in consideration of the City Charter?

        **MS. KUMAR:**  Objection, Your Honor.  Privilege, work product, and all of the previous --

        **THE COURT:**  Overruled.  You can answer the question.

        **THE WITNESS:**  I'm not sure how to answer that question.  Can you repeat it?

//

**BY MS. MYERS:**

Q    Sure.  When you attested that the city council approved the encampment reduction plan, was your statement, was that in consideration of the provisions of the City Charter related to council approval?

A    Nothing in the stipulation is inconsistent with the Charter or the council rules.

        **THE COURT:**  I'm sorry, would you repeat that?

        **THE WITNESS:**  Sure.  Nothing in the stipulation is inconsistent with the Charter or the council rules.

Q    Okay, can you tell me which council rules you relied on to support that testimony?

A    By number, no.

Q    Would you like the rules?  Would you like to take a look at them so you can tell us which rules the stipulation is consistent with?

        **MS. KUMAR:**  Objection, Your Honor.  This is simply not relevant.  Mr. Marcus is here to testify about whether the fact in the stipulation was true.  He has testified that it was.  Whether or not it complied with some sort of city council rule or City Charter is irrelevant as to whether this statement was true or not, which is the purported scope of this inquiry.

        **THE COURT:**  Overruled.  You can answer that question as to the reliance.  You can answer the question, sir.

        **THE WITNESS:**  Can you repeat the question?

Marcus - Direct / By Ms. Myers                    **82**

**BY MS. MYERS:**

Q    Sure.  When you testified just now that nothing was inconsistent with the city council rules in the stipulation, can you tell me what provisions of the council rules you were acting consistently with with regards to that provision of the stipulation?

A    I believe I was acting consistent with all of them.

Q    So can you point specifically to the ones that are relevant for purposes of your testimony?

          **MS. KUMAR:**  Objection, Your Honor.  Same objection.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Again, it was consistent with all of them.  I don't believe it was inconsistent with any of them.  It's a better way to say it.

**BY MS. MYERS:**

Q    Okay.  So you're testifying then that it was consistent with a requirement that actions by the council shall be taken by a majority vote of the entire membership of the council.

          **MS. KUMAR:**  Objection, Your Honor.  Misstates the witness's testimony.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  Yes.

Q    Okay.  But no vote was taken.

A    Correct.

Q    And at this point, you're refusing to answer any questions

about the process by which the city council approved the Encampment Reduction Plan.

MS. KUMAR:  Your Honor, objection.  Argumentative.  I have made the objection at the request of counsel.

THE COURT:  It's argumentative at the present time.  You can restate the -- it's a proper area, counsel.  You can re-ask the question.

Q    Is it your position today that you refuse to answer any questions related to the process by which the city council approved the Encampment Reduction Plan?

MS. KUMAR:  Objection, Your Honor.  Argumentative.  Trying to impugn this witness's character when at the direction of counsel, his not answering the question is inappropriate.

THE COURT:  No, you can --

MS. MYERS:  I'm simply asking if he's following his counsel's instructions.

THE COURT:  I'm sorry, both of you.  Thank you very much.  No, you can answer the question, sir.  Overruled.

THE WITNESS:  I haven't refused to answer anything yet.  The Court put those question on hold.

BY MS. MYERS:

Q    Okay.  So with regards to the City Charter, are there specific provisions that you were relying on in the City Charter related to the Encampment Reduction Plan when you testified -- when you stated that the Encampment Reduction Plan

Marcus - Direct / By Ms. Myers                    **84**

was approved by the city council?

A    I don't believe that the stipulation is inconsistent with any of the provisions of the Charter.

Q    That wasn't my question, Mr. Marcus.  So my question was, when you attested that the city council approved the Encampment Reduction Plan, were you informed by or relying on any specific provisions of the Charter to inform your testimony that the city council approved the Encampment Reduction Plan?

A    No specific provision comes to mind.

Q    So there wasn't a specific provision or process in the Charter that provides for the approval of the Encampment Reduction Plan such that it informed your testimony that the city council approved the ERP?

        **MS. KUMAR:**  Objection, Your Honor.  Misstates witness's testimony, and compound.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Approval of the Encampment Reduction Plan isn't required by or covered by the Charter.

**BY MS. MYERS:**

Q    Is it required by or covered -- so it's your testimony then that approval of the Encampment Reduction Plan is not required by or covered by the Charter.  Is that correct?  Is that your testimony?

A    Yes, in the context that you are asking it, yes.

Q    I'm asking in the context of a federal court proceeding.

Marcus - Direct / By Ms. Myers                **85**

I'm not so -- I'm not sure what you mean by that as a qualification.  Is it your testimony that the approval of the Encampment Reduction Plan is not required by the city council Charter.

MS. KUMAR:  Objection.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  The approval of the Encampment Plan did not require a vote as that is defined in the Charter of the council rules.

Q    Why not?

A    Because it is not an action taken as that term is used in the council rule you have in front of me.

THE COURT:  I'm sorry.  You dropped your voice. There's not an action taken --

THE WITNESS:  By the council -- it's not an action by the council as that term is being used in the Council Rule No. 25 that I see in front of me.

**BY MS. MYERS:**

Q    So it's your testimony that the city council approval of the Encampment Reduction Plan is not an action taken by the city council for purposes of the city council rule?

MS. KUMAR:  Objection, Your Honor.  Misstates the witness's assessment.

THE COURT:  Overruled.  Can you answer the question, sir.

Marcus - Direct / By Ms. Myers                    **86**

THE WITNESS:  Yes, I believe that's correct.

Q    What would an action taken by the city council be that would be required by Rule 25 for purposes of this to get to your understanding of what you testified to?

MS. KUMAR:  Objection, Your Honor.  Relevance.

THE COURT:  If you have an example, you can state it.

THE WITNESS:  One example would be approval of a settlement agreement itself to resolve litigation.  Settlement agreements themselves within certain parameters need to be approved by the city council by action.

Q    So it's your testimony that -- back up on that.  So it's your testimony that the city council approval of the Encampment Reduction Plan was not an action by the city council for purposes of the city council rules, is that correct?

MS. KUMAR:  Objection, Your Honor. Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Yes.

**BY MS. MYERS:**

Q    And for purposes of the City Charter, is it also your testimony that it was not an action, that the approval of the Encampment Reduction Plan was not an action by the city council?

MS. KUMAR:  Same objection, Your Honor.

THE COURT:  Overruled.

EXCEPTIONAL REPORTING SERVICES, INC

Marcus - Direct / By Ms. Myers                    **87**

**THE WITNESS:**  It was not an action requiring a vote by the city council, correct?

Q    That's not what I asked.  So I asked if it was an action by the city council.

A    An action by definition can only be taken by a vote of the council, so the answer is no.  It was not an action requiring a vote.

Q    It's not an action requiring a vote because the city council didn't vote, is that your testimony?

A    No, it was not -- the approval of the Encampment Plan was not an action that required a vote.

Q    Why not?

A    Because it wasn't necessary.

Q    Why not?

**MS. KUMAR:**  Objection, Your Honor.  Calls for a legal conclusion and relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  The Encampment Reduction Plan was a step being taken by the CAO's office and the City Attorney's Office to negotiate compliance with the settlement agreement.

**BY MS. MYERS:**

Q    And so the city council didn't need to approve it, is that correct?

A    In my opinion, no.  They did not need to approve it under the Charter or the council rules.

Marcus - Direct / By Ms. Myers                              **88**

Q    But you testified in your stipulation that they did approve it, correct?

A    Yes.

Q    And so, but as you sit here, you're not -- you will not testify as to what process was used to approve it.

        **MS. KUMAR:**  Objection, Your Honor.  Same objection, asked and answered, argumentative.  The Court is the one that took those questions --

        **THE COURT:**  Well, this is from his opinion, his objective mindset.

        **THE WITNESS:**  Well, I believe her question was, I'm refusing to testify to something and those questions haven't been put to me in that manner.  The Court has taken them under submission.

**BY MS. MYERS:**

Q    So as you sit here today, is it your testimony that the city council approved the Encampment Reduction Plan in this closed session on January 31st, 2024?

A    Yes, that's what's in the stipulation.

Q    That's not what I asked.  So I asked if it was your testimony today that the city council approved the Encampment Reduction Plan in closed session on January 31st, 2024.

A    Yes.

Q    The city council did not, however, take a vote on the Encampment Reduction Plan related to -- did not take a vote

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                    **89**

during the closed session, correct?

**MS. KUMAR:**  Objection, Your Honor.  Asked and
answered, I think, now twice or three times.

**THE COURT:**  Overruled.  You can answer the question,
sir.

**THE WITNESS:**  There was no vote.

Q    And there's no provision of the charter that you can point
to that provides for the approval of the encampment reduction,
that provides for the approval outside of through a vote,
correct?

**MS. KUMAR:**  Objection, Your Honor.  Calls for a legal
conclusion, relevance.

**THE COURT:**  This is for your mindset.  You can answer
the question, sir.

**THE WITNESS:**  I didn't understand the question.

**THE COURT:**  All right.  Just please repeat, Counsel.

**BY MS. MYERS:**

Q    Sure.  So when you said that the city council approved the
Encampment Reduction Plan, you were not referring to any
specific provision of the charter that provided for the
approval by any other way other than a vote, is that correct?

A    That question presumes that approval can only be done by a
vote, and I am disagreeing with that presumption.

Q    I'm not making that presumption, Mr. Marcus.  I'm simply
asking if it is your testimony that there are no other

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                          **90**

provisions of the charter upon which you were basing your

statement that the city council approved the Encampment

Reduction Plan.

A    I still didn't get that.

Q    So the charter provides various ways the city council must

conduct its business, correct?

A    I believe so, yes.

Q    And Section 244 provides a mechanism by which the city

council can approve things, correct?

A    I believe it's actions is what it says.

Q    Okay, so can take actions pursuant to a vote, correct?

A    Yes.

Q    And so there's no other provision in the charter that you

are relying on when you testify that the city council approved

the Encampment Reduction Plan?

A    The provisions refer to actions by the council, yes, and

this approval was not an action requiring a vote by the

council.

Q    So we're not talking about a vote, Mr. Marcus, and I know

you keep wanting to come back to a vote.  I'm not asking that.

I'm asking about whether or not there are any other provisions

in the city charter that you were relying on when you made the

statement that the city council approved the Encampment

Reduction Plan.

             **MS. KUMAR:**  Objection, Your Honor, assumes that there

**EXCEPTIONAL REPORTING SERVICES, INC**

was any reliance on any city council rule or City charter.

She's testifying for the witness.

          **THE COURT:**  Overruled.  Overruled.  You can answer

the question, sir.

          **THE WITNESS:**  Again, I don't believe there was any

specific provision in mind other than my general adherence to

charter provisions and city council provisions and my role as

counsel for the City.

**BY MS. MYERS:**

Q    And are there any provisions that you can point to that

you relied on in determining, for purposes of this stipulation,

that the city council approved the Encampment Reduction Plan?

          **MS. KUMAR:**  Objection, Your Honor.  Calls for a legal

conclusion and calls for privilege.

          **THE COURT:**  This is his mindset.  You can answer the

question, sir.

          **THE WITNESS:**  If there is a provision you believe was

violated, that might help.

**BY MS. MYERS:**

Q    I'm not asking about what I believe or even what your

counsel believes.  I'm asking what you believed when you

submitted a stipulation to the federal court saying that it was

approved, whether you were relying on any provisions of the

city charter to support your testimony that the city council

approved the ERP.

Marcus - Direct / By Ms. Myers                    **92**

A    Again, no specific provision.

Q    Were you relying on any specific council rule to support your statement that the city council approved the ERP?

A    No.

          **MS. MYERS:**  No further questions at this time. Obviously, we reserve --

          **THE COURT:**  The cross-examination would turn to LA Alliance, if it's acceptable, and then back to the City.

          **MS. MYERS:**  Your Honor, we reserve, obviously, the right to call Mr. Marcus back once you've issued your ruling on those questions.

          **THE COURT:**  I'm sorry?

          **MS. MYERS:**  We reserve the right to call Mr. Marcus back once you've ruled on the specific questions.

          **THE COURT:**  Well, I'm going to also take a recess with the court reporter.  There's a couple of questions answered that I'd like to later ruling on.  Counsel, your cross-examination.

          **MS. MITCHELL:**  Thank you, Your Honor.  Good afternoon, Mr. Marcus.

          **THE COURT:**  Would you state your name for the record?

          **MS. MITCHELL:**  Yes, thank you.  Elizabeth Mitchell on behalf of the Alliance.

//

//

**CROSS EXAMINATION**

**BY MS. MITCHELL:**

Q    What are the different ways the city council can approve something?

A    Council can approve things by a vote.  They can also approve things on unanimous consent.  They can approve things by consensus.

Q    And what is -- oh, I'm sorry.  Anything else?

A    That's what comes to mind.

Q    Okay.  What is unanimous consent?

A    There's a, I believe, actually a council rule that talks about what it is, or maybe it's a Roger (phonetic) rule of procedure, one of those things.  It's a way of doing business without taking formal votes.

Q    And what is consensus?  When city council approves something by consensus, what does that mean?

A    It means, in general, there's a discussion and an agreement how to move forward.

Q    And how does that happen without a vote?  How is there an agreement to move forward on something without a vote?

A    There can be an agreement to move forward without a vote. It's a consensus discussion.

Q    What types of things have you seen city council approve without a vote?

         **MS. KUMAR:**  Objection, Your Honor.  I would direct

Marcus - Cross / By Ms. Mitchell                    **94**

the witness to only answer to those that have no reference to

anything in the closed session.

**THE COURT:**  Overruled.

**THE WITNESS:**  Sorry, can you ask the question again,

please?

**BY MS. MITCHELL:**

Q    Sure.  What types of things have you seen city council

approve without a vote?

**MS. KUMAR:**  Same objection, Your Honor.

**THE COURT:**  I'm going to take that under submission.

I want some time to think about that question, counsel.

**MS. MITCHELL:**  Okay.

**THE COURT:**  Whether it gets into communication versus

act.  Okay.  Could the court reporter mark that for me?  Thank

you.

**MS. MITCHELL:**  Thank you, Your Honor.

**BY MS. MITCHELL:**

Q    Let me try to ask it maybe a different way.  Without

revealing communications that you have had in closed session or

outside of the public view, have you seen city council approve

anything without a vote?

A    Yes.

Q    And again, only referring to the public actions, what

types of things have you seen city council approve without a

vote?

Marcus - Cross / By Ms. Mitchell                    **95**

A    The encampment reduction plan.

Q    Okay.  Anything else?

A    Nothing else comes to mind.

        **THE COURT:**  Just one moment, please.  Thank you.
Please continue.

Q    Are you still in the position of advising city council?

        **MS. KUMAR:**  Objection, Your Honor.  Relevance.

        **THE COURT:**  What's the relevance, counsel?

        **MS. MITCHELL:**  Well, my question essentially is how
long was he in the position of advising city council?

        **THE COURT:**  Okay.  You can ask the question.

Q    So I'll ask that question, Mr. Marcus.  How long were you
in that position of advising city council if, in fact, that was
part of your role?

A    I served as counsel representing the City from 2016
through 2024, and during that time in various litigation
matters, I would advise council.

Q    And no other -- I don't want to call it an action because
I think that's a term of art that you're using, but there's
nothing else that you can think of where you saw city council
approve something either by unanimous consent or by consensus
without a vote?

        **MS. KUMAR:**  Objection, Your Honor.  I direct the
witness not to answer anything about anything he's observed in
any closed session.  He just referred to litigation.

**THE COURT:**  Both of you are way too quick for the record.  Would you restate that more slowly and then your objection more slowly?

**MS. MITCHELL:**  Sure.

**THE COURT:**  Repeat the question, please.

**MS. MITCHELL:**  Sure.  My question is in that time in those eight years, there's nothing that you can think of where you witnessed city council do something by unanimous consent or by consensus, i.e. without a vote?

**THE COURT:**  We're talking about the act, not the communication.

**MS. KUMAR:**  Your Honor, I would direct the witness not to answer about any circumstances in which he participated in a closed session.  Revealing those closed sessions not only violates the privilege but also subjects Mr. Marcus to discipline under the Brown Act.

**THE COURT:**  Overruled.  You can answer the question.  This pertains to an act, not any communication.

**THE WITNESS:**  So I have observed city council in open session approve things by unanimous consent and by consensus.  I think an answer with respect to any closed session would invade attorney-client privilege, and I refuse to answer on closed sessions.

//

//

**BY MS. MITCHELL:**

Q    Okay.  So specifically referring to open session matters, what types of items have you seen the city council approve without a vote?

A    It happens all the time.  I couldn't give you one example over another, but I've seen it happen.

Q    Okay.  Now, when something is approved by unanimous consent or by consensus, isn't that considered a unanimous vote when city council does that?

        **MS. KUMAR:**  Objection, Your Honor.  Calls for a legal conclusion.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I don't believe so, no.

Q    It doesn't go into the minutes as a unanimous vote?

A    I don't take the minutes.  I don't know how it's recorded.

Q    So I'm going to try to ask this very specifically.  Without disclosing any communications that happened in closed session, can you tell us what action was taken to cause you to believe that the encampment reduction plan was approved?

        **MS. KUMAR:**  Objection, Your Honor.  I direct the witness not to answer anything about what occurred during the closed session for fear of Brown Act and all of the privileges that we've previously objected on the basis for.  I direct him not to answer the question.

THE COURT:  I'd like the court reporter to mark that question for the Court, please.

MS. MITCHELL:  Thank you, Your Honor.

BY MS. MITCHELL:

Q    Now, Mr. Marcus, your testimony is that approval of the encampment reduction plan was not required by the city charter or city council rules.  Is that right?

A    Sorry, can you say that again?

Q    Yeah.  Your testimony was that approval of the encampment reduction plan in question was not required by the city charter or by the city council rules.  Is that right?

A    That's my understanding, yes.

Q    And your understanding is based on what?

A    Based on my familiarity with the charter and the rules and my years serving as counsel for the city.

Q    What actions require a vote by city council to approve?

MS. KUMAR:  Objection, Your Honor.  Asks -- calls for a legal conclusion.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I couldn't give you a list of all of them.

BY MS. MITCHELL:

Q    Then how do you know that the encampment reduction plan was not one of them?

A    It was not because it was a step being taken by counsel

for the City and the CAO's office in compliance with a

settlement agreement.

Q    If the city council was not required to approve it, why did you submit it to city council for approval?

MS. KUMAR:  Objection, Your Honor.  I order the witness not to answer to the extent it would reveal any privilege or his communications with his client, the City.

THE COURT:  Overruled.

THE WITNESS:  One of the reasons it was submitted to council was because the LA. Alliance demanded it be so before they would agree to it.

Q    And in what context did the LA Alliance demand it to be so before the Alliance would agree to it?

A    I don't recall if it was a letter or an email or a conversation.

Q    With me, correct?

A    I believe it was with you, yes.

Q    And the LA Alliance required or informed you that city council was required, in the Alliance's view, to approve it before the Alliance would agree to it.  Is that right?

MS. KUMAR:  Objection, Your Honor.  Hearsay. Relevance as to the Alliance's thinking of what was required and not.

THE COURT:  Overruled.

THE WITNESS:  Could you repeat the question?

Marcus - Cross / By Ms. Mitchell                    **100**

**BY MS. MITCHELL:**

Q   Yeah, it was actually a bad question.  Let me re-ask that.  You were informed by me that the LA Alliance would not agree to the encampment reduction plan unless the city council approved it.  Is that true?

A   I don't recall the precise words, but generally, yes.

Q   Okay.  And so that is the reason that you caused the encampment reduction plan to be submitted to city council for approval.  Is that true?

A   I would say that was a reason, yes.

Q   And so when you reported back to me that the city council had approved it, did you ever communicate that that was not done by vote?

        **MS. KUMAR:**  Objection, Your Honor.  Relevance as to what this witness told Ms. Mitchell.  It's not relevant.  It doesn't have anything to do with her purported misrepresentation to this Court.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Can you repeat the question?

**BY MS. MITCHELL:**

Q   Yeah.  When you reported back to the Alliance that the city council had approved the proposed encampment reduction plan, did you report back to the Alliance that that was not done by a vote?

        **MS. KUMAR:**  Objection.  Relevance, hearsay,

Marcus - Cross / By Ms. Mitchell          **101**

argumentative.

THE COURT:  Overruled.

THE WITNESS:  I don't recall.

Q   Did you at any point inform the Court that the approval was not done by vote by the city council?

A   The stipulation we filed said that it was approved.  The approval wasn't required to be done by a vote, but we did not mention the word vote in the stipulation, I do not believe.

MS. MITCHELL:  Okay.  May I have a moment, Your Honor?

THE COURT:  You may.

(Pause)

BY MS. MITCHELL:

Q   Mr. Marcus, you mentioned that because the LA Alliance asked for City Council approval of the encampment reduction plan prior to agreeing to it, that was one of the reasons that you submitted it to City Council for approval.  What are the other reasons?

MS. KUMAR:  Objection.  I direct the witness not to answer to the extent it will reveal any privileged conversations he had with his client, the City.

THE COURT:  I'm concerned whether that overlaps into any communication and please don't answer that.  Mark that, counsel, and I'm concerned that the question is broad and therefore it might invoke a communication.  Can you narrow that

Marcus - Cross / By Ms. Mitchell                                **102**

question?

        **MS. MITCHELL:**  Sure.

Q    Without revealing any communications that you may have with your client, specifically my question is, other than reflecting on communications with your client, are there any other reasons why you submitted the encampment reduction plan to City Council for approval?

        **THE COURT:**  And this is limited to your mindset.

        **MS. KUMAR:**  Objection, Your Honor, and also object to things related to his mindset as he's counsel, so anything he's thinking is necessarily work product and privileged.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Any answer to that question would evade the privilege and I decline to answer.

        **MS. MITCHELL:**  Okay.  Your Honor, we'll submit at this time, subject to reopening and being able to ask those questions that the Court is still considering.

        **THE COURT:**  All right.  Thank you.  And then on behalf of the City please.  Just a moment.  I had assumed something.  Does the County have any questions?

        **MS. BRODY:**  No, Your Honor, thank you.

        **THE COURT:**  My apologies.  The City, please, and would you once again state your name.

        **MS. KUMAR:**  Yes, Your Honor, thank you, Poonam Kumar on behalf of the City.

                **EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Cross / By Ms. Kumar                                      **103**

**CROSS EXAMINATION**

**BY MS. KUMAR:**

Q    Good afternoon, Mr. Marcus.

Mr. Marcus, we've gone through some of this, but just so that we're clear, you were present in the closed session of the City Council on January 31st, 2024; is that correct?

A    Yes.

Q    And based on what you observed, you understood that the encampment reduction plan was approved by the City Council; is that right?

A    Yes.

Q    In your role as counsel working in the City Attorney's Office have you observed other City Council sessions?

A    Yes.

Q    How many would you say?

A    Dozens.

Q    Okay.  Have you observed and participated in other closed sessions?  Now, I didn't want to hear what happened, but just whether you have, in fact, participated in or observed other closed sessions.

A    Yes.

Q    And how many closed sessions have you observed or participated in?

A    Dozens.

Q    Based on your employment with the City -- in the City

Marcus - Cross / By Ms. Kumar                            **104**

Attorney's Office and your observations in these sessions and without reference to any particular session or meeting, can you describe to us some of the ways that the City Council can approve something in your understanding.

A    It's -- yes.  What I mentioned before, they can approve things by a vote, they can approve things on unanimous consent. They can approve things via consensus.  They can approve things via discussion.

Q    Okay.  To your knowledge, Ms. Myers showed you Section 5.2 of the settlement agreement.  Do you recall that?

A    Yes.

Q    And I can show it to you if you need but, Mr. Marcus, do you recall anything in Section 5.2 of the settlement agreement requiring that there be City Council approval for the encampment reduction plan?

A    No.

Q    Do you recall anything in Section 5.2 of the settlement agreement that required there be a vote by the City Council?

A    No.

         **MS. KUMAR:**  Excuse me, Your Honor.

    **(Pause)**

**BY MS. KUMAR:**

Q    Mr. Marcus, you were shown a stipulation that was filed and that you signed in April of 2024 by Ms. Myers.  Do you recall that?

A    I recall seeing the stipulation, I don't recall the specific date.

Q    Okay.  Fair enough.  I'm just going to bring it up on the screen.  Let me show you the first page.  Does this look like the stipulation that Ms. Myers showed you?

A    It appears to be, yes.

Q    Okay.  And for the record, that is Exhibit 326, Docket entry 713.  If I turn your attention, Mr. Marcus, to paragraph 8 of that -- well, let me first show you the signature.  Do you see that you signed that stipulation on behalf of the City?

A    Yes.

Q    I show you paragraph 8 and that first sentence.  Do you see where it reads, which approved them without delay, do you see that?

A    Yes.

Q    Mr. Marcus, in anywhere in that stipulation does it state that the City Council approved the encampment reduction plan with a vote?

A    I don't believe so, no.

Q    Is there any statement in paragraph 8 of this stipulation that specifies the manner in which the City Council approved the encampment reduction plan?

A    No.

Q    Is there any indication here, any reference to the City Council rules in this paragraph?

Marcus - Cross / By Ms. Kumar                    **106**

A    No.

Q    Any reference to any definitions within the City Council rules referenced?

A    No.

Q    Is there any reference to the City charter in paragraph 8?

A    No.

Q    Any reference to any definitions contained within the City charter in paragraph 8?

A    No.

Q    Ms. Marcus -- excuse me, Ms. Myers asked you about the City Council charter and she specifically asked you about Section 244.  Do you recall that?

A    Yes.

Q    Are you also familiar and I'm going to put this before you and I don't know what exhibit number we're on.

        **MS. KUMAR:**  I will come back to Your Honor on the exhibit number, because I don't recall where we left off.

Q    Do you see before you Section 272 control of litigation before you?

A    Yes.

Q    Do you see that -- do you recognize that as a part of the City charter?

A    Yes.

Q    And does it say at the outset, Mr. Marcus, that in the second sentence, the City Attorney shall defend the City in

Marcus - Cross / By Ms. Kumar                **107**

litigation.  Do you see that?

THE COURT:  Counsel, would you read that again, closer to the microphone.

MS. KUMAR:  Sure.

BY MS. KUMAR:

Q    In the second sentence it says, the City Attorney shall defend the City in litigation.  Do you see that, Mr. Marcus?

A    Yes.

Q    Okay.  And if we go through a few sentences later, it says, the City Attorney shall manage all litigation of the City, subject to client direction in accordance with this section and subject to the City Attorney's duty to act in the best interests of the City and to conform to professional and ethical obligations.  Did I read that correctly?

A    Yes.

Q    Does it say there, subject to City Council vote?

A    It does not say that.

Q    And, in fact, do you see the word vote anywhere in Section 272?

A    I do not.

Q    Now, Mr. Marquez, you referenced in your cross-examination by Ms. Myers that a settlement or an agreement may be something that would require a vote; is that right?

A    Yes.

Q    And that is specifically laid out in Section 273 of the

charter; isn't that right?

A     I'd have to see the section in front of me, but that could be.

Q     If I have it.  I don't, but we'll come back to that, Mr. Marcus.  Ms. Myers also referenced the City Council rules. Do you remember that?

A     Yes.

Q     She pointed you out to City Council Rule 25, if memory serves.

A     Yes.

Q     Let me show you -- first, I'll show you the cover page. Do you see the rules of the Los Angeles City Council as amended, do you see that, Mr. Marcus?

A     Yes.

Q     I'm going to turn your attention to, excuse me, oops, Chapter 7 -- oh, no, that's not it.  There we go.  Chapter 8, voting.  Do you see that?

A     Yes.

Q     And I'd like to direct your attention specifically to Section 49 -- Rule 49.  Do you see that?

A     I see it on the screen.

Q     It says roll calls are required and then it has a long list of items.  Do you see that?

A     Yes.

Q     Do you see an encampment resolution plan listed there?

Marcus - Cross / By Ms. Kumar                    **109**

A     No.

Q     And, in fact, this is a list of things where a vote is required; isn't that right, Mr. Marcus?

        **MS. MYERS:**  Objection, misstates the document.

        **THE COURT:**  Overruled, you can answer the question.

        **THE WITNESS:**  It appears to be.

**BY MS. KUMAR:**

Q     So by extension, there are things where a vote is not required?

        **MS. MYERS:**  Objection, misstates the document and is testifying for the witness.

        **THE COURT:**  Well, counsel, there will be redirect/recross.  You can answer the question, sir.

        **THE WITNESS:**  Can you repeat the question?

Q     By extension, if these are the items in which there has to be a vote, is it inferable that there are items in which no votes is necessary?

A     I think that's a reasonable inference, yes.

        **THE COURT:**  Just a moment.  Would you put the document back up for just a minute?

        **MS. KUMAR:**  Sure.

        **THE COURT:**  I didn't have time to read it.

        Counsel, thank you.

        **MS. KUMAR:**  Nothing else at this time, Your Honor.

        **THE COURT:**  Why don't you check with your team.  You

EXCEPTIONAL REPORTING SERVICES, INC

Marcus - Redirect / By Ms. Myers                    **110**

have --

MS. KUMAR:  I did already, Your Honor, thank you.

THE COURT:  Then, counsel, would be this redirect I believe.

MS. MYERS:  Yes, thank you, Your Honor.

THE COURT:  Ms. Myers, once again, would you state your name for the record.

**(Pause)**

### REDIRECT EXAMINATION

**BY MS. MYERS:**

Q    Okay.  I'm just going to start where your counsel left off, which is Section -- Chapter 8, voting, which is the section we were just referring to.  Section 49.  Do you understand the difference between -- what do you understand a roll call to be?

A    A roll call vote, I would believe, is when they just that, have a roll call vote so that every person's vote is registered.

Q    So is it your understanding that if a roll call is not conducted then a vote is not conducted?

MS. KUMAR:  Objection, Your Honor, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  I don't know if -- I'm not familiar enough with the rules to know if there are other ways of

EXCEPTIONAL REPORTING SERVICES, INC

Marcus - Redirect / By Ms. Myers            **111**

voting, that Council can vote.

Q    If you look at Rule 49 where it says, on other matters, if opportunity is given and no objection is raised, the presiding officer may announce a unanimous approval of an item under consideration and the clerk so record.  Does that give you an indication of when else a vote may be taken that does not include a roll call?

A    I interpret that sentence to refer to the unanimous consent.

Q    So when you were testifying about unanimous consent, this is the provision of the rules that you were referring to?

A    I don't know that I was referring to a specific provision when I was testifying, but looking at this sentence in front of me now, this is what I would infer to mean unanimous consent.

Q    Okay.  So when there's a unanimous approval of an item under consideration that is what you were referring to as unanimous consent; is that correct?

          **MS. KUMAR:**  Objection, Your Honor, misstates the witness' testimony --

          **THE COURT:**  Overruled.

          **MS. KUMAR:**  -- he just said it wasn't.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I think unanimous consent can apply both to items under consideration and approvals and other forms.

**BY MS. MYERS:**

Q    So what I'm asking about is you testified about unanimous consent.  So I'm -- is what you -- when you referred to unanimous consent in the rules is this provision in the rules that you were referring to, is this unanimous approval provision?

A    Again, I wasn't referring to a specific provision when I mentioned unanimous consent earlier.  But this sentence does seem to apply to unanimous consent, yes.

Q    Okay.  So unanimous consent in your mind is the same as unanimous approval of an item under consideration?

          **MS. KUMAR:**  Objection, Your Honor, misstates the witness' testimony.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I don't know if I would say it is exactly the same, but this sentence does seem to refer to unanimous consent.

**BY MS. MYERS:**

Q    Okay.  Are there other provisions in the City Council rules that refer to unanimous consent?

A    I don't know.

Q    Okay.  You testified that the City Council can give approval via unanimous consent; is that correct?

A    I believe it can, yes.

Q    And that may be what is referred to here as unanimous

Marcus - Redirect / By Ms. Myers                    **113**

approval; is that correct?

A     Yes.

Q     And it's your testimony that when the City Council gives unanimous approval they are not voting?

A     I wouldn't consider unanimous consent a vote, no.

Q     How is it recorded, do you know, by the city clerk?

A     I don't.

Q     Because it says, the clerk shall so record.

A     That's what this sentence says, yes.

Q     But you don't understand that to be recording a unanimous vote?

          **MS. KUMAR:**  Objection, Your Honor, lacks personal knowledge.  This witness just said he didn't know.

          **THE WITNESS:**  I don't work at the clerk's office, so I don't know how they record things.

**BY MS. MYERS:**

Q     Tell me what you mean by consensus, Mr. Marcus.  You testified that the City Council can approve things via consensus; is that correct?

A     In certain circumstances, yes.

Q     What are those circumstances?

A     Again, I think the answer to that question would cause me to disclose matters from closed sessions, so I don't believe I can answer that.

Q     Consensus to you is different than unanimous approval of

Marcus - Redirect / By Ms. Myers                    **114**

an item?

A     Yes.

Q     And how is it different?

          **MS. KUMAR:**  Objection, calls for a legal conclusion.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I think there is a difference between City Council approving items on an agenda and counsel approving or providing guidance in a closed session.

**BY MS. MYERS:**

Q     And what is the difference?

A     Approval of items on an agenda in open session is governed by various rules and closed session is just that, it is a closed session discussion between the City and its counsel.

Q     And so that doesn't require a following the rules related to votes that are taken in open session, is that your testimony?

          **MS. KUMAR:**  Objection, Your Honor, misstates the testimony and argumentative.

          **THE COURT:**  Would you restate that question?

Q     So is it your testimony that these discussions in closed session are not governed by the same rules as decisions made in open session?

          **MS. KUMAR:**  Objection, Your Honor, calls for a legal conclusion, relevance, and argumentative.

          **THE COURT:**  Overruled.

Marcus - Redirect / By Ms. Myers                  **115**

THE WITNESS:  I would say that what happens in a closed session sometimes requires a vote or other action in open session and sometimes does not.

**BY MS. MYERS:**

Q    That wasn't my question.  So you testified that the -- that actions taken in closed session are different for purposes of the rules than actions taken in open session.

A    If you're using action in the sense that the word action is used in the charter and the Council rules, I think we need to be careful what word you're using.  Actions by the City Council need to be taken by a vote, you showed me that earlier. That's different than things that happened in closed session, discussions and the results of those discussions in closed session do sometimes require votes and other actions in open session, based on the rules, and sometimes do not.

Q    And who decides whether things that happen in closed session need to occur in open session?

MS. KUMAR:  Objection, lack of personal knowledge, foundation.

THE COURT:  Overruled.

THE WITNESS:  It's governed by the charter and by the rules.

**BY MS. MYERS:**

Q    Okay.  So the charter and the rules define when things that happen in closed session need to occur in open session.

A    I can't speak to that, I don't know off the top of my head a charter provision or Council rule that's specific to closed sessions.

Q    What types of things, we'll use your language, what types of things can the City approve by discussion?

            **MS. KUMAR:**  Objection, Your Honor, I direct the witness not to answer any question that would divulge privileged information or other information protected by the Brown Act.

            **THE COURT:**  I don't believe that that question is going to get into communication.  You can answer that question, sir.

            **THE WITNESS:**  Can you ask it again, please?

**BY MS. MYERS:**

Q    What types of things, to your use your language, can be decided by the City Council through discussion?

A    Guidance in litigation, for example.

Q    What else?

A    I'm sure there's others, that's the one that comes to mind.

Q    And where do you base your understanding that things can be decided by discussion?

            **MS. KUMAR:**  Objection, Your Honor, relevance.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  As an attorney working for the City we

Marcus – Redirect / By Ms. Myers                    **117**

sometimes seek guidance or instruction from our client.  Those

conversations take place in closed sessions.

Q    Yes, that's not what I was asking.  So I'm asking when you

said that things can be decided by discussion, I'm asking where

you're grounding your understanding that the City of Los

Angeles and the City Council can decide things by discussion.

A    That's the purpose of having a closed session.

Q    So that the City Council decide things by discussion.

A    Within the context of a litigation, yes.

Q    Okay.  I'm asking for purposes of -- so before I showed

you Rule 25, which says that actions taken by the City Council

have to be done by vote, is there a City Council rule or a

charter provision that provides that the City Council can

decide things by discussion?

          **MS. KUMAR:**  Objection, Your Honor, calls for a legal

conclusion.

          **THE COURT:**  Do you understand the question?

          **THE WITNESS:**  I do.  It's not every decision by the

City Council is an action requiring a vote.  It's just that

simple.

**BY MS. MYERS:**

Q    That's not my question.  My question is, you testified

that the City Council can decide things by discussion and I'm

asking you if there's a City Council rule or a provision of the

charter that guides you in your understanding of that?  Is it

**EXCEPTIONAL REPORTING SERVICES, INC**

grounded in a City Council rule or charter provision?

A    Not -- there's no single provision or rule that comes to mind.  It is how the City and its counsel communicate with each other.

Q    Okay.  And so this deciding things by discussion is limited only to litigation.  Is that -- to guidance and litigation; is that correct?

A    I can't say that.  That is certainly my personal understanding because that is my role or was my role as counsel for the City.  Whether it occurs in other contexts, I couldn't speak to.

Q    So as counsel for the City, you leave open the possibility that other things could be decided by the City Council by discussion?

A    Again I can't speak to what's beyond my experience.

Q    Things that are decided by discussion, would those be considered approval by the City Council in your mind?

        **MS. KUMAR:**  Objection, Your Honor, vague and beyond the scope of this witness' knowledge.

        **THE COURT:**  Counsel, would you repeat that, I missed the question, I'm sorry.

**BY MS. MYERS:**

Q    You said things are decided by discussion, would that be considered in your mind approval by the City Council if the City Council decided something by discussion?

Marcus - Redirect / By Ms. Myers                **119**

A    It could be.

Q    And what would be the factors that you would look to to determine whether a thing that was decided by discussion constituted approval for purposes of the City Council?

        **MS. KUMAR:**  Objection, Your Honor, this is work product and asking this witness to testify in the abstract about a hypothetical without any reference to specifics.  I don't see its relevance.

        **THE COURT:**  And repeat that question one more time, counsel.

        **MS. MYERS:**  Sure, Your Honor.

**BY MS. MYERS:**

Q    So if you have things that are decided by discussion, what factors would go into your determination that constituted approval by the City Council?

        **MS. KUMAR:**  Same objection, Your Honor.

        **THE COURT:**  Overruled.  You can answer the question, sir.

        **THE WITNESS:**  Again, I think the question invades the attorney/client privilege in discussions that take place in closed session, so I don't think I can answer that.

Q    Okay.  You testified in response to a question from your attorney that you believed that the City Council approved the encampment resolution plan, correct?

A    Yes.

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Redirect / By Ms. Myers                    **120**

Q    And what factors -- what facts support your testimony that the City Council approved the encampment reduction plan?

**MS. KUMAR:**  Objection, Your Honor, I direct the witness not to answer the question to the extent it would reveal anything that occurred in closed session and otherwise covered by the attorney/client privilege, the lawyer privilege, the legislative privileges, any official information.

**THE COURT:**  And that's specific to the encampment reduction plan?

**MS. MYERS:**  Yes, Your Honor.

**THE COURT:**  I'll have that marked by the clerk.

**MS. MYERS:**  And I'd like to be heard on this particular point.

**THE COURT:**  Please.

**MS. MYERS:**  Your Honor, the City asked Mr. Marcus to testify about his view of what occurred during the meeting, specifically testifying about his view that the City Council had approved the encampment reduction plan.  The City can't now object to us asking the facts that support his opinion and his view of what happened.  They opened the door to this specific question.

If they did not want this line of questioning asked here, Your Honor, they simply should not have asked Mr. Marcus to testify to that.  This is -- they opened the door.

**MS. KUMAR:**  Your Honor, Ms. Myers asked the

**121**

question --

THE COURT:  Just a moment, both of you --

MS. MYERS:  -- immediately.

THE COURT:  -- I want to make sure you've finished your argument and then I'll turn to the City.  Have you concluded?

MS. MYERS:  Your Honor, whether -- if we asked the question, that's fine, but the City asked the question and he was allowed to testify on that point.  When I asked the question, the City objected, then they went forward and asked that question and he testified, Your Honor.  If they don't want this line of questioning, they need to not ask him and allow him to testify in support of their position.  That's our whole argument, Your Honor, this morning.

MS. KUMAR:  Your Honor, this is the central problem --

THE COURT:  Just a moment, have you finished.  I'm going to turn to the City in just a moment.

MS. MYERS:  Yes, Your Honor.

THE COURT:  Counsel, on behalf of the City.

MS. KUMAR:  This is the quintessential example of the problem with this hearing, Your Honor.  The City is being asked to defend itself against questioning by Ms. Myers and Ms. Mitchell about what happened and what goes into that stipulation.

**122**

Then subject to the City's objections we stated all this morning and at the outset of the questioning of the witnesses and again throughout the testimony, because the City asked the same question that Ms. Myers and Ms. Mitchell asked, the City is somehow waiving its privilege or sometimes using it as a sword and a shield.  The City can't be expected to defend itself with both hands tied behind its back, Your Honor, that is entirely inappropriate.

They asked the question.  The Court asked the question.  And over objection, we're still here having this witness testify.

**MS. MYERS:**  But when we ask the questions, Your Honor, they object to it and say he shouldn't be allowed to testify and again, this is what has happened time and again, Your Honor, in these proceedings.  Is that we ask questions, the City objects, but when those questions benefit the City then they ask the questions and their witnesses are allowed to testify.  This is exactly what occurred, Your Honor, in which Mr. Marcus testified in his stipulation about what occurred in closed session.  And then when we ask questions about what occurred, he's not allowed to testify about it.  Exactly the same as the issues related to the vote.

We asked questions about the procedure and they refuse to answer questions.  But when it benefits them, then they are -- then they put it forward.  This is exactly the

**123**

definition of waiver, Your Honor, is that the City is not allowed to condition its privileges whenever it wants to.  They asked Mr. Marcus this question.  We are allowed to interrogate the facts that support his testimony, Your Honor.

THE COURT:  Okay.  Counsel, on behalf of the City.

MS. KUMAR:  Your Honor, I cannot more strenuously object.  The idea that the entire morning we spent talking about the City's objection to this very testimony.  The Court assured the City that it would be narrow, still over the City's objection we proceeded.

Ms. Myers and Ms. Mitchell asked questions about this very paragraph in the stipulation.  We objected to that, the Court overruled, and he was ordered to testify.  So then I'm not allowed to ask any questions in an attempt to try to protect the City from a ruling that this Court is going to do on an incomplete record.

Your Honor, I have to say this is the central problem with this hearing and proceeding in this fashion.  If the Court is inclined to direct Mr. Marcus to answer that question, several things are going to have to happen and I won't go there unless the Court is inclined to do that, but I would like to be heard if the Court is going to do that.

THE COURT:  I want to thank you both.  We're going to take a recess in just a moment, but broadly speaking a democracy depends upon transparency.  And that means the

**124**

ability of the public to participate, to give their input to Council, to give different viewpoints. And on one hand, I'm going to be extraordinarily careful in terms of communication. On the other hand, these questions seem to evolve around the criteria being used to make these decisions and what you or the City, in particular you relied upon.

So let me take a few moments for reflection and give each of you a break for a moment.

MS. KUMAR: Your Honor, can I be heard on one more point?

THE COURT: No, not right now, counsel. I think it's time to take a break and when we come back you certainly can. Okay? All right. We're in recess for about 20 minutes, counsel. You may step down, sir, thank you.

**(Recessed at 2:21 p.m.; reconvened at 2:40 p.m.)**

THE COURT: The witness is returned to the stand, Ms. Myers and counsel, all parties are present.

This is being used as a sword and a shield. You're allowed to answer these questions. So, Ms. Myers, if you'd continue please.

MS. KUMAR: Your Honor, I have to reiterate our objection. I would ask the Court to stay its decision until we can seek relief from the Ninth Circuit. You're asking -- deciding on the spot whether or not the City can maintain its privileges without an adequate basis. We'd at least ask for

EXCEPTIONAL REPORTING SERVICES, INC

briefing on the topic before that's done, and I -- you know, and I also -- Your Honor, at this point if the Court is going to order Mr. Marcus to testify over the objection and direction of counsel, I mean, Mr. Marcus -- we don't represent Mr. Marcus individually.  We represent the City.  So we're in an untenable situation where he needs separate advice about whether or not he should follow the Court's order.

THE COURT:  All right.  Thank you.  Counsel, your question please.

### REDIRECT EXAMINATION (CONTINUED)

**BY MS. MYERS:**

Q    So you previously testified that you believed based on your observations during the City Council meeting that the City Council had approved the encampment reduction plan; is that fair?

A    Yes.

Q    And what were the facts that supported your determination that the City Council approved the encampment reduction plan?

MS. KUMAR:  Your Honor, I repeat my objection and ask for a stay and ask for an opportunity to brief this question and ask the opportunity for Mr. Marcus to consult separate counsel.

THE COURT:  This is mindset, counsel, it's not a communication.  You can answer the question.

THE WITNESS:  Has anyone denied that the Council

Marcus - Redirect / By Ms. Myers                    **126**

approved the plan?

MS. MYERS:  Your Honor --

THE WITNESS:  Is there anyone denying that the City Council approved the plan?

MS. MYERS:  Your Honor, would you instruct Mr. Marcus to answer.  That's -- obviously that's not an answer to the question that I posed.

THE COURT:  Repose the question, please.

BY MS. MYERS:

Q    What facts support your testimony that you observed -- that you believed that the City Council approved the encampment reduction plan?

MS. KUMAR:  Same objections, Your Honor, she's asking for facts, not acts necessarily involves communications.

THE COURT:  Just rephrase that, counsel.

Q    You testified that based on your observations, the City Council approved the encampment reduction plan.  So I'm asking what you observed that informed your opinion that the City Council approved the encampment reduction plan.

MS. KUMAR:  Objection, same objection, Your Honor, observations include communications and include acts that are privileged.

THE COURT:  Overruled.  This door was opened, counsel.  It can't be used as a sword and a shield, you can answer, sir.

Marcus - Redirect / By Ms. Myers                    **127**

THE WITNESS:  That question would require me to invade the attorney/client privilege and I decline to answer it.

MS. MYERS:  I'd ask for an instruction from the Court to answer the question, they're not going to answer the question.

THE COURT:  Pardon me?

MS. MYERS:  The witness is declining to answer the question.

THE COURT:  I'll leave the record as it is, counsel.

MS. MYERS:  Your Honor, we have a number of additional questions outstanding that the Court has not yet ruled on, is the Court prepared to make a ruling on those? Should I ask those questions again or is the Court going to refer to those questions?

THE COURT:  I wanted to look at those questions and I didn't want to do that haphazardly during the recess.

MS. MYERS:  Sure.

THE COURT:  It was only 20 minutes and I want to be careful with this.  You've asked that the gentleman be available for return, you've also requested Mr. Szabo be present.  I don't know what that date would be yet.  We have another witness in the audience, I think we ought to be polite to and have on the stand today.

MS. KUMAR:  Your Honor, can I just advise that per

EXCEPTIONAL REPORTING SERVICES, INC

discussions I've had with Ms. Myers Mr. Fogel has a conflict at 3, we've had these conversations.

THE COURT:  At 3 o'clock?  Okay.

MS. MYERS:  I understood it was 3:30, is it 3?

MS. KUMAR:  3.

THE COURT:  Well, we can be in continuous session and I'm not going to inquire about the conflict, but we can certainly come back tomorrow.  Counsel.

**BY MS. MYERS:**

Q    So at this point, you are declining to answer questions related to the basis of your testimony that you observed that the City Council -- that you believed that the City Council approved the encampment reduction plan.

MS. KUMAR:  Same objections, Your Honor, and argumentative.

THE COURT:  Counsel, you can answer the question.

THE WITNESS:  The question you just asked me I believe would require me to invade the attorney/client privilege in order to answer it and I'm declining to answer that question.

MS. MYERS:  If I can just have one moment, Your Honor.

THE COURT:  Surely.

MS. MYERS:  I do not have any further questions for this witness at this time, but obviously I would defer pending

**129**

a ruling on the additional questions.

THE COURT:  Back to LA Alliance, please.

MS. MITCHELL:  Again, we have no further questions subject to the questions that the Court is taking under consideration.  Thank you.

THE COURT:  All right.  And back to the City.  I'm sorry, to the County, pardon me.

MS. BRODY:  Nothing from the County, Your Honor.

THE COURT:  And the City?

MS. KUMAR:  And nothing further, Your Honor, pending further questioning obviously so if we could let Mr. Marcus go. And then, of course, as I advised Mr. Coble -- Foble (phonetic) has a conflict at 3.

THE COURT:  Okay.  And the clerk was kind enough to mark those questions and I can go over those with you this evening.  And what's the next available date for Mr. Strobel (phonetic)?

MS. KUMAR:  I can find out, if you give me a moment, Your Honor.

MS. MYERS:  Your Honor, I only have a couple of questions, but it's -- I mean, I'm happy to come back but I only have a few questions.

THE COURT:  Well, I don't know if 15 minutes we're going to accomplish -- I just don't know what your questions are.  I'd rather hear it continuously.

**130**

MS. MYERS: Thank you, Your Honor.

(Pause)

THE COURT: And, counsel, we're back on the record. And it'll be difficult for all of us to get one calendared event. All of you are busy.

I'd like to hear again the briefing schedule from the Ninth Circuit, the dates.

MR. HAMBURGER: Yes, Your Honor, the Ninth Circuit yesterday set a seven day deadline for a response for the real parties in interest to file a response and invited the Court to file a response, so that was seven days from yesterday. So six days from today. And then a reply is due three days after that.

THE COURT: Do you know the schedule concerning my colleague Judge Kin and when his next hearing date is?

MS. MYERS: Your Honor, the parties -- sorry about that, Your Honor. The parties are meeting and conferring and we expect that the Court will set an OSC regarding the issuance of the judgment, so at this point it's not clear what the Court's briefing schedule will be.

THE COURT: One consideration is that there's been testimony concerning privileges and other issues that the Circuit could examine and if the Court's correct can proceed in trying to make these rulings. The other is if the Court's incorrect, the Court can be corrected by the Circuit.

I'd hoped to get both the testimony today, as I reflected over the recess of both Mr. Strobel and at least the present witness up to the circuit in a package.  But I didn't know when Mr. Szabo was available.  I can go back into session literally any time.  But --

MS. KUMAR:  He's unavailable, Your Honor, until next week.

THE COURT:  Until next week?

MS. KUMAR:  Yeah.

THE COURT:  What day next week?

MS. KUMAR:  He can be available beginning Tuesday.

THE COURT:  On Tuesday.  All right.  Just a moment.

MS. KUMAR:  And I believe Mr. Foble and Mr. Marcus are also available on Tuesday.  At some point during the day Mr. -- you know, there may be appointments but we can confer with counsel.

THE COURT:  Well, first of all, Mr. Strobel, you're in the audience, you have a 3 o'clock, why don't you go about whatever that personal obligation is.  And we can inform you about the date, so as we discuss those dates, you're not sitting waiting, okay.

And I know your representation is short, but I don't think that in 10 to 15 minutes all of you are going to conclude no matter how short the questions are and I'd rather hear that in a block of time.

So a number of factors, courtesy to the Circuit, availability of the witnesses, trying to get the Court's decisions to the Circuit to reflect upon, try to take into account my colleague in the state court system, but somewhat setting a tenor also of the parameters that I've drawn trying to narrow this to X, they're not privileged versus confidential communications that may be privileged.

What's your suggestion, counsel?  In other words, when should the Court reconvene?

**MS. KUMAR:**  May we have a moment for discussion?

**THE COURT:**  Well, I know from the City probably never, just joking, but you know --

**MS. KUMAR:**  I don't want to repeat myself, Your Honor, but at the conclusion of --

**THE COURT:**  No, I understand --

**MS. KUMAR:**  -- the Cangress litigation.

**THE COURT:**  -- your position is, but it's, you know.

**MS. MITCHELL:**  May we have a moment to discuss?

**THE COURT:**  Yeah, why don't you.

**MS. MITCHELL:**  Exchange schedules?  Thank you.

**THE COURT:**  Now, I can't make it convenient for everyone, but I'd like to pay that courtesy to all of those from the Circuit to the litigants and --

**(Pause)**

**THE COURT:**  Counsel, I have a suggestion for all of

**133**

you because -- counsel.  My suggestion is this, it's next Wednesday for a couple of reasons.  First of all, Monday is a holiday.  The Court has a huge calendar which is why I had to move you from the request by the City to have this on Monday to this Tuesday.  I had to move that one day just because we had so many cases on our calendar.  We also have a huge calendar set for next Tuesday, so I'm going to request next Wednesday.  And I can be here at 7:30, I can stay as late as late as Judge Gee will let me.

MS. MITCHELL:  Wednesday works for us, Your Honor.

MS. MYERS:  That's fine, Your Honor.

MS. KUMAR:  Your Honor, I just need to confer with -- I mean I did not ask that one day with Mr. --

THE COURT:  Yeah, well I'm smiling at all of you which means it's probably next Wednesday.

MS. KUMAR:  Yeah, understood.  I just wanted to make sure the witness --

THE COURT:  So why don't you talk very quickly and communicate.  Mr. Szabo should be available, Mr. Strobel should be available and that way I can examine the questions, Mr. Marcus, that I've delayed and --

MS. KUMAR:  And is the City's 2.8 motion be heard that day?

THE COURT:  Are there any more questions at least at this time of Mr. Marcus?

**134**

MS. MITCHELL:  Not at this time, not from the Alliance, Your Honor.

THE COURT:  At least at this time.

MS. KUMAR:  And nothing else from the City, Your Honor.

THE COURT:  Let me ask that you be available, but we'll be courteous.  We'll try to fit into your schedule next Wednesday also and give you plenty of due notice, but if you're needed back.  Okay?

THE WITNESS:  Understood.

THE COURT:  Thank you very much, sir, if you'd step down.

Then next Wednesday what time would you like to reconvene?  Is 9 o'clock acceptable, would you like 8 o'clock or 7:30?

MS. KUMAR:  9 o'clock sounds great, Your Honor.

THE COURT:  9 o'clock good?

MS. MITCHELL:  That's fine, Your Honor.

THE COURT:  9 o'clock?

MS. MYERS:  That's fine, Your Honor.

THE COURT:  All right.  And I'd like to be apprised of the schedule of Judge Kin, if possible.

MS. MYERS:  As soon as we have an update, Your Honor, we will let you know.

THE COURT:  Okay.  Thank you very much.  Counsel,

135

have a nice week and we'll see you next Wednesday at 9 o'clock.

We're in recess.

        (Proceedings concluded at 3:00 p.m.)

                    * * * * *


                    CERTIFICATION


        I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.


_____                    February 11, 2026

           Signed                                       Dated


                    *TONI HUDSON, TRANSCRIBER*