UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

LA ALLIANCE FOR HUMAN RIGHTS, ) CASE NO: 2:20-cv-02291-DOC-KESx
ET AL.,                        )
                               )              CIVIL
            Plaintiffs,        )
                               )     Los Angeles, California
     vs.                       )
                               )   Wednesday, February 18, 2026
CITY OF LOS ANGELES, ET AL.,   )   ( 9:01 a.m. to 10:19 a.m.)
                               )   (10:38 a.m. to 10:50 a.m.)
            Defendants.        )   (11:00 a.m. to 11:46 a.m.)
                               )   ( 1:04 p.m. to  1:14 p.m.)
                               )   ( 2:51 p.m. to  2:57 p.m.)


HEARING RE:

ORDER TO SHOW CAUSE RE CONTEMPT CITY OF LOS ANGELES
[DKT.NO.1066];

MOTION TO ENFORCE A TERM OF THE PARTIES' SETTLEMENT AGREEMENT
[DKT.NO.1122]


BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE


APPEARANCES:            SEE PAGE 2

Courtroom Deputy:       Karlen Dubon

Court Reporter:         Recorded; CourtSmart

Transcribed by:         Exceptional Reporting Services, Inc.
                        20079 Stone Oak Pkwy.
                        Ste 1105-237
                        San Antonio, TX 78258
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES**</u>:


For Plaintiffs:            ELIZABETH A. MITCHELL, ESQ.
                           Umhofer Mitchell & King
                           767 S. Alameda Street, Suite 270
                           Los Angeles, CA 90021
                           213-394-7979

For Defendants:            BRADLEY J. HAMBURGER, ESQ.
                           POONAM KUMAR, ESQ.
                           Gibson Dunn & Crutcher
                           333 South Grand Avenue
                           Los Angeles, CA 90071
                           213-299-7000

                           THEANO EVANGELIS, ESQ.
                           TIMOTHY DANIEL BICHE, ESQ.
                           Gibson Dunn & Crutcher
                           333 S. Grand Ave.
                           Los Angeles, CA 90071
                           213-229-7726

                           LAUREN MARIE BRODY, ESQ.
                           JASON H. TOKORO, ESQ.
                           Miller Barondess
                           2121 Avenue of the Stars
                           Suite 2600
                           Los Angeles, CA 90067
                           310-552-4400

For Intervenor:            SHAYLA R. MYERS, ESQ.
                           Legal Aid Foundation of LA
                           7000 S. Broadway
                           Los Angeles, CA 90003
                           213-640-3983

Special Master:            MICHELLE MARTINEZ

3

**INDEX**

| INTERVENORS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| STREFAN FAUBLE | | | | |
| BY MS. MYERS | 35/60 | | 84 | |
| BY MS. KUMAR | | 71 | | 101 |

| EXHIBIT | MARKED | RECEIVED |
|---|---|---|
| 575 | 84 (PREV) | |
| 577 | 72 (PREV) | |
| 581 | | 84 |
| 590 | 60 | |
| 591 | 65 | |
| 592 | 68 | |
| 593 | 85 | |

**4**

1          __Los Angeles, CA; Wednesday, February 18, 2026; 9:01 a.m.__

2                                   --oOo--

3          **THE COURT:**  All right.  Counsel, we're on the record

4    in the LA Alliance case.  If you'd be kind enough because we're

5    on CourtSmart to make your appearances today.

6          **MS. MITCHELL:**  Good morning, Your Honor, Elizabeth

7    Mitchell on behalf of plaintiffs here today.

8          **THE COURT:**  All right.  Thank you.

9          **MS. EVANGELIS:**  Good morning, Your Honor, Theano

10   Evangelis on behalf of the City.

11         **THE COURT:**  Morning.

12         **MR. BICHE:**  Good morning, Your Honor, Timothy Biche

13   on behalf of the City.

14         **THE COURT:**  Thank you.

15         **MS. KUMAR:**  Good morning, Your Honor, Poonam Kumar on

16   behalf of the City and our partner Brad Hamburger is also here,

17   who just stepped out of the courtroom.

18         **THE COURT:**  All right.  Thank you.

19         **MS. BRODY:**  Lauren Brody for the County of Los

20   Angeles.  I'm going to be joined today by my colleague Jason

21   Tokoro.

22         **MS. MYERS:**  Shayla Myers on behalf of the

23   intervenors.

24         **THE COURT:**  Let me start first of all by welcoming

25   you back.  And, counsel, when all of you have filed pleadings

1     either in this court or with the Ninth Circuit I read them.

2     And reading what you've recently filed a couple of things have

3     occurred to me, but is there anything else that you'd like to

4     add to any of the documents that you've filed?  Beginning with

5     the LA Alliance?

6         **MS. MITCHELL:**  Not anything to the documents.  We

7     have not responded to the City's most recent response, but I

8     was in the case law over the weekend, Your Honor, looking at

9     kind of how other courts have dealt with closed session

10    privileged objections.

11        And what I have found and I can pull the cites and

12    send them to Court and counsel if helpful, is that what is

13    frequently done in an in camera review of the recording of

14    closed session, if it exists.  An alternative might be if a

15    recording doesn't exist, like a factual determination in camera

16    with a sealed transcript or something like that, if that's

17    something the City is interested in.

18        And I say that because, you know, there is a

19    legitimate public policy interest in protecting closed session

20    privilege and there is no doubt about that.  But I think

21    there's also a legitimate public policy and certainly core

22    interests in determining whether there was a misrepresentation

23    made.

24        And I think an in camera or under seal review of

25    these issues might be the right balance to strike here, such

1    that it's not public information, but I think that the heart of

2    the issues could be evaluated.  So that is something that I

3    would like the Court and the parties to consider and I'm happy

4    to forward those cites if helpful.

5         **THE COURT:**  All right.  Thank you.  Now, turning to

6    Ms. Myers then before I turn back to the City.

7         **MS. MYERS:**  Your Honor, we have nothing more to add

8    beyond what we've added in our pleadings.

9         **THE COURT:**  Are you joining in this request by LA

10   Alliance concerning an in camera process concerning the audio

11   or this hearing session?

12        **MS. MYERS:**  Your Honor, we think that there are

13   significant public policy issues at stake related to the

14   transparency of these proceedings.  Also that's my client's

15   position in the Brown Act litigation which is separate and

16   apart from this.

17             In terms of the Court's review of what occurred, we

18   would be open to an in camera review, our concern though is

19   that the public would not have access to the Court's

20   determination related to this and we think that there's a

21   significant public policy issue at stake related to the Court -

22   - the public understanding what is happening in these

23   proceedings which is our concern related to an in camera

24   review.

25             But certainly if the Court viewed an in camera review

1    as an appropriate way forward, we do think that would certainly

2    resolve this particular issue, this narrow issue that we think

3    is before the Court.

4            **THE COURT:**  You're counsel in Judge Kin's court?

5            **MS. MYERS:**  Yes, Your Honor.

6            **THE COURT:**  Let me come back to the City.

7            **MS. KUMAR:**  Thank you, Your Honor, Poonam Kumar on

8    behalf of the City.  To address Ms. Myers' point first, Your

9    Honor, in terms of the public's access that is not at issue

10   here.  That's an issue in the Cangress litigation and we have -

11   - as we have said repeatedly do not believe that the

12   appropriate purview of this Court in any way, shape or form.

13           The Brown Act governs what the public has access to

14   and the transparency of city meetings and so that should govern

15   and Judge Kin has not decided on the appropriate remedy in that

16   litigation.  So that case, for all of the reasons we said,

17   including the fact that this Court should not be meddling in

18   what's happening in a state court proceeding should not be

19   relevant today.

20           To the question of an in camera review of the Court,

21   I'd first note for the record, of course, we have not seen

22   these cases, counsel never advised us that they were requesting

23   this, so this is completely on the spot for us notwithstanding

24   her representation she did this over the weekend.

25           I would say to Your Honor that there's no basis for

1     an in camera review.  I suspect, I would look at the cases,

2     that in those cases there was some reason to believe that an in

3     camera review would further something.  I would repeat here for

4     the Court that the purported scope of this hearing is two

5     purported misrepresentations.

6             First, a stipulation in which a City -- an officer of

7     this Court, an attorney for the City represented the City

8     Council approved the encampment reduction plan.

9             The second purported misrepresentation is the

10    testimony by Mr. Szabo that the encampment reduction plan was

11    approved.  Neither statement said anything about a vote, all

12    that was said that it was approved.

13            So the -- and then what we saw -- and I am aware of

14    not a single witness that either side has proposed that is

15    going to walk into this courtroom and testify that it wasn't

16    approved.  Not a single witness.  All of the witnesses I will

17    proffer to you will say that it was approved.

18            So why are we here and what would be the basis for

19    this Court to invade the City Council's privilege that has been

20    mandated by the state legislature is applicable and interfere

21    with the Cangress litigation and review those recordings in

22    camera.  There is no reason to do that because there's no good

23    faith basis to believe that there was any willful

24    misrepresentation.

25            At best, the intervenors and the Alliance, at best,

1  they are pointing to some sort of procedural defect, the City

2  maintains there was no such procedural defect, but some sort of

3  procedural defect as to whether or not the approval could have

4  only come in the form of the vote.  That has no impact

5  whatsoever.

6         And so whether there was a willful misrepresentation

7  to this Court by an officer of the Court and by the city

8  administrative officer, there's no reason to believe that

9  anyone walked in this courtroom and lied.  In fact, no one did.

10        And in order to understand whether, even though

11 there's no basis to look behind and see what it is, to -- this

12 is essentially a fishing expedition.  Your Honor, when I -- I

13 was a federal prosecutor in this courthouse for seven and a

14 half years.  When a defense attorney represents that they've

15 spoken to their counsel and they're going to plead guilty,

16 they've been informed they're going to pled guilty, this Court,

17 nor court inquires as to how that got into that basis, what was

18 the basis of that representation, because there's no reason to.

19 Just like there's no reason to do that in this particular case.

20        So, Your Honor, we just don't think there's any

21 reason to have this hearing and we certainly don't believe

22 there's any reason to invade the Court's -- the City Council's

23 privileges to look at attorney/client privileged material,

24 invade the Brown Act protections and review that recording and

25 there's no reason to interrogate whether there was a

1    willfulness misrepresentation where there is no basis to

2    believe so.

3             Lastly, Your Honor, I would point out that the Brown

4    Act, Section 54960 does not contemplate in camera review.  We

5    can brief this issue, Your Honor, once counsel provides us

6    these case citations.  But between the Brown Act, the

7    attorney/client privilege, the deliberative process privilege,

8    the legislative privilege, and the official information

9    privilege, this Court should not be invading those privileges

10   and doing an in camera review to satisfy a representation we

11   had no idea where it's coming from when there's no basis to

12   believe there was a misrepresentation.

13            No one will be walking into this courtroom and saying

14   it wasn't approved, not a single person, no witness, no

15   document, nothing.  So to do that would be a serious injury to

16   the City Council and to the City.  And we would strenuously

17   object and request the ability to brief this and actually

18   confront the objection with the case law that counsel cited.

19            **MS. MITCHELL:**  Your Honor, if I may, California

20   Government Code Section 54960 specifically permits in camera or

21   even calls for in camera review by the Court if there is an

22   alleged violation of the Brown Act.  Now, that's certainly in a

23   different context because we're not talking about a violation

24   of the Brown Act, but it does explicitly permit in camera

25   review of recordings of closed sessions by this Court under

1    that section.  So I just wanted to correct the record on that.

2              **MS. KUMAR:**  Your Honor --

3              **THE COURT:**  Just a moment, counsel.  Let me turn to

4    intervenors next and we'll come back to the City so we have a

5    process.

6              **MS. MYERS:**  Thank you, Your Honor.  First just to

7    clarify the position from the City related to the intervenor's

8    position about the public transparency at issue here.  That has

9    to do not with the issues related to the Brown Act proceeding,

10   not related to the issues of whether or not the City should

11   have properly engaged in approving or not the encampment

12   reduction plan, but rather the veracity of the City's

13   statements to this Court.  That is a significant issue of

14   public concern when the City of Los Angeles is making

15   representations and there are questions about the veracity that

16   the public has a right to know what its city attorneys are

17   saying, what its politicians are saying, what its

18   representatives are saying.

19              We are a time right now where the City of Los

20   Angeles' integrity has to be pressure tested by the Court, Your

21   Honor, and I would say this is exactly that circumstance.

22              Your Honor, and I think the City's consistent focus

23   on the Brown Act misses the point completely.  The City of Los

24   Angeles through its attorney made a representation that the

25   City Council approved the encampment reduction plan without

1    delay and then when asked in a separate court proceeding what

2    the vote tally was, said there was no vote.

3            And so, Your Honor, it is a reasonable, very straight

4    forward, and very basic question, what was the process used by

5    the City Council then to approve it.  The intervenors have

6    consistently pointed to the City Charter as well as the City

7    rules that provide only that the City Council may approve, may

8    take actions through a vote.  And that did not occur here.

9            And so all we are asking, and all we are suggesting

10   that is in the Court's purview then, how did the City Council

11   approve it.  We do not believe that the Court needs to

12   interrogate what actually occurred in that meeting vis a vis

13   discussions with Council, vis a vis the City's deliberations,

14   that issue will be resolved through the Brown Act, that

15   proceedings in front of Judge Kin.  That issue will be involved

16   through the Court of Appeals or the Court of Appeal if that's

17   how the City chooses to move forward.

18           But, Your Honor, the question of the process used by

19   the City Council to approve the encampment reduction plan will

20   not be addressed by the Brown Act.  If it's not interrogated

21   here, it will not be interrogated anywhere.  The City's made

22   that clear in the Brown Act proceedings, that that is a red

23   herring, that that issue is not before the Court and that is

24   absolutely the case, it is not before the Court, before Judge

25   Kin, whether or not the City Council approved the encampment

1    reduction plan.

2            And, Your Honor, I would go back to why we are

3    standing here, why we have been in front of Your Honor for

4    weeks in numerous proceedings since June of last year.  The

5    City of Los Angeles makes statements.  They use plain language,

6    they say the City Council approved things and expect that we

7    will understand that to mean that the City Council went through

8    the normal processes, approved it consistent with the charter

9    and the rules.  They approved it.  That was a representation by

10   the City Attorney's Office.

11           Your Honor, the stipulation didn't have to say vote,

12   because Your Honor is allowed to read into the City Attorney's

13   plain language, the legal context in which that statement was

14   made.

15           When the City Attorney's Office said that the City

16   Council approved something, you would expect, Your Honor, and

17   this is a fair expectation for you, for the public, for the

18   plaintiffs, for intervenors to expect that the City Attorney's

19   Office represents that the City Council approved something,

20   that they did so consistent with their own rules and the City

21   Charter.

22           And when in subsequent proceedings the City

23   Attorney's office represents that they did not, in fact, use

24   the normal course to approve it, it is a very basic and very

25   fundamental question what the City Attorney's Office meant

**14**

1    then, when they said, the City Council approved it.

2              Full stop, Your Honor, that's what these proceedings

3    are about.  The fact that the City is hiding behind the Brown

4    Act proceeding is frustrating to say the least.

5              No one asked the City or the City Attorney's Office

6    to represent to this Court what occurred during the January

7    31st, 2024 meeting.  The City Attorney's Office and the City

8    did that on their own.  They said, despite the fact that it

9    occurred in closed session, they said that the ERP, the

10   encampment reduction plan was approved by the City Council.

11   They opened that door, Your Honor.

12             And subsequently when they were asked in another

13   forum whether -- what the vote tally was, a very basic and very

14   fundamental question that one would ask when it's represented

15   that the City Council approved something, they opened the door

16   further, Your Honor.  And they said that no vote was taken.

17             So they discussed to Your Honor or to the intervenors

18   and the petitioner in that case, they discussed aspects of the

19   process.  Your Honor, that is quintessentially what it means to

20   open the door to basic questions about what that process was,

21   and we know it wasn't a vote.

22             And how do we know it wasn't a vote, Your Honor?

23   Because the City said it wasn't.  And they don't get to tell us

24   what they want to tell us and then refuse to answer questions

25   when the Court takes it upon itself using its inherent

1    authority to ask fundamental questions to preserve the sanctity

2    of this Court.

3              And that's what's at issue here, it's not about the

4    Brown Act.  That, Your Honor, is a complete red herring, it is

5    about simply asking basic questions about what the City meant

6    when the City put forward on its own that it approved the

7    encampment reduction plan.

8              And, Your Honor, in terms of an in camera review, I

9    would say on further reflection that an in camera review would

10   open the door to a significant interference with the closed

11   session, which we are somewhat concerned about.  We think it

12   probably goes beyond what the Court actually needs to

13   interrogate for purposes of answering this question, right,

14   which is simply what the process was.  And if the City would

15   answer that question, then I think we could move on and we

16   could do the briefing if the Court desires the parties to do

17   so, we could do the briefing that the City -- that the counsel

18   for the City last week represented would be helpful, which is

19   whether or not that approval was consistent with the rules in

20   the charter.

21             We just have to know what happened, Your Honor, and

22   that's what we're asking for.  Thank you.

23             **THE COURT:**  The City please.

24             **MS. KUMAR:**  Your Honor, just as -- I mean, it sounds

25   like Ms. Myers is in agreement that no in camera review is

1    appropriate here, but to address Ms. Mitchell's point about the

2    Brown Act, it allows for in camera review in a proceeding

3    related to a Brown Act violation, which this is decidedly not.

4    It does not allow for any court anywhere to review in camera

5    recordings protected by the Brown Act because of some other

6    unrelated purpose that has nothing to do with the Brown Act, so

7    we don't believe that justifies this question.

8           But to address Ms. Myers' last statements regarding

9    the need for the public to know and that the need for the

10   City's integrity to be pressure tested, first of all, Your

11   Honor, that's not the appropriate purview of this Court to just

12   generally interrogate the integrity of the City of Los Angeles.

13          Particularly where here there is no basis to do so.

14   The City hid nothing.  If you listen to Ms. Myers' statements,

15   what she said was, we both hid everything but then we disclosed

16   enough to waive everything.  I mean, it is candidly a little

17   bit confusing.

18          The City is going its best to balance the needs

19   between the Brown Act and its desire to be transparent.  So as

20   a result of that, it disclosed that it did, in fact, approve

21   the encampment reduction plan, it being the City Council

22   approved the encampment reduction plan.  That is transparency.

23          Now, the fact that Ms. Myers and the Alliance want to

24   know how was it approved, is irrelevant to this hearing,

25   because no one's saying that it wasn't approved.  No one is

1  looking to back away from the encampment reduction plan.  It

2  continues to be a valid plan.  The City has said that

3  repeatedly.  It is -- no one is seeking to unwind the plan.

4  Ms. Myers could have sought that in the Cangress litigation,

5  declined to do so.  It is a valid plan, it continues to be the

6  plan that this City proposed in conjunction with this

7  settlement agreement.

8         Your Honor, as to whether or not it was properly done

9  per City Council and City Charter rules, Mr. Marcus answered

10  that.  We are prepared to brief that question, but I will tell

11  you, Your Honor, to the extent this hearing devolves into

12  whether the City followed its own rules in approving the plan,

13  that is outside of the purview of this Court.

14         The scope of this hearing is a purported willful

15  misrepresentation, which again I would repeat no one is saying

16  occurred.  But for this Court to now delve into whether the

17  City Council charter and the City Council rules allowed for

18  approval to happen, short of a vote, that is running right into

19  a state and local proceeding that this Court has no authority

20  to do.

21         More importantly, they are wrong.  The City Council

22  can approve things or act in ways short of a vote.  Mr. Marcus'

23  testimony establishes that.  And again I point out, Your Honor,

24  that no witness I am aware of is going to walk into this

25  courtroom and say that that can't happen.

1          So it's not the appropriate purview of this Court,

2   but even if it were, they're wrong.  So why are we in this

3   courtroom interrogating a purported misrepresentation that no

4   one is saying is, in fact, a misrepresentation.

5          Again, Your Honor, I point us back to every time that

6   counsel in this courtroom makes a representation that this

7   client authorized a proceeding or my client authorized -- is

8   prepared to plead guilty, has that attorney waived what that

9   lawyer -- what their client told them?  If I stand here before

10  you as a defense attorney and say, and you ask if my client is

11  prepared to plead guilty and I say, yes, Your Honor, have I now

12  waived what that client told me?  I think we would be upending

13  our principles of attorney/client privilege to say that that is

14  what would happen.

15         Simply saying that something was approved does not

16  waive what actually happened behind that, nor does any witness

17  have the ability to waive what happened in the closed session

18  on behalf of the City and violate the Brown Act.  They're

19  subjecting themselves to discipline by doing so.  They also do

20  not have the authority to waive the attorney/client privilege

21  or any of these privileges that are at issue here.

22         Ms. Myers says we're using it as a sword and a

23  shield.  That's particularly ironic, Your Honor, because we

24  never called this hearing.  A sword and a shield is when the

25  City is putting forth something, so that it can advocate

1    something, so that it can advocate a position.

2          The classic example that this Court is well familiar

3    with is an attorney -- a device of counsel defense in any sort

4    of proceeding.  You can't say my lawyer told me to do this and

5    then not reveal what the basis for that is.  That's the classic

6    sword/shield example.  That is not what happened here.

7          The City answered the question that it was approved.

8    Simple.  We do that day in and day out, nor do we waive what

9    happened underneath that by doing so.  The idea that we're

10   using this as a sword and a shield when it's the City that is

11   being threatened to be held in contempt, it's -- Your Honor,

12   it's just not tenable, it's just not a tenable position to

13   take.

14         It's not -- we're not wielding some sort of sword.

15   We're trying to defend ourselves against a contempt proceeding

16   and may I remind Your Honor that we vociferously objected,

17   asked for this to be held over so that we were not put in a

18   position where we would have to discuss what happened in those

19   closed sessions.

20         We have maintained that line, no one has done so.  I

21   anticipate that will continue today, but there's no reason to

22   look behind the veil when no one is saying what was represented

23   to this Court is untrue, and I would point out that Ms. Myers

24   in her statements doesn't make any representation as to why she

25   believes it wasn't approved, other than her belief that it

1   wasn't approved in accordance with the City Charter or the City

2   Council's rules.  That's not saying there was a willful

3   misrepresentation.

4           The fact that this Court could read in that there was

5   a vote, well I mean, I don't know why that would happen, it

6   didn't say there was a vote.  It said approved.  And, you know,

7   as I would have said before it's incorrect to believe that the

8   City Council can only act by vote.  And we can brief that issue

9   if the Court desires.

10          But, Your Honor, again I would point out there's --

11  the City is not using it as a sword and a shield, it's not

12  hiding anything.  The California legislature passed a statute

13  that called for instances in which things can happen in closed

14  session.  That is not the City hiding behind anything.  It is

15  entitled as a municipal body to maintain its attorney/client

16  privilege and to act in accordance with the Brown Act.  In

17  fact, it's required to.

18          So, Your Honor, I -- there's no reason to continue

19  with this hearing and certainly no reason for an in camera

20  review of the recordings related to this meeting.  Thank you,

21  Your Honor.

22          **THE COURT:**  Check with your team.  You have a number

23  of attorneys here today, make sure you've covered all of your

24  arguments.

25          **(Pause)**

1          **MS. KUMAR:**  Nothing further at this time, Your Honor.

2          **THE COURT:**  Okay.  Anyone else?  I want to make

3     certain that if there's anything that any other party wants to

4     add, you're more than welcome to.

5          **MS. MYERS:**  Thank you, Your Honor.  I'd just like to

6     point out the sword that the City of Los Angeles used.  That

7     was when they represented that the City Council approved the

8     encampment reduction plan, I would just point the Court back to

9     the reason why the City made that representation.  That was in

10    response to a settlement enforcement action that the plaintiffs

11    had filed.

12          So it is patently false to suggest that the City did

13    not use that as a sword.  Mr. Marcus made that representation

14    as part of a stipulation to resolve the settlement enforcement

15    action against the City of Los Angeles, when at issue, Your

16    Honor, was the fact that the City Council had not approved an

17    encampment reduction plan before January 31st, 2024.  There's a

18    reason, Your Honor, why Mr. Marcus made that representation to

19    the Court at the time that he did.

20          Second of all, Your Honor, with regards to the vote

21    tally and the vote was not taken, Your Honor, that was

22    absolutely used as a sword in the underlying Brown Act

23    proceeding because the City of Los Angeles made that

24    representation that the -- a vote tally, like a vote did not

25    have to be disclosed because no vote was taken.

1          And I understand the City is going to jump up here

2    and they're going to say, and Your Honor, that's why we can't

3    move forward with this, because that was related to the Brown

4    Act.  But, Your Honor, we're not talking about the vote tally

5    as a sword in these proceedings.  We're talking about what

6    gives rise to the skepticism of the City's representation that

7    the City Council approved the encampment reduction plan.

8          Your Honor, the City says we're not calling any

9    witnesses who are going to attest that the encampment reduction

10   plan was not approved.  Your Honor, that's because no one from

11   the City will get up here and testify about what happened

12   during the January 31st, 2024 meeting.  They're not going to

13   testify that it wasn't approved, nor are they going to testify

14   that it was approved -- well, I mean, they will testify that it

15   was approved because the City will allow them to testify that

16   it was approved.

17         But when asked about the process, when asked about

18   what gave rise to that approval, they won't testify to it.

19   They will -- I submit that they will do exactly what Mr. Marcus

20   did, that despite an order from this Court that the City had

21   waived attorney/client privilege, Mr. Marcus continued to

22   assert attorney/client privilege in spite of Your Honor's

23   ruling.

24         This suggestion, Your Honor, that the City has not

25   waived anything by representing to the Court numerous aspects

23

 1   of what occurred in the closed session completely ignores the

 2   City's position and the ways in which they are skirting the

 3   line relative to that position.  Either, Your Honor, the City

 4   doesn't have to testify or either the Brown Act prevents

 5   disclosure of anything, Your Honor, and that bell has already

 6   been rung or Your Honor is well within his authority to ask

 7   questions about the process related to that.

 8          And, Your Honor, I think the City's position that the

 9   Brown Act prevents them from disclosing what occurs, the City

10   of Los Angeles has disclosed what occurred during that meeting.

11   The City Council's position is the Brown Act does not allow the

12   disclosure of anything that occurred during the January 31st

13   meeting.  And yet on numerous occasions in this court and in

14   other proceedings the City has, in fact, represented what

15   occurred during those proceedings.

16          So to the extent that the City is claiming that it

17   would subject them to misdemeanors and prosecution, Your Honor,

18   then Mr. Marcus made that representation in violation of the

19   Brown Act then.  And, Your Honor, that's exactly the position

20   that we're in here.

21          So that's what we would say, the City is, in fact,

22   using these representations as a sword and has used them in

23   these proceedings as a sword, and now they are using the Brown

24   Act to shield or they're using the Brown Act and

25   attorney/client privilege to shield themselves from any sort of

1    interrogation and to the very, very basic question about what

2    process the City of Los Angeles used.

3            And the last point that I will make, Your Honor, is

4    that while Mr. Marcus made representations that the City could

5    approve things, the City Council could approve things by a

6    discussion or unanimous consent and the suggestion that

7    unanimous consent does not equal a vote, the City has not

8    pointed to, nor could Mr. Marcus point to anything in the City

9    Council charter or the rules that supported his position.  That

10   was his opinion related to that, but the City has not come

11   forward with any sort of representation that that is actually

12   the case.  So thank you, Your Honor.

13           **MS. MITCHELL:**  May I be heard briefly, Your Honor?

14           **THE COURT:**  Certainly.

15           **MS. MITCHELL:**  As to Ms. Myers' last point, when

16   there is a consent vote in City Council, that is recorded by

17   the clerk as a unanimous vote.  So the minutes reflect a

18   unanimous vote, so they do reflect a vote.

19           So any time something is placed on the consent

20   calendar, again that's recorded by the clerk as a unanimous

21   vote and that's reflected in any of the minutes that are

22   reviewed.

23           But I think separately regarding the in camera review

24   process, counsel is absolutely right, that the California cases

25   addressing the in camera review of a closed session recording

1  or interrogation of the facts is all in the Brown Act context.

2  But I think it is relevant here to bring up because an in

3  camera review is something that federal courts frequently do

4  when there are conflicting interests, particularly regarding

5  privilege.  And it is a way to maintain and acknowledge and

6  respect to the privilege while still getting to the truth of

7  the matter.

8          It's commonly done, for example, when there's -- in

9  civil litigation when there's a work product or an

10  attorney/client privilege claim over a document and the other

11  side says I think that we're entitled to it.  Oftentimes,

12  courts will do an in camera review to determine privilege.

13          And I do think that that is an appropriate balanced

14  solution here to the Court's consideration.  Thank you.

15          **THE COURT:**  City.

16          **MS. KUMAR:**  Thank you, Your Honor.  I will endeavor

17  to be brief and respond.

18          Ms. Myers' position is that by saying that the

19  encampment reduction plan was approved by the City Council, the

20  City has waived.  Your Honor, we've already given examples of a

21  criminal plea and what we do day in and day out as lawyers, but

22  I would point the Court also to the Brown Act.

23          The Brown Act does provide that under certain

24  circumstances, which are not applicable here, but under certain

25  circumstances that the City Council must report out actions

1    taken after a closed session has been completed.

2         Under Ms. Myers' theory reporting on a reportable

3    action as is required by California law, would be waiving what

4    happened in the closed session in every instance.  That is

5    like -- it's just absurd, Your Honor.

6         The idea that the representation of what happened,

7    general conclusion as this Court said, not discussions, but

8    facts, that is not a waiver.  It is not a tenable position,

9    Your Honor.

10        She also said that the reason that no one's going to

11   walk into this courtroom and contradict the purported

12   misrepresentation is that no one's being allowed to testify to

13   it.  False.  Mr. Marcus already testified that it was approved.

14   I can represent to the Court that the two remaining witnesses

15   will also testify that it was approved.  No one is walking into

16   this courtroom and saying it wasn't approved.

17        Instead what we're hearing is a procedural argument,

18   contorting ourselves into various shapes to try to argue under

19   City Council charter -- the City charter and the City Council

20   rules that it had to have happened by a vote, and that

21   otherwise it's somehow procedurally defective.

22        First of all, it doesn't make the representation

23   false even if Ms. Myers is right.  More importantly, she is not

24   right.  Mr. Marcus testified to that.  I anticipate if the

25   Court insists there will be more testimony to that and we can

27

1    brief the question.

2         But most importantly, the Court shouldn't be

3    inquiring into the City municipality -- like deciding whether

4    things were done according to the City charter and the City

5    Council rules.  It's running right into the abstention

6    doctrine.  You should not -- the Court should not be doing

7    that, Your Honor.  It's not appropriate and more importantly

8    it's irrelevant because there's no basis to believe there was a

9    misrepresentation.  There was none.

10         Your Honor, again, and to the question if we're going

11   to go down to there has to be a vote, I point the Court to what

12   Mr. Marcus said which is Section 272 of the City charter that

13   specifically calls for a discussion of litigation, no mention

14   of vote, mention of client direction, no mention of a vote, no

15   requirement of a vote.

16         And the portion that Ms. Myers constantly wants to

17   refer to is Section 244, which says, except as otherwise

18   provided by this charter, as otherwise provided, for example,

19   although there are others, Section 272 which provides for

20   client direction and no requirement of a vote.

21         Your Honor, on that I would submit.

22         **THE COURT:**  All right.  Anyone want to respond?

23         **MS. MYERS:**  I'd just like to make one quick point

24   about the Brown Act, Your Honor.

25         **THE COURT:**  Please.  I want to make sure all of

1    you've had as much time as you need for your arguments.

2         **MS. MYERS:**  Your Honor, we would be more than open to

3    briefing on the issue of how the City -- whether the City

4    properly approved the encampment reduction plan if the City

5    would just tell the Court how the City approved the encampment

6    reduction plan.  Otherwise it's entirely hypothetical and there

7    is nothing to brief.  I think that's what's frustrating about

8    all of this colloquy going back and forth, about whether --

9    about how the -- how it was approved.  There's nothing to

10   brief, Your Honor, if we don't know how it was actually

11   approved, that's the very straight forward problem.

12        Also I would just say, Your Honor, that the back and

13   forth related to the Brown Act in these court proceedings it is

14   misrepresenting what the Brown Act actually says, left and

15   right, Your Honor.  The Brown Act says that certain things have

16   to be disclosed.  Your Honor, whether or not this is the type

17   of thing has to be disclosed is actually an issue that was

18   litigated in the Brown Act case and the Court found that it was

19   something that would have to be disclosed, Your Honor, but that

20   is separate and apart from this.

21        I just didn't want to let the City's representation

22   about what the Brown Act says and what it requires to stand

23   because it's simply inaccurate both in terms of the facts, the

24   law and Judge Kin's ruling on this particular issue.

25        But, Your Honor, you don't have to go down that path.

```
 1   We do not have to go down the path of the Brown Act.  We can
 2   simply focus on the very straight forward issue of how the City
 3   Council approved it.  And again, we would be more than open to
 4   briefing on the issue if the City would simply represent what
 5   the process was, and then we can brief it if Your Honor finds
 6   it necessary about whether that process is consistent with the
 7   charter.
 8           And the last point that I will make is the provision
 9   that the City wants to keep pointing to which is direction and
10   litigation is not what this was.  This -- the City did not
11   represent to the Court that they instructed the City Attorney's
12   Office to enter into an agreement.  They represented that the
13   City Council approved it.
14           And if the representation had been that the City
15   Council instructed counsel as to a litigation issue, then
16   perhaps the provision of the charter would apply.  But that's
17   not the representation that was before the Court.  The
18   representation before the Court was that the City Council
19   itself approved the plan and that is what has opened this
20   entire proceeding to interrogating that particular point.
21           THE COURT:  Are all counsel satisfied with their
22   arguments?
23           MS. KUMAR:  Yes, Your Honor.
24           THE COURT:  Counsel?
25           All right.  I want to share with you some thoughts
```

1    I've had since last week and first, the City is continuing to

2    object to me broadening the scope of this contempt hearing and

3    this objection seems to be largely based on the City's belief

4    that this hearing somehow interferes with Judge Kin's case over

5    in the Superior Court.  And I don't think so because Judge Kin

6    and I are concerned about two different things.

7         I know that Judge Kin will deal with the potential

8    Brown Act violation in his own time and make whatever rulings

9    he believes are warranted, but I've asked counsel to keep me

10   apprised of Judge Kin's proceedings.

11        The Brown Act is not my concern in this contempt

12   hearing.  My concern here is that the possibility that an

13   unauthorized representative -- strike that.  That an

14   authorized, I'm sorry, that an authorized representative of the

15   City of Los Angeles may have made an intentional

16   misrepresentation of a material fact to this Court.  Those are

17   two very different things.

18        I'm confident that we can answer that question

19   without intruding into Judge Kin's jurisdiction and I think the

20   only way I can figure out what happened is to hear testimony

21   about it.  So we'll continue with that process today.

22        Next, I think I need to remind everyone about the

23   extraordinary history of this case, which dates back six years

24   to 2020.  Some of you were not with us back then.  And in 2020,

25   the COVID pandemic had just begun and there was a different

1  administration in City Hall, that administration was Mayor

2  Garcetti's administration.

3           Our work in this case was just beginning and on March

4  19th of 2020, I presided over an unusual hearing, I believe in

5  this courtroom.  Attending that hearing included the Mayor of

6  Los Angeles at the time, his counsel, members of the Los

7  Angeles City Council, and their counsel and the President of

8  that Council, members of the Board of Supervisors, it actually

9  also included Los Angeles District Attorney at the time and the

10  Fire Chief.

11           There were mayors of different cities present, but we

12  had to limit the attendance because of COVID, we were separated

13  by six feet.  And we had to restrict this to 50 attendees at

14  the time or this place would have literally overflowed with

15  mayors, council people, not just throughout the city, but Los

16  Angeles, we actually had to restrict the attendance.

17           There's a transcript of that hearing that you all can

18  read and I'll docket it today.  In open court and on the record

19  we discussed my involvement in this case and the fact that I

20  felt that I needed the flexibility to have ex parte

21  communications with various people as the case moved forward.

22           And thereafter as I said in open court many times,

23  I've spoken to hundreds and hundreds of people.  There were no

24  objections.  No one objected.  No elected officials, no

25  counsel, and to the contrary at one point Mayor Garcetti said,

32

1    it's great to be here at the first convening of the Judge

2    Carter fan club Los Angeles chapter and we all laughed.

3            The -- later, however, I had said, if you get rid of

4    me, it's no problem at all.  The Mayor replied we don't want

5    that and so it went back and forth.  I also had multiple

6    meetings with every member of the Los Angeles City Council.

7    Almost every member of the Los Angeles Board of Supervisors, I

8    was transparent with that throughout the record as counsel,

9    Ms. Myers, you were here, Carol Sobel was here, Brook Weitzman

10   were here, Ms. Mitchell, you were here.  Mr. Marcus who's in

11   the back was here.

12           And we reached out, while every member of the City

13   Council and the Board of Supervisors reached out to this Court.

14   I've been transparent at all times about those meetings.

15   Everyone knew about them and I even have the personal cell

16   phones of past mayor, present mayor, they have my personal cell

17   phone.  This is all described throughout the record.

18           When Mayor Bass came in after Mayor Garcetti there

19   were a few new Council members at the time.  They also reached

20   out to this Court and the Special Master initially and we've

21   met on a multitude of occasions, not every one of them, there

22   were a couple of folks we didn't meet.

23           In fact, my first meeting was actually with Mayor

24   Bass, your client and it was on skid row and I've eluded to

25   that at least two or three different times on the record, and I

33

1   also eluded to the fact that we met at the Biltmore Hotel,

2   Denny's Restaurant, and different coffee shops on a multitude

3   of occasions, including your new Council members.

4           This also occurred not only with your Council

5   members, with the Governor and I've stated that on the record

6   also, who came by to see this Court.  No one ever objected.

7   This was never an issue.

8           It's clear to me that the parties wanted me to be

9   involved in this case, and as a result they agreed that I could

10  do certain things that otherwise might not have been

11  permissible, absent that agreement.  And some of the arguments

12  the City is currently making to this Court and the Circuit

13  might be warranted, but in light of the City's agreement and

14  the continued ex parte conversations in what is absolutely an

15  extraordinary case, I know of no other case like this, there's

16  no past precedent or guideline for this case, I don't think any

17  of those objections are well taken.

18          So with that in mind, we're going to continue and if

19  you'd call your witness who's been very polite and I think he

20  had a 3 o'clock appointment on the other day.  I think it's

21  Mr. Fauble.  Is this the next witness, counsel, I believe who's

22  going to be called?

23          **MS. KUMAR:**  Yes, I believe Ms. Myers is calling

24  Mr. Fauble, the City is --

25          **THE COURT:**  Sir, if you'd be kind enough to step

34

1    forward.  Thank you for your courtesy.  And hopefully you made

2    your 3 o'clock appointment Friday or last Wednesday.

3              **MR. FAUBLE:**  I did make it, thank you.

4              **THE COURT:**  Thank you.  If you'd raise your right

5    hand, sir.

6              **STREFAN FAUBLE, INTERVENOR'S WITNESS, SWORN**

7              **THE COURT:**  Thank you, sir.  Would you please be

8    seated here in this box.

9              **MS. MYERS:**  Thank you, Your Honor.  If I can have

10   just a minute to get the technology set up.

11             **THE COURT:**  Be careful.  There's a slight

12   indentation.

13             **THE WITNESS:**  Thank you, sir.

14             **THE COURT:**  And, sir, after being seated would you

15   face the parties and state your full name please.  Sir, would

16   you state your full name please.

17             **THE WITNESS:**  Oh, Strefan Fauble.

18             **THE COURT:**  And would you spell your last name, sir?

19             **THE WITNESS:**  F-A-U-B-L-E.

20             **THE COURT:**  Just one moment, please.  Would you spell

21   your first name for me also?

22             **THE WITNESS:**  S-T-R-E-F-A-N.

23             **THE COURT:**  Thank you.  Counsel, direct examination.

24             **MS. MYERS:**  Yes, Your Honor.  If I can have just one

25   moment to get the technology set up.  Thank you.

1          **(Pause)**

2                        **DIRECT EXAMINATION**

3     **BY MS. MYERS:**

4     Q     Good morning.  Shayla Myers on behalf of the

5     intervenors.  Thank you, Mr. Fauble for coming this

6     morning.  Can you tell us what your position is?  First of all,

7     are you employed by the City of Los Angeles?

8     A     Yes.

9     Q     Can you tell us what your position is?

10    A     I'm an assistant city attorney.

11    Q     And how long have you worked in the City Attorney's

12    Office?

13    A     11 years.

14    Q     And what is your primary position within the City

15    Attorney's Office?  Is there a specific department that you're

16    in?

17    A     So I'm the compliance branch chief.

18    Q     And what does the compliance branch chief do?

19    A     I oversee a number of different aspects of the City

20    Attorney's Office under several other people.  I deal with city

21    council and Brown Act, Public Records Act, investigations, and

22    recently the administrative citation enforcement program.

23    Q     And how long have you had that position?

24    A     Approximately a year.

25    Q     And prior to obtaining this position, what position did

1    you have within the City Attorney's Office?

2    A    So I was -- prior to becoming the branch chief, I was

3    still an assistant city attorney and my primary assignment was

4    both the Public Records Act and staffing and advising the city

5    council.

6    Q    Can you tell us what you mean by staffing and advising the

7    city council?

8    A    So as you -- I believe you saw a video of one of the

9    meetings before, there's typically somebody sitting in a chair

10   that has a sign, city attorney, in front of him or her.  That

11   person is providing legal advice and to some degree guiding the

12   administration of the meeting, as well as providing Brown Act

13   advice and other advice as may be appropriate.  Or connecting

14   people, connecting the members or the chair to other experts if

15   there are specific issues.

16   Q    So when you're providing legal advice to the city, to the

17   city council, is that during the city council meetings?

18   A    Yes, but not exclusively.

19   Q    Okay.  During the city council meetings when you're

20   providing that legal advice, is that in the open session?

21   A    It's sometimes an open session.

22   Q    Okay.  And so then you as the attorney for the city of Los

23   Angeles are providing that legal advice in the course of an

24   open session related to issues that may arise in the course of

25   that meeting, correct?

1    A    Sometimes, yes.

2    Q    And what kinds of issues have you dealt with over the past

3    11 years in that?  Well, first of all, how long have you

4    been  -- were you in that particular position?

5    A    So I think I was in that position for at least nine years.

6    I'm not sure how much longer than that it was.  So examples, it

7    could be issues relating to the Brown Act.  That would be very

8    common.  It could be any of a number of matters.  I don't claim

9    to be a subject matter expert on most issues because the city

10   deals with myriad things, but certain baby questions in other

11   areas I'll answer.  But if you delve too deeply, for example,

12   into CEQA, what I'm probably going to do is find somebody who

13   knows more than I do.

14   Q    Fair.  We're not going to get into CEQA here.  But how

15   about the city council rules?  Are you familiar with the rules

16   of the Los Angeles City Council?

17   A    Yes, I'm familiar with them.

18   Q    And is part of your job then to advise the city council

19   about the operative city council rules in the course of

20   meetings?

21   A    Yes, not exclusively, but yes.

22   Q    And are you familiar with the Los Angeles City Charter?

23   A    Yes.

24   Q    And is part of your job then to advise the city council of

25   the applicable charter provisions in the course of meetings?

1   A    In the course of meetings, yes.

2   Q    And that advice often comes up in open meetings, correct?

3   A    Often, yes.

4   Q    Okay.  And under what circumstances -- well, never

5   mind.  I will strike that.  Were you the -- were you in this

6   position in January of 2024?

7   A    In January -- well, tell me what you mean by this

8   position.

9   Q    In the position of advising the city council related to

10  compliance with the various provisions that we've talked about.

11  A    Yes.

12  Q    And were you in that position in May of 2024?

13  A    Yes.

14  Q    Okay.  When the city convenes in closed session and you

15  are the -- you are the city attorney that is staffing a city

16  council meeting, are you in that closed session?

17  A    If I'm staffing it, definitely.

18  Q    Do you know if you were staffing a city council meeting on

19  January 31st, 2024?

20  A    I was not.

21  Q    Okay.  Do you know if you were staffing a city council

22  meeting on May 2nd, 2024?

23  A    I do not know.

24  Q    Okay.  Do you know who had the role that you frequently

25  take up on January 31st, 2024?

1    A    Yes.

2    Q    Who was that?

3    A    Jonathan Groat.

4          THE COURT:  I'm sorry, Jonathan what?

5          THE WITNESS:  Groat, G-R-O-A-T.

6          THE COURT:  I'm sorry.  Would you spell that more

7    slowly?

8          THE WITNESS:  Yes.  G-R-O-A-T.

9          THE COURT:  Thank you.

10   BY MS. MYERS:

11   Q    How many individuals in the city council -- in the City

12   Attorney's Office have that particular position that you had in

13   terms of staffing city council meetings?

14   A    There are, with rare exceptions, only three of us that

15   would be doing that.

16   Q    Are you familiar with the term a roll call?

17   A    Yes.

18   Q    What is a roll call?

19   A    It's a type of vote.

20   Q    And can you describe what that type of vote is?

21   A    Yes.  So it's -- during the actual vote, be it oral or

22   otherwise, it's taking the name of the member and then

23   indicating whether that member is voting yay or nay on the

24   matter before him or her.

25   Q    And so it's an individual identification of the specific

1    vote by council member; is that fair to say?

2    A    Yes.  While the vote's going on.

3    Q    Okay.  And it's specific while the vote is going on?

4    A    Yes.

5    Q    Okay.  Are you familiar with unanimous -- the term

6    unanimous consent?

7    A    Yes.

8    Q    What does unanimous consent mean to you?

9    A    So I see you scrolling through the rules right now.

10    Q    Let me find you.

11    A    Yeah.  If you find rule 49, I think.

12    Q    Yes.  Getting there.

13    A    You'll find that it uses the phrase unanimous approval.

14    Q    Yes.  I'm asking specifically about the term unanimous

15    consent.  So I'll get to unanimous approval in a minute.  But

16    can you -- are you familiar with the term unanimous consent?

17    A    Yes.

18    Q    What does that mean to you?

19    A    It's a form of voting in which there is typically in order

20    for the chair saying, does anybody object to the following

21    proposed action?  And if there's sufficient time to object and

22    nobody does, then eyes are spread across the roles on the

23    members, but it's not a roll call vote.

24    Q    What's the difference between then the unanimous consent

25    and a roll call vote?

Fauble - Direct / By Ms. Myers                                41

1    A    I think the roll call vote is while the vote is going on,

2    we ascribe a yay or nay to each person.  Whereas unanimous

3    consent is if there is no sufficient objection, it's deemed

4    that everybody has voted yes.

5    Q    Okay.  So in that case, it's a form of voting that just

6    simply does not require the individual tabulation of each of

7    the council members votes, correct?

8    A    While the vote is going on.  Yes.

9    Q    Okay.  And so if there is an action by the city council

10   that does not require a roll call vote, how else could a vote

11   be taken?

12   A    So, well, a vote, I think, could only be taken as far as

13   I'm aware, by a roll call vote or by unanimous consent.

14   Q    And you mentioned unanimous approval.

15   A    Yes.

16   Q    And that's a phrase that appears in Section 49, which is

17   the these are the -- are you familiar with these -- the

18   document in front of you?

19   A    Yes.

20   Q    And can you tell the Court what this document is?

21   A    Sure.  It's the -- I assume it's the current edition, but

22   an addition of the rules of the Los Angeles City Council.

23   Q    Are you familiar with prior versions of the city council

24   rules?

25   A    Some of them to some degree.

Fauble - Direct / By Ms. Myers                                    **42**

1    Q    Do you know when the last time the city council rules were

2    changed?

3    A    Oh, gosh, I think it was a couple of years ago.

4    Q    Okay.

5    A    If you go to the beginning of the document, it would

6    refresh my memory and I could tell you for sure.

7    Q    Are you aware of what the change was the last time the

8    rules were changed?

9    A    So I believe the last change was regarding use of certain

10   racial and other epithets in the council rules.

11   Q    And are you aware of any changes that were made to Chapter

12   8 before you, the voting?

13   A    Chapter -- I don't recall there being any.

14   Q    Okay.  Okay.  So going back to number 49, which is in

15   front of you, where it says the last line, it says on other

16   matters, if opportunity is given and no objection is raised,

17   the presiding officer may announce a unanimous approval of an

18   item under consideration and the clerk shall so record.  And

19   that particular line where it says unanimous approval, is that

20   the same to you as unanimous consent?

21   A    I believe it is.

22   Q    Are you aware of the term unanimous consent appearing in

23   the charter other than -- well, first, are you aware of the

24   term unanimous consent appearing in the charter?

25   A    Not that I recall.

Fauble - Direct / By Ms. Myers                              **43**

1   Q    Okay.  And are there any other provisions that you're

2   aware of that discuss this unanimous approval voting process?

3   A    Not that I recall.

4   Q    Okay.  Are there other provisions of the city rules that

5   you recall that discuss how the city council can approve items?

6   A    Yes.

7   Q    What provisions are those?

8   A    Well, Rule 25 comes to mind.

9   Q    Let's go to Rule 25.  Okay.  So this is Rule 25 of the

10  city council rules.  And it says ten members of the city

11  council shall constitute a quorum.  Is this the provision that

12  you were just -- that you just identified?

13  A    Yes.

14  Q    And what is your understanding of what this -- when this

15  provision applies?

16  A    When it applies, it applies whenever.  Well, there are

17  different parts of this provision.  So the first sentence talks

18  about a quorum for transaction of business.  So that tells you

19  when there's a quorum.  Right.  And when business can be

20  transacted.  Second sentence says that except as otherwise

21  required by the charter or other law or by these rules, we're

22  not inconsistent therewith, action by the council shall be

23  taken by a majority vote of the entire membership, which I

24  think is fairly self-explanatory, or at least I shouldn't say

25  that.  That's what it says.  Right?  It says a majority vote

Fauble - Direct / By Ms. Myers                                    **44**

1    for action is required.

2    Q    And when is your understanding that this provision

3    applies?

4    A    Whenever council takes an action by a vote, it requires a

5    majority of the membership, which would be eight votes.

6    Q    And when -- are there times when the city council can take

7    actions without a vote?

8    A    An action?  No, I don't believe so.

9    Q    When you use the term action, what do you understand that

10   term to mean?

11   A    I think it's -- I'm not sure that I can define it.  I

12   think it's a legal term of art.  I don't think it's equivalent

13   to the council doing something.  Right.  So it -- I hesitate to

14   characterize it more than that because I don't think I have a

15   definition at my fingertips.

16   Q    When you say that the council can do something other than

17   taking an action, what are those some things that the council

18   can do?

19   A    Well, I don't know that I have an exhaustive list, but it

20   can instruct somebody.  It can express agreement or approbation

21   to a plan, for example.  So those are two -- two things it

22   does.

23   Q    So tell me about instructing.  Who can the city council

24   instruct?

25   A    Well, the one that comes to mind, unsurprisingly, given my

1   job is it can instruct the city attorney.

2   Q    And what do you mean by instruct the city attorney?

3   A    I mean, instruct the city attorney.  I'm not quite sure

4   how else to explain it.  Giving us indications of what it would

5   like us to do.

6   Q    And when the city council does that, is it your position

7   that the city council does not have to vote on that?

8   A    It does not have to.  That's correct.

9   Q    Why is that your position?

10  A    Why is it my position?  Because I think nothing prevents

11  them from instructing us.  And indeed, one of the council rules

12  actually talks about instructing the city attorney or the

13  charter, I should say.

14  Q    Do you know what provision of the charter that is?

15  A    I don't remember offhand.  I suspect you do.

16  Q    Does it specifically say that the city council can

17  instruct the city attorney without a vote?

18  A    It does not say that.  It says it may instruct the city

19  attorney.

20  Q    And what does it mean for the city council to instruct the

21  city?  I know we're getting into -- we're getting into very

22  specifics here, but I want to understand when you say the city

23  council can instruct, how many members of the city council are

24  there?

25  A    Fifteen.

1  Q    Okay.  So when you say that the city council can instruct

2  the city attorney, how would the city council instruct the city

3  attorney to take a particular action without a vote of the

4  body?

5  A    So without referring to any particular closed session,

6  there could be a discussion and it could be just very clear

7  that the council wants us to do thus and such.  It's the same

8  way if you were talking to a group of -- a client that had

9  multi members and you talk to them and you go away

10 understanding perfectly what they've instructed you to do, but

11 there's no vote.

12 Q    And when that happens, how would that -- you would

13 understand that to be an instruction to the City Attorney's

14 Office, correct?

15 A    Yes.

16 Q    And that's -- that is the verb.  It would be an

17 instruction to the city attorney to do something, correct?

18         MS. KUMAR:  Objection, Your Honor.  Mischaracterizes,

19 argumentative.

20         THE COURT:  Overruled.

21         THE WITNESS:  Can you ask the question again, please?

22 BY MS. MYERS:

23 Q    Sure.  When you were discussing this process, the city

24 council coming to an agreement, the verb that you would use

25 then is you instruct the city attorney to take a particular

1   action, correct?

2   A    I might use that verb.  I don't know.

3   Q    What other verbs would you use?

4   A    Told us.  For example.

5   Q    Okay.

6         THE COURT:  I'm sorry, the word?

7         THE WITNESS:  Told us.  A very common English word.

8   BY MS. MYERS:

9   Q    And then the understanding is then that would be then the

10  City Attorney's Office or the city's lawyers would then take a

11  subsequent action, correct?

12  A    Presumably.

13  Q    Okay.  And you just said you said approbation of a plan.

14  What do you mean by that?

15  A    Expressing liking of it.  Right.

16  Q    But what circumstances would the city council like express

17  like of a plan?

18        MS. KUMAR:  Objection, Your Honor.  I direct the

19  witness not to answer to the extent it's any specifics.  He can

20  speak in generalities, but he can't obviously reveal what

21  happens in closed sessions or is otherwise protected by the

22  attorney/client privilege.

23        THE COURT:  Overruled.  You can answer that question.

24        THE WITNESS:  Okay.  And I -- indeed, I think the

25  question is answerable.  It's sort of a hypothetical in

Fauble - Direct / By Ms. Myers                                   **48**

1   generalities.

2           So perhaps I can give you an example.  Again, this

3   would be a hypothetical.  But imagine that the head librarian

4   from the city is in front of city council and he's presenting

5   his plans at what he's going to do with the library and what

6   kind of services he's going to provide.  And it's clear during

7   the course of the discussion that the -- clearly, certainly a

8   majority of the council members are expressing approbation or

9   liking of what he's planning to do.  Right.  So they're clearly

10  approving of what he's suggesting through discussion.  There's

11  no vote.

12  **BY MS. MYERS:**

13  Q    And under that -- under those circumstances in which the

14  members of the city council like what is being presented to

15  them, in your example, it is the head librarian that is taking

16  a particular action, correct?

17  A    That was my example.

18  Q    Okay.  Are there real world instances that you can recall

19  from your 11 years of staffing city council meetings in which

20  the city council liked something that was presented to them?

21          **MS. KUMAR:**  Objection, Your Honor.  Same objection.

22  Nothing -- only as to open session can the witness respond?

23          **THE COURT:**  Overruled.

24          **THE WITNESS:**  So the answer is, I can't think of a

25  particular case, but I know that it happens, you know, not

1    infrequently.  Right.  It's not unusual at all.

2    Q    And it's not unusual at all that the city council likes

3    things that are presented to them and expresses that like

4    through discussion.  Is that your testimony?

5    A    That's what I said.  Yes.

6    Q    Okay.  And you would consider that -- would you consider

7    that to be an action taken by the city council?

8    A    No.  Not in the sense of Charter Section 25.

9    Q    Okay.  What other examples do you -- can you give us any

10   other examples of the city council liking something and

11   expressing their like of someone presenting to them taking a

12   particular action?

13   A    So as I've told you, I really can't think of any specific

14   examples where they've -- there was clearly an expression of,

15   you know, approbation of what was being suggested.  But again,

16   it's not unusual.  This would be a lot like if you asked me to

17   dredge up a memory of buying celery at the market.  I know I've

18   done it many times.  I can't think of a specific instance.

19   Q    And so how would the -- would the expressing like through

20   discussion be recorded anywhere as an official action of the

21   city council?

22   A    I don't think so.

23   Q    And how would the public know that the full city council

24   liked something?

25             MS. KUMAR:  Objection, Your Honor.  Relevance.

Fauble - Direct / By Ms. Myers                                    50

1          **THE COURT:**  Overruled.

2          **THE WITNESS:**  So if it were -- if this occurred in

3    open session, a member of the public could watch the video or

4    listen to it and understand perfectly well what occurred.

5    **BY MS. MYERS:**

6    Q    Okay.  And where in the city charter does the approbation

7    of a plan occur?  Or where in the city charter does it refer to

8    that process of liking something through discussion?

9    A    So it doesn't -- it's not referenced in the charter.  I'm

10   worried that you may be misunderstanding the nature of the

11   charter, however.

12         **THE COURT:**  So like is not mentioned in the city

13   charter?

14         **THE WITNESS:**  It's not.  But the confusion that I

15   think -- I suspect where Ms. Myers is going is that she's

16   suggesting that if something is not called out as allowed in

17   the charter, we don't have authority to do it.  That's to

18   misunderstand the nature of the charter.  The charter is not a

19   document of authorization.  It's a document of limitation.

20         And so I would point, for example, to charter Section

21   25, where it says actions are taken unless otherwise, you know,

22   exempted are taken by a vote.  That doesn't mean that anything

23   that the charter -- that the council does, which isn't an

24   action, you actually use the word official action at one point,

25   requires a vote.  I just think otherwise would be

1  misunderstanding what the kind of -- what the charter is.

2  **BY MS. MYERS:**

3  Q    So just to clarify, you said charter.  I believe you mean

4  Council Rule 25?

5  A    Yeah.  Sorry.  Council rule.  There's a similar charter

6  section.

7  Q    Yeah.  So you're referring to Council Rule 25.

8  A    Yeah.  Thank you.

9  Q    So the charter is about limiting the power of the city

10  council, correct?  That's your testimony?

11  A    Yes.

12  Q    And is it about limiting the power of the city council to

13  take actions pursuant to specific procedural requirements?

14  A    So if there's a procedural requirement in it, I think that

15  would be telling us how we have to do it, to put it that

16  way.  And if it doesn't say how we have to do something, then

17  we're allowed to do it under the charter.

18  Q    So when you say, and I'm going to go to the city council

19  Rule 25 that I think you were referring to.  So where it says,

20  except as otherwise required by the charter or other law or by

21  these rules, where not consistent therewith, action by the city

22  council shall be taken by a majority vote of the entire

23  membership of the council, are you suggesting that there are

24  other ways that are not outlined in these rules, the charter or

25  applicable law that would allow the city to take actions?  Is

1    that what you're representing about the city council rules?

2    A    So insofar as you're talking about an action, other than

3    possibly unanimous consent, because I'm not sure whether rule

4    25 is talking about a roll call vote, I would say no.

5    Q    You previously testified that a roll call vote and

6    unanimous consent are two ways to achieve a vote, correct?

7    A    That's right.  So maybe in light of what you said, maybe

8    the answer to the question is no.  Council can't take an action

9    outside of a majority vote or if a higher percentage is

10   required, of course.

11   Q    And so then the question rests on what an action is then.

12   A    Yes.

13   Q    And so it's your testimony -- again, what do you

14   understand an action to be?

15   A    So I don't think I have a definition.  You used the phrase

16   official action at one point, which I don't know that's in the

17   rules or the charter anywhere, but maybe captures the idea.  So

18   I can give you a non-exhaustive list.  Voting on an ordinance

19   is an action.  Voting on a resolution is an action.  Voting on

20   the budget is an action.  I can probably give you a non-

21   exhaustive list of non-actions, instructing the city attorney,

22   expressing approbation or disapprobation to a planned course of

23   action.  So those are some examples.  But I'm not prepared and

24   it's very difficult to create definitions for fairly common

25   English words on the spot.  I don't think I can do it.

1   Q    Perhaps hit on what's happening here is questions about

2   specific words and what they mean.  But your job is to

3   interpret the rules and advise the city council related to

4   those rules, correct?

5   A    Part of my job.

6   Q    Yeah.  And so the city council routinely approves reports

7   from committees, correct?

8   A    Yes.

9   Q    And is that an action taken by the council?

10  A    Well, actually, it votes on them.  So, yes, I'm quite

11  sure.  And they have recommendations in the reports, usually,

12  that are very specific.  I can give you hypothetical examples

13  if you want.

14  Q    So if there was a report from the Transportation Committee

15  that went in front of the city council, the city council would

16  vote on that to express approbation, liking that report,

17  correct?

18  A    I think to say that they vote to express approbation is a

19  very strange phrase.  I wouldn't use that.

20  Q    Neither would I.

21  A    A vote is a performative act, and they vote on the

22  recommendations in the report.

23  Q    Yes.  And they frequently use the votes in that vote to

24  instruct specific departments to take actions, correct?

25  A    Yes.

Fauble - Direct / By Ms. Myers                           **54**

1    Q    And that is, in fact, a large part of what the city

2    council does, right, is that they instruct various city

3    departments to take specific actions, correct?

4    A    So they tend to  -- so I'm not quite sure that's right.

5    They instruct departments through, usually, maybe entirely,

6    passing ordinances.  Other than that, it's usually a

7    departmental report or recommendations where the department is

8    asking for something.  For example, please approve this

9    contract that's for five years, and then the council votes to

10   approve the contract.

11   Q    So it's your position that the city council does not

12   routinely instruct departments to take specific actions through

13   voting to approve reports?

14   A    I think the answer is -- I think that's what I'm

15   saying.  I think they instruct departments through

16   ordinances.  I'm trying to think of examples.

17   Q    Sure.

18   A    And the ones that are coming to mind are usually --

19   something that you would think of is not an ordinance where

20   maybe you're characterizing as instruction.  The department

21   sends a report in, and, for example, it would say, you know,

22   we'd like to enter into this contract for a five-year period

23   for this building project and to have the controller transfer

24   funds.  I suppose the controller instructions are instructions

25   of the controller, and council votes on that.  So if you have

1    specific examples, it may help me.

2    Q    Sure.  We'll come back to that, specific instructions of

3    the city council instructing departments to take specific

4    actions.

5    A    Thank you.

6    Q    I'm going to go back to the -- I'm going to show you

7    what --

8    A    Actually, can I add to the previous testimony?  I think

9    there are examples.  I'm trying to think of examples.  I think

10   they're examples of instructions as I'm thinking through many

11   past agendas.  But if you had examples, that would help.

12   Anyway, sorry, continue.

13   Q    And what you're now saying you are aware of, and those

14   would be city council actions, the purpose of which is to

15   instruct city departments, other entities to take specific

16   actions, correct?

17   A    I think that's right.  But, again, if you have examples at

18   your fingertips, that would help me.

19   Q    Sure.  We'll come back to that in just a minute.  And in

20   those instances, the city council votes on it, correct?

21   A    Yes.

22   Q    And a vote is recorded?

23   A    At least in some cases, maybe all cases.

24   Q    And how would you be able to distinguish some cases versus

25   all cases?  What instances can you imagine the city council

1    instruct the department to take action?

2    A    Well, again, the simplest example, which I'm very familiar

3    with, is they instruct the city attorney to do something.

4    Q    Okay.  We'll come back to why the city council feels it

5    can do that without a vote.  I'm going to go to Section 244.

6    First of all, are you familiar with this document?

7    A    It's the charter of the City of Los Angeles.

8    Q    Okay.  And what is the charter of the City of Los Angeles?

9    A    It's the main governing document.  It's a bit like a

10   constitution for the city.

11   Q    And so, as you previously testified, it limits the

12   authority of various entities within the city, correct?

13   A    Yes.

14   Q    Okay.  And it's one of those entities that it limits the

15   city council?

16   A    Yes.

17   Q    Okay.  So I'm going to show you Section 244.  And then --

18   so I'm going to tell you where it's in the middle of the

19   paragraph.  It starts where it says, except.  Except as

20   otherwise provided in the charter, action by this council shall

21   be taken by a majority vote of the entire membership of the

22   council.  Are you familiar with that particular provision?

23   A    Yes.

24   Q    And is it your understanding that that's where the rule

25   for the city council is derived from, is this provision of the

Fauble - Direct / By Ms. Myers                                    57

1    charter?

2    A    I don't know if it's derived from it.  It mirrors it.

3    Q    Okay.  Were there other provisions of the charter that,

4    it's your testimony, dictate how the city council can take

5    specific actions other than through a vote?

6    A    I haven't testified to that.  No.

7    Q    So as you sit here, you're testifying then that you're not

8    aware of any other provisions that dictate how the city council

9    can take actions.

10   A    That's all that's coming to mind right now.

11   Q    Okay.  Are you familiar with any other provisions of the

12   city charter that allow for approbation through discussion?

13   A    Well, again, the city attorney can be instructed.  And I

14   don't think that requires an action or a vote.  So yes.

15   Q    And so when you're referring to the city council's

16   instruction to the city attorney, do you know what provision

17   you're referring to?

18   A    I don't remember the number.

19   Q    If I showed you, would you know what that provision is?

20   Let me just show you Section --

21   A    Yeah, I think it's 272 now that you have that there.

22   Q    Yeah.  Is this the provision that you're referring to?

23   A    I believe so.

24   Q    And where does it say that the city council can instruct

25   the city attorney without a vote?

1   A    Oh, I'll have to read it.  Let's see.

2   Q    Okay.  Tell me if you need me to scroll.

3   A    Yes, please.  If you direct me to the sentence, that may

4   speed us along.

5   Q    No, I'm asking you.

6   A    Okay.  Right.  So the third sentence, I think, the city

7   attorney shall manage all litigation of the city subject to

8   client direction in accordance with this section.  That, for

9   example.

10  Q    So that's the provision that says that the city council

11  can instruct the city attorney without a vote?

12  A    And can you scroll down, please?

13  Q    Sure.

14  A    Make sure there's nothing else.  I believe that's it.

15  Q    So that's the provision that you're referring to that

16  gives rise to your understanding that the city council can

17  instruct the city attorney without a vote?

18  A    Yes.  Although, again, it's a document of limitation.  Or

19  excuse me, the charter is a document of limitation, so I

20  don't -- your question seems to have a false premise in it,

21  which is that we can't do it unless you find a provision here

22  that says that we can.

23  Q    That like, for example, that says, unless otherwise

24  authorized, the city shall -- the city council shall take a

25  particular action, like that?

1   A     For example.

2   Q     For example.  Okay.

3           **MS. MYERS:**  Your Honor, would it be possible to take

4   just a short recess?

5           **THE COURT:**  Absolutely.

6           **MS. MYERS:**  Thank you.

7           **THE COURT:**  So, counsel, about 15, 20 minutes.  Okay?

8   Thank you very much.  Have a good recess.  Sir, you may step

9   down.  Thank you.  Then we're in recess.

10          **(Recessed at 10:19 a.m.; reconvened at 10:38 a.m.)**

11          **THE COURT:**  Thank you for your courtesy, if you'd be

12  seated, we're back in session, all counsel are present.  This

13  is continued direct examination by Ms. Myers on behalf of the

14  intervenors.

15          **MS. MYERS:**  Thank you, Your Honor, for your courtesy

16  for a recess, I'm going to go over a couple of documents.  I

17  think we're on Exhibit 577, is that correct, do we know?

18          **THE COURT:**  Why don't you put it up and let's see if

19  we all agree, 577.

20          **MS. MYERS:**  Okay, that sound right?

21          **MS. KUMAR:**  It may be, but -- could you go?

22          **MS. MYERS:**  Let's go 580, how about that, is that

23  safe enough?

24          **MS. KUMAR:**  Could we do 590?

25          **MS. MYERS:**  590, sure, yeah, 100 percent we will do.

1    We can go 600 if you want, that's fine.  Okay, we'll go with

2    590 then.

3                    **DIRECT EXAMINATION (CONTINUED)**

4    **BY MS. MYERS:**

5    Q    Okay, Shayla Myers with the Legal Aid Foundation of Los

6    Angeles on behalf of the intervenors.  Before we broke for a

7    recess, you said -- you asked if there were examples that I

8    could give related to instructions, and so are you familiar

9    with this document?

10   A    It appears to be an agenda for the LA City Council from

11   February 17th, 2026.

12   Q    And when is February 17th relative to today?

13   A    I think it was yesterday.

14   Q    Okay, so based on this document, is it fair to say this is

15   the City Council agenda for the meeting yesterday?

16   A    It looks like it.

17   Q    Okay, and I'm going to mark this as Exhibit 590.

18             **THE COURT:**  590, not 577?

19             **MS. MYERS:**  No, 590, Your Honor.

20             **THE COURT:**  590, thank you.

21        **(Exhibit Number 590 marked for identification)**

22   **BY MS. MYERS:**

23   Q    Are you familiar with city council agendas?

24   A    Yes.

25   Q    And what's the purpose of a city council agenda?

Fauble - Direct / By Ms. Myers                          61

1    A    It's to provide notice to the public of what is going to

2    be discussed or acted on or whatever.

3    Q    And the city council agenda lists items that are to be

4    voted on by the city council, correct?

5    A    Among other things, yes.

6    Q    Okay.  So I'm going to show you what is the agenda from

7    yesterday's city council meeting.  So it is a 65-page document,

8    so we're not going to walk through the entire thing.

9    A    Thank you.

10   Q    Apologies for that.  Not sure what just happened.  Okay.

11   So items noticed for public hearing.  What is an item noticed

12   for public hearing on the agenda?

13          **MS. KUMAR:**  Objection, Your Honor.  I'm going to

14   object to relevance to the relevance of a February 17th, 2026

15   city council meeting.

16          **THE COURT:**  Overruled.

17          **THE WITNESS:**  It's exactly what it suggests, which is

18   there are certain items which had been -- notices had been sent

19   out, and they are separated out from other parts of the agenda.

20   **BY MS. MYERS:**

21   Q    Okay.  And so on the agenda, then, it lists items that the

22   city council is going to be considering, correct?

23   A    Yes, among other things.

24   Q    And then it also lists actions for the city council to

25   take; is that correct?

Fauble - Direct / By Ms. Myers                                    62

1    A    Yes, among other things.

2    Q    Okay.  And part of when listing the actions that the city

3    council can take, those actions require a vote, correct?

4    A    The actions require a vote.

5    Q    Okay.  So looking at item number one on the city council

6    agenda from yesterday, it says recommendations for council

7    action, correct?

8    A    Yes.

9    Q    Okay.  And so then it says number one is to acknowledge,

10   correct?

11   A    Yes.

12   Q    Okay.  Number two is review and consider.

13   A    Yes.

14   Q    Number three is find.

15   A    Yes.

16   Q    Number four is concur.

17   A    Yep.

18   Q    Five and six, seven, eight, nine, ten are find.

19   A    Yes.

20   Q    Eleven is adopt.

21   A    Yes.

22   Q    Twelve is authorize.  And those are the actions when the

23   city council voted on this item, those were the actions that

24   the city council was voting on taking, correct?

25   A    I assume so.  I wasn't at the meeting.  Unless this was

Fauble - Direct / By Ms. Myers                                63

1   amended, yes.

2   Q    Okay.  So I'm going to go down to item number three, which

3   is a motion and resolution relative to the issuing of bonds.

4   The recommendation for council action subject to approval of

5   the Mayor, number one is to consider, correct?

6   A    Correct.

7   Q    Number two is to adopt?

8   A    Yes.

9   Q    So when the city council approved that item, if they did,

10  then the actions they were taking were considering and

11  adopting, correct?

12          MS. KUMAR:  Objection, Your Honor.  Calls for a legal

13  conclusion, relevance.

14          THE COURT:  Overruled.  Overruled.

15          THE WITNESS:  Yes.

16  BY MS. MYERS:

17  Q    Okay.  So I'm going to go down to number six.  And this is

18  Council File 26-0054.  So recommendation for council action

19  subject to the approval of the Mayor, same question.  What's

20  listed are the actions that the city council is to take,

21  correct?

22  A    Yes.  Or what's being presented to them for possible

23  action, yes.

24  Q    And to take these actions, they would vote on that,

25  correct?

1          **MS. KUMAR:**  Objection, Your Honor.  Speculation,

2   calls for a legal conclusion.

3          **THE COURT:**  Overruled.

4          **THE WITNESS:**  Yes, they would typically vote on

5   these.

6   Q    Okay.  So number one is to adopt?

7   A    Yes.

8   Q    Number two is to approve?

9   A    Yes.

10  Q    Number three is to present and adopt?

11  A    Yes.

12  Q    So when the city council voted on this item, that is what

13  they were -- those are the actions they were voting to take,

14  correct?

15  A    Assuming they voted on it, yes.

16  Q    Okay.  And then you asked for a specific example of an

17  instance in which the council was instructing the Department.

18  So I'm going to show you Council File 25-1257, documents from

19  that council file.  What is your understanding of what a

20  council file is?

21  A    Oh, gosh.

22         **MS. KUMAR:**  Objection, Your Honor.  Relevance.

23         **THE COURT:**  Overruled.

24         **THE WITNESS:**  So a council file is a bit like the

25  name suggests.  It's a file that has usually a number of

1    documents, not always, it could be one, related to a specific

2    item that is potentially coming to the city council.

3    **BY MS. MYERS:**

4    Q    And that council file is assigned by the Clerk's Office,

5    is that correct?

6    A    Yes.

7    Q    And it's just a way to identify the documents that are

8    related to a specific action by the city council, correct?

9    A I think that's a fair characterization.

10   Q    Okay. And are you familiar with council files?

11   A    Yes.

12   Q    And that's part of your, in the course of your work over

13   the last 11 years in compliance with the City Attorney's

14   Office, correct?

15   A    Yes.

16   Q    Okay.  I'm going to show you what I will mark as Exhibit

17   591.

18       **(Exhibit Number 591 marked for identification)**

19       At the top of the document it says File Number 25-

20   1257.  Is that the structure of a council file as you

21   understand it to be?

22   A    So this is -- well, it's not the structure of a council

23   file.  What's in front of me appears to be a report.

24   Q    Let me just clarify.  I trailed off.  The structure of a

25   council file number.

Fauble - Direct / By Ms. Myers                                    66

1   A     Oh, yes.

2   Q     Apologies.

3   A     Thank you.

4   Q     That is on me.  Okay.

5             **THE COURT:**  Just a moment.  That's the 25-1257,

6   correct?

7             **MS. MYERS:**  Yes.

8   **BY MS. MYERS:**

9   Q     So I'm showing you what is a document from Council File

10  Number 25-1257.  Are you familiar with this particular

11  document?

12  A     No.

13  Q     Okay.  Are you familiar with documents of this type?

14  A     Yes.

15  Q     What is this, as you review it?  What is your

16  understanding of what this is?

17  A     It appears to be a report which would be drafted by the

18  Clerk's Office of a Public Safety Committee meeting.

19  Q     And that would be a Public Safety Committee of the city

20  council, is that correct?

21  A     That's correct.

22  Q     And so this is a report that would have been passed by the

23  Public Safety Committee, is that correct?

24  A     The report isn't passed by it.  This is the Clerk's

25  summary of the meetings and the recommendations going from the

Fauble - Direct / By Ms. Myers                              67

1    committee to the council, which would be agendized, presumably,

2    for a later council meeting.

3    Q    Okay.  And out of that city council committee came a,

4    based on this council file that you're looking at, and this

5    specific report prepared by the Clerk, out of that Public

6    Safety Committee came a recommendation for council action, is

7    that correct?

8    A    It appears to be the case, yes.

9    Q    Okay.  And what does the third paragraph say?

10   A    And this is a very useful example.  Yes, instruct the, and

11   I'll summarize, CAO in coordination with the Department of

12   Transportation, Police Department, and the City Attorney to

13   implement an assembly bill, which I assume was passed.

14   Q    And so the operative action there is to instruct a

15   specific city department to take a specific action, correct?

16   A    Yes.  Thank you very much for the example.

17   Q    No problem.  Okay.  So I'm going to show you another

18   document from the same council file.  And this is City, it says

19   City of Los Angeles, California, has the City seal at the top,

20   and I'm going to mark this as Exhibit 591.

21            THE COURT:  The last exhibit was --

22            MS. MYERS:  592.  Thank you.

23            THE COURT:  -- 591, is this 5 --

24            MS. MYERS:  It's the number I had in my head.

25            THE COURT:  Just a moment, counsel, 59 what?

1          **MS. MYERS:**  592, Your Honor.

2          **THE COURT:**  592, okay, thank you.

3          **(Exhibit Number 592 marked for identification)**

4          **MS. MYERS:**  Thank you.

5    **BY MS. MYERS:**

6    Q    And so here this lists Council File Number 25-1257.

7    That's the same council file as the Public Safety Report we

8    just saw, correct?

9    A    Yes.

10   Q    Okay.  And so this -- what is this document, if you're

11   familiar with these types of documents?

12   A    So it appears to be, I'll call it a report, of the -- by

13   the City Clerk, recording the action of the city council on

14   this particular council file on a particular date.

15   Q    And based on this document, it appears that the city

16   council adopted the Public Safety Committee report, correct?

17   A    Yes, it does.

18   Q    Okay, and so does that mean that the city council then --

19   the action from the city council, was then to instruct --

20   A    Yes.

21   Q    -- the CAO's office?

22   A    Correct.

23   Q    And then at the bottom it says a council vote.

24   A    Yes, that's a roll call vote.  Yes.

25   Q    Okay, and so this would be an example of a roll call vote,

Fauble - Direct / By Ms. Myers                                    **69**

1    correct?

2    A    Yes.

3    Q    And it's a -- you know it's a roll call vote, how?

4    A    Well, so I -- well, I know it has to be a roll call vote

5    because Council President Harris-Dawson has marked as a no.  So

6    it couldn't have been unanimous approval.  So it was, as I

7    would have suspected, voted on during the meeting.

8    Q    Just to clarify for the record for Council President

9    Harris-Dawson, I believe it's Council Member Hernandez.

10   A    Okay, you are correct.  Thank you.  Thank you.

11   Q    And so Council Member Hernandez is voted -- is approved --

12   is listed as voting no, as is Council Member Soto Martinez.

13   A    Thank you.  Just those two, it appears.  Yes.

14   Q    But because there were no votes, that's how you know that

15   there was a roll call, correct?

16   A    Correct.

17   Q    And if it had been a unanimous vote, through unanimous

18   approval, what would be -- it would still list out all of the

19   council members, correct?

20   A    Yes.

21           **MS. KUMAR:**  Objection, Your Honor, relevance.  This

22   has nothing to do with the January 2024 session.

23           **THE COURT:**  Overruled.

24           **THE WITNESS:**  Yes.

25   //

1  **BY MS. MYERS:**

2  Q   And that would -- it would still record those as

3  votes.  It would just be that all of them would be yes votes,

4  correct?

5  A   I believe that's correct.

6  Q   Okay.

7          **MS. MYERS:**  Okay.  I have no other questions for this

8  witness at this time, Your Honor.

9          **THE COURT:**  Counsel, do you want me to turn to LA

10  Alliance next?

11         **MS. KUMAR:**  I have no questions, Your Honor.

12         **THE COURT:**  Then back to the City, please.

13         **MS. MITCHELL:**  Your Honor, can we just take a few

14  minutes so I can confer with my colleagues?

15         **THE COURT:**  Certainly, please.  Take your time.

16  Would you like -- so you're not rushed, why don't I get off the

17  bench?

18         **MS. MITCHELL:**  Okay.  Thank you, Your Honor.

19         **THE COURT:**  Thank you.

20     **(Recessed at 10:50 a.m.; reconvened at 11:00 a.m.)**

21         **THE COURT:**  Counsel, we're back on the record and the

22  City's cross-examination.

23         **MS. KUMAR:**  Thank you, Your Honor.  Poonam Kumar on

24  behalf of the City.

25  //

**CROSS EXAMINATION**

**BY MS. KUMAR:**

Q    Mr. Fauble, as part of your employment with the City

Attorney's Office it has become clear, but if you could repeat

for us, have you sat in on City Council meetings?

A    Yes.

Q    How many would you estimate?

A    Thousands.

Q    And have you sat in on or participated in closed sessions

of the City Council?

A    Yes.

Q    Without reference to any particular session or meeting,

how many would you approximate you've sat in on or participated

in?

A    At least many dozens, probably into the hundreds.

Q    Based on your personal experience and your experience and

employment in the City Attorney's Office and in participating

in these sessions and meetings and without reference to any

particular session or meeting, could you describe to us the

ways that the City Council can approve something?

A    Sure.  So I don't know if this is an exhaustive list, but

without reference to any particular meeting, there could be a

vote, there could be unanimous approval, there could be sort of

generalized agreement what I've called approbation to what's

being proposed.  There could be -- well, that would be

Fauble - Cross / By Ms. Kumar                               72

1   approval.  So I -- those are the ones that are coming to mind

2   off hand.

3   Q    In your experience, does the City Council only approve

4   things by vote?

5   A    No.

6   Q    And in your experience, is it unusual for the City Council

7   to approve things not by vote?

8   A    It's not unusual.

9   Q    Ms. Myers in her questioning of you seemed to imply that

10  the City Council must take a vote every time it does anything.

11  Do you believe that to be accurate?

12  A    I do not.

13  Q    I'd like to direct your attention to the City Charter,

14  we'll mark that Exhibit 577 unless it's been marked previously.

15          **MS. MYERS:**  It was.

16          **MS. KUMAR:**  Was it.

17          **THE WITNESS:**  I believe there was specific

18  provisions.  No, these are the specific provisions.

19          **MS. KUMAR:**  Oh, okay, these are the specific

20  provisions.  So maybe we can get that in, is that okay?

21          **MS. MYERS:**  That was marked the whole charter but --

22          **MS. KUMAR:**  Okay.

23      **(Exhibit Number 577 previously marked for identification)**

24  //

25  //

1   **BY MS. KUMAR:**

2   Q    We can mark the entire charter as Exhibit 577, but I'll

3   direct your attention to Section 244 which is on the screen

4   before you.  Do you see that, Mr. Fauble?

5   A    I do, yes.

6   Q    Okay.  And this is the same provision that Ms. Myers

7   directed you to during her direct examination; is that right?

8   A    That's correct.

9   Q    I'm going to direct your attention to the third sentence,

10  which reads, except as otherwise provided in the charter,

11  action by this Council shall be taken by a majority vote of the

12  entire membership of the Council.  Do you see that?

13  A    I do.

14  Q    What do you understand that to mean?

15  A    It means that except as otherwise provided, so possible

16  exceptions, the Council takes an action by a majority vote and

17  the entire membership being 15, means that it needs to be a

18  vote of 8, unless for example, this would be the except part, a

19  higher percentage is required.

20  Q    Okay.  And when you earlier testified that action is a

21  term of art, a legal term of art, I know that you said it was

22  difficult to define, but when you say it was a legal term of

23  art, what do you mean by that?

24  A    I don't mean that -- I think it's narrow or different in

25  meaning from the way people sometimes use action in other

1    contexts.  So, for example -- it's not an example.  I think

2    people sometimes use action as synonymous when anything happens

3    or anything is done.  I don't know anything -- I don't think

4    everything that Council does is an action for purposes of this

5    section.

6    Q    Okay.  So there could be things that the Council does that

7    are short of action as it is used in this section; is that

8    right?

9    A    That's correct.

10   Q    And if it is something short of what is referred to in

11   this section, does that mean in your opinion, that whatever

12   Council did didn't actually happen?

13   A    No, not at all.  And again I --

14   Q    Okay.  Does it mean that the thing that Council did was

15   somehow invalid?

16   A    No.

17   Q    Do you believe that this provision means that the City

18   Council can only do anything by vote?

19   A    No, I believe contrary to that.

20   Q    Now, you described that the charter was a limiting

21   document.  Could you just explain that a little bit more?

22   A    Yes.  So can you imagine two kinds of documents.  One is a

23   document of authorization.  It says, you're allowed to do the

24   following things in only the following ways.  And if we don't

25   provide for it here, you're not allowed to do it.

1       A document of limitation would be something where the

2   understanding is that subject to state or federal law, you have

3   plenary authority to do anything.  And what we've got in this

4   document is telling you what you can't do, so it's a document

5   of limitation.

6   Q    Okay.  I'd now like to direct your attention to Section

7   272 of the City Charter.  This is the section entitled control

8   of litigation, this was also shown to you by Ms. Myers.  Do you

9   recall that?

10  A    Yes, I do.

11  Q    Okay.  So in the third sentence it says the City Attorney

12  shall manage all litigation of the City subject to client

13  direction in accordance with this section.  Do you see that?

14  A    I do.

15  Q    It doesn't use the word action, does it?

16  A    No.

17  Q    It uses the word direction, correct?

18  A    Correct, correct.

19  Q    And it says that direction -- does it say anywhere that

20  direction must happen by vote?

21  A    No.

22  Q    Now, there are certain things that the City Attorney may

23  bring to the attention of the City Council in the course of

24  litigation that do require a vote; isn't that right,

25  Mr. Fauble?

Fauble - Cross / By Ms. Kumar                              76

1  A    Yes.

2  Q    So, for example, the approval of a settlement.

3  A    That would require a vote.

4  Q    Okay.  And just to be clear, this -- the City Attorney's

5  Office, that's your office; isn't that right?

6  A    That's correct.

7  Q    And you frequently have meetings with the City Council

8  that are pursuant to these -- this particular section; isn't

9  that right?

10 A    Yes.

11 Q    And when it says client direction, that could refer to the

12 City Council; is that right?

13 A    Yes, in this context I think it does, okay.

14 Q    Okay.  And it could also refer to the Mayor or other

15 constituencies of the City; is that right?

16 A    That's correct.

17 Q    Okay.  Speaking generally without reference to any

18 particular meeting or session, have you, as an employee as a

19 City Attorney received direction from the City Council with

20 regard to litigation?

21 A    Yes.

22 Q    And without reference to a specific meeting or session,

23 does that direction always come in the form of a vote?

24 A    Definitely not.

25 Q    Okay.  Now I'd like to direct your attention to Exhibit

Fauble - Cross / By Ms. Kumar                              77

1    580 if we can.

2            **MS. KUMAR:**  If we could turn to the second page.

3    Q    Do you recognize this document, Mr. Fauble?

4    A    Yes.

5    Q    What is it?

6    A    It's the City Council agenda for January 31st, 2024.

7    Q    Okay.  And -- I'm sorry, before we go to this, Mr. Fauble,

8    Ms. Myers showed you a number of -- a different agenda for

9    February 17th, 2026.  Do you recall that?

10   A    I do.

11   Q    And do you recall that there were certain other things she

12   showed you that had various verbs, adopt, recommend, et cetera,

13   do you see?

14   A    Yes.

15   Q    Does the fact that someone was -- something was taken to

16   the City Council for a vote mean that a vote was actually

17   necessarily required?

18   A    No, it would depend upon what the item is.

19   Q    Okay.  So there could be instances in which the City

20   Council is asked to vote on some things that may not have been

21   required under the City Charter for a vote; is that right?

22   A    That's correct.

23   Q    So this is the agenda for January 31st, 2024.  If we could

24   turn to item 22 in this agenda.  Do you see that there,

25   Mr. Fauble?

Fauble - Cross / By Ms. Kumar                                    78

1    A    I do.

2    Q    Okay.  And it says here, the City Council may recess to

3    closed session pursuant to Government Code Section 54956.9,

4    Subsection D, Subsection 1 to confer with its legal counsel

5    relative to the case, the Alliance case here.  Did I read that

6    correctly?

7    A    Yes.

8    Q    Okay.  Are you familiar with Government Code Section

9    54956.9?

10   A    I am.

11   Q    Okay.  And what is that, generally speaking, what is that

12   code refer to?

13   A    It refers to some of the bases under which we can go into

14   closed session.

15   Q    Okay.

16   A    Pursuant to the Brown Act.

17   Q    Okay.  So it's the Brown Act, right?

18   A    Yeah, uh-huh.

19   Q    And it allows for certain instances in which a closed

20   session is permissible; is that right?

21   A    That's right.

22   Q    And the Brown Act was -- is a statute; is that right?

23   A    Yes.

24   Q    Passed by the California legislature.

25   A    Correct.

Fauble - Cross / By Ms. Kumar                                    79

1   Q    And D-1, do you recall off hand what that exception refers

2   to?

3   A    Oh, it refers to being a party to litigation.  So it's

4   saying, in effect, you can go into closed session, you, the

5   Council members can go into closed session with -- to confer

6   with your legal counsel regarding litigation in this case, it

7   named the litigation.

8   Q    And so this would, for example -- this is about litigation

9   and we saw the City Charter reference Section 272 also dealing

10  with litigation; is that right?

11  A    Yes.

12  Q    Mr. Fauble, could you just tell us what is the purpose of

13  a closed session?

14  A    Well, it can have various purposes, but if you want -- let

15  me give you two examples and then I'll give you a more abstract

16  statement.

17       So, for example, we can go into closed session to -- we,

18  meaning the City Council, to instruct negotiators in real

19  estate discussions.  We can go into closed session to give

20  directions to or seek advice from the City Attorney.  All of

21  those -- those are two examples.  The purpose then is more

22  abstractly, there are cases in which in order to conduct

23  business in the best interests of the City, it's important that

24  certain kinds of discussions not be open to the public.

25       You can imagine what would happen if there were an open

Fauble - Cross / By Ms. Kumar                              80

1    session in which we had to reveal what our final offer was

2    going to be on a purchase of a piece of property, we get a bad

3    deal.  And the state legislature has struck the balance through

4    the Brown Act as to when it's important enough to be able to go

5    into closed session.

6    Q    Thank you, Mr. Fauble.  I'd like to now direct your

7    attention to Exhibit 581, which is a You Tube video that this

8    Court identified on its own at the last hearing and showed the

9    parties.  If we could bring up 581 will be the entirety --

10        **(Video played)**

11            **MS. KUMAR:**  Sorry.  This is the video of the January

12   31st, 2024 meeting.

13   Q    Just for the record, Mr. Fauble, you stated that you

14   didn't staff this meeting.  Were you present at the meeting?

15   A    I was.

16   Q    Okay.  I'd like to direct your attention to hour 2 minute

17   3 second 18, if we can.

18        **(Video played)**

19   Q    Mr. Fauble, we saw earlier the agenda was item 22 was the

20   one listed as the Alliance litigation; is that right?

21   A    Correct.

22   Q    Do you believe based on what you saw that to be the

23   reference that they were talking about in that clip?

24   A    Yes, that's right.

25   Q    So what was happening in that clip?

Fauble - Cross / By Ms. Kumar                                    81

1   A    So the then Council President Krekorian was saying to the

2   members and the people in the room, we're going to go into

3   closed session, which will then trigger a number of things.

4   The Council sergeants will clear the room of the public, non-

5   essential personnel will leave.  The people, for example, the

6   City Attorney who are relevant to the discussion will probably

7   move to the table to speak to the Council and that would be the

8   beginning of the closed session.

9        So I assume either where you cut it off are very shortly

10  thereafter, the video of the live meeting at that point ended

11  and then we were in closed session.

12  Q    But then the video continues usually with like some sort

13  of blue screen, talking about things the City is doing?

14  A    Yeah, it's like promo stuff for the City and with a little

15  something running along the bottom saying the Council is in

16  closed session, so that the public knows the meeting isn't

17  over, they're in closed session.

18  Q    Okay.  I'd now like to direct your attention to hour 4,

19  minute 32, second 19 of that same video.

20       **(Video played)**

21       **MS. KUMAR:**  We can pause that there.

22  Q    Mr. Fauble, when the City Council adjourned to closed

23  session on this January 31st, 2024 meeting, were you present in

24  the closed session?

25  A    Yes.

Fauble - Cross / By Ms. Kumar                    **82**

1  Q    And when they came back, you heard Mr. Krekorian, who was

2  then City Council President say, after a lengthy closed session

3  discussion.  Did you hear that?

4  A    I did.

5  Q    Okay.  And then he had a colloquy with the City Attorney,

6  the person who was sitting at the City Attorney --

7  A    Yeah.

8  Q    -- marker.  Could you describe to us what was happening?

9  A    So the Council President was asking whether there was

10 any -- whether any action occurred in the closed session that

11 pursuant to the Brown Act would have to be reported out.  The

12 City Attorney said no.  Then it's clear that the Council

13 President realized he had to do the roll call to make sure

14 there was a quorum there, he did that, and then he asked again

15 and he got the same answer.

16 Q    And so when Mr. Krekorian, the City Council President

17 asked if there was anything to report from the closed session,

18 you said that was pursuant to the Brown Act.  Could you explain

19 that?

20 A    Yes.  So there's a section of the Brown Act that explains

21 the circumstances under which actions that occur in closed

22 session need to be reported out.  And if it's not listed there,

23 I don't think you need to report it out.

24 Q    And so that is -- let's talk about -- let's show you

25 Exhibit 582, Section 54957.1, is that the section of the Brown

Fauble - Cross / By Ms. Kumar                    **83**

1    Act you're talking about?

2    A    Yes, it is.

3    Q    Okay.  So if the City Attorney on the video saw that there

4    was no reportable action coming out of the City Council

5    meeting, does that mean nothing happened?

6    A    No, not at all.

7    Q    Okay.  It just means that something that needed to be

8    reported according to this didn't happen; is that right?

9    A    That's correct.

10           **MS. KUMAR:**  Hold on one second, Your Honor.

11           Nothing further at this time, Your Honor.

12           **THE COURT:**  Thank you.  Redirect?

13           Well, first of all, is there any further objection to

14   this exhibit?  There was an objection by the City, to its

15   introduction on the last occasion.  I didn't want to take the

16   time to have Mr. Marcus look at the three or four hours of

17   this.

18           **MS. KUMAR:**  Your Honor, just for the purposes of

19   explaining what we think the Court's misunderstanding of that

20   was, that's why we did the video --

21           **THE COURT:**  Well, counsel --

22           **MS. KUMAR:**  -- since it's in the record.

23           **THE COURT:**  -- that's a speaking objection.  Let's do

24   this again, okay?  Let's do this properly.  Is there any

25   objection foundationally to this exhibit being received?

Fauble - Redirect / By Ms. Myers                                84

1          **MS. KUMAR:**  No, not to foundation, Your Honor.

2          **THE COURT:**  All right.  Thank you very much.

3          This is received.  And did you want this then marked

4    as -- I believe it was 581; is that correct?

5          **MS. KUMAR:**  Yes, 581.

6          **THE COURT:**  Then 581 is received, there's no

7    objection concerning foundation any longer, counsel.

8          **(Exhibit Number 581 received in evidence)**

9          **MS. MYERS:**  Apologies, Your Honor, it's not -- there

10   we go.  Okay.

11                    **REDIRECT EXAMINATION**

12   **BY MS. MYERS:**

13   Q    I'm going to show you what was previously -- Shayla Myers

14   with the Legal Aid Foundation of Los Angeles on behalf of the

15   intervenors.

16        I'm going to show you what was previously marked as

17   Exhibit 575.

18        **(Exhibit Number 575 previously marked for identification)**

19          Are you familiar with this document?

20   A    I believe so.  Would you scroll to the bottom please?

21   Q    Sure.

22   A    Yes.

23   Q    And is this your signature on the document?

24   A    Yes.

25   Q    Did you write this letter?

1   A    Yes.

2   Q    Did you -- so you wrote the statement that says the --

3   under the heading post closed session disclosure requirements

4   regarding the January 31st, 2024 closed session, no settlement

5   or agreement was voted on or approved.  Did you write that

6   statement?

7   A    Yes.

8   Q    And you were present at the closed session.

9   A    Yes.

10  Q    And so this was a representation of your observations

11  about what occurred during that closed session; is that

12  correct?

13  A    Yes.

14  Q    Okay.  And when you said, in fact, no vote was taken, is

15  that a representation of what occurred during that closed

16  session?

17  A    Yes.

18  Q    Okay.  And then I'm going to show you really quickly, I'm

19  going to mark this as --

20          **MS. MYERS:**  Are we at 593?

21          **MS. KUMAR:**  Yes.

22          **THE COURT:**  And this is exhibit what, counsel?

23          **MS. MYERS:**  593, Your Honor.

24          **THE COURT:**  593, thank you.

25      **(Exhibit Number 593 marked for identification)**

Fauble - Redirect / By Ms. Myers                          86

**BY MS. MYERS:**

1   Q    First of all, you testified in response to the City's

2   questions that there are things that the City can do, that the

3   City Council can do that don't require votes, correct?

4   A    Yes.

5   Q    What are those -- can you give us examples of those

6   things?

7   A    Well, it can instruct someone to do something.  It can

8   express approval of something.  It can express disapproval of

9   it.  So those are some examples.

10  Q    And so it's your position and those are things the City

11  can do, the City Council can do without Council vote?

12  A    Yes.

13  Q    Those are -- the City Council can instruct individuals to

14  do things without a Council vote?

15  A    I think so, yes.

16  Q    And what is the basis of your representation that the City

17  Council can instruct departments and other entities to do

18  things without a Council vote?

19  A    Well, again I feel like I'm retestifying over the same

20  material.  So I gave an example, using the city librarian

21  before, which could be an example of there's no vote, but the

22  Council members are clearly in favor of something that he's

23  proposing or maybe they want to change to what he's proposing

24  and there's clear agreement, there's no vote, but it's obvious,

Fauble - Redirect / By Ms. Myers                           87

1   let's say everyone is in favor of it.  And again, this is a

2   hypothetical, the Council President could say something like,

3   okay, do you understand where we are with this and the

4   librarian could say, yeah, I do, thank you.  And I think that

5   would be using -- a competent English speaker would describe

6   that as an instruction.

7   Q    And that is -- so an action like that or I'm sorry a thing

8   like that, to use the Council's term, a thing like that, that

9   instruction, would that appear on an agenda?

10  A    So what would probably be on the agenda would be something

11  like, again this is a hypothetical, report from, you know,

12  librarian on services available at the Central Library.  Again,

13  I'm making this up.

14  Q    Uh-huh.

15  A    On the Central -- if this were an oral report, the city

16  librarian would be at the table in front of the Council

17  describing what he's planning to do in the library and the

18  programs he has and the Council members could be asking

19  questions and expressing views on it, and again, what I as a

20  competent English speaker would describe as instructing the

21  librarian on something, or giving them approval of something.

22  There's no vote there.

23  Q    So that instruction, for which there is no vote, would

24  that appear as on an agenda?

25  A    No.  The general item of business which would be report,

Fauble - Redirect / By Ms. Myers                    88

1   you know again I'm going to make this up, but you know, report

2   by city librarian on, you know, planned services available to

3   Central Library.  So that would be what's on the agenda, for

4   example.

5   Q    And so the instruction would not be on the agenda, the

6   approval would not be on the agenda, but the City Council would

7   instruct and approve --

8   A    Yes.

9   Q    -- even though it's not on the agenda?

10  A    It might not be on the agenda.

11  Q    Okay.

12  A    Right.

13  Q    If it's on the agenda, though, you testified that that

14  would be voted on, correct?

15  A    It could be voted on, yes.  So there could be a

16  recommendation, for example, from the librarian that would be

17  on the agenda.  I would expect that would probably be voted on

18  unless there's a motion to amend it.

19  Q    But if it's on the agenda and it says instruct, it was

20  previously your testimony that that would be voted on by the

21  City Council, correct?

22  A    I think you may be -- so, yes, but I think you're

23  misconstruing my testimony.  Right --

24  Q    The record will certainly speak for itself, but --

25            MS. KUMAR:  Objection, Your Honor, if the witness

EXCEPTIONAL REPORTING SERVICES, INC

 1  could finish his answer.

 2          **THE COURT:**  Finish your answer, sir.

 3          **THE WITNESS:**  So I think, Ms. Myers, you're creating

 4  the impression that unless it's on the agenda -- that any

 5  instruction has to be on the agenda and voted on.

 6  **BY MS. MYERS:**

 7  Q    Yes.

 8  A    That was not my testimony and it is not my testimony.

 9  Q    So it's your -- just so we're clear, it is your testimony

10  that the City Council can instruct and approve things even

11  though they don't appear on the agenda without a vote?

12  A    Correct.

13  Q    Okay.  Where in the charter is that allowed?

14          **MS. KUMAR:**  Objection, Your Honor, asked and answered

15  several times now.

16          **THE COURT:**  Overruled.

17          **THE WITNESS:**  So again I would point for example to

18  Section, I think it's 244 of the charter that says actions

19  require a vote, and then I would again point out to you that

20  the charter is a document of limitation, so it's telling you

21  that things that require, in your characterization, official,

22  you know, approvals require a vote.  But that doesn't mean that

23  everything does.

24  //

25  //

**BY MS. MYERS:**

2    Q    Yeah.  And putting aside your use of the term official,

3    not that I concede that I use that, let's take the word

4    official out of the records, since we're not using the word

5    official, it doesn't appear in the charter, we're talking about

6    actions, right, we're talking about actions by the City

7    Council, correct?

8    A    Yes.

9    Q    Yes, okay.  And so it's your position that there are

10   things the City Council does, like instruct and approve that do

11   not appear on the agenda and do not require a vote but are

12   instructions and approvals by Council; is that correct?

13   A    So the -- I don't think I can give you a simple yes or no

14   to that because there's a little bit of nuance.  Except for --

15   the Brown Act allows for certain things to be taken up that are

16   not on the agenda.  So put those to the side.

17        Everything else is on the agenda, whether the specific

18   approval of a plan say is on their called out, it may not be.

19   That doesn't mean that the general item of business isn't.  So

20   again, my example was the head librarian is on the agenda, is

21   plans for services at the Central Library.  The -- it doesn't

22   call out on the agenda what the specific services would be, but

23   the head -- but it's sufficient for Brown Act purposes that the

24   head librarian could talk about those.  And the City Council

25   could approve of what he's suggesting.

1   Q    And they would do that -- they would express approval how?

2   A    Through discussion.

3   Q    Okay.

4   A    Right, the same way if you get together with a group of

5   people and you're discussing something, you without a vote, can

6   understand perfectly well they've approved what you're

7   proposing.  It's normal human communication.

8   Q    And that's allowed under the charter, it's your testimony

9   that's --

10  A    Yes, my testimony is that --

11  Q    -- allowed?

12  A    -- normal human communication is allowed under the

13  charter.

14  Q    Well, that's not what I'm asking, Mr. Fauble.  Let's just

15  be clear here what I'm asking.  Under the charter of the City

16  of Los Angeles it is your testimony as you sit here today as a

17  representative of the City Attorney's Office, that it is

18  allowed for the City Council to instruct and approve things via

19  discussion.

20  A    Some things, yes, those that don't require a vote.

21  Q    And how do we know what requires a vote?

22  A    So I don't know if I have a perfect answer for you.

23  There's certain things that are called out on the charter that

24  require votes, ordinances, resolutions.

25  Q    Actions?

Fauble - Redirect / By Ms. Myers                           92

1   A    Actions require a vote, but the question here is what's an

2   action I think is what you're getting at.  Certain kinds of

3   findings are required under state law, so you need to make CEQA

4   findings for example.  So I don't think I can give you a

5   formula.  I'd have to go through and see whether there's an

6   actual obligation to vote on a particular issue.

7   Q    Okay.  And your job duty is to instruct the City Council

8   about the Brown Act, correct?

9   A    I advise the City Council on the Brown Act, among other

10  things.

11  Q    And the City Charter, correct?

12  A    Yes, depending on what the section is, there are parts of

13  it that other people know far better than I do.

14  Q    But compliance with the City Charter.

15  A    Yes.

16  Q    And compliance with the city rules.

17  A    Yes.  Again, depends upon the particular circumstance, but

18  yes.

19  Q    Okay.  And you've been doing that for 11 years?

20  A    Approximately, well not quite, but at least nine.

21  Q    Okay.  So I'm going to show you what is marked as Exhibit

22  593.  This is a submission to this Court, Document 1040, filed

23  10/3, 2025.  This was a notice of submission of the defendant

24  City of Los Angeles' updated bed plan.  Are you familiar with

25  this?  Are you familiar with the City's updated bed plan and

1  milestones?

2  A    I know of it.  I don't really know it in any detail.

3  Q    Okay.  I'm going to ask you specifically about the Council

4  approval process.  So I'm going to show you page 2 of 19 of the

5  documentary, which is a report from Matthew Szabo to the City

6  Council, it's -- the subject is the Alliance settlement

7  agreement ASAP, which is the bed plan and strategy.

8       What is a report like this, as you understand it, for

9  purposes of the Council file?

10           MS. KUMAR:  Objection, Your Honor, this postdates the

11  meeting at issue and this has no relevance on to the purported

12  misrepresentation that the Court is reviewing.

13           THE COURT:  Overruled.

14           THE WITNESS:  Well, it appears to me to be a -- I

15  mean, it's titled interim departmental correspondence, I think

16  in effect it's a letter from Matt Szabo, the CAO to the City

17  Council.

18  BY MS. MYERS:

19  Q    Okay.  And it has a Council file number on it, right, 23-

20  1022-S18?

21  A    Correct.

22  Q    And the S18, what does the S stand for?

23  A    It's a subfile.

24  Q    So is it sub or supplement?

25  A    So I thought -- I think it's a sub file 18, but I won't

Fauble - Redirect / By Ms. Myers                              **94**

1    swear to that.

2    Q    Okay.  I'm going to show you now -- I'm going to scroll

3    down and apologies for moving the documents so fast.  I'm going

4    to show you page -- which is Exhibit B, it's Document 10040-2

5    and this is file -- same Council file, correct?

6    A    Yes.

7    Q    And you know that because of the Council number on the

8    top?

9    A    Yep.

10   Q    And this has the same structure as the previous Council

11   file that you -- Council file report that you identified,

12   correct?

13   A    This appears to be a -- I assume it's a clerk document,

14   it's a report from Housing and Homelessness Committee.

15   Q    And so you previously testified that these reports are

16   prepared by the City Clerk but they -- to memorialize actions

17   taken by the specific committees, correct?

18   A    Yes.

19   Q    Okay.  And so the second line of this, I'm sorry the

20   second paragraph says, recommendations for Council action,

21   subject to the approval of the Mayor, correct?

22            **MS. KUMAR:**  Objection, Your Honor, the witness

23   already said he doesn't know this document, isn't familiar with

24   it, asking him to testify would be inappropriate, lacks

25   personal knowledge, foundation.

1              **THE COURT:**  Overruled.

2              **THE WITNESS:**  That's what the document says.

3    BY MS. MYERS:

4    Q    And the first item is to approve the proposed bed plan for

5    2,130 beds for the Alliance settlement agreement, correct?

6    A    It says approve the proposed bed plan, specifies the

7    number of beds or units for the Alliance settlement agreement

8    as detailed by the CAO and a date.

9    Q    Yeah.

10   A    And it's attached.  So that's -- but all I'm doing is I'm

11   reading it, I don't know anything other than what it says on

12   the paper.

13   Q    But you're -- but you have familiarity with these types of

14   Council -- City Council reports as evidenced by your prior

15   testimony, correct?

16   A    Yes.

17   Q    And you had previously asked for examples of the types of

18   documents that are in front of the City Council, correct?

19   A    Yes.

20   Q    Okay.  And so this specific Council file, then the

21   recommendations for Council action include 1, approve, right;

22   2, approve; 3, instruct; 4, instruct; 5, 6, 7, 8, 9, there's a

23   lot of instructions going on, 9, 10, 11, 12, 13, right, are

24   instructions, correct?

25   A    I believe they were all instructions, yes.

Fauble - Redirect / By Ms. Myers                96

1    Q    Okay.

2    A    Or the recommendation rather.  Let me be more precise.

3    According to the City Clerk's report, the -- what came -- what

4    the Housing and Homeless Committee did was recommend the

5    following potential actions by the City Council.

6    Q    And those are to instruct and to approve, correct?

7    A    Correct.

8    Q    And, in fact, approve the bed plan for this case, correct?

9    A    You'd have to move back up for me to see that.

10   Q    Sure.

11   A    Yep.

12   Q    Okay.  And then the last one, note and file, what does it

13   mean to note and file something?

14   A    It basically means we've accepted it, we're really not

15   doing anything with this, thank you very much for the paper,

16   we're putting it in the file.

17   Q    And when it says the Council action, note and file, note

18   and file is a Council action, correct?

19   A    Yes.

20   Q    And that requires a vote, correct?

21   A    Yes.

22   Q    Okay.  And, in fact -- okay, I'm just going to show you

23   the last thing which is Exhibit C, which is the official

24   Council action.  Official action of the Los Angeles City

25   Council?

Fauble - Redirect / By Ms. Myers                    **97**

1   A    Yes, it appears to be.

2   Q    Okay.  And what does this represent to you that the City

3   Council did?

4        **MS. KUMAR:**  Objection, Your Honor, lacks personal

5   knowledge, foundation.

6        **THE COURT:**  Overruled.

7        **THE WITNESS:**  So it appears to be a report by the

8   clerk indicating the action by the Housing -- action by Council

9   on a certain date on a Housing and Homeless Committee report.

10  **BY MS. MYERS:**

11  Q    And that would be this Housing and Homeless Committee

12  report, correct?

13  A    I think, I'm not sure, I think so.

14  Q    Okay.  And it indicates that there was a vote taken,

15  correct?

16  A    Yes, that's what it says.

17  Q    And you know that there was a vote taken, because it says

18  Council vote and then it lists the 15 members of the City

19  Council and what their vote was?

20       **MS. KUMAR:**  Objection, Your Honor, lacks personal

21  knowledge and foundation.

22       **THE COURT:**  Overruled.

23       **THE WITNESS:**  Yes.

24  Q    And this is a vote tally, correct?

25  A    That's what it appears to be, yes.

1  Q    I mean, based on your knowledge as working in the City

2  Council -- for the City Council for the last 11 years --

3  A    Yes.

4  Q    -- this is a vote tally, correct?

5  A    Yes.

6  Q    Okay.  Is this the kind of vote tally that would have been

7  a unanimous vote tally, unanimous?

8  A    I don't --

9         **MS. KUMAR:**  Objection, Your Honor, lacks personal

10  knowledge, foundation.

11         **THE COURT:**  Overruled.

12         **THE WITNESS:**  I don't think I can tell from this.

13  **BY MS. MYERS:**

14  Q    And why can't you tell?

15  A    Well, relating back to the prior discussion, there are no

16  no votes on this, so there was only person who appeared to be

17  absent, the rest are yeses, so I can't tell whether a roll call

18  vote was taken or this was unanimous consent based on this

19  document.

20  Q    Uh-huh.  Unanimous consent vote?

21  A    I don't know.

22  Q    And with unanimous consent vote, it would be recorded the

23  same way though, correct?

24  A    I believe so.  You'd have to ask the clerk and I really

25  should say unanimous approval because that's the language in

Fauble - Redirect / By Ms. Myers                    99

1    the rule.

2    Q    And there's no such thing as unanimous consent, correct?

3    A    I don't believe the Council rules refer to that.  I think

4    they say unanimous approval.

5    Q    Okay.  Are there any other -- we talked about the charter

6    and we talked about the Council rules, are there any other

7    documents that the Court or the parties should be looking at to

8    dictate how the City Council conducts its business?

9    A    Well, state law.

10   Q    Sure.

11   A    Right.

12   Q    Sure.  Other than that?

13   A    Other than -- well, federal law, state law, including

14   constitutions, the charter, Council rules, I think that's it.

15   Q    Okay.  You previously testified that the approval of the

16   settlement requires a vote.

17   A    Yes.

18   Q    And why is that?

19   A    I mean, I should say so settlements that require Council

20   approval require a vote, because it specifically says I believe

21   in the charter that a vote is required, Council action has to -

22   - is required.

23   Q    And where in the charter does it say that?

24   A    I don't remember the number.

25   Q    Is it 272, is that provision related to the City

Fauble - Redirect / By Ms. Myers                    **100**

1    Attorney's Office?

2    A    Might be.

3    Q    We'll pull that up, just so we're clear about this.

4    Apologies.  Okay.

5    A    Why don't --

6    Q    So where in the -- is this the provision you're referring

7    to?

8    A    I think so.  So move up a little bit to see what section

9    we're in.

10   Q    Okay.

11   A    So we appear to be in charter Section 273.

12   Q    Uh-huh.

13   A    Right.  And then this calls out who has authority to

14   settle cases and let's see if we go down to B.3.

15   Q    Uh-huh.

16   A    I believe it says, the Council shall have authority to

17   approve or reject settlement of litigation, falls only the

18   payment of or receipt of money damages and it goes on.

19   Q    Uh-huh.

20   A    So this appears to be at least one provision that calls

21   out the authority of the Council to approve or reject

22   litigation settlements.

23   Q    Yes.  Where does it require the City Council to vote on

24   that approval?

25   A    I don't know.

Fauble - Recross / By Ms. Kumar                           **101**

1    Q    Take your time, feel free.  This is in front of you, take

2    your time, read it, tell me where it says in the charter that

3    the City Council must approve a settlement by vote.

4    A    Well, it says, the Council shall have the authority to

5    approve right there.

6    Q    Yes.  And so approval, your understanding, is that's by

7    vote?

8    A    So I don't think it generally means that.  I've always

9    understood it to require a vote.

10   Q    Okay.

11           **MS. MYERS:**  I don't have any further questions.

12           **THE COURT:**  Thank you.  LA Alliance?

13           **MS. MITCHELL:**  No questions, Your Honor.

14           **THE COURT:**  And back to the City.

15           **MS. KUMAR:**  One minute, Your Honor.

16       **(Pause)**

17                           **RECROSS EXAMINATION**

18   **BY MS. KUMAR:**

19   Q    Okay.  Mr. Fauble, I want to just review some of the

20   things Ms. Myers did in her questioning.

21           **MS. KUMAR:**  If we could bring up Mr. Fauble's letter

22   that Ms. Myers marked as Exhibit 575, it may be something else.

23   It would be 584 in our records, Todd, but for the record it's

24   Exhibit 575.  Oh, sorry.

25           If we could scroll down.

1    Q    Mr. Fauble, does that letter the same letter that

2    Ms. Myers showed you, as far as you can tell?

3    A    Yes, it appears to be.

4    Q    Okay.  If we could turn to -- and this was a letter you

5    wrote in connection with the separate litigation pending in

6    state court; is that right?

7    A    I believe that's right.

8    Q    Before the litigation was filed I believe.

9    A    I think so.  I think this was in response to a cease --

10           **THE COURT:**  Was this in Judge Kin's court?

11           **MS. KUMAR:**  Yes, Your Honor.

12           **THE COURT:**  All right.  Thank you.

13   **BY MS. KUMAR:**

14   Q    And this -- so this was before that action was filed, but

15   based on the same topic, as far as you understand it?

16   A    I believe that's right, yes.

17           **MS. KUMAR:**  If we could turn to page 2 of this letter

18   and -- oh, sorry, it's page 3 of the exhibit, page 2 of the

19   letter.

20   Q    And if we could look at the section under post closed

21   session disclosure requirements, that was the section Ms. Myers

22   referred you to, Mr. Fauble.

23   A    Yes.

24   Q    In the second paragraph it says, regarding the January

25   31st, 2024 closed session no settlement or agreement was voted

Fauble - Recross / By Ms. Kumar                    **103**

1    on or approved.  Do you see that?

2    A    Yes.

3    Q    Is that -- that is a statement of what didn't happen at

4    the meeting; is that right?

5    A    That's correct.

6    Q    And if a settlement or agreement had been voted on or

7    approved, would that have been something that would have been

8    reported out under the Brown Act?

9    A    So if -- it depends.  So if the settlement were -- if the

10   Council were the final approval authority of the settlement, so

11   in other words, the other side had already signed the document,

12   once Council approves it, it's done.  Then per the Brown Act we

13   would report it out.

14       If the settlement were subject to further approvals by

15   other parties, we wouldn't be required to.

16   Q    Okay.  But if it fell into that first category it would

17   have been reported out as part of the Council's actions,

18   correct?

19   A    That's right.

20   Q    And then the second sentence says, in fact, no vote was

21   taken.  Do you see that?

22   A    I do.

23   Q    Okay.  So that also is describing what didn't happen; is

24   that right?

25   A    That's correct.

Fauble - Recross / By Ms. Kumar                                    **104**

1  Q    And then in the third sentence it says, therefore, there

2  could not be anything to report out of the January 31st, 2024

3  closed session; is that right?

4  A    That's right.

5  Q    And again, we're talking about reporting out under the

6  Brown Act; is that right?

7  A    That's correct.

8  Q    Okay.  Does that mean nothing happened in the meeting?

9  A    No.

10 Q    If we could look at Exhibit 593 marked by Ms. Myers.

11        **MS. KUMAR:**  Do we have that?

12        **(Counsel confer)**

13        **MS. KUMAR:**  593.  Is it 1040?  Okay.  Yeah, yeah,

14 yeah.

15 Q    So we're going to direct Exhibit 593, which is Docket

16 entry 1040, okay.  Do you see that document in front of you,

17 Mr. Fauble?

18 A    I do.

19 Q    And you're -- you are not counsel of record in the

20 Alliance case; is that correct?

21 A    Correct.

22 Q    Okay.  And so you were not involved in preparing this

23 document; is that fair?

24 A    That is correct.

25 Q    Okay.  So if we could go to -- so you saw this is a

Fauble - Recross / By Ms. Kumar                                    **105**

1  portion that Ms. Myers -- one portion, it's a letter from

2  Mr. Szabo.  Do you see that?

3  A    I do, yes.

4  Q    Okay.

5           **MS. KUMAR:**  And then if we could go to Exhibit B,

6  page 21, which is 1040-2 on the Docket, still part of Exhibit

7  593.  If we go to the second page.

8  Q    Now again, you're not familiar with this particular

9  report, are you?

10  A    I'm not sure I'd seen it before Ms. Myers showed it to me.

11  Q    Okay.  And this is a report relative to the Alliance

12  settlement agreement; is that right?

13  A    That's what it appears to be.

14  Q    Just if we can scan quickly, do you see any mention of an

15  encampment reduction plan in this document?

16  A    So based on Palma (phonetic) scanning before I didn't.

17  Q    Okay.  So that -- and then separately if the City Council

18  votes on something, does that necessarily mean that the vote

19  was required under the City Council rules or the City Charter?

20  A    It does not mean that.

21  Q    Okay.  If the City Council reported out that it approved

22  something, does that mean that the only way it could approve

23  things is to report out that it did report something -- approve

24  something?

25  A    Sorry, can you reask that question, it was complicated.

Fauble - Recross / By Ms. Kumar                    **106**

1    Q    Yeah, sure.  If we go to the top of this page, number 1,

2    approve the proposed bed plan.  Do you see that?

3    A    I do.

4    Q    Now, Ms. -- does the fact that the City Council stated

5    that it was -- the recommendation for the Housing and

6    Homelessness Committee was to approve the proposed bed plan,

7    first of all does that mean that the City Council was required

8    to approve it necessarily?

9    A    No, they're not required to approve it.

10   Q    Okay.  Your understanding is they were not required to

11   approve this?

12   A    I don't think they're required to approve anything.

13   Q    Okay.  And so they -- but the fact that they said it,

14   right, doesn't mean that it was necessarily required; is that

15   fair?

16   A    Yes.

17   Q    Okay.  And so the -- and in your experience, the City

18   Council can approve things in manner short of a vote, right?

19   A    Yes.

20   Q    And your experience would include attending thousands of

21   City Council meetings; is that right?

22   A    Yes.

23            **MS. KUMAR:**  Nothing further at this time, Your Honor.

24            **THE COURT:**  All right.  Any other questions by any

25   other counsel?

1          **MS. MYERS:**  No, Your Honor.

2          **MS. MITCHELL:**  No, Your Honor, thank you.

3          **THE COURT:**  All right.  Sir, I'm going to ask you to

4   remain available, sir, until this portion concludes.

5          **THE WITNESS:**  Thank you.

6          **THE COURT:**  Thank you very much, you may step down.

7          And, counsel, why don't we go to lunch.  Will 1

8   o'clock be okay for a return?

9          **MS. KUMAR:**  Mr. Szabo's here, Your Honor.  He does

10  have a hard stop at 3:30.

11         **THE COURT:**  Okay.

12         **MS. KUMAR:**  So I'm fine with going to lunch as long

13  as we can all endeavor to get him off the stand today.

14         **THE COURT:**  Oh, that's fair warning.  But 1 o'clock,

15  thank you, have a good lunch.

16         **MS. MITCHELL:**  Thank you, Your Honor.

17      **(Recessed at 11:46 a.m.; reconvened at 1:04 p.m.)**

18         **THE COURT:**  Counsel, good afternoon.  We're back on

19  the record.  I'm sorry.  Good afternoon.  We're back on the

20  record.  Counsel, your next witness, please.

21         **MS. MYERS:**  The intervenors call Matt Szabo to the

22  stand.

23         **THE COURT:**  Thank you.  Mr. Szabo, if you'd please

24  return to the stand.  I don't think it's necessary, but you

25  recall the oath that was administered to you previously; is

108

1    that correct?

2            **MR. SZABO:**  Yes.

3            **THE COURT:**  Thank you, sir.  If you'd please be

4    seated and watch this small --

5            **MATT SZABO, INTERVENOR'S WITNESS, PREVIOUSLY SWORN**

6            **THE COURT:**  Mr. Szabo, welcome back.  Counsel, for

7    just a moment, with Mr. Szabo present, I've been thinking about

8    how this case can move forward for the public good.  I think we

9    all want that, especially with respect to accountability and

10   transparency.  And you know that I've been calling for that a

11   long time.  The settlement that all of you agreed to was

12   enacted in 2022 and it expires in 2027, correct?

13           **MS. KUMAR:**  Yes.

14           **THE COURT:**  Yes.

15           **MS. KUMAR:**  Yes, Your Honor.

16           **THE COURT:**  In fact, is it June or October?  It's

17   June, isn't it?

18           **MS. KUMAR:**  June, I believe, Your Honor.

19           **THE COURT:**  It's June.  Section 7.2 of the settlement

20   agreement calls for the appointment of a data monitor and

21   specifically, it says, quote, the parties will engage a

22   mutually agreed upon third party to provide data collection,

23   analysis, comments, regular public reports on the City's

24   compliance with the terms of this agreement.  The City shall be

25   responsible for paying all fees, if any, or for obtaining

1    grants or other private funding if needed.

2          You as the parties have presented your disagreement

3    to the Court concerning the appointment of a monitor, and it's

4    reflected once again in Document 1045, and I'll read the

5    literal language from that.  Quote, Plaintiffs' LA Alliance for

6    Human Rights, et al., the Alliance, and the City of Los Angeles

7    submit this joint report to update the Court regarding the

8    status of the City Council's approval of the third party

9    monitor contemplated by Section 7.2 of the settlement agreement

10   and the Court's June 2025 order, and to request the Court's

11   review and resolution of the issue pursuant to Section 24 of

12   the settlement agreement.  End of quote.

13         Pursuant to Section 24, I resolved these

14   disagreements on October 14th, 2025, by appointing City

15   Comptroller Kenneth Mejia and Daniel Garrie as the data

16   monitors.  Mr. Skolnick, representing the City, and

17   Ms. Mitchell, representing LA Alliance, agreed to this

18   appointment subject to approval by the City Council.  A

19   representative of the City Attorney's Office was present on

20   that day, and assured the Court that it would have a quick

21   response.

22         For almost a month thereafter, we waited.  There were

23   two agendized motions before the City Council to consider the

24   appointment of the monitor.  It became apparent that the City

25   Council would not act anytime soon.  The Council then referred

1  this matter to the Homeless and Housing Subcommittee.  I think

2  all of us could recognize the immense amount of time that would

3  be taken by any such referral and any subsequent action by the

4  Council.

5          We're now three-and-a-half years into this settlement

6  agreement.  Let me repeat that, three-and-a-half years.  The

7  provision that requires accountability, transparency, and

8  accuracy cannot be enforced without a data monitor.  It is

9  impossible to verify the accuracy of the City's data without a

10  monitor.  And you know Michelle Martinez's report came in last

11  week, saying basically there's procedural noncompliance

12  regardless of any substantive non-compliance.

13          This dispute between the parties is harmful to the

14  public and to the public good.  You can break this impasse, so

15  I'm going to ask the parties to go to the back of the courtroom

16  in just a moment with Mr. Szabo, you're here.  You're the

17  highest representative other than the Mayor and the President

18  of the Council.  And under 7.2, you can control by agreement

19  who the monitor will be.  If you can agree on this, it may

20  bring a new fresh start to goodwill between all of you, which

21  has been hard to come by.  And this would be for the public

22  good.  The Court, depending upon your answer and appointing a

23  monitor, may be inclined to hold this matter in abeyance to see

24  if there can be cooperation on other issues, because there are

25  other issues pending.

1          The public needs the accountability and transparency

2    envisioned in the settlement.  That's an agreement you both

3    entered into.  If we can agree on a monitor, then perhaps there

4    will be an ability to move forward in so many different areas

5    on behalf of our public.  I think our time is spent now.

6          Mr. Szabo, before we get into more of your testimony,

7    if we can understand each of your respective positions about

8    this monitor.  And I want to ask each of you individually, when

9    you come back, what your respective positions are.  My duty

10   right now, I think, is to try to break this impasse if

11   possible.  So, Mr. Szabo, for just a few moments, I think it's

12   time well spent.  I know also and point out to counsel that

13   this is unending amounts of money being spent, and it's only

14   going to increase.

15          **MS. MITCHELL:**  Your Honor, may I just update the

16   Court on the ongoing discussions between the parties?  Because

17   there have been regular meetings and consistent discussions

18   between the parties on this exact issue with Judge Birotte.

19   And I think I --

20          **THE COURT:**  I walled myself off completely.

21          **MS. MITCHELL:**  I understand that, Your Honor.  It's

22   directly relevant to the Court's instruction.

23          **THE COURT:**  If all of you are together at the lectern

24   at the same time, that's a good sign.

25          **MS. KUMAR:**  Your Honor, I don't think we're revealing

**112**

1    what we talked about.  We just want to advise the court that

2    this is an issue that the parties are meeting regularly in good

3    faith about and we have another meeting scheduled --

4            **THE COURT:**  I'm asking for a decision now.  You have

5    the ability to break at least the monitor, and I have to be

6    bound by it.

7            **MS. KUMAR:**  Your Honor, I don't believe we do --

8            **THE COURT:**  Hold on.  Just a moment.  A couple

9    minutes doesn't hurt.

10           **MS. KUMAR:**  Certainly not, Your Honor.

11           **THE COURT:**  I mean, this is time well spent.  This

12   meter's going up to the public detriment, quite frankly, in

13   trying to resolve issues, and this isn't going to be the last

14   of the hearing or the last of the appeal.  This money is better

15   spent on the public good, quite frankly.

16           So if you would have reached this, you can tell

17   me.  Maybe that discussion has led you to an agreement.  But

18   you've had months now, and I'm three and a half years in, and I

19   don't know what's happening with Judge Birotte, and I'm not

20   going to go any further with that.  You can resolve this

21   literally in a couple minutes.

22           **MS. KUMAR:**  Your Honor, I would just note for the

23   record we don't believe we can.

24           **THE COURT:**  Thank you very much.  I'm going to go

25   into recess.  I'm going to ask you in a moment.  I'm going to

1  be polite about this, but I have to be satisfied that I've made

2  the effort to break this.  And I'm trying to humbly make that

3  effort on behalf of the public. And if I don't have some

4  response about when this would occur, then why would I hold

5  this in abeyance?  In other words, I'm going forward, and this

6  might be a fresh start in some of these areas at least, to take

7  some of the sharpness off that.  So that's my humble attempt,

8  okay?

9          And if you come back and you tell me, Judge, that's

10  it, then I'll go forward today with Mr. Szabo or whatever you'd

11  like.  But I'd really like to know just the fact that you

12  gathered for a moment and made the attempt.  And then I would,

13  obvious question, with all these months, why haven't you been

14  able to agree upon a monitor?  Because I'm bound by that.  If

15  you both agree, I'm bound.  So that seems to be the first step

16  to maybe breaking the logjam because that's what's caused a

17  part of the quagmire.  And part of this repetition, part of

18  this concern has been when we referred it back to the counsel,

19  Mr. Szabo, two agendized items, and then they put it to a

20  subcommittee.

21          **MR. SZABO:**  Understood.

22          **THE COURT:**  Without responding.  That is a large part

23  of possibly the pattern of practice here that the Court was

24  concerned about, okay?  So humbly, I'm the one asking, very

25  humbly, on behalf of the public, go make the effort.  And if

1    you haven't decided, then if you want me to go forward, I'm

2    going forward with this hearing.  That's why we're here.  I'll

3    certainly decide 8.2, by the way.  In other words, we'll hear

4    that no matter what.  But if we're going forward on the

5    contempt and the other matters, this is burning up a lot of

6    public money, quite frankly, that can go to much better uses.

7              So all I'm asking you is to go back to the back.  I'm

8    asking why you can't reach a resolution.  Mr. Szabo, why don't

9    you step down?

10         **MS. MITCHELL:**  Thank you, Your Honor.

11         **THE COURT:**  Thank you.  And by the way, if we need

12   Judge Birotte, I'll call him down.

13         **MS. MITCHELL:**  No, Your Honor.

14      **(Recessed at 1:14 p.m.; reconvened at 2:51 p.m.)**

15         **THE COURT:**  I'm sorry, we're back on the record.  All

16   counsel are present.  Mr. Szabo, why don't you come up and join

17   us, sir?  If you would retake the stand, I'd appreciate

18   it.  Mr. Szabo is present, all counsel are present.

19         **MS. KUMAR:**  Good afternoon, Your Honor.  Poonam Kumar

20   on behalf of the City.  The parties have met and discussed.  We

21   all collectively believe we've made very good progress in our

22   sessions before Judge Birotte.  We are on several outstanding

23   issues, including the issue of the data monitor.  We are

24   hopeful we can get to an agreement.  We have another session

25   scheduled for Tuesday before Judge Birotte.  We are hopeful,

1  and they'll correct me, but I vetted this with them, we're

2  hopeful that we can get to an agreement.

3          If we reach an agreement, what I can represent is it

4  will be agendized quickly to obviate the Court's concern about

5  what happened the last time.  It will be agendized quickly

6  before the city council because obviously it is our position

7  that their approval should be sought and received.  And I can

8  also attest that Mr. Szabo spoke with the council president at

9  the break and received a similar --

10         **THE COURT:**  Thank you.  I was going to ask if you'd

11  speak with the mayor and/or the council president or both just

12  to know an opportunity for a fresh start.

13         **MS. KUMAR:**  Yes.  And that that if we reach an

14  agreement with the parties, the intervenors and the Alliance

15  that the council president agreed same, which is what I've

16  already said, which is that it would be agendized quickly

17  after.

18         **THE COURT:**  Okay.  Yeah, I just want to thank all of

19  you.  I've been really mulling this over actually for quite a

20  while as we got deeper in this and I just wanted to make sure

21  that the mayor and the council were aware of our conversation

22  today through you and just hopefully an opportunity to save a

23  huge amount of money that we could devote back.  I know the

24  City's got some financial issues, homeless citizens and maybe

25  just a fresh start for transparency.

1              And this is the one issue I focused on for one

2    reason.  This is the issue that you control.  In other words,

3    unlike some of the other portions, this -- I'm uniquely at your

4    pleasure if you agree.  So, all right now, when do we

5    reconvene?  Because if there's a good faith effort, which I'm

6    hearing there is, then the best thing I could do is give you

7    some latitude and some time and your meeting is next Tuesday?

8              **MS. KUMAR:** Yes, Your Honor.

9              **THE COURT:**  Okay.  The week after or the early part

10   of the next week, what is all your schedules look like?  We've

11   been here quite a while.  And so as long as there's a lot of

12   thought that goes into this, I don't want to rush in terms of

13   time with your contact with the council or the mayor.  I really

14   do believe this could be an opportunity just for the citizens

15   of the homeless and everyone.  And I say that humbly.

16             Can I check my calendar also, get back to you with

17   some dates, give you two or three dates, but I'm thinking

18   probably the second week in March because we were going to

19   reconvene anyway.  I'm going to hold off Mr. Garrie, assuming

20   we may not be going forward, having him fly in and out.  And if

21   it's acceptable, then do you want me to leave the table set

22   just as it is today and recess?  Do you want me to go forward

23   with anything else today and why don't you two discuss?

24             **MS. KUMAR:**  We've already discussed that, Your

25   Honor.  And I believe I can say that the parties would agree

1   that if we could recess and you could schedule it for the

2   second week of March, then we hopefully would have more of a

3   report then.

4           **MS. MYERS:**  That's fine, Your Honor.  I have a -- I

5   have a conflict the second week -- the entire second week of

6   March that I can't get out of.

7           **THE COURT:**  So about the first part of the third

8   week?

9           **MS. MYERS:**  That's great for me, Your honor.

10  Apologies.

11          **THE COURT:**  Generally speaking, I'll make sure that

12  I'm available and try to fit in all of your folks.  So Matt,

13  okay.  Let's see how we can do.

14          Okay.  Listen, we'll be in recess.  We'll get ahold

15  of you next week with some suggested dates.  Ms. Mitchell,

16  okay?

17          **MS. MITCHELL:**  Yes.  That works for us, Your Honor.

18  Thank you.

19          **THE COURT:**  Counsel?  Ms. Myers?

20          **MS. MYERS:**  Thank you, Your Honor.

21          **THE COURT:**  All right.  Let's see if we can get a

22  fresh start then.  Thanks a lot.  Have a good day.

23          **(Proceeding concluded at 2:57 p.m.)**

24

25

118

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    February 19, 2026

            Signed                                   Dated


              *TONI HUDSON, TRANSCRIBER*