**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

### CIVIL MINUTES – GENERAL

Case No: LA CV 20-02291-DOC(KESx)          Date: February 18, 2026

Case Title: LA Alliance for Human Rights, et al v. City of Los Angeles, et al.

PRESENT:    THE HONORABLE DAVID O. CARTER, UNITED STATES DISTRICT JUDGE

|  Karlen Dubon  |  Court Smart  |
| :---: | :---: |
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
| :---: | :---: |
| Elizabeth Mitchell | **City of Los Angeles:** |
|  | Brad Hamburger, Theane Evangelis, Poonam Kumar |
| **Intervenor:** Shayla Myers | **Los Angeles County:** |
|  | Lauren Brody |

PROCEEDINGS:          **EVIDENTIARY HEARING FOR ORDER TO SHOW CAUSE RE CONTEMPT CITY OF LOS ANGELES [1066]** *(Held at Los Angeles First Street)*

Also present, Special Master Michele Martinez and Justice Tom Goethals.

The Court hears witness testimony.

The Court orders the transcript for these proceedings be produced forthwith at the Government's expense, billed at the daily rate. The Court orders the transcript be made available on the public docket immediately.

The transcript will also be available to download on the Court's Cases of Interest webpage, located here: https://www.cacd.uscourts.gov/newsworthy/cases-of-interest.

Th hearing date to be set by the Court.

|  | 2 | : | 26 |
| --- | --- | --- | --- |

Initials of Deputy Clerk: kdu

**cc:**  CourtRecording_CACD@cacd.uscourts.gov
Transcripts_CACD@cacd.uscourts.gov
Reporter_CACD@cacd.uscourts.gov

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, an unincorporated Association, JOSEPH BURK, HARRY TASHDJIAN, KARYN PINSKY, CHARLES MALOW, CHARLES VAN SCOY, GEORGE FREM, GARY WHITTER, and LEANDRO SUAREZ, individuals, )<br><br>              Plaintiffs, )<br><br>      vs. )<br><br>CITY OF LOS ANGELES, a Municipal entity; COUNTY OF LOS ANGELES, a municipal entity; and DOES 1 through 200 inclusive, )<br><br>              Defendants. ) | **Certified Transcript**<br><br>Case No.<br>2:20-cv-02291 DOC (KES) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS
STATUS CONFERENCE
THURSDAY, MARCH 19, 2020
10:00 A.M.
LOS ANGELES, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CA 90012-4565
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFFS:**

SPERTUS LANDES & UMHOFER LLP
BY:  MATTHEW DONALD UMHOFER, ESQ.
     ELIZABETH ANNE MITCHELL, ATTORNEY AT LAW
617 West 7th Street
Suite 200
Los Angeles, California 90017
213-205-6520

**FOR THE DEFENDANT CITY OF LOS ANGELES:**

LOS ANGELES CITY ATTORNEY'S OFFICE
BY:  SCOTT D. MARCUS, ESQ.
200 North Main Street
7th Floor, Room 675
Los Angeles, California 90012
213-978-7558

**FOR THE DEFENDANT COUNTY OF LOS ANGELES:**

FOLEY & LARDNER LLP
BY:  BYRON J. McLAIN, ESQ.
555 South Flower Street
Suite 3300
Los Angeles, California 90071-2411
213-972-4500

**FOR THE INTERVENOR ORANGE COUNTY CATHOLIC WORKER:**

CAROL A. SOBEL LAW OFFICES
BY:  CAROL A. SOBEL, ATTORNEY AT LAW
725 Arizona Avenue
Suite 300
Santa Monica, California 90401
310-393-3055

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**
**(Continued:)**

**FOR THE INTERVENOR LOS ANGELES CATHOLIC WORKER:**

SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP
BY:  CATHERINE ELIZABETH SWEETSER, ATTORNEY AT LAW
11543 West Olympic Boulevard
Los Angeles, California 90064
310-396-0731

**FOR THE LEGAL AID FOUNDATION OF LOS ANGELES ON BEHALF OF INTERVENOR L.A. CATHOLIC WORKER AND LOS ANGELES COMMUNITY ACTION NETWORK:**

LEGAL AID FOUNDATION OF LOS ANGELES
BY:  SHAYLA RENEE MYERS, ATTORNEY AT LAW
7000 South Broadway
Los Angeles, California 90003
213-640-3983

**ALSO PRESENT:**

Honorable Judge Andre Birotte, Federal Judge

Honorable Judge Philip S. Gutierrez, Federal Judge

Honorable Judge James Smith - Special Master

Thomas Fawn - Senior Assistant County Counsel, County of Los Angeles

Brooke Weitzman - Intervenor Orange County Catholic Worker

Scott Marcus - Los Angeles City Attorney's Office

Jessica Mariani - Los Angeles City Attorney's Office

Mike Feuer - Los Angeles City Attorney's Office

Kevin de Leon - Los Angeles City Council

**UNITED STATES DISTRICT COURT**

**APPEARANCES OF COUNSEL:**
**(Continued:)**

**ALSO PRESENT:**

Michele Martinez - Chief Dot Connector

Juan Garza - Mayor of Bellflower

Miguel A. Pulido - Mayor of Santa Ana

Yvette Ahlstrom - Elimination Foundation

Paul Cho - Elimination Foundation

Paul Leon - CEO of Elimination Foundation

Gary Kranker - Whittier City Attorney

Joe Vinatieri - Mayor of Whittier

Kathryn Barger - Los Angeles County Supervisor

Heidi Marsdon - Interim LAHSA

Aleen Langton - LAHSA

Nury Martinez - Los Angeles City Council President

Ken Price

Jackie Lacey - Los Angeles County District Attorney

Robert Cartwright - Assistant Los Angeles County Counsel

Gabriel Dermer - Los Angeles City Attorney's Office

Brandon Young - Manatt, Phelps & Phillips

**UNITED STATES DISTRICT COURT**

**APPEARANCES:**
**(Continued:)**

**ALSO PRESENT:**

Byron McLain - Foley & Lardner

Rodrigo Castro-Silva - Los Angeles County Counsel

Mark Ridley-Thomas - Los Angeles County Supervisor

Michel Moore - Los Angeles Police Chief

Ralph Terrazas - Los Angeles Fire Chief

Commissioner Kenneth Hodder - The Salvation Army

Lieutenant Colonel John Chamness - The Salvation Army

Miguel Santiago - California Assemblyman

Bill Taormina

**LOS ANGELES, CALIFORNIA; THURSDAY, MARCH 19, 2020**

**10:00 A.M.**

**- - -**

THE COURT:  Well, first, good morning.  If you would try to find a seat and be as distant as you can from normally our wonderful and collegial executive and legislative and court family, it would be appreciated.

So it's a huge courtroom.  We planned it that way.  But if you can get six feet apart, we would actually appreciate it.  Okay?  There's plenty of room.  That's not quite six feet, but we're working on it.  Okay.  And there's -- we tried to supply sanitary, you know, for you as best we can.

A couple of general thoughts.  I'm going to get right into business.  And for counsel, I'm calling the matter of *L.A. First Alliance for Human Rights versus City of Los Angeles*.  But believe it or not, I don't even want your appearances at this time, although I'm going to spend a good part of the day with you.  We're going to get our elected officials back doing what they do best in this critical time.  That's making good decisions on all of our part.

And although we've called you together concerning the homeless, whatever happens concerning the homeless community, they're not a socially acceptable distance right now, and I think we're all on the same page collaboratively, and that is, you know, if we can do something through your good

UNITED STATES DISTRICT COURT

graces, and if the Court can be of a benefit and not a hindrance in this matter, then we're working together, hopefully saving time.

The other thing is this is eventually, unfortunately, going to probably affect our citizens who are able to socially distance, which our homeless community is not. If it breaks out in the homeless community, I don't think any of the socially distanced community is going to be safe in any way, shape, or form. And from whatever I read, this may come in waves over a long period of time. So at some point most of us are going to be exposed and hopefully survive.

I'm not going to stand on further ado. I'm going to call on Mayor Garcetti. I'm going to call you Eric from now on. Okay? I'm Dave or whoever you want to call me when you're done.

And Kathryn Barger, I'm going to call on you next.

And then we've got a little bit of a program. Let me give you an overlay. With transparency, we're going to talk about our phone call last night, who was on it, and I'm going to ask at the end of the day for the plaintiffs' and defense counsel -- and by the way, you can use your cell phones at any time. Okay? Keep those conversations going. Because I don't want to hold another one of these.

But I'm going to ask the parties, if eventually you trust this Court or another member of the Court as the other

community that we've been involved in has trusted us, I need the following from you.  If not a settlement, I need the ability to reach out in an ex parte situation and make a call to Eric or to Kathryn or to you or to you, but share that transparently and get you together as a court family as we work together, because together we accomplished a tremendous amount before.  But if I don't have that ex parte ability to communicate, I can't hold these kinds of meetings timely enough for this wave that's about to hit us.  The same thing, that means you have to trust me.

We can do it in two ways.  You can enter into a temporary settlement for a month setting out those parameters or three months but not -- certainly not a consent decree and not over a period of time.  These issues have to be worked out.

So at the end of the day I'm going to spend quite a bit of time with you, but we're getting folks on the way.

So, Mayor Garcetti, the lectern is yours.  You can remain seated.  If you have notes, you can go to the lectern.  There's --

MAYOR GARCETTI:  What's best for you?  Is it best for me to go there?

THE COURT:  Whatever is good for you.

MAYOR GARCETTI:  I'll go up there.

THE COURT:  I think our goal is the same.  Let's get collaborative.  If the courts can help you, let's save some

lives as fast as we can.

MAYOR GARCETTI: Thank you so much, Your Honor. And it's great to be here at the first convening of the Judge Carter Fan Club meeting, Los Angeles chapter.

THE COURT: Tell me that in a couple weeks.

MAYOR GARCETTI: Yeah, exactly. Appreciate you and appreciate the energy you've brought to the most pressing humanitarian crisis of our time, certainly in Southern California, across California, and too much of America.

As you're well aware, overlaid on this right now is the most existential crisis we have, which is the coronavirus spread and COVID-19. And I want to thank Kathryn Barger and our County and our other fellow mayors, not just in the County of Los Angeles but across the counties of Southern California, for really acting more as a single organism that I've ever seen in my life. When it comes to homelessness, I think it's a pretty fitting model, too, that it's about breaking down all the boundaries that have separated us, all those borders that distinguish us.

But we're in the midst of a global emergency unprecedented in recent modern history. We know that the novel Coronavirus is now in 150 different countries of the world. It's only a matter of time before every corner of the globe has it.

And I think there's considerable fear and anxiety,

**UNITED STATES DISTRICT COURT**

especially for those of us who have a deep caring for those who are not only the most vulnerable but the most susceptible; most vulnerable because they're much more likely to have underlying health conditions which the public health officials, of course, tell us makes them more likely to die, and most susceptible because of the way they're living right now and where they're clustered together.

So the City and the County have been working around the clock really hand in glove in a County that already has good relationships between City and County. I know that's not always the case. But here we do, and it's been even closer. But we know that our homeless neighbors that are out there today with the underlying health conditions that I described and living in environments that put them at a higher risk, we have a special obligation.

So let me thank you for letting me go back to the rest of the work shortly. But between testing, bed capacity, restrictions on people's movements right now, closures of businesses, this is one of the five, I would say, equal pillars of our fight right now against coronavirus and its spread.

We had the first death of somebody who is homeless in Northern California from COVID-19. We have no confirmed cases here of anybody homeless. But we know, of course, like all of us that the actual number of cases is dozens above -- by a factor of dozens above what we are officially reporting.

So to protect the unhoused population during this public health emergency, at the beginning of this I asked my team to start drawing up what sort of plans we could do in this emergency.  And I want to be clear, I took that direction first from Dr. Barbara Ferrer.  Really had some pushes back and forth about what is the public health advice and -- because there was some service providers, others who said, "No, maybe keeping people on the street is better."  She has been, at least with me, and I think the county's direction has been crystal clear, that this is best prevented and treated indoors, not outdoors. That's the first principle.

And so the City of Los Angeles, I asked what would it take for us to take decisive action, to be not looking at dozens as we usually do when we celebrate the opening of a shelter or even hundreds but thousands of people off of our streets.

So we're increasing in advance of that outreach together LAHSA, the City, the County, and other cities to educate those Angelenos experiencing homelessness about the disease.  They, like anybody who is housed, want to save their lives and want to be healthy.  When people ask, "How are you going to get them off the streets?" everybody wants to care for themselves, whether they are lucky enough to be in housing or not.

And so we added critical resources right away.  I

think there's over 250 new handwashing stations already deployed, another 60 on the way or deployed as well for a total of 310. 120 mobile bathrooms on the way in addition to the many mobile bathrooms that we put up in encampment sites months before this as well.

And these interventions may sound basic, but whether it's that or continuing street sweeping even as we relax ticketing for that, these things are critical to public health around and in encampments as well to improve hygiene, to flatten the curve of local infections, and to prepare the County and the health system better for the onslaught of beds that will be taken.

And, also, in coordination with the County, we've made plans to isolate and quarantine unhoused individuals, either at and/or away from shelters. Nobody will go into a shelter who's exhibiting those symptoms. That vetting will happen with County public health officials before anybody boards a bus and is transported to these areas.

And our preparation to isolate and quarantine unhoused patients is happening several levels of government. County led, as of yesterday -- or two days ago, excuse me, 34 RVs have been placed by the County for isolation units for COVID-confirmed cases. 124 motel rooms have been acquired by the County for symptomatic COVID-unconfirmed cases.

And the County, with assistance from the City, has

13

been engaging hotel and motel owners who are about to go out of business, so it's actually a good time to help them and help this crisis, to begin designating rooms with bathrooms with quarantine and isolation.

To be clear, the County has to do that simultaneously for housed people and unhoused people. But there's no discrimination on that, and the highest priority goes to those most at risk. That is disproportionately going to help those who are unhoused given their underlying health conditions.

Second, city-led efforts, we've acquired 50 pallet shelters that will be delivered Friday. We got 50 of, I think, the last 75 left in America from this company. We're looking at the potential placement of these pallet shelters in parking lots in City Council District 13, Mitch O'Farrell, who asked if we could put them there. We're considering them for quarantine and isolation use. So, if somebody has symptoms, immediately be able to take them into essentially their own housing, almost like a mini-home for them to be able to be in for the period of quarantine and then take the direction from public health.

One of the reasons we were advised by public health also to look at this with proper spacing using the 35 tenets of the CDC's recommendations for homeless shelters is because -- everything from making sure people are head to toe properly spaced, we're looking at whether there can be even partitions.

UNITED STATES DISTRICT COURT

14

But we took that advice because the public health officials said this is a place where we can monitor better. We cannot monitor very well on the street. Of course, this is right now voluntary.

And we know that our homeless neighbors, like the rest of us, are safer and healthier when they're indoors. So I've exercised my emergency authority under the City Charter and our administrative code to extend the winter shelter period which would be ending just next week on March 21st until this crisis is over. So indefinitely.

THE COURT: Okay.

MAYOR GARCETTI: And then a couple last notes. Over the past 19 months before this crisis hit, we had been part of a historic surge of bridge-housing shelters. These are shelters that have your own little area, pets, partners, possessions, all those things can come in, low barrier. You stay there. You're not kicked out during the day.

So today we have 12 of those open with 813 beds. We had 14 due to open by July 1st. And I can tell you we're pressing the accelerator on that so that we will have over 2,200 beds that didn't exist just 18 months ago on top of our plans to take 1600 people, we believe, or have capacity for 1600 people by the end of this weekend.

Think about that. 18 months to get 2200. When this happens, it will be in four or five days, 1,600 additional

UNITED STATES DISTRICT COURT

beds.  And then a second phase will go to 29 additional recreation centers and have a full capacity when we're done of 6,006 beds.

So we're working to identify with LAHSA who's prioritized the 4,000 most vulnerable folks that are in their system to make sure that we're making the contact with them and offering these beds to them first.  This will make it easier for the at-risk population to practice safe social distancing, to remain visible to outreach workers who are focused on getting them crucial services.

And we'll also work to relocate vulnerable Angelenos indoors into low barrier congregate settings.  So this isn't just something that we'll probably be doing over the long term for those that are unhoused.  As our hospital beds are overwhelmed, we can expect that those of us that live in housing will need to go to those low barrier settings as well and isolation in hotels, motels, et cetera, if they cannot stay at home in a safe space.

And with our partners at LAHSA, as I mentioned, this is really -- I want to thank our rec and parks, our emergency operations center -- I've never seen this before -- and the Red Cross, we have obtained, you know, 6,000 beds -- actually 7,000 cots, all the blankets.  We've put in the orders for everything we need for sanitation.  Not every rec center is equal.  They don't all have showers.  But our Department of Transportation

buses will take people for their showers to those rec centers that have them if they're staying at one that doesn't. And this will be paid for through City dollars, state aid, and federal dollars, we believe, through FEMA reimbursements now that I've mobilized emergency workers.

So this means together with the existing shelters and ones opening, we can bring 7,000 unhoused Angelenos off the streets and into emergency housing.

One last note, which is not about COVID but is, I think, very important, up and down the state, Mayor Pulido and I are part of the big 13 mayors, we've been talking every single night, and we appreciated the contact as well from you last night. We need to plan for the moment this crisis winds down to make sure that folks that we bring in aren't just thrown back out on the streets.

THE COURT: Right.

MAYOR GARCETTI: And whether that federal aid will be there, whether the state dollars that have been promised from the legislature and Governor Newsom yesterday can be used for that, we're going to have to look everywhere, but this is an opportunity to not let this crisis go to waste and to say not only did we save lives during this crisis, but we finally healed those lives and brought people home.

So I'm encouraged that that money is coming. It's $100 million directly to local governments and $50 million in

trailers and to lease rooms in hotels and motels. And whether it's leads you've given us from North Dakota, oil and gas employee housing, whether it is the trailers, the tiny homes, we have to look all over to be able to make sure at a time of scarce resources that we can make this happen.

So in closing, let me say as the mayor of Los Angeles, I can assure the Court that the City is committed before this crisis, during this crisis, and after this crisis to doing everything that we can to listen and to bring together a coalition of folks. You never make 100 percent of people happy.

THE COURT: Right.

MAYOR GARCETTI: But for those who will say, "You're never doing anything right," and for those who say, "I never want anything in my neighborhood," there is a huge wide berth in between of, I think, you've seen in our actions and our willingness to stand up on both sides to be able to say let's keep moving forward.

Never stop listening to people no matter how they communicate, because often there's kernels of truth to what everybody is saying. But we're very excited. Your coalition-building powers are part of this and your wide shoulders, as you said, to be able to say from a federal court perspective that this needs to keep going. I would only ask that of you, help us keep momentum, help us keep momentum, help

us keep momentum.  These are trying days for our city, but we will get through them together.

THE COURT:  Don't go away.  And I can't tell you how much you're appreciated.  Let's have a conversation transparently.  And I'm not going to allow counsel to enter into this.

MAYOR GARCETTI:  Okay.

THE COURT:  It's just -- it's a very complimentary conversation, by the way.

First of all, I want all counsel to know that we started ex parte communications immediately when a wonderful colleague of mine, Steve Wolfson, and I had a conversation last Friday.  This was actually Judge Wolfson's case.  We go back for many, many years.  We had a collegial conversation about who's going to take this case.  And so let me tell you how this ended up.  And by the way, if you get rid of me, it's no problem at all.

MAYOR GARCETTI:  We don't want that.

THE COURT:  First of all, in Orange County we had what's perceived to be a modicum of success.  And I want to lay out how that was to the parties so we discuss this later on.  First of all, *Boise* is a decent and good case, but when Judge Berzon wrote this, you can read *Boise* as requiring 100 percent.

So let's say we have 35- to 38,000 homeless in

Los Angeles with Juan Garza, the president of the League of Cities will tell me we have probably another 20,000 in the surrounding cities. Well, *Boise* could be read that we take 100 percent of that, Mayor, and we say you have to build 38,000 shelters.

I'm not certain if I'm going against *Boise*, but in working with Carol and Brooke down in our part of the world and other folks who are involved on the plaintiff and defendant's side, we came together and came up with this thought and idea; that all of your homeless aren't going to go into shelters. In fact, some are going to avoid it. Whether they're using narcotics, et cetera, you're not going to save every soul, although we're going to try.

And, therefore, in the Santa Ana River we had this -- and you need to hear why we're at these numbers. We took the unheard of step of walking down the river before it was cleared, and there weren't a thousand people on the river, there were about 1400. And when we put out two-weeks' notice, we saw people walking away.

So in a good faith, the plaintiffs' counsel came and said to us, "Look, the number is about 81 percent because we have 1,000 people on the river and 810 wanted shelter." There was also a different number, and that is for weeks 3- or 400 people had walked away. So I took the lowest number. That's the first time I thought I was in trouble with one of the

**UNITED STATES DISTRICT COURT**

parties. I took the 60 percent. So, therefore, it was, in a sense, a defendant's number at the time. And we held pretty close to 60 percent in the 11 or 12 encampments that we've gone out.

Now, I want to tell you and share with you how many mistakes I've made and how many times I've tried to back up and get it right. It's very humbling. I didn't recognize the number of women. I didn't recognize the number of people who had lost their homes. I didn't recognize the number of veterans. I probably started off with the perception that most of these were criminals. But what I found was a huge degree of mental illness. And I found an awful lot of people who had lost their homes from UCI -- UCI students and dock workers and, I'll name it, Disneyland workers and Angel workers and just good people out there also.

And then the multitude, I also found, quite frankly, that most of those were homegrown. They didn't come from Los Angeles or from another state, they came from Orange County. And I was surprised.

That's why the 60 percent number. And what I find fault with me about is this: If I write an order, you folks are stuck with that for ten years. That's a federal order, and some other case has to go along with that; otherwise, you have this order. So I've taken a 60 percent figure, right or wrong.

But in working with my cities -- and I'll tell you

about the L.A. supervisor in just a moment also, because you've been very helpful with this -- what we're finding is that we're holding not only to about 60 percent of the number, but what happens in a year, Mayor, if you and the supervisor have been successful and you've swept your city and the people who want to go into shelter have gone into shelter?  And now we're done to 30 percent.

I shouldn't be at that 60 percent.  I need you to come back to me working together and say, "You know, Dave, we're about 30 to 40 percent we're showing in this last year, and we don't need 30 to 40 percent emergency shelter.  It's badly spent money."  So, therefore, I want that continuing interplay in negotiations so we're spending your money wisely and quickly from the Court's perspective and you don't have that hindsight of our wisdom that you're stuck with as a bright line duty.  So that's what I'm offering back to you.  That collaboration is absolutely critical that our courts are flexible.

Second, I want to introduce you to two wonderful colleagues.  Well, first of all, Judge Smith who's been with me from the beginning, he's my former friend because he's probably given over $1.5 million of free time that he would normally charge, so I call him my former friend.

But Andre Birotte, who is my colleague, and Phil Gutierrez, would you folks stand up.  I personally asked these

jurists to become involved. And in the finishing colloquy I have with the mayor, Phil, if you have any questions, just blurt them out. Fair enough? Okay.

We only have jurisdiction over three cases. 18 other cases have come in voluntarily who were never going to be sued and held up their hand and said, "Judge, I want to be sued," because they want to be tucked under the federal umbrella, and they wanted to know going forward what they could do, not what they couldn't do. Because the end result working all together, we came up with some parameter and some ability to move forward. Because otherwise, it's a chilling effect. And it's a chilling effect that five or six judges are making a decision, because which judge's decision do you start playing to? So you are always chilled.

I think our courts are offering you a real opportunity for collaboration from our point of view and a real good discussion with both these parties later today to try to either reach a negotiation or hammer one out that will give us all some guidelines so you're not chilled in any way and you do that in record time.

I think the last thing I'd say is that the reason you came to me was, frankly, we're negotiating with 16 other cities in Los Angeles at the present time. It's a slow walk, but Bellflower has settled. We were just talking to Whittier today, not quite certain where they're at, but I think they're

**UNITED STATES DISTRICT COURT**

the next ones up.  And I'll say to Joe -- Mayor Joe is here.  I just know Joe by "Joe" because we call each other all the time.

But there's 14 or 15 other cities who have been into my chambers.  And what's happening is this is starting to speed along.  So whatever happens in Downtown L.A., we've got to be careful with our surrounding cities, which you well know, which is why Juan Garza is here, and a lot of other mayors who wanted to come that we turned away because we didn't want over 50.  Because if, in fact, folks migrate, they're going to go out to your residential areas, your surrounding cities.  So whatever we're doing, hopefully we're containing it here, we're getting some things to you much needed.

Finally, let me say this:  You've done a fabulous job.  Judges aren't supposed to say that.  Thank you very much.

MAYOR GARCETTI:  Thank you.

THE COURT:  And the next thing I would say to you is this:  I think you're going to see us in a few moments, and your staff can make the decision because I want to get you out of here, along with the supervisor, if you leave somebody to listen to this presentation, I think we're going to be able to augment, if you choose, a huge amount of resources.

Now, let me disclose to all parties, I can't tell you the number of phone calls, but I'll tell you the last one.  They got my home number through some colleagues.  I got a call at 8:15.  I thought it was just Rusty Bailey, the mayor of

Riverside, who we've talked, but it was the mayor from Los Angeles, Stockton, Oakland, San Diego --

MAYOR GARCETTI: The 13 most popular cities.

THE COURT: -- 13, yeah, all on the phone. And I thought --

MAYOR GARCETTI: Your Honor, I didn't call because I don't know what these rules are, I'm not a lawyer, but Mayor Pulido brought him in.

THE COURT: So I want to disclose to the parties that that's the way I've got to be able to operate. If the mayors want to call me individually or collectively, or Kathryn, you want to call me, I have to have that ability or I can't function. And just go litigate, which is wasteful. We need to hammer this out.

So at the end of the day, you have got to give me that consent or just go litigate. The phone's open to you, period.

MAYOR GARCETTI: Thank you.

THE COURT: And I think this: I think that your cities are going to come running with consent decrees and tuck under the federal umbrella, but they need help. We're paying attention, and we should, to Los Angeles and San Francisco. It's our smaller cities right now who don't have that financial backing but the supervisors, quite frankly, have been very helpful in getting.

UNITED STATES DISTRICT COURT

Janice Hahn and your colleague and you, Kathryn, have stepped forward and tried to step forward with funding. But they need a funding source also, and we need to get that message out to the governor who, by the way, had his staff on the phone at 10:00 o'clock after the call.

Lastly, help me, I've got 14 to 20 percent of folks out there who have done nothing with women who have to dress up over the top of their head.

Jimmy, what time did we go out in the morning? What time did we appear on the scene?

JUDGE SMITH: 4:30, 4:45, 5:30.

THE COURT: 4:30 a.m. because your homeless are moving. They're not working on County hours or my hours. They're moving at 4:30. And by 6:00 o'clock you're not finding the homeless. They're scattering.

So what are we going to do with that 14 to 20 percent who are truly bipolar when we closed our mental hospitals, who I can't put inside a shelter because they'll tear it apart and they've done absolutely nothing wrong? And that I'm going to ask you -- and I think Gavin's fully on board with our conversations last night, so I'm paying compliments today, I think he's recognizing that whether it's Norwalk, Fairview, Sonoma, those hospitals have to be opened up in some form to contain these people. I want to ask your help because I've been on that bandwagon from day one.

26

And number two, if we get these for the local folks here in the state of California, maybe we're not getting people shipped in off Princess Cruise -- I'm just kidding you -- but we need those facilities anyway for our own state, and we're going to have to have them sooner or later.  Sooner is better.

I'm going to ask you to leave a staff member here.

MAYOR GARCETTI:  Yes.

THE COURT:  I want to compliment you on these motel rooms.  I have the personal opinion that they're transitory, but their transitional in the sense -- and I think we're going to be able to offer you 20,000 units really quick out of North Dakota.  And if anybody doesn't like them, I'm going to invite today, give me a better solution.  Show me the pop-up tents that are supposed to be coming, show me the spring tents, tell me why the price is wrong, et cetera.  And if you don't like this alternative, just give me an alternative.

Number two, Michelle Martinez in Santa Ana hammered out and knocked down all of the barriers because she put a building inspector onsite.  So when we went for a permit, we didn't go into an office and wait for a good person who was doing their job to take 24 to 36 hours or two weeks.  They're well-intentioned people.  But I'm encouraging you, if we get some trucks down here that we're going to talk about, we've got 40 trucks ready to roll, if you'd like it.

The last thing I'll disclose to counsel is this:  If

UNITED STATES DISTRICT COURT

L.A. doesn't want it, Dave, you're the mayor of Stanton, you want some?  Joe, you want some out in Anaheim?  Sure.  I just got off the phone with Harry Sidhu.  He wants some.

Here's my concern:  Can we transition these trailers fast enough to help our Los Angeles community?  Because if we're going to a hookup with a sewer system and you can't accomplish it quickly, as I said to the mayors last night, we can't wait with that valuable resource.  I want to get them up to Oakland for the governor or whatever.  And so, therefore, please leave somebody here for this presentation.

MAYOR GARCETTI:  We'll have somebody here throughout.  And if you'll permit me 15 seconds, we appreciate that.  Our goal, also, is not to have an order but to have a collaboration.

THE COURT:  Exactly.

MAYOR GARCETTI:  Second, the flexibility we greatly appreciate.  And know that even though I was presenting on our plan amidst this crisis, you will hear from the City what we're doing -- permanent housing, special services, working with veterans -- which I know is near and dear to our hearts, and we've reduced by 80 percent in this city.

There's a lot of other aspects of this that I know will be in the larger case, but you asked us to come today because of COVID-19.

THE COURT:  Yeah.

**UNITED STATES DISTRICT COURT**

MAYOR GARCETTI:  And Council President Nury Martinez is here representing incredible City Council.

THE COURT:  Right.

MAYOR GARCETTI:  Beautiful leadership.  And we'd love other cities to be involved if they want to be in this.  So we are not in any way -- we know that this problem has no borders, and the solutions need to have no borders as well.  We very much appreciate you.

THE COURT:  Okay.  Mayor, just a moment.

Jimmy, any thoughts?  Any thoughts on your part?

JUDGE SMITH:  No.

THE COURT:  Okay.  Let's do this:  I have no jurisdiction right now.  Understand?

MAYOR GARCETTI:  Yes.

THE COURT:  The defendants are here by choice.  They haven't even been served.  But I couldn't wait for the 60 days and the answer.  So you were invited today.  I really appreciate your courtesy.  I promise that we're going to have uniformity back from the courts from all of us as colleagues trying to be cooperative and collaborative within reason as we talk to the parties today to get some reasonableness, which is why I have allowed the intervention on the plaintiffs' side of every potential plaintiff we can get here, because there will be disputes between the plaintiffs, and they're going to have to come to some agreement basically to give us some guidance.

**UNITED STATES DISTRICT COURT**

Fair enough?

MAYOR GARCETTI: Thank you.

THE COURT: Okay. We can work together.

MAYOR GARCETTI: My sister, I'm sitting down. You're smart to do that.

THE COURT: And Mayor, listen, would you designate somebody by name, because I'd like to be able to call you as early as tonight and as late as tomorrow morning.

MAYOR GARCETTI: Could you stay?

THE COURT: Okay. Could one of you stay --

MAYOR GARCETTI: So Christina Miller, who's deputy mayor of City Homelessness Initiatives, our first deputy mayor, and my deputy chief of staff, one of them will always be here.

THE COURT: Perfect. Let's get you back. That way you're reporting back to the mayor, not through my eyes tonight. And we'll talk as early as tonight or as late as tomorrow. Okay? But you're reporting back through your eyes. And I want you to listen to this presentation and keep asking -- we're not necessarily in favor or disfavor of what you're about to hear, but what else is out there. And if we can get 20- and maybe 30,000 units down here -- we got 40 trucks up there ready to roll. It depends upon how fast we can sequence. And if we can't, then just tell me. Let's get these up to Oakland if they're interested with some of the other mayors. Okay? Fair enough?

UNITED STATES DISTRICT COURT

Mayor, I can't thank you enough.  Stay as long or as little as you'd like.  You're socially distanced.  Go take good care of yourself and make great decisions for us.

Kathryn, please.

MS. BARGER:  Thank you.  First of all, I want to thank Mayor Garcetti, because this is about all hands on deck.

THE COURT:  Yeah.

MS. BARGER:  And while L.A. city is probably ground zero for where the greatest number of homeless are located, the impact it has throughout all of L.A. County -- Whittier, Bellflower, Pasadena -- it's still really a humanitarian crisis.  And I view being in this court today not as adversarial, but actually, I think we're all on the same page.

THE COURT:  We are.

MS. BARGER:  And the plaintiffs, quite frankly, have been in our office, and we've talked to them, and we wanted to work toward addressing this issue.  So I don't view this as us against them because we're all in this together.  And working with all of our 87 other cities along with L.A. city is what L.A. County is committed to do.

And I believe that the challenges that we have before us as it relates to the Coronavirus are going to present opportunities.  Because while we're looking right now short term and we've got 2,000 isolation beds set aside, 4200 County property beds also ready to go right now, and we're moving that

out.  And our team at the County will really outline what exactly our plan is for the Coronavirus.  But this is only the beginning of what we are doing.

And as Mayor Garcetti said last night, I watch every briefing you have every night.  But what is being done at the City level and the County level was already in the works.  Coronavirus just accelerated and actually broke down barriers that we recognize were in place, whether it be CEQA and/or other issues that, quite frankly, given this virus, we have to think outside the box and recognize that asking for permission is not necessary -- sorry, lawyers -- but we're going to ask for forgiveness because we have to get this done and we have got to get it down now.  And we recognize that prevention is the key.

And to your point, the homeless population is very good at moving early morning and are oftentimes invisible.  And we need to be aggressive in how we do outreach.
Sheriff Villanueva has got his host team boots on the ground out there working very aggressively to try to convince people to come in.  Because many of them do not understand how at risk they are right now.  And many do not understand what this Coronavirus means or could mean.

And so when we hear the number of one death already amongst the homeless, my biggest concern is that that is going to rise because we all know that healthwise they are

compromised. They are not in the best of health. And we know that the studies show that the elderly and those with compromised immune systems are at greatest risk.

And when we talk about slowing the spread, it's done so that we do not overwhelm our hospitals. Because right now, you know, what's keeping me up at night is making sure that we have the inventory of beds across the County should we need them, especially the ICU beds, for those that are going to be presenting themselves in the emergency rooms.

So, you know, Judge Carter, I have admired the work you did in Orange County, and you keep saying it's going to change. It won't change. Because I know where your heart is, and I know where my fellow colleagues on the board of supervisors' heart is, and that is we have to do better.

And Measure H gave us an opportunity to put new money into addressing the homeless population. So money really prior to the Coronavirus wasn't our issue. Post Coronavirus it may be because we don't know what the implication is going to be as it relates to jobs that are being lost, people that are presenting themselves as possibly homeless.

I know we did exactly what the City did in terms of eviction notices and putting a stay on that because that is another issue for those that can't pay. We're trying to get the ones that are currently on the street off the street. God forbid we add more. So we are looking at that, and we don't

know what the implication would be financially.

But prior to this, Measure H provided us with an infusion of money. We projected 355 million. In fact, it came in over 400 million thanks to the hard work of people like Supervisor Mark Ridley-Thomas, who saw this as a crisis long before we even came into this court, long before you were dealing with the Orange County.

So I know that money is not necessarily the issue, it's about leadership. And I will tell you that I know in my cities -- and I look at Juan Garza. Is he here? You keep saying "Juan."

THE COURT: He is. Come on, Juan. Come on up here.

MS. BARGER: Okay. There he is. I look at people like Juan Garza, who I had the honor of meeting last year and heard him speak, and listened to his vision about wanting to understand who the homeless are. And then I flash forward, read about how he's entered into the consent decree within Bellflower to address the homeless within his population --

THE COURT: Kathryn, on May 5th, Bellflower got swept.

MS. BARGER: Yeah -- no, but I mean -- my point being Bellflower was ahead of the curve as it relates to recognizing that they could do it if given the opportunity, but they actually wanted to enter into the consent decree to give them coverage so that they could be compassionate. Because

it's not about criminalizing the homeless, but also being firm. And I know Whittier is looking at doing the same.

We have an opportunity, both the plaintiffs, the counties, and the cities to get this right. And I am committed, along with my colleagues. And you referenced Supervisor Janice Hahn who took a lot of heat for pushing to San Pedro. But what I tell people is they're already in our community. If left to their own device, not great neighbors. But if provided the supportive services and the help that they need, I'd be proud to have them as my neighbor.

So as a board, we are committed to moving forward, Your Honor. And I want you to know that, again, I don't view the people that got us here today in an adversarial way. In fact, I admire their courage for stepping forward and saying, "We want to be a part of the solution as well."

Because you will in the end be a part of the solution, because it's going to be a give and take and it's going to impact neighborhoods and people that you may know that are going to say, "We want you to fix it. But by the way, do it over there, don't do it over here," which I'm sure Mayor Garcetti's heard, I'm sure a lot of my colleagues have heard that are elected officials.

So we have to have the political will and the leadership to get it done. And we're going to be looking to you, Judge Carter, to help us navigate those waters. So thank

you for having us here today.

THE COURT: Well, thank you. And let me be a safe forum because I've got heroes and heroines out there, and our job is to create that for you as elected officials and let you proceed as quickly as possible without being an impediment.

Now I'm going to ask the following of you specifically: You're so well thought of in so many circles, so I'm going to toss out some names, Robert O'Brien, okay, and Joe Grogan, they're a phone call away. All right?

You know that I went back -- Ben Cardin wanted to come out and see our program. I went back to DC because nobody cares about a federal judge in DC or most places, by the way, but certainly not in DC. And that was too big a story having him come out. If they're going to produce, this is the collaborative effort, but I'm going to be asking the tough questions in the future on behalf of our city, and that is if they're going to produce and help you, maybe you can't say it, but I can. So right now, love to all, best wishes, collaborative effect. But the federal government, if they're going to step up, Mayor, and they're not, this is going to be a much different session in the future. Okay? And that's not a threat, that's just a promise.

Now, sharpen your pencils. You don't have to stay. You've got decisions to make. But in a moment we're going to try to give you a presentation because since Steve was kind

36

enough to accede to me taking this case, I think folks have been working night and day. I don't know many folks who have slept since last Friday.

And we're going to see if there's 20,000 to 30,000 units that you're interested in and how you would sequence them and what permitting would take place, et cetera, and how quickly. Because if not, then let's get on the phone. I want you to have my number. Okay? If I can't communicate with you, then -- and I don't want the whole public to know it, because I'm going to make a transcript, and I'm going to ship it out to everybody. We're going to get a transcript out because we had to limit this today. But you've got to be able to call me, and I've got to be able to call you.

But most importantly, Andre Birotte is a great admirer of you. Judge Birotte speaks nothing but praise. I'd like you to coordinate with Andre Birotte and work though him on all occasions, okay, that are possible. You've always got my number. But we're such close friends. Okay.

Now, I want to show you one picture on the way out.

Eddie, put up a picture of someplace called Georgia. And I want to show you what our country can do. So anybody tells us that they can't build a shelter within 28 days, then go talk to Michelle Martinez or the mayor in Anaheim --

MAYOR PULIDO: And Santa Ana.

THE COURT: And Santa Ana, yeah. Thanks, Miguel.

**UNITED STATES DISTRICT COURT**

-- and go talk to Michelle Martinez.  They put a shelter up in 28 days.  Anaheim matched them.  And right now you're looking at America.  This is a place called Georgia right after the war, right after the debacle called genocide had taken place.  And this is South Ascension coming across the border into Georgia.

By the way, this gentleman was born a short place from here.  That's your money.  They may call it UN money, but that's United States money, and these were put up overnight by USAID.  So anybody who tells you from the federal or state government that America can't do this, well, I'll just show them this picture.

Now, would you take me over to where I just sat in Saipan.  They got hit by a god-awful typhoon.  It destroyed it.  If you don't like those kind of shelters, then I'm all for tents.  Because if we're going to get them off the street, it's not going to be pretty.  Some people are going to get hurt.  But we're trying to move as many people as quickly and save their lives.

And they're not going to be the optimum conditions, plaintiffs' counsel.  They're not going to have all the ADA.  We're going to try.  We don't want a paraplegic on the second floor of a motel without whatever, an elevator.  And so we're going to try.  But this is not going to be perfect.  In fact, don't let the --

What is it, Jim?  Get a --

JUDGE SMITH:  Don't let the perfect be the enemy of the good.

THE COURT:  Yeah.  So if we're going to move, then there's going to be a lot of criticism for everybody.  Well, these are tents.  Guess what, they've been going to school now for five and a half months over there, and these kids are going to be going to school over there in these tents for probably another year and a half to two years.

If a country is doing that this quickly and we've got a crisis involving death on Skid Row -- hey, tents, I love tents.  So you're not getting any pushback from this court or from my colleagues in terms of getting structure up because I'm going to say this:  We are losing more people right now to hypothermia, pneumonia, and other disease than possibly this COVID crisis is going to cause in increased deaths.

In Orange County alone, we've lost 240 without the crisis hitting.  Well, God help us, I hope it doesn't add substantially.  But with those kinds of numbers, if you could give me these in every city in Orange County and Riverside and Los Angeles immediately -- so if you don't like the following presentation, great, I'm going to ask everybody what's better.

So without further ado, Paul Leon, come up here, and I'm going to get a pencil and step off of the bench, and we're going to get numbers.  And you're going to start taking down

UNITED STATES DISTRICT COURT

numbers for me. Because if this doesn't make sense, tell me what does.

Eric, thank you. I'll call you tonight.

MR. LEON: Good morning. My name is Paul Leon. I am a public health nurse and CEO of Elimination Foundation. And we currently are working in Orange County, L.A. County, and Inland Empire.

So Judge Carter asked me to present real quickly on what we were doing prior to COVID-19 hitting, and that was we ran recuperative care, medical recuperative care. We're the largest recuperative care currently in the nation. And we had already started looking at supply and emergency housing, bridge housing, and then permanent supportive housing.

And about a month ago, Mr. Ken Rice [sic] came to us with these units. We had already talked to him about purchasing these units at cost. They were in North Dakota, and they were assembled for oil derricks and oil derrick workers. When we saw these units, we realized that we could not only assemble them quickly, but they could serve as recuperative care medical respite units for our clients that were homeless and were really increasing.

You could see the beds are complete. They come with all the soft items needed to run. You know, they can be stacked. They could get here -- they could start coming. They have full kitchens that could be set up. And they could also

**UNITED STATES DISTRICT COURT**

be assembled and serve 300 meals three times a day.

We -- they can be configured any way.  They have full washrooms.  And on the right you'll see they have complete generator systems if they need to be brought in and they can't be hooked up to a grid.  Full-on washing machines, pretty much everything similar to -- these are the generators -- to what we're doing now.

Now, again, these are at cost.  It's a public/private partnership that we were going to do in Orange County, and our nonprofit was going to bring in 78 beds as a stepdown facility for COVID-19.  So we had already talked to Ken about having them on the way.  And, again, we could go over the prices with you.

My colleague in just a second -- these are the Caltrans places that we identified that we were already looking at putting LifeArk -- and I'll show you LifeArk in a second -- but we were already looking at acquiring some of these places in L.A., Orange County, and we were already on our way to filling out the applications to put up LifeArk.

And, again, LifeArk, for those of you who don't know, Mayor Garcetti's office had a challenge for innovative housing.  We actually won that housing challenge.  And we won the challenge for services.  LifeArk, again, will take a little bit longer to set up, about 90 days.  90 days to six months.

The first facility is going to be set up --

**UNITED STATES DISTRICT COURT**

Paul, is that Monterey Park?

THE COURT: No, no, too long. Move on.

MR. LEON: Okay. So, again, these are the units. We could have 7,000 of the first units here in 90 days to six months max. So, again, Judge Carter wanted us to present.

THE COURT: You presented that. Still too long.

MR. LEON: 7,000 beds, 11,000 per bed, and that's a total of 4,648 units. We showed you the Caltrans sites that we're able to apply to put them on that.

As far as services, both Elimination Foundation, Salvation Army, we in Orange County run probably the two biggest shelters, and we have capacity to scale up.

THE COURT: Okay. Now, let's have a conversation. That's excellent for the long term. But our conversation was also about 1.9 million --

Come on up, Ken.

-- about 1.9 million for 70 beds. Right, Paul? No, Paul, stay there. About 1.9 million for 70 bedrooms; right?

MR. LEON: Yes.

THE COURT: But on my discussion, and I want all of you to be clear, I don't care if these are purchased or not. You could put up tents. You could put up Tuff Sheds if you could save lives. But the end result is that if you double bunk these, then you move from 70 to 140.

And the problem facing us right now is we don't know

**UNITED STATES DISTRICT COURT**

the standard. Can 50 of us assemble under the present guidelines or shortly are we at 10? And so, therefore, wherever we're doing, we need the flexibility to make certain we're not spending money and backing up and having to do it again.

The next thing is we need these now, which is why I'm going to call on Kevin De Leon in just a moment. And so I want to talk about what we could do now as we transition in, because if Los Angeles can't absorb this, then, Joe, I want a couple hundred out in Whittier. Dave, in Stanton, I want 100 out there. In Anaheim, Harry wants some. I think Mayor Silva is here. But I want to give this opportunity, if it is an opportunity, right here because we're the most impacted in Los Angeles. So let's see if this makes sense monetarily. And if it doesn't, okay.

So if we -- remember, I can't add, so you're going to help me in the audience. Are you ready for this? And multiply. How many trucks can you use for transportation? And I informed you my dad was a long-haul truck driver. How many trucks can you put on the road?

MR. PRICE: Right now I have a commitment for 240.

THE COURT: Trucks?

MR. PRICE: Trucks.

THE COURT: Okay. On each truck, I'm going to call one of these units of 70 bedrooms holding 140 people -- what do

UNITED STATES DISTRICT COURT

you want to call this?

MR. PRICE:  That's a facility.

THE COURT:  A facility.

So I want to just take 40 trucks.  And would somebody multiply for me in the audience 40 times 140 and tell me what the answer is.

UNIDENTIFIED SPEAKER:  5,600.

THE COURT:  5,600.

Now, when the Saudis got in a fight with Russia over oil prices -- if you're not broke by now, something's wrong -- but it went down into the 50s, and now if you check, it's in the high 30s or low 20s.  He's having to stash these up in Canada probably.

So you say you're selling at cost, I don't know.  Check it out.  Not in favor or disfavor, but if that's the case --

Eddie, start flipping up the first photo of what one of these looks like.

Without the bureaucracy of well-intentioned permits and going into offices, if you put 40 trucks on the road, Ken, how quick could you have them here?

MR. PRICE:  We've worked it out for the 70-bed facility --

THE COURT:  Not set up.  Just how soon can you get to the outskirts of L.A.?

MR. PRICE: A little less than a week.

THE COURT: Okay. Let's say eight days to be sure, a little more. As we put up these pictures --

And blow that up, Eddie, if you can.

Let's go to the interior of what one of these looks like. Because, folks, I'll represent I haven't seen these in person. I'm only giving you alternatives about adding to a supply, if we can add to the supply, and then getting a cost figure and seeing if we can beat that cost figure or negotiate it or do something else as an alternative instead of what are we going to do next. So all I'm doing is laying out for you a possibility that I don't necessarily subscribe to.

Let's just start with 40 trucks; right? Eight days. 5,600 -- what do we call them? Bedrooms?

UNIDENTIFIED SPEAKER: Facilities.

THE COURT: Facilities? Well, whatever they are.

Is that 5,600 if I double-bunk those rooms?

MR. PRICE: We're looking at -- right now I think we have nine facilities on the offer. The first unit is the 70-bed complex.

THE COURT: Right. We're right here.

MR. PRICE: And that we can have --

THE COURT: 140 capacity.

MR. PRICE: That we can have here and operational in three weeks.

THE COURT: So if we -- now, not operational because the City is about to help you. Part of the problem with operation is are these the four units that operate off of a septic tank where we don't have to hook into a main sewer line, and that's 640 you can supply that I know about? Or are these units that we have to hook into a sewer line?

MR. PRICE: This unit is built to connect into the local utilities.

THE COURT: Okay. In a sewer line or electricity. So the question would become for the mayor and the City, where do they go and how many do you want, if you even want these? And how do we shorten that permit process and do it as the City of Santa Ana just did it, that is, put an inspector onsite with these and sign off as we go, because every time we had to go back to the office in my cities in Orange County, it took a long time because folks were doing what they were supposed to be doing. But when we got them out in the street, we were able to build shelters in 28 days. Okay?

How many of these do you have?

MR. PRICE: Right now I've set aside for Paul 20,000 beds.

THE COURT: How many do you and Paul have under contract that he's trying to tie you up with?

MR. LEON: 4,000.

THE COURT: 4,000. So if I had a population in

Los Angeles, according to "Los Angeles Times" -- and who's here from the "Times"? Anybody? Yeah. So you wrote in yesterday's article 38- to 37,000 homeless people in Los Angeles. That's what you said. I'll read it to you. And if I took 60 percent of that, what's that?

UNIDENTIFIED SPEAKER: I'm sorry?

THE COURT: What's 60 percent of 37,000?

UNIDENTIFIED SPEAKER: I didn't write it.

THE COURT: How much? 25,000. 25,000. So at 60 percent, you've already got 4,000, and you have it under contract.

MR. LEON: For Orange County.

THE COURT: For Orange County, right. But I might be asking you -- well, we'll see. You got it under contract; right? Yeah, show me the money. Put up your contract for me.

MR. LEON: We actually don't own it, but we have the purchase agreements.

THE COURT: You agree? You've got a purchase agreement?

MR. PRICE: We have a purchase agreement.

THE COURT: So I won't have to do the drama of putting up the contract. We can believe that. Okay.

Now, that's going to leave -- what's your capacity here? You said 20,000?

MR. PRICE: We have set aside 20-.

**UNITED STATES DISTRICT COURT**

THE COURT: 20,000?

MR. PRICE: Since this hit, we're getting demands from all across the country now.

THE COURT: Exactly. So if you're going to jump on this, you better jump on it if it's being true to cost, because otherwise, in our discussion with the mayors last night, we're quite willing to ship them right up to Oakland as we dawdle and discuss this and try to get perfect instead of good.

Because my input to the governor and staff last night was as follows: If we can't absorb them here in Los Angeles with a need, we're not going to wait for Los Angeles. We're going to get them up to Oakland, et cetera. So you got first opportunity or nonopportunity. And the longer you take -- and by the way, it's okay to reject it. In other words, if it doesn't fit, just tell me no and let somebody else take a shot at it. But you have got about 24 hours to make up your mind. And we're going to do that today. Back to your office. And I'm going to stay here until I get it. Fair enough?

Now, Eddie, what are my court hours?

MR. NUGENT: We've been on the record until 1:30 in the morning.

THE COURT: 1:30 in the morning, no problem. I'll just sit here.

So I believe that we're collaborative, but I also

believe that when we get back to our offices, we have got a thousand things to do. And just tell me you don't want them. Because 13 other mayors were on the line last night, right, Miguel? Miguel's gone. Yeah. But, Joe, et cetera, and other folks. Kevin, you said you wanted some. Come on up for a moment. Kevin, come on up. Don't be shy. How many you want? If the price is right.

MR. DE LEON: We'll negotiate. One thing I want to make sure it's clear, these are not just beds. When these facilities drop in, you have a full commercial kitchen. We have one complex that is 330 beds. It has a full commercial kitchen that will serve breakfast, lunch, and dinner for over 700 people a day.

THE COURT: Eddie, show them the kitchen.

Now, remember, this may be pie in the sky. Okay? Just tell me what else you got going that's better, or even less better, whatever that means, that you think is acceptable.

MR. DE LEON: These all have laundry facilities. They all have dining halls. They all have commissaries. We have meeting rooms. We have treatment rooms. We have examination rooms. We have boardrooms. We have fitness centers that can work as rehab centers.

THE COURT: So for the mayor, the Board, we obviously have an opportunity far beyond homelessness. We actually have an opportunity in this crisis to set up, if you

will, intake centers and isolation centers in the same module. Now that's a lot different than a motel room that we're putting folks in and asking a doctor to go to.

And the question is how fast in talking to City Manager Rick from Santa Monica yesterday, he said, "Watch out, Judge, because we may not be able to sequence these fast enough." And if we can't sequence these fast enough, then I think that there's a general agreement that we don't want to wait while they sit there for a period of time because then another city can use them.

So my last question is I want to do some fancy calculations, okay. I calculated that 140 into 1.9 million is how much? Would somebody calculate that for me in the audience?

"L.A. Times," you're doing real well. How much?

UNIDENTIFIED SPEAKER: It's about 13.5, Judge.

THE COURT: I would know the answer, but we'll see how he does. 13,500. Okay. Good.

All right. 13,500 to serve one homeless person in a two-person separated --

I'll be right with you, I promise you.

-- separated unit. So you don't have to worry about whether there's 10 or 50 as the CDC gives direction to us. And they haven't given direction yet.

Hold on, I'll get to you. But if I let you in, I

UNITED STATES DISTRICT COURT

50

let everybody in.  So hold on.

Now take what's the cost of 27,000 units or -- or 27,000 people on the streets of Los Angeles?  In other words, if you supplied 60 percent of the 37- or 38,000, I want everybody in this room to come up with a bottom-line number that should scare the heck out of us.

MS. SOBEL:  The current budget, it is around 50 million just for the cleanups.

THE COURT:  Okay.  Just hold on.  I just want to know what these units are going to cost for a moment.  Come on.

UNIDENTIFIED SPEAKER:  350 million.

UNIDENTIFIED SPEAKER:  350 million, Your Honor.

THE COURT:  350.  Do it again.  Remember, we're double-bunking.  So really, one module of 70 is 140; right?  So how many modules do we need?  140 into 27,000, let's say, times -- and we'll take the smaller modules because they get less expensive, the larger modules --

And you've got much larger modules; right?

UNIDENTIFIED SPEAKER:  Up to 1800 beds.

THE COURT:  So let's get the worst figure possible. Do it one more time.  You may be right.

UNIDENTIFIED SPEAKER:  It's around 340 million.

THE COURT:  Okay.  340 million.  That's our bottom line with other costs, of course, with hookup.  Now that's a scary number, but at least it's a number to work with; right?

**UNITED STATES DISTRICT COURT**

That's a number to decide if there's a more quicker -- if there's a quicker, more economical, more humane way. But eventually, you're going to go to some kind of transitional or long-term supportive housing. And what I'm suggesting is this may be the jump right now with the crisis that gets you into one bedroom, two people per bedroom, et cetera. But law enforcement's here and I'd like to speak to LAPD.

UNIDENTIFIED SPEAKER: Chief Moore is here.

THE COURT: Chief, thank you. The first concern would be, Chief, hey, why am I putting a bunch of folks into a room where I can't see them? I can't see them. Because I've got these folks coming in and some are using narcotics who want shelter. And so at least in our part of the world, we were putting them into larger rooms for supervision until they gave us some degree of, let's say, of getting off of narcotics for those who were on narcotics or psychiatric issues.

So our experience was we put you into a little bit larger facility, or tried to, and then you kind of earned your way out because law enforcement couldn't see unless they were in more of a dormitory style. And we don't know if we're going to 10 or 50 yet. CDC hasn't told us that yet.

And, number two, you've got a tough call to make, and I really respect you, and that is, do you even want these folks in jail if they're loitering, et cetera, or they're going to carry the Coronavirus in, and my guess is that's the last

**UNITED STATES DISTRICT COURT**

thing you want to do.

CHIEF MOORE: Well, Your Honor, thank you for the opportunity to appear before you. And I appreciate your energy and even more importantly your authority on this critical issue. This is an organization as a local government that is trying to work feverishly to provide needed services for individuals that are in -- terribly at risk, and this pandemic is only amplifying the crisis that we have before us. And frankly, this is also an organization of County and City officials that have worked tirelessly in order to get through red tape and bureaucracy and seemingly endless counts of obstacles.

And I'm -- it's my hope by being here today that I'm witnessing an opportunity to break through that, and that you'll have the authority and the ability to actually allow us to work in a common-sense manner that can provide shelter for those that are in need as well as care and treatment for people who are experiencing mental health crises, substance abuse problems, and that the complexity of this is not simply the establishment of a large shelter or individual beds. But the real care of this is not the construction of the units, but also the augmenting it with staffing that can provide.

The worst-case scenario is a barrack setting with law enforcement on gun post, looking at this population as if it's somehow an offender or somehow the enemy. The best-case

scenario is mental health workers, medical personnel, outreach and engagement of social workers that are present 24/7, 365. That has been a challenge for this region and it is across America.

So I look forward to you working with us in this coalition, working in support of our joint endeavor here, which is to provide affordable, realistic, resilient housing immediately for people who are in crisis because they're in an environment in a public setting that exposes them to this Coronavirus as only the latest chapter of the risk to their safety and their welfare.

And so, secondly, as is perhaps is a moment that can transition us into a more lasting solution, I -- we all share that ambition. But as law enforcement, what I would first ask is that we find the means to build and locate and establish immediate shelters so that we have ample opportunity for people who are willing or able to provide, then to take advantage of that shelter.

THE COURT: Absolutely. In other words, let's get folks under shelter as quickly as possible, supervise them as best we can.

Okay. A couple things. This won't work unless it works for law enforcement. It's just as simple as that. And historically, when I started, the cities wanted to sweep the City from a law enforcement perspective, but we didn't have the

same kind of help, impetus, and push.  I don't think people really cared about that as much in the community.  That's transitioning now because the community is terrified of this COVID-19.  So health has really risen to the top of the ladder.

I want you to tell me and educate me what the best scenario for law enforcement is and repeat that to me.  So if we were going down, let's say, Broadway, and we were cleaning encampments and we just started -- I mean, street to street -- you took in a thousand people, tell me the module that you'd like that initial thousand people, what that module would look like for you.

CHIEF MOORE:  Well, the worst-case scenario is the one you just described.  The clearing of streets by law enforcement in Los Angeles would, in my view, as a professional of nearly four decades of service, lose the very trust of the community in which we're attempting to maintain.

THE COURT:  Everybody hear that?

Now, here's what I got from the governor's office.  They're right on board.  They're expecting that they may get from CDC as of 10:00 o'clock last night in the conversation, "Hey, hold these encampments in place because the scattering is going to cause chaos and mayhem.  And, Judge, what do you think about that?"

I said, well, I would never interfere with the input of a professional like CDC, but why aren't we increasing, then,

the health of these people in that very area by supplying these tents or trailers or whatever you decide because they're not social distancing themselves now, Chief, they're all rubbing elbows and using subway and I don't care about our social distancing. It's just not going to work in the gate-guarded communities even. So I'm right on board with you.

CHIEF MOORE: So we join with you, the -- the sheltering system, the 13 that are being established starting tomorrow as part of a 42 overall outreach effort will also have challenges in regards to social distancing. And I do not intend for LAPD to be the enforcers of social distancing. We're not carrying tape measures around nor do we expect to use them.

THE COURT: Listen closely as we discuss these trailers or tents today from your perspective. And jump in at any time because this must work for law enforcement in the community and the citizens. Because although we're focusing on homelessness, it's really the whole community. Okay?

UNIDENTIFIED SPEAKER: Yes.

THE COURT: Any input, just step forward. All right?

Okay, Ken, we're almost done. So there's your price tag. Are you going to flimflam us and negotiate and drive that price up or are you going to hold your word --

CHIEF MOORE: Excuse me, Your Honor. I'm going to

56

excuse myself.

THE COURT: -- to that cost?

CHIEF MOORE: Your Honor, absent other direction or desire, I'm going to excuse myself. I do have staff here --

THE COURT: Excellent.

CHIEF MOORE: -- that will continue to monitor this and be a party to our efforts.

THE COURT: And by the way, you'll have my phone number.

CHIEF MOORE: Very good, sir.

THE COURT: And I'll reach out.

So Ken, here, now we're going to test you. I get input as of two days ago that we're going to go with cost. You're going to stay with cost?

MR. PRICE: Yes.

THE COURT: Okay. There's the commitment. He's not going to flimflam you or raise it. Those were the numbers that we were given. Take it or leave it or take a portion of it, but please let the governor, let me, and let other people know what our needs are in Los Angeles. And please let us work together from the City perspective if we can sequence these in, if you want some of these, Kevin, quickly enough so that we're not wasting time by either finding professionals who we don't have to get in here, because then let's get some up to Oakland and help the governor. Okay? Let's not let them sit for six

**UNITED STATES DISTRICT COURT**

months.

Now, anybody in the audience, this is -- come on down. You tell me and give me a better price for units of this type.

MS. SOBEL: I have a question.

THE COURT: Okay. Now, hang on, Carol, I promise you you'll have all day and night. I want to hear from the audience. I want to even hear from the press. You guys are covering this, and gals. Give me a better price.

Okay. Then either go with trailers or they come back with some alternative or cheaper solution. Tell me why it's better. Tell me why hotel rooms are going to work. While they might in the interim, how in the heck are we going to eventually service those hotel rooms with professionals going place to place? And aren't we wasting money in the long run by not having transitional and long-term supportive centers that we need anyway? So for God's sake, if the governor's helpful and going to give away money, and if President Trump -- can somebody get him on the line? No, call Joe Grogan. I tried this morning. I'm not kidding you. Call him. Then if they're serious about this, then let's take advantage of this god-awful situation and do something.

So, Ken, I'm going to come back to you. Anything else you want to say? Because you got about 30 more seconds. You did great.

MR. PRICE: Oh, I just think this is a full-service offering. So you're not just throwing people into beds, you're getting them fed, you're making them secure, you're getting them treatment all on-site. So this is a total solution, not just a throw-them-in-a-bed solution.

UNIDENTIFIED SPEAKER: Ken, what's your last name?

MR. PRICE: Price.

THE COURT: Okay. Paul.

And by the way, we've got lots of photos. I'm not -- trust me, I'm going to remain a judge for the rest of my life. I don't care if you take it or not. Just give me a better alternative that works better for Los Angeles. Ears open.

Carol, you had one question?

MS. SOBEL: One question. Can we tell what the square footage of each unit is?

MR. LEON: Yes. We have that. We've got it. We have the footprint.

But I want to just clarify, Judge, that we're the service providers. So although Ken seems like a nice guy, we said this is the price. We've got to show its at cost because we have contracts with DHS, L.A. Care, Orange County Health Care Agency. We're already at the front line and our beds are -- DHS cleared some out because they're going to bring some other people to our recuperative cares, but we've already been

59

in contact with hospitals. We anticipate by the weekend they're going to be full.

And I used to be a critical care director at Saddleback and Orange County. I already know their biggest need right now is to clear the people that are healthy. And this could be an option. LifeArk could be an option. Because this is going to be for months, to clear the hospital so then they can really use their ICU beds. So far we've sent about 50 people that we deemed -- and remember, we're medical personnel -- that we deemed are significant. They met the criteria. And probably about 40 of them came back roughly as nonCOVID-19. So it's just a huge problem we're going to have continuing forward.

And as a provider, we're seeing both those as the immediate answer to -- that we really need. We're telling as a provider that not only can we use them now moving forward, December, January next year, we would have needed similar units like this to house, you know, roughly, give or take, 16,000 in L.A. and about 10,000 in Orange County. So --

THE COURT: Thank you very much. In fact, there are schematics of the space, et cetera. Remember, I don't care if you accept these or reject them. Just make a decision, and then let's move on, if you want some of these or not.

So now I want to turn to Nury Martinez. You're the council president. It's a pleasure. I wanted to --

UNITED STATES DISTRICT COURT

And thank you for letting me get that presentation on.

Let me turn to you.

MS. MARTINEZ:  Thank you very much, Judge.  One thing about me, and I hope through this whole process you and I can become friends, I don't mince words and I'm very direct in terms of not only what I believe the leadership of this council is trying to do with this homeless crisis, but also to give you an indication of how our neighborhoods and our communities are heavily impacted by this crisis that's been going over the last couple of years.

And so for me, I think the mayor has already covered what the City is doing.  These -- two days ago when we had a council meeting, we appropriated $20 million for our COVID-19 crisis.  Over the last couple of years through the commitment of this council and the voters of the City, we voted on Measure HHH, which you are well aware about, and we have now -- our goal is to build almost 10,000 units of housing.  I want to say that 10 out of the 15 council districts have already met, if not exceeded the 222 pledge, which basically we took 10,000 units of housing, divided it by 15, and that was our pledge to at least build 222 units of housing in each council district.

I am adamant -- and I don't mince words -- I am adamant that all communities need to provide a homeless solution.  Historically, some parts of our city have not shared

UNITED STATES DISTRICT COURT

the same responsibility and we are overwhelmed.  Particularly, those communities or districts -- communities of color and districts that -- who have historically have had to deal with environmental justice issues.  Basically, every and any other facility that no one else wanted in the City, it gets built in these communities.  So if we are going to do this, we need to do it fair and we need to do it equitable for everyone to share in the responsibility.

We are in an era of NIMBYism, and I have to say that my colleagues on the City Council have dealt with opposition, with community pushback, and they have stood up to some of those oppositions and moved forward with some of these permanent supporting housing projects and their district.  That needs to be recognized.  We need to do more of that and we need to ensure that as a city, we're committed to doing this and sharing the responsibility of solving this crisis.  You know, it's a decent thing to do and we're up to the obligations to make sure that we fulfill those commitments.

THE COURT:  I want to thank you.  And that equitable responsibility is critical.  No community can feel that they're being disproportionately harmed.  By the same token, if everybody does whatever they've got there, then if one community has more, that's the problem.  If another community has less, that may be good for that community.  But unless they cooperate, there's going to be an unintended consequence of

**UNITED STATES DISTRICT COURT**

migration for some of these communities who so far have felt relatively distant, and we're seeing that in some portions of Orange County where there's been an influx towards our beaches and some other locations that have been unintended by some of those communities that didn't step up as quickly, let's say, as others.

MS. MARTINEZ:  That's correct.

THE COURT:  And so I want to thank you.

I want to turn really quickly to The Salvation Army.

MS. MARTINEZ:  One more thing, Judge, if I may.  I know that Chief Terrazas is also here in the audience --

THE COURT:  Oh, thank you.

MS. MARTINEZ:  -- from our fire department.  They need to get back to deal with our Coronavirus crisis --

THE COURT:  Chief, I want to recognize you --

MS. MARTINEZ:  -- so I want to recognize him if he has anything.

Chief, do you want to come up?  Because I know our first responders are heavily being impacted by this crisis, and I want to recognize him and give him the ability to be able to go back to work because I know you have a full plate.

THE COURT:  Chief, we're getting you back to work right now.

MS. MARTINEZ:  Thank you, sir.

CHIEF TERRAZAS:  Thank you, President Martinez.

Thank you, Your Honor, for allowing me to be here.

I think public safety has an important role in this whole effort. Just to give you an idea of the numbers that we deal with on a regular basis, we run 1350 emergency incidents every 24 hours in the City of Los Angeles. Of that 1350, about 11 percent is to our homeless population. We transport about 600 people to the hospital every 24 hours. Of that number, we transport about 14 percent of our homeless population to the hospitals.

I think bringing the homeless into shelters is going to help us. They're going to be protected from the elements. They're going to be congregated together instead of spread out throughout the city. And we should have a healthcare component on-site at these shelters so we can catch these issues, these medical emergencies while they're still minor. So we're here to do whatever is necessary to support the effort.

THE COURT: And we're going to extend that courtesy back from the bench. I don't want you to be chilled. I think you're the first responders and it's amazing that I'm capable of social distancing. I'm privileged and lucky and fortunate, but that homeless population isn't. And guess who's responding to it?

CHIEF TERRAZAS: We are, Your Honor.

THE COURT: Yeah, just like the military, you're right on the front line.

UNITED STATES DISTRICT COURT

64

CHIEF TERRAZAS:  Yes, sir.

THE COURT:  And so, you know, anything that we can do, you've got that pledge right back.  We're not going to be an obstacle.  We're going to give you hopefully a parameter so the plaintiffs and defendants here can operate in good faith within that parameter, and you get the necessary nonimpediment and nonchilling effect just immediately.  Okay.  And the same thing to the police chief.

But I want to follow with Kevin De Leon for just a moment because he's got a -- and I apologize to The Salvation Army because he's got the most impacted area, which you commonly refer to as Skid Row.  So Kevin?

CHIEF TERRAZAS:  Yes, sir.  Am I excused, Your Honor, or would you like me to --

THE COURT:  Listen.  A long time ago.  I humbly can't thank you enough.  You've got really important things to do.  Let me hammer this out with the plaintiffs and defendants later tonight.

CHIEF TERRAZAS:  Yes, sir.

THE COURT:  And phone's open, okay?

CHIEF TERRAZAS:  Thank you very much.

THE COURT:  Pleasure.

CHIEF TERRAZAS:  Thank you.

MR. DE LEON:  Thank you very much, Judge David Carter, Judge Birotte, as well as the fellow judges here

UNITED STATES DISTRICT COURT

present today, I want to thank everyone who's had the opportunity to present to you.

Judge Carter, it was indeed an honor and pleasure, quite a kick, actually, a few years ago to work with you and the dilemma in Orange County with regards to the housing homeless crisis. But it was a real honor -- it was a real honor, once again, to touch base with you again.

I am a senate president emeritus of the California State Senate. I am an aspirant to say that hopefully sometime soon within the next few weeks I can call myself council member-elect of CD 14. And CD 14 is also the epicenter of the homelessness crisis not in the City of Los Angeles, but actually in the United States of America. There's not one city in America that can claim the most number of unhoused individuals, any particular geographical area, than Skid Row specifically in CD 14. If we walk out this U.S. federal building, this beautiful brand-new federal building, just down the street past Little Tokyo, we will be in Skid Row, and it's unlike anything we have ever seen there. In fact, let me say this --

THE COURT: In fact, you're going to take me down there, aren't you?

MR. DE LEON: We're going to go together.

THE COURT: That's right.

MR. DE LEON: And you said you wanted to go at 4:00

or 5:00 in the morning, so...

Let me say that a few months ago I took some family members down to Skid Row purposefully. And as we were driving, my family members said, who are not from Los Angeles --

**(Speaking in Spanish.)**

"This cannot be. This is incredible. This is the City of Los Angeles." Which to another relative in the van said --

**(Speaking in Spanish.)**

"This looks like the third world."

To another family member corrected that family member and said, "That's an insult to Third World nations to say something like this. In one of the wealthiest cities, clearly in the wealthiest state, in the wealthiest nation in the world, obviously, this leaves an indelible mark of shame and it wounds our civic pride as Angelenos, as Californians, and as Americans. And I think as Kathy Barger, who just said a few moments ago before she left, "This is all hands on deck."

I appreciate our great mayor, Eric Garcetti, who I know him and his staff have been on this 24/7 as well as our new council president, Nury Martinez. And before I want to just share a few -- just a couple minutes, but I do want to emphasize what Council President Nury Martinez just mentioned a few moments ago.

This is about equity. And those communities that

UNITED STATES DISTRICT COURT

have been disproportionately impacted by poverty, lack of parks, lack of open space, a dearth of supermarkets, fresh food, freeways, deep-entrenched poverty, gentrification displacement, these communities also to -- through Council President Nury Martinez's comments have to be treated through the lens of equity, and how we distribute this issue throughout the City and County of Los Angeles. So therefore, I say it is all hands on deck.

Let me say the following, Judge Carter, is one is -- and I think it was mentioned here a few moments ago. This is about leadership and accountability. And the reason why I say leadership and accountability is that taxpayer dollars are finite. HHH, I'm the author of "No Place Like Home." That's $2 billion that are coming down the pipeline to build permanent housing solutions. Those are finite dollars.

It is ultimately up to the citizens of the City, the County, and the state of California to make that determination if, in fact, they'll continue to fund housing programs. We need value to get volume because the crisis that we have. You cannot have extraordinary amounts of dollars being spent, therefore, politically, you have an electorate saying if we're spending 500-, 600-, $700,000 per unit on permanent housing solutions, I can't afford to purchase with a great FICO score with any capital to put down as a down payment to get into a condominium or a townhouse.

UNITED STATES DISTRICT COURT

So you run the risk of alienating the electorate. Because as mayors know, as our great council member Nury Martinez, and our Mayor Eric Garcetti knows, budgets are tied up for fire and police, Department of Transportation, city parks, after-school programs, and so forth. So your wiggle room is limited to nonexistent. Therefore, you have to go to the electorate to ask for money, whether it's a government bond, whether it's an enhancement on a tax revenue.

And if the electorate themselves are saying, "I'm done, that's it," then we're going to be in a heap of trouble, even more so, than the current situation today.

I would differ with regards to the chief when he said -- when he described the worst-case scenario. The worst-case scenario is what is happening today present in realtime. That is the worst-case scenario. We have tens of thousands of men and women, increasingly children, who are living on our streets every single night.

To that, I want to say the following: The question is, can we build what I authored, Senate Bill 100 RPS, Renewable Portfolio Standard, which clearly says to utility companies you must by a certain year have X amount procurement of renewable energy. I think for leadership and accountability, and to have the teeth that's built in, city governments throughout California, especially in Southern California, have to have a legal mandate. We will build X

amount of housing units, and the question is by when.

THE COURT:  By when.  Okay.

MR. DE LEON:  How many units and by when which is absolutely critical.  Because if we don't have the legal teeth, then we'll be in litigation after litigation after litigation.  The *Boise* decision, the *Mitchell* decision, all of these lawsuits that are coming down the pipeline today right now.  If we're all hands on deck by using the money that we have today in the most prudent manner, we can resolve this crisis.

THE COURT:  And let me share something with you.  One of the best things that's happened through the settlements and the consent decrees with the 21 cities is that in 18 months, we've had two issues that were resolved by Judge Smith that took 15 to 30 minutes each.  And that wasn't necessarily satisfactory to all parties, but we have absolutely flattened the litigation.  That is money that you can be spending that normally goes out for litigation purposes that's devastating and, quite frankly, could be better spent in other ways.

So that's one of the good things.  Maybe a city attorney or law firm might not be as appreciative of that, but we have flattened the litigation in our part of the world.  And it's caused two things, our ability to move forward.

Kevin, hypothetically, I'm going to offer you 4,000 trailers.

MR. DE LEON:  I will say this --

THE COURT: No, hold on. Hypothetically, I want you to walk me through that. How are you going to get the permits? How are you going to hook them up? And how long would it -- and you don't have these answers yet, so you don't have to respond today, but are you interested?

MR. DE LEON: I am absolutely interested. I don't have the legal or political authority to accept these units, but I do have the moral authority as a constituent of CD 14 and as a constituent --

THE COURT: So if we can get them here hypothetically in seven days and without the City's help, if it took 30, 60, 90 days to hook up, but hypothetically, if my dad were still alive and he got in his long-haul rig and he drove down here -- see, he used to go from Portland to Detroit down to L.A. to deliver cars -- back to see mom and me, and made that circle. Okay? So North Dakota, no big deal.

All right. Now, you arrive with 4,000 units out here at the -- either the train station or you arrive -- if they're overland. I think it's become a real problem in terms of well-intended bureaucracy because we take it to an office, the person does a good job looking at it, but the one miracle that I saw with Michele Martinez in Santa Ana and Anaheim and the rest of these cities was they actually took that inspectorate and put it right on-site. And it didn't go to an office. They signed off as they went if it was appropriate.

And if not, they corrected it. That's the realtime action we need because this doesn't have to take 90 days.

And that's why I kind of rudely, and I apologize to Ken and Paul, cut them off when I said 90 days is too much. Because we've talked about a much shorter period, if we get the cooperation of the City, because we watched it work before. So it's nothing new. We're not inventing something. We've just sat there and watched the time cut in two-thirds, just slashed.

MR. DE LEON: Well, I would say, Judge Carter, in that I think that city/local governments have to identify city-owned real estate portfolio assets that are underappreciated, undervalued, underused. So those are real estate locations where we can immediately --

THE COURT: Okay.

MR. DE LEON: -- find the housings. And specifically, I think when it comes to planning departments, we have to cut the red tape and roll out the red carpet.

THE COURT: I have to depend upon you to do that. I don't want to tell folks the date we're going out there. Call me at home again.

MR. DE LEON: I'll give you a call.

THE COURT: Okay. 4:30, 5:00, 5:00 o'clock, and we're out there; right?

MR. DE LEON: We'll do it together.

THE COURT: In a very short period. Because I don't

want the press with us or anybody else. We'll just quietly go out there.

MR. DE LEON: We'll go out there in cognito.

THE COURT: By the way, I used to be here in the Mexican Mafia case for two years so I used to run down through Skid Row every day. So I know it. I just want to relook at it again. I wasn't -- haven't been there for a while.

MR. DE LEON: Okay.

THE COURT: Kevin, thank you very much.

MR. DE LEON: Thank you very much.

THE COURT: Give me a call.

MR. DE LEON: Just one last -- I will take those units right there, as many as we can --

THE COURT: Okay.

MR. DE LEON: -- for CD 14 at least.

THE COURT: Okay. Then we'll work out the sequencing and stuff.

MR. DE LEON: Okay.

THE COURT: Fair enough, Kevin. Thanks a lot.

Okay. I want to call on Salvation Army for a moment. General, you've come down. I know you don't go by "general," I just promoted you. Thank you. Introduce yourself to the audience really quick, tell me your capacity, and then get back to the front line as a first responder.

COMMISSIONER HODDER: Thank you very much, Your

Honor. It's a privilege to appear before you today. My name is Commissioner Kenneth Hodder. I'm privileged to serve as the territorial commander for The Salvation Army USA Western Territory, all of its operations from the eastern border of Colorado to Guam and Saipan.

I'm accompanied today by Lieutenant Colonel John Chamness, who is the divisional commander for the California South Division, and by Captain Nursen Keyston (phonetic) with whom I know you had the opportunity to work when you were doing your fine work in Orange County.

Your Honor, as you know, The Salvation Army has been passionate about the issue of homelessness since its founding in 1865. We have 155 years of experience in this area. It is at the very core of what The Salvation Army does. In the last few years, of course, we've hit an explosion in this problem. We determined, therefore, last year that we were going to double our capacity to improve the lives of the homeless around the Western United States within five years.

THE COURT: Now, just a moment. My colleagues in Portland, Seattle, and San Francisco are very interested in what's happening in court today.

COMMISSIONER HODDER: Yes, sir.

THE COURT: So you're about to speak far beyond Los Angeles for a moment. There's a network of judges out there who want to be, let's say, helpful. And that may be best

UNITED STATES DISTRICT COURT

in a collaborative sense, as long as it's within reason and the parties being involved, instead of you guessing what we're about to do a year from now.  Can you add to this capacity?  You've heard today some representations that were made, you've heard the issues and problems about sequencing, et cetera.  Can you add to the capacity in Los Angeles?  And if so, tell me how.

COMMISSIONER HODDER:  Your Honor, within 24 hours, we can add 80,000 square feet of facility available in Bell for triage purposes.  Within 24 hours under your direction, we'll have an additional 27 properties which are closed Salvation Army thrift stores.  By instruction, I closed all of them yesterday and repurposed them for purposes of serving the homeless and those who are vulnerable in the Coronavirus crisis.

THE COURT:  Okay.  Repeat that very quickly.  And then Mike and certainly our district attorney, Jackie, I'd like to call on you.  I'll get you back on the front lines.

Okay.  I want you to repeat that.

COMMISSIONER HODDER:  Certainly, sir.  Subject to appropriate governmental approvals and the necessary funding, we can make available 80,000 square feet in Bell for purposes of indoor sheltering, for isolation purposes, or for triage.  In 24 hours, we can also make two of our camps available in the Calabasas area that will provide recuperative recovery care and

it will also provide isolation services for those who perhaps have already tested positive for Coronavirus, again, within 24 hours.

We have more than 60 properties here in Los Angeles County that The Salvation Army will make available for any use that any municipality feels is most appropriate to respond to the crisis. We can have all of those ready in 24 hours. Store personnel that have been working in Salvation Army stores will be available to provide additional personnel.

THE COURT: So you're going to switch those out of the stores into the field?

COMMISSIONER HODDER: Yes, sir. We'll just bring them right in. And all of those facilities, sir, will be led by trained Salvation Army officers.

THE COURT: Okay. You've done an outstanding job in Anaheim, first, is where we've been working with you. And on every occasion, I want to pay a compliment to you. The homeless have actually come to believe that you're one of the premiere, if not primary programs, that they tend to stay in. And that's quite frankly because of some of your rules and rigidity, which they're not rejecting.

Now, I want to walk through this again. 80,000 square feet. Give me specifics. Who do you need to talk to? What do you need? How do you get this up and running?

COMMISSIONER HODDER: We would like to work through

UNITED STATES DISTRICT COURT

LAHSA so as to --

THE COURT:  Hold on.  Where's LAHSA?

UNIDENTIFIED SPEAKER:  Right here.

THE COURT:  Thank you.  Come on up.  LAHSA's coming up.  There she is.  Hold on.  Have we have a chance to talk yet?  And that's not fault finding because I want to see a big hug -- just kidding you.  Get six feet apart.

COMMISSIONER HODDER:  It's a pleasure to meet her this morning.

THE COURT:  Well, there's no problem.  That's why we're here.  Say hi to each other.

COMMISSIONER HODDER:  Good morning.

UNIDENTIFIED SPEAKER:  Good morning.

THE COURT:  Good.  Now give each other your phone numbers.  Write down your phone number.  Write down your phone number for each other.

COMMISSIONER HODDER:  We will, indeed.

THE COURT:  Yeah, right now.  Good.  Now exchange the phone number.  Now, hold on.

So we don't know when, but I would love to be able to go out and see these 80,000 feet, so would you and so would the public, although they can't go, operational; right.

COMMISSIONER HODDER:  Yes, sir.  At the present time on that site, we already have one of the largest shelters in L.A. County.  The Bell --

THE COURT:  I know about it.  Harry Pregerson, I think, was involved.

COMMISSIONER HODDER:  Yes, sir.

THE COURT:  Yeah, he took me down there years ago and I wish Harry was with us now.  He would be a fabulous asset.

Okay.  I don't know what you have to do and I'm not going to take the time to hammer that out.  But I would like to get back to you not in a huge setting like this, but on a phone call.  Okay?  If I could be of help, great.  If I can't be of help, get me out of the way.  In other words, you don't need a lookie-loo coming in and interfering with professionals.  You're on the front line shooting bullets right now.

But by the same token, I'm going to be asking why that isn't up and running.  And so I don't want to get into the particulars, I don't have time.  I need my first responders back.  But the next meeting will be why isn't this up and running?  And I want names of why it's not.  Okay?  But today, we're all happy.  Next time, I'm not sure we're happy.  Okay.

Now, what else are you going to do for us?  You've got 80,000 feet.  I want to hear the next one.

COMMISSIONER HODDER:  Next place, sir, would be the repurposing of all of our closed Salvation Army thrift stores.  We will be ready to clear those out so as to make them available for --

THE COURT: Give me an idea of capacity. In other words, what am I talking about? Am I talking about a hundred people or am I talking about a thousand people? A rough guesstimate. And I'm not holding you to exactness, but tell Eric and his staff what kind of capacity we have out here in our communities.

COMMISSIONER HODDER: Each store would have approximately 12- to 15,000 square feet of area.

THE COURT: Wow. Time out. Now, if you made that available and I was in a smaller city like La Puente or Rosemead or hypothetically some city who might have come in, and I don't have any money and I heard that I could get a Salvation Army site that I formerly couldn't afford, then I need to go to somebody for provider services, because in the past our smaller cities are afraid to put in a building, because after they spend their 1 or 2 million -- right, Joe? -- out in Whittier or 3 million, they have no guarantee of provider services, so they're searching for 1.5 or $1.2 million each of the succeeding years. They can't get started.

If you could do that, the end result would be a lot of these cities would now cut their costs in half, and they just have to go back to whomever for provider services. I mean, that would be a huge benefit to kick start these for the cities because you're everywhere. I drop off stuff at Salvation Army a lot of times. So does my wife.

UNITED STATES DISTRICT COURT

Okay.  So how do we get these locations?  How do we know at least in the Southern California area, let's just say Los Angeles, let's say the southern cities of Los Angeles or the valley, I don't care, how can we get these sites to LAHSA, and then how could we coordinate --

Where's Juan Garza?  Juan?

-- how could we coordinate as the president of the League of Cities --

Come on up.

-- and how could we coordinate, Nury, through your agencies getting our cities, these individually scattered small cities who have a hard time, together with these potential sites that they're offering for free and maybe even some professional intake help because we're transitioning -- you know, Salvation Army, I mean, this -- if this worked, this would be a godsend.  You'd have immediate structures up and ready to go with some kind of professional.  Even if we don't have the nursing staff we need, it's better than what's happening now.

MS. MARTINEZ:  Do you have a number of Salvation Army stores?  How many are there?  Do you know where they're located?

COMMISSIONER HODDER:  In Los Angeles County we have 17.  In Orange County we have 10.  We have approximately -- and speaking to those in Portland and Seattle, we have about

another 100 stores that would be available.

THE COURT: I'll be on the phone with my colleagues after this up in Portland and Seattle. But right now, 17 L.A.?

COMMISSIONER HODDER: 17 L.A.

THE COURT: And we can give those designations to Nury?

MS. MARTINEZ: 17 L.A. City or L.A. County?

COMMISSIONER HODDER: They're L.A. County.

THE COURT: That's why I've got Juan up here also on behalf of the cities. We need to find out where these are. And if we can really transition these into dropping off, you know, things for the folks and transition these, we'd have 17 new locations.

I don't care whether we call it city or -- cities or the Downtown L.A. area, it's got to be a benefit to all of us in breaking down these barriers; right?

COMMISSIONER HODDER: Yes, sir.

THE COURT: Now, how do we get what you want to call a tickle date, what I call a drop-dead date where we just don't talk about it but we're responsible by phone or in person in a much smaller group getting back together in a timeline that either gives us a yes or a no? How do we make that progress?

Okay. Time out. Go talk about that for a moment. The next presentation, come back with a plan in a few moments about some schematic of getting us together in a time frame

UNITED STATES DISTRICT COURT

that's reasonable to make that kind of decision so we don't go back to our offices and just kind of, you know, do our job, but we don't get together. There's a wonderful corner. Stay six feet apart or jump in there with the press. They'll love that.

COMMISSIONER HODDER: Thank you, Your Honor. We will do so.

THE COURT: Okay. Here we go.

Okay. District Attorney Jackie and whatever you'd like to say, please.

MS. LACEY: Thank you. First of all, just from an entertainment point of view, it's great to see a federal judge cut elected officials off. I've never smiled so much.

THE COURT: Well, usually my attorneys cut me off, and so --

MS. LACEY: Only you can do that, so that's really good, because you're making people get to the point.

Here's just a brief thing I want to say. Does the 340 million number include services? Because without services --

THE COURT: Great. I don't think it does.

MS. LACEY: I don't think it does either.

THE COURT: Hold on. But Paul and Ken, come on up here.

Jackie, let's get those answers. That's a great question. I didn't think it does. Just what's the bottom line

to get X amount?  If we can't afford it, can we do half of it?

MS. LACEY:  Right, Your Honor, because we don't need a timeshare presentation.  We need to get down to brass tacks.

THE COURT:  Let's find out.  There they are.  What's real and what's not?

MR. LEON:  So our services, we are already working with DHS.  We're just looking for capacity.  And so we already provide services.  So they're already paid for in different, you know, venues by different contracts.

So the problem that we have is that we have clients or patients that are funded, but we don't have anywhere to put them or for our nurses and our case managers to work.  So...

THE COURT:  So the funding -- I keep hearing, Jackie, that we've actually got the funding out there.

MS. LACEY:  Yeah.

THE COURT:  What we don't have is let's get together because we're so large, quite frankly and, you know --

THE WITNESS:  Right.  Right.  My next question is will they house people who are infected?

THE COURT:  Well, let's find out.

MS. LACEY:  That's fine.

THE COURT:  Because that's one of the things I like about the trailers is that we can separate out with the trailers so I could use them for two purposes.

MS. LACEY:  Right.

UNITED STATES DISTRICT COURT

THE COURT:  Not homelessness, but I could also get those over to the medical community where we were sorting out. And maybe we had one trailer with OVID [sic] whatever, and I also like the fact that we weren't putting 10 or 15 people in the same room whenever CDC gives us direction.

MS. LACEY:  Right.

THE COURT:  Can somebody call CDC and get some direction?  I'm just kidding.

MR. LEON:  They can be converted any way.  And they're actually perfect because the fact that you could use it isolation, we could do triage, we could break them apart.

THE COURT:  Yeah.  Come on up.

MR. LEON:  And again, they're temporary.  However, once they're done, we can continue to use them in different capacities.  That's the difference from having just a trailer. They're temporary.  And then we already have permanent supportive housing coming in the back of ours.

THE COURT:  Jackie, I promise you, it's a lot of money, but the money really isn't the problem.

MS. LACEY:  Right.  No, I agree.

THE COURT:  Long term it's not really the money, believe it or not.

MS. LACEY:  Well, so is it the RFP process?  Can these things be done --

THE COURT:  Well, let's find out, Jackie.  Hold on.

84

Come on back up here.

MS. LACEY:  The request for proposal, does it have to be competitive bidding for the City to accept?

THE COURT:  Mike, do we have to spend a whole lot of time spending out for 30 people -- you know, 30 days or 60 days while people die?

MR. FEUER:  In the emergency, competitive bidding is not required.

THE COURT:  Bingo.

Jackie, see what I mean?  We've got an answer now. Mike is not going to stand in our way with competitive bidding because we've got an emergency so we don't have to take that normal 30-, 60-day timeline.

Mike, thanks.

MS. LACEY: Right.  Right.  So hypothetically speaking, let's say L.A. County was getting ready to release a certain percentage of inmates in response to this emergency. Okay?  Some of those people are going to be homeless.  So we're getting them out of the jail.  Will we be able to get them into some of this housing?  Is there going to be housing set aside for the justice involved?

THE COURT:  Great question.  That's why I asked the police chief to come over today.  Look, they've got a tough decision to make, and that's a decision I'd love to hear between you and the police chief, and I don't want to put you

**UNITED STATES DISTRICT COURT**

on the spot.

MS. LACEY:  Right.

THE COURT:  Because as the jails are down loaded because they're worried about taking in a COVID-19, by the same token, where are they going to go?

MS. LACEY:  That's right.

THE COURT:  And then the public's going to say, and they should, "Hey, I've got all these homeless running around down here."  And by the way, you downloaded the jails, and why aren't they in jail because they're loitering, camping, defecating and, by the way, committing some robberies and shooting some dope?  And now the police chiefs is really in a tough bind as he's trying to keep his jail population pure.

Come on up, representative.

MR. LEON:  I just want to mention that --

THE COURT:  Hold on.  Hold on.  Hold on.

Jackie --

Hold on.  Hold on.  Wait.  Paul, you got it.

So, Jackie, that's a really hard, tough question.  And the second thing is the courts.  Hey, are the courts going to do, what I would think from the plaintiffs' perspective, what I call a turnaround?  If somebody was arrested and they, you know, were loitering or being homeless, then the end result is if we had these old loitering laws, do you really take them into custody for two days and let them out?

MS. LACEY: No.

THE COURT: See, the courts are going to have a very difficult -- because I used to be a state court judge. Jim was my presiding judge. We're going to have a very tough problem back, Phil, on the state court side if we were still there. Andre, you know, we're going to turn these people right back? I mean, it's a heck of a problem. So I leave that to the professionals because I don't have the answer to that.

MS. LACEY: Right. So like I said, hypothetically speaking, there may actually be more homeless people next week out there, so...

THE COURT: Absolutely, with no place to go, by the way.

MS. LACEY: So as a prosecutor who's concerned about public safety, I would love it if these people had someplace to live because that would cut down on them being rearrested.

THE COURT: Have you asked the police how many they're going to release?

MS. LACEY: We're working on it.

THE COURT: No, just go ask her. She knows. Just step over and ask her. No. Quietly, not in front of me.

MS. LACEY: She doesn't represent the sheriff.

UNIDENTIFIED SPEAKER: I don't represent the sheriff, Your Honor. So the police only have a very short term, and then they go into County jail.

UNITED STATES DISTRICT COURT

THE COURT: Oh, and you're not the County?

UNIDENTIFIED SPEAKER: Sorry.

MS. LACEY: Right. Yeah.

THE COURT: Is the County here?

MS. LACEY: So I think the sheriff might have a rep here. But I know they've identified 2,000 people who are in there are nonserious, nonviolent that may be able to be released. So we're talking about that now. So in terms of --

THE COURT: Jackie, I'm going to leave that alone for the time being. Because I -- that's something to you uniquely and there's -- you'll have to work out.

MS. LACEY: Right. Right. Exactly. So my only comment is we just need to ask more questions.

THE COURT: Get back and do your job. But thank you for the courtesy. Okay?

And let me turn -- because I'm going to conclude court in just a moment -- to Mike. You've been very patient with me. Thank you for that wisdom concerning the emergency and not having to go through an RFP.

And then, Bill, I want to get to you for a moment, and then we're going to disband court.

MR. FEUER: Your Honor, thank you very much for convening this extraordinary session today. As the Court probably knows, I came to public life having directed that side of legal services that provides free legal work to tens of

UNITED STATES DISTRICT COURT

thousands of people. And we emphasized for the first time in the history of the organization reaching out to homeless people. I also served as a state legislature and a city council member.

The roles there are different than the role I occupy here, but the values remain the same. So our office has a program which is focused on in the "L.A. Times" over the weekend that -- where we send a nurse, a substance abuse expert, a mental health expert, and formerly incarcerated caseworkers to the street to locations where homelessness and drug possession offenses intersect to direct people to services before they commit an offense.

We have a program we competed for and won a grant to take over the County's homeless court program. So we now have convened dozens and dozens and dozens of sessions where we help people, principally homeless people, eliminate outstanding fines and citations and warrants in exchange for them agreeing to connect to services to lift them out of homelessness.

We have been very aggressive on what's called patient dumping, unlawful discharge of homeless patients to the street, not only going after --

THE COURT: Just a moment. Thank you.

MR. FEUER: For what it's worth, the principal goal we have is not to be punitive. The goal is to change medical facility protocols so that no homeless patient is ever

unlawfully discharged. And now we're collaborating with the hospital association to achieve that.

We have a program in conjunction with the public defender in courts where the offenders have serious mental health issues to divert them immediately in a collaborative way working across the lines of prosecutor and defense counsel to get people the services they need rather than have them languish in an incarcerated setting.

I could go on a number of very important programs, many of which transcend the traditional role of a city attorney. But the crisis demands, as you pointed out, that we transcend our traditional roles. So for purposes --

THE COURT: By the way, Mike, as uncomfortable as it is, it's uncomfortable, in coming out of these traditional roles, everybody's going to have to get uncomfortable in this process.

MR. FEUER: The least comfortable people are people who have Coronavirus and/or homeless at the same time, the numbers for which we do not know at this moment.

So -- but for today, the Court's focus today is on the intersection between Coronavirus and homelessness. And it's not as though I stand here with a ready solution to deal with that confluence, but I do want to say that our office has been deeply involved in both collaboration with the mayor's office and the City Council on an array of emergency measures.

UNITED STATES DISTRICT COURT

90

We continue to be there for this particular purpose: To eliminate where possible impediments to action, to be sure that rules that may otherwise seem appropriate, if they can be circumvented in order to achieve the result of getting services to people who desperately need them, we will try to find a way to do that. Our role is in this crisis, with regard to our partners on the policy-making side, to get to the point of providing services as rapidly as possible with as few impediments as possible.

And so in addition to the outreach programs we engage in on the affirmative side to try to lift people out of homelessness in our purely legal capacity as the lawyers for the City Council and the mayor, we're going to working as we did over the past weekend day and night.

So, Your Honor, having said that, if you have requests of me and of my office --

THE COURT: I'm making one right now.

MR. FEUER: Yeah.

THE COURT: In the past, historically, I'm really good at telling you what you did wrong two years from now because I've got the hindsight and the wisdom of looking back at people who are struggling on the front line making tough decisions and making value choices that actually the courts might not agree with.

This whole scenario is changing in realtime because

**UNITED STATES DISTRICT COURT**

if you wait for the courts, we have a chilling effect on you. You don't know what injunctive relief we're going to assign. You don't know what we're going to do. You haven't seen the parties get together this afternoon.

I'm going to toss back to you that we need to be more helpful in going forward in this new dynamic so that the parties and the Court hammer out and get together with you so that you don't have a chilling effect. You can move forward. You know what you can do within reason and you have input about that.

And if you wait, Mike, that the problem's going to be -- that the Courts are going -- or at least this Court's going to have to change its shallow thinking to some degree and be a little bit more listening to both parties, but a little bit more demanding on them to really get together for the public good and hammer this out and take off the litigation.

And I will pay a compliment to plaintiffs on both sides. I was told that -- and I told plaintiffs' counsel when you go down the riverbed in L.A., we're going to have 20 1983 cases. There's going to be a battle going on and a couple of my litigants down in Orange County. He said, "No, Judge, there's not going to be."

And what they did is actually put down their sword, and they went into the tents. They got out in front of the health workers followed by the police. We didn't have one

UNITED STATES DISTRICT COURT

incident in five days. Let me repeat that. I was astounded and absolutely wrong. And it was a great lesson about a cooperative effort when the council finally got together. Because unless they can get together today, I'm going to go back to Orange County and do what I do best, and that is deal with my cities down there. But in a few moments, I'm going to ask them if they want us involved, fine. If they don't, just go litigate and have a great day.

So I think if we're still involved, we're going to be getting together, but probably by phone, because I'm not going to have another big tent meeting like this. In fact, knowing now, you know, we limited it to 50. Let's get you back to work. Okay?

MR. FEUER: No, we'll trade you -- we'll trade cell phone numbers, Your Honor.

THE COURT: Yeah. Then they got to give me permission and you permission to talk and trust, and then I'll disclose to you what we're saying. And we have to do that in realtime, Mike.

MR. FEUER: Yeah. And let me conclude with this --

THE COURT: Oh, and I'll give you Judge Smith's number. No, I'm just kidding.

MR. FEUER: I already know Judge Birotte's phone number. And Judge Gutierrez is trying to shield his phone number from me.

THE COURT: Let me give you both of them, then.

MR. FEUER: There you go. But seriously for a second, the one -- you know, a couple key revelations that emerge from a conversation as broad as this. One is there needs to be region-wide collaboration because homeless people don't know where the boundary is between Beverly Hills and Los Angeles and so on; right?

THE COURT: Right.

MR. FEUER: And region-wide sharing of obligation as well. You know, Ms. Martinez alluded to the importance within the City of Los Angeles of shared commitments across council district lines, across neighborhood lines. The same argument pertain with even more force with regard to the cities in the broader region here, and that's going to require several things.

And one thing is, as I conclude here, with regard to the various proposals for -- I'll call them putting beds on the street right now -- we do have to work collaboratively in the larger system including with the state and ideally the federal government, because if you crossed out $340 million for those beds, for example, I have no idea what the service provision costs are associated with that, let alone -- what the mayor's office is doing right now is redirecting staff members from throughout the City whose roles have been changed --

THE COURT: Right.

MR. FEUER: -- because of the emergency and putting them for the first time in settings to assist homeless people.

THE COURT: And we just heard that about the Salvation Army which I didn't know until I heard this presentation.

MR. FEUER: Right. But there is going to be a need to assure that there is a supply of people to provide the services of the police chief and what others have said are necessary concomitants of this location of this housing.

So let's -- if we're going to think about working together across jurisdictional lines, it has to be with real common sense in a practical way, saying what's real in terms of actually delivering an array of services in a setting that's helping --

THE COURT: Hold on.

Come on up, Salvation Army. If you've had a meeting.

Mike --

MR. FEUER: Ken and I are law school classmates.

THE COURT: No, I know. But, folks, come on down from LAHSA, whatever -- whoever wants to participate. Colonel, Captain, come on up.

Now, hold on, Mike.

Let's find out real quick, what's our solution here? How are we doing?

95

COMMISSIONER HODDER: Based upon the conversations we've been having, Your Honor, we will have a final plan in place by Tuesday.

THE COURT: Excellent. And who do I call to verify that? I believe you.

COMMISSIONER HODDER: The man here (indicating).

THE COURT: Okay. So I'll see you in my court Tuesday at what time?

UNIDENTIFIED SPEAKER: What time do you want me?

THE COURT: No. You know my hours. 5:00 in the morning, 10:00 o'clock? You name the time.

UNIDENTIFIED SPEAKER: 10:00 a.m.

THE COURT: I'll see you at 10:00 a.m. along with the captain. Fair enough. Now, you don't have to drive all the way down. We'll get you by phone. I'm not trying to get folks down. Okay? I just want to know that if we're setting dates, that those are kind of dates that we're really working towards. So thank you. Every day, everything -- we have 17 maybe, places.

UNIDENTIFIED SPEAKER: Yes, sir.

THE COURT: Wow. Yeah, I can't tell you how much --

Michele, isn't that going to help our cities? Yeah.

Juan -- I mean, Nury, isn't that going to help our cities?

MS. MARTINEZ: Absolutely.

UNITED STATES DISTRICT COURT

THE COURT: No matter how you call it. And if they're going to transition, I mean, just -- that was worth it for me to drive down just today to hear that. I had no idea about that. I had no idea when I talked to you by phone and asked you to come down that you were in the process of actually taking Salvation Army personnel and willing to give up your storefront and the drop-offs, which by the way, I'm still going to do, okay. But then transition those folks into people trying to help. We just now need to get to the medical folks. Let's work on that, because maybe we can get our healthy folks in there.

And so for the mayor's office, you're hearing something I never heard. This is a gift. And if it's happening in Los Angeles, you know -- so we need their number also; right? We certainly need Nury's number; right? We're going to need the litigants. We're going to have to talk about this today as we run with it. I know there are problems, but you just overcame those problems. Thank you. They're not now problems. There are no problems. All right. Good.

MR. FEUER: Can I ask a question? Just for my edification --

Ken, good to see you. Is -- are you offering these locations free of charge to the City, or would there be some compensation you'd be asking for?

COMMISSIONER HODDER: We are asking for no rent of

any kind.

THE COURT: Hold on.

Did you hear that, everybody?

MS. SOBEL: Zero rent.

THE COURT: Zero rent.

COMMISSIONER HODDER: We would ask for assistance in operational funding, but no rent.

THE COURT: Sure. That's fair enough. And Carol's saying that that's really high, but we'll get it lower; right?

COMMISSIONER HODDER: We're willing to work with all involved.

THE COURT: Okay. So at least we can get the establishments which we didn't have before. And wherever the negotiations are now, it's over the servicing, Carol, that's going to take place. And so you might say it's too high, and you might say it's too low, and you might say we're not going to pay for it, but at least we have something we never had before, and that is 17 different locations with personnel. That's worth just having this meeting in and of itself.

Okay. Mike, get back to work. Thanks. Blessing.

UNIDENTIFIED SPEAKER: Judge, can we be excused or would you --

THE COURT: Oh, no, absolutely. Get back and do what you do best.

Nury, do you want -- do you need to go?

MS. MARTINEZ: Yeah, I need to leave.

THE COURT: Yeah, please. Don't stand up in the gallery. Just walk out. We have got just a few more presentations, and I'm going to disband also.

MS. MARTINEZ: Thank you, Judge.

THE COURT: Thank you very much.

Okay. Mayor, I'm going to -- Mayor Joe -- and I just know Mayor Joe as Mayor Joe. So, Mayor, would you introduce yourself on behalf of Whittier.

And by the way, I expressed some -- I got it. I expressed -- where's Miguel? Ask Miguel to come up.

Miguel, my apologies. Where's Miguel? Yeah, come on up here.

Join with the mayor. He's going to be just a moment, Miguel. I saw you. I thought you'd left. Come on up or just a moment.

But, Joe, tell me your thoughts in a couple minutes. Then I want to talk to Miguel.

MAYOR VINATIERI: Your Honor, thank you very much. I'm in court all the time. This is an -- I've never seen a court hearing like this. Thank you. There is hope. I'm hearing hope this morning. And thank you that the Court's making something happen, that there's accountability. That's very important.

I'm Joe Vinatieri. I'm the mayor of the City of

**UNITED STATES DISTRICT COURT**

Whittier. We have 88,000 people. We've been talking about L.A. County and the City of Los Angeles. We're a small city, somewhat small, 80,000 in Southeast L.A. County, and we border Orange County. We also have --

THE COURT: Thanks again, Mike. And, Nury, thank you very much. And tell your staff thank you.

MAYOR VINATIERI: As you know, we have 231 homeless, and we've done our City Net survey. There are three things I just want to say. The City of Whittier, we have the City council-approved settlement agreement has been sent to plaintiffs' counsel.

THE COURT: Let me say this in complete transparency. I expressed frustration with both of you out in the hallway. My apologies. This just arrived last night. So although the council's approved it, I put you both in a position of making the decision, and I think I growled. My apologies to both of you. Isn't that nice to hear apologize? I apologize. But I was growling at both of you.

She needs time to look at that. So we probably have a good chance of a settlement that we could have put on record today or modification, Carol, if you looked at it and didn't see something you like. But it's not fair to you to lay out that settlement now. But I know that Whittier is going to settle. And I know that, Carol, whatever those modifications is, we'll get back in a reasonable period of time. But I don't

expect you to stress over that today.  She got that last night, okay?

MAYOR VINATIERI:  We are very motivated, Your Honor, and to join with the City of Bellflower and the other cities in Los Angeles County, the smaller cities.

Secondly, we're very concerned, of course, about the mental health aspects of what is going on.  There's been lots of discussion.  And you've talked about Fairview and Costa Mesa, Metropolitan State Hospital in Norwalk.  From our perspective, at least in the southeast area, and with the governor's order relative to state facilities, we're working with Juan Garza, and we're hopeful of getting here very shortly with the City of Norwalk and talk about how we can work some things through because you have lots of space, and I saw it, I think, indicated on one of the screens we saw just earlier.

So we think it's very important for the regional approach to homelessness to make things happen that way also.

THE COURT:  Eddie, you want to put up Fairview?

MAYOR VINATIERI:  Yeah.  We had all those, I think, various properties that are properties within Los Angeles County.

THE COURT:  Now, a lot of the cities have expressed this.  So, Joe, here's what I need.  And I would -- I know my colleagues may be interested.  And, in fact, I think Andre or Phil orchestrated all of this.  And I want to thank you for

bearing with me for so long just humbly as colleagues.  So appreciative.

I've been on the bandwagon about what do I do with that 10 to 14 percent and some people say 20 percent of just the poor people out there who are just so schizophrenic and bipolar.  Guess what, they got downloaded a long time ago.  And the governor's not going to bring them onboard.  Maybe you ought to know that.  So we're sharing courts --

It's all my -- my fault.  Would you get on the phone, just apologize.  Doing my best.  It's L.A.; right.

She's been expressing that a long time.  If the governor is going to open them, great.  And if he's not, just tell us that, bottom line.

MAYOR VINATIERI:  We're going to find out.  We're working on it.  It needs to be done.  It's a major issue in Whittier.  I know it is everywhere else.

THE COURT:  But if we're not going to put it -- if we're not going to put them on the grounds at Norwalk or Fairview or Sonoma or whatever, hey, just bottom line it, maybe you sell it, maybe you do something else.  But right now we have got to find a way to get those 10 or 14 or 20 percent off those streets because I can't get them into a shelter.  And I'm watching them close so --

MAYOR VINATIERI:  It's a major issue in our jurisdiction.

102

THE COURT: Okay. Let me talk jointly with the assembly person. So would you introduce yourself. By the way, I disclosed to both parties that members of the California Assembly called, they got on FaceTime, I think there was six or seven of us, maybe more dropping by. I was in court. And we had a conversation about you being here. So I want that fully disclosed to the parties that I didn't wait for this meeting today to take place.

MR. SANTIAGO: And I want to thank you, Judge. We're here at your discretion to expedite and facilitate anything that we can do. I know the questions that you had asked at the time were what sort of funds had the state expended and what sort of ideas or facilities do we have.

I don't want to take the Court's time -- too much of your time. But I do want to say I want to thank you for making this happen because I think otherwise we'd be waiting a little bit longer to get some of this stuff online. In terms of state dollars, those that expended had already had been HEAP dollars, and they're close to about 86 million for L.A. city continuum of care. About 81 million HAP dollars, to my knowledge, have not been expended but will be released.

THE COURT: How much?

MR. SANTIAGO: So it's my knowledge that the -- for this region alone, about 81 million to the continuums of care, about 118 million to the City, and L.A. County about 194

UNITED STATES DISTRICT COURT

million.  If I have erred, I will correct myself to you.

THE COURT:  Don't worry.  It's a good faith.  Okay.

MR. SANTIAGO:  It is.  We were jotting this down.

And when the governor asked us for -- about authority, we passed $1 billion in emergency funding that gave the governor the authority to use at his discretion.

A day ago yesterday, as you know, the governor released $150 million.  Of that approximately 19 million is going to the City of Los Angeles and to the region, these are approximate numbers, 37 million to the region in total.  So we expect that money to be used as fast as possible.

THE COURT:  Now, let me tell you the content of the conversation without the -- with the governor's office last night.  The governor's not on the phone.  I don't think it's good that we communicate.  But I told them that the Court was going to be very supportive if I had jurisdiction over this case in terms of moving forward.

But the one thing was going to be absolute consistency, and that is that I was going to ask the tough question and, I didn't want them to feel slighted as everybody left with a very warm hospitable phone call about 10:00 last night, that I wasn't going to say time and time again what we were going to do with that 10, 14, or 20 percent of these hopeless schizophrenic/bipolar men and women who have done absolutely nothing wrong.  And so you don't have the answer to

104

that.

MR. SANTIAGO:  But I think you should ask the tough questions because it will force immediate action.

THE COURT:  Oh, I am.  And I'm going to trust you to take that back to the governor's office, to Williams.  Okay?

MR. SANTIAGO:  I will.

THE COURT:  Okay.  Real quick.  I mean, please.

MR. SANTIAGO:  I will call.  Absolutely.

THE COURT:  And I'm wide open tonight for another phone call because we -- we said we would get on the phone with his chief, et cetera, and they know that I'm asking that tough question again, why aren't these hospitals open?  If not, what are you going to do with this percentage of people that are in our cities that the co-op person just can't cope with?

MR. SANTIAGO:  I will note, Judge, if I may, that the governor took an extraordinary step to -- in exempting CEQA for emergency shelters.

THE COURT:  I was very complimentary last night about that, both for municipality --

MR. SANTIAGO:  That was my bill so I know very well about it.  But to local municipalities, it really does cut down the time that they need to go through that process.  So that -- and L.A. already has that.  But for other municipalities up and down the stat for the region, they no longer have to wait for that.

UNITED STATES DISTRICT COURT

I would ask you as another piece to take a look at, too, would be the conservatorship or Lanterman Act conversations.

THE COURT: Right.

MR. SANTIAGO: Because there are going to be a series of populations who are going to be hard to press to get off the street. But I would ask the Court in a future late, maybe take a look at that as well.

THE COURT: Other than, you know, having this pulpit, that's the legislative function. I understand that. I can growl. But I have no power in a sense to implement what you can implement. But I don't care whether it's Norwalk or Fairview or Sonoma or whatever, we seem to have the federal government on one occasion saying that we can bring people off the Princess Cruise, and I'm just wondering when I saw that why aren't we handling our own California people who we have to deal with at some point anyway and providing those services that are so needed?

Because every police chief tells me, "You know, Judge, if I could get 10 or 15 people just out of my community who are just bipolar and schizophrenic and they've done nothing wrong, I take my violence level down. I take" -- I leave that with you. But next session I'm going to be asking the same question. So please tell Darrel that. Please convey that to the governor. And I'll convey that tonight.

MR. SANTIAGO:  I will make that call when I leave here.

THE REPORTER:  Excuse me, can I have your appearance.

MR. SANTIAGO:  Sure.  Miguel Santiago.

THE COURT:  Okay.  Thank you very much.  All right. And I appreciate your patience.  I love Sharon Quirk-Silva. I -- would you apologize, and I'll text her later on.  I just had Los Angeles folks I wanted to get to immediately.  So no disrespect intended.

So, Joe, do you want any of these trailers?

MAYOR VINATIERI:  Yes, Your Honor.

Just one last thing.  Trailers, looks great.  I haven't talked to my council about it.

THE COURT:  Right.

MAYOR VINATIERI:  But the mayor of Whittier wants to make it happen.  So put us in line.

THE COURT:  Okay.  So check the price.  I mean, get involved.  If you don't want them, fine.  I don't care.  But if they are of any value, so be it.  If they're not, just reject them.  I don't care.  You know, we can get tents.  We can get other trailers, et cetera.  I just want to come up with something concrete, Joe, that's on the table.  If people don't like it, reject it, but if it's going to go, then make it go. Okay?  And if you want some of these and L.A. doesn't want

them, let's feed them out to Oakland, let's get them over to Whittier.

MAYOR VINATIERI: My suspicion is with this information that you've elicited today, I think there will be a lot of people interested.

THE COURT: Oh, I've gotten calls. In fact, we asked some mayors not to come who are going to make the same statement, that they wanted these trailers.

Michele, you've been extraordinary helpful as usual.

Bill, I invite you to come up for a moment.

And I want to thank Miguel and Christine for remaining also.

MR. TAORMINA: Good afternoon, sir.

THE COURT: Hi, Bill.

MR. TAORMINA: Bill Taormina. I am here to add to your arsenal to avoid anarchy. I'm from the private sector. I'm not an elected official, nor will I ever be one. I need 90 seconds of the Court's time.

THE COURT: Take it.

MR. TAORMINA: I need six points to tell to you right now.

Number one, I'm the private sector. I represent numerous families in Orange and Los Angeles County that are ready to move forward on this. We are a catalyst. We are a catalyst to make action. We are not driven by profit. We are

driven by the preservation of the quality of life and life itself.

Point two, the funding is ready. We need zero dollars from any government. We are ready to buy these trailers today. In a moment I'm going to hand my credit card to Mr. Price for whatever deposit he wants. We're going to tie these trailers up today.

Number three, logistics, the shipping and the installation is ready. We are ready to move forward.

Number four, our nonprofit operators are sitting in the front row. They're ready to move forward.

Number five, what we need -- the gentleman from Whittier just said we need locations. We need government property. We need private property. We need -- we just need locations. We need to break a few rules relative to zoning and land entitlements. That should be easy because your other choice is anarchy. Let's be honest here. This thing is out of control and we need to fix it.

Point six, this is a solution for both homelessness and to control this virus. Thank you for your time. I'm going to hand my --

THE COURT: Oh, no, don't go away. I love this credit card. Could I -- no, I'm just kidding.

MR. TAORMINA: It has unlimited credit amount, and I'm here to give this to Mr. Price. I'm going to walk back

there and hand him my business card and the credit card number is on the back. And I'm dead serious.

THE COURT: By the way, I know his worth, and he has got a substantial limit, trust me.

MR. TAORMINA: It doesn't matter. It's time for action. Thanks to you for this Court for making it happen. So let's do it.

THE COURT: Okay. Now, here is a strong ally for some portion of the plaintiffs. They're your business community. In my part of the world, before I came to this part of the world and now I'm part of our world here in Los Angeles, I may be getting a shelter up here, okay, I'm going to start living up here thanks to Judge Carney and his being so gracious about maybe getting me some hotel space -- he's what I call the police league side. He's what I call the business side.

If you don't know who he is -- and by the way some of the other major families, who he's going to probably privately disclose to you, trust me, he's probably very much in line with the First Alliance Group, because I perceive you as more business oriented in a sense than maybe some of the other groups that might be -- there's going to be an accord.

So he's speaking your language. Okay? In fact, he actually sued the railroads to clean up the mess on the railroads behind his multiple properties. So talk to him. Okay.

UNITED STATES DISTRICT COURT

Bill, I want to thank you for stepping up. I had no idea you were going to do that. I'm actually a little stunned.

Okay. I'm ready to suspend this Court except for my esteemed and incredibly wonderful counsel. And here's the bottom line. You've heard today -- and I've asked nothing of you -- if you want the Court not to be involved, that's just great. We will litigate for the next ten years, and I could care less.

And Andre and -- Birotte, thank you for being here for this wonderful opportunity to meet all these good folks.

But if you want us involved, we can give you a shelter and parameter to operate within, I hope, with a lot of disagreements on occasion, a lot of disagreements on occasion. Okay? But the point is we moved forward in our part of the world to an extent that I never expected before I got involved. It's not been pretty. It's not been perfect. People have gotten hurt. But by God we moved forward.

And I know that we can move forward on this. So you tell me what time you want me to be back here. I'm going to go walk around and get a cup of coffee for a moment and visit with some of the folks who've remained, just because they're friends and I'd like to meet some of the other people in the audience who have been so patiently sitting here with us that I haven't had a chance to talk to.

If you want the Court involved, I want you to tell

**UNITED STATES DISTRICT COURT**

me that, but you have to give me the following or I won't be involved: One, I must be able not to gather a group like this again. I have to be able to reach out to Eric. I have to get on the phone with the governor's office tonight. I've got to be able to talk to Bill about trailers or call Ken, you know, and Paul. I've got to be able to talk to Carol. I've got to be able talk to you. And you've got to trust me in those ex parte conversations. Because they're going to be more valuable, I hope, than litigation.

And if you get to litigation, I've got great judges who can litigate. And they can probably be much more collaborative than even I am. So I'm reaching out to you choosing two of what I think are the finest colleagues that I could possibly find on the bench to participate in this, because you should have a tremendous -- you should have a tremendous sense of confidence that when you talk about people like Judge Birotte -- in fact, our entire bench here and Judge Gutierrez, that you're talking about people that are the middle of the road, that don't have an axe to grind, liberal or conservative or however you toss those silly labels around, who will get down to work with you, and by God, we're going to get criticized for the lives we didn't save. We're never going to be accountable or known for the lives we did save.

But you have got a chance for us to save an awful lot of lives. And if we act quickly -- and if not, we came

**UNITED STATES DISTRICT COURT**

here for the homelessness and COVID, right, the community right now distancing themselves who have that benefit, and God bless them. Thank you. It's coming. It's just going to delay.

So what time would you like me to meet? Because you're going to be ordered to meet and confer.

Carol, you've been through this before. Okay? And you know that I have to be able to communicate with you early in the morning or late at night and share with the other side. And I've made a lot of mistakes.

But you have got to give me an answer today. And I'm going to sit here until I get "yes" or "no." And then you're going to sign up and you're going to give me some limited jurisdiction for a limited period of time so you're not trapped. Because I don't want a three-year consent decree. I don't want a settlement. You don't even have to call it a settlement. You just have to call it an agreement of some kind so you're not trapped. And then let's get going. Okay?

Now --

MR. UMHOFER: Your Honor, we want you involved.

THE COURT: Wait, wait, wait. Not so fast. You talk to those people over there, and you talk to the defendants sitting there. They're not here, et cetera. Get on the phone. But I'm going to sit here until I get an answer "yes" or "no." Okay?

So get together. I'll be back at what time? How

**UNITED STATES DISTRICT COURT**

about 1:30?  Because she's got some defendants here also.  I mean, you need to have a conference back in that room, just like Salvation Army.  Be certain -- because I'm a complete nightmare.  Smiling, but I'm a nightmare.

MR. UMHOFER:  It's the nightmare we need, Your Honor.

THE COURT:  Well, we'll see.  Okay.  So 1:30 then.

For all you folks outside, let me come out and just humbly thank you for a moment because you've stayed and sat through this.

**(Lunch recess from 12:14 p.m. to 3:08 p.m.)**

THE COURT:  We're on the record.  We're on the record.  We're on the record.

And now I will have the parties identify themselves.  So just please identify who you are and who you represent.

MR. UMHOFER:  Good afternoon, Your Honor.  Matthew Umhofer on behalf of the plaintiffs.  With me at counsel table is Elizabeth Mitchell.  We're both with the law firm of Spertus, Landes & Umhofer.

THE COURT:  Just introduce -- I know both of you gentlemen, but let me make a record of who's here.

MR. FAWN:  Yes.  Thomas Fawn, senior assistant county counsel on behalf of the County of Los Angeles.

MR. CARTWRIGHT:  Bob Cartwright, assistant county counsel on behalf of the County of Los Angeles.

THE COURT: Thank you. Let's go down -- well, let me see. Let's take the other plaintiffs, in a sense. Plaintiffs.

MS. WEITZMAN: Brooke Weitzman on behalf of intervenor Orange County Catholic Worker.

MS. SOBEL: Carol Sobel on behalf of intervenor Orange County Catholic Worker and also on behalf of intervenor Los Angeles Catholic Worker and Los Angeles Community Action Network.

MS. MYERS: Shayla Myers with the Legal Aid Foundation of Los Angeles on behalf of intervenor L.A. Catholic Worker and Los Angeles Community Action Network.

MS. SWEETSER: Catherine Sweetser on behalf of all intervenors.

THE COURT: Now, for the other parties, I want it clear that the parties who are about to identify themselves were invited to come to the court, because the Court had no legal ability to order you into court. So please.

MR. CASTRO-SILVA: Thank you, Your Honor. Rodrigo Castro-Silva for the County of Los Angeles. I'm from the Office of County Counsel.

MR. MCLAIN: Byron McLain on behalf of Los Angeles County from Foley & Lardner.

MR. YOUNG: Brandon Young on behalf of the County of Los Angeles from the law firm of Manatt, Phelps & Phillips.

UNITED STATES DISTRICT COURT

MR. DERMER:  Gabriel Dermer from the Los Angeles City Attorney's Office on behalf of the defendant City of Los Angeles.

MR. MARCUS:  Scott Marcus from the Los Angeles City Attorney's Office on behalf of the City of Los Angeles.

THE COURT:  First, there's an agreement that we will convene next Tuesday at --

MR. UMHOFER:  10:00 in the morning.

UNIDENTIFIED SPEAKER:  10:00 a.m.

THE COURT:  -- 10:00 a.m.  Not p.m., 10:00 a.m.  At the location of?

MR. UMHOFER:  The Alexandria Building in Pershing Square.  We'll provide details to all the parties and the Court.

THE COURT:  And it's my intent to exclude the public but not the press because I'm going to make the same order, and I'm not quite certain how I'm going to control that, you understand, in an outside facility.  So one of the things I want you to take into account is I can control excluding the public in the court, but that's because of the emergency health issue.  So we're going to try this, though, next week at this location to see if it works.  I think we can control it.

Is that correct, Counsel?

MS. MITCHELL:  Yes.  The address is 501 South Spring.

THE COURT: 501 South Spring.

JUDGE SMITH: It seems to me it's not a problem. If it's a private-owned building, you have the right to exclude anybody. If you decide that you're not going to let the public in, it's not a court order, it's the parties. If other parties don't want to participate under those circumstances, that's their decision.

MR. UMHOFER: Right. And, Your Honor, in the interim, should I put the agreement that we talked about off the record on the record; that is, the agreement to suspend litigation deadlines and things along those lines?

MS. MITCHELL: The original agreement when we first came into the court this afternoon, Your Honor.

MR. UMHOFER: So, Your Honor, I'll put this on the record. The parties during lunch --

THE COURT: Oh, I'm sorry. Put that on the record for me. I thought we were back in the settlements.

MR. UMHOFER: No, no, no, no. I apologize.

So we have a limited agreement that we reached over the -- over the lunch break. That agreement was to suspend litigation deadlines, including the 21 days that the City and County have to respond, because they have been served, so it's 21, not 60, to permit the Court and the parties to engage in settlement discussions and in efforts to address the underlying problems that occasioned this hearing today.

UNITED STATES DISTRICT COURT

117

The parties have no objection to the Court's ex parte communications with other relevant parties. And at the service of trying to get both resolution and action on the underlying issues of the Coronavirus and the homelessness crisis, the parties stand ready to support and assist the Court. And the parties have no objection to the involvement of Judges Birotte and Gutierrez in the process.

MS. SOBEL: And Judge Smith.

MR. UMHOFER: And Judge Smith as well.

THE COURT: Who's earning nothing.

MR. UMHOFER: Yes. Yes.

THE COURT: Would you state who you are and if this is acceptable as stated by counsel.

MR. CASTRO-SILVA: So this is Rodrigo Castro-Silva on behalf of the County of Los Angeles. We're in agreement.

MR. MARCUS: On behalf of the City of Los Angeles, this is Scott Marcus from the City Attorney's Office, that's acceptable.

MS. MYERS: On behalf of the intervenors LA CAN and LA Catholic Worker, that's acceptable.

MS. SOBEL: And on behalf of intervenor Orange County Catholic Worker, that is acceptable.

MR. UMHOFER: Your Honor, one more thing, Mr. McLain just pointed out to me that -- we just wanted to make it clear -- I think the Court has already issued orders on this

point that the intervenors are allowed to -- or their motions to intervene have been granted and that they're allowed to --

THE COURT: And the other motion you brought to me is --

MR. UMHOFER: Well, we haven't brought any other motions. They've all been over there.

THE COURT: Okay. Let's anticipate two things, and that is, we're trying to give access to the public through the press. And you've heard that we're going to start with transparency until it's called to my attention that there's a reason for going in camera. But you're different entities. You're the printed press. Then we might have the audio or radio station, and then we might have the television.

The difficulty is in federal court with our rules, we would not allow television. And what I can't have is moving off-site and then perceiving that I'm treating one area of the public access television unfairly. I think that they would be saying, "Golly, gosh, what's happening here?" But I'm not really comfortable having a televised off-site because it's violating our local rules.

I need to go to my chief judge here. I need to have a court meeting to abrogate those rules. And there's just no way to do that. The judges are all over the place and they're not going to have a special meeting in that regard. So help me.

UNITED STATES DISTRICT COURT

119

MS. SOBEL:  I have a suggestion to amend the stipulation or add to it, which is that because of the court closures for dealing with the pandemic, that the parties agree that meetings that are scheduled with the Court off-site are to be held under the same rules as if the meeting were occurring in the federal courthouse.

THE COURT:  I think my colleagues would appreciate that.

MR. UMHOFER:  No objection.

THE COURT:  Because we're not going against our time-honored rules otherwise.

MR. UMHOFER:  No objection.

THE COURT:  Would that be acceptable, Counsel?

MR. UMHOFER:  No objection.

THE COURT:  Counsel, acceptable?

**(Counsel collectively responded "No objection.")**

THE COURT:  I think that will allow us to honor the decorum and the tradition of the federal court regardless.  But I'll have to get an explanation from some of you folks who can come in from the printed press about what's happened here. Because if I was the television station, I'd be concerned and wonder why I would be treated differently.  But those are the federal rules.

Is there anything else today?  Otherwise, I want to thank you very much and see you next Tuesday at 10:00 o'clock.

**UNITED STATES DISTRICT COURT**

Case 2:20-cv-02291-DOC-KES Document 911 Filed 06/20/23 Page 121 of 122 Page ID #:33603

120

(Proceedings concluded at 3:16 p.m.)

--oOo--

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES     )
                          )
STATE OF CALIFORNIA       )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  March 20, 2020*

*/S/ DEBBIE HINO-SPAAN*

*Debbie Hino-Spaan, CSR No. 7953*
*Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**