FILED
CLERK, U.S. DISTRICT COURT

03/31/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ kdu _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LA ALLIANCE FOR HUMAN RIGHTS, et al,

Plaintiffs,                                         CASE NO. 2:20-cv-02291 DOC

v.

CITY OF LOS ANGELES, et al,

Defendants

Pursuant to the standing order of Judge David O. Carter, Special Master Thomas Goethals submits this report to the court regarding recent compliance by the County of Los Angeles with the 2022 settlement agreement.

INTRODUCTION

In 2020, the LA Alliance for Human Rights, a coalition of Los Angeles residents and business owners, filed a lawsuit in the United States District Court in the Central District of California against both the City of Los Angeles (the City) and County of Los Angeles (the County). The Alliance sought both declaratory and injunctive relief. The case was assigned to District Court Judge David O. Carter.

The Alliance settled its claims against the City of Los Angeles in 2022. The Alliance settled its claims against the County in 2023. The settlement agreements created distinct obligations for the City and the County

Both settlement agreements permitted the court to appoint a special master to monitor the parties' compliance with the settlement agreements. The court initially appointed retired federal magistrate judge Jay Ghandi to serve as its special master. Judge Ghandi resigned in 2025. In June 2025, the parties stipulated to my appointment as special master for the County of Los Angeles. From the date of my appointment until October 1, 2025, Michele

Martinez and I served as co-special masters for the County. Since October 1, 2025 I have served as the sole special master for the County, while Michele Martinez has been the special master for the City.

Judge Carter has directed his special masters to file written reports annually regarding the parties' recent compliance with their respective settlement agreements. This is my County compliance report for 2026.

BACKGROUND

Pursuant to the terms of its settlement agreement with the Alliance, the City of Los Angeles is required to provide interim and permanent housing for people experiencing homelessness (PEH). Its separate settlement agreement with the Alliance requires the County of Los Angeles to provide supportive services for PEH, which include mental health and substance abuse treatment, and access to certain high service needs beds. The County is also required to provide coordinated outreach to PEH.

Judge Carter has charged his special masters with monitoring efforts by the City and the County to comply with the responsibilities the parties have undertaken pursuant to the terms of their settlement agreements. Given the number of PEH currently living within the City and the County, and the multitude of organizations involved in the effort to serve them, this task has proven to be both challenging and complex. In order to understand and discharge my responsibilities, and to educate myself about the issues involved, since my appointment I have visited many of the areas in Los Angeles County which are currently populated by PEH. I have also relied on counsel for the plaintiffs, County staff, counsel for the County, special master Martinez, and Judge Carter and his staff to help bring me up to speed.

Media coverage by the *Los Angeles Times* (the *Times*) and similar sources has also helped me get my bearings on the issues and the timelines involved in this extraordinary case.  In June 2025, for example, just as I was beginning my work as the special master for the County, the *Times* carried extensive coverage of the hearing then in progress before Judge Carter which resulted from the Alliance's request that the court appoint a receiver to take over management of the City's PEH-related programs.

In August, the *Times* reported that, in response to requests by County Supervisors Lindsay Horvath and Kathryn Barger, the County created its own Emergency Centralized Response Center "with a goal of better coordinating the various efforts among different government

agencies and non-profits to clean encampments, and get people healthcare and into temporary or permanent housing."

In September, the *Times* reported that "the Los Angeles area appears to be making progress in its fight against homelessness" before adding that future progress "could be much tougher, due in large part to a slowing economy that is reducing funding for homeless services and programs."

In October, a *Times* team concluded that data provided by the Los Angeles Homeless Services Authority (LAHSA) was suspect. The article added that "LAHSA, a joint city-county agency established in 1993, has long faced criticism for not adequately tracking its programs and funds, potentially leaving them open to waste and fraud."

In November, the *Times* reported on the County's spending plans for the fiscal year beginning on July 1, 2026. "The plan revealed last week...details how the county Department of Homeless Services and Housing proposes to spend money collected through the county's Measure A sales tax that pays such things as outreach, temporary housing subsidies and the cost to operate shelters and permanent housing." The article indicated the County proposed in its new budget to spend roughly $635,000,000 in fiscal 2026/27 on services for PEH, a reduction of 0.5%. The director of the County's Homeless Services and Housing (HSH) department projected that $865,000,000 would be required to maintain the County's current level of PEH services.

In November 2025 Judge Carter began a contempt hearing involving the City of Los Angeles related to its alleged non-compliance with its 2022 settlement agreement. In January 2026, the *Times* reported that "the city's defense is that it's doing the best it can and making progress on the goals of the May 2022 settlement agreement." That hearing continues as I write this report.

I have considered none of the information contained in these articles as competent evidence. Nor have I concluded that every fact set forth in the articles is true. I nonetheless found each of them, and others like them, to be useful and informative. They have generally alerted me to potential issues which I continue to monitor in real time.

DISCUSSION

In January 2026, the County launched its own agency—independent of LAHSA—to administer its PEH-related programs: the Homeless Services and Housing (HSH) department. Sarah Mahim is the director of the new agency. Early in 2026 I visited the new

HSH headquarters. At the same time, I sat down with Ms. Mahim and members of her senior staff. My initial impression was positive.

The HSH headquarters is situated in what appears to be an appropriate location, near what is commonly referred to as the Skid Row section of the City of Los Angeles, an area with a large population of PEH. I found Ms. Mahim to be experienced, motivated, and qualified to operate HSH in a clear eyed and cost-efficient manner. Time will tell if my initial judgment is correct as I intend to maintain contact with her and her staff. Ms. Mahim understands that Judge Carter is also watching.

The County's settlement agreement requires it to file quarterly status reports concerning its compliance with that agreement. The County has consistently filed these reports on a timely basis, most recently in February of 2026.

Several points made by the County in its recent report are worth noting.

First, the County claims that in the final quarter of 2025 "the County added 239 MH/SUD beds, bringing the total portfolio of new resources to 2,729 MH and SUD beds (1,205 MH beds and1,524 SUD beds)…"  MH refers to mental health beds. SUD refers to substance abuse disorder beds.

The initial settlement agreement between the Alliance and the County required the County to "develop 300 additional substance use and mental health beds" by June 30, 2024. The parties executed a "Second Addendum" (or modification) to the original agreement in September 2023. In that addendum the parties agreed that by December 31, 2026 "the County shall develop/contract 3,000 mental health and substance abuse disorder beds according to the greatest need as solely determined by the County." The addendum also laid out a specific timeline which included annual compliance milestones.

In its recent report, the County asserts that it ended 2025 "ahead of the December 2025 milestone of 1,800 new beds and on track to meet the December 2026 milestone of 3,000." To support that claim the County references Exhibit C which is attached to the report. "Exhibit C reflects cumulative reporting per the Settlement Agreement, meaning all of the beds listed have been developed/contracted since June 14, 2022 and continue to be open and operational unless otherwise noted in a subsequent report."

Exhibit C includes a dizzying array of statistics. It begins with these:

| | |
|---|---|
| Total beds reported last quarter | 2450 |
| Beds added this quarter | 256 |
| Beds reduced this quarter | -16 |

Total beds added this quarter          239

Total beds as of this quarter          2729

These numbers are followed by several pages of discrete columns which provide the following data:

Provider Name

No. of beds developed/contracted

Date beds became open and operational

Street address

City

Zip Code

In the report, counsel for the County acknowledges that, in response to my request, the County modified the structure of Exhibit C in the recent report. "The accompanying Exhibit C has been reformatted at the request of County Monitor Goethals and now includes a new column highlighting net change during the reporting period and improves readability with a larger font."

I appreciate the effort. The data contained in the report nonetheless remains problematic with respect to its reliability. The report concludes that hundreds of beds are currently available for use by PEH at dozens of different locations throughout the County. The problem is this: how can Judge Carter, or his special master, determine whether the numbers provided by the County are accurate without personally visiting every listed location, interviewing administrators and residents, and then comparing the data in the report with the actual numbers we find on the ground? Given the scope of the work that needs to be done, the number of people currently experiencing homelessness in Los Angeles County, and the vast expanse of the County that requires services, neither the court nor his special master can visit every service site. So how can the data be verified?

Judge Carter has repeatedly indicated to both the City and the County that the accuracy of the data they provide to him and his special masters continues to be of critical concern to him. As he wrote last June: "Without accurate data, the public is left to rely on the assurance of public officials who have already presided over repeated reporting failures." While this comment was largely directed at the City's compliance efforts to date, I believe his concern about data accuracy applies to the County as well.

Judge Carter has repeatedly expressed skepticism about the accuracy of data contained in reports he has received from the parties since these settlement agreements were executed. Last year, for example, he wrote this: "The pattern is clear: documentation is withheld until exposure is imminent, public accountability is resisted until judicially mandated, and the truth of reported progress remains clouded by evasive record keeping. These failures have undermined public trust and judicial trust alike."

Apparently recognizing the ongoing urgency of this issue, the County devoted an entire section in its recent report to "data verification;" it concluded with this representation:

> "The County continues to work with County Monitor Goethals to validate the information provided in the County's quarterly reports...The County has...offered to provide the County Monitor with additional background documentation, interviews, future site visits, and raw data upon request."

I have accepted the County's offer and hope that it manifests the spirit of cooperation and transparency that Judge Carter expects to see from the parties. Once again, Judge Carter will be watching to make sure that promises made are promises kept.

Next, in its recent report, the County says that "(a)s of December 31, 2025, DHS received 121 referrals from County outreach teams and accepted 57 clients." DHS stands for the County's Department of Health Services. As I understand the process, DHS referrals are made by County outreach teams labeled MDT (Multi-Disciplinary Team) and HOME (Homeless Outreach and Mobile Engagement).

I have had the opportunity to observe members of both MDT and HOME teams working with PEH on the streets of downtown Los Angeles. Team members have impressed me with their diligence and motivation in the face of extremely challenging circumstances.  This is hard work. There were, according to the County, 34 MDT's and 10 HOME teams serving the PEH community during the last quarter of 2025.

It is difficult for me to understand how 44 teams of qualified outreach workers could generate only 57 successful "client" referrals to DHS during the entire three-month reporting period, particularly when the areas they serve are so densely populated with PEH. I see them every time I visit; so does Judge Carter.

This statistical anomaly is not a new issue; it became apparent as I reviewed all of the County's prior quarterly reports shortly after I undertook my special master responsibilities. I have discussed my concern with County staff and counsel for the County; they seem to understand it. Indeed, in its most recent report, the County briefly addressed the issue:

"Those referrals that were not accepted were due to a variety of reasons including an incomplete application, referrals to others programs, and referrals rescinded."

I am not convinced this explanation resolves the issue. I have heard the City's representatives deny any responsibility for the low referral and acceptance numbers; they seem to believe, or at least suggest, that the problem lies with the accuracy of contact reports filed by County outreach workers and that the true referral and acceptance rates are much higher than indicated by the County's statistics. Based on my review of the data and the situation I see on the ground, I can only conclude that either there are far too few referrals to and acceptances by DHS, or the statistics are unreliable. Whatever the problem is, these numbers remain unacceptable.

On a more positive note, co-special master Martinez and I acknowledged in our 2025 report "the County's ongoing effort to comply with the terms of the settlement agreement." That positive sentiment remains true as I write this. As suggested above, the County's new HSH department appears to have launched with the right leadership and direction. And the County's MDT and HOME teams are out on the street everyday trying to make a difference with the local PEH population. I expect this good work to continue.

In our prior report, Michele Martinez and I also made this observation.  "We...recognize the difficulty of verifying certain data—particularly that involving health services, housing placement, and interagency coordination." But I must qualify this recognition with this thought: recognizing the difficulty of verifying certain types of data should not be misunderstood as a suggestion or belief on my part that the court's relentless effort to ensure the accuracy and transparency of the data it receives will abate any time soon. To the contrary, I expect that Judge Carter will continue to focus on data transparency and accuracy until his arduous task in this case is completed.

RECOMMENDATIONS

Over the course of the past several months, County staff and its counsel have regularly attended the contempt hearing related to the City's compliance with its settlement agreement being conducted by Judge Carter. As have I. We have heard the testimony of the witnesses, the arguments of counsel, and Judge Carter's comments. We have all been witness to the City's various claims of compliance. The court has made timely observations but has yet to rule on the allegations of non-compliance made by the Alliance and the intervenors.

This proceeding has been an educational opportunity for the County. If the County hopes to avoid engaging in a similar proceeding—which I feel certain that it does--it must continue to enhance its effort to provide verifiable data to the court in its quarterly reports. As Michele Martinez and I wrote in our last report, "(t)he data should include...information related to specific providers, programs and income streams." When Judge Carter reviews the County's quarterly claims, he must be able to link those claims to verifiable, transparent data.

Both procedural and substantive compliance with the terms of the County's settlement agreement are important to the court, but perhaps not equally so. I believe Judge Carter expects to receive data that convinces him that, as required by the County's settlement agreement, there has been real time improvement in the living conditions of the thousands of PEH who reside in Los Angeles County. I am confident he will recognize such data when he sees it.

I do not believe that, given the complexity of the issues involved, the court expects perfection. Judge Carter understands that not every effort by the County, or the City, will be successful. There is hard, challenging work to be done. What Judge Carter does expect to see is an honest, good faith effort by the parties to comply with the terms of their settlement agreements.

CONCLUSION

The County has been represented daily by counsel during the recent contempt hearing involving the City. I have also attended every session reasoning that if the County is interested enough to send counsel, then the County's special master should also be present. I believe both the County and I have benefitted from our consistent attendance as the testimony, the argument of counsel, and Judge Carter's comments have been enlightening in many areas.

Having now heard Judge Carter speak repeatedly on the importance of this issue, I will continue to focus on the transparency and reliability of the data provided by the County to the court. It behooves the County to meet the challenge of making every quarterly report more transparent than was its predecessor. What will it take to ultimately convince Judge Carter that compliance data supplied by the County is reliable and verifiable? Resolving that question is the challenge before us.

I will end with a couple of final thoughts.

First, I regard potential County funding cuts to be an ongoing compliance-related issue. Past expenditures demonstrate that it takes a significant amount of money to provide adequate PEH-related services. It now appears that the federal government intends to act on its stated intent to reduce funding relied on by the County to provide those services. That reality will generate additional pressures on the County's budget in the months ahead. These potential budget cuts underscore the critical need for the County to efficiently and creatively operate its Homeless Services and Housing department.

Next, I am convinced that Judge Carter understands the complexities of providing services to the disparate PEH community in Los Angeles County. He comprehends that some ideas will lead to successes while others may not. But he believes that the possibility of failure should not preclude vigorous efforts to succeed. In any event, such efforts are mandated by the settlement agreement.

Finally, I find it appropriate to remind the parties of these handwritten words which were added to the "Second Addendum" to their settlement agreement before they signed it in September 2023. They have stayed with me since I first read them:

> "This agreement is a floor not a ceiling. While this agreement does not solve homelessness in Los Angeles County, it is a huge step forward...All future billings from providers must be completely transparent and all invoices are to be public documents."

In that spirit, and with those thoughts in mind, I conclude there is still work to be done to ensure the County's full compliance with its settlement obligations. I look forward to engaging with the County in that process.

Dated: April 1, 2026

Respectfully submitted,

The Honorable Thomas Goethals, Ret.

Special Master